<u>EXHIBIT "1" (Amended)</u>

<u>FACTS IN SUPPORT OF DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION
FOR CLASS CERTIFICATION</u>

The facts which follow are taken from DHS records which have been produced to Plaintiffs' counsel.  Unlike the Amended Complaint, they are not a lawyer's argumentative characterization of the facts.  If the records themselves would assist the Court in the required rigorous inquiry into the class action issues, then Defendants would gladly supply them.

**A.    Olivia Y.**

Olivia Y. has been in the custody of the Forrest County Department of Human Services ("FCDHS") since September 10, 2003.  She is currently four years old and is living in a foster home with her sixteen-year-old sister where she has been since December 29, 2003.  Her foster parents are Mr. and Mrs. R.  She attends elementary school in classes for developmentally delayed children and is receiving all the services offered by the school system.  Her social worker's reports indicate that she is happy in this home and appears to be very close to her foster parents.

Olivia was born three months premature. Her mother's drug screen was positive for cocaine, marijuana, and alcohol.  Olivia's newborn drug screen was positive for cocaine.  Forrest General Hospital filed a report with FCDHS.  Olivia was followed by the Forrest County Health Department in its high risk program and was monitored by a social worker.  Reports from the Health Department indicate that her mother, Ms. Y., was following the Health Department's instructions for Olivia's care.

FCDHS investigated Olivia's home February 1, 2001, after a report that her mother was drinking and using illegal drugs.  The investigator found that Olivia lived with Ms. Y., Ms. Y's

sister, and Olivia's two older sisters.  Olivia's aunt stated that she took care of Olivia when Ms. Y. is drinking and that Ms. Y. was not using drugs.

On June 14, 2001, a physician reported that Olivia was developmentally delayed and failing to thrive. The physician offered Ms. Y. several programs for Olivia, but Ms. Y. refused. The physician also reported the smell of alcohol on Ms. Y.'s breath and that she appeared impaired.  FCDHS visited the home the next day, observed Ms. Y.'s behavior, and found that Olivia was very alert and appropriately dressed.

On August 30, 2001, it was reported that Ms. Y. sits around drinking beer all day with friends and her three children have no food.  Again, FCDHS visited the home the next day.  Ms. Y.'s older two children, aged 17 and 14, and Ms. Y's sister denied the allegations.  Neighbors were interviewed on September 6 and also denied the allegations.  A follow-up with the Health Department in November 2001 found that Ms. Y. was complying with the high risk program and Olivia was doing well.  A follow up with physician's office found Ms. Y. was complying with the physician's recommendations.

In December of 2002, Olivia's daycare reported a burn on her buttock and a match found in her diaper.  FCDHS tried to locate the family as well as tried to observe Olivia at the daycare, but they were unable to make contact.

On September 2, 2003, FCDHS received a report that Ms. Y. was not taking care of her three children, Olivia and her two older sisters.  This report came from Ms. Y's eighteen-year-old daughter.  Social workers attempted to visit the home on September 2, 3 and 4, but Ms. Y. was not there.  Ms. Y. was visited on September 5, 2003.  Ms. Y. was observed drinking beer and behaving erratically, and was asked to come in to the FCDHS office that afternoon.  Ms. Y. did not appear on the 5th or a subsequent appointment on the 8th.  On September 9, 2003,

FCDHS required Ms. Y. to take a drug test.  On September 10, the results were positive for cocaine, marijuana, and alcohol.  On September 10, 2003, FCDHS requested and received a verbal order from the Youth Court to remove the children from the home, which FCDHS did that same day.  Olivia's father, Mr. D., signed an affidavit stating that he would assume full responsibility for Olivia's health and welfare.  Mr. D. requested that Olivia be placed with his aunt, Ms. H.  Olivia and one of her sisters spent the night of the 10th in the foster home of Ms. J. and on the 11th were placed in the foster home of Mr. and Mrs. R. until FCDHS could conduct a home study and background check on Ms. H.

On September 11, 2003, Ms. H. came to FCDHS for an interview and signed an authorization for a background check.  Ms. H. had been employed by a state university for 27 years.  During her interview, Ms. H. indicated that she lived alone.

On September 17, 2003, Olivia was placed in the home of her aunt, Ms. H.  On September 19, 2003, a home study was done of Ms. H's home.  The social worker spoke to three personal references for Ms. H.  All three references reported that Ms. H. would take good care of Olivia.  During the home study, FCDHS learned that Ms. H's forty-year-old son was living in the home.  The social worker obtained an authorization for a background check from Mr. H., which was faxed to the Forrest County Sheriff's Department.  The Sheriff's Department reported that Mr. H. had been convicted of rape.  Olivia was removed from the home on September 25, 2003, and again placed overnight with Ms. J.  On September 26, 2003, Olivia was sent to a licensed shelter for abused and neglected children.

On October 3, 2003, the director of the shelter sent a letter to FCDHS and the Youth Court.  It is this letter which makes up the factual allegations regarding Olivia in the Amended Complaint.  In the letter, among other physical conditions, the director reported some signs of

suspected sexual abuse.  FCDHS investigated these allegations on October 14 and October 15,

2003, but were unable to confirm any suspicion of such conduct with Olivia's family members.

On October 23, the shelter sent another letter to FCDHS and advised FCDHS that part of the

report on Olivia contained information which pertained to another child, not Olivia.    On

December 12, 2003, FCDHS requested a full report from the physician who initially examined

Olivia.  Dr. Shakir reported that Olivia was seen six times, initially on October 3, 2003.  At that

time Olivia was still in diapers, and Dr. Shakir noted that she had some redness and chapping of

her buttocks and genital area.  Dr. Shakir reported that no sexual assault examination was

performed because there was no history or report of sexual abuse.  Dr. Shakir reported that on

her last two visits, she was "so much better – cheerful and with an increased weight" as well as

"no more rashes."

On October 28, 2003, the shelter sent an update on Olivia's progress.  She had been

receiving weekly doctor visits because of her low weight.  She was placed on an antibiotic for an

infection and skin cream for her psoriasis and seborrhea (not "cradle cap" as reported in the first

letter).  The report states that Olivia "has become very outspoken when she is in a comfortable

setting" and "she loves to dance and sing her alphabet" and that "she is a very happy child."  On

November 14, 2003, the shelter requested authorization to place Olivia in speech therapy with

the local school district.  On December 12, 2003, the shelter reported that Olivia's weight was

nearly 30 pounds, she was doing well with potty training, and was a "very happy and well

adjusted child."

Olivia was placed in the R.'s home with her sixteen-year-old sister on December 29,

2003.  On January 16, 2004, Olivia's sister reported that she was making a lot of new friends at

the high school and that everyone was really nice to them.  Their February 17, 2004, report states

that both are doing well and that Mrs. R. is trying to find a proper daycare facility for Olivia. The March 18, 2004 report is equally positive: Olivia is gaining weight and has started school in the developmentally delayed class at a local elementary school. The social worker reports that Olivia is potty trained and smiled when they talked about her school. Olivia also showed the social worker the room she shares with her sister. Olivia's sister reports that they are happy and content in this foster home.

