Kathy Triplett - 10/20/04

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

OLIVIA Y, By and
Through Her Next Friend,
James D. Johnson, et al.                          PLAINTIFFS

VS.                          CIVIL ACTION NO. 3:04CV25LN

HALEY BARBOUR, As Governor
Of the State of Mississippi;
DONALD TAYLOR, as Executive
Director of the Department of
Human Services; and BILLY MANGOLD,
As Director of the Division of
Children's Services                               DEFENDANTS

DEPOSITION OF KATHY TRIPLETT

Taken at the instance of the Plaintiff at the
offices of Bradley Arant, LLP, One Jackson Place,
188 E. Capitol Street, Suite 450, Jackson,
Mississippi, on Wednesday, October 20, 2004,
beginning at approximately 8:09 a.m.

ORIGINAL

APPEARANCES:

    ERIC E. THOMPSON, ESQ.
    MARCIA ROBINSON LOWRY, ESQ.
    Children's Rights, Inc.
    404 Park Avenue South
    New York, NY 10016

COUNSEL FOR PLAINTIFFS

Brooks Court Reporting
1-800-245-3376



EXHIBIT
BB

Kathy Triplett - 10/20/04

Page 2

BETTY A. MALLETT, ESQ.

McGlinchey Stafford, PLLC

Skytel Centre South, Suite 1100

200 South Lamar Street

Jackson, Mississippi 39201


COUNSEL FOR DEFENDANTS


Reported By:     Julie Brown, CSR #1587

Brooks Court Reporting

Post Office Box 2632

Jackson, Mississippi  39207

(601) 362-1995

Kathy Triplett - 10/20/04

Page 3

# INDEX

|  | PAGE |
|---|---|
| Appearances | 1 |
| Certificate of Deponent | 95 |
| Certificate of Court Reporter | 96 |

## EXAMINATIONS

|  | PAGE |
|---|---|
| Examination By Mr. Thompson | 4 |

## EXHIBITS

|  | PAGE |
|---|---|
| Exhibit 13 - Abuse and Neglect Information form | 81 |

```
 1                    KATHY TRIPLETT,
 2   having been first duly sworn, was examined and
 3   testified as follows:
 4   EXAMINATION BY MR. THOMPSON
 5        Q.    Good morning, Ms. Triplett, my name is
 6   Eric Thompson.  I'm with Children's Rights and I am
 7   representing plaintiffs in this matter.  Do you
 8   understand that you're here to give sworn testimony
 9   in this case regarding abuse and neglect
10   investigations?
11        A.    Yes, I do.
12        Q.    A couple of ground rules -- if at any
13   time you don't understand a question, please let me
14   know, I'll try to rephrase it.  If at any point you
15   wish to clarify a previous question, let me know,
16   we'll do that on the record.  And finally, this is
17   not an endurance contest, if you need to take a
18   break, let me know and we'll do that as well.  Ms.
19   Triplett, could you tell me what your current title
20   is?
21        A.    Division director also known as the
22   protection unit director.
23        Q.    And what is the protection unit?
24        A.    The protection unit encompasses intake
25   and investigative action on child protective
```

Kathy Triplett - 10/20/04

Page 5

```
 1   services, adult protective services, the central
 2   registry program, the training program, the 24-hour
 3   hot line and foster care review program.
 4        Q.   How long have you been a director of the
 5   protection unit?
 6        A.   For approximately five and a half years,
 7   since 1999.
 8        Q.   And how long have you been employed by
 9   DHS?
10        A.   I've been employed by DHS for
11   approximately 15 years, not consecutively.
12        Q.   What was your position immediately before
13   being director of the protection unit?
14        A.   I was a social worker advanced with the
15   training program.
16        Q.   And is that the same training program
17   that's within the protection unit?
18        A.   Yes, it is.
19        Q.   Is that the program that's responsible
20   for training of all DHS staff within the division
21   of children/family services?
22        A.   For all social work staff.  There are
23   some staff members such as adoption and licensure
24   that are not routinely trained by the training
25   program.
```

1  that we had before. But I can't say whether that's
2  going to be an impediment or not until we've
3  actually continued our plans to see how that affects
4  us.
5      Q.   Well, since April or May, you're saying
6  the loss of staff has had no impact on your program?
7           MS. MALLETT: Objection. She's already
8  answered.
9      Q.   (By Mr. Thompson) You can answer the
10 question?
11          MS. MALLETT: As best you can.
12     A.   One person left in, I believe, about
13 April or May, I'm not sure of the months. One
14 person left and the other people have just left
15 within just a very recent time period. I'm not
16 saying that the one person who left was not
17 valuable.
18          But obviously, there would be, you know,
19 some difference between what with one person leaving
20 and three persons leaving. And with the three
21 persons leaving within a short period of time,
22 recently, I really have not been able to see yet
23 what if any impact that's going to have.
24     Q.   (By Mr. Thompson) Isn't it true, though,
25 that at least some of your training staff have been

