Not Reported in F.Supp.2d                                                    Page 22

2004 WL 1620866 (S.D.N.Y.), 94 Fair Empl.Prac.Cas. (BNA) 1, 85 Empl. Prac. Dec. P
41,729

(Cite as: 2004 WL 1620866 (S.D.N.Y.))

> evidence relevant to proof of an issue at trial can support an inference
> that the evidence would have been unfavorable to the party responsible for
> its destruction.") (cited in *Residential Funding*, 306 F.3d at 109); *see also*
> *Residential Funding*, 306 F.3d at 109 ("[A] showing of [wilfullness or] gross
> negligence in the destruction or *untimely production* of evidence will in
> some circumstances suffice, standing alone, to support a finding that the
> evidence was unfavorable to the grossly negligent party.") (emphasis added);
> *see also id.* at 110 ("Just as the intentional or grossly negligent
> *destruction* of evidence in bad faith can support an inference that the
> destroyed evidence was harmful to the destroying party, so, too, can
> intentional or grossly negligent acts that hinder discovery support such an
> inference ....") (emphasis in original).

### B. Remedy

Having concluded that UBS was under a duty to preserve the e-mails and that it
deleted presumably relevant e-mails wilfully, I now consider the full panoply of
available sanctions. [FN97] In doing so, I recognize that a major consideration in
choosing an appropriate sanction--along with punishing UBS and deterring future
misconduct--is to restore Zubulake to the position that she would have been in had
UBS faithfully discharged its discovery obligations. [FN98] That being so, I find
that the following sanctions are warranted.

> FN97. *See Fujitsu*, 247 F.3d at 436 (holding that the choice of sanctions for
> spoliation and failure to produce evidence "is confined to the sound
> discretion of the trial judge, and is assessed on a case-by-case basis").

> FN98. *See West*, 167 F.3d at 779 (explaining that the chosen sanction should
> "(1) deter parties from engaging in spoliation; (2) place the risk of an
> erroneous judgment on the party who wrongfully created the risk; and (3)
> restore 'the prejudiced party to the same position he would have been in
> absent the wrongful destruction of evidence by the opposing party.' ")
> (quoting *Kronisch*, 150 F.3d at 126); *see also Pastorello v. City of New York*,
> No. 95 Civ. 470, 2003 WL 1740606, at *8 (S.D.N.Y. Apr. 1, 2003).

**13** First, the jury empanelled to hear this case will be given an adverse
inference instruction with respect to e-mails deleted after August 2001, and in
particular, with respect to e-mails that were irretrievably lost when UBS's backup
tapes were recycled. No one can ever know precisely what was on those tapes, but
the content of e-mails recovered from other sources--along with the fact that UBS
employees wilfully deleted e-mails--is sufficiently favorable to Zubulake that I
am convinced that the contents of the lost tapes would have been similarly, if not
more, favorable. [FN99]

> FN99. *Cf. Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir.1994)
> (" '[e]mployers are rarely so cooperative as to include a notation in the
> personnel file' that their actions are motivated by factors expressly

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                           Page 23

2004 WL 1620866 (S.D.N.Y.), 94 Fair Empl.Prac.Cas. (BNA) 1, 85 Empl. Prac. Dec. P 41,728

(Cite as: 2004 WL 1620866 (S.D.N.Y.))

> forbidden by law. Because an employer who discriminates is unlikely to leave a 'smoking gun' attesting to a discriminatory intent, a victim of discrimination is seldom able to prove his claim by direct evidence, and is usually constrained to rely on circumstantial evidence.") (quoting *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 464 (2d Cir.1989)) (citations omitted); *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1112 (2d Cir.1988) ("[In] reality ... direct evidence of discrimination is difficult to find precisely because its practitioners deliberately try to hide it. Employers of a mind to act contrary to law seldom note such a motive in their employee's personnel dossier.")
> Note that I am *not* sanctioning UBS for the loss of the tapes (which was negligent), but rather for its *willful* deletion of e-mails. Those e-mails happen to be lost forever because the tapes that might otherwise have contained them were lost.

*Second*, Zubulake argues that the e-mails that were produced, albeit late, "are brand new and very significant to Ms. Zubulake's retaliation claim and would have affected [her] examination of every witness ... in this case." [FN100] Likewise, Zubulake claims, with respect to the newly produced e-mails from Kim and Tong's active files, that UBS's "failure to produce these e-mails in a timely fashion precluded [her] from questioning any witness about them." [FN101] These arguments stand unrebutted and are therefore adopted in full by the Court. Accordingly, UBS is ordered to pay the costs of any depositions or re-depositions required by the late production.

> FN100. Tr. at 10.

> FN101. Pl. Mem. at 10.

*Third*, UBS is ordered to pay the costs of this motion. [FN102]

> FN102. Fed.R.Civ.P. 37(b)(2).

Finally, I note that UBS's belated production has resulted in a self-executing sanction. Not only was Zubulake unable to question UBS's witnesses using the newly produced e-mails, but UBS was unable to prepare those witnesses with the aid of those e-mails. Some of UBS's witnesses, not having seen these e-mails, have already given deposition testimony that seems to contradict the newly discovered evidence. For example, if Zubulake's version of the evidence is credited, the e-mail from Davies acknowledging receipt of Zubulake's EEOC charge at 11:06 AM on August 21, 2001, puts the lie to Davies' testimony that he had not seen the charge when he spoke to Orgill—a conversation that was reflected in an e-mail sent at 2:02 PM. Zubulake is, of course, free to use this testimony at trial.

These sanctions are designed to compensate Zubulake for the harm done to her by the loss of or extremely delayed access to potentially relevant evidence. [FN103] They should also stem the need for any further litigation over the backup tapes.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 24

2004 WL 1620866 (S.D.N.Y.), 94 Fair Empl.Prac.Cas. (BNA) 1, 85 Empl. Prac. Dec. P
41,728

**(Cite as: 2004 WL 1620866 (S.D.N.Y.))**


FN103. Another possible remedy would have been to order UBS to pay for the
restoration of the remaining backup tapes. Zubulake, however, has conceded
that further restoration is unlikely to be fruitful. See Tr. at 30-31.

C. Other Alleged Discovery Abuses

In addition to the deleted (and thus never- or belatedly produced) e-mails,
Zubulake complains of two other perceived discovery abuses: the destruction of a
September 2001 backup tape from Tong's server, and the belated production of a UBS
document retention policy.

1. Tong's September 2001 Backup Tape

Zubulake moves for sanctions because of the destruction of Tong's September 2001
backup tape. In Zubulake III, I ordered UBS to pay 75% of the cost of restoring
certain backup tapes. [FN104] Understandably, one of the tapes that Zubulake chose
to restore was Tong's tape for August 2001, the month that Zubulake filed her EEOC
charge. That tape, however, had been recycled by UBS. Zubulake then chose to
restore Tong's September 2001 tape, on the theory that "the majority of the
e-mails on [the August 2001] tape are preserved on the September 2001 tape."
[FN105] When that tape was actually restored, however, it turned out not to be the
September 2001 tape at all, but rather Tong's October 2001 tape. This tape,
according to UBS, was simply mislabeled. [FN106]

FN104. See Zubulake III, 216 F.R.D. at 291.

FN105. Zubulake IV, 220 F.R.D. at 221.

FN106. See Def. Mem. at 12 n. 8; Tr. at 57 (attributing mislabeling of tape
to "human error"); see also Declaration of James E. Gordon, Vice President
of Pinkerton Consulting & Investigations, Inc. (detailing UBS's
investigation into the missing September 2001 tape), Ex. I to the 5/14/04
Declaration of Norman C. Simon ("Simon Decl.").


