IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

**JAMES D. JOHNSON, ET AL**                                                           **PLAINTIFFS**

**V.**                                                                  **CIVIL ACTION NO. 3:04CV251LN**

**HALEY BARBOUR, ET AL.**                                                           **DEFENDANTS**

**MEMORANDUM RESPONSE TO PLAINTIFFS' EXPEDITED MOTION
FOR A RULE 35(a) ORDER REQUIRING DEFENDANTS TO PRODUCE NAMED
PLAINTIFF JOHN A. FOR MENTAL EXAMINATION**

**COME NOW**, Defendants, by counsel, and respond to Plaintiffs' Expedited Motion For a Rule 35(a) Order Requiring Defendants to Produce Named Plaintiff John A. for Mental Examination (the "Motion") and would show unto the Court the following:

**I. INTRODUCTION**

The Plaintiffs ask this Court to expedite their Motion for a Rule 35(a) examination of named plaintiff John A. Plaintiffs filed their initial Complaint on or about March 30, 2004, and their Amended Complaint on May 17, 2004. Accordingly, Plaintiffs have been aware of and have been making allegations with regard to John A.'s mental health for at least 18 months. Plaintiffs have also known the expert witness deadlines throughout the course of this matter. Yet at this late hour Plaintiffs ask this Court for an expedited ruling because of a retained expert's scheduling conflicts, without any regard to what is in the best interest of John A.

The Defendants have been placed in the tenuous position of responding to the request for a Rule 35 examination without having the opinions of the mental health clinic[1] and John's treating physician concerning the appropriateness, location or parameters of such an examination. On August 12, 2005, defense counsel advised Plaintiffs' counsel that it would be August 23, 2005,[2] before a report and recommendations from John A.'s treating physician could be obtained. Nevertheless, the Plaintiffs proceeded with the filing of this Motion requesting an expedited ruling. To understand why no examination of John A. should take place without the consultation and involvement of the treating physician and facility, it is necessary to understand John's history.

## II. BACKGROUND

John entered the custody of the Forrest County Department of Human Services ("FCDHS") when he was nine years old. He is currently fifteen years old and is living in the foster home of Mr. and Mrs. B., where he has lived since January of 2004.

John's mother was addicted to crack cocaine and would leave John and his siblings alone or with a friend for days at a time. FCDHS took custody of John and his siblings after John's school reported that he was exhibiting extremely violent behavior, attempting to harm himself and others. His mental status was evaluated at a mental health facility (the "Facility")[3] and he was admitted to a residential psychiatric treatment center (the "Center") where he was diagnosed with severe bipolar disorder (mood instability) with psychosis, and placed on medication. Reports indicated that John heard voices, had suicidal ideation, homicidal threats, explosive

---

[1] Facility name omitted to protect confidentiality.
[2] Consistent with the Affidavit of Ramona Lockett, Area Social Work Supervisor, attached hereto as Exhibit A, stating the report of John's treating physician and clinic would not be available until the week of August 21, 2005.
[3] Facility names have been altered to protect confidentiality.

outbursts and assaultive aggression. John was found to be severely emotionally disturbed. It was also determined that he would require special education.

Following his discharge from the Center, John was placed in the foster home of Mr. and Mrs. C. John's destructive behavior escalated, and Mr. and Mrs. C. asked that he be removed from their home.

John was placed in a licensed group home, and continued to receive outpatient therapy. While at the group home, John's behavior was sometimes quite violent. In one incident, he became agitated and aggressive, broke a window, and cut a tire. He was transferred to the Facility for treatment but his violent behavior continued. At age ten, John was five-feet five-inches tall and weighed approximately 200 pounds. He made threats against other children in his unit and was moved to a unit for older children.

After a month of therapy John was discharged from the Facility and placed in a group home in Memphis for residential treatment. John's progress report stated that his aggressive behavior had escalated in severity but not frequency; about one incident a day, throwing chairs and hitting the staff or fighting with other residents.

