

# CHILDREN'S RIGHTS

Marcia Robinson Lowry
President &
Executive Director

Board of Directors
Alan C. Myers
Chairman & Treasurer
Robin L. Dahlberg
Secretary
Daniel H. Galpern
Jeffrey B. Gracer
Howard M. Maisel
Alice Rosenwald
Melissa G. Salten
Hershel B. Sarbin
Carol Wilson Spigner
Anne Strickland Squadron

March 11, 2005

**VIA FAX – (601) 352-7757**
**and REGULAR MAIL**
Ms. Betty Mallett
McGlinchey Stafford PLLC
City Centre, Suite 1100
200 South Lamar Street
Jackson, MS 39201

Re: *Olivia Y. et al. v. Barbour et al.*

Dear Ms. Mallett:

We are in receipt of Defendants' Responses to Plaintiffs' First Request for Production of Documents and related documents. Although we continue to review the documents produced, several deficiencies in Defendants' production are immediately apparent.

First, in response to Document Request No. 4, Defendants have failed to produce any documents "reflecting or concerning the data elements currently capable of being input into MACWIS." Plaintiffs seek to discover what kind of information Defendants enter electronically in their Child Welfare Information System. Please identify and produce any responsive documents. If DHS does not maintain any lists of such data elements, please so state and provide a representative MACWIS printout of all possible data screens.

Second, in response to Document Request Nos. 7, 8, 9, 20, and 29, Defendants have withheld numerous documents identified as responsive without any claim of privilege. The confidentiality concerns you cite were addressed by the Court's Amended Case Management Order, which specifically orders Defendants to produce in this litigation responsive DHS records otherwise protected by state and any other confidentiality laws. Please produce the identified responsive documents.

Third, in response to Document Request No. 13, Defendants have only produced one Annual Assessment dated May 2004. If there are no other such Annual Assessments from 2000 to the present as requested, please so state. Otherwise, please identify and produce the additional responsive Annual Assessments.

Fourth, in response to Document Request No. 16, Defendants have only produced Service Array Assessments as to 19 Counties. If they are no other such Service Array Assessments, please so state. Otherwise, please identify and produce the additional responsive Service Array Assessments.

Fifth, as to Document Request No. 18, Plaintiffs attach the referenced page of the Self-Assessment to the extent Defendants need clarification of what they referred to therein as an assessment of the reasons for adoption disruptions. Please produce responsive documents.



404 Park Avenue South, New York, NY 10016
Tel: 212-683-2210 · Fax: 212-683-4015 · info@childrensrights.org · www.childrensrights.org

Sixth, as to Document Request No. 19, Plaintiffs attach the referenced pages of the Self-Assessment to the extent Defendants need clarification of what they referred to therein as Recruitment Plan assessments by the Regions regarding foster and adoptive resources for children in foster care. Please produce responsive documents.

Seventh, as to Document Request No. 32, Defendants only state that the Mississippi Department of Health may have such reports. However, because the Governor is a named Defendant in this action, Defendants have control and custody of any responsive documents at such a State agency and must produce them.

Eighth, as to Document Request Nos. 33 and 34, Defendants fail to produce any of the requested correspondence regarding the Program Improvement Plans (PIPs) submitted to the Department of Health and Human Services, Administration for Children, or the requested PIPs. Defendants state that they will only produce the final PIP approved by USDHHS. The requests are not so limited, and there are no legitimate grounds for such a limited response. As you know, the failures in Mississippi's child welfare system that the PIP must address include the very failures cited by Plaintiffs in their injunctive Complaint. Defendants' ability to adequately respond to these concerns, as evidenced by their PIPs, is highly relevant. *See* Defendant Billy Mangold deposition testimony (first PIP was submitted to DHHS on August 16, 2004), 52:9-15; 52:19-53:21. Please produce all correspondence and submitted PIPs as requested.

Finally, the almost complete absence of any responsive email (only two were produced) or any other digital communications pursuant to Rule 26(a)(1) and Rule 34(a), leads us to infer that no search (systematic or otherwise) has been made for responsive electronic or digital communications. Please advise how Defendants have complied with their discovery obligations to preserve and produce electronic documents, including but not limited to relevant emails, and produce any such additional responsive documents.[1]

Please let me hear from you in response by March 18, 2005. I look forward to receiving the additional documents shortly. Plaintiffs reserve the right to bring additional deficiencies to your attention after further review of the documents produced.

