

CHILDREN'S RIGHTS

Marcia Robinson Lowry
President &
Executive Director

Board of Directors
Alan C. Myers
Chairman & Treasurer
Robin L. Dahlberg
Secretary
Daniel H. Galpern
Jeffrey B. Gracer
Howard M. Maisel
Alice Rosenwald
Melissa G. Salten
Hershel B. Sarbin
Carol Wilson Spigner
Anne Strickland Squadron

July 7, 2005

**VIA FAX – (601) 352-7757**
**and REGULAR MAIL**
Ms. Betty Mallett
Mr. Rusty Fortenberry
McGlinchey Stafford PLLC
City Centre, Suite 1100
200 South Lamar Street
Jackson, MS 39201

Re: *Olivia Y. et al. v. Barbour et al.*

Dear Ms. Mallett and Mr. Fortenberry:

I understand that you plan to supplement your document production to Plaintiffs with additional responsive documents to Plaintiffs' First Request for Production of Documents on or before July 14, 2005. Please be sure to include in this supplemental production the following documents identified by Defendants' employees at depositions.

Document Request No. 2: All written policies, procedures and directives in your possession, custody or control, issued by DFCS at the state and regional level and in effect as of March 30, 2004, or thereafter, that relate to protecting and providing services to children in DHS custody, including but not limited to such policies, procedures and directives....

In response to this request Defendants produced the DFCS Policy and Procedures Manual. Gail Young, however, testified at her June 15, 2005 deposition to the existence of a Policy Bulletin dealing primarily with the length of stay in shelters that was sent around September 2004 to Regional Directors, Area Social Worker Supervisors, and Social Workers. [Young Dep., at 110:2 – 112:4.] Ms. Young further testified to the existence of at least one other version of the Policy Bulletin. [Young Dep., at 115:21 –116:14.] Please provide all Policy Bulletins updating DFCS policy.

Document Request No. 6: All documents in your possession, custody or control regarding the progress in achieving full MACWIS integration into county casework such as described on page 22 of the Self Assessment.

In response to this request Defendants produced, *inter alia*, the MACWIS Technical Workplan for Changes and Enhancements covering November 2004 – January 2005. In addition, however, Nancy Meadors testified at her May 2005 deposition that Cheryl Joiner and MIS Director Bud Douglas developed a "MACWIS Work Plan." [Meadors Dep., at 21:7-22:22.] Please produce this additional responsive document.

Document Request No. 7: All regular or ad hoc management reports in your possession, custody or control, generated by MACWIS including but not limited to....



EXHIBIT
"8"

404 Park Avenue South, New York, NY 10016
Tel: 212-683-2210 · Fax: 212-683-4015 · info@childrensrights.org · www.childrensrights.org

In response to this request Defendants produced several reports regarding children in DHS custody. In addition, however, Robert Hamrick testified at his June 20, 2005 deposition that he receives "Children in Custody with Conference Dates More than Six Months," reports as part of his foster care review oversight. [Hamrick Dep., at 52:11-53:22.] Please produce this responsive document.

Document Request No. 8: All internal and external assessments, audits, evaluations or reviews of DFCS operations and practice in your possession, custody or control, including but not limited to documents generated by the Quality Improvement Unit, 6-month reviews, Peer reviews, Program Integrity Unit Reviews and all documents regarding any response, corrective action or "action plan" requested or undertaken in relation to those assessments, audits, evaluations and reviews.

In response to this request Defendants produced several periodic reports on DFCS operations. In addition, however, Robert Hamrick testified at his June 20, 2005 deposition that he and a team of reviewers and a consultant developed a Foster Care Reviewer Quality Assurance Sample Case Review that was originally intended for the Child and Family Services Review but was never used for that purpose. Mr. Hamrick stated that from these reviews, Quarterly Reports were compiled and forwarded to Senior Management and Directors within DFCS, and that these reports include data on safety, permanency, and well-being issues facing children in care. [Hamrick Dep., at 75:17-79:17.]

Mr. Hamrick further testified at his June 20, 2005 deposition that he receives an "Itemized Issues Observed" report that provides a summary of the number of DHS cases reviewed broken down by issues identified during the course of the review. [Hamrick Dep., at 105:12-107:10.] Please produce these responsive documents.

Document Requests Nos. 21 through 23: All documents in your possession, custody or control, reflecting the turnover and vacancy rates for DFCS caseworkers, managers and supervisors; All documents in your possession, custody or control concerning DFCS caseworker caseloads, staffing to census ratios, and adequate staffing estimates, such as discussed on pages 12-15 of the Self-Assessment; and Documentation regarding staffing cutbacks, hiring freezes or temporary assignments at DFCS.

In response to these requests Defendants produced a limited number of charts and employee reports and a listing of Direct Services Cases by County. In addition, however, Mechille Henry testified at her September 9, 2004 deposition that as Regional Director for Region 6 North, she receives memoranda from her staff regarding staffing requirements. [Henry Dep., at 117:2-117:10.] Since these documents and any similar documents received by other Regional Directors are directly responsive to Document Request Nos. 21 and 22, please produce these responsive documents.

Linda Millsaps also testified at her June 2005 deposition to the existence of both a MACWIS-generated Workload Report and similar paper files referred to as "Manual Workload Reports." [Millsaps Dep., at 50:9-52:5.] These documents are responsive to Document Request Nos. 21 and 23 and should be produced.

Nancy Meadors also testified in her May 2005 deposition to the existence of paper requests issued to Gloria Salters at the State Office to have workers logged in as proxies for other workers in specific counties, so that they can document their activities while temporarily assigned to particular children. [Meadors Dep., at 48:1-48:16.] These requests are directly responsive to Document Request No. 23 and should be produced.

Document Request No. 35: Any and all documents relating to child maltreatment reports, child abuse and neglect investigations, critical incident reports, child fatality reports or special reviews regarding the abuse or neglect of children in DHS custody or of children in homes or facilities where children in DHS custody reside, including facilities not licensed by DHS.

In response to this request Defendants produced a limited number of documents including a tally of children maltreated while in custody. Kathy Triplett, however, testified at her June 14, 2005 deposition that she receives reports of abuse and neglect via email, forwarded by the MIS Department. [Triplett Dep., at 31:11-33:21.] She further testified to the existence of forms filled out by the Protection Unit documenting calls received by DFCS staff regarding abuse and neglect allegations and that these forms are tracked in a "Manual Log." She further stated that the forms are kept for three years and that the Manual Log is retained by the hotline staff in the State Office. [Triplett Dep., at 31:11-33:21.] To the extent that these documents relate to children in DHS custody or in homes or facilities where children in DHS custody reside, please produce these additional responsive documents. I attach the deposition excerpts referenced herein for your convenience.

Many of these documents were specifically requested during the referenced depositions. I look forward to receiving these documents by July 14th or shortly thereafter.

Sincerely Yours,

Eric Thompson
Plaintiffs' counsel

Enclosures
cc:    Stephen Leech, Esq.
       Wayne Drinkwater & Melody McAnally, Bradley Arant
       John Lang, Loeb & Loeb

-3-

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                  JACKSON DIVISION
 3
 4   OLIVIA Y., ET AL.,
 5        Plaintiffs,
 6   V.        CIVIL ACTION NO. 3:04CV251LN
 7   HALEY BARBOUR, ET AL,
 8        Defendants.
 9
10
              DEPOSITION OF GAIL YOUNG
11
        Taken at the law offices of Bradley,
12   Arant, Rose & White, located at One
     Jackson Place, 188 E. Capitol Street,
13   Suite 450, on Wednesday, June 15, 2005,
     beginning at 8:33 a.m.
14
15
16   REPORTED BY:
17     SANDI L. SUAREZ, RPR, CSR #1301
       State-Wide Reporters,
18     A LegaLink Company
       Post Office Box 14113 (39236)
19     4400 Old Canton Road, Suite 160
       Jackson, Mississippi 39211
20     Telephone: (601) 366-9676
       Fax: (601) 366-9756
21
       Biloxi Office:
22     764 Water Street
       Biloxi, Mississippi 39530
23     Telephone: (228) 432-0770
       Fax: (228) 432-0690
24
       1(800)372-DEPO
25     www.legalink.com
```

**Page 2**

```
 1   APPEARANCES:
 2
       TARA S. CREAN, ESQUIRE
 3     ERIC E. THOMPSON, ESQUIRE
       Children's Rights
 4     404 Park Avenue South
       New York, New York  10016
 5     Telephone: (212) 683-2210
          ATTORNEY FOR PLAINTIFFS
 6
 7     BETTY A. MALLETT, ESQUIRE
       McGlinchey Stafford, PLLC
 8     Skytel Centre South, Suite 1100
       200 South Lamar Street
 9     Jackson, Mississippi  39201
       Telephone: (601) 960-8400
10        ATTORNEY FOR DEFENDANTS
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1                    INDEX
 2
 3   WITNESS:  Gail Young           PAGE:
 4   EXAMINATION BY:
 5   Ms. Crean                 6
 6               EXHIBITS
       Exhibit No. 69,         10
 7       Individual Service Plan, Bates
         No. NP 4560 through 4563.
 8     Exhibit No. 70,         12
 9       Policy Pages From Volume IV
         Manual
10     Exhibit No. 71,         19
11       Mississippi Department Of
         Human Services, Office Of
12       Social Services, Custody
         Case Plan
13     Exhibit No. 72,         42
14       Policy Manual Page, Bates
         Stamped DHS 418
15     Exhibit No. 73,         50
16       Service Plan, Bates Stamped
         NP 3421 and 3422
17     Exhibit No. 74,         52
18       From 445 Service Plan,
         Bates Stamped NP 3424
19     Exhibit No. 75,         53
20       Form 446A, Case Service Plan
         Supplement, Bates Stamped
21       NP 3425
22     Exhibit No. 76,         74
23       Issues Observed During The
         Foster Care Review, Bates
24       Stamped DHS 14050
       Exhibit No. 77,         81
25       Policy Manual Excerpts, Bates
         Stamped DHS 363 Through DHS 402
```

**Page 4**

```
 1
 2   INDEX (Continued):
       Exhibit No. 78,         115
 3       Policy Manual Pages
 4   Stipulations              5
 5   Certificate of Reporter   149
 6   Errata Sheet              150
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1              STIPULATION
 2       It is hereby stipulated and agreed by and
 3    between the parties hereto, through their respective
 4    attorneys of record, that this deposition may be
 5    taken at the time and place hereinbefore set forth,
 6    by SANDI L. SUAREZ, RPR, CSR, Court Reporter and
 7    Notary Public, pursuant to the Federal Rules of
 8    Civil Procedure, as amended;
 9       That the formality of READING AND SIGNING is
10    specifically RESERVED;
11       That all objections, except as to the form of
12    the questions and the responsiveness of the
13    answers, are reserved until such time as this
14    deposition, or any part thereof, may be used or is
15    sought to be used in evidence.
16
17
18
19
20
21
22
23
24
25
```

Page 6

```
 1              GAIL YOUNG,
 2       Having been produced and first duly sworn, was
 3           examined and testified as follows:
 4              EXAMINATION
 5    BY MS. CREAN:
 6       Q.  Ms. Triplett (sic), I'm Tara Crean, and
 7    I'm here with Eric Thompson.  We're attorneys with
 8    Children's Rights.  We represent the plaintiffs in
 9    the matter of Olivia Y. versus Barbour.
10       Ms. Triplett (sic), you've taken —
11    MS. MALLETT:
12       That's not Ms. Triplett.
13    MS. CREAN:
14       I'm sorry.  Good morning.  Ms. Young, I'm
15    sorry.
16    THE WITNESS:
17       Should I go call her?
18    BY MS. CREAN:
19       Q.  Ms. Young, you've taken the oath to tell
20    the truth in today's testimony; is that correct?
21       A.  That's correct.
22       Q.  You've given depositions before in this
23    matter; is that correct?
24       A.  That's right.
25       Q.  You remember that the ground rules for the
```

Page 7

```
 1    deposition include that you have to give answers
 2    orally so that the court reporter can take them
 3    down?
 4       A.  Yes.
 5       Q.  And do you agree that if there's any
 6    question that you don't understand, you can tell me,
 7    and I can rephrase it to make it clear?
 8       A.  Yes.
 9       Q.  And if you don't ask me to rephrase it,
10    then is it fair for me to assume that you understand
11    the question?
12       A.  Yes.
13       Q.  All right.  Let's begin.
14       Ms. Young, I'm handing you a document that
15    has been previously marked Exhibit 68.  Do you
16    recognize this document?
17       A.  Yes.
18       Q.  And this document is the 30(b)(6) notice
19    of deposition; is that correct?
20       A.  That's what it says, yes.
21       Q.  And you understand that the division of
22    children and family services has designated you as
23    the person with knowledge as to all topics except
24    for Topic 9 listed in Exhibit A?
25       (Witness and Ms. Mallett confer.)
```

Page 8

