**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION**

**OLIVIA Y.,** *et al.,*
**For And On Behalf of All Others Similarly Situated**                    **PLAINTIFFS**

**v.**                                                            **CIVIL ACTION NO. 3:04CV251**

**HALEY BARBOUR,**
**as Governor of the State of Mississippi,** *et al.*                     **DEFENDANTS**

<u>**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON LIABILITY**</u>

Plaintiffs respectfully move this Court for summary judgment on liability, pursuant to

Federal Rule of Civil Procedure 56, because there are no genuine issues of material fact as to

Plaintiffs' substantive due process claim.   In support of this Motion, Plaintiffs submit the

following exhibits:

| | | |
|---|---|---|
| Ex. 1 | | Dr. Sue Steib expert report, March 31, 2006 ("Steib Expert Rpt.") |
| Ex. 2 | | Dr. Bill Brister expert report, February 7, 2006 ("Brister Expert Rpt.") |
| Ex. 3 | | Dr. Marva Lewis expert report, February 7, 2006, *redacted* ("Lewis Expert Rpt.") |
| Ex. 4 | | Dr. Peg Hess expert report, February 2006, with Addendum and correction sheet ("Hess Expert Rpt.") |
| Ex. 5 | | Dr. Wood Hiatt expert report, February 2, 2006, *FILED UNDER SEAL*, ("Hiatt Expert Rpt.") |
| Ex. 6 | | Ms. Cathy Crabtree expert report, February 2006 ("Crabtree Expert Rpt.") |

Ex. 7       MDHS/DFCS Foster Care Review ("FCR") Program
            Quarterly Regional Comparison Reports: 3rd Quarter FY 2005, 4th
            Quarter FY 2005, and 1st Quarter FY 2006 ("FCR Quarterly
            Regional Comparison Reports")

Ex. 8       DFCS FY 2007 Budget Request Package ("DFCS FY 07
            Budget Request")

Ex. 9       DFCS FY 2006 Budget Request Package ("DFCS FY 06
            Budget Request")

Ex. 10      DHS FY 2007 Budget Request Package ("DHS FY 07
            Budget Request")

Ex. 11      DHS FY 2006 Budget Request Package ("DHS FY 06
            Budget Request")

Ex. 12      MDHS/DFCS "BEYOND DANGER!" Workload
            Information Chart ("'BEYOND DANGER!' Chart")

Ex. 13      Direct Service Clients by Region Chart, August 2005
            ("Direct Service Clients Chart")

Ex. 14      2004 Federal Child and Family Services Review
            ("CFSR")

Ex. 15      2003 Statewide Self Assessment ("Self Assessment")

Ex. 16      Letter from former Director of DFCS Sue Perry to then-
            Governor Ronnie Musgrove, May 8, 2002 ("Perry letter")

Ex. 17      Joint Legislative Committee on Performance Evaluation and
            Expenditure Review (PEER) Report to the Mississippi Legislature:
            *A Follow-up Review of the Division of Family and Children's
            Services of the Department of Human Services*, May 11, 1999,
            with response of MDHS Executive Director Don Taylor, May 10,
            1999 ("PEER Rpt.")

Ex. 18      *Cranford, J. v. Lefeve, R. and Decelle, D.,* 2006 WL 839517 (S.D.
            Miss. Mar. 30, 2006)

Ex. 19      MDHS/DFCS Draft Plan as of March 9, 2006, Rickie Felder,
            Director ("Felder Draft Plan")

Ex. 20          MDHS Policy Manual Excerpts ("MDHS Policy")

Ex. 21          Excerpts from *Child Welfare League of America Standards of Excellence for Services for Abused and Neglected Children and Their Families* ("CWLA Standards for Abused and Neglected Children")

Ex. 22          Excerpts from *Child Welfare League of America Standards of Excellence for Family Foster Care Services* ("CLWA Standards for Foster Care")

Ex. 23          Mick Polowy's report to Dr. Sue Steib on DFCS training ("Polowy Training Rpt.")

Ex. 24          Stability of Foster Care Placements/ Emergency Shelter Care for the Month of May, 2005, *redacted* ("Shelter Care Chart")

Ex. 25          Transcript of MDHS budget hearings before Joint Legislative Budget Committee of Mississippi Legislature, FY 2006 ("Budget Hearing Transcript")

Ex. 26          Memorandum, Opinion and Order Granting Class Certification, March 11, 2005 ("Class Cert. Order")

Ex. 27          Excerpts from Deposition of Defendants' Expert Dr. Sue Steib, April 13, 2006 ("Steib Dep.")

Ex. 28          Excerpts from Deposition of DFCS Director Ricky Felder, April 5, 2006 ("Felder Dep.")

Ex. 29          Excerpts from Deposition of Director of the Division of Budgets and Accounting Peter Boulette, March 16, 2006 ("Boulette Dep.")

Ex. 30          Excerpts from Deposition of Protection Unit Director Kathy Triplett, June 15, 2005 ("Triplett Dep.")

Ex. 31          Excerpts from Deposition of Regional Director Martha McDaniel, July 20, 2005 ("McDaniel Dep.")

Ex. 32          Excerpts from Deposition of Placement Unit Director Gail Young, June 15, 2005 ("Young Dep.")

Ex. 33          Excerpts from Deposition of Director of the Office of Budget and Fund Management Deb Biggers, April 17, 2006 ("Biggers Dep.")

Ex. 34          Excerpts from Deposition of Regional Director Mechille Henry, September 9, 2004 ("Henry Dep.")

Ex. 35          Excerpts from Deposition of DFCS Director Billy Mangold, August 25, 2004 ("Mangold Dep. 8/25/04")

Ex. 36          Excerpts from Deposition of DFCS Director Billy Mangold, May 16, 2005 ("Mangold Dep. 5/16/05")

Ex. 37          Excerpts from Deposition of DFCS Director Billy Mangold, June 2, 2005 ("Mangold Dep. 6/2/05")

Ex. 38          Excerpts from Deposition of MDHS Director Don Taylor, April 6, 2006 ("Taylor Dep.")

Ex. 39          Excerpts from Deposition of DFCS Social Worker Yutaska Simpson, October 26, 2004 ("Simpson Dep.")

Ex. 40          Excerpts from Deposition of DFCS Administration Unit Program Manager Robin Wilson, May 16, 2005 ("Wilson Dep.")

Ex. 41          Excerpts from Deposition of Regional Director Zadie Rogers, August 9, 2005 ("Rogers Dep.")

Ex. 42          Excerpts from Deposition of Dr. Wood Hiatt, March 29, 2006 ("Hiatt Dep.")

Ex. 43          Excerpts from *Child Welfare League of America Standards for Health Care Services for Children in Out-of-Home Care* ("CWLA Standards for Health Care")

Ex. 44          Excerpts from *Child Welfare League of America Standards of Excellence for Adoption Services* ("CWLA Standards for Adoption")

For reasons set forth more fully in Plaintiffs' Memorandum of Law in Support of Their Motion for Summary Judgment on Liability, Plaintiffs are entitled to summary judgment as matter of law.  In support of their Motion, Plaintiffs incorporate by reference their Memorandum

of Law, filed contemporaneously with this Motion, and submit the following statement of uncontested facts:

<u>**Statement of Uncontested Facts**</u>

**"GENERALLY ACCEPTED PRACTICE STANDARDS"**

1.      Defendants' expert, Dr. Sue Steib ("Dr. Steib"), agrees that "there are generally accepted practice standards in the field of child welfare," (Ex. 27 at 38:10-13), and that the Child Welfare League of America ("CWLA") is "nationally recognized for their child welfare standards," including "their standards for foster care services" and "caseloads." (Ex. 27 at 41:10-42:5).

