BILL M BRISTER, PH.D.

Page 1

1  UNITED STATES DISTRICT COURT OF SOUTHERN MISSISSIPPI

2

   OLIVIA Y., ET AL.                               PLAINTIFF
3

   VERSUS                                      NO. 3:04cv251LN
4

   BARBOUR, ET AL.                                DEFENDANTS
5

6  \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

7

8           DEPOSITION OF BILL M. BRISTER, PH.D.

9

10 \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

11
               APPEARANCES NOTED HEREIN
12

13            DATE: MARCH 28th, 2006
      PLACE: MCGLINCHEY STAFFORD, PLLC
14          200 SOUTH LAMAR STREET
       JACKSON, MISSISSIPPI 39201
15           TIME: 9:00 a.m.

16

17

18

19

20

21

22

23 REPORTED BY:  AMANDA M. WOOTTON, CSR, RPR

24

25

EXHIBIT A

BILL M BRISTER, PH.D.

Page 2

APPEARANCES:

    John F. Lang, Esquire
    John Piskora, Esquire
    Loeb & Loeb
    345 Park Avenue
    New York, NY 10154-1895

    Eric E. Thompson, Esquire
    Children's Rights, Inc.
    330 7th Avenue
    New York, NY 10001

    Rusty Fortenberry, Esquire
    Ashley Tullos Young, Esquire
    McGlinchey Stafford
    200 South Lamar Street
    Jackson, Mississippi 39201

Page 3

TABLE OF CONTENTS

| | | |
|---|---|---|
| Appearances | | 2 |
| Examination by Mr. Fortenberry | | 4 |
| Exhibit 145 | | 35 |
| Exhibit 147 | | 69 |
| Exhibit 148 | | 70 |
| Exhibit 149 | | 72 |
| Exhibit 150 | | 81 |
| Exhibit 151 | | 84 |
| Exhibit 152 | | 92 |
| Exhibit 153 | | 101 |
| Exhibit 154 | | 106 |
| Exhibit 155 | | 107 |
| Exhibit 156 | | 111 |
| Conclusion of Deposition | | 155 |
| Certificate of Reporter | | 156 |
| Certificate of Deponent | | 157 |
| Correction Sheet | | 158 |

Page 4

\* \* \* \* \* \*

BILL M. BRISTER, PH.D., after having first been duly sworn, was examined and testified under oath as follows, to-wit:

EXAMINATION

EXAMINATION BY MR. FORTENBERRY:

Q  If you don't mind, state your name for the record, please.

A  Bill M. Brister.

Q  And can you briefly describe your educational background for me, please.

A  Grew up in Brookhaven, Mississippi. Graduated from Brookhaven High School. Went to the University of Southern Mississippi. Got a degree in -- with a major economics. Got a master's of business administration from the University of Southern Mississippi. Then got a Ph.D. degree from the University of Arkansas with a major in finance and minors in economics and statistics.

Q  Dr. Brister, can you also give me your business address for me, please.

A  I work at Millsaps College, 1701 North State Street, Jackson, Mississippi.

Q  And I take it you are from Mississippi?

Page 5

A  I am from Mississippi.

Q  Are you related to anybody -- any attorneys that you know of that you claim?

A  I do have one cousin who's an attorney in the State of Texas.

Q  Okay. Any attorneys in Mississippi?

A  No.

Q  Are you related to anybody in the federal court system in the State of Mississippi, to your knowledge?

A  I am not.

Q  Okay. I take it you've given your deposition on previous occasions?

A  I have.

Q  Approximately how many times?

A  Approximately 12 times.

Q  And can you give me the reason generally why you've been deposed previously?

A  I would be serving as an expert witness in the area of economics or finance.

Q  So I take it all those depositions were in the area of economics and finance?

A  Yes, sir.

Q  Okay. And all of those depositions you were deposed in your capacity as an expert witness?

Page 6

1   A  Yes.
2   Q  Okay. Have you ever been deposed in your
3 individual capacity, for example?
4   A  No.
5   Q  Now, have you ever been a party to a
6 lawsuit before?
7   A  No.
8   Q  Okay. Have you ever had any judgments
9 entered against you?
10   A  No.
11   Q  Okay. Have you ever been subjected to a
12 professional disciplinary action of any sort?
13   A  No.
14   Q  And I apologize for asking these
15 questions, but have you ever been charged with a
16 crime?
17   A  No.
18   Q  Now, as we go through this -- and you're
19 familiar with depositions -- feel free to take a break
20 at any time. If you need to get up, stretch, water,
21 restroom, just let me know. One thing is I will not
22 try to confuse you at all. So if my questions tend to
23 be confusing or I make a misstatement, just let me
24 know. Ask me to rephrase it.
25      In fact, if you need to think about an

Page 7

1 answer, feel free. Say I need a break. That's fine.
2 If you don't understand anything I may say, just let
3 me know and I'll try to rephrase it to the best of my
4 ability.
5   A  Okay.
6   Q  In preparing for the deposition, did you
7 meet with anyone? And when I say the deposition, this
8 particular deposition.
9   A  Yes, sir.
10   Q  Who did you meet with?
11   A  I met with John Lang and John Piskora.
12   Q  And when did you meet?
13   A  Yesterday.
14   Q  And where did you meet?
15   A  In the offices of Bradley Arandt.
16   Q  Okay. And can you tell me approximately
17 how long you met?
18   A  Approximately eight hours.
19   Q  And I'm sure we'll get into the details
20 as I go through asking questions, but can you
21 summarize briefly what y'all discussed in preparing
22 for the deposition?
23   A  Yes, sir. I was given advice as to how
24 to approach answering questions such as -- was the
25 main part of the -- of the preparation. I don't know

Page 8

1 how much detail you want me to go into about that, but
2 it was -- the substance of the conversation yesterday
3 was to -- how to approach answering questions, not the
4 substance of the answer, but the -- and what to expect
5 in this -- here today.
6   Q  Okay. And that was going to be my point.
7 The answers that you give today are your answers and
8 not the answers of someone else or -- is that correct?
9   A  That is correct.
10   Q  Did you discuss any potential topic areas
11 for this deposition today?
12   A  Yes.
13   Q  And what were those areas?
14   A  Well, we talked about you would go
15 through my qualifications. Many of the questions
16 you've already asked me today would be asked. And the
17 substance of the report and how these questions might
18 be phrased or come to me.
19   Q  Okay. Did you discuss any topic areas
20 outside of the opinions and facts set forth in your
21 report?
22   A  No.
23   Q  Did you review any documents in
24 preparation for this deposition?
25   A  Yes.

Page 9

1   Q  And can you tell me what documents you
2 reviewed?
3   A  I reviewed the documents that are
4 referenced in the report.
5   Q  And did you bring any documents with you
6 to the deposition?
7   A  I brought the report itself and that's
8 all.
9   Q  Without the attachments?
10   A  Well, I have the footnotes, the end notes
11 and the graphs, and a copy of my CV.
12   Q  Okay. And we just met today, so I take
13 it you're feeling well today?
14   A  I feel fine.
15   Q  Good health, to your knowledge?
16   A  Reasonably good health, yes, sir.
17   Q  Not on any medication that may influence
18 the way you feel?
19   A  No, no. A little blood pressure
20 medicine, perhaps. That's about it.
21   Q  When was your first contact with
22 Children's Rights? I may use the term CRI if
23 that's -- is that okay? When I refer to CRI, it's
24 Children's Rights.
25   A  Okay. January approximately 2005.

Page 10

1   Q   Okay. How did that come about? Did you
2   approach them or did they approach you?
3   A   They approached me.
4   Q   Okay. Do you recall who approached you?
5   A   Yes. Steven Leach.
6   Q   Okay. And tell me about the initial
7   approach.
8   A   I got a call from Steven Leach. I did
9   not know the gentleman. He said he had received my
10  name from someone. I actually don't even know who,
11  that might be -- might be someone that could serve as
12  an expert witness in regard to this case. Would I
13  meet with him and some others to discuss that
14  possibility.
15  Q   And did you make a decision at that
16  initial conference with Steven Leach about whether you
17  would get involved in this case?
18  A   I did not.
19      MR. LANG: Objection as to form, but
20  go ahead and answer.
21  MR. FORTENBERRY: (Continuing.)
22  Q   Was this a telephone conversation or in
23  person, this meeting with Steven Leach?
24  A   The first conversation with Steven was a
25  phone conversation.

