BILL M BRISTER, PH.D.

|  | Page 70 |
|---|---|

1   When you finish your question, I'll put my
2   objection on the record. Sorry, I apologize
3   for interrupting.
4   MR. FORTENBERRY: (Continuing.)
5       Q    The ability to hire social workers to
6   reduce case load sizes is contingent upon funding from
7   the legislature?
8           MR. LANG: I object on the record to
9   counsel asking the witness to agree with his
10   legal conclusions knowing that the witness
11   has -- is not an attorney.
12      A    I am -- I am not an attorney. I don't --
13  I can't comment as an expert to these Mississippi code
14  sections and whatever. That's -- that's my answer.
15  MR. FORTENBERRY: (Continuing.)
16      Q    But the legislature has ultimate control
17  of funding, correct?
18      A    Yes. The legislature has ultimate
19  control on funding with the -- but I would like to add
20  that the legislature is provided information by the
21  agencies in which they're funding and has to rely on
22  that information or does rely on that information.
23          MR. FORTENBERRY: Get this marked as
24  Exhibit 148.
25          (DOCUMENT MARKED AS DEPOSITION EXHIBIT

|  | Page 71 |
|---|---|

1           NO. 148 AND ATTACHED.)
2       A    Okay.
3   MR. FORTENBERRY: (Continuing.)
4       Q    Dr. Brister, this Exhibit 148, as opposed
5   to social workers, addresses an automated child
6   welfare information system. And again, it's
7   conditioned upon funds being appropriated from the
8   legislature; isn't that true?
9       A    And again, you're handing me --
10          MR. LANG: Objection as to form.
11      Grounds previously stated.
12      A    You're handing me copies of laws that are
13  taken in isolation. I don't know what is on each side
14  of this law or anything else. And I can't -- I can't
15  comment as to the legal structure of this. I am not
16  an expert in the legalities of this thing.
17  MR. FORTENBERRY: (Continuing.)
18      Q    But throughout your report, you use the
19  term over and over underfunding or severe
20  underfunding, correct?
21      A    Uh-huh. (Affirmative response.) I do.
22      Q    What has Governor Barbour done to cause
23  the department to be underfunded?
24      A    Governor Barbour is the -- has the role
25  to protect the children of the State of Mississippi.

|  | Page 72 |
|---|---|

1   If he does not act as an advocate for those children,
2   then he is, in my opinion, not doing his job.
3       Q    Okay. Would you take money away from the
4   schoolteachers to give to the Department of Family and
5   Children Services?
6       A    That's not my call. It's --
7           MR. LANG: Objection as to form.
8   MR. FORTENBERRY: (Continuing.)
9       Q    Well, whose call is it?
10      A    That would be the decision-makers, the
11  governor, the legislature, whoever is making decisions
12  on that level.
13      Q    It would be the legislature's decision,
14  wouldn't it?
15      A    It would be their ultimate decision. Of
16  course, the governor has power. He introduces budgets
17  to the legislature. He serves as advocate for his
18  budgets and he has veto power, so it's not entirely
19  the legislature.
20      Q    Dr. Brister, I have one more exhibit for
21  you to look at here.
22          MR. FORTENBERRY: Exhibit 149.
23          (DOCUMENT MARKED AS DEPOSITION EXHIBIT
24          NO. 149 AND ATTACHED.)
25      A    Okay.

|  | Page 73 |
|---|---|

1   MR. FORTENBERRY: (Continuing.)
2       Q    Exhibit 149 refers to a Child Welfare
3   Enhancement Fund in the State of Mississippi to be
4   administered by the Department of Human Services. But
5   again, it's conditioned upon appropriations of monies
6   by the legislature; isn't that true?
7           MR. LANG: Objection as to form.
8       A    And again, we're back to interpreting the
9   law.
10  MR. FORTENBERRY: (Continuing.)
11      Q    Do you know whether the legislature has
12  ever funded this fund?
13      A    I do not.
14      Q    Have you ever attended a legislative
15  budget office hearing?
16      A    Could I back up to that previous
17  question?
18      Q    Sure.
19      A    I do know -- it references the Child
20  Welfare League of America. I do know they're -- they
21  are one of the ones who recommend case load standards
22  that are not even close to being met by the State of
23  Mississippi. I do not know if that was ever funded by
24  the legislature, though.
25      Q    But it would be the legislature's -- it

BILL M BRISTER, PH.D.

Page 74

1  is within the realm of the legislature to appropriate
2  money for this fund in order to meet those standards?
3       MR. LANG: Objection.
4       Argumentative.
5  MR. FORTENBERRY: (Continuing.)
6       Q    Correct?
7       A    Again, with the information supplied to
8  them by the agencies and with the -- with the
9  influence of the governor.
10      Q    How do you think the legislature -- or
11 strike that.
12           Do you have an opinion as to whether the
13 legislature learned of these standards by the Child
14 Welfare League of America?
15      A    Pardon me? Would you ask again?
16      Q    Who told the legislature of these CWLA
17 standards?
18      A    I don't know.
19      Q    Have you ever attended a legislative
20 budget office hearing?
21      A    I have.
22      Q    Now, when did you attend one?
23      A    Well, I've attended one -- not this
24 legislative -- it was not prior to this legislative
25 session, but the last one. And the -- I guess it was

Page 75

1  2005 legislative session. There was legislative
2  budget hearings prior to it. I attended that for a
3  while. And I attended some back in the '90s when I
4  was doing demonstration work for DHS.
5       Q    And which state agency hearings did you
6  attend?
7       A    DHS. But there were some others
8  presented, but I was there to hear DHS.
9       Q    And what was the purpose of your being
10 there?
11      A    To hear what was said.
12      Q    And what work were you doing that
13 required you -- required --
14      A    This work.
15      Q    Wait. That's what I'm not understanding.
16 Did you attend the -- well, let me back up.
17           Legislative budget office is often
18 referred to LBO, L-B-O.
19      A    Okay.
20      Q    Is it okay if I just use the term LBO?
21      A    You may.
22      Q    Okay. And I take it from your testimony
23 that you attended some LBO hearings involving the
24 Department of Human Services and possibly others?
25      A    You know -- and maybe I'm not

Page 76

1  understanding exactly what hearings you're talking
2  about. Although, again, I'm not that -- an expert in
3  the entire legislative process. There was a -- as I
4  understand it, there was perhaps a joint legislative
5  hearing which Don Taylor presented. The budget is the
6  beginning -- one of the beginning process steps in the
7  budgetary process. That's what I attended.
8       Q    Correct. And that's what I refer to as
9  an LBO hearing.
10      A    Okay.
11      Q    Do you remember who all served on that
12 committee, the members of the committee?
13      A    I couldn't name the legislators, no, sir.
14      Q    Do you remember which offices have had --
15 or had a spot on that committee?
16      A    Which --
17      Q    Which public offices or officers?
18      A    I couldn't tell you the composition of
19 the committee.
20      Q    Are you aware that the lieutenant
21 governor is a member of that committee?
22      A    I -- I won't dispute that.
23      Q    Are you aware that the speaker of the
24 house of representatives is a member of that
25 committee?

Page 77

1       A    I will not dispute that.
2       Q    Are you aware that the chairman of the
3  senate appropriations committee is a member of the LBO
4  committee?
5       A    Again, I do not know the composition, so
6  I would take your word for it.
7       Q    Are you aware that the chairman of
8  appropriations in the house of representatives is also
9  present and has a spot on that committee?
10      A    Again, I do not know the composition of
11 the committee.
12      Q    And I believe it was your testimony that
13 you were there in the '90s on behalf of the Department
14 of Human Services, or you -- had you been retained by
15 the department in any way?
16      A    I had been retained by the department.
17      Q    I'm sorry. You had --
18      A    I had been retained by that department.
19      Q    And in what capacity were you working for
20 the Department of Human Services?
21      A    In the demonstration -- in the evaluation
22 of the demonstration project in the Taniff reform.
23      Q    Okay. Tell me, what does that mean in
24 layman's terms?
25      A    Beginning around 19 -- I believe it was

20 (Pages 74 to 77)

BILL M BRISTER, PH.D.

| Page 78 | Page 80 |
|---|---|
| 1   1995 or so, Mississippi was granted a waiver to<br>2   conduct an experiment in the State of Mississippi with<br>3   work based -- what was then called AFDC reforms,<br>4   welfare forms, cash payments, welfare payments. And<br>5   the -- it was a national movement, come to find out,<br>6   in those days to go to work-based reforms and time<br>7   limited receipts -- receipts of these benefits. To<br>8   get the waiver, they had to have an evaluator,<br>9   independent evaluator, and that was -- I served in<br>10  that capacity.<br>11       Q   And you used the determine AFDC. What is<br>12  that term?<br>13       A   Aide to Families with Dependent Children.<br>14  That term is not used anymore. It's since changed.<br>15       Q   Okay. And you used the phrase work-based<br>16  reforms or worked-base training.<br>17       A   Yes.<br>18       Q   What is that?<br>19       A   The AFDC is a cash payment to people who<br>20  meet certain income requirements. People in poverty<br>21  can receive cash payments if they don't have a certain<br>22  income level. That was AFDC. And children were<br>23  involved. They had -- children were usually involved<br>24  in these families. The -- prior to the reforms in the<br>25  mid '90s, there was no work requirement. In other | 1       Q   Well, was Mississippi successful?<br>2       A   It's according to how you term success.<br>3   The welfare world certainly declined. Different<br>4   people had different views on if that was successful<br>5   or not.<br>6       Q   Did any of that work involve the<br>7   Department of Family and Children -- or excuse me, the<br>8   Division of Family and Children Services or foster<br>9   care?<br>10      A   It did not.<br>11          MR. FORTENBERRY: We're at sort of a<br>12  break point. Let's take a couple-minute break.<br>13          MR. LANG: Could we -- I'm going to<br>14  request that Dr. Brister just step out for a<br>15  moment. I want to make a statement on the<br>16  record --<br>17          MR. FORTENBERRY: Sure.<br>18          MR. LANG: -- in his absence.<br>19          (Witness excused.)<br>20          MR. LANG: Thank you. I appreciate<br>21  you giving me the courtesy. I wanted to make<br>22  this statement because there was something that<br>23  didn't seem to get on the record, but I don't<br>24  want to, in any way, suggest anything to the<br>25  witness, so I've asked that the witness step |

| Page 79 | Page 81 |
|---|---|
| 1   words, the parents or the adults in the AFDC family<br>2   could receive the benefits without any particular work<br>3   requirements. And that we were experimenting -- the<br>4   state was experimenting with requiring searching for<br>5   work, at the very least, or in training program for<br>6   work or actually going to work.<br>7       Q   Do you know how the state was selected to<br>8   participate in this program?<br>9       A   I don't really. I'm sure there was a<br>10  proposal sent up from the state to the feds and was<br>11  accepted.<br>12      Q   And I believe you stated to the effect<br>13  that you were hired to conduct an independent<br>14  evaluation to determine if Mississippi complied?<br>15      A   And the outcomes.<br>16      Q   And what was the outcome?<br>17      A   Well, there were many, many outcomes.<br>18  This was a series of studies. It was a huge<br>19  experiment not only in Mississippi, but throughout the<br>20  nation. And approximately one year after the waiver,<br>21  the Congress of the United States and the President<br>22  signed that these similar reforms were national.<br>23  Outcomes were many. I mean, I don't know how much<br>24  detail you want me to go into that. I mean, it's a<br>25  very complex, very large experiment. | 1   outside.<br>2          On page -- according to this printout, I<br>3   have, on Page 54 of the transcript, which I<br>4   know you were tape-recording, he was talking<br>5   about the governor. And I thought, because I'm<br>6   standing inches away -- sitting -- that he said<br>7   something like the buck stops there. And my<br>8   colleague, John Piskora, who I asked to verify<br>9   to me that he thought he heard it, too.<br>10         In the transcript, I didn't see it. So<br>11  what I would ask is that the reporter -- I'm<br>12  totally going by what you say, my hearing's not<br>13  great, anyway -- check the recording to see if<br>14  it's there. And I didn't want to be suggesting<br>15  to the witness that he use that term later on<br>16  in his testimony, so I asked him to stay out.<br>17  Thank you very much.<br>18         (Off the record.)<br>19         (DOCUMENT MARKED AS DEPOSITION EXHIBIT<br>20         NO. 150 AND ATTACHED.)<br>21  MR. FORTENBERRY: (Continuing.)<br>22      Q   Dr. Brister, I handed to you what's been<br>23  marked as Exhibit No. 150, and ask that you flip<br>24  through that for a moment.<br>25      A   Okay. You don't want me to read the |

BILL M BRISTER, PH.D.

