**Expert Report of**

**Bill M. Brister, Ph.D.**

**Olivia Y., et al. v. Barbour, et al.**

**Civil Action No. 3:04cv251LN**

**February 7, 2006**



# TABLE OF CONTENTS

**Page**

I.   Executive Summary ................................................................................................ 1

    A.   The Division's Budget Does Not Reflect Current Need and Is Based on Grossly Inflated Forecasts of Available Federal Funds ........................................ 1

    B.   Mississippi Fails to Maximize Federal Funding Programs and Has Left Millions of Federal Dollars Unspent ................................................................ 2

    C.   MDHS Has Failed to Effectively Manage the Funds It Has .................................. 4

II.  Reviewer Qualifications ........................................................................................ 5

III. DFCS Budget Process ........................................................................................... 5

IV.  MDHS Budget Forecasting .................................................................................... 6

V.   The Budget of the Division of Family and Children's Services ....................................... 7

    A.   Total Revenue to DFCS ......................................................................................... 7

    B.   Total Federal Funding for DFCS ........................................................................ 7

    C.   Total State (General Fund) Appropriation ........................................................... 7

    D.   The Percentage of State Funds Used as Match ........................................................ 8

    E.   Federal/State Ratio ................................................................................................ 8

VI.  Title IV-E .............................................................................................................. 9

    A.   Title IV-E Foster Care .......................................................................................... 9

    B.   Title IV-E Adoption Assistance ........................................................................... 11

    C.   Title IV-E Foster Care Independence Program .................................................. 12

    D.   Title IV-E Foster Care Waiver Demonstration .................................................. 12

VII. Title IV-B, Subpart 1, Child Welfare Services .................................................... 13

VIII. Title IV-B, Subpart 2, Promoting Safe and Stable Families ............................... 13

IX.  Social Services Block Grant ................................................................................ 14

X.   Temporary Assistance for Needy Families (TANF) .............................................. 14

i

**Page**

XI.   DFCS Budget Categories and Trends ....................................................................... 15

    A.   Salaries, Wages, and Fringe ......................................................................... 15

    B.   Subsidies, Loans, and Grants ....................................................................... 15

    C.   Contractual Services ..................................................................................... 15

    D.   Travel ............................................................................................................ 15

    E.   Equipment ..................................................................................................... 16

    F.   Commodities ................................................................................................. 16

XII.   Board Rates Compared to Cost of Raising a Child ............................................... 16

XIII.   Placement Settings and Comparative Board Rates ............................................... 19

XIV.   The Long-Term Economic Impact of Child Abuse and Neglect ......................... 19

XV.   Conclusion ............................................................................................................ 21

## I.    Executive Summary

I have been retained by counsel for plaintiffs in this action to review funding, spending, fiscal management, and related budgetary issues in regard to Mississippi's child welfare agency, the Division of Families and Children (DFCS) of the Mississippi Department of Human Services (MDHS), and to assess whether such budgetary and fiscal management procedures comport with reasonable minimum professional standards.[1]    For reasons set forth below, I conclude that MDHS's fiscal practices failed to meet minimum professional standards, causing Mississippi's child welfare system, and the children in its care, to unnecessarily suffer from the harmful effects of severe underfunding.

Despite dangerously high DFCS social worker caseloads, and extreme funding deficiencies known to MDHS for numerous years:

- MDHS never requested that the division be funded at a level to bring caseloads within well-recognized standards, nor communicated the urgency of correcting this funding shortage, which placed the foster care children of Mississippi "Beyond Danger!"[2]  To the contrary, total actual DFCS spending has dropped to its lowest level since 2000;

- Mississippi has left millions of dollars of allocated Federal funds unspent;

- In addition, MDHS has failed to maximize open-ended Federal funding sources. For instance, Mississippi receives the lowest amount of Title IV-E funds per child of any of the 50 states and the District of Columbia.  As set forth below, if Mississippi could raise its Title IV-E eligibility rate to the national average, it would significantly increase the amount of Title IV-E funds available:

| IV-E Eligibility Rate | Total IV-E Federal Funds[3] | State Match[4] |
|---|---|---|
| 20.4% (Current MS Rate) | $7,946,420 | $2,362,895 |
| 40.6% (Double Current Rate) | $15,812,320 | $4,701,847 |
| 62.6% (National Average) | $24,380,572 | $7,249,646 |
| 80% (High Rate) | $31,157,280 | $9,264,723 |

### A.    The Division's Budget Does Not Reflect Current Need and Is Based on Grossly Inflated Forecasts of Available Federal Funds

Through the budget planning process, MDHS has been warned that abolished and unfilled personnel positions are causing dangerously high caseloads for social workers.   DFCS documented the need to hire 500 to 700 *additional* social workers in order to reduce caseloads to well-recognized standards.[5]  Yet, MDHS did not include this information in its budget requests to the Legisature and, thereby, failed to communicate the scope, urgency, and critical nature of the situation.

1

Instead, MDHS provided extremely unreasonable and inaccurate forecasts of future funding levels (in particular, Federal funding). For State fiscal years (SFY)[6] 2002 through 2005, for example, forecasting errors as to anticipated levels of Federal funding totaled approximately $132 million (averaging an error of $33 million/per year in connection with an actual budget of less than $70 million) These inacurrate forecasts posed the risk that budgetary decision-makers in the Legislature would conclude that DFCS budgetary shortfalls would be alleviated by substantial increases in future Federal funding, thereby reducing the need for them to act though budgetary increases or stricter oversight.

In fact, the actual total spending by DFCS decreased by 7.6% in SFY 2005 from the previous year and has decreased by 9.2% from its peak in SFY 2002. The actual level of spending on personnel (e.g. Salaries, Wages, and Fringe Benefits) in SFY 2005 decreased by 6.9% from the previous year and was at its lowest level since SFY 1999.

### B. Mississippi Fails to Maximize Federal Funding Programs and Has Left Millions of Federal Dollars Unspent.

Mississippi's child welfare program is funded, like all other states, primarily with a combination of State and Federal funds (through numerous Federal programs, the most significant of which are detailed below). Indeed, the great majority (over 95%) of DFCS funding is derived from State and Federal funds.

To maximize the State's funding of its child welfare programs, it is obvious that the State must attempt to maximize Federal funding sources rather than pay for these activities solely with state or local funds. For the reasons set forth below, however, Mississippi has failed to maximize its Federal funding streams, and instead spends approximately $7,000,000 or 41% of its allocated State funds without securing any Federal matching funds.

Titles IV-E and IV-B of the Social Security Act are the principal sources of Federal funds *dedicated* for child welfare activities. Other Federal programs, such as Social Services Block Grant (SSBG) and Temporary Assistance of Needy Families (TANF), are also used for child welfare purposes. A brief overview of the dedicated Federal funding programs, and the extent to which MDHS has accessed those available funds, follows.

1. The Title IV-E programs, the largest Federal funding stream, consists of the Foster Care program, the Adoption Assistance program, and the Chafee Foster Care Independence program.

The Title IV-E Foster Care Program is an uncapped (a potentially unlimited source of funding) entitlement which reimburses states for maintenance payments provided to cover shelter, food, and clothing for foster children whom the State has established as meeting certain Federal eligibility requirements; foster care placement and administrative costs; and training costs of staff, foster parents, and adoptive parents. Reimbursement for foster care maintenance payments has a Federal match equal to the state Medicaid matching rate. In FY 2005, Mississippi had the highest matching rate of all 50 states at 77.08% for maintenance payments; 50% for administrative costs, and 50% for training-related costs.

