IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

OLIVIA Y., *et al.*                                                                PLAINTIFFS

v.                                               CIVIL ACTION NUMBER 3:04CV251

HALEY BARBOUR,
as Governor of the State of Mississippi, *et al.*                    DEFENDANTS

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON LIABILITY

W. Wayne Drinkwater, Jr. (MBN 6193)
Melody McAnally (MBN 101236)
BRADLEY ARANT ROSE & WHITE LLP
188 East Capital Street, Suite 450
Jackson, MS 39201
Telephone: (601) 948-8000

Stephen H. Leech (MBN 1173)
850 East River Place, Suite 300
Jackson, MS 39202
Telephone: (601) 355-4013

Marcia Robinson Lowry (MBN 43991 *pro hac vice*)
Eric E. Thompson (MBN 43993 *pro hac vice*)
Susan Lambiase (MBN 43992)
Shirim Nothenberg (MBN 43990 *pro hac vice*)
Tara S. Crean (MBN 44447 *pro hac vice*)
Children's Rights
330 Seventh Avenue, 4th Floor
New York, NY 10001
Telephone: (212) 683-2210

John Lang (MBN 43987 *pro hac vice*)
Christian Carbone (MBN 43986 *pro hac vice*)
John Piskora (MBN 44474 *pro hac vice*)
LOEB & LOEB LLP
345 Park Avenue
New York, NY 10154
Telephone: (212) 407-4000

4/83411.1

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ ii

TABLE OF AUTHORITIES ........................................................................................ iv

I. INTRODUCTION ................................................................................................... 1

II. ARGUMENT .......................................................................................................... 3

    A. Summary Judgment Should Be Granted Where The Material Facts
       Establishing The Violation of Plaintiffs' Substantive Due Process
       Rights Are Uncontested. ......................................................................................... 3

    B. Defendants Have A Constitutional Duty To Protect Plaintiff Class
       Members From Harm And Provide Them With Adequate Care
       And Treatment Consistent With Reasonable Professional Judgment
       Or Without Deliberate Indifference To Known Substantial Risks. ..................... 4

    C. The Governing Professional Standards Are Conceded By Defendants. .............. 6

    D. It Is Undisputed That Plaintiff Children Are Being Harmed
       In Their Placements. ............................................................................................. 7

         1.   Foster Children Are Being Abused And Neglected. .................................... 7

         2.   Foster Children Are Being Routinely Shuffled Through
             Inappropriate Homes And Institutions. ...................................................... 9

         3.   Children Are Being Deprived Of Medical, Dental and Mental
             Health Care And Treatment. .................................................................... 13

    E. It Is Undisputed That The Harms Plaintiff Class Members Are Being
       Subjected To Result From Defendants' Failure To Maintain Adequate
       Staffing, Training and Supervision, And Resources, Consistent With
       Reasonable Professional Judgment, And In Deliberate Indifference
       To Plaintiffs' Constitutional Rights ...................................................................17

         1.   It Is Uncontested That Defendants Are Knowingly
             Maintaining A Chronically Understaffed Child Welfare Agency
             With Caseloads That Put Children "BEYOND DANGER!" ................... 17

         2.   It Is Uncontested That Defendants Have Knowingly Failed
             To Provide DFCS Staff With Adequate Training And The
             Supervision Necessary To Ensure That Foster Children
             Are Kept Free From Harm. ...................................................................... 23

a. Training ........................................................................ 23

b. Supervision ................................................................. 27

3. It Is Uncontested That Defendants Knowingly Fail To Provide DFCS Staff With The Resources Necessary To Fulfill Their Obligations To Foster Children. ................................................... 28

    a.    Defendants Have Failed To Develop A Sufficient Number And Range Of Foster Placements To Meet The Needs Of Foster Children ....................................................... 28

    b.    Defendants Have Failed To Make Available Adequate Health Services To Meet The Needs Of Foster Children............. 31

    c.    Defendants Have Failed To Maintain An Adequate Computer Information System Necessary To Ensure The Well-being Of Foster Children. ............................................... 32

    d.    Defendants Have Failed To Provide Essential Administrative Support To Staff .................................................... 35

    e.    Defendants' Unprofessional Fiscal Practices Deprive Foster Children Of Resources Necessary For Their Protection .... 36

        i.    Defendants Fail To Request The Funding They Know is Necessary to Protect and Care For The Plaintiff Children. .............................................. 36

        ii.    Defendants Have Knowingly Failed to Take Advantage of Available Federal Funding. ....................... 37

III. CONCLUSION ........................................................................ 39

# TABLE OF AUTHORITIES

**Cases:**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) .......................................... 3

*B.H. v. Johnson,* 715 F. Supp. 1387, 1396 (N.D. Ill. 1989) ................................................. 5

*Brian A. v. Sundquist,* 149 F. Supp. 2d 941, 953 (M.D. Tenn. 2000) ................................. 5

*Brown v. Board of Education*, 347 U.S. 483, 494 (1954) ...................................................... 3

*Charlie and Nadine H. v. Whitman*, 83 F. Supp. 2d 476, 507 (D.N.J. 2000) .................... 5

*Cranford v. Lefeve*, No. 1:04CV 555, 2006 WL 839517 (S.D. Miss. Mar. 30, 2006) ........ 4

*Danielle v. Adriazola*, 284 F. Supp. 2d 1368, 1378 (S.D. Fla. 2003) ................................ 5

*Danielle v. Johnson*, 284 F. Supp. 2d 1368, 1373-73 (S.D. Fla. 2003) ............................. 5

*DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 198 (1989) ....... 4

*Eric L. v. Bird*, 848 F. Supp. 303, 307 (D.N.H. 1994) ........................................................ 5

*Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994) .......................................................... 4

*Hernandez v. Texas Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 880
(5th Cir. 2004) ................................................................................................................. 4, 5, 6

*K.H. v. Morgan*, 914 F.2d 846, 851 (7th Cir. 1990) ........................................................... 5

*Kenny A. v. Perdue*, 218 F.R.D. 277, 296 (N.D. Ga. 2003) ................................................ 5

*Kline v. North Texas State University*, 782 F.2d 1229, 1235 (5th Cir. 1986) ..................... 5

*Krim v. BancTexas Group, Inc.,* 989 F.2d 1435, 1449 (5th Cir.1993) ................................ 4

*LaShawn A. v. Dixon*, 762 F. Supp. 959, 993, 996 (D.D.C. 1991) ........................... 5, 6, 35

*Marisol A. v. Giuliani*, 929 F. Supp. 662, 675-77 (S.D.N.Y. 1996) ................................... 5

*Monsanto Co. v. Scruggs*, 342 F. Supp. 2d 568, 572-73 (N.D. Miss. 2004)...................... 4

*Nicholson v. Scoppetta,* 344 F.3d 154, 166 (2d Cir. 2003) ................................................. 5

*Norfleet v. Arkansas Dep't of Human Servs.,* 989 F.2d 289, 293 (8th Cir. 1993) ............. 5

*Olivia Y. ex rel. Johnson v. Barbour*, 351 F. Supp. 2d 543, 555-556 (S.D. Miss. 2004) ................................................................................ 4, 5, 6

*Olivia Y. ex rel. Johnson v. Barbour*, No. 3:04CV251, slip op. (S.D. Miss. Mar. 11, 2005). ................................................................................................ 5

*Phillips Oil Co. v. OKC Corp.,* 812 F.2d 265, 272 (5th Cir. 1987) ..................................... 4

*Ross v. Alabama* 15 F. Supp. 2d 1173, 1193-94 (M.D. Ala. 1998) ..................................... 5

*State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990) ......................... 4

*T.M. v. Carson,* 93 F. Supp. 2d 1179, 1195-96 (D. Wyo. 2000) ......................................... 5

*Taylor v. Ledbetter,* 818 F.2d 791, 795 (11th Cir. 1987) ..................................... 5

*Walsh v. Erie County Dept. of Job and Family Services*, 240 F. Supp. 2d 731, 761 (N.D. Ohio 2003) ................................................................................ 5

*Wendy H. v. City of Philadelphia*, 849 F. Supp. 367, 372 (E.D. Pa. 1994) ....................... 6

*Winston v. Children & Youth Servs. of Del. Cty.*, 948 F.2d 1380, 1391 (3d Cir. 1991) ..... 5

*Yvonne L. v. New Mexico Dep't of Human Servs.*, 959 F.2d 883, 892-93 (10th Cir. 1992) ................................................................................ 5

*Youngberg v. Romeo*, 457 U.S. 307, 321-323 (1982) ........................................ 6

**Statutes:**

42 U.S.C. § 1983 ................................................................................ 1

**Regulations:**

45 C.F.R. § 1355.34 ................................................................................ 8

45 C.F.R. § 1355.53 ................................................................................ 35

**Constitutional Provisions:**

U.S. Const. amend. XIV ................................................................................ 1

**Treatises:**

*Child Welfare League of America Standards of Excellence for Services for Abused and Neglected Children and Their Families* §§ 5.12, 5.35, 5.9, 6.3

*Child Welfare League of America Standards of Excellence for Family Foster Care Services* §§ 1.4, 1.12, 2.30, 2.46, 2.54, 2.55, 2.63, 2.66, 2.67, 2.69, 2.70, § 3.45, 3.48, 3.49

*Child Welfare League of America Standards for Health Care Services for Children in Out-of-Home Care* §§ 2.6-2.7

*Child Welfare League of America Standards of Excellence for Adoption Services* §§ 7.19, 7.22

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT ON LIABILITY**

## I.  INTRODUCTION

This is a certified class action brought pursuant to 42 U.S.C. § 1983 on behalf of a class of children who are or will be in the legal or physical custody of the Mississippi Department of Human Service ("DHS") Division of Family and Children's Services ("DFCS").  Plaintiffs claim that Defendant state officials have for years operated a constitutionally deficient child welfare system that places Plaintiff class members at substantial risk of harm, in violation of their substantive due process rights under the 14th amendment of the United States Constitution.  *See generally* Ex. 26 [Class Cert. Order].

As this Court has already noted, "plaintiffs have identified shortcomings by DHS, in terms, *inter alia*, of its staffing, policies and practices, which if proven, could readily be found to place every child in DHS custody at substantial risk of harm."  (Ex. 26 [Class Cert. Order] at 7).  Significant discovery has now revealed the indisputable and continuing constitutional shortcomings in the State's child welfare system that this Court should now address.  Plaintiffs are entitled to summary judgment on liability based on the undisputed evidence that Plaintiff children *are* being harmed by Defendants' child welfare operations and case practices, and are being systematically placed at substantial risk of further harm, in violation of their substantive due process rights.

As presented in detail below, Defendants' own reviews of children's cases confirm the findings of Plaintiffs' experts that children in DHS custody are maltreated at more than *five times* the rate set by the federal government as the allowable norm for state child welfare systems, and that these children are denied basic care and treatment necessary to keep them from deteriorating while in state custody.  Defendants' own expert report submitted March 31, 2006, by Dr. Sue D.

