# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

----------------------------------------------------------------x

BRIAN A., by his next friend, Bobbi Jean Brooks;  )
TRACY B., by her next friend, Pamela Pallas;  )
JACK and CHARLES C., by their next friend,  )
Linda Lloyd;  )
AMY D., by her next friend, Frank Koon;  )
DENISE E., by her next friend, Linda Lloyd;  )
CHARLETTE F., by her next friend,  )
Juanita Veasy; and  )
TERRY G., by her next friend, Carol Oldham,  )
on their own behalf and on behalf of all others  )
similarly situated,  )

                         Plaintiffs,  )

--against--  )

DONALD SUNDQUIST, Governor of the State  )
of Tennessee; and  )
GEORGE HATTAWAY, Commissioner of the  )
Tennessee Department of Children's Services  )

                        Defendants.  )

----------------------------------------------------------------x

Civil Action No. 3-00-0445
Judge Campbell
Magistrate Brown

---

## SETTLEMENT AGREEMENT

---


This document was entered on
the docket in compliance with
Rule 58 and / or Rule 79 (a).

FRCP, on 7/37/06 by ___


EXHIBIT
M
tabbies

## TABLE OF CONTENTS

Preamble...................................................................................................................4

I.      Principles Of Settlement Agreement and Class Definition.......................................4

        A.      Principles of Settlement Agreement................................................4

        B.      Class Definition................................................................................6

II.     Structure of the Agency...............................................................................6

III.    Reporting Abuse and Neglect.....................................................................7

IV.     Regional Services.........................................................................................7

V.      Staff Qualifications, Training, Caseload, Supervision.........................................8

VI.     Placement and Supervision of Children......................................................13

VII.    Planning for Children....................................................................................21

VIII.   Freeing a Child for Adoption.......................................................................27

IX.     Adoptive and Foster Parent Recruitment, Retention, and Licensing.......................29

X.      Statewide Information System......................................................................31

XI.     Quality Assurance........................................................................................32

XII.    Supervision of Contract Agencies..............................................................35

XIII.   Financial Development..................................................................................36

XIV.    Technical Assistance Committee.................................................................37

XV.     Monitoring....................................................................................................38

XVI.    Outcome and Performance Measures.........................................................40

2

XVII. Modification..............................................................................................52

XVIII. Enforcement, Termination and Exit................................................................53

      A.      General Principles Guiding Enforcement.............................................53

      B.      Dispute Resolution......................................................................53

      C.      Termination and Exit....................................................................55

XIX. Named Plaintiffs.........................................................................................56

XX. Attorneys Fees and Expenses..........................................................................56

PREAMBLE

A.    The provisions of this Settlement Agreement resolve the existing disputes and issues in the case of Brian A., et al., v. Don Sundquist, et al., Civil Action Number 3-00-0445 (Judge Campbell/Brown), and satisfy and resolve the claims of the named plaintiffs and the plaintiffs' class in the above-entitled case as of the date of this Settlement Agreement.

B.    This court has subject matter jurisdiction and personal jurisdiction over this action and therefore the authority to enter this Settlement Agreement.

C.    This court shall have continuing jurisdiction of this action to ensure compliance with the terms of this Settlement Agreement for as long as the Settlement Agreement remains in effect.

D.    Any state agency responsible for the care, protection, and/or supervision of plaintiff class members shall be bound by the provisions of this Settlement Agreement. For as long as this Settlement Agreement remains in effect, all provisions of this Settlement Agreement referring to the "Department," the "Department of Children's Services" or "DCS," upon any subsequent changes to the current governmental organizational structure of the Tennessee Department of Children's Services concerning the children in the plaintiff class as defined in this Settlement Agreement, shall apply with full force and effect to the State of Tennessee and to any subsequent agency or agencies with any of the responsibilities that apply to the current Tennessee Department of Children's Services under this Settlement Agreement as of the date of this Settlement Agreement.

E.    This Settlement Agreement, and any of its provisions, are not, and shall not be construed to be, an admission of any liability on the part of any of the defendants concerning any of the claims and allegations in the complaint in this litigation.

I.    PRINCIPLES OF SETTLEMENT AGREEMENT AND CLASS DEFINITION

A.    Principles of Settlement Agreement

1.    All children should have the best possible opportunity to grow up within a safe, nurturing family, either their biological family or, if that is not possible, within an adoptive family.

2.    The state should make reasonable efforts to avoid foster care placement by providing services to preserve the biological family whenever that is reasonably possible. However, child welfare decision-makers must have the professional capacity to make determinations as to when making

4

efforts to preserve the biological family, or leaving the child with that family, is neither safe for the child nor likely to lead to an appropriate result for the child.

3.    After children enter placement, all non-destructive family ties should be maintained and nurtured. Children should be placed with relatives who are able to provide a safe, nurturing home for them, and should be placed with siblings, and relationships with relatives and siblings should be facilitated and maintained by the child welfare agency.

4.    Foster care should be as temporary an arrangement as possible, with its goal being to provide a permanent home for the child as quickly as possible. In making the determination about what plans and services will best meet this goal, the child's interests must be paramount.

5.    The state has primary responsibility for the care and protection of children who enter the foster care system. Insofar as it relies on private contractors to assist in meeting this responsibility, it should only do so according to standards set by and rigorously monitored by the state.

6.    All children in need of child welfare services should receive full and equal access to the best available services, regardless of race, religion, ethnicity, or disabilities.

7.    Children in foster care placement should be in the least restrictive, most family-like setting possible, and the state should make all efforts to avoid the use of non-family settings for children, particularly young children.

8.    Children in foster care placement should have stable placements that meet their needs and the services necessary to address both the trauma of foster care placement and the problems surrounding their removal from their family.

9.    Children in out-of-home placement must have timely decision-making about where and with whom they will spend their childhood, and timely implementation of whatever decisions have been made.

10.    Families of children in foster care should be significant participants in the planning and decision-making concerning their children.

11.    The state should achieve these goals in a family environment whenever possible, separating the child from the child's parents only when necessary for the child's welfare or in the interest of the child's safety, keeping a child as close to home as possible.

12. All parties in judicial proceedings involving neglect, abuse, unruly and delinquency should be provided a fair hearing and their constitutional and other legal rights should be enforced and recognized.

13. Except where a particular provision of this Settlement Agreement establishes a specific limit on the resources required to be allocated, defendants shall commit all necessary resources (administrative, personnel, financial and otherwise) to implement all provisions of the Settlement Agreement.

14. All actions required for plaintiff class members under the Settlement Agreement shall be documented within the individual case file of each member of the plaintiff class. DCS shall have the ability to produce aggregate data requested by the Monitor concerning compliance with the provisions of this Settlement Agreement.

B.   Class Definition

Pursuant to the terms of this Settlement Agreement, this case shall be certified as a class action and the class certified shall be defined as follows: All foster children who are or will be in the legal custody of the Tennessee Department of Children's Services. "Foster children" shall mean all children who are or will be in the legal custody of the Tennessee Department of Children's Services, excluding children who are or will be in the legal custody of the Department of Children's Services upon an allegation or adjudication of a delinquent or criminal act. Children who are or will be in the custody of the Department of Children's Services upon an allegation or adjudication of an unruly or status offense shall be included in the class, and children who are or will be in the custody of the Department of Children's Services upon on allegation of a delinquent or criminal act and which allegation is subsequently dropped or fails to result in an adjudication of a delinquent or criminal act and who remain in the legal custody of the Department of Children's Services, shall be included in the class.

II.   STRUCTURE OF THE AGENCY

A.   DCS shall establish child welfare policy and determine statewide standards and practices for the entire state. DCS shall take all reasonable steps necessary to ensure that statewide policies, standards and practices are implemented and maintained in each region of the state and that uniform forms and data collection and reporting are utilized in each region. Regions retain the right to develop and use forms and data instruments that address issues of local concern.

6

III.   REPORTING ABUSE AND NEGLECT

     A.    DCS's system for receiving, screening and investigating reports of child abuse and neglect for foster children in state custody shall be adequately staffed to ensure that all reports are investigated within established time periods.

     B.    All matters of abuse or neglect of foster children in DCS custody shall be investigated by the child protective services unit in the manner and within the time frame provided by law. All matters concerning abuse or neglect of foster children in DCS custody in institutional, group, residential or contract agency foster home placements shall also be referred to and reviewed by the quality assurance unit and, as appropriate, the licensing division. The purpose of this review is to determine whether a pattern of abuse or neglect exists within the institutional, group, residential or contract agency foster home placements that contributed to the abuse or neglect; whether the facility should be closed or the contract terminated; and what other steps are necessary to safeguard the well-being of the children in the facility. The quality assurance unit and, where appropriate, the licensing division, shall be responsible for taking appropriate action, including the development of a corrective action plan, monitoring the implementation of any corrective action plan, and determining if additional monitoring is needed. This review (and any necessary investigation) shall be completed within 90 days, and DCS shall provide all necessary interim actions prior to, during and after any investigation, and shall provide reports of any investigation to the Monitor.

