I.       The intent of the parties is for the Monitor to develop a plan that transfers
         the primary monitoring function to the Quality Assurance Unit after the
         termination of this Settlement Agreement.

## XVI. OUTCOME AND PERFORMANCE MEASURES

This section lists the child welfare outcomes and performance indicators related to
practice improvements. Performance targets are listed for three time periods for
the child welfare outcomes and the practice performance indicators. Period 1
covers 18 months beginning on September 1, 2001. Period 2 covers months 19-
36, beginning March 1, 2003, and Period 3 includes months 37-54, beginning
September 1, 2004.

A.       Child Welfare Outcomes

         The child welfare outcomes will be measured using a combination of
         longitudinal data analysis and point in time data analysis. The Monitor
         shall use appropriate and adequate means to determine whether defendants
         have achieved the following levels of compliance with the following
         requirements, by measuring defendants' achievement of these
         requirements as soon as possible after the time periods specified.

         1.       Reunification

                  Period I

                  At least 70% of children entering care after September 1, 2001,
                  who are reunified with their parents or caretakers at the time of
                  discharge from custody, shall be reunified within 12 months of the
                  latest removal date.

                  Period II

                  At least 75% of children entering care after September 1, 2001,
                  who are reunified with their parents or caretakers at the time of
                  discharge from custody, shall be reunified within 12 months of the
                  latest removal date.

                  Of the remaining children (i.e. those who are not reunified with
                  their parents or caretakers at the time of discharge from custody
                  within 12 months of the latest removal date), 60 % shall be
                  reunified within 24 months of the latest removal date.

Period III

At least 80% of children entering care after September 1, 2001, who are reunified with their parents or caretakers at the time of discharge from custody, shall be reunified within 12 months of the latest removal date.

Of the remaining children (i.e. those who are not reunified with their parents or caretakers at the time of discharge from custody within 12 months of the latest removal date), 75 % shall be reunified within 24 months of the latest removal date.

2.    Adoption Finalization (point in time measure). Adoptive placement is defined as the date the adoption contract is signed.

Period I

At least 70% of adoptions that become final within the reporting period shall have become final within 6 months of the adoptive placement.

Period II

At least 80% of adoptions that become final within the reporting period shall have become final within 6 months of the adoptive placement.

Period III

At least 85% of adoptions that become final within the reporting period shall have become final within 6 months of the adoptive placement.

3.    Number of placements (measures in this section apply to children in care at any time during the reporting period and children still in care at the end of the reporting period). Placements made prior to September 1, 2001, shall not be counted in this measure. For children requiring emergency hospitalization who return to their immediately prior placement, that return shall not count as an additional placement.

Period I

At least 60% of children in care at any time during the reporting period shall have had two or fewer placements not including

41

temporary breaks in placement for children who run away or require emergency hospitalization not exceeding 10 days.

Period II

At least 75% of children in care at any time during the reporting period shall have had two or fewer placements not including temporary breaks in placement for children who run away or require emergency hospitalization not exceeding 10 days.

Period III

At least 85% of children in care at any time during the reporting period shall have had two or fewer placements not including temporary breaks in placement for children who run away or require emergency hospitalization not exceeding 10 days.

4.   Length of time in placement.  This measure shall include all children who entered care after October 1,1998 and either left care at any time during the reporting period or are still in care at the end of the reporting period. Measurement shall exclude children still in care at the end of the reporting period who are in a long term relative placement for whom a long term placement agreement has been signed, and shall exclude children in permanent foster care.

Period I

At least 60% of children in placement shall have been in placement for two years or less.

No more than 25% of children in placement shall have been in placement for between two and three years.

No more than 15% of children in placement shall have been in placement for over three years.

Period II

At least 70% of children in placement shall have been in placement for two years or less.

No more than 18% of the children in placement shall have been in placement for between two and three years.

No more than 12% of the children in placement shall have been in placement for more than three years.

42

Period III

At least 75% of the children in placement shall have been in placement for two years or less.

No more than 20% of the children in placement shall have been in placement for between 2 and 3 years.

No more than 5% of the children in placement shall have been in placement for more than 3 years.

5.    Reentry into placement. Measures in this section apply to children who are discharged from foster care at any time up to the end of the reporting period. For each child, reentry shall be determined from the date of discharge for a period of 12 months. The overall performance percentage of compliance on this measure shall be calculated 12 months after the end of the reporting period. This measure shall only be calculated for periods I and II.

Period I

No more than 8% of the children who are discharged from foster care at any time up to the end of the reporting period shall reenter custody within 12 months after the discharge date from the prior custody episode.

Period II

No more than 5% of the children who are discharged from foster care at any time up to the end of the reporting period shall reenter custody within 12 months of discharge from the prior custody episode.

6.    Adoptive placement disruption (defined as occurring between the signing of the adoption contract and finalization). Measures in this section apply to children who were placed in an adoptive home during the reporting period.

Period I

No more than 10% of adoptive placements that occurred in the reporting period shall have disrupted.

