IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

JAMES D. JOHNSON, as next friend to                           PLAINTIFFS
Olivia Y., et al.

vs.                                          CIVIL ACTION NO. 3:04cv251LN

HALEY BARBOUR, as Governor of the                            DEFENDANTS
State of Mississippi, et al.

---

**DEFENDANTS' MEMORANDUM OF AUTHORITIES IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

---

COME NOW Haley Barbour, as Governor of the State of Mississippi, Donald Taylor, as

Executive Director of the Mississippi Department of Human Services ("MDHS"), and Rickie

Felder, as Director of the Division of Family and Children's Services ("DFCS") ("Defendants"),

by their attorneys of record, and submit this memorandum of authorities in support of their

Motion for Summary Judgment dismissing Plaintiffs' claims against them brought under the

United States Constitution.

**I.      Background**

Eight Plaintiffs assert claims against Mississippi's Governor, the Executive Director of

the MDHS, and the Director of the DFCS of the MDHS on behalf of themselves and an alleged

class of approximately 3,000 foster children in the custody of the MDHS.  *See* Amended

Complaint, attached as Exhibit "I" to Defendants' Motion for Summary Judgment.  The initial

Complaint was filed on March 30, 2004, within three months of the Barbour administration

taking office.  The Amended Complaint was filed on May 17, 2004.  Plaintiffs seek declaratory

and permanent injunctive relief that would make this court responsible for overseeing and administering Mississippi's foster care system. *Id.* at p. 60.

All but one of Plaintiffs' causes of action were previously dismissed by this court. *See Johnson ex rel. Olivia Y. v. Barbour*, 351 F. Supp. 2d 543 (S.D. Miss. 2004). The only remaining cause of action is an alleged substantive violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Plaintiffs seek liability based on 42 U.S.C. § 1983.

For the reasons stated herein, Defendants are entitled to summary judgment on Plaintiffs' remaining claim.[1] First, Defendants assert that as a matter of law, Plaintiffs have been provided with constitutionally adequate care and safekeeping although they seek judicial enforcement of optimal care through the improper expansion of the scope of their rights protected by the Fourteenth Amendment. Second, Plaintiffs have failed as a matter of law to satisfy the requirements of deliberate indifference as required by precedent of the United States Court of Appeals for the Fifth Circuit.

The named Plaintiffs consist of foster children identified as Olivia Y., Jamison J., Cody B., John A., Mary W., Tom W., Matthew W., and Dana W. Each named Plaintiff was removed from parental custody by a Mississippi Youth Court Judge as the result of tragic facts and circumstances.

Olivia Y. was removed from her mother's home on September 10, 2003 and was placed in the custody of the Forrest County Department of Human Services. Olivia was born three

---

[1] As an initial matter, Defendants reassert their position that the court should abstain from hearing Plaintiffs' claims under the abstention doctrine announced in *Younger v. Harris*, 401 U.S. 37 (1971). A separate motion and memorandum of authorities are being filed contemporaneously with this Motion for Summary Judgment and supporting memorandum reasserting Defendants' claim under the abstention doctrine of *Younger*.

months premature. At the time of her birth, Olivia's mother's drug screen was positive for cocaine, marijuana, and alcohol, and Olivia's drug screen was positive for cocaine. Olivia's parents' rights have been terminated. She is currently five years old and is living in a relative placement with her older sister. Olivia attends elementary school and classes for developmentally delayed children and is receiving all of the services offered by the school system. A summary of the medical and dental services provided to Olivia since she entered MDHS/DFCS custody is set forth in Exhibit "A" attached to Defendants' Motion for Summary Judgment.[2]

Jamison J. was removed from his mother's custody on December 9, 1991 because he was living in deplorable conditions and was placed in the custody of the Bolivar County Department of Human Services. Jamison's parents' rights have been terminated. He is currently nineteen years old, is residing in a reputable boys' home, and is scheduled to graduate from public high school in May, 2006. A summary of the mental health, medical and dental services provided to Jamison since he entered MDHS/DFCS custody is set forth in Exhibit "B" attached to Defendants' Motion for Summary Judgment.

Cody B. was removed from his parents' custody in July, 2002, when he was about two months old and was placed in the custody of the Jackson County Department of Human Services. He had been left alone in an apartment, and the Youth Court determined that neither his mother nor father were mentally competent to care for him. Cody's parents' rights have been terminated. He is currently three years old and is living with foster parents who plan to adopt him. A summary of the mental health, medical and dental services provided to Cody since he

---

[2] Due to the extensive amount of services provided for the named Plaintiffs, defense counsel has summarized the documents into charts for each child with corresponding references to documents produced during discovery. If the court so requests, Defendants can provide the referenced documents under seal.

entered MDHS/DFCS custody is set forth in Exhibit "C" attached to Defendants' Motion for Summary Judgment.

John A. was removed from parental custody by the Forest County Youth Court on March 5, 1999, when he was nine years old. John's mother would leave John and his siblings alone or with friends for days at a time. The Forrest County Department of Human Services took custody of John and his siblings after John's school reported that he was exhibiting extremely violent behavior, attempting to harm himself and others. John's parents' rights have been terminated. He is currently sixteen years old and is living in a foster home with his three siblings, where he has been since January 24, 2004. A summary of the mental health, medical and dental services provided to John since he entered MDHS/DFCS custody is set forth in Exhibit "D" attached to Defendants' Motion for Summary Judgment.

Mary W., Tom W., Mathew W., and Dana W. (the "W. Children") entered custody of the Hinds County Department of Human Services on October 31, 2000. These children first came to the attention of Hinds County on October 26, 2000, when the children, then aged nine, seven, four, and three years old, were discovered by a neighbor in an apartment where they had been left alone by their mother. The W. children's parents' rights have been terminated. They are currently fifteen, twelve, nine, and eight years old and are living together in a foster home. Summaries of the mental health, medical and dental services provided to Mary, Tom, Matthew, and Dana since entering MDHS/DFCS custody are set forth in Exhibits "E," "F," "G," and "H," respectively, attached to Defendants' Motion for Summary Judgment.

While in custody, each named Plaintiff has been provided adequate care, consisting of food, clothing, shelter, and medical care, and safekeeping, *See, e.g.* Affidavit of Deborah Stewart, attached as Exhibit "T" to Defendants' Motion for Summary Judgment; Affidavit of

Queen Coleman, attached as Exhibit "FF" to Defendants' Motion for Summary Judgment; Affidavit of Brenda Coe, attached as Exhibit "GG" to Defendants' Motion for Summary Judgment; and Affidavit of Earnest Johnson, attached as Exhibit "HH" to Defendants' Motion for Summary Judgment. In fact, Dr. Marva Lewis, who is Plaintiffs' designated case record expert for the named Plaintiffs, testified that Cody B., Olivia Y., and Jamison J. have been provided basic shelter, food, and clothing while merely questioning the adequacy of clothing received by John A. *See* Case Reviews of Four Individual Children by Marva L. Lewis, Ph.D. ("the Lewis Report"), attached as Exhibit "Q" to Defendants' Motion for Summary Judgment, pp. 63-67. Dr. Lewis also never interviewed the children, any social workers, case workers, physicians, psychiatrists, medical providers, social worker supervisors or foster families. Lewis Depo, attached as Exhibit "O" to Defendants' Motion for Summary Judgment, at 52:12-55:16. More importantly, neither Dr. Lewis nor any of the Plaintiffs' designated experts reviewed medical provider records for the named Plaintiffs. *See* Exhibit "O" at 48:3-49:24; Hess Depo, attached as Exhibit "P" to Defendants' Motion for Summary Judgment, at 63:3-64:9; Crabtree Depo, attached as Exhibit "R" to Defendants' Motion for Summary Judgment, at 59:22-25; Hiatt Depo, attached as Exhibit "S" to Defendants' Motion for Summary Judgment, at 19:6-8, 20:25-21:3, 59:1-7; Brister Depo, attached as Exhibit "CC" to Defendants' Motion for Summary Judgment, at 17:14-21. Further, not one of the Plaintiffs' designated experts offered an opinion or evidence relative to one half of the named Plaintiffs, being Mary W., Tom W., Matthew W., and Dana W.

## II.    Summary Judgment Standard

A motion for summary judgment should be granted where there is no genuine issue as to any material fact which would necessitate a trial, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Alexandria Assocs., Ltd. v. Mitchell Co.*, 2 F.3d 598, 600

(5th Cir. 1993); *Williams v. CXF Transp., Inc.*, 925 F. Supp. 447, 449 (S.D. Miss. 1996), *aff'd*, 139 F.3d 899 (5th Cir. 1998).

The United States Supreme Court has stressed that summary judgment requires "that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 248 (emphasis in original). Thus, disputes concerning facts not material to a determinative issue do not preclude summary judgment because "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citing 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure  2725, pp. 93-95 (1983)).  Should the non-movant fail to demonstrate an essential element of its claim or defense, summary judgment is appropriate, and all other facts are deemed immaterial. *Oliver v. Forrest County Gen. Hosp.*, 785 F. Supp. 590, 593 (S.D. Miss. 1991).  Furthermore, the non-movant is required to demonstrate "substantial evidence" in support of the essential elements of its claim or defense; a mere scintilla of evidence will not suffice. *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990).

