*#394*

**Joint Legislative Committee on Performance Evaluation and Expenditure Review (PEER)**

Report to
the Mississippi Legislature



# A Follow-up Review of the Division of Family and Children's Services of the Department of Human Services

In its 1992 review, PEER found that the Department of Human Services' effectiveness in protecting children and vulnerable adults was seriously compromised by the absence of well-trained professionals at all levels and the lack of a quality assurance system capable of identifying and correcting weaknesses in service delivery.

Many of the problems identified in PEER's 1992 review persist. Although qualifications of social workers in the department's Division of Family and Children's Services improved with passage of a 1994 law requiring licensure, the department has not provided adequate remedial training to many of the division's social workers. Due to a grandfathering provision in the 1994 law, many of the division's social workers have continued employment without passing the state board's licensure examination or otherwise demonstrating their competence to perform social work.

The division's individual employee performance appraisal system fails to document serious deficiencies in casework (e.g., failure to conduct investigations of child abuse and neglect in a timely manner). This failure deprives management of a critical tool for early identification and correction of service delivery problems through remedial training.

May 11, 1999

DHS
068705



## PEER: The Mississippi Legislature's Oversight Agency

The Mississippi Legislature created the Joint Legislative Committee on Performance Evaluation and Expenditure Review (PEER Committee) by statute in 1973. A standing joint committee, the PEER Committee is composed of five members of the House of Representatives appointed by the Speaker and five members of the Senate appointed by the Lieutenant Governor. Appointments are made for four-year terms with one Senator and one Representative appointed from each of the U. S. Congressional Districts. Committee officers are elected by the membership with officers alternating annually between the two houses. All Committee actions by statute require a majority vote of three Representatives and three Senators voting in the affirmative.

Mississippi's constitution gives the Legislature broad power to conduct examinations and investigations. PEER is authorized by law to review any public entity, including contractors supported in whole or in part by public funds, and to address any issues which may require legislative action. PEER has statutory access to all state and local records and has subpoena power to compel testimony or the production of documents.

PEER provides a variety of services to the Legislature, including program evaluations, economy and efficiency reviews, financial audits, limited scope evaluations, fiscal notes, special investigations, briefings to individual legislators, testimony, and other governmental research and assistance. The Committee identifies inefficiency or ineffectiveness or a failure to accomplish legislative objectives, and makes recommendations for redefinition, redirection, redistribution and/or restructuring of Mississippi government. As directed by and subject to the prior approval of the PEER Committee, the Committee's professional staff executes audit and evaluation projects obtaining information and developing options for consideration by the Committee. The PEER Committee releases reports to the Legislature, Governor, Lieutenant Governor, and the agency examined.

The Committee assigns top priority to written requests from individual legislators and legislative committees. The Committee also considers PEER staff proposals and written requests from state officials and others.

PEER Committee
Post Office Box 1204
Jackson, MS 39215-1204

(Tel.) 601-359-1226
(Fax) 601-359-1420
(Website) http://www.peer.state.ms.us

The Mississippi Legislature

# Joint Committee on Performance Evaluation and Expenditure Review

PEER Committee

**SENATORS**
WILLIAM CANON
Vice-Chairman
HOB BRYAN
Secretary
BOB M. DEARING
EZELL LEE
JOHNNIE E. WALLS, JR.

TELEPHONE:
(601) 359-1226

FAX:
(601) 359-1420



Post Office Box 1204
Jackson, Mississippi 39215-1204

Max K. Arinder, Ph. D.
Executive Director

**REPRESENTATIVES**
TOMMY HORNE
Chairman
WILLIAM E. (BILLY) BOWLES
ALYCE G. CLARKE
HERB FRIERSON
MARY ANN STEVENS

OFFICES:
Professional Building
222 North President Street
Jackson, Mississippi 39201

May 11, 1999

Honorable Kirk Fordice, Governor
Honorable Ronnie Musgrove, Lieutenant Governor
Honorable Tim Ford, Speaker of the House
Members of the Mississippi State Legislature

On May 11, 1999, the PEER Committee authorized release of the report entitled **A Follow-up Review of the Division of Family and Children's Services of the Department of Human Services.**

Representative Tommy Horne, Chairman

**This report does not recommend increased funding or additional staff.**

DHS
068707

## *Table of Contents*

Letter of Transmittal............................................................................................................i

List of Exhibits    ...............................................................................................................v

Executive Summary    .....................................................................................................vii

Introduction    .....................................................................................................................1

    Authority    .....................................................................................................................1
    Scope and Purpose..........................................................................................................1
    Method    ..........................................................................................................................1

Background    ......................................................................................................................2

Qualifications and Training of Social Workers..............................................................4

    Minimum Qualifications for Social Workers.................................................................4
        1992 Report Conclusions and Recommendations................................................4
        Follow-up Conclusions..........................................................................................4
    Training of Social Workers.............................................................................................8
        1992 Report Conclusions and Recommendations................................................8
        Follow-up Conclusions..........................................................................................8

Quality Assurance System.............................................................................................12

    Employee Performance Appraisals...............................................................................12
        1992 Report Conclusions and Recommendations..............................................12
        Follow-up Conclusion..........................................................................................12

Adequacy of Staff Resources.........................................................................................20

    1992 Report Conclusions and Recommendations.......................................................20
    Follow-up Conclusion..................................................................................................21

Recommendations    ........................................................................................................22

Appendix:       State Personnel Board's Performance Appraisal
               Review Report Form..........................................................................23

Agency Response    ..........................................................................................................27

DHS
068708

### *List of Exhibits*

1.  Department of Human Services Division of Family and
    Children's Services Organization Chart (As of July 1, 1998).....................................3

2.  Educational Credentials of the Division of Family
    and Children's Services' 107 Social Workers Grandfathered
    on the Basis of Five Years' Experience (as of January 1999)...................................7

DHS
068709

# A Follow-up Review of the Division of Family and Children's Services of the Department of Human Services

## Executive Summary

The Division of Family and Children's Services within the Mississippi Department of Human Services offers protective services to children, youth, vulnerable adults, and families; provides foster care and adoption placement services for children in its custody; and conducts education and prevention activities for individuals and families who are at risk of developing behavior patterns associated with abuse and neglect.

In a 1992 review of the Office of Social Services of the Division of Family and Children's Services, the PEER Committee found that the office had not reached its fullest service potential due to the absence of well-trained professionals at all levels and lack of a quality assurance system capable of identifying and correcting weaknesses in service delivery. Further, PEER determined that the office had not collected the information necessary to determine accurately how many social workers were needed to deliver the desired level of social services to all clients.

**The Legislature has taken steps to improve the qualifications of the Division of Family and Children's Services social worker staff in the years since PEER's 1992 review; however, despite improvements, deficiencies still exist.**

With respect to improvements in workforce quality, in 1994 the Legislature began requiring all social workers hired by the department to be licensed by the state. While this is a marked improvement over having no degree or licensure requirements for social workers as had previously been the case, the 1994 law contained a "grandfathering" provision. This provision allowed social workers in MDHS's Division of Family and Children's Services employed at the time of the law's passage to be licensed without a degree in social work and in some cases without passing the licensure examination. Of the 381 social workers employed with the Division of Family and Children's Services as of January 1999, 204 had been hired after July 1, 1994, and therefore had obtained their licenses via normal licensing, 70 had been grandfathered by passing the licensure examinations and 107 had been grandfathered on the basis of having five or more years of experience (and were not required to take the licensure examination).

