IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

OLIVIA Y., ET AL. PLAINTIFFS

VERSUS NO. 3:04CV251

HALEY BARBOUR, AS GOVERNOR OF THE STATE OF MISSISSIPPI, ET AL. DEFENDANTS

VIDEOTAPED DEPOSITION OF DEB BIGGERS

TAKEN AT INSTANCE OF PLAINTIFFS
IN THE OFFICES OF BRADLEY ARANT ROSE & WHITE, LLP
JACKSON, MISSISSIPPI
APRIL 17, 2006
BEGINNING AT APPROXIMATELY 9:00 A.M.

APPEARANCES NOTED HEREIN.

REPORTED BY: Laurie Abraham
Court Reporter and Notary Public
CSR #1143

123 Plantation Drive
Madison, Mississippi 39110
(601) 856-7555

EXHIBIT
6
tabbies

Page 10

formerly the Department of Economic and Community Development.
Q. And what was the job that you referred to in 1996?
A. In 1996 I moved to the director of the Office of Budget and Fund Management, my current position.
Q. And have you been the director of the Office of Budget and Fund Management since 1996?
A. I have.
Q. What is the Department of Finance and Administration?
A. DFA is the administrative agency in state government that performs all of the financial matters necessary for state government, including the production of warrants or checks, if you will.
BY MR. PISKORA: Could you read back the answer.
(Reporter reads back answer.)
Q. Okay. And when you say that DFA is the administrative agency responsible for these things, are you saying that there's no agency of Mississippi state government that is more senior to DFA in regard to fiscal matters?

Page 11

BY MR. FORTENBERRY: Object to form.
You can go ahead and answer.
A. I'm not sure I understand your question. Could you -- could you restate it.
Q. Sure. What I'm trying to get at is, there are other agencies that we've had some testimony from -- for instance, Peter Boulette testified from the office of budget and accounting in DHS, and he testified at some point -- and I'm just giving you background. I don't want to be quoting it exactly -- testified that he worked with your office in regard to the budget and fiscal matters in some regard. And I'm just wondering, is there a -- is there a department that is more senior to the Department of Finance and Administration in Mississippi state government that DFA ultimately reports to?
A. We are an executive agency. We are under the governor's policy direction.
Q. Okay. And so the only person that DFA would report to would be the Governor?
A. Yes, sir.
Q. Can you tell me what is the responsibility of the Office of Budget and Fund Management.

Page 12

A. Our function is to administer the enacted budget, the budget that is passed by the legislature.
Q. Is that it?
A. We also serve as the Governor's budget office insofar as the preparation of his executive budget recommendation.
Q. And do you monitor the budget after it's been put in place?
A. That is our function to --
Q. Okay.
A. -- to administer and control the enacted budget.
Q. And in regard to the budgeting process in -- strike that.
When you're developing a budget, it's your responsibility to create a budget that reflects the Governor priorities, correct?
A. Yes, sir.
Q. Okay. And in developing the budget, do you do forecasting?
A. Forecasting of --
Q. Do you do any forecasting?
A. And if I may clarify, what we develop and assist the Governor with is the development

Page 13

and publication of his budget recommendation.
Q. I understand your clarification.
A. Okay.
Q. And we'll see some documents that I think will make that quite clear.
A. (Witness nods head affirmatively.)
Q. But what I -- I think I asked a slightly different question. The question was, in preparing the budget recommendation of the Governor, do you do any forecasting?
A. We do forecast revenues and assist the state fiscal officer insofar as forecasting potential revenues, general fund revenues for the state. That is one of the components of the preparation of the legislative budget recommendation and the executive budget recommendation.
Q. Okay. And do you do any forecasting other than the state revenues?
A. Forecasting, no, sir.
Q. No. Okay. And in regard to the state revenue forecast, who do you work with to develop that?
A. We work internally within DFA. Our office will prepare our best projections. The

question.
Does -- does the Office of Budget and Fund Management have any involvement in the preparation of this estimate?
A. On some years, we prepare an estimate at the same time that Mr. Lucius prepares an estimate; not in all years.
Q. And why does your office prepare a separate estimate?
A. To compare.
Q. And what happens if there's some discrepancy between the two estimates?
A. Well, there generally is a difference between the two estimates because we do it by source of revenues, source of general fund revenue by type of taxes. So -- and I mentioned the range earlier. At that -- at that point the state fiscal officer has a range to look at when working with the revenue estimating committee insofar as adopting a revenue estimate.
Q. And in what years did the Office of Budgets and Fund Management prepare a separate estimate than the bond advisory division?
A. I would say, if memory serves me correctly, the last two.

