Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

OLIVIA Y., ET AL.                          PLAINTIFFS

VERSUS                    CIVIL ACTION NO. 3:04CV251LN

HALEY BARBOUR, ET AL.                       DEFENDANTS


DEPOSITION OF DR. SUE STEIB


Deposition Taken at the Instance of Plaintiffs
In the Offices of Bradley, Arant, Rose & White
Jackson, Mississippi
On April 13, 2006
Commencing at 8:45 a.m.


REPORTED BY:  CHERIE G. BOND, RMR
              Mississippi CSR #1012

              BOND & ASSOCIATES
        107 Mill Creek Corners, Suite C
          Brandon, Mississippi 39047
                (601) 936-4466


STATE-WIDE REPORTERS (800) 372-3376


EXHIBIT
JJJ

Page 130

1  recommendations?
2      A    We haven't been retained to do anything
3  other than what is reflected in the contract that you
4  have.
5      Q    Okay.  And is any other entity as far as you
6  know retained to implement any of these -- any of
7  these recommendations contained in your report?
8      A    It's my understanding that the National
9  Resource Centers are doing a lot of this work.
10     Q    Okay.  On page 3 of your report -- I'm
11 sorry.  I have to take a break.  I have to find my
12 marked-up copy.  While I'm looking for that, I'll do
13 that over lunch so that we don't waste time.
14         (Off Record)
15 BY MS. LAMBIASE:
16     Q    Ms. Steib -- it's Steib.  Right?
17     A    Yes.
18     Q    I'm sorry.  I keep mispronouncing it.
19 Ms. Steib, I would like to now turn strictly to the
20 actual findings in your report.
21     A    All right.
22     Q    And specifically you talk about staffing and
23 understaffing.  I think your conclusion in your
24 executive summary is that there is understaffing at
25 all levels.  On i. you say, "DFCS is understaffed at

Page 131

1  all levels."  Correct?
2      A    Yes.
3      Q    You talk about caseworkers carrying
4  workloads at least double the average number they can
5  manage based on your analysis.  How high did you see
6  case loads based on what workers told you?
7      A    The highest I saw cited other than in your
8  expert's reports I believe was 80.  The highest that
9  was cited in any direct conversation with a
10 caseworker -- the caseworkers who were in the focus
11 groups when we asked them how many cases do you have,
12 some of them didn't know specifically.  But the
13 highest that was cited among that group was something
14 slightly over 50 was sort of the response, not a
15 specific number but something over 50.
16     Q    Okay.  And when you say the highest cited in
17 a document was 80, what documents are you remembering?
18     A    I think that was from the deposition of the
19 supervisor in Forrest County.
20     Q    Okay.  And there may have been others, but
21 that's the one I specifically remember.
22     A    Okay.
23     Q    How -- how serious would you characterize
24 that problem?
25         MS. RACHAL:  Objection to form.

Page 132

1      A    You know, it's hard to know.  I don't know
2  what kinds of cases those were, you know.  I mean, all
3  I can say is it sounds high.  Our workload analysis
4  indicates that there's different levels for different
5  types of cases.
6  BY MS. LAMBIASE:
7      Q    Right.
8      A    So the severity would be related to that as
9  well as to other factors regarding those specific
10 cases.  All I can say is it sounded high.
11     Q    And sometimes worse than high.  Right?
12 Sometimes outrageously high.
13         MS. RACHAL:  Objection to form.
14     A    That's a --
15 BY MS. LAMBIASE:
16     Q    Would you agree?
17     A    That's subjective.
18     Q    I understand it's subjective; but from your
19 subjective judgment, would you agree?
20     A    Given that -- I don't remember what the
21 highest was that we found in our workload analysis.
22 Intake was the highest, but the other ongoing cases I
23 believe the highest was -- well, intake we said 118.
24 But for the ongoing cases, the highest was 27.
25     Q    And that's --

