**Help Wanted:** Paid mentors on the job at Friends of the Children (Earl Fonville Jr., left), the Hmong American Partnership (Long Vang, center) and Children's Village (Sarah Reid and Carl Johnson, right).

few <!-- --> adults to fill that role. From such efforts, "encouraging track records are beginning to emerge," said a report issued in June by Public/Private Ventures (P/PV). Although the evidence is

continued on page 20

## *Class Action?*
# 13 Lawsuits That Reformed (or Drained) Child Welfare

■ **By John Kelly**

In 1980, attorney Marcia Lowry led the American Civil Liberties Union (ACLU) to court against New Mexico for failing to properly serve children in its child welfare system. It appears to have been the first such suit against a state system – and a portent of things to come.

A quarter-century later, Lowry and a nonprofit she founded, Children's Rights (CR), have brought similar suits against six other states and six local governments. The question is, what does she have to show for it?

Did Lowry launch a new strategy that has improved the lives of kids in child welfare systems, or create a lot of high-priced work for attorneys while making it harder for child welfare workers to do their jobs?

The lawsuits have "definitely focused people's attention and generated some energy," says Bob McKeagney, vice president of program operations for the Child Welfare League of America (CWLA), and former head of Maine's child welfare system. "But in most situations, they have proved to be debilitating and demoralizing to the departments themselves."

"Litigation should be a last resort," says Lowry. "But it does produce results."

Those results include more spending on child welfare and smaller caseloads in several of the jurisdictions that Lowry has sued. But the lawsuits have also soaked up financial and staff resources that agencies say they could have been better spent elsewhere, including millions of dollars in legal fees that the agencies have paid to Lowry's group to settle the lawsuits.

### The System on Trial
Class-action lawsuits have become standard practice in the United States, sometimes forcing significant overhauls in social services, such as those for the mentally ill. Back in 1980, the strategy looked promising for overhauling child welfare agencies.

continued on page 28

### INSIDE

**Juvenile Justice**
Award-winning data system improves treatment of youth. Page 5.

**My Job**
A new feature profiles youth workers. Page 13.

**Health**
Congress looks at kids detained for lack of mental care. Page 31.



EXHIBIT KKK

# Lawsuits Force Reform – Or Soak Up Resources



Lowry: "There's no question that the pressure of litigation has caused significant changes."

continued from page 1

Three years after that first lawsuit by Lowry and the ACLU – filed against what is now New Mexico's Children, Youth and Families Department (CYFD) – the state signed a consent decree to improve its system, under court supervision.

Then the case got mired in the kind of legal merry-go-round that is common for such decrees and has prompted some one-time supporters of the lawsuits to question their value. New Mexico struggled to comply. Lowry took the state to court again. The state agreed to reach certain benchmarks in order to be released from court supervision. Continued noncompliance prompted Lowry and CR to file a contempt charge in 1995, which ended with a court dismissing the entire case – until four years later, when that decision was reversed.

Nearly 25 years after it began, the case rolls on.

Now the plaintiff in the case is CR, which Lowry formed in 1995 to focus on the kind of child welfare litigation that she had handled as head of the ACLU's Children's Rights Project.

Lowry and CR have sued six other states (Connecticut, Florida, New Jersey, New York, Tennessee and Mississippi) and six cities or counties (DeKalb and Fulton counties in Georgia, and Philadelphia, Milwaukee, Kansas City, Mo., and Washington, D.C.).

Other states, including Utah, Alabama, Illinois and Washington, have been sued by groups such as the Youth Law Center and the Bazelon Center for Mental Health Law, both based in Washington, D.C.

Lowry says her organization conducts at least a year of investigation before filing a lawsuit, speaking with nonprofit advocates, caseworkers, agency managers, juvenile court judges and people in the mental health system. She says she recalls just two cases in which such an investigation did not lead to a lawsuit.

Each defendant has settled, except for one. Washington, D.C., went to trial and lost. Connecticut settled in 11 months; New York, in 13 years.

For all sides involved in such cases, the rightness or wrongness of the claim is only part of the battle. Equally important is how much it costs to fight. From 1996 to 2002, CR spent $14.5 million on its programs, predominantly litigation, while taking in $16.3 million in revenue, according to its federal tax returns.

Most of its revenue is listed as "attorney's fees." Much of the money is recouped from the jurisdictions being sued. Only certain lawyer-related costs can be charged to the state, says Lowry – mostly what is spent during discovery and trial.

### Results?

The enduring nature of the cases has left many in the field asking whether the lawsuits are more trouble than they're worth.

"I've been involved with New Mexico over the years in a consulting capacity, and they have all the same problems now, just years older," says McKeagney of the CWLA.

