Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 105279 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

Page 1

▷
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.
K.H., through her next friend and Guardian Ad Litem, Patrick T. Murphy, Plaintiff,
v.
Gary T. MORGAN, Guardianship Administrator, Department of Children and Family Services, Gordon Johnson, Director Department of Children and Family Services, Maritza Correa, Caseworker, Department of Children and Family Services Jean Hoth, Caseworker, Department of Children and Family Services, Defendants.
No. 87 C 9833.

Sept. 8, 1989.

*MEMORANDUM OPINION AND ORDER*

MAROVICH, District Judge.
*1 K.H. a physically, emotionally, and sexually abused minor, sues Gary G. Morgan, guardianship administrator for the Illinois Department of Children and Family Services ("DCFS") and other DCFS personnel, including the Agency's Director, Gordon Johnson, under 42 U.S.C. § 1983 based on certain alleged deprivations of constitutional rights. Defendants now move to dismiss under Federal Rule of Civil Procedure 12, raising a variety of grounds. For the reasons stated in this memorandum opinion and order, defendants' motion is granted in part and denied in part.

I. *FACTS*

As with every motion to dismiss, the court accepts as true the well-pleaded factual allegations of the complaint, with all reasonable factual inferences drawn in favor of the party opposing the motion, here, K.H. This approach involves no findings of facts. *Rubacha by Rubacha v. Coler,* 607 F.Supp. 477 (N.D.Ill.1985) citing *Wolfolk v. Rivera,* 729 F.2d 1114, 1116 (7th Cir.1984). Defendants filed under seal the Transcript of a Juvenile Court proceeding concerning K.H. which was held on October 6, 1987. The court takes judicial notice of the transcript and considers it for limited purposes as discussed further herein. To the extent the transcript contains sworn testimony which contradicts the factual allegations of the complaint, the court disregards it as any factual disputes should be resolved at a further stage in this proceeding.

K.H. is a black child born on December 8, 1981. In May 1983, when K.H. was seventeen months old, the Board of Health certified to DCFS that KH had the venereal disease gonorrhea as a result of vaginal intercourse. (Amended Complaint ¶ 9). Three months later, in August of 1982, a Juvenile Arrest Warrant was issued for K.H. and on October 12, 1982, the Juvenile Court placed K.H. in DCFS's custody. (*Id.* ¶¶ 9, 10).

DCFS immediately placed K.H. in the home of DCFS fosterparent G.H., the first in a long series of foster placements for K.H. Less than two weeks later, on October 25, 1982, DCFS removed K.H. from G.H.'s custody and placed K.H. with another DCFS foster parent, W.C. K.H. remained with W.C. for four months until she was transferred to the home of A.B., a third DCFS foster parent. (*Id.* ¶ 12). Approximately 10 months later DCFS removed K.H. from A.B.'s home placing K.H. with S.T., a fourth DCFS foster parent. (*Id.* at ¶ 14). K.H. remained with S.T. for over a year until January 31, 1985 when the Juvenile Division of the Circuit Court of Cook County ordered K.H. returned to her natural parents under DCFS supervision (*Id.* ¶ 15).

After only three months with her natural parents DCFS again removed K.H. from her home due to continued parental neglect. K.H. was then three years old. DCFS placed her with DCFS foster parent V.G., K.H.'s sixth placement in 18 months. On April 30, 1985 the juvenile court awarded guardianship of K.H. to DCFS.

At this same time DCFS appointed Central Baptist Family Services ("CBFS") as DCFS's agent to monitor and supervise K.H. in her placement. DCFS assigned DCFS caseworker defendant Maritza Correa to supervise CBFS's handling of K.H.'s case (*Id.* ¶ 17).

*2 A few weeks later, on June 17, 1985, K.H. was placed in the home of O.L. There, she was sexually abused by a man who lived close to the foster home. (*Id.* ¶ 20). Several months later defendant Correa approved a service plan which provided that K.H. would be referred for therapy. Despite the plan, for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 105279 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

Page 2

more than one year Correa failed to insure that K.H. received counseling. (*Id.*).

In April of 1986 K.H. was evaluated by Mt. Sinai Hospital. Mt. Sinai staff determined that K.H. had been sexually abused and that K.H.'s current foster parent, O.L., was physically abusing K.H. The hospital staff recommended that K.H. not be returned to O.L.'s home and that instead K.H. be placed in a loving, nurturing foster home which would be sensitive to her history of physical and sexual abuse. (*Id.* ¶ 21). Experts at Mt. Sinai also found that K.H. was in immediate need of individual therapy to focus on her history of physical and sexual abuse, disruption of her family, and multiple placements. (*Id.* ¶ 22).

On or about May 23, 1986, defendant Correa approved K.H.'s placement with Mary Henry. Defendant Correa knew that Ms. Henry did not have the training or ability to care for an emotionally disturbed child. (*Id.* ¶ 24) On October 27, 1986, six months after Mt. Sinai staff recommended immediate therapy and almost a year after Correa recommended counseling in K.H.'s case plan, K.H. finally began to receive therapy at the University of Chicago. On June 8, 1987 K.H. was removed from the Henry home because of physical abuse by the foster parent.

