IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION


OLIVIA Y., *et al.*                                                                     PLAINTIFFS


v.                                                    CIVIL ACTION NUMBER 3:04CV251


HALEY BARBOUR,
as Governor of the State of Mississippi, *et al.*                      DEFENDANTS

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

W. Wayne Drinkwater, Jr. (MBN 6193)
Melody McAnally (MBN 101236)
BRADLEY ARANT ROSE & WHITE LLP
188 East Capital Street, Suite 450
Jackson, MS 39201
Telephone:  (601) 948-8000

Stephen H. Leech (MBN 1173)
850 East River Place, Suite 300
Jackson, MS 39202
Telephone:  (601) 355-4013

Marcia Robinson Lowry (MBN 43991 *pro hac vice*)
Eric E. Thompson (MBN 43993 *pro hac vice*)
Susan Lambiase (MBN 43992)
Shirim Nothenberg (MBN 43990 *pro hac vice*)
Tara S. Crean (MBN 44447 *pro hac vice*)
Children's Rights
330 Seventh Avenue, 4th Floor
New York, NY 10001
Telephone:  (212) 683-2210

John Lang (MBN 43987 *pro hac vice*)
Christian Carbone (MBN 43986 *pro hac vice*)
John Piskora (MBN 44474 *pro hac vice*)
LOEB & LOEB LLP
345 Park Avenue
New York, NY  10154
Telephone:  (212) 407-4000

4/84756.1

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................... ii

TABLE OF AUTHORITIES ...............................................................................iii

I.      Defendants' Failure To Proffer Any Undisputed Evidence As To
        Plaintiffs' Class-Wide Claims Precludes Summary Judgment For
        Defendants........................................................................................................ 1

II.     Defendants' Attempt To Limit The Scope Of Plaintiff Children's
        Liberty Interests To Reasonable Safety And Basic Necessities Is
        Unsupported And Does Not Warrant Summary Judgment For
        Defendants........................................................................................................ 3

III.    Defendants Are Not Entitled To Summary Judgment Regardless Of
        The Culpability Standard Applied To This Equitable Foster Care Case ............. 11

IV.     There Is Overwhelming and Uncontested Evidence Establishing That
        Defendants Are Violating Plaintiffs' Substantive Due Process Right
        To Be Protected From Harm Precluding Summary Judgment For
        Defendants...................................................................................................... 15

        A.      Defendants Fail to Ensure Plaintiff Children's Safety ........................ 16

        B.      Defendants Subject Plaintiffs to Psychological Harm
                Caused by Multiple, Avoidable Moves and Inappropriate
                Placements............................................................................................ 20

        C.      Defendants Deny Plaintiff Children Adequate Health Care
                and Treatment....................................................................................... 23

        D.      Defendants' Evidence Regarding the Provision of Basic
                Food, Shelter, and Clothing is Immaterial ........................................... 30

V.      Defendants Have Not Taken Reasonable Measures To Abate Known
        Constitutional Violations ................................................................................. 30

VI.     Defendants Cannot Justify Their Lack Of Reasonable Action To Abate
        Known Constitutional Violations On Lack Of Funding ...................................... 32

VII.    CONCLUSION ................................................................................................ 33

# TABLE OF AUTHORITIES

*Alberti v. Sheriff of Harris County, Texas*,
    600 F. Supp. 443 (S.D. Tex. 1984) ....................................................................... 33

*Alberti v. Sheriff of Harris County, Texas*,
    937 F.2d 984 (5th Cir. 1991) ................................................................................ 33

*Alberti v. Sheriff of Harris County, Texas*,
    978 F.2d 893 (5th Cir. 1992) ................................................................................ 33

*A.M. v. Luzerne County Juvenile Det. Ctr.*,
    372 F.3d 572 (3d Cir. 2004) ................................................................................... 6

*Atteberry v. Nocona Gen. Hosp.*,
    430 F.3d 245 (5th Cir. 2005) ................................................................................ 11

*B.H. v. Johnson*,
    715 F. Supp. 1387 (N.D. Ill. 1998) ................................................................... 5, 25

*Braam ex rel. Braam v. Dep't. of Social & Health Servs.*,
    81 P.3d 851 (Sup. Ct. Wash. 2003) ................................................................. 12, 13

*Brian A. v. Sundquist*,
    149 F. Supp. 2d 941 (M.D. Tenn. 2000) .............................................................. 25

*Carey v. Piphus*,
    435 U.S. 247 (1978) ............................................................................................... 4

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ............................................................................................... 2

*Charlie & Nadine H. v. Whitman*,
    83 F. Supp. 2d 476 (D.N.J. 2000) ........................................................................ 25

*Clark-Murphy v. Foreback*,
    439 F.3d 280 (2d Cir. 2006) ................................................................................... 7

*County of Sacramento*,
    523 U.S. 833 (1998) ............................................................................................. 11

*Danielle v. Adriazola*,
    284 F. Supp. 2d 1348 (S.D. Fla. 2003) ............................................................. 4, 25

*Del A v. Roemer*,
    777 F. Supp. 1297 (E.D.La. 1991) ........................................................... 6

*DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*,
    489 U.S. 189 (1989) .............................................................................. 3

*Doe v. New York City Dep't of Soc. Servs.*,
    649 F.2d 134 (2d Cir. 1981) ............................................................... 3, 14

*Doe v. New York City Dep't of Soc. Servs.*,
    670 F. Supp. 2d 1145 (S.D.N.Y. 1987) ................................................... 5

*Doe v. Taylor Independent School District*,
    15 F.3d 443 (5th Cir. 1994) ............................................................ 11, 14

*Drummond v. Fulton County Department of Family & Children's Services*,
    563 F.2d 1200 (5th Cir. 1977) ............................................................... 9

*E.C. v. Sherman*,
    No. 05-726, 2006 U.S. Dist. LEXIS 27506 (W.D. Mo. May 9, 2006) .................. 7

*E.F. v. Scafidi*,
    No. 3:91CV591, Slip op. (S.D. Miss. Mar. 13, 1996) ............................. 9

*Eric L. v. Bird*,
    848 F. Supp. 303 (D.N.H. 1994) ....................................................... 4, 8

*Estelle v. Gamble*,
    429 U.S. 97 (1976) ........................................................................ 6, 14

*Farmer v. Brennan*,
    511 U.S. 825 (1994) ........................................................................ 11

*Forsyth v. Barr*,
    19 F.3d 1527 (5th Cir. 1994) ............................................................. 18

*Frazier v. Harrison ISD*,
    980 F.2d 1514 (5th Cir. 1993) .............................................................. 9

*Gates v. Collier*,
    501 F.2d 1291 (5th Cir. 1974) ........................................................ 25, 32

*Gates v. Collier*,
    349 F. Supp. 881 (N.D. Miss. 1972) ................................................... 25

*Gates v. Cook,*
    376 F.3d 323 (2004) ................................................................. 4, 6

*Grandstaff v. City of Borger,*
    767 F.2d 161 (5th Cir. 1985) ...................................................... 6

*Greason v. Kemp,*
    891 F.2d 829 (11th Cir. 1990) .................................................... 7

*Griffith v. Johnston,*
    899 F.2d 1427 (5th Cir. 1990) .................................................... 5

*Hernandez v. Texas Dep't of Protective and Reg. Servs.,*
    380 F.3d 872 (5th Cir. 2004) .............................................. *passim*

*Hope v. Pelzer,*
    536 U.S. 730 (2002) ................................................................... 15

*Huff v. N.D. Cass Co. of Alabama,*
    485 F.2d 710 (5th Cir. 1973) ...................................................... 2

*Inmates of the Allegheny County Jail v. Pierce,*
    612 F.2d 754 (3d Cir. 1979) ........................................................ 6

*Int'l Shortstop, Inc. v. Rally's, Inc.,*
    939 F.2d 1266 (5th Cir. 1991) .................................................... 18

*K.H. ex rel. Murphy v. Morgan,*
    914 F.2d 846 (7th Cir. 1990) .............................................. *passim*

*Krim v. BancTexas Group, Inc.,*
    989 F.2d 1435 (5th Cir. 1993) .................................................... 18

*Langford v. City of Atlantic City,*
    235 F.3d 845 (3d Cir. 2000) ...................................................... 33

*Langley v. Coughlin,*
    888 F.2d 252 (2d Cir. 1989) ........................................................ 6

*LaShawn A. v. Dixon,*
    762 F. Supp. 959 (D.D.C. 1991) ........................................ *passim*

*Lenard v. Argenta,*
    699 F.2d 874 (7th Cir. 1983) .................................................... 11

*L.J. v. Massinga,*
   838 F.2d 118 (4th Cir. 1988) ............................................................ 13

*Marisol A. v. Giuliani,*
   929 F. Supp. 662 (S.D.N.Y. 1996) .............................................. *passim*

*McClendon v. City of Columbia,*
   305 F.3d 314 (5th Cir. 2002) ............................................................ 11

*Meador v. Cabinet for Human Res.,*
   902 F.2d 474 (6th Cir. 1990) ........................................................ 3, 14

*Nicini v. Morra,*
   212 F.3d 798 (3d Cir. 2000) ............................................................ 12

*Norfleet v. Arkansas Dep't of Human Servs.,*
   989 F.2d 289 (8th Cir. 1993) ..................................................... *passim*

*Olabisiomotosho v. City of Houston,*
   185 F.3d 521 (5th Cir. 1999) ............................................................ 11

*Olivia Y. v. Barbour,*
   351 F. Supp. 2d 543 (S.D. Miss. 2004) .......................................... 3, 11

*Omar v. Lindsey,*
   334 F.3d 1246 (11th Cir. 2003) ...................................................... 3, 8

*Parham v. Southwestern Bell Tel. Co.,*
   433 F.2d 421 (8th Cir. 1970) .............................................................. 2

*Rhyne v. Henderson County,*
   973 F.2d 386 (5th Cir. 1992) ............................................................ 11

*Riddle v. Mondragon,*
   83 F.3d 1197 (10th Cir. 1996) ......................................................... 6, 7

*Shinn v. College Station Independent School District,*
   96 F.3d 783 (5th Cir. 1996) ................................................................ 6

*Smith v. Sullivan,*
   553 F.3d 373 (5th Cir. 1977) ...................................................... 25, 32

*Sosna v. Iowa,*
   419 U.S. 393 (1975) ........................................................................... 3

*Suter v. Artist M.*,
      503 U.S. 347 (1992) ................................................................ 13

*Taylor v. Ledbetter*,
      818 F.2d 791 (11th Cir. 1987) ...................................... 3, 8, 13

