LEXSEE 2006 U.S. DIST. LEXIS 27506

**E.C., J.L., J.C., T.G., B.G., and A.G., each a minor by Next Friend, Jill Katz; W.S., M.S., and D.S., each a minor by Next Friend, Robert Strange; M.P., a minor by Next Friend, Michael Patterson; A.C., a minor by Next Friend, Lana Capps; J.A., a minor by Next Friend, John Antonich; T.J. and A.J., each a minor by Next Friend, Lavada Johnson; and N.S., a minor by Next Friend, Tammy Smith, Plaintiffs, vs. K. Gary Sherman, in his official capacity as Director of the Missouri Department of Social Services, Defendant.**

**No. 05-726-CV-W-SOW**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI, WESTERN DIVISION**

*2006 U.S. Dist. LEXIS 27506*

**May 9, 2006, Decided**

**COUNSEL:** [*1] For E.C., a minor, by Next Friend, Jill Katz, J.L., a minor, by Next Friend, Jill Katz, T.G., a minor, by Next Friend, Jill Katz, B.G., a minor, by Next Friend, Jill Katz, A.G., a minor, by Next Friend, Jill Katz, W.S., a minor, by Next Friend, Robert Strange, M.S., a minor, by Next Friend, Robert Strange, D.S., a minor, by Next Friend, Robert Strange, M.P., a minor, by Next Friend, Michael Patterson, A.C., a minor, by Next Friend, Lana Capps, J.A., a minor, by Next Friend, John Antonich, T.J., a minor, by Next Friend, Lavada Johnson, A.J., a minor, by Next Friend, Lavada Johnson, A.E., a minor, by Next Friend, Elizabeth Euer, N.S., a minor, by Next Friend, Tammy Smith, J.C., a minor, by Next Friend, Jill Katz, Plaintiffs: Ira Lustbader, New York, NY; James Patrick Muehlberger, Kathleen A. Jeanetta, Loretta E. Burns-Bucklew, Michael Sara Bartosz, Nicholas Patrick Mizell, Pamela Macer, Shook, Hardy & Bacon, LLP-Grand, Kansas City, MO; James J. Wilson, Stephen Reynolds, Berg, Borgmann, Wilson & Wolk LLC, Clayton, MO; John J. Ammann, St. Louis University Legal Clinic, St. Louis University School of Law, St. Louis, MO; Michael Sara Bartosz, Priy Sinha, Children's Rights, Inc., New York, [*2] NY US.

For Matt Blunt, in his official capacity as Governor of the State of Missouri, K. Gary Sherman, in his official capacity as Director of the Missouri Department of Social Services, Defendants: Douglas G. Leyshock, Missouri Attorney General, Jefferson City, MO; Gary L. Gardner, Missouri Attorney General's Office, Jefferson City, MO.

**JUDGES:** SCOTT O. WRIGHT, Senior United States District Judge.

**OPINIONBY:** SCOTT O. WRIGHT

**OPINION:**

FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF THE COURT'S MAY 1, 2006 ORDER AND FINAL JUDGMENT GRANTING PERMANENT INJUNCTIVE RELIEF

Plaintiffs seek to permanently enjoin harmful and unlawful changes to Missouri's adoption subsidy program in Missouri Senate Bill 539. n1 Specifically, plaintiffs challenge (1) changes to *Missouri Revised Statutes Section 453.073.3(4)* concerning the imposition of a blanket policy that retroactively makes all existing adoption subsidy contracts expire on their one year anniversary, makes all new contracts automatically expire annually, with renewals in all circumstances at the sole discretion of the DSS Director n2; and (2) the creation of a new *Section 453.073.4* concerning the imposition of [*3] a means test on the income of existing or prospective adoptive parents of a targeted group of foster children. n3

> n1 The certified class includes "all future, current and former foster children in the Missouri foster care system, for whom adoption was, is or will be a court-ordered permanent placement goal, and who are or would be



beneficiaries of adoption assistance subsidies under Missouri law as unchanged by Senate Bill 539." (September 29, 2005 Order of Judge Scott O. Wright.) Following a full evidentiary hearing, a preliminary injunction was issued on September 8, 2005. After a trial on the merits conducted on April 27, 2006, on May 1, 2006, this Court issued an Order Granting Permanent Injunctive Relief with a further order to be entered including findings of fact and conclusions of law.

n2 Senate Bill 539 amends *Section 453.073.3(4) of RSMo* to require: "The time period for which the subsidy is granted [if that period is reasonably ascertainable] shall not exceed one year. The agreement can be renewed for subsequent years at the discretion of the director. All existing agreements will be deemed to have expired one year after they were initially entered into." (Senate Bill 539 at 453.073.3(4).)

[*4]

n3 Senate Bill 539 amends *Section 453.073.4 of RSMo* to require: "The subsidy shall only be granted to children who reside in a household with an income that does not exceed two hundred percent of the federal poverty level or are eligible for Title IV-E adoption assistance." (Senate Bill 539, Ex. 34, at 453.073.3(4).)

Plaintiffs assert (1) that the automatic expiration, blanket one year duration and discretionary renewal provisions violate and are preempted by the Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997, *42 U.S.C. § § 620-629(i)* and *670-679(b)* (collectively "AACWA"); (2) that the means test violates the *Equal Protection Clause of the Fourteenth amendment to the U.S. Constitution*; and (3) that both challenged provisions, as they pertain to those children with existing subsidy contracts, violate the *Contracts Clause of the U.S. Constitution*.

Plaintiffs' showing of a significant risk of irreparable harm if the law is [*5] not permanently enjoined has not been rebutted by any contrary facts in the record. Plaintiffs have adduced evidence showing that (1) hundreds, if not thousands, of children who already have contracts entitling them to adoption assistance maintenance subsidies until they turn 18 will have those subsidies permanently terminated as a result of the challenged law; (2) children still in state custody in foster care who are targeted by the challenged law will be disadvantaged in relation to other foster children in their chances of ever getting adopted; (3) children still in state custody in foster care who are targeted by the challenged law will be forced to stay in custody longer as a direct result of the challenged law; (4) the new law will have the likely effect of deterring parents from adopting special needs foster children and will likely shrink the pool of available adoptive parents for such children - even without implementation of Senate Bill 539, there are currently almost 2,000 children in foster care awaiting adoption; and (5) even Title IV-E eligible children who currently hold contracts for subsidies will at best continue to receive payments until June 30, 2006, after which [*6] renegotiation is solely at the discretion of the DSS Director.

While the risk of harm to plaintiffs is considerable, no harm will befall defendant from a permanent injunction. The evidence presented in the record shows that defendant made obvious and questionable assumptions in projecting savings from the challenged law. Additionally, it is undisputed that foster care is significantly more expensive than adoption assistance subsidies, and defendant concedes that the law will directly result in children spending longer time in foster care. The State will not save money under Senate Bill 539; it will lose money.

Plaintiffs have firmly established success on the merits of their claims. *Section 453.073.3(4)* plainly applies to all subsidy contracts, both "IV-E eligible" children and "non IV-E eligible" children. The automatic expiration, blanket one year duration and discretionary renewal policy violates, and are preempted by, the plain language of *42 U.S.C. 673(a)(3)*, which prohibits any change in the amount of the subsidy (including shrinking the amount to zero by automatically terminating the contract) without the concurrence of the adoptive parents. The challenged [*7] provision also violates several explicit official issuances of the federal Department of Health and Human Services (HHS). The Court was presented at trial with an undisputed and unrebutted letter from HHS to defendant Sherman, outlining the very same violations of federal law and official HHS issuances.

Defendant's only defense to preemption under the statute is that all contracts (even those for IV-E eligible children) expire in one year, but that DSS "intends" at present not to do what their own statute allows for the IV-E eligible children. This supposed "intent" -- never reduced to even a written policy and included solely as a position in litigation -- is belied by Senate Bill 539 and current DSS policies unchanged by the new law. DSS policy makes an explicit distinction between contracts that are reviewed and may be "renewed" and those that "expire" and must be "renegotiated." *See*

Plaintiffs' Exh. 48, at 30.4.G. Since Senate Bill 539 deems every contract to "expire" on its one-year anniversary, defendant's position is logically inconsistent and easily rejected. Defendant would remain free to change the "intent" next month.

Plaintiffs have established success on their Equal [*8] Protection claim. Defendant's argument that the two groups -- those targeted for the means test and those not targeted -- are not similarly situated because of the different funding streams misses the point entirely: the federal AACWA is silent on means testing non-IV-E eligible children, but does not *require* defendant to target that group for discriminatory treatment -- the federal law actually *bans* means testing, as does accepted adoption subsidy policy and practice standards. Missouri has chosen to target the non-IV-E eligible children for affirmative discriminatory treatment. The only way to equally apply the means test would have been to means test all adoptive parents, but the federal statute expressly bans that practice.

The means test triggers strict scrutiny because it infringes on plaintiffs' fundamental right to be free from unnecessarily prolonged government confinement, and the law is not narrowly tailored to a compelling state interest. Even if the Court were to evaluate the means test using rational basis scrutiny, it would not survive. The means test is not rationally related to directing money to the most needy children and families because: (1) the income [*9] of the biological parents of the targeted group is not rationally related to these children's adoptive parents' income; (2) the adoptive parents' gross income tested by the new law is irrelevant to the child's needs or the family's actual expenses; (3) all of the children excluded are by definition as needy as those not excluded under the new law; and (4) the state expends 40% of state dollars on subsidies for all IV-E eligible children without regard to the adoptive parents' income. Finally, the means test is not rationally related to saving the state money because the evidence shows that the state will lose money under the new law.

Plaintiffs have also established success on their *Contracts Clause* claim. It is not disputed that the subsidy agreements are legal contracts and that the State is a party to the contracts, triggering heightened scrutiny. Nor is it disputed that the retroactive termination impairs children's rights under the contracts -- indeed the impairment is total since children will permanently lose their subsidies and Medicaid benefits. Defendant's false cost savings argument fails to provide a sufficient governmental justification for the substantial impairment. [*10] Defendant points only to a "termination without cause" provision in the individual contracts, which is plainly void under both applicable contract law and public policy.

Finally, a permanent injunction will further the public interest. The parties do not dispute that the central premise of the entire federal-state adoption subsidy program, accepted good subsidy policy and practice, and the State's own policies, is to increase opportunities for the adoption of special needs foster children so they do not grow up as state wards. The challenged provisions run directly counter to this important public policy; the permanent injunction promotes this critical public interest.

For all these reasons, as set forth in the findings of fact and conclusions of law presented below, the Court is entering a permanent injunction in this case.

## I. FINDINGS OF FACT

### Adoption Assistance Subsidies: Promotion of Permanency for Special Needs Foster Children

1. The state of Missouri, through the Department of Social Services ("DSS"), Children's Division, acts to remove children who are subject to abuse and/or neglect at home into the temporary custody of the state and to provide [*11] care and services to those vulnerable children until a permanent placement can be secured, either through reunification with their biological parent(s) or through adoption by a new family when reunification is not in the child's best interests. Such services are referred to as "permanency" services. (DSS Child Welfare Manual, Sec. 1, Ch. 1, Ex. 77, at 1.1, 1.2.)

2. DSS has statutory responsibility and authority for accepting and investigating all reports of child abuse or neglect within the state under *RSMo Ch. 210* and for serving the needs of Missouri's abused and neglected children through temporary foster care and permanency services under *RSMo Ch. 207* and *211*. (*See* DSS Child Welfare Manual, Philosophical Base of Child Welfare Practice, Ex. 76.)

3. Defendant, K. Gary Sherman, is the Director of DSS and, in that capacity, oversees the administration and management of the Children's Division and the implementation of its child welfare programs and services, including adoption services. (*RSMo Section 660.010.1*; Sherman Dep., Jan 26, 2006, at 4-5.)

4. The DSS Children's Division serves the citizens of Missouri and is charged with advancing [*12] the public's interest in the safety and well being of Missouri's children, including all special needs foster children residing in state custody. (DSS Child Welfare Manual, Sec. 1, Ch. 1, Ex. 77, at 1.2.)

5. As of December 31, 2005, there were 10,772 foster children in the custody of DSS's Children Division. (Defendants' Response to Plaintiffs' Second Set of Rule 33 Interrogatories, Ex. 100, at 1.)

6. For all children adopted from DSS custody in FY2003 and FY2004, the average length of stay in foster care was 33 and 31.7 months, respectively, which is longer than the national standard of 24 months promulgated by the U.S. Department of Health and Human Services. (Report No. 2005-79, October 2005, Office of the State Auditor of Missouri, Ex. 96, at 1.)

7. As of December 31, 2005, a total of 1891 foster children in DSS custody had been assigned a permanency plan or goal of adoption. (Defendants' Response to Plaintiffs' Second Set of Rule 33 Interrogatories, Ex. 100, at 1.) As of January 31, 2006, a total of 1919 foster children in DSS custody had been assigned a permanency plan or goal of adoption. (Caseload Counter, http://www.dss.mo.gov/mis/clcounter/history.htm., [*13] Ex. 53.)

8. As of December 31, 2005, the total number of foster children who were adopted and receiving adoption assistance maintenance subsidies was 11,450. (Defendants' Response to Plaintiffs' Second Set of Rule 33 Interrogatories, Ex. 100, at 2.)

9. As of December 31, 2005, 8,845 of 11,450 former foster children who were adopted and receiving adoption assistance maintenance subsidies, received subsidies funded by a combination of federal and state funds, also known as Title IV-E subsidies. (*Id.* at 2.)

10. For those children receiving adoption assistance maintenance subsidies paid with a combination of federal and state funds, the allocation is 62% federal funding and 38% state funding. (*69 Fed. Reg. 68,372* (Federal Financial Participation in State Assistance Expenditures, FY2006), Ex. 92.)

11. As of December 31, 2005, 2,605 of 11,450 former foster children who were adopted and receiving adoption assistance maintenance subsidies received subsidies funded by solely state funds.

12. Children enter state foster care systems because they are abused and/or neglected, and for some reason their biological parent(s) could not keep them safe. The [*14] goal of the foster care system is to attempt reunification with biological parent(s) and to create a plan to help parents make the necessary changes in their lives or living conditions so that their child or children can be returned to their care. Foster care is intended to be a short-term, temporary stay for children. (CWLA, Family Foster Care Standards, Ex. 114, at 0.13; Expert Report of Jeanette Wiedemeier Bower, Ex. 115, at 3; trial testimony Wiedemeier Bower.)

13. Nationally, approximately 55 percent of children are returned to their biological homes. (Expert Report of Jeanette Wiedemeier Bower, Ex. 115, at 3, citing to AFCARS data, 2005, Ex. 82; trial testimony of Wiedemeier Bower.)

14. In some cases, however, where children cannot be safely returned to their birth parents, their permanent case plan will be identified as adoption, and social workers working on behalf of these children will begin to look for permanent adoptive homes for them. (Expert Report of Jeanette Wiedemeier Bower, Ex. 115, at 3-4; trial testimony of Wiedemeier Bower.)

15. A majority of children in foster care who need permanent adoptive homes require additional services to meet their special [*15] needs, often due to the circumstances of their abuse or neglect. (Expert Report of Jeanette Wiedemeier Bower, Ex. 115, at 3-4; trial testimony of Wiedemeier Bower.) The array of services they need to address their special needs is both extensive and varied, and can include, without limitation, specialized medical care, dental care, mental health care, physical therapy, occupational therapy, play or talk therapy, or educational tutoring. (Expert Report of Jeanette Wiedemeier Bower, Ex. 115 at 4; trial testimony of Wiedemeier Bower.)

16. Missouri state policy, as stated in the DSS Child Welfare Manual, provides, "[i]n keeping with the philosophical base that every child is entitled to a safe, secure and permanent home, the Children's Division is obligated to make a diligent search for appropriate adoptive placements for those children for whom adoption has become the permanent plan." (DSS Child Welfare Manual, Sec. 4, Ch. 27, Ex. 78, at 27.1.)

17. Congress enacted the Title IV-E Adoption Assistance Act to "establish a program of federal support to encourage adoptions of children with special needs." (1980 U.S. Code Cong. and Admin. News, Ex. 36, at 1448, 1460.)

18. The [*16] State of Missouri has a qualifying "State Plan for Title IV-E of the Social Security Act Foster Care, Independent Living and Adoption Assistance" ("Missouri State Plan") and receives federal funding for adoption assistance. Missouri's DSS is the state agency responsible for submitting the Missouri State Plan to the Secretary of Health and Human Services for approval and for administering the plan. (Missouri Title IV-E State Plan, Ex. 45.)

