```
 1            IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                       JACKSON DIVISION

 3

 4    OLIVIA Y., ET AL                        PLAINTIFFS

 5    VERSUS            CIVIL ACTION NO. 3:04CV251LN

 6    HALEY BARBOUR, as Governor of the
      State of Mississippi, et al.            DEFENDANTS
 7

 8

 9

10

11       VIDEOTAPED DEPOSITION OF DONALD TAYLOR

12
                 Taken at the law offices of
13               Bradley, Arant, Rose & White, LLP,
                 188 East Capital Street
14               Jackson, Mississippi, on
                 Friday, April 6, 2006,
15               beginning at 8:38 a.m.

16

17

18

19

20
      REPORTED BY:
21
         ELISA M. MEDDERS, BCR, CSR #1670
22       State-Wide Reporters
         4400 Old Canton Road
23       Suite 160 (39211)
         Post Office Box 14113
24       Jackson, Mississippi 39236
         Telephone:  (601) 366-9676
25       Fax:  (601) 366-9756
```

EXHIBIT 2

Page 158

1  we can take a break altogether --
2      A.  Break?
3      Q.  -- if you would --
4      A.  I don't eat breakfast.
5      Q.  Well, it's almost twelve o'clock, so
6  this would be a --
7  MR. THOMPSON:
8          It's going to be a good time for a
9  lunch break.
10 MS. LOWERY:
11     Q.  -- good time to break for lunch.
12     A.  On you?
13 THE VIDEOGRAPHER:
14         We're now going off the record.  The
15 time is approximately 11:59 a.m.
16         (A lunch break was taken.)
17 THE VIDEOGRAPHER:
18         We're now back on the record.  The
19 time is approximately 12:47 p.m.
20 MS. LOWERY:
21         Thank you.
22 MS. LOWERY:
23     Q.  Good afternoon, Mr. Taylor.  We were
24 going through a list of findings that I
25 represented to you that were contained in one of

Page 159

1  plaintiffs' expert reports, and I was asking you
2  the degree to which those findings were
3  consistent with your knowledge and the degree to
4  which you had any basis to disagree with them.
5  We were in the middle of the list when we broke.
6  The next finding that we have is that DFCS
7  subjects foster children to multiple moves.  Is
8  that consistent with your knowledge?
9      A.  Well, before I begin to try to answer
10 that, let me say, you know, these statements
11 that you are presenting, of course, are general
12 in nature, and of those that we agree with, I am
13 agreeing with the general statement and not
14 necessarily the background material that
15 produced that statement, because I agree with it
16 may being that I'm looking at something entirely
17 different from your expert, and I wanted to make
18 that a matter of record.
19         Now, do we subject foster children to
20 multiple moves?
21     Q.  Uh-huh.  (Affirmative.)
22     A.  Was that your question?
23     Q.  Uh-huh.  (Affirmative.)
24     A.  Speculation on my part, I guess, in
25 some instances, we do.  Do I know what is a

Page 160

1  percentage or how often or what is the average,
2  no, I don't know that.
3      Q.  Okay.  And have you ever asked for
4  that information?
5      A.  I don't know that I have asked for
6  that information.  It may be part of that
7  performance objective that we get, but I'm not
8  sure.
9      Q.  All right.  The next thing I want to
10 ask you about is the statement that DFCS does
11 not regularly monitor foster children in their
12 placement.
13     A.  I would disagree with that, because I
14 think the operate word there is regularly.  If I
15 may, do I believe that there are instances where
16 those children are not monitored -- foster
17 children --
18     Q.  Yes.
19     A.  -- as required?  Yes.  I do believe
20 that there are instances where they are not
21 monitored on a monthly or a 30-day basis.
22     Q.  Okay.
23     A.  But regularly, I can't speak to that.
24     Q.  Okay.  And have you seen any data that
25 enables you to determine how frequently children

Page 161

1  in foster care receive either a monthly or
2  30-day visit from workers?
3      A.  You know, come to think of it, I do
4  believe that that's one of those performance
5  objectives that we started getting, but I
6  couldn't tell you that with any degree of
7  certainty.
8      Q.  Okay.  And you don't recall what it
9  might have shown?
10     A.  I believe that that is part of that
11 monthly report that I get from the Division of
12 Family & Children's Services.  I'm trying to
13 recall.  I can't testify with any degree of
14 certainty, but I believe it's broken down by
15 region, and I believe that there have -- there's
16 been established for them a benchmark, if you
17 will, and I believe that report indicates how
18 well they are or are not meeting that benchmark.
19     Q.  Do you recall what it shows with
20 regard to how well they are or are not meeting
21 the benchmark?
22     A.  No.  I -- I -- I don't -- I don't
23 remember what it said overall or by region.
24     Q.  Okay.  And are you aware of concerns
25 expressed that DFCS is using noncaseworkers,

