Deborah Stewart - 10/27/04

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

OLIVIA Y, By and
Through Her Next Friend,
James D. Johnson, et al.                    PLAINTIFFS
VS.                          CIVIL ACTION NO. 3:04CV25LN
HALEY BARBOUR, As Governor
Of the State of Mississippi;
DONALD TAYLOR, as Executive
Director of the Department of
Human Services; and BILLY MANGOLD,
As Director of the Division of
Children's Services                         DEFENDANTS


DEPOSITION OF DEBORAH STEWART


Taken at the instance of the Defendant at the
offices of Bradley Arant, LLP, One Jackson Place,
188 E. Capitol Street, Suite 450, Jackson,
Mississippi, on Thursday, October 27, 2004,
beginning at approximately 7:58 a.m.


APPEARANCES:
    ERIC E. THOMPSON, ESQ.
    SHIRIM NOTHENBERG, ESQ.
    Children's Rights, Inc.
    404 Park Avenue South
    New York, NY 10016
        COUNSEL FOR PLAINTIFFS

    BETTY A. MALLETT, ESQ.
    McGlinchey Stafford, PLLC
    Skytel Centre South, Suite 1100
    200 South Lamar Street
    Jackson, Mississippi 39201

        COUNSEL FOR DEFENDANTS


EXHIBIT
4

Deborah Stewart - 10/27/04

Page 82

1  are placed in the home, she knows. And so we know
2  when the beds are available and when they're not.
3  She does.
4     Q.  How would she know, let's say in Perry
5  County, that a child has just been reunified and
6  that bed has opened up?
7     A.  I guess the ASWS would contact her and
8  let her know. I'm just really not sure.
9     Q.  In ASWS, do you contact other counties
10  and let them know when a foster bed has opened up in
11  Forrest County?
12     A.  No, I don't.
13     Q.  Okay. If there's no placement available
14  in Forrest County, let's say a child needs regular
15  foster home, what does the licensure person do?
16     A.  If it's not an available person, foster
17  home in Forrest County, what does she do?
18     Q.  Uh-huh (affirmatively).
19     A.  She may look at the different foster
20  homes that she has licensed so see if they are --
21  how many they are licensed for and she may call --
22  let me know this foster home has -- she just
23  licensed this foster home and they got two, three,
24  four beds available.
25     Q.  My question to you was if there was no

Page 83

1  home available in Forrest County what would the
2  licensure person do?
3     A.  In Perry County that she licensed, she
4  may look and say I just licensed this home and she
5  will let me know or let the worker know or someone
6  else in the office know.
7     Q.  And if no placement is available is there
8  ever an instance -- strike that.
9     Just so I understand the placement process,
10  if a caseworker has a child in need of a foster home
11  placement and there are no foster homes in Forrest
12  County that have an available bed, how does that
13  caseworker go about finding a foster home for that
14  child?
15     A.  We could call another ASWS in another
16  county and ask if they have any available openings.
17     Q.  Is the we the caseworker who's making
18  that phone call?
19     A.  The caseworker, me, the foster care
20  licensure person, the social worker aid, the
21  homemaker. We all work together in finding
22  placement.
23     Q.  But there's nobody whose job
24  responsibility is in fact to make that call
25  specifically?

Page 84

1     A.  No.
2     Q.  So the bottom line is, in order to find a
3  placement you call around to a variety of counties
4  to see?
5     A.  For foster homes. Uh-huh
6  (affirmatively).
7     Q.  Okay.
8     (Exhibit 30 - Letter re: Youth Villages
9  marked for identification.)
10     MS. NOTHENBERG: The witness is being
11  shown what's previously been marked as Exhibit 30
12  with the heading "Youth Villagers" and with Bates
13  number 06623-06624.
14     Q.  (By Ms. Nothenberg) Take a minute to
15  review briefly just the first three paragraphs of
16  this letter. Just the first three paragraphs which
17  are quite brief. Do you recognize this letter?
18     A.  No, I don't.
19     Q.  Okay. Is Josie Brown a caseworker in
20  Forrest County?
21     A.  Yes.
22     Q.  Is she under your supervision?
23     A.  Yes.
24     Q.  Are you familiar with the name James
25  Austin, foster child James Austin?

