FIRST QUARTERLY MONITOR'S REPORT


The United States of America,
Plaintiff
v.
The State of Mississippi, et.al.,
Defendants

Civil Action NO.: 3:03-cv-1354WSu


Submitted by:  Joyce L. Burrell, Court Monitor



EXHIBIT
6A

I

**THE COMPLAINT**

The United States Department of Justice Civil Rights Division filed a suit in the United States District Court for the Southern District of Mississippi against the State of Mississippi Department of Human Services, Division of Youth Services. The action was brought pursuant to the pattern or practice provision of the Violent Crime Control and Law Enforcement Act of 1994, 42U.S.C. 14141, and sought to enjoin the State of Mississippi from depriving youth confined in Mississippi's Oakley and Columbia Training Schools of rights, privileges, or immunities secured or protected by the Constitution and laws of the United States. This litigation is now settled and a consent decree has been entered for some issues with a rule 41 agreement for the other issues.

One condition of the consent decree and agreement was the selection of a monitor that both parties agreed upon. The selected monitor is Joyce Burrell who is tasked with filing quarterly reports on the progress of compliance with the Agreement.

**MONITOR'S REPORTS**

The monitor shall file with the Court and provide the parties with reports describing the steps taken by the State to implement the Agreement entered by the State of Mississippi, the Mississippi Department of Human Services with the U.S. Justice Department. The State of Mississippi consented to the entry of finding that it has violated the federal rights of juveniles at Columbia and Oakley Training Schools in each area addressed in Section IV of the Agreement. Conditions set forth in the Agreement include allowing the monitor full and complete access to the facilities, all facility and Division records, staff, and residents. It also says the State shall direct all

2

employees to cooperate fully with the Monitor. Although, most staff have cooperated
fully, some are uncomfortable talking with this monitor.

- It is recommended that all staff receive an advice memorandum from the State
  advising them of the State's expectation that they cooperate fully with the monitor
  and to assure them that the State has agreed not to retaliate against any person
  because they provided information or assistance, or participated in any other
  manner in an investigation or proceeding related to this Agreement.(65)

**SUBSTANTIVE REMEDIAL MEASURES**

This first report covers May, 2005, through July, 2005, and based on discussions, student,
staff and administrator interviews, as well as records and report reviews. Discussions
were held with staff and attorneys, interviews with students, staff and administrators, as
well as observations from visits during May through July, 2005, to Columbia and Oakley
Training Schools with consultants and attorneys representing the U.S. Department of
Justice and the State of Mississippi and tours of both facilities. I have also reviewed
reports of the consultants for the State of Mississippi, lead by Mr. Richard Barnhart and
those for the U.S. Department of Justice, including John Platt for facilities and juvenile
justice programming, Kelly Dedel Johnson, Ph.D., for education and special education;
Cheryl D. Wills, M.D., Lee Underwood, Psy.D. and Eric Trupin, Ph.D., for mental
health and substance abuse services; and Michael D. Cohen, M.D. for medical and dental
services. I also reviewed the Mississippi Department of Human Services (MDHS),
Division of Youth Services (DYS) Cadet Orientation Package : "THE RIGHT STUFF",
Student's Orientation Handbook; MDHS/DYS Community Services Policy and
Procedure Manual; MDHS/DYS 2004 Annual Statistical Report—"*Bringing the Pieces*

3

*Together"*: Mississippi Youth Court Desk Book, 2004 Edition; and the Occupational and Speech Therapy Services manual for MDHS/DYS.

Among other forms and records I reviewed were facility organization charts; evacuation forms; intake forms for May, June and July, 2005; campus population forms; Staffing Classification forms for June, 2005; DYS/MSYCC Suicide Prevention Policy and Procedures; grievance form retrieved from Oakley Units 1 and 2 from 11/04 – 6/05; hearings outcomes form for April, May and June, 2005, and student education folders and files. I reviewed psychological evaluations for process and action on recommendations. I reviewed the list of youth on some level of suicide watch, as well as youth involved in active psychiatric treatment at both Oakley and Columbia Training Schools.

It is important to note that Mississippi has been under the agreement for three months and a huge part of this period has been spent organizing to plan and actually planning the strategy to address the identified issues, as well as developing the master plan for submission to the U.S. Department of Justice.   Even though it is accurate to say that the State and its representatives have been extremely cooperative and it is important to note that there are so many areas to be addressed that it was not possible to have addressed all of the findings in this reporting period.  The master plan should detail how those issues will be addressed and the timeline for that. Although a plan was developed in a short window of time, the dates in the plan have not been accepted by both parties.  As such, it is difficult, if not impossible to take off the table or delay compliance to the date

4

proposed by the State. It is important that the State work with the U.S. DOJ to get
agreement on the plan and dates for compliance with the various parts.

It is significant to report that much of treatment and many of the current institutional
practices are not grounded in standards of treatment for juvenile justice facilities,
adolescent medical services, mental health services or educational, especially, special
education services and practice as is required by the consent degree and memorandum of
agreement, as well as <u>Mississippi Youth Court Book</u>, 2004 Edition, in Section 43-27-8.
The DYS has invested a great deal of time into beginning to establish policies and
procedures for each area of treatment in the Consent Decree and MOA, there is no
evidence that the policies and procedures are operational—meaning requisite sign-offs
have not occurred; that protocols for applying the policies do not exist; staff training has
not occurred; and a quality assurance protocol for each policy is not in place, which
would be the indicators of operational policies.

There has certainly been a flurry of activity on the part of the State in response to the
Agreement and Consent Decree. On my visits, it appears evident that this matter is being
taken seriously and there is an air of urgency to meet the requirements. I commend
Kathy Pittman and her consultant team for the establishment of committees with diverse
membership to address the areas in the master plan. When I first reviewed the master
plan, I thought it needed to have included more information that told how the State would
achieve the objectives. As important as this level of activity is, **it is equally important
to establish a mechanism for communicating activities, as well as progress to every**

5

**staff member at both facilities, as well as to the U.S. Department of Justice and the courts.** Given the 24-hour nature of the administration of juvenile corrections facilities and the very high risk youth placed in such facilities due to their special needs rather than the seriousness of committing offense, staff meetings, as well as some type of regular written communication to all staff are essential. If staff receive paychecks, it may be wise to insert a monthly update in the pay envelope or with the pay stub for those who participate in direct deposit.

