the educational facilities. The deficits identified in this section indicate again a procedure or policy needed in order to handle "special education only" classes that may be needed for those whose IEPs may require it; the need for an administrative person to assist in administrative tasks, so that the other certified special education teacher does not have to do so if the population increases. The level of clerical work may require a clerical position which relates to overall staffing needs of the program.

- A quality assurance program has not been developed and the educational director's role has not been defined in this process.
- Again a policy on how to accommodate for an increase in population for the array of vocational programs.

**My Observation:** Here again, the staff and program needs technical assistance in developing policy, procedures and planning for any changes in population in order to accommodate the needs of the students. It has been noted that clerical support for the teachers and staff is needed.

*30. Special Education Upon Intake. The State shall ensure that all students who qualify for special education receive such services within a reasonable time following intake at the facilities.*

Again, the facility has not designated a person, policy or procedure to assure that a student receives enrollment and services in a timely manner in the education program. They have a person to verify the special education services but no sure mechanism is in place to identify the student's eligibility in special education.

**My Observation:** It has been recommended that the information be obtained by phone with some one designated to perform this task within three days of a student's admission to the school. This is a policy and procedure issue. There also must be a contingency plan for summer when regular public schools are closed or staff are working flexible, compressed and/or vacation schedules

*31. Parent, Guardian and Surrogate Involvement. The State shall develop and implement policies, procedures and practices to ensure appropriate parent, guardian, or surrogate parent notice and involvement in evaluations, eligibility determinations, IEPs, placement and provision of special education services.*

The report indicates that efforts had been made to involve parents, but it was suggested that more effort be made and it was also suggested that the facility should include in the correspondence the parent's rights in regards to their child's education. This information should be posted in the facility for the parents to see. Again, the report indicates that the

38


EXHIBIT
6 B

procedure for notifying all parents has not been uniformed and improvements can be made in this area.

*32. Staffing.. The Superintendent(s) shall develop and implement an education staffing plan to ensure adequate staff to comply with the terms of the MOA.*

The report indicates that the staff as it currently is constructed is more than sufficient at CTS. The OTS teacher complement needs to be revisited based on the planned departures of several teachers. The deficiencies outlined indicate that very few teachers have participated in IEP meetings and the facility does not have access to the services of a psychologist. These services are needed to conduct psycho-educational testing to determine initial or continued eligibility for special education services.

*33. Screening for Special Education Needs. Consistent with Federal regulations, the State shall provide prompt and adequate screening of youth for special education needs and shall identify youth who are receiving special education in their home school districts or who may be eligible to receive special education services but have not been so identified in the past.*

The report indicates that the facility has done a commendable job of identifying students. However, the deficiency has been in not fulfilling the Child Find obligation. The report indicates that the absence of these procedures is the most glaring deficit at CTS. The following recommendations were made:

- The Teacher Support Team (TST) does not function in the manner envisioned by the federal law or the MOA. The team serves as more of a perfunctory classification committee to make educational programming assignments. It is recommended that it be restructured to serve the pre-referral function needed to satisfy the Child Find obligations.
- The facility has recently implemented a "Child Find" checklist but the report indicates that the process has been stymied by a lack of direction surrounding the purpose of the information.
- The staff has yet to define the procedures for referring students for Child Study.
- The absence of a psychometrist has also stymied their ability to implement the Child Find process.
- The facility does not have the ability to update expired eligibility determinations.

**My Observation:** The deficiencies outlined in the report indicate a consistent problem with the staff not being able to establish policy and procedures. The report indicated a lack of some valuable resources needed to make "Child Find" determinations and it is the my opinion that the staff does not recognize the need for a psychometrist in order to determine "Child Find" eligibility or the facility is not able to obtain the services of a competent psychometrist in the area.

The final sections of this report do not reflect any glaring deficiencies other than that which may be the result of not having a psychometrist which may be the reason no children have been referred for evaluation to determine special education eligibility. The report discusses the process of developing the IEPs and it was determined that more specificity is needed. The facility does not have the capacity to serve students along the full continuum of their special education needs. It indicates that students may be assigned to a special education only some portion of the day, but the assignments do not always reflect the IEP services that are prescribed. It also indicated that the regular and special education students are in the same classes and this cannot be considered a resource placement, according to the report. The report indicated that more detail is needed in the IEP so that an adequate portrait of the student's present level of performance can be assessed. It is further revealed that the facility receives very little diagnostic information on the students from the previous schools they attended.

The report indicates that the facility is in compliance with the vocational education component of the MOA.

The report indicates that with the absence of a psychometrist, the facility has not referred any student for evaluation to determine special education eligibility, and has not satisfied this portion of the MOA

Training for teachers has been provided, but the report indicated that few teachers could remember the topics or anything that was discussed. It was suggested that additional activities may be needed to ensure the retention and application of the information presented. One deficiency under this area is that the facility has not developed a quality assurance program. In addition, the facility does not have a teacher certified to teach math, although one is assigned to do so.

**My Observation:** The report indicates that some improvements have been made, but the facility remains out of compliance with nearly all provisions of the MOA and most of the components of federal and state regulations. It is my opinion that the staff, and administration need very intensive technical assistance on how to establish proper policies and procedures, and every effort needs to be made to facilitate a better understanding of the Child Find regulations and the proper program for special education students as defined by the law. It is also recommended that the staff and administrators be provided training on education in general and IDEA and section 504 of the No Child Left Behind Act specifically. With such background, all staff would understand their responsibility to ask questions and make referrals regarding children/youth whose behavior suggests there may be a need for additional supports.

**APPENDIX I**

**(DRAFT: MONITOR'S FIRST QUARTERLY REPORT**

**The United States of America,**

**Plaintiff,**

**v.**

**The State of Mississippi, et.al.,**

**Defendants**

**Civil Action No.: 3:03-cv-1354WSu**

| ference mber | MS Reference Number for Consent Decree | V. COMPLIANCE AND QUALITY ASSURANCE (37) Document Development and Revision. The State shall revise and/or develop policies, procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, address, and implement all provisions of this Agreement. The State shall revise and/or develop as necessary other written documents such as screening tools, logs, handbooks, manuals, and forms to facilitate the provisions of this Agreement and (38) Document Review. | Completion Dat |
|---|---|---|---|
| | A.V.37, M.V.38 | a. Write a comprehensive policy for the development, distribution, and maintenance of policy/procedure | Jul-05 |
| | | A comprehensive policy and procedure for the management of policy and procedure has been developed. A copy of that policy is attached as Exhibit A. | |
| | | | |

42

| | | |
|---|---|---|
| A.V.37, M.V.38 | **b. Revamp the format to be used in each policy and procedure** | **Jul-05** |
| | A new format has been developed. The policy and procedure for the development, distribution, and maintenance of policy/procedure (Exhibit A) is in the revised format. | |
| A.V.37, M.V.38 | **c. Train administrative staff to write policy and procedure** | **Aug-05** |
| | An initial training session was conducted June 10, 2005, with 15 people attending. An additional training session is scheduled for September 9, 2005. | |
| | **Develop a comprehensive training program for the Division** | |
| A.V.37, M.V.38 | **a. Revise the policy and procedure guiding training** | **Aug-05** |
| | DYS is in the process of hiring a director of training (see the following task). Completion of the new policy and procedure for training has been delayed until the new training director is hired and has an opportunity to have input into the new policy and procedure. The policy and procedure will be completed and implemented by September 30, 2005. | |
| | **c. Develop a pre-service and in-service training plan for the fiscal year starting July 1, 2005** | **Aug-05** |
| | A draft of the training plan has been completed. Final approval of the plan is being delayed until the new training director has been hired. The strategic plan for training will be finalized by September 30, 2005. | |
| | IV. SUBSTANTIVE REMEDIAL MEASURES A. PROTECTION FROM HARM (1) Protection from Harm: The State shall at all times provide youth in the facilities with reasonably safe living conditions. | |
| A.IV.A.1 | **b. Establish a sanitation plan, conduct regular inspections, and correct deficiencies** | **Aug-05** |
| | Weekly sanitation/maintenance inspections were initiated in July. Key administrators, or their designees, are assigned areas of the campus to inspect weekly. When deficiencies are noted, maintenance will initiate a work order and make needed repairs or improvements. | |
| | IV. SUBSTANTIVE REMEDIAL MEASURES A. PROTECTION FROM HARM (9) Uses of Force: The State shall develop and implement comprehensive policies, procedures and practices governing uses of force, ensuring that the least amount of force necessary for the safety of staff, youth residents, and visitors is used on youth. | |
| | **Establish constitutional practices related to the use of force and restraints** | |
| A.IV.A.9 | a. Revise the use of force policy and procedure | Sep-05 |
| | The use of force policy is currently being modified and will be completed by September 10, 2005. Trainers will be trained to teach the new use of force policy September 12-13, 2005. Training of line staff will begin shortly after that. | |
| A.IV.A.9 | 1. Define when force is authorized and when it is not authorized | Sep-05 |

