the policy. He recommended using the space in both the OTS and CTS clinical areas differently, which would provide a confidential setting for the nurses to talk to students and assess injuries out of the hearing range and view of staff and other students. The State is not in compliance on this item.

(9) Uses of Force The State shall develop and implement comprehensive policies, procedures and practices governing uses of force, ensuring that the least amount of force necessary for the safety of staff, youth residents, and visitors is used on youth.

A Use of Force policy has been developed. It had not been issued to all staff, although training has started. Although training has not occurred for all staff, a training schedule exists to provide the training to all staff on both campuses. The quality assurance plan is not in place. Since this issue was one of the main issues that brought the investigation and subsequent action by the U.S. Department of Justice, **this is one area that I recommend be reviewed on a continuous basis.** The QA indicators for monitoring compliance are being developed. The new training director placed this at the top of her priority list when she came on board. As of December 15, 2005, the state was not in compliance on this· issue.

(10) Investigations:  The State shall develop and implement an adequate system for investigation by senior management of uses of force, alleged child abuse, youth-on-youth violence, and alleged sexual contacts.

Policies and procedures have been written for the investigation system. Although the training for all staff has not occurred and the quality assurance indicators have not been identified, some progress has been made as of this reporting period. Still, this item is not in compliance. Timely investigations and reaction help to create the sense of safety and order for residents, as well as for all others working in the facilities. Unless there is an

EXHIBIT
6C

emergency circumstance, the administrator will not investigate such matters because of

the role of the agency Administrator in the decision making process.

(11) <u>Staff Training in Behavior Management, De-Escalation and Crisis Intervention</u> The facilities shall provide appropriate competency-based training to staff in behavior management, de-escalation techniques, appropriate communication with youth, and crisis intervention before staff may work in direct contact with youth.

The first trainings have been offered in behavior management and a Train-the-Trainer

session has also occurred. The committee that was established in early July continues to

work on this issue. The training schedule has been expanded to provide training to all

staff. Staffing issues make it impossible to deliver the training in a timely fashion.

Therefore, this item is not in compliance.


(12) <u>Behavior Management Program</u> The State shall develop and implement an effective behavior management program. The behavior management program shall be implemented throughout the day including during school time. The State shall develop and implement policies, procedures, and practices to ensure that mental health staff provide regular behavior management consultation and training to custody and other staff involved in the behavior management program, and shall develop a mechanism to assess the effectiveness of interventions utilized.

Drafts of the policies and procedures for the Behavior Management Unit (BMU) have

been completed.  Training has started, but is not complete. An overall behavioral

management program is not in place.  The Quality Assurance  protocol for the BMU had

not been completed by the end of the reporting period.  The State is not in compliance on

this issue.


(13) <u>Staffing</u> The State shall ensure that there are sufficient numbers of adequately trained direct care and supervisory staff to supervise youth safely, protect youth from harm, and allow youth reasonable access to medical and mental health services, and adequate time spent in out-of-cell activities.

The State is not in compliance on this issue.  During this period, Columbia Training School (CTS) had an adequate number of direct care and supervisory staff. Columbia actually had an excess number of staff given its low population over the summer and fall of 2005.  Although staff members on each unit are provided some information from the Classification meeting on needs of youth, that information also indicates the need for staff with different skill sets to address those needs. All staff have not been trained in the best practices for dealing with youth with mental health problems, special education needs and/or other learning disabilities and/or substance abuse problems. The staff members are certainly willing, but they recognize their limitations and have asked for training.  Some of the youth at both facilities have multiple mental health and other behavioral diagnoses that require sophisticated treatment plans, close observation, early intervention and support services that custodial staff have not been trained to provide. Both facilities have clinical staff on site which reduces some of the risk of having serious problems, however, there is not sufficient or efficient coverage for twenty-four hour facilities.  Draft policies have been developed, but they had not been implemented by December 15.  The state is not in compliance on this issue.

There were obvious shortages in staff coverage at OTS when I visited both times in June and July, 2005 and again in late October, November and December.  Following the hurricanes, the staffing shortages increased.  Such shortages jeopardize youth's safety, placing them at risk.  It also results in excessive staff-to-student ratios, adding to the safety risks for students and staff.  Shortages also result in staff having to work overtime, whether they feel up to it or not.  This compromises the quality of care to the youth.

23

The current overtime policy seems unreasonable, as well as being unfair. Staff said they had to work more than a hundred hours of compensatory time before they earn any overtime, for which they could be paid. Although the staff members receive compensatory time, it is very difficult to use that compensatory time while staff shortages exist. The policy sets the institution up for always having coverage problems.

A staffing analysis was completed by Dick Barnhart's group in October and the recommended staffing pattern is the guideline both facilities are using. These data are also being used to support requests for adequate staffing. To increase efficient, permanent and collapsible posts have been identified. At this time, the state is not in compliance.

**The Compensatory Time/Overtime Policy needs to be revisited using real numbers to project future need, as well as developing a strategy that is fair to the employees who are making their best effort to support compliance and demonstrate a good work ethic.** This is a matter which probably will have to be reviewed with upper management and even the administrative board that handles labor issues for MDHS. It is adversely affecting the morale of the staff, which can negatively impact the care to the youth at OTS.

The staffing ratios must be and justifications must be presented to the officials who make the final decision on the assignment of personnel numbers. The safety concerns that

24

result from insufficient numbers of staff/qualified staff must be addressed as quickly as possible.

(14) <u>Isolation</u> The State shall develop and implement policies, procedures and practices to ensure that isolation, lockdown, seclusion and other similar restrictions are used only when appropriate and in an appropriate manner, and to document fully the use of isolation. The State shall immediately cease requiring youth to strip and remain naked while in isolation.

Changes in this practice have occurred at both facilities, through the creation of special management units. The special management unit (SMU) policy has been revised. Training has started, but is not complete for all staff. The staff assigned to the SMU have been trained. The SMU eliminates isolation and seclusion. A student can still be assigned to room restriction, but not without regular monitoring and documentation. As was the case during the previous reporting period, the quality assurance measures are not in place this reporting period. Until the training occurs for all staff and quality assurance measures are put in place, the State will not be in compliance on this issue.

Isolation, lockdown and seclusion records will be reviewed on all visits. Special attention will be paid to educational, emotional and intellectual level of youth placed in the special management and behavior management units because both appeared to be used for youth with special needs youth who could be managed appropriately in other setting if staff were appropriately trained. There might be a few youth with such complex needs that they need to be maintained in a SMU or BMU, but training could reduce the reliance on such units significantly.

25

(15) <u>Due Process:</u> The State shall ensure that youths confined for more than 24 hours receive an appropriate due process hearing by an impartial supervisory staff member to determine whether cause exists for continued disciplinary confinement.

Interviews with youth in confinement indicate they are having reviews, but there is evidence that some youth may not be seen by an impartial supervisory staff member. The current practice is not consistent with the current policies of the institution. A review of the logs at both facilities still reveal inconsistent practices. According to the Master Plan, a policy and procedure is expected to be in place by the required November, 2005. Since training had not occurred and the quality assurance measures are not in place, *the state is still not in compliance.*. This is a quality of life issue that requires immediate attention.

(16) <u>Grievances</u> The State shall develop and implement policies, procedures, and practices to ensure that the facilities have an adequate grievance system.

A revised grievance system has been implemented. This new policy and procedure is being adopted. It assures the availability of grievance forms and each unit has a box to place the grievance. As of October, 2005, I observed boxes and forms. Students said they knew how to use the process, even though constant tweaking is necessary to make the process function maximally. The State has made major progress on compliance on this issue. The written policies and procedures are not in place and training has been scheduled, but not completed. The State has achieved partial compliance on this item.

(17) <u>Admissions Intake and Orientation</u> The State shall develop and implement policies, procedures and practices to establish a consistent and orderly admissions intake system conducive to gathering necessary information about youth, disseminating information to staff providing services and care for youth, and maintaining their safety. Each youth entering the facility shall receive an effective orientation that shall include simple directions for reporting abuse, and assure youth of their right to be protected from harm

26

and from retaliation for reporting allegations of abuse. The orientation shall also clearly set forth the rules youth must follow at the facility, explain how to access medical and mental health care and the grievance system, and provide other information pertinent to the youth's participation in facility programs.

