IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

OLIVIA Y, By and
Through Her Next Friend,
James D. Johnson, et al.                    PLAINTIFFS

VS.                       CIVIL ACTION NO. 3:04CV25LN

HALEY BARBOUR, As Governor
Of the State of Mississippi;
DONALD TAYLOR, as Executive
Director of the Department of
Human Services; and BILLY MANGOLD,
As Director of the Division of
Children's Services                         DEFENDANTS


DEPOSITION OF JAMES D. JOHNSON, ESQ.

Taken at the instance of the Defendant at the
offices of Bradley Arant, LLP, One Jackson Place,
188 E. Capitol Street, Suite 450, Jackson,
Mississippi, on Thursday, September 9, 2004,
beginning at approximately 8:09 a.m.

APPEARANCES:

   ERIC E. THOMPSON, ESQ.
   SHIRIM NOTHENBERG, ESQ.
   Children's Rights, Inc.
   404 Park Avenue South
   New York, NY 10016

                                    COUNSEL FOR PLAINTIFFS


EXHIBIT 000

James Johnson, Esq. - 09-09-04

BETTY A. MALLETT, ESQ.
McGlinchey Stafford, PLLC
Skytel Centre South, Suite 1100
200 South Lamar Street
Jackson, Mississippi 39201

COUNSEL FOR DEFENDANTS

Reported By: Julie Brown, CSR #1587
Brooks Court Reporting
Post Office Box 2632
Jackson, Mississippi 39207
(601) 362-1995

Page 4

1  JAMES D. JOHNSON, ESQ.,
2  having been first duly sworn, was examined and
3  testified as follows:
4  EXAMINATION BY MS. MALLETT:
5      Q. This is the deposition of Mr. James D.
6  Johnson in this matter, Olivia Y, et al. versus
7  Haley Barbour, et al. The witness has been sworn.
8  I'm Betty Mallett representing the defendants in
9  this case. And I understand that, Mr. Johnson, that
10 we have other lawyers here. We will allow them to
11 identify themselves.
12     MR. THOMPSON: For the record, Eric
13 Thompson, Children's Rights for plaintiffs, attorney
14 for the plaintiffs.
15     MS. NOTHENBERG: Shirim Nothenberg for
16 plaintiffs.
17     Q. (By Ms. Mallett) Mr. Johnson, this
18 deposition is taken pursuant to the Federal Rules of
19 Civil Procedure. I'm sure you're aware of all of
20 that. And I'm just going to have his notice of
21 deposition marked as an exhibit.
22     (Exhibit 6 marked for identification.)
23     Q. Mr. Johnson, again, I'm Betty Mallett
24 representing the defendants. Will you please give
25 me your full name?

Page 3

INDEX
                                    PAGE
Appearances                          1
Certificate of Deponent            128
Certificate of Court Reporter      129

EXAMINATIONS
                                    PAGE
Examination By Ms. Mallett           4
Examination By Mr. Thompson        116

EXHIBITS
                                    PAGE
Exhibit 6                            4
Exhibit 7                           34

Page 5

1   A. James Dewitt, D-E-W-I-T-T, Johnson.
2   Q. What is your address?
3   A. I'm in Hattiesburg at 103 Dovercliff
4  Road.
5   Q. And you're an attorney; is that correct?
6   A. That's correct.
7   Q. Can you give me a little bit of
8  information about your educational background?
9   A. Graduated U S M in 1973 with a degree in
10 political science. And then graduated from
11 Mississippi College School of Law in 1978.
12  Q. Okay?
13  A. With a Juris Doctrate degree.
14  Q. U S M being University of Southern
15 Mississippi?
16  A. Yes, ma'am.
17  Q. And after you finished college, where did
18 you work?
19  A. Well, during my law school years, I
20 worked here in Jackson at Legal Services Corporation
21 from '73 to '80.
22  Q. Okay. So after college you started
23 working for Legal Services?
24  A. During college and after college, I
25 worked at Legal Services, Inc.

Brooks Court Reporting
1-800-245-3376

Page 42

Q. And you believe it's accurate?
A. Uh-huh. (Affirmatively), yes, ma'am.
Q. In paragraph 44 of the complaint, I think it generally states that       . was repeatedly uprooted; is that correct?
A. Right.
Q. Do you have any idea what impact the frequency of her placement as described in the complaint has had on her?
A. I don't have any idea what impact it had on her. I can guess that being moved five times in five weeks wasn't healthy, but I can't look at her psyche and figure out what she's thinking.
Q. Now are you aware of or have you seen any medical or professional reports that have concluded that she was negatively affected because of the number of times that she was moved around?
A. I have not seen anything like that.
Q. Did you bring this issue of her being moved around as the complaint described, did you bring this as an issue to Judge MacPhail, as a concern?
A. No, because it was moot in that by the time we got to her case, she was settled in the Raney home. These movements occurred between her

Page 43

being taken and the Judge having her case heard.
Q. So by the time that you had her review before Judge MacPhail, you felt as her guardian ad litem, that she was in a safe place?
A. Correct.
Q. And you did not bring up to the judge any concerns that she might be moved again?
A. No, because that issue didn't come up. Because the Raney's testified that they were willing to take her as long as the court wanted them to.
Q. Now how many times did the Raney's have Olivia       ?
A. It would be a guess. I know they've had her consistently for a number of months. But during these five moves, they may have had her for like an overnight or something when they were trying to find a placement. But I'm not certain, I can't remember.
Q. So by the time that you all had the review, the last review, you were not concerned that D H S was going to move her again?
A. Correct.
Q. And you didn't voice any complaint about the frequency of her moves at the last hearing?
A. Yes. Not to the extent that we could do anything about it because it was over, but we were

Page 44

seeking an explanation as to why.
Q. Okay?
A. So complaint only because we needed an explanation. I mean, I couldn't complain --
Q. So you brought the issue up to Judge MacPhail?
A. Correct.
Q. And what was his, what did he do in response to you?
A. Had a five-day hearing.
Q. On       ?
A. On her case, trying to get the D H S workers whose names I gave earlier, who played what role in doing this that is described in --
Q. In the complaint?
A. Yeah, paragraphs 43 through 49.
Q. So Judge MacPhail had the authority to look into these complaints that you -- let me finish my question, these complaints that you were alleging in regards to Olivia?
A. Well, yeah, he didn't. It wasn't sue sponte. He had the prosecutor reopen the case and she asked for a review, Ms. Castle.
Q. Ms. Castle?
A. She's the county prosecutor.

