WOOD HIATT

Page 1

1       IN THE UNITED STATES DISTRICT COURT
2       FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
3                    JACKSON DIVISION

7   JAMES D. JOHNSON, et al.                    PLAINTIFFS

10  VS                          CIVIL ACTION NO. 3:04CV251LN

13
    HALEY BARBOUR, et al.                       DEFENDANTS

17              DEPOSITION OF DR. WOOD HIATT

20  Taken at the instance of the defendants at the
    offices of McGlinchey Stafford, PLLC, 200 South
21  Lamar Street, Jackson, Mississippi, on Wednesday,
    March 29, 2006 at 9:00 a.m.

EXHIBIT SSS

WOOD HIATT

Page 83

1   a time for everybody to have a long, long time
2   ahead, let's plan for where he's going to go. We're
3   going to get the right place. We're going support
4   the right place. That's not what happened.
5        **Q.   (Mr. Fortenberry)  It is a difficult**
6   **question to answer, isn't it?**
7        A.   Well, there comes --
8             MR. THOMPSON:  Objection.  Argumentative.
9        A.   There comes a time when no, it's not
10  really difficult to answer.  There comes a time when
11  enough was known about this boy, enough was known
12  about the fact that if you keep bouncing him, he's
13  going to act out.  That the supervision over this
14  boy should have said, hey, we've got -- we have to
15  stop that.  We can't -- we can't -- of all things we
16  cannot allow, we cannot him to continue to bounce.
17            So what happens?  He goes in three foster
18  homes, goes in a psychiatric facility, comes out of
19  that psychiatric facility, he goes five visits and
20  three more foster homes.  Then he goes back into
21  that psychiatric facility, then to another one.
22  Now, nobody would say that that was going to do
23  anything but provoke this boy to explosively
24  disruptive behavior.
25       **Q.   What's your opinion of John A's current**

1   placement?

2       A.  Well, I don't really know.  Quite

3   frankly, it is the only stable one that he's had,

4   and it has the enormous value of his siblings being

5   with him.  He made it very clear to me, as you see

6   in my report, that his family is his siblings.

7           And, therefore, his contact with his

8   siblings over the years was always a major issue.

9   And we have suggestion, comment in the record that

10  he went long periods of time without any contact

11  with his siblings.  His mother drifted out.  He

12  doesn't really much remember, but his siblings are

13  his family.  His siblings were in that particular

14  foster home long before he came in.

15          Contact with his siblings was so

16  important to him, why was that not provided.  I

17  don't know.  All I know is that he's been in that

18  foster home since January 2004, then at the time I

19  saw him, to January of this year.

20      Q.  Doctor Hiatt, I want to move on to your

21  diagnosis, Axis 1, page 24.  Isn't it true that the

22  condition of adjustment disorder with disturbance of

23  mood and behavior was present in John A when he

24  entered DHS custody in March 1999?

25      A.  Well, we don't know that.  I mean, I

WOOD HIATT

Page 89

1  relying on what people thought happened as opposed
2  to what actually happened?
3      A.   Well, oh, no, no, no.  There were written
4  records in there that indicate that he -- that
5  people tried to find him.  Well, why wasn't he in
6  school?  And it turns out that he's sitting in the
7  DHS office.
8      Q.   In particular, which records are you
9  referring to?
10     A.   Frankly, I don't remember.
11     Q.   Isn't it true that John A's conditions
12 have improved since he's been in the current foster
13 home that he's in?
14     A.   I certainly think they have.  And I think
15 that you can say generally, yes.  He is not doing
16 the explosive, self-destructive, other destructive
17 kind of things as well as I can tell.
18          Now, remember that I don't have any
19 eyewitness reports of what he's like in the home,
20 what he's like in the neighborhood, what he's like
21 in the school.  We don't have any of those.  I would
22 think, generally speaking, what we know indicates
23 that he's doing -- he's better now than he has been
24 in the past.
25     Q.   Isn't it true that you said he's

1   significantly improved as opposed to generally
2   improved?
3       A.   Well, I don't know how to answer that.
4       Q.   Page 26 of your report, Axis 4, says
5   these conditions have been significantly improved
6   since he has entered the B foster home. So, do you
7   --
8       A.   Wait a minute. Wait a minute. Wait a
9   minute. What are we talking about?
10      Q.   Page 26, three lines from the bottom.
11  Just the specific question I have for you, Dr.
12  Hiatt, you use the term significantly improved?
13      A.   Oh, I'm talking about it's very, very
14  clear that now he's in contact with his family, and
15  now he's stopped the bounce.
16      Q.   Dr. Hiatt, that's not my question. My
17  question is; you stated that those conditions have
18  been significantly improved?
19      A.   That's what has been significantly
20  improved that he has contact now with his siblings,
21  and that he's stopped moving from place to place.
22  That is significantly changed and improved.
23      Q.   It's your opinion that John A should
24  continue in the present placement that he's in?
25      A.   On the basis of what I know, yes. A lot