IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

OLIVIA Y., *et al.*                                                 PLAINTIFFS

v.                                                  CIVIL ACTION NUMBER 3:04CV251

HALEY BARBOUR,
as Governor of the State of Mississippi, *et al.*            DEFENDANTS

### PLAINTIFFS' REPLY IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Defendants do not attempt to dispute Plaintiffs' statement of 185 "Uncontested Facts" establishing class-wide violations of Plaintiff children's constitutional rights to reasonable safety and adequate health care while in state custody. *See* Pls' Mot. for Summ. J. on Liability. They cannot. Defendants' own expert report, along with Defendants' documents and deposition testimony, all confirm that Defendants are knowingly operating a child welfare agency that is placing Mississippi foster children at substantial risk of harm because it is inadequately staffed, trained, supervised, and resourced. Defendants thus fail to adduce any disputed material facts as to the Plaintiff class' established substantive due process claims to adequate safety, care, and treatment to defeat summary judgment.

Even as to the Named Plaintiffs, Defendants offer only general avowals that they were provided with safety and basic necessities without disputing any of the specific findings of harm made by Plaintiffs' experts Dr. Marva Lewis and Dr. Wood Hiatt. The following additional facts, which are taken directly from these unrebutted expert reports previously submitted as exhibits to Plaintiffs' Motion for Summary Judgment, are therefore also uncontested and

1

establish violations of the Named Plaintiffs' constitutional rights to reasonable safety and adequate health care as matter of law.[1]

## Statement of Uncontested Facts

186. Dr. Lewis establishes that "Mississippi's foster children are at risk of further neglect, and even abuse, as a result of poor DHS case practice and oversight." (Ex. 3 at 128).

187. Dr. Lewis also establishes that MDHS has failed to engage in appropriate permanency planning on behalf of these Named Plaintiffs and has squandered available adoptive opportunities, which has prolonged the Named Plaintiffs' stay in state custody to the detriment of these children's well-being. (Ex. 3 at 14-18).

**Cody B.**

188. With what social work expert Dr. Lewis describes as "callous disregard for Cody's health," Defendants persisted in leaving Cody, an asthmatic toddler, for unsupervised visits in a home where he was being exposed to life-threatening cigarette smoke. "Cody's caseworkers knew of the life-threatening risk improperly supervised visits posed to Cody, yet there is no record that DHS made any effort to raise the issue with the Youth Court." (Ex. 3 at 32, 39-40, 48).

189. Cody experienced respiratory distress following many such visits, requiring emergency room treatment on at least two occasions. (Ex. 3 at 31-32, 39-40; Defs' Mot. for Summ. J. on Liability ("Defs' Motion") at Ex. C).

190. During one incident of respiratory distress following such a visit, Cody's doctor ordered blood work. There is no evidence that MDHS obtained this blood work, and

---

[1] All cited Exhibits were submitted with Plaintiffs' Motion for Summary Judgment on Liability unless otherwise noted.

Cody's foster mother at the time indicated that the agency did not. (Ex. 3 at 31, 33, 40; Defs' Motion at Ex. C).

191. MDHS documented that it did not maintain a complete medical record of Cody's asthmatic condition and did not consistently inform his caregivers of his known medical problems. Dr. Lewis establishes that this meant "he could die from a sudden unrecognized asthma attack in the home of an unprepared caregiver, who might mistake his symptoms for a common cold." (Ex. 3 at 29, 32-33, 35, 38-39).

192. In 2004 Cody was placed for the first time with foster mother Ms. BYK, who had not been made aware of his condition and who was unprepared to address the severe asthma attack that he experienced while in her care. This incident resulted in an additional hospitalization. (Ex. 3 at 33, 39; Defs' Motion at Ex. C).

193. Immediately following that hospitalization, Defendants placed Cody in an emergency shelter despite a plea by his former foster mother to resume care for him. This former foster mother had cared for Cody for 19 months, and MDHS had documented her to be a loving caretaker. (Ex. 3 at 23, 29, 33, 37).

