IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

OLIVIA Y., *et al.*                                                          **PLAINTIFFS**

v.                                                           CIVIL ACTION NUMBER 3:04CV251

HALEY BARBOUR,
as Governor of the State of Mississippi, *et al.*                **DEFENDANTS**

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' REPLY AS TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

W. Wayne Drinkwater, Jr. (MBN 6193)
Melody McAnally (MBN 101236)
BRADLEY ARANT ROSE & WHITE LLP
188 East Capital Street, Suite 450
Jackson, MS 39201
Telephone: (601) 948-8000

Stephen H. Leech (MBN 1173)
850 East River Place, Suite 300
Jackson, MS 39202
Telephone: (601) 355-4013

Marcia Robinson Lowry (MBN 43991 *pro hac vice*)
Eric E. Thompson (MBN 43993 *pro hac vice*)
Susan Lambiase (MBN 43992)
Shirim Nothenberg (MBN 43990 *pro hac vice*)
Tara S. Crean (MBN 44447 *pro hac vice*)
Children's Rights
330 Seventh Avenue, 4th Floor
New York, NY 10001
Telephone: (212) 683-2210

John Lang (MBN 43987 *pro hac vice*)
Christian Carbone (MBN 43986 *pro hac vice*)
John Piskora (MBN 44474 *pro hac vice*)
LOEB & LOEB LLP
345 Park Avenue
New York, NY 10154
Telephone: (212) 407-4000

## TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................... ii

TABLE OF AUTHORITIES ............................................................................. iv

I.    Plaintiffs Are Entitled To Summary Judgment Because Defendants Do
      Not Contest Plaintiffs' Undisputed Evidence Of Class-Wide Harms ....................1

      A.    Defendants Do Not Dispute Plaintiffs' Evidence Of Class-
            Wide Abuse In Care And Lack Of Medical, Dental, And
            Psychological Care, Which Are Harms From Which
            Defendants Concede Plaintiffs Have A Right To Be Free ...................4

      B.    Defendants Do Not Dispute Plaintiffs' Evidence Of Class-
            Wide Psychological Harm Caused By Multiple, Avoidable
            Moves And Inappropriate Placements, Which Is Also
            Actionable .........................................................................................7

      C.    Defendants Do Not Dispute Plaintiffs' Evidence That The
            Plaintiff Class Is Put At Substantial Risk By Defendants'
            Failure to Train And Supervise Their Staff, Which Is Also
            Actionable .......................................................................................12

      D.    Plaintiffs Are Entitled To Summary Judgment Regardless
            Of The Culpability Standard Applied To This Equitable
            Foster Care Case .............................................................................13

            1.   Defendants Do Not Dispute Plaintiffs' Evidence
                  That Defendants Substantially Depart From
                  Professional Standards Causing Plaintiff
                  Children Harm .......................................................................17

            2.   Defendants Do Not Dispute Plaintiffs' Evidence
                  That Defendants Have Knowingly Failed To
                  Remedy Their Substantial Departure From
                  Professional Standards In Deliberate
                  Indifference To The Ongoing Substantial Risk
                  Of Harm To Plaintiff Children...........................................18

            3.   Defendants Cannot Justify Their Lack Of
                  Reasonable Action To Abate Known
                  Constitutional Violations On Lack Of Funding.................22

II.    Defendants Do Not Contest Plaintiffs' Undisputed Evidence Of Harm To The Named Plaintiffs.................................................................................23

      A.    Cody B. Has Been Harmed and Placed at Imminent Risk of Harm ........................................................................................24

      B.    Olivia Y. Has Been Harmed and Placed at Imminent Risk of Harm ........................................................................................27

      C.    John A. Has Been Harmed and Placed at Imminent Risk of Harm ........................................................................................29

      D.    Jamison J. Has Been Harmed and Placed at Imminent Risk of Harm ........................................................................................33

      E.    Defendants' Evidence Regarding The Services Provided to Named Plaintiffs is Either Immaterial or Confirms Plaintiffs' Allegations ........................................................................37

III.    CONCLUSION..............................................................................38

## TABLE OF AUTHORITIES

*Alberti v. Sheriff of Harris County,*
 937 F.2d 984 (5th Cir. 1991) ...............................................................................22

*Alberti v. Sheriff of Harris County,*
 600 F. Supp. 443 (S.D. Tex. 1984) ..................................................................22, 23

*Alberti v. Sheriff of Harris County,*
 978 F.2d 893 (5th Cir. 1992) ............................................................................22, 23

*A.M. v. Luzerne County Juvenile Det. Ctr.,*
 372 F.3d 572 (3d Cir. 2004) ..................................................................................9

*Atteberry v. Nocona Gen. Hosp.,*
 430 F.3d 245 (5th Cir. 2005) ................................................................................14

*B.H. v. Johnson,*
 715 F. Supp. 1387 (N.D. Ill. 1998) .......................................................................8

*Braam* ex rel. *Braam v. Dep't. of Social & Health Servs.,*
 81 P.3d 851 (Sup. Ct. Wash. 2003).................................................................15, 16

*Brown v. Protective Life Ins. Co.,*
 353 F. 3d 405 (5th Cir. 2003) ...........................................................................3, 4

*Carey v. Piphus,*
 435 U.S. 247 (1978)...............................................................................................7

*Clark-Murphy v. Foreback,*
 439 F.3d 280 (2d Cir. 2006)...................................................................................9

*County of Sacramento v. Lewis,*
 523 U.S. 833 (1998)..............................................................................................14

*Danielle v. Adriazola,*
 284 F. Supp. 2d 1348 (S.D. Fla. 2003) .................................................................8

*de la O v. Housing Authority of City of El Paso,*
 417 F.3d 495 (5th Cir. 2005) ...........................................................................6, 27

*Del A. v. Roemer,*
 777 F. Supp. 1297 (E.D.La. 1991).........................................................................9

*Doe v. New York City Dep't of Soc. Servs.,*
    670 F. Supp. 1145 (S.D.N.Y. 1987)................................................................8, 10

*Doe v. New York City Dep't of Soc. Servs.,*
    649 F.2d 134 (2d Cir. 1981)................................................................17

*Doe v. Taylor Independent School District,*
    15 F.3d 443 (5th Cir. 1994) ................................................................13

*Drummond v. Fulton County Department of Family & Children's Services,*
    563 F.2d 1200 (5th Cir. 1977) ................................................................10, 11

*E.F. v. Scafidi,*
    No. 3:91CV591, Slip op. (S.D. Miss. Mar. 13, 1996) ................................11

*Eric L. v. Bird,*
    848 F. Supp. 303 (D.N.H. 1994)................................................................10

*Estelle v. Gamble,*
    429 U.S. 97 (1976)................................................................9, 16

*Forsyth v. Barr,*
    19 F.3d 1527 (5th Cir. 1994) ................................................................6

*Frazar v. Gilbert,*
    300 F.3d 530 (5th Cir. 2002) ................................................................18

*Frazier v. Harrison ISD,*
    980 F.2d 1514 (5th Cir. 1993) ................................................................11, 18

*Frew* ex rel. *Frew v. Hawkins,*
    540 U.S. 431 (2004)................................................................18

*Gates v. Collier,*
    501 F.2d 1291 (5th Cir. 1974) ................................................................22

*Gates v. Collier,*
    349 F. Supp. 881 (N.D. Miss. 1972)................................................................13

*Gates v. Cook,*
    376 F.3d 323 (2004)................................................................7, 9

*Grandstaff v. City of Borger,*
    767 F.2d 161 (5th Cir. 1985) ................................................................9

*Greason v. Kemp,*
891 F.2d 829 (11th Cir. 1990) ............................................................10

*Griffith v. Johnston,*
899 F.2d 1427 (5th Cir. 1990) .............................................................8

*Hernandez v. Texas Dep't of Protective and Reg. Servs.,*
380 F.3d 872 (5th Cir. 2004) ..................................................... *passim*

*Hope v. Pelzer,*
536 U.S. 730 (2002)...........................................................................19

*Huff v. N.D. Cass Co. of Alabama,*
485 F.2d 710 (5th Cir. 1973) ...............................................................3

*Inmates of the Allegheny County Jail v. Pierce,*
612 F.2d 754 (3d Cir. 1979).................................................................9

*K.H.* ex rel. *Murphy v. Morgan,*
914 F.2d 846 (7th Cir. 1990) ...................................................... *passim*

*Knight v. Sharif,*
875 F.2d 516 (5th Cir. 1994) (en banc) ...............................................2

*Langford v. City of Atlantic City,*
235 F.3d 845 (3d Cir. 2000)...............................................................22

*Langley v. Coughlin,*
888 F.2d 252 (2d Cir. 1989)................................................................9

*LaShawn A. v. Dixon,* '
762 F. Supp. 959 (D.D.C. 1991) ................................................ *passim*

*Lenard v. Argenta,*
699 F.2d 874 (7th Cir. 1983) .............................................................14

*Lewis v. Casey,*
515 U.S. 343 (1996).............................................................................3

*Little v. Liquid Air,*
37 F.3d 1069 (5th Cir. 1994) (en banc) ...............................................2

*L.J. v. Massinga,*
838 F.2d 118 (4th Cir. 1988) .............................................................16

*Marisol A. v. Giuliani,*
    929 F. Supp. 662 (S.D.N.Y. 1996) .................................................................8, 10

*McClendon v. City of Columbia,*
    305 F.3d 314 (5th Cir. 2002) ....................................................................14

*Meador v. Cabinet for Human Res.,*
    902 F.2d 474 (6th Cir. 1990) ....................................................................17

*Nicini v. Morra,*
    212 F.3d 798 (3d Cir. 2000).......................................................................15

*Norfleet v. Arkansas Dep't of Human Servs.,*
    989 F.2d 289 (8th Cir. 1993) ................................................................10, 17

*Olabisiomotosho v. City of Houston,*
    185 F.3d 521 (5th Cir. 1999) ....................................................................14

*Olivia Y. v. Barbour,*
    351 F. Supp. 2d 543 (S.D. Miss. 2004)......................................................4, 14

*Omar v. Lindsey,*
    334 F.3d 1246 (11th Cir. 2003) .................................................................10

*Parham v. Southwestern Bell Tel. Co.,*
    433 F.2d 421 (8th Cir. 1970) ......................................................................3

*Rhyne v. Henderson County,*
    973 F.2d 386 (5th Cir. 1992) ....................................................................14

*Riddle v. Mondragon,*
    83 F.3d 1197 (10th Cir. 1996) .....................................................................9

*Shinn v. College Station Independent School District,*
    96 F.3d 783 (5th Cir. 1996) .......................................................................9

*Smith v. Sullivan,*
    553 F.3d 373 (5th Cir. 1977) ....................................................................22

*Sosna v. Iowa,*
    419 U.S. 393 (1975)...................................................................................3

*Suter v. Artist M.,*
    503 U.S. 347 (1992)...................................................................................16

*Taylor v. Ledbetter,*
 818 F.2d 791 (11th Cir. 1987) ............................................................10, 16

*T.M.* ex rel. *Cox v. Carson,*
 93 F.Supp.2d 1179 (D. Wyo. 2000).............................................................15

*TIG Ins. Co. v. Sedgwick James of Washington,*
 276 F.3d 754 (5th Cir. 2002) ......................................................................2

*Vaughan v. Lacey,*
 49 F.3d 1344 (8th Cir. 1995) ......................................................................9

*Waubanascum v. Shawano Cty.,*
 416 F.3d 658 (7th Cir. 2005) ....................................................................10

