**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION**

| | |
|---|---|
| JAMES D. JOHNSON, as next friend to Olivia Y., et al. | PLAINTIFFS |
| vs. | CIVIL ACTION NO. 3:04cv251LN |
| HALEY BARBOUR, as Governor of the State of Mississippi, et al. | DEFENDANTS |

**DEFENDANTS' SURREBUTTAL IN RESPONSE TO PLAINTIFFS' REPLY IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

COME NOW, Haley Barbour, as Governor of the State of Mississippi, Donald Taylor, as Executive Director of the Mississippi Department of Human Services, and Rickie Felder, as Director of the Division of Family and Children's Services ("Defendants") and present this Surrebuttal in Response to Plaintiffs' Reply in Further Support of Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Reply") filed by Plaintiffs on May 30, 2006. This Surrebuttal is necessary to refute the sixty-two alleged facts set forth for the first time in Plaintiffs' Reply, which Plaintiffs claim are "uncontested."

In an attempt to salvage their chance at summary judgment, Plaintiffs outline several isolated incidents concerning the provision of care given to the named Plaintiffs taken from the reports of their designated case record review expert, Marva Lewis, and their designated psychiatrist, Dr. Wood Hiatt. *See, e.g.* Plaintiffs' Reply. Defendants vehemently dispute Plaintiffs' allegations that the named Plaintiffs have not been provided reasonably safe living conditions and adequate food, clothing, shelter, and medical care, as evidenced in Defendants'

1

own pending motion for summary judgment, in Defendants' reply in further support of their motion for summary judgment, and in Defendants' response to Plaintiffs' motion for summary judgment.

Included in Plaintiffs' listing of isolated incidents of alleged violations of their substantive due process rights are several assertions specifically related to the medical and/or psychological history and condition of the named Plaintiffs. *See, e.g.* Plaintiffs' Reply. Lewis' *only* support for her report was a review of the MDHS/DFCS case files for Olivia Y., Cody B., John A., and Jamison J. Lewis did not conduct an in-depth review of the named Plaintiffs' medical records or Youth Court records. Further, Lewis did not interview any medical providers nor did she interview or conduct any psychological testing on the named Plaintiffs. The effect of the limitations of Lewis' review of the children's history is most evident in the specific incidents described in detail as follows.

**Cody B.:**

Plaintiffs allege the following as "uncontested facts" related to Cody B.:

1) With what social work expert Dr. Lewis describes as "callous disregard for Cody's health," Defendants persisted in leaving Cody, an asthmatic toddler, for unsupervised visits in a home where he was being exposed to life-threatening cigarette smoke. "Cody's caseworkers knew of the life-threatening risk improperly supervised visits posed to Cody, yet there is no record that DHS made any effort to raise the issue with the Youth Court.

*See* Plaintiffs' Reply at p. 2 (# 188).

2) In 2004 Cody was placed for the first time with foster mother Ms. BYK, who had not been made aware of his condition and who was unprepared to address the severe asthma attack that he experienced while in her care. This incident resulted in an additional hospitalization.

Immediately following that hospitalization, Defendants placed Cody in an emergency shelter despite a plea that his former foster mother to resume care for him. This former foster mother had cared for Cody for 19 months, and MDHS had documented her to be a loving caretaker.

2

> Cody's placement with a foster mother who cared for him for 19 months disrupted because MDHS failed to address her concerns regarding Cody's treatment by MDHS. She explained at the time that these concerns involved, among other issues, the agency's placement of Cody for day-long, unsupervised visits in an environment where he was exposed to cigarette smoke and the agency's failure to provide him with doctor-mandated treatment.
>
> When Defendants placed Cody in a shelter immediately after a hospitalization, his long-term physician filed an abuse and neglect report with Defendants asserting that Cody was suffering from the medical condition "failure to thrive" and that the lack of a stable family environment was directly and adversely affecting his development and emotional well-being.
>
> There is no evidence that Defendants complied with Cody's doctor's request to follow up with her regarding her maltreatment report. The agency maintained Cody in the shelter placement for nearly three weeks following the report.

