Deborah Stewart - 10/27/04

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

OLIVIA Y, By and
Through Her Next Friend,
James D. Johnson, et al.                    PLAINTIFFS

VS.                    CIVIL ACTION NO. 3:04CV25LN

HALEY BARBOUR, As Governor
Of the State of Mississippi;
DONALD TAYLOR, as Executive
Director of the Department of
Human Services; and BILLY MANGOLD,
As Director of the Division of
Children's Services                         DEFENDANTS

DEPOSITION OF DEBORAH STEWART

Taken at the instance of the Defendant at the
offices of Bradley Arant, LLP, One Jackson Place,
188 E. Capitol Street, Suite 450, Jackson,
Mississippi, on Thursday, October 27, 2004,
beginning at approximately 7:58 a.m.

APPEARANCES:
    ERIC E. THOMPSON, ESQ.
    SHIRIM NOTHENBERG, ESQ.
    Children's Rights, Inc.
    404 Park Avenue South
    New York, NY 10016
        COUNSEL FOR PLAINTIFFS

    BETTY A. MALLETT, ESQ.
    McGlinchey Stafford, PLLC
    Skytel Centre South, Suite 1100
    200 South Lamar Street
    Jackson, Mississippi 39201

        COUNSEL FOR DEFENDANTS


EXHIBIT "A"

Deborah Stewart - 10/27/04

Page 3

**INDEX**

| | PAGE |
|---|---|
| Appearances | 2 |
| Index | 3 |
| Certificate of Deponent | 138 |
| Certificate of Court Reporter | 139 |

**EXAMINATIONS**

| | PAGE |
|---|---|
| Examination By Ms. Nothenberg | 5 |

Also Present: Earl Scales, Office of Attorney General

Reported By:   Julie Brown, CSR #1587
              Brooks Court Reporting
              Post Office Box 2632
              Jackson, Mississippi  39207
              (601) 362-1995

Page 4

**EXHIBITS**

| | PAGE |
|---|---|
| Exhibit 27 - Deposition of Michelle Henry | 18 |
| Exhibit 28 - Video Deposition of Nelson Billyman | 36 |
| Exhibit 29 - Periodic Administrative Determination | 49 |
| Exhibit 30 - Letter re: Youth Villages | 84 |
| Exhibit 31 - Document from Jean Forteta concerning ▮▮▮▮▮ | 117 |
| Exhibit 32 - Memorandum from the Mississippi Department of Human Services, Division of Program Integrity | 127 |

Page 5

1    DEBORAH STEWART,
2    having been first duly sworn, was examined and
3    testified as follows:
4    EXAMINATION BY MS. NOTHENBERG:
5    Q.   Good morning, my name is Shirim
6    Nothenberg.  This is the case of Olivia Y v.
7    Barbour.  Do you understand that you're here to give
8    deposition testimony in that matter?
9    A.   Yes.
10   Q.   I'm just going to lay out some of the
11   ground rules.  If you don't understand a question,
12   just stop me and ask me to rephrase it or just say,
13   "I don't understand."
14        If you need to take a break, go ahead, we
15   can.  I would just ask that you finish answering a
16   question.  If there's a question that's posed to
17   wait until you've given the answer.
18        If you answer a question and later think
19   about it and would like to augment or in any way
20   clarify your answer, never hesitate.
21        What did you do to prepare for your
22   deposition today?
23   A.   Nothing really.
24   Q.   Did you review any documents?
25   A.   No.


Page 82

1 are placed in the home, she knows. And so we know
2 when the beds are available and when they're not.
3 She does.
4    Q.  How would she know, let's say in ▮
5 County, that a child has just been reunified and
6 that bed has opened up?
7    A.  I guess the ASWS would contact her and
8 let her know. I'm just really not sure.
9    Q.  In ASWS, do you contact other counties
10 and let them know when a foster bed has opened up in
11 ▮ County?
12    A.  No, I don't.
13    Q.  Okay. If there's no placement available
14 in ▮ County, let's say a child needs regular
15 foster home, what does the licensure person do?
16    A.  If it's not an available person, foster
17 home in ▮ County, what does she do?
18    Q.  Uh-huh (affirmatively).
19    A.  She may look at the different foster
20 homes that she has licensed so see if they are --
21 how many they are licensed for and she may call --
22 let me know this foster home has -- she just
23 licensed this foster home and they got two, three,
24 four beds available.
25    Q.  My question to you was if there was no

Page 83

1 home available in ▮ County what would the
2 licensure person do?
3    A.  In ▮ County that she licensed, she
4 may look and say I just licensed this home and she
5 will let me know or let the worker know or someone
6 else in the office know.
7    Q.  And if no placement is available is there
8 ever an instance -- strike that.
9        Just so I understand the placement process,
10 if a caseworker has a child in need of a foster home
11 placement and there are no foster homes in ▮
12 County that have an available bed, how does that
13 caseworker go about finding a foster home for that
14 child?
15    A.  We could call another ASWS in another
16 county and ask if they have any available openings.
17    Q.  Is the we the caseworker who's making
18 that phone call?
19    A.  The caseworker, me, the foster care
20 licensure person, the social worker aid, the
21 homemaker. We all work together in finding
22 placement.
23    Q.  But there's nobody whose job
24 responsibility is in fact to make that call
25 specifically?

