Mechille Henry - 09/09/04

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

OLIVIA Y, By and
Through Her Next Friend,
James D. Johnson, et al.                PLAINTIFFS

VS.                           CIVIL ACTION NO. 3:04CV25LN

HALEY BARBOUR, As Governor
Of the State of Mississippi;
DONALD TAYLOR, as Executive
Director of the Department of
Human Services; and BILLY MANGOLD,
As Director of the Division of
Children's Services                     DEFENDANTS

DEPOSITION OF MECHILLE HENRY

Taken at the instance of the Plaintiffs at the
offices of Bradley Arant, LLP, One Jackson Place,
188 E. Capitol Street, Suite 450, Jackson,
Mississippi, on Thursday, September 9, 2004,
beginning at approximately 1:00 p.m.

APPEARANCES:

    ERIC E. THOMPSON, ESQ.
    SHIRIM NOTHENBERG, ESQ.
    Children's Rights, Inc.
    404 Park Avenue South
    New York, NY 10016

COUNSEL FOR PLAINTIFFS


EXHIBIT "C"

Page 4

BETTY A. MALLETT, ESQ.
McGlinchey Stafford, PLLC
Skytel Centre South, Suite 1100
200 South Lamar Street
Jackson, Mississippi 39201

COUNSEL FOR DEFENDANTS

Reported By: Julie Brown, CSR #1587
Brooks Court Reporting
Post Office Box 2632
Jackson, Mississippi 39207
(601) 362-1995

1    MECHILLE HENRY,
2  having been first duly sworn, was examined and
3  testified as follows:
4  EXAMINATION BY MR. THOMPSON:
5    Q.  Good afternoon, Ms. Henry. My name is
6  Eric Thompson. I am counsel with Children's Rights
7  and I represent the plaintiffs in the matter of
8  Olivia Y. et al. Do you understand that you're here
9  to give sworn testimony in that matter?
10   A.  Yes.
11   Q.  Ms. Henry, could you spell your first
12 name for the record, please?
13   A.  M-E-C-H-I-L-L-E.
14   Q.  Thank you. Ms. Henry, have you ever been
15 deposed before?
16   A.  No.
17   Q.  Just a couple of ground rules. I'll be
18 asking questions. If at any time my question is
19 unclear to you, I'll be happy to rephrase it. Just
20 let me know?
21   A.  Okay.
22   Q.  If at any time you need to take a break,
23 let me know and we will do that. That's it. We'll
24 just get started. Ms. Henry, what is your current
25 position?

Page 3

INDEX
                                          PAGE
Appearances                               1

Certificate of Deponent                   124

Certificate of Court Reporter             125

EXAMINATIONS
                                          PAGE
Examination By Mr. Thompson               4

EXHIBITS
                                          PAGE
Exhibit 8 - MDHSSS 440 A form             70

Exhibit 9 - Investigation Report          92

Exhibit 10 - MACWIS Report                101

Exhibit 11 - Letter re: Olivia Y          110

Page 5

1    A.  Regional director.
2    Q.  And that's with?
3    A.  The Department of Human Services Division
4  of Family and Children Services.
5    Q.  And for what region are you the regional
6  director?
7    A.  6th North.
8    Q.  That covers a number of counties,
9  correct?
10   A.  Yes, ten.
11   Q.  Ms. Henry, can you tell me what you did
12 to prepare for today's deposition?
13   A.  I spoke with my attorney.
14   Q.  How long did you speak with your
15 attorney?
16   A.  Do you mean time wise?
17   Q.  Yes?
18       MS. MALLETT:  Objection. I don't think
19 she has to reveal that.
20   Q.  (By Mr. Thompson) I'm not inquiring into
21 the nature of the conversation, just how long?
22       MS. MALLETT:  I'm going to instruct her
23 not to answer.
24   Q.  (By Mr. Thompson) How many times did you
25 have discussions with your attorney regarding

