IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

OLIVIA Y., et al.                                                                                            PLAINTIFFS

v.                                                                              CIVIL ACTION NO.  3:04CV251

HALEY BARBOUR, as Governor of the State of Mississippi, et al.            DEFENDANTS

### PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO FILE A SURREBUTTAL

Defendants' Motion for Leave to File a Surrebuttal is an improper attempt to reargue their Response in Opposition to Plaintiffs' Motion for Summary Judgment. Moreover, Defendants' belated factual submissions are immaterial because they do not address, let alone call into question, the overwhelming evidence that Defendants have knowingly operated a dangerously understaffed and under-funded child welfare agency for years that puts all class members, including the Named Plaintiffs, at constant risk of substantial harm in violation of their constitutional rights.

Defendants' accusation of "sandbagging" is not credible.[1]  Plaintiffs first submitted their five expert reports, including those of Drs. Lewis and Hiatt, to Defendants on February 7, 2006, pursuant to this Court's Case Management Order, and again in support of Plaintiffs' Motion for Summary Judgment on Liability.  (*See* Pls' Mot. for

---

[1] It is Plaintiffs who have been sandbagged.  Defendants raise factual arguments as to liability on the Named Plaintiffs' cases that they chose not to make until their Reply brief in support of their own Motion for Summary Judgment and now as part of their proposed Surrebuttal.

Summ. J. on Liability at Exs. 2-6.[2]) Plaintiffs' Motion focused on the uncontested facts that establish that all children in the certified class (which includes the Named Plaintiffs) are being subjected to a substantial risk of harm in violation of their constitutional rights. The expert reports of Drs. Lewis and Hiatt submitted in support of Plaintiffs' Motion for Summary Judgment present explicit findings of how individual Named Plaintiffs have suffered actual harm. (*See* Exs. 3, 5.) In response, Defendants focused their entire Opposition on the supposed lack of evidence of harm to the Named Plaintiffs. (*See* Defs' Response in Opposition to Pls' Mot. for Summ. J. on Liability.) Inexplicably, however, Defendants chose not to address the findings of any of Plaintiffs' expert reports, including those of Drs. Lewis and Hiatt.[3] It thus should have come as no surprise to Defendants that Plaintiffs in their Reply focused on highlighting the previously submitted unrebutted evidence that established harm to the Named Plaintiffs and which Defendants did not address. No new evidence was presented.

Defendants have had ample opportunity to marshal the facts that they believe rebut the findings of Plaintiffs' experts. They could have done so through an expert report of their own, in their Response to Plaintiffs' Motion, or finally in their own Motion for Summary Judgment. In fact most of the arguments and facts presented in Defendants' proposed Surrebuttal are recycled from their Reply regarding their own Motion for Summary Judgment. (*See* Defs' Reply Mem. of Authorities in Further Support of Defs' Mot. for Summ. J.) Defendants' improper attempt at another opportunity to present their evidence should be rejected.

---

[2] Further references to Exhibits indicate those submitted in support of Plaintiffs' Motion for Summary Judgment on Liability unless otherwise noted.

[3] Defendants filed a separate Motion and Memorandum to Exclude Dr. Brister's report.

4/88503.1                              2

Should the Court choose to consider Defendants' Surrebuttal, a review of the proposed evidence reveals it to be immaterial. Defendants' proposed submission does not address Plaintiffs' class-wide evidence, which is more than sufficient to establish liability as matter of law. (*See* Pls' Mem. of Law in Supp. of Pls' Reply as To Pls' Mot. for Summ. J. ("Pls' Reply") at 2-4.) Likewise, it does not address a substantial portion of Plaintiffs' evidence regarding the harms suffered by the Named Plaintiffs. Of the facts Defendants do address, their proposed Surrebuttal does not, in fact, rebut the evidence Plaintiffs' have established concerning harm to the Named Plaintiffs. For example,

