

**STATE OF MISSISSIPPI**
HALEY REEVES BARBOUR, GOVERNOR
**DEPARTMENT OF HUMAN SERVICES**
DONALD R. TAYLOR
EXECUTIVE DIRECTOR

October 31, 2006

Ms. Carola Pike, MSW, LCSW
Children and Families Program Specialist
Administration for Families and Children
Region IV Southeastern United States
Atlanta Federal Center
61 Forsyth Street, Southwest, Suite 4M60
Atlanta, Georgia 30303-8909

Dear Ms. Pike:

In addition to submitting our Program Improvement Plan (PIP), I would like to provide you an update on the progress the Mississippi Department of Human Services (MDHS), Division of Family and Children's Services (DFCS), has made in improving outcomes for children and families. We are committed to doing all we can to meet and exceed the PIP. However, due to challenges, we are presently behind in meeting some of the six-month PIP goals. Although we support the need for a PIP, the PIP alone does not provide a complete picture of the progress and strides being made in Mississippi. Below are a few of our accomplishments.

**As of 10/13/06:**

|  | July 2004 | June 2006 | Improvement |
|---|---|---|---|
| Monthly Face-to-Face Contacts | 1,644 | 2,763 | 68% |
| Investigations Initiated Within 24 Hours | 870 | 1,171 | 35% |
| Average Number of Days in Shelter Care | 41 | 27 | 34% |
| Total Days in Shelter Care | 50,170 | 33,672 | 33% |
| Investigations Open More Than 30 Days | 2,196 | 1,522 | 31% |
| No Missing Placements | 2,589 | 3,353 | 30% |
| No Missing Permanent Plans (*2005) | *3,202 | 3,410 | 7% |
| With No Quality Issues Identified | 325 | 345 | 6% |
| Investigations With No Missing ISP | 3,907 | 3,803 | 3% |



DHS
146541

Ms. Carola Pike, MSW, LCSW
October 31, 2006
Page 2

| As of 10/1/06: | **Filled** | **Vacant** | **% Vacancy** |
|---|---|---|---|
| • Direct Service Worker Positions 2005 | 317 | 66 | 17% |
| • Direct Service Worker Positions 2006 | 385 | 50 | 11% |

| | **Dec. 2006** | **Oct. 2006** | **Decrease** |
|---|---|---|---|
| • Children in Custody | 3,505 | 3,344 | 5% |

| | **FY 05** | **FY 06** |
|---|---|---|
| • Revenue Maximization | $3,300,000 | $4,589,914 |
| • Educational Training Vouchers | | Fully Utilized |

This past summer, with the support of Governor Barbour and MDHS Executive Director, Don Taylor, we were successful in justifying a significant salary adjustment for our direct service workers. In addition, with approval from the Governor and Legislature, we were able to fund a career ladder for these same workers. The salary changes are listed below:

**Salary Adjustments** (Salary increases awarded ½ in July and ½ in January 2007)

| | | |
|---|---|---|
| Social Worker | $ | 25,286.00 |
| Family Protection Specialist I | $ | 27,016.00 |
| **\*Salary Increase** | **$** | **1,730.00** |
| | | |
| Area SW Supervisor | $ | 32,247.00 |
| Area SW Supervisor | $ | 36,912.00 |
| **\*Salary Increase** | **$** | **4,665.00** |
| | | |
| Child Protection Specialist | $ | 21,761.00 |
| Family Protection Worker I | $ | 23,044.00 |
| **\*Salary Increase** | **$** | **1,283.00** |
| | | |
| Family Protection Worker II | $ | 27,016.00 |
| **\*Salary Increase** | **$** | **3,972.00** |
| *(12 Months/Training/Testing)* | | |
| | | |
| **Career Ladder Funded** | $ | 1,100,000 |
| | | |
| Within Existing Budget, est. | | |
| **Cell/Data Service** | $ | 400,000 |
| **Shelter Payments-Standard** | $ | 800,000 |

Ms. Carola Pike, MSW, LCSW
October 31, 2006
Page 3

- Beginning January 1, 2007, an individual with a license in Social Work has a new start salary of $28,367, an increase of $3,081.

**Challenges and Opportunities for Existing Resources**

As of July 1, 2006, workers were not allowed to carry a caseload until a four-week intensive training class and test has been successfully completed. Since then, 86 workers have been trained. Although the majority of the workers trained were new workers, when the entire workforce was assessed, it was found that some of our older workers had never been through intensive training. All workers are now required to complete the intensive training. This made it necessary to pull untrained workers off the job to attend a training class, thus increasing the daily workload for existing trained workers. This increase in workload was exacerbated by the change in the State policy prohibiting Social Worker Aides and Homemakers from making monthly home visits. We believe these changes will improve the quality of service to Mississippi's children.

We have been working diligently with the court system in Mississippi to make improvements. I am meeting with the Chief Justice on a quarterly basis. From these meetings, the Chief has ordered a Commission on Children's Justice be formed and to provide a final report of findings and recommendations. DFCS has already benefited tremendously from the Commission, which has assisted in addressing delays by the Attorney General's Office in their handling of Termination Parental Rights (TPR) and Adoption cases. Hopefully our work with the Commission will result in more timely permanency for children.

In addition to meeting with the individual judges through the Commission, I have had the opportunity to speak at the Annual Youth Court Judges and Referee Conference as well as the Annual Youth Court Prosecutors Conference. At both, DHS was warmly received and it was evident that the Mississippi Courts desire to partner with DFCS to continue improvement of Child Welfare in Mississippi.

Unfortunately, the court and legal system is not up to full speed post Hurricane Katrina. The finalization of permanency orders, TPRs, adoptions, and placement of children are still being impacted by the aftermath of Katrina. Even so, we managed to exceed our adoption numbers from the prior year. I would like to emphasize the appreciation I have for the National Resources Centers (NRC) and their efforts made with the Coastal Assessment and Recovery Planning. They have been a valuable resource to Mississippi.

We are thankful and excited to have received the assistance of the NRC with a Statewide Placement Stability Project. They are evaluating cases, assessing the needs of the State, and will submit a final report. This kind of assessment is imperative in determining the path the State must take to address Safety, Permanency and Well-being within our Child Welfare System. We look forward to receiving their final report.

Ms. Carola Pike, MSW, LCSW
October 31, 2006
Page 4

There are concerns about the direct correspondence of Susan Orr with a vocal, influential provider in the state. It has created an additional strain on resources, both at the state and field level. Our understanding is that the PIP requires that a foster child have no more than two placement moves in a twelve-month period. This provider proposed that all children in certain counties automatically be placed with them. DFCS is not in agreement with automatic placement of children in shelters and is also concerned that it could affect Mississippi's compliance with the PIP. This provider corresponded directly with Susan Orr who advised the provider that Mississippi would not be penalized for making more than two moves a year. This provider has contacted the Governor, State legislators, and courts to promote its position, using Ms. Orr's advice that Mississippi would not be penalized for more than two placement moves a year. As a result of this, DFCS staff has had to respond to numerous queries and media requests.

