# STATE OF MISSISSIPPI
## Department of Human Services
### Division of Family and Children's Services



## Mississippi FY 2006 Annual
## Progress and Services Report (APSR)

**State Title IV-B Child and Family Services Plan
Child Abuse Prevention and Treatment State Plan
Chafee Foster Care Independence Program
Education and Training Vouchers Program**

Submitted November 2006



EXHIBIT
F

1
DHS
146786

# Annual Progress and Services Report

## Contents

Mississippi Program Improvement Plan ........................................................3

On-site Case Review ...................................................................... 3-4

Mississippi's CFSR Key Findings...............................................................4

CFSR Outcome Findings.................................................................... 4-6

CFSR Systemic Factor Findings.................................................................6

Program Improvement Plan Development........................................... 6-8

Mississippi's Renegotiated Program Improvement Plan ........................... 9-22

Status of and Progress Made During the Last Two Quarters .................. 22-36

Service Description for DFCS Programs.................................................. 38-124

Appendix ................................................................................................125

the child(ren) in the family had education-related needs. Stakeholders noted that when educational needs were not being met it was due primarily to large caseloads and/or a lack of effective collaboration between MDHS and local school systems.

**Well-being Outcome 3: Children receive adequate services to meet their physical and mental health needs was achieved in only 52.3 percent of applicable cases.** A key CFSR finding with regard to this outcome was that MDHS is not consistent in its efforts to meet children's physical or mental health needs. Identified concerns pertained to a lack of dentists who will accept Medicaid and a general lack of mental health services throughout the State.

<u>CFSR Systemic Factor Findings</u>

Mississippi was found to be in substantial conformity with two of the seven systemic factors, including Agency responsiveness to the Community and Foster and Adoptive Parent Licensing, Recruitment and Retention. The state did not achieve substantial conformity with five of the systemic factors, including Statewide Information System; Case Review System; Quality Assurance System; Training; and Service Array.

Stakeholders reported that inadequate staff and large caseloads have an adverse effect on several of the systemic factors. Large caseloads and inadequate support staff are prohibiting Family Protection Specialists/Workers from entering timely information into the State's statewide information system, Mississippi Automated Child Welfare Information System (MACWIS). Staff vacancies within DFCS and the Attorney General's office were identified as a major constraint in the timely filing of Termination of Parental Rights (TPR) petitions and the search for absent parents. These staffing issues also influence the agency's ability to meet the required monthly visits to foster homes. Stakeholders also expressed concern that staffing is a barrier to implementing Quality Assurance efforts consistently throughout the State. In addition, stakeholders identified high caseloads as a barrier to Family Protection Specialists/Workers being able to attend on-going training.

The State does not have a sufficient array of services in place to address the needs of children and families. Critical gaps in the service array include foster homes (for children of all ages), substance abuse and mental health services for children, youth and parents. CFSR findings further indicated that services are not accessible in all political jurisdictions of the State and that MDHS has limited ability to individualize services for the children and families served by the agency.

<u>Program Improvement Plan Development</u>

Mississippi began developing its Program Improvement Plan (PIP) prior to receiving the CFSR Final report based on the statewide assessment and preliminary findings identified during the CFSR Exit Conference. Technical assistance was provided to senior management from the NCWRCOI to establish Mississippi's PIP planning

DHS
146791

process and structure. PIP planning groups were established based on the seven outcomes and seven systemic factors to analyze the CFSR findings and develop solutions and strategies for improvement.

PIP training was provided for Senior Management in March 2004. Statewide training for the MS PIP was held March 31 – April 1, 2004, with technical assistance and training provided by the NCWRCOI for agency staff, community stakeholders and service providers. Over 80 participants were involved. The training served as a PIP kickoff and initiated the work of the planning groups. The groups included the same individuals involved with the statewide assessment and additional stakeholders and providers. The group members were assigned to groups based on their area of interest and expertise. The planning groups were chaired by a Regional Director (RD) and co-chaired by a community stakeholder. The planning groups recommendations were documented in a preliminary PIP outline, discussed at the Senior Management meeting, and recommendations were made to the chairperson for further group input. The chairperson resubmitted additional group recommendations for the plan.

The CFSR final report was received in May 2004. The report was utilized by the DFCS State planning groups to re-evaluate group recommendations for the PIP. With the assistance of an outside consultant, group recommendations were drafted into a preliminary PIP. This document was provided to the chairperson to share with group members for review and feedback. This was to ensure statewide input into the PIP development and to gain support from community stakeholders in implementing strategies to improve outcomes.

The PIP was submitted to the ACF Regional Office on August 16, 2004. On August 30, 2004, the state received comments from Carola Pike, ACF Regional Office. The regional office arranged for a federal team, including National Resource Center (NRC) staff and peer consultants from other States to provide on-site technical assistance to incorporate the directives outlined in the comments. The purpose of the technical assistance was to assist the state in developing a PIP that the state could support and to conceptualize the framework for program improvements. Technical assistance was provided to Mississippi by the federal team in August. In September 2004, the federal team made another site visit to work with DFCS to incorporate revisions based on the review and comments from the earlier site visit and submission. Following the September site visit, the third submission was made on November 19, 2004. Conference calls were held to discuss the written feedback related to the second submission. These federal recommendations and input were incorporated into Mississippi's PIP, with additional work involving DFCS Senior Management team. The PIP was resubmitted on January 28, 2005. Following further feedback and discussion, Mississippi's PIP was resubmitted on March 24, 2005. Mississippi's PIP was approved, effective April 1, 2005.

