The specific plans of reunification, durable legal custody, and guardianship will be discussed. Specific issues related to emancipation, independent living, interdependent living, and transitional living need to be thoroughly discussed in order to educate the trainees about the special needs of teens who are aging out of the system. Particular emphasis will be on identifying the specific needs of foster teens and how to help them prepare for a life outside of foster care.

## Intake and Investigation

This component will focus on the specific information that is needed at the time of intake in order to make an accurate decision in the screening process. It will also focus on how to appropriately initiate an investigation and how to conduct interviews that are not tainted or biased. Information will be provided about what is and is not considered evidence in the investigation process as it relates to abuse and/or neglect.

## Family Team Meetings

This component will focus on family group conferencing techniques. This training will demonstrate how to bring stakeholders and family members together in order to identify strengths and needs of the family. It will also place emphasis on setting goals and tasks for all members in the meeting so everyone can work together to help improve the living environment of the family.

Each module will be developed in a 6-hour training session provided by the DFCS Training Program. Each module will be presented twice in each venue for the purpose of training one-half of the designated staff each day. The training will be provided to the following staff persons in each of the nine Regions and the State Office:

### Staff Positions Benefiting From Statewide Training on PIP Modules

| Positions | Number of Trainees |
|---|---|
| Regional Directors | 9 |
| Area Social Work Supervisors (ASWS) | 57 |
| Family Preservation ASWSs | 25 |
| Social Workers | 268 |
| Family Preservation Social Workers | 33 |
| All Other Social Worker Positions (Training, FC Review, Adoption, FP) | 50 |
| Child Protection Specialists | 14 |

| Positions | Number of Trainees |
|---|---|
| Family Preservation Program Specialists | 31 |
| Licensure Program Specialists | 10 |
| Family Preservation Homemakers | 81 |
| State Office Staff | 65 |

TOTAL STAFF TO BE TRAINED ON EACH MODULE:     643

### Intensive Training for New Family Protection Specialists/Workers

The Training Program will continue to provide Intensive Training for all new DFCS Family Protection Specialists/Workers. The Intensive Training curriculum include our automated child welfare reporting system, MACWIS, family centered practice, best practices and other policy and practice related to child protection work. The curriculum continues to be revised with changes in policy and practice. In addition, on-the-job training will be provided to all new direct service workers during the 4 weeks of Intensive Training. This on-the-job training will include targeted training on practice and policy, assessments of the family's strengths and risk to the child, which include the use of the best practices tools, case planning in all cases, and working with sexually abused children and their families. On-the-job training will alternate with the 4 weeks of Intensive Training. As stated earlier this training will be held either in a regional location to allow close proximity for training or at a DFCS sponsored training site within close proximity to State Office and within the Hinds County area. The training session lasts four weeks which is four and a half days per week, based on an eight hour work day. The number of graduates will vary based on the number of new hires.

### Foster/Adopt Training

- Provide training for foster/adoptive parents.
  - o Provide a minimum of 12 hours of in-service training per school per quarter. (Each university will provide a total of 48 hours of training per year.) Training will be coordinated with DFCS Training Program and Foster/Adopt Licensure staff. [As stated in the contractual agreement, all curricula developed by CWTI are the sole property of MDHS.] MDHS reserves the right to approve/disapprove selection of all CWTI trainers.
  - o The State has received approval for technical assistance from NCWRC to assist licensure adoption program with revising foster/adoptive parents in senior training curricula known as PATHS to enhance foster/adoptive parents' role in working with birth parents and agency.

Training topics will include, but not be limited to the following: Working With Children With Special Needs I and II; Transitions in Foster Care I and II; Discipline Without the Use of Corporal Punishment I and II; and Working With Biological Parents I and II.

DHS
146887

Children's Justice Act (CJA) Training was identified as the most critical activity of the Statewide Network in accomplishing the goal of comprehensive systemic reform and change relating to the methodology by which child abuse cases are handled in this State. In Mississippi, the ability to confidently and competently interview an alleged child victim is much sought after and impacts several of the professional disciplines involved in this area. The activity of training can be the means by which to bring divergent disciplines and viewpoints together in order to break down longstanding misperceptions and promote the endorsement of the multi-disciplinary approach.

## CJA Training

Over the last few years, the CJA has been responsible for the continued provision of the two day specialized training in forensic interviewing skills development. The established two day forensic interviewing skills training program, which has been in place since 2000, has continued to have a major impact. During the last 12 months, there have been 12 such training sessions; these included approximately 126 participants. Post-training evaluations consistently rate this training very high (on a five point scale 1-poor to 5-excellent) and in many instances call for more in-depth training.

Training was identified as the most critical activity of the Statewide Network in accomplishing the goal of comprehensive systemic reform and change relating to the methodology by which child abuse cases are handled in this State. In Mississippi, the ability to confidently and competently interview an alleged child victim is much sought after and impacts several of the professional disciplines involved in this area. The activity of training can be the means by which to bring divergent disciplines and viewpoints together in order to break down longstanding misperceptions and promote the endorsement of the multi-disciplinary approach.

To date, there have been three advanced training classes with a total of 63 participants. The make up of the students breaks down as follows:
- social workers, 15
- police department/investigators, 14
- bureau of narcotics investigator, 1
- district attorneys, 5
- youth court representatives, 2
- mental health official, 1
- Choctaw (tribal) professionals, 5
- youth services representative, 1
- health professional, 1
- prevention agency representatives. 18.

