# OLIVIA Y. v. BARBOUR

# CASE REVIEWS OF FOUR
# INDIVIDUAL CHILDREN

By

Marva L. Lewis, Ph.D.

February 7, 2006



# TABLE OF CONTENTS

**Section**                                                                          **Page**

Overview ...................................................................................................................2

Cody B. .................................................................................................................23

        Case Summary ...............................................................................................24
        Casework Analysis.........................................................................................35

Olivia Y. ...............................................................................................................53

        Case Summary ...............................................................................................54
        Casework Analysis.........................................................................................62

John A. ..................................................................................................................74

        Case Summary ...............................................................................................75
        Casework Analysis.........................................................................................86

Jamison J. .............................................................................................................97

        Case Summary ...............................................................................................98
        Casework Analysis.......................................................................................114

Conclusion ..........................................................................................................128

Appendix A. *Curriculum Vitae* for Marva Lewis

Dr. Marva Lewis

## OVERVIEW

This report provides a review and analysis of the foster care case files of four children currently in the custody of the Mississippi Department of Human Services, Division of Family and Children Services (DHS). The children whose records I reviewed are: **Olivia Y.**, an African-American five-year-old who entered foster care as a three-year-old weighing less than a healthy toddler half of her age; **Cody B.**, an asthmatic African-American three-year-old who entered care as a two-month-old because his parents were too mentally challenged to care for him; **Jamison J.**, an African-American 19-year-old who, having entered care as a five-year-old, has essentially grown up in DHS custody; and **John A.**, an African-American 16-year-old who entered care close to seven years ago with a psychiatric diagnosis of severe mental illness.[a]

Each of these children is a named plaintiff in the federal lawsuit *Olivia Y. v. Barbour*. This report first provides a summary of my findings regarding each child and an analysis of common findings that exemplify systemic failings of case practice in the Mississippi foster care system. The report then provides a brief case summary and a review of DHS case practice with respect to each child in turn.

After reviewing the children's extensive records, I conclude, based on my professional experience and judgment, that the state of Mississippi has provided foster care services to these vulnerable children and their needy families in a manner that disregards their most <u>basic</u> developmental, medical, and emotional needs.

---

[a] All of these children are being referred to by pseudonyms to protect their identities, as well as the identities of their families.

2

Dr. Marva Lewis

In none of these cases has DHS met its fundamental obligation to provide the degree of safety, stability, and permanence to which all foster children are entitled. Olivia, Cody, Jamison, and John had each been the subject of multiple prior reports of abuse or neglect before being placed in DHS custody. Since they entered care, DHS actions have endangered the physical and psychological safety and well-being of these children to the extent that they constitute systematic maltreatment. Unfortunately for these children, the harm that they have suffered has been inflicted by the very agency charged with their protection.

The reviewer and author of this report is Marva L. Lewis, Ph.D. For 12 years I practiced as a child welfare caseworker for a local county department of social services in the state of Michigan. This practice included serving as a child protection worker, which involved investigating allegations of child maltreatment and providing preventive services to families of children at high risk of abuse and neglect, and serving as a foster care and adoption worker. I later served as a psychotherapist as part of a nurse-therapist team and provided in-home services to new parents with children at high risk for abuse and neglect. I have also served as part of a multidisciplinary intervention team for young children (ages zero to 49 months) placed in foster care in Jefferson Parish, Louisiana. Over the past 20 years I have served as a consultant for local child welfare offices and provided training on a variety of topics related to child abuse and neglect and casework practice for social work staff and management in Michigan and Louisiana. I currently teach graduate-level social work courses on theories of child development at the Tulane School of Social Work in New Orleans, Louisiana. These courses include specific topics of attachment, parent-child relations, and child abuse and neglect. I conduct research on

3

Dr. Marva Lewis

the impact of race and culture on parenting styles and effective group interventions for

parents who have abused or neglected their children. I have a Ph.D. and a Master's

degree in Sociocultural Psychology from the University of Colorado, as well as a

Bachelor's degree in Psychology from Michigan State University. A current copy of my

curriculum vitae is attached to this report as Appendix A.

In preparing this report, I reviewed the case files of each child as turned over by

DHS and by the private agencies with which DHS contracts to provide foster care

services; summaries of the case files as created by the children's attorneys; and the state

policies governing DHS's child welfare practice.

**CODY B.**

- Cody B. entered foster care at only two months of age following four reports that his mentally incapacitated parents were endangering him. It was reported that the newborn was not being fed, was being hit, and was being left unsupervised. Although infants are by far the most eligible candidates for adoption, Cody, now almost four, has remained in DHS custody for virtually his entire life because DHS long continued to pursue a permanency plan of reunification despite mounting evidence, included two psychiatric assessments, that Cody's parents could not safely parent him without daily assistance that DHS failed to provide.

- DHS endangered Cody's physical health by inadequately supervising home visits with his parents even after documenting that the parents were likely exposing this asthmatic toddler to life-threatening cigarette smoke and animal hair. As a result, Cody suffered respiratory distress that, on at least two occasions, necessitated emergency medical assistance. DHS further endangered Cody's health by failing to monitor and adequately inform his multiple foster parents about his serious medical condition.

- DHS followed unacceptable case practice that separated Cody from the first safe and stable caregiver he had ever experienced. After providing what DHS described as loving care of Cody for 19 months, Cody's foster mother, who had consistently stated an interest in adopting him, requested that he be removed from her home. She asked that he be removed because she felt she could not assure his well-being in the face of DHS's disregard of his safety and medical needs. Rather than addressing the potential adoptive mother's complaints that DHS's poor case

4

Dr. Marva Lewis

practice was endangering Cody, DHS moved him to a series of temporary foster homes and shelter placements.

- After Cody was released from one of numerous hospital stays, DHS placed the very ill toddler in a shelter, even though his former foster mother pleaded to resume care of him, and even after his long-term doctor reported that such institutional care was actively harmful to Cody.

**OLIVIA Y.**

- Olivia, who was born with cocaine in her blood stream, was placed into foster care following six separate reports that she was being severely neglected or abused by her drug-addicted and alcoholic mother. Upon placing Olivia in foster care, DHS cycled her through three separate foster homes within the space of three weeks without a single caseworker noticing that she weighed less than a normal child half of her age, that she had a rash covering much of her face and torso, that she had a distinct and disagreeable odor, and that, as a three-year-old, she was so developmentally delayed she could not follow simple instructions like "touch your nose." Even after her medical condition was brought to the agency's attention, DHS failed to monitor and document her medical needs, and as a result, her needs were not adequately addressed.

- DHS placed Olivia in the home of a convicted sexual abuser for over a week, and then it failed to investigate whether she had been sexually abused there and failed to provide her with a complete sexual abuse exam, despite a doctor's report indicating that such an examination was warranted.

- DHS failed to engage in even the most rudimentary permanency planning for Olivia and her chronically substance-abusing parent. Once her permanency goal was changed to relative placement, DHS failed to pursue as placement resources many of the numerous relatives who had been identified to DHS. Even when a suitable relative came forward and requested to care for Olivia, it took DHS over eight months to conduct an assessment of that relative. As a result, Olivia has been growing up in state custody.

- After documenting Olivia's strong attachment to the sister who had served as her functional parent during the years of their mother's neglect, DHS severed their contact. When the toddler became attached to the foster parents who were her primary caregivers for over a year, DHS moved her with little or no documentation to justify the need for this move.

5

Dr. Marva Lewis

**JOHN A.**

- DHS took custody of John when, as a nine-year-old, he suffered a psychiatric break at school and it was discovered that his mother had left him in the care of her boyfriend without any indication of her whereabouts or when she would return. At that time, his family had been known to DHS for seven years because of his mother's chronic drug abuse and pattern of abandoning her children for days.

- DHS moved John more than 35 times in under five years, in many cases to placements that could not meet his special psychiatric needs, despite repeated documentation that these moves were aggravating his severe emotional disturbance.

- During at least three of John's psychiatric hospitalizations, DHS failed to provide the hospital in question with crucial medical and psychiatric records despite repeated requests by his treatment teams. Over a course of years, DHS also maintained the same incomplete and inaccurate record of his strong psychotropic prescriptions.

- Despite his mother's long history of neglect and drug abuse, DHS chose reunification as John's permanency plan yet failed to provide his mother with the services that would have been necessary for the plan to succeed.

- DHS deprived John of all but a few visits with his siblings over a period of almost five years despite evidence that visits with them substantially aided his emotional and behavioral progress.

- DHS failed to exercise the minimally adequate case practice of consistently providing such fundamental necessities as clothing and reliably performing basic case supervision.

**JAMISON J.**

- Jamison was placed in DHS custody at age five following reports that his mother was a substance abuser and prostitute who failed to properly feed or care for him. Since taking custody of Jamison 14 years ago, DHS has shuttled him through at least 28 placements.

- Repeatedly throughout Jamison's time in care, DHS has exposed him to immediate physical danger, in one instance returning him to a home where his sister had recently been raped and where he then witnessed the chronic beating of a three-year-old child who would later die from the abuse in that home.

6

Dr. Marva Lewis

- DHS failed to provide Jamison, a psychologically traumatized child, with minimally adequate mental healthcare and failed to supervise his regimen of powerful psychotropic medications.

- Though DHS has been the sole legal guardian of Jamison, now nineteen, since he was barely five years old, the agency has retained him in custody without developing a viable plan to provide him with a permanent home. DHS pursued a plan to reunify him with his abusive, alcohol-dependent mother for seven years although she had made no progress in rehabilitating herself.

- For years DHS isolated Jamison from his sister and extended family, denying him what could have been his one major source of stability and emotional support.

- DHS denied Jamison a basic education by attempting to prevent him from finishing high school.

In each of these four cases, DHS failed, in the ways outlined below, to meet its mandate to protect children from experiencing further physical, psychiatric, and emotional harm and to move them expeditiously out of the foster care system and into homes that they could call their own.

