Dr. Marva Lewis

## F. DHS EXHIBITED IRRESPONSIBLE OR HARMFUL CASE PRACTICE

### 1. DHS failed to provide for John's basic needs

John's experience of parental neglect was echoed by the agency's failure to provide in a consistent manner the clothing, education, and funds necessary for his care. The chaotic nature of the casework practice associated with John's care is most clearly illustrated in the recurrent theme of his inadequate clothing supply. The case record reflects at least eleven instances of DHS noting or being informed that he lacked necessary clothing; at least eight of those instances were across one three-month period, and it seems clear from each subsequent notation that DHS had persisted in failing to meet this fundamental need.

### 2. DHS failed to exercise basic case supervision

Repeatedly throughout John's years in DHS custody the agency has proved unable or unwilling to provide the most basically adequate case practice to ensure his well-being. In 2002 he spent three months utterly unsupervised by DHS before the ███ County DHS office "discover[ed]" that ███ County had asked it to provide courtesy supervision. During that three-month period, ███ County failed to notice that John lacked any DHS oversight. In another incident, DHS failure to file necessary paperwork caused John's Medicaid benefits to be temporarily discontinued. Later, John's policy-mandated county conference could not go forward because of incomplete paperwork.[423] Finally, John was unable to register for school because his caseworker had not filed the necessary paperwork, and as a result he appears to have spent the days until the agency managed to enroll him just sitting in the DHS office.

95

**EXHIBIT 3b**

Dr. Marva Lewis

**CONCLUSIONS**

John A's case poignantly illustrates how agency indifference can recreate an experience of parental neglect and abuse for a vulnerable child. John entered the foster care system at age nine with a psychiatric diagnosis of severe mental illness, and in numerous ways throughout the nearly seven years he has been in foster care, DHS has repeatedly disregarded or undermined his psychiatric, emotional, and physical well-being.

It is hard to identify which of these unacceptable case practices was most harmful to this psychiatrically fragile child, but probably most egregious was the agency's irresponsible series of placement decisions. In under five years, John cycled through over 35 placements, few if any of which were appropriate to meet his needs, and many of which were outright harmful. Now a teenager and finally placed with the siblings he saw so rarely for all of that time, John is demonstrating a measure of resilience in the face of his punishing and chaotic years in the Mississippi foster care system.

96

Dr. Marva Lewis

## JAMISON J.

## INTRODUCTION

Jamison J., who is now a 19-year-old, was removed by DHS at age five from his mother, a life-long alcoholic, due to her severe neglect of him.  He has since spent more than 14 years in DHS custody, during which time the agency has shuttled him through over 28 placements, and disregarded his fundamental needs for safety, stability, and permanency in the following ways:

- DHS has placed Jamison in settings that exposed him to clear and immediate risks of serious abuse, despite the fact that the agency knew or should have known that the placements were dangerous.  One of DHS's unsafe placements was at the home of Jamison's mother, where Jamison's sister was raped and a three-year-old child was murdered just weeks after a visit by Jamison.  By moving Jamison at least 28 times, DHS also failed to provide stable placements to him, inflicting psychological harm.

- DHS ignored or mishandled Jamison's serious mental health needs.  During his lifetime in DHS custody, Jamison has suffered acute mental health problems that have been either left untreated or treated inconsistently.  DHS has also failed to monitor and supervise his psychotropic drug therapy.

- DHS engaged in permanency planning that was contrary to Jamison's best interests.  For a torturous seven years, DHS relentlessly pursued a plan to reunify Jamison with his mother despite the documented psychological harm that the reunification effort was having on him.  Once reunification failed, the agency did not develop any other viable permanency plan, at one point even placing Jamison with the father whose parental rights had been terminated.

- DHS unnecessarily separated Jamison from his sister and extended family for years.

- DHS denied Jamison access to a basic education by prohibiting him from attending high school.

97

Dr. Marva Lewis

## I. CASE SUMMARY

### A. 1991-1992

In 1991, there were at least two different reports that Jamison, age four, and his two siblings were being neglected by their mother, Ms. M. The first alleged that there was no electricity, gas, or water in the home, that Jamison's mother left the children alone at night, and that when she was at home, she had a lot of "male company." The second alleged that Jamison was unfed, unsupervised, and not properly clothed, and that his mother was doing drugs and working as a prostitute.

A caseworker who investigated the reports found Jamison unsupervised, "filthy & appear[ing] ungroomed & unbathed," and the home was described as filthy with no toilet, running water, or stove for cooking. The social worker told Ms. M that her children could not live in the home.[424]

On December 2, 1991, DHS filed a petition in Youth Court seeking that Jamison, aged five, and his sister TM, aged seven, be found neglected.[425] In that petition, a DHS Social Summary described in detail the squalor of their mother's home and Jamison's filthy appearance.[426] Jamison's older sister, LM, was placed with her father (Jamison had a different father, who lived in Kansas).

A case plan analyzed the suitability of placing Jamison and TM with their maternal grandmother, Ms. D. A caseworker noted that "she doesn't have inside plumbing or gas heaters" and found that the "sleeping arrangement is not satisfactory." The document noted, "We have our doubts [about the placement] but we will just hold any action at this time." [427] DHS placed Jamison and his sister TM with their maternal grandmother on December 5, 1991, without first receiving the approval of a Youth Court judge or undertaking the required home study necessary to ensure the safety of Ms. D's home.[428]

DHS caseworkers visited Jamison and his sister twice at their informal relative placement. DHS recorded that there was no bathroom and that TM was sleeping in the living room on a sofa bed in the same room as Ms. D's two teenaged sons. The social workers did not see Jamison during either visit, but they did observe Ms. D drinking beer both times. Ms. D was told that she needed to clean the house and that TM should not sleep in the same room as two teenaged boys. Following the visits, Jamison's caseworker recommended removing the children immediately, but no such action was taken.[429]

Instead, one month after Jamison and TM entered foster care, DHS allowed them to be officially placed in the custody of the maternal grandmother, whose home the caseworkers had recently deemed unacceptable for the children.[430] On January 13, 1992, a caseworker acknowledged that Ms. D's home remained unsuitable and noted that "if the Grandmother's home doesn't improve by the end of this month, there is a possibility that the children will then be placed in Foster Care."[431] There are no records

Dr. Marva Lewis

showing any further investigation or improvement within this timeframe, and the children were not removed until March 1992.[432]

On March 10, DHS workers returned to the grandmother's house to find nothing changed. Though TM was now sleeping in Ms. D's bed with her, Jamison was sleeping in an uncushioned armchair.[433] The workers informed Ms. D that DHS intended to remove the children, to which the grandmother replied, "[Come] get 'em."[434]

On March 13, 1992, DHS removed Jamison and his sister from their grandmother's house and placed them in DHS custody. When the caseworkers arrived, no one was at home. DHS found Ms. D wandering around downtown, intoxicated. DHS located the children, who were filthy, with their mother, who was very drunk.[435]

Jamison's first custody case plan was established on March 18, 1992. It stated his permanency plan to be "return to parents."[436] His mother appears to have signed her first service agreement with DHS on March 31, 1992. In it, she agreed to regularly attend Alcoholics Anonymous meetings, visit her children monthly, and establish a suitable home for their return. DHS appears not to have adequately assessed Jamison's father's interest in Jamison or his suitability as a placement. The stated goal was to reunify her with her children.[437]

Jamison was first placed in the WG foster home, but within four days, he was moved to the home of Ms. JF, a friend of the family who was not a licensed foster caregiver.[438] This was Jamison's second placement in an unlicensed home.[439] On April 2, Jamison was officially placed in DHS custody by the Youth Court judge.[440] On April 10, TM informed DHS that she did not want to return to her mother because her mother would slap the children when she was drunk, and her boyfriend would throw them against the wall.[441]

On November 25, Jamison reported to a caseworker that he wanted to hurt himself because the other children at school did not like him. The caseworker instructed Ms. JF to take Jamison to see a mental health practitioner, but Jamison appears not to have received any mental health services in 1992 and there is no record that the caseworker followed up on her instruction. [442]

**B.  1993**

In January 1993, Ms. M. acknowledged to DHS that she was "well aware of what she needs to do in order to get [Jamison] back," but said she did not have housing, a job, or means to take care of Jamison. DHS also noted that she met her caseworker for the first time that month.[443] Ms. M. signed another service agreement in which she agreed to find housing, attend parenting classes, engage in rehabilitation for alcohol/drug use, and visit the children. The stated goal was reunification.[444]

On March 8, 1993, Jamison's foster mother called a caseworker because Jamison, then five years old, was acting out sexually and had talked about suicide. He also

Dr. Marva Lewis

indicated that before he was removed from his mother, he would watch her engage in sexual activity. Jamison's DHS caseworker documented the call and her subsequent call to Mid-South Hospital to set up an evaluation of Jamison, but these case notes do not mention any inquiry into whether Jamison might have experienced sexual abuse as a child.[445]

Jamison underwent a psychological assessment in late March, nearly four months after he had first expressed suicidal thoughts. He told the counselor that the devil talked to him in his sleep, but that he was not going to kill himself. The counselor appeared to conclude that Jamison was not actively suicidal, though she stated she was "very worried about [him]," and she recommended that they try out-patient treatment initially "to see if it works."[446]  In April 1993, Jamison was taken to see another mental health professional. On the trip home, he told his caseworker that he wanted to kill himself. His social worker called Ms. JF, who stated that she was concerned because Jamison talked a lot about suicide. [447]  Jamison was taken for further mental health assessments on April 20 and 27.[448]  He told the therapist that his mother had beat him with an extension cord, had "cussed [him] out all the time," and that he thought she "must not love [him] much."[449] There is no clear record that Jamison was provided with any mental health services following these assessments, other than a May 4 screening by a mental health counselor who observed Jamison in the classroom after a teacher mentioned that Jamison was acting up.[450]

During the spring and summer of 1993, Ms. M did not comply with her service agreement. She had not visited her children at all since signing the agreement, and had visited them only once since they were removed from their grandmother's house the previous spring.[451]  According to a Foster Care Review form that appears to be dated August 2, Jamison's permanency plan remained reunification with his mother.[452]

The same Foster Care Review form indicated that Jamison "hears voices" and had suicidal thoughts but that he had not yet been provided a psychological evaluation.[453]

In August, a therapist saw Jamison for what appeared to be a screening assessment and recommended that he undergo intensive testing and evaluation, and that he receive therapy to address his sexualized and defiant behavior. She stated her opinion that his treatment might take a very long time to accomplish in weekly counseling sessions and it might be more quickly accomplished in a short, intensive in-patient program.[454]  There is no record indicating that Jamison actually received the recommended evaluation and therapy that year.

Caseworker notes from January 5, 1994, by Jamison's caseworker acknowledge that DHS had no contact with Jamison in February 1993 and did not document any face-to-face contact with Jamison from April through November of 1993.[455]

100

Dr. Marva Lewis

## C. 1994

Jamison underwent psychological testing and evaluation on January 10, 1994.[456] The examiner diagnosed Jamison as suffering from a developmental reading disorder and recommended further testing regarding whether he had a learning disability in the area of reading.[457] There is no documentation of any follow-up.

