

SYSTEMS REVIEW OF THE MISSISSIPPI DEPARTMENT OF HUMAN
SERVICES, DIVISION OF FAMILY AND CHILDREN'S SERVICES

FINAL REPORT

Submitted by
Child Welfare League of America
March 31, 2006

EXHIBIT

tabbies'

9

Table of Contents

I.     Executive Summary ........................................................................................ i

II.    Introduction ................................................................................... 1

III.   Systems Review Methodology ................................................................. 6

IV.    Findings.................................................................................................. 11

V.     Conclusions ................................................................................... 39

References ......................................................................................... 41

APPENDIX A Workload Study Description Analysis, and Findings.................... 44

APPENDIX B Guides for Interviews with Regional Directors ............................. 51

APPENDIX C Caseworker Service Need and Availibility Survey........................ 56

APPENDIX D Caseworker and Supervisor Focus Group Interview Guides........ 67

APPENDIX E Consultant Vitas .......................................................................... 89

# I. Executive Summary

This report describes a systems review of the Mississippi Department of Human Services, Division of Family and Children's Services (DFCS) that was conducted by the Child Welfare League of America under contract with the Mississippi Office of the Attorney General.  This review is part of the state's response to the Olivia Y., et al., vs. Haley Barbour class action lawsuit which alleges that the constitutional rights of children placed in the protective custody of DFCS were violated by virtue of the state's failure to provide them with basic care and protection.  The review was conducted with the full cooperation of DFCS and in partnership with agency staff at multiple levels.  Activities were guided by the need to answer two key questions:

1. What are the major strengths and needs of MDHS/DFCS with regard to its ability to discharge its responsibility for the well being and permanency of children who have been placed in its custody?

2. How can MDHS/DFCS act most strategically and expeditiously to address identified deficiencies in its capacity and practice related to serving, protecting, and attaining permanency for children in its custody?

**Review Methodology**

The following activities were undertaken to collect the data on which the findings and conclusions of this study are based:

- Review of documents including agency policies, data profiles, internal and external reports, and training materials;
- Review of case records of named plaintiffs in the litigation;
- Analysis of caseworker workload;
- Group and individual interviews with administrators, managers, supervisors, and caseworkers; and
- Survey of caseworkers regarding service needs and availability.

**Major Findings**

Mississippi's child welfare system suffers from a lack of sufficient resources to support the family-centered practice approach it is attempting to undertake. Major areas of need include:

*1. Staffing*

DFCS is under-staffed at all levels.  Many caseworkers carry workloads which are at least double the average number they can manage based on the workload analysis conducted in this review. Many supervisors also carry cases and have administrative duties in addition to providing supervision for

i

caseworkers. Administrative and management staff are inadequate to provide the support needed by those responsible for service delivery. This is particularly true with regard to staffing of the agency's policy, program management, and training units and the support of its automated data system.

The recruitment and retention of qualified staff is adversely impacted by heavy workload, low pay and lack of opportunity for advancement or cost of living adjustments. Delays in the hiring process further contribute to the agency's inability to hire the most qualified applicants.

### 2. Training

Training resources are so limited that new caseworkers are often on the job for weeks or months before they are able to attend training. Most supervisors have had no training specific to their supervisory role, and individual professional development plans are lacking for staff at all levels.

### 3. Resources

Agency staff are hampered in their efforts to serve children and families by a lack of resources. This is particularly true in the area of available placements for children. The lack of a sufficient number and variety of qualified foster family homes and supports for relative placements has forced an over-reliance on emergency shelters and the use of placements that are too far from children's families of origin.

This review confirmed several of the findings of Mississippi's federal Child and Family Services Review (CFSR) conducted in 2004. The state has begun to address some areas of need as outlined in its federal Program Improvement Plan and indicated in DFCS initiatives that were planned or underway when the study began. Positive action already taken or in progress includes:

- Submission of a request to the legislature for an additional $694,085.64 to fund modest pay increases for caseworker staff;

- Plans to outsource family preservation services to the private sector and shift the 49 caseworker positions allocated in DFCS for that function to delivery of services in the core child welfare programs in each county;

- Revision of foster care policy and issuance of desk references to separate policy and practice and provide easier reference for service delivery staff;

- Development of additional management reports to enable administrators and managers to track critical information such as rates of shelter care placement and case contacts;

- Development and issuance of a guide for regional action plans to identify and address specific service needs at the local level;

- Plans to achieve better results from the state's agency-university partnership funded through federal Title IVE;

- Initiation of a contract with a consulting group to maximize the state's access to federal funding; and

- Support of a shift to a family centered practice approach through issuance of a practice guide, greater emphasis on engaging and teaming with families, and delivery of training to all service delivery staff.

The level of participation of DFCS personnel in this review also reflects positively on the agency's desire to more specifically identify strengths and needs as a basis for internal planning and justification of requests for necessary resources. DFCS has begun to lay a foundation that will enable it to better respond to the needs of children and families in Mississippi. The success of these efforts will be reliant, as it is in any child welfare system, on the provision of the resources necessary to support the building of a workforce sufficient in number and skill and an organizational structure and environment that supports them in doing this very difficult and important work.

## II. Introduction

### A. Agency Request for Consultation

The Child Welfare League of America (CWLA) was asked to provide consultation to the Mississippi Department of Human Services, Division of Family and Children in connection with the <u>Olivia Y., et al., v. Haley Barbour</u> lawsuit which had been filed in March, 2004.  This lawsuit alleges that the constitutional rights of children in the custody of MDHS have been violated by the state's failure to provide basic care, including health, mental health, and educational services, to children in its custody. It is further alleged that children are placed in unsafe, unlicensed family homes or facilities that fail to protect them from harm or to provide the least restrictive placement.  Additionally the suit alleges that these children are not provided with the timely and appropriate services needed to ensure that they are safely reunited with their families or, when that is not possible or advisable, moved to another permanent home.

After a period of discussion and negotiation, a contract between the Mississippi Office of the Attorney General and CWLA was finalized on June 16, 2005. Specific work to be performed under the terms of this agreement included the following:

- Review MDHS/DFCS' policies, procedures, and organizational structures in order to understand MDHS/DFCS' system and how they can maximize their resources through both staffing and current financial budgetary funding.

- Analyze the structure, caseload, workflow, case management and capacity of MDHS/DFCS' staff who serve children in its custody. Make recommendations for needed changes in these areas based upon prior models and studies of others similarly situated states, and provide assistance in developing and crafting a program evaluation tool in these areas to be used by MDHS/DFCS.

- Provide expert testimony as to the issues before the United States District Court for the Southern District of Mississippi in the case styled <u>Olivia Y., et al. v. Haley Barbour, as Governor of the State of Mississippi, et al.</u>, Civil Action No. 3:04-cv-25 ILN. This testimony will include, but not be limited to information gathered through review and analysis of MDHS/DFCS' policies, procedures, organizational structures, caseload, workflow, case management, and capacity of MDHS/DFCS' staff to meet and serve the needs of the children who are in the custody of MDHS/DFCS.

The goals of the systems review and workload and workflow analysis were to provide information that would inform and support the efforts of the current administration to address systemic barriers to effective service delivery, especially in the area of foster care services as these are the focus of the class action lawsuit.

1

At the request of MDHS/DFCS and the attorneys representing the Office of the Attorney General, this review focused most strongly on issues related to workload, professional development, and the practices and processes that characterize services to children in the foster care system and their families. This report provides the findings of that review and the recommendations for changes based on those findings.

It should be noted that this review was conducted in the months immediately following the state's having been hit by Hurricane Katrina, the most devastating storm in United States history. The storm virtually wiped out large portions of the coastal regions, effecting heavy damage through the entire lower half of the state, displacing many DFCS offices, courts, and offices of service providers, and calling for deployment of staff throughout the state to emergency duty for several weeks. Even in the northern portions of Mississippi less directly affected by the storm, communities faced a large influx of storm refugees. In light of the obvious impact of this event, it is possible that some aspects of this review are not reflective of regular agency operation.

## B.  CWLA Capacity

The Child Welfare League of America is the nation's oldest and largest membership-based child welfare organization. It is well-known and respected as a champion for children, advocating on their behalf since 1920. As the nationally recognized standard-setter for child welfare services, CWLA provides direct support to agencies that serve children and families, improving the quality of the services that they provide to more than 9 million children every year. Through its programs, publications, research, conferences, professional development, and consultation, CWLA speaks with authority and candor about the status and the needs of America's children, young people, and families. CWLA staff possess broad expertise in child welfare and related fields, including direct service delivery, public and private agency administration, research, and data technology systems.

This systems review was led by two CWLA consultants. Their vitas are included in Appendix E.

## C.  Agency Overview

Child welfare services in the state are administered by the Division of Family and Children's Services (DFCS) within the Mississippi Department of Human Services (DHS). The stated mission of the social service system, including private non-profit providers, local government agencies, and state agencies is to protect vulnerable children and adults from abuse, neglect or exploitation; support family preservation and community living; and prevent family violence and disruption.

Mississippi is a largely rural state comprising 82 counties. More urban areas include the capital city of Jackson which is centrally located, larger towns in the

2

coastal area just east of New Orleans, Louisiana, and the area in the northwest part of the state where towns make up the metropolitan area of Memphis, Tennessee.

Most child welfare services are delivered at the county level through 84 offices that are part of a nine-region organizational structure. County staff provide intake, child protection investigation, foster care, and in-home services to families in which children have been deemed in need of protection. Currently, personnel responsible for adoptions and licensing of child placement agencies and resource families are assigned to three regions which cover the entire state for these functions. Each of the nine regions is administered by a Regional Director who reports to the Director of Field Operations in the DFCS State Office. The Director of Field Operations reports to the DFCS Director as does a Director for Data and Fiscal Operations. Programmatic functions are managed through unit managers for Prevention, Protection, and Placement.

At the end of federal fiscal year 2005, there were 3,288 children in the custody of MDHS/DFCS, an increase of 368 over the previous year (MS CFSR Data Profile, December 8, 2005). The agency uses a "primary client" designation as a means of counting cases. Currently, it employs approximately 265 caseworkers who serve about 11,674 primary clients or an average of about 44 primary clients per worker.

