# "BEYOND DANGER!"
## A Management Review of the Mississippi Department of Human Services Division of Family and Children's Services (MDHS/DFCS)

### Cathy R. Crabtree

### February 2006



# TABLE OF CONTENTS

EXECUTIVE SUMMARY                                                           1

I.   INTRODUCTION                                                          4

     A. Reviewer Qualifications and Methodology                            5

     B. Agency Overview                                                    6

     C. Historical Background                                             7

II.  MDHS IS DANGEROUSLY UNDERSTAFFED AND STAFF ARE
     POORLY TRAINED                                                       12

     A. "BEYOND DANGER!" Caseloads Put Children's Safety At Risk          12

     B. MDHS Maintains High Staff Turnover And An Ineffective
        Hiring Process                                                    14

     C. MDHS Fails to Adequately Train and Supervise Its Staff            16

            (i)     Training
            (ii)    Supervision

III. MDHS LACKS STRONG AND STABLE LEADERSHIP
     TO ENSURE EFFECTIVE SERVICES FOR CHILDREN                            20

     A. MDHS Leadership Has Been Inconsistent And Ineffective             20

            (i)     The Governor
            (ii)    MDHS Executive Director
            (iii)   DFCS Division Director
            (iv)    A Doomed Program Improvement Plan

     B. MDHS Fails To Provide Staff Adequate Resources                    24

            (i)     Failure To Develop Adequate Placements
            (ii)    Failure to Develop an Adequate Service Array
            (iii)   MACWIS
            (iv)    Lack of Modern Technology

     C. The MDHS Management Structure Is Inefficient And Creates
        Gaps In Lines Of Responsibility For Children's Safety And
        Well-Being                                                        32

     D. MDHS Lacks A System Of Accountability For Agency
        Responsibilities                                                  36

        (i)     Lack of Administrative Accountability
        (ii)    Failure to Develop an Adequate Quality Assurance System

IV.   **MDHS DENIES CHILDREN ADEQUATE SERVICES AND FAILS
      TO PROTECT THEM FROM HARM**           **42**

     **A. MDHS Denies Children Safe and Appropriate Placements**    **42**

        (i)     Children Are Arbitrarily Placed
        (ii)    Children Are Over-Institutionalized
        (iii)   Children Are Placed in Inappropriate Emergency Shelter Placements
        (iv)   Children Are Denied Needed Therapeutic Placements
        (v)    Children Are Placed in Overcrowded Homes and Facilities
        (vi)   Children Are Placed in Unlicensed Homes and Facilities
        (vii)  Children Are Placed in Inadequately Screened Relative Placements
        (viii) Children in MDHS Custody Are Routinely Separated from Their
              Siblings
        (ix)   Children Are Placed Far Away From Family
        (x)    Children Are Subjected to Multiple Moves
        (xi)   MDHS Fails to Supervise and Screen Children's Placements
        (xii)  Children Are Maltreated in Foster and Adoptive Placements

     **B. MDHS Fails To Provide Children With Health Care And Other
       Needed Services**                 **65**

        (i)     Failure to Assess Children's Needs
        (ii)    Failure to Provide Regular Medical and Dental Health Care
        (iii)   Failure to Provide Mental Health Services
        (iv)   Failure to Provide Educational Services

     **C. MDHS Fails to Plan For Children**     **73**

        (i)     Poor Permanency Planning Services
        (ii)    Missed Case Plan Reviews and Judicial Permanency Hearings
        (iii)   Adoption Delays

V.    **CONCLUSIONS AND RECOMMENDATIONS**    **87**

     **A. Recommendations**    **87**

        (i)     Staffing and Training
        (ii)    Administration
        (iii)   Resources

Appendix A.  *Curriculum Vitae* for Cathy R. Crabtree

## EXECUTIVE SUMMARY

In the federal lawsuit *Olivia Y. v. Barbour*, the state of Mississippi child welfare agency is charged with failing to meet the state's constitutional obligation to keep children in state custody free from harm. The author of this report has extensive experience in social service agency management, including eight years as Assistant Commissioner of the Tennessee Department of Children's Services, and is currently retained to serve as interim Director of Quality Assurance for Alabama's child welfare agency. I was asked to undertake an expert review of the Mississippi Department of Human Services (MDHS) Division of Family and Children's Services (DFCS) to assess whether its operational management allows it to meet the minimum professional standards required to accomplish its mandate of protecting children in state custody. My assessment is based on a review of the extensive documentation that has been made available in this lawsuit.

My conclusion is that MDHS is mismanaged, insufficiently staffed, and lacking in qualified and skilled leadership. As a result, Mississippi's foster care system fails to meet almost every professional standard designed to protect the children in its custody. This failing child welfare system places children at substantial risk of harm on a daily basis. In this report I offer recommendations for reform, but in my expert opinion, reform of MDHS cannot be achieved absent significant oversight and ongoing technical assistance.

**Key Report Findings:**

 ➢ **MDHS is dangerously understaffed.**

   ▪ While national standards for foster care caseloads are set at 12 to 15 children per social worker, MDHS averages 48 cases per worker, with individual social workers carrying caseloads as high as 286.

   ▪ MDHS itself has categorized caseloads of 31 or more as "DANGER!" and caseloads of 40 or above as "BEYOND DANGER!" for the children relying on the agency for care and protection. As of August 2005, 80.5% of counties had caseworkers carrying caseloads at or above the *Danger* level; more than half the counties had caseloads at the *Beyond Danger* level.

- By DFCS's own calculations, an additional 554 caseworkers are needed to bring caseloads down to the national professional standard. Yet, in its most recent Budget Request Package, DFCS requested only that 38 vacant positions be filled and that 59 previously abolished positions be re-established.

➢ **MDHS deploys untrained and unqualified staff to work with abused and neglected children.**

- New social workers are routinely put on the job and made to carry caseloads for one month to a year before they receive any training.

- MDHS relies on unqualified and untrained aides, homemakers, and clerical staff to perform social work tasks such as required face-to-face contacts with foster children.

➢ **MDHS lacks knowledgeable and stable leadership to run the agency and protect children.**

- DFCS is led by a Director with no child welfare or social services experience.

- DFCS State Office administrators do not provide adequate leadership, because they are uninformed and out of touch with what is happening in the field to children in the State's custody.

- DFCS has failed to put into place any system to ensure that all staff is held accountable for ensuring the safety and well-being of foster children. The agency's electronic case record system (MACWIS) fails to provide reliable information concerning the children in MDHS custody that is necessary to monitor both individual cases and system-wide case practices.

➢ **As a result of agency-wide deficiencies, MDHS fails to protect children from harm and denies them adequate services.**

- MDHS denies children safe and appropriate placements. MDHS's own foster care case reviews document that 3.2% of children in custody were maltreated in their placements during *the first nine months of 2005.*

- DFCS practices an "any port in a storm" approach to placement decisions, in which foster children are placed in any home or institution that can accommodate them, without regard to their individual needs or circumstances. This arbitrary approach to placement decisions results in children experiencing multiple temporary placements.

- MDHS fails to provide children with basic medical, mental health, and educational assessments and services.

- The agency fails to provide the planning or services required to ensure that children do not spend years in foster care.

A lack of competency was found at nearly all MDHS staffing levels, with key managers demonstrating little knowledge of basic social work and child welfare concepts. The case example that follows, derived from MDHS documents and formal discovery responses, is just one illustration of the risk of harm to which Mississippi foster children are subjected.

---

**Case Example**

In April 2002 MDHS investigated an allegation that a Jones County foster mother was physically abusing two foster children, 11-year-old Amy and 10-year-old Sally, and determined that no abuse had occurred. In January 2003, MDHS received another maltreatment report concerning the same foster family. Following an investigation, MDHS determined that the foster mother had, in fact, physically and emotionally abused Amy, Sally, and another foster child in the home. MDHS further concluded that the foster mother had emotionally neglected all three children, as well as a fourth foster child who was residing in the home. In spite of those findings, MDHS did not revoke the foster home license or remove all of the children from the abusive foster mother's care. In April 2003, MDHS investigated another report that Amy was being harmed in the same foster home and concluded that she had been sexually abused by the foster mother's son. MDHS still failed to take licensing action that would have prevented foster care placements in this home. In February 2004, following another investigation, MDHS concluded that a different 10-year-old girl had been sexually abused in this same foster home. Again, MDHS took no licensing action. As of November 5, 2005, following a total of three confirmed reports that children were being seriously abused in the foster home, the home remains licensed with at least one female foster child placed there; Amy and Sally are no longer in the home, as both were residing in psychiatric treatment facilities. (Defendants' Responses to Plaintiffs' Second Set of Interrogatories, at 5-6, 11-12; Calendar Year 2004 MDHS Foster Home Investigations at DHS 053505; MDHS Listing of Children Currently in Custody as of 11/05/05, at DHS 086630).

