response. In fact, however, at least three of the nine Regional Directors have failed to acknowledge ongoing problems brought to light through the case review process. In the words of the head of the MDHS Foster Care Review Unit, "the reviewers have no case control. You know, they don't tell the workers or the supervisors how to work their cases. They just make suggestions, recommendations."[170] At present the Foster Care Reviewers generate a monthly randomly sampled case review of cases per regions whose purpose is to compare performance across regions against a small set of indicators. These indicators are duplicative, fail to capture qualitative information, and do not align with the federal CFSR measures.[171]

The March 2005 PIP proposes to further dilute the statistical power of the Foster Care Case Review process. Because "[t]hese revisions have increased the number of items and added to the length of time it would take to review a case," the number of cases reviewed in the FCR's monthly random sample case review will be reduced from 5 cases per region per month to 3 cases per region per month, for a total of 324 cases a year (down from 540 cases).[172]

41

PENGAD-Bayonne, N.J.

EXHIBIT

6a

## IV.    MDHS Denies Children Adequate Services And Fails To Protect Them From Harm

Tragically, the Agency's operational and fiscal mismanagement creates a grave risk of harm to children in State custody that is both foreseeable and avoidable.

Federal and State law and professional standards require that children in custody have services available to meet their needs.[173] Children who are removed from their homes for safety reasons must be placed in the least restrictive, most family-like setting possible in close proximity to their homes and have their needs assessed.[174] Child welfare agencies must also provide regular medical and dental care, and necessary mental health services to foster children.[175] Reunification and adoption services are also required to meet the permanency needs of the custodial child.[176]

### A.    MDHS Denies Children Safe and Appropriate Placements

MDHS policy ranks placement settings from the least to the most restrictive – from foster homes to emergency shelters and other institutional facilities – and, consistent with federal law and professional standards, requires children to be matched to the least restrictive placement appropriate to their needs and in close proximity to their home.[177] The goal is to keep children in the most home-like setting possible and geographically located such that they are better able to maintain family ties, especially when the permanency plan is family reunification. Children in State custody must also be protected from further abuse and neglect. Their placements should be adequately screened, and the children should be seen face-to-face by their caseworker at least monthly.[178]

### (i)    Children Are Arbitrarily Placed

Children are being inappropriately placed by MDHS using an "any port in a storm" approach. The May 2004 CFSR Final Report finds that "[o]ne of the areas of greatest concern is the State's performance on Permanency Outcome 1," finding that MDHS

> does not engage in adequate matching of children with foster care placements to ensure stability. Placement stability is also undermined by the lack of foster homes and agency support to foster

42

> parents and relative caregivers. Furthermore, . . . [DFCS] relies extensively on the use of emergency shelter facilities for the initial placement (even for very young children) or when placements disrupt (often due to children's behavior and foster parents' inability to manage behavior).[179]

Though the MACWIS system, at least in theory, tracks the most basic information on placements, such that a Social Worker may search for homes which have the capacity to take additional children, the system does not provide the Social Worker with such essential facts as which homes can meet a child's medical needs, are in a child's school district, or are willing to accept siblings.[180] In most counties, a Social Worker is responsible knowing those details about a placement for a child by relying solely on his or her memory.[181] There is no comprehensive written list of placement resources; MDHS once tried to maintain such a list, but abandoned that effort because "it was just going to be too much work."[182] Though there is a list of placements with substantiated or pending allegations of abuse or neglect, the list is kept in the State Office and Social Workers, who are based in the county offices, do not routinely check whether particular placements are on the list before placing children in them.[183] The impact of such a disorganized placement process is devastating: children already traumatized by abuse and neglect are forced to travel miles away from familiar family, friends, and schools to live among strangers; family members must travel great distances to visit with children with whom they may soon be reuniting; and, most troubling, MDHS is putting children into the hands of caregivers whom MDHS knows, or should know, are alleged to have, or have been shown to have, maltreated children.

---

| Case Example |
| --- |

*In response to a February 2005 foster care review report finding that a foster child's placement information in MACWIS is incorrect, Forrest County states: the child "does not have a placement. He is with a sitter." (Foster Care Review Monthly Case Status Report (Issues Observed During Foster Care Review) for February 2005, at DHS 047569)*

### (ii)    Children Are Over-Institutionalized

MDHS places children who would be better served in families in overly restrictive institutional placements because it does not have enough regular foster homes.[184] The Hess Case Record Review found that 20.8% of children in MDHS custody were in congregate care facilities.[185] Of 2958 children whose placements are reported, there are 609 in group homes and "institutions" (20.59%), and 30 are on runaway status (1.01%).[186]    The December 2003 Statewide Self Assessment acknowledges that the 1995 federal review of Mississippi's child welfare system had already noted that Mississippi was "overly dependent on institutional facilities for children."[187]    Of particular concern is data even more recent than the Care Record Review indicating a significant increase in the State's institutionalization rate.  Mississippi's Child and Family Services Review Data Profile, dated December 8, 2005, found that for Federal FY 2005 (ending September 30, 2005), 24.8% of children in custody were placed in group homes or institutions.[188]

### (iii)    Children Are Placed in Inappropriate Emergency Shelter Placements

The Hess Case Record Review found that 63.8% of children in custody have been placed at least once in an emergency shelter facility or emergency foster home during their current foster care stay, spending an average of three months in such placements.  The total time spent by children in emergency placements ranged from one day to one year and 15 weeks, and 45% of the children faced multiple emergency placements.  26% of these children were between zero and five years old and they spent an average of two months in emergency placements.[189]

MDHS concedes in its March 2005 PIP, that it continues to over-utilize shelter placements for very young children, and children remain in shelters for extended periods of time.[190]  In some counties, MDHS has admitted that "standard practice" is to "use the shelter as the first placement for children."[191]  In Harrison County, according to Regional Director Rogers, it is unwritten "protocol" that children who have been the victim of sexual abuse are automatically placed in a shelter rather

than with a foster family.[192]  The May 2004 CFSR Final Report likewise found that in 40% of the foster care cases reviewed shelter facilities were used as placements because of the lack of available foster homes, including in the case of a one-year-old child.[193]  Regional Director Rogers admitted that children were still being stuck in shelters even though they would be better served in a foster home because the shortage of foster homes continued as of her deposition on August 9, 2005.[194]  (It is worth noting that the shelters in Rogers' region are lockdown facilities in which children are limited to on-campus schools.[195])

MDHS's "Weekly Shelter Care Report" from December 10, 2005 to December 16, 2005 shows that there were 40 children in shelters across the state during that week, including a child who had been in a shelter for 128 days, one who had been in a shelter for 129 days, and one who had been in a shelter for 142 days.  The statewide average length of stay in a shelter was 53 days; the statewide average for cumulative days stayed in a shelter was 64 days.[196]  It is noted that the Weekly Shelter Care Report for August 6-12, 2005 included three children with 800 "days in shelter," as well as other children listed with 359, 269, 263, 247, and 220 "days in shelter."[197] And MACWIS shelter data from May 2005 indicates that of all children placed in emergency shelters statewide, 42 (or 18%) were less than four years of age.[198]

It is difficult to imagine a professionally acceptable circumstance that would require a baby or very small child to be placed in an emergency shelter rather than a home setting.  In this reviewer's experience, it is the rare foster parent that will turn down very young children such as these, and in fact, it is commonly known that young children are much

> **Case Example**
>
> *An August 2005 Foster Care Review notes that Veronica, age sixteen and her six-month old daughter, spent 144 days in emergency shelter placements before Veronica finally ran away with her infant child.  As noted by the Foster Care Reviewer, "shelters are considered short-term interim placement resources and thus not appropriate for long-term placements."  The reviewer recommended that, if found, the children be placed in a "more family-like placement."  Periodic Administrative Determination, August 5, 2005, DHS 070172*

easier to place with foster families than older children and teens.

In November/December 2005, ACF reviewed Mississippi's second quarterly PIP progress report for July-September 2005 and found that DFCS had not yet completed *any* of the action steps related to clarifying regional procedures and criteria related to Regional Director review and approval for extensions of shelter placements beyond 45 days.[199]

### (iv)    Children Are Denied Needed Therapeutic Placements

MDHS fails to place children with special needs in therapeutic settings corresponding to the level of care they require. The Hess Case Record Review found that as of June 1, 2005, 83.4% of the children with diagnosed mental illness or developmental disorders who were placed with foster families were placed in non-therapeutic foster homes. One in four of these children (25.7%) were placed with unlicensed relatives.[200]

The "Therapeutic Foster Care Placement Log/Pending Placements" lists manually maintained by the State Office Placement Unit show that of the 265 foster children referred for a therapeutic placement during the second half of 2005, 133 (50%) had not been placed in such a placement as of January 12, 2006. Of those, 55 had been waitlisted for at least three months, despite their multiple diagnoses such as "major depressive D/O, recurrent with psychotic features R/O bipolar; PTSD; polysubstance abuse," and "PTSD; ODD; Psychosis NOS."[201]

### (v)    Children Are Placed In Overcrowded Homes and Facilities

DFCS routinely places children in overcrowded foster homes and facilities. As of January 12, 2005 MACWIS data, 18 foster homes

---

**Case Example**

*A June 2004 Foster Care Review reports that ten-month-old Jarod is placed in a foster home that is "licensed for four children and housing eleven children," "two reportedly babies," and recently under investigation for abuse. The Foster Care Reviewer notes that she is unable to assess the safety and appropriateness of the placement given her "questions about the appropriateness of the placement." As of the date of the review, Jarod had not been visited at the home in more than three months. Periodic Administrative Determination, June 10, 2004, DHS*

---

had more children placed in them than the number for which they were licensed. One congregate care facility licensed for 10 children was housing 22 children.[202] The May 2004 CFSR Final Report specifically reports that "maltreatment in foster care may be a result of too many children in a foster home."[203]

### (vi)    Children Are Placed In Unlicensed Homes and Facilities

DFCS places children in unlicensed homes and facilities, putting those children at great risk.[204]  In a policy bulletin dated February 26, 2003 to DFCS staff, Wanda Gillom states that provisional licenses for foster homes are no longer permitted: "It was recently brought to our attention during the Federal Title IV-E Audit, that Title IV-E funds cannot be claimed for children placed in foster homes with a provisional license." She also states: "In addition, we will no longer be able to maintain children in a foster home whose license has expired."[205] According to a January 12, 2005 MACWIS report, however, at least four foster homes had children placed with them even though their licenses were expired.[206]

The May 2004 CFSR Final Report finds that the State may also place children in "unlicensed group facilities that are exempt from licensing because they are religious organizations."[207]  As of January 12, 2005, 18 foster homes had more children placed than the number for which they were licensed. One

> **Case Example**
>
> *According to a September 2005 Foster Care Review, siblings Cindy and Hannah, ages six and eight, are placed in an "unlicensed, non-relative placement." The Foster Care Reviewer explains that there are "serious concerns" regarding safety of this placement and evidence "indicat[ing] that the father molested Cindy in the home of the current placement." Despite these concerns, the reviewer notes that she is unable to assess the safety and appropriateness of the placement as there is "only one in-placement face-to-face contact" documented in the last six months. Periodic Administrative Determination, September 21, 2005, DHS 070490, 011669.*

congregate care facility licensed for 10 children was housing 22 children. 4 foster homes had children placed with them even though their licenses had expired.[208]  Some children are placed in medical or psychiatric facilities because no other placement has been identified. The agency has no ability to license and monitor these services effectively. This occurs even though DFCS policy

requires immediate agency legal intervention with the court should such an unlicensed placement be ordered.[209]

### (vii)    Children Are Placed In Inadequately Screened Relative Placements

DFCS has also placed children with relatives without required criminal background checks on those relatives or adequate screening of their homes. Named Plaintiff Olivia Y., for example, was placed in a relative's home before a background check revealed that a convicted sex offender also lived in the home.[210]    Most (83%) of the substantiated abuse and neglect in care incidents acknowledged by MDHS in its Self-Assessment involved relative placements.[211]    The State Office Protection Unit does not keep track of allegations of abuse or neglect of children in MDHS custody if those children are in unlicensed placements or if they are on a visit or trial reunification with their biological parents.[212]

---

**Case Example**

*A July 2005 Foster Care Review notes that four-year old Samantha is placed in the home of her paternal grandfather. While there, Samantha's mother has "allowed [Samantha] to be in potentially threatening situations," exposing her to sexual abuse by the babysitter's son, and "allowing [Samantha] to go away from her with various men." The reviewer notes that Samantha has been a victim of prior sex abuse and characterizes Samantha's placement as "neither safe nor appropriate." Samantha's individualized service plan has not been updated in ten months, and no investigation is documented. Periodic Administrative Determination, July 13, 2005, DHS 069798.*

---

---

**Case Example**

*A foster care reviewer observed and reported in June 2005 that a seven-year-old foster child's "6-22-05 narrative in MACWIS reads as follows: 'Anonymous caller stated that [mother] has been in jail twice in the last few months for various things. Concerns are with the children being with her and she is being picked up by police and the kids are with her when this happens.* **[Foster child] is the only one right now in jeopardy with Mom.** *She may also have other warrants in Florida, Louisiana, and Stone county area.'" (emphasis in original) "The child is supposedly placed with his grandmother. There is no documentation that this allegation has been followed up on."¹ )Foster Care Review Monthly Case Status Report (Issues Observed During Foster Care Review), July 7, 2005, at DHS 047723).*

---

### (viii)    Children in MDHS Custody Are Routinely Separated from Their Siblings

DFCS unnecessarily separates children from siblings and otherwise isolates them from family. Accepted professional standards stress the importance of maintaining family ties by keeping siblings together and ensuring visitation with family as a key to successful outcomes.[213] The May 2004 CFSR Final Report finds that in 23% of applicable foster care cases reviewed "there was no valid reason for the separation of the siblings."[214] Likewise, the Hess Case Record Review found that for the 44.7% of children who were placed separately from one or more of their siblings, 28.1% had no documented justification for the separation and 72.3% had no case documentation of any MDHS efforts to identify a placement for the sibling group.[215]

Moreover, in 45% of applicable foster care cases reviewed by ACF, MDHS "had not made concerted efforts to ensure that visitation between parents and children and among siblings was of sufficient frequency to meet the needs of the child."[216] The Hess Case Record Review found that the majority of the children with the goal of reunification had not been provided *any* parent-child visits with their mothers (51%) or their fathers (85%) during the 12-month period prior to June 1, 2005.[217] Likewise, *none* of the children placed separately from other siblings in MDHS custody were

49

provided with sibling visits twice a month as required by Agency policy, and 60.1% were denied even one sibling visit during the entire 12-month period prior to June 1, 2005.[218]

The March 2005 PIP acknowledges that "MDHS was not consistent in its efforts to (1) place siblings together; (2) establish frequent visitation between children in foster care and their parents and siblings; (3) preserve connections for children in foster care; (4) seek relatives as potential placement resources; and (5) promote or maintain a strong, emotionally-supportive relationship between children in foster care and their parents."[219]  In addition, according to the PIP, MDHS's Foster Care Program 4th Quarter 2004 Annual Report documents that siblings were placed together in only 59.9% of the 167 applicable cases reviewed during 2004.[220]  The Foster Care Review Program found it to be "of concern" that during the first quarter of Fiscal Year 2006, three quarters of the children reviewed had "infrequent contact (less than monthly or none at all) with either parent or their siblings who are placed separately in state's custody."[221]  In the fourth quarter of Fiscal Year 2005, 55.6% of children reviewed did not have frequent visits with their siblings, and 70.3% did not have frequent visits with their parents.[222]  DFCS Foster Care Review Program's quarterly report for the third quarter of fiscal year 2005, reports that 47.7% of the sample children did not have MACWIS documentation of frequent visitation with siblings, and 63.7% did not have documentation of frequent visitation with parents.[223]  Although county office staff are required (by federal and state law) to conduct "diligent searches" for relatives[224] and make "reasonable efforts" to place children with relatives within two months of the child's entry into custody[225], the Regional Directors do nothing to ensure that such searches take place.[226]

The March 2005 PIP aims to increase the statewide percentage of siblings placed together to 61.9% by March 2007 (with a benchmark interim goal of 60.9% by March 2006), an increase of only 2% from its 2004 baseline of 59.9%.[227]  In its second quarter PIP progress report, for July-September 2005, DFCS admits that for July-September 2005, 57% of children in custody

were placed with siblings, a decline from 66% in the preceding quarter and even below the state's baseline for this performance measure.[228]

### (ix)    Children Are Placed Far Away From Family

MDHS concedes that "[t]he availability of appropriate placement options for children within counties varies greatly, impacting the ability to comply with policy" requiring children to be placed in their home county in close proximity (within a 50 mile radius) of their original home.[229]   In the fourth quarter of FY 2005, the Foster Care Review Program determined that 16.2% of children it reviewed had not been placed within close proximity of their homes.[230]   By the first quarter of FY 2006, over one third of all children reviewed (36%) had been placed more than 50 miles from their original homes.[231]   The March 2005 PIP acknowledges the 2004 CFSR's finding that "MDHS did not make concerted efforts to ensure that children in foster care are placed, when appropriate, in close proximity to their parents and communities of origin," and additionally concedes that the Foster Care Program 4th Quarter 2004 Annual Report found that in 16% of the 376 applicable cases reviewed the child was not placed within 50 miles of his/her original home.[232]   Likewise, the May 2004 CFSR found that in 16% of applicable foster care cases reviewed "the child was in a placement outside of his or her community of origin because of a lack of adequate placement resources."[233]   Even children MDHS is supposed to be making diligent efforts to reunify with their parents are placed out-of-state (including in Tennessee, Texas, and Florida) because Mississippi lacks appropriate placement options.[234]

The CFSR noted that Mississippi had not developed enough regular foster homes willing to accept adolescents.[235]   In deposition, Regional Director McDaniel testified that one of her counties had zero foster homes able to accept sibling groups.[236]   But despite MDHS's repeated acknowledgment that it does not have enough foster homes of all types, MDHS has failed to enact the most basic, common-sense fixes. A full year and a half after it admitted in its Self-Assessment to

a pattern of losing potential foster families through failure to process foster parent applications in a timely manner due to insufficient recruitment staff,[237] it had failed to add, or even seek, more recruitment staff, or to keep track of how long applications lie dormant.[238]

In its second quarter PIP progress report, for July-September 2005, DFCS admits that "[t]he State has failed to meet or exceed the established baseline [for proximity of foster care placement] for two consecutive quarters." For July-September 2005, 64% of children in custody were placed in close proximity of their original homes, a dramatic 20% drop in performance from the preceding April-June 2005 quarter, where 83.8% of children in custody were placed in close proximity to their original homes.[239]

### (x)    Children are Subjected to Multiple Moves

Children are also subjected to multiple moves preventing them from achieving any sense of stability and permanency.   As acknowledged in the MDHS Policy Manual, a "foster child who moves many times, or who constantly fears that he/she may have to move, can suffer devastating effects on his/her emotional health."[240]   As reported in the May 2004 CFSR Final Report, however, in 40% of the foster care cases reviewed "[t]he child experienced placement changes that were not for the purpose of meeting the child's needs or attaining the child's goals."[241]

The Hess Case Record Review found that 82.7% of children in custody have been moved between one and 57 times during their most recent stay in custody. For these children, the average number of moves was 5.8. When examined by length of stay in custody, more than a third of these children averaged three or more moves per year. Some of the youngest children were subjected to the highest average number of moves per year of any age group: infants less than one year of age (4.1 moves per year) and three year olds (4.3 moves per year).[242]  Similarly, the Self Assessment acknowledges that many of the children in MDHS custody are subjected to a large number of placement moves, with over 200 children in care experiencing nine or more placements.[243]

52

MACWIS data from November 2005, indicates that children in MDHS custody have undergone an average of 3.4 placement moves during their time in care. 236 of the children out of the 3,277 reported have had 9 or more placement moves, 54 have had 8 placement moves, 82 have had 7 placement moves, 128 have had 6 placement moves, and 212 have had 5 placement moves.[244]

**Number of placements for children in MDHS custody**



Most recently, the Foster Care Review Program found that in the first quarter of SFY 2006 (July – September 2005), 43% of children reviewed changed placement, 57% of whom experienced two or more placement moves in just those three months.[245]

Many of these damaging placement moves could have been avoided. The Hess Case Record Review found that over 90% of the time DFCS failed to make efforts to offer or provide supportive services to either the child or the caregiver to maintain the placement and prevent a move.[246] MDHS concedes in the Self Assessment that support and training for foster parents to help them address the needs of foster children – a deficiency noted in the 1995 federal review[247] – continues to be problem.[248] The May 2004 CFSR Final Report likewise determined that there is "no formal support system in place for foster parents," and that in 25% of the applicable foster care cases reviewed

"needed services were not provided to foster parents."[249]    It notes with concern that in cases of multiple placement disruptions due to the child's behavior "there was no evidence that the agency provided support to foster parents to help maintain the placement when there was a threat of disruption due to behavioral acting out."[250]    MDHS does not even have any system for respite care, whereby another licensed caretaker may watch a foster child on a short-term basis.[251]    The CFSR further found that, insofar as "most of these children should be in therapeutic foster care or other therapeutic settings, [] these types of placement are not available."[252]    In this same vein, the Hess Case Record Review finds that 45.7% of placement moves were related to the child's mental health or behavioral needs or difficulties, or the unmet need for a different level of care.[253]

Since the CSFR noted that MDHS does an inadequate job of matching children with placements, which sets the stage for those placements to disrupt, MDHS has made no changes to its matching process.[254] In November/December 2005, ACF reviewed Mississippi's second quarterly PIP progress report for July-September 2005, and found that DFCS had not yet completed any of the action steps due in the first two quarters of PIP implementation related to enhancing and expanding foster and adoptive parent support groups and services. [255]

This expert foresees that placements will remain unstable without radical reform of the State's placement procedures, a dramatic increase in the pool of placement resources available to MDHS, and the development of adequate supportive services and training programs for foster parents.

### (xi)    MDHS Fails to Supervise and Screen Children's Placements

The harm to children caused by MDHS's placement of them in inappropriate and/or distant placements is compounded by MDHS's inability to consistently monitor their welfare.    MDHS policy and national practice standards require monthly supervision of children in their placements, including face-to-face contact with children.[256]    Former Director Mangold confirmed that the Social

Worker to whom a foster child is assigned is responsible for monitoring the child's ongoing safety in the placement, including in situations in which the child is placed in a private placement.[257]  The Director of the State Office Placement Unit testified, however, that while it would be "best practice" for Social Workers to visit foster children in their placements and make observations about whether that setting is safe and meets children's health needs, her understanding of MHDS policy did not require that visits be in person or that Social Workers lay eyes on the homes where the children on their caseload are being held in state custody.[258]  In further contradiction of MDHS policy and accepted professional standards, Regional Director McDaniel testified that MDHS is relieved of its obligation to make face-to-face contact with children in its custody when it places them out of state, even if the state in which MDHS has placed the children has refused to visit them.[259]

The Hess Case Record Review finds that 87.6% of children in custody failed to receive at least one face-to-face contact per month by their caseworker or supervisor during the one-year period prior to June 1, 2005, and that 13.5% were deprived of *any* such contact during the entire year. Social workers/supervisors only made an average of less than half of the required monthly visits to children.

---

**Case Example**

*Siblings Lashana, James, Thomas and Kaleb came into foster care in December 2000, at the ages of 1, 5, 7 and 14. A February 2005 Foster Care Review notes that these children "have not been seen by a social worker since their placement in their maternal grandparents home" in 2000, and that there was "insufficient documentation" to assess the safety of the children's placement. The Foster Care Reviewer also reports that the children's individualized service plans lack any medical, dental, psychological or immunization records.  Periodic Administrative Determination, February 22, 2005, DHS 064088.*

---

Due to a lack of staff, MDHS has resorted to using social work aides, homemakers, and clerical staff "to do much of the same duties" as Social Workers, even though "[f]ormalized training is not available for case aides and homemakers."[260]  For example, the agency has waived the requirement that a child's assigned Social Worker maintain face-to-face contact with children in custody, allowing unqualified and

untrained MDHS homemakers and case aides to make these critical visits.[261]  Of course this defeats the purpose of hiring trained Social Workers, a reform that was instituted in 1994 in direct response to prior agency failures.[262]  In any event, even counting face-to-face contacts made by unqualified and untrained MDHS staff, including clerks, children in MDHS custody still averaged only 9.9 contacts for the year, and 8.4% of children failed to receive *any* MDHS contact for the entire year prior to June 1, 2005.  Moreover, *none* of the children's foster parents were seen face-to-face in their homes by a Social Worker or supervisor on a monthly basis for the entire year prior to June 1, 2005, and for 32.6% of the children, MDHS staff did not visit the caretakers in their home *even once* during that year.[263]

The Foster Care Review Program similarly found that in the first quarter of FY 2006, 20% of the children reviewed had been visited by a caseworker "or other responsible party" either less than monthly or not at all.[264]  And though the March 2005 PIP acknowledges "the importance and the impact that caseworker visitation [with children] can have on improved outcomes for families and children," MDHS admits in it that staffing and caseloads issues are impacting DFCS' ability to make monthly visits.  MDHS itself reports that from July to December 2004, an average of only 67.1% of children statewide had monthly face-to-face contacts with their Social Worker.[265]  And recent MDHS aggregate reporting indicates that as of November 2005, of the 3423 children reported in custody, 880 (25.71%) had not had contact with their Social Worker in at least 30 days.[266]    It is significant that this level of failure to regularly lay eyes on children in custody is despite the statewide waiver of agency policy allowing the required face-to-face contacts "to be made by agency Homemakers and Social Work Aides as well as Social Workers."[267]

> **Case Example**
>
> *Siblings Michele and Sam, ages nineteen months and four years old, have been in care since August 2004. In the children's January 2005 Foster Care Review, the reviewer reports that she is unable to assess the safety or appropriateness of the children's placement because: "\*\*There is no placement information\*\*" and no documentation of face to face contact with these children in either the placement home or in the office. Periodic Administrative Determination, January 10, 2005, DHS 063837.*

**Number of Children Not Seen by MDHS Staff in Last 30 Days**



268

Every month that a MDHS Social Worker fails to see the children on their caseload is a lost opportunity to assess the child's safety, well-being and progress towards permanency and prevent further maltreatment. Although the March 2005 PIP acknowledges "the importance and the impact that caseworker visitation [with children] can have on improved outcomes for families and children," MDHS characterizes its plan to increase the percentage of minimum monthly face-to-face worker contacts with children in custody by only 6% over two years as "ambitious due to the staffing and caseloads issues impacting casework."[269]  Regional Director Zadie Rogers testified that throughout her five years in that position, her staff had never succeeded in making the required visits to all children in care.[270]  As another Regional Director testified when asked about the impact that repeated denials of her requests for more staff had had on her staff's ability to make required visits, "I regret that we cannot do that because we really need it, we really need it.  But if we can't, we can't."[271]

57

> **Case Example**
>
> Brian is three years old and has been in custody for almost half his life. A December 2005 Foster Care Review notes that evidence seems to "indicate that this is a child with some special needs who may require more frequent contact." However, Brian's individualized service plan had not been updated in five months and the reviewer notes that "there is no documentation that agency staff persons have had face to face contact with [Brian] since [October 12, 2005]." In addition, despite the fact that "[c]ourt orders filed in the case record show the court ordered on [September 28, 2005] that the agency pursue termination of parental rights and then adoption for this child," a TPR petition had not been filed. Periodic Administrative Determination, December 19, 2005, DHS 090291.

The Licensure Unit of DFCS is responsible for the licensing of foster homes, child placing agencies, and residential child caring facilities. As of January 12, 2005, MDHS active placement resources included 859 homes and 33 facilities with MDHS child placements.[272] At one time the Unit had fifteen Foster Home Licensure Specialists, but in the FY 2006 Budget Request it was noted that the number had been reduced to eleven to cover the entire state.[273] The May 2004 CFSR Final Report finds that while "[p]olicy requires licensing staff to visit each foster home one time per month[, t]his standard is not met due to the high caseloads of staff."[274]

MDHS's Self Assessment acknowledges, furthermore, that private child caring agencies have limited access to Central Registry background check information on past abuse and neglect incidents involving childcare staff and foster parent applicants. Instituting "a policy to require annual criminal background checks and child abuse checks on foster parents and adoptive parents" is recommended,[275] but MDHS has yet to issue such a policy. The Self Assessment also acknowledges that "due to significant staff turnover and several reorganizations," a planned revision of the 1986-88 standards for child placing agencies and residential child caring facilities has yet to be completed and issued.[276] The May 2004 CFSR Final Report cited "staffing issues in the licensing unit" for the continued failure to issue these new standards as planned.[277]

---

**Case Example**

A foster care reviewer observed and reported in June 2005 that a one-year-old medically fragile child with a severe heart defect who came into care June 18, 2004 has been placed in a foster home in Arkansas. There is no documentation that any Arkansas social service staff has had face-to-face contact with the child since she has been placed there, and the last face-to-face contact with a Mississippi social worker was six months prior to the review, in January 2005. Foster Care Review Monthly Case Status Report (Issues Observed During Foster Care Review), July 7, 2005, at DHS 047704

---

**Case Example**

An April 2005 foster care review notes that "[t]he DFCS Jackson County ASWS stated to the Reviewer [] that Jackson County DFCS staff can no longer visit Mississippi foster children placed in Alabama except for children placed at Wilmer Hall in Mobile." As a result, two young Mississippi foster children (ages 3 and 2) placed with their grandmother in Alabama had not been seen by a Mississippi or Alabama social worker in at least eight months. (Foster Care Review Monthly Case Status Report (Issues Observed During Foster Care Review) for April 2005, at DHS 047653).

---

### (xii)    Children Are Maltreated In Foster And Adoptive Placements

Keeping children safe is a primary responsibility of MDHS. State policy requires child abuse and neglect referrals to be classified and, if accepted, responded to within 24 hours. Case investigation must be complete within 30 days of the referral.[278] In practice, however, MDHS does not respond in a timely fashion to protect children, nor does it appear to have operationalized or even formulated a consistent or coordinated response to allegations of maltreatment of children already in foster care.* Of most significant concern to this reviewer is the fact that an unacceptably high percentage of children in MDHS custody are being exposed to maltreatment and corporal punishment in their placements.

During the first nine months of 2005, the average maltreatment rate of children in MDHS custody was 3.2%, according to MDHS's own case reviews of 342 children in custody. This is more than five times the allowable federal standard of 0.57% on this critical child safety measure. During

---

* Many of the maltreatment reports on foster children recorded by the Protection Unit were not evidenced. The validity of those findings cannot be assessed at this time as MDHS did not produce the investigation reports until several days ago.

January to March 2005, four out of the 135 children reviewed (3.0%) experienced abuse or neglect in MDHS custody.[279]  During April to June 2005, four of 126 children reviewed (3.2%) experienced abuse or neglect in their MDHS placements.[280]  During July to September 2005, three children out of 81 reviewed (3.7%) experienced abuse or neglect in State custody.[281]



The State Office Protection Unit, which only keeps a manual log of those cases it is notified of, is oblivious to how many children are really being maltreated in care.  The Unit's manual log documents only six substantiated cases of abuse or neglect of foster children in the whole State for all of 2005.  By contrast, during only the first nine months of 2005 Foster Care Reviewers tallied 11 cases of substantiated abuse out of a sample of only 342 foster children.[282]  Applying the actual rate of maltreatment in care recorded by the Foster Care Reviewers to the average number of children in care for the first nine months of 2005 (3323), *approximately 106 foster children would have been the victims of substantiated abuse in care during that same period.*[283]

The Director of the Protection Unit concedes that the Unit may not get notified of all reports and investigations of abuse and neglect of children in MDHS custody, and that their manual log purporting to list all allegations of abuse of children in custody is incomplete.  The Unit relies on manual notification as there is no automated reporting system.  Nonetheless, the Protection Unit

Director has never directed anyone in this State Office Unit to conduct an electronic search of MACWIS for maltreatment reports on children in custody that the Protection Unit was never notified of.[284] Thus, only the county office Social Work staff who are supposed to enter each investigation into the computer are likely to know of allegations of abuse or neglect of foster children. Even a Regional Director, charged with supervising investigations and signing off on ultimate findings, testified that she does not keep track of how many children in her region are abused while in MDHS custody.[285] Another Regional Director testified that although she had learned almost a year and a half before her deposition that 6.7% of foster children in her region had been abused or neglected while in MDHS custody, she had done nothing about it.[286]

---

**Case Example**

The first week in August 2005, Ronald H. Shiyou was arrested on four counts of sexual molestation involving two foster girls, six and eight years old, in his Hancock County home. A Sun Herald article the following week recounted these facts and stated that the "state Department of Human Services is working with Hancock investigators to determine how many children have lived with Shiyou since 2002, when the alleged sex crimes began." ("Abuse charges go up to four," Sun Herald, August 11, 2005) As of December 2005, however, the State Office Protection Unit had yet to determine who the sexually abused foster children were and whether an MDHS investigation was conducted. Where the "Allegations," "Investigative Report," and "Findings" are supposed to be noted, the 2005 MDHS Foster Home Investigations log only notes "E-mail stated possibly [Smith] children. No specific foster children named at this point and nothing in MACWIS". (DHS 091929)

---

The Hess Case Record Review confirms that maltreatment of foster children is rampant in Mississippi's child welfare system. The review found that nearly one in four children in MDHS custody (24%) had indications in their records that they themselves, or another foster child placed in their home or facility, had been the subject of maltreatment while in custody. One in ten children in custody (11.8%) were placed in homes or facilities where maltreatment was substantiated and/or the conduct complained of was serious enough to result in a placement move. One in twenty children in custody (4.9%) were the victims of substantiated maltreatment. As alarming, for 5.6% of children,

suspected maltreatment in their placements was documented but never formally reported or investigated.[287]

According to Ms. Triplett, the Director of the Protection Unit, MDHS does not treat or investigate allegations of corporal punishment as child abuse, although MDHS policy expressly forbids the use of corporal punishment on foster children (who are often prior victims of physical and sexual abuse).[288]  In reviewing an allegation that a man hit a foster child with a belt, Ms. Triplett – the MDHS administrator responsible for MDHS policy on child maltreatment and protection – stated that she "d[id] not see a report that meets the criteria for abuse and neglect" and determined that "this would not require an investigation."[289]   She went on to testify that MDHS would "not necessarily" investigate whether sexual abuse had occurred if "a little girl" contracted a sexually transmitted disease while in a foster home.[290]   The Director of Protection's understanding of maltreatment diverges so far from professionally acceptable standards – including the legal presumption that sex with a child below the age of consent is by definition abuse – as to shock the conscience.

Even when reports of maltreatment of foster children rise to the level necessary to trigger investigation by MDHS, the agency fails to treat those reports with urgency and protection of children may be subordinated to staffing concerns.  MDHS's Self Assessment notes that in 2003 the agency had a backlog of over 2,800 incomplete abuse and neglect investigations open more than 30 days "due to insufficient staffing numbers."  It also identifies a troubling connection between MDHS's staffing crisis and investigations:

> The areas of the state with chronic understaffing have a lower rate of substantiated reports per capita.  In reviewing data, areas with fewer staff appear more likely to 'screen-out calls' and have fewer substantiated investigations.  If the number of investigations exceeds the number that can reasonably be done by available staff, the result may be less thorough investigations."[291]

Recent aggregate MACWIS data indicates that as of November 15, 2005, there were 2754 investigations statewide open more than 30 days.[292]   A September 2005 "Child Investigation

Timeliness Report – Statewide Summary" (dated 10/10/05) shows that only 75.4% of 1030 investigations were initiated within 24 hours as of October 10, 2005.[293]

The May 2004 CFSR Final Report finds that in 25% of applicable cases reviewed (both foster care and in-home cases), including the case of a maltreatment report of abuse in a treatment facility, MDHS "had not established face-to-face contact with the child subject of a maltreatment report in accordance with the State's required timeframes." It is also reported that "'follow-up' on investigations after the initial contact with the child is made often do not occur in a timely manner," and that "a large percentage of maltreatment reports . . . are not substantiated even when there is evidence to warrant substantiation."[294] In 13% of applicable foster care cases reviewed, DFCS had *not* made "diligent efforts to reduce the risk of harm to the children involved in each case." In one case it was specifically found that "[t]here was insufficient assessment of risk of harm to children in their foster homes and risk issues were not addressed." It is also reported that "maltreatment in foster care may be a result of too many children in a foster home."[295] MDHS's March 2005 PIP confirms that from July-December 2004 an average of only 67.99% of intake investigations were initiated within 24 hours, as required by Mississippi policy.[296]

---

**Case Example**

*GARY entered foster care in February 2001, at the age of five. According to a July 2004 Foster Care Review, Gary was subjected to "nineteen placements" in his first two years in care. Seven of the placements were "emergency" or "temporary" facilities. Although the "Reasons for Removal" indicate that Gary was sexually molested in at least two different placements and was suffering from encopresis and sexual acting out, there is no indication that such maltreatment was ever formally reported or investigated. Gary was freed for adoption on February 13, 2003, at the age of seven, but it was no cause for celebration as he spent the next two nights in a "Holiday Inn Express" with a "sitter" because MDHS had no other placement for him. After another fifteen months in custody Gary was still not adopted, his individualized service plan was more than twenty months out-of-date and "lack[ed] physical, dental, psychological, immunization record and the correct placement." The Foster Care Reviewer had to reconstruct his placement history as only one placement was showing in his primary MDHS case file. Periodic Administrative Determination, July 29, 2004, p. 2, DHS 012178 (See below)*

---



*4253 Page 2*

■■■■

*Harrison County*

■■■■ *PLACEMENTS, DATES OF PLACEMENTS, REASONS FOR REMOVAL*

| Date | Placement | Reason |
|---|---|---|
| 2/13/01 | ■■■■ (maternal cousin) | *Family moved from place to place, financial problems* |
| 2/12/02 | *Shelter* | *Temporary* |
| 2/21/02 | ■■■■ *Foster Home (Pearl River County)* | ■■■ *had endless screaming fits when told "no"* |
| 2/25/02 | ■■■ *Foster Home* | *Temper tantrums, kicked a hole in wall* |
| 3/25/02 | ■■■ *Foster Home* | *"Pooping" in his pants three and four times a day, at this home* ■■■ *began saying his cousin* ■■■ *(see first placement) "touched" him.* |
| 6/13/02 | ■■■ *Foster Home* | *He would argue constantly, not a "fun" child to be around,* ■■■ *began having to take off all the time for behavior at school or to take him to the doctor.* |
| 7/26/02 | *Shelter* | *Temporary* |
| 8//02 | ■■■ *Adoptive Home (Clark County)* | ■■■ *was defiant and uncontrollable* |
| 1/22/03 | *Pine Grove* | *Temporary facility, respite for the* ■■■ |
| 1/31/03 | ■■■ *Adoptive Home (Clark County)* | *Behavior uncontrollable, they didn't think he fit into their home* |
| 2//03 | *Pine Grove* | *Facility* |
| 2/7/03 | ■■■ *Foster Home* | ■■■ *put a pillow over another child with intentions of smothering him, he tried to touch the* ■■■ *granddaughter sexually* |
| 2/13/03 | *Holiday Inn Express* | *Family & Children's Services tried to get* ■■■ *into Memorial Behavior but they could not accept him. Had a sitter for him at Holiday Inn* |
| 2/15/03 | *Pine Grove* | *Temporary facility* |
| 2/25/03 | ■■■ *Foster Home* | *Temporary* |
| 2/27/03 | ■■■ *Emergency Foster Home* | *Temporary* |
| 7/3/03 | ■■■ *Foster Home* | *Another child in the home touching* ■■■ *sexually* |
| 7/8/03 | ■■■ *Emergency Foster Home* | ■■■ *did well in this home, had medication changed, Adoption Unit found him an Adoptive home* |
| 12/19/03 | ■■■ *Adoptive Home* | *They want to finalize* |

DHS
012178

---

**Case Example**

*Matthew, a six-year-old child in DHS custody, was placed out of state in a Louisiana nursing home because Matthew requires around-the-clock special medical care. In February 2004, when Matthew was four years old, a MDHS Foster Care Reviewer concluded that Matthew's county of supervision "is aware that Louisiana DHS does not supervise placements in nursing homes, and it appears the county is neglecting to ensure [the child's] safety."[1] The Southdown Care Center where DHS left Matthew completely unsupervised for almost 10 months was the site of a deadly viral outbreak in 1996 that killed 10 child residents. A federal Center for Disease Control investigation found that Southdown's management failed to take basic steps to contain the virus and care for the medically needy children, who continued to get sick and die over a period of two and a half months. The facility has been cited and fined three times since 1996 for violations that endangered its residents, and found liable in 2000 for two of the deaths by a jury in a $1.2 million verdict. As of August 2005, Matthew was still placed at Southdown "Tragedy in the Children's Ward," New Orleans Times-Picayune, April 18, 2005.*

---

### B.    MDHS Fails To Provide Children With Health Care And Other Needed Services

Children in the State's custody are required by federal law and professional standards to have their educational, medical, and mental health needs met,[297] and MDHS policy requires the Social Worker to whom each child is assigned to ensure that treatment is in fact delivered on an ongoing basis.[298] The trauma of being removed from their homes makes the importance of stable and ongoing connections with family, friends, and school even more important for these children. Children in out-of-home care are at a higher risk for emotional and behavioral problems than are children in their biological homes.[299] Without having their needs adequately assessed and met, foster children suffer continuing harm at the hands of those charged with their care.

MDHS's Self Assessment acknowledges that the federal review in 1995 had already identified as a problem that "[h]ealth records for children [were] not routinely contained in the foster child's foster care case records, and the children's "mental health needs [were] not [being] adequately identified, assessed or addressed."[300] Although the Self Assessment acknowledges that services should be available statewide, MDHS concedes that "[m]inimal services are available in most rural counties."[301]

The May 2004 CFSR Final Report likewise identifies as a key concern "a general lack of mental health services throughout the State."[302] "A key CFSR finding with regard to [Well-Being Outcome 3] was that [DFCS] is not consistent in its efforts to meet children's physical or mental health needs."[303] In 52% of the foster care cases reviewed DFCS had not met the service needs of children, parents, and foster parents; had not involved children and parents in the case planning process; and/or had not established face-to-face contact with children and parents with sufficient frequency to ensure the children's safety and well-being.[304] Yet, in both August 2005 and November/December 2005, ACF reviewed Mississippi's quarterly PIP progress reports for April-September 2005 and found that MDHS had failed to add steps and strategies for ensuring that "services are accessible to families and children in all political jurisdictions covered in the State's CFSP" and that "services can be individualized to meet the unique needs of children and families served by the agency." [305]

### (i)    Failure to Assess Children's Needs

Establishing the physical and mental health of children entering State custody is critical to the Agency's ability to provide for their needs and prevent further harm to them. It is also imperative for the Agency's ability to properly advocate for the best interests of the children in custodial proceedings to have documentation of the children's baseline condition at the time of entry into custody. MDHS policy requires that children be provided a physical health exam within seven days of entry into foster care custody; a dental exam for children ages three or older within 90 days of entry into custody; and a psychological exam for those children ages four and older, also within 90 days.[306]

All of a foster child's medical, dental and psychological information must be maintained in the child's case record,[307] and the child's complete health history, including immunization

66

records, must be in the child's Initial Service Plan.[308] Further, foster caregivers must be provided with the current health information of the foster children placed in their care.[309]

The Hess Case Record Review found that 84.1% of children entering custody on or after June 1, 2003, were not provided the required physical exam within seven days. Wide variation was found in County practices, with Humphreys County providing all such children a physical exam within seven days, and Harrison County only providing such exams to 4% of its children entering custody on or after June 1, 2003. DHS also failed to provide 80.8% of children three and older with the required dental exam within 90 days of entry into custody on or after June 1, 2003. Moreover, for 89.4% of children entering custody on or after June 1, 2003, health records were not provided to the child's caretaker at the time of entry into custody. MDHS also failed to maintain immunization records for 17.4% of children in custody age 0-5 years old. For 40% of the children *no* health or mental health information was included on the child's initial ISP because no ISP was even completed within 90 days of entry into custody.[310]

MDHS likewise failed to provide 57.7% of children age four and older the required psychological assessment within 90 days of entry into care on or after June 1, 2003. Over a third of children (35.5%) never received *any* evaluation. This included children who had identified behaviors of concern such as hurting other children, perpetrating sex abuse, damaging or destroying property, attempting suicide, carrying a weapon, masturbating in public, stealing, and having serious emotional and behavioral problems in school. Even for those who did receive an evaluation, 50% of those whose evaluation recommended further assessment were never provided with any further assessment. It is significant that 80.3% of those children in custody who were evaluated for mental illness or

67

developmental disorder were diagnosed with such an illness or disorder.[311] This underscores how vulnerable and at risk the population of children in DHS custody truly is.

MDHS's own Foster Care Review Program found that between July and September 2005, 9% of the foster children's physical health needs were not assessed.[312] MDHS's Self Assessment concedes that "[a]lthough policy mandates a medical review within 7 days, review of files indicates that many of these cases require additional time to complete the medical assessment." In addition, only approximately half of reviewed cases "indicated documented evidence of the sharing of detailed [medical] information" with foster and adoptive caregivers.[313] The Self Assessment also concedes that although all children in custody ages four and older are required to have a psychological assessment/evaluation within 90 days of custody, "for children in relative placements and in cases that have been opened less than 6 months, the psychological is missing."[314]

---

### Case Example

*Siblings Caleb, Thomas, Alex and Monica, ages 14, 11, 6 and 3, entered care in January 2005. A July 2005 Foster Care Review reports that the children still do not have individualized service plans and "[t]here are no written permanent plans." "The medical screens for all four children show that they have not had dentals, psychologicals and only [Monica] has been to the doctor. There is no documentation that fourteen-year-old [Caleb] has been offered Independent Living Services." The Foster Care Reviewer observed that, during the conference, Monica would "stare off into space several times before coming to herself and proceeding with her activity." The paternal grandmother reports that Monica "does that all the time and she would like for [Monica] to see a specialist or psychologist." Periodic Administrative Determination, July 7, 2005, DHS 069619.*

---

The May 2004 CFSR Final Report likewise finds that "mental health assessments are not always completed on children entering foster care despite agency policy requiring them," and that "social workers may make assessments . . . without input from mental health professionals."[315] The CFSR Final Report also notes that the quality and availability of sexual abuse examinations are "problematic."[316]

MDHS is still unable to run a MACWIS report that tracks the provision of medical, dental and psychological assessments to children in MDHS custody.[317]  Moreover, the March 2005 PIP contains no plans to address the issue of medical documentation and health records being missing from children's case records.

---

**Case Example**

A foster care reviewer observed and reported in March 2005 that there was no documentation that two Jackson County foster children, who entered DFCS custody in October 2004 due to sexual abuse, ever received a medical exam. The county's response indicates that a doctor finally saw the children in April 2005, six months later. Foster Care Review Monthly Case Status Report (Issues Observed During Foster Care Review) for March 2005, at DHS 047612

---

### (ii)    Failure to Provide Regular Medical and Dental Health Care

The Hess Case Record Review found that DHS failed to provide *any* physical exam for 28.2% of the children in custody at least one year, during the two years prior to June 1, 2005.  The youngest children in custody (0-5 yrs), those for whom multiple immunizations are required and important developmental milestones occur, were the most likely not to have received any physical exam (32.4%).  DHS also failed to provide *any* dental exams to 42.2% of children ages three and older who had been in custody at least one year during the two year period prior to June 1, 2005.[318]

MDHS's own Foster Care Review Program found that between July and September 2005, one in ten of the children whose physical health assessments revealed medical needs did not receive physical health services to meet those needs.[319]  The Foster Care Review Program likewise found that between April and June 2005, 14.3% of children's ISPs reviewed did not "indicate" that the child's medical needs were being met with appropriate physical health services.[320]

The December 2003 Statewide Self Assessment similarly concedes that although "Health and Safety are paramount in planning for children in foster care," medical documentation, including immunizations and doctor visits, continues to be missing from case records. "More emphasis is [still]

---

**Case Example**

*Siblings Alan, Lana, Diana, Joshua, James and Shana entered care in November 1999, when they were aged 10, 8, 7, 5, 3 and 1. According to a November 2005 Foster Care Review, adoption was not established as the permanency plan for these children until more than five years later, on January 6, 2005. The Foster Care Reviewer notes: "no TPR referral yet forwarded to State office," further delaying the possibility of achieving the plan. In the interim, "there is no documentation [that] the physical, mental health, and educational needs of all the children have been assess[ed]. There is no psychological in the system for James or Shana; Alan's 'current' medical and dental were 18 months ago; Diana's 'current' medical and dental visits were in mid-2002 as was James's last dental visit; Lana's last dental was fourteen months ago and her current referral to a cardiologist does not appear in her health record in the system only in Narratives; the psychologicals for Diana, Joshua, Lana, and Alan were 'scheduled' for May, 2001, but there is no follow-up documented under their health records beyond 'see hard copy' so that actual needed services are not in the system." In addition, children's individualized service plans had not been updated in more than seven months and the reviewer notes that "it is not clear whether their grade levels are accurate" in the reviews, but "if they are, some may need tutoring or other educational services that do not appear on the ISPs." There is also "no indication that the agency has attempted any sibling visits since the last one documented in June, 2005." Periodic Administrative Determination, November 10, 2005, DHS 089835.*

---

needed to document and track the health care of children," as "medical information is not routinely entered into MACWIS, and cannot be measured through automated means."[321]   State Office Program Specialist Robin Wilson confirmed at deposition that MDHS is still unable to run a MACWIS report that tracks the provision of medical and dental services to children in MDHS custody.[322]   The May 2004 CFSR Final Report finds that in 20% of the foster care cases reviewed "there was clear evidence of [children's] health-related needs that were not being addressed by the agency."[323]   In the words of Regional Director Rogers, "[w]e have not necessarily done a really good job with making sure that medical and physical needs have been met."[324]   Having admitted that, Rogers conceded that she does not take any action to check that foster children get physicals or immunizations.[325]   The March 2005 PIP concedes that DFCS has yet to even determine a baseline statewide percentage of children who receive health services based on identified and assessed physical health needs.[326]

### (iii)    Failure to Provide Mental Health Services

The Hess Case Record Review found that of the children in custody who received a psychological evaluation, 80.3% were diagnosed with a mental illness or developmental disorder. Of these, 81% had specific treatment recommendations documented in their case records. As of June 1, 2005, however, most children were not being provided the recommended treatment by DHS, including 92.3% of those children with recommended treatment for an anxiety disorder, 69.2 % of those children with recommended treatment for a psychotic disorder, 60.8 % of those children with recommended treatment for an adjustment disorder, 54 % of those children with recommended treatment for a developmental disability, mental retardation (MR), or borderline MR, and 51.9 % of those children with recommended treatment for post-traumatic stress disorder. In 21% of the instances in which inpatient treatment – which addresses acute mental illness – was specifically recommended for a child, such treatment was not provided during the entire two-year period prior to June 1, 2005.[327]

MDHS's own Foster Care Review Program found that between July and September 2005, one out of every 10 child (11%) who were found to be in need of mental health services did not receive those services.[328] The Foster Care Review Program likewise found that between April and June 2005, 17.8% of ISPs did not contain documentation that services had been provided to meet children's mental health needs.[329] The December 2003 Statewide Self Assessment concedes that there continues to be inconsistency in the provision of mental health services, due in part to the unavailability of resources. "Services such as counseling, especially when recommended in the psychological [evaluation], are frequently absent from case recordings, even when a support service has been funded. More emphasis in documenting mental health counseling and the outcomes of this counseling are [still] needed."[330]

As conceded by MDHS in its Self-Assessment: "There are not enough therapeutic placements for foster children needing such services. Currently, there are only contracts for 250

71

therapeutic slots (Therapeutic Group Homes, Therapeutic Foster Homes, and Intensive In-Home Services)."[331]   The May 2004 CFSR Final Report confirmed that in 48% of applicable foster care cases reviewed DFCS "had not made concerted efforts to address the mental health needs of children." In those cases "[m]ental health needs were not fully assessed, although a mental health assessment was warranted" or "[m]ental health needs were assessed but needed services were not provided."[332]  MDHS is still unable to run a MACWIS report that tracks the provision of mental health services to children in MDHS custody.[333]  MDHS's March 2005 PIP concedes that DFCS has yet to even determine a baseline statewide percentage of children who receive mental health services based on identified needs.[334]

### (iv) Failure to Provide Educational Services

Federal law and MDHS policy require that children in custody receive appropriate services to meet their educational needs and that the child's educational records and information be included in their agency case record and provided to the child's caretakers at the time of placement.[335]

The Hess Case Record Review found that 22% of school-age children who entered custody on or after June 1, 2003, had *no* information in their MDHS case files about the child's schooling. MDHS also failed to provide school records to foster caregivers for 78.8% of school-aged children who entered custody on or after June 1, 2003, even though the majority of school-age children (58.4%) did not remain in the school they attended prior to their most recent entry into custody. Of those children who changed schools, 63.6% had *no* information regarding their subsequent school enrollment in their MDHS files. Of those children with school enrollment information in their files, 40.4% missed more than one week of school when first placed in custody because MDHS failed to ensure that they were enrolled in school for periods from 10 to 90 days. Moreover, 61.9% of the school-age children with school enrollment information in their files had experienced at least one school change once in custody, with 9.1% changing school four times. Notably, 78.3% of the

children's documented school changes while in custody were due to MDHS moving the child to another out-of-home placement.[336]

The Hess Case Record Review also found that only 18.2% of school-age children in custody were receiving special education services. One quarter of the children (24.1%) who had been referred to special education were not in special education as of June 1, 2005. Likewise, 80% of those children who had been diagnosed with mental illness or a developmental disorder were not receiving special education services. MDHS failed for 29.2% of those children receiving special education services to even maintain a copy of their current Individualized Education Plan (IEP) in their file.[337]

Although MDHS acknowledges that "educational issues and problems should be part of working with the child," "attention to educational issues with children in custody vary by county and region," and "workers do not consistently enter adequate data." The Self-Assessment acknowledges that "[d]ocumentation in the automated system is lacking, and so does not provide enough information to adequately track data." "During mock reviews, it was evident that casework addressing educational needs of the child varied considerably based on . . . the staffing resources in the DFCS county office."[338]

MDHS's March 2005 PIP acknowledges the 2004 CFSR's finding that children received appropriate services to meet their educational needs in only 75.9% of applicable cases, yet concedes that DFCS has yet to determine a baseline statewide percentage of children who receive educational services based on identified educational needs.[339]   MDHS is still unable to run a MACWIS report that tracks the provision of educational services to children in MDHS custody.[340]

### C.    MDHS Fails to Plan For Children

When children cannot be kept safely in their homes and must enter foster care, the primary responsibility for the state once it assumes custody becomes establishing a permanent living situation for the child. Federal law requires that the state have a permanency plan for each foster child and

prescribes time frames that must be adhered to for reunification of the child with parents, terminating parental rights to free the child for adoption, or finalizing some other permanent placement.[341]  Long years in foster care keep children from available permanent, loving families and leave them as adults without the stability of an extended family of their own.

The Hess Case Record Review found that as of June 1, 2005, the total length of time that children had been in MDHS custody ranged from less than one year to 17.9 years, with a mean length of stay of 2.8 years.  Nearly thirty percent (29.8%) of the children had been in custody three or more years, and 8.8% had been in custody for more than five years.  20.9% of the children had spent at least half of their lives in MDHS custody.[342]

MDHS MACWIS data shows that as of September 30, 2005, (736) children had been in care at least three years.[343]

### Length of Stay in Foster Care



"Unfortunately, the lack of staff may be contributing to the length of time children remain in care."[344]  As acknowledge by MDHS in its Self Assessment, "[i]t appears from the mock reviews that when a worker is able to devote more time to a case . . .  the length of time a child is in care is

shortened." "During the Mock Reviews, there was a noted concern on [sic] the amount of time workers could devote to their families."[345]  The May 2004 CFSR Final Report likewise finds that "[o]ne of the areas of greatest concern is the State's performance on Permanency Outcome 1," which measures whether children in state custody have permanency and stability in their living situations. In 64% of the foster care cases reviewed MDHS failed to establish an appropriate permanency goal for children in a timely manner and/or ensure their placement stability.[346]

### (i) Poor Permanency Planning Services

MDHS uses an Individual Service Plan (ISP) as the official method by which permanency planning for a child takes place in Mississippi.[347]  It is through this plan that the federal mandates of safety, permanency, and well-being are individually addressed for each child.  The initial child ISP is required to be completed within 30 days of the child's entry into custody, and then reviewed at least every 6 months thereafter.  Parent ISPs are also required within 30 days of the child's entry into custody.  MDHS policy requires a family team conference within 30 days of the child's entry into custody and every six months thereafter to work with the family to identify other family members, extended family, and supportive persons that the family wants to engage in the process and to bring these members into the assessment and case planning process as early as possible and actively engage the family throughout the life of the case in the decision-making process.[348]

The Hess Case Record Review found that child ISPs were not completed within 30 days for 66.7% of children entering custody on or after June 1, 2003.  Non-compliance with this requirement was particularly routine in Clarke (100%) and DeSoto (87.8%).  For 40% of the children entering custody on or after June 1, 2003, MDHS failed to provide them with an ISP within the first three months.  Even when an ISP was provided within 90 days, one out of five failed to contain a primary permanency plan, and one out four failed to contain a concurrent permanency plan.  As a result, MDHS failed to provide 61.8% of the children entering custody on or after June 1, 2003, an initial

ISP with an identified primary permanency plan within 90 days of placement, either because no initial ISP was provided, or the ISP provided failed to contain the required permanency plan. Two thirds of children (66.1%) failed to have a concurrent permanency plan as required within 90 days.[349]

---

**Case Example**

*Allison, age seven, has been in care since November 2003. A May 2004 Foster Care Review reports that Allison still lacks both an individualized service plan and a valid permanency plan. Though the "permanent plan mentioned in the Conference was reunification," "there is no Parental ISP approved." In addition, it is "unknown if [Allison] is safe in her placement and whether or not it is the least restrictive or most appropriate" because "the last face-to-face with [Allison] by agency staff was on December 23, 2003," "no one from DHS has seen [Allison]" since she was placed in her maternal aunt's home, and "[t]he placement listed in MACWIS incorrect." Periodic Administrative Determination, May 3, 2004, DHS 010986-010987.*

---

Moreover, MDHS failed to complete an ISP for either parent within 30 days for 56.1% of the children who entered custody on or after June 1, 2003. Another 36% of the children only had an ISP completed for one of two applicable parents. MDHS also failed to convene a Family Team Conference within 30 days for 97.5% of the children who entered custody after June 1, 2003. MDHS failed to hold even one Family Team Conference for 94.5% of all children in custody during the two-year period prior to June 1, 2005.[350]

For 95.2% of the children with a primary or concurrent goal of reunification as of June 1, 2005, MDHS social workers/supervisors failed to maintain monthly face-to-face contact with the child's mother during the prior 12-month period (92.1% non-compliance for fathers). For 45.5% of these children, MDHS failed to meet with the child's mother even once (58.5% for fathers). Moreover, 51% of these children were not even provided one visit with their mother, and 85.2% were not provided a single visit with their father, during the entire one-year period prior to June 1, 2005, despite their goal of reunification. MDHS failed to offer or provide services to 57% of the mothers and 83.4% of the fathers to facilitate reunification. Children with a primary permanency goal of reunification had been in MDHS custody for an average of 1.2 years, ranging from .8 years in Hinds to 3.4 years in Humphreys.[351]

76

For 23.5% of all children in custody, MDHS failed to complete or update their ISP during the six months prior to June 1, 2005. For 9.6% of those children, MDHS did not provide a single ISP during the two-year period prior to June 1, 2005. Of those who had an ISP during this period, 14% of the children's most recent ISP were missing their primary permanency goal, 46.3% were missing their concurrent permanency goal, 42% did not even have a caseworker signature, and 28.6% were missing a supervisor's signature.[352]

MDHS's own Foster Care Review Program found that between July and September 2005, 38% of children did not have an ISP developed within 30 days of their entry into custody as required by MDHS policy.[353] In the previous quarter, the Foster Care Review Program determined that 15.1% of children reviewed did not have an ISP competed within the mandated timeframe.[354] The March 2005 PIP concedes that DFCS has yet to even determine a baseline percentage for how many children in foster care have appropriate permanency plans.[355]

MDHS's Self Assessment concedes that inconsistencies in assessment and case planning has been an ongoing issue. "Case plans lack specificity and are not updated or individualized." "Notification and case planning with the parents and caretakers were noted as continuing to be problematic." Additionally, "in only approximately 50% of the cases are all dates associated with the case plan consistent with policy."[356] The 2004 CFSR likewise found that in 36% of the foster care cases reviewed MDHS "had not established an appropriate [permanency] goal for the child in a timely manner." Also, case plans are not developed jointly with the child's parents on a consistent basis.[357] Even when concurrent goals appear in the case plans, it is reported that "most of the social workers tend to work on the goals consecutively rather than concurrently." The May 2004 CFSR Final Report finds that in 58% of the foster care cases reviewed with a goal of reunification, guardianship, or permanent placement with a relative "there were avoidable delays in attaining [those] goals."[358]

The May 2004 CFSR Final Report also finds that in 53% of the applicable foster care cases reviewed MDHS "had not made diligent efforts to support the parent-child relationships of children in foster care," and "the frequency and/or quality of social worker visits with parents were not sufficient to . . . promote the attainment of case goals."[359]  As noted in the PIP, current policy "does not clearly address frequency of visitation with parents."[360]

The March 2005 PIP admits that while "Mississippi has understood the importance and necessity of family centered practice since the CFSR pilot review in 1995," the State has failed to consistently implement family centered practice in its casework.  "Supports necessary to reinforce this family centered approach and practice change such as on-going training for caseworkers and supervisors was [sic] not in place."[361]  The Hess Case Record Review found that MDHS failed to convene *even one* conference with family members (Family Group Conference) to make plans for the child for 94.5% of the children who entered custody on or after June 1, 2003.[362]

MDHS has in fact abandoned any pretense of "trying to replicate a formal family team conferencing model with the caseworker being responsible for the workload and activities" as it is "not feasible" due to "Mississippi's current staffing issues."[363]  Although the March 2005 PIP relies heavily on Family Centered Practice (FCP), Family Team Meetings (FTM), and County Conferences (CC) "to improve the appropriateness and timeliness" of foster children's permanency goals, it provides for FTM to be "implemented in a way that does not create additional workload for existing staff."  Practice guidelines are to be developed *not* to contain "explicit procedures and requirements," so as not to "burden" staff.[364]  It is unclear how MDHS expects that current casework practice by overwhelmed staff will improve with such studious avoidance of any measurable performance standards. Mississippi's Child and Family Services Review Data Profile, dated December 8, 2005, found that for Federal FY 2005 (ending September 30, 2005), of all

children who exited care to reunification with their parents or caretakers, only 69% exited care less than 12 months from the latest date of removal. The national standard is 76.2% or more. [365]

MDHS fails to diligently search for relatives as required by policy and practice standards.[366] The May 2004 CFSR Final Report finds that in 32% of the foster care cases reviewed MDHS "had not made diligent efforts to locate and assess relatives as potential placement resources."[367]    The March 2005 PIP concedes that in FFY2004, only 33.5% of children statewide were placed in relative foster family homes, according to Mississippi's CFSR Data Profile generated December 13, 2004.[368] As the Self Assessment acknowledges, a plan for "permanently funded kinship care is needed" for those relatives that require financial support for a permanent family placement.   "Because of a lack of State funding, Mississippi has not been able to effectively promote kinship care through durable legal custody as a viable option for permanency."[369]

---

### Case Example

*Siblings Andy and Carrie entered foster care in March 2003, at the ages of nine and seven. An April 2005 Foster Care Review notes that, despite the children's young age, the permanency plan for the children is "formalized long term foster care" with a concurrent plan of "emancipation," a plan that is "inappropriate," and contrary to "agency policy," given that "the more stable permanent arrangement of adoption is the goal of choice for those children when reunification or placement with relatives is not possible." The Foster Care Reviewer also notes that an assessment of the safety and appropriateness of Andy's current placement is not possible because there was no documented face-to-face contact with the child in the previous five months. Periodic Administrative Determination, April 21, 2005, DHS 064804.*

---

(i)    **Missed Case Plan Reviews and Judicial Permanency Hearings**

Children's cases must be reviewed at least every six months, with at least one of those reviews annually being a judicial permanency hearing.[370]  The Hess Case Record Review found that 85.5% of the children who had been in custody at least one year as of June 1, 2005, were not provided a 12-month judicial permanency hearing in the previous 24 months. For 5% of children, MDHS failed to even provide one six-month review during the previous 24 months.[371]

MDHS's own Foster Care Review Program reports document that between April-May 2005, 23.6% of foster children in need of an annual permanency hearing had no documentation in MACWIS that any such hearing was held.[372] The Foster Care Review Program found that between July-September 2005, for 30% of the children who had not had a permanency hearing, "the primary reason appears to be that the agency did not request the hearing."[373]

MDHS's Statewide Self Assessment concedes that DFCS is often out of compliance with the required six-month case reviews. "There are currently twelve (12) foster care reviewers in the State of Mississippi to cover 82 counties and conduct reviews and County Conferences on the cases of approximately 3,150 foster children." "Currently, there are not enough Foster Care Review staff to adequately and consistently cover all areas of the state. Those areas not consistently reviewed have noted a decrease in [the quality of] documentation, and an inability to ensure that each child in custody is reviewed every 6 months." "Additional FCR staff are needed to ensure 100% compliance with review dates." "[C]ounties with a full time FCR indicated that 80% of the cases were within the time frames expected, however that number was significantly lower in the counties without a full-time review staff, dropping to less than 50%."[374] In his deposition, Mr. Hamrick – Program Administrator Senior for the Foster Care Review Program – confirmed that no new Foster Care Reviewers have been added, although he had difficulty remembering whether he had 12 or only 11 reviewers working for him at that point.[375]

The December 2003 Statewide Self Assessment acknowledges that required annual judicial permanency hearings, meant "to promote and achieve a safe and permanent setting for children within time frames that are more conducive to their physical and emotional well-being, "are not being held as required, and IV-E funding is lost due to inadequate court orders." For example, the DFCS IV-E Eligibility Unit reported that "court reviews were missed on an estimated 8% of the cases in July through September, 2002. It is estimated that as much as $200,000 dollars could be lost on those cases alone over the next year." Quality Improvement reports also indicate that

80