Dr. Marva Lewis

DHS has endangered Cody's physical health by failing to properly assess and document Cody's medical needs, by failing to adequately prepare his caretakers to address those needs, and most significantly, by placing him without adequate supervision in an environment known to be life-threatening.

## C. DHS FAILED TO PROVIDE PLANNING AND SERVICES NECESSARY FOR CODY TO ACHIEVE HIS PERMANENCY GOAL OF REUNIFICATION

### 1. DHS Failed to Engage in Minimally Reasonable Case Planning

In creating initial service plans for Cody and his family, DHS minimized or ignored three high-risk factors that were critical to determining whether reunification was an appropriate permanency goal for Cody and identifying the services Cody and his parents required to safely achieve that goal. Those risk factors are, first, Cody's special medical and developmental needs; second, the documented intellectual limitations of the parents; and third, the multiple previous reports of child abuse and neglect concerning Cody and his older siblings. These red flags should have been a focal point for the agency's initial assessment of the family and all case and permanency planning that followed.

Risk Factor #1: Cody's special medical and developmental needs.

Understanding the child's physical and developmental status is essential when making planning and service determinations for a foster child. For Cody, who had been labeled "high risk" at birth because of his parents' mental impairment, such an initial assessment was even more important. Yet his case file does not include any medical results from any such initial medical screen, nor is there any documentation that DHS obtained a

41



EXHIBIT
7a

Dr. Marva Lewis

comprehensive developmental evaluation of Cody to determine his specific service needs. This lack of initial medical documentation indicates that DHS made critical determinations about Cody's future without first fully understanding his medical and developmental status. This goes against basic case practice principles.

Risk factor #2: The documented mental incapacity of Cody's parents.
Intellectual limitation in a parent is a permanent condition that must be thoroughly assessed and accounted for by the caseworker when evaluating whether reunification is an appropriate permanency goal and, if so, identifying the services necessary to achieving that goal. The DHS policy manual makes clear that a psychological evaluation may be needed for a complete assessment of a family.[155] In Cody's case, the critical question that DHS needed to be asking was, *Do these mentally challenged parents have sufficient capacity and resources to provide proper care for a newborn with potential medical or developmental problems?* Before Cody entered foster care DHS identified his parents as too mentally impaired to gain anything from the agency's Family Preservation classes, and when DHS placed him in custody his caseworker recommended that Cody remain a ward of the state "until it can be determined if the parents can learn to parent this child." In spite of all this, DHS chose a permanency plan of reunification, and drew up a service plan to achieve that goal, without first learning the extent of his parents' mental impairment. Standard case practice required that Cody's caseworker seek the results of existing mental health or intellectual testing of Cody's parents or request that this type of testing be conducted as part of the initial assessment and planning process. Because DHS failed to undertake these basic steps, the service plan established for Cody's parents did not focus on the realities of their intellectual limitations.

42

Dr. Marva Lewis

DHS arranged for psychological testing of Cody's parents only after being ordered to do so, not once but three times, by the Youth Court. What is astonishing about this, in addition to the fact that DHS entirely ignored the first two orders by the Court, is that once it complied by obtaining the evaluations, it largely ignored the results. The evaluating psychologist concluded that the parents had very limited parenting skills and lacked "the ability to adequately function in a parenting capacity." The psychologist also determined that Cody's parents exhibited potential signs of drug abuse and should undergo drug testing. This report is remarkable in the unequivocal nature of its assessment that Cody's parents could not safely care for him unassisted; in my professional experience, such emphatic conclusions are unusual in psychological assessments of parental capacity. When presented with this very straightforward assessment of the parent's clear limitations, DHS appears to have taken no action to reassess either Cody's permanency goal of reunification or the services that DHS would need to provide his parents to ensure this goal could be achieved. Moreover, DHS did nothing to determine if, in fact, the parents were substance abusers. The parents' ISPs were not even updated to reflect the results of this evaluation.

A second psychological evaluation was completed on Cody's mother four months later, again not at the initiative of DHS, but rather by order of the Youth Court. It confirmed that Ms. H's limited intellectual capacity precluded her from safely parenting Cody without full-time assistance. Although this psychologist's opinion was clearly germane to DHS's case planning for Cody, DHS, in yet another breach of standard casework practice, failed to update either Cody's or his mother's ISP to reflect the results of this evaluation.

43

Dr. Marva Lewis

Risk Factor #3: The family's previous history of multiple child neglect referrals. There is no indication that Cody's caseworkers educated themselves about, or even considered, Cody's family's extensive child welfare history when formulating his case plan. Not only had Cody been the subject of four reports of neglect within two months of his birth, but DHS had also documented that Cody had older siblings who were no longer residing with Cody's mother. There is no indication in the record that Cody's caseworker attempted to determine if, as suggested by a number of Cody's relatives, DHS had removed Cody's older siblings from their mother's care. There is no documented indication that DHS endeavored to gain a complete and accurate knowledge of the family's prior history with DHS despite how critical such information is to assessing how well a family will respond to reunification efforts.

Cody's parents' mental incapacity and the family's prior child welfare history, taken together with Cody's medical and developmental issues, were risk factors that DHS did not properly document or consider in Cody's initial case planning. As a result, the case plan DHS devised for Cody and submitted to the Youth Court did not accurately reflect either the level of danger and risk Cody faced if returned to his biological parents or the depth of services required to reunify Cody with his parents and ensure his safety. Without a well-thought-out and -supported case plan, the Youth Court did not have sufficient information upon which to base appropriate permanency planning orders, and Cody was destined by DHS's actions to drift in the foster care system.

2. DHS Failed to Obtain or Provide Reunification Services Appropriate to Mentally Impaired Parents and a Special Needs Infant

In its records, DHS characterized Cody's parents as "childlike," "very limited," and "probably retarded," and it possessed two psychological evaluations documenting

44

Dr. Marva Lewis

their intellectual difficulties and reduced capacity to parent, yet it failed to provide the specialized services necessary for their acknowledged limitations. While parenting classes were a required component of the parents' case plan, there is no evidence that their caseworker consulted with a DHS adult service specialist familiar with mentally challenged clients or succeeded in securing some type of parenting services for mentally challenged adults such as offered by Singing River Industries, where they were referred at the outset of the case. One of the few documents in which Cody's caseworker discussed making any effort to arrange for parenting services at Singing River is dated March 4, 2003, but a periodic review dated a year later made clear that Cody's caseworker had yet to obtain Singing River services for Cody's parents. In a periodic review completed May 6, 2003, almost a year after Cody entered foster care, the reviewer noted that there was no documentation in MACWIS that the agency was working with Cody's parent to achieve the stated goal of reunification.

The harm to Cody caused by DHS's failure to provide appropriate services to his mentally disabled parents is two-fold: (1) Cody was placed in further danger of repeated neglect and abuse while in his parents' care during unsupervised visits because his parents were essentially unchanged; and (2) Cody's length of time in a temporary placement was prolonged unnecessarily while his unfeasible permanency plan of reunification with his parents remained stagnant.

45

Dr. Marva Lewis

### D. DHS FAILED TO PROVIDE CODY WITH A REASONABLE VISITATION PLAN CALCULATED TO FURTHER HIS PERMANENCY GOAL WHILE PROTECTING HIS SAFETY

DHS's approach to visits between Cody and his parents was arbitrary and clearly harmful to Cody.

1. DHS Denied Cody Parental Contact as an Infant

The formation of parent-child attachment takes place over the first 24 months of an infant's life. The quality of that attachment—whether it will be a secure or an insecure attachment relationship—is determined in part by the child's consistent interaction with the parents in the early months of a child's life. During this phase of the attachment formation, the child comes to see his parents as a secure source of nurturance and protection. Simultaneously, the parents are learning the unique personality and needs of their growing and developing infant. When Cody first entered care, his case plan called for him to see his biological parents twice a month. Nearly five months after he entered state custody, a periodic administrative review report alerted DHS to the fact that there were no documented visits in his case record, but no action appears to have been taken. A Youth Court Hearing and Review Summary held more than nine months after Cody entered custody again found that there had been no documented visits between Cody and his parents.

According to the DHS's policy manual, contact between a foster child and his biological parents is "essential in foster care services."[156] When Cody's foster mother raised the lack of parental contact with Cody's caseworker, the caseworker responded that DHS should have been providing parental visits, but had not done so due to inadequate staffing. The lack of available staff is simply not a valid justification for

46

Dr. Marva Lewis

denying Cody parental contact, especially when such visits were critical to both Cody's psychological well-being and achievement of Cody's stated goal of reunification. Further, Cody's parents were denied the opportunity to get to know their new infant and form a loving bond. Instead, this forced separation by DHS may have contributed to the father's alienation from his son and led to such behavior during visits as threatening to "whip" Cody and calling Cody "bad."

### 2. DHS Failed to Revise Cody's Visitation Plan to Protect His Well-Being

When Cody was finally provided with some contact with his parents, he began to evidence alienation from his parents and lack of an emotional attachment, which should have been expected when, at that time, he had spent the vast majority of his young life in the custody of DHS and without parental contact, and had begun to bond with his foster caregiver. In addition, though, as soon as visits between Cody and his parents began in earnest, DHS began to document serious health and safety risks posed to Cody by those largely or entirely unsupervised visits. It does not appear that DHS advised the Youth Court of its concerns or reevaluated Cody's visitation plan.

DHS documented that Cody's father exhibited a punitive and dangerous attitude toward the toddler, for whom he had little developmental understanding. His father more than once described Cody as "bad" and on one occasion threatened to "whip" Cody, simply because the baby cried at the prospect of being left alone with his parents. DHS documented numerous additional concerns about both parents' parenting capabilities, which included difficulties they were having with caring for their infant daughter that resulted in at least one report of neglect, and the need by DHS to offer such elemental

47

Dr. Marva Lewis

parenting advice as to feed Cody breakfast, to wake up before he was dropped off at their house, and not to leave their children in the care of "just anybody."

More alarming was the fact that DHS documented that Cody's mother continued to smoke in the house and permitted a cat to live with them, despite the fact that both were life-threatening to her asthmatic toddler. As a result, Cody was unnecessarily placed at risk of harm and suffered acute respiratory problems that required more than one trip to the emergency room. The DHS workers' legal and moral responsibility to Cody was to advocate for his physical safety, but they failed to do so.

Cody's caseworkers knew of the life-threatening risk improperly supervised visits posed to Cody, yet there is no record that DHS made any effort to raise the issue with the Youth Court. When DHS later did request that daily visits be discontinued, it did so based largely on the agency's difficulty transporting Cody to the visits.

DHS's chaotic and unreasoned visitation planning was in disregard for Cody's emotional and physical well-being, and it prolonged a failing permanency goal of reunification.

### E. DHS FAILED TO LOCATE RELATIVES FOR PERMANENT PLACEMENT OR FREE CODY FOR ADOPTION IN A TIMELY MANNER

DHS repeatedly ignored glaring documented factors that warranted an earlier reassessment of Cody's permanency goal of reunification. Six months after Cody entered foster care, there was no evidence that his parents were meeting their service plans and no indication that they had visited Cody, and psychological evaluations completed two months after Cody entered care had determined that neither parent had the ability to

48

Dr. Marva Lewis

function adequately in a parenting capacity. Contrary to stated policy, DHS took no action to reevaluate, let alone change, the reunification goal, although there appear to have been no compelling reasons documented for maintaining this goal. A second psychological assessment of Cody's mother, completed in February 2003, confirmed that she was not competent to safely parent her children unassisted. The clinician found that "her lack of intelligence will certainly compromise the welfare and safety of the children." By this point, there were clearly grounds to, at the very minimum, reconsider Cody's permanency plan, but no such reassessment appears to have taken place, and Cody's goal remained "reunification" for five more months.

Although the record is unclear, in approximately February 2004, the Youth Court directed that reunification efforts be resumed, based on the assertion that Cody's infant sister was doing well in the home. Yet at the time the judge issued this instruction, DHS records reflected numerous red flags that should have clearly signaled that, as two psychological reports had previously concluded, these parents were placing Cody's health at risk during visits, and that his parents could not, in fact, properly care for his infant sister. Cody's respiratory problems and related trips to the hospital following parental visits were clear markers that the parents either did not care about Cody's health or did not have the capacity to understand what Cody needed for his safety and health. There is no indication initially that DHS registered the import of these red flags, and then, when a caseworker did note concerns about the parents' functioning, no indication that it forcefully documented such crucial information for the Youth Court. The failure to do so prevented Cody from moving towards a more realistic permanency plan.

49

Dr. Marva Lewis

When Cody's permanency goal was finally changed to adoption, DHS failed to take those steps necessary to provide Cody with a permanent family. Although DHS was ordered to prepare a TPR package in June 2004, it was nearly a year before DHS completed the package, and as of December 2005, his case record did not indicate whether Cody had been freed for adoption. Furthermore, DHS deprived Cody of the opportunity for permanency by ignoring repeated statements by his long-term and loving foster mother, Ms. BB, that was interested in adopting him. Despite such interest, Ms. BB appears to have been excluded from participating in permanency-planning hearings and denied information about Cody's permanency plans. In her final letter to DHS, Ms. BB cited this failure to even discuss Cody's permanency planning with her as part of her frustration.

Through similar inaction, DHS risked losing another potential adoptive placement for Cody. Cody's current foster parents had expressed reservations about adopting him, based on concerns about his developmental delays and the cost of caring for Cody, yet it took DHS over four months to secure the updated developmental assessment they requested.

Cody, now nearly four years old, has spent all but two months of his life in DHS foster care. DHS has deprived him of the opportunity for permanency by ignoring or disregarding clear indications that his parents were unfit to resume custody of him, by ignoring stated interests in adopting him, and by failing to timely file a TPR package and work with his foster parents to secure his adoption.

50

Dr. Marva Lewis

## F. DHS FAILED TO TIMELY INVESTIGATE POSSIBLE RELATIVE RESOURCES

Despite at least one Court order that DHS conduct home studies on available relatives, and the fact that DHS workers were given extensive lists of relatives and had access to a genogram, there is no evidence in the case record that DHS conducted even a cursory home study on any of Cody's relatives. In 2003, DHS reported to the Court that "Efforts are being made to find a family member to care for Cody," yet no such efforts are documented. Thus, DHS allowed the permanency goal of relative placement to become just as meaningless as the goal of reunification.

This failure by DHS to locate relatives for placement violates standard casework practice and harmed Cody by depriving him of a connection to his biological family through use of relatives as visitation resources, and by prohibiting him from achieving his stated permanency goal of relative placement.

## CONCLUSION

From the outset of Cody's tenure in the Mississippi foster care system, DHS has failed Cody and his mentally limited parents. DHS did not document and take into account the plethora of medical, developmental, and psychological assessments of Cody and his parents that were critical to any reasonable permanency planning. While DHS failed to obtain or provide the services necessary for this special-needs infant to be returned to his mentally impaired parents, it also unnecessarily severed Cody's relationship with a loving foster mother who demonstrated nothing but interest in providing him a safe and stable home. With actions that can only be described as irrational to the point of cruelty, DHS missed this early opportunity to provide Cody with

51

Dr. Marva Lewis

a permanent home, instead choosing to cycle him through a number of foster and shelter placements, during which time it continued to leave him improperly supervised in a setting where he risked being exposed to life-threatening cigarette smoke and animal dander. These actions are entirely beyond the pale of standard case practice and have caused Cody unnecessary and repeated harm.

Dr. Marva Lewis

## OLIVIA Y.

### INTRODUCTION

Olivia Y. was born premature and with cocaine in her blood. Although DHS received multiple reports that her mother was maltreating her and Olivia had been repeatedly diagnosed as suffering from failure to thrive, developmental delays and fetal alcohol syndrome, it did not place Olivia into foster care until she was three years old. When DHS finally did take custody of Olivia, she weighed 22 pounds, which was less than half the expected weight of a child her age. Throughout Olivia's placement in the Mississippi foster care system, DHS's actions have so endangered the physical and psychological safety and well-being of this medically fragile young child as to clearly constitute indifference to her needs:

- DHS placed Olivia in a home with a relative convicted of sexual abuse, and then failed to have Olivia examined for sexual abuse, despite clear indications that such an exam was warranted.

- DHS cycled Olivia through three separate foster homes without a single caseworker noticing that she was severely malnourished, that she had a rash covering her face and torso, that she had a distinct and disagreeable odor, and that she was so developmentally delayed that she could not follow simple commands. Once her medical and developmental problems were finally recognized, DHS failed to provide her with ongoing services necessary to address them.

- DHS failed to develop or implement a feasible permanency plan for this medically fragile infant and chronically substance-abusing mother in a timely manner with the best interests of the child at the core of the plan.

- DHS failed to maintain Olivia's familial bonds. DHS did not aggressively and consistently identify relatives as permanency placement and visitation resources. DHS also denied Olivia ongoing regular contact with her older sister with whom she had a strong emotional attachment.

These errors and omissions have caused Olivia physical and psychological harm.

Dr. Marva Lewis

## I. CASE SUMMARY

### A. 2000-2002

Olivia first became known to DHS when the ▮▮▮▮ General Hospital reported that on July ▮▮, 2000, she had been born three months premature, weighing only two pounds and one ounce and with cocaine in her blood.[157] In response to this initial report, filed by the hospital shortly after Olivia's birth, a DHS caseworker completed an Initial Assessment stating that the infant's biological mother, Ms. Y, "has a substance abuse problem which affects the way she cares for her child. She knowingly used drugs during her pregnancy, which caused the baby to be premature and placed in neonatal intensive care." The caseworker determined that Olivia's home was "high risk" but left Olivia in her mother's care.[158]

On January 31, 2001, a caller reported to DHS that Ms. Y "smokes crack and is an alcoholic" and that she was neglecting Olivia. She also stated that Ms. Y habitually left her middle daughter, HY, alone with the baby "for 6 to 7 hours."[159] DHS closed the case as unsubstantiated following an interview with Ms. Y in which she admitted to drinking but claimed to leave Olivia with Olivia's aunt when she was drunk.[160]

On June 14, 2001, a doctor reported that Ms. Y appeared to be drunk when she arrived at his office with Olivia, and that Olivia suffered from developmental delays and failure to thrive but Ms. Y refused to take her to programs that would address the issues.[161] DHS closed the investigation as unsubstantiated five days later after Ms. Y stated that she was following the doctor's instructions, though DHS later documented that at the time of the investigation she had not in fact been doing so.[162] In August Olivia underwent a developmental assessment that revealed that she had "significant delays."[163]

DHS received a fourth report on August 30, 2001, which alleged that Ms. Y habitually drank all day and that the children had no food. The reporter also stated that Olivia had been born premature and needed medical treatment. DHS found this report unsubstantiated, finding that Olivia "appears to be healthy."[164] There is no record that DHS requested copies of any medical evaluations at the time of this investigation. In October, Olivia began to receive Early Intervention services to address her developmental delays.[165]

Throughout 2002, Olivia's health was closely monitored by the Mississippi Department of Health because the premature infant was not gaining weight and suffered from chronic skin rashes.[166] Department of Health medical records reflect that Olivia was diagnosed with failure to thrive, fetal alcohol syndrome and developmental delays.[167] At one point, Olivia was hospitalized because of her medical condition, and for the second time, a doctor noted that Olivia's mother smelled of alcohol at one of Olivia's medical appointments.[168]

On December 16, 2002, a social worker reported that Olivia's teacher, who described the child as having Down syndrome, had found a burn on her buttock and a match in her

54

Dr. Marva Lewis

diaper. This report was unsubstantiated without DHS ever seeing Olivia, on the grounds that DHS could not locate the family.[169] Around the time DHS recorded its inability to locate the family, Olivia was enrolled in a Early Head Start Program and her correct address was listed on a number of associated documents.[170]

**B. 2003**

In May of 2003, Department of Health records reflect that Olivia's diagnosis remained failure to thrive because her weight was so low, and was decreasing.[171] On September 2, 2003, Ms. Y's oldest daughter reported that Ms. Y used all the children's child support money for drugs and also drank alcohol "all the time."[172] Later that day, Ms. Y's middle daughter, HY, confirmed that their mother "drunk alcohol all the time" and stated that she thought their mother used crack. HY explained that feeding, bathing, and taking care of Olivia was usually her responsibility.[173] Three days later, two DHS caseworkers interviewed Ms. Y, who was drinking when the caseworkers arrived at her home and was loud and belligerent throughout the interview.[174] The caseworkers informed Ms. Y that she needed to go to the DHS office that day and that "her children were at risk of coming into custody."[175] Ms. Y did not appear at the office until four days later, and there is no record that DHS took any action to ensure the safety of Olivia or the other children in the home during the intervening time.[176] On September 10, eight days after the sixth report of maltreatment, Olivia and her older sister HY were taken into custody when Ms. Y's drug screen came back positive.[177]

When DHS took custody of Olivia on September 10, 2003, there is no record that DHS provided her with a medical examination. She was initially placed in the R foster home in ▮▮▮▮ County with her sister HY.[178] On September 17, Olivia was moved to the home of her paternal aunt, Ms. CH.[179] Case notes from the same day indicated that Olivia's sister would be placed with a different relative.[180] There is no record to reflect that DHS attempted to keep the siblings placed in the same home. Two days after DHS placed Olivia in the CH home, it filed a Home Evaluation report with the Youth Court which noted that Ms. CH's 40-year-old son, Mr. H, was also living in the home. The report states that "Worker interviewed [Ms. CH] on September 19, 2003," which was two days after DHS recorded that Olivia was placed in the home.[181] According to the evaluation submitted to the Court, background checks had been completed by the date of the evaluation.[182] The report concludes with the DHS recommendation that Olivia be placed with Ms. CH, though she already had been so placed.[183] On September 25, eight days after placing her there, DHS removed Olivia from the CH home and placed her in the J foster home because the background check on Mr. H revealed that he was a convicted rapist.[184] A September 26 Youth Court Hearing and Review Summary filed with the Youth Court, however, reported that Olivia was still in the CH home and doing well.[185]

Upon learning that DHS workers had placed Olivia in a home with a convicted sex offender and left her there for a week, the Youth Court ordered a DHS investigation into the ▮▮▮▮ County office responsible for the placement.[186] When the DHS Program Integrity investigator interviewed the caseworkers and supervisor involved in the

55

Dr. Marva Lewis

incident, they provided conflicting information regarding when the agency conducted the home study, when the agency learned of Mr. H's presence in the home, and when the agency learned of Mr. H's criminal history.[187] The supervisor acknowledged that the Youth Court allowed relative placements without specific Court approval only when home studies and background checks were completed prior to the placements.[188] Although no explanation was ever given for why Olivia was placed before both of these reviews had been completed, or why DHS erroneously informed the Youth Court that they had been completed, the DHS investigator concluded that "all staff acted within their scope of services and duties."[189] The investigation did not address the erroneous September 26 assertion to the Court that Olivia was still placed in the CH home.

On September 24, 2003, Ms. Y signed a Case Plan requiring her to stop using drugs and pay for her own random drug screens, to maintain employment, to maintain appropriate housing, to attend parenting classes, and to visit her children.[190] There is no case plan in the record for Olivia's father. The September 26 Youth Court Hearing and Review Summary cites a permanency plan of reunification with the mother, with a concurrent plan of relative placement.[191] That same day, DHS moved Olivia to Hope Haven emergency shelter.[192]

On October 3, 2003, the shelter's ███████, ███████████, sent a letter to DHS in which he described Olivia's condition at the time the agency dropped her off: she exhibited "extremely small stature, low weight, abnormal facial features, severe cradle cap...extremely foul smelling bowel movements [and] a strong body odor that is not related to bowel movements." The letter went on to notify DHS that Olivia had undergone a physical which found that she weighed 22 pounds, which the doctor described as a normal weight for a one-year-old, though she was over three at this point; that she was suffering severe malnutrition; that she exhibited severe cradle cap "due to inadequate bathing and care"; that a rash covered most of her face and upper torso; and that she showed "extreme fear" when the doctor attempted to examine her vaginal area, which was red and swollen.[193] Mr. ███████ wrote that Olivia had very clearly suffered severe physical neglect and that she may have been the victim of sexual assault but the doctor could not complete a thorough examination because Olivia "reacted in terror" when she attempted to do so.[194] The letter from the shelter to DHS also noted that Olivia was extremely delayed in language and cognitive skills, making her unable to understand such basic commands as "Touch your nose."[195] On the very day DHS delivered Olivia to the shelter in this condition, the agency reported to the Court that "[Olivia] appears to be a healthy child and has no known medical conditions."[196]

There is no record of any inquiry into why Olivia's clear physical and developmental problems had gone undetected by the many caseworkers who had been involved in her case. Although the physician's report that Olivia's vaginal area was red and swollen came immediately after Olivia's week-long placement with a known sexual offender, there is no record that DHS arranged a subsequent examination to determine whether she had in fact been sexually abused. Although DHS asked Olivia's mother if Olivia might have been sexually abused before she entered DHS custody, there is no evidence in the

Dr. Marva Lewis

record that DHS interviewed Mr. H, the convicted rapist, or Ms. CH, his mother, about the possible sexual abuse.

The shelter stated that the Medicaid number provided by the agency was inaccurate and requested any medical information DHS had regarding Olivia.[197]  There is no indication that DHS acted upon the request for further medical information.

On October 16, DHS submitted a letter to the Court stating that Olivia had been removed from the CH home because "[Ms. CH] could not provide adequate supervision"; the letter did not mention Mr. H's status as a convicted felon and sexual offender.  Nor did the letter mention any of the numerous concerns raised by the Hope Haven staff regarding Olivia's physical and developmental health.  Instead the letter stated, "Despite her recent change in placement [Olivia] seems to be doing well."[198]

An October 20, 2003 case note states that Ms. Y had failed to appear for a scheduled October 17 drug screen, although other records indicate that she did appear and tested positive for cocaine that day.[199]  The next week, Ms. Y did not appear for a scheduled visit with Olivia.[200]  According to case notes regarding the missed visit, when Ms. Y called to explain her absence she was "either intoxicated or was using some kind of controlled substance."  A caseworker wrote, "I told her that her daughter never knew she was suppose to be here and that made her cry even more.  Through heavy sobbing, she asked how [Olivia] was.  I told her she was a beautiful child and that it was a shame she did not make more of an effort to get here."[201]  A December 12 letter from Hope Haven indicates that this was the only visit DHS had scheduled for Ms. Y and Olivia during the two and a half months she had been placed there.[202]

In December, the doctor who had been treating Olivia during her stay at the Hope Haven shelter sent a letter to DHS explaining that she had examined Olivia four times and that at the first visit Olivia was malnourished, depressed, and suffering from a skin rash.  The doctor noted that she had not received any medical history or health information regarding Olivia, and that she had at no point conducted a thorough sexual abuse examination of Olivia because the clinic lacked the necessary facilities and DHS had given no indication that there was reason to suspect sexual assault.[203]  There is no record that DHS disclosed to Olivia's doctor that she had been placed with a sexual offender, or that DHS ever took steps to have Olivia undergo a sexual abuse examination.  Also that month, DHS recorded that Olivia "needs to stay [at Hope Haven]...due to her severe delays."[204]

According to case notes from December 18, 2003, Olivia's mother had made no progress on her service agreement.[205]  On December 29 DHS moved Olivia from the shelter back to the R foster home, her fifth placement since entering care less than four months before.[206]

Dr. Marva Lewis

## C. 2004

Case notes from January 2004 indicate that DHS had not obtained Olivia's medical records from her pediatrician and that Ms. Y could not submit to a drug screen because she did not have the money to pay for it.[207] There is no indication that DHS made arrangements to provide Ms. Y with a drug screen, even though without one she could not prove that she was meeting her service-plan requirement of having discontinued her drug use.

Although Olivia's weight had risen from 22 to nearly 30 pounds while she was at the Hope Haven shelter, a February 12, 2004 medical record indicates that Olivia's weight had dropped to 21½ pounds, which was less than she had weighed when a doctor deemed her severely malnourished.[208]

A Periodic Administrative Determination prepared for a February 18, 2004 conference indicates that the only ISP for Olivia in MACWIS was undated and unapproved.[209] What appears to be the first approved ISP for Olivia in the case file is dated six months later, close to a year after she entered care.[210] The Determination also reflects that Ms. Y had no current ISP and that Olivia's father had no ISP at all, though Olivia's permanency plan remained reunification. The Determination concludes, "Reviewer should note that ▮▮▮▮ County has 217 children (at last count) in agency custody and only two Social Workers."[211] On February 27, a doctor examining Olivia wrote, "get [Olivia] in school!!"[212]

On March 8, DHS explained to Ms. Y that she could not see Olivia again until she presented a clean drug screen. Olivia's father, who appears still not to have had a case plan, was also being denied visits until he obtained a clean drug screen.[213] On March 18, 2004, DHS recorded that Olivia's foster parent Mrs. R "was proud to announce that [Olivia]"—who was over three-and-a-half by that date—"has gained a pound and now weighs 22 pounds."[214] This is the amount she weighed upon arrival at Hope Haven almost six months earlier.

A Youth Court Hearing and Review Summary Report dated the following day states that Olivia "appears very attached to both [Mr. R] and [Mrs. R]."[215] The Report also lists the permanency plan as "Relative Placement" and notes that "the agency needs to aggressively explore family resources for placement."[216] At this point DHS had had Olivia in custody for over six months without appearing to make any efforts to place her with known relatives besides Ms. CH or to locate additional relatives. An undated form titled "Family Resources for Children" lists four maternal aunts and uncles.[217]

On May 6, 2004, the Youth Court issued a permanency order confirming the plan of relative placement but ordering "that reasonable efforts shall continue on part of the Department of Human Service towards reunification of the minor child with the biological parents."[218] The order directed DHS to achieve the plan of relative placement by August 3.[219] On May 10 and May 13, Ms. Y wrote to DHS from the Whitfield State

Dr. Marva Lewis

Hospital, where she was receiving drug and alcohol treatment, to request that Olivia and her sister HY be placed with Ms. Y's sister, Ms. WH, who had agreed to take them.[220] Though is no documentation of any DHS follow-up on this request, a June 8 case note states only: "Search for appropriate relatives has been unproductive at this time."[221]

On July 21 DHS conducted and approved a home study for an aunt and uncle, Mr. and Mrs. CC, but the couple indicated that they were not willing to care for Olivia, only for her sister HY, because Mrs. CC worked every day and did not think she could handle a very young child.[222] DHS does not appear to have offered supportive services to Mr. and Mrs. CC to allow them to care for both sisters in spite of their scheduling constraints. The agency left both Olivia and HY in the R home and repeatedly documented the sisters' bond and the desirability of placing them together.[223] The CC home study lists as a reference Mrs. CC's sister, Ms. AB, along with a Florida address, but there is no record or case note from around this time of any conversation with Ms. AB about the possibility of placing the children with her.[224]

In a Youth Court Hearing and Review Summary regarding a July hearing but signed in August, Olivia's permanency plan is identified in one section as relative placement, with a concurrent plan of TPR / adoption, and in a different section as reunification, with a concurrent plan of relative placement durable legal custody.[225] In a Periodic Administrative Determination prepared for the same July 16, 2004 conference, the reviewer wrote that she could not tell whether DHS had been complying with Olivia's ISP because Olivia's health records were blank in MACWIS.[226]

On July 30, 2004, Olivia's sister HY provided DHS with her aunt Ms. AB's name and phone number.[227] This is the same relative previously identified by Mrs. CC. Again, there is no record of any follow-up on this information.

On August 22, 2004, nearly a year after Olivia first entered foster care, DHS created an Individual Service Plan for Olivia. This appears to be the first ISP in Olivia's case record, and the health and educational records are completely blank.[228] Case notes indicate that throughout August and September, Olivia still "was not gain [sic] any weight."[229] These August and September notes do not record Olivia's current weight, and the most recent record of her actual weight that was clearly entered in the case record at the time of the measurement was, by the September entries, over six months out of date.[c][230] While records show that her growth was being monitored before DHS placed

---

[c] In January 2006, I received a number of medical records for Olivia that dated from her birth in 2000 to December 2005. It is abundantly clear that the vast majority of these records was not obtained contemporaneously with the actual treatment, and was only very recently made a part of her case file. First, the medical records dating from 2000 through 2004 were not a part of any original or earlier supplemental production of Olivia's case record documents. Second, many of the medical records contain years' worth of medical information on a single page, such as a page of medical progress notes that contains entries dating from 2002 through 2005 and a growth chart with notations from 2002 through 2004, indicating the record was obtained in 2005 at the earliest. [DHS Olivia Y. 000547, 000561]. Third, the agency reported to the Court that "[Olivia] appears to be a healthy child and has no known medical conditions," something clearly inconsistent with the lifetime of medical problems that the records document. [NP 06485]. Finally,

Dr. Marva Lewis

Olivia in custody, her height and weight do not appear to have been charted regularly for the first year she was in care.[231]

On August 27, Ms. TW, Olivia's first cousin, called DHS to volunteer as a relative placement. According to case notes, a home-study request for the TW home was submitted by the ███ County DHS office to the ███ County office that same day. [232]

In an unsigned and undated Youth Court Hearing and Review Summary Report prepared for an October 25, 2004 conference, some sections identify Olivia's permanency plan as TPR / adoption while others identify it as relative placement.[233] The Report does not mention Ms. TW's offer to care for Olivia or report any progress on identifying a relative placement. DHS submitted a November 3 addendum to the report which stated that Mr. and Mrs. R were not interested in adoption, as they felt they were "too old to be a permanent placement."[234] Although at this point DHS had maintained four-year-old Olivia in the R home for nearly a year and had documented her attachment to Mr. and Mrs. R, this is the first record addressing the couple's unwillingness to adopt. In the November addendum DHS also wrote that after having informed the Court of its inability to identify a suitable relative placement, "it was learned" that the ███ County office was still waiting for ███ County DHS to complete a relative home study on Ms. TW, which had been requested in August.[235] ███ County DHS resubmitted the home study request on November 1, over two months after Ms. TW volunteered to care for Olivia.[236] DHS also tried to reach Ms. AB, the aunt whose name and phone number Olivia' sister HY had supplied three months before, to inquire about her willingness to care for both Olivia and HY.[237]

In an unsigned and undated Youth Court Hearing and Review Summary prepared for a December 6, 2004 conference, one section identifies the permanency plan as relative placement with a concurrent plan of relative placement durable legal custody, while a different section describes the concurrent plan as TPR / adoption.[238] Regarding what needed to be done by DHS to achieve the primary permanency plan of relative placement, DHS stated only that "the agency needs to continue to make monthly contacts with the children and see that their needs are met."[239] The Summary does not mention the potential relative placement with Ms. TW or the status of the corresponding home study.

**D. 2005**

An Adult ISP for Ms. Y, dated January 12, 2005, but signed on August 22, 2004, is blank except for Ms. Y's name, Olivia's name, and the reason why Olivia was placed into foster care.[240]

A January 31, 2005 Youth Court Hearing and Review Summary Report regarding a January 28 conference indicates that the TW home study, which was requested the previous August, was still pending.[241]

---

Olivia's caseworker wrote in a case note dated January 14, 2004, that she had not received medical records from Olivia's pediatrician. [NP 06358].

Dr. Marva Lewis

On March 28, 2005, DHS removed Olivia from the R home, where she had been for 15 months, and placed her in the F foster home.[242] There is no explanation or discussion in the case record of why this move was warranted, nor any indication of whether four-year-old Olivia was prepared in any way to leave the parents with whom she had formed an attachment. The same day, DHS incorrectly reassigned Olivia's case to ▮▮▮▮ County as the county of service.[243] Also that day, a ▮▮▮▮ County Social Worker Supervisor approved an ISP for Olivia that was dated the previous August and in which all educational and health records had been left blank.[244]

On May 3, 2005—over 13 months after DHS chose the permanency plan of relative placement, and over eight months after Ms. TW volunteered to be a relative placement and a home study was requested—DHS presented the Court with the TW home study and background checks and the Court approved the placement.[245] DHS moved Olivia to the TW home soon thereafter.[246]

On May 23, the case was reassigned to a new caseworker.[247] This was at least the fifth primary caseworker assigned to Olivia's case in less than two years.[248] An unsigned and undated Youth Court Hearing and Review Summary prepared for a May 25, 2005 conference states that the Court had revoked Ms. Y's visitation rights but does not provide an explanation for this action.[249] Despite this revocation, and despite the fact that Olivia had been in custody for over 20 months, the permanency plan remained relative placement, with a concurrent plan of relative placement durable legal custody.[250] There is no indication of why the primary permanency plan was neither durable legal custody nor TPR. As of June 10, 2005, Olivia's caseworker was responsible for a total of 110 children in DHS custody.[251] On June 21, DHS approved an ISP for Olivia that, like the previous ISP, is completely blank under all educational and health headings.[252] Although the Youth Court had revoked Ms. Y's visitation rights in May, the June ISP lists Olivia's visitation plan with her mother as bi-weekly, as does another ISP approved in October.[253]

An unsigned and undated Youth Court Hearing and Review Summary prepared for a September 21, 2005 conference continues to list Olivia's permanency goal as relative placement, with a concurrent plan of relative placement durable legal custody, and states that "sibling visitation is not taking place and the agency needs to arrange a visit between [HY] and [Olivia]."[254]

61

Dr. Marva Lewis

## II. CASEWORK ANALYSIS

### A. DHS PLACED OLIVIA WITH A RELATIVE CONVICTED OF SEXUAL ABUSE AND FAILED TO INVESTIGATE CLEAR INDICATIONS OF POSSIBLE SEXUAL ABUSE.

Olivia was initially placed in a licensed foster home, but DHS moved her to her aunt's home without first conducting a home study and obtaining the results of background checks on the aunt and the aunt's adult son, who also resided in the home. This placement was contrary to state policy and the Youth Court Judge's explicit order that placement be made only <u>after</u> the completion of both a home study and criminal background checks.  Because DHS failed to abide by a Court order and its own policy, Olivia was placed in a home with a convicted rapist for over a week, which put her at clear risk of sexual abuse.

When DHS learned that it had exposed Olivia to a criminal sex offender, the caseworker seems not to have taken any steps to determine if she had suffered any resulting abuse.  When a caseworker becomes aware that a foster child has been exposed to a sexual abuser, it is standard casework practice to undertake an investigation to determine if the child should undergo an immediate medical examination and whether the police must be informed of a possible crime.  It does not appear that DHS engaged in a proper investigation, as there is no documentation that Olivia, her aunt, or her aunt's son was ever questioned about possible sexual abuse.  This remained the case even after a doctor reported to DHS that Olivia's vagina was red and swollen and that she had reacted "in terror" when the doctor attempted to examine her genitals.  When Olivia's treating doctor made a specific point of telling DHS that she had not undertaken a thorough

62

sexual abuse examination of Olivia, in part because DHS had not informed her of any reason to suspect sexual abuse, DHS still does not appear to have disclosed that Olivia had been living with a convicted rapist. The evident failure by DHS to have Olivia examined for possible sexual abuse or the presence of sexually transmitted diseases, or to disclose to her doctor why such an exam was clearly merited, demonstrates a complete disregard for Olivia's physical well-being.

The internal DHS investigation of why Olivia ended up in a DHS-sanctioned home with a convicted rapist was entirely inadequate. The investigation did not look into the reason why DHS reported to the Court that Olivia was doing well when, at the time of that report, she was in a deplorable physical condition and exhibited signs of potential sexual abuse. Nor was there any apparent investigation of why DHS had not been forthcoming to the Court about the reason for the removal of Olivia from her aunt's home. Most distressingly, when the investigation did reveal unmistakable violations of both DHS policy and an explicit Youth Court order, the investigator nonetheless declared that all personnel had behaved properly.

**B. DHS FAILED TO ENSURE THAT OLIVIA'S SPECIAL MEDICAL AND DEVELOPMENTAL NEEDS WERE ADDRESSED BY HER STATE CAREGIVERS**

1. DHS Caseworkers Failed to Recognize Olivia's Significant Physical and Developmental Problems

When Olivia was placed in the Hope Haven shelter, more than two weeks after she had entered state custody, she was in acute medical distress. According to DHS records, she was severely malnourished, she had a rash covering her face and stomach, and she had a very strong odor. She also exhibited obvious developmental delays. Yet,

63

the same day Olivia arrived at Hope Haven in that condition, DHS reported that she appeared "to be a healthy child and has no known medical conditions." Not only was this assessment contradicted by Olivia's physical appearance as documented in the records, it was also contradicted by the years of medical records indicating her status as a child suffering from failure to thrive and fetal alcohol syndrome.

The fact that DHS had custody of Olivia for over two weeks and transported her to no fewer than four separate placements before her extreme condition was even noted is shocking. To adequately address the comprehensive needs of foster children, caseworkers must be trained to recognize their normal physical and developmental milestones, which include age-appropriate appearances, and when a child should acquire basic skills such as how to walk and talk. Without this developmental knowledge, the caseworker cannot adequately address one of the most fundamental questions in child welfare: *"What type of placement, permanency, and service plans would best suit this child's need for safety, and his or her unique developmental needs?"* Either the DHS workers responsible for Olivia's case were woefully ignorant of normal child appearances and development, or they were callously indifferent to her extreme medical needs. In either case, they were clearly not suited and unable to ensure Olivia's adequate protection and safety. After all, a caseworker cannot address the injuries suffered by a child victim of neglect if that worker fails to even recognize them.

### 2. DHS Failed To Provide Olivia with Necessary Medical Services

Even if the numerous caseworkers who were involved in Olivia's case failed to assess her appearance, or were so untrained or incompetent as not to recognize her visible medical problems, her condition should have been addressed earlier had her caseworker

brought Olivia to the doctor within seven days of entering foster care, as required by Mississippi State Foster care guidelines. The paramount need for Olivia to be timely provided this mandatory initial medical screen should have been clear to the caseworker from the family's extensive history with DHS and even more extensive history with the Department of Health. DHS appears to have failed to follow standard practices and its own policies by not initially obtaining a full medical as well as developmental history and assessment of this clearly medically fragile child. As a result, Olivia did not get the immediate medical and therapeutic services she so clearly required.

### 3. DHS Failed to Adequately Monitor or Document Olivia's Medical Needs.

Reasonable case practice dictated that DHS maintain updated medical and developmental assessments of Olivia, not only to ensure that her immediate medical needs were met, but also to ensure that she was placed with foster parents who were informed of, and could meet, her special medical and developmental needs.

Consistent with the entire inadequate record of this case, there is no medical documentation of Olivia's weight or cognitive development in many of the caseworker's reports. During at least one periodic review, the reviewer noted that she could not determine if Olivia's needs were being met because Olivia's medical records were not in MACWIS. DHS failed to note a single health concern in what appears to be Olivia's first documented case plan, which was entered nearly a year after she was placed in DHS custody and after years of medical reports concerning her troubled health. Subsequent ISPs contain no information regarding Olivia's health.

Medical records that were plainly not part of Olivia's ongoing case record, but were obtained after the fact, indicate that Olivia's weight and height were being

65

monitored before she entered DHS custody. However, in her first year of DHS foster care, her growth does not appear to have been charted regularly, even when her weight dropped down to less than 22 pounds at age three and a half, returning her to the weight she had been when deemed severely malnourished several months before.

DHS was equally inattentive to Olivia's developmental problems. Prior to entering foster care, Olivia was receiving therapeutic services through a Head Start program. There is no indication that DHS made any effort to resume those services at the time it took her into custody, despite its obligation to do so, pursuant to state policy.[255] In a case note dated December 2003, Olivia's caseworker noted that Olivia "needs to stay [at Hope Haven]…due to her severe delays," yet despite those delays, DHS appears not to have enrolled her in a school program for at least two months after removing her from Hope Haven, as noted by the treating doctor who recommended, "get [Olivia] in school!!" As recognized by DHS, when a special needs child is provided early enough interventions, the effect of the debilitation on the child's growth and development can often be lessened.[256]

DHS' apparent failure to obtain and maintain medical and developmental information not only harmed Olivia by denying her timely medical and developmental interventions, but also placed her at risk of being moved to a foster home unaware of her needs.

Dr. Marva Lewis

## C. DHS FAILED TO DEVELOP AND IMPLEMENT A TIMELY AND APPROPRIATE PERMANENCY PLAN FOR THIS SPECIAL NEEDS CHILD

Throughout her years in foster care, DHS engaged in poor, haphazard and thoughtless permanency planning for Olivia. There is no indication in Olivia's case file that DHS undertook the required family and child assessment within 30 days, as mandated by regulation. What appears to be the first documented ISP for Olivia is dated almost a year after she entered DHS custody, and there seems to have been no documented ISP for either of Olivia's identified fathers.

The ISPs that existed in Olivia's case failed to reflect an adequate assessment of Olivia's family's strengths and needs. At the time Olivia was placed in foster care, she had been the subject of six reports of neglect and physical abuse. Yet, there is no evidence in the case record that the serious parenting issues were even discussed with the mother and fathers. In fact, it does not appear the caseworker took the steps necessary to fully assess the safety issues by requesting such documentation as the health department records on Olivia and her mother and criminal background checks of the parents. Because the initial service plan Ms. Y was asked to achieve in order to regain custody of Olivia did not reflect the magnitude of the safety risks posed to this young child or the intensive support Ms. Y required to ameliorate those risks, it was patently unfeasible.

Not only was Ms. Y's service plan not properly geared to achieve reunification, but DHS also undermined rather than supported her in the efforts she did make to regain custody of her daughter. In a case note written after the mother failed to appear at a scheduled visit, the worker noted," I told her that her daughter never knew she was supposed to be here and that made her cry even more. Through heavy sobbing, she asked

Dr. Marva Lewis

how Olivia was. I told her she was a beautiful child and that it was a shame she did not
make more of an effort to get here." The seemingly punitive and judgmental attitude
suggested by this case note, coupled with the apparent lack of any documented attempts
to assist the mother in meeting her service plan, virtually assured that Olivia would not
achieve the very permanency goal of reunification that DHS had assigned to her. As
could have been predicted, Olivia's mother was unable to achieve the sobriety and
stability necessary to have Olivia returned to her care.

When Olivia's permanency goal was changed from reunification to relative
placement, the change did not herald any permanency for Olivia. DHS continued to do
virtually nothing to help this toddler find a stable family to call her own. At times, it
appears that DHS caseworkers were not even clear as to what Olivia's permanency goal
was. On more than one occasion, DHS reports to the Youth Court list two conflicting
permanency goals for Olivia: in August 2004 Olivia's permanency plan was listed as
relative placement in one section of the report, and in another as reunification. In
October 2004, DHS listed her primary permanency goal as both TPR / adoption and
relative placement. In a December 2004 report to the Youth Court, Olivia's permanency
goal is listed as relative placement but she is listed as having two conflicting concurrent
plans: relative placement durable legal custody and TPR / adoption.

### D. DHS FAILED TO AGGRESSIVELY AND CONSISTENTLY PURSUE THE IDENTIFICATION OF OLIVIA'S RELATIVES AS PERMANENCY PLACEMENT AND VISITATION RESOURCES

DHS failed to aggressively and consistently pursue the identification of Olivia's
multiple relatives as an initial placement and visitation resource. When Olivia first

68

entered foster care, DHS knew the whereabouts of both the father listed on Olivia's birth

certificate and the man who actually acknowledged paternity. Taken together, Olivia's

mother, her biological father, and her legal father opened up the possibility of available

relative resources from three different parents. Contrary to DHS policy and through poor

casework practice, indifferent supervision and inconsistent agency oversight, following

the disastrous placement of Olivia with her aunt, these remaining relative resources do

not appear to have been fully investigated or followed up as placement or visitation

resources when Olivia entered DHS custody.

DHS appears not to have actively pursued several possible relative leads, even

after Olivia's permanency goal was changed to relative placement. In a form "Family

Resources for Children" all of Ms. Y's siblings are listed, but there is no indication that

DHS explored their suitability as a placement resources for Olivia at the time that

information was provided. Days after Olivia's permanency plan was ordered changed to

relative placement, Olivia's mother wrote to DHS that her sister WH might be interested

in taking her children, but DHS made no documented effort to investigate that aunt as a

resource. In July, another relative, AB was identified by two separate sources, but DHS

inexplicably made no documented attempt to reach out to AB until November. Finally,

in August, TW, Olivia's first cousin, reached out to DHS and volunteered to be a relative

placement. Astonishingly, it took DHS over eight months to complete a home study on

this relative.

Reasonable case practice called for DHS to immediately and actively attempt to

locate an adequate relative as a placement resource within this extensive extended family

network of legal and biological relatives. Instead DHS chose to repeatedly move this

Dr. Marva Lewis

medically fragile toddler in and out of four non-relative placements in the first four

months she was in DHS care. Additionally, as recorded by DHS, in the year that DHS

took virtually no steps to find a relative placement for Olivia, she was developing a

strong emotional attachment to the R family which DHS knew would have to be severed

once a relative resource was finally located because the R's were not interested in

adopting Olivia. The movement among placements and the severing of the only recorded

bond that Olivia experienced in the first year and a half she was in foster care was

unnecessary and would be psychologically harmfully for any toddler.


### E. DHS IGNORED THE SPECIAL SIBLING BOND BETWEEN OLIVIA AND HER OLDER SISTER

DHS documented that Olivia had a strong attachment to her older sister who had

most likely become an emotional attachment figure as a result of her role as primary

caregiver and "parentified child" in a family system with a substance abusing and

neglectful mother. When DHS separated Olivia from her sibling, it deprived them of

regular contact, despite previously documenting the importance of their relationship.

When the relatives Mr. and Mrs. CC, who were described by DHS as a stable

and suitable placement, informed DHS that they would be willing to parent Olivia's

sister, but not Olivia, there is no indication that DHS tried to provide the CCs with the

support and services they would have needed for Olivia to join her sister in their home.

This unnecessary separation of Olivia from her family and relatives contributed to

the psychological harm of disrupted attachments for this young child.

70

Dr. Marva Lewis

## F. DHS CASE PRACTICE DEMONSRATED A PROFOUND LACK OF BASIC CHILD WELFARE SOCIAL WORK SKILLS AND SUPERVISION

To adequately address the enormous challenges that caseworkers meet in their work with troubled families, a caseworker must be properly supervised and have attained a proficiency in basic child welfare case practice. In one of the foster care reviews done in Olivia's case it was noted that "████████County has 217 children (at last count) in agency custody and only two Social Workers." As of June 2005, Olivia's caseworker was responsible for 110 children in DHS custody. This horrendous caseload size makes it virtually impossible for even the most skilled caseworker, under the closest supervision, to engage in the minimal level of social work required to keep foster children safe. Unfortunately, Olivia's case record demonstrates that her dramatically overburdened caseworkers were neither properly skilled nor properly supervised.

There were multiple caseworkers assigned to work with this family after Olivia was brought into care. With heavy caseload turnover, a properly documented case record that reflects the family's history of services and the child's needs is essential. In the case of a medically fragile child, ongoing and complete case recordation is even more important. Yet, Olivia's case record is consistent only in its lack of proper documentation. Outdated and missing ISPs, a lack of medical records, and incomplete and conflicting permanency records made it all but impossible for DHS to ensure Olivia's safety and need for permanency were achieved. Although the poor documentation was brought to the attention of DHS by at least one periodic review, the case record did not reveal any efforts by DHS supervisors to address this issue.

More disturbingly, there appears to be no effort by DHS management to understand how Olivia could have been in DHS care and custody for over two weeks

71

Dr. Marva Lewis

without her medical needs being identified and addressed, or to identify what actions needed to be taken to ensure that caseworkers received proper training to ensure that this did not happen again. Nor was there a thorough and proper investigation of why DHS caseworkers were not forthcoming with the Youth Court about Olivia's dire physical condition and the circumstances around her placement with a convicted rapist.

The harm Olivia sustained while in the custody of DHS is a direct result of a foster care system in which caseworkers engaged in poor case practice laboring under impossibly high caseloads in the absence of adequate supervision and administrative oversight.

**CONCLUSION**

The Mississippi Foster Care system failed to provide adequate care for Olivia in multiple ways. DHS placed Olivia in a home with a convicted rapist and has yet to provide her with a proper sexual abuse examination, despite the clear indication of possible assault. DHS failed to immediately recognize her clear and dangerous medical condition and developmental delays, and has failed to provide her necessary follow-up treatment and services. DHS failed to develop and implement a timely and appropriate permanency plan for this special-needs child and her chronically substance-abusing parent or to aggressively and consistently pursue the identification of relatives as permanency placement and visitation resources. Lastly, DHS failed to adequately maintain the special sibling bond between Olivia and her older sister. All of these failings demonstrate a profound lack of training and supervision. It is my opinion that

72

Dr. Marva Lewis

these errors and omissions directly caused and continue to cause Olivia psychological

harm, and for over two years have unnecessarily prolonged her stay in the state's custody.

Dr. Marva Lewis

## JOHN A.

### INTRODUCTION

John A. was born to Ms. A on January ▮, 1990. By the time he was two years old DHS was aware of her chronic drug abuse and neglect of her children. After monitoring this pattern for seven years, DHS placed John and his siblings in custody on March 5, 1999, when John experienced psychiatric problems requiring hospitalization and Ms. A proved to have left her children for several days without information of her whereabouts.

During John's nearly seven years in custody, DHS has harmed him in the following ways:

- DHS moved John from one placement to another at least 35 times in under five years, prompting John to tell a therapist, "I wished I had a home." The agency continued to move him despite his statement after an attempted suicide that all of his changes in residence and school were causing him psychological strain, and despite his attempt to mutilate himself to prevent further placement disruptions. About half of these placements were non-therapeutic in spite of repeated recommendations by his doctors that he be placed in therapeutic care. Furthermore, on at least one occasion DHS allowed John to remain in a placement well after it had been informed that his prolonged stay in that placement was causing his mental health to deteriorate.

- During at least three of John's psychiatric hospitalizations, DHS failed to provide the hospital in question with crucial medical or psychiatric records despite repeated requests by his treatment teams. Over a course of years, DHS also maintained the same incomplete and inaccurate record of his strong psychotropic prescriptions.

- Despite Ms. A's long history of neglect and drug abuse, DHS chose reunification as John's permanency goal yet failed to provide his mother with the services that would have been necessary for the plan to succeed. When his mother struggled without adequate support to comply with her case plan, the agency failed for two years either to invest additional services to help her meet her goals or to move for the termination of parental rights.

Dr. Marva Lewis

- DHS needlessly deprived John of all but a few visits with his siblings over a period of almost five years despite evidence that such isolation from them exacerbated his severe emotional disturbance.

- DHS failed to exercise the minimally adequate case practice of consistently providing such fundamental necessities as clothing and reliably performing basic case supervision. Among other significant lapses, DHS left John for three months without any agency oversight when two county offices lost track of who was responsible for monitoring his care.

## I. CASE SUMMARY

### A. 1999

On March 5, 1999, nine-year-old John A experienced a violent outburst while in school, during which he attempted to hurt himself and others.[257]  Unable to reach John's mother, school officials contacted ████County DHS. DHS sent a Family Preservation Worker to the school to transport John to the ████ County General Hospital, where doctors recommended that John be admitted to Pine Grove, the hospital's psychiatric treatment center.[258]  The DHS caseworker was also unable to locate John's mother but did reach her live-in boyfriend, who reported that she had not been home for three days and he did not known where she was or when she would return.[259]  Although John's father was located, he stated that he was unable to come to John's assistance.[260]  Unable to find a parent willing to claim responsibility for John, and needing the authority to have him admitted to Pine Grove, DHS obtained an order from the Youth Court placing John, as well as his three siblings, into foster care.[261]  John was admitted into Pine Grove that day, where, according to a DHS case note, he was diagnosed as bipolar.[262]  John's siblings were placed in a foster home.[263]

At the time John was placed in foster care, his family had been known to DHS for seven years because of "a chronic history of the mother using crack/cocaine and leaving the children alone for days," but this history is largely missing from John's DHS case record.[264]  At some point the family had also been provided with family preservation services, but there is no contemporaneous documentation of those services in John's case record, nor any indication as to why the services were discontinued.[265]

Upon John's discharge from Pine Grove on March 19, 1999, DHS placed this mentally ill young boy in an emergency shelter, where his mental health deteriorated, necessitating another psychiatric hospitalization at Pine Grove on March 28.[266]  Upon his second discharge from Pine Grove, John was placed in the Millcreek Psychiatric Residential Treatment Facility.[267]  He remained at this residential facility for seven months.[268]

While at Millcreek, John underwent a psychological evaluation from which the clinician concluded that John suffered from severe psychological disturbance; his

75

Dr. Marva Lewis

diagnosis was "Bipolar Disorder – severe – mixed with psychosis." According to the evaluation, John had previously been diagnosed with reactive attachment disorder, bipolar disorder, ADHD, and disruptive behavior disorder, and he was currently on a regimen of psychotropic medications. The evaluation noted that John had "a history of family chaos [and] neglect."[269] The treatment plan drawn up by Millcreek included meeting with a therapist twice a week to discuss the neglect and abuse John experienced at the hands of his mother, and meeting with a DHS social worker and a therapist twice a month to discuss why DHS would not return John to his mother's custody.[270]

On March 30, 1999, DHS completed a Custody Case Plan for John in which he was assigned a permanency goal of return to his mother.[271] In the section of the document designated for the visitation plan, there is no discussion of visitation for John and his three siblings.[272] On April 12, DHS entered into a service agreement with his mother, Ms. A, that required her to complete drug and alcohol treatment, attend parenting classes, visit her children, find a job, and obtain adequate housing. The service agreement does not contain a single reference to DHS' previous involvement with the family.[d][273] The agreement is also devoid of any mention of John's severe mental disturbances.[274] Although records from Millcreek reflect that John's mother was also being assessed for psychiatric services,[275] there is no documentation in the foster care record that this assessment was ever obtained by DHS or used to guide casework planning for the family.

According to an August Foster Care Review Board Participant Statement Summary, John's mother had participated in family therapy with John at Millcreek.[276] DHS also reported to the Court that month that she was making monthly visits with John, keeping all scheduled visits with her other children, and had begun to meet many of her service plan requirements by finding a job, securing a home, and testing negative for cocaine.[277] However, she had tested positive for cocaine a month before, and though this report does not mention the incident, she had recently struck John's brother RA repeatedly during a visit supervised by DHS.[278] While RA was struck by his mother while in DHS care, John's brother JA was struck by his foster mother. As documented in a Foster Care Review Summary, JA's foster mother, Ms. C, admitted to "whip[ping]" JA to "show him" that being a foster child did not protect him from corporal punishment.[279] DHS recommended to the Court that RA and JA be returned to their mother's physical custody and that John be allowed to leave Millcreek for unsupervised home visits until his discharge, at which point DHS recommended he also be returned to Ms. A.[280]

In November, after seven months of residential treatment, John was discharged from Millcreek. At the time of discharge, Millcreek presented DHS with a written aftercare plan that listed the regimen of psychotropic medications prescribed to John and detailed the treatment team's recommendation that John be placed in a therapeutic foster home.[281] DHS first moved John to what appears to have been a non-therapeutic foster

---

[d] A document labeled "Case Plan" and signed by Ms. A and a social worker on April 12, 1999, appears in the case file at least three times [NP 06669; DHS John A. 000641, 000642], yet in each case the available page is labeled "Page 1 of 2" but is not followed by another page of the same document; this second page does not appear to be in the case record.

Dr. Marva Lewis

home with Ms. C, who had recently described to the Foster Care Review Board how she had "whipped" John's brother JA.[282]  There is no documentation in the case record of any effort by DHS to prepare the C foster parents to care for a child with John's psychiatric history, nor is there any indication that DHS instructed the foster parents on how to monitor the many powerful medications John was taking.  After spending only three weeks in the C foster home, John's behavior deteriorated and he was moved to the Mercy House group home.[283]  The DHS case record contains no information regarding the appropriateness of this group home for John in light of the Millcreek discharge recommendation for therapeutic foster home placement.

**B.  2000**

In a Custody Case Plan completed for John in January 2000, DHS described his mother as complying with her service agreement.[284]  The next month DHS reported to the Youth Court that she was taking parenting classes and visiting her children regularly, but had quit her job, lost her section-8 housing, and once again tested positive for cocaine.[285]  A March case note describes her as having "a bad attitude."[286]  This note includes no discussion of her partial success at working towards meeting her service plan requirements or of any specific efforts by DHS to address her substance abuse problems.  In April, five months before the target date established by DHS for reunification, Ms. A still did not have her own place to live.[287]  There is no indication in the case record that DHS assisted her in trying to secure housing.

In March 2000, while John was placed at the Mercy House group home, his mental health deteriorated to such a degree that he was hospitalized twice at Pine Grove.[288]  Two days before the first hospitalization, DHS recorded, "No problems and appears happy and healthy."[289]  Following this first of the March hospitalizations, he was returned to Mercy House, and the next day he was hospitalized again.[290]  In a case note dated March 13, John's caseworker wrote that she had transported John's sister to Millcreek for a visit with John, which she indicated had gone well.[291]  However, John is documented to have been in Pine Grove during this period,[292] and there are no other records suggesting that he was placed at Millcreek at any point that year.  On April 6, DHS transported John from Pine Grove to Memphis, Tennessee, where he was placed in the Youth Villages residential treatment facility.[293]  Youth Villages was at least John's tenth placement since entering foster care a year before.[294]

On the admission form for Youth Villages, John's caseworker noted that John's previous treatment plans had failed in part because of his separation from his family.  The caseworker also acknowledged at the time of placement that placing John in an out-of-state facility "makes it hard" for family therapy sessions to take place.[295]  Aside from the March case note regarding a visit with his sister for which he does not seem to have been present, there is no documentation of any visits between John and his siblings in 2000.[296]

On March 14, 2000, the Youth Court ordered that John's permanency goal be relative placement and that Ms. A be allowed supervised visitation.[297]  In a DHS Individual Service Plan (ISP) for John dated June 1, 2000, however, the section regarding

77

visits with parents was left entirely blank, as were many sections regarding John's health and education.[298] The same is true for the case plan completed six months later.[299] An April 5, 2000 case note reflects that John's mother had called DHS to report her dismay at not being able to speak to John. During this call, Ms. A confirmed her phone number and place of employment.[300] However, according to a Youth Villages Treatment Plan, as of April 20, 2000, nobody knew Ms. A's whereabouts.[301] In August, she tried to contact John at his Youth Villages placement, and in September she and John spoke on the phone, but DHS does not appear to have assisted her in visiting her son.[302] Despite this conversation and Ms. A's other attempts to contact John in 2000, DHS's 2001 report to the Court states that John's mother had not spoken to him in "almost two year [sic]."[303]

On August 11, 2000, while John's caseworker was visiting him at Youth Villages, John stated, "I need to get out of this place. They keep putting bruises on me – the staff." John also reported that he had suffered an injury to his eye while in a therapeutic hold.[304] There is no indication that, after learning of the injuries John was experiencing, his caseworker took any steps to report or follow up on his allegations. Her August 11 case note also reflects that John was in need of clothing and shoes.[305] She does not appear to have taken any immediate steps to provide John with such basic necessities or ensure that Youth Villages was meeting John's therapeutic needs. In reporting to the Youth Court about the August 11 visit, DHS simply wrote that John had "appear[ed] happy and healthy."[306]

DHS conducted a Foster Care Review of John's case in November 2000. The review indicated that John's permanency goal was "Reunification with Mother / Adoption by 7-7-00," although his goal had been ordered changed to relative placement over seven months before and the stated target date for reunification was four months past.[307] At the time of the Foster Care Review, there was no documentation in John's file that DHS had taken any recent action to locate an appropriate relative placement for John. DHS had recently documented that in-home therapeutic services or family preservation services might help maintain a placement for John.[308]

The end of 2000 was marked by yet another move for John. On December 18, he was transferred from Youth Villages to the DeSoto Sunrise Homes, another residential treatment facility.[309]

## C. 2001

In January 2001, twenty-two months after John came into foster care, DHS conducted a permanency planning review. Yet again, the review documentation listed John's permanency goal as reunification despite the judge's order that it be changed. The reviewers recommended that John A's parents' parental rights be terminated.[310] DHS submitted a completed TPR referral to the Attorney General's office on April 16, over twenty-five months after DHS placed him in care.[311]

At the time DHS informed John that it was moving to terminate his mother's parental rights, he began to exhibit psychotic and self-injurious behavior, which included

Dr. Marva Lewis

trying to stick his tongue into a light socket.[312]  On April 20, John was admitted to Lakeside Hospital for acute inpatient psychiatric treatment,[313] which was at least his fifth such hospitalization in the two years that he had spent in foster care.  Following his discharge from Lakewood, DHS placed him at the Alliance Health Center for less than two weeks, and then, on May 16, again placed him at Youth Villages in Tennessee, where he remained for the rest of 2001.[314]

A DHS Individual Service Plan with an approval date of June 2001 is largely incomplete and inaccurate.  The case plan does not reflect John's actual placement, it contains no information under the section regarding education, the visitation plan is blank, and the health section is largely incomplete.[315]  The medications DHS listed John as taking are Risperdal, Catapress, and "unknown."[316]  The only discussion of John's permanency plan is a note stating that "adoption issues has [sic] not been discussed with the child due to child being placed out of state."[317]

In August, John had a visit with his siblings.[318]  His treatment plan indicates that it was the first time he had seen them in two years.[319]  A Youth Court Hearing and Review Report completed for a September 2001 conference noted that the visit had gone really well, and that as his siblings were leaving, 10-year-old John "just cried and cried and said 'I want to go with ya'll [sic].'"[320]  John's treatment team at Youth Villages noted that "[John's] display of depressive behaviors are possibly due to him not having contact with his family."[321]  The Youth Villages treatment team also noted that John's behavior improved when he was provided contact with his siblings.[322]  John does not appear to have been provided with any further face-to-face visits with his siblings for the remainder of the year.

In a Youth Court Hearing and Review Summary Report approved in October 2001, a social worker supervisor indicated that the DHS adoption unit "will explore the adoptive possibilities and services for [John]."[323]  There is no further documentation of any such efforts to find a permanent placement for John, who earlier that year had told a therapist, "I wished I had a home."[324]

On November 16, 2001, John's DHS caseworker noted that as of that day, DHS had two weeks to find an alternative placement for John, who was still residing at Youth Villages.[325]  Nearly a month later, on December 12, 2001, a Youth Villages Residential Counselor faxed a letter to DHS recounting how John's original discharge date had to be repeatedly changed because DHS had failed to find John a new placement.  The letter stated that John had reached the "maximum benefit of stay" at Youth Villages, and that he "has [begun] to digress and disrupt due to his knowledge of there being no placement options for him at this time."[326]  The letter detailed numerous phone calls to DHS that were left unreturned and conveyed Youth Villages' concern with DHS's clear failure to engage in any discharge planning for John.[327]  The letter closed with the counselor writing, "On this day, 12/12/01, I am setting the final discharge date for [John A.] as 12/19/01.  As I have stated before, [John] has reached maximum benefit at this residential treatment facility and will only begin to regress to negative behaviors if not discharged."[328]  Though the date of John's ultimate discharge is not clear, he was still in

Dr. Marva Lewis

attendance at the Youth Villages school as of December 21, two days after the "final discharge date" set by the facility.[329]  What appears to be the next change of placement recorded by DHS did not occur until January 2002.[330]

## D. 2002

In early January 2002, DHS placed John in an emergency shelter.[331]  Soon after his placement there, a comprehensive psychological evaluation reported the then-12-year-old boy's statement that he had tried to kill himself within the last six months, something confirmed at other points in the record.[332]  During that evaluation, two of the three psychological "stressors" John reported were change in residence and change in school.[333]  John's diagnosis remained bipolar disorder, and he was also diagnosed with a conduct disorder and assessed as having a full-scale IQ of 67.[334]  The treatment recommendation was that John be placed in a therapeutic group home and be assessed for a long-term residential treatment program.[335]

Instead, the agency arranged for him to be sent to a detention center, where a DHS caseworker insisted he spend three days for destroying a phone cord and a calculator, even though the shelter where John destroyed the property opposed pressing charges.[336]  During the course of the year, the agency moved John at least 11 times in all, among foster homes, shelters, a group home, a treatment center, a psychiatric hospital, and the detention center.[337]  DHS may also have placed him in yet another foster home at some point in 2002, but the record is not clear.[338]  On at least three separate occasions that year, John spent only a single night in a placement before DHS moved him again.[339]

The Individual Service Plan DHS approved for John in January 2002 is copied verbatim from the previous ISP, dated June 2001, in which DHS failed to complete the health or education sections, stated that "adoption issues has not been discussed with this child due to child being placed out of state," and listed his medications as Risperdal, Catapress, and "unknown."[340]  According to John's January 14 psychological evaluation, his medications at that point were in fact Serequel, Paxil, and Topomax.[341]  Additional ISPs approved in March, April, July, September, October, and December 2002 are virtually identical, each including the same assertion that John was placed out of state though he is documented to have been placed in Mississippi for all or nearly all of 2002. In each of the ISPs DHS failed to complete the health or education section, and in each the visitation plan is blank.  All of the ISPs, including the one approved in July, continue to document John's medications as Risperdal, Catapress, and "unknown," though July medical records indicate that he was instead receiving Paxil, Depakote, Clonidine, and Concerta.[342]  Another ISP with no clear submission or approval date lists no medications at all.[343]

Although John had been placed in a ▇▇▇ County group home since January, it was not until April that a DHS supervisor from the ▇▇▇ County DHS office "discover[ed] via MACWIS" that ▇▇▇ County had requested that the ▇▇▇ office provide John with courtesy supervision.[344]  The agency's failure to maintain appropriate

80