On May 6, 2004, the Youth Court held a permanency review hearing for Olivia and found that reunification efforts with her biological parents had not been successful at this time and that Olivia's permanency plan would be for Relative Placement with a concurrent plan of Termination of Parental Rights.

At the June 9, 2004 visit, Olivia was playing happily and asked the social worker what her name was. The social worker reported that Olivia let the social worker hold her and that Olivia is a very friendly little girl. For the summer, Olivia and her sister are both attending the Girl's Club program at the Y.M.C.A. The social worker visited July 7, 2004, and reported that both girls appeared to be happy and in good health.

The Youth Court held a review hearing on August 3, 2004, and ordered that Mr. and Mrs. R. would have continued physical custody of Olivia and that FCDHS was to continue efforts to reunite Olivia with her biological parents,[1] although her permanency plan would continue to be Relative Placement with a concurrent plan of Termination of Parental Rights. On August 27, 2004, Olivia's first cousin, Mrs. W., contacted FCDHS about Olivia being placed with her. Mr. and Mrs. W. live on the campus of a junior college. FCDHS requested that Hinds County DHS conduct a home study of Mr. and Mrs. W.

---

[1] Olivia's parents were required to have a clean drug screen before they would be permitted to have Olivia for visitation.

Olivia started headstart in September, 2004. Olivia interacts well with her peers at school. Her social worker's September 23, 2004 report states that Olivia has not had any health problems other than that she is failing to gain weight. Her doctor, Dr. Lancaster, has put her on a special diet and vitamins. At the social worker's October 12, 2004, visit Olivia was playing with her sister. Her foster father reported that Olivia had a stomach virus and saw her doctor on October 6, 2004. Her November report was positive – Olivia had not been sick or had to go to the doctor and is not on any medication. Her foster father reports that Olivia's behavior is good. Olivia's health was good in December, 2004 as well. Her social worker reports that Olivia is excited about Christmas.

These documented facts do not show a "system-wide failure" as alleged by the Amended Complaint. FCDHS conducted an investigation into the eight-day placement of Olivia with her aunt during which a convicted sex offender was in the home. The investigation report dated December 31, 2003, found that all staff acted within their scope of services and duties. There was and has been no substantiation of any sort of sexual abuse of Olivia.

**B.    Jamison J.**

Jamison J. has been in the custody of the Bolivar County Department of Human Services ("BCDHS") since March 19, 1992. Jamison J. is currently eighteen years old and is residing in a licensed group home where he is a junior at the local high school, works at an after school job, plays football, is involved with modeling, and has plans to attend college for a nursing degree. The current plan is for Jamison to be emancipated from DHS custody when he is ready. However, if an adoptive family becomes available, DHS will work toward that goal.

BCDHS was contacted in November 1991 about the deplorable living conditions of Jamison and his sister. Upon inspection of the house, BCDHS workers found that the house had

no electricity or water; the house had no inside or outside toilet; piles of dirty clothes were found in the house; and Jamison and his sisters were unbathed.  Jamison's mother had a severe alcoholism problem, and his biological father had a history of multiple incarcerations.[2]  The agency took emergency steps to remove the children, and on December 5, 1991, the Youth Court of Bolivar County placed them with their grandmother with orders for BCDHS to conduct a home evaluation.  A home evaluation was completed on December 5, 1991.  The house was found to be dirty and without a toilet.  On December 10, 1991, the agency again visited the house, found it to be in the same condition and advised the grandmother to clean the house and to get a bathroom.  However, when the agency returned on March 13, 1992, inspections of the grandmother's house revealed that the children were being neglected by their grandmother; the agency removed the children from the house.  The Youth Court ordered DHS custody of Jamison on March 13, 1992.

Jamison was originally placed in the foster home of Mr. G but was removed on March 17, 1992.  Jamison was then placed in the foster home of Ms. F.  In December 1992, Ms. F. reported that Jamison had begun to express thoughts of hurting himself.  In early 1993, Ms. F. reported that Jamison had begun to express thoughts of suicide and to exhibit inappropriate sexual behaviors.  Jamison was denied treatment at Parkwood because he was too young, but DHS did provide other mental health evaluations and counseling to treat these problems.  While in Ms. F.'s home, Jamison also received regular physical evaluations and dental checkups.

In May 1993, Jamison's paternal grandmother contacted DHS seeking custody of Jamison.  DHS completed an Interstate Compact Placement Request and sent it to Kansas where the grandparents lived.  In June 1994, the Kansas Department of Social and Rehabilitation

---

[2] From subsequent therapy sessions involving the children, it was discovered that the biological mother also physically abused the children and allowed them to witness her having sexual intercourse with various partners.

Services completed a home study of grandparent's home. The Department did not approve placement of Jamison in the house of his grandparents because his uncle lived there, and the Department had confirmed a sexual abuse case of a seven-year-old boy by the uncle. On June 24, 1994, the Interstate Compact Placement Request was denied.

Despite therapy, Jamison continued to exhibit behavioral problems. On June 10, 1994, Jamison was removed from Ms. F.'s home and placed in the foster home of Mr. and Mrs. M. when Ms. F. notified the agency she could no longer take care of him. Then, on August 11, 1994, Jamison was again placed with Ms. F. when Mrs. M. requested he be removed from her house because he was in possession of a knife. However, Jamison's behavioral problems again prevented him from staying in Ms. F.'s home. On August 23, 1994, Jamison was admitted to the Laurel Wood Center in Meridian to address his behavioral problems. Laurel Wood Center diagnosed Jamison with post-traumatic stress disorder and ADHD.

Upon his release on September 21, 1994, Jamison was placed in Therapeutic Foster Care through Catholic Charities in the home of Mr. and Mrs. B. While in the B. home, Jamison continued to receive therapy for his behavioral problems and received regular physical evaluations and dental checkups. He also was involved in the Boys and Girls Club's summer day camp, took karate and gymnastics lessons, and sang in the church choir.

Throughout this time, the agency continued to work with the biological mother to return her children to her. During the summer of 1995, Jamison's mother began writing letters to her son, and in December 1995, she entered an alcohol rehabilitation program. Upon her release from the program, the mother went to live with a relative briefly before finding a home of her own; the mother also started attending parenting classes. DHS thus began allowing visits and telephone calls between the mother, Jamison, and his sisters. In September 1996, during a visit,

Jamison told his mother that Mr. B. had physically abused him. A subsequent investigation by DHS found this allegation to be unsubstantiated.

Over the next year, Jamison continued to visit with his mother, his sisters, and his extended family including extended visits at his mother's home. His therapist noted that Jamison had begun to be attached to his mother and was happy that he was able to talk to and see his mother. His therapist also noted that his behavioral problems had begun to improve. Jamison expressed a desire to return to live his mother when he completed the sixth grade in 1999.

During a visit to the biological mother's home during the Christmas holidays of 1997, Jamison's fourteen-year-old sister had sexual intercourse with an adult male. Upon returning to her foster parent's home, Jamison's sister reported the incident to DHS which immediately began an investigation. When the children's biological mother found out, she reported the man to the authorities. The man was arrested and charged with capital rape.

The children had an extended visit with their mother from June 26, 1998 to July 10, 1998. On June 29, 1998, a DHS social worker made an unannounced visit to the home and discovered the mother was intoxicated; the children had spent the night with their older sister and were not home when the social worker made the visit. The social worker informed the mother that the children were not allowed to stay at anyone else's home without prior approval. Jamison's sister reported that during this visit Jamison exhibited explosive behavior and the children were not adequately supervised. Because of this report, DHS had a family conference with the mother; at the meeting, DHS suggested a revised plan for the children to first transition to regular foster homes in Cleveland to facilitate biological family contact and then placement into their mother's home. DHS also required the mother to start attending AA meetings again.

After short visits back with their foster parents, Jamison and his sister returned to their biological mother's home for another extended visit from July 20, 1998 to August 3, 1998. During this visit, a friend's three-year-old child was staying at the house also. The children were returned to their therapeutic foster parents to provide closure before they were to return to Cleveland; this visit was scheduled from August 3, 1998 to August 7, 1998. On August 5, 1998, DHS received a report that the three-year-old child had been killed by his father in Jamison's mother's house. After the death, Jamison's sister reported that she had seen the father beat the child but had not reported it to the authorities. Further investigation by DHS revealed that Jamison's mother knew about the abuse but did not report it to the authorities for fear that it would prevent her children being returned to her. Because of this incident, Jamison and his sister were returned to their therapeutic foster homes but were allowed continued contact with their mother.

Upon learning that he would not be returned to his biological mother but returned to the B. home, Jamison's behavioral problems intensified, and he exhibited anger about not being able to be reunited with his mother. On September 23, 1998, Jamison was placed in a licensed shelter due to these problems but was released to the Mr. and Mrs. B. on October 8, 1998. The permanent plan for both children was changed to formalized foster care in October 1998 due to the death of the young child in their mother's home. On November 16, 1998, Jamison was placed in another licensed shelter after running away from his foster home. When questioned about the incident, Jamison reported that the foster parents physically abused him. While investigating the allegations, DHS was informed by Jamison that he had lied, and DHS found the allegations to be unsubstantiated.

By the end of November of 1998, the second shelter had released Jamison because he refused to follow staff's instructions, refused to participate in chores, and threatened to report that the staff had abused him. He was released to the first shelter and then returned to the B. home. Over the next few months, Jamison's behavior began to worsen, including increased problems with aggression, defiance, and anger. At one point, he tried to commit suicide by taking an overdose of his medication. On March 22, 1999, Jamison was admitted to Millcreek for treatment because he pulled a knife on Mrs. B.

Despite the fact that Jamison continued to be in need of a permanent home, Jamison's social worker reported that Mr. and Mrs. B. did not want to adopt Jamison and requested that he not be returned to their home upon discharge from Millcreek. During this time, Jamison continued to have visits and contact with his biological mother but the contacts were less than prior to the child's death in her home. In addition, she started to drink again as evidenced by the smell of alcohol on her breath during a foster care review board conference in February 1999 and a visit with the children on June 23, 1999. Because of these facts, in July of 1999, DHS recommended that the Youth Court terminate the mother's rights, and Jamison be freed for adoption. On August 11, 1999, the Youth Court changed the permanent plan for the children to adoption.

On October 15, 1999, Jamison was released from Millcreek and placed in a licensed shelter until a foster home that was being prepared for him was available. On November 2, 1999, Jamison was placed in the foster home of Mr. H.. On May 10, 2000, the Youth Court terminated the parental rights of both Jamison's biological parents. Jamison's behavioral problems again interfered with his placement when Mr. H. advised DHS that he did not want to adopt Jamison because of his behavioral problems in August 2000. Jamison continued to exhibit

behavioral problems, and Mr. H. finally asked that he be removed.  In November 2000, Jamison was returned to the licensed shelter.

On December 7, 2000, Jamison visited his biological mother with permission of the Youth Court.  After an emotional visit, Jamison was placed in a group home in Memphis because DHS could not provide another foster home due to Jamison's behavioral problems.  While at this group home, Jamison had no significant reports of behavioral problems and progressed well.  He also had several visits with Mr. and Mrs. B.  On March 30, 2001, DHS was notified that Jamison's biological mother had passed away from a drug overdose.  Jamison was discharged from the group on April 6, 2001 and returned to Mr. and Mrs. B.  While at the B. home, Jamison worked at a local school as a mentor during the summer and worked at the Boys and Girls Club with their computers during the school year.  He was also enrolled in the Jr. ROTC Program at a local high school, involved with the marching band, and the school choir.

In May 2002, Jamison began acting out at Mr. and Mrs. B.  On May 27, 2002, Jamison was again returned to the licensed shelter for a few days; Jamison told his therapist that he was having some grief issues surrounding his mother's death and his not being adopted by his foster parents yet.  While at the shelter, there were reports that Jamison was leaving the shelter and going to Wal-Mart where he was stealing.  On June 13, 2002, Jamison was released from the shelter and placed back with Mr. and Mrs. B.  After returning, his behavior did not significantly improve.  In July, Mrs. B. arranged for Jamison to go to the shelter after school until she got off of work.  Jamison said he enjoyed that because he knows everyone at the shelter.

In November 2002, Mr. and Mrs. B. informed DHS they did not want to adopt Jamison.  In February 2003, they got a divorce, and Jamison again began exhibiting behavioral problems.  Jamison was again placed at the shelter in February 2003 because Ms. B. had moved out of the

home.  After Ms. B. got settled, Jamison was returned to her home, but then Ms. B. asked that Jamison be removed from her home on March 10, 2003.  Jamison was placed in a licensed shelter.  On March 24, 2003, Jamison was placed in the foster home of Ms. M.  On April 15, 2003, Jamison was again placed in the shelter on a temporary basis after being removed from the M. home due to his behavioral problems.  On May 21, 2003, the Youth Court changed the permanent plan for Jamison to emancipation because Jamison did not want to be adopted.

On June 2, 2003, Jamison was placed in another licensed shelter.  On June 13, 2003, Jamison was released from the shelter due to behavioral problems and placed in the foster home of Mr. and Mrs. H. on an emergency basis.  On June 16, 2003, the shelter contacted DHS to inform them that the foster home was not working out, and Jamison would be discharged from all shelter placement but they would keep him while DHS found another place for him to go. After contacting nearly a dozen foster homes, shelters, and group homes about taking Jamison, DHS placed Jamison in a group home on June 19, 2003.  While at the group home, Jamison inquired about living with his paternal family in Kansas.  On July 30, 2003, staff at the group home reported that Jamison had sexually harassed them.  Jamison was scheduled to be released on August 1, 2003 but could not be given an extension due to his behavior; the group home wanted him out before the weekend started.  So on August 1, 2003, Jamison was removed from the group home and placed in the foster home of Ms. W. for the weekend.  On August 3, 2003, Jamison was placed in the foster home of Clara Lewis, his next friend in this lawsuit.

On July 17, 2003, DHS submitted a request for an Interstate Compact Placement home study on Jamison's biological father.  On August 11, 2003, Jamison's biological father traveled to Mississippi, and he and Jamison met for the first time in many years.  Jamison reported that the visit went well.  While at the Lewis foster home, Jamison played football for the local high

school and was still active in the choir but was no longer active in the ROTC. On August 12, 2003, Kansas notified DHS that it should have requested an adoptive home study since the father's rights had been terminated. On September 17, 2003, DHS submitted a revised request for an Interstate Compact Placement adoptive home study.

In December 2003, Jamison was removed from the home of Clara Lewis because of behavior problems and was returned to a shelter. At this point, Catholic Charities informed DHS that they had no more foster families for Jamison. On January 12, 2004, Jamison was placed with his father pending the Interstate Compact Placement approval by Kansas. This placement was approved by the Youth Court on January 7, 2004. On January 14, 2004, DHS spoke to Jamison's stepmother in Kansas and learned that Jamison and his father had an argument because Jamison would not call the man "Daddy." On February 11, 2004 Jamison's father asked that he be removed due to behavioral problems; he stated that no other family member wanted Jamison either. Because of this disruption, the Interstate Compact Placement was denied by Kansas. DHS purchased a plane ticket for Jamison, and his father escorted him back to Mississippi on February 25, 2004.

Upon his return, Jamison was placed at the Transitional Living Center ("TLC") at the Oakley Training School. While at the TLC, the children do not attend regular school but are instead enrolled in G.E.D. classes, so Jamison was enrolled in these classes. While he was at the TLC, there were no significant behavioral problems, and Jamison took a job at a local restaurant. Because of Jamison's desire to graduate from high school, DHS worked with Catholic Charities to find a foster home to take Jamison. On March 18, 2004, DHS was notified that Catholic Charities was unable to take Jamison due to his history.

On May 14, 2004, DHS was informed that Jamison had stopped attending his G.E.D. classes.  Because the TLC only houses children that are under eighteen years old, DHS began seeking a place for Jamison to go before he turned eighteen in November 2004.  On June 23, 2004, the Youth Court ordered Jamison to be placed in his present group home.  On June 23, 2004, DHS took Jamison for a short visit with his maternal grandmother.  Jamison was placed in the group home on July 1, 2004.  He was enrolled in public school; because he had spent several months out of school while was at the TLC, he had to repeat his junior year.  Jamison is currently still at the group home where his therapist and social worker report that he continues to have difficulties with his behavior.  Jamison has developed a close relationship with one of the adult volunteers at the home; the volunteer and his wife are currently considering adopting Jamison.

C.     **Cody B.**

Cody B. has been in the custody of the Jackson County Department of Human Services ("JCDHS") since July 29, 2002.  He is currently two years old and is living in a foster home with Mr. and Mrs. Br. where he has been since March, 2004.  He attends daycare and is talking.  His social worker's reports indicate that he has bonded well with his foster parents.

After Cody's birth, Cody was followed by the Jackson County Health Department in its high risk program and was monitored by a social worker.  Reports from the Health Department indicate that neither his mother or his father are mentally competent to care for Cody.   In addition, his mother suffers from seizures.  Ms. H., his mother, has five other children that have been placed in the care of other relatives.

JCDHS investigated Cody's home in July of 2002, after a report that his parents' home had no electricity, gas or water.  The investigator found that Cody lived with his mother and Mr. B., Cody's father.  The home had electricity but no gas or water.  At the initial visit, neither Cody

or Ms. H. were at the home, reportedly staying with other family members.  Social workers visited the home again on July 16 and 19.  On July 22, Ms. H. and her cousin, Ms. D., came to JCDHS office, and a home visit was scheduled for the next day.  The visit was conducted by the social worker and two Family Preservation specialists.  They found that Cody was apparently well cared-for.  Family Preservation allowed Cody to remain in the home so long as Ms. D. would continue to supervise Ms. H. in the baby's care.

On July 29, 2002, Ms. D. reported that she left Cody alone with his parents for an hour and returned to find him alone in the apartment, in the adult bed, tangled in the bedclothes, crying and shaking.  Ms. D.  left a second time for 15 minutes and returned to find the baby in a baby swing, alone in the apartment.

Cody was removed from the home on July 25, 2002 and placed in a licensed shelter.  Cody was moved to foster care with Ms. Bo. on August 2, 2002.  A custody hearing was held July 29, 2002, continued until August 7, 2002 so that the parents could meet with their court-appointed attorneys.  On August 21, 2002, the Youth Court of Jackson County granted temporary legal custody to JCDHS and further ordered JCDHS to conduct a home study of Cody's parents as well as any other relatives that may be interested in physical custody of Cody.

On August 13, 2002, JCDHS visited the home of Ms. Bo.  Ms. Bo. expressed concern about JCDHS's long-term plan for Cody.  Cody's social worker explained Cody's parents' situation and advised Ms. Bo. that Cody's future was uncertain at this point.  Social workers from both JCDHS and the Health Department continued to contact and visit Cody's parents through the months of August, September, and October 2002.

Ms. Bo. took Cody to the emergency room on September 13, 2002, with a fever and diarrhea.  He was given a prescription and not admitted to the hospital.  Ms. Bo. took Cody to the hospital again on January 2, 2003.  He was diagnosed with asthma.

Cody had a monitored visit with his biological parents on May 22, 2003.  The next visit was scheduled for June 5, 2003, but the biological parents did not appear for the visit.  On September 18, 2003, Cody had a monitored visit with his parents.  Reports indicate that Ms. H. was pregnant again.  The Health Department social workers had been struggling to make sure she gets prenatal care.  Ms. H. gave birth to a baby girl, and home health workers continued to visit Ms. H. and Mr. B. twice each week.

Because Cody's biological parents still wanted to regain custody of Cody, Cody began visiting his biological parents daily in December while his foster mother, Ms. Bo., was at work.  Ms. Bo. was unhappy with this arrangement and refused to drop Cody off at his parents' home on her way to work.  Social workers had to pick Cody up from Ms. Bo.'s home, take him to his biological parents and return him to his foster mother at the end of the day.

On December 12, 2003,  a neighbor drove Ms. H. and Cody to the JCDHS office because Cody was sick.  The JCDHS worker told Ms. H. to take Cody to Singing River Hospital.  Cody's social worker met Cody and Ms. H. at the hospital.  Ms. Bo. was contacted but could not come to the hospital.  Cody was diagnosed with an upper respiratory infection and given medicine and prescriptions.  On December 17, 2003, Ms. Bo. reported Cody still had a bad cough and a runny nose.  His social worker took him to see Dr. Gina, who diagnosed Cody with an ear infection.  He was placed on an antibiotic.

Cody continued to visit his biological parents daily through the month of December, 2003.  In January, 2004, by Order of the Youth Court, the visits were rescheduled to once weekly

because of the difficulty in having a social worker transport Cody to and from his biological parents' home daily.

On February 11, 2004, a social worker drove Cody from his biological parents' home to his foster home. Ms. Bo. was not at home. The social worker then went to Cody's babysitter's home, and she was not at home either. The worker tried to make contact with both Ms. Bo. and the babysitter several times but without success. The worker contacted Cody's primary social worker about the situation. Cody's primary social worker contacted the Youth Court and was given permission for Cody to spend the night with his biological parents. Before taking Cody to his biological parents, the worker went to Ms. Bo.'s home again, but Ms. Bo. still was not at home.

On February 25, 2004, Ms. Bo. requested that Cody be removed from her home. Cody was temporarily placed in the same shelter in which he was previously placed on February 25th. On February 26, 2004, Cody was placed in the foster home of Mr. and Mrs. Bk. On March 1, 2004, Mrs. Bk. reported that Cody was eating well and talking. On March 5, 2004, Mrs. Bk. reported that Cody had a severe asthma attack and was admitted to Singing River Hospital. Mrs. Bk. stated that she would not be able to continue to care for Cody because of his asthma as she has other toddlers at home. Cody was again placed temporarily in the shelter on March 7, 2004. From March 19 through 21, Cody had a pre-placement visit with Mr. and Mrs. Br. and on March 26, Cody was placed in their home.

At the status hearing held March 22, 2004, it was ordered that Cody's parents could exercise visitation for a maximum of two hours each week. Cody's last visit with his biological parents was June 1, 2004. Cody, his foster parents and the social worker met Cody's biological parents at a McDonald's in Ocean Springs. Ms. H. and Mr. B. reported that they had not been

able to visit Cody because they did not have transportation; however, the social worker noted that they talked about their visits to the casinos.

Ms. L.K. called JCDHS on August 16, 2004 to report that Ms. H. was leaving her baby daughter with anyone in the neighborhood, including Ms. H.'s disabled mother. She also alleged that Ms. H. and Mr. B. were drinking and were observed smoking marijuana. On August 20, 2004, a social worker made an unannounced visit to Ms. H.'s home. Mr. B. admitted that he drinks beer and that Ms. H. goes to the casinos, but he denied that she smoked marijuana.

Cody's social worker visited him at his daycare in September and October and also at his church in October. He is talking well, knows his colors and is reported by his teachers to be a happy baby.

The Youth Court of Jackson County held a permanency review hearing for Cody on December 2, 2004, and found that reunification efforts with his biological parents had not been successful. Cody's permanency plan has been changed to Adoption following Termination of Parental Rights.

**D.    John A.**

John A. entered the custody of the Forrest County Department of Human Services March 5, 1999, when he was nine years old. He is currently fifteen years old and is living in the foster home of Mr. and Mrs. B. with his three siblings, where he has been since January 24, 2004.

John's mother, Ms. A., is addicted to crack cocaine and would leave John and his siblings alone or with a friend for days at a time. The family was followed by Prevention Services and a Family Preservation Specialist. FCDHS took custody of John and his three siblings under a verbal order after John's school reported that he was exhibiting extremely violent behavior,

attempting to harm himself and others.  He was admitted to Pine Grove Recovery Center ("PGRC") in Hattiesburg for evaluation and his siblings were taken to a licensed shelter.

John was released from PGRC and placed at the shelter with his siblings on March 19, however his behavior deteriorated and he was readmitted to PGRC on March 28.  It was determined at PGRC that John was in need of long term residential treatment and was admitted to Millcreek Behavioral Health Services on April 8, 1999.  John's evaluation at Millcreek stated that he had been admitted to PGRC twice previously and that he had received outpatient treatment through Pine Belt Mental Health Center.  John was diagnosed with Axis I: bipolar disorder (mood instability), severe with psychosis, and he was placed on medication.  Reports indicated that John heard voices, had suicidal ideation, homicidal threats, explosive outbursts and assaultive aggression.  John was found to be severely emotionally disturbed and required special education.

Ms. A. entered a detox program March 8 at Pine Grove and completed it on March 17. She signed a Service Agreement with FCDHS on April 12, 1999.  She secured employment and visited John at Millcreek on April 29, 1999.  The court report of August 16, 1999, states that she maintained weekly contact with the social worker, all of her scheduled visits with John's siblings and visited John monthly at Millcreek.  It was decided that two of John's siblings could be returned to Ms. A. and the plan was to continue to work toward reunification of the family.

The court review of October 12, 1999 recommended that John continue in the custody of FCDHS with physical custody at Millcreek.  John was discharged from Millcreek on November 11, 1999.  It was recommended that he be placed in a therapeutic foster home and continue special education class for emotionally disturbed children.  John was placed in the foster home of

Mr. and Mrs. C.  His behavior problems escalated, and Mr. and Mrs. C. asked that he be removed from their home.  John was placed at a licensed group home on November 24, 1999.

The court report of February 28, 2000 stated that John adjusted to his placement at the group home, but his behavior at school resulted in a nine day suspension in the month of February.  He was still in counseling at Pine Belt Mental Health Center.  His social worker visited John monthly at the group home and saw him weekly at church.

On March 5, John became violent at the group home, broke a window, and cut a tire.  He was transferred to PGRC for treatment.  John's violent behavior continued at PGRC.  At age ten, John was five-feet five-inches tall and weighed approximately 200 pounds.  He threatened the other children in his unit at PGRC and was moved to a unit for older children.  John was discharged from PGRC on April 7 and placed in a group home in Memphis for residential treatment.  His social worker's report of May 4 stated John was smiling and said he liked it there. FCDHS contacted DeSoto County DHS and requested that a local social worker make monthly visits to John in Memphis.  Progress report of August 14 stated that John's aggressive behavior had escalated in severity but not frequency; about one incident a day, throwing chairs and hitting the staff or fighting with other residents.

John's Six Month Review Order, September 12, 2000, ordered continued custody by DHS.  On December 18, 2000, John was placed in another group home for continued treatment. In January 2001, the foster care review board found that John and his siblings had been in custody over fifteen months, the mother had not completed her service agreement, and recommended that John's permanency plan be changed from reunification with his mother to termination of parental rights.  At his County Conference in April 2001, his social worker reported that he was doing well at his new home.  However on April 17, John deteriorated and

started exhibiting psychotic symptoms.  He was taken to Lakeside Hospital in Memphis for an evaluation.  Lakeside recommended hospitalization.  John was admitted to Alliance Health Center in Meridian on May 3.  John was returned to the group home in Memphis on May 16, 2001.  John continued to have problems controlling his behavior, evidenced by incident reports nearly every day, which included aggressive conduct directed at staff and peers, throwing chairs and destroying property, inappropriately removing his clothing as well as self harm by head banging, swallowing objects and cutting himself.

John was scheduled to be discharged from the group home in November.  FCDHS attempted to find a therapeutic foster home for John.  He was placed in the foster home of Mr. and Mrs. M. on December 28, however he became aggressive, he hurt the foster parents' other children by squeezing their arms and slamming their fingers in doors and then set a fire in the home.  Mr. and Mrs. M. asked that he be removed on December 30.  John was moved to another shelter.  He was evaluated by the Sassafrass Hill Counseling Center on January 14, 2002, and it was recommended that he be placed in a therapeutic group home with possible long term in-patient psychiatric treatment.

John was placed at such a home on January 23 where he was enrolled in the local school.  His Placement hearing on January 29 ordered he remain in the custody of FCDHS.  On June 4, 2002, the Youth Court terminated his parents' parental rights.

John was admitted to Alliance Hospital in Meridian on June 3 and discharged July 15.  From July 16 to July 22, John was placed at a licensed shelter and then on July 23 he was placed at the Millcreek Residential Psychiatric Treatment Center in Pontotoc. (During the months of June through July, 2002, John was placed in the B. foster home and the D. foster home overnight several times while making a move to his next placement.)  John continued to have behavioral

problems, resulting in pharmacological restraint on August 25.  On August 29, Millcreek reported that John broke into a therapist's office, kicked in the door, broke the therapist's eye glasses, and stole a purse with six dollars in it.  His therapist reported to believe John will be at Millcreek for at least a year.  John continued to have behavioral problems through the fall semester.

In January 2003, John was still having problems, but his 9-Week Progress Report had his grades in high "C" to lower "B" range, an improvement from the prior semester.  His instructional level is about 5th grade.  The January 30 Youth Court Hearing & Review Summary shows the following: verbal altercations with peers, cursing, disregards personal boundaries (10/30);  recently put on lock-down for hitting peer in the mouth (11/22);  disregards personal boundaries with female staff (12/19);  behavioral problems (1/28).  Agency Assessment was that as John's behavior was still unpredictable and volatile, he was not ready for adoption.  His June 3, 2003, 9-week progress report revealed John working in solid "C" level and 5th grade instructional level;  had been promoted to 7th grade for next school year;  but had "very inappropriate boundaries with staff, inappropriate conversation with staff" and although he was very easily distractible and did not stay on task, when he does stay on task "he does really well."

On June 5, Dr. Arnold of Millcreek advised DHS social worker that John was unable to benefit from the Millcreek program and that his discharge date was set for August 7, 2003.  John's discharge Summary Report showed: on April 7, 2003, he kicked the door off the hinges and urinated on the floor; on June 28, 2003, he was on restriction for slapping a resident; and  his permanent plan is adoption with a concurrent plan of long-term institutionalization.

On August 19, John entered junior high school in 7th grade with special education classes for emotional disability and language impairment.  On September 24, John was admitted to

Memorial Behavioral Health Center, Gulfport, in the Acute Adolescent Psychiatric Unit because of self-harm threats and anger management issues. John had no aggressive acting out during his 2-week stay at Memorial Behavioral Health Center.

John was moved between three foster homes in October, and stayed in foster home of Mr. and Mrs. R. from October 16 until December 15, when he was moved to the B. foster home. On December 18, however, John made homicidal threats to his peers – said he was going to get a gun and shoot everyone on the bus. John was again admitted to Memorial Behavioral Health Center. While at Memorial Behavior Health, John got into major conflicts and physical aggressions with peers over minor "infractions" and police had to be called at least once. John's verbal fluency indicates a higher IQ than what tests show. Dr. Jackson diagnosed John with Intermittent Explosive Behavior Disorder with Borderline Personality Disorder. John was discharged from Memorial Behavioral on January 6, 2004 and referred to the Mississippi State Hospital at Whitfield. At Whitfield, John's diagnosis included poor impulse control and lack of consideration for his and others' safety, as well as inappropriate sexual behavior.

John was discharged from Whitfield on January 21 and was placed in the B. foster home with his siblings. Therapeutic placement was attempted with several homes but he could not be placed. Millcreek denied admission to John because of his long inpatient treatment history, because he said he didn't want to go there and wouldn't participate in his interview with the admitting nurse. Parkwood did not have any openings.

John remains in the B. foster home with his siblings and receives outpatient treatment and follow up care at Pine Belt. He is making progress and Mr. and Mrs. B. report that there are no real problems having John in the home. During his social worker's visit May 14, 2004, John stated that he loves it there. The social worker noted that John had lost weight, looks well, and

was very polite.  In June, it was noted that John was promoted to the 9th grade.  His July report was positive as well – John still says he is happy at the B. home.  Mrs. B. reports that he plays his games and does his chores.  In August, John started regular classes at the local high school where he plays on the basketball team.  John has not had any reports of uncontrolled behavior for September or October, and his grades are very good.  He is taking his medication as directed and attending his mental health appointments.  On November 29, Mrs. B. called DHS and requested a ride home from school for John as he was "kicked off of the bus."  No explanation as to why he was not allowed to ride the bus that day.  The final report available is December 28, 2004.  The social worker reports that John and his siblings had a very good Christmas.

> **E.  Mary, Tom, Matthew and Dana W.**

Mary, Tom, Matthew, and Dana W. (the "W Children") entered Hinds County Department of Human Services ("HCDHS") on October 31, 2000.  The four siblings are currently thirteen, eleven, eight, and seven years old and are living in foster homes.  HCDHS is actively seeking an adoptive family for the siblings.

The W. Children first came to the attention of the Hinds County, Mississippi office of DHS on October 26, 2000, when the children, then aged nine, seven, four and three, were discovered by a neighbor in an apartment, where they had been left alone by their mother.  The mother, Tracy W. had left a note advising the neighbor that the mother wanted the neighbor to have custody of the children.  Unable to care for the children financially, the neighbor contacted DHS.  The children were taken to a licensed emergency shelter.

On October 31, 2000, the Hinds County Prosecutor petitioned the Youth Court to have the children declared abused and neglected and requested the issuance of a summons to the children's parents to respond to the charges.  On the same date, Judge Houston Patton issued a

Shelter Hearing Order and placed the children in the custody of DHS for appropriate placement. A day later, on November 1, 2000, Judge Patton issued an 48-hour Emergency Order finding that placement of the children in the emergency shelter was the most reasonable alternative, given the emergency nature of their circumstances.

During their twenty-day stay in the shelter, the children were provided food, clothing, physical and psychological examinations. Shelter employees reported that the children adjusted fairly well during their stay, although they were described as exhibiting occasional defiance and disobedience toward staff.

A psychological evaluation performed by Dr. John B. Jolly concluded that Tom exhibited Attention Deficit Hyperactivity Disorder ("ADHD"), a speech impairment, average intelligence and possible past physical and sexual abuse. Dr. Jolly determined that Mary W. was having difficulty adjusting to separation from her mother but was performing well academically.

While the children were in the shelter, Mr. and Mrs. Zelatra and L. W., sister-in-law (and next friend in this lawsuit) and brother of the children's father (the "W's"), expressed an interest in caring for the children. Therefore, DHS commenced an investigation of the W's home and ordered criminal and child abuse background checks on the couple.

On November 16, 2000, Judge Patton determined that DHS should continue to provide care and custody of the W. Children and authorized the children to be placed in the home of their aunt and uncle, the W's. At the time that the children were taken into custody by DHS, the father, Marcus W., was incarcerated.

On November 28, 2000, Judge Patton issued an Adjudicatory Order adjudging that the W Children were neglected within the meaning of the Youth Court Act; that care and custody of the children shall be placed with their aunt and uncle, the W's; that the natural mother, Tracy W. was

to enter into a service agreement with DHS  (agreement to seek housing, employment, drug screening, etc.) and have supervised visitation rights.  All benefits to which the children were entitled were ordered transferred to the aunt and uncle.

Tracy W., the mother, signed a case plan on December 4, 2000, which required her to attend parenting classes, submit to random drug testing, and maintain stable housing  and employment.  However,  Tracy W. failed to return to the agency after she signed the Case Plan. On January 18, 2001, Tracy W. advised DHS that she was incarcerated in Madison County, Mississippi and would not be able to meet her court dates until after February 13,  2001.

On September 11, 2001, Zelatra W. requested that the Hinds County Youth Court conduct a rehearing on the placement of the children so that DHS could resume custody of the four children with placement of the children with Zeltatra and L. W. as their foster parents.  In a memorandum dated September 25, 2001, the children's social worker, Jennie Hall, advised Judge Patton that Zelatra  W. had stated that she could not care for the children without board payments from DHS. Ms. Hall explained to Zelatra W. that DHS policy provided that children must be in DHS custody before a board payment may be made to foster parents.  Thereafter, Zelatra W.  requested that DHS resume custody of the four children so that she and her husband could receive foster care board payments.

Accordingly, on September 25,  2001 and September 28,  2001, Judge Patton ordered that DHS resume custody of the children with foster placement with Zelatra and L. W., retroactive to August, 2001, the time in which the children first came to live with the W's.  In addition to foster board payments,  the W's received Temporary Assistance to Needy Families ("TANF") and Medicaid benefits on behalf of the four children.  They received $1,400 in monthly board payments on behalf of the children.

The children received regular visits to their doctor and dentist while in the custody of DHS. Tom W. was reported to exhibit voyeuristic behavior toward his sisters when they were dressing.

On January 8, 2002, Judge Patton ordered a permanency hearing be held for the children by August 6, 2002. On February 27, 2002, Judge Patton determined in the Sixth Month Review Order that the children were to remain in the custody of DHS with placement with their relatives, Zelatra and L. W.

The W's moved to Pike County. Thereafter, the W's began to report to DHS that the children were suddenly exhibiting severe behavioral problems. On February 25, 2002, Zelatra W. advised DHS workers visiting her home that she wanted her home to become a therapeutic foster home because the children were having emotional and behavioral problems. Zelatra W. advised that the children were undergoing counseling to address some past abuse issues. Earlier, on January 29, 2002, a Dr. Mary Nellums advised the children's social worker that the foster parents were inquiring about the differential in board payments for specialized foster care. On February 26, 2002, Zelatra W. again expressed an interest in having her home licensed as a therapeutic foster home.

In the interim, Mary W. reported to social workers on February 28, 2002 that Zelatra W. and L. W., the foster parents, tended to treat the four W. Children differently than the W's own biological children.

In March, 2002, unbeknownst to social workers, Zelatra W. arranged for Tom W. to be assessed by doctors at Brentwood Behavioral Services for hospitalization. DHS social workers reported that the foster parents had not advised them that the child had problems or that he had been taken to Brentwood. The social worker, Jennie Hall, contacted Dr. Mary Nellum, who had

been treating the children.  Dr. Nellum advised that L. W. at first told her on March 13,  2002, that Tom threatened to kill himself. After Dr. Nellums instructed him to take the child to Brentwood,  L. W. changed his story and advised that Tom had threatened to kill himself when he was living with his biological parents. The doctor advised L. W. to take the boy to Brentwood,  and the social worker signed the assessment paperwork necessary for admittance.

Social Worker Patricia Seals noted in her case narrative of March 15,  2002 that Tom W. did not express any suicidal thoughts during a recent visit on February 25, 2002, nor did the foster parents report that he ever threatened suicide.

On March 18, 2002, an DHS homemaker, Lajolla Dillon, visited Tom's teacher at school. The teacher advised that Tom was very well behaved (much better behaved than his classmates) and that he was a good reader.  The teacher stated that Tom told her that he was taken from this mother, but that was the only time that she saw him sad.  A homemaker also visited Matthew at his school and he was reported to have been doing well on March 20,  2002.

When a homemaker visited Mary  at school on March 20, 2002, she related that Tom was in Brentwood after an incident when L. W. ordered Tom to his room when he refused to eat a sandwich.  Tom began to cry and tried to apologize to his foster parents, who refused to accept his apology.  Mary stated that L. W. took the child's television, v.c.r., games and playstation, at which time Tom took one of the games, rubbed it on his neck, saying that he wanted to kill himself. Later, Tom calmed down and went to bed and was feeling fine the next morning.  Tom was released from the hospital and was ordered by his doctor to take two types of medication, including Ritalin,  and to visit his doctor on an outpatient basis.

In the interim, the children's biological father was requesting that DHS arrange visits with his children.  During a visit with the W's on March 30,  2002,  DHS worker Patricia Seals

reported that the foster parents were concerned about the biological father's visits because he was a stalker. They requested that future visits be arranged at a neutral site outside of their home. Zelatra and L. W. reported that they wanted to adopt the children but would need additional financial support.

On April 17, 2002, DHS worker Patricia Seals visited Tom at school to find that he was wearing shoes that were too big for him and was wearing dirty shorts with spots on them. Two days later, on April 19, 2002, Zelatra W. advised DHS that Dr. Benitez at Brentwood wanted to see Mary on an outpatient basis. By May 1, 2002, Mary was taking Zoloft.  When Seals met with the children on May 17,  2002, the children seemed well adjusted.

On July 23,  2002, Zelatra W. advised DHS that the children would be seeing a Dr. Wilson at Brentwood and that all of the children had undergone physical examinations with the exception of Matthew and all of them had received dental examinations.

The August 6, 2002 court summary by Jennie Hall, the children's social worker, advised Judge Patton that DHS had not heard from the children's mother, Tracy, since January 18, 2001 when she was incarcerated in Madison County for shoplifting. The children's father, Markus W., entered into a service agreement with DHS on March 1, 2002, but failed to follow through on the requirements and eventually lost contact with the children.

The DHS permanency plan for the children as of August 6,  2002 was to terminate the parents' rights and allow their aunt and uncle to adopt them.

On August 6, 2002, the children's case came before Judge Patton for a 12-month permanency review.  The judge adopted the recommendations of the social worker and ordered that the children remain in DHS custody and authorized DHS to provide medical, psychological and other services needed by the children.

By October, 2002, DHS was preparing to move forward with terminating the rights of the children's biological parents. The mother, Tracy W., at that time, was living in Georgia and had another child in the protective services of the department of human services in Georgia. The sixth-month Review Order of December 12, 2002 indicated that the DHS was pursuing adoption for the four children.

Zelatra W. advised in a December 4, 2002 report to DHS that Tom had threatened to stab the school principal, that Mary was getting into things and telling lies, that Matthew was not sleeping well, and that Dana was throwing temper tantrums. The reports by Zelatra W. described behavior different than what the social workers observed when they visited the children's school.

By December 23, 2002, Zelatra W. advised DHS that all of the children were taking medications, mainly Zoloft, an antidepressant. On January 10, 2003, Zelatra W., for the first time, reported that Mary and Dana told her that their biological father had sexually abused them when they lived with him.

On February 3, 2003, Zeltara W. reported that Mary wanted to kill herself, so Zelatra W. contacted Brentwood to have the child assessed. When the social worker, Jennie Hall, arrived at Brentwood, Mary advised that she wanted to hurt herself because she was afraid that her father would kidnap her. She also disclosed that her father had sexually molested her and that her mother's boyfriends had touched her inappropriately.

On February 5, 2003, Zelatra W. advised the social worker, Patricia Seals, that all four of the children had been scheduled for psychological evaluations. Zelatra W. again asked Patricia Seals on February 5, 2003, about the procedure to have her home licensed as a therapeutic foster home. On February 7, 2003, Zelatra W. wrote DHS to advise that the children needed individual

attention from DHS caseworkers every week to deal with their past problems.  She advised that the children were stealing food and coming home from school with stomach aches.

On February 13, 2003, Zelatra W. was attempting to have Matthew admitted to Pine Grove treatment center.  However, Zelatra W. again failed to advise DHS that Matthew needed an assessment on that date.  Matthew was eventually admitted to Pine Grove. He stayed until February 19, 2003.  In the interim, Brentwood called DHS workers to get permission to prescribe Risperal to Mary for psychotic behavior.  Matthew was prescribed anti-psychotic behavior medicine as well.

On March 3, 2003, Zelatra W. reported that Matthew did not want to go to school and ran from their home into the woods. As L. W. approached the boy, the boy continued to run in the woods.  The sheriff's department was called and a report was taken on the incident.

On March 4, 2003, DHS workers advised Zelatra W. that Matthew's medication appeared to be too strong for him.

On March 5, 2003, DHS workers received a call from the children's principal at school, who reported that she suspected that the W Children were being abused and neglected.

On March 6, 2003, an DHS homemaker visited the children's school and spoke with Dana W. Dana's clothes were dirty, her hair was not combed  and she appeared sad. Her teacher reported that Dana was acting out in an unusual manner.  The teacher reported that when Dana saw her aunt, Zelatra W. in the school one day, she backed up against the wall and started screaming.

A March 7, 2003, report by areas social worker supervisor Carolyn Roberts outlined her suspicions that Zelatra and L. W.  may be exploiting the four W Children to receive money.  The report stated that Zelatra and L. W. moved the children to Pike County without advising Hinds

County officials, and suspected that Zelatra and L. W. were trying to avoid close supervision of their home. The report emphasized that Zelatra and L. had requested board payments for the children and received some $3,000 in retroactive board payments.

According to the March 7, 2003 report of Carolyn Roberts, the children's school principal reported to DHS that Zelatra and L. W. were not taking good care of the children. Zelatra and L. W. asked the school for money on behalf of the children while, at the same time, the W.'s were contacting the Pike County Department of Human Services for assistance with their utility bills.  The school principal also reported that the W's wanted her to complete Supplemental Security Income ("SSI") applications for the four children although school officials did not detect any mental deficiencies with the children.

A relative of the four children, who worked as the school librarian, advised DHS that the children should be removed from the home of Zelatra and L. W. because the children were constantly on punishment by the Ws.

The school principal and teachers advised DHS that Zelatra W's  reports of the children's behavioral problems at home were inconsistent with the children's behavior at school, where they functioned without any major problems and performed well academically.   The W's requested school officials to construct a letter outlining the behavioral problems that the W's had described in reference to Matthew.  The letter, in turn, was used by the W's to have Matthew admitted to a hospital. Although Matthew's doctor assumed that the letter reflected the sentiments of school officials, the school officials called Matthew's doctor to clarify that the letter was written due to the manipulative efforts of the W's.

After speaking with the children at their school and interviewing school personnel, DHS decided to remove the children from the home of Zelatra and L. W. on March 7,  2003 and place

them in new foster homes due to suspicions that the children were being emotionally abused by the W's for monetary gain.  Although DHS did not pursue charges of abuse and neglect against the W's, DHS workers believed that Zelatra and L. W. could not properly care for the children and that it was in the children's best interest to live with other foster parents.

On April 22, 2003, Judge Patton issued a Rehearing Order placing the children in the custody of DHS for appropriate placement due to the children's parents or guardians' inability to provide for their care and supervision.

When the children settled into their new foster homes, the new foster parents reported that the children were well behaved and adjusting well. Their new school teachers  reported that the children were performing very well academically.  By June 19,  2003,  none of the children were taking medication although they continued to attend therapy sessions.  In July, 2003, a Hinds County chancellor terminated the parental rights of the children's biological parents, and the W Children were freed for adoption.

By October 29, 2003, DHS worker Jennie Hall received a call from a disability worker advising that she had received an application from Zelatra W. in February, 2003 to receive disability payments for Dana because of a purported eating disorder.

On November 13, 2003,  DHS worker Jennie Hall visited Matthew at his new school. Matthew's teacher advised that he had an outburst after he was visited by Zelatra and L. W. Matthew told Hall that he developed bad feelings whenever he saw his aunt and uncle and asked that visits by Zelatra and L. W. discontinue.

By November 15, 2003, the four children were attending adoption picnics and meeting with families who were interested in adopting them. The children reported to workers that their Christmas of 2003 was the best Christmas they had ever had.  Throughout 2003, the children

continued to see their therapists but were not medicated to the extent that they had been while they lived with Zelatra and L. W.

The children continued to visit each others' foster homes regularly and share outings together.  By March 2004, Tom was in a gifted program at his school.  Mary was working  as an office worker in her school.  DHS worker Carolyn Roberts noted after a March 4, 2004 visit that a change in environment had worked wonders for Tom who, just months prior, had been described as a child in need of disability benefits by his aunt, Zelatra W.

In May, 2004, Matthew received all A's on a midterm report and Tom received good grades as well.  Tom's teacher wrote that he was a joy to have in her classroom. Dana received an award for having the highest reading level of her first grade class,  and Mary was on the honor roll at her school.  DHS workers continued to transport the children to regular visits with their therapist.

The DHS Adoption Unit reported that prospective adoptive families began to inquire about the W. children for adoption. Although the children reported problems from time to time, they continued to reside with their respective foster families, attend regular therapy sessions, but were not hospitalized.

A couple who showed interest in adopting the children reported in November 2004 that adoption of the four children would be too overwhelming.  However, a second couple expressed interest in pursuing placement activities with the sibling group by Thanksgiving 2004 and began weekend visits with the children by December 3, 2004 with the ultimate goal of adoption.