1  temporarily assigned to various county offices?
2       A.    That's true.
3       Q.    And is that the case as of today?
4       A.    As of today, to my knowledge, we don't
5  have any training staff temporarily assigned, on
6  temporary assignments to my knowledge as of today.
7       Q.    Well, would it be fair to say that some
8  of them have been temporarily assigned to county
9  offices as recently as this summer?
10      A.    Yes.
11      Q.    And why were they reassigned?
12      A.    To those county offices?
13      Q.    Yes?
14      A.    I was told by, by my supervisor that the
15 assistance was needed in those counties.
16      Q.    I'm sorry, who is your supervisor?
17      A.    Well, at that time, my direct supervisor
18 was Bill Mangold, the division director.  Now my
19 supervisor is Rickie Felder, the bureau director.
20      Q.    I'm sorry, why has that changed?
21      A.    Rickie Felder, that was a vacant position
22 and Rickie Felder was hired recently.
23      Q.    I'm sorry, Rickie Felder now has what
24 position?
25      A.    He's the Bureau Director with the

1   Division of Family Services.
2       Q.   And that's different from the director?
3       A.   Yes, he's.
4       Q.   Position?
5       A.   He reports to the division director,
6   Billy Mangold. At that time, the bureau director
7   position was vacant and I reported directly to Bill
8   Mangold.
9       Q.   I understood. So Mr. Mangold requested
10  that some of your staff be reassigned to various
11  county offices; is that correct?
12      A.   That's correct.
13      Q.   When was this?
14      A.   I can't recall exactly this because there
15  were, I believe, a couple of times when that
16  occurred within the last several months. And the
17  most recent one, if I recall correctly, was did go
18  into, into May or June. I could be mistaken about
19  the exact months.
20      Q.   And that is the second time?
21      A.   Yes.
22      Q.   And the first time would have been
23  earlier in 2004?
24      A.   There were a couple of times when there
25  was a short period of time where the workers'

Kathy Triplett - 10/20/04

Page 48

```
1    temporary assignment ended and then someone else was
2    sent back.  I can't really recall.  It was within
3    that short period of time.
4         Q.   Well, how many of your training staff
5    have been reassigned at any time within the past
6    calendar year, 2004?
7         A.   There were, at one time, there were four
8    at once.  And then on another occasion, two of the
9    same four were on a separate assignment, I believe,
10   and that's all I can recall right now.  I'm not the
11   immediate, their immediate supervisor so I could be
12   a little off on the timeframe.
13        Q.   And when we're saying temporary
14   assignments, how long are we talking about?
15        A.   I believe one assignment was maybe for
16   30 days and then there was another assignment, I
17   believe, maybe the second assignment was for -- I'm
18   not sure.  I think it was 60 days, but I'm not
19   positive of that.
20        Q.   Have any of those assignments been
21   extended?
22        A.   Yes.  There had, I can't recall which
23   ones but there were assignments, when it initially,
24   the initial information I was given was that it
25   would not be that long and then they were extended.
```

Kathy Triplett - 10/20/04

```
1      Q.    And do you recall what counties we're
2   talking about that they were sent to?
3      A.    Forrest County -- I'm trying to recall if
4   there were any other counties. I believe Forrest
5   County was the only one, but I'm not sure. There
6   could have been another county, but I believe
7   Forrest County was the only one where they were all
8   sent.
9      Q.    And that includes the separate
10  assignments that you were testifying to, they were
11  all in the same county, just different assignments?
12     A.    Yes, different times. At one time, four
13  were there at the same time. And then another time,
14  two of those four, I believe, were there. And I'm
15  not sure how lengthy they were.
16     Q.    And did Mr. Mangold tell you why this was
17  necessary?
18     A.    He told me that they were needed, that
19  the assistance was needed in those counties.
20     Q.    Did he say why?
21     A.    I don't recall any other elaboration
22  other than they were needed. That he needed them to
23  go there.
24     Q.    And what were their duties when they
25  went there, do you know?
```

Kathy Triplett - 10/20/04

1   A.   I believe their duties were somewhat
2   divided. Some of them may have separate
3   assignments. Some were doing investigations and
4   some were working with making visits to foster
5   children. Some were doing the screening of the
6   investigations, I believe. There were different
7   assignments while they were there so I can't recall,
8   really recall exactly, but that was the scope of
9   what they were doing.
10  Q.   Your understanding is that they were
11  filling in for caseworkers?
12  A.   Yes.
13  Q.   So presumably during that time they were
14  filling in for caseworkers, they were not doing
15  training?
16  A.   Well, there was some on the job training
17  that was being done with the workers who were there.
18  I can't recall how many workers are there at that
19  time, but there was some on the job training that
20  was going on. But that was happening as they were
21  doing the work also and that was not all of them
22  doing on the job training.
23  Q.   And it's fair to say, though, that they
24  were not available for their usual duties in the
25  training program?

```
 1      A.      That's true.
 2      Q.      Did Mr. Mangold make this request to you
 3   verbally or in writing?
 4      A.      I believe at least on one occasion it was
 5   both.  Each time he made it verbally, gave
 6   instructions verbally, but there was at least one
 7   occasion that I believe he also followed up in
 8   writing.
 9      Q.      And was this a request or a directive?
10      A.      It was a directive.
11      Q.      During that time that up to four of your
12   training staff were assigned to Forrest County, did
13   that in any way impact your ability to provide
14   extensive training to new staff?
15      A.      I don't believe that there was a time
16   that we suspended the intensive training based upon
17   those special assignments.  I can't recall at that
18   time if there was intensive training actually
19   occurring throughout the entire period.  Usually
20   intensive training does not cover the summer months,
21   May through June.  We may go through the beginning
22   of May, but not through June and July.  Usually, it
23   starts about the end of August or September.  I
24   don't believe we suspended any intensive training on
25   that basis.
```