*14 Zubulake has already (unintentionally) restored Tong's October 2001 tape,
which should contain the majority of the data on the September 2001 tape. In
addition, UBS has offered to pay to restore Varsano's backup tape for August 2001,
which it has and which has not yet been restored. [FN107] Varsano was Tong's HR
counterpart in the United States, and was copied on many (but not all) of the
e-mails that went to or from Tong. [FN108] These backup tapes, taken together,
should recreate the lion's share of data from Tong's August 2001 tape. UBS must
therefore pay for the restoration and production of relevant e-mails from
Varsano's August 2001 backup tape, and pay for any re-deposition of Tong or
Varsano that is necessitated by new e-mails found on that tape.

FN107. See Tr. at 58-59.


© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2004 WL 1620866 (S.D.N.Y.), 94 Fair Empl.Prac.Cas. (BNA) 1, 85 Empl. Prac. Dec. P 41,728

(Cite as: 2004 WL 1620866 (S.D.N.Y.))


FN108. See id.

2. The July 1999 Record Management Policy

Zubulake also moves for sanctions in connection with what she refers to as "bad faith discovery tactics" on the part of UBS's counsel. [FN109] In particular, Zubulake complains of a late-produced record management policy. [FN110] The existence of this policy was revealed to Zubulake at Varsano's second deposition on January 26, 2004, [FN111] at which time Zubulake called for its production. [FN112] Zubulake twice reiterated this request in writing, in the hopes that she would have the policy in time for Hardisty's deposition on February 5, 2004. UBS did not produce the policy, however, until February 26, 2004. [FN113]

> FN109. Pl. Mem. at 8.
>
> FN110. See June 1999 UBS Record Management Policy for the Americas Region (the "June 1999 policy"), Ex. M to the Batson Aff.
>
> FN111. See Varsano Dep. at 489-94.
>
> FN112. See id. at 494.
>
> FN113. See 4/26/04 Letter from Norman Simon, counsel to UBS, to James Batson, Ex. N to the Batson Aff.

The late production of the July 1999 policy does not warrant sanctions at all. First, UBS's production of the policy was not late. Zubulake requested it at Varsano's deposition on January 26, 2004, and UBS produced it one month later, on February 26. The Federal Rules afford litigants thirty days to respond to document requests, [FN114] and UBS produced the policy within that time. The fact that Zubulake wanted the document earlier is immaterial--if it was truly necessary to confront Hardisty with the policy, then his deposition should have been rescheduled or Zubulake should have requested relief from the Court. [FN115] Not having done so, Zubulake cannot now complain that UBS improperly delayed its production of that document.

> FN114. See Fed.R.Civ.P. 34(b).
>
> FN115. See id. (reserving to the court the authority to lengthen or shorten the time in which a party must respond to a document request).

Second, even if UBS was tardy in producing the policy, Zubulake has not demonstrated that she was prejudiced. She suggests that she would have used the policy in the depositions of Hardisty and perhaps Chapin, but does not explain how. Nor is it at all clear how Zubulake might have used the policy. With respect to e-mail, the policy states: "Email is another priority. We will have a separate policy regarding email with appropriate reference or citation in this policy

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 26

2004 WL 1620866 (S.D.N.Y.), 94 Fair Empl.Prac.Cas. (BNA) 1, 85 Empl. Prac. Dec. P 41,728

(Cite as: 2004 WL 1620866 (S.D.N.Y.))

and/or retention schedules." [FN116] Prior to these depositions, Zubulake had a number of UBS document retention policies that post-dated the June 1999 Policy. [FN117]

    FN116. June 1999 Policy § 3.2.

    FN117. See Retention of Back-up Tapes of Email Servers (dated June 2001),
    Ex. H to Simon Decl.; Retention of Back-Up Tapes of E-mail and Interchange
    (dated October 2001), Ex. K to Simon Decl.; see also Ex. M to Batson Aff.
    (consisting of four UBS document retention policies, including one entitled
    "Use of Electronic Mail, Chat and Text Messaging," dated November 2002).

V. CONCLUSION

In sum, counsel has a duty to effectively communicate to her client its discovery obligations so that all relevant information is discovered, retained, and produced. In particular, once the duty to preserve attaches, counsel must identify sources of discoverable information. This will usually entail speaking directly with the key players in the litigation, as well as the client's information technology personnel. In addition, when the duty to preserve attaches, counsel must put in place a litigation hold and make that known to all relevant employees by communicating with them directly. The litigation hold instructions must be reiterated regularly and compliance must be monitored. Counsel must also call for employees to produce copies of relevant electronic evidence, and must arrange for the segregation and safeguarding of any archival media (e.g., backup tapes) that the party has a duty to preserve.

*15 Once counsel takes these steps (or once a court order is in place), a party is fully on notice of its discovery obligations. If a party acts contrary to counsel's instructions or to a court's order, it acts at its own peril.

UBS failed to preserve relevant e-mails, even after receiving adequate warnings from counsel, resulting in the production of some relevant e-mails almost two years after they were initially requested, and resulting in the complete destruction of others. For that reason, Zubulake's motion is granted and sanctions are warranted. UBS is ordered to:
    1. Pay for the re-deposition of relevant UBS personnel, limited to the subject of the newly-discovered e-mails;
    2. Restore and produce relevant documents from Varsano's August 2001 backup tape;
    3. Pay for the re-deposition of Varsano and Tong, limited to the new material produced from Varsano's August 2001 backup tape; [FN118] and

        FN118. Rulings numbered (1) and (3) may both result in the re-deposition of
        Tong and Varsano. Obviously, each should only be re-deposed once.

    4. Pay all "reasonable expenses, including attorney's fees," [FN119] incurred by Zubulake in connection with the making of this motion.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                     Page 27

2004 WL 1620866 (S.D.N.Y.), 94 Fair Empl.Prac.Cas. (BNA) 1, 85 Empl. Prac. Dec. P
41,728

**(Cite as: 2004 WL 1620866 (S.D.N.Y.))**

FN119. Fed.R.Civ.P. 37(b)(2).

In addition, I will give the following instruction to the jury that hears this
case:

You have heard that UBS failed to produce some of the e mails sent or received by
UBS personnel in August and September 2001. Plaintiff has argued that this
evidence was in defendants' control and would have proven facts material to the
matter in controversy.

If you find that UBS could have produced this evidence, and that the evidence was
within its control, and that the evidence would have been material in deciding
facts in dispute in this case, you are permitted, but not required, to infer that
the evidence would have been unfavorable to UBS.

In deciding whether to draw this inference, you should consider whether the
evidence not produced would merely have duplicated other evidence already before
you. You may also consider whether you are satisfied that UBS's failure to
produce this information was reasonable. Again, any inference you decide to draw
should be based on all of the facts and circumstances in this case. [FN120]

FN120. This instruction was adapted from LEONARD B. SAND ET AL., MODERN
FEDERAL JURY INSTRUCTIONS 75-7 (2004); see also Zimmerman v. Associates
First Capital Corp., 251 F.3d 376, 383 (2d Cir.2001) (affirming district
court's use of a similar charge); cf. New York Pattern Jury
Instructions--Civil 1:77 (3d ed.2004).

The Clerk is directed to close this motion [number 43 on the docket sheet]. Fact
discovery shall close on October 4, 2004. A final pretrial conference is scheduled
for 4:30 PM on October 13, 2004, in Courtroom 15C. If either party believes that a
dispositive motion is appropriate, that date will be converted to a pre-motion
conference.

VI. POSTSCRIPT

The subject of the discovery of electronically stored information is rapidly
evolving. When this case began more than two years ago, there was little guidance
from the judiciary, bar associations or the academy as to the governing standards.
Much has changed in that time. There have been a flood of recent
opinions--including a number from appellate courts--and there are now several
treatises on the subject. [FN121] In addition, professional groups such as the
American Bar Association and the Sedona Conference have provided very useful
guidance on thorny issues relating to the discovery of electronically stored
information. [FN122] Many courts have adopted, or are considering adopting, local
rules addressing the subject. [FN123] Most recently, the Standing Committee on
Rules and Procedures has approved for publication and public comment a proposal
for revisions to the Federal Rules of Civil Procedure designed to address many of
the issues raised by the discovery of electronically stored information. [FN124]

FN121. See MICHAEL ARKFELD, ELECTRONIC DISCOVERY AND EVIDENCE (2003); ADAM

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                     Page 28

2004 WL 1620866 (S.D.N.Y.), 94 Fair Empl.Prac.Cas. (BNA) 1, 85 Empl. Prac. Dec. P
41,728

**(Cite as: 2004 WL 1620866 (S.D.N.Y.))**

> F. COHEN & DAVID J. LENDER, ELECTRONIC DISCOVERY: LAW AND PRACTICE (2004).
>
> FN122. *See* Memorandum from Gregory P. Joseph & Barry F. McNeil, *Electronic
> Discovery Standards -Draft Amendments to ABA Civil Discovery Standards* (Nov.
> 17, 2003), available at http://
> www.abanet.org/litigation/taskforces/electronic/document.pdf; The Sedona
> Conference, *The Sedona Principles: Best Practices Recommendations &
> Principles for Addressing Electronic Document Production* (January 2004),
> available at http://www.thesedonaconference.org/publications_html.
>
> FN123. *See, e.g.*, E.D. Ark. Local Rule 26.1; W.D. Ark. Local Rule 26.1; D.
> Wy. Local Rule 26.1; D.N.J. Local Rule 26.1(d); *see also* Memorandum from the
> Ninth Circuit Advisory Board, *Proposed Model Local Rule on Electronic
> Discovery*, available at http://
> www.krollontrack.com/LawLibrary/Statutes/9thCirDraft.pdf, D. Kan. *Electronic
> Discovery Guidelines*; D. Del. *Default Standards for Discovery of Electronic
> Document*. In addition, a number of states have adopted rules governing
> electronic discovery. *See, e.g.*, Miss. R. Civ. P. 26; Tex.R. Civ. P. 193.3,
> 196.4. With the exception of the proposed Ninth Circuit model rule, all of
> these rules are collected at http:// www.kenwithers.com/rulemaking/.
>
> FN124. The proposals forwarded from the Civil Rules Advisory Committee to
> the Standing Committee can be found on pages 20-70 of the memorandum
> available at http://
> www.kenwithers.com/rulemaking/civilrules/report051704.pdf. Those proposals
> were subsequently revised by the Standing Committee; the final text of the
> proposed rules that will be published for comment should be available some
> time in August 2004.

**\*16** Now that the key issues have been addressed and national standards are
developing, parties and their counsel are fully on notice of their responsibility
to preserve and produce electronically stored information. The tedious and
difficult fact finding encompassed in this opinion and others like it is a great
burden on a court's limited resources. The time and effort spent by counsel to
litigate these issues has also been time-consuming and distracting. This Court,
for one, is optimistic that with the guidance now provided it will not be
necessary to spend this amount of time again. It is hoped that counsel will heed
the guidance provided by these resources and will work to ensure that
preservation, production and spoliation issues are limited, if not eliminated.
SO ORDERED:

2004 WL 1620866 (S.D.N.Y.), 94 Fair Empl.Prac.Cas. (BNA) 1, 85 Empl. Prac. Dec. P
41,728

### Motions, Pleadings and Filings (Back to top)

• 2003 WL 23724585 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2004 WL 1620866 (S.D.N.Y.), 94 Fair Empl.Prac.Cas. (BNA) 1, 85 Empl. Prac. Dec. P 41,728

(Cite as: 2004 WL 1620866 (S.D.N.Y.))

of Law in Opposition to Plaintiff's Motion for an Order Compelling Defendants to Produce E-Mails, Permitting Disclosure of Deposition Transcript and Directing Defendants to Bear Certain Expenses (Mar. 21, 2003)

• 2002 WL 32632000 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum of Law in Opposition to Plaintiff's Motion to Compel Discovery (Oct. 09, 2002)

• 2002 WL 32631998 (Trial Pleading) Answer (Mar. 12, 2002)

• 1:02CV01243 (Docket)

(Feb. 15, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                              Page 1

2004 WL 1895122 (N.D.Ill.), 94 Fair Empl.Prac.Cas. (BNA) 627

(Cite as: 2004 WL 1895122 (N.D.Ill.))

**H**

Motions, Pleadings and Filings

United States District Court,
N.D. Illinois, Eastern Division.
Amy WIGINTON, Kristine Moran, Norma Plank Fethler, Andrea Corey and Olivia
Knapp, individually and on behalf of all persons similarly situated,
Plaintiffs,
v.
CB RICHARD ELLIS, INC., Defendant.
No. 02 C 6832.

Filed Sept. 25, 2002.
Aug. 10, 2004.

Steve W. Berman, Jeniphr AE Breckenride, Nicholas Styant-Browne,   Hagens &
Berman, Seattle, WA, Kenneth A. Wexler, Elizabeth A. Fegan, Wexler Firm LLP,
Chicago, IL, Michael Lawrence Duffy, Jennifer Fountain Connolly, Renee Lynn
Zipprich, The Wexler Firm, Chicago, IL, Daniel E Gustafson, Karla Gluck, Gustafson
Gluck PLLC, Minneapolis, MN, Jo-Dee Favre-Jones, Favre Law Office, LLC,
Belleville, IL, for Amy Wiginton, individually and on behalf of all persons
similarly situated, plaintiff.

Steve W. Berman, Jeniphr AE Breckenride, Nicholas Styant-Browne,   Kenneth A.
Wexler, Elizabeth A. Fegan, Michael Lawrence Duffy, Jennifer Fountain Connolly,
Renee Lynn Zipprich, Daniel E Gustafson, Karla Gluck, Jo-Dee Favre-Jones, (See
above), for Kristine Moran, individually and on behalf of all persons similarly
situated, plaintiff.

Steve W. Berman, Jeniphr AE Breckenride, Nicholas Styant-Browne,   Kenneth A.
Wexler, Elizabeth A. Fegan, Michael Lawrence Duffy, Jennifer Fountain Connolly,
Renee Lynn Zipprich, Daniel E Gustafson, Karla Gluck, Jo-Dee Favre-Jones, (See
above), for Andrea Corey, plaintiff.

Steve W. Berman, Jeniphr AE Breckenride, Nicholas Styant-Browne,   Kenneth A.
Wexler, Elizabeth A. Fegan, Michael Lawrence Duffy, Jennifer Fountain Connolly,
Renee Lynn Zipprich, Daniel E Gustafson, Karla Gluck, Jo-Dee Favre-Jones, (See
above), for Olivia Knapp, individually, and on behalf of all persons similarly
situated, plaintiff.

Steve W. Berman, Jeniphr AE Breckenride, Nicholas Styant-Browne,   Kenneth A.
Wexler, Elizabeth A. Fegan, Jennifer Fountain Connolly, Renee Lynn Zipprich,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                             Page 2

2004 WL 1895122 (N.D.Ill.), 94 Fair Empl.Prac.Cas. (BNA) 627

(Cite as: 2004 WL 1895122 (N.D.Ill.))

Daniel E Gustafson, Karla Gluck, Jo-Dee Favre-Jones, (See above), for Dondi Plank,
plaintiff.

Michael Lawrence Duffy, (See above), for Norma Plank Fethler suc Dondi Plank,
plaintiff.

Brenda H. Feis, Sari M. Alamuddin, Christopher James DeGroff,  Deborah S. Davidson
, Seyfarth Shaw, Chicago, IL, for CB Richard Ellis, defendant.

Kenneth A. Wexler, Elizabeth Fegan Hartweg, Jennifer Fountain Connolly, The
Wexler Firm, Chicago, IL, Nicholas Styant-Browne, Hagens Berman, L.L.P., Seattle,
WA, Daniel E. Gustafson, Karla Gluek, Renae Steiner, Gustafson Gluek, P.L.L.C.,
Minneapolis, MN, JoDee Favre, Favre & Allen, Belleville, IL, for Plaintiff.

Brenda H. Feis, Sari M. Alamuddin, Deborah S. Davidson, Seyfarth Shaw, Chicago,
IL, for Defendant.

*MEMORANDUM OPINIONS AND ORDER*

ASHMAN, Magistrate J.

*1 Plaintiffs have filed a Motion for Costs for Electronic Discovery .   [FN1]
They argue that Defendant CB Richard Ellis, Inc. ("CBRE") should bear the costs of
searching CBRE's e-mail backup tapes to find documents containing pornographic
terms and images, as well as documents relating to CBRE's workplace environment
generally, due to the large number of these types of documents that have been
found in a controlled sampling. CBRE responds that only a small fraction of the
e-mails that have been found contain arguably relevant material and that it should
not be forced to pay for the search or production. For the following reasons the
Court grants Plaintiffs' motion in part and denies it in part.

> FN1. This matter is before the Court pursuant to 28 U.S.C. § 636(b)(1)(A)
> and Local Rule 72.1.

*I. Background*

Plaintiffs filed this class action complaint against CBRE alleging a nationwide
pattern and practice of sexual harassment at the CBRE offices.  [FN2] As evidence
of the hostile work environment prevalent at the offices of CBRE, Plaintiffs seek
discovery of pornographic material that they claim was distributed electronically
(i.e., via e-mail) and displayed on computers throughout the offices.

> FN2. Further background of this case is set forth in this Court's Report and
> Recommendation of October 24, 2003, and familiarity with such facts is
> presumed.

CBRE initially produced 94 monthly e-mail backup tapes from 11 offices.  [FN3]
The backup tapes consist of the e-mails that existed on a given server at the time
the backup is made. They are not a complete depiction of every e-mail that existed

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3

2004 WL 1895122 (N.D.Ill.), 94 Fair Empl.Prac.Cas. (BNA) 627

(Cite as: 2004 WL 1895122 (N.D.Ill.))

on the CBRE system during a month. Kroll Ontrack, an electronic discovery service, was retained by Plaintiffs to restore and extract the user e-mails from the tapes, perform searches for keywords and file attachment types, and load the results of the searches onto Kroll's ElectronicDataViewer ("EDV"), an Internet-based system, for review.

> FN3. According to the revised affidavit of Joel Bothoff, a Kroll project manager, Kroll received tapes from 10 offices. According to the Joint Stipulation of Facts, tapes from 11 offices were received.

Kroll was instructed to process one monthly tape from each of three offices. [FN4] It correctly searched the August 1999 tape for the Chicago office, the June 1999 tape for the St. Louis office, and inadvertently searched the June 1999 tape for the Columbus office, instead of the Oak Brook office. Kroll recovered over two hundred thousand documents from the tapes, referred to as the "processing set." Next, Kroll searched the documents for a 92 pornographic term and six disciplinary term search list using a processing engine which is able to search in the text of the documents and in metadata (embedded data in an electronic document). The processing engine can find the terms at the beginning, middle or end of a word or series of symbols. Kroll searched the documents and provided the resulting review set to Plaintiffs' counsel, who noted that spam had not been removed from the review set. For purposes of this motion, the parties have defined "spam" as anything received from outside the company, or sent solely to someone outside the company from inside the company so that the review set would contain only e-mails transmitted from a CBRE employee to at least one CBRE employee.

> FN4. If pornographic pictures or movies existed, they would likely be found in certain types of file attachments, such as GIF or JPEG files. It does not appear that such files were searched.

Kroll processed the documents again to remove spam from the review set. It also removed documents that did not contain a search term but that would otherwise be counted as a hit due to family cascading--a phenomenon whereby a document related to a document containing a hit are counted as two separate hits even if the related document does not contain a search term. For example, an e-mail that contains a search term with an attachment that does not contain a search term was counted as two hits even if the attachment did not contain a hit. After accounting for spam and family cascading, Kroll provided the parties with the new review set which contained 17,375 documents. At this point, Kroll also gave the parties a new estimate of costs to process the tapes from the 11 offices. Although the original estimates of the project ranged from $46,000 to $67,000, due to the large number of documents containing the pornographic and disciplinary search terms, Kroll revised its cost estimate and advised the parties it could cost up to $249,000 to perform the work.

*2 In the meantime, before the parties had the opportunity to review the most recent processing set, the Court ordered the parties to each choose four terms from the list of search terms developed by Plaintiffs. Plaintiffs instructed Kroll

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2004 WL 1895122 (N.D.Ill.), 94 Fair Empl.Prac.Cas. (BNA) 627

(Cite as: 2004 WL 1895122 (N.D.Ill.))

to search for the eight terms and produce all of the documents containing search terms. [FN5] Kroll was also instructed to use the process of de-duplication, the process whereby documents which appear in a user's mailbox on multiple days are not counted as multiple hits. For example, if the same e-mail appeared in an inbox over a period of several months, only one copy of the document would be produced. After de-duplication, Kroll found 8,660 documents by searching for the 8 search terms, and by accounting for spam and family-cascading.

> FN5. Plaintiffs chose "sex," "kiss," "breast," and "porn." CBRE selected "behavior," "discipline," "inappropriate," and "oral."

At this point, we note that discussing documents in terms of numbers is somewhat inexact. For example, an e-mail containing a search term that exists in a user's outbox, and also exists in another user's inbox, counts as two hits, even though it is really one document. A document containing a search term that is sent from one user to another, and returned under the "reply with history" option available on CBRE's e-mail system counts as two hits. But, because of de-duplication, an e-mail that is present multiple times in one user's mailbox is not counted multiple times. So although talking about documents in terms of numbers is not entirely accurate, the search system was designed to get an idea of how frequently the documents containing search terms were being passed around by CBRE users within or between the offices. Because spam was eliminated, it means the picture does not present an entirely accurate view of any other pornographic e-mails that maybe have been available on the CBRE e-mail system, or how often users are opening such documents in view of other people. The numbers also do not reflect e-mails that were not captured on backup tapes.

The parties are able to view the documents on Kroll's EDV, a software program designed for viewing electronic documents such as these. One problem with the EDV, however, is that the search engine is not as advanced as the initial processing search engine that was used to find the 8,660 documents. The EDV search engine can find words with root extenders (e.g. "kiss!" finds kiss, kissing, kissed), but unlike the original search engine, the EDV search engine only finds search terms located at the beginning of words (so *moral* is a hit on the original search, but not through the EDV). The parties also discovered that family cascading was still a problem. Therefore, in the end, the parties reviewed approximately 1/3 of the documents (2,667), and have agreed that the remaining documents are "non-responsive." The Court, therefore, likewise considers the remaining documents as non-responsive.

The parties have manipulated the numbers and categorized the 8,660 documents in various ways that supports their respective positions. Plaintiffs claim that 567 of the documents are responsive, i.e., are pornographic or are documents reflecting CBRE policies and procedures. Therefore they calculate that 567 of the 2,667 documents were responsive, for a 21.3% responsive rate. This is technically accurate—21.3% of the documents that the parties reviewed were responsive. By agreeing that the remaining unreviewed documents were non-responsive, the parties effectively agreed, however, that the pertinent number for the denominator was the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 5

2004 WL 1895122 (N.D.Ill.), 94 Fair Empl.Prac.Cas. (BNA) 627

(Cite as: 2004 WL 1895122 (N.D.Ill.))

8,660 documents. Therefore, (567/8,660) equals a 6.5% responsive rate. Defendants
of course have calculated a much smaller responsive rate, and claim that the
parties have identified only (142/8,660) documents as responsive, for a 1.64%
responsive rate.

                                   II. *Discussion*

  A. General Principles

  *3 Guiding this Court's decision are the overarching principles of Federal Rule
of Civil Procedure 26. Under the familiar language, a party may seek discovery of
"any matter, not privileged, that is relevant to the claim or defense of any
party.... Relevant information need not be admissible at the trial if the
discovery appears reasonably calculated to lead to the discovery of admissible
evidence." Fed.R.Civ.P. 26(b)(1). The court may limit discovery if it determines
that the burden of the discovery outweighs its likely benefit. Fed.R.Civ.P.
26(b)(2)(iii). To make this determination, the Court will consider what has been
dubbed the proportionality test of Rule 26(b)(2)(iii): the needs of the case, the
amount in controversy, the resources of the parties, the importance of the issues
at stake in the litigation, and the importance of the proposed discovery in
resolving the issues. In this way, parties are protected from unduly burdensome or
expensive discovery requests. Fed.R.Civ.P. 26(c).

  The Court also begins this discussion with the general presumption in discovery
that the responding party must bear the expense of complying with discovery
requests. *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 358 (1978). However, if
the responding party asks the court for an order protecting it from "undue burden
or expense," the court may shift the costs to the non producing party, rather than
just disallowing the requested discovery. Fed.R.Civ.P. 26(c); *Oppenheimer Fund,
Inc.,* 437 U.S. at 358; *Rowe Entm't v. The William Morris Agency, Inc.,* 205 F.R.D.
421, 428 (S.D.N.Y.2002); Fed. R. Civ. Pro. 34, Advisory Committee Notes, 1970
Amendment ("courts have ample power under Rule 26(c) to protect respondent against
undue burden or expense, either by restricting discovery or requiring that the
discovering party pay costs").

  B. Standards for Discovery of Electronic Data

  Electronic data, such as e mails, are discoverable. As contrasted with
traditional paper discovery, e-discovery has the potential to be vastly more
expensive due to the sheer volume of electronic information that can be easily and
inexpensively stored on backup media. *Zubulake v. UBS Warburg LLC,* 217 F.R.D. 309,
316 (S.D.N.Y.2003) ("*Zubulake I*"); *Byers v. Ill. State Police,* No. 99 C 8105,
2002 WL 1264004, at *10 (N.D. Ill. June 3, 2002). Depending on how the electronic
data is stored, it can be difficult, and hence expensive, to retrieve the data and
search it for relevant documents. Theoretically, as technology improves,
retrieving and searching data will become more standard and less costly. *See e.g.,
Discovery By Keyword Search,* 15 No. 3 Prac. Lit. 7 (2004).

  In the meantime, until the technology advances and e-discovery becomes less

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 6

2004 WL 1895122 (N.D.Ill.), 94 Fair Empl.Prac.Cas. (BNA) 627

(Cite as: 2004 WL 1895122 (N.D.Ill.))

expensive, cost will continue to be an issue as parties battle over who will foot
the bill. In the electronic arena, three main tests have been suggested to
determine when it is appropriate to shift the costs of searching and producing
inaccessible data to the requesting party in order to protect the producing party
from unduly burdensome e-discovery requests. [FN6]

> FN6. *See cf. Zubulake v. UBS Warburg LLC*, 216 F.R.D. 280, 284 (S.
> D.N.Y.2003) ("*Zubulake II*") (suggesting that cost-shifting is only
> appropriate when, as here, the data to be searched is inaccessible).

*4 First, under the marginal utility approach, the more likely it is that the
search will discover critical information, the fairer it is to have the responding
party search at its own expense. *McPeek v. Ashcroft*, 202 F.R.D. 31, 34
(Dist.D.C.2001). Next, the court in *Rowe* created eight factors for consideration
in the cost-shifting analysis, one of which incorporated the marginal utility test.
[FN7] 205 F.R.D. at 429. Finally, the court in *Zubulake I* modified the *Rowe* test
to account for the fact that it interpreted the *Rowe* test as generally favoring
cost-shifting, which had ignored the presumption that the responding party pays
for discovery. [FN8] 217 F.R.D. at 320. We agree with both the *Rowe* court and the
*Zubulake* court that the marginal utility test is the most important factor.
Furthermore, while we are guided by the remainder of the *Rowe* and *Zubulake*
factors, we find that the proportionality test set forth in Rule 26(b)(2)(iii)
must shape the test. Thus, we modify the *Zubulake* rules by adding a factor that
considers the importance of the requested discovery in resolving the issues of the
litigation.

> FN7. The eight factors are: (1) the specificity of the discovery requests;
> (2) the likelihood of discovering critical information; (3) the availability
> of such information from other sources; (4) the purposes for which the
> responding party maintains the requested data; (5) the relative benefit to
> the parties of obtaining the information; (6) the total cost associated with
> production; (7) the relative ability of each party to control costs and its
> incentive to do so; and (8) the resources available to each party. *Rowe*, 205
> F.R.D. at 429.

> FN8. The seven *Zubulake* factors are (1) the extent to which the request is
> specifically tailored to discover relevant information; (2) the availability
> of such information from other sources; (3) the total cost of production,
> compared to the amount in controversy; (4) the total cost of production,
> compared to the resources available to each party; (5) the relative ability
> of each party to control costs and its incentive to do so; (6) the
> importance of the issues at stake in the litigation; and (7) the relative
> benefits to the parties of obtaining the information. 217 F.R.D. at 322. We
> agree with the court in *Zubulake* that the fourth *Rowe* factor (the purposes
> for which the responding party maintains the requested data) is not
> important.

Therefore, we will consider the following factors: 1) the likelihood of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2004 WL 1895122 (N.D.Ill.), 94 Fair Empl.Prac.Cas. (BNA) 627

(Cite as: 2004 WL 1895122 (N.D.Ill.))

discovering critical information; 2) the availability of such information from other sources; 3) the amount in controversy as compared to the total cost of production; 4) the parties' resources as compared to the total cost of production; 5) the relative ability of each party to control costs and its incentive to do so; 6) the importance of the issues at stake in the litigation; 7) the importance of the requested discovery in resolving the issues at stake in the litigation; and 8) the relative benefits to the parties of obtaining the information. At all times we keep in mind that because the presumption is that the responding party pays for discovery requests, the burden remains with CBRE to demonstrate that costs should be shifted to Plaintiffs. *See Zubulake II*, 216 F.R.D. at 283.

C. Application of the Eight Factors

*Marginal Utility*

1. *The likelihood of discovering critical information.* [FN9]

FN9. *Rowe*, 205 F.R.D. at 430 (second factor); *McPeek*, 202 F.R.D. at 34.

When the matter is initially brought to the court's attention, the extent to which the request appears to be specifically tailored to discover relevant information may help the court weigh this factor. *Zubulake I*, 217 F.R.D. at 323 (first factor); *Rowe*, 205 F.R.D. at 429 (first factor); *Byers*, 2002 WL 1264004, at *12 (shifting costs to requesting party where it was unlikely the search would uncover relevant information). If a test run is ordered, as in this case, the actual results of the test run will be indicative of how likely it is that critical information will be discovered.

The 8 term search list chosen by the parties contains five pornographic terms, four of which were selected by Plaintiffs, and three disciplinary terms, all three of which were chosen by CBRE. The 8 term search resulted in 8,660 hits. Whether many of the resulting documents are actually responsive is subject to debate by the parties, and they have gone to great lengths to characterize the documents in various ways that support their respective positions. Plaintiffs have identified at least 567 documents as being responsive which is a 6.5% responsive rate. [FN10] These documents include graphic pornographic images, sexual correspondence and jokes, and CBRE policies and procedures regarding the circulation of inappropriate e-mail and the visitation of inappropriate websites, as well policies relating to sexual harassment. Plaintiffs also claim they recovered documents demonstrating the demeaning attitude of CBRE towards its female employees pervading the work environment. Some of these documents appeared in multiple user accounts which supports Plaintiffs' theory that these types of documents were being spread throughout the offices. On the other hand, some of these documents were sent from a single user to another single user. There is nothing to indicate that any CBRE employee indicated that these e-mails were offensive or that any employee refused any future such e-mails. Furthermore, Plaintiffs do not explain how one-to-one e-mails support their theory of a hostile work environment.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2004 WL 1895122 (N.D.Ill.), 94 Fair Empl.Prac.Cas. (BNA) 627

(Cite as: 2004 WL 1895122 (N.D.Ill.))

> FN10. Considering only documents that were actually reviewed by the parties (2,667) would result in a 21.3% response rate. However, we find that the number of documents in the denominator of the equation is the 8,660 hits found by the 8 term search because the parties agreed that the remaining unreviewed documents would be deemed non-responsive for purposes of this motion. (Jt. Stip. of Facts ¶ 30.)

*5 CBRE disputes these classifications, arguing that the majority of the 8,660 documents are not even relevant, extrapolating the results of the documents that were reviewed to all the documents that were found. It asserts that many of the e-mails were not considered offensive to the women who received them, or were sent from men to men. [FN11] CBRE's interpretation of the women's tolerance to sexually explicit e-mails, however, is necessarily slanted in its own favor, and there is no information regarding whether women routinely viewed other people's e-mails, such as secretaries who accessed their bosses' e-mails as part of their job requirements. CBRE would further decrease the number of relevant documents by excluding documents concerning CBRE's policies and procedures. It was CBRE, however, who chose the three disciplinary search terms so it cannot now complain now that the terms it selected successfully found the documents they were intended to find. Therefore, under CBRE's analysis, even excluding what CBRE has characterized as male-to-male e-mails, there are 386 responsive documents. [FN12] This is a 4.5% responsive rate.

> FN11. The parties spend a significant amount of time parading the other side's mistakes in front of the Court, while neglecting to provide factual support to their assertions that would be useful to the Court.

> FN12. Calculated as follows: (142 mutually responsive documents) + (244 policy documents) = 386. CBRE claims that all the relevant policy documents have already been produced to Plaintiffs. Plaintiffs assert that most of the documents have never been produced but are clearly relevant. The Court agrees that these documents may be relevant, such as a March 7, 2001 e-mail from the IT department sent to field technical support stating, in part, that "due to some serious employee issues lately, I want to make sure you are all dead clear on the appropriate use of e-mail within CBRE."

Before determining whether this factor supports cost-shifting, we will consider whether this information is available from other sources.

2. *The availability of such information from other sources.* [FN13]

> FN13. *Zubulake I,* 217 F.R.D. at 323 (second factor); *Rowe,* 205 F.R.D. at 430 (third factor).

If the information is available from another source, the marginal utility from the e-discovery is low, and would support cost-shifting. These first two factors which comprise the marginal utility test are the most important, because the more likely it is that relevant information will be discovered, the fairer it is to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 9

2004 WL 1895122 (N.D.Ill.), 94 Fair Empl.Prac.Cas. (BNA) 627

(Cite as: 2004 WL 1895122 (N.D.Ill.))

make the responding party pay for the information. *Zubulake I*, 217 F.R.D. at 323.

Clearly, relevant information on CBRE's backup e-mail tapes is only available through restoring and searching the backup tapes unless it has been previously produced by CBRE. The test search did result in relevant documents that had not been produced by CBRE. Specifically, although CBRE argues that it has produced relevant policy documents, we note that the search did find policy documents that had not been previously produced, as well as e-mails containing pornographic material which had not been produced and are not available through any other source. In addition to confirming the existence of relevant documents on backup tapes that have not been restored, it is likely that there were relevant documents that have already been destroyed as CBRE failed in its duty to preserve relevant electronic information. [FN14]

> FN14. Further detail is set forth in this Court's Report and Recommendation of October 24, 2003.

Given that the search resulted in a 4.5 to 6.5% responsive rate, and that the majority of the documents are not available from another source, we consider whether the marginal utility factors support shifting the cost to Plaintiffs. As a comparison, in *Zubulake II*, the test run ordered by the court resulted in 1,075 e-mails after duplicates were eliminated, 600 of which were deemed responsive by the defendant (or 55.8%), and 68 of which were identified by the plaintiff as directly supporting her gender discrimination claim (6.3%). 216 F.R.D. at 282, 285 . The court found that although all the documents had some relevancy to the claims of the case, not one e-mail provided any direct evidence of discrimination. *Id.* at 286. The most the e-mails demonstrated was the "dysfunctional atmosphere" in which the plaintiff worked. *Id.* at 285. The court, nevertheless, found that there was a "speculative" chance that the remaining backup tapes would provide evidence of direct discrimination, especially because some of the restored evidence indicated that the plaintiff's supervisor had intentionally deleted especially relevant e-mail. *Id.* at 287. It therefore found that the marginal utility was potentially high due to the types and number of documents that had been recovered, and that the test tipped slightly against cost-shifting even though the actual number of recovered relevant documents was low. *Id.*

*6 In this case, the search has resulted in a small number of relevant documents, although substantially less than in *Zubulake*, as would be expected. In *Zubulake*, the plaintiff was able to narrow her search to five employees and used only search terms involving her name and initials. In this case, Plaintiffs are attempting to prove that discrimination existed in CBRE offices across the nation. Although CBRE argues that the number of pornographic and policy documents are only a minuscule fraction of the total documents on the backup tapes, [FN15] we decline to determine at this juncture exactly what percentage of documents on the e-mail system would prove a hostile environment. But, because the test results are partially based on Plaintiffs' selection of what Plaintiffs believed are words or terms most likely to produce evidence of a sexually hostile atmosphere, the Court is of the opinion that the percentage of sexually objectionable e-mails is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2004 WL 1895122 (N.D.Ill.), 94 Fair Empl.Prac.Cas. (BNA) 627

(Cite as: 2004 WL 1895122 (N.D.Ill.))

substantially lower than 4.5%. It will be Plaintiffs' onus to demonstrate that
hostile environment existed in CBRE's offices; in the meantime they are entitled
to relevant information as long as it is reasonably calculated to lead to the
discovery of admissible evidence. Fed.R.Civ.P. 26(b)(1). Nevertheless, because the
search also revealed a significant number of unresponsive documents, we find that
the marginal utility test weighs slightly in favor of cost shifting. [FN16]

> FN15. CBRE misstates the issue. The question to be answered is how
> successful was the search, not how many of the total documents on their
> system are pornographic.

> FN16. CBRE discusses each factor in terms of whether it weighs in favor of
> cost-shifting to itself. The presumption is, of course, that the responding
> party pays for discovery costs, so the question for this Court is whether
> CBRE has met its burden to prove that the factors weigh in favor of shifting
> costs to Plaintiffs.

*Factors 3-5 The Cost Factors*

3. *The amount in controversy, as compared to the total cost of production.*
[FN17]

> FN17. Fed.R.Civ.P. 26(b)(2)(iii); *Zubulake I*, 217 F.R.D. at 323 (third
> factor); *Rowe*, 205 F.R.D. at 431 (sixth factor).

Plaintiffs' expert estimated that the total cost of the production would range
from $183,500 to $249,900 for ten offices considering the initial results of the
92 term search list. The parties have not addressed whether the results of the 8
term search allowed the expert to more accurately estimate the production costs.

Plaintiffs claim that should a class be certified, their class recovery could
extend into the tens of millions of dollars. While the Court cannot completely
accept Plaintiffs' speculative estimate of its potential damage award, neither can
it accept that their claims are worthless, especially considering that the burden
of proving that cost-shifting is warranted falls on CBRE's shoulders. Furthermore,
even if the class is not certified, there are still five named plaintiffs, and
their recovery is potentially high enough to justify some of the costs of
discovery. *See Xpedior Creditor Trust v. Credit Suisse First Boston (USA), Inc.*,
309 F.Supp.2d 459, 466 (S.D.N.Y.2003) (noting that even if a class were not
certified, the named plaintiff's claims were potentially worth tens of millions of
dollars). *See also Zubulake II*, 216 F.R.D. at 288 (noting that the case was not a
nuisance value case, a small case, or a frivolous case).

CBRE would have the Court find that the total cost of production for all of its
offices nationwide would stretch into the millions of dollars, ignoring the fact
that discovery has been limited to only a small fraction of the 125 offices.
Nevertheless, several hundred thousand dollars for one limited part of discovery
is a substantial amount of actual dollars to pay for such a search. Therefore,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                              Page 11

2004 WL 1895122 (N.D.Ill.), 94 Fair Empl.Prac.Cas. (BNA) 627

(Cite as: 2004 WL 1895122 (N.D.Ill.))

this factor weighs in favor of cost-shifting.

  4. *The parties' resources, as compared to the total cost of production.*   [FN18]

       FN18. Fed.R.Civ.P. 26(b)(2)(iii); *Zubulake I,* 217 F.R.D. at 324 (fourth
       factor); *Rowe,* 205 F.R.D. at 431 (sixth factor).

*7 According to its website, CBRE is "the global leader in real estate services."
As stated on its most recent from 10 K/A, CBRE had net revenues of 1.6 billion
dollars for fiscal year 2003. Plaintiffs, who include former employees of CBRE,
are clearly at a serious financial disadvantage. Plaintiffs' counsel, however,
obviously has been willing to front substantial amounts of money, and probably
could contribute to these discovery costs. *See Zubulake II,* 216 F.R.D. at 288
(noting that it is common for plaintiff's firms to front huge expenses when the
recovery is potentially millions of dollars). CBRE is now put in the awkward
position of reversing its previous argument for factor number three that this case
is not worth much money, because now it must argue that the case is potentially
worth millions, so that costs should be shifted to Plaintiffs. Because we found
that the recovery in this case is potentially high, but we also now find that
CBRE's resources are large compared to the total cost of production, we find that
this factor weighs against cost-shifting. *See Xpedior,* 309 F.Supp.2d at 466
(finding that this factor weighs against cost-shifting where defendant's assets
dwarfed plaintiff's assets even if plaintiff's attorney could contribute).

  5. *The relative ability of each party to control costs and its incentive to do so.*
  [FN19]

       FN19. *Zubulake I,* 217 F.R.D. at 323 (fifth factor); *Rowe,* 205 F.R.D. at
       431-32 (seventh factor).

  In most cases, both parties will likely have the ability and desire to control
costs. The requesting party should have an incentive for limiting its requests,
and the responding party may have an incentive for using accessible searchable
media, or for pressuring its software contractors to create such media or
software. The responding party may also employ cost-saving measures, such as
performing a key word search for a privilege review rather than examining each
document.

  In this case, it appears that the ability to control costs partially pivots
around the selection of the vendor. Plaintiffs have agreed to work with CBRE to
jointly select a new electronic discovery service and to minimize costs to the
extent it is possible to do so. The costs of the search, however, are also driven
to some extent by the scope of the search as selected by Plaintiffs. A smaller
search term list would result in less hits, and less documents that must be
transferred to an electronic viewer. For example, words that did not result in a
large number of documents could be taken off the term search list. Documents that
are non-responsive and appear multiple times (such as an e-mail discussing a virus
with the words sexyvirgin) could easily be searched for and eliminated. However,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 12

2004 WL 1895122 (N.D.Ill.), 94 Fair Empl.Prac.Cas. (BNA) 627

(Cite as: 2004 WL 1895122 (N.D.Ill.))


Plaintiffs' search must necessarily be broad, due to the nature of the information for which they are searching. Therefore, we find that this factor slightly weighs in favor of cost-shifting.

*Remaining Factors*

6. *The importance of the issues at stake in the litigation.* [FN20]

> FN20. Fed.R.Civ.P. 26(b)(2)(iii); *Zubulake I*, 217 F.R.D. at 323 (sixth factor).

Plaintiffs cite *Zubulake II* for the proposition that this factor "will only rarely come into play ... [and that] discrimination in the workplace ... is hardly unique." 216 F.R.D. at 289 (quotation omitted); *see also Xpedior*, 309 F.Supp.2d at 466 (finding that a potential class action involving manipulation of the securities market does not raise the kind of public policy issues that might affect cost-shifting). Because the parties agree that this factor is neutral, we find that it does not weigh in favor of or against cost-shifting.

7. *The importance of the requested discovery in resolving the issues at stake in the litigation.*

*8 As this is a factor explicitly set forth in Rule 26(b)(2)(iii), we add it to the Rowe and Zubulake analysis. *See In re Gen. Instrument Corp.*, No. 96 C 1129, 1999 WL 1072507, at *6 (N.D.Ill. Nov. 18, 1999) (denying plaintiffs' motion to compel where plaintiffs did not identify any specific factual issue for which additional discovery would help them prove their case).

CBRE argues that Plaintiffs' claims are not primarily based on pornographic material that may have been circulating through its offices. Plaintiffs respond that this information supports their hostile environment claim. Plaintiffs are entitled to obtain discovery relevant to their claims, as long as the discovery is reasonably calculated to lead to the discovery of admissible evidence. *See* Fed.R.Civ.P. 26(b)(1). If relevance is in doubt, courts should err on the side of permissive discovery. *Channelmark Corp. v. Destination Prods. Int'l, Inc.*, 99 C 214, 2000 WL 968818, at *2-3 (N.D.Ill. July 7, 2000). As there is reason to believe that the requested discovery would assist in resolving the issues at stake in this case, but because there is also other evidence to support Plaintiffs' claims, we find that this factor weighs slightly in favor of cost-shifting.

8. *The relative benefits to the parties of obtaining the information.*   [FN21]

> FN21. *Zubulake I*, 217 F.R.D. at 325 (seventh factor); *Rowe*, 205 F.R.D. at 431 (fifth factor).

This factor is the least important because in discovery the requested information is more likely to benefit the requesting party. *See Zubulake I*, 217 F.R.D. at 323 (finding that this is the least important factor because the requesting party

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 13

2004 WL 1895122 (N.D.Ill.), 94 Fair Empl.Prac.Cas. (BNA) 627

(Cite as: 2004 WL 1895122 (N.D.Ill.))


usually benefits from its requests). In some cases, the information may aid the
producing party, in which case it is more fair to require the producing party to
pay for the discovery. In this case, the information requested will benefit
Plaintiffs more than CBRE. Therefore, this factor is neutral.

  D. Summary

  Factors 1 and 2, the most important factors, weigh slightly in favor of
cost-shifting to Plaintiffs. For the cost factors: factor 3 weighs in favor of
cost-shifting; factor 4 weighs against cost-shifting; and factor 5 weighs slightly
in favor of cost-shifting. Factor 6 is neutral; factor 7 weighs slightly in favor
of cost-shifting; and factor 8 is neutral.

  Therefore, because the factors favor cost-shifting, but the presumption is that
the responding party pays for discovery costs, we find that CBRE should bear 25%
and Plaintiffs 75% of the discovery costs of restoring the tapes, searching the
data, and transferring it to an electronic data viewer. Each party will bear their
own costs of reviewing the data and printing documents, where necessary.

                                    IV. Conclusion
  For the foregoing reasons, Plaintiffs' motion for costs is granted in part and
denied in part as stated in this opinion.

  2004 WL 1895122 (N.D.Ill.), 94 Fair Empl.Prac.Cas. (BNA) 627


                        Motions, Pleadings and Filings (Back to top)

• 2004 WL 1686035 (Trial Pleading) Answer and Affirmative Defenses to Third
Amended Class Action Complaint (May. 27, 2004)

• 2004 WL 1686031 (Trial Pleading) Answer and Affirmative Defenses to Third
Amended Class Action Complaint (May. 19, 2004)

• 2004 WL 1686027 (Trial Pleading) Third Amended Class Action Complaint (Apr. 22,
2004)

• 2004 WL 1686023 (Trial Pleading) Answer and Affirmative Defenses to Second
Amended Class Action Complaint (Feb. 27, 2004)

• 2004 WL 869785 (Trial Pleading) Answer and Affirmative Defenses to Second
Amended Class Action Complaint (Feb. 27, 2004)

• 2004 WL 869787 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion for
Leave to File Additional Exhibit to Plaintiffs' Supplement to Memorandum in
Support of Motion for Costs for Electronic Discovery and Request for a
Determination of Law (Feb. 23, 2004)

• 2004 WL 869783 (Trial Motion, Memorandum and Affidavit) Defendant's Unopposed

                    © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 14

2004 WL 1895122 (N.D.Ill.), 94 Fair Empl.Prac.Cas. (BNA) 627

(Cite as: 2004 WL 1895122 (N.D.Ill.))

Motion to File Instanter Its Response Beyond Local Rule Page Limit (Feb. 17, 2004)

• 2004 WL 1686018 (Trial Pleading) Second Amended Class Action Complaint (Feb. 09, 2004)

• 2004 WL 869781 (Trial Pleading) Second Amended Class Action Complaint (Feb. 09, 2004)

• 2004 WL 869778 (Trial Motion, Memorandum and Affidavit) Defendant's Motion for Return of Improperly-Obtained Computer Back-Up Tapes (Jan. 28, 2004)

• 2004 WL 869777 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Supplement to Memorandum in Support of Motion for Costs for Electronic Discovery and Request for a Determination of Law (Jan. 26, 2004)

• 2004 WL 869779 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion for Leave to Amend First Amended Class Action Complaint (Jan. 23, 2004)

• 2004 WL 869776 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion for Extension of Time to File Supplements to Motion for Costs for Electronic Discovery (Jan. 12, 2004)

• 2004 WL 1686016 (Trial Pleading) Second Amended Class Action Complaint (Jan. 09, 2004)

• 2004 WL 869780 (Trial Pleading) Second Amended Class Action Complaint (Jan. 09, 2004)

• 2003 WL 23418204 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion for Case Management Order Permitting Second Phase Discovery and for Leave to Take More Than 10 Depositions (Dec. 22, 2003)

• 2003 WL 23418200 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion for Leave to Join Additional Plaintiffs (Nov. 24, 2003)

• 2003 WL 23418196 (Trial Motion, Memorandum and Affidavit) Defendant's Motion to Prohibit Plaintiffs' Inappropriate Media Disclosures (Nov. 19, 2003)

• 2003 WL 23418193 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion for Costs for Electronic Discovery (Nov. 17, 2003)

• 2003 WL 23418190 (Trial Motion, Memorandum and Affidavit) Defendant's Unopposed Motion for Extension of Time to File Objections to Magistrate Judge Ashman's Report and Recommendation (Oct. 30, 2003)

• 2003 WL 23418186 (Trial Motion, Memorandum and Affidavit) Defendant's Motion for Clarification of Court's September 15, 2003 Ruling on Plaintiffs' Motion to Restrict Class Communications (Sep. 18, 2003)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                           Page 15

2004 WL 1895122 (N.D.Ill.), 94 Fair Empl.Prac.Cas. (BNA) 627

(Cite as: 2004 WL 1895122 (N.D.Ill.))


• 2003 WL 23418182 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion for
Extension of Time to File Reply in Support of Plaintiffs' Cross-Motion to Modify
This Court's June 12, 2003 Order to Seek First Phase Discovery from Defendant's
Beverly Hills, California Office (Sep. 09, 2003)

• 2003 WL 23418178 (Trial Motion, Memorandum and Affidavit) Defendant's Motion for
Protective Order Concerning Plaintiffs' Beverly Hills, CA 30(b)(6) Deposition
(Aug. 14, 2003)

• 2003 WL 23418170 (Trial Motion, Memorandum and Affidavit) Defendant's Brief in
Opposition to Plaintiffs' ''Emergency Motion for Order Restricting Communications
Between Defendant and Putative Class Members'' and ''Motion for Approval of
Scientific Survey of Putative Class for Purposes of Class Certification '' (Jul.
17, 2003)

• 2003 WL 23418174 (Trial Motion, Memorandum and Affidavit) Defendant's Brief in
Opposition to Plaintiffs' ''Emergency Motion to Prevent the Further Destruction of
Evidence and for Sanctions for Spoliation of Evidence'' (Jul. 17, 2003)

• 2003 WL 23418166 (Trial Pleading) Answer and Affirmative Defenses to First
Amended Class Action Complaint (Jul. 14, 2003)

• 2003 WL 23684221 (Trial Pleading) Answer and Affirmative Defenses' to First
Amended Class Action Complaint (Jul. 14, 2003)

• 2003 WL 23418164 (Trial Motion, Memorandum and Affidavit) Defendant's Unopposed
Motion for Extension of Time to Answer or Otherwise Plead to First Amended Class
Action Complaint (Jul. 02, 2003)

• 2003 WL 23418161 (Trial Motion, Memorandum and Affidavit) Motion to Enlarge the
Time for Plaintiffs' Depositions (Jun. 26, 2003)

• 2003 WL 23418157 (Trial Pleading) First Amended Class Action Complaint (Jun. 17,
2003)

• 2003 WL 23684218 (Trial Pleading) First Amended Class Action Complaint (Jun. 17,
2003)

• 2003 WL 23418148 (Trial Motion, Memorandum and Affidavit) Plaintiff's
Supplemental Memorandum in Support of Her Motion for Sanctions for Spoliation of
Evidence and Her Motion to Compel Defendant's Compliance with Plaintiff's First
Set of Document Requests (Jun. 11, 2003)

• 2003 WL 23418151 (Trial Motion, Memorandum and Affidavit) Plaintiff's Motion for
Leave to Amend Class Action Complaint (Jun. 11, 2003)

• 2003 WL 23418154 (Trial Motion, Memorandum and Affidavit) Plaintiff's Motion for
Leave to Add Plaintiff (Jun. 11, 2003)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2004 WL 1895122 (N.D.Ill.), 94 Fair Empl.Prac.Cas. (BNA) 627

(Cite as: 2004 WL 1895122 (N.D.Ill.))


• 2003 WL 23418138 (Trial Motion, Memorandum and Affidavit) Plaintiff's Emergency
Motion to Prevent the Further Destruction of Evidence and for Sanctions for
Spoliation of Evidence (May. 19, 2003)

• 2003 WL 23418140 (Trial Motion, Memorandum and Affidavit) Emergency Motion for
Order Restricting Communications Between Defendant and Putative Class Members
(May. 19, 2003)

• 2003 WL 23418144 (Trial Motion, Memorandum and Affidavit) Plaintiff's Motion to
Compel Defendant's Compliance with Plaintiff's First Set of Document Requests
(May. 19, 2003)

• 2003 WL 23418131 (Trial Motion, Memorandum and Affidavit) Defendant's Motion for
a Protective Order and Case Management Conference (May. 14, 2003)

• 2003 WL 23418126 (Trial Motion, Memorandum and Affidavit) Agreed Motion for
Entry of Protective Order (May. 09, 2003)

• 2003 WL 23418122 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of
Law in Support of Defendant's Motion to Dismiss Plaintiff's Title VII Class Claim
(Count 1) and State Law Tort Claims (Counts II-IV) (Jan. 21, 2003)

• 2002 WL 32451882 (Trial Motion, Memorandum and Affidavit) Defendant's Unopposed
Motion for Extension of Time to File Reply in Support of its Motion to Dismiss
(Dec. 03, 2002)

• 2002 WL 32602912 (Trial Pleading) Answer and Affirmative Defenses to Count of
the Complaint (Nov. 18, 2002)

• 2002 WL 32451871 (Trial Pleading) Answer and Affirmative Defenses to Count I of
the Complaint (Nov. 13, 2002)

• 2002 WL 32451876 (Trial Motion, Memorandum and Affidavit) Defendant's Motion to
Dismiss Plaintiff's Title VII Class Claim (Count I) and State Law Tort Claims
(Counts II-IV) (Nov. 13, 2002)

• 2002 WL 32451863 (Trial Motion, Memorandum and Affidavit) Defendant's Unopposed
Motion for Extension of Time to Answer or Otherwise Plead to Plaintiff's Complaint
(Oct. 02, 2002)

• 2002 WL 32451852 (Trial Pleading) Class Action Complaint (Sep. 25, 2002)

• 1:02CV06832 (Docket)
                           (Sep. 25, 2002)

• 2002 WL 32602905 (Trial Pleading) Class Action Complaint (2002)

END OF DOCUMENT

            © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.