That April, after exhibiting psychotic symptoms, John was taken to a psychiatric hospital in Memphis for an evaluation and hospitalization was recommended. John was treated for two weeks at an in-patient facility in Meridian and was discharged to the group home in Memphis. John continued to have problems controlling his behavior, as shown by incident reports nearly every day, which included aggressive conduct directed at staff and peers, throwing chairs and destroying property, inappropriately removing his clothing, as well as self-harm by head banging, swallowing objects and cutting himself.

John was scheduled to be discharged from the group home in November. FCDHS attempted to find a therapeutic foster home for John. He was placed in the foster home of Mr. and Mrs. M., however, two days later Mr. and Mrs. M. asked that he be removed because he had hurt the foster parents' other children by squeezing their arms and slamming their fingers in doors. He then set a fire in the home. John was removed and evaluated by a counseling center in January of 2002. It was recommended that he be placed in a therapeutic group home with possible long-term in-patient psychiatric treatment.

The next week John was placed at such a home and was enrolled in the local school. His placement hearing in January ordered that he remain in the custody of FCDHS, and in June the Youth Court terminated his parents' parental rights.

John's emotional and behavioral problems persisted. John was admitted to the facility in Meridian again in early June and stayed for six weeks. In mid-July, John was placed at a licensed shelter until a place became available at a residential psychiatric treatment center. John continued to have behavioral problems, which in one incident resulted in being placed on pharmacological restraint. The Center reported that John broke into a therapist's office, kicked in the door, broke the therapist's eyeglasses, and stole a purse.

In January 2003, John was still having problems, but his school's 9-week progress report showed an improvement from the prior semester. His Youth Court Hearing & Review Summary showed: verbal altercations with peers, cursing, disregards personal boundaries (10/30); put on lock-down for hitting peer in the mouth (11/22); disregards personal boundaries with female staff (12/19); behavioral problems (1/28). The agency assessment was that as John's behavior was still unpredictable and volatile, and therefore he was not ready for adoption.

In June, the treating physician at the Center advised John's social worker that John was unable to benefit any further from the Center's program and set his discharge date for August. John's discharge summary showed: in April he kicked the door off the hinges and urinated on the floor; in June he was on restriction for slapping a resident; and his permanent plan was adoption with a concurrent plan of long-term institutionalization. In August, John was hospitalized for two weeks at a behavioral health center ("Behavioral") in the Acute Adolescent Psychiatric Unit because of self-harm threats and anger management issues.

Because of his volatile behavior, John was moved between three foster homes in October, and remained in the foster home of Mr. and Mrs. R. from October until December, when he was moved to the B. foster home. However, in mid-December John made homicidal threats to his peers – he said he was going to get a gun and shoot everyone on the school bus - and John was again admitted to Behavioral. While at Behavioral, John got into major conflicts and physical aggressions with peers over minor "infractions" and police had to be called at least once. The treating physician at Behavioral found that John's verbal fluency indicated a higher IQ than what tests showed. John was diagnosed with Intermittent Explosive Behavior Disorder with Borderline Personality Disorder.

John was discharged from Behavioral in January of 2004, and referred to the Mississippi State Hospital at Whitfield. At Whitfield, John's diagnosis included poor impulse control and lack of consideration for his and others' safety, as well as inappropriate sexual behavior.

After three weeks of treatment, John was discharged from Whitfield and was placed in the B. foster home with his siblings. Therapeutic placement was attempted, but the Center denied readmission to John because of his long inpatient treatment history, because John said he

didn't want to go there and wouldn't participate in his interview with the admitting nurse. Mr. and Mrs. B. agreed to allow John to remain in their home.

John has remained in the B. foster home for over a year and a half. He receives outpatient treatment and follow up care. He is making progress and Mr. and Mrs. B. report that there are no real problems having John in the home. Mrs. B. reports that he plays his games and does his chores. John has indicated to his social worker that he enjoys living in the B. home. John's social worker noted that John has lost weight, looks well, and is very polite. His grades have improved since being in the B. home. In August, 2004, John was able to start regular classes at the local high school. He plays on the basketball team and also participates in football and church activities. John continues his regular mental health appointments.

John has made great progress in the last year and a half, after six years of therapy and inpatient treatment. This is why John's caseworkers are so concerned about the effect that an extended interview with an unfamiliar doctor in an unfamiliar environment could have on John and why MDHS is insisting that John's doctor be consulted before any such interview takes place. *See*, Affidavit of Ramona Lockett, Area Social Work Supervisor, attached hereto as Exhibit A.

### III. THE SUBJECT MOTION

The Plaintiffs have filed a motion for an order from this Court requiring defendants to produce named Plaintiff John A. for mental examination by Plaintiffs' testifying expert, Dr. Wood Hiatt.

On August 1, 2005, Plaintiffs' counsel sent a letter to Defendants' counsel stating that they "intend to arrange for [their] client John A. to be examined this month by Dr. Wood Hiatt." *See* correspondence from Susan Lambiase, attached as Exhibit B.

6

Counsel for Defendants responded by letter on August 2, 2005, advising Plaintiffs' counsel that MDHS was concerned about the impact that an examination of John by an unfamiliar doctor may have on John and requested that Plaintiffs' counsel provide more detail about the examination for John's caseworkers and his physician. *See* correspondence of Betty A. Mallett, attached as Exhibit C.

In response to MDHS's request for more detail about the examination, on August 3, 2005, Plaintiffs' counsel responded with Dr. Hiatt's qualifications and asserted Plaintiffs' counsel's entitlement to such an examination, rather than provide more detail about the examination itself. *See* correspondence from Susan Lambiase, attached as Exhibit D.

Counsel for Defendants responded to Plaintiffs' counsel on August 9, 2005, and informed Plaintiffs' counsel that MDHS had advised that John's caseworkers needed to confirm with John's physician that the information sent by Plaintiffs' counsel regarding the proposed examination is sufficient for a determination of the potential impact of an examination by an unfamiliar doctor. *See* correspondence of Betty A. Mallett, attached as Exhibit E. Counsel for Defendants further requested that Plaintiffs' counsel refrain from filing any motions until adequate instructions from John's physician had been received. *See id.*

On August 10, 2005, Plaintiffs' counsel set a deadline of August 12, 2005, for Defendants' counsel to agree to give Plaintiffs' expert access to John. *See* correspondence from Susan Lambiase, attached as Exhibit F.

Counsel for Defendants advised Plaintiffs' counsel that MDHS had contacted the clinic where John is treated, however, John's physician had been out of town and the clinic would need until August 23, 2005 to review the matter and render a decision regarding the potential impact of the proposed examination. *See* August 12, 2005 correspondence of Betty A. Mallett, attached

as Exhibit G.  The same day Plaintiffs' counsel responded that Plaintiffs would file this Motion. *See* correspondence from Susan Lambiase, attached as Exhibit H.

### IV.  THE BEST INTERESTS OF THE CHILD SUPERCEDE ANY OTHER INTERESTS

The Mississippi Supreme Court has long held that the best interest of the child takes precedence over any other interest.  Protecting the best interests of a child is the paramount concern in actions to which a child is a party; it is the goal of utmost import in any judicial proceeding.  *Mississippi Dept. of Human Services v. Helton*, 741 So.2d 240, 242 (Miss.,1999) (*citing Lauderdale County Dept. of Human Services v. T.H.G. and L.D.G.,* 614 So.2d 377, 383 (Miss.1992); *Dept. of Human Services v. Jones,* 627 So.2d 810, 811 (Miss.1993)).  *See also Ash v. Ash*, 622 So.2d 1264, 1266 (Miss.1993) ("[T]he best interest of the child remains paramount and the central focus…should always be on how a given situation may adversely impact upon the child."); *Clark v. Clark*, 739 So.2d 440 (Miss.App.1999) ("This Court has repeatedly based its decisions in cases involving minors by asking the familiar question 'what is in the best interests of the child.'").

"Protection of a child's best interest is a goal which this Court considers to be of utmost import ..." *Matter of Estate of Chambers*, 711 So.2d 878, 882 (Miss.1998) (citing *Department of Human Servs. v. Smith,* 627 So.2d 352, 353 (Miss.1993)).

John's well being is the overriding concern.  Given the tenuous state of John's emotional and mental health, and the progress he has made in the past year, MDHS finds that it is in John's best interest to obtain the opinion of John's treating physician and clinic as to the appropriateness or the parameters and limitations to any examination or interview.

Plaintiffs' counsel demands that John be taken out of school and made available to their expert for two three-hour sessions to be held in one day in Jackson.  *See* Exhibits A and G. Plaintiffs' counsel emphasizes the need to expedite this process because of the limited availability of their expert and the deadline for the designation of experts.  *See* Exhibit C and Plaintiffs' Motion, p. 4.  These factors do not outweigh considerations of what is in John's best interest and the possible adverse impact upon the child.

Plaintiffs argue that by placing John's mental condition in controversy, they are entitled to have John examined by their expert.  Plaintiffs' Motion, p. 5.  Plaintiffs' argue that this is necessary to prove that John's condition has deteriorated while in MDHS's custody.  *Id*. However, requiring another psychiatric evaluation by another psychiatrist contradicts the allegations made in the Plaintiffs' Complaint, in which they state:

> Professionally accepted psychiatric practice dictates that mental health patients, most critically and especially children, have continuity in their psychiatrists and therapists and having to re-start treatment numerous times creates abandonment and trust problems for children with mental illness….
>
> Plaintiffs' Amended Complaint, ¶ 81.

John's best interest requires that his clinic and treating physician be given reasonable time to review this matter, and if they find that such an examination will not be detrimental to John's condition, that Plaintiffs abide by any limits his physician may ask to be placed on this examination.  It is unfortunate that Plaintiffs' expert has restricted dates that he is available and that the clinic is unable to evaluate this matter until August 23, 2005, but the necessity of placing John's well-being first and foremost outweighs the inconvenience this delay may cause.

WHEREFORE, PREMISES CONSIDERED, Defendants respectfully request that Plaintiffs' Expedited Motion For a Rule 35(a) Order Requiring Defendants to Produce Named Plaintiff John A. for Mental Examination be denied, or in the alternative, that Defendants be allowed a reasonable time after August 23, 2005 in which to respond to Plaintiffs' demands.

**THIS**, the 18th day of August, 2005.

Respectfully submitted,

**HALEY BARBOUR, as Governor of the State of MS; DONALD TAYLOR, as Exec. Dir. of the Dept. of Human Services; and BILLY MANGOLD as Director of the Div. of Family and Children's Services**

By: /s/Amy Kebert Elder

**OF COUNSEL:**

Attorney General Jim Hood
State of Mississippi
P.O. Box 220
Jackson, MS 39205-0220

**McGLINCHEY STAFFORD, PLLC**
Sam E. Scott (MSB #6567)
Betty A. Mallett (MSB #8867)
Dewitt L. ("Rusty") Fortenberry, Jr. (MSB #5435)
Amy Kebert Elder (MSB #99149)
City Centré South, Suite 1100
200 South Lamar Street (39201)
Post Office Drawer 22949
Jackson, Mississippi 39225
Telephone: (601) 960-8400
Facsimile: (601) 352-7757

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to the following: W. Wayne Drinkwater, Jr. Esq., Melody McAnally, Esq., Stephen H. Leech, Esq., Eric E. Thompson, Esq., and Harold E. Pizzetta, III.

**CERTIFICATE OF SERVICE**

    I also certify that I have this day served a copy of the foregoing on the following non-ECF participants by United States Mail, postage prepaid:

Marcia Robinson Lowry, Esq.
Corene Kendrick, Esq.
Tara Crean, Esq.
Erik S. Pitchal, Esq.
CHILDREN'S RIGHTS, INC.
404 Park Avenue
New York, New York 10016

Eric S. Manne, Esq.
John Piskora, Esq.
LOEB & LOEB, LLP
345 Park Avenue
New York, NY 10154

    **SO CERTIFIED**, this the 18th day of August, 2005.

                                              /s/ Amy Kebert Elder_____