Sincerely yours,

*Eric Thompson* /AW

Eric Thompson
Plaintiffs' counsel

Enclosures
cc: Stephen Leech, Esq.
    Wayne Drinkwater & Melody McAnally, Bradley Arant
    John Lang, Loeb & Loeb

---

[1] *See Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309 (S.D.N.Y. 2003); *Hagemeyer N. Am., Inc. v. Gateway Data Scis. Corp.* 222 F.R.D. 594 (E.D. Wis. 2004); *OpenTV v. Liberate Techs.* 219 F.R.D. 474 (N.D. Cal. 2003); *Expedior Creditor Trust v. Credit Suisse First Boston (USA), Inc.* 309 F. Supp.2d (S.D.N.Y. 2003); *see also Wiginton v. CB Richard Ellis, Inc.*, No. 02-6832, 2004 WL 1895122 (N.D. Ill. Aug. 10, 2004).

For youth who will continue in custody, educational assistance, assistance with finding employment, and completing high school or a GED program are all important parts of working towards independent living and should be included in the case planning efforts.

In addition to the contracted Independent Living program, several of the resources that accept older children whose permanency plan is for emancipation have Independent Living training components to help youth succeed once they leave care.

**Supportive Services for relatives:** Where possible, the Agency continues to help support families where they have chosen to become Legal Durable Custodians for their relative children. Consistently, throughout the Agency, relatives are sought as the first resource for children coming into care. For those children who cannot be reunified with their biological parents, all efforts are made to try to keep them placed with relatives, moving towards a legal, permanent relationship.

- **Identified gaps in services and State efforts to address those gaps:**

Adoption: Identification of gaps in services began with an assessment of the reasons for disruptions. Assistance was needed in handling problems such as poor child to parent matches, inadequate skills training for difficult children especially those with family histories of mental illness, and inadequate assessment of parent's background and preparedness for difficult children. Additional training for families and contracting with private sources has helped alleviate some gaps in services. Staffing continues to be problematic in this area.

The Director's Advisory Committee on Permanency Planning (DACOPP) has been instrumental in assisting counties in expediting permanency for children in custody. During the calendar year 2002, DACOPP reviewed 597 cases involving children in custody. Of those case reviewed, 540 were referred to the Office of the Attorney General for Termination of Parental Rights. A total of 57 parents voluntarily surrendered their rights of children in custody enabling these children to be placed in permanent homes. This committee has been very effective in helping local staff make timely decisions regarding children in custody. Children are being placed in adoptive homes at a more rapid rate. This is due in part to legal risk adoptive placements, cases that have been referred to the Office of the Attorney General, with established grounds for termination, and pending termination hearings.

Adoption Incentive funds were used to supplement the needs of the Adoption Specialist with resources that were not available through other funding sources. Five (5) Adoption Recruiters were hired through a personal service contract, however these positions were eliminated June 30, 2002, due to legislation prohibiting MDHS from entering into personal service contracts.

5.  *Citing any data available in the State, discuss how effective the State has been in meeting the State plan requirement to recruit and use adoptive families for waiting children across State or other jurisdictional boundaries. In responding, consider relevant agency policies, time frames for initiating recruitment activities, and specific methods.*

- **Recruitment methods for addressing the needs of children who require placement in close proximity to their original community**

Meetings were held with Regional Directors and Licensure Specialists in April and May 2003. Regional Directors facilitated meetings with foster and adoption staff to develop individualized recruitment plans for their regions. Part of this activity included the assessment of the following characteristics of children in each of their Regions: Number of children in foster care by county, numbers by age, gender, membership in a sibling group, culture/ethnicity, special developmental, behavior, medical needs, number of children placed outside their home county, number of children placed in emergency shelters, therapeutic group home, therapeutic foster homes, residential treatment centers, acute care hospitals, mental retardation centers, training schools, detention centers, and other institutions.

In addition, characteristics of the foster and adoptive homes in each county were documented to include: number of licensed foster homes, number of approved adoptive homes, number of families by culture/ethnicity, number of specialized homes (Foster/Adopt, Relative, Medical Treatment, Teen parent, emergency) Regions were asked to do a special emphasis to recruit and increase the number of Medical Treatment foster homes. These homes could serve the medically fragile children as well as some of the children needing therapeutic placements. The Recruitment Plan should identify how targeted, specific recruitment will be conducted to meet the needs of the types of children in the county. To target Medical Treatment foster homes, medical facilities, such as hospitals, and clinics should be identified and a plan made as to who will contact the facility, and how the recruitment will be conducted upon approval of the facility (a table/booth set up at the facility, presentations at their staff meetings, and training at their facility) To target more homes for teenagers, recruitment efforts should be coordinated with high school events (PTSA, sports, band concerts, plays, etc. ) and also with community and four year colleges. Many college communities are accepting of teenage foster children and also have an interest in their education and future.

- **Recruitment methods for addressing the needs of children who might be placed in another jurisdiction.**

Part of the Recruitment Plan assessments by the Regions involved identifying all children and indicating those who were placed outside of their county. Recruitment efforts for all for all MDHS' children , regardless of the placement, are incorporated into the 4 media events. Although it is more difficult to place children who are special needs and/or are in residential treatment, equal efforts are given to those difficult place youngsters.

When children are placed in county of service communities within the date, the same level of expectation of services should be provided by the county of service office. If a relative or other potential family members lives in another county, the county of service is asked to do a home study to determine if it is appropriate for the child to be placed, and follow-up case work is provided by the county service in conjunction with the county of responsibility. Interstate Compact on the Placement of Children is used to ensure services to Mississippi children placed out of state are equally served, and is used for children who are in the custody of other jurisdictions and placed in Mississippi. This service is expected for children who are in adoptive placements, and also foster care and relative placements.

- **Methods for measuring the State's effectiveness in meeting the needs of children waiting for placement in close proximity to their original community.**

In reviews held in various parts of the state, a large number of children were not being served in their home community. By adding licensing workers and bringing this problem to the attention of the regional offices and the private sector, MDHS-DFCS is hoping to address the need for community resources at the county level.

- **Methods for measuring the State's effectiveness in recruiting placements in other jurisdictions**

The media is used to inform areas surrounding Mississippi, of children available for adoption in the state. At the time of this writing, alterations to MACWIS are being made to better capture adoption information, in order to better measure effectiveness of the recruiting effort.

- **Lessons learned during the Statewide Assessment Focus groups, interviews, and consultations about the State's ability to recruit adoptive families from within the State and other jurisdictions.**

    o Additional efforts are needed for all types of resources.
    o Additional emphasis is needed on the possibility of adoption for foster family homes, indicating a change in perception of the fostering process.
    o Information is needed for relatives to better understand the legal benefits of adopting a relative child

- **Quality and effectiveness of the State's system for recruiting adoptive families from within the State and from other jurisdictions**

The State is divided into three Adoption Districts, Northern, Central, and Southern. Each District represents three Regions. Joint Placement Committee meetings are held with staff from all three Districts in order to match children with families from all over the State. This helps placements across jurisdictional boundaries.

- **Promising practices in this area**

P 002044



# CHILDREN'S RIGHTS

Marcia Robinson Lowry
President &
Executive Director

Board of Directors
Alan C. Myers
Chairman & Treasurer
Robin L. Dahlberg
Secretary
Daniel H. Galpern
Jeffrey B. Gracer
Howard M. Maisel
Alice Rosenwald
Melissa G. Salten
Hershel B. Sarbin
Carol Wilson Spigner
Anne Strickland Squadron

April 29, 2005

**VIA FAX – (601) 352-7757**
**and REGULAR MAIL**
Ms. Betty Mallett
McGlinchey Stafford PLLC
City Centre, Suite 1100
200 South Lamar Street
Jackson, MS 39201

Re: *Olivia Y. et al. v. Barbour et al.*

Dear Ms. Mallett:

I write as to pending and additional matters related to Defendants' incomplete production of documents in response to Plaintiffs' First Request for Production of Documents dated December 17, 2004.

First, I have yet to receive any response to my letter of April 13, 2005, noting additional specific deficiencies with Defendants' production.

Second, we also have yet to receive, as promised in your letter of April 6, 2005, further information regarding additional Mississippi State Advisory Board Annual Assessments (Request No. 13) and representative MACWIS screen printouts that reflect all data fields (Request No. 4); and the State's Program Improvement Plan (PIP) that has now been approved by USDHHS (Request Nos. 33-34). As to Request No. 32, you maintain in your letter of March 30, 2005, that Governor Barbour does not have custody and control of the requested documents presumably maintained by a State agency other than DHS (the Mississippi State Department of Health (MSDH)) and suggest Plaintiffs may subpoena the documents from MSDH. You have cited no legal or statutory grounds, however, to support your position that the Defendant Governor, as chief executive officer of the State, cannot produce the requested State-generated documents. Please state the legal basis for your position, or have your client produce these documents.

Your letter of March 30, 2005, also vaguely asserts that "documents that are responsive to Plaintiffs' Request for Production of Documents include consideration of electronic e-mail as well, if any." Again, in light of the almost complete absence of any responsive email (only two were produced) or any other digital communications pursuant to Rule 26(a)(1) and Rule 34(a), we request that you please advise in concrete detail <u>how</u> Defendants have complied with their discovery obligations to preserve and produce electronic documents, including but not limited to relevant emails.[1]

---

[1] See *Zubulake v. UBS Warburg LLC*, No. 02-1243, 2004 WL 1620866, *10 (S.D.N.Y. July 20, 2004) ("[C]ounsel should instruct all employees to produce electronic copies of their relevant active files. Counsel must also make sure that all backup media which the party is required to retain is identified and stored in a safe place. In cases

Third, further review has revealed additional deficiencies in Defendants' production:

<u>Document Request No. 3</u>: Defendants produced the MACWIS chart "Direct Service Primary Clients by Region" (DHS 020023-24) for January 2004, but for no other time period. Please identify and produce all such responsive reports from 2002 to the present, as requested. Additionally, the December 8, 2003 memo from Linda Barnes to Wanda Gillom and Gloria Salters that was produced (DHS 020061) refers to "attached personnel actions (219s)," but the attachments were not included in Defendants' production. Please produce these attachments that were originally transmitted with the document.

<u>Document Request No. 15</u>: Defendants have produced only six pages (DHS 014770-75) in response to Plaintiffs' request for all documents prepared for, concerning, or generated by all Statewide Assessment focus groups convened in preparation for the Self-Assessment. Yet it is clear from the content of these six pages relating to only one foster care review focus group that additional Statewide Assessment focus groups were convened in preparation for the Self-Assessment. If there are no other such documents in relation to focus groups, as requested, please so state. If Defendants are unable to locate any other such focus group documents, please so state and detail the steps taken by Defendants to search for the requested documents. Otherwise, please identify and produce the additional responsive focus group documents.

<u>Document Requests Nos. 21-23</u>: Missing from Defendants' production of documents are any memos or other correspondence between county and regional officials regarding staffing requirements, such as those testified to by Mechille Henry at her deposition (117:2-10). These updates and similar correspondence to and from Regional Directors and county officials, as well as to and from Regional Directors and State Office personnel, whether by hard copy or email, should be produced as responsive.

Please let me hear from you in response no later than May 6, 2005. Plaintiffs reserve the right to bring additional deficiencies to your attention after further review of the documents produced.

          Sincerely yours,

          Eric Thompson /aw

          Eric Thompson
          Plaintiffs' counsel

cc: Stephen Leech, Esq.
   Wayne Drinkwater & Melody McAnally, Bradley Arant
   John Lang, Loeb & Loeb

---

involving a small number of relevant backup tapes, counsel might be advised to take physical possession of backup tapes. In other cases, it might make sense for relevant backup tapes to be segregated and placed in storage. ... One of the primary reasons that electronic data is lost is ineffective communication with information technology personnel."). *See also Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309 (S.D.N.Y. 2003); *Hagemeyer N. Am., Inc. v. Gateway Data Scis. Corp.* 222 F.R.D. 594 (E.D. Wis. 2004); *OpenTV v. Liberate Techs.* 219 F.R.D. 474 (N.D. Cal. 2003); *Expedior Creditor Trust v. Credit Suisse First Boston (USA), Inc.* 309 F. Supp.2d (S.D.N.Y. 2003); *see also Wiginton v. CB Richard Ellis, Inc.*, No. 02-6832, 2004 WL 1895122 (N.D. Ill. Aug. 10, 2004).