```
 1    MS. CREAN:
 2       Would you just make your statements to the
 3    witness on the record, please?
 4    MS. MALLETT:
 5       No.  She's my client.  I'm talking to her
 6    as her attorney.
 7    MS. CREAN:
 8       The question is pending.
 9    MS. MALLETT:
10       I understand that.  She's going over the
11    list, and I'm just going over the list with her.
12    MS. CREAN:
13       Are you conferring with her about
14    privileged matters?
15    MS. MALLETT:
16       Yes.
17    BY MS. CREAN:
18       Q.  Is there something you don't understand
19    about what is privileged?
20       A.  I understand.
21       Q.  So you can answer the question.
22       A.  I was trying to see if there was the one
23    about the contract still on here.
24    MS. MALLETT:
25       You can just explain that to her.
```

Page 9

1    THE WITNESS:
2        Okay.
3    BY MS. CREAN:
4        Q.  Do you have knowledge as to the topics
5    listed in Exhibit A except for Topic No. 9?
6        A.  Yes.
7        Q.  And you mentioned something on the record
8    about trying to explain the one about the contracts.
9    What did you mean by that?
10       A.  Well, we do have another unit that does
11   handle the actual contract process.
12       Q.  And which topic are you referring to in
13   Exhibit 68?
14       A.  No. 8. No. 8.
15       Q.  Do you have knowledge as to the topic
16   listed in No. 8?
17       A.  I have some knowledge, but the actual
18   processing is done by another unit.
19       Q.  And what unit is that?
20       A.  That's the administration unit.
21       Q.  And who is the person who heads the
22   administration unit?
23       A.  Theresa Jackson.
24       Q.  Does Theresa Jackson have more knowledge
25   than you about the topic listed in number -- the

Page 10

1    topics described in No. 8 of Exhibit A to the notice
2    of deposition?
3        A.  I think she or one of her staff members
4    would have more knowledge about the actual
5    processing of the contracts.
6        Q.  Is there a particular staff member that
7    you're thinking would have more knowledge about
8    Topic A than you?
9        A.  Janice Gresham.
10       Q.  Janice Thresham?
11       A.  Gresham, G-R-E-S-H-A-M.
12   MS. CREAN:
13       Will you please mark this as Exhibit
14   No. 69.
15       (Exhibit No. 69 was marked.)
16   BY MS. CREAN:
17       Q.  Ms. Young, you have before you an exhibit
18   that's been marked Exhibit 69, Bates stamped Named
19   Plaintiffs -- or NP 4560 through 4563.
20       This is the individual service plan for a
21   child, is it not?
22       A.  Yes, it is.
23       Q.  And, in this case, we call our named
24   plaintiffs by the pseudonyms they've been designated
25   by in this case. And the pseudonym for this child

Page 11

1    is Jameson. So for purposes of the deposition, to
2    preserve his privacy, do you agree to call him
3    Jameson?
4        A.  Jimison?
5        Q.  Jameson.
6        A.  Jameson.
7        (Witness and Ms. Mallett confer.)
8    MS. CREAN:
9        Again, I'm going to have to ask you to
10   make your comments while the question is pending on
11   the record.
12   MS. MALLETT:
13       I'm her attorney. I can counsel with her.
14       A.  I don't have personal knowledge of this
15   particular child.
16   BY MS. CREAN:
17       Q.  Do you recognize this form?
18       A.  I recognize that it is an individual
19   service plan or a case plan. I usually see it in
20   the MACWIS format.
21       Q.  Are you finished with your answer?
22       A.  Yes.
23       Q.  How long has this particular form for an
24   individual service plan or a case plan been in use?
25       A.  Since the implementation of MACWIS.

Page 12

1        Q.  Which was in 2001?
2        A.  I think it was around October of 2001.
3        Q.  Does the division retain hard copies of
4    this form that's filled out on MACWIS?
5        A.  I do not have knowledge of that.
6        Q.  Is this form called both an individual
7    service plan and a custody case plan?
8        A.  Yes, it would be.
9        Q.  So, an ISP and a case plan are the same
10   thing?
11       A.  A child's ISP, yes. A custody case plan
12   would be the same thing.
13       Q.  Ms. Young, I'm going to show you a
14   document that's going to be previously marked as Exhibit
15   40. It is Bates stamp DHS 430 through 433.
16       Do you recognize this document?
17       A.  Yes, I do.
18       Q.  Do you recognize it as portions of the
19   policy manual?
20       A.  Yes, it is.
21   MS. CREAN:
22       Would you please mark this as 70.
23       (Exhibit No. 70 was marked.)
24   BY MS. CREAN:
25       Q.  And do you recognize these pages?

Page 109

1  to monitor those.
2      Q.  And what is that MACWIS report called?
3      A.  Shelter -- children in shelter report, I
4  guess. I'm not real sure what the name of it is.
5      Q.  And how often is that MACWIS report run?
6      A.  I don't know. I think monthly.
7      Q.  And is your testimony that they started
8  running that MACWIS report this year, 2005?
9      A.  It's my understanding, yes.
10     Q.  And you first discussed the need to
11  monitor the placement of children in shelters with
12  Sue Perry when she was your supervisor. And when
13  did she cease being your supervisor?
14     A.  I can't recall. It was two years ago.
15     Q.  Do you review this MACWIS report on
16  shelter care?
17     A.  I do not receive that report.
18     Q.  How many discussions did you have with
19  Billy Mangold about the overreliance on shelters?
20     A.  Probably not that many because he hasn't
21  been the division director or wasn't the division
22  director very long out of here.
23     Q.  You said probably not that many
24  conversations with Mr. Mangold about overreliance on
25  shelters. Did you have more than one conversation

Page 110

1  with Mr. Mangold about overreliance of shelters?
2      A.  Probably what I do remember is that we did
3  generate a memorandum out to the regional directors.
4      Q.  And has that memorandum, in fact, been
5  distributed to regional directors?
6      A.  Yes, it was.
7      Q.  And when was it distributed?
8      A.  I can't recall. I mean, it primarily was
9  dealing with the length of time in a shelter, I
10  believe is the way it came out. I believe it
11  was around September of 2004, is when it was sent
12  out.
13     Q.  And who was involved in creating that
14  memorandum?
15     A.  Myself and Mr. Mangold.
16     Q.  Were you and Mr. Mangold listed as the
17  authors on that memorandum?
18     A.  I would think so, yes.
19     Q.  And what is the approximate date of that
20  memorandum?
21     A.  September 2004.
22     Q.  Have you had any discussions about that
23  memorandum since it was disseminated?
24     A.  There was discussions about the content of
25  the memorandum. And like I say, it primarily refers

Page 111

1  to the length of time in the shelters.
2      Q.  And do you have any facts that would lead
3  you to believe that the length of time in shelters
4  is decreased since this September 2004 memorandum
5  was disseminated to regional directors?
6      A.  I don't have facts or anything to base
7  that decision on.
8      Q.  This September 2004 memorandum from you
9  and Mr. Mangold, it was sent to regional directors;
10  is that correct?
11     A.  That's correct.
12     Q.  Was it sent to anybody else?
13     A.  I'm thinking area -- probably everyone,
14  every area social work supervisors and social
15  workers. It was, if I'm not mistaken, a policy
16  bulletin.
17  MS. CREAN:
18         Ms. Mallett, I would call for the
19  production of this policy bulletin. I believe it is
20  responsive to requests that we've propounded on you
21  in our request for production.
22  MS. MALLETT:
23         Okay. Do you know which request you would
24  have asked for that?
25  MS. CREAN:

Page 112

1         We can go check letter. I don't know off
2  the top of my head.
3  MS. MALLETT:
4         Just send me a note about it.
5  MS. CREAN:
6         I need more than one actually, but I'm
7  happy to memorialize the request and follow-up
8  correspondence.
9  BY MS. CREAN:
10     Q.  And why was the length of stay in shelters
11  a topic that you and Mr. Mangold were motivated to
12  write a memo to everyone about?
13     A.  I can't really recall, but I think we had
14  probably observed some of the foster care review
15  reports where children had stayed longer than 45
16  days.
17     Q.  If you could please turn to exhibit -- if
18  you would please turn to Exhibit 77, the page that's
19  been Bates stamped DHS 371.
20     A.  (Witness complies.)
21     Q.  At the bottom of page 371, the policy
22  manual states that children's stays in the shelters
23  may be extended beyond the 45-day limit; is that
24  correct?
25     A.  That's correct.



**Page 113**

1  Q. Does the division do anything to monitor
2 how often children stay beyond the 45-day limit?
3  A. Again, I believe there is a MACWIS report
4 generated.
5  Q. But you have not reviewed that MACWIS
6 report?
7  A. I have not reviewed the report.
8  Q. Are stays beyond the 45 days in the
9 shelter of concern to the division?
10  A. Yes, it would be.
11  Q. And why is it perceived as a problem?
12  A. Because, again, we want to get children in
13 the most family-like setting.
14  Q. Do you review the foster care review
15 reports regularly?
16  A. I don't review the entire reports. I do
17 review the summaries that they generate.
18  Q. And with what frequency do you review
19 those summaries?
20  A. Whenever they generate the report. And
21 those are really just identifying the deficiencies.
22  Q. And what deficiencies have you seen
23 identified in the summaries of the foster care
24 reviews?
25  A. A wide variety of things such as -- some

**Page 114**

1 of them I flagged to program staff such as
2 independent living program participation,
3 visitation.
4  Q. Anything else?
5  A. Well, there are others. I just can't --
6 can't recall without looking at a report.
7  Q. When you say "visitation," do you mean
8 visitation between caseworkers and children?
9  A. It could be any types of visitation,
10 parental visitation or worker visitation.
11  Q. And does it include visitation between
12 siblings?
13  A. Yes, sometimes it does.
14  Q. And you flagged the issue of caseworker
15 visits, and for whom have you flagged this?
16  A. Caseworker visits I don't flag. Those go
17 to the regional directors, and primarily it is a
18 tool for regional directors to use and comment back
19 as to their corrective action. And also understand
20 that some regions may have no deficiencies, so this
21 is not reflective of every case that they reviewed.
22 There are some that may not have any listed for a
23 certain month.
24  Q. And what deficiencies have you flagged for
25 others to pay attention to?

**Page 115**

1  A. The ones that I might have flagged would
2 be the independent living, the permanency plans, the
3 termination of parental rights issues, the
4 interstate compact issues.
5  Q. And what particular issues -- what
6 particular deficiencies did you flag with regard to
7 independent living?
8  A. Most of them are that the child is age 14
9 or over, and it's not documented that the child is
10 participating in independent living programs.
11  Q. Is it division policy that all foster
12 children age 14 and over should be participating in
13 independent living program services?
14  A. Yes.
15 MS. CREAN:
16  Please mark this as the next exhibit.
17  (Exhibit No. 78 was marked.)
18 MS. CREAN:
19  Here's a courtesy copy. This is yours.
20 BY MS. CREAN:
21  Q. Do you recognize Exhibit 78 as pages from
22 the policy manual?
23  A. Yes, I do.
24  Q. And do these pages contain the division's
25 policy on independent living services?

**Page 116**

1  A. I believe there has been at least one
2 updated policy bulletin that did revise the age,
3 which is now 14.
4  Q. And are you referring to the section
5 titled, Eligibility on the page that's Bates stamped
6 DHS 504, the first page of Exhibit 78?
7  A. That's correct.
8  Q. Where it says that, Independent living
9 services are provided to all youth age 16 to 20?
10  A. That's correct.
11  Q. And is it your testimony that that has
12 been revised to provide services to all youth age 14
13 to 20?
14  A. That's correct.
15  Q. What was the reason for that change?
16  A. It came about as the Chaffee Grant program
17 allowed us to have that flexibility, and we decided
18 to start the program earlier for younger children.
19  Q. And why did you decide to start it for
20 14-year-olds rather than start with 16-year-olds?
21  A. Because it's our belief that the earlier
22 you start in preparing them for independence the
23 better.
24  Q. What specific skills are taught in
25 independent living program services?

Page 1

1                IN THE UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

3                        JACKSON DIVISION

4

5      OLIVIA Y., et al.
                                            PLAINTIFFS,

6

7      VS.                          CIVIL ACTION NO. 3:04CV251LN

8

9      HALEY BARBOUR, et al.
                                            DEFENDANTS.

10

11              30(b)(6) DEPOSITION OF NANCY MEADORS

12

13        Taken at the offices of Bradley, Arant, Rose & White, LLP,

14    on Tuesday, May 16, 2005, beginning at 8:40 A.M.

15

16

17

18      REPORTED BY:

19          REBECCA A. KIDDER

20          State Wide Reporters

21          4400 Old Canton Road, Suite 201 (39211)

22          Post Office Box 14113

23          Jackson, Mississippi  39236

24          Telephone: (601) 366-9676

25          Fax: (601) 366-9756

Page 2

```
1    APPEARANCES:
2
3        ERIC E. THOMPSON, ESQUIRE
4        TARA S. CREAN, ESQUIRE
5        Children's Rights
6        404 Park Avenue South
7        New York, New York 10016
8        Telephone: 212.683.2210
9        Fax: 212.683.4015
10       ATTORNEYS FOR PLAINTIFFS
11
12       BETTY A. MALLETT, ESQUIRE
13       McGlinchey Stafford, PLLC
14       Skytel Centre South, Suite 1100
15       200 South Lamar Street
16       Jackson, Mississippi 39201
17       Telephone: 601.960.8424
18       Fax: 601.960.8431
19       ATTORNEY FOR DEFENDANTS
20
21
22
23
24
25
```

Page 4

```
1                    STIPULATION
2        It is hereby stipulated and agreed by and between the
3    parties hereto, through their respective attorneys of record,
4    that this deposition may be taken at the time and place
5    hereinbefore set forth, by Rebecca A. Kidder, Court Reporter and
6    Notary Public, pursuant to the Mississippi Rules of Civil
7    Procedure, as amended;
8        That the formality of READING AND SIGNING is
9    specifically NOT WAIVED;
10       That all objections, except as to the form of the
11   questions and the responsiveness of the answers, are reserved
12   until such time as this deposition, or any part thereof, may be
13   used or is sought to be used in evidence.
14                        ---
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1              T-A-B-L-E  O-F  C-O-N-T-E-N-T-S
2    Examination By:                          Page
3        MR. THOMPSON                          5
4    Exhibits:
5        43: excerpt w/ case reporting requirements    12
6        44: direct service primary clients by region    72
7        45: direct service cases                73
8        46: outcomes for the direct service of placement  77
9        47: MACWIS report regarding missing placement    78
10       48: MACWIS report regarding dormant cases     79
11       49: MACWIS report regarding child abuse
12           and neglect intake report           80
13       50: MACWIS report regarding child
14           investigation timeliness           81
15       51: MACWIS report regarding the number of
16           children in placements by placement type    82
17       52: MACWIS report regarding the number of
18           court ordered TPR requests          85
19       53: MACWIS report regarding the number of
20           children free for adoption          86
21       54: MACWIS report regarding the number of
22           children's adoptions finalized      87
23   Stipulation                               4
24   Certificate of Court Reporter             90
25   Witness Signature Sheet                   91
```

Page 5

```
1                    NANCY MEADORS
2            having been first duly sworn, was
3            examined and testified as follows:
4
5                    EXAMINATION
6    MR. THOMPSON:
7        Q.  Good morning, Ms. Meadors.  My name is Eric
8    Thompson.  This is Tara Crean.  We both represent plaintiffs in
9    the action of Olivia Y. v Barbour.  Do you understand that
10   you're here to give us sworn testimony in that matter?
11   THE WITNESS:
12       A.  Yes.
13       Q.  Thank you.  Ms. Meadors, what's your current
14   position with DHS?
15       A.  I'm a project officer for Special.
16       Q.  And that's with the Division of Youth and Family
17   Services?
18       A.  Family and Children services.
19       Q.  I'm going to show you what's been previously
20   marked Exhibit 34 which is an organizational chart beginning
21   with the state office.  Is that your position down at the
22   bottom: 'Project Officer for Special?'
23       A.  Yes.
24       Q.  And that's under the director of administration;
25   is that correct?
```

STATE-WIDE REPORTERS (228) 432-0770

2 (Pages 2 to 5)

Page 18

1  development?
2      A.  Yes.
3      Q.  Are you aware of any specific rollout date for
4  full implementation of Title 4E eligibility information in
5  MACWIS?
6      A.  No. It will be the same. The eligibility
7  process and the placement process are being worked on
8  simultaneously. So it would go on the same date.
9      Q.  So currently the Title 4E information is also
10 collected by the eligibility unit; is that correct?
11     A.  Yes.
12     Q.  And that's still a paper system?
13     A.  Yes. That's the 443 series that I mentioned.
14     Q.  Do they collect the information on the same
15 forms?
16     A.  It's different forms. They have one for when the
17 child is initially placed in custody where they answer these 4E
18 eligibility questions. And then if there's a change, if it's in
19 placement or if the child starts receiving income, something
20 like that, then there's a change form that they use. There's
21 also a re-determination form.
22     Q.  Having MACWIS be able to process board payments
23 and Title 4E eligibility information, are those requirements,
24 federal requirements, for SACWIS systems?
25     A.  Yes.
            STATE-WIDE REPORTERS (228) 432-0770

Page 19

1      Q.  So is it fair to say it's always been the
2  plan that it's being incorporated into MACWIS?
3      A.  Yes.
4      Q.  Let me show you what's been previously marked
5  Exhibit 42. Do you recognize these documents to be printouts of
6  MACWIS screens?
7      A.  Yes.
8      Q.  You previously testified as to dealing with
9  MACWIS user requirements.
10     A.  Yes.
11     Q.  Are there any particular screens in MACWIS that
12 you have identified as creating user requirement problems or
13 issues?
14     A.  No. Other than like I said, the eligibility is
15 being reworked.
16     Q.  Are these the format of the screens that a social
17 worker would be scrolling through when they have online access
18 to MACWIS?
19     A.  Yes.
20     Q.  So these are the user screens that allow for
21 entry of child and family information into MACWIS?
22     A.  Yes, but that's not all of them.
23     Q.  Is it the user who would have to pick and choose
24 from the available menu what item they wanted to complete at the
25 time?
            STATE-WIDE REPORTERS (228) 432-0770

Page 20

1      A.  Yes.
2      Q.  Is there, to your knowledge, any MACWIS manual
3  that sets out the information and screens that a social worker
4  or case worker is required to enter into MACWIS?
5      A.  There is a user manual but it basically has
6  instructions on this is the screen, these are the fields. It
7  doesn't really tell them if this is a child in custody you do
8  this or that kind of thing. No. It's just basic instruction
9  for the screen or the tab.
10     Q.  Would a case worker then be expected to be
11 referring to the policy manual in terms of what information
12 needs to be entered into MACWIS?
13     A.  The policy and also they get information when
14 they come for their MACWIS training.
15     Q.  That's part of the curriculum?
16     A.  Yes. The social worker intensive training; it's
17 a four-week training. The last week is MACWIS.
18     Q.  As part of that training, is there any materials
19 or handouts regarding what are the MACWIS requirements for data
20 entry?
21     A.  They have a scenario that they go through, and
22 they take the scenario back to the town with them.
23     Q.  Does MACWIS have any automatic prompts once a
24 case file is opened in MACWIS?
25     A.  No; not yet. That is one of our changes that we
            STATE-WIDE REPORTERS (228) 432-0770

Page 21

1  plan to implement.
2      Q.  Is that also something that's being currently
3  worked on?
4      A.  No.
5      Q.  Is there a timeline or a plan regarding
6  development of that function?
7      A.  We have a work plan, and it is included in that
8  work plan.
9      Q.  And when you say 'we' what would this work plan
10 be called?
11     A.  The MACWIS Work Plan. It's developed by someone
12 on the program side along with the lead person from MIS who is
13 over the contractor.
14     Q.  And this leading person from MIS is within the
15 division or a DHS MIS person?
16     A.  MIS, Management Information Systems, is a
17 separate division of DHS.
18     Q.  Of DHS?
19     A.  Right.
20     Q.  Do you know the name of the director of MIS?
21     A.  Douglas Taylor.
22     Q.  So the MACWIS work plan would be a document that
23 Mr. Douglas has developed?
24     A.  No.
25     Q.  Who has developed that document?
            STATE-WIDE REPORTERS (228) 432-0770

Page 22

1    A.   Cheryl Joyner who is our lead MIS person
2    on MACWIS.
3    Q.   Is he under the bureau of director in the
4    division for administration?
5    A.   No. She's a MIS employee. I'm not sure who her
6    immediate boss is, but Mr. Douglas is over MIS.
7    Q.   You mentioned some on-going issues in terms of
8    the completeness of information being entered into MACWIS by
9    case workers; is that correct?
10   A.   Yes.
11   Q.   Can you tell me if you know what, if anything,
12   processes are in place to ensure the complete entry of
13   information in MACWIS?
14   A.   I'm not exactly sure what you're asking.
15   Q.   Let me try and rephrase it. Are you aware of how
16   the division is attempting to ensure that information is entered
17   into MACWIS consistently?
18   A.   Yes.
19   Q.   And what are those? What has been put in place?
20   A.   We have an advisory team that meets once a month.
21   During the meeting, we talk about changes that are needed for
22   the system. We have several changes that are on the work plan.
23   One of those changes is to sort of guide the worker when a child
24   comes in, or, actually, when a case is opened, when they are
25   completing the relationship screen, to guide them if there's a
STATE-WIDE REPORTERS (228) 432-0770

Page 23

1    child who came into custody to take them from the
2    relationship screen. They get a message. They will get a
3    message - it's not in yet - to tell them that they need to go to
4    the legal history tab and enter the custody. After that's
5    done. It prompts them to go to the ISP screen which is the
6    individual service plan or case plan for the child; complete
7    that. It also prompts them to go to the eligibility screen,
8    complete that, and to the placement screen to complete that.
9         And we also have other changes that are: making
10   fields mandatory that are, for instance, AFGAR's requirements.
11   We have implemented some of those already. In the ISP we have
12   removal reasons, and if a child is in custody there has to be a
13   reason selected before they can submit the ISP to their
14   supervisor.
15   Q.   Are there any other mandatory fields currently in
16   MACWIS?
17   A.   We have several mandatory fields; yes.
18   Q.   Can you tell me what those are besides the
19   removal reasons that you know?
20   A.   Through the old system? We have lots of
21   mandatory fields. On the intake report there has to be a
22   county. They have to pick an intake type. They have to enter
23   the date and the time before they can save the intake. On that
24   same screen they have to enter at least one person on the intake
25   before they can submit it for screening. If they recommend
STATE-WIDE REPORTERS (228) 432-0770

Page 24

1    screen out they have to select a reason for screening it
2    out. If it is screen in and becomes an investigation, then
3    there are certain fields on the investigation screen that they
4    have to complete. The findings for the allegation; they also
5    have to --. I think that's the only mandatory --. When they do
6    the finding they have to enter the date for the finding. Do you
7    want me to go through the whole system?
8    Q.   Let me ask you this: So as I understand it,
9    mandatory fields means that if there's no information entered in
10   the field, then is it the screen that can't be completed; is
11   that correct?
12   A.   Yes.
13   Q.   Or if it's a report like the ISP, then it's the
14   document that can't be completed or printed out; is that
15   correct?
16   A.   The ISP is a screen, and they can't submit it to
17   the supervisor. The supervisor has to approve it. And there is
18   a document that prints out, but if they try to print before it
19   was completed then it would be incomplete.
20   Q.   Let me show you what's been previously marked
21   Exhibit 41. If you can refer to both Exhibit 41 and 42, in 42
22   we've got specific data fields on different MACWIS screens;
23   correct?
24   A.   Yes.
25   Q.   On Exhibit 41, is this a template that would
STATE-WIDE REPORTERS (228) 432-0770

Page 25

1    appear on the case worker screen?
2    A.   No.
3    Q.   How would the information on Exhibit 41, the
4    youth court hearing and review summary form, be completed online
5    in MACWIS?
6    A.   The information is entered by the social worker
7    on a different screen. This particular printout is from our
8    county conference, and we have a county conference screen in
9    MACWIS that's completed by the foster care review person, the
10   county worker, and the county supervisor. Once it's completed
11   they print it out. It goes to the judge. But the information
12   such as the child's name is pulled from the different parts of
13   where it's entered in the system. They won't have to put this
14   in again. It just pulls it altogether.
15   Q.   Just to make sure I understand: The various data
16   pieces or entries that are reflected on the form in Exhibit 41
17   are populated electronically from screen entries made into
18   MACWIS via the screens that are reflected, for example, in
19   Exhibit 42?
20   A.   Yes.
21   Q.   So on a document like Exhibit 41 which reflects
22   information entered by the case worker, the foster care reviewer
23   --
24   A.   -- and the supervisor.
25   Q.   -- and the supervisor, all three of those
STATE-WIDE REPORTERS (228) 432-0770

7 (Pages 22 to 25)

Page 46

1 would fill out?
2    A. Yes.
3    Q. Is a case worker able to make entries on a
4 child's MACWIS case record without being the assigned case
5 worker identified in the system?
6    A. They could add a narrative to the case.
7    Q. Are they able to make any sort of any other data
8 entries that are required of the ongoing case worker? Let me
9 ask you a specific example. Would someone, other than the
10 assigned case worker, be able to input updated information as to
11 the child's placement, for example?
12    A. No.
13    Q. It would have to be the assigned case worker or
14 the supervisor?
15    A. Yes.
16    Q. So a social work aid or SWA could not make those
17 types of entries; correct?
18    A. No.
19    Q. Likewise, for a homemaker for example?
20    A. No.
21    Q. Both a homemaker and a SWA could make narrative
22 entries in the case then?
23    A. Yes.
24    Q. In light of that, do you know how case recording
25 is occurring in counties where there are no full-time case
STATE-WIDE REPORTERS (228) 432-0770

Page 47

1 workers assigned?
2    MS. LOWRY:
3       I'm going to object to that.
4    THE WITNESS:
5    A. If there is no social worker working in the
6 county that's assigned to the county then the regional director
7 for that county would have another social worker from another
8 county to fill in until a social worker was hired.
9    MR. THOMPSON:
10    Q. In terms of MACWIS case recording, a covering
11 social worker would need to be formally designated then as the
12 assigned case worker that; is that correct?
13    A. Yes.
14    Q. Otherwise they could make any of these MACWIS
15 entries besides narrative; is that correct?
16    A. Right.
17    Q. Are you aware that staff had been detailed from
18 the state office to counties such as Forrest County for certain
19 periods of time to assist with casework tasks there?
20    A. Yes.
21    Q. Would it be the same thing for those social
22 workers regarding their ability during the time of their
23 detailing to a county office such as Forrest County that they
24 would need to be designated in MACWIS as the assigned case
25 worker for cases on which they were covering?
STATE-WIDE REPORTERS (228) 432-0770

Page 48

1    A. They could be proxy. If there's a worker
2 in the county, they can be proxy for that worker.
3    Q. Can you explain what you mean by proxy?
4    A. The supervisor and regional director have to make
5 a request to the state office, to Ms. Saulters, for any proxy's
6 that are put in the system. She decides, Ms. Saulters decides
7 if it's a valid request. If it is, she enters the proxy
8 information into the system which allows another worker to login
9 as a proxy for the worker in the county and they have access to
10 that worker's work load and can do work on the cases just like
11 the case worker.
12    Q. Are these requests for proxies made through the
13 MACWIS system, or --
14    A. No; paper.
15    Q. -- is this a written request?
16    A. Yes.
17    Q. When a child is placed in a different county than
18 the original county's responsibility, the county and the county
19 office that has the child placed in their county is then
20 responsible for certain ongoing services for the child; is that
21 correct?
22    A. Yes.
23    Q. Hence the designation county of service?
24    A. Yes.
25    Q. Is a case worker in the county of service somehow
STATE-WIDE REPORTERS (228) 432-0770

Page 49

1 assigned to that child?
2    A. Yes.
3    Q. Is that assignment also reflected in MACWIS?
4    A. Yes. It's on the assigned transfer screen.
5    Q. So the system allows for two case workers to be
6 assigned at the same time to the child; is that correct?
7    A. Yes.
8    Q. Does the system reflect or distinguish between a
9 county of responsibility case worker or a county of service case
10 worker?
11    A. Yes.
12    Q. So one would be able to look up the assigned
13 transfer screen?
14    A. Yes.
15    Q. And both workers would show up?
16    A. Yes.
17    Q. And from the screen one would be able to tell who
18 was the social worker from the county of responsibility and who
19 is the one from the county of service?
20    A. Yes.
21    Q. As you understand it, they both have different
22 responsibilities at that point?
23    A. Yes.
24    Q. So once a case worker is assigned in the county
25 of service they then have the same abilities to update and
STATE-WIDE REPORTERS (228) 432-0770

13 (Pages 46 to 49)

STATE-WIDE REPORTERS (800) 372-3376



Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

OLIVIA Y., ET AL                PLAINTIFFS

VS.          CIVIL ACTION NO. 3:04CV251LN

HALEY BARBOUR, ET AL          DEFENDANTS

DEPOSITION OF ROBERT HAMRICK

Taken at Bradley Arant Rose & White,
188 East Capitol Street, Suite 450,
Jackson, Mississippi, on Monday,
June 20, 2005, beginning at 8:30 a.m.

REPORTED BY:

CELESTE O. WERKHEISER, RMR
State-Wide Reporters
4400 Old Canton Road
Suite 160 (39211)
Post Office Box 14113
Jackson, Mississippi 39236
Telephone: (601) 366-9676
Fax: (601) 366-9756
www.legalink.com

Page 2

APPEARANCES:

ERIC E. THOMPSON, ESQUIRE
MARCIA LOWRY, ESQUIRE
Children's Rights, Inc.
404 Park Avenue South
New York, New York 10016
Telephone: (212) 683-2210
Fax: (212) 683-4015
        ATTORNEYS FOR PLAINTIFFS

RUSTY FORTENBERRY, ESQUIRE
McGlinchey Stafford, PLLC
200 South Lamar Street
Suite 1100
Jackson, Mississippi 39201
Telephone: (601) 960-8400
Fax: (601) 960-8431
        ATTORNEY FOR DEFENDANTS

Page 3

STIPULATION

It is hereby stipulated and agreed by
and between the parties hereto, through their
respective attorneys of record, that this
deposition may be taken at the time and place
hereinbefore set forth, by Celeste O.
Werkheiser, Registered Merit Reporter and Notary
Public, pursuant to the Federal Rules of Civil
Procedure, as amended;

That the formality of READING AND
SIGNING is specifically NOT WAIVED;

That all objections, except as to the
form of the questions and the responsiveness of
the answers, are reserved until such time as
this deposition, or any part thereof, may be
used or is sought to be used in evidence.

---

Page 4

T-A-B-L-E O-F C-O-N-T-E-N-T-S

Examination By:                Page
Mr. Thompson................................5

Stipulation....................................3

Exhibits:
No. 81   Foster Care Review Board's Report...36
No. 82   Periodic Administrative
         Determination on Foster Children....47
No. 83   Issues Observed - Comparison Report
         Foster Care Review - FY 2004........86
No. 84   MDHS Division of Family & Children's
         Services - Individual Service Plan..94
No. 85   Foster Care Review - Summary Report -
         Issues in Foster Children's Cases..101
No. 86   MDHS - Family & Children's Services -
         Memo dated 6-17-03.................111
No. 87   Foster Care Review - Summary Report -
         Issues in Foster Children's Cases..114
No. 88   Page 2 of 2.......................120
No. 89   Foster Care Review - Summary Report -
         Issues in Foster Children's Cases..126
Certificate of Court Reporter...............140
Witness Signature Page......................141

1 (Pages 1 to 4)

Page 5

```
 1              ROBERT HAMRICK
 2         having been first duly sworn, was
 3         examined and testified, as follows:
 4               EXAMINATION
 5    BY MR. THOMPSON:
 6    Q.    Good morning, Mr. Hamrick.
 7    A.    Morning.
 8    Q.    Mr. Hamrick, would you state your
 9    full name, please, for the record?
10    A.    Robert Andrew Hamrick.
11    Q.    Mr. Hamrick, my name is Eric
12    Thompson. This is attorney Marcia Lowry. We
13    represent the plaintiffs in the matter of Olivia
14    Y. v. Barbour. Do you understand that you're
15    here today to give sworn testimony in that
16    matter?
17    A.    Yes.
18    Q.    Mr. Hamrick, did you review any
19    documents in preparation for this deposition?
20    A.    No.
21    Q.    Could you state what your position is
22    with DHS, please?
23    A.    My title is Program Administrator
24    Senior over the state's Foster Care Review
25    Program.
```

Page 6

```
 1    Q.    Before we get into more questions,
 2    have you ever been in a deposition before?
 3    A.    No.
 4    Q.    Let's talk about a few basic ground
 5    rules. I'll be asking you questions. I'll need
 6    you to verbalize your response so the court
 7    reporter can take everything down instead of
 8    nodding or saying uh-huh.
 9    A.    Okay.
10    Q.    If at any time my question is
11    unclear, please let me know. I'll try and
12    rephrase it so that you can answer it.
13    A.    Okay.
14    Q.    And this is not an endurance contest.
15    So if you need to take a break just let me know
16    and we'll do that as long as there is not a
17    question pending.
18    A.    Okay.
19    MR. FORTENBERRY:
20         Eric, just for the record, we reserve
21    all objections until the time of trial except as
22    to form, just for the record.
23    MR. THOMPSON:
24         Yes, that's fine. Thank you.
25    Q.    Mr. Hamrick, how long have you been
```

Page 7

```
 1    in your current position?
 2    A.    Two years and five months.
 3    Q.    And before assuming your current
 4    position, were you employed by DHS?
 5    A.    Yes, sir.
 6    Q.    And what position did you have
 7    immediately preceding your current position?
 8    A.    I was Social Worker Advanced with the
 9    Foster Care Review Program.
10    Q.    And did that entail being a Foster
11    Care Reviewer?
12    A.    Yes, sir.
13    Q.    And how long were you a Foster Care
14    Reviewer for?
15    A.    Since 1993. So it would have been, I
16    guess, about 10 years.
17    Q.    Were you previously employed by DHS
18    before assuming the position of Foster Care
19    Reviewer?
20    A.    Yes.
21    Q.    And what position did you have?
22    A.    I was a county social worker in
23    Newton County and Scott County.
24    Q.    Are those both in the same DFCS
25    region?
```

Page 8

```
 1    A.    Back then, I believe they were. Now
 2    they're not, but back then they were.
 3    Q.    How long were you a county social
 4    worker for?
 5    A.    I believe five years. I started in
 6    December of 1987 with the agency.
 7    Q.    Previous to that had you worked at
 8    all in any social work field?
 9    A.    No, sir.
10    Q.    Could you tell me what undergraduate
11    degrees you have?
12    A.    I have a bachelor's degree in
13    Business Administration from University of
14    Southern Mississippi.
15    Q.    Do you have any advanced degrees?
16    A.    No, sir.
17    Q.    As Program Administrator Senior of
18    the Foster Care Review Program, what are your
19    general responsibilities?
20    A.    I supervisor 11 Foster Care Reviewers
21    throughout the state who are responsible for
22    reviewing the cases of children in foster care
23    every six months. And as they complete their
24    reviews and reports they send them in. Of
25    course, I review them and there's statistical
```

2 (Pages 5 to 8)

Page 49

1  addressed in the comments?
2      A.   No.
3      Q.   And is there any requirement that
4  DHS's efforts to achieve the permanent plan be
5  addressed in the comments?
6      A.   It's no requirement, no.
7      Q.   Do you see on Exhibit 82 a comment
8  for number 13 that the placements listed in
9  MACWIS for each child do not appear to be
10  correct?
11      A.   Yes, sir.
12      Q.   Is the accuracy of MACWIS entries an
13  ongoing issue at DHS?
14      A.   Not all MACWIS entries. There's some
15  information that is -- where it's been a
16  problem. Placements is one of them. Well --
17  and it's not statewide or anything like that. I
18  don't mean to say that it's a statewide problem.
19      Q.   Well, besides placements, are there
20  any other data fields that have been problematic
21  in terms of accuracy?
22      A.   Medical information, psychological
23  information. Again, not in every county in the
24  state, but in some areas there's information
25  lacking in certain fields of MACWIS.

Page 50

1      Q.   And when you say in certain areas,
2  are we talking about specific counties or
3  regions?
4      A.   We produce a report each month that
5  does show a comparison between the regions and
6  what those issues are. And there are specific
7  regions, areas of the state, where it's more
8  problematic than others.
9      Q.   And what is that report?
10      A.   It's a report we call Issues Observed
11  During Foster Care Review. It's just one --
12  it's nothing automated. It's something I put
13  together manually each month.
14      Q.   The issues observed include other
15  issues besides the lack of adequate
16  documentation, correct?
17      A.   It could, yes, sir.
18      Q.   Focusing specifically on the accuracy
19  of MACWIS entries, are there specific counties
20  or regions that have come to your attention as
21  having more problems than others in the accuracy
22  of their MACWIS data entry?
23      A.   Yes, sir.
24      Q.   And what counties or regions are
25  those?

Page 51

1      A.   Primarily Region 6 North, Forrest
2  County. And Region 6 South, Harrison and
3  Hancock.
4      Q.   And does that include the accuracy of
5  placement data?
6      A.   Yes, sir.
7      Q.   Does it include the accuracy of entry
8  of the custody dates?
9      A.   That's been reported a time or two.
10  It's nothing that the reviewers focus on too
11  much. They're more concerned with what happens
12  after they come into custody as opposed to when
13  a date got entered into -- like when a custody
14  got entered into a system. But they have --
15  reviewers have reported it to me on a few
16  occasions.
17      Q.   You base the scheduling of Foster
18  Care Reviews, though, on the entry date into
19  custody, correct?
20      A.   Yes.
21      Q.   So if that entry date into custody is
22  erroneously entered or not entered into MACWIS,
23  you would not be able to accurately schedule a
24  case for a six-month review; is that correct?
25      A.   That is correct.

Page 52

1      Q.   Has it come to your attention that
2  certain cases have been scheduled for reviews
3  that were not due for review?
4      A.   What was that now?
5      Q.   Let me ask it a different way. Has
6  it come to your attention that there have been
7  cases that were due for reviews that were not
8  scheduled due to erroneous MACWIS information?
9      A.   I'm sorry. I hate to be hard headed.
10  But you're saying there's cases that have not
11  been scheduled for a review because the
12  information entered into MACWIS was not timely
13  or --
14      Q.   Yes. That's my question.
15      A.   Okay. I'm sorry. Yes. Yes, that's
16  correct.
17      Q.   And what have you done as a result of
18  that being brought to your attention?
19      A.   Well, when we find out about them, we
20  just try to schedule them as quickly as we can
21  for a review. Also, we will go in, me and --
22  I'll usually take that report I was telling you
23  about earlier, that Children in Custody With
24  Conference Dates More Than Six Months, I'll take
25  that report and sit down with one of our -- one

**Page 53**

1  of the staff persons in our state office and
2  she'll look up that information on -- I don't
3  know what she calls the back end of the system,
4  I don't know what she means by that, but that's
5  what she does, and she can usually pinpoint
6  exactly what happened on those cases.
7      So if I find that it's one where the
8  county may have been late entering information
9  into the system, I'll notate it on that report
10  and send a copy of that report to the Regional
11  Director who's over that area of the state as
12  well as I'll send a copy to the reviewer because
13  they still have -- I mean, even though it was
14  entered, the information was entered into the
15  system late, they still need to review it so
16  I'll tell them to go ahead and schedule it as
17  quickly as they can for review.
18      Q.   How do those cases come to your
19  attention?
20      A.   Like I said, on that printout that we
21  get each month of Children in Custody With
22  Conference Dates More Than Six Months.
23      Q.   I guess my question is more the ones
24  that have not been scheduled because there was
25  erroneous MACWIS information, how do those cases

**Page 54**

1  come to your attention?
2      A.   We must not be talking about the same
3  thing because that's how I find out about them
4  is that report I was telling you about.
5      Q.   Let me just back up then. The
6  report, though, as I understand it is generated
7  by MACWIS, correct?
8      A.   Yes.
9      Q.   And so the dates that it tracks are
10  based on the entry dates that have been entered
11  into MACWIS, correct?
12      A.   Yeah.  What they do is, let's say a
13  child comes into custody January 1st, maybe the
14  county doesn't get around to entering that
15  custody date into the system until August 15th,
16  you know, eight months has done passed.  MACWIS
17  will pick up on that, they'll notice that
18  custody date from back in January and they'll
19  notice there's -- no Foster Care Review action
20  had been taken on it.  So the system doesn't
21  know, it just reports that there was no Foster
22  Care Review done.
23      So then that's when I go to our
24  person in the Administration Unit and we look it
25  up and see what happened.  Sometimes the

**Page 55**

1  reviewer overlooks them.  But it's rare.  It's
2  usually because of something like that.
3      Q.   So until the county enters the
4  placement date, you would have no notice as to
5  the need for a Foster Care Review, correct?
6      A.   No, sir.  No, sir.  Not unless the
7  county came to us and told us, you know, we took
8  this child into custody and the reviewers, you
9  know, would write it down.  They do keep their
10  own separate custody listings for reasons such
11  as that.  But the county has got to tell us
12  about them.  If they don't tell us, we don't
13  know.
14      Q.   Besides the requirement that they
15  enter the entry date into MACWIS, though,
16  there's no requirement that they notify the
17  Foster Care Review unit of a child being taken
18  into custody, correct?
19      A.   No.  Some of the individual
20  supervisors may tell them but I guess that's
21  just on a county by county basis.  Some folks
22  tell us, others don't.
23      Q.   Let me show you what's been
24  previously marked Exhibit 41.  Is this the Youth
25  Court Hearing and Review Summary that you

**Page 56**

1  previously testified to?
2      A.   Yes, sir.
3      Q.   If you would turn to the third page,
4  which begins part B.
5      A.   Okay.
6      Q.   Is part B the section that's filled
7  out by the Foster Care Reviewer?
8      A.   Yes, sir.
9      Q.   Is the reviewer required to list all
10  the persons invited to the Foster Care Review?
11      A.   Are you looking at 106?
12      Q.   Yes.
13      A.   MACWIS automatically populates those
14  names onto that particular page.  The social
15  worker will go in and select who is to be, you
16  know, who all is to be invited and MACWIS will
17  automatically populate them on there.  And then
18  the reviewer, on the next page, on 107, the
19  reviewer goes in and lists who actually showed
20  up, persons who attended.
21      Q.   If you turn to page 108, is this
22  where -- well, first of all, is the Foster Care
23  Reviewer required to fill out the text in answer
24  to each one of these questions?
25      A.   Yes, sir.

Page 73

1   Q.   Turn to page 28 of Exhibit 79,
2   please. First sentence states that the Foster
3   Care Review Program supervisor is housed at the
4   state office and supervises 12 Foster Care
5   Reviewers. Has this in fact changed in terms of
6   the number of Foster Care Reviewers since this
7   was prepared?
8       A.   No. We only have 11. We had a
9   secretary which made it 12. I don't know. No.
10  We only have 11 reviewers.
11      Q.   Have you ever had 12 Foster Care
12  Reviewers?
13      A.   Not that I'm aware of. I don't know.
14  Maybe I need to go back and recount. Yes. I'm
15  sorry. That's correct, 12.
16      Q.   So when we had previously gone over
17  Exhibit 34 at DHS 019706 and listed the
18  applicable Foster Care Reviewer positions --
19      A.   There's 12 but one of them has
20  retired so there's 11 right now.
21      Q.   But you have 12 PINs?
22      A.   Yes, sir.
23      Q.   And as we had gone through the list
24  we had identified 11 in 11 different county
25  offices. Do you recall what the 12th county

Page 74

1   office assignment is?
2       A.   Can I use a pen? I have to write
3   this stuff down. Let's see. Okay. I'm having
4   a hard time here.
5       Q.   Referring to 019706, you had
6   identified that there was no assignment to
7   Marion County.
8       A.   No. There's not.
9       Q.   There was only one as to Hinds
10  County, correct?
11      A.   Correct.
12      Q.   You had identified an addition to the
13  list reflected here, one assigned to Forrest
14  County and one to Greenville.
15      A.   Yes.
16      Q.   By my count that totals 11.
17      A.   That's 11, yeah. I sat here and did
18  it on my hand. I figured it up as well. But
19  it's 11. I'm sorry.
20      Q.   And so is your testimony that you
21  have 11 PINs or 12 PINs?
22      A.   It's 11.
23      Q.   And to your knowledge, has it been 11
24  since you've been head of the program?
25      A.   Yes, sir.

Page 75

1       Q.   So here on page 28 of Exhibit 79,
2   does that appear to be an error when it says
3   that you supervise 12 Foster Care Reviewers?
4       A.   Yes, sir.
5       Q.   Do the Foster Care Reviewers in
6   addition to the six-month periodic reviews
7   review randomly sampled cases on a periodic
8   basis?
9       A.   Yes, sir.
10      Q.   And what's the purpose of that
11  review?
12      A.   It's kind of a quality assurance
13  review. It's something we're going to be doing.
14      Q.   Are you currently doing it?
15      A.   Yes, sir. Just not on the scale that
16  we intend to do it.
17      Q.   Well, since when have the Foster Care
18  Reviewers been doing any kind of additional
19  quality assurance sample case reviews?
20      A.   Probably August, 2003, I believe.
21      Q.   And do you know why those were
22  initiated?
23      A.   The intent was, we were trying to
24  prepare to get ready for the Child and Family
25  Services Review. And we thought if we could go

Page 76

1   out and review some of these cases in a format
2   similar -- we weren't real familiar with the
3   Child and Family Services Review at that time.
4   And what we ended up doing was nothing like the
5   Child and Family Services Review was, but, you
6   know, we thought we were doing something good
7   there.
8       But the intent was to hopefully try
9   to, you know, prepare the counties for the
10  review, to kind of give them an idea of what
11  they're going to be reviewed on and how they
12  could, you know, kind of improve their case work
13  as a result.
14      Turns out that the reviews we were
15  doing were nothing like what the Child and
16  Family Services Review was. It was more of a
17  souped up Foster Care Review. Just kind of more
18  of a compliance thing. But since the Child and
19  Family Services Review has happened, we've
20  learned a lot more about those kind of reviews
21  and have since adjusted our approach to it,
22  which will be implemented next month.
23      Q.   With the original reviews, did you
24  have a set instrument, standard instrument, case
25  review instrument that the reviewers were using?

Page 77

1     A.   Yes, sir.
2     Q.   Was that the same or similar to the
3  quality improvement instruments that were
4  created for the previous quality improvement
5  program?
6     A.   No, sir, it wasn't similar.
7     Q.   Who developed those instruments?
8     A.   Me, along with a couple of the
9  reviewers, and a consultant that was working
10  with the agency at the time.
11     Q.   And beginning in August, 2003, how
12  many cases were being reviewed?
13     A.   With this particular review
14  instrument?
15     Q.   Yes.
16     A.   We were doing a sample of five cases
17  per month per region.
18     Q.   Was the data that was compiled
19  through this review process aggregated in any
20  way?
21     A.   Yes, sir.  We compiled a quarterly
22  report and forwarded it on to senior management,
23  the Division Director, the Unit Directors, and
24  the Regional Directors each quarter.
25     Q.   Was there an annual report as well?

Page 78

1     A.   Just what we did in the fourth
2  quarter we would total up, at the end of the
3  year we would total up all the numbers and so
4  forth and present it along with the fourth
5  quarter report.
6     Q.   And what kind of data was aggregated
7  in these quarterly reports?
8     A.   Oh, we would look to see -- focus
9  primarily on safety, permanency, and well-being
10  issues.  Looking to see if the child -- since we
11  do just review foster care cases, we were
12  looking to see if any children were being
13  mistreated or if there were any allegations that
14  a child was being mistreated in foster care or
15  while they were in agency custody.  And if so,
16  did the agency take proper steps to resolve the
17  matter.
18         Permanency questions, things like
19  were the children's individualized service plans
20  developed and approved in a timely manner, if
21  they had a permanent plan on their case plans,
22  if they had been in custody 15 or 22 months and,
23  if so, had a TPR referral been forwarded and if
24  not were there compelling reasons for not doing
25  so.

Page 79

1         Well-being questions apprised pretty
2  much of, you know, if their medical needs were
3  being met, psychological, mental health needs,
4  educational needs.  And then we would also
5  collect information on county conference
6  notification.
7     Q.   And the quarterly reports reflected
8  aggregate data on those issues?
9     A.   Yes, sir.  On those and other -- I
10  can't think of all of them off the top of my
11  head but that's -- yes, sir.
12  MR. THOMPSON:
13         Rusty, I don't believe these
14  documents have been produced and would be
15  directly responsive to plaintiff's previous
16  document request.  I would state for the record
17  that we would request those be produced.
18  MR. FORTENBERRY:
19         Let me check into it.  Also I think
20  there were a couple the other day.  Can you just
21  as a part of that letter fax something?
22  MR. THOMPSON:
23         We will follow up with a written
24  letter request.
25  MR. FORTENBERRY:

Page 80

1         Fax it to me.
2     A.   I was going to further add, after the
3  Child and Family Services Review was over with,
4  I mean, the instrument we were using was -- it
5  became obvious it was obsolete.  It was not what
6  we needed to be using.  I requested that we not
7  use it anymore.  So there was a period of a
8  couple of months where it was not being used but
9  then one of the deputies asked that we continue
10  using it again so we started it back up.  I
11  believe that was in October of 2004.
12  MR. THOMPSON:
13     Q.   In October of 2004 is when you
14  started using it again?
15     A.   We started using it back again, yes,
16  sir.
17     Q.   And that was after how many months of
18  not using it?
19     A.   Probably about two or three months.
20     Q.   And is that because none of these
21  reviews were occurring or were you using a
22  different instrument?
23     A.   They just weren't occurring.  We
24  stopped using it and it was just something we
25  started doing on our own, I guess.  It was one

Page 105

1  notate it.
2      Q.   Would the frequency of this issue
3  being noted be reflected in the detailed
4  attachments that you've testified exist as to
5  Exhibit 83?
6      A.   No. This particular document
7  doesn't. In 83, it doesn't break it down or
8  anything by the issues. It just says how many
9  were reviewed and -- how many cases were
10  reviewed and how many of those cases had issues.
11  This here is what we used to break it down with.
12      Q.   So as I understand your testimony,
13  Exhibit 83 as it is before you here is just an
14  aggregate summary of number of cases reviewed
15  and those that had issues flagged, correct?
16      A.   Yes, sir.
17      Q.   And as you know that document to be
18  created and maintained there are additional
19  detailed pages breaking it down by county and
20  region; is that correct?
21      A.   Repeat the question? I'm sorry.
22      Q.   Sure. As I understood your previous
23  testimony, attached to Exhibit 83, not before
24  you, but as you maintain it in your office, is
25  additional detailed information that breaks down

Page 106

1  some of the summary information at Exhibit 83 in
2  terms of counties and issues?
3      A.   Yes, sir. Right here. On this
4  document right here it breaks it down by county
5  and by issue here.
6      Q.   And for the record you're referring
7  to 85?
8      A.   Yeah. Exhibit 85. Yes, sir.
9      Q.   Is the information in Exhibit 85 in
10  any way further aggregated by, for example,
11  issue type in any form?
12      A.   We recently began breaking it down by
13  issue. Not by county, but we did recently begin
14  doing it by issue and by region in data form.
15      Q.   And is that a manual report --
16      A.   Yes, sir.
17      Q.   -- that your office produces?
18      A.   Yes, sir.
19      Q.   And what do you call that report?
20      A.   Itemized Issues Observed.
21      Q.   And from that report, can one then
22  determine the frequency of the lack of
23  documented face-to-face contact in any given
24  county or region?
25      A.   In region, yes, sir. MACWIS also

Page 107

1  produces a report by -- it goes by county of
2  face-to-face contacts.
3  MR. THOMPSON:
4      Rusty, just for the record, again, I
5  believe the reports as to itemized issues by
6  region produced by the Foster Care Review
7  Program have not been produced and would be
8  responsive to specific requests by plaintiffs.
9  I ask that that be produced.
10  MR. FORTENBERRY:
11      All right. If you'll give me a
12  letter summarizing the various --
13  MR. THOMPSON:
14      I will.
15      Q.   Looking back at Exhibit 85, once you
16  produced this document, does it then go back to
17  the county for a response?
18      A.   Yes, sir.
19      Q.   Who do you transmit the form to in
20  the region or county?
21      A.   I send it to the Division Director
22  who then sends it out to the region with a memo
23  attached with his -- at this time I'm saying
24  his -- with his signature or initials on it.
25  And then it goes out to the regions.

Page 108

1      Q.   And is a response then required?
2      A.   Yes, sir.
3      Q.   And within how much time is a
4  response required?
5      A.   30 days.
6      Q.   And to whom is that response required
7  to be submitted?
8      A.   The cover memo says they're to submit
9  it back to the state office. They usually send
10  it to both me and the Division Director.
11      Q.   As to any responses that are
12  generated, do they eventually all come to your
13  attention?
14      A.   The responses are kept on file in my
15  office.
16      Q.   So whether they're actually submitted
17  to the Division Director or some place else, you
18  eventually get them all, correct?
19      A.   Yes, sir.
20      Q.   Now, as to Exhibit 85, I don't see
21  any county or regional staff response documented
22  here. Do you in fact get responses on all cases
23  flagged on these Summary Report issues in foster
24  children's cases?
25      A.   I'm not sure I understand what you're

27 (Pages 105 to 108)

Mechille Henry - 09/09/04

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

OLIVIA Y, By and
Through Her Next Friend,
James D. Johnson, et al.                          PLAINTIFFS

VS.                                CIVIL ACTION NO. 3:04CV25LN

HALEY BARBOUR, As Governor
Of the State of Mississippi;
DONALD TAYLOR, as Executive
Director of the Department of
Human Services; and BILLY MANGOLD,
As Director of the Division of
Children's Services                               DEFENDANTS

DEPOSITION OF MECHILLE HENRY

Taken at the instance of the Plaintiffs at the
offices of Bradley Arant, LLP, One Jackson Place,
188 E. Capitol Street, Suite 450, Jackson,
Mississippi, on Thursday, September 9, 2004,
beginning at approximately 1:00 p.m.

APPEARANCES:

        ERIC E. THOMPSON, ESQ.
        SHIRIM NOTHENBERG, ESQ.

        Children's Rights, Inc.

        404 Park Avenue South

        New York, NY 10016

COUNSEL FOR PLAINTIFFS

Mechille Henry - 09/09/04

Page 4

1            MECHILLE HENRY,
2   having been first duly sworn, was examined and
3   testified as follows:
4   EXAMINATION BY MR. THOMPSON:
5       Q.   Good afternoon, Ms. Henry. My name is
6   Eric Thompson. I am counsel with Children's Rights
7   and I represent the plaintiffs in the matter of
8   Olivia Y. et al. Do you understand that you're here
9   to give sworn testimony in that matter?
10      A.   Yes.
11      Q.   Ms. Henry, could you spell your first
12   name for the record, please?
13      A.   M-E-C-H-I-L-E.
14      Q.   Thank you. Ms. Henry, have you ever been
15   deposed before?
16      A.   No.
17      Q.   Just a couple of ground rules. I'll be
18   asking questions. If at any time my question is
19   unclear to you, I'll be happy to rephrase it. Just
20   let me know?
21      A.   Okay.
22      Q.   If at any time you need to take a break,
23   let me know and we will do that. That's it. We'll
24   just get started. Ms. Henry, what is your current
25   position?

BETTY A. MALLETT, ESQ.
McGlinchey Stafford, PLLC
Skytel Centre South, Suite 1100
200 South Lamar Street
Jackson, Mississippi 39201


COUNSEL FOR DEFENDANTS



Reported By: Julie Brown, CSR #1587
Brooks Court Reporting
Post Office Box 2632
Jackson, Mississippi 39207
(601) 362-1995

Page 3

INDEX
                    PAGE

Appearances              1

Certificate of Deponent       124

Certificate of Court Reporter   125

        EXAMINATIONS

                PAGE

Examination By Mr. Thompson     4

        EXHIBITS

                PAGE

Exhibit 8 - MDHSSS 440 A form     70

Exhibit 9 - Investigation Report   92

Exhibit 10 - MACWIS Report      101

Exhibit 11 - Letter re: Olivia Y    110

Page 5

1      A.   Regional director.
2      Q.   And that's with?
3      A.   The Department of Human Services Division
4   of Family and Children Services.
5      Q.   And for what region are you the regional
6   director?
7      A.   6th North.
8      Q.   That covers a number of counties,
9   correct?
10     A.   Yes, ten.
11     Q.   Ms. Henry, can you tell me what you did
12   to prepare for today's deposition?
13     A.   I spoke with my attorney.
14     Q.   How long did you speak with your
15   attorney?
16     A.   Do you mean time wise?
17     Q.   Yes?
18          MS. MALLETT: Objection. I don't think
19   she has to reveal that.
20     Q.   (By Mr. Thompson) I'm not inquiring into
21   the nature of the conversation, just how long?
22          MS. MALLETT: I'm going to instruct her
23   not to answer.
24     Q.   (By Mr. Thompson) How many times did you
25   have discussions with your attorney regarding

2 (Pages 2 to 5)

Mechille Henry - 09/09/04

Page 114

1    A.   Not every case, no.
2    Q.   Have you done a sample of cases?
3    A.   Yes, I have.
4    Q.   And you've reviewed that specific
5    compliance with that specific requirement?
6    A.   I've reviewed, you may as well say I have
7    taken some cases and I have reviewed everything that
8    is required in that particular, in a foster care
9    case.
10   Q.   Which would include then your review of
11   whether or not the child received the medical
12   examination within seven days of entering custody?
13   A.   Right. I would look at the medical part.
14   If it's not completed, then what I used to do would
15   be to do a screen print of that particular tab or
16   whatever you want to call it, screen. And
17   basically, I would fax it or mail it to the
18   supervisor and say that this information needs to be
19   completed.
20   Q.   You say you used to do that. Do you no
21   longer do that?
22   A.   When I say I used to, what I'm saying is
23   that when I was required to go to court sometimes
24   two days out of a week, and now I'm having to attend
25   another court thing that's a half a day a week. I

Page 115

1    don't review as frequently, but I have been at work
2    at 11 o'clock and midnight, a couple of weeks ago,
3    2 a.m. and 5 a.m. in order to get some things done
4    that needed to be done. So what I'm saying is I
5    don't do them as a magnitude as I used to because of
6    the time, well, the time consumption that I have.
7    Q.   Do you have any other D H S staff who
8    function in a quality assurance role to review cases
9    for compliance with policy and law?
10   A.   Our foster care reviewers.
11   Q.   And is there currently a foster care
12   reviewer assigned to your county?
13   A.   Yes.
14   Q.   Is there more than one?
15   A.   There is. They cross regions, so you may
16   have one only in your region. You may have two or
17   three in your region.
18   Q.   And in your region, how many do you have?
19   A.   Approximately four.
20   Q.   And are they solely, those four solely
21   responsible for cases within your region?
22   A.   They're responsible for, they may be
23   responsible for some cases in another region, too,
24   I'm not sure.
25   Q.   How many foster care cases do you have in

Page 116

1    your region?
2    A.   Probably at least 600.
3    Q.   How many investigations do you receive a
4    year in your region?
5    A.   I don't know.
6    Q.   Well, do you ever review data as to that
7    number?
8    A.   I more review the investigations
9    theirselves or the other components of it as opposed
10   to the total number.
11   Q.   Well, do you think it would be relevant
12   to know the total number in terms of whether or not
13   your staff is in fact able to cover the number of
14   cases that are coming in?
15   A.   That's more, I look at that more on a, as
16   opposed to a annual total number or anything like
17   that. I look at that more with staffing with my
18   supervisors, or if I'm looking at the log for a
19   month. You know, believe me, when it comes to
20   staffing issues, my supervisors keep me well aware
21   of when they need some staff, believe me, or when
22   they are getting a lot of investigations, or if
23   there are some, you know, they keep me aware of
24   issues.
25   Q.   And how do they do that?

Page 117

1    A.   Call me. And I see them.
2    Q.   Have you ever received any memos from
3    your staff as to the staffing conditions and case
4    loads?
5    A.   I've received one recently where they
6    were requesting that if at all possible, they be
7    able to hire another social worker. And I asked
8    them did they have anyone that was interested. And
9    they said that they did, so I forwarded the memo
10   along with the application to my state office.
11   Q.   Have you ever communicated to your
12   superiors the need in your region or any particular
13   counties in your region for additional staff?
14   A.   Yes, I mean, we all, we tell them that we
15   would like to have, I mean, that's ultimate, you
16   would want to have more staff. You know, because if
17   just, just be, say for instance, if you had an
18   office where there were five people and people were
19   working and they would want their jobs, you know,
20   they would love to have five more people to come in
21   and take some of the work.
22   So yes, I mean, I have asked, you know,
23   that we could get additional staff across the
24   region, even for those counties where there is
25   probably people with not a whole lot of work. That

30 (Pages 114 to 117)

1         IN THE UNITED STATES DISTRICT COURT       Page 1

       FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

2              JACKSON DIVISION

3

4  OLIVIA Y., ET AL

                          PLAINTIFFS

5  VERSUS        CIVIL ACTION NO. 3:04CV251LN

6  HALEY BARBOUR, ET AL

                          DEFENDANTS

7

8

9

10          DEPOSITION OF LINDA MILLSAPS

11

12      Taken at Bradley, Arant, Rose & White,

       Jackson, Mississippi, on

13     Thursday, June 2, 2005,

       beginning at 12:50 p.m.

14

15

16

17

18

19

20  REPORTED BY:

21   ELISA M. MEDDERS, BCR, CSR #1670

     State-Wide Reporters

22   4400 Old Canton Road

     Suite 160(39211)

23   Post Office Box 14113

     Jackson, Mississippi 39236

24   Telephone:  (601) 366-9676

     Fax:  (601) 366-9756

25

Page 2

1  APPEARANCES:
2
3     ERIC E. THOMPSON, ESQUIRE
      CORENE KENDRICK, ESQUIRE
      Children's Rights, Inc.
4     404 Park Avenue South
      New York, New York  10016
5     Telephone:  (212) 683-2210
      Fax:  (212) 683-4015
6        ATTORNEYS FOR PLAINTIFFS
7
      BETTY A. MALLETT, ESQUIRE
8     RUSTY FORTENBERRY, ESQUIRE
      McGlinchey Stafford, PLLC
9     200 South Lamar Street
      Suite 1100
10    Jackson, Mississippi  39201
      Telephone:  (601) 960-8400
11    Fax:  (601) 960-8431
         ATTORNEYS FOR DEFENDANTS
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1                STIPULATION
2        It is hereby stipulated and agreed by
3   and between the parties hereto, through their
4   respective attorneys of record, that this
5   deposition may be taken at the time and place
6   hereinbefore set forth, by Elisa M. Medders,
7   Court Reporter and Notary Public, pursuant to
8   the Federal Rules of Civil Procedure, as
9   amended;
10       That the formality of READING AND
11  SIGNING is specifically NOT WAIVED;
12       That all objections, except as to the
13  form of the questions and the responsiveness of
14  the answers, are reserved until such time as
15  this deposition, or any part thereof, may be
16  used or is sought to be used in evidence.
17                   ---
18
19
20
21
22
23
24
25

Page 3

1        T-A-B-L-E O-F C-O-N-T-E-N-T-S
2   Examination By:
3     Mr. Thompson........................... 5
4   Exhibits:
5     Exhibit 59, Individual Service Plan..... 19
6     Exhibit 60, Foster Care Review,
          Summary Report...................... 43
7
8   Stipulation................................ 4

    Certificate of Court Reporter.............. 95
9
    Witness Signature Sheet.................... 96
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1                LINDA MILLSAPS
2       having been first duly sworn, was
3       examined and testified, as follows:
4                 EXAMINATION
5   BY MR. THOMPSON:
6       Q.   Good afternoon.
7       A.   Okay.
8       Q.   My name is Eric Thompson.  I'm an
9   attorney for plaintiffs with Children's Rights
10  on the case Olivia Y. V. Barbour.
11       Do you understand that you're here
12  today to give testimony in that case?
13       A.   Yes, I understand.
14       Q.   Ms. Millsaps, could you tell me what
15  your current position is with DFCS?
16       A.   Yes.  I am a program administrator
17  junior.
18       Q.   And with which unit?
19       A.   The adoption unit, Southern District.
20       Q.   The Southern District encompasses
21  Regions 5 and 6, north and south; is that
22  correct?
23       A.   That's correct.
24       Q.   Okay.  And where is your office
25  physically located?

2 (Pages 2 to 5)

Page 6

1    A.   In 4, Region 4, in Laurel.
2    Q.   I'm sorry.  In Laurel?
3    A.   In Laurel, uh-huh.
4    Q.   And that's the Laurel county office?
5    A.   Exactly.  Jones County.
6    Q.   Okay.  And as a program administrator
7    for the adoption unit, what are your job
8    responsibilities?
9    A.   Okay.  I am responsible for overseeing
10   the children that's legally free for adoption in
11   the Southern District; myself, along with the
12   staff.
13   Q.   Any other job responsibilities?
14   A.   That's the main responsibility.
15   Q.   Does that include recruiting for
16   adoptive families?
17   A.   It does.
18   Q.   Does it include doing home studies on
19   potential adoptive families?
20   A.   Yes.
21   Q.   And, if you know, how many children
22   are currently legally free in the Southern
23   Region?
24   A.   Currently, we have approximately 200.
25   Q.   Do those children still have a

Page 7

1    caseworker assigned to them?
2    A.   Yes, they do.
3    Q.   And that's separate from the adoption
4    staff, correct?
5    A.   It is.
6    Q.   Do the caseworkers continue to have
7    all their regular duties to monitor the safety
8    and services provided to those children that
9    they are assigned to?
10   A.   Yes.
11   Q.   Do you have staff that you supervise?
12   A.   Yes, I do.
13   Q.   And what kind of staff do you
14   supervise?
15   A.   Adoption workers, specialists.
16   Q.   Those are what are known as adoption
17   specialists?
18   A.   Uh-huh, exactly.
19   Q.   How many do you have in the Southern
20   Region?
21   A.   We currently have six.
22   Q.   And who do you report to directly?
23   A.   The program administrator senior in
24   the state office.
25   Q.   And who is that?

Page 8

1    A.   Phoebe Clark.
2    Q.   How long have you had your position?
3    A.   I'm currently -- it's three years.
4    I've been with the department longer, but in
5    this position, I've been in it approximately
6    three years.
7    Q.   And prior to this position, were you
8    working in adoptions?
9    A.   Yes, I was.  An adoption specialist.
10   Q.   As an adoption specialist?
11   A.   Uh-huh.
12   Q.   Also in the Southern Region?
13   A.   Exactly.
14   Q.   Since you've held your current
15   position, have you always reported to
16   Phoebe Clark?
17   A.   No, I haven't.
18   Q.   How long have you been reporting to
19   Phoebe Clark for?
20   A.   Approximately two years.
21   Q.   So for the past two years, she has
22   been the director of the adoption unit?
23   A.   Exactly.
24   Q.   The six adoption specialists that you
25   currently supervise, do you have any other PIN

Page 9

1    positions allocated for adoption specialists in
2    the Southern Region?
3    A.   One.
4    Q.   One additional one?
5    A.   Uh-huh.
6    Q.   And that is a vacant position?
7    A.   It's vacant.
8    Q.   How long has that position been
9    vacant?
10   A.   I'd say approximately a year.
11   Q.   Do you know if there are any current
12   efforts to fill that position?
13   A.   Not to my knowledge.
14   Q.   Do you know why not?
15   A.   Not to my knowledge.  I mean, I
16   requested to fill the vacant PIN, and I was just
17   told they're not gonna fill it right now.
18   Q.   And that's somebody in the state
19   office who told you that?
20   A.   My supervisor.
21   Q.   What, specifically, are the
22   responsibilities of the adoption specialists?
23   A.   They are responsible for locating a
24   permanent home for the children that's legally
25   free for adoption.

3 (Pages 6 to 9)

Page 50

1    Q.  And you could cross-check that report
2  against the workload report that you receive
3  from MACWIS; is that correct?
4    A.  Yes. I can. I can.
5    Q.  And just to confirm, the workload
6  report you testified to earlier is also a MACWIS
7  report?
8    A.  It is.
9    Q.  And is that workload report generated
10  on a monthly or quarterly basis?
11    A.  No, it's not.
12    Q.  Is it an ad hoc report?
13    A.  You mean -- explain -- what do you
14  mean by that?
15    Q.  I guess what I'm asking is, is the
16  workload report generated on a periodic or
17  regular basis, or is it generated upon request?
18    A.  I mean, it's reviewed on the screen
19  daily. I mean, just --
20    Q.  I see. You can pull up the workload
21  report on the screen?
22    A.  Yeah. Yeah.
23    Q.  You don't have to request the state
24  office to send you a printout of the workload
25  report?

Page 51

1    A.  No, I don't.
2    Q.  Do you, in fact, print out the
3  workload report?
4    A.  No, I don't.
5    Q.  So you would have no paper copies of
6  this workload report?
7    A.  No, I don't. Other than manually.
8    Q.  I'm sorry?
9    A.  Manually. I have a manual report.
10    Q.  In other words, a report that's
11  created manually?
12    A.  Exactly.
13    Q.  And is that something you create?
14    A.  Yes, I did.
15    Q.  And what is on the manual report as
16  opposed to the MACWIS workload report?
17    A.  Basically, the same information.
18    Q.  And this manual report is something
19  that you maintain in your office?
20    A.  I do.
21    Q.  Do you maintain that in a separate
22  file?
23    A.  Yes, I do.
24    Q.  And do you create this workload report
25  on any specific periodic basis?

Page 52

1    A.  Yes, I do.
2    Q.  And how often do you create this
3  report?
4    A.  Quarterly.
5    Q.  Do the adoption specialists have any
6  written policies that they can refer to
7  regarding the home study process?
8    A.  Yes, they do.
9    Q.  And where would those policies be?
10    A.  They are located in the agency's
11  policy manual.
12    Q.  Is there anyplace else besides the DHS
13  policy manual that would spell out criteria for
14  selecting an adoptive home for a child?
15    A.  Yes. We have a concise guide that we
16  compiled, the administrators did. They'd have
17  that information to use.
18    Q.  And this guide, does it have a name?
19    A.  No, it doesn't.
20    Q.  What is the subject matter of this
21  guide?
22    A.  I don't understand what --
23    Q.  You stated that there's a guide that's
24  been compiled by some of the administrators?
25    A.  Like, it's -- it's just a notebook,

Page 53

1  for example, if you -- like the home study -- it
2  has the home study process, what information to
3  put in the home study.
4    Q.  And how is this guide maintained or
5  distributed to staff?
6    A.  It's updated as needed, staff
7  meetings.
8    Q.  Is this a guide that's then available
9  to the adoption specialists to consult?
10    A.  Yes, it is.
11    Q.  Okay. And do they each have a copy of
12  this guide?
13    A.  They do.
14    Q.  And does the guide principally, then,
15  address the process and criteria for selecting
16  an adoptive home?
17    A.  No, it doesn't.
18    Q.  What does it principally address?
19    A.  Just the assessment, the home study
20  assessment itself, the child evaluation of the
21  child.
22    Q.  Would it be fair to characterize this
23  as an adoption specialist's guide?
24    A.  Just a guide. I mean --
25    Q.  Is it a guide that's designed to

14 (Pages 50 to 53)

1          IN THE UNITED STATES DISTRICT COURT

2         FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

3                   JACKSON DIVISION

4

5     OLIVIA Y., et al.                        PLAINTIFFS,

6

7     VS.                      CIVIL ACTION NO. 3:04CV251LN

8

9     HALEY BARBOUR, et al.                    DEFENDANTS.

10

11            30(b)(6) DEPOSITION OF NANCY MEADORS

12

13      Taken at the offices of Bradley, Arant, Rose & White, LLP,

14    on Tuesday, May 16, 2005, beginning at 8:40 A.M.

15

16

17

18    REPORTED BY:

19          REBECCA A. KIDDER

20          State Wide Reporters

21          4400 Old Canton Road, Suite 201 (39211)

22          Post Office Box 14113

23          Jackson, Mississippi  39236

24          Telephone: (601) 366-9676

25          Fax: (601) 366-9756

Page 2

```
 1    APPEARANCES:
 2
 3        ERIC E. THOMPSON, ESQUIRE
 4        TARA S. CREAN, ESQUIRE
 5        Children's Rights
 6        404 Park Avenue South
 7        New York, New York 10016
 8        Telephone: 212.683.2210
 9        Fax: 212.683.4015
10        ATTORNEYS FOR PLAINTIFFS
11
12        BETTY A. MALLETT, ESQUIRE
13        McGlinchey Stafford, PLLC
14        Skytel Centre South, Suite 1100
15        200 South Lamar Street
16        Jackson, Mississippi 39201
17        Telephone: 601.960.8424
18        Fax: 601.960.8431
19        ATTORNEY FOR DEFENDANTS
20
21
22
23
24
25
```

Page 4

```
 1                    STIPULATION
 2        It is hereby stipulated and agreed by and between the
 3    parties hereto, through their respective attorneys of record,
 4    that this deposition may be taken at the time and place
 5    hereinbefore set forth, by Rebecca A. Kidder, Court Reporter and
 6    Notary Public, pursuant to the Mississippi Rules of Civil
 7    Procedure, as amended;
 8        That the formality of READING AND SIGNING is
 9    specifically NOT WAIVED;
10        That all objections, except as to the form of the
11    questions and the responsiveness of the answers, are reserved
12    until such time as this deposition, or any part thereof, may be
13    used or is sought to be used in evidence.
14                        ---
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1            T-A-B-L-E  O-F  C-O-N-T-E-N-T-S
 2    Examination By:                          Page
 3        MR. THOMPSON                            5
 4    Exhibits:
 5        43: excerpt w/ case reporting requirements      12
 6        44: direct service primary clients by region    72
 7        45: direct service cases                73
 8        46: outcomes for the direct service of placement 77
 9        47: MACWIS report regarding missing placement    78
10        48: MACWIS report regarding dormant cases        79
11        49: MACWIS report regarding child abuse
12            and neglect intake report           80
13        50: MACWIS report regarding child
14            investigation timeliness            81
15        51: MACWIS report regarding the number of
16            children in placements by placement type  82
17        52: MACWIS report regarding the number of
18            court ordered TPR requests          85
19        53: MACWIS report regarding the number of
20            children free for adoption          86
21        54: MACWIS report regarding the number of
22            children's adoptions finalized      87
23    Stipulation                          .      4
24    Certificate of Court Reporter               90
25    Witness Signature Sheet                     91
```

Page 5

```
 1                    NANCY MEADORS
 2        having been first duly sworn, was
 3        examined and testified as follows:
 4
 5                    EXAMINATION
 6    MR. THOMPSON:
 7        Q.  Good morning, Ms. Meadors. My name is Eric
 8    Thompson. This is Tara Crean. We both represent plaintiffs in
 9    the action of Olivia Y. v Barbour. Do you understand that
10    you're here to give us sworn testimony in that matter?
11    THE WITNESS:
12        A.  Yes.
13        Q.  Thank you. Ms. Meadors, what's your current
14    position with DHS?
15        A.  I'm a project officer for Special.
16        Q.  And that's with the Division of Youth and Family
17    Services?
18        A.  Family and Children services.
19        Q.  I'm going to show you what's been previously
20    marked Exhibit 34 which is an organizational chart beginning
21    with the state office. Is that your position down at the
22    bottom: 'Project Officer for Special?'
23        A.  Yes.
24        Q.  And that's under the director of administration;
25    is that correct?
```

STATE-WIDE REPORTERS (228) 432-0770

Page 46

1   would fill out?
2       A.  Yes.
3       Q.  Is a case worker able to make entries on a
4   child's MACWIS case record without being the assigned case
5   worker identified in the system?
6       A.  They could add a narrative to the case.
7       Q.  Are they able to make any sort of any other data
8   entries that are required of the ongoing case worker?  Let me
9   ask you a specific example.  Would someone, other than the
10  assigned case worker, be able to input updated information as to
11  the child's placement, for example?
12      A.  No.
13      Q.  It would have to be the assigned case worker or
14  the supervisor?
15      A.  Yes.
16      Q.  So a social work aid or SWA could not make those
17  types of entries; correct?
18      A.  No.
19      Q.  Likewise, for a homemaker for example?
20      A.  No.
21      Q.  Both a homemaker and a SWA could make narrative
22  entries in the case then?
23      A.  Yes.
24      Q.  In light of that, do you know how case recording
25  is occurring in counties where there are no full-time case
                STATE-WIDE REPORTERS (228) 432-0770

Page 47

1   workers assigned?
2       MS. LOWRY:
3           I'm going to object to that.
4       THE WITNESS:
5           A.  If there is no social worker working in the
6   county that's assigned to the county then the regional director
7   for that county would have another social worker from another
8   county to fill in until a social worker was hired.
9       MR. THOMPSON:
10      Q.  In terms of MACWIS case recording, a covering
11  social worker would need to be formally designated then as the
12  assigned case worker that; is that correct?
13      A.  Yes.
14      Q.  Otherwise they could make any of these MACWIS
15  entries besides narrative; is that correct?
16      A.  Right.
17      Q.  Are you aware that staff had been detailed from
18  the state office to counties such as Forrest County for certain
19  periods of time to assist with casework tasks there?
20      A.  Yes.
21      Q.  Would it be the same thing for those social
22  workers regarding their ability during the time of their
23  detailing to a county office such as Forrest County that they
24  would need to be designated in MACWIS as the assigned case
25  worker for cases on which they were covering?
                STATE-WIDE REPORTERS (228) 432-0770

Page 48

1       A.  They could be proxy.  If there's a worker
2   in the county, they can be proxy for that worker.
3       Q.  Can you explain what you mean by proxy?
4       A.  The supervisor and regional director have to make
5   a request to the state office, to Ms. Saulters, for any proxy's
6   that are put in the system.  She decides, Ms. Saulters decides
7   if it's a valid request.  If it is, she enters the proxy
8   information into the system which allows another worker to login
9   as a proxy for the worker in the county and they have access to
10  that worker's work load and can do work on the cases just like
11  the case worker.
12      Q.  Are these requests for proxies made through the
13  MACWIS system, or --
14      A.  No; paper.
15      Q.  -- is this a written request?
16      A.  Yes.
17      Q.  When a child is placed in a different county than
18  the original county's responsibility, the county and the county
19  office that has the child placed in their county is then
20  responsible for certain ongoing services for the child; is that
21  correct?
22      A.  Yes.
23      Q.  Hence the designation county of service?
24      A.  Yes.
25      Q.  Is a case worker in the county of service somehow
                STATE-WIDE REPORTERS (228) 432-0770

Page 49

1   assigned to that child?
2       A.  Yes.
3       Q.  Is that assignment also reflected in MACWIS?
4       A.  Yes.  It's on the assigned transfer screen.
5       Q.  So the system allows for two case workers to be
6   assigned at the same time to the child; is that correct?
7       A.  Yes.
8       Q.  Does the system reflect or distinguish between a
9   county of responsibility case worker or a county of service case
10  worker?
11      A.  Yes.
12      Q.  So one would be able to look up the assigned
13  transfer screen?
14      A.  Yes.
15      Q.  And both workers would show up?
16      A.  Yes.
17      Q.  And from the screen one would be able to tell who
18  was the social worker from the county of responsibility and who
19  is the one from the county of service?
20      A.  Yes.
21      Q.  As you understand it, they both have different
22  responsibilities at that point?
23      A.  Yes.
24      Q.  So once a case worker is assigned in the county
25  of service they then have the same abilities to update and
                STATE-WIDE REPORTERS (228) 432-0770

13 (Pages 46 to 49)

Kathy Triplett.061405.txt

Kathy Triplett, 6/14/05                                    1

1           IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
2                     JACKSON DIVISION

3

4    OLIVIA Y., ET AL.,

5                                        PLAINTIFFS

6    VS.                            NO. 3:04CV251LN

7    HALEY BARBOUR, AS GOVERNOR OF
     THE STATE OF MISSISSIPPI, ET
8    AL.,
                                         DEFENDANTS
9

10           DEPOSITION OF MS. KATHY TRIPLETT

11          Taken by the Plaintiffs at the offices of Bradley
         Arant Rose & White located in Jackson, Mississippi
12       beginning at 10:00 a.m. on Tuesday, June 14, 2005.

13

14    APPEARANCES:

15    Representing the Plaintiff(s):

16          ERIC E. THOMPSON, ESQ.
           Tara S. Crean, ESQ.
17         Children's Rights, Inc.
           404 Park Avenue South
18         New York, New York 10016

19    Representing the Defendant(s):

20          RUSTY FORTENBERRY, ESQ.
           McGlinchey Stafford, PLLC
21         200 South Lamar Street, Ste. 1100
           Jackson, MS   39201
22

23

24    REPORTED BY:   BARBARA L. CRAWFORD, CSR #1182
                     Metro Court Reporting Services
25                   709 Windward Road
                     Jackson, MS   39206
                     COMPUTER-AIDED TRANSCRIPTION BY
                     METRO REPORTING (601) 368-9616

Kathy Triplett, 6/14/05                                    2

1                     TABLE OF CONTENTS
                         Page 1

Kathy Triplett.061405.txt

2                                                        PAGE

3

4    Title & Appearances ...........................  1

5

6    Contents ......................................  2

7

8    EXAMINATION OF MS. KATHY TRIPLETT:

9        By Mr. Thompson ...........................  3

10

11   Signature Page ................................  93

12

13   Certificate Page ..............................  94

14

15                   E-X-H-I-B-I-T-S

16

17   Exhibit No. 61, Notice ........................  3

18   Exhibit No. 62, Procedures ....................  4

19   Exhibit No. 63, 2003 Foster care investigations.  52

20   Exhibit No. 64, Review & Recommendations .......  55

21   Exhibit No. 65, Intake Form ...................  76

22

23

24

25

                COMPUTER-AIDED TRANSCRIPTION BY
                METRO REPORTING (601) 368-9616

0

     Kathy Triplett, 6/14/05                          3

1                    MS. KATHY TRIPLETT,

2         having first been duly sworn, was examined

3         and testified as follows, to wit:

4    EXAMINATION BY MR. THOMPSON:
                        Page 2

Kathy Triplett.061405.txt

5      Q.    Good morning, Ms. Triplett.

6      A.    Good morning.

7            MR. THOMPSON:  Let me get this marked as

8            Exhibit 61.

9    (EXHIBIT NO. 61 WAS MARKED FOR THE RECORD.)

10     Q.    (By Mr. Thompson) Let me show you what's been

11   marked Exhibit 61, which is the 30(b)(6) Notice of

12   Deposition to DHS.  If you will, turn to Exhibit A of

13   that Notice.  Do you understand that you're here today

14   to give sworn testimony in the matter of Olivia Y. v.

15   Barbour?

16     A.    Yes, I do.

17     Q.    And do you understand that you've been

18   designated to testify to the matters in Exhibit A of

19   this Notice?

20     A.    Yes, I do.

21     Q.    Do you, in fact, have knowledge as to the

22   matters listed in Exhibit A of the Notice?

23     A.    Yes, I do have some knowledge.

24     Q.    Ms. Triplett, are you still the Division

25   Director for the Protection Unit?

                COMPUTER-AIDED TRANSCRIPTION BY
                METRO REPORTING (601) 368-9616

Ü

Kathy Triplett, 6/14/05                              4

1      A.    Yes, I am.

2            MR. FORTENBERRY:  Just for the record,

3            we're reserving objections, except as to the

4            form of questions?

5            MR. THOMPSON:  Yes, thank you.

6            MR. FORTENBERRY:  I was just making sure.

7      Q.    (By Mr. Thompson) Ms. Triplett, you're
                        Page 3

Kathy Triplett.061405.txt

8      familiar with the policies of DHS regarding -- are you

9      familiar with the policies of DHS regarding the

10     investigation of abuse and neglect of --

11         A.    Yes.

12         Q.    -- children in foster care custody?

13         A.    Yes.

14              MR. FORTENBERRY:   Let me have this marked

15              as Exhibit 62.

16     (EXHIBIT NO. 62 WAS MARKED FOR THE RECORD.)

17         Q.    (By Mr. Thompson) Let me show you what has

18     been marked as Exhibit 62.  Do you recognize this to be

19     various excerpts from the DHS policy manual?

20         A.    Yes.

21         Q.    Just for the record, we're looking at Bates

22     DHS 00096 through 00145.  If you will turn to the first

23     page regarding mandated reporters, would DHS social

24     workers be considered mandated reporters under this

25     definition?

                    COMPUTER-AIDED TRANSCRIPTION BY
                    METRO REPORTING (601) 368-9616

Kathy Triplett, 6/14/05                           5

1          A.    Yes.

2          Q.    So, if a social worker became aware of any

3      reports or concerns regarding suspicions of abuse and

4      neglect of a child in DHS custody, would they be

5      mandated to make some report of that to the agency?

6          A.    Yes.

7          Q.    And would you, in fact, expect a social

8      worker with DHS to make a written report to that

9      effect?

10         A.    Well, in accordance with the policy,
                          Page 4

Kathy Triplett.061405.txt

3   that?

4       A.    Yes, I do.

5       Q.    In Mississippi, would that be a county, a

6   county district attorney, if you know?

7       A.    It would be one of the district attorneys

8   with their judicial districts that are set up.  I don't

9   know if they're referred to as county district

10  attorneys or not.

11      Q.    Number five is a requirement to advise the

12  youth court; is that right?

13      A.    Yes, uh-huh.

14      Q.    And that would certainly apply to an

15  allegation regarding a child in DHS custody?

16      A.    Yes.

17      Q.    Let's skip to Bates 100.  Again, as I

18  understand it, there are some provisions for lesser

19  allegations and your understanding would be that these

20  requirements would apply regardless of whether the

21  child is in DHS custody or not, correct?

22      A.    I'm sorry.  Which requirements?

23      Q.    Up at the top, as I understand it, these are

24  provisions for lesser allegations and they are

25  requirement numbers one through three.  You see that?

COMPUTER-AIDED TRANSCRIPTION BY
METRO REPORTING (601) 368-9616

Kathy Triplett, 6/14/05                        14

1       A.    Yes, yes, that is true.

2       Q.    And so, just to be clear for the record, you

3   would agree that those requirements apply whether the

4   child is in DHS custody or not, correct?

5       A.    Correct.

Kathy Triplett.061405.txt

6    Q.    Now, when we're talking about the

7    requirements that the report would be documented,

8    currently that means documentation in MACWIS; is that

9    correct?

10        A.    Yes.

11        Q.    Historically, that would include some paper

12   documentation prior to the implementation of MACWIS?

13        A.    Yes.

14        Q.    Are you aware of any paper documentation that

15   is still required now that MACWIS has been implemented

16   regarding the reporting of suspected child abuse and

17   neglect?

18        A.    For whom?

19        Q.    For children in DHS custody, for example?

20        A.    I mean, by staff or --

21        Q.    Well, let's start with that, by staff.

22        A.    I'm not aware.  I can't think of anything

23   that's required.

24        Q.    Is it fair to say, though, that for third

25   parties who are reporting child abuse and neglect that

COMPUTER-AIDED TRANSCRIPTION BY
METRO REPORTING (601) 368-9616

Kathy Triplett, 6/14/05                          15

1    may come in to DHS in a written form?

2        A.    Yes, it could.

3        Q.    Whether it's some correspondence or

4    facsimile, for example?

5        A.    Yes.

6        Q.    And if there is such a report, though, you

7    would -- or the policies that that report be reflected

8    in the MACWIS system, as well?

Page 13

Kathy Triplett.061405.txt

9       A.     Yes, yes.

10      Q.     Are you aware of any reports ever coming in

11    through DHS's website?

12      A.     Yes.

13      Q.     Would those be reports -- what format do

14    those reports come in?  Is it e-mails?

15      A.     Yes.

16      Q.     Exclusively e-mail, is that how it's received

17    through the website?

18      A.     I've never seen any -- I've only seen reports

19    that have come in through e-mails, through the website.

20      Q.     My understanding is that the county and

21    regional staff does not have access to e-mail

22    currently; is that correct?

23      A.     That's correct.

24      Q.     Where would that --

25      A.     Let me clarify that.  It could be happening

                     COMPUTER-AIDED TRANSCRIPTION BY
                      METRO REPORTING (601) 368-9616

Kathy Triplett, 6/14/05                              16

1    as we speak.  I don't know.  Because it's my

2    understanding that is being worked on currently.  So,

3    to my knowledge, they still don't.

4      Q.     Are you aware of where this e-mail -- who

5    would be receiving this e-mail on behalf of DHS?

6      A.     When I have received reports that have been

7    passed on, they have come to me through the Management

8    Information Systems Division.  That's the only way that

9    I know of those.  So, I would think that that's the way

10   that all of them come in, but I don't know that.  I

11   just know how I receive them when I receive them.

                          Page 14

Kathy Triplett.061405.txt

12          Q.    Are you the person who is designated to

13     receive those?

14          A.    I have -- there is nothing that is

15     established to say that I am the person designated to

16     receive those within the office, but I have received

17     them when e-mails are often given to someone else and

18     said -- referred to someone and say do you handle this?

19     I've received them in that manner.

20          Q.    Let me just make sure I understand.  You said

21     the Management Information Systems function is where

22     the e-mails first come in?

23          A.    Well, I'm saying that's where I've received

24     them.  I don't know if that's where all of them come

25     in.  The only knowledge that I have of the e-mails that

COMPUTER-AIDED TRANSCRIPTION BY
METRO REPORTING (601) 368-9616

Kathy Triplett, 6/14/05                    17

1      have reports of abuse and neglect are reports that I

2      have personally seen and I have received from

3      Management Information Systems.

4           Q.    And I'm sorry.  Who's in charge of Management

5      Information Systems?

6           A.    I believe his name is Bud Douglas.  I'm not

7      really sure of his name.  I believe he's the division

8      director for that.

9           Q.    Is that a separate division within DHS?

10          A.    Yes.

11          Q.    It's not part of Children Family Services?

12          A.    No.

13          Q.    And do you get those e-mails forwarded to you

14     by e-mail?

Page 15

Kathy Triplett.061405.txt

15    A.   Yes.

16    Q.   What do you do with them when you get them?

17    A.   I then pass them on to our hotline and we

18  ensure that they are entered into the system if we have

19  enough information. Sometimes we contact the center

20  again for additional information.

21    Q.   So, the expectation is that these will be

22  treated just as a hotline call would in terms of the

23  information that's contained therein?

24    A.   Yes. If it is a report of abuse and neglect,

25  yes.

COMPUTER-AIDED TRANSCRIPTION BY
METRO REPORTING (601) 368-9616

Kathy Triplett, 6/14/05         18

1    Q.   What is the role of the hotline once they do

2  receive a report of abuse and neglect?

3    A.   They will, at some point, enter that

4  information into the system, whether they need to seek

5  additional information first or if they have enough

6  information to enter it at that time. They then call

7  the -- our practice is to contact the county to notify

8  someone in the county office that a report has been

9  entered into MACWIS. If the system is down, we would

10  fax the information.

11    Q.   Now if we're talking just about children in

12  DHS custody, they already have a MACWIS file, correct?

13    A.   Of the children in custody?

14    Q.   Yes.

15    A.   Yes.

16    Q.   In other words, they have a case record

17  that's opened on MACWIS?

Page 16

Kathy Triplett.061405

18    A.    Yes.

19    Q.    And is that where the hotline intake report

20    would be entered?

21    A.    No.  The reports, if a report of a child in

22    custody is entered by the hotline, it would still -- it

23    would be entered as a report of abuse and neglect.  It

24    would go, if I'm not mistaken -- it doesn't go into the

25    child's file.  If I'm not mistaken, somehow the

COMPUTER-AIDED TRANSCRIPTION BY
METRO REPORTING (601) 368-9616

Kathy Triplett, 6/14/05                              19

1    regional directors are able to see those reports if I'm

2    not mistaken.  I'm not really sure of how that happens

3    or how they see that, but it's not entered into the

4    child's case.  It is attached to the child's name.

5    Q.    My understanding is that we have another

6    witness later on today who is going to address MACWIS

7    issues specifically, but as I understand it, you don't

8    know exactly how this information is entered, whether

9    it's directly into the child's MACWIS case record or

10   not; is that correct?

11   A.    That's correct.

12   Q.    What about the county or regional level when

13   a social worker is entering information about a report

14   of suspected abuse and neglect?  Where does that get

15   entered?

16   A.    As far as being entered into the system?

17   Q.    Yes.

18   A.    Any report of abuse and neglect would be

19   expected to be entered into the system.  Exactly how it

20   would happen in each county office, I don't know.

Page 17

Kathy Triplett.061405.txt

23        Q.    (By Mr. Thompson) Now under agency employees

24    at No. 2, there's a note that the regional director

25    determines the need for a social worker from outside

COMPUTER-AIDED TRANSCRIPTION BY
METRO REPORTING (601) 368-9616

Kathy Triplett, 6/14/05                                    31

1     the county to investigate.  You see that?

2        A.    Yes.

3        Q.    Is that, in fact, the practice within DHS for

4     special investigations?

5        A.    It's my understanding that that is the

6     practice.

7        Q.    As to agency homes, the section that follows,

8     are these the kinds of investigations that are now

9     labeled resource reports?

10       A.    Yes.

11       Q.    If you turn to page 132 at No. 4 where it

12    indicates that Family and Children's Services staff

13    will notify the Protection Unit upon receiving a report

14    that involves allegations of child abuse or neglect

15    within the following listed facilities.  Do social

16    workers, in fact, directly notify the Protection Unit

17    of such allegations?

18       A.    Not just social workers.  Many times I'm

19    notified or we're notified by the regional directors or

20    Area Social Work Supervisors.

21       Q.    But this requirement that the social work

22    staff notify you directly, is that, in fact, the

23    practice?

24       A.    Yes, that is the practice.

25       Q.    And how do you get notified?

Page 28