2.      Dr. Steib agrees that federal and state child welfare laws and regulations are legal requirements with which public agencies are required to comply. (Ex. 27 at 38:14-40:17).

3.      Dr. Steib agrees that a public agency is expected to abide by its own policies, as reflected in Defendants' Policy Manual (and related Policy Bulletins). (Ex. 20; Ex. 27 at 41:7-9).

**Standards Governing Visits to Children**

4.      Defendants' Policy Manual states:

> Face to face contact shall be maintained with all foster children, regardless of their placement type every 30 days [after the children are placed]. This could require a County of Service Social Worker to make the face to face contact. Some funding sources such as Medicaid may require more frequent contact. It is important that this be upheld in order not to jeopardize payment for services.
>
> When a child has entered into a Formalized Foster Care Agreement, the MDHS/DFCS Social Worker is required to visit the child every 30 days.

(Ex. 20 at DHS 00392).

5.      CWLA's published standards require social workers to meet "face-to-face . . . at least monthly" with each foster child.  (Ex. 22 at §§ 2.54, 2.55).

**Standards Governing Medical, Dental, and Psychological Treatment**

6.      Defendants' Policy Manual provides in relevant part:

> When a child is placed in the custody of the Mississippi Department of Human Services, the Division of Family and Children's Services assumes the responsibility for securing the child's access to medical, dental, psychological and educational services.  Every foster child:
>
> > 1.  Shall be referred to the local health department or screening provider for a medical examination through EPSDT Medicaid screening . . . .
> >
> > 2.  Shall be referred to the local health department for a dental exam through EPSDT Medicaid screening when the child reaches 3 years of age and regularly thereafter (as prescribed by the dental practitioner).
> >
> > 3.  Shall be provided psychological services . . . . All children ages four and older should have a psychological assessment.
>
> It is not necessary to follow the time frame listed if otherwise prescribed by the medical/dental practitioners.  Case documentation to reflect a different time frame shall include a statement from the doctor/dentist or be described in case dictation.

(Ex. 20 at DHS 00473).

7.      Defendants' Policy Manual provides:

> Medicaid services for children birth to 20 (or 21 if by Chancery Court order) years of age are provided if medically necessary . . . .
>
> All foster children shall be referred to EPSDT (Early Periodic Screening and Diagnostic Testing) . . . .  It is important for children

to go through these periodic screenings to identify any health problems as well as to maintain good health.

(Ex. 20 at DHS 00500-1).

8.      CWLA's published standards state, "within 30 days of placement, the family foster care agency social worker, in collaboration with the foster parents, should arrange for medical, dental, [and] developmental … assessments for each child in care."  (Ex. 22 at § 2.63).

9.      CLWA's published standards provide, in relevant part, that the foster care agency should "work closely with the parents to identify and obtain access to preventative health care services; routine health and dental services; emergency health care; mental health care services; remedial health and dental care."  (Ex. 22 at § 2.66).

10.     CWLA's published standards state:

> [B]ecause children entering family foster care frequently have experienced difficult conditions in their own homes or previous placements, it is possible that they will have emotional disturbances that require mental health services. Thus, for the protection of both the child and the foster parents, an initial health screening of children entering care should include assessment of emotional disturbances, such as depression, suicide potential, severe behavioral problems, serious emotional disturbance or substance abuse.

11.     CWLA's published standards further stipulate that the foster child's service plan should include treatment for any conditions diagnosed in the assessment and access to treatment should be assured.  (Ex. 22 at § 2.67).

12.     CWLA's published standards require the public child welfare agency to provide sufficient placement resources to meet the significant mental and medical health needs of foster children while they are in custody.  (Ex. 22 at § 1.12).

13.     CWLA's published standards require comprehensive health evaluations of all children within 30 days of entering foster care (Ex. 43 at § 2.6).  As part of the health assessment, a qualified mental health practitioner should complete a standardized diagnostic mental health evaluation. (Ex. 43 at §§ 2.6, 2.7).

**Standards Governing Placements**

14.     Defendants' Policy Manual states:

> The child shall be provided out of home care which gives special consideration to the child's health, safety and well being, and also gives priority to placement of a child … in the most suitable and least restrictive setting for a planned period of time, during which targeted case management and other treatment services shall be provided to the child's parents/relatives."

(Ex. 20 at DHS 00358).

15.     Defendants' MDHS/DFCS Policy Manual provides:

> The child should be placed in the least restrictive setting.  This means the most family-like and appropriate setting that can provide the environment and services needed to serve the child's best interest and special needs.  In order of consideration, this means placement with relatives or tribal members, foster family home care, group home care, institutional care.  Although foster family home care is preferable, some children's needs are such that a group home setting is more appropriate.  The social worker must consider if the program of the licensed child caring facility will be appropriate for the individual child's needs."

(Ex. 20 at DHS 00384).

16.     Defendants' Policy Manual states that foster children should not be moved from their existing placement to another foster placement unless Defendants "specifically document[]" justifications for that move, including "that another placement is in the child's best interest." (Ex. 20 at DHS 00396).

17.    Defendants' Policy Manual provides: "All children have a need for and right to continuity and stability. A child needs a stable home environment in which to grow." (Ex. 20 at DHS 00405).

18.    Defendants' Policy Manual directs staff to "[r]educe the number of moves (placements) children experience while in care." (Ex. 20 at DHS 00406).

19.    CWLA's published standards direct that multiple moves from one foster home or facility to another are to be avoided because they result in a lack of stability and feelings of loss, rejection, and trauma for foster children, who are particularly vulnerable to such harms due to the circumstances or experiences that initially caused them to be removed from their homes and placed in foster care. (Ex. 22 at § 2.46).

**Standards Proscribing Abuse and Neglect of Children in Custody**

20.    Defendants' Policy Manual directs as follows:

> A foster parent shall not use corporal punishment or maltreat a foster child, and shall not allow any other person to do so. As used in this section, 'corporal punishment or maltreatment' include, but are not limited to, the following actions:
>
> a.    Any type or threat of physical hitting, striking, spanking, switching, slapping inflicted in any manner using a hand, switch, strap, belt, paddle or other instrument upon the body.
>
> b.    Verbal abuse, including arbitrary threats of removal from the foster home.
>
> c.    Disparaging remarks about a foster child or a foster child's birth family members or significant persons.
>
> d.    Deprivation of meals, clothing, bedding, shelter or sleep.

    e.   Denial of visitation or communication with a foster child's birth family members and significant persons when such denial is inconsistent with the foster child's case plan.

    f.   Cruel, severe, depraved or humiliating actions.

    g.   Locking a foster child in a room or confined area inside or outside of the foster home.

    h.   Requiring a foster child to remain silent or be isolated for unreasonable periods of time.

(Ex. 20 at DHS 00838-39).

21.    Pursuant to federal regulations, a state's conformity with federal child welfare requirements is measured by its ability to protect its children: "(i) In the area of child safety: (A) Children are, first and foremost, protected from abuse and neglect." 45 C.F.R. § 1355.34(b)(i)(A).

22.    CWLA's published standards state that all children in out-of-home care have a right to safety and protection. (Ex. 21 at § 6.3); (Ex. 22 at §§ 1.4, 2.69, 2.70).

**Standards Setting Caseload Caps**

23.    In recognition of the vital role played by caseworkers, CWLA's published standards stipulate that their workloads shall be limited as follows: (a) no more than 17 families per worker for ongoing services within family homes; (b) between 12 and 15 children per worker for foster care services; (c) between 10 and 12 children per worker for adoption services; and (d) supervisory ratios of 1 supervisor per 5 workers. (Ex. 21 at § 5.9; Ex. 22 at §§ 3.48, 3.49; Ex. 44 at §§ 7.19, 7.22).

**Standards Governing Training**

24.     CWLA's published standards dictate that a public child welfare agency should require and offer a strong pre-service training program, regardless of the academic training and experience, of all newly hired staff.  According to CWLA's published standards, such training should be competency-based and should have clearly defined learning outcomes.  (Ex. 22 at § 3.45; Ex. 21 at § 5.35).

25.     CWLA's published standards dictate that a child welfare agency should routinely provide in-service training and continuing educational opportunities to ensure that its staff members have the specialized skills and knowledge necessary to provide quality services.  (Ex. 22 at § 3.45; Ex. 21 at § 5.35.).

**Standards Governing Electronic Documentation of Information**

26.     Pursuant to federal statute, child welfare systems in receipt of federal funding are required to develop a "statewide information system from which can readily be determined the status, demographic characteristics, location and goals for the placement of every child who is… in foster care."  42 U.S.C. § 622 (10)(B)(i).

27.     Pursuant to federal regulations, states in receipt of certain federal funding must design and implement a Statewide Automated Child Welfare Information System ("SACWIS"), which the regulations define as an integrated single child welfare services computer system with specifically identified elements that the regulations deem necessary for effective case management.  45 C.F.R. § 1355.53.  The organic federal statute provides that child welfare systems must develop a "statewide information system from which can be readily determined the status, demographic

characteristics, location, and goals for the placement of every children who is . . . in

foster care." 42 U.S.C. § 622(10)(B)(i).

28.    Pursuant to federal regulations, a SACWIS system must be "a comprehensive system,

which is effective and efficient, [and which will] improve the program management

and administration of the State plans for titles IV-B and IV-E."  45 C.F.R. §

1355.53(a).

> "At a minimum, the system must provide for effective
> management, tracking and reporting by providing automated
> procedures and processes to:  (1) Meet the Adoption and Foster
> Care reporting requirements through the collection, maintenance,
> integrity checking and electronic transmission of the data elements
> specified by the [AFCARS] requirements . . . ; (2) Provide, for
> electronic exchanges and referrals, as appropriate, with . . . [other
> data] systems within the State . . . ; (4) Collect and manage
> information necessary to facilitate the delivery of client services . .
> . ; (6) Support necessary case assessment activities; (7) Monitor
> case plan development, payment authorization and issuance,
> review and management, including eligibility determinations and
> redeterminations; and (8) Ensure the confidentiality and security of
> the information and the system."

45 C.F.R. § 1355.53(b).

29.    CWLA's published standards direct a child welfare agency to have a comprehensive

management information system ("MIS") to enable it to gather and analyze data to

assist in casework, strategic planning, service delivery, community development,

needs identification, quality improvement, staff performance and staff evaluation.

(Ex. 21 at § 5.12.)

**ABUSE AND NEGLECT**

**Incidence of abuse and neglect while in custody**

30.    Defendants' case reviews from the first nine months of calendar year 2005 found that 3.2% of the 342 children reviewed had experienced abuse or neglect in Defendants' custody during the past year.  (Ex. 7 at DHS 047115, 063563, 070991).

31.    The case record review conducted by Dr. Peg McCartt Hess ("Dr. Hess") found that one in eighteen (5.7%) children in Defendants' custody had experienced substantiated abuse or neglect while in custody, and that a majority (70%) of those children had been abused or neglected since January 1, 2004.  For 6.2% of children in custody, abuse or neglect of themselves or of another foster child living with them had been substantiated by Defendants.  (Ex. 4 at Addendum p. 17).

32.    For one in ten (11.8%) children in Defendants' custody, maltreatment of themselves or of another child in their foster home had either been substantiated or had been considered serious enough to warrant a placement move.  (Ex. 4 at Addendum, 17).

33.    Dr. Hess found that one in four (24.8%) children in Defendants' custody, had some documentation in their records (in Defendants' reports, Defendants' investigations, or Defendants' case notes) indicating that they were abused or neglected while in custody or that another foster child was abused or neglected while living with them. (Ex. 4 at Addendum, 16).

34.    The week of February 9, 2004, the Children's Bureau of the Administration on Children, Youth and Families, Administration for Children and Families, U.S. Department of Health and Human Services, conducted a Child and Family Services

Review for the State of Mississippi. The federal agency assessed Mississippi's performance on seven child welfare outcomes pertaining to children's safety, permanency, and well being, and on seven systemic factors related to the State's capacity to achieve positive outcomes for children and families. The period under review for the onsite review was October 1, 2002 through February 9, 2004. The May 2004 Mississippi Child and Family Services Review Final Report ("CFSR") presents the CFSR findings. (Ex. 14).

35.    The federal CFSR found that the State of Mississippi did not achieve substantial conformity with any of the seven child welfare outcomes assessed for child safety, permanency, and well-being, nor with the systemic factors of Statewide Information System, Case Review System, Quality Assurance System, Training, and Service Array. (Ex. 14 at 058951, 058953-54).

36.    In finding that the State of Mississippi did not achieve substantial conformity with the child welfare outcome of safety, the federal CFSR noted a concern regarding "a practice in many areas of the State of not substantiating maltreatment reports even when there is evidence to support substantiation." (Ex. 14 at DHS 058955).

**Defendants' response to allegations of abuse or neglect while in custody**

37.    Division of Family and Children's Services ("DFCS") Director Rickie Felder ("DFCS Director Felder") testified in April 2006 that Defendants have a backlog of approximately 3,000 overdue investigations, including investigations of abuse and neglect in foster care. (Ex. 28 at 232:25-233:9). Director Felder also testified that Defendants' incidents of failure to initiate investigations within 24 hours, as required

by Defendants' policy, caused him specific concern about the safety and well-being of children in Defendants' custody.  (Ex. 28 at 39:4-14).

38.    Dr. Hess found that 16.4% of children in Defendants' custody had been subjected to at least one incident of suspected abuse or neglect that Defendants did not investigate. For 7.4% of children in custody, there was some documentation in the child's case file of at least one allegation of abuse or neglect that Defendants never treated as a formal report.  (Ex. 4 at Addendum, 19).

39.    Protection Unit Director Kathy Triplett ("Ms. Triplett") testified that investigations into abuse and neglect allegations must be initiated promptly because "[t]he child could be in harm's way," but she stated that the Protection Unit nonetheless does not keep track of whether investigations are in fact conducted in a timely manner.  (Ex. 30 at 71:14-72:3, 52:22-24).

40.    Ms. Triplett testified that an allegation that a foster parent hit his foster child with a belt did not constitute "a report that meets the criteria for abuse and neglect" and "would not require an investigation of abuse and neglect."  (Triplett 6/14/05 Dep., at 76:20-22, 77:6-10, 77:25-78:1).  Furthermore, she stated that the fact that "a little girl" had contracted a sexually transmitted disease while in a placement in DHS custody would "not necessarily" warrant an investigation.  (Triplett 6/14/05 Dep. at 79:13-17, 80:8-14).

41.    Dr. Hess reported that after Defendants substantiated an incident of abuse or neglect in a foster placement, Defendants left the victimized child and/or other foster children in that placement the majority (54%) of the time.  (Ex. 4 at Addendum, 17).

42.     The federal CFSR found that in 18% of applicable foster care cases reviewed (4 of 25), Defendants "had not established face-to-face contact with the child subject of a maltreatment report in accordance with the State's required timeframes." (Ex. 14 at DHS 058989).

43.     The federal CFSR noted a concern that "a large percentage of maltreatment reports…are not substantiated even when there is evidence to warrant substantiation." (Ex. 14 at DHS 058990).

44.     In 1999, a Joint Legislative Committee on Performance Evaluation and Expenditure Review ("PEER") report found "serious" and "significant performance deficiencies" "in the provision of critical social work services," including Defendants' failure to substantiate (and in some cases even investigate) any of the abuse and neglect reports in Hinds County, including incidents that Defendants themselves had "marked 'high risk,' …several [of which] contained evidence that the reviewers believed was adequate to substantiate and which required investigation under MDHS policy"; the untimely investigation of reports; and investigations "not thoroughly completed according to policy." (Ex. 17 at DHS 068728).

**Assessment and documentation of risk of maltreatment in placements**

45.     DFCS Director Felder testified in April 2006 that MACWIS blocks front-line staff from determining whether a foster home into which they are thinking of placing a child is under investigation for alleged child abuse and neglect. He admitted that "there's the potential for a risk" that Defendants will put foster children in foster homes where Defendants have good reason to believe they will be abused, and that

"we need to do a better job" of protecting children in custody from preventable further abuse.  (Ex. 28 at 205:4-206:5).

46.    Then-Director of DFCS Billy Mangold ("then-Director Mangold") admitted in May 2005 that there is no "notation in MACWIS regarding any investigations or other concerns that may have been noted by licensing or other social work staff about a particular placement," meaning that caseworkers do not routinely know whether such concerns exist regarding a home before placing a child there.  (Ex. 36 at 20:11-22).

47.    Ms. Triplett testified as a 30(b)(6) witness pertaining to Defendants' procedures for dealing with abuse in care that it is unclear who among DFCS personnel is responsible for entering into the system a report that a child has been abused or neglected while in foster care.  (Triplett 6/14/05 Dep. at 11:16-20).

48.    Ms. Triplett stated that the Protection Unit, of which she is Director, does not track allegations of abuse and neglect in unlicensed placements with relatives or during trial home visits, although those children are in Defendants' custody.   (Triplett 6/14/05 Dep. at 34:8-16).

49.    The federal CFSR found that in 13% of applicable foster care cases reviewed, Defendants had not made "diligent efforts to reduce the risk of harm to the children involved in each case."   In one case, the federal CFSR specifically concluded that "[t]here was insufficient assessment of risk of harm to children in their foster homes and risk issues were not addressed."  (Ex. 14 at DHS 058993-5).

50.    Named Plaintiff Olivia Y. was placed in a home with a convicted sex offender. Defendants left Olivia, then three years old, in the home for eight days, although they

represented to the Youth Court that the home had passed the background check. After Defendants removed Olivia from the home, a doctor reported that her vaginal area was red and swollen, and that she "reacted in terror" when he tried to perform a complete exam.  (Ex. 3 at 55-56).

**Effects of staffing on child supervision**

51.    Dr. Steib testified that high caseloads and resulting reduction in frequency of caseworker visits to foster children increased the risk that caseworkers would not know if children were in danger.  (Ex. 27 at 102:8-13, 102:22-103:16).

52.    In May 2002, then-DFCS Director Sue Perry informed then-Governor Ronnie Musgrove by letter that:

> "[T]he vast majority of staff are responsible for caseloads two, three, four, five and even six to seven times the federally recognized standard of 12 to 15 cases.  This scenario places the children of this state at higher risk and the state in a potentially libelous position – should a child die or be seriously injured in a case that was not investigated, or on an open case that a worker did not have the time to properly monitor.  I am sorry to inform you that this has already happened . . . . A 19-month-old child was brutally beaten by his stepfather in a case known to the agency." She further wrote that she was attaching a notice requiring DFCS "to abolish 88 permanent and 8 time-limited positions.  I am sure you can understand the devastating effect this will have . . . on the children that will remain in abusive, neglectful situations and some of whom will die."  A "loss of funding [and] loss of positions," she wrote, had "result[ed] in a loss of children's lives."

(Ex. 16 at P 000153-55).

53.    DFCS Director Felder stated in April 2006 that Defendants' failure to make monthly visits to children in its custody caused him specific concern about the safety and well-being of those children.  (Ex. 28 at 39:2-14).

54.    MDHS Executive Director Donald Taylor  ("Executive Director Taylor") testified in April 2006 that he was certain that there are instances when Defendants failed to monitor children in their custody.  (Ex. 38 at 160:9-22).

55.    Regional Director Martha McDaniel ("Ms. McDaniel") explained in July 2005 that face-to-face contact with foster children was how Defendants are supposed to ensure that the children are not being abused or neglected.  (Ex. 31 at 123:12-20).

56.    In August 2005, Regional Director Zadie Rogers ("Ms. Rogers") testified that in the five years she had held her position, Defendants had not once succeeded in making the required monthly visits to children in custody in her region.  (Ex. 41 at 67:11-14).

57.    The federal CFSR found that "[a]lthough social worker contacts with children in foster care are a primary means of assuring that health and safety standards are met," in 16% of the foster care cases reviewed Defendants had not visited children once a month.  For  20% of foster children, federal "reviewers determined that social worker visits with children were not of sufficient frequency and/or quality to ensure children's safety and attainment of case goals."  (Ex. 14 at DHS 059034, 059017-8).

58.    As required for the federal CFSR, Defendants prepared a Statewide Self Assessment issued in December 2003 that reviewed the current status of their performance on various child welfare outcome measures related to children's safety, permanency, and well being.  (Ex. 15).

59.    Defendants' 2003 Self Assessment conceded that "[a]reas with fewer [abuse and neglect] reports are also areas that have been consistently understaffed for years, and these staffing numbers have a direct effect on 1) receiving reports from the

community 2) recording accurately the number of incoming reports and 3) consistently screening in and out reports." It further acknowledged that:

> "The areas of the state with chronic understaffing have a lower rate of substantiated reports per capita. In reviewing data, areas with fewer staff appear more likely to 'screen-out calls' and have fewer substantiated investigations. If the number of investigations exceeds the number that can reasonably be done by available staff, the result may be less thorough investigations."

(Ex. 15 at P 002049, 002051).

60. In a May 10, 1999 letter responding to the 1999 PEER report, the findings of which included MDHS failure to substantiate child abuse and neglect allegations despite what the reviewers found to be sufficient evidence, Executive Director Taylor explained that "the Division has been dangerously under funded and under staffed for many years," and that "our employees [have] been struggling to stay on top of their mandated responsibilities." (Ex. 17 at DHS 068728, 068743).

61. Dr. Steib found that "most social work staff hav[e] insufficient time for services to foster children and, in some instances, delegate[e] responsibility for required contacts with children to paraprofessional support staff such as homemakers and case aides." (Ex. 1 at 24).

62. Executive Director Taylor admitted that delegating to support staff the task of making contact with children is "poor social work practice." (Ex. 38 at 162:1-163:4).

63. Then-DFCS Director Mangold testified that although one purpose of the monthly visits required for all children in custody was to ensure the children's safety, and although social workers were better able to make such determinations than

Homemakers were, understaffing nonetheless forced Defendants to rely on Homemakers for some such visits.  (Ex. 35 at 60:24-61:2, 61:13-62:16).

64.    Defendants have characterized any caseloads of 31 to 39 as "DANGER!" and those of 40 or higher as "BEYOND DANGER!"  (Ex. 12 at DHS 020088).

65.    As of August 2005, six counties had caseload averages that were more than double the "BEYOND DANGER!" level.  (Ex. 13 at DHS 091851-52).

66.    In October 2004, a "Workload Information" chart revealed that all nine regions were averaging caseloads above the "DANGER! 31 Cases Per Worker" level, and that five of the nine regions were averaging caseloads at the "BEYOND DANGER! 40 Cases per Worker" level.  (Ex. 12 at DHS 020088).

67.     The DFCS Director at the time noted, "There is grave concern for these counties—children in these counties are placed at risk.  Their lives depend on our ability to provide staff resources to investigate and access dangerous situations.  Our staff are [sic] totally overwhelmed and we are losing more staff every day! . . . The danger/risk level to our children increases dramatically as the caseloads continue to increase and our staffing level stays the same or decreases."  (Ex. 9 at DHS 030746).

68.    Named Plaintiff Cody B.'s caseworker testified that she was carrying 120 cases, including those of 62 children in custody as well as 19 investigations of abuse and neglect allegations.  (Ex. 39 at 11:3-12:16).

**Staff maltreatment training**

69.     Dr. Steib found that "caseworkers and supervisors . . . have had no training in state

laws related to . . . maltreatment," which she admitted is an important component of

training.  (Ex. 1 at 18); (Ex. 27 at 163:11-24).

70.     Dr. Steib admitted that Defendants' lack of caseworker training "could contribute to

children being at risk" while in Defendants' custody.  (Ex. 27 at 109:22-110:3).

## INAPPROPRIATE & MULTIPLE PLACEMENTS

71.     Dr. Steib testified that she agreed that "it is generally true that children need stability

in their caregivers."  (Ex. 27 at 110:20-23).

72.     Dr. Hess found that 82.7% of children in custody "were moved at least once from

their original placement and up to 57 times," and 11.3% "were moved ten or more

times."  (Ex. 4 at 2).

73.     The federal CFSR found that "[o]ne of the areas of greatest concern is the State's

performance on Permanency Outcome 1," which measures whether children in

custody have permanency and stability in their living situations.  (Ex. 14 at DHS

058951).

74.     The federal CFSR states that Defendants "do[] not engage in adequate matching of

children with foster care placements to ensure stability.   Placement stability is also

undermined by the lack of foster homes and agency support to foster parents and

relative caregivers."  (Ex. 14 at DHS 058952).

75.     The federal CFSR found that in 40% of the foster care cases reviewed "[t]he child

experienced placement changes that were not for the purpose of meeting the child's

needs or attaining the child's goals."  In each one of those cases, shelter facilities were used as placements because of the lack of available foster homes, including in the case of a one-year-old child.  (Ex. 14 at DHS 058997-8).

76.    Defendants conceded in their Self Assessment that "there are many children who have had a large number of placement changes," with over 200 children in their custody having experienced nine or more placements.  (Ex. 15 at P 002070-71).

77.    Defendants conceded in their Self Assessment that their "[p]lacement resources need to be more stable."  (Ex. 15 at P 002027).

78.    Executive Director Taylor acknowledged in 1999 that "there is a lack of appropriate placement alternatives for children in need of specialized care . . . .  These children are needlessly moved from placement to placement, further damaging them and guaranteeing an unstable future."  (Ex. 17 at DHS 068743).

79.    As established by Dr. Wood Hiatt's expert report and deposition testimony, subjecting foster children to frequent, unpredictable, and unexplained moves can be seriously harmful to their mental status, ability to adjust, and any existing psychiatric conditions, and can virtually destroy their chances to belong to successful homes.  (Ex. 42 at 95:21-96:25; Ex. 5 at 28-9).

80.    Dr. Steib reported that although it is "generally considered better for children in out-of-home care to be placed with families rather than in group care," "[a]bout 25% of children in foster care custody are in some type of congregate care (group homes or institutions)" instead of foster homes.  (Ex. 1 at 6).

81.    Then-DFCS Director Billy Mangold testified that "there's definitely a distinct possibility that if children are placed in residential placements and shouldn't be there that it certainly could be harmful to them."  (Ex. 35 at 84:19-85:4).

82.    The Self Assessment noted that the "over use of shelter placements is a concern to the agency," and conceded that in some counties, DFCS "standard practice" is to "use the shelter as the first placement for children."  (Ex. 15 at P 002072).

83.    The federal CFSR stated that Defendants "rel[y] extensively on the use of emergency shelter facilities for the initial placement (even for very young children) or when placements disrupt (often due to children's behavior and foster parents' inability to manage behavior)."  (Ex. 14 at DHS 058969).

84.    Dr. Hess found that 63.8% of children in custody "were placed at least once in an emergency shelter facility or emergency foster home since their most recent entry into custody."  (Ex. 4 at 2).

## MEDICAL, DENTAL & MENTAL HEALTH CARE & TREATMENT

### Medical and dental care

85.    The federal CFSR determined that Defendants did not achieve substantial conformity with any of the three child well-being outcomes reviewed by the CFSR: physical and mental health services, educational services, and provision of services to families. (Ex. 14 at DHS 058957-8).

86.    The federal CFSR reported that "performance on this outcome [requiring that children receive adequate services to meet their physical needs] was low in all CFSR sites."  (Ex. 14 at DHS 059023).

87.    The federal CFSR found that in 20% of applicable foster care cases Defendants were not adequately addressing children's health needs.  (Ex. 14 at DHS 059024).

88.    The federal CFSR also stated that "non-existent" services or services of "limited availability" include "services for medically fragile children."   (Ex. 14 at DHS 059041).

89.    Dr. Hiatt reported that "children in foster care are at high risk for medical, emotional and psychological problems which demands careful and consistent attention to their medical and mental health needs."  (Ex. 5 at 9); (Ex. 42 at 95:21-96:25).

90.    Dr. Hiatt's expert report and deposition testimony establish that failing to provide consistent medical and mental health care can create severe and unnecessary difficulties in managing foster children's psychiatric and behavioral problems, and can directly cause their existing conditions to worsen and be prolonged.  (Ex. 5 at 28-9; Ex. 42 at 95: 21-96:25).

91.    In their Self Assessment, Defendants conceded that although "Health and Safety are paramount in planning for children in foster care," medical documentation, including immunizations and doctor visits, continues to be missing from case records.  (Ex. 15 at P 001940, 2079-80).

92.    Dr. Steib testified that she "did not request the data" to help her determine the level at which children in Defendants' custody are or are not receiving medical or dental services.  (Ex. 27 at 185:8-14).

93.    Dr. Hess found in her review of the case files of children in Defendants' custody that "MDHS failed to provide the overwhelming majority (84.1%) of children a physical

exam within 7 days of placement as required" by the MDHS Policy Manual.  (Ex. 4 at 3).

94.    Dr. Hess's review found that "MDHS failed to provide *any* annual physical exam for 28.2% of the children during the two years prior to June 1, 2005."  (Ex. 4 at 3).

95.    Dr. Hess found that "MDHS failed to provide *even one* dental exam for 42.2% of the children ages 3 and older in custody at least one year during the two-year period prior to June 1, 2005."  (Ex. 4 at 3).

96.    Defendants' Foster Care Review Program Quarterly Regional Comparison Report for the first quarter of FY 2006 found that the physical health needs of 9% "[o]f the 81 children in the sample…were not assessed."  For 10% of the children for whom "physical health needs were identified," services were not provided to meet the identified needs. Of those children who did not receive services to meet their physical health needs, "[f]or none was the reason due to a lack of available or accessible services."  (Ex. 7 at DHS 071007).

97.    In the third and fourth quarters of FY 2005, Defendants' Foster Care Review Program Quarterly Regional Comparison Reports found that, on average, 18% of children's most recent individual service plans ("ISPs") did not indicate that appropriate physical health services were being provided.  (Ex. 7 at DHS 047100, 063548).

**Mental health care**

98.    The federal CFSR found that "performance on this outcome [requiring that children receive adequate services to meet their mental health needs] was low in all CFSR sites."  (Ex. 14 at DHS 059023).

99.     The federal CFSR concluded that Defendants had not made a concerted effort to meet the mental health needs of 47.6% of foster children.  (Ex. 14 at DHS 059025-6).

100.    The federal CFSR found "a need for more services," including: "[s]ubstance abuse services for adolescents;" "residential treatment services;" "[m]ental health services for children . . . including counseling, specialized therapy, day treatment, and child psychiatrists/psychologists."  (Ex. 14 at DHS 059041).

101.    The federal CFSR also found that "in-patient psychiatric care for children" is among the services that are "non-existent" or of "limited availability" for children in custody."  (Ex. 14 at DHS 059041).

102.    The federal CFSR found that mental health needs of children in foster care and in-home care were "not at all" assessed 31.3% of the time and were assessed only "partially" 21.9% of the time.  (Ex. 14 at DHS 059041).

103.    The federal CFSR found that mental health service needs were "not at all met" in 28.1% of cases and only "partially met" in 12.5% of cases.  (Ex. 14 at DHS 059025).

104.    In April 2006, DFCS Director Felder stated that "we need objective psychologicals to really determine what the child needs, and we're lacking that right now."  (Ex. 28 at 196:25-197:3).

105.    The Self Assessment admitted that, as of 1995, "[c]hildren's mental health needs are not adequately identified, assessed or addressed."  (Ex. 15 at P 001940).

106.    The Self Assessment conceded that the provision of psychological evaluations is hampered by "inconsistency in practice."  (Ex. 15 at P 001940).

107.    DFCS Director Felder conceded in March 2006 that "43.9% of the children in State custody whose cases were reported to have issues of concern, are lacking psychological information on their Individualized Service Plans (ISPs), in addition to medical, dental, and educational information."  (Ex. 19 at DHS 115414).

108.    Dr. Steib testified that some staff "did not believe that they had access to all the mental health services that they needed."  (Ex. 27 at 66:19-23).

109.    Dr. Hess found that 57.7% of children ages four and older in Defendants' custody "were not provided a psychological assessment as required within 90 days; 35.5% were *never* evaluated for mental illness or developmental disorders."  (Ex. 4 at 3).

110.    Dr. Hess found that inpatient treatment was not provided for 21% of foster children when it prescribed.  (Ex. 4 at 4).

111.    Defendants' own Foster Care Review Program Quarterly Regional Comparison Report for the first quarter of FY 2006 found that, of the 64 children who were eligible for a mental health assessment, 6% did not receive such an assessment.  For 11% of the children for whom mental health needs were identified, services were not provided to meet the identified need.  (Ex. 7 at DHS 071008).

112.    In the third and fourth quarters of FY 2005, Defendants' Foster Care Review Program Quarterly Regional Comparison Reports found that, on average, 20.5% of children's most recent ISPs did not indicate that appropriate mental health services were being provided.  (Ex. 7 at DHS 047100, 063548).

**STAFFING**

**MDHS Caseworker Caseloads**

113.    MDHS has characterized caseloads of 40 or higher as "BEYOND DANGER!"  (Ex. 12).

114.    Workload analysis by Defendants' expert Dr. Sue Steib ("Dr. Steib") concludes that a "reasonable" caseload standard for DFCS foster care cases should be 14 cases per worker based on "the amount of time required to manage [a foster care] case in accordance with current agency policy." (Ex. 1 at 25-26).

115.    In DFCS's FY 2007 Budget Request, Director Felder reported that DFCS staff carried caseloads of up to 286.  (Ex. 8 at DHS 053725).

116.    According to Mr. Felder,   "[a]gencies must maintain sufficient staff to achieve manageable workloads." (Ex. 19 at DHS 115419).

117.    A net total of 205 DFCS positions ("PINs") have been abolished since 2002. (Ex. 19 at DHS 115422).

118.    As of August 2005, six counties had caseload averages that were more than twice the "BEYOND DANGER!" level.  DFCS's caseload report showed caseworkers carrying an average of 48 cases statewide.   (Ex. 13 at DHS 091851-52).

119.    Dr. Steib testified that workers reported caseloads in excess of 50, and that she had heard of caseloads as high as 80.  (Ex. 27 at 131:7-8, 18-19).

120.    Dr. Steib reports that DFCS caseworkers average 44 cases and that "many DFCS staff routinely carry caseloads in excess of 40 foster children and/or in-home cases, with

some caseloads reported to be substantially higher." (Ex. 1 at 3, 24). Dr. Steib notes that the "standard . . . currently set by the agency" is 40. (Ex. 1 at 39).

121.    With respect to high caseloads, then-DFCS Director Mangold testified: "The danger is that some child will be missed, some child will not be provided the services that should be provided." (Ex. 35 at 67:7-14).

122.    Dr. Steib concludes in her expert report that:

> "DFCS is under-staffed at all levels. Many caseworkers carry workloads which are at least double the average number they can manage based on the workload analysis conducted in this review. Many supervisors also carry cases and have administrative duties in addition to providing supervision for caseworkers. Administrative and management staff are [sic] inadequate to provide the support needed by those responsible for service delivery."

(Ex. 1 at i-ii).

123.    Dr. Steib testified that high caseloads involve a risk that if a caseworker were not able to see a child regularly, the worker might not know if the child were in trouble or in danger. (Ex. 27 at 102:22-103:16).

124.    DFCS Director Felder conceded that when caseworkers have unreasonable workloads, DFCS runs the risk that needed services will not be delivered to troubled children and families. (Ex. 28 at 123:10-16).

125.    Regional Director McDaniel testified that face-to-face contact with foster children was one of her region's ways of ensuring that the children were not experiencing abuse or neglect in their placements. (Ex. 31 at 123:12-20).

126. Regional Director Rogers testified that she could not remember a time in the five years she had held her position when DFCS staff had succeeded in making the required monthly visits to children in custody in her region. (Ex. 41 at 67:11-14).

127. DFCS Director Felder acknowledged that the "low salaries, burdensome hiring practices, the lack of advancement opportunities, [and] high caseloads" were among the "major challenges" facing DFCS. (Ex. 19 at DHS 115412).

128. DHS Executive Director Taylor admitted at deposition that DFCS is understaffed (Ex. 38 at 150:11-14) and stated: "I think anyone would say that the caseloads are high." (Ex. 38 at 193:5-6).

129. Named Plaintiff Cody B.'s caseworker testified at deposition in October 2004 that she was carrying 120 cases, including those of 62 foster children as well as 19 investigations of abuse and neglect allegations. (Ex. 39 at 11:3-12:16).

130. Regional Director McDaniel testified that actual caseloads were sometimes even higher than reported because DFCS caseload data count workers on leave as carrying full caseloads while in fact other DFCS staff have to cover their cases. (Ex. 31 at 64:20-65:6).

131. Regional Director McDaniel testified that when caseworkers attend certain training sessions other workers are required to carry the trainees' caseloads in addition to their own, though their own cases may be in non-neighboring counties and though this added burden was not reflected in any document of which McDaniel was aware. (Ex. 31 at 113:3-115:4).

132. In June 2004, DFCS reported a statewide average caseload of 48. Two counties, Forrest and Yazoo, averaged 197 and 196 cases per worker, respectively. (Ex. 9 at DHS 030742-45).

133. Then-DFCS Director Mangold's June 2004 Budget Request Package for Fiscal Year 2006, noted: "There is grave concern for these counties – children in these counties are placed at risk. Their lives depend on our ability to provide staff resources to investigate and access dangerous situations. Our staff are [sic] totally overwhelmed and we are losing more staff every day! . . . The danger/risk level to our children increases dramatically as the caseloads continue to increase and our staffing level stays the same or decreases . . . ." (Ex. 9 at DHS 030742-46).

134. The FY 2006 Budget Request Package from DFCS to DHS requested 16 additional positions, the reinstatement of 109 abolished positions and funding for 49 vacant positions. (Ex. 9 at DHS 030734, 030745).

135. The DHS budget request to the Legislature submitted by Executive Director Taylor for FY 2006 did not include information about how high DFCS caseloads were putting children at risk. (Ex. 9 at DHS 30693-30751). In support of the request, Defendant Taylor testified to the Legislature that year that "we're going to do all we can do with whatever it is that you choose to give us." (Ex. 25 at DHS 115366:8-10).

136. The federal CFSR found that "large caseloads have a negative effect on the quality of the visits and the time that workers have to spend with children." (Ex. 14 at DHS 059018).

137. The federal CFSR attributed the reported failure of licensing staff to meet the standard of visiting each foster home one time per month to " the high caseloads of staff." (Ex. 14 at DHS 059035).

138. The December 2003 Statewide Self Assessment conceded that "excessive caseloads still exist in 60% of the counties, with some counties reporting double and triple" the Child Welfare League of America caseload standards. (Ex. 15 at P001941). The Self-Assessment documented that a lack of DFCS staff was resulting in inadequate child protection investigations and a failure to provide child welfare services. (Ex. 15 at P 001941-45, P 002011, P 002013, P 002033-34, P 002053).

139. Then-DFCS Director Sue Perry wrote in a letter to then-Governor Musgrove in 2002 that DFCS "has been severely understaffed and underfunded for years . . . [which] places the children of this state at higher risk and the state in a potentially libelous [sic] position – should a child die or be seriously injured in a case that was not investigated, or on an open case that a worker did not have time to properly monitor." Perry continued, "The caseloads are impossible and the children are at risk." Finally, Perry stated, "The advocates of this state are asking that a law suit be filed against the state for failing to provide adequate staff and resources to ensure the protection of children." (Ex. 16 at P000153-55).

140. In 1999, a Joint Legislative Committee on Performance Evaluation and Expenditure Review (PEER) report found "serious" DFCS case practice deficiencies, including the failure to substantiate or investigate cases marked "high risk," the untimely

investigation of reports, and investigations "not thoroughly completed according to policy." (Ex. 17 at DHS 068728).

141.    In May 1999, DHS Executive Director Taylor, in a letter to the PEER Committee, conceded that "the Division has been dangerously under funded and under staffed for many years," and that "our employees [have] been struggling to stay on top of their mandated responsibilities." (Ex. 17 at 31).

142.    In his Fiscal Year 2007 Budget Request, Director Felder reported that "the inability to fill vacancies has resulted in a decrease in the quality of care and a higher turnover for social workers." (Ex. 8 at DHS 053725).

143.    DFCS's August 2005 Direct Service Clients By Region report acknowledged that 554 additional caseworkers are "needed." (Ex. 13 at DHS 091852). In its FY 2007 Budget Request, DFCS requested an additional 5 million dollars to fund 38 vacant positions and that 59 positions that were abolished be reinstated. (Ex. 8 at DHS 053725). In his request to the legislature, Executive Director Taylor did not ask for the additional five million. Instead, he requested an additional 2.4 million dollars. (Ex. 10 at DHS 115703).

144.    DFCS delegates required visits to paraprofessional support staff such as homemakers and case aides in some instances. (Ex. 1 at 24; Ex. 35 at 60:24-61:2, 61:13-62:16; Ex. 34 at 53:24-54:6; Ex. 41 at 75:3-17). Dr. Steib opines that it should not be the practice that aides make visits to children instead of caseworkers. (Ex. 27 at 72:16-20).

145. Then-DFCS director Billy Mangold testified that one purpose of the monthly visits required for all children in custody was to ensure the children's safety, and that social workers were better able to make such determinations than homemakers.  He further testified that because of understaffing, DFCS relied on homemakers for some child visits.  (Ex. 36 at 60:24-61:2, 61:13-62:16).

146. Then-DFCS Director Billy Mangold agreed at deposition that "you would not want homemakers making case work [sic] decisions for children in custody." (Ex. 36 at 61:13-16).

147. Regional Director Michelle Henry testified that homemakers and aides "tend to do most of the same duties" as Social Workers.  (Ex. 34 at 53:24-54:6).

148. Regional Director Rogers established that homemakers and other aides were not required to receive any formal training.  (Ex. 41 at 75:3-17).

**TRAINING**

149. Dr. Steib acknowledged that a lack of caseworker training could contribute to risk of harm to children in foster care.  (Ex. 27 at 109:22-110:3).

150. According to Dr. Steib "[a]n effective child welfare agency . . . must provide the administrative supports to ensure that [service delivery] staff have the guidance, training, and oversight that they need to function well."  (Ex. 1 at 30).

151. DFCS Director Felder states in his 2006 Draft Plan for DFCS that "lack of accountability, mentoring and training contributes to low morale and the high turnover rate of field staff."  (Ex. 19 at 115414).

152.    In his March 2006 Draft Plan for DFCS, Director Felder points to training and accountability as  "some of the major challenges" that he has identified for the agency.  (Ex. 19 at 115412).

153.    The federal CFSR found Defendants' in substantial non-compliance with the federal requirements for staff and provider training.   (Ex. 14 at DHS 058953-4, DHS 058960).

154.    During the preparation of Mississippi's Statewide Self Assessment in 2003, "[a]dditional training in all areas of the job, from the social work practice to the documentation, was noted as being of significant importance."  (Ex. 15 at P 001958).

155.    Protection Unit Director and Training Program supervisor Triplett agreed that training intended for new caseworkers "cover[s] . . . very important material" that is "relevant to social workers' daily job duties" and "necessary to teach social workers how to assess a child's needs . . . [and] match a child with the services that she needs."  (Ex. 30 at 31:24-32:21).

156.    Dr. Steib states that "[t]raining resources are so limited that new caseworkers are often on the job for weeks or months before they are able to attend training."  (Ex. 1 at ii, 15).

157.    Dr. Steib acknowledges that no established pre-service training curriculum for new caseworkers currently exists.  (Ex. 1 at 15; Ex. 27 at 158:11-159:1).

158.    Executive Director Taylor stated that, "I believe that for a long time that they were putting people in the field without any semblance of training, and certainly there wasn't a lot of accountability there."  (Ex. 38 at 192:11-14).

159.    Protection Unit Director and Training Program supervisor Triplett and former DFCS
        Director Billy Mangold conceded that some newly hired social workers were carrying
        caseloads before receiving Intensive Training.  (Ex. 30 at 29:7-14, Ex. 35 at 73:22-
        74:12).

160.    Regional Director McDaniel testified that regional directors are ultimately
        responsible for ensuring that social workers receive pre-service training but that she
        does nothing concrete to ensure this.  (Ex. 31 at 110:4-18).

161.    Defendants' Self Assessment acknowledged that the majority of new caseworkers
        were beginning to work in their counties without the benefit of any formal training,
        which they were receiving at some point between a month and a year or more after
        their hiring.  (Ex. 15 at P 001988, 001990).

162.    Dr. Steib acknowledged that there is no mandatory in-service training program for
        caseworkers and that there is no minimum number of in-service training hours
        required.  (Ex. 27 at 140:7-18).

163.    Training Program Supervisor Triplett acknowledged the specific need for more
        ongoing training, for which she said there had been numerous requests and which she
        testified had "been a goal for as long as [she had] been involved with the training
        program," which had been "more than five [years]."  (Ex. 30 at 17:8-12, 17:23-
        18:22).

164.    As of her June 2005 testimony, Training Program supervisor Triplett agreed that
        ongoing training was in large part  "a random offering without a core curriculum,"

which is how it was characterized by the March 2005 Program Improvement Plan. (Ex. 30 at 41:14-19).

165.    Defendants' training materials include citations to research and literature that is out of date, including references to research from 1981-1985 and information compiled in 1974.  (Ex.  23 at Steib 002699).

166.     Mick Polowy, the person Dr. Steib relied on to review DFCS training materials, could not complete the requested analysis because the information Defendants had provided to him was "incomplete" and because the reviewer "could never determine what exactly [he] was reviewing."  (Ex. 23 at Steib 002696-7; Ex. 27 at 143:6-7).

167.    DFCS Director Felder testified that DFCS's training had problems with "timeliness" as well as with "completeness" of the curriculum, and that there is a "lack of an evaluation of effectiveness."  (Ex. 28 at 30:19-22).

168.    Training Program supervisor Triplett testified that when new social workers do complete their training program, they are tested on the material covered, but the State does not require that they pass the test before returning to the field.  (Ex. 30 at 32:25-33:9).

169.    Executive Director Taylor characterized DFCS training as "certainly underchallenged."  (Ex. 38 at 150:16-19).

170.    Dr. Steib finds in her report and testified that caseworkers and supervisors do not receive training in state laws related to child dependency, maltreatment, and custody, in court procedures, in organizing information in court reports, or in providing

testimony.  Dr. Steib further testified that such information was important material for training.  (Ex. 27 at 163:11-164:3; Ex. 1 at 18).

171.    Dr. Steib testified that her impression was that the limitation in training resources had existed "for a few years."  (Ex. 27 at 136:6-14).

172.    According to the Budget Request Package submitted in June 2005: "Training Program staff continues to provide special assistance to county and regional staff, in addition to performing their regular duties," including "completing home studies, investigations, home visits, ICPC requests, case plans, and work in MACWIS to assist in closing out old cases" in counties where there are "staffing issues."  (Ex. 8 at DHS at 053712).

**SUPERVISION**

173.    Dr. Steib reports that although casework supervisors "are the lynchpins of front line practice," they "often carry caseloads or spend much of their time fulfilling casework activities rather than providing guidance and support for front-line staff" because of "heavy [caseworker] workloads" and "vacant caseloads."  (Ex. 1 at 29-30).

174.    Dr. Steib finds that "many supervisors also carry cases and have administrative duties in addition to providing supervision for caseworkers." (Ex. 1 at i-ii).

175.    DFCS Director Felder acknowledges that "competent, supportive supervision" is a crucial element in staff retention, and that many supervisors are responsible not only for supervising direct service workers but also for "carrying their own caseloads, supervising aides and clerical employees, . . . and [being] responsible for

administrative duties associated with the management of their office buildings." (Ex. 19 at DHS 115420).

176. Dr. Steib reports that some county offices do not have a supervisor on location. (Ex. 1 at 30).

177. Dr. Steib finds that "[p]rogram management staff does not have the capacity to provide functional supervision and consultation, to participate in planning and policy development, or to work with Regional Directors closely enough to bridge the gap that typically exists between state level administration and field staff in large bureaucracies." (Ex. 1 at 30).

178. Dr. Steib reports that "program managers are not in regular attendance at key meetings, such as those with Regional Directors or work groups that involve their area of responsibility." (Ex. 1 at 30-31).

179. DFCS Director Felder attributed caseworkers' delay in entering into MACWIS information necessary for a child to be adopted to "lack of supervision, poor supervision." (Ex. 28 at 222:3).

180. DFCS Director Felder notes in his draft plan that "[s]upervisors within the agency have difficulty transitioning from social worker to area social work supervisor." (Ex. 19 at 115414).

181. DFCS Director Felder testified that "we have not prepared [supervisors] for what it means to be a supervisor." (Ex. 28 at 159:18-19).

182. DFCS Director Felder admitted that the individuals who occupy supervisory positions, were selected without satisfying any job-related criteria, and that "most"

supervisors have not proven that they have "certain abilities" needed to supervise. (Ex. 28 at 159:25-160:18).

183. Executive Director Taylor admitted that at least some DFCS staff is poorly supervised. (Ex. 38 at 151:18-19).

184. Dr. Steib found that "[m]ost supervisors have had no training specific to their supervisory role, and individual professional development plans are lacking for staff at all levels." (Ex. 1 at ii).

185. Ms. Triplett testified that as far as she was aware, supervisors receive no formal training. (Ex. 30 at 39:8-40:2).

For the above reasons and the reasons set forth more fully in the Memorandum of Law in Support of their Motion for Summary Judgment on Liability, Plaintiffs respectfully request that the Court grant their Motion for Summary Judgment on Liability.

Respectfully submitted, this 1st day of May, 2006.

/s Melody McAnally
W. Wayne Drinkwater, Jr. (MBN 6193)
Melody McAnally (MBN 101236)
BRADLEY ARANT ROSE & WHITE LLP
188 East Capitol Street, Suite 450
Jackson, MS  39201
Telephone:  (601) 948-8000
Facsimile:  (601) 948-3000

Stephen H. Leech (MBN 1173)
850 East River Place, Suite 300
Jackson, MS 39202
Telephone:  (601) 355-4013

Marcia Robinson Lowry (MBN 43991 *pro hac vice*)
Susan Lambiase (MBN 43992 *pro hac vice*)
Eric E. Thompson (MBN 43993 *pro hac vice*)
Tara Crean (MBN 44447 *pro hac vice*)

Shirim Nothenberg (MBN 43990 *pro hac vice*)
CHILDREN'S RIGHTS
330 Seventh Ave, 4th Floor
New York, NY 10001
Telephone:  (212) 683-2210

John Lang (MBN 43987 *pro hac vice*)
Christian Carbone (MBN 43986 *pro hac vice*)
John Piskora (MBN 44474 *pro hac vice*)
LOEB & LOEB LLP
345 Park Avenue
New York, NY 10154
Telephone:  (212) 407-4000

*PLAINTIFFS' COUNSEL*

## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2006, I electronically filed the foregoing with the Court

using the ECF system, which sent notification of such filing to the following:

Dewitt L.  ("Rusty") Fortenberry Jr., Esq.
Kenya Key Rachal, Esq.
Gretchen L. Zmitrovich, Esq.
Ashley Tullos Young, Esq.
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC
428 I-55 North
Meadowbrook Office Park
Jackson, MS 39211
(601) 351-2400

Harold E. Pizzetta, III, Esq.
Assistant Attorney General
General Civil Division
Carroll Gartin Justice Building
430 High Street
Jackson, Mississippi  39201

*Attorneys for Defendants Haley Barbour, et al.*

/s Melody McAnally_____