Page 11

1   Q   And then after that, I take it that you
2   agreed to meet with Steven and/or someone else?
3   A   Yes.
4   Q   And when did that meeting take place, the
5   next meeting?
6   A   Well, I can't give you the exact date,
7   but it's all around January of 2005.
8   Q   And who did you meet with?
9   A   I met at that next meeting with John Lang
10  and a representative of Children's Rights. And I
11  don't think it was Eric, but I could be mistaken. I'm
12  sorry.
13  Q   That's fine. We're in the same sort of
14  time frame, January of '05?
15  A   Oh, yes.
16  Q   And was that meeting in Jackson or
17  somewhere --
18  A   It was in Jackson.
19  Q   And what was discussed at that meeting?
20  A   We discussed my qualifications. We
21  discussed what the case was about. Just sort of
22  general get to know each other on a professional
23  basis. That's about it. That's about the substance
24  of the meeting.
25  Q   At that meeting, did you make a decision

Page 12

1   whether to get involved in the case?
2   A   I think we agreed that we would all think
3   it over for a day or two and get back together.
4   Q   And so I take it at some point after this
5   second meeting that you got back together with them or
6   someone from CRI?
7   A   Phone, via telephone.
8   Q   Via phone. Okay. And approximately when
9   would that have been?
10  A   Oh, maybe a week later.
11  Q   Okay. And what was discussed during this
12  phone conversation?
13  A   We -- I think we discussed -- we both --
14  both sides, me and the Children's Rights side just
15  both said yes, we would -- we thought we could work
16  together and we probably discussed terms,
17  compensation.
18  Q   Okay. Who was this conversation with; do
19  you recall?
20  A   Marsha Lowery got in on it at some point,
21  but there was another contact gentleman at Children's
22  Rights and I can't recall.
23  Q   That's fine. And you mentioned the
24  terms -- discussing terms or some sort of agreement.
25  A   Uh-huh. (Affirmative response.)

Page 13

1   Q   Can you tell me what those terms are?
2   A   The terms of the agreement is that I
3   would be paid $18,000 to write this report and would
4   then be paid on a per hourly basis for depositions, et
5   cetera.
6   Q   And how much are you being paid per hour?
7   A   $150.
8   Q   And that's over and above the $18,000?
9   A   Yes.
10  Q   Okay. Any time during this time period
11  of the -- I take it you had one telephone -- initial
12  phone call with Steven Leach, then a meeting and then
13  another phone call. At any point during that time
14  frame, did you do any research with respect to
15  Children's Rights or an investigation of the
16  organization?
17  A   I pulled up their website.
18  Q   And do you recall what you read on the
19  website?
20  A   I read the mission of the organization.
21  I looked at some of the staff, maybe some of their
22  previous work.
23  Q   And do you recall what their mission is?
24  A   Mission is -- I can't recall it verbatim,
25  but it's to work on behalf of abused and neglected

Page 14

1  children throughout the United States.
2     Q    And without recalling the details, do you
3  recall whether you agreed with the mission or
4  disagreed with any portions of it?
5            MR. LANG: Objection as to form.
6     A    No. I think that's an admirable mission
7  to work on behalf of abused and neglected children.
8  MR. FORTENBERRY: (Continuing.)
9     Q    And so there was nothing in part of the
10 mission that you recall that you disagreed with?
11    A    No.
12    Q    Okay. When was the first time that you
13 heard of CRI?
14    A    At this initial meeting.
15    Q    Initial phone call with Steven Leach?
16    A    Yes.
17    Q    Okay. Have you ever been involved in
18 another lawsuit involving a foster care system?
19    A    No.
20    Q    Have you ever been involved in a lawsuit
21 concerning a health and human services agency?
22    A    No.
23    Q    Have you ever been involved in a lawsuit
24 involving a state as a party or a state agency?
25    A    No.

Page 15

1     Q    Have you been retained by CRI or anyone
2  else as an expert in another lawsuit other than this
3  one --
4     A    No.
5     Q    -- involving a child welfare agency?
6     A    No.
7     Q    So this is the only lawsuit you've been
8  involved in that touches on the child welfare agency?
9     A    Yes.
10    Q    Have there been any discussions about you
11 working as an expert for CRI in the future?
12    A    No.
13           MR. LANG: Objection as to form.
14           MR. FORTENBERRY: Do we need to take
15 a break?
16           MR. LANG: No, no, no. I was just
17 asking the witness to go a little bit slower
18 and give me a chance to read the readout on the
19 screen so I can make objections before he
20 answers. It's fine. Go ahead. I don't want
21 to --
22           MR. FORTENBERRY: And that's fine.
23 If I start going too fast or need to slow down,
24 just get my attention.
25           MR. LANG: No, it's fine. I don't

Page 16

1  want to burden the proceedings with my
2  disability any more than necessary. If the
3  witness just takes a second before he answers,
4  then you can talk as fast as you'd like.
5            MR. FORTENBERRY: Okay.
6  MR. FORTENBERRY: (Continuing.)
7     Q    I take it after this third meeting, an
8  agreement was then reached to work as an expert in
9  this litigation? The third meeting with someone from
10 CRI is what I'm referring to.
11    A    Yes.
12    Q    And once the agreement was reached, can
13 you walk me through what you started doing from the
14 beginning? I take it the goal was to prepare a
15 report. What did you start doing initially?
16           MR. LANG: Objection as to form.
17    A    I began a discussion with counsel as to
18 what materials and information I might need, documents
19 I might need was probably the very first thing.
20 MR. FORTENBERRY: (Continuing.)
21    Q    Did you then start searching for
22 documents or were you provided information from CRI?
23    A    I was provided documents at some point by
24 CRI and, of course, I did an Internet search for not
25 documents, but perhaps just the information in this

Page 17

1  area.
2     Q    Okay. And I take it that that being the
3  initial point, that you did not have a reference file
4  or anything on the state foster care system in your
5  office or of that nature. You initially started with
6  the documents provided by CRI and your research on the
7  Internet; is that correct?
8            MR. LANG: Objection as to form.
9            You may answer.
10    A    That is correct.
11 MR. FORTENBERRY: (Continuing.)
12    Q    Okay. And can you tell me what documents
13 were provided by CRI?
14    A    I received boxes of documents in
15 different -- at different times. I think the initial
16 documents I received were perhaps three legal boxes of
17 documents. You would -- I can't recall all of the
18 documents that were in that box, obviously, but they
19 were documents that had to do with the fiscal
20 situation, fiscal management of Department of Family
21 and Children Services at DHS.
22    Q    Okay. And can you tell me what
23 information you obtained from the Internet, if you
24 recall?
25    A    I -- the Urban Institute has a couple of

Page 18

1  good papers written on this subject. I received
2  information from the National Child Welfare League of
3  America, something like that. I probably have the
4  name not exactly right, but they have some information
5  from the Department of Health and Human Services. The
6  Administration of Children and Families have
7  information. Those were the ones that I recall right
8  now.
9     Q   Do you recall receiving any summaries of
10 this lawsuit from CRI?
11    A   Perhaps the complaint. You mean legal
12 documents?
13    Q   Any type of document. You mentioned that
14 you received budget documents or what appeared to be
15 budget documents. Do you remember receiving anything
16 where issues of the lawsuit had been summarized by
17 CRI?
18    A   I do not other than the legal documents
19 like the complaint, perhaps interrogatories. I don't
20 know. I probably get the legal names wrong, but I do
21 not remember a summary.
22    Q   Okay. Now, I take it at that point, you
23 began working on your report. Approximately what time
24 frame are we in the year 2005 now?
25    A   We're in the probably March area.

Page 19

1     Q   And when was your report completed,
2  roughly?
3     A   It's dated February the 7th, '06.
4     Q   Okay. Now, walk me through the process
5  of drafting your report. I take it -- you may not
6  have, but I take it you would have gone through some
7  drafts of the report?
8     A   Yes.
9     Q   Can you walk me through -- when did you
10 finish your initial draft; do you recall?
11    A   I cannot give you the exact date. I
12 think it was probably after the -- I believe it might
13 have been after the hurricane because the hurricane
14 did create a delay in all of this and moving all the
15 dates back. So it was perhaps after September. I'm
16 sorry I can't remember the exact date that the first
17 draft was submitted.
18    Q   That's fine. And then from
19 approximately -- so it's safe to say from about March
20 of 2005 until the area of the fall or September of
21 2005, you worked on the initial draft of the report,
22 correct?
23    A   Yes.
24    Q   And do you recall approximately how many
25 hours per month you worked on the report?

Page 20

1     A   The hours -- of course, more and more
2  hours as the deadline approaches.
3     Q   And I'll rephrase: Do you recall
4  approximately how many hours you spent working
5  preparing the draft?
6     A   On the whole report, I would estimate 200
7  hours perhaps.
8     Q   And did you subsequently receive any
9  other documents from CRI?
10    A   I did receive documents. Two other
11 mailings, I believe.
12    Q   Okay. And what were contained in those
13 mailings?
14    A   More of the same. Fiscal-related
15 documents that were obtained, I assume, through
16 discovery at different points. And they were -- the
17 ones that were -- had some bearing to the fiscal
18 situation were forwarded to me.
19    Q   And did you on -- during that time frame,
20 did you receive any summaries of the lawsuit or
21 summaries of issues from CRI?
22        MR. LANG: Objection. Asked and
23    answered.
24    A   No.
25

Page 21

1  MR. FORTENBERRY: (Continuing.)
2     Q   Now, when you finished the draft of the
3  report, what did you do with it, the initial draft?
4     A   I e-mailed it to, I assume, John Piskora.
5     Q   Okay.
6     A   Perhaps Eric was on that e-mail, too.
7     Q   And did you then have discussions or
8  meetings or phone conversations with them about the
9  draft of the report?
10    A   Yes.
11    Q   And can you tell me about those
12 discussions?
13    A   We went through the report in some
14 detail. I was explaining what I had found and
15 explaining my findings in the initial draft. They
16 made suggestions on format. Perhaps you could move
17 this up here, this back here. This is redundant here.
18 Those sorts of format and editing type of changes.
19        And remember, it was an initial draft.
20 There was much more work to be done. In my initial
21 draft, I have notes in there. Here's where I'm going
22 to insert more on this, here's where I'm going to
23 insert more on this. This a place for this topic. I
24 have to write an introduction, all this sort of stuff.
25 So we discussed what all those holes were and that I

Page 22

1  was planning to fill, that sort of thing.
2      Q   Did any of those conversations involve
3  the substantive portion of the report, changes to the
4  substantive portion?
5      A   We discussed my opinion there and they
6  suggested changes on how I might approach the format
7  of the report. But all opinions given in the report
8  are -- is certainly mine.
9      Q   Okay. Well, were there any disagreements
10 with the substantive portion of the report?
11     A   No.
12     Q   Okay. Now, was this meeting -- I may
13 have asked it, and I apologize if I did. But was this
14 discussion about the draft of the report by telephone
15 or in person?
16     A   The initial draft was by telephone.
17     Q   And approximately how long was the
18 discussion?
19     A   Perhaps it was an hour phone
20 conversation.
21     Q   And after this discussion that was
22 sometime in September of '05, what happened then? Did
23 you go back and continue working on the report?
24     A   Continued working on the report.
25     Q   Okay. And after that discussion,

Page 23

1  September of '05, were you provided any other
2  documents from CRI?
3      A   September of '05, yes, I believe I was
4  provided more documents.
5      Q   Do you recall what you were provided
6  with?
7      A   Well, it was, again, more of the same
8  documents obtained through discovery and forwarded to
9  me.
10     Q   Okay. And again, were you provided any
11 summaries of information or a summary of the lawsuit
12 or anything at that point?
13         MR. LANG: Objection. Asked and
14     answered.
15     A   No, sir.
16 MR. FORTENBERRY: (Continuing.)
17     Q   Now, I take it after this initial draft
18 and then you went through the formatting, that you
19 probably got to the point of a second draft?
20     A   Uh-huh. (Affirmative response.)
21     Q   When did you -- when was the next draft
22 prepared?
23     A   I can't give you -- I don't know the
24 date, but it was maybe a month later, something like
25 this. It was in different stages as we approached the

Page 24

1  final product.
2      Q   And what I call this second draft prior
3  to the final product, was that, again, provided to
4  CRI?
5      A   Yes.
6      Q   Okay. And in what format? Was it
7  e-mailed to them?
8      A   It was e-mailed.
9      Q   Okay. And once they received it, did you
10 have another conversation with them?
11     A   Yes.
12     Q   Okay. And what did that conversation
13 involve? What was discussed there?
14     A   It was more of the same. It was -- it
15 was suggestions about editing for the most part
16 format, getting it in a -- in a format and an outline
17 that they think was more effective for a legal
18 document. I tend to write like an academic and they
19 wanted it more as a -- as perhaps a document that
20 could be better -- more clearly understood by the
21 judge or lawyers, or whoever might be reading it. It
22 was that sort of comments.
23     Q   In changing the way it was written, did
24 it include a change of any of the substantive
25 portions?

Page 25

1      A   No, sir.
2      Q   And was this conversation discussion also
3  by telephone?
4      A   Yes, sir.
5      Q   And do you recall approximately how long
6  it took?
7      A   It was another hour conversation.
8      Q   And do you recall who participated in it?
9      A   John and Eric were usually the parties on
10 the other end.
11     Q   And after this second draft, what did you
12 do going from that point? I take it you made some
13 more changes?
14     A   Yeah. We kept -- I kept editing and
15 adding to the report and moving things around, and
16 just generally cleaning up. I mean, you know, in a
17 report like this, it goes through many, many
18 iterations.
19     Q   And after this, did you ever reach the
20 point of a third draft, or were you then to the final
21 product?
22     A   No. There was probably -- well, I'm sure
23 there was a third draft. There were a series of
24 drafts. In fact, I can't tell you how many, but at
25 least three.

Page 26

1  Q  Now, during this series of drafts, were
2  you ever provided any summaries from CRI?
3  A  No.
4  Q  Okay. Were you ever told that -- well,
5  let me back up.
6      When you were initially retained to
7  prepare a report, what was the -- why were you
8  retained, in your opinion?
9  A  Why was I --
10 Q  Were why you retained?
11 A  Why was I personally retained rather than
12 someone else?
13 Q  No. Why were you retained for this
14 lawsuit as an expert witness?
15 A  Oh, the purpose of --
16 Q  The purpose.
17 A  To conduct an examination and an analysis
18 of the fiscal management of the child welfare system
19 of Mississippi, to produce a report and perhaps
20 testify.
21 Q  Okay. And as a part of going through
22 this process, reviewing documents, did you ever
23 interview anybody involved with the child welfare
24 system in the State of Mississippi?
25 A  No.

Page 27

1  Q  Have you ever interviewed anyone involved
2  in the management of the child welfare system in any
3  state in the United States?
4  A  No.
5  Q  Have -- did you have any discussions with
6  anyone that has ever had experience in managing a
7  child welfare system?
8  A  Had conversations with Kathy Crabtree,
9  and I believe she had some experience in that area.
10 Q  Okay. And can you tell me about those
11 conversations?
12 A  Very brief conversations with Kathy
13 basically comparing or -- she wrote a report also and
14 comparing so that there's no overlap basically and --
15 or -- and it was -- I've seen these reports coming
16 together. But I didn't want to do something she was
17 doing and she didn't want to do something that I was
18 doing.
19 Q  Okay. And other than that, was there any
20 concern -- why is there a concern that there might be
21 an overlap?
22 A  Well, it seemed to be wasted effort.
23 Q  Okay. And other than Kathy Crabtree, you
24 did not talk to anyone else that has ever managed a
25 child welfare system, correct?

Page 28

1  A  No. Correct.
2  Q  Did you review any reports or documents
3  from other lawsuits addressing issues involving child
4  welfare systems?
5  A  I was provided a report of -- by
6  Children's Rights. And I can't remember the state.
7  It was perhaps -- it was perhaps New York. I can't
8  remember, but it -- I can't even remember the
9  substance of the report. It had very little, if
10 anything, to do with what I was doing.
11 Q  Do you still have a copy of that report?
12 A  Perhaps.
13 Q  When -- at what point in time were you
14 provided with that report?
15 A  I don't remember the date. It was
16 somewhere in all of this process. Early on, I think,
17 actually.
18     MR. FORTENBERRY: Can we have a copy
19     of that produced? I'm not sure if that's been
20     produced. We can talk about it off the record.
21     MR. LANG: Well, we'll take it under
22     consideration and get back to you on that.
23 MR. FORTENBERRY: (Continuing.)
24 Q  Did that report from what you believed to
25 be New York, influence the way you wrote your report?

Page 29

1  A  Not at all.
2  Q  Not at all. Did it influence the format
3  of your report?
4  A  No, sir.
5  Q  Did it influence the substantive opinion
6  of your report?
7  A  No, sir.
8  Q  Did it bias you in any way?
9  A  Absolutely not. I didn't even address
10 the fiscal issues.
11 Q  Okay. So that report did not address the
12 fiscal management of this particular --
13 A  No.
14 Q  -- state?
15     Okay. Then what was the purpose of your
16 having that report?
17 A  I don't know.
18 Q  Okay. Did you read the report?
19 A  I glanced at it, thumbed through it, saw
20 it was nothing that could help me and that's it.
21 Q  Did you review any other documents
22 involving a lawsuit over a child welfare system other
23 than that report?
24 A  No.
25 Q  Now, in preparation in drafting your

Page 30

1 report, did you review Mississippi statutory law?
2  A   Did I review Mississippi statutory law?
3 Legal phrase there. I'm not sure I -- I did look at
4 legislative budget documents and that sort of thing.
5 I don't think that's statutory law, so I guess the
6 answer there is no.
7  Q   Okay. Did you rely on any sort of
8 knowledge that you may have of Mississippi law in
9 preparing your report other than budget bills?
10  A   Well, no. I mean, whatever knowledge I
11 have, I, of course, rely on, but I have no specific
12 knowledge of Mississippi law on this regard.
13  Q   Do you have an opinion whether
14 Mississippi law is relevant to your opinions expressed
15 in this case?
16  A   A legal question and I don't have an
17 opinion. I don't know.
18  Q   So you don't know whether Mississippi law
19 would be relevant to any of the opinions expressed in
20 your report, correct?
21  A   Yes. I don't know.
22  Q   Okay. Now, I take it in the documents
23 that you reviewed -- I want to make sure that you
24 reviewed DHS, Department of Human Services' budget
25 bills in preparing your report?

Page 31

1  A   I did.
2  Q   And which fiscal years did you review?
3  A   When you say -- budget documents prepared
4 by DHS? Is that your --
5  Q   Budget documents or budget bills or
6 budget legislation, do you recall which fiscal years
7 that you reviewed?
8  A   Budget documents, 1998 through 2005 were
9 the actual years in which the -- I mean, they were
10 dated some year in the future.
11  Q   Just for point of clarification, we're
12 talking calendar year as opposed to fiscal year?
13  A   It's probably state fiscal years in most
14 cases.
15  Q   And certainly, those DHS budget bills
16 that you -- would be relevant to the issues of this
17 lawsuit, correct?
18  A   Yes.
19  Q   Did you review any depositions in
20 preparing your report?
21  A   Yes.
22  Q   Do you recall which depositions you
23 reviewed?
24  A   I reviewed a deposition by Teresa
25 Jackson. I reviewed a part of a deposition by Billy

Page 32

1 Mangold. Pardon me if I get the name wrong. And I
2 attended Mr. Bledst deposition.
3  Q   Okay. Prior to issuing your report, the
4 only depositions that you reviewed would have been
5 Teresa Jackson and Billy Mangold; is that correct?
6  A   I believe that is correct.
7  Q   Okay. And what was the need or the
8 purpose for reviewing those two depositions?
9  A   Because they were involved in the
10 budgetary process in the Department of Human Services
11 and DFCS, and might provide some information useful.
12  Q   Do you recall whether you asked for those
13 depositions or were they provided by CRI?
14  A   I asked for any depositions that might
15 provide me relevant information, and those were
16 provided to me.
17  Q   We touched on a report that you reviewed
18 which you believe from New York. Did you review any
19 other reports in preparing your report?
20  A   No.
21  Q   Okay. Did you review Kathy Crabtree's
22 report prior to preparing your report?
23  A   No.
24  Q   Did you review drafts of any other
25 reports prior to your final draft?

Page 33

1  A   No.
2  Q   In preparing your drafts and doing basic
3 research on the Internet and getting to the point of
4 having your final report, did you review any treatises
5 or scholarly articles of any sort?
6  A   To the extent that articles are published
7 by the Urban Institute or by the Administration for
8 Children and Families, these are the Internet sources
9 I -- you might call those scholarly articles or
10 certainly scholars are preparing them.
11  Q   Do you recall the subject matter of those
12 articles?
13  A   The -- I keep referring to the Urban
14 Institute. There was one particular paper they wrote
15 that I -- that I used in my report. It was called The
16 Cost of Protecting Vulnerable Children For. And it
17 was useful.
18  Q   Okay. And in what way was it useful?
19  A   It provided some data, particularly data
20 about -- compared to data of states, and also just
21 general information about funding programs, et cetera,
22 for child welfare.
23  Q   And did it have specific data with
24 respect to Mississippi?
25  A   It did.

Page 34

1  Q   Okay. And do you still have a copy of
2  that article?
3  A   Yes.
4  Q   And if I want to go on the Internet,
5  where would I find that article?
6  A   It's in -- the website is given in the
7  end notes of this report.
8  Q   Okay. And that's what I want to make
9  sure, that it's in your report --
10  A   Yes, sir.
11  Q   -- and I can have enough information that
12  I can go get the article.
13  A   Absolutely.
14  Q   Okay. Did you review any other articles
15  or journals of any sort?
16  A   I reviewed, again, Internet sources. I
17  would go to an Internet site and they would have -- I
18  don't know if you call them articles or treatises or
19  whatever you call them, but they would be reports
20  on -- I don't even know if they're reports. There
21  would be documents providing information or even data.
22  Q   Are all of those reports or Internet
23  sources reflected in your report?
24  A   Yes.
25  Q   Are there any other articles or Internet

Page 35

1  sources that you read and used during the preparation
2  that are not reflected in your report?
3  A   No.
4  Q   Okay. So everything I -- if I go to your
5  report, I can literally find every article that you
6  relied on?
7  A   Yes, I believe you can.
8  Q   And there are no others that you read?
9  A   Correct.
10  Q   Okay.
11      MR. FORTENBERRY: If I can have this
12  marked.
13      (DOCUMENT MARKED AS DEPOSITION EXHIBIT
14      NO. 145 AND ATTACHED.)
15  MR. FORTENBERRY: (Continuing.)
16  Q   Okay. Dr. Brister, Exhibit No. 145 has
17  just been marked. Do you recognize this exhibit?
18  A   Yes, sir.
19  Q   And what is it?
20  A   It is a report I prepared for this case.
21  Q   And does it appear to be -- and take a
22  few minutes if you need to.
23  A   Uh-huh. (Affirmative response.)
24  Q   Does it appear to be a true and accurate
25  copy of your report?

Page 36

1  A   Yes, sir. On first glance, it does.
2  Q   And as we go through this, if you notice
3  that it's not and there's something missing, just
4  bring it to my attention. Would that be okay with
5  you?
6  A   Yes, sir.
7  Q   And we can take a break now or at the
8  next break, if you want to review it and make sure
9  it's a true and accurate report, that will be fine.
10  A   Okay.
11  Q   Did anybody else have a role in helping
12  you prepare this report?
13  A   Well, again, we -- we've covered a series
14  of drafts that were discussed with parties that we've
15  already mentioned. Are you talking about in addition
16  to them?
17  Q   Correct.
18  A   I have a graduate assistant who helped me
19  organize data and input data into the computer.
20  Q   And who is that graduate assistant?
21  A   His name is Lee Nettles.
22  Q   Lee Nettles. And is he still graduate
23  assistant?
24  A   No, he's graduated.
25  Q   And where may I find Lee Nettles?

Page 37

1  A   Well, he works for State Street
2  Properties in Jackson, Mississippi.
3  Q   Okay. And can you -- can you tell me
4  briefly what his educational background was when he
5  helped you on this report?
6  A   He was an MBA student at Millsaps.
7  Q   Now, you mentioned he collected data for
8  you. Did he go -- did he got out and actually obtain
9  data for you --
10  A   No.
11  Q   -- or did you provide him with data?
12  A   No.
13  Q   I'm sorry. In other words, can you be a
14  little more specific about what his role was?
15      MR. LANG: Objection as to the form.
16      You have accurately characterized his
17      testimony.
18      MR. FORTENBERRY: I'll tell you
19      what. Let me just back up and ask it this way.
20  MR. FORTENBERRY: (Continuing.)
21  Q   What was -- specifically, what was his
22  role in helping you prepare the report?
23  A   Lee had a very limited role. I would
24  receive data, all this budget information through
25  discovery. Also, the comparative data of the states

Page 38

1 from the Urban Institute report, et cetera. It was
2 much inputting, key stroking of data and rather than
3 spend hours doing that myself, I used my graduate
4 assistant.
5    Q   I understand. Did he prepare any
6 summaries for you?
7    A   No.
8    Q   Okay. You referenced comparative data
9 from the Urban Institute. Specifically, what is that;
10 do you recall?
11    A   What is --
12    Q   What is the comparative data that you're
13 referring to?
14    A   It would be data such as the amount of
15 funding for each state and different categories of
16 funding for child welfare. It would be data on the
17 number of children in the system, that sort of thing.
18    Q   Did -- I'm sorry. Is it Lee was the
19 graduate student?
20    A   Lee Nettles, yes.
21    Q   Lee Nettles. Did Mr. Nettles make any
22 revisions to your report?
23    A   Oh, no.
24    Q   Did he offer any suggestions about any
25 changes to your report?

Page 39

1    A   No. He didn't even read the report.
2    Q   And so I take it -- well, would you have
3 had any discussions with him about the report?
4    A   No.
5    Q   Now, all of the opinions expressed in
6 Exhibit 145, being your report, are solely your
7 opinions; is that correct?
8    A   They are.
9    Q   Are there any changes or corrections that
10 you want to make to those opinions at this point?
11    A   No.
12    Q   Okay. Are you aware of any mistakes in
13 the report?
14    A   No.
15    Q   Other than what we talked about in your
16 discussions with CRI, which you testified to were
17 addressing the format of your report, did you have any
18 discussions with CRI or anyone else, whomever they may
19 be, about your opinions or conclusions that are
20 reflected in your report?
21       Did you ever talk to anybody about your
22 substantive opinions or conclusions in your report
23 other than those that we -- you testified earlier to
24 with CRI?
25    A   I never talked to anyone about the

Page 40

1 conclusions in this report except people at CRI.
2    Q   And it's your testimony that those
3 discussions were solely about the format as opposed to
4 the substantive portions of the report, correct?
5    A   This is correct.
6    Q   Did you ever discuss the issues of this
7 report or your work with any other professors at
8 Millsaps?
9    A   No.
10    Q   Any other professors anywhere?
11    A   No.
12    Q   During the process of preparing this
13 report as Exhibit No. 145, did you ever make any trips
14 to New York to discuss the report with anyone at CRI?
15    A   Yes.
16    Q   Okay. And how many trips did you make?
17    A   One trip.
18    Q   And when would that have been?
19    A   Early December.
20    Q   Of 2005?
21    A   '05.
22    Q   And what was the purpose of that trip?
23    A   Purpose of the trip is to -- actually, I
24 needed a quiet place to work away from the busyness of
25 my office and my family, and they were willing to

Page 41

1 provide that. Also, they had all of the data there
2 that they had that might be useful that proved that I
3 had everything that I needed, but they had it all
4 there. Rather than shipping me everything they had
5 had in discovery, I said let me come up there.
6    Q   And what type of data are you referring
7 to?
8    A   Well, the budget data, the fiscal data,
9 that sort of thing.
10    Q   Okay. Would that have included any
11 summaries of budget reports or budget data?
12    A   Only as prepared by DHS.
13    Q   Okay. So that there -- again, there
14 weren't any summaries by CRI of the budget data that
15 you relied on?
16    A   No.
17    Q   And how long were you in New York?
18    A   Three days.
19    Q   And did you have any meetings with anyone
20 at CRI while you were in New York on this trip?
21    A   John Piskora, Eric Thompson and briefly
22 with John Lang.
23    Q   And what was the purpose of those
24 meetings?
25    A   To discuss the drafts of the report.

11 (Pages 38 to 41)

Page 42

1   Q   And again, what did those discussions
2   entail?
3   A   We talked about the data. I showed them
4   what I was finding, what my opinions were in that. We
5   discussed the format. They were big into the end
6   notes and they drove me crazy about end notes and
7   documenting everything. So we spent a lot of time on
8   chasing down where did you get that and let's get
9   right Bates numbers, and let's get it in the right
10  footnote, which proved taleful later on, and that sort
11  of thing.
12  Q   Now, at any time since you've been
13  retained as an expert in this case, have you prepared
14  any other documents from CRI other than the drafts of
15  your report and your report?
16  A   No.
17  Q   Okay. Did you have any written
18  correspondence to CRI?
19  A   No.
20  Q   Did you have any written correspondence
21  from CRI?
22  A   No.
23  Q   And I take it you continue, as we sit
24  here today, to adopt the opinions expressed in your
25  report?

Page 43

1   A   I do.
2       MR. FORTENBERRY: Let's take about a
3   five-minute break. I'm sort of at a stopping
4   point, and restroom and so forth.
5       (Off the record.)
6   MR. FORTENBERRY: (Continuing.)
7   Q   Okay. Dr. Brister --
8       MR. LANG: Could I just make one
9   brief note on the record? Just so the record
10  is clear, I think, I'm not certain, that in
11  your questions, you're using the term CRI to
12  include plaintiff's counsel such as Steve Leach
13  or Bradley Arandt or Lobe & Lobe, and that the
14  witness, when the witness is answering your
15  questions, is responding affirmatively if it's
16  a question concerning CRI regardless of whether
17  the individual or place is Lobe & Lobe or
18  Bradley Arandt or Steve Leach's office or what
19  have you, even though those firms are obviously
20  not part of CRI but are co-counsel with CRI.
21      And I just wanted to note that because I
22  assume you're continuing to do that and the
23  witness, with whom I conferred with briefly
24  during the break, is continuing to respond in
25  that way.

Page 44

1       MR. FORTENBERRY: Thank you. And I
2   apologize. I should have defined in a better
3   way the term CRI.
4   MR. FORTENBERRY: (Continuing.)
5   Q   When I use the term CRI and after this
6   point, Dr. Brister, I include plaintiff's counsel,
7   whether it's co-counsel with CRI. So is that how
8   you've been responding?
9   A   Yes, that's how I --
10  Q   And I did that for -- not to try to
11  confuse anyone, but just to simplify things.
12      You've mentioned prior to our break the
13  Urban Institute and reviewing some of their records?
14  A   Yes, I did.
15  Q   Okay. And who or what is the Urban
16  Institute?
17  A   It's a -- it's a think tank, for lack of
18  a better term, I suppose. I believe it's located in
19  Washington, DC. It deals with a host of social
20  issues, has a staff of scholars who research and
21  create reports on many, many issues.
22  Q   And can you -- so we're clear, can you
23  tell me what a think tank is?
24  A   Well, they have a -- a think tank is
25  usually a nonprofit organization that is -- either is

Page 45

1   endowed or engages in fundraising to hire scholars to
2   engage in research on whatever topic fits the mission
3   of that particular organization.
4   Q   And isn't it true that in that capacity,
5   they are advocates for their position?
6   A   I -- I would assume some or more
7   independent than others in terms of how they -- how
8   they present their information.
9   Q   What about Urban Institute? Are they
10  more independent or are they an advocacy group?
11  A   I found their reports to be unbiased.
12  Q   Okay. And why do you think their reports
13  are unbiased?
14  A   I detected no -- no agenda within their
15  reports for any particular legislation or any
16  particular side of the issue. It seemed to be cut and
17  dry. Here's information, explanatory information on
18  topics.
19  Q   Did you inquire as to how they obtained
20  their information?
21  A   I didn't inquire. I looked in their
22  footnotes, et cetera, to term that.
23  Q   Did you have any discussions with anyone
24  at the Urban Institute?
25  A   One lady, Rosanna Bess was her name.

12 (Pages 42 to 45)

Page 46

1   Q   And who was she?
2   A   She was one of the authors of the report
3   that I referenced.
4   Q   Okay. And when was this discussion?
5   A   Oh, I don't know. Sometime in the early
6   stages of this.
7   Q   And what was the discussion about?
8   A   It was about -- it was about the data, am
9   I interpreting this data correctly. I gave her my
10  view of how I'm reading her data and see if she
11  agreed, and she did.
12  Q   And is her report reflected in your
13  report, or is there a reference to her?
14  A   The report is referenced, yes.
15  Q   Okay. Did you disagree with her
16  interpretation -- or excuse me.
17      Did you disagree with her report in any
18  way?
19  A   I did not.
20  Q   Did she disagree with your interpretation
21  of her data?
22  A   Unh-unh, no. She didn't express any.
23  Q   And was this a telephone conversation?
24  A   It was.
25  Q   Did you ever meet with her or anyone else

Page 47

1   at Urban Institute in person?
2   A   No.
3   Q   Did you have any other phone
4   conversations with anyone at Urban Institute?
5   A   No.
6   Q   Did you ever have any conversations with
7   anybody -- any other person that may be working for
8   what you've referred to as a think tank?
9   A   No.
10  Q   Regarding the issues of this lawsuit?
11  A   No.
12  Q   Okay. Referring to your report, which is
13  Exhibit 145 on Page 1.
14  A   Yes, sir.
15  Q   I may have touched on this generally
16  earlier, but the first sentence under the heading
17  Executive Summary.
18  A   Yes, sir.
19  Q   You state that you were "retained to
20  review funding, spending, fiscal management and
21  related budgetary issues", correct?
22  A   That's correct.
23  Q   Did you review any other issues other
24  than those?
25  A   No, not in regard to this report, no.

Page 48

1   Q   Okay. Did you review any other issues
2   not in regard to this report?
3   A   Well, I mean, the data is presented in a
4   context where there's -- where there's other
5   information provided also perhaps in programs or that
6   sort of thing that I couldn't help but see. But it
7   had nothing to do with this report, so I didn't
8   concentrate on it.
9   Q   Okay. Now, in that statement in that
10  first paragraph, one, two, three, four, five lines
11  down.
12  A   Yes.
13  Q   You used the term "reasonable minimum
14  professional standards"?
15  A   Yes.
16  Q   What are those standards?
17  A   They are standards -- they're my
18  standards that seem to me, as an expert, to be
19  reasonable and professional.
20  Q   Is this a single set of standards?
21  A   It's -- it's the standards of which I
22  viewed the fiscal management of DHS.
23  Q   And what are those standards?
24  A   Well, they have to do with budgetary
25  processes. They have to do with funding sources and

Page 49

1   et cetera. I mean, the report is full of that. I
2   mean, it would be -- I mean, I can sit here and go
3   through the report to answer that question, or we can
4   take it item by item. But that's what this report is
5   about actually.
6   Q   Are those standards quantified in any
7   place?
8   A   No.
9   Q   So you can't point me to an organization
10  or a group and say here are the standards I'm relying
11  on?
12  A   No. They're standards that I think are
13  reasonable and professional.
14  Q   Okay. And you never had any
15  conversations or interviews with anyone at the
16  Department of Human Services?
17  A   I did not.
18  Q   Are you aware of them ever knowing what
19  your standards are?
20  A   I am not.
21  Q   Does any other state agency or -- have
22  knowledge of what your standards might be?
23  A   Probably not.
24  Q   If I wanted to get a copy of your
25  standards, where would I go?

Page 50

1  A  You could not get a copy of my standards.
2  As I reviewed this data, I say this does not seem to
3  be reasonable way of doing things, nor a professional
4  way of doing things.
5  Q  Which other states in the United States
6  did not meet your reasonable minimum professional
7  standards?
8  A  I have not reviewed any other states'
9  child welfare system.
10  Q  Mississippi is the only state that you
11  reviewed?
12  A  Yes.
13  Q  What other states did you compare
14  Mississippi to in the context of your reasonable
15  minimum professional standards?
16  A  In the context of processes within the
17  agency, none in context of certain quantitative
18  variables. I did performance measures, but not in
19  terms of these standards.
20  Q  How does Mississippi compare to other
21  states?
22      MR. LANG: Objection as to form.
23  A  In what area?
24  MR. FORTENBERRY: (Continuing.)
25  Q  With respect to your reasonable minimum

Page 51

1  professional standards, how does Mississippi compare
2  to any other state in the country?
3  A  I cannot answer that.
4  Q  And why not?
5  A  Because I did not do a study of other
6  states' budgetary processes, funding sources, et
7  cetera, et cetera.
8  Q  So to your knowledge, there is not
9  another state in the country that meets your
10  reasonable minimum professional standards when it
11  comes to funding, spending, fiscal management or
12  related budgetary issues?
13      MR. LANG: Objection as to form.
14  A  I don't know. I did not conduct a study
15  of other states.
16  MR. FORTENBERRY: (Continuing.)
17  Q  Okay. So you don't know how Mississippi
18  is different from other states, do you?
19  A  Not in regard to this phrase.
20  Q  Now, on the next line you use the term
21  "minimum professional standards." How is that
22  different from reasonable minimum professional
23  standards?
24  A  It's really not.
25  Q  It's really not?

Page 52

1  A  It's not different. Just the word was
2  not included, reasonable.
3  Q  Okay. What is unreasonable -- strike
4  that.
5      On the next line under the word
6  reasonable, that line begins with MDHS', do you see
7  that? It's one, two, three, four, five, six lines
8  down, first paragraph.
9  A  Oh, yes.
10  Q  "I conclude that MDHS' fiscal practices
11  failed to meet minimum professional standards." If
12  I'm correct, minimum professional standards is the
13  same in your terminology as reasonable minimum
14  professional standards?
15  A  Yes.
16  Q  Okay. What physical -- excuse me. What
17  fiscal practices did MDHS fail to meet?
18  A  Well, this -- many. Do you want me to go
19  down the list right now?
20  Q  Yeah, give me a list.
21  A  I think it's unreasonable and
22  unprofessional to not report the -- the needs as
23  expressed by the agencies of DHS to the
24  decision-making bodies on up the line in the budgeting
25  process. I think it is unreasonable and irresponsible

Page 53

1  to limit what the agencies down the line can request
2  in the area of budgetary needs. I think it is
3  unreasonable to present to the decision-makers up the
4  line estimates of funding that in no way can actually
5  occur and were not, in fact, expected to occur in
6  reality.
7      I think it is unprofessional and
8  unreasonable to -- to not do what is necessary within
9  the agency to capture unlimited federal funds from --
10  from uncapped federal sources, matching sources. I
11  think it is unreasonable and unprofessional to -- to
12  overspend a capped source of funds because you fail to
13  do the work on the uncapped sources of funds, and
14  therefore, funding had to be -- had to be spent out of
15  capped sources that were then exhausted and the State
16  of Mississippi had to pay 100 percent of the cost of
17  children and foster care and adoption, when otherwise,
18  the federal government would have picked up part of
19  the tab.
20      I think it is unreasonable and
21  unprofessional to not provide funding in order to draw
22  down all monies that are allocated to the State of
23  Mississippi by the federal government. I think it is
24  unreasonable and unacceptable for the federal
25  government to have to write a report to the State of

BILL M BRISTER, PH.D.

Page 54

1  Mississippi saying you left millions and millions of
2  dollars unspent that are allocated to you and as for
3  improvements in the process to actually spend federal
4  money.
5       I think it is -- that's all I can recall
6  right off the top of my head. There is, I'm sure,
7  more.
8     Q   Okay. You used the term several times in
9  your answer there unprofessional and unreasonable,
10 correct?
11    A   I did.
12    Q   And on which standards do you base that
13 conclusion?
14    A   My standards.
15    Q   And how are those standards quantified
16 anywhere?
17    A   They're not quantified anywhere. They're
18 standards that are -- seem to me, as an expert in
19 budgeting processes, to be reasonable and
20 professional.
21    Q   But there is no set of standards by which
22 to go by, correct?
23    A   Only my standards, that I know of. I
24 will elaborate.
25    Q   Sure.

Page 55

1     A   I mean, again, there's been multiple
2  reports provided from the federal government to the
3  state asking, why didn't you spend this money?
4  There's been -- there's really very little in this
5  report that is new. This all basically information
6  that is generated within the Department of Human
7  Services stating, why aren't we doing this? We could
8  do this better. We need to do more of this. So it's
9  my standards, but it's other standards, too.
10    Q   But my point being is there's nowhere I
11 can go where those standards are quantified?
12    A   Correct.
13    Q   Also, in your answer, you referred a
14 couple of times at least to decision-making bodies or
15 decision-making persons. Who are those
16 decision-making bodies or persons that you referred
17 to?
18    A   There are several. It's a collective
19 decision-making process on budgetary issues. Do you
20 want more detail?
21    Q   Can you tell me how it's a collective
22 making process?
23    A   Responsibility of the budget for DFCS
24 and, I assume, other agencies is -- is -- the governor
25 has a role. In this role, the governor's job is to

Page 56

1  protect the citizens of Mississippi and to lobby
2  whoever else might have a role, such as the
3  legislature, into doing what is necessary to protect
4  the children of Mississippi. So the governor
5  certainly has a role that he -- the executive director
6  of the Department of Human Services plays a role in
7  this process. Continue?
8     Q   Go ahead. I'm sorry.
9     A   The director of human services plays a
10 role in this process in that all the budgets go up to
11 his or her office and then are -- from there, are
12 disseminated to governor, legislature, whoever has a
13 role to play into -- and to present budgets that tell
14 the story of the needs of the agency to protect the
15 citizens of Mississippi.
16       The director of the Department --
17 Division of Family and Children Services plays a role
18 to -- to bring the information up through the agency
19 to the executive director and to -- and to be an
20 advocate to receive fundings for whatever is necessary
21 to protect the children of Mississippi.
22       And I would assume the legislature. I
23 don't assume. I know that the legislature plays a
24 role in this to -- to investigate and to fund what is
25 necessary to protect the children of Mississippi. So

Page 57

1  when I say a collective, there's a lot of people
2  involved in this process.
3     Q   A lot of people other than the governor
4  involved, correct?
5     A   There are -- there are other people other
6  than the governor, although, the governor is the chief
7  executive officer of the state. The buck stops there.
8     Q   And since you didn't review Mississippi
9  statutory law prior to preparing your report, how do
10 you know what the governor's statutory role is in this
11 process?
12    A   Just from my own opinion in what is the
13 role of the governor. I cannot quote statutory law as
14 regarding that.
15    Q   Okay. So you don't know what his legal
16 role is in this process? You base this on what your
17 opinion of his role should be?
18    A   What his -- well, I would hope the
19 governor would be involved in protecting the children
20 of Mississippi.
21    Q   But you did not review his statutory
22 authority as governor, did you?
23    A   I did not.
24    Q   Okay. And the same question: You did
25 not review the statutory authority of the executive

15 (Pages 54 to 57)

Henjum Goucher Reporting Services
601-713-2424

BILL M BRISTER, PH.D.

Page 58

1  director of the Department of Human Services, did you?
2    A    I did not.
3    Q    And same with director of the Division of
4  Family and Children Services: You did not review his
5  statutory authority, did you?
6    A    I did not.
7    Q    Okay. And in your answer that you gave
8  previously you made a statement to the effect that
9  they were unprofessional and unreasonable in not
10 providing funding to be able to draw down federal
11 funds. Do you recall that?
12   A    I do.
13   Q    Who would have provided that funding to
14 be able draw down federal funds?
15   A    Funding is -- funding decisions are
16 ultimately made by the legislature, but they react to
17 information that is provided to them. And it is the
18 executive's duty, in my opinion, to present accurate
19 forecasts and to reflect the needs of the agency to
20 the legislature.
21   Q    The funding is ultimately up to the
22 legislature in the State of Mississippi; isn't that
23 true?
24   A    I would think that's true.
25   Q    Okay. In this line that we referred to

Page 59

1  here, MDHS' fiscal practices, I take it that MDHS
2  refers to the Mississippi Department of Human
3  Services, correct?
4    A    Correct.
5    Q    And you state that their -- "MDHS' fiscal
6  practices failed to meet minimum professional
7  standards", correct?
8    A    Correct.
9    Q    What practices of Governor Barbour failed
10 to meet those standards as opposed to MDHS?
11   A    I can't testify as to what Governor
12 Barbour knew or didn't know. I can say that the
13 budget presented to the legislature did not reflect
14 the needs of the agency to protect the children, nor
15 have I seen any documents or statements where he was
16 to that effect.
17   Q    You stated that -- I believe that the
18 budget didn't reflect the needs of the children. What
19 should the budget request have been? What would have
20 been adequate?
21   A    Are you asking a dollar figure?
22   Q    Yeah. You looked at these dollar figures
23 and said that's not adequate. Well, what would have
24 been adequate?
25   A    I can't give you a dollar figure. I did

Page 60

1  not conduct a study of what resources it would have
2  taken to provide adequate funding for the division;
3  however, there were many, many statements and alarms
4  sent up that the children were in danger, that the --
5  there was a chronic shortage of case workers. There
6  is also -- and that chronic shortage leads to many
7  other outcomes.
8    Q    Okay. I guess what I'm struggling to
9  find is, well, what is your point of reference
10 dollar-wise to determine what is an adequate budget?
11   A    I can only say that my opinion it was
12 underfunded and in many other experts within the
13 agency have stated that DFCS was underfunded many
14 years.
15   Q    And which experts are you referring to?
16   A    Well, in depositions, Bledst made that
17 statement. Many division heads have made that
18 statement in various formats.
19   Q    Okay. On what you based your report,
20 which was prior to Mr. Bledst's deposition --
21   A    Uh-huh. (Affirmative response.)
22   Q    -- which experts are you referring to?
23   A    Oh, the -- there were numerous reports
24 coming up from DFCS of chronic shortages of case
25 workers and underfunding of -- to the extent that we

Page 61

1  could not pull down various federal monies.
2    Q    Okay. Who determines how many case
3  workers or social workers there should be at the
4  Department of Human Services? Who has that ultimate
5  responsibility?
6    A    How many there should be --
7    Q    Uh-huh. (Affirmative response.)
8    A    -- is, I would assume, the executive
9  director of the Department of Human Services is
10 ultimately who should determine how many there should
11 be.
12   Q    And that's an assumption, correct?
13   A    He would be advised, of course, by his
14 division heads and staff below him, but you said
15 ultimately who has that responsibility and decision,
16 and I would say the department -- the executive
17 director.
18   Q    So let's use an arbitrator number, 500
19 additional social workers just for the sake of our
20 discussion.
21   A    Uh-huh. (Affirmative response.)
22   Q    Is it your opinion that the executive
23 director, being Don Taylor, can then go out and hire
24 500 new social workers?
25   A    He probably could not go out and hire 500

16 (Pages 58 to 61)

Page 62

1   new social workers, but he certainly could present the
2   case that he needs them.
3       Q    And does your opinion change any if he
4   presents the case that he needs them?
5       A    No. It was not done.
6       Q    It was not done?
7       A    They were not hired.
8       Q    And for them to be hired, wouldn't it be
9   necessary for there to have been funding for those
10  positions?
11      A    Yes.
12      Q    Can you tell me what Don Taylor, as
13  executive director of Department of Human Services,
14  failed to do or how he failed to meet the minimum
15  professional standards you referred to?
16      A    The executive director, regardless of who
17  it was at the point, failed to make the case to the
18  governor, to the legislature, to whoever that these
19  were chronically needed positions, that the children
20  were in danger, and to make the case in a way that it
21  was funded.
22      Q    If the executive director would have made
23  the case to the legislature, then would not have his
24  actions have been reasonable?
25      A    They would have been reasonable.

Page 63

1       Q    Now, let's move to the director of the
2   Division of Family and Children Services. What did
3   Ricky Felder do, in your opinion, or how did he fail
4   to meet the minimal professional standards that you
5   have?
6       A    Again, as an individual, I don't want
7   to -- I don't want to point fingers at any individual,
8   but that department head has a responsibility to
9   present budgets up the -- up the line that reflect the
10  needs of the -- of the -- of the division.
11      Q    Who are the --
12      A    And let me -- and let me continue. And
13  to also do what is necessary in terms of personnel or
14  organizational structure to draw down the federal
15  monies that are available.
16      Q    Who is the defendant or defendants in
17  this lawsuit?
18      A    Well, you know, that's a -- this is a
19  lawsuit -- as we established earlier, I've never been
20  involved in suing a state before. So -- but the named
21  defendants are Governor Barbour and Don Taylor, I
22  think, and maybe et al. I don't know how it's
23  phrased.
24      Q    Okay. But the Department of Human
25  Services is not a defendant, is it? Is that correct?

Page 64

1       A    You're asking me a legal question, and I
2   really don't know how that works.
3       Q    That's fine. Now, although it can't
4   quantified and in referring to your reasonable
5   professional minimum standards, are there any
6   reasonable professional minimum standards, in your
7   opinion, in which the Department of Human Services
8   satisfies or complies with?
9       A    I don't know. I don't know of any. I
10  mean, in a fiscal sense at the family and children
11  services, it's pretty much a major problem area across
12  the board.
13      Q    Okay. So you're of the opinion that they
14  don't satisfy any professional minimum standard, that
15  you're aware of?
16      A    I can't call one up right now.
17      Q    Are you aware of any national standards
18  in this area? We've used the term reasonable
19  professional minimum standards, which I take it you
20  have in your mind. Are there any -- is there a set of
21  national standards that I can go to to determine what
22  they're doing correct and what they're doing wrong, in
23  your opinion?
24      A    Well, the -- there are various documents
25  saying -- from the federal government to DHS about not

Page 65

1   drawing down funds usually because of not providing a
2   match. Other documents about, perhaps, low
3   penetration rates. So there have been correspondence,
4   of course, from the federal government to the state
5   that improvements could be made.
6       Q    Can you tell me how the fiscal practices,
7   actions or inactions, ever how you may term it, refer
8   to in your report violate the constitutional rights of
9   the named plaintiffs in this case?
10      A    Well, that's a legal question that I -- I
11  can't respond to.
12      Q    Now, how do you determine which standard
13  to apply in which situation since they aren't
14  quantified? And I can't say, Dr. Brister, here's a
15  list of the standards. How do you determine which
16  standard to apply and not to apply?
17      A    I -- again, as I said earlier, these are
18  standards that I believe should apply into any
19  organization. And in looking at this data and all
20  this information, I found that there were practices
21  that I did not consider professional nor reasonable.
22  So again, it's my own opinion, as I look through this
23  data, of what is reasonable and professional.
24      Q    And that's based on your opinion and
25  not -- and also, the fact that you've never run a

BILL M BRISTER, PH.D.

Page 66

1  state agency before, correct?
2           MR. LANG: Objection as to form.
3           MR. FORTENBERRY: Let me back up. I
4       apologize.
5  MR. FORTENBERRY: (Continuing.)
6       Q   We've already -- you've already testified
7  that you don't have experience running a state agency;
8  isn't that correct?
9       A   Correct.
10      Q   And you're holding the Department of
11 Human Services to standards that I can't quantify,
12 correct?
13      A   Correct.
14      Q   And also, we've established that you
15 didn't review Mississippi statutory law prior to
16 issuing this opinion, correct?
17      A   That's correct.
18      Q   Who's responsible for a child when
19 they're removed from the control of the child's
20 parents in the State of Mississippi? Which state --
21      A   If the state removes them, it is the
22 responsibility of the Department of Human Services. I
23 would assume the courts also get involved in making
24 that decision to remove them, but ultimately, the
25 responsibility lies with the Department of Human

Page 67

1  Services.
2           MR. FORTENBERRY: I'm going to have
3       this marked as Exhibit 145 -- 146.
4           (DOCUMENT MARKED AS DEPOSITION EXHIBIT
5           NO. 146 AND ATTACHED.)
6  MR. FORTENBERRY: (Continuing.)
7       Q   Dr. Brister, please take a moment and
8  look over Exhibit 146, please.
9       A   (Witness complies.) All right.
10      Q   In particular, the last sentence of which
11 I'm referring to, isn't it true that when a child is
12 removed from the control of the child's parents, that
13 the youth court shall secure proper care for such
14 child?
15          MR. LANG: I object this entire line
16      of questioning as getting into legal issues and
17      interpretations that are outside of the
18      witness' area of testimony.
19          MR. FORTENBERRY: Okay. I think he
20      can go ahead and answer.
21          MR. LANG: Yeah.
22          MR. FORTENBERRY: Objection is duly
23      noted.
24      A   This is outside of my area of expertise.
25

Page 68

1  MR. FORTENBERRY: (Continuing.)
2       Q   Right.
3       A   Right.
4       Q   But the youth court -- this statutory law
5  says the youth court shall secure proper care for such
6  child?
7       A   Uh-huh. (Affirmative response.) It says
8  that.
9           MR. LANG: Objection as to the form.
10 MR. FORTENBERRY: (Continuing.)
11      Q   Dr. Brister, earlier, you touched on
12 hiring additional social workers in the State of
13 Mississippi?
14      A   I did.
15      Q   And we talked about the executive -- I
16 think I used the arbitrary number of 500 social
17 workers in the executive director's ability regarding
18 hire?
19      A   Yes, you did.
20      Q   Are you aware of whether his ability to
21 hire social workers is limited by law in Mississippi?
22      A   I do not know about limited by law.
23      Q   Okay.
24      A   I would think you can -- as long as
25 funding's available, there's no law that forbids him

Page 69

1  to hire social works.
2       Q   Okay. And that's my -- that's the point
3  I'm making, Dr. Brister. He's authorized to hire
4  social workers so long as there's funds from the
5  legislature; isn't that true?
6       A   As long is there's funds, right.
7           MR. LANG: Objection as to form.
8           MR. FORTENBERRY: I'll have this
9       marked as Exhibit No. 147, I believe.
10          MR. LANG: I object to any form of
11      legal argument with the witness in the form of
12      questions.
13          (DOCUMENT MARKED AS DEPOSITION EXHIBIT
14          NO. 147 AND ATTACHED.)
15 MR. FORTENBERRY: (Continuing.)
16      Q   Dr. Brister, if you don't mind, take a
17 moment and look at 147.
18      A   (Witness complies.) All right.
19      Q   This exhibit is statutory law. It's
20 Section 43-27-109 and it does give the Department of
21 Human Services authority to hire social workers to
22 reduce case load sizes; is that correct?
23      A   That's what it says.
24      Q   But it's conditioned upon legislature --
25          MR. LANG: Objection. I'm sorry.

18 (Pages 66 to 69)