Page 82

1 whole thing sitting right here or do you?
2     Q    No. It's -- has the DHS No. 115015
3 through 115067.
4     A    Okay.
5     Q    Have you seen this before?
6     A    No, I don't believe I have.
7     Q    Have you -- so I take it you never saw it
8 prior to your report being finalized?
9     A    I did not see it prior to the report.
10    Q    And you have not seen it after your
11 report?
12    A    You know, I think it may be included in a
13 package of material I got, but I have not read it.
14 But I'm not sure it was in there, but I think it was.
15 Very possibly in there.
16    Q    On Page 1, which is Bates numbered
17 115015 --
18    A    Uh-huh. (Affirmative response.)
19    Q    -- it's identified as the Budget Request
20 for Human Services, Fiscal Year 2000; is that correct?
21    A    That's right.
22    Q    And referring to Page 20 and 21, please.
23    A    (Witness complies.)
24    Q    I ask that you look over those two
25 pages.

Page 83

1     A    (Witness complies.)
2         MR. LANG:  Should the witness read
3 those pages?
4         MR. FORTENBERRY:  Yes, please. Look
5 over it or read.
6         MR. LANG:  I suggest that you go to
7 a page earlier just to make sure you get the
8 context.
9         MR. FORTENBERRY:  Or you want to
10 take a moment and read the entire exhibit, that
11 will be fine.
12    A    (Witness complies.) Okay.
13 MR. FORTENBERRY: (Continuing.)
14    Q    On Page 20, does it indicate that Family
15 and Children Services or the Department of Human
16 Services is asking for an increase budget in the
17 amount of $4 million?
18    A    Well, Mr. Maddox says, "We have a net
19 difference or increase of $4 million." I'm not
20 100 percent sure of what he is referring -- or
21 Ms. Maddox is. I'm not sure what she's referring to.
22 Okay.
23    Q    And also, asking for an increase of 51
24 new positions and seven social worker positions being
25 re-allocated to social worker advanced positions?

Page 84

1     A    That's right. That's what it says.
2     Q    And they're also asking for an increase
3 in travel money for social workers?
4     A    Correct.
5     Q    And Page 21 with reference to Colonel
6 Taylor who is asking for an additional $2.4 million to
7 increase foster care payments?
8     A    "We're asking for 1.8 million." Is that
9 what you're referring to, Line 14?
10    Q    Yes. I'm sorry. 1.8 million to increase
11 foster care payments?
12    A    Right.
13    Q    And so that -- and then he states that
14 the Family and Children Services accounts were roughly
15 a $2.4 million increase in the general funds?
16    A    That's what it says. That's all?
17    Q    Yeah.
18        (DOCUMENT MARKED AS DEPOSITION EXHIBIT
19        NO. 151 AND ATTACHED.)
20 MR. FORTENBERRY: (Continuing.)
21    Q    On what's been marked as Exhibit No. 151,
22 if you want to read the entire thing, but I direct
23 your attention to Pages 15, 16, 17. Also, Page 14.
24        MR. LANG:  Mr. Fortenberry, may I
25 make a suggestion? I know you're offering the

Page 85

1 witness an opportunity to read the entire
2 document. Perhaps you can do your questioning
3 and he can reserve on reading it perhaps during
4 the lunch break, and maybe take a little longer
5 break. And then if he has anything, any
6 comments based on that when we get back, he
7 could -- he could perhaps be given an
8 opportunity as opposed to his reading these
9 entire exhibits now in response to your kind
10 invitation.
11        MR. FORTENBERRY:  Sure.
12 MR. FORTENBERRY: (Continuing.)
13    Q    And just so it's clear for the sake of
14 going through this, I'll refer you to the specific
15 pages. But if you want to read the entire exhibits at
16 lunch and come back and offer any other comments,
17 that's certainly fine.
18    A    Okay.
19    Q    Or if counsel wants to ask you any
20 questions after I finish, then that's fine, also.
21    A    All right.
22    Q    Because I certainly don't want to have to
23 ask you to sit here and read page after page that may
24 not be pertinent.
25    A    It's something I really want to do over

22 (Pages 82 to 85)

BILL M BRISTER, PH.D.

Page 86

1  lunch. That's sounds like fun.
2      Q    Sure.
3      A    That was a joke. A bad joke, obviously,
4  but...
5      Q    Referring to Pages 14 and 15 --
6      A    Yes.
7      Q    -- do you see where the Division of
8  Family and Children Services is asking for an overall
9  increase in their budget over $2 million?
10     A    Refer me to the line, please.
11     Q    I'm sorry. Beginning on Line 23 on Page
12 14 and going through on Page 15.
13     A    Increase of $2 million. Yeah. I don't
14 know if that's general fund, overall authority or
15 what, but yeah, it says that.
16     Q    Okay. And then Page 15, Lines 2 through
17 6 --
18     A    Uh-huh. (Affirmative response.)
19     Q    -- salary category, "We're asking for
20 increase of $1,072,026 for the funding of 30
21 additional social worker positions."
22     A    It says that. A drop in the bucket
23 what's needed, but it says that. One of those cases
24 where there's a standard in place of what they ought
25 to be asking for, but that's what it says. You're

Page 87

1  right.
2      Q    Okay. How many should they have asked
3  for?
4      A    The agency has said we need to -- we more
5  than this just to get to the danger point.
6      Q    And this is fiscal year 2001?
7      A    Or four or five. It might have been a
8  later fiscal year, but the situation had not changed.
9      Q    And the funding of those social worker
10 positions is up to the legislature, correct?
11     A    Well, we've been through that. Yes.
12 The legislature does the funding with advice and --
13 from the governor and data from the agencies, and et
14 cetera, et cetera.
15     Q    And if the legislature won't fund 30
16 positions, what makes you think they will fund 500
17 positions?
18     A    Perhaps if the chronic nature, the danger
19 that the kids are in, the necessary and importance of
20 this were expressed here rather than saying we're
21 asking for an increase of million for 30 social
22 workers. It sounds great, but it doesn't say here
23 what we really need is 500 to keep these kids safe.
24     Q    And are you aware of the number of times
25 the executive director from the Department of Human

Page 88

1  Services annually goes over to the legislature or
2  meets with legislators?
3      A    I don't how many.
4      Q    Do you have an opinion as to what a
5  reasonable number of requests would be?
6      A    A reasonable --
7      Q    Should an executive director go over to
8  the legislature every day and request the same thing?
9  What's a reasonable number of requests to the
10 legislature for additional social worker positions?
11         MR. LANG: Objection. A couple of
12         times you seem to be interrupting the witness.
13         Maybe not doing it deliberately, but I'd
14         appreciate it if you let him finish when he
15         speaks.
16         MR. FORTENBERRY: I apologize if I
17         interrupt.
18     A    Your question again, please.
19 MR. FORTENBERRY: (Continuing.)
20     Q    What is a reasonable number of times for
21 the executive director to go to the legislature to ask
22 for additional social workers?
23     A    I can't give you a number of what is a
24 reasonable number of times you should go to the
25 legislature and ask. I think what is more reasonable

Page 89

1  is that you make the case of what is needed to protect
2  the children in a forceful manner whether it's once or
3  more than once.
4      Q    Page 17, Lines 3 through 5.
5      A    Yeah. Let me back up.
6      Q    Sure.
7      A    Okay.
8      Q    Isn't it true on Page 17, Line 3 through
9  5 that the LBO committee is being told that DHS
10 is trying to lower -- "What we're trying to do is
11 lower the social worker case load down to acceptable
12 levels"?
13     A    Well, the speaker is unidentified. I
14 don't know who's saying that. I assume it's not
15 Colonel Taylor because he is identified. So I don't
16 know who's saying that, but that is a -- again, sure
17 doesn't give information of -- in a forceful manner of
18 how many and why, and the danger level that is -- that
19 these kids are facing because of the lack of social
20 workers.
21     Q    Do you have anything, to your knowledge,
22 to indicate that that information was not delivered to
23 any legislator or the legislature in a forceful
24 manner?
25     A    I do not have information that it was

23 (Pages 86 to 89)

BILL M BRISTER, PH.D.

<table>
<tr><td>

**Page 90**

1  not, nor that it was.
2      Q    Now, continue on Page 17, Lines 10
3  through 17.
4      A    Okay. Yeah.
5      Q    Isn't it true that Colonel Taylor is
6  there giving notice to the legislature the growth on
7  the coast and the needs on the coastal area of
8  Mississippi?
9      A    Yes. I would hope he would do that. He
10 says, "The number of cases of child abuse and neglect
11 has gone up." Almost exponentially you would hope he
12 would address that problem.
13     Q    So he was advising the legislative budget
14 committee of that problem?
15     A    He was. He didn't speak out as to how
16 many social workers we particularly need down there or
17 I don't see any particular funding directed down
18 there, but he did make that statement that there
19 was -- seems to be a problem.
20     Q    On Page 15, we've already discussed
21 Lines 2 through 5. He did say there was a need for 30
22 additional social workers and the cost for those
23 social workers?
24     A    He did say that. I assume that's 30
25 statewide. It's not directed at the coast, but -- and

</td><td>

**Page 92**

1  factor it into is it important to my report or not.
2          (DOCUMENT MARKED AS DEPOSITION EXHIBIT
3          NO. 152 AND ATTACHED.)
4  MR. FORTENBERRY: (Continuing.)
5      Q    I'll hand to you 152, which is FY2003.
6  And the same goes for all of these reports,
7  Dr. Brister. If you want to review them at lunch in
8  more detail, that's fine.
9      A    Uh-huh. (Affirmative response.)
10     Q    And I'll try to -- for the sake of
11 getting through this, I'll try to refer you to certain
12 particular pages.
13         In this case, Pages 3, 4, 5 and 6.
14     A    Yes. Okay.
15     Q    On Page 3, beginning Line 12 here -- Line
16 18.
17     A    Line 18?
18     Q    Lines 12 through 18 on Page 3.
19     A    Okay. Okay.
20     Q    At this time, Executive Director
21 Brooks -- I believe you may have -- I apologize. You
22 may have to go up to Page 2 to see it's Ms. Brooks
23 speaking.
24     A    Yeah, uh-huh. (Affirmative response.)
25     Q    Do you recall that Ms. Brooks was the

</td></tr>
<tr><td>

**Page 91**

1  again, that's a drop in the bucket of what the reports
2  say is needed.
3      Q    And again, you use the term drop in the
4  bucket of what is needed. What makes you think that
5  the legislature would fund 500 positions if they
6  wouldn't fund those 30 positions?
7      A    I don't know what they would fund.
8      Q    And do you have any information that
9  Colonel Taylor never or the executive director at that
10 time never asked or communicated the need to any
11 legislator or the committee chairman, appropriation
12 committee chairman?
13     A    I do not know that he didn't nor that he
14 did. I have no evidence one way or another. I would
15 love to see it if there is that evidence.
16     Q    Why would you love to see it?
17     A    Well, it would be pertinent to my -- to
18 my report.
19     Q    And in what way would it be pertinent to
20 your report?
21     A    That Colonel Taylor asked for these
22 positions?
23     Q    Uh-huh. (Affirmative response.)
24     A    If -- I mean, I would take any
25 information that I've not had prior to the report and

</td><td>

**Page 93**

1  executive director of the Department of Human Services
2  at that time?
3      A    Yes.
4      Q    And do you see here on Page 3 where she's
5  talking to the legislative budget committee about the
6  need for general funds in order to maximize federal
7  funds?
8      A    Yes.
9      Q    And she also communicates that any
10 reductions experienced in general funds results in a
11 direct reduction in federal funds?
12     A    She says that.
13     Q    And she's making the legislative budget
14 committee aware of that fact?
15     A    She says that, yes, that's correct.
16     Q    Page 5 beginning at Line 9 through
17 approximately Line 18.
18     A    Okay.
19     Q    Executive Director Brooks is also
20 pointing out that the need to restore funding to the
21 previous years?
22     A    Right.
23     Q    And she's also acknowledging the state is
24 undergoing a period of extreme shortfall of revenues?
25     A    She states that.

</td></tr>
</table>

24  (Pages 90 to 93)

BILL M BRISTER, PH.D.

Page 94

1    Q    And then Page 6 -- going on to Page 6,
2  Lines 6 through 10.
3    A    Uh-huh. (Affirmative response.)
4    Q    Director Brooks is also pointing out the
5  decrease in funding to DHS in general fund dollars?
6    A    Uh-huh. (Affirmative response.)
7    Q    Yeah. I'm sorry. Verbalize yes or no,
8  please.
9    A    Oh, yes. Yes, she is doing that.
10   Q    Just for the sake of the record.
11   A    I understand.
12   Q    Referring to Pages 10 and 11.
13   A    Pardon me. I'm going to go back and read
14  it a little bit. Okay?
15   Q    Sure. Sure.
16   A    Okay. I've read through Line 5 on
17  Page 11 where it shifts to youth services. Okay.
18   Q    And do you see where Dr. Brooks is
19  notifying the legislature of the need of 39 social
20  worker positions to bring Mississippi closer to
21  nationally recognized standards?
22   A    Right.
23   Q    And do you see where she's indicating a
24  graph to show how far away Mississippi is from those
25  standards?

Page 95

1    A    I do.
2    Q    And do you see where she notified the
3  legislative budget committee that the case load should
4  range anywhere up to 15 cases?
5    A    Yes.
6    Q    And she notified the legislative budget
7  office that our case load was about 40?
8    A    Yes.
9    Q    And she also notified the legislative of
10  problems in the coastal counties of Jackson, Hancock
11  and Harrison Counties?
12   A    Uh-huh. (Affirmative response.)
13   Q    That the coastal counties' workers are
14  buried in case loads of up to 100 cases each?
15   A    Yes.
16   Q    And that the Department of Human Services
17  is in a compromised position of not being able to
18  adequately respond to the needs of children and
19  families?
20   A    Yes.
21   Q    Do you see where she notifies the
22  legislative budget office or committee that this is a
23  matter of potential life and death?
24   A    I do. And I also see that she requested
25  39 social worker positions to cure a situation of life

Page 96

1  and death, which again, is not carrying the message
2  forward. Thirty-nine is -- does not scratch the
3  surface of this.
4         I also see in previous things here that
5  we talk about, for example, Page 8, Line 23, Division
6  of Family and Children, "This division has
7  historically overspent Child Welfare Services grant
8  and the FSBG contracts each year are roughly between 3
9  and $4 million." She's talking about overspending.
10  That she goes on on Page -- on Line 9 -- on Page 9,
11  Line 10: "Division must use 100 percent general funds
12  to cover this overspending."
13        Line 15: "This 100 percent general funds
14  reduces our division's ability to match its other
15  grants." Line 21: "In prior years, funds had to be
16  returned to the federal government because of lack of
17  matching dollars."
18        So, you know, she -- yeah, she points out
19  some of the mismanagement in the agency and -- and
20  then requests 39 social workers to cure a problem that
21  is a matter of life and death.
22   Q    How is it mismanagement in not obtaining
23  enough federal funds because the legislature did not
24  appropriate general fund money?
25   A    You have to -- I mean, that's one of

Page 97

1  those principals we were talking about earlier. You
2  have to -- you should maximize your federal funds.
3  This is all coming about -- you've got to back up down
4  the line. This is all coming about because of the low
5  penetration rate in 4E. We're not -- the agency is
6  not doing the job of establishing eligibility for 4E
7  funds in foster care and adoption assistance.
8         Well, that means the federal government
9  doesn't pay for those, so -- in the 4E funds, so the
10  funds get shifted to Child Welfare Services, which is
11  the capped funds. Well, they -- she admits here
12  that's overspent by 3 or $4 million, which then has to
13  be paid by state general funds that should be used to
14  match.
15        So it all goes all the way back to a
16  mismanagement and in large part because of they're not
17  doing the job of establishing 4E eligibility. So I
18  mean, there's a, you know, cause and effect all the
19  way through the system here.
20   Q    And that cause and effect is based on a
21  severe underfunding, correct?
22   A    Oh, that's part of it, yes.
23   Q    Okay. Is it your position that federal
24  funds are unlimited?
25   A    Well, there is unlimited -- there are the

25  (Pages 94 to 97)

BILL M BRISTER, PH.D.

| Page 98 | Page 100 |
|---|---|

**Page 98**

1   uncapped sources. As long as you can establish
2   eligibility for the children and the children need the
3   funds and you establish eligibility, the federal
4   government will pay a match, anyway. Won't pay the
5   full cost.
6      Q   Right. But that's not an unlimited
7   supply of federal money, is it?
8      A   Well, it's uncapped. I mean, unlimited,
9   you can't just say send us money forever. You've got
10   to establish eligibility. But it's unlimited to the
11   extent that you can -- the children are in need and
12   you can establish eligibility. They'll pay their
13   share.
14      Q   But it's directly related to availability
15   of general funds, is it not?
16      A   Matching funds and the penetration rate.
17      Q   So are you saying the state should take
18   every penny that it has and put it into the general
19   fund budget for the Department of Division of
20   Family and Children Services?
21      A   No.
22      Q   Why not?
23      A   Well, because decisions have to be made,
24   but they can certainly do better. They can do --
25      Q   Well, what are those decisions --

**Page 99**

1      A   I mean, there's -- to me -- we were
2   talking about other principals or standards of
3   professional behavior. I mean, one in this case is
4   you maximize your amount of federal funds. To me, if
5   you can -- you know, you can spend X amount of money
6   over here and get two or three times that over here
7   from the federal government, that seems to be a
8   reasonable thing to do.
9      Q   But wouldn't you agree --
10      A   And should be -- you should try to
11   maximize the amount of federal funds.
12      Q   You should try to, correct?
13      A   Absolutely.
14      Q   If there are federal funds still
15   available for foster children -- you mentioned that
16   decisions have to be made, but if there are federal
17   funds available for foster children, should the
18   legislature automatically take money from the
19   Department of Education to go get matching federal
20   funds for foster children?
21      A   That's not my call. I mean, that's up to
22   the legislature. If -- perhaps.
23      Q   Should they take money away from the
24   Highway Patrol to get matching money for foster
25   children?

| Page 99 | Page 101 |
|---|---|

**Page 100**

1      A   Again, it's not my call. That's the call
2   of the elected officials to decide -- to decide that.
3   And, you know, perhaps.
4      Q   Do you consider it unreasonable if they
5   decide not to do that?
6      A   I consider it unreasonable to allow
7   children to be in danger. In the words of the
8   director here, "a matter of life and death." Yes, I
9   think it's responsible behavior to -- to address
10   matters of life and death in an immediate emergency
11   sense.
12      Q   So it's certainly reasonable for the
13   director to express to the legislative body that it
14   was a matter of life and death, correct? That was a
15   reasonable act by the director to express that to the
16   legislature?
17      A   Yes, it was, uh-huh. (Affirmative
18   response.)
19      Q   With respect to this fiscal year we
20   talked about, we touched on her request for 39
21   additional social worker positions on Page 10.
22      A   Yes.
23      Q   Do you know whether the legislature even
24   funded those positions?
25      A   I can tell you if the amount of money for

**Page 101**

1   salaries and personnel expenses increased or not. I
2   can't, off the top of my head, tell you if those
3   particularly positions were funded or not.
4        (DOCUMENT MARKED AS DEPOSITION EXHIBIT
5        NO. 153 AND ATTACHED.)
6   MR. FORTENBERRY: (Continuing.)
7      Q   Dr. Brister, just for the sake of speed,
8   I'll be focusing primarily on Pages 5 through 8, 13
9   through 15.
10      A   Okay.
11      Q   And 30 and 39.
12      A   I'm sorry. What page again? I was
13   reading something.
14      Q   Pages 5 through 8.
15      A   Okay.
16      Q   Thirteen through 15.
17      A   Okay.
18      Q   Pages 30 and 39.
19      A   Five through eight. Let me start with
20   those.
21      Q   I'm sorry. We're referring to Exhibit
22   No. 153.
23      A   Okay. Five through eight, I've read if
24   you want to -- do you want me to read those other
25   sections?

26 (Pages 98 to 101)

BILL M BRISTER, PH.D.

Page 102

1    Q    Whichever you prefer.
2    A    Let's -- we can talk about this.
3    Q    Why don't you go ahead and read the
4 others and --
5    A    Okay. Five through -- and what were the
6 others again?
7    Q    Thirteen through 15.
8    A    All right. Okay. Thirteen through 15.
9 And what was the other?
10   Q    Thirty and 39.
11   A    Thirty and 39. Okay.
12   Q    Going back to the beginning on Page 5
13 approximately Lines 11 through 14, isn't it
14 communicated to the LBO committee a recognition that
15 the state has not had sufficient general fund dollar
16 appropriations for childcare?
17   A    Childcare. I don't think that's the same
18 thing as what we've been talking about. It's a
19 different deal.
20   Q    But it's communicating the lack of
21 general fund appropriations?
22   A    For childcare.
23   Q    And on Page 7, Lines roughly 8 through
24 18, isn't it communicated to the committee again that
25 this is an effort for Family and Children Services

Page 103

1 Division to increase the number of trained social
2 workers available?
3    A    Line 8 says, "Our Family and Children
4 Services Division is negotiating our typing program
5 with the state's public universities and this is
6 in" -- okay. Well, I guess you could call that
7 addressing the problem if you want to, I suppose.
8    Q    Lines 8 through 17.
9    A    Eight through 17, yeah, uh-huh.
10 (Affirmative response.) "And this is our effort to
11 increase the number of trained social workers --
12   Q    Available?
13   A    -- available." "Is negotiating a typing
14 program in the state's public universities." Okay.
15 Is that -- if that's addressing the problem, okay.
16   Q    Are you familiar with the program?
17   A    I'm -- I'm not familiar with the program.
18   Q    Okay. Are you --
19   A    But it doesn't say we need, you know, a
20 bunch of the social workers.
21   Q    Are you offering an opinion as to that
22 program?
23   A    Actually, what I said is, if that
24 addresses the problem, that's -- that's okay.
25   Q    Okay. And my question is, are you

Page 104

1 offering an opinion as to that program?
2    A    I don't have an opinion on that program.
3    Q    And continuing to the top of Page 8 at
4 Lines 1 and 2.
5    A    Yes.
6    Q    Again, the committee's informed that we
7 are at a critical situation relative to the number of
8 social workers?
9    A    Yes. It says they're going to be
10 experiencing a refute of the childcare welfare
11 program. Doesn't say child welfare program. Continue
12 on that sentence. Okay.
13   Q    Page 13, Lines 12 through 19 roughly.
14   A    Okay. Lines what?
15   Q    Beginning at Line 12.
16   A    Yes.
17   Q    Again, communicating to the committee
18 that the agency has been underfunded over the years.
19 And the impact of the underfunding on increase case
20 loads, that's communicated to the committee, correct?
21   A    Well, let's see here. It's says in
22 Line 7, "Our Taniff case loads have increased and our
23 food stamp case loads have increased." And under --
24 and I'm not sure -- I guess the case loads in Line 17
25 are referring to food stamps and Taniff case loads. I

Page 105

1 don't see where it says -- it's not referring to
2 those. But yes, it does -- I guess that's in
3 reference to food stamp case loads.
4    Q    Page 15, Line 16 through 22.
5    A    Yes. Page 15 through 22?
6    Q    Fifteen, Lines 16 through 22.
7    A    Okay. Yes, uh-huh. (Affirmative
8 response.) Yeah, uh-huh. (Affirmative response.)
9 Yes, sir.
10   Q    It's communicated that Family and
11 Children Services is working diligently to recruit
12 additional social workers?
13   A    And have hired 36. And I'm continuing
14 the sentence. "And since May, we have hired 36
15 additional social workers."
16   Q    Page 30, Lines 7 through 13.
17   A    Yes, sir.
18   Q    It's communicated that the Family and
19 Children Services is asking for an additional or needs
20 an additional $2.7 million?
21   A    I assume dollars, yes. And then
22 continues on, "We're asking" -- yes, sir -- "for $2.7
23 million over our request for a total of $97 million
24 for the agency in general fund dollars for state
25 fiscal year '04." So yes, she goes on to talk about

27 (Pages 102 to 105)

BILL M BRISTER, PH.D.

Page 106

1  the overall agency.
2      (DOCUMENT MARKED AS DEPOSITION EXHIBIT
3      NO. 154 AND ATTACHED.)
4  MR. FORTENBERRY: (Continuing.)
5      Q   Dr. Brister, I'll hand you what's marked
6  Exhibit 154, in particular Pages 7, 8 and 9.
7      A   All right.
8      Q   Executive Director Brittain is
9  communicating to the legislative budget committee that
10 funding of the Division of Family and Children
11 Services has been inadequate, and historically, that
12 division has been severely underfunded.
13     A   The Division of Family and Children has
14 been historically severely underfunded. Yes, there is
15 a -- from the executive director of the Department of
16 Human Services saying that this division has
17 historically been severely underfunded.
18     Q   By the legislature?
19     A   Well, it doesn't say that. It just says
20 severely underfunded. I'm reading from the
21 transcript.
22     Q   But we've established earlier in your
23 testimony that the legislature is responsible for
24 funding?
25     A   Again, yes --

Page 107

1      MR. LANG: Objection as to form.
2      A   -- with the input from the governor and
3  the agencies. And it continues on saying, "The
4  division must provide court ordered services that
5  consistently exceed Child Welfare Services' grant by
6  three million a year and the Social Security Services'
7  block grant by approximately three million each year.
8  This reduces the division's general funds, which must
9  be used to cover these expenditures. This reduces
10 the" -- excuse me -- "the division's ability to fully
11 match other federal grants." Okay.
12 MR. FORTENBERRY: (Continuing.)
13     Q   So, again, it's being pointed out to the
14 legislature that the lack of general fund dollars
15 reduces the division's ability to match or obtain
16 other federal funds, correct?
17     A   It does.
18     (DOCUMENT MARKED AS DEPOSITION EXHIBIT
19     NO. 155 AND ATTACHED.)
20 MR. FORTENBERRY: (Continuing.)
21     Q   We'll be referring to Exhibit 155.
22 Dr. Brister, to speed things up, again, you're
23 certainly welcome to read everything at the break and
24 we'll go back into it. But Pages 3, 11 and 15.
25     A   Okay. I'm sorry. I was --

Page 108

1      Q   Page 3, Page 11 and Page 15.
2      A   Okay. Eleven and 15. Page 3, Line 11?
3      Q   No. I'm sorry. Page 3, Page 11 and
4  Page 15.
5      A   Okay. Okay. All right. And Page 11.
6  Okay. I did three, now I'm going to Page 11.
7      Q   And also, it may start at the bottom of
8  Page 10. I apologize.
9      A   Okay. All right. Page 11. And what was
10 the other page, sir?
11     Q   Fifteen.
12     A   Fifteen. Okay. Yes, sir, I'm through
13 reading.
14     Q   Page 3, is it true that Colonel Taylor is
15 informing the budget committee about losing social
16 workers faster than they can be hired?
17     A   That's what it says.
18     Q   And that 56 social workers have been
19 lost, yet, only 30 hired for a net loss of 26?
20     A   That's what it says. On Page 2 it
21 says -- Line 11, "We have a performance improvement
22 plan in Family and Children Services. We have two
23 years to make improvements coming down from the
24 federal government." I assume that's saying they
25 didn't meet certain standards that the federal

Page 109

1  government put in place for them.
2      It says -- he continues to say, "We have
3  two years to make improvements. If we fail to make
4  those improvements, we're facing sanctions up to
5  $1 million per year." He goes on to say, "We have
6  lawsuits against us." Okay. And -- all right. Now,
7  we did Page 3. What's next, sir?
8      Q   Are you familiar with the performance
9  improvement plan?
10     A   I know what it's about.
11     Q   What's it about?
12     A   It's a -- it's a federal governments --
13 again, I'm not an expert in the improvement plan, but
14 it's the federal government came in here and did a
15 survey of some sort and identified several areas of
16 weaknesses, and asked the state to provide a plan to
17 improve things or else face these sanctions.
18     Q   Have any states passed the requirements
19 of the performance improvement plan?
20     A   I'm not an expert in the improvement
21 plan.
22     Q   But do you know whether any states have
23 completely passed those requirements?
24     A   I don't know if they have or they
25 haven't.

28 (Pages 106 to 109)

BILL M BRISTER, PH.D.

Page 110

1    Q    Okay. Bottom of Page 10, Line 24
2  continuing through Page 11, Line 2.
3    A    Yes.
4    Q    It's communicated to the legislative
5  budget committee again that "We need social workers
6  desperately all over the state." Is that true?
7    A    You know, it says here we have lawsuits
8  and we have the PIP thing that I just referred to, so
9  we need social workers desperately all over the state.
10  The sounds reactive, not proactive.
11    Q    Are you aware that the state did not have
12  legislative budget hearings for fiscal year 2007 as a
13  result of Hurricane Katrina?
14    A    I think I heard that. I haven't seen a
15  document or anything, but somehow I knew that.
16    Q    Do you agree that Hurricane Katrina was
17  the greatest natural disaster to impact the state or
18  that the state ever faced?
19    A    Yes, sir.
20    Q    It's put a definite squeeze on the
21  state's budget, correct?
22    A    I think the jury's still out somewhat.
23    Q    You've used the term that it's put a
24  squeeze on the state budget.
25    A    Yeah. I thought it would. Are you

Page 111

1  referring to a newspaper article?
2    Q    Right.
3    A    I think I was forecasting there and at
4  that time, I thought it probably would, but --
5    Q    Has that opinion changed?
6    A    -- it seems that the -- can I see the
7  article?
8    Q    Sure.
9    A    No. The opinion hadn't -- that it
10  certainly could put a squeeze on the budget. I think
11  maybe...
12        MR. FORTENBERRY: Excuse me. Off
13    the record a second.
14        (Off the record.)
15  MR. FORTENBERRY: (Continuing.)
16    Q    This will be Exhibit 156 and we can
17  substitute a clean copy for it, but on the second page
18  of Exhibit 156 you state, "I don't see any way around
19  the squeeze on the state budget." That's what I'm
20  referring to.
21        (DOCUMENT MARKED AS DEPOSITION EXHIBIT
22        NO. 156 AND ATTACHED.)
23        MR. PISKORA: Since we only have one
24    copy, can we just get on the record what
25    newspaper this is and the date?

Page 112

1        BY THE WITNESS: It's --
2  MR. FORTENBERRY: (Continuing.)
3    Q    Go ahead and read it.
4    A    It's the Metro Business Chronicle, Volume
5  1, No. 11-12, September/October 2005.
6        Yeah. Are you ready for my response?
7    Q    Sure.
8    A    Yes, I said that it -- "I don't see any
9  way around the squeeze on the state budget." Earlier,
10  I referred to -- well, the questioner asked, "While
11  the storm destroyed a lot of wealth, it will also
12  result in a big increase in economic activity and
13  transactions as the coast is rebuilt." And I answer,
14  "Right. While the loss of wealth is a hit to assets
15  on America's balance sheet, the GDP is an income
16  statement type figure focused on activity and new
17  production."
18        So it may, in the long run, turn out that
19  it's not as big a squeeze as I might have thought.
20    Q    But there's a definite squeeze on the
21  state budget?
22    A    You know, I don't know. I haven't seen
23  the numbers on the state funding since Katrina, to
24  tell you the truth. I mean, there's a lot of federal
25  money coming in and a lot of private money coming in,

Page 113

1  a lot of charitable contributions coming in. I really
2  don't know if it's putting a squeeze on the state
3  budget or not.
4    Q    Well, had you seen those numbers when you
5  made that statement?
6    A    I had not. I had not. It was sort of a
7  guess what might happen.
8        MR. FORTENBERRY: Okay. Why don't
9  we take a lunch break. It's 12:05.
10        (Off the record.)
11        MR. LANG: I just want to note in
12    connection with my objection to the questioning
13    of Dr. Brister on the -- these very extensive
14    transcripts for several years of appearances by
15    state officials before the state legislature,
16    that it is my understanding that we asked that
17    the plaintiffs, in their third request for
18    production of documents dated February 2nd,
19    2005, over a year ago, in Request No. 6,
20    specifically called for the production of all
21    transcripts and testimony of legislative
22    hearings.
23        We followed up on August 5th, 2005 in a
24    letter from Mr. Piskora, who is here today, to
25    Betty Melay specifically requesting transcripts

29 (Pages 110 to 113)

BILL M BRISTER, PH.D.

Page 114

1  of the joint legislature budget hearings. On
2  February 7th, 2006, over a year after our third
3  request for production of documents in which we
4  asked for these items, Dr. Brister made his
5  report.
6       It was only on March 10th, which is
7  really just a few days ago, that these
8  documents were finally produced to us. The --
9  Dr. Brister has not had an opportunity,
10  although, he was somewhat vague on in his
11  answers and thought he might have gotten them
12  from us some time ago, but we didn't have
13  them -- we didn't send them to him because we
14  didn't have them, and he had not had an
15  opportunity before today to look at these
16  documents.
17       We appreciate the opportunity that you
18  have given to Dr. Brister to look at these
19  items, exhibits so far marked 150 through 155,
20  each of which constitutes a transcript. And
21  however, even with the extended lunch you
22  afforded us, Dr. Brister has only been able to
23  go through, I believe, two years rather
24  quickly. And if you would be as kind, I
25  believe he did want to make some comments now

Page 115

1  that he's had -- had the opportunity to read
2  the entire transcript for those two years over
3  and above the selection which you directed his
4  attention to.
5       Now, I will note that at the time that
6  you asked him the questions, you did give him
7  the opportunity, if he wished, to read the
8  entire transcript, and that I declined that
9  opportunity and suggested that it would be more
10  efficient for him to look at it during the
11  lunch hour. So I'm not, in any way, suggesting
12  that you ever denied him an opportunity to read
13  the whole transcript at the time that you asked
14  him the question. Thank you.
15       MR. FORTENBERRY: Okay. And should
16  we need to, I will file an appropriate response
17  with the times that these were requested and
18  the times they were received by this law firm,
19  and the times they were produced and so forth.
20  But I do not feel that's necessary at this
21  point, just as we have received documents from
22  the plaintiffs with respect to Dr. Brister's
23  deposition within the last three or four days,
24  and I have not had opportunity to read those
25  documents.

Page 116

1       MR. LANG: Excuse me. Can we go off
2  the record for one minute?
3       (Off the record.)
4       MR. LANG: And just so we note, I
5  don't think it is intentional, but Exhibits
6  150 through 155, there may be handwritten notes
7  or pencil notations on these exhibits. Now,
8  Dr. Brister, those are your notes or notations?
9       BY THE WITNESS: Yes, they are.
10       MR. LANG: Okay. Just for the
11  record.
12       BY THE WITNESS: Yes.
13       MR. LANG: Okay.
14       BY THE WITNESS: Well, may I make
15  that very brief statement that --
16       MR. FORTENBERRY: I would like to
17  continue my questioning and then if counsel
18  wants to ask you questions to clarify anything,
19  I would agree to that.
20       MR. LANG: All right. Just for the
21  record, I had asked for the opportunity for
22  Dr. Brister to respond on two of the
23  transcripts that he has had an opportunity. If
24  you'd rather not do that now, then it's your
25  deposition and we would then ask to reserve

Page 117

1  some time at the end of the deposition so that
2  I can give him an opportunity to respond more
3  fully to your earlier questions.
4       MR. FORTENBERRY: (Continuing.)
5  Q    Go ahead and -- for everybody's
6  convenience, Dr. Brister, which two exhibits are we
7  referring to?
8  A    I believe it's 155 and 154 --
9  Q    Okay.
10  A    -- are the transcripts that I had --
11  Q    155 being fiscal year 2006, and 154 being
12  the fiscal 2005. What comments would you like to add?
13  A    Just very briefly, after reading through
14  both of those transcripts, I saw no requests for the
15  number of social workers that would be needed to bring
16  the case load down in Mississippi to the standards set
17  forth by the -- I think it's the National Association
18  of Child Welfare -- National Association of Child
19  Welfare America, something like that.
20       And nowhere in these or other documents
21  have I seen a request for funding that would be
22  adequate to hire the necessary number of social
23  workers to bring it down to the national standards.
24  And, in fact, it's an example of where budgeting
25  standards -- accepted budgeting standards has not

Henjum Goucher Reporting Services
601-713-2424

BILL M BRISTER, PH.D.

| Page 118 | Page 120 |
|---|---|
| 1 really been met, because it is my opinion that an<br>2 accepted budgeting methodology would be to bring<br>3 forward the requests by the agency, especially the<br>4 agency in the line to -- that is -- the request for<br>5 funding and social workers in this case to do their<br>6 job to protect the children. And I did not see that<br>7 in here, and it seems to me, that would be proper<br>8 budgeting procedure.<br>9     Q   And where are those budgeting procedures<br>10 documented so that I may review them?<br>11     A   It's -- it's documented in generally<br>12 accepted budgeting procedures. I cannot give you a<br>13 reference where you go to it, but it is generally<br>14 accepted in the industry -- in the finance industry<br>15 that budgeting should be a process where the<br>16 decision-makers understand what is needed. They<br>17 understand the resources that are needed to fulfill<br>18 the mission of the agency that is requesting the<br>19 funding, and that the information given to them should<br>20 be truthful and complete.<br>21     Q   Are you saying anywhere in here that any<br>22 of the executive directors were not truthful with the<br>23 legislative budget?<br>24     A   Incomplete.<br>25     Q   Did you ever -- have you ever talked to | 1 obvious we have a deposition procedure for<br>2 talking to people from the state.<br>3     MR. FORTENBERRY: Simple question.<br>4 Did he request to talk to the budget leaders of<br>5 the state.<br>6     MR. LANG: Objection.<br>7     A   I don't recall requesting that. I assume<br>8 that would not be -- that would not happen even if I<br>9 requested it.<br>10 MR. FORTENBERRY: (Continuing.)<br>11     Q   Dr. Brister, this morning you used the<br>12 terms that Governor Barbour is supposed to protect the<br>13 interest of the children of Mississippi or something<br>14 to that effect. Can you tell me the details or duties<br>15 that he should have specifically done in order to<br>16 satisfy your minimum professional standards? Detail<br>17 what Governor Barbour should have done to satisfy your<br>18 minimum professional standards.<br>19     MR. LANG: Excuse me. Can we read<br>20 back the entire question?<br>21     MR. FORTENBERRY: Sure.<br>22     (Whereupon, the question was read back by<br>23 the court reporter.)<br>24     A   The information that the extremely large<br>25 case load in any, in fact, most counties in |

| Page 119 | Page 121 |
|---|---|
| 1 the chairman of the senate appropriation committee?<br>2     A   I have not.<br>3     Q   Have you ever interviewed the chairman of<br>4 the house appropriations committee?<br>5     A   I have not.<br>6     Q   Have you ever interviewed the state<br>7 senator or representative in charge of the Department<br>8 of Human Services budgets?<br>9     A   I have not.<br>10     MR. LANG: Objection as to asked and<br>11 answered. It's repeating your earlier line of<br>12 questioning.<br>13 MR. FORTENBERRY: (Continuing.)<br>14     Q   Dr. Brister, would that not have been<br>15 necessary to determine whether they had sufficient<br>16 information in which to determine funding?<br>17     A   I felt it was -- would be improper in a<br>18 litigation environment to make those calls.<br>19     Q   In what way would it be improper?<br>20     A   Well, I would assume you would have<br>21 wanted me to run it by counsel on both sides before I<br>22 would make calls of that sort.<br>23     Q   To use your terms, did you run that by<br>24 counsel for CRI?<br>25     MR. LANG: I object. I mean, it's | 1 Mississippi left the children of Mississippi in a very<br>2 dangerous situation. That theme has been repeated<br>3 numerous times. Even today we have seen it stated by<br>4 people at DHS and, in fact, in documents not yet<br>5 discussed in here, budgetary documents that<br>6 information is made known.<br>7     Did that information then go from the<br>8 executive director of DHS to Governor Barbour? I<br>9 don't know. I saw that it was not in the document --<br>10 that it was in the document that came from DFCS to<br>11 DHS, and then it was omitted from the document that<br>12 came out of DHS. Was Governor Barbour informed<br>13 informally verbally? I don't know. He should have<br>14 been.<br>15     So I can't say what Governor Barbour<br>16 should have done or should not have done; however, had<br>17 he known this information, he should have made it<br>18 clear and forcefully clear that this is a situation<br>19 that needs immediate remedy and expressed that in --<br>20 in quantified terms.<br>21 MR. FORTENBERRY: (Continuing.)<br>22     Q   Same question as to Don Taylor: What<br>23 should he have done to satisfy your minimum<br>24 professional standards?<br>25     A   Don Taylor, again, I don't know what he |

31 (Pages 118 to 121)

BILL M BRISTER, PH.D.

|  | Page 122 |
|---|---|

1  knew or didn't know. I saw the information in a
2  document that went from the division to -- to the DHS
3  level. It was omitted. Mr. Bledst testified at his
4  deposition that someone above his pay grade omitted
5  that information when it went on up the ladder. I
6  don't know who did that.
7       If it -- but I -- again, I don't know
8  what Don Taylor knew or didn't know, but I assume he
9  saw that and at some point up there, was in on the
10  decision to admit that as it goes forward to the
11  governor and to the legislature. He should not have
12  done that. He should have made it abundantly clear
13  what were the needs and what were the dangers.
14       Q    And if the needs or dangers were made
15  clear to the legislature, then he would have acted
16  reasonably, correct?
17       A    If he would have done it in a manner that
18  was consistent with the urgency of the situation.
19       Q    And you've seen budgetary transcripts
20  this morning in which one executive director
21  communicated that it was a matter of life and death,
22  didn't you?
23       A    Yes, but it did not then request what was
24  needed to solve the situation.
25       Q    And if the legislature wouldn't fund the

|  | Page 123 |
|---|---|

1  30 positions that were requested, why do you think
2  they would have funded 500 positions?
3       MR. LANG:  Objection as repetitive
4       and argumentative.
5       A    I don't know what the legislature would
6  have funded. It is reasonable to think that they
7  might have funded many more positions had they been
8  cognizant of the dangers that were involved.
9  MR. FORTENBERRY: (Continuing.)
10       Q    You used the term it's reasonably
11  expected that they would have funded. You're making
12  the assumption that -- I don't understand that. What
13  do you mean by that?
14       A    I mean, I don't know what the legislature
15  would have done had they had this information, but at
16  least they would have had the information and we could
17  have gone from there.
18       Q    Same question: What specifically should
19  Ricky Felder or the division director of DFCS should
20  have done to satisfy your minimum professional
21  standards?
22       A    Again, made known, which in some
23  documents I've seen, it was made known. So I'm not
24  going to state that he did not -- did not pass it on,
25  because I think that it was passed on from the

|  | Page 124 |
|---|---|

1  division head. But could have, in fact, been a more
2  forceful advocate.
3       Q    What could any one of these three
4  defendants done to have made it more forceful, in your
5  opinion?
6       A    In these budget hearings, they could have
7  said we need 500 social workers, give or take,
8  whatever the right number is, to bring it down to
9  nationally accepted case load standards. We need X
10  amount of funding to do that. Short of this, these
11  children are in danger. While they could have, in
12  fact, made changes even within the agency as far as
13  penetration rates, as far as establishing eligibility
14  for children to draw down funds, that would have
15  helped some.
16       So there's some changes within the
17  organization, but mainly in -- what I'm talking about
18  here is in communication with the decision-makers
19  higher up to portray the sense of urgency and the
20  sense of importance that was, indeed, the case.
21       Q    So are you saying if it had been
22  communicated more urgently, in your opinion, then it
23  would have been reasonable, that would have satisfied
24  your minimum standards?
25       A    Yes, in that regard. There's others.

|  | Page 125 |
|---|---|

1       MR. LANG:  Objection as to form.
2  MR. FORTENBERRY: (Continuing.)
3       Q    The reasonable minimum standards that
4  we've been talking about today and we keep referring
5  over and over, has anyone ever evaluated those
6  standards, to your knowledge?
7       A    Those -- evaluated those standards?
8       Q    Yes.
9       A    I mean, they're standards of practice
10  that are well-documented in financial management, in
11  budgeting -- budgeting practices where you -- you
12  asked for the needs of the agency, you develop a
13  budget that fulfills those needs, you present that
14  budget in a -- in a manner that is complete. You --
15  and you do not present a budget with numbers perhaps
16  that is in -- no way could come true and knowingly
17  they could not come true.
18       Q    And where are these standards quantified
19  in a written form that I can look at?
20       A    I cannot give you that source. They're
21  generally accepted principals in budgeting and in
22  financial management. They're just -- just general
23  practices that -- and principals that should be
24  adhered to.
25       Q    To your knowledge, has anybody ever

32 (Pages 122 to 125)

BILL M BRISTER, PH.D.

Page 126

1  debated the reasonableness of those standards?
2      A    The standards have been -- have been in
3  practice -- in practice and have become standard
4  practice because of their reasonableness.
5      Q    And Dr. Brister, that's where I struggle
6  with. How -- but then there's nowhere I can go to
7  find these standards in writing?
8      A    Well, I'm sure there are papers and books
9  that I can't, off the top of my head, quote to you
10 that go through a budgeting process, and how one would
11 communicate that budgeting process. I'm sure they're
12 in both public finance and corporate finance.
13 Certainly, you don't go forward with inflated numbers
14 or leave out critical pieces of information.
15     Q    Have you ever written any articles
16 regarding the management of a foster care system or
17 human services agency?
18     A    No, sir.
19         MR. LANG: Objection as repetitive.
20 MR. FORTENBERRY: (Continuing.)
21     Q    Although you may dispute the numbers as
22 I'm sure from the LBO transcripts that the DHS
23 executive director asked for additional funding for
24 social workers over the last four or five years?
25     A    He did ask for some amount of additional

Page 127

1  social workers, yes. Not nearly enough to convey the
2  need.
3      Q    Referring to Page 9 of Exhibit 154, which
4  is fiscal year 2005, I believe you may have made a
5  pencil notation there to the left.
6         MR. LANG: Could we later have
7  copies of the annotated version of the
8  exhibits? Would you -- you're referring to
9  pencil notations, but they don't appear on the
10 copies of the exhibits that we have.
11        MR. FORTENBERRY: Right. And --
12        MR. LANG: So if after -- all I'm
13 saying is after the deposition, I ask we could
14 get those copies of the ones with the pencil
15 notations so we'll know what you're talking
16 about when you tell him to look at the part
17 next to the --
18        MR. FORTENBERRY: And also, just for
19 the record, I don't have those copies either.
20 Those are the actual exhibits, I think, that
21 Dr. Brister wrote on. So at the appropriate
22 time I believe when we get our transcripts from
23 Ms. Wootton, we will each receive a copy.
24        MR. LANG: Didn't you just hand it
25 to him?

Page 128

1         MR. FORTENBERRY: No. This is the
2  exhibit that he wrote on this morning.
3         MR. LANG: Yeah. That's what I'm
4  talking about.
5         MR. FORTENBERRY: And I'm saying
6  once this is transcribed, then both sides will
7  receive copies --
8         MR. LANG: The reporter has them,
9  you're saying?
10        MR. FORTENBERRY: Right. I don't
11 have them.
12        MR. LANG: Okay. So I would ask
13 that you would ask -- I'll ask you directly,
14 Madam Reporter. If you could kindly give both
15 sides an extra copy of the exhibits. You
16 probably do it anyway, but we would appreciate
17 that.
18        I also compliment you while I'm -- at the
19 moment. The instantaneous feed that I'm
20 relying upon is magnificent. Thank you.
21 MR. FORTENBERRY: (Continuing.)
22     Q    Dr. Brister, are you familiar at all with
23 the revenue maximization contract that's being
24 referred to there?
25     A    A small bit. I mean, I am familiar that

Page 129

1  it existed.
2      Q    And what is your knowledge of that
3  contract or its existence?
4      A    And again, this could be totally off
5  base, but it's my understanding that a firm was
6  hired -- outside consulting firm to help the agency
7  maximize federal revenue. And that might take several
8  different forms.
9      Q    And would that have been a reasonable act
10 to hire an outside consulting firm to help the agency
11 with revenue maximization?
12     A    Well, certainly, if they were not capable
13 of doing it themselves, it's reasonable to hire an
14 outside firm.
15     Q    And isn't it true that the Department of
16 Human Services did this?
17     A    It is true that they did this.
18     Q    And are you familiar with the outcome of
19 that particular consultant on revenue maximization
20 contract?
21     A    Not enough to give you the -- I see what
22 it says here. I can't go much further than that.
23 I -- as I understand it, there were some funds
24 requested from the feds that were paid, and then there
25 was a disallowance for a part of those funds that had

33 (Pages 126 to 129)

BILL M BRISTER, PH.D.

Page 130

1  to be repaid. And that's -- I'm sort of getting that
2  from this right here, and that was my understanding,
3  also.
4      Q    Are you aware that the state has
5  currently retained another revenue maximization
6  organization?
7      A    Yes. I assume that's what the purpose of
8  retaining the firm is for. I mean, I haven't read the
9  contract. I don't know exactly what the terms of the
10 contract is.
11     Q    Do you know who is behind or who
12 contracted with this revenue maximization contract?
13 Do you have any knowledge of that?
14     A    What individual?
15     Q    Or which organization, which part of the
16 state government?
17     A    Well, I really don't. No. I mean, I
18 assume DHS, but I don't know. That could be totally
19 wrong.
20     Q    So other than what you've testified to,
21 you have no other knowledge of the revenue
22 maximization contracts?
23     A    No, no. But may I take a second?
24 Because I remember reading something here further
25 about it. May I look at fiscal year 2006?

Page 131

1      Q    Sure.
2      A    This may not do anything, but let me just
3  look real quick.
4          MR. LANG: Just for the record,
5      while Dr. Brister is looking through those
6      documents, this is another carrier where
7      documents that might have enabled Dr. Brister
8      to respond to these questions were produced
9      quite recently and after his report. And this
10     is a matter that came up later in the Bledst
11     deposition, which is also after his report.
12     A    Well, I can't put my hands on where I
13 read this in one of these documents, but somewhere it
14 says in here that after the disallowance of some of
15 these funds, and the state had to pay it back at
16 the -- I think at the rate of $560,000 a year for -- I
17 don't know -- ten years, I think, that the state got
18 skittish, I think was the word used and discontinued
19 the contract.
20 MR. FORTENBERRY: (Continuing.)
21     Q    All right. That is the contract being
22 referenced here in the --
23     A    I believe so. I believe so.
24     Q    -- in the FY2005 budget?
25     A    I believe that is the case, but I'm

Page 132

1  just -- I'm just recalling something I read earlier
2  today.
3      Q    In fact, because -- strike that.
4          And that contract was, in fact, ended.
5  Are you aware that there's currently another revenue
6  maximization contract?
7      A    Yes, you asked that before. I assume
8  that's what the company is hired to do. Perhaps among
9  other things, but that's part of it, as I understand
10 it.
11     Q    But my point, Dr. Brister -- I may not be
12 making it clear -- the contract being referenced in
13 fiscal year 2005 ended in the -- because of the
14 overassessment of the consultant, the state had to pay
15 back $560,000 per quarter and that contract was ended.
16 Are you aware that there is now another separate
17 revenue maximization contract with another company?
18     A    Yes.
19         MR. LANG: Objection as to form.
20 MR. FORTENBERRY: (Continuing.)
21     Q    And what details do you know about this
22 new revenue maximization contract?
23     A    None.
24     Q    Okay.
25         MR. LANG: May I suggest you may

Page 133

1      wish to show the witness the contract if you've
2      been asking about it -- him about it.
3          MR. FORTENBERRY: Sure. The IHHS
4      contracts that were produced in the year 2005,
5      and we'll be glad to go pull them out of the
6      documents if y'all would like and discuss them.
7          MR. LANG: We just got it, as far as
8      I --
9          MR. FORTENBERRY: We can get into
10     that off the record later, but the IHHS
11     contracts were produced last year.
12         MR. LANG: In any event, regardless
13     of when it was produced, if you're going to ask
14     the witness about it, I'm suggesting you may
15     want to show it to him.
16         MR. FORTENBERRY: Well, duly noted
17     your suggestion, and I'll go ahead and ask the
18     questions.
19 MR. FORTENBERRY: (Continuing.)
20     Q    On Page 2 of your report, Dr. Brister,
21 the paragraph at the top, fifth line down, it says --
22 it begins, "These inaccurate forecasts pose the risk
23 that budgetary decision-makers and the legislature."
24 Do you see that sentence?
25     A    Yes, I do.

34 (Pages 130 to 133)

BILL M BRISTER, PH.D.

Page 134

1    Q    You used the term "posed the risk." You
2  have no actual knowledge that there are -- excuse me.
3  Strike that.
4         You have no personal knowledge that that
5  actually happened, do you?
6    A    I do not.
7    Q    On Page 3, top paragraph, the last
8  sentence that starts, "But MDHS has displayed a lack
9  of organizational capacity." Do you see that
10 sentence?
11   A    I do.
12   Q    What do you mean by the term of "lack of
13 organizational capacity"?
14   A    The -- we're referring here to the title
15 4E eligibility documentation for children. And the
16 fact that the 4E eligibility rate is so very low, in
17 fact, the lowest in the nation at some points, and the
18 fact -- and even the fact that they had to hire these
19 consulting firms that you just referred to in order to
20 help them do this, to me, displays a lack of
21 organizational capacity to get that job done.
22   Q    But my question was, what do you mean by
23 the term "lack of organizational capacity"?
24   A    That they were not able to get -- to do
25 this job.

Page 135

1    Q    And what would have been sufficient
2  organizational capacity to do this job?
3    A    That is probably for an expert -- another
4  expert to say what it would take exactly to get our --
5  to get the state's 4E eligibility rate up. So I would
6  leave it to another expert to -- to give details of
7  how the organization should do that.
8    Q    So the 4E funding is outside your area of
9  expertise?
10   A    How to increase it or -- yes, sir, I
11 would say it is. I can tell you what the number is
12 and tell you what the impact is fiscally, but I -- I
13 cannot, as an expert, tell you how or what should be
14 done to get it up.
15   Q    So you can't sit here and say what they
16 were doing was not reasonable with respect to --
17   A    It's one of those deals where the facts
18 speak for themselves. The numbers were low. They
19 weren't getting the job done. They've hired a
20 consulting firm now to help them do it. We'll see if
21 it helps. That's -- so if -- if what they were doing
22 was reasonable, it was also obviously flawed and not
23 enough to get the job done.
24   Q    Can you explain to me in detail the
25 requirements that must be met so that a child can

Page 136

1  qualify for title 4E funding?
2    A    I don't know how much detail would
3  suffice for you. When you say can I do it in detail,
4  my report, in fact -- my report on Page 9, in fact,
5  lists briefly some those criteria near the bottom of
6  the page under title 4E foster care eligibility.
7         "Eligibility criteria applied to foster
8  children:  States are required to provide foster care
9  maintenance payments to AFDC eligible children moved
10 from the home of a relative." Do you want me to read
11 this paragraph? There is a list of about three
12 criteria right there.
13   Q    That's fine. You can go ahead so it's
14 clear what you're referring to.
15   A    Okay. The paragraph reads -- I'm going
16 to start at the beginning of the paragraph. "Several
17 eligibility criteria applied to the foster children on
18 whose behalf federal reimbursement is available to
19 states. States are required to provide foster care
20 maintenance payments to AFDC eligible children removed
21 from the home of a relative. If the child received or
22 would have received AFDC, which is a 1996 criteria,
23 prior to removal from the home and if the following
24 also apply.
25         One, the removal and foster care

Page 137

1  placement were based on a voluntary placement
2  agreement signed by the child's parents or guardians
3  or a judicial determination that remaining in the home
4  would be contrary to the child's welfare. Two,
5  reasonable efforts were made to eliminate the need for
6  removal or to return the child home. And three, care
7  and placement of the child are the responsibility of
8  the state."
9    Q    Do you have any knowledge of what steps
10 have been taken at DFCS to increase title 4E funding?
11   A    I do not know. Not to speak of, no.
12   Q    Can you tell me what you would say do
13 differently to increase 4E funding?
14        MR. LANG: Objection as to form.
15   A    That's not my expertise.
16 MR. FORTENBERRY: (Continuing.)
17   Q    Okay. In order to prepare your report,
18 can you tell me what you did to educate yourself about
19 4E funding?
20   A    I -- as mentioned earlier, I -- I looked
21 at documents provided through discovery from DHS to
22 see levels of 4E funding. I examined documents on the
23 Internet, papers written, reports written that define
24 4E funding. As you say here, the eligibility of 4E
25 funding. I looked at the website of the Department of

35  (Pages 134 to 137)

BILL M BRISTER, PH.D.

| Page 138 |
|---|
| 1 Health and Human Services and information about 4E |
| 2 funding in order to educate myself. And I pointed out |
| 3 I concentrated on the fiscal aspects of it rather than |
| 4 programmatic aspects of it. |
| 5     Q   Dr. Brister, I apologize if I've asked |
| 6 this or you think I've asked it again, but let me try |
| 7 to phrase it this way: If you were the division |
| 8 director of the Department of Family and Children |
| 9 Services, what would you do to increase 4E funding? |
| 10         MR. LANG: Objection as to form. |
| 11     Go ahead. |
| 12     A   I -- again, I'm not an expert in this. I |
| 13 can't give you the -- a list of actions at this point, |
| 14 except I would engage in -- in further educating |
| 15 myself on best practices. I would do the best I could |
| 16 to -- as I said, best practices is very important. I |
| 17 would do my best to -- to acquire adequate resources |
| 18 in order to get the personnel in place and the |
| 19 training in place, and whatever else needs to be in |
| 20 place in order to achieve this goal. |
| 21 MR. FORTENBERRY: (Continuing.) |
| 22     Q   So if you're not sure how to increase the |
| 23 4E funding, how can you give an opinion that what |
| 24 Ricky Felder or Don Taylor or the governor have done |
| 25 does not -- does not satisfy your reasonable minimum |

| Page 139 |
|---|
| 1 standards that are not quantified in a written form? |
| 2         MR. LANG: Objection as to form. |
| 3     Argumentative. |
| 4     A   The -- there are numerous references from |
| 5 within the agency that the 4E eligibility rate is a |
| 6 major problem in acquiring federal funds. It's come |
| 7 out in several documents and in depositions, I might |
| 8 add. And therefore, with knowledge that it is a -- it |
| 9 is a major problem of acquiring federal funds, it |
| 10 seems -- it seems not a responsible course of action |
| 11 to -- to continue to do or to not do whatever it is is |
| 12 necessary to get the rate up. |
| 13        And I've seen no indication that the rate |
| 14 is up. And in fact, the rate is -- the eligibility |
| 15 rate of Mississippi is, if not the lowest, one of the |
| 16 lowest in the nation. It is the lowest by some |
| 17 accounts, significantly lower than any other state. |
| 18 And given the fact that one of the criteria for 4E |
| 19 eligibility is that the child would have been eligible |
| 20 to receive AFDC, that is an income criteria that this |
| 21 is a poor child. |
| 22        And given the fact that Mississippi has a |
| 23 relatively large number of poor children, one would |
| 24 assume that our 4E eligibility rate should be high |
| 25 except -- so the only possible reason that it's not is |

| Page 140 |
|---|
| 1 not the fact of the condition of the child, but the |
| 2 fact that the organization is not doing what is |
| 3 necessary to establish eligibility of those children. |
| 4        Therefore, to me, that is an indication |
| 5 that the -- that the state is not doing what is the |
| 6 responsible course of action, physically speaking. |
| 7 I'm not the only one that points out the 4E -- the low |
| 8 4E rates, I might add. They have been pointed out |
| 9 by -- by other researchers, also. |
| 10 MR. FORTENBERRY: (Continuing.) |
| 11     Q   And who are those researchers? |
| 12     A   Well, the one that comes to mind is |
| 13 the -- is the -- I think it's called the Institute of |
| 14 Applied Research, which did the 4E waiver project |
| 15 for -- for the state that was, in fact, discontinued |
| 16 before it was complete. And they point out that |
| 17 the -- that the very low eligibility rate is -- is -- |
| 18 is contrary to what one would expect given the |
| 19 economic conditions of the State of Mississippi. |
| 20     Q   So which one of your standards does this |
| 21 not satisfy? |
| 22         MR. LANG: Objection as to form. |
| 23     A   One of my standards would be -- and I |
| 24 think it's generally accepted in public finance -- is |
| 25 that general fund dollars should, whenever possible, |

| Page 141 |
|---|
| 1 be used to match -- be used as they match to bring |
| 2 down federal dollars. In fact, I think we read it |
| 3 earlier in some of these transcripts where the |
| 4 executive director said that, maybe more than one |
| 5 place. And when we -- when the state does not do what |
| 6 is necessary to have a -- at least a -- you know, a |
| 7 reasonably high -- and I don't know what average |
| 8 eligibility rate, something lower than what it -- |
| 9 something higher than what it is, then that forces the |
| 10 state to move the funding for these children that are |
| 11 in foster care over to another capped federal program, |
| 12 which means there is a limit on exactly how much |
| 13 money. |
| 14        We see testimony that those funds were |
| 15 exhausted to the tune of something like $3 million a |
| 16 year, which then that money has to be paid solely out |
| 17 of general fund dollars. So to me, it violates the |
| 18 standard that you do whatever you can to use general |
| 19 fund dollars to match in order to obtain federal |
| 20 dollars in which you're doing here by not -- by having |
| 21 such a low 4E rate and allowing it to exist, is you |
| 22 are using state dollars solely to support foster care |
| 23 when the federal government is more than willing to |
| 24 share the cost. |
| 25 |

36 (Pages 138 to 141)

BILL M BRISTER, PH.D.

Page 142

1 MR. FORTENBERRY: (Continuing.)
2    Q   And you referenced LBO hearings. And is
3 that not what the executive directors told the
4 legislature was being hampered because of the lack of
5 general fund dollars?
6    A   They said that -- well, they -- I don't
7 know they were talking about -- they didn't talk about
8 the eligibility rate, I don't believe, in these. I
9 don't remember them talking about that. They did say
10 that they did not have enough general fund dollars to
11 pull down federal dollars. That's not what I'm
12 talking about.
13        I'm talking about using state money for
14 purposes other than pulling down federal -- it's not a
15 matter of not having enough. It's about using what
16 you have in -- for -- for using what you have for
17 purposes other than pulling down federal dollars.
18    Q   And you're being critical of the
19 executive director and division director and the
20 governor, whoever that may be, but you cannot sit here
21 and tell us how to improve the 4E penetration rate?
22        MR. LANG: Objection as to form.
23    A   I'm being critical from a fiscal
24 perspective that this would have been a very --
25 this -- this would have been not only a reasonable

Page 143

1 thing to concentrate on as to get up to 4E rate, but
2 the responsible thing to do is to concentrate efforts
3 on getting up -- in increasing the 4E rate so that
4 general fund dollars would not have to be used for
5 purposes other than for matching federal dollars.
6 MR. FORTENBERRY: (Continuing.)
7    Q   Was it not a reasonable lack to hire an
8 outside consultant to assist in that area?
9    A   Yes. As I said before, I think that is
10 reasonable if you don't believe you can do it without
11 the consultant.
12        MR. LANG: Did you want to take a
13 break?
14        MR. FORTENBERRY: I'm fine, but
15 if --
16        MR. LANG: Okay. Just some time was
17 passing.
18 MR. FORTENBERRY: (Continuing.)
19    Q   Page 4 of your report.
20    A   Yes, sir.
21    Q   Numerical paragraph down at the bottom,
22 No. 4, Long-term Impact of Abuse and Negligent.
23    A   Yes.
24    Q   And you give estimates regarding total
25 cost of abuse and neglect of children in Mississippi.

Page 144

1 You're not limiting to foster children there, are you?
2    A   Ask again, please, sir.
3    Q   When you give an estimate as to the cost
4 of the State of Mississippi of abuse and neglect of
5 children --
6    A   Yes, I see that, yes.
7    Q   -- that is not limited to foster
8 children, is it?
9    A   No, no, no.
10    Q   Okay. What's the difference between
11 general funds and special funds when you talk about a
12 state budget?
13    A   General funds are state monies. Special
14 funds are, for the most part, federal monies.
15    Q   And do you also have to have spending
16 authority in addition to money budgeted? Is that
17 clear as mud?
18    A   You do. Yes, you do have to have
19 spending authority.
20    Q   In other words, if the federal government
21 says here's $100 million to the Department of Human
22 Services and the legislature has not given $100
23 million authority, then that money cannot be used,
24 correct?
25    A   If the legislature does not give the

Page 145

1 agency the authority to pull down the federal funds,
2 then those monies could not be used. I don't think
3 it's -- would ever be a problem to ask for increase
4 authority to pull down federal funds, so that is not
5 usually the case.
6    Q   And how do you go about asking for that
7 increased authority?
8    A   I'm -- I can't -- I don't know the exact
9 process. I would think it starts with a request to --
10 to the -- I don't know, the office of budgets and
11 accounting or something like that and explaining the
12 situation. And I don't know. Perhaps there's a
13 governor or a legislative committee involved. I
14 really don't know.
15        And let me qualify. I would hope that
16 there is a mechanism that you can get increased
17 authority if you need it to pull down federal funds,
18 if they become available.
19    Q   Have you ever prepared or participated in
20 preparing a budget on behalf of a state agency or a
21 division of a state agency?
22    A   No, sir, not in any significant form.
23    Q   Have you ever participated in going to
24 the legislature or lobbying legislators on behalf of
25 the state or a state agency or a state agency division

BILL M BRISTER, PH.D.

Page 146

```
1    with respect to their budget?
2        A   I have not.
3        Q   Dr. Brister, are there -- is there any
4    literature, text or articles that you consider to be
5    authoritative on the subject of what constitutes the
6    minimal practice standards or reasonable, professional
7    judgment for funding, spending, fiscal management or
8    budgetary issues for a state human services agent --
9    agency or foster care system?
10       A   No. I cannot direct you to a particular
11   written source.
12           MR. FORTENBERRY: Let's take a break
13       now.
14           MR. LANG: Okay.
15           (Off the record.)
16   MR. FORTENBERRY: (Continuing.)
17       Q   Dr. Brister, just a few more questions
18   and I think we'll be able to wrap up.
19       A   All right.
20       Q   Other than the opinions expressed in your
21   report, are there any other opinions that you expect
22   to testify to at the trial of this case?
23       A   No.
24       Q   Are there any opinions that you want to
25   add to your report?
```

Page 147

```
1        A   No.
2        Q   Are there any opinions you want to take
3    out of your report?
4        A   No.
5        Q   Are there any opinions that you want to
6    clarify in your report?
7        A   No.
8        Q   Just before we took this last break, on
9    one of your answers, you used the word forceful
10   enough, that the executive director or governor,
11   division director was not forceful enough in
12   requesting funds or positions from the legislature.
13   Do you recall that?
14       A   Yes.
15       Q   If they weren't forceful enough, can you
16   tell me exactly what words they could have used that
17   would have satisfied your standards?
18           MR. LANG: Objection as asked and
19       answered.
20       A   I think I would have -- I'm a number
21   cruncher. I would have looked for numbers that here
22   is the federal standards, here is our case loads,
23   here's how far we're off, here's how many we need,
24   here's how much it's going to cost to get us there.
25   This is -- and then forcefully emphasize the
```

Page 148

```
1    importance that we do this for the well being of the
2    abused and neglected children.
3    MR. FORTENBERRY: (Continuing.)
4        Q   And what words, in your opinion, would
5    have been forceful enough?
6            MR. LANG: Objection as asked and
7        answered.
8        A   I don't know if it's words as much as an
9    entire, you know, argument that should be made and
10   made in a way that presents the case to the
11   legislature so that they -- so that they get the
12   message. I don't think I would say any particular
13   words. It's an argument that needs to be made in a
14   complete fashion.
15   MR. FORTENBERRY: (Continuing.)
16       Q   If the legislature had funded or given
17   more general fund dollars to the Division of Family
18   and Children Services -- strike that.
19           What amount of money would it have taken
20   for the legislature to have adequately funded the
21   division of Family and Children Services?
22       A   I've not done that analysis to give you a
23   dollar figure on that.
24       Q   Then how do you know that the money that
25   has been funded has not been adequate?
```

Page 149

```
1        A   Well, the statements are plentiful from
2    even within the division that we don't have enough
3    general fund dollars to draw down these federal
4    dollars. We don't have enough general fund dollars to
5    get our case load down. We don't have enough general
6    fund dollars for this or that. So I mean, it is -- it
7    is a recurring theme in the documents.
8        Q   What number of social workers would have
9    satisfied your standards?
10       A   It is to -- to satisfy the standards set
11   forth by the National Child Welfare League of America.
12   And I know I'm getting that name wrong. It would
13   have -- and this has been expressed within the agency.
14   it would -- at different times anywhere from 500 to
15   700 social worker -- additional social workers in
16   order to bring it down to the optimal level.
17       Q   How many states in the United States
18   satisfy the standards set forth by the Child Welfare
19   League of America as to the number of social workers?
20       A   I don't know.
21       Q   Do you know whether that is an actual
22   number that should be used or an optimal goal?
23       A   It is a -- it is certainly a goal that
24   should be -- that you should shoot for. There's no
25   doubt about that. And -- and according to these
```

38 (Pages 146 to 149)

BILL M BRISTER, PH.D.

Page 150

1  experts in the national association, if you want to --
2  to protect the children, benefit the children that
3  are in -- that are under the custody of the agency,
4  these are the numbers that should be used. So
5  certainly, you should -- there are goals to shoot for
6  and hopefully you can get it.
7      Q    And if you do not, that means your
8  actions were unreasonable?
9      A    If you do not, by the extent that
10  Mississippi does not, I think it is unreasonable.
11     Q    And what is that extent?
12     A    Well, when the optimal -- I mean, when it
13  is labeled by internal documents as we're at the
14  danger level, children are going to die, the -- I want
15  to say in one document it is beyond danger in many
16  counties. You know, that's -- that sort of
17  terminology, I think, is -- represents a case load
18  that's unreasonable.
19     Q    So you're basing your opinion on internal
20  documents of the Department of Human Services as
21  opposed to what your standards are?
22          MR. LANG: Objection as to form.
23     A    Well, that is -- that is a part of a
24  formulation of what a standard would be, is what is --
25  what does the staff and administration of DHS think is

Page 151

1  adequate. And then as I said before, there are
2  external standards also that provide guidance.
3  MR. FORTENBERRY: (Continuing.)
4      Q    How much money should the State of
5  Mississippi spend per foster child in order to meet
6  your standards?
7          MR. LANG: Objection as to form.
8      A    Again, I have not done that study and the
9  question would -- and even if you clarified the
10  question, I'm not sure I could answer because I've not
11  done that study. But I couldn't give you a dollar
12  figure.
13  MR. FORTENBERRY: (Continuing.)
14     Q    Do you -- are you aware of the annual
15  cost of caring for a foster child in the State of
16  Mississippi?
17     A    I'm aware of the board rates, if that's
18  what you're referring to.
19     Q    Well, are you aware of what it costs
20  annually for a foster child in the State of
21  Mississippi, to care for that child?
22     A    You could certainly back into that number
23  by the budget divided by the number of children. I
24  can't pull it up. It's not on -- in my head right
25  this second.

Page 152

1      Q    Are you aware of that dollar figure in
2  any other state in the United States?
3      A    No.
4      Q    Are you aware how it compares with those
5  states compared to Mississippi?
6      A    If you're asking am I aware of the total
7  budget of the Division of Family and Children Services
8  divided by the number of children in custody or
9  divided by the number of the children in the state or
10  something like that, I cannot pull those up. I've
11  seen -- I think I've seen some of those numbers as
12  budget spending, but I can't call them up right now.
13  Does not compare favorably, I don't believe.
14     Q    Are you familiar with how many social
15  worker positions have been appropriated to the
16  Department of Human Services, yet, the legislature
17  chose not fund those positions?
18     A    How many positions that they chose not to
19  fund?
20     Q    Let me back up and ask it this way: Are
21  you aware that the legislature appropriates money for
22  the Department of Human Services to operate, correct?
23     A    Correct.
24     Q    And you're aware that they also
25  appropriate positions or what is -- what are called

Page 153

1  PINS, P-I-N-S, for positions at various state
2  agencies?
3      A    Correct.
4      Q    So the legislature controls not only the
5  money that is appropriated, but also the number of
6  employees that may be working for a particular agency?
7          MR. LANG: Objection as to form.
8      A    Well, we've covered, you know, who's
9  responsible, but, yes, the legislature has authority.
10  MR. FORTENBERRY: (Continuing.)
11     Q    And are you aware that the legislature
12  may appropriate positions but not appropriate the
13  money to fund those positions?
14     A    I believe that is possible.
15     Q    And if you have a number of social worker
16  positions that have been appropriated but not funded,
17  what good would it do to ask the legislature to add
18  more social worker positions to the agency when they
19  have not funded the ones in existence?
20          MR. LANG: Objection.
21  Argumentative.
22     A    I would say it would do very little good.
23  In previous answers, I've always coupled they didn't
24  request social workers, nor did they request the
25  funding to fill those positions.

39 (Pages 150 to 153)

BILL M BRISTER, PH.D.

Page 154

1    MR. FORTENBERRY: That's all I have,
2  Dr. Brister. Thank you.
3    BY THE WITNESS: Thank you.
4    MR. LANG: May we have a moment? I
5  just want to confer with my co-counsel as to
6  whether or not we want to question Dr. Brister.
7  We'll be back in five minutes.
8    MR. FORTENBERRY: Sure.
9    (Off the record.)
10    MR. LANG: I did want to make a
11  statement before I forget it. You had asked
12  Dr. Brister whether he wants to make any
13  changes to his report or anything of that
14  nature. I just wanted to, I guess, alert you
15  or put you on notice to the possibility that
16  due to documents and testimony being produced
17  and taken respectively after his report and due
18  to the fact that discovery is still continuing
19  and we can predict what might still come up, it
20  is possible that we may discuss with
21  Dr. Brister the potential of amending or
22  supplementing his report so that it will
23  reflect what may be developed or what has been
24  developed since his report, and what he may not
25  have yet had a chance to review.

Page 155

1    MR. FORTENBERRY: And I find it
2  difficult to respond to what may happen, so my
3  point -- my point would be that if it's
4  necessary that you need to file some sort of a
5  pleading or a letter or so forth, do so and I
6  will respond accordingly once I see what it is.
7    MR. LANG: All right.
8    (Off the record.)
9    MR. LANG: We have no questions and
10  I thank defendant's counsel for the courtesies
11  they've shown us during our visit here today.
12    MR. FORTENBERRY: Thank you. That's
13  all we have at this time.
14    (CONCLUSION OF DEPOSITION.)
15
16
17
18
19
20
21
22
23
24
25

Page 156

1    CERTIFICATE OF REPORTER
2
3    I, AMANDA MAGEE WOOTTON, Court Reporter and
4  Notary Public for the State of Mississippi, do hereby
5  certify that the above and foregoing pages contain a
6  full, true and correct transcript of the proceedings
7  had in the aforenamed case at the time and place
8  indicated, which proceedings were recorded by me to
9  the best of my skill and ability.
10    I also certify that I placed the witness
11  under oath to tell the truth and that all answers
12  were given under that oath.
13    I certify that I have no interest,
14  monetary or otherwise, in the outcome of this
15  case.
16
17    This the 4th day of April 2006.
18
19
20    AMANDA M. WOOTTON
21
22  My Commission Expires:
23  December 15, 2006
24
25

Page 157

1    CERTIFICATE OF DEPONENT
2
3
4    I,_____, do hereby
5  certify that the foregoing testimony is true and
6  accurate to the best of my knowledge and belief, as
7  originally transcribed, or with the changes as noted
8  on the attached Correction Sheet.
9
10
11
12
13
14
15
16
17
18    Subscribed and sworn to before me
19  this the _____ day of _____, 2006.
20
21
22    _____
22    Notary Public
23
24  My Commission Expires:
25

40 (Pages 154 to 157)

BILL M BRISTER, PH.D.

Page 158

1        CORRECTION SHEET
2
3       I,_____, do hereby
4  certify that the following corrections and additions
5  are true and accurate to the best of my knowledge and
6  belief.
7

CORRECTION     PAGE   LINE  REASON

8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17
18
19
    Subscribed and sworn to before me
20  this the _____ day of _____, 2006.
21            _____
22           Notary Public
23  My Commission Expires:
24
25