A major factor that contributes to MDHS's inability to maximize Federal funds, notwithstanding Mississippi high matching rate, is that the State has the lowest Title IV-E Foster Care eligibility

2

rate in the nation. Because the eligibility rate is determined in large part based upon income levels, and given that Mississippi is the poorest state in the nation, one would expect the State to have one of the highest eligibility rates in the nation. But MDHS has displayed a lack of organizational capacity to document Title IV-E eligibility for children who would otherwise be eligible.

As a result, expenses to care for the majority of foster care children must be paid solely by State funds; or, in some cases, shifted from the *uncapped* Title IV-E Foster Care program to the *capped* (a limited amount of funds are allotted to each state) Title IV-B Child Welfare Services program. It is not fiscally responsible to place the complete burden of the expense of foster care on the State when Federal matching funds are available. Similarly, it is not fiscally justifiable to shift the expense of caring for foster care children to Federal programs that are capped (and can fund other child welfare activities), when an open-ended source of Federal funds is available.

The Adoption Assistance Program is an *uncapped* entitlement which reimburses states for payments made to adoptive parents of eligible special needs children; administrative costs; training for staff and adoptive parents; and non-recurring expenses, such as court costs and attorney fees. Reimbursement for payments to adoptive parents has a Federal match equal to the state Medicaid matching rate, 77.08% in Mississippi in FY2005, which again was the highest of the 50 states; 50% for administrative costs; and 50% for training-related costs. Non-recurring expenses are reimbursed at a 50% Federal match up to $2,000 per placement.

Mississippi ranks 49th lowest in the nation in Federal funds received per child through the Title IV-E Adoption Assistance program  The children for whom MDHS fails to access available adoption subsidy money either do not receive any adoption assistance or the adoption subsidies are paid solely by the State. This failure to claim money that the Federal government makes accessible for promoting adoptions, unnecessarily hobbles the State's adoption efforts, potentially keeping children unnecessarily in foster care.

The Chafee Foster Care Independence Program provides funding to states for services and programs to prepare youth who are currently or formerly in foster care to live independently after exiting foster care. The Chafee Program is a *capped* entitlement. Mississippi was allotted a total of $970,291 in Chafee funds ($723,166 for Independent Living and $247,125 in Education and Training Vouchers) in FY 2005.

MDHS admits that it has not been able to draw down all of the Title IV-E Chafee Independent Living funds available because of the lack of State funds to serve as the 20% required State match. In the last three SFYs alone, MDHS has left $1,087,107 in Title IV-E Chafee funds unspent because of the lack of State funds for the match.

        2.      Title IV-B, Subpart 1 (Child Welfare Services) and Subpart 2 (Promoting Safe and Stable Families) provide grants to states to pay for services to prevent child abuse and neglect, reduce foster care placements, reunite families, arrange adoption, and ensure adequate foster care. This is a *capped* Federal funding source. Mississippi's allotment for Child Welfare Services was $3,769,621 in FY 2005 and its allotment for Promoting Safe and Stable Families was $6,333,688 in that same fiscal year. The State is required to provide a 25% non-Federal funding match to access these funds.

Mississippi has a history of not spending the allotted Title IV-B (Promoting Safe and Stable Families) funds. The U.S. Department of Health and Human Services found that Mississippi did not use $6.2 million or 30% of the $20.4 million of the Promoting Safe and Stable Families program grant funds available to the State for FYs 1994 through 1999 because State funds were not available for matching. In the last three years alone, Mississippi did not spend $7,765,168 allotted to it by the Federal government through the Title IV-B Promoting Safe and Stable Families program.

Such fiscal mismanagement is particularly disturbing given that MDHS itself estimates that in SFY 2005 the Family Preservation Program, which is funded with Title IV-B (Promoting Safe and Stable Families) funds, saved the State of Mississippi $33,348,720 in expenses that were avoided by keeping children in the parent's home. It is fiscally unjustifiable to leave millions of dollars unspent when the savings to the State are acknowledged by DFCS to be many times greater than the level of spending.

### C.    MDHS Has Failed to Effectively Manage the Funds It Has

1.    Spending: Each year around April or May (the SFY ends on June 30), DFCS tends to run out of General Fund dollars. While the Division of Budgets and Accounting must look for other sources of general funds to transfer to DFCS, many functions of the Division (e.g. filling vacant positions and up-grading social workers) are halted. And, without general fund dollars, the Division cannot maximize Federal funds.

2.    Board Rates: Mississippi spends more on foster care board payments then perhaps necessary because a relatively high percentage of the children in State custody are placed in group homes rather than in less-expensive foster homes. Board rates paid to group homes ($900 to $1,650 per month) are 2.5 to 5 times higher than board rates paid to foster care parents ($325 to $400 per month). Yet Mississippi has the next to the lowest percentage of children in non-relative foster care homes and the sixth highest percentage of its children in custody in group homes. Foster care placement is yet another area where Mississippi spends more and, in some cases, achieves a less than desirable result.

3.    Title IV-E Waiver Project: The State requested a Title IV-E waiver, seeking to use the waiver to increase the nature and extent of available services to children and their families in an effort to reduce harm to children, reduce foster care placements, and achieve greater permanency and safety for children. The project was approved by the Department of Health and Human Services on September 17, 1998. After significant delays, implementation began on April 1, 2001 and the demonstration was approved to run for 60 months. The project was suspended after 42 months, however, and ended on September 30, 2004 due to staffing and cost issues (i.e. the project was not cost-neutral). The suspension of the waiver demonstration cost the State Title IV-E funds and highlighted the lack of organizational capacity to manage the process demanded of this waiver demonstration. The fact that MDHS does not have the capacity to manage a waiver demonstration in eight counties is another example of MDHS's inability to responsibly manage its fiscal resources.

4.    The Long-term Impact of Abuse and Neglect: It is estimated that the total costs (direct costs and indirect costs) of abuse and neglect of children in Mississippi is $940 million per year. Given this tremendous overall expense of child abuse and neglect to the State, it is imperative that the State marshal all possible funds and efficiently and effectively spend

4

those funds to care for the victims of child abuse and neglect and to prevent further harm. As set forth above, the State is failing in this regard.

## II.    Reviewer Qualifications

Bill M. Brister is the Director of Graduate Admissions and Assistant Professor of Finance at the Else School of Management at Millsaps College in Jackson, Mississippi. Dr. Brister has been on the faculty of Millsaps College for 16 years and served as Director of the MBA program at Millsaps College from 1993-1997. Dr. Brister has published numerous academic articles and has taught courses in Financial Management, Financial Markets and Institutions, International Finance, Business Statistics, and Portfolio Management.

From 1995 to 2000, Dr. Brister served as Co-Director of the Center for Applied Research at Millsaps College. In this position he directed the evaluation of the welfare reform demonstration conducted by the Mississippi Department of Human Services. This statewide evaluation included the compilation of detailed findings regarding the implementation of reforms in the State's welfare system stemming from the passage of the Personal Responsibility and Work Opportunity Reconciliation Act.

Dr. Brister presented welfare reform evaluation findings routinely to the Executive Director of MDHS, key committees of the Mississippi Legislature, and to officials at the U.S. Department of Health and Human Services. Dr. Brister also presented welfare reform related papers at professional conferences including the Annual Conference of Welfare Evaluators sponsored by the Administration of Children and Families, annual meetings of the National Association for Welfare Research and Statistics, and the American Statistical Association.

Dr. Brister has testified as to financial and economic issues on numerous occasions both in Mississippi's State and Federal courts. Dr Brister's CV is attached hereto as Exhibit A.

## III.    DFCS Budget Process

The formal process to construct and gain approval of the budget for the Division of Family and Children's Services begins with a planning memo (Budget Planning Memo) from the Director of the Division of Budgets and Accounting to the various Division Directors of MDHS including the Director of DFCS.[7] The Budget Planning Memo is usually dated in May, June or July, approximately one year in advance of the state fiscal year for which the budget is being developed. The Budget Planning Memo instructs the Division Directors to produce a budget request for their division and informs the Division Directors of guidelines and any constraints to be followed in preparation of the budget request.[8]

The DFCS Director submits a DFCS Budget Request package in the form of a memo and attachments to the Director of Budgets, Cost Allocations, and Grants Management.[9] This DFCS Budget Request includes a budget request for the SFY beginning approximately one year in the future, and supporting materials such as a Budget Narrative, Performance Indicators, and tables that show the Division's staffing needs.

The DFCS Budget Request represents the Division's most significant opportunity to formally communicate to MDHS the level of resources needed by DFCS to successfully fulfill its mission.[10]

5

MDHS budget planning instructions effectively prevented DFCS from freely requesting additional funds for Salaries, even though DFCS was aware that additional funds for Salaries were necessary to adequately care for the abused and neglected children of Mississippi.[11]  The Budget Planning Memo for SFY 2005 (dated July 9, 2003) stated the following restriction: "Please remember that you may not change ... the FY 2005 Salaries and General Fund totals."[12] This constraint obviously prevented DFCS from requesting additional funds to pay salaries for much needed DFCS personnel.  In fact, the Salaries budget line on the worksheet provided in the SFY 2005 Budget Planning Memo has the Salaries budget line already filled-in at the SFY 2004 level.[13]

From documents produced, it appears that no formal constraints were placed on DFCS subsequent to the SFY 2005 Budget Request in regard to the level of salaries that could be requested.  As a result, DFCS requested increases in funds for total Salaries in both the SFY 2006 and SFY 2007 Budget Requests,[14] but not enough to meet acknowledged personnel needs. Even these relatively modest requests for additional funds for payment of Salaries were not fulfilled.  The actual level of spending on Salaries, Wages, and Fringe Benefits in SFY 2005 decreased by 6.9% from the previous year, and is at its lowest level since SFY 1999.[15]

## IV.     MDHS Budget Forecasting

In August of each year, MDHS submits a Budget Request to the Legislature.  The DFCS budget request is included with the budget requests of the other MDHS divisions in the overall MDHS Budget Request.  This MDHS Budget Request for DFCS contains a detailed budget breakdown that includes budget categories and sources of funds, a detailed Budget Narrative, and lists of contractors and suppliers of services.  The MDHS Budget Request also includes the *actual* budget for the SFY just completed, the *estimated* budget for the SFY just beginning, and the *requested* budget for the upcoming SFY.

As set forth in Table 1,[16] the estimates of funds (particularly Federal funds) to be received by DFCS in the coming year are extremely and unreasonably inaccurate forecasts of the actual funds subsequently received by DFCS.  Over the last four fiscal years, the estimates of Federal funds to be received by DFCS have consistently and grossly over-stated the level of funding that actually transpired.  This gross and consistent over-estimation of future funding misleadingly suggests that DFCS funding will significantly increase in the coming year from the past year, when, in fact, total funding of DFCS has generally declined over the last five fiscal years.  This practice poses the risk that budgetary decision-makers in the Legislature will assume that budgetary problems at DFCS will be alleviated by substantial increases in future Federal funding, thereby, reducing the need for them to act though budgetary increases or stricter oversight.

For example, as set forth in Table 1, MDHS estimated at the beginning of SFY 2005 that $54,961,939 in total Federal funds would be received and used by DFCS in SFY 2005.  Then after SFY 2005 was complete, MDHS reports that Federal funds actually received by DFCS totaled only $44,583,395, an over-estimate of $10,378,544, or 23% of the actual level of Federal funding in SFY 2005.  And this 23% over-estimate of Federal funding was a relatively small error compared to the forecasting errors of the previous three years.

6

For SFY 2004, MDHS estimated Federal funding for DFCS at $85,221,197. Then actual Federal funding turned out to be only $47,338,855 for SFY 2004. This is an over-estimation of $37,882,342, or an 80% forecasting error.

For SFY 2003, MDHS estimated Federal funding for DFCS at $97,806,195. Actual Federal funding turned out to be only $43,213,560 for SFY 2003. This is an over-estimation of $54,592,635, or a 126% forecasting error.

And in SFY 2002, MDHS over-estimated Federal funding by $29,147,008, a 59% forecasting error.

As set forth above, the forecasts of future Federal funding as given by MDHS are highly inaccurate. In fact, the level of Federal funds actually received each year by DFCS seldom deviates more than 5% from the level received the previous year. The forecasters at MDHS would be much more accurate in their estimations if they would simply estimate the next year's Federal funds to be the same as the previous year's level of Federal funding. This method is not very creative, complex, or scientific; but much more accurate than whatever method is currently used.

### V.    The Budget of the Division of Family and Children's Services

#### A.    Total Revenue to DFCS

As set forth in the attached Table 2, total revenue received by DFCS in SFY 2005 decreased by $5,296,192, or 7.6%, from the previous year.[17] Total revenue received by DFCS did not significantly change between SFY 2001 and SFY 2004. Even in the face of continuous and dire warnings regarding dangerously high caseloads and inadequate funds to fulfill the mission of DFCS during this time period,[18] the budget of DFCS has declined 9.24% since its peak in SFY 2002.

#### B.    Total Federal Funding for DFCS

As set forth in the attached Table 2, total Federal funds received by DFCS totaled $44,583,395 in SFY 2005. This is down $9,210,167 or 17% from the peak in Federal funding in SFY 2001.[19] The fiscally responsible course of action is to maximize the amount of Federal funds available to DFCS. Because of a low rate of Title IV-E eligibility determination, Mississippi does not maximize the uncapped funding available from the Title IV-E Foster Care program. Therefore, the expenditures for the care of most of the State's foster children are paid solely by State funds or by capped Federal funding programs. In some cases these capped sources of funds are overdrawn, as in the case of Title IV-B Child Welfare Services. DFCS must use 100% General Funds (State funds) to cover the overspending. This, in turn, reduces the ability of DFCS to match its other grants (i.e. Family preservation, Independent Living, Adoption Opportunities, etc.)[20], and therefore reduces the ability of DFCS to draw down the total Federal funds allotted to the state.

#### C.    Total State (General Fund) Appropriation

As set forth in attached Table 2, the State of Mississippi contributed $17,256,000 from its General Fund to the revenues of DFCS in SFY 2005. This represents a decrease of 17.4% from

7

the State funding peak of $20,882,136 in SFY 2003.[21]  In order to maximize the amount of Federal funds available to DFCS, State funds should serve, to the extent possible, as a match for the drawdown of Federal funds.  Mississippi, however, does not always draw down the Federal funds that are allocated to it because of the lack of State funds to serve as the match.  Also, MDHS must spend State funds without Federal match for the care of many children in custody because MDHS does a poor job of determining eligibility of children for federal matching funds.

Except for SFY 2005, each year around April or May (the SFY ends on June 30), DFCS tends to run out of General Fund dollars causing disruption in the everyday functions of the Division and preventing the maximization of Federal funds.[22]  Better planning and forecasting of the use of general funds dollars could prevent this disruption of services.[23]

### D.    The Percentage of State Funds Used as Match to Secure Federal Funds

Approximately 40% of the State funds appropriated to DFCS in SFY 2005 were not used to secure Federal matching funds.

The Federal funding programs and the approximated State match are set forth in the attached Table 3.  As shown, DFCS spent $17,256,000 of General Fund (State) money in SFY 2005. Approximately $10,282,115 of this amount was used for matching funds to secure $44,583,395 in Federal funds.[24]  The balance of the State funds, approximately $6,973,885, was spent by DFCS in SFY 2005 and not used to secure matching Federal monies.

The fact that Mississippi has the lowest Title IV-E eligibility rate in the country leads, in large part, to the fact that DFCS is forced to use a substantial percentage of its General Fund Allocation to support children in foster care without a Federal match.  More will be discussed about Mississippi's Title IV-E eligibility rate and its financial impact later in this report.

### E.    Federal/State Ratio

The great majority (over 95%) of the total funds that support the spending of DFCS come from either the Federal government or the State government.  As data in Table 2 establishes, the Federal government has funded 70.5% of the total spending by DFCS over the 1998-2005 time period, while the State government has funded 26.2%.  Local sources fund a relatively small amount (usually less than 3%) of total spending by DFCS.[25]

Over the entire 1998 through 2005 time period, the Federal government contributed $2.69 to the DFCS budget for every $1.00 contributed by the State of Mississippi.

The Federal/State funding ratio varies somewhat from year to year.  For example, the federal share of the funding of DFCS was as high as 78.85% in 2001 and as low as 63.20% in 2003.  The state funding share, of course, moves in the opposite direction and was at its lowest at 19.56% in 2001 and at it highest in 2003 at 30.54 percent.

In a fiscal environment where Federal funding is maximized and State funds are efficiently used as a match to secure Federal funds, a relatively high Federal/State ratio would be expected.

8

## VI.    Title IV-E

Mississippi received a total of $14,919,822 in Title IV-E funds in SFY 2002.[26] As set forth in Table 4, that equates to $20 per child in the State.[27] This is the lowest amount of Title IV-E funds per child of any of the 50 states and the District of Columbia. A combination of factors including low eligibility rates, spending in high state match categories, and not drawing down the full allotment of capped funds has resulting in the fact that Mississippi receives the lowest amount of Title IV-E funds per child in the nation. As discussed below, the low eligibility rate posted by Mississippi has persisted to date.

Another way to illustrate the fact that Mississippi receives a very low level of Title IV-E dollars from the Federal government is to understand that Mississippi's child population comprises 1.04% of the nation's child population. The Federal government in FY 2002 distributed a total of $5,553,276,701 in Title IV-E funds to the states. Mississippi's share of the total Title IV-E funds, if based on child population, would have been $57,955,532. Mississippi received only $14,919,822, or 0.27% of the total Title IV-E funds allocated to the states.

### A.    Title IV-E Foster Care

Mississippi received $10,531,505 in Title IV-E Foster Care funds from the Federal Government in SFY 2005[28]. As set forth in attached Table 5, this figure represents a decrease of $10,549,287, or 50%, from its peak in SFY 2001.

The Foster Care Program under Title IV-E is a permanent entitlement that provides open-ended matching payments to States for the costs of maintaining certain children in foster care, and associated administrative, child placement, and training costs. The percentage of foster care maintenance assistance payments that the Federal government will pay is set at the Federal Medical Assistance Percentage (FMAP). The FMAP was 77.08% for Mississippi in FY 2005,[29] the highest FMAP in the nation.[30] In addition to a 77.08% match for maintenance payments, the Federal government will pay 75% of training expenses and 50% of administrative and database expenses.[31]

#### 1.    Title IV-E Foster Care Eligibility

Several eligibility criteria apply to the foster children on whose behalf Federal reimbursement is available to States. States are required to provide foster care maintenance payments to AFDC eligible children removed from the home of a relative if the child received or would have received AFDC (1996 criteria) prior to removal from the home and if the following also apply: (1) the removal and foster care placement were based on a voluntary placement agreement signed by the child's parents or guardians or a judicial determination that remaining in the home would be contrary to the child's welfare; (2) reasonable efforts were made to eliminate the need for removal or to return the child home; and (3) care and placement of the child are the responsibility of the State.[32]

As set forth in attached Table 6, Mississippi, by far, has the lowest Title IV-E eligibility rate of the 47 states that reported data. In FFY 2002 only 23% of the children in foster care in Mississippi were eligible for Title IV-E reimbursement from the Federal government. Of the 3,261 children in the custody of the State, 23%, or 750 children[33], were determined to be eligible

9

for Title IV-E Foster Care reimbursement by the Federal government.    The average reimbursement rate for the 47 states reporting was 62.6% in 2002.[34]

MDHS's own reports to the Administration of Families and Children (ACF)[35] as summarized in the attached Table 7 show that in FFY 2002 a monthly average of 500 children out of 3,685 in State custody[36] received Title IV-E Foster Care reimbursement.    This is a 13.6% Title IV-E eligibility rate.  The Title IV-E eligibility rate was 18.0% in FFY 2003, 20.2% in FFY 2004, and 20.4% in FFY 2005.[37]

Title IV-E eligibility is based, in large part, on income level.  Since Mississippi, by most income measures, is the poorest state in the nation, it should have a relatively high Title IV-E eligibility rate.[38]  But it has one of the lowest in the nation.[39]  Some of the possible reasons for the low Title IV-E eligibility rate include chronic staff shortages, extremely high caseloads, and lack of administrative support.

            2.      The Financial Impact of the Low Title IV-E Foster Care
                        Eligibility Rate

The Title IV-E Foster Care program is an open-ended entitlement.  The result of the low Title IV-E Foster Care eligibility rate is that the cost of caring for the children in foster care who are not determined to be eligible for Title IV-E Foster Care reimbursement is paid solely by state and/or local funds.  Or, in some cases, the cost is shifted to the capped Federal programs such as the Title IV-B Child Welfare Services program.  To maximize Title IV-E Foster Care eligibility is the fiscally responsible course of action.[40]  It certainly is not fiscally justifiable to place the complete burden of the expense of foster care on the State when Federal matching funds are available.  And it not fiscally justifiable to shift the expense of caring for foster care children to Federal programs that are capped when an open-ended source of Federal funds is available.[41]

MDHS reported that there was an average of 3,372 children receiving care in the custody of MDHS in FY 2005.[42]  On average, 688 of these children were eligible for Title IV-E Foster Care reimbursement.[43]  As set forth in the attached Table 7, DHS reported that a total of $7,946,420 in Title IV-E Foster Care funds were reimbursed by the Federal government in FFY 2005 to offset expenses related to the care of these 688 foster care children.  That averages to $11,550 in Federal Title IV-E money per child.[44]

The expense for caring for the remaining 2,684 foster care children who are not determined to be Title IV-E eligible is shifted to the capped Title IV-B Child Welfare Services program.[45]  However, the Title IV-B Child Welfare Services funds are substantially and consistently overspent.  DFCS must use 100% State money to cover the overspending.[46]

The fiscal implications of maximizing the Title IV-E eligibility rate are significant. The following table illustrates the increase in Title IV-E Foster Care Federal funds that would come to the State at various Title IV-E Foster Care eligibility rates.

| IV-E Eligibility Rate | Total IV-E Federal Funds[47] | State Match[48] |
|---|---|---|
| 20.4% (Current MS Rate) | $7,946,420 | $2,362,895 |
| 40.6% (Double Current Rate) | $15,812,320 | $4,701,847 |
| 62.6% (National Average) | $24,380,572 | $7,249,646 |
| 80% (High Rate) | $31,157,280 | $9,264,723 |

A higher Title IV-E eligibility rate means that the State receives an expense reimbursement from the Federal government for a higher percentage of children who in State custody. As a result, the amount of uncapped Title IV-E Foster Care funds coming to the State increases, thereby reducing the reliance of the State on the use of the capped Title IV-B Child Welfare Services grant or unmatched State funds to care for foster care children.[49]

3.      Title IV-E Foster Care Expenditure Categories and Matching Rates

As stated above, the matching rates for Title IV-E Foster Care expenditures vary with the type of expenditure claimed. Foster care maintenance costs are reimbursed at the State's FMAP Rate (77.08% in FY 2005), administrative costs at 50%, and training costs at 75%. Mississippi consistently spends the great majority of its Title IV-E Foster Care money in expense categories that receive the lowest Federal match.[50] Mississippi has the fifth lowest percentage of spending in the Foster Care Maintenance Category of all the states in the nation. As can be surmised from attached Table 8, Mississippi could have saved $1,833,863 had it been possible to allocate Title IV-E expenditures into the various categories consistent with the national average.[51]

**B.      Title IV-E Adoption Assistance**

The Title IV-E Adoption Assistance Program is an open-ended entitlement program required of States that participate in TANF. The IV-E Adoption Assistance Program funds three distinct types of activities: assistance payments for qualified children who are adopted, administrative payments for expenses associated with placing children in adoption, and training of professional staff and parents involved in adoptions. Under the Adoption Assistance Program, which is permanently authorized, states develop adoption assistance agreements with parents who adopt eligible children with special needs. Federal matching funds are provided to States that, under these agreements, provide adoption assistance payments to parents who adopt AFDC or SSI eligible children with special needs. In addition, the program authorizes Federal matching funds for States that reimburse the nonrecurring adoption expenses of adoptive parents of special-needs children (regardless of AFDC or SSI eligibility).[52]

The percentage of adoption assistance payments that the Federal government will pay is set at the Federal Medical Assistance Percentage (FMAP). The FMAP was 77.08 % for Mississippi in FY 2005.[53] In addition to the FMAP match for adoption assistance payments, the Federal government will pay 50% of state and local administrative expenses and 75% of training expenses. Non-recurring expenses are reimbursed at a 50% federal match up to $2,000 per placement.

11

To maximize Title IV-E Adoption Assistance eligibility is the fiscally responsible course of action. However, as set forth in attached Table 6, Mississippi has the lowest Title IV-E Adoption Assistance eligibility rate in the nation.[54] The non-IV-E eligible children either do not receive adoption assistance or adoption subsidies are paid solely by the State.[55]

In FFY 2002, Mississippi received $3,575,228 in federal funds for the Title IV-E Adoption Assistance program.[56] This equates to $4.70 per child in the state. By comparison, the federal government distributed $1,341,737,302 to the states in FFY 2002 through the Title IV-E Adoption Assistance program. This equates to $18.40 per child in the nation. Mississippi ranks 49th lowest in the nation in federal funds received per child through the Title IV-E Adoption Assistance program.[57]

**C.    Title IV-E Foster Care Independence Program (Chafee Independence Program)**

The Chafee Foster Care Independence Program provides funding to states for services and programs to prepare youth who are currently or formerly in foster care to live independently after exiting foster care. The Independence program has two components – the Independence Program and the Education and Training Vouchers Program. The Chafee Independence Program is a capped state entitlement. Mississippi's allotment for the Chafee Independence Program in FFY 2003 totaled $953,267 ($730,819 for Independent Living and $222,448 in Education and Training Vouchers). In FFY 2004, Mississippi's allotment for the Chafee Independence Program totaled $1,005,560 ($758,148 for Independent Living and $247,412 in Education and Training Vouchers). And in FFY 2005, Mississippi was allotted a total of $970,291 in Chafee funds ($723,166 for Independent Living and $247,125 in Education and Training Vouchers).[58]

Mississippi has a history of not spending the Chafee Independent Living funds allotted to it. In the last three fiscal years (2003-2005) alone, Mississippi has failed to draw down a total of $1,087,107, or 37% of the funds allotted to the State.[59] The Chafee Independent Living grant requires a 20% State match. For $271,777 in State money spread over three years, the State could have drawn down an additional $1,087,107 in Federal money to care for and educate the abused and neglected adolescents of Mississippi.[60]

**D.    Title IV-E Foster Care Waiver Demonstration**

The State requested a Title IV-E waiver, seeking to use the waiver to increase the nature and extent of available services to children and their families in an effort to reduce harm to children, reduce foster care placements, and achieve greater permanency and safety for children.[61] The project was approved by the Department of Health and Human Services on September 17, 1998. After significant delays, implementation began on April 1, 2001 and the demonstration was approved to run for 60 months. The project was suspended after 42 months, however, and ended on September 30, 2004. The suspension of the waiver demonstration cost the State Title IV-E funds and highlighted the way in which chronic staffing shortage impacts the ability of DFCS to access all available federal funds.[62]

12

**VII.    Title IV-B, Subpart 1, Child Welfare Services**

Title IV-B, Subpart 1, Child Welfare Services (CWS) provides grants to states to pay for services to prevent child abuse and neglect, reduce foster care placements, reunite families, arrange adoption, and ensure adequate foster care services. The Division of Family and Children's Services has historically overspent the capped Title IV-B CWS grant. In the last three years (2003-2005) alone, DFCS has overspent its allotment of Title IV-B CWS funds by a total of $6,754,211.[63]

The Division must use 100% General Funds to cover the overspending. This reduces MDHS's ability to match its other grants (i.e. Family Preservation, Independent Living, Adoption Opportunities, etc.)[64] The low eligibility rate in Title IV-E programs, which are uncapped funding sources, forces expenditures to care for foster care children into this capped Title IV-B program.[65]

**VIII.    Title IV-B, Subpart 2, Promoting Safe and Stable Families**

Title IV-B, Subpart 2 Promoting Safe and Stable Families (PSSF) is a capped entitlement program that provides grants to states for services to: support families;  avert foster care placement; reunify foster children with their families; and, promote adoption.

Mississippi has a history of not spending the allotted Title IV-B Promoting Safe and Stable Families funds. On April 22, 2002, the U.S. Department of Health and Human Services (DHHS) reported that "Mississippi did not use $6.2 million or 30% of the $20.4 million of the Promoting Safe and Stable Families program grant funds available for FYs 1994 through 1999 because State funds were not available for matching. State officials said they were unable to expend all of the Federal funds during those FYs because of the lack of general funds dollars being appropriated by the legislature to use as matching funds. ... We believe that two States, Florida and Louisiana, have resolved their problems and should be able to use all of their grant funds in future grant periods. The problems identified in two other States, Mississippi and Arkansas, are expected to continue and can result in unspent grant funds being reported on their financial status reports."[66]

As anticipated by HHS, Mississippi continued to not spend the allotted Title IV-B PSSF funds. In the last three years (2003-2005) alone, Mississippi has left $7,765,168 in Title IV-B PSSF funds unspent.[67] To obtain these funds, the State is required to provide a 25% match. In other words, Mississippi could have claimed $7,765,168 in Federal funds with a State match of $2,588,389 spread over three years.

This would have been money well spent. By MDHS's own calculations, the Family Preservation Program, which is funded by Title IV-B PSSF funds, saved the State $33,348,720 in SFY 2005 alone.[68] But rather than expanding a program that is dramatically successful, DFCS was forced to reduce the size of the program. The reason given was:

13

> Due to the State budget situation and the lack of funds to fill positions, some Family Preservation positions were abolished or put in use for other social service needs such as social work functions. This has reduced the ranks of the Family Preservation Program from its status of a year ago.[69]

It is fiscally unjustifiable to leave millions of Federal dollars unspent and to abolish Family Preservation positions when the cost savings to the State from the program that the spending would have supported are so dramatic.

And to add insult to injury, MDHS appears to have abolished 39 Family Preservation positions in 2002 that would have been funded with 100% Federal TANF funds.[70]

## IX.    Social Services Block Grant

The Social Services Block Grant (SSBG) is a capped entitlement program with no required state match. States are given wide discretion to determine the services funded by SSBG and the population eligible to receive those services. States use SSBG funds for various child welfare related activities, including preventive, protective, and adoption services, and services for children in foster care. SSBG funds may also be used for room and board in cases of temporary emergency shelter provided in protective service cases. States can also transfer up to 10% of their TANF grant to SSBG, which may in turn be used to support a broad range of child welfare activities.[71]

As set forth in attached Table 5, the Social Services Block Grant (SSBG) funding has been a very volatile revenue component in the DFCS budget over the SFY 1998 though 2005 time period. SSBG funding in the DFCS budget has been as high as $15,127,626 in SFY 1998 and as low as $36,806 in SFY 2003[72]. In SFY 2005 the SSBG amount allocated to DFCS was $3,450,360 and was $3,467,503 in SFY 2004.[73]

## X.    Temporary Assistance for Needy Families (TANF)

TANF is a capped block grant program with no required state match, although states must spend their own funds to receive the grant.[74] Within certain guidelines, states may fund various child welfare activities using TANF funds, including family reunification, parenting education, and in-home, as well as crisis intervention services. States can also use TANF funds to support children whom DFCS has removed from their parents' homes and placed with relative or kinship caregivers. States can also transfer up to 10 percent of their TANF grant to SSBG, which may in turn be used to support a broad range of child welfare activities.[75]

TANF funds entered the funding stream for the DFCS budget beginning in the year 2000. Since that time, TANF has become the single largest source of federal funding for DFCS. As set forth in attached Table 5, TANF funding has averaged $19,367,915 per year in the 2001 through 2004 time period.[76]

14

## XI.    DFCS Budget Categories and Trends

DFCS spending falls in the following six categories.

### A.    Salaries, Wages, and Fringe

As can be construed from the attached Table 9, the single largest budget category of spending over the eight-year period that spans 1998 through 2005 is Salaries, Wages, and Fringe Benefits. For that period, the Salary, Wages, and Fringe Benefits category of spending comprised 36.4% of the total spending of DFCS.[77]

A consistent theme in Budget Narratives produced by DFCS is that DFCS suffers from chronic staffing shortages.[78] In spite of warning that DFCS caseworkers were carrying dangerously high caseloads, and that the State was losing available child welfare money because of staffing shortages, the level of spending on Salaries dropped by $1,709,539, or 6.9%, from SFY 2004 to SFY 2005. In fact, actual spending on Salaries in SFY 2005 are at their lowest level since SFY 1999.

### B.    Subsidies, Loans, and Grants

For the 1998-2005 period, the category of Subsidies, Loans, and Grants was the second largest category of spending by DFCS, just slightly less than Salaries. This category comprised 35.7% of total DFCS spending over the eight year period. During the most recent five years (2001-2005), the level of Subsidies, Loans, and Grants has been somewhat stable with an average annual level of $24,561,838.

In 2005, the two largest single sub-categories of Subsidies, Loans, and Grants were MDHS Grants to Non-Governmental Institutions ($11,447,164) and Foster Care ($12,279,848). The Foster Care sub-category includes board payments made to foster care parents which totaled approximately $6,000,000 in 2005.[79]

### C.    Contractual Services

Contractual Services is a relatively large category of spending comprising 22.5% of the DFCS budget in the eight years given (1998-2005). Spending in the Contractual Services category has declined by $5,823,116, or 30.3%, since its peak in SFY 2002. Major objects of expenditure within this category include Utilities, Rent, Professional Fees, and Data Processing. Spending on Personnel Services Contracts has comprised over half of the spending in the Contractual Services category since 2001. Prior to 2001, spending on Personnel Services Contracts was relatively small compared to the level of spending in 2001 and thereafter.

### D.    Travel

Travel had been a relatively stable category of spending averaging $2,288,573 per year over the four year period from 2001-2004. However, Travel expenditures decreased by 15.5% in SFY 2005. Over the 1998-2005 periods, Travel comprised 3.2% of the total expenditures by DFCS.

15

### E.    Equipment

Purchase of Equipment is also a relative small, but volatile, category of spending in the DFCS budget. Over the seven year period from 1998 through 2004, purchases of equipment averaged $1,168,699 per year. But in SFY 2005 Equipment purchases decreased to $76,658. Equipment purchases average less than 2% of the total DFCS budget.

### F.    Commodities

Purchase of commodities represents a very small category of spending by DFCS. In every year since 1998, spending on commodities has been less than 1% of the total DFCS budget.

## XII.    Board Rates Compared to Cost of Raising a Child

Mississippi board rates cover only a fraction of the total cost of raising a child.[80] In fact, the Mississippi board payment to foster care parents in rural areas covers approximately 50% of the total cost of raising a child (excluding medical care) for a family with total income between $41,400 and $69,700 in 2004.

MDHS reports that foster care board rates in Mississippi per month are as follows:[81]

| Age/Status | Board | Clothing | Personal Allowance | Total Payment |
|---|---|---|---|---|
| 0-3 | $280 | $45 | $0 | $325 |
| 4-5 | $285 | $50 | $0 | $335 |
| 6-9 | $285 | $50 | $20 | $355 |
| 10-12 | $290 | $60 | $25 | $375 |
| 13-15 | $300 | $60 | $30 | $390 |
| 16-21 | $300 | $65 | $35 | $400 |
| Special Needs I | | | | $440 |
| Special Needs II | | | | $500 |
| Therapeutic Foster Home | | | $700 | |
| Medical/Treatment | | | | $700 |
| Emergency Foster Home | | | $700 | |
| Foster Teen Parent | | | | $725 |
| Emergency Group Shelter | | | $900 | |
| Therapeutic Group Home | | | $900 | |
| Contractual Rates | | | | |
| Emergency Group Shelter | | | $1,650 | |
| Therapeutic Foster Home | | | $2,160 | |
| Therapeutic Group Home | | | $2,160 | |

16

These rates went into effect on July 1, 1999.

The following table compares the annual cost of raising a child (excluding medical care) as reported by the DOA for families with income below $41,300 in the Urban South in 2004 to the annual board rate received by foster care providers in Mississippi for various age children. Approximately 60% of the cost of raising a child is covered by foster care maintenance payments to foster care parents in this category.

| Age | Annual Board Rate | Annual DOA Estimate of Cost of Raising a Child | Board Rate as % of Cost |
|-----|-------------------|-----------------------------------------------|-------------------------|
| 2   | $3,900            | $6,460                                        | 60.4%                   |
| 5   | $4,020            | $6,690                                        | 60.1%                   |
| 8   | $4,260            | $6,640                                        | 64.2%                   |
| 11  | $4,500            | $6,620                                        | 68.0%                   |
| 14  | $4,680            | $7,410                                        | 63.2%                   |
| 17  | $4,800            | $7,390                                        | 65.0%                   |

The following table compares the annual cost of raising a child (excluding medical care) as reported by the DOA for families with income between $41,300 and $69,500 in the Urban South in 2004 to the annual board rate received by foster care providers in Mississippi for various age children. Approximately 45% of the cost of raising a child is covered by foster care maintenance payments to foster care parents in this category.

| Age | Annual Board Rate | Annual DOA Estimate of Cost of Raising a Child | Board Rate as % of Cost |
|-----|-------------------|-----------------------------------------------|-------------------------|
| 2   | $3,900            | $9,120                                        | 42.8%                   |
| 5   | $4,020            | $9,470                                        | 42.4%                   |
| 8   | $4,260            | $9,280                                        | 45.9%                   |
| 11  | $4,500            | $9,160                                        | 49.1%                   |
| 14  | $4,680            | $9,820                                        | 47.7%                   |
| 17  | $4,800            | 10,140                                        | 47.3%                   |

17

The following table compares the annual cost of raising a child (excluding medical care) as reported by the DOA for families with income below $41,400 in the Rural Areas in 2004 to the annual board rate received by foster care providers in Mississippi for various age children. Approximately 70% of the cost of raising a child is covered by foster care maintenance payments to foster care parents in this category.

| Age | Annual Board Rate | Annual DOA Estimate of Cost of Raising a Child | Board Rate as % of Cost |
|-----|-------------------|------------------------------------------------|-------------------------|
| 2   | $3,900            | $5,720                                          | 68.2%                   |
| 5   | $4,020            | $5,940                                          | 67.7%                   |
| 8   | $4,260            | $5,930                                          | 71.8%                   |
| 11  | $4,500            | $5,930                                          | 75.9%                   |
| 14  | $4,680            | $6,710                                          | 69.7%                   |
| 17  | $4,800            | $6,670                                          | 72.0%                   |

The following table compares the annual cost of raising a child (excluding medical care) as reported by the DOA for families with income between $41,400 and $69,700 in the Rural areas in 2004 to the annual board rate received by foster care providers in Mississippi for various age children. Approximately 50% of the cost of raising a child is covered by foster care maintenance payments to foster care parents in this category.

| Age | Annual Board Rate | Annual DOA Estimate of Cost of Raising a Child | Board Rate as % of Cost |
|-----|-------------------|------------------------------------------------|-------------------------|
| 2   | $3,900            | $8,310                                          | 46.9%                   |
| 5   | $4,020            | $8,640                                          | 46.5%                   |
| 8   | $4,260            | $8,490                                          | 50.2%                   |
| 11  | $4,500            | $8,400                                          | 53.6%                   |
| 14  | $4,680            | $9,060                                          | 51.7%                   |
| 17  | $4,800            | $9,350                                          | 51.3%                   |

Mississippi board rates cover only a fraction of the total cost of raising a child. While most individuals decide to become foster parents for reasons other than financial, the financial considerations do play a role. If board payments were higher and paid a higher percentage of the total cost of caring for a child, the supply of foster homes would increase, and more foster parents would be willing and able to foster more than one child.

18

### XIII.  Placement Settings and Comparative Board Rates of Children in MDHS Care

As set forth in attached Table 10, Mississippi had placed 34% of the children in its custody in a licensed non-relative foster care home as of September 30, 2001.[82]  Of the 50 states and DC, Mississippi places the next to the lowest percentage of children in Non-Relative Foster Homes. The average for the States and DC is 52.7% of the children in State custody placed in Non-Relative Foster Homes.  The average board payment for a child in custody in Mississippi is approximately $375 per month or $4,500 per year, for a child in a licensed foster home.

Mississippi also places a high percentage of children in its custody in Group Home situations. Mississippi places 18% of the children in custody in Group Homes compared to the national average of 8.8 percent.

Group care are a much more expensive method to house the children in the custody of the State. Yet Mississippi has the next to the lowest percentage of children in non-relative foster care homes and the sixth highest percentage of its children in custody in Group Homes.  Foster care placement is yet another area where Mississippi spends more and, in some cases achieves a less than desirable result.

### XIV.  The Long-Term Economic Impact of Child Abuse and Neglect

Cost-of-injury analysis (also referred to as cost-of-illness or cost-of-failure analysis) attempts to estimate the economic impact of child abuse and neglect on society (or on a local community).[83] In other words, how much does it cost when a community fails to prevent child abuse and neglect?

These analyses frequently estimate both direct and indirect costs associated with child maltreatment.

Direct costs include those associated with addressing the immediate needs of maltreated children. They might include:
- Hospitalization for severe injuries resulting from abuse and neglect
- Medical treatment (such as physician visits, emergency department visits, outpatient clinics, dental visits, physical therapy, etc.) for health problems resulting from abuse and neglect
- Mental health treatment for issues resulting from abuse and neglect
- Child welfare services to intervene in existing cases of child abuse and neglect
- Law enforcement and judicial system costs associated with intervention.

Indirect costs include those associated with the long-term and secondary effects of maltreatment, as well as productivity losses for the abused child (missing school) or parent/caretaker (needing to attend criminal hearings or stay home with an injured child). Examples of indirect costs include:
- Special education costs

19

- • Treatment for chronic physical and mental health problems as a result of child abuse and neglect
- • Costs of increased juvenile delinquency and adult criminality
- • Lost productivity to society (due to decreased earning potential, unemployment, or premature death)
- • Costs associated with treatment of increased substance abuse
- • Costs associated with interventions for domestic violence resulting from child maltreatment.

In 2001, Prevent Child Abuse America released report that estimated the annual costs in the Unites States of both the direct and the indirect results of child abuse and neglect.[84]  The following table includes these estimates of the overall costs associated with child abuse and neglect.

| Direct Costs | Estimated Annual Cost |
|---|---|
| Hospitalization | $6,205,395,000 |
| Chronic Health Problems | $2,987,957,400 |
| Mental Health Care System | $425,110,400 |
| Child Welfare System | $14,400,000,000 |
| Law Enforcement | $24,709,800 |
| Judicial System | $341,174,702 |
| Total Direct Costs | $24,384,347,302 |

| Indirect Costs | Estimated Annual Cost |
|---|---|
| Special Education | $223,607,830 |
| Mental Health and Health Care | $4,627,636,025 |
| Juvenile Delinquency | $8,805,291,372 |
| Lost Productivity to Society | $656,000,000 |
| Adult Criminality | $55,380,000,000 |
| Total Indirect Costs | $69,692,535,227 |
| Total Costs | $94,076,882,529 |

Mississippi's population comprises about 1% of the national population.   Assuming that Mississippi's share of the annual national cost of child abuse and neglect is 1%, the total annual cost of child abuse and neglect in Mississippi is approximately $940,768,825.

Given this tremendous overall expense of child abuse and neglect to the State, it is imperative that the State marshal all possible funds and efficiently and effectively spend those funds to care for the victims of child abuse and neglect and to prevent further abuse and neglect to the children of Mississippi.

20

## XV.    Conclusion

Fiscal mismanagement and improper budgeting practices by MDHS has resulted in a severely underfunded foster care system. The MDHS budget process is deeply flawed. Despite years of reports that high social worker caseloads were placing children at risk, MDHS has failed to request that the Division be funded at a level necessary to hire the caseworkers it acknowledges it needs. The requests that MDHS does make are based on gross overestimations of future federal funding.

Under the federal Title IV-E program, the federal government is willing to shoulder most of the costs of providing foster care services, including 77% of the maintenance of Title IV-E eligible children (which is the highest match rate in the country). Because MDHS has not properly established Title IV-E eligibility, the State receives the lowest amount of Title IV-E funds per child in the nation. In other words, Mississippi has the most financially to gain from properly claiming Title IV-E funds, but is the state least likely to do so.

MDHS pays for foster care costs that could be covered by Title IV-E funds with both state funds and Title IV-B funds. It is fiscally unjustifiable to use state funds that could be spent to hire the much-needed additional caseworkers which MDHS has acknowledged are necessary to adequately staff the child welfare system when federal monies are available. It is equally fiscally unsound to pay for foster care services that could be covered by unlimited Title IV-E reimbursements with capped Title IV-B funds.

Mississippi has also left millions of more dollars in allocated federal funds unspent by not providing state funds necessary to meet the federal matching requirement. Millions of dollars that could have been spent on providing services to keep children safely with their families, or to move children from foster care to adoptive homes have been not been claimed by MDHS. If MDHS were to maximize its Title IV-B funding, state funds could be freed up to claim these additional available federal dollars. There is no fiscal justification for the MDHS practice of not claiming and spending federal money for services that would effectively lower state costs by helping to reduce the number of children in foster care custody.

Furthermore, MDHS has not effectively managed the funds it has available to it. By placing such a large percentage of its foster children in group care, rather than less expensive foster homes, and by reducing funding for programs intended to keep children out of the foster care system entirely, MDHS wastes money that could be applied to claim further federal dollars.

Over the last year, MDHS has forfeited millions of dollars in federal funds, and has misallocated the scarce money that it has. In a child welfare system plagued by the effects of severe underfunding, this fiscal mismanagement is inexcusable.

Dated: February 7, 2006
       Jackson, Mississippi

Bill M. Brister, Ph.D

21

# ENDNOTES

---

[1] It is my understanding that discovery in this matter is not complete. I reserve the right to amend this report and/or its attachments upon the receipt of additional information.

[2] DHS 047498-499; DHS 030742-46.

[3] Calculations based on 3,372 children in State custody and an $11,550 per child Title IV-E Federal Payment for FFY 2005.

[4] Based on the FY 2005 FMAP rate of 77.08 percent.

[5] FY 2005 at DHS 030657-692, FY 2006 at DHS 030693-747, FY 2007 at DHS 053703-732.

[6] The State Fiscal Year (SFY) ends on June 30 of each year. The Federal Fiscal Year (FFY) ends on September 30 of each year.

[7] SFY 2004 at DHS 053621-647, SFY 2005 at DHS 053648-671, SFY 2006 at DHS 053672-677, SFY 2007 at DHS 053678-681.

[8] Deposition of Teressa Jackson (Jackson DEP) at 15:6-15:17.

[9] FY 2005 at DHS 030657-692, FY 2006 at DHS 030693-747, FY 2007 at DHS 053703-732.

[10] DHS 068342 (Sue Perry, then Director of DFCS, in a memo to Senior Management Staff asks them to submit personnel needs in order to comply with caseload standards of CWLA. She then states, "I do not know what we will be permitted to request in the end, but let's be sure our true needs are known going in.")

[11] Expert Report of Dr. Cathy R. Crabtree dated February 7, 2006 (Crabtree Report), discussion at II.A.

[12] Similarly, in the Budget Planning Memo dated June 18, 2001, Sandra Maddox, Director of the Division of Budgets and Accounting gives the following parameter, "...in developing your FY 2003 budget request, Mrs. Brooks [Executive Director of MDHS] has stated that we will not be requesting an increase for FY 2003." DHS 062872.

[13] DHS 053648-671 (When DFCS submitted its SFY 2005 budget request to MDHS, the Salaries budget line is unchanged from the SFY 2004 level, as instructed by MDHS. But in the Budget Narrative, DFCS provides substantial data and makes numerous statements that show that additional personnel are exactly what DFCS desperately needs to adequately care for the abused and neglected children of Mississippi. In the SFY 2005 DFCS Budget Request there is an obvious disconnect between the budget request numbers provided on the budget forms and the description of the resources needed.).

At her deposition, Teresa Jackson, Director of Administration for DFCS, testified that Peter Boulette, Budget Director at MDHS, established the parameter for the SFY 2005 DFCS Budget Request that DFCS may not ask to reinstate abolished PINS. Jackson DEP at 22:18 -22:22.

[14] SFY 2006 at DHS 053138-207, SFY 2007 at DHS 059090-128.

[15] SFY 2007 at DHS 059090-059128, SFY 2006 at DHS 031539-031606, SFY 2005 at DHS 031467-031538, SFY 2004 at DHS 031395-031466, SFY 2003 at DHS 031315-031394, SFY 2002 at DHS 031245-031314, SFY 2001 at DHS 031177-031244, SFY 2000 at DHS 031111-031176.

Data given in attached Table 9.

[16]SFY 2007 at DHS 059090-059128, SFY 2006 at DHS 031539-031606, SFY 2005 at DHS 031467-031538, SFY 2004 at DHS 031395-031466, SFY 2003 at DHS 031315-031394, SFY 2002 at DHS 031245-031314, SFY 2001 at DHS 031177-031244, SFY 2000 at DHS 031111-031176.

[17] SFY 2007 at DHS 059090-059128, SFY 2006 at DHS 031539-031606, SFY 2005 at DHS 031467-031538, SFY 2004 at DHS 031395-031466, SFY 2003 at DHS 031315-031394, SFY 2002 at DHS 031245-031314, SFY 2001 at DHS 031177-031244, SFY 2000 at DHS 031111-031176.

[18] Crabtree Report, Discussion at II.A.

[19] SFY 2007 at DHS 059090-059128, SFY 2006 at DHS 031539-031606, SFY 2005 at DHS 031467-031538, SFY 2004 at DHS 031395-031466, SFY 2003 at DHS 031315-031394, SFY 2002 at DHS 031245-031314, SFY 2001 at DHS 031177-031244, SFY 2000 at DHS 031111-031176.

[20] FY 2003 Budget Presentation by Janice Broome Brooks, Executive Director of MDHS, DHS 058611.

[21] SFY 2007 at DHS 059090-059128, SFY 2006 at DHS 031539-031606, SFY 2005 at DHS 031467-031538, SFY 2004 at DHS 031395-031466, SFY 2003 at DHS 031315-031394, SFY 2002 at DHS 031245-031314, SFY 2001 at DHS 031177-031244, SFY 2000 at DHS 031111-031176.

[22] SFY 2000 at DHS 030769-80, SFY 2001 at DHS 030781-802, SFY 2002 at DHS 030803-14, SFY 2003 at DHS 030815-26, and SFY 2004 at DHS 030827-37.

[23] DHS 062095 (Memo dated April 25, 2000, from Sue Perry, Director of DFCS, to Mary Ross, Deputy Director of Programs, informing her that, "Each year around this time, DFCS runs out of general fund dollars. My concern is that so many functions are stopped while other funds are being identified. It would seem to me that if we know each year this is going to happen shouldn't we have a plan in place ahead of time, so that disruption of our everyday functions can be avoided?").

[24] The State required match in Table 3 attached to this report was estimated by calculating the required State match to draw down the amount of federal dollars received from each Federal funding program as given in the FY 2007 MDHS Budget Requests at DHS 059090-059128.

[25] SFY 2007 at DHS 059090-059128, SFY 2006 at DHS 031539-031606, SFY 2005 at DHS 031467-031538, SFY 2004 at DHS 031395-031466, SFY 2003 at DHS 031315-031394, SFY 2002 at DHS 031245-031314, SFY 2001 at DHS 031177-031244, SFY 2000 at DHS 031111-031176.

[26] Urban Institute, The Cost of Protecting Vulnerable Children IV, 2004, page 17.

[27] The total resident population under age 18 in Mississippi as of July 1, 2002 was 760,747 according the U.S. Census Bureau.

[28] DHS 059094.

[29] Department of Medicaid 2004 Annual Report at http://www.mississippi.gov/frameset.jsp?URL=http%3A%2F%2Fwww.dom.state.ms.us%2F

[30] Reported by the U.S. Department of Health and Human services at http://aspe.hhs.gov/health/fmap05.htm

[31] DHS 066738-066769.

[32] House Ways and Means Committee Prints: 108-6, 2004 Green Book, Section 11, page 8.