Steib of the Child Welfare League of America ("CWLA"), concludes that Mississippi's child welfare system "does present a picture of having been chronically under-resourced, seriously so in several areas."  (Ex. 1 [Steib Expert Rpt.] at 39).  Dr. Steib's "Major Findings" are that (1) "DFCS is under-staffed at all levels;" (2) there is limited or no training for caseworkers and supervisors; and (3) a lack of resources hampers the delivery of services to children and families, most notably for placements.  (Ex. 1 [Steib Expert Rpt.] at i-ii).  Defendants themselves acknowledge that the understaffing of the agency has resulted in caseloads that are at "BEYOND DANGER!" levels and that "[t]he danger/risk level to our children increases dramatically as the caseloads continue to increase and our staffing level stays the same or decreases."  (Ex. 12 ["BEYOND DANGER!" Chart] at DHS 020088; Ex. 9 [DFCS FY 2006 Budget Request] at DHS 030742-6).

Thus, according to Defendants' own expert, their deposition testimony and agency documents, and consistent with Plaintiffs' five uncontested expert reports, Defendants have failed to provide a constitutionally acceptable child welfare system able to adequately care for and protect plaintiff class members.  These grim facts come as no surprise to Defendants, who have been on notice for years of these deficiencies and the risks they pose to plaintiff children.  Nevertheless, in deliberate indifference to this substantial risk of harm, and inconsistent with the exercise of reasonable professional judgment, Defendants continue to expose these most vulnerable children to a chaotic and dysfunctional system.  The undisputed facts thus establish Defendants' violation of Plaintiffs' substantive due process rights as matter of law.

There are powerful equitable reasons why this Court should act now.  Each day, the present unconstitutional system does lasting damage to thousands of children, whose only offense is to have been born into circumstances that exposed them to abuse and neglect.  If not

redressed, their lack of care at the hands of the State will, as in a different case many years ago, do harm "that may affect their hearts and minds in a way unlikely ever to be undone." *Brown v. Board of Education*, 347 U.S. 483, 494 (1954). Some injuries, particularly those done to impressionable children, are irreparable. Plaintiffs urgently need this Court's prompt judgment, so that the Court may turn expeditiously to the formulation of an appropriate remedial decree.

## II.  ARGUMENT

### A. Summary Judgment Should Be Granted Where The Material Facts Establishing The Violation of Plaintiffs' Substantive Due Process Rights Are Uncontested.

Summary judgment should be granted where, as here, there is no genuine issue of "material" fact. Fed. R. Civ. P. 56. A dispute over irrelevant or unnecessary facts will not preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Phillips Oil Co. v. OKC Corp.,* 812 F.2d 265, 272 (5th Cir. 1987). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990); *Monsanto Co. v. Scruggs*, 342 F. Supp. 2d 568, 572-73 (N.D. Miss. 2004).

Courts will not rely on "conclusory allegations, improbable inferences, and unsupported speculation" to defeat a motion for summary judgment, because those are in no way probative of the "significant" factual dispute required to repel a well-supported motion. *Krim v. BancTexas Group, Inc.,* 989 F.2d 1435, 1449 (5th Cir.1993); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994); *Cranford v. Lefeve*, No. 1:04CV555, 2006 WL 839517 (S.D. Miss. Mar. 30, 2006) (Ex. 18).

**B.  Defendants Have A Constitutional Duty To Protect Plaintiff Class Members From Harm And Provide Them With Adequate Care And Treatment Consistent With Reasonable Professional Judgment Or Without Deliberate Indifference To Known Substantial Risks.**

As this Court has recognized, because class members are custodial wards of the State, Defendants have a "special relationship" with these Plaintiff children that creates a substantive due process duty for Defendants to provide them with "adequate care and treatment" and "safekeeping" while in state custody.  *Olivia Y. ex rel. Johnson v. Barbour*, 351 F. Supp. 2d 543, 555-556 (S.D. Miss. 2004); *accord Hernandez v. Texas Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 880 (5th Cir. 2004); *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 198 (1989).  Courts have recognized that this constitutional duty includes, among other responsibilities:

- protecting foster children from maltreatment and providing appropriate placements;[1]

- providing medical, dental and psychological care and treatment deemed necessary to prevent children's "deterioration" while in care;[2] and,

- providing adequate training and supervision to child welfare staff necessary to prevent foreseeable violations of children's constitutional rights.[3]

---

[1]  *Olivia Y. ex rel. Johnson v. Barbour*, slip op. at 6 (Mar. 11, 2005); *Hernandez v. Texas Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 293 (8th Cir. 1993); *Yvonne L. v. New Mexico Dep't of Human Servs.*, 959 F.2d 883, 892-93 (10th Cir. 1992); *Taylor v. Ledbetter*, 818 F.2d 791, 795 (11th Cir. 1987); *Marisol A. v. Giuliani*, 929 F. Supp. 662, 675-77 (S.D.N.Y. 1996); *Eric L. v. Bird*, 848 F. Supp. 303, 307 (D.N.H. 1994); *LaShawn A. v. Dixon*, 762 F. Supp. 959, 993, 996 (D.D.C. 1991) ("[Foster children] are wards of the District who rely wholly on the District to provide them with all of life's necessities. They are children and rely on the District to protect them from harm and ensure their well-being. To the extent that certain services, such as appropriate placements and case planning, are essential to preventing harm to the children in the District's custody, this Court holds that the children have a constitutional liberty interest in those services.").

[2]  *Olivia Y. ex rel. Johnson v. Barbour*, slip op. at 6 (Mar. 11, 2005); *Norfleet v. Arkansas Dep't of Human Servs.*, 989 F.2d 289, 293 (8th Cir. 1993);  *K.H. v. Morgan*, 914 F.2d 846, 851 (7th Cir. 1990); *Danielle v. Johnson*, 284 F. Supp. 2d 1368, 1373-73 (S.D. Fla. 2003); *Brian A. v. Sundquist,* 149 F. Supp. 2d 941, 953 (M.D. Tenn. 2000); *Charlie and Nadine H. v. Whitman*, 83 F. Supp. 2d 476, 507 (D.N.J. 2000); *Marisol A. v. Giuliani*, 929 F. Supp. 662, 675-77 (S.D.N.Y. 1996); *LaShawn A. v. Dixon*, 762 F. Supp. 959, 996 (D.D.C. 1991); *B.H. v. Johnson,* 715 F. Supp. 1387, 1396 (N.D. Ill. 1989).

[3]  *Nicholson v. Scoppetta*, 344 F.3d 154, 166 (2d Cir. 2003); *Walsh v. Erie County Dept. of Job and Family Services*, 240 F. Supp.2d 731, 761 (N.D. Ohio 2003); *T.M. v. Carson*, 93 F. Supp. 2d 1179, 1195-96 (D. Wyo. 2000); *Ross v. Alabama* 15 F. Supp. 2d 1173, 1193-94 (M.D. Ala. 1998); *Danielle v. Adriazola*, 284 F. Supp. 2d 1368, 1378 (S.D.

The appropriate standard by which the State's performance of its constitutional duty should be judged is the professional judgment standard that, as this Court has explicitly recognized, has been applied in other foster care injunctive cases. *Olivia Y.*, 351 F. Supp. 2d at 556 n. 8. *See*, *e.g.*, *Yvonne L. v. New Mexico Dep't of Human Servs.*, 959 F.2d 883, 892-93 (10th Cir. 1992); *K.H. v. Morgan*, 914 F.2d 846, 851 (7th Cir. 1990); *Winston v. Children & Youth Servs. of Del. Cty.*, 948 F.2d 1380, 1391 (3d Cir. 1991); *Kenny A. v. Perdue*, 218 F.R.D. 277, 296 (N.D. Ga. 2003); *Brian A. v. Sundquist,* 149 F. Supp. 2d 941 (M.D. Tenn. 2000)*; T.M. v. Carson*, 93 F. Supp. 2d 1179, 1187 (D. Wyo. 2000); *Wendy H. v. City of Philadelphia*, 849 F. Supp. 367, 372 (E.D. Pa. 1994); *LaShawn A. v. Dixon*, 762 F. Supp. 959, 996 (D.D.C. 1991).

In *Youngberg v. Romeo*, 457 U.S. 307, 321-323 (1982), the United States Supreme Court distinguished between civilly committed patients, who the Court found could establish substantive due process violations as to their care and treatment based on "a substantial departure from accepted professional judgment, practice or standards," and the deliberate indifference standard applicable to Eighth Amendment prisoner cases.  As this Court has previously recognized, the deliberate indifference standard has been utilized in the penal context, and "[t]he reasoning that has led courts [to apply the professional judgment standard in the foster care context] is exemplified by the opinion in *LaShawn*, where the court stated,

> [T]he rights of a person in the civil custody of the state are greater than the rights of a person in the state's criminal custody. The foster children that make up the plaintiff class in this case have done society no wrong and they deserve no punishment. It would be inappropriate to force them to endure constitutional deprivations absent a showing of 'deliberate indifference' by their caretakers. At the same time, it would be inappropriate to hold caretakers liable for constitutional deprivations when those caretakers had exercised their professional judgment in determining the best course of conduct."

---

Fla. 2003).  *See generally Kline v. North Texas State University*, 782 F.2d 1229, 1235 (5th Cir. 1986) (failure to supervise that rises above managerial incompetence and gives rise to constitutional violation can be grounds for Section 1983 liability).

*Olivia Y.*, 351 F. Supp. 2d at 556 n. 8 (citing *LaShawn*, 762 F. Supp. at 996).  As the district court found in *LaShawn*, innocent children who are wards of the state deserve no less protection than civilly committed patients.  They should hardly be judged by the standards that apply to penitentiary inmates who are necessarily in state custody due to criminal misconduct.

Even if Defendants' conduct were to be judged under a deliberate indifference standard, the result would be no different.  Defendants have knowingly "exposed [Plaintiffs] to a substantial risk of danger."  *Hernandez v. Texas Dept. of Protective and Regulatory Services*, 380 F.3d 872, 882 (5th Cir. 2004) (individual culpability standard for damages liability in foster care case).  The undisputed evidence shows that Defendants have known for years about ongoing and severe DFCS deficiencies that expose plaintiff children to substantial risks of harm, and Defendants have failed to take necessary actions to eliminate the risks.

**C.  The Governing Professional Standards Are Conceded By Defendants.**

Defendants' sole expert, Dr. Sue Steib, Director of Practice to Research at the Child Welfare League of America, agrees that "there are generally accepted practice standards in the field of child welfare," and that CWLA is "nationally recognized for their child welfare standards," including "their standards for foster care services" and foster care "caseloads."  (Ex. 27 [Steib Dep.] at 38:10-13; 41:10-42:5).  Dr. Steib also agrees that federal and state child welfare laws and regulations are standards and legal requirements that public agencies are required to comply with.  (Ex. 27 [Steib Dep.] at 38:14-41:6).  It is also undisputed that Defendants' own policies, as reflected in the DHS Policy Manual (and any related Policy Bulletins), are professional standards that apply specifically in Mississippi.  (Ex. 20 [MDHS Policy]; Ex. 27 [Steib Dep.] at 41:7-9.).

**D.  It Is Undisputed That Plaintiff Children Are Being Harmed In Their Placements.**

Defendants have a basic constitutional duty to protect the Plaintiff children in their custody from harm.  The undisputed evidence, however, is that Defendants have been knowingly failing to protect foster children from abuse and neglect while in foster care, moving them through harmful places to live, and depriving them of basic health care and treatment, causing Plaintiff children unnecessary suffering.

### 1.   Foster Children Are Being Abused And Neglected.

Accepted professional standards and federal policy recognize that children in out-of-home care have a fundamental right to safety and protection—that "children are, first and foremost, to be protected from abuse and neglect."  (Ex. 21 [CWLA Standards for Abused and Neglected Children] at § 6.3; Ex. 22 [CWLA Standards for Foster Care] at §§ 1.4, 2.69, 2.70; 45 C.F.R. § 1355.34(b)(i)(A)).   In recognition of this most basic of child welfare obligations, Defendants' Policy Manual expressly prohibits the following behaviors by foster caretakers:

> a.  Any type or threat of physical hitting, striking, spanking, switching, slapping inflicted in any manner using a hand, switch, strap, belt, paddle or other instrument upon the body.
> b. Verbal abuse, including arbitrary threats of removal from the foster home.
> c.  Disparaging remarks about a foster child or a foster child's birth family members or significant persons.
> d.  Deprivation of meals, clothing, bedding, shelter or sleep.
> e.  Denial of visitation or communication with a foster child's birth family members and significant persons when such denial is inconsistent with the foster child's case plan.
> f.  Cruel, severe, depraved or humiliating actions.
> g.  Locking a foster child in a room or confined area inside or outside of the foster home.
> h.  Requiring a foster child to remain silent or be isolated for unreasonable periods of time.

(Ex. 20 [MDHS Policy] at DHS 00839).

The undisputed evidence, however, establishes that foster children are being maltreated by their caretakers, in violation of their constitutional rights.  Defendants' own Foster Care

Review Program reports that of 342 foster children's cases randomly selected from all DFCS regions that were reviewed during the first nine months of 2005, 3.2% of those children had been the victims of abuse or neglect substantiated by DHS within the past year.[4]  This is more than *five times* the rate of maltreatment in care (.57%) set by the federal government as the standard for state child welfare systems.  (Ex. 14 [CFSR] at DHS 058965).  According to the unrebutted expert report of Plaintiffs' child welfare management expert Cathy Crabtree, applying this percentage to the population of children in care during the same period represents over 100 foster child victims of substantiated abuse or neglect.  (Ex. 6 [Crabtree Rpt.] at 60).  In light of the finding in the May 2004 federal Child and Family Services Review (CFSR) Final Report[5] that "a large percentage of maltreatment reports . . . are not substantiated even when there is evidence to warrant substantiation," it is likely that the number of children actually abused and neglected while in state custody is much higher.  (Ex. 14 [CFSR] at DHS 058990).

Plaintiffs' uncontested expert review of a representative sample of Mississippi's foster children's case records, conducted by on of Plaintiffs' social work experts, Dr. Peg Hess, confirms this high rate of maltreatment in care.  Dr. Hess concludes that:

---

[4] In the first three months of 2005, 4 children out of a sample of 135 had been victims of substantiated abuse or neglect within the past year.  In the second three months of 2005, it was 4 out of a sample of 126.  In the third three months of 2005, it was 3 out of a sample of 81, for a total of 11 for the three quarterly review periods.  (Ex. 7 [FCR Quarterly Regional Comparison Reports] at DHS 063563, 070991).

[5] The week of February 9, 2004, the Children's Bureau of the Administration on Children, Youth and Families, Administration for Children and Families, U.S. Department of Health and Human Services, conducted a Child and Family Services Review (CFSR) for the State of Mississippi.  The CFSR assessed Mississippi's performance on seven child welfare outcomes pertaining to children's safety, permanency, and well being, and on seven systemic factors related to the State's capacity to achieve positive outcomes for children and families.  The period under review for the onsite review was October 1, 2002 through February 9, 2004.  The May 2004 CFSR Final Report found that the State of Mississippi did not achieve substantial conformity with any of the seven child welfare outcomes assessed for child safety, permanency, and well-being, nor with the systemic factors of Statewide Information System, Case Review System, Quality Assurance System, Training, and Service Array.  (Ex. 14 [CFSR] at DHS 058951, 058953-4, 058984).

- 5.7% of foster children were the victims of substantiated abuse or neglect while in custody, with a substantial majority of that maltreatment occurring since January 1, 2004. (Ex. 4 [Hess Expert Rpt.] at Addendum p. 17);

- one in four children had some DHS documentation that they or another foster child in their placement were being abused or neglected, but many of those indications of maltreatment were never investigated. (Ex. 4 [Hess Expert Rpt.] at Addendum, pp. 16, 19); and

- Even when maltreatment of foster children was substantiated, DFCS left the children in the abusive placement a majority of the time. (Ex. 4 [Hess Expert Rpt.] at Addendum, p. 17).

Even though Defendants have known for years about their own failure to protect foster children in their care, they have failed to take necessary action to keep the children in their charge from getting hurt. The CFSR concluded in May 2004 that DFCS did not meet minimum federal requirements for child safety, specifically finding that in 21% of cases reviewed the agency did not make "diligent efforts to reduce the risk of harm to the children." (Ex. 14 [CFSR] at DHS 058995). Defendants' own 2003 Self Assessment submitted by DHS to the federal government[6] conceded that:

> The areas of the state with chronic understaffing have a lower rate of substantiated reports per capita. In reviewing data, areas with fewer staff appear more likely to 'screen-out calls' and have fewer substantiated investigations. If the number of investigations exceeds the number that can reasonably be done by available staff, the result may be less thorough investigations.

(Ex. 15 [Self Assessment] at P 002051).

## 2. Foster Children Are Being Routinely Shuffled Through Inappropriate Homes and Institutions.

Generally accepted professional standards provide that multiple moves from one foster home or facility to another are to be avoided as they result in a lack of stability and feelings of

---

[6] As required for the 2004 federal Child and Family Services Review ("CFSR") for the State of Mississippi, DFCS prepared a Statewide Self Assessment issued in December 2003 that reviewed the current status of the agency's performance on various child welfare outcome measures related to children's safety, permanency, and well being. (Ex. 15, [Self Assessment] at P 001930-2090).

loss, rejection, and trauma for foster children, who are particularly vulnerable to such harms due to the circumstances or experiences that initially caused them to be removed from their homes and placed in foster care. (Ex. 22 [CWLA Standards for Foster Care] at § 2.46).   The Defendants' Policy Manual similarly provides that the agency shall "[r]educe the number of moves (placements) children experience while in care." (Ex. 20 [MDHS Policy] at DHS 00406). Defendants acknowledge:

> Since a child's ability to bond and trust is damaged by each placement change, any break in continuity and stability should be avoided as much as possible.  The more children experience a change in placement, the more that damage is inflicted deepens [*sic*].  A foster child who moves many times, or who constantly fears that he/she may have to move, can suffer *devastating effects* on his/her emotional health.

(Ex. 20 [MDHS Policy] at DHS 000405 (emphasis added)).

As further established by the unrebutted expert report and deposition testimony of Plaintiffs' medical expert, Dr. Wood Hiatt, subjecting foster children to frequent, unpredictable, and unexplained moves can be seriously harmful to their mental status, ability to adjust, and any existing psychiatric conditions, and can virtually destroy their chances to belong to successful homes.  (Ex. 5 [Hiatt Expert Rpt.] at 28-29; Ex. 42 [Hiatt Dep.] at 95:21-96:25).  Plaintiffs' expert in the field of social work, Dr. Marva Lewis, further establishes that:

> Frequent or arbitrary moves dramatically increase the risk that a foster child will not attach to any new family or caregiver.  Thus, stability of placement is crucially important to a foster child's fragile psychological well-being.[7] Stability of placement is especially critical for infants and young children, because these are the years when children learn to attach to protective caregivers and develop a sense of trust in the world.

(Ex. 3 [Lewis Expert Rpt.] at 9).

---

[7] According to Dr. Lewis, "the psychological harm caused by multiple moves through unstable and institutional placements is illustrated by John," who "…became so desperate for stability that when he was placed in a psychiatric facility that was at least his 25th placement, he stated that he wanted to remain there 'until he is grown.' When DHS prepared to move him again he began trying to mutilate himself, explaining that he thought this might stop DHS from moving him to yet another placement."  (Ex. 3 [Lewis Expert Rpt.] at 12).

Yet, for years, DFCS has subjected foster children to multiple harmful placement moves and inappropriate places to live, to their detriment and harm. Dr. Hess's unrebutted case record review confirms that 82.7% of children were moved at least once from their original placement and up to 57 times," and 11.3% were moved ten or more times.[8] (Ex. 4 [Hess Expert Rpt.] at 2, 26-27). Defendant Taylor acknowledged as early as 1999 that "children are needlessly moved from placement to placement, *further damaging them* and guaranteeing an unstable future." (Ex. 17 [PEER Rpt.] at DHS 068743 (emphasis added)). In 2003, Defendants' Self-Assessment conceded that more than 200 children in care had been through nine or more homes, and admitted that "[p]lacement resources need to be more stable." (Ex. 15 [Self Assessment] at P 002027, 002071). In May 2004, the federal CFSR singled out permanency and stability as "[o]ne of the areas of greatest concern." (Ex. 14 [CFSR] at DHS 058951). The CFSR specifically found that 40% of children experienced placement moves that "were not for the purpose of meeting the child's needs or attaining the child's goals." (Ex. 14 [CFSR] at DHS 058997-98).

Additionally, Defendants acknowledge that family-based care is better for children than group care (Ex. 1 [Steib Expert Rpt.] at 6) and that foster children should be placed with a family unless an institutional setting is required to meet a specific treatment need. (Ex. 27 [Steib Dep.] at 106:3-14; Ex. 19 [Felder Draft Plan] at DHS 115425). Dr. Lewis's unrebutted expert report further establishes that "institutional settings, where children receive care from multiple caregivers and not one primary caregiver, are harmful for all children. Institutional care is especially harmful for infants, who require consistent nurturing and human touch to properly

---

[8] In her review of DHS case records for four Named Plaintiffs, Dr. Lewis found that "[b]oth John and Jamison have been moved over 26 times. DHS has forced these young boys to live like transients, carting their belongings from place to place, sometimes night after night." (Ex. 3 [Lewis Expert Rpt.] at 9-10). Dr. Lewis also found that "[I]n her two and a half years in DHS custody, five-year-old Olivia has had seven placements" and that "Cody, who is not yet four, experienced five different placements in a span of just 31 days." (Ex. 3 [Lewis Expert Rpt.] at 10).

grow and thrive." (Ex. 3 [Lewis Expert Rpt.] at 11). As acknowledged by former Director Mangold, "there's definitely a distinct possibility that if children are placed in residential placements and shouldn't be there that it certainly could be harmful to them." (Ex. 35 [Mangold Dep. 8/25/04] at 84:19-85:4).

Defendants' expert Dr. Steib reports that approximately 25% of DHS foster children live in a group home or institution.[9] (Ex. 1 [Steib Expert Rpt.] at 6). Despite DHS policy that infants and young children should be placed in family care (Ex. 1 [Steib Expert Rpt.] at 12), an aggregation of Defendants' own data from May 2005 reflects that 18% of all foster children in an emergency shelter were younger than four years old, and that the average length of stay for all children's current stint in a shelter was over 69 days. (Ex. 24 [Shelter Care Chart]).

Dr. Hess's uncontested expert case record review likewise found that almost two out of three (63.8%) children in MDHS custody were placed at least once in an emergency shelter or emergency foster home since their most recent entry into custody. (Ex. 4 [Hess Expert Rpt.] at 2). By way of further example, in her review of the Named Plaintiff case records, Plaintiffs' social work expert Dr. Lewis found that both Olivia and Cody spent several weeks in shelters when they were under four years old, and DHS did not move Cody "to a more suitable environment even after his doctor had filed an abuse and neglect report stating that the lack of a stable foster home was causing him psychological harm." (Ex. 3 [Lewis Expert Rpt.] at 11-12, 33, 56).

Defendants have known for years that they over-use institutional placements, including emergency shelters, to warehouse children. The 2004 CFSR found that "MDHS relies

---

[9] Mississippi has the sixth highest percentage of its foster children in group homes in the country, while the practice of unnecessarily institutionalizing foster children comes at an enormous cost to the State, as the "[b]oard rates paid to group homes ($900 to $1,650 per month) are 2.5 to 5 times higher than board rates paid to foster care parents ($325 to $400 per month). (Ex. 2 [Brister Expert Rpt.] at 4).

extensively on the use of emergency shelter facilities for the initial placement (even for very young children) or when placements disrupt (often due to the children's behavior and foster parents' inability to manage behavior)." (Ex. 14 [CFSR] at DHS 058952). In fact, one reason the federal government cited Defendants as non-compliant with the requirement for foster care stability and permanency was their finding that 40% of foster children, including a one-year-old baby, were housed in shelter facilities, regardless of their individual needs to live in a more stable environment: "The reviewers determined that shelter facilities were used as placements because of a lack of foster care homes and not for the purpose of conducting assessments to ensure appropriate matching of children with foster placements." (Ex. 14 [CFSR] at DHS 058998).

### 3. Children Are Being Deprived Of Medical, Dental and Mental Health Care And Treatment.

Accepted professional standards and federal law recognize that children in out-of-home care have a fundamental right to health care and services. Defendants' own Policy Manual provides:

> When a child is placed in the custody of the Mississippi Department of Human Services, the Division of Family and Children's Services assumes the responsibility for securing the child's access to medical, dental, psychological and educational services . . . . All foster children shall be referred to EPSDT (Early Periodic Screening and Diagnostic Testing) as part of Medicaid eligibility. It is important for children to go through these periodic screenings to identify any health problems as well as to maintain good health.

(Ex. 20 [MDHS Policy] at DHS 00473, 00501). Pursuant to accepted professional standards, the family foster care agency should "work closely with the parents to identify and obtain access to preventative health care services; routine health and dental services; emergency health care; mental health care services; remedial health and dental care . . . ." (Ex. 22 [CWLA Standards for Foster Care] at § 2.66). Accepted professional standards further provide:

because children entering family foster care frequently have experienced difficult conditions in their own homes or previous placements, it is possible that they will have emotional disturbances that require mental health services. Thus, for the protection of both the child and the foster parents, an initial health screening of children entering care should include assessment of emotional disturbances, such as depression, suicide potential, severe behavioral problems, serious emotional disturbance or substance abuse.

(Ex. 22 [CWLA Standards for Foster Care] at § 2.67).

Dr. Wood Hiatt's unrebutted expert report further establishes that children in foster care are at high risk for medical, emotional, and psychological problems that demand "careful and consistent attention to their medical and mental health needs." These vulnerable children are more likely to suffer emotional and psychological harm from inconsistency in treatment. (Ex. 5 [Hiatt Expert Rpt.] at 9-10); (Ex. 42 [Hiatt Dep.] at 95:21-96:25). His report further establishes that failing to provide consistent medical and mental health care can create severe and unnecessary difficulties in managing foster children's psychiatric and behavioral problems, and can directly cause their existing conditions to worsen and be prolonged. (Ex. 5 [Hiatt Expert Rpt.] at 28-29); (Ex. 42 [Hiatt Dep.] at 95:21-96:25).

Despite this, the undisputed evidence shows that foster children are not being provided with regular and necessary health care. Defendants' own Foster Care Review Program reports that for the first quarter of FY 2006:

- The physical health needs of 9% of foster children "were not assessed;"

- For 10% of the foster children for whom "physical health needs were identified," services were not provided to meet the identified needs;

- Of those foster children who were eligible for a mental health assessment, 6% did not receive such an assessment; and

- For 11% of the foster children for whom mental health needs were identified, services were not provided to meet the identified need.

(Ex. 7 [FCR Quarterly Regional Comparison Reports] at DHS 071007-8).  In the third and fourth quarters of FY 2005, Defendants' Foster Care Review Program found that, on average:

- 18.0% of foster children's most recent Individual Service Plans (ISPs) did not indicate that appropriate physical health services were being provided; and

- 20.5% of foster children's most recent ISPs did not indicate that appropriate mental health services were being provided.

(Ex. 7 [FCR Quarterly Regional Comparison Reports] at DHS 047100, 063548).  Defendant Felder reports that a full "43.9% of the children in State custody whose cases were reported to have issues of concern, are lacking psychological information on their Individualized Service Plans (ISPs), in addition to medical, dental, and educational information."  (Ex. 19 [Felder Draft Plan] at DHS 115414).

Plaintiffs' uncontested expert case record review by Dr. Peg Hess also confirms that DFCS fails to deliver basic medical, dental, and psychological care to children.  Dr. Hess found that:

- 84.1% of children were not provided a physical exam at the time of placement as required to assess their health needs;[10]

- 28.2% of children who had been in custody at least one year were not provided a *single* physical exam in the most recent two year period;

- 42.2% of the children who had been in custody at least one year were not provided *even one* dental exam in the most recent two year period;

- 57.7% of foster children ages 4 and up were not provided a psychological assessment as required within 90 days of entering custody;

- 35.5% of foster children ages 4 and up were *never* evaluated for mental illness or developmental disorders;

---

[10] Dr. Lewis found, for example, that the failure by DFCS caseworkers to provide Olivia Y. with a timely medical screen upon her entry into care even though she was severely malnourished, had a rash covering her face and stomach, and had a very strong odor, resulted in a delay in Olivia receiving the medical services that she required. (Ex. 3 [Lewis Expert Rpt.] at 56, 63-4).

- For 50% of the children whose case files documented the identification of a mental illness or developmental disorder for which further assessment was recommended by a mental health provider, MDHS failed to provide any further assessment; and

- In-patient treatment was not provided for 21% of the foster children for whom it was specifically recommended.

(Ex. 4 [Hess Expert Rpt.] at 3-4).

Defendants have known about these deficiencies for years. Defendants' own 2003 Self-Assessment conceded that as far back as 1995 children's "mental health needs [were] not adequately identified, assessed, or addressed," and that in 2003 the provision of mental health services continued to be hampered by "inconsistency in practice" (Ex. 15 [Self-Assessment] at P 001940). The 2004 federal CFSR found that DFCS did not achieve substantial compliance with federal requirements in *any* of the three outcome measures relating to child well-being. (Ex. 14 [CFSR] at DHS 058957-58). On the measure of whether children received adequate services to meet physical and mental health needs, the CFSR specifically found that agency "performance on this outcome was low at all CFSR sites." (Ex. 14 [CFSR] at DHS 059023). The CFSR determined that DFCS was:

- "not adequately address[ing] the [physical] health needs" of 20% of foster children;

- "not ma[king] concerted efforts to address the mental health needs" of 47.6% of foster children;

- assessing mental health needs of children "not at all" 31.3% of the time;

- assessing mental health needs of children only "partially" 21.9% of the time;

- meeting mental health needs that had been identified "not at all" for 28.1% of children; and

- meeting mental health needs that had been identified only "partially" for 12.5% of children.

(Ex. 14 [CFSR] at DHS 059024-26).  Despite such knowledge, Defendants continue to maintain

a child welfare system that does not provide basic health care and treatment to plaintiff children

in their custody.

     **E.   It Is Undisputed That The Harms Plaintiff Class Members Are Being Subjected To Result From Defendants' Failure To Maintain Adequate Staffing, Training And Supervision, And Resources, Consistent With Reasonable Professional Judgment, And In Deliberate Indifference To Plaintiffs' Constitutional Rights.**

          **1.   It Is Uncontested That Defendants Are Knowingly Maintaining A Chronically Understaffed Child Welfare Agency With Caseloads That Put Children "BEYOND DANGER!"**

Caseload standards promulgated by the Child Welfare League of America, which

Defendants' expert agrees are nationally recognized and generally accepted, provide for between

12 and 15 children per worker for foster care services.   (Ex. 22 [CWLA Standards for Foster

Care] at §§ 3.48, 3.49).   DFCS, however, routinely assigns its caseworkers caseloads far in

excess of these standards, thereby placing children at great risk of harm.   Dr. Sue Steib,

Defendants' own expert, finds that:

> DFCS is under-staffed at all levels.  Many caseworkers carry workloads which are at least double the average number they can manage based on the workload analysis conducted in this review.  Many supervisors also carry cases and have administrative duties in addition to providing supervision for caseworkers.  Administrative and management staff are inadequate to provide the support needed by those responsible for service delivery.

(Ex. 1 [Steib Expert Rpt.] at i-ii).

Defendant DHS Executive Director Taylor readily admits that DFCS is understaffed (Ex.

38 [Taylor Dep.] at 150:11-14), and that "anyone would say that the caseloads are high." (Ex. 38

[Taylor Dep.] at 193:5-6).  Defendant DFCS Director Rickie Felder also acknowledges that high

caseloads are among the "major challenges" facing DFCS.  (Ex. 19 [Felder Draft Plan] at 2).  He

admits that, despite the fact that "[a]gencies must maintain sufficient staffing to achieve

manageable workloads," a net total of 205 DFCS positions ("PINs") have been abolished over the past four years. (Ex. 19 [Felder Draft Plan] at 9, 12). Dr. Steib reports that, as a result, DFCS caseworkers average 44 cases each, even though Dr. Steib's own analysis concluded that a reasonable foster care caseload for DFCS caseworkers should be 14 children.[11] (Ex. 1 [Steib Expert Rpt.] at 3, 25-26). Dr. Steib testified that DFCS workers reported caseloads as high as over 50, and that she had heard of caseloads going as high as 80.[12] (Ex. 27 [Steib Dep.] at 131:7-8, 18-19).

Defendants have acknowledged that these high caseloads place children at risk, characterizing caseload levels of 40 or higher as "BEYOND DANGER!" (Ex. 12 ["BEYOND DANGER!" Chart] at DHS 020088). Dr. Steib reports that, nevertheless, the "standard . . . currently set by the agency" is a caseload of "40." (Ex. 1 [Steib Expert Rpt.] at 39). Defendants have thus consciously condoned maintaining agency casework staffing at a dangerous level with known and predictable harmful consequences for plaintiff children.

As of June 2004, DFCS was already reporting a statewide average caseload of 48. Two counties, Forrest and Yazoo, were averaging 197 and 196 cases per worker, respectively.[13] (Ex. 9 [DFCS FY 06 Budget Request] at DHS 030742-45). As of August 2005, DFCS caseworkers

---

[11] Dr. Steib testified that her own extensive workload analysis of how long each task assigned to DFCS caseworkers would take, based on "the amount of time required to manage each type of case in accordance with current agency policy," led her to conclude that, based on the work required of caseworkers in the Mississippi Division of Children and Families, a "reasonable" caseload standard for DFCS foster care cases should be 14 foster care children's cases per worker. (Ex. 1 [Steib Expert Rpt.] at 25-26). This is consistent with CWLA's caseload standards that establish caseloads of between 12 and 15 children per worker for foster care services. (Ex. 22 [CWLA Standards for Foster Care] at §§ 3.48, 3.49).

[12] Named Plaintiff Cody B.'s caseworker testified that she was carrying 120 cases, including those of 62 foster children and 19 investigations of abuse and neglect allegations. (Ex. 39 [Simpson Dep.] at 11:3-12:16). This is almost ten times the caseload she should have been handling, and *three times* the "Beyond Danger!" level.

[13] In fact, caseloads can be far higher than reported. Region II Director Martha McDaniel testified that workers on leave were counted as carrying full caseloads while in fact other DFCS staff had to cover their cases, (Ex. 31 [McDaniel Dep.] at 64:25-65:6), and that when caseworkers attend certain trainings, other workers were required to carry the trainees' caseloads in addition to their own, though this was not reflected in any document of which McDaniel was aware. (Ex. 31 [McDaniel Dep.] at 113:3-115:4).

still carried an average of 48 cases statewide.  (Ex. 13 [Direct Service Clients Chart] at DHS 091851-52).  Moreover, *six counties had caseload averages that were more than **twice** the "BEYOND DANGER!" level (80+).*  (Ex. 13 [Direct Service Clients Chart] at DHS 091851-52). Indeed, DFCS reported individual caseloads of *up to 286* cases in June 2005.  (Ex. 8 [DFCS FY 07 Budget Request] at DHS 053725).

Defendants' expert Dr. Steib concedes that DFCS's excessive caseloads pose a risk to children's well-being, including the risk that if a caseworker is not able to see a child regularly the worker might not know if the child were in trouble or in danger.  (Ex. 27 [Steib Dep.] at 102:4-103:16).[14]  Former DFCS Director Billy Mangold confirmed that one purpose of the required monthly visits for all children in custody is to ensure the children's safety, and stated that "[t]he danger is that some child will be missed, some child will not be provided the services that they should be provided."  (Ex. 36 [Mangold Dep. 5/16/05] at 67:7-14).  Defendant Felder agrees, stating that when caseworkers have unreasonable workloads, DFCS runs the risk that needed services will not be delivered to troubled children and families  (Ex. 28 [Felder Dep.] at 123:10-15).  Region Director McDaniel also confirmed that face-to-face contact with foster children was one of her region's ways of ensuring that the children were not experiencing abuse or neglect in their placements.  (Ex. 31 [McDaniel Dep.] at 123:12-20).  Region Director Rogers, however, testified that she could not remember a time in the five years she had held her position

---

[14] The MDHS/DFCS Policy Manual provides: "the MDHS/DFCS Social Worker shall maintain weekly contacts (either face to face or by telephone) with the child during the first 30 days of placement.  Face to face contact shall be maintained with all foster children, regardless of their placement type every 30 days thereafter. This could require a County of Service Social Worker to make the face to face contact.  Some funding sources such as Medicaid may require more frequent contact.  It is important that this be upheld in order not to jeopardize payment for services." (Ex. 20 [MDHS Policy] at DHS 00392). Likewise, generally accepted professional standards provide that the child welfare agency worker should meet "face-to-face … at least monthly" with both the child and with the foster caregivers. (Ex. 22 [CWLA Standards for Foster Care] at §§ 2.54, 2.55).

when DFCS staff succeeded in making the required monthly visits to children in custody in her region. (Ex. 41 [Rogers Dep.] at 67:11-14.)

Understaffing has also forced DFCS to delegate required visits to paraprofessional support staff such as homemakers and case aides in some instances (Ex. 1 [Steib Expert Rpt.] at 24; Ex. 36 [Mangold Dep. 5/16/05] at 60:24-61:2, 61:13-62:16; Ex. 34 [Henry Dep.] at 53:24-54:6; Ex. 41 [Rogers Dep.] at 75:3-17), even though Dr. Steib opined that it should not be the practice that aides make visits to children instead of caseworkers. (Ex. 27 [Steib Dep.] at 72:16-20). Former Director Mangold similarly agreed at deposition that "you would not want homemakers making casework decisions for children in custody" (Ex. 36 [Mangold Dep. 5/16/05] at 61:13-16), but Region Director Mechille Henry acknowledged that case aides and homemakers "tend to do most of the same duties" as Social Workers. (Ex. 34 [Henry Dep.] at 53:24-54:6).

Defendants have known about the severe under-staffing and the resulting risk of harm to foster children for years without taking necessary actions to remedy the deficiency. As early as 1999, a Joint Legislative Committee on Performance Evaluation and Expenditure Review (PEER) report found "serious" DFCS case practice deficiencies, including the failure to substantiate or investigate cases marked "high risk," the untimely investigation of reports, and investigations "not thoroughly completed according to policy." (Ex. 17 [PEER Rpt.] at DHS 068728). In response, Defendant Taylor, Executive Director of DHS for a previous administration at the time, in a letter to the PEER Committee dated May 10, 1999, conceded that "*the Division has been dangerously under funded and under staffed for many years,*" and that "our employees [have] been struggling to stay on top of their mandated responsibilities . . . ." (Ex. 17 [PEER Rpt.] at DHS 068743 (emphasis added)).

In May 2002, eight days after she tendered her resignation, then-Director of DFCS Sue Perry wrote to then-Governor Musgrove, advising that the DFCS program "*has been severely understaffed and underfunded for years . . . [which] places the children of this state at higher risk* and the state in a potentially libelous [sic] position – should a child die or be seriously injured in a case that was not investigated, or on an open case that a worker did not have time to properly monitor." Perry continued, "*The caseloads are impossible and the children are at risk*." Finally, Perry warned the Governor that a lawsuit would come if conditions did not improve: "The advocates of this state are asking that a law suit be filed against the state for failing to provide adequate staff and resources to ensure the protection of children." (Ex. 16 [Perry letter] at P000153-55 (emphasis added)).

Over a year later, a Defendants' Statewide Self Assessment again acknowledged inadequate DFCS staffing, undocumented child protection investigations, and a lack of services for children. (Ex. 15 [Self Assessment] at P 001941-45, 2011, 2013-14, 2033-34, 2053). The May 2004 CFSR Final Report then found that "[a]lthough social worker contacts with children in foster care are a primary means of assuring that health and safety standards are met," in 16% of the foster care cases reviewed (4 out of 25 cases) DFCS case workers had not visited face-to-face with children at least monthly. (Ex. 14 [CFSR] at DHS 059017, 059034). The CFSR Final Report further found that "large caseloads have a negative effect on the quality of the visits and the time that workers have to spend with children." (Ex. 14 [CFSR] at DHS 059018). DFCS licensing staff were also failing to meet the standard of visiting each foster home one time per month "due to the high caseloads of staff." (Ex. 14 [CFSR] at DHS 059035).

The risk to children in counties with high caseloads was specifically recognized in the June 2004 Budget Request Package for Fiscal Year 2006 submitted to DHS by then DFCS Director Mangold:

> There is grave concern for these counties – *children in these counties are placed at risk*. Their lives depend on our ability to provide staff resources to investigate and access dangerous situations.  Our staff are [sic] totally overwhelmed and we are losing more staff every day! . . . *The danger/risk level to our children increases dramatically as the caseloads continue to increase and our staffing level stays the same or decreases* . . . .

(Ex. 9 [DFCS FY 06 Budget Request] at DHS 030746 (emphasis added)).  Despite this acknowledgment of the dire circumstances, that caseworkers carried caseloads of up to 200 cases, and the identified need for at least 348 additional caseworker positions to reach an acceptable caseload level, the DFCS budget request package to DHS only requested 16 additional positions, the reinstatement of 109 abolished positions and funding for 49 vacant positions.  (Ex. 9 [DFCS FY 06 Budget Request] at DHS 030734, 030745).  Moreover, the DHS budget request that Defendant Taylor ultimately submitted to the Legislature for Fiscal Year 2006, relayed these requests for additional positions without including information about DFCS's extremely high caseloads and the resulting risk to children that would justify even these limited requests.[15]  (Ex. 10 [DHS FY 06 Budget Request] at DHS 115631).

In the following year's budget cycle, Defendant Felder noted the high caseloads because of insufficient staff in his June 2005 Fiscal Year 2007 Budget Request.  DFCS staff now carried caseloads of up to 286, and "the inability to fill vacancies has resulted in a decrease in the quality of care and higher turnover for social workers."  (Ex. 8 [DFCS FY 07 Budget Request] at DHS 053725).  Although Director Felder reported 495 additional caseworker positions as being

---

[15] Instead of making the case for the desperately needed funds for DFCS, Defendant Taylor testified to the Legislature that year that "we're going to do all we can do with whatever it is that you choose to give us."  (Ex. 25 [Budget Hearing Transcript] at DHS 115366, lines 8-10).

"needed," he only requested additional funding for 38 vacant positions and to reinstate 59 abolished positions at the cost of approximately 5 million dollars. (Ex. 8 [DFCS FY 2007 Budget Request] at DHS 053725, 053732). Despite the obvious need for additional staff, Defendant Taylor then cut DFCS's limited request by more than half, only requesting an additional 2.4 million dollars for DFCS in the DHS budget request he submitted to the Legislature. (Ex. 10 [DHS FY 07 Budget Request] at DHS 115703). Although 50 additional positions have reportedly been subsequently sought by DHS, Dr. Steib acknowledged that such a small number of additional positions would be insufficient to cure the understaffing problem as described in her report. Ex. 27 [Steib Dep.] at 138:12-22). Notably, DFCS recently acknowledged that 554 additional caseworkers are "needed." (Ex. 13 [Direct Service Clients Chart] at DHS 091852).

In light of Dr. Steib's findings and expert conclusions, and Defendants' own multiple admissions, it cannot be disputed that Defendants' well-known and chronic under-staffing of DFCS places class members at risk of substantial harm on a daily basis.

**2. It Is Uncontested That Defendants Have Knowingly Failed to Provide DFCS Staff With Adequate Training And The Supervision Necessary To Ensure That Foster Children Are Kept Free From Harm.**

**a. Training**

Generally accepted professional standards require public child welfare agencies to offer strong pre-service training, regardless of the academic training and experience of newly hired staff. This training should be competency-based with clearly defined learning outcomes. (Ex. 22 [CWLA Standards for Foster Care] § 3.45; Ex. 21 [CWLA Standards for Abused and Neglected Children] § 5.35). Moreover, child welfare agencies should regularly provide in-service training and continuing educational opportunities to ensure that its staff members have

the specialized skills and knowledge necessary to provide quality services.  (Ex. 22 [CWLA Standards for Foster Care] § 3.45; Ex. 21 [CWLA Standards for Abused and Neglected Children] § 5.35).  Dr. Steib acknowledged that the lack of caseworker training could contribute to children in foster care being at risk of harm.  (Ex. 27 [Steib Dep.] at 109:22-110:9).

Executive Director Taylor himself admits that DFCS caseworkers are sent out into the field to work with children before undergoing any DFCS child welfare training (Ex. 38 [Taylor Dep.] at 124:6-16), stating: "I believe that for a long time that they were putting people in the field without any semblance of training." (Ex. 38 [Taylor Dep.] at 192:11-14).  While DFCS Training Program director Kathy Triplett states that the DFCS "Intensive Training" program for case workers "cover[s] very important material" that is "relevant to social worker's daily job duties" and is "necessary to teach social workers how to assess a child's needs . . . [and] match a child with services she needs," both Ms. Triplett and former DFCS Director Billy Mangold concur that in some cases, newly hired social workers begin carrying cases before receiving this training.  (Ex. 30 [Triplett Dep.] at 15:9 -32:21; Ex. 35 [Mangold  Dep. 8/25/04] at 73:22-74:12).  Dr. Steib concludes that "[t]raining resources are so limited that new caseworkers are often on the job for weeks or months before they are able to attend training."   (Ex. 1 [Steib Expert Rpt.] at ii.).  Dr. Steib's impression was that the limitation in training resources had existed "for a few years." (Ex. 27 [Steib Dep.] at 136:6-14).  Meanwhile, although regional directors are ultimately responsible for ensuring that social workers receive pre-service training, Region Director McDaniel testified that she does nothing concrete to ensure this.  (Ex. 31 [McDaniel Dep.] at 110:4-18).

Defendants have also failed to establish a pre-service training curriculum for new caseworkers.  (Ex. 27 [Steib Dep.] at 158:11-159:1).  Nor is there a particular required in-service

training program, and there exists no current minimum requirement for in-service training hours for caseworkers. (Ex. 27 [Steib Dep.] at 140:4-18). The training materials that do exist include citations to outdated literature and research, (Ex. 27 [Steib Dep.] at 142:23-143:7; Ex. 23 [Polowy Training Report] at Steib 002699 (references to research from 1981-1985 and information compiled in 1974), Steib 002701 (statistics on child sexual abuse from 1979)), and are so ill-presented that they are incomprehensible to the person relied upon by Defendants' expert to review the materials. (Ex. 23 [Polowy Training Report] at Steib 002695-002704; Ex. 27 [Steib Dep.] at 143:6-7).

Dr. Steib found that caseworkers and supervisors do not receive training regarding state laws on child dependency, maltreatment, custody issues, or other legal issues, although Steib testified these were important training components. (Ex. 27 [Steib Dep.] at 163:11-24; Ex. 1 [Steib Expert Rpt.] at 18). Defendant Felder admitted that DFCS training is plagued by problems with "timeliness" as well as "completeness" of the curriculum, and "lack of an evaluation of effectiveness." (Ex. 28, [Felder Dep.] at 30:19-22). DFCS training was charitably described by Defendant Taylor as "certainly underchallenged." (Ex. [Taylor Dep.] at 150:11-19).

Defendants also concede that the limited training staff available is also not able to dedicate its time to offering training, but is being required to perform casework activities due to understaffing. "Training Program staff continues to provide special assistance to county and regional staff, in addition to performing their regular duties," including "completing home studies, investigations, home visits, ICPC requests, case plans, and work in MACWIS to assist in closing out old cases." (Ex. 8 [DFCS FY 07 Budget Request] at DHS 053709, 053712).

Moreover, Defendants do not require that those caseworkers who do in fact complete the Intensive Training program, actually pass the test that is administered at the end of the course before returning to the field. (Ex. 30 [Triplett Dep.] at 32:25-33:10). Director Felder admits in his March 2006 Draft Plan for the agency that "training" and "accountability" are "some of the major challenges" that he has identified within DFCS. (Ex. 19 [Felder Draft Plan] at DHS 115412). Defendant Felder further concedes that "[t]he lack of accountability, mentoring, and training contributes to low morale and the high turnover rate of field staff." (Ex. 19 [Felder Draft Plan] at DHS 115414).

It is undisputed that Defendants have known about the lack of training and the resulting risk of harm to children for years without taking necessary action to provide adequate training to staff. The federal CFSR conducted in 2004 found DFCS in substantial non-conformity with the federal requirements for staff and provider training. (Ex. 14 [CFSR] at 058953-54). The 2003 Statewide Self Assessment acknowledged that the majority of new caseworkers carry cases without the benefit of any formal training for between a month to a year or more. (Ex. 15 [Self Assessment] at P 001984-87). "Additional training in all areas of the job, from the social work practice to the documentation, was [also] noted as being of significant importance." (Ex. 15 [Self Assessment] at P 001958).

Training program director Triplett acknowledged the specific need for more ongoing training, for which she said there had been numerous requests and which had "been a goal for as long as [she had] been involved with the training program," which had been "more than five [years]." (Ex. 30 [Triplett Dep.] at 17:4-15, 17:23-18:22). Despite this long-standing goal, Triplett agreed that ongoing training continued in large part to be "a random offering without a core curriculum." (Ex. 30 [Triplett Dep.] at 41:14-19).

In light of Dr. Steib's findings and expert conclusions, the conclusions given to Dr. Steib regarding the training materials, and Defendants' own multiple admissions, it cannot be disputed that Defendants fail to provide adequate training to DFCS front-line staff and thus routinely place class members at risk of substantial harm.

### b. Supervision

Although casework supervisors "are the lynchpins of front line practice," Dr. Steib reports that supervisors "often carry caseloads or spend much of their time fulfilling casework activities rather than providing guidance and support for front-line staff" because of "heavy [caseworker] workloads" and "vacant caseloads."  (Ex. 1 [Steib Expert Rpt.] at 29-30).   Mr. Felder acknowledges that "competent, supportive supervision" is a crucial element in staff retention, yet supervisors are stretched between not only supervising direct service workers but also "carrying their own caseloads, supervising aides and clerical employees, . . . and [being] responsible for administrative duties associated with the management of their office buildings." (Ex. 19 [Felder Draft Plan] at DHS 115420).   Defendant Taylor also acknowledges that at least some DFCS staff is poorly supervised.  (Ex. 38 [Taylor Dep.] at 150:20-151:23).

Most supervisors have had no training specific to their supervisory role, and individual professional development plans are lacking for staff at all levels.  (Ex. 1 (Steib Expert Rpt.) at ii; Ex. 30 [Triplett Dep.] at 39:8-40:2).  "Supervisors within the agency have difficulty transitioning from social worker to area social work supervisor."  (Ex. 19 [Felder Draft Plan] at DHS 115414). Defendant Felder further admits that the individuals who occupy supervisory positions were selected without satisfying any job-related criteria, and that "most" supervisors have not proven that they have any ability to supervise.  (Ex. 28 [Felder Dep.] at 159:1-160:18).   "[W]e have not prepared them for what it means to be a supervisor."   (Ex. 28 [Felder Dep.] at 159:1-160:12).

Dr. Steib also found that "[p]rogram management staff does not have the capacity to provide functional supervision and consultation, to participate in planning and policy development, or to work with Regional Directors closely enough to bridge the gap that typically exists between state level administration and field staff in large bureaucracies."  (Ex. 1 [Steib Expert Rpt.] at 30).  "Further, program managers are not in regular attendance at key meetings, such as those with Regional Directors or work groups that involve their area of responsibility." (Ex. 1 [Steib Expert Rpt.] at 30-31).  Some county offices do not even have a supervisor on location.  (Ex. 1 [Steib Expert Rpt.] at 30).

Although it is common sense that poor supervision leads to poor case practice, Defendant Felder acknowledged that fact when attributing delays in achieving permanency for children through adoption to "lack of supervision, poor supervision."  (Ex. 28 [Felder Dep.] at 221:25-222:3).  In light of Defendants' admissions and the magnitude of agency failure to protect children from harm, it cannot be disputed that Defendants' long-standing failure to provide adequate training and supervision to DFCS staff has directly contributed to poor casework practice and resulting harm to plaintiff children for whom they are responsible.

   **3.  It Is Uncontested That Defendants Knowingly Fail To Provide DFCS Staff With The Resources Necessary To Fulfill Their Obligations To Foster Children.**

      **a.  Defendants Have Failed to Develop a Sufficient Number and Range of Foster Placements to Meet the Needs of Foster Children**

Pursuant to generally accepted professional standards, a child welfare agency is required to provide sufficient placement resources to meet the significant mental and medical health needs of foster children while they are in state custody.  (Ex. 22 [CWLA Standards for Foster Care] at § 1.12).  Defendants have expressly recognized this basic obligation to develop and maintain an

adequate range of placement settings to serve the individual needs of vulnerable foster children.

Defendants' Policy Manual thus provides:

> The child should be placed in the least restrictive setting. This means the most family-like and appropriate setting that can provide the environment and services needed to serve the child's best interest and special needs. In order of consideration, this means placement with relatives or tribal members, foster family home care, group home care, institutional care. Although foster family home care is preferable, some children's needs are such that a group home setting is more appropriate. The social worker must consider if the program of the licensed child caring facility will be appropriate for the individual child's needs.

(Ex. 20 [MDHS Policy] at DHS 00384). The Policy Manual further acknowledges the obligation of the agency to maintain sufficient resources to avoid subjecting children to multiple placements during their foster care stays, requiring that DFCS "reduce the number of moves (placements) children experience while in care." (Ex. 20 [MDHS Policy] at DHS 00406).

Defendants have admitted that they lack a sufficient number and variety of qualified foster placements, which results in DFCS having to place children in institutions such as emergency shelters and precludes caseworkers from being able to match children with placements that address the children's needs. (Ex. 1 [Steib Expert Rpt.] at ii; Ex. 41 [Rogers Dep.] at 190:23-191:4; Ex. 27 [Steib Dep.] at 103:24-104:3). Among the critical shortages are therapeutic placements and residential treatment facilities. (Ex. 35 [Mangold Dep. 8/25/04] at 81:17-20; Ex. 41 [Rogers Dep.] at 204:23-205:4, 206:13-207:3, 208:10-15, 209:1-4). According to staff at all levels who were interviewed by Dr. Steib, the lack of a sufficient array and distribution of foster placements also "results in the need to separate siblings and to place children farther from their communities than is desirable."[16] (Ex. 1 [Steib Expert Rpt.] at 36). DFCS Placement Unit director Gail Young even

---

[16] Generally accepted professional standards emphasize the importance of placing siblings in the same home: "The foster family agency should recognize the right of siblings to be placed together while in foster care. Placement of siblings separate from each other should take place rarely and should be an exception to agency policy. Siblings should be placed separately only if placement together would be contrary to the developmental, treatment, and safety needs of a given child." (Ex. 22 [CWLA Standards for Foster Care] at § 2.30).

testified that foster children with certain special therapeutic needs are regularly placed in Tennessee, Texas, and Florida, even when their permanency plans are reunification with their parents (who live in Mississippi), because there are inadequate in-state residential treatment facilities to meet their needs. (Ex. 32 [Young Dep.] at 93:13-94:12). Ms. Young could only point to limited efforts to develop such placements. (Ex. 32 [Young Dep.] at 95:9-97:1).

Defendants have been on notice for many years that their failure to develop sufficient foster placement resources results in children being unnecessarily institutionalized, subject to multiple placements, and otherwise placed in settings not designed to meet their needs. As early as 1999, Defendant Taylor conceded that "there is a lack of appropriate placement alternatives for children in need of specialized care . . . . These children are needlessly moved from placement to placement, further damaging them and guaranteeing an unstable future." (Ex. 17 [PEER Rpt.] at 31). In their 2003 Self Assessment, Defendants likewise acknowledged that "[t]here are not enough therapeutic placements for foster children needing such services." (Ex. 15 [Self Assessment] at P 002029). The Self Assessment also noted that the "overuse of shelter placements is a concern to the agency" and reported that in some counties, DFCS "standard practice" is to "use the shelter as the first placement for children." (Ex. 15 [Self Assessment] at P 002072).

The 2004 CFSR "determined that shelter facilities were used as placements because of a lack of foster care homes and not for the purpose of conducting assessments to ensure appropriate matching of children with foster placements." (Ex. 14 [CFSR] at DHS 058998). There is "an overall lack of therapeutic foster homes and treatment facilities," along with a lack of foster homes willing to accept adolescents, as well as group homes. Also found lacking were

placements for children needing very specialized therapeutic care, who were therefore being placed in out-of-state facilities. (Ex. 14 [CFSR] at DHS 059006).

Despite this, former DFCS Director Mangold acknowledged that he had done nothing to try to increase the number of therapeutic slots available to DFCS. (Ex. 35 [Mangold Dep. 8/25/04] at 85:5-15). Similarly, the DFCS Director of Placement was aware of no initiatives to expand on residential treatment services. (Ex. 32 [Young Dep.] at 102:23-103:1). Moreover, even though Defendants' 2003 Self Assessment identified insufficient specialized staff to recruit foster and adoptive applicants as a barrier to developing an adequate array of placements (Ex. 15 [Self Assessment] at P 002033-34), Defendants' expert Dr. Steib testified that by 2006, the number of full-time personnel with the full-time responsibility for recruiting and retaining foster placement resources was zero. (Ex. 27 [Steib Dep.] at 191:20-192:16).

### b. Defendants Have Failed to Make Available Adequate Health Services to Meet the Needs of Foster Children.

The undisputed evidence establishes that Defendants have knowingly failed to develop or make available a sufficient amount of health services to meet the needs of the foster children in their custody.

Defendant Felder admitted at deposition that DFCS cannot adequately assess mental health needs of the children in its custody, testifying that "we need objective psychologicals to really determine what the child needs, and we're lacking that right now." (Ex. 28 [Felder Dep.] at 196:25-197:3). Defendants' expert Dr. Steib confirmed that some staff "did not believe that they had access to all the mental health services that they needed." (Ex. 27 [Steib Dep.] at 66:19-23).

Defendants have known about the lack of adequate health services for foster children for years. The May 2004 CFSR Final Report identified "a need for more services," including:

"residential treatment services;" "[m]ental health services for children . . . , including counseling, specialized therapy, day treatment, and child psychiatrists/psychologists;" and "[s]ubstance abuse services for adolescents." (Ex. 14 [CFSR] at DHS 059041). Services that were "non-existent" or of "limited availability" included "in-patient psychiatric care for children" and "services for medically fragile children." (Ex. 14 [CFSR] at DHS 059041).

### c. Defendants Have Failed to Maintain An Adequate Computer Information System Necessary to Ensure the Well-being of Foster Children.

It is common sense that the Defendants' ability to meet their constitutional obligation to provide for the safety, care and treatment of foster children depends on their having access to reliable information concerning the status, service needs and well-being of those children. Generally accepted professional standards thus require a child welfare agency to have a comprehensive management information system to enable it to gather and analyze data to assist in casework, strategic planning, service delivery, community development, needs identification, quality improvement, staff performance and staff evaluation. (Ex. 21 [CWLA Standards for Abused and Neglected Children] at § 5.12.) As recognized by another federal district court,

> Federal law requires any child welfare agency receiving federal funds to maintain an information system from which the status, location, and goals for the placement of all foster care children may be readily determined. 42 U.S.C. § 627(a)(2)(A). Such a system is also mandated by reasonable professional standards and, this Court believes, by basic common sense.

*LaShawn A.*, 762 F. Supp. at 976 (citing the predecessor to 42 U.S.C. § 622(b)(10)(B)(i)).[17] As Dr. Hess explains, "[g]iven the life-altering nature of the decisions made within the child

---

[17]  Pursuant to federal regulations, a SACWIS system must be "a comprehensive system, which is effective and efficient, [and which will] improve the program management and administration of the State plans for titles IV-B and IV-E." (45 C.F.R. § 1355.53(a)). "At a minimum, the system must provide for effective management, tracking and reporting by providing automated procedures and processes to:  (1) Meet the Adoption and Foster Care

protection and permanency planning process, decisions based upon incomplete or inaccurate documentation are likely to be arbitrary, unwise and even life-threatening." (Ex. 4 [Hess Expert Rpt.] at 54). "[W]ithout a full and accurate record of the child's needs and experiences, the child's well-being and safety are in constant jeopardy." (Ex. 4 [Hess Expert Rpt.] at 20).

There is no dispute that Defendants have failed to operate an information system capable of accurately providing essential information about the individual children in their custody, or generating accurate aggregate child welfare information necessary for Defendants to engage in critical management decisions. DFCS uses an automated system, the Mississippi Automated Child Welfare Information System (MACWIS), for virtually all documentation and data tracking. (Ex. 1 [Steib Expert Rpt.] at 13). It is undisputed that although MACWIS is the primary vehicle for monitoring the provision of services to children, and that the timely and accurate entry of information into MACWIS is especially critical in the event of staff turnover, MACWIS does not contain complete and accurate information regarding the children in DFCS foster care custody. (Ex. 37 [Mangold 6/2/05 Dep.] at 80:12-81:4, 81:15-82:5). As recently as March 2006, current DFCS Director Felder referred to MACWIS data as "problematic," and to case documentation as a "major concern." (Ex. 19 [Felder Draft Plan] at 115412, 115415). Defendants' own expert has documented the following MACWIS problems:

- "The reliance on over-burdened casework staff alone to enter data into MACWIS means that record keeping is often not up to date;"

---

reporting requirements through the collection, maintenance, integrity checking and electronic transmission of the data elements specified by the [AFCARS] requirements . . . ; (2) Provide, for electronic exchanges and referrals, as appropriate, with . . . [other data] systems within the State . . . ; (4) Collect and manage information necessary to facilitate the delivery of client services . . . ; (6) Support necessary case assessment activities; (7) Monitor case plan development, payment authorization and issuance, review and management, including eligibility determinations and redeterminations; and (8) Ensure the confidentiality and security of the information and the system." (45 C.F.R. § 1355.53(b)).

- The system "overwrites case histories meaning that neither caseworkers, supervisors, nor other reviewers have access to all relevant information concerning children and families;" and,

- There is a "lack of staff to manage programming and to correct problems in the system."

(Ex. 1 [Steib Expert Rpt.] at 13).

It is also uncontested that MACWIS failures directly put foster children's safety in jeopardy. Defendant Felder testified that MACWIS precludes front-line staff from determining whether a potential foster home for a child is under investigation for alleged child abuse and neglect. He admitted that "there's the potential for a risk" that foster children will be placed by MDHS into foster homes where MDHS has good reason to believe they will be abused, and that "we need to do a better job" of protecting children in custody from preventable further abuse. (Ex. 28 [Felder Dep.] at 205:4-206:5). Former Director Mangold further admitted that there is no "notation in MACWIS regarding any investigations or other concerns that may have been noted by licensing or other social work staff about a particular placement," which means that caseworkers are not routinely informed of whether there are safety concerns regarding a foster home before placing a child there. (Ex. 36 [Mangold Dep. 5/16/05] at 20:11-22).

Director Felder specifically noted MACWIS's missing and inaccurate placement data and that "[c]ourts are sometimes relying on incomplete documentation . . . to make decisions affecting the lives of the children in our care." (Ex. 19 [Felder Draft Plan] at 115412, 115415). Former DFCS program specialist Robin Wilson, produced as Defendants' Rule 30(b)(6) designee regarding DFCS electronic record-keeping practices, testified that some MACWIS aggregated data reports do not accurately reflect what is in children's case files and that she had "no confidence" in the accuracy of various aggregate data that had been produced regarding medical, dental, psychological, and educational services to children. (Ex. 40 [Wilson Dep.] at

34:7-35:3).  Ms. Wilson further stated that she had been aware of the problem with this data for a year, that she knew the agency needed this information "to ensure that our children are getting proper medical, dental and psychological care," but that programming staff to make the system changes necessary to accurately aggregate this data "got pulled off several times" on other urgent issues.  (Ex. 40 [Wilson Dep.] at 35:9-36:3).

Defendants have known about these critical problems plaguing the agency's information system for years, but have yet to provide for an adequate system.  According to Defendants' 2003 Self Assessment "staffing vacancies or an inadequate number of staff to support the workload continues to compromise the State's ability to provide accurate data."  (Ex. 19 [Self Assessment] at P 002046).  Defendants' Self Assessment further conceded that "medical information is not routinely entered into MACWIS, and cannot be measured through automated means."  (Ex. 19 [Self Assessment] at P 002079-80).  The May 2004 federal CFSR found that MDHS was not in substantial conformity with the systemic outcome of "Statewide Information System" (Ex. 14 [CFSR] at DHS 058959), and determined that MACWIS data was too inaccurate to be relied upon for such critical information as the location, status and goals of children in Defendants' custody.  (Ex. 14 [CFSR] at DHS 059027).

### d.  Defendants Have Failed to Provide Essential Administrative Support To Staff.

According to Defendants' expert "[a]n effective child welfare agency . . . must provide the administrative supports to ensure that [service delivery] staff have the guidance, training, and oversight that they need to function well."  (Ex. 1 [Steib Expert Rpt.] at 30).  Dr. Steib's review revealed, however, that "[a]dministrative . . .  staff are inadequate to provide the support needed by those responsible for service delivery."  (Ex. 1 [Steib Expert Rpt.] at ii).  According to Dr. Steib's report, "supervisors contacted by CWLA consultants in the course of this review were

uniformly frustrated at what they perceived as unreasonably adverse working conditions, lack of administrative support, and inadequate compensation and benefits." (Ex. 1 [Steib Expert Rpt.] at 29). Among the concerns reported by Dr. Steib are that "state level administrators do not understand the work that [county caseworkers, supervisors and managers] do," and that "so many people have been dismissed or have quit at the state level that there are not sufficient people there to provide programmatic support and functional supervision and those who are there are not perceived as having sufficient knowledge or experience to be helpful." (Ex. 1 [Steib Expert Rpt.] at 19-20).

Defendant Felder has admitted that "day-to-day deficiencies in operations or lack of planning, lack of daily management activities," were already apparent years earlier when he was previously working at DFCS. (Ex. 28 [Felder Dep.] at 24:23-25:8). Despite the undeniable severity of the consequences for children when the State's child welfare staff is left without the required support, guidance, training, and oversight, Defendants have failed to maintain adequate administrative supports at DFCS and DHS.

### e. Defendants' Unprofessional Fiscal Practices Deprive Foster Children Of Resources Necessary For Their Protection

The undisputed evidence makes clear that Defendants knowingly engage in fiscal and budgetary practices that do not comport with minimum professional standards and deprive the child welfare system of critically needed and available funding to protect plaintiff children from harm.

### i. Defendants Fail To Request The Funding They Know is Necessary to Protect and Care For The Plaintiff Children.

Defendants have been aware that DFCS has been dangerously underfunded and understaffed for years. (Ex. 2 [Brister Expert Rpt. at 15, 21]; (Ex. 29 [Boulette Dep.] at 22:21–

24:25); (Ex. 33 [Biggers Dep.] at 76:25–78:2).  DFCS has repeatedly documented the need to

hire 500 to 700 *additional* social workers to address dangerously high caseloads.  (Ex. 2 [Brister

Expert Rpt.] at 1).  However, for the period from 2000 to the present, neither MDHS nor DFCS

ever requested from the Legislature in their annual budget request submissions that DFCS be

funded at levels necessary to meet its known staffing and other critical needs.  (Ex. 2 [Brister

Expert Rpt.] at 1-2, 5-7, 21; Ex. 29 [Boulette Dep.] at 70:22–72:23, 74:9–75:16, 232:13-20; Ex.

33 [Biggers Dep.] at 66:4-20, 71:7–73:25, 76:25–77:15, 89:11-97:8).  Defendant Taylor testified

that he did not request more funds to create additional caseworker positions because DFCS had

not been able to fill positions that currently existed, stating, "[i]n my opinion, it is no value to ask

for 500 additional social workers if you cannot fill the PINS that you've got right now."  (Ex. 38

[Taylor Dep.] at 101:14-18).

Although Defendants attribute the inability to hire and retain DFCS staff to low salaries,

the absence of advancement opportunities and the lack of any salary increases, (Ex. 38 [Taylor

Dep.] at 105:23-25, 106:1-4, 111:9-25, 112:1-5; Ex. 1 [Steib Expert Rpt.] at 21; Ex. 19 [Felder

Draft Plan] at 115412, 115419-24), Defendant Taylor's FY 2007 request to the Legislature did

not include any increases for salary raises or career advancement opportunities for frontline

caseworkers and supervisors.   (Ex. 10 [DHS FY 07 Budget Request] at DHS 115703).

Moreover, Defendant Felder acknowledged at deposition that the statement in his March 2006

Draft Plan that he had requested pay increases for Social Workers was not, in fact, true.  (Ex. 28

[Felder Dep.] at 186:8-10, 186:14-16).

### ii. Defendants Have Knowingly Failed to Take Advantage of Available Federal Funding.

Plaintiffs' fiscal expert Dr. Bill Brister's uncontested expert analysis of Defendants' own

budget documents reveals that Mississippi receives the lowest amount of federal Title IV-E child

welfare funds per child of any state in the nation because of a failure to document eligibility. (Ex. 2 [Brister Expert Rpt.] at 1, n. 3-4). In federal FY 2002, 23% of children in DHS custody received Title IV-E federal reimbursement, as opposed to the 62% average for all 47 reporting states in that year. (Ex. 2 [Brister Expert Rpt.] at 9-10). Mississippi's Title IV-E eligibility rate was 18% in federal FY 2003, 20.2% in federal FY 2004 and 20.4% in federal FY 2005. (Ex. 2 [Brister Expert Rpt.] at 10, n.37). Although DFCS reported a substantially higher eligibility rate in its current Draft Plan, Defendant Felder conceded at deposition that there are some concerns with the accuracy of the eligibility determination piece in MACWIS. (Ex. 28 [Felder Dep.] at 246:14-19).

If Mississippi were to bring its Title IV-E eligibility rate up to the national average, it would increase the amount of federal funds available for services to Mississippi foster children by over $24 million. (Ex. 2 [Brister Expert Rpt.] at 1, n. 3-4). As noted by Dr. Brister:

> The result of the low Title IV-E Foster Care eligibility rate is that the cost of caring for the children in foster care who are not determined to be eligible for Title IV-E foster care reimbursement is paid solely by state and/or local funds. In some cases, the cost is shifted to the capped Federal programs . . . . It is certainly not fiscally justifiable to place the complete burden of the expense of foster care on the State when Federal matching funds are available. And it is not fiscally justifiable to shift the expense of caring for foster children to Federal Programs that are capped when an open-ended source of federal funds is available.

(Ex. 2 [Brister Expert Rpt.] at 10 (footnotes omitted)).

In addition to not pulling down Title IV-E foster care funds for which the State is eligible, Defendants have failed to make use of millions of dollars in other available federal matching funds. "In the last three years alone, Mississippi did not spend $7,765,168 allotted to it by the Federal government through the Title IV-B Promoting Safe and Stable Families program" for lack of state matching funds. (Ex. 2 [Brister Expert Rpt.] at 4). This was despite Defendants' recognition that prevention services funded through that program have in the past "saved the

State of Mississippi $33,348,720 in expenses that were avoided by keeping children in the parents' home." (Ex. 2 [Brister Expert Rpt.] at 13). Meanwhile, in FY 2005, "[a]pproximately 40% of the State funds appropriated to DFCS . . . were not used to secure Federal matching funds." (Ex. 2 [Brister Expert Rpt.] at 8).

Defendants readily admit that DFCS does not maximize available federal funds. At deposition, Executive Director Taylor stated that "I concede that we were not drawing down the IV-E money to which were entitled," and that the current rate at which Mississippi accesses federal funds is "considerably lower than the national average." (Ex. 38 [Taylor Dep.] at 146:24-25, 143:11-19). Defendant Felder agreed with Dr. Brister's assessment that Defendants were not maximizing various grants and resources, and stated that the Defendants could not request more money [from the Legislature] when they had not maximized their resources, because there was "still money on the table." (Ex. 28 [Felder Dep.] at 77:21-25; 116:20-25; 117:1-5).

Defendants' known failure to maximize its federal revenue is longstanding. In 2002, Sue Perry, then-Director of DFCS, informed then-Governor Ronnie Musgrove that "several million dollars in federal grant monies were being returned each year because there were not adequate general funds for match." (Ex. 16 [Perry letter] at P 000153). Despite this, Defendants continue to maintain an underfunded agency that is unable to protect plaintiff children from harm for lack of adequate resources.

### III. CONCLUSION

The constitutional shortcomings discussed above are not anecdotal; they are systemic. They are not short-term or temporary; they are chronic. They are not contested; defendants largely concede the facts that demonstrate the overwhelming failures of Mississippi's system of child welfare. In the main, the facts we describe are drawn from the defendants themselves,

from their witnesses, their documents, and their one expert, who confirms that Mississippi's child welfare system suffers from a severe and longstanding lack of necessary resources.  Nor is the situation improving.  Incredibly, it worsened in material respects even after this action was commenced in early 2004.

When a State voluntarily takes abused and neglected children into its custody, it assumes an obligation to provide a constitutionally minimum standard of care to those children.  Mississippi has failed to meet that standard, and is instead operating a child welfare system that systematically fails to protect Plaintiffs and their class, in violation of their substantive due process rights.

The Court should grant Plaintiffs' Motion for Summary Judgment on Liability and proceed to formulation of an appropriate remedial decree.

Respectfully submitted, this 1st day of May, 2006.

/s Melody McAnally_____
W. Wayne Drinkwater, Jr. (MBN 6193)
Melody McAnally (MBN 101236)
BRADLEY ARANT ROSE & WHITE LLP
188 East Capitol Street, Suite 450
Jackson, MS  39201
Telephone:  (601) 948-8000
Facsimile:  (601) 948-3000

Stephen H. Leech (MBN 1173)
850 East River Place, Suite 300
Jackson, MS 39202
Telephone:  (601) 355-4013

Marcia Robinson Lowry (MBN 43991 *pro hac vice*)
Susan Lambiase (MBN 43992 *pro hac vice*)
Eric E. Thompson (MBN 43993 *pro hac vice*)
Tara Crean (MBN 44447 *pro hac vice*)
Shirim Nothenberg (MBN 43990 *pro hac vice*)
CHILDREN'S RIGHTS
330 Seventh Ave, 4th Floor
New York, NY 10001

Telephone:  (212) 683-2210

John Lang (MBN 43987 *pro hac vice*)
Christian Carbone (MBN 43986 *pro hac vice*)
John Piskora (MBN 44474 *pro hac vice*)
LOEB & LOEB LLP
345 Park Avenue
New York, NY 10154
Telephone:  (212) 407-4000

*PLAINTIFFS' COUNSEL*

## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2006, I electronically filed the foregoing with the Court using the ECF system, which sent notification of such filing to the following:

Dewitt L. ("Rusty") Fortenberry Jr., Esq.
Kenya Key Rachal, Esq.
Gretchen L. Zmitrovich, Esq.
Ashley Tullos Young, Esq.
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC
4268 I-55 North
Meadowbrook Office Park
Jackson, Mississippi 39211

Harold E. Pizzetta, III, Esq.
Assistant Attorney General
General Civil Division
Carroll Gartin Justice Building
430 High Street
Jackson, Mississippi  39201

*Attorneys for Defendants*

/s Melody McAnally