IV.   REGIONAL SERVICES

     A.    Each region shall have available a full range of community-based services to support and preserve families of foster children in state custody, and to enable children to be reunified with their families safely and as quickly as possible.

     B.    Each region shall have available or shall develop a full range of community based family services, which shall be available to:

          1.    Foster families for whom children have established a significant, beneficial emotional bond and which provide the possibility of long-term stability and permanence, but which are in danger of disrupting without intensive home-based crisis intervention services;

          2.    Families to whom children in foster care could be returned safely with the availability of intensive family services for a transition period; and

7

3.    Adoptive families in which an adoption contract has been signed and, who prior to finalization, are in danger of disrupting without intensive home-based crisis intervention services.

V.    STAFF QUALIFICATIONS, TRAINING, CASELOAD, SUPERVISION

A.    All provisions of this section shall apply to all DCS Case Managers 1-4, Community Service Agency (CSA) custodial case managers, all contract agency foster care case workers and supervisors, and any other workers with corresponding responsibilities for foster children in state custody. CSA case managers will no longer have caseloads that include children in the plaintiff class, effective March 1, 2002.

B.    Qualifications for case managers responsible for cases of class members shall be as follows:

1.    A Case Manager 1 shall have a bachelor's degree, with employment preference given to applicants holding a bachelor's degree in social work or a related behavioral science. No Case Manager 1 shall be promoted to Case Manager 2 until the completion of a job performance evaluation developed in consultation with the technical assistance committee (defined in Section XIV in this Settlement Agreement). Such evaluation tool shall include evaluation of their performance on the case management requirements of this Settlement Agreement. Failure to receive a satisfactory job performance evaluation at the end of one year will result in the termination of the case manager's employment.

2.    A case manager 2 must have either been promoted from case manager 1, or have at least a bachelor's degree, with employment preference given to applicants holding a bachelor's degree in social work or a related behavioral science and one year experience in providing child welfare services. No Case Manager 2 shall be promoted to Case Manager 3 until the completion of a job performance evaluation developed in consultation with the technical assistance committee. Such evaluation tool shall include evaluation of their performance on the case management requirements of this Settlement Agreement. Failure to receive a satisfactory job performance evaluation at the end of six months will result in the termination of the case manager's employment.

8

3.     A Case Manager 3 must have either been promoted from Case Manager 2; or have at least a bachelor's degree, with employment preference given to applicants holding a bachelor's degree in social work or a related behavioral science, and two years experience in providing child welfare services. A master's degree in social work or a related behavioral science may substitute for one year experience in providing child welfare services.

C.     In consultation with the technical assistance committee, the state shall develop and implement stipends and other incentives to support graduate work that will provide reasonable steps to enable the state to hire and retain case managers with undergraduate and graduate degrees in social work and relevant and related fields. As part of this process, the state will assess and determine whether salary increases are necessary to ensure that Tennessee is competitive with neighboring states concerning compensation for case managers and supervisors.

D.     No case manager shall assume any responsibility for a case, except as part of a training caseload, until after completing training, as specified below, and after passing a skills-based competency test, the content and passing standards for which shall be developed in consultation with the technical assistance committee.

E.     DCS shall have a full-time training unit headed by a chief of training with appropriate qualifications.

1.     In consultation with the technical assistance committee, this unit shall have sufficient staffing, budget funds, and other resources to assure that it can provide comprehensive child welfare training to ensure that all persons responsible for children in the plaintiff class will have sufficient training to permit them to comply with the relevant mandates of this Settlement Agreement, DCS policy, and reasonable professional standards.

2.     This unit shall determine, on an annual basis, those DCS workers in need of retraining, as indicated by workers' failure to ensure that cases for which they are responsible meet the requirements of this Settlement Agreement, DCS policy and/or reasonable professional standards, and shall ensure that additional training is provided to them. Workers who fail to meet the requirements of this Settlement Agreement, DCS policy and/or reasonable professional standards, despite the provision of additional training, shall be eligible for reassignment or termination.

9

3. The details of both a pre-service and in-service training program for case managers as determined necessary shall be reviewed and developed in consultation with the technical assistance committee. All case managers shall have a minimum of 160 hours of pre-service training, including instructional training and supervised field training. All case manager supervisors shall receive a minimum of 40 hours of in-service training that is directed specifically at the supervision of child welfare case workers, prior to receiving any supervisory responsibilities. All case managers shall receive a minimum of 40 hours of ongoing training each year. All case managers with supervisory responsibility shall receive a minimum of 24 hours of in-service training each year.

4. Prior to contracting with any agency, DCS will review, approve, and monitor the curriculum for caseworker pre-service and in-service training to assure that general content areas are appropriate to the work being performed by the agency. Where casework activities mirror the duties of the DCS case manager, the curriculum will correspond with DCS pre-service and in-service training. As a minimum, DCS will require 80 hours of pre-service instructional training and 80 hours of pre-service supervised field training, as well as 40 hours of ongoing training each year.

F. No Case Manager 1 having responsibility for the case of any class member shall have a case load totaling more than 15 class members, or, for those workers carrying a mixed caseload, the weighted equivalent, as those weights have been determined in consultation with the technical assistance committee. No Case Manager 2 or 3 having responsibility for the case of any class member shall have a case load totaling more than 20 class members, or, for those workers carrying a mixed caseload, the weighted equivalent, as those weights have been determined in consultation with the technical assistance committee. Case managers with an adoptions caseload shall not have a caseload totaling more than 12 children in the plaintiff class. Case Manager 3's having no supervisory responsibility shall not have a caseload of more than 20. Case Manager 3's that supervise shall have a weighted caseload. Case Manager 3's supervising up to two lower level case managers shall not have caseloads totaling more than 10. A Case Manager 3 supervising three or more lower level case managers shall not have a caseload. A case manager 3 shall not supervise more than 4 case managers. Case manager 3's shall be given supervisory responsibility only in circumstances in which the caps on supervisory caseloads dictate that an additional case manager 4 would have less than a full supervisory case load. A single case manager assigned to a case shall have full responsibility for that case, including the responsibility to work with the child and the family and to visit with both for the purposes of assessing and meeting the child's and the family's

10

needs, determining and implementing a permanency plan, supervising, supporting and assuring the stability of the child's placement and assuring a safe, adequate and well planned exit from foster care.

1.  All case managers or case workers with supervisory responsibility for case managers or case workers carrying the cases of any class members (i.e., team leaders or supervisors) shall have a minimum of a master's degree in social work or related behavioral field with a child or family focus (excluding criminal justice) and at least three years experience as a case worker in child welfare; however, an additional 2 years of providing child welfare services may substitute for the master's degree (this sentence shall not apply to supervisors currently holding their positions as of the date of this Settlement Agreement or employees who are currently eligible for appointment as team leaders as of the date of this Settlement Agreement).  No team leader/supervisor shall assume his or her supervisory responsibility until after completing training as specified herein, and after passing a skills-based competency test geared specifically to child welfare supervision.

2.  By January 1, 2002, 50% of all team leaders or supervisors shall supervise no more than 7 case managers or case workers at any one time, and shall not carry their own caseloads.  By April 1, 2002, all team leaders or supervisors shall supervise no more than 7 case managers or case workers at any one time, and shall not carry their own caseloads.  By January 1, 2003, 50% of all team leaders or supervisors shall supervise no more than 6 case managers or case workers at any one time, and shall not carry their own caseloads. By April 1, 2003, all team leaders or supervisors shall supervise no more than 6 case managers or case workers at any one time, and shall not carry their own caseloads.  By January 1, 2004, 50% of all team leaders or supervisors shall supervise no more than 5 case managers or case workers at any one time, and shall not carry their own caseloads.  By April 1, 2004, all team leaders or supervisors shall supervise no more than 5 case managers or case workers at any one time, and shall not carry their own caseloads.  If team leaders or supervisors have any responsibilities other than the direct supervision of case-carrying case managers or case workers, their responsibilities shall be weighted, and their supervisory case load reduced to an equivalent weighted caseload.

3.  Child care workers employed in any child care facility or program providing placements and services to children in foster care and their families shall have a minimum of a high school diploma, with preference given to those applicants with one year of previous child welfare-related experience.

11

4.    All persons applying for positions with DCS or a contract agency which involve any contact with children shall be required to submit to a criminal records check and a child abuse registry screening process before beginning training or employment. No DCS or contract employee who has any contact with children shall have been convicted of a prior felony for an offense designated as a crime against the person or have been the subject (i.e., alleged perpetrator) in any substantiated or indicated case of child abuse or neglect. An individual who has been convicted of any prior felony may not be employed by DCS or a contract agency in a position involving contact with children unless: 1) the conviction occurred at least 5 years prior to the employee's hiring; 2) the employee has not been convicted of any other criminal offense since that conviction; 3) the DCS regional administrator or agency program director personally reviews the circumstances of the applicant and determines that this employee could work productively and constructively with children. An individual who has been convicted of any prior misdemeanor may not be employed by DCS or a contract agency in a position involving contact with children unless criteria ##2-3 above are satisfied. If, however, any employee for whom the above criteria has been satisfied is the subject of a criminal conviction or becomes the subject in any substantiated or indicated case of child abuse or neglect during his/her employment, the employment shall be immediately terminated. The section is not applicable to employees convicted of delinquent offenses. This provision shall not apply to foster and adoptive parents.

5.    When a case manager leaves the agency, his/her cases shall be reassigned within one business day. No cases shall be uncovered at any time. Except in documented emergency situations, or when the case manager leaves without prior notice, all transfers of cases between case managers shall take place after a face-to-face meeting, including the departing and the receiving case manager's supervisors, to discuss the case. The departing case manager shall make every effort to introduce the receiving case manager, in person, to the child and the child's parents.

6.    Any region with an annual case worker turnover rate that exceeds 10% in which cases are either uncovered or are being reassigned to workers at the caseload cap, shall establish and maintain a pool of trained workers available to take over the caseloads of departing workers.

12

G.    Case recordings and all other documentation concerning contacts or developments in the cases of class members shall be added to the case file for that child within 30 days of the case work activity or development. The case files of class members shall contain adequate documentation tracking the services provided, progress, any change in placement of the child, and authorizations which document the approval for placements, treatment and services provided to each child.

VI.    PLACEMENT AND SUPERVISION OF CHILDREN

A.    DCS shall immediately conduct a statewide needs assessment, under the supervision and auspices of an independent expert chosen by the technical assistance committee. This needs assessment shall be completed by November 1, 2001, unless the independent expert determines that additional time is necessary, which shall not exceed 60 days. The results of the needs assessment shall be publicly available 15 days after the results are provided in written form to the Monitor and the Commissioner. This needs assessment and all future needs assessments will determine the need for new and/or different placement and services resources, and where those placements and services should be located. This independent expert and the technical assistance committee may consider DCS's past and present efforts in the area of needs assessment but the independent expert shall independently determine the manner and methodology of the needs assessment to be performed. The needs assessment shall be updated annually under the supervision of the independent expert for two years, and under the supervision of the technical assistance committee thereafter. However, after the first year, upon the determination of the technical assistance committee that the independent expert should be replaced, the technical assistance committee may appoint a new independent expert for the second year. The assessments shall include a plan and timetables within which the findings of the needs assessment shall be implemented, beginning immediately after the completion of the needs assessment. DCS shall provide funding to implement the findings of the needs assessments. DCS will commit 4 million dollars over each of five years from the date of this Settlement Agreement. In addition, DCS will establish a 2 million dollar contingency fund for each of five years from the date of this Settlement Agreement. If the costs of the recommendations from any needs assessment exceeds the available funding for that year, DCS will consult with the technical assistance committee to get assistance in crafting effective methods through grants, direct appropriations and other resources, to fund the recommendations. During any of five years from the date of this Settlement Agreement, DCS may choose to accelerate the spending of state appropriated funds designated for those years.

13

B.     A child shall be considered to have entered foster care custody on the date that the child enters DCS's physical, out-of-home custody, or on the date on which the child enters DCS's legal custody, whichever is sooner. The duration of a child's time in foster care custody shall include the entire time period after which a child entered foster care custody until formally discharged from foster care custody, including but not limited to any and all emergency, shelter or other temporary placements during which the child is in DCS's physical, out-of-home custody or legal custody.

C.     All children shall be placed according to the following standards:

1.     All children shall be placed within their own region or within a 75 mile radius of the home through which the child entered custody, unless the child's needs are so exceptional that they cannot be met by a family or facility within the region, or the child needs re-placement and the child's permanency goal is to be returned to his parents who at that time reside out of the region or the child is to be placed with a relative out of the region, under which circumstances the regional administrator or the team coordinator shall be specifically required to so certify in writing, based on his or her own examination of the circumstances.

2.     Children shall not remain in emergency or temporary facilities, including but not limited to emergency shelters, for more than 30 days. Children shall not be placed in more than one shelter or other emergency or temporary facility within any 12 month period. An exception to the multiple placement limit within any 12-month period may occur for an individual placement episode for a maximum of 5 days. The exception shall only apply to runaways and children facing a direct threat to their safety, or who are a threat to the safety of others, where immediate removal is necessary. As an additional exception to the multiple placement limit within any 12-month period, if a child's behavior has changed so significantly that placement for the purposes of assessment is critical for the determination of an appropriate placement, and the regional administrator certifies in writing that the assessment is essential for an appropriate placement, there may be a single additional placement in a primary treatment center (PTC) for up to a maximum of 15 days.

3.     No child in DCS physical or legal custody in foster care shall be placed, by DCS or with knowledge of DCS, in a jail, correctional or detention facility unless such child has been charged with a delinquency charge or unless otherwise placed or ordered by the court. Within 60 days of the signing of this Settlement Agreement, DCS shall inform the appropriate law enforcement offices and

14

judicial officials in all Tennessee counties of this policy. DCS shall provide law enforcement and judicial officials with written instructions to immediately notify DCS of any child in DCS legal custody who has been placed in a jail, correctional or detention facility.

4.  DCS shall not place any child determined by a DCS assessment to be at high risk for perpetrating violence or sexual assault in any foster care placement with foster children not so determined.

5.  All children shall be placed in accordance with their individual needs, taking into account the child's needs to be placed as close to home and community as possible, the need to place siblings together, and the need to place children in the least restrictive, most home-like setting.

6.  Siblings who enter placement at or near the same time shall be placed together, unless doing so is harmful to one or more of the siblings, one of the siblings has such exceptional needs that can only be met in a specialized program or facility, or the size of the sibling group makes such placement impractical notwithstanding diligent efforts to place the group together. If a sibling group is separated at the initial placement, the case manager shall make immediate efforts to locate or recruit a family in whose home the siblings can be reunited. These efforts will be documented and maintained in the case file.

7.  No child shall be placed in a foster home if that placement will result in more than three foster children in that foster home, or a total of six children, including the foster family's natural and/or adopted children. No placement will result in more than 3 children under the age of 3 residing in a foster home. An exception in the best interests of the child shall apply under which the regional assistant commissioner will be allowed to make an exception on an individual basis that is documented in the child's case file. Such exception shall not be made in more than 10% of all placements made annually in each grand region. All such exceptions in each grand region and the detailed reasons justifying each exception shall be reported by the assistant commissioner for each grand region to the Monitor annually, from the date of this Settlement Agreement. The only other exception to these limits shall be in those instances in which the placement of a sibling group in a foster home with no other children in the home would exceed these limits.

8. No child under six years of age shall be placed in a group care non-foster family home setting, except for children with exceptional needs which cannot be met in any other type of placement and upon the express written approval by the regional administrator. Such approval shall be based on the regional administrator's certification based on a personal determination that the child's needs can only be met in that specific facility, including a description of the services available in the facility to address the individual child's needs.

9. No child shall be placed in a residential treatment center or any other group care setting with a capacity in excess of eight children without express written approval by the regional administrator. Such approval shall be based on his or her certification and specific findings that the child's needs can be met in that specific facility, including a description of the services available in the facility to address the individual child's needs and that the facility is the least restrictive placement that could meet this child's needs.

10. Children for whom the permanency goal is adoption should, whenever possible, be placed with a family in which adoption is a possibility.

11. Race and/or ethnicity and/or religion shall not be the basis for a delay or denial in the placement of a child, either with regard to matching the child with a foster or adoptive family or with regard to placing a child in a group facility. Race and/or ethnicity shall otherwise be appropriate considerations in evaluating the best interest of an individual child to be matched with a particular family. DCS shall not contract and shall immediately cease contracting with any program or private agency that gives preference in its placement practices by race, ethnicity, or religion.

12. DCS shall only contract for placements or services with licensed contractors or subcontractors.

D. All children in DCS custody shall receive an assessment using a standardized assessment protocol. The assessment shall include a medical evaluation and, if indicated, a psychological evaluation. The assessment may take place prior to custody, if the need for placement is known in advance, but no later than 30 days after the child comes into custody. As soon as the assessment is completed, the child's placement shall be reevaluated to ensure that it meets the child's needs and, if not, a new placement obtained. The technical assistance committee shall review DCS's assessment protocol, to determine if it constitutes a complete assessment of a child's individual needs, and if it does not, it will

16

recommend revisions which DCS shall implement.

E.      All children in DCS custody shall have access to a reasonable
        and appropriate education, including special education services the need
        for which shall be timely identified. Children shall be placed in
        community schools whenever possible. Within 60 days of the signing of
        this Settlement Agreement, DCS shall undertake an evaluation of all "in
        house" schools located within group, residential or institutional facilities,
        to determine if such schools are providing children in foster care with
        access to a reasonable and appropriate education, including special
        education services the need for which shall be timely identified, and to
        determine if such schools are providing educational services as required
        by law. This evaluation will be designed in close collaboration with the
        technical assistance committee and any educational experts it deems
        appropriate. The technical assistance committee shall make
        recommendations, which shall include timetables for implementation,
        promptly upon reviewing the results of the evaluation. DCS shall
        implement the results of the technical assistance committee's
        recommendations as they pertain to any schools within the DCS local
        educational authority (LEA). DCS shall require all recommendations of
        the technical assistance committee to be mandatory contractual obligations
        for any contract agency providing "in house" schools located within
        group, residential or institutional facilities. Within 6 months of the date of
        the recommendations of the technical assistance committee, DCS shall
        terminate the contract with any agency providing "in house" schools
        located within group, residential or institutional facilities that have not
        implemented the recommendations of the technical assistance committee,
        unless the contract agency demonstrates to the approval of the technical
        assistance committee that additional time up to 6 months is necessary to
        complete implementation of the recommendations. DCS shall assign a full
        time educational specialist in each region to ensure that individual children
        in DCS custody have access to a reasonable and appropriate education,
        including special education services the need for which shall be timely
        identified. DCS shall assign twelve additional lawyers statewide who will
        specialize in representing children in DCS custody to ensure that
        individual children in DCS custody have access to a reasonable and
        appropriate education, including special education services the need for
        which shall be timely identified.

F.      Psycho-tropic medication shall not be used as a method of
        discipline or control for any child. Within 6 months of the signing of this
        Settlement Agreement, DCS shall undertake a review of the policies and
        procedures surrounding the use of psycho-tropic medications. This
        evaluation will be designed in close collaboration with the technical
        assistance committee and any additional experts on the use of psycho-
        tropic medication for children it deems appropriate. The technical

17

assistance committee shall make recommendations, which shall include timetables for implementation, promptly upon reviewing the results of the evaluation, which DCS shall implement. Within 6 months of the signing of this Settlement Agreement, DCS shall create and as soon as possible thereafter fill a position of full time Medical Director, with appropriate qualifications, who shall, among other things, be responsible for overseeing the implementation of policies and procedures concerning the use of psycho-tropic medications for all children in DCS custody, and who shall have the authority to issue and impose corrective actions. The Medical Director shall report directly to the Commissioner of DCS. When possible, parents shall consent to the use of medically necessary psycho-tropic medication. In the event that a parent is not available to provide consent for psycho-tropic medication, the regional health unit nurse shall review and consent to medically necessary medication. Regional health unit nurses shall maintain a log of psycho-tropic medication approvals as well as copies of logs maintained by contract agencies for all uses of psycho-tropic medication and shall submit the logs to the Medical Director for review on an ongoing basis.

G.     Within 6 months, of the signing of this Settlement Agreement, DCS shall undertake a review of the policies and procedures surrounding all forms and use of physical restraint and seclusion/isolation of children in the plaintiff class. This evaluation will be designed in close collaboration with the technical assistance committee and any additional experts on the use of restraint and seclusion/isolation for children it deems appropriate. The technical assistance committee shall make recommendations, which shall include timetables for implementation, promptly upon reviewing the results of the evaluation, which DCS shall implement. Within 6 months of the signing of this Settlement Agreement, DCS shall create and as soon as possible thereafter fill a position of full time Medical Director (same position identified in VI.F. herein), with appropriate qualifications, who shall, among other things, be responsible for monitoring the implementation of policies and procedures surrounding all forms and use of physical restraint and seclusion/isolation of children in DCS custody, and who shall have the authority to issue and impose corrective actions. The Medical Director shall report directly to the Commissioner of DCS. All uses of physical restraint for children in any placements, and all uses of seclusion/isolation in group, residential or institutional placements, shall be reported to the central office resource management unit. Such reports shall be made available to the licensing unit and the Medical Director for appropriate action.

H.     DCS shall not contract with any agency, for which any owner, member of the board of directors, or member of the board of trustees of that private agency also holds any other position which may influence the placements provided to children in the plaintiff class. Such positions include, but are

not limited to, juvenile court judges, referees or other court officers involved in the individual cases of children in foster care. Within 30 days of the signing of this Settlement Agreement, DCS shall notify all contract agencies involved in foster care placements and services of this policy, and shall receive written confirmation from all agencies with existing contracts that they will be in compliance with this policy within 60 days of receiving the written notice, after which time DCS shall terminate its contract with any agency that is not in compliance with this policy. All future contracts or contract renewals shall contain this policy as a binding term of the contract.

I.    DCS shall have a full range of independent living services and shall provide sufficient resources to provide independent living services to all children in the plaintiff class who qualify for them.

J.    DCS will establish and maintain a resource management unit within its central office. The resource management unit will be responsible for training regional staff on placement issues so that regional placement resource management units are able to ensure a careful and appropriate match between the child's individual needs and a placement facility or foster family. DCS's unified computer system will allow for the central office and regional offices to track the following information concerning placements provided by directly by DCS or through contract agencies: the facility's or contract agency's current license and accreditation status and whether any reports of abuse or neglect have been filed and/or substantiated against the facility or agency within the last three years; whether the facility or contract agency has any vacancies; the ages and genders of children whom the facility or agency is licensed to accept; the age and gender of all children in the facility or agency; the level of care that the facility or agency can provide; specialized services available through the facility, agency or by the foster parents; and the total number of children who may reside in the facility or with the agency at any one time pursuant to the facility's or agency's license. DCS will establish and maintain regional resource management units with sufficient staff and other resources to ensure all children requiring placement are placed promptly and appropriately, and in accordance with their needs. Any agency or program contracting with DCS shall be prohibited from refusing to accept a child referred by DCS as appropriate for the particular placement or program.

K.    All children in the plaintiff class shall receive visits from the DCS case manager responsible for their case, whether the child is placed through a program directly run by DCS or through a contract agency, as follows:

1.    For children in DCS foster homes, worker-child visiting shall mean a face-to-face visit between the child's DCS case manager and the

19

child. Visits may take place in the child's placement, at school if the child is of school age, in the case manager's office, or in another appropriate setting. Visits shall be made as frequently as is necessary to assure the child's adjustment to the placement, to ensure the child is receiving appropriate treatment and services, and to determine whether the child's needs are being met and service goals are being implemented. A new placement shall mean either the child's entrance into custody or any placement that is different from the immediately prior placement. All visits shall include a private meeting between the case manager and the child out of the presence of the foster parents or other caretaker, except for those cases in which the child is an infant. There shall be at least 6 face-to-face visits during the first 8 weeks a child is in a new placement, and at least 3 of these visits shall take place in the child's placement. During the second 8 weeks the child is in a new placement, there shall be at least 1 face-to-face visit every 2 weeks. Following the first 16 weeks a child is in a new placement, there shall be at least 2 face-to-face visits each month.

2.    For children in a foster home or facility operated by or under a private contract agency:

   a.    Private agency case worker: DCS shall require and ensure that the private agency case worker visits the child as frequently as necessary to ensure the child's adjustment in placement, to ensure the child is receiving appropriate treatment and services, and to determine that the child's needs are being met and service goals are being implemented. Visits may take place in the child's placement, at school if the child is of school age, in the case manager's office, or in another appropriate setting. Worker-child visiting shall mean a face-to-face visit between the child's private agency case worker and the child. A new placement shall mean either the child's entrance into custody in a foster home or facility operated by or under a private contract agency, or any placement in a foster home or facility operated by or under a private contract agency that is different from the immediately prior placement. All visits shall include a private meeting between the private agency case worker and the child out of the presence of the foster parents or other caretaker, except for those case in which the child is an infant. There shall be at least 6 face-to-face visits during the first 8 weeks a child is in a new placement, and at least 3 of these visits shall take place in the child's placement. During the second 8 weeks the child is in a new placement, there shall

be at least 1 face-to-face visit every 2 weeks. Following the first 16 weeks a child is in a new placement, there shall be at least 2 face-to-face visits each month.

b. DCS case manager: The DCS case manager shall visit each child in a foster home or facility operated by or under a private contract agency as frequently as necessary to ensure the child's adjustment to the placement, to ensure the child is receiving appropriate treatment and services, and to determine that the child's needs are being met and service goals are being implemented, but at least once each month. Worker-child visiting shall mean a face-to-face visit between the child's DCS case manager and the child in the child's placement. All visits shall include a private meeting between the DCS case manager and the child out of the presence of the foster parents or other caretaker, except for those cases in which the child is an infant, and, outside the presence of the facility staff and the private contract agency case worker. The private contract agency case worker shall accompany the DCS case manager to these visits at least once every three months in order to have substantial discussions with each other, the foster parent(s) or other caretaker, and the child, if age appropriate.

L. DCS, in close collaboration with the technical assistance committee and any additional experts the technical assistance committee deems appropriate, if any, shall review the delivery of services and payment structure of "continuum" contracts. The technical assistance committee shall report on the results of the review and make recommendations. DCS shall implement the recommendations of the technical assistance committee in regard to the delivery of services and payment structure of "continuum" contracts. However, such recommendations may not include the elimination of the use of "continuum" contracts.

VII. PLANNING FOR CHILDREN

A. DCS shall maintain and update policies and procedures that will establish a planning process for all foster children in DCS custody that 1) initially will seek to work intensively with the child's parents and other appropriate family members to allow the child to remain safely at home, if appropriate; 2) in those instances in which removal from the home is necessary, will work intensively with the child's parents and other appropriate family members in a collaborative process to return the child home quickly under appropriate circumstances consistent with reasonable professional standards; and 3) if return home is not appropriate or cannot be accomplished safely within a reasonable period of time, will assure the

21

child an alternative, appropriate permanent placement as quickly as possible.

B.   In all cases in which a report of abuse or neglect is substantiated and results in a child being placed in state custody, the DCS worker assigned to the child and family's case shall meet as soon as possible with the child's parents or family member(s) with whom the child was living prior to entering DCS custody to initiate the planning process. If the child is already in placement in a private agency, the private agency worker assigned to the case shall also participate in the planning meeting. If the child is 12 years or older, the child shall participate in the meeting, unless extraordinary circumstances exist, and are documented in the case record, as to why the child's participation would be contrary to his/her best interests. This meeting is different from a permanency plan staffing described in Section VII (C) that occurs within 15 working days of the child coming into custody.

   1.   This meeting shall take place as soon as possible but in all instances must occur within 7 working days of the child entering state custody.

   2.   The purposes of the 7-day meeting are to discuss the problems that necessitated the child's removal; to assess the appropriateness of the child's placement based on the reasons for removal, contacts with the child, contacts with the foster home or other placement, and all other available information; to arrange an immediate visitation schedule between the child and the parents; to identify possible relative placements; to begin an assessment of the child's and family's needs; and to arrange for a schedule of contacts between the parents and the worker.

   3.   In all cases in which the whereabouts of one or both parents is unknown, DCS immediately shall institute a diligent search for the parent(s), which shall be documented in the child's case record.

   4.   In all instances in which it is impossible to meet with the parents, the planning process shall begin as described above, notwithstanding the parents' absence, within the time period set forth above.

C.   A permanency plan staffing shall occur within 15 working days of a child entering custody. The permanency staffing shall be attended by the DCS caseworker assigned to the child and family's case, the DCS team leader assigned to the case, and the private agency worker assigned to the child's case if the child is placed with a private agency. DCS shall provide notice of the staffing to the guardian ad litem for the child if one has been

22

appointed and to the court appointed special advocate (CASA) worker for the child if one has been appointed. If the child is 12 years or older, the child shall participate in the meeting, unless extraordinary circumstances exist, and are documented in the case record, as to why the child's participation would be contrary to his/her best interests. The biological parents and foster parents shall be encouraged to attend the meeting and all reasonable efforts shall be made to enable the parents and foster parents to attend. In the event that the biological or foster parents do not attend the staffing, the DCS case manager shall document efforts to ensure their appearance, including the offer to reschedule the staffing if inconvenient and to offer assistance in arranging child care and transportation to the meeting.

1.     The purposes of the permanency staffing meeting are to discuss the problems that necessitated the child's removal; to identify the changes by the parents that may be necessary to allow the child to return home safely; to identify the services that need to be provided to the parents to allow the child to return home; to determine the appropriateness of the child's placement; to arrange a visitation schedule between the child and the parents; to ensure that all reasonable efforts will be made to enable the visitation to take place; and to arrange a schedule of contacts between the parents and the worker. In the event that the parents cannot be located or refuse to meet with the worker, the DCS worker shall make and document all efforts made to locate the parent and to ensure that the meeting takes place.

2.     The biological parents shall have the opportunity to sign a completed permanency plan at the permanency plan staffing if it is completed at that time; if it is not, the permanency plan shall be completed and presented to the child's parents for discussion and signature no later than 30 calendar days after the child enters custody.

D.     Children with an initial goal of return home may also have another concurrently planned permanency goal. Record keeping and tracking for any child in the class with more than one concurrently planned permanency goal shall be consistent with a goal of return home until such time that return home is no longer an option, at which time the other concurrently planned goal shall be the child's sole permanency goal for all purposes.

E.     For any child who has a permanency goal of return home for more than 12 months, the child's worker, with written approval from the supervisor, shall include in the record a written explanation justifying the continuation of the goal, and identifying the additional services necessary or

23

circumstances which must occur in order to accomplish the goal. No child shall have a permanency goal of return home for more than 15 months unless there are documented in the record and approved by the child's worker's supervisor compelling circumstances and reason to believe that the child can be returned home within a specified and reasonable time period.

F.    DCS may assign a permanency goal of long term relative placement to a child for whom it has not made adoption efforts if an appropriate relative has been identified, the relative is willing to assume long-term responsibility for the child but has legitimate reasons for not adopting the child, and it is in the child's best interests to remain in the home of the relative rather than be considered for adoption by another person. In such circumstances, there shall be in place a long term placement agreement signed by DCS and the relative ensuring the permanency and stability of this placement unless emergency circumstances dictate the removal of the child.

G.    No child shall be assigned a permanency goal of permanent foster care unless a) the child is at least 15 years old; b) DCS has made every reasonable effort, documented in the record, to return the child home, to place the child with appropriate family members or to place the child for adoption; and c) the person to whom DCS proposes to assign permanent caretaker status has demonstrated a commitment to assuming long-term responsibility for the child.

H.    No child younger than 16 shall be assigned a permanency goal of independent living.

I.    All permanency plans shall contain specific information about how the permanency goal will be achieved, what services are necessary to make the accomplishment of the goal likely, who is responsible for the provision of those services, when the services will be provided, and the date by which the permanency goal is likely to be achieved. All services documented in the record as necessary for the achievement of the permanency goal shall be provided, within the time period in which they are needed. These dates cannot be extended more than once, except for extraordinary circumstances, documented in the record and approved by the team coordinator.

J.    The child's DCS case manager and supervisor shall have an ongoing responsibility to assure that the child's permanency goal is appropriate or to change it if it is not, to assure that the child's services and placement are appropriate and are meeting the child's specific needs, to assure that the parents and other appropriate family members are receiving the specific services mandated by the permanency plan and that they are progressing

toward the specific objectives identified in the plan, and to assure that any private service providers identified in the plan or with whom the child is in placement are delivering appropriate services.

1.     The child's permanency plan shall be reviewed at meetings at least at the following time periods: 6 months after the date the child entered custody, 12 month after the date the child entered custody, 15 months after the date the child entered custody, 21 months after the date the child entered custody, 24 months after the date the child entered custody, and every 3 months thereafter.  These meetings are intended to address the responsibilities outlined in this Section VII (J) and must be separate and distinct from any court hearings, foster care review board meetings or other judicial or administrative reviews of the child's permanency plan.  This permanency plan review shall include a face-to-face meeting involving the child's DCS case manager, the DCS supervisor, the worker from the private agency if the child is in placed in a private agency, the parent(s), the foster parent(s) (unless DCS determines that the foster parent's attendance would be inappropriate) and the child, if the child is over 12, and wishes to participate.  DCS shall provide notice of any such meeting to the guardian ad litem for the child if one has been appointed and to the court appointed special advocate (CASA) worker for the child if one has been appointed. The plan review shall be scheduled at such a time, and in such a place, as to facilitate the attendance by the child and the child's parents.  DCS shall make all reasonable efforts to ensure the parents' and the child's attendance.  In the event that the biological or foster parents or the child do not attend the meeting, the DCS case manager shall document efforts to ensure their appearance, including the offer to reschedule the staffing if inconvenient and to offer assistance in arranging child care and transportation to the meeting.

2.     The permanency plan shall be reviewed and updated if necessary at each of these permanency plan reviews.  A statewide standardized form shall be completed promptly after each meeting, documenting the issues discussed and an assessment of progress toward achievement of the permanency goal.

K.     Upon the agreement of the parties, DCS may initiate a pilot program in a specific region of the state to develop a comprehensive family conference model which, if agreed to by the parties, would replace the requirements in sections VII (B), (C) and (J) for the duration of the pilot for that region. Upon the agreement of the parties, after the completion of the pilot program, a comprehensive family conference model may be used to replace the requirements in sections VII (B), (C) and (J) in some or all

regions of the state and shall become fully enforceable under the terms of this Settlement Agreement.

L.    Discharge Planning

1.    DCS shall recommend to the court a 90 day trial home visit for all children for whom a decision is made to return home or to be placed in the custody of a relative.

2.    A decision to return a child to his/her home or to be placed in the custody of a relative shall be made at a discharge staffing meeting for any child in state custody regardless of whether that child is to be released from state custody immediately upon return home or whether that child remains in state custody during a 90 day trial home visit.

3.    The discharge staffing meeting shall be attended by the child's DCS case manager, the case manager's supervisor, the worker from the private agency if the child is placed with a private agency, the foster parents (unless DCS determines that the foster parent's attendance would be inappropriate), and the biological parents or relative who is assuming custody and the child. DCS shall provide notice of the meeting to the guardian ad litem for the child if one has been appointed and to the court appointed special advocate (CASA) worker for the child if one has been appointed. At the discharge staffing meeting, the participants will identify all of the services necessary to ensure that the conditions leading to the child's placement in foster care have been addressed, and that the child's safety will be assured, and will identify the services necessary to support the child and the trial home visit. DCS shall provide or facilitate access to all services necessary to support the child and the trial home visit.

4.    During any trial home visit period, the child's case manager shall visit the child in person at least 3 times in the first 30 days and 2 times per month for the remaining 60 days, and each visit shall occur outside the parent's or caretaker's presence. The case manager shall also contact service providers, and shall visit the school of all school age children at least once each month, shall interview the child's teacher, and ascertain the child's progress in school and whether the school placement is appropriate.

5.    Before the end of any trial home visit period, there shall be a final discharge staffing meeting, which shall include the child's case manager, the child, and the parent or relative, to determine the appropriateness of a final discharge. For staffings attended by a

Case Manager I, the team leader shall be present at the meeting; otherwise, the team leader shall document in the record approval of the decision to finally discharge the child or to seek an extension prior to the expiration of the trial home visit. If final discharge is determined to be inappropriate, DCS shall make the appropriate application to the court to extend the child's placement in the custody of DCS before the expiration of the trial home visit period.

VIII.   FREEING A CHILD FOR ADOPTION

A.    The process of freeing a child for adoption and seeking and securing an adoptive placement shall begin as soon as the child's permanency goal becomes adoption, but in no event later than as required by federal law. The adoption process shall begin immediately for all children for whom a diligent search has failed to locate the whereabouts of either parent and for whom no appropriate family member is available to assume custody.

B.    DCS has developed a process for making legal risk placements, and will consult with the technical assistance committee to ensure that the process developed will assure that children for whom the plan is adoption, but who are not yet legally freed for adoption, are placed in appropriate adoptive homes as soon as possible. If the technical assistance committee recommends modifications to the process, DCS shall make those adjustments.

C.    DCS shall follow the policies and procedures in its adoption policy and procedures manual governing the process of freeing children for adoption and selecting adoptive family resources. The technical assistance committee shall review the DCS uniform policies and procedures governing the process of freeing children for adoption and selecting adoptive family resources, and shall make recommendations, which DCS shall implement.

D.    DCS policies and procedures establish various time frames for case management and legal activities related to adoptions. DCS will follow the time lines set out in DCS adoption policy and procedures manual. The following is a series of time frames related to critical activities in the adoption process which shall be followed by DCS:

1.    Within 30 days of a decision to set a goal of adoption, the case manager will schedule an appointment with the local DCS lawyer to discuss the case and assist in the preparation of the petition to terminate parental rights.

27

2.    Within 30 days of that meeting, the lawyer will file the petition to terminate parental rights unless there is a legal impediment to the filing, but in any event the petition will be filed within 90 days of that meeting.

3.    For cases where a petition to terminate parental rights has been filed, the case manager will schedule a case conference with adoption staff within 30 days of the petition being filed.

4.    If a child's case is appropriate for transfer to the adoption unit, the case must be transferred within 30 days of the case conference.

5.    Cases involving full guardianship must be transferred for adoption services within 15 days of guardianship.

6.    Case managers will explain the voluntary surrender process to the birth/legal parents at the completion of the permanency plan staffing and if appropriate at each subsequent foster care review board meeting. If requested, the case manager will assist the parent/s in accomplishing the surrender process.

E.    DCS shall provide and maintain an approval process in which foster parents and adoptive parents may be approved simultaneously so that whenever possible and appropriate, replacements can be minimized and foster parents shall be eligible to adopt the children for whom they have been providing foster care. A foster parent who has been providing appropriate foster care for a child for twelve months shall have a preference as an adoptive parent for that child, should the child become legally available for adoption.

F.    For all children for whom an adoptive contract has not been signed within three months after the child has been legally freed for adoption, DCS will convene immediately a specialized adoption team to review the child's individualized recruitment plan. For all children for whom an adoptive contract has not been signed within six months after the child has been legally freed for adoption, DCS will contract with private agencies with proven success in seeking and securing permanent adoptive families for children, using specialized agencies wherever necessary. However, upon written approval of the director of adoptions and documentation in the child's case record regarding potential success of a particularized ongoing recruitment effort, a contract with such private agencies may be delayed for a single period of three months.

G.    DCS shall establish and maintain a system of post-adoptive placement services, to stabilize and maintain adoptive placements, to which all adoptive families shall be entitled.

28

IX.    ADOPTIVE AND FOSTER PARENT RECRUITMENT, RETENTION, AND LICENSING

   A.    DCS shall establish and maintain a statewide, regional and local program of adoptive and foster parent recruitment, in consultation with the technical assistance committee. DCS will ensure the availability of a toll free phone number in all regions of the state to ensure access to information concerning the availability of adoption information, training, the approval process and children available for adoption.

   B.    DCS will develop and maintain standards for the approval of foster and adoptive families, to ensure that only appropriate families are approved, and will provide recruitment teams in each region. All such approval will be handled within the regions and field offices, which shall be adequately staffed and trained. DCS shall comply with federal law and shall utilize nationally accepted standards for the approval of foster and adoptive parents, in consultation with the technical assistance committee. These standards shall apply to all approvals of foster and adoptive parents, including those recruited and/or approved through any contract agencies, for any foster child in DCS custody.

   C.    DCS shall maintain a statewide and regional plan of foster parent and adoptive parent training, in consultation with the technical assistance committee.

      1.    All applications to be either adoptive or foster families shall be responded to within 7 days after receipt, and home studies shall be completed within 60 days of completing the approved training curriculum, unless the applicant defaults or refuses to cooperate.

      2.    Training classes shall be available beginning every 30 days in every region with individualized training available as needed, at times convenient for foster and adoptive parent applicants.

      3.    Foster care support specialists will conduct exit interviews with all foster families who voluntarily resign as foster parents, and DCS shall issue annual reports on why foster families leave DCS and what steps are necessary to ensure their retention.

      4.    To the extent possible, DCS shall maintain a practice of using existing foster and adoptive families to recruit and retain new foster and adoptive families, and shall maintain a statewide and regional support system for foster families and will develop and maintain a statewide and regional support system for adoptive families.

5.  Beginning in fiscal year 2003 (i.e., July 1, 2002), DCS shall provide adequate and appropriate respite services on a regional basis to foster and pre-adoptive parents with special needs children.

D.  By July 1, 2001, all foster parent payment room and board rates, including the rates of foster parents under the supervision of private agencies, will at a minimum meet USDA standards and will be adjusted annually to be no lower than USDA standards for the cost of raising children within this region. By July 1, 2001, relatives who are approved as foster parents shall receive the same foster parent payments as all other foster parents, and all foster payment room and board rates for relatives, including the rates of relative foster parents under the supervision of private agencies, will at a minimum meet USDA standards and will be adjusted annually to be no lower than USDA standards for the cost of raising children within this region.

E.  DCS shall provide specialized rates for DCS foster parents providing services to special needs children. DCS shall provide and shall ensure that contract agencies provide any specialized training necessary for the care of special needs children. DCS also will continue to contract with private agencies for the provision of therapeutic foster care and medically fragile foster care. The details concerning the provision of foster care to special needs children will be presented to the technical assistance committee for consultation, including the issue of establishing minimum foster parent payment rates for categories of special needs children. DCS will follow recommendations from technical assistance committee for program modifications.

F.  All potential adoptive families, including foster families caring for a child with special needs who has become legally available for adoption, shall be advised of the availability of the adoption subsidy. This notification shall be documented in the child's record, and the family's access to such subsidy shall be facilitated.

G.  No foster family shall receive a foster child for placement until the family has received foster parenting training, which training shall be specified in consultation with the technical assistance committee. Each foster family shall receive additional annual foster parent training which training shall be specified in consultation with the technical assistance committee. DCS will provide for a waiver of approval of the requirements for relatives wishing to care for related children. Prior to the waiver of requirements, staff shall have completed a home visit and conducted a local criminal records check. In situations where approval for placement has been granted under a waiver, all remaining approval requirements, including the

30

relatives' completion of approved foster parent training shall be completed within 150 days of the placement.

H.    In consultation with the technical assistance committee, DCS shall develop and implement a statewide program to ensure that the pool of foster and adoptive families is proportionate to the race and ethnicity of the children and families for whom DCS provides placement and services, provided however that individual children shall be placed in foster homes and adoptive homes without regard to race or ethnicity.

X.    STATEWIDE INFORMATION SYSTEM

A.    DCS shall establish and maintain a statewide computerized information system for all children in DCS custody that is accessible in all regional offices and into which workers shall be able to directly enter data. The state-wide computerized information system shall ensure data integrity and user accountability. The system shall have the necessary controls to prevent the duplication of data and to reduce the risk of incorrect or invalid data.

B.    This system shall include uniform data presentation including but not limited to AFCARS elements from DCS for all children in the plaintiff class. This system shall be audited periodically to ensure the accuracy and validity of the data in the system. This system shall provide an immediately visible "audit trail" to the data base administrators of all information entered, added, deleted or modified, and shall have necessary security to protect data integrity. This system shall be capable of providing system-wide reports. Within 6 months of the signing of this Settlement Agreement, DCS, with the direct involvement and approval of the technical assistance committee, and with the assistance of any management information systems expert(s) which the technical assistance committee determines appropriate, if any, shall undertake and complete an evaluation of the following: (1) the data elements and uniformity of data presentation from DCS for children in the plaintiff class; (2) the audit processes of the data in the system utilized by DCS's current management information systems for children in the plaintiff class; (3) the "audit trail" in the system utilized by DCS's current management information systems for children in the plaintiff class; and (4) the system-wide reports that DCS's management information system is currently able to provide for children in the plaintiff class. The technical assistance committee shall make recommendations including timetables for implementation upon its review of the evaluation, which DCS shall implement.

C.    An intensive data clean-up process shall ensure the accuracy of all data, including but not limited to data on all individual children in the plaintiff class, in the statewide computerized information system. The data shall be

31

audited no less frequently than every 12 months after the signing of this Settlement Agreement to ensure its ongoing accuracy.

XI.   QUALITY ASSURANCE

A.   No later than January 1, 2002, DCS shall develop and implement a statewide quality assurance program, in consultation with and subject to the approval of the technical assistance committee, which shall be directed by a quality assurance unit. The quality assurance unit's functions will coordinate with and complement the independent Monitor's functions and the unit is intended to become a permanent unit of DCS. The quality assurance unit shall assure that, in addition to external case file reviews and monitoring, there is an internal method to perform special administrative case record reviews. The quality assurance unit shall track, coordinate and integrate all DCS quality assurance activities. The quality assurance unit shall provide critical attention to the follow-up needed to improve services and outcomes.

B.   This unit shall provide regular, periodic reports and shall also conduct specialized case record reviews on issues addressed by this Settlement Agreement, as well as other issues affecting the care of children.

C.   This unit shall be directed by a person with appropriate qualifications. The director of the quality assurance unit shall report directly to the Commissioner of DCS. The unit shall be adequately staffed and shall receive special training to fulfill its responsibilities.

D.   All reports provided by the quality assurance unit shall be public record, unless disclosure is prohibited by law. It is the intent of the parties to disclose all information that is not individually identifiable.

E.   In addition to reviews otherwise required, DCS shall establish a process for conducting special administrative case record reviews, in consultation with the technical assistance committee.

1.   The purpose of the reviews is to provide necessary information to DCS management and to determine on an ongoing basis whether DCS is following the provisions of this Settlement Agreement, DCS policy and good social work practice.

2.   The reviews will include specific processes and procedures for identifying workers or supervisors who, as a result of a quality assurance review, are in need of additional training, reassignment, or for whom termination may be appropriate.

32

3.    At a minimum, the quality assurance unit shall, once every twelve months, review a statistically significant number of cases from each region in the state. These case file reviews shall include interviews and an independent assessment of the status of children in the plaintiff class. As part of this minimum annual case record review, the quality assurance unit, central office and other designated staff, in consultation and with the approval of the technical assistance committee, shall develop a measure of appropriate and professional decision-making, concerning the care, protection, supervision, planning and provision of services and permanency for children in the class. This measure shall be utilized in conjunction with the case file reviews to measure DCS's performance.

4.    If significant problems are identified within a region, the quality assurance unit shall review a statistically valid sample of cases within each supervisory unit, to identify whether particular units have particular problems and, if necessary, whether administrative action is necessary.

5.    Beginning July 1, 2002, the quality assurance unit will oversee special administrative reviews. The reviews will include the following categories:

a.    All cases in which there have been three or more reports of neglect or abuse concerning a particular caretaker for a particular child in the plaintiff class.

b.    All cases in which a child in the plaintiff class is the subject of substantiated or indicated abuse or neglect.

c.    All cases within the preceding twelve months in which a child has been placed in three different placements excluding a return home.

d.    All cases in which a child has been in more than two shelters or other emergency or temporary placements within the past 12 months, and in all cases in which a child has been in a shelter or other emergency or temporary placement for more than 30 days.

e.    All cases in which a child has had a permanency goal of return home for more than 24 months.

33

f.      All cases in which a child has had a permanency goal of adoption for more than one year and has not been placed in an adoptive home.

g.      All cases in which a child has returned home and has reentered care more than twice and has a plan of return home.

h.      All cases in which the date for the accomplishment of the permanency goal of reunification has been exceeded by 12 months.

6.      The parties to this Settlement Agreement are concerned with the national problem of the overrepresentation of African American children in child welfare systems. The parties to this Settlement Agreement are committed to ensuring that there is no disparate treatment of, or disparate impact on, African American children in the plaintiff class. Within 90 days of the date of this Settlement Agreement, DCS shall retain an independent expert, jointly agreed to by the parties (or, if the parties cannot agree then appointed by the technical assistance committee), to conduct a statewide evaluation of the Tennessee foster care program. The evaluation shall determine whether there are any disparities concerning the placement, services and treatment provided to African American children in foster care and their families, the recruitment and retention of foster and adoptive families, as well as the foster parent payments provided to foster parents for the care of African American children in foster care. The evaluation and a report of its findings and recommendations shall be presented to the Commissioner and the Monitor no later than 12 months from the date the expert is retained. The report shall include a plan and timetables within which the recommendations shall be implemented, beginning immediately after the completion of the evaluation. DCS shall implement the recommendations in the report.

7.      The quality assurance unit shall issue reports on a periodic basis, at least every six months. These reports shall be presented to the Commissioner of DCS and to the Monitor. In the event that the DCS Commissioner does not take appropriate action on any of the findings in the quality assurance report, the Court Monitor may recommend such action, or plaintiffs may seek an order from the court directing that further action be taken, pursuant to the enforcement procedures set out in this Settlement Agreement.

F.    Within 90 days after the date of this Settlement Agreement, DCS, in conjunction with designated field and central office staff, shall begin the specialized review of all foster children in DCS custody who entered DCS custody prior to October 1, 1998. The permanency plan for each child shall be reviewed and a determination made regarding the appropriateness of the goal, the barriers to permanency and the services in place to move the child to permanency. This review will include interviews including relevant personnel and an individualized written corrective action plan including, if necessary, a new permanency plan. These special reviews shall occur at least once every three months until permanency is achieved for each child.

G.    Within 90 days after the entry of this Settlement Agreement, DCS shall have a process in place under which it shall report on and immediately take all necessary action on the status of children in the following categories:

1.    Children in one or more emergency, temporary or shelter facilities for more than 45 days within the last 12 months;

2.    Foster children in DCS physical or legal custody who are currently or who have been placed in jail, detention or other correctional facilities and who have not been arrested on a delinquency charge, within the past 12 months.

3.    Children in foster homes or facilities that exceed their licensed capacities, or children in foster homes or facilities that do not have a valid license.

4.    Children with a permanency goal of return home that has remained in effect for more than 22 months.

5.    Children who do not have a permanency plan.

6.    Children for whom the permanency goal has not been updated for more than 12 months.

7.    Children with a sole permanency planning goal of adoption for more than 12 months and for whom a petition to terminate parental rights has not been filed.

XII.    SUPERVISION OF CONTRACT AGENCIES

A.    All contract agencies which provide placements or services to children in the plaintiff class shall only do so pursuant to annual performance-based contracts issued by DCS. Such contracts shall be developed by DCS

35

within 90 days after the approval of this Settlement Agreement. These contracts shall be entered into in the next contracting cycle.

B.    DCS shall only contract with those agencies that meet the provisions of this Settlement Agreement that specifically apply to those agencies and that meet state standards governing the operation of child care facilities. These state standards shall reflect reasonable professional standards. DCS shall not contract with any agency that has not been licensed by the State to provide placements for children in the plaintiff class.

C.    DCS shall expand the staff of the current licensing unit to allow for increased monitoring and oversight responsibilities of the contract agencies. All contract agencies providing placements for children in the plaintiff class shall be inspected annually by DCS licensing staff in an unannounced visit, and DCS shall determine in a written report whether the agency complies with state licensing standards. The licensing unit shall collaborate with the DCS quality assurance unit and the central office resource management unit to determine agency compliance with the terms of this Settlement Agreement.

D.    Alleged abuse or neglect of children placed with a contract agency must be reported by the agency to the DCS child protective services unit in the county in which the facility is located. Additionally, alleged abuse or neglect concerning children placed with any contract agency shall be reported to the central office resource management unit and the quality assurance unit. DCS shall incorporate these reports, and their findings, into the annual review of each contract agency. DCS will evaluate carefully those reports and consider prior corrective actions, the history of the agency and determine if there are serious problems that place children at serious risk of harm and prevent further contracts from being issued.

XIII. FINANCIAL DEVELOPMENT

A.    DCS shall develop and implement policies and procedures by which it can maximize funds available to it through Titles IV-B and IV-E of the Adoption Assistance and Child Welfare Act of 1980, the Medicaid Act, and SSI. The technical assistance committee shall evaluate the work of any current consultants retained by DCS to develop and implement policies and procedures under the terms of this provision, and shall make recommendations on the continued use of the current consultants and/or the use of other consultants. The technical assistance committee shall also evaluate the current policies and procedures in place and in development, and make any recommendations to modify these policies and procedures. DCS shall implement any recommendations made by the technical assistance committee.

36

B.    All funds remitted for children in the plaintiff class to the State of Tennessee by the United States Department of Health and Human Services, as described above, shall be committed exclusively to the provision of services and staff serving the children in the class covered by this Settlement Agreement. It is the intent of the State that dollars committed to DCS for the provision of services and resources to benefit children in the class and children at risk of entering the class shall not be decreased if efforts to maximize federal dollars result in additional federal funding. DCS shall establish a mechanism acceptable to the Monitor for reporting the budgeting of both federal and state dollars. Nothing in this provision shall reduce the defendants' financial obligations to comply with the terms of this Settlement Agreement.

C.    FINANCIAL RECORD KEEPING

1.    When a child in the plaintiff class is removed from a DCS family foster or adoptive home, the DCS case manager shall, within 7 days, enter this status change and update placement information directly into the Children's Plan Financial Information System (ChipFins) or any comparable database used for this purpose.

2.    DCS shall maintain an adequate system for identifying and collecting overpayments to foster care and adoption assistance parents.

3.    DCS shall maintain an adequate system relating to cash receipting procedures.

XIV.  TECHNICAL ASSISTANCE COMMITTEE

A.    A Technical Assistance Committee of five neutral experts in the child welfare field has been selected to assist the state in meaningful implementation of the requirements of this Settlement Agreement. The technical assistance committee will have the ability to consult and involve other experts as necessary. John Mattingly, of the Annie E. Casey Foundation, has agreed to convene the technical assistance committee and provide guidance and leadership, as he is available. If any of the 5 technical assistance committee members becomes unavailable, the remaining technical assistance committee members, with the assistance of John Mattingly, will select the replacement(s), with the consent of the parties.

B.    The role of the technical assistance committee is to advise DCS on the child welfare policy, management and practice issues delineated in this Settlement Agreement, as well as other issues which DCS or the technical assistance committee agree to consult on. It is understood by the parties

37

and the technical assistance committee that the primary function of the technical assistance committee is advisory; however, DCS shall implement the technical assistance committee's recommendations in all areas so specified in this Settlement Agreement.

C.    When time frames are specified for the completion of an evaluation or review by DCS, the technical assistance committee is authorized, after consultation with both parties, to give time-limited extensions for completion of the evaluation or review. The time frames stipulated for implementation of any technical assistance committee recommendations in this Settlement Agreement shall remain in place, and while the technical assistance committee is not authorized to extend implementation time periods for recommendations under this Settlement Agreement, the technical assistance committee is authorized to advise the parties when extensions may be needed.

XV.    MONITORING

A.    DCS shall enter into a contract consistent with the terms of this Settlement Agreement with an independent and neutral party who will monitor compliance with the terms of this Settlement Agreement. The parties agree the independent Monitor will be Shiela Agneil. DCS will make available a state employee at least at the Case Manager 3 level to work full-time for the Monitor, who shall choose this person and be solely responsible for supervising and evaluating his/her work and to whom this person shall report exclusively.

B.    The state shall provide to the independent Monitor all information necessary to fulfill the Monitor's obligations, including access to documents and personnel, and shall where appropriate facilitate and ensure access to documents and personnel from the contract agencies involved in the care of the plaintiff class members.

C.    The technical assistance committee and the Monitor will, within their respective responsibilities, work together and share information so they can remain informed about the operations of the agency. During the initial months of this Settlement Agreement, DCS will coordinate an orientation program for the technical assistance committee and the Monitor. DCS will provide the orientation to the technical assistance committee and the Monitor concurrently.

D.    The Monitor shall have the authority to require reports on the status of the implementation of any and all requirements of this Settlement Agreement, the status of foster children in DCS custody, and compliance with this Settlement Agreement.

38

E.      In order to avoid duplication and to build capacity within the agency, the Monitor will look first to DCS data and to data and reports created and maintained by the DCS Quality Assurance Unit. However, the Monitor will have the authority to require reports and to create new reports concerning the status of foster children in DCS custody and concerning compliance with this Settlement Agreement, to the extent the Monitor deems necessary.

F.      Plaintiffs shall have access from the Monitor to all information made available to the Monitor, and to all other information necessary to ensure compliance and enforcement of this Settlement Agreement. If plaintiffs become aware of information related to possible non-compliance about which they wish to investigate, plaintiffs shall notify the Monitor of the matter as part of plaintiffs' investigation, without any limitation to plaintiffs' right to access all information necessary to ensure compliance and enforcement of this Settlement Agreement. Plaintiffs shall not initiate case file reviews unless necessary in connection with a motion for non-compliance or enforcement.

G.      All reports made available pursuant to this Settlement Agreement shall be public information, provided that if any report contains, or is requested by the Monitor to contain, individually identifiable information, such individually identifiable information shall not be made public.

H.      The Monitor's budget during the first six months after the date of the Settlement Agreement shall not exceed $115,000 and shall include but not be limited to, the salary of the Monitor, the salary of the Monitor's assistant, all travel, meals and lodging expenses which shall be reimbursed at the prevailing State of Tennessee rates. The Monitor's salary shall be set at $65.00 per hour. DCS shall provide the Monitor with adequate office space, necessary office equipment including telephone, computer, access to copiers and other necessary supplies, which shall not be included in the budget. For the remaining period of this Settlement Agreement, the Monitor's budget shall not exceed $275,000 during a 12-month period, unless the Monitor at any time documents the need for additional funding and presents that request to DCS for approval. DCS shall approve or deny the request for additional funding within 10 days of receiving the request from the Monitor. If DCS denies the request, or fails to act on the request within 10 days of receiving the request, the Monitor or the plaintiffs may submit the request to the court for approval. The Monitor's and other staffs' salary shall be increased with corresponding increases in the state salary structure but otherwise shall remain as indicated above, and reimbursement for travel, meals and lodging expenses shall continue to be at the prevailing State of Tennessee rates as they may be amended by the state.

39