43

Period II

No more than 6% of adoptive placements that occurred in the reporting period shall have disrupted.

Period III

No more than 5% of adoptive placements that occurred in the reporting period shall have disrupted.

7.    Achievement measures upon discharge (this measure shall exclude children on runaway status at the time they reach the age of 18).

Period I

At least 80% of the children who are discharged from foster care during the reporting period because they reached the age of 18 shall have at least one of the following apply at the time of discharge:  earned a GED, graduated from high school, enrolled in high school or college or alternative approved educational program for special needs children, currently enrolled in vocational training, or employed full time.

Period II

At least 85% of the children who are discharged from foster care during the reporting period because they reached the age of 18 shall have at least one of the following apply at the time of discharge:  earned a GED, graduated from high school, enrolled in high school or college or alternative approved educational program for special needs children, currently enrolled in vocational training, or employed full time.

Period III

At least 90% of the children who are discharged from foster care during the reporting period because they reached the age of 18 shall have at least one of the following apply at the time of discharge:  earned a GED, graduated from high school, enrolled in high school or college or alternative approved educational program for special needs children, currently enrolled in vocational training, or employed full time.

44

B.     Performance Indicators / Practice.

The Monitor shall use appropriate and adequate means to determine whether defendants have achieved the following levels of compliance with the following requirements, by measuring defendants' achievement of these requirements as soon as possible after the time periods specified. The compliance levels articulated in this section shall be enforceable at the levels indicated at the end of periods one, two, and three respectively. However, after March 1, 2002, plaintiffs may seek enforcement of any of these standards in this section at any time upon a showing of defendants' gross deviation from any of these standards.

1.     Parent-child visiting

a.     The standard:

For children in the plaintiff class with a goal of reunification, parent-child visiting shall mean a face-to-face visit with one or both parents and the child which shall take place for no less than one hour each time (unless the visit is shortened to protect the safety or well-being of the child as documented in the child's case record). The visit shall take place in the child's home if possible or in as homelike a setting as possible, or for longer as otherwise required by the child's permanency plan and reasonable professional standards. This standard does not apply to situations in which there is a court order prohibiting visitation or limiting visitation to less frequently than once every month. The child's case manager may consider the wishes of a child (generally older adolescents) and document in the case file any deviation from usual visitation requirements.

b.     Measurement periods / compliance levels
This measure applies to children with a goal of reunification.

Period I

20% of all class members with a goal of reunification shall be visited at least once every two weeks.

For the remaining class members with a goal of reunification who are not visited once every two weeks, at least 75% shall be visited once a month.

45

Period II

30% of all class members with a goal of reunification shall be visited at least once every two weeks.

For the remaining class members with a goal of reunification who are not visited once every two weeks, at least 70% shall be visited once a month.

Period III

50% of all class members with a goal of reunification shall be visited at least once every two weeks.

For the remaining class members with a goal of reunification who are not visited once every two weeks, at least 60% shall be visited once a month.

2.    Sibling visiting

a.    The standard:

For children who are not placed in the same home or facility as their siblings there shall be face to face visits between the child and any of his or her sibling(s) who are in the plaintiff class in the most home-like setting available. The visits shall take place in the parent's home, the foster home in which one of the siblings is living, the home of a relative, or the most home-like setting otherwise available and shall occur as frequently as is necessary and appropriate to facilitate sibling relationships but no less frequently than once each month. The visiting shall take place for no less than one hour each time (unless the visit is shortened to protect the safety or well-being of the child as documented in the child's case record), or more as otherwise required by the child's permanency plan and reasonable professional standards. This standard does not apply to situations when there is a court order prohibiting visitation or limiting visitation to less frequently than once every two months.

46

b.  Measurement periods / compliance levels

Period I

75% of all children in the class in placement who have siblings with whom they are not living shall visit with those siblings at least once a month.

Of the remaining children in the class in placement who have siblings with whom they are not living and with whom they did not visit at least once a month, at least 85% shall visit at least once every two months.

Period II

85% of all children in the class in placement who have siblings with whom they are not living shall visit with those siblings at least once a month.

Of the remaining children in the class in placement who have siblings with whom they are not living and with whom they did not visit at least once a month, at least 90% shall visit at least once every two months.

Period III

90% of all children in the class in placement who have siblings with whom they are not living shall visit with those siblings at least once a month.

Of the remaining children in the class in placement who have siblings with whom they are not living and with whom they did not visit at least once a month, at least 90% shall visit at least once every two months.

3.  Placing siblings together

a.  The standard:

Siblings who enter placement at or near the same time shall be placed together, unless doing so is harmful to one or more of the siblings, one of the siblings has such exceptional needs that can only be met in a specialized program or facility, or the size of the sibling group makes such placement impractical notwithstanding diligent efforts to place the group together.  If a sibling group is separated

47

at the initial placement, the case manager shall make immediate efforts to locate or recruit a family in whose home the siblings can be reunited. These efforts will be documented and maintained in the case file.

b.    Measurement period/ compliance levels

Period I

At least 70% of all siblings who entered placement during the reporting period shall be placed together in the same foster home or other placement.

Period II

At least 80% of all siblings who entered placement during the reporting period shall be placed together in the same foster home or other placement.

Period III

At least 85% of all siblings who entered placement during the reporting period shall be placed together in the same foster home or other placement.

4.    Filing a petition to terminate parental rights

a.    The standard:

The process of freeing a child for adoption and seeking and securing an adoptive placement shall begin as soon as the child's sole permanency goal becomes adoption, but in no event later than is required by federal law. The adoption process shall begin immediately for all children for whom a diligent search has failed to locate the whereabouts of either parent and for whom no appropriate family member is available to assume custody.

b.    Measurement period/ compliance levels

Period I

At least 75% of children in the class with a sole permanency goal of adoption during the reporting period shall have a petition to terminate parental rights filed within 6 months of when goal was changed to adoption.

48

Period II

At least 60% of children in the class with a sole permanency goal of adoption during the reporting period shall have a petition to terminate parental rights filed within 3 months of when goal was changed to adoption.

Of the remaining children in the class with a sole permanency goal of adoption during the reporting period who did not have a petition to terminate parental rights filed within 3 months, at least 50% shall have a petition for termination of parental rights filed within 6 months of when the goal was changed to adoption.

Period III

At least 65% of children in the class with a sole permanency goal of adoption during the reporting period shall have a petition to terminate parental rights filed within 3 months of when goal was changed to adoption.

Of the remaining children in the class with a sole permanency goal of adoption during the reporting period who did not have a petition to terminate parental rights filed within 3 months, at least 75% shall have a petition for termination of parental rights filed within 6 months of when the goal was changed to adoption.

5.     Placement in an adoptive home

a.     The standard:

Once there has been a termination of parental rights for a child in the plaintiff class, an adoptive home shall be identified and an adoption contract shall be signed for that child as soon as possible.

b.     Measurement period/ compliance levels

Period I

At least 75% of children freed for adoption during the reporting period (for whom termination of parental rights was obtained) shall have an adoptive home identified and an adoption contract signed within 12 months of the termination of parental rights.

49

Period II

At least 45% of children freed for adoption during the reporting period (for whom termination of parental rights was obtained) shall have an adoptive home identified and an adoption contract signed within 6 months of the termination of parental rights.

Of the remaining children in the class who have been freed for adoption during the reporting period (for whom termination of parental rights was obtained) who have not had an adoptive home identified and an adoption contract signed within 6 months, at least 70% shall have an adoptive home identified and an adoption contract signed within 12 months of the termination of parental rights.

Period III

At least 65% of children freed for adoption during the reporting period (for whom termination of parental rights was obtained) shall have an adoptive home identified and an adoption contract signed within 6 months of the termination of parental rights.

Of the remaining children in the class who have been freed for adoption during the reporting period (for whom termination of parental rights was obtained) who have not had an adoptive home identified and an adoption contract signed within 6 months, at least 85% shall have an adoptive home identified and an adoption contract signed within 12 months of the termination of parental rights.

6. Goal of permanent or long term foster care

a. The standard:

No child shall be assigned a permanency goal of permanent foster care unless a) the child is at least 15 years old; b) DCS has made every reasonable effort, documented in the record, to return the child home, to place the child with appropriate family members or to place the child for adoption; and c) the person to whom DCS proposes to assign permanent caretaker status has demonstrated a commitment to assuming long-term responsibility for the child.

50

b.    Measurement period/ compliance levels

Period I

No more than 10% of children in the plaintiff class shall have a goal of permanent or long term foster care.

Period II

No more than 8% of children in the plaintiff class shall have a goal of permanent or long term foster care.

Period III

No more that 5% of children in the plaintiff class shall have a goal of permanent or long-term foster care.

7.    In-region placements

a.    The standard:

All children shall be placed within their own region or within a 75 mile radius of the home through which the child entered custody, unless the child's needs are so exceptional that they cannot be met by a family or facility within the region, or the child needs re-placement and the child's permanency goal is to be returned to his parents who at that time reside out of the region or the child is to be placed with a relative out of the region, under which circumstances the regional administrator or the team coordinator shall be specifically required to so certify in writing, based on his or her own examination of the circumstances.

b.    Measurement period/ compliance levels

Period I

At least 70% of children in the class shall be placed within the region from which they entered placement or within a 75 mile radius of the home from which the child entered custody.

51

Period II

At least 80% of children in the class shall be placed within the region from which they entered placement or within a 75 mile radius of the home from which the child entered custody

Period III

At least 85% of children in the class shall be placed within the region from which they entered placement or within a 75 mile radius of the home from which the child entered custody.

C.    Performance Indicators Related to Administration

DCS shall complete the following by the dates provided below.

1.    On or before July 1, 2001, DCS shall designate a Director of Training as contemplated in section V. E.

2.    On or before October 1, 2001, DCS shall designate a Director of Quality Assurance as contemplated in section XI. C.

3.    On or before January 1, 2002, DCS shall submit to the technical assistance committee an employee incentive and stipend plan as described in section V. C.

4.    On or before September 1, 2001, DCS shall submit to the technical assistance committee a plan for making legal risk placements as described in section VIII. B.

5.    On or before January 1, 2002, DCS shall install a toll free number designated to provide adoption information as described in section IX. A.

6.    On or before July 1, 2001, every region will submit an adoptive and foster parent recruitment plan as described in section IX.A.

## XVII. MODIFICATION

This Settlement Agreement may be modified on the consent of the parties or upon appropriate motion filed with the court.

52

## XVIII. ENFORCEMENT, TERMINATION AND EXIT

A.    General Principles Guiding Enforcement

1.    All of the provisions in this Settlement Agreement are separately and independently enforceable, as set forth in this Settlement Agreement. Plaintiffs agree not to seek judicial relief for isolated, technical, or de minimis violations of this Settlement Agreement, or for violations relating solely to an individual child (other than an individual child who is a named plaintiff in this litigation).

2.    Unless otherwise specifically stated in a provision of this Settlement Agreement, all provisions of this Settlement Agreement shall apply to all children in the class, regardless of whether they are in a DCS or contract agency placement, and regardless of the type of placement.

3.    Nothing in this Settlement Agreement shall limit the right of the plaintiffs to seek from the court appropriate relief to remedy any violations of the Settlement Agreement.

B.    Dispute Resolution

1.    Solely with regard to the provisions contained in Section XVI (A) above regarding outcome measures, the following enforcement process will apply:  If DCS fails to meet the performance standard for any outcome measure at the end of the specified compliance period, as determined by the Monitor, prior to seeking judicial relief, plaintiffs will submit the non-compliance issue to the technical assistance committee.  Within 45 days of that submission, DCS, after consultation with the technical assistance committee and plaintiffs, will present a corrective action plan designed to enable DCS to meet the performance standard within a specified time period. The technical assistance committee will review the plan and recommend any changes it deems necessary. DCS shall revise the plan based on the recommendations of the technical assistance committee. Upon the technical assistance committee's final approval of the plan, the parties agree to be bound by the corrective action plan.  Defendants' failure to adopt and implement the corrective action plan within the time period specified constitutes prima facie evidence of noncompliance, for which plaintiffs may seek appropriate legal remedies.

2.    With regard to all provisions of this Settlement Agreement, with the exception of the provisions in Section XVI (A) regarding outcome measures for which the enforcement process is set out

above in XVIII (B)(1), the following enforcement process shall apply:

a.    Prior to seeking judicial remedies for non-compliance, plaintiffs shall notify the defendants in writing if they believe defendants are out of compliance with any provisions of this Settlement Agreement.

b.    The parties shall engage in a 30 day period of good faith negotiations in an effort to resolve the non-compliance issues and shall utilize the Monitor to facilitate this process.

c.    Plaintiffs may bypass the dispute resolution provisions of this Settlement Agreement and seek immediate relief in court if plaintiffs clearly demonstrate that DCS action or inaction in contravention of this Settlement Agreement caused or is likely to cause an immediate and substantial risk of serious harm to children in the class.

d.    After the completion of Period II, (36 months from the signing of the Settlement Agreement), if defendants believe that they are in substantial compliance with specific provisions of this Settlement Agreement, they may seek a diminution of monitoring of any or all of those specific provisions from the Monitor. If plaintiffs do not oppose that application, the Monitor may diminish monitoring of those provisions, but only to a level sufficient to determine whether compliance continues for the duration of this Settlement Agreement. If plaintiffs oppose the diminution of monitoring, plaintiffs shall seek a finding of non-compliance with the relevant provisions from the court, and the court shall determine whether non-compliance exists. If the court finds non-compliance, the monitoring of the relevant provisions shall not be diminished. If the court finds compliance, monitoring shall be diminished as determined by the Monitor. However, even in the event that monitoring of any particular provision is diminished, pursuant to this paragraph, based on an agreed-upon or court-determined finding of substantial compliance, court jurisdiction to enforce compliance with that and all provisions of this Settlement Agreement shall continue for the duration of the entire Settlement Agreement.

C.     Termination and Exit

    1.     Only after the completion of Period III as defined in Section XVI as 54 months after September 1, 2001, Defendants may seek the termination of court jurisdiction over any specific provision in this Settlement Agreement, as follows:

        a.     Defendants may seek the termination of court jurisdiction over any specific provision of this Settlement Agreement if the Monitor finds substantial compliance with the provision at the end of Period III.  If plaintiffs do not agree that court jurisdiction should be terminated, defendants may seek a ruling terminating court jurisdiction over that provision from the court.  The parties intend that the court shall grant termination of jurisdiction over the provision only if (1) defendants can prove substantial compliance with the provision; AND  (2) if plaintiffs fail to demonstrate that the provision is directly related to defendants' achievement of compliance with other provisions of this Settlement Agreement.

        b.     If the Monitor finds non-compliance with the provision at the end of Period III, and the Monitor subsequently finds sustained compliance with the provision for two consecutive six-month periods after the end of Period III, defendants may seek a ruling terminating court jurisdiction over that provision from the court.  The parties intend that the court shall grant termination of jurisdiction over the provision only if defendants can prove substantial compliance with the provision AND if plaintiffs fail to demonstrate that the provision is directly related to defendants' achievement of compliance with other provisions.

    2.     This Settlement Agreement shall remain in full force and effect until at least the conclusion of Period III.  Following the conclusion of Period III, and after the Monitor submits a report on compliance levels after Period III, the defendants may seek a ruling from the court for the full termination of court jurisdiction over this Settlement Agreement based on achievement of the compliance levels specified, so long as there are no pending non-compliance motions and no other pending remedial court orders based on non-compliance with any provisions of this Settlement Agreement, unless plaintiffs can demonstrate that continued court jurisdiction is necessary to accomplish the purposes of this Settlement Agreement.

XIX.  NAMED PLAINTIFFS

    A.    The Commissioner of DCS shall monitor the individual cases of the named plaintiffs in this action, to ensure that all necessary and appropriate plans are developed and implemented and that all necessary placements and services are provided.

    B.    The parties shall attempt to agree on necessary services and plans for the named plaintiffs, within 30 days after the signing of this Settlement Agreement.

    C.    The Monitor shall begin overseeing the cases of the named plaintiffs within 45 days after the signing of this Settlement Agreement and continuing for so long as the named plaintiffs remain in defendants' custody. If the parties cannot agree on any aspect of the care of any of the named plaintiffs, including placements, services, treatment or plans, the Monitor shall have final decision-making authority. The Monitor shall have the authority to consult with the technical assistance committee on particular issues pertaining to the named plaintiffs, as necessary.

    D.    The Commissioner of DCS shall ensure that plaintiffs' counsel receive documents and reports every 60 days concerning the status of the named plaintiffs, services that have been provided, and implementation of plans, so long as the named plaintiffs remain in defendants' custody. Plaintiffs' counsel shall receive immediate notification of any significant events or developments concerning the named plaintiffs, including but not limited to any change in placement, services, permanency goal or permanency plans; any reports of any incident of abuse or neglect involving any of the named plaintiffs or occurring at the placement where any of the named plaintiffs are currently placed; any serious incident (requiring generation of a serious incident report as defined in DCS policy as it exists on the date of the signing of this Settlement Agreement) involving any of the named plaintiffs or occurring at the placement where any of the named plaintiffs are placed.

XX.    ATTORNEYS FEES AND EXPENSES

    As prevailing parties in this lawsuit, plaintiffs are entitled to recover and reserve the right to seek reasonable attorneys fees and expenses up to the date of this Settlement Agreement and for all subsequent activities in this lawsuit to the extent authorized pursuant to 42 U.S.C. §1988.

DATED:       May __, 2001
             Nashville, TN


**SO ORDERED:**

HONORABLE TODD J. CAMPBELL, U.S.D.J.                    DATE


**APPROVED FOR ENTRY:**

**ATTORNEYS FOR PLAINTIFFS:**

MARCIA ROBINSON LOWRY (pro hac vice)
IRA P. LUSTBADER (pro hac vice)
JEFFREY K. POWELL (pro hac vice)
MADELYN FREUNDLICH
CHILDREN'S RIGHTS, INC.
404 Park Avenue South, 11th Floor
New York, NY 10016
(212) 683-2210


HOLLINS, WAGSTER & YARBROUGH, P.C.
DAVID L. RAYBIN (TN BPR # 3385)
JACQUELINE B. DIXON (TN BPR # 12054)
22nd Floor Sun Trust Center
424 Church Street
Nashville, Tennessee 37219
(615) 256-6666

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## AT NASHVILLE

BRIAN A., by his next friend, Bobbi Jean Brooks, )
TRACY B., by her next friend, Pamela Pallas, )
JACK and CHARLES C., by their next friend, )
Linda Lloyd; )
AMY D., by her next friend, Frank Koon; )
DENISE E., by her next friend, Linda Lloyd; )
CHARLETTE F., by her next friend, Juanita )
Veasy; and )
TERRY G., by her next friend, Carol Oldham, )
on their own behalf and on behalf of all others )
similarly situated, )
                   )
        Plaintiffs, )
                   )
v. )       Civil Action No. 3:00-0445
                   )       Judge Campbell
DONALD SUNDQUIST, Governor of the State )
of Tennessee; and )
GEORGE HATTAWAY, Commissioner of the )
Tennessee Department of Children's Services, )
                   )
        Defendants. )

---

## STIPULATED MODIFICATION OF SETTLEMENT AGREEMENT

---

        Pursuant to Section XVII of the Brian A. Settlement Agreement, the parties agree to modify

the Brian A. Settlement Agreement by deleting the text of Section V.A. of the Settlement Agreement

in its entirety and replacing it with the following language:

           All provisions of this section shall apply to all DCS Case
        Managers 1 through 4, Community Service Agency (CSA) custodial
        case managers, all contract agency foster care case workers and
        supervisors, and any other workers with corresponding
        responsibilities for class members. As of December 1, 2001, no CSA
        employees shall have any supervisory responsibility over case
        managers of children in the plaintiff class. As of December 1, 2001,
        there shall be at least a 50% reduction of the current number of class
        members receiving case management from CSA case managers, and

-1-

This document was entered on
the docket in compliance with
Rule 58 and / or Rule 79 (a).

FRCP on 7/27/01 By AXT



CSA case managers in Davidson and Shelby Counties shall no longer have caseloads that include class members. As of July 1, 2002, CSA case managers shall no longer have caseloads that include children in the plaintiff class.

DATED:    May __, 2001
          Nashville, TN

**SO ORDERED:**

_____
HONORABLE TODD J. CAMPBELL
United States District Judge

DATE: _____

**APPROVED FOR ENTRY:**

**ATTORNEYS FOR PLAINTIFFS:**

_____
MARCIA ROBINSON LOWRY (pro hac vice)
IRA P. LUSTBADER (pro hac vice)
JEFFREY K. POWELL (pro hac vice)
MADELYN FREUNDLICH
CHILDREN'S RIGHTS, INC.
404 Park Avenue South, 11th Floor
New York, NY 10016
(212) 683-2210

_____
HOLLINS, WAGSTER & YARBROUGH, P.C.
DAVID L. RAYBIN (TN BPR # 3385)
JACQUELINE B. DIXON (TN BPR # 12054)
22nd Floor, SunTrust Center
424 Church Street
Nashville, TN 37219
(615) 256-6666

-2-

GEORGE W. HATTAWAY
Commissioner
State of Tennessee
Department of Children's Services
7th Floor, Cordell Hull Bldg.
436 Sixth Avenue, North
Nashville, TN 37243-1290
(615) 741-9701

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## AT NASHVILLE

BRIAN A., by his next friend, Bobbi Jean Brooks, )
TRACY B., by her next friend, Pamela Pallas, )
JACK and CHARLES C., by their next friend, )
Linda Lloyd; )
AMY D., by her next friend, Frank Koon; )
DENISE E., by her next friend, Linda Lloyd; )
CHARLETTE F., by her next friend, Juanita )
Veasy; and )
TERRY G., by her next friend, Carol Oldham, )
on their own behalf and on behalf of all others )
similarly situated, )
                                      )

      Plaintiffs, )

           )

       v. )          Civil Action No. 3:00-0445

           )          Judge Campbell

DONALD SUNDQUIST, Governor of the State )
of Tennessee; and )
GEORGE HATTAWAY, Commissioner of the )
Tennessee Department of Children's Services, )
                                       )

      Defendants. )

---

## STIPULATED MODIFICATION OF SETTLEMENT AGREEMENT

---

      Pursuant to Section XVII of the Brian A. Settlement Agreement, the parties agree to modify

the Brian A. Settlement Agreement by deleting the first sentence of Section XIII.A. of the

Settlement Agreement in its entirety and replacing it with the following language:

      DCS shall develop and implement polices and procedures by which

-1-

This document was entered on
the docket in compliance with
Rule 58 and / or Rule 79 (a).

FRCP, on 7/27/06 By ___



UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

BRIAN A., by his next friend Bobbi Jean    )
Brooks; TRACY B., by her next friend,       )
Pamela Dallas; JACK and CHARLES C.,        )
by their next friend, Linda Lloyd, AMY D., )
by her next friend, Frank Koon;             )
DENISE E., by her next friend, Linda        )
Lloyd; CHARLETTE F., by her next friend    )
Juanita Veasy; and TERRY G., by her next   )
friend, Carol Oldham, on their own behalf  )
and on behalf of all others similarly situated )
                                             )
v.                                           )        NO. 3:00-0445
                                             )        JUDGE CAMPBELL
DONALD SUNDQUIST, Governor of               )
the State of Tennessee; and GEORGE          )
HATTAWAY, Commissioner of the              )
Tennessee Dept. of Children's Services      )

## ORDER

Pending before the Court are the following Motions: Plaintiffs' Motion for Approval of

Class Action Settlement (Docket No. 96) and Defendants' Motion for Approval of Class Action

Settlement (Docket No. 98). The Court held a hearing on July 20, 2001. The Motions are

GRANTED.

Contemporaneously herewith, the Court has approved and filed the Settlement

Agreement, a Stipulated Modification of Settlement Agreement regarding Section V.A. and an

additional Stipulated Modification of Settlement Agreement regarding Section XIII.A.

IT IS SO ORDERED.

This document was entered on
the docket in compliance with
Rule 58 and / or Rule 79 (a).

FRCP, on 7/27/01 By ___

TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE



IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

```
----------------------------------------------------------x
```
BRIAN A., by his next friend, Bobbi Jean Brooks;  )
TRACY B., by her next friend, Pamela Pallas;  )
JACK and CHARLES C., by their next friend,  )
Linda Lloyd;  )
AMY D., by her next friend, Frank Koon;  )
DENISE E., by her next friend, Linda Lloyd;  )
CHARLETTE F., by her next friend,  )          Civil Action No. 3-00-0445
Juanita Veasy; and  )                         Judge Campbell
TERRY G., by her next friend, Carol Oldham,  )  Magistrate Brown
on their own behalf and on behalf of all others  )
similarly situated,  )

                Plaintiffs,  )
                   )

--against--  )
                   )

DONALD SUNDQUIST, Governor of the State  )
of Tennessee; and  )
GEORGE HATTAWAY, Commissioner of the  )
Tennessee Department of Children's Services  )

                Defendants.  )
```
----------------------------------------------------------x
```

## SETTLEMENT AGREEMENT

This document was entered on
the docket in compliance with
Rule 58 and / or Rule 79 (a).

FRCP, on ⁷/²⁷/⁰⁶ By _____



## TABLE OF CONTENTS

Preamble.................................................................................................4

I.      Principles Of Settlement Agreement and Class Definition....................................4

        A.      Principles of Settlement Agreement...............................................4

        B.      Class Definition...................................................................6

II.     Structure of the Agency..............................................................6

III.    Reporting Abuse and Neglect...........................................................7

IV.     Regional Services....................................................................7

V.      Staff Qualifications, Training, Caseload, Supervision............................8

VI.     Placement and Supervision of Children...........................................13

VII.    Planning for Children.................................................................21

VIII.   Freeing a Child for Adoption.......................................................27

IX.     Adoptive and Foster Parent Recruitment, Retention, and Licensing.......................29

X.      Statewide Information System........................................................31

XI.     Quality Assurance...................................................................32

XII.    Supervision of Contract Agencies..................................................35

XIII.   Financial Development...............................................................36

XIV.    Technical Assistance Committee....................................................37

XV.     Monitoring.............................................................................38

XVI.    Outcome and Performance Measures.................................................40

2

XVII.   Modification...................................................................................52

XVIII. Enforcement, Termination and Exit............................................................53

     A.     General Principles Guiding Enforcement.............................................53

     B.     Dispute Resolution....................................................................53

     C.     Termination and Exit.................................................................55

XIX.   Named Plaintiffs................................................................................56

XX.   Attorneys Fees and Expenses....................................................................56

3

PREAMBLE

A.  The provisions of this Settlement Agreement resolve the existing disputes and issues in the case of <u>Brian A., et al., v. Don Sundquist, et al.</u>, Civil Action Number 3-00-0445 (Judge Campbell/Brown), and satisfy and resolve the claims of the named plaintiffs and the plaintiffs' class in the above-entitled case as of the date of this Settlement Agreement.

B.  This court has subject matter jurisdiction and personal jurisdiction over this action and therefore the authority to enter this Settlement Agreement.

C.  This court shall have continuing jurisdiction of this action to ensure compliance with the terms of this Settlement Agreement for as long as the Settlement Agreement remains in effect.

D.  Any state agency responsible for the care, protection, and/or supervision of plaintiff class members shall be bound by the provisions of this Settlement Agreement.  For as long as this Settlement Agreement remains in effect, all provisions of this Settlement Agreement referring to the "Department," the "Department of Children's Services" or "DCS," upon any subsequent changes to the current governmental organizational structure of the Tennessee Department of Children's Services concerning the children in the plaintiff class as defined in this Settlement Agreement, shall apply with full force and effect to the State of Tennessee and to any subsequent agency or agencies with any of the responsibilities that apply to the current Tennessee Department of Children's Services under this Settlement Agreement as of the date of this Settlement Agreement.

E.  This Settlement Agreement, and any of its provisions, are not, and shall not be construed to be, an admission of any liability on the part of any of the defendants concerning any of the claims and allegations in the complaint in this litigation.

I.  PRINCIPLES OF SETTLEMENT AGREEMENT AND CLASS DEFINITION

A.  Principles of Settlement Agreement

1.  All children should have the best possible opportunity to grow up within a safe, nurturing family, either their biological family or, if that is not possible, within an adoptive family.

2.  The state should make reasonable efforts to avoid foster care placement by providing services to preserve the biological family whenever that is reasonably possible.  However, child welfare decision-makers must have the professional capacity to make determinations as to when making

4

efforts to preserve the biological family, or leaving the child with that family, is neither safe for the child nor likely to lead to an appropriate result for the child.

3.    After children enter placement, all non-destructive family ties should be maintained and nurtured. Children should be placed with relatives who are able to provide a safe, nurturing home for them, and should be placed with siblings, and relationships with relatives and siblings should be facilitated and maintained by the child welfare agency.

4.    Foster care should be as temporary an arrangement as possible, with its goal being to provide a permanent home for the child as quickly as possible. In making the determination about what plans and services will best meet this goal, the child's interests must be paramount.

5.    The state has primary responsibility for the care and protection of children who enter the foster care system. Insofar as it relies on private contractors to assist in meeting this responsibility, it should only do so according to standards set by and rigorously monitored by the state.

6.    All children in need of child welfare services should receive full and equal access to the best available services, regardless of race, religion, ethnicity, or disabilities.

7.    Children in foster care placement should be in the least restrictive, most family-like setting possible, and the state should make all efforts to avoid the use of non-family settings for children, particularly young children.

8.    Children in foster care placement should have stable placements that meet their needs and the services necessary to address both the trauma of foster care placement and the problems surrounding their removal from their family.

9.    Children in out-of-home placement must have timely decision-making about where and with whom they will spend their childhood, and timely implementation of whatever decisions have been made.

10.   Families of children in foster care should be significant participants in the planning and decision-making concerning their children.

11.   The state should achieve these goals in a family environment whenever possible, separating the child from the child's parents only when necessary for the child's welfare or in the interest of the child's safety, keeping a child as close to home as possible.

5

12.   All parties in judicial proceedings involving neglect, abuse, unruly and delinquency should be provided a fair hearing and their constitutional and other legal rights should be enforced and recognized.

13.   Except where a particular provision of this Settlement Agreement establishes a specific limit on the resources required to be allocated, defendants shall commit all necessary resources (administrative, personnel, financial and otherwise) to implement all provisions of the Settlement Agreement.

14.   All actions required for plaintiff class members under the Settlement Agreement shall be documented within the individual case file of each member of the plaintiff class. DCS shall have the ability to produce aggregate data requested by the Monitor concerning compliance with the provisions of this Settlement Agreement.

B.   Class Definition

Pursuant to the terms of this Settlement Agreement, this case shall be certified as a class action and the class certified shall be defined as follows: All foster children who are or will be in the legal custody of the Tennessee Department of Children's Services. "Foster children" shall mean all children who are or will be in the legal custody of the Tennessee Department of Children's Services, excluding children who are or will be in the legal custody of the Department of Children's Services upon an allegation or adjudication of a delinquent or criminal act. Children who are or will be in the custody of the Department of Children's Services upon an allegation or adjudication of an unruly or status offense shall be included in the class, and children who are or will be in the custody of the Department of Children's Services upon on allegation of a delinquent or criminal act and which allegation is subsequently dropped or fails to result in an adjudication of a delinquent or criminal act and who remain in the legal custody of the Department of Children's Services, shall be included in the class.

II.   STRUCTURE OF THE AGENCY

A.   DCS shall establish child welfare policy and determine statewide standards and practices for the entire state. DCS shall take all reasonable steps necessary to ensure that statewide policies, standards and practices are implemented and maintained in each region of the state and that uniform forms and data collection and reporting are utilized in each region. Regions retain the right to develop and use forms and data instruments that address issues of local concern.

6

it can maximize funds available to it through Titles IV-B and IV-E of the Adoption Assistance and Child Welfare Act of 1980.

DATED:      July __, 2001
            Nashville, TN

**SO ORDERED:**

_____
HONORABLE TODD J. CAMPBELL
United States District Judge


DATE: _____


**APPROVED FOR ENTRY:**

**ATTORNEYS FOR PLAINTIFFS:**


_____
MARCIA ROBINSON LOWRY (pro hac vice)
IRA P. LUSTBADER (pro hac vice)
JEFFREY K. POWELL (pro hac vice)
MADELYN FREUNDLICH
CHILDREN'S RIGHTS, INC.
404 Park Avenue South, 11th Floor
New York, NY 10016
(212) 683-2210


_____
HOLLINS, WAGSTER & YARBROUGH, P.C.
DAVID L. RAYBIN (TN BPR # 3385)
JACQUELINE B. DIXON (TN BPR # 12054)
22nd Floor, SunTrust Center
424 Church Street
Nashville, TN 37219
(615) 256-6666

-2-

**OF COUNSEL FOR PLAINTIFFS:**

RICHARD B. FIELDS (TN BPR # 4744)
266 South Front Street
Memphis, TN 38103-3803
(901) 543-4299

JOHN W. PIEROTTI (TN BPR # 7851)
ROBERT LOUIS HUTTON (TN BPR # 15496)
GLANKLER BROWN, PLLC, Suite 1700
One Commerce Square
Memphis, TN 38103
(901) 525-1322

WADE V. DAVIES (TN BPR # 016052)
RITCHIE, FELS & DILLARD, P.C.
606 W. Main Street, Suite 300
Knoxville, TN 37902
(865) 637-0661

**ATTORNEYS FOR DEFENDANTS:**

JIM CREECY
Chief Special Counsel (TN BPR # 2944)

Douglas Earl Dimond (by ECD, with permission)
DOUGLAS E. DIMOND
Assistant Attorney General (TN BPR # 17953)

ELIZABETH C. DRIVER
Assistant Attorney General (TN BPR # 19363)
Office of the Attorney General
425 Fifth Avenue, North
Nashville, TN 37243
(615) 741-3491

-3-

GEORGE W. HATTAWAY
Commissioner
State of Tennessee
Department of Children's Services
7th Floor, Cordell Hull Bldg.
436 Sixth Avenue, North
Nashville, TN 37243-1290
(615) 741-9701

-4-