The mere existence of an alleged factual dispute does not defeat a properly supported motion for summary judgment; the dispute must involve a *genuine* issue.  Although given the benefit of all favorable inferences which may be drawn from the evidence, the non-movant may not rest solely upon unsupported allegations in order to withstand a motion for summary judgment. *Moore v. Miss. Valley State Univ.*, 871 F.2d 545, 549 (5th Cir. 1989); *Williams*, 925 F. Supp. at 449.  Thus, "[o]nce a properly supported motion for summary judgment is presented, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  As the Fifth Circuit has held,

> We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence

of contradictory facts.  We do not, however, in the absence of any proof, assume
that the nonmoving party could or would prove the necessary facts.

*Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

Because there is no genuine issue as to any material fact related to Plaintiffs' claim of
violation of their substantive due process rights and because Defendants are entitled to judgment
as a matter of law, summary judgment is proper and should be granted for Defendants.

**III.    Plaintiffs' Substantive Due Process Claims Fail as a Matter of Law.**

It is important to state that what Plaintiffs are seeking is the enforcement of rights secured
by the United States Constitution, not merely the enforcement of federal or state statutory law,
agency policy, or even sound public policy.  Plaintiffs are attempting to resolve systemic issues
that involve fundamental resource allocation decisions by the State of Mississippi and its
executive agencies under the guise of enforcing federal constitutional rights.  The United States
Supreme Court has held that even though States are obligated to provide basic necessities and
care to institutionalized persons, those that are "wholly dependent on the State," "a State
necessarily has considerable discretion in determining the nature and scope of its
responsibilities."  *Youngberg v. Romeo*, 457 U.S. 307, 317 (1982) (citing *Richardson v. Belcher*,
404 U.S. 78, 83-84 (1971); *Dandridge v. Williams*, 397 U.S. 471, 478 (1970)); *see also*
*DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 200, n.7 (1989) (citations
omitted).

The Court continued by noting that a State should not have to "'choose between attacking
every aspect of a problem or not attacking the problem at all.'" *Youngberg*, 457 U.S. at 317
(quoting *Dandridge*, 397 U.S. at 486-87).  "Minimum standards must be met, and the child's
fundamental rights must not be impaired; but the decision to go beyond these requirements – to
give one or another of the child's additional interests priority over other concerns that compete

7

for public funds and administrative attention – is a policy judgment rather than a constitutional imperative." *Reno v. Flores*, 507 U.S. 292, 304-05 (1993). As the Seventh Circuit held in a suit filed by a child abused by her foster parents against the state child welfare workers:

> The underlying problem is not lack of professional competence but lack of resources, a problem of political will unlikely to be soluble by judicial means. Good foster parents are difficult to find, unless they are paid generously; good institutional care is expensive too. The needs of neglected, abused, and abandoned children compete with other demands, both public and private, for scarce resources. The allocation of the nation's – even of single state's – resources is not a realistic assignment for the federal courts. Any standard of foster care that the courts declare in the name of the Constitution is likely to be a minimum one that will do little for the plight of the unwanted, abandoned, neglected, or abused child.

*K.H. v. Morgan*, 914 F.2d 846, 853 (7th Cir. 1990). *See also Dawson v. Milwaukee Hous. Auth.*, 930 F.2d 1283, 1285 (7th Cir. 1991) ("Government is the art of compromise, including striking the balance between cost and quality. More police means fewer schools and parks. Money spent on safety is unavailable for salaries.").

It is against this background that the actions of Defendants must be judged.

A.      **Plaintiffs' Substantive Due Process Rights Are Limited to the Rights to Reasonably Safe Conditions and Basic Necessities.**

The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend XIV, § 1. In order for an individual to have a viable cause of action under 42 U.S.C. § 1983 for a violation of the Substantive Due Process Clause, the individual must first assert a recognized "liberty" interest within the meaning of the Fourteenth Amendment and show that they were deprived of these interests under color of state law. *Griffith v. Johnston*, 899 F.2d 1427, 1435 (5th Cir. 1990), *cert. denied*, 498 U.S. 1040 (1991).

Neither the Supreme Court of the United States nor the Fifth Circuit has expressly decided the extent of due process rights applicable to children in foster care. However, it is well

8

settled that only a limited range of interests fall within the protection of the Fourteenth

Amendment. *Hewitt v. Helms*, 459 U.S. 460, 466 (1983), *overruled on other grounds by Sandin*

*v. Conner*, 515 U.S. 472 (1995). As this court held in a similar suit filed by a class of mentally

and physically handicapped children who were foster children or otherwise in State custody

against various State agencies, including MDHS:

> Plaintiffs who have been involuntarily placed in the custody of the DHS have
> substantive due process rights under the fourteenth amendment to be free from
> harm while in state custody. Thus, Defendants have an affirmative duty to
> provide these Plaintiffs with *adequate* food, shelter, clothing, medical care
> and *reasonable* safety under *DeShaney*. Defendants are not required under the
> Constitution to provide Plaintiffs with an *optimal* level of care and treatment.

*E.F. v. Scafidi*, No. 3:91CV591LN, at *20 (S.D. Miss. Mar. 13, 1996) (Dist. File) (quoting *Baby*

*Neal v. Casey*, 821 F. Supp. 320, 327 (E.D. Pa. 1993)) (emphasis added), attached as Exhibit "J"

to Defendants' Motion for Summary Judgment.

Plaintiffs attempt to expand the rights protected under the Fourteenth Amendment by

asserting a myriad of interests that they claim are entitled to protection:

1) Right to protection from harm – physical, emotional, developmental or otherwise;
2) Right not to remain in state custody unnecessarily;
3) Right to treatment;[3]
4) Right to treatment related to the cause of their confinement; and
5) Right to receive care, treatment and services consistent with competent professional judgment.

Exhibit "I" at ¶ 204. In addition, Plaintiffs claim Defendants failed: [4]

---

[3] Defendants are unsure what subtle differences Plaintiffs are attempting to evoke by listing "treatment," "treatment related to the cause of their confinement," and "care, treatment, and services consistent with competent professional judgment" as three separate rights. Defendants will address these claimed rights as being the right to receive basic necessities, including food, shelter, clothing, and medical care.

[4] Because of the nebulous nature of Plaintiffs' Amended Complaint, Defendants have been unable to determine exactly what rights Plaintiffs claim are afforded due process protection and what actions or inactions by Defendants that Plaintiffs contend violate these rights. For example,

1)    To place Plaintiffs in certain placements – with available relatives, in appropriate, in stable, in licensed, and/or in the least restrictive placements. *See* Exhibit "I" at ¶¶ 65, 82, 106, 142, 148, 156; and

2)    To monitor Plaintiffs through face-to-face contacts, case reviews, and permanency hearings. *See* Exhibit "I" at ¶ 160.

Under Supreme Court and Fifth Circuit precedent, only those interests stemming from specific privileges enumerated by the Bill of Rights and from "fundamental rights implicit in the concept of ordered liberty" and "deeply rooted in this Nation's history and tradition" are within the purview of the Fourteenth Amendment. *Griffith*, 899 F.2d at 1435 (quoting *Michael H. v. Gerald D.*, 491 U.S. 110, 123-24 (1989); *Bowers v. Hardwick*, 478 U.S. 186, 191 (1986); *Hewitt*, 459 U.S. at 466; *Moore v. City of East Cleveland*, 431 U.S. 494, 503 (1977)). The Supreme Court has also held that "Courts must resist the temptation to augment the substantive reach of the Fourteenth Amendment, 'particularly if it requires redefining the category of rights deemed to be fundamental.'" *Id.* (citations omitted); *see also Reno*, 507 U.S. at 302 ("Substantive due process analysis must begin with a careful description of the asserted right, for the doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field.") (internal quotations and citations omitted).

To the extent the rights claimed by Plaintiffs exceed the rights recognized by the Supreme Court or the Fifth Circuit, Plaintiffs do not have a viable cause of action for violation of their substantive due process rights.

## 1.    Right to Reasonably Safe Conditions and Basic Necessities

Plaintiffs allege Defendants have violated their right to be free from harm while in custody and their right to basic necessities such as adequate medical care. *See* Exhibit "I" at ¶¶

---

several rights are alleged to violate Plaintiffs' "constitutional and statutory rights" with no attempt by Plaintiffs to discern which are based on the Fourteenth Amendment. *See, e.g.,* Exhibit "I" at ¶ 65. Defendants have, therefore, addressed all the above enumerated interests and failures as alleged Fourteenth Amendment substantive due process rights.

50, 65, 82, 96, 106, 148, and 170.  The Supreme Court has recognized a protected right in reasonably safe conditions in the context of mental institutions.  *See Youngberg*, 457 U.S. at 315 ("this Court has noted that the right to personal security constitutes a 'historic liberty interest' protected substantively by the Due Process Clause.").  The Supreme Court has also recognized a protected right to basic necessities, such as food, clothing, shelter, and medical care in state institutional settings.  *See Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976) (Eighth Amendment requires State to provide adequate medical care to incarcerated prisoners); *Youngberg*, 457 U.S. at 315, 324 (State must provide mental patients with "reasonable care" and "adequate food, shelter, clothing, and medical care").

In *DeShaney*, the Court held that when taken together, *Youngberg* and *Estelle* "stand . . . for the proposition that when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."  489 U.S. at 199-00.  The Fifth Circuit has held

> When the state, through the affirmative exercise of its powers, acts to restrain an individual's freedom to act on his own behalf 'through incarceration, institutionalization, or other similar restraint of personal liberty,' the state creates a 'special relationship' between the individual and the state which imposes upon the state a constitutional duty to protect that individual from dangers . . . .

*McClendon v. City of Columbia*, 305 F.3d 314, 324-25 (5th Cir. 2002) (quoting *DeShaney*, 489 U.S. at 200).  This duty is inherently limited to the duty to provide reasonable safety and basic necessities such as food, clothing, shelter, and medical care, not the extensive services asserted by Plaintiffs.  *See* Exhibit "J" at *20.

Based on the special relationship created between foster children and the states when the children are taken into state custody, lower federal courts have extended the right to reasonably safe conditions and basic necessities to children in the states' foster systems.  *Johnson*, 351 F.

11

Supp. 2d at 555 -56 (State must provide foster children with "constitutionally adequate care" and "safekeeping") (citing *Griffith*, 899 F.2d at 1439). *See also Hernandez v. Texas Dep't of Protective and Reg. Servs.*, 380 F.3d 872, 880 (5th Cir. 2004); *Nicini v. Morra*, 212 F.3d 798, 808 (3d Cir. 2000); *Norfleet v. Arkansas Dep't of Human Servs.*, 989 F.2d 289, 293 (8th Cir. 1993); *Lipscomb v. Simmons*, 962 F.2d 1374, 1379 (9th Cir. 1992); *Yvonne L. ex rel. Lewis v. New Mexico Dep't of Human Servs.*, 959 F.2d 883, 893 (10th Cir. 1992); *K.H. ex rel. Murphy v. Morgan*, 914 F.2d 846, 852 (7th Cir. 1990); *Meador v. Cabinet for Human Res.*, 902 F.2d 474, 476 (6th Cir. 1990), *cert. denied*, 498 U.S. 867 (1990); *Taylor ex rel. Walker v. Ledbetter*, 818 F.2d 791, 795 (11th Cir. 1987), *cert. denied*, 489 U.S. 1065 (1989); *Doe v. New York City Dep't of Soc. Servs.*, 649 F.2d 134, 141 (2d Cir. 1981), *cert. denied*, 464 U.S. 864 (1983); *Eric L. v. Bird*, 848 F. Supp. 303, 307 (D.N.H. 1994); *LaShawn A. v. Dixon*, 762 F. Supp. 959, 993 (D.D.C. 1991).

Plaintiffs attempt to expand the right to be free from harm to include the right to be free from "emotional," "developmental," and "psychological" harm. Neither the Supreme Court nor the Fifth Circuit has extended the right to reasonably safe living conditions to encompass these alleged rights. In fact, the Fifth Circuit has effectively foreclosed such an extension. In *Griffith*, eighteen "hard-to-place" children and their adoptive parents filed suit against the Texas Department of Human Services for failures to provide information to the parents about the children prior to their adoptions and failures to provide post-adoption services to the children. 899 F.2d at 1432. The children claimed liberty interests in the "uninhibited development of their personalities" and their "interest in living in non-restrictive circumstances." *Id.* at 1438. Looking to prior substantive due process cases to determine if the asserted interest was a "fundamental right," the Fifth Circuit held "the 'personality interests' asserted by the Griffith

children are beyond anything even remotely suggested in other substantive due process cases and, indeed, would require a breaktaking extension of that doctrine." *Id.* at 1439. The court held the state did not have an obligation to maximize the children's "personal psychological development." *Id. See also Hernandez,* 380 F.3d at 880 (recognizing right to be from harm encompassing "personal security" and "reasonably safe living conditions"); *Shinn ex rel. Shinn v. College Station Ind. Sch. Dist.*, 96 F.3d 783, 786 (5th Cir. 1996) (citing *Grandstaff v. City of Borger, Tex.*, 767 F.2d 161, 172 (5th Cir. 1985) ("There is no constitutional right to be free from emotional distress"); *Del A. v. Roemer*, 777 F. Supp. 1297, 1319 (E.D. La. 1991) ("plaintiffs' claims that their emotional well-being has been harmed invokes no constitutionally protected liberty interest.")

In addition, the Second, Third, Sixth, Eighth, Tenth, and Eleventh Circuits have all recognized the right to be safe from harm only in the context of physical or sexual abuse. *See Nicini*, 212 F.3d 798 (recognizing right to safety for child who was sexually abused in placement); *Yvonne L.*, 959 F.2d at 893 (recognizing right to be "reasonably safe from harm" for child who was sexually abused in foster home; *Meador*, 902 F.2d at 476 (recognizing "right to be free from the infliction of unnecessary harm" for children who were sexually abused in foster home); *Taylor*, 818 F.2d at 794 (recognizing right to "physical safety"); *Doe*, 649 F.2d at 137 (recognizing right to be safe from harm for child who was sexually and physically abused in foster home). *See also Del A.*, 777 F. Supp. at 1318 ("there is no requirement that the State justify conditions of less than absolute safety.); *Vonner v. State Through Dep't of Public Welfare*, 273 So. 2d 252, 256 (La. 1973) (state agency has duty to ensure children are protected from "intentional physical abuse causing serious injury.").

13

Plaintiffs further allege Defendants fail to fund foster care placements "at levels sufficient to provide essential and appropriate services for foster children" in violation of their right to basic necessities. *See* Exhibit "I" at ¶ 144. Defendants do not have the statutory authority to set the foster board payment rates. Miss. Code Ann. § 43-15-17. Furthermore, Defendants' constitutional duty is to provide Plaintiffs with *adequate* and *reasonable* care, not the *best* care. *See Reno*, 507 U.S. at 304 ("child-care institutions operated by the State . . . are not constitutionally required to be funded at such a level as to provide the *best* schooling or the *best* health care available) (emphasis in original); *Youngberg*, 457 U.S. at 315, 324 (State must provide mental patients with "*reasonable* care" and "*adequate* food, shelter, clothing, and medical care") (emphasis added); *Norfleet*, 989 F.2d at 293 ("state had an obligation to provide *adequate* medical care, protection and supervision.") (emphasis added); *Vonner*, 273 So. 2d at 256 (Department has "legal responsibility that the children be *adequately* fed [and] clothed") (emphasis added).

### 2.    Right Not to Remain in State Custody Unnecessarily

Plaintiffs allege Defendants have allowed them, in violation of their constitutional rights, to languish unnecessarily in state custody by failing to develop and implement permanency plans that would allow them to leave foster care and secure safe and permanent homes, by failing to provide necessary and appropriate permanency and adoption services, and by failing to timely file termination of parental rights petitions. *See* Exhibit "I" at ¶¶ 50, 65, 82, 96, 106, 177. These alleged rights are based on the Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. §§ 620-628, 670-679a ("AACWA").[5]  This court has previously dismissed these statutory

---

[5] Section 671(a)(16) requires the State to develop a "case plan" for each foster child receiving foster care payments and to provide for a "case review system" with respect to each such child. Section 675 defines "case plan" to include such requirements as a plan for services designed to "facilitate . . . the permanent placement of the child" and documentation of the steps taken by the

claims. *Johnson*, 351 F. Supp. 2d at 558-59, 565.  Plaintiffs have not provided any support for the proposition that the Supreme Court or the Fifth Circuit recognizes the right not to remain in state custody unnecessarily as a constitutional right protected by the Fourteenth Amendment.

### 3.    Right to Certain Placements

Plaintiffs allege Defendants failed to place Plaintiffs with available relatives in violation of their constitutional rights. *See* Exhibit "I" at ¶ 106.  Plaintiffs also allege Defendants failed to place Plaintiffs in appropriate, stable, licensed, and least restrictive placements. *See id.* at ¶¶ 65, 82, 148, and 156.  These alleged rights also are based on the AACWA which this court has previously dismissed.[6] *Johnson*, 351 F. Supp. 2d at 558-59, 565.

The Fifth Circuit has held that foster children do not have a constitutional right to be placed in the "best" home. *Drummond v. Fulton County Dep't of Family & Children's Servs.*, 563 F.2d 1200, 1210 (5th Cir. 1977), *cert. denied*, 437 U.S. 910 (1978) (holding "The 'best' home for [a particular foster child] is basically a subjective determination" and is determined by "policy inquiries, not factual disputes."); *see also Reno*, 507 U.S. at 304 (holding the Constitution does not require States to place children in their custody in "private nonadoptive custody" instead of "institutional care").  In *Drummond*, a foster child asserted a liberty interest of "not [being] moved from home to home, without a prior hearing, particularly in light of the significant literature which indicates a traumatic effect of such moves on young children." *Id.* at 1208.  In holding the infant did not have a right to stable placements, the court stated "Child

---

State to find a permanent family for the child including specific recruitment efforts made for the benefit of the child.  42 U.S.C. § 675(1)(B), (E). Section 675 also defines "case review system" to include such requirements as a procedure for terminating the parental rights of any child that has been in foster care for fifteen of the most recent twenty-two months. *Id.* at § 675(5)(E).

[6] 42 U.S.C. §§ 671(a)(19) requires the State's plan to provide "that the State shall consider giving preference to an adult relative over a non-related caregiver," and 675(5)(A) requires that the State's "case review system" shall assure that child's case plan is "designed to achieve placement in a safe setting that is the least restrictive (most family like) and most appropriate setting available."

placing is an art, not a science that can be computerized to follow rigid rules." *Id.* at 1209-10. *See also K.H.*, 914 F.2d at 853 (holding there is no "established right to a stable foster-home environment"); *Eric L.*, 848 F. Supp. at 307 (same).

Furthermore, federal courts have also held foster children do not have a constitutional right to the least restrictive placement. *See* Exhibit "J" at *20 ("Defendants are not required under the Constitution to provide Plaintiffs with an *optimal* level of care and treatment. . . . Plaintiffs' claim to the least restrictive, most appropriate treatment is simply a request for "optimal" treatment while in the custody of the state.") (emphasis added); *Del A.*, 777 F. Supp. at 1319. S*ee also Feagley v. Waddill*, 868 F.2d 1437, 1440 (5th Cir. 1989) (holding committed mental patient did not have right to least restrictive placement); *Marisol A.*, 929 F. Supp. 662, 675 (S.D.N.Y. 1996) ("Fourteenth Amendment does not require the state to provide children in foster care with an optimal level of care or treatment.") (citing *Baby Neal*, 821 F. Supp. at 327; *Del A.*, 777 F. Supp. at 1319-20; *B.H. v. Johnson*, 715 F. Supp. 1387, 1397-98 (N.D. Ill. 1998)).

### 4.    Right to Monitoring

Plaintiffs allege Defendants failed to monitor children in custody through face-to-face contacts, case reviews, and permanency hearings in violation of their constitutional rights. *See* Exhibit "I" at ¶ 160. These alleged rights are based on the AACWA which this court has previously dismissed.[7] *Johnson*, 351 F. Supp. 2d at 558-59, 565. Plaintiffs have not provided any support for the proposition that the Supreme Court or the Fifth Circuit recognizes a right to monitoring as a constitutional right protected by the Fourteenth Amendment.

---

[7] 42 U.S.C. §§ 675(5)(B) provides the State's "case review system" shall ensure "the status of each child is reviewed periodically but no less frequently than once every six months by either a court or by administrative review," and 675(5)(C) provides the State's "case review system" shall ensure each child has a permanency hearing every twelve months.

As shown above, Plaintiffs have improperly attempted to expand the scope of rights protected by the Fourteenth Amendment. Under Supreme Court and Fifth Circuit precedent, Plaintiffs' rights are limited to the right to be safe from harm while in state custody which places Defendants under the duty to provide Plaintiffs with reasonably safe living conditions and the right to basic necessities which places Defendants under the duty to provide adequate food, shelter, clothing, and medical care.

**B.    The Proper Standard For Judging Defendants' Liability Is Deliberate Indifference.**

Plaintiffs "must demonstrate culpability beyond mere negligence or even gross negligence;" they must prove Defendants were deliberately indifferent to their substantive due process rights. *Hernandez*, 380 F.3d at 882 (citing *Conner v. Travis County*, 209 F.3d 794, 796 (5th Cir. 2000); *Rhyne v. Henderson County*, 973 F.2d 386, 392 (5th Cir. 1992); *Taylor*, 15 F.3d at 453, n.7); *see also Farmer v. Brennan*, 511 U.S. 825, 835 (1994) ("deliberate indifference describes a state of mind more blameworthy than negligence."); *Lenard v. Argento*, 699 F.2d 874, 885 (7th Cir. 1983), *cert. denied*, 464 U.S. 815 (1983) (a government official's failure to act or failure to correct constitutional deprivations requires "an extremely high degree of culpability.").

In *Hernandez*, a foster child died while in the custody of his foster family, and the child's biological parents filed a suit against employees of the Texas Department of Protective and Regulatory Services. 380 F.3d. at 876. The Fifth Circuit held that "To demonstrate a viable substantive due process claim, in cases involving government action, the plaintiff must show that the state acted in a manner that 'shocks the conscience.'" *Id.* at 880 (quoting *County of Sacramento, et al. v. Lewis*, 523 U.S. 833, 846 (1998)). The court continued, "we have generally required plaintiffs to demonstrate that 'the defendant state official at a minimum acted with

deliberate indifference toward the plaintiff.'" *Id.* (quoting *McClendon*, 305 F.3d at 326). *See also Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 254 (5th Cir. 2005) (deliberate indifference standard applied in suit filed by relatives of patients murdered by nurse against hospital administrators); *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 526 (5th Cir. 1999) (suit filed by pretrial detainee denied medical treatment against police); *Walton v. Alexander*, 20 F.3d 1350, 1355 (5th Cir. 1994) (suit filed by sexually abused student against the Mississippi School for the Deaf); *Doe v. Taylor Ind. Sch. Dist.*, 15 F.3d 443, 454 (5th Cir. 1994) (suit filed by sexually abused student against school).

The Fifth Circuit is in line with the majority of circuits on this issue; the Second, Third, Fourth, Sixth, Eighth, and Eleventh Circuits apply the deliberate indifference standard in foster care cases. *See Nicini*, 212 F.3d at 811; *White v. Chambliss*, 112 F.3d 731, 737 (4th Cir. 1997); *Norfleet*, 989 F.2d at 293; *Meador*, 902 F.3d at 476; *Taylor*, 818 F.2d at 792; *Doe*, 649 F.2d at 137. Only the Seventh, Tenth, and the District of Columbia Circuits apply the professional judgment standard. *Yvonne L.*, 959 F.2d at 894; *K.H.*, 914 F.2d at 854; *LaShawn A.*, 762 F.Supp. at 996.

The Fifth Circuit has held that "the test of deliberate indifference [i]s a significantly high burden for plaintiffs to overcome." *Hernandez*, 380 F.3d at 882 (citing *Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 218 (5th Cir. 1998)). "To act with deliberate indifference, a state actor must consciously disregard a known and excessive risk to the victim's health and safety." *Hernandez*, 380 F.3d. 880 (citing *Farmer* 511 U.S. at 837; *McClendon*, 305 F.3d at 326, n.8); *see also Doe*, 649 F.2d at 145 ("Defendants may be held liable under 1983 if they, or in the case of an agency, its top supervisory personnel, exhibited deliberate indifference to a known injury, a known risk,

or a specific duty and their failure to perform the duty or act to ameliorate the risk of injury was a proximate cause of plaintiff's deprivation of rights under the Constitution.").

The deliberate indifference test has multiple requirements for liability. *Farmer*, 511 U.S. at 845. First, the test is *subjective* rather than objective. *Hernandez*, 380 F.3d at 881 (citing *McClendon*, 305 F.3d at 326). "'[T]he official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Hernandez*, 380 F.3d at 881 (quoting *Smith v. Brenoettsy*, 158 F.3d 908, 912 (5th Cir. 1998) (quoting *Farmer*, 511 U.S. at 837)); *see also Farmer*, 511 U.S. at 839 (the focus of the deliberate indifference standard is "on what a defendant's mental attitude actually was (or is), rather than what it should have been (or should be)"). Furthermore, one's "failure to alleviate a significant risk that he should have perceived but did not" does not support a finding of deliberate indifference. *Farmer*, 511 U.S. at 838.

Second, the official, after becoming aware of a substantial risk of serious harm, must fail "to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. Reasonableness unavoidably involves considerations of fiscal restraints, limitations of statutory authority, and the effects of external factors, such as the political atmosphere and societal views, on an agency's ability to conduct its work. Deliberate indifference is not proven when "officials who actually knew of a substantial risk to inmate health or safety . . . responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

Third, the deliberate indifference test "'should be determined in light of the [defendants'] current attitudes and conduct,' their attitudes and conduct at the time suit is brought and persisting thereafter." *Id.* at 845 (internal citation omitted). In discussing the standard of deliberate indifference as applied to a suit seeking an injunction, the Court held:

to survive summary judgment, [the Plaintiffs] must come forward with evidence from which it can be inferred that the defendant-officials were at the time suit was filed, and are at the time of summary judgment, knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so; and finally to establish eligibility for an injunction, the [Plaintiffs] must demonstrate the continuance of that disregard during the remainder of the litigation and into the future.

*Id.* at 846.

Therefore, to survive summary judgment on their substantive due process claims and establish their right to a permanent injunction, Plaintiffs must show:

1)    That Plaintiffs are currently being, and will continue in the future to be, subjected to a substantial risk of harm or are currently being denied and will continue in the future to be denied basic necessities;

2)    That Defendants currently have, and will continue in the future to have, actual knowledge of the facts from which the inference can be drawn that a substantial risk of harm or denial of basic necessities exists;

3)    That Defendants are currently drawing, and will continue in the future to draw, that inference; and

4)    That Defendants are currently failing, and will continue in the future to fail, to take reasonable measures to abate the risk of harm or to provide basic necessities.

**C.    The Evidence Demonstrates That The Defendants Have Not Been Deliberately Indifferent to The Plaintiffs' Rights to Reasonably Safe Conditions and Basic Necessities.**

Plaintiffs have caused to be produced over 225,000 pages of documents, have submitted five reports by their designated experts, and have taken twenty-four depositions trying to prove Defendants violated their constitutional rights.  Yet, Plaintiffs have not met their burden of demonstrating Defendants were deliberately indifferent to Plaintiffs' constitutional rights.  Their substantive due process claims must fail because none of the documents, reports, or deposition

20

testimony show that Defendants acted with deliberate indifference to Plaintiffs' rights to basic necessities of adequate shelter, food, clothing, and medical care or to Plaintiffs' rights to be reasonably safe from harm. To the contrary, the record contains substantial evidence that Defendants provided constitutionally adequate care to Plaintiffs and have consistently taken steps to improve the provision of services to all foster children in their custody.[8]

### 1. The Named Plaintiffs Have Experienced Reasonably Safe Conditions and Received Basic Necessities.

The undisputed record in this case demonstrates that there is no basis in fact for the named Plaintiffs to assert any continuing deprivation of reasonably safe conditions and basic necessities. Plaintiffs have apparently taken the approach in this lawsuit that if the case file records maintained for each child by Defendants do not contain complete documentation of the services provided for the child, then the services were not provided.[9] *See* Exhibit "P" at 64:15-20, 65:7-12 (Plaintiffs' designated case record expert admitted that she concluded services were not provided if the services were not documented).

---

[8] As one member of the Joint Legislative Budget Committee noted, "My wife and I have been foster parents for 12 years now, and we have seen first hand in our county what social workers for the DHS really go through. And I would submit to this committee that, you know, I know there are some problems out there, but by and large if you will get into the bowels of this organization at your county level you will see the kind of work that is produced by these people. It's nothing short of phenomenal . . . ." FY 2006 Joint Legislative Budget Committee Hearing Transcript, attached as Exhibit "K" to Motion for Summary Judgment, at 39:24-40:7.

[9] Although MDHS/DFCS policy requires documentation in the child's case file of services provided, including paper copies of all medical and educational records, there are several reasons for the lack of documentation. *See* MDHS/DFCS Policy and Procedures Manual, attached as Exhibit "L" to Defendants' Motion for Summary Judgment, at DHS 00050; Affidavit of Martha McDaniel (Regional Director of Regions II and III), attached as Exhibit "M" to Defendants' Motion for Summary Judgment (indicating high caseloads force social workers to chose delivery of services over documentation); Affidavit of Maggie Mixon (Acting Regional Director of Region VII), attached as Exhibit "N" to Defendants' Motion for Summary Judgment (indicating high caseloads result in lack of documentation); Affidavit of Terry Phillips (Acting Regional Director for Region I-W), attached as Exhibit "W" to Defendants' Motion for Summary Judgment (indicating provision of services has priority over documentation).

Plaintiffs' own designated experts did not find any credible evidence of a deprivation of basic necessities. One of Plaintiffs' designated experts reviewed four of the eight named Plaintiffs' case files.[10] *See generally* Exhibit "Q". Dr. Lewis did not conduct any interviews, not a single agency employee, foster parent, foster child, or service provider, in making her assessment of whether Defendants have been deliberately indifferent to the rights of the named Plaintiffs. *See* Exhibit "O" at 52:12-55:16.[11] The Lewis Report outlines alleged failures by MDHS/DFCS to provide the named Plaintiffs with what Dr. Lewis views as optimal care and mentions MDHS/DFCS violation of "policy" *ad nauseam*. However, the Lewis Report does not make any allegations of inadequate food or shelter being provided to any of the named Plaintiffs, and in her deposition, Dr. Lewis admitted that she found no evidence that the named Plaintiffs had inadequate food or shelter. Exhibit "O" at 62:9-63:18, 63:25-64:7.

While the Lewis Report references that the case file reflects that MDHS/DFCS either noted or was informed that one named Plaintiff, John A., needed clothing, she admitted in her deposition that her conclusion that John A. was not provided adequate clothing was based on the fact that the record did not reflect that he was provided clothing. Exhibit "O" at 57:23-58:2 and 64:14-65:11 (Dr. Lewis admitted that lack of documentation does not mean that services were not provided); Exhibit "Q" at p. 78, 82 and 83. Dr. Lewis furthermore acknowledged that there was no evidence that John A. ever went without clothing. Exhibit "O" at 65:21-67:6; *see also*

---

[10] It is not clear from reading the Lewis Report why Dr. Lewis did not review the W Children's files as Plaintiffs' attorneys were timely provided their files during discovery. At her deposition, Dr. Lewis testified that Plaintiffs' attorneys chose which children's files to review. *See* Exhibit "O" at 22:15-20.

[11] In fact, with the exception of Dr. Hiatt, none of Plaintiffs' designated experts conducted any interviews of agency employees, foster parents, foster children, or service providers. Exhibit "CC" at 26:21-25; Exhibit "P" at 68:9-19; Exhibit "R" at 60:1-12. Dr. Hiatt admitted to only interviewing John A. and the social worker, who was not John A's direct care worker, transporting him to his interview with Dr. Hiatt. Exhibit "S" at 57:12-60:1.

Exhibit "BBB" at 88:1-6 (In a face to face evaluation of John A., Plaintiffs' designated expert admitted that he was adequately clothed, well-fed, and well-nourished).

The evidence shows that John A. was provided with clothing on numerous occasions.[12] *See, e.g.* Supportive Services for John A., attached as Exhibit "LL" to Defendants' Motion for Summary Judgment. Also, the supervisor of the social worker assigned to John A.'s case, attests to the fact that he has never been without clothing while in State custody. Exhibit "T"; Stewart Depo, attached as Exhibit "U" to Defendants' Motion for Summary Judgment, at 64:8-13; *see also* Exhibit "AA" (Regional Director over Forrest County DHS attests to the fact that foster children in Region VI-N have been provided sufficient clothing).

Furthermore, Dr. Lewis indicates in her report and deposition that there is no documentation of certain medical services being provided for the named Plaintiffs within policy timeframes.[13] *See, e.g.* Exhibit "Q" at p. 64, 65; Exhibit "O" at 48:3-49:24. The evidence shows these children did receive adequate medical care, including doctor visits, immunizations, dental visits, psychiatric services, counseling, and vision care.[14] *See, generally* Exhibits "A," "B," "C,"

---

[12] In addition, foster board payments are paid to placement providers to cover, in addition to other expenses, the expense of clothing. *See* discussion of foster board payments, *infra*.

[13] Dr. Lewis reports that the named Plaintiffs are to have a medical examination within seven days of entering custody pursuant to MDHS policy. Exhibit "Q" at pp. 12-13. This policy has been recently changed to require a medical examination within thirty days of entering custody. *See* Bulletin 7500, attached as Exhibit "V" to Defendants' Motion for Summary Judgment. The policy change was driven by several issues including the lack of medical doctors accepting Medicaid. *See* Felder Depo, attached as Exhibit "II" to Defendants' Motion for Summary Judgment, at 155:16-157:3.

[14] In compiling the complete history of the named Plaintiffs for the court, Defendants have attempted to obtain complete medical, educational, and other records of services provided for each named Plaintiff. While in many instances these records were not found in named Plaintiffs' case file, the names of the service providers and the dates of service were found in the case files that were provided throughout discovery to Plaintiffs. Despite Plaintiffs having the knowledge and right to acquire these records, Plaintiffs' designated experts admit to not reviewing the service provider records. *See* Exhibit "Q" at p. 19-20 and 59, n.c.; Exhibit "O" at 48:3-49:24; Exhibit "P" at 63:3-64:9; Crabtree Depo, attached as Exhibit "R" to Defendants' Motion for

"D," "E," "F," "G," and "H."    The Regional Directors, who are directly responsible for

supervising the social workers' supervisors for each of the seven regions in the State, all attest

that based on their personal knowledge of the daily practices of the direct care workers, Plaintiffs

have received adequate services, including but not limited to adequate medical services.

Affidavit of Tracy Malone (Regional Director for Region I-E), attached as Exhibit "X" to

Defendants' Motion for Summary Judgment; Exhibit "W"; Exhibit "M"; Affidavit of John Webb

O'Bryant (Regional Director of Region IV), attached as Exhibit "Y" to Defendants' Motion for

Summary Judgment; Affidavit of Sylvia Sessions (Regional Director of Region V), attached as

Exhibit "Z" to Defendants' Motion for Summary Judgment; Affidavit of Mechille Henry

(Regional Director of Region VI-N), attached as Exhibit "AA" to Defendants' Motion for

Summary Judgment; Affidavit of Zadie Rogers (Regional Director of Region VI-S), attached as

Exhibit "BB" to Defendants' Motion for Summary Judgment; Exhibit "N." The total amount of

Medicaid expenses paid for each named Plaintiff during his or her length of stay in State custody

further illustrates the number and extent of services each child has received. *See* DHS 132575,

attached as Exhibit "MM" to Defendants' Motion for Summary Judgment (reflecting the

following amounts paid by the State:  $433,208.30 for John A., $18,565.32 for Cody B.,

$108,953.98 for Jamison J., $6,169.71 for Dana W., $26,452.13 for Matthew W., $19,268.41 for

Mary W., $14,874.85 for Tom W., and $6,548.37 for Olivia Y.).[15]    In addition, in each

circumstance of *any* alleged abuse or neglect from a placement provider, MDHS/DFCS made

efforts to investigate the allegation and if necessary, moved the child to another placement in

---

Summary Judgment, at 59:22-25; Hiatt Depo, attached as Exhibit "S" to Defendants' Motion for
Summary Judgment, at 19:6-8, 20:25-21:3, 59:1-7.
[15] In addition to Medicaid, Plaintiffs are provided medical services through other funding sources
when Medicaid does not cover the services. *See, e.g.* Selected services for the named Plaintiffs,
attached as Exhibit "LL" to Defendants' Motion for Summary Judgment.

order to protect the child from harm. *See* Exhibit "M," "N," "W," "X," "Y," "Z," "AA," and "BB."

Plaintiffs have also submitted a report on alleged systemic failures of Defendants to protect the constitutional rights of Plaintiffs as a class and a report assessing MDHS/DFCS' management practices. *See* Custody, but No Care: A Review of Children's Experiences in MDHS Custody by Peg Hess, Ph.D. (the "Hess Report"), attached as Exhibit "DD" to Motion for Summary Judgment and "Beyond Danger!" A Management Review of the Mississippi Department of Human Services Division of Family and Children's Services (MDHS/DFCS) by Cathy Crabtree (the "Crabtree Report"), attached as Exhibit "EE" to Motion for Summary Judgment. However, like the Lewis Report, the Hess Report and Crabtree Report focus on standards of care that go far beyond rights protected by the Constitution. *See generally* Exhibit "DD" and "EE".

Furthermore, while Dr. Hess and Ms. Crabtree make the conclusion that Defendants are not caring for the basic needs of the foster children of Mississippi despite their admissions that case documentation was not complete, the evidence shows that Defendants and the State of Mississippi have expended enormous amounts of money on all foster children in State custody. *See* Exhibit "DD" at 54-55, 68-84; Exhibit "EE" at pp. 2, 30, 66-72; Exhibit "K" at 29:2-11; Affidavit of Vicky Donaho and corresponding attachments, attached as Exhibit "JJ" to Defendants' Motion for Summary Judgment. Defendant Rickie Felder also attends two foster parent associations' monthly meetings to listen to complaints and to find ways to respond to the complaints of foster parents. *See* Exhibit "II" at 208:6-13. None of the foster parents attending these meetings have indicated to Felder that the needs of the foster children placed in their homes are not being met by MDHS/DFCS. *See id.* at 208:14-209:1.

25

Defendants, on the other hand, hired the Child Welfare League of America ("CWLA") to conduct an agency wide review of MDHS/DFCS operations, which included interviews with social workers and supervisors, and to provide a report on problems identified and recommendations that may be incorporated into a strategic plan.[16] *See* Systems Review of the Mississippi Department of Human Services, Division of Family and Children's Services, Final Report by CWLA (the "CWLA Report"), attached as Exhibit "NN" to Defendants' Motion for Summary Judgment; Steib Depo, attached as Exhibit "OO" to Defendants' Motion for Summary Judgment, at 43:18-22. The CWLA Report found that MDHS/DFCS "suffers from a lack of sufficient resources," including staff, training, and resources. *See* Exhibit "NN" at pp. i-ii. The chief contributor to the CWLA Report, Sue Steib, Ph.D., testified that the agency is providing for foster children's basic needs and that she did not find a lack of sufficient resources as an impediment to Plaintiffs receiving basic necessities and reasonably safe living conditions. Exhibit "OO" at 185:9-186:1. The CWLA Report also outlined positive actions that MDHS/DFCS is taking, some of which are discussed *infra*. *See generally* Exhibit "NN" at pp. ii-iii. Furthermore, Dr. Steib did not find any evidence of deliberate indifference on the part of Defendants and testified that the actions of Defendants were reasonable. Exhibit "OO" at 196:4-197:1.

Additionally, MDHS/DFCS makes foster care board payments to all licensed foster parents, group homes, shelters, and institutions providing a placement for a foster child. Miss. Code Ann. § 43-15-17. The board payment rates are set periodically by the State legislature.[17]

---

[16] MDHS/DFCS is currently in the process of developing a strategic plan as part of the current administration's strategy for being better stewards of taxpayers' money and improving the lives of the foster children in its custody. This plan will be discussed further *infra*.

[17] Since 1994, MDHS/DFCS has made several proposals to the State legislature to raise the foster board payment rates. Two of the proposals died in committee in 1994 and 1995,

These board payments are intended to reimburse the foster care placement providers for board, replacement clothing, and the child's personal allowance. *See* Exhibit "L" at DHS 00483. There is no evidence that the providers of placements for the named Plaintiffs did not receive board payments pursuant to Mississippi statutory law and MDHS/DFCS policy.[18]    On the contrary, Peter Boulette, Director of the Division of Budgets and Accounting for MDHS, testified that he was not aware of any time that board payments were delayed because of lack of funding.    Boulette Depo, attached as Exhibit "TT" to Defendants' Motion for Summary Judgment, at 145:20-25.

DFCS also provides an extensive amount of services aimed at reimbursing, supplementing, or directly paying for not only the basic necessities but also extraneous expenses and amenities of its foster children. A partial list of these services includes:

1)    initial clothing for foster children upon entering State custody;

---

respectively. *See* SB 2694, attached as Exhibit "KK" to Defendants' Motion for Summary Judgment and HB 572, attached as Exhibit "PP" to Defendants' Motion for Summary Judgment. SB 2173 was signed into law effective July 1, 1998 and raised the foster board payment rates by $100.00 per month per child, *subject to the availability of funds. See* SB 2173, attached as Exhibit "QQ" to Defendants' Motion for Summary Judgment; *see also* Miss. Code Ann. § 43-15-17(2). DFCS plans to either request an adjustment to the board rates in its FY 2008 budget request package presented to MDHS in 2006 or absorb an adjustment out of federal funds received as a result of a new revenue maximization program currently being implemented at MDHS/DFCS (discussed *infra*). *See* Exhibit "II" at 213:2-21, 214:15-215:21.

[18] Plaintiffs allege that after the W children's aunt and uncle with whom the children were living became licensed foster parents, MDHS/DFCS did not provide them with foster care board payments. *See* Exhibit "I" at ¶¶ 98-99. However, at the time, the aunt and uncle were serving as a relative placement, not as foster parents, for the children and were prohibited from receiving board payments. The parties sought assistance from the court on the matter, the children were placed back in the legal custody of MDHS, the aunt and uncle were given physical custody of the children *as foster parents*, and MDHS/DFCS began payments, including retroactive payments as ordered by the Youth Court. *See id.* at ¶ 99; Youth Court Order, attached as Exhibit "RR" to Defendants' Motion for Summary Judgment. Also, Plaintiffs allege that Jamison J.'s placements did not receive adequate payments to meet Jamison's needs. *See* Exhibit "I" at ¶ 51. Jamison was placed in an unlicensed foster home pursuant to a Youth Court Order and per the agreement of the foster parent despite her knowledge that she would not receive board payments until she was licensed. Order, attached as Exhibit "SS" to Defendants' Motion for Summary Judgment.

2)     special clothing for any child who has had frequent moves or other situations justifying a need;

3)     special allowances for and expenses associated with special occasions such as school dances, extracurricular activities, and special trips;

4)     Christmas allowances;

5)     birthday allowances;

6)     child care;

7)     life insurance;

8)     medical, dental, and psychological services not paid by Medicaid;

9)     new school clothes every year in the sum of $200 per child;

10)     for children aged 14-20 who attend the Annual Foster Teen Conference, $200 for clothing and personal incidentals and $30 for meals;

11)     senior year stipend of $200 to help defray senior year expenses;

12)     high school graduation/GED stipend of $100;

13)     college stipend of $500 for those foster children beginning college and planning to reside in a campus dormitory;

14)     a start-up stipend of $1,000 to help defray establishment of a home.

*See* MDHS FY 2007 Budget Request for DFCS, attached as Exhibit "UU" to Defendants' Motion for Summary Judgment, at DHS 115676-677; Exhibit "L" at DHS 00492-00493, 00496-00497, 00502, 00511-00516. Additionally, all foster children meeting eligibility requirements are entitled to Medicaid and the School Lunch Program for free or reduced price meals or free milk. Exhibit "L" at DHS 00499 and 00491. The services, where applicable and subject to funding, have been provided to the named Plaintiffs throughout their stay in State custody. *See, e.g.* Exhibit "LL" at DHS Olivia Y 000427 (services such as clothing and housing expenses provided for Olivia Y.), DHS John A 007582-83 (services such as clothing, party allowances, and school supplies provided for John A.), DHS Jamison J 008884 (services such as clothing, party allowances, and teen conference expenses provided for Jamison J.); DHS Cody B 003459 and 003515 (services such as child care, clothing, and party allowances provided for Cody B.); DHS W 001959-60 (services such as clothing, party allowances, and medical needs provided for Mary W.); DHS W 002037 (services such as clothing, party allowances, and personal needs provided for Tom W.; DHS W 002105 (services such as clothing, party allowances, and

counseling provided for Matthew W.; DHS W 006634 (services such as clothing, party allowances, school supplies, and counseling not paid by Medicaid provided for Dana W.).

In addition to providing for their basic necessities, Defendants have taken steps to help these children to achieve stability and permanence. Olivia Y. is currently living with relatives with her sister. Exhibit "T." Jamison J. is currently living in a reputable group home, attending high school, and planning to attend college upon his graduation. Exhibit "FF"; *see also* Narrative printed from Plaintiffs' counsel's website concerning Jamison J., attached as Exhibit "XX" to Defendants' Motion for Summary Judgment (Plaintiffs' counsel admitting that Jamison is currently in a reputable placement). John A. is currently placed in a foster home with his biological brothers and sister where he has made improvements in his behavior and mental health. Exhibit "T;" Exhibit "S" at 90:19-91:5 (Dr. Hiatt testified that John A. has significantly improved and should continue in his present placement). Cody B. is currently living in a potential adoptive home. Exhibit "GG." The W Children are currently living together in a foster home. Exhibit "HH."

### 2. Defendants Governor Haley Barbour, Donald Taylor, and Rickie Felder Have Made Reasonable Efforts to Identify and Remedy Issues and Concerns at MDHS/DFCS.

Plaintiffs' Amended Complaint and experts lose focus of the legal standard by which Defendants must be judged for alleged constitutional violations and for the granting of a permanent injunction. While focusing on the tragic events that brought the named Plaintiffs into State custody as well as management and policy decisions under prior State and agency administrations, Plaintiffs attempt to shift the focus away from the real issue. This court must focus on what Defendants have done and are doing to identify potential problems that put children at risk of having their constitutional rights violated and what Defendants have done and are doing to eliminate those risks. The evidence shows that not only have Defendants publicly

identified issues and concerns at MDHS/DFCS but also Defendants have taken substantial measures to remedy them.

Defendant Governor Haley Barbour ("Governor Barbour"), shortly after taking office in January 2004, recognized that MDHS had been under ineffective management:    MDHS is an agency "that has collapsed, for lack of management and lack of leadership, far more so than any lack of money." *See* P 002323, attached as Exhibit "III" to Defendants' Motion for Summary Judgment. On January 13, 2004, he appointed Defendant Donald Taylor ("Taylor") as executive director of MDHS.[19]  *Id.*  Shortly after taking office, Defendants were served in this lawsuit. Since that time, Defendants have been trying to assess the issues and develop remedies for them while, at the same time, devoting precious manpower and financial resources to defending this lawsuit.  Despite these obstacles, Taylor began taking active steps in improving the management and functioning of MDHS.

In July 2005, Taylor appointed Defendant Rickie Felder ("Felder") to head DFCS in part because of his extensive years of management experience in state government agencies.[20]  *See* Exhibit "II" at 8:5-14:10, 33:1-24.  Under the direction of Taylor, Felder immediately put these years of management experience to work by conducting a six-month assessment of the current

---

[19] Taylor had previously served as Executive Director from 1995 to 2000, a period when MDHS and DFCS made substantial progress in improving services for foster children. *See* Taylor Depo, attached as Exhibit "YY" to Defendants' Motion for Summary Judgment, at 10:11-14; MDHS/DFCS Child and Family Service Review Program Improvement Plan, attached as Exhibit "ZZ" to Defendants' Motion for Summary Judgment, at DHS 038162; MDHS/DFCS Child and Family Service Review Statewide Self Assessment, attached as Exhibit "AAA" to Defendants' Motion for Summary Judgment, at P 001935-001937.  During his first tenure as Executive Director, Taylor acknowledged that MDHS was underfunded and understaffed. *See* Exhibit "YY" at 16:1-26:1.

[20] Prior to assuming the position of Director of DFCS, Felder was hired as a Deputy Director of DFCS under Taylor's leadership to support the state office where he began the process of identifying issues and concerns at MDHS/DFCS. *See, e.g.* Exhibit "II" at 15:23-18:2; 27:13-31:15.

situation of affairs at DFCS.  *See* Exhibit "II" at 35:22-36:12; 36:18-37:2; 41:4-41:12; 59:13-60:17; Affidavit of Charles Rickie Felder and Draft Plan, attached as Exhibit "CCC" to Defendants' Motion for Summary Judgment.  Based on this assessment, MDHS/DFCS set goals of how DFCS should operate and developed strategies to allow DFCS to accomplish those goals.  *See* Draft Plan, Exhibit "CCC" at p. 1.  The result of this assessment process was the Draft Plan that contains recommendations aimed at both management and case worker levels.  *See generally* Exhibit "CCC."  A strategic planner will be hired to craft this plan into a more detailed, comprehensive strategic operational plan for DFCS.  *See* Draft Plan, Exhibit "CCC" at p. 1; Exhibit "II" at 61:16-20.  Then, the plan will be presented to MDHS for budgetary analysis, and MDHS will set priorities for implementation based on funding.  *See* Exhibit "YY" at 216:19-23, 217:3-218:1; Exhibit "OO" at 197:4-8.  The strategies outlined in the Draft Plan will result in improvements in many areas including training, documentation, and case management.  *See* Exhibit "CCC."

Several improvements are already being made.  For example, one of the challenges Defendants have identified was that the MACWIS system does not always contain accurate and timely information due to "constantly changing federal guidelines, practice and procedure, and lack of dedicated state staff."  *See* Draft Plan, Exhibit "CCC" at p. 2.[21]  To remedy this problem, DFCS recommended that the agency request sixteen additional MACWIS PINS and $1.2 million from the legislature to replace current contractual personnel.  *See id.* at p. 2; Exhibit "II" at 72:20-73:10.  Felder also currently reviews several MACWIS reports aimed at identifying when inaccurate or untimely information is entered into MACWIS and ensures the regional directors remedy the identified issues.  *See* Draft Plan, Exhibit "CCC" at p. 2.  One such report, the

---

[21] MACWIS, Mississippi Automated Child Welfare Information System, is Mississippi's computerized case management system.

Emergency Shelter Report, was created by Felder to show the number and the length of time a foster child has been in an emergency shelter; under his direction, the number of children in emergency shelters over 45 days dropped from 124 to 4. *See* Exhibit "II" at 202:7-203:6.

Another challenge identified by Defendants was the processing time for termination of parental rights ("TPR") cases. *See* Draft Plan, Exhibit "CCC" at p. 3; Exhibit "II" at 29:25-30:13. MDHS/DFCS has implemented a renewed focus on utilizing Family Centered Practice methods that will allow social workers to obtain much needed information for the TPR referral from the child's family early in the management of the case. Draft Plan, Exhibit "CCC" at p. 3. When the child's permanency plan becomes adoption, the worker will have the needed information already available. *Id.* MDHS/DFCS has also created a TPR and Adoption tracking process. Exhibit "CCC," Exhibit "II" at 216:21-221:11. This process has reduced the time required for TPRs from two years in some cases to six months in some cases. Exhibit "CCC." In addition, the number of adoptions finalized by MDHS/DFCS has risen by over 100 percent since the current administration took office. *See* Exhibit "K" at 7:22-8:1.

Under the new administration, MDHS/DFCS have also focused on identifying personnel issues, including staff retention and hiring of new staff, and have concluded that MDHS/DFCS faces several challenges in this area including low morale, low pay, burdensome hiring practices, and lack of advancement opportunities.[22] *See* Exhibit "II" at 63:14-64:1; 65:12-20; 65:24-66:2;

---

[22] Plaintiffs allege that Defendants have not adequately staffed MDHS and DFCS. *See, e.g.,* Exhibit "I" at ¶¶ 3 and 7; Exhibit "EE" at p. 23 (MDHS/DFCS operates on "a bare shoestring budget . . . with very few staff."). Under Mississippi law, Defendants do not have the statutory authority to hire employees without the legislature first allocating a position, referred to as a PIN, and second funding that PIN. *See* Miss. Code Ann. § 43-1-4(d) (MDHS has power and duty "[t]o *employ personnel . . . appropriated to the department* to carry out the duties and responsibilities assigned to the department by law.") (emphasis added). The legislature also has the power to abolish PINS. *See* HB 1747, attached as Exhibit "DDD" to Defendants' Motion for Summary Judgment (the legislature abolished 59 PINS in FY 2005); Boulette Depo, attached as

66:20-67:6; Exhibit "YY" at 32:6-33:11.  Although some of these issues are entirely within the

authority and discretion of the legislature, such as the salaries and advancement opportunities,

MDHS/DFCS did begin making improvements in those areas within their authority.[23]  Taylor has

---

Exhibit "TT" to Motion for Summary Judgment, at 78:2-19.  Furthermore, the legislature sets
MDHS and DFCS budgets; under Mississippi law, Defendants only have the power to request
funding from the legislature through its budgeting process.  Miss. Code Ann. §§ 43-1-2(4)(c)
(Executive Director is authorized "[t]o apply for, receive and expend any federal or state funds . .
. ."), 43-1-4(d) (MDHS has the power and duty "[t]o . . . *expend funds appropriated to the
department* to carry out the duties and responsibilities assigned to the department by law")
(emphasis added),  and 43-27-109 (MDHS "may employ a sufficient number of new social
workers, child protection specialists, youth counselors and clerical staff to reduce the case load
sizes for social workers and youth counselors of the department and to reduce the work load on
clerical staff, *if funds are appropriated to the department for that purpose*.") (emphasis added);
Exhibit "TT" at 26:3-25, 27:4-8.

Under the current administration, MDHS has submitted budget requests to the State legislature
for SFY 2006 and SFY 2007; these budget requests were submitted to the legislature in August
2004 and August 2005, respectively.  *See* MDHS FY 2006 Budget Request for DFCS, attached
as Exhibit "EEE" to Defendants'Motion for Summary Judgment and Exhibit "UU".  In both of
these budget requests, Defendants have taken reasonable measures to remedy staffing shortages
by including, within statutory authority, a request for more employees and salaries to compensate
those employees.  *See, e.g.,* Exhibit "EEE" at DHS 115595 and 115631 (requesting an additional
$1,600,000 to fund 49 vacant positions; Exhibit "UU" at DHS 115666 and 115703 (requesting an
additional $2,443,806, in part, to fund 59 PINS that were abolished in FY 2005 and to fund 38
vacant positions); Expert Report of Bill M. Brister, Ph.D. ("Brister Report"), attached as Exhibit
"FFF" to Defendants' Motion for Summary Judgment, at p. 6; Exhibit "II" at 93:5-95:23; Exhibit
"TT" at 71:2-25; Exhibit "OO" at 132:22-24.

Despite testimony by Defendant Taylor before the Joint Legislative Budget Committee in the fall
of 2004 of the importance of the requested positions, the legislature did not honor MDHS'
request to fund the 49 vacant positions for FY 2006.  *See* Exhibit "K" at 3:16-23, 9:3-10, 11:1-2,
12:22-13:24, 20:3-21:22; HB 81, attached as Exhibit M to Motion for Summary Judgment, at
DHS 053211; Exhibit "FFF" at p. 6 (acknowledging that "Even these relatively modest requests
for additional funds for payment of Salaries were not fulfilled.").  However, Defendants were
successful in getting the PINS that were abolished in FY 2005 reestablished during FY 2006,
and, in April 2006, the legislature passed its appropriation bill giving funding for the 59 PINS
that were reestablished in FY 2006, for the 38 vacant positions requested in MDHS' FY 2007
budget request, and for an 12 additional positions.  *See* HB 1576, attached as Exhibit "GGG" to
Defendants' Motion for Summary Judgment, at DHS 132896; Exhibit "YY" at 105:16-108:9.
[23] In its FY 2007 Budget Request to the State legislature, MDHS requested an additional
$3,863,888 in part to fund a career ladder for child protection workers; the legislature approved
the funding in April 2006.  *See* Exhibit "UU" at DHS 115777; Exhibit "GGG" at 132895;

33

weekly status meetings with the directors of the all the divisions at MDHS and regularly visits the county offices to get a first hand perspective of what the direct service employees are facing. *See* Exhibit "YY" at 18:4-19:6. Since taking office, Defendants have also implemented new accountability measures in the State Office. *See* Exhibit "CCC." These measures resulted in a turnover in the State Office with more capable people being hired. *Id.* Under its current leadership, MDHS/DFCS placed all vacant PINS in a "pool" through which Regional Directors can move PINS among counties to accommodate staffing needs, resulting in the immediate placement of qualified applicants in the field. *See* Exhibit "II" at 66:5-19; Exhibit "OO" at 133:24-134:9.

In addition, on May 4, 2004, Governor Barbour signed into law HB 816, creating the position of child protection specialists to help lower caseloads and improve worker morale. *See* HB 816, attached as Exhibit "VV" to Defendants' Motion for Summary Judgment. These child protection specialists are used to provide services in "counties in which there is not a sufficient number of licensed social workers to adequately provide those services in the county." Miss. Code Ann. § 43-1-55(4). This law is set to be repealed on July 1, 2006. *Id.* Recently, SB 2388 was introduced to the legislature. *See* SB 2388, attached as Exhibit "WW" to Defendants' Motion for Summary Judgment. SB 2388 seeks to delete the repealer on and reenact the sections of the Miss. Code Ann. related to child protection specialists; Governor Barbour signed this bill into law on April 24, 2004.

---

Exhibit "II" at 185:12-186:6. In addition, the legislature gave MDHS employees a pay raise effective July 1, 2006. *See* Exhibit "GGG" at DHS 132902; *see also* Exhibit "DDD" (the legislature mandated that "The agency shall not take any action to award salary increases through reallocation, reclassification, realignment, education benchmark or career ladder, except for the award of teacher pay increases.").

MDHS/DFCS has also identified effective use of resources and maximization of revenues as issues. *See* Exhibit "II" at 34:22-25; Exhibit "TT" at 120:15-19. MDHS/DFCS has initiated measures to review and reduce services provided by and to the agency and the economic impact of those services. *See* Exhibit "K" at 3:24-6:16. MDHS/DFCS has also combined the Prevention and Administration Units to maximize existing resources. *See* Exhibit "II" at 98:1-14. In addition, as part of a statewide initiative to maximize federal draw down, MDHS/DFCS entered into a revenue maximization contract with Public Consulting Group.[24] *See, e.g.* Exhibit "TT" at 218:2-25, 222:16-22.

Finally,[25] MDHS/DFCS realized that its providers have sometimes licensed foster homes or placed foster children in foster homes that have had their licenses revoked by MDHS/DFCS or have otherwise been determined not to be suitable as placements for foster children. *See* Exhibit "II" at 204:3-12. MDHS/DFCS has begun to remedy this problem by discussing with an association of providers a plan to ensure that all providers check MDHS/DFCS records prior to placing a foster child in the placement. *See* Exhibit "II" at 204:13-206:9.

---

[24] Plaintiffs further allege that Defendants have not adequately funded MDHS/DFCS by failing to draw down all available federal funding. *See* Exhibit "I" at ¶¶ 9, 185-87. Under Mississippi law, MDHS/DFCS' budgets are set by the State legislature and to draw down federal monies, the State legislature must specifically allocate general funds for that purpose. *See* Exhibit "II" at 77:19-78:4; 79:13-19; Exhibit "TT" at 23:4-20, 54:4-14, 54:20-55:21, 98:21-99:7. Defendants have acted within their statutory authority by presenting to the State legislature a budget request every year seeking an appropriate amount of general funds; a request that has not always been honored. *See* Exhibit "UU;" Exhibit "K" at 10:11-15, 23:22-24; Exhibit "II" at 77:19-78:4; *see also* Exhibit "FFF" at p. 8 ("Mississippi, however, does not always draw down the Federal funds that are allocated to it because of the lack of State funds to serve as the match."). In addition, for FY 2004 and FY 2005, the legislature approved a lump-sum budget for MDHS; in those years, MDHS raised the amount of general funds available to DFCS to allow them draw down a greater amount of federal funds. *See* Exhibit "TT" at 255:9-24. The legislature has returned to a line-item budget for FY 2006 and FY 2007 which greatly restricts the ability of MDHS to manage the general funds appropriated by the legislature. *See id.*

[25] The discussion of actions currently and historically taken by Defendants to remedy issues of concern at MDHS is not intended to be exhaustive but is merely used as examples of reasonable measures taken by Defendants to identify and correct potential problems.

Given all the efforts outlined above by Defendants, clearly Plaintiffs have not met their burden of showing deliberate indifference.[26]  The continuing efforts by Defendants to identify challenges and to develop strategies to improve the services and outcomes for children in DFCS custody conclusively demonstrate that Defendants have not exhibited deliberate indifference to Plaintiffs' substantive due process rights.  Plaintiffs may criticize Defendants for not enacting the best practices and policies to deal with the complex issue of child welfare, and they may be correct from a public policy standpoint but litigation brought under the United States Constitution is not the forum for debating public policy.  Plaintiffs may criticize Defendants for not "doing enough" to identify and correct alleged shortfalls of MDHS/DFCS or not "pushing hard enough" in requesting resources from the legislature but such allegations raise questions of negligence which does not support a claim of deliberate indifference.  Because Plaintiffs cannot demonstrate that Defendants have been deliberately indifferent to Plaintiffs' basic needs or physical safety, summary judgment should be entered in favor of Defendants.

## IV.    Conclusion

No genuine issue of material fact exists in this case, and Defendants are entitled to a judgment as a matter of law.  Plaintiffs seek to reform the Mississippi child welfare system to a level of optimal care through the guise of violations of constitutional rights.  Because Plaintiffs have failed to demonstrate that Defendants have not provided constitutionally adequate care and safekeeping and failed to demonstrate that Defendants acted with deliberate indifference, Defendants' Motion for Summary Judgment should be granted.

---

[26] On top of all of these accomplishments, Governor Barbour, Taylor, and Felder were struck by an obstacle shortly after taking office that affected not only MDHS/DFCS but also the entire State – Hurricane Katrina.  *See* Affidavit of Richard A. Berry, attached as Exhibit "HHH" to Defendants' Motion for Summary Judgment.

Respectfully submitted,

**HALEY BARBOUR, as Governor of the State of Mississippi; DONALD TAYLOR, as Executive Director of the Department of Human Services; and RICKIE FELDER as Director of the Division of Family and Children's Services**

BY:    _____/s/ Dewitt L. ("Rusty") Fortenberry, Jr._____

**OF COUNSEL:**

Attorney General Jim Hood
State of Mississippi
P.O. Box 220
Jackson, MS 39205-0220

**BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC**
Dewitt L. ("Rusty") Fortenberry, Jr. (MSB #5435)
Gretchen L. Zmitrovich (MSB #101470)
Ashley Tullos Young (MSB #101839)
Kenya Key Rachal (MSB #99227)
4268 I-55 North
Meadowbrook Office Park
P.O. Box 14167
Jackson, Mississippi 39211
Telephone: (601) 351-2400
Facsimile: (601) 351-2424

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to the following:

W. Wayne Drinkwater, Jr. Esq.
Melody McAnally, Esq.
BRADLEY ARANT ROSE & WHITE LLP
Suite 450, One Jackson Place
Post Office Box 1789
Jackson, MS 39215

Stephen H. Leech, Esq.
850 East River Place, Suite 300

Jackson, Mississippi 39215

Eric E. Thompson, Esq.
CHILDREN'S RIGHTS, INC.
330 Seventh Avenue, 4th Floor
New York, New York  10001

Harold E. Pizzetta, III
Special Assistant Attorney General
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 220
Jackson, MS  39205

I also certify that I have this day served a copy of the foregoing on the following non-ECF participants by United States Mail, postage prepaid:

Marcia Robinson Lowry, Esq.
Susan Lambiase, Esq.
Shirim Nothenberg
Tara Crean, Esq.
CHILDREN'S RIGHTS, INC.
330 Seventh Avenue, 4th Floor
New York, New York  10001

Eric S. Manne, Esq.
John Piskora, Esq.
LOEB & LOEB, LLP
345 Park Avenue
New York, NY 10154

**SO CERTIFIED**, this the **1st** day of **May, 2006**.

/s/ Dewitt L. ("Rusty") Fortenberry, Jr.