DHS
068710

**MDHS's training policies do not insure that the division's "grandfathered" social workers who have not passed the licensure exam have obtained the knowledge, skills, and abilities necessary to perform social work competently.**

Given the seriousness of a social worker's job responsibilities and the fact that more than a quarter of the division's social worker staff employed as of January 1999 were grandfathered without having demonstrated anything more than five years of service, training is critical to assuring a competent workforce. Although the department has developed an in-house training program since PEER's 1992 review and all social workers must now meet continuing education requirements established by the Board of Examiners for Social Workers and Marriage and Family Therapists, MDHS does not perform the steps necessary to determine whether the training it provides is relevant to and effective in addressing deficiencies and needs of the social workers in the Division of Family and Children's Services. For example, the department administers tests to that division's social workers subsequent to its new employee training program, but because the department does not consistently score tests or review the results of those tests which are scored, it cannot prescribe remediation where needed. Further, 91 of the 381 social workers employed with the Division of Family and Children's Services as of January 1999 never participated in the training program.

**The Division of Family and Children's Services still does not have an adequate quality assurance system.**

With respect to the department's failure to implement a quality assurance system capable of identifying and correcting problems in service delivery on an ongoing basis, PEER found that:

- while the department has developed a casework-based employee appraisal form as recommended by PEER in 1992, supervisors do not use these forms to document serious deficiencies in case work, although MDHS investigative teams have clearly documented such deficiencies in ad hoc reports. This failure to document deficiencies through the performance appraisal process deprives management of a critical tool for identifying and correcting problems in service delivery (including providing employees with appropriate training); and,

- the department has not improved its system for assessing the adequacy and proper placement of service staff. The department still uses outdated case/workload standards in establishing resource needs.

Although MDHS's Program Integrity Division conducts periodic reviews in all counties for compliance with policies and procedures, the division only conducts these reviews for a small number of cases (e.g., only eight investigation and eight foster care cases were reviewed in a county with a large caseload).

**Findings of the department's ad hoc reviews and investigations of selected county operations reflect significant performance deficiencies and highlight supervisors' failure to implement MDHS's employee performance appraisal system properly.**

In response to specific complaints or requests, the Division of Family and Children's Services conducted three ad hoc investigations which documented serious service delivery problems in Hinds and Lauderdale counties and to a lesser extent in Jackson County. While it is encouraging that MDHS has the capacity to conduct such reviews when it commits the resources, it is essential that the department conduct intensive casework oversight on an ongoing basis (e.g., through properly conducted employee performance appraisals).

## Recommendations for Departmental Action

1. The Division of Family and Children's Services Training Unit Director should ensure that every social worker has successfully completed (as measured by a passing grade on the test) the four-week in-house training program and provide any individual social worker remediation necessary to achieve this objective.

2. The Division of Family and Children's Services Training Unit Director should conduct a training needs assessment based on information obtained through internal program reviews and individual performance appraisals to identify appropriate continuing education course offerings for social workers.

3. The Director of the Division of Family and Children's Services should ensure that all area social work supervisors are trained in the proper completion of employee performance appraisals. Proper implementation of the appraisal system requires review of each case by a social worker for compliance with departmental policies and procedures. Division management should annually review social workers' performance appraisals to determine problem areas (e.g., case management) which should be improved.

4. The Director of the Division of Family and Children's Services should carry out PEER's 1992 recommendation to:

   • identify objectives and standards for each case type;

   • determine the average time needed to meet those objectives and standards;

   • determine the maximum number of cases by type that a social worker can carry on average if service objectives are to be accomplished;

DHS
068712

- determine current and projected workload by case type; and,

- apply caseload ratios to current and projected workload to arrive at resource needs.

---

**For More Information or Clarification, Contact:**

PEER Committee
P.O. Box 1204
Jackson, MS  39215-1204
(601) 359-1226
http://www.peer.state.ms.us

Representative Tommy Horne, Chairman
Meridian, MS  (601) 483-1806

Senator William Canon, Vice-Chairman
Columbus, MS  (601) 328-3018

Senator Hob Bryan, Secretary
Amory, MS  (601) 256-9989

---

x

PEER Report #394

DHS
068713

# A Follow-up Review of the Division of Family and Children's Services of the Department of Human Services

## Introduction

### Authority

The PEER Committee reviewed the Division of Family and Children's Services of the Mississippi Department of Human Services (MDHS) pursuant to the authority granted by MISS. CODE ANN. Section 5-3-57 et seq. (1972).

### Scope and Purpose

In response to a legislative request, the PEER Committee conducted this follow-up review of the Division of Family and Children's Services. The purpose of the review was to evaluate MDHS's actions relative to PEER's 1992 report, *A Review of the Office of Social Services of the Division of Family and Children's Services.*[*]

### Method

In conducting its follow-up review, PEER reviewed state law, MDHS reports, records, policies and procedures, licensure records of the Mississippi Board of Examiners for Social Workers and Marriage and Family Therapists, and interviewed MDHS personnel.

---

[*] As a result of a departmental reorganization, the Office of Social Services of the Division of Family and Children's Services became the equivalent of the Division of Family and Children's Services.

DHS
068714

# Background

In 1986, the Legislature created the Division of Family and Children's Services within the Mississippi Department of Human Services. The division offers protective services to children, youth, vulnerable adults, and families; provides foster care and adoption placement services for children in its custody; and conducts education and prevention activities for individuals and families who are at risk of developing behavior patterns associated with abuse and neglect. Because abuse, neglect, and possible death of children and vulnerable adults are the issues at stake, adequacy and quality of staff and timely detection and correction of service delivery problems are especially critical. As of January 1999, the Division of Family and Children's Services operated with 690 employees (including 381 social workers) with four program units created to administer social services to families and children: prevention, placement, protection, and licensure of child care agencies, child placing agencies, and foster homes (refer to Exhibit 1, page 3).

PEER Report #394

DHS
068715

**Exhibit 1: Department of Human Services Division of Family and Children's Services Organization Chart (As of July 1, 1998)**



\* Mississippi Automated Child Welfare Information System

SOURCE: Mississippi Department of Human Services

DHS
068716

# Qualifications and Training of Social Workers

## Minimum Qualifications for Social Workers

### 1992 Report Conclusions and Recommendations

Social workers employed by the Division of Families and Children's Services are responsible for delivering services designed to strengthen, rehabilitate, and preserve families and provide protection and care for children and adults. During PEER's 1992 review, the Department of Human Services' minimum requirement for the social worker position was that an applicant have a bachelor's degree in any field from an accredited four-year college or university. This requirement provided no assurance that the employee had the minimum level of knowledge and skills necessary to perform his or her job duties.

PEER recommended that MDHS identify and validate minimum employment standards for social workers in the Division of Family and Children's Services. PEER noted that while the U.S. Court of Appeals for the Fifth Circuit upheld the department's minimum requirement in the 1984 lawsuit *Walls v. Department of Public Welfare*, the decision did not prevent the Department of Human Services from developing valid job-related education or experience employment standards for social workers employed by the Division of Family and Children's Services.

### Follow-up Conclusions

**Beginning in 1994, all newly hired MDHS social workers must by state law be licensed, which is a valid minimum qualification.**

In 1994, the Legislature passed MISS. CODE ANN. § 43-27-107 (1972) authorizing MDHS "to set the qualifications necessary for all social workers employed by the department, which shall at a minimum require state licensure as a social worker." The Board of Examiners for Social Workers and Marriage and Family Therapists licenses applicants meeting qualifications as set forth in MISS. CODE ANN. § 73-53-13:

4

DHS
068717

**To be licensed, the division's social worker applicants now must hold an accredited bachelor's degree in social work and must pass the licensure exam.**

- a baccalaureate degree in social work from a college or university accredited by the Council on Social Work Education or Southern Association of Colleges and Schools; and,

- satisfactory completion of the licensure exam (the American Association of Social Work board exam) or comparable license or registration from another state or territory of the United States with substantially similar qualifications.

MISS. CODE ANN. § 73-53-13 also requires that the applicant prove to the satisfaction of the Board of Examiners for Social Workers and Marriage and Family Therapists that the applicant is:

- at least 21 years of age;

- of good moral character, (a continuing requirement for licensure);

- a United States citizen or a legal resident alien;

- without conviction of a felony related to the practice of social work for the last ten years;

- free of dependency on alcohol or drugs; and,

- not declared mentally incompetent by any court and if any such decree has ever been rendered that the decree has since been changed.

By requiring that all social workers employed by the department be licensed by the state, MDHS has some assurance that social workers have acquired the knowledge and skills necessary to deliver appropriate social services to clients.

All but two of the division's 381 social workers employed as of January 1999 had a current license. PEER determined that the causes related to the hiring of these two unlicensed social workers related to administrative errors by the State Personnel Board and the Department of Health's Professional Licensure Branch, which licensed MDHS social workers prior to the creation of the Board of Examiners for Social Workers and Marriage and Family Therapists.

During fieldwork, PEER informed the Director of the Division of Family and Children's Services of its findings related to the two MDHS social workers' unlicensed status. On March 16, 1999, a Deputy Director of the Division of Family and Children's Services told PEER that both unlicensed social workers had resigned from their positions with the department.

DHS
068718

**"Grandfathering" provisions of the 1994 law have allowed continued employment of social workers who do not meet the degree and licensure requirements for new hires.**

**State law allowed "grandfathering" of the division's social workers employed before 1994 for those with five years' social work experience or a provisional license and passage of the exam.**

While the requirement established by the Legislature in 1994 that all MDHS social workers be licensed is a valid employment standard, a provision of MISS. CODE ANN. § 73-53-7 allows social workers already employed by MDHS at the time of the law's passage to be grandfathered if they have either (a) five years of experience in social work, or (b) less than five years of social work experience and a provisional license for two years, during which time the social worker was required to pass the state social worker licensure exam.

**Of the 381 social workers employed by the division as of January 1999, 177 were grandfathered: 70 by passing the licensure exam and 107 on the basis of experience.**

Of the 381 social workers employed with the Division of Family and Children's Services as of January 1999, 204 were hired after July 1, 1994, and obtained their licenses via normal licensing, 70 were grandfathered by passing the licensure examination, and 107 were grandfathered on the basis of having five or more years of experience. While the 274 employees who passed the state licensure examination demonstrated that they possess the minimum knowledge and skills necessary to perform social work, the 107 employees who were licensed strictly on the basis of experience provided no such assurance. Because of the concerns relative to the adequacy of the knowledge and skills possessed by this grandfathered group, PEER examined the types of degrees held by these individuals.

Of the 107 social workers employed with the Division of Family and Children's Services who were five-year grandfathered licensees, twenty-one (20%) have degrees in social work, forty have degrees in a closely related social sciences field (e.g., psychology), thirty-seven have degrees in a non-related field (e.g., physical education), and four do not have degrees (see Exhibit 2, page 7). MDHS had no information on five social workers' degree status.

Because the division's one hundred and seven social workers grandfathered on the basis of five years' experience did not have to pass the state social worker licensure exam or have a degree in social work, it was especially important for MDHS to establish a mechanism for identifying any knowledge or skill deficiencies among members of this group and to provide appropriate training to ensure that these employees had the minimum knowledge and skills necessary to perform their job effectively. As will be discussed in the following sections, because of flaws in its performance appraisal process, MDHS has no assurance that it has identified skill deficiencies in social workers employed by the Division of Family and Children's Services (see page 12). Also, because of flaws in the training program, the division has no assurance that its social

6

DHS
068719

workers have been adequately trained (see discussion on page 8).

**Exhibit 2: Educational Credentials of the Division of Family and Children's Services' 107 Social Workers Grandfathered on the Basis of Five Years' Experience (As of January 1999)**



No Degree (4)
4%

Unknown Degree (5)
5%

Social Work (21)
20%

Non-related Social
Service Field (37)
35%

36%

Related Social
Service Field
(40)

SOURCE:    PEER analysis of Board of Examiners for
Social Workers and Marriage and Family Therapists
and Department of Human Services records.

DHS
068720

## Training of Social Workers

### 1992 Report Conclusions and Recommendations

During PEER's 1992 review, MDHS contracted with the University of Tennessee to develop and pilot a four-week training program for the Division of Family and Children's Services entry-level social workers. The program trained the division's social workers in seven phases, combining on-the-job and classroom training in areas including interpersonal skills, assessment, and treatment and prevention of sexual abuse. After receiving the training, the division's social workers took an exam. Requirements for certification (i.e., successful completion of the training course) were met when a social worker passed the exam and completed one year of satisfactory job performance with MDHS. This was especially critical given the inadequacy of the department's minimum employment qualifications at the time. Because the state did not require social workers to be licensed at the time of the 1992 review, PEER recommended that MDHS develop minimum training and competency requirements to be incorporated into its social worker training program.

### Follow-up Conclusions

While the licensure requirement established in 1994 helps provide assurance that Division of Family and Children's Services social workers hired since that date have the minimum knowledge and skills necessary to perform their jobs, MDHS's training policies do not insure that the division's grandfathered social workers who have not passed the licensure examination have obtained the knowledge, skills, and abilities necessary to perform social work competently. Further, MDHS's training policies do not ensure that even those employees with social work degrees who have passed the licensure examination can perform their jobs within the department's unique and complex environment.

#### Development of an In-House Training Program

**The division developed an in-house training program for social workers based on the University of Tennessee's program.**

Following the conclusion of its contract with the University of Tennessee for training social workers, MDHS developed a four-week in-house training program for social workers based on materials from the university. The department began training the Division of Family and Children's Services social workers with its in-house program during Fall 1994.

PEER reviewed the department's training materials and determined that MDHS provides training in subject areas related to the responsibilities of social workers for the Division of Family and Children's Services. Subject areas addressed by the

8

DHS
068721

in-house training program include investigation, assessment, case planning, foster parent licensure, departmental policies and procedures, and related state laws.

Following the training program, the participants take a test. MDHS's Training Coordinator told PEER that the purpose of the test was to determine whether the participants had learned what was covered during the training program. According to the Training Coordinator, if a social worker scores below seventy, MDHS's training unit staff provides the social worker, the area social work supervisor, and the regional director with a memorandum addressing needed additional training.

**Although the division's in-house training includes appropriate subject areas, MDHS does not effectively utilize the tests given after the training program to help prescribe remediation.**

While PEER determined that MDHS's in-house training program includes appropriate subject areas, in practice MDHS has not followed the remediation plan described by the department's Training Coordinator because:

- *MDHS did not obtain test scores for the 132 Division of Family and Children's Services social workers trained by the University of Tennessee.* Therefore, the department did not know who passed or failed the University of Tennessee's training test and who needed remediation in what areas. MDHS only obtained the scores at PEER's request, six years after the University of Tennessee administered the tests. The test scores obtained by PEER showed that 10 of the 132 social workers trained by the University of Tennessee failed the test. All ten of these social workers are still employed by the department. Because MDHS did not obtain the test scores from the University of Tennessee before PEER's request, these employees never received remedial training to address their deficiencies.

- *MDHS has not consistently scored the tests taken after the training program.* MDHS did not score any of the 125 tests taken from Fall 1994 through December 1996 as part of its in-house training program. Because the department did not score the tests, it could not review test results, which is necessary to determine the subject areas in which participants need further training.

- *MDHS has not provided remediation for individuals who received failing scores on the test.* Of the 381 social workers employed by the Division of Family and Children's Services as of January 1999, fifty-four failed the department's in-house training test, but received no remediation in areas of deficiencies. Twenty-two of the fifty-four had received their license via the grandfathering route (fifteen based on five years of experience and seven based on passing the state board's licensure examination). As discussed on page 6, the department has no assurance that social workers in the Division of Family and Children's Services who were licensed strictly

**DHS
068722**

on the basis of experience have the knowledge and skills necessary to perform social work.

- *Many of the social workers in the Division of Family and Children's Services have not participated in the department's in-house training program.* Of the 381 social workers employed in the Division of Family and Children's Services as of January 1999, ninety-one did not participate in either the University of Tennessee's or MDHS's in-house training program. Of these ninety-one employees, forty-nine were grandfathered by the state licensure board (forty based on five years of experience and nine based on passing the state board's licensure exam).

Because it does not provide training to all social workers in the Division of Family and Children's Services or remedial training to social workers when needed, the department does not provide assurance that social workers have the necessary training to carry out their responsibilities.

**All social workers employed by the Division of Family and Children's Services as of January 1999 have met the continuing education requirements set forth by the Board of Examiners for Social Workers and Marriage and Family Therapists. However, the department has no formal mechanism in place to insure that this continuing education meets the training needs of the department for the individual social worker.**

The Mississippi Board of Examiners for Social Workers and Marriage and Family Therapists requires licensed social workers to complete four social worker units (forty training hours) to renew their license biennially. The state licensure board requires social workers to submit a list of continuing education credits, with a notarized statement that the list is true and correct.

The Board of Examiners for Social Workers and Marriage and Family Therapists has designated MDHS as a provider of continuing education for social workers. The board must pre-approve each continuing education course pursuant to board regulations. Continuing education offerings must consist of subjects relevant to social work practice and include academic courses related to the licensee's social work practice, staff development, workshops, conferences, or continuing programs sponsored by national, regional, or state social work or social welfare organizations. Examples of training topics offered by the department include: "Secondary Trauma Stress," "Working With Substance Abusing Families," "Working with Traumatized Children," and "Preparation of Termination of Parental Rights Cases."

The Board of Examiners for Social Workers and Marriage and Family Therapists reported to PEER that all 381 social workers employed by the Division of Family and Children's Services as

DHS
068723

of January 1999 are current in meeting their continuing education requirements.

**MDHS does not link continuing education course offerings to deficiencies documented through its in-house training tests and performance appraisals.**

While social workers of the Division of Family and Children's Services are current in meeting continuing education requirements established by the state licensing board, PEER determined that MDHS could improve its continuing education program by tying course offerings to deficiencies documented through its in-house training tests and performance appraisals (see discussion of deficiencies in these areas--e.g., failure to score training tests, failure to document observed deficiencies on performance appraisals--on pages 9 and 13). Also, the department does not keep a record of continuing education courses completed by employees and is therefore unable to assess training deficiencies on an individual basis in a timely manner.

DHS
068724

# Quality Assurance System

## Employee Performance Appraisals

### 1992 Report Conclusions and Recommendations

During its 1992 review of MDHS, PEER found that area social work supervisors were not completing performance appraisals of social workers in a timely manner and in accordance with MDHS policy. PEER also found that MDHS did not have a system to track the status of performance appraisals for its employees to insure timely performance improvement. PEER recommended that all area social work supervisors begin conducting and documenting performance appraisals in accordance with departmental policy. PEER also recommended that MDHS management make the necessary revisions to the performance appraisal monitoring system to allow needed tracking.

### Follow-up Conclusion

**Although MDHS has developed a casework-based employee appraisal form and has shown significant improvement in the timeliness of its evaluations, MDHS supervisors do not use these forms to document serious deficiencies in casework. This failure to document performance deficiencies through the performance appraisal process deprives management of a critical tool for early identification and correction of problems in service delivery.**

#### MDHS's Performance Appraisal Process

The content of MDHS employee appraisal forms represents an adequate basis for performance appraisal. The Appendix, page 23, provides a copy of MDHS's performance appraisal form for social workers. This form provides a reporting mechanism for appraising the critical duties of an MDHS social worker in terms of timeliness and quality.

DHS
068725

**MDHS has improved the timeliness of its performance appraisals. However, PEER questions the quality of these performance appraisals, because the division's high number of "meets expectations" ratings (+99%) contradicts findings of the department's own reviews.**

In compliance with State Personnel Board guidelines, MDHS policy requires appraisal of new MDHS social workers just prior to the end of the sixth and twelfth month from date of hire by his or her immediate supervisor. Thereafter, the department requires performance appraisals annually. MDHS's Human Resources Division monitors appraisals by computer and notifies area social work supervisors of appraisals that are past due. According to data compiled by MDHS, of the 327 social workers employed by the Division of Family and Children's Services as of January 1, 1998, 277 should have had a current performance appraisal on file. Of these 277 individuals, 254 (92%) had performance appraisals on file that had been conducted on a timely basis, 5 (2%) had no current performance appraisal on file and the appraisals were six months to twelve months past due, and 18 (6%) had no current performance appraisal on file and the appraisals were twelve to twenty-four months past due. The ninety-two percent of appraisals which had been conducted on time represented a significant improvement from 1992 when PEER found that 77% of the performance appraisals of social workers had been conducted in a timely manner.

Although the timeliness of MDHS performance appraisals has improved, significant discrepancies between employee performance appraisal ratings and ad hoc reports of MDHS investigative teams cause PEER to question the accuracy and utility of MDHS employee appraisals for social workers.

Timeliness and content of appraisals represent important technical elements of a performance appraisal system. However, those elements lose significance if the appraisal process is not used to provide quality appraisals that identify weaknesses and suggest training needs. In reviewing MDHS performance ratings, PEER found that all but one of the 277 social workers in the Division of Family and Children's Services who were eligible for a performance appraisal in 1998 (with the exception of one social worker in the first-year probationary period) received a "meets expectations" rating on their appraisals. The rating of "meets expectations" reflects an acceptable level of performance and does not require submission of a plan of remediation or correction.

On the basis of the performance appraisal system alone, it would appear that +99% of social workers in the Division of Family and Children's Services are performing at an acceptable level. However, other indicators of employee and division performance bring the validity of MDHS performance appraisal ratings into question. The high number of "meets expectations" individual performance appraisals seems to contradict the findings of the department's own Program Integrity Division reports and the division's ad hoc reviews of county operations.

DHS
068726

*Program Audits of the Division of Family and Children's Services
at the County Level*

The MDHS Program
Integrity Division's reviews
document weaknesses in job
performance which should
also be documented in
performance appraisals of
individual employees.

PEER reviewed forty-one MDHS county-level Division of Family
and Children's Services program audits (for the period July 1,
1995, through December 31, 1997) which had been conducted
by MDHS's Program Integrity Division staff. These reports
document problems related to the performance of the
division's social workers at the county level that should also
be revealed in performance appraisals. It is to the Program
Integrity Division's credit that its personnel uncovered and
reported serious problems related to the performance of the
Division of Family and Children's Services social workers at
the county level. These problems included failure to conduct
investigations of child abuse and neglect in a timely manner,
to contact law enforcement officials for referrals of sexual
abuse, and to develop a service plan for substantiated or
suspected cases in a timely manner. All are serious problems
which social worker supervisors should also document
through the performance appraisal process and which MDHS
should be addressing through its training and continuing
education programs.

The Program Integrity Division's periodic reviews do not take
the place of (and are not an adequate substitute for) properly
executed performance appraisals of each social worker.
Program Integrity Division reviews are small sample reviews
designed to show the presence or absence of problems of
compliance with policies and procedures, but they do not
establish a rate of noncompliance or target the individuals
responsible for the noncompliance. These reviews are limited
to a small number of cases (e.g., eight investigation and eight
foster care cases reviewed for a county with a large caseload)
and should not substitute for a performance appraisal system.

DHS
068727

**Ad Hoc Reviews and Investigations of the Division of Family and Children's Services at the County Level,**

Findings of the department's ad hoc reviews and investigations of Hinds, Lauderdale, and Jackson county operations reflect significant performance deficiencies and highlight supervisors' failure to implement MDHS's employee performance appraisal system properly.

In response to specific complaints or requests, the state office of the Division of Family and Children's Services conducted special targeted ad hoc reviews of county-level operations. These county reviews document serious performance deficiencies that PEER believes should be reflected in routine performance appraisals. The conclusions one can draw from these special reviews and the conclusions one can draw from +99% of the social workers reviewed receiving a "meets expectations" performance rating on performance appraisals vary significantly. The discrepancy calls into question the care with which supervising social workers carry out their employee evaluation, problem identification, and remediation responsibilities. The range of job performance reported in the department's special reviews suggest that the state-level review process is more reflective of actual job performance in these counties than are recent employee performance evaluations which, almost universally, show acceptable job performance by social workers. Ad hoc reviews can provide the basis for improvement, but the department should require that its employee appraisal process accurately identify deficiencies needing remediation on an ongoing basis.

The Division's ad hoc review of Hinds County operations noted serious deficiencies such as lack of investigation of some high-risk cases, incomplete and untimely submission of reports, and non-professional staff carrying primary caseload responsibility.

During July and August of 1998, staff from the Department of Human Service's Division of Family and Children's Services conducted a systematic review of the division's operations in Hinds County. The department conducted the review partly in response to concerns expressed by MDHS supervisors about the handling of cases in the county and other agencies and clients' complaints about the handling of cases.

The review team examined 148 cases. In addition to reviewing case records for a subset of these cases, the team interviewed clients and community professionals. The review revealed serious deficiencies in the provision of critical social work services in Hinds County. For example, county staff had ruled all investigations included in the review sample as "unsubstantiated or inappropriate for investigation," even though some of the files were marked "high risk" and several of the cases contained evidence that the reviewers believed was adequate to substantiate and which required investigation under MDHS policy. Further, the review team found that some reports were not investigated timely or submitted to the area social worker supervisor on a timely basis and that many investigations were not thoroughly completed according to policy (e.g., required interviews not conducted, forms unsigned, failure to complete risk assessments and safety plans). With respect to these findings, the reviewers noted:

DHS
068728

> *The strong pattern of not opening cases after*
> *investigations, unless children are removed, is of grave*
> *concern. While appropriate casework decisions must be*
> *made, and while we cannot intervene in every case, there*
> *were many cases reviewed which had strong indications*
> *of being high risk, yet no case was opened. . . .Because*
> *investigations are not being done according to policy,*
> *adequate and appropriate assessments are not being*
> *made to determine the risk of harm to children or to*
> *determine if the family can protect the children. . . .By*
> *not doing thorough and complete investigations into*
> *allegations of abuse, there is the strong possibility that*
> *children are continuing to be abused and are not*
> *receiving the protection and help that they should.*
> *Because workers and supervisors are responsible for the*
> *actions taken on behalf of the agency, there is great*
> *potential liability for the agency and for the employee*
> *when we cannot clearly show what intervention has been*
> *done in a child's life.*

In addition to the problems documented with respect to
investigations, the review team concluded that in many open
cases, the services which social workers were providing to
clients were inadequate:

> *This county is making little to no efforts to do family*
> *centered practice, and is providing no follow up services*
> *to ensure that children are being protected or to see if*
> *parents/caretakers have followed through with*
> *Counseling other [sic] recommendations of the court.*
> *Even if a prevention or court ordered supervision is*
> *opened, little intervention is being documented and*
> *appropriate case plans are not being done.*

The review team also documented significant recordkeeping
problems, such as abuse/neglect logs kept by the area social
worker supervisors not matching the master log submitted to
the state office; lack of a uniform filing system, making it
difficult to retrieve cases for review; and case materials that
were not organized and filed appropriately, making it "most
difficult" for a new worker to pick up an open case and tell
what had happened on that case. The poor recordkeeping was
making it difficult to follow the department's ninety-day rule,
which requires that a second report received within ninety
days of a first report must be routed for investigation to the
unit that received the first report.

Also, the team found one social worker aide who was carrying
primary responsibility for 600 cases. Regardless of the
number of cases involved, the State Personnel Board's job
description for "social worker aide" states that the work is
paraprofessional work <u>assisting</u> social workers in county
offices providing social services to protective service cases.

DHS
068729

The reviewers noted that "it is imperative that a licensed social worker be responsible for these cases and make contact with these children, and carry out the social work case functions in these cases."

The reviewers rejected excessive workloads as an explanation for the numerous deficiencies cited, noting:

> *There is a perception by staff and supervisors in these units that their caseloads are extremely high. However, according to workload statistics, and the staff's own records, they all have very manageable caseloads. Most workers have an average of 20 cases. There should be no problem in following policy and in providing appropriate services to each and every family.*

This rejection of the excessive caseload argument, on which PEER takes no position in this report (see page 21) leads one to question what is the cause of the serious problems in Hinds County family and children's services that were documented by the review team. If there is adequate time to conduct casework according to policy, an alternative explanation for not conducting casework according to policy could be that the staff is poorly trained or unable to carry out its responsibilities. Yet individual performance appraisals for Hinds County staff show that everyone is meeting expectations and little data exists to document the effectiveness of the department's training programs. Thus the number of employee evaluations requiring comment and plans of correction and remediation should be above the <1% indicated by performance appraisal data.

**The division's special investigation of Lauderdale County operations noted failure of a social worker to respond to the local police department's request for assistance and failure to investigate at least one serious incident.**

During August 1998, staff from the Department of Human Services' Program Integrity Division conducted a special investigation of two MDHS social workers employed by the Division of Family and Children's Services in Lauderdale County. The division's director requested the investigation.

Program Integrity Division staff examined twelve cases. In addition to reviewing case records, Program Integrity Division staff interviewed clients and community professionals. The review revealed deficiencies in the provision of social work services by the two employees who were the subjects of the investigation. With respect to its investigation, Program Integrity Division staff noted:

> *The casework review combined with interviews of relevant persons involved reveal a county office poorly managed and dominated by the personality of the social worker. Although the casework was not performed according to policy in many instances and at times violated the Mississippi Code, the social worker had the confidence of the Youth Court Judge. The employees'*

DHS
068730

> *compliance [sic] with policy was consistent with the
> direction and leadership provided by the area social
> work supervisor and social worker who displayed either a
> lack of understanding regarding agency policies and
> laws or disregard for them. The performance of their
> duties were unprofessional at times, even if done with the
> best intentions. As a result, children have been placed at
> risk or left unprotected, exposing the Agency to public
> criticism if not liability.*

The investigative report revealed failure of the social worker
under investigation to respond to the Meridian Police
Department's requests for assistance. For example, two
children were found by the police wandering the streets. When
the police called the Lauderdale County MDHS office, the social
worker advised them to contact the mother and return the
children to her rather than conducting an investigation after
receiving the report. The Meridian Police Department also cited
the social worker's failure to investigate an incident in which a
child was locked in the car at a local shopping center on a hot
day. The two social workers under investigation resigned from
MDHS on October 31, 1998, subsequent to the conclusion of
the investigation.

PEER believes that the special investigation in Lauderdale
County reflects the critical importance of insuring that social
work supervisors perform their duties in accordance with
acceptable professional standards. If supervisors do not
perform their supervisory and appraisal duties with diligence
and care, children are placed at risk. Problems compound until
uncovered by targeted state-level office review.

**The division's ad hoc review of Jackson County operations noted problems with meeting contact requirements and timely initiation and completion of cases.**

On October 11, 1996, MDHS's Jackson County Regional
Director requested a review team to identify the county's
needs and to offer suggestions for resolution. The team
reviewed 33 placement cases, 30 investigations, and 139
workload cases from May through August 1996. The Regional
Director for Region 1 prepared a memorandum dated October
11, 1996, reporting the review team's findings and
recommendations.

Placement case records were "found to be in very good shape"
according to the reviewers. All cases had been entered into
the MDHS's Mississippi Social Services Information System
(MSSIS) and a service plan form had been submitted on 119 of
them.

However, the review team also found that several cases had
been active for an extended period with no documented
contact. (MDHS policy for child protective services requires at
least one monthly home visit which includes face-to-face
contact by the social worker with the primary client and any

18

DHS
068731

children at risk for the first three months, and then at least one
home visit every three months thereafter.)

Of the thirty investigations reviewed, only six had been
completed within the thirty-day limit set by MDHS, fifteen had
been initiated within the appropriate time frame, and nine had
been discussed with the area social work supervisor within ten
days. On a positive note, the reviewers concluded that the
thirty investigations had been appropriately investigated and
the division's social workers followed MDHS policies and
procedures in their decisions as to whether to open cases.

The findings of the division's ad hoc review of Jackson County
operations are more positive than those of the two studies
previously presented, but specific deficiencies highlight the
contradiction between the "meets expectations" individual
performance appraisals and caseworkers' performance
deficiencies cited in the report. PEER would have expected
that at least some of these problems would have been
highlighted and targeted for performance improvement in the
employee appraisal process.

DHS
068732

# Adequacy of Staff Resources

## 1992 Report Conclusions and Recommendations

During its 1992 review, PEER found that the Division of Family and Children's Services had not collected the information it needed to determine accurately how many social workers are needed to deliver the desired level of social services to clients. MDHS used Child Welfare League of America caseload/workload standards to determine the caseload per social worker performing investigations of abuse and neglect. In other work areas (e.g., adoptive home studies, foster home studies), PEER found that MDHS based its workload standards on outdated time study data collected in 1986.

PEER recommended that the Director of the Division of Family and Children's Services appoint a task force, composed of directors of the Division of Family and Children's Services Administration, Protection and Placement Units, area social work supervisors, and division directors to:

- identify objectives and standards for each case type;

- determine the average time needed to meet those objectives and standards;

- determine the maximum number of cases by type that a social worker can carry on average if service objectives are to be accomplished;

- determine current and projected workload by case type; and,

- apply caseload ratios to current and projected workload to arrive at resource needs.

DHS
068733

## Follow-up Conclusion

**MDHS has not improved its system for assessing the adequacy and proper placement of service staff. The department still uses outdated case/workload standards in establishing resource needs.**

MDHS still uses the Child Welfare League social worker caseload standards that it used in 1992, even though that body encourages agencies to determine their own caseload standards through time studies.

MDHS has still not conducted the time studies needed to validate staffing needs. The Division of Family and Children's Services still uses Child Welfare League of America caseload/workload standards to determine the caseload per social worker performing abuse and neglect investigations. The Child Welfare League of America encourages agencies to determine their own optimum caseload per social worker in each service category "through careful time studies carried on within the individual agency. . .based on the responsibilities assigned to complete a specific set of tasks, or units of work, for which the worker is responsible." Similarly, workload standards for other categories (e.g., foster care home supervision, adoptive home supervision), are still based on time studies which are over ten years old.

DHS
068734

# Recommendations

**MDHS's Division of Family and Children's Services should develop a training program for its social workers that helps to ensure that these employees can perform their jobs within the department's unique and complex environment.**

1. The Division of Family and Children's Services Training Unit Director should ensure that every social worker has successfully completed (as measured by a passing grade on the test) the four-week in-house training program and provide any individual social worker remediation necessary to achieve this objective.

2. The Division of Family and Children's Services Training Unit Director should conduct a training needs assessment based on information obtained through internal program reviews and individual performance appraisals to identify appropriate continuing education course offerings for social workers.

**Division supervisors should make performance appraisals a useful tool in determining problem areas and making improvements.**

3. The Director of the Division of Family and Children's Services should ensure that all area social work supervisors are trained in the proper completion of employee performance appraisals. Proper implementation of the appraisal system requires review of each case by a social worker for compliance with departmental policies and procedures. Division management should annually review social workers' performance appraisals to determine problem areas (e.g., case management) which should be improved.

**The division should update its caseload standards for social workers.**

4. The Director of the Division of Family and Children's Services should carry out PEER's 1992 recommendation to:

   • identify objectives and standards for each case type;

   • determine the average time needed to meet those objectives and standards;

   • determine the maximum number of cases by type that a social worker can carry on average if service objectives are to be accomplished;

   • determine current and projected workload by case type; and,

   • apply caseload ratios to current and projected workload to arrive at resource needs.

PEER Report #394

DHS
068735

# Appendix:
# State Personnel Board's Performance Appraisal Review Report Form

23

DHS
068736

MS STATE PERSONNEL BOARD
PERFORMANCE APPRAISAL REVIEW REPORT

DHS-PER-111
PB Form 80-3
Revised January, 1996
2/1/1994

NAME: _____

TITLE: DHS-Social Worker (Occu 4220, AGENCY 0662 PIN: _____

Employee's Signature: _____     Date: _____

Page 1 of 1

| Section 2. Duties / Performance Standards | WT | Section 5. Accomplishments / Areas To Improve | Weight x | Rating = | Points |
| --- | --- | --- | --- | --- | --- |
| 1. Provides professional casework services in the areas of Protection, Placement and Prevention. Uses social work skills and knowledge to arrive at accurate assessments of client needs within established agency time frames. Initiates appropriate services within time frames established by law and policy and updates accordingly. Client contacts are frequent and are in accordance with agency policy and commensurate with client needs. Formulates and implements written case plan based on client needs and agency guidelines. Utilizes supervisory consultation in the provision of services. | 2 | | | | 0.00 |
| 2. Communicates and cooperates with superiors, subordinates, clients, other professionals and the public. Works courteously and professionally with colleagues, clients and the general public with no more than one (1) documented, valid complaint in rating period. Responds to colleague, client, and public inquiries and complaints within ninety-four hours or as soon as practical. Through their response demonstrates the ability to communicate with others by achieving mutual understanding within established agency and professional parameters. Responds to the need for additional, after hours or emergency work and performs accordingly. Assumes willingly the need for other duties as assigned and agrees to serve on task forces, local committees and special project when these are necessary and appropriate. | 2 | | | | 0.00 |
| 3. Produces legible and understandable written work products. Written work products are concise, legible, understandable and accurate, is characterized by correct spelling, subject-verb agreement, and correct grammar. Records contacts give sufficient details to determine specific case activities with regard to who is involved, what actions are being taken, when and where they occurred, what methods were used and why. Written work of all types is consistently neat, professionally worded, and complete with agency policies, as well as instructions by the court. | 1 | | | | 0.00 |

Weight x Rating (1.0, 2.0 or 3.0)

MDHS-A-JR-211
SPB Form 800-J
Revised: January, 1996

MS STATE PERSONNEL BOARD
PERFORMANCE APPRAISAL REVIEW REPORT

Page 2 of 1
NAME: _____ TITLE: DHS Social Workr (Cons.4122) AGENCY: 0062 PIN: _____

Employee's Signature: _____    Date: _____

| Section 2. Duties / Performance Standards | WT | Section 5. Accomplishments / Areas To Improve | Weight x | Rating = | Points |
|---|---|---|---|---|---|
| 4.  Uses effective casework controls and administrative policy to manage service delivery. Established and utilizes monthly work plans, case files, tickler system, up to date practice and policy manuals, inter and outer office communications, child abuse log, workload report, MSSIS, and other agency control systems in order to: | 2 | | | | 0.00 |
| a.  Do investigations and reports within prescribed time frames | | | | | |
| b.  Complete case package, i.e., case plan, 445/446, 440A/440B, IV-E Forms, etc, and submit to ASWS according to policy in Volume IV, Section A | | | | | |
| c.  Complete foster home evaluations timely | | | | | |
| d.  Prepare for and participate in foster care review system according to established procedures | | | | | |
| e.  Complete court summaries, social summaries, ICPC reports and other required reporting timely and procedurally correct. | | | | | |
| f.  Update records, i.e., records of contact, case plans, 445/446, etc., timely and in accordance with agency policy | | | | | |
| g.  Has an overall system in place that allows them to be contacted and to respond accordingly when called upon. | | | | | |
| 5.  Develops resources necessary for service delivery. Actively seeks involvement in the community, participates in public awareness and prevention activities, appropriately advocates to regional and state offices and government officials, and coordinates activities with other service delivery agencies. Has a recruitment and training program for foster families and has a plan whereby these are periodically implemented. Willingly meets with church, civic groups, and other organizations when requested and periodically initiates activities designed to develop resources, foster coordination and team work, and promotes prevention. | 1 | | | | 0.00 |
| 6.  Participates in professional training, study, or formal educational opportunities to increase social work knowledge, skills and abilities. Goes beyond licensure requirements to seek training and self-development opportunities. Consistently studies and makes use of the Practice Manual. Demonstrates a knowledge of social work concept, i.e., self determination, human worth and dignity, absence of racial or other prejudices, etc., and puts them into practice. | 1 | | | | 0.00 |

DHS
068737

MDHS-PER-211
SPB Form 800-3
Revised: January, 1996

# MS STATE PERSONNEL BOARD
# PERFORMANCE APPRAISAL REVIEW REPORT

Page 1 of 1

NAME: *TITLE: DHS Social Worker Class #323 AGENCY: 0662 PIN:___*

Employee's Signature:_____   Date:_____

| Section 2. | Duties / Performance Standards | WT | Section 5. | Accomplishments / Areas To Improve | Weight | x | Rating | = | Points |
|---|---|---|---|---|---|---|---|---|---|
| 7.   MAINTAINS CURRENT OFFICE PROPERTY & EQUIPMENT LOG, FORM MDHS-PROP-1148, VISIBLY POSTED IN OFFICE OR WORK AREA. | | 1 | | | | | | | 0.00 |
| | | | | | | | | | 0.00 |
| TOTALS | | | | | 0.00 | | 0.00 | | 0.00 |
| SUMMARY RATING (TOTAL POINTS/TOTAL WEIGHT) | | | | | | | | | 77 |

_____ TOTAL WEIGHT

_____ TOTAL POINTS

Total Points  ÷  Total Weight  =  SUMMARY RATING

_____   ÷   _____   =   _____   SUMMARY RATING

PEER Report #394

DHS
068738

25

# Agency Response



**STATE OF MISSISSIPPI**
**DEPARTMENT OF HUMAN SERVICES**

Donald R. Taylor
Executive Director

May 10, 1999



Mr. Max Arinder
PEER Committee
222 North President Street
Jackson, MS 39201

Dear Mr. Arinder:

The following is the Mississippi Department of Human Services' response to PEER's, May 11, 1999-follow-up review report of the Division of Family and Children's Services.

Let me begin by saying that I was most pleased to see that PEER obviously found, during their review, that the Division of Family and Children's Services (DFCS) had made great strides in improving the operation and efficiency of the services provided to families and children of this State. I say this, not because the report reflects that progress, but because many problems identified in the 1992 report were not identified as problematic during this review.

I would like to state emphatically that I am very proud of the progress made within the Division over the last four to five years, and I would like to take a few brief moments to outline just a portion of that progress before addressing PEER's findings. After all, the proof is most assuredly in the pudding!

- FY - 1998 MS increased adoptions by 64% over the FY'97 totals. This placed MS 6th in the nation in improved outcomes in adoption. The State anticipates an award in the amount of $378,000 in bonus monies for these increases.

- MS was featured on Cinemax on April 8, April 21 and May 4, 1999; this is the result of a documentary which was filmed by the British Broadcasting Company focusing on Mississippi's innovative approach to finding permanent homes for foster children; "The Adoption Picnic." The story was picked up by *The London Times*, who also published an article on the subject.

- MS received funding for a proposal which was written focusing on increasing the number of finalized adoptions of minority children in custody, who are free for adoption. This brings an additional $150,000 to the Adoption Program each year for the next three years.

27

**DHS**
**068739**

Page 2
May 10, 1999

    •   . MS was the only State in the Southeastern region to submit two penalty free Adoption and Foster Care Analysis and Reporting System (AFCARS) reports for 1998. This saved the State an estimated $550,000 in sanctions. ·

    •   Mississippi's IV-E Waiver proposal was one of· the first two awarded by the Federal Government in 1998. Only ten proposals were awarded last year. The focus of Mississippi's proposal is utilizing Title IV-E funds to keep children safe by reducing or eliminating harm. Keeping children safe, not only from abuse and neglect, but also harm caused by separation (from parents and foster parents), impermanency, multiple placement, and other identified harmful factors.

    •   MS has utilized Family Preservation grant dollars to fund 32 time-limited social workers to provide intensive family preservation services to families at imminent risk of disruption due to abuse and/or neglect. During the calendar year 1998, 660 children did not enter Agency custody due to the excellent work done by our Specialists.

        Ultimately, this translates in huge financial savings to the State; but, most importantly, children are not traumatized by being removed from their families; but, instead given the opportunity to live with parents, who have improved their parental skills and can provide a safe and loving home for their children. Only 32 children ultimately had to be placed into protective custody because of the lack of cooperation and/or improvement in the parents' ability to care for'their child's needs.

    •   Mississippi has been asked to host a National Child Welfare Summit in September of 1999. We were asked because of the tremendous progress Mississippi has made in the last four to five years in our Child Welfare System.

The above represents just a small portion of the tangible evidence of success of the Division. Now, there is also statistical data which verifies we are doing a better job: From 1997 to 1998 there has been a 19.3% decrease in the number of subsequent substantiated reports of abuse/neglect of children known to the Agency; there has been an average of 27% decrease in the number of reentries into foster care for that time frame; and there has been a 15% decrease in the number of placement moves of children in custody.

All these represent indisputable evidence of the progress made by the Division of Family and Children's Services. The DFCS staff should be commended for their commitment and hard work. They are making a difference for the families and children of this State and, have been recognized on a national level for that progress. It is my sincere hope that our own State would also recognize that progress.

Now regarding PEER's findings and recommendations, I will say that overall I agree with the areas of weakness identified. However, I must say that in several instances broad assumptions are made for the entire State when in all actuality, several problems referenced are confined to specific areas. For

PEER Report #394

DHS
068740

Page 3
May 10, 1999

example, PEER states that "while the department has developed a casework-based employee appraisal form, as recommended by PEER in 1992, supervisors do not use these forms to document serious deficiencies in casework, although MDHS investigative teams have clearly documented such deficiencies in ad hoc reports. This failure to document deficiencies through the performance appraisal process deprives management of a critical tool for identifying and correcting problems in service delivery."

Performance appraisals are indeed useful tools for supervisors and employee being rated. It is intended to identify strengths and areas which should be addressed, if the employee is to provide appropriate services to the clients we serve. Not accurately reporting performance is unfair to the employee, agency and the clientele.

During PEER's review, the only counties reviewed were counties that had already been identified by the Division as problematic. The reports of the reviews completed by the Division's own staff, and those completed by our Division of Program Integrity were provided to PEER. In fact, excerpts from those reports were utilized in PEER's report. We acknowledge the problems in those counties and had dealt with them before the PEER review began. Disciplinary action was appropriately carried out in many instances.

The Division is performing successfully in the vast majority of the State. There will always be problems, but I submit to you that the progress referenced above would not be possible if staff were not successfully performing.

Also, during calendar year 1998, our own Human Resource Director traveled to each region to provide training to all supervisors on the employees' appraisal system and the importance of clearly documenting deficiencies. Thus, I am confident that any problems will be resolved as reviews are being completed by supervisors now and in the future.

There are additional steps taken regarding quality assurances that are not mentioned in the report. All cases of children in the custody of the Department are required by State and federal law to be reviewed on an ongoing basis to ensure that appropriate services are being provided to the families and children in each case. They are reviewed at 3 months, 6 months and 12 months through the foster care review process. At 3 months, the case is reviewed by the Area Social Work Supervisor responsible for the case. That review sheet is signed off on by the worker and supervisor and placed in the case file. The case is then reviewed at 6 months by an impartial reviewer from State office. Deficiencies are recorded and feedback provided to the supervisor and worker. At 12 months the case is reviewed by a Foster Care Review Board, made up of professional volunteers, from outside the Agency. All reports are submitted to the judge having jurisdiction of the case, who in turn reviews the report and issues a court order agreeing with the Foster Care Review Boards' ruling, making his/her own ruling, or calling a special hearing to review the matter in court.

This is only one piece of our quality assurance system. All cases are continuously reviewed by the responsible Area Social Work Supervisor, who is required to sign off on all case work performed by the social worker. In addition, our Regional Directors review random samples of cases to ensure

Page 4
May 10, 1999

compliance with law and policy.

As a big part of quality assurance, DFCS is in the process of designing and developing a statewide automated system, so that the Division can more efficiently meet service delivering goals to improve the well-being of children and families; ease the administrative duties of caseworkers and increase staff time with clients; make improvement in case practice; and provide accurate and current information to assist reporting, decision making, and program modification. MACWIS is to be the computerized representation of social work performed by staff in DFCS. The system will allow compiling, tracking, and reporting of the different functional areas including: abuse/neglect reporting, investigations, assessment, case management, resource management, financial management, eligibility, court activities, and administrative activities. In addition, MACWIS will provide automated responses to federally mandated reporting requirements.

DFCS contracted for the development of a fully automated Child Welfare Information System that will be designed and developed to meet the needs of the Division. Statewide implementation is anticipated SFY 2000.

The Division also has a public relations person responsible for looking into all complaints made by the public regarding the handling of specific cases. Many case reviews take place each month, but very few of the complaints are with any merit whatsoever.

In fact, it is because of public concerns and complaints that Program Integrity was called in to review the counties referenced in PEER's report. They were called on after the Division found that there was merit to the allegations made by people in the community.

Regarding DFCS's training program, the four-week in-house training program has been very well received by new employees, and has been an excellent tool. Due to limited staff resources, there has not been the follow-up necessary to determine the effectiveness of training for each employee who completed the training. This is needed and will be addressed immediately, as the Legislature did approve additional PINS for our training unit, which should adequately staff the unit. Also, supervisors and regional directors provided training on the job daily. Plans for revising curriculum and training plans for the next year are in progress.

It is also important to mention that, even with limited staff resources, the Training Unit has continued to provide numerous training sessions, in addition to the Intensive Training segment. This training has been provided to DFCS staff, and staff in other MDHS divisions. The need for such additional training was determined by an ongoing "training need assessment" based on requests from supervisory and field staff, and feedback obtained from training evaluations.

The PEER report identifies the use of some "training needs assessment based on information obtained through internal program reviews and individual performance appraisals" as a recommendation. However, the report does not acknowledge the already existing means, by which this assessment is being done.

30                                                                      PEER Report #394

Page 5
May 10, 1999

The Division has been in the process of reworking Caseload Standards to identify objectives and standards for each case type; determine the average time needed to meet objectives, and to determine the maximum number of cases by type that a social worker can adequately carry. This process is not yet complete, but will be in the near future. One of the difficulties in setting uniform standards for social workers is that expectations for certain types of work vary because of expectations by judges, other agencies and by the availability of resources in each county. What is done by a social worker with a family in urban Hinds County may differ from the activities and time involved in working with a family in rural Wilkinson County where few resources exist.

In summary, these are areas of weaknesses that the Division had identified and begun to work on to resolve. Unfortunately, the Division has been dangerously under funded and under staffed for many years. Not only have our employees been struggling to stay on top of their mandated responsibilities, but were constantly being held responsible for what should be the responsibility of others. Just one example is mentally ill children are being placed in Agency custody to access mental health services. Although this population is very small yet time consuming for our social workers, it is also a tremendous drain on our budget.

In addition, there is a lack of appropriate placement alternatives for children in need of specialized care, and treatment time certified by Medicaid is not adequate to ensure children receive much needed help. These children are needlessly moved from placement to placement, further damaging them and guaranteeing an unstable future.

Should you need additional information, please do not hesitate to let me know.

Sincerely,

Donald R. Taylor
Executive Director

DRT:SMP:obe

C:\SUB\PEERS79.DON

DHS
068743