Q. And if you could, just generally describe to me how the two estimates get reconciled.
A. The numbers are placed on a piece of paper. The state fiscal officer takes those to a meeting and in the discussion of the revenue estimating committee, which is a six-member group, each person presents their ideas insofar as revenue and then they come to a consensus.
Q. So no consensus is reached at DFA prior to its admission to this committee?
A. No, sir.
Q. Okay.
BY MR. PISKORA: Just put a request on the record. I'm not sure that we have received these general estimates of the state fund so I'd call for their production now.
BY MR. FORTENBERRY: And as in the previous depositions, just send me a request so I'll know what it is.
BY MR. PISKORA: Fair enough.
Q. We've been talking generally about the estimates of state fund revenues that might be available for a future budget request, correct?
A. Yes, sir.

Q. And do you do any forecasting of the amount of federal or special funds that the state would be able to draw down?
A. No, sir. The forecast of federal funds is done, generally speaking, on an agency level and state funds are tracked and reported -- state -- special fund balances are recorded by the State Treasurer's office.
Q. I understand your answer. So in this case we're dealing with DHS, have you ever seen a forecast of the amount of federal funds that could be drawn down in any given year based on their level of state funding?
A. Their federal funds forecast, if you will, is a part of their Mississippi budget request.
Q. I understand your answer, but there's been some testimony in this case that the federal or special fund element of the budgetary request is not forecast. So I'm wondering, have you seen any document whatsoever about a calculation of how much the department could realistically draw down in federal funds?
A. I have not seen a calculation, per se. In every budget request, an agency presents their

general funds request and their federal funds request, including a special fund detail that indicates anticipated revenues of federal and other special funds.
Q. I think I understand your answer, but let me just try and clarify it for myself. When you receive the agencies' budget requests which includes the special fund detail and the detail of federal funds that would be part of those special funds, is it your understanding that the agency has done some sort of forecast or calculation that this is how much special funds they could be able to draw down with the budget allocation they're requesting in state funds?
A. Yes, sir.
Q. Okay. Can I show you a document now that I got just off the website. I'm going to have the court reporter mark it so we just have it in the record.
BY MR. PISKORA: And, Rusty, I think that we were just continuing the deposition exhibits. And I was advised that we are maybe up to 178. Do you have a different number?
BY MR. FORTENBERRY: We had two

A. I think the major component of the request was for social workers, but there was another component that was not. I just do not recollect what that was for.
Q. Okay. And when the agency submits a revised budget request, don't they have to give a justification for the revision?
A. They do.
Q. And did they do so in this case?
A. They -- DHS never revised its Mississippi budget request, officially.
Q. Okay. How did they do it?
A. When -- in planning for the council meeting, the Governor had asked them if they had any need to make any revisions in their request. So which is not uncommon during the session, they did an additional request but never officially revised their budget request form.
Q. I see. So the budget request form that usually contains a justification for budget increases was never revised?
A. Right.
Q. Okay.
A. Not the standard form, no, sir.
Q. Well, was another form submitted?

A. They utilized an Excel spreadsheet. The executive agencies utilized an Excel spreadsheet to show what their original MBR request was and any revisions that they had to make during the session.
Q. Okay. Can you just tell me generally the process that your office goes through after it receives all the budget requests from the various state agencies in accumulating those to form an executive budget?
A. What we do is, we divide up the budget requests by analysts. The analysts go through and look at critical needs, look at nonrecurring expenditures from one year to the next. In years where the revenues have not kept up -- or we've had revenue shortfalls, doing the budget is a little different than in years when we have a lot of available revenue to work with.
So for the past several years, we've looked at trying to maintain level funding for agencies and then taking a very limited pool of resources and trying to address the critical needs posed in the recommendation. We furnish a copy of the budget request to the policy advisors in the Governor's office and work with them in

answering any questions that they have about their needs or their requests.
Q. Okay. And would it be fair to say, then, that the requests in total -- the amount of the requests in total that your office receives from the various state agencies often goes above the amount of money that the state has to fund the various agencies?
A. (Witness nods head affirmatively.)
Q. Is that correct?
A. Very much so.
Q. Is that very common?
A. Annually.
Q. Every year this happens?
A. Yes, sir.
Q. Okay. And you started speaking a little bit about an analysis of critical needs. Is that correct?
A. (Witness nods head affirmatively.)
Q. What are -- what are the -- withdrawn.
Who does the critical needs analysis?
A. The critical needs analysis is compiled by the budget analysts from what is presented in the Mississippi budget request documents.
Q. Okay. And so would it be fair to say

that there are various budget analysts working on the various divisions' budget requests?
A. Yes, sir.
Q. And we had talked about Pam Davis as being the one who has been addressing the DHS budget requests in the more recent years, correct?
A. Yes, sir.
Q. Okay. What has your office concluded were the critical needs of the Division of Family and Children's Services?
A. In recent years, we -- the Governor has advocated that the agencies should be lump summed, and insofar as funding, we recommended that all agencies, if possible, be lump summed to have maximum flexibility so that DHS, in the case of having multiple budgets within it, could utilize its funds in whichever budget they needed to in order --
Q. And they --
A. I'm sorry.
Q. Go ahead. You can complete your answer. I thought I cut you off a little bit.
A. That's fine.
Q. I understand that the -- the executive

Page 66

branch has been advocating for a lump-sum-type budget. And we'll get to the lump-sum issue a little bit later, but my question went more to the critical needs analysis. Has the Office of Budget and Fund Management done a critical needs analysis of DHS and, more specifically, the Division of Family and Children's Services?
A. Not apart from their Mississippi budget request.
Q. I'm not sure I understand the question, but do you mean not other than what you receive in the form of the DHS budget request package?
A. Yes, sir.
Q. So to the extent the agency has needs, you would expect to see it in the budget request package, right?
A. Yes, sir.
Q. And the budget analyst, then, would determine which are really the critical needs?
A. Yes, sir.
Q. And is the budget analyst looking for things to cut, generally?
A. Not generally speaking. In years where revenues were not meeting estimates, budget cuts would be something we would have to review.

Page 67

Q. Okay. And in years where -- well, I thought that you had testified earlier that it seems like almost every year that budget requests exceed the amount of estimated general funds, correct?
A. They do.
Q. Okay. So wouldn't the budget analysts have to figure out a way to pare down all the budget requests to bring it in line with the estimated revenue guidance?
A. From the Legislative Budget Office standpoint, that is correct, and they are required to utilize or maintain notes of what they are paring down on the budget requests.
Q. Okay. So on the -- in the formulation of the executive budget, does the Governor often submit a budget that he is requesting state fund allocations in excess of what your office has determined was the amount of revenues available for the upcoming fiscal year?
A. He has to rely upon the same revenue estimate as the joint legislative budget committee.
Q. So I think your answer is that the Governor does not submit a budget that's in

Page 68

excess of the revenue estimates, correct?
A. The Governor is permitted to recommend other forms of revenues, but they have to be submitted separate from his executive budget recommendation.
BY MR. PISKORA: Could you read back the answer.
(Reporter reads back answer.)
Q. Okay. So in regard to his executive budget recommendation, doesn't the Governor submit an executive recommendation that is in line with the revenue estimates that were developed by LBO and your office?
A. Not revenue estimates developed by us. Revenue estimates emanating and approved by -- or the recommendation of the revenue estimating committee.
Q. Okay. Let me try to just close the loop, then. Once the revenue estimating committee has determined what the revenue estimate should be, whether or not your office agrees with that or not, does the Governor then submit a budget that's in line with those estimates?
A. He submits an executive budget

Page 69

recommendation based upon the consensus estimate.
Q. And he doesn't submit a budget that's over the amount of those estimates?
A. Not his executive budget recommendation, no, sir.
Q. Okay. And so when the various budget requests come in and if you were to add up all the dollars that the various agencies are requesting and it's more than the revenue estimate, how does the Governor go about paring down the various requests so that his executive budget is in line with the revenue estimate?
A. He reviews -- I say he. His policy advisors review the MBRs and make recommendations.
Q. Okay. Is your office at all involved in making any recommendations to the Governor about necessary cuts?
A. When you say cuts --
Q. Well, I understand your clarification. The -- the budgets that are submitted -- I'm sorry, withdrawn.
I think that we got to the point where in most years, the budget requests from the various agencies, if you added them up, would

Page 70

exceed the revenue estimates. Is that correct?
A. That's correct.
Q. Okay. And I'm trying to figure out how the Governor gets his budget in line with the revenue estimates. Do you understand?
A. Uh-huh (affirmative).
Q. And some money that is being requested is not going to be able to be allocated because there just isn't enough money to go around. Do you agree?
A. That's correct. Not enough money to go around to accommodate requests. Revenues which are above and beyond, if you start in one year and you have revenue of X and the subsequent years the revenue of X plus a million, then you only -- it's just like your checking account. You only have a million dollars to work with to divide amongst the requests by the numerous budgets and agencies.
Q. I think -- I think I understand your answer, but let me just try and clarify it. You're saying that, generally, you get what you got last year and we'll talk about the little difference of additional funding that you might be requesting. Is that correct?

Page 71

A. Any revenue that would be in addition to prior year would be available to address multiple agency needs.
Q. I understand that. And multiple agencies are asking for that additional --
A. That's correct.
Q. And my question is, how is it determined in the executive budget which agency gets additional funding?
A. There would be a review of the critical needs as presented by the agencies and then whatever revenues above and beyond prior year would be available to address some, probably not all of those needs.
Q. I understand your answer. I think we're getting to it now. Who is doing that review?
A. The review of the agencies, the critical needs?
BY MR. PISKORA: Can you go back and read her last answer.
(Reporter reads back answer.)
Q. Okay. I think I need clarified just a couple points. I'm not understanding how the executive budget decides who is getting what

Page 72

amount of money.
A. It doesn't.
Q. Well, the executive budget has to make a determination that's ultimately submitted, correct?
A. It's a recommendation.
Q. Exactly. It's a recommendation.
A. (Witness nods head affirmatively.)
Q. Now, as to that recommendation, that's what I'm trying to get at. As to the executive budget recommendation, who is deciding how much each agency gets in terms of funding?
A. Recommendations are made to the policy advisors.
Q. Who are the policy advisors?
A. Jim Perry.
Q. Okay. So you mean the Governor's policy advisors?
A. Yes, sir.
Q. Okay. And recommendations are made by who?
A. By the Office of Budget and Fund Management.
Q. Okay. So your office develops recommendations to the Governor's office's policy

Page 73

advisors concerning what should be the allocation of funding in regard to the executive budget recommendation, correct?
A. What the recommendation should be.
Q. I'm sorry. We're talking about the recommendation, right?
A. Right. The recommendation is not an allocation of funding.
Q. Oh, I understand what you're saying.
A. (Witness nods head affirmatively.)
Q. But it -- the recommendation contains proposed allocations, correct?
A. Yes, sir.
Q. Okay. In regard to the recommendation, the executive budget recommendation, is it correct that your office provides guidance and recommendations to the Governor's policy advisors?
A. Yes, sir.
Q. All right. And who in your office makes those recommendations?
A. Generally, I do.
Q. Okay. And what is the basis for your recommendations?
A. The analysts' review of critical needs.

Page 74

Q. Okay. So would it be fair to say that in each and every year you review, at the very least, the analysts' review of the various agencies' critical needs in regard to your recommendations to the Governor's policy advisors as to what should go into the executive budget recommendation?
A. Yes, sir.
Q. Okay. And in reviewing the analysts' analysis of the agencies' budget requests, do you see any documents or do you just have a meeting?
A. Sometimes both.
Q. Okay. And let's take DHS just as an example. Do you speak to the budget analyst as to the amount of funding that DHS is requesting for various line items of their budget request?
A. It depends. I don't recollect reviewing major objects or line items for DHS from the analysts.
Q. Well, do you ever discuss, in formulating your recommendations to the Governor's policy advisors, the amount of money that DHS would be requesting for salaries?
A. Do we ever review that with them? Was that your question? I'm sorry. I didn't

Page 75

understand.
Q. I'm getting to your analysis and recommendations to the Governor's policy advisors. And I'm asking, do you review what DHS is requesting in regard to salaries with your budget analysts prior to --
A. Probably so.
Q. Okay. And what other budgetary elements do you review with your budget analysts prior to making your recommendations to the Governor's policy advisors?
A. We look at what the agency has requested insofar as their critical needs.
Q. Okay. And since you're doing this review, can you just tell me what is DHS's critical needs in regard to the Department of Family and Children's Services?
A. It's my understanding that they need additional funds to fund positions that -- where the positions have been appropriated, but the funds were not made available to fill the positions.
Q. Okay. And how long have you had that understanding?
A. Current fiscal year '07; '06, I

Page 76

believe, that they did not have the funds for the PINs.
Q. What about '05?
A. '05, DHS was a lump-sum budget.
Q. So does that mean that you didn't review their critical needs in regard to additional funding for staffing?
A. No, sir. I -- I'm just saying that in '05 they were a lump-sum budget. The legislature gave them lump-sum authority so they could have put every dollar into salaries for Family and Children's Services if they chose.
Q. I understand they could have done that in a hypothetical world, but they couldn't do that in a practical world.
A. Right.
Q. Right. So I'm getting back to the question, in the practical reality of the budget request, even under a lump-sum budget, did you review in 2005 whether or not additional funds should go to DHS for the Division of Family and Children's Services for additional salaries?
A. I do not recollect. That was in 2004. I do not recollect that year.
Q. Okay. Would it be fair to say that you

Page 77

understand that the Division of Family and Children's Services is underfunded?
A. (Witness nods head affirmatively.) I would say that.
Q. Okay. And how -- how many years have they been underfunded to your recollection?
A. Insofar as state agencies are concerned, since state agencies, including Family and Children's Services, during the years of revenue shortfalls, most state agencies, including DHS, I believe, will say that they have been underfunded since we had revenue shortfalls.
Q. And -- and did the revenue shortfalls start in 2000?
A. 2000.
Q. Okay. You said that the state agencies would say they're underfunded, but was it the position of your office that those agencies -- withdrawn.
Was it the position of your office that DHS and, more specifically, DFCS have been underfunded since 2000?
A. If you look at the amount requested by the agency versus what the legislature appropriated and if you say that their request is

Page 78

the amount that they needed, then the answer is yes.

Q. Okay. So the amount that they requested, you're presuming, is the amount that they need, correct?

A. Yes, sir.

Q. And so if they got less, then they're underfunded, correct?

A. Yes, sir.

Q. Okay. In regard to your recommendations to the policy advisors in the Governor's office about formulating the executive budget recommendation, do you ever have any analysis directly from the head of DFCS in regard to figuring out what critical needs are?

A. No, sir.

Q. And so you're relying entirely on the DHS budget request that has been submitted?

A. Yes, sir.

Q. And that's a consolidated DHS request, correct?

A. The individual programs are submitted by program, and there is a roll-up document, a consolidated document.

Q. I'm going to jump back to Exhibit 181

Page 79

again.

A. Okay.

Q. We were talking about the second paragraph, the first sentence which was, When the agencies' budget requests are submitted, both LBO and DFA review the requests.

A. Uh-huh (affirmative).

Q. Remember that?

A. Yes, sir.

Q. And I guess my question to you is, do you review the requests in conjunction with the LBO or separately?

A. Separately.

Q. Okay. And then it goes on a few sentences later, The executive and legislative offices develop their own recommendations for the amounts to be appropriated to each agency within the estimated available funds. Do you see that?

A. Yes, sir.

Q. That's correct?

A. Yes, sir.

Q. That's accurate?

A. Yes, sir.

Q. Okay. It goes on, A summary document is then prepared of these recommendations. Do

Page 80

you see that?

A. Yes, sir.

Q. What is that summary document?

A. It is the spreadsheet that I referenced earlier which shows the agency -- agencies, state funding, the prior fiscal year and the executive budget recommendation for the fiscal year at hand and includes the Governor's transmittal letter to the legislature.

Q. Okay. And so a separate summary document is then prepared for the LBO recommendation?

A. Yes, sir.

Q. And that would be done outside of your offices, correct?

A. Yes, sir. That's done by the Legislative Budget Office for the joint legislative budget committee.

Q. Okay. And who prepares the summary document for the executive budget recommendation?

A. We work with the Governor's office to prepare the spreadsheet and we also work with them to prepare the transmittal letter. Generally speaking, Mr. Perry.

Q. Mr. Perry at the Governor's office?

Page 81

A. Yes, sir.

Q. And would you have copies of these -- these letters and spreadsheets?

A. Yes, sir.

Q. And do you call them anything in particular other than the spreadsheet?

A. Executive budget recommendation.

Q. Summary?

A. Uhm --

Q. Or is it the whole thing attached?

A. The spreadsheet is actually entitled "Executive Budget Recommendation."

Q. Okay. And who in your offices would maintain these documents?

A. All of us.

Q. Everyone keeps them?

A. Yes, sir.

Q. Fair enough.

BY MR. PISKORA: Just put on the record that we would request that those documents be produced for 2000 to the present.

Q. And to the extent that the Legislative Budget Office prepares a separate and distinct recommendation, does this summary document do any analysis comparing the two different budgets?

Page 102

they go about getting the revision?
A. If they were doing it within the limits prescribed in general law or the appropriation bill, then they would submit either a transfer form -- well, you're talking about a transfer -- a transfer form and a new form Z-1 to our office.
Q. Okay. And how does DHS go about requesting a deficit allocation?
A. They request that by formulating a letter to the chairman of the appropriations committees requesting additional funding and justifying what it's for, but it's a request of the legislature.
Q. Okay. In regard to the budgets, the recommendations and in regard to what the agencies and the divisions are requesting, there's the state general fund component and then there's also this special fund component, correct?
A. Uh-huh (affirmative).
Q. What, if any, review do you do of the special fund component?
A. We look at all components in the budget.
Q. Okay. And would it be fair to say that

Page 103

when you get a DHS budget request that includes a special fund component that it's your understanding that the division would be able to realize that amount of special funds?
A. It's our understanding from the Mississippi budget request -- Exhibit 164 is an example --
Q. Yeah.
A. -- that when the agency prepares its special funds detail -- that's page 3 or DHS115663 -- that they are showing insofar as both federal and nonfederal other special funds their requested revenues for the year -- in this case, FY '07 and that is their estimate.
Q. But do you understand their estimate to be the amount that they can realize?
A. It's our understanding that that is their estimate of revenues for FY '07.
Q. Okay. And have you ever -- withdraw the question.
In your analysis of the DHS budget request and in your analysis of the critical needs evaluation, have you ever contacted DHS to discuss whether or not the estimates of the special funding levels were realizable?

Page 104

A. No, sir, because we assume that when they prepare that special funds detail that they are projecting the revenues that they anticipate for that fiscal year. That is their best estimate.
Q. Fair enough. So you were talking about page 3, DHS115663?
A. Uh-huh (affirmative).
Q. And I guess the first one is social services block grant. Do you see that, Title 20?
A. Yes, sir.
Q. Have you ever seen any analysis by DHS showing how they would realize the estimates that are provided here in Column 2?
(Witness examines document.)
Q. I'll rephrase the question. You see that if we even just take the first one, social services block grant --
A. Uh-huh (affirmative).
Q. -- it has an increase between the actual fiscal year 2005 and the estimated fiscal year 2006 and it's approximately 600,000. Do you see that?
A. Yes, sir.
Q. My question is, have you ever seen any

Page 105

analysis of how DHS has calculated that they would get approximately 600,000 more in Title 20 social services block grant funding?
A. No, sir.
Q. Okay. Looking at this same exhibit which is Exhibit 164, if you go to the third page in, which is page 1, really, it's a spreadsheet that shows various columns in the budgeting line items and it has actual expenses, 2005; estimated expenses, 2006; and requested for 2007. Do you see that?
A. Yes, sir.
Q. Do you ever compare what was the actual expenses with the earlier years, what DHS said that they would be able to draw down in special funds?
A. No, sir.
Q. Okay. We did discuss very early in the morning that one of the things that your office does in addition to the preparation of the budgets is then it monitors the expenditures. Is that correct?
A. Uh-huh (affirmative).
Q. And again, is that your particular office that does that?

Page 154

prudent thing anyway.
Q. With respect to state contracts, whether it be for leases or anything else, are you familiar whether the state requires a provision in there to opt out if the legislature decides not to appropriate funds?
A. Yes, sir. That's very standard.
Q. And why is that provision there?
A. Because budgeting is done on a year-by-year basis, and anything that encompasses more than one year, you really don't know what the future years are going to be, so that funding-out clause is necessary.
BY MR. FORTENBERRY: That's all I have.
REEXAMINATION BY MR. PISKORA:
Q. I just have a few more questions on redirect. I think that you had testified earlier about the special funds. Do you remember that?
A. (Witness nods head affirmatively.)
Q. And you clarified a little bit on direct here. And my question to you is, we were looking at the special fund detail of the budget request. Do you remember that?
A. Uh-huh (affirmative).
Q. And I had asked you a question of

Page 155

whether or not you had made any sort of analysis of whether or not this special fund -- the amount of special fund set forth on the special fund detail were realized. Do you remember that?
A. Uh-huh (affirmative).
Q. And I think you testified that you rely on the agencies to provide you that information, correct?
A. Yes, sir.
Q. Okay. In determining your -- doing your critical needs analysis, do you take into account the amount of special funds that are set forth in the budget request in combination with the general funds?
A. In looking at the critical needs, we do.
Q. And isn't it true that if you lose a certain amount of general funds, it would be -- make it harder, in essence, to get the special funds -- withdrawn. Withdrawn.
Isn't it true that if you have a cut to your general funds that, in essence, you're going to be losing out on the opportunity to get a special fund federal match?
A. If those state general funds or general

Page 156

fund equivalents are used for matching purposes, then if you have a cut in general funds, it's possible that you would lose some federal funds.
Q. Right. And don't most of the federal programs match it at least one to one or sometimes even better than one to one?
A. I don't know about most, but generally, you know, there's a reasonable match.
Q. Okay. And then I think you testified a little bit about that, you know, policy decisions have to be made in regard to the limited resources that Mississippi has in regard to their state general funds.
A. (Witness nods head affirmatively.)
Q. And my question to you is, isn't that -- an analysis of the various agencies throughout the state and what they're requesting part of what your office does prior to the submission of the executive budget recommendation?
A. I'm sorry. Could you repeat that one more time.
Q. I think that you said that there were agency heads camped out. There are a limited amount of funds. Everybody's fighting over a

Page 157

fixed pot of limited state general funds. Am I getting the character of it right?
A. Uh-huh (affirmative).
Q. And my question to you is, well, isn't the division of this limited pot of state general funds part of your recommendations to the Governor's policy advisors prior to the submission of the Governor's budget recommendation?
A. Yes. We made recommendations about -- based upon the initial estimate that he publishes in November and the legislature publishes in December. However, between the time of the original revenue estimate and the time the legislature convenes, things can change and the pot can change.
Q. I understand that. But just in regard to what agencies are going to get what levels of funding, you've taken into account the nature of the agency and their critical needs, correct?
A. Yes, sir.
Q. Okay. So to the extent that the state is operating under some fixed amount of general funds -- which they are every year, and it's just an estimate -- you've taken into account the