Page 133

1      A    Other than licensing renewal.
2      Q    That's double what you recommend.  You
3  recommend -- your workload analysis showed that at
4  least for foster care cases they should have 14
5  children.
6      A    14, right.  But I don't know that the -- I
7  have no idea about the 80 cases or the 50-plus cases.
8      Q    Which loads they are?
9      A    Right.
10     Q    And did you learn from your work how long
11 the understaffing problem has existed?
12     A    Not precisely.  In interviews and I believe
13 it may also -- well, I was trying to remember if
14 anything was referenced in the self-assessment or the
15 PIP, but I know in interviews.  Some people would say,
16 Well, up until five years ago, four or five years ago,
17 things were better, and then they would cite the staff
18 freezes, the hiring freezes.
19     Q    Okay.  And do you know of anything that's
20 currently underway to solve the staffing --
21 understaffing situation?
22     A    Yes.  I know of several things that are
23 going on right now.  I understand that there have been
24 50 new positions approved by the legislature.
25     Q    What type of positions?

34  (Pages 130 to 133)

1    A  I believe there's some flexibility, and they
2  are trying to decide right now how to best allocate
3  those to get the most benefit. It's my understanding
4  that the funding to outsource family pres is approved
5  so that will -- there will be able then to move those
6  positions.
7    Q  Do you know how many positions currently
8  exist for family preservation?
9    A  Caseworkers positions will be 49, but there
10  are 25 supervisor positions. And I believe that
11  there's been some discussion about maybe some of those
12  could be transitioned to caseworker positions.
13    Q  No decisions as far as you know?
14    A  No. There are also 67 paraprofessional
15  positions I believe it's 67 in that -- currently
16  allocated to family pres. I do not know whether or
17  not there are any plans to try to realocate any of
18  those positions to another level.
19    Q  Okay.
20    A  There's also -- in terms of the staffing
21  problem, one of the issues that was cited in our
22  report was the delays in hiring.
23    Q  Yes.
24    A  And I understand that they have just gotten
25  a waiver from the personnel board or rather an

1  expedited process approved through the personnel
2  board. It has to do with the waiver of some of the
3  different approval levels or whatever that they
4  were -- had been having to go through that were
5  creating those delays that the regional directors
6  talked about and that are reflected in our report, and
7  that they also now have -- have a more flexible system
8  for being able to move positions around so that they
9  can be placed in counties who need them most needed.
10    Q  This is all since March 31st when your
11  report came out?
12    A  Of course, we knew and I believe it's
13  reflected in here that they were attempting to get the
14  funding to outsource family pres, and so it's my
15  understanding now that the funding has been -- is
16  available and I've learned that since the 31st. I
17  just learned about the 50 new positions. Apparently
18  that's come out of the legislature very recently.
19    Q  And the expedited process for hiring, the
20  delays in hiring, do you have any idea when that will
21  be implemented?
22    A  No, I don't.
23    Q  And the more flexible system for moving
24  positions, any idea when that will be implemented?
25    A  I believe that's in place. I believe -- and

1  I believe they already have the waiver for -- or the
2  approval for the expedited process. I just don't
3  know.
4    Q  If they are using it?
5    A  Right.
6    Q  Okay. And you talked about training
7  resources being very limited.
8    A  Yes.
9    Q  And my question to you is:  How long as far
10  as you know has that problem existed?
11    A  I don't know. I really -- I can't recall.
12  I do remember having had some discussion about -- I
13  would just have to say at this point my impression is
14  that it's existed for a few years.
15    Q  Okay. And you talk about resource
16  limitations, particularly regarding placements. Do
17  you know how long that problem has existed?
18    A  I do not. I don't.
19    Q  Okay. Is there anything regarding resources
20  currently underway that you know of that would solve
21  that problem?
22    A  Well, I believe that there is a request for
23  funding for the -- some of the recruitment services
24  that is one -- that's one of the recommendations in
25  the recruitment and retention plan, the draft

1  recruitment and retention plan that we reviewed that
2  staff said that it would be helpful if they had some
3  monies that they could use for -- like development of
4  materials, publications, those kinds of things.
5    Q  That was a request that went -- you believe
6  that was a request for funding. Do you know whether
7  that request was made?
8    A  I believe it was made. I don't know if it's
9  been authorized. I don't know if it's been approved.
10    Q  Okay.
11    A  I also understand that there are some
12  negotiations going on with faith-based groups with an
13  eye toward contracting for recruitment of resource
14  families.
15    Q  Do you have any idea whether there's
16  additional monies for those contracts?
17    A  No, I do not know the status of that.
18    Q  Okay.
19    A  I will say that it's my understanding that
20  there was some -- that some money could be made
21  available, but I don't know how much or precisely.
22    Q  Or whether it's -- whether it's sufficient?
23    A  Yeah. I just don't know.
24    Q  And whether or not, in fact, that money was
25  made available, you don't know?

STATE-WIDE REPORTERS (800) 372-3376

Page 150

1  put time frames in your recommendations. Is there a
2  particular reason?
3      A   I think most of them don't have time frames.
4  I know in a few cases I talk about over a two-year
5  period or over a three-year period or whatever in the
6  general discussion. I mean, many of these things take
7  time and some of them are predicated on others, and
8  that's -- I mean, that's the main reason why -- then
9  it becomes difficult to specify because if one thing
10 has to occur in order for something else to occur,
11 then those time frames all have to be in sync.
12     Q   Okay. Would that be something that an
13 implementation plan might be useful for?
14     A   Yes
15     Q   And the next section that you talk about on
16 page 136 of your report is the information system,
17 MACWIS. You talk about challenges, as it were, in the
18 first paragraph to MACWIS. Is that right?
19     A   Yes.
20     Q   And you talk about what is needed for an
21 automated data system to be reliable.
22     A   Yes.
23     Q   And is it true that this system is not able
24 right now to provide regular reports and responses to
25 queries?

Page 151

1      MS. RACHAL: Objection to form.
2      A   I think it does provide regular reports.
3  BY MS. LAMBIASE:
4      Q   Uh-huh.
5      A   And I believe it can provide -- in fact, I
6  know I can provide some responses to queries.
7      Q   You talk -- I'm sorry. Go ahead.
8      A   I was re-reading this first paragraph to
9  see. Right. I believe that the -- sort of the basis
10 of this statement was reflected in the sentence about
11 a number of delays and implementation of new practice
12 initiatives called for in the state PIP reduced solely
13 to the lack of capacity to program MACWIS so that they
14 can be documented.
15     Q   Uh-huh.
16     A   So it's not so much that -- you know, that
17 it can't currently be queried or it's not providing
18 any reports. I believe it is providing some
19 management reports. But in order to do some of the
20 additional things that will included in the PIP, some
21 more programming needs to be done.
22     Q   I see. Okay. And they don't have the
23 capacity now to actually have that programming occur?
24     A   That's correct.
25     Q   And the additional problem that you note is

Page 152

1  that since caseworkers have to input the data, very
2  often they don't have time to do so.
3      A   That's what we were told.
4      Q   So that that would, therefore, have the risk
5  of the data not being accurate because it's not
6  getting in. Is that correct?
7      A   If it's not entered, that's right. It's not
8  accurate, if it's not entered.
9      Q   Do you know if there's any system for
10 correcting things once it is entered in the MACWIS
11 system? Let's say somebody does some data entry. Is
12 there any check and balance for people to make sure
13 that things are accurate?
14     A   I think check and balance --
15        MS. RACHAL: Object to the form.
16     A   -- would be the reports.
17 BY MS. LAMBIASE:
18     Q   Is there a system in place that someone gets
19 the reports and reviews them for accuracy and directs
20 that corrections be made?
21     A   I know that some reports -- they do go out
22 to the regions. There are management reports that go
23 to the regions and that it would then -- the regions
24 would then presumably be responsible for identifying
25 areas where they thought that their specific data was

Page 153

1  not accurate.
2      Q   But you don't know specifically if that
3  happens?
4      A   No, no. Right.
5      Q   Your recommendations include item number 4
6  on page 14, expediting programming and finding staff
7  to -- I'm sorry. Let me make sure I get it right.
8  Finding staff to actually do that programming. Is
9  that right?
10     A   Correct.
11     Q   Do you know whether or not there is any
12 staff coming on board at any time soon?
13     A   It's my understanding that new staff are
14 coming on board, and I was, in fact, even given a
15 number, if I could just remember what it was. I'm
16 going to guess that it was seven
17     Q   Is it an educated guess?
18     A   That's an educated guess, that there are --
19 this is a new MACWIS director, I understand, that's
20 just hired since this report was written, and I also
21 understand that there are new positions for MACWIS.
22     Q   Okay.
23     A   And I believe the number given to me was
24 seven.
25     Q   And would you consider that recommendation

Page 154

1   to be a significant one as well to add the staff to do
2   the programming?
3       A   I believe -- yes, I think it's a significant
4   recommendation.
5       Q   You don't have a recommendation that it
6   should not be case work staff doing the inputting.
7       A   No.
8       Q   Is there a particular reason since that was
9   one of the concerns that you had?
10      A   I'm not sure that it should be case work
11  staff doing the input, but case work staff -- that
12  goes back to the staffing issue.
13      Q   So is it your position that if caseworkers
14  had levels of case loads that you recommend in your
15  report, for example, foster care case load being 14
16  children, that they would have sufficient time to do
17  the inputting that they need to do?
18      A   I believe so because that's their -- as I
19  appreciate how the MACWIS system works, their case
20  record documentation --
21      Q   Is in there?
22      A   -- becomes the MACWIS data.  So, yes.
23      Q   Was that part of -- that considered in
24  your workload analysis, the amount of time it takes
25  for a particular case to do the input?

Page 155

1       A   Absolutely.  Absolutely.  That was one of
2   the activities in each and every job function we
3   considered.
4       Q   Did you exclude in doing -- I'm sorry, not
5   excluded.  Strike that.  I'll start again.  In doing
6   your workload analysis, did you include any training
7   time for workers that they might be attending?
8       A   The training time is included in the
9   30 percent of time we deducted as time not available
10  for case -- for case-related activity.
11      Q   So that was the admin time?
12      A   That's all included in admin.
13      Q   So training is included in admin?
14      A   Yes.
15      Q   And how about like lunch breaks, coffee
16  breaks, that kind of thing?
17      A   That's all included in that.
18      Q   It is?
19      A   Yes.
20      Q   Okay.  Vacation time as well?
21      A   Yes.
22      Q   Leave, any sort of leave?
23      A   Yes.
24      Q   It's your conclusion on page 14 that the
25  agency still lacks a quality assurance system.  Is

Page 156

1   that correct?
2       A   An overall -- that foster care review is
3   currently serving as the quality assurance system for
4   foster care.
5       Q   And you don't believe that's adequate.  Is
6   that correct.
7       A   It doesn't cover the other programs of the
8   agency.  It may -- it may be for the foster care
9   system, but it's not a comprehensive system.
10      Q   Do you think that foster care review is
11  adequate as a QA, quality assurance, for the foster
12  care system?
13      A   I think it's certainly helpful, and I think
14  that they have made some enhancements to FCR with an
15  eye to having it be more adequate for foster care
16  quality assure.
17      Q   As a stand alone as it currently stands now,
18  do you think the foster care review system currently
19  in place is adequate as a quality assurance system for
20  the foster care system in Mississippi?
21          MS. RACHAL:  Objection to the form.
22      A   I'm trying to think back to our discussions.
23  The one area in which I guess -- or the major area in
24  which I would have concern was with regard to its
25  being in MACWIS, and I understand that that is now

Page 157

1   underway to get it more fully placed into MACWIS
2   rather than having it just be in separate reports, and
3   that was an issue for us.
4          In our discussions with the regional
5   directors with regard to that, I believe that they
6   felt pretty good about foster care review in terms of
7   quality assurance -- providing them with the
8   information that they needed once it kicks in.  Of
9   course, foster care review doesn't kick in instantly
10  when a child comes into care; but once it kicks in,
11  regional directors felt that those reports were very
12  helpful to them.
13      Q   So I guess -- just backing up to make sure
14  my question is answered, I understand that people
15  think that it's helpful, but the foster care review
16  system is helpful.  But that alone as a stand-alone
17  quality assurance system for foster care, do you
18  believe it's adequate?
19          MS. RACHAL:  Objection to form.
20  BY MS. LAMBIASE:
21      Q   In your professional opinion.
22      A   I don't know.  I just don't know.
23      Q   And recommendation number 9 on page 15 talks
24  about establishing a separate continuous quality
25  improvement system that covers all service delivery.

STATE-WIDE REPORTERS  (800) 372-3376