Even the media attention is not always helpful, McKeagney says. "People in the field are being criticized and generally feel like they are in a no-win situation," he says. "That is not a good environment to work in."

One thing officials must do to turn around a child welfare system, McKeagney says, is make its problems part of the public dialogue. But publicly admitting failure creates legal problems.

"They might want to reach out to the community, but the attorney general will say, 'Don't admit anything.'" McKeagney says.

Critics also say the suits focus too much on resources, such as getting more caseworkers or funding, without addressing fundamental breakdowns in the agencies' philosophy, structures and procedures.

"If you don't change management behavior and don't base [the system] on effective intervention practices, you will get more money and the same results," says Tom Morton, president of the Child Welfare Institute, an Atlanta-based technical assistance provider to state and local child welfare agencies.

"I think you'd be hard put to look at states that have been sued and say there has been substantial improvement in critical outcome measures for kids," he says. "Time in care, adoption placements, the reduction of kids exiting to independent living, [better] permanency planning – they haven't really been helped."

Meanwhile, say McKeagney and Morton, the lawsuit forces the agency to allocate hours and money to reviewing case files and preparing a defense. Assuming it does not beat CR, the state will almost certainly be paying a large sum of the nonprofit's legal expenses.

Morton favors the type of settlement reached in Alabama, which was sued by the Bazelon Center in 1989. He says that 1991 settlement allowed the state's Division of Family and Children's Services to pursue broad reform agendas without continually reporting to the courts or meeting a host of numeric requirements.

Conversely, he looks at the Connecticut settlement with CR, where Lowry's group "had very tight control and monitor-

### Since the Lawsuits...

Following are examples of some changes in child welfare systems that have been sued by Children's Rights. Figures are provided for the year the system was sued and the most recent year available. While CR says its lawsuits helped to spur many of the changes, some states say other factors contributed.

#### Caseworkers' Average Caseloads

|  | 2000 | 2004 |
|---|---|---|
| Tennessee | 35 | 23 |
| Florida | 21.7 | 14 |

|  | 1999 | 2004 |
|---|---|---|
| New Jersey | 36 | 40 |

#### Child Welfare Spending
(in dollars and as percentage of state budget)

|  | 1999 | 2004 |
|---|---|---|
| Connecticut | $134.3 million; 2.4% | $565.5 million; 4.2% |

|  | 2000 | 2004 |
|---|---|---|
| Tennessee | $197.2 million; 2.7% | $249.6 million; 3% |

#### Time in Care

|  | 1980 | 2003 |
|---|---|---|
| New Mexico (average) | 5 years | 7.9 months |

|  | 1995 | 2002 |
|---|---|---|
| New York (median) | 3.19 years | 2.43 years |

|  | 2000 | 2004 |
|---|---|---|
| New Jersey | 1.9 years | 2.24 years |

#### Substantiated Cases
(as percentage of complaints)

|  | 2000 | 2004 |
|---|---|---|
| Tennessee | 23.1% | 20.5% |
| Florida | 51.5% | 51% |

|  | 1999 | 2003 |
|---|---|---|
| New Jersey | 23.5% | 19.5% |

Note: Florida's settlement with CR was considerably narrower than those in other states. Judges in the case rejected most of CR's original allegations.

ing and was really focused on numbers," such as caseworker hiring. Connecticut now has a "brand-new exit plan" to get out of court supervision, "but only after 10 years."

Lowry's reaction to criticisms that the lawsuits are ineffective? "Anyone who would say that must be an uninformed person," she says.

She says that in every system she has sued, "the amount of money spent on child welfare has increased substantially. In Connecticut, it quadrupled. New Jersey has committed itself to increasing spending by $320 million over the next two years. ... There's no question that the pressure of litigation has caused significant changes."

Connecticut confirms that its child welfare spending rose from $150 million in 1991 (when CR sued) to $600 million last year. New Jersey actually plans to spend $320 million over three years, not to increase spending by that amount, says state Department of Human Services spokesman Andy Williams.

As CR claims on its website, caseloads are down in Milwaukee (from about 100 per worker to 11), and Tennessee has added more than 350 caseworkers. It's impossible to tell if such changes would have taken place without the lawsuits or with a different legal strategy.

What is clear is that the litigation is expensive for the states. Case in point: In its ultimately losing fight against CR, New Jersey spent $1.2 million in private attorneys' fees and $1.2 million for expert work done by the CWLA (much of it case reviews), according to The Philadelphia Inquirer. And as part of the consent decree, Lowry says, the state paid CR $1.6 million to cover its costs.

Lowry says the states repeatedly rebuff her attempts to lower costs for both sides by hiring an independent third party to review the agencies' cases. "We ask every time for a joint reviewer," says Lowry. "In each instance the state refused, and re-did work the we had already done." In New Jersey, she says, CR paid just $300,000 for such a review,

continued on page 30

# Foster Funding Overhaul on the Way?

■ By John Kelly

Child welfare watchdogs and administrators are lining up for and against a law that would drastically change the shape of federal foster care funding.

The legislation, co-sponsored by five Republican members of the House Ways and Means Committee and House Majority Leader Tom Delay (R-Texas), follows recent recommendations by the Pew Commission on Foster Care and a proposal by the Bush administration.

The Child Safe Act proposes several changes in the Title IV-E and IV-B sections of the Social Security Act, such as:

• Creating a Safe Children, Safe Families fund with the IV-B money. Three previous IV-B funding streams, specified for things such as caseworker training, administrative costs and efforts to prevent children from being placed in foster care, would converge in a large pot of money for use at the state's discretion. The bill adds $200 million to last year's IV-B total of $404.3 million.

• Instead of a foster care entitlement system – where states receive money based on a formula derived from the previous year's services – states would receive a "capped" amount each year to provide foster care. Any federal funds a state did not use for foster care could be pooled with the Safe Children, Safe Families money to use for other services.

• States would be eligible to receive matching funds for children sent to foster care, regardless of family income. States now receive money only for children who qualify under the Aid to Families with Dependent Children standards set in 1996. The cost of making more children eligible (estimated by Pew to be $1.6 billion) would be offset by a 35 percent reduction in the rate at which the government matches state funding.

"I think the bill is a good step forward," says Wade Horn, assistant secretary for children and families for the U.S. Department of Health and Human Services. "It provides flexibility to states in their use of child welfare funds, ... increases resources and maintains adoption as an open-ended entitlement to ensure that there will be no unintentional disincentive for adoption."

The president's proposal, Horn says, is similar, but voluntary. States could choose to forgo much of the federal funding structure and agree to a five-year block grant scheme.

"If you want to opt in, we'll project out how much you get over five years, and they take that money and use it more flexibly," Horn says of the Bush proposal. "So if all 50 states opted in to ours, it would be the same thing" as the Safe Act.

But the Safe Act has some advocacy groups and House Democrats up in arms, especially over the cap on money that a state could receive for foster care. The amount a state can receive now is uncapped and can change with a dramatic upswing in foster care placements.

"If the need went up – and given the ups and downs of the past, that's possible – there is a concern about capping it," says Nick Gwinn, minority staff director for the Ways and Means Committee.

Researchers at the Child Welfare League of America (CWLA) and the Children's Defense Fund (CDF) say the purpose of the spending limits, which would be tied to projections from each state's performance in 2003, is misdirected.

"The reason for the cap is that they believe we need to reduce the number of kids in foster care," says Elizabeth Meitner, CWLA's vice president of government affairs. "If you reduce the federal dollars for foster care, the number of kids in foster care will be reduced."

"Reducing foster care caseloads should never be an end in itself," says CDF Child Welfare Director Mary Lee Allen. "The goal should be movement toward permanency."

However, Richard Wexler, director of the National Coalition for Child Protection Reform, finds it "repellent that my fellow liberals are taking a knee-jerk reaction and defending a status quo that's harmed hundreds of thousands of children."

The cap on foster care spending is crucial, he says, "because you say we rely too much on foster care, yet continue the notion that the only program which should have open-ended entitlements is foster care. As long as you do nothing to close that open spigot, you'll never fix this system."

Wexler has his own problems with the Safe Act. Funds to prevent children from entering foster care are now part of the Safe Children, Safe Families block grant, but under the Safe Act, that money could be used for things such as foster care training and administrative costs. "When you take money from foster care and put it in a pot for prevention and tell people to fight for it, prevention will always lose," says Wexler.

Ways and Means Committee staff say that bill co-author Rep. Wally Herger (R-Calif.) plans to amend the bill to wall off money for services such as prevention.

The CWLA, CDF and Wexler join in criticizing the bill for not providing funds for subsidized guardianship – assistance to relatives who agree to adopt children who otherwise have little chance of adoption or reunification and who have been in foster care for more than 12 months.

And the bill doesn't follow a call by the Pew Commission report to overhaul the way the federal government measures state child welfare outcomes. (See "Fixing Foster Care," June.) "With this bill there would be more of a reliance on a system of measurement that has been demonstrated not to be robust," says Chapin Hall research fellow Fred Wulczyn.

The Pew Commission leadership appears to be treating the bill as a work in progress. "I'd like to see the entitlements reinstated," along with the subsidized guardianship, says former U.S. Rep. William Frenzel (R-Minn.), co-chairman of the commission. "But I'm just absolutely delighted that someone introduced a bill. In these days, it takes strong interest to move anything forward."

# State's Legal Nemesis Shifts Strategy

continued from page 29

### New Strategy

The litigator concedes that her own legal strategy hasn't always focused on the best outcomes. "At first, we thought too narrowly as lawyers," Lowry says. "We looked for and asked for things that involved more process, more supervision."

Today, the strategy at CR is to litigate, then distance itself from the implementation process. The key tool has been an outside panel empowered to evaluate and consult on measures stipulated in settlements.

The authority of the panels varies. Under the 1999 settlement with New York state, a panel for New York City essentially shadowed the reform process, assisting when asked. In Tennessee, the panel must approve many of the decisions made by the Department of Children's Services.

The panels, funded partly by the Annie E. Casey Foundation, have made a big difference to some in the field. Before the New York case, the Casey foundation watched from the outside and was "almost uniformly disappointed in results that the lawsuits had achieved," says senior associate John Mattingly. With the exception of Bazelon's Alabama case, Mattingly says, "they tended to grind on forever and yielded little changes."

Child Welfare Group Director Paul Vincent, who served as the head of the Alabama system during its lawsuit and as a member of the panels in New York and Tennessee, agrees that the New York model was the turning point in Lowry's efforts.

"Before that, it was very compliance-driven," he says of reform demands imposed on child welfare agencies by the plaintiff's lawyers. He says the panels essentially put in place diplomats with prominence in the field to work with former courtroom combatants. Vincent's nonprofit consults with child welfare systems on improving their practices.

But Jerome Miller, a veteran child welfare administrator and reformer who ran Washington, D.C.'s, system after CR got it placed under court control, says "a system will never be reformed by lawyers." He thinks the reformers contracted to help turn things around, including the Annie E. Casey Foundation and the Child Welfare Institute, won't fare much better.

"There's almost a circuit of reformers now," says Miller, co-founder of the National Center on Institutions and Alternatives. "They go from state to state, like groups that help after natural disasters. But you don't see much in their track record."

A child welfare director could use a court mandate to get more government funding, Miller says, but money doesn't necessarily improve systems. In Washington, he says, "I was told my budget would be around $50 million [in 1995]. It ended up being $100 million. Now, D.C. is pushing close to $200 million. I'd like to see where it's all going."

### Another Way

Some hope that changes now under way in Washington will help to make the lawsuits moot.

The problem is that the way federal child welfare funding works, "there is no incentive to encourage states to run organizations at a top level," says Susan Orr, associate commissioner of the Children's Bureau in the Administration for Children and Families, a division of the U.S. Department of Health and Human Services.

"Moving kids toward permanency makes them ineligible to claims by the state, which lowers funding eligibility," she notes. "Not moving kids toward permanency, however, can ultimately lead to [financial] penalties." A lawsuit, she says, cannot change such fundamental structural problems.

Some in Washington believe two pieces of legislation can. The Child Safe Act and a foster care proposal by President Bush, both now in congressional committees, seek to make dollars going to the state for child welfare more flexible. (See story, page 29). Freer spending, proponents say, is the best way to enable states to fix what is wrong.

If flexible funding is the carrot in helping to reform state systems, Orr says, the agency's new Child and Family Services Reviews (CFSR) might serve as a stick. With the first round of reviews of child welfare systems completed, each state has begun drafting a Program Improvement Plan.

Orr says many states are using their plans to persuade legislators that improving services and hiring more caseworkers are less costly than the alternative: federal financial penalties for failing to reach the goals of the plans.

Lowry, who along with a number of her adversaries is critical of the standards set in the CFSR, says that letting states take flexible grants instead of entitlements will eliminate the few federal minimum standards that already exist.

She says the federal government should set more standards of practice, such as caseload limitations and training requirements. "The federal government has remarkably few standards for child welfare, when you compare it to, say, the weight of trucks on highways," Lowry says dryly.

Until that changes in her eyes, Lowry and Children's Rights will be waiting on the courthouse steps.

*John Kelly can be reached at jkelly@youthtoday.org.*

---



## Looking For More QUALITY, DIVERSITY and an INTERNATIONAL FLAIR To Your Staff?

Become a Training Site Agency with the American Youth Work Center's Practical Training Program Benefits can include:
- Savings on FICA/FUTA and other "employee" benefits
- Smart, educated enthusiastic early career professionals
- 18-month commitment from participants with a strong work ethic who are eager to learn
- Spanish and other bilingual candidates

Since 1986, AYWC's Practical Training Program has placed over 2,000 fully qualified early career human service workers from 20 foreign nations with leading U.S. children and youth serving agencies for an 18-month term of continuous training while earning the prevailing wage.

It's proven to be a "win-win" scenario for all involved!

For additional information and references contact Bill Treanor, Executive Director of American Youth Work Center or Nova Lollis, International Program Officer at (202) 785-0764 ext. 107 or visit our website www.youthtoday.org/aywc.



---