On July 7, 1987 defendants filed their first request for an 18 month review by the court. This request, which is mandated by state law, was more than nine months late. As a result of this review, plaintiff's court appointed attorney and guardian ad litem became aware of plaintiff's situation and brought this suit.

K.H., who was six years old at the time this suit was filed, seeks monetary damages from the defendants in their individual capacities. The four-count complaint alleges that defendants deprived K.H. of the following constitutional rights:

1. Count I charges that K.H. was deprived of her substantive due process right to minimally adequate or reasonable training in violation of the fourteenth amendment. *See Youngberg v. Romeo,* 457 U.S. 307, 319 (1981).

2. Count II alleges that defendants deprived K.H. of her procedural due process right to notice and hearing before she was deprived of certain entitlements created by federal and state statutes all in violation of the fourteenth amendment.

3. Count III alleges that defendants' failure to consider placing K.H. with non-black foster families denied plaintiff her rights to equal protection in violation of the fourteenth amendment.

4. Count IV alleges that defendants Morgan and Johnson's policies excluding wards' attorneys from administrative case reviews violated K.H.'s rights to procedural due process.

*3 Defendants move to dismiss on a multitude of grounds: lack of subject matter jurisdiction, federalism and comity, abstention, res judicata, eleventh amendment immunity, failure to state a claim, and qualified immunity. The court addresses each argument in turn.

## II. *ANALYSIS*

### A. Proceedings Before the Juvenile Court Do Not Deprive This Court of Jurisdiction.

At the root of several of defendants' dismissal arguments is the juvenile court's jurisdiction over K.H.

The amended complaint recites several actions the juvenile court has taken regarding K.H.:

In August 1983 the court (we assume the juvenile court) issued a juvenile arrest warrant authorizing the police to take custody of K.H. (Amended Complaint ¶ 9)

On October 12, 1983, the juvenile court placed K.H. in the custody of DCFS. (*Id.* ¶ 10)

On April 30, 1985 the juvenile court granted guardianship of K.H. to DCFS. (*Id.* ¶ 16).

Defendants argue alternatively that the juvenile court's actions: (1) deprive this court of subject matter jurisdiction; (2) mean this court should abstain for comity and federalism reasons; (3) bar this suit on grounds of res judicata.

### 1. Lack of Subject Matter Jurisdiction

Defendants argue this case should be dismissed under *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 482 (1983). There, the Court held that United States district courts have no appellate

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 105279 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

Page 3

jurisdiction over challenges to state court judicial decisions. *Feldman* itself involved a direct challenge in federal district court to a final judgment of the District of Columbia Court of Appeals.

In the instant case, K.H. does not object to the juvenile court's orders first to remove then to return K.H. to her natural parents. Nor does K.H. object to the court's order naming DCFS as K.H.'s guardian. Instead, K.H. challenges the actions of DCFS personnel in their treatment of K.H. after the court awarded DCFS custody of K.H. Because K.H. does not challenge any action by the juvenile court, reliance on *Feldman* is entirely misplaced. *See Doe v. Lambert,* No. 87 C 8150, slip op. at 3, 4 (N.D.Ill. April 19, 1988) (Kocoras, J.) (Juvenile Court's approval of foster children's move to home of foster parents in North Carolina does not bar federal suit against DCFS based on abuse of children and murder of one child by foster parents).

Defendants also argue that this court lacks subject matter jurisdiction because "the state court acquired prior jurisdiction" over K.H. As authority for this argument, defendants cite a 1935 Supreme Court case where a federal and state court both had *in rem* or *quasi in rem* jurisdiction over a piece of property. *Penn General Casualty Co. v. Pennsylvania,* 294 U.S. 189 (1935). There the Court held that the court first acquiring *in rem* jurisdiction over the property should retain that jurisdiction to the exclusion of the second court. *Id.* at 195. The court distinguished *in personam* suits where both courts may proceed with the litigation. *Id.* Defendants argue that K.H., as a ward of the juvenile court, is subject to that court's *quasi in rem* jurisdiction. Without reaching that debatable assertion, the court notes that the civil rights suit before this court is clearly *not* an *in rem* or *quasi in rem* suit. The *Penn Central* case is inapposite to the instant action. Likewise, the other case emphasized by defendants, *United States v. Kipp,* 232 F.2d 147 (7th Cir.1956) concerns the effect of a writ *ad prosequendum* and is entirely irrelevant to this suit. Accordingly, defendant's arguments that this court lacks subject matter jurisdiction are rejected.

2. Comity, Federalism, and Abstention

*4 Defendants urge this court to abstain from deciding K.H.'s constitutional claims on the principles of comity and federalism. Defendants rely on *Pennzoil Co. v. Texaco, Inc.,* 481 U.S. 1 (1987) to support their abstention arguments. The *Pennzoil* decision is grounded in the *Younger* abstention doctrine. In its present form the *Younger* doctrine basically provides "that absent extraordinary circumstances, a federal court should not interfere with pending state judicial proceedings." *Hickey v. Duffy,* 827 F.2d 234, 244 (7th Cir.1987) (Flaum, J. conc.). *See also Fort v. Daley,* Nos. 83 C 623 and 87 C 2402, slip op. at 8-12 (N.D.Ill. Sept. 2, 1988) (Marovich, J.) (This court discusses the evolution of the *Younger* doctrine).

The threshold question on the abstention issue is whether there is a pending proceeding in which a state court will have the authority to adjudicate the merits of K.H.'s federal claims. This court does not believe so. None of the juvenile court's isolated orders can be considered a *pending* state proceeding, those self-contained proceedings have been concluded. Defendants here also filed under seal a transcript of a "case review" before the juvenile court which took place on October 6, 1987. According to the transcript, the case review did not result in the court taking any action. There is no indication that the review is still pending. That proceeding therefore also fails to provide a basis for abstention.

Nor does the mere fact of continuing jurisdiction by the juvenile court over K.H.'s affairs required abstention here. Neither party argues that the juvenile court presently has matters concerning K.H. pending before it. And, the mere *availability* of a state forum for a plaintiff's grievances does not mandate federal abstention. *Monaghan v. Deakins,* 798 F.2d 632, 638 (3d Cir.1986) *aff'd in part, vacated in part as moot,* 484 U.S. 193, (1988); *see also Hawaii Housing Authority v. Midkiff,* 467 U.S. 229 (1984). In short, there does not appear to be a pending state proceeding where K.H. can raise her constitutional claims. Accordingly, *Younger* abstention is not called for.

Further, K.H. does not complain that the juvenile court's orders or procedures deprived her of constitutional rights. K.H. complains of DCFS personnel's actions independent of any court order. In contrast, in *Pennzoil* the federal plaintiff was collaterally attacking a pending state proceeding's procedures. *See also Brunken v. Lance,* 807 F.2d 1325 (7th Cir.1986).

3. Res Judicata

Defendants argue that the Cook County Public Guardian "litigated the very issues raised in plaintiff's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 105279 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

Page 4

complaint in a state proceeding on October 6, 1987." Defendants argue that the Public Guardian's failure to raise K.H.'s constitutional claims in state court bars this suit under the doctrine of *res judicata*.

The doctrine of *res judicata* bars a later suit on claims that were made or could have been made in an earlier suit, provided certain prerequisites are met. The prerequisites are:

*5 (1) a final judgment on the merits in an earlier action; (2) an identity of the cause of action in both the earlier and the later suit; and (3) an identity of parties or their privies in the two suits.

*Spiegel v. Continental Illinois National Bank*, 790 F.2d 638, 645 (7th Cir.) *cert. denied* 479 U.S. 987 (1986).

The hearing conducted by the juvenile court in October 1987 can only loosely be termed "litigation." The transcript filed with this court contains only testimony from a series of witnesses who were questioned and cross-examined by a DCFS attorney and an attorney from the Cook County Public Guardian. According to the transcript, no motions were before the court, the court made no findings of fact, nor did the court enter any rulings or orders that could be considered a final judgment on the merits. Such a proceeding cannot be the basis for a *res judicata* bar.

B. Eleventh Amendment Immunity

Defendants argue that K.H.'s claims are barred by the eleventh amendment which has been interpreted to bar suits against a state by citizens of that state. The Supreme Court defines when a suit is considered against the state as follows:

The general rule is that a suit is against the sovereign if "the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration," ... or if the effect of the judgment would be "to restrain the Government from acting, or to compel it to act."

*Dugan v. Rank*, 372 U.S. 609, 620 (1963) (citations omitted).

Plaintiff here names each of the individual defendants in their individual capacity. Such a designation is strong evidence that plaintiff does not seek recovery from the state treasury. See *Kolar v. County of Sangamon of State of Ill.*, 756 F.2d 564, 568 (7th Cir.1985). The state's possible indemnification of defendants from state funds does not transform an individual capacity suit into a suit against the state. *Rubacha by Rubacha v. Coler*, 607 F.Supp. 477, 481 (N.D.Ill.1985).

Defendants argue that despite plaintiff's labeling her claims as individual capacity claims, they are in substance official capacity claims. Defendants cite *Walker v. Rowe*, 791 F.2d 507 (7th Cir.) *cert. denied* 479 U.S. 994 (1986)) for the proposition that a court should look to the substance rather than the form of the complaint's capacity allegations. That case also recognizes that whether a suit is an official capacity or individual capacity suit is "largely the plaintiff's choice." *Id.* at 508. Here plaintiff alleges that the actions or inaction of particular DCFS personnel caused her harm. She does not allege and the court does not perceive the substance of her allegations to be that defendants are liable merely because of the office they hold. *Cf. Walker, supra*, 791 F.2d 507 ("these ... complaints have to do with the prison system as a whole").

Defendants raise another, closely related objection to the charges against them. Defendants argue that the complaint's allegations in substance seek to impose vicarious liability. According to *Walter v. Rowe, supra*, 791 F.2d at 508, "the constitution does not make supervisory officeholders vicariously liable for the acts and omissions of their subordinates."

*6 Defendants argue that the complaint runs afoul of the rule against vicarious liability in two ways. First, defendants argue that because CBFS, a private agency, was assigned primary responsibility for placing K.H. during *some* of the time she was under DCFS guardianship, DCFS personnel are being sued vicariously for the actions or inactions of a private agency. This argument is rejected. DCFS was never relieved of guardianship over K.H. The complaint alleges that DCFS personnel continued to play a role in K.H.'s care even when she was under CBFS's custody. DCFS monitored and approved CBFS's actions. DCFS personnel may be liable for their *own* actions in approving or failing to monitor CBFS personnel's actions. Plaintiff here clearly alleges that DCFS personnel consented to CBFS's actions.

Likewise, defendants argue that defendants Morgan and Johnson, as DCFS supervisory personnel, cannot be vicariously liable for action or inaction of lower level DCFS personnel. This complaint does not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 105279 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

Page 5

charge Morgan and Johnson with such vicarious liability. The complaint alleges that Morgan and Johnson know that caseworkers frequently engage in the practices complained of. (See complaint ¶ 55) Despite this knowledge, Morgan and Johnson failed to take any action to prevent the alleged constitutional violations. These allegations are sufficient to establish personal liability, *Id.* *See also Crowder v. Lash,* 687 F.2d 996 (7th Cir.1982).

D. Absolute Immunity

Defendants also argue that they are absolutely immune from suit because defendant Morgan is a court-appointed guardian and the other defendants assist him in his duties. Defendants claim they are enveloped in the same absolute immunity that protects judges from liability. Although some courts use an analogy between prosecutors and child welfare workers to extend absolute immunity to workers for their decisions to *initiate* child abuse and neglect proceedings, *see, e.g., Meyers v. Contra Costa County,* 812 F.2d 1154, 1156-7 (9th Cir.) *cert. denied* 108 S.Ct. 98 (1987). (Child service workers entitled to absolute immunity for the initiation and pursuit of dependency petitions in cases of suspected child neglect and abuse), this court is unwilling to stretch that immunity to a case where the defendants were engaged in decidedly non-judicial activities. To the extent K.H. seeks recovery for actions not directly ordered by the court and not a part of the initial decision to seek custody and guardianship over K.H., there is no absolute immunity.

E. Failure to State a Claim

Defendants move under F.R.Civ.P. 12(b)(6) to dismiss each of the four counts in the complaint for failure to state a claim upon which relief can be granted. Each count is addressed separately.

1. Count I-Substantive Due Process

In *Youngberg v. Romeo,* 457 U.S. 307 (1982), the Supreme Court recognized that persons in non-punitive state custody have certain constitutionally protected liberty interests under the Due Process Clause of the fourteenth amendment. The *Youngberg* case concerned Nicholas Romeo, a thirty-three year old mentally retarded man with the mental capacity of an 18 month-old child. Until he was 26, Romeo lived with his parents; however, upon his father's death, his mother had Romeo involuntarily commited to a state mental facility. Romeo's mother objected to Romeo's treatment at the facility and filed suit on his behalf under 42 U.S.C. § 1983 against three administrators of the institution, claiming damages for the alleged breach of Romeo's constitutional rights. The question presented to the Supreme Court by that case was:

*7 whether respondent, involuntarily committed to a state institution for the mentally retarded, has substantive rights under the Due Process Clause of the fourteenth amendment to (i) safe conditions of confinement (ii) freedom from bodily restraints; and (iii) training or "habilitation".

*Id.* at 309.

The Court held that involuntary commitment does not deprive an individual of all substantive liberty interests under the fourteenth amendment. In addition to conceeded rights to adequate food, shelter, clothing, and medical care, the Court ruled that Romeo had rights to personal security and freedom of movement. *Id.* at 316. The toughest question for the Court was whether Romeo had a constitutional right to treatment or training and development of needed skills. Based on the Court's finding that Romeo had a constitutionally protected liberty interest in safety and freedom from restraint, the Court concluded that the liberty interests "require the state to provide minimally adequate or reasonable training to ensure safety and freedom from undue restraint." *Id.* at 319. Because Romeo only sought this limited treatment, the Court declined to reach the "difficult question" whether Romeo had some general constitutional right to training *per se.* *Id.* at 318.

The Court then articulated a standard to be applied in determining whether a state has adequately protected the previously identified rights of the involuntarily committed mentally retarded. This standard balances the individual's liberty interest against the relevant state interests. The Court adopted the following language from a concurring appellate court opinion:

the Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the Courts to specify which of several professionally acceptable choices should have been made.

*Id.* at 321 (citation omitted).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 105279 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

Page 6

In a concurring opinion, Justice Blackmun, joined by Justices Brennan and O'Connor, suggested that Romeo might have had an independent constitutional claim, grounded in the due process clause, to training necessary to preserve those basic self-care skills he possessed when he first entered the state institution. *Youngberg, supra,* 457 U.S. at 327 (Blackmun, J., conc.). As examples of basic self-care skills Blackmun listed the ability to dress oneself and care for personal hygiene. Although the majority had declined to define the contours of "minimally adequate training," Blackmun would include "such training as is reasonably necessary to prevent a person's pre-existing self-care skills from *deteriorating* because of his commitment." *Id.* (emphasis in original).

In this case, K.H.'s first count is based on *Youngberg.* At least one circuit court has found that the liberty interest of a child who has been removed from her parent's custody and placed into the custody of the state is analogous to the the liberty interest defined in *Youngberg. Taylor by and through Walker v. Ledbetter,* 818 F.2d 791, 795 (11th Cir.1987) cert. denied 109 S.Ct. 1337 (1989). ("In both cases, the state involuntarily placed the person in a custodial environment, and in both cases, the person is unable to seek alternative living arrangements.") This court agrees that the principles announced in *Youngberg* are applicable to children the juvenile court has placed in state custody.

*8 K.H.'s complaint is confusingly imprecise about the liberty interests of which she claims the state has deprived her. Nonetheless, this court's duty is to determine whether K.H. states a claim under any set of facts.

The court finds that some of the factual allegations K.H. makes do give rise to a substantive due process claim under *Youngberg.* In *Youngberg,* the court identified that institutionalized persons have a constitutional right to safe conditions. Although in *Youngberg* the safety the court was addressing was physical safety, this court believes that an interest in safety must include an interest in some minimal level of psychological and emotional safety. Such an interest is supported by recent cases from this district and the Southern District of New York. In *Doe v. N.Y. City Dept. of Social Services,* 670 F.Supp. 1145 (S.D.N.Y.1987), the district court addressed the New York City Dept. of Social Services' ("Department") practice of repeatedly assigning children to foster care facilities on a night-to-night basis. Plaintiffs there, a class of children in the Department's foster care system, "object[ed] to being shuttled nightly to different places to sleep, carrying their few possessions with them [in plastic garbage bags] while they spend days in offices waiting for placement." *Id.* at 1172. The court found that the Department's practice implicated the plaintiffs' basic liberty interests explaining that the practice resulted in:

physical, emotional and psychological harm to the children exposed to it [the practice]. Children are by their nature in a developmental phase of their lives. If they do not move forward, they move backward. Positive efforts are necessary to prevent stagnation, which, for children, is synonymous with deterioration. The evidence indicates an even more egregious situation. The problems of children who participate in repeated overnights are exacerbated by the experience.

*Id.* at 1175. *See also B.H. v. Johnson,* No. 88 C 5599, slip op. at p. 15 (N.D.Ill. May 30, 1989) (Grady, J.) ("a child who is in the state's custody has a substantive due process right to be free from unreasonable and unnecessary intrusions on both its physical and emotional well-being.")

The *Doe* court also held that the treatment plaintiffs receive while in the Department's care must bear some reasonable relation to the statutory goals of the foster care system including the goal of permanence. *Id. See also Jackson v. Indiana,* 406 U.S. 715, 738 (1971) (procedural due process case) ("the nature and duration of commitment [must] bear some reasonable relation to the purpose for which the individual is committed"). The *Doe* court found that the Department's practice of placing traumatized children in the night-to-night program is inconsistent with the stated purposes of the foster care system, *Doe, supra,* 670 F.Supp. at 1175.

Here, K.H. complains that she has suffered severe emotional and psychological harm from her placement in multiple foster homes over a relatively short period of time. The complaint recites a total of 9 placements in a period of approximately three and a half years, from October 12, 1983 to June 8, 1987. The court finds that K.H. does have a liberty interest in some minimal level of emotional and psychological safety. That interest may include not being subject to multiple placements which cause emotional harm and may result in severe psychological problems as K.H. matures.

*9 Each of the individuals charged here is named as

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 105279 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

Page 7

having participated in K.H.'s multiple placements. Defendants Correa and Hoth were caseworkers who supervised K.H.'s placements during part of the time she was in DCFS custody. Gary Morgan and Gordon Johnson were supervisory personnel who knew that caseworkers frequently subject young children to multiple placements and failed to take any steps which would prohibit multiple foster home placements, or would require caseworkers to consider the effect of multiple placements on individual children. (Complaint ¶ 55).

K.H. also asserts that the state has an obligation to provide her with some treatment for her emotional and psychological injuries sustained as a result of the physical and sexual abuse she suffered at the hands of her natural parents and various foster parents. Because K.H. is a developing child, failure to treat her emotional handicaps may result in a deterioration of K.H.'s psychological well being. Further, K.H.'s placement in foster homes where the foster parents lacked the skills and training necessary to manage a child with emotional and mental problems has lead, K.H. asserts, to further emotional injury. Indeed, K.H. claims that lack of any counseling for herself and foster parents threatens K.H.'s physical safety because K.H.'s mental problems have lead to K.H.'s engaging in self-destructive behaviors such as peeling paint from walls and eating paint chips; chewing around the cap of a can of lighter fluid; chewing ink pens and smearing the ink; drinking perfume; rubbing sealer on herself; and standing on her head on the stairs. (Complaint ¶ 29).

As a starting point in analyzing whether K.H. states a claim for deprivation of counseling services, the court notes that "[a]s a general matter, a State is under no constitutional duty to provide substantive services for those within its border." *Youngberg, supra,* 457 U.S. at 317. When, however, a person is institutionalized or is a ward of the state, and wholly dependent on the state, a duty to provide certain services and care does exist. *Id.* This court previously found a protected interest in emotional and psychological safety for children in a state's foster care system. It follows from *Youngberg* that there must be a corresponding interest in some minimal treatment "necessary to avoid unconstitutional infringement of those rights." *Id.* at 318. Justice Blackmun expressed the view that an individual's condition should not *deteriorate* because of state custody. *Id.* at 327-329 (Blackmun, J., conc.); *Society for Good Will to Retarded Children v. Cuomo,* 737 F.2d 1239 (2d Cir.1984) ("We agree with the result suggested by Justice Blackmun's concurrence, that an individual has a due process right to training sufficient to prevent basic self-care skills from deteriorating"). This court agrees. The state cannot obtain custody of children from their parents on the grounds they are being neglected and then neglect the children itself. To the extent K.H. claims she is entitled to counseling and therapy to prevent her mental and psychological health from deteriorating, K.H. states a protected interest.

*10 To establish a claim for deprivation of these interests, plaintiff K.H. will have to meet the standard adopted by the *Youngberg* court. There, Romeo was entitled to minimally adequate training. Judicial review of whether this standard was met was limited to ensuring that professional judgment concerning treatment was exercised. *Youngberg, supra,* 457 U.S. at 321. Thus, decisions regarding K.H. if made by a professional, are presumptively valid; "liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 322. K.H. has pled as much. (Complaint ¶¶ 72, 73, 74).

K.H.'s complaint contains many more allegations of alleged constitutional deprivations. None of them are sufficiently pled to establish a substantive due process violation. K.H. spends many paragraphs of the complaint alleging that she should have been put up for adoption; that adoption was the correct permanency goal for her. K.H. provides no case support for any right to be put up for adoption, and this court can discern no constitutional basis for such a claim. Likewise, K.H. complains that for a period of time when she was under DCFS care no caseworker was assigned to her case. K.H. fails to allege any injury she suffered as a result of the lack of a caseworker. Finally, although K.H. makes numerous references to physical and sexual abuse foster parents inflicted on her, she does not allege that this abuse deprived her of any substantive due process interest nor that the defendants are in any way personally responsible for the abuse.

2. Count II-Procedural Due Process

Count Two purports to be a claim for deprivation of procedural due process under *Board of Regents v. Roth,* 408 U.S. 564 (1971). There, the Supreme Court held that the fourteenth amendment protects individuals from being deprived of liberty or property

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 105279 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

Page 8

interests without some type of prior hearing. *Id.* at 569-570. *See also Goldberg v. Kelly*, 397 U.S. 254 (1970). K.H. claims that Illinois and federal statutes and regulations create vested entitlements which constitute property rights to certain services, care, protection and permanency planning for plaintiff. K.H. asserts that defendants deprived her of these property rights without notice or an opportunity for a hearing in violation of the fourteenth amendment. (First Amended Complaint, ¶ 76).

To determine whether K.H. has a constitutionally protected liberty or property interest in the state and federal provisions, the court's focus is on whether plaintiff has a "legitimate claim of entitlement to those benefits." *Roth, supra.* As the *Roth* court explained:

To have a property interest in a benefit a person clearly must have more than an abstract need or desire for it.... He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

*11 *Id.* at 577.

Each of K.H.'s procedural due process claims suffers from the same fatal infirmity. The statutes and regulations upon which K.H. relies to establish entitlements do not contain standards by which a due process hearing can determine what services are available or appropriate under the circumstances. *See BH v. Johnson, supra,* at pp. 26-28 (finding an identical infirmity in claims based on many of the same statutes) citing *Eidson v. Pierce,* 745 F.2d 453, 459-60 (7th Cir.1984); *Farmer v. Lane,* 864 F.2d 473 (7th Cir.1988).

Plaintiff cites to numerous statutes and regulations as sources for entitlements. K.H. bases her state law entitlements primarily upon the Act creating the Department of Children and Family Services ("the Act"), Ill.Rev.Stat. ch. 23, ¶ 5001 *et seq.* and DCFS Regulations promulgated thereunder. The Act provides that each department client shall be provided with a case plan designed with several permanency goals in mind. Ill.Rev.Stat. ch. 23, ¶ 5006a. Updated plans are to be filed with the court every six months. Ill.Rev.Stat., ch. 37, ¶ 705-8. DCFS Regulations further describe the procedure for preparing the plans and the contents and goals of the plans. DCFS Regs. 305, 305.6, 305.5(b), 305.5(b)(c), 305.6(c), 305.6(d). These sections are all mandatory, each and every child is entitled to a case plan conforming to the statutory and regulatory provisions. The statutes do not contain a list of requirements a child must satisfy before being provided with a case plan such that a due process hearing would be relevant and useful.

K.H. also cites to a myriad of additional DCFS Regulations relating to the protection of children placed in foster care and group homes, covering such diverse subjects as: the frequency of social worker visits to foster placements (Regs. 401.20(b)), the mandatory qualifications of a foster parent (Regs. 402.12), when the permanency goal of "return home" is appropriate (Regs. 305.4(2)(A)), considerations and guidelines when making a placement (Regs. 302.390(e)), the role the child's race and cultural background are to play in a placement decision (Regs. 302.390(f)(4)), and others.

Plaintiff cites one case that supports her procedural due process theory regarding these DCFS regulations. In *Taylor by and through Walker v. Ledbetter,* 818 F.2d 791 (11th Cir.1988) *cert. denied* 109 S.Ct. 1337 (1989), the court held that Georgia child welfare statutes and ordinances defined a liberty interest in personal safety that a child could base a *Roth* claim upon if the child was deprived of statutory mandates. *Id.* at 799. The court found that each child in the Georgia foster care system had an entitlement to a pre-placement investigation and subsequent supervision of any foster home in which the child was placed. *Id.* at 819. (Tjoflat, J., dissenting). A strong dissent in that case, however, recognized that there are major analytical and remedial problems with recognizing a *Roth* claim under these circumstances. *Id.* at 822. Neither *Taylor* nor this case is like *Goldberg* where a statute defines eligibility for certain benefits and a hearing is mandated to determine whether a particular individual qualifies for the benefits under the statute. The *Taylor* dissenters pointed out that the foster children did not really seek notice and a hearing to determine whether they were entitled to investigation and supervision of foster homes, all were entitled, they only sought to make the state comply with its own statutes or face monetary damages. *See also Eidson v. Pierce,* 745 F.2d 453, 459-60 (7th Cir.1984) ("a legitimate claim of entitlement is created only when the statutes or regulations in question establish a framework of factual conditions delimiting entitlements which are capable of being

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 105279 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

Page 9

explored at a due process hearing"). As for the state statutes, and in particular the DCFS regulations, this court declines to follow the *Taylor* analysis. Instead, this court finds that the state statutes and regulations do not create an entitlement to certain services. *Accord B.H. v. Johnson, supra,* slip op. at pp. 26-28.

*12 K.H. further attempts to find entitlements in federal regulations which require that foster children be given a "case plan" outlining the agency's treatment and goals for the child. Those regulations also require states to provide case review systems to insure that each child has a case plan and that the status of each child is reviewed periodically. *See* 42 U.S.C. § 675. K.H. claims that defendants failed to develop a case plan for her and fail to maintain an adequate review system. (First Amended Complaint ¶¶ 63-65).

This court finds that K.H.'s federal claims are more in the nature of a direct claim for violation of the Adoption Assistance and Child Welfare Act of 1980. 42 U.S.C. § 670 *et seq.* Several courts have found a private cause of action under the Act enforceable through 42 U.S.C. § 1983. *See L.J. by and through Darr v. Massinga,* 838 F.2d 118, 123 (4th Cir.1988) (listing cases). Because plaintiff failed to plead such a cause of action and instead relies on the fourteenth amendment, the court grants defendants' motion to dismiss count II without prejudice. Plaintiff may amend the complaint if she chooses. The court will then address the sufficiency of a direct claim if plaintiff repleads.

3. Count Three-Equal Protection

K.H.'s third cause of action is a claim that the defendants deprived K.H. of equal protection of the laws in violation of the fourteenth amendment. K.H. alleges that defendants failed and refused to consider placing her with a non-black foster family, solely because of her race. K.H. claims she was injured because defendants' actions reduced the number of potential foster placements leading to multiple placements in inadequate homes.

Defendants move for dismissal on one ground: that plaintiff fails to allege purposeful and intentional discrimination. Defendants cite in support *Shango v. Jurich,* 681 F.2d 1091, 1104 (7th Cir.1981) (citation omitted) where the court indeed held that "[a] plaintiff 'must demonstrate intentional or purposeful discrimination' to show an equal protection violation." Plaintiff makes absolutely no attempt to justify or explain her equal protection claim in her briefs. The first amended complaint does not allege purposeful discrimination, something more than volition or awareness of consequences. *Id.* Accordingly, count three is dismissed without prejudice. If plaintiff chooses to allege an equal protection claim, plaintiff is referred to the case of *Wilder v. Bernstein,* 645 F.Supp. 1292 (S.D.N.Y.1986) where a similar equal protection claim was apparently advanced.

4. Count Four: Procedural Due Process

According to both federal statutes and DCFS regulations, children in DCFS custody must be provided with an administrative review at least once every six months. 42 U.S.C. § 675(5)(b); DCFS Regulations § 305.6. Count Four alleges that defendants Morgan and Johnson deprived K.H. of procedural due process by adopting a policy and practice of refusing to notify K.H.'s guardian ad litem of administrative case reviews and refusing to permit K.H.'s guardian ad litem to participate in the reviews (First Amended Complaint ¶ 78).

*13 The Supreme Court has established a two-part analysis for evaluating procedural due process claims. *See, e.g., Lemon v. Tucker,* 695 F.Supp. 963 (N.D.Ill.1988). First, plaintiff must allege she has a protectable property or liberty interest. If plaintiff has pled a protectable interest, then the due process clause is implicated and the court must address what the clause requires in this situation. This second step in the analysis involves the accommodation of the competing interests at stake in the case. *Id.* at 968; *see Matthews v. Eldridge,* 424 U.S. 319 (1976). At a minimum, due process usually requires notice and an opportunity to be heard. *Cleveland Bd. of Education v. Loudermill,* 470 U.S. 532 (1985). An opportunity to be heard may necessarily encompass a right to be represented by an attorney. *See e.g. Goldberg v. Kelly,* 397 U.S. 254 (1970).

Although the court recognizes that K.H. may be able to pursue a procedural due process claim, the court is not convinced that she has adequately pled such a claim in her First Amended complaint. Most importantly, plaintiff nowhere alleges what property interest is at stake. Despite this court's earlier ruling that a case plan and case review system are not entitlements requiring notice and a hearing before they can be taken away, plaintiff may have other

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 105279 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

Page 10

entitlements created by federal and state laws which are at stake in an administrative review and which may mandate that the review comply with due process. Accordingly, although the court also dismisses Count IV, this is done without prejudice so that plaintiff can replead a procedural due process claim which clearly states all the requisite elements. *See* Fed.R.Civ.P. 8.

E. Qualified Immunity

Defendants raise the defense of qualified immunity to each of the four causes of action in the First Amended Complaint. Because the court dismisses counts II, III, and IV, the court only addresses the defense's application to count I. In *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1981), the Supreme Court enunciated an objective standard for determining whether a governmental official executing discretionary tasks is entitled to qualified governmental immunity. The Court held that:

government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Id.* at 818.

Defendants argue that the specific substantive due process rights K.H. presses here were not clearly established during the time period this suit covers, 1983-1987. At this point in the proceedings, the court has only the sketchy allegations of the complaint as a source for the facts regarding the defendants' actions. The Seventh Circuit admonishes that although the question of whether the law was clearly established is a question of law, the court cannot look at the legal norm in the abstract and must examine the specific facts confronting the official when he or she acted. *Green v. Carlson,* 826 F.2d 647 (7th Cir.1987); *see also Stacy v. Governors State University,* No. 88 C 6580, slip op. at 5 (N.D.Ill. May 11, 1989) (Marovich, J.).

*14 This court held that K.H. states a substantive due process claim based on her allegations that defendants failed to exercise professional judgment in their treatment of K.H. K.H.'s rights to physical, emotional and psychological safety, and treatment to insure those rights, are grounded in the decision *Youngberg v. Romeo,* 457 U.S. 307 (1982) decided before the time period involved in this suit. *Youngberg's* application to a foster child in the DCFS's custody is clear. *See Rubacha by Rubacha v. Coler,* 607 F.Supp. 477 (N.D.Ill.1985) ("defendants cannot really argue-given the June 1982 *Youngberg* decision and a number of earlier similar decisions at other levels-the right of a juvenile in state custody to bodily security had not been clearly established by October 1983"). K.H. states a colorable claim under *Youngberg* and it is not necessary that there be a precedent that is "factually on all-fours with the case at bar" to defeat qualified immunity. *Jefferson v. Yselita Independent School District,* 817 F.2d 303, 305 (5th Cir.1987).[FN1]

Defendants also argue that they are entitled to qualified immunity because budgetary constraints prevented them from acting within the Constitution. *See Youngberg, supra,* 457 U.S. at 323. ("In an action for damages against a professional in his individual capacity, however, the professional will not be liable if he was unable to satisfy his normal professional standards because of budgetary constraints; in such a situation, good-faith immunity would bar liability"). That determination would be premature at this point because on a motion to dismiss the court takes as true the factual allegations of the complaint. Nowhere does the complaint allege any facts regarding budgetary problems. The court is of the opinion that *both* qualified immunity issues would be more properly presented in a summary judgment motion.

III. *CONCLUSION*

Defendants' motion to dismiss is granted as to counts II, III, and IV and denied as to count I.

> FN1. Defendants call the court's attention to the Seventh Circuit's recent opinion in *Doe v. Bobbitt,* No. 88-3225 (7th Cir. August 9, 1989). There, the court addressed the question:
> whether it was clearly established in 1984 that public officials who place a child at risk of violence from private individuals in a foster home violate that child's constitutional rights.
> *Id.,* slip op. at 1. The district court found that the proposition was clearly established in 1984 and denied the defendants' motion for summary judgment on the grounds of qualified immunity. The Seventh Circuit

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 11
Not Reported in F.Supp., 1989 WL 105279 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

reversed, ruling only that in 1984 "a substantial consensus" had not been reached that placing a child in a potentially dangerous foster home was a violation of the due process clause. *Id.,* slip op. at 3. The *Bobbitt* case is different from the instant case because *Bobbitt* involved DCFS' responsibility for the actions of a third party-the foster parents. In the instant case, it is the actions of DCFS personnel themselves which is challenged. Thus, plaintiff's constitutional claims are grounded in cases other than those relied upon by the *Bobbitt* plaintiffs. Most importantly, the claims in the instant case are grounded in *Youngberg,* a U.S. Supreme Court decision released before the actions forming the basis for this lawsuit.

N.D.Ill.,1989.
K.H., Through Murphy v. Morgan
Not Reported in F.Supp., 1989 WL 105279 (N.D.Ill.)

Briefs and Other Related Documents (Back to top)

• 1:87cv09833 (Docket) (Nov. 16, 1987)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.