*T.M. ex rel. Cox v. Carson*,
      93 F.Supp.2d 1179 (D. Wyo. 2000) .................................... 12

*TIG Ins. Co. v. Sedgwick James of Washington*,
      276 F.3d 754 (5th Cir. 2002) .............................................. 2

*U. S. v. Miss.*,
      Civ. A. No. 3:03CV1354 (S.D. Miss.) ............................... 31

*Vaughan v. Lacey*,
      49 F.3d 1344 (8th Cir. 1995) ............................................. 7

*Waubanascum v. Shawano Cty.*,
      416 F.3d 658 (7th Cir. 2005) ......................................... 3, 8

*Walton v. Alexander*,
      44 F.3d 1297 (5th Cir. 1995) ........................................... 11

*Wendy H. v. City of Philadelphia*,
      849 F. Supp. 367 (E.D. Pa. 1994) .................................... 10

*White v. Chambliss*,
      112 F.3d 731 (4th Cir. 1997) ........................................... 14

*Winston v. Children & Youth Servs. of Delaware County*,
      948 F.2d 1380 (3d Cir. 1991) ........................................... 12

*Wyatt v. Aderholt*,
      503 F.2d 1305 (5th Cir. 1974) ......................................... 32

*Youngberg v. Romeo*,
      457 U.S. 307 (1982) ...............................................*passim*

*Yvonne L. v. New Mexico Dep't of Human Servs.*,
      959 F.2d 883 (10th Cir. 1992) ................................... 3, 8, 12

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants' Motion for Summary Judgment should be denied for a number of reasons. At the outset, summary judgment for Defendants is precluded because Defendants fail to proffer any competent evidence addressing Plaintiff foster children's class-wide claims in this certified class action. Plaintiffs' five expert reports, Defendants' own expert report, and Defendants' documents and deposition testimony all establish that Defendants are operating a child welfare agency that is placing Mississippi foster children at substantial risk of harm because it is inadequately staffed, trained, supervised, and resourced. As to the individual Named Plaintiffs, Defendants fail to adduce undisputed evidence warranting summary judgment against Plaintiffs' well-established substantive due process claims to adequate safety, care, and treatment while in the State's custody. Indeed, Plaintiffs have cross-moved for summary judgment based on the overwhelming and unrebutted evidence of harm to the Plaintiff class, and Defendants' lack of reasonable actions to protect them from known and grave risks. *See generally* Pls' Mot. for Summ. J. on Liability ("Pls' Motion"); Pls' Mem. of Law in Support of Their Mot. for Summ. J. ("Pls' Mem.").

## I.    Defendants' Failure To Proffer Any Undisputed Evidence As To Plaintiffs' Class-Wide Claims Precludes Summary Judgment For Defendants

At summary judgment, the moving party must initially show "that there is an absence of evidence to support the non-moving party's cause." *TIG Ins. Co. v. Sedgwick James of Washington*, 276 F.3d 754, 759 (5th Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Plaintiffs have proffered five expert reports, based upon evidence obtained from Defendants through discovery, that establish how the

certified class of foster children and the Named Plaintiffs are being harmed by well-known and long-standing deficiencies in Mississippi's foster care system.[1]  Defendants' motion, however, inexplicably fails to present any competent factual evidence that addresses Plaintiffs' *class-wide* claims.[2]  Defendants even make various erroneous references to an "alleged class,"[3] as if this Court had not already certified the class well over a year ago.  *See* Pls' Motion at Ex. 26.

Defendants' failure to make a showing as to an absence of evidence in support of Plaintiffs' class-wide allegations precludes summary judgment for Defendants.  It is settled law that "the ultimate failure of the plaintiff to establish his individual claim will not bar class action relief."  *Huff v. N.D. Cass Co. of Alabama*, 485 F.2d 710, 712 n.4 (5th Cir. 1973) (citing *Parham v. Southwestern Bell Tel. Co.*, 433 F.2d 421 (8th Cir. 1970) (holding that though named plaintiff failed to establish employment discrimination based on race, statistical evidence demonstrated employer's racial discrimination against the class)); *see also Sosna v. Iowa*, 419 U.S. 393, 399 (1975) (in a certified class action, "the class of unnamed persons described in the certification acquire[s] a legal status separate from the interest asserted by [the named plaintiff]").  Thus, even if Defendants successfully established that the Named Plaintiffs had failed to develop sufficient evidence of substantive due process violations in their individual cases, which they do not, Defendants would still not be entitled to summary judgment in this class action seeking equitable and prospective relief on behalf of the whole class.

---

[1] Of the five expert reports submitted by Plaintiffs, Defendants have moved to exclude only the expert report of Dr. Bill Brister, the exclusion of which Plaintiffs separately oppose.

[2] The vague and conclusory statements found in the affidavits submitted by Defendants in support of their Motion regarding the care that has allegedly been provided to the Plaintiff class are not competent summary judgment evidence, and are addressed in Plaintiffs' Motion to Strike, which is being filed contemporaneously to this Opposition.

[3] *See* Defs' Mot. for Summ. J. ("Defs' Mot.") at ¶ 1; Defs' Mem of Authorities in Support of Their Mot. for Summ. J. ("Defs' Mem.") at 1.

II.    **Defendants' Attempt To Limit The Scope Of Plaintiff Children's Liberty Interests To Reasonable Safety And Basic Necessities Is Unsupported And Does Not Warrant Summary Judgment For Defendants**

Defendants concede, as they must, that they owe Plaintiff children who are wards of the State a constitutional duty to protect their "safety and general well-being," *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.,* 489 U.S. 189, 199-200 (1989), and to provide them with "reasonable care," including "adequate food, shelter, clothing, and medical care." *Youngberg v. Romeo*, 457 U.S. 307, 315, 324 (1982); *see* Defs' Mem. at 11. Indeed, this Court has recognized that Plaintiff children have a substantive due process right to "safekeeping" and "adequate care and treatment while in state custody." *Olivia Y. v. Barbour*, 351 F. Supp. 2d 543, 555-56 (S.D. Miss. 2004). *See also Hernandez v. Texas Dep't of Protective and Reg. Servs.,* 380 F.3d 872 (5th Cir. 2004) (foster children have right to "personal security" and "reasonably safe living conditions"). Defendants, however, urge this Court to embrace an improperly narrow definition of the duty to keep foster children free from harm that would deny Plaintiff children even the most basic constitutional protections that the Fifth Circuit has held the state owes to its prisoners. Further, notwithstanding the unrebutted evidence of harm suffered by foster children in State custody, Defendants incorrectly characterize Plaintiffs' substantive due process claim as one for "optimal care." *See* Defs' Mem. at 9. In fact, Plaintiffs ask that Defendants do no more and no less than meet their well-established constitutional obligation to do what is necessary to protect foster children's health and safety. [4]

---

[4] *See, e.g., Waubanascum v. Shawano County.*, 416 F.3d 658, 665 (7th Cir. 2005); *Omar v. Lindsey,* 334 F.3d 1246, 1248 (11th Cir. 2003); *Norfleet v. Arkansas Dep't of Human Servs.*, 989 F.2d 289, 291-293 (8th Cir. 1993); *Yvonne L. v. New Mexico Dep't of Human Servs.*, 959 F.2d 883, 892-93 (10th Cir. 1992); *K.H. v. Morgan*, 914 F.2d 846, 849-851 (7th Cir. 1990); *Meador v. Cabinet for Human Res.*, 902 F.2d 474, 476 (6th Cir. 1990); *Taylor v. Ledbetter*, 818 F.2d 791, 794-795, 797-98  (11th Cir. 1987) (en banc); *Doe v. New York City Dep't of Soc. Servs.,* 649 F.2d 134, 141 (2d Cir. 1981); *Marisol A. v. Giuliani*, 929 F. Supp.

Defendants first argue that their constitutional duty of care does not extend to protecting Plaintiff children from harm that is "emotional," "developmental," or "psychological." *See* Defs' Mem. at 12-13. The Fifth Circuit, however, has unequivocally recognized the constitutional right to mental health care for prisoners, expressly noting that "it is important to remember that mental health needs are no less serious than physical needs." *Gates v. Cook*, 376 F.3d 323, 343 (2004) (citations omitted); *see generally Carey v. Piphus*, 435 U.S. 247, 264 (1978) (mental and emotional distress compensable under Section 1983). Similarly, the protection of a foster child's "general well-being" has been recognized to extend to the child's mental health, including the child's emotional and psychological well-being. *K.H. v. Morgan*, 914 F.2d 846, 848 (7th Cir. 1990) ("The extension [of substantive due process] to [this foster care] case in which the plaintiff's mental health is seriously impaired by deliberate and unjustified state action is straightforward."); *Danielle v. Adriazola*, 284 F. Supp. 2d 1368, 1377 (S.D. Fla. 2003) ("[T]he Plaintiff's claim here is not merely that her care was not optimal, but rather that the Defendants failed to uphold their duty of providing that degree of reasonable safety guaranteed by the Fourteenth Amendment when they allowed abuse and Plaintiff's psychological decline to continue even after they had actual knowledge of it."); *Marisol A. v. Giuliani*, 929 F. Supp. 662, 675 (S.D.N.Y. 1996) ("[C]ustodial plaintiffs have a substantive due process right to be free from unreasonable and unnecessary intrusions into their emotional well-being."); *LaShawn A. v. Dixon*, 762 F. Supp. 959, 993 (D.D.C. 1991) ("[substantive due process] right extends to safety from psychological and emotional harm"); *Doe v. New York City Dep't of Soc. Servs.,* 670 F.

---

662, 675-77 (S.D.N.Y. 1996); *Eric L. v. Bird*, 848 F. Supp. 303, 307 (D.N.H. 1994); *Wendy H. v. City of Philadelphia*, 849 F. Supp. 367, 371 (E.D. Pa. 1994).

Supp. 1145, 1175-77 (S.D.N.Y. 1987) (foster child's right to be free from psychological deterioration).

Indeed, it would be a perverse outcome if foster children, who are in their critical years of mental development, were not provided at least the minimum constitutional protections to their mental health as provided to inmates.  *See B.H.*, 715 F. Supp. at 1395 ("A child's physical and emotional well-being are equally important . . . . their exposure to traumatic experiences can have an indelible effect upon their emotional and psychological development and cause more lasting damage than many strictly physical injuries"); *Doe,* 670 F. Supp. at 1175 ("Children are by their nature in a developmental phase of their lives.  If they do not move forward, they move backward.  Positive efforts are necessary to prevent stagnation, which, for children, is synonymous with deterioration.").

Defendants' reliance on *Griffith v. Johnston*, 899 F.2d 1427 (5th Cir. 1990), for the opposite proposition (*see* Defs' Mem. at 12-13) is misplaced as the child plaintiffs in that case were asserting liberty interests to post-adoptive services *after* their discharge from state custody.  Not only did the former foster children in *Griffith* no longer have a special relationship with the state once adopted, but their articulated right to have their "personal psychological development" *maximized* is not what is being sought by the Plaintiffs here.  Unlike *Griffith*, this case is brought by custodial plaintiffs who seek to be protected from harm to their psychological, as well as physical, health.[5]    Equally

---

[5] To the extent that *Del A v. Roemer*, 777 F. Supp. 1297, 1319 (E.D.La. 1991), fails to recognize foster childrens' right to be protected from psychological injury, it is of no precedential value because it relies upon the Fifth Circuit's *Griffith* opinion, which, as noted, did not involve children in state custody, and because it was decided before *Gates v. Cook*, in which the Fifth Circuit made clear that the constitutional obligations that arise from a state's special relationship include the duty to safeguard a custodial plaintiff's mental health.

inapposite is *Shinn v. College Station Independent School District* (*see* Defs' Mem. at 13), as it also involved children without a claim to a special relationship with the government defendant. *Shinn*, 96 F.3d 783 (5th Cir. 1996) (per curiam) (non-custodial students sought to have recognized such frivolous liberty interests as playing instruments other than the B-flat clarinet in the school band, and being provided with information about a marching band competition).[6]

Defendants' further suggestion that six Circuits have limited their recognition of the constitutional right to protection from harm to physical or sexual abuse is simply wrong. *See* Defs' Mem. at 13. None of the decisions cited by Defendants affirmatively state any such limit. Moreover, all of those Circuits have specifically recognized the types of constitutional harms Plaintiffs assert here. *See, e.g.*, *Langley v. Coughlin*, 888 F.2d 252, 254 (2d Cir. 1989) ("[F]rom the legal standpoint psychiatric or mental health care is an integral part of medical care. It thus falls within the requirement of *Estelle v. Gamble* [ ] that it must be provided to prisoners."); *A.M. v. Luzerne County Juvenile Det. Ctr.*, 372 F.3d 572, 575-77, 583-85 & n.3 (3d Cir. 2004) (holding that substantive due process rights of juvenile detainees include the right to be protected from emotional and psychological harm); *Inmates of the Allegheny County Jail v. Pierce*, 612 F.2d 754, 763 (3d Cir. 1979) (recognizing right to adequate psychological or psychiatric care in jails and prisons); *Clark-Murphy v. Foreback*, 439 F.3d 280, 286-87 (6th Cir. 2006) (deprivation of psychological services to prisoners violates constitution); *Vaughan v. Lacey*, 49 F.3d 1344, 1346 (8th Cir. 1995) (prison staff members violate constitution if they are deliberately indifferent to an inmate's serious mental health care needs); *Riddle v.*

---

[6] Moreover, *Grandstaff v. City of Borger*, Tex., 767 F.2d 161 (5th Cir. 1985), "cannot properly be made to stand for a broad rule that there is no constitutional right to be free from emotional distress." *Shinn v. College Station Indep. Sch. Dist.*, 96 F.3d 783, 787 (5th Cir. 1996).

*Mondragon*, 83 F.3d 1197, 1202 (10th Cir. 1996) (states have a constitutional duty to provide necessary psychological or psychiatric care to inmates); *Greason v. Kemp*, 891 F.2d 829, 833-34 & n.9 (11th Cir. 1990) (providing an inmate with inadequate psychiatric care violates constitution).

Defendants next argue that their failure to reasonably provide permanency services to children resulting in unnecessary delays in exiting custody to a permanent home is not constitutionally actionable. *See* Defs' Mem. at 14-15. However, that failure is alleged to cause serious and avoidable psychological harm to children (*see* Defs' Mot. at Ex. I at ¶¶ 48, 175), and Plaintiffs' unrebutted medical expert establishes that such failure does in fact cause medically cognizable psychological harm.[7] *See* Pls' Mot. at Ex. 5 at 28; Defs' Mot. at Ex. BBB. The substantial harm caused by remaining confined in government custody unnecessarily has readily been found to warrant substantive due process protection. *See E.C. v. Sherman*, No. 05-726, 2006 U.S. Dist. LEXIS 27506, at *103 (W.D. Mo. May 9, 2006) ("Unnecessarily prolonged confinement in government foster care invokes the substantive due process liberty interests of foster children") (attached as Ex. 1); *Marisol*, 929 F. Supp. at 676 ("the right to be free from harm encompasses the right alleged by plaintiffs to appropriate conditions and duration of foster care"). Plaintiffs have at the very least proffered sufficient facts as to the nature of the harm to make this unsuitable to be disposed of in Defendants' favor at summary judgment.

Defendants further erroneously argue that Plaintiffs assert a constitutionally protected right to the "best" and most "stable" placements. *See* Defs' Mem. at 15-16. To

---

[7] *See also* Ps' Mot. at Ex. 4 [Hess Expert Rpt. at 16, 129-132]; Defs' Mot. at Ex. DD; Pls' Mot. at Ex. 3 [Lewis Expert Rpt. at 123]; Defs' Mot. at Ex. Q.

the contrary, what Plaintiffs seek is no more than to be free from the harm that results from inappropriate placements that do not meet their needs for care and treatment, and from the psychological injury caused by multiple, unnecessary, and traumatic moves.[8] Such failures are alleged to cause serious harm to children (*see* Defs' Mot. at Ex. I [Amended Complaint at ¶¶ 148, 151-152, 156]), and Plaintiffs' unrebutted medical expert establishes that such failures do in fact cause medically cognizable psychological harm. *See* Pls' Mot. at Ex. 5 [Hiatt Expert Rpt. at 25]; Defs' Mot. at Ex. BBB.[9]  Again, the substantial harm alleged and documented by Plaintiffs as a result of Defendants' lack of reasonable placement practices falls within the ambit of substantive due process protections.  *See LaShawn A. v. Dixon*, 762 F. Supp. 959, 993 (D.D.C. 1991) ("To the extent that certain services, such as appropriate placements . . . , are essential to preventing harm to the children in the District's custody, this Court holds that the children have a constitutional liberty interest in those services."); *K.H. v. Morgan*, 914 F.2d 846, 850 (7th Cir. 1990) ("If . . . the defendants must have known they were placing [plaintiff] in a sequence of foster homes that would be destructive of her mental health, the ingredients of a valid constitutional claim are present."); *Doe,* 670 F. Supp. at 1175 ("The overnight system's inherent instability as well as its inevitable lack of any coordinated supervision of basic need or support has resulted in physical, emotional, and psychological harm to the children exposed to it.").

---

[8] Foster children have a right to reasonably safe placements in which they will not be harmed.  *See, e.g., Waubanascum v. Shawano Cty.*, 416 F.3d 658, 665 (7th Cir. 2005); *Omar v. Lindsey,* 334 F.3d 1246, 1248 (11th Cir. 2003); *Norfleet v. Arkansas Dep't of Human Servs.*, 989 F.2d 289, 293 (8th Cir. 1993); *Yvonne L. v. New Mexico Dep't of Human Servs.*, 959 F.2d 883, 892-93 (10th Cir. 1992); *K.H. v. Morgan*, 914 F.2d 846, 849, 851 (7th Cir. 1990); *Taylor v. Ledbetter*, 818 F.2d 791, 795 (11th Cir. 1987) (en banc); *Marisol A. v. Giuliani*, 929 F. Supp. 662, 675-77 (S.D.N.Y. 1996); *Eric L. v. Bird*, 848 F. Supp. 303, 307 (D.N.H. 1994).
[9] *See also* Pls' Motion at Ex. 4 [Hess Expert Rpt. at 16, 30, 64-65]; Defs' Motion at Ex. DD; Ps' Motion at Ex. 3 [Lewis Expert Rpt. at 86-87, 116-117]; Defs' Motion at Ex. Q.

Defendants' reliance on *Drummond v. Fulton County Department of Family & Children's Services*, 563 F.2d 1200, 1209 (5th Cir. 1977), is misplaced as the plaintiff there asserted a procedural due process right to a hearing *prior* to any move from one foster placement to another, whereas Plaintiffs in this case seek protection from the avoidable harms caused by Defendants' unreasonable and unprofessional placement practices.  Not only is it well established that the constitutional inquiry for determining what liberty interests are protected by substantive due process is different than that for procedural due process,[10] but the Fifth Circuit in *Drummond* made clear that its holding was limited to the narrow facts presented.  *Drummond,* 563 F.2d at 1208 ("This decision by its facts is necessarily applicable only to an infant of tender years placed in a foster home for the length of time and under the circumstances here involved.").  Nor does *E.F. v. Scafidi*, No. 3:91CV591, Slip op. at 19 (S.D. Miss. Mar. 13, 1996) (attached as Ex. J to Defs' Mot.), control the instant case, because in that case the plaintiffs had failed to support their allegations with any material facts regarding resulting harm.  By contrast, the Plaintiff class here has proffered multiple expert reports that detail the harms resulting from Defendants' placement practices, the conclusions of which Defendants have confirmed in large measure.  *See, e.g.,* Pls' Mot. at ¶¶ 1-3, 37, 45, 51, 53-54, 61-62, 69-71, 80, 108, 114-17, 119-120, 122-24, 127-28, 142, 149-152, 156-58, 162, 165-67, 170-71, 173-184.  Plaintiffs have at the very least proffered sufficient facts as to the nature of the harm to make this unsuitable to be disposed of in Defendants' favor at summary judgment.

---

[10] *See, e.g.*, *Frazier v. Harrison ISD,* 980 F.2d 1514, 1528 (5th Cir. 1993) ("Due process has two major meanings: first, substantive due process may require courts to void certain types of government action that infringe on individual rights and individual freedom of action; second, procedural due process may require government to assure that individuals are afforded certain procedures before they are deprived of life, liberty, or property.") (citations omitted).

Finally, Defendants argue that their alleged failure to monitor and supervise Plaintiff children in custody is not constitutionally actionable. *See* Defs' Mem. at 16-17. However, such failure is alleged to cause serious harm to children (*see* Defs' Mot. at Ex. I [Amended Complaint at ¶¶ 157, 160]), and Plaintiffs' unrebutted social work experts establish that such failures do, in fact, cause harm. *See* Pls' Mot. at Ex. 4 [Hess Expert Rpt. at 39-42]; Defs' Mot. at Ex. DD; Pls' Mot. at Ex. 3 [Lewis Expert Rpt. at 4, 5, 8, 14, 65-66, 77, 90-91, 97, 118-119]; Defs' Mot. at Ex. Q. Defendants' duty to provide the oversight necessary to protect foster children from such harm is clearly subsumed within substantive due process protections. *See, e.g.*, *Wendy H. v. City of Philadelphia*, 849 F. Supp. 367, 374-75 & n.2 (E.D. Pa. 1994) ("It is not too much to ask that the state honor its obligation to monitor the current *status and needs of children dependent upon its care mandated within the parameters of its own regulations. . . .* If we fail to insist that the state appropriately supervise and monitor placements, then children like [plaintiff] may lose an opportunity to extricate themselves from victimization, and are left to suffer harms that may never be undone.") (quotations and citations omitted); *see also Norfleet v. Arkansas Dep't of Human Servs.*, 989 F.2d 289, 293 (8th Cir. 1993) ("[I]n light of . . . the undeniable nature of the state's relationship with and corresponding obligations to [plaintiff foster child] . . . the state had an obligation to provide adequate medical care, protection and supervision."). Plaintiffs have at the very least proffered sufficient facts as to the nature of the harm to make this unsuitable to be disposed of in Defendants' favor at summary judgment.

### III.    Defendants Are Not Entitled To Summary Judgment Regardless Of The Culpability Standard Applied To This Equitable Foster Care Case

Defendants incorrectly contend that the "deliberate indifference" standard applicable to prisoners' Eighth Amendment claims[11] and to claims made on behalf of non-custodial plaintiffs[12] applies to Plaintiff foster children's substantive due process claims. However, Plaintiff foster children have a "special relationship" with Defendants because, as State wards through no choice or fault of their own, they are entirely dependent upon the State for their well-being. As such, they are deserving of greater constitutional protection than is afforded to either members of the general public or imprisoned criminals. *See Olivia Y. v. Barbour*, 351 F. Supp. 2d at 556 n. 8 ("[T]he rights of a person in the civil custody of the state are greater than the rights of a person in the state's criminal custody.") (quoting *LaShawn A.,* 762 F. Supp. at 996).

The Supreme Court has expressly recognized that the "professional judgment" standard, as opposed to the "deliberate indifference" standard, applies in non-penal custodial ("special relationship") cases asserting substantive due process violations under the Fourteenth Amendment. *Youngberg v. Romeo*, 457 U.S. 307, 321-23 (1982) (civilly committed wards of state who are "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish" can establish liability "when the decision by the professional is such a substantial

---

[11] *See* Defs' Mem. at 17-20. *See, e.g., Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (deliberate indifference to safety of prisoners constitutes cruel and unusual punishment); *Rhyne v. Henderson County*, 973 F.2d 386 (5th Cir. 1992) (due process pretrial detainee case); *Olabisiomotosho v. City of Houston*, 185 F.3d 521 (5th Cir. 1999) (pretrial detainee); *Lenard v. Argenta*, 699 F.2d 874 (7th Cir. 1983), *cert. denied*, 464 U.S. 815 (1983) (due process police custody case).

[12] *See* Defs' Mem. at 17-20. *See, e.g., County of Sacramento*, 523 U.S. 833 (1998) (non-custodial bystander victim of police chase); *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443 (5th Cir. 1994) (schoolchild's substantive due process right to be free from sexual abuse by teacher); *McClendon v. City of Columbia*, 305 F.3d 314 (5th Cir. 2002) (non-custodial victim of shooting by police informant); *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245 (5th Cir. 2005) (non-custodial hospital patients); *Walton v. Alexander*, 44 F.3d 1297 (5th Cir. 1995) (non-custodial student).

departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.").[13]

The United States Courts of Appeals for the Third, Seventh, and Tenth Circuits have adopted the *Youngberg* "professional judgment" standard in the foster care setting. *Winston v. Children & Youth Servs. of Delaware County*, 948 F.2d 1380 (3d Cir. 1991);[14] *K.H. v. Morgan*, 914 F.2d 846 (7th Cir. 1990); *Yvonne L. v. N.M. Dep't. of Human Servs.*, 959 F.2d 883, 894 (10th Cir. 1992).[15]  Defendants, meanwhile, do not cite to a single precedent anywhere in the country that applies the "deliberate indifference" standard in the non-penal custodial context in a case seeking prospective injunctive relief such as this one.

Defendants' reliance on *Hernandez v. Texas Dep't of Protective and Regulatory Services*, 380 F.3d 872 (5th Cir. 2004), for the appropriate liability standard is misplaced. In that suit for damages brought on behalf of a deceased foster child, the Fifth Circuit applied a "deliberate indifference" standard in determining whether state employees sued in their individual capacities were entitled to qualified immunity.  Plaintiffs in the case at bar, however, present an institutional reform action seeking injunctive relief from State Defendants in their official capacities.  Such equitable relief is prospective in nature and

---

[13] The "professional judgment" standard was recently articulated as follows in the context of a §1983 action brought by foster children: "The State, as the custodian and caretaker of these children, is therefore liable for the harm allegedly caused by a violation of a foster child's substantive due process right to be free from unreasonable risk of harm and to reasonable safety only when his or her care, treatment, and services 'substantially depart from accepted professional judgment, standards or practice.'" *Braam v. State*, 81 P.3d 851, 859-60 (Wash. 2003).

[14] *Nicini v. Morra*, 212 F.3d 798, 811 n. 9 (3d Cir. 2000), cited by Defendants, applied the "deliberate indifference" standard only after the parties declined the Court's express invitation to consider the "professional judgment" standard.

[15] *See also LaShawn A. v. Dixon*, 762 F. Supp. 959, 996 (D. D.C. 1991) (applying the "professional judgment" standard at trial in the foster care context); *Wendy H. v. City of Philadelphia*, 849 F.Supp. 367, 372 (E.D.Pa. 1994) (adopting the "professional judgment" standard in the foster care context); *T.M. v. Carson*, 93 F.Supp.2d 1179, 1187 (D. Wyo. 2000) (applying the "professional judgment" standard on summary judgment in the foster care context).

serves to force state compliance with constitutional requirements without exacting a financial penalty.  In equitable cases, the culpability standard can be calibrated to achieve a favored policy goal, such as constitutional compliance by the state, without the potential social cost of exposing state actors to financial liability, which might deter individuals from pursuing government employment or chill their professional conduct. Qualified immunity for state actors sued in their individual capacities for money damages is premised on this very rationale.[16]  *See Hernandez*, 380 F.3d at 879 ("The doctrine of qualified immunity seeks to strike a balance between competing social objectives, providing breathing space for the vigorous exercise of official authority, while at the same time allowing a possibility of redress for victims of officials' abuses."); *see also L.J. v. Massinga*, 838 F.2d 118, 121 (4th Cir. 1988) ("The element of deliberate indifference may be a substantial factor in the aspect of this case which seeks monetary recovery, but it is of little moment with regard to injunctive relief *in futuro* if plaintiffs can prove that defendants are not acting lawfully."), *abrogated on other grounds*, *Suter v. Artist M.*, 503 U.S. 347 (1992).  The additional "deliberate indifference" foster care cases cited by Defendants are similarly inapposite, as they are all individual damages actions. *See Taylor v. Ledbetter,* 818 F.2d 791, 793 (11th Cir. 1987) (damages cause of action pursued only upon the "deliberate indifference" standard enunciated in *Estelle v. Gamble*, 429 U.S. 97 (1976) and *Doe v. New York City Dep't. of Soc. Servs*., 649 F.2d 134 (2d Cir.

---

[16] A recent Washington Supreme Court decision, *Braam v. State*, 81 P.3d 851 (Wash. 2003), underscores this very point.  In *Braam*, the Court applied the "professional judgment" standard to a foster care class action seeking injunctive relief, noting:

> First, the federal cases that have applied the "deliberate indifference" standard to the substantive due process rights of foster children have been in the context of the limited question of whether individual state actors were entitled to qualified immunity in a 42 U.S.C. §1983 suit [for damages]. Whether and when qualified immunity is available to state actors triggers a consideration of issues not before us.

*Id.*.at 858-59.

1981) (*Doe* being decided one year before *Youngberg*); *White v. Chambliss*, 112 F.3d 731 (4th Cir. 1997) (same);[17] *Norfleet v. Arkansas Dept. of Human Servs.*, 989 F.2d 289, 291 (8th Cir. 1993) (same); *Meador v. Cabinet for Human Res.*, 902 F.3d 474, 476 (6th Cir. 1990) (same).

As this is a suit sounding in equity on behalf of foster children who "have done society no wrong and [who] deserve no punishment," *LaShawn A.*, 762 F. Supp. at 996, in which the only relief sought is to deter future unconstitutional conduct, the Supreme Court's "professional judgment" standard is appropriate. Even assuming, *arguendo*, that the Court elects to examine the evidentiary record under the "deliberate indifference" standard, Defendants are certainly not entitled to summary judgment. The following three-prong test has been articulated by the Fifth Circuit for "deliberate indifference" personal liability:

> (1)    the defendant learned of facts or a pattern of [facts] pointing plainly toward the conclusion that [the plaintiff's constitutional rights were being violated]; and
>
> (2)    the defendant demonstrated deliberate indifference toward the constitutional rights of the [plaintiff] by failing to take action that was obviously necessary to prevent or stop the [constitutional deprivation]; and
>
> (3)    such failure caused a constitutional injury to the [plaintiff].

*Doe v. Taylor Indep. Sch. Dist.,* 15 F.3d 443, 454 (5th Cir. 1994) (affirming denial of state defendant's summary judgment motion, holding that plaintiff "adduced clear summary judgment evidence [*i.e.* apathy and the failure to act] of deliberate

---

[17] *White v. Chambliss* is not instructive both because it is a qualified immunity decision in a damages action and because the Fourth Circuit erroneously held that state foster care officials did not have a clearly established duty to protect children in foster care. *See White*, 112 F.3d at 737-738.

indifference"). In applying the "deliberate indifference" standard, a court "'may infer the existence of [defendant's] subjective state of mind from the fact that *the risk of harm is obvious*.'" *Hernandez*, 380 F.3d at 881 (emphasis in original) (*quoting Hope v. Pelzer*, 536 U.S. 730, 738 (2002)).

As discussed below, there is ample evidence adduced by Plaintiffs that Defendants have knowingly and persistently failed to provide them with safety, care, and treatment in substantial departure from applicable professional standards, and have failed to take action that was obviously necessary to prevent Plaintiffs from suffering further harm. Thus, under either standard, Defendants' Motion fails.

**IV.    There Is Overwhelming And Uncontested Evidence Establishing That Defendants Are Violating Plaintiffs' Substantive Due Process Right To Be Protected From Harm Precluding Summary Judgment For Defendants**

Plaintiffs have adduced an overwhelming amount of evidence establishing that they are being harmed by Defendants' ongoing and knowing failure to act in accordance with reasonable professional judgment to ensure children's physical safety, to ensure children are free from avoidable psychological injury, and to ensure children receive necessary medical, dental, and psychological care and treatment. Indeed, Plaintiffs have cross-moved for summary judgment based on the uncontested evidence establishing Defendants' substantive due process violations. *See generally* Pls' Motion; Pls' Mem.

Remarkably, Defendants seek summary judgment without marshaling a single fact addressing Plaintiffs' class-wide evidence. Defendants do not address the overwhelming evidence established through discovery that foster children are subjected to abuse and neglect in care and psychologically harmful placement practices, and that children do not receive health care and treatment to address specific, documented needs

in violation of professional standards.  Nor do Defendants address evidence that Defendants have been aware of the grave risk to the children in their custody and their failure to act reasonably in response.  The factual evidence that Defendants do submit, namely that the Named Plaintiffs were provided with  "basic necessities," narrowly defined by Defendants as food, shelter, at least one outfit of clothing, and access to at least some medical care, is immaterial.  *See* Defs' Mem. at 4-5, 21-24.

### A.      Defendants Fail to Ensure Plaintiff Children's Safety

Plaintiffs have established that Defendants do not provide conditions of reasonable safety for the children in their custody.  *See* Pls' Motion at ¶¶ 1-70; Pls' Mem. at 7-9.  As detailed in Plaintiffs' Motion for Summary Judgment and Memorandum in Support, Defendants' own case review of 342 foster children's case records found that children were being abused in foster care at a rate of *more than five times* the standard set by the Federal Government for state child welfare systems.  *See* Pls' Motion at ¶ 30 [Ex. 7, FCR Quarterly Regional Comparison Reports at DHS 047115, 063563, 070991]; Pls' Motion at Ex. 14 [CFSR at DHS 058965].  Plaintiffs' case record review conducted by child welfare expert Dr. Peg Hess likewise revealed that one in 18 children in foster care had experienced substantiated abuse or neglect while in custody, and that a majority (70%) of those children had been abused or neglected since January 1, 2004.  *See* Pls' Motion at ¶ 31 [Ex. 4, Hess Expert Rpt. at Addendum p. 17]; Defs' Motion at Ex. DD. Dr. Hess further found that one in four children had some MDHS documentation that they had been abused or neglected in custody or that another foster child had been abused or neglected while living with them, and that even when abuse and neglect was found to have occurred, MDHS left children in the abusive placement the majority of the time.

*See* Pls' Motion at ¶¶ 33, 41 [Ex. 4, Hess Expert Rpt. at Addendum p. 16, 17]; Defs'
Motion at Ex. DD.

Moreover, Defendants acknowledge that the caseworkers directly charged with
ensuring the safety of foster children carry caseloads that Defendants deem as placing
children "BEYOND DANGER!"   *See* Pls' Mot. at ¶¶ 64-66, 113, 118 [Ex. 12,
"BEYOND DANGER!" chart; Ex. 13, Direct Service Clients Chart at DHS 091851-52];
Pls' Mem. at 17-23.  Despite the policy requiring that MDHS workers make face-to-face
visits with the foster children on their caseloads at least monthly (s*ee* Pls' Mot. at ¶ 4 [Ex.
20, MDHS Policy at DHS 00392]), MDHS Executive Director Taylor testified in April
2006 that he was aware that such visits were not always taking place.  *See* Pls' Mot. at ¶
54; Taylor Dep. Tr. at 160:9-22 (attached as Ex. 2).  DFCS Director Felder acknowledged
the lack of caseworker visits has adverse ramifications on the safety and well-being of
Plaintiff class members.  *See* Pls' Mot. at ¶ 53; Felder Dep. Tr. at 39:2-14 (attached as
Ex. 3).

Not only are DFCS caseworkers unable to adequately supervise children once
they have been placed in a foster care setting, but furthermore Defendants have conceded
that they cannot even ensure that the foster placements that they select for children are
not already suspected to be dangerous.  According to DFCS Director Felder, front-line
staff is precluded from determining whether a foster home into which they are
considering placing a child is the subject of an abuse or neglect investigation.  Felder
acknowledged the potential risk inherent in not being able to discern the safety of foster
care placements and testified that "we need to do a better job" of protecting children in
custody from preventable further abuse.  *See* Pls' Mot. at ¶ 45 [Ex. 28, Felder Dep. Tr. at

205:4-206:5].  Defendants also acknowledge that "its providers have sometimes licensed foster homes or placed foster children in foster homes that have had their licenses revoked by MDHS/DFCS or have otherwise been determined not to be suitable as placements for foster children."  *See* Defs' Mem. at 35.

Ignoring this detailed and concrete evidence of harm to Plaintiff class members, Defendants rely on various affidavits of DFCS managers in which they affirm in vague and conclusory terms that, in their opinion, Defendants are doing the very best they can under the circumstances to keep children safe.[18]  The reliance on these self-serving affidavits of various MDHS employees, without providing any factual support for their assertions, is plainly "not competent summary judgment evidence."  *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994) ("Needless to say, unsubstantiated assertions are not competent summary judgment evidence"); *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1449 (5th Cir. 1993) (summary judgment may be appropriate where the nonmoving party rests on "conclusory allegations, improbable inferences, and unsupported speculation") (quoting *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1266 (5th Cir. 1991)).  Plaintiffs, by separate motion, have moved to strike such conclusory statements as inadmissible and immaterial for summary judgment purposes.

---

[18] *See* Defs' Mem. at 24-25; Defs' Mot. at Ex. M [Affidavit of Martha McDaniel at ¶ 4 ("MDHS has done all it reasonably can to ensure the safety of foster children")]; Defs' Mot. at Ex. N [Affidavit of Maggie Mixon at ¶ 3 ("Given the number workers [*sic*] and available resources, MDHS has done what it reasonably can to keep children safe.")]; Defs' Mot. at Ex. W [Affidavit of Terry Phillips at ¶ 5 "MDHS has done all it reasonably can to see that foster children are protected from harm")]; Defs' Mot. at Ex. X [Affidavit of Tracey Malone at ¶ 3 ("Our direct service workers have done all they reasonably can to keep foster children safe and away from harm")]; Defs' Mot. at Ex. Y [Affidavit of John Webb O'Bryant at ¶ 3 ("MDHS has done what it reasonably can to see that foster children are protected from harm")]; Defs' Mot. at Ex. Z [Affidavit of Sylvia Sessions at ¶ 4 ("MDHS has done all it reasonably can to ensure the safety of foster children in its care")]; Defs' Mot. at Ex. AA [Affidavit of Mechille Henry at ¶ 3 ("Our workers have done all they reasonably can to keep our foster children free from harm")]; Defs' Mot. at Ex. BB [Affidavit of Zadie Rogers at ¶ 4 ("MDHS has done all it reasonably can to protect the foster children in its care from harm and is not indifferent to the children's needs")].

Defendants have similarly failed to establish that the Named Plaintiffs have not been subjected to unsafe and harmful placements. Plaintiffs' evidence establishes the following:

- Olivia Y. was placed by DFCS in a home with a convicted rapist. After Olivia was removed from the home, she was not provided a full sexual abuse exam, despite a doctor's finding that her vaginal area was red and swollen. *See* Pls' Mot. at Ex. 3 [Lewis Expert Rpt. at 62-63]; Defs' Mot. at Ex. Q.

- John A. remained in a placement long after he complained that the staff was leaving him bruised, and that complaint does not appear to have been investigated. Instead, John was reported to the Youth Court as "happy." *See* Pls' Mot. at Ex. 3 [Lewis Expert Rpt. at 89]; Defs' Mot. at Ex. Q.

- MDHS persisted in leaving asthmatic Cody B. for unsupervised visits despite numerous indications that he was subjected to life-threatening cigarette smoke. As a result, he suffered respiratory distress that, on at least two occasions, necessitated emergency room treatment. *See* Pls' Mot. at Ex. 3 [Lewis Expert Rpt. at 39-40, 48]; Defs' Mot. at Ex. Q.

- Cody B. was left in a shelter for close to three weeks despite the report by his doctor that the shelter was affirmatively harmful to him. *See* Pls' Mot. at Ex. 3 [Lewis Expert Rpt. at 37]; Defs' Mot. at Ex. Q.

- Jamison J. was sent to live in Kansas with a father with whom he had no previous relationship and whose parental rights had been terminated. The father had a criminal history and Jamison's placement with him by MDHS was deemed by Kansas child welfare officials to be illegal. *See* Pls' Mot. at Ex. 3 [Lewis Expert Rpt. at 8, 116]; Defs' Mot. at Ex. Q.

Defendants only state that "in each circumstance of *any* alleged abuse or neglect from a placement provider, MDHS/DFCS made efforts to investigate the allegations and if necessary, moved the child to another placement in order to protect the child from harm." *See* Defs' Mem. at 24-25. The only evidence Defendants cite as support for this claim is various affidavits that do not mention MDHS investigations into harmful placements and instead blandly assert without support that MDHS has done what it

"reasonably could" to protect the Named Plaintiffs from harm.[19]    Plaintiffs have

established sufficient evidence of harm to make this case unsuitable to be disposed of in

Defendants' favor at summary judgment.

> **B.    Defendants Subject Plaintiffs To Psychological Harm Caused By Multiple, Avoidable Moves And Inappropriate Placements**

Plaintiffs have established that Defendants harm foster children by routinely

shuffling them through inappropriate homes and institutions.  *See* Pls' Mot. at ¶¶ 71-84;

Pls' Mem. at 9-13.  It is undisputed that children are harmed by repeated, unnecessary,

and unexplained moves from placement to placement.  *See* Pls' Mot. at Ex. 3 [Lewis

Expert Rpt. at 9, 11]; Defs' Mot. at Ex. Q; Pls' Mot. at Ex. 42 [Hiatt Dep. at 95:21-

96:25]; Pls' Mot. at Ex. 5 [Hiatt Expert Rpt. at 28-29]; Defs' Mot. at Ex. BBB; Pls' Mem.

at 9-11.  As Defendants' policy manual explains, "[a] foster child who moves many

times, or who constantly fears that he/she may have to move, can suffer devastating

effects on his/her emotional health."  *See* Pls' Mot. at Ex. 20 [MDHS Policy at DHS

00405].  It is equally undisputed that institutionalizing foster children absent a therapeutic

need subjects them to a risk of harm.  *See* Pls' Mot. at ¶ 81 [Ex. 35, Mangold Dep. Tr.

8/25/04 at 84:19-85:4 (acknowledgment by former DFCS Director Billy Mangold that

placing children in institutions without therapeutic justification can be harmful)]; Pls'

Mot. at Ex. 27 [Steib Dep. Tr. at 106:3-107:3 (acknowledging the child welfare research

that has concluded that unnecessary institutionalization of children is harmful)]; Pls' Mot.

at Ex. 3 [Lewis Expert Rpt. at 11 (discussing harms associated with institutionalizing

---

[19] *See* Defs' Mot. at Ex. T [Affidavit of Deborah Stewart at ¶ 8 ("MDHS has done what it reasonably can to protect John and Olivia from harm")]; Defs' Mot. at Ex. FF [Affidavit of Queen Coleman at ¶ 5 ("MDHS has done what it reasonably can to protect Jamison from harm")]; Defs' Mot. at Ex. GG [Affidavit of Brenda Coe at ¶ 5 ("MDHS as done what it reasonably can to protect [Cody] from harm")].

children, especially infants)]; Defs' Mot. at Ex. Q; Stewart Dep. at 87:7-9 (agreeing that "unnecessary institutionalization of children can be harmful") (attached as Ex. 4)].

According to Defendants' own Foster Care Review Program, of 81 children whose cases were reviewed in the first quarter of FY 2006, 43% changed placements during the review period, with a majority of those being moved two or more times. Of those children who were moved during the review period, DFCS acknowledges that for 26% none of their moves were related to helping the child achieve his or her case plan goal. *See* Pls' Mot. at Ex. 7 [FCR Quarterly Regional Comparison Reports at DHS 070992-070993]. According to Dr. Hess's expert case record review, 82.7% of foster children experienced from at least one to up to 57 placement moves. Over 10% of foster children experienced at least 10 moves. *See* Pls' Mot. at ¶ 72 [Ex. 4, Hess Expert Rpt. at 2, 26-27]; Defs' Mot. at Ex. DD. Additionally, Defendants' own expert found that an extraordinarily high number of foster children are placed in institutional settings: approximately 25% of all foster children are placed in a group environment. *See* Pls' Mot. at Ex. 1 [Steib Expert Rpt. at 6]; Defs' Mot. at Ex. NN. Dr. Hess not only confirmed that figure, but also found that close to 64% of children had been placed at least once in an emergency shelter or emergency foster home. S*ee* Pls' Mot. at ¶ 84 [Ex. 4, Hess Expert Rpt. at 2]; Defs' Mot. at Ex. DD. Defendants' own data from May 2005 reflects that 18% of the foster children in an emergency shelter were four years old or younger, despite the MDHS policy that young children and infants should be placed in foster homes. *See* Pls' Mem. at 13 [Ex. 24, Shelter Care Chart]; MDHS Policy at DHS 00370 (attached as Ex. 5).

The Named Plaintiffs have also been harmed by MDHS's failure to engage in reasonable professional placement practices. Named Plaintiff John A. was moved over 35 times in his first five years of custody. MDHS removed him from each placement after an average of less than two months. *See* Pls' Mot. at Ex. 3 [Lewis Expert Rpt. at 84, 86-87]; Defs' Mot. at Ex. Q. According to Dr. Hiatt, who conducted a psychiatric evaluation of John A., "It is my opinion within a reasonable degree of medical certainty the pattern of placements and moves of John A. by Mississippi DHS, from the time he entered custody, has been seriously damaging to his mental status, his ability to adjust and his psychiatric conditions." *See* Pls' Mot. at Ex. 5 [Hiatt Expert Rpt. at 27-28]; Defs' Mot.at Ex. BBB. Dr. Hiatt found that John suffers from Adjustment Disorder with disturbance and that "[t]he cause has been the frequent, disorganized, threatening and confusing moves through many placements that John A. has suffered since entering DHS custody." *See* Pls' Mot. at Ex. 5 [Hiatt Expert Rpt. at 24]; Defs' Mot. at Ex. BBB.[20] Similarly, Jamison J. was shuttled among at least 28 foster care settings. According to Dr. Lewis, "[t]his extraordinarily high number of placements has likely caused psychological damage to Jamison in the form of feelings of instability, insecurity, and a lack of attachment to any caregivers." *See* Pls' Mot. at Ex. 3 [Lewis Expert Rpt. at 116-117]; Defs' Mot. at Ex. Q.

Named Plaintiff Cody B. was left in a shelter as a sick toddler for close to three weeks *after* a report by his doctor that he required the stability of a foster home and that

---

[20] Dr. Lewis concluded that as a result of John's multiple moves through unstable and institutional placements, he became "so desperate for stability that when he was placed in a psychiatric facility that was at least his 25th placement, he stated that he wanted to remain there 'until he is grown.' When DHS prepared to move him again he began trying to mutilate himself, explaining that he thought this might stop DHS from moving him to yet another placement." *See* Ps' Mot. at Ex. 3 [Lewis Expert Rpt. at 12, 87]; Defs' Mot. at Ex. Q.

the shelter was affirmatively harmful to his development. *See* Pls' Mot. at Ex. 3 [Lewis Expert Rpt. at 33, 37]; Defs' Mot. at Ex. Q. Defendants allowed John A. to languish in a treatment facility over a month and a half after his treatment team had determined he should be discharged, even though that treatment team notified DFCS that John's mental health was deteriorating as a result of his extended stay. *See* Pls' Mot. at Ex. 3 [Lewis Expert Rpt. at 88]; Defs' Mot. at Ex. Q. Deborah Stewart, a DFCS Forrest County Supervisor, testified that John A. is not the only foster child who has been left at a residential treatment center past the recommended discharge date because of a lack of therapeutic placements. *See* Ex. 4 [Stewart Dep. Tr. at 85:14-22]. Plaintiffs have established sufficient evidence of harm caused by Defendants' inappropriate placement practices to make this unsuitable to be disposed of in Defendants' favor at summary judgment.

### C. Defendants Deny Plaintiff Children Adequate Health Care and Treatment

Plaintiffs have established that Defendants are depriving foster children of medical, dental, and mental health care and treatment. *See* Pls' Mot. at ¶¶ 85-112; Pls' Mem. at 13-17. Although Defendants readily concede their obligation to provide adequate health care to Plaintiff class members (*see* Defs' Mem. at 11), according to Defendants' own Foster Care Review Program, for the first quarter of FY 2006 DFCS did not even assess the physical health needs of 9% of foster children, and, for 10% of the foster children for whom "physical health needs were identified," DFCS entirely failed to provide services to meet those needs. *See* Pls' Mot. at ¶ 96 [Ex 7, FCR Quarterly Regional Comparison Reports at DHS 071007]. Plaintiffs' uncontested expert case record review further establishes that system-wide, foster children are not being provided

with necessary health screening and follow-up care.  *See* Pls' Mot. at ¶¶ 93-95, 109-110 [Ex. 4, Hess Expert Rpt. at 3-4]; Defs' Mot. at Ex. DD.  To cite just a few findings, Dr. Hess found that more than 84% of children were not provided a physical exam at the time they entered foster care as required to assess their health needs, and more than 57% of foster children four years and older were not provided a psychological assessment within 90 days as is required by DFCS policy as necessary to assess their mental health needs.  *See* Pls' Mot. at ¶¶ 93, 109 [Ex. 4, Hess Expert Rpt. at 3]; Defs' Mot. at Ex. DD.  Further, even when a child was assessed to determine his or her health needs, Defendants regularly failed to provide recommended services.  *See* Pls' Mot. at Ex. 4 [Hess Expert Rpt. at 4]; Defs' Mot. at Ex. DD.

Defendants do not address this class-wide evidence of harm.  In fact, Defendants did not give their own expert the data necessary for her to assess whether MDHS provides children in its custody with adequate health care.  *See* Defs' Mot. at Ex. OO [Steib Dep. Tr. at 185:8-11].  Instead, Defendants' support for the proposition that children's health care needs are met in foster care is the assertion that "Defendants and the State of Mississippi have expended enormous amounts of money on all foster children" and that no foster parents have taken it upon themselves to personally report to DFCS Director Felder that they are not providing for the needs of the children placed in their foster homes.  *See* Defs' Mem. at 25.  Plainly, neither the amount *in total* that Defendants spend on foster care services, nor what foster parents have chosen to divulge to Director Felder as to the care they provide to children, is probative of the adequacy of medical services provided to the Plaintiff class.

Moreover, to the extent that Defendants address the adequacy of the health care services provided to the Named Plaintiffs, their evidence is either immaterial or serves to bolster Plaintiffs' claims.  Defendants submit running lists of the health care services that each Named Plaintiff has received over the multiple years that he or she has been in Defendants' custody, as well as the total cost of those services.[21]  *See* Defs' Mem. at 3-4, 23-24.  These health care summaries, to they extent that they demonstrate that each Named Plaintiff has had access to at least some medical care, are immaterial because it has never been alleged that Defendants deprived Named Plaintiffs of *any and all* access to medical professionals.  Rather, it is alleged that Named Plaintiffs have been denied *adequate* health care, including timely treatment and services that were necessary to address known health problems.[22]  *See* Defs' Mot. at Ex. I [Amended Complaint at ¶¶ 43-51, 53, 56, 65, 75-76, 79-82, 85, 87, 95-96, 100, 103].

Defendants' summaries, which, according to Defendants, accurately reflect the actual medical care the Named Plaintiffs have received because they are drawn from the records of medical providers rather than from MDHS records (*see* Defs' Mem. at 23-24

---

[21] In reviewing these "summaries" it is important to recognize that Cody B. (four years old) and Jamison J. (19 years old) have been in custody nearly their entire lives, and both John A. (16 years old) and Olivia Y. (five years old) have been in custody nearly half of their lives.  *See* Ps' Mot. at Ex. 3 [Lewis Expert Rpt. at 18]; Defs' Mot. at Ex. Q.  Each of these children has experienced significant physical or psychological problems.  *See* Ps' Mot. at Ex. 3 [Lewis Expert Rpt. at 13-14]; Defs' Mot. at Ex. Q.

[22] The Fifth Circuit has defined the constitutional obligation to provide adequate medical care in the prison context as requiring that prisons have sufficient medical facilities, equipment, staff, *Gates v. Collier*, 501 F.2d 1291, 1303-04 (5th Cir. 1974); that treatment be tendered immediately after report of an injury; and that physician-prescribed medication be supplied.  *Smith v. Sullivan*, 553 F.2d 373, 376, 380 (5th Cir. 1977); *see also Gates v. Collier*, 349 F. Supp. 881, 888, 894 (N.D. Miss. 1972) (prison must provide "prompt or efficient medical examination, treatment or medication").  The cases recognizing the duty to provide medical care to foster children are legion.  *See, e.g.*, *Norfleet v. Arkansas Dep't of Human Servs.*, 989 F.2d 289, 293 (8th Cir. 1993); *K.H. v. Morgan*, 914 F.2d 846, 851 (7th Cir. 1990); *Danielle v. Adriazola*, 284 F. Supp. 2d 1368, 1379 (S.D. Fla. 2003); *Brian A. v. Sundquist*, 149 F. Supp. 2d 941, 953-54 (M.D. Tenn. 2000); *Charlie H.. v. Whitman*, 83 F. Supp. 2d 476, 507 (D.N.J. 2000); *B.H. v. Johnson*, 715 F. Supp. 1387, 1396 (N.D. Ill. 1989); *Marisol A. v. Giuliani*, 929 F. Supp. 662, 675-77 (S.D.N.Y. 1996); *LaShawn A.v. Dixon*, 762 F. Supp. 959, 996 (D.D.C. 1991).

n. 14), in fact confirm that Defendants have failed to provide Plaintiffs with needed

medical care.  For example:

- Plaintiffs establish that MDHS cycled Olivia through three separate foster homes without a single caseworker noting that the 22-pound three-year old was severely malnourished, that she had a rash covering her face and torso, that she had a distinct and disagreeable odor, and that she was so developmentally delayed that she could not follow simple commands.  MDHS reported to the youth court that this extremely sick young girl appeared "to be a healthy child and [had] no known medical conditions."   The delay in recognizing her severe medical distress contributed to a delay of treatment.  *See* Pls' Mot. at Ex. 3 [Lewis Expert Rpt. at 56, 64-65]; Defs' Mot. at Ex. Q.

   According to Defendants' own summary of services, Olivia was not assessed by a medical professional for over three weeks after entering care on September 10, 2003.  *See* Defs' Mot. at Ex. A [Medical and dental services provided to Olivia Y. at 1]; Pls' Mot. at Ex. 3 [Lewis Expert Rpt. at 55 (providing date of entry into custody)]; Defs' Mot. at Ex. Q.

- Plaintiffs establish that DFCS placed Olivia in the home of a convicted sex offender, and that it failed to provide her with a sexual abuse examination following her removal from that placement despite a doctor's report that her vaginal area was red and swollen and she reacted "in terror" when the doctor attempted to examine her genitals.  *See* Pls' Mot. at Ex. 3 [Lewis Expert Rpt. at 62-63]; Defs' Mot. at Ex. Q.

   Defendants' summary of services confirms that the only doctor who examined Olivia in the four months after her removal from the home of the rapist was the very doctor who pointedly informed MDHS that "she had at no point conducted a thorough sexual abuse examination of Olivia because the clinic lacked the necessary facilities and DHS had given no indication that there was reason to suspect sexual abuse."  *See* Defs' Mot. at Ex. A [Medical and dental services provided to Olivia Y. at 1]; Pls' Mot. at Ex. 3 [Lewis Expert Rpt. at 57]; Defs' Mot. at Ex. Q.  Notably, none of the medical services listed in the summary of services provided to Olivia includes a sexual abuse examination.  *See* Defs' Mot. at Ex. A [Medical and dental services provided to Olivia Y. at 1].

- Plaintiffs establish that when John was diagnosed with severe psychiatric disorders and his various treatment teams recommended that he receive therapeutic care, DFCS nonetheless placed him in foster care settings that were not therapeutic, that is, were not among those designated by MDHS to care for children with severe behavioral, emotional, and psychological impairments.  *See* Pls' Mot. at Ex. 3 [Lewis Expert Rpt. at 76-77, 80, 81, 83, 84]; Defs' Mot. at Ex. Q.

Defendants' summary of services reflects that DFCS had not placed John A. in therapeutic environments even after such placement was recommended by John's treatment team. *See* Defs' Mot. at Ex. D [Mental health, medical, and dental services provided to John A.].

- Plaintiffs establish that Jamison was diagnosed with a series of conditions including PTSD, ADHD, developmental reading disorder, depressive disorder, oppositional defiant disorder, and adjustment disorder. MDHS failed to provide Jamison with ongoing mental health services to address those serious mental health problems. *See* Pls' Mot. at Ex. 3 [Lewis Expert Rpt. at 117-118]; Defs' Mot. at Ex. Q. Specifically, Plaintiffs establish that MDHS failed to arrange for an initial psychological screening for Jamison when he was first removed from his mother's home in 1991 or when he reported to his caseworker that he wanted to hurt himself in 1992. *See* Pls' Mot. at Ex. 3 [Lewis Expert Rpt. at 117]; Defs' Mot. at Ex. Q. Plaintiffs also establish that there were several periods during which MDHS did not provide Jamison with ongoing therapy despite his documented need for such services. *See* Pls' Mot. at Ex. 3 [Lewis Expert Rpt. at 100, 101, 117-118]; Defs' Mot. at Ex. Q.

Defendants' summary of services provided to Jamison confirms that he was not provided with any mental health service until March of 1993. *See* Defs' Motion at Ex. B [Mental health, medical, and dental services provided to Jamison J. at 1]. Defendants' summary of services also confirms the gaps in the provision of mental health services to Jamison. *See* Defs' Mot. at Ex. B [Mental health, medical, and dental services provided to Jamison J. at 1, 17].

In addition, nothing in the vague, conclusory, and unsubstantiated affidavits by the Named Plaintiffs' caseworkers and DFCS Regional Supervisors addresses this very specific evidence of harm.[23] To the contrary, Defendants' multiple admissions that caseworkers fail to document relevant medical information concerning foster children, including the medical services that they have been provided, is itself an admission that Plaintiff children are being placed at risk. *See* Defs' Mem. at 21-24, n. 14; Defs' Mot. at Ex. M [Affidavit of Martha McDaniel at ¶ 4]; Defs' Mot. at Ex. N [Affidavit of Maggie

---

[23] *See* Defs' Mot. at Ex. T [Affidavit of Deborah Stewart at ¶ 8 ("John and Olivia both been [*sic*] provided with sufficient…medical care, and MDHS has done what it reasonably can to protect John and Olivia from harm")]; Defs' Mot. at Ex. FF [Affidavit of Queen Coleman at ¶ 5 ("All of Jamison's basic needs have been met including…health care. MDHS has done what it reasonably can to protect Jamison from harm")]; Defs' Mot. at Ex. GG [Affidavit of Brenda Coe at ¶ 5 ("Cody has been provided with adequate…medical care, and MDHS as done what it reasonably can to protect him from harm")].

Mixon at ¶ 3]; Defs' Mot. at Ex. W [Affidavit of Terry Phillips at ¶¶ 3-4]; Defs' Mot. at

Ex. Z [Affidavit of Sylvia Sessions at ¶ 3].   The unrebutted expert reports of Drs. Lewis,

Hiatt, and Hess demonstrate that Defendants' failure to record and maintain medical

information in children's case records and the resulting inability to convey that

information to caretakers and health care providers places the health and safety of

children at substantial risk of harm.  *See* Pls' Mot. at Ex. 3 [Lewis Expert Rpt. at 14];

Defs' Mot. at Ex. Q; Pls' Mot. at Ex. 5 [Hiatt Expert Rpt. at 14, 28]; Defs' Mot. at Ex.

BBB; Pls' Mot. at Ex. 4 [Hess Expert Rpt. at 19-20 (the failure to maintain a child's

accurate and complete medical and psychological record places a child's well-being and

safety "in constant jeopardy")]; Defs' Mot. at Ex. DD.

As detailed by Dr. Hiatt, "John A.'s treating physicians repeatedly documented

DHS's failure to provide them with John A.'s medical and psychiatric records and

information," which were critical for formulating a treatment plan for John.  *See* Pls'

Mot. at Ex. 5 [Hiatt Expert Rpt. at 14]; Defs' Mot. at Ex. BBB; *see also* Pls' Mot. at Ex.

3 [Lewis Expert Rpt. at 14]; Defs' Mot. at Ex. Q.  In his report, Dr. Hiatt concluded: "It is

my opinion within a reasonable degree of medical certainty that the failure of the DHS

managers to keep [John] under the care of staff members and doctors who were familiar

with him and to quickly provide each new treating [physician] with his medical records,

created severe, unnecessary difficulties in management of his psychiatric and behavioral

problems."  *See* Pls' Mot. at Ex. 5 [Hiatt Expert Rpt. at 28]; Defs' Mot. at Ex. BBB.

Plaintiffs have further established that the acknowledged failure by Defendants to

maintain case records that include accurate medical history endangered Cody B.'s life.

Cody's severe asthmatic condition was not consistently reflected in his case record, and

he was placed in a foster home with a foster mother who was not made aware of his condition.  *See* Pls' Mot. at Ex. 3 [Lewis Expert Rpt. at 39]; Defs' Mot. at Ex. Q.  As a result, the foster mother was entirely unprepared when Cody experienced a severe asthma attack that necessitated a trip to the emergency room.  *See* Pls' Mot. at Ex. 3 [Lewis Expert Rpt. at 39]; Defs' Mot. at Ex. Q.

Additionally, Plaintiffs have demonstrated that MDHS failed to accurately record and adequately supervise the strong psychotropic medications that Jamison J. and John A. were taking "even though such drugs are widely understood to have potentially dangerous side effects, which can include suicidal tendencies, if improperly administered."  *See* Pls' Mot. at Ex. 3 [Lewis Expert Rpt. at 14]; Defs' Mot. at Ex. Q. Dr. Hiatt establishes that to adequately address John's safety, "[i]t is essential to understand that [John A.'s psychotropic] medications had to be fully monitored and provided to John A. on a regular basis...."  *See* Pls' Mot. at Ex. 5 [Hiatt Expert Rpt. at 15]; Defs' Mot. at Ex. BBB.  However, John's MDHS case record listed one of his medications as "unknown" for nearly four consecutive years.  *See* Pls' Mot. at Ex. 3 [Lewis Expert Rpt. at 91]; Defs' Mot. at Ex. Q.  The similar failure to monitor Jamison's medications was so significant that in 2000 a serious incident report was filed with the Department of Mental Health because Jamison was not being provided his medication at school or at the shelter where MDHS had placed him.  *See* Pls' Mot. at Ex. 3 [Lewis Expert Rpt. at 118]; Defs' Mot. at Ex. Q.

The only facts that Defendants have put forward confirm that Named Plaintiff class members were not provided treatment in accordance with their documented medical needs.  Moreover, Defendants concede the agency practice of not recording medical

information in children's foster care case records, despite Plaintiffs' unrebutted expert evidence that the failure to maintain such information in agency records jeopardizes children's health and safety.  Plaintiffs have established sufficient facts that foster children are being harmed and daily subjected to further risk of harm by Defendants' knowing and persistent denial of necessary medical care and treatment to make this unsuitable to be disposed of in Defendants' favor at summary judgment.

> **D.    Defendants' Evidence Regarding The Provision Of Basic Food, Shelter, And Clothing Is Immaterial**

Defendants go to considerable lengths to demonstrate that all of the Named Plaintiffs have been provided "basic shelter, food and clothing."  *See* Defs' Mem. at 5. Defendants' more specific proof is that not a single Named Plaintiff has gone without clothes (*see* Defs' Mem. at 22-23), that the Named Plaintiffs have always had a roof over their heads (*see* Ds.' Mem. at 5), and that each Named Plaintiff has had access to food, at least in so far as they are entitled to the "School Lunch Program for free or reduced meals or free milk."  *See* Defs' Mem. at 28.  Plaintiffs' claims, however, do not include allegations that Plaintiff children are left homeless, starved, or naked.  Defendants' proffered evidence is immaterial in light of the overwhelming evidence that Plaintiffs are being harmed by Defendants' failures to keep them safe and provide appropriate placements and adequate health care and treatment.

> **V.    Defendants Have Not Taken Reasonable Measures To Abate Known Constitutional Violations**

In light of the magnitude of the known systemic deficiencies at DFCS and the acknowledged grave risk of further harm to Plaintiff children, Defendants' professed "efforts to identify and remedy issues and concerns at MDHS/DFCS" are insufficient and

unreasonable on their face, and do not insulate them from a finding of liability as they suggest. *See* Defs' Mem. at 29-36.

Defendants concede that both Defendant Barbour and Defendant Taylor were personally aware of MDHS failures upon taking office in January 2004, and that Defendants were served with this lawsuit shortly thereafter. *See* Defs' Mem. at 30, n. 19. Yet, *more than two years later*, Defendants can point to only a recently formulated "Draft Plan," which is to be crafted into "a more detailed, comprehensive strategic operational plan for DFCS" by a *to-be-hired* strategic planner, which will *then* "be presented to MDHS for budgetary analysis, and MDHS will set priorities for implementation based on funding."[24] *See* Defs' Mem. at 30-31. As Defendant Taylor expressly confirmed in his recent deposition testimony, Defendants have made *no* commitment to pursue even the limited remedial initiatives and funding discussed in the Felder Draft Plan.[25] *See* Pls' Mot. at Ex. 38 [Taylor Dep. at 194:12-23]. Instead of relieving Defendants from a finding of deliberate indifference, Defendants' belated Draft Plan *to plan* for addressing longstanding and acknowledged harms highlights and confirms Defendants' lack of necessary *action* to remedy the unconstitutional conditions of which they have been aware for years.[26]

---

[24] Similarly, even though Defendants acknowledge that "its providers have sometimes licensed foster homes or placed foster children in foster homes that have had their licenses revoked by MDHS/DFCS or have otherwise been determined not to be suitable as placements for foster children," Defendants can only point to "*discussing...a plan* to ensure that all providers check MDHS/DFCS records prior to placing a foster child in the placement" (emphasis added). *See* Defs' Mem. at 35.

[25] For example, although Defendants' brief points to "improvements [that] are already being made" such as DFCS "recommend[ing] that the agency request sixteen additional MACWIS PINS and $1.2 million from the legislature to replace current contractual personnel" (*see* Defs' Mem. at 31), Defendant Taylor specifically testified that he has taken a "wait and see" approach on this recommendation and will only decide whether to support it when he "begin[s] to look at the next budget process" for "the fiscal year beginning the summer of 2007 [FY 2008]." *See* Ex. 2 [Taylor Dep. at 204:19-205:16].

[26] This Court can also take judicial notice of the fact that even when Defendants commit to ameliorate unconstitutional MDHS conditions of care, their ability to implement reforms cannot be assumed. *See, e.g., U. S. v. Miss.*, Civ. A. No. 3:03-cv-1354 (S.D. Miss.), Monitor's First Rpt., January 23, 2006, Monitor's

Most obvious is the failure of Defendants to provide DFCS with adequate staffing.  Even with the recent addition of FY 2007 funding for 59 previously abolished positions, 38 previously un-funded vacant positions, and 12 new positions, DFCS staffing is still 97 positions down from where it was at the beginning of 2004.  *See* Defs' Mem. at 33 n. 22; Defs' Ex. CCC [Draft Plan at DHS 115422 (109 DFCS positions were abolished in June 2004; 59 positions were abolished in June 2005)].  Defendants' own expert testified that this limited effort will not adequately address the serious staffing deficiencies that she documented as one of her "Major Findings."  *See* Pls' Mot. at Ex. 27 [Steib Dep. at 138:12-20]; Pls' Mot. at ¶ 122 [Ex. 1, Steib Expert Rpt. at i-ii ("DFCS is under-staffed at all levels.  Many caseworkers carry workloads which are at least double the average number they can manage based on the workload analysis conducted in this review.  Many supervisors also carry cases and have administrative duties in addition to providing supervision for caseworkers.  Administrative and management staff are [*sic*] inadequate to provide the support needed by those responsible for service delivery.")]; Defs' Mot. at Ex. NN.

## VI.   Defendants Cannot Justify Their Lack Of Reasonable Action To Abate Known Constitutional Violations On Lack Of Funding

Defendants' attempt to justify their lack of reasonable action on lack of funding is unavailing.  *See* Defs' Mem. at 14, 19, 32-35, n. 22-24; Defs' Answer at Eleventh Defense (attached as Ex. 7).  It has long been established in this Circuit that "[s]hortage of funds is not a justification for continuing to deny citizens their constitutional rights." *Gates v. Collier*, 501 F.2d 1291, 1320 (5th Cir. 1974); *see also Smith v. Sullivan*, 553

---

Second Report, March 22, 2006 (DHS non-compliance with training schools consent decree) (attached as Ex. 6).

F.2d 373, 378 (5th Cir. 1977) (same); *Wyatt v. Aderholt*, 503 F.2d 1305, 1315 (5th Cir. 1974) ("[S]tate may not fail to provide treatment for budgetary reasons alone. Humane considerations and constitutional requirements are not, in this day, to be measured or limited by dollar considerations.") (internal citation and quotation marks omitted).

Indeed, as the Fifth Circuit has affirmed, "deliberate indifference" may be based upon findings of inadequate funding. *See Alberti v. Sheriff of Harris County, Texas*, 600 F. Supp. 443, 463 (S.D. Tex. 1984), *remanded*, 937 F.2d 984, 999-1000 (5th Cir. 1991) ("*Alberti I*") (citing cases), *aff'd after remand by Alberti v. Sheriff of Harris County, Texas*, 978 F.2d 893 (5th Cir. 1992) ("*Alberti II*") (affirming district court's finding of deliberate indifference); *see also Langford v. City of Atlantic City*, 235 F.3d 845, 849 (3d Cir. 2000) (holding, in accord with numerous other Circuits, that "absolute immunity is not available to a municipality under section 1983, even in a budgetary context"). As the district court in *Alberti* expressly held:

> [P]rotestations from the defendants that they do not have enough money to fund the Court-ordered staffing increases, or that the county has not budgeted for the additional staff this year or that they do not have the authority to expend funds for additional staffing are factually unpersuasive in view of the inordinate period of time which has passed in remedying staffing deficiencies and are legally unsupportable. *That the defendants' inadequate staffing levels are caused by inadequate funding by the county or lack of authority over funds is no defense to the maintenance of conditions which violate the Constitution.*

*Alberti*, 600 F. Supp. at 463 (emphasis added); *see also Alberti II*, 978 F.2d at 895. Defendants' putative funding defense should be stricken as matter of law.

## VII.    CONCLUSION

Defendants' own documents and testimony, as well as their sole expert, confirm Plaintiffs' allegations that Defendants have been knowingly operating a failing child

welfare agency for years. Plaintiffs present overwhelming evidence that high caseloads, poorly trained and supervised staff, and a chronic lack of necessary resources place the Plaintiff class of foster children at daily risk of substantial harm. This is not speculative; nor is it anecdotal. Scores of children are being maltreated, subjected to harmful placements and multiple traumatic moves, and deprived of basic and necessary medical care.

In light of these documented and largely conceded facts, Defendants' motion for summary judgment avoids applicable law and available facts. Not only are Defendants unable to show that there is an absence of evidence in support of Plaintiffs' claims, the available uncontested evidence compels summary judgment for Plaintiffs, as argued in Plaintiffs' motion for summary judgment on liability. Accordingly, Defendants' motion should be denied.

Respectfully submitted, this 18th day of May, 2006.

/s Melody McAnally
W. Wayne Drinkwater, Jr. (MBN 6193)
Melody McAnally (MBN 101236)
BRADLEY ARANT ROSE & WHITE LLP
188 East Capitol Street, Suite 450
Jackson, MS 39201
Telephone: (601) 948-8000
Facsimile: (601) 948-3000

Stephen H. Leech (MBN 1173)
850 East River Place, Suite 300
Jackson, MS 39202
Telephone: (601) 355-4013

Marcia Robinson Lowry (MBN 43991 *pro hac vice*)
Susan Lambiase (MBN 43992 *pro hac vice*)
Eric E. Thompson (MBN 43993 *pro hac vice*)
Tara Crean (MBN 44447 *pro hac vice*)
Shirim Nothenberg (MBN 43990 *pro hac vice*)
CHILDREN'S RIGHTS

330 Seventh Ave, 4th Floor
New York, NY 10001
Telephone:  (212) 683-2210

John Lang (MBN 43987 *pro hac vice*)
Christian Carbone (MBN 43986 *pro hac vice*)
John Piskora (MBN 44474 *pro hac vice*)
LOEB & LOEB LLP
345 Park Avenue
New York, NY 10154
Telephone:  (212) 407-4000

*PLAINTIFFS' COUNSEL*

## CERTIFICATE OF SERVICE

I hereby certify that on May 18, 2006, I electronically filed the foregoing with the Court using the ECF system, which sent notification of such filing to the following:

Dewitt L. ("Rusty") Fortenberry Jr., Esq.
Kenya Key Rachal, Esq.
Gretchen L. Zmitrovich, Esq.
Ashley Tullos Young, Esq.
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC
4268 I-55 North
Meadowbrook Office Park
Jackson, Mississippi 39211

Harold E. Pizzetta, III, Esq.
Assistant Attorney General
General Civil Division
Carroll Gartin Justice Building
430 High Street
Jackson, Mississippi  39201

*Attorneys for Defendants*

/s Melody McAnally_____