19. The Missouri Title IV-E State Plan states "As a condition of the receipt of Federal funds under title IV-E of the Social Security Act ... the [state agency] ... hereby agrees to administer the program in accordance with the provisions of this State plan, title IV-E of the Act, and all applicable Federal regulations and other official issuances of the Department." (Missouri Title IV-E State Plan, Ex. 45, at 2.) (emphasis added)

20. The state of Missouri, through DSS, is to provide basic shelter, food and care to all foster children in its legal custody. To meets this obligation, DSS remits foster care maintenance payments to all foster families, group homes and child-placing agencies licensed by the state to provide day-to-day care [*17] to the foster child population. (DSS Child Welfare Manual, Sec. 4, Ch. 11, Atmt. A, Ex. 101; Missouri State Plan, Ex. 45, at Sec. 2.) The obligation of the state to remit these foster care maintenance payments continues until a child exits from state legal custody by virtue of reunification, adoption or attainment of adulthood. (See generally, HHS Child Welfare Policy Manual, Section 8.3 (foster care maintenance payment programs.)) (DSS Child Welfare Manual, Sec. 4, Ch. 11, at 11.12, Ex. 123; trial testimony of Wiedemeier Bower.)

21. The Federal Child Welfare Policy Manual of the United States Department of Health and Human Services ("HHS"), Administration for Children and Families, states: ... "the legislative history [of the Adoption Assistance Act] indicates that Congress was concerned primarily with moving children in State foster care systems into permanent adoptive homes when appropriate. The Title IV-E adoption assistance program, therefore, was developed to provide permanency for children with special needs in public foster care by assisting States in providing ongoing financial and medical assistance on their behalf to the families who adopt them." (Federal Child Welfare [*18] Policy Manual, ACYF-CB-PA-01-01, Jan. 23, 2001, Ex. 40; expert report of Jeanette Wiedemeier Bower, Ex. 115, at 3, 4; trial testimony of Wiedemeier Bower.)

22. Missouri State DSS policy defines a special needs child as "any child in the custody of the Children's Division, Division of Youth Services, Department of Mental Health or a Missouri licensed child-placing agency and who meets one of the following conditions: minority parentage; handicapping condition -- mental, physical or emotional; member of a sibling group ...; guarded prognosis ...; is over five years of

age, without any of the above characteristics. Children who meet the criteria for special needs may qualify for adoption subsidy." (DSS Child Welfare Manual, Sec. 4, Ch. 27, Ex. 47, at 27.4.2.)

23. Missouri State DSS policy states: "[c]hildren placed in the custody of the Division with a history of abuse and/or neglect may be defined as children having special needs and are, therefore, eligible for subsidy." All current or former foster children are designated as "special needs" for purposes of an adoption assistance subsidy in Missouri. (Missouri DSS Child Welfare Manual, Sec. 4, Ch. 30, Ex. 48, at 30.4.C; [*19] Expert Report of Jeanette Wiedemeier Bower, Ex. 115, at 5; trial testimony of Wiedemeier Bower.)

24. Adoptive children meeting the definition of "special needs" in Missouri receive adoption assistance subsidies funded by either a combination of federal and state dollars or solely by state dollars. Children with adoption subsidies funded by a combination of federal and state dollars are also referred to as Title IV-E eligible children. (Trial testimony of Jeanette Wiedemeier Bower.) Children with adoption subsidies funded by state dollars only are referred to as non-Title IV-E eligible children. (Missouri DSS Child Welfare Manual, Sec. 4, Ch. 30, Ex. 48, at 30.1; testimony of Weidemeier Bower.)

25. There is significant value to society and to an individual foster child to have that specific child move from the foster care system into a permanent, adoptive home when reunification is not possible. (CWLA, Adoption Standards, Ex. 85, at 5; Expert Report of Jeanette Wiedemeier Bower, Ex. 115, at 4; trial testimony of Wiedemeier Bower.)

26. CWLA standards state that ". . . subsidies may make possible the adoption of children who have special medical needs or are a part of a [*20] special population for whom these benefits are intended." (CWLA, Family Foster Care Standards, Ex. 114, at 2.100; Expert Report of Jeanette Wiedemeier Bower, Ex. 115, at 4; trial testimony of Wiedemeier Bower.)

27. The federal adoption assistance program has been credited with significantly decreasing the number of children languishing in foster care by finding them permanent adoptive families. (Expert Report of Jeanette Wiedemeier Bower, Ex. 115, at 4, citing Bussiere, in Segal, 1985, Ex. 87; trial testimony of Wiedemeier Bower.) With adoption subsidies, more children find permanent loving homes and fewer graduate or "age out" of the foster care system. (Expert Report of Jeanette Wiedemeier Bower, Ex. 115, at 4; trial testimony of Wiedemeier Bower.)

28. A widely accepted policy reason behind the provision of adoption subsidies for children is that it eliminates financial barriers to adoption for parents. (Expert Report of Jeanette Wiedemeier Bower, Ex. 115, at 6-7; trial testimony of Wiedemeier Bower.)

29. The Missouri Child Welfare Manual states: "[s]ignificant to the use of an adoption/legal guardianship subsidy, is the realization that without this resource a family [*21] would not otherwise have the resources to provide permanency to a special needs child." (Missouri DSS Child Welfare Manual, Sec. 4, Ch. 30, Ex. 48, at 30.1.)

30. The federal Child Welfare Policy Manual states that the intended beneficiaries of adoption assistance payments are the special needs children themselves, not their adoptive parents. (Federal Child Welfare Policy Manual, Sec. 8.2, Ex. 59, at 8.2D.4.) ("Unlike other public assistance programs in the Social Security Act, the IV-E adoption assistance program is intended to encourage an action that will be a life-long social benefit to certain children and not to meet short term monetary needs during a crisis. Further, the adoptive parents' income is not relevant to the child's eligiblity for the program.") (Expert report of Jeanette Wiedemeier Bower, Ex. 115, at 4-5; trial testimony of Wiedemeier Bower.)

**Federal and State Adoption Assistance Subsidies**

31. Special needs children qualify for adoption subsidies funded with a combination of state dollars and federal dollars (using federal Title IV-E funds) by meeting one of the following eligibility categories: (1) the special needs child was eligible [*22] for Aid for Families With Dependent Children program (AFDC) benefits (as defined in 1996) during the month in which court proceedings for adoption were initiated, or was eligible for said benefits within 6 months prior to that time; or (2) the special needs child was eligible for Supplemental Security Income ("SSI") programs under the Social Security Act before adoption; or (3) the special needs child's parent was in foster care and receiving Title IV-E funds that covered both the parent and the child when the adoption was initiated; or (4) the special needs child previously received adoption assistance, and his or her adoptive parent died or the adoption was dissolved. The special needs child need only meet one of the above four eligibility prongs to claim a right to Title IV-E adoption assistance. (See 42 U.S.C. Sec. 673; Expert Report of Jeanette Wiedemeier Bower, Ex. 115, at 5-6; trial testimony of Wiedemeier Bower)

32. The primary qualification for Title IV-E eligibility for adoption assistance subsidies is through AFDC eligibility. The other categories involve a relatively small group of children. The SSI eligible children are generally medically [*23] fragile or medically-oriented; the minor-child-of-a-foster-child eligibility allows infants in foster care to receive IV-E eligibility if the parent in custody is IV-E eligible and the minor-parent and minor-child live together; and the death/dissolution eligibility assumes that the child's adoption is finalized and the child is coming back into the care of the department after the adoptive parents' death or the legal dissolution of the adoption. (See 42 U.S.C. Sec. 673; Expert Report of Jeanette Wiedemeier Bower, Ex. 115, at 6.)

33. In general, an AFDC child is a child who is removed from a low-income birth family where only one parent is in the home such that there is a deprivation of parental support. To receive Title IV-E adoption assistance, the child must be removed from their biological home either through a voluntary placement agreement or as a result of a judicial determination that continuation in the home would be contrary to the welfare of the child. If the AFDC child is special needs and meets either of these removal qualifications, the child will receive a federal-state funded adoption assistance subsidy upon adoptive placement. (Federal [*24] Child Welfare Policy Manual, Sec. 8.2, Ex. 59, at 8.2B.13; Expert Report of Jeanette Wiedemeier Bower, Ex. 115, at 6; trial testimony of Wiedemeier Bower.)

34. Eligibility for a federally subsidized adoption assistance agreement under IV-E is based upon 1996 AFDC income thresholds, which have not been adjusted for inflation. See 42 U.S.C. 673(a)(3). What was defined as "poor" ten years ago remains the standard today under the Title IV-E adoption assistance program. (Expert Report of Jeanette Wiedemeier Bower, Ex. 115, at 6)

35. Special needs children not meeting one of the four Title IV-E eligibility prongs receive adoption assistance payments under the terms of the state-funded adoption subsidy program in Missouri. As stated in the Missouri Department of Social Services ("DSS") Child Welfare Manual, "[a]n adoption subsidy is a service that may be used to assist in providing permanency for children who, because of special needs, might not otherwise be adopted, and for whom a family is not readily available." (Missouri DSS Child Welfare Manual, Sec. 4, Ch. 30, Ex. 48, at 30.1.)

36. Missouri has provided a single system for adoption assistance [*25] maintenance subsidies to both IV-E eligible and non IV-E eligible children continuously for over 25 years. (Simmens, Preliminary Injunction hearing, at 38-41.)

37. The DSS Child Welfare Manual states that an adoption subsidy agreement must be approved by the Division Director and executed on a Form CS-SA-2 contract document. "The CS-SA-2 ... is a legally binding agreement." (Missouri DSS Child Welfare Manual, Sec. 4, Ch. 30, Ex. 48, at 30.2.) The CS-SA-2 Adoption Subsidy Agreement is a pre-printed form contract prepared by DSS and presented to adoptive parents for signature on behalf of their special needs adopted child. (Form CS-SA-2, Ex. 99)

38. The Form CS-SA-2 Adoption Subsidy Agreement states the contractual obligations of the State to the adoptive parent and the adopted children. The State agrees to subsidize adoptive parents for "mainte-

nance," "recurring expenses for special services" and other "nonrecurring expenses." (Form CS-SA-2, Ex. 99, at 2.)

39. Form CS-SA-2 Adoption Subsidy Agreement states the contractual obligation of the State "to provide the necessary authorization for participation [of the adopted child] in the Missouri Medicaid Plan...." (Form [*26] CS-SA-2, Ex. 99, at 2.)

40. The DSS Child Welfare Manual states: "[s]ubsidy agreements ... are considered a contract, which must be reviewed annually and renewed prior to the end of the Missouri fiscal year (i.e., June 30, 2XXX). Contracts are automatically renewed unless changes are agreed to as a result of the annual review or requested by the adoptive parent(s) or legal guardian(s). However if approved services on the attachment (CS-SA-2 ATT/CS-LG-2 ATT) have expired, a new attachment must be developed between the family and the agency." (Missouri DSS Child Welfare Manual, Sec. 4, Ch. 30, Ex. 48, at 30.4.G.)

41. In FY2006, which runs from July 1, 2005 through June 30, 2006, approximately 11,400 children formerly in the Missouri foster care system will be beneficiaries of adoption assistance subsidy contracts between Missouri and the children's adoptive parent(s). (Defendant's Response to Plaintiffs' Second Set of Rule 33 Interrogatories, at 2.)

42. All adoption subsidy agreements executed by the state of Missouri utilize state funds to meet the government's monthly payment obligations. Title IV-E adoption subsidy agreements are funded 62% by federal matching dollars [*27] and 38% by state dollars. State-only adoption subsidy agreements are funded 100% by state dollars. (*69 Fed. Reg. 68,372* (Federal Financial Participation in State Assistance Expenditures, FY2006), Ex. 92.)

**The Governmental Purpose Underlying Senate Bill 539**

43. Missouri Governor Matt Blunt signed Senate Bill 539 into law on April 26, 2005. By its terms, Senate Bill 539 has an effective date of August 28, 2005. (Current Bill Summary, published at: www.senate.mo.gov, Ex. 34).

44. Governor Blunt and the Missouri legislature enacted Senate Bill 539 with the stated intent to "reform Missouri's social welfare system to ensure that taxpayer funded assistance is getting to the most needy ...." (Press Release from the Office of Governor Matt Blunt, May 13, 2005, Ex. 54, at 1.) As stated in the accompanying emergency rule, the law was necessary "to achieve a balanced state budget for SFY 2006." (Emergency Rule 13 CSR 35-38.020, Ex. 50.) Emergency Rule 13 CSR 35-38.020 became effective on August 28, 2005, and expired on February 23, 2006.

45. The State of Missouri and the Department of Social Services ("DSS"), through duly authorized and responsible [*28] state officials, have identified a single governmental purpose to be advanced by the means test provision of Senate Bill 539: achieving cost savings in the state's adoption subsidy program by reducing the amount of state funds appropriated for the program and directing those funds to the state's most needy families. (Renne Dep., Jan. 26, 2006, at 31-32; Boies Dep., Jan. 18, 2006, at 103; Kinkade Dep., Jan. 18, 2006, at 64; Martin Dep., Dec. 13, 2005, at 37; Martin, Preliminary Injunction hearing, at 164.)

46. William Boies, a Budget Analyst 2 in the Budget and Planning Division of the state Office of Administration ("OA"), testified at his deposition regarding the origin and development of the adoption subsidy means test provision during the FY2006 budget process in Missouri. Boies testified that following the November 2004 gubernatorial election, the FY2006 budget process (for the FY beginning July 1, 2005) was turned over to Governor-Elect Blunt's transition team. Michael Keathley, who was later named Commissioner of OA by Governor Blunt, headed the transition team within OA. (Boies Dep., Jan. 18, 2006, at 2, 20-25.)

2006 U.S. Dist. LEXIS 27506, *

47. William Boies testified in his deposition that Keathley, [*29] upon joining OA in November or December 2004, took note of the historic rate of growth in the costs of the adoption subsidy program in Missouri when reviewing the FY2006 departmental budget submitted by DSS and inquired about the program. Mr. Keathley specifically inquired about methods that could be used to control further growth in the program and suggested means testing recipient adoptive families to reduce cost. (Boies Dep., Jan. 18, 2006, at 32-39.)

48. Thereafter, OA and DSS staff developed a means test scheme with the intended purpose of reducing costs within the Missouri adoption subsidy program by directing a decreased subsidy appropriation to low income adoptive families only, regardless of the needs of the adoptive child. The only governmental purpose to be served by the means test was cost reduction. (Boies Dep., Jan. 18, 2006, at 103.)

49. William Boies testified at his deposition that he never heard discussion of any other governmental purpose or justification for the new eligibility scheme. (Boies Dep., Jan. 18, 2006, at 103.)

50. Amy Martin, a Program Development Specialist at the Department of Social Services in the Children's Division who is responsible [*30] for the development of policy and procedures relating to the adoption program, testified at her deposition that the only policy justification she heard discussed for the Senate Bill 539 means test was "cost savings." (Martin Dep., Dec. 13, 2005, at 37.)

51. Amy Martin also testified at her deposition that she was not able to identify any way in which the Senate Bill 539 provisions regarding adoption subsidies would serve to benefit children, whether they were in adoptive or foster care. (*Id.* at 38.)

52. Steve Renne, Acting Director of DSS through April 1, 2005, now Deputy Director of DSS, also testified to his understanding that the Senate Bill 539 means test was designed simply to achieve cost reductions in the state's adoption subsidy program. (Renne Dep., Jan. 26, 2006, at 31-32.)

53. Defendant K. Gary Sherman, the current Director of DSS, testified at his deposition that he played no role in the development of Senate Bill 539 and its adoption subsidy provisions due to the timing of his nomination for DSS Director by Governor Blunt and subsequent Senate confirmation, which occurred less than one month before the enactment of Senate Bill 539. (Sherman Dep., Jan. 26, 2006, at [*31] 5, 10, 11, 23.)

54. Boies participated in a final FY2006 DSS budget presentation to Governor Blunt in January 2005, conducted by means of a telephone conference that occurred shortly before the January "State of the State" address. During this conference, the means test and cost reduction scheme, later made law through Senate Bill 539, were presented to and discussed with Governor Blunt. Neither the Governor nor his staff identified additional policy bases for the means test. (Boies Dep., Jan. 18, 2006, 98-102.)

55. On Jan 26, 2005, Governor Blunt submitted a budget that called for reductions in the adoption subsidy program consistent with a means test set at 200% of the federal poverty level ("FPL".) (Initial Summary of Missouri Governor's Budget Proposal, Feb. 11, 2005, Ex. 51.)

56. The federal poverty guidelines, which include the FPL, are published annually by HHS for administrative purposes, including for use in determining financial eligibility for certain federal programs. (HHS Poverty Guidelines, 2005 Ex. 42.)

57. DSS staff, specifically Patrick Luebbering, Assistant Deputy Director of the Family Support and Children's Division, prepared a memorandum [*32] in the course of researching the fiscal impact of the proposed changes in the adoption subsidy program, entitled, "Bullet Points for Means Testing Adoption Subsidy," ("Bullet Points Memo") that stated among other things:

2006 U.S. Dist. LEXIS 27506, *

(a) "By implementing a means test on only the state only adoptions, children who are not IV-E eligible will be put at a disadvantage to being adopted versus children that are IV-E eligible."

(b) "By reducing the resources available to parents to adopt special needs children, it is likely that children will remain in custody longer. The average cost for a child in foster care is 20.48% higher than the average cost of a child in adoption subsidy, not including the additional staff time required for Foster Care as opposed to children [in] who are in Adoption Subsidy."

(c) "Any savings due to means testing adoption subsidy could be offset by the children remaining in custody longer."

(d) "Projecting an accurate amount for the savings is difficult."

(Bullet Points Memo, Ex. 93; Luebbering Dep., Dec. 13, 2005, at 50.) The Bullet Points Memo was distributed from DSS to OA, and from OA to the Office of the Governor in revised form. (Boies Dep. [*33] , Jan. 18, 2006, at 84-87)

## Senate Bill 539, *Section 453.073.3(4)*: Blanket Annual Renewal and Automatic Expiration Provision

58. Senate Bill 539 amends *Section 453.073.3(4) of RSMo* to provide: "The time period for which the subsidy is granted [if that period is reasonably ascertainable] shall not exceed one year. The agreement can be renewed for subsequent years at the discretion of the director. All existing agreements will have deemed to have expired one year after they were initially entered into." (Senate Bill 539, Ex. 34, at 453.073.3(4).) The text of *Section 453.073.3(4)*, as amended by Senate Bill 539, makes no distinction between and applies to both federal/state funded and state-only funded adoption assistance agreements.

59. The HHS Child Welfare Policy Manual, Section 8.2D.2, states: "States may not have a blanket policy which limits the duration of all adoption assistance payments to a date earlier than the eighteenth birthday of eligible children, although a time limit may be set in individual cases with the concurrence of the adopting parents, depending on the needs of the child and the circumstances of the parents. [*34] " (HHS Child Welfare Policy Manual, Sec. 8.2, Ex. 59, at 8.2D.2)

60. Senate Bill 539 violates federal policy which prohibits the blanket limitation on duration or termination of all adoption assistance agreements. (Expert Report of Jeanette Wiedemeier Bower, Ex. 115, at 8-10; trial testimony of Wiedemeier Bower.)

61. The HHS Child Welfare Policy Manual, Section 8.2D.5, provides: "Once an adoption assistance agreement is signed and in effect, it can be terminated under three circumstances only: (1) the child has attained the age of 18 (or 21 if the state has determined that the child has a mental or physical disability which would warrant the continuation of assistance); (2) the State determines that the adoptive parents are no longer legally responsible for the support of the child; or (3) the State determines that the adoptive parents are no longer providing any support to the child." (HHS Child Welfare Policy Manual, Sec. 8.2, Ex. 59, at 8.2D.5.)

62. HHS Child Welfare Policy Manual, Sec. 8.2B.9 similarly states: "Once a child has been determined eligible and is receiving adoption assistance, a State may terminate the assistance only under the circumstances specified [*35] at *section 473(a)(4) of the Social Security Act*." (HHS Child Welfare Manual, Ex. 59, at Sec. 8.2B.9.)

63. The DSS Child Welfare Manual states that the Division may close an adoption subsidy upon one of the following events, "(a) the child reaches age 18 or age 21 (if child's condition is extraordinary); or ... (b) At the request of the family; or ... (c) Upon determination that the child is no longer receiving any financial support from the adoptive family; or ... (d) Upon determination that the adoptive parent(s) are no longer legally responsible for the support of the child (TPR has occurred); or ... (e) In the event of death of the subsidized child; or ... (f) In the event of the death of both adoptive parents or the death of a single adoptive parent if the subsidy was granted to a single adoptive parent ...." (*See* DSS Child Welfare Manual, Sec. 4, Ch. 30, Ex. 48, at 30.11.)

64. Fred Simmens, the DSS Director from August 2003 to October 2005, testified that he agreed that, apart from the exceptions set forth by the federal statutes, any changes to the subsidy contracts would have to be agreed to by the parents. (Preliminary Injunction hearing, at 57-58.)

65. Senate [*36] Bill 539 violates federal policy, DSS policy, and good and accepted subsidy practice, which prohibit the termination of adoption subsidy agreements in cases other than the categories proscribed, and allows only periodic readjustments of subsidies on a case by case basis, with the concurrence of the adoptive parents. (Expert Report of Jeanette Wiedemeier Bower, Ex. 115, at 8-10; trial testimony of Wiedemeier Bower.)

66. Specifically, *Section 453.073.3(4)* of Senate Bill 539 explicitly causes all existing adoption agreements to "expire" upon their one-year anniversary and, if implemented, would trigger the provision of Section 30.4.G of the DSS Child Welfare Manual requiring that if approved services in the subsidy agreement have "expired," a new attachment must be renegotiated without automatic renewal.

67. An August 29, 2005 letter from Linda K. Lewis, Regional Administrator of the United States Department of Health and Human Services, to DSS Director K. Gary Sherman states, "The Administration for Children and Families has determined that Missouri is out of compliance with title IV-E requirements because SB 539 states that all subsidies will be granted [*37] will not exceed one year and the director has the discretion as to whether the agreement can be renewed for subsequent years." (Letter from L. Lewis of HHS to G. Sherman of DSS, August 29, 2005, Ex. 94, at Bates No. 1 PRP 38-4 to 38-6.)

68. The August 29, 2005 HHS letter further states, "Federal requirements state that once a child is determined eligible for title IV-E adoption assistance, he or she remains eligible and the subsidy continues for reasons specified in the Federal policy [Child Welfare Policy Manual, Section 8.2B.9 and Social Security Act -- *Section 473*]. The Federal policy further states that States may not have a blanket policy which limits the duration of adoption assistance payments to a date earlier than the eighteenth birthday of eligible children, although a time limit may be set in individual cases with the concurrence of the adopting parents ... [Child Welfare Policy Manual, Section 8.2D.2 and Social Security Act -- *section 473*]. The Missouri legislation, however, states that the period for which all subsidies will be granted will not exceed one year."

   (Letter from L. Lewis of HHS to G. Sherman of DSS, August 29, 2005, Ex. 94, at Bates No. 1 [*38] PRP 38-4 to 38-6.)

69. The August 29, 2005 letter also states, "Federal policy [Child Welfare Policy Manual Section 8.2D.5 and Social Security Act -- *section 473*; and *45 CFR 1356.40(b)*] provides that once a child is determined eligible for adoption assistance under IV-E, he or she remains eligible and the subsidy continues unabated. Once an adoption assistance agreement is signed and in effect, it can only be terminated if 1) the child has reached the age of 18 (or the age of 21 if the State has determined that the child has a mental or physical disability which would warrant continuation of assistance), 2) the State determines that the adoptive parents are no longer legally responsible for the support of the child, or 3) the State determines that the adoptive parents are no longer providing any support to the child. Missouri's legislation, how-

ever, states that the agreement can be renewed for subsequent years "at the discretion of the director" and therefore violates Federal policy."(Letter from L. Lewis of HHS to G. Sherman of DSS, August 29, 2005, Ex. 94, at Bates No. 1 PRP 38-4 to 38-6.)

**Senate Bill 539,** *Section 453.073.4*: **Means** [*39] **Test**

70. Senate Bill 539 amends *Section 453.073.4 of RSMo* to provide: "The subsidy shall only be granted to children who reside in a household with an income that does not exceed two hundred percent of the federal poverty level or are eligible for Title IV-E adoption assistance." (Senate Bill 539, Ex. 34, at 453.073.4.)

71. The use of an income standard for adoptive parents to determine a child's eligibility for adoption assistance subsidies is commonly referred to as a "means test."

72. The means test established in *Section 453.073.4*, on its face, creates two classifications of otherwise similarly situated abused and neglected, special needs children, all current or former state wards of the foster care system. The means test will be applied to deny adoption subsidy benefits to one group of children and not the other. Specifically, for one group in which the income of the children's biological parent(s) (from whom they were removed and placed into foster care) exceeded the AFDC eligibility standard for Title IV-E purposes, the means test will be imposed on the income of the children's existing or prospective adoptive parents to deny [*40] or terminate their adoption subsidy. For the other group, in which the income of the children's biological parent(s) met the AFDC eligibility standard for Title IV-E purposes, no means test will be applied to the children's current or prospective adoptive parent(s), regardless of their income. (Expert Report of Jeanette Wiedemeier Bower, Ex. 115, at 11; trial testimony of Wiedemeier Bower.)

73. HHS policy, reflected in Federal Policy Announcement, PIQ-90-02, October 2, 1990, states, "Congress at first considered the inclusion of a 'means test' as a requirement under the Title IV-E adoption assistance program . . . the restriction was later dropped after the Committee noted 'we should not design a program to foster adoptions only in those families with the least financial capacity to care for these special needs children.'" (Federal Policy Announcement, PIQ-90-02, October 2, 1990, Ex. 41, at 1, citing Congressional Record -- Senate -- S11704, Aug. 3, 1979.)

74. The HHS Child Welfare Policy Manual, Section 8.2A.2, states: "The use of a means test is prohibited in the process of selecting a suitable adoptive family, or in negotiating an adoption assistance agreement, including [*41] the amount of the adoption assistance payment." (Federal Child Welfare Policy Manual, Sec. 8.2, Ex. 59, at 8.2A.2.)

75. Fred Simmens, the DSS Director from August 2003 to September 2005, testified that in his 26 years with the agency, he had never suggested a means test for people who adopt special needs children. (Preliminary Injunction hearing, at 38.) Mr. Simmens testified that he had concerns about the adoption subsidy revisions in Senate Bill 539 because they were changing longstanding policy in the state to treat all children the same, whether or not they were receiving federal funds through Title IV-E. (*Id.* at 39-40.) Mr. Simmens testified that this longstanding policy was a very fair system. (*Id.* at 41.) Mr. Simmens further testified that the adoption subsidy program was an important one, and was a factor that encouraged parents to adopt children with special needs. (*Id.* at 44, 41.)

76. Steve Renne, the Acting Director of DSS at all relevant times until April 1, 2005, and now Deputy Director of DSS, testified that in the 20-plus years he had worked for Missouri's Department of Social Services, a means test had never before been proposed and that he had [*42] never before personally advocated such a test. (Renne Dep., Jan. 26, 2006, at 16.) He testified that a non-IV-E eligible child could have more significant needs than a IV-E eligible child, (*id.* at 52-53), and that the means test does not ensure that the most needy children receive subsidies due to the fact that the subsidy is based on the adop-

2006 U.S. Dist. LEXIS 27506, *

tive family's income. (*Id.* at 52.) Renne testified that, as a "bureaucrat," he would not recommend different treatment among the two groups of adoptive children that Senate Bill 539 creates. (*Id.* at 50-51.)

77. Amy Martin, a Program Development Specialist at the Department of Social Services in the Children's Division who is responsible for the development of policy and procedures relating to the adoption program, also agreed that from a policy standpoint, the natural birth parents' income had "no relevance" in determining whether a child should get an adoption subsidy. (Martin Dep., Dec. 13, 2005, at 85.)

78. As a factual matter, an adoptive child's special needs are in no way correlated with his or her birth family's income. For example, if two brothers who suffered from fetal alcohol syndrome as well as other behavioral [*43] disabilities were removed separately from their biological mother's home at times when her income differed, one boy might receive a subsidy jointly funded by state and federal dollars, and the other a purely state-funded subsidy. Adoptive parents would be faced with the situation of being financially able to adopt one brother and not the other, or face the prospect of not being able to meet both boys' needs. (Expert Report of Jeanette Wiedemeier Bower, Ex. 115, at 11-12; trial testimony of Wiedemeier Bower.)

79. Amy Martin, a Program Development Specialist at the Department of Social Services in the Children's Division, also testified that there could be families who had adopted more than one child, where one child might be Title IV-E eligible and the other not. Under the SB 539 scheme, the same family could possibly lose the adoption subsidy for one child, but keep it for the other. When asked if that made sense to her, she testified, "It's difficult for me to get my head around." (Preliminary Injunction hearing, at 188.)

80. If a family were moving ahead with the adoption of a IV-E eligible child, the state would never inquire of the income of the adoptive parents no matter [*44] how high the income. (Trial testimony of Plaintiffs' adoption subsidy policy and practice expert, Jeanette Wiedemeier Bower.)

81. DSS cannot state the number of class member children currently receiving adoption assistance subsidies funded by state and federal funds and whose adoptive parents earn more than 200% of the federal poverty level. (Defendants' First Supplemental Response to Plaintiffs' Second Set of Rule 33 Interrogatories, Ex. 102, at 2-3.)

82. The Senate Bill 539 means test is an irrational mechanism for directing funds to the "most needy" because it uses the gross income of putative or existing adoptive families as an eligibility threshold and fails to account for actual family expenses and other pertinent circumstances that clearly impinge upon a family's ability to adopt and provide for a special needs child. (Emergency Rule 13 CSR 35-38.020, Ex. 50, at (12)(C); Preliminary Injunction hearing, at 162-163.)

**The Challenged Provisions of Senate Bill 539, if Implemented, Will Serve to Increase the Cost of Child Welfare to the State of Missouri**

83. The State of Missouri and the Department of Social Services ("DSS"), through duly authorized [*45] and responsible state officials, have identified a single governmental purpose to be advanced by the means test provision of Senate Bill 539: achieving cost savings in the state's adoption subsidy program by reducing the amount of state funds appropriated for the program and directing those funds to the state's most needy families. (Renne Dep., Jan. 26, 2006, at 31-32; Boies Dep., Jan. 18, 2006, at 103; Kinkade Dep., Jan. 18, 2006, at 64; Martin, Preliminary Injunction hearing, at 164.)

84. Prior to enactment of the Senate Bill 539 mean test provision, DSS prepared a fiscal impact analysis in order to project the cost savings to be generated by the new eligibility scheme in relation to state-only adoption subsidy agreements. Specifically, Patrick Luebbering, an Assistant Deputy Director within DSS, performed a fiscal impact analysis of the proposed means test at the request of the state's Office of

Administration, the agency charged with compiling the annual statewide budget for the Office of the Governor. This fiscal impact analysis concluded that the Senate Bill 539 means test provision would yield a projected annual cost savings of $ 9,716,863 in the state's adoption subsidy [*46] program, assuming that the income threshold was set at 200% of FPL. (Luebbering Dep., Dec. 13, 2005, at 29-32; Fiscal Impact Analysis, Ex. 103, at Bates 1 PRP 28-7.)

85. The fiscal impact analysis prepared by Mr. Luebbering served as the sole basis for the later April 25, 2005 Fiscal Note authored by the Missouri legislature's Committee on Legislative Research, Oversight Division for purposes of informing elected legislative members and the general public regarding, among other things, the anticipated fiscal implications of the Senate Bill 539 means test. (Luebbering Dep., Dec. 13, 2005, at 81-82; 134-136; Summary of Fiscal Impact, Ex. 104; Fiscal Note, Ex. 35; Kinkade Dep., Jan. 18, 2006, at 73-78.)

86. The April 25, 2005 Fiscal Note published by the Committee on Legislative Research includes and adopts the fiscal analysis prepared by Mr. Luebbering. (Fiscal Note, Ex. 35.)

87. The fiscal analysis prepared by Mr. Luebbering erroneously and irrationally projected that cost savings would flow from the Senate Bill 539 means test. The means test, if implemented, actually will increase the overall cost to the state to finance its child welfare program.

88. First, the [*47] projected $ 9,716,863 reduction in adoption subsidy costs is overstated due to the subsequent decision by the Missouri legislature to fund the state's adoption subsidy program in FY2006 at 250% of FPL, as opposed to 200% of FPL, as provided in Senate Bill 539. This legislative action, alone, served to reduce the annual cost savings to be generated by the means test from $ 9,716,863 to $ 5,886,654 (the savings figures derived by Mr. Luebbering's fiscal impact analysis performed at 200% and 250% of FPL, respectively). (Savings from Means Testing, Ex. 106, at 1 PRP 28-36.)

89. Second, the fiscal impact analysis substantially over-counted the number of existing state-only adoption subsidy recipients to be effected by the Senate Bill 539 means test. The fiscal impact analysis assumed that 43% of all existing adoption subsidy recipients in Missouri received state-only funded benefits, as opposed to Title IV-E federally subsidized benefits. (Luebbering Dep., Dec. 13, 2005, at 62-68, 72, 78; Fiscal Impact Analysis, Ex. 103, at Bates 1 PRP 28-7.)

90. This assumption was erroneous for two reasons. First, DSS audited all existing state-only funded adoption subsidy files in the Spring [*48] of 2005 to confirm whether Title IV-E eligibility had been properly denied in the first instance. As a result of the audit process, DSS determined that over 1,000 existing state-only adoption subsidy agreements were actually eligible for Title IV-E federal funding and, therefore, retroactively re-designated those cases to Title IV-E status. (Morris Dep., Dec. 12, 2005, at 50-53; State-Only Adoption Subsidy Case Review, Ex. 107, at 1 PRP 27-2.) Second, the state of Missouri reported a Title IV-E adoption subsidy penetration rate of 82% as of the summer of 2005, meaning that only 18% of adoption subsidy recipients in the state were then receiving state-only funded subsidy payments. Mr. Morris testified that the state of Missouri never has reported a Title IV-E adoption subsidy penetration rate below 70% to his knowledge. (Morris Dep., Dec. 12, 2005, at 27-31.)

91. The $ 5,886,654 in projected cost savings, as calculated by Mr. Luebbering at 250% of FPL, reflects the patently erroneous and irrational assumption that 43% of all adoption subsidy recipients in Missouri are state-only funded. This projected cost savings figure, when recalculated to reflect the fact that only 18% of all [*49] adoption subsidy recipients in Missouri are state-only funded, falls to $ 2,452,772. Put another way, Mr. Luebbering overstated the size of the relevant non-Title IV-E population by a factor of 2.4 (43% versus 18%), resulting in a projected cost savings figure that was also overstated by a factor of 2.4.

92. Moreover, the fiscal impact analysis substantially over-counted the number of prospective state-only adoption recipients to be affected by the Senate Bill 539 means test. The fiscal impact analysis simply carried forward to the population of prospective adoption subsidy recipients the assumption that 43% of

the program's recipients in Missouri receive state-only funded benefits. (Luebbering Dep., Dec. 13, 2005, at 76, 78.)

93. This assumption was erroneous for two reasons. First, as reflected above, the accurate figure for the current percentage of state-only adoption subsidy recipients within the overall adoption subsidy population in Missouri is 18%. Second, the fiscal impact analysis projected a total FY2006 adoption subsidy population in Missouri of 12,474, an estimate that assumed growth in the subject population of 1300 new adoptive children per year. In reality,  [*50]  the state of Missouri experienced a steady decline in the annual number of finalized adoptions from FY2002 through the present as follows: 1,515 in FY2002, 1,429 in FY2003, 1,356 in FY2004, 1,123 in FY2005, and 1,008 projected for FY2006 based upon the actual number of finalized adoptions through the first three quarters of the year. (Table 28, February 2006 Children's Services Management Report, Ex. 120.)

94. The fiscal impact analysis overstated the prospective effect of the means test by assuming too large a prospective recipient population to be means tested. (Renne Dep., Jan. 26, 2006, at 20-23; Martin Dep., Dec. 13, 2005, at 35-36.) Indeed, as of December 31, 2005, the total number of foster children who were adopted and receiving adoption assistance maintenance subsidies in Missouri was 11,450, fully 1,000 children lower than assumed by Mr. Luebbering. (Defendant's Response to Plaintiffs' Second Set of Rule 33 Interrogatories, at 2.)

95. Additionally, as demonstrated below, the $ 2,452,772 adjusted figure must further be reduced to account for significant, additional governmental costs to flow from implementation of the mean test that were not adequately addressed,  [*51]  if at all, in Mr. Luebbering's fiscal analysis.

96. First, the fiscal impact analysis adopted by the state of Missouri underestimated the cost implications of the Senate Bill 539 means test provision in terms of the additional expenses it would impose by causing disruption to existing and putative adoptions. The major component of this increased governmental cost relates to the continuing obligation of DSS to pay monthly foster care maintenance payments to that group of otherwise adoptable children who remain in temporary foster care longer because the means test prevented finalization of their adoptions. (Fiscal Impact Analysis, Ex. 103, at 1 PRP 28-4.)

97. As stated in the "Bullet Points" memorandum prepared by Mr. Leubbering, "[b]y reducing the resources available to parents to adopt special needs children, it is likely that children will remain in custody longer. The average cost for a child in foster care is 20.48% higher than the average cost of a child in adoption subsidy, not including the additional staff time required for Foster Care as opposed to children [in] who are in Adoption Subsidy . . . Any savings due to means testing adoption subsidy could be offset [*52]  by the children remaining in custody longer . . . Projecting an accurate amount for savings is difficult." (Bullet Points Memo, Ex. 93.)

98. Though the fiscal impact analysis properly assumed that the eligibility means test would serve to prevent or disrupt a number of adoptions due to the financial constraints it would impose on adoptive families, it arbitrarily and unreasonably assumed that these disruptions would result in additional foster care stays for displaced children of only six months duration on average. (Luebbering Dep., Dec. 13, 2005, at 98-99; Fiscal Impact Analysis, Ex. 103, at 1 PRP 28-4.) No state witness has provided an empirical or any other rational basis for this six-month figure. (Luebbering Dep., Dec. 13, 2005, at 98-99; Kinkade Dep., Jan. 18, 2006, at 96; Boies Dep., Jan. 18, 2006, at 80-83.)

99. The assumption of an average six-month additional stay in state foster care is arbitrary and demonstrably erroneous based upon DSS adoption policy and Missouri law. Specifically, Section 29.4 of the DSS Child Welfare Manual sets forth agency policy, consistent with *RSMo. § 453.077.1*, that any adoption of a child from temporary [*53]  state care may not be finalized by a court *until the child has lived in the putative adoptive placement for a period of no less than six months.* (DSS Child Welfare Manual, Sec. 4, Ch. 29.4, Ex. 80.) The pre-finalization period also must include vital foster care activities such as the completion of an adoptive home study, a thorough assessment of the child's readiness and suitability for the adoptive placement facilitated by a series of supervised pre-placement visits between

2006 U.S. Dist. LEXIS 27506, *

the child and adoptive family, and a determination of the child's eligibility for adoption subsidy assistance. (Id.)

100. Existing, and readily available, DSS data supports the conclusion that adoptive disruptions will cause children to experience additional foster care stays of 24 months or longer as the state seeks to identify and qualify new adoptive parents. The state of Missouri has reported the following percentages of children exiting foster care into finalized adoptions *within* 24 months of removal from home: 33.10% in FFY2003, 33.70% in FFY 2004, and 38.6% in FFY2005. (DSS Adoption/Guardianship Subsidy Fact Sheet, February 2, 2006, Ex. 95, at 1.) Based upon these reported statistics by DSS, [*54] some 61.4% to 66.9% of the children in state legal custody who attain finalized adoptions only to do so after residing in temporary care for a period *in excess* of 24 months.

101. An October 2005 Yellow Sheet published by the Missouri State Auditor reported that the average length of stay in foster care for children exiting to adoption was 33 months in FY2003 and 31.7 months in FY2004. (Report No. 2005-79, October 2005, Office of the State Auditor of Missouri, Ex. 96, at 1.)

102. The number of children awaiting adoption in Missouri whose biological parents already have lost their parental rights through court ordered termination has been increasing. This subgroup of children in temporary care has risen from 1,527 on September 30, 2000 to 1,660 on September 30, 2002 to 1,919 as of January 2006. (HHS AFCARS Performance Data, Missouri Context Data, Ex. 83, at VI-202; Caseload Counter, http://www.dss.mo.gov/mis/clcounter/history.htm., Ex. 53.)

103. Based upon the above readily available DSS adoption data, the state of Missouri should reasonably anticipate additional foster care stays of 24 months, or even longer, for difficult-to-place, special needs children whose [*55] adoptive placements disrupt as a result of the means test. Mr. Luebbering's cost figure of $ 427,635, which assumes 6 month additional stays for children experiencing disrupted adoptions (with a means test at 250% of FPL), is understated by a factor of at least 3, or by some $ 1.5 million. (Savings from Means Test, Ex. 106, at Bates 1 PRP 28-35.)

104. The fiscal impact analysis likewise failed to account for the increased administrative and caseworker costs directly attributable to adoptive disruptions occasioned by the Senate Bill 539 means test. As noted in the April 25, 2005 Fiscal Note published by the Committee on Legislative Research, Oversight Division, "additionally, there may be some additional cost in staff time due to children staying in care longer. However the impact is unknown." (Fiscal Note, Ex. 35, at 9.) Though unknown in terms of its precise amount, this increased overhead is not inconsequential. Fred Simmens testified that he agreed that there were expenses to foster care outside the maintenance payment to foster parents, such as administrative costs for caseworkers, deputy juvenile officers, and court time (Preliminary Injunction hearing, at 46-47), and that [*56] this comment in the Fiscal Note essentially meant that "this fiscal note did not calculate what the added expense was going to be by kids being in foster care longer." (Id. at 47, 69-71.)

105. In a recent peer review publication of the University of Chicago, University of North Carolina Professor Richard Barth stated "the burgeoning numbers of children receiving adoption subsidies have led some states to be concerned about or even to curtail adoption subsidy levels . . . This study uses longitudinal adoption subsidy and foster care placement data to estimate the relative costs of foster care and adoption . . ." and concluded, "[o]n balance, adoption achieves substantial governmental savings." ("A Comparison of the Governmental Costs of Long-Term Foster Care and Adoption," Richard P. Barth, Chung Kwon Lee, Judith Wildfire, and Shenyang Guo, University of Chicago Social Service Review, March 2006, Ex. 105, at 1.)

**Senate Bill 539 Means Test: Elimination of a Threshold into Medicaid for Special Needs Children**

2006 U.S. Dist. LEXIS 27506, *

106. The DSS Child Welfare Manual expressly recognizes that the "Adoption and Safe Families Act of 1997 requires that Medicaid is provided for [*57] children who have a state funded adoption assistance agreement." (DSS Child Welfare Manual, Sec. 4, Ch. 30, Ex. 48, at 30.3.)

107. The state of Missouri provides Medicaid coverage to children under a variety of programs including: (1) "MC+ for Children" which covers children under the age of one whose family income is at or less than 185% of the FPL, children between the ages of one and six whose family income is at or less than 133% of the FPL, and children from ages six to eighteen whose family income is at or less than 100% of the FPL; (2) "MC+ for Kids," Missouri's State Children's Health Insurance Program (SCHIP), 1115 Demonstration Waiver which covers children whose family income is at or less than 300% of the FPL and who do not otherwise benefit from employer-subsidized health care insurance or other health care coverage; and (3) "Children's Division Adoption Subsidy" which provides coverage to all children receiving state-funded adoption assistance payments. (DSS Missouri Medicaid Description, published at http://www.dss.mo.gov/dms/global/pages/about.htm, Ex. 55)

108. Prior to the implementation of the Senate Bill 539 means test, special needs children adopted [*58] by families with an income above 300% of the FPL remain eligible for Medicaid coverage under the "Children's Division Adoption Subsidy" program because they receive adoption subsidies, though they are not qualified for Medicaid coverage under the means tests employed in Missouri's alternative Medicaid programs. (Missouri DSS Child Welfare Manual, Sec. 4, Ch. 30, Ex. 48, at 30.3)

109. *Section 208.640.2* of Senate Bill 539 amends RSMo to provide that "[p]arents and guardians of uninsured children with incomes between one hundred fifty-one and three hundred percent of the federal poverty level who do not have access to affordable employer-sponsored health care insurance or other affordable health care coverage may obtain coverage pursuant to this section."

110. Upon implementation of the Senate Bill 539 means test, special needs children adopted by families earning more than 300% of the FPL will lose their adoption subsidy eligibility and, therefore, their access into the state's Medicaid program through the Children's Division Adoption Subsidy program. (Senate Bill 539, Ex. 34, at 208.640.2, 453.073.)

111. Upon implementation of the Senate Bill 539 means test, special [*59] needs children adopted by families earning above 200% of the FPL and carrying available employer-sponsored health care coverage will be entitled to Medicaid coverage only if the family purchases such coverage under *Section 208.640.2*. Prior to the implementation of the Senate Bill 539 means test, these same special needs children qualify for Medicaid under the Children's Division Adoption Subsidy program at no additional cost to the adoptive family.

112. Amy Martin, a Program Development Specialist at the Department of Social Services in the Children's Division who is responsible for the development of policy and procedures relating to the adoption program, testified that SB 539 includes "vague" language about the ability of families to keep Medicaid if they are means-tested out. She testified that the view she and the Children's Division have taken, however, is that children whose subsidies are denied or terminated under the implementation of SB 539 will continue to keep their Medicaid. She further characterized Medicaid as an "essential" benefit under adoption agreements. (Martin Dep., Dec. 13, 2005, at 18-19.)

113. Counsel for defendant stipulated on the record that all [*60] children adopted from DSS temporary care must be and will be provided with Medicaid coverage, regardless of the income of their adoptive parent. Counsel for defendant further stipulated that the state intended to implement Senate Bill 539 consistent with this obligation. (Preliminary Injunction hearing, at 6-9.)

**Senate Bill 539: Threat of Irreparable Harm to Current Foster Children and Adopted Foster Children in Missouri**

114. As of August 17, 2005, the Children's Division projected that at least 1274 special needs children currently receiving an adoption subsidy under an existing contract with DSS will lose their benefit as a result of the Senate Bill 539 amendments. (Adoption Subsidy and Legal Guardianship, Ex. 121, at Bates 1 PRP 41-17.)

115. It is undisputed that the direct result of the adoption subsidy provisions of Senate Bill 539, if implemented, will be longer stays by special needs children in government foster care. (Bullet Points Memo, Ex. 93.)

116. *Sections 453.073.3(4)* and *453.073.4* of Senate Bill 539, if implemented, also will create uncertainty in relation to the financial capacity of existing adoptive families and putative adoptive [*61] parents to meet the serious, and oftentimes expensive, medical, educational and emotional needs of the special needs children they adopt or wish to adopt. The essential bargain underlying an adoption assistance agreement is the promise by the adoptive parent(s) to accept legal custody, and the concurrent responsibilities and duties, of a special needs child until he or she reaches the age of majority in exchange for the state's commitment to provide monthly assistance payments to make the adoption financially possible without causing undue economic burden on the adoptive family. Senate Bill 539 threatens to undermine or completely withdraw the state's end of this vital bargain. The resulting uncertainty will cause a reduction in the number of adoptions and will prolong the stays of special needs children in temporary foster care placements much to their emotional detriment. (Trial testimony of Wiedemeier Bower.)

117. Fred Simmens, the DSS Director from August 2003 to October 2005, testified that he agreed that the means test in SB 539 could have a negative impact on the level of confidence that foster parents and prospective adoptive parents have in some portions of the child [*62] welfare system in Missouri, based on the "reasonable assumption" that parents might feel that the state broke its promise to them in the subsidy contracts. (Preliminary Injunction hearing, at 78.)

118. Steve Renne, Acting Director of DSS at all relevant times until April 1, 2005, now Deputy Director of DSS, agreed that Missouri's adoption subsidy program helped to move children from foster care to adoptive families more quickly than if there were not a subsidy program. (Renne Dep., Jan. 26, 2006, at 9.) He also testified that an adoption subsidy can make the difference between adopting and not adopting for some families. (*Id.* at 39.) He testified that SB 539's scheme regarding adoption subsidies provided no direct benefits to children. (*Id.* at 32.)

119. Martin testified that her department recognized that 1) some children may remain in foster care for longer periods of time under SB 539; 2) some children may come back into foster care due to the inability of families to support their needs; and 3) the bill was "unfair" to those children who are not eligible for IV-E federal funds. (Martin Dep., Dec. 13, 2005, at 14-17; DSS Bill Review, Ex. 97, at Bates 1 PRP 40-123.) [*63] Martin testified that if adoptive families were means tested out, but kept their child, the loss of the adoption subsidy could present a hardship to the family. (Martin Dep., Dec. 13, 2005, at 39.)

120. Martin testified that DSS had a fact sheet observing that children are less likely to be abused if they are adopted, as opposed to remaining in foster care. (*Id.* at 52-54; DSS Fact Sheet, Ex. 98, at Bates 1 PRP 40-145.) Martin further testified that she was aware of and accepted studies that found it is harmful for children to stay in foster care longer, and that it is preferable to be in an adoptive family as opposed to staying in foster care longer. (Martin Dep., Dec. 13, 2005, at 29.)

121. *Sections 453.073.3(4)* and *453.073.4* of Senate Bill 539 will also deter foster parents from adopting special needs children placed into their temporary physical custody. These foster parents currently receive for the duration of the child's foster care episode a dependable stream of foster care maintenance payments from the state to assist in the care of the child. If Senate Bill 539 takes effect, foster parents will become less inclined to adopt a special needs foster child and thereby [*64] exchange the certain stream of foster care maintenance payments for the, oftentimes, reduced flow of adoption assistance

payments, particularly when the stream of adoption assistance benefits is rendered uncertain in duration and amount. (Trial testimony Weidemeier Bower.)

122. As children spend more time in foster care, they are likely to be subjected to multiple moves in custody, which is harmful. (Expert Report of Jeanette Wiedemeier Bower, Ex. 115, at 14; trial testimony Weidemeier Bower.)

123. Senate Bill 539 also threatens to reverse the significant improvements in permanency outcomes achieved in Jackson County, Missouri under the court-supervised consent decree entered in *G.L., An Infant, by and through his Next Friend, et al. v. Gary Stangler et al,* No. 77-0242-CV-W-1 in the Western District of Missouri. The systemic reforms implemented in Jackson County under the *G.L.* consent decree have caused the average time a child spends in foster care before realizing adoption to fall from 36.12 months in 1994 to 26.99 months in 2004. Similarly, the average length of time between the identification and assignment of adoption as a child's permanency goal to the child's [*65] adoptive placement has fallen from 23.37 months in 1995 to 15.92 months in 2004. (July 1, 2004 through December 31, 2004 Report of Compliance, *G.L. et al. v. Gary Stangler et al.,* Ex. 56.)

**Harm to Named Plaintiffs: Impact of Senate Bill 539 on Adoption Assistance Agreements**

**E.C.**

124. Named Plaintiff E.C., by her Next Friend Jill Katz, resides in the legal custody of the Children's Division of the Missouri Department of Social Services in Jackson County, Missouri. E.C. is a member of the class of foster children privy to the consent decree entered in *G.L., An Infant, by and through his Next Friend, et al. v. Stangler, et al.,* No. 77-0242-CV-W-1 (United States District Court for the Western District of Missouri). (Trial testimony of E.C.; Preliminary Injunction hearing, at 22.)

125. E.C. has lived in numerous foster homes since entering foster care at the age of seven and has tired of moving from one home to another. E.C. has lived in her current foster home for two years, has formed a bond with her current foster mother, and wishes to be adopted by her. She desperately wants to enjoy safety and stability in her life. (Trial testimony [*66] of E.C.; Preliminary Injunction hearing, at 23-26.

126. The Children's Division had previously determined that E.C. was ineligible for Title IV-E adoption assistance, but in February 2006, the Children's Division found that it had determined E.C.'s Title IV-E eligibility status in error, and that E.C. is in fact entitled to federally funded adoption assistance, if she is adopted. (Katz Dep., February 23, 2006, at 12-13.) This also means that a family who wishes to adopt E.C. will not be subjected to a means test as provided for in *Missouri Revised Statute section 453.073.4,* as amended by Senate Bill 539, nor will such a family risk losing adoption assistance in the future because their income has surpassed the level permitted by the amended statute.

127. E.C.'s foster mother, Niann Hines received monthly foster care maintenance payments from DSS to care for E.C. Though she wished to adopt E.C., Ms. Hines feared that loss of the foster care maintenance payments, coupled with E.C.'s non-IV-E adoption subsidy status, would impose an economic hardship and prevent her from fully providing for E.C.'s special needs. Upon learning that E.C. is actually [*67] eligible for a Title IV-E adoption subsidy, Ms. Hines shortly thereafter instituted proceedings to adopt E.C. (Trial testimony of Niann Hines.)

**A.C.**

2006 U.S. Dist. LEXIS 27506, *

128. Named Plaintiff A.C., by his parent and Next Friend Lana Capps, is a six-year-old boy who was adopted from the Missouri foster care system in 2002. A.C. and Ms. Capps live in Boone County, Missouri. (Declaration of Lana Capps, Ex. 7; Capps Dep., February 28, 2006, at 6, 9, 10.)

129. A.C. suffers from a congenital heart disorder that has necessitated 14 hospitalizations and two open-heart surgeries during his young life. He will require additional heart surgeries. (Declaration of Lana Capps, Ex. 7.)

130. Ms. Capps earns approximately $ 3,600 a month. She currently receives a monthly adoption subsidy of $ 651 under an adoption assistance agreement she executed with the State of Missouri. The adoption subsidy is a significant portion of Ms. Capps' monthly income, and without it Ms. Capps ability to meet A.C.'s necessary and regular medical, emotional, psychological, and educational needs will be severely and negatively affected. (Declaration of Lana Capps, Ex. 7.)

131. The Children's Division [*68] determined that A.C. is not eligible for federally funded adoption assistance under Title IV-E because A.C.'s natural mother had income that exceeded Title IV-E guidelines at the time A.C. was removed from the home and placed into foster care. ((Declaration of Lana Capps, Ex. 7; Capps Dep., February 28, 2006, at 32; Letter to L. Capps from L. Cole, July 29, 2005, Ex. 119, PR 14-285.)

132. Because A.C. is ineligible for Title IV-E adoption assistance, the State of Missouri has subjected Ms. Capps' income to a means test and has determined that her income exceeds the amount permitted by *Missouri Revised Statute section 473.053.4*, as amended by Senate Bill 539. If Senate Bill 539 is permitted to take effect, the state-funded monthly maintenance adoption subsidy of $ 651 that Ms. Capps has received since she adopted A.C. will terminate. (Declaration of Lana Capps, Ex. 7.)

**J.C.**

133. Named Plaintiff J.C., by his Next Friend Jill Katz, is a 16-year-old now living in the legal custody of the Children's Division, Missouri Department of Social Services, in Jackson County, Missouri. J.C. is a member of the *G.L. v. Stangler, et al.* [*69] class. (Preliminary Injunction hearing, at 31-32.)

134. J.C. has lived in foster care since 1997, following the death of his mother and a short stay with his legal guardian. J.C.'s father's parental rights have been terminated. Since 1997, J.C. has been placed into more foster homes and group homes than he can recall, and he presently resides in a group home. (Preliminary Injunction hearing, at 32-33.)

135. J.C. wishes to be adopted and has experienced several adoptive placements that disrupted before finalization. After J.C.'s mother died and his legal guardian had relinquished custody, it was discovered that J.C. had been the victim of severe abuse while in his mother's care. These experiences left J.C. physically and emotionally traumatized and have necessitated ongoing therapy and treatment. J.C.'s condition and prognosis have improved, but he continues to require therapy and medication. (Child Profile, January 28, 2000, Ex. 108, at Bates RP 3 -- 2000-2007)

136. J.C. would like to have a family that he can count on and trust, and J.C. believes he could have a better life if he were adopted. In foster care, J.C. has not been able to do some of the things that other [*70] 16-year-olds do, such as go with friends to the mall or get a driver's license, and J.C. has not been able to spend the Christmas holidays with a family since he has been in foster care. J.C. fears that the absence of an adoption subsidy will prevent his dream of having an adoptive family. (Preliminary Injunction hearing, at 32-34; Katz Dep., February 23, 2006, at 5-6; Judgment, TR02-00083, In the Interest of J.C., Ex. 74.)

**T.F., B.F. and A.F.**

137. Named Plaintiffs T.F., B.F. and A.F., (formerly known as T.G., B.G., and A.G.), by their Next Friend Jill Katz are biological siblings, ages ten, seven, and five, living with their adoptive parents, Elizabeth W. Fischer and John S. Fischer, in Jackson County, Missouri. Prior to their adoption of T.F., B.F., and A.F., Mr. and Mrs. Fischer were foster parents to the three children through the Missouri foster care system. (Affidavit of Elizabeth Fischer Ex. 3; Fischer Dep., February 21, 2006, at 5-6.)

138. T.F., B.F, and A.F. were severely neglected by their biological parents with far-reaching consequences for the children. T.F. is diagnosed with ADHD and has required residential treatment in the past. T.F. continues [*71] to be evaluated for other possible disorders. B.F., who was also subjected to abuse in her biological home, has long-term conditions, including bipolar and attachment disorders. B.F. has also required hospitalization for her disorders, including after the finalization of her adoption by Mr. and Mrs. Fischer. A.F. has been diagnosed with posttraumatic stress disorder for which she receives therapy and takes prescription medication. (Affidavit of Elizabeth Fischer Ex. 3; Fischer Dep., February 21, 2006, at 17-22.)

139. As foster parents for T.F., B.F., and A.F., Mr. and Mrs. Fischer received approximately $ 1,800 per month in foster care maintenance and subsidies, which included the behavioral rate for T.F. and B.F. Federal law prohibits the payment of Title IV-E adoption assistance benefits in amounts in excess of the pre-existing foster care maintenance payments. *See 42 U.S.C. 673(a)(3).* (Missouri Title IV-E State Plan, Ex. 45, at Sec. 4, Requirement 3(c).) Because of the preliminary injunction granted by the Court in this cause, the state now pays the Fischer's approximately $ 1,500 per month in adoption assistance maintenance payments. T.F. and B.F. [*72] continue to be paid at the behavioral rate. (Affidavit of Elizabeth Fischer Ex. 3; Fischer Dep., February 21, 2006, at 10-11.)

140. All three siblings would have been eligible for federally-funded assistance under Title IV-E but for errors in family court documents only detected by the state after the time frame for perfecting Title IV-E eligibility had expired. (Affidavit of Elizabeth Fischer Ex. 3; Fischer Dep., February 21, 2006, at 14-15.)

141. Because the three children do not qualify for Title IV-E adoption assistance, if the means test in Senate Bill 539 is enforced, the Fischer's eligibility for state-funded adoption subsidies will depend upon their income. The Fischer's monthly income is approximately $ 7,800 -- well above the level permitted by Senate Bill 539. Thus, the Fischer's will lose the adoption assistance they now receive for their three adopted children, which constitutes approximately 15% of their present family income. (Affidavit of Elizabeth Fischer Ex. 3.)

**W.S., M.S. and D.S.**

142. Named Plaintiffs W.S., M.S., and D.S., by their parent and Next Friend Robert Brian Strange, are boys aged 10, 7 and 6, respectively, who were adopted [*73] from the Missouri foster care system in 2000 as a sibling group. The boys were all in the *G.L. v. Stangler et al.* class prior to their adoption. (Trial testimony of Robert Strange.)

143. W.S., M.S. and D.S. now live with their adoptive parents, Robert and Jennifer Strange, in Cass County, Missouri. The boys were initially removed from their biological home after M.S. sustained severe burns when held against a hot water heater by his mother. D.S. is developmentally disabled. (Trial testimony of Robert Strange.)

144. The Strange's annual income is about $ 62,400. They currently receive three separate $ 275 adoption assistance payments each month under the adoption assistance agreements they executed with the state of Missouri on behalf of each of the boys. The Strange's cannot support the medical, educational,

emotional and physical needs of the boys absent the adoption assistance. (Trial testimony of Robert Strange.)

145. The state of Missouri sent a notice letter to the Strange's stating that W.S.'s and M.S.'s adoption subsidies will terminate permanently if the family's gross annual income exceeds the Senate Bill 539 means test. The letter further gave notice that [*74] should the family's gross income meet the means test, all three boys' adoption assistance agreements will, by operation of Senate Bill 539, permanently expire within the year. (Trial testimony of Robert Strange.)

**M.P.**

146. Named Plaintiff M.P., by adoptive parent and Next Friend Michael Patterson, is a 16-year-old adopted child who currently reside with his father in Jackson County, Missouri. M.P. was a member of the *G.L. v. Stangler et al.* class prior to his adoption. (Affidavit of Michael Patterson Ex. 5; Patterson Dep., February 21, 2006, at 4-7.)

147. M..P. was placed in Michael Patterson's home as a foster child. Mr. Patterson has been a foster parent to over 20 children in the past eight years. In addition to M.P., Mr. Patterson has adopted four other children from foster care, three of whom are now adults and living on their own. Mr. Patterson is proud that all of his three grown children graduated from high school, and the youngest was offered a college scholarship. (Affidavit of Michael Patterson Ex. 5; Patterson Dep., February 21, 2006, at 7-8, 18-19.)

148. M.P. was removed from his home and placed in foster care in 1992 because of [*75] neglect and his mother's drug abuse. He was placed in Mr. Patterson's foster home in December 2002 after having lived in over 15 foster homes and children's shelters. Mr. Patterson received the behavioral rate for M.P.'s foster care because of problems that M.P. was experiencing both at home and at school. Mr. Patterson has adopted M.P. and continues to receive the behavioral rate as maintenance under an adoption subsidy agreement executed with DSS. (Affidavit of Michael Patterson Ex. 5; Patterson Dep., February 21, 2006, at 16-18; Psychological Evaluation, July 15, 2003, Ex. 109, at Bates PR12/43-47.)

149. Mr. Patterson has been informed that M.P. is not eligible for federal adoption assistance under Title IV-E, and that therefore, under Senate Bill 539, M.P.'s adoption assistance for maintenance will terminate permanently if Mr. Patterson's gross annual income fails the bill's means test. Mr. Patterson expects that his income will exceed the level permitted by Senate Bill 539. Mr. Patterson has been further informed that even if his gross income passes the means test, M.P.'s adoption assistance agreement will, by operation of Senate Bill 539, permanently expire at the end of [*76] one year. (Affidavit of Michael Patterson Ex. 5; Letter to M. Patterson from F. Simmens of DSS, May 25, 2005, Ex. 63; Letter to M. Patterson from F. Simmens of DSS, July 25, 2005, Ex. 64, at 1.)

**J.A.**

150. Named Plaintiff J.A., by his parent and Next Friend John Antonich, is a 15-year-old boy. He was adopted from the Missouri foster care system in 2004 after some 6 years in foster care. J.A. lives with his adoptive parents in Jefferson County, Missouri. (Trial testimony of J.A..)

151. While in foster care, J.A. lived in 23 different foster homes between the ages of 8 and 10. He later was placed into group care after a suicide attempt. J.A. suffers from severe anxiety, attention deficit hyperactive disorder ("ADHD"), oppositional defiant behavior, and depression. The depression condition has required hospitalization. J.A. also has required intensive tutoring to improve his challenged educational growth. (Testimony of John Antonich at preliminary injunction hearing.)

Case 3:04-cv-00251-HSO-ASH    Document 309-2    Filed 05/18/06    Page 23 of 37

Page 23
2006 U.S. Dist. LEXIS 27506, *

152. Mr. Antonich earns approximately $ 4,580 a month. The Antonich's currently receive a monthly $ 651 adoption subsidy under an adoption assistance agreement they executed with the state [*77] of Missouri. The Antonich's cannot afford the considerable educational, psychiatric and behavioral care necessary to address J.A.'s special needs absent the adoption subsidy. (Testimony of John Antonich at preliminary injunction hearing.)

153. The state of Missouri has sent a notice letter to the Antonich's stating that their adoption subsidies will be terminated permanently if their annual income exceeds the Senate Bill 539 means test -- 200% of the FPL for a family of 3 is $ 32,180 under current federal guidelines. Mr. Antonich earns approximately $ 54,960 per year, and his income will, therefore, surpass the Senate Bill 539 means test. The letter further gave notice that should the family's gross income meet the means test, J.A.'s adoption assistance agreement will, by operation of Senate Bill 539, permanently expire within the year. (Testimony of John Antonich at preliminary injunction hearing.)

## T.J. and A.J.

154. Named Plaintiffs T.J. and A.J., by their parent and Next Friend Lavada Johnson, are 7 and 5 years old, respectively. They were adopted from the Missouri foster care system. Ms. Johnson, who is 60 years old, also supports two children in [*78] therapeutic foster care. (Trial testimony of Lavada Johnson.)

155. T.J. suffers from severe asthma, sinus disease, ADHD and hypoglycemia and requires daily medication. A.J. suffers from chronic lung disease, chronic and persistent asthma and ADHD and also requires daily medication. (Trial testimony of Lavada Johnson.)

156. Ms. Johnson earns approximately $ 1,160 a month. She currently receives monthly $ 651 adoption subsidy payments under the adoption assistance agreements she executed with the state of Missouri. Ms. Johnson cannot afford the considerable medical, psychiatric, educational and emotional care necessary to address T.J.'s and A.J.'s special needs absent the adoption subsidy. (Trial testimony of Lavada Johnson.)

157. The state of Missouri has sent a notice letter to Ms. Johnson stating that the children are Title IV-E eligible, but that her adoption assistance agreements will automatically expire in 2006. (Trial testimony of Lavada Johnson.)

## N.S.

158. Named Plaintiff N.S., by his parent and Next Friend Tammy Smith, is a four-year-old boy who was adopted from the Missouri foster care system in 2002 by Mrs. Smith and her husband, Harold [*79] Smith. N.S. lives with his adoptive parents in St. Charles County, Missouri. (Declaration of Tammy Smith Ex. 10; Smith Dep., February 28, 2006, at 6-7.)

159. N.S.'s natural mother consented to the termination of her parental rights shortly after N.S. was born. The parental rights of N.S.'s natural father were terminated by default. (Order, Judgment and Decree of Court, St. Louis County, June 12, 2002, Ex. 111, at Bates PR 20/9-11.)

160. At the time of N.S.'s adoption, Mr. and Mrs. Smith executed an adoption subsidy agreement with the Division of Family Services (now Children's Division) that provides a monthly adoption assistance maintenance payment at the standard rate until the year 2020 when N.S. will be eighteen years old. (Declaration of Tammy Smith Ex. 10; Smith Dep., February 28, 2006, at 6-7.)

161. N.S. suffers from severe asthma and takes four different medications daily to control the condition. N.S. also requires two breathing treatments twice daily. The asthma condition occasionally results in

asthmatic crises and has required as many as 11 visits to the hospital in one 13-month span. (Declaration of Tammy Smith Ex. 10.)

162. Because of N.S.'s severe [*80] asthma and allergies, Mr. and Mrs. Smith requested that N.S.'s adoption assistance maintenance payment be increased to the medical rate of $ 651 per month, and that request was granted by the Division of Family Services in 2004. Mr. and Mrs. Smith use the additional money to pay for daycare services not provided by the state, co-pays for N.S.'s medical care, and N.S.'s medications not covered by insurance. Because of N.S.'s condition and special needs, the Smith's have had to modify their home, including, but not limited to, the removal of carpeting and the installation of special flooring and bedding, and the increased payment helps to cover that expense. Utility costs are higher for the Smith's because windows in the home must be kept closed. Finally, N.S.'s frequent illnesses have required Mrs. Smith to be absent from her job, so much that she uses her allowable time off as quickly as she earns it, and thus the maintenance payment helps to make up for income lost when Mrs. Smith is forced to take unpaid leave in order to care for N.S. (Declaration of Tammy Smith Ex. 10; Smith Dep., February 28, 2006, at 14-15.)

163. N.S. is eligible for federally funded adoption assistance [*81] under Title IV-E. The state, however, has informed Mr. and Mrs. Smith that their subsidy agreement will expire within one year and have to be renegotiated. (Declaration of Tammy Smith Ex. 10.)

164. The Smith's have obtained approval to adopt a second child, but they are concerned that the changes in the adoption subsidy program will make adoption a financial hardship, and they have lost confidence that the state will adhere to its agreements in these matters. (Declaration of Tammy Smith Ex. 10; Smith Dep., February 28, 2006, at 21.)

## II. CONCLUSIONS OF LAW:

### Elements of Proof for Permanent Injunctive Relief

1. Entry of an injunction is proper where (1) there is a threat of irreparable harm to the movant, (2) the threatened irreparable harm outweighs the injury that granting the injunction will inflict on other litigants, (3) the movant has a probability or likelihood of success on the merits, and (4) the public interest will be served by granting an injunction. *Dataphase Systems v C L Systems, Inc., 640 F.2d 109, 114 (8th Cir. 1980)* (en banc). The standard for granting a permanent injunction is essentially the same as for a preliminary [*82] injunction, except that to obtain a permanent injunction the movant must attain success on the merits. *Bank One v. Guttau, 190 F.3d 844, 847 (8th Cir. 1999)* (citing *Amoco Prod. Co. v. Village of Gambell, Alaska, 480 U.S. 531, 546 n.12, 107 S. Ct. 1396, 94 L. Ed. 2d 542 (1987))*. The grant of a permanent injunction lies within the discretion of the trial court and is subject to review for abuse of that discretion. *Randolph v. Rodgers, 170 F.3d 850, 856 (8th Cir. 1999)*.

2. This Court entered a preliminary injunction on September 9, 2005. By order dated September 29, 2005, this Court certified a plaintiff class in this action comprised of "all future, current and former foster children in the Missouri foster care system, for whom adoption was, is or will be a court-ordered permanent placement goal, and who are or would be beneficiaries of adoption assistance subsidies under Missouri law as unchanged by Senate Bill 539."

### Federal and State Statutory and Regulatory Scheme for Missouri Adoption Subsidy Program

3. Defendant, K. Gary Sherman, is the Director of DSS and, in that capacity, oversees and is legally responsible for the administration [*83] and management of the Children's Division and the implementation of its child welfare programs and services, including adoption services. (*RSMo Section 660.010.1*; Sherman Dep., Jan. 26, 2006, at 4, 19-21.)

2006 U.S. Dist. LEXIS 27506, *

4. The federal Title IV-E adoption assistance program provides federal matching funds to states that establish HHS-approved "qualifying plans" to provide adoption assistance for children with special needs. *42 U.S.C. § 671.*

5. The state of Missouri has a qualifying "State Plan for Title IV-E of the Social Security Act Foster Care, Independent Living and Adoption Assistance" ("Missouri State Plan") and receives federal funding for adoption assistance purposes. (Missouri Title IV-E State Plan, Ex. 45.)

6. Missouri state law, *§ 453.074.1*, states that "the division of family services shall have the following duties in the administration of the subsidy program. . . Comply with all federal laws relating to adoption subsidies in order to maintain the eligibility of the state of Missouri for federal funds." *§ 453.074.1 RSMo.* As a matter of law, DSS is required to operate its entire adoption subsidy [*84] program in compliance with federal law.

7. Additionally, the Missouri State Plan requires that "[a]s a condition of the receipt of Federal funds under title IV-E of the Social Security Act . . . the [state agency] . . . hereby agrees to administer the program in accordance with the provisions of this State plan, title IV-E of the Act, and all applicable Federal regulations and other official issuances of the Department." (Missouri Title IV-E State Plan, Ex. 45, at 2.) As a matter of law, DSS is required to operate its entire adoption subsidy program in compliance with federal law.

8. As held by the Eighth Circuit Court of Appeals, "The state of Missouri has availed itself of the funds offered by Congress through the [Adoption Assistance Act]. Although Congress may not require a state to participate in a program created pursuant to the Spending Clause, once a state agrees to take the funds offered through such programs the state is bound to comply with federally imposed conditions . . . . The [Adoption Assistance Act] requires Missouri to submit to the Secretary of Health and Human Services (HHS) a state plan for providing foster care and adoption assistance that meets [*85] the standards enacted by Congress. *42 U.S.C. § 671.* In Missouri, the Department of Social Services, through its Division of Family Services, has been designated to administer the state plan and assure compliance with the [federal] Act. *Mo.Rev.Stat. § § 207.010, 207.060, 660.010 (2000)." Missouri Child Care Ass'n v. Cross, 294 F.3d 1034, 1036 (8th Cir. 2002)* (internal quotation marks and citation omitted).

9. As a matter of law, the state of Missouri has agreed through its State Plan to comply with federal regulations and official HHS issuances in administering its entire adoption subsidy program to Title IV-E eligible and state-only recipients. (Missouri Title IV-E State Plan, Ex. 45.)

10. Available to the public on-line since September of 2001, the federal Child Welfare Policy Manual provides official issuances of the U.S. Department of Health and Human Services (HHS) on the interpretation of federal law and federal regulations in the area of child welfare, including adoption subsidies. (Federal Child Welfare Policy Manual, Ex. 113; http://www.acf.hhs.gov/j2ee/programs/cb/laws_policies/laws/cwpm/index. [*86] jsp; trial testimony of Jeanette Wiedemeier Bower.)

11. Children with "special needs" are those whom the State has "determined . . . cannot be returned to the home of his parents" and for whom "there exists with respect to the child a specific factor or condition (such as his ethnic background, age, or membership in a minority or sibling group, or the presence of factors such as medical conditions or physical, mental, or emotional handicaps) because of which it is reasonable to conclude that such child cannot be placed with adoptive parents without providing adoption assistance under this section or medical assistance under title XIX." *See 42 U.S.C. § 673(c).*

12. Missouri law and Missouri DSS policy include all foster children in the custody of the Children's Division of DSS as "special needs" children for purposes of adoption assistance subsidies. *See Mo.Rev.Stat. § 453.073.2.*

13. As a matter of law, all class members are thus "special needs" children under federal and state law.

14. The federal Adoption Assistance Act, *Section 673(a)(3)*, requires, in part: "[t]he amount of the payments [adoption subsidies] [*87] to be made in any case under clauses (i) and (ii) of paragraph (1)(B) shall be determined though agreement between the adoptive parents and the State or local agency administering the program under this section, which shall take into consideration the circumstances of the adopting parents and the needs of the child to be adopted, and may be readjusted periodically, with the concurrence of the adopting parents (which may be specified in the adoption assistance agreement), depending upon changes in such circumstances."

15. *Section 673(a)(21)* of the Adoption Assistance Act requires that a state's Title IV-E plan must: "provide for health insurance coverage ... for any child who has been determined to be a child with special needs, for whom there is in effect an adoption assistance agreement (other than an agreement under this part [*42 USCS § § 670 et seq.*] between the state and an adoptive parent or parents, and who the state has determined cannot be placed with an adoptive parent or parents without medical assistance ...."

16. As a matter of law, all current or former DSS foster children are entitled to full medical benefits upon adoption regardless of [*88] the income of their adoptive parents. *See Section 673(a)(21).*

17. Federal law prohibits the payment of Title IV-E adoption assistance benefits in amounts in excess of the pre-existing foster care maintenance payments. (Missouri Title IV-E State Plan, Ex. 45, at Sec. 4, Requirement 3(c).) *See 42 U.S.C. 673(a)(3).*

18. The federal Adoption Assistance Act, *Section 675(3)*, requires that "[t]he term "adoption assistance agreement" means a written agreement, binding on the parties to the agreement, between the State agency, other relevant agencies, and the prospective adoptive parents of a minor child which at a minimum (A) specifies the nature and amount of any payments, services, and assistance to be provided under such agreement, and (B) stipulates that the agreement shall remain in effect regardless of the State of which the adoptive parents are residents at any given time." *See 42 U.S.C. § 675(3).*

19. *Section 453.073 RSMo* requires: "a written agreement shall be entered into by the division and the parents. The agreement shall set forth the following terms and conditions: (1) The type of [*89] allotment; (2) The amount of assistance payments; (3) The services to be provided; (4) The time period for which the subsidy is granted."

20. Senate Bill 539 amends *Section 453.073.3(4) of RSMo* to require: "The time period for which the subsidy is granted [if that period is reasonably ascertainable] shall not exceed one year. The agreement can be renewed for subsequent years at the discretion of the director. All existing agreements will have deemed to have expired one year after they were initially entered into." (Senate Bill 539, Ex. 34, at 453.073.3(4).) *Section 453.073.3(4)* of Senate Bill 539, on its face, applies to both Title IV-E eligible (federal/state funded) and non-Title IV-E eligible (state-only funded) adoption assistance agreements.

21. Senate Bill 539 amends *Section 453.073.4 of RSMo* to require: "The subsidy shall only be granted to children who reside in a household with an income that does not exceed two hundred percent of the federal poverty level or are eligible for Title IV-E adoption assistance." (Senate Bill 539, Ex. 34, at 453.073.3(4).) *Section 453.073.4*, on its face, applies to non-Title IV-E [*90] eligible adoption assistance agreements.

22. HHS regulations require that "there must be no income eligibility requirement (means test) for the prospective adoptive parent(s) in determining eligibility for adoption assistance payments." *45 CFR 1356.40(c).*

**(1) Plaintiffs' Success on the Merits**

Plaintiffs have succeeded on the merits of the statutory and constitutional causes averred in Counts I, II and III of their complaint.

**COUNT I: Violation of Adoption Assistance Act**

23. Under *42 U.S.C. § 1983*, a federal cause of action exists against anyone acting pursuant to state authority that violates any "rights, privileges or immunities secured by the Constitution and laws of the United States." *Pediatric Specialty Care, Inc. v. Arkansas Dep't of Human Services, 293 F.3d 472, 477 (8th Cir. 2002)* (quoting *42 U.S.C. § 1983*). *Section 1983* provides a federal claim for violations of both federal constitutional and statutory law. *Id.* (citing *Maine v. Thiboutot, 448 U.S. 1, 4, 100 S. Ct. 2502, 65 L. Ed. 2d 555 (1980)*.

24. The Adoption Assistance and Child Welfare Act of 1980, [*91] as amended by the Adoption and Safe Families Act of 1997, *42 U.S.C. § § 620-629(i)* and *670-679(b)*, constitutes controlling federal statutory law under the *Supremacy Clause of the United States Constitution. See Blum v. Bacon, 457 U.S. 132, 145-46, 102 S. Ct. 2355, 72 L. Ed. 2d 728 (1986)*(holding that, under the *Supremacy Clause*, federal Spending Clause legislation, such as the Adoption Assistance Act, supercedes conflicting state statutes and regulations). *See also Missouri Child Care Association v. Cross, 294 F.3d 1034 (8th Cir. 2002)*(the Adoption Assistance Act constitutes the supreme law of the land).

25. Moreover, *Section 673(a)(3)* of the Adoption Assistance Act is privately enforceable. *See Pediatric Specialty Care, supra, 293 F.3d 472, 477-78 (8th Cir. 2002)* (setting forth private right of action standard); *ASW v. Oregon, 424 F.3d 970, 975-78 (9th Cir. 2005)* (*§ 673(a)(3)* creates private right of action); *Missouri Child Care Ass'n v. Martin, 241 F. Supp. 2d 1032, 1041-42 (W.D. Mo. 2003)* (on remand) (*§ § 672* and *675* confer enforceable private [*92] rights of action).

26. Three factors determine whether a particular statute creates a private right of action: (1) whether the provision in question was "intend[ed] to benefit the putative plaintiff"; (2) whether the interest the plaintiff asserts is not so "vague and amorphous" that it is beyond the competence of the judiciary to enforce; and (3) whether the provision in question creates a binding obligation on the governmental unit. *Pediatric Specialty, 293 F.3d 472, 477 (8th Cir. 2002)*(citing *Blessing v. Freestone, 520 U.S. 329, 340, 117 S. Ct. 1353, 137 L. Ed. 2d 569 (1997)*).

27. *Section 673(a)(3)* meets the first prong of the private right of action test, as Plaintiffs are the intended recipients and beneficiaries of the adoption assistance benefits conferred under the federal statute. *Mo. Child Care Ass'n v. Martin, 241 F. Supp. 2d 1032, 1041 (W.D.Mo. 2003)*(the beneficiaries of *Section 672* foster care maintenance payments are the foster children though their benefits may be paid indirectly through licensed providers); *ASW, 424 F.3d 970, 975-78 (9th Cir. 2005). Section 673(a)(3)* contains "rights creating language" that demonstrates a statutory intent [*93] to confer a private right of action. *See Gonzaga University v. Doe, 536 U.S. 273, 122 S. Ct. 2268, 153 L. Ed. 2d 309 (2002)*(where the Court clarified the three-pronged standard in *Blessing, Id at 340*); *see also Masterman v. Goodno, 2004 U.S. Dist. LEXIS 354 at *20-24 (D.Minn. Jan. 8, 2004)*.

28. *Section 673(a)(3)* additionally satisfies the second prong of the private right of action test requiring that plaintiff assert an interest that is not so "vague and amorphous" as to be beyond the competence of the judiciary to enforce. *Pediatric Specialty Care, 293 F.3d at 477* (citing *Blessing, 520 U.S. at 340*). *See also Mo. Child Care Ass'n v. Martin, 241 F. Supp. 2d 1032, 1041 (W.D.Mo. 2003)*; *ASW, 424 F.3d 970, 975-78 (9th Cir. 2005) Section 673(a)(3)* explicitly provides that the amount of any adoption assistance payments may be adjusted only with the "concurrence" of the adopting parents, and in consideration of specific factors, including the "the needs of the child being adopted." *42 U.S.C § 673*. As a matter of law, this statutory provision is well suited to court enforcement.

29. The final prong [*94] of the test, "whether the provision in question creates a binding obligation on the governmental unit," is also satisfied by *§ 673(a)(3)*. *Pediatric Specialty Care, 293 F.3d at 477* (citing *Blessing, 520 U.S. at 340*)(the statutory provision to be enforced must be couched in mandatory rather than precatory terms."). *Section 673(a)(3)* states that the adoption subsidy "*shall* be determined through agreement between the adoptive parents and the state or local agency" and that the *only* circumstance where the subsidy may be "adjusted periodically" is "with the concurrence of the adopting par-

ents." (emphasis added). *See also ASW, 424 F.3d 970, 975-78 (9th Cir. 2005)* (concluding *§ 673(a)(3)* creates a private right of action).

30. *Section 453.073.3(4)* places within the discretion of the DSS Director the unilateral authority to re-new adoption subsidy agreements executed by the state of Missouri for both IV-E eligible and non-IV-E eligible subsidies. On its face, this provision conflicts with, violates, and is preempted by the express language of *42 U.S.C. 673(a)(3)* which states that adoption subsidy agreements [*95] "may be read-justed periodically, *with the concurrence of the adopting parents* (which may be specified in the adoption assistance agreement), depending upon changes in such circumstances." (emphasis added.)

31. *Section 453.073.3(4)* further imposes a blanket one-year limitation upon the duration of all adoption subsidy agreements and causes all existing adoption subsidy agreements to expire automatically upon their one-year anniversary. On its face, this provision likewise conflicts with, violates, and is preempted by the express language of *42 U.S.C. 673(a)(3)* which states that adoption subsidy agreements "may be readjusted periodically with the concurrence of the adopting parents . . ."

32. In evaluating an alleged statutory violation or conflict, courts first look to the plain meaning of the subject statutory provisions. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984); See also Camacho v. Texas Workforce Comm'n, 408 F.3d 229, 236-37 (5th Cir. 2005).* Additionally, official policy issuances of HHS, the federal agency charged with implementing the Title IV-E program, are to be [*96] given deference. *See id. at 844* ("a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of any agency").

33. Here, the plain language of *Section 673(a)(3)* is dispositive; however, even if the Court were to look beyond this plain statutory language, *Section 453.073.3(4)*, in imposing a blanket limitation on duration and automatic expiration, conflicts with and is preempted by the controlling official HHS issuance in the HHS Child Welfare Policy Manual, Section 8.2D.2, which states: "States may not have a blanket policy which limits the duration of all adoption assistance payments to a date earlier than the eighteenth birth-day of eligible children, although a time limit may be set in individual cases with the concurrence of the adopting parents, depending on the needs of the child and the circumstances of the parents."

34. Moreover, the blanket limitation on duration provision also conflicts with and is preempted by the controlling official HHS issuance in the HHS Child Welfare Policy Manual, Section 8.2D.5, requiring that adoption assistance payments must continue until (1) the child has attained [*97] the age of 18 (or 21 if the state has determined that the child has a mental or physical disability which would warrant the continuation of assistance); (2) the State determines that the adoptive parents are no longer legally re-sponsible for the support of the child; or (3) the State determines that the adoptive parents are no longer providing any support to the child. (HHS Child Welfare Policy Manual, Sec. 8.2, Ex. 59, at 8.2D.5.)

35. As a matter of law, under the challenged amendments to 473.073.3(4), all existing adoption subsidy contracts expire on June 30, 2006, and all new subsidy contracts will expire on their one-year anniver-sary. DSS policy, unchanged by the challenged provision, expressly distinguishes between review and automatic renewal on the one hand, and renegotiation upon expiration on the other hand. (Plaintiffs' Ex. 48; Defendant's Post Trial Proposed Findings of Fact para. 39; Plaintiffs' Post Trial Proposed Findings of Fact para. 77.) Defendant's assertion of an "intent" not to do what the challenged provision and DSS pol-icy both say to the contrary -- taken as a litigation position and never reduced in writing within even a DSS policy -- is without merit. [*98] *See, e.g., Idaho Dep't of Health and Welfare v. United States Dep't of Energy, 959 F.2d 149, 153 (9th Cir. 1992)* ("We grant no deference to [a regulatory] interpretation put forth merely as a litigation position.")

36. Finally, the Court has received into the evidentiary record an August 29, 2005 letter from Linda K. Lewis, Regional Administrator of the United States Department of Health and Human Services to DSS Director K. Gary Sherman. This letter sets forth the following official position of HHS: "[t]he Admini-stration for Children and Families has determined that Missouri is out of compliance with title IV-E re-

2006 U.S. Dist. LEXIS 27506, *

quirements because SB 539 states that the period for which all subsidies will be granted will not exceed one year and the director has the discretion as to whether the agreement can be renewed for subsequent years." (Letter from L. Lewis of HHS to G. Sherman of DSS, August 29, 2005, Ex. 94, at Bates 1 PRP 38-4 to 38-6.)

37. The August 29, 2005 HHS letter further states, "Federal requirements state that once a child is determined eligible for title IV-E adoption assistance, he or she remains eligible and the subsidy continues for reasons specified [*99] in the Federal policy [Child Welfare Policy Manual, Section 8.2B.9 and Social Security Act - *Section 473*]. The Federal policy further states that States may not have a blanket policy which limits the duration of adoption assistance payments to a date earlier than the eighteenth birthday of eligible children, although a time limit may be set in individual cases with the concurrence of the adopting parents . . . [Child Welfare Policy Manual, Section 8.2D.2 and Social Security Act -- *section 473*]. The Missouri legislation, however, states that the period for which all subsidies will be granted will not exceed one year." (Letter from L. Lewis of HHS to G. Sherman of DSS, August 29, 2005, Ex. 94, at Bates 1 PRP 38-4 to 38-6.)

38. The August 29, 2005 letter also states, "Federal policy [Child Welfare Policy Manual Section 8.2D.5 and Social Security Act -- *section 473*; and *45 CFR 1356.40(b)*] provides that once a child is determined eligible for adoption assistance under IV-E, he or she remains eligible and the subsidy continues unabated. Once an adoption assistance agreement is signed and in effect, it can only be terminated if 1) the child has reached [*100] the age of 18 (or the age of 21 if the State has determined that the child has a mental or physical disability which would warrant continuation of assistance), 2) the State determines that the adoptive parents are no longer legally responsible for the support of the child, or 3) the State determines that the adoptive parents are no longer providing any support to the child. Missouri's legislation, however, states that the agreement can be renewed for subsequent years "at the discretion of the director" and therefore violates Federal policy." (Letter from L. Lewis of HHS to G. Sherman of DSS, August 29, 2005, Ex. 94, at Bates 1 PRP 38-4 to 38-6.)

39. The Court gives due deference to this letter as well as official HHS policy issuances in construing of *42 U.S.C. Section 673(a)(3)*. *Section 453.073.3(4)* conflicts with and is preempted by the plain meaning of *673(a)(3)* of the Adoption Assistance Act, the reasonable official HHS issuances under that Act, and as specifically construed and applied by HHS in the Lewis letter in administering the Title IV-E federal program.

## COUNT II: Equal Protection

40. Missouri Senate Bill 539 amends the state's [*101] adoption subsidy law to include a new *Mo.Rev.Stat. § 453.073.4*. The "means test" established in *Section 453.073.4*, on its face, creates two classifications of otherwise similarly situated abused and neglected, special needs children, all current or former state wards of the Missouri foster care system. The means test will be applied both retroactively and prospectively to initially deny or terminate existing adoption subsidy benefits to one group of children and not the other.

41. Specifically, for one group, in which the income of the children's *biological* parent(s) (from whom they were removed and placed into foster care) exceeded the 1996 Aid for Families With Dependent Children (AFDC) eligibility standard for Title IV-E purposes (also referred to as "non IV-E eligible" children), the new means test will be imposed on the income of the children's existing or prospective *adoptive* parents to initially deny or terminate their existing adoption subsidy. For the other group, in which the income of the children's biological parent(s) met the AFDC eligibility standard for Title IV-E purposes ("IV-E eligible" children), no means test will be applied [*102] to the children's current or prospective adoptive parent(s), regardless of their income. *Mo.Rev.Stat. § 453.073.4* creates an unlawful discriminatory classification under the *Equal Protection Clause*.

42. A single governmental purpose has been advanced for § 453.073.4 and its means test: achieving cost savings in the state's adoption subsidy program by reducing the amount of state funds appropriated for the program and directing those funds to the most needy.

43. First, this classification infringes on the fundamental right of foster children -- their liberty interest in avoiding unnecessary government confinement -- and cannot survive strict scrutiny review. A discriminatory classification implicating a suspect class or a fundamental right triggers strict scrutiny. *Plyler v. Doe, 457 U.S. 202, 216-218, 102 S. Ct. 2382, 72 L. Ed. 2d 786 (1982); Lubin v. Panish, 415 U.S. 709, 721-22, 94 S. Ct. 1315, 39 L. Ed. 2d 702 (1974)*. Under strict scrutiny, a statute's classification must be narrowly tailored to achieve a compelling state purpose. *Plyler v. Doe, 457 U.S. at 216-218.*

44. "Liberty from bodily restraint always has been recognized as the core of the liberty [*103] protected by the *Due Process Clause* from arbitrary governmental action." *Youngberg v. Romeo, 457 U.S. 307, 316, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982)* (citing *Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1, 18, 99 S. Ct. 2100, 60 L. Ed. 2d 668 (1979)* (Powell, J., concurring in part and dissenting in part). *See also DeShaney v. Winnebago, 489 U.S. 189, 200, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989); Ingraham v. Wright, 430 U.S. 651, 673-674, 97 S. Ct. 1401, 51 L. Ed. 2d 711 (1977); Collins v. Bellinghausen, 153 F.3d 591, 596 (8th Cir. 1998).*

45. Unnecessarily prolonged confinement in government foster care invokes the substantive due process liberty interests of foster children. *See DeShaney, 489 U.S. at 201 n.9; Taylor v. Ledbetter, 818 F.2d 791, 796-97 (11th Cir. 1987)* (recognizing due process liberty interest of foster child in state custody in a damages action under § 1983); *Kenny A. v. Perdue, 356 F.Supp.2d 1353, 1360-61 (N.D.Ga., 2005)* (finding that "the evidence shows that foster children in state custody are subject to placement in a wide array of different types of foster care placements, including institutional facilities where their physical liberty is greatly restricted"). [*104] *See also Norfleet ex rel. Norfleet v. Arkansas Dep't of Human Servs., 989 F.2d 289, 293 (8th Cir. 1993)* (foster children have constitutional right to "adequate medical care, protection and supervision"). *See also Foucha v. Louisiana, 504 U.S. 71, 85-86, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992)* (plurality opinion) (four justices acknowledged that restraint on liberty is a fundamental right and violative of equal protection where the State had not provided a "particularly convincing reason.") The asserted purpose of cost savings here fails to meet this articulation of heightened scrutiny.

46. Defendant in this case concedes that *Mo.Rev.Stat. § 453.073.4* will result in foster children staying in foster care for *at least six months longer*. This impingement of foster children's substantive due process rights constitutes a violation of their fundamental rights, triggering strict scrutiny review. *Section 453.073.4* must be enjoined because it is not narrowly tailored to serve a compelling state interest. The state's asserted government purpose, cost savings, is not sufficient to withstanding this rigorous standard of review. *See Shapiro v. Thompson, 394 U.S. 618, 632, 89 S. Ct. 1322, 22 L. Ed. 2d 600 (1969).* [*105] The means test is not narrowly tailored, as it selectively tests some adoptive parents' gross income without consideration of actual expenditures or even the child's needs.

47. Second, even assuming *arguendo* that rational basis review applies, the means test in *RsMo 453.073.4* is not rationally related to a legitimate government interest.

48. The means test established in *Section 453.073.4*, on its face, creates two classifications of otherwise similarly situated abused and neglected, special needs children, all current or former state wards. The means test will be applied to deny adoption subsidy benefits to one group of children and not the other. Specifically, for one group in which the income of the children's biological parent(s) (from whom they were removed and placed into foster care) exceeded the AFDC eligibility standard for Title IV-E purposes, the means test will be imposed on the income of the children's existing or prospective adoptive parents to deny or abrogate their adoption subsidy. For the other group, in which the income of the children's biological parent(s) met the AFDC eligibility standard for Title IV-E purposes, no means test will be applied to the [*106] children's current or prospective adoptive parent(s), regardless of their income. In the area of economics and social welfare, equal protection analysis requires that the state establish that

the challenged classification is rationally related to some legitimate governmental purpose. *Ranschburg, 709 F.2d 1207, 1209 (8th Cir. 1983)* (citing *United States Dep't of Agric. v. Moreno, 413 U.S. 528, 533, 93 S. Ct. 2821, 37 L. Ed. 2d 782 (1973); Dandridge v. Williams, 397 U.S. 471, 485, 90 S. Ct. 1153, 25 L. Ed. 2d 491 (1970); Medora v. Colautti, 602 F.2d 1149, 1152 (3d Cir. 1979); Alcala v. Burns, 545 F.2d 1101, 1104 (8th Cir. 1976)).*

49. A virtually identical social welfare classification in Missouri failed to withstand Equal Protection scrutiny in *Ranschburg, 709 F.2d 1207 (8th Cir. 1983).* In *Ranschburg,* plaintiffs challenged on Equal Protection grounds a utility subsidy program in Missouri that granted financial assistance to multiple classifications of disabled citizens, whose eligibility for a statutory utility program under state law was determined solely by their additional participation in other statutorily enumerated public assistance programs. [*107] *Id. at 1208-09.* Plaintiffs, deemed "disabled" under the purview of the Missouri Medical Assistance Program, were nonetheless denied utility subsidy benefits because they did not participate in any of the public assistance programs specifically enumerated in the challenged statute. *Id.*

50. Plaintiffs contended that because they were equally situated in terms of need and disability with those receiving the utility subsidy, the state had acted unconstitutionally in excluding them from the program benefits. *See Id. at 1209-11.* The state of Missouri defended its statutory scheme in the District Court, arguing that it rationally promoted the state's legitimate interest in allocating limited public funds among the state's most needy citizens. *Id.* The Court struck down the challenged statute finding that no legitimate governmental interest was served by the subject classification.

51. Upon review, the Eighth Circuit Court affirmed the District Court's judgment striking down the utility subsidy law on Equal Protection grounds. The Circuit agreed that the state of Missouri generally possesses a legitimate interest in directing limited public [*108] funds to the most needy; however, it concluded that the challenged program's eligibility classifications were irrational as they assured no greater need on the part of program recipients than was demonstrated by the non-recipient plaintiffs. *Id. at 1210.*

52. The Eighth Circuit held: "[a]lthough states may have great discretion in the area of social welfare, they do not have unbridled discretion. They must still explain why they chose to favor one group of recipients over another. Thus, it is untenable to suggest that a state's decision to favor one group of recipients over another by itself qualifies as a legitimate state interest." *Id. at 1211.*

53. The classification imposed by Senate Bill 539 is as irrational as the classification struck down in *Ranschburg.* The means test in Senate Bill 539 is not rationally related to a legitimate governmental interest, and is arbitrary and harmfully unfair. No conceivable thread ties means testing a child's *adoptive* parents' gross income because that same child's *biological* parents' income exceeded an income standard, to the governmental interest in directing state funds to the most needy. [*109] Undisputedly needy children will be denied the benefit -- the children whose adoption assistance subsidies are selectively denied or terminated under the new law are, by definition, at least equally in need of the benefit as those who will receive the subsidies.

54. The challenged law is also unfair and not rationally related to saving money by directing state funds to the most needy because it will never apply a means test to the income of the adoptive parents of IV-E eligible children, no matter how high their gross income may be. Moreover, the state will continue to fund all IV-E eligible children, regardless of their adoptive parents' gross income, with 38% state dollars. *See 69 Fed. Reg. 68,372 (Nov. 24, 2004)* (Federal Financial Participation in State Assistance Expenditures, FY 2006). At the same time, the law will deny or terminate adoption assistance subsidies completely to only certain special needs children whose adoptive parents' gross income exceeds 200% of the federal poverty level or "FPL" ($ 32,180 for a family of three) solely because their biological parents' income exceeded the 1996 AFDC standard. State dollars will thus fund subsidies for children [*110] in adoptive homes with higher gross incomes than the homes where the state will deny or terminate subsidies for equally needy children. Adoptive parents with more than one adoptive child could arbitrarily lose the subsidy for one child, but retain it for another. (Preliminary Injunction hearing, at 188.)

55. Finally, the asserted governmental purpose underlying the means test is wholly illusory and non-existent because the means test will not save taxpayer money, but will increase the overall cost of child welfare in the State of Missouri. The State irrationally projected fiscal savings to flow from Senate Bill 539 based upon (1) the clearly erroneous assumption that 43% of all existing adoption subsidy benefici-aries in Missouri were non-IV-E eligible when, in actuality, only 18% were non-IV-E eligible, (2) the clearly erroneous assumption that the adoption subsidy population in Missouri would grow at the flat rate of 1300 per year when, in actuality, adoptions in Missouri had steadily declined from 1,515 in FY 2002 to 1,123 in FY2005 according to readily available DSS adoption program data, (3) the arbitrary and false assumption that children whose adoptive placements are disrupted [*111] as a result of the means test will experience, on average, a six month additional stay in foster care, even though readily available state foster care performance data demonstrated that additional stays of 24 months or longer should be ex-pected, (4) a complete failure to account for the significant administrative and caseworker costs required to serve the increased foster care population resulting from Senate Bill 539, even though these cost im-pacts were fully recognized and anticipated by DSS officials, and (5) a failure to properly account for the legislature's FY2006 adoption subsidy program appropriation at 250% of FPL, instead of 200% of FPL. (Morris Dep., Dec. 12, 2005, at 27-31; Table 28, February 2006 Children's Services Management Report, Ex. 120; Report No. 2005-79, October 2005, Office of the State Auditor of Missouri, Ex. 96, at 1; Pre-liminary Injunction hearing, at 46-47; Savings from Means Testing, Ex. 106, at 1 PRP 28-36.)

56. As a matter of law, the Court holds that the asserted governmental purpose for the adoption subsidy provisions of Senate Bill 539 is arbitrary and clearly erroneous. *State of Minnesota v. Clover Leaf Creamery, 449 U.S. 456, 464, 101 S. Ct. 715, 66 L. Ed. 2d 659 (1981)*. [*112] In the face of readily available DSS adoption data and the recognized additional foster care costs to flow from the means test, the budgetary savings asserted by the state could not reasonably be conceived to be valid by any reason-able governmental decision-maker.

**COUNT III: *Contracts Clause***

57. The *Contracts Clause of the United States Constitution* prohibits the states from enacting legislation that "impair[s] the Obligation of Contracts . . ." on a retroactive basis. *United States Constitution, Art. I, Sec. 10, cl. 1*. In adjudicating the legality of a statute under the *Contracts Clause*, the court must deter-mine "whether the state law has, in fact, operated as a substantial impairment of a contractual relation-ship." *Energy Reserves Group, Inc. v. Kansas Power and Light Co., 459 U.S. 400, 411, 103 S. Ct. 697, 74 L. Ed. 2d 569 (1983)* (citing *Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 244, 98 S. Ct. 2716, 57 L. Ed. 2d 727 (1978)). See also, Koster v. City of Davenport, Iowa, 183 F.3d 762, 766 (8th Cir. 1999)*.

58. The United States Supreme Court has established a three-part analysis for a constitutional inquiry under the *Contracts Clause*: "(1) does a contractual [*113] relationship exist, (2) does the change in the law impair that contractual relationship, and, if so, (3) is the impairment substantial." *Koster, 183 F.3d at 766* (quoting *Honeywell, Inc. v. Minnesota Life and Health Ins. Guar. Assoc., 110 F.3d 547, 551 (8th Cir. 1997))*.

59. Significantly, when the State is a party to the subject contract, the Court does not grant the customary level of deference it affords a state legislature when "reviewing economic and social regulation[.]" *En-ergy Reserves Group, 459 U.S. at 412-413* (quoting *United States Trust v. New Jersey, 431 U.S. 1, 22, 97 S. Ct. 1505, 52 L. Ed. 2d 92 (1977))*. "Impairment of a State's own contract ... faces[s] more stringent ex-amination under the *Contract Clause* than would laws regulating contractual relations between private parties." *Allied Structural Steel Company v. Spannaus, 438 U.S. 234, 245 n. 15, 98 S. Ct. 2716, 57 L. Ed. 2d 727 (1978)*(citing *United States Trust, 431 U.S. at 22-23*). "When a State itself enters into a contract, it cannot simply walk away from its financial obligations." *Energy Reserves Group, 459 U.S. at 413 n.14*. "Complete deference to a legislative [*114] assessment of reasonableness and necessity is not ap-propriate because the State's self-interest is at stake." *Id.* (quoting *United States Trust, 431 U.S. at 26*).

60. The Form CS-SA-2 Adoption Subsidy Agreements executed between the state of Missouri and adoptive parents, on behalf of their adopted children, constitute binding and enforceable contracts.

61. The Form CS-SA-2 Adoption Subsidy Agreement, Part 1, A, 1-5 obligates the State to "subsidize adoptive parents" for expenses which are categorized in the contracts as "maintenance," "recurring expenses" and "non-recurring expenses."

62. The Form CS-SA-2 Adoption Subsidy Agreement, Part I, C obligates the State "to provide the necessary authorization for participation [of the adopted child] in the Missouri Medicaid Plan...."

63. *Sections 453.073.3(4)* and *453.073.4* of Senate Bill 539 on their face impair the obligation of the state to subsidize the expenses of adopted parents through maintenance payments as stated in the Form CS-SA-2 Adoption Subsidy Agreement and the Form CS-SA-2 Attachments.

64. *Sections 453.073.3(4)* and *453.073.4* of Senate Bill 539 on their face impair the State's contractual [*115] obligation to "provide necessary authorization for participation [of adopted children] in the Missouri Medicaid Plan" as stated in the Form CS-SA-2 Adoption Subsidy Agreement, Part I Sec. C.

65. The impairment of contractual rights caused by *Sections 453.073.3(4)* and *453.073.4* of Senate Bill 539 is substantial. *Section 453.073.3(4)* abrogates all existing agreements ("all existing agreements will have been deemed to have expired ...."). *Section 453.073.3(4)* transforms what were binding contractual obligations for adoption assistance into payments made "at the discretion" of the State and reviewable by the State alone on a yearly basis.

66. By making all pre-existing contracts expire after one year, *Section 453.073.3(4)* fundamentally alters the duration of existing contracts. Significantly, the State's obligation to authorize the participation of adopted children in the Missouri Medicaid Plan becomes an item subject to a yearly review for eligibility under *Sections 453.073.3(4)* and *453.073.4.*

67. Finally, *Section 453.073.4* adds requirements and conditions for adoption assistance and Medicaid participation which were not part of the original contracts.

68. *Sections 453.073.3(4)* [*116] and *453.073.4* of Senate Bill 539 are unconstitutional under the Contracts Clause of Article I, Section 10 of the United States Constitution. Under the heightened scrutiny standard set forth in *U.S. Trust, Allied Structural Steel* and *Energy Reserves,* the subject statutory revisions are not reasonable as they are intended solely to further an asserted governmental interest in saving money. (See e.g. *U.S. Trust, 431 U.S. at 26:* "If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the *Contract Clause* would provide no protection at all.")

69. As a matter of law, the Court finds that the state may not lawfully use the pre-printed termination clause of Form CS-SA-2 Adoption Subsidy Agreement, Sec. V.C, to terminate existing adoption assistance agreements. This provision states, "(f)urther, either party at any time may, upon thirty (30) days written notice, terminate this agreement without the necessity of showing good cause for this termination. The Division does not intend to terminate this Agreement unless legal, fiscal, or other circumstances necessitate some [*117] adjustment in the Missouri Adoption Subsidy Program expenditures or procedures." (Form CS-SA-2, Ex. 99, at V.C.)

70. First, the V.B. termination clause undermines the federal and state statutory schemes providing for the existence of the contracts in the first place. Missouri contract law requires the severance of clauses that violate public policy. *See Swain v. Auto Services, Inc., 128 S.W.3d 103 (Mo. Ct. App. 2003)* and *High Life Sales Company v. Brown-Forman Corp., 823 S.W.2d 493 (Mo. 1992)* (forum selection clauses voided for reasons of public policy; remainder of arbitration agreements held valid).

2006 U.S. Dist. LEXIS 27506, *

71. Where a party terminates a contract according to its provisions, the contract and all rights thereunder are wholly abandoned. After termination of a contract, all of the parties' unperformed undertakings are ended. *HGS Homes, Inc. v. Kelly Residential Group, Inc. 948 S.W.2d 251, 255 (Mo. Ct. App. 1997); Thumm v. Lohr, 306 S.W.2d 604, 609 (Mo. Ct. App. 1957)*. Such a result is clearly against public policy and unenforceable. The Adoption Assistance and Child Welfare Act of 1980, *42 U.S.C. Sec. 620-629(i)* [*118] , the Adoption and Safe Families Act of 1997, *42 U.S.C. Sec 670-679(b)* and *RSMO Chapter 453* were all enacted to help provide permanent homes for adopted children.

72. Second, operation of the termination clause would violate the principle that a party seeking to rescind or terminate a contract must act before the other party is placed in a position where it would be prejudiced by a rescission or termination. *See e.g., Jetz Service Company, Inc. v. KC Citadel Apartments, L.L.C. Coinmach Corporation, 59 S.W.3d 527, 530 (Mo. Ct. App. 2001); Gilmartin Bros., Inc. v. Kern, 916 S.W.2d 324, 330 (Mo. Ct. App. 1995)*. While the parents did not adopt children solely because of the availability of financial assistance from the State, the parents relied upon the State to fulfill its contractual obligation to defray the considerable financial expenses required to raise and support special needs children. Adoptive parents, regardless of income, relied upon the State to provide financial assistance to special needs children until their eighteenth birthday. The State's abandonment of the contracts is too late. Once the children were [*119] adopted, the parents became legally and morally obligated to raise their adopted children.

73. Finally, under Missouri law, specific contractual terms control over inconsistent general provisions. *See e.g. A&L Holding Company v. Southern Pacific Bank, 34 S.W.3d 415, 418 (Mo. Ct. App. 2000); Tri-County Retreading, Inc. v. Bandag Inc., 851 S.W.2d 780 (Mo.Ct. App.1993)*. It is a well-accepted rule in Missouri that where one contract clause is general, and another is more limited and specific, the more specific clause acts to modify and nullify the more general clause. *Id. at 784; In re Marriage of Buchmiller, 566 S.W.2d 256, 259 (Mo. Ct. App. 1978); Surface v. Ranger Insurance Company, 526 S.W.2d 44, 48 (Mo. Ct. App. 1975)*.

74. The purpose of the Form CS-SA-2 Adoption Subsidy Agreement is to make possible the permanent placement of special needs children in adoptive households. The general termination upon 30 days notice language in Part V., Paragraph B conflicts with the more specific contractual language contained in Part V. A(1)-(6) which identify particular events in the lives of the adoptive [*120] child and parent(s) that will terminate the agreement:

> Assistance as agreed upon in this Agreement shall continue until: (1) The child's 18th birthday or the age of 21 years ... or; (2) The parent's rights to the child have been terminated; (3) The parent is no longer financially responsible for the child; or (4) The child is no longer in the legal custody of the parent . . . or; (5) Child moved out of the home; or (6) Death of the child or both adoptive parents.

75. Use of the term "shall" demonstrates that the contract guarantees that assistance will continue until one of the specifically defined events occurs. Viewed in consideration of V.A and B and the overall purpose of the contract, Sec. V.B. provides the mechanism by which parents or the State would stop the receipt or payment of assistance following the occurrence of one of the events in V.A. Generalized terms in a contract are limited and restricted by the specific provisions. *Surface v. Ranger Ins. Co., 526 S.W.2d 44, 48 (Mo. Ct. App. 1975)*.

## (2) Irreparable Harm to Plaintiffs

76. Absent the entry of a permanent injunction, the plaintiff children will suffer irreparable [*121] harm and the continuing threat of irreparable harm to the stability of their existing adoptive relationships and

home settings. For children still in foster care, they will suffer irreparable harm to their prospects for finding a permanent home through adoption. It is undisputed that children will remain in government custody in foster care for longer periods of time as a direct result of the Senate Bill 539 adoption subsidy provisions. (Bullet Points Memo, Ex. 93.)

77. The *Section 453.073.4* means test of Senate Bill 539, if permitted to take effect, will likely reduce the overall number of adoptions of special needs children in Missouri by reducing the pool of financially capable adoptive parents. This will cause irreparable harm to those foster children who, as a result, will not achieve permanency. (Trial testimony of Jeanette Wiedemeier Bower.)

78. The *Section 453.073.4* means test of Senate Bill 539, if permitted to take effect, would substantially interfere with the financial ability of existing adoptive parents to care for and meet the unique needs of their adopted special needs children. This will cause harm to the adopted children in the form of either inadequate [*122] care or disrupted adoptions. (Trial testimony of Jeanette Wiedemeier Bower.)

79. For example, Named Plaintiff A.C., a 5 year-old boy, is an adopted special needs child with a congenital heart disorder. A.C. has already undergone 14 hospitalizations and requires additional heart surgeries for his serious medical condition. A.C.'s parent and Next Friend, Lana Capps, now earns an annual income of approximately $ 43,200, an amount that exceeds the Senate Bill 539 means test. Without the monthly $ 651 adoption subsidy provided by Missouri pursuant to the long-term adoption subsidy agreement executed at the time of A.C.'s adoption, however, Ms. Capps cannot sustain her household and financially meet the special needs of A.C. and his medical, psychiatric and educational care.

80. Similarly, Named Plaintiff J.A., another 5 year-old boy, is an adopted special needs child who suffers from severe anxiety, ADHD, oppositional defiant behavior disorder, depression and delayed learning. J.A. lived in some 23 different DSS foster homes from ages 8 through 10 and later resided in a group foster home following a failed suicide attempt. J.A's special needs are quite substantial; and his parent [*123] and Next Friend, John Antonich, along with his spouse, Sharon, relies upon J.A.'s long-term $ 651 monthly adoption subsidy to provide special professional care. Mr. Antonich earns an annual income that also surpasses the Senate Bill 539 means test. (Testimony of John H. Antonich at the preliminary injunction hearing.)

81. On a prospective basis, the annual renewal provision of Senate Bill 539 will deter putative adoptive parents from choosing special needs children for adoption, as these otherwise interested parents will quite rationally worry about their long-term financial ability to support the adopted child. (Trial testimony of Jeanette Wiedemeier Bower.)

82. On a retroactive basis, the annual renewal provision threatens to negate the benefits now provided under the numerous existing adoption assistance agreements in Missouri. This basic threat to the viability of adoption assistance agreements creates an increased likelihood that numerous finalized adoptions will disrupt due to changed circumstances resulting in financial hardship within effected adoptive families and the risk that children's special needs will go unaddressed. (Trial testimony of Jeanette Wiedemeier [*124] Bower.)

83. Affected special needs children, including the Named Plaintiffs, will suffer irreparable harm in the form of lost permanency, lost services to meet their special needs, and lost stability. (Declarations of Next Friends, John Fischer, Robert Strange, Michael Patterson, Lana Capps, John Antonich, Lavada Johnson and Tammy Smith.)

84. Moreover, Senate Bill 539 threatens to reverse the significant improvements in permanency outcomes achieved in Jackson County, Missouri under the court-supervised consent decree entered in *G.L. et al. v. Gary Stangler et al,* No. 77-0242-CV-W-1 in the Western District of Missouri. The systemic reforms implemented in Jackson County under the *G.L.* consent decree have caused the average time a child spends in foster care before realizing adoption to fall from 36.12 months in 1994 to 26.99 months in 2004. Similarly, the average length of time between the identification and assignment of adoption as a

child's permanency goal to the child's adoptive placement has fallen from 23.37 months in 1995 to 15.92 months in 2004. (July 1, 2004 through December 31, 2004 Report of Compliance, *G.L. et al. v. Gary Stangler et al.,* Ex. 56.)

85. [*125] In enacting Senate Bill 539, the state of Missouri and DSS were aware that the new eligibility scheme would undermine the essential purpose underlying the state's adoption subsidy program: the achievement of timely permanency with adoptive families for special needs children. Thus, DSS staff prepared a memorandum entitled, "Bullet Points for Means Testing Adoption Subsidy," ("Bullet Points Memo") that provided as follows:

> (a) "By implementing a means test on only the state only adoptions, children who are not IV-E eligible will be put at a disadvantage to being adopted versus children that are IV-E eligible."

> (b) "By reducing the resources available to parents to adopt special needs children, it is likely that children will remain in custody longer. The average cost for a child in foster care is 20.48% higher than the average cost of a child in adoption subsidy, not including the additional staff time required for Foster Care as opposed to children [in] who are in Adoption Subsidy."

> (c) "Any savings due to means testing adoption subsidy could be offset by the children remaining in custody longer."

(Bullet Points Memo, Ex. 93.)

**(3) Balancing the    [*126]    Equities**

86. The irreparable harm to be suffered by plaintiffs absent injunctive relief substantially outweighs any threat of prejudice to defendant.

87. The only possible "harm" to the State is the loss of asserted "savings" to be generated by the new law; however, these purported savings are not only dwarfed by the undisputed harm to occur to the plaintiff children, they are false.

88. The state irrationally projected fiscal savings to flow from Senate Bill 539 based upon (1) the clearly erroneous assumption that 43% of all existing adoption subsidy beneficiaries in Missouri were non-IV-E eligible when, in actuality, only 18% were non-IV-E eligible, (2) the clearly erroneous assumption that the adoption subsidy population in Missouri would grow at the flat rate of 1300 per year when, in actuality, adoptions in Missouri had steadily declined from 1,515 in FY2002 to 1,123 in FY2005 according to readily available DSS adoption program data, (3) the demonstrably false assumption that children whose adoptive placements disrupt as a result of the means test will experience, on average, a six month additional stay in foster care, even though readily available state [*127] foster care performance data demonstrated that additional stays of 24 months or longer should be expected, (4) a complete failure to account for the significant administrative and caseworker costs required to serve the increased foster care population resulting from Senate Bill 539, even though these cost impacts were fully recognized and anticipated by DSS officials and (5) a failure to properly account for the legislature's FY2006 adoption subsidy program appropriation at 250% of FPL, instead of 200% of FPL. (Morris Dep., Dec. 12, 2005, at 27-31; Table 28, February 2006 Children's Services Management Report, Ex. 120; Report No. 2005-79, October 2005, Office of the State Auditor of Missouri, Ex. 96, at 1; Preliminary Injunction hearing, at 46-47; Savings from Means Testing, Ex. 106, at 1 PRP 28-36.)

89. The costs of disrupting the lives of special needs children, diminishing their opportunities for adoption, and maintaining them in state custody for longer periods of time -- the likely results of the SB 539

provisions -- far surpass the false, and, even if true, comparably insignificant, cost savings asserted by the state.

**(4) The Public Interest**

90. The [*128] public interest will be served by the entry of permanent injunctive relief. Public policy strongly favors the efficient and expeditious provision of permanency for abused and neglected children taken into the temporary custody of the state and its child welfare agency. Moreover, the public has a strong interest in the sanctity and enforceability of contracts entered into between the state of Missouri and its citizens. Missouri Senate Bill 539, if allowed to take effect, will undermine these vital interests.

91. There is immense value to society and to individual foster children to have those children move from the foster care system into permanent, adoptive homes when reunification is not possible. (CWLA, Adoption Standards, Ex. 85, at 5; Expert Report of Jeanette Wiedemeier Bower, Ex. 115, at 4; trial testimony of Wiedemeier Bower.)

92. The Senate Bill 539 means test will cause emotional and developmental harm to those children who fail to achieve permanency through adoption. It is widely recognized that there is a higher incidence of poverty, emotional and mental disability, and criminal behavior among foster youth who have attained adulthood, particularly among those foster [*129] youth who aged out of the foster care system without ever knowing a permanent family. (Trial testimony of Wiedemeier Bower.)

93. The challenged provisions will serve to undermine the core purpose of the federal/state adoption subsidy program: to promote permanent homes for special needs foster children. The public interest in furthering the purpose of the federal/state adoption subsidy program will thus be served by issuing a permanent injunction.

Accordingly, the Court has previously signed an Order granting plaintiffs' Motion for Permanent Injunction in this matter for the reasons stated in these Findings of Fact and Conclusions of Law.

SCOTT O. WRIGHT

Senior United States District Judge

Date: 5/9/2006

ORDER

Before the Court are plaintiffs' Proposed Notice of Order Granting Injunctive Relief and defendant's Objections. The Court has reviewed the Proposed Notice as well as defendant's objections. The Court finds that defendant's objections are well-taken.

Accordingly, it is hereby

ORDERED that the Court will not enter the Proposed Notice of Order Granting Injunctive Relief submitted by plaintiffs. There is no need for such a Notice.

SCOTT O. WRIGHT

Senior [*130] United States District Judge

Dated: May 9, 2006