Page 202

1  year, you will be submitting a budget request
2  for the additional 1.2 million for the 16
3  additional MACWIS PINs?
4  MS. RACHAL:
5      Objection to form.
6  THE WITNESS:
7      A.  No, that's not my testimony.  My
8  testimony is, given the opportunity to begin
9  drawing down funds which we should have drawn
10 down to begin with, I can't say with any degree
11 of certainty that that will not afford us the
12 opportunity to do some of these things without
13 asking for that money.  My testimony is that at
14 the appropriate time, we are going to look at
15 this as well as across the board.
16     Q.  My questions --
17     A.  Am I suggesting -- is that our top
18 priority?  No, it's not our top priority, and
19 I'll tell you why.  The reason it's not our top
20 priority is because the contractual people are
21 doing this at the moment.  And my top priority
22 is to provide adequate protection services.
23     Q.  Are you aware of the number of
24 contractual personnel that are now dealing with
25 MACWIS?

Page 203

1      A.  I believe when I brought in a new MIS
2  director, there were, perhaps, eight to ten
3  contractual people down there.  That -- I
4  believe that's accurate.  I also believe that
5  based on the assessment of the MIS director,
6  some of them were sent home.  Again, the
7  cheapest one was $80 an hour, and I could tell
8  you with every degree of certainty, if I made
9  $80 an hour, that system wouldn't be operational
10 when Jesus comes again.
11     Q.  Do you know -- if I told you that
12 there were currently six contractual personnel
13 in MACWIS, would that comport with your
14 understanding?
15 MS. RACHAL:
16     Objection to form.
17 THE WITNESS:
18     A.  You asked me how many -- do I know
19 know how many people are down there?  No, I do
20 not know how many people are down there.
21 MS. LOWERY:
22     Q.  Okay.  Well, so we're not talking
23 about one-to-one substitution, where if it's
24 six, or you said maybe eight to ten, sixteen is
25 more than eight or ten or six, so -- and

Page 204

1  Mr. Felder has recommended that you need sixteen
2  at a cost of 1.2 million.  Are you prepared to
3  make a commitment either through seeking
4  additional legislative authorization or through
5  the utilization of more IV-E money that may come
6  in to, in fact, fund an additional sixteen
7  additional MACWIS PINs?
8  MS. RACHAL:
9      Objection to form.
10 THE WITNESS:
11     A.  I am prepared to say that at the
12 appropriate time, we will look at that, and if
13 in my opinion it will serve us more efficiently
14 commensurate with being good stewards of
15 taxpayer dollars, certainly we will try to do
16 that.  If it's not efficient, and if I don't
17 think it's going to work to good effect, no, I'm
18 not going to (indistinct).
19     Q.  So with regard to this plan that
20 Mr. Felder has submitted with regard to this
21 specific recommendation for 1.2 million, is it
22 the case that you have at this point an opinion
23 about whether or not you're gonna support this
24 recommendation?
25 MS. RACHAL:

Page 205

1      Objection to form.
2  THE WITNESS:
3      A.  I think I've -- I think I've answered
4  your question, but my position is, at the
5  moment, wait and see.  And we are going to take
6  what I believe to be in the best interest of
7  that division and the department at that time.
8  MS. LOWERY:
9      Q.  Well, and what time is that?
10     A.  It's when we begin to look at the next
11 budget process.
12     Q.  And if we're talking about the next
13 budget process, that would be for the summer --
14 that would be for the fiscal year beginning the
15 summer of '07; is that right?
16     A.  Probably.  You asked me about the
17 process.  Permit me to tell you about my
18 process.  My process in this instance is like my
19 process in most instances, where we will go
20 through a five-step problem solving model.  And
21 the first step in the problem solving model is
22 to identify the problem.  The second step in
23 that process is to gather information.  The
24 third step in that process is to determine what
25 are your alternatives.  The fourth step in that