Page 85

1     A.  Yes.
2     Q.  Is he under your supervision?
3     A.  Yes.
4     Q.  Okay. Do you see how the first paragraph
5  reads that, "James Austin was admitted to Memphis
6  Boys Town on May 16, 2001 with a discharge date of
7  11/16/2001"?
8     A.  Yes.
9     Q.  Okay. Do you see on the second paragraph
10  where it says, "Due to difficulty with finding
11  James' placement, his date was changed to
12  11/30/2001"?
13     A.  Yes.
14     Q.  And the next line says, "Note that James
15  has been on the list for therapeutic foster care."
16  Are you aware of other instances in which children's
17  discharge date from a residential placement had to
18  be changed simply because there are no therapeutic
19  foster placements available for that child?
20     A.  Well, yes.
21     Q.  You are?
22     A.  No placements.
23     Q.  How frequently does that occur?
24     A.  I don't know how frequently.
25     Q.  But it occurs?

22 (Pages 82 to 85)

Deborah Stewart - 10/27/04

Page 86

1    A.    Yes.  And I can say this that it does
2    occur because I wouldn't say that I think as I
3    stated earlier that is always because of no
4    available placement, but sometimes the criteria is
5    not met or either the child has been at that
6    placement before and they refused to take him back.
7    So it's different criteria why they may still be on
8    a waiting list until we find something else.
9        Q.    But there are in fact instances where a
10   child is waiting for a therapeutic placement because
11   no foster care placements have been identified, as
12   is the case here?
13       A.    Like I said, yeah.
14       Q.    Okay.
15       A.    And the reason why.
16       Q.    Do you see in the last sentence on the
17   third paragraph, "I am concerned that James has
18   began to digress and disrupt due to his knowledge of
19   there being no placement options for him at this
20   time"?
21       A.    Yes.
22       Q.    Are you aware of other instances where
23   children have begun to digress because they know
24   that they're waiting in a placement and there are no
25   other placements available for them?

Page 87

1    A.    I really can't answer that.  This is what
2    whoever wrote this is saying, so.
3        Q.    Okay.
4        A.    So I can't answer that as to say that
5    that has actually happened because I'm not one to be
6    there to say that it did happen.
7        Q.    Would you agree that unnecessary
8    institutionalization of children can be harmful?
9        A.    Oh yes.
10       Q.    Would you agree that children who need
11   therapeutic placements who don't receive those
12   placements often end up moving from placement to
13   placement because of disruptions?
14       A.    Repeat the question, please.
15       Q.    Would you agree that children who need
16   therapeutic placements who don't receive those
17   placements often end up moving frequently because of
18   placement disruptions?
19       A.    I can't agree with that.
20       Q.    Do you believe children who are in need
21   of therapeutic placements who don't receive those
22   placements are at risk of movement, more movement?
23       A.    Yeah, I can agree to that.
24       Q.    And is it your experience in Forrest
25   County that some children experience placement

Page 88

1    disruptions because they were in need of a
2    therapeutic placement and were not in such a
3    placement?
4        A.    No, I wouldn't say that.
5        Q.    Are you aware of instances in which
6    children in Forrest County have spent the day in the
7    DFCS office while awaiting placement?
8        A.    Yes.  Well, not awaiting placement.  I
9    would say we have placement and they are there until
10   a worker can take them for placement.
11       Q.    So they're awaiting to be placed?
12       A.    Yes.
13       Q.    Okay.  Do children waiting placement in
14   DFCS office attend school?
15       A.    Yeah.  Some of them do and some of them
16   don't.  It just depends.  We may have gotten a child
17   that day, so he's not in school, but they're waiting
18   for the worker to transport them to where they are
19   going.
20       Q.    Did children -- are you familiar with
21   instances in which children have spent the day, more
22   than one day, have spent consecutive days in DFCS
23   office awaiting placement?
24       A.    Yes, it has happened.
25       Q.    And would that be because there are not

Page 89

1    enough placements available for children in Forrest
2    County?
3        A.    No.  I would say we have foster homes
4    there, but it's because of maybe the behavior of the
5    child that we're trying to find an appropriate
6    placement.
7        Q.    Is it Forrest County practice to place a
8    child in an emergency temporary foster home in
9    consecutive nights when a more permanent placement
10   can't be located?
11       A.    Is it our practice to place --
12       Q.    A child in an emergency temporary foster
13   placement overnight while --
14       A.    Like a shelter that you're speaking of?
15       Q.    A shelter or are there such things as
16   emergency temporary foster homes that take children
17   for just one night?
18       A.    We don't have them in Forrest County.
19       Q.    So if a child is awaiting placement in
20   the DFCS office and no placement is found that day,
21   where does that child sleep?
22       A.    We find a placement.  And I'm not going
23   to -- you know, I can't say foster home, shelter.
24   We find a placement.
25       Q.    And then that child is returned to the

23 (Pages 86 to 89)