In preparation for writing this report, I was provided a status report on the master plan that reflected more information on how issues would be achieved. I am aware that several policies have been developed, including policies on policy management: training management; use of force; and special management unit pod observation and that the format for policies has been revamped. These are critically needed policies and without these and procedures to guide the staff on how to safely manage such high risk youth, staff will continue to do business as best they can, not based on accepted practice standards for youth housed and receiving treatment in juvenile correctional facilities. One would expect the youth to present with very serious charges, but at both facilities youth present with complex emotional, behavioral and educational needs.  The <u>Mississippi Youth Court Book</u>, 2004 Edition,  in Section 43-27-8 requires the Mississippi Department of Human Services implement and administer laws and policy relating to youth services; to establish standards, provide technical assistance and exercise the requisite supervision as it relates to youth service programs over all state-supported juvenile correctional facilities; and to promulgate and publish such rules, regulations and

policies of the department as are needed for efficient government and maintenance of all facilities and programs in accord, in so far as possible, **with currently accepted standards of juvenile care and treatment.**

These standards of care provide staff and administrators with benchmarks for providing and evaluating the consistency of care, custody and treatment practices employed at the facility, as well as assurances that the individual rights of the children mandated to the facility are protected. They also provide staff and administrators with a system of regular review. It is through regular review and documentation of practices that change occurs in settings like Oakley and Columbia Training Schools.

Among the basic standards that would enhance practice at both Oakley and Columbia Training Schools are the <u>ACA Standards for Juvenile Training Schools, 3rd Edition;</u> <u>Standards for Health Services in Juvenile Detention and Confinement Facilities</u> from the National Commission on Correctional Health Care (2005) and <u>Performance-Based</u> <u>Standards for the Operation of Juvenile Training Schools and Detention Centers, (OJJDP,</u> <u>1999.)</u>  I am aware that the Mrs. K. Pittman, Director of Youth Services, has applied for candidacy to the Performance Based Standards Project, which should provide an invaluable tool for review of practice in both Oakley and Columbia Training School and make the regular review of incidents, practices and operations easier for the administrative team.

### SUBSTANTIVE REMEDIAL MEASURES:

7

**Attachment 1:** I put all the activities that are due by the State of Mississippi by September 2005 into a single document. (Attachment 1) I then separated them by each measure from the Consent Decree (each measure is highlighted in a blue color), and grouped activities that referenced the same Consent Decree measure together. There are a total of 59 activities that were scheduled to be done by September with an additional 6 from the earlier Agreement.

In the body of this document, I have inserted the Consent Decree item number and added the number Mississippi created for each activity (1 to 143 for all activities) next to its appropriate measure, followed by the status in narrative form.

## IV. SUBSTANTIVE REMEDIAL MEASURES
## A. PROTECTION FROM HARM

(1) <u>Protection from Harm</u> The State shall, at all times, provide youth in the facilities with reasonably safe living conditions.
**Number 28**

Without clear policies and procedures, the administration of consistent practice is hit or miss at best. As stated earlier, no student reported physical abuse by staff to me, but I did group interviews with youth which may have had an impact on some student's willingness to mention anything as serious as a personal altercation with a staff. They did report student fights with other students, which can be reduced with policies that govern the activities of students and staff during wake hours.

Graffiti must be removed from the walls on a daily basis. Repairs to furniture and removal of damaged, unused furniture must happen daily. I observed a bed with springs exposed in a room shared by three girls at Columbia. The serious risk such

8

items present was brought to the attention of the administrator and staff. I was quite surprised to find it still in the room when I returned a month later.

It is critical that staff monitor showers and dressing areas closely, especially during intake and orientation, when staff don't know youth well. All three justice department mental health experts mentioned structural things in showers and bathrooms that could facilitate a suicide attempt.

Sanitation and care of the physical plant is neglected which contributes to the existence of an environment that is not safe for children/youth. There were instances where a shelf was damaged and could be a perfect place to hang a sheet or pair pants if one was inclined to try to hang himself. There were exposed metal bedsprings on a bed without a mattress that could be used as a very dangerous weapon. The DOJ consultants sited the shower handles and grab bars as major concerns because of the increased risk of using them in a suicide attempt. They recommended enclosing the grab bars and changing the shower fixtures to push button fixtures. In the short term, increased supervision is absolutely necessary.

The cafeteria at Oakley, when I visited in June, was dirty and greasy which made that facility unsuitable for preparing and serving food. The kitchen seemed disorganized as well as not being as sanitary as a place for food storage and preparation is required to be. Situations like this can, if not monitored and corrected, cause bigger problems for students and staff who already have compromised health conditions. The DOJ

consultants also sited the condition of the Oakley cafeteria kitchen and eating areas as being unacceptable. They also sited the vermin control protocol as inadequate, because of the visible dropping and dead rodents observed in storage cabinets.

(2) <u>Protection from Abuse</u> The State shall ensure that youth are protected from violence and other physical or sexual abuse by staff and other youth.
**Number 42**

Although my interviews with twenty youth during my June   14 – 17, 2005 June 27 – 30, 2005, revealed no youth who claimed to be afraid or unsafe, the youth did speak of instances where they or their peers had been physically harmed by JCOs, CAs or security. Again, it is important to emphasize the fact that I held group interviews with youth or was accompanied by the U.S. Department of Justice and State attorneys when I did have interview individual youth. Several youth said staff still curse at them. Youth were aware of the grievance procedures and where to retrieve and turn in forms. Many of them said they had filed grievances and as many said they do not use the process anymore because it does NO good. According to the youth, nothing ever happens as result of their filing a grievance and they question why waste the time filling out the form. The Due Process portion of the grievance practice appears to still need considerable work. When asked if anyone had ever been sent to the lock down unit (SIU), during this commitment, for fighting or hurting another youth, each could remember someone in their unit who had received such a sanction.

In contrast, the DOJ consultants and at least one attorney interviewed several youth, in July who had been personally experienced a physical assault by staff or had privileges, food and or candy taken away arbitrarily. This information was obtained during individual interviews of youth.

10

I recommend that the DYS revisit the grievance policy and close the loop in the application of Due Process. This is a good place to include student voice. At both facilities, opportunities exist for student leadership. It is recommended that input during development and feedback on proposed drafts be solicited from the youth. In some of the most progressive juvenile justice settings, youth sit on interview panels with new staff and review policies and procedures as student government leaders. (Missouri is an example of such practices.)

With the lower ratio of student to staff at both Columbia and Oakley Training School, there is the opportunity to improve the living conditions and safety of students/cadets. Again, without adequate policies and procedures the DYS structure and systems do not support consistent, effective program management and treatment. Accountability rests at the top, instead of resting with all staff in the facility.

(3) <u>Protection from Abusive Institutional Practices</u> The State shall ensure that abusive institutional practices such as hog-tying, pole shackling, "sitting in a chair," "guard duty," making youth eat vomit, making youth run with tires around their bodies, or run with mattresses, cease immediately.
**Number 44, 45, 52**
    Although my interviews with twenty youth during my June   14 – 17, 2005 June 27 –

30, 2005, revealed no youth who claimed to be afraid or unsafe, the youth did speak of

instances where they or their peers had been physically harmed by JCOs, CAs or security.

Several youth said more than one staff continue the practice of cursing at them. **A critical**

**observation is that the grievance process was NOT confidential in June.  During my**

**July visit, I noticed grievance boxes and forms that were accessible and clearly**

11

marked on the units and at school. **This created several places for students to drop**

**off forms, a step in the right direction.** It is important to restate the experience of the

DOJ consultants and at least one attorney who interviewed several youth, in July who had

personally experienced a physical assault by staff or had privileges, food and or candy

taken away arbitrarily.


(4) Protection from the "Dark Room" The State shall immediately cease using the "dark
room" cells at Columbia for the inappropriate punitive isolation of girls in the SIU.
**Number 51**
The dark room is closed and locked and there was no evidence from interviews with

students and staff of use of the dark room.


(5) Ironwood:  Ironwood is closed and shall not be used for youth committed to the
Division during the life of this Agreement.
**Number 50, 80**
Everyone interviewed reported that Ironwood is closed and locked down.  No students or

staff use Ironwood for any purpose and it is not expected to reopen ever.


(6) Protection from Undue Restraints The State shall ensure that youth are not subjected
to unreasonable restraints and that restraints are never used to punish youth. The State
shall develop and implement policies, procedures and practices to ensure that only safe
methods of restraint are used at the facilities, and only in those circumstances necessary
for safety and security.
**Number 35, 40, 81**
A Restraint Policy has been developed, but had not been implemented during my visits

through July, 2005.  Training did not occur during this period, nor has the quality

assurance process been put in place.  This is one of the key areas that had to be a first

priority in any attempt to meet the requirements of the decree and MOA. Monitoring of

the quality of this process is essential to protecting the rights of all youth at the facility.


12

(7) <u>Reporting of Staff Misconduct and Other Serious Incidents</u> The State shall develop
and implement appropriate policies, procedures, and practices to ensure that all incidents
of staff-on-youth and youth-on-youth violence, inappropriate staff relationships with
youth, and abusive institutional practices are reported to appropriate individuals, and that
such reporting may be done through confidential means, without fear of retaliation. The
State shall ensure that all incidents are adequately documented and reported appropriately
and with sufficient detail, including the facts of the incident, any injury that occurred as a
result of the incident, and in a way that permits review.
**Number 42, 43, 46, 47, 78**

Policies, procedures and practices are not in place to insure reporting of staff misconduct

and other serious incidents. Furthermore, policies and practice MUST insure that the

administrator be notified immediately of all serious incidents, as described in (7). Of

greater concern is that fact that there are mandated reporters (teachers, nurses and

counselors) who are not reporting incidences of staff abuse to the CPS hotline, but to the

administrator on duty at the facility. Nurses complained that there is not a feedback loop

when such reports are made.   Staff need to be informed that their failure to report

jeopardizes their professional licenses. Excellent models of policies and procedures, as

well as training exist in many states to assure appropriate practice in this area.   I would

suggest that the Pennsylvania practice is an excellent model to replicate for mandated

reporting, if Mississippi state policy or other effective policies, with procedures, have not

been put in place by the completion of the final report for this period.

(8) <u>Health Care Inquiries Regarding Injury</u> A nurse or other health care provider shall
question, outside the hearing of other staff or youth if appropriate, each youth who
reports to the infirmary with an injury, regarding the cause of the injury. If, in the course
of the youth's infirmary visit, a health care provider suspects staff-on-youth abuse, that
health care provider shall immediately:
a. take all appropriate steps to preserve evidence of the injury (e.g., photograph the injury
and any other physical evidence);
b. report the suspected abuse to the appropriate local officials;
c. document adequately the matter in the youth's medical record; and
d. complete an incident report.
**Number 38, 77**

13

**According to the master plan submitted to DOJ, this practice is set to be remedied by the end of September.**

During my last visit in July, 2005, nurses interpreted this requirement inconsistently, which made it clear that they managed incidents differently. Healthcare standards for adolescents, as well as healthcare standards for the care of youth in confinement are available. The state of MS has clear standards for reporting suspected abuse. I would recommend that these policies be reviewed and the appropriate sections implemented to meet this requirement now. I know that Richard Barnhart and his team of consultants are aware of and have access to these policies, as well as similar policies from other states. Since this is another of those very high priority safety requirements, I would also recommend Dr. Mary Tierney, Pediatrician, to consult with the team. Dr. Tierney's expertise includes having helped write the standards for the healthcare of incarcerated youth.

In the July, 2005, debriefing, Dr. Cohen, the U.S. DOJ medical consultant, recommended using the space in both the OTS and CTS clinical areas differently, which would provide a confidential setting for the nurses to talk to students and assess injuries out of the hearing range and view of staff and other students.

The State is not in compliance on this critical issue.

(9) Uses of Force The State shall develop and implement comprehensive policies, procedures and practices governing uses of force, ensuring that the least amount of force necessary for the safety of staff, youth residents, and visitors is used on youth.
**Numbers: 33, 34, 36, 37, 39, 81**
A Use of Force policy has been developed. It had not been issued, training had not occurred and the quality assurance plan had not been put in place for this issue as of July 31, 2005. Since this issue was one of the main issues that brought the investigation and subsequent action by the U.S. Department of Justice, it is one that MUST be addressed

14

immediately with issuance of the policy, training and QA monitoring. This cannot wait

for the hiring of a training director. If training director is not on board, I recommend

hiring a consultant to put this in place immediately.

(10) <u>Investigations</u> The State shall develop and implement an adequate system for
investigation by senior management of uses of force, alleged child abuse, youth-on-youth
violence, and alleged sexual contacts.
**Number 84**

The system for investigations was not written into policy and procedures by the end of

July, 2005. A policy has since been written, but not disseminated and staff training has

not occurred. Although this is being worked on, it is another area that has to be

prioritized and monitored by senior management. Timely investigations and action help

to create the sense of safety and order for residents, as well as all others working in the

facilities. The Administrator must be notified of all such incidents and investigations.

Unless there is an emergency circumstance, the administrator will not investigate such

matters because of the role of the agency Administrator in the decision making process.

As of this reporting period, the State is not in compliance.

(11) <u>Staff Training in Behavior Management, De-Escalation and Crisis Intervention</u> The
facilities shall provide appropriate competency-based training to staff in behavior
management, de-escalation techniques, appropriate communication with youth, and crisis
intervention before staff may work in direct contact with youth.

As of July 31, 2005, the training had not occurred. A committee has been established and

the members have been working on this issue. The training is scheduled to begin in the

fall of 2005. This is a date proposed in the Master Plan, which has not been accepted by

the U.S. DOJ, as of the date of this report. Therefore, this item is not in compliance.

15

(12) <u>Behavior Management Program</u> The State shall develop and implement an effective behavior management program. The behavior management program shall be implemented throughout the day including during school time. The State shall develop and implement policies, procedures, and practices to ensure that mental health staff provide regular consultation and training regarding behavior management to custody and other staff involved in the behavior management program, and shall develop a mechanism to assess the effectiveness of interventions utilized.

Drafts of the policies and procedures for the Behavior Management Units have been completed. Training has not occurred. The Quality Assurance protocol has not been developed. As of July 31, 2005, the State was not in compliance on this issue and the proposed date in their Master Plan is a couple of months out.

(13) <u>Staffing</u> The State shall ensure that there are sufficient numbers of adequately trained direct care and supervisory staff to supervise youth safely, protect youth from harm, and allow youth reasonable access to medical and mental health services, and adequate time spent in out-of-cell activities.

The State is not in compliance on this issue, although staff on each unit are provided some information from the Classification meeting on needs of youth, it is hardly adequate. All staff have not been trained in the best practices for dealing with youth with mental health and substance abuse problems. The staff are certainly willing, but they recognize their limitations and have asked for training. Some of the youth at both facilities have multiple mental health and other behavioral diagnoses that require sophisticated treatment plans, close observation, early intervention and supports that custodial staff have not been trained to provide. Both facilities have clinical staff on site which reduces some of the risk of serious problems, but does not result in sufficient coverage for twenty-four hour facilities.

16

There were obvious shortages in staff coverage at OTS when I visited both times in June and July, 2005. Such shortages force staff to have too many youth to supervise and forces staff to have to work overtime. The overtime policy seems unfair. Staff said they had to work more than a hundred hours of overtime before they could be paid for it. They are receive compensatory time, but it is very difficult to use compensatory time while staff shortages exist because those same staff continue to provide the day-to-day coverage. The policy sets the institution up for always having coverage problems.

A staffing analysis is critically important to assuring correct numbers to include in a request for adequate staffing.

**The Compensatory Time/Overtime Policy needs to be revisited using real numbers to project future need, as well as developing a strategy that is fair to the employees who are making their best effort to support compliance and demonstrate a good work ethic.** This is a matter probably will have to be reviewed with upper management and even the administrative board that handles labor issues for MDHS. It is adversely affecting the morale of the staff, which can negatively impact the care to the youth at OTS.

Youth now have access to medical passes for health and mental health services. In July, 2005, **students were still reporting** that they have to give their request for medical services to the counselor on the unit, who decides whether to give it to the nurse. This is unacceptable and violates the consent decree. The process is not confidential and youth continue to be at risk of not being seen based on the judgment of non-medical staff.

17

Brief assessments were still being made by nurses at the time when they were delivering

medications to the units, a practice that is not confidential nor is it good medical practice.

As Dr. Cohen suggested in his exit interview, time should be set aside for sick call.

(14) <u>Isolation</u> The State shall develop and implement policies, procedures and practices
to ensure that isolation, lockdown, seclusion and other similar restrictions are used only
when appropriate and in an appropriate manner, and to document fully the use of
isolation. The State shall immediately cease requiring youth to strip and remain naked
while in isolation.
**Number 52**

Changes in this practice have occurred at both facilities. The special management unit

policy has been revised. Training has not occurred and quality assurance measures are

not in place as of July 31, 2005. Until the training occurs for all staff and quality

assurance measures are put in place, the State is not in compliance on this issue.

Isolation, lockdown and seclusion records will be reviewed on all visits. Special

attention will be paid to educational, emotional and intellectual level of youth placed in

the special management and behavior management units because both appeared to be

used for youth with special needs youth who could be managed appropriately in other

setting if staff were appropriately trained. There might be a few youth with such complex

needs that they need to be maintained in a SMU or BMU, but training could reduce the

reliance on such units significantly.

(15) <u>Due Process</u> The State shall ensure that youths confined for more than 24 hours
receive an appropriate due process hearing by an impartial supervisory staff member to
determine whether cause exists for continued disciplinary confinement.
**Number 56**

Interviews with youth in confinement indicate they are having reviews, but there is

evidence that some youth may not be seen by an impartial supervisory staff member. The

current practice is not consistent with the current policies of the institution. A review of

the logs at OTS clearly showed that no impartial supervisory staff had held a hearing on

at least one of the students in the lockdown unit when I visited in July. According to the

Master Plan, a policy and procedure is expected to be in place by the required November,

2005, date. Hopefully, this will be in place much sooner. This is a quality of life issue

that requires immediate attention.

(16) Grievances The State shall develop and implement policies, procedures, and
practices to ensure that the facilities have an adequate grievance system.
**Number 61**

A revised grievance system has been implemented. This new policy and procedure

assured the availability of grievance forms and a box to place the grievance in on each

unit. As of July, 2005, the State was in compliance on this issue of placement of

grievance boxes and forms, but all procedures and practices were not in place.

(17) Admissions Intake and Orientation The State shall develop and implement policies,
procedures and practices to establish a consistent, orderly admissions intake system,
conducive to gathering necessary information about youth, disseminating information to
staff providing services and care for youth, and maintaining their safety. Each youth
entering the facility shall receive an effective orientation that shall include simple
directions for reporting abuse, and assure youth of their right to be protected from harm
and from retaliation for reporting allegations of abuse. Orientation shall also clearly set
forth the rules youth must follow at the facility, explain how to access medical and
mental health care and the grievance system, and provide other information pertinent to
the youth's participation in facility programs.
**Number 65, 66, 76**

There is a consistent admissions intake system. Information is provided to the youth and

the youth participates in orientation. No information is provided to the parent or

guardian. I question the effectiveness of the orientation because the written materials are

at a grade level that is at least not readable and understandable by one third of the youth

because of their low I Qs and poor reading skills. I also recommended the development of

a handbook for lower level readers on one of my first visits. This is essential for

reinforcement after the initial time in the intake unit.  Some of the residents are testing

between the second half of the first grade and fourth grade in reading, which make it very

difficult to read the current handbook.  At this time, there is not consistent use of the

mental health data that is received at admission.  There is a plan to begin to use the YASI

for screening at intake. The tool is comprehensive, but a clear policy with procedures for

using the data is essential if practice is expected to change by integrating the YASI

information and data into the treatment planning process.

(18) <u>Employment Practices</u> The State shall ensure that only individuals fit to work with
youth residents are employed at the institutions. The State shall utilize reasonable
measures to determine applicants' fitness to work in a juvenile justice facility prior to
hiring employees for positions at the facilities. Within 120 days of the Effective Date of
this Agreement, the State shall conduct a criminal record check for all current employees
at the facilities, taking appropriate actions where new information is obtained. Every two
years thereafter, the State shall update record checks for all employees who come into
contact with youth.
**Number 29, 31**

In July, the MDHS/DYS had its personnel numbers for vacant positions restored to the

budget.  DYS has ordered a program, Ergometrics, to help them to improve the selection

process.  The DYS is currently running NCIC background checks and checking

references on all employees. The status of background checks of and hiring must be

reviewed regularly during the monitoring.  An accountability system, whereby employees

are charged with reporting any new arrests and/or convictions also needs to be developed

and monitored.

(19) <u>Classification:</u> The State shall develop and implement a classification system that places youth appropriately and safely within the facility, and provides for reclassification in appropriate circumstances.

The state has developed and implemented a classification system. I am not comfortable that it is the right system, since the youth do not seem to understand that their role in the process and staff who are present don't do anything to seriously engage these youth in healthy dialogue about their treatment plan. It is a good start, but definitely needs refining to make it more useful. The increase in mental health disorders, substance use/abuse, educational disabilities, and physical disabilities in the population does not get discussed with the effected youth, so the placements seem somewhat arbitrary at Oakley. Columbia has begun to assign girls to cottages based on their needs, but the cottage staff had not been trained in the treatment modalities each cottage offers. i.e. Drug and Alcohol; Anger Management; Behavior Modification; Conflict Resolution, etc. (July, 2005) When a Counselor was asked if she was a certified addictions counselor or if she had any training as a substance abuse counselor, the staff person's response was no. When asked how the girls receive their treatment in that cottage, she said they read in their books. There are evidence-based interventions available to DYS and it is critical that they be used. The model has potential, but technical assistance is needed. The idea of implementing evidence-based interventions in the cottages is commendable.

**E. SUICIDE PREVENTION**

(20) <u>Development and Implementation of Policy</u> The State shall develop and implement adequate policies, procedures, and practices relating to suicide prevention.
**Number 100**

There is a policy, but staff are not aware of it and there is no consistency in the way they handle suicide gestures and ideations. This includes nursing personnel. The current

policy and procedures on file are not being followed. Even when there is information

about a student's suicidal behavior at the time of admission, it is often overlooked. On

two charts that I reviewed, the boys scored in the warning range for the suicide domain.

The note added by OTS staff was "no further action required." There was no name

signed, so there was no way to determine if the comment was that of school staff, where

the files were housed, or that of the psychiatrist, psychologist or a JCO. This was one of

the more frightening experiences I have had while reviewing records at the facility. It was

suggested that someone may have seen the youth and did not make the notation in the

file. That is not sufficient. Since a policy exists, it is critical to implement a quality

assurance protocol that reviews practice regularly and flags action(s) that must be

addressed or details as to why there was no action.

(21) Suicide Risk Assessments
The State shall develop and implement policies, procedures, and practices to ensure that
qualified mental health professionals conduct timely suicide risk assessments, using
reliable assessment instruments, for a) all youth exhibiting behavior which may indicate
suicidal ideation, and b) when determining whether to change the level of suicide
precautions.
**Number 101**
Current policies and procedures are under revision and are expected to be out by

September, 2005. The State is planning to acquire the YASI for screening. The YASI

screening, by its own descriptors, is usually used at diversion, before placement on

informal or formal probation or before secure detention. It is not a tool I would normally

recommend for a training school because of the long-term nature of most juvenile

corrections placements. The 90-day placements at OTS and CTS are relatively short. The

YASI has been determined to be appropriate for probation and secure detention and may

be appropriate for this short-term population. The tool would be a welcome addition. I

22

Case 3:03-cv-01354-HTW-JCS    Document 121    Filed 01/23/2006    Page 23 of 58

would use of the screening version of the YASI in conjunction with the MAYSI 2, since the mental health portion of the YASI screen is so brief.

At least half the youth arrive at OTS and CTS with MAYSI 2 results in their records. That number needs to be 100%. This can be accomplished by instituting administration of a MAYSI 2 for every youth being admitted to either institution whose records from the referring court did not include recent MAYSI 2 results. The consultants for the DOJ recommended the MAYSI 2 for screening and the ISO 30, a standardized screening tool, for suicide risk. No matter which tools are used, the protocols must be followed and all staff should be trained in responding to students/cadets exhibiting suicidal behavior, as well as those at high risk of suicide who are not exhibiting gestures or ideations. It is critical that the policy include a requirement that mental health staff provide regular consultation and training to custody staff on suicide prevention. I agree with Dr. Trupin, USDOJ mental health consultant, that the institution also **consider using a trauma assessment** for all youth entering the facilities since there is evidence that so many of the boys and girls entering secure juvenile corrections have been exposed to repeated trauma that has gone unaddressed. There is a significant body of research that supports better outcomes for youth who have an integrated plan that includes trauma response with the mental and substance use/abuse interventions.

(22) Mental Health Response to Suicidal Youth The State shall develop and implement policies, procedures, and practices to ensure that youth who demonstrate suicidal ideation or attempt self-harm receive timely and appropriate mental health care by qualified mental health professionals. This shall include helping youth develop skills to reduce their suicidal ideations or behaviors, and ensuring that all youth discharged from suicide precautions receive adequate follow-up treatment within the facilities.
**Number 102, 109, 110, 111**

23

Both facilities have access to contract psychiatrists and have psychologists on staff. The DOJ mental health consultants identified the shortage of psychiatric consultation in DYS facilities as a serious concern, given the numbers of youth on psychotropic medications. One consultant expressed a concern that the psychiatrists were functioning as "prescribers" and not as active members of a rehabilitation team. Another DOJ consultant expressed a specific concern about the lack of training of nursing personnel on the side effects of both psychiatric and psychotropic medications and how this impedes their ability to recognize early reactions to the medications. It is important that the policy indicate the time limit for mental health professionals to respond in times of crisis and for admissions screening and interviews. The psychiatrist for CTS has given notice of her imminent departure. Compensation packages must be reviewed for parity. Mentally ill and behaviorally challenged youth are referred to as disruptive youth and the staff response is being spelled out in the policy and procedure for disruptive youth, as opposed to youth with disabilities that are treatable according to the DSM IV. The State has already put into practice a requirement that these youth not be confined to locked cells during non-sleep hours. Since the proposed completion date for the policy for suicidal youth is the end of September, it was not available at the time of this report and will be included in the next quarterly report.

The DOJ consultants recommended the use of the Inventory of Suicide Orientation-30 (ISO-30), which measures a youth's orientation toward suicide and the degree to which they are experiencing a sense of hopelessness. Along with the ISO-30 scores, the clinical input from mental health and input from custody staff should be part of the basis for

24

placing youth on or changing the level of suicide risk. Lastly, since the MAYSI 2 is in

the files of over fifty percent of the youth, the results must be carefully reviewed for any

warning or caution scores in the suicide domain which would be an early indicator for an

immediate clinical referral. MAYSI 2 results must get to the Psychologist I before his/her

intake interview with each student.

(23)Supervision of Youth at Risk of Self-Harm The State shall ensure that newly-arrived
youth, youth in isolation or seclusion, and other youth at heightened risk of self-harm are
sufficiently supervised to maintain their safety.
**Number 103**

Those youth at risk of self harm are being addressed in the revised suicide prevention

policy. At this time, the old policy is still in effect. A new policy is expected by early

fall, 2005. All three of the DOJ mental health consultants recommend more training and

staff development opportunities on current issues and provide mental health coverage

around the clock. They also recommended comprehensive screening and assessment to

insure that the initial classification and placement decisions take mental health history

and status into consideration.

(24) Housing for Youth at Risk of Self-Harm The State shall ensure that all housing for
youth at heightened risk of self-harm, including holding cells, isolation cells, seclusion
cells, and housing for youth on suicide precautions, is free of hazards that would allow
youth to hang themselves or commit other acts of self-harm.
**Number 104**
Policies and procedures for the care of youth at heightened risk of self-harm are being

addressed in the revised suicide prevention policy that will not be available until the end

of September, 2005. The current practice is close observation or moving them to the

special management unit, which appears to function like lockdown. During my visits this

25

quarter I did not find the building/facility or program plan especially conducive to

treatment. It is too early for me to formulate a strong opinion on the care of youth at risk

of self harm. I will be able to say more in the next report.

(25)Restrictions for Suicidal Youth The State shall ensure that youth on suicide
precautions are not restricted in their access to programs and services more than safety
and security needs dictate.
**Number 105**
Youth on suicide precautions are able to access their programs and services. This issue is

being formally addressed in the revised suicide prevention policy that comes out at the

end of September, 2005.

(26)Documentation of Suicide Precautions The State shall develop and implement
policies, procedures, and practices to ensure that the following information is thoroughly
and correctly documented and provided to all staff that need to know such information:
a. the times youth are placed on and removed from precautions;
b. the levels of precautions on which youth are maintained;
c. the housing location of youth on precautions;
d. the conditions of the precautions; and
e. the times and circumstances of all observations by staff monitoring the youth.
**Number 106, 107**
The revised suicide prevention policy is proposed to be completed at the end of

September, 2005, and will include each of these requirements for thoroughly

documenting all information about a youth's history of suicide attempts and the levels of

care s/he was on during interventions. The current suicide precautions practice at both

facilities is inconsistent and must be addressed. Training on the model to be used at both

facilities must include all staff and be reviewed in a regular quality assurance review.

(27)Access to Emergency Equipment The State shall ensure that direct care staff have
immediate access to appropriate equipment to intervene in the event of an attempted
suicide.
**Number 108**
Even though this will be addressed in the suicide prevention plan, Dr. Cohen, Dr. Wills

and Dr. Trupin addressed the need for staff to have a simple response kit that included

rubber gloves, airway tube and a cut down tool for immediate response to crises. The kit

could be worn on the belt or placed someplace that staff can access very easily if the kit is

needed. Administrators were advised at the exit meeting at OTS and CTS in July, 2005,

that staff need to have a smaller kit to take when intervention is necessary for an

attempted suicide. The current medical cart is too big and contains too much equipment

that cottage and nursing staff do not know how to use. The facility administrators were

advised to reorganize the crash cart to pull out a special emergency kit for responding to

attempted suicide. That special kit will be described in the revised suicide prevention

policy coming out at the end of September, 2005.

(28)<u>Suicide and Suicide Attempt Review</u> The State shall ensure that appropriate staff
review all completed suicides and serious suicide attempts for policy and training
implications.
**Number 48**
Since the revised suicide prevention policy will include the suicide and suicide attempt

review protocols, it will not be available until the end of September, 2005. A suicide

review process was not provided in the documents I reviewed this quarter. The status

will be included in the next quarterly report. Mrs. Pittman is aware of the suicide

prevention tools available on the website of Lindsay Hayes, as well as his recent

monograph on suicides in juvenile facilities. Dr. Hayes is considered one of the leading

experts in the USA on suicide prevention in juvenile institution.

**C. MEDICAL AND DENTAL CARE**
(29)<u>Appropriate Care</u> The State shall provide youth adequate, appropriate, and timely
medical and dental care to meet the individualized needs of youth, including treatment of
acute and chronic medical conditions. The State shall develop and implement adequate
medical and dental policies, procedures and protocols. The State shall ensure that there
are sufficient numbers of qualified medical professionals to meet these needs.
**Number 117**
Both medical and dental care operations need some reorganization. Recommendations

from the DOJ consultant include reorganizing current practice in order to maximize the

27

dentist's time at both facilities. It recommended providing line staff to facilitate smooth movement of youth to and from the dental office. This can be a permanent or collapsible post. A second collapsible post would provide a line staff to supervise youth waiting for treatment. The use of the dentist's time could be improved by having patients/students waiting for him, instead of him waiting for students to arrive. It is also necessary to clarify policies and procedures regarding how the dentist accesses materials needed to provide the treatment youth need.

Both facilities need to have a preventive dentistry program, including but not limited to topical applications of fluoride; placement of sealants—especially for youth with cavity histories; cleaning of teeth and treatment for inflamed and infected gums, including making mouthwash and flossing materials (loops) available to youth. The toothbrushes are of the lowest quality and **are not suitable** for proper routine brushes. The practice of dispensing toothpaste from a single tube directly to the brushes of all youth on a pod, places youth at risk of exposure to germs from their pod-mates' brushes. It is recommended that paste be squeezed into small cups for each resident if they can't have personal tubes of toothpaste.

A staffing analysis was done by the consulting firm of Richard Barnhart to identify the types and numbers of staff needed by each facility to comply with this requirement. Findings from the analysis will be in the October monitor's report, but it is important to note that DYS has received sufficient positions to provide a part-time doctor and a part-time dentist at both facilities; sufficient nursing positions have been funded to provide

28

nursing coverage for day and afternoon shifts on both campuses. Physicians and dentists are already available on contract. Nurses are presently being hired. Dental Hygienists were recommended for both facilities, freeing dentists to examine and treat youth.

The DOJ consultant for medical and dental recommends immediate filling of RN and LPN vacancies, as well as hiring a permanent nursing supervisor. Although the temporary staff from the contract agency have made quite a few improvements at CTS, a permanent nursing supervisor would stabilize the fragile program. The salaries are not competitive to areas surrounding the facility; therefore, the shortage of professional medical personnel provides them with choice and better benefits in other places. This information was shared by medical, cottage life and educational services staff. The MDHS/DYS may have to consider ways to provide incentives for medical professionals willing to work at the two facilities. Of course, a cost-benefit analysis should be done, if one does not exist already. That analysis should include some review of the number of staff MDHS/DYS has trained who have moved on to nearby states and counties for similar jobs that provide better compensation. It is not unheard of to provide incentives such as signing bonuses and special wage packages for hard-to-fill positions.

All charts in the medical and dental area need to be organized and labeled appropriately. It was suggested by the medical consultant that the reorganization of charts at least include the following sections: Initial Assessment; Progress Notes; Problem List; Plan of Care; Mental Health section and a Dental section. Reorganizing and binding the charts would encourage documentation by all health personnel in chronological order.

29

(30) <u>Coordination of Medical, Dental, and Mental Health Care</u> The State shall hire a qualified health care services coordinator who shall coordinate the medical, dental, and mental health care of each youth in the facilities. The qualified health care services coordinator shall coordinate care provided by lower level practitioners, and participate in quality assurance and infection control programs. **116**

The State has advertised the Health Services Coordinator position. The salary has been

authorized and approved. The recruitment effort is to be complete with the position filled

by September 30, 2005. The DOJ consultant recommended hiring a Nurse Practitioner

for the position whose duties could be 50% administrative and 50% clinical. If hiring a

nurse practitioner is not possible, identifying an expert medical team to serve as a review

panel is recommended.

(31) <u>Medical Facilities</u> The State shall ensure that the facilities are equipped with adequate medical and dental clinics and that medical equipment that could be used as weapons is not accessible to youth. Each clinic shall provide for an appropriately confidential environment in which to conduct medical and mental health assessments. **Number 121, 122, 123, 124**

The medical facilities at both OTS and CTS are new and are equipped with adequate

medical and dental clinics. Both facilities are in need of locks for all cabinets where

medical supplies and equipment are stored, especially needles and other sharp objects.

Locks are also needed for file cabinets for medical records storage to assure

confidentiality. Both Drs. Cohen and Trupin suggested that a one key system would be

adequate. John Platt also made reference to this in his exit report at OTS in July. It has

been suggested that one of the isolation rooms at each clinic be converted to an office for

the nurse/supervisor, which could double as a private room for interviewing

residents/cadets about confidential matters.

(32) <u>Health Assessments</u> The State shall ensure that youth receive adequate health assessments upon admission or re-admission to the facilities.

30

**Number 126**

Policies and procedures have been revised. The training was scheduled for September, due to the hurricane throwing off the August schedule. I will have report the actual status in the next report.

According the US DOJ medical consultants health assessments were occurring, but they were not always within that critical 8 hour window. The initial assessment is not thorough and does not take into consideration the fact that youth admitted to training schools are often medically-neglected and have a higher incidence of acute and chronic illnesses than do adolescents in the general population. For this reason, youth at OTS and CTS need comprehensive assessments upon admission. He found that both training schools take a limited history and the facility physician does a physical exam, a simple urine chemistry test is the only lab work, and a vision screening.

The USDOJ medical consultant recommends the following:

Height and weight with body mass index

History of chronic illnesses or disability

TB skin test

Complete blood count

A blood chemistry panel to assess for chronic liver or kidney disorders & blood fats

Urine DNA amplification tests for Chlamydia and gonorrhea & serological test for syphilis

Formal test of hearing acuity

Further diagnostic evaluation for youth with histories of shortness of breath

Trauma Assessment

31

(33) <u>Medication Administration</u> The State shall develop and implement training for all
medical staff responsible for medication administration to prevent medication
discontinuity and ensure that generally accepted professional standards are followed.
**Number 129**
The policy, procedure and protocols are currently being revised.

The medical consultant said the process at OTS using the new pharmacy contract was

working well.  Recommended improvements included training nursing on the side

effects of medications, particularly psychiatric medications.  He also recommended that

needles and syringes be kept in locked cabinets and a system for accountability for each

syringe and need be established.  The issue of installing locks on cabinet containing

needles and other sharp instruments was raised at CTS as well. He identified medication

management as an area that was working well at CTS.

(34) <u>Medical Referrals</u> The State shall develop and implement policies, practices, and
procedures to ensure that medical decisions to refer youth for specialty consultations or
dental treatment are not overruled by non-medical personnel.
**Number 127, 128**
The policies and procedures governing medical referrals are being revised. They were to

have been complete by the end of August, 2005, according to the schedule in the master

plan. Since agreement has not been reached on that schedule by both parties, the date is

just a proposed date.  Training of all staff was not complete and quality assurance

procedures had not been put in place at the time of this report, which results in non-

compliance this period.

The USDOJ medical consultant recommended a quality assurance process that assured

youth would be referred for follow-up to medical and dental care, if they were released

before the plan of care was complete.  He also recommended developing dental plans

with the proposed/planned release date in mind.  This way the dentist develops a plan of

32

care for the youth that can be accomplished during the time the youth is scheduled to be in the facility...

(35) <u>Medical and Mental Health Records Retrieval</u> The State shall develop and implement policies, procedures and practices to ensure that, consistent with State and Federal law, at a minimum, the juvenile courts in the State, all juvenile detention facilities, and all placement settings from which youth are committed, timely forward all pertinent youth records regarding medical and mental health care.

Recommendations have been made to retrieve records in a timely manner, including collaboration with the DYS community supervisors to retrieve records from courts and detention centers in a timely manner.

(36) <u>Medical and Mental Health Record System</u> The State shall develop and implement policies, procedures and practices to ensure that medical and mental health care staff have access to documents that are relevant to the care and treatment of the youth.

This process is not in place at this time, but the State is working on improving the record keeping processes. They are exploring the possibility of using an electronic filing system. It is anticipated that the new process will be in place by October.

**V. COMPLIANCE AND QUALITY ASSURANCE**

(37) <u>Document Development and Revision</u> The State shall revise and/or develop policies, procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, address, and implement all provisions of this Agreement. The State shall revise and/or develop as necessary other written documents such as screening tools, logs, handbooks, manuals, and forms, to effectuate the provisions of this Agreement.
**Number 11, 12, 13, 18, 20**
The State is early in its development of a quality assurance process. They recognize the importance of a QA process, but have not completed it at this time.

(38) <u>Document Review</u> Within 30 days after the filing of this Agreement with the Court, the State shall submit a master plan to DOJ that establishes a time line of up to one year to revise and/or develop written policies, procedures, protocols, training materials, and screening and assessment tools to effectuate the provisions of this Agreement. The master plan and the policies, procedures, protocols, training materials, and screening and

33

assessment tools shall be submitted to the DOJ for review and approval consistent with
this paragraph. The DOJ shall provide prompt guidance to the State, including specific
explanations as to how the provisions, policies, or procedures, if any, are inconsistent
with the terms of this Agreement, and shall suggest revisions. In the event that the DOJ
asserts that policies, procedures, and other written documents are not in compliance with
the terms of this Agreement, the parties will agree to a schedule for the parties' experts to
communicate. The State shall revise policies as necessary to conform to the terms of this
Agreement. If, after the policies, procedures, and practices affected by this Agreement are
implemented, either of the parties determines that a policy, procedure, or practice, as
implemented, fails to effectuate the terms of this Agreement, the parties shall consult and
the policy, procedure, or practice shall be revised as necessary to conform to the terms of
this Agreement. If the parties are unable to agree on revisions to the policies, etc., the
parties shall submit the issue to the Monitor. If either party is unsatisfied with the
Monitor's resolution, then either party may invoke mediation. If neither party requests
mediation, or at the conclusion of mediation, the dispute may be submitted to the Court.
**Number 11, 12, 13, 18, 20**
The Master Plan was submitted, although the USDOJ felt it needed more information in

it to meet this requirement. The latest status report fills in more information, but still

does not detail steps for accomplishing the plan. Having visited and observed some of

the work being done by the plaintiffs and their consultants, I am aware of the committees

that have been established and some of the tasks they are working on. This needs to be

detailed in the Master Plan and subsequent status reports. The plan has "good bones", but

needs an accompanying narrative that describes the level of effort of the State as they

move toward compliance.


(39) Quality Assurance Programs The State shall develop and implement Quality
Assurance (QA) programs consistent with generally accepted professional practices for
each discipline addressed in this Agreement.

The DYS has outlined the framework for a quality assurance program in its master plan

and subsequent status report. The proposed dates for substantial portions of the QA

program are October and December, 2005.

(40) <u>Corrective Action Plans</u> For each discipline addressed in this Agreement, the State shall develop and implement policies and procedures to address problems that are uncovered during the course of quality assurance activities. The State shall develop and implement corrective action plans to address these problems in such a manner as to prevent them from occurring again in the future.

DYS is gathering standards from other states and reviewing current organizational

standards and has proposed a date of December, 2005, to meet this requirement.

(41) <u>Technical Assistance</u> DOJ will provide the State with technical assistance in the development of policies and procedures required to effectuate the terms of this Agreement. DOJ will assist the State in identifying additional financial resources to supplement those resources currently allocated to the facilities.

The US DOJ has offered its consultants to provide technical assistance and each consultant made recommendations that support compliance at the exit interview in July. It will be important that the state request additional TA as they determine their needs.

Even though there were no education issues due during this quarter, it is important to note

that the education director has been hired and the USDOJ consultant that the education

staff still need significant technical assistance to achieve compliance with the

requirements in the Agreement and Memorandum of Agreement/Rule 41.

**Purpose of Review:** On April 1, 2001, the Mississippi Department of Education (MDE) and the Mississippi Department of Human Services, Division of Youth Services (MDHS; the administrative agency of the Columbia Training School), entered into an interagency agreement specifying the responsibilities of the MDHS in providing special education services to students with disabilities. Specifically, the agreement stated, "A Free and Appropriate Public Education must be provided to youths with disabilities, in accordance with IDEA and the rules and regulations of the State Board of Education. Youth Services will be responsible for the provision of special education and related services to youth with disabilities placed in State Juvenile Correctional Facilities.

On September 26 and 27, 2002, at the request of attorneys in the Civil Rights Division of the United States Department of Justice, Dr. Kelly Dedel Johnson assessed the adequacy of education programs provided by the Columbia Training School in Columbia Mississippi. Again on August 16 and 17, 2005, at the request of the United States Department of Justice, Dr. Johnson assessed the facility's compliance with the education paragraphs of the Memorandum of Agreement.

35

- The initial assessment of the educational program in 2002 provided that the "Columbia Training School fails to meet minimum standards and does not adhere to the provisions of applicable federal and state legislation and regulations.
- In the August 2005 report the findings indicate "the facility has much work to do but there are some assets that will assist in programmatic reforms. The assets include:
  - -unprecedented low populations
  - -a number of dedicated and talented staff
  - -a newly hired Special Education Coordinator
  - -a school environment that is controlled, calm and conducive to learning
  - -a well-stocked library with an enthusiastic librarian
  - -a number of new procedures that are essential to the special education program
  - -excellent occupational and speech therapy resources;
  - -new vocational opportunities for students; and
  - -a successful GED program

The 2002 and 2005 assessments both indicate the need for more specific involvement of staff in the development of policy and procedures for the educational program. The facility Director and the Principal should be more involved in coordinating and participating in all aspects of policy and procedure for the facility.
Compliance assessments related to the MOA and IDEA in reference to Special Education at the facility.

*28.The State shall, at all times, provide all youth confined at the facility with adequate special education in compliance with the individuals with Disabilities Act (IDEA), and regulations promulgated thereunder, and this MOA.*

The assessment indicates that there are deficits with compliance of this section of the agreement. Significant deficits still exist in staffing, operations and expertise required to implement a comprehensive special education program. The report indicates that some improvements have been made since 2002 but the report indicates that they have been performed in a haphazard manner. It was further reported that there are no overall strategies or comprehensive set of policies and procedures to govern operations. The report continues by stating that the school is meeting many of the minimum standards, such as those governing

- Classroom space
- Equipment and supplies
- Teacher-student ratio
- Job Performance Appraisals

- Providing 330 Minutes of Instruction per Day

In other areas there are major concerns where technical assistance is needed

- Policies for Disciplinary Practices
- Procedures for Monitoring Student Absences
- Collecting, Maintaining and Disseminating Records

**My Observation:** It is evident from a review of this section of the MOA that the CTS Director, Principal and staff need technical assistance in developing policies and procedures. They have a grasp of fulfilling the basic structure of an educational program, but need assistance to go steps further to assure the types of services needed to comply with the law relating to IDEA and other regulations.

OTS would benefit from more technical assistance. When I recommended an outside consultant, I was told that the State Special Education Department has started and would continue to provide technical assistance. This way the MS standards, as well as the consent decree and MOA requirements would be addressed.

Another major concern at OTS is the planned departure of several special education teachers, including the teacher serving as the special education coordinator.

*29. Director. The State shall designate a Director of Education to oversee the facilities. The Director shall meet minimum standards as specified by the State. The State shall provide the Director with sufficient staff and resources to perform the tasks required by the MOA..........................*

The Division of Youth Services has hired an Education Director and it appears that the director is clear of his responsibility for overseeing the education program at CTS according to the report. In addition, the director appears to have a sound relationship with the CTS school principal. The deficits outlined under this section of the report indicate:

- To date, no policies, procedures or training programs have been created since those submitted in the litigation of 2004. They were inadequate and did not discuss the essential components of the education programming, such as enrollment, scheduling, teacher qualification and certification. Further the facility does not have a procedures manual to guide the implementation of the Special Education program. A newly hired Special Education Coordinator has been designated to develop the manual and Dr. Johnson has recommended that the education director contact the Georgia Department of Juvenile Justice to obtain a copy of their manual to guide in the development of a manual.
- The Education Director is aware of and plans to address the certification issues according to the report. A Special Education Coordinator has been hired to oversee the education program at both of

37