|  |  |  |
|---|---|---|
|  | The use of force policy is currently being modified and will be completed by September 10, 2005. Trainers will be trained to teach the new use of force policy September 12-13, 2005. Training of line staff will begin shortly after that. |  |
| A.IV.A.9 | 3. Define a "Planned" use of force and the process to be followed | Sep-05 |
|  | The use of force policy is currently being modified and will be completed by September 10, 2005. Trainers will be trained to teach the new use of force policy September 12-13, 2005. Training of line staff will begin shortly after that. |  |
| A.IV.A.9 | 4. Revise the investigative and administrative processes following a use of force incident | Sep-05 |
|  | The use of force policy is currently being modified and will be completed by September 10, 2005. Trainers will be trained to teach the new use of force policy September 12-13, 2005. Training of line staff will begin shortly after that. |  |
| A.IV.A.9 | 6. Define "abuse" and prohibit abusive practices | Sep-05 |
|  | The use of force policy is currently being modified and will be completed by September 10, 2005. Trainers will be trained to teach the new use of force policy September 12-13, 2005. Training of line staff will begin shortly after that. |  |
| M.IV.A.9 | a. Refer youth with serious mental illnesses to a psychiatrist for an initial evaluation | Aug-05 |
|  | Current practice calls for youth with serious mental illnesses to be referred to a psychiatrist. Both Oakley and Columbia have contractual psychiatrists on retainer for services. |  |
|  | IV. SUBSTANTIVE REMEDIAL MEASURES A. PROTECTION FROM HARM (6) Protection from Undue Restraints The State shall ensure that youth are not subjected to unreasonable restraints and that restraints are never used to punish youth. The State shall develop and implement policies, procedures and practices to ensure that only safe methods of restraint are used at the facilities, and only in those circumstances necessary for safety and security. |  |
| A.IV.A.6 | 2. Specify when restraints may be used and for how long | Sep-05 |
|  | The use of force policy is currently being modified and will be completed by September 10, 2005. Trainers will be trained to teach the new use of force policy September 12-13, 2005. Training of line staff will begin shortly after that. |  |
| A.IV.A.6 | b. Secure restraint equipment in control centers and establish logs for its use | Sep-05 |

| | | | |
|---|---|---|---|
| | | Restraint equipment (handcuffs, waist chains, leg restraints, and chemical spray) will be maintained in secure lockers in control centers and/or security offices. Roving security officers (who function as emergency response personnel) will check out a pair of handcuffs and a canister of spray when they go on duty and check them back in at the end of their shift. Additional equipment will only be checked out in an emergency. A log will be maintained showing when restraint equipment has been checked out, who checked it out, and when it was returned. Final modifications to policy and practices will be completed by the end of September 2005. | |
| M.IV.A.6 | | h. Youth with immediate safety issues will be promptly seen by a qualified mental health professional | Sep-05 |
| | | Youth are presently being screened and referred to a qualified mental health professional if safety needs are evident. However, the policies, procedures, and practices for initial screening and orientation are being revised to enhance the intake process. These revisions will be completed by September of 2005. | |
| | | IV. SUBSTANTIVE REMEDIAL MEASURES A. PROTECTION FROM HARM (8) Health Care Inquiries Regarding Injury. A nurse or other health care provider shall question, outside the hearing of other staff or youth if appropriate, each youth who reports to the infirmary with an injury, regarding the cause of the injury. If, in the course of the youth's infirmary visit, a health care provider suspects staff-on-youth abuse, that health care provider shall immediately: a. take all appropriate steps to preserve evidence of the injury (e.g., photograph the injury and any other physical evidence); b. report the suspected abuse to the appropriate local officials; c. document adequately the matter in the youth's medical record; and d. complete an incident report. | |
| A.IV.A.8 | | 5. Require youth be privately examined by a health care provider after force has been used | Sep-05 |
| | | The use of force policy is currently being modified and will be completed by September 10, 2005. Trainers will be trained to teach the new use of force policy September 12-13, 2005. Training of line staff will begin shortly after that. | |
| M.IV.A.8 | | 1. Youth will receive a timely mental health evaluation | Sep-05 |
| | | Youth are presently being screened and evaluated to determine the need for mental health services. However, the policies, procedures, and practices for initial screening and orientation are being revised to enhance the intake process. These revisions will be completed by September of 2005. | |

| | | | |
|---|---|---|---|
| | | **IV. SUBSTANTIVE REMEDIAL MEASURES** **A. PROTECTION FROM HARM. (2) Protection from Abuse.** The State shall ensure that youth are protected from violence and other physical or sexual abuse by staff and other youth; **and (7) Reporting of Staff Misconduct and Other Serious Incidents.** The State shall develop and implement appropriate policies, procedures, and practices to ensure that all incidents of staff-on-youth and youth-on-youth violence, inappropriate staff relationships with youth, and abusive institutional practices are reported to appropriate individuals, and that such reporting may be done through confidential means, without fear of retaliation. The State shall ensure that all incidents are adequately documented and reported appropriately and with sufficient detail, including the facts of the incident, any injury that occurred as a result of the incident and in a way that permits review. | |
| | | **Expand the reporting related to "incidents" and establish a formal system for reviewing incidents** | |
| A.IV.A.2 & A.7 | | a. Revise the policy and procedure which defines incidents, the reporting process, and the review process | Sep-05 |
| | | We are in the process of revising said policies and procedures. It is anticipated that the policies regarding "incidents," the reporting process, and review process will be drafted by the September deadline. | |
| | | **IV. SUBSTANTIVE REMEDIAL MEASURES** **A. PROTECTION FROM HARM (7) Reporting of Staff Misconduct and Other Serious Incidents.** The State shall develop and implement appropriate policies, procedures, and practices to ensure that all incidents of staff-on-youth and youth-on-youth violence, inappropriate staff relationships with youth, and abusive institutional practices are reported to appropriate individuals, and that such reporting may be done through confidential means, without fear of retaliation. The State shall ensure that all incidents are adequately documented and reported appropriately and with sufficient detail, including the facts of the incident, any injury that occurred as a result of the incident and in a way that permits review. | |
| A.IV.A.7 | | 1. Include inappropriate relationships and incidents of violence as serious incidents | Sep-05 |
| | | Inappropriate relationships and incidents of violence will be included in the new policies and procedures as serious incidents. | |
| A.IV.A.7 | | b. Provide a confidential means for reporting abusive or serious incidents | Sep-05 |
| | | The grievance procedure is being modified to allow youth to file a confidential grievance. A confidential grievance, filed by a youth, will be delivered directly to the Administrator or his/her designee, and not read by any other staff. This change to the grievance procedure will be completed by the end of September 2005. | |
| A.IV.A.7 | | c. Establish an investigative process and review for all abusive or serious incidents | Sep-05 |

| | | |
|---|---|---|
| | We are in the process of writing and implementing a policy and procedure for a more comprehensive investigative process for all use of force situations. When abusive situations occur, they will be reported to the Department of Human Services, the agency legislatively tasked with investigating serious incidents and abusive situations. | |
| M.IV.A.7 | 2. Youth who are screened and may need mental health services will receive a timely evaluation | Sep-05 |
| | Youth are presently being screened and evaluated to determine the need for mental health services. However, the policies, procedures, and practices for initial screening and orientation are being revised to enhance the intake process. These revisions will be completed by September of 2005. | |
| | IV. SUBSTANTIVE REMEDIAL MEASURES A. PROTECTION FROM HARM (3) Protection from Abusive Institutional Practices The State shall ensure that abusive institutional practices such as hog-tying, pole-shackling, "sitting in a chair", "guard duty", making youth eat vomit, making youth run with tires around their bodies, or run with mattresses, cease immediately. | |
| A.IV.A.3 | 2. Include humiliating or degrading practices (eating vomit, carrying tires, etc.) as abusive incidents | Sep-05 |
| | Abusive practices are not permitted. Humiliating and degrading practices will be defined in the new policies and procedures as abusive incidents. | |
| A.IV.A.3 | 3. Include abusive institutional practices as serious incidents | Sep-05 |
| | Abusive institutional practices will be defined in the new policies and procedures as serious incidents. | |
| | IV. SUBSTANTIVE REMEDIAL MEASURES B. SUICIDE PREVENTION (28) Suicide and Suicide Attempt Review The State shall ensure that appropriate staff review all completed suicides and serious suicide attempts for policy and training implications. | |
| A.IV.A.28 | d. Ensure any suicide attempt is considered an incident and subject to the review procedures | Sep-05 |
| | Suicide attempts will be included in the incident policy and procedure as a serious incident and subject to the investigation and review process. It is anticipated that the new incident policy and procedure will be in place by the September deadline. | |
| | IV. SUBSTANTIVE REMEDIAL MEASURES A. PROTECTION FROM HARM (5) Ironwood Ironwood is closed and shall not be used for youth committed to the Division during the life of this Agreement | |
| | Establish constitutional practices related to the operation of special management units | |
| A.IV.A.5 | a. Refrain from using the Ironwood building to house youth | Jul-05 |

| | | | |
|---|---|---|---|
| | | Ironwood is closed and the building is secured.  Ironwood has not been used to house youth since March 2004. | |
| M.IV.A.5 | | g. Assure all youth are screened by qualified mental health professionals using acceptable procedures | Sep-05 |
| | | We are in the process of revising the procedures used by mental health professionals.  It is anticipated that all procedures being used by mental health professionals will be revised by the September 2005 deadline. | |
| | | IV. SUBSTANTIVE REMEDIAL MEASURES A. PROTECTION FROM HARM (4) Protection from the "Dark Room" The State shall immediately cease using the "dark room" cells at Columbia for the inappropriate punitive isolation of girls in the SIU. | |
| A.IV.A.4 | | b. Define the "Dark Room" and prohibit the establishment and/or use of such a room | Jul-05 |
| | | The Dark Room has not been used since July of 2003.  Policy and procedure for the operation of a special management unit that provides for disciplinary segregation which meets constitutional requirements has been written. | |

| | | | |
|---|---|---|---|
| | | **IV. SUBSTANTIVE REMEDIAL MEASURES** **A. PROTECTION FROM HARM (3) Protection from Abusive Institutional Practices:** The State shall ensure that abusive institutional practices such as hog-tying, pole shackling, sitting in a chair "guard duty," making youth eat vomit, making youth run with tires around their bodies, or run with mattresses, cease immediately; **and (14) Isolation:** The State shall develop and implement policies, procedures and practices to ensure that isolation, lockdown, seclusion and other similar restrictions are used only when appropriate and in an appropriate manner and to document fully the use of isolation. The State shall immediately cease requiring youth to strip and remain naked while in isolation. | |
| | A.IV.A.3 & A.14 | c. Revise the policy and procedure which defines how special management units will operate | Sep-05 |
| | | Drafts of the policy and procedure for the operation of the special management units are being reviewed at this time. They will be completed and implemented by the end September 2005 deadline. | |
| | | **IV. SUBSTANTIVE REMEDIAL MEASURES** **A. PROTECTION FROM HARM (15) Due Process** The State shall ensure that youths confined for more than 24 hours receive an appropriate due process hearing by an impartial supervisory staff member to determine whether cause exists for continued disciplinary confinement. | |
| | A.IV.A.15 | 2. Insure youth confined for discipline are given proper administrative reviews | Aug-05 |
| | | We are in the process of revising the policies, practices and procedures regarding the disciplinary process for youth to assure adequate administrative reviews are provided. It is anticipated they will be in place by the November 2005 deadline. | |

| | | |
|---|---|---|
| | IV. SUBSTANTIVE REMEDIAL MEASURES<br>A. PROTECTION FROM HARM (16) Grievances The State shall develop and implement policies, procedures, and practices to ensure that the facilities have an adequate grievance system. | |
| A.IV.A.16 | **Develop, implement, and maintain an adequate grievance system for youth** | **Jul-05** |
| | A revised grievance system has been implemented. This policy and procedure assures grievance forms will be available in all of the housing units. Completed forms will be placed in a secure mailbox. The policy and procedure allows for appeals. | |
| | IV. SUBSTANTIVE REMEDIAL MEASURES<br>A. PROTECTION FROM HARM (17) Admissions Intake and Orientation The State shall develop and implement policies, procedures, and practices to establish a consistent, orderly admissions intake system conducive to gathering necessary information about youth, disseminating information to staff providing services and care for youth, and maintaining their safety. Each youth entering the facility shall receive an effective orientation that shall include simple directions for reporting abuse, and assure youth of their right to be protected from harm and from retaliation for reporting allegations of abuse. Orientation shall also clearly set forth the rules youth must follow at the facility, explain how to access medical and mental health care and the grievance system, and provide other information pertinent to the youth's participation in facility programs. | |
| | **Classification and Programs** | |
| M.IV.A.17 | b. Insure that every youth is assigned a counselor | Jul-05 |
| | A counselor is assigned to each cottage or pod where youth are housed. The youth living in a given cottage or pod are assigned to the counselor responsible for that cottage or pod. | |
| M.IV.A.17 | c. Insure that each facility maintains a counselor to youth ratio of 1:25 | Jul-05 |
| | Each cottage or pod has one counselor assigned and no counselor is assigned to more than one cottage or pod. Since no cottage or pod houses more than 25 youth, a 1 to 25 ratio is being maintained. At this time, Columbia has 7 counselor positions and Oakley has 13 counselor positions so the ratio of 1:25 is being met. | |
| | e. Youth will be screened and evaluated for the need for mental health services | Sep-05 |
| | Youth are presently being screened and evaluated to determine the need for mental health services. However, the policies, procedures, and practices for initial screening and orientation are being revised to enhance the intake process. These revisions will be completed by September of 2005. | |

| | | | |
|---|---|---|---|
| | | IV. SUBSTANTIVE REMEDIAL MEASURES A. PROTECTION FROM HARM (10) Investigations The State shall develop and implement an adequate system for investigation by senior management of uses of force, alleged child abuse, youth-on-youth violence, and alleged sexual contacts. | |
| | M.IV.A.10 | b. Place youth in need of medication under the care of a licensed psychiatrist | Aug-05 |
| | | Both facilities have contract psychiatrists who are responsible for monitoring the youth who are in need of, and placed on, medication. | |
| | | IV. SUBSTANTIVE REMEDIAL MEASURES A. PROTECTION FROM HARM (18) Employment Practices The State shall ensure that only individuals fit to work with youth residents are employed at the institutions. The State shall utilize reasonable measures to determine applicants' fitness to work in a juvenile justice facility prior to hiring employees for positions at the facilities. Within 120 days of the Effective Date of this Agreement the State shall conduct a criminal record check for all current employees at the facilities, taking appropriate actions where new information is obtained. Every two years thereafter the State shall update record checks for all employees who come into contact with youth. | |
| | M.IV.A.18 | c. Ensure information about psychotropic medication is made available | Aug-05 |
| | | Medical policies are being revised and information about medication in use at the two facilities will be provided to youth and to staff. These changes are being made at this time. | |
| | M.IV.A.18 | 1. Ensure youth are given such information | Aug-05 |
| | | Medical policies are being revised and information about medication in use at the two facilities will be provided to youth and to staff. These changes are being made at this time. | |
| | M.IV.A.18 | 2. Ensure a good faith effort is made to provide parents and guardians with such information | Aug-05 |
| | | Medical policies are being revised and information about medication in use at the two facilities will be provided to youth and to staff. Revisions to policies will include a good faith effort to provide parents and guardians with information about medication. be These changes are being made at this time. | |
| | | IV. SUBSTANTIVE REMEDIAL MEASURES B. SUICIDE PREVENTION (20) Development and Implementation of Policy The State shall develop and implement adequate policies, procedures and practices relating to suicide prevention. | |
| 0 | A.IV.A.20 | Insure that policies, procedures and practices provide adequate suicide prevention services | Sep-05 |

| | | IV. SUBSTANTIVE REMEDIAL MEASURES B. SUICIDE PREVENTION (21) Suicide Risk Assessments The State shall develop and implement policies, procedures, and practices to ensure that qualified mental health professionals conduct timely suicide risk assessments, using reliable assessment instruments for a) all youth exhibiting behavior which may indicate suicidal ideation, and b) when determining whether to change the level of suicide precautions. | |
|---|---|---|---|
| 1 | A.IV.A.21 | a. Ensure assessments are completed by qualified mental health professionals | Sep-05 |
| | | The intake and assessment processes at each facility are currently being managed by a qualified mental health professional - a master's degree psychologist. An initial assessment is made on all incoming youth. If needed, referrals are made to a Ph.D. psychologist and/or a psychiatrist. | |
| | | IV. SUBSTANTIVE REMEDIAL MEASURES B. SUICIDE PREVENTION (22) Mental Health Response to Suicidal Youth The State shall develop and implement policies, procedures, and practices to ensure that youth who demonstrate suicidal ideation or attempt self-harm receive timely and appropriate mental health care by qualified mental health professionals. This shall include helping youth develop skills to reduce their suicidal ideations or behaviors, and ensuring that all youth discharged from suicide precautions receive adequate follow-up treatment within the facilities. | |
| 2 | A.IV.A.22 | b. Provide suicidal youth with mental health care by qualified mental health professionals | Sep-05 |
| | | Policies, procedures, and practices regarding the care and assessment of youth who are suicidal are currently under revision. These changes will be completed in September of 2005. | |
| 9 | M.IV.A.22 | **Ensure that youth are not confined to locked cells during non-sleep hours unless:** | **Aug-05** |
| 0 | M.IV.A.22 | a. They need time to calm down immediately following a violent incident | Aug-05 |
| | | Policy and procedure for the management of disruptive youth is being revised. The revised policy and procedure will include a statement that youth may only be placed in a locked room if out of control or serving a term of disciplinary segregation. | |
| 1 | M.IV.A.22 | b. They have been given disciplinary segregation in a formal disciplinary hearing | Aug-05 |
| | | Policy and procedure for the management of disruptive youth is being revised. The revised policy and procedure will include a statement that youth may only be placed in a locked room if out of control or serving a term of disciplinary segregation. | |

| | | IV. SUBSTANTIVE REMEDIAL MEASURES<br>B. SUICIDE PREVENTION (23) Supervision of Youth at Risk of Self-Harm. The State shall ensure that newly arrived youth, youth in isolation or seclusion and other youth at heightened risk of self-harm are sufficiently supervised to maintain their safety. | |
| 3 | A.IV.A.23 | c. Provide extra supervision for youth at times of higher risk of suicide | Sep-05 |
| | | Policies, procedures, and practices regarding the care and assessment of youth who are suicidal are currently under revision. These changes will be completed in September of 2005. | |
| | | IV. SUBSTANTIVE REMEDIAL MEASURES<br>B. SUICIDE PREVENTION (24) Housing for Youth at Risk of Self-Harm. The State shall ensure that all housing for youth at heightened risk of self-harm, including holding cells, isolation cells, seclusion cells, and housing for youth on suicide precautions, is free of hazards that would allow youth to hang themselves or commit other acts of self-harm. | |
| 4 | A.IV.A.24 | d. Provide housing to suicidal youth that is free of hazards allowing a youth to commit suicide | Sep-05 |
| | | Policies, procedures, and practices regarding the care and assessment of youth who are suicidal are currently under revision. These changes will be completed in September of 2005. | |
| | | IV. SUBSTANTIVE REMEDIAL MEASURES<br>B. SUICIDE PREVENTION (25) Restrictions for Suicidal Youth. The State shall ensure that youth on suicide precautions are not restricted in their access to programs and services more than safety and security needs dictate. | |
| 5 | A.IV.A.25 | e. Assure suicidal youth are provided programs and services to the extent safety allows | Sep-05 |
| | | Policies, procedures, and practices regarding the care and assessment of youth who are suicidal are currently under revision. These changes will be completed in September of 2005. | |
| | | IV. SUBSTANTIVE REMEDIAL MEASURES<br>B. SUICIDE PREVENTION (26) Documentation of Suicide Precautions. The State shall develop and implement policies, procedures, and practices to ensure that the following information is thoroughly and correctly documented, and provided to all staff who need to know such information:<br>a. the times youth are placed on and removed from precautions;<br>b. the levels of precautions on which youth are maintained;<br>c. the housing location of youth on precautions;<br>d. the conditions of the precautions; and<br>e. the times and circumstances of all observations by staff monitoring the youth. | |
| 6 | A.IV.A.26 | f. Require comprehensive documentation for youth who are suicidal | Sep-05 |

| | | | |
|---|---|---|---|
| | | Policies, procedures, and practices regarding the care and assessment of youth who are suicidal are currently under revision. These changes will be completed in September of 2005. | |
| 7 | A.IV.A.26 | g. Assure the documentation related to suicidal youth is provided to staff working with those youth | Sep-05 |
| | | Policies, procedures, and practices regarding the care and assessment of youth who are suicidal are currently under revision. These changes will be completed in September of 2005. | |

| | | **IV. SUBSTANTIVE REMEDIAL MEASURES** **B. SUICIDE PREVENTION (27) Access to Emergency Equipment** The State shall ensure that direct care staff have immediate access to appropriate equipment to intervene in the event of an attempted suicide. | |
|---|---|---|---|
| 8 | A.IV.A.27 | h. Ensure direct care staff have access to equipment needed to intervene in the case of a suicide attempt | Sep-05 |
| | | Policies, procedures, and practices regarding the care and assessment of youth who are suicidal are currently under revision. These changes will be completed in September of 2005. | |
| | | **C. MEDICAL AND DENTAL CARE** **(29) Appropriate Care** The State shall provide youth adequate, appropriate, and timely medical and dental care to meet the individualized needs of youth, including treatment of acute and chronic medical conditions. The State shall develop and implement adequate medical and dental policies, procedures and protocols. The State shall ensure that there are sufficient numbers of qualified medical professionals to meet these needs. | |
| 7 | | **Hire and maintain the staff needed to meet the medical needs of youth** | |
| 8 | A.IV.C.29 | a. Conduct a staffing study to identify the types of staff and numbers of each needed to provide adequate care | Sep-05 |
| | | A staffing study for medical is currently in process. It is anticipated that the staffing analysis will be completed by the end of September. | |
| | | **C. MEDICAL AND DENTAL CARE** **(31) Medical Facilities** The State shall ensure that the facilities are equipped with adequate medical and dental clinics and that medical equipment that could be used as weapons is not accessible to youth. Each clinic shall provide for an appropriately confidential environment in which to conduct medical and mental health assessments. | |
| 0 | | **Maintain the facilities and equipment needed to provide adequate medical and dental care** | |
| 1 | A.IV.C.31 | a. Provide adequate, well maintained facilities for providing medical and dental services | Aug-05 |
| | | A new clinic housing medical and dental was opened in March of 2004 at Oakley. A new medical and dental clinic was opened in August 2005 at Columbia. | |
| 2 | A.IV.C.31 | b. Provide adequate, well maintained equipment for providing medical and dental services | Aug-05 |
| | | Adequate equipment is being purchased for the two clinics. This will be completed by the August 2005 due date. | |
| 3 | A.IV.C.31 | c. Manage any medical equipment that could be used as a weapon in a safe and secure manner | Aug-05 |

| | | | |
|---|---|---|---|
| | | Policy and procedure for the operation of the two medical clinics is being developed. It will include requirements for the proper management and storage of medical equipment. | |
| 4 | A.IV.C.31 | d. Provide an area for assessments that is confidential | Aug-05 |
| | | Space is being established for conducting private assessment interviews. These spaces will be in use by the August 2005 deadline. | |
| | | C. MEDICAL AND DENTAL CARE (32) Health Assessments. The State shall ensure that youth receive adequate health assessment upon admission or re-admission to the facilities. | |
| | | **Provide adequate, appropriate and timely medical and dental care** | |
| 6 | A.IV.C.32 | b. Assure each youth receives an adequate health assessment upon admission | Aug-05 |
| | | We are in the process of revising the policies, protocols and procedures regarding medical and dental care and it is anticipated they will be in place by the August 2005 deadline. | |
| | | C. MEDICAL AND DENTAL CARE (34) Medical Referrals. The State shall develop and implement policies, practices, and procedures to ensure that medical decisions to refer youth for specialty consultations or dental treatment are not overruled by non-medical personnel. | |
| 7 | A.IV.C.34 | c. Refer youth for medical and dental specialty consultations as needed | Aug-05 |
| | | We are in the process of revising the policies, protocols and procedures regarding medical and dental care and it is anticipated they will be in place by the August 2005 deadline. The revised procedures will include a provision for speciality consultations as needed. | |
| 8 | A.IV.C.34 | d. Insure referrals for specialty consultations are not overruled by non-medical staff | Aug-05 |
| | | We are in the process of revising the policies, protocols and procedures regarding medical and dental care and it is anticipated they will be in place by the August 2005 deadline. The revised procedures will include a provision that referrals may not be overruled by non-medical staff. | |
| | | C. MEDICAL AND DENTAL CARE (33) Medication Administration. The State shall develop and implement training for all medical staff responsible for medication administration to prevent medication discontinuity and ensure that generally accepted professional standards are followed. | |
| 9 | M.IV.A.19 | e. Properly store and distribute medications | Aug-05 |

| | | | |
|---|---|---|---|
| | | We are in the process of revising the policies, protocols and procedures regarding medical and dental care and it is anticipated they will be in place by the August 2005 deadline. The revised procedures will include a provision for the proper storage and distribution of medications. | |
| | | | |
| | | | |
| 4 | M.IV.B.29 | **Designate a Director of Education** | Sep-05 |
| | | A position for a Director of Education has been created. The new Director of Education began working in March, 2005. | |
| 5 | | **Hire and maintain the staff needed to provide educational and vocational programs** | |
| 6 | M.IV.B.32 | a. Conduct a staffing analysis and determine the staff needed at the two facilities | Sep-05 |
| | | A staffing analysis for education is being conducted. It is anticipated that the staffing analysis will be completed by the end of September 2005. | |
| 7 | M.IV.B.32 | 1. Include the number of needed special education teachers | Sep-05 |
| | | The need for special education teachers will be included in the education staffing study. It should be completed by the September 2005 deadline. | |
| 8 | M.IV.B.32 | 2. Include the number of psychologists needed to provide adequate participation | Sep-05 |
| | | A staffing analysis for education is being conducted. It is anticipated that the staffing analysis will be completed by the end of September 2005. It will include a review of the number of psychologists needed. | |
| 9 | M.IV.B.32 | 3. Provide for the services of specialized professionals specified in the IEP's | Sep-05 |
| | | Contractual speech and occupational therapists began working on July1, 2005. | |
| 4 | M.IV.B.31 | b. Youth who qualify for special education services will receive them within a reasonable time | Sep-05 |
| | | Policy, procedure, and practices for special education are being developed at this time. It is anticipated youth with special education needs will receive them in a timely manner by the September 2005 deadline. | |

## CERTIFICATE OF SERVICE

I hereby certify that on January 23, 2006, I electronically filed the foregoing on behalf of Joyce L. Burrell, Court Monitor, with the Clerk of the Court using the ECF system which sent notification of such filing to the following: Harold E. Pizzetta, III, Special Assistant Attorney General, Counsel for the State Defendants, P.O. Box 220, Jackson, Mississippi, 39205.

s/ Tammi Simpson

# MONITOR'S SECOND REPORT



The United States of America,
Plaintiff
v.
The State of Mississippi, et.al.,
Defendants

Civil Action NO.: 3:03-cv-1354WSu

Submitted by:  Joyce L. Burrell, Court Monitor

## THE COMPLAINT

The United States Department of Justice Civil Rights Division filed a suit in the United States District Court for the Southern District of Mississippi against the State of Mississippi Department of Human Services, Division of Youth Services. The action was brought pursuant to the pattern or practice provision of the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. 14141, and sought to enjoin the State of Mississippi from depriving youth confined in Mississippi's Oakley and Columbia Training Schools of rights, privileges, or immunities secured or protected by the Constitution and laws of the United States. This litigation is now settled and a consent decree has been entered for some issues with a rule 41 agreement for the other issues.

- Most of the conditions of the agreement were not met by the end of the period covered by this second quarterly report, August 1, 2005 – December 15, 2005. Although progress was made during this period, it was significantly hampered by the devastating impact of Hurricanes Katrina and Rita on Mississippi in the summer of 2005.

- The training schools have remained the highest priority for Director Pittman, it is apparent that the priorities for the Director of the DHS and the governor have had to shift to address the immediate safety and well-being of the thousands of citizens harmed by the Hurricane, some of whom are the families of the children and youth in the facilities as well as the employees of the facilities. Some of the families representing the State in this case were displaced by the storms and the city of Jackson (relevance of the City of Jackson) was without power for over a week. It is anticipated that it will take up to a year to restore the most basic services to the entire state; as a result of the demand on service providers and craftsmen there will be delays to scheduled facility repairs. . One of the effects of

responding to catastrophic disturbances is finding qualified workers. At this time, the job market is very competitive; the demand on qualified workers is driving the cost of labor up while the expectations and standards of performance in various industries have been reduced.

## MONITOR'S REPORTS

The monitor shall file with the Court and provide the parties with reports describing the steps taken by the State to implement the Agreement entered by the State of Mississippi, the Mississippi Department of Human Services with the U.S. Justice Department. The State of Mississippi consented to the entry of finding that it has violated the federal rights of juveniles at Columbia and Oakley Training Schools in each area addressed in Section IV of the Agreement. Conditions set forth in the Agreement include allowing the monitor having full and complete access to the facilities, all facility and Division records, staff, and residents. Further, the State shall direct all employees to cooperate fully with the Monitor. *This has improved significantly in the second quarter and was evident in discussions, email exchanges and conversations with staff and administrators.*

- Communication between staff and the Monitor improved during the second reporting period. Through her regular meetings with staff, Director Pittman has a consistent practice of reinforcing the new expectation of open communication and continuous improvement in this area by keeping her staff informed of consent decree and memorandum of agreement requirements and status. The Leadership Committee is working to post bulletin boards in common areas that are accessible to staff, as well as producing a monthly newsletter that will include

3

announcements regarding policy changes, training opportunities, committees staff

can participate on with contact information.

- I was briefed on several occasions by Director Pittman's team, including the new

  policy director, training director, special education coordinator and the lead

  consultant, Dick Barnett of Compet, Inc. Change has been very difficult for the

  staff. The destabilizing effect of change is still the primary complaint of staff at

  both facilities, but Leadership Team is committed to improving the overall

  climate in DYS for students and staff.

- If the policies, procedures, training and the quality assurance system were in

  place, I think staff would find the process less destabilizing. Some staff persons

  feel they are being asked to change work day practices on a daily basis.

- Improved communication is definitely a priority, but it is still occurring

  haphazardly rather than systemically.

---

*Recommendation: Make up and down communication a consistent priority for all members of the team. This must include staff, supervisors, managers and partner agency staff and managers.*

---

- Director Pittman held town meetings with staff and Mr. Don Taylor, DHS

Director, and members of his executive team visited the campuses during this

reporting period. Those visits presented opportunities for Mr. Taylor to provide

information and answer staff members' questions directly.


- **SUBSTANTIVE REMEDIAL MEASURES**

4

This report covers my observations, interviews and interpretations of materials provided by the State, its contractors, as well as reviews of reports from the U.S. Department of Justice (DOJ) consultants for this quarter. There were discussions with both state and DOJ attorneys, interviews with students, staff and administrators, as well as observations from visits during August and October, November and December, 2005, to both Columbia Training School and Oakley Training School. I had an opportunity in August to spend some time with U.S. Department of Justice consultants and attorneys representing both the U.S. Department of Justice and the State of Mississippi during tours of both facilities. Due to the scarcity of hotel accommodations and communication problems in September and October, no visits were scheduled until the last week in October. The primary form of communication and evaluation of progress between the State and the monitor during those months was by telephone and email. I also reviewed reports of the consultants for the State of Mississippi, lead by Mr. Richard Barnhart and his team, including Dr. Robert Hofacre and Carol Cramer Brooks, as well as reports from the consultants for the U.S. Department of Justice, including Kelly Dedel Johnson, Ph.D., for education and special education; Cheryl D. Wills, M.D. for mental health and substance abuse services; and Michael D. Cohen, M.D. for medical and dental services. Further, I had an opportunity to interview the new policy director, training director and special education coordinator during my visits. I was able to secure copies of the latest signed policies and procedures; the Strategic Training Plan and a training schedule; the Staffing Analysis for Medical Services; the Staffing Analysis for Educational Services; The training schedule was a draft. According to Director Pittman, the policies and procedures were pending approval by DOJ.

5

Thru the review of intake forms, incident reports, cottage coverage schedules, student

classification forms and population sheets for the cottages, I had an opportunity to review

the list of youth on different levels of suicide watch, as well as youth receiving

psychiatric treatment at both Oakley and Columbia Training Schools.   I was especially

interested in the numbers of youth assigned to the Behavior Management Units and the

Special Management Units, a well as the reasons for the placements. The length of time a

student spends in those housing units is a concern because there is reduced access to

services at both facilities and the of the unresolved noise level in the building at

Columbia Training School. Students complained about access to recreation services.


This report marks the completion of the six months period following the signing the

Memorandum of Agreement and not unlike the first quarter, a great deal of time was

spent organizing and planning the strategy to address the identified issues. The hurricanes

caused tremendous setbacks to the timeline the State originally proposed, but the team

has continued to work to meet the established commitments.  The status of the master

plan is of great importance to the team in Mississippi.  Although, the Department of

Justice determined that the submitted plan was not adequate, my discussions with the

Director of DYS indicated an expectation of additional feedback from DOJ.  As it turns

out, a revised Master Plan was not submitted to DOJ for comment prior to the end of this

period, December 15, 2005.

There certainly is evidence of progress and as expected, that progress has been uneven.

Unfortunately, the areas of substantial compliance are very few, but there are examples of

6

indicative of making progress towards compliance, partial compliance, in this reporting period. However, given the massiveness of the task, it was unlikely the State would have complied in all of the areas in the first six months, even without the Hurricane Katrina catastrophe.

I have seen the strategic plan and a draft of the revised master plan and feel that it is much more detailed and specific in terms of how the state will proceed on each component of the decree and Memorandum Of Agreement (MOA). Although there have been extenuating circumstances following Hurricanes Katrina and Rita and the fact that it will take years to restore Mississippi, the children and youth impacted by this settlement agreement and  Memorandum of Agreement must also be among the highest priorities for the State, as a party to this case.  The State representatives have indicated that this case remains a priority. There will be a discussion between DOJ and the State on issues regarding the catastrophic impact of the two hurricanes have had on the state's resources and the result of that discussion will be covered in the next quarterly iteration of the report. Although modifying dates for compliance on some of the decree issues may seem critical, the well being and civil rights of these youth must also be carefully considered and protected. The State must work closer with the Department of Justice to achieve agreement on the master plan, outstanding policies and procedures, the training schedule and the revisions of latest reiteration of the suicide prevention policy, which was formally addressed in a letter to the State from the DOJ.  At this point, it is apparent that both parties in this action are experiencing some frustration as result of the lack of progress.

7

The American Correctional Association Standards for Juvenile Justice Facility's manuals were purchased and distributed to key managers and supervisors as a tool for realigning practices that were identified as "not being grounded in standards of treatment for juvenile justice facilities or the standards of treatment." For the disciplines of special education, mental health and adolescent medicine, it is commendable that there has been some minimal progress in addressing special education services, but the large issue of "type of special education program" still poses a critical problem. A draft special education manual has been developed and policies and procedures have been established, which will go to the DOJ for approval early in 2006. The state has chosen to delay some planned staff training pending the approval by the U.S. DOJ. I have recommended that they go forward with training, especially if the practices to be reinforced by training are grounded in good juvenile justice practice and if DYS is able to site the standards that support their policies and procedures. It is so critical that the work continue that I recommended that the DYS to go forward with the training. The policies I have received reference the related standards on the cover sheet.

During this period there was again a great deal of activity on the part of the State in response to the settlement agreement and the MOA. During my visits in August, it was obvious that the matter was being taken seriously. I reiterate the urgency to meet the requirements is much more evident from the Department of Youth Services' team. (The Mississippi Department of Human Services is a first responder to children and families in all types of crises; the numbers of families in crisis far exceed anything they had ever planned, budgeted or staffed to address in the past. I admit that I cannot conceive of the

8

magnitude of the hurricanes impact in terms of human or organizational toll.) As the

monitor, I still have to say whether the State is in compliance or not, even when it such

catastrophic events as the Hurricane Katrina crisis complicate efforts toward compliance

with this settlement agreement and the memorandum of agreement regarding the safety,

well-being and protection of the children and youth housed in the two training schools.

The well-being of these children and youth has to be of the highest priority. Certainly the

hurricane/disaster response has drawn on the energies of the DYS staff in DHS, as well as

all other staff throughout the entire DHS, but the needs of this population and those rights

that were determined to have been violated must be corrected as quickly as is possible.

MDHS Director Taylor, DYS Director Pittman, her staff and consultant team are to be

commended once again for simultaneously making some progress on both fronts. I raised

the issue of communication in the last report and communication has improved

dramatically.  Although it may be as result of changes in reporting requirements as a

direct result of the storms, it has been beneficial to the staff regarding the settlement

agreement and the MOA. Mrs. Pittman does regular briefings with staff on all shifts and

holds town meetings to keep them informed.  The most recent practice changes to address

the needs of the high risk youth population placed in such facilities due to their special

needs rather than the seriousness of committing offense will be addressed more

specifically when I address the sections of the agreement on education, medical and

dental and  mental health.

In preparation for writing this report, I was provided a status report on the master plan that reflected more information on how issues would be addressed. I also held lengthy discussions with Mrs. Pittman and her lead consultant, Dick Barnhart, on each item. I also received reports from the consultant teams. The implementation of critical policies and procedures is needed because without them to guide the staff on how to safely manage high risk youth, staff will continue to do business as best they can, which is not and was not based on accepted practice standards for youth housed and receiving treatment in juvenile correctional facilities. One would expect the youth to present with very serious charges, but at both facilities youth present with complex emotional, behavioral and educational needs. Since the  Mississippi Youth Court Book, 2004 Edition, in Section 43-27-8 requires the Mississippi Department of Human Services to apply **currently accepted standards of juvenile care and treatment,** the department has issued ACA Standards for Juvenile Training Schools, 3rd Edition to staff and supervisors.  The Division has made application for and been accepted for candidacy and have scheduled training and implementation of Performance-Based Standards for the Operation of Juvenile Training Schools and Detention Centers, (OJJDP, 1999.) to begin in February, 2006, this date was offered because the October candidacy class was full. For the division, this action provides staff and administrators with benchmarks for providing and evaluating the consistency of care, as well as custody and treatment practices employed at the facility.  Adhering to the proposed practices will protect the individual rights of the children mandated to the facilities if Director Pittman and her team review and report the outcomes of some of the performance based standards, like incident reporting and status of grievances, more often than the two times per year

10

required for the national project data collection. *They also need to set up a beneficial system of regular review that staff, supervisors and administrators can use.*.  Regular review of documented practices and facility improvement plans developed to address deficits will begin to positively change practices at both Oakley and Columbia Training Schools.

The DYS and the Department of Mental Health applied for and were accepted to be part of the fall policy academy sponsored by the Substance Abuse Mental Health Services Administration, a division in the U.S. Department of Health and Human Services. The team jointly worked on policies and procedures to address alcohol, other illegal drugs and mental health issues of youth in the juvenile justice system.

## SUBSTANTIVE REMEDIAL MEASURES:

Attachment 1:

## IV. SUBSTANTIVE REMEDIAL MEASURES
## A. PROTECTION FROM HARM
(1) *Protection from Harm: The State shall, at all times, provide youth in the facilities with reasonably safe living conditions*

Although the State is **not in compliance**, policies and procedures for major areas regarding the safety of youth have been established and signed off on by the leadership of the Youth Services for the most critical areas of care.  The division has started some training. Dick Barnhart, lead consultant and CEO of Compet, Inc., did initial training on the policy on policies, as well as and the first draft of the suicide prevention policy. Although most staff have had the training on the policy on policies, it only achieves partial compliance on one policy out of many. According to Director Pittman, only 10 of 200 staff had been trained on Use of Force and Handle with Care by December 15, and only 20/200 had been trained in motivational interviewing, although a Train the Trainer was held to increase training capacity during this period.  Trainers were trained for Columbia, Oakley and the community.

11

Oakley has defined a two-pronged approach by identifying and replacing the original SMU staff (formerly Ironwood). The strong new staff will operate the cottage in a manner that is consistent with national standards for juvenile correctional facilities and other standards for the provision of care to students with disabilities, the way the administration wants to see youth managed. There will be more training on the suicide prevention policy, as well as other policies and procedures that will improve the staffs' ability to manage youth effectively. The team is still revising the policy and plans to have full implementation by *January, 2006.*

*Recommendation: Review the work of Lindsay Hayes and implement a suicide prevention plan that will be easily approved. The implementation of the Hayes Plan has helped other states achieve compliance. Director Pittman and members of her team that attended the Policy Academy in September in Bethesda, MD, had an opportunity to meet Lindsay Hayes and hear a presentation on the plan content.*

The State will be DOJ approval of the latest iteration of their suicide prevention policy. Even though all staff persons at both facilities have not competed the training as of December 15, it is anticipated that it will be completed by the first of the year. Several managers expressed concerns about whether or not the policies would be approved. The State has struggled with whether retraining would be required in the case of policy disapproval. It is critical that the training capacity be increased so that the State can meet its own deadline to have full compliance on this by January, 2006. As long as the policies are grounded in accepted practice standards for youth housed and receiving treatment in juvenile correctional facilities and the standard are cited, **it is recommended that they continue the training.**

12

Staffing shortages have impacted coverage practices and some of the attempts to meet staffing requirements may have sparked some of the negative behavior of students toward each other and staff. Students still complain about staff cursing them and about disparate discipline practices. Although the Use of Force and Incident Reporting policies prohibit such behavior, it is hard to reinforce such policies when all staff have not had the benefit of the training. Other strategies must be employed to force staff to comply. The planned training in motivational interviewing and aggression replacement therapy will provide staff with strengths-based interventions that will work campus wide. The earlier idea of moving staff around is a good strategy, but there also have to be other interventions to improve the climate in both schools and make students feel safe. *Students on both campuses still report being afraid of other students and students report that fights between students still occur on both campuses.*

Some supervisors and counselors have already participated in Motivational Interviewing training, which is a strength-based process for managing behavior. The staff members who have been through the training are already using it and experiencing positive results. Unfortunately, all staff persons could not be scheduled for the training during this period, but are scheduled in the new training plan for the next reporting period.

As was the case in my first report, no student reported physical abuse by staff to me. I made sure I had the opportunity to interview several youth individually at both OTS and CTS. I interviewed youth who were afraid of other youth and others who had been in fights or threatened by other youth.

13

Lastly, I observed and talked with several disgruntled staff who feel under-valued in the reform efforts at both facilities. They expressed feeling left out most of the time, which speaks to the need for more work on the communication strategy. It is highly recommended that more staff be integrated in the committee work and that they have more opportunities for input. It is essential that they see evidence of their input in order to encourage others to become more actively involved in the compliance/reform activities.

Graffiti removal and repairs to furniture and removal of damaged, unused furniture must happen daily. For many people, the presence of graffiti indicates a breakdown in community expectations and tolerance. In an institutional setting, the presence of graffiti can indicate and breakdown in supervision of youth and maintenance of the facility. In the last reporting period I observed a bed with springs exposed in a room shared by three girls at Columbia. The serious risk such items present was brought to the attention of the administrator and staff. I was quite surprised to find it still in the room when I returned a month later during this reporting period. Before the end of the reporting period, the staffs were being much more diligent about removing broken, damaged and/or otherwise unsafe equipment and furnishings.

It is critical that staff monitor showers and dressing areas closely, especially during intake and orientation, when staff don't know youth well. Of extreme importance is monitoring of these areas in the two new buildings on the CTS campus because of the hazardous

14

conditions that resulted from a construction design that does not meet current standards regarding suicide risk. It becomes critical to have additional staff to monitor these areas at a time when what had been characterized as an excessive staffing pattern at Columbia Training School is now reduced because Columbia staff are now providing coverage at Oakley Training School. All three justice department mental health experts mentioned structural changes that are needed in the shower rooms and bathrooms in both the new medical facility and the SMU building because the current structure increases the risks for suicidal youth. Without the structural changes, staffing and supervision were to have been the interim remedy, but the coverage solution that was in place for this reporting period thwarted that. All consultants from DOJ sited instances where the living areas had structural defects that provide the enhance the possibility of a student being able to tie a sheet or pair pants around a grab bar or shower rod, if one was inclined to try to hang himself/herself. They noted the exposed metal bedsprings on a bed without a mattress that could be used as a very dangerous weapon. I agree with the DOJ consultants sited the shower handles and grab bars as major concerns because of the increased risk of using them in a suicide attempt. The consultants recommended enclosing the grab bars and changing the shower fixtures to push button fixtures. In the short term, the State has developed a plan to make immediate short term structural improvements and increased supervision of the space until the State Capitol Improvement program schedules and makes the long-term repairs.

Sanitation and care of the physical plant is still neglected contributing to the existence of an environment that is not safe for children/youth. Although I did observe staff from the

Capitol Building Program on grounds assessing damage and developing repair plans, I was told informed that none of the repairs would occur before February, 2006.

The cleanliness of the cafeteria at Oakley, when I visited in August, late October and December, 2005, appeared to be improved. The kitchen seemed better organized. Although I am not an inspector, I did not see bugs or residue from bugs.

> ▉ <u>Protection from Abuse</u> The State shall ensure that youth are protected from violence and other physical or sexual abuse by staff and other youth.

The state is not in compliance on number 2. Several students admit to being afraid of other students. Although my interviews with twenty youth during my August and October visits revealed no youth who claimed to be afraid of staff or unsafe due any staff behavior. In December, one youth at Oakley did speak of instances where peers had been physically harmed by JCOs, CAs or security. He could not tell me which JCOs or CAs had harmed the other youths. The Use of Force Policy, Policy #7, approved September 15, 2005) clearly forbids abusive behavior, including use of profanity and name calling. On the December 6th visit, one girl at the Columbia Training school said she was afraid of another girl in the facility. (I made sure I held individual interviews this time, so that I could reduce the discomfort some youth may have experienced talking about confidential matters in groups.) Several youth told me staff still curse at them, which is a violation of the Use of Force Policy. Youth were aware of the grievance procedures and where to retrieve and turn in forms. Some of them said they had filed grievances. Youth did not say they did not trust the process this time. One recidivist at Columbia Training School

16

told me she still does not bother with the grievance process because she did not believe it works. Of the eight boys I interviewed in December, 2005, at Oakley, none of them had used the grievance process. One Caucasian male told me he was afraid because he was locked up with so many black youth. He said it was the first time he had ever been in a situation where there were so many black youth. Lastly, he said he did not know anyone here and that made him uncomfortable too.

I recommend that the DYS revisit the grievance policy and close the loop in the application of Due Process. The gap that was most evident was informing students of the final outcome of the grievance in a timely manner. This is an excellent opportunity to include student voice. At both facilities, opportunities exist for student leadership. It is recommended that input during development and feedback on proposed drafts be solicited from the youth, assuring that everyone knows what would make students feel that the process meets their needs.

In some of the most progressive juvenile justice settings, youth sit on interview panels for new staff and review policies and procedures as student government leaders. (Missouri DYS is an example of a department that has implemented such practices.) A student council was starting at Columbia Training School and flyers were posted at Oakley Training School to recruit students who might be interested in having input in the development of the incentives program, behavior management system and the revision of the student handbook.

17

With the lower ratio of student to staff at both Columbia and Oakley Training School, there is the opportunity to improve the living conditions and safety of students/cadets. Again, without adequate policies and procedures, the DYS structure and systems do not support consistent, effective program management and treatment. Accountability rests at the top, instead of resting with all staff in the facility.

Protection from Abusive Institutional Practices The State shall ensure that abusive institutional practices such as hog-tying, pole shackling, "sitting in a chair," "guard duty," making youth eat vomit, making youth run with tires around their bodies, or run with mattresses, cease immediately.

The records indicate that the state is in substantial compliance on number 3.

(4) Protection from the "Dark Room" The State shall immediately cease using the "dark room" cells at Columbia for the inappropriate punitive isolation of girls in the SIU.

The dark room remains closed and locked. There was no evidence from interviews with students and staff of use of the dark room. The state is in substantial compliance with this requirement.

(5) Ironwood: Ironwood is closed and shall not be used for youth committed to the Division during the life of this Agreement.

Everyone interviewed reported that Ironwood remains closed and locked down. No students or staff use Ironwood for any purpose and it is not expected to reopen ever. The state is in substantial compliance on this issue.

(6) Protection from Undue Restraints The State shall ensure that youth are not subjected to unreasonable restraints and that restraints are never used to punish youth. The State shall develop and implement policies, procedures and practices to ensure that only safe methods of restraint are used at the facilities, and only in those circumstances necessary for safety and security.

18

The policy addressing the use of restraints has been included in the Use of Force policy (Policy #7: Sections 22 – 28) which was being implemented during the reporting period. Training started, but was not offered to ALL staff during this period, nor were the quality assurance indicators and process in place. This is one of the key areas that had to be a first priority in any attempt to meet the requirements of the decree and MOA. Monitoring of the quality of this process is essential to protecting the rights of all youth at the facility. Therefore, the state is not in compliance on this issue. It is expected that all staff will be trained by the end of the year and the quality assurance process will be developed early in 2006.

(7) <u>Reporting of Staff Misconduct and Other Serious Incidents</u> The State shall develop and implement appropriate policies, procedures and practices to ensure that all incidents of staff-on-youth and youth-on-youth violence, inappropriate staff relationships with youth, and abusive institutional practices are reported to appropriate individuals, and that such reporting may be done through confidential means, without fear of retaliation. The State shall ensure that all incidents are adequately documented and reported appropriately and with sufficient detail, including the facts of the incident, any injury that occurred as a result of the incident, and in a way that permits review.

Policies, procedures have been developed to insure reporting of staff misconduct and other serious incidents. Furthermore, policies and practice MUST insure that the administrator be notified immediately of all serious incidents, as described in (7). Retraining of mandated reporters (teachers, nurses and counselors) has occurred. They now know to report incidences of staff abuse to the CPS hotline, rather than following their old practice of reporting to the administrator on duty at the facility. Memoranda reinforcing the State and Department position on mandated reporting have been disseminated to staff.  Excellent models of policies and procedures, as well as training

19

exist in many states to assure appropriate practice in this area. The Mississippi state

policy was a great place to start. Distribution of the mandated reporting policy that Mr.

Taylor referenced in an earlier exit meeting would enhance practice uniformly on both

DYS campuses.

**Even though some work has been done, more work is still needed, especially on the**

**quality assurance indicators. Training needs to occur for all staff. The state is not**

**in compliance on this issue.**

(8) <u>Health Care Inquiries Regarding Injury</u> A nurse or other health care provider shall
question, outside the hearing of other staff or youth if appropriate, each youth who
reports to the infirmary with an injury, regarding the cause of the injury. If, in the course
of the youth's infirmary visit, a health care provider suspects staff-on-youth abuse, that
health care provider shall immediately:
A. take all appropriate steps to preserve evidence of the injury (e.g., photograph the
injury and any other physical evidence);
B. report the suspected abuse to the appropriate local officials;
C. document adequately the matter in the youth's medical record; and
D. complete an incident report.

**A considerable amount of work was done this quarter to address this. There is a**
**policy and training has been provided. The quality assurance indicators were not in**
**place by December 15, 2006.** The state is not in compliance on this issue.

During my visits in August and October, this was not interpreted correctly by the nursing

staff I spoke to. Healthcare standards for adolescents, as well as healthcare standards for

the care of youth in confinement were consulted while developing the final policy and

procedures. The state of MS has clear standards for reporting suspected abuse, which

provided clear guidelines to which the team could align the new policy. Since this is

another of those very high priority safety requirements, I know that the consultant team

has taken this seriously and brought in outside expertise to address it quickly. The

recommendations from Dr. Cohen, the U.S. DOJ medical consultant were integrated into

20