There is a consistent admissions/intake system in use. Information is provided to the youth and the youth participates in the orientation process. It still cannot be said that information is consistently provided to the parent or guardian, but that practice is improving. Written orientation materials have been prepared for readers beginning with the fourth grade. The written materials are not at a grade level for those reading between first and third grade and work continues to improve on providing materials at the lowest reading levels. Everyone I have spoken to agrees that it is important that the handbook needs to be readable and understandable the third of the youth who have very low I Qs and poor reading skills. I also recommended the development of a handbook for lower level readers on one of my first visits. This is essential for reinforcement after the initial time in the intake unit. Some of the residents are testing between the second half of the first grade and fourth grade in reading, which make it very difficult to read the current handbook. At this time, there is not consistent use of the mental health data that is received at admission. There is a plan to begin to use the YASI for screening at intake. The tool is comprehensive and four policies had been drafted to support admissions, orientation, program needs assessment, treatment teams and services plans. The quality assurance process needs to be clearly articulated and training needs to occur for all staff. Clear procedures need to be implemented to assure integration of the YASI information and data into the treatment planning process.

27

(18) <u>Employment Practices</u> The State shall ensure that only individuals fit to work with youth residents are employed at the institutions. The State shall utilize reasonable measures to determine applicants' fitness to work in a juvenile justice facility prior to hiring employees for positions at the facilities. Within 120 days of the Effective Date of this Agreement, the State shall conduct a criminal record check for all current employees at the facilities, taking appropriate actions where new information is obtained. Every two years thereafter, the State shall update record checks for all employees who come into contact with youth. As of December, 2006, background checks for existing employees had not started, even though background checks are in place for new or potential hires. *The State is not in compliance on this issue.*

Criminal background checks have not been completed on all current employees.

Therefore, this was not done within the first 120 days following signing of the decree.

Ergometrics has been incorporated into the current practice for hiring staff. The screening of good candidates has been enhanced through the use of this systemic model for identifying and selecting appropriate staff to work with the identified client population. MDHS personnel policies and practice are expected to be enhanced by the additional use of the Ergometrics software.

Based on the restoration of some of the MDHS/DYS personnel numbers for vacant positions, identification and selection of new staff started this quarter. The software that was ordered is now being used to help them to improve the selection process. The DYS is currently running NCIC background checks and checking references on all potential and new employees. The status of background checks of and hiring must be reviewed regularly during the monitoring.

(19) <u>Classification:</u> The State shall develop and implement a classification system that places youth appropriately and safely within the facility, and provides for reclassification in appropriate circumstances.

The state has developed and implemented a classification system at both Oakley and Columbia Training Schools. I am not comfortable with the decision to remove teachers from the classification team and have recommended that teaching staff be restored to the team. Since education constitutes such a large part of the programming at both facilities, the opportunity for all disciplines participating in the classification process to hear about any educational disabilities or talents is critical to maximizing the treatment opportunity for youth committed to DYS. When I visited in December, 2005, teachers reported being involved in the classification process again. It is still critical that staff focus more attention on helping youth to understand their role in the process and there should be an adult assigned to assure these youth engage in healthy dialogue about the importance of developing an appropriate treatment plan. It is a good start, but definitely needs refining to make it more useful. Much more emphasis must be placed on the impact of the co-occurring behavioral issues and/or co-morbid conditions youth present. Without such information and training for the classification team, the placement process will continue to appear to be arbitrary at Oakley. Columbia continues to assign girls to cottages based on their needs, but the *cottage staff still had not been trained in the treatment modalities each cottage offers.* i.e. Drug and Alcohol; Anger Management; Behavior Modification; Conflict Resolution, etc. (October, 2005) The model has potential, but technical assistance is needed. The idea of implementing evidence-based interventions in the cottages is commendable. Technical assistance has been requested from the Department

29

of Justice for clinical training for staff implementing treatment models at the DYS

facilities.

(20) <u>Development and Implementation of Policy</u> The State shall develop and implement
adequate policies, procedures, and practices relating to suicide prevention.

There is a policy, but only a few staff and trainers have been trained on it; it is helpful

that this policy is under revision based on the recommendations of the DOJ.   The current

policy and procedures on file are not being followed.  On occasion when there is

information about a student's suicidal behavior at the time of admission, it is still

sometimes going unnoticed. Although I only saw it on a couple of charts this period and

discussed one case at length with Director Pittman, this was also a finding of the medical

and mental health consultants for DOJ.   Since a policy exists, it is critical to implement a

quality assurance protocol that reviews practice regularly reviews and flags action(s) that

must be addressed or details as to why there was no action. Fortunately, the performance-

based standards training is coming up in the next reporting period and this can be the first

indicator the State focuses on. *The state is not in compliance on this issue.*

(21) <u>Suicide Risk Assessments</u>
The State shall develop and implement policies, procedures, and practices to ensure that
qualified mental health professionals conduct timely suicide risk assessments, using
reliable assessment instruments, for a) all youth exhibiting behavior which may indicate
suicidal ideation, and b) when determining whether to change the level of suicide
precautions.

Current policies and procedures are under revision and several were signed and

disseminated this period.  The State has acquired the YASI for screening and assessment

instruments. The YASI training started during this period. Although, this would not have

been my first choice for screening because of the point in the juvenile justice continuum

30

that I am familiar with the instrument being used, which includes screening (diversion, before placement on informal or formal probation or before secure detention) it is an appropriate instrument. I would have selected another instrument only to increase the size of the comparison group, but I support the State's choice. I am aware of states that use the YASI assessment. It represents a step forward for Mississippi which was not uniformly using any tool to determine the emotional temperature of all clients. The 90-day placements at OTS and CTS are relatively short. The YASI has been determined to be appropriate for probation and secure detention and is appropriate for this short-term facilities with populations similar to those found at OTS and CTS.

The classification team was only receiving screening results on about half the youth arriving from community courts at OTS and CTS with MAYSI 2 results in their records. That number did not reach 100% this period either, so it is wise for DYS to institute a process that will assure a mental health assessment on all youth. Since, the State has decided that it prefers administering the YASI, which is a very similar instrument, I will monitor for compliance to be sure the protocols are being followed and that all appropriate staff are being trained in responding to students exhibiting suicidal behavior, as well as those at high risk of suicide who are not exhibiting gestures or ideations. It is critical that the policy include a requirement that mental health staff provide regular consultation and training to custody staff on suicide prevention. I agree with Dr. Trupin, USDOJ mental health consultant, that the institution also **consider using a trauma assessment** for all youth entering the facilities since there is evidence that so many of the boys and girls entering secure juvenile corrections have been exposed to repeated trauma which has gone unaddressed. There is a significant body of research that supports better

31

outcomes for youth who have an integrated plan that includes trauma response with the mental and substance use/abuse interventions. As of December 15, 2005, DYS had purchased the Trauma Symptom Checklist of Children and implementation is scheduled in early 2006.

(22) <u>Mental Health Response to Suicidal Youth</u> The State shall develop and implement policies, procedures, and practices to ensure that youth who demonstrate suicidal ideation or attempt self-harm receive timely and appropriate mental health care by qualified mental health professionals. This includes helping youth develop skills to reduce their suicidal ideations or behaviors, and ensuring that all youth discharged from suicide precautions receive adequate follow-up treatment within the facilities.

Both facilities have access to contract psychiatrists and have psychologists on staff. The DOJ mental health consultants identified the shortage of psychiatric consultation in DYS facilities as a serious concern, given the numbers of youth on psychotropic medications. One consultant expressed a concern that the psychiatrists were functioning as "prescribers" and not as active members of a rehabilitation team. Another DOJ consultant expressed a specific concern about the lack of training of nursing personnel on the side effects of both psychiatric and psychotropic medications and how this impedes their ability to recognize early reactions to the medications. It was recommended that the policy indicate the time limit for mental health professionals to respond when youth are in crisis and for admissions screening and interviews, which was incorporated into the contract for psychiatric coverage.

The psychiatrist for CTS has given notice of her imminent departure and Dr. Pruett accepted the position effective 12/01/05. In my work with systems of care around the country, it is typical for behaviorally challenged youth to be referred to as disruptive youth. The training that needs to be spelled out in the new policy should inform practice

32

for the staff who work with youth with disabilities, rather than relying only on methods for reforming discipline problems. Although the MS numbers for seriously emotionally disturbed, learning disabled and special education students are significantly lower than the national average, which is 68% – 70% for youth with at least one mental health disorder (Teplin, 1999) and 40% or more for learning disabilities and special education (Osher, D.,2004, Safe and Successful Schools: Step by Step, and Jan., 2006, OJJDP conference presentation). Currently, the State has put into practice a requirement that these youth not be confined to locked cells during non-sleep hours.  All staff completed the training on the current suicide prevention policy and will be retrained on changes in the new policy in early 2006. Work still needs to be done in the area of training youth and helping them develop skills to reduce their suicidal ideations.

The DOJ consultants recommended the use of the Inventory of Suicide Orientation-30 (ISO-30), which measures a youth's orientation toward suicide and the degree to which they are experiencing a sense of hopelessness. Along with the ISO-30 scores, the clinical input from mental health and input from custody staff should be part of the basis for placing youth on or changing the level of suicide risk.  Lastly, since the MAYSI 2 is in the files of over fifty percent of the youth, the results must be carefully reviewed for any warning or caution scores in the suicide domain which would be an early indicator for an immediate clinical referral. MAYSI 2 results must get to the Psychologist I before his/her intake interview with each student.   Though not in compliance, progress is being made on this critical issue.

**Administer the MAYSI 2 on all new admissions, who arrive without one, until the**

33

> YASI training can be completed and implemented.

(23)<u>Supervision of Youth at Risk of Self-Harm</u> The State shall ensure that newly-arrived youth, youth in isolation or seclusion, and other youth at heightened risk of self-harm are sufficiently supervised to maintain their safety.

Those youth at risk of self harm are being addressed in the revised suicide prevention policy. At this time, the old policy is still in effect. A new policy was developed and circulated to the DOJ for approval this quarter. Although, it did not meet all expectations of the DOJ, revisions area being made and a quick turnaround is expected. All three of the DOJ mental health experts used in either the investigative or compliance phase of this case recommended more training and staff development opportunities on current issues and provide mental health coverage around the clock. They also recommended comprehensive screening and assessment to insure that the initial classification and placement decisions take mental health history and status into consideration.

(24) <u>Housing for Youth at Risk of Self-Harm</u> The State shall ensure that all housing for youth at heightened risk of self-harm, including holding cells, isolation cells, seclusion cells, and housing for youth on suicide precautions, is free of hazards that would allow youth to hang themselves or commit other acts of self-harm.

Policies and procedures for the care of youth at heightened risk of self-harm are being addressed in the revised suicide prevention policy. The current practice is close observation or moving them to the special management unit, which appears to function like lockdown. During my visits this period, I did not find the building/facility or program plan especially conducive to treatment. At both facilities students said they did

34

not have a full school day or go out to recreation. *The state is not in compliance on this issue.*

(25) <u>Restrictions for Suicidal Youth</u> The State shall ensure that youth on suicide precautions are not restricted in their access to programs and services more than safety and security needs dictate.

Youth on suicide precautions are able to access some of their programs and services. I spoke to students who acknowledged access to educational, recreation, medical and clinical services. This issue is being formally addressed in the revised suicide prevention policy. There is no clear evidence to show that suicidal youth are having access to all programs and services. *The state is not in compliance on this.*

(26) <u>Documentation of Suicide Precautions</u> The State shall develop and implement policies, procedures, and practices to ensure that the following information is thoroughly and correctly documented and provided to all staff that need to know such information:
a. the times youth are placed on and removed from precautions;
b. the levels of precautions on which youth are maintained;
c. the housing location of youth on precautions;
d. the conditions of the precautions; and
e. the times and circumstances of all observations by staff monitoring the youth.

The revised suicide prevention policy was completed this period and sent to the Department of Justice for review. The Department of Justice sent comments to the State suggesting further improvements to the policy. Although the new policy included each of the requirements for thoroughly documenting all information about a youth's history of suicide attempts and the levels of care s/he was on during interventions, additional changes are being made. The current suicide prevention practice at both facilities is inconsistent and it is recommended that DYS implement a uniform policy. Training on changes in the new suicide prevention policy is planned for the next reporting period. At this time, the State is not in compliance on this issue..

35

(27)Access to Emergency Equipment The State shall ensure that direct care staff have immediate access to appropriate equipment to intervene in the event of an attempted suicide.

Even though this will be addressed in the suicide prevention plan, Dr. Cohen, Dr. Wills and Dr. Trupin addressed the need for staff to have a simple response kit that included rubber gloves, airway tube and a cut down tool for immediate response to crises. The kit could be worn on the belt or placed somewhere that staff can have easy access if the kit is needed. Administrators were advised at the exit meetings at both OTS and CTS in July, 2005, that staff need to have a smaller kit to take when intervention is necessary for an attempted suicide. The current medical cart is too big and contains equipment that cottage and nursing staff do not know how to use. The facility administrators were advised to reorganize the crash cart to pull out a special emergency kit for responding to medical emergencies and suicide attempts. That special kit will be described in the revised suicide prevention policy. As of December 15, 2005, the state was not in compliance on this issue.

(28)Suicide and Suicide Attempt Review The State shall ensure that appropriate staff review all completed suicides and serious suicide attempts for policy and training implications.

The first iteration of the revised suicide prevention policy that included the suicide and suicide attempt review protocols, was made available in early October for review by the U.S. Department of Justice. Although it included a suicide review process, the DOJ sent a letter recommending changes. Among the changes identified were abatement of suicide hazards such as projections in the environment which was not included; emergency response to attempted hangings was not included and the fact that no protocol for first

36

responders was included. The DOJ review requested additional revisions. Mrs. Pittman
is aware of the suicide prevention tools available on the website of Lindsay Hayes, as
well as his recent monograph on suicides in juvenile facilities. Dr. Hayes is considered
one of the leading experts in the USA on suicide prevention in juvenile institution. She
also has recommendations of an Ohio consultant who has done significant work in the
areas of suicide prevention. My recommendation would be Dr. Lindsay Hayes because
he has successfully helped other states meet this compliance issue. I do not know the
person recommended to Director Pittman, I will keep track of the decision she makes
regarding her consultant of choice. At the end of this period, the state is not in
compliance on this issue.


DYS developed a draft suicide prevention plan, including:

1. Explicit directions to staff, such as: call for help; lift weight off the neck; remove
ligature with cut down tool; start CPR; call on-site nursing staff to assist; mobilize 911
emergency response.

2. The nurses' emergency response bag should include equipment for resuscitation such
as: oxygen; bag-valve-mask capable of delivering 100% oxygen; oral airways; hand-
operated suction; AED.

## C. MEDICAL AND DENTAL CARE
(29)<u>Appropriate Care</u> The State shall provide youth adequate, appropriate, and timely
medical and dental care to meet the individualized needs of youth, including treatment of
acute and chronic medical conditions. The State shall develop and implement adequate
medical and dental policies, procedures and protocols. The State shall ensure that there
are sufficient numbers of qualified medical professionals to meet these needs.

A staffing analysis of medical services was completed during this reporting period.

37

Overall the Oakley and Columbia medical and dental programs were stable, but did not meet the requirements in the agreement. Even though medical services at Oakley and Columbia were in place, they don't meet the requirements without the hiring of a sufficient number of qualified medical professionals and the health services coordinator. The number of approved personnel numbers is sufficient, but it is critical that recruitment efforts be increased so that hiring for vacant positions is possible.

Although both medical and dental care operations could improve with some reorganization, Dr. Cohen acknowledged that there have been improvements in both services. If the medical services improve, it is likely there will be more prescriptions which would indicate the need for more nurses to monitor medications. This issue is addressed in the medical staffing analysis which proposes a higher level of care than that which is required or is currently available. If the proposed staffing is implemented, care for students at both facilities will be adequate. *At this time, the state is not in compliance.*

Recommendations from the DOJ consultant include reorganizing current practice in order to maximize the dentist's time at both facilities. He has suggested that his full report be made available to the physician and nursing supervisor at the Oakley facility.

The report recommended providing line staff to facilitate the smooth movement of youth to and from the dental office, which I have seen work well in other facilities. This can be a permanent or collapsible post. Another possible collapsible post would provide a line staff to supervise youth waiting for treatment. This temporary/collapsible post assignment maximizes efficiency. The use of the dentist's time could be improved by having

38

patients/students already waiting for him, instead of him waiting for students to arrive. It is also necessary to clarify policies and procedures regarding how the dentist gains access to materials needed to provide the necessary treatment.

According to Dr. Cohen, both facilities need to have a preventive dentistry program, including but not limited to topical applications of fluoride; placement of sealants— especially for youth with cavity histories; cleaning of teeth and treatment for inflamed and infected gums, including making mouthwash and flossing materials (loops) available to youth. Certainly, this reflects a level of care that one would expect if the youth were not in the training school.

I agree with Dr. Cohen that youth should be provided appropriate toothbrushes, which happened at CTS this period. Hopefully his assessment that the toothbrushes are of the lowest quality and **are not suitable** for proper routine brushes will be addressed expeditiously at OTS. The practice of dispensing toothpaste from a single tube directly to the brushes of all youth on a pod, places youth at risk of exposure to germs from their pod-mates' brushes. Dr. Cohen has made a reasonable recommended to address this problem by having the paste be squeezed into small cups for each resident if they can't have personal tubes of toothpaste. CTS provided each girl with a zip lock bag which held her personal tube of toothpaste, soap, deodorant and an upgraded toothbrush. The same is needed at Oakley.

39

It is significant to note that DYS has been allotted a sufficient number of positions to provide a part-time doctor and a part-time dentist at both facilities; sufficient nursing positions have been funded to provide nursing coverage for day and afternoon shifts on both campuses. Additional physicians and dentists are already available on contract. Nurses are presently being hired. Dental Hygienists were recommended for both facilities, freeing dentists to examine and treat youth.

Both the State and DOJ consultant for medical and dental services recommend the immediate filling of RN and LPN vacancies, as well as hiring a permanent nursing supervisor. In addition to the temporary staff from the contract agency making improvements at CTS, a permanent nursing supervisor was hired before the end of this reporting period. According to Director Pittman, the non-competitive salaries for nursing staff and supervisors, identified in the last report, resulted in legislative initiative to increase the salaries in hard-to-fill positions for the facility.

All charts in the medical and dental area need to be organized and labeled appropriately. It was suggested by the medical consultant that, at a minimum, the chart should include the following when they are reorganized:  Initial Assessment; Progress Notes; Problem List; Plan of Care; Mental Health section and a Dental section. Reorganizing and binding the charts would encourage documentation by all health personnel in chronological order. Recommendations for the health record from the DOJ medical consultant, Dr. Cohen, included a recommendation for the drafting of an adequate health records policy which would minimally inclusion of a format for health records such as:

40

a. be bound in three ring binders which make use of manila folders

b. organize with a consistent order with labeled dividers for:

> problem list
> initial assessment
> consents
> orders
> progress notes
> labs and test results
> court orders
> related legal forms
> consults
> medical
> dental
> mental health/psychiatry

c. list "Health Alerts" on the cover

d. uniform health forms for both OTS & CTS with date and number designated

(30) <u>Coordination of Medical, Dental, and Mental Health Care</u> The State shall hire a qualified health care services coordinator who shall coordinate the medical, dental, and mental health care of each youth in the facilities. Further, the qualified health care services coordinator shall coordinate care provided by lower level practitioners, and participate in quality assurance and infection control programs.

In an effort to hire a Health Services Coordinator, the State has advertised the Health Services Coordinator position. In addition, the state has authorized and approved the salary for the position. The recruitment effort was to have been completed with the position filled by September 30, 2005. **There were no applicants.** The DOJ consultant recommended hiring a Nurse Practitioner for the position whose duties could be 50% administrative and 50% clinical. If hiring a nurse practitioner is not possible, identifying an expert medical team, a medical authority, with credentials greater than those of a nurse practitioner is recommended in the medical staffing analysis. **The staffing analysis for medical services was completed before the end of the reporting period and is available.**

41

(31) <u>Medical Facilities</u> The State shall ensure that the facilities are equipped with adequate medical and dental clinics. In addition any medical equipment that could be used as weapons shall not accessible to youth. Each clinic shall ensure that there is a confidential environment in which to conduct medical and mental health assessments.

The medical facilities at both OTS and CTS are new and are adequately equipped medical and dental clinics. At the close of the reporting period, both facilities maintained a few locked cabinets where the facilities medical supplies and equipment are stored, especially needles and other sharp objects. Additional locks were on order, but had not arrived. To assure confidentiality locks were ordered to be added to all file cabinets used to store medical records. In addition, the one-key system recommended by both Drs. Cohen and Trupin was being implemented. John Platt, DOJ expert consultant on juvenile corrections issues, also made reference to this in his exit report at OTS in July. It has been suggested that one of the isolation rooms at each clinic be converted to an office for the nurse/supervisor, which could double as a private room for interviewing residents/cadets about confidential matters. It was restated in the December consultant report. At the time of my December 6 visit to Columbia, one room had been identified to become the office of the nursing staff.

(32) <u>Health Assessments</u> The State shall ensure that youth receive adequate health assessments upon admission or re-admission to the facilities.

The policies and procedures for health assessments upon admission and re-admission have been revised. The initial training was rescheduled for September; however, due to the hurricane the training was not available in August. According to the US DOJ medical consultants health assessments were occurring, but they were not always within the

42

critical 8 hour window. Further the consultants indicated that the initial assessment is not thorough and does not take into consideration the fact that youth admitted to training schools are often medically-neglected and have a higher incidence of acute and chronic illnesses than do adolescents in the general population. For this reason, youth at OTS and CTS need comprehensive assessments upon admission. In addition, the consultant found that the practice at both training schools was to take a limited history and the facility physician does a basic physical exam, a simple urine chemistry test is the only lab work, and a vision screening.

The USDOJ medical consultant recommends the following as a minimum standard of care:

Height and weight with body mass index

History of chronic illnesses or disability

TB skin test

Complete blood count

A blood chemistry panel to assess for chronic liver or kidney disorders & blood fats

Urine DNA amplification tests for Chlamydia and gonorrhea & serological test for syphilis

Formal test of hearing acuity

Further diagnostic evaluation for youth with histories of shortness of breath

Trauma Assessment

Follow-up for students with chronic or persistent illnesses

Although very few students with chronic illnesses had been identified when records were reviewed, it was evident that most of the care is provided by the nurse. Awareness of

43

students with chronic or persistent illnesses is usually happens as a result of the youth

initiating the discussion.

    1. tuberculosis

    2. asthma;

    3. heart problems

    4. seizures

    5. Kidney disease, etc.

    6. Migraine headaches

    7. Brain shunt

The DOJ consultant noticed there were very few referrals to physicians outside the

facility. Relationships with the universities near both facilities need to be re-

established/reinforced to assure support for students with chronic ailments.

---

*1. The medical consultants for both the State and DOJ strongly restate the importance*

*of hiring the Health Services Coordinator. They both highly recommended the filling*

*of the RN and LPN positions for both campuses.*

*2. Comprehensive medical evaluations are needed on all youth.*

*3. Reports from outside medical consultants must be integrated in the patient charts.*

*DOJ consultant recommends that all needed immunizations be provided to youth, not*

*just hepatitis B. He also recommended a nursing protocol be developed that would*

*guide the nurses assessment of each youth's immunization record.*

*4. CTS: Removal of closet bars is critical as they are an extremely serious suicide*

*Hazard*

---

44

Assessments were taking place in a confidential environment on my visits in December to Columbia Training School and I observed girls being taken to the medical unit during the day, on weekday evenings and on Saturday. I did not observe one instance of of a girl's interview of medical triage occurring in the foyer. Now, Staff take students to the medical unit for those consultations and treatment.

Youth now have access to medical passes for health and mental health services. In July, 2005, **students were still reporting** that they have to give their request for medical services to the counselor on the unit, who decides whether to give it to the nurse. This is unacceptable and violates the consent decree. The process is not confidential and youth continue to be at risk of not receiving care or treatment based on the judgment of non-medical staff.

(33) Medication Administration The State shall develop and implement training for all medical staff responsible for the administration and provision of medication in an effort to prevent medication discontinuity and ensure that generally accepted professional standards are followed.

The policy, procedure and protocols are still under revision. The medical consultant said the process at OTS using the new pharmacy contract was working well. The consultant recommended procedural improvements; for example, revising protocol to provide training to nursing staff about the side effects of medications, particularly psychiatric medications. He also recommended that needles and syringes be kept in locked cabinets and a system for accountability for each item be established. The need to have locks installed on cabinet containing needles and other sharp instruments was also raised at

45

CTS. Some locks have been provided, but not on all area. The procurement and installation of a sufficient number of locks and the installation of additional lock that are substantial enough to keep the youth from forcing them open is still needed.

The medical consultant has recommended that sick call requests be submitted and registered and the clinical response should be documented in the health record. I talked with youth who said they now use the clinic pass and put it in a box that only the nurse has access to. At this time, students are completing clinic passes and placing them in the medical box for the nurse. This represents an improvement. There is no quality assurance mechanism in place at this time. The state is not in compliance on this item.

(34) Medical Referrals The State shall develop and implement policies, practices, and procedures to ensure that medical decisions to refer youth for specialty consultations or dental treatment are not overruled by non-medical personnel.

The policies and procedures governing medical referrals are being revised. They were to have been complete by the end of August, 2005. They were not complete by the close of this reporting period. Training of all staff has not been completed and quality assurance procedures were not in place at the time of this report, resulting in non-compliance at the end of this reporting period.

The DOJ medical consultant, Dr. Cohen, recommended a quality assurance process that assured youth would be referred for follow-up medical and dental care if they were released before the plan of care was complete. He also recommended developing dental plans with the proposed/planned release date in mind. This would allow the dentist to develop a plan of care for the youth that can be accomplished during the time the youth is scheduled to be in the facility. In addition, the medical consultant recommended

46

developing a protocol for student referrals to the dentist that are more efficient and reduce the likelihood that the student can leave the facility without a community follow-up plan.

The new dentist, Dr. Carr, has reported and is very efficient at this point. Dr. Cohen, the DOJ medical consultant, *is concerned that there is not enough dentist time to address the needs of the facility population at OTC. There is a plan for the two dentists to provide coverage for each other.*

(35) <u>Medical and Mental Health Records Retrieval</u> The State shall develop and implement policies, procedures and practices to ensure that, consistent with State and Federal law, at a minimum, the juvenile courts in the State, all juvenile detention facilities, and all placement settings from which youth are committed, timely forward all pertinent youth records regarding medical and mental health care.

Recommendations have been made to retrieve records in a timely manner, including collaboration with the DYS community supervisors to retrieve records from courts and detention centers. The state is not in compliance on this item.

(36) <u>Medical and Mental Health Record System</u> The State shall develop and implement policies, procedures and practices to ensure that medical and mental health care staff have access to documents that are relevant to the care and treatment of the youth.

There is no process in place at this time to allow staff to access documents relevant to the care and treatment of the youth; however, the State is working on improving the record retrieval and transfer processes. They are exploring the possibility of using an electronic filing system for use once the records are in the facility. It is anticipated that the new process would be in place by October, but it was not complete by the end of the period. *The state is not in compliance on this issue.*

47

**Columbia Training School**

*1. Recommendations from the DOJ consultant include reorganizing current practice by hiring full time nursing supervisor, which has happened.*

*2. He and the State medical consultant recommended the hiring of a permanent, full time Registered Nurse staff to stabilize the health program and move forward with staff training to implement and maintain a quality health program at CTS, which has not happened. This full-time RN must be in addition to the nursing supervisor..*

*3. He recommends additional dentist time to catch up with the dental needs of current residents.*

*4. He has suggested that his full report be made available to the physician and nursing supervisor at the facility.*

*5. Additional security staff to support provision of health services in the health unit rather than on the living units or in the foyer of the school. (A full-time security post will be justifiable when sick call and medication management or implemented.) This has been implemented during the day at Columbia, but still needs work to include CTS nights and all shifts at OTS.*

B. Columbia Space, Equipment and Health Records:

1. Space and equipment: The medical and dental services are provided in a large, new facility at CTS. Locks are still needed on all drawers.

2. As was indicated in the last report, the medical consultant suggested making one infirmary room into two or three separate nursing assessment/treatment areas, using curtains as room dividers and privacy screens.

*Recommendation from DOJ consultant: Immediately acquire and emergency equipment bag for resuscitation, including bag-valve-mask; oxygen; oral airway and hand-operated suction.*

*Immediately provide a copying machine in the medical unit*

3. **Confidentiality of Care** – The DOJ medical consultant and I observed different practices. He reported most treatment occurring on the unit. I observed girls being taken to the medical unit on weekday day and evening, as well as Saturday. I will check this more carefully on future site visits.

C. **Initial health assessment at CTS**

Include height and weight on standard adolescent growth charts to assess objectively evidence of disorders of growth and weight.

Include Body Mass Index for those who appear overweight

Provide a PAP test for every patient who is provided a pelvic exam

Tuberculosis testing should be provided.

Hearing acuity is necessary.

Blood chemistry should be performed to assess for chronic disorders of the kidneys, liver and blood fats.

D. **Care for Sick and Injured Youth at Columbia**

The new sick call system is in place at CTS, as is the revamped grievance process. The boxes are present, but the DOJ medical consultant observed a unit where there were no forms in the boxes and staff members were still signing requests for medical care.

49

Medication administration should be occurring in the clinic during daylight hours, and in the units at night to reduce the possibility of girls running; however, I observed a girl being taken to the medical unit for meds early in the evening during my visit. As the DOJ consultant indicated, the process has not taken hold, but an effort is being made support the adoption of the process.

Use of pepper spray or tear gas has been limited to only two occasions in the last 18 months and the practice the DOJ consultant suggested will be implemented (what is the practice), instead of the current practice of checking girls who are symptomatic.

> *Recommendation from DOJ consultant: There are still some problems with getting timely approval for some procedures.* **This is critical and DYS must routinely reiterate the policy regarding urgently needed dental services in order to eliminate any misunderstandings by staff, youth or medical personnel.**

## V. COMPLIANCE AND QUALITY ASSURANCE

(37) <u>Document Development and Revision</u> The State shall revise and/or develop policies, procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, address, and implement all provisions of this Agreement. The State shall revise and/or develop as necessary other written documents such as screening tools, logs, handbooks, manuals, and forms, to effectuate the provisions of this Agreement.

The State is not in compliance on this item. It is beginning its development of a quality assurance process. They recognize the importance of a QA process, but have not completed it at the end of the second quarter.

(38) <u>Document Review</u> Within 30 days after the filing of this Agreement with the Court, the State shall submit a master plan to DOJ that establishes a time line of up to one year to revise and/or develop written policies, procedures, protocols, training materials, and screening and assessment tools to effectuate the provisions of this Agreement. The master plan and the policies, procedures, protocols, training materials, and screening and assessment tools shall be submitted to the DOJ for review and approval consistent with this paragraph.

50

The DOJ shall provide prompt guidance to the State, including specific explanations as to how the provisions, policies, or procedures, if any, are inconsistent with the terms of this Agreement, and shall suggest revisions. In the event that the DOJ asserts that policies, procedures, and other written documents are not in compliance with the terms of this Agreement, the parties will agree to a schedule for the parties' experts to communicate. The State shall revise policies as necessary to conform to the terms of this Agreement. If, after the policies, procedures, and practices affected by this Agreement are implemented, either of the parties determines that a policy, procedure, or practice, as implemented, fails to effectuate the terms of this Agreement, the parties shall consult and the policy, procedure, or practice shall be revised as necessary to conform to the terms of this Agreement. If the parties are unable to agree on revisions to the policies, etc., the parties shall submit the issue to the Monitor. If either party is unsatisfied with the Monitor's resolution, then either party may invoke mediation. If neither party requests mediation, or at the conclusion of mediation, the dispute may be submitted to the Court.

The Master Plan was submitted, although the USDOJ felt it needed more information to meet this requirement. The latest status reiteration shows more detail, but still did not have enough information for the Department of Justice. Having visited and observed some of the work being done by the plaintiffs and their consultants, I am aware of the continued efforts of the committees that have been established and some of the tasks they are working on. . The State is not in compliance on this issue at this time.

(39) <u>Quality Assurance Programs</u> The State shall develop and implement Quality Assurance (QA) programs consistent with generally accepted professional practices for each discipline addressed in this Agreement.

The DYS has outlined the framework for a quality assurance program in its master plan and subsequent status report, but **no quality assurance plan exists.** The proposed dates for substantial portions of the QA program were October and December, 2005. At the close of this period, the State was not in compliance with this item.

(40) <u>Corrective Action Plans</u> For each discipline addressed in this Agreement, the State shall develop and implement policies and procedures to address problems that are uncovered during the course of quality assurance activities. The State shall develop and

51

implement corrective action plans to address these problems in such a manner as to prevent them from occurring again in the future.

The State is not in compliance at this time. DYS is gathering standards from other states

and reviewing current organizational standards and has proposed a date of December,

2005, to meet this requirement.

(41) Technical Assistance DOJ will provide the State with technical assistance in the development of policies and procedures required to effectuate the terms of this Agreement. DOJ will assist the State in identifying additional financial resources to supplement those resources currently allocated to the facilities.

The US DOJ has offered its consultants to provide technical assistance and each consultant made recommendations that support compliance at the exit interview in July. Dr. Eric Trupin, DOJ mental health expert, will assist the state in developing a behavioral management system that is strengths-based and rehabilitative.

It will be important that the state request additional technical assistance as they determine their needs

MOA ON SPECIAL EDUCATION AND MENTAL HEALTH: This Memorandum of Agreement ("MOA") resolves litigation concerning the mental health, rehabilitation, education, and special education claims in United States v. Mississippi, Civil Action. 3:03-cv-1354WSu (S.D. Miss.).

### A. Mental Health
The State is not in compliance with this section of the MOA. They had not hired and brought on board the qualified mental health professional, as is mandated in the MOA.

Since the first Monitor's report, Dr. Cheryl D. Wills, child psychiatrist and DOJ mental health consultant, has visited both programs at least once to determine the level of compliance during this quarter. Again, she reviewed records, interviewed students and staff, analyzed the physical plant and services for students in the areas of security, education, recreation, healthcare and other program areas, as well as mental healthcare. She reviewed obstacles to the emotional and well-being of students, such as the quality and quantity of mental health staff and services available to students, as well as security and surveillance, counseling and custodial staff, space, nutrition, cleanliness and climate control. She also analyzed resources and strategies in existence to enhance the emotional welfare and rehabilitation of students.

In order to determine the status of compliance with this section of the MOA, Dr. Wills reviewed additional documents, including log sheets, activity sheets and incident reports for this reporting period. Student, staff and administrator interviews were also conducted on site during the visit. In this report, she restated some of the concerns from her July report. The standard she based her review on was what mental health providers would consider to be reasonable mental healthcare if the youth were in the community. She acknowledges that **much has been accomplished, even though the compliance effort regarding the MOA is in its infancy.**

Dr. Wills acknowledges the impact of Hurricanes Katrina and Rita on progress on complying with the MOA. She acknowledges the existence of a skeleton administrative structure and that policies and procedures are being developed and that quality indicators are being identified and integrated.

1. **Special Populations:**

> Dr. Wills observed a closed Ironwood Cottage during visits in July and November. She also noted the existence of the Special Observation Unit/Special Management Unit (SMU) for de-escalation , which had no youth and the Behavior Management Unit (BMU) for longer term placements of physically aggressive youth. **Youth told the mental health expert that the required group sessions they are to be provided on the Behavior Management Unit DO NOT EXIST.**

> Dr. Wills also acknowledged the work the agency has done to develop some incentive-based programming at Oakley with the inception of the Behavior Management Unit and Special Management Unit programs. She also acknowledge the work that has been done in the areas of recruitment, pre-employment screening, training and the improvements in the intake process by having classification twice a week at both OTS and CTS .

> Dr. Wills acknowledges the plan for use of the CMS to prepare treatment plans for all youth. Training on CMS will begin in the institutions before being offered to community staff. The YASI will be used to determine the risk and needs of youth for treatment planning. The States is attempting to develop a process to automate any data it collects.

> Dr. Wills acknowledged the plans for the Chemical Addictions Rehabilitation program that will begin at the CTS. Certification is required for staff and is available through the MS Dept of Mental Health.

53

**Oakley Training School**

Dr. Wills' concerns include:

1. Assuring that information from the institution is shared with the appropriate personnel when planning for reintegration.

2. Comprehensive screening is still not occurring for each youth.

3. Families are not routinely interviewed, therefore, they are not involved in treatment planning or treatment.

**Psychiatric Care**

1. The proportion of youths with psychosis of less than 1% comports with the percentage in the community and is inconsistent with the percentage generally found in juvenile correctional facilities.

2. The proportion of youth on second generation antipsychotic medication exceeds the proportion of youth diagnosed with psychoses by a magnitude of 16.

> *Recommendation by DOJ Consultant: Clarify dosages based on symptom and treatment histories. Use evidence-based psychiatry to guide treatment protocols. Document treatment failures prior to prescribing medication for off-label (non FDA-approved) indications. Even though I am not a clinician, I would agree with both recommendations. Both are grounded in standards for adolescent psychiatry.*

**Recommendations for Psychiatric Services by the DOJ Psychiatry Expert – Dr. Wills:**

1. During the Assessment/Intake phase of evaluations, mental health records should be requested before youth are evaluated by the psychiatrist. If records do not arrive in a reasonable amount of time, follow-up requests should be made. All efforts to acquire records should be documented.

2. Phone interviews with next of kin should occur as part of the intake assessment process. Children do not exist in a vacuum and may not be good historians. Professional and community standards for mental health evaluation require that documented efforts be made to interview next of kin. The data acquired will improve the quality of the evaluations, diagnosis, treatment plan and aftercare plan.

3. A mental health case conference program should be initiated. For

54

example, each month, an interesting/challenging youth's history is reviewed from scratch to aid the staff with enhancing the youth's rehabilitation. The review would include a careful review of past treatment with medications and therapy and interviews with the youth's next of kin, probation officer, chemical additions counselor, etc. Specific questions regarding the youth's rehabilitation should be prepared so that the participants ay discuss the case.

4. A "difficult case conference model" should be established for those youths that are most challenging at the facility. Efforts should be made to invite child psychiatrists, child psychologists, and/or other mental health professionals with expertise in managing challenging adolescents to review the case with OTS staff. The staff psychiatrist should be present for these evaluations. Mental heal, administrative and counseling staff should be able to make recommendations regarding which youth to present, and priority should be give to the Behavior Management Unit frequent flyers in the interest of safety and stability of the facility.

5. Rating scale should be used to screen for and to monitor clinical responses to medication and other therapeutic interventions for depression, psychosis, and attention deficit/hyperactivity disorder. The rating scales should be completed in advance of the youth's office meeting with the psychiatrist.

6. Statistical spreadsheets that include data about assaults, suicide attempts, special interventions, BMU populations, etc. should be maintained so that they may be reviewed by the OTS administration, as well as clinical leaders. The spreadsheets will enhance the ability of OTS professionals to speak confidently about the trends at the facility, and to determine if certain interventions have been effective.

DOJ Psychiatric Consultant Recommendations for understanding and monitoring the effectiveness of psychiatric care at the facility.

1. Policies, procedures and protocols for psychiatric care should be implemented.

2. A continuous policy improvement program should be established with auditing protocols as well as protocols for corrective action.

3. A peer review program, with monitoring and corrective action, should be established so that the expectations set forth in the protocols will be monitored by a child-psychiatry professional.

4. A monthly report regarding psychiatric care should be prepared. The

55

report should be submitted to be included as part of the packet of facility-wide monthly reports.

5. *A <u>second child psychiatrist</u> should be recruited* to assist with vacations, sick coverage, and peer review. OTS Must require psychiatrists to fulfill the back-up coverage, if that is a requirement in the contract.

6. The psychiatrist should make significant contributions to the treatment plans and updates.

7. The psychiatrist should be required to look beyond the Conduct Disorder diagnosis in youths that have been hospitalized and prescribed psychotropic medication in the past.

8. Medication information sheets should be provided to youths and their families to assist them with learning about the medications students are prescribed at OTS.

Dr. Wills also expressed concerns about the:

1. facility's failure to provide psychiatric care to youth who were receiving care before entering the facility.

2. issues related to access to care.

3. issues related to the emotional abuse of students by healthcare and other staff.

4. grossly inadequate addictions counseling by qualified personnel;

5. failure to involve parents in the student's rehabilitation.

6. gross inadequacy of all programming in the OTS Behavior Management Unit.

7. excessive use of force, as reported to her by students, in the BMU at OTS.

8. inadequacy of the emergency response/contingency plan for OTS.

**Columbia Training School**

*DOJ Psychiatric Consultant recommendations: Education staff need to participate in the on-going classification process and revisit when and where educational testing occurs, which was reinstated at the end of this reporting period.*

56

> *Establish an honors level for youth who master current programs so they can have a challenging experience at CTS.*
>
> *The parent involvement protocols need to be improved and phone calls should begin during intake and continue through efforts to reintegrate youth in their home communities.*

Although Dr. Wills found that educational material had NOT been reviewed for developmental appropriateness, I was advised that the materials have been revised to meet the needs of new admits down to fourth grade level. This is a big improvement over the situation in the prior reporting period. At this point, it is imperative that the administration review the numbers of youth with developmental needs below that level and make the necessary adjustments.

Although students at CTS were aware of the programs that are available and how to access them, the programs are not individualized and materials still require further adjustment to meet the needs of all interested students.

> *Follow up on the tele-psychiatry proposal with Jackson State Univ. in Jackson, MS.*
>
> *Establish initiation and termination requirements for programs which will reduce the discretion staff have when deciding whether students have successful completed their programs.*
> *Establish a maintenance phase to the programming.*
> *Develop a conflict resolution group for line staff, enabling staff to develop the skills needed to handle student conflicts more effectively.*
> *Integrate families, counselors and other community support into the post-parole planning with the student.*
> *Assure that curriculum workbooks are readable by all students at CTS.*

The DOJ consultant identified the need to:

Develop appropriate treatment plans and improve documentation in psychiatric records.

Fill the child psychiatrist vacancy.

Make sure there is a treatment plan in the every student's file.

Make sure every file has an Initial Assessment Report that is complete.

The DOJ psychiatric consultant commended CTS staff on the rate of reporting incidents and the inclusion of counseling notes; chemical dependence histories; administrative segregation histories; and a "Leisure Assessments" in the files.

57

**EDUCATION:**

**Purpose of Review:** On April 1, 2001, the Mississippi Department of Education (MDE) and the Mississippi Department of Human Services, Division of Youth Services (MDHS; the administrative agency of the Oakley Training School and the Columbia Training School), entered into an interagency agreement specifying the responsibilities of the MDHS in providing special education services to students with disabilities. Specifically, the agreement stated, "A Free and Appropriate Public Education must be provided to youths with disabilities, in accordance with IDEA and the rules and regulations of the State Board of Education. Youth Services will be responsible for the provision of special education and related services to youth with disabilities placed in State Juvenile Correctional Facilities.

Since the last report, Dr. Kelley Dedel Johnson, DOJ consultant, has visited each of the institutions for two days to determine status of compliance with the agreement. She reviewed numerous records, as well as interviewing staff and students at both facilities. Her overall assessment is that **neither special education program, OTS or CTS, meets the requirements in the memorandum of agreement or that of the Individuals with disabilities education act.** From my review, I concur with Dr. Johnson.

## OAKLEY TRAINING SCHOOL SPECIAL EDUCATION

- Again, there is some agreement between the consultants (State and DOJ) and the monitor that there has been progress this quarter. However, The State is not in compliance with the requirements for this section.
- There is no clear record of how the Child Find process is being implemented, although at Oakley, the assistant principal, acting special education coordinator, special education teacher and para-professionals explained parts of the process they are responsible for and are doing.
- Both teachers and the school administrator were proud to tell me that the DOJ consultant, Dr. Kelly Dedel Johnson, had commended them on their progress. I agree that progress has been made and there is much more work to be done to improve the processes and comply with State and Federal requirements, as well as the requirements of the MOA.
  - o She clearly identifies the program as severely deficient in her latest report. Dr. Johnson commends the program for having speech and language therapists which have assured that student's were receiving the related services identified in their IEPs
  - o The special education manual is well under way and there is a warning not to copy the Georgia Special Education Manual, but to use it as a guide as they develop theirs in collaboration with the Mississippi Department of Education.
  - o The contract for speech and language services is still working well for the youth in need of related services

58

    o  There is an absence of a clear behavior management system. Procedures for managing discipline are inadequate.

**Columbia Training School**
This facility, like Oakley, has much to do to comply with the Memorandum of Agreement. According to Dr. Johnson, DOJ consultant, progress has been made and the facility's special education program has several strengths, including:

- A full complement of dedicated and talented staff
- A calm, supportive school environment that is conducive to learning
- unprecedented low populations
- well stocked library
- Both the DYS education coordinator and the special education recognize their status and what technical assistance they need.

and
- A process for getting new admission into school within three days.
- 

Both the facility director and the principal, as well as teachers, have become more involved in policy and procedure development for the facilities

**28.** *The State shall, at all times, provide all youth confined at the facility with adequate special education in compliance with the individuals with Disabilities Act (IDEA), and regulations promulgated thereunder, and this MOA.*
The state is not in compliance on item 28.

**OTS and CTS**
The assessment indicates that there are deficits with compliance of this section of the agreement at both facilities. . Improvements have been made at both OTS and CTS resulting identification of an adequate number of teachers to fill special education positions at both facilities. If all candidates accept job offers, there will be an adequate number of certified special education teachers at both facilities. The requirement for a 330 minute/day school day is in effect at both facilities.

The issue with insufficient clerical assistance has been remedied, at this time, by the hiring of two new assistants to the acting special education coordinator at the Oakley School, which makes it possible for the acting special coordinator and the assistant principal at Oakley to focus on other critical tasks.

*The Substitute Teacher issue MUST be resolved at both facilities. Having teachers to absorb the students of absent teachers interrupts the continuity of the education program. If nothing else, it is recommended that a couple of full time substitutes be available on a daily basis at Oakley Training School and at least one, at Columbia Training School since the population is increasing.*

*Collecting, Monitoring and Disseminating Records: A protocol MUST be established and implemented at both facilities for requesting records, follow-up requests and*

59

> *dissemination of school records. Dr. Johnson recommends that the protocol must be distributed to courts, community schools, families and the staffs at OTS, CTS and the Community Service Program. Monitoring must include an audit and a report at intervals of not less than 30 days until the practice becomes routine at both facilities.*

**For Both Facilities:** The Director of Education, the new special education coordinator, two principals and two assistant principals, as well as their support staff are working very hard to comply. MDHS Director Taylor's office has shown tremendous support for improving practice through his letter to the Mississippi Department of Education (MDE), which has opened more dialogue between the two agencies on educational issues in the Agreement. As one might expect, this level of support is going to be necessary to support the efforts of staff and leaders at the facility. It is my opinion that the MDE has not taken the OTS or CTS educational programs seriously and leaves much to be desired in terms of how they support and monitor what goes on in the DYS educational program. Although they have provided some technical assistance through in-service activities related to special education, trainings and even auditing visits have been cancelled this reporting period.

> *Recommendation: The MDHS would benefit from negotiating with its sister agency, MDE, for some consistency in auditors assigned to the two facilities during the period the State is attempting to comply with the requirements under this MOA. Both agencies should require notification all the way up to the level of department directors when scheduled audits and trainings are cancelled. Currently, MDE has NOT provided the required support to either school.*

As the processes at these two institutions improve, I think more children will be identified as being in need of special education services which will present additional challenges to the program, as well as the MSDE. It is still evident that the DYS Director (acting as the OTS Director), the CTS Director, Principal and staff need technical assistance in developing policies and procedures that are consistent with MSDE and IDEA. On-going technical assistance is necessary to assure the types of services needed to comply with the law relating to IDEA and other regulations.

For both facilities, a training schedule for MSDE technical assistance must be developed and the two highest level officials for the organizations must commit to complying with schedule. If MSDE is not willing to provide the necessary support, I highly recommend acquiring an outside consultant who would assure that the program is in compliance with federal requirements, which may exceed State requirements. .

*29. Director. The State shall designate a Director of Education to oversee the facilities. The Director shall meet minimum standards as specified by the State. The State shall*

60

*provide the Director with sufficient staff and resources to perform the tasks required by the MOA......................*
The State has achieved partial compliance with the hiring of the education director and designation of personnel numbers to fill any educational staff vacancies.

The Division of Youth Services has hired an Education Director and it appears that the director has a clear understanding of his responsibility for overseeing the education program at CTS. In addition, the director appears to have a sound relationship with the CTS school principal. The deficits outlined under this section of the report indicate:

- A staffing analysis was completed this reporting period, as well as policies and procedures. A special education coordinator was hired. Mrs. Rhoda Smith formerly worked at the Mississippi Department of Education (MDE) in the Special Education Department. She is very familiar with the MDE special education policies and procedures. The MDE practices are also known by the new special education coordinator. She can be very influential is building the bridge between the MDE and MDHS/DYS. From my interview with her, I learned that she and the special education team have nearly completed the special education manual and she is working with the new policy and training directors to complete the necessary training and policies and procedures. Modeling the manual and policies after the Georgia DJJ Special Education manual was the recommendation of the DOJ consultant, Dr. Kelley Johnson, with the caveat that the manual not be copied, but that the Georgia manual be used as a guide and that the schools identify a team to work with the coordinator to develop the policies and procedures.
- The level of clerical work has been considered and addressed this reporting period with the hiring of two new assistants to the special education coordinator at the Oakley School. Further monitoring will tell if two is the right number of aides/assistants.
- Although some work has been done on the quality assurance program, this has not been integrated into practice and it is generally not understood by staff. Most of the staff are unaware of the quality assurance program in the schools.

> **Recommendation: Both OTS and CTS must determine whether they will have a full inclusion model or a more traditional self-contained, resource model.**

Here again, the staff and program needs technical assistance in developing policy, procedures and planning for any changes in population in order to accommodate the needs of the students. It has been noted that clerical support for the teachers and staff is needed.

61

*30. Special Education Upon Intake. The State shall ensure that all students who qualify for special education receive such services within a reasonable time following intake at the facilities.*

The state is not in compliance on this item.

The process is clearer this reporting period, although the manual has not been completed. Both facilities have tasked educational personnel to interview new students in an attempt to identify those with existing special education involvement while they are in the intake cottage. Dr. Johnson, DOJ consultant found the process is a considerable change from the previous practice, but there was *no central or aggregate report that identified each child/youth who had been interviewed.* I agree with Dr. Johnson that this represents positive change. They have a person to verify the special education services, but no written protocols or procedures are in place to identify the student's eligibility in special education.

Dr. Johnson recommended a contingency plan for summer when regular public schools are closed or when staff work flexible, compressed and/or vacation schedules. I, again, agree with her assessment

*Recommendation: Restore an educator to the teams participating in the classification process a each facility.* This was done.

*31. Parent, Guardian and Surrogate Involvement. The State shall develop and implement policies, procedures and practices to ensure appropriate parent, guardian, or surrogate parent notice and involvement in evaluations, eligibility determinations, IEPs, placement and provision of special education services.*

The state is not in compliance.

Both the consultant from DOJ and I concur that much has been done to involve parents. The addition of teacher assistants to support the acting special education coordinator has increased the manpower to make such calls. In the last report, I cited the need for information regarding parent involvement be posted, including the procedures for parent notifications, which has not been done. The information should be posted in the facility for the parents to see. Now that there is an active student council, it is important that youth also have input in where information should be posted so that families are informed when they visit the institution. For those who do not visit the institution, procedures must be established for notifying all parents and the process should be uniform at both facilities.

*32. Staffing. The Superintendent(s) shall develop and implement an education staffing plan to ensure adequate staff to comply with the terms of the MOA.*
The state is not in compliance.

62

████ and ██: The staff complement, as it currently is constructed, is still more than sufficient at CTS. Additional teachers have been recruited for OTS. The state hired a consultant to complete an education staffing analysis for both facilities. Interviews are in process and there is high expectation that they will be reporting very soon. The DYS administrator, Education Coordinator and the special education coordinator for the schools are working closely with the Mississippi Department of Education (MDE) to assure training of the OTS education staff on developing IEPs, IEP meetings and other issues related to IDEA. *The problem with the lack of a school psychologist from the last reporting period has not been corrected* as of this writing. This unmet need is **at an emergency status** because it clearly reduces the capacity to conduct psycho-educational testing to determine initial or continued eligibility for special education services.

> *Recommendation:  Exercise the emergency powers of the state to hire, even if through contract, a licensed psychologist who can administer and interpret educational test outcomes to determine initial and continued eligibility for special education.*

**Concern:** Having been former employees of the MS Department of Education (MDE), it is hoped that both the Education Director and the Special Education Coordinator will benefit from their relationships with colleagues at MDE and that they will push hard for the rights of the children at OTS and CTS. It is imperative that they demand expeditious and regular support from the MDE which has oversight of this special education program, like all other public special education programs in the state.


*33. Screening for Special Education Needs. Consistent with Federal regulations, the State shall provide prompt and adequate screening of youth for special education needs and shall identify youth who are receiving special education in their home school districts or who may be eligible to receive special education services but have not been so identified in the past*
The State is not in compliance. Although the process of identifying youth for special education has improved this reporting period, much more improvement is needed.
**Oakley Training School**
The DOJ consultant, Dr. Johnson found in her review:
- There was evidence in the records of more attempts to contact and involve parents. The half-day vocational programming observed in the first quarter had been corrected. Now youth attend vocational and academic programming for a full day of services.
- There is evidence of a new practice to identify children and youth who previously received special education services through a MSIS codes.
- Problems still exists identifying youth who have not been previously identified.


**Columbia**

63

Although I agree with the DOJ consultant that the facility has done a commendable job of identifying students who have been previously identified for special education, a standardized process is not being used. The absence of policies and procedures is still raised by the consultant regarding CTS. Dr. Johnson's expert opinion is valuable to this process and the following findings were identified:

- The Teacher Support Team (TST) does not function in the manner envisioned by the federal law or the MOA. The team serves as more of a perfunctory classification committee to make educational programming assignments. It is recommended that it be restructured to serve the pre-referral function needed to satisfy the Child Find obligations. This is an area that the new special education coordinator is working to provide training on.

- There is evidence of a new practice to identify children and youth who were previously involved in special education services through a MSIS codes.

- Problems still exist with timely identification of youth who have not been previously identified.

- The staffers have yet to give a unified response when asked to define the procedures for referring students for Child Study.

- The absence of a psychometrist has also continued to impede the capability of both schools to implement the Child Find process.

64

- The facility does not have the ability to update expired eligibility determinations.

- Licensure issues for special education teachers makes it impossible to certify that students are being served appropriately

- Insufficient diagnostic information in IEPs is a problem at both schools.

- Students continue to be assigned to special education for a portion of the day, but the assignments do not always reflect the IEP services that are prescribed, especially the related services and support.

*The DOJ special education consultant concluded that the special education program at both schools is non-functional in terms of service provision. Even the related services she lauded are not connected to other services in a planful manner.*

The deficiencies previously outlined regarding the absence of policies and procedures is still a serious problem. Although the issue is not resolved, it is being addressed as a top priority for both the new policy director and special education coordinator. Training on the policy and a process for auditing adherence are still outstanding. These policies and procedures are essential for determining who will be involved in the process. Director Pittman is working with the Jackson State University to resolve the issue of providing a school psychologist or psychometrist to do the testing that is necessary initial identification of special education students and reevaluations. The State is not in compliance with the special education requirements at either school, but the compliance issues at Oakley are greater than those at Columbia.

65

*This period, the facilities still do not have the capacity to serve students along the full continuum of their special education needs.* Training for teachers has been provided, but the MDE has not shown up for scheduled trainings, other than the IEP training that was scheduled and occurred on September 28, 2005, or audits which have been attributed to the added stressors on MDE from Hurricane Katrina.

As of this report both OTS and CTS schools have realized more improvements, but the facilities remain out of compliance with nearly all provisions of the MOA and most of the components of federal and state regulations. Number 35 (Vocational Education)is the only one that is in full compliance. It is my opinion that the staff and administration need to establish proper policies and procedures that are consistent with both MDE and the federal IDEA regulations. It is once again recommended that the staff and administrators, outside of the education department at the facilities, be provided training on general education, IDEA and section 504 of the No Child Left Behind Act specifically so that they know what to do to support the education of the youth they serve in other parts of the institution programming. With such background, all staff would understand their responsibility to ask questions and make referrals regarding children/youth whose behavior suggests there may be a need for additional supports.

**35.    Vocational Education:  In Compliance at OTS and CTS.**
Both Oakley and Columbia offer a sufficient array of vocational education services for youth with disabilities. As of this report, both facilities are in compliance on this item.

**36. Forwarding Screening and Assessment Information Upon Transfer.**
  The state is not in compliance on item 36.

The absence of a school psychologist or psychometrist negatively impacts the ability of facilities to transfer records with the necessary diagnostic information that would benefit youth in the transition from OTS and CTS to the community for school, more vocational

66

training and./or work  A contract has been worked out with one of the MS universities to

provide the required services under both positions.

**37. Training and Quality Assurance:**   The State is not in compliance on item 37.

Although training was to have occurred during this period by MDE, it had to be

rescheduled.  This must be addressed by the two agency directors so that it becomes

as much of a priority for MDE as it is for MDHS>  If it is already a priority, it is

critical that there be agreement on evidence of the prioritization by making sure the

training and auditing occurs.