Page 45

Q. So there was a proceeding held before Judge MacPhail on this case?
A. Yes, ma'am.
Q. And during that proceeding, you discussed or there was a discussion or request for explanation as to why       had been moved?
A. Correct.
Q. And there was a discussion regarding why, about the assessments that she did or did not have; is that correct?
A. Correct.
Q. And any conduct regarding Department of Human Services that you had a complaint about or had some concerns about was dealt with in this hearing; is that correct?
A. Most of them, yeah. We didn't get answers, but we tried to deal with them.
Q. This was a proceeding where you could bring up those issues?
A. Correct.
Q. Okay. And did Judge MacPhail make any kind of orders regarding the medical assessment? Did he direct D H S to go out and get any sort of particular type of medical or psychological treatment for       ?

Page 46

1  A. Not that I'm aware of, but I don't know.
2  Q. Did he make any orders in regards to
3  placement, any further placement of Olivia?
4  A. Well, again, I don't believe the issue
5  came up since the Raney's were willing to keep her.
6  And it was everybody's agreement that she was in a
7  secure foster placement and she didn't need to be
8  moved, so it didn't really come up.
9  Q. What about termination of parental
10 rights, was that discussed?
11 A. Yes.
12 Q. What was the conclusion on that?
13 A. It was mixed. Some wanted to T P R the
14 mother and the father and others wanted to give them
15 a second chance. And I think officially, they're
16 still in the reunification mode.
17 Q. What was the judge's order in regards to
18 termination of parental rights or pursuing
19 termination of parental rights?
20 A. He didn't direct the county attorney
21 either way. He just directed the county attorney to
22 work with the Department. My understanding is that
23 they are looking at T P R.
24 Q. So you understand that?
25 A. It hasn't been filed that I'm aware of.

Page 47

1  Q. In preparation for this hearing that you
2  had, what was the, what prompted this proceeding
3  before Judge MacPhail regarding         ?
4  A. Well, I don't know what prompted it.
5  Everybody kept coming back to a memo letter that was
6  faxed to the court from Hope Haven about her
7  physical condition and complications with her
8  physical condition. And that, I guess, kind of was
9  the red flag that everybody started looking at.
10 That's my understanding -- now, I don't know what
11 Ms. Castle, what triggered her or what triggered
12 Judge MacPhail or whatever, but that's what my, my
13 role as guardian ad litem triggered by interest in
14 it.
15 Q. Now as the guardian ad litem, when these
16 proceedings are initiated, do you go out and do an
17 independent investigation regarding Olivia or do you
18 just read the reports that are coming in from the
19 prosecutor or from D H S?
20 A. Most of the time, reading reports from D
21 H S and the prosecutor. In her case, I did have
22 some contact with Hope Haven people and Mr. Raney,
23 just to maybe corroborate, you know, what I was
24 hearing was in fact true and accurate.
25 Q. What was the final conclusion of this

Page 48

1  hearing? What orders did the judge make regarding
2            ?
3  A. Well, the hearing was really more to find
4  out how all of this happened. He basically just
5  left her in the Raney home and asked the Department
6  to, you know, monitor her situation.
7  Q. Did he issue any sort of punishment for
8  the Department of Human Services? Hold anybody in
9  contempt or something like that?
10 A. No, I can't remember. I mean, we really
11 didn't get to the bottom of it to be quite frank
12 with you.
13 Q. So as I understand, you just had this
14 proceeding before Judge MacPhail regarding
15 that brought up these issues that you're talking
16 about in the complaint. And at the end of the day,
17 there was no conclusion as to whether D H S had done
18 anything wrong in regards to         ?
19 A. I think there was conclusion in the
20 court's mind that it was not handled correctly. But
21 the court could not find anybody within the
22 Department that would give the court the information
23 regarding how this happened. Everybody was saying,
24 "I don't know or ask so and so or check with so and
25 so."

Page 49

1  Q. So nobody at the Department of Human
2  Services, the judge didn't hold anybody at the
3  Department of Human Services liable for anything?
4  A. Correct. He had a lot to say in his
5  closing remarks, but as far as an adjudication
6  disposition of anything, no.
7  Q. As your statutory, as a guardian ad
8  litem, some of your statutory duties would include
9  you can make recommendation to the judge; is that
10 correct?
11 A. Correct.
12 Q. And you can do reports, enter reports?
13 A. Correct.
14 Q. And you can institute the type of
15 proceedings that you were just describing; is that
16 correct, on behalf of minor children?
17 A. Correct, uh-huh. (Affirmatively).
18 Q. Have you made a determination of whether
19     parents' rights should be terminated?
20 A. Legally, no. She'll make two steps
21 forward and then she'll drop back, the mother. The
22 father is pretty much, he hasn't signed away his
23 parental rights but he's not fighting for them. The
24 mother is. But Judge MacPhail and also D H S really
25 give the parents a lot of time to try to get their