194. Cody's placement with a foster mother who cared for him for 19 months disrupted because MDHS failed to address her concerns regarding Cody's treatment by MDHS. She explained at the time that these concerns involved, among other issues, the agency's placement of Cody for day-long, unsupervised visits in an environment where he was exposed to cigarette smoke and the agency's failure to provide him with doctor-mandated treatment. (Ex. 3 at 32-33, 36).

195. When Defendants placed Cody in a shelter immediately after a hospitalization, his long-term physician filed an abuse and neglect report with Defendants asserting that

Cody was suffering from the medical condition "failure to thrive" and that the lack of a stable family environment was directly and adversely affecting his development and emotional well-being. (Ex. 3 at 33, 37).

196. There is no evidence that Defendants complied with Cody's doctor's request to follow up with her regarding her maltreatment report. The agency maintained Cody in the shelter placement for nearly three weeks following the report. (Ex. 3 at 37).

197. Cody's placement in the shelter was one of five placements that Cody experienced in the span of 31 days. (Ex. 3 at 38).

198. Dr. Lewis notes that "[i]t is well established that children who have been abused or neglected by their biological parents require a stable, consistent, family-like environment." (Ex. 3 at 38).

199. Cody, who was one at the time, suffered psychological harm when MDHS severed the secure attachment he had developed with the foster mother with whom he had lived with for the majority of his life and then moved him through five different placements. (Ex. 3 at 38).

**Olivia Y.**

200. When Defendants took custody of Olivia, she was three years old but weighed only 22 pounds, which is the expected weight of an average child half of her age. (Ex. 3 at 53).

201. Defendants cycled Olivia through no fewer than three separate foster placements without a single MDHS worker noting that not only was she severely underweight, but she also had a visible rash covering her face and torso, had a distinct and

disagreeable odor, and was so developmentally delayed that she could not follow simple commands. (Ex. 3 at 63-64).

202. According to Defendants' own summary of services, Olivia was not assessed by a medical professional for over three weeks after entering care on September 10, 2003, and MDHS reported to the Youth Court that Olivia appeared "to be a healthy child with no known medical conditions." (Defs' Motion at Ex. A; Ex. 3 at 55-56).

203. As established by Dr. Lewis, "[e]ither the DHS workers responsible for Olivia's case were woefully ignorant of normal child appearances and development, or they were callously indifferent to her extreme medical needs. In either case, they were clearly not suited and unable to ensure Olivia's adequate protection and safety." (Ex. 3 at 64).

204. Dr. Lewis further establishes that Defendants' failure to "obtain and maintain medical and developmental information not only harmed Olivia by denying her timely medical and developmental interventions, but also placed her at risk of being moved to a foster home unaware of her needs." (Ex. 3 at 66).

205. Olivia was removed from her aunt's home eight days after her placement there because the background check on her aunt's son revealed he was a convicted rapist. One day after her removal, MDHS reported to the Youth Court that Olivia was still in her aunt's home and doing well. (Ex. 3 at 55-56).

206. When MDHS disclosed in a letter to the Youth Court that it had removed Olivia from her aunt's home, it offered by way of explanation only that Olivia's aunt "could not provide adequate supervision." The presence of a convicted sex offender in the home was not mentioned in the letter. (Ex. 3 at 57).

207. After Olivia was removed from the home of the convicted sex offender, she was not provided a full sexual abuse exam, despite a doctor's finding that Olivia's vaginal area was red and swollen and that she reacted "in terror" when the doctor attempted a vaginal exam. (Ex. 3 at 62-63; Defs' Motion at Ex. A).

208. The doctor who examined Olivia following her removal from the placement with the convicted rapist made clear to MDHS that she had not undertaken a complete sexual abuse examination of Olivia because MDHS had not provided her with any reason to suspect sexual abuse and because the clinic lacked the proper facilities. (Ex. 3 at 57, 62-63).

209. As established by Dr. Lewis, the "failure by DHS to have Olivia examined for possible sexual abuse or the presence of sexually transmitted diseases, or to disclose to her doctor why such an exam was clearly merited, demonstrates a complete disregard for Olivia's physical well-being." (Ex. 3 at 63).

**John A.**

210. When John entered MDHS custody at nine years old, MDHS knew that he suffered from serious psychological problems, as his need for psychiatric hospitalization had been the impetus for Defendants to place him into foster care. (Ex. 3 at 87).

211. In the first five years that Defendants had custody of John, they moved him through over 35 placements, with each placement lasting an average of less than two months. (Ex. 3 at 74, 87).

212. John's treating mental health care providers repeatedly documented to MDHS his need to be placed in a therapeutic setting, yet, as established by Dr. Lewis, Defendants' records reflect that "[a]gain and again, DHS ignored this professional

advice and placed John in non-therapeutic homes and shelters not equipped to meet his specific needs, which predictably led to numerous disruptions." (Ex. 3 at 88).

213. Defendants left John in a restrictive residential treatment center well past his intended discharge date despite reports from the facility staff that leaving John in that environment was causing his mental health to deteriorate. (Ex. 3 at 88).

214. Dr. Hiatt concludes

> within a reasonable degree of medical certainty [that] the pattern of placements and moves of John A. by Mississippi DHS, from the time he entered custody, has been seriously damaging to his mental health status, his ability to adjust and his psychiatric condition. From the moment he was identified in 1999, he was known to be a seriously disturbed boy with major, severe risk factors in need of therapeutic placement. His overwhelming need was stability of home, guidance, management and treatment. To the contrary, the frequent moves, often overnight, which were unpredicted by him and unexplained to him, guaranteed that he would feel threatened, maximized his failures to cope and unleashed his characteristic response of anger and defiance. (Ex. 5 at 27-28).

215. At age 12, John reported trying to kill himself within the past six months, placing the suicide attempt around the time when he told his therapist, "I wished I had a home," and he identified change in residence and change in school as two of his three primary psychological stressors. MDHS moved him ten more times that year, and when it tried to move him again he attempted to mutilate himself in an effort to prevent another placement disruption. (Ex. 3 at 79-83, 87).

216. Dr. Lewis establishes that "[p]sychiatric and therapeutic history is absolutely essential to the success and the safety of any new treatment." (Ex. 3 at 90).

217. MDHS repeatedly failed to provide John's medical history to his treating mental health professionals despite documented requests for such information. MDHS's failure to provide such information directly affected the ability of John's treating providers to meet his mental health needs. (Ex. 3 at 90).

7

218. Dr. Hiatt establishes "within a reasonable degree of medical certainty that the failure of the DHS managers to keep him under the care of staff members and doctors who were familiar with him and to quickly provide each new treating physician with his medical records, created severe, unnecessary difficulties in management of his psychiatric and behavioral problems." (Ex. 5 at 28).

219. Defendants failed to adequately record or supervise the multiple psychotropic medications John was prescribed. (Ex. 3 at 14, 91).

220. Dr. Lewis establishes that psychotropic drugs "are widely understood to have potentially dangerous side effects, which can include suicidal tendencies, if improperly administered." (Ex. 3 at 14).

221. Dr. Hiatt establishes that in assessing John's experience in MDHS custody, "it is essential to understand that [John's psychotropic medications] had to be fully monitored and provided to John A. on a regular basis." (Ex. 5 at 15).

222. By March 2005, MDHS had approved nearly four years of service plans for John that each contained an identical incomplete and inaccurate listing of his medications, each of which listed one medication as "unknown." (Ex. 3 at 91). Some or all of these listings had no overlap whatsoever with the medications John was in fact taking. (Ex. 3 at 80).

223. Despite clear evidence that isolation from his siblings exacerbated John's psychological problems and interfered with his treatment, Defendants denied him regular contact with his siblings for nearly five years after placing him in foster care. (Ex. 3 at 93-94).

224. John's mental health treatment team and his MDHS caseworker documented the correlation between sibling contact and his psychological progress. MDHS records also document evidence of the corresponding damage caused by the lack of such contact. (Ex. 3 at 93-94).

225. MDHS records reflect that at one point, John "'indicated that [suicide] was the best way to avoid the pain of never returning to live with his family.'" (Ex. 3 at 93).

226. Dr. Lewis finds that "[d]espite such compelling evidence that seeing his siblings was essential to the traumatized child's emotional well-being, his [Individual Service Plans] consistently failed to reflect any sibling visitation plan and more than one caregiver noted that he saw them rarely or never." (Ex. 3 at 93).

227. Dr. Hiatt concludes "within a reasonable degree of medical certainty that the failure of the DHS managers to allow [John] to maintain contact, to hold on to the bond with the only family he had, his siblings, greatly added to his difficulties with adjustment." (Ex. 5 at 28).

228. At one institution, John complained to his caseworker, "I need to get out of this place. They keep putting bruises on me—the staff." There is no evidence that MDHS investigated this allegation. In reporting to the Youth Court about this visit with John, MDHS described him as "happy." (Ex. 3 at 78, 89).

**Jamison J.**

229. Jamison, who is now 19, was taken into MDHS custody at the age of five. Over the next fourteen years, MDHS shuttled him through more than 28 placements. (Ex. 3 at 97).

230. As established by Dr. Lewis's review of MDHS case records, "Jamison's placements have varied in length from days to four years, and have included emergency shelters, group homes, crisis centers, foster homes, and psychiatric institutions." (Ex. 3 at 116-117). Jamison was also placed in an institution for delinquent youth, although he had never been adjudicated delinquent. (Ex. 3 at 113).

231. Dr. Lewis establishes that moving Jamison through this extraordinarily high number of placements caused him psychological harm. (Ex. 3 at 97).

232. Jamison reported that he felt hopeless about finding a family and described himself as homeless. (Ex. 3 at 123).

233. When MDHS first removed Jamison from his mother's custody, it placed him with his maternal grandmother for three months, during which time MDHS made several documented observations that the home was unsafe and that the grandmother could not provide the five-year-old with adequate care and supervision. (Ex. 3 at 98-99, 114-115).

234. MDHS removed Jamison from the first placement with his maternal grandmother because he was being maltreated. Jamison was later returned to this placement unsupervised for a week without any documented indication that conditions had been improved such that he would not be subject to yet further neglect. (Ex. 3 at 115).

235. MDHS also returned Jamison to his mother for unsupervised overnight visits even after the agency had documented that he returned from those visits unfed, ungroomed, sleep-deprived, and without having taken his medications. (Ex. 3 at 115).

236. During unsupervised overnight visits with his mother, Jamison witnessed the severe and ongoing physical abuse of a three-year-old who was living in the home and who

was eventually beaten to death there. (Ex. 3 at 6, 108, 115-16). Only after the beating death of this toddler did MDHS determine that Jamison should not be returned to his mother's care. (Ex. 3 at 108).

237. Jamison J. was sent to live in Kansas with a father with whom he had no previous relationship and whose parental rights had been terminated. (Ex. 3 at 8, 112, 116).

238. At the time of Jamison's placement with his father in Kansas, MDHS's records reflected that Jamison's father had multiple felony convictions for which he had been incarcerated and that he had previously been deemed an inappropriate placement resource for Jamison. (Ex. 3 at 8, 112, 116).

239. At the time MDHS placed Jamison with his father, it did not have the results of any home evaluation study, and it had not performed the requisite background and criminal checks necessary to determine if the placement was safe. (Ex. 3 at 116).

240. Kansas child welfare officials contacted MDHS to report that Jamison's placement with his father was illegal because it violated the guidelines governing interstate placement of children. (Ex. 3 at 116).

241. As established by Dr. Lewis, MDHS's placement of Jamison with his father, which soon disrupted, seriously jeopardized his safety and "was the third environment in which DHS placed Jamison that left him as vulnerable, if not more so, than he had been prior to being placed in DHS custody." (Ex. 3 at 116).

242. MDHS failed to arrange for an initial psychological screening for Jamison when he was first removed from his mother's home in 1991 or when he reported to his caseworker that he wanted to hurt himself in 1992. MDHS did not provide Jamison

with any psychological services at all until March of 1993. (Ex. 3 at 117; Defs' Motion at Ex. B).

243. Jamison has been diagnosed with PTSD, ADHD, developmental reading disorder, depressive disorder, oppositional defiant disorder, and adjustment disorder. Jamison has not received consistent treatment necessary to address these serious psychiatric problems. (Ex. 3 at 97, 117-118; Defs' Motion at Ex. B).

244. Dr. Lewis establishes that

> DHS's inconsistent provision of treatment harmed Jamison because he was denied mental health services appropriately calibrated to his serious needs. In addition, DHS's failure to provide Jamison his needed treatment directly resulted in the disruption of at least one of his placements. Jamison's first foster mother, JF, became so frustrated after months of DHS's failure to secure needed psychiatric services for Jamison that she went to the DHS offices with all of Jamison's belongings and told the agency that she could no longer care for him. (Ex. 3 at 118).

245. In 2000 a serious incident report was filed with the Department of Mental Health because Jamison was not being provided his medication at school or at the shelter where MDHS had placed him. (Ex. 3 at 118).

246. On almost 20 occasions, documents intended to track whether and how much medication Jamison received were left blank. (Ex. 3 at 118-119).

247. Dr. Lewis establishes that "DHS's failure to properly administer his strong psychotropic medications not only disrupted and delayed his much-needed treatment, but also placed him at serious risk of withdrawals or overdoses." (Ex. 3 at 119).

For the above reasons and the reasons set forth more fully in the Memorandum of Law in Support of Plaintiffs' Reply as to Plaintiffs' Motion for Summary Judgment, Plaintiffs respectfully request that the Court grant their Motion for Summary Judgment on Liability.

Respectfully submitted, this 30th day of May, 2006.

/s Melody McAnally
W. Wayne Drinkwater, Jr. (MBN 6193)
Melody McAnally (MBN 101236)
BRADLEY ARANT ROSE & WHITE LLP
188 East Capitol Street, Suite 450
Jackson, MS 39201
Telephone: (601) 948-8000
Facsimile: (601) 948-3000

Stephen H. Leech (MBN 1173)
850 East River Place, Suite 300
Jackson, MS 39202
Telephone: (601) 355-4013

Marcia Robinson Lowry (MBN 43991 *pro hac vice*)
Susan Lambiase (MBN 43992 *pro hac vice*)
Eric E. Thompson (MBN 43993 *pro hac vice*)
Tara Crean (MBN 44447 *pro hac vice*)
Shirim Nothenberg (MBN 43990 *pro hac vice*)
CHILDREN'S RIGHTS
330 Seventh Ave, 4th Floor
New York, NY 10001
Telephone: (212) 683-2210

John Lang (MBN 43987 *pro hac vice*)
Christian Carbone (MBN 43986 *pro hac vice*)
John Piskora (MBN 44474 *pro hac vice*)
LOEB & LOEB LLP
345 Park Avenue
New York, NY 10154
Telephone: (212) 407-4000

*PLAINTIFFS' COUNSEL*

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 30, 2006, I electronically filed the foregoing with the Court using the ECF system, which sent notification of such filing to the following:

> Dewitt L. ("Rusty") Fortenberry Jr., Esq.
> Kenya Key Rachal, Esq.
> Gretchen L. Zmitrovich, Esq.
> Ashley Tullos Young, Esq.
> BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC
> 4268 I-55 North
> Meadowbrook Office Park
> Jackson, Mississippi 39211
>
> Harold E. Pizzetta, III, Esq.
> Assistant Attorney General
> General Civil Division
> Carroll Gartin Justice Building
> 430 High Street
> Jackson, Mississippi 39201
>
> *Attorneys for Defendants*

/s Melody McAnally