*Walton v. Alexander,*
 44 F.3d 1297 (5th Cir. 1995) ....................................................................14

*Wendy H. v. City of Philadelphia,*
 849 F. Supp. 367 (E.D. Pa. 1994) ........................................................15, 18

*White v. Chambliss,*
 112 F.3d 731 (4th Cir. 1997) ....................................................................17

*Winston v. Children & Youth Servs. of Del. Cty.,*
 948 F.2d 1380 (3d Cir. 1991)....................................................................15

*Wyatt v. Aderholt,*
 503 F.2d 1305 (5th Cir. 1974) ..................................................................22

*Youngberg v. Romeo,*
 457 U.S. 307 (1982)............................................................................14, 18

*Yvonne L. v. New Mexico Dep't of Human Servs.,*
 959 F.2d 883 (10th Cir. 1992) ............................................................10, 15

<u>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' REPLY AS TO**</u>
<u>**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**</u>

Defendants do not even attempt to dispute Plaintiffs' Statement of 185 "Uncontested Facts" establishing class-wide violations of Plaintiff children's constitutional rights to reasonable safety and adequate health care while in State custody. *See* Pls' Mot. for Summ. J. on Liability ("Pls' Motion") at ¶¶ 1-185. They cannot. Defendants' own expert report, along with Defendants' documents and deposition testimony, all confirm that Defendants are knowingly operating a child welfare agency that is placing Mississippi foster children at substantial risk of harm because it is inadequately staffed, trained, supervised, and resourced. Defendants thus fail to adduce any disputed material facts as to the Plaintiff class' established substantive due process claim to adequate safety, care, and treatment to defeat summary judgment. Nor do Defendants dispute any of the material facts that establish the Named Plaintiffs' constitutional claims.[1] Summary judgment on liability should enter for Plaintiffs.

**I.    Plaintiffs Are Entitled To Summary Judgment Because Defendants Do Not Contest Plaintiffs' Undisputed Evidence Of Class-Wide Harms**

Plaintiffs have proffered five expert reports based on evidence obtained from Defendants through discovery that establish how the certified class of foster children and the Named Plaintiffs are being harmed by well-known and long-standing deficiencies in Mississippi's foster care system.[2] Plaintiffs' Motion for Summary Judgment proffers 185 uncontested statements of fact derived from these expert reports, Defendants' own expert's report and testimony, and Defendants' documents and testimony. *See* Pls'

---

[1] Based on Defendants' submissions in opposition it is now clear that Defendants do not dispute any of the specific findings made by Drs. Marva Lewis and Wood Hiatt as to the Named Plaintiffs. Plaintiffs' Reply thus includes additional Uncontested Facts as to the Named Plaintiffs taken from these expert reports.
[2] Of the five expert reports submitted by Plaintiffs, Defendants have moved to exclude only the expert report of Dr. Bill Brister, the exclusion of which Plaintiffs separately oppose.

Motion at ¶¶ 1-185. Defendants' response in opposition does not dispute the accuracy of Plaintiffs' "Statement of Uncontested Facts." Defendants only proffer their own "Statement of [five] Facts" that summarizes the types of services that have been provided to the Named Plaintiffs. Defs' Resp. in Opp. to Pls' Mot. for Summ. J. on Liability ("Defs' Resp.") at ¶¶ 4-8. Defendants thus fail to present any competent factual evidence that even addresses Plaintiffs' *class-wide* evidence.[3] This Court should accept and adopt Plaintiffs' statement of undisputed facts. *See Knight v. Sharif*, 875 F.2d 516, 518, 522-23 (5th Cir. 1989) (where non-movant failed to present reasons or factual support for contesting movant's statements of undisputed fact, court accepted and adopted movant's statements of undisputed fact); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (holding that genuine factual controversy requires that both parties submit "evidence of contradictory facts" based on more than unsubstantiated assertions and explaining that "*[w]e do not . . . in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts*").

Defendants' failure to raise a material factual dispute as to Plaintiffs' evidence of class-wide harms in violation of their substantive due process rights to adequate safety and care entitles Plaintiffs to summary judgment on liability. *See TIG Ins. Co. v. Sedgwick James of Washington*, 276 F.3d 754, 759 (5th Cir. 2002) ("the non-movant must come forward with 'specific facts' showing a genuine factual issue for trial") (quoting FED. R. CIV. P. 56(e)). The entitlement to summary judgment would exist even if Defendants had successfully raised factual disputes as to the care provided to the Named

---

[3] The vague, conclusory and factually unsupported statements found in the affidavits submitted by Defendants in support of their Motion for Summary Judgment regarding the care that has allegedly been provided to the Plaintiff class are not competent summary judgment evidence, and are addressed in Plaintiffs' pending Motion to Strike.

Plaintiffs. It is settled law that "the ultimate failure of the plaintiff to establish his individual claim will not bar class action relief." *Huff v. N.D. Cass Co. of Alabama*, 485 F.2d 710, 712 n.4 (5th Cir. 1973) (citing *Parham v. Southwestern Bell Tel. Co.*, 433 F.2d 421 (8th Cir. 1970) (holding that though named plaintiff failed to establish employment discrimination based on race, statistical evidence demonstrated employer's racial discrimination against the class)); *see Sosna v. Iowa*, 419 U.S. 393, 399 (1975) (in a certified class action, "the class of unnamed persons described in the certification acquire[s] a legal status separate from the interest asserted by [the named plaintiff]"). Plaintiffs are entitled to summary judgment on liability in this class action seeking equitable and prospective relief on behalf of the class based on the undisputed class-wide facts.

Defendants' reliance on *Lewis v. Casey*, 515 U.S. 343 (1996), to suggest that summary judgment is not warranted where Plaintiffs rely on class-wide injuries to establish constitutional violations is misplaced. *See* Defs' Resp. at 2; Defs' Mem. of Law in Support of Their Resp. in Opp. to Pls' Mot. for Summ. J. on Liability ("Defs' Mem.") at 12-14. *Lewis* simply restates the established proposition that for the purposes of *standing* an alleged injury to other members of a putative class does not satisfy the requirement that the individual named plaintiff show some personal injury. *Lewis*, 515 U.S. at 357 (two instances of injury sufficed to establish standing but, without more, were not sufficient to warrant system-wide injunction on behalf of prisoners seeking access to courts); *see also Brown v. Protective Life Ins. Co.*, 353 F.3d 405, 407-08 (5th Cir. 2003) (named plaintiff's individual injury for standing purposes in civil RICO action cannot be based on class-wide damages aggregation). Defendants have never challenged the

Named Plaintiffs' standing, which was the issue in *Lewis* and *Brown*, nor did they challenge the adequacy of the Named Plaintiffs as representatives of the class, which has been certified by this Court. *See* Pls' Motion at Ex. 26[4] [Class Cert. Order]. Moreover, as detailed below, Plaintiffs have adduced specific evidence of substantial harm to the Named Plaintiffs that is uncontested.

A.     **Defendants Do Not Dispute Plaintiffs' Evidence Of Class-Wide Abuse In Care And Lack Of Medical, Dental, And Psychological Care, Which Are Harms From Which Defendants Concede Plaintiffs Have A Right To Be Free**

Defendants concede, as they must, that they owe Plaintiff children, who are wards of the State, a constitutional duty to protect them from "harm while in state custody." *See* Defs' Resp. at ¶ 1. Indeed, this Court has recognized that Plaintiff children have a substantive due process right to "safekeeping" and "adequate care and treatment while in state custody." *Olivia Y. v. Barbour*, 351 F. Supp. 2d 543, 555-56 (S.D. Miss. 2004). Defendants thus "do not dispute that Plaintiffs have the constitutionally protected right to reasonably safe living conditions . . . [and] to adequate medical, dental, and psychological care and treatment." *See* Defs' Mem. at 5 n.3.

Plaintiffs' uncontested evidence of Defendants' failure to protect the Plaintiff class from unsafe placements and health care deprivations (*see* Pls' Motion at ¶¶ 30-70, 85-112), which Defendants fail to address in any way, includes the following:

- According to Defendants' own Foster Care Review Program, 3.2% of the 342 foster children reviewed in the first nine months of 2005 had experienced abuse or neglect in foster care during the past year, a rate *more than five times* the standard set by the Federal Government for state child welfare systems. *See* Pls' Motion at ¶ 30 [Ex. 7, FCR Quarterly Regional Comparison Reports at DHS 047115, 063563, 070991]; Ex. 14 [CFSR] at DHS 058965; Ex. 6 [Crabtree Expert Rpt.] at 59-60.

---

[4] Further references to Exhibits are those submitted in support of Plaintiffs' Motion for Summary Judgment unless otherwise noted.

- The expert case record review conducted by Plaintiffs' child welfare expert Dr. Peg Hess found that one in 18 children in foster care (5.7%) had experienced substantiated abuse or neglect while in custody, and that a majority of those children (70%) had been abused or neglected since January 1, 2004. *See* Pls' Motion at ¶ 31 [Ex. 4, Hess Expert Rpt. at Addendum p. 17].

- Dr. Hess found that one in four foster children (24.8%) had some MDHS documentation that they had been abused or neglected in custody or that another foster child had been abused or neglected while living with them, and that even when abuse and neglect was found to have occurred, MDHS left children in the abusive placement the majority of the time. *See* Pls' Motion at ¶¶ 33, 41 [Ex. 4, Hess Expert Rpt. at Addendum pp. 16-17].

- Defendants acknowledge that the caseworkers directly charged with ensuring the safety of foster children carry caseloads that Defendants deem as placing children "BEYOND DANGER!" *See* Pls' Motion at ¶¶ 64-66, 113, 118 [Ex. 12, "BEYOND DANGER!" chart; Ex. 13, Direct Service Clients Chart at DHS 091851-52].

- Defendant DFCS Director Rickie Felder has conceded that Defendants cannot ensure that they are not placing children in abusive foster homes because front-line staff is precluded from determining whether a foster home into which a child is to be placed is the subject of an ongoing abuse or neglect investigation. Felder acknowledged the potential risk related to not being able to discern the safety of foster care placements and conceded that "we need to do a better job" of protecting children in custody from preventable further abuse. *See* Pls' Motion at ¶ 45 [Ex. 28, Felder Dep. Tr. at 205:4-206:5].

- Defendants acknowledge that their "providers have sometimes licensed foster homes or placed foster children in foster homes that have had their licenses revoked by MDHS/DFCS or have otherwise been determined not to be suitable as placements for foster children." *See* Defs' Mem. in Support of Defs' Mot. for Summ. J. at 35.

- According to Defendants' own Foster Care Review Program, for the first quarter of FY 2006, DFCS did not even assess the physical health needs of 9% of foster children, and, for 10% of the foster children for whom "physical health needs were identified," DFCS failed to provide any services to meet those needs. *See* Pls' Motion at ¶ 96 [Ex 7, FCR Quarterly Regional Comparison Reports at DHS 071007].

- Dr. Hess' expert case record review found that a majority of foster children are not being provided with necessary health screening and follow-up care. *See* Pls' Motion at ¶¶ 93-95, 109-110 [Ex. 4, Hess Expert Rpt. at 3-4]. Dr. Hess found that more than 84% of children were not provided a physical exam at the time they entered foster care as required to assess their health needs, and more than 57% of foster children four years and older were not provided a psychological assessment within 90 days as required to assess their mental health needs. *See* Pls' Motion at ¶¶ 93, 109 [Ex. 4, Hess Expert Rpt. at 3]. Further, even when a child's health needs were assessed, Defendants regularly failed to provide the recommended services. *See* Ex. 4 [Hess Expert Rpt.] at 4.

- Defendants acknowledge that caseworkers fail to document relevant medical information concerning foster children, including the medical services that they have been provided. *See* Defs' Mot. for Summ. J. ("Defs' Motion") at Ex. M [Affidavit of Martha McDaniel at ¶ 4]; Defs' Motion at Ex. N [Affidavit of Maggie Mixon at ¶ 3]; Defs' Motion at Ex. W [Affidavit of Terry Phillips at ¶¶ 3-4]; Defs' Motion at Ex. Z [Affidavit of Sylvia Sessions at ¶ 3].
- The expert reports of Drs. Lewis, Hiatt, and Hess establish that Defendants' failure to record and maintain medical information in children's case records and that the resulting inability to convey that information to caretakers and health care providers places children at substantial risk of harm. *See* Ex. 3 [Lewis Expert Rpt.] at 14; Ex. 5 [Hiatt Expert Rpt.] at 14, 28; Ex. 4 [Hess Expert Rpt.] at 19-20 (the failure to maintain a child's accurate and complete medical and psychological record places a child's well-being and safety "in constant jeopardy").

Ignoring this detailed and system-wide evidence of harm to Plaintiff class members, Defendants rely on various affidavits of DFCS managers in which they affirm in vague and conclusory terms that, in their opinion, Defendants are doing the very best they can under the circumstances to keep children safe.[5] These self-serving assertions are entirely devoid of factual support and cannot be competent summary judgment evidence, as Defendants themselves recognize. *See* Defs' Mem. at 14 n.6 (citing *de la O v. Housing Authority of City of El Paso*, 417 F.3d 495 (5th Cir. 2005); *Forsyth v. Barr*, 19 F.3d 1527 (5th Cir. 1994)). Plaintiffs, by separate motion, have moved to strike such conclusory statements as inadmissible and immaterial for summary judgment purposes.

Nor does Defendants' expert raise any dispute of material fact as to the Plaintiff class' conditions of safety or care. There is no indication in Dr. Steib's expert report or

---

[5] *See* Defs' Mem. at 16-19; Defs' Motion at Ex. M [Affidavit of Martha McDaniel at ¶ 4 ("MDHS has done all it reasonably can to ensure the safety of foster children")]; Defs' Motion at Ex. N [Affidavit of Maggie Mixon at ¶ 3 ("Given the number workers [*sic*] and available resources, MDHS has done what it reasonably can to keep children safe.")]; Defs' Motion at Ex. W [Affidavit of Terry Phillips at ¶ 5 ("MDHS has done all it reasonably can to see that foster children are protected from harm")]; Defs' Motion at Ex. X [Affidavit of Tracy Malone at ¶ 3 ("Our direct service workers have done all they reasonably can to keep foster children safe and away from harm")]; Defs' Motion at Ex. Y [Affidavit of John Webb O'Bryant at ¶ 3 ("MDHS has done what it reasonably can to see that foster children are protected from harm")]; Defs' Motion at Ex. Z [Affidavit of Sylvia Sessions at ¶ 4 ("MDHS has done all it reasonably can to ensure the safety of foster children in its care")]; Defs' Motion at Ex. AA [Affidavit of Mechille Henry at ¶ 3 ("Our workers have done all they reasonably can to keep our foster children free from harm")]; Defs' Motion at Ex. BB [Affidavit of Zadie Rogers at ¶ 4 ("MDHS has done all it reasonably can to protect the foster children in its care from harm and is not indifferent to the children's needs")].

elsewhere that she reviewed any documents or data related to child safety. According to Dr. Steib herself, Defendants did not give her the data necessary for her to assess whether MDHS provides children in its custody with adequate health care. *See* Defs' Motion at Ex. OO [Steib Dep. Tr. at 185:8-11]. Moreover, that "Defendants and the State of Mississippi have expended enormous amounts of money on all foster children in State custody" (*see* Defs' Mem. at 20), in no way challenges Plaintiffs' evidence that a significant proportion of the Plaintiff class is not being provided health care.

### B. Defendants Do Not Dispute Plaintiffs' Evidence Of Class-Wide Psychological Harm Caused By Multiple, Avoidable Moves And Inappropriate Placements, Which Is Also Actionable

Defendants do not dispute Plaintiffs' evidence that the Plaintiff class is being subjected to psychological harm from multiple, avoidable moves and inappropriate placements. Instead, Defendants argue that their constitutional duty of care does not extend to protecting Plaintiff children from harm that is "emotional," "developmental," or "psychological." *See* Defs' Mem. at 7-8. The Fifth Circuit, however, has unequivocally recognized the constitutional right to mental health care for prisoners, expressly noting that "it is important to remember that mental health needs are no less serious than physical needs." *Gates v. Cook*, 376 F.3d 323, 343 (2004) (citations omitted); *see generally Carey v. Piphus*, 435 U.S. 247, 264 (1978) (mental and emotional distress compensable under Section 1983). As recognized by this Court and many others, the protection of a foster child's "general well-being" has been recognized to extend to the child's mental health, including the child's emotional and psychological well-being. *See* Ex. 26 [Class Cert. Order] at 6 (finding that "whether defendants have failed to provide children in foster care with required services necessary to keep them safe and *prevent*

*them from deteriorating* physically, *psychologically or otherwise* while in custody" is a question of fact common to class members' substantive due process claim) (emphasis added).[6]   Indeed, it would be a perverse outcome if foster children, who are in their critical years of mental development, were not provided at least the minimum constitutional protections of their mental health as provided to inmates.[7]

Defendants' reliance on *Griffith v. Johnston*, 899 F.2d 1427 (5th Cir. 1990), for the opposite proposition (*see* Defs' Mem. at 7) is misplaced as the child plaintiffs in that case were asserting liberty interests to post-adoptive services *after* their discharge from state custody. Not only did the former foster children in *Griffith* no longer have a special relationship with the state once adopted (as they were no longer wards of the state), their articulated right to have their "personal psychological development" *maximized* is not what is being sought by the Plaintiffs here. Unlike *Griffith*, this case is brought by custodial plaintiffs with an established special relationship with Defendants who seek to be protected from harm to their psychological, as well as physical, health.[8]   Equally

---

[6] *See K.H. v. Morgan*, 914 F.2d 846, 848 (7th Cir. 1990) ("The extension [of substantive due process] to [this foster care] case in which the plaintiff's mental health is seriously impaired by deliberate and unjustified state action is straightforward."); *Danielle v. Adriazola*, 284 F. Supp. 2d 1368, 1377 (S.D. Fla. 2003) ("[T]he Plaintiff's claim here is not merely that her care was not optimal, but rather that the Defendants failed to uphold their duty of providing that degree of reasonable safety guaranteed by the Fourteenth Amendment when they allowed abuse and Plaintiff's psychological decline to continue even after they had actual knowledge of it."); *Marisol A. v. Giuliani*, 929 F. Supp. 662, 675 (S.D.N.Y. 1996) ("[C]ustodial plaintiffs have a substantive due process right to be free from unreasonable and unnecessary intrusions into their emotional well-being."); *LaShawn A. v. Dixon*, 762 F. Supp. 959, 993 (D.D.C. 1991) ("[substantive due process] right extends to safety from psychological and emotional harm"); *Doe v. New York City Dep't of Soc. Servs.*, 670 F. Supp. 1145, 1175-77 (S.D.N.Y. 1987) (foster child's right to be free from psychological deterioration).

[7] *See B.H. v. Johnson*, 715 F. Supp. 1387, 1395 (N.D. Ill. 1998)("A child's physical and emotional well-being are equally important . . . . their exposure to traumatic experiences can have an indelible effect upon their emotional and psychological development and cause more lasting damage than many strictly physical injuries"); *Doe*, 670 F. Supp. at 1175 ("Children are by their nature in a developmental phase of their lives. If they do not move forward, they move backward. Positive efforts are necessary to prevent stagnation, which, for children, is synonymous with deterioration.").

[8] To the extent that *Del A v. Roemer*, 777 F. Supp. 1297, 1319 (E.D. La. 1991), fails to recognize foster childrens' right to be protected from psychological injury, it is of no precedential value because it relies upon the Fifth Circuit's *Griffith* opinion, which, as noted, did not involve children in state custody, and

inapposite is *Shinn ex rel. Shinn v. College Station Independent School District* (*see* Defs' Mem. at 7), as it also involved children without a claim to a special relationship with the government defendant. *Shinn*, 96 F.3d 783 (5th Cir. 1996) (per curiam) (non-custodial students sought to have recognized such frivolous liberty interests as playing instruments other than the B-flat clarinet in the school band, and being provided with information about a marching band competition).[9]

Defendants' further suggestion that six Circuits have limited their recognition of the constitutional right to protection from harm to physical or sexual abuse is simply wrong. *See* Defs' Mem. at 8. None of the decisions cited by Defendants affirmatively state any such limit. Moreover, all of those Circuits have specifically recognized the types of constitutional harms Plaintiffs assert here.[10]

Defendants further erroneously argue that Plaintiffs assert a constitutionally protected right to "appropriate," or "least restrictive, optimal, best, or stable" placements. *See* Defs' Mem. at 5-6. What Plaintiffs seek is no more than to be free from the substantial harms that result from inappropriate placements that do not meet their

---

because it was decided before *Gates v. Cook*, in which the Fifth Circuit made clear that the constitutional obligations that arise from a state's special relationship include the duty to safeguard a custodial plaintiff's mental health.

[9] Moreover, *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985), "cannot properly be made to stand for a broad rule that there is no constitutional right to be free from emotional distress." *Shinn*, 96 F.3d at 787 (Dennis, J., concurring).

[10] *See, e.g., Langley v. Coughlin*, 888 F.2d 252, 254 (2d Cir. 1989) ("[F]rom the legal standpoint psychiatric or mental health care is an integral part of medical care. It thus falls within the requirement of *Estelle v. Gamble* that it must be provided to prisoners.") (citation omitted); *A.M. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 575-77, 583-85 & n.3 (3d Cir. 2004) (holding that substantive due process rights of juvenile detainees include the right to be protected from emotional and psychological harm); *Inmates of the Allegheny County Jail v. Pierce*, 612 F.2d 754, 763 (3d Cir. 1979) (recognizing right to adequate psychological or psychiatric care in jails and prisons); *Clark-Murphy v. Foreback*, 439 F.3d 280, 286-87 (6th Cir. 2006) (deprivation of psychological services to prisoners violates constitution); *Vaughan v. Lacey*, 49 F.3d 1344, 1346 (8th Cir. 1995) (prison staff members violate Constitution if they are deliberately indifferent to inmate's serious mental health needs); *Riddle v. Mondragon*, 83 F.3d 1197, 1202 (10th Cir. 1996) (states have constitutional duty to provide necessary psychological or psychiatric care to inmates); *Greason v. Kemp*, 891 F.2d 829, 833-34 & n.9 (11th Cir. 1990) (providing inmate with inadequate psychiatric care violates Constitution).

documented needs for care and treatment, and from the psychological injury caused by multiple, unnecessary, and traumatic moves.[11]  Plaintiffs' unrebutted experts establish that such failures do in fact cause medically cognizable psychological harm.  *See* Ex. 5 [Hiatt Report] at 28; Ex. 4 [Hess Report] at 16, 30, 64-65; Ex. 3 [Lewis Report] at 86-87, 116-117.  The substantial harm alleged and documented by Plaintiffs as a result of Defendants' lack of reasonable placement practices falls within the ambit of substantive due process protections.[12]

Defendants' reliance on *Drummond v. Fulton County Department of Family & Children's Services*, 563 F.2d 1200, 1209 (5th Cir. 1977), (*see* Defs' Mem. at 6), is misplaced as the plaintiff there asserted a procedural due process right to a hearing *prior* to any move from one foster placement to another, whereas Plaintiffs in this case seek protection from the avoidable harms caused by Defendants' unreasonable and unprofessional placement practices.  Not only is it well established that the constitutional inquiry for determining what liberty interests are protected by substantive due process is different than that for procedural due process,[13] but the Fifth Circuit in *Drummond* made

---

[11] Foster children have a right to reasonably safe placements in which they will not be harmed. *See, e.g., Waubanascum v. Shawano Cty.*, 416 F.3d 658, 665 (7th Cir. 2005); *Omar v. Lindsey*, 334 F.3d 1246, 1248 (11th Cir. 2003); *Norfleet v. Arkansas Dep't of Human Servs.*, 989 F.2d 289, 293 (8th Cir. 1993); *Yvonne L. v. New Mexico Dep't of Human Servs.*, 959 F.2d 883, 892-93 (10th Cir. 1992); *K.H.*, 914 F.2d at 849, 851; *Taylor v. Ledbetter*, 818 F.2d 791, 795 (11th Cir. 1987) (en banc); *Marisol A. v. Giuliani*, 929 F. Supp. 662, 675-77 (S.D.N.Y. 1996); *Eric L. v. Bird*, 848 F. Supp. 303, 307 (D.N.H. 1994).

[12] *See LaShawn A.*, 762 F. Supp. at 993 ("To the extent that certain services, such as appropriate placements . . . , are essential to preventing harm to the children in the District's custody, this Court holds that the children have a constitutional liberty interest in those services."); *K.H.*, 914 F.2d at 850 ("If . . . the defendants must have known they were placing [plaintiff] in a sequence of foster homes that would be destructive of her mental health, the ingredients of a valid constitutional claim are present."); *Doe*, 670 F. Supp. at 1175 ("The overnight system's inherent instability as well as its inevitable lack of any coordinated supervision of basic need or support has resulted in physical, emotional, and psychological harm to the children exposed to it.").

[13] *See, e.g., Frazier v. Harrison ISD*, 980 F.2d 1514, 1528 (5th Cir. 1993) ("Due process has two major meanings: first, substantive due process may require courts to void certain types of government action that infringe on individual rights and individual freedom of action; second, procedural due process may require government to assure that individuals are afforded certain procedures before they are deprived of life, liberty, or property.") (citations omitted).

clear that its holding was limited to the narrow facts presented. *Drummond*, 563 F.2d at 1208 ("This decision by its facts is necessarily applicable only to an infant of tender years placed in a foster home for the length of time and under the circumstances here involved."). Nor does *E.F. v. Scafidi*, No. 3:91CV591, slip op. at 19 (S.D. Miss. Mar. 13, 1996) (attached as Ex. J to Defs' Motion), control the instant case, because in that case the plaintiffs failed to support their allegations with any material facts regarding any resulting harm.

Plaintiffs' uncontested evidence of Defendants' harmful placement practices (*see* Pls' Motion at ¶¶ 71-84), which Defendants fail to dispute in any way, includes the following:

- Plaintiffs' experts establish that children are harmed by repeated, unnecessary, and unexplained moves from placement to placement. *See* Ex. 3 [Lewis Report] at 9, 11; Ex. 42 [Hiatt Dep.] at 95:21-96:25; Ex. 5 [Hiatt Report] at 28-29.
- As Defendants' policy manual confirms, "[a] foster child who moves many times, or who constantly fears that he/she may have to move, can suffer devastating effects on his/her emotional health." *See* Ex. 20 [MDHS Policy] at DHS 00405.
- According to Defendants' own Foster Care Review Program, of 81 children whose cases were reviewed in the first quarter of FY 2006, 43% changed placements during the review period, with a majority of those being moved two or more times. Of those children who were moved during the review period, DFCS acknowledges that for 26% none of their moves were related to helping the child achieve his or her case plan goal. *See* Ex. 7 [FCR Quarterly Regional Comparison Reports] at DHS 070992-070993.
- According to Dr. Hess's expert case record review, 82.7% of foster children experienced from at least one to up to 57 placement moves. More than 10% of foster children experienced 10 or more moves. *See* Pls' Motion at ¶ 72 [Ex. 4, Hess Report] at 2, 26-27.
- Plaintiffs' experts establish, and Defendants concede, that institutionalizing foster children absent a therapeutic need subjects them to a risk of harm. *See* Ex. 3 [Lewis Report] at 11 (discussing harms associated with institutionalizing children, especially infants); Pls' Motion at ¶ 81 [Ex. 35, Mangold Dep. Tr. 8/25/04 at 84:19-85:4] (acknowledgment by former DFCS Director Billy Mangold that placing children in institutions without therapeutic justification can be harmful); Ex. 27 [Steib Dep. Tr.] at 106:3-107:3 (acknowledging child welfare research that has concluded that unnecessary institutionalization of children is harmful); Pls'

Opp. to Defs' Mot. for Summ. J. at Ex. 4 [Stewart Dep. Tr. at 87:7-9] (agreeing that "unnecessary institutionalization of children can be harmful").

- Defendants' own expert found that a high number of foster children are placed in institutional settings: approximately 25% of all foster children are placed in a group environment. *See* Ex. 1 [Steib Report] at 6.

- Dr. Hess found that close to 64% of children had been placed at least once in an emergency shelter or emergency foster home. *See* Pls' Motion at ¶ 84 [Ex. 4, Hess Report at 2].

- Defendants' own data from May 2005 reflects that 18% of the foster children in an emergency shelter were four years old or younger, despite MDHS policy that young children and infants should be placed in foster homes. *See* Pls' Mem. of Law in Support of Their Mot. For Summ. J. on Liability ("Pls' Mem.") at 12 [Ex. 24, Shelter Care Chart]; Pls' Opp. to Defs' Mot. for Summ. J. at Ex. 5 [MDHS Policy at DHS 00370].

**C.    Defendants Do Not Dispute Plaintiffs' Evidence That The Plaintiff Class Is Put At Substantial Risk By Defendants' Failure To Train And Supervise Their Staff, Which Is Also Actionable**

Defendants do not dispute Plaintiffs' evidence that the Plaintiff class is being subjected to a substantial risk of harm by Defendants' failure to train and supervise their staff. *See* Pls' Motion at ¶¶ 69-70, 149-185. Instead, Defendants argue that their alleged failure to train and supervise their staff is not constitutionally actionable, without citing any authority in support. *See* Defs' Mem. at 8-9. Defendants' attempt to distinguish the many cases establishing a constitutional duty to train and supervise staff to avoid violating the constitutional rights of custodial wards is unpersuasive.[14] *See also, Canton v. Harris*, 489 U.S. 378, 387-92 & n.8 (1989) (recognizing failure to train police can be basis for § 1983 municipal liability in case involving denial of due process right to medical care while in detention); *Gates v. Collier*, 501 F.2d 1291, 1306-10 (5th Cir. 1974) (finding that use of untrained inmates who possessed disciplinary power and were

---

[14] While Plaintiffs agree that the type of suit at issue has affected the appropriate constitutional liability standard in some cases, the distinctions Defendants rely on do not affect Plaintiff children's entitlement in this injunctive case to the most generous scope of constitutionally protected rights.

not supervised by civilian guards contributed to constitutionally inadequate protection of inmates).

Moreover, Plaintiffs' unrebutted social work experts establish that such failures to train and supervise do, in fact, place children at grave risk of harm. *See* Ex. 6 [Crabtree Report] at 2, 16-19 ("MDHS's routine placement of inexperienced, untrained and inadequately supervised workers on the 'front lines' places the children ostensibly in these workers' care at significant ongoing risk of abuse, neglect and even death"); Ex. 4 [Hess Report] at 50-53, 65-66, 147-149 ("case notes also documented serious errors made by MDHS staff whose lack of knowledge regarding indicators of child abuse and neglect and of agency policy regarding child abuse reporting placed children at serious risk").

Defendants' expert agrees. *See* Pls' Motion at ¶¶ 69-70, 149 [Ex. 27, Steib Dep. Tr. at 109:22-110:3] (Defendants' lack of caseworker training can "contribute to children being at risk" while in Defendants' custody); Ex. 1 [Steib Expert Rpt.] at 29 ("Casework supervisors are the lynchpins of front line practice.").

### D.    Plaintiffs Are Entitled To Summary Judgment Regardless Of The Culpability Standard Applied To This Equitable Foster Care Case

Defendants incorrectly contend that the "deliberate indifference" standard applicable to prisoners' Eighth Amendment claims[15] and to claims made on behalf of non-custodial plaintiffs[16] applies to Plaintiff foster children's substantive due process

---

[15] *See* Defs' Mem. at 9-12. *See, e.g., Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (deliberate indifference to safety of prisoners constitutes cruel and unusual punishment); *Rhyne v. Henderson County*, 973 F.2d 386 (5th Cir. 1992) (due process pretrial detainee case); *Olabisiomotosho v. City of Houston*, 185 F.3d 521 (5th Cir. 1999) (pretrial detainee); *Lenard v. Argenta*, 699 F.2d 874 (7th Cir. 1983) (due process police custody case).

[16] *See* Defs' Mem. at 9-12. *See, e.g., County of Sacramento v. Lewis*, 523 U.S. 833 (1998) (non-custodial bystander victim of police chase); *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443 (5th Cir. 1994) (schoolchild's substantive due process right to be free from sexual abuse by teacher); *McClendon v. City of Columbia*, 305 F.3d 314 (5th Cir. 2002) (non-custodial victim of shooting by police informant); *Atteberry*

claims.  However, Plaintiff foster children have a "special relationship" with Defendants because, as State wards through no choice or fault of their own, they are entirely dependent upon the State for their well-being.  As such, they are deserving of greater constitutional protection than is afforded to either members of the general public or imprisoned criminals.  *See Olivia Y. v. Barbour*, 351 F. Supp. 2d at 556 n.8 ("[T]he rights of a person in the civil custody of the state are greater than the rights of a person in the state's criminal custody.") (quoting *LaShawn A.*, 762 F. Supp. at 996).

The Supreme Court has expressly recognized that the "professional judgment" standard, as opposed to the "deliberate indifference" standard, applies in non-penal custodial ("special relationship") cases asserting substantive due process violations under the Fourteenth Amendment.  *Youngberg v. Romeo*, 457 U.S. 307, 321-23 (1982) (civilly committed wards of state who are "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish" can establish liability "when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.").[17]

The United States Courts of Appeals for the Third, Seventh, and Tenth Circuits have adopted the *Youngberg* "professional judgment" standard in the foster care setting.

---

v. *Nocona Gen. Hosp.*, 430 F.3d 245 (5th Cir. 2005) (non-custodial hospital patients); *Walton v. Alexander*, 44 F.3d 1297 (5th Cir. 1995) (non-custodial student).

[17] The "professional judgment" standard was recently articulated as follows in the context of a §1983 action brought by foster children: "The State, as the custodian and caretaker of these children, is therefore liable for the harm allegedly caused by a violation of a foster child's substantive due process right to be free from unreasonable risk of harm and to reasonable safety only when his or her care, treatment, and services 'substantially depart from accepted professional judgment, standards or practice.'" *Braam v. State*, 81 P.3d 851, 859-60 (Wash. 2003).

*Winston v. Children & Youth Servs. of Delaware County*, 948 F.2d 1380 (3d Cir. 1991);[18] *K.H. v. Morgan*, 914 F.2d 846 (7th Cir. 1990); *Yvonne L. v. N.M. Dep't. of Human Servs.*, 959 F.2d 883, 894 (10th Cir. 1992).[19]  Defendants, meanwhile, do not cite to a single precedent anywhere in the country that applies the "deliberate indifference" standard in the non-penal custodial context in a case such as this one seeking prospective injunctive relief.

Defendants' reliance on *Hernandez v. Texas Department of Protective and Regulatory Services*, 380 F.3d 872 (5th Cir. 2004), for the appropriate liability standard is misplaced.  In that suit for damages brought on behalf of a deceased foster child, the Fifth Circuit applied a "deliberate indifference" standard in determining whether state employees sued in their individual capacities were entitled to qualified immunity.  Plaintiffs in the case at bar, however, present an institutional reform action seeking injunctive relief from state Defendants in their official capacities.  Such equitable relief is prospective in nature and serves to force state compliance with constitutional requirements without exacting a financial penalty.  In equitable cases, the culpability standard can be calibrated to achieve a favored policy goal, such as constitutional compliance by the state, without the potential social cost of exposing state actors to financial liability, which might deter individuals from pursuing government employment or chill their professional conduct.  Qualified immunity for state actors sued in their

---

[18] *Nicini v. Morra*, 212 F.3d 798, 811 n.9 (3d Cir. 2000), cited by Defendants, applied the "deliberate indifference" standard only after the parties declined the court's express invitation to consider the "professional judgment" standard.

[19] *See also LaShawn A.*, 762 F. Supp. at 996 (applying the "professional judgment" standard at trial in the foster care context); *Wendy H. v. City of Philadelphia*, 849 F.Supp. 367, 372 (E.D.Pa. 1994) (adopting the "professional judgment" standard in the foster care context); *T.M. v. Carson*, 93 F.Supp.2d 1179, 1187 (D. Wyo. 2000) (applying the "professional judgment" standard on summary judgment in the foster care context).

individual capacities for money damages is premised on this very rationale.[20]   *See Hernandez*, 380 F.3d at 879 ("The doctrine of qualified immunity seeks to strike a balance between competing social objectives, providing breathing space for the vigorous exercise of official authority, while at the same time allowing a possibility of redress for victims of officials' abuses."); *see also L.J. v. Massinga*, 838 F.2d 118, 121 (4th Cir. 1988) ("The element of deliberate indifference may be a substantial factor in the aspect of this case which seeks monetary recovery, but it is of little moment with regard to injunctive relief *in futuro* if plaintiffs can prove that defendants are not acting lawfully."), *abrogated on other grounds by Suter v. Artist M.*, 503 U.S. 347 (1992).

The additional "deliberate indifference" foster care cases cited by Defendants are similarly inapposite, as they are all individual damages actions that did not pursue a "professional judgment" standard.  *See Taylor v. Ledbetter,* 818 F.2d 791, 793 (11th Cir. 1987) (damages cause of action pursued only upon the "deliberate indifference" standard enunciated in *Estelle v. Gamble*, 429 U.S. 97 (1976) and *Doe v. New York City Dep't. of Soc. Servs.*, 649 F.2d 134 (2d Cir. 1981);[21] *White v. Chambliss*, 112 F.3d 731 (4th Cir. 1997) (same);[22] *Norfleet v. Arkansas Dept. of Human Servs.*, 989 F.2d 289, 291 (8th Cir.

---

[20] A recent Washington Supreme Court decision, *Braam v. State*, 81 P.3d 851 (Wash. 2003), underscores this very point.  In *Braam*, the Court applied the "professional judgment" standard to a foster care class action seeking injunctive relief, noting:

> First, the federal cases that have applied the "deliberate indifference" standard to the substantive due process rights of foster children have been in the context of the limited question of whether individual state actors were entitled to qualified immunity in a 42 U.S.C. §1983 suit [for damages].  Whether and when qualified immunity is available to state actors triggers a consideration of issues not before us.

*Id.*.at 858-59.
[21] Note that *Doe* was decided one year before *Youngberg*.
[22] *White v. Chambliss* is not instructive both because it is a qualified immunity decision in a damages action and because the Fourth Circuit erroneously held that state foster care officials did not have a clearly established duty to protect children in foster care.  *See White*, 112 F.3d at 737-38.

1993) (same); *Meador v. Cabinet for Human Res.*, 902 F.3d 474, 476 (6th Cir. 1990) (same).

As this is a suit sounding in equity on behalf of foster children who "have done society no wrong and [who] deserve no punishment," *LaShawn A.*, 762 F. Supp. at 996, in which the only relief sought is to deter future unconstitutional conduct, the Supreme Court's "professional judgment" standard is appropriate.

### 1. Defendants Do Not Dispute Plaintiffs' Evidence That Defendants Substantially Depart From Professional Standards Causing Plaintiff Children Harm

Defendants do not dispute Plaintiffs' uncontested evidence that Defendants place the Plaintiff class at substantial risk of harm by their substantial departures from applicable professional standards. Nor do they dispute what the applicable professional standards are. Instead, Defendants mischaracterize Plaintiffs' claim as being that the violation of professional standards is itself the injury claimed, and appear to argue that professional standards, including federal laws and regulations, agency policy, and generally accepted child welfare practice standards, are not even probative as to what is constitutionally adequate care. *See* Defs' Mem. at 14-16 & n.7 ("By holding that the AACWA does not confer individual rights on Plaintiffs, this court has barred Plaintiffs from using deviations from the standards outlined in the AACWA and the CFSR process as proof of constitutional violations.").

In their attempt to reframe Plaintiffs' constitutional claim as merely a claim that professional standards have been violated, Defendants studiously ignore the overwhelming evidence of actual constitutionally cognizable injury to Plaintiff children discussed above as to the class and below as to Named Plaintiffs. Moreover, Defendants'

claim that undisputed professional standards are *irrelevant* to the constitutional inquiry is unsupported by even Defendants' cited case law. *See Frazar v. Gilbert*, 300 F.3d 530, 538 (5th Cir. 2002) (stating the well-established proposition that "[p]roof of a violation of a federal statute, *by itself*, does not entitle a plaintiff to relief under §1983") (emphasis added), *rev'd sub nom. on other grounds*, *Frew* ex rel. *Frew v. Hawkins*, 540 U.S. 431 (2004). The Supreme Court, of course, has made the applicable professional standards central to the constitutional inquiry. *See Youngberg*, 457 U.S. at 321-23 (substantive due process liability is established "when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment"); *see also Wendy H. v. City of Philadelphia*, 849 F. Supp. 367, 374-75 & n.2 (E.D. Pa. 1994) ("It is not too much to ask that the state honor its obligation to monitor the current *status and needs of children dependent upon its care mandated within the parameters of its own regulations.*").

      **2.**      **Defendants Do Not Dispute Plaintiffs' Evidence That Defendants Have Knowingly Failed To Remedy Their Substantial Departure From Professional Standards In Deliberate Indifference To The Ongoing Substantial Risk Of Harm To Plaintiff Children**

Even assuming, *arguendo*, that the Court elects to examine the evidentiary record under the "deliberate indifference" standard, Plaintiffs are entitled to summary judgment. The following three-prong test has been articulated by the Fifth Circuit for "deliberate indifference" personal liability:

     (1)     the defendant learned of facts or a pattern of [facts] pointing plainly toward the conclusion that [the plaintiff's constitutional rights were being violated]; and

(2)     the defendant demonstrated deliberate indifference toward the constitutional rights of the [plaintiff] by failing to take action that was obviously necessary to prevent or stop the [constitutional deprivation]; and

(3)     such failure caused a constitutional injury to the [plaintiff].

*Doe v. Taylor Indep. Sch. Dist.,* 15 F.3d 443, 454 (5th Cir. 1994) (affirming denial of state defendant's summary judgment motion, holding that plaintiff "adduced clear summary judgment evidence [*i.e.* apathy and the failure to act] of deliberate indifference"). In applying the "deliberate indifference" standard, a court "'may infer the existence of [defendant's] subjective state of mind from the fact that *the risk of harm is obvious*.'" *Hernandez*, 380 F.3d at 881 (emphasis in original) (quoting *Hope v. Pelzer*, 536 U.S. 730, 738 (2002)).

Defendants do not dispute Plaintiffs' uncontested evidence that Defendants have knowingly left the Plaintiff class at substantial risk of harm in violation of their constitutional rights by failing to take necessary action to remedy Defendants' substantial departures from applicable professional standards, including the following:

- In a May 10, 1999 letter responding to a 1999 PEER report, Defendant Don Taylor acknowledged that "the Division has been dangerously under funded and under staffed for many years," and that "our employees [have] been struggling to stay on top of their mandated responsibilities." *See* Pls' Motion at ¶ 60 [Ex. 17 at DHS 068728, 068743].

- In May 2002, then-DFCS Director Sue Perry informed then-Governor Ronnie Musgrove by letter that: "[T]he vast majority of staff are responsible for caseloads two, three, four, five and even six to seven times the federally recognized standard of 12 to 15 cases. This scenario places the children of this state at higher risk and the state in a potentially libelous position – should a child die or be seriously injured in a case that was not investigated, or on an open case that a worker did not have the time to properly monitor. I am sorry to inform you that this has already happened . . . ." The "loss of funding [and] loss of positions," she wrote, had "result[ed] in a loss of children's lives." *See* Pls' Motion at ¶ 52 [Ex. 16, Perry letter at P 000153-55].

- The federal May 2004 Mississippi Child and Family Services Review Final Report ("CFSR") established that the State of Mississippi did not achieve substantial conformity with any of the seven child welfare outcomes assessed for child safety, permanency, and well-being, nor with the systemic factors of Statewide Information System, Case Review System, Quality Assurance System, Training, and Service Array. *See* Pls' Motion at ¶¶ 34-35 [Ex. 14, CFSR at 058951, 058953-54]. "Although social worker contacts with children in foster care are a primary means of assuring that health and safety standards are met," in 16% of the foster care cases reviewed Defendants had not visited children once a month. For 20% of foster children, federal "reviewers determined that social worker visits with children were not of sufficient frequency and/or quality to ensure children's safety and attainment of case goals." *See* Pls' Motion at ¶ 57 [Ex. 14, CFSR at DHS 059034, 059017-8].
- Defendants have characterized caseloads levels of 31 to 39 as "DANGER!" and those of 40 or higher as "BEYOND DANGER!" In October 2004, Defendants' "Workload Information" chart revealed that all nine regions were averaging caseloads above the "DANGER! 31 Cases Per Worker" level, and that five of the nine regions were averaging caseloads at the "BEYOND DANGER! 40 Cases per Worker" level. *See* Pls' Motion at ¶¶ 64, 66 [Ex. 12, "BEYOND DANGER!" Chart].
- The then-DFCS Director Billy Mangold noted in June 2004, as to the counties with caseloads at the "DANGER!" level and above: "There is grave concern for these counties—children in these counties are placed at risk. Their lives depend on our ability to provide staff resources to investigate and access dangerous situations. Our staff are [sic] totally overwhelmed and we are losing more staff every day! . . . The danger/risk level to our children increases dramatically as the caseloads continue to increase and our staffing level stays the same or decreases." *See* Pls' Motion at ¶ 67 [Ex. 9, DFCS FY 06 Budget Request at DHS 030746].
- Defendants own expert recently confirmed that "DFCS is under-staffed at all levels. Many caseworkers carry workloads which are at least double the average number they can manage based on the workload analysis conducted in this review. Many supervisors also carry cases and have administrative duties in addition to providing supervision for caseworkers. Administrative and management staff are [*sic*] inadequate to provide the support needed by those responsible for service delivery." *See* Pls' Motion at ¶ 122 [Ex. 1, Steib Expert Rpt. at i-ii].

In light of the magnitude of the known systemic deficiencies at DFCS and the acknowledged grave risk of further harm to Plaintiff children, Defendants' vague promises "to identify challenges and to develop strategies to improve the services and outcomes for children in DFCS custody" ring hollow and do not insulate them from a

20

finding of liability as they suggest. Defendants point, for example, to their participation in a recently established Commission on Children's Justice. *See* Defs' Mem. at 24-25 [Ex. LLL]. While laudable, not only is the role of the Commission limited to yet another assessment and set of recommendations, but any related reform actions that might result will not even be initiated until after the Commissions' report is due in November 2006. *See* Defs' Mem. at 24. Defendants do not point to any immediate or concrete actions to protect children from the substantial ongoing harms Defendants have been aware of for years, including high abuse in care rates and the failure to provide basic medical care to Plaintiff class members.

Moreover, as Defendant Taylor expressly confirmed in his recent deposition testimony, Defendants have made *no* commitment to pursue even the limited remedial initiatives and funding discussed in the recent Felder Draft Plan. *See* Ex. 38 [Taylor Dep.] at 194:12-23. Even with the recent addition of FY 2007 funding for 59 previously abolished positions, 38 previously unfunded vacant positions, and 12 new positions, DFCS staffing is still 97 positions down from where it was at the beginning of 2004. *See* Defs' Mem. at 23-24; Defs' Motion at Ex. CCC [Draft Plan at DHS 115422] (109 DFCS positions were abolished in June 2004; 59 positions were abolished in June 2005). Defendants' own expert testified that this limited effort will not adequately address the serious staffing deficiencies that she documented as one of her "Major Findings." *See* Ex. 27 [Steib Dep.] at 138:12-20.

3.   **Defendants Cannot Justify Their Lack Of Reasonable Action To Abate Known Constitutional Violations On Lack Of Funding**

Defendants' attempt to justify their lack of reasonable action on lack of funding is unavailing.  *See* Defs' Mem. at 22-23, n.17.  It has long been established in this Circuit that "[s]hortage of funds is not a justification for continuing to deny citizens their constitutional rights."  *Gates v. Collier*, 501 F.2d 1291, 1320 (5th Cir. 1974); *see Smith v. Sullivan*, 553 F.2d 373, 378 (5th Cir. 1977); *see also Wyatt v. Aderholt*, 503 F.2d 1305, 1315 (5th Cir. 1974) ("[S]tate may not fail to provide treatment for budgetary reasons alone.  Humane considerations and constitutional requirements are not, in this day, to be measured or limited by dollar considerations.") (internal citation and quotation marks omitted).

Indeed, as the Fifth Circuit has affirmed, "deliberate indifference" may be based upon findings of inadequate funding.  *See Alberti v. Sheriff of Harris County,* 600 F.Supp. 443, 463 (S.D. Tex. 1984), *remanded,* 937 F.2d 984, 999-1000 (5th Cir. 1991) ("*Alberti I*") (citing cases), *aff'd after remand by Alberti v. Sheriff of Harris County,* 978 F.2d 893 (5th Cir. 1992) ("*Alberti II*") (affirming district court's finding of deliberate indifference); *see also Langford v. City of Atlantic City,* 235 F.3d 845, 849 (3d Cir. 2000) (holding, in accord with numerous other Circuits, that "absolute immunity is not available to a municipality under section 1983, even in a budgetary context").  As the district court in *Alberti* expressly held:

> [P]rotestations from the defendants that they do not have enough money to fund the Court-ordered staffing increases, or that the county has not budgeted for the additional staff this year or that they do not have the authority to expend funds for additional staffing are factually unpersuasive in view of  the inordinate period of time which has passed in remedying staffing deficiencies and are legally unsupportable. *That the defendants'*

> *inadequate staffing levels are caused by inadequate funding by the county or lack of authority over funds is no defense to the maintenance of conditions which violate the Constitution.*

*Alberti*, 600 F. Supp. at 463 (emphasis added); *see also Alberti II*, 978 F.2d at 895. Defendants' putative funding defense fails as matter of law.

## II.    Defendants Do Not Contest Plaintiffs' Undisputed Evidence Of Harm To The Named Plaintiffs

To illustrate the very real and substantial harms Plaintiff class members are at risk of every day, Plaintiffs proffered specific and detailed evidence of the significant harms suffered by Named Plaintiffs, as documented in their MDHS case records reviewed by Dr. Marva Lewis and Dr. Wood Hiatt. *See* Pls' Reply in Further Support of Pls' Mot. for Summ. J. ("Pls' Reply") at ¶¶ 186-245 (additional Uncontested Facts as to Named Plaintiffs from previously submitted and unrebutted expert reports of Drs. Lewis and Hiatt). Defendants quibble with Plaintiffs' experts' findings only because neither Dr. Hiatt nor Dr. Lewis interviewed MDHS caseworkers or sought the medical records of the Named Plaintiffs that were not already contained in the children's MDHS case records. *See* Defs' Mem. at 17-18, 22, n.11, 23 n.14. Yet Defendants, with complete access to the MDHS caseworkers involved in the care and treatment of the Named Plaintiffs and to additional medical documentation that Defendants acknowledge should have been maintained in the Named Plaintiffs' case records, entirely fail to come forward with *any* competent summary judgment evidence that rebuts or calls into question the specific instances of substantial harm documented in the Named Plaintiffs' MDHS case records. Specific examples of that harm follow.[23]

---

[23] While Plaintiffs' Summary Judgment submissions contain sufficient evidence of the harm Named Plaintiffs have suffered to warrant Summary Judgment, they by no means reflect the entire universe of evidence of harm contained in Plaintiffs' expert reports.

### A.    Cody B. Has Been Harmed and Placed at Imminent Risk of Harm

Plaintiffs have established by uncontested evidence that Defendants failed to provide Cody with adequate medical care or reasonable safety and knowingly caused him psychological harm in deliberate indifference to his well-being. *See* Ex. 3 [Lewis Report] at 23-52.

Defendants knowingly and persistently endangered Cody's physical health by continuing to allow him unsupervised visits in an environment where it was known that this asthmatic toddler was being exposed to life-endangering cigarette smoke. *See* Ex. 3 [Lewis Report] at 32, 39-40, 48. As established by Dr. Lewis, "Cody's caseworkers knew of the life-threatening risk improperly supervised visits posed to Cody, yet there is no record that DHS made any effort to raise the issue with the Youth Court." *See* Ex. 3 [Lewis Report] at 48. Cody was injured as a result of this "callous disregard for [his] health" (*see* Ex. 3 [Lewis Report] at 39), as he suffered respiratory distress following many such visits, which, on at least two occasions, was severe enough to require emergency room treatment. *See* Ex. 3 [Lewis Report] at 39-40, 48. Further, Defendants knowingly failed to consistently or accurately document Cody's serious asthmatic condition or to provide critical medical information to his caregivers. *See* Ex. 3 [Lewis Report] at 29, 32-33, 35, 38-39. For example, MDHS documented that it did not maintain a complete medical record of Cody's asthmatic condition and did not consistently inform his caregivers of his known medical problems. *See* Ex. 3 [Lewis Report] at 29, 32-33, 35, 38-39. This placed Cody in immediate jeopardy as "he could die from a sudden unrecognized asthma attack in the home of an unprepared caregiver, who might mistake his symptoms for a common cold." *See* Ex. 3 [Lewis Report] at 39.

In fact, Cody was subject to that very risk in 2004 when he was placed for the first time with Ms. BYK, a foster parent who had not been informed of Cody's asthma and was entirely unprepared to address the severe asthma attack that he experienced while in her care and which resulted in yet another hospitalization. *See* Ex. 3 [Lewis Report] at 33, 39.

Following that hospitalization, this small and sickly child was placed by Defendants in an emergency shelter, despite the plea by his former foster mother, who had cared for him for 19 months, and whom MDHS had documented to be a loving caretaker, to resume caring for him. *See* Ex. 3 [Lewis Report] at 23, 29, 33, 37. The only reason Cody's placement with this foster mother had initially disrupted was that MDHS had refused to address her concerns regarding Cody's treatment, including the fact that MDHS was allowing the asthmatic child to be exposed to cigarette smoke and was not providing him with doctor-mandated treatment. *See* Ex. 3 [Lewis Report] at 32-33, 36.

Defendants' placement of Cody in this shelter was so harmful to Cody that his treating physician filed an abuse and neglect report with Defendants, in which the doctor asserted that Cody was suffering from the medical condition "failure to thrive" and that the lack of a stable family environment was directly and adversely affecting his development and emotional well-being. *See* Ex. 3 [Lewis Report] at 33, 37. Despite this explicit notice from Cody's physician that the shelter was actively harmful to him, Defendants maintained him in that placement for almost three additional weeks. *See* Ex. 3 [Lewis Report] at 37. Defendants proffer no evidence that they followed up with the doctor to address her report of Cody's maltreatment.[24] *See* Ex. 3 [Lewis Report] at 37.

---

[24] While Defendants assert in their legal papers that "in each circumstance of *any* alleged abuse or neglect from a placement provider, MDHS/DFCS made reasonable efforts to investigate the allegation" (*see* Defs'

Although "[i]t is well established that children who have been abused or neglected by their biological parents require a stable, consistent, family-like environment," and Cody's physician had alerted MDHS as to Cody's specific need for such a stable placement, this inappropriate shelter was but one of five placements that Cody would experience in the span of 31 days. *See* Ex. 3 [Lewis Report] at 38. According to Dr. Lewis, Cody, who was not yet two at the time, suffered psychological harm when MDHS severed the secure attachment he had developed with the foster mother with whom he had lived with for the majority of his life and then shuffled him through five different placements. *See* Ex. 3 [Lewis Report] at 38.

Defendants entirely fail to directly address or dispute any of this concrete evidence that their actions and inactions harmed Cody's physical health and psychological well-being. The summary of medical services that Defendants put forward simply confirms that Cody required emergency treatment following an overnight visit with his parents, who were known to expose him to cigarette smoke, as well as while in a foster home with a caretaker who had not been informed of his asthma. *Compare* Ex. 3 [Lewis Report] at 31-33, 39-40, *with* Defs' Motion at Ex. C. Moreover, Defendants readily concede that complete medical information, the absence of which Plaintiffs' expert concluded imperiled the health of this asthmatic toddler, was not routinely made a part of the Named Plaintiffs' case records. *See* Defs' Mem. at 18 n.12. Defendants also offer the factually and legally conclusory affirmances by Cody B.'s caseworker's supervisor that Cody was provided "adequate" medical care and shelter. *See* Defs'

---

Mem. at 19, *citing* Defs' Motion at Exs. M, N, W, X, Y, Z, AA, BB), none of Defendants' cited affidavits address the general subject of abuse-in-care investigations, let alone dispute that in the case of Cody B., MDHS did nothing to address his doctor's claim that placement in an emergency shelter was harming him or to ameliorate that ongoing harm.

Motion at Ex. GG. As Defendants themselves recognize, however, conclusory and unsupported statements are not competent summary judgment evidence.[25]  *See* Defs' Mem. at 14 n. 6 (citing *de la O v. Housing Auth. of El Paso*, 417 F.3d 495 (5th Cir. 2005); *Forsyth v. Barr*, 19 F.3d 1527 (5th Cir. 1994)).

**B.     Olivia Y. Has Been Harmed and Placed at Imminent Risk of Harm**

Plaintiffs proffer ample uncontested evidence that Defendants' actions and inactions have knowingly caused Olivia Y. harm, and placed her at risk of further injury, in deliberate indifference to her well-being. *See* Ex. 3 [Lewis Report] at 33-73.

When Defendants took custody of Olivia, she was three years old but weighed only 22 pounds, which is the expected weight of an average child half of her age. *See* Ex. 3 [Lewis Report] at 53. Defendants cycled Olivia through no fewer than three separate foster placements without a single MDHS worker noticing that not only was she severely underweight, but she also had a visible rash covering her face and torso, had a distinct and disagreeable odor, and was so developmentally delayed that she could not follow simple commands. *See* Ex. 3 [Lewis Report] at 63-64. Despite her obvious medical needs, MDHS did not provide Olivia with an initial medical exam or treatment as required, and reported to the Youth Court that she appeared "to be a healthy child and has no known medical conditions." *See* Ex. 3 [Lewis Report] at 55-56. According to Dr. Lewis, "[e]ither the DHS workers responsible for Olivia's case were woefully ignorant of normal childhood appearances and development, or they were callously indifferent to her extreme medical needs. In either case, they were clearly not suited and unable to ensure

---

[25] These and all similarly unsupported and conclusory statements contained in Defendants' affidavit evidence are the subject of a Motion To Strike, which is currently before this Court.

Olivia's adequate protection and safety."[26]  *See* Ex. 3 [Lewis Report] at 64.  As a result,

Olivia was denied the immediate medical and therapeutic services she so clearly needed.

*See* Ex. 3 [Lewis Report] at 65.

Although Olivia was first placed in a licensed foster home, Defendants moved her

to the home of a convicted rapist, where she remained for more than a week.  *See* Ex. 3

[Lewis Report] at 55-56; Defs' Mem. at 19 (acknowledging that Defendants placed

Olivia in the home of a convicted rapist).  When MDHS did move Olivia from that home

to a shelter,[27] MDHS failed to undertake any investigation to determine if she had been

sexually abused.  *See* Ex. 3 [Lewis Report] at 62-63.  Olivia was not provided with a full

sexual abuse examination despite a doctor's finding that Olivia's vaginal area was red

and swollen and that she reacted "in terror" when the doctor attempted a vaginal exam.

*See* Ex. 3 [Lewis Report] at 62-63; Defs' Motion at Ex. A.  The doctor made clear to

MDHS that she had not undertaken a complete sexual abuse examination of Olivia, as

MDHS had not provided her with any reason to suspect sexual abuse and because the

clinic lacked the proper facilities.  *See* Ex. 3 [Lewis Report] at 57, 63.  As noted by Dr.

Lewis, the "failure by DHS to have Olivia examined for possible sexual abuse or the

presence of sexually transmitted diseases, or to disclose to her doctor why such an

examination was clearly merited, demonstrates a complete disregard for Olivia's physical

well-being."  *See* Ex. 3 [Lewis Report] at 63.

---

[26] The fact that the DFCS regulation requiring that foster children be provided medical examinations within seven days of entering custody has since been changed because DFCS was unable to meet the seven-day requirement (*see* Defs' Mem. at 18 n.11), in no way impacts Dr. Lewis's finding that Olivia, as a visibly malnourished and sickly child, required immediate medical attention.

[27] MDHS withheld the truth from the Youth Court regarding when or why Olivia had to be moved from the home.  *See* Ex. 3 [Lewis Report] at 55.  When MDHS finally disclosed to the Youth Court that it had moved Olivia out of the rapist's home, it offered by way of explanation only that Olivia's aunt was unable to provide her with adequate supervision. *See* Ex. 3 [Lewis Report] at 57.

Despite the medically fragile condition in which Olivia entered foster care, Defendants failed to adequately monitor and track Olivia's medical needs. According to Plaintiffs' expert, the failure to "obtain and maintain medical and developmental information not only harmed Olivia by denying her timely medical and developmental interventions, but also placed her at risk of being moved to a foster home unaware of her needs." *See* Ex. 3 [Lewis Report] at 66. Indeed, Defendants confirm that DFCS does not make it a top priority to track foster children's medical information. *See* Defs' Motion at Exs. M, N, W, Z.

Although Defendants vaguely claim to have provided Olivia with "adequate" care and shelter (*see* Defs' Mem. at 16-17; Defs' Motion at Ex. T), they do not deny even one of the above-detailed facts concerning the injuries sustained by Named Plaintiff Olivia as documented in her MDHS record. In fact, Defendants' summary of medical services provided to Olivia supports Dr. Lewis's findings that Olivia was not provided immediate medical care upon entering MDHS custody, and that she was never provided a sexual abuse examination. *See* Defs' Mem. at Ex. A.

### C.    John A. Has Been Harmed and Placed at Imminent Risk of Harm

Plaintiffs' uncontested evidence establishes that Defendants have caused John A. to unnecessarily suffer significant emotional and psychological harm and did not protect him from physical abuse, in deliberate indifference to his well-being. *See* Ex. 3 [Lewis Report] at 74-96.

When John entered MDHS custody at nine years old, MDHS knew that he suffered from serious psychological problems, as his need for psychiatric hospitalization had been the impetus for Defendants to place him into foster care. *See* Ex. 3 [Lewis

Report] at 87. Nonetheless, in the first five years that Defendants had custody of John, they moved him through more than 35 placements, with each placement lasting on average less than two months. *See* Ex. 3 [Lewis Report] at 74, 87. John's treating mental health care providers repeatedly documented to MDHS his need to be placed in a therapeutic setting, yet Defendants' records reflect that "[a]gain and again, DHS ignored this professional advice and placed John in non-therapeutic homes and shelters not equipped to meet his specific needs, which predictably led to numerous disruptions." *See* Ex. 3 [Lewis Report] at 88.

In at least one instance, Defendants allowed John to languish in a restrictive residential treatment center well past his intended discharge date, despite the protestations of the facility staff that leaving him in that environment was causing his mental health to deteriorate. *See* Ex. 3 [Lewis Report] at 88. Having reviewed John's case record, Plaintiffs' expert Dr. Hiatt concluded:

> [W]ithin a reasonable degree of medical certainty [that] the pattern of placements and moves of John A. by Mississippi DHS, from the time he entered custody, has been seriously damaging to his mental health status, his ability to adjust and his psychiatric condition. From the moment he was identified in 1999, he was known to be a seriously disturbed boy with major, severe risk factors in need of therapeutic placement. His overwhelming need was stability of home, guidance, management and treatment. To the contrary, the frequent moves, often overnight, which were unpredicted by him and unexplained to him, guaranteed that he would feel threatened, maximized his failures to cope and unleashed his characteristic response of anger and defiance.

*See* Ex. 3 [Lewis Report] at 27-28.

The psychological damage suffered by John and established by Dr. Hiatt is illustrated by the fact that when he attempted suicide at or near the age of 12, he told his therapist, "I wished I had a home" and identified frequent placement and school changes

as two of his three primary psychological stressors. When MDHS moved him ten more times in the year following his statement that he had attempted suicide, he tried to mutilate himself in an effort to avert yet another move. *See* Ex. 3 [Lewis Report] at 79-83, 87.

MDHS also repeatedly failed to provide critical medical history to John's treating mental health professionals, despite documented requests for such information and the undisputed fact that "[p]sychiatric and therapeutic history is absolutely essential to the success and the safety of any new treatment." *See* Ex. 3 [Lewis Report] at 90. The failure to provide such information directly affected the ability of John's treating providers to meet his mental health needs. *See* Ex. 3 [Lewis Report] at 90. Dr. Hiatt stated that it is his opinion "within a reasonable degree of medical certainty that the failure of the DHS managers to keep him under the care of staff members and doctors who were familiar with him and to quickly provide each new treating physician with his medical records, created severe, unnecessary difficulties in management of his psychiatric and behavioral problems. *See* Ex. 5 [Hiatt Report] at 28.

Defendants also failed to adequately record or supervise the multiple psychotropic medications John was prescribed, even though the potential for dangerous side effects if improperly combined or administered makes such supervision critical. *See* Ex. 3 [Lewis Report] at 14, 91. As made clear by Dr. Hiatt, in order to ensure John's safety, "it is essential to understand that [John's A.'s psychotropic medications] had to be fully monitored and provided to John A. on a regular basis." *See* Ex. 3 [Lewis Report] at 15. Yet, by March 2005, MDHS had approved nearly four years of service plans for John that contained an incomplete and inaccurate listing of his medications, each of which listed

one medication as "unknown." *See* Ex. 3 [Lewis Report] at 91. Some or all of these listings had no overlap whatsoever with the medications John was in fact taking at the given time. *See* Ex. 3 [Lewis Report] at 80.

Defendants also denied John regular contact with his siblings for nearly five years after placing him in foster care. *See* Ex. 3 [Lewis Report] at 93-94. The agency denied him this contact without documenting any justification and despite the clear and documented evidence that unnecessarily isolating him from his siblings exacerbated his psychological problems and interfered with his treatment. *See* Ex. 3 [Lewis Report] at 93-94. Both John's mental health treatment team and his caseworker documented the correlation between sibling contact and his psychological progress. MDHS records are also replete with evidence of the corresponding damage caused by the lack of such contact. *See* Ex. 3 [Lewis Report] at 93-94. At one point MDHS records reflect that John "'indicated that [suicide] was the best way to avoid the pain of never returning to live with his family.'" *See* Ex. 3 [Lewis Report] at 93. As found by Dr. Lewis, "[d]espite such compelling evidence that seeing his siblings was essential to the traumatized child's emotional well-being, his [Individual Service Plans] consistently failed to reflect any sibling visitation plan and more than one caregiver noted that he saw them rarely or never." *See* Ex. 3 [Lewis Report] at 93. Dr. Hiatt similarly concluded that "the failure of the DHS managers to allow [John] to maintain contact, to hold on to the bond with the only family he had, his siblings, greatly added to his difficulties with adjustment." *See* Ex. 3 [Lewis Report] at 28.

Not only did Defendants fail to meet John's psychiatric needs, but they placed him in environments that jeopardized his physical safety. For example, while in one of

the many institutions in which he was placed, John stated, "I need to get out of this place. They keep putting bruises on me—the staff." *See* Ex. 3 [Lewis Report] at 89. There is no evidence that MDHS investigated this allegation; instead the agency reported to the Youth Court that he appeared to be "happy."[28] *See* Ex. 3 [Lewis Report] at 89.

Defendants fail to dispute even one of the facts Plaintiffs have put forward establishing the harm John A. suffered as a result of Defendants' indifference to his physical and mental health. In fact, Defendants' summary of medical services provided to John confirms that DFCS failed to place him in therapeutic care even after such placement was recommended by John's treatment team. *See* Defs' Motion at Ex. D. Defendants have also conceded their failure to maintain updated medical information concerning the children in their care. *See* Defs' Motion at Exs. M, N, W, Z. The only specific fact Defendants proffer regarding John is that he always had at least one outfit of clothing during the entire seven years he has been in Defendants' custody (*see* Defs' Mem. at 18), which is immaterial to Plaintiffs' claims.

### D.    Jamison J. Has Been Harmed and Placed at Imminent Risk of Harm

Plaintiffs have established without dispute that Jamison J. has suffered harm and been placed at serious risk of further harm because MDHS knowingly placed him in foster care settings that posed a clear and immediate risk to his safety and health, in deliberate indifference to his well-being. *See* Ex. 3 [Lewis Report] at 97-128.

Jamison, who is now 19, was taken into MDHS custody at the age of five. Over the next 14 years, MDHS shuttled him through more than 28 placements. *See* Ex. 3

---

[28] While Defendants assert in their legal papers that "in each circumstance of *any* alleged abuse or neglect from a placement provider, MDHS/DFCS made reasonable efforts to investigate the allegation" (*see* Defs' Mem. at 19, citing Defs' Exs. M, N, W, X, Y, Z, AA, BB), none of Defendants' affidavits address the subject of abuse-in-care investigations, let alone dispute that in the case of John A., MDHS did nothing to address his claim that facility staff members were physically abusing him.

[Lewis Report] at 97.  According to Dr. Lewis's review of MDHS case records, "Jamison's placements have varied in length from days to four years, and have included emergency shelters, group homes, crisis centers, foster homes, and psychiatric institutions."  *See* Ex. 3 [Lewis Report] at 116-117.  Jamison was also placed in an institution for delinquent youth, although he had never been adjudicated delinquent.  *See* Ex. 3 [Lewis Report] at 113.  As established by Dr. Lewis, moving Jamison through this extraordinarily high number of placements caused him psychological harm.  *See* Ex. 3 [Lewis Report] at 97.  Jamison reported that he felt hopeless about finding a family, and he described himself as homeless.  *See* Ex. 3 [Lewis Report] at 123.

While many of Jamison's placements were entirely unsuited to meet his documented needs, some were also known by Defendants to pose a risk to Jamison's physical safety.  When MDHS first removed Jamison from his mother's custody, it placed him with his maternal grandmother and kept him there for three months despite its own documentation that the home was unsafe and that the grandmother could not provide the five-year-old with adequate care and supervision.  *See* Ex. 3 [Lewis Report] at 98-99, 114-115.  MDHS eventually removed Jamison from this placement because he was being maltreated but again returned him to the home for a week without any proof that conditions had been improved such that he would not be neglected again.  *See* Ex. 3 [Lewis Report] at 115.  MDHS also returned Jamison to his mother for unsupervised overnight visits even after documenting in his case record that he was being neglected in her care, as evidenced by the fact that, according to those records, he returned from those visits unfed, ungroomed, sleep-deprived and not having taken his medications.  *See* Ex. 3 [Lewis Report] at 115.  During those unsupervised visits, Jamison witnessed the severe

34

and ongoing physical abuse of a three-year-old who was living in the home, and who was eventually beaten to death there. *See* Ex. 3 [Lewis Report] at 6, 108, 115-116. Only after the death of this toddler did MDHS determine that Jamison should not be returned to his mother's care. *See* Ex. 3 [Lewis Report] at 108.

Defendants again placed Jamison at imminent risk of harm when it flew him to Kansas to live with his father. At the time of the placement, MDHS's own records reflected that Jamison's father had multiple felony convictions for which he had been incarcerated, that MDHS had previously deemed him an inappropriate placement resource for Jamison, and that the Youth Court had terminated his parental rights. *See* Ex. 3 [Lewis Report] at 8, 112, 116. When MDHS placed Jamison with his father, it did not have the results of any home evaluation study, and it had not performed the requisite background and criminal checks necessary to determine if the placement was safe. *See* Ex. 3 [Lewis Report] at 116. Jamison was placed in this home over the objections of Kansas child welfare officials who contacted MDHS to inform it that the placement was illegal. *See* Ex. 3 [Lewis Report] at 116. As found by Dr. Lewis, Jamison's placement in this home seriously jeopardized his safety and "was the third environment in which DHS placed Jamison that left him as vulnerable, if not more so, than he had been prior to being placed in DHS custody." *See* Ex. 3 [Lewis Report] at 116.

Defendants have also knowingly disregarded Jamison's serious mental health needs. MDHS failed to arrange for an initial psychological screening for Jamison when he was first removed from his mother's home in 1991 or when he reported to his caseworker that he wanted to hurt himself in 1992. *See* Ex. 3 [Lewis Report] at 117. MDHS did not provide Jamison with any psychological services at all until March of

1993.  *See* Ex. 3 [Lewis Report] at 117; Defs' Motion at Ex. B.  Jamison has been diagnosed with a series of conditions including PTSD, ADHD, developmental reading disorder, depressive disorder, oppositional defiant disorder, and adjustment disorder, for which he has received only inconsistent treatment.  *See* Ex. 3 [Lewis Report] at 97, 117-118; Defs' Motio at Ex. B.  As Dr. Lewis concluded:

> DHS's inconsistent provision of treatment harmed Jamison because he was denied mental health services appropriately calibrated to his serious needs.  In addition, DHS's failure to provide Jamison his needed treatment directly resulted in the disruption of at least one of his placements.  Jamison's first foster mother, JF, became so frustrated after months of DHS's failure to secure needed psychiatric services for Jamison that she went to the DHS offices with all of Jamison's belongings and told the agency that she could no longer care for him.

*See* Ex. 3 [Lewis Report] at 118.

In addition to failing to meet Jamison's mental health needs, Jamison has been harmed by Defendants' failure to monitor the strong psychotropic drugs that he has been prescribed.  *See* Ex. 3 [Lewis Report] at 118.  Although MDHS has the ultimate responsibility to ensure that foster children receive needed medications, on at least twenty occasions, documents intended to track Jamison's medication were left blank, and on at least one occasion the failure to ensure Jamison was receiving his medications became so extreme that it triggered a serious incident report to the Mississippi Department of Mental Health.  *See* Ex. 3 [Lewis Report] at 119.  Dr. Lewis concluded that "DHS's failure to properly administer his strong psychotropic medications not only disrupted and delayed his much-needed treatment, but also placed him at serious risk of withdrawals or overdoses."  *See* Ex. 3 [Lewis Report] at 119.

Not one of these facts established by Plaintiffs regarding the harm to Jamison has been disputed by Defendants.

36

### E.    Defendants' Evidence Regarding The Services Provided to Named Plaintiffs is Either Immaterial or Confirms Plaintiffs' Allegations

Rather than address the specific and concrete evidence of harm that Defendants' indifference to Mississippi's failing foster system has caused to the Named Plaintiffs, Defendants assert that the Named Plaintiffs' have been provided "adequate" care, and proffer lists of services that they have provided to the Named Plaintiffs and the total cost of those services. *See* Defs' Mem. at 16-20; Defs' Motion at Exs. A-H, MM, LL.[29]   As previously established, Defendants medical summaries, which, according to Defendants, accurately reflect the medical care the Named Plaintiffs received because they are drawn from the records of medical providers rather than MDHS records (*see* Defs' Mem. at 18 n.12), only serve to confirm that Defendants have failed to provide Plaintiffs with needed medical care.   That those summaries establish at various times that each Named Plaintiff had access to some medical professionals is immaterial; Plaintiffs have never claimed that Plaintiffs received *no* medical care during their years in custody, but rather that they did not receive timely and *adequate* care and treatment necessary to address their documented health needs, a fact Defendants fail to specifically dispute.

Nor is the tally of total expenditures made by Defendants on behalf of Named Plaintiffs probative.   Plaintiffs have never alleged that maintaining Jamison J. and Cody B. in custody for nearly all of their lives, and maintaining Olivia Y. and John A. for half of their lives, was without cost to the State.   In fact, Plaintiffs' evidence clearly establishes that Mississippi could have significantly reduced the cost of providing care for these children if they had not relied on inappropriate and expensive institutional

---

[29] Defendants' statement that "Plaintiffs' own designated experts did not find any credible evidence of a deprivation of a basic necessities" (*see* Defs' Mem. at 17) is simply wrong.   As discussed above, Dr. Lewis described in great detail the many ways in which Defendants failed to provide for the Named Plaintiffs' fundamental safety and critical medical needs. *See* Ex. 3 [Lewis Report].

placements. *See* Ex. 3 [Lewis Report] at 11-12; Ex. 2 [Brister Expert Rpt.] at 19. Moreover, Plaintiffs establish that Defendants failed to engage in appropriate permanency planning on behalf of these Named Plaintiffs, and squandered available adoptive opportunities, which has prolonged the Named Plaintiffs' stay in state custody, at a great expense to Mississippi, and in detriment to these children's well-being. *See* Ex. 3 [Lewis Report] at 14-18. As all of the Named Plaintiffs continue to reside in a foster care system that Defendants have conceded is plagued by untrained and improperly supervised staff laboring under impossibly high caseloads with insufficient resources, they remain at imminent risk of continued harm. In the words of Dr. Lewis, "Mississippi's foster children are at risk of further neglect, and even abuse, as a result of poor DHS case practice and oversight." *See* Ex. 3 [Lewis Report] at 128.

## III.    CONCLUSION

Defendants' own documents and testimony, as well as their sole expert, confirm Plaintiffs' allegations that Defendants have been knowingly operating a failing child welfare agency for years. Plaintiffs present uncontested evidence that high caseloads, poorly trained and supervised staff, and a chronic lack of necessary resources place the Plaintiff class of foster children at daily risk of substantial harm. This is not speculative; nor is it anecdotal. Defendants do not specifically dispute that scores of children are being maltreated, subjected to harmful placements and multiple traumatic moves, and deprived of basic and necessary medical care.

In light of these documented and largely conceded facts, Plaintiffs' motion for summary judgment should be granted.

Respectfully submitted, this 30th day of May, 2006.

/s Melody McAnally
W. Wayne Drinkwater, Jr. (MBN 6193)
Melody McAnally (MBN 101236)
BRADLEY ARANT ROSE & WHITE LLP
188 East Capitol Street, Suite 450
Jackson, MS 39201
Telephone: (601) 948-8000
Facsimile: (601) 948-3000

Stephen H. Leech (MBN 1173)
850 East River Place, Suite 300
Jackson, MS 39202
Telephone: (601) 355-4013

Marcia Robinson Lowry (MBN 43991 *pro hac vice*)
Susan Lambiase (MBN 43992 *pro hac vice*)
Eric E. Thompson (MBN 43993 *pro hac vice*)
Tara Crean (MBN 44447 *pro hac vice*)
Shirim Nothenberg (MBN 43990 *pro hac vice*)
CHILDREN'S RIGHTS
330 Seventh Ave, 4th Floor
New York, NY 10001
Telephone: (212) 683-2210

John Lang (MBN 43987 *pro hac vice*)
Christian Carbone (MBN 43986 *pro hac vice*)
John Piskora (MBN 44474 *pro hac vice*)
LOEB & LOEB LLP
345 Park Avenue
New York, NY 10154
Telephone: (212) 407-4000

*PLAINTIFFS' COUNSEL*

## CERTIFICATE OF SERVICE

I hereby certify that on May 30, 2006, I electronically filed the foregoing with the Court using the ECF system, which sent notification of such filing to the following:

Dewitt L. ("Rusty") Fortenberry Jr., Esq.
Kenya Key Rachal, Esq.
Gretchen L. Zmitrovich, Esq.
Ashley Tullos Young, Esq.
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC

4268 I-55 North
Meadowbrook Office Park
Jackson, Mississippi 39211

Harold E. Pizzetta, III, Esq.
Assistant Attorney General
General Civil Division
Carroll Gartin Justice Building
430 High Street
Jackson, Mississippi  39201

*Attorneys for Defendants*

/s Melody McAnally