*See* Plaintiffs' Reply at pp. 3-4 (## 192-196).

A thorough review of the factual evidence surrounding Plaintiffs' allegations reveals that Plaintiffs and Lewis disregard the role of the Youth Court in Cody's life and mischaracterize the evidence. The Youth Court, which was fully aware of Cody's medical condition, ordered the above mentioned visits with Cody's biological parents. *See* Exhibit "ZZZ" to this Surrebuttal at DHS Cody B 0003804 (Youth Court Transcript of the Disposition Hearing and Permanency Hearing on June 23, 2003 in which Cody's guardian ad litem informed the court that Cody had asthma when his parents requested and MDHS/DFCS recommended he have visits with his biological parents); DHS Cody B 003864-65 (Youth Court Transcript of the Status Hearing on March 22, 2004, in which MDHS/DFCS vehemently opposes day-long unsupervised visits with biological parents due to Cody having "a history of respiratory, asthma problems" and disputing that problems started after Cody began visiting his biological parents). *See also* Exhibit "QQQ" to Defendants' Reply Memorandum of Authorities in Further Support of Defendants' Motion for Summary Judgment ("Defendants' Reply") at AG Cody B. 000077 (Youth Court Order dated June 24, 2003 noting Cody's health and safety are the "paramount concern"), AG Cody B.

3

000095 (Youth Court Order dated November 24, 2003 ordering that "parents shall exercise daytime visits with the minor each weekday"), AG Cody B. 000111 (Youth Court Order dated January 28, 2004, ordering that visitation with biological parents to be "every Wednesday between the hours of 10:00 A.M. and 4:00 P.M."), and AG Cody B. 000250 (guardian ad litem advising that biological parents should have overnight and weekend visitation with Cody).

The Youth Court also became involved with Cody's placements in 2004 when his foster mother asked that he be removed from her care. *See* Exhibit "H" to Defendants' Motion for Abstention Based on *Younger v. Harris* (Youth Court Order dated February 25, 2004, placing Cody in an emergency shelter when his foster mother requested his removal). From the shelter, he was placed in the home of Ms. BYK. *See* Exhibit "ZZZ" to this Surrebuttal at DHS Cody B 000580 (notice of change for February 26, 2004, placing Cody in the home of Ms. BYK). While in her care on March 5, 2004, he was hospitalized for RSV, not a severe asthma attack. *See* Exhibit "ZZZ" to this Surrebuttal at DHS Cody B 003009 (final diagnosis of "Bronchospasm secondary to RSV – stable on discharge."). Upon his discharge on March 8, 2004, the Youth Court placed him back into the emergency shelter. *See* Exhibit "QQQ" to Defendants' Reply at AG Cody B. 000168 (Youth Court Order dated March 9, 2004). On the day of his discharge from the hospital, Cody's doctor recommended that he be placed in a foster home "for proper development." *See* Exhibit "ZZZ" to this Surrebuttal at DHS Cody B 003199.

Plaintiffs insinuate that MDHS/DFCS ignored Cody's doctor's recommendation and that the "agency maintained Cody in the shelter placement for nearly three weeks following the report." *See* Plaintiffs' Reply at p. 4 (# 196). The evidence shows, however, that during his placement in the shelter following his discharge from the hospital, MDHS/DFCS was actively seeking a permanent home for Cody. *See* Exhibit "ZZZ" to this Surrebuttal at DHS Cody B

4

003857 (Youth Court noting that MDHS/DFCS notified it that Cody's foster mother asked him to be removed from her home, that MDHS/DFCS placed him into a shelter, and that MDHS/DFCS had been providing preplacement visits with a prospective placement during his stay at the shelter); *see also* Exhibit "QQQ" to Defendants' Reply at AG Cody B. 000168 (Youth Court order dated March 9, 2004, ordering preplacement visits with licensed foster parents during his stay at shelter) and AG Cody B. 000179 (Cody was placed in a licensed foster home on March 26, 2004). The evidence also shows that the Youth Court made the decision to place Cody in the shelter while MDHS/DFCS found him a home where he could be placed long-term to minimize the number of moves Cody experienced. *See* Exhibit "ZZZ" to this Surrebuttal at DHS Cody B 003858 (Judge Sigalas stating that "I didn't believe we wanted to keep him in the shelter for a long period of time but I wasn't willing to just keep moving him around . . . ."). Finally, both MDHS/DFCS and Cody's court appointed guardian ad litem, a Mississippi licensed attorney, reported to the Youth Court that Cody was doing well in the shelter. *See* Exhibit "ZZZ" to this Surrebuttal at DHS Cody B 003857 (MDHS/DFCS reporting "[Cody] is doing excellent once he was placed back in the shelter."); DHS Cody B 003859 (MDHS/DFCS acknowledging that "he's made a significant amount of progress in the shelter . . . ."); and DHS Cody B 003865 (guardian ad litem reporting that she saw Cody while he was in the shelter and "he's been doing fabulously. He's healthy, his wheezing is gone. He has really, really perked up I have to say. He is as healthy as I've seen him.").

**Olivia Y.:**

Plaintiffs allege the following as "uncontested facts" related to Olivia Y.:

1) When Defendants took custody of Olivia, she was three years old but weighed only 22 pounds, which is the expected weight of an average child half of her age.

> Defendants cycled Olivia through no fewer than three separate foster placements without a single MDHS worker noting that not only was she severely underweight, but she also had a visible rash covering her face and torso, had a distinct and disagreeable odor, and was so developmentally delayed that she could not follow simple commands.
>
> According to Defendants' own summary of services, Olivia was not assessed by a medical professional for over three weeks after entering care on September 10, 2003, and MDHS reported to the Youth Court that Olivia appeared "to be a healthy child with no known medical conditions."

*See* Plaintiffs' Reply at pp. 4-5 (## 200-202);

2)  Olivia was removed from her aunt's home eight days after her placement there because the background check on her aunt's son revealed he was a convicted rapist.

> After Olivia was removed from the home of the convicted sex offender, she was not provided a full sexual abuse exam, despite a doctor's finding that Olivia's vaginal area was red and swollen and that she reacted "in terror" when the doctor attempted a vaginal exam.
>
> The doctor who examined Olivia following her removal from the placement with the convicted rapist made clear to MDHS that she had not undertaken a complete sexual abuse examination of Olivia because MDHS had not provided her with any reason to suspect sexual abuse and because the clinic lacked the proper facilities.
>
> As established by Dr. Lewis, the "failure by DHS to have Olivia examined for possible sexual abuse or the presence of sexually transmitted diseases, or to disclose to her doctor why such an exam was clearly merited, demonstrates a complete disregard for Olivia's physical well-being."

*See* Plaintiffs' Reply at pp. 5 and 6 (## 205 and 207-209).

A thorough review of the factual evidence surrounding Plaintiffs' allegations reveals that Lewis ignored vital evidence contained in the record that provides the complete story. Plaintiffs allege that Defendants were indifferent to Olivia's right to adequate medical care in that she "was not assessed by a medical professional for over three weeks after entering care." Plaintiffs do not submit any evidence that the three week "delay in treatment" caused Olivia any harm but merely assert the timing of this examination was not adequate because it violates MDHS policy

6

to have a medical examination within seven days of entering custody. *See* Exhibit "Q" to Defendants' Motion for Summary Judgment ("Defendants' Motion") at pp. 12-13 (Lewis reporting violations of right to adequate medical care because examinations not provided per MDHS policy). As noted in Defendants' Motion and accompanying memorandum of authorities, this policy has recently been changed to require a medical examination within thirty days of entering custody. *See* Exhibit "V" to Defendants' Motion. The policy change was driven by several issues including the lack of medical doctors accepting Medicaid. *See* Exhibit "II" to Defendants' Motion at 155:16-157:3.

In addition, Lewis' allegation that not a single MDHS worker noted Olivia's medical condition during her first three weeks in custody is clearly erroneous. *See* Exhibit "BBBB" to this Surrebuttal at DHS Olivia Y 000210 (as she transported Olivia from the placement with her aunt to a shelter, worker Sharon Robinson noted the following in a case narrative: Olivia was "very distant, trying to cry, worker noticed the child to be very small in size. When trying to walk, she was very off balanced. Upon worker and [Olivia's] arrival at the shelter the question was asked if they needed to do a full physical on [Olivia]. Worker stated yes, and to please notify the office."). Finally, as the summaries of the medical services provided to Olivia show, while in the shelter, she was seen four times in thirty-three days. *See* Exhibit "A" to Defendants' Motion.[1]

---

[1] Olivia was born prematurely and had cocaine in her bloodstream at birth. *See* Exhibit "NNN" to Defendants' Reply at DHS Olivia Y 002986. She was regularly seen by physicians at the Hattiesburg Health Department, including Dr. Gaudet on September 9, 2003, just one day prior to being placed in MDHS/DFCS custody. *See* Exhibit "NNN" to Defendants' Reply at DHS Olivia Y 000539. Nearly every doctor Olivia saw before being placed into custody and after being placed into custody has noted that she is small for her age and does not eat well. *See, e.g.* Exhibit "NNN" to Defendants' Reply at DHS Olivia Y 000537-542.

Plaintiffs' assertion that liability should be imposed on Defendants for the placement of Olivia with a convicted rapist and the subsequent "failure" to provide Olivia with a sexual abuse examination clearly ignores the actual evidence and the involvement of the Youth Court in Olivia's life. Olivia Y. was placed into MDHS/DFCS custody on September 10, 2003. *See* Exhibit "NNN" to Defendants' Reply at AG Olivia Y 000056-57. On September 11, 2003, her paternal aunt signed a form giving her permission for a background check where she indicated that she was the only adult living in the home. *See* Exhibit "NNN" to Defendants' Reply at AG Olivia Y 000061. On September 17, 2003, the social worker assigned to the case was mistakenly informed that the home study and background check had been performed, and Olivia was placed in her aunt's home. *See* Exhibit "NNN" to Defendants' Reply at AG Olivia Y 000079. When the home study was actually conducted on September 19, MDHS/DFCS discovered that an adult male was also living in the home. *See* Exhibit "NNN" to Defendants' Reply at AG Olivia Y 000169-000171. As a result of the background check on this male, MDHS/DFCS immediately removed Olivia from the home out of an abundance of caution, despite the fact that there was no evidence she was subjected to any abuse, and placed her in an overnight foster home and then into an emergency shelter. *See* Exhibit "NNN" to Defendants' Reply at AG Olivia Y 000091, AG Olivia Y 000092, and AG Olivia Y 000093.

At that time, Olivia, who was three years old, was still in diapers; from the time she arrived at the shelter to the time she was examined by a doctor, not a single shelter employee expressed concerns about her being a victim of sexual abuse despite the obvious opportunities to observe her when her diapers were being changed.[2] When she was examined on October 3, Dr.

---

[2] In addition, as shown above, Defendants did inform the shelter of a need to give Olivia a full physical exam on September 26, 2003. *See* Exhibit "BBBB" to this Surrebuttal at DHS Olivia Y 000210.

8

Shakir found that Olivia was premature, had dermatitis and had *diaper rash*. *See* Exhibit "NNN" to Defendants' Reply at DHS Olivia Y 002929. The lack of notations on Olivia's medical chart about any suspicions of sexual abuse is significant.[3] *See also* Exhibit "NNN" to Defendants' Reply at AG Olivia Y 000159-160 (letter from Dr. Shakir in response to MDHS/DFCS investigation into the allegations in which she notes only that Olivia "had some redness and chapping of skin around the buttock and labial folds"). The single unfounded allegation that she may have been sexually abused was made by the director of the shelter in a letter to MDHS/DFCS where he mistakenly linked the symptoms of Olivia's diaper rash with a story of another child who called her gown "a dirty dirty thing."[4] *See* Exhibit "NNN" to Defendants' Reply at AG Olivia Y 000101-102 (director noting that Olivia "may have been the victim of sexual assault") and AG Olivia Y 000129 (assistant manager noting that the story about the gown referred to another child).

Judge McPhail of the Forrest County Youth Court conducted his own investigation of the events surrounding the placement during several adjudicatory and dispositional hearings. *See* Exhibit "NNN" to Defendants' Reply at AG Olivia Y 000169 (indicating a meeting was conducted by Judge McPhail to discuss alleged misconduct of MDHS/DFCS employees); DHS Olivia Y 002423-24 (Forrest County Youth Court Case Summary indicating that adjudicatory

---

[3] Under Mississippi law, any physician who has reason to suspect a child has been abused must immediately report such suspicion to MDHS. Miss. Code Ann. § 43-21-353(1).

[4] The director also makes the statement that Olivia "reacted in terror when the doctor tried to perform a more thorough examination and it could not be completed." *See* Exhibit "NNN" to Defendants' Reply at AG Olivia Y 000101-102. The doctor, however, made no such notations on Olivia's medical chart and did not mention the occurrence in the letter to MDHS/DFCS regarding her observations while examining Olivia. *See* Exhibit "NNN" to Defendants' Reply at DHS Olivia Y 002929 and AG Olivia Y 000159-160. Other than this hearsay statement by the director, Plaintiffs have submitted no evidence that the examination transpired as the director stated.

9

hearings were continued to allow shelter representatives to be present and indicating that Dr. Shakir had been subpeoned); DHS Olivia Y 002815 (Subpoena Duces Tecum for Mickel Hodges, Integrity Division, to bring complete copy of investigation conducted concerning Olivia Y.); DHS Olivia Y 002849 (Subpoena Duces Tecum for Dr. Shakir to bring complete copy of medical record for Olivia Y.); and Exhibit "OOO" to Defendants' Reply at 43:2-49:17 (Olivia's next friend and guardian ad litem acknowledging that Judge McPhail conducted a five day hearing over the allegations contained in the shelter letter and that Judge McPhail did not find liability against MDHS/DFCS for their actions). After hearing testimony from the case workers, shelter staff, Dr. Shakir, and Mr. Hodges, Judge McPhail entered an Order of Adjudication and an Order of Disposition without any reference to substantiation of the single allegation by the director of the emergency shelter and found that Olivia Y. had not been sexually abused. *See* Exhibit "NNN" to Defendants' Reply at DHS Olivia Y 002389-90 (finding Olivia Y to be a "neglected child")[5] and DHS Olivia Y 002384-002386.

---

[5] Under Mississippi law, an abused child, which includes a sexually abused child, is statutorily defined differently from a neglected child:

(l) "Neglected child" means a child:
    (i) Whose parent, guardian or custodian or any person responsible for his care or support, neglects or refuses, when able so to do, to provide for him proper and necessary care or support, or education as required by law, or medical, surgical, or other care necessary for his well-being; provided, however, a parent who withholds medical treatment from any child who in good faith is under treatment by spiritual means alone through prayer in accordance with the tenets and practices of a recognized church or religious denomination by a duly accredited practitioner thereof shall not, for that reason alone, be considered to be neglectful under any provision of this chapter; or
    (ii) Who is otherwise without proper care, custody, supervision or support; or
    (iii) Who, for any reason, lacks the special care made necessary for him by reason of his mental condition, whether said mental condition be mentally retarded or mentally ill; or
    (iv) Who, for any reason, lacks the care necessary for his health, morals or well-being.

**John A.:**

Plaintiffs allege the following as an "uncontested fact" related to John A.:

1) At one institution, John complained to his caseworker, "I need to get out of this place. They keep putting bruises on me – the staff." There is no evidence that MDHS investigated this allegation.

*See* Plaintiffs' Reply at p. 9 (# 228).

A thorough review of the factual evidence surrounding Plaintiffs' allegation reveals that Lewis again ignored vital evidence contained in the record that provides the complete story. While residing in a residential treatment facility, John reported to his social worker that "I need to get out of this place. They keep putting bruises on me – the staff." *See* Exhibit "PPP" to Defendants' Reply at AG John A 000474. John informed the social worker that he was placed into a therapeutic hold and was hit in the eye. *See id.* John also admitted that he had been violent – "sometimes I be having a fit, throwing chairs and hitting staff." *See id.* The social worker also noted that she spoke with the staff of the facility about the incident and found that John had been violent and belligerent toward staff. *See id.* The social worker did not note that she observed any bruises on John. *See id.* While there is no documentation of a formal investigation into the complaint, the actions of the social worker in speaking to John and then following up with the staff do not rise to deliberate indifference or lack of professional judgment.

Even under the professional judgment standard, the social worker's actions are entitled to

---

(m) "Abused child" means a child whose parent, guardian or custodian or any person responsible for his care or support, whether legally obligated to do so or not, has caused or allowed to be caused upon said child sexual abuse, sexual exploitation, emotional abuse, mental injury, nonaccidental physical injury or other maltreatment. Provided, however, that physical discipline, including spanking, performed on a child by a parent, guardian or custodian in a reasonable manner shall not be deemed abuse under this section."

Miss. Code Ann. § 43-21-105(l)-(m).

11

a presumption of validity. Plaintiffs have submitted no evidence that the social worker did not use her judgment in her investigation or in finding that the bruises sustained by John were the result of an accident and not the result of abuse. Furthermore, John's violent behavior was noted more than one time while he was in this placement, and staff was forced on more than one occasion to use therapeutic holds, recognized methods for controlling violent patients, to calm him. *See* Exhibit "PPP" to Defendants' Reply at AG John A 000326-327 (Intake form noting that at prior placement, John was placed in therapeutic hold when he threatened suicide, and he becomes aggressive on a weekly basis); AG John A 000481 (placed in therapeutic hold for not following directions); AG John A 000475 (staff was afraid John was going to hurt himself or someone else and was getting incident reports filed on a daily basis); AG John A 000491-492 (therapeutic hold used when John began punching and kicking a door and began throwing items at staff); AG John A 000584-585 (therapeutic hold used when John became aggressive with staff); and AG John A 000606 (John threw book at peer, causing peer's nose to bleed).

**Jamison J.:**

Plaintiffs allege the following as "uncontested facts" related to Jamison J.:

1) Jamison J. was sent to live in Kansas with a father with whom he had no previous relationship and whose parental rights had been terminated.

   At the time of Jamison's placement with his father in Kansas, MDHS's records reflected that Jamison's father had multiple felony convictions for which he had been incarcerated and that he had previously been deemed an inappropriate placement resource for Jamison.

   At the time MDHS placed Jamison with his father, it did not have the results of any home evaluation study, and it had not performed the requisite background and criminal checks necessary to determine if the placement was safe.

   Kansas child welfare officials contacted MDHS to report that Jamison's placement with his father was illegal because it violated the guidelines governing interstate placement of children.

>  Jamison was also placed in an institution for delinquent youth, although he had never been adjudicated delinquent.

*See* Plaintiffs' Reply at p. 10 and 11 (## 230, 237-240).

2)  When MDHS first removed Jamison from his mother's custody, it placed him with his maternal grandmother for three months, during which time MDHS made several documented observations that the home was unsafe and that the grandmother could not provide the five-year-old with adequate care and supervision.[6]

>  MDHS removed Jamison from the first placement with his maternal grandmother because he was being maltreated. Jamison was later returned to this placement unsupervised for a week without any documented indication that conditions had been improved such that he would not be subject to yet further neglect.

*See* Plaintiffs' Reply at p. 10 (## 233-234).

A thorough review of the factual evidence surrounding Plaintiffs' allegations reveals that in each of these incidents, Plaintiffs disregard the role of the Youth Court in making decisions regarding Jamison's placements. Jamison was placed in his father's home by order of the Youth Court, with approval from the Bolivar County Prosecuting Attorney and Jamison's guardian ad litem, pending approval of the Interstate Compact on the Placement of Children Request from the state of Kansas. *See* Exhibit "RRR" to Defendants' Reply at AG Jamison J 004711-12. This placement was recommended by MDHS/DFCS out of desperation as Jamison had disrupted several placements and finding a suitable placement for him had been difficult. *See id.* at AG Jamison J 004592-4595. Jamison also disrupted the placement with his father, and he was returned to Mississippi. *See id.* at AG Jamison J 004593. At that time, Jamison was ordered by

---

[6] Jamison was placed into his grandmother's home prior to being placed into the custody of MDHS/DFCS per court order, and this evidence is therefore not relevant to the issues of this case which concerns only children in the custody of MDHS/DFCS. *See* Exhibit "AAAA" to this Surrebuttal at NP 00139 (Case Plan dated December 5, 1991, identifying Jamison as a "Protective Services" child) and NP 00445 (memorandum stating children were placed into grandmother's home on a "temporary placement" and are not in foster care at the time).

the Youth Court to be placed in a transitional institution for youth transitioning out of an institution for delinquent youth into society. *See id.* at AG Jamison J 004678.

When MDHS/DFCS moved Jamison out of this transitional institution, he spent about a week with his grandmother for a family visit. MDHS/DFCS conducted background checks on both Jamison's grandmother and uncle who were living in the home at the time, and Jamison reported no problems from his stay at his grandmother's home. *See* Exhibit "AAAA" to this Surrebuttal at AG Jamison J 004739, 004740, 004761, and 004763 (background checks for grandmother and uncle).

For these reasons, Plaintiffs have not met their burden of demonstrating they are entitled to judgment as a matter of law regarding the named Plaintiffs' rights to reasonably safe living conditions and adequate food, clothing, shelter, and medical care. Because Plaintiffs' have not met their burden of establishing there are no genuine issues of material fact and that they are entitled to judgment as a matter of law, Plaintiffs' Motion for Summary Judgment should be denied.

Respectfully submitted,

**HALEY BARBOUR, as Governor of the State of Mississippi; DONALD TAYLOR, as Executive Director of the Department of Human Services; and RICKIE FELDER as Director of the Division of Family and Children's Services**

BY:  /s/ Dewitt L. ("Rusty") Fortenberry, Jr.

**OF COUNSEL:**

Attorney General Jim Hood
State of Mississippi
P.O. Box 220
Jackson, MS 39205-0220

**BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC**
Dewitt L. ("Rusty") Fortenberry, Jr. (MSB #5435)
Gretchen L. Zmitrovich (MSB #101470)
Ashley Tullos Young (MSB #101839)
Kenya Key Rachal (MSB #99227)
4268 I-55 North
Meadowbrook Office Park
P.O. Box 14167
Jackson, Mississippi 39211
Telephone: (601) 351-2400
Facsimile: (601) 351-2424


**CERTIFICATE OF SERVICE**

    I hereby certify that I have this day electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to the following:

W. Wayne Drinkwater, Jr. Esq.
Melody McAnally, Esq.
BRADLEY ARANT ROSE & WHITE LLP
Suite 450, One Jackson Place
Post Office Box 1789
Jackson, MS 39215

Stephen H. Leech, Esq.
850 East River Place, Suite 300
Jackson, Mississippi 39215

Eric E. Thompson, Esq.
CHILDREN'S RIGHTS, INC.
330 Seventh Avenue, 4th Floor
New York, New York 10001

Harold E. Pizzetta, III
Special Assistant Attorney General
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 220
Jackson, MS  39205

I also certify that I have this day served a copy of the foregoing on the following non-ECF participants by United States Mail, postage prepaid:

Marcia Robinson Lowry, Esq.
Susan Lambiase, Esq.
Shirim Nothenberg
Tara Crean, Esq.
CHILDREN'S RIGHTS, INC.
330 Seventh Avenue, 4th Floor
New York, New York  10001

Eric S. Manne, Esq.
John Piskora, Esq.
LOEB & LOEB, LLP
345 Park Avenue
New York, NY 10154

**SO CERTIFIED**, this the **6th** day of **June**, **2006**.

/s/  Dewitt L. ("Rusty") Fortenberry, Jr.

16