Page 84

1    A.  No.
2    Q.  So the bottom line is, in order to find a
3 placement you call around to a variety of counties
4 to see?
5    A.  For foster homes. Uh-huh
6 (affirmatively).
7    Q.  Okay.
8        (Exhibit 30 - Letter re: Youth Villages
9 marked for identification.)
10       MS. NOTHENBERG: The witness is being
11 shown what's previously been marked as Exhibit 30
12 with the heading ▮ and with Bates
13 number 06623-06624.
14    Q.  (By Ms. Nothenberg) Take a minute to
15 review briefly just the first three paragraphs of
16 this letter. Just the first three paragraphs which
17 are quite brief. Do you recognize this letter?
18    A.  No, I don't.
19    Q.  Okay. Is Josie Brown a caseworker in
20 ▮ County?
21    A.  Yes.
22    Q.  Is she under your supervision?
23    A.  Yes.
24    Q.  Are you familiar with the name ▮
25 ▮, foster child ▮?

Page 85

1    A.  Yes.
2    Q.  Is he under your supervision?
3    A.  Yes.
4    Q.  Okay. Do you see how the first paragraph
5 reads that, "▮ was admitted to Memphis
6 Boys Town on May 16, 2001 with a discharge date of
7 11/16/2001"?
8    A.  Yes.
9    Q.  Okay. Do you see on the second paragraph
10 where it says, "Due to difficulty with finding
11 ▮ placement, his date was changed to
12 11/30/2001"?
13    A.  Yes.
14    Q.  And the next line says, "Note that ▮
15 has been on the list for therapeutic foster care."
16 Are you aware of other instances in which children's
17 discharge date from a residential placement had to
18 be changed simply because there are no therapeutic
19 foster placements available for that child?
20    A.  Well, yes.
21    Q.  You are?
22    A.  No placements.
23    Q.  How frequently does that occur?
24    A.  I don't know how frequently.
25    Q.  But it occurs?

Deborah Stewart - 10/27/04

Page 86

1  A.  Yes. And I can say this that it does
2  occur because I wouldn't say that I think as I
3  stated earlier that is always because of no
4  available placement, but sometimes the criteria is
5  not met or either the child has been at that
6  placement before and they refused to take him back.
7  So it's different criteria why they may still be on
8  a waiting list until we find something else.
9  Q.  But there are in fact instances where a
10 child is waiting for a therapeutic placement because
11 no foster care placements have been identified, as
12 is the case here?
13 A.  Like I said, yeah.
14 Q.  Okay.
15 A.  And the reason why.
16 Q.  Do you see in the last sentence on the
17 third paragraph, "I am concerned that ▮▮▮▮ has
18 began to digress and disrupt due to his knowledge of
19 there being no placement options for him at this
20 time"?
21 A.  Yes.
22 Q.  Are you aware of other instances where
23 children have begun to digress because they know
24 that they're waiting in a placement and there are no
25 other placements available for them?

Page 87

1  A.  I really can't answer that. This is what
2  whoever wrote this is saying, so.
3  Q.  Okay.
4  A.  So I can't answer that as to say that
5  that has actually happened because I'm not one to be
6  there to say that it did happen.
7  Q.  Would you agree that unnecessary
8  institutionalization of children can be harmful?
9  A.  Oh yes.
10 Q.  Would you agree that children who need
11 therapeutic placements who don't receive those
12 placements often end up moving from placement to
13 placement because of disruptions?
14 A.  Repeat the question, please.
15 Q.  Would you agree that children who need
16 therapeutic placements who don't receive those
17 placements often end up moving frequently because of
18 placement disruptions?
19 A.  I can't agree with that.
20 Q.  Do you believe children who are in need
21 of therapeutic placements who don't receive those
22 placements are at risk of movement, more movement?
23 A.  Yeah, I can agree to that.
24 Q.  And is it your experience in ▮▮▮▮
25 County that some children experience placement

Page 88

1  disruptions because they were in need of a
2  therapeutic placement and were not in such a
3  placement?
4  A.  No, I wouldn't say that.
5  Q.  Are you aware of instances in which
6  children in ▮▮▮▮ County have spent the day in the
7  DFCS office while awaiting placement?
8  A.  Yes. Well, not awaiting placement. I
9  would say we have placement and they are there until
10 a worker can take them for placement.
11 Q.  So they're awaiting to be placed?
12 A.  Yes.
13 Q.  Okay. Do children waiting placement in
14 DFCS office attend school?
15 A.  Yeah. Some of them do and some of them
16 don't. It just depends. We may have gotten a child
17 that day, so he's not in school, but they're waiting
18 for the worker to transport them to where they are
19 going.
20 Q.  Did children -- are you familiar with
21 instances in which children have spent the day, more
22 than one day, have spent consecutive days in DFCS
23 office awaiting placement?
24 A.  Yes, it has happened.
25 Q.  And would that be because there are not

Page 89

1  enough placements available for children in Forrest
2  County?
3  A.  No. I would say we have foster homes
4  there, but it's because of maybe the behavior of the
5  child that we're trying to find an appropriate
6  placement.
7  Q.  Is it ▮▮▮▮ County practice to place a
8  child in an emergency temporary foster home in
9  consecutive nights when a more permanent placement
10 can't be located?
11 A.  Is it our practice to place --
12 Q.  A child in an emergency temporary foster
13 placement overnight while --
14 A.  Like a shelter that you're speaking of?
15 Q.  A shelter or are there such things as
16 emergency temporary foster homes that take children
17 for just one night?
18 A.  We don't have them in ▮▮▮▮ County.
19 Q.  So if a child is awaiting placement in
20 the DFCS office and no placement is found that day,
21 where does that child sleep?
22 A.  We find a placement. And I'm not going
23 to -- you know, I can't say foster home, shelter.
24 We find a placement.
25 Q.  And then that child is returned to the

23 (Pages 86 to 89)

Deborah Stewart - 10/27/04

Page 94

1 that's going on.
2  Q. In your review of children in foster care
3 in ▮▮▮▮ County, are you seeing children under ten
4 who are experiencing say more than two moves?
5  A. Some do, some don't.
6  Q. And does that concern you?
7  A. Depending on why.
8  Q. Do you believe a greater array of
9 available placements in ▮▮▮▮ County would
10 decrease the number of moves children under ten
11 experience?
12  A. It could help and it could not. I still
13 say that it just depends on what the circumstances
14 are revolving around that child.
15  Q. So just -- what is the ▮▮▮▮ County
16 practice regarding an initial medical examination
17 for children entering foster care?
18  A. If they are at a shelter the shelter
19 takes them for medical exams and foster parents take
20 them for medical exams.
21  Q. Is there a requirement that a child has a
22 medical exam within a certain period of time upon
23 entering care?
24  A. I think so. I'm not sure what the time
25 is.

Page 95

1  Q. So you don't know?
2  A. I'm not sure what the time is.
3  Q. Would the results of any medical exam
4 provided to a child upon entering care be documented
5 in the child's case file?
6  A. Yes.
7  Q. Do you know if there are any impediments
8 to ensuring medical exams to children who enter
9 foster care custody?
10  A. No, not that I'm aware of, no.
11  Q. Do you track in your review of case files
12 whether a child has undergone a medical screen?
13  A. Yes. Basically when, like I was saying,
14 the form that we have when we make sure the children
15 are being seen, that information is on that form
16 also about medical diagnosis, prescriptions that
17 they are taking, last time at the doctor, last time
18 at the dentist.
19  Q. And that's something you review when
20 you're making?
21  A. Every month.
22    MS. NOTHENBERG: I'm going to show the
23 witness what's previously been marked as Exhibit 11.
24  Q. (By Ms. Nothenberg) Do you recognize
25 this document?

Page 96

1  A. Yes.
2  Q. And what is it?
3  A. It's a letter from ▮▮▮▮.
4  Q. Documenting what?
5  A. It's giving information on a child.
6  Q. Okay. And that child is ▮▮▮▮
7 ▮▮▮▮. Are you familiar with the case of
8 ▮▮▮▮ who came into custody on
9 September 10th, 2003?
10  A. Somewhat, yes.
11  Q. Now, you'll note the date of this letter
12 is the 3rd of October?
13  A. Yes.
14  Q. Okay. And the second paragraph states
15 that, "We have had an initial physical completed
16 this date with the following results." And then it
17 lists, "The child weight is 22 pounds, the weight of
18 a normal one year old child." Do you know how old
19 ▮▮▮▮ was when she entered custody?
20  A. No, I don't.
21  Q. The child is diagnosed with severe
22 malnutrition. The child has severe cradle cap due
23 to inadequate bathing and care. The child has an
24 undiagnosed rash over most of her face and upper
25 torso. And the child exhibited extreme fear when

Page 97

1 the doctor attempted to examine her vaginal area.
2    Now, would you expect these conditions to
3 have been noted by the caseworker when ▮▮▮▮ first
4 came into custody?
5  A. What, expect what to have been noted?
6  Q. Would you expect the caseworker to have
7 recognized that the child was severely malnourished?
8  A. No.
9  Q. Would you expect your caseworker to
10 recognize severe cradle cap?
11  A. Yes.
12  Q. Would you expect your caseworker to
13 recognize rash over most of her face and upper
14 torso?
15  A. Yes.
16  Q. Would you expect those to be noted in the
17 case file?
18  A. Yes.
19  Q. Would they be noted anywhere else?
20  A. In the case file.
21  Q. And would that be in the MACWIS or in a
22 paper record?
23  A. Both.
24  Q. It would be in both?
25  A. Yeah, it could be in either or.

Deborah Stewart - 10/27/04

Page 98

1   Q.  Okay.
2   A.  I would say either or.
3   Q.  Now, would you expect these conditions to
4 have been noted by a doctor who had given the child
5 a medical screen?
6   A.  Yeah.
7   Q.  Yes. Would you agree with me that it
8 doesn't appear that ▓▓▓ had a medical screen
9 before she came into the custody of ▓▓▓?
10   A.  I don't know if she had one or not. I
11 would like to --
12   Q.  Would it be unusual --
13   A.  Could I note this one thing?
14   Q.  Sure.
15   A.  I was not a super -- over foster care at
16 that time. The supervisor that was over foster care
17 was Ramona Lockett.
18   Q.  Okay. Thank you. Would it be unusual
19 for a child to have been in care for a couple of
20 weeks not to have had a physical?
21   A.  Yeah, I would say it is.
22   Q.  That is unusual?
23   A.  Yes.
24   Q.  And how do you know that?
25   A.  We try to get our children a physical as

Page 99

1 soon as possible.
2   Q.  And where is Ramona Lockett now?
3   A.  She's not with the agency.
4   Q.  When did she leave?
5   A.  It was last year.
6   Q.  Do you know why she left?
7   A.  No.
8   Q.  And ▓▓▓ is still in foster care; is
9 that right?
10   A.  Yes.
11   Q.  And under your supervision?
12   A.  Yes.
13   Q.  Okay. Can you look with me at the last
14 paragraph where it reads, "It is clearly evident
15 that this child has suffered severe physical neglect
16 and may have been the victim of sexual assault"?
17 To your knowledge, has ▓▓▓ undergone any
18 assessment to determine whether she was a victim of
19 sexual assault?
20   A.  I believe an exam. I'm just not really
21 sure. I believe an exam.
22   Q.  Such an -- would the results of such an
23 exam be in ▓▓▓ case file?
24   A.  It should be.
25   Q.  In the MACWIS file?

Page 100

1   A.  Well, it would have come from -- it would
2 be on letter and it would be in the case file.
3   Q.  Okay. And you're the supervisor of her
4 case currently?
5   A.  Yes.
6   Q.  And you would look in your monthly review
7 of her case, would you look to determine whether
8 that sexual abuse evaluation or exam was undertaken?
9   A.  I wouldn't do it now. At that time, I
10 was not over this, so I didn't look to see if that
11 was there.
12   Q.  When did you become the supervisor in
13 this case?
14   A.  When did I become the supervisor?
15   Q.  Uh-huh (affirmatively).
16   A.  After -- I would say the first of this
17 year.
18   Q.  First of this year?
19   A.  Yes.
20   Q.  But in your review of a file, that's not
21 something you look for when you're reviewing
22 caseworker's work on a file, whether things that
23 were noted earlier on had in fact been taken care
24 of?
25   A.  Yes, you do.

Page 101

1   Q.  You do? So that is something you would
2 look for, whether she's under sexual?
3   A.  Uh-huh (affirmatively).
4   Q.  Have you reviewed this case?
5   A.  Yes. I've looked at this case, yes.
6   Q.  How recently?
7   A.  Last month.
8   Q.  And you don't recall whether in fact she
9 has now been examined to determine whether she was a
10 victim?
11   A.  I can't recall that, no.
12   Q.  When are children provided a permanency
13 plan?
14   A.  I didn't hear the beginning.
15   Q.  When are children provided a permanency
16 plan?
17   A.  At the time we take custody, we start
18 working on a permanency plan.
19   Q.  Who's responsible for the permanency
20 plan.
21   A.  The social worker that the case is
22 assigned to or the social worker.
23   Q.  Is it a document that they fill out to
24 create a permanency plan?
25   A.  No. The permanency plan is something

26 (Pages 98 to 101)