Mechille Henry - 09/09/04

Page 110

1 locating these children without an address. They
2 found a relative who said that the children did not
3 live there. If they were in school, they would have
4 been able to call the school to see if they have
5 children registered there for the schools that were
6 in the area of this address. I don't know if school
7 was in or not.
8        MS. MALLETT: Are you about done because
9 she's telling me that she has another appointment at
10 four.
11        MR. THOMPSON: I've got, I think allotted
12 another 18 minutes and I'm going to need those
13 18 minutes.
14        MS. MALLETT: 18 minutes okay?
15    A.   I just didn't know if that was going to
16 go over to 4:30.
17        MR. THOMPSON: That may depend on your
18 counsel. I'll be done in 18 minutes.
19        (Exhibit 11 - Letter re: Olivia Y marked
20 for identification).
21    Q.   (By Mr. Thompson) Now I show you a
22 document that's been marked as Exhibit 11. Do you
23 recognize this letter regarding named plaintiff
24 Olivia Y?
25    A.   No.

Page 111

1    Q.   You've never seen this document?
2    A.   No.
3    Q.   When I refer to plaintiff Olivia Y from
4 ▓▓▓▓▓▓▓▓▓▓, a three-year old girl who came into
5 custody in September of 2003, do you recall
6 attending any hearings before Judge MacPhail
7 regarding this child?
8    A.   I believe in the very beginning, but at
9 one point, I was not allowed in the courtroom. And
10 I do not know what has transpired with this case.
11    Q.   Since that time?
12    A.   They were not allowed to discuss it or
13 anything, so I can't tell you anything about this
14 case basically.
15    Q.   Well, you're aware that a separate D H S
16 investigation was conducted on this case, aren't
17 you?
18    A.   Yes.
19    Q.   And are you aware that part of the events
20 that were investigated had to do with the condition
21 of this child when she was placed at Hope Haven
22 children's shelter?
23    A.   I was not made aware of any of it at all.
24 Per the, I would have to assume per the instructions
25 of the judge.

Page 112

1    Q.   If you would review for me the first
2 paragraph of this letter?
3    A.   Okay.
4    Q.   And do you see in the subsequent
5 paragraph where there are bullets. And the first
6 bullet that says the child's weight is 22 pounds,
7 the weight of a normal one year old child?
8    A.   Yes.
9    Q.   Assuming now, hypothetically, that a
10 child comes into D H S custody in the physical state
11 described in the first paragraph and weighing at
12 three-years-old 22 pounds, would you expect that
13 child to be taken by D H S for a medical
14 examination?
15        MS. MALLETT: Objection, calls for
16 speculation.
17    A.   I can say this, that when children come
18 into custody, if we don't take them to the doctor,
19 the shelter's, usually if they come in, and I don't
20 know what time this child came into custody, I don't
21 know any of the details. But a lot of our shelters
22 will take our children to the doctor as a service to
23 us for us. And I'm not sure whether this one does
24 or not.
25    Q.   (By Mr. Thompson) Are you aware of the

Page 113

1 requirements in D H S policy that a child receive a
2 medical examination upon coming into custody within
3 at least seven days?
4    A.   Yes.
5    Q.   And do you expect that that in fact
6 should occur in your region?
7    A.   I would like to say that I hope that that
8 is being done.
9    Q.   Do you have any way of knowing whether
10 that is being done or not?
11    A.   If it is documented in MACWIS, there is a
12 section where they can put medical information.
13    Q.   Well, is there any way of reviewing on an
14 aggregate basis for example by county as to those
15 children in foster care, whether or not they in fact
16 have received a medical examination within seven
17 days of coming into custody?
18    A.   You can review the case and you can look
19 and see whether or not they have entered that
20 information.
21    Q.   You'd have to do a case by case review
22 though, correct?
23    A.   Right.
24    Q.   Have you in fact done such a case by case
25 review?

29 (Pages 110 to 113)

Mechille Henry - 09/09/04

Page 114

1  A.  Not every case, no.
2  Q.  Have you done a sample of cases?
3  A.  Yes, I have.
4  Q.  And you've reviewed that specific
5  compliance with that specific requirement?
6  A.  I've reviewed, you may as well say I have
7  taken some cases and I have reviewed everything that
8  is required in that particular, in a foster care
9  case.
10  Q.  Which would include then your review of
11  whether or not the child received the medical
12  examination within seven days of entering custody?
13  A.  Right. I would look at the medical part.
14  If it's not completed, then what I used to do would
15  be to do a screen print of that particular tab or
16  whatever you want to call it, screen. And
17  basically, I would fax it or mail it to the
18  supervisor and say that this information needs to be
19  completed.
20  Q.  You say you used to do that. Do you no
21  longer do that?
22  A.  When I say I used to, what I'm saying is
23  that when I was required to go to court sometimes
24  two days out of a week, and now I'm having to attend
25  another court thing that's a half a day a week. I

Page 115

1  don't review as frequently, but I have been at work
2  at 11 o'clock and midnight, a couple of weeks ago,
3  2 a.m. and 5 a.m. in order to get some things done
4  that needed to be done. So what I'm saying is I
5  don't do them as a magnitude as I used to because of
6  the time, well, the time consumption that I have.
7  Q.  Do you have any other D H S staff who
8  function in a quality assurance role to review cases
9  for compliance with policy and law?
10  A.  Our foster care reviewers.
11  Q.  And is there currently a foster care
12  reviewer assigned to your county?
13  A.  Yes.
14  Q.  Is there more than one?
15  A.  There is. They cross regions, so you may
16  have one only in your region. You may have two or
17  three in your region.
18  Q.  And in your region, how many do you have?
19  A.  Approximately four.
20  Q.  And are they solely, those four solely
21  responsible for cases within your region?
22  A.  They're responsible for, they may be
23  responsible for some cases in another region, too,
24  I'm not sure.
25  Q.  How many foster care cases do you have in

Page 116

1  your region?
2  A.  Probably at least 600.
3  Q.  How many investigations do you receive a
4  year in your region?
5  A.  I don't know.
6  Q.  Well, do you ever review data as to that
7  number?
8  A.  I more review the investigations
9  theirselves or the other components of it as opposed
10  to the total number.
11  Q.  Well, do you think it would be relevant
12  to know the total number in terms of whether or not
13  your staff is in fact able to cover the number of
14  cases that are coming in?
15  A.  That's more, I look at that more on a, as
16  opposed to a annual total number or anything like
17  that. I look at that more with staffing with my
18  supervisors, or if I'm looking at the log for a
19  month. You know, believe me, when it comes to
20  staffing issues, my supervisors keep me well aware
21  of when they need some staff, believe me, or when
22  they are getting a lot of investigations, or if
23  there are some, you know, they keep me aware of
24  issues.
25  Q.  And how do they do that?

Page 117

1  A.  Call me. And I see them.
2  Q.  Have you ever received any memos from
3  your staff as to the staffing conditions and case
4  loads?
5  A.  I've received one recently where they
6  were requesting that if at all possible, they be
7  able to hire another social worker. And I asked
8  them did they have anyone that was interested. And
9  they said that they did, so I forwarded the memo
10  along with the application to my state office.
11  Q.  Have you ever communicated to your
12  superiors the need in your region or any particular
13  counties in your region for additional staff?
14  A.  Yes, I mean, we all, we tell them that we
15  would like to have, I mean, that's ultimate, you
16  would want to have more staff. You know, because if
17  just, just be, say for instance, if you had an
18  office where there were five people and people were
19  working and they would want their jobs, you know,
20  they would love to have five more people to come in
21  and take some of the work.
22      So yes, I mean, I have asked, you know,
23  that we could get additional staff across the
24  region, even for those counties where there is
25  probably people with not a whole lot of work. That

30 (Pages 114 to 117)