**Cody B.**

- <u>By knowingly allowing the asthmatic toddler to be exposed to dangerous cigarette smoke during unsupervised visits with his parents, Defendants failed to protect Cody's health.</u> Defendants' argument that the Youth Court was responsible for decisions regarding Cody's visitation plan (*see* Defs' Surrebuttal in Response to Pls' Reply in Further Supp. of Pls' Mot. for Summ. J. ["Defs' Surrebuttal"] at 3) is self defeating when the evidence shows that MDHS kept from the Youth Court the information most essential for making such decisions. Dr. Lewis's finding stands: MDHS, which has the ultimate responsibility for Cody's health and safety, placed him at serious risk of harm by failing either to immediately apprise the Youth Court of its concerns regarding the safety risks entailed by those visits or to supervise the visits when caseworkers documented the presence of cigarette smoke and animals in Cody's parents' home. *See* Ex. 3 at 31-2, 39-40, 48. The daily unsupervised visits were discontinued only when MDHS informed the Youth Court that it could no longer provide transportation, and even when the Court then held a hearing specifically to establish a new visitation plan, MDHS not only failed to make any mention of these serious health risks but even suggested to the Court that weekly day-long unsupervised visits be provided. *See* Youth Court Transcript of the Motion Hearing on January 26, 2004 (filed UNDER SEAL as Ex. A), at DHS 003831-55, 003834. Without the central information that such visits presented an immediate threat to Cody's health, the Youth Court accepted MDHS's proposal and granted the visits. *See* Ex. 3 at 32. Defendants do not dispute that they understood the significant danger cigarette smoke and animal hair posed to the asthmatic toddler: Defendants concede that two months after this visitation hearing—during which interval Cody had been subjected, at MDHS's suggestion, to further day-long unsupervised visits in this dangerous

environment—MDHS "vehemently oppose[d]" such visits on the basis of these risks. *See* Defs' Surrebuttal at 3. Only at this point, when Defendants finally provided the Youth Court with the vital information they had possessed all along, did MDHS permit the Youth Court to make an informed decision regarding Cody's safety and well-being. Once supplied with this information, the Youth Court immediately ordered the endangerment of Cody to stop: "I do not, and the court Order will reflect, that I do not want [Cody] in an atmosphere where there has been cigarette smoking or animals. If he has asthma, he deserves a clean, healthy environment to breathe in, so he cannot be in an environment that that [*sic*] has been going on, not just not happening in front of him. If his home has smoke and animals, then they need to visit elsewhere." *See* Defs' Ex. ZZZ at DHS 003868.[4] Incredibly, three days after the Court ordered that Cody not be subjected to environments in which animals or cigarette smoke were ever present, Cody's MDHS caseworker placed him in the BR foster home without inquiring as to whether the foster parents smoked, and in spite of the fact that the BRs owned two or more dogs. *See* Ex. 3 at 34; Simpson Dep. Tr. at 124:23-126:4 (redacted transcript attached hereto as Ex. B).

- <u>Defendants failed to maintain a complete medical record of Cody's asthmatic condition and did not consistently inform his caregivers of his known medical problems.</u> Defendants do not rebut that the BYK foster parent was not informed of Cody's serious medical condition. They argue that he was hospitalized not for asthma, as their own records indicate (*see* DHS Cody B. 000027 [redacted MDHS case record attached as Ex. C]), but for another respiratory ailment. *See* Defs' Surrebuttal at 4. Putting aside the fact that the same discharge summary Defendants cite in this assertion characterizes Cody's condition as "exacerbation of his asthma" (*see* Defs' Ex. ZZZ at DHS Cody B. 003009), the situation remains that by MDHS's own admission it did not inform Cody's foster mother of his serious medical condition despite the high likelihood that the toddler, who had repeatedly required medical care for his asthma during the preceding months (*see* Ex. 3 at 32-3; Defs' Ex. C), would experience an asthma attack in her home or would be especially vulnerable to other respiratory problems in light of his asthma. *See* Pls' Reply at ¶ 192; Ex. 3 at 33. Nor do Defendants dispute that their records further establish that this foster mother, not having been prepared by MDHS to anticipate any respiratory problems, let alone those serious enough to warrant hospitalization, declined to resume caring for him. *See* Ex. 3 at 33. In this way, Defendants' dangerous failure to provide Cody's foster mother with the most basic and essential medical information not only created serious, unnecessary risk in the event that he experience an asthma attack but also caused unnecessary placement disruption, the specific harm of which is described below.

---

[4] References to Defendants' Exhibits indicate those submitted with Defendants' summary judgment filings.

- <u>Cody was left to languish in a shelter for three weeks after his treating physician notified MDHS that the placement was harmful.</u>  Defendants assert that Cody remained in the shelter because there was no readily available alternative placement.  *See* Defs' Surrebuttal at 4-5.  The fact that MDHS lacks the necessary array of available foster homes to meet the needs of foster children is a central claim in this class action and does not absolve MDHS of liability for the harm it caused Cody.  Defendants also assert that the Youth Court was responsible for Cody's placement in the shelter (*see* Defs' Surrebuttal at 5), but according to the deposition testimony of Cody's caseworker, placement at the shelter was at the request of MDHS.  *See* Ex. B to this Opposition at 108:16-23.  Moreover, Defendants once again failed to provide the Youth Court with the information necessary to make a decision in Cody's best interests: Defendants offer no indication that MDHS ever notified the Youth Court of the offer by Cody's former foster mother, whom they had documented to be a loving and competent caretaker, to resume care for him, or of the assessment by Cody's treating physician that the shelter was failing to address Cody's diagnosed emotional and developmental problems.  *See* Ex. 3 at 33; Pls' Reply at ¶ 195.  The testimony by Cody's guardian ad litem that Cody "really perked up" while residing at the shelter (*see* Defs' Surrebuttal at 5) can hardly be deemed to contradict this assessment.

- <u>MDHS caused Cody psychological and physical harm by severing the only long-term loving relationship the toddler had ever experienced and cycling him through numerous placements.</u>  Defendants do not dispute that their failure to address the concerns raised by Cody's foster mother Ms. BB, with whom he had resided for 19 months and whom MDHS had documented as loving, caused that placement to disrupt.  *See* Pls' Reply at ¶¶ 194, 199.  Nor do they dispute that they declined Ms. BB's request to resume caring for Cody following his hospital stay and instead subjected him to a total of five placements in 31 days.  *See* Pls' Reply at ¶¶ 193, 194, 197, 199.  Youth Court transcripts document the concrete harm MDHS caused Cody through such frequent moves: "we do know from our past experience with [Cody] that moving him around a lot and switching up his schedule a lot causes stress which causes his asthma to flare up."  *See* Defs' Ex. ZZZ at DHS Cody B. 003866.

**Olivia Y.**

- <u>Defendants cycled Olivia through no fewer than three separate foster placements without a single MDHS worker obtaining treatment for her severe malnourishment, visible rash, and disagreeable odor.</u>  *See* Pls' Reply at ¶ 201.  Remarkably, Defendants do not dispute that Olivia spent three weeks in MDHS custody in this appalling physical condition without any attempt by the agency to obtain treatment for her, but instead argue

that the failure to treat her did not cause her harm. *See* Defs' Surrebuttal at 6. Leaving a child covered in a rash and suffering from malnourishment for even a day, let alone three weeks, is surely harmful. The fact that three weeks after MDHS placed Olivia in custody, her caseworker responded affirmatively *when asked* whether Olivia needed to undergo a physical examination (*see* Defs' Surrebuttal at 7) only serves to underscore the failure by MDHS to procure needed medical services for Olivia on its own initiative and in a timely manner.

- <u>MDHS placed Olivia in the home of rapist.</u> *See* Pls' Reply at ¶ 205. Defendants do not dispute that Olivia was placed in this inappropriate setting where she was at immediate risk of harm. Instead they insist that Plaintiffs "[ignore]…the involvement of the Youth Court in Olivia's life." *See* Defs' Surrebuttal at 8. This is an interesting argument in light of the fact that, as in the instances described above regarding Cody, MDHS was not forthcoming with the Youth Court regarding any aspect of this episode. In fact, MDHS violated the Youth Court's Order prohibiting the agency from placing a child in a relative home before a home study had been conducted; it placed Olivia in the home two days before it reported to the Youth Court that she was going to be so placed; it represented to the Youth Court that the home study and background checks had been completed before Olivia's placement when in fact they had not; it indicated to the Youth Court that Olivia remained in the home and was doing well even after she had been removed; and when it finally acknowledged to the Youth Court that Olivia had been removed from the home, MDHS prevaricated by claiming that the removal was necessary only because the aunt was not able to provide adequate supervision. *See* Ex. 3 at 55-7. Notably, in none of these communications did MDHS notify the Youth Court of the presence of the rapist in the home. *See* Pls' Reply at ¶ 206. Contrary to Defendants' assertion, the Youth Court's investigation into this matter did not absolve MDHS of any wrongdoing. In fact, the Youth Court concluded that there *was* wrongdoing but could not identify anybody at MDHS who would acknowledge responsibility. *See* Defs' Ex. OOO at 48:19-25.

- <u>MDHS failed to remove Olivia from the unsafe placement in a timely manner.</u> Defendants assert that "[a]s a result of the background check on this male, MDHS/DFCS immediately removed Olivia from the home out of an abundance of caution." *See* Defs' Surrebuttal at 8. Setting aside whether "abundant" caution rather than minimal caution warranted Olivia's removal from the home of a known rapist, the fact remains that by leaving her in the home for the six days between the home study and the results of the background check—during which interval the agency knew that Olivia was living with a man whose criminal history was unknown—MDHS knowingly violated the Youth Court's Order that foster children

reside in homes *only after* such background checks had been completed. *See* Defs' Ex. NNN at AG Olivia Y. 000171.

- MDHS failed to provide Olivia with a sexual abuse examination when it was warranted. Defendants' attempt to dismiss the clear indications that a sexual abuse examination was warranted is unavailing. The undisputed evidence reveals that following her placement in the home of a convicted rapist, Olivia "reacted in terror" when a doctor attempted to examine her vaginal area, and her vaginal area was red and swollen. *See* Pls' Reply at ¶ 207; Defs' Surrebuttal at 9, n. 4. Defendants' assertion that "not a single shelter employee expressed concerns about her being a victim of sexual abuse" (*see* Defs' Surrebuttal at 8) is unsupported. The communication in evidence from the shelter to MDHS regarding Olivia's condition states, "It is clearly evident that this child has suffered severe physical neglect and may have been the victim of sexual assault." *See* Defs' Ex. NNN at AG Olivia Y. 000101. This letter reflects the observations of the multiple staff members who had been caring for Olivia, as evidenced by the use of "we" and "the staff" throughout. *See* Defs' Ex. NNN at AG Olivia Y. 000101-2. Defendants further argue that there was no cause to conduct a sexual abuse exam because the examining doctor—who was not aware of Olivia's placement with a rapist, had no reason to suspect sexual abuse, and thus might reasonably interpret any vaginal irritation as diaper rash or something equally innocuous—did not file an allegation of possible sexual abuse. In fact, MDHS itself clearly concluded that sexual abuse was a serious possibility, as evidenced by its inquiry more than two months after the fact specifically asking the physician in question about signs of sexual abuse. *See* Defs' Ex. NNN at AG Olivia Y. 000159. The doctor responded that Olivia presented with "redness & chapping of skin around her buttocks and labial folds. But since no history of sexual assault was given to me I did not do a detailed vaginal examination.… I repeat, I did not examine her with that perspective in mind (abuse) *as no history was forwarded*" (emphasis added). *See* Defs' Ex. NNN at AG Olivia Y. 000160. The lack of notation in this doctor's chart regarding suspicions of sexual abuse is indeed significant, but not in the way Defendants suggest. *See* Defs' Surrebuttal at 9. It is significant in that it reflects MDHS's failure to provide Olivia's doctor with information crucial to an adequate examination. As Dr. Lewis found, the failure by MDHS to disclose to Olivia's doctor why a sexual abuse examination was warranted "demonstrates a complete disregard for Olivia's physical well-being." *See* Pls' Reply at ¶ 209. Defendants' assertion that the Youth Court judge presiding over Olivia's case "found that Olivia Y. had not been sexually abused" (*see* Defs' Surrebuttal at 10) is utterly untrue; rather, the Judge did not enter an order affirmatively finding that she *had* been sexually abused, which is hardly surprising when such a finding would necessarily have to be based on a MDHS investigation of sexual abuse, which MDHS

failed to properly undertake, and when by the time of the hearing too much time had passed for an effective examination to take place.

**John A.**

- <u>MDHS failed to investigate John's complaint that he was being physically abused in a residential placement.</u> Defendants claim that this report was informally investigated by the caseworker. *See* Defs' Surrebuttal at 11-12. However, the case note on which Defendants rely, reporting on a single conversation with a staff member that does not discuss his injuries or the circumstances that led to his receiving them, does not support the contention that the caseworker conducted any inquiry, informal or otherwise. *See* Defs' Ex. PPP at AG John A. 000474.

**Jamison J.**

- <u>MDHS placed Jamison in the Kansas home of his father, a convicted felon who had been incarcerated, who had lost his parental rights to Jamison, and whose home had previously been deemed unfit by MDHS.</u> Defendants do not dispute any of these allegations in their Surrebuttal, but instead argue that Plaintiffs disregard the role of the Youth Court because the Court ordered this placement pending approval of the placement by the State of Kansas. Defendants neglect to mention that while the Court signed this order on January 12, 2004, a Kansas caseworker had actually informed MDHS *three days earlier* on January 9, 2004, "that the child was in Kansas illegally." *See* DHS Jamison J. 000637 (redacted MDHS case record attached hereto as Ex. D). Once again, MDHS failed to provide the Youth Court with the information necessary to make appropriate decisions: as noted in Dr. Lewis's expert report, there is no documentation that MDHS notified the Youth Court of Kansas's strenuous objections. *See* Ex. 3 at 113. Kansas soon after officially denied Jamison's placement with his father, deeming it unsuitable. Defendants also concede that MDHS recommended this placement "out of desperation" because no alternative placements could be located. *See* Defs' Surrebuttal at 13. Again, the failure by Defendants to develop a sufficient array of foster care placements does not absolve them of liability for placing a foster child in a home that MDHS had already deemed unsafe.

- <u>MDHS returned Jamison to the home of his grandmother for an unsupervised placement even though MDHS had previously removed him from her home due to maltreatment.</u> Defendants provide evidence that MDHS conducted criminal background checks on Jamison's grandmother prior to returning him for unsupervised visits. *See* Defs' Surrebuttal at 14. However, Defendants entirely fail to dispute that no investigation of the grandmother's home was undertaken by MDHS to determine if the unsafe

and neglectful conditions that precipitated his initial removal from that home had improved.

Defendants' request for leave to file their Surrebuttal should be denied because they had ample opportunity to present the Court with the evidence and arguments contained therein and, in fact, have presented those very facts in their Reply Memorandum of Authorities in Further Support of Defendants' Motion for Summary Judgment. Moreover, the evidence Defendants seek to present through their improper application does not create any material dispute regarding the Named Plaintiffs' claims.

/s Melody McAnally
W. Wayne Drinkwater, Jr. (MBN 6193)
Melody McAnally (MBN 101236)
BRADLEY ARANT ROSE & WHITE LLP
188 East Capitol Street, Suite 450
Jackson, MS 39201
Telephone: (601) 948-8000
Facsimile: (601) 948-3000

Stephen H. Leech (MBN 1173)
850 East River Place, Suite 300
Jackson, MS 39202
Telephone: (601) 355-4013

Marcia Robinson Lowry (MBN 43991 *pro hac vice*)
Susan Lambiase (MBN 43992 *pro hac vice*)
Eric E. Thompson (MBN 43993 *pro hac vice*)
Tara Crean (MBN 44447 *pro hac vice*)
Shirim Nothenberg (MBN 43990 *pro hac vice*)
CHILDREN'S RIGHTS
330 Seventh Ave, 4th Floor
New York, NY 10001
Telephone: (212) 683-2210

John Lang (MBN 43987 *pro hac vice*)
Christian Carbone (MBN 43986 *pro hac vice*)
John Piskora (MBN 44474 *pro hac vice*)
LOEB & LOEB LLP
345 Park Avenue

>New York, NY 10154
>Telephone: (212) 407-4000

>*PLAINTIFFS' COUNSEL*

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 16, 2006, I electronically filed the foregoing with the Court using the ECF system, which sent notification of such filing to the following:

>Dewitt L. ("Rusty") Fortenberry Jr., Esq.
>Kenya Key Rachal, Esq.
>Gretchen L. Zmitrovich, Esq.
>Ashley Tullos Young, Esq.
>BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC
>4268 I-55 North
>Meadowbrook Office Park
>Jackson, Mississippi 39211


>Harold E. Pizzetta, III, Esq.
>Assistant Attorney General
>General Civil Division
>Carroll Gartin Justice Building
>430 High Street
>Jackson, Mississippi 39201

>*Attorneys for Defendants*


>/s Melody McAnally