A major area of concern for DFCS is SACWIS compliancy. As you are aware, we have had several discussions with ACF regarding this matter. In conjunction with ACF, it was determined a hiatus would allow adequate time to assess the situation and regroup. The hiatus was granted, but required that the support contract be re-bid, an APDU be submitted, and a Quality Assurance contractor be hired. As a result of these requirements, the hiatus has not provided us with any relief. This has put a strain on staff which ultimately has taken away resources that would have been utilized for the PIP.

In my last meeting with you in Mississippi, I stated that it would be a failure if we did not plan to develop and build a sustainable high performance organization. In order to do that, we must assess our core processes, the organizational structure, service delivery, system usage and reliability, and most importantly, the current culture and how to change it. We hope that the increase in filled positions and increased recruitment due to new start salaries, will contribute to timely implementation of the PIP as we do our best to meet all the deadlines.

If you have any questions or would like to discuss, please contact me (601) 359-4999.

Sincerely,

C. Rickie Felder, Director
Division of Family and Children's Services

RF:KS:ks

Enclosure

cc: Donald R. Taylor

# Mississippi Department of Human Services
# Division of Family and Children Services

## PROGRAM IMPROVEMENT PLAN NARRATIVE



### 1st Quarterly Report (April 1, 2006-June 30, 2006)
### and
### 2nd Quarterly Report (July 1, 2006-September 30, 2006)

### Submitted October 2006

DHS
146545

## **List of Acronyms in Program Improvement Plan Narrative**

ASWS – DFCS Area Social Work Supervisor

CC – County Conference

CFSR – Child and Family Service Review

CFSP – Child and Family Service Plan

DFCS – Division of Family and Children's Services

FCR – Foster Care Review

FCCR – Foster Care Case Review

FCP – Family Centered Practice

FP – Family Preservation

FTM – Family Team Meeting

ICWA – Indian Child Welfare Act

ISP – Individual Service Plan

MACWIS – Mississippi Automated Child Welfare Information System

MDHS – Mississippi Department of Human Services

PIP – Program Improvement Plan

RAP – Regional Action Plan

RD – DFCS Regional Director

SO – DFCS State Office

# Program Improvement Plan Narrative

## Introduction

This is Mississippi's first quarterly Program Improvement Plan (PIP) progress report since the renegotiation of the PIP following Hurricane Katrina. This report covers two quarters of the eight quarter reporting period – April through June 2006 and July through September 2006.

## Background

In preparation for the Child and Family Service Review (CFSR), Mississippi began the development of a statewide assessment in May 2003 at the annual CFSP Retreat. The CFSP Retreat is an intensive working session where agency staff, community stakeholders, and service providers are engaged to assess the DFCS annual progress and accomplishments toward the goals and objectives of the Title IV-B CFSP. During the CFSP Retreat, work groups focus on the strategies in the plan to determine if they are having the intended effect and to evaluate the impact on improving the safety, permanency and well-being outcomes. In addition, the workgroups made specific recommendations to revise and update the plan for the next year. During the May 2003 CFSP Retreat, participants were provided with an orientation to the CFSR process and information related to the national findings from the reviews by the NCWRCOI. Preparation for the statewide assessment began and stakeholders were invited to participate in focus groups to develop the statewide assessment and participate in the CFSR.

In preparing for the statewide assessment, key agency staff, community stakeholders including state university representatives, child placing agencies, law enforcement, youth court judges, community-based service providers, tribal representatives, former and current foster youth representatives, other state agency representatives such as mental health, health, education the Attorney General's office, and other interagency representatives served as focus group members. There were also targeted groups utilized, including the State Level Case Review Team, the State Level Citizen Review Panel, the Independent Living Youth Advisory Group, the therapeutic residential child placing agencies and foster and adoptive parent support groups. These groups evaluated every aspect of the child welfare system and made recommendations for the statewide assessment. The focus groups were established based on the CFSR outcomes of safety, permanency and well-being. The statewide assessment was submitted to the ACF Regional Office in December 2003.

## On-site Case Review

In preparation for the CFSR on-site case review, the agency conducted a "mock review" process to assess casework and practice at the local level. The findings from the review were included in the statewide assessment.

The Mississippi CFSR on-site case review was conducted the week of February 9-13, 2004. The county sites included Hinds, Washington and Adams counties. Hinds County is the largest metropolitan area in the state and includes the capital city of Jackson. Hinds County is centrally located in the State. Hinds County experiences a high staff turnover rate due to the competitive job market in Jackson. Washington County is a rural county in the Mississippi delta and was selected for review due to issues impacting services, such as poverty and a lack of available resources. Washington County also has issues centered on in-home cases being open longer than social worker's recommend. Adams County is located in the southwestern part of the state and has experienced lost industry and high unemployment rates. Adams County includes the city of Natchez, a historic port north of New Orleans, Louisiana. Adams County has a significantly higher than average number of older children coming into state custody and into residential treatment and group homes. These youth are coming into custody due to delinquency, lack of supervision and drug related issues.

The participants involved with the on-site case reviews included DFCS staff, federal staff and community stakeholder volunteers. All DFCS staff and community stakeholders involved with the on-site CFSR case review participated in training held in January 2004, which was conducted by federal consultants and Carola Pike, ACF Region IV Office.

The on-site case review team consisted of a DFCS Regional Director (RD) as the team leader, a federal reviewer, DFCS staff and community stakeholders. The state ensured that no state staff was assigned to their office location. This was to avoid any conflict of interest or bias in reviewing cases.

The on-site review ended with the Exit Conference held at the Hinds County office. During the Exit Conference, Jerry Milner, Children's Bureau, provided a high level overview of the preliminary findings during the onsite review. Invitations to the Exit Conference were mailed to community stakeholders, such as, child placing agencies, citizen review panels, multidisciplinary teams, judicial personnel, interagency division heads and other DFCS staff. Jerry Milner noted that many of the preliminary findings documented during the on-site review coincided with the statewide assessment.

## Mississippi's CFSR Key Findings

The CFSR evaluated state performance on six national data standards. Mississippi met three of the six national data standards, including repeat maltreatment, maltreatment in foster care, and re-entry into foster care. Mississippi did not meet three of the national data standards, including reunification within 12 months, adoption within 24 months, and no more than 2 placement settings within 12 months or less from entering foster care.

## CFSR Outcome Findings

The CFSR evaluated state performance on seven outcome areas. Mississippi did not achieve substantial conformity with any of the seven child welfare outcomes for safety,

permanency, and well-being. The CFSR documented several areas of concern, including the following:

**Safety Outcome 1: Children are, first and foremost, protected from abuse and neglect was substantially achieved in 84.4 percent of the applicable cases.**
MDHS was found to be inconsistent in its efforts to address the safety of children who come into contact with the child welfare system. A key finding was that MDHS was not consistent with regard to initiating investigations within the State's time frames.

**Safety Outcome 2: Children are safely maintained in their homes whenever possible was achieved in 76.6 percent of the applicable cases reviewed.** This raised concerns that some children are not being sufficiently protected from risk of harm while in their own homes due to the insufficiency or lack of preventative and in-home services.

**Permanency Outcome 1: Children have permanency and stability in their living situation was substantially achieved in 36.0 percent of the 25 foster care cases reviewed.** The CFSR Final report found that MDHS is not consistent in making diligent efforts to (1) establish appropriate goals in a timely manner; (2) achieve permanency for children (through adoption, reunification, permanent placement with relatives) in a timely manner; or (3) ensure that older children in long-term foster care receive appropriate services to assist them in making the transition from foster care to independent living.

**Permanency Outcome 2: The continuity of family relationships and connections is preserved for children were substantially achieved in 56 percent of the 25 foster care cases reviewed.** The CFSR findings indicated that MDHS did not make concerted efforts to ensure that children in foster care are placed, when appropriate, in close proximity to their parents and communities of origin. Also, MDHS was not consistent in its efforts to (1) place siblings together; (2) establish frequent visitation between children in foster care and their parents and siblings; (3) preserve connections for children in foster care; (4) seek relatives as potential placement resources; and (5) promote or maintain a strong, emotionally-supportive relationship between children in foster care and their parents. The permanency and well-being of Native American children in foster care was also noted as an area of concern.

**Well-Being Outcome 1: Families have enhanced capacity to provide for their children's needs, was substantially achieved in only 36.0 percent of the 50 cases reviewed.** CFSR findings for this outcome indicated that MDHS is not consistent in (1) meeting the service needs of children, parents, and foster parents; (2) involving children and parents in the case planning process; and (3) establishing face-to-face contact with children and parents with sufficient frequency to ensure children's safety and well-being.

**Well-Being Outcome 2: Children receive appropriate services to meet their educational needs, was substantially achieved in 75.9 percent of the applicable cases.**
The CFSR findings cited that MDHS did not consistently address the educational needs of children in in-home cases where there was clear evidence that the child(ren) in the family had education-related needs. Stakeholders noted that when educational needs were

not being met it was due primarily to large caseloads and/or a lack of effective collaboration between MDHS and local school systems.

**Well-being Outcome 3: Children receive adequate services to meet their physical and mental health needs was achieved in only 52.3 percent of applicable cases.** A key CFSR finding with regard to this outcome was that MDHS is not consistent in its efforts to meet children's physical or mental health needs. Identified concerns pertained to a lack of dentists who will accept Medicaid and a general lack of mental health services throughout the State.

## CFSR Systemic Factor Findings

Mississippi was found to be in substantial conformity with two of the seven systemic factors, including Agency responsiveness to the Community and Foster and Adoptive Parent Licensing, Recruitment and Retention. The state did not achieve substantial conformity with five of the systemic factors, including Statewide Information System; Case Review System; Quality Assurance System; Training; and Service Array.

Stakeholders reported that inadequate staff and large caseloads have an adverse effect on several of the systemic factors. Large caseloads and inadequate support staff are prohibiting social workers from entering timely information into the State's statewide information system, MACWIS. Staff vacancies within MDHS and the Attorney General's office was identified as a major constraint in the timely filing of Termination of Parental Rights (TPR) petitions and the search for absent parents. These staffing issues also influence the agency's ability to meet the required monthly visits to foster homes. Stakeholders also expressed concern that staffing is a barrier to implementing Quality Assurance efforts consistently throughout the State. In addition, stakeholders identified high caseloads as a barrier to social workers being able to attend on-going training.

The State does not have a sufficient array of services in place to address the needs of children and families. Critical gaps in the service array include foster homes (for children of all ages), substance abuse and mental health services for children, youth and parents. CFSR findings further indicated that services are not accessible in all political jurisdictions of the State and that MDHS has limited ability to individualize services for the children and families served by the agency.

## Program Improvement Plan Development

Mississippi began developing its Program Improvement Plan (PIP) prior to receiving the CFSR Final report based on the statewide assessment and preliminary findings identified during the CFSR Exit Conference. Technical assistance was provided to senior management from the NCWRCOI to establish Mississippi's PIP planning process and structure. PIP planning groups were established based on the seven outcomes and seven systemic factors to analyze the CFSR findings and develop solutions and strategies for improvement.

PIP training was provided for Senior Management in March 2004. Statewide training for the MS PIP was held March 31 – April 1, 2004, with technical assistance and training provided by the NCWRCOI for agency staff, community stakeholders and service providers. Over 80 participants were involved. The training served as a PIP kickoff and initiated the work of the planning groups. The groups included the same individuals involved with the statewide assessment and additional stakeholders and providers. The group members were assigned to groups based on their area of interest and expertise. The planning groups were chaired by a Regional Director (RD) and co-chaired by a community stakeholder. The planning groups recommendations were documented in a preliminary PIP outline, discussed at the Senior Management meeting and recommendations were made to the chairperson for further group input. The chairperson resubmitted additional group recommendations for the plan.

The CFSR Final report was received in May 2004. The report was utilized by the DFCS State planning groups to re-evaluate group recommendations for the PIP. With the assistance of an outside consultant, group recommendations were drafted into a preliminary PIP. This document was provided to the chairperson to share with group members for review and feedback. This was to ensure statewide input into the PIP development and to gain support from community stakeholders in implementing strategies to improve outcomes.

The PIP was submitted to the ACF Regional Office on August 16, 2004. On August 30, 2004, the state received comments from Carola Pike, ACF Regional Office. The regional office arranged for a federal team, including National Resource Center (NRC) staff and peer consultants from other States to provide on-site technical assistance to incorporate the directives outlined in the comments. The purpose of the technical assistance was to assist the state in developing a PIP that the state could support and to conceptualize the framework for program improvements. Technical assistance was provided to Mississippi by the federal team in August. In September 2004, the federal team made another site visit to work with DFCS to incorporate revisions based on the review and comments from the earlier site visit and submission. Following the September site visit, the third submission was made on November 19, 2004. Conference calls were held to discuss the written feedback related to the second submission. These federal recommendations and input were incorporated into MS's PIP, with additional work involving DFCS Senior Management team. The PIP was resubmitted on January 28, 2005. Following further feedback and discussion, MS's PIP was resubmitted on March 24, 2005. MS's PIP was approved, effective April 1, 2005.

Two Quarterly PIP Progress Reports were completed and submitted to the ACF Regional Office – one in July 2005 and one in September 2005. On August 29, 2005 Hurricane Katrina devastated the Mississippi Gulf Coast. As a result of the widespread devastation caused by Hurricane Katrina, the state requested and was granted a one year extension on its PIP – moving the PIP completion date from March 2007 to March 2008. The submission of the Quarterly PIP Progress Reports was suspended, pending the renegotiation of MS's PIP.

MS's PIP was renegotiated during an on-site visit by ACF personnel during the three-day period January 31– February 2, 2006. In addition to ACF personnel, participants in the renegotiation process included DFCS Senior Management, DFCS State Office staff, and community stakeholders. The three days of renegotiation resulted in a restructuring of MS's PIP that included the revamping of goals to be more qualitative than quantitative, moving completion dates for action steps forward by several months (on average about 6-12 months), adjusting proposed collaboration efforts with the tribal Choctaws, restructuring our Project Homestead program and our Family Preservation services, making adjustments to our on-going training for our Resource Families, our advanced training for supervisors, and our on-going training for caseworkers. Following the three days of renegotiations, a revised MS PIP was submitted on March 31, 2006. After receiving ACF written response to the submission, a conference call was held to discuss the written feedback regarding the latest submission. The federal recommendations and input were then incorporated into the revised PIP. The revised PIP was then resubmitted on May 1, 2006. Once again, following further written feedback from ACF and additional discussion, the revised MS PIP was resubmitted on May 18, 2006. Due to delays in preparing the May 18th submission, ACF granted an extension until May 23, 2006.

## Mississippi's Renegotiated Performance Improvement Plan
### Key Elements

Due to the impact of Hurricane Katrina on the State and its child welfare system, the renegotiation of MS'S Pip included the need to develop a Coastal Recovery Plan for the child welfare system on the Mississippi Gulf Coast. A Coastal Recovery Plan has been developed, and corresponding strategies and action steps have been incorporated into the PIP Matrix. A narrative description of Mississippi's overall Coastal Recovery Plan is as follows:

## The Coastal Recovery Plan

On August 29, 2005, Hurricane Katrina devastated the Mississippi Gulf Coast. Although it has been over six months since the hurricane, the recovery effort has just begun. Initially, basic needs had to be met because communities were left without shelter, food, water, sewer, and electricity. Now that the crisis situation has stabilized, we can take a step back and evaluate the impact of the hurricane on our agency; the current needs of the agency, partner agencies, staff, and foster homes; and develop a plan to move forward. We must also ask the question, "How has this hurricane affected the safety, permanency, and well being of the families the Division of Family and Children's Services (DFCS) comes into contact?" The Mississippi Department of Human Services (MDHS) recognizes the need to assess the current obstacles and challenges post-Katrina in our three Coastal counties.

Prior to the hurricane, the Mississippi Gulf Coast was a thriving area that had entered an economic and development boom. The Mississippi Division of Family and Children's Services is divided into nine regions. Region VI South is made up of the three Coastal counties most impacted by Hurricane Katrina. On August 19, 2006, ten days before

Hurricane Katrina, Region VI South had 675 children in custody. This was an increase of almost 100 children from January 10, 2005. As of February 13, 2006, they had 716 children, an increase of 24% since January 2005.

During the month of July 2005, Region VI South had 177 child investigations. 68% of those investigations were initiated within 24 hours. The February 2006 report reflected that the same region conducted 173 investigations. The Child Investigation Timeliness Report reflects the following:

- Hancock County initiated 54.4% of the investigations within 24 hours
- Harrison County initiated 64.7% of the investigations within 24 hours
- Jackson County initiated 81.4 % of the investigations within 24 hours

Of note, all three counties had significant damage during Hurricane Katrina. Jackson County had the least amount of damage and the impact being more significant moving West with Hancock being the hardest hit.

## The Problem

There are many challenges facing the Division of Family and Children's Services post-Katrina. The Harrison County DFCS building flooded during Hurricane Katrina and the Hancock County building was completely destroyed. It has not been determined at this point if the Hancock building will be rebuilt. Currently, the Harrison County staff is working out of small trailers. Necessary materials were destroyed; records, case files, equipments, office furniture, and supplies. Many staff in the three Coastal counties either completely lost their homes or were badly damaged. 100% of the Hancock County staff had their homes destroyed or badly damaged.

Currently, stress and burnout is at an all time high. Child welfare positions are highly stressful due to the intense emotional turmoil that is naturally associated with child abuse and neglect. This has been compounded by staff being displaced from their homes and working through their own posttraumatic stress. Fourteen staff members have either relocated to other parts of the state or have left the agency altogether. Some staff have left the agency to work for higher paying jobs that are funded through Federal relief monies. This competition has placed added strain on the already understaffed division. Fewer workers are managing higher caseloads of families who are in extreme crisis and under financial strain. Compounding the issue is the fact that we have few-to-no qualified applicants to fill vacancies.

## Foster Homes, TPR, and Adoptions

Ninety percent of the Hancock County foster homes suffered major damage. Currently, there are thirteen Mississippi children placed in foster homes out of the state. Louisiana has twenty children placed in Mississippi foster homes. Hancock County has started to recruit new foster homes. The challenge is that families residing in FEMA trailers are not eligible due to DFCS guidelines, therefore locating temporary homes for the children brought into custody is a major problem. The shelter in Hancock County was damaged

during Katrina and currently is not in operation. Relative placement is always the best choice; however most are residing in FEMA trailers. DFCS policies may need to be altered for the Coastal Counties (i.e. placement of children within 50 miles of their homes, and allowing children to be placed in the home of family friends.) Many families are financially strained and unable to accept kinship placement. Challenges are also encountered in our TPR cases. Parents have relocated with no forwarding address. Relatives also have often left the area due to the destruction.

The Youth Court of Hancock County was damaged by Katrina and unable to reopen until mid-January. Some problems that they have encountered include being unable to locate and properly notify clients for hearings. Referral services in the area, such as counseling for the increasing substance abuse problems, are limited. Currently there is no Youth Counselor in the court system of Hancock County. The court is having difficulty locating qualified applicants.

## Housing

At present, housing is the top issue facing DFCS. There is an extreme housing shortage. More than 134,000 homes received damage with 65,000 of those being a complete loss. Over 50,000 homes received flood damage and 35,000 of those homeowners did not have flood insurance. There are thousands of people living in FEMA trailers or damaged homes. The view of what was considered unacceptable living conditions prior to the hurricane must be altered.

Federal and low income housing is limited along the Mississippi Gulf Coast. All four low income housing complexes in Hancock County were demolished. In Harrison County, *The Point*, an area of the city that has a large Vietnamese community, was virtually destroyed. Families are now living in small FEMA trailers that are located in crowded trailer parks. Many of the trailer parks do not include trailer numbers, but yet can have hundreds of trailers. This adds to the difficulty of locating a family during investigations because workers must go door to door looking for families. Previously, workers typically knew the safety of a neighborhood prior to entering the home during an investigation. Now workers are unsure if they are knocking on the door of a physician's trailer or a meth lab.

FEMA trailers do not include washers, dryers, or telephones. Reports regarding cleanliness will have to be evaluated because of the lack of laundry facilities. Telephones can not be added to FEMA trailers because they are intended to be "temporary" housing. It can be assumed that many of our families will be living in this "temporary" housing for years.

## Transportation and Communication

Transportation continues to be difficult due to the damaged roads and complete destruction of the two major bridges connecting the three Coastal counties. Debris and debris trucks block roadways and at times making them impassable. Many clients lost

DHS
146554

their automobiles during the storm. The price of gasoline and the heavy traffic on limited roadways will be an added expense to staff and clients. The cost of public transportation has doubled while resources are limited and further apart. For example, in Hancock County, there are only two remaining grocery stores. Families may have to travel up to 15 miles to buy a gallon of milk.

Although most areas have consistent communication, Hancock County is still having difficulty with the telephone grids. In that area, the telephone lines are unreliable. In addition, many schools and offices are without fax machines. This adds to the time it can take to transfer information, especially when the mail service is still delayed.

## Employment and Other Financial Issues

Tourism was a major employer along the Coast. Casinos, hotels, and other businesses were destroyed or damaged, leaving thousands without jobs. At the same time, "Help Wanted" signs are a common sight. The housing shortage may contribute to the inability to fill vacancies.

## Schools

As reported in the Governor's Commission Report, 53% of the school districts and 25% of the schools were damaged. Some schools are located in Quantum Tents producing their own set of problems. School buses were destroyed with fewer buses there are longer commutes for school children.

## Services and Social Issues

Law enforcement and DFCS have noticed an increase in domestic abuse cases as well as drug and alcohol related crimes. It is presumed that this increase is related to the stress associated with inadequate housing, financial strain, loss of employment, and posttraumatic stress. It will not be surprising if a trend is noticed with an increase in other mental health related issues such as depression, anxiety, and suicide is noticed as well.

Additionally, DFCS relies on partner agencies to assist with services for families and children. Non-profit agencies are also feeling the financial strain which will result in cutbacks of staff or services and potentially closure of programs. Donations and other aid will likely be filtered to recovery efforts instead of nonprofit programs. This will become a greater challenge for our already short staffed agency that relies on these outside providers for additional services to the families we serve. For example, in Hancock County, the Hope Haven Shelter was badly damaged in the hurricane. The agency was able to repair the damage, but ultimately was unable to reopen due to the lack of financial support and lack of staff.

The culture of the Mississippi Gulf Coast has dramatically changed, impacting investigations and other services provided by DFCS. Language barriers rarely presented

a problem pre-Katrina, however, now there is a large Spanish-speaking community with few translators.

## The Solution

The Mississippi Department of Human Services, Family and Children's Services took a significant beating from the hurricane. The affects of Katrina were so catastrophic, that even operating a perfect system, DFCS would have had difficulty to recovering. Our hope is that out of this disaster we will rebuild a much stronger and more effective system.

Technical assistance is needed to conduct a Needs Assessment to determine the appropriate course of action needed to recover from this devastating natural disaster. DFCS has requested technical assistance from the appropriate National Child Welfare Resource Centers to assist with the needs assessment and to determine the most effective method to collaborate with other agencies on a local, state, and federal level. DFCS will act as the lead agency in coordinating the Coastal Recovery Plan. Initial telephone conference calls have been set up for March 31, 2006, and April 7, 2006. A planning meeting has been set for April 13-14, 2006, to discuss the Needs Assessment and Coastal Recovery Plan. The Needs Assessment will be initiated following that collaboration.

The Mississippi Children's Home Society has also offered to assist with the Needs Assessment. They will participate in the initial meetings and coordination. A stakeholders meeting will be coordinated by the Mississippi Children's Home Society to assess the current needs along the three Coastal counties. It is imperative to develop a board comprising of the various agencies, both private and public, that are involved with children and at-risk families. Invitations will be extended to members of the school board, local public officials, child-caring agencies, foster parents, law enforcement, mental health providers, medical providers, DFCS staff, as well as other key members of the community. Input will be solicited regarding current challenges facing these agencies in regards to child welfare. This meeting is tentatively set for May 9-10, 2006, in Biloxi, Mississippi.

Discussion groups and needs assessments will be conducted with agencies and groups such as the Foster Parent Association, stakeholders, court system, and DFCS staff. Quarterly and monthly DFCS reports will need to be gathered and analyzed, reviewing shelter care reports, foster care reports, timeliness of investigations, and workload analysis. A formalized Needs Assessment will be completed by October 2006.

Resources in Region VI South will be evaluated to determine what available and what is needed to appropriately address the issues impacting Child Welfare in Hancock, Harrison, and Jackson Counties. Recommendations will be considered from the National Child Welfare Resource Center. These recommendations will be incorporated, along with the needs identified during the stakeholders meeting, into a Coastal Recovery Plan Draft. This draft will be circulated in-house for review and edits. The draft will be revised and finalized. The Coastal Recovery Plan will be implemented by April 2007. It

will be impossible to predict all of the needs and problems that will be realized over the next several years due Hurricane Katrina. It will be imperative that we reassess our plan six months after implementation, and yearly thereafter to determine any changes or additions that need to be included in the plan.

A workgroup will be established to identify the unique resource needs for children entering care in Region VI South. Members of the workgroup will identify internal and external resources that can be engaged. A formalized plan will be developed by August 2007 and will be implemented by September 2007.

## Addendum to the Coast Recovery Plan

The Division of Family and Children Services has requested technical assistance from the National Child Welfare Resource Centers to assist with the needs assessment and to determine the most effective method to collaborate with other agencies on a local, state, and federal level. The Division of Family and Children Services will act as the lead agency in coordinating the Coastal Recovery Plan. Telephone conference calls were conducted on March 31, 2006 and April 7, 2006 to launch the assistance from the NRCs. NRCs that have been represented in this planning process include Child Protection Specialist, Family Centered Practice and Permanency Planning,

A Coastal Recovery Planning Meeting was held on April 13-14, 2006 in Jackson to discuss the Needs Assessment and the Coastal Recovery Plan. Attendees included State Representatives from MDHS, Medicaid, Health, Mental Health, Courts, as well as National Representatives from Administration for Children and Families and the National Resource Centers. Sarah Webster, Organizational Improvement, facilitated the two day discussion. Changes and obstacles in Child Welfare services since the hurricane were discussed. Staff representing the three Coastal counties expressed concerns regarding diminishing support services, staffing issues, recruitment of foster homes, as well as other challenges due to the after effects of Hurricane Katrina. Representatives from Mississippi Children's Home Services provided a framework for the Needs Assessment and the Gulf Coast Child Welfare Needs Assessment that would be held on May 9-10, 2006. The NRCs provided input on services and assistance that could be provided to the Division of Family and Children Services. The attendees provided input on key community members that needed to be invited to the Gulf Coast Child Welfare Needs Assessment.

An invitation was mailed out to representatives from various State Departments and local community representatives, requesting their attendance at the May 10, 2006 Coastal Recovery Planning Meeting and completion of an initial Needs Assessment. On May 9, 2006, the representatives from the NRCs, ACF, MCHS, local community representatives and MDHS participated in a tour of Harrison and Hancock Counties. The tour included the cities of Biloxi, Gulfport, Long Beach, Pass Christian, Bay St. Louis, and Waveland.

There were sixty-nine responders to Needs Assessment and approximately 85 attendees at the Coastal Recovery Meeting. The Needs Assessment measured sixteen Focal Areas

on a likert-type scale. Responders were asked to identify existing strengths, weaknesses, and proposed solutions. During the meeting, the attendees were divided into ten focus groups that were narrowed from the original sixteen Focal Areas. Facilitators were provided with the responses from the Needs Assessment. The groups were asked to develop an Action Plan based on the needs identified in the Assessment and from group discussion.

In addition, the NRC representatives conducted small focus groups with stakeholders. Groups conducted were with birth parents, foster parents, staff, and school personnel. The information obtained from the stakeholders will be incorporated into the information obtained from the Needs Assessment, recommendations from the NRCs, and recommendations from the groups at the Coastal Recovery Meeting. The information will be developed into a Coastal Recovery Plan Draft.

## Safety Issues for Harrison, Hancock and Jackson Counties

Safety of children and families in Harrison, Hancock and Jackson Counties is a priority for the Division of Family and Children's Services. Hurricane Katrina has provided additional obstacles with responding timely to reports of abuse and neglect. Temporary workers will be hired to assist with post-Katrina needs, including the backlog of cases that was exacerbated by effects of the storm.

Jackson County received less damage and the percentage of response can be maintained until temporary workers are available to assist. Harrison and Hancock Counties have additional benchmarks to address safety. Harrison County has developed a plan to allow all direct service workers to investigate cases. The plan is designed to provide more workers to handle investigations in a shorter time frame. Hancock County will work with local providers to address the frequent number of referrals for overcrowded FEMA trailers and children who are reportedly dirty. Some schools are working with the families to provide washer/dryers at the school, but the counties are still receiving a large number of referrals. Partnership with local providers will provide opportunities to explore alternative solutions and potential services needed. For example, domestic violence is increasing with few to no services available.

## On-Going Training for Resource Parents

Resource parents, formerly known as foster and adoptive parents, are a vital component of any child welfare system, and on-going training for resource parents is of the utmost importance. The primary purpose of on-going training for resource parents is to help educate families on practices, policies and procedures on parenting foster children. One of the first things that will need to be done to establish a system of on-going training for resource parents is to determine the needs of resource parents. In order to determine the needs of resource families, DFCS will conduct a statewide survey of resource family needs. It is anticipated that this survey will be completed by April 2007, and then will be repeated annually thereafter, on or about July 1st. These surveys will be used as the basis for determining the content of the on-going training for resource parents. It is anticipated

that the results of these annual surveys will be compiled by MDHS administrators, along with designated staff. Selected topics for on-going training will be determined from the surveys completed by resource families, MDHS staff, as well as the input from private providers and the universities. Selected topics will be approved by MDHS administrators rather than a workgroup because workgroups tend to work better in the short term and not so for the long term. A yearly calendar of scheduled family resource trainings, based on the survey findings, will be posted on the DFCS MACWIS website. It is anticipated that this yearly calendar will be available starting in August 2007.

It is anticipated that seven regional quarterly support group meetings, with approved training hours for resource families (1-3 hours quarterly coordinated by the private agencies with approval from the State Office or MDHS Administrators), will be offered beginning in April 2007. In addition, DFCS will coordinate with private providers to offer additional trainings for resource families. The private providers will submit quarterly schedules to be mailed out with the MDHS schedule to resource families. This is anticipated to begin by August 2007. The topics for these trainings will be based on the yearly survey results, and/or regional support group requests. Further, yearly conference training opportunities will be provided to resource parents who have been selected and/or volunteered to serve as regional trainers. The Agency will pay for 28 resource families to attend the annual MPPN (Mississippi Permanency Partnership Network)) Conference and another 25 families are selected to attend the Lookin' to the Future Conference each year in July. Other families may attend these conferences, but it would be without the stipends.

## Collaboration with the Mississippi Band of Choctaws

Mississippi considers collaboration with the Mississippi Band of Choctaws to be extremely important. Collaboration between MDHS and the Mississippi Band of Choctaws Social Services will be initiated on the local and regional levels, rather than from the state level. Contact with the appropriate tribes for the two regions and the counties that are contiguous to tribal lands will be initiated by the Regional Directors for Region 3 and Region 4. The contiguous counties to the tribal lands that will be involved in the collaborative efforts are Neshoba County, Leake County, Kemper County, Winston County, and Newton County.

It is anticipated that the collaborative efforts between MDHS and the Mississippi Band of Choctaw Social Services will culminate with an interagency agreement. The primary - purpose of this interagency agreement with the tribe will be to outline and specify jurisdictional questions and issues. In addition to addressing issues of jurisdiction in the interagency agreement, it is anticipated that opening new and improving on existing lines of communication will be addressed, as well as tribal involvement in other areas of child welfare, such as Independent Living. Once the interagency agreement is completed, it is anticipated that meetings to discuss the interagency agreement on an on-going basis would occur at a minimum of twice a year.

## Family Preservation

The concept of Family Preservation was created by federal law in 1993 under the "Home Ties Program" to provide concentrated and intense home-based services to families. The purpose of this law was to prevent removal of children from their homes, and/or to reunify children who have been removed from their families. Mississippi adopted this law in 1994.

The key component of Mississippi's plan to provide services to families to protect children in-home and prevent removal is through the offering of Family Preservation services. Providing Family Preservation services to families in need has been done in-house, but the program is now in the process of being contracted out. The contract is not yet written, but when the contract is written and finalized, Family Preservation services will be provided by two private providers – Youth Villages and Mississippi Children's Home Society. It is anticipated that through these two private providers, every county in the state will have access to Family Preservation services. Once the contract is finalized, a process for referring families for Family Preservation services will be developed, as well as revising current policy and practice pertaining to Family Preservation.

## Project Homestead

Due to concerns about the overall effectiveness of the existing Project Homestead program, a number of changes are being proposed and discussed about renaming, revamping and restructuring the program. It is anticipated that a programmatic evaluation of the effectiveness of the existing Project Homestead County Task Forces will be utilized in developing the changes to the program.

Among the changes being discussed is a name change that would be more easily identifiable. Changing the name of Project Homestead to the Mississippi Community Family Coalition (MCFC) has been proposed. The reasoning behind this proposed change in name and the choice of using the words "community, family, and coalition" in the name is to bring out the idea of everyone being involved – communities, families, service agencies - all coming together to work toward a common goal.

Another aspect of the restructuring of Project Homestead is the possibility of using statewide initiatives in such a way that these initiatives will not take away from the emphasis on local community concerns. It is anticipated that any proposed goals and activities designed to meet the criteria of the funding source, will also be open ended enough for communities across the state to address in their own fashion, though this will not be possible in all situations. Some events, out of necessity, will have to be structured similarly across the state as defined by MDHS and/or the funding source.

It is anticipated that similar to the Project Homestead Regional Coordinators that were utilized for Project Homestead, the same concept will be used to oversee and coordinate the restructured statewide program. The use of coordinators for the restructured Project Homestead is still under discussion, and is a key issue that needs to be resolved. Once the

coordinator issue is decided, then two aspects of that decision need to be weighed - how these coordinators will be funded (the funding source), and who will be responsible for the supervision of these coordinators. Utilizing Regional Directors has been suggested as an answer to the supervision issue.

It is anticipated that the renaming of Project Homestead and the other changes to the program will be fully implemented by October 2006. It is also anticipated that by March 2007 the restructured Project Homestead will be operating in at least one county in all seven regions of the state.

# Training

Ongoing training for caseworkers and supervisors has been a random offering of various trainings and conferences without a core curriculum targeted at enhancing specific skills and the knowledge base required by the field. In order to address this matter, the DFCS training program will be restructured to include the development and implementation of a comprehensive training system for both caseworkers and supervisors. This training system will include two tracks – one for caseworkers and one for supervisors. The caseworker track will have two levels: Level I will comprise intensive training for new caseworkers, and Level II will be the ongoing advanced training for all caseworkers. (Plans for a Level III caseworker training have been dropped and will be incorporated into the Level II ongoing advanced training for all caseworkers). The Supervisory track will also have two levels: Level I will be the intensive supervisory training for all new supervisors, and Level II will be the on-going advanced supervisory training for all supervisors. While the Level I training for both new caseworkers and new supervisors will be just a one time deal (once a new caseworker or a new supervisor has completed the training it is over for them, and they move onto the next level of training). On the other hand, the Level II training is intended to be never-ending with new training areas and topics being evaluated, added and revised on an annual basis.

## Intensive Training Curriculum

The University of Southern Mississippi is being contracted with to take over the process of updating DFCS's Intensive Training Curriculum. It is anticipated that the Intensive Training Curriculum will be revised yearly based on an analysis of need, agency policy updates, MACWIS system changes and child welfare practice. MDHS is currently in the final stages of completing a contractual agreement with the University of Southern Mississippi, School of Social Work, to revise and develop curriculum for new and existing staff. If the contract is approved, implementation and a plan of action between MDHS and the University of Southern Mississippi will include revisions of the existing Core Intensive Training Curriculum for new workers, supervisors and the development of a Level Two caseworker training that will consist of three two-day training modules in Case Planning, Assessment and Engagement. In addition, a one-day writing module will also be developed to enhance staff writing skills. However, if the proposed contract with the University of Southern Mississippi does not meet the approval process, the DFCS

training unit will work with focus groups and/or other curriculum development sources to ensure revision of both the existing Core Intensive Training for caseworkers, the Core Intensive training for Supervisors, and the development of a Level II on-going advanced caseworker curriculum. All future revisions of each curriculum identified will be done through the survey process, as well as with either a focus group, the University of Southern Mississippi School of Social Work (if an agreeable alliance is formed), and/or other curriculum development sources external to MDHS.

## Level I Intensive Supervisory Training for New Supervisors

Supervisory training is a key component of any child welfare system, especially for new supervisors. DFCS will develop and implement a Level I Intensive Supervisory Curriculum for all new supervisors. The focus of this Level I Intensive Supervisory Curriculum is intended to incorporate training that will be largely done as On the Job Training (OJT). It was decided to go in this direction because it is unusual to have a group of new Supervisors all starting at the same time. In approaching the new supervisory training for new supervisors from this perspective it will allow new supervisors to be trained more rapidly and more efficiently.

To further elaborate on this matter, a specific curriculum will be developed for Level I Intensive Supervisory Training. The Level I Intensive Supervisory Training will be designed for supervisors who have been on the job from 0-12 months. There will be a training manual with modules addressing a variety of topics, including:
* Transitioning from Worker to Supervisor
* The Roles of an ASWS
* Communication Skills
* Group Work

It is anticipated that Program Managers and/or mentors will be trained to provide this training as OJT to new supervisors in their regions as the new supervisors are hired. The Program Managers and/or mentors will be required to have weekly face-to-face meetings with the new Supervisors during their first six months and monthly face-to-face meetings with the new Supervisors during the second six months. Training will be provided during this time as well as mentoring and clinical supervision. These meetings will be documented and a process will be developed for evaluation and tracking purposes to ensure that the training is being held and is consistent agency wide. Regional Directors will be responsible for assuring that the training takes place, monitoring the effectiveness of the training and that the information is forwarded to the State Training Director. The State training Director will maintain oversight of the training process and evaluations.

The strongest focus during the first six months of this training will be on administrative issues that current supervisors are already familiar with and do not need this additional "classroom" training. Also during this time, the Level II Supervisor Training will be ongoing in every region for all supervisors, including the new ones.

DHS
146562

All new supervisors will receive the Level I Intensive Supervisory Training. Additions, subtractions, adjustments, improvements and revisions to the Level I Intensive Supervisory Curriculum will be based on a number of factors, including the results of an annual supervisory training needs survey that will be distributed to Regional Directors, Area Social Work Supervisors (ASWS) and Program Managers, as well as any changes in agency policy, our automated computer system, child welfare practice and supervision that may occur.

## Level II Advanced Supervisory Training for All Supervisors

The Level II Supervisory Training, also known as Advanced Supervisory Training, will be a regionally based training. The Program Managers and/or Regional Directors will be responsible for facilitating this training. There will be specific modules available form this training and the Program Managers and Regional Directors will identify the needs of their Regions and choose the modules most needed. Every module will eventually be trained in every Region. The training will be provided during monthly staff meetings at which time a minimum of three hours will be devoted to this training at least six times a year. The training provides a more advanced skill level for all Supervisors. Examples of modules include, but are not limited to the following:
* Community Partnerships
* Diversity
* Working with Difficult People
* Principle Centered Leadership
* Seven Habits of Highly Successful People
* Clinical Supervision-Critical Contact Points in Casework
* Post Traumatic/Secondary Traumatic Stress, Vicarious Traumatization, Countertransference, Burnout
* Leadership Styles
* Interactive Supervision/Parallel Process
* Managing Data
* Liability Issues
* Personal and Professional Boundaries
* Supervising in the Midst of Trauma
* Self-Awareness and Awareness of Effects on Actions of Supervisees

Plans for a Level III Supervisory Training have been dropped and will be incorporated into Level II Supervisory Training and made a part of the ongoing advanced supervisory training for all supervisors. All supervisors will receive Level II Advanced Supervisory Training. The Level II Advanced Supervisory Training curriculum will consist of training sponsored by the DFCS Training Unit and/or provided by obtaining training programs from sources external to DFCS on a yearly basis. Additions, subtractions, adjustments and improvements to the Level II Advanced Supervisory Training Curriculum will be based on several factors, including the results of an annual supervisory training needs survey that will be distributed to Regional Directors, Area Social Work Supervisors (ASWS) and Program Managers, as well as any national changes in child welfare practice and supervision.

## Pre-Service and Ongoing Caseworker Training

All new caseworkers will receive the Core Intensive Training (Level I Intensive Training), and all caseworkers will receive Level II ongoing advanced caseworker training. Core Intensive Training and Level II Training will be provided in conjunction with State Office training staff and regional training staff to allow for flexibility and rapid scheduling for new caseworkers. The Level I Core Intensive Training Curriculum will consist of ten weeks of training that includes three weeks of orientation in the county office, followed by four weeks of classroom intensive training in Agency Policy, Child protection Law, Interpersonal helping Skills, Family Centered Practice, Intake, Investigation, Assessment, case Planning, Work with Sexually Abused Children and Their Families, and the MACWIS system. The classroom training will be in collaboration with three one-week sets of structured on-the-job training at the work site. To complete the training, caseworkers will take an exam based on the ten weeks of training.

Level II caseworker training Curriculum will consist of three-day classroom training in Family Centered practice, Intake, Investigation, Assessment, Case Planning, Placement Services, and MACWIS system training. To complete the training, caseworkers will take an exam based on the training.

## On-Going Training in Specialized Targeted Areas

As part of the DFCS ongoing caseworker and supervisor training, the planned specialized targeted training that had been provided through local universities (CWTI) will now be provided through the DFCS Training Unit. All curriculum revisions will be done on a yearly basis through an annual survey process, as well as in conjunction with either focus groups or other curriculum development sources. The first of these specialized targeted training areas will family Violence Training. All caseworkers and supervisors will receive Family Violence Training. This training will be provided in conjunction with regional training staff to ensure transfer of knowledge on a yearly schedule. Supervisors will receive an additional half-day informational session on supervisory effectiveness skills and the supervisors' role as a mentor and coach. Family Violence Training Curriculum will be updated yearly, based on need analysis and practice.

This Family Violence Training process will begin in 2007. It is anticipated that train-the-trainers will be completed by March 2007, and all the regional training will be completed by May 2007 and then yearly thereafter. The DFCS Training Unit will provide this training based on the following guidelines:
- Training will be provided regionally across the State of Mississippi. It will be held annually and the material will be updated annually in order to provide the most accurate information. Train-the-Trainers will be provided to field staff to facilitate this training in their regions.
- Regional training will consist of a one day training for all staff which will consist of prescribed agenda and schedule. Upon the completion of each training, each participant will evaluate, to assist in the improvement of future trainings.

- The prescribed agenda for the one day training will consist of the following:
  * Session I: Introduction
    a. Welcome
    b. Pre-Test
    c. Statistics of family violence
    d. Fact or Fiction Statements

  * Session II: Overview of Domestic/Family Violence
    a. Definitions
    b. Types of family violence
    c. Personality traits of victims and batterers
    d. Types of batterers
    e. Dynamics of family violence
      1. Why do men batter?
      2. Why do women stay?
    f. Elements which interfere with effective intervention
    g. The cycle of violence theory
    h. Interventions

  * Session III: Impact of family Violence and Substance Abuse on Children and their Parents
    a. Effect of family violence on children
    b. Characteristics of children who have witnessed violence
    c. Roles of the child protection worker in working with children who witness violence in their homes
    d. Impact of substance abuse on children and their families

  * Session IV: Domestic Violence and Culture
    a. Multicultural society
    b. Domestic Violence and race ethnicity
    c. Cultural factors that influence the victim's response to domestic violence
    d. Immigrant ethnic minority women and domestic violence
    e. Resources

  * Session V: Wrap it up!
    a. Post-Test
    b. Evaluations

## Yearly Analysis of Need for Ongoing Training

Throughout this narrative description regarding the DFCS plan for ongoing training, there have been references to a yearly analysis of need. The primary purpose of this yearly need analysis is to determine staff training needs, develop new curriculums, and/or modify existing curriculums. This yearly need analysis will be done by the DFCS Training Unit. The yearly need analysis will be in the form of an annual report and will

be based primarily on the results of the staff surveys. In addition, the DFCS Training Unit will also conduct surveys with supervisors to address caseworkers' application of learning after each training session. These surveys will be conducted after the third, sixth, ninth, and the twelfth month of the caseworker training. The tool for the supervisory survey is currently in development.

## Status of and Progress Made During the First and Second Quarters

### Safety Outcome 1:
### Children are First and Foremost Protected from Abuse and Neglect

**Timeliness of Initiating Investigations**
The CFSR documented several areas of concern. One of those areas found MDHS to be inconsistent in its efforts to address the safety of children who come into contact with the child welfare system. A key finding of the CFSR was that MDHS was not consistent with regard to initiating investigations within the State's time frames. A concerted effort by MDHS has been underway to improve the timeliness of initiating investigations of reports of child maltreatment (see chart below). Over the past six quarters, starting with the April-June 2005 quarter through the July-September 2006 quarter, MDHS has averaged 75.1 percent of the child investigations being initiated within the State's time frame per quarter.



**Regional Action Plans**
All Regions have completed individual County Self Assessments to determine strengths and areas needing improvement for timeliness of investigations. Based on an analysis of the assessment results, counties identifying timeliness of investigations as a practice area needing improvement will develop safety strategies to improve practice in the Regional Action Plan.

**Family Centered Practice**
The concept of Family Centered Practice (FCP) is being implemented through the processes of Family Team Meetings (FTM) and enhanced County Conference (CC). The concept of FCP and the processes of FTM and CC were fully introduced during the statewide FCP training that was completed in April 2006. FTM is the responsibility of the caseworker as part of everyday practice to engage and involve the family in the decision-making process. FTM is required for all cases within 30 days to engage the families and to develop the initial Individual Service Plan (ISP). CC is conducted on all custody cases