Two Quarterly PIP Progress Reports were completed and submitted to the ACF Regional Office – one in July 2005 and the other in September 2005. On August 29, 2005, Hurricane Katrina devastated the Mississippi Gulf Coast. As a result of the

**DHS**
**146792**

widespread devastation caused by Hurricane Katrina, the state requested and was granted a one year extension on its PIP – moving the PIP completion date from March 2007 to March 2008. The submission of the Quarterly PIP Progress Reports was suspended, pending the renegotiation of Mississippi's PIP.

Mississippi's PIP was renegotiated during an on-site visit by ACF personnel during the three-day period January 31–February 2, 2006. In addition to ACF personnel, participants in the renegotiation process included DFCS Senior Management, DFCS State Office staff, and community stakeholders. The three days of renegotiation resulted in a restructuring of MS's PIP that included the revamping of goals to be more qualitative than quantitative, moving completion dates for action steps forward by several months (on average about 6-12 months), adjusting proposed collaboration efforts with the tribal Choctaws, restructuring our Project Homestead program and our Family Preservation services, making adjustments to our on-going training for our Resource Families, our advanced training for supervisors, and our on-going training for caseworkers. Following the three days of renegotiations, a revised Mississippi PIP was submitted on March 31, 2006. After receiving ACF written response to the submission, a conference call was held to discuss the written feedback regarding the latest submission. The federal recommendations and input were then incorporated into the revised PIP. The revised PIP was then resubmitted on May 1, 2006. Once again, following further written feedback from ACF and additional discussion, the revised Mississippi PIP was resubmitted on May 18, 2006. Due to delays in preparing the May 18th submission, ACF granted an extension until May 23, 2006.

## Mississippi's Renegotiated Program Improvement Plan

### Key Elements

Due to the impact of Hurricane Katrina on the State and its child welfare system, the renegotiation of Mississippi's PIP included the need to develop a Coastal Recovery Plan for the child welfare system on the Mississippi Gulf Coast. A Coastal Recovery Plan has been developed, and corresponding strategies and action steps have been incorporated into the PIP Matrix. A narrative description of Mississippi's overall Coastal Recovery Plan is as follows:

### The Coastal Recovery Plan

On August 29, 2005, Hurricane Katrina devastated the Mississippi Gulf Coast. Although it has been over six months since the hurricane, the recovery effort has just begun. Initially, basic needs had to be met because communities were left without shelter, food, water, sewer, and electricity. Now that the crisis situation has stabilized, we can take a step back and evaluate the impact of the hurricane on our agency: the current needs of the agency, partner agencies, staff, and foster homes; and develop a plan to move forward. We must also ask the question, "How has this hurricane affected the safety, permanency, and well being of the families encountered by DFCS?" The Mississippi Department of Human Services (MDHS) recognizes the need to assess the current obstacles and challenges post-Katrina in our three Coastal counties.

Prior to the hurricane, the Mississippi Gulf Coast was a thriving area that had entered an economic and development boom. The Mississippi Division of Family and Children's Services is divided into nine regions. Region VI South is made up of the three Coastal counties most impacted by Hurricane Katrina. On August 19, 2006, ten days before Hurricane Katrina, Region VI South had 675 children in custody. This was an increase of almost 100 children from January 10, 2005. As of February 13, 2006, they had 716 children, an increase of 24% since January 2005. During the month of July 2005, Region VI South had 177 child investigations, 68% of those investigations were initiated within 24 hours. The February 2006 report reflected that the same region conducted 173 investigations. The Child Investigation Timeliness Report reflects the following:

- Hancock County initiated 54.4% of the investigations within 24 hours
- Harrison County initiated 64.7% of the investigations within 24 hours
- Jackson County initiated 81.4 % of the investigations within 24 hours

Of note, all three counties had significant damage during Hurricane Katrina. Jackson County had the least amount of damage and the impact being more significant moving west with Hancock County being the hardest hit.

## The Problem

There are many challenges facing DFCS post-Katrina. The Harrison County DFCS building flooded during Hurricane Katrina and the Hancock County building was completely destroyed. It has not been determined at this point if the Hancock building will be rebuilt. Currently, the Harrison County staff is working out of small trailers. Necessary materials were destroyed: records, case files, equipment, office furniture, and supplies. Many staff's homes in the three Coastal counties were either completely destroyed or were badly damaged (100% of the Hancock County staff had their homes destroyed or badly damaged.).

Currently, stress and burnout are at an all time high. Child welfare positions are highly stressful due to the intense emotional turmoil that is naturally associated with child abuse and neglect. This has been compounded by staff being displaced from their homes and working through their own post-traumatic stress. Fourteen staff members have either relocated to other parts of the state or have left the agency altogether. Some staff left the agency to work for higher paying jobs that are funded through Federal relief monies. This competition has placed added strain on the already understaffed division. Fewer workers are managing higher caseloads of families who are in extreme crisis and under financial strain. Compounding the issue is the fact that we have few qualified applicants to fill vacancies.

## Foster Homes, TPR, and Adoptions

Ninety percent of the Hancock County foster homes suffered major damage. Currently, there are thirteen Mississippi children placed in foster homes out of the state. Louisiana has twenty children placed in Mississippi foster homes. Hancock County has started to recruit new foster homes. The challenge is that families residing in FEMA trailers are not eligible due to DFCS guidelines; therefore, locating temporary homes for the children brought into custody is a major problem. The shelter in Hancock County was damaged during Katrina and currently is not in operation. Relative placement is always the best choice; however, most are residing in FEMA trailers. DFCS policies may need to be altered for the Coastal counties (i.e. placement of children within 50 miles of their homes, and allowing children to be placed in the home of family friends). Many families are financially strained and unable to accept kinship placement. Challenges are also encountered in our TPR cases. Parents have relocated with no forwarding address. Relatives also have often left the area due to the destruction.

The Youth Court of Hancock County was damaged by Katrina and unable to reopen until mid-January. Some problems they have encountered include being unable to locate and properly notify clients for hearings. Referral services in the area, such as counseling for the increasing substance abuse problems, are limited. Currently, there is no Youth Counselor in the court system of Hancock County. The court is having difficulty locating qualified applicants.

## Housing

At present, housing is the top issue facing DFCS. There is an extreme housing shortage. More than 134,000 homes received damage with 65,000 of those being a complete loss. Over 50,000 homes received flood damage and 35,000 of those homeowners did not have flood insurance. There are thousands of people living in FEMA trailers or damaged homes. The view of what was considered unacceptable living conditions prior to the hurricane must be altered.

Federal and low income housing is limited along the Mississippi Gulf Coast. All four low income housing complexes in Hancock County were demolished. In Harrison County, *The Point*, an area of the city that has a large Vietnamese community, was virtually destroyed. Families are now living in small FEMA trailers that are located in crowded trailer parks. Many of the trailer parks do not include trailer numbers, but yet have hundreds of trailers. This adds to the difficulty of locating a family during investigations because workers must go door to door looking for families. Previously, workers typically knew the safety of a neighborhood prior to entering the home during an investigation. Now workers are unsure if they are knocking on the door of a physician's trailer or a meth lab.

FEMA trailers do not include washers, dryers, or telephones. Reports regarding cleanliness will have to be evaluated because of the lack of laundry facilities. Telephones can not be added to FEMA trailers because they are intended to be "temporary" housing. It can be assumed that many of our families will be living in this "temporary" housing for years.

## Transportation and Communication

Transportation continues to be difficult due to the damaged roads and complete destruction of the two major bridges connecting the three Coastal counties. Debris and debris trucks block roadways and at times making them impassable. Many clients lost their automobiles during the storm. The price of gasoline and the heavy traffic on limited roadways will be an added expense to staff and clients. The cost of public transportation has doubled while resources are limited and further apart. For example, in Hancock County, there are only two remaining grocery stores. Families may have to travel up to 15 miles to buy a gallon of milk.

Although most areas have consistent communication, Hancock County is still having difficulty with telephone service. In that area, the telephone lines are unreliable. In addition, many schools and offices are without fax machines. This adds to the time it can take to transfer information, especially when the mail service is still delayed.

## Employment and Other Financial Issues

Tourism was a major source of employment along the Coast. Casinos, hotels, and other businesses were destroyed or damaged, leaving thousands without jobs. At the same time, "Help Wanted" signs are a common sight. The housing shortage is a major contributor to the inability to fill vacancies.

DHS
146796

**Schools**
As reported in the Governor's Commission Report, 53% of the school districts and 25% of the schools were damaged.   Some schools are located in Quantum Tents producing their own set of problems.  School buses were destroyed with fewer buses there are longer commutes for school children.

**Services and Social Issues**
Law enforcement and DFCS have noticed an increase in domestic abuse cases as well as drug and alcohol related crimes.  It is presumed that this increase is related to the stress associated with inadequate housing, financial strain, loss of employment, and post-traumatic stress.  It will not be surprising if a trend is noticed with an increase in other mental health related issues such as depression, anxiety, and suicide is noticed as well.

Additionally, DFCS relies on partner agencies to assist with services for families and children.  Non-profit agencies are also feeling the financial strain which will result in cutbacks of staff or services and potentially closure of programs.  Donations and other aid will likely be filtered to recovery efforts instead of nonprofit programs.  This will become a greater challenge for our already short staffed agency that relies on these outside providers for additional services to the families we serve.  For example, in Hancock County, the Hope Haven Shelter was badly damaged in the hurricane.  The agency was able to repair the damage, but ultimately was unable to reopen due to the lack of financial support and lack of staff.

The culture of the Mississippi Gulf Coast has dramatically changed, impacting investigations and other services provided by DFCS.    Language barriers rarely presented a problem pre-Katrina; however, now there is a large Spanish-speaking community with few translators.

**The Solution**
Technical assistance is needed to conduct a Needs Assessment to determine the appropriate course of action to recover from this devastating natural disaster.  DFCS has requested technical assistance from the appropriate National Child Welfare Resource Centers to assist with the Needs Assessment and to determine the most effective method to collaborate with other agencies on a local, state, and federal level. DFCS will act as the lead agency in coordinating the Coastal Recovery Plan.  Initial telephone conference calls have been set up for March 31, 2006, and April 7, 2006. A planning meeting has been set for April 13-14, 2006, to discuss the Needs Assessment and Coastal Recovery Plan.  The Needs Assessment will be initiated following that collaboration.

Mississippi Children's Home Society (MCHS) has also offered to assist with the Needs Assessment. They will participate in the initial meetings and coordination.  A stakeholders meeting will be coordinated by the Mississippi Children's Home Society to assess the current needs along the three Coastal counties.  It is imperative to develop a board comprising of the various agencies, both private and public, that are

DHS
146797

involved with children and at-risk families. Invitations will be extended to members of the school board, local public officials, child-caring agencies, foster parents, law enforcement, mental health providers, medical providers, DFCS staff, as well as other key members of the community. Input will be solicited regarding current challenges facing these agencies in regards to child welfare. This meeting is tentatively set for May 9-10, 2006, in Biloxi, Mississippi.

Discussion groups and needs assessments will be conducted with agencies and groups such as the Foster Parent Association, stakeholders, court system, and DFCS staff. Quarterly and monthly DFCS reports will need to be gathered and analyzed, reviewing shelter care reports, foster care reports, timeliness of investigations, and workload analysis. A formalized Needs Assessment will be completed by October 2006.

Resources in Region VI South will be evaluated to determine what is available and what is needed to appropriately address the issues impacting Child Welfare in Hancock, Harrison, and Jackson Counties. Recommendations will be considered from the National Child Welfare Resource Center. These recommendations will be incorporated, along with the needs identified during the stakeholders meeting, into a Coastal Recovery Plan Draft. This draft will be circulated in-house for review and edits. The draft will be revised and finalized. The Coastal Recovery Plan will be implemented by April 2007. It will be impossible to predict all of the needs and problems that will surface over the next several years due to Hurricane Katrina. It will be imperative that we reassess our plan six months after implementation, and yearly thereafter to determine any changes or additions that need to be included in the plan.

A work group will be established to identify the unique resource needs for children entering care in Region VI South. Members of the work group will identify internal and external resources that can be engaged. A formalized plan will be developed by August 2007 and will be implemented by September 2007.

### Addendum to the Coastal Recovery Plan

DFCS has requested technical assistance from the National Child Welfare Resource Centers (NRCs) to assist with the needs assessment and to determine the most effective method to collaborate with other agencies on a local, state, and federal level. DFCS will act as the lead agency in coordinating the Coastal Recovery Plan. Telephone conference calls were conducted on March 31, 2006, and April 7, 2006, to launch the assistance from the NRCs. NRCs that have been represented in this planning process include Child Protection Specialist, Family Centered Practice and Permanency Planning,

A Coastal Recovery Planning Meeting was held on April 13-14, 2006, in Jackson to discuss the Needs Assessment and the Coastal Recovery Plan. Attendees included State Representatives from DFCS, Medicaid, Health, Mental Health, Courts, as well as National Representatives from Administration for Children and Families and the

National Resource Centers. Sarah Webster, Organizational Improvement, facilitated the two day discussion. Changes and obstacles in Child Welfare services since the hurricane were discussed. Staff representing the three Coastal counties expressed concerns regarding diminishing support services, staffing issues, recruitment of foster homes, as well as other challenges due to the after effects of Hurricane Katrina. Representatives from Mississippi Children's Home Services provided a framework for the Needs Assessment and the Gulf Coast Child Welfare Needs Assessment that would be held on May 9-10, 2006. The NRCs provided input on services and assistance that could be provided to the Division of Family and Children Services. The attendees provided input on key community members that needed to be invited to the Gulf Coast Child Welfare Needs Assessment.

An invitation was mailed out to representatives from various State Departments and local community representatives, requesting their attendance at the May 10, 2006 Coastal Recovery Planning Meeting and completion of an initial Needs Assessment. On May 9, 2006, the representatives from the NRCs, ACF, MCHS, local community representatives and DFCS participated in a tour of Harrison and Hancock Counties. The tour included the cities of Biloxi, Gulfport, Long Beach, Pass Christian, Bay St. Louis, and Waveland.

There were sixty-nine responders to the Needs Assessment and approximately 85 attendees at the Coastal Recovery Meeting. The Needs Assessment utilized sixteen focus groups, and based on those results, the Assessment was measured on a Likert type scale. Responders were asked to identify existing strengths, weaknesses, and proposed solutions. During the meeting, the attendees were divided into ten focus groups and asked to develop an Action Plan based on the needs identified in the Assessment and from group discussion. Facilitators for each group were provided with the responses from the Needs Assessment.

In addition, the NRC representatives conducted small focus groups with stakeholders. Group sessions were conducted with birth parents, foster parents, staff, and school personnel. The information obtained from the stakeholders will be incorporated into the information obtained from the Needs Assessment, recommendations from the NRCs, and recommendations from the groups at the Coastal Recovery Meeting. The information was developed into a Coastal Recovery Plan Draft.

### Safety Issues for Harrison, Hancock and Jackson Counties

The safety of children and families in Harrison, Hancock and Jackson Counties is a priority for the Division of Family and Children's Services. Hurricane Katrina has provided additional obstacles with responding timely to reports of abuse and neglect. Temporary workers will be hired to assist with post-Katrina needs, including the backlog of cases that was exacerbated by effects of the storm.

Jackson County received less damage and the percentage of response can be maintained until temporary workers are available to assist. Harrison and Hancock Counties have additional benchmarks to address safety. Harrison County has

DHS
146799

developed a plan to allow all direct service workers to investigate cases. The plan is designed to provide more workers to handle investigations in a shorter timeframe. Hancock County will work with local providers to address the frequent number of referrals for overcrowded FEMA trailers and children who are reportedly dirty. Some schools are working with the families to provide washers and dryers at the school, but the counties are still receiving a large number of referrals. Partnership with local providers will provide opportunities to explore alternative solutions and potential services needed. For example, domestic violence is increasing with few services available. DFCS subcontracts with the Gulf Coast Women's Center for Nonviolence to provide domestic violence services to clients in the area.

## On-Going Training for Resource Parents

Resource families, formerly known as foster and adoptive parents, are a vital component of any child welfare system, and on-going training for resource families is of the utmost importance. The primary purpose of on-going training for resource parents is to help educate families on Family Centered Practices, policies and procedures on parenting foster children. One of the first things that will need to be done is to establish a system of on-going training for resource parents in order to determine the needs of resource families. To determine the needs of resource families, DFCS will conduct a statewide survey of resource family needs. It is anticipated that this survey will be completed by April 2007. This survey will be used as the basis for determining the content of the on-going training for resource parents. Selected topics for on-going training will be determined from the surveys completed by resource families, DFCS staff, as well as the input from private providers and the universities. Selected topics will be approved by DFCS administrators rather than a work group because work groups tend to work better in the short term. A yearly calendar of scheduled family resource trainings, based on the survey findings, will be posted on the DFCS MACWIS website. It is anticipated that this yearly calendar will be available starting in August 2007.

It is anticipated that seven regional quarterly support group meetings, with approved training hours for resource families (one to three hours quarterly coordinated by the private agencies with approval from the State Office or DFCS Administrators), will be offered beginning in April 2007. In addition, DFCS will coordinate with private providers to offer additional trainings for resource families. The private providers will submit quarterly schedules to be mailed out with the DFCS schedule to resource families. This is anticipated to begin by August 2007. The topics for these trainings will be based on the yearly survey results, and/or regional support group requests. Further, yearly conference training opportunities will be provided to resource parents who have been selected and/or volunteered to serve as regional trainers. The Agency will pay for 28 resource families to attend the annual MPPN (Mississippi Permanency Partnership Network)) Conference and another 25 families are selected to attend the Lookin' to the Future Conference each year in July. Other families may attend these conferences, but it will be without the stipends.

DHS
146800

### Collaboration with the Mississippi Band of Choctaws

Mississippi considers collaboration with the Mississippi Band of Choctaws to be extremely important and will be initiated on the local and regional levels, rather than from the state level. Contact with the appropriate tribes for the two regions and the counties that are contiguous to tribal lands will be initiated by the Regional Directors for Region 3 and Region 4. The contiguous counties to the tribal lands that will be involved in the collaborative efforts are Neshoba, Leake, Kemper, Winston, and Newton.

It is anticipated that the collaborative efforts between DFCS and the Mississippi Band of Choctaw Social Services will culminate with an interagency agreement. The primary-purpose of this interagency agreement with the tribe will be to outline and specify jurisdictional questions and issues. In addition to addressing issues of jurisdiction in the interagency agreement, it is anticipated that improving on existing lines of communication will be addressed, as well as tribal involvement in other areas of child welfare, such as Independent Living. Once the interagency agreement is signed, it is anticipated that meetings to discuss this relationship will be on an on-going basis would occur at a minimum of twice a year.

### Family Preservation

The concept of Family Preservation was created by federal law in 1993 under the "Home Ties Program" to provide concentrated and intense home-based services to families. The purpose of this law was to prevent removal of children from their homes, and/or to reunify children who have been removed from their families. Mississippi adopted this law in 1994.

The key component of Mississippi's plan to provide services to families to protect children in-home and prevent removal is through the offering of Family Preservation services. Providing Family Preservation services to families in need is currently done in-house, but the program is now in the process of being contracted out. The Request for Proposal has been written and once the contract is written and finalized, Family Preservation services will be provided statewide. It is anticipated that through these providers, every county in the state will have access to Family Preservation services. Once the contract is finalized, a process for referring families for Family Preservation services will be developed, as well as revising current policy and practice pertaining to Family Preservation.

### Project Homestead

Due to concerns about the overall effectiveness of the existing Project Homestead program, a number of changes are being proposed and discussed about renaming, revamping and restructuring the program. It is anticipated that a programmatic evaluation of the effectiveness of the existing Project Homestead County Task Forces will be utilized in developing the changes to the program.

Among the changes being discussed is a name change that would be more easily identifiable. Changing the name of Project Homestead to the Mississippi Community Family Coalition (MCFC) has been proposed. The words "community, family, and

DHS
146801

coalition" in the name focuses on communities, families, service agencies all coming together to work toward a common goal.

Another aspect of the restructuring of Project Homestead is the possibility of using statewide initiatives in such a way that these initiatives will not take away from the emphasis on local community concerns. It is anticipated that any proposed goals and activities designed to meet the criteria of the funding source, will also be open ended enough for communities across the state to address in their own fashion, though this will not be possible in all situations.

It is anticipated that similar to the Project Homestead Regional Coordinators that were utilized for Project Homestead, the same concept will be used to oversee and coordinate the restructured statewide program. The use of coordinators for the restructured Project Homestead is still under discussion.

It is also anticipated that by March 2007 the restructured Project Homestead will be operating in at least one county in all seven regions of the state.

## Training
The DFCS training program is being restructured to develop and implement a comprehensive training system for both caseworkers and supervisors. This training system will include two tracks – one for caseworkers and one for supervisors. The caseworker track will have two levels: Level I will comprise intensive training for new caseworkers, and Level II will be the ongoing advanced training for all caseworkers. The Supervisory track will also have two levels: Level I will be the intensive supervisory training for all new supervisors, and Level II will be the on-going advanced supervisory training for all supervisors. Level I training is also designed to train the new Family Protection Specialists/Workers on the key components of DFCS child welfare system. Level II training is intended to be never-ending with new training areas and topics being evaluated, added and revised on an annual basis.

## Intensive Training Curriculum
The University of Southern Mississippi (USM) has been contracted to develop the process of updating DFCS's Intensive Training Curriculum. It is anticipated that the Intensive Training Curriculum will be revised yearly based on an analysis of need, agency policy updates, MACWIS system changes, and Family-Centered Practice. The contract implements a plan of action between DFCS and USM that includes revisions of the existing Core Intensive Training Curriculum for new workers, supervisors and the development of a Level II caseworker training that will consist of three two-day training modules in Case Planning, Assessment and Family Engagement. In addition, a one-day writing module will also be developed to enhance staff writing skills. All future revisions of each curriculum identified will be done through the survey process, as well as with a focus group, the USM School of Social Work, and/or other curriculum development sources external to DFCS.

DHS
146802

### Level I Intensive Supervisory Training for New Supervisors

Supervisory training is a key component of any child welfare system, especially for new supervisors. DFCS will develop and implement a Level I Intensive Supervisory Curriculum for all new supervisors. The focus of this Level I Intensive Supervisory Curriculum is intended to incorporate training that will be largely done as On the Job Training (OJT). It was decided to go in this direction because it is unusual to have a group of new Supervisors all starting at the same time. In approaching the new supervisory training for new supervisors from this perspective it will allow new supervisors to be trained more rapidly and more efficiently.

In addition, a specific curriculum will be developed for Level I Intensive Supervisory Training. The Level I Intensive Supervisory Training will be designed for supervisors who have been on the job from 0-12 months. There will be a training manual with modules addressing a variety of topics, including:

- Transitioning from Family Protection Specialist/Worker to Supervisor
- The roles of an ASWS
- Communication skills
- Group work

It is anticipated that Training Coordinators and/or mentors will be trained to provide this training as OJT to new supervisors in their regions as the new supervisors are hired. The Program Managers and/or mentors will be required to have weekly face-to-face meetings with the new Supervisors during their first six months and monthly face-to-face meetings with the new Supervisors during the second six months. Training will be provided during this time as well as mentoring and clinical supervision. These meetings will be documented and a process will be developed for evaluation and tracking purposes to ensure that the training is being held and is consistent agency wide. Regional Directors will be responsible for assuring that the training takes place, monitoring the effectiveness of the training and that the information is forwarded to the State Training Director. The State training Director will maintain oversight of the training process and evaluations.

The strongest focus during the first six months of this training will be on administrative issues that current supervisors are already familiar with and do not need this additional "classroom" training. Also during this time, the Level II Supervisor Training will be ongoing in every region for all supervisors, including the new ones.

All new supervisors will receive the Level I Intensive Supervisory Training. Additions, subtractions, adjustments, improvements and revisions to the Level I Intensive Supervisory Curriculum will be based on a number of factors, including the results of an annual supervisory training needs survey that will be distributed to Regional Directors, Area Social Work Supervisors (ASWS) and Training Coordinators, as well as any changes in agency policy, our automated computer system, child welfare practice and supervision that may occur.

### Level II Advanced Supervisory Training for All Supervisors

The Level II Supervisory Training, also known as Advanced Supervisory Training, will be a regionally based training. The Training Coordinators and/or Regional Directors will be responsible for facilitating this training. There will be specific modules available form this training and the Training Coordinators and Regional Directors will identify the needs of their Regions and choose the modules most needed. Every module will eventually be trained in every Region. The training will be provided during monthly staff meetings at which time a minimum of three hours will be devoted to this training at least six times a year. The training provides a more advanced skill level for all supervisors. Examples of modules include, but are not limited to the following:

- Community Partnerships
- Diversity
- Working with Difficult People
- Principle Centered Leadership
- Seven Habits of Highly Successful People
- Clinical Supervision-Critical Contact Points in Casework
- Post-traumatic/Secondary Traumatic Stress, Vicarious Traumatization Countertransference, Burnout
- Leadership Styles
- Interactive Supervision/Parallel Process
- Managing Data
- Liability Issues
- Personal and Professional Boundaries
- Supervising in the Midst of Trauma
- Self-Awareness and Awareness of Effects on Actions of Employees

All supervisors will receive Level II Advanced Supervisory Training. The Level II Advanced Supervisory Training curriculum will consist of training sponsored by the DFCS Training Unit and/or provided by obtaining training programs from sources external to DFCS on a yearly basis. Additions, subtractions, adjustments and improvements to the Level II Advanced Supervisory Training Curriculum will be based on several factors, including the results of an annual supervisory training needs survey that will be distributed to Regional Directors, Area Social Work Supervisors (ASWS) and Training Coordinators, as well as any national changes in child welfare practice and supervision.

### Pre-Service and Ongoing Caseworker Training

All new Family Protection Specialists/Workers will receive the Core Intensive Training (Level I Intensive Training), and all Family Protection Specialists/Workers will receive Level II ongoing advanced caseworker training. Core Intensive Training and Level II Training will be provided in conjunction with State Office training staff and regional training staff to allow for flexibility and rapid scheduling for new caseworkers. The Level I Core Intensive Training Curriculum will consist of ten weeks of training that includes three weeks of orientation in the county office,

DHS
146804

followed by four weeks of classroom intensive training in Agency Policy, Child Protection Law, Interpersonal Helping Skills, Family Centered Practice, Intake, Investigation, Assessment, Case Planning, Working with Sexually Abused Children and Their Families, and the MACWIS system. The classroom training will be in collaboration with three one-week sets of structured on-the-job training at the work site. To complete the training, caseworkers take an exam based on the ten weeks of training.

Level II Family Protection Specialist/Worker training curriculum will consist of three-day classroom training in Family-Centered Practice, Intake, Investigation, Assessment, Case Planning, Placement Services, and MACWIS system training. To complete the training, caseworkers will take an exam based on the training.

### On-Going Training in Specialized Targeted Areas

As part of the DFCS ongoing Family Protection Specialist/Worker and supervisor training, the planned specialized targeted training that had been provided through local universities. Child Welfare Training Institute (CWTI), will now be provided through the DFCS Training Unit. All curriculum revisions will be done on a yearly basis through an annual survey process, as well as in conjunction with either focus groups or other curriculum development sources. The first of these specialized targeted training areas will be Family Violence Training. All Family Protection Specialists/Workers and supervisors will receive Family Violence Training. This training will be provided in conjunction with regional training staff to ensure transfer of knowledge on a yearly schedule. Supervisors will receive an additional half-day informational session on supervisory effectiveness skills and the supervisors' role as a mentor and coach. Family Violence Training Curriculum will be updated yearly, based on need analysis and practice.

This Family Violence Training process will begin in 2007. It is anticipated that Train-The-Trainers will be completed by March 2007, and all the regional training will be completed by May 2007 and then yearly thereafter. The DFCS Training Unit will provide this training based on the following guidelines:

- Training will be provided regionally across the State of Mississippi. It will be held annually and the material will be updated annually in order to provide the most accurate information. Train-the-Trainers will be provided to field staff to facilitate this training in their regions.
- Regional training will consist of a one-day training for all staff which will consist of prescribed agenda and schedule. Upon the completion of each training, each participant will evaluate, to assist in the improvement of future trainings.
- The prescribed agenda for the one day training will consist of the following:
  - Session I: Introduction
    a. Welcome
    b. Pre-Test
    c. Statistics of family violence
    d. Fact or Fiction Statements

DHS
146805

o  Session II: Overview of Domestic/Family Violence
   a.  Definitions
   b.  Types of family violence
   c.  Personality traits of victims and batterers
   d.  Types of batterers
   e.  Dynamics of family violence
       1.  Why do men batter?
       2.  Why do women stay?
   f.  Elements which interfere with effective intervention
   g.  The cycle of violence theory
   h.  Interventions

o  Session III: Impact of Family Violence and Substance Abuse on Children and
   their Parents
   a.  Effect of family violence on children
   b.  Characteristics of children who have witnessed violence
   c.  Roles of the Family Protection Specialist/Worker in working with children
       who witness violence in their homes
   d.  Impact of substance abuse on children and their families

o  Session IV: Domestic Violence and Culture
   a.  Multicultural society
   b.  Domestic Violence and race ethnicity
   c.  Cultural factors that influence the victim's response to domestic violence
   d.  Immigrant ethnic minority women and domestic violence
   e.  Resources

o  Session V: Wrap it up!
   a.  Post-Test
   b.  Evaluations

**Yearly Analysis of Need for Ongoing Training**

Throughout this narrative description regarding the DFCS plan for ongoing training, there
have been references to a yearly analysis of need. The primary purpose of this yearly
need analysis is to determine staff training needs, develop new curriculums, and/or
modify existing curriculums. This yearly need analysis will be done by the DFCS
Training Unit. The yearly need analysis will be in the form of an annual report and will
be based primarily on the results of the staff surveys. In addition, the DFCS Training
Unit will also conduct surveys with supervisors to address caseworkers' application of
learning after each training session. These surveys will be conducted after the third, sixth,
ninth, and the twelfth month of the caseworker training. The tool for the supervisory
survey is currently in development.

DHS
146806

## Status of Progress Made During the Last Two Quarters

### Safety Outcome 1:
### Children are First and Foremost Protected from Abuse and Neglect

#### Timeliness of Initiating Investigations

The CFSR documented several areas of concern. One of those areas found DFCS to be inconsistent in its efforts to address the safety of children who come into contact with the child welfare system. A key finding of the CFSR was that MDHS was not consistent with regard to initiating investigations within the State's time frames. A concerted effort by MDHS has been underway to improve the timeliness of initiating investigations of reports of child maltreatment (see chart below). Over the past six quarters, starting with the April-June 2005 quarter through the July-September 2006 quarter, MDHS has averaged 75.1 percent of the child investigations being initiated within the State's time frame per quarter.



#### Regional Action Plans

All Regions have completed individual County Self Assessments to determine strengths and/or areas needing improvement for timeliness of investigations. Based on an analysis of the assessment results, counties identifying timeliness of investigations as a practice area needing improvement will develop safety strategies to improve practice in the Regional Action Plan.

#### Family Centered Practice

The concept of Family Centered Practice (FCP) is being implemented through the processes of Family Team Meetings (FTM) and enhanced County Conferences (CC). The concept of FCP and the processes of FTM and CC were fully introduced during the statewide FCP training that was completed in April 2006. FTM is the responsibility of the caseworker as part of everyday practice to engage and involve the family in the decision-making process. FTM is required for all cases within 30 days to engage the families and to develop the initial Individual Service Plan (ISP). CC is conducted on all custody cases within six months of entering custody, and then every six months thereafter for the life of the case. The CC serves as Mississippi's six month periodic administrative review; as Mississippi's family team conferencing model to continuously engage the family and children in the planning process by focusing on achieving timely permanency; is intended to enhance and strengthen the standard FTM casework process.

**Quality Assurance**

The quality assurance methods being used to track the implementation of the revised policy and practice to improve timeliness of investigations includes the monthly monitoring of the MACWIS Timeliness of Investigations Report and data. In addition, the custody cases are continuously reviewed (monthly) by the foster care reviewers as part of the CC every six months.

**Coastal Recovery Plan**

In addition to Mississippi's Coastal Recovery Plan, MDHS has contracted with Social Work p.r.n. to provide temporary workers for the counties directly impacted by Hurricane Katrina. These temporary workers will be used to assist the counties with cleaning up the backlog of cases. To date, a total of six temporary workers have been hired, completed training, and have been assigned to the following counties: Jackson County (one worker), Harrison County (one worker), Forrest County (three workers), and Pearl River County (one worker).

**Appropriate Permanency Plans (PIP Item 7)**

Among the primary issues concerning the Foster Care Review Program is the appropriateness of permanency plans and the timeliness of their achievement. In the timeframe April-June 2006 the appropriateness of permanent plans based on case information was 94.4%. For the timeframe July-September 2006 it was 88.9%.



A review of the sample for April through June indicates a significant number of adoption cases. The next quarter's sampling was more varied which resulted in a percentage closer to the average for the past year. The Foster Care Review Program will monitor this issue closely on an every case basis beginning October 16, 2006, and report monthly to determine if there is a trend for this item that needs to be addressed with field staff.

DHS
146808

**Safety Outcome 2**
**Children are Safely Maintained in their Homes When Possible and**
**Appropriate.**

This particular outcome raised concerns that some children are not being sufficiently protected from risk of harm while in their own homes due to the insufficiency or lack of protective and in-home services.

**Family Preservation**
As noted in the CFSR Final Report and through interviews with stakeholders, the Family Preservation Program, which was handled in-house, was clearly identified as a strength for DFCS. Based on stakeholder comments the main concern was that the supply of this type of service did not meet the demand. Available funding for expansion of the program was an issue, so the decision was made to contract with a private provider to continue the Family Preservation Program. A new RFP has been written and is going through the approval process. It is estimated that the new RFP will be issued and advertised by November 30, 2006, with December 31, 2006, as the deadline for submissions. The contract date with the new provider is anticipated to run from February 1, 2007, through August 15, 2007.

**Family Centered Practice**
The concept of FCP has been trained statewide and implemented (statewide training was completed in April 2006). A key component of FCP is FTM, which is required for all cases within 30 days to engage the families in the decision-making process and to develop the initial Individual Service Plan (ISP). FTM is the responsibility of the caseworker as part of everyday practice to engage and involve the family in the decision-making process. It is anticipated that by improving family engagement in the decision making process as early possible, referrals to family preservation will be improved and the usage of in-home services to families to protect children in-home will increase.

**Quality Assurance**
An overarching strategy for improving the utilization and quality of in-home services will be the implementation of supervisory reviews of in-home cases on a quarterly basis. ASWS will review one in-home case per worker quarterly with the caseworkers to identify and assess the quality of case practice related to in-home cases and the services provided to protect children in-home and prevent removals when possible.

**Regional Action Plans**
All Regions have completed individual County Self Assessments to determine strengths and areas needing improvement for in-home services to protect children in-home and prevent removal. If the counties within a region identify areas needing improvement to protect children in-home and prevent removal as a safety priority, strategies will be developed and included in the RAP relating to safety. Each Regional Action Plan must be submitted to the DFCS Division Director for final

review and approval. After State Office approval, the region will be required to implement and monitor progress on completing action steps and progress toward established goals. The ASWS and county will report progress monthly to the RD, who in turn will report quarterly to the State Office.

All Regions have completed individual County Self Assessments to determine strengths and areas needing improvement related to risk of harm. If the counties within a region identify areas needing improvement to reduce risk of harm, such as safety and risk assessments, initial case planning, or FTM, then safety strategies will be developed and included in the RAP to improve practice.

**Permanency Outcome 1**
**Children Have Permanency and Stability in Their Living Situations**

The CFSR Final Report indicated that MDHS is not consistent in making diligent efforts to (1) establish appropriate goals in a timely manner; (2) achieve permanency for children (through adoption, reunification, permanent placement with relatives) in a timely manner; or (3) ensure that older children in long-term foster care receive appropriate services to assist them in making the transition from foster care to independent living.

**Family Centered Practice**
The overarching strategy to improve FCP through FTM and CC impacts the stability of placements. A FTM should be held around any major changes within the case such as placement decisions, placement moves and placement disruptions. By including the family and children in the FTM regarding placement decisions, more appropriate placements could be made. In addition, by matching the needs of the family and child with the appropriate placement type more placement stability would be created. The family centered enhanced CC, being held every six months, creates another opportunity to engage the family, children, foster parents or other placement providers as active team members in reviewing placement issues and permanency goals. The enhanced CC provides an opportunity to engage the foster parents and community providers as team members to improve placement stability while working toward permanency goals for children.

FTM and CC strategies are being utilized as a strategy to improve timely reunification or permanency. FTM is helping caseworkers engage the family in decision-making and case planning to achieve more timely permanency through reunification, relative placements, or adoption. Holding FTM around major changes in the case, such as changes in the permanency goal would allow for more timely decisions for reunification or concurrent plans. The CC provides a forum for the staff and family team to review and make decisions related to reunification and other permanent options for the child.

DHS
146810