Two Regional training sessions were conducted to allow increased access for teams from all areas of the State. The first session was in Hinds County (the largest county in the State), in south-central Mississippi. About 200 people, primarily law officers and social workers, were in attendance. Roger Canaff (from the American

Prosecutors Research Institute in Alexandria, Virginia) was the speaker. His topics for the conference included Prosecution of Child Abuse, Testifying Tips for Professionals, Internet Crimes and Offender Typology, and Crawford vs. Washington. The second session was held at the Mississippi Gulf Coast, the southernmost part of the State. This meeting was also attended by at least 200 people. The keynote speakers were Osceola Edmondson, who spoke on "Childlike Not Childish Behavior," and George Ryan's presentation was entitled "Search Warrants Related to Child Sexual Offenders."

Additionally, MDHS has been active in continuing to develop a larger pool of doctors to conduct forensic examinations. A 21-hour forensic examination training session was offered in Jackson, Mississippi, in June 2005. The class offers education in both a lecture and hands-on format. The doctors are able to conduct "real" forensic examinations with equipment that they might not otherwise been able to use. The number of participants is kept small in order to facilitate the learning process, and the number of students wishing to participate always exceeds the capacity of the course. Therefore, we fully expect to fund similar programs in the future.

This year, the Children's Justice Act Task Force identified the following areas for training:
- Provide approximately 20 dates for forensic training sessions for First Responders—such as emergency room doctors and nurses, law enforcement, and social workers. To increase the ability and knowledge base of the people who are the first contact with a child victim, to assist in their ability to know what to ask and how not to question a child, and to provide the First Responder with the ability to articulate his/her observations in a manner that will be allowable in court and understood by laymen in the jury.
- Provide approximately 10 dates of forensic training as part of the Court Improvement Plan (CIP) which would include training judges, guardians ad litem, district attorneys, and county prosecutors. The training is designed to educate the court personnel on the forensic interview techniques, the importance of safeguarding the child from being re-victimized, and to increase their knowledge in how to question a child who may come before them in court.
- Technical assistance and training will continue to be provided to the active teams in the Statewide MDT Network. A minimum of two Regional training sessions will be conducted to allow for increased access for teams from all areas of the State.

Furthermore, the CJA grantees will continue to offer training to their MDTs. Training that will be offered by the grantees will be similar in nature to that provided over the previous 12 months. A partial list of the training offered by the grantees follows:
- Formation of a New MDT
- FBI Agency In-Service
- Statutory Rape/Child Abuse
- MDT Procedure

- Emergency Department Care for Victims of Sexual Assault
- SANE Nurse Training
- Department of Human Services Agency Information
- Court School
- Crawford vs. Washington
- Pediatric Sexual Assault Exam Course
- Offenders
- Victim Rights
- How the Dynamics between Animal Abuse and Child Abuse Affect the Forensic Interview Process
- Protocol Training
- Community Resources
- Overview of Teams and Forensic Interviews
- Child Development
- Normal Child Sexual Behavior
- Why Children Recant
- Statues
- MDT Role and Individual Agency Responsibilities
- Advanced Finding Words
- Stress Management
- Update on Link between Viewing Child Pornography and Molesting Children
- Team Dynamics- Team Investigation vs. Joint Investigations, Standard of Proof
- Cost of Child Abuse
- Requesting a Forensic Interview
- Medical Evidence in Child Abuse Cases
- Effective Prosecution, Policy and Procedures for Forensic Interviews.

## FOSTER CARE REVIEW

Objective 1: The objective to ensure quality practice is to enhance Foster Care Review to evaluate and monitor quality and consistency of practice Statewide. The results of this review are documented through a quarterly report that was made available in October 2005. The baseline for monitoring improvement in practice will be determined after four quarters of data is available from the report in July 2006. Program Improvement Plan items will also be monitored monthly through the Foster Care Review Program's, monthly "issues" report beginning in July 2006.

The information collected from this sample of cases between the months of July 2005 and June 2006 by the Foster Care Review Program is as follows:

## Safety in Foster Care Placement:
- Totals for the year (SFY 2006 – July '05 to June '06) are as follows:
  - Of the 324 children reviewed, there had been allegations of abuse and/or neglect on 20 (6%) of the cases.
    - Of the 20 cases where there were allegations of abuse and/or neglect, 6 (30%) were substantiated while 14 (70%) were not.

- Of the 6 cases where it appears abuse and/or neglect may have been substantiated, it appears appropriate action was taken by agency staff to assure the child's safety and reduce risk of harm.
  - 304 (94%) did not have allegations of abuse and/or neglect.

## Stability of Placement

Of the 324 children in the SFY 2006 sample, 126 (39%) are in licensed foster homes; 22 (7%) are in a trial placement home with their parents; 76 (23%) are in a facility or group home placement setting; 66 (20%) are placed with a relative; 24 (7%) are in a pre-adoptive placement; and 10 (3%) are in some other kind of placement setting such as Job Corps or emergency shelters.



Of the 324 children in the SFY 2006, 102 (31%) have been in their current placement 0-6 months; 72 (22%) have been in their placement setting 7-12 months; 104 (32%) have been in their placement setting 13-24 months; 46 (14%) have been in their current placement setting for over 24 months.

|  | Time Frame | Total # | Total % |
|---|---|---|---|
| State Totals | 0-6 Months | 102 | 31% |
|  | 7-12 Months | 72 | 22% |
|  | 13-24 Months | 104 | 32% |
|  | Over 24 Months | 46 | 14% |

Of the 324 children reviewed in the SFY 2006 sample, 137 (42%) changed placement settings while 187 (58%) did not.

*Of the 137 children whose placement changed during this period, 42% had only one change; 25% had 2 changes; and 33% had more than 2 placement changes.*



Of the children who changed placements during the review period, 78% were directly related to helping the child achieve the goals of their case plan while 22% were not.

293 (94%) of the children in the sample in foster care placements were determined to be in placements that are currently free from the risk of an unplanned disruption or move that is not directly related to achievement of the child's permanency goals in the foreseeable future. 18 (6%) were found to be in placements where the stability is/was questionable.

## Permanency Goals

- Of the 324 children in the SFY 2006 sample, 121 (37%) have been in agency custody for twelve months or longer with a permanent plan of Reunification or Durable Legal Custody (Relative or Non Relative).

- The barriers to achieving the permanent plan of Reunification or Durable Legal Custody within twelve months of the child entering state's custody are listed below:
  o In 54% of the cases in the sample, parents or family members were determined to be inhibiting achievement in a timely fashion by failing to comply with parental individualized service plans (ISPs) or through failed trial placements with parents or relatives.
  o Court related issues accounted for 16% of the barriers identified. The court related barriers include a judge continuing to order a plan of Reunification after 12 months of custody and children who have been in agency custody for without an adjudication hearing.
  o 18% of the barriers were determined to be "other" which includes children with a plan of Reunification or Durable Legal Custody who are awaiting ICPC placement approvals or who require extensive treatment for behavioral health issues or medical issues prior to being able to achieve permanence.
  o During this sample period (July 2005 to June 2006), agency staff was deemed to be a barrier to achievement to this item in 7% of the cases.

- 4% of the barriers determined were due to a lack of resources that could assist in achieving the permanent plan within twelve months.

- If a child has been in state's custody for 15 of the most recent 22 months, or meets other Adoption and Safe Families Act (ASFA) criteria, the case is to be referred for termination of parental rights unless there are compelling reasons for not filing or joining in a petition to terminate parental rights (TPR) documented on the child's individual service plan (ISP). Of the 324 children reviewed in the sample, 154 were found to be in agency custody 15 months or longer. 73% of the 154 children had compelling reasons documented on their ISPs while 26% had no compelling reasons documented on their individual service plan for not pursuing termination of parental rights after 15 months in state's custody. Some of the compelling reasons given were foster teens ages 16 to 20 not wanting to be adopted, courts ordering that TPR is not in the best interest of the child, courts extending the time for the plan of Reunification, and relatives caring for the child while the parents continue to work on their individual service plans.

- 141 children in the sample were found to have a permanent plan of Adoption. 57% were on track for finalization within 24 months of entering custody while 43% were not found to have steps in place for finalization within 24 months.

- The barriers to achieving the permanent plan of Adoption within 24 months were as follows:
  - During the review period of July 2005 to June 2006 court related issues such as continuing TPR hearings accounted for 29% of the identified barriers to achieving a plan of Adoption within 24 months of the child entering custody.
  - Agency staff was found to be responsible for 41% of the barriers to achieving permanency through adoption within 24 months of entering states custody. These barriers include, but are not limited to, failure to complete a TPR referral, the court ordering a plan of TPR with the county completing the TPR referral in a timely manner but the referral was not process through the agency's state office in a timely manner, and county staff not appropriately returning petitions for TPR to the attorneys serving the agency in TPR matters.
  - Disruption of the adoptive placement was responsible for 6% of the barriers identified in this particular review sample.
  - "Other" barriers accounted for 24% of the identified barriers. This would include, but is not limited to, staff in the Attorney General's Office not securing a TPR hearing date in a timely manner and foster parents delaying finalization of the adoption of one foster child in order to achieve the finalization of two foster children in their care on the same date.



Barriers to Achieving Finalization of Adoption

If the permanency plan is Emancipation or Formalized Long Term Foster Care other, more permanent, plan options must be considered and ruled out for the child.

- 49 of the 324 children in the sample were found to have a permanency plan of Emancipation or Formalized Long Term Foster Care.
- 8% was found to have not had other permanent plan options considered and ruled out. 92% were found compliant.
- Below is a year to date total (including state totals that exclude the three coastal counties):

| State Totals | | Total |
|---|---|---|
| Consideration of | Total Applicable | 49 |
| other plan options | Total "Yes" | 45 |
| given prior to | % "Yes" | 92% |
| FLTFC and | Total "No" | 4 |
| Emancipation | % "No" | 8% |

| State Totals Minus | | |
|---|---|---|
| Coastal Counties* | Total Applicable | 46 |
| | Total "Yes" | 42 |
| | % "Yes" | 91% |
| *(Hancock, Harrison, | Total "No" | 4 |
| Jackson Counties) | % "No" | 9% |

**Appropriateness of permanent plans based on case information:**

All of the children in the sample were applicable to this item. 90% were found to have appropriate permanent plans based on case information. 10% were found not to have appropriate permanent plans based on case information. Below is a SFY 2006 total (including totals without the three coastal counties affected by Hurricane Katrina):

| State Totals | Total Applicable | 324 |
|---|---|---|
| | Total "Yes" | 290 |
| Appropriateness | % "Yes" | 90% |
| Of | Total "No" | 34 |
| Permanent Plan | % "No" | 10% |

| State Totals Minus | Total Applicable | 288 |
|---|---|---|
| Coastal Counties* | Total "Yes" | 258 |
| | % "Yes" | 90% |
| *(Hancock, Harrison, | Total "No" | 30 |
| Jackson Counties) | % "No" | 10% |

### Placement with Relatives
- 307 children reviewed in the sample were applicable to this item. 30% are placed with relatives while 70% (214) are not placed with relatives.
- Of the 214 children in the sample who are not placed with relatives, it was determined that maternal relatives had been identified and considered in 86% of the applicable cases in the sample. Efforts were not made in 14% f the applicable cases.
- It was determined that efforts were made to identify and consider paternal relatives in 76% of the applicable cases. Efforts were not made to seek out paternal relatives in 24% of the cases.

### Proximity of Placement
- While determining if the child's current placement is within close proximity (within a 50 mile radius) to their original home it was found that 67% were placed within close proximity of their original home while 33% were not. Below is a SFY 2006 total (including totals without the three coastal counties affected by Hurricane Katrina):

| State Totals | | Total |
|---|---|---|
| | Total Applicable | 320 |
| | Total "Yes" | 215 |
| | % "Yes" | 67% |
| | Total "No" | 105 |
| | % "No" | 33% |
| State Totals Minus | Total Applicable | 284 |
| Coastal Counties* | Total "Yes" | 194 |
| | % "Yes" | 68% |
| *(Hancock, Harrison, | Total "No" | 90 |
| Jackson Counties) | % "No" | 32% |

If a child was placed outside a 50-mile radius of their original home, Reviewers were to determine if the reason for the location for the placement was clearly related to helping the child achieve his or her case plan goals.

- Of the 105 children placed outside of a fifty mile radius of their original home, 90% met the criteria of the placement being related to helping the child meet his or her case plan goals (91% excluding the 3 coastal counties) while 10% did not (9% excluding the coastal counties).
- 18 children in the sample taken from July 2005 to June 2006 are placed outside of the State of Mississippi. There is clear evidence in 17 (94%) of those cases that the placements are related to helping achieve the case plan goals for the children.
- Of the 18 applicable cases, 50% had the appropriate report from the supervising state on file and 50% did not.

**Placement with Siblings**

In determining if the children in the sample are placed with siblings who are also in state's custody it was found there were 189 children in the sample have siblings who are in state's custody and are therefore applicable to this item.

- 125 or 66% are placed with siblings who are also in state's custody. 34% children in the sample are not placed with siblings who are also in state's custody.
- The FY 2004 percentage for this item is 60% "Yes" and 40% "No". The percentages for SFY 2005 are 67% "Yes" and 33% "No".
- Of the 189 applicable cases from the July 2005 – June 2006 sample, 56% are placed with all of their siblings who are in state's custody. 10% are placed with one or more (but not all) of their siblings in custody and 34% are placed apart from all of their siblings who are in state's custody.

Below is SFY 2006 and year totals (including totals without the three coastal counties affected by Hurricane Katrina):

| State Totals | Child's Placement Status With Siblings | Total # | Total % |
|---|---|---|---|
| | All Siblings | 106 | 56% |
| | 1 or More Siblings | 19 | 10% |
| | Apart from All Siblings | 64 | 34% |

| State Totals Minus Coastal Counties* | | |
|---|---|---|
| | Total Applicable | 167 |
| | Total Placed with Siblings | 112 |
| | Percentage Yes | 67% |
| *(Hancock, Harrison, | Total Not Placed with Sibs | 55 |
| Jackson Counties) | Percentage No | 33% |

- For children not placed with all of his/her siblings who are in state's custody, there is clear evidence that separation is necessary to meet the needs of the children in 86% of those cases. The percentages for FY 2004 are 86% "Yes" and 14% "No". The percentages for SFY 2005 are 80% "Yes" and 20% "No".
- Reasons for separation were found to be:
  o One sibling may be perpetrating abuse upon another.

- o There is a large sibling group placed with two separate relatives.
- o The siblings of the child in focus are placed in an adoptive placement but the child in focus does not want to be adopted.
- o One sibling may be placed in a setting that is necessary for them to receive therapeutic/mental health or life skills services.

## Visitation with Parents and Siblings

- Of total applicable cases (excluding Hancock, Harrison, and Jackson Counties) in the SFY 2006 sample, 33% of the children had at least monthly visitation with their mother while 67% did not. 22% had at least monthly visitation with their father while 78% did not. 32% had at least monthly visitation with their siblings placed separately in state's custody while 68% did not.

- Below is a comparison between these categories for SFY 2006 without including the three coastal counties affected by Hurricane Katrina – Hancock / Harrison / Jackson:

**Visitation with Parents and with Siblings in State's Custody**



*Percentages do not include coastal counties

| At Least Monthly  ■ Less Than Monthly |

- Of the total applicable children in the sample, documented efforts were made by the agency to promote visitation in 86% of the cases while 14% did not have such efforts documented.
- Of the applicable cases in the sample of children with siblings placed separately in state's custody, efforts made by the agency to promote visitation between the child and his/her siblings occurred in 72% of the cases and did not occur in 28% of the cases.

60% of the cases (62% excluding the coastal counties affected by Hurricane Katrina) are rated strengths on this item while 40% (38% excluding the coastal counties) are rated as an area needing improvement.

- **It is of concern that a large percentage of the children in the sample have infrequent contact (less than monthly or none at all) with either parent or their siblings who are placed separately in state's custody.**

- Efforts made by the agency to promote visitation between the child and his/her parents is 86% while efforts made to support visitation between children and their siblings placed separately is 72%. It appears that fewer efforts are being made to promote siblings visitation as opposed to parent/child visitation.

- Transportation difficulties as well as vacancies in some counties exacerbate the failure to provide adequate visitation for sibling groups necessarily divided in placements.

- Also of concern is a number of cases in each quarterly sample where it is documented in case narratives that siblings request visitation with one another but these requests sometimes go unfulfilled. In many of these cases it appears that there is a stronger bond between the siblings than between the children and their parents.

### Preserving Connections and Characteristics

- Of the 322 applicable children in the sample, it was found that primary connections and characteristic were preserved for 281 (87% - 88% excluding the coastal counties) while 41 (13% - 12% excluding the coastal counties) were not. The percentages for FY 2004 are 92% "Yes" and 8% "No". The percentages for SFY 2005 were 93% "Yes" and 7% "No". Below is the year to date information on preserving connections and characteristic for children in foster care:

| State Totals | | Total |
|---|---|---|
| Connections & Characteristics | Total Applicable | 322 |
| | Total "Yes" | 281 |
| | % "Yes" | 87% |
| | Total "No" | 41 |
| | % "No" | 13% |
| *State Totals Minus Coastal Counties* | Total Applicable | 287 |
| | Total "Yes" | 253 |
| | % "Yes" | 88% |
| *Harrison, Hancock Jackson Counties* | Total "No" | 34 |
| | % "No" | 12% |

The drastic drop in these percentages from the last two fiscal years (2004 and 2005) could be due to one or more of the following:

- The number of children placed outside the 50-mile radius of their home where they have no connections to family members, relatives, friends, schools, churches, and other primary connections in their lives that contributes to the decrease in the numbers preserving connections and characteristics.

- The Reviewers collecting this information may not have had as complete an understanding of the concept of preserving connections and characteristics in FY 2004-2005 as they do now with the addition of three subsequent items regarding

DHS
146898

Native American ancestry and the Indian Child Welfare Act. More discussion of connections and characteristics with the Reviewers in May 2005 and October 2005 may have led to a better understanding of all of the ramifications surrounding this issue than previously.

Cases in the sample were also reviewed to determine if steps were taken to comply with the Indian Child Welfare Act (ICWA):

- Of the 322 applicable children in the sample, steps were taken to determine Native American ancestry in only 29% of the cases where in 71% such steps were not taken.
- 9 children in the sample were found to have Native American ancestry. Appropriate steps were not taken in by the agency in 6 (67%) of those cases to determine if the child was eligible for membership in a federally recognized American Indian tribe.
- 5 children in the sample were found to have some degree of Native American ancestry but it does not appear agency staff persons contacted the appropriate tribe to determine if the children may have been eligible for membership in 3 (60%) of those cases while 2 (40%) did have such documentation.

### Needs and Services for Parents and Foster Parents

The individual needs of the mother, father, and foster parents assessed:

- **Mother** – 170 (153 excluding the coastal counties) cases were applicable. In 83% (84% excluding the coast) of the cases, the mother's needs were assessed. Of the applicable cases, 127 (116 excluding the coastal counties) were identified as mothers having needs that required some kind of services. In 92% of those cases (93% excluding the coastal counties) services were provided to meet the identified needs of the mother. Of the cases in which services were not provided, it was determined that a lack of resources was not an issue in 90% of the cases (88% excluding the coastal counties).
- **Father** – 114 cases (101 excluding the coastal counties) were applicable. In 62% of the cases (63% excluding the coastal counties), the father's needs were assessed. Of the applicable cases, 63 cases (56 excluding the coastal counties) were identified as fathers having needs that required some kind of services. In 71% of those cases (73% excluding the coastal counties) it was found that services were provided to meet the identified needs of the father. Of the cases in which services were not provided, it was determined that a lack of resources was not an issue in 94% of the cases (93% excluding the coastal counties).
- **Foster Parents** – 208 cases (186 excluding the coastal counties) were applicable. In 86% of the cases (88% excluding the coastal counties), the needs of the foster parents were assessed. Of the applicable cases, 119 cases (111 excluding the coastal counties) were identified as foster parents having needs that required some kind of services. In 92% of those cases (94% excluding the coastal counties) it was found that services were provided to meet the identified needs of the foster parents. Of the cases in which services were not provided, it was determined that

DHS
146899

a lack of resources was not an issue in 88% of those cases (100% excluding the coastal counties).

## Child and Family Involvement in Case Planning

This item is broken down into five (5) items. Each item is addressed separately for the mother, the father, and (if applicable) the child. The items are as follows:

- Was an initial individual service plan (ISP) developed within 30 days of the child entering state's custody?
- Is there evidence that the mother, father, and (if applicable) the child were actively involved in the development of their initial ISP?
- Is there evidence of on-going active involvement of the mother, the father, and (if applicable) the child in their ISP?
- Was a family team meeting held to develop the initial ISP?
- Have other family teams meetings been held throughout the period under review?

**Mothers:** There were 221 cases in the SFY 2006 sample that appear to require active engagement of the mother in case planning. Of the 221 applicable cases, the mother's ISP was developed within 30 days of the child's entering state's custody in 48% of the cases. In 52% of the cases, an initial ISP was not developed within 30 days of the child entering state's custody. There were 210 cases identified where an initial ISP was done. Some were within 30 days of custody and others were not. Of the 210 applicable cases, the mother was actively involved in the development of her initial ISP in 52% of the cases (56% excluding the coastal counties). A family team meeting was held to develop the ISP with the mother in 34% of the cases in the sample. In 66% a family team meeting was not held to develop the initial ISP with the mother. There is evidence of on-going active involvement in her ISP by the mother in 37% of the 221 originally applicable cases (41% excluding the coastal counties).

**Fathers:** There were 138 cases in the sample that appear to require active engagement of the father in case planning activities. Of the 138 applicable cases, the father's ISP was developed within 30 days of the child's entering state's custody in 20% of the cases. In 80% of the cases, an initial ISP was not developed with the father within 30 days of the child entering state's custody. There were 124 cases where an initial ISP was done. Some were within 30 days of custody and others were not. The father was actively involved in the development of his initial ISP in 30% of the cases (34% excluding the coastal counties). A family team meeting was held to develop the ISP with the father in only 21% of the cases in the sample. There is evidence of on-going active involvement in his ISP by the father in 21% of the applicable cases (24% excluding the coastal counties).

**Foster Child:** All 324 children in the sample required an initial ISP to be developed within 30 days of entering state's custody. Of the 324 children in the sample, 64% had an individual service plan (ISP) developed within 30 days of entering state's custody while 35% did not. Of the 324 children in the sample, 198 were applicable for the child's involvement in developing his or her initial individual service plan. 47% were actively involved in the development of his or her ISP (51% excluding the

coastal counties). It appears that a family team meeting was held to develop the initial ISP with the child in 27% of the cases while 73% were not developed in a family team meeting. Of the 324 children in the sample, 231 are applicable for on-going active involvement in their case planning activities. Of these 231 children, 64% are actively involved in on-going case planning activities (67% excluding the coastal counties).

**Other Family Team Meetings:** Of the applicable cases, 42% indicate that other family team meetings have been held throughout the review period to discuss progress on the ISPs of the mother, father, and foster child as well as service needs of the individuals involved in the case. On-going family team meetings have not been held in 58% of the applicable cases.

**Permanency Hearings:** Of the 317 applicable children in the sample, 255 (80%) have had an annual permanency hearing while 62 (20%) have not.

### Of the cases where it was found that no permanency hearing had been held:

- In 32% of the cases the primary reason appears to be that the agency did not request the hearing.
- In 22% of the cases, the court was not petitioned.
- In 3% of the cases where a permanency hearing was not held, a petition was filed but the hearing was never held by the court.
- In 6% the reason for no permanency hearing being held is given as the permanency hearing was scheduled but continued by the court.
- In 37% the reason for no permanency hearing being held is "other". "Other" includes, but is not limited to, the child's being in agency custody for a year and still not being adjudicated as abused or neglected; adjudication is a prerequisite for a permanency hearing. "Other" can also mean that a TPR hearing was scheduled instead of an annual permanency hearing. A number of judges appear to not hold annual permanency hearings after termination of parental rights have been accomplished. In some cases jurisdiction was transferred to the Chancery Court and the court has not or will not hold a permanency hearing.


### Worker Visits with Child

Agency policy mandates face-to-face contact with foster children at least once every month. The chart below breaks down the most typical pattern of face to face visitation between the Family Protection Specialist/Worker (or other responsible party) and the child at least monthly and less than monthly. "Other responsible party" refers to other agency staff persons who maintain contact with the child such as the Area Social Work Supervisors and Adoption Workers, county of service staff or other state staff through ICPC.



Of the 324 children in the sample, it was determined that 257 children were old enough for the visits between the caseworker (or other responsible parties) and the child to focus on issues pertinent to case planning, service delivery, and goal attainment. Of the 257 applicable children 88% had visits that did focus on pertinent issues while 12% did not have such interaction.

**Worker Visits with Parents and Foster Parents**

This item breaks down the most typical pattern of face to face visitation between caseworker (or other responsible party) and the mother, father, and foster parents in weekly, bi-weekly, monthly, less than monthly, and no visits. "Other responsible party" refers to other agency staff who maintains contact with the child such as the Area Social Work Supervisors, CPS Workers, Adoption Workers, county of service staff or other state staff through ICPC.

**Mothers:**  Of the applicable cases in the SFY 2006 sample where contacts were to be made with a mother, 40% were seen on at least a monthly basis, 40% were seen less than monthly and 20% were not seen at all by agency staff persons.

**Fathers:**  Of the applicable cases where contacts were to be made with a father, 23% were seen at least monthly, 24% were seen less than monthly and **64% had no visits at all documented by agency staff.**

**Foster Parents:**  Of the applicable cases where contacts were to be made with a foster parent, 74% were made at least monthly, 25% were made less than monthly, and 2% where no visits at all were documented by agency staff.

Of the applicable cases where contacts were made with mothers and fathers, 94% of these contacts focused on issues pertinent to case planning, service delivery, and goal attainment while 6% did not focus on pertinent issues.

In the applicable cases where contacts were made with foster parents, 87% of these contacts focused on issues pertinent to case planning, service delivery, and goal attainment. In 13% of the cases these contacts did not focus on these pertinent issues.

DHS
146902

## Needs and Services for the Child

An evaluation of the assessment and provision of the physical health, mental health, and educational needs of the child as well as useful services and barriers to services resulted in the following information:

### Physical Health:

- Of the 324 children in the sample, it was determined that the physical health needs were assessed in 94% (96% excluding the coastal counties) of the cases.
- In 242 cases in the sample, it was determined that physical health needs were identified. In 93% (94% excluding the coastal counties) of those cases, services were provided to meet the identified needs.

| State Totals | | Total |
|---|---|---|
| Services Provided to meet identified Physical health needs | Total Applicable | 242 |
| | Total "Yes" | 226 |
| | % "Yes" | 93% |
| | Total "No" | 16 |
| | % "No" | 7% |
| State Totals Minus Coastal Counties* *(Hancock, Harrison, Jackson Counties) | Total Applicable | 225 |
| | Total "Yes" | 212 |
| | % "Yes" | 94% |
| | Total "No" | 13 |
| | % "No" | 6% |

- Services that were reported to be beneficial to resolving physical health needs were regular medical and dental check ups, transportation to medical appointments, referrals to specialists such as Endocrinologists and Orthodontists, drug screening, glasses and hearing aids, early intervention programs, diets, and nicotine patches.
- Physical health needs were identified for 16 children in the sample for whom services were not provided. The reason for services not being provided to resolve the needs does not appear to be due to a lack of available or accessible services in 94% of those cases (100% excluding the coastal counties).

### Mental Health:

- Of the 324 children in the sample, 255 were applicable for mental health assessment. For 94%, mental health needs were assessed.
- Of the 255 applicable for assessment, needs were identified for 192 children. Of those 192 children identified in the sample, 94% had some degree of mental health services provided to meet their mental health needs.

DHS
146903

| State Totals | | Total |
|---|---|---|
| Services provided to meet identified Mental Health needs | Total Applicable | 192 |
| | Total "Yes" | 180 |
| | % "Yes" | 94% |
| | Total "No" | 12 |
| | % "No" | 6% |

| State Totals Minus Coastal Counties* *(Hancock, Harrison, Jackson Counties) | Total Applicable | 175 |
|---|---|---|
| | Total "Yes" | 165 |
| | % "Yes" | 94% |
| | Total "No" | 10 |
| | % "No" | 6% |

- Mental health services that were effective in resolving mental health needs were residential treatment, medications, speech therapy, drug assessments, and the Youth Villages Intercept Program.
- Mental health services were not provided to 12 children in the sample who had needs identified. A lack of available and accessible resources was not an issue in 92% of those cases (90% excluding the coastal counties).

**Educational:**
- Of the 324 children in the sample, 265 were applicable for educational needs assessment. Of those 265, 97% had their educational needs assessed while 3% did not.
- Of the 265 whose educational needs were assessed, needs were identified for 163 of them. For 95%, services were provided to meet their identified educational needs (96% excluding the coastal counties).

| State Totals | | Total |
|---|---|---|
| Services provided to meet identified Educational needs | Total Applicable | 163 |
| | Total "Yes" | 155 |
| | % "Yes" | 95% |
| | Total "No" | 8 |
| | % "No" | 5% |

| State Totals Minus Coastal Counties* *(Hancock, Harrison, Jackson Counties) | Total Applicable | 150 |
|---|---|---|
| | Total "Yes" | 144 |
| | % "Yes" | 96% |
| | Total "No" | 6 |
| | % "No" | 4% |

- Educational services that were effective in resolving educational needs include early childhood development programs, sign language instruction, special educational rulings, day care, the Head Start Program, GED classes, independent living classes, the True Love Waits Program, tutoring services,

placement in the educational fast track program, preparation for the ACT exam.

- 8 children in the sample were identified with educational needs that did not appear to be met. In all 8 cases (6 cases excluding the coastal counties) it appears a lack of available and accessible resources was not the reason for the services not being provided.
- Provision of **Independent Living Services** to children in state's custody agency 14 or older was measured in the sample. Of the 324 children in the SFY 2006 sample, 120 were applicable to this item. 84% are being provided services to help them transition to independent living while 16% in the sample are not.

In summary, the information collected from the cases included in the survey between the months of July 2005 and June 2006 seems to indicate:

- The majority of our foster children are safe in their current placements. In the event that allegations of abuse or neglect do arise, the allegations are usually found to be unsubstantiated and when they are substantiated, the appropriate action is taken to alleviate the situation and protect the child.
- While the majority of our children have achieved stability of placement, some work toward stabilized placement remains needed.
- Statistics from the SFY 2006 sample seem to indicate that the plan of Reunification or Durable Legal Custody remains in excess of 12 months without actions from the family to achieve that particular plan and the finalization of adoptions remains in excess of within 24 months of the child entering the state's custody.
- 30% of the children in this quarter's sample are placed with relatives. Of the 70% of children not placed with relatives, it appears efforts were not made in 14% of the cases to identify and/or considered maternal relatives for placement of the child and efforts to identify and consider paternal relatives were not made in 24% of the cases.
- 67% of the children in the sample are placed within a 50 miles radius of their original home while 33% are not. Of the children in the sample who are placed outside of a 50-mile radius of their original home, 90% were placed for reasons clearly related to goal achievement.
- Of the 64 children not placed with all of their siblings, there is clear evidence in 86% of the cases that separation was necessary to meet the needs of the child (85% excluding the coastal counties).
- 32% of the applicable children in the sample had no visits with their mothers, 57% had no visits with their fathers, and 18% had no visits with their siblings who are placed separately in state's custody. Agency attempts to promote and support visitation took place in 85% regarding parents and in 68% regarding siblings. It appears the agency is putting more efforts into supporting parent/child visitation as opposed to sibling visitation. Equal efforts should be made to promote and support visitation with parents as well as siblings.
- Pertaining to the children in the sample, primary connections and characteristics are being achieved at a 87% level (88% excluding the coastal

counties). However, determination of Native American Ancestry to comply with the Indian Child Welfare Act (ICWA) is being achieved at a 29% level.

- Services to mothers to meet identified needs are provided at 92% (93% excluding coastal counties) while services are provided to fathers at 71% (73% excluding the coastal counties) and to foster parents at 92% (94% excluding the coastal counties). It appears that more provision for the involvement of fathers in case activities needs to be made.
- Initial case planning needs more active involvement from the mother, father, and child and utilization of family team meetings (initial and on-going) to develop and assess those plans may ensure appropriate involvement of parents and child toward achievement and goals. Early engagement of all parties involved in case planning should result in more timely permanence with results of lowered custody census.
- The majority of the foster children in the sample are visited at least monthly by a caseworker or other responsible party as mandated by policy and those contacts appear to focus on pertinent issues in 88% of the applicable cases.
- 40% of the mothers are visited at least monthly by a caseworker. 23% of the fathers are seen at least monthly by a caseworker. 74% of the foster parents are seen at least monthly. 94% of the contacts actually made with parents focus on issues relevant to case planning, service delivery, and goal attainment. 87% of the contacts actually with the foster parents focus on issues relevant to case planning, service delivery, and goal attainment.
- 93% of the children's physical health needs are provided to the children with identified needs. 94% of the mental health needs were provided to children with identified needs. 95% of the educational needs were provided to children with identified needs.
- In cases where services were not provided to meet the identified physical health, mental health, and educational needs of the child, a lack of accessible and available resources was rarely the reason except in some coastal counties that were affected by Hurricane Katrina.
- 84% of children in the sample eligible for independent living services had those services provided to them (86% excluding the coastal counties).
- It appears continued efforts need to be made to:
  - Maintain siblings connections for our foster children;
  - Pursue all relatives (maternal and paternal);
  - Make more efforts to allow children to maintain connections to friends, family, schools, and other positive relationships in an effort to maintain primary connections and characteristics as well as determine any Native American ancestry;
  - Involve parents, children, and potential relative placements early and frequently in case planning activities to attempt to assure timely achievement of permanence for the children.
  - Efforts should be increased to identify and involve fathers in all aspects of our foster care cases.
  - Identification of cases where successful efforts to reunify children with their parents or place them in a legal guardianship arrangement (relative or

non-relative) within a 12 month time period have to be identified in a more timely manner so other permanent plan options such as Adoption can be pursued to provide permanence for a child within 24 month's of entering state's custody.

## Recruitment of Foster and Adoptive Families

Mississippi has utilized various methods of recruitment for foster and adoptive families. The following illustrates some of the methods chosen:

- Wendy's Foundation has provided Mississippi with two (2) recruiters who have assisted the state in recruiting families for older youth of color. Most of these youths have been males. Wendy's recruiters have developed contacts with many of the local churches and businesses. They have contacted civic groups and presented at conferences. Mississippi is one of the twenty-five (25) sites nationwide chosen to participate in the random assignments program.
- Mississippi has partnered with the private adoption agencies and participated at the annual adoption rally held at the State's Capitol.
- An annual picnic is given by one of the private agencies and one of Family and Children's Services regions to encourage participation in the Foster/Adopt Program.
- Foster and adoptive parents participated in the train-the-trainers workshops held to train foster and adoptive parents as well as staff on how to recruit other families for the targeted population.
- John and Julie McKenzie from AdoptUSKids provided training to staff and the foster/adopt parents on recruiting and how to partner to achieve goals.
- An adoption celebration was held in November 2005 to recruit families and show our gratitude to other families.
- Post adoption activities.
- A spokesperson from the local TV station was spotlighted and she gave words of encouragement to the families and staff that attended.
- Yard signs and other recruitment items were used to provide information about the need for resource families.
- Several monthly meetings are attended by Adoption Unit staff to secure information for children in custody and to obtain leads for recruiting families. These meetings include the COMPASS Project meeting, State Level review, and the adoption Consortium Meeting.
- Another meeting has been planned to assist with recruitment is with Mental Health dealing with children with disabilities.
- Continued use of the web site and the Adoption Booklet.

## Planned Activities for the 2007 year include the following:

- A mini-conference is being planned to assist our current foster/adoptive parents to provide for older children, sibling groups, and children of color.
- Several activities are scheduled for the month of November 2006 to celebrate Adoption Awareness Month. These activities will enhance recruitment efforts.
- The Wendy's recruiters will continue to assist the Agency in finding families and developing child evaluations to assist the Adoption Unit staff.
- Post adoption retreats.

- Spring and winter mass adoption celebrations in the three (3) adoption districts.
- A revised plan to create regional adoption ASWSs.
- Continued use of the website, the Adoption Booklet.
- Presentations at churches and business groups.
- Set up booths at the malls.

DFCS is currently working with the Choctaw tribe to implement a plan to recruit foster families to serve as emergency foster families for Choctaw children placed in MDHS custody.

### Procedures for Recruiters Working with MDHS

A. **Wendy's Wonderful Kids** is a partnership between Mississippi Department of Human Services and Southern Christian Services for Children and Youth, Inc. (Harden House Adoption Program) and Mississippi Families for Kids through a grant from the Dave Thomas Foundation for the purpose of recruiting families for Mississippi's foster children who are awaiting a permanent placement.

B. **The Recruitment Advisory Council (RAC)** will be comprised of the three adoption program administrators, the MDHS Adoption Unit Program Director and representatives from Mississippi Families for Kids and Harden House Adoption Program. This committee, meeting at least quarterly, will operate in the capacity of tracking and critiquing the progress of the recruitment efforts for MDHS children. They will assist in removing barriers to accomplishing the goals of the recruitment program. The RAC team will assign children who are freed for adoption to the specific recruitment partner to facilitate a recruitment plan.

C. **MDHS/DFCS Adoption Program Administrators** will work with the recruitment partners to make appointments in writing with the ASWS and child's social worker. Should any problems arise in the working relationship with the child's Social Worker, the recruiter will consult his/her supervisor and then the MDHS Program Administrator.

D. **The MDHS County Family Protection Specialist/Worker** for the child for whom recruitment is being done, will work with the recruitment partners to establish a line of communication with the foster parents, house parents, caretaker, etc. with whom the child lives. The MDHS Social Worker will also make available the case file and office space to the recruitment partners in order to prepare a thorough child evaluation. The case file also will be used to search for "significant others" in the child's life who might be a permanency option. The MDHS County of Responsibility Social Worker, or the MDHS County of Service Social Worker, if applicable, will also introduce or make available an opportunity to visit with the child. This visit may take place more than one occasion.

**DHS**
**146908**

E. **The Wendy's Wonderful Kids Recruitment Partners** (MFFK and HHAP) will discuss with the child about adoption and any other options he/she may have as a permanent plan. The recruitment partners will also discuss with the child anyone from his past who might be a viable option for his/her permanency.

F. **Wednesday's Child** presentations will be directed by the recruitment partners. They will work with the TV station representatives and MDHS Social Workers/Adoption Workers to schedule the taping sessions, transportation and responses from the children.

## QUESTIONS:

1. Are there any restrictions on what the recruitment partners are able to do as far as recruitment? **YES**

2. If a family is recruited for a specific child, is it necessary to wait for the quarterly Placement Committee meeting or can more administrative match committees be done for a specific child? **NO**

3. Will the recruitment partners be able to recruit for legal risk children? **YES**

4. Do the recruitment partners need to get approval from MDHS (i.e. PR department) before using specific recruitment material about a child, such as: child specific bulletins containing photographs and biographies, presentations for the web site, etc? **YES**

5. Can the recruitment partners transport children to events such as: the Wednesday's child tapings, to get a soda and hamburger, park, etc? **YES**

6. Can the recruitment partners' telephone numbers be advertised on the recruitment efforts such as Wednesday's Child? **NO**