## DHS FAILED TO MEET ITS BASIC OBLIGATION TO KEEP CHILDREN SAFE

When DHS removes children from their homes and places them in state custody, its purpose is to make their lives safer. DHS, which exercises complete control over the wards in its care, has the legal responsibility to ensure that foster children are placed in DHS-sanctioned settings that do not subject them to further physical or psychological harm. DHS policy and good case practice therefore dictate that all foster care settings, including relative placements, be screened, and that those providing direct care to children undergo criminal and child welfare background checks.[1] Policy and standard

7

Dr. Marva Lewis

casework practice also require that caseworkers have monthly face-to-face visits with foster children in their foster care placements to ensure that the settings remain appropriate and meet their needs.[2]

In each case reviewed, DHS placed a child in a setting that posed a clear risk to the child's safety. Olivia was placed in a home with a convicted rapist; asthmatic Cody was left for what appear to have been day-long unsupervised visits in a home where he was subjected to life-threatening cigarette smoke; Jamison was sent to live in Kansas with a father with whom he had no previous relationship and whose parental rights had been terminated, who had a criminal history and whose home Kansas child-welfare officials deemed an illegal placement; John remained in a placement long after he complained that he was being physically abused. Even when caseworkers were made aware that Olivia had been subject to possible sexual abuse and John had been subject to possible physical abuse, there is no documentation in their case records that DHS properly investigated these allegations, as required by state policy and reasonable case practice.[3]

Not only were these children all subject to dangerous or harmful environments while in DHS custody, but their caseworkers also failed to provide them with monthly visits necessary to monitor their safety. Cody's caseworker provided the justification that there were simply too few caseworkers to make the required visits, but in some instances, as in Jamison's case, the lack of visits left these children as vulnerable as they had been before entering foster care.

8

Dr. Marva Lewis

## DHS UNNECESSARILY CHURNED THESE CHILDREN THROUGH MULTIPLE, UNSTABLE, INSTITUTIONAL SETTINGS

It is a well-settled principal in child welfare case practice that children heal emotionally from parental abuse and neglect by building consistent, positive relationships with reliable adults. Frequent or arbitrary moves dramatically increase the risk that a child will not attach to any new family or caregiver. Thus, stability of placement is crucially important to a foster child's fragile psychological well-being. Stability of placement is especially critical for infants and young children, because these are the years when children learn to attach to protective caregivers and develop a sense of trust in the world. For this reason, standard casework practice is for children to be placed in a stable, family-like environment. As stated in the Mississippi DHS's own policy manual, "Since a child's ability to bond and trust is damaged by each placement change, any break in continuity and stability should be avoided as much as possible. The more children experience a change in placement, the more that damage is inflicted deepens [*sic*]. A foster child who moves many times, or who constantly fears that he/she may have to move, can suffer devastating effects on his/her emotional health."[4] Accordingly, the policy manual specifies that a child "cannot be moved unless [DHS] specifically documents to the court that the current placement is unsafe or unsuitable or that another placement is in the child's best interest."[5]

In none of the cases that I reviewed has DHS provided the child with a consistent foster family throughout his or her time in custody. Both John and Jamison have been moved over 26 times. DHS has forced these young boys to live like transients, carting

9

Dr. Marva Lewis

their belongings from place to place, sometimes night after night. Twelve-year-old John, learning that he was about to be placed in a home for a single night, asked his caseworker in bewilderment, "Where [will I] go on tomorrow?" His caseworker had no answer for him, and DHS subsequently moved him 12 times in as many months. Even infants and young children are not safe from these placement practices. In her two and a half years in DHS custody, five-year-old Olivia has had seven placements, and Cody, who is not yet four, experienced five different placements in a span of just 31 days.

These multiple moves were, in almost every instance, avoidable. On numerous occasions DHS ignored the documented placement recommendations made by John, Cody, and Jamison's treating health care providers. As a result, each boy was placed in settings that could not meet his needs and predictably had to be moved. This disregard for the explicit direction of treating professionals was most notable in the case of John: despite consistent diagnoses of severe psychiatric disorders and consistent placement recommendations for therapeutic care, about half of his placements were not therapeutic, that is, were not among those designated by DHS to care for children with severe behavioral, emotion, and psychological impairments.[6] Repeatedly DHS moved John directly from residential psychiatric care or hospitals to shelters or non-therapeutic homes; when these latter placements disrupted, the cycle began again. Jamison was also repeatedly denied the therapeutic settings he required, causing him to suffer through multiple unsuitable placements.

Additional placement disruptions resulted from DHS's failure to adequately screen the homes in which they placed children, as both Olivia and Jamison were quickly moved into and then out of unsuitable relative homes. In many instances, the failure by

10

Dr. Marva Lewis

DHS to educate foster parents regarding a child's specific needs, and failure to provide minimally adequate support to the parents in meeting those needs, caused unnecessary disruptions. For instance, both Jamison and Cody had loving foster parents who eventually determined that they could not continue to care for them because DHS did not provide either the psychiatric services or the basic caseworker support that the foster parents had requested as being necessary to ensure the boys' well-being. Cody was also removed from another foster home after the foster mother complained that DHS had not adequately prepare her to deal with his asthma.

The harmful moves experienced by each of these vulnerable children appear to be due to a frequent reliance by the agency on any available bed, regardless of its suitability, due to a simple lack of alternatives. Each child was placed at least once in an inappropriate institution, such as a shelter, despite ample research demonstrating that the best place for a child's physical, psychological, and emotional development is a family-like environment.[7] DHS policy guidelines clearly state that placements should be the "least restrictive" and most family-like setting appropriate for the child.[8] Institutions, such as emergency shelters, are to be sought for infants only when no foster home placement is available.[9] These DHS policies reflect the long-established research findings that institutional settings, where children receive care from multiple caregivers and not one primary caregiver, are harmful for all children. Institutional care is especially harmful for infants, who require consistent nurturing and human touch to properly grow and thrive.[10]

Both Olivia and Cody spent several weeks in shelters, and DHS refused to move Cody to a more suitable environment even after his doctor filed an abuse and neglect

11

report stating that the lack of a stable foster home was causing him psychological harm. Jamison was repeatedly placed in shelters and was once even placed in a group home for delinquent boys though he had never been charged with delinquency. John was left at a residential treatment facility after his treatment team alerted DHS that its failure to find a new placement for him—and John's knowledge that DHS had nowhere for him to go— was causing his mental health to deteriorate. It appears that these children were subjected to these inappropriate institutional placements because DHS had not identified or had not planned for alternative, more suitable homes.

The psychological harm caused by these multiple moves through unstable and institutional placements is illustrated by John, who, during his fifth year in DHS custody and already past his 34th placement, explained that he didn't try to behave, "because every time he gets in a foster placement, he gets put in another one." John became so desperate for stability that when he was placed in a psychiatric facility that was at least his 25th placement, he stated that he wanted to remain there "until he is grown." When DHS prepared to move him again he began trying to mutilate himself, explaining that he thought this might stop DHS from moving him to yet another placement.

## DHS FAILED TO PROVIDE NECESSARY MEDICAL AND PSYCHOLOGICAL SERVICES

When children become wards of the state, DHS assumes direct and complete responsibility for their safety and medical care.[11]  Because the vast majority of children who enter foster care have substantiated experiences of abuse and neglect, the effects of which are not immediately or readily discernable, it is critical that their DHS foster-care

Dr. Marva Lewis

workers abide by the state regulation requiring that each foster child receive a full physical examination within seven days of entering DHS custody.[12]  In addition to medical screenings, DHS is required to provide all follow-up services deemed medically necessary and to follow all medical advice.[13]  Furthermore, as a result of the trauma that children who have been abused and neglected experience, they often require mental health services during the time they are in the care of DHS.  Accordingly, it is necessary and required case practice that children over four years old be provided with a psychological screening upon entering care, and all recommended follow-up services thereafter.[14]  All of these DHS mandates are consistent with good case practice.  However, for these four children, these clear policies were not followed.

In each of the cases I reviewed, DHS failed to fulfill this basic responsibility to address children's medical and mental health needs and psychological problems, and each child suffered as a consequence.  The results of an initial medical screen are missing from at least three of the case records that I reviewed.  Had Olivia been examined in accordance with state regulation, her serious medical conditions could have been addressed much sooner.  DHS also denied John and Jamison consistent and timely mental health services, even after each had exhibited serious psychological problems and each had, at a very young age, threatened to hurt or even kill himself.

Maintaining updated medical information in a child's case record and informing placement resources of that child's medical needs are not only essential practices in the proper care of a child but are also mandated by Mississippi state policy.[15]  Current and complete medical records are particularly important for the proper care of very young children, who die more often from neglect in part because they simply cannot tell anyone

13

Dr. Marva Lewis

what has happened to them.[16]  Despite the fact that Olivia, John, Jamison, and Cody all entered care with serious medical or psychiatric problems, not one of the case records that I reviewed contained all of the child's medical records.  To the extent that the case files currently include medical history, it is clear that many of those records had not been maintained in the case record during the course of the child's time in foster care.

The failure to maintain updated medical information and convey that information to foster care providers placed each of these children at risk.  Although Olivia's extremely low weight was of obvious medical concern, DHS failed to recognize it initially and, even after it was brought to the agency's attention, did not closely track it for the first year she was in custody.  Cody's asthmatic condition was not consistently reflected in his case record or disclosed to foster parents, which resulted in Cody experiencing a severe asthma attack while in the care of a foster mother unprepared to address the life-threatening medical emergency.  In John's case, DHS repeatedly failed, despite multiple requests, to provide John's treating psychiatric teams with his medical and psychiatric history, which was essential to the safety and success of his treatment.  DHS also failed to ensure that the strong psychotropic drugs that were prescribed to both Jamison and John were closely monitored and supervised across all placements, even though such drugs are widely understood to have potentially dangerous side effects, which can include suicidal tendencies, if improperly administered.[17]

## DHS DENIED THESE CHILDREN PERMANENCY

While many state agencies play a role in keeping the state's children safe, only the foster care system is charged with the unique and difficult responsibility of providing

14

Dr. Marva Lewis

children with permanent families. Safe and permanent homes are essential for children's proper psychological development. They provide the context for the formation of an individual, family, and cultural identity. Growing up with a permanent home, with people who claim you as their own, provides a critical foundation for a lifetime of emotional health. When a child is successfully reunified or adopted, the child can now say, "I am safe, and I belong." Because of the developmental importance of such permanency, when a child is placed in state custody, caseworkers have a paramount obligation to minimize the time he or she spends in temporary care before reaching a safe and permanent home.[18]

In choosing a permanency goal, the overriding objective must be to protect and serve the best interests of children.[19] According to state policy, this means strengthening families whenever it is possible so that children can return home safely and grow up with their parents.[20] However, safe and successful reunification is not always possible. Appropriate and viable permanency planning therefore requires close initial and ongoing assessment of three things: (1) the child's medical and developmental status and needs; (2) the parents' ability to safely meet those needs; and (3) the availability of, and parents' response to, services targeted to resolving the problems that resulted in the child entering foster care. DHS policy and standard casework practice require that the initial assessment of the child and of the strengths, resources, and needs of the parents be completed within 30 days of the child's entrance into custody, along with Individual Service Plans (ISPs) for both the child and the parents.[21]

In the four cases that I reviewed, it DHS both assigned the family a permanency goal of reunification and devised service agreements without first obtaining and taking

15

Dr. Marva Lewis

into account critical information necessary to meaningfully engage the family and viably plan for the child. In each case, the child entered foster care with special needs, which were not assessed or reflected in the case plans. In each case the family had a substantial prior history of child maltreatment allegations known to DHS that was not sufficiently accounted for in identifying the services the family required to ensure that the chosen goal of reunification could be safely achieved.

Having failed to properly evaluate each family's strengths and weaknesses, DHS entered generic service plans that a reasonable professional should have known would fail because they did not accurately reflect the reality of the family's specific problems and service needs. For instance, DHS took custody of Cody because of his parents' significant intellectual limitations yet chose a permanency plan of reunification without first assessing their mental capacity. DHS maintained service agreements with the parents that did not acknowledge or address the fact that separate psychological evaluations had concluded that both parents' limitations were so severe as to preclude them from safely parenting unassisted, and DHS did not provide Cody's parents with this assistance.

Not only did DHS disregard its obligation to provide sufficient services for safe reunification where possible, it also failed to timely reassess the plan of reunification when faced with abundant and irrefutable evidence that, without immediate and significant intervention, safe reunification was not possible.

For a child to achieve permanency within a reasonable timeframe, case planning cannot be stagnant.[22] DHS policy requires that service plans be updated to reflect any changes in the status of the child and, where reunification is the goal, the progress the

16

Dr. Marva Lewis

parents are making in remediating the problems that brought their children into care.[23]

The importance of maintaining updated and accurate permanency-planning documentation cannot be overstated, as it serves as the evidence for making the single most important decision that arises in a foster care case: whether a child will return home or be freed for adoption. Further, this documentation serves as the basis for decisions regarding the frequency of visits between parents and children in care, as well as whether these visits should be supervised or unsupervised.

DHS policy provides that parents initially have six months to meet the conditions of their service agreement before DHS begins the process of terminating their parental rights. This time may be extended if DHS documents "extraordinary and compelling reasons" that such an extension is in the best interest of the child. The Youth Court must also render a judicial determination of any reasons identified by DHS for extending the timeframe of a reunification plan.[24] According to federal and state law, unless DHS has documented a statutory exception or other compelling reason, it is required to initiate termination of parental rights (TPR) proceedings, which free a child for adoption, when a child has been in foster care for 15 of the most recent 22 months.[25]

In each case that I reviewed, DHS not only failed to provide sufficient services to assist families, it also failed to maintain ongoing assessments of whether the family was making progress toward the stated goal of reunification within the six-month timeframes. Additionally, DHS did not concurrently plan for these children, which involved simultaneously planning for alternatives to reunification, despite an obligation to do so.[26] Although the likelihood of adoption is greater for younger children in foster care, DHS does not appear to have reconsidered the permanency plan of reunification within six

17

Dr. Marva Lewis

months for Cody, John, or Jamison, despite the policy requirement that it do so.[27]  As a result, Jamison and Cody have spent virtually their entire lives in foster care, during which time DHS turned away loving families interested in adopting the boys.  John has spent nearly half of his life in state care, during which time DHS has consistently failed to adequately explore available relatives as adoptive resources.  Because DHS failed to concurrently plan for Olivia at the time she entered care, she has also spent half her life in DHS custody.  Each day that these children remain in foster care without a family that they can claim unequivocally as their own causes them psychological harm.  The state's failure to timely achieve permanency for these children has breached basic social work practice requirements.

## DHS FAILED TO MAINTAIN THESE CHILDREN'S PSYCHOLOGICAL AND EMOTIONAL BONDS

A critical feature of casework planning for children in foster care is to maintain relative and sibling bonds.  In the painful aftermath of familial abuse or neglect, when children are often living with strangers while they come to terms with the trauma and sudden changes in their lives, the opportunity to sustain relationships with family members can be crucial to preserving a child's emotional, psychological, and cultural identity. It is therefore standard and required casework practice to make every attempt possible to preserve sibling relationships throughout a child's placement in foster care and to make early and aggressive efforts to locate relatives as placement and visitation resources.[28]

18

Dr. Marva Lewis

In all four cases that I reviewed, DHS caseworkers ignored the importance of these familial relations. John, Olivia, and Jamison were each separated from their siblings with little effort made to ensure that the children had regular sibling visits. In John's case, DHS denied him consistent contact with his siblings for almost five years, even in the face of documented evidence that his behavior and mental health suffered as a result of this deprivation.

In each case, DHS did not aggressively pursue relatives as placement or visitation resources. For instance, in Cody's case, DHS made no documented efforts to follow up with the numerous relatives who were known to the agency, even though the Youth Court ordered DHS to do so and the agency repeatedly informed the Court that it was pursuing a relative placement. In Olivia's case, even after a relative came forward seeking to care for her, it took DHS over eight months just to conduct the necessary home study. DHS violated the basic social work practice tenet to support and preserve foster children's sibling and relative bonds.

## DHS FAILED TO PROVIDE MINIMALLY ACCEPTABLE CASE PRACTICE

Each of the children whose cases I reviewed had a high number of foster care workers, case aides, and supervisors involved in their cases. Time and again, these workers failed to follow the basic casework practice of maintaining current and complete case records for the children under their supervision. A complete case record of a child's stay in foster care is essential for assuring that appropriate supervision, care, and services can be provided continuously, regardless of frequent caseworker turnover, and so that other professionals and the Youth Court have access to all information relevant to making

19

Dr. Marva Lewis

decisions about the child's care and permanency.[29]  Across the board, the cases I

reviewed were missing critical medical, psychiatric, and placement histories.  John's case

record was so incomplete that there are some periods of time in which it cannot be

determined where John was even placed.  The entire first volume of case records of

Jamison's life in custody is missing and could not be provided by DHS for review.

The records that are in the file are often incomplete and clearly inaccurate;

service plans and court reports contain outdated or conflicting information about the

children's permanency goals and placements.  Medical and educational histories are left

undocumented and serious medical concerns unnoted.

Moreover, there was virtually no evidence in the record that these caseworkers

were subject to competent supervision or oversight.  Area Social Work Supervisors

signed off on undated and incomplete service plans, and failed to take any apparent

action when a caseworker's decisions were clearly outside the range of reasonable case

practice. For instance, when the Foster Care Review Board questioned the propriety of

maintaining Jamison's goal of reunification for nearly six years, there is no documented

indication that the decision was discussed or seriously examined by anyone with

supervisory authority over the workers involved in that decision.  On the rare occasion

that there were documented efforts at oversight, those efforts were so slight that they

were not within the standard of reasonable case practice.  Most notable is the

investigation DHS conducted at the direction of the Youth Court into how Olivia was

placed in a DHS-sanctioned home with a convicted sex offender.  Although the

investigator received conflicting information about when Olivia was placed and when the

home study and background checks were completed—and none of this information

20

Dr. Marva Lewis

provided an adequate explanation for the questionable placement—no effort was made to try to reconcile the differences, and the DHS investigation concluded that nothing had gone amiss.

The Youth Court, which is empowered to approve all placement and permanency decisions, is positioned to provide a type of supervisory check on DHS case practice. However, DHS has undermined the Youth Court's ability to properly perform that role by not creating or submitting accurate and complete information about the children in its care. In John's case, DHS reported to the Court that he was doing well in an institution on a day when he had in fact told DHS that he was being injured in that placement. In Cody's case, when the court was considering a revision to Cody's visitation plan, there is no record that DHS submitted documentation regarding its numerous concerns about the ability of Cody's parents to provide him with a safe, smoke-free environment. In Jamison's case, there is no record of DHS informing the Youth Court that Kansas child-welfare officials deemed its placement of Jamison with his father illegal and refused to supervise that placement. His caseworker also requested that a rehabilitation center not release his mother until an upcoming Youth Court hearing in part because she might return to her "old drinking environments," which suggests that the agency sought to shield the Court from learning that Jamison's mother was unable to remain sober on her own. In Olivia's case, DHS reported to the Court that she was doing well in the home of her aunt, when she in fact had been removed because of the rapist residing there and she was exhibiting signs of sexual abuse; when DHS did inform the Court of Olivia's removal, it provided the reason as the aunt's inability to supervise Olivia adequately. The harm caused by this withholding and dissembling of critical information is that the

21

Dr. Marva Lewis

Youth Court unknowingly sanctioned the agency's failure to provide for the safety and protection of these four children. This was an unacceptable breach of reasonable case practice.

**FINDINGS**

The failings by DHS are consistent across all four of the cases that I reviewed, which makes it clear that abused and neglected children in Mississippi state custody are at high risk for further neglect, and even abuse, because of poor DHS case practice and lack of oversight. In the remainder of this report I will highlight those instances of DHS failure to provide minimum casework practice that I believe most directly contributed to the harm of these dependent and minor children.

22

Dr. Marva Lewis

## CODY B.

**INTRODUCTION**

Cody B. was taken into foster care custody when he was two months old following several reports that his mentally impaired parents were neglecting him. Three and a half years later, he remains in state care. Rather than providing Cody with safety and moving him toward a permanent family as required, DHS has engaged in case planning and practices that can best be described as overtly harmful to Cody's physical and psychological well-being:

- DHS failed to provide Cody with the stable and loving foster home available to him. Instead the agency repeatedly placed Cody in a shelter, even when he was desperately sick, and left him there after a doctor reported to DHS that such institutional care was actively harmful to him.

- DHS sabotaged through unacceptable case practice the first safe, stable, and loving relationship Cody had ever experienced. After Cody's foster mother provided him with what DHS described as loving care for 19 months, DHS removed him and placed him in a series of temporary foster homes and shelter placements instead of addressing his foster mother's complaints about DHS' lack of attention to Cody's needs and safety.

- DHS endangered Cody's physical health by failing to properly assess and document Cody's medical problems, which include asthma, by failing to adequately inform all of his multiple foster parents about his serious asthmatic condition, and, most significantly, by continuing to allow parental visits without adequate supervision when those visits were known to be life-threatening to Cody.

- DHS chose a permanency plan of reunification for Cody without first assessing his serious medical and developmental needs, the capacity of his mentally challenged parents, or the family's prior history of child maltreatment. As a result, the case plan DHS devised for Cody was entirely unfeasible because it did not accurately reflect either the level of danger and risk Cody faced if returned to his biological parents or the depth of services required to reunify Cody with his parents and ensure his safety.

23

Dr. Marva Lewis

- DHS failed to provide the significant services required by Cody's mentally
  challenged parents to safely resume caring for Cody. As a result, Cody's
  length of time in foster care was prolonged while an unfeasible goal of
  reunification with his parents was maintained for almost two years.

- DHS engaged in irrational and damaging visitation planning for Cody and his
  parents. When Cody entered care as an infant, DHS appears to have kept him
  in custody for over a year without providing him and his parents with any
  contact, despite a goal of reunification. Once parental visitation was
  established, DHS documented the serious health and safety risks those visits
  posed to Cody, which caused Cody to require emergency room treatment on
  several occasions, yet there is no indication that DHS considered revising the
  toddler's visitation plan to ensure his safety. When DHS did finally request
  that the Court change Cody's visitation plan, the request was based largely on
  the burden to the agency of transporting Cody to visits.

- Even after Cody's permanency plan was changed to relative placement, DHS
  failed to pursue as placement resources the numerous relatives brought to the
  agency's attention throughout his time in custody.

Cody will soon be four years old, and he has spent his life in DHS custody

without the care, protection, and stability that all children require and deserve.


## I. CASE SUMMARY

### A. 2002

Cody B. was born May ▮, 2002. Immediately after birth, he was enrolled in a
high-risk program by the ▮▮▮▮ County Health Department because his mother is
mentally disabled.[30] DHS placed Cody into foster care on July 25, 2002, when he was
just two months old because DHS caseworkers determined that both of Cody's parents
were seriously mentally impaired and unable to provide safe care for their infant.[31]

At the time two-month-old Cody was placed in foster care, DHS had received
four separate reports that Ms. H, Cody's biological mother, was unable to care for Cody
properly. In the first of the reports, on June 12, 2002, an anonymous caller indicated that
the family's home had no gas or water, the mother did not appear to feed the baby, and
the mother habitually sat on the edge of the road with the baby.[32] On June 21 a social
worker from the ▮▮▮▮ County Health Department informed DHS that she did not think
the parents were "mentally able" to care for Cody and that the mother was not caring for
her five older children, all of whom were believed to be residing with a relative.[33] A
third caller stated on July 16 that Cody's mother had no milk and that she admitted to
hitting the infant.[34] Following this third report, DHS requested that Cody's parents, Ms.

24

Dr. Marva Lewis

H and Mr. B, attend a meeting at the DHS office with a Family Preservation Program (FPP) worker. Cody's parents complied. Following that meeting, the FPP worker determined the couple was clearly "very limited" and "probably retarded," and she therefore doubted whether the family could take advantage of the program's services, which are intended to help parents learn to care for their children safely.[35] The next day, a DHS Family Preservation Team visited Ms. H and Mr. B at the home of Ms. H's cousin, with whom they were residing, to assess their parenting abilities. During this visit, a caseworker observed unsafe behavior on the part of Ms. H with Cody.[36] The visit ended with the agreement that DHS would leave Cody in the care of his parents so long as they continued to reside with Ms. H's cousin until they could make their home safe for the baby. The following day, Cody's parents again met with DHS, after which a supervisor recommended closing the Family Preservation case on the grounds that the parents were simply too mentally impaired to take advantage of the family preservation services.[37] The day after that, Ms. H's cousin called DHS to report that Cody's parents had left him unsupervised and that the boy had nearly suffocated. At this point, DHS assumed custody of the infant.[38]

After picking up two-month-old Cody on July 25, DHS caseworkers placed him in an emergency shelter.[39] Five days later, Cody's maternal aunt, Ms. C, telephoned DHS to report that DHS had previously removed Cody's five older siblings from Ms. H's care. According to Ms. C, at least four of these children had been adopted. Ms. C also provided DHS with names of relatives who might be willing to provide Cody with care. Case notes from Ms. C's call indicate that there was a "genogram" for the family in the file, and that Ms. C would talk with other relatives to see if they would take Cody.[40] There is no indication in the record that any caseworker followed up by determining whether Cody's parents' rights had in fact been terminated for Cody's older siblings. Nor is there any indication that DHS attempted to communicate with any of the relatives Ms. C discussed in order to find a relative placement for Cody.

On August 2, 2002, after spending eight days in the emergency shelter, Cody was moved to the BB foster home.[41] The same day, Cody's biological parents and a cousin of Ms. H's went to DHS to request that Cody be placed with the cousin.[42] Although the caseworker who spoke with them noted that she would make an appointment to visit the cousin's home to determine whether it was an appropriate placement, there is no record that DHS took any action to follow up. Instead, the caseworker simply noted in her case record that the cousin had "never called back".[43]

Cody's biological parents signed individual case plans with DHS on August 6 and 7, 2002. These documents contain no reference to the parents' limited mental capacity as observed and noted by multiple DHS employees and a Health Department social worker. The case plans required Ms. H and Mr. B to attend parenting classes, provide a safe and secure home for Cody, and discontinue use of a baby swing that Ms. H had been observed using inappropriately, and which had been recalled by its manufacturer.[44] The case plans do not include a requirement that the parents undergo any mental health evaluation, despite the fact that their low functioning was the reason Cody was placed into care. Although Cody's caseworker noted separately Ms. H and Mr. B's statement

25

Dr. Marva Lewis

that both were receiving funds from Social Security Insurance (SSI), there is no record that she attempted to determine whether this was true and, if so, how their disabilities were defined.[45]

At an August 7, 2002 custody hearing, the Youth Court ordered DHS to provide Ms. H and Mr. B with a psychological assessment and with supervised visits with Cody.[46] DHS does not appear to have taken any steps at that time to obtain the court-ordered psychological assessments. Nor is there any documentation of a visit between Cody and his parents until over a year past the date on which those visits were ordered.

An Ongoing Family Assessment dated August 17, 2002, was left blank aside from the family's identifying information and a description of one of the four pre-custody abuse and neglect reports concerning Cody.[47] On August 21, 2002, the Youth Court judge again ordered DHS to provide Cody's parents with a psychological examination. The judge further ordered that home studies be conducted for any potential relative placements.[48] The same day, a caseworker referred both parents to Singing River Industries, a United Way program that provides services to adults with mental impairment and developmental disabilities, but there is no documentation in the record that DHS attempted to schedule any psychological evaluations at this time or attempted to arrange home studies with any of Cody's relatives, including those already brought to the agency's attention.[49]

What appears to be the first Individual Service Plan (ISP) for Cody in the record was approved on August 28, 2002, which was over a month after he had entered care. The permanency goal is cited as reunification, with a concurrent plan of relative placement / adoption.[50] The reason for this permanency plan is noted as, "The parents do not appear to be able to care for the baby. They both have mental disabilities." The visitation plan for Cody and his parents was to be twice a month.[51]

On September 6, 2002, the Investigative Summary regarding the June 12, 2002 abuse and neglect report was completed. In the summary, the investigating caseworker noted that a Health Department social worker had previously stated her belief that both parents were mentally incompetent to care for the baby, and the DHS caseworker also concluded that they did not in fact appear to be capable of caring for him. The summary asserts that "they both state they have a mental problem. Their actions since the birth of this child, has [sic] been questionable. Their lack of an appropriate home; different people caring for this child and their inability to understand the danger they have place this child. They both appear to have limited knowledge on the day to day efforts in caring for a child. They both appear to be 'childlike' themselves." The summary recommends that Cody remain in foster care "until it can be determined if the parents can learn to parent this child." The summary does not refer to the previous determinations by DHS that Cody's parents were too mentally impaired to take advantage of DHS's family preservation services.[52]

26

Dr. Marva Lewis

On September 13, Cody's foster mother, Ms. BB, took him to the hospital in one of what would be numerous trips to the emergency room to address his chronic respiratory and other health problems.[53]

During a September 23, 2002 Youth Court Hearing, DHS was ordered, for the third time, to provide Cody's biological parents with a psychological evaluation. At this hearing, Cody's parents reported that they had not seen their child since he entered custody in July.[54] Following this third order, DHS finally arranged for the psychological examinations. The psychologist concluded that because of their intellectual limitations, neither Ms. H nor Mr. B possessed "the ability to adequately function in a parenting capacity."[55] The psychologist also raised additional concerns about Cody's parents, including that each of them smoked a pack of cigarettes per day and had "exposed their child to second hand cigarette smoke, which is not in this child's medical best interest," and that "a question is raised concerning [Ms. H and Mr. B's] possible drug usage.... It would be advantageous that they have random drug screens, including follicle hair testing."[56] The psychologist recommended that Cody not be returned to their custody.[57] There is no indication that DHS reevaluated Cody's permanency goal of reunification in light of this report.

In an unsigned and undated Youth Court Hearing and Review Summary prepared for a December 18, 2002 conference, DHS stated that in order to achieve the permanency goal of reunification, the parents needed to make contact with the agency and visit Cody, whom they had not visited "for quite a while," and that there was nothing more that the agency could do to further the plan.[58] At this point, there is no record of any visit at all between Cody and his parents since he entered custody five months previously, and there is no indication in the record that DHS had attempted to arrange any visits between Cody and his parents. Although Cody's caseworker noted in his case record that "all of the relatives in the Laurel and Hattiesburg area, etc. were made aware that the child is in custody, but none of them have shown any interest in having the child in their home," there appears to be no record of any affirmative attempts by DHS to contact any of Cody's relatives.[59]

In a December 20, 2002 periodic administrative review of Cody's DHS case, it was noted that the assigned caseworker was not at the review conference and there was no documentation available as to how long it had been since Cody's parents had had a visit with him.[60]

## B. 2003

On January 2, 2003, Cody was again admitted to the hospital, where he remained for two nights for respiratory distress diagnosed as asthma.[61] A follow-up appointment was scheduled for the following week, but Ms. BB, Cody's foster mother, told DHS she did not have the Medicaid card she would need for that appointment.[62] There is no record of whether Ms. BB received the necessary card or whether she was able to keep Cody's appointment.

27

Dr. Marva Lewis

Pursuant to a February 6, 2003 Youth Court Order, Ms. H underwent a second psychological evaluation on February 7, 2003.[63] The clinician wrote that returning any children to Ms. H's custody should not be considered unless she had full-time assistance from an individual "competent and responsible in child care," as otherwise "her lack of intelligence will certainly compromise the welfare and safety of the children."[64] He also noted that she had told him that neither she nor Mr. B had a driver's license but that, while Mr. B " 'can't learn how to drive,' " they did have a car that she sometimes drove. The clinician wrote, "This is certainly a situation of concern. One, she does not have a driver's license, and two, she has a Seizure Disorder and would place herself and any children at risk if she had a seizure while driving."[65]

There is a memo dated March 4, 2003, by Cody's caseworker, in which she stated that she had contacted Singing River Mental Health about a parenting program suitable for Cody's parents' limitations and that she would look into finding a babysitter for Cody's infant sister SB to allow Cody's parents to attend the program.[66] The case note is dated almost eight months before SB was born and before any records have indicated that Cody's mother was pregnant.[67] Unsigned case notes maintained in the DHS case record from a March 24 visit to Cody's parents' home by what appears to have been Cody's Court Appointed Special Advocate (CASA) indicate that Ms. H was pregnant and that she smoked.[68] The CASA discussed the parents' mental incapacity and concluded that without full-time assistance they would not be able to provide adequate childcare. Ms. H told the CASA that her mother, her step-father, and "several aunts" would be willing to help her; there is no indication in the case record that any caseworker followed up with these relatives regarding assistance to Cody's parents or placement for Cody.[69] Cody's father reported to the CASA that he was willing to go to parenting classes but lacked transportation.[70] There is no indication in the case record that DHS attempted to provide transportation to Mr. B so that he might meet his obligations under his case plan.

Unsigned notes in the DHS case record from an April 15, 2003 meeting with Cody's foster mother, Ms. BB, reflect the foster mother's complaint that no DHS worker had been to her home to see Cody in the nine months he had been placed with her.[71] The notes indicate that Cody seemed very happy and that Ms. BB said she loved him and would like to adopt him, though "she was not aware of a court date nor did she know status of his case".[72] At an April 17 meeting in the DHS office, Cody's caseworker observed that Cody "appeared to be loved by his foster mother."[73] There is no evidence in the record that Ms. BB's interest in providing a permanent home was discussed at any permanency hearing or other event, nor is there evidence that Ms. BB was ever invited to such a hearing. On April 29, 2003, the Youth Court judge ordered DHS to arrange "a minimum of one to two" visits between Cody and his parents before the next court hearing.[74] At this point there had been no documented parent visits since Cody entered custody almost nine months before. There is no indication in the record that DHS complied with this order or that any parent visit occurred before September of 2003. The judge also ordered DHS to assist Cody's parents in applying for services through Singing River Industries.[75] It would appear from a Youth Court Hearing and Review Summary prepared for a conference 11 months after this court order that DHS had still not provided Cody's parents with such assistance.[76]

28

Dr. Marva Lewis

A May 6, 2003 Periodic Administrative Determination found that the MACWIS case plan did not mention Cody's asthma under medical background or anywhere else: "this is important information that needs to be flagged in case of a change in placement."[77] The case record had not been presented for review and neither the caseworker nor the supervisor was available to clarify issues. The reviewer wrote that "It is unknown as to whether there is a suitable relative or not," and that there was no documentation in MACWIS that the agency had done any work with Cody's mother to achieve the permanency goal of reunification.[78] At this point, 12-month-old Cody had been in custody for nearly his entire life. An unsigned and undated Youth Court Hearing and Review Summary prepared for a conference also on May 6 notes that there had been no documented visits between Cody and his biological parents, and that the agency could not report on what services were needed to further the permanency plan because the assigned caseworker was not available.[79] DHS reported to the Court that it would undertake "a more thorough search" for potential relative placements, but there is no indication such a search subsequently took place.[80]

In a court report submitted June 21, 2003, Cody's caseworker asserted that Cody's biological parents were unable to care for him and that he needed a permanent home; however, she wrote, DHS was not recommending the termination of parental rights (TPR) at that time. Instead, the agency would recommend TPR six months later if no relative placement could be found. This recommendation was made after Cody had been in DHS custody for nearly a year and had been residing in a foster home DHS had documented as loving, and during which time a host of family members had been identified as possible relative placement resources. DHS's plan to pursue a relative placement was intended to allow Cody's parents to maintain contact with him.[81] The court report seems to suggest that at this point, Cody's parents had seen their 13-month-old son once since he entered custody, although there is no other documentation of such a visit in Cody's record.[82] On June 24, the Youth Court changed Cody's permanency plan to durable legal custody / relative placement with a concurrent plan of adoption. The Order called for supervised visitation between Cody and his parents two times per month.[83]

On August 26, 2003, Cody's caseworker received from his CASA the names and contact information of two of Cody's relatives, as well as the names of two additional relatives who could be reached through the first two.[84] DHS does not appear to have attempted to contact any of these relatives in order to further the permanency plan of relative placement. On September 15, 2003, Ms. H provided Cody's caseworker with names and phone numbers for two more relatives, one of whom Ms. H stated she would like to have custody of both Cody and the child she was carrying. Ms. H also provided the name, though not the phone number, of a third relative.[85] There is no record of DHS follow-up regarding any of these relatives.

What appears to be the first documented visit between Cody and his biological parents took place on September 18, 2003. According to case notes, the DHS caseworker present for the visit stated that she needed to "get some family history." Case notes

Dr. Marva Lewis

indicate that two aunts on Ms. H's side of the family were also present and that one of them was seeking custody of Cody; the case notes did not record either name or any contact information, and there is no indication of any subsequent attempt to contact either.[86]

An unsigned and undated Youth Court Hearing and Review Summary prepared for an October 7, 2003 conference notes that the agency needs to consider "other relatives" for placement, though there is no record that any relatives had been seriously considered. Although the permanency plan was changed by court order on June 24 from reunification to durable legal custody / relative custody with a concurrent plan of adoption, this October 7 Summary indicates that "the judge wants the agency to continue with the permanent plan of reunification."[87] Also, while the most recent court report on the matter stated that the agency did not recommend TPR, the Summary states the following without further explanation: "Although this agency feels TPR is in the child's best interest, court has directed that efforts to reunite continue for the time being."[88]

An October 10, 2003 Periodic Administrative Determination also cites the permanency plan as reunification with a concurrent plan of relative placement / adoption, and notes that the agency needs to "check out and see if there is a suitable relative as part of concurrent planning." The reviewer noted that there was no documentation of the parents meeting their obligations under their service agreements and that the social worker supervisor had said they might be incapable of fulfilling the agreements.[89]

Ms. H gave birth to her seventh child on October ■, 2003, and within three days, DHS received a report that Ms. H was not able to properly care for the infant.[90]

In a November 24, 2003 report to the Youth Court, Cody's caseworker wrote that "efforts are being made to find a family members [*sic*] to care for [Cody]. The agency has not found a family member who could be considered for the care of the minor." The caseworker went on to state, "It is this worker's opinion that [Cody's] parents are not able to care for him and his sister, [SB], without some assistance, due to their limited intellectual functioning. The agency will pursue relative placement for [Cody], in hope that his parents will be able to obtain joint custody with him."[91] At the time that the agency made this report, Cody had been in custody for 16 months, DHS had not located a single relative to care for him, his parents had not been regularly visiting him, and more than five months had passed since the June 21 court report in which DHS stated that it would recommend the termination of Cody's parents' parental rights if a relative placement had not been found within six months. At the November hearing, the Youth Court ordered visitation between Cody and his biological parents every weekday.[92]

Throughout December of 2003, DHS staff transported Cody to his parents' house for day-long, unsupervised visits.[93] During this period, caseworkers recorded numerous concerns regarding the safety and appropriateness of the home. Cody's parents had to be instructed on such basic parenting principles as the need to wake up before Cody arrived and to feed him breakfast, and they were nonetheless still "usually asleep" when Cody reached their house.[94] Mr. B told a caseworker that Cody was "bad," and on at least one

Dr. Marva Lewis

occasion he threatened to "whip" him in the presence of a DHS homemaker.[95] Ms. H and Mr. B persisted in living with a cat and smoking in their home, despite the clear and serious risk cat dander and smoke posed to Cody's health in light of his asthma.[96] On at least one occasion, the DHS homemaker confronted Ms. H about having lied regarding where she smoked and where the cat was allowed.[97] The DHS homemaker also noted once that "The baby was sitting in her swing....Everything was fine."[98] There is no indication that any staff member investigated whether this was the same baby swing that was recalled by the manufacturer and that the parents' case plans required them to remove.[99]

On December 10, 2003, Cody's foster mother voiced a number of complaints to his caseworker, including that for a long time after Cody was placed with her no one from DHS visited her home. According to her case notes, Cody's caseworker responded to these complaints as follows: "Worker apologized about the situation in that due to not having adequate staff we often do not comply with policy but that the agency should have been working on reunification form [sic] day one and should have allowed visits for the parents and that we should have been visiting [Cody] at least once per month."[100]

During the period of intensive unsupervised visits with his biological parents, Cody suffered from severe respiratory problems. He was treated in the emergency room on December 12, and on December 15 Cody's caseworker noted "obvious" congestion.[101] When his breathing difficulties continued on December 17 he was taken for another medical examination. The doctor prescribed an antibiotic and instructed the DHS worker present to take him to the hospital for blood work, but there is no documentation that DHS followed up regarding the blood work, and a February 2004 letter written by Cody's foster mother states that it did not.[102] Cody's caseworker noted continued congestion on December 19 and January 5, 2004.[103] There is no evidence that any staff members considered whether Cody's chronic respiratory problems might be related to exposure to cigarette smoke and cat dander in his parents' home.

### C. 2004

On January 5, 2004, Cody's foster mother told his caseworker that she was out of his medication, but there is no record that DHS took steps to obtain a refill.[104]

On January 5, 2004, DHS requested that the Youth Court order that Cody's daily parent visits be discontinued on the grounds that DHS could no longer provide Cody with transportation to those visits. Although the permanency plan was no longer reunification and DHS had documented that Cody's parents were too mentally impaired to care for him, in its motion to discontinue visitation DHS wrote that "the parents needs a larger place and due to this reason along with some medical problems we are not recommending placement." There is no record that DHS informed the court of the numerous concerns caseworkers had described in their case notes throughout the period of visits to the parents' home. Nor did DHS document in its motion what visitation plan would be in Cody's best interest.[105] The Court granted the motion to discontinue daily visits and scheduled a January 26 hearing to consider alternative visitation plans.[106]

Dr. Marva Lewis

On January 9, 2004, an early intervention program evaluated Cody for developmental delays and found him to be suffering delays of 10 to 47 percent in all tested areas, including Gross Motor, Fine Motor, Cognition, Language/Communication, Self-Help, Relationship to Persons, Emotions and Feeling States, and Coping Behavior.[107] Despite these developmental problems and his ongoing medical problems, DHS does not seem to have considered classifying him as special-needs.

Throughout January 2004, DHS caseworkers continued to document concerns regarding the ability of Ms. H and Mr. B to parent their infant daughter safely.[108] Although these concerns were clearly relevant to Cody's safety during visits, there is no documentation that DHS shared them with the Youth Court at the January 26 hearing to create a new visitation plan or at any other time. At that hearing the Youth Court judge ordered "that visitation shall be amended due to the inability of the Department of Human Services to transport the minor child on a daily basis, this visitation is not amended for any type of punitive reasons," and that six-hour weekly visits would be instituted with additional ones attempted.[109]

According to notes by Cody's caseworker in a subsequent ISP, the Youth Court judge instructed DHS in what appears to have been February that "there is no grounds to terminate [Cody's parents'] parental rights...[as] there is another child in the parents' home who is doing well. She requested that we have a plan to reunify by April, 2004, or a reason why we want her to consider TPR."[110] There is no record that the agency shared any of its documented concerns regarding the ability of Mr. B and Ms. H. to care for their infant daughter when the Court expressed the belief that she was doing well in the home despite the two psychological reports finding Ms. H and Mr. B incompetent to parent.[111]

On February 12 Cody had to return to the emergency room with respiratory problems after spending the previous day and night in his parents' home.[112] The first instruction on his discharge papers reads, "Do not smoke cigarettes near your child."[113] According to a letter Cody's foster mother, Ms. BB, later sent to various parties, including the Youth Court, Cody's caseworker took him from the emergency room to his babysitter's house and left him there, while his breathing difficulties continued, without telling the babysitter why he had been to the hospital. Ms. BB further recounted in her letter that when she picked Cody up from the babysitter's home, he was continuing to suffer from breathing problems and required two "breathing treatments" before he was able to breathe normally again. When Ms. BB saw Cody's caseworker later that night the caseworker refused to explain the trip to the ER beyond stating that Cody "just had some respiratory problem."[114]

Cody's parent visits continued, and although the DHS case record is unclear, it appears as though he returned to the emergency room again on February 25, 2004.[115] The same day, Ms. BB asked DHS to remove Cody from her home.[116] She wrote a letter the next day to various DHS and government officials explaining that while she loved Cody deeply, she could not continue to work with DHS while the actions and inactions of its employees made it too difficult for her to ensure his safety and well-being.[117] As discussed above, she recounted that the agency had allowed daily, unsupervised parent

Dr. Marva Lewis

visits even after she alerted Cody's caseworker to the fact that his parents were exposing him to cigarette smoke; that DHS had failed to obtain blood work when it was ordered by a doctor; and that Cody's caseworker had refused to provide her or Cody's babysitter with adequate information regarding emergency medical treatment.[118] DHS had also failed to provide a substitute caseworker when the assigned caseworker was on leave, and caseworkers consistently failed to pick Cody up and drop him off when they said they would.[119] Though Ms. BB expressed interest in adopting Cody, she stated that she had not been invited to any of the hearings, conferences, or other events where permanency planning was discussed.[120] Ms. BB repeatedly approached the social worker supervisor and the regional director with her concerns regarding Cody's health, but, she recounted, they were unresponsive and the problems persisted.[121] The letter concludes, "After 19 months with [Cody], he has been nothing but joy. I truly love him and if no one wants him, I do. I want to give him a loving, supportive home, because I have time, and understanding. During my training, I was told to treat him as if he was mine own. I am trying to do just that. This is my way of fighting for him....Give him the chance he deserves. I truly hope and pray that this letter touches someone that cares....Who will join me in fighting for [Cody's] life?"[122]

There is no indication that any of the letter's recipients, who included the regional director, responded to the letter in any way.[123] Though the record showed Ms. BB to be a loving and stable foster mother who wanted to provide Cody with a permanent home, there is also no evidence that DHS attempted to work with her at this juncture and address her concerns.[124] Instead, the agency placed the 21-month-old child—who was sick enough to have recently been admitted to the emergency room—in a shelter.[125] After two days in the shelter Cody was moved to the BYK foster home, but that placement disrupted after a week when Cody was hospitalized because of a severe asthma attack.[126] Case notes reflect that Ms. BYK "related to worker that she would not be able to take [Cody] back. If she had known about his Asthma she could have been better prepared."[127]

Ms. BB, although no longer his foster mother, went to the hospital to see Cody, who "was crying and very upset....[He] had to be held down by worker and 2 nurses."[128] Ms. BB offered to sit up with him that night and to take him back when he left the hospital. Instead, the caseworkers' supervisor instructed Ms. BB to leave, and rather than return Cody to the home where he had spent most of his life and where DHS had documented that he was loved, the agency placed him in a different shelter upon discharge.[129] The day Cody was placed back in a shelter, the physician who had been treating him for over a year filed an abuse and neglect report asserting that he was suffering emotional problems and failure to thrive and would not develop properly without placement in a stable and loving foster family.[130] The doctor requested that somebody at DHS call her, but there is no record that anybody did so or that DHS followed up on her report. Cody remained in the shelter for 18 more days.[131] There is no DHS record indicating that the agency considered returning Cody to the BB foster home even temporarily, despite the fact that Ms. BB had offered to resume care of him and his doctor had determined that Cody needed a loving and stable foster home.

33

Dr. Marva Lewis

In an unsigned, undated Youth Court Hearing and Review Summary prepared for conference in early March of 2004, Cody's caseworker asserted that his parents "had maintained a stable and secure home" and that "they have a more recent baby who receives appropriate care from them."[132] Cody's caseworker did not mention any of the safety concerns regarding that home about which she wrote she was "very concerned" in mid-January.[133] A March 5, 2004 Periodic Administrative Determination noted that Cody's parents had not completed their parenting class, possibly because of their mental limitations. During the review, Cody's caseworker indicated that she would try to enroll the parents in a program through Singing River Mental Health.[134] On March 23 the Court ordered weekly parent visits for Cody but specified in this Order that Cody was not to be exposed to "cigarette smoke or animals."[135]

On March 26, 2004, Cody was moved from the emergency shelter to the BR foster home, his fifth placement in 31 days.[136] Ms. BR called DHS a week after Cody was placed in her home to ask how to administer his medicine, and a DHS homemaker told her that "she wasn't sure, but could call Dr. G■ and find out."[137] There is no record that DHS had provided the foster mother with any information about Cody's serious medical history. The next day Ms. BR inquired about visits with Cody's biological parents and the DHS homemaker told her that these court-ordered visits had not been occurring because of transportation problems.[138] Later, Ms. BR also told Cody's caseworker that "she did not know why [Cody] has not been considered as a special need child as much as he has been sick."[139] There is no indication in the record that Cody's caseworker made any effort to determine whether he qualified as a special needs child. On May 2, an abuse and neglect report was filed that seems to have concerned Cody's infant sister.[140] On May 10 Ms. H informed Cody's caseworker that "a warrant was out for her arrest and she was afraid that the police would come there and arrest her."[141] The caseworker's notes show no sign that she asked Ms. H about this warrant or investigated the issue in any other way. In her case notes, the caseworker wrote that she remained concerned that Cody's family was not able to care for him adequately, but that she nonetheless wanted to maintain contact between them.[142]

In a report submitted to the Youth Court for a May 12, 2004 permanency hearing, DHS recommended adoption as Cody's permanency plan. In support of that plan, DHS cited the difficulties it had experienced maintaining contact with the family for purposes of visitation, the fact that the mother only had custody of one of her seven children, and the fact that DHS had received three calls from medical professionals regarding the care that this infant was receiving.[143]

On June 1 Cody's parents saw him for the first time since his placement in the BR home. During that visit, it took 30 minutes for Cody to leave his foster parents' arms and interact with his family, and Cody's father "continued to say that they [sic] boy is just bad." Cody's caseworker provided the parents with some parenting advice, including "not to drop the baby off with just any body [sic] that they must have a reliable babysitter," and not to tell people they could adopt Cody's younger sister if they did not mean it. Nonetheless, the caseworker wrote that they "had a good visit."[144]

34

Dr. Marva Lewis

On June 28, 2004, 23 months after DHS took custody of Cody, the Court changed his permanency plan to adoption and ordered the agency to prepare a TPR package.[145] This package, which contains the papers necessary to begin the termination process, remained incomplete at a permanency hearing five months later, at which point the judge ordered a report from DHS within two weeks describing the status of the package.[146] DHS did not complete the TPR package until five months after that, ten months after the Court ordered it to do so.[147]

### D. 2005

Cody returned to the emergency room on March 18, 2005.[148]  On March 30, 2005, Cody's foster mother, Ms. BR, told Cody's caseworker "that he took a sucker (candy) and held it between his two fingers as if he was smoking.  Worker told her that the worker was aware that [Cody]'s mother smoked cigarettes." Cody's caseworker also noted that the agency had not maintained a complete medical record for Cody, and she expressed confusion regarding whether or not Cody actually had asthma.[b][149]

On June 1, 2005, Cody's foster father told Cody's caseworker that he and his wife were considering adopting Cody but had not made a final decision.  He requested further testing to determine the extent of Cody's developmental delays and to identify any appropriate interventions.[150]  An unsigned and undated Youth Court Hearing and Review Summary prepared for a conference the next day lists this testing as a service not yet provided that was needed to achieve the permanency plan of adoption.  This section also notes concerns the foster parents had about the added expense of caring for Cody.[151] Cody seems not to have been provided with another developmental assessment until October.[152]  The next month, Cody's foster parents agreed to adopt him.[153]  As of the end of 2005—close to a year and a half after the judge ordered TPR and over 41 months after Cody entered care as two-month-old—Cody appeared still not to have been adopted.


## II. CASEWORK ANALYSIS


### A. DHS FAILED TO PLACE CODY IN THE STABLE, FAMILY-LIKE ENVIRONMENT NECESSARY FOR HIS PROPER DEVELOPMENT

DHS has acted disregarded Cody's psychological development and well-being in

the placement decisions it has made for him.  Despite DHS policy and ample research

regarding the danger, especially for very young children, of institutional care, when DHS

---

[b] In January 2006, Defendants provided a number of medical records that had not previously appeared in Cody's case record and that had clearly been obtained long after most of the treatment in question.  These records include three full years' worth of records from the Children's Clinic submitted together as a single 12-page document.  [DHS Cody B. 000780-000792]

Dr. Marva Lewis

took custody of Cody as a two-month-old infant it placed him in a shelter. Inexplicably, Cody remained in this institution for over a week, during which time DHS appears to have made no effort to determine whether any of the relatives already brought to its attention could provide Cody with a home.

When DHS finally placed Cody in a loving and stable foster home, it then engaged in egregious casework practice that is directly responsible for Cody being removed after 19 months from the care of a devoted foster mother who wanted to adopt him. Ms. BB asked that Cody be removed only after he twice required emergency care following visits with his parents and after her appeals to the social worker supervisor and regional director regarding Cody's health had been disregarded. In a letter Ms. BB wrote to every official she thought might be able to help Cody's plight, she recounted how she had tirelessly advocated for Cody but could not continue to care for him when DHS's actions, including its persistence in allowing Cody to be exposed to cigarette smoke and its failure to provide doctor-mandated medical treatment, made it impossible for her to ensure Cody's safety. Her closing plea, "This is my way of fighting for him….Who will join me in fighting for [Cody's] life?" underscores the fact that her request for his removal was based on her deep concern for Cody, and her inability to capture DHS's attention in any other way. The case record includes no subsequent acknowledgement by DHS of its failures as outlined in the foster mother's letter, nor any evidence that DHS attempted to salvage the placement by providing the minimal level of casework that Ms. BB recognized as necessary to Cody's well-being. DHS disrupted the first safe, stable, and loving relationship Cody had experienced in his life.

36

Dr. Marva Lewis

Not only did DHS do nothing to work with Ms. BB to rescue the placement, but after Cody had lived with this loving foster mother for 19 months, it did nothing to ensure that Cody's transition from the home was not psychologically harmful. Instead, DHS abruptly moved Cody, who had just been released from the hospital, back to the inappropriate environment of a shelter, and then to a new foster home. In what can only be described as a cruel disregard for Cody's psychological and emotional health, when Cody was again hospitalized and Ms. BB tried to visit him, DHS ordered her to leave the hospital and denied her request to resume fostering Cody. Instead, when Cody was released from the hospital, DHS placed him in another shelter.

The clear damage DHS caused Cody by denying him the opportunity to return to a loving foster home and instead placing him in an institutional shelter was made explicit when his long-term doctor filed a report of suspected abuse and neglect about his placement. In the report she asserted that he was suffering emotional problems and failure to thrive and required a stable and loving foster family to develop properly. A note on this report indicates that the doctor requested that someone call her, but contrary to reasonable case practice, DHS did not document any follow-up calls to the doctor in Cody's case file. In my professional experience, it is highly unusual for a medical doctor to go to these professional lengths regarding concern for the type of placement an abused or neglected child should receive. This report does not appear in the MACWIS narrative, nor does DHS seem to have reported it to the Youth Court. Instead, DHS left Cody in the shelter, identified by his treating physician as actively harmful to him, for almost three weeks.

37

Dr. Marva Lewis

In addition to relying on inappropriate shelter care, DHS subjected Cody to multiple placement moves. It is well established that children who have been abused or neglected by their biological parents require a stable, consistent, family-like environment to begin their process of healing and to learn to trust the world.[154] However, DHS placed Cody, who was not yet two at the time and showed evidence of having formed a secure attachment to the foster mother with whom he had lived for the majority of his life, in five separate foster homes and institutions in the space of 31 days. Cody was psychologically harmed by such a high number of placements. At a time when Cody required stability for proper development, DHS moved him through multiple and thoughtless placements.

## B. DHS ENDANGERED CODY'S LIFE BY IGNORING HIS MEDICAL NEEDS

Cody's chronic illness is inconsistently and inaccurately reported throughout his case record. During a May 2003 administrative review, the foster care reviewer indicated that Cody's MACWIS case plan did not mention his asthma, and noted that this was important information to be flagged in case of a change in placement. Although a doctor had clearly documented that Cody must not be exposed to cigarette smoke, no such medical order had yet been placed in Cody's ISP. As late as March 2005, Cody's caseworker even expressed some confusion as to whether Cody actually had asthma.

It does not appear that DHS obtained all of the medical records from Cody's innumerable visits to the doctor and emergency room and entered them into his case record at the time he received medical services, as is required by Mississippi foster care policy. Instead, all of his medical records from three years of visits to the Children's

38

Dr. Marva Lewis

Clinic were provided for review in January 2006 and appear as one 12-page document, with more than a month's worth of information on any given page. This dangerous failure to track and understand the significance of Cody's medical condition is unacceptable for the professional agency charged with ensuring the safety of this infant.

Throughout Cody's placements, DHS has repeatedly withheld critical medical information from Cody's caregivers. The immediate harm of this to Cody has been the danger that he could die from a sudden unrecognized asthma attack in the home of an unprepared caregiver, who might mistake his symptoms for a common cold. In fact, Cody experienced a severe asthma attack that required emergency hospital care while residing with a foster mother who is quoted by DHS as stating that she had not been informed of his condition. This evident failure to educate his foster mother about his chronic illness not only was life-threatening to Cody but also caused him to lose yet another caregiver, as the shaken foster mother refused to resume care of Cody when he was released from the hospital. DHS failed to adequately inform another of Cody's foster parents about how to give him his medicine. Given the number of medical documents and court orders that specifically referenced Cody's medical condition, it is disgraceful that DHS did not properly document and disclose to his caretakers his basic medical needs.

Most egregious, however, was the callous disregard for Cody's health that DHS showed in not adequately supervising visits with his parents when it was apparent that they were likely exposing Cody to cigarette smoke. DHS and others repeatedly documented that Cody's parents smoked and that, with respect to smoking as well as other issues, they were irresponsible and untrustworthy. The first psychological

39

Dr. Marva Lewis

evaluation of Cody's parents, completed in September 2002, two months after Cody entered care, recorded that each parent smoked a pack of cigarettes a day and had previously exposed Cody to second-hand smoke, and that such exposure was not in Cody's best medical interests. In March 2003, case documentation reflected that Ms. H smoked despite being pregnant, and in December 2003, during the period of Cody's day-long unsupervised visits, DHS workers observed his mother smoking at least twice, once inside her home with her new infant, and confronted her about her previous statement that nobody smoked around the baby. Cody's foster mother Ms. BB reported to DHS in 2004 that he returned from visits with his parents smelling of smoke, and in 2005, Cody's foster mother Ms. BR reported that Cody held a piece of candy like a cigarette and pretended to smoke, to which Cody's caseworker responded that she knew Cody's mother smoked. On two occasions, if not more, Cody had to be taken to the emergency room in respiratory distress following visits with his parents. Following one such visit, his doctor ordered that blood work be completed for Cody. There is no clear documentation that DHS obtained this blood work in a timely fashion, and in February 2004 his foster mother indicated that the agency had not in fact complied with this doctor's order. Again, the failure could have endangered Cody's life because of incomplete medical information. Despite the overwhelming indications that Cody was at risk of being exposed to smoke during visits with his parents, and the court and doctor's orders that he not be so exposed, DHS persisted in allowing these visits to continue without the supervision or complete, current medical information necessary to ensure his health and safety.

40

Dr. Marva Lewis

DHS has endangered Cody's physical health by failing to properly assess and document Cody's medical needs, by failing to adequately prepare his caretakers to address those needs, and most significantly, by placing him without adequate supervision in an environment known to be life-threatening.

## C. DHS FAILED TO PROVIDE PLANNING AND SERVICES NECESSARY FOR CODY TO ACHIEVE HIS PERMANENCY GOAL OF REUNIFICATION

### 1.  DHS Failed to Engage in Minimally Reasonable Case Planning

In creating initial service plans for Cody and his family, DHS minimized or ignored three high-risk factors that were critical to determining whether reunification was an appropriate permanency goal for Cody and identifying the services Cody and his parents required to safely achieve that goal. Those risk factors are, first, Cody's special medical and developmental needs; second, the documented intellectual limitations of the parents; and third, the multiple previous reports of child abuse and neglect concerning Cody and his older siblings. These red flags should have been a focal point for the agency's initial assessment of the family and all case and permanency planning that followed.

Risk Factor #1: Cody's special medical and developmental needs.

Understanding the child's physical and developmental status is essential when making planning and service determinations for a foster child.  For Cody, who had been labeled "high risk" at birth because of his parents' mental impairment, such an initial assessment was even more important.   Yet his case file does not include any medical results from any such initial medical screen, nor is there any documentation that DHS obtained a

41

Dr. Marva Lewis

comprehensive developmental evaluation of Cody to determine his specific service needs. This lack of initial medical documentation indicates that DHS made critical determinations about Cody's future without first fully understanding his medical and developmental status. This goes against basic case practice principles.

Risk factor #2: The documented mental incapacity of Cody's parents.
Intellectual limitation in a parent is a permanent condition that must be thoroughly assessed and accounted for by the caseworker when evaluating whether reunification is an appropriate permanency goal and, if so, identifying the services necessary to achieving that goal. The DHS policy manual makes clear that a psychological evaluation may be needed for a complete assessment of a family.[155] In Cody's case, the critical question that DHS needed to be asking was, *Do these mentally challenged parents have sufficient capacity and resources to provide proper care for a newborn with potential medical or developmental problems?* Before Cody entered foster care DHS identified his parents as too mentally impaired to gain anything from the agency's Family Preservation classes, and when DHS placed him in custody his caseworker recommended that Cody remain a ward of the state "until it can be determined if the parents can learn to parent this child." In spite of all this, DHS chose a permanency plan of reunification, and drew up a service plan to achieve that goal, without first learning the extent of his parents' mental impairment. Standard case practice required that Cody's caseworker seek the results of existing mental health or intellectual testing of Cody's parents or request that this type of testing be conducted as part of the initial assessment and planning process. Because DHS failed to undertake these basic steps, the service plan established for Cody's parents did not focus on the realities of their intellectual limitations.

42

Dr. Marva Lewis

DHS arranged for psychological testing of Cody's parents only after being ordered to do so, not once but three times, by the Youth Court. What is astonishing about this, in addition to the fact that DHS entirely ignored the first two orders by the Court, is that once it complied by obtaining the evaluations, it largely ignored the results. The evaluating psychologist concluded that the parents had very limited parenting skills and lacked "the ability to adequately function in a parenting capacity." The psychologist also determined that Cody's parents exhibited potential signs of drug abuse and should undergo drug testing. This report is remarkable in the unequivocal nature of its assessment that Cody's parents could not safely care for him unassisted; in my professional experience, such emphatic conclusions are unusual in psychological assessments of parental capacity. When presented with this very straightforward assessment of the parent's clear limitations, DHS appears to have taken no action to reassess either Cody's permanency goal of reunification or the services that DHS would need to provide his parents to ensure this goal could be achieved. Moreover, DHS did nothing to determine if, in fact, the parents were substance abusers. The parents' ISPs were not even updated to reflect the results of this evaluation.

A second psychological evaluation was completed on Cody's mother four months later, again not at the initiative of DHS, but rather by order of the Youth Court. It confirmed that Ms. H's limited intellectual capacity precluded her from safely parenting Cody without full-time assistance. Although this psychologist's opinion was clearly germane to DHS's case planning for Cody, DHS, in yet another breach of standard casework practice, failed to update either Cody's or his mother's ISP to reflect the results of this evaluation.

43

Dr. Marva Lewis

Risk Factor #3: The family's previous history of multiple child neglect referrals. There is no indication that Cody's caseworkers educated themselves about, or even considered, Cody's family's extensive child welfare history when formulating his case plan. Not only had Cody been the subject of four reports of neglect within two months of his birth, but DHS had also documented that Cody had older siblings who were no longer residing with Cody's mother. There is no indication in the record that Cody's caseworker attempted to determine if, as suggested by a number of Cody's relatives, DHS had removed Cody's older siblings from their mother's care. There is no documented indication that DHS endeavored to gain a complete and accurate knowledge of the family's prior history with DHS despite how critical such information is to assessing how well a family will respond to reunification efforts.

Cody's parents' mental incapacity and the family's prior child welfare history, taken together with Cody's medical and developmental issues, were risk factors that DHS did not properly document or consider in Cody's initial case planning. As a result, the case plan DHS devised for Cody and submitted to the Youth Court did not accurately reflect either the level of danger and risk Cody faced if returned to his biological parents or the depth of services required to reunify Cody with his parents and ensure his safety. Without a well-thought-out and -supported case plan, the Youth Court did not have sufficient information upon which to base appropriate permanency planning orders, and Cody was destined by DHS's actions to drift in the foster care system.

2. DHS Failed to Obtain or Provide Reunification Services Appropriate to Mentally Impaired Parents and a Special Needs Infant

In its records, DHS characterized Cody's parents as "childlike," "very limited," and "probably retarded," and it possessed two psychological evaluations documenting

44

Dr. Marva Lewis

their intellectual difficulties and reduced capacity to parent, yet it failed to provide the specialized services necessary for their acknowledged limitations. While parenting classes were a required component of the parents' case plan, there is no evidence that their caseworker consulted with a DHS adult service specialist familiar with mentally challenged clients or succeeded in securing some type of parenting services for mentally challenged adults such as offered by Singing River Industries, where they were referred at the outset of the case. One of the few documents in which Cody's caseworker discussed making any effort to arrange for parenting services at Singing River is dated March 4, 2003, but a periodic review dated a year later made clear that Cody's caseworker had yet to obtain Singing River services for Cody's parents. In a periodic review completed May 6, 2003, almost a year after Cody entered foster care, the reviewer noted that there was no documentation in MACWIS that the agency was working with Cody's parent to achieve the stated goal of reunification.

The harm to Cody caused by DHS's failure to provide appropriate services to his mentally disabled parents is two-fold: (1) Cody was placed in further danger of repeated neglect and abuse while in his parents' care during unsupervised visits because his parents were essentially unchanged; and (2) Cody's length of time in a temporary placement was prolonged unnecessarily while his unfeasible permanency plan of reunification with his parents remained stagnant.

45

Dr. Marva Lewis

## D. DHS FAILED TO PROVIDE CODY WITH A REASONABLE VISITATION PLAN CALCULATED TO FURTHER HIS PERMANENCY GOAL WHILE PROTECTING HIS SAFETY

DHS's approach to visits between Cody and his parents was arbitrary and clearly harmful to Cody.

### 1. DHS Denied Cody Parental Contact as an Infant

The formation of parent-child attachment takes place over the first 24 months of an infant's life. The quality of that attachment—whether it will be a secure or an insecure attachment relationship—is determined in part by the child's consistent interaction with the parents in the early months of a child's life. During this phase of the attachment formation, the child comes to see his parents as a secure source of nurturance and protection. Simultaneously, the parents are learning the unique personality and needs of their growing and developing infant. When Cody first entered care, his case plan called for him to see his biological parents twice a month. Nearly five months after he entered state custody, a periodic administrative review report alerted DHS to the fact that there were no documented visits in his case record, but no action appears to have been taken. A Youth Court Hearing and Review Summary held more than nine months after Cody entered custody again found that there had been no documented visits between Cody and his parents.

According to the DHS's policy manual, contact between a foster child and his biological parents is "essential in foster care services."[156] When Cody's foster mother raised the lack of parental contact with Cody's caseworker, the caseworker responded that DHS should have been providing parental visits, but had not done so due to inadequate staffing. The lack of available staff is simply not a valid justification for

46

Dr. Marva Lewis

denying Cody parental contact, especially when such visits were critical to both Cody's psychological well-being and achievement of Cody's stated goal of reunification. Further, Cody's parents were denied the opportunity to get to know their new infant and form a loving bond. Instead, this forced separation by DHS may have contributed to the father's alienation from his son and led to such behavior during visits as threatening to "whip" Cody and calling Cody "bad."

### 2. DHS Failed to Revise Cody's Visitation Plan to Protect His Well-Being

When Cody was finally provided with some contact with his parents, he began to evidence alienation from his parents and lack of an emotional attachment, which should have been expected when, at that time, he had spent the vast majority of his young life in the custody of DHS and without parental contact, and had begun to bond with his foster caregiver. In addition, though, as soon as visits between Cody and his parents began in earnest, DHS began to document serious health and safety risks posed to Cody by those largely or entirely unsupervised visits. It does not appear that DHS advised the Youth Court of its concerns or reevaluated Cody's visitation plan.

DHS documented that Cody's father exhibited a punitive and dangerous attitude toward the toddler, for whom he had little developmental understanding. His father more than once described Cody as "bad" and on one occasion threatened to "whip" Cody, simply because the baby cried at the prospect of being left alone with his parents. DHS documented numerous additional concerns about both parents' parenting capabilities, which included difficulties they were having with caring for their infant daughter that resulted in at least one report of neglect, and the need by DHS to offer such elemental

47