In January, a "Family Contacts" chart recorded that Jamison's mother had not visited her children in over a year and a half, and a case plan update for her indicated that she had found housing with an indoor bath but no utilities and had not attended an Alcoholics Anonymous session for five months.[458] This case plan appears to be her new service agreement.[459] A Foster Care Review hearing held in January recommended that Jamison receive in-patient treatment to evaluate his emotional and psychological problems. [460]

On January 25, Jamison's nine-year-old sister TM brought a condom to school and disrupted her class. DHS, noting that Jamison's foster mother had also reported behavioral problems with him, recommended that both children be hospitalized at Parkwood, a psychiatric hospital.[461] The hospital's admission intake form noted that Jamison, aged seven, was getting into fights, acting out sexually, and threatening to burn down the house with him inside.[462] Both Jamison and TM were evaluated but only TM was admitted because Parkwood determined Jamison to be too young. [463] Jamison appears not have received any further therapeutic services at all until June of that year.

As of March 18, 1994, a full 24 months after the children were brought into care, Ms. M, the children's mother, had not complied with her case plan. However, reunification remained the permanency plan for Jamison.[464]

Throughout the late winter and spring of 1994, Jamison continued to exhibit behavioral problems.[465] In April, Jamison's teacher, who had a degree in psychology, told DHS workers that she believed Jamison's severe behavioral problems needed to be addressed therapeutically.[466]

That same month, Ms. JF informed a caseworker that Jamison had been misbehaving and needed counseling. Ms. JF asked why DHS had not contacted the child psychiatrist in Jackson whose number Ms. JF had provided in an effort to secure counseling services for him.[467] The next month, Ms. JF again told DHS about Jamison's behavior and asked when he would see a specialist.[468]

On May 3, a DHS caseworker noted a telephone call to a doctor about counseling for Jamison. The record does not indicate that DHS secured any actual therapeutic services for Jamison at this time, and his behavior worsened.[469] In June 1994, Ms. JF became frustrated with Jamison's untreated behavioral and psychological problems and went to the DHS offices with all of Jamison's belongings and stated that she could no longer care for him. There are no documented steps that DHS to took to stabilize the foster placement. DHS moved Jamison from the home where he had lived for over two

101

Dr. Marva Lewis

years and placed him in the RM foster home on June 10.[470] Although the records are unclear, Jamison was briefly treated in an inpatient psychiatric facility at this time.[471]

On July 6, 1994, a so-called "speed letter" was sent to Jamison's biological mother, Ms. M, asking for a progress report on the service agreement and telling her that she needed to visit her children.[472] There is no record that DHS had been meeting with Ms. M to assess her progress. DHS entered another service plan for Ms. M on July 15, which was identical to all earlier unfulfilled plans despite the fact that it stated it could not locate her to evaluate her progress.[473] A Foster Care Review report dated the same day that DHS renewed Ms. M's service agreement recognized that Ms. M had shown little, if any, progress and "strongly suggested" that the permanency goal be changed from reunification to the next permanent plan option within six months if there continued to be no progress.[474]

Throughout the summer of 1994, Jamison continued to exhibit behavioral problems. Mrs. RM ultimately requested Jamison be moved due to these problems.[475] A caseworker's notes from July and August 1994 indicate that DHS was trying to find a new placement for Jamison but did not indicate that Jamison was receiving any mental health services at the time[476] In August 1994, DHS noted that Jamison needed a therapeutic foster home because of his behavioral issues.[477] A therapeutic foster home request form noted that Jamison was not currently on medications because his previous foster home, presumably the JF foster home, refused to place him on any.[478] There is no indication in the record of whether Jamison had been prescribed medication or whether the foster parent's refusal to administer medication had been discussed with a health care professional. On August 11, Jamison moved from the RM foster home back to the JF foster placement, which was not a therapeutic foster home.[479]

A Social Summary for Jamison prepared by DHS and dated August 11, 1994, notes that "The Agency does not believe that neither [Jamison's mother] or [Jamison's grandmother] is capable of giving these children the care that they need."[480] As of July 28, Ms. M was not seeking alcohol counseling, and she told DHS that she was in an abusive relationship.[481] Yet, DHS maintained reunification as Jamison's permanency goal.[482]

At the end of August 1994, Jamison's mental health deteriorated to such an extent that he was hospitalized for a month.[483] Jamison was seven years old at the time of this psychiatric hospitalization.

DHS records show it requested a home evaluation regarding Jamison's father, Mr. H, who lived in Kansas. According to DHS records, the evaluation came back in September 1994 as "unfavorable" to Mr. H.[484]

At the time Jamison was hospitalized, his intake form indicated that he had only seen his mother once in the past year. Jamison told his doctor that he wanted to get an education and become a lawyer.[485] The hospital stated that Jamison "was noted as being 'brilliant', [he] should be encouraged & praised to continue his good work."[486] Jamison

Dr. Marva Lewis

was diagnosed with post-traumatic stress disorder, with a secondary diagnosis of ADHD. He was also diagnosed with a developmental reading disorder.[487] Jamison was prescribed Ritalin and Clonidine. [488]

On September 21, 1994, Jamison was released from the hospital and placed in the LB foster home, a therapeutic foster placement.[489] This home was not in the county of responsibility for Jamison and was a several-hour drive from his hometown.[490] He remained there continuously for about four and a half years.

At the end of 1994, DHS stated that in the three years Jamison had been in foster care, Ms. M. "has made no efforts towards reunification" and had not regularly visited her children. When the Foster Care Review Board expressed concern with the continued plan of reunification, the social worker's response was that she would visit with Ms. M and would try to find relatives that could be placement resources.[491] No note was made in this document about attempts to locate the father's family.

### D. 1995

As of mid-March, Jamison's mother told a caseworker that she was living with a friend, and that her only income was food stamps.[492] At this time, DHS entered into yet another service agreement with Ms. M. which reiterated the same conditions that she had failed to meet in the preceding three years: that she would secure housing, keep her utilities connected, visit her children, and go through drug/alcohol counseling.[493] Despite the acknowledgment months earlier by DHS that Ms. M was not capable of caring for her children, it again assigned the family a permanency goal of reunification.[494]

At a May 8, 1995 Foster Care Review conference, DHS said it would pursue a relative placement or TPR if Ms. M did not meet the terms of her service agreement by June 17, 1995. It was noted that Ms. M smelled like alcohol, and though she claimed to have received substance abuse counseling, she could not recall the name of her counselor or the dates she had been seen.[495]

In June 1995, Ms. M, who at this time weighed only 78 pounds, was hospitalized for exhaustion.[496] She reported that she sometimes got the "shakes," and that she drank four to six beers every other day. She said her longest period of sobriety had been for one month, and she had been in trouble with the law for public drunkenness.[497] She was diagnosed by a Certified Alcohol and Other Drugs of Addiction Counselor as meeting most of the DSM-III-R criteria for alcohol dependency.[498]

In June, which was the same month that DHS had stated it would move to terminate Ms. M's parental rights if she made no progress on her service agreement, DHS instead entered yet another service agreement that was identical to all of Ms. M's previous service agreements.[499]

A June 1995 therapeutic summary for Jamison stated that when he was given a letter written by his mother, he "became agitated, expressing his fear that he would have

103

Dr. Marva Lewis

to return to the home of his biological mother. He expressed the desire to stay with his present foster parents 'forever.' "[500]

On August 9, 1995, Catholic Charities, the private contract agency that was supervising Jamison's therapeutic foster home placement, recommended to DHS that Jamison's mother's parental rights be terminated and that it pursue adoptive placement in a therapeutically trained home for Jamison. Catholic Charities further recommended that if there were to be any contact between Jamison and his mother, it should be "gradual, consistent, and non-threatening as in letters for six months and then supervised visits at Catholic Charities to establish a parent-child relationship that has been severely damaged by mother's behavior/absence of consistent and appropriate nurture/structure in the home for the last several years."[501]

As of August 15, 1995, Ms. M had seen her children only twice in the past three years.[502] A September therapeutic summary for Jamison showed that he displayed hurt feelings because of his biological family's sporadic contact. [503]

On October 23, 1995, DHS, through a Foster Care Review Board dispositional hearing, changed Jamison's permanency goal from reunification to relative placement because Ms. M had not made progress on her numerous service agreements apart from attending Alcoholics Anonymous meetings several times. It recommended that the home of Ms. L, Jamison's great-aunt, be evaluated for his placement.[504] During this time, Jamison discussed in therapy his anger against his mother for physically abusing him by whipping him with an extension cord.[505] His foster parents reported that he had shredded a letter he received from his mother.[506]

DHS assisted Ms. M in being admitted to an in-patient rehabilitation center on December 18, 1995. A DHS case worker requested that the center not release Ms. M until her upcoming Youth Court date, in part because otherwise she might return to her "old drinking environments." The center refused this DHS request to keep Ms. M at the center beyond the time necessary for her to complete her program.[507]

Though Ms. M wrote Jamison many letters during this time, he wrote back to her only once after being strongly encouraged by his foster mother.[508] In December 1995, Jamison's DHS caseworker wrote to Jamison encouraging him to write to his mother.[509] Also that month, Medicaid authorized continued therapy for Jamison to address his verbal and physical aggression, impulsivity, behavioral difficulties, and abandonment issues.[510]

**E. 1996**

Around January 1996, DHS performed a home study of Jamison's great aunt Ms. L, but it determined she was unsuitable.[511] DHS also entered another case plan for Ms. M that called on her to secure and maintain adequate housing; visit, call, and write to her children; and attend Alcoholics Anonymous and parenting classes.[512]

104

Dr. Marva Lewis

In February, Ms. M completed her alcohol rehabilitation program. The rehabilitation center discharge summary and initial treatment plan for Ms. M noted that she completed all program requirements with "moderate progress" but was in denial about the seriousness of her drinking. It also noted that she "lacks motivation to change her lifestyle or give up old friends that will enable her to continue her self-defeating lifestyle," and that the center believed she would not apply the insight she had gained about her addiction during the treatment to her life.[513]

Following her completion of the program, DHS requested that Jamison's permanency plan be changed back to reunification with his mother on the grounds that, though she had gotten off to a slow start, she had made "great progress" since the last court date.[514]

On February 27, 1996, the Youth Court changed Jamison's permanency plan for the next six months from relative placement back to reunification with his mother, with the understanding that if the plan failed, Jamison's permanency plan would revert to relative placement.[515]

Psychiatric reports for Jamison during this time observed that he continued to resist writing his mother, and said her letters brought back difficult memories, especially about being abused.[516] Jamison's foster mother confirmed that he became more agitated upon receiving letters from his mother.[517]

On May 30, 1996, a DHS worker returned to Ms. M letters she had written to her children in which she stated she had begun drinking again, with the warning that "you shouldn't write that to them because [Catholic Charities] counselors read these letters also as to screen them....You can talk to us about if you're drinking again (Hope not) but not to them okay." [518]

A mental health assessment of Ms. M from July 10, 1996, noted that she had drunk a six-pack of beer the night before, that her boyfriend at the time drank heavily and abused her, and that she had had suicidal thoughts after he beat her. It further recorded that she had attempted suicide five times with pills and had tried to shoot herself. It also noted that her mother, Ms. D, had physically abused her and was an alcoholic.[519]

By the summer of 1996, Ms. M had ceased complying with her service agreement. In addition to her admission to DHS that she had been drinking, she was failing to call or write letters to Jamison. Catholic Charities wrote a letter to DHS warning that Ms. M's behavior was damaging to Jamison and requested a team meeting before Ms. M was allowed an in-person visit with the children.[520]

In August 1996, DHS notes show that it entered into another service agreement with Ms. M.[521] It continued to support keeping the permanency goal as reunification.[522] The records do not show that the February 27 court order for reassessment of Jamison's case plan was performed, or what grounds DHS used to officially justify maintaining the plan of reunification.

105

Dr. Marva Lewis

An August 1996 therapeutic report for Jamison stated he was anxious about his family of origin and called his mother a "stranger."[523] In September 1996, Jamison began demonstrating increased anxiety and concern over the prospect of having to leave the foster family he had lived with for two years. The foster mother reported that he removed a photograph of his mother from his dresser mirror and became angry when it was put back.[524]  He demonstrated confusion and ambivalence about visits with his mother. Catholic Charities noted that on October 24, 1996, Jamison expressed shock, sadness, anger, and loneliness related to a cancelled visit by his mother.[525]

### F. 1997

Jamison spent time with Ms. M during a home visit over the holidays. Upon his return in January, Jamison displayed an increase in disruptive behavior.[526]   It was also discovered that month that his school had not administered his noon dosage of Ritalin for four weeks.[527]

DHS entered another case plan with Ms. M in January that repeated that she needed to secure and maintain adequate housing and regularly contact her children, and continue alcohol/drug counseling.[528]

In the spring of 1997, DHS notes show that Ms. M was arrested after she apparently stabbed her boyfriend in self-defense. All charges were later dropped. She remained unemployed and was inconsistent in her contact with Jamison.[529]

Jamison told Catholic Charities that he had asked his foster parents to adopt him, and that he was anxious and had safety concerns about returning to live with his mother.[530]  At this time, DHS obtained Youth Court approval for unsupervised weekend and holiday visits between Jamison and his mother.[531]  DHS records show that TM's foster mother expressed concern about the upcoming unsupervised visits, stated that TM required careful supervision and that Ms. M would have to watch TM closely due to her adolescent sexual curiosity.[532]

During a Foster Care Review hearing on June 5, 1997, Board members renewed their concern about whether Ms. M could ever successfully parent Jamison and TM.[533] The Board cited the "slow and minimum progress being made by the mother" and stated that "no child should have to endure 5.3 years of foster care." The Board "respectfully request[ed]" that the Court reconsider DHS's recommendation of reunification so that the children could have permanency.[534]  That same month, around June 12, 1997, Jamison's current foster parents, Mr. and Mrs. B, expressed interest in keeping Jamison for the long term.[535]

On August 7, 1997, a worker with DHS's Permanency Planning Unit spoke to Jamison's caseworker about freeing him for adoption and about the Bs' desire to adopt him. Jamison's caseworker responded that his permanency goal would remain reunification because his mother was currently attending alcohol and drug sessions and

106

Dr. Marva Lewis

parenting courses. The caseworker further stated it would be impossible for the Bs to adopt Jamison because it appeared that reunification would be accomplished.[536] There is no indication that the worker divulged to the Permanency Unit Jamison's mother's spotty contact with him or the fact that she had experienced a relapse.

A November 1997 Foster Care Review Conference Report stated that 5.8 years in care "appears to be more than sufficient time for Mother to conclude reunification efforts, and too much time for [Jamison] and [TM] to spend in foster care."[537]

### G. 1998-1999

In January 1998, Jamison's 13-year old sister TM reported to DHS that she was raped by a 30-year-old friend of her mother's during an unsupervised Christmas visit at her mother's home. A DHS caseworker later characterized the incident as a consensual sexual encounter, despite TM's allegation. Apparently responding to Catholic Charities' concerns about the unsupervised nature of the visits, the caseworker also wrote:

> I would like to know who told you that DHS would be willing to allow these children to have unsupervised visits. This is not true. These children are a ward of the State of Mississippi. They MUST be supervised. They have NEVER had an unsupervised visit since I have been their supervisor. They will not have an unsupervised visit until ordered by the court.[538]

At this time, Catholic Charities warned DHS that Jamison would need a lot of supervision and support if he were reunified with his mother, and that he experienced problems after visits with her. DHS scheduled a trial reunification with the mother for part of the summer of 1998.[539] If everything went well during the summer, DHS intended to return Jamison and his sister permanently to their mother.[540] As the date for trial reunification approached, Jamison exhibited anxiety about visitation and placement issues.[541] From late June to mid-July, Jamison and TM were sent on a home visit with their mother in preparation for reunification later that summer.[542] There is no documentation of any consistent DHS supervision of the mother's home or the children during this time.

Catholic Charities notified DHS in July 1998 that Jamison had returned from the extended home visit with his mother with eight days' worth of medication not taken. The DHS caseworker said that she would remind Ms. M about Jamison's medications on future visits.[543] Catholic Charities reported that upon his return, he was lethargic, had a flat affect, was sloppily groomed, and had not eaten. He was immediately fed and given his medication and once he reached his foster mother's home, he slept for about 2 days.[544]

Catholic Charities noted in late July 1998 that Jamison's continuing needs included: individual and family therapy, psychiatric follow-up, advocacy with his school to assist with ADHD issues, and follow-up with therapy and a psychiatrist.[545] August 1998 notes by Catholic Charities observed that Jamison experienced an increase in impulsivity/irritability upon returning from visits with his mother.[546]

107

Dr. Marva Lewis

On August 4, 1998, while DHS was preparing to formally reunify Jamison with his mother, a three-year-old child who had been living with a roommate of Ms. M was beaten to death in their home.[547]   Newspapers reported that the toddler also displayed evidence of ongoing abuse in the home, such as what appeared to be cigarette burns, evidence of beatings with a belt, and severe trauma to his lips.[548]  DHS records indicate that Jamison witnessed this severe abuse against the young child during his summer visit to his mother's home.  CC-00046.  It was only after this child's homicide that DHS determined that Ms. M could not adequately care for her children and sought to change Jamison's permanency plan from reunification.[549]

In September 1998, Jamison's mental health continued to decline.  At one point, he attempted to overdose on his medications and stated that he was "gonna wake up dead."[550]  Following his increased unsafe behavior, including suicidal ideation, he was admitted to Hope Haven Adolescent Crisis Center where he remained for two weeks, and was prescribed a third drug to target "loose thought associations and impulse control." His behavior was thought to be most closely related to "reactive attachment issues."[551]

On October 27, 1998, the Youth Court ordered that Jamison's permanent plan be changed to "formalized foster care."[552]

A memorandum from Catholic Charities in late November 1998, stated that over the past eleven months, Jamison's behavior had become increasingly unpredictable. During that time, Jamison had apparently been placed for short periods in various respite centers, including Rainbow Respite, Hope Haven, and Our House Shelter.[553]

In the beginning of 1999, Jamison's mental health deteriorated further.  His behavioral problems included anger outbursts, verbal aggression, threats of harm toward others, physical altercations with peers, oppositional behavior toward authority figures, and academically performing below abilities.[554]  Jamison underwent a psychological evaluation on February 19, 1999, after which he was diagnosed with ADHD, PTSD, and Oppositional Defiant Disorder.  The doctor recommended that Jamison be provided with long-term residential treatment focused on anger management, ADHD, academic concerns, coping strategies, and his defiance, with the plan to return to his present foster placement.[555]

Rather than a residential treatment facility, in February 1999, DHS placed Jamison in a shelter in Jackson, Mississippi for about one month.[556]

A February 16, 1999 Foster Care Review Board Report noted that the Board again disagreed with the DHS recommendation that Jamison's permanency goal be long-term formalized foster care.  The Board instead recommended that Jamison be freed for adoption because he had been in custody for nearly seven years.  It stated that unless a judicial review determined a TPR was not in the best interest of the children, DHS should have begun the process of terminating Ms. M's parental rights.[557]

108

Dr. Marva Lewis

Jamison was placed in Millcreek Hospital, his second psychiatric hospitalization, in late March 1999.[558] After approximately seven months, Jamison was discharged from the institution on October 15, 1999 with a diagnosis of depressive disorder, oppositional defiant disorder, ADHD, and adjustment disorder, and was prescribed Adderall and Zyprexa.[559] The discharge summary recorded that his major life crises included trauma through abuse and witnessing repeated abuse, as well as "repeated losses of support."[560] Millcreek recommended that Jamison be placed in a therapeutic foster home, return to regularly seeing his counselor, and attend a self-contained classroom for the emotionally disabled.[561]

DHS placed Jamison in a crisis center in ███████, Mississippi from October 15 to November 2, 1999 because a therapeutic foster home was not yet available. At this point, he began to ask questions about his permanency plan, and stated that he was ready to move toward adoption because he knew it was in his best interest.[562]

DHS moved Jamison from the shelter to the H foster home, a therapeutic foster home, on November 2, 1999, where he stayed for one year.[563] He was placed at the H foster home in a neighboring county because of the lack of appropriate foster homes in his home county.[564] In mid-November 1999, Jamison discussed with his therapist his refusal to accept that the placement with the B foster home was over and that there was no longer a chance that he would be adopted by that foster family. There is no indication of any efforts made by DHS at this time to devise a service and support plan that could have allowed Jamison to return to the B's care, despite Jamison's clear emotional attachment to the family.[565]

**H. 2000-2001**

A DHS Custody Case Plan dated March 1, 2000, noted that Jamison's treatment was focused on ADHD and PTSD, that he was being observed by a social worker / therapist monthly, and that he was taking Zyprexa and Adderall. DHS's permanency plan was listed as adoption.[566] A Catholic Charities report observed that Jamison had been extremely unstable lately, and his foster father reported that Jamison had become verbally assaultive.[567]

A mental health treatment plan review dated May 11, 2000, outlined Jamison's four identified issues/problems as: (1) unresolved grief issues stemming from history of abuse and repeated losses, (2) oppositional behavior and poor impulse control, (3) school difficulties, and (4) permanency issues.[568]

In May 2000, 8 years after DHS had placed Jamison in foster care, his mother's parental rights were terminated. TPR was ordered on the grounds that she was responsible for negligent incidents concerning her children, she was unable to care for them due to her alcohol addiction, her relationships with them were substantially eroded, and she had failed to implement a plan of return. The parental rights of Jamison's father, Mr. H, were terminated due to abandonment.[569]

109

Dr. Marva Lewis

In June 2000, without any documented explanation, Jamison ran out of his medications.[570] His doctor recommended that he continue his current medication regime.[571]

On June 28, 2000, Catholic Charities contacted DHS to request a placement move because Jamison was acting out, and his current foster father Mr. H was not interested in adopting him.[572] DHS determined at this point that Jamison required a higher level of care than a foster home,[573] but Jamison was not moved out of Mr. H's home until November 2000. Upon removal from the H foster home, Jamison was placed in the Hope Haven crisis center. [574]

Jamison reported in a therapy session in November 2000 that he felt hopeless about finding a family and described himself as homeless. He felt angry at himself and others.[575] A psychological evaluation dated November 13, 2000 recommended his placement in a long-term psychiatric residential facility, a psychiatric consultation, perhaps individual or group counseling, and additional academic assistance at school.[576] Around mid-November 2000, a serious incident report was filed with the Department of Health because Jamison did not receive at least ten of his medication doses. Packets had not been sent to his school as instructed and several times the crisis center had failed to administer them. Almost twenty reports from this time were blank regarding whether and how much medication Jamison received. [577]

DHS maintained Jamison at Hope Haven center until December. DHS then moved Jamison from the center to a residential treatment facility called Youth Villages in Memphis, Tennessee, where he remained for 4 months. NP-04549. The center observed that Jamison is "frustrated about being in this placement and realizes that he really does not have any other place to go."[578] Jamison's mother passed away on March 30, 2001. Jamison was 14 years old. Although Jamison remained at Youth Villages, he attended the funeral.[579] At this time, Jamison was currently taking Adderall, Zyprexa, and "Trampdone."[580]

In March, DHS records indicate it collected information about Jamison to place in an "Adoption Book."[581]  DHS also appears to have included Jamison in a television broadcast recruiting adoptive parents for him.[582]

In April 2001, Jamison was discharged from Youth Villages and returned to the B foster home,[583] where he remained for the next two years. For six months that year, the Youth Court ordered that DHS cease efforts to find adoptive parents, other than the Bs.[584]

On August 20, 2001, Catholic Charities noted that Jamison appeared anxious about his status as a "ward of the state," and expressed feelings of sadness, frustration, and a sense of powerlessness over his future.[585]

A Catholic Charities monthly summary for Jamison on December 20, 2001, noted all his medications except Adderall had been discontinued.[586]

110

Dr. Marva Lewis

### I. 2002-2003

A Children Health Services treatment plan noted in April 30, 2002, that Jamison continued to possess problems with unresolved grief stemming from a history of abuse and repeated losses, oppositional behavior, and poor impulse control.[587]     On June 3, 2002, Jamison's psychiatrist stated that she did not feel medication could help Jamison's behavior.[588]   In July 2002, Catholic Charities further observed that Jamison admitted to worrying about his future and thinking a lot about where he would go if he were unable to remain in his current placement. He stated that his worrying kept him awake at night, and that he had stayed awake all night several times over the summer. He also admitted he had not been taking his prescription of Adderall regularly for several months.[589]

A September 2002 services questionnaire documented that Jamison had received psychiatry services within the past 12 months but it erroneously stated that he had never attempted suicide.[590]

Catholic Charities noted in October 2002 that the B foster home ultimately decided not to adopt Jamison.[591]  By November 13, 2002, Jamison's permanency goal had been changed from adoption to emancipation from the foster care system.[592]

From March 10 to March 24, 2003, Jamison was moved from the B foster home to a shelter in Jackson.[593]   Two weeks later, Jamison was moved again, to the M therapeutic foster home. He appeared anxious and expressed some reservations about moving to another placement.[594]    This placement quickly disrupted when the foster mother reported that Jamison appeared unhappy and refused to follow set guidelines.[595] Catholic Charities observed that it appeared Jamison needed a higher level of care.[596]

On April 15, Jamison was returned to a shelter while awaiting foster home placement and stayed there until June 2, 2003.[597] The shelter recommended a permanency plan for Jamison of placement within a therapeutic foster care program.[598]

A psychological evaluation done in April 2003 diagnosed Jamison as having adjustment disorder with mixed disturbance of emotions and conduct, and "family conflict, multiple foster placements." It recommended family therapy to focus on establishing familial boundaries. The evaluation incorrectly stated, however, that Jamison had never received psychiatric treatment and had suffered no major illnesses or accidents while growing up.[599]

On June 2, DHS placed Jamison at the Sunnybrook Children's Home, an institution in ▮▮▮▮, for 11 days.[600] He then was moved to a Sunnybrook foster home for less than a week.[601] Next, DHS moved Jamison to an emergency shelter for approximately six weeks.[602]

A DHS Permanency Plan for Jamison in August 2003 maintained emancipation as his permanency goal and noted his goals of graduating from high school and attending college. Though it listed him as participating in therapeutic foster care, it did not identify

Dr. Marva Lewis

any specific therapeutic services apart from "general support, financial support, and permanency."[603]  A Hope Haven/Therapeutic Foster Care checklist noted, though, that Jamison fell into the eligibility category of "Child/Adolescent with Serious Emotional Disturbance" (SED), that he was impaired in the areas of instrumental living skills and social functioning, and that the severity and longevity of his problems required more frequent services than for children who did not have SED.[604]

On August 1, Jamison was discharged from the shelter, which noted that though it had prescribed medication to Jamison, DHS subsequently informed the shelter that he had not taken this medication.[605]  Jamison was moved to an emergency foster home, where he remained for four days.[606]  He was then placed with his sister's foster mother, Ms. CL, who ran a therapeutic foster home with Catholic Charities and was his sister TM's adoptive mother.[607]  A therapeutic foster care assessment and service plan dated August 14, 2003, noted that Jamison was being followed by "UMC Child/Adolescent Psychiatry," but also reported that he said he had not taken any of his prescribed medication since he left therapeutic foster care.  It stated that he requires case management services to ensure that he attends psychiatric appointments and complies with medications.[608]

In a Youth Court Hearing and Review Summary for a six-month review conference on September 25, 2003, a DHS caseworker listed that Independent Living Services were the only services the agency was providing Jamison, and he had no other needs at that point.[609]  No therapeutic services were listed.

At the end of December, Jamison was moved from the therapeutic placement with Ms. Lewis to a crisis center.[610]  Jamison was told that there were no therapeutic foster care homes available for him at the time, and DHS was seeking an alternative option.[611]

### J. 2004-2006

In January 2004, DHS requested that the Youth Court permit Jamison to be placed with his biological father, Mr. H, in Kansas, with legal custody to remain with Mississippi "pending ICPC [Interstate Compact on the Placement of Children] approval by the State of Kansas."[612]  According to Jamison's therapist at Catholic Charities, it appeared that DHS was seeking to discharge or emancipate Jamison from the foster care system, which could be done when he turned 17.5 years old, and this placement was a step towards that goal.[613]  DHS had submitted to the Kansas child welfare agency a home study request in the summer of 2003 to Kansas for his father, which Kansas rejected due to the fact that his father's parental rights had been terminated in 2000.  DHS submitted another adoptive home study request in September 2003, as well as the ICPC application to place Jamison with him in Kansas.  Before the Kansas child welfare agency responded to the ICPC application, DHS sent Jamison to Kansas.  Jamison was sent without the required home study and approval by Kansas even though DHS had in its possession numerous records that showed that Mr. H had multiple felony criminal convictions, had not been able to pay child support for Jamison because he had been incarcerated for years, and had been previously evaluated for a placement and been denied

112

Dr. Marva Lewis

It appears from the case record that DHS sent Jamison to his father without any preparation, plan, or support services in place.  There is no record that DHS followed Catholic Charities' assessment that Jamison needed psychiatric follow-up services, continuing individual therapy, family intervention and assessment, and close supervision during the attempted reunification with his father.[614]   DHS documents from the time he was placed with his father stated that his emotional/mental health was "normal" and he needed no care.[615]  A Social History from approximately January 2004 noted that the reunion with his father was not smooth.[616]

On January 9, 2004, DHS received a phone call from a Kansas child welfare official who seemed "very upset."  She stated that she could not approve of Jamison's placement in Kansas because it violated the ICPC contract.  According to the DHS case note, the Kansas caseworker "stated that the child was in Kansas illegally."[617]   There is no documentation that DHS notified the Mississippi Youth Court of Kansas's objections.  The court signed the requested placement order on January 12, 2004.[618]

Kansas denied the ICPC application, finding Jamison's placement with this father unsuitable.[619]  After the ICPC placement denial, a Social Summary for Jamison dated February 17, 2004, stated only that DHS was seeking to remove Jamison from Kansas because he was misbehaving, but made no mention that the ICPC was denied.[620]

In February 2004, Jamison returned to Mississippi.  He was placed at the Oakley Transitional Living Center, a halfway house for delinquent youth transitioning out of the Oakley Training School, even though he had never been adjudicated delinquent.[621]  The center imposed restrictive rules on Jamison's conduct while he lived there, including prohibitions on having a cellphone, dating, having a car, and having "adult music."[622]  Jamison's therapist noted that he "does not – in my opinion – require this level of supervision."[623]

Despite Jamison's expressed desire to graduate from high school and attend a four-year college, DHS's placement precluded him from attending regular high school because all youth placed at Oakley were required to attend G.E.D. courses and were not allowed to attend regular high school.  The Youth Court ordered that Jamison pursue a G.E.D., as opposed to a high school diploma, and DHS repeatedly urged Jamison to take the G.E.D. as soon as possible.[624]  Jamison told DHS he wanted a high school diploma, and that he feared some colleges would not let him enroll with a G.E.D.[625]   When informed that "it looks bad if [Jamison] is smart and not in school," DHS justified its actions in part by stating that it was difficult for it to find placements for Jamison at 17 and that they were looking to his becoming independent.[626]   Because Jamison was prohibited from attending high school while he was living at Oakley, he failed the 11th grade due to his many absences from school.[627]

While Jamison resided in this placement, he was observed to be depressed, and expressed feeling victimized, punished, and "more hopeless than ever."[628]  He expressed repeatedly he did not wish to remain at TLC.[629]

113

Dr. Marva Lewis

After Jamison was placed at Oakley, Ms. JF, a former foster mother with whom Jamison had stayed as a young child, contacted DHS to see if he might be placed with her instead. Catholic Charities supported this request.[630] DHS denied her request on the grounds that her home was not a therapeutic foster home, and for unspecified past behavioral reasons. It admitted that Oakley was not a therapeutic placement, but said it "is supervised by strong males."[631] In addition, the records appear to indicate a therapeutic foster home run by Ms. DR was also willing to take Jamison,[632] but DHS did not pursue this option either.

In June 2004, DHS approved Jamison's move to Rowland Home for Boys, a group home in _____, Mississippi. It placed him too late, however, to permit him to be enrolled in summer school to make up for his high school absences while at Oakley.[633] Before moving Jamison to the group home, he was first placed on June 23, 2004 in the unlicensed and unapproved home of his maternal grandmother, Ms. D, the same home from which DHS had removed Jamison years earlier for neglect and who had been revealed as having been abusive to Jamison's mother, Ms. M.[634] DHS did not identify this placement move in Jamison's placement history as being with Ms. D, but simply called the placement "Own Home, Own Home."[635]

On July 1, Jamison was moved from his grandmother's home and placed at the Rowland Home, where he remains.[636] This group home was at least the 28th placement for Jamison in his more than 13 years in DHS custody. He remains focused on graduating from high school.[637]

## II. CASEWORK ANALYSIS

Over the 14 years that Jamison has been in the Mississippi foster care system, there have been an astounding number of clear failures of casework practice. This analysis will highlight the most harmful practices to which DHS subjected Jamison.

### A. DHS PLACED JAMISON IN FOSTER CARE SETTINGS THAT POSED CLEAR AND IMMEDIATE RISKS TO HIS SAFETY

When DHS first removed Jamison from his mother's custody in 1991, it placed him with his maternal grandmother, Ms. D, without performing any evaluation or

114

Dr. Marva Lewis

background check of the home. DHS workers quickly observed and documented that Ms. D could not appropriately supervise five-year-old Jamison and that her home was unsanitary, unsafe, and unsuitable for him. Despite this recognition that Ms. D's home posed the same serious risks to Jamison as had his mother's home, DHS permitted Jamison to stay with Ms. D for over three months before finally removing him. For no clear reason, DHS later returned Jamison to the same unsafe home for a week without any documented indication that the risks necessitating his earlier removal had been addressed.

DHS also returned Jamison to his mother for overnight unsupervised visits when it was clear she still could not provide for his safety. DHS knew from its previous records that Jamison's mother had a history of neglecting him, that Jamison had reported she had whipped him with an extension cord, and that she had allowed him to be beaten by her boyfriend at the time. When DHS sought these unsupervised visits with Ms. M, it had no indication that she could now safely parent Jamison. The inability of Jamison's caseworker to assess properly the risks posed to him in the unsupervised care of his mother was most clearly demonstrated by her response when Jamison's 13-year-old sister reported being raped by a 30-year-old friend of the mother while on a home visit. I am outraged that Jamison's caseworker shrugged off the sexual encounter as nothing more than "consensual" because his sister admitted that she had had an earlier sexual experience and did not report having bled during the episode. DHS maintained Jamison's visitation plan with his mother, even when he returned from her home unfed, ungroomed, sleep-deprived, and not having taken his medications. During these visits, Jamison observed the ongoing and severe abuse—reportedly resulting in cigarette burns, belt

115

Dr. Marva Lewis

marks, and severe trauma to the lips—of a three-year-old toddler who lived with Ms. M

and who was eventually murdered. Evidence from recent research suggests that children

who witness such violent events may develop emotional disturbance, including

symptoms of post-traumatic stress disorder.[638]

In addition to the unsafe homes of his mother and grandmother, DHS placed

Jamison in Kansas with his father, whose parental rights had been terminated years

before. At the time DHS shipped Jamison to this out-of-state home, it did not have the

results of any home evaluation study, and it had not performed the requisite background

and criminal checks to show his father's home was safe for Jamison. A Kansas child

welfare worker had even called DHS to inform it that the placement was illegal because it

violated the Interstate Compact on the Placement of Children (ICPC) guidelines

governing the placement of children across state lines. DHS nonetheless deposited

Jamison with his father with no preparation or support for the family and no

arrangements with the local child welfare agency to provide courtesy supervision. This

doomed placement, which was so clearly in defiance of DHS policy and standard case

practice, seriously jeopardized Jamison's safety. This was the third environment in

which DHS placed Jamison that left him as vulnerable, if not more so, than he had been

prior to being placed in DHS custody.


## B. DHS FAILED TO PROVIDE STABLE PLACEMENTS, INFLICTING PSYCHOLOGICAL HARM ON JAMISON

DHS has placed Jamison in at least 28 settings over the course of his now over

fourteen years in foster care. Jamison's placements have varied in length from days to

four years, and have included emergency shelters, group homes, crisis centers, foster

116

Dr. Marva Lewis

homes, therapeutic foster homes, and psychiatric institutions. This extraordinarily high number of placements has likely caused psychological damage to Jamison in the form of feelings of instability, insecurity, and a lack of attachment to any caregivers.

### C. DHS FAILED TO MEET JAMISON'S MENTAL HEALTH NEEDS

DHS harmed Jamison by ignoring and mishandling his mental health needs. Throughout Jamison's 28 placements, DHS either denied Jamison needed mental health care, or provided care that was erratic and inconsistent.

#### 1. DHS Failed to Provide Jamison with Psychiatric Services

From the very outset, DHS disregarded Jamison's mental health needs. His case record does not indicate that DHS arranged for an initial psychological screening, as it should have, when he was first removed from his mother's home or even when he reported to a case worker in November 1992, at around age six, that he wanted to hurt himself. While he was finally provided psychological assessments in 1993, the counselors' recommendations for therapeutic testing and evaluation do not appear to have been followed by DHS in a timely fashion. For instance, according to the case record, he was not given a full psychological evaluation until January 1994, almost five months after a therapist recommended he be provided such treatment. DHS appears to have failed to provide Jamison with ongoing out-patient therapy over the next six months despite the repeated warnings by Jamison's foster mother at the time that counseling was necessary.

Starting in late 1994, Jamison fell into the category of youth who evidenced serious mental health concerns because he was diagnosed with a series of conditions

117

Dr. Marva Lewis

including PTSD, ADHD, developmental reading disorder, depressive disorder,

oppositional defiant disorder, and adjustment disorder. DHS's approach to these serious

mental health problems was erratic. Although Jamison appears to have been receiving

regular counseling in 2003, for example, DHS abruptly ended Jamison's mental health

treatment without medical consultation when it sent him to live with his father in Kansas.

DHS's inconsistent provision of treatment harmed Jamison because he was denied

mental health services appropriately calibrated to his serious needs. In addition, DHS's

failure to provide Jamison his needed treatment directly resulted in the disruption of at

least one of his placements. Jamison's first foster mother, JF, became so frustrated after

months of DHS's failure to secure needed psychiatric services for Jamison that she went

to the DHS offices with all of Jamison's belongings and told the agency that she could no

longer care for him. No records show that DHS attempted to stabilize the placement,

which had lasted over two years, by providing the mental health services that Jamison

needed.

2. DHS Failed to Monitor and Supervise Jamison's Mental Health Care

During his tenure in DHS custody, Jamison has been prescribed strong

psychotropic medications. Jamison's many, many moves and frequency of change in

caregivers made the need for consistent and coordinated monitoring of his treatment and

medications a critical casework responsibility, one which DHS failed to undertake. On

numerous occasions, DHS did not ensure that Jamison was administered his medications.

Around mid-November 2000, a serious incident report was filed with the Department of

Mental Health because Jamison was not being provided his medication at school or at the

shelter where DHS had placed him. Documents that tracked his drug treatment were

118

Dr. Marva Lewis

blank on almost twenty occasions regarding whether and how much medication he had received. In August 2003, after Jamison told DHS he had not been taking his prescribed medications for at least two months, his case plan stated he required case management services to ensure his compliance with medication, but no DHS records show he was provided these services. Additional records from that month show that DHS had been aware that Jamison was not following his medication regimen.

DHS's failure to properly administer his strong psychotropic medications not only disrupted and delayed his much-needed treatment, but also placed him at risk of withdrawals or overdoses.

## D. DHS ENGAGED IN HARMFUL PERMANENCY PLANNING FOR JAMISON

DHS continued to pursue the goal of reunification for Jamison and his mother years after it proved harmful to him. Once reunification failed, DHS developed no other viable permanency plan.

### 1. DHS Relentlessly Pursued a Plan of Reunification for Years, even after it Documented the Psychological Harm that Plan was Causing Jamison

DHS pursued a plan of reunification with Jamison's mother from the time he was removed from her home in 1991 until late 1998. It was not until a small child was murdered in her home that DHS determined that reunification was no longer an appropriate plan. Remarkably, Jamison's seven-year reunification odyssey was not the result of mere inattention on the part of DHS. DHS actively took steps to protect the mother's parental rights even when it was clear that she could not safely parent Jamison, and even though DHS knew the plan was causing psychological harm to Jamison.

119

Dr. Marva Lewis

**a. DHS failed to engage in a proper and reasonable reunification plan by not changing the goal once it was clear Jamison's mother was not rehabilitating**

In the first four years that Jamison was in DHS care, Ms. M entirely failed to comply with her service agreement. Although under a continuing obligation to assess the viability of Jamison's permanency goal, DHS never once reevaluated that goal during this period. Instead, contrary to both policy and proper case practice, DHS permitted her to sign virtually identical service agreements year after year without any documentation of "extraordinary and compelling reasons" for extending the time period for compliance and in the absence of any sustained progress.

Although Ms. M attempted rehabilitation in 1995, by the summer of 1996, she had stopped complying with her service agreement by failing to contact Jamison and by admitting to a DHS worker that she had started drinking again. DHS still entered into another service agreement with Ms. M and maintained Jamison's goal of reunification for an additional two years, until a young child living in Ms. M's home was murdered.

DHS tenaciously maintained Jamison's goal of reunification in defiance of repeated recommendations by the agency charged with overseeing DHS case practice and the one charged with direct supervision of Jamison. In June 1997, the Foster Care Review Board cited the minimal progress made by Ms. M and stated that "no child should have to endure 5.3 years of foster care." In November 1997, it declared 5.8 years in care "appears to be more than sufficient time for Mother to conclude reunification efforts, and too much time for [Jamison] . . . to spend in foster care." Catholic Charities, the private agency with which DHS contracted to oversee Jamison's therapeutic foster home placement from 1994 to 1999, repeatedly echoed the Board's concerns. Because Catholic Charities had worked closely with Jamison for such a long period of time, it also

120

Dr. Marva Lewis

was uniquely situated to provide an informed view on his best interests. Reasonable case practice dictated that DHS consider the unanimous opinions of the Board and Catholic Charities, yet there is no indication that these recommendations triggered any reassessments by DHS of Jamison's permanency goal.

### b. DHS actively colluded with Jamison's substance-abusing mother in complete disregard for Jamison's well-being

DHS took unusually active steps to assist Jamison's mother toward a goal of reunification, even when it was clear to all of the other entities familiar with Jamison's case that she could not safely parent him. It appeared that DHS was working harder to convince the court of the mother's progress than even she was. After Ms. M had failed to comply with her service agreement for over three years, DHS assisted her in being admitted into a rehabilitation center. DHS notes show that a case worker actually requested that the center not release Ms. M until an upcoming Youth Court date in part because she might return to her "old drinking environments," which suggests that the agency sought to shield the Court from learning that Jamison's mother was unable to remain sober on her own.

Jamison's mother later wrote letters to him at his placement with Catholic Charities in which she confessed that she had relapsed. A DHS worker returned these letters to her, telling her in what appears to be a conspiratorial manner that "you shouldn't write that to them because [Catholic Charities] counselors read these letters also as to screen them." The DHS worker's action demonstrates the extent to which she was willing to protect Ms. M's parental rights, even though the worker knew or should have known by then that maintaining Jamison's goal of reunification despite Ms. M's inability to remain sober was entirely unreasonable.

121

Dr. Marva Lewis

**c. Most egregiously, DHS knew the reunification plan was causing psychological harm to Jamison**

DHS maintained the plan of reunification between Jamison and his mother, even as it was aware that Jamison at times was agitated and scared by the prospect of being returned to her. He called his mother a "stranger" and, on one occasion, he removed a photograph of her from his dresser mirror and became angry when it was put back. In therapy, he revealed that he was concerned about his safety if he were to live with his mother, and when Ms. M wrote to him, DHS notes describe Jamison as "agitated, expressing his fear that he would have to return to the home of his biological mother. He expressed the desire to stay with his present foster parents 'forever'." DHS also observed him as resisting writing to his mother and saying her letters brought back difficult memories. Further, Catholic Charities reported to DHS that Jamison experienced psychological problems after he visited with his mother, and after Ms. M suffered a relapse, it flatly warned DHS that Ms. M's behavior was damaging to Jamison.

Although both DHS policy and good case practice require that the touchstone for all permanency planning be the best interest of the child, DHS marched forward with its plan of reunification, in flagrant disregard of Jamison's well-documented anxiety and fear regarding contact with his mother.

2. DHS Possessed no Other Viable Alternate Permanency Plan to Reunification

During the seven-year period in which DHS pursued reunification, it did not seriously develop any concurrent plan for Jamison in the event that reunification were to fail. At one point, it rebuffed the overtures of Jamison's foster parents the Bs to adopt Jamison by telling its Permanency Planning Unit that adoption would be "impossible" because reunification would be accomplished. DHS knew at the time that Ms. M had not

122

Dr. Marva Lewis

achieved sobriety, which was a critical goal of her five-year-old service agreement. Once DHS's plans for reunification failed in 1998, DHS had no viable alternate permanency plan. DHS simply changed the plan to "formalized foster care"—a concession that it had no true permanent goal for Jamison apart from having him spend the rest of his youth in foster care. Four months after his plan was finally changed from reunification, the Foster Care Review Board made the obvious point that Jamison should be freed for adoption, yet the parental rights of both Ms. M and Jamison's father, Mr. H, were not officially terminated until May 2000. Around November 2002, Jamison's permanency goal was changed to emancipation from the foster care system.

The failure by DHS to establish a viable permanency plan for Jamison caused him psychological anguish. Jamison reported that he felt hopeless about finding a family, and described himself as homeless. He was observed as appearing anxious about his status as a "ward of the state." He told Catholic Charities that he worried about his future placement, and his worries kept him awake at night.

## E. DHS UNNECESSARILY SEPARATED JAMISON FROM HIS SISTER AND EXTENDED FAMILY FOR YEARS

A critical feature of casework planning for children in foster care is to maintain family bonds. Family connections help to preserve a child's family and cultural identity and sense of belonging. These connections may contribute to a child's resiliency when temporarily separated from his or her biological parents.

DHS caseworkers tore Jamison apart from his sister almost immediately after they entered foster care, and it made almost no concerted efforts to assure that they had regular visits. It also took no serious and thorough steps to maintain contact with relative

123

Dr. Marva Lewis

resources during Jamison's time in the foster care system. The records do not show that

DHS sincerely pursued relative placement for Jamison, such as by creating a

comprehensive list of relative resources and pursuing each one systematically.

As a result of DHS's improper case practice, Jamison was left to feel abandoned

and alone, disconnected from anyone he could claim as a relative. In the 14 years that

Jamison has remained in custody, it is hard to believe that there is not even one extended

family member who could have served as a safe visitation resource so that he would have

had some type of consistent family connection.

### F. DHS WAS NOT FORTHCOMING IN ITS DOCUMENTATION

Violating fundamentals of ethical case practice, DHS case workers appear to have

dissembled or withheld information in correspondence from the Youth Court, and in

DHS notes. For example, after Jamison's sister TM reported that she was raped during a

Christmas visit at her mother's home in 1997, DHS submitted a letter to Catholic

Charities minimizing the encounter and also stating:

> I would like to know who told you that DHS would be willing to allow these children
> to have unsupervised visits. This is not true. These children are a ward of the State of
> Mississippi. They <u>MUST</u> be supervised. They have <u>NEVER</u> had an unsupervised
> visit since I have been their supervisor. They will not have an unsupervised visit until
> ordered by the court.

DHS records show, however, that DHS sought and received permission for

unsupervised visits with Jamison's mother in May 1997. Further DHS records, such as

the complaint by TM's foster mother in June 1997 expressing concern about the

unsupervised nature of the upcoming visits, would appear to confirm that the Christmas

visit was in fact unsupervised.

124

Dr. Marva Lewis

In addition, DHS obtained a Youth Court order that permitted Jamison to be placed with his father in Kansas "pending ICPC approval by the State of Kansas." The order was dated January 12, 2004. Three days before this court order, however, DHS received a phone call from an upset Kansas child welfare official who stated she could not approve of Jamison's placement in Kansas because it violated the ICPC contract. She told DHS that Jamison was in Kansas illegally. There are no DHS records indicating that it notified the Youth Court of Kansas's strong objections. It is unlikely that the Court would have approved the placement had it known of Kansas's position.

Furthermore, various DHS casenotes are self-servingly inaccurate. When Kansas denied ICPC approval of Jamison's placement with his father, DHS created a document providing a summary of Jamison's placements. The summary only stated that Jamison's father wanted to have him removed from the home because he had been misbehaving. It did not mention that Kansas had denied the ICPC. What appears to be an earlier version of the summary also exists in DHS records. Dated the same day, that version makes no mention of Jamison's misbehavior at his fathers' house.

## G. DHS DENIED JAMISON ACCESS TO LEGALLY MANDATED EDUCATION

By 2002, DHS had established Jamison's permanency plan as emancipation from the foster care system. This plan requires that Jamison be prepared to be self-sufficient and independent once he exits foster care custody. Jamison noted in that plan that his goals were to graduate from high school and to attend college. DHS records also show that Jamison had cherished the desire to get an education and become a lawyer since he was seven.

125

Dr. Marva Lewis

Despite Jamison's need and desire for a sound education, DHS placed him at the Oakley Transitional Living Center in February 2004. Youth at Oakley are not permitted to attend regular high school, and instead must attend general equivalency diploma (GED) courses. Though Jamison told DHS that he wanted to go to regular high school and he feared some colleges would not let him enroll with only a GED, DHS persisted in forcing him to forego regular schooling.

DHS's actions constitute unacceptable and harmful case practice. Not only did DHS deny Jamison proper educational opportunities while at Oakley by not permitting him to attend regular high school, but the placement resulted in Jamison failing the 11th grade because of his many absences from school. Jamison must now struggle to get back on track with learning necessary academic skills and pursuing his educational goals.

## CONCLUSIONS

DHS took Jamison into its care at the age of five, and over the next fourteen years proceeded to knowingly expose him to unsafe environments, fail to provide or supervise his mental health care, and refuse him permanency, family ties, and educational skills. In particular, I am concerned with two core issues. First, there are other children in the case load of the same supervisor as Jamison's who may be in imminent danger for abuse and neglect because of this supervisor's inability to recognize abuse and to accurately assess whether a placement is safe for a child. In addition, there appears to be a general failure of the accountability mechanism to enforce DHS permanency planning policies. There is no documented compelling reason anywhere in the case record to justify workers' dogged

126

Dr. Marva Lewis

determination to reunite Jamison with his mother over a seven-year period rather than filing for termination of his mother's rights.

Jamison's case thoroughly demonstrates how DHS's irresponsible and improper case practice can utterly fail to provide for a child's basic needs while he or she is in its custody. Jamison's level of resilience and determination in the face of the chronic maltreatment he has suffered at the hands of both his family and the Mississippi foster care system is truly remarkable.

Dr. Marva Lewis

## CONCLUSION

Foster care is intended to be a temporary and safe harbor for vulnerable children, where their needs are met until they can securely return to their own families or be placed in another permanent home. For the four children whose cases I reviewed, however, entering Mississippi state custody did not shield them from maltreatment. While each child entered foster care under different circumstances, they have all been subjected to a clearly failing child welfare system that has not met its most basic obligation to protect them from experiencing further physical, psychiatric, or emotional harm.

In each case, DHS exposed the child to an environment that posed an immediate and real risk to the child's safety. All four children were frequently and arbitrarily moved from placement to placement. Many of the placements each child experienced were unsuitable and disrupted, thereby forcing the child to endure yet another move. Not one of these children received the consistent medical and psychological services necessary to meet their serious medical or mental health needs. Lastly, as DHS has failed to provide these children with timely and appropriate services necessary for them to achieve permanency, all four have been growing up in state custody, often isolated from their siblings and known relatives. The case practice evident in each of these files was unprofessional, unreasonable and, at times, entirely irrational. Each of these children has been harmed by these failings. The fact that the failings are consistent across all four cases that I reviewed leads me to the conclusion that Mississippi's foster children are at risk of further neglect, and even abuse, as a result of poor DHS case practice and oversight.

128

Marva L. Lewis, Ph.D.
New Orleans, LA

February 7, 2006

Dr. Marva Lewis

[1]  DHS 047308-047309, 000750-000862, 000374
[2]  DHS 00392
[3]  DHS 00131-000143
[4]  DHS 000405
[5]  DHS 000396
[6]  DHS 000376
[7]  Goldstein, Joseph, Anna Freud, and Albert J. Solnit. *Beyond the Best Interests of the Child.* New York: Free Press, 1973.
[8]  DHS 000384
[9]  DHS 000370
[10] Frank, Deborah A., MD; Perri E. Klass, MD; Felton Earls, MD; and Leon Eisenberg, MD. "Infants and Young Children in Orphanages: One View from Pediatrics and Child Psychiatry." *Pediatrics.* 97.4 (1996): 569-578.
[11] DHS 000473, 000358
[12] DHS 000369
[13] DHS 000473, 000836
[14] DHS 000473
[15] DHS 000387, 0000431-000433, 000473
[16] Scannapieco, Maria and Kelly Connell-Carrick. *Understanding Child Maltreatment: An Ecological and Developmental Perspective.* New York: Oxford University Press, 2005.
[17] FDA Public Health Advisory: Suicidality in Children and Adolescents Being Treated with Antidepressant Medications. October 15, 2004. U.S. Food and Drug Administration. Date of Access: February 6, 2006.
[18] Goldstein, Joseph, Anna Freud, and Albert J. Solnit. *Beyond the Best Interests of the Child.* New York: Free Press, 1973.
[19] Goldstein, Joseph, Anna Freud, and Albert J. Solnit. *Beyond the Best Interests of the Child.* New York: Free Press, 1973.
[20] DHS 00364
[21] DHS 000426-000433, 000419-000422
[22] DHS 00426
[23] DHS 000409, 000411, 000426, 000428-000433, 000435
[24] DHS 000425
[25] DHS 000451-000452
[26] DHS 000403
[27] Smith, B. D. "After Parental Rights are Terminated: Factors Associated with Exiting Foster Care." *Children and Youth Services* Review. 25.12 (2003): 965-985.
[28] DHS 000385-000386, 00372, 00363-64, 00358, 00435-36
[29] DHS 000066, 000068
[30] DHS Cody B. 000053-000054, NP 06109
[31] NP 06093, DHS Cody B. 000053
[32] NP 06090
[33] NP 06093
[34] NP 06104
[35] DHS Cody B. 000294
[36] DHS Cody B. 000294
[37] DHS Cody B. 000294
[38] NP 06093
[39] NP 06093
[40] NP 06094
[41] NP 06191
[42] NP 06092, 06207
[43] NP 06207

Dr. Marva Lewis

44   NP 06097-06098, NP 06093, DHS Cody B. 000294
45   NP 06205
46   NP 06102, 06194
47   DHS Cody B. 000225-000229
48   NP 06176-06177
49   DHS Cody B. 000002
50   DHS Cody B. 000053-000055
51   DHS Cody B. 000053
52   NP 06193-06195
53   DHS Cody B. 000003
54   DHS Cody B. 000004
55   DHS Cody B. 000102, 000096
56   DHS Cody B. 000094, 000099, 000102
57   DHS Cody B. 000096, 00102
58   DHS Cody B. 000287
59   DHS Cody B. 000287
60   NP 06172
61   DHS Cody B. 000006
62   DHS Cody B. 000006-000007
63   NP 06148, DHS Cody B. 000088-000092
64   DHS Cody B. 000092
65   DHS Cody B. 000091
66   DHS Cody B. 000690
67   DHS Cody B. 000012, NP 06140
68   NP 06164
69   NP 06165
70   NP 06164
71   NP 06162-06163
72   NP 06162-06163
73   DHS Cody B. 000007-00008
74   NP 06169-06170
75   NP 06169
76   DHS Cody B. 000263
77   NP 06167-06168
78   NP 06167
79   DHS Cody B. 000279
80   DHS Cody B. 000281
81   NP 06110
82   NP 06110
83   NP 06160
84   NP 06041
85   DHS Cody B. 000010
86   DHS Cody B. 000011
87   DHS Cody B. 000271
88   NP 06110, DHS Cody B. 000273
89   NP 06145-06146
90   DHS Cody B. 000012
91   NP 06140
92   NP 06143
93   DHS Cody B. 000014-000019
94   DHS Cody B. 000014-000015, 000018
95   DHS Cody B. 000014
96   DHS Cody B. 000013, 000014, 000016; NP 06059
97   DHS Cody B. 000014
98   DHS Cody B. 000014

131

Dr. Marva Lewis

---

[99] NP 06093, 06097-06098
[100] DHS Cody B. 000016
[101] NP 06042-06043, DHS Cody B. 000017
[102] DHS Cody B. 000018, NP 06059
[103] DHS Cody B. 000019, 000020
[104] DHS Cody B. 000020
[105] NP 06150
[106] NP 06150
[107] NP 06050-06058
[108] DHS Cody B. 000020-000021
[109] NP 06137
[110] DHS Cody B. 000057
[111] DHS Cody B. 000012, 000013, 000020-000022
[112] DHS Cody B. 000023, NP 06025-06026
[113] NP 06025
[114] NP 06060
[115] DHS Cody B. 000024-000025
[116] DHS Cody B. 000025
[117] NP 06059-06065
[118] NP 06059-06060
[119] NP 06060-06061
[120] NP 06059
[121] NP 06060-06061
[122] NP 06061-06062
[123] NP 06063
[124] DHS Cody B. 000007, NP 06162-06163
[125] NP 06111, DHS Cody B. 00024-00025
[126] NP 06131, DHS Cody B. 000027
[127] DHS Cody B. 000027
[128] DHS Cody B. 000027
[129] DHS Cody B. 000027; NP 06130
[130] NP 06086; DHS Cody B. 000006-000007, 000018, 000024-000025
[131] NP 06086, 06085
[132] DHS Cody B. 000263, 000265
[133] DHS Cody B. 000021
[134] DHS Cody B. 000606
[135] NP 06115
[136] NP 06085
[137] DHS Cody B. 000028
[138] DHS Cody B. 000028
[139] DHS Cody B. 000029
[140] DHS Cody B. 000226, 000030, 000577
[141] DHS Cody B. 000030
[142] DHS Cody B. 000030
[143] DHS Cody B. 000576-000577
[144] DHS Cody B. 000031
[145] DHS Cody B. 000043, 000049, 000051
[146] DHS Cody B. 000064
[147] DHS Cody B. 000505
[148] DHS Cody B. 000075
[149] DHS Cody B. 000075
[150] DHS Cody B. 000112, 000172
[151] DHS Cody B. 000172
[152] DHS Cody B. 000770-000771
[153] DHS Cody B. 000520

---

[154] Goldstein, Joseph, Anna Freud, and Albert J. Solnit. *Beyond the Best Interests of the Child.* New York: Free Press, 1973.
[155] DHS 000425
[156] DHS 000392
[157] NP 06582-06583, 06577; DHS 000650
[158] NP 06578-06579
[159] NP 06379
[160] NP 06380
[161] NP 06372
[162] NP 06372-06374, DHS Olivia Y. 000304-000305
[163] DHS 000491
[164] NP 06565-06567
[165] DHS 000608
[166] DHS, 000541-000542, 000547, 000555, 000638-640, 000642-000645
[167] DHS 000643-645
[168] DHS 000542, 000639, DHS 000640
[169] NP 06562, 06564
[170] DHS 000742, 000739
[171] DHS 000540
[172] NP 06569
[173] NP 06545
[174] NP 06548, 06487
[175] NP 06548
[176] NP 06550, 06487
[177] NP 06553
[178] NP 06468, 06480
[179] NP 06370, 06440
[180] NP 06370
[181] NP 06393
[182] NP 06396
[183] NP 06397
[184] NP 06369, 06440, 06423-06424
[185] NP 06480, 06485
[186] NP 06423
[187] NP 06423-06425
[188] NP 06425
[189] NP 06425
[190] NP 06471-06472
[191] NP 06481
[192] NP 06440, 06407, 06452
[193] NP 06407
[194] NP 06407-06408
[195] NP 06408
[196] NP 06485
[197] NP 06408
[198] NP 06452
[199] NP 06463, 06438
[200] NP 06365, 06364
[201] NP 06365
[202] NP 06410
[203] NP 06406
[204] NP 06360
[205] NP 06360
[206] NP 06440, 06359
[207] NP 06358, 06456

Dr. Marva Lewis

[208] NP 06410, 06350
[209] NP 06422
[210] DHS Olivia Y. 000040-000042
[211] NP 06422
[212] NP 06348
[213] NP 06429
[214] DHS Olivia Y. 000198
[215] NP 06430
[216] NP 06431-06432
[217] NP 06470
[218] DHS Olivia Y. 000067, 000068
[219] DHS Olivia Y. 000067
[220] NP 06343, 06344-06346, 06428
[221] NP 06353
[222] DHS Olivia Y. 000048, 000006
[223] DHS Olivia Y. 000006, 000011, 000016; NP 06353
[224] DHS Olivia Y. 000047
[225] DHS Olivia Y. 000079, 000075
[226] DHS Olivia Y. 000084
[227] DHS Olivia Y. 000011
[228] DHS Olivia Y. 000040-000042
[229] DHS Olivia Y. 000093, 000010, 000009
[230] DHS Olivia Y. 000009, 000198
[231] DHS Olivia Y. 000559-000566, 000746
[232] DHS Olivia Y. 000191
[233] DHS Olivia Y. 000093, 000094, 000097, 000096
[234] DHS Olivia Y. 000102
[235] DHS Olivia Y. 000101
[236] DHS Olivia Y. 000007-000008, 000022
[237] DHS Olivia Y. 000008
[238] DHS Olivia Y. 000104, 000108
[239] DHS Olivia Y. 000108
[240] DHS Olivia Y. 000043-000044
[241] DHS Olivia Y. 000119
[242] DHS Olivia Y. 000228
[243] DHS Olivia Y. 000182
[244] DHS Olivia Y. 000120-000122
[245] DHS Olivia Y. 000180
[246] DHS Olivia Y. 000228
[247] DHS Olivia Y. 000179
[248] NP 06371, 06466, 06356; DHS Olivia Y. 000007, 000179
[249] DHS Olivia Y. 000219
[250] DHS Olivia Y. 000214
[251] DHS 038436-038437
[252] DHS Olivia Y. 000222-000224
[253] DHS Olivia Y 000223, 000428
[254] DHS Olivia Y 000466-000473
[255] DHS 000476
[256] DHS 000475
[257] NP 07439
[258] NP 07439, 07609
[259] NP 07439, 07609
[260] NP 07439
[261] NP 07439
[262] NP 07439, 07609, 07502

Dr. Marva Lewis

[263] NP 07609
[264] NP 07609
[265] NP 07609, 07439, 07497
[266] NP 07615
[267] NP 07615, 07859, 07475
[268] NP 07615
[269] NP 06670
[270] NP 07006-007007
[271] NP 07497
[272] NP 07498
[273] NP 06669
[274] NP 06669
[275] NP 07006
[276] NP 07711
[277] NP 07705
[278] NP 07705, 07721
[279] NP 07711-07712
[280] NP 07705-07706
[281] NP 06687-06689
[282] NP 07483, 07615, 07711-07712
[283] NP 07616, 07436, 07616, 07481
[284] NP 06996
[285] NP 07623-07624
[286] NP 07467
[287] NP 07497, 07867
[288] NP 07467, 07616, 07425
[289] DHS John A. 000607
[290] NP 07426, 07616
[291] NP 07465
[292] NP 07616
[293] NP 07616, 07239
[294] NP 07615-07616
[295] NP 07865
[296] NP 07465
[297] NP 06806
[298] NP 06973-06975
[299] NP 08128-08130
[300] NP 07464
[301] NP 07902
[302] NP 08113, 07895
[303] NP 08149
[304] NP 07896
[305] NP 07896
[306] NP 07240
[307] NP 07608, 06806
[308] DHS John A. 000610
[309] NP 06681
[310] NP 07856
[311] NP 07842
[312] NP 07252, 06978
[313] NP 06784, 06799, 07835
[314] NP 06799-06800, 07841, 07621, 06623-06624
[315] DHS John A. 000048-000050
[316] DHS John A. 000049
[317] DHS John A. 000050

135

Dr. Marva Lewis

[318] NP 06800, 06964, 06839
[319] NP 06839
[320] DHS John A. 000320-000321
[321] NP 06839
[322] NP 06841-06842
[323] NP 08147
[324] DHS John A. 000905
[325] NP 07627
[326] NP 06623-06624
[327] NP 06623-06624
[328] NP 06624
[329] NP 06820
[330] NP 06798
[331] NP 06798
[332] NP 07926, DHS John A. 000974, 001389
[333] NP 07925
[334] NP 07926, DHS John A. 000751
[335] NP 07926
[336] DHS John A. 000002, NP 06614
[337] NP 06787, 07260, 07261, 07258, 06782, 06606, 06798, 06788, 07539, 06607, 06606, 07259, 06606, 06783
[338] NP 06773
[339] NP 06787, 06788, 07257, 07258, 06782, 06783
[340] DHS John A. 000051-000053
[341] DHS John A. 000750
[342] DHS John A. 000048-000071, 002603
[343] NP 07935
[344] NP 07539, DHS John A. 000004
[345] NP 07512, 07593, 07182
[346] NP 07929
[347] DHS John A. 000990, 001069, 001074
[348] NP 06606, 07259, 07261, 07260, 07258, 07383
[349] DHS John A. 001288, 001300
[350] NP 07258
[351] NP 06606, 07257, 06782
[352] NP 06606
[353] DHS John A. 000009, 000013
[354] DHS John A. 000024
[355] DHS John A. 000011
[356] NP 07582, 07580, 07670, 07545; DHS John A. 002504, 002518, 002530
[357] NP 07571
[358] DHS John A. 001429
[359] DHS John A. 002753, 002916, 002611, 002610, 002607, 002605, 001424
[360] DHS John A. 002626
[361] DHS John A. 000011-000013
[362] DHS John A. 000012-0000013
[363] DHS John A. 002636, 002635
[364] DHS John A. 000013
[365] DHS John A. 000015
[366] DHS John A. 002631
[367] DHS John A. 000015, 002629
[368] DHS John A. 000016
[369] NP 07503, 07546, 07547
[370] DHS John A. 001421, DHS 002921
[371] DHS John A. 002689

136

Dr. Marva Lewis

[372] DHS John A. 002916
[373] DHS John A. 002611, 002610, 002607, 002605
[374] DHS John A. 000018
[375] DHS John A. 000072-000078
[376] NP 07929
[377] DHS John A. 000019
[378] DHS John A. 002911
[379] NP 07615-07616, 07415, 06799, 06623, 06798; DHS John A. 000002; NP 06787, 07539, 07261, 07260, 07259, 07258, 07257, 06782, 06783
[380] DHS John A. 000018-000019, 002616
[381] DHS John A. 002607
[382] DHS John A. 002604, 002914
[383] DHS John A. 002914
[384] NP 07585
[385] DHS John A. 003048
[386] DHS John A. 002914, NP 07253, 07254
[387] NP 07432, 07258
[388] NP 07228-07229, 07286
[389] NP 07286, 07288
[390] NP 07286-07287
[391] NP 07288-07289
[392] NP 07286
[393] NP 07289
[394] NP 07383
[395] NP 07383-07387, 06759, 06759, 07269
[396] NP 07269
[397] NP 07269
[398] DHS John A. 000589, NP 06759
[399] NP 07355
[400] NP 07361
[401] DHS John A. 000847
[402] NP 07361
[403] NP 07432; DHS John A. 000026
[404] NP 07253, 07254, 07228-07229, 07586, 06758, 06759
[405] DHS John A. 000025; NP 07338-07341
[406] DHS John A. 000025
[407] NP 07189-07194
[408] DHS John A. 000026
[409] DHS John A. 000026
[410] DHS John A. 000026
[411] DHS John A. 000031, 000033, 000034
[412] DHS John A. 000090, 000135, 000137, 000537, 000541, 000540, 000538, 000535
[413] DHS John A. 000090
[414] DHS John A. 000135
[415] DHS 000691
[416] DHS John A. 000687, 000534, 000533,DHS 000537, 000541, 000540, 000538, 000535
[417] DHS John A. 000131-000134
[418] DHS John A. 000188-000191
[419] DHS John A. 000542-000545
[420] DHS John A. 000089, 000208, 000581
[421] DHS 00390
[422] DHS 000387, 000370
[423] DHS 00524
[424] NP-00140--NP-00142
[425] NP-00714--NP-00715

Dr. Marva Lewis

---

[426] NP-00704--NP-00705; NP-00045 - NP-00049; NP-00050 - NP-00054.
[427] NP 00139
[428] NP 00445
[429] NP-00228--NP-00229
[430] NP-00702--NP-00703.
[431] NP 00445
[432] NP-00123
[433] NP-00150
[434] NP 00136
[435] NP-00123; NP-00129 – NP-00133

[436] NP-00129
[437] NP-00691-692.
[438] NP 00129, 00135; DHS Jamison J. 001575
[439] NP –00103
[440] NP –00687
[441] NP –00120
[442] NP-00086
[443] NP-00185
[444] NP –00196-00198
[445] NP 00080-00081
[446] NP-00079
[447] NP-00066
[448] NP –00065, 00064
[449] DHS Jamison J. 001650
[450] NP-00064; DHS Jamison J. 001649
[451] NP –00146- 00149
[452] NP 00156
[453] NP-00156—NP-00165
[454] NP-00330
[455] NP –00035
[456] NP-00034; NP-00052.
[457] NP-00510--NP-00513
[458] NP 000146-000149, NP-00597--NP-00601
[459] NP-00148
[460] NP-00657--NP-00663.
[461] NP-00032
[462] NP-00269--NP-00274
[463] NP-00030, NP-00274
[464] NP 00565, 000563
[465] NP –00263-00268
[466] NP –00595
[467] NP-00593
[468] NP-00592
[469] NP-00591; NP-00588
[470] NP 00587, 00683,00685
[471] NP 02900
[472] NP-00236
[473] NP-00584 - NP-00586
[474] NP-00638 - NP-00653
[475] NP-00678
[476] NP 00577-00578
[477] NP-00678
[478] CC 00769 - CC 00777
[479] NP-00675

Dr. Marva Lewis

[480] NP –00677-00678
[481] NP –00925
[482] NP –00531
[483] NP-00671; NP-00856--NP-00859
[484] NP-03462.
[485] NP –00868
[486] DHS Jamison J. 002068.
[487] CC-00787 – CC-00788.
[488] NP-00856 - NP-00859
[489] NP –00667
[490] NP –01792
[491] NP-00620
[492] NP-00516
[493] NP-00485--NP-00488
[494] NP-00501--NP-00506.
[495] NP-00806.
[496] NP-00728--NP-00735
[497] NP-00749--NP-00755
[498] NP-00748
[499] NP-00985--NP-00989
[500] NP-01203
[501] NP-00758--NP-00759
[502] NP-00995
[503] NP-00454
[504] NP-00947; NP-01363 - NP-01385
[505] NP-00948
[506] NP-01296
[507] NP-00940 - NP-00946
[508] NP-01294-NP-01295
[509] NP-01116 - NP-01124
[510] CC-02115 – CC-02116.
[511] NP-01095 - NP-01097
[512] NP-01246--NP-01249
[513] NP-01246--NP-01249
[514] NP-01362 - NP-01363
[515] NP-00993 – NP-00994
[516] NP-01269, NP-01318
[517] CC-01939; CC-01673
[518] NP-01531
[519] NP-01494 - NP-01499
[520] NP-01488
[521] NP-01243
[522] NP-01242
[523] NP-01244
[524] CC-01927
[525] CC-02019 – CC-02065
[526] NP-01803
[527] NP-01797; NP-01801
[528] NP-01667 - NP-01670
[529] NP-01667 - NP-01670
[530] NP-01723; NP-01724
[531] NP-01664
[532] NP-01678-79
[533] NP-01718
[534] NP-03457

Dr. Marva Lewis

[535] NP-01722
[536] NP-01646 - NP-01651; NP-01648-01652
[537] NP-03456
[538] NP-03446 – NP-03447; NP-03451
[539] NP-03449 - NP-03455
[540] NP-03454
[541] CC-02372 – 02373
[542] CC-02199; CC-02358
[543] CC-02354 - 02355
[544] CC-02356 – CC-02357
[545] CC-02353
[546] CC-02367 – CC-02368
[547] CC-02200; NP-03439
[548] CC-02197; *Alligator Resident Charged with Death of Three-Year-Old Son*, Associated Press, Aug. 6, 1998.
[549] CC-02200; NP-03448; NP-03440.
[550] CC-02299
[551] CC-02301; CC-01332; CC-02167
[552] NP-03440
[553] CC-02194
[554] CC-02189-02193
[555] NP-03387 - NP-03392
[556] NP-03502, NP-04549.
[557] NP-03437
[558] NP-03034 – NP-03035, 03537.
[559] NP-03034 – NP-03035; CC-00790-CC-00793
[560] DHS Jamison J. 001786
[561] CC-00791- CC-00792
[562] NP 03537; NP-03410; CC-00975
[563] NP-03537
[564] NP-03379 - NP-03383
[565] CC-00970 – CC-00971
[566] NP-03379 - NP-03383
[567] CC-00957
[568] NP-03337
[569] DHS Jamison J. 001587-001589
[570] CC-00941
[571] CC-00939
[572] NP-03336
[573] CC-00937; CC-00918
[574] NP-04178
[575] CC-00917
[576] CC-00043 – CC-00048
[577] CC-01055
[578] DHS Jamison J. 001733
[579] CC-00905 – CC-906; CC-00035.
[580] CC 00034-00036
[581] DHS Jamison J. 001612
[582] DHS Jamison J. 001611.
[583] NP-04293
[584] DHS Jamison J. 001606.
[585] CC-00255
[586] CC-01638
[587] CC-02607 – CC-02611
[588] CC-00217

Dr. Marva Lewis

[589] CC-210
[590] CC-00598 – CC-00613
[591] CC-00192.
[592] DHS Jamison J. 001897
[593] NP-04259
[594] CC-00163
[595] CC-00155
[596] CC-00156

[597] NP-04259; NP-04550.
[598] NP-04845
[599] NP-04564 - NP-04569
[600] NP-04379
[601] NP-04550
[602] NP-04387, NP-04550.
[603] NP-04815
[604] CC 00549
[605] DHS Jamison J. 001687
[606] NP-04550.
[607] NP-04550; CC-00681
[608] CC-00582 – CC-00584
[609] NP-04676 - NP-04679
[610] CC-00655-657
[611] CC-00654
[612] NP-04644; NP-04648 - NP-04649; NP-04548; NP-04550.
[613] CC-00653.
[614] NP-4792 – NP-4932.
[615] NP-04745
[616] NP-04728
[617] DHS Jamison J. 000637.
[618] NP-04548; NP-04550; NP-04648.
[619] NP-04739; CC-00648
[620] NP-04651 - NP-04652  NP-04547 - NP-04551
[621] NP-04633
[622] DHS Jamison J. 001825
[623] CC-00637.
[624] NP-04633; NP-04550; DHS Jamison J. 000774, NP-04550; DHS Jamison J. 000756, DHS Jamison J. 000759
[625] DHS Jamison J. 000766.
[626] DHS Jamison J. 000761; DHS Jamison J. 000777.
[627] DHS Jamison J. 000746; CC-00641-42.
[628] CC-00645; CC-00637; CC-00636; CC-00638
[629] CC-00646.
[630] CC-00641.
[631] NP-04550
[632] CC-00642,
[633] DHS Jamison J. 000746.
[634] DHS Jamison J. 001000, 00102; 000587; NP-00228 – NP-00229; NP-01494 - NP-01499
[635] DHS Jamison J. 000417.
[636] DHS Jamison J. 000433.
[637] DHS Jamison J. 002133.
[638] Lewis, Marva L. & Ippen, C. G. "Rainbows of tears, souls full of hope: Cultural issues related to young children and trauma." J. D. Osofsky, Ed. *Young children and trauma: What do we know and what do we need to know?* 11-46 New York: Guilford Press, 2004.