## D. Mississippi's Child and Family Services Reviews (CFSR)

Given that current state efforts toward child welfare systems reform are largely driven by the federal CFSR standards, it is useful to consider where Mississippi stands with regard to these indicators and how it compares with other Southern states. The CFSRs, which are conducted by the U.S. Children's Bureau in the Department of Health and Human Services, assess states' performance in relation to seven outcomes related to child safety, permanency, and well-being. This is done based on the state's self-assessment, extensive interviews with persons involved in and with the child welfare system, and reviews of a sample of 50 cases in each state. A series of six quantitative measures related to (1) the incidence of repeat child maltreatment; (2) incidence of maltreatment of children in foster care; (3) re-entry of children into foster care within twelve months of a prior discharge; (4) length of time to required to achieve family reunification; (5) stability of foster care placements; and (6) length of time required to finalize adoptions are reviewed. State programs are also reviewed on seven systemic factors designed to determine the extent to which the state agency has implemented state plan requirements that build the capacity to deliver services leading to improved outcomes. These systemic factors include: (1) statewide information systems; (2) a case review system; (3) a quality assurance system; (4) staff and provider training; (5) service array; (6) agency responsiveness to the community; and (7) foster and adoptive parent licensing, recruitment and retention.

3

Mississippi's review was conducted in February 2004 and the final report issued in May 2004. The state met the national standard for two of the six quantitative measures, those pertaining to repeat maltreatment and re-entry of children into foster care. Their performance on these measures as compared to other Southern states and as compared to the federal standard is shown in Table 1 below. It was also found to be in compliance with two of the seven systemic factors, those of agency responsiveness to the community and foster and adoptive parent licensing, recruitment, and retention. It was not found to be in substantial compliance with any of the seven outcomes related to safety, permanency, and well-being, although it was noted that performance varied considerably with some strengths apparent in each.

**Table 1: Southern States' Performance on Six Quantitative CFSR Measures**

| State | Repeat Maltreatment 6.1% | A/N in FC .57% | FC Re-entry 8.6% | Reunification 76.2% | Adoption 32% | Place Stability 86.7% |
|-------|--------------------------|----------------|------------------|---------------------|--------------|-----------------------|
| AL | 5.20 | 0.15 | 7.90 | 63.00 | 13.10 | 96.40 |
| AR | 4.22 | 0.29 | 10.57 | 83.38 | 26.02 | 68.63 |
| GA | 4.22 | 1.08 | 4.43 | 63.05 | 23.05 | 92.29 |
| LA | 6.80 | 0.58 | 7.80 | 65.00 | 11.60 | 83.30 |
| MS | 4.60 | 0.59 | 4.60 | 56.70 | 19.00 | 55.00 |
| NC | 7.98 | 0.83 | 1.19 | 57.66 | 25.96 | 61.29 |
| SC | 3.4 | 0.51 | 6.60 | 82.10 | 14.00 | 76.00 |
| TN | 2.80 | .60 | 10.10 | 61.30 | 10.50 | 61.10 |

*Shading indicates that the state met or exceeded the federal measure.*

**Table 2: Compliance with Seven CFSR Outcomes/Systemic Factors**

| State | Outcomes | Systemic Factors |
|-------|----------|------------------|
| AL | 1 | 6 |
| AR | 1 | 7 |
| GA | 0 | 7 |
| LA | 1 | 7 |
| MS | 0 | 2 |
| NC | 0 | 7 |
| SC | 1 | 5 |
| TN | 0 | 4 |

All states must develop a Program Improvement Plan (PIP) to address deficiencies identified in the CFSR. Mississippi's PIP was approved by the U.S. Children's Bureau in May 2005. The plan identifies family-centered practice as its foundational principle and is organized around six priority goals for program improvement:

- Ensure that the safety of children is the first priority.
- Achieve timely permanency outcomes.

4

- Enhance families' capacity to care for children and be actively engaged in the decision-making process.
- Increase community involvement and shared responsibility for the well-being of children and families.
- Improve the quality and consistency of practice statewide by actively engaging and supporting staff at the local level.
- Enhance quality assurance methods to reinforce practice and inform staff.

Key strategies identified to achieve the above goals are

- Increased use of family team meetings;
- Streamlining of cumbersome policy manuals;
- Development of user-friendly practice guidebooks;
- Development of Regional Action Plans that identify and address local service needs;
- Development and implementation of additional caseworker and supervisory training;
- Development of new screening and assessment tools;
- Development of a new statewide recruitment and retention plan for family placement resources;
- Enhancements to the automated data system (MACWIS); and
- Development of community collaboratives for service coordination.

Work was begun on several of these initiatives during the spring and summer of 2005. A national group (Adopt U.S. Kids) was engaged to assess the need for family placements and consult on the development of a resource family recruitment and retention plan. The PIP relies heavily on technical assistance from the U. S. Children's Bureau's National Child Welfare Resource Centers, particularly in the development of training and resource guides. A training manual and guide for family centered practice was developed with assistance from the National Resource Center for Family Centered Practice and the University of Southern Mississippi School of Social Work, and the National Resource Center for Child Protective Services assisted in creating a screening and assessment tool.

Work on the plan came to a standstill for a period after Hurricane Katrina hit the state in August, 2005. Subsequently, the U.S. Children's Bureau offered an opportunity for the state to renegotiate its plan to better reflect its needs and capacity in the wake of the storm. Federal officials met with DFCS administrators and managers in January, 2006 and the new plan is currently being drafted.

### E. State Foster Care Data Profile

It is generally considered better for children in out-of-home care to be placed with families rather than in group care. The CFSR Data Profile of December 8, 2005 shows that, on the last day of federal fiscal year 2005, 74% of the children in MDHS/DFCS custody were in family placements, an increase of 4% from the prior year, and of 23% over 2003. About 25% of children are in some type of congregate care (group homes or institutions), down from 28% in 2004, but an increase over the 23% recorded in 2003. These data on the number of children entering care during the past three federal fiscal years show a greater increase in family care placements from 45% in FY 2003 to 95% in FY 2005 as depicted in Table 3 below.

**Table 3: MS Children in Family Placements – Entry Cohort**

| Federal FY 2003 | Federal 2004 | Federal 2005 |
|---|---|---|
| 46% | 69% | 95% |

The last year for which comparative data is publicly available is 2003. Table 4 depicts MS in relation to other Southern states on length of stay in foster care and placement stability.

**Table 4: Median Length of Stay (LOS) and # Placements**

| State | LOS (month) | # of Placements |
|---|---|---|
| AL | 18.3 | 2.0 |
| AR | 12.6 | 3.0 |
| GA | 13.8 | 1.0 |
| LA | 14.5 | 2.0 |
| MS | 15.9 | 2.0 |
| NC | 14.0 | 4.0 |
| SC | 19.3 | 1.0 |
| TN | 11.4 | 2.0 |

## III. Systems Review Methodology

In conducting this systems review, CWLA consultants engaged people at all levels of DFCS to gain the most comprehensive understanding of the agency and its operation possible within the scope of this project. Small representative work groups were relied on as much as possible for data collection in order to gather information with minimal disruption of regular work activities. This was especially important in view of the impact of the recent hurricane as well as the fact that many staff across the state were involved in additional activities related to the implementation of the state's federal Program Improvement Plan.

6

Areas of inquiry were based on those factors which experience and research have found to be the foundational requisites of a successful child welfare system. These include:

- A service delivery workforce, particularly caseworkers and first-line supervisors, of a size sufficient to meet the needs of the service population;
- A workforce with sufficient skills to accurately assess child and family strengths and needs and engage families in the selection and use of services targeted to address their needs;
- Organizational supports that create a positive work environment, guide and sustain effective practice, and ensure accountability; and
- An array of resources that can be accessed to fulfill service needs.

## A. Research Questions:

1. What are the major strengths and needs of MDHS/DFCS with regard to its ability to discharge its responsibility for the well being and permanency of children?

2. How can MDHS/DFCS act most strategically and expeditiously to address identified deficiencies in its capacity and practice related to serving, protecting, and attaining permanency for children?

## B. Data Collection

A variety of activities were undertaken to gain a basic understanding of the structure and of the administration and management in MDHS/DFCS, its workforce, and its practices, especially those related to services provided to children in out-of-home care. These activities are enumerated and described below:

## 1. Document Review

CWLA consultants developed a partial document request at the outset of the project based on their knowledge of child welfare agency operation. Additional documents were requested as their existence and relevance were disclosed either in materials already requested or in contacts with DFCS staff. Documents reviewed included the following:

- Policies pertaining to agency administrative policy and programmatic activities;
- Written guidelines for family-centered strengths and needs assessment and family centered practice;
- Agency organizational charts;
- Agency job descriptions;

7

- Agency data profiles;
- Agency reports including:
  - ✧ Mississippi Program Improvement Plan
  - ✧ Foster Care Review
  - ✧ Client Satisfaction Survey Reports
  - ✧ Resource Family Recruitment and Retention (draft);
- Management documents including:
  - ✧ Staff Guide to the Regional Action Plans
  - ✧ Reorganization white paper
- External reports including:
  - ✧ Mississippi Child and Family Services Review Final Report
  - ✧ Citizen's Review Board
- Transcripts of depositions in Olivia Y.

## 2.  *Workload Review and Analysis*

Workload and other personnel issues are among the most significant challenges facing child welfare systems in the United States today. As they attempt to serve a population that is growing in both number and complexity of need, many human service agencies, both public and private are grappling with high workloads, high turnover and vacancy rates, and the inability to recruit staff with the requisite knowledge and skill for effective practice in this demanding field.

In Mississippi, documentation provided indicates that turnover among entry level social work staff as of August 2005 was 35.36%. The vacancy rate across all caseworker positions stood at nearly 19%. High rates of turnover are of significant concern for two reasons. First and most importantly, research has shown that change in caseworkers is strongly associated with delays in children's attainment of permanency outside of the foster care system (Potter & Klein-Rothschild, 2002). Secondly, turnover is costly to agencies (Graef, & Hill, 2000).

Based on their recognition of the importance of this issue in service delivery, the MDHS/DFCS administration requested that a caseworker workload analysis and recommendations for staffing be a major focus of the CWLA systems review. In response, CWLA consultants worked with a group of agency staff representing each region of the state to examine the case-related job functions of DFCS caseworkers and the amount of time required to complete activities and sub-activities associated with each function.

## 3.  *Training Review*

CWLA consultants reviewed the following training materials:

- Modules used in the *Intensive Training* series for new caseworkers;

8

- Documents describing a pilot *Learning Labs* training for supervisors which was tested in two regions (1 West and 1 East) in the northern part of the state; and

- A summary of the new *Family Centered Practice* training currently being delivered to staff statewide during February and March, 2006.

In addition, several university personnel involved in the agency's Title IVE training program were interviewed regarding the *Learning Labs* supervisory training and the agency training director, director of the supervisory training work group, and the Division Director were interviewed regarding plans for further training development.

### 4.   Interviews with Administrators and Managers

Two group interviews were conducted with management staff appointed by the Division Director to provide information to the CWLA consultant team.   This group included two unit directors in state office and three Regional Directors. Interviews were guided by two documents, (1) a paper that linked issues expressed in the Olivia Y. complaint with related agency initiatives and (2) with an analysis of key points in the agency's foster care program policy.

Interviews with the Regional Directors group solicited their views of strengths and needs in three areas:

Workforce:  Factors that impact their ability to hire and retain staff; quality and preparation of staff

Placement Resources:  Factors that impact the agency's ability to recruit, prepare, and retain an array and distribution of placement providers, particularly resource families, that meet the needs of the children in MDHS custody; and

Administrative Support:  The type and degree of supports needed and received from the state level.

Interview guides for the meetings with the Regional Directors are contained in Appendix B of this report.

### 5.   Attendance at Management Meetings

CWLA consultants also participated in two meetings of management staff.  The first was a meeting of the Policy and Practice Work Group which was attended to gain a better understanding of the policy development process currently used and the status of policy changes underway in the organization.  The second was a meeting of the Regional Directors, administrators, and middle managers involved in reviewing the state's PIP in preparation for re-negotiation with the project officers in federal Region IV.  Attendance at this two day meeting provided more in-depth knowledge of the status of PIP goals and strategies and of barriers to their completion.

9

### 6. Caseworker Survey

Caseworkers were surveyed to determine the major service needs of children in MDHS custody and their families and the availability and accessibility of those services. These surveys were distributed through the Regional Managers, who transmitted them to their supervisors with the instruction that they be distributed to all caseworkers assigned to children in agency custody. A total of 138 usable surveys were received, representing a response rate of 52%. A copy of the survey instrument is contained in Appendix C.

### 7. Focus Groups with Caseworkers and Supervisors

In order to gain a better understanding of factors that directly affect the ability of front line staff to perform their jobs, CWLA conducted a series of focus groups around the state. Focus groups are an accepted qualitative research technique particularly suited to gathering information about the day-to-day experience, attitudes, and beliefs of persons who are related by their common involvement in a particular situation or activity, in this case employment in Mississippi's child welfare system.

Group interviews were conducted in regions II, III, and VII during the week of March 13, 2006. These regions were selected for their geographic location and rural-urban representation. The Regional Director in each was asked to randomly select eight caseworkers and eight supervisors from their staff roster to participate in the groups. One group of supervisors and one group of caseworkers was interviewed in each of the three regions. The interview questions were designed to solicit information about factors that either impede or facilitate caseworkers' and supervisors' fulfillment of their job responsibilities and to examine work flow in order to identify any areas where service delivery and facilitation of permanency for children in agency custody might be handled more efficiently.

A total of 22 caseworkers and 18 supervisors participated in the interviews. All of the caseworkers worked directly with children and families; one also recruited and trained foster and adoptive families. Five of the participating supervisors indicated that they work directly with children and families in addition to supervising caseworkers. One supervisor also recruited and trained foster and adoptive families in addition to doing direct casework and supervision of staff. Focus group interview guides and summary interview data may be found in Appendix D.

### 8. Review of Named Plaintiffs' Cases

Case record materials and additional documentation regarding services delivered to eight named plaintiffs were reviewed and analyzed. The focus of this review was to determine the adequacy of services to these children and their consistency with standards for reasonable practice at the time they were delivered. The findings of this review are provided in a separate document.

10

## IV. Findings

### A. Organizational Supports

Although effective child welfare service delivery is most directly dependent upon front line staff, it is well established that staff cannot function optimally without a full complement of administrative supports. These include accurate and up-to-date policies and practice guidelines, quality assurance and data tracking systems, and the availability of programmatic expertise to provide policy interpretation and consultation in the myriad unique situations that inevitably occur in the daily delivery of services to children and families. Policies, procedures, and organizational structures must provide clear and sufficient guidance and support to staff in making sound decisions, delivering services targeted to match the needs of the client population, and in setting and attaining reasonable goals for the protection of children.

### 1. Policy

The following policies were reviewed:

- Administrative
- Child Protection Investigations
- Adult Protective Services
- Foster Care
- In-home Services
- Interstate Compact for the Placement of Children

For the most part, DFCS policies are consistent with at least minimally acceptable expectations for child welfare practice. As in many agencies, however, policy manuals also include practice guidelines, making them too lengthy to be easily usable and creating difficulty for staff in trying to distinguish legal or regulatory requirements from practice guidance. DFCS has already recognized the need to separate practice guidelines. It is expressed in the Program Improvement Plan and this work is underway with technical assistance from several of the National Child Welfare Resource Centers. A handbook for family centered practice has already been developed and numerous policy memoranda have been issued including directives that prohibit the use of paraprofessional staff such as homemakers for making required monthly contacts with foster children.

*Policy Concerns*

The following are key areas of concern that were noted in foster care policy (Volume IV of the DFCS policy manual):

11

♦ Emergency shelter is listed first among placement resources, and considerably more content is devoted to this type of placement. This fact alone may suggest to staff, especially those working under pressure of time, that shelter placement is to be considered the option of first resort. Although policy provides that shelter placements be limited to no more than 45 days in a six month period, there are few restrictions placed on the conditions under which emergency shelter care can be used. It is stated that infants and preschool children should be placed in family care but there are no guidelines regarding its use for other children.

♦ Although policy supports concurrent planning, the practice of working on an alternative permanent plan while also pursuing family reunification as a means of expediting permanency, it does not clarify precisely to whom or when it should be applied or how decisions regarding foster-adoptive placements should be made.

♦ There is insufficient emphasis on working with families; rather the focus is on making contact with children. Both are critically important as children cannot be safely returned to their families if the parental problems that led to their removal are not addressed.

♦ There should be better clarification regarding the role of homemakers and aides in relation to casework staff. One aspect of the role that is not clear in policy is when the need to transport a child is simply a transportation event and when it is of a much more sensitive nature and should be handled by the child's social worker or perhaps by a foster parent and/or a member of the child's family. In interviews, CWLA consultants heard repeated references to paraprofessional staff transporting children for changes in placement, court appearances, and attendance at therapy. These are emotionally-charged events that represent critical points in the casework process and should not be delegated to persons not trained to assess and respond to the child's reactions.

*Policy Development and Issuance*

A finding of significant concern regarding policy development is that DFCS is understaffed for this function. Currently, only one person is assigned full time to the writing and issuance of policy and this position was only created during 2005 under the current administration through the reassignment of a Foster Care Reviewer. Further, Regional Directors and other managers are called to attend lengthy meetings to develop and write policy, taking them away from their regular work. Although input from staff at multiple levels is an important part of policy development, a system for doing this more expeditiously and with less demand on the time of other staff could be implemented if there were a policy unit with this capacity. Policy and practice guide drafts might, for example, be circulated through the Regional Directors and their comments and those of other staff

12

assigned to review reconciled and integrated by policy writers. The current system also results in new directives too often being issued in the form of memoranda that do not clearly delineate the parts of existing policy they replace or modify. There is concern that policy memos may not be consistently distributed to service delivery staff. This can result in some staff following obsolete policy simply because they are not aware of new issuances or do not fully understand their impact.

> **Recommendations:**
>
> 1. DFCS should continue its efforts to separate policy and practice and to develop practice handbooks that are easier for caseworkers and supervisors to use.
>
> 2. Practice guides and policy revisions should address the concerns identified above with regard to foster care policy content in the areas of shelter placement, concurrent planning, working with parents, and the role of paraprofessional staff.
>
> 3. A state level policy unit is needed. This unit should have sufficient staff with the expertise and experience required to track policy for needed revisions, solicit and organize staff input, and to write, circulate, and issue materials timely and in a manner that ensures that changes are incorporated into existing manuals and consistently distributed to all staff.

## 2. Information Systems

The agency uses an automated data system, the Mississippi Automated Child Welfare Information System (MACWIS) for virtually all documentation and data tracking. The reliance on over-burdened casework staff alone to enter data into MACWIS means that record keeping is often not up to date. However, the most serious issue with MACWIS appears to be the lack of staff to manage programming and to correct problems in the system. A number of delays in implementation of new practice initiatives called for in the state's PIP are due solely to the lack of capacity to program MACWIS so that they can be documented. An additional problem is that MACWIS overwrites case histories meaning that neither caseworkers, supervisors, nor other reviewers have access to all relevant information concerning children and families.

In order for an automated data system to be reliable, those responsible for entering the data must have an investment in its accuracy. This typically occurs when a system is able to provide regular reports and responses to queries that are useful in guiding and managing the work of staff at all levels. Any lack of reliability in MACWIS' may be at least partially due to its inability to be responsive to the needs of caseworkers and middle managers.

Interviews with current administrators indicate that they have attempted to improve the quality and quantity of MACWIS reports to the regions in accordance

13

with the needs of Regional Directors to be better informed concerning key case management activities. Efforts have been made to understand the problems associated with MACWIS and plans are underway to add staff who can make adjustments that will enable the system to better support the work of both management and service delivery staff.

> **Recommendations:**
>
> 4.  Pursue current plans to add staff to expedite programming, and to work as quickly as possible with a representative group of field staff to identify and correct shortcomings in MACWIS.
>
> 5.  Assure that tracking and exception reports for key activities are issued and distributed.
>
> 6.  Develop and implement a standard process for MACWIS revisions and enhancements based on input from staff at all levels.

### 3. Quality Assurance

Foster Care Review (FCR) serves as the quality assurance system for services to children in out-of-home care and their families. FCR is conducted by DFCS staff. As is required by federal regulation, these reviewers do not have direct responsibility for the reviewed case. There are currently 13 positions assigned to FCR. One, however, has been allocated to the policy unit. Reviews are conducted at six month intervals for all children in agency custody. A single FCR worker reviews case record documentation, facilitates the agency's family team meeting (County Conference), and completes a standard evaluation form that assesses compliance with policy.

Lack of a quality assurance system was among the systemic factors cited as needing improvement in the CFSR. Although the agency still lacks a quality assurance system for other service programs, there have been some enhancements to FCR in the two years since the federal review. Efforts to improve the consistency and utility of the FCR process include:

- More in-depth review of a monthly random selection of three cases per region;

- Expansion of review instruments;

- Systematic state level review of FCR reports and issuance of case status reports to Regional Directors so that follow-up can be made on cases with deficiencies cited; and

- Development of a County Conference guide for reviewers and county staff.

Efforts are also underway to improve tracking of cases through MACWIS to insure that reviews are conducted on all cases. Longer range plans are for more

14

detailed entries of review findings into MACWIS to ensure that a complete record of all reviews is maintained. FCR has also developed a client satisfaction survey that is administered at each County Conference. Other participants such as CASA, guardians ad litem, and foster parents have an opportunity to complete these surveys.

An administrative review process such as FCR serves an important function in assuring adherence to policy requirements for children in out of home care. It does not, however, replace a comprehensive integrated quality assurance system.

---

**Recommendations:**

7. FCR data should be incorporated into MACWIS.

8. Feedback from reviews, including a compilation of client satisfaction surveys, should reach to the worker level as well as to supervisors and Regional Directors through regularly issued management reports.

9. Ultimately, DFCS should establish a separate continuous quality improvement system that covers all service delivery.

---

### 4. Training

*Intensive Training (Caseworker Pre-Service)*

The Intensive Training for new caseworkers is designed to be a four-week curriculum delivered one week at a time, with workers returning to their offices between sessions for supervised application. Curriculum materials provided to CWLA revealed that it contains significant content consistent with generally accepted practice standards. However, a number of concerns related to organization of the materials and their utility as a guide for trainers were identified in this review. Ideally, training should be based on a set of competencies and clearly identified learning objectives; these could not be discerned in the materials provided. It also appears that the curriculum is in need of updating with references to more current research and data.

A particularly troubling aspect of the current system for training new workers is that they are often unable to begin the training upon being hired. If a caseworker is hired after a session has begun, it is necessary for that individual to wait until the start of the next session to enroll. That time may be several weeks or even months. Both managerial and casework staff reported that it is common for new staff to be assigned cases prior to being trained.

The DFCS administration has described plans to institute a pre-service training curriculum that would be provided to all new caseworkers before they are actually assigned responsibility for cases. This is planned to follow a model used in several other states in which new caseworkers participate in classroom

15

training interspersed with on-the-job mentoring by a supervisor or experienced worker for a combined training period of twelve weeks. To this end, the agency has hired a training director and assigned four staff positions to the state level training unit. Plans also call for new Program Manager positions which have been requested for each region and for Area Social Work Supervisors (ASWS) to fulfill some responsibilities related to staff development.

This plan represents a significant enhancement to the agency's training capacity. However, attention should be paid to whether the new positions allocated to this function are at a level sufficient to attract experienced personnel with the unique skills needed to develop and deliver effective training curricula. Further, the agency's recent shift from nine to seven regions increases the scope of work for Regional Directors and may mean that the new Program Manager positions assigned to them will need to be primarily administrative in function, leaving little time for training activities. The expectation that a single individual will have the requisite skills to perform both training and managerial functions at an optimum level may also be unrealistic.

---

**Recommendations:**

10. Develop a trainer's guide and participant workbook using existing material and updated research findings.

11. Follow through with plans to fully staff the state level training unit.

12. If persons with child welfare experience and in-depth knowledge of the content which they are training are not available for regular training positions in the agency, training positions should be assigned administrative and coordinating functions and content experts obtained through contractual arrangements.

13. Develop materials that provide for transfer of learning, such as a structured mentoring process, self-guided learning materials, and assessment of skills and knowledge attained.

14. Design and implement a professional development process that is based on an individualized assessment of learning needs.

---

*Training of Supervisors*

A supervisory training work group established by DFCS has recommended development and implementation of a three level training program for supervisors. This will begin with Level One which will be individualized and delivered by regional directors or Program Managers through a mentoring model so as to accommodate newly hired supervisors without the necessity of waiting for several new supervisors to form a group for classroom-based training. Level Two is envisioned to provide intermediate level clinical knowledge and skills needed to guide caseworkers in service delivery and to promote a learning environment within the agency. Level Three would provide more advanced level clinical skills.

16

The work group has recommended that Level Two be built on the *Learning Labs* training for supervisors that was delivered in two northern regions of the state through the University of Mississippi School of Social Work under a demonstration grant. It was part of a multi-site pilot conducted by the Southern Regional Quality Improvement Center at the University of Kentucky. The pilot in Mississippi took place in Regions 1 East and 1 West and was carried out over a two year period ending in 2005. CWLA consultants were provided with an overview of the curriculum and some sample activities and agendas for review. Strengths noted in this review are that the curriculum is competency-based and uses individualized assessments of learning needs. It emphasizes clinical skills development, mentoring, and collaboration.

Participants who were interviewed viewed the curriculum very favorably, believing that it had resulted in better skills among participating supervisors and had improved both the learning environment and workplace morale of supervisors and first line staff. An overview of this training had been provided to all Regional Directors and several indicated a desire to have it delivered in their regions.

Evaluation results of the *Learning Labs* are being compiled and are scheduled to be published later in March, 2006. The University of Mississippi faculty member who is conducting the evaluation was interviewed and reported that the evaluation used a comparison of two other regions not receiving the training. Two measures were used, one of professional organizational culture, and the other of caseworker self-efficacy (Ellett, Ellett, and Rugutt, 2003). These are measures developed for use in the child welfare field and tested in other public agency studies. The pilot evaluation found a modest but significant improvement in both organizational culture and caseworker self-efficacy in the pilot regions.

---

**Recommendations:**

15. Give priority to the development and implementation of Level One supervisory training.

16. Commit to providing ongoing training for all supervisors. This should include not only agency-sponsored but also the opportunity to attend at least an occasional external conference or workshop.

17. Consider adopting the *Learning Labs* training for state-wide implementation. Additional evaluation methods could be used to that would more directly assess the impact of the training on supervisor and caseworker performance and client outcomes.

18. Ensure that any training for supervisors include a focus on their role in supporting and mentoring subordinate staff.

19. Obtain internal expertise or work with consultants to develop more advanced training and a system that provides for ongoing professional development of supervisors based on regular assessment of their learning needs.

17

*Family Centered Practice Training*

Family Centered Practice training is currently being offered to both caseworkers and supervisors throughout the state. Interviews with caseworkers, supervisors, and managers indicated that this training is being well received. Several of those interviewed suggested that adoption of a family centered approach might eventually lead to lowered caseloads if they are able to engage families earlier and do a better job of connecting them with community and informal resources.

**Recommendation:**

20.  Content from the family-centered practice curriculum should be incorporated into the training curriculum for new staff and monitored and reinforced by supervisors.

## 5.  Legal Representation and Support

The judicial system is heavily involved in the oversight of child welfare practice in the United States. In virtually every public agency, service delivery staff are in and out of court rooms on a regular basis and judicial decisions and the work of legal professionals have as much influence on the experiences and outcomes of the families and children who are served by the system as does the quality of agency casework. DFCS relies on legal representation from the Office of the Attorney General and local county attorneys. County and regional DFCS staff involved in this review described a variety of experiences with local courts. Some indicated that agency-court relationships work well and that the courts handle child dependency cases efficiently and effectively. Often, however, staff cited concerns related to the timeliness of hearings, quality of decisions, and/or their own experiences in the courtroom.

Agency staff in some counties are expected to perform legal functions such as the filing of documents and scheduling permanency review hearings. However, with the exception of one region which had recently received some legal training from its county attorneys, caseworkers and supervisors contacted in this review indicated that they have had no training in state laws related to child dependency, maltreatment, and custody, in court procedures, in organizing information in court reports, or in providing testimony. Several of those participating in focus groups described very negative relationships with the court in their jurisdictions. At best, these staff felt that the information they provide and their recommendations are discounted by the court; at worst, they perceive themselves as routinely experiencing rude and demeaning treatment by judges and attorneys. Most viewed themselves as completely powerless in these situations and without any support by the DFCS administration. Further, both managers and line staff indicated that they have never known of a local court decision in any of their cases being appealed and viewed this as a practical impossibility given the current system of legal representation. While appeals of lower court decisions should be undertaken very carefully, they can sometimes

be necessary to ensure that sound decisions are made regarding permanency for children.

Problematic relationships between juvenile courts and child welfare agencies are common, but they can be effectively addressed. This is an area of critical importance in two ways: First and most importantly, when agencies and courts do not work well together, decision making on both sides may be affected by factors that have nothing to do with the best interests of children and families. Secondly, such adversarial court relationships have been found to negatively impact the ability of the child welfare agency to attract and retain qualified staff (Dickinson & Perry, 2003; Malm, Bess, Urbel, Geen, & Markowitz, 2001).

**Recommendations:**

21. All DFCS staff who work with the courts should be provided with training in legal issues related to child dependency and in working with the courts. This should be provided to existing staff as well as being made a part of the initial training curriculum for all new caseworkers.

22. DFCS should request the assistance of the National Child Welfare Resource Center for Legal and Judicial Issues to identify key issues in the agency-court working relationship and to develop and implement a plan to address them.

## 6. *Perceived Administrative Support*

Interviews with caseworkers, supervisors, and managers suggested that, as a group, they perceive themselves to lack support from the state level administration. The notion that state level administrators do not understand the work that they do or the circumstances under which they do it was a recurring theme in conversations with service delivery staff. The following are among the specific staff concerns expressed regarding the level of administrative support:

- Complaints made about county staff are assumed to be founded before they are explored. Caseworkers and supervisors feel that they are put in a defensive position any time their actions are the subject of a complaint or inquiry to the state office.

- Lines of communication are poor. There is a feeling among regional and county staff that they are excluded in the decision making process and that information that affects them is not readily shared. They report that, even when they are requested to attend meetings to provide input, key state level people often do not participate, and then later question the decisions that have been made.

- So many people have been dismissed or have quit at the state level that there are not sufficient people there to provide programmatic support and

19

functional supervision and those who are there are not perceived as having sufficient knowledge or experience to be helpful.

- Some staff indicate having been told that, in the current administration, social workers are viewed negatively and it is considered better to have another educational degree.

- Staff perceive that the agency could do more to provide tangible or visible benefits that would demonstrate that they are valued. The following were among those suggested:

  ✧ Cell phones for field staff. This was by far the most frequently mentioned need related to equipment with caseworkers and supervisors viewing it as a safety issue for themselves and their clients. They are often working in rural areas with no pay phones and many indicated that they use their own cell phones and have had to go to higher cost personal phone plans as a result.

  ✧ More flexibility in the use of compensatory time. Staff indicated that it would be much easier for them to work the late and irregular hours often required of them if they had some ability to adjust their work schedules to accommodate their personal needs and those of their own families.

  ✧ Provision of cars, or at least agency advocacy with businesses for discounts on tires and gasoline to help offset the costs associated with the use of personal cars for field travel.

Although not mentioned by the staff interviewed, it was noted during the course of this review that many caseworkers do not have access to electronic mail. Further, several reports requested, although computer generated, were not available electronically. This is of significant concern as the use of electronic mail and the ability to transmit documents electronically can save many hours of valuable staff time.

> **Recommendations:**
>
> 23. Administrators should immediately identify and implement ways to improve communication between all levels of the organization. This should include, at a minimum, a review of regularly scheduled meetings to clarify their purpose and mandatory participants. Consideration might also be given to the institution of an electronic newsletter or other standard communication.
>
> 24. DFCS should work with counties to assess the status of their technological support in local offices and develop a plan to provide all staff with access to basic computer services.

25. Some accommodation for flexible working hours for service delivery staff should be made. Research has indicated that such flexibility is highly valued by staff and that it has the potential to improve retention (Texas PRS, 2001).

26. DFCS should seek means of obtaining cell phones for field staff as quickly as possible.

27. The agency should explore the feasibility of providing cars for field work or, at a minimum, ensure that compensation for the use of personal cars is sufficient to cover the cost incurred by personnel.

## B. Staffing

### 1. Recruitment, Hiring, and Retention of Front Line Staff

When asked to identify barriers to the recruitment, hiring, and retention of qualified front-line staff, particularly of licensed baccalaureate social workers, Regional Directors uniformly identified low salary and lack of opportunities for advancement as the most serious impediments. The significance of these factors was further confirmed in focus groups with supervisors and caseworkers. Reportedly, Mississippi's Personnel Board has refused to upgrade salaries for caseworkers in over five years. No annual or other cost of living increases are built into the existing salary scale.

All Regional Directors indicated that starting salaries were not competitive with other social work jobs in their regions. Several noted that, even in areas where other social work jobs had low entry level pay, DFCS positions were still not competitive when viewed in relation to the demands of the work. DFCS caseworkers have higher workloads, longer hours, and incur greater personal safety and liability risks than do staff in most jobs with similar requirements. All agreed that the lack of opportunity for salary increases was a major factor. Most other jobs for which applicants could qualify offer the promise of at least nominal periodic pay increases. A "career ladder" that provided for a $2,000 salary increase at two years of service and an additional $4,000 at four years was designed several years ago, but was implemented only briefly before it was eliminated due to lack of funding.

Most Regional Directors felt that licensed social workers could be recruited if working conditions and compensation were better. Some of those interviewed recalled that, up until five or six years ago, it had been easier to attract qualified staff; but as hiring freezes became more frequent and workload increased, the word spread that DFCS was a difficult place to work.

Another factor cited as problematic was the long delay often encountered in the hiring process. It is reportedly not unusual for it to take three months or longer to get authorization to fill a vacancy. As a result, applicants often give up and go to work elsewhere. This delay has been especially troublesome in hiring new social

21

work graduates who have prepared to work in child welfare but who cannot afford to remain unemployed during the long wait to be hired.

The DFCS administration has initiated measures intended to address at least some of the problems with hiring. These include the development of a state-level hiring pool and the introduction of legislation that would provide pay raises.

The issue of educational qualifications for caseworkers and supervisors in DFCS is concerning. Currently, there are two positions in front line service delivery, Social Worker, which requires a baccalaureate degree in social work and a basic social work license, and Child Protection Specialist, which requires only a baccalaureate degree in "social work, education, sociology, criminal justice, psychology, or a directly related field" (MS Personnel Board, 2003). Social Workers have a starting salary of $25,285.68 while Child Protection Specialists begin at $21761.10. Both positions are expected to perform essentially the same functions. Reportedly the Child Protection Specialist position was instituted in order to allow for hiring of unlicensed personnel because the agency was unable to obtain licensed bachelor level social workers in sufficient numbers. This is attributed at least in part to the low pass rates on the licensing examination. While nationally 80.6% of all those taking the basic examination pass (Association of Social Work Boards, personnel communication, January 18, 2006), it is reported that less than half of those participating in Mississippi's Title IVE sponsored social work education program in state universities passed the exam. Because of this, the agency is seeking to establish parity in salary for the Child Protection Specialist position and to develop its own licensing examination which will be open to candidates without social work degrees.

Although most states will accept related degrees, or in some instances any degree as qualifying for entry level child welfare work, a body of research provides evidence that those with social work education have more job-related competencies and remain in the work longer than do others (Albers, Reilly, & Rittner, 1993; Booz-Allen & Hamilton, 1987; Dhooper, Royse, & Wolfe, 1990; Ellett, 2000; Lieberman, Hornby, & Russell, 1988). A number of writers have suggested that there is a relationship between the myriad problems affecting child welfare practice and the de-professionalization of the field which began in the 1960s (Leighninger & Ellett, 1998; Steib & Blome, 2003-2004). Further, in several states, agency-university partnerships funded through Title IVE have been shown to produce graduates that have greater job-related skills (Fox, Burnham, Barbee, & Yankeelov, 2000; Hopkins, Mudrick, & Ruduolph, 1998; Okamura & Jones, 1998) and whose performance is more conducive to attainment of safety, permanency, and well-being goals for children (Hubener, 2003). In view of this, the move of DFCS away from professional standards is troubling. It exceeds the scope of this review to determine whether the inability of the agency to hire licensed BSW level social workers is due to the low pass rates on the licensing examination or whether those who do pass simply choose to work elsewhere. However, the best evidence to date suggests that more long term gains might come through working with universities to improve child welfare

content in their curricula and raise performance expectations than to abandon professional standards.

Several staff also expressed concern that the "Educational Benchmark" program which has now been eliminated may be a factor negatively impacting the agency's ability to hire or retain staff. This program provided agency support for employees wishing to obtain a work-related college degree and was reportedly valued by paraprofessional staff such as aides and homemakers as a means of advancing in the agency as well as by caseworkers wishing to obtain an MSW. Staff reported that such programs are available in the state's mental health agency and public schools, a fact which further contributes to their perception of being less valued than the workforce in those systems. The elimination of this program in DFCS is unfortunate as studies have shown that employees who obtain social work education through such programs are likely to remain with the agency even after they complete the period of commitment that is usually required (Jones, 2002; Robin & Hollister, 2002). Further, this program could provide a valuable opportunity to increase the number of MSW level social workers, particularly among supervisors. Although the total number of supervisors having an MSW was not made available in this review, it was noted that only two of the eighteen supervisors who participated in focus groups had an MSW.

A final issue of concern in recruitment of qualified staff is that state personnel regulations reportedly require that anyone entering agency service for the first time start at entry level. Such a policy further handicaps the agency in recruiting qualified staff by presenting an unnecessary barrier to hiring those who happen to move to Mississippi or who might wish to transfer to DFCS from other agencies.

**Recommendations:**

28. Compensation is a critical issue for service delivery staff in DFCS and needs to be addressed as quickly as possible. The following measures are recommended:

   a. Adding an annual cost of living increase into the current pay structure.

   b. Implementing a career ladder that provides opportunities for advancement in grade while remaining in direct service delivery. When promotions are available only by moving into management, agencies risk losing the service delivery capacity of experienced staff who may be best suited to front line work.

29. Continue to work within DFCS and with the Personnel Board to identify ways to expedite the hiring process. This should include assurance that students completing agency sponsored Title IVE stipends are hired as quickly as possible following graduation so that the agency does not risk losing them through expiration of their contractual commitment.

23

30. DHS/DFCS should take action to remove the restriction on starting experienced child welfare or social work professionals from other systems at higher levels in the pay scale.

31. Re-institute the "Educational Benchmarks" or a similar model that offers educational leave and tuition support, either part- or full-time for employees desiring to further their social work education in schools that have demonstrated an ability to produce graduates capable of passing the baccalaureate level social work licensing examination at an acceptable level (i.e., at least 70%) for the past two years. A similar passage rate should be required of graduate schools for those pursuing a Masters in Social Work. Further, supervisors should be given priority consideration for support in obtaining an MSW.

32. Institute a multi-faceted initiative to attract the best social workers in Mississippi to work in DFCS. This would include, at a minimum:

   a. Following through with recommendations to lower workload to manageable levels, institute more equitable compensation, and provide stronger supervisory and administrative support and publicizing these efforts through the media, schools of social work and the state chapter of NASW.

   b. Establishing requirements for Title IVE contracting with universities to include:

      i. A passage rate threshold of at least 70% on the baccalaureate licensing examination within two years;

      ii. Inclusion of specific child welfare practice content in the required course content for stipend students as has been done in IVE programs in Kentucky, Georgia, and Louisiana.

## 2. Workload

The workload of front line staff is among the most critical of the concerns identified in this review. Although a few caseworkers interviewed in focus groups indicated that their current caseloads were manageable, most viewed excessive workload as a major impediment in doing their jobs effectively. Many DFCS staff routinely carry caseloads in excess of 40 foster children and/or in-home cases, with some caseloads reported to be substantially higher. Supervisors report that they often carry cases as well or that the largest share of their time is devoted to casework activities rather than to supervision. Further, Regional Directors acknowledge that most social work staff are expected to give priority to child protection investigations, resulting in their having insufficient time for services to foster children and, in some instances, delegating responsibility for required contacts with children to paraprofessional support staff such as homemakers and case aides. This practice is prohibited by a recent revision in agency policy, but

24

where workloads remain unmanageable, adherence to the new policy may be a practical impossibility.

A workload study was a major part of this systems review. This study examined the case-related job functions of DFCS caseworkers and the amount of time required to complete activities and sub-activities associated with each function in order to determine the number of cases that might comprise a reasonable workload for a single caseworker. The process began in September, 2005 with a review of agency program policies, job descriptions, and other key documents included in the listing in Section B.1. of this report. A workgroup of agency representatives was organized in October, 2005 and worked through January, 2006 identifying activities associated with distinct job functions and using a structured process to arrive at the most accurate estimations of the time required for these activities.

Due to limitations in the contract for this project and to circumstances in the state at the time of the study, a structured estimation methodology, rather than an actual time study, was used as a basis for determining workload. As a result of the previously mentioned storm, a time study measuring "business as usual," which is usually considered optimal in workload analysis, was not feasible within the time frame needed. The structured or "expert" estimation process employed in this study has been used effectively in other jurisdictions to examine workload (Washington DSHS, 1997).

A detailed description of the study process and supporting documentation are contained in Appendix A. The key findings of the study are the amount of time required to manage each type of case in accordance with current agency policy for one month as depicted in Table 5 on page 26.

Recommendations regarding reasonable workload are based on two key factors: the estimated time an individual caseworker has available to perform case-related activities and the amount of time required to complete the activities associated with carrying a particular case during a month. Any determination of reasonable workload must consider the time actually available for an individual caseworker to perform case-related activities. This means that time consumed by administrative activities (training, general staff meetings, leave, breaks, holidays, and any other activities not case related) must be excluded to derive the base amount of time available for casework. In this study, the general "one third rule" (Tooman & Fluke, 2002) derived from numerous workload studies in child welfare and related human services, was applied to represent administrative time and to obtain the figure of 116 hours for the time available for an individual caseworker to complete case-related activities. Using this figure with the time estimates in the table below yields the following monthly caseload standard in each category:

- Intakes - 118

- Child Protection Investigations - 14

- Foster Care - 14
- Adult Protective Services - 27
- In-home Dependency – Prevention - 25
- In-Home – Protection – 17
- Adoption – 9
- Licensing – New Application – 15
- Licensing – Renewal - 36

**Table 5**

| Major County Job Functions | Estimated Time Per Month Per Case |
|---|---|
| General Intake | 59 minutes |
| Child Protection Investigation (CPI) | 484 minutes; 8 hrs./4 min. |
| Adult Protective Services (APS) | 254 minutes; 4 hrs./14 min. |
| In-Home Dependency – Prevention | 275 minutes; 4 hrs./35 min. |
| In-Home Dependency – Protection | 410 minutes; 6 hrs./50 min. |
| Foster Care | 507 minutes; 6 hrs./50 min. |
| Associated County Job Functions | Estimated Time Per Month Per Case |
| Interstate Compact (ICPC) | 106 minutes; 1 hr./46 min. |
| Intra-State Home Studies | 288 minutes; 4 hrs./48 min. |
| Courtesy Interviews | 65 minutes; 1 hr., 5 min. |
| Regional Job Functions | Estimated Time Per Case Per Month |
| Adoption | 807; 13 hrs./27 min. |
| Licensing – New Application | 470 minutes; 7 hrs./50 min. |
| Licensing – Renewal | 191 minutes; 3 hrs./11 min. |

*Application of Workload Study Findings*

The above-listed time estimations make it possible for caseworker needs to be calculated for the state as a whole, as well as for regions and counties, based on the case count in each identified job function. Individual caseload assignment is somewhat more complicated, however, as most county offices of DFCS use generic caseload assignment. This system is supported by Mississippi law and allows a single caseworker to maintain continuous responsibility for serving a family rather than requiring a change of caseworkers as a family moves through different programs in the service continuum. However, because any given caseworker is subject to carrying an ever-changing mixture of case types, individual workloads will need to be monitored from month to month. This is done by applying the total time required for cases carried by a caseworker to the approximately 116 hours, or 6960 minutes, available for case related work. For example, a caseworker having a mixed caseload may carry 20 cases one month (4 FC, 6 Prevention, 4 CPI, 3 Protection, and 2 ICPC for a total of 6,860 minutes) and be within the acceptable workload and only 15 the following month (6 CPI, 5 FC, and 4 Protective for a total of 7,079 minutes) and be slightly over the

standard. This means that regulation of workload will require careful monitoring by supervisors.

It is to be expected that workloads will vary somewhat, with some staff slightly exceeding the standard one month and falling slightly below it in others. In order to use these standards effectively in overall planning, DFCS should establish a margin which would trigger re-evaluation and possible re-allocation of staff in a particular county or region or in the state overall. The state of Delaware, for example, has legislation that requires some action be taken when average caseloads exceed the caseload standard by ten percent (personal communication Keith Zirkle, Delaware of Children, Youth, and Their Families, December, 2004).

*Additional Considerations in Workload Management*

The caseload allocations suggested by this study are substantially lower than those currently being carried by DFCS caseworkers and, with the exception of in-home prevention services, closely approximate the recommendations in the standards of the Child Welfare League of America. The application of these standards will do much to move DFCS forward in its capacity to deliver an acceptable level of services to needy children and families in Mississippi. There are, however, a number of factors related to this study as well as to other issues that should be considered in undertaking a comprehensive effort to achieve equitable and manageable workloads for service delivery staff in DFCS.

First, time estimations derived from this study are based on the mid-range of the individual estimates given by members of the study group or by the colleagues from whom they solicited information. Although there was generally remarkable convergence in time estimations among group participants, this may mean that there are a few counties in which the standards developed by the work group are not fully applicable. There were some outlier estimations which were most often attributed to the impact of individual court practices on agency staff time. A few courts, for example, require that review hearings be held more frequently, demand more frequent reports, require that DFCS staff, rather than other county or court personnel, serve legal documents to clients, or schedule hearings in a way that results in more court waiting time for caseworkers and/or supervisors. Counties named by group members as having particularly intensive court involvement include Alcorn, Forrest, Harrison, Madison, Rankin, and Yazoo. Activities impacted by court requirements may warrant additional study in these counties in order to achieve reasonable and equitable workloads. Once clearly identified and measured, issues such as court waiting time that far exceeds the norm may be raised with the Administrative Office of the Court for possible attention in the state's Court Improvement Project or in another venue with the Youth Court judges. If this cannot be done successfully, it may be necessary to apply a unique workload standard to these counties.

It should also be recognized that it is likely that there is variation in screening and service authorization practices among counties or regions, with some using more

27

restrictive standards as a means of limiting workload. Thus the use of these study findings must be combined with uniform intake and screening practices to promote equity and consistency in service delivery across the state. DFCS has already undertaken the development of a new screening and assessment process with technical assistance from the National Child Welfare Resource Center for Child Protective Services and plans to implement this during calendar year 2006.

Members of the Workload Study Group were asked to estimate the time required to complete each activity and sub-activity as required to conform to current policy requirements. Thus, this analysis reflects the amount of time that an individual activity would require if done completely according to staff's current understanding of policy and practice. Thus these estimations may not in every instance be reflective of best practice. Any workload analysis must be regularly updated if an agency is to ensure that its capacity for effective service delivery is maintained. Caseload standards can become outdated almost overnight if work requirements change as may happen in the wake of new legislation or the imposition of additional expectations by the administration. Mississippi's federal Program Improvement Plan and training currently underway in the state are moving child welfare practice toward a more family-centered approach. This shift is consistent with both research and practice wisdom related to effective service delivery (NCWRCFCP, 2000; Rooney, 1992; Shireman, Yatchmenoff, Wilson, Sussex, & Gordon, et al., 1998). However, such practice calls for greater engagement of families, more individualized assessment and case planning, and more reliance on the development and use of informal resources. These things take time; family engagement is directly, although not solely, dependent upon time spent with families. Involving families in a thorough assessment and in case planning is more time consuming than simply writing a case plan in the office and presenting it to the family.

Several additional issues that surfaced during this study process are of concern and have implications for workload management. One is the use of the "primary client" system to count cases. With foster children this is straightforward as each child constitutes both a primary client and an individual case. With in-home cases, however, the system becomes confusing due to the fact that, in addition to heads of households normally being considered as primary clients, any other family members who are subjects of a protective order may also be so designated. Thus a family of the same size with very similar service needs may have two, three, or more primary clients in one county, and thus be weighted more heavily, and only one primary client in the other county simply because of differences in court practices related to issuance of protective orders.

The current caseload system uses a designation of "county of responsibility" and "county of service" in those instances in which children in foster care are placed outside of the county in which they entered care or when families move across county lines. Some, but not all, case contacts are made by county of service staff while duties associated with court hearings, reports, and permanency planning are conducted and coordinated by the caseworker having responsibility

28

for the family case. This practice further splits responsibility for cases, creates greater need for communication and coordination, and thus increases the risk that service needs will be overlooked. Additionally, some caseworkers indicated that, in the case of children in out of home care, contact and services provided by the "county of service" worker are less intensive and consistent.

---

**Recommendations:**

33. Using the time estimations derived from the workload study, develop a phased-in plan for adding caseworkers in sufficient numbers to achieve manageable workloads within two years. Such a plan, to be credible, will obviously require a commitment from the legislature for funding. It will be neither possible nor practical for DFCS to attempt to bring the number of new workers needed on board at one time. The plan for achieving reasonable workloads will need to be aligned with implementation of the recommendations regarding training and supervision.

34. DFCS may do well to re-think its system of case counting. One alternative would be to count the cases of foster children individually as is done now, and to count CPI and other in-home cases by family.

35. Transfer cases of children placed across county lines would eliminate ambiguity regarding responsibility for service delivery. The caseworker providing services to the family could then be responsible for coordinating information and permanency planning activities.

---

### 3. Supervision

Casework supervisors are the lynchpins of front line practice. In child welfare workforce research, no factor has been more consistently linked to agencies' ability to attract and maintain stable service delivery staff than has supervision (Arkansas DCFS, 2002; Bernatovicz, 1997; Cicero-Reese & Black, 1998; Dickinson & Perry, 2002; GAO, 2003; Rycraft, 1994; Samantrai, 1992; Scannapieco & Connell-Corrick, 2003; Yoo, 2002). The strength of these findings suggests that agencies concerned with strategic pursuit of systemic reform can make no better investment than in the development of their supervisors.

Unfortunately, supervisors contacted by CWLA consultants in the course of this review were uniformly frustrated at what they perceive as unreasonably adverse working conditions, lack of administrative support, and inadequate compensation and benefits. In one region, for example, supervisors indicated that they may be appointed to their position in an acting capacity but continue to receive the salary of their caseworker job, sometimes also carrying their caseload while adding supervision. Supervisors said that they often carry cases or spend much of their time fulfilling casework activities rather than providing guidance and support for front-line staff. This is necessitated both by the need to assist caseworkers in

managing their heavy workloads and to cover the vacant caseloads that result from the high turnover and inability to hire new staff.

It was learned that supervisors are not located in every county office. Although it is understood that some counties are too small to justify more than one or two caseworkers, this practice is of concern given what is known about the importance of supportive supervision in child welfare.

---

**Recommendations:**
*Several of the recommendations given above with regard to recruitment and retention of front line staff and workload will also impact supervisors. In addition, DFCS should consider the following:*

36. Compensation and opportunities for advancement for Area Social Work Supervisors should be re-evaluated and a system developed that allows for them to advance in their positions. This compensation plan should be at least comparable to those provided for casework supervisors in other Southern states.

37. Supervisors should receive pay for the supervisory position even when they are appointed in an acting capacity.

38. Consider consolidation of offices in small rural counties to allow for on-site supervision of caseworkers.

---

## 4.  Administrative Staffing

An effective child welfare agency not only needs sufficient numbers of qualified staff at the level of service delivery, but also must provide the administrative supports to ensure that those staff have the guidance, training, and oversight that they need to function well. Agency accountability to funding bodies and to the public is also dependent upon administrative capacity to assess practice, track data and expenditures, and plan for future organizational needs.  Observations made in this review suggest that DFCS is understaffed at the administrative and management levels.  Currently, DFCS has only one staff person assigned to policy; its MACWIS system is inadequately staffed resulting in programming delays of several months; its level of human resource support is inadequate, making it difficult even for senior management to access key data such as staff turnover rates; and it has only very limited capacity to conduct quality assurance activities. Program management staff does not have the capacity to provide functional supervision and consultation, to participate in planning and policy development, or to work with Regional Directors closely enough to bridge the gap that typically exists between state level administration and field staff in large bureaucracies.   Regional Directors, for example, point out that there is a perceived lack of support from the state level and that, while there had at one time been plans for regular meetings between regional staff and program management as a means of facilitation communication and building trust, this has not occurred.  Further, program managers are not in regular attendance at

key meetings, such as those with Regional Directors or work groups that involve their area of responsibility.

Levels of pay for most administrative and management jobs are in the $30,000 to $40,000 dollar range. This level of pay may not be sufficient to attract experienced staff into key administrative positions.

The current administrative structure divides program units into the categories of Prevention, Protection, and Placement. The staffing of these units, does not, however, conform to their stated functions. Foster Care Review, for example, is located in the Protection unit. Lack of clarity in the responsibility of these divisions may be confusing to staff at the regional and county levels and further contribute to problems in communication.

> **Recommendations:**
>
> 39. MDHS/DFCS should undertake an analysis of its administrative and management needs and develop a staffing plan that ensures its ability to fulfill key functions necessary for accountability and the support service delivery staff.
>
> 40. The agency should re-evaluate its organizational structure at the administrative and program management levels to ensure the most efficient grouping and assignment of related functions and maximize responsiveness to regional and county staff.

## C. Practice and Resources

### 1. Service Needs and Availability

Information regarding service needs and availability was derived from the staff survey described in Section III.B.6. as well as from focus groups and interviews.

*Mental Health and Substance Abuse Services*

DFCS staff at all levels expressed a need for greater variety and availability of mental health services for clients. The most frequently requested services named by caseworkers were psychological assessment or testing (26.74%), counseling (19.28%), and individual therapy (18.77%). Twenty-one percent of those responding indicated that such services were readily available while 66% said that they were somewhat available. Just over 65% of respondents said that the most requested services were accessible to clients while 13% indicated that they were not accessible.

Family therapy headed the list of mental health services that caseworkers would like to see increased, followed by behavioral interventions, and counseling. This is consistent with findings of focus groups and interviews in which some staff expressed concern that the mental health services available may not be family focused or particularly suited to the needs of children and families involved in

31

child welfare. These responses combined with those of the survey, suggest that caseworkers and supervisors may be asking for services they know are available, while recognizing that they may not be the most effective interventions for their clients. This is understandable given the pressure on service delivery staff to "do something" even when needed services are in short supply.

Children and families involved with child welfare, not surprisingly, represent a population with greater mental health needs. At the same time, however, it is important to consider that increased use of mental health services in child welfare may also be associated with the absence of clinically skilled service delivery staff. When caseworkers and their supervisors have neither the knowledge, skills, nor time to conduct thorough and accurate individual and family assessments or to engage and problem solve with clients, the tendency may be to view every psychosocial need as warranting a referral for mental health evaluation or treatment. In fact, families and children benefit most from strategic mental health services, those that answer clearly defined questions or address specifically identified needs. A practice of routinely making general referrals for non-directed treatment is likely to expend resources without yielding real benefits (Chambless & Ollendick, 2001; Lipsey, 1992).

The most frequently requested substance abuse services were for the screening, assessment, and in-patient treatment of adults. These services appear to have somewhat greater availability than other mental health screening and treatment; 22.46% of respondents rated them as readily available and 63.77% as somewhat available. However, 23.19% indicated that accessibility of substance abuse services is a problem for their clients, while 47.83% rated them as readily accessible. In-patient (20.41%) and out-patient (18.66%) adult substance abuse treatment were by far the most frequently named areas needing additional resources.

**Recommendations:**

41. Use data from this survey as well as Medicaid utilization records of DFCS clients to assess mental health service needs in each region and work at the state level with mental health and Medicaid system officials to align resources with needs as closely as possible.

42. Consider adding clinical capacity within DFCS in the form of licensed masters level social workers at the regional level to provide consultation in assessment and case planning in new foster care cases. Such capacity can better ensure that referrals for additional clinical evaluation and treatment are necessary and targeted to meet specifically identified needs.

## 2. Medical and Dental Treatment

Caseworkers named lack of financial resources and service availability as the leading barriers to obtaining medical and dental examinations for children. In

focus group questioning, they explained that few providers are willing to accept Medicaid payment rates so those that do have waiting lists. Over 20% of survey respondents named waiting lists as the chief barrier to obtaining medical treatment for children once a condition is diagnosed.

---

**Recommendations:**

43. In conjunction with state Medicaid officials, identify providers in each region and their utilization rates by children in custody to determine gaps in service availability as a basis for focused recruitment of providers.

44. Approach providers in uncovered areas to provide services for children in DFCS custody.

---

### 3. Parent Education

Because parent education is widely regarded as one of the most frequently applied interventions in child welfare, the survey included specific questions about this service. Caseworkers named appropriate disciplinary practices (28.31%), parental understanding of age-appropriate child behavior (21.96%), and safety and nurturing of young children as the three areas most frequently needing to be addressed in parent education. Only 17.39% indicated that parenting programs to address these needs were readily available, while 62.32% responded that they are somewhat available and 10.87% indicated that they are not available. Regarding geographic accessibility, less than half (42.03%) rated parenting programs to address identified needs as being readily accessible to clients.

Measurement of intervention effectiveness is a common area of concern in child welfare. Indeed, a small body of research has begun to identify the tendency of courts and agencies to consider compliance a proxy for successful completion of services (Brank, Williams, Weisz, & Ray, 2001). Thus, caseworkers were asked specifically what factors they considered in determining successful completion of services. The most frequently provided answer to this question was attendance (21.39%), followed by progress reports from the program (20.45%), level of participation (19.51%), parent feedback (18.39%), and observed transfer of learning (18.20%). In rating factors that are most important in gauging success, however, observed transfer of learning (36.84%) was by far the most frequently provided response.

Most parent education is offered through Mississippi's network of family resource centers. Discussion of these services in focus groups and interviews indicated that there is little knowledge among staff regarding the types of parenting interventions offered. However, the need for greater availability and accessibility was more frequently expressed than were concerns about quality. The provision of parent education through regional family resource centers is viewed as a positive in this review. Parent education and family skills building interventions

33

have been found helpful in addressing child maltreatment and, to an even greater extent, in helping families deal with problems related to child behavior (Corcoran, 2000). Effective programs tend to be ones that involve the entire family, use active engagement techniques, have a cognitive behavioral orientation, and focus on building skills in problem solving, communication and interpersonal relationships, and anger and stress management. Many also include a group component. There are a number of models available for replication that include these characteristics and have some degree of demonstrated effectiveness in changing parental attitudes, knowledge, and to a lesser extent, parenting behavior. Even if programs do not adhere strictly to an evidence-based model, they may be effective if they have the preceding characteristics. However, this can only be determined through an evaluation which includes some measurement of changes in knowledge and attitude and of transfer of learning into the parent-child relationship.

---

**Recommendations:**

45. The agency should inventory the parent education programs available to its clients to determine whether an evidence-based model is used or, alternatively, that the program has the characteristics associated with effective interventions.

46. All programs should be required to use some type of evaluation to demonstrate, at a minimum, changes in parental knowledge and attitudes, and preferably in targeted parenting behaviors.

47. Additional programs, implemented either through the resource centers, directly by agency staff, or through the use of contracted providers should be established to ensure greater availability and accessibility.

---

## 4.  Other Supportive Services

Other service needs most often identified by caseworkers in either the survey or focus groups were transportation and concrete services such as furnishings, clothing, or utility payments which typically call for small expenditures of flexible funding. An agency's ability to provide concrete services is important factor in engaging clients as well as in meeting real immediate needs (Dawson & Berry, 2002). Each county has an allocation of flexible funds which varies depending on the extent of county support. It is also possible to request assistance from other counties that may have surplus monies available. However, many caseworkers indicated that this resource is very limited and thus tightly controlled and difficult for them to access on behalf of their clients.

34

**Recommendations:**

48. DFCS, at the state and regional or county levels, should explore means of increasing funding to meet the immediate concrete needs of clients and establish guidelines that provide for their prompt use and accessibility.

## 5. Practice Issues

*Family Centered Practice and Team Decision Making*

DFCS is making efforts to move from a more traditional child centered practice approach to one that is family centered. This is a framework based on the belief that the best way to protect children in the long run is to strengthen and support their families, whether nuclear, extended, foster, or adoptive. As part of this shift, the agency is also supporting more consistent use of team decision making including family team meetings for initial service planning and as part of ongoing periodic case review. Training in family centered practice is currently underway around the state.

A move to family centered practice is supported by both research and prevailing thought among child welfare professionals (NCWRCFCP, 2000). It is viewed as a positive and staff in focus groups were enthusiastic about this shift. The agency's ability to successfully accommodate this practice shift will be reliant on the assurance of administrative support and adequate staffing as noted above. It is also important that the training, policy, and supervision that support family centered practice involves careful individualized assessment and should not mean that children are exposed to greater risk of harm.

### Concurrent Planning

Concurrent planning refers to the practice of working on an alternative permanent plan for a child at the same time that efforts are made to reunite the family. It is widely considered effective in moving children more quickly to permanency and is encouraged in DFCS policy. Caseworkers are, in fact, required to list an alternative permanent plan on case plans and the new practice guides for family team meetings that the agency has issued address fundamental principles of concurrent planning, such as being open and honest with families about all possible outcomes of the agency's intervention. In spite of this, however, both managers and caseworkers interviewed indicated that planning for permanency is most often sequential, with no real work done to effect an alternative plan until it is determined that a child cannot be returned to his or her family of origin. Managers felt that many staff do not really understand concurrent planning and are still focusing on reunification alone until it becomes clear that it will not occur. This was confirmed in focus groups with caseworkers.

**Recommendations:**

49. Training of both new and existing staff should include the basic principles of concurrent planning.

50. DFCS should use data on length of stay and permanency outcomes for children in custody to consider whether concurrent planning, including foster/adoptive placement should focus on a particular group of children.

*Placement Resources*

Staff at all levels indicated that the lack of a sufficient array and distribution of family placement resources results in the need to separate siblings and to place children farther from their families and communities than is desirable. The lack of respite services and child care were identified as the most serious impediments to recruiting and retaining qualified foster parents. Some caseworkers also expressed concern about the quality of foster parents who are approved and their willingness or capacity to care for the largely special needs population of children in out of home care. Finally, the current practice of covering the states licensing needs with staff assigned through only three regions was seen as problematic with regard to the amount of time consumed by travel and the fact that licensing personnel are not sufficiently connected to the other regions they serve to understand their needs and provide support to resource families.

In an attempt to address the need for a greater array of family placement resources, the agency in 2005 engaged technical assistance through *Adopt U.S. Kids* and conducted a statewide assessment of the agency's recruitment, response, and retention of resource families. A total of 352 stakeholders, staff, private providers, and resource families took part in the assessment in order to make recommendations to the state planning committee formed to address resource family recruitment and retention. This group developed a series of nine strategies, all of which have the potential of improving recruitment and retention of foster and adoptive families. Needs and strategies developed from this process include:

- Begin dual licensure so that applicants gain approval at the outset for both foster and adoptive parenting rather than having to undergo an additional process should they wish to adopt a child in their home or, in the case of adoptive parents, to accept a child in temporary care.

- Develop policy and practice guidelines to prevent the use of resources for the licensure of families not interested in accepting children with special needs. Currently, Mississippi has a large number of unused resource families, apparently because it is believed that any applicant who complies with regulations has a right to be licensed.

36

- Provide resources and authority for regions to contract with private agencies for recruitment and licensing of resource families.
- Develop regional recruitment and retention plans.
- Develop and implement additional supports for resource families.

Although the recruitment and retention plan has not been fully implemented, some of the above recommendations are already being addressed. For example, DFCS has undertaken a review of its current board payments in relation to the cost of caring for a child in the urban South as established by the United States Department of Agriculture. Plans are being made to assign licensing personnel to each region and the administration is seeking allocation of funds to provide payment for respite care for children in order to offer periodic relief to foster parents. However, there remains a need to more consistently provide child care to enable children to be placed in families where parents are employed. Currently, child care for foster families is only available under the state's federally funded child care program and foster families do not receive any priority consideration in their application for this service.

The number of licensed foster homes available for children placed by DFCS increased by 53 over the past year. It is unclear, however, the extent to which this actually represents usable additional resources as the agency reportedly continues to license families who are not interested in most of the children for whom placements are needed..

*Kinship Placements*

Caseworkers and supervisors alike expressed concern regarding the agency's inability to provide greater financial support to relatives who are caring for children in agency custody. Some indicated that more children could be placed with extended family if funds were available to pay for child care and to cover additional expenses such as clothing. Currently, policy provides that relatives may be licensed and thus receive a foster care board rate for children placed with them if they meet the same standards as an unrelated foster family. In practice, however, agency staff indicated that this is not encouraged due to concerns that dependence on the board payment will discourage relatives from accepting custody of children if they cannot return home. This concern is recognized in DFCS and funding is being sought to provide additional financial assistance to kinship placements.

**Recommendations:**

51. Complete implementation of the recommendations of the draft recruitment and retention plan developed in June 2005.

52. Consider the use of private providers to augment agency capacity in recruitment and preparation of family resources. Private providers often are able to promote fostering and adoption among constituency unavailable to the public sector

53. Address the assessing and licensing of families who are not interested in the children for whom homes are needed. This may be a legal issue since Mississippi 43-15-5 (2) provides that if a person meets licensing requirements to operate a "child residential home" as defined in Section 43-16-3, he or she shall be granted a license. The definition in the referenced section appears to pertain to foster and adoptive families.

*Expediting Permanency*

Examination of work processes revealed several areas which appear to be especially prone to delays that slow the attainment of permanency for children. A particular area of concern is the termination of parental rights process. Although voluntary relinquishments are frequently obtained in those instances in which children cannot be returned to their families, caseworkers indicated that this usually does not occur until after a petition to terminate parental rights have already been filed.

Particular points in which delays were identified in the termination process include (1) the completion of the required information packet by caseworkers; (2) state level review; and (3) preparation of the petition by staff attorneys in the Office of the Attorney General.

**Recommendations**
*Delays in the termination process may be mitigated by the above recommendations regarding agency legal representation, as well as by more consistent implementation of concurrent planning and family-centered practice which might be expected to support earlier alternative planning for permanency and eliminate the need for involuntary terminations in some instances. The following additional steps are suggested:*

54. Review the information packet currently required to determine whether it can be streamlined, particularly when a termination is requested on a sibling group.

55. Consider whether the review and approval process that is now conducted at the state level can be expedited or moved to the regional level.

## V. Conclusions

Every effort has been made in this systems review to evaluate objectively the current MDHS/DFCS system and to communicate the concerns that were raised to the Director of DFCS. Although many, if not most, of the needs identified in this review might be found at some level in any child welfare system in the United States, the Mississippi system does present a picture of having been chronically under-resourced, seriously so in several areas.

This document lists 55 recommendations for systems improvement. While all are considered important, some are viewed as foundational in a comprehensive effort to create a child welfare system that is fully responsive to the needs of children and families in Mississippi. The most pressing needs in DFCS are in the following areas:

1. Increased numbers of skilled professional staffing at all levels, but particularly in the area of direct service delivery;

2. Training and ongoing professional development for service delivery staff; and

3. Additional family placement resources for children in the agency's custody.

Staffing is critical at all levels, particularly in service delivery and in the training and organizational support of direct service personnel. A recommendation for an exact number of additional staff is reliant upon factors which exceed the scope of this review, such as the existence of backlogged or inactive cases. However, the workload analysis conducted with the assistance of DFCS personnel suggests that most caseloads should be less than half of the standard of 40 primary clients currently set by the agency. Staffing of the agency at an acceptable level will require a multi-faceted initiative that includes attention to equitable compensation and opportunities for advancement, a system for ongoing review of workload, training and staff development, skilled and supportive supervisors, and outreach to schools of social work and social work organizations in the state to inform them of the changes being made in the agency and enlist their help in the recruitment of new applicants.

The ability of DFCS to effectively address needs related to training and placement resources is also dependent upon staffing. In these areas as in service delivery, it is critical that the focus be not just on numbers of personnel, but on their quality and the way in which they are supported by the organization. Adding positions will be of little benefit to needy children and families in Mississippi if staff lack the skills and supports they need to work effectively and if turnover remains high. This document outlines recommendations for working with universities and professional organizations to enlist their support and help in attracting and preparing personnel who have the requisite knowledge and skills for this very important work.