---

As set forth in detail in this report, it is clear that MDHS lacks the ability to manage the day-to-day affairs of the agency, which results in the inability of MDHS to meet its basic obligation to provide for the safety and well-being of the children in its custody. Although there is certainly no "quick fix" for this agency, as long as this situation is allowed to continue, children in MDHS custody remain in danger.

## I.    INTRODUCTION

I was asked to undertake a review of the functioning of Mississippi's child welfare system and assess whether its operational management allows it to meet the minimum professional standards required to accomplish its mandated mission of ensuring the safety, permanency, and well-being of children in State custody.  My conclusion is that the Mississippi Department of Human Services (MDHS) Division of Family and Children's Services (DFCS) suffers from such poor staffing, leadership, and management, that it fails to meet most every known legal and professional standard designed to protect the foster children for whom MDHS currently serves as legal custodian.

A functional child welfare agency must meet at least four criteria:

- The agency must employ enough staff to perform the agency's work.

- These employees must be sufficiently trained and supervised.

- Employees must be provided with the resources necessary to do their jobs.

- The agency must have a strong and stable leadership in place to support the staff by setting official policy, monitoring the services delivered by frontline staff, and maximizing the effectiveness of available resources.

When an agency fails to meet even one of these criteria, it can experience symptoms ranging from minor disruptions in services to complete failure.  MDHS fails to meet *any* of these four criteria.  The systemic deficiencies that characterize MDHS and lead to poor outcomes for the State's foster children include:

- MDHS maintains dangerously high caseloads.

- MDHS caseworkers are poorly trained and inadequately supervised.

- MDHS has failed to develop adequate resources for staff and the children the agency serves.

- MDHS lacks the strong leadership and accountability necessary to effectively monitor the delivery of services and to manage existing resources.

4

As a result of MDHS's failure to meet any of the criteria necessary for a functional child welfare agency, children in state custody are routinely harmed. These harms include the denial of safe and appropriate placements, adequate supervision, necessary medical and mental health care, and permanent homes for children in State custody.

This report describes how MDHS has knowingly maintained a child welfare system that fails to meet even minimum professional standards and continues to put children at risk of harm. It begins in Section I by providing the reviewer's qualifications and methodology, an overview of MDHS structure and responsibilities, and a brief history of longstanding agency failure. Section II looks at MDHS staffing, training and supervision of caseworkers, concluding that deficiencies in these areas doom the agency to continued failure absent dramatic changes in support of a fully staffed professional agency workforce. Section III provides a review of MDHS's leadership, communication and accountability structures, and related infrastructural issues, finding a pronounced lack of knowledgeable or involved managers, a denial of basic resources for staff at all levels, and a general failure to encourage communication and accountability. Section IV highlights findings regarding the many ways in which MDHS's systemic failures harm children, including such harms as (i) being subjected to multiple temporary placements and exposed to additional abuse and neglect; (ii) missing out on basic health services, like regular physicals and immunizations; and (iii) being left to languish in State custody without hope of finding a permanent family. Finally, Section V offers recommendations for badly needed reform, though with the caution that given the capacity of MDHS's current leadership, the agency will undoubtedly require significant oversight and ongoing technical assistance in order to fix its many entrenched deficiencies.

### A.    Reviewer Qualifications and Methodology

The author, Cathy Crabtree, has more than 28 years of professional experience working with and advocating on behalf of children and families. Ms. Crabtree is currently a

private consultant in the field of child welfare, and in February 2006 was retained as the interim Director of Quality Assurance for Alabama's child welfare agency. She has served as a child welfare expert in two previous federal litigations. Ms. Crabtree has worked as a direct service provider as well as in management and administrative positions in the fields of child welfare and mental health. She held the position of Assistant Commissioner of the Tennessee Department of Children's Services for eight years and has extensive experience in the areas of children's services, social service agency management and compliance with minimum practice standards. A current copy of Ms. Crabtree's *curriculum vitae* is attached to this report as Appendix A.

In order to assess the overall organization and operation of MDHS as the State agency charged with the safety, permanency, and well-being of Mississippi's children, the reviewer utilized many sources, including:

- MDHS policy and training manuals.
- MDHS organizational charts.
- MDHS planning documents and correspondence.
- MDHS state and county data reports.
- MDHS case review and audit data.
- MDHS and State budget documents.
- Federal review results and correspondence.
- Transcripts of MDHS staff deposition testimony in the *Olivia Y. v. Barbour* case.
- Results of Plaintiffs' expert case record review of a representative statewide sample of 286 individual cases, conducted by Dr. Peg Hess.

All of this information was reviewed in light of professionally accepted standards, including applicable federal and state laws and policies, and the professional experience and expertise of the author.

### B.    Agency Overview

Governor Barbour is the chief executive officer of the State of Mississippi and has ultimate responsibility for the functioning of the State's child welfare system. MDHS is the State agency charged by statute with the responsibility for the safety and welfare of

6

Mississippi's children.[1]   The agency is led by an Executive Director appointed by the Governor, who is responsible for the approximately 4000 employees of MDHS.   The Executive Director has oversight and administrative responsibility for state and federal programs for children and families in all 82 counties of the state, including adult services, child support enforcement, the federal welfare program known as Temporary Assistance to Needy Families (TANF), Food Stamp programs, Medicaid, and services for delinquent youth.[2]

DFCS – the Division of Family and Children's Services of MDHS – is the state government entity charged with protecting abused and neglected children in the State.  The Division is charged with ensuring child safety, permanency, and well-being (*i.e.*, child welfare services) and is led by a Division Director.[3]  The Division Director is responsible for the operations and administration of DFCS.  DFCS has split the State into nine regions, led by nine Regional Directors, from which responsibility descends to 84 county or local offices. The county offices are the work locations for the DFCS Social Workers, Area Social Work Supervisors (ASWS), and non-social work staff responsible for the day-to-day child welfare work of the agency.  The DFCS State Office is responsible for administrative and operations oversight and is organized around three program areas – Prevention, Protection, and Placement – with a separate area for Administration.

C.      **Historical Background**

The State of Mississippi – which ranks 50th in the nation in overall child well-being scores, including infant mortality and child death rate[4] – has been aware of serious deficiencies in its child welfare agency for over a decade.  A number of federal, state and third-party reviews, reports and supposed reform initiatives from the past 15 years have

documented largely the same serious failings in the State's child welfare system. Among

them:

**1992**

- In its 1992 review, the Joint Legislative Committee on Performance Evaluation and Expenditure Review (PEER Committee) finds that the Department of Human Services' effectiveness in protecting children and vulnerable adults is "seriously compromised by the absence of well-trained professionals at all levels and the lack of quality assurance system capable of identifying and correcting weaknesses in service delivery."[5]

- The Child Welfare League of America (CWLA) undertakes a joint study with MDHS to review agency functioning.[6] In that review CWLA warns that children are in danger of abuse or death due to excessive caseloads and inadequate staffing.[7]

**1995**

- A federal review of Mississippi's child welfare agency documents a failing system with unmanageable and excessive caseloads.[8] Among the problems cited are a lack of preventive services, the failure to provide sound case assessments and case planning, the failure to address the medical, mental health and educational needs of children, lengthy stays in foster care with multiple moves, and a lack of placements and foster parent training and support.

- DFCS puts together a written Strategic Plan to address the agency's failings, as identified in the federal audit, but the agency's financial and staffing setbacks interrupt and impede any progress.[9]

**1999**

- The PEER Committee, in its Follow-up Review of the DFCS finds "serious" MDHS case practice deficiencies, including failure to substantiate or investigate cases marked "high risk," untimely investigation of reports, and investigations "not thoroughly completed according to policy." "Many of the problems identified in PEER's 1992 review persist."[10]

- MDHS Executive Director Donald R. Taylor's response to the PEER Follow-up Review concedes that "the Division has been dangerously under funded and under staffed for many years," and that "our employees [have] been struggling to stay on top of their mandated responsibilities . . . . In addition, there is a lack of appropriate placement alternatives for children in need of specialized care . . . . These children are needlessly moved from placement to placement, further damaging them and guaranteeing an unstable future."[11]

**2001**

- DFCS Division Director Sue Perry, in a memo to the MDHS Executive Director, writes: "In prior memorandums, I have stated our state and federal mandate to protect children; I have also mentioned the 6,200 plus cases left unattended; I have relayed the fact that children will most assuredly die, and finally, that 23 million federal dollars are at stake should the situation continue."[12]

- In another memo to the MDHS Director, Sue Perry writes: "there will be a death which could have been prevented, if staff [were] available to investigate, assess and work with the family. We are on the brink of a lawsuit. I have warned of this for months."[13]

- Mississippi Attorney General Mike Moore writes to the MDHS Executive Director concerning the effect DFCS staffing shortages are having on the State's ability to protect its children, and how failure to protect those children is making the State vulnerable to a class action lawsuit.[14]

**2002**

- In a letter to Governor Ronnie Musgrove, DFCS Director Sue Perry tenders her resignation on the ground that she can no longer fulfill her responsibility to protect children "when there are inadequate resources provided for their protection by the State." She documents how a child might needlessly die because of the impossibly high caseloads, and that she was "sorry to inform you that this has already happened in DeSoto County."[15]

- The Mississippi Council of Youth Court Judges adopts a resolution stating that the shortage of DHS staff creates such a crisis for children at risk as to constitute "an endangerment to the citizens and the children of Mississippi."[16]

**2003**

- MDHS's own Self-Assessment—required as part of a federal review process conducted in all 50 states by the Children's Bureau of the Administration on Children, Youth and Families, Administration for Children and Families (ACF) of the U.S. Department of Health and Human Services to gauge child welfare program effectiveness—acknowledges its inadequate staffing, undocumented child protection investigations, and lack of services for children.[17]

**2004**

- Governor Haley Barbour acknowledges to reporters that MDHS "has collapsed, for lack of management and a lack of leadership[18].... DHS has been the most poorly run, ineffective agency in the state of Mississippi for years now."[19]

- ACF conducts a Child and Family Services Review (CFSR) of Mississippi's performance against federal minimum requirements for protecting and providing for

foster children.[20]  The CFSR Final Report finds that the State of Mississippi did not achieve substantial conformity with any of the seven child welfare outcomes assessed for child safety, permanency, and well-being, nor with the systemic factors of the Statewide Information System, Case Review System, Quality Assurance System, Training, and Service Array, related to the State's capacity to achieve positive outcomes for children and families.  Specific findings include:

- o   In 40% of the cases reviewed, it was determined that MDHS had not made concerted efforts to ensure placement stability for children in foster care.

- o   In 36% of the cases reviewed, an appropriate permanency goal had not been established in a timely manner.

- o   In 44% of the cases reviewed, reviewers determined that social worker visits with children were not of sufficient frequency and/or quality to ensure children's safety and attainment of case goals.

- o   In 24% of the applicable cases, reviewers determined that MDHS had not made diligent efforts to meet children's educational needs.

- o   In 26% of the applicable cases, reviewers determined that MDHS had not adequately addressed the health needs of children in either foster care or in-home services cases.

- o   In 50% of the applicable cases, reviewers determined that MDHS had not made a concerted effort to meet the mental health needs of children.

- o   The June DFCS Budget Request Package submitted to MDHS indicates that many caseloads across the state are above the "Danger!" level (31+).  Of that, there are three "counties with caseloads but do not have workers.  These caseloads are covered by staff from other counties.  The children placed in these counties are in eminent [sic] risk of falling through the cracks."  "There is grave concern for these counties – children in these counties are placed at risk.    Their lives depend on our ability to provide staff resources to investigate and access dangerous situations.    Our staff are [sic] totally overwhelmed and we are losing more staff every day!  There must be a way to fortify these counties of great need and possibly encourage the remaining staff to stay in the fight with us."[21]

### 2005

- •   As a result of failing the CFSR, MDHS was required in 2004 to submit a Program Improvement Plan (PIP) to ACF addressing all the identified deficiencies.  Three PIPs were rejected by ACF, however, as inadequate before Mississippi's March 2005 PIP was finally approved.[22]

- MDHS's March 2005 PIP concedes that "[t]he CFSR conducted in 2004 clearly highlights the fact that . . . the State is still addressing many of the same systemic and practice issues that were identified in the original pilot review [in 1995]."[23]

- MDHS's PIP concedes that while some progress toward improving outcomes for families and children had been made from 1995-2000, "after 2000, the Division of Family and Children's Services began a struggle to maintain the progress and improvements" due to "changes in the agency and division leadership, budget cuts, loss of staff positions, and staff turnover."[24]

- Inexplicably, there are no provisions in MDHS's PIP that directly address critical agency staffing shortages, acknowledged by all as one of the major impediments to improving the agency's performance. Moreover, MDHS has already failed to complete over 50% of the initial PIP tasks according to recent federal review.[25]

- The June 2005 DFCS Budget Request Package submitted to MDHS indicates that even though recommended caseloads are 15 to 20 cases per social worker, "[s]taff currently carry caseloads up to 286."[26]

These and numerous other formal and informal assessments of MDHS' functioning tell the story of an agency in a state of ongoing crisis that is putting Mississippi's children at risk even today. Yet State and agency leadership have failed to take necessary remedial actions. Without a significant and long-term commitment to reform, Mississippi children will continue to be victims of the very agency charged with protecting and caring for them.

## II.    MDHS Is Dangerously Understaffed and Staff Are Poorly Trained

### A.    "BEYOND DANGER!" Caseloads Put Children's Safety At Risk

National standards promulgated by the CWLA set maximum caseloads as follows: (i) 12 to 15 individual children for workers responsible for children already in foster care; (ii) 12 families for child protective services workers doing investigations of alleged abuse or neglect of children; (iii) 10 to 12 children for adoption workers; and (iv) 17 families for workers responsible for children not in foster care but with on-going "in-home" cases (also known as "preventive" and "protective" services cases).[27]    In Mississippi, DFCS social workers generally carry mixed caseloads that include children in foster care, children and families receiving prevention services, and children alleged to have been maltreated who are receiving protection services. Child welfare caseloads as reported by MDHS are based on the number of "primary clients" served by a given worker, with that term including children in out-of-home care, children under court-ordered protective supervision, and families (who may have more than one child) receiving prevention, reunification or other services.[28]

MDHS acknowledges in its own caseload tracking documents and in deposition testimony that caseloads of 25 cases per social worker are "MARGINAL," caseloads of 31 are in the "DANGER!" zone, and that caseloads of 40 and above are at "BEYOND DANGER!"[29] As of August 2005, the DFCS statewide caseload average was *48 cases per social worker*. Some counties *averaged* twice the "Beyond Danger!" caseload level or more, including Lamar (130), Wayne (106), Neshoba (94), DeSoto (85), Harrison (83), and Madison (82).[30]  Named Plaintiff Cody B.'s Forrest County social worker acknowledged at deposition carrying 120 cases, including 62 children in foster care and 19 investigations of child maltreatment.[31]

12

Meanwhile, the Regional Director with authority over Forrest County testified that she does not consider a caseload of 75 to be understaffed because caseloads there have been higher.[32] According to the FY 2007 budget request submitted by DFCS, individual social workers are responsible for as many as *256 cases*, and some have to temporarily cover additional caseloads in counties without *any caseworkers*.[33]  Such numbers also undercount the number of children for whom individual Social Workers are responsible at any point in time, because staff on leave, whose cases must be covered (in fact, if not on paper) by other Social Workers, are left in the count.[34]

Explaining MDHS's categorizations of "DANGER!" and "BEYOND DANGER!," then-DFCS Director Mangold stated at his deposition: "The danger is that some child will be missed, some child will not be provided the services they should be provided."[35]  In an elaboration of that point, then-Director Mangold's June 2004 budget submission stated:

> The danger/risk level to our children increases dramatically as the caseloads continue to increase and our staffing level stays the same or decreases due to resignations, retirements, reduction of PINs, etc.  We are mandated by State and Federal Statutes to provide safety, permanency, and well-being for our children and I strongly believe that we are also morally obligated to do so.  Anything less is unacceptable.[36]

Indeed, it is quite simply impossible for a caseworker to function adequately carrying such egregiously high caseloads.  Caseworkers cannot get their day-to-day work done.  As Director Mangold testified, staff do not have time to work on their cases or to document the information they do learn because of the staff shortage.[37]  As MDHS acknowledged in its March 2005 PIP, critical ongoing tasks such as assessing children's needs, identifying suitable placements for children, making regular face-to-face contacts with children and their caretakers, providing for children's educational, medical and mental health needs, planning for permanent homes for children, and documenting each child's progress while in foster care go unattended by Social Workers who are simply overwhelmed.[38]

In its FY 2007 Budget Request Package, DFCS pleads for sufficient additional funding to fund "38 vacant positions that have not been filled due to lack of general fund dollars," and to "reestablish and fund 59 positions abolished in SFY2006."[39] After years of cuts (109 positions in SFY2005 and 96 positions in SFY2004), no attempt is even made to secure full staffing for DFCS. According to DFCS's own calculations, this would entail adding 554 social workers.[40]

### B.    MDHS Maintains High Staff Turnover And An Ineffective Hiring Process

MDHS routinely fails to retain the employees it hires and replace the employees it loses. In the past two years, Social Worker and supervisor attrition has far outstripped hiring. During 2004 and 2005, a total of 104 Social Workers and 17 supervisors resigned. During the same two-year period, MDHS was only able to hire 68 Social Workers and 1 supervisor.[41]

The Hess Case Record Review documents that 58.3% of children in MDHS custody had at least two social workers during the 24-month period prior to June 1, 2005, with 21.4% having had three or more social workers responsible for their case during that period.[42] In Yazoo County over half the children in custody (52.2%) had four or more social workers during that same two-year period.[43] MDHS noted in its Self-Assessment that turnover among Social Workers is highest in areas of the state that have the highest vacancy rates,[44] yet MDHS had done nothing to get at the root of attrition. The only "concrete actions" to fight attrition cited by one Regional Director were giving workers "recognition," "a shirt," "pizza," and "certificates."[45]

The consequences for children of high staff turnover are severe. High staff turnover increases the risk of harm to children who, at a minimum, lose continuity in the management of their cases with each worker hand-off. Every time a social worker resigns, critical data on

children is lost because no one has the time to either record it or, if recorded, to subsequently review the record and become aware of it. If a worker goes on leave, all work on his or her assigned cases are suspended until the worker returns.[46] On a systemic level, high turnover is a major contributor to the failures of the entire agency. The March 2005 PIP concedes that "changes in the agency and division leadership, budget cuts, loss of staff positions, and staff turnover" have impeded MDHS's ability to maintain progress and improvements.[47]

The consequences of MDHS's chronically high levels of staff turnover are compounded by its failure to fill vacant staff positions. Since the end of 2004, MDHS Executive Director Don Taylor has imposed an informal hiring freeze for all positions except Social Worker. This freeze includes senior management vacancies, so DFCS has been without anyone directing the State Office Prevention Unit or the Placement Unit.[48] Even when MDHS is authorized to hire, Regional Directors frequently find themselves unable to fill openings because the high caseloads discourage potential applicants.[49]

Other unnecessary bureaucratic hurdles create long delays from when a position becomes vacant until the time a replacement is found (if indeed one is ever found). For instance, all hiring requests must be funneled through the State Office, causing unjustifiable delays. Regional Director Martha McDaniel testified that she had yet to begin interviewing applicants for a supervisory position that had been vacant for more than a year because she was still waiting for the State Office to give her the names of the applicants.[50]

Meanwhile, Regional Directors do not have the ability to move allocated staff positions (known as "PINS") among their counties to accommodate staffing needs. They must instead send temporary help from one county to another to cover heightened needs, and the Social Workers dispatched to struggling counties remain responsible for the children to whom they are assigned in their own counties (which may or may not be contiguous with the counties to which they are temporarily sent).[51]

15

C.    **MDHS Fails to Adequately Train and Supervise Its Staff**

Adequate worker training and supervision are absolutely critical to the operation of a safe, well-functioning child welfare system. MDHS Social Workers are required to make daily decisions regarding the safety, well-being and permanency of children in state custody, in accordance with established professional standards as embodied in federal and state law and agency policy. MDHS's routine placement of inexperienced, untrained and inadequately supervised workers on the "front lines" places the children ostensibly in these workers' care at significant ongoing risk of abuse, neglect and even death.

(i)    **Training**

A well-designed child welfare training program is built around the social work practice model used by the child welfare agency and includes all the varying agency responsibilities related to the day-to-day work. Training links policy and procedure to practice in a way that helps the work to flow seamlessly and invisibly for the child and family. Ideally, families should experience one well-trained caseworker during their involvement with the agency. Effective training should include, at a minimum, the following components:

- a comprehensive and easily understood curriculum;
- an evaluation component both for the trainee and the trainer;
- resource materials for reference;
- an on-the-job training (OJT) period;
- ongoing, formal in-service training;
- a performance feedback mechanism for measuring the quality of the training; and
- a process that facilitates the regular review, update, and revision of the training in order for it remain abreast of changes in statute, policy, and practice.

MDHS is well aware, however, that its training program does not begin to meet these minimal requirements. In 2005, MDHS admitted to needing additional training for workers

16

and supervisors on (i) case planning with clear goals and tasks that support the permanency plan; (ii) purposeful narrative recording related to assessment, case planning, movement towards the permanency plan, and safety and well-being; and (iii) using MACWIS, MDHS's management information system.[52]  MDHS has further conceded that new Social Workers must wait for their training until there is a critical mass of new hires.[53]  As a result, the majority of (in some regions, *all*) new MDHS Social Workers are put on the job carrying a full caseload *without the benefit of any formal training*, a state of affairs that can last from between one month *to a year or more.*  A review of the training MDHS provided to new workers in 2002 showed the extent to which the agency neglects initial training for workers. At best, only 13 new Social Workers completed the MDHS training that year.  Moreover, that training was interrupted and delayed for six months due to travel and budget shortages.[54]

By MDHS's own admission, new worker training "covers very important material" "relevant to [Social Workers'] daily job duties" and is "necessary to teach [Social Workers] how to assess children's needs and match them with services."[55]  At the end of the training course, there is a test on absorption of the material, but passing it is optional.[56]  One Regional Director testified that she does not even look to see whether the Social Workers under her supervision passed the test.[57]

In addition, no formalized training is available for supervisors.[58]  MDHS's March 2005 PIP concedes that although an intensive supervisory curriculum was developed in 2001, "supervisory intensive training was not implemented on an on-going basis."[59]  As for ongoing training for social workers and supervisors, MDHS does not require it and concedes that it is a random offering without any core curriculum.[60]  Staff generally do not attend such training due to high caseloads.[61]  Kathy Triplett, Director of the State Office Protection Unit under which DFCS's Training Unit is housed, testified that "[t]he opinion [of DFCS] was

that we needed to provide more ongoing training" and that "it's been a goal for as long as I've been involved with the training program," which is "more than five years."[62]

MDHS also fails to maintain an adequate training staff to properly train its workforce. "During 2004, the Training Program experienced a reduction in staff from nine to four staff members." [63] Moreover, this reduced staff is being deployed to assist with social work tasks: "Giving assistance to counties where there are staffing issues: The training staff is completing home studies, investigations, home visits, ICPC requests, cases plans and work in MACWIS to assist in closing out old cases."[64]

A critical "lack of funding and staff for on-going training" was also noted by the State Level Citizens Review Board, an agency charged with reviewing and making recommendations regarding the MDHS Five-Year Plan. In its May 2004 Report, the Board concluded that these deficiencies would have to be overcome for MDHS to be in a position to carry out the agency's mission.[65]

### (ii)    Supervision

Strong ongoing supervision is necessary to make sure decision-making is appropriate, consistent and timely. CWLA standards provide that supervisors be responsible for no more than five front line case workers at any one time.[66] This is especially needed in Mississippi where MDHS concedes that the current policy manual is "cumbersome" and "difficult for staff to access and reference," and "has created confusion."[67] And yet there is no supervisory training, as described above, and little evidence of regular supervisory review of casework. [68]

Regional Directors also have supervisors perform Social Workers' job duties due to severe staffing shortages.[69] This makes it less likely that a supervisor will be able to monitor Social Workers' work with children.

The Hess Case Record Review found that supervisors allow basic casework functions and documentation to go un-reviewed. For example, within 30 days of when children first

enter custody, federal law and MDHS policy require the preparation of a child-specific Individual Service Plan (ISP) that includes a discussion of the safety and appropriateness of the child's placement and of the services needed and provided.[70] A review of initial ISPs for all children who entered custody on or after June 1, 2003, however, found that 40% of children did not even have this basic planning document within 90 days of entry into custody. Of those who had them, many were incomplete.[71] An MDHS Foster Care Reviewer even reported in May 2005 that two Walthall County foster children's "most recent ISPs are blank but have been approved by the supervisor."[72] The county provided no response to explain how or why a supervisor would approve ISPs that contain no information.[73]

The case record review shows that poor management practices infect the system all the way up the MDHS/DFCS chain of command. In deposition testimony, Regional Directors, who bear ultimate supervisory responsibility for case practice, admitted to failing to verify that local staff were taking critical actions to achieve the outcomes by which the federal government measures a child welfare system's performance. For example, Regional Director Zadie Rogers testified that when children's primary permanency goal is reunification, she does nothing to check that they have an alternate goal, although both Mississippi law and MDHS policy require such concurrent planning for all children in that position.[74] Rogers further admitted that even when judges ordered MDHS to prepare a petition for termination of parental rights (TPR), she does nothing to ensure that the county offices under her supervision comply.[75]

19

## III.    MDHS Lacks Strong And Stable Leadership To Ensure Effective Services For Children

### A.    MDHS Leadership Has Been Inconsistent And Ineffective

#### (i)    The Governor

Based on the limited involvement of anyone in the Governor's Office with the issues facing the State's child welfare system, it would seem that the Governor's attention to the "Beyond Danger!" crisis at MDHS has been limited to a few sentences in his 2006 State of the State address. Formal responses to discovery requests in this case confirm that the Governor's Office does not have any briefings, meeting minutes, memos, complaints, letters, e-mail and other communications concerning MDHS's and DFCS's ability to meet its mandated functions and protect children during 2004 and 2005.

#### (ii)    MDHS Executive Director

Over the last four years, MDHS has been under the leadership of four different Executive Directors: In January 2000, Dr. Bettye Ward Fletcher was appointed to the position. She served until Janice Broome Brooks was appointed Executive Director in November 2000. Ms. Brooks was succeeded by Thelma W. Brittain, who served until the current Governor appointed Donald Taylor the current Executive Director, in January 2004.[76] The current MDHS Executive Director was mentioned only rarely in the many pages of documents reviewed in the preparation of this report. Approval of the release of a Request for Proposals and approvals or denials of requests to fill vacant positions accounted for most such references. For the most part, however, the Executive Director appears to have been largely uninvolved in the operation and funding of Mississippi's child welfare system, notwithstanding the many deficiencies identified in this and many other prior reports. Advocating for the Governor to request, and the state legislature to grant, the resources needed to adequately serve children and families in Mississippi's annual budget process

20

should be one of the Executive Director's most important responsibilities. The record indicates that the Executive Director has failed MDHS in this respect.

### (iii)    DFCS Division Director

The DFCS Division Director position demands an individual with a thorough knowledge of the agency as well as strong administrative skills to advocate for the agency to get what it needs, develop and implement policy, and oversee on a macro level the quality of social work practice. Instead, the position has turned over frequently for reasons unrelated to child welfare expertise and administrative skill and this has forced the staff to constantly adjust to a revolving door of personnel at the top.[77] Additionally, the Division Director's position remained vacant from May 31, 2002, until January 2004, when Billy Mangold was appointed to the position,[78] a fact recognized as problematic in the December 2003 Statewide Self Assessment.[79]

The DFCS Division Director, as the chief administrator, should have the most thorough working knowledge of his agency and all its operations. This is not the case at DFCS. The Director in May 2005 did not know how many vacant positions remained unfilled, vacancies that had led to what DFCS referred to as the "danger" level in caseloads.[80] Nor did he know whether MDHS conducts an internal review of children's permanency plans when they have been in custody for 15 or more consecutive months, as required by the federal Adoption and Safe Families Act.[81] Former Director Mangold admitted that he had been aware that MDHS/DFCS was out of compliance with Title IV-E eligibility criteria, with the result that MDHS/DFCS is unable to collect federal reimbursements. However, he could not describe what process was in place to ensure that Title IV-E criteria are met, nor how many staff were assigned to monitoring the Title IV-E penetration rate for federal reimbursements, nor what, if anything, the PIP demanded in terms of improving Title IV-E compliance.[82] Protection Unit Director Triplett testified that she had been aware, through

21

reviews of Foster Care Review Board aggregate data, that there is a recurring problem with the wording of Youth Court orders, with the result that children were ineligible for Title IV-E funds, but that no specific action had been taken by the State Office to rectify that problem since Ms. Sue Perry served as Division Director in 2002.[83]  Mr. Mangold, who at least had approximately 25 years of experience in child welfare, has been replaced as DFCS Director, without explanation, by Rickie Felder.[84]  Director Felder has no child welfare or social services experience.[85]

The problems created by the short tenures of DFCS's various Directors have been compounded by instability at the State Office itself.  The May 2004 CFSR Final Report finds that "staff turnover at the State level inhibited the collaboration process" between MDHS and stakeholders, and that "systemic barriers to achieving greater coordination of services" included "turnover in the State office, limited personnel, limited funding, and the lack of a statewide strategy to address service coordination."  It also reports a concern about "the limited working relationships between the agency and key child-serving institutions (e.g. the school system, the Youth Court, and youth service agencies), and . . . that there is a lack of shared information, resources, and case coordination."[86]

Lack of effective leadership has also resulted in management's failure to prioritize MDHS's core mission of protecting children.  For example, a July 11, 2005 Memorandum from a Regional Director to Director Rickie Felder complains about the known child abuse Hotline practice of not transferring after-hours reports to the County for investigation until the next business day.  Thus, a child abuse and neglect report that came in on a Friday evening whose nature "indicated the need for immediate response" was not entered in MACWIS for investigation by the County until the following Monday, 62 hours later.  The investigation was not initiated until late Monday afternoon, well beyond the 24-hour response requirement.  The concern articulated in the memorandum, however, is not for the children

left unprotected by the delayed response, but only for the workers who cannot show 100% compliance with policy, as "it is not fair to hold the workers accountable for something that is beyond their control." The Regional Director even suggests that MDHS could "begin counting the timeliness when the Hotline enters and *transfers* the report to the county – not when the Hotline receives it."[87] This elevation of compliance documentation, and a perceived inequity in how untimely reports are counted, over ensuring a timely response to a suspected child maltreatment victim illustrates a misguided management culture that is unable to prioritize the agency's primary mission of protecting children.

### (iv)    A Doomed Program Improvement Plan

MDHS is an agency heavy on paper plans with no follow through. For example, in 1995, MDHS developed a Strategic Plan to institute reforms, but never implemented it.[88] A Quality Assurance system was scrapped after only a few months.[89] The March 2005 Program Improvement Plan (PIP), which MDHS was required by the federal government to prepare for having failed the CFSR, cannot reasonably be expected to correct the agency's collapse. This is a paper tiger of a plan that provides nothing in the way of a measurable benefit in the life of a child in foster care. It is also unclear how the agency expects to complete the PIP plan on a bare shoestring budget and with very few staff. MDHS expects the regions to shoulder much of the PIP work with a staff that is already unbelievably overburdened just trying to see the children and families on their heavy caseloads. Nothing in the PIP indicates how the staff in the field is supposed to balance or prioritize responsibilities under the PIP with the responsibilities of their day-to-day work.[90] The only response to the prioritization of such an overwhelming burden by the state administrators was that they intended to "work smarter."[91]

23

MDHS has, in fact, failed to meet most of the initial deadlines it set for itself.[92]  In November/December 2005, ACF reviewed Mississippi's second quarterly PIP progress report for July-September 2005 and found that of a total 230 action steps that were due during the first and second quarter of PIP implementation, 49% (or 114) "are overdue or postponed."  In addition, of 21 performance measure baselines that the State was to establish during the first two quarters of PIP implementation, 15 (or 70%) had not yet been established.[93]  MDHS requested a one-year waiver in implementing its March 2005 PIP in November 2005.  In response, ACF stated that it was "willing to work with [MDHS] to provide the additional time [it] requested."  The formal renegotiation of the PIP was due to occur January 31 – February 2, 2006.[94]

Quite simply, MDHS/DFCS has not had the stable, effective leadership needed to chart and keep a course for the agency.  And the PIP is but one more example of a reform plan that MDHS has failed to put into practice.

### B.    MDHS Fails To Provide Staff Adequate Resources

#### (i)    Failure to Develop Adequate Placements

MDHS has failed to develop "a sufficient array of services in place to address the needs of children and families."[95]  MDHS knows it lacks "foster homes, therapeutic foster homes, and group homes for children of all ages;" "residential treatment services;" "services for medically fragile children;" "substance abuse services for adolescents;" "mental health services for children . . . including counseling, specialized therapy, day treatment, and child psychiatrists/psychologists;" and "services to prevent placement disruption," including "support and respite services for foster parents."[96]

"There are not enough therapeutic placements for foster children needing such services," as there are currently only contracts for 250 therapeutic placements (defined

broadly to encompass therapeutic group homes, therapeutic foster homes, and intensive in-home services) statewide. Accordingly, children must wait in line for therapeutic placements to be granted by the Placement Unit in the State Office; MDHS does not have a process for keeping track of how long children are kept waiting for such services.[97] A large number of children are placed outside their home communities because their own counties lack resources.[98]

Compounding the State's placement resource problems, the State has cut and failed to restore funding for Licensing Specialists, who serve as recruiters for foster and adoptive applicants and determine if foster homes and facilities are maintaining compliance with the established standards. The Self Assessment indicates that DFCS had only 15 Licensing Specialist positions statewide designated to the foster home licensure program, and that due to insufficient staff, "[a]pplications and inquiries cannot be processed in a timely manner." As a result, "[r]esources are lost due to the length of time for follow-up and the actual process." Moreover, "due to budget constraints, two of these [Licensing Specialist] positions were abolished effective July 2002."[99] A request for five additional positions, which would allow DFCS to provide two licensing specialists dedicated to foster homes in each of the nine Regions, was made for the FY05 Budget but was denied.[100] The Self-Assessment also noted that staff responsible for actually placing children in foster homes and other placements had been cut: "The number of State Level program staff to support placement has also been reduced and does not keep up with the increasing need for more therapeutic resources."[101] Further reducing the potential placement resource pool, the board rates MDHS pays to families and facilities in order to reimburse them for the cost of providing for foster children do not come close to meeting the actual cost of raising a child in the rural or urban Southeast (as calculated by the U.S.D.A.), and have not been adjusted upward since at least 1999.[102]

The March 2005 PIP states that "[t]o achieve placement stability, it will be necessary to have a pool of available and qualified foster family homes. Foster families must receive training and support to insure placement stability. With an increased pool of foster homes, the agency will rely less on emergency shelters and be able to make placement decisions based on the child's needs and the skills and capacity of the foster parents."[103] And yet, though the DFCS State Office administrator in charge of the Placement Office concedes that children are placed wherever a bed is available and "we need more of all types of resources,"[104] *the March 2005 PIP makes no provisions for the addition of staff or resources to recruit, train and support additional foster and adoptive homes.*[105] Without addressing the lack of available placement resources, the PIP, even if implemented, will have little impact on DFCS's poor placement practices.

---

**Case Example**

On April 29, 2005, an MDHS supervisor sent her Regional Director a shelter extension request for a 10-week old baby girl. The baby had been placed in an emergency placement in an adjoining County after her mother voluntarily placed her in foster care at 3 weeks old, "as no regular foster home placement was available in the immediate area." Since then, MDHS has had no contact with the mother, the putative father is presumed to be incarcerated, and the supervisor acknowledged that she was unsure if a home evaluation had been requested for a maternal aunt who had contacted MDHS about custody of the infant. "The only foster home available in the area is a single, black male, who works full time and then has numerous part time jobs." The Regional Director approved an additional 45 days of shelter care, noting: "Foster homes (regular) need to be sought for this child." *(Memorandum, Barnes to McDaniel, April 29, 2005, DHS 066324-25)*

---

###  (ii)  Failure to Develop an Adequate Service Array

In order for a child welfare system to ensure that quality services are delivered consistently it is necessary for the agency to first know the make up of the families it serves. Required information includes:

- the demographics of the agency's child population;

26

- the educational, behavioral and medical services available; and

- historical tracking of trends in services

Such information is fundamental to gauge service gaps and plan effectively from year to year. A thorough needs assessment based on data and practice, not on hearsay or popular myth, is a must. From there, an agency can efficiently budget and plan year to year for changing service needs of families.

The May 2004 CFSR Final Report finds that "Mississippi did not achieve substantial conformity with the systemic factor of Service Array." The State "does not have in place a sufficient array of services to assess the strengths and needs of children . . .[,] determine other service needs, . . . and help children in foster and adoptive placements achieve permanency." "Critical gaps in the service array are foster homes for children of all ages, substance abuse services for adolescents . . . and mental health services for children and families." "In addition, services are not accessible to families and children in all political jurisdictions . . . [and] county staff have a limited ability to individualize services for all children and families served by the agency." "[L]ack of transportation, staffing shortfalls, and inadequate funding sources result in an insufficient service menu to meet the needs of families and children served by the agency."[106]

DFCS has no apparent method or planned approach for obtaining needed resources to serve children in foster care. In the documents and depositions reviewed, DFCS administrators admit the inadequacy of the State's service array[107] but maintain that there is no money available to access needed services.[108] There is no acknowledgment of the facts that the State continues to pay back money to the federal government due to improper documentation of eligible children's services, and that correcting documentation practices

would significantly increase the availability of federal funding, which could be used for service development among other critical needs.[109]

When resources have been added, DFCS has relied on a "dart board" approach to issuing standard Requests for Proposals (RFP). Insofar as there is any process, DFCS relies on staff in the local county offices to call attention to the need for services and pass that along to the Regional Director and State Office. The Executive Director may then approve or not approve the issuance of an RFP to cover the service need identified and decide how much money will be made available for any particular service.[110] With no basis in any statewide needs assessment, MDHS's service development is haphazard and inefficient and the services developed are not tailored to the needs of the children in MDHS custody. Thus, MDHS is out of compliance with the federal requirement that the agency meet children's individual needs as identified in their individual service plans.[111]

### (iii)    MACWIS

The child welfare SACWIS systems that have been developed across the country are intended to be social work practice systems for caseworkers and the official repository of case records for children. SACWIS systems are designed and jointly funded with state and federal funds.

Mississippi's SACWIS system – MACWIS – has been designated the primary case record for all children in DHS custody since its statewide implementation in 2001, and, according to former DFCS Director Mangold, is the primary vehicle by which MDHS monitors its provision of services to children.[112] However, MACWIS is not in substantial conformity with federal requirements. As was determined in the State's 2004 CFSR review, MACWIS is unable to consistently identify, among other things, the status, demographic characteristics, location, and goals for the placement of each child in foster care because the system's "data quality is compromised due to poor data entry." Case information is often

28

incomplete, with "high worker caseloads, time constraints, lack of remote access, and inadequate clerical support," all cited as barriers to timely data entry.[113]

As of March 1999, total expenditures for MACWIS had already reached more than $35 million dollars.[114]  Six years later, in March of 2005, ACF's Division of State Systems (DSS) conducted a site visit at MDHS for the purposes of assisting Mississippi "in preparing for the [federal] SACWIS Assessment Review (SAR)."[115]  Though the project had originally been scheduled for completion in 2001, at the time of the PEER Report, in March 2005, following the expenditure of millions of additional dollars, there remained (and remain today) alarming areas of serious deficiency that negatively impact the functioning of the entire agency.  Some of the deficiencies documented by the federal site visit directly put children at risk:

- Social workers currently receive no MACWIS notification if a child is placed with a resource provider whose license has expired, has been revoked, or is under investigation.[116]

- Although it is agency practice to group related intakes in a single investigation, MACWIS does not link intake reports in the system by alerting the investigator that an additional related report has come in.  This puts children at risk by preventing a complete picture of a particular child's alleged maltreatment.[117]

- Services through a particular provider listed in MACWIS, including placements, can show as "not available" but the meaning of this is unclear and easily misinterpreted by the Social Worker.  As stated from the federal site visit, MACWIS defines this "as meaning the service is not available *in that county*.  However, the service could still be available in an adjacent county and accessible to the client.  A worker could easily conclude that a 'No' means the service is not available *at all*" thereby keeping the child or family from receiving a needed service.[118]

The Hess Case Record Review revealed other significant MACWIS deficiencies, including a systemic programming error that electronically over-writes historical information in children's ISPs and County Conference reports.  Historical information, including placements and health information, is automatically replaced with current information as of

the date the report is printed out from MACWIS. Unless documents are routinely printed out and hard copies are filed in the child's paper record, Social Workers, ASWS's, foster care reviewers, judicial decision makers, and others are prevented from using these legally required documents to identify change and evaluate progress over time.[119]  MACWIS also does not enable a user to hit "print" once and print out a child's electronic case file; instead, a worker must manually bring up each screen and print the screens separately.[120]

With regard to medical, dental, psychological, and educational services, the aggregate reports generated from MACWIS have not been able to accurately reflect the information in children's case files "[b]ecause the program was not pulling the data correctly."  Despite devoting resources to this report for a full year since discovering that problem, MDHS has yet to correct the data pulling function. One MDHS deposition witness testified that she personally compared the information in children's case files with information in certain MACWIS aggregate reports and noted discrepancies sufficient to cause her to lose confidence in the accuracy of those reports in their entirety.  Responsible for MACWIS reporting, she discovered this problem over a year before her May 2005 deposition but had not had enough technical support available to resolve it.[121]

Mr. Mangold, the DFCS Division Director at the time, testified that he knew of no problems with the capacity of MACWIS to generate aggregate data on medical, dental, psychological and educational services.[122]  According to him, these MACWIS reports are what MDHS is going to use to measure compliance with the PIP.[123]  The PIP as a whole presupposes a marked increase in aggregate data collection and dissemination to MDHS managers, and assumes in turn that MDHS managers will use MACWIS as their primary tool to measure improved outcomes, if any, for children. However, as noted, MACWIS is still unable to generate critical management tracking reports.

Moreover, what MACWIS aggregate reports are presently available continue to be of limited usefulness because staff are unable to keep up with entering accurate data.[124] The PIP acknowledges, for example, that even after a data clean up project targeting missing placement data in MACWIS, approximately 150 children still were missing current placement information.[125] As Mr. Mangold testified to at his deposition, the timely entry of information into MACWIS is critical if the system is to perform its intended functions as a monitoring tool and as a repository of information, functions that are particularly necessary when the staff directly responsible for children turn-over frequently.[126]

MDHS acknowledges in its Statewide Self Assessment that "[t]he ability to develop and integrate MACWIS and move it smoothly into case work practice was significantly under-funded and under-staffed, given the impact it has had on practice."

> [T]he effect of adding an automated system to overburdened workers [was] significantly underestimated in many ways, including: the learning curve for more seasoned workers to translate the paper processes into MACWIS, the need for more training for supervisors to help them make the transition in reviewing an electronic case file, the time and effort required to enter investigations, document cases, use reports to manage for outcomes, and the necessity of remaining in the office to document narratives that had previously been portable (taken home, completed waiting for doctor visits, etc.). Much more time than originally anticipated was needed to develop the system, adequately train users, document the usage of the system, integrate the system into policy and practice, and correct users' errors."

And yet, "[i]nitial estimates on the amount of training needed were reduced due to budget constrictions, and additional budget cuts ended a contract for resources identified for developing supportive materials to help supervisors review cases on MACWIS."[127]

---

**Case Example**

A foster care reviewer observed and reported in April 2005 that not only was a Forrest County sibling group separated, but that MACWIS also had completely wrong placement information for each of the siblings. "The placement information for all three children is incorrect in MACWIS. [Child 1] is listed in MACWIS as being placed in the K[] foster home but the Reviewer reports that she is actually on active runaway status. [Child 2] is listed in MACWIS as being in the K[] foster home but the Reviewer reports that she is actually placed in the E[] foster home. [Child 3] is listed in MACWIS as being placed at the P[group home] but the Reviewer reports that she is actually placed with a relative." *Foster Care Review Monthly Case Status Report (Issues Observed During Foster Care Review) for April 2005, at DHS 047644).*

---

### (iv)    Lack of Modern Technology

MDHS does not provide its front line staff with the resources needed for them to communicate effectively. Employees of the regional and local DFCS offices do not have access to electronic mail.[128] In some counties, they do not have cell phones, which a Regional Director testified are unnecessary.[129]

### C.    The MDHS Management Structure Is Inefficient And Creates Gaps In Lines Of Responsibility For Children's Safety And Well-Being

MDHS is a state administered system. Policy and procedure are developed at the

---

**Case Example**

Foster Care Reviewer reports in February 17, 2004 Periodic Administrative Determination in Harrison County that reviewed child's sibling "is in DHS custody per court order dated 10-2-03, but apparently has not been entered into the Macwis system. There is no ISP for [this sibling], and verbal information was obtained from the Social Worker regarding the current permanent plans for [him], and the expected date of achievement. There is no placement information in the Macwis system for the children." The reviewer notes that the children have been placed out-of-state with their grandmother in Louisiana, but that there is no evidence of an approved home study on the relative placement. *(Periodic Administrative Determination on Children in State's Custody, February 2004, DHS 010422-010423)*

---

state level. Financing of programs and personnel staffing are also done at the state level. Counties carry out the delivery of services based on what is directed by policy and procedure and provided by the State office. While this might on the surface seem to make sense, within DFCS, communication is so poor that there are long delays in the transfer of information from the State Office to the counties (and in some cases no effective communication at all), including on key issues involving staffing and service needs.[130]

There are pronounced disconnects within DFCS between the State Office and the Regional Directors, and also in the field between the DFCS Regional Directors and the county staff. The documentation and information reviewed indicates that true bi-lateral communication between the State office and the Regional Directors rarely occurs. More typically, Regional Directors pass on requests for assistance to the State Office and then wait for an answer. The wait may be never-ending, yet there is little or no follow-up on requests or more aggressive advocacy for getting needs met.[131] As a corollary to this, there is a historical pattern of non-responsiveness on the part of the State Office. Even inside the State Office itself, requests to fill staff positions are sent repeatedly with no response.[132] The lines of communication are simply broken in both directions: Although the State Office generates some limited aggregate data reporting from MACWIS intended to identify performance deficiencies in the regions, Regional Directors are generally unable to interpret such reports.[133] There is a lack of awareness on the part of key administrators within DFCS of the scope and seriousness of problems within the agency.[134]

MDHS has a structure that by design isolates and limits communication within the State Office. The office is fragmented into program-based divisions, a structure that inhibits communication across child welfare program areas that are intertwined in practice.[135] In another case of parallel universes, the State Office designs policy without information from staff in the local offices, who are in the best position to know which social work practices are

or are not yielding the sought-after outcomes in children's lives. This lack of coordination and transparency is replicated up the chain of command. For example, budgets are submitted by the DFCS Division Director, but he never sees the actual budget that goes to the legislature, and has no way of knowing if the Budget Division included his request with the greater MDHS budget.[136] It was impossible to ascertain any back and forth dialog within the MDHS agency as a part of the budget planning process. This exacerbates an inability to forecast expenditures and plan for the use of already scarce state resources.

MDHS administrators also show a "not my job" attitude. The Director of the Protection Unit reported that she does not know who, if anyone, reviews the quality of investigations into allegations of abuse and neglect, noting only that "[t]hat's not something that would be a routine part of my responsibility."[137] In another example, while MDHS policy provides that an protective services investigation's finding – whether abuse was or was not evidenced – and recommendations – what to do about any evidenced abuse or neglect – are incomplete until the ASWS reviews and approves them, the Director of the Child Protection Unit did not know when, pursuant to her own policy, such approval is supposed to occur.[138] Her Unit does not track how many children die while under the supervision of MDHS, and she does not know if anyone else in the agency does. Similarly, neither the Protection Unit nor anyone else within MDHS, to her knowledge, keeps track of "Special Investigations" into alleged abuse or neglect by MDHS employees.[139]

34

Regrettably, the Director of the Protection Unit is not alone in viewing her responsibilities extremely narrowly. The Director of the Placement Unit, which has jurisdiction over the medical services for children in MDHS custody, testified that she had no idea whether children receive physicals, and that she does not review data on that.[140] She testified that she "really can't address what [Social Workers'] problems are because I don't work out there in the field."[141] Asked whether Social Workers' caseloads impaired their ability to document the provision of services to children, she stated, "I really don't know because I don't see that. I think the regional directors get reports of their caseloads."[142] When, by MDHS's own admission, caseloads have been the driving force creating danger for children in state custody, such ignorance from high-level managers strains credulity.

This "not my job" attitude is especially problematic for foster children caught between jurisdictions. When children enter foster care, the DFCS county office in the child's home county becomes what is called the "county of responsibility (COR)" in regard to his or her DFCS case. Children placed in out of home care outside their home county also have a "county of service (COS)" which splits responsibility for them. Confusion of roles between COS and COR staff means that there are children in MDHS custody for whom no staff member considers him or herself directly responsible. "Hinds County sees over 200 custody children, along with

> **Case Example**
>
> *A foster care reviewer observed and reported in June 2005 that there is no documentation that three Hancock County children placed together in a foster home licensed through Sunnybrook Children's Home have ever been seen face-to-face by a Social Worker since they entered MDHS custody on August 18, 2004. "[I]t appears that Hancock County has not made a county of service request to the county these children are placed in." Foster Care Review Monthly Case Status Report (Issues Observed During Foster Care Review), July 7, 2005, at DHS 047724*

over 200 County of Service Cases from other counties. These children are placed in various facilities and foster homes. This is a tremendous task given limited staff."[143]

| Case Example |
| --- |

A county response to a February 2005 foster care review report concedes that it took over ten months to obtain a court order formally placing two foster children in DHS custody. "County Attorney only recently prepared court order even though SW has requested." The children physically entered DHS custody in April 2004. Foster Care Review Monthly Case Status Report (Issues Observed During Foster Care Review), February 2005, at DHS 047576

### D.  MDHS Lacks A System Of Accountability For Agency Responsibilities

For a child welfare agency to be effective there must be supervision and leadership at all administrative levels. The supervisory and administrative personnel of the agency are the people who, as stated at the beginning of this report, chart the course for the agency. These are the individuals who have the responsibility of measuring the success of the services provided and the work performed by the staff. These are the individuals who make the course changes necessary to improve performance and institute new and best practice to improve services. The performance of the agency's supervisors and administrators sets the tone for the entire organization.

### (i)  Lack of Administrative Accountability

Little in the way of administrative accountability for agency responsiveness was found among the many documents reviewed. Even DFCS State Office administrators exhibit a general lack of knowledge about their own child welfare agency and child welfare work in general. The person responsible for the State Office Protection Unit of DFCS (a fifteen-year employee) views her role as a policy writer rather than a chief administrator necessary to guide DFCS child protection work.[144] This same administrator conceded there was no adequate method for caseworkers to check the child abuse registry when they begin an investigation of an alleged perpetrator.[145] Checking a child abuse registry is a common professional practice basic to a child abuse investigation at the beginning of the work.

36

This reviewer could find no indication of a standardized method for ensuring that supervisory directives are implemented, including directives issued by State Office to the Regional Directors, by Regional Directors to their administrative staff and supervisors, or by supervisors to caseworkers. One Regional Director reported "requiring" caseworkers to send an explanation to her concerning unmade visits to children then in the same sentence in her deposition reported she would, however, accept simply having a "sit-down" meeting with the caseworker instead.[146]    Such inconsistency of approach discourages the written documentation necessary to measure outcomes for foster children.

Regional Directors have no consistent method by which they gauge work performance in the counties they administer. For example, although she admitted that her region needs more foster homes, Regional Director McDaniel testified that she is not aware of the extent of that need, which may be because Regional Directors do not keep track of how many placement resources are available in their regions.[147] Although the federal CFSR had called MDHS' attention to the lack of foster homes openings for adolescents, Regional Director McDaniel did not know if the number of such homes had increased or decreased since that finding in December 2004.[148]  Regional Director Rogers testified that she does nothing to enforce the policy limit of no more than six children in a foster home.[149] Regional Directors seem to rely on the ASWS to convey important information to them, but there is no documentation of regular supervisory meetings or a formalized feedback structure.[150]

The MDHS Policy Manual has not been updated since 1999. Policy changes about matters as important as deadlines are assumed to be "understood" without being disseminated to staff in writing.[151] Policy is duplicative in the case of the MACWIS system. One of the conditions of accepting federal funds is that each state's SACWIS system is expected to operate in an unduplicated fashion to automate child case records.[152] But in Mississippi, DFCS continues to operate using both a paper case file and a computer case file. The DFCS

policy manual lists paper case record and MACWIS case record policies side-by-side, directing caseworkers to enter work in both the paper and computer files. In at least one case, the two side-by-side policies are contradictory with no explanation given.[153] This is at best confusing and at worst misleading for caseworkers who must determine how to act on behalf of children facing multiple threats to safety and well-being.

In addition, there is no way to gauge what work has actually taken place with a child and family. Records reviewed indicated that missing documentation is found in everything from Individual Service Plans and recordings of filings for Termination of Parental Rights to entry of children's out of home placements. Although admitting that it is important for information about a child to be documented in the case file because "[t]hat's all we have to go on,"[154] DFCS administrators did not express concern about a lack of documentation. Instead, Regional Directors make an assumption that work has been done, just not entered.[155] This begs the question, how do they know? With no viable quality assurance system (as discussed below) and only a random look at cases themselves, the answer has to be that they do not know what is happening with the children for whom they are responsible. They don't know if children have service plans or are getting services needed. Of great concern is that in many cases they simply do not know where the children are. In a report about children in custody by placement type from May 2005, 97 children had a placement location left blank in the case record.[156]

### (ii)    Failure to Develop an Adequate Quality Assurance System

Child welfare agencies must be able to monitor performance and correct course as needed to prevent the entrenchment of systemic problems. Aggregated data with trends analyzed over time educates the staff about systemic problems and provides a yardstick for measuring progress. In addition, a complete feedback loop that includes expected outcomes, actual performance, corrective action plans, and, most importantly, close monitoring of

compliance with the corrective action plans ensures that an organization has a reliable basis

from which to remedy problems that arise.

> The December 2003 Statewide Self Assessment acknowledges that:

> efforts of the Quality Improvement Unit are limited to the reviewing of DFCS case records due to the extreme shortage of staff. Additional quality assurance processes need to be incorporated in other areas of the Division to review all aspects of service delivery, including direct services (foster care provision) and supportive services (therapy and counseling, and other contracted services). The Quality Assurance program cannot be enhanced without additional resources.[157]

Additional Quality assurance deficiencies acknowledged by the Self Assessment include:

- "Quality Assurance processes that include supervisory practice, regional administrative practice and review of State Office procedures are needed. Current Quality Improvement staff are social workers advanced positions and additional expertise is needed to review other State level functions."[158]

- "There is currently no assessment process to determine whether [foster parent] training is effective, or offered at a level that is consistent in all service areas. Current staffing resources in the licensing areas and in Quality Improvement/Assurance cannot assess this information."[159]

- "Quality Improvement/Assurance reviews are needed for foster resources to ensure that they are properly trained, and properly supported when issues arise." "Licensing workers have the responsibility for ensuring quality [placement] resources, however there is currently no link to a statewide quality assurance component." "Currently, there are not enough positions to allow for a Quality Improvement focus for this effort."[160]

- "There is no statewide evaluation for the effectiveness of [foster and adoptive home] recruitment and retention plan/activities or the degree of effectiveness demonstrated."[161]

- "The ability to support permanency placements through statewide assessment and monitoring of these [permanency] programs is limited" due to staffing.[162]

The May 2004 CFSR Final Report finds that Mississippi is not in substantial

conformity with the systemic factor requiring a quality assurance system. "The State's

Quality Improvement system is not fully operational . . . and is limited to the review of case

records for newly opened in-home cases." "[F]oster care cases are monitored through the

Foster Care Review . . . [but] counties do not consistently prepare the required Action Plans to

address identified concerns."[163]  This lack of a functioning Quality Assurance process means that no one in the state knows whether policies are, in fact, followed in practice.

Reasonable child welfare professional standards would require an internal case review system as part of an overall quality assurance program.  The data generated by a randomly selected sample of case records provides first, a baseline, and later, performance outcomes to strive for in improving the work.  The case review process is one of DFCS's weakest areas.[164]  In the past, Foster Care Review Boards were utilized as a type of quality check for casework with children and families.  Originally the Foster Care Review Boards were comprised of community stakeholders who reviewed children's records and progress every six months.  Recommendations of the Foster Care Review Boards were reported to the courts and were to be followed by DFCS if approved by the courts.  While the policy and procedure regarding the Foster Care Review Board process continues to remain in the DFCS policy manual,[165] the Boards were discontinued in 1999-2000.[166]  Again, what is put on paper by DFCS does not match reality.

In another now abandoned effort, MDHS once had what was called a Quarterly Regional Comparison Report, which was drawn from a sampling of five cases per region per month and compiled quarterly.  The report was summarily discontinued.  A State Office manager described the Quarterly Regional Comparison Report as "one of those well-meaning things that didn't quite pan out."[167]

DFCS uses its own staff as foster care reviewers now, but only eleven reviewers have been allocated to cover the entire state of Mississippi.[168]  These foster care reviewers facilitate what is called a county conference in which they look over the ISP and the case record and make recommendations that have no force of authority.  The county conference is nothing more than an exercise in paperwork.[169]  In theory, reviewers' concerns are sent up the chain of command and back out to the Regional Directors for follow-up explanation and