Dr. Marva Lewis

documentation and respond to requests in a timely manner also resulted in John's Medicaid benefits being temporarily discontinued.[345]

On June 4, 2002, three years after John entered foster care, the Youth Court terminated his parents' parental rights.[346] The same day, a psychosocial assessment indicated that he "does not see [his siblings] often", though in at least two July therapy sessions he discussed his attachment to his brother.[347] On June 3 he once again required hospitalization after cycling through two more foster homes that, according to rates later paid by DHS, were not therapeutic.[c 348] His hospital psychiatrist indicated that one of John's Axis IV diagnoses (psychosocial and environmental problems) was "multiple placements," and at least twice he documented his belief that John's next placement should be a therapeutic residential program.[349] Instead, when John was discharged after a month and a half in the hospital, DHS again moved him to a foster home that, according to the rate paid by DHS, was not therapeutic.[350] This placement disrupted after a day and the agency moved him to an emergency shelter, then it returned him a week later to the same non-therapeutic home.[351] Once again this placement disrupted after a day and John was returned to the Millcreek residential treatment facility.[352]

Case notes reflect that while residing at Millcreek, John was in telephone contact with his mother and was requesting that his caseworker arrange a visit with his mom.[353] It is not clear whether John or the staff at the facility was aware that his mother's right's had been terminated. There is no record that John received any form of notice or counseling about the termination, and indeed a caseworker noted over a year later that "It appeared [John] did not know his mother has been TPR[ed]."[354] A case note from his time at Millcreek also describes extreme behavior problems requiring "the restraint bed" and "a shot to calm down" and notes that "He has no family contact."[355]

John's DHS caseworker was consistently unavailable by phone during critical episodes in John's stay at Millcreek in 2002. There is a series of instances when the facility contacted DHS to discuss the need to use severe behavioral modification techniques—including pharmacological restraint, mechanical restraint, and seclusion—and John's caseworker was unavailable.[356] John's caseworker also failed to attend the Foster Care Review Conference for John's case held in December 2002.[357]

On October 31, 2002, the psychiatrist treating John at Millcreek noted that he had had no contact with his siblings since his admission over three months before, concluding, "It is reasonable therefore to try to make sure that he has contact with his siblings in order to establish some sort of motivation and some sense of hope."[358] Further records appear to indicate that he continued not to see his siblings for the rest of his year-long stay at Millcreek —at one point he was told that he could not because of "the distance, which the social worker must travel"—and three months after her October note the same psychiatrist wrote that he had "very little to look forward to."[359] Another therapist wrote that "[John] became more withdrawn and indicated suicidal ideations; expressing that he does not care about anything, he only wants to die. After exploring

---

[c] Where rates later or previously paid by DHS are cited as evidence of a foster home's non-therapeutic status, it is because the contemporaneous record is incomplete and omits the relevant information.

EXHIBIT

7b

PENGAD-Bayonne, N.J.

[John's] thoughts and feelings, he indicated that this was the best way to avoid the pain of never returning to live with his family." [360]

DHS case notes from the fall and winter of 2002 reflect that John lacked necessary clothing: an October case note stated that John needed a winter jacket, and three separate November case notes indicate that John needed winter clothes and boots, that he only had two outfits, and that he needed money for clothes. [361] In one note, the caseworker stated, "he needs clothes badly," and a mid-December case note indicates that John "needs clothes." [362] In November, John's therapist also noted the problem of his "much needed clothes," and in December she "Contacted [John's] social worker regarding his need for clothes." [363]

A December case note from John's caseworker states that John had no plans for Christmas, and that he wanted to stay at Millcreek "until he is grown and not have to leave." [364]

### E. 2003

In January 2003, John's therapist reported that John was making no progress at Millcreek and that discharge planning needed to be done. [365] Nonetheless, John remained in that placement for an additional six months. During this time he experienced several questionable disciplining techniques. In one instance, he alleged that the staff had deliberately "slammed him against the wall" while putting him in a restraint. [366] In another instance, his nose was "busted" when he was "taken down" and "hit the floor", and the case record reflects his statements that the staff purposefully hit him. [367] In a third instance he was left screaming and tied to a restraining bed all night. [368] There is no record that DHS took any measure to investigate whether these were incidents of institutional abuse or, if there were injuries, whether John received appropriate medical treatment. As in 2002, John's caseworker continued to be unavailable when the facility attempted to reach her to discuss the use of serious behavioral modification techniques. [369]

In February a Millcreek psychiatrist recorded John's stated desire to be closer to his siblings and his therapist indicated his social worker's belief that "[John's] separation from his family has been difficult." [370] In April, John identified his problems as "anger, boundaries and loss of family." [371] When his social worker told him she would try to arrange a visit with his siblings, "[John] smiled greatly at this possibility and he promised to maintain his level [of good behavior]." [372] This visit appears not to have taken place, though John continued to ask about it through the time of his discharge in July. [373]

In April, a DHS Program Administrator reported that a county conference for John's case could not go forward because of incomplete paperwork. The Administrator noted that "another" letter would be sent to the ▮▮▮▮ County DHS office regarding this problem. [374] John's February and May ISPs continued list John's medications incorrectly and incorrectly report that adoption could not be discussed with him because he was placed in an out-of-state facility. [375] There is no clear indication that John had been out of state in over a year. In a May Periodic Administrative Review of John's case, the

reviewer noted that the placement listed in MACWIS appeared incorrect and that medical, dental, and psychological information was missing from John's ISP in MACWIS. [376]

By April 2003, John's discharge from Millcreek was scheduled for June. [377] In June his therapist recorded at least five attempts to reach his caseworker to discuss the upcoming discharge before she finally reached her on what was at least the sixth try; these records give no indication that John's caseworker ever responded to the messages his therapist had left. [378] Although the records are unclear, a move from Millcreek would be at least his twenty-fifth move since entering foster care. [379] In April he began to act out and engage in self-mutilation by, for instance, scratching himself with a wire or with a staple. He stated to his therapist that he wanted to injure himself so that DHS would not move him from Millcreek. [380]

In June John's therapist noted that she had attempted to contact his caseworker, as he had expressed a need for clothing and personal items. [381]

As of John's Millcreek discharge, which had been pushed back to July 8, DHS had not yet secured a placement for him beyond that night. [382] His therapist noted that before leaving Millcreek that day, "[John] continually inquired where he would go after [discharge]?" When he was told where he would spend the first night, he asked his caseworker and his therapist, "Where [will I] go on tomorrow?" He was then "Encouraged [that] the social worker continues to seek long-term placement." [383] John's Millcreek treatment team, which included his psychiatrist, his therapist, nurses, and academic staff, had concluded and informed DHS a month ahead of time that upon discharge John required a highly structured environment with a specialized program for treating low-functioning mentally ill patients. [384] When John left, his treating psychiatrist wrote, "Please note that at the time of [John's] discharge the Department of Human Services could not identify his placement." [385] When John was discharged from the highly restrictive therapeutic environment of Millcreek, DHS placed him in the B foster home for a single night and next moved him to the D foster home. [386] According to the rates previously and later paid by DHS, neither foster home was therapeutic. [387] There is no record of any discussions between DHS and the D foster parents about John's specific mental health care needs. Nine days later, DHS moved him to yet another foster home before he suffered yet another psychiatric episode in September and was hospitalized at Memorial Behavioral Health. [388]

When John was hospitalized in September 2003, his treating psychiatrist complained that DHS had failed to provide the psychiatric facility with complete information regarding John's mental health history or with the records of John's previous hospitalizations, though the facility had requested these documents. [389] The psychiatrist noted that the only history she had to work with was from an intake questionnaire and from John's self-reporting, and she repeatedly stated that the information obtained from John was unreliable, as he was a poor historian. Although DHS reported that John had a history of sexual abuse and perpetration, DHS failed to provide the hospital with any more specific information. The hospital only had "vague" information about such things

Dr. Marva Lewis

as the abuse to which John had been subject and the auditory hallucinations he experienced.[390] By the time of his discharge, DHS had still not provided the requested historical documentation.[391]

Memorial Hospital discharged John in October 2003.[392] The discharge recommendation by John's treating psychiatrist was that John be placed in a structured therapeutic environment pending further clarification about his history of sexual abuse or sexual acting out.[393] DHS, however, placed John in what the rate identifies as a non-therapeutic foster home.[394] Predictably, that placement immediately disrupted, and from October through December, John bounced five times in and out of three separate foster homes—none of which, according to the rates paid by DHS, was therapeutic—until he required hospitalization once again.[395] At the hospital, John was documented as stating that he did not even try to behave in foster care placements because "every time he gets in a foster placement, he gets put in another one."[396]

When John was re-admitted to Memorial Behavioral Health, DHS once again failed to provide the treating physicians with essential mental health history necessary for John's treatment. In recounting the history of John's presenting illness, John's psychiatrist at Memorial hospital wrote: "These hospital records [of John's previous psychiatric hospitalizations] nor DHS records nor a detailed history of maternal and early childhood and perinatal period have not been made available to us. There have been references made to sexual acting out at Millcreek and to a history of sexual abuse, however, the patient, who is the sole historian, adamantly denies these. These records have been requested and will be requested again."[397] There is no record to indicate that DHS ever supplemented the information that had been provided to Memorial Behavioral Health or ever undertook to clarify whether John had been sexually abused.

### F. 2004

John, who turned fourteen on January 11, 2004, began the year by being transported by a ████████ County Sheriff from Memorial Behavioral Health to Oak Circle, another psychiatric hospital.[398] There is no indication in the record of why DHS relied upon law enforcement to provide John with transportation. John's admission records note that DHS failed to provide Oak Circle with copies of prior psychological evaluations.[399] A letter to DHS from Oak Circle stated that John and his caseworker "did their best, but could not answer many of the treatment team's questions regarding his social history and prior treatment." The letter also noted that John entered Oak Circle with "hardly [any] clothes."[400] The Social Service assessment Oak Circle completed for John listed his psychological "stressors" as multiple hospitalizations, "no appropriate discharge site," and "no contact with mother and/or siblings."[401]

John's Oak Circle treatment team recommended that when he was discharged he receive residential treatment or be placed in a therapeutic group home.[402] Instead, on January 21 DHS moved him from the hospital to the B foster home, which, according to the rate paid by the agency, was non-therapeutic, and which was where his siblings already resided.[403] This was at least the thirty- sixth time DHS had moved John since placing him in custody.[404]

84

Dr. Marva Lewis

In late January and early February 2004, DHS made several unsuccessful attempts to locate a therapeutic program for John.[405] In a least one instance, an admission worker requested a psychological evaluation that John had undergone within the last sixty days. DHS did not have such a record and was not able to readily obtain one from Oak Circle because John's caseworker had failed to execute a medical release.[406] Another residential service application that DHS submitted for John was nearly entirely incomplete. Other than stating that John required a therapeutic placement, the eight-page form was largely left blank, with no information entered in response to such basic inquiries as whether John suffered from any psychological problems.[407] It appears that after these initial failed attempts to move John into a therapeutic program, DHS simply gave up.

On February 9, a caseworker attempted to enroll John in school. The school declined to accept John because DHS did not have the appropriate paperwork.[408] It appears that it took DHS over a month to place John in school after he was discharged from Oak Circle.[409] Although the case record is unclear, it also seems that during the time John was not enrolled in school, he was spending the day in the DHS office.[410]

John spent the remainder of 2004 in the B foster home with his siblings. Despite his well-documented acute psychological needs, and despite the aborted attempt by DHS to place him in a therapeutic program, there are no clear records indicating what regular mental health services he received from February through August 2004. By September 2004, John was being provided therapy only once every two months.[411]

### G. 2005

John remained in the B foster home with his siblings throughout 2005, and DHS recorded that he thrived there.[412] According to an unsigned Youth Court Hearing and Review Summary prepared for a January conference, "all [John] has ever wanted was to be with his brothers and his sister and...he has been very happy since he was placed with them."[413] A March 29 DHS Social Summary states, "Since [John's] placement in this home with his siblings his grades have improved, his mental health has improved, and his behaviors have improved. [John] has maintained this placement successfully for a year and two months, which is the longest he has successfully maintained a placement. [John] has a history of being prescribed psychotropic medications to assist him with his adjustment to foster care and his behavioral and emotional problems, but due to his improvement he is now able to maintain without any medication....He enjoys the placement and enjoys school."[414] His April report card indicates grades of 90 or higher—aside from a single 89—in all of his classes so far that school year.[415] The case record reflects two incidents in the fall of 2005 in which he brought a knife to school, but DHS has otherwise continued to report that he "appear[s] to be happy and well adjusted," that he plays football and has a girlfriend.[416]

The Individual Service Plans entered for John in 2005 continued to be inaccurate and incomplete. An ISP with an approval date of March 2005 notes John's whereabouts

85

Dr. Marva Lewis

in different sections as in the B foster home, in the Millcreek residential facility, and out of state. The ISP also continues to list his medications as Risperdal, Catapress, and "unknown," and most of the education section remains blank.[417]  A slightly different ISP with the same approval date contains all of the same inaccurate and conflicting information regarding placement and medication. [418]  An ISP approved July 18 continues to identify his placement as the B foster home, Millcreek, and "out of state," and the last is still reported to preclude any discussion of adoption with John.[419]

According to the Youth Court Hearing and Review Summaries prepared for January, June, and November conferences, the permanency goal for John and his siblings remained adoption, but the B foster parents were not interested in adopting them.[420] There is no indication that DHS has endeavored to work with the B family to make this placement more permanent for John and his siblings, for instance by considering such supports as an adoption subsidy.

## II. CASEWORK ANALYSIS

The episodes of psychotic deterioration John A. has experienced throughout his time in DHS custody can be directly linked to the ongoing neglect and abuse he has experienced at the hands of the Mississippi state foster care agency.

### A. DHS MOVED JOHN MORE THAN 35 TIMES IN LESS THAN FIVE YEARS

Through what appears to have been poor to non-existent case planning and a lack of placement resources, John spent his first five years in custody being shuffled through over thirty-five placements, which included shelters, institutions, hospitals, group homes, foster homes, and, most appallingly, a detention center. The question he once asked his therapist and caseworker—a question they could not answer—captures the first five years of his experience in care: "Where [will I] go on tomorrow?"

Children enter foster care because, almost always, they have been abused or neglected by their parents or guardians, which means that they are a highly vulnerable

86

Dr. Marva Lewis

population. John, who had been diagnosed with a variety of psychiatric disorders and low intellectual functioning, and whose violent outburst in school had been the impetus for DHS to seize custody, was known to be even more so. Rather than working to minimize John's placement moves and cultivate bonds between him and his caregivers as required by standard casework practice, DHS recreated his years of parental neglect and abandonment by removing him from each placement after an average of less than two months. The psychological damage caused by this disastrous case practice is painfully clear. In January 2002, John reported trying to kill himself within the past six months—placing the suicide attempt around the time he told his therapist, "I wished I had a home"—and identified his frequent changes in residence and school as psychological stressors. Instead of receiving this report as a wake-up call and beginning to exercise responsible case management with respect to this highly disturbed young boy, DHS went on to move him at least ten more times that year. By December he was so desperate for stability that he said he wanted to stay in the psychiatric facility where he had most recently landed "until he is grown," and when DHS prepared to move him again he began trying to mutilate himself to prevent yet another placement disruption.

Some of John's moves were ostensibly caused by his behavior problems, but at least in part the opposite seems true: during his fifth year in DHS custody and on at least his thirty-fifth placement, he explained that he didn't try to behave, "because every time he gets in a foster placement, he gets put in another one."

87

Dr. Marva Lewis

## B. DHS PLACED JOHN IN INAPPROPRIATE AND HARMFUL SETTINGS AND FAILED TO ADEQUATELY SUPERVISE THE PLACEMENTS

Nearly all of John's placement moves might have been avoidable if DHS had engaged in appropriate case practice. Not only did the relentless moves themselves promote further disruptions by eliminating John's motivation to succeed within any one placement, but also the very nature of many of these placements doomed them to failure. Had DHS consistently provided John with placements that had any hope of meeting his clearly documented needs, he would have had a chance to form the long-term relationships that the psychologically traumatized child so desperately needed.

Repeatedly throughout John's time in care, DHS documented recommendations by his treating mental healthcare providers that he be placed in a therapeutic setting, either a foster or group home or a residential facility. Again and again, DHS ignored this professional advice and placed John in non-therapeutic homes and shelters not equipped to meet his special needs, which predictably led to numerous disruptions. Even when DHS had not documented a specific placement recommendation by his immediately previous mental health treatment team, adequate case practice would have precluded the agency from placing a severely disturbed and often hospitalized child in a non-therapeutic setting. Certainly adequate case practice would have prevented DHS from twice allowing John's discharge date to arrive without arranging any new placement at all for him, on one occasion simply leaving him in a highly restrictive facility for another month and a half while the facility complained that he was regressing because of it. Certainly rational case practice also would have prevented DHS from insisting, over the objections of the wronged party, that such a psychologically vulnerable child be sent to a detention center.

88

Not only were many of John's placements inappropriate in their failure to meet his psychiatric needs, but some also posed a threat to his physical safety. Corporal punishment of any child in custody is specifically prohibited by DHS policy, and such methods are especially disastrous when used on children as emotionally traumatized as John.[421]  In 1999, DHS moved John directly from a highly structured residential treatment facility where he had spent seven months into the home of an evidently non-therapeutic foster parent whose documented disciplinary strategy included "whipping." When later, in a different placement, John reported an injury caused by a therapeutic hold and said, "I need to get out of this place.  They keep putting bruises on me—the staff," there is no documentation that DHS followed up by investigating the possibility of physical abuse within the institution.  Instead, DHS reported to the Youth Court that he "appear[ed] to be happy."  John's case record reflects further injuries from restraints and further allegations by John, as well as the dubious therapeutic technique of leaving him screaming and tied to a restraining bed all night.  Again, there is no record that DHS questioned or investigated the facility's methods in any way.  Rather, when the facility repeatedly attempted to consult with DHS about the use of such extreme techniques, John's assigned caseworker was consistently unavailable.

Inappropriate as so many of John's placements were, even they might have been more successful had DHS adequately prepared his caregivers for his needs and behavior and supported them when problems arose.  The challenges presented by a mentally ill adolescent can be daunting for even a well-trained therapist, caseworker, or foster parent; angry outbursts, suicide attempts, and destruction of property are all behaviors that such an adolescent might present.  Although at one point DHS documented that in-home

Dr. Marva Lewis

therapeutic support and family preservation services might help John achieve placement
stability, DHS appears to have chosen not to provide such assistance, instead allowing
placement after placement to fail for the emotionally disturbed child.

### C. DHS CONSISTENTLY FAILED TO MONITOR AND TRACK JOHN'S MEDICAL NEEDS AND SERVICES AND TO PROVIDE ESSENTIAL PSYCHIATRIC INFORMATION TO THOSE CHARGED WITH HIS CARE, INCLUDING HIS TREATING MENTAL HEALTH PROFESSIONALS

1. DHS failed to provide crucial medical history and documentation to his treating
mental health professionals

During three separate psychiatric hospitalizations, the hospital staff complained to
DHS in writing that they had little or no information about the source or history of the
disorders they were supposed to be treating. Psychiatric and therapeutic history is
absolutely essential to the success and the safety of any new treatment, and DHS's failure
to provide this fundamental information for a child whose medical and psychological
well-being it was solely responsible for protecting was irresponsible and breached
standard casework practice. In at least two of the cases, the hospital staff explained that
this lack of information was especially problematic since John denied much of what
limited background his treatment team did have. In none of these cases is there any
record that DHS ever provided the hospital in question with the requested essential
psychiatric history. Not surprisingly, in at least one instance the facility expressed
difficulty treating John's problems for lack of clarity about their nature or context;
without such information, none of these hospitals could reasonably have been expected to
give him the treatment he so clearly needed.

90

Dr. Marva Lewis

### 2. DHS failed to adequately record or supervise the strong psychotropic drugs being administered

For much of his time in state custody, John was receiving multiple psychotropic medications intended to treat his ongoing psychiatric problems. Because such medications have potential for major side effects if improperly combined or administered, careful supervision is critical. As a child's ISP serves as the information source and documentary foundation for all services being provided to the child by the numerous caseworkers involved in his or her care, it is crucial that this record accurately reflect such a drug regimen. In a unacceptable breach of standard casework practice, by March 2005 DHS had approved nearly four years' worth of ISPs displaying the same incomplete and inaccurate list of medications, each of which named "unknown" as one of his prescriptions. The DHS policy manual specifies that all caregivers should be provided with information regarding a child's medical needs at placement.[422] There is no documentation that John's caretakers were given careful and accurate instructions as to how to properly dispense his medications. The absence of such documentation is especially troubling in the context of the ongoing inaccuracy of his ISP.

### D. DHS FAILED TO PROVIDE JOHN PERMANENCY

When a child is placed in state custody, caseworkers must focus on the circumstances that necessitated the child's removal from home and, with those circumstances in mind, must develop a realistic plan to achieve safe permanency for the child. To do this effectively, the agency must learn as much as possible about a family's pattern of abuse and neglect and consider any special challenges the family confronts. In the case of John A., two distinct risk factors existed at the time DHS placed him in

91

custody: first, his mother's persistent neglect and drug abuse in spite of family preservation services provided; second, John's severe emotional disturbance.

When DHS placed John in care, it failed to conduct a thorough initial family assessment and complete individual case plans that included historical documentation of the agency's seven years of involvement with the family and the reasons why family preservation services had been unsuccessful. DHS assigned John's case a goal of reunification without even, in considering Ms. A's capacity to care for him, seeming to have obtained the results of psychiatric testing that Ms. A herself appears to have undergone. It also failed to discuss the extra skills and level of responsibility John's mother would need to develop for reunification with her special-needs child. In fact, Ms. A's case plan failed to mention John's mental illness at all.

As Ms. A struggled to fulfill a service agreement that did not address her particular circumstances, DHS failed on the one hand to invest the additional services needed to build on her initial motivation or, on the other hand, to move to terminate her parental rights when she faltered and find John an adoptive placement. When she hit one of John's brothers repeatedly during a visit, DHS does not appear to have offered supportive services, reported the incident to the Court, or considered revising John's reunification plan. Instead, soon after this incident and only six weeks after she tested positive for cocaine, the agency recommended that both of John's brothers be returned to her care and that she be allowed unsupervised home visits with John. When DHS repeatedly documented her failure to comply with her case plan, the agency continued for over a year neither to offer sufficient services nor to move to terminate her parental rights.

Dr. Marva Lewis

### E. DHS EXACERBATED JOHN'S EXPERIENCE OF FAMILIAL NEGLECT AND EMOTIONAL TRAUMA BY NEEDLESSLY ISOLATING HIM FROM HIS SIBLINGS

DHS inflicted psychological and emotional harm on John by denying him nearly all visitation with his brothers and sister for almost five years after placing him in custody. DHS denied John regular visits with his siblings not only in violation of state policy and not only in the face of clear indication that isolation from his family was very painful for him, but also in spite of evidence that this denial interfered with ongoing efforts to treat his severe psychological problems.

Placing John apart from his siblings for most of his first five years in care is perhaps justifiable in light of his extreme special needs, but denying him visits with his siblings during most of that time is not. His case record clearly documents his anguish at being separated from his family—"He indicated that [suicide] was the best way to avoid the pain of never returning to live with his family"—as well as his specific emotional attachment to his brothers and sister and his elation at the prospect of seeing them. Despite such compelling evidence that seeing his siblings was essential to the traumatized child's emotional well-being, his ISPs consistently failed to reflect any sibling visitation plan and more than one caregiver noted that he saw them rarely or never.

In April of 2000, John's caseworker noted that his previous treatments had failed in part because of separation from his family, yet she proceeded to place him out of state. The same caseworker acknowledged that this placement "makes it hard" for family therapy sessions to take place. Despite its recognition that isolation from his family was directly detrimental to his psychological progress, DHS is documented to have let another

93

Dr. Marva Lewis

year and five months pass—including nine months after he returned to Mississippi—
before allowing him a visit with his brothers and sister. When the siblings were finally
allowed to see each other, DHS recorded that John "just cried and cried and said 'I want
to go with ya'll [*sic*].'" That month, his treatment team documented, as his caseworker
had done previously, that a clear correlation existed between contact with his siblings and
his psychological progress. In spite of this evidence that regular visits with his brothers
and sister would be hugely beneficial for him, and despite Mississippi's own policy
requirements, DHS continued to deny John almost any face-to-face contact with them
and John's severe emotional troubles persisted. While placed in an intensive psychiatric
facility over a year and a half after his tearful reunion with his siblings, since which he
appears to have been provided no or almost no visits with them, he identified his
problems as "anger, boundaries and loss of family."

When finally, in 2004, John was placed with his brothers and sister after spending
nearly five years in and out of psychiatric hospitals, on heavy psychotropic drugs and
consistently evaluated as violent and severely troubled, he largely stabilized and for
intervals was able to function successfully even without medication. While in some
sense this progress is astonishing, improvement was entirely predictable, and DHS had
held the key to it all along: "All John ever wanted," DHS told the Court, "was to be with
his brothers and his sister....he has been very happy since he was placed with them."

94

Dr. Marva Lewis

## F. DHS EXHIBITED IRRESPONSIBLE OR HARMFUL CASE PRACTICE

### 1. DHS failed to provide for John's basic needs

John's experience of parental neglect was echoed by the agency's failure to provide in a consistent manner the clothing, education, and funds necessary for his care. The chaotic nature of the casework practice associated with John's care is most clearly illustrated in the recurrent theme of his inadequate clothing supply. The case record reflects at least eleven instances of DHS noting or being informed that he lacked necessary clothing; at least eight of those instances were across one three-month period, and it seems clear from each subsequent notation that DHS had persisted in failing to meet this fundamental need.

### 2. DHS failed to exercise basic case supervision

Repeatedly throughout John's years in DHS custody the agency has proved unable or unwilling to provide the most basically adequate case practice to ensure his well-being. In 2002 he spent three months utterly unsupervised by DHS before the ████████ County DHS office "discover[ed]" that █████ County had asked it to provide courtesy supervision. During that three-month period, ██████ County failed to notice that John lacked any DHS oversight. In another incident, DHS failure to file necessary paperwork caused John's Medicaid benefits to be temporarily discontinued. Later, John's policy-mandated county conference could not go forward because of incomplete paperwork.[423] Finally, John was unable to register for school because his caseworker had not filed the necessary paperwork, and as a result he appears to have spent the days until the agency managed to enroll him just sitting in the DHS office.

95

Dr. Marva Lewis

## CONCLUSIONS

John A's case poignantly illustrates how agency indifference can recreate an experience of parental neglect and abuse for a vulnerable child. John entered the foster care system at age nine with a psychiatric diagnosis of severe mental illness, and in numerous ways throughout the nearly seven years he has been in foster care, DHS has repeatedly disregarded or undermined his psychiatric, emotional, and physical well-being.

It is hard to identify which of these unacceptable case practices was most harmful to this psychiatrically fragile child, but probably most egregious was the agency's irresponsible series of placement decisions. In under five years, John cycled through over 35 placements, few if any of which were appropriate to meet his needs, and many of which were outright harmful. Now a teenager and finally placed with the siblings he saw so rarely for all of that time, John is demonstrating a measure of resilience in the face of his punishing and chaotic years in the Mississippi foster care system.

96

Dr. Marva Lewis

## JAMISON J.

## INTRODUCTION

Jamison J., who is now a 19-year-old, was removed by DHS at age five from his mother, a life-long alcoholic, due to her severe neglect of him. He has since spent more than 14 years in DHS custody, during which time the agency has shuttled him through over 28 placements, and disregarded his fundamental needs for safety, stability, and permanency in the following ways:

- DHS has placed Jamison in settings that exposed him to clear and immediate risks of serious abuse, despite the fact that the agency knew or should have known that the placements were dangerous. One of DHS's unsafe placements was at the home of Jamison's mother, where Jamison's sister was raped and a three-year-old child was murdered just weeks after a visit by Jamison. By moving Jamison at least 28 times, DHS also failed to provide stable placements to him, inflicting psychological harm.

- DHS ignored or mishandled Jamison's serious mental health needs. During his lifetime in DHS custody, Jamison has suffered acute mental health problems that have been either left untreated or treated inconsistently. DHS has also failed to monitor and supervise his psychotropic drug therapy.

- DHS engaged in permanency planning that was contrary to Jamison's best interests. For a torturous seven years, DHS relentlessly pursued a plan to reunify Jamison with his mother despite the documented psychological harm that the reunification effort was having on him. Once reunification failed, the agency did not develop any other viable permanency plan, at one point even placing Jamison with the father whose parental rights had been terminated.

- DHS unnecessarily separated Jamison from his sister and extended family for years.

- DHS denied Jamison access to a basic education by prohibiting him from attending high school.

Dr. Marva Lewis

## I. CASE SUMMARY

### A. 1991-1992

In 1991, there were at least two different reports that Jamison, age four, and his two siblings were being neglected by their mother, Ms. M. The first alleged that there was no electricity, gas, or water in the home, that Jamison's mother left the children alone at night, and that when she was at home, she had a lot of "male company." The second alleged that Jamison was unfed, unsupervised, and not properly clothed, and that his mother was doing drugs and working as a prostitute.

A caseworker who investigated the reports found Jamison unsupervised, "filthy & appear[ing] ungroomed & unbathed," and the home was described as filthy with no toilet, running water, or stove for cooking. The social worker told Ms. M that her children could not live in the home.[424]

On December 2, 1991, DHS filed a petition in Youth Court seeking that Jamison, aged five, and his sister TM, aged seven, be found neglected.[425] In that petition, a DHS Social Summary described in detail the squalor of their mother's home and Jamison's filthy appearance.[426] Jamison's older sister, LM, was placed with her father (Jamison had a different father, who lived in Kansas).

A case plan analyzed the suitability of placing Jamison and TM with their maternal grandmother, Ms. D. A caseworker noted that "she doesn't have inside plumbing or gas heaters" and found that the "sleeping arrangement is not satisfactory." The document noted, "We have our doubts [about the placement] but we will just hold any action at this time." [427] DHS placed Jamison and his sister TM with their maternal grandmother on December 5, 1991, without first receiving the approval of a Youth Court judge or undertaking the required home study necessary to ensure the safety of Ms. D's home.[428]

DHS caseworkers visited Jamison and his sister twice at their informal relative placement. DHS recorded that there was no bathroom and that TM was sleeping in the living room on a sofa bed in the same room as Ms. D's two teenaged sons. The social workers did not see Jamison during either visit, but they did observe Ms. D drinking beer both times. Ms. D was told that she needed to clean the house and that TM should not sleep in the same room as two teenaged boys. Following the visits, Jamison's caseworker recommended removing the children immediately, but no such action was taken.[429]

Instead, one month after Jamison and TM entered foster care, DHS allowed them to be officially placed in the custody of the maternal grandmother, whose home the caseworkers had recently deemed unacceptable for the children.[430] On January 13, 1992, a caseworker acknowledged that Ms. D's home remained unsuitable and noted that "if the Grandmother's home doesn't improve by the end of this month, there is a possibility that the children will then be placed in Foster Care."[431] There are no records

showing any further investigation or improvement within this timeframe, and the children were not removed until March 1992.[432]

On March 10, DHS workers returned to the grandmother's house to find nothing changed. Though TM was now sleeping in Ms. D's bed with her, Jamison was sleeping in an uncushioned armchair.[433] The workers informed Ms. D that DHS intended to remove the children, to which the grandmother replied, "[Come] get 'em."[434]

On March 13, 1992, DHS removed Jamison and his sister from their grandmother's house and placed them in DHS custody. When the caseworkers arrived, no one was at home. DHS found Ms. D wandering around downtown, intoxicated. DHS located the children, who were filthy, with their mother, who was very drunk.[435]

Jamison's first custody case plan was established on March 18, 1992. It stated his permanency plan to be "return to parents."[436] His mother appears to have signed her first service agreement with DHS on March 31, 1992. In it, she agreed to regularly attend Alcoholics Anonymous meetings, visit her children monthly, and establish a suitable home for their return. DHS appears not to have adequately assessed Jamison's father's interest in Jamison or his suitability as a placement. The stated goal was to reunify her with her children.[437]

Jamison was first placed in the WG foster home, but within four days, he was moved to the home of Ms. JF, a friend of the family who was not a licensed foster caregiver.[438] This was Jamison's second placement in an unlicensed home.[439] On April 2, Jamison was officially placed in DHS custody by the Youth Court judge.[440] On April 10, TM informed DHS that she did not want to return to her mother because her mother would slap the children when she was drunk, and her boyfriend would throw them against the wall.[441]

On November 25, Jamison reported to a caseworker that he wanted to hurt himself because the other children at school did not like him. The caseworker instructed Ms. JF to take Jamison to see a mental health practitioner, but Jamison appears not to have received any mental health services in 1992 and there is no record that the caseworker followed up on her instruction. [442]

### B. 1993

In January 1993, Ms. M. acknowledged to DHS that she was "well aware of what she needs to do in order to get [Jamison] back," but said she did not have housing, a job, or means to take care of Jamison. DHS also noted that she met her caseworker for the first time that month.[443] Ms. M. signed another service agreement in which she agreed to find housing, attend parenting classes, engage in rehabilitation for alcohol/drug use, and visit the children. The stated goal was reunification.[444]

On March 8, 1993, Jamison's foster mother called a caseworker because Jamison, then five years old, was acting out sexually and had talked about suicide. He also

Dr. Marva Lewis

indicated that before he was removed from his mother, he would watch her engage in sexual activity. Jamison's DHS caseworker documented the call and her subsequent call to Mid-South Hospital to set up an evaluation of Jamison, but these case notes do not mention any inquiry into whether Jamison might have experienced sexual abuse as a child.[445]

Jamison underwent a psychological assessment in late March, nearly four months after he had first expressed suicidal thoughts. He told the counselor that the devil talked to him in his sleep, but that he was not going to kill himself. The counselor appeared to conclude that Jamison was not actively suicidal, though she stated she was "very worried about [him]," and she recommended that they try out-patient treatment initially "to see if it works."[446] In April 1993, Jamison was taken to see another mental health professional. On the trip home, he told his caseworker that he wanted to kill himself. His social worker called Ms. JF, who stated that she was concerned because Jamison talked a lot about suicide. [447] Jamison was taken for further mental health assessments on April 20 and 27.[448] He told the therapist that his mother had beat him with an extension cord, had "cussed [him] out all the time," and that he thought she "must not love [him] much."[449] There is no clear record that Jamison was provided with any mental health services following these assessments, other than a May 4 screening by a mental health counselor who observed Jamison in the classroom after a teacher mentioned that Jamison was acting up.[450]

During the spring and summer of 1993, Ms. M did not comply with her service agreement. She had not visited her children at all since signing the agreement, and had visited them only once since they were removed from their grandmother's house the previous spring.[451] According to a Foster Care Review form that appears to be dated August 2, Jamison's permanency plan remained reunification with his mother.[452]

The same Foster Care Review form indicated that Jamison "hears voices" and had suicidal thoughts but that he had not yet been provided a psychological evaluation.[453]

In August, a therapist saw Jamison for what appeared to be a screening assessment and recommended that he undergo intensive testing and evaluation, and that he receive therapy to address his sexualized and defiant behavior. She stated her opinion that his treatment might take a very long time to accomplish in weekly counseling sessions and it might be more quickly accomplished in a short, intensive in-patient program.[454] There is no record indicating that Jamison actually received the recommended evaluation and therapy that year.

Caseworker notes from January 5, 1994, by Jamison's caseworker acknowledge that DHS had no contact with Jamison in February 1993 and did not document any face-to-face contact with Jamison from April through November of 1993.[455]

100

Dr. Marva Lewis

### C. 1994

Jamison underwent psychological testing and evaluation on January 10, 1994.[456] The examiner diagnosed Jamison as suffering from a developmental reading disorder and recommended further testing regarding whether he had a learning disability in the area of reading.[457] There is no documentation of any follow-up.

In January, a "Family Contacts" chart recorded that Jamison's mother had not visited her children in over a year and a half, and a case plan update for her indicated that she had found housing with an indoor bath but no utilities and had not attended an Alcoholics Anonymous session for five months.[458] This case plan appears to be her new service agreement.[459] A Foster Care Review hearing held in January recommended that Jamison receive in-patient treatment to evaluate his emotional and psychological problems.[460]

On January 25, Jamison's nine-year-old sister TM brought a condom to school and disrupted her class. DHS, noting that Jamison's foster mother had also reported behavioral problems with him, recommended that both children be hospitalized at Parkwood, a psychiatric hospital.[461] The hospital's admission intake form noted that Jamison, aged seven, was getting into fights, acting out sexually, and threatening to burn down the house with him inside.[462] Both Jamison and TM were evaluated but only TM was admitted because Parkwood determined Jamison to be too young.[463] Jamison appears not have received any further therapeutic services at all until June of that year.

As of March 18, 1994, a full 24 months after the children were brought into care, Ms. M, the children's mother, had not complied with her case plan. However, reunification remained the permanency plan for Jamison.[464]

Throughout the late winter and spring of 1994, Jamison continued to exhibit behavioral problems.[465] In April, Jamison's teacher, who had a degree in psychology, told DHS workers that she believed Jamison's severe behavioral problems needed to be addressed therapeutically.[466]

That same month, Ms. JF informed a caseworker that Jamison had been misbehaving and needed counseling. Ms. JF asked why DHS had not contacted the child psychiatrist in Jackson whose number Ms. JF had provided in an effort to secure counseling services for him.[467] The next month, Ms. JF again told DHS about Jamison's behavior and asked when he would see a specialist.[468]

On May 3, a DHS caseworker noted a telephone call to a doctor about counseling for Jamison. The record does not indicate that DHS secured any actual therapeutic services for Jamison at this time, and his behavior worsened.[469] In June 1994, Ms. JF became frustrated with Jamison's untreated behavioral and psychological problems and went to the DHS offices with all of Jamison's belongings and stated that she could no longer care for him. There are no documented steps that DHS to took to stabilize the foster placement. DHS moved Jamison from the home where he had lived for over two

101

years and placed him in the RM foster home on June 10.[470] Although the records are unclear, Jamison was briefly treated in an inpatient psychiatric facility at this time.[471]

On July 6, 1994, a so-called "speed letter" was sent to Jamison's biological mother, Ms. M, asking for a progress report on the service agreement and telling her that she needed to visit her children.[472] There is no record that DHS had been meeting with Ms. M to assess her progress. DHS entered another service plan for Ms. M on July 15, which was identical to all earlier unfulfilled plans despite the fact that it stated it could not locate her to evaluate her progress.[473] A Foster Care Review report dated the same day that DHS renewed Ms. M's service agreement recognized that Ms. M had shown little, if any, progress and "strongly suggested" that the permanency goal be changed from reunification to the next permanent plan option within six months if there continued to be no progress.[474]

Throughout the summer of 1994, Jamison continued to exhibit behavioral problems. Mrs. RM ultimately requested Jamison be moved due to these problems.[475] A caseworker's notes from July and August 1994 indicate that DHS was trying to find a new placement for Jamison but did not indicate that Jamison was receiving any mental health services at the time[476] In August 1994, DHS noted that Jamison needed a therapeutic foster home because of his behavioral issues.[477] A therapeutic foster home request form noted that Jamison was not currently on medications because his previous foster home, presumably the JF foster home, refused to place him on any.[478] There is no indication in the record of whether Jamison had been prescribed medication or whether the foster parent's refusal to administer medication had been discussed with a health care professional. On August 11, Jamison moved from the RM foster home back to the JF foster placement, which was not a therapeutic foster home.[479]

A Social Summary for Jamison prepared by DHS and dated August 11, 1994, notes that "The Agency does not believe that neither [Jamison's mother] or [Jamison's grandmother] is capable of giving these children the care that they need."[480] As of July 28, Ms. M was not seeking alcohol counseling, and she told DHS that she was in an abusive relationship.[481] Yet, DHS maintained reunification as Jamison's permanency goal.[482]

At the end of August 1994, Jamison's mental health deteriorated to such an extent that he was hospitalized for a month.[483] Jamison was seven years old at the time of this psychiatric hospitalization.

DHS records show it requested a home evaluation regarding Jamison's father, Mr. H, who lived in Kansas. According to DHS records, the evaluation came back in September 1994 as "unfavorable" to Mr. H.[484]

At the time Jamison was hospitalized, his intake form indicated that he had only seen his mother once in the past year. Jamison told his doctor that he wanted to get an education and become a lawyer.[485] The hospital stated that Jamison "was noted as being 'brilliant', [he] should be encouraged & praised to continue his good work."[486] Jamison

was diagnosed with post-traumatic stress disorder, with a secondary diagnosis of ADHD. He was also diagnosed with a developmental reading disorder.[487] Jamison was prescribed Ritalin and Clonidine. [488]

On September 21, 1994, Jamison was released from the hospital and placed in the LB foster home, a therapeutic foster placement.[489] This home was not in the county of responsibility for Jamison and was a several-hour drive from his hometown.[490] He remained there continuously for about four and a half years.

At the end of 1994, DHS stated that in the three years Jamison had been in foster care, Ms. M. "has made no efforts towards reunification" and had not regularly visited her children. When the Foster Care Review Board expressed concern with the continued plan of reunification, the social worker's response was that she would visit with Ms. M and would try to find relatives that could be placement resources.[491] No note was made in this document about attempts to locate the father's family.

### D. 1995

As of mid-March, Jamison's mother told a caseworker that she was living with a friend, and that her only income was food stamps.[492] At this time, DHS entered into yet another service agreement with Ms. M. which reiterated the same conditions that she had failed to meet in the preceding three years: that she would secure housing, keep her utilities connected, visit her children, and go through drug/alcohol counseling.[493] Despite the acknowledgment months earlier by DHS that Ms. M was not capable of caring for her children, it again assigned the family a permanency goal of reunification.[494]

At a May 8, 1995 Foster Care Review conference, DHS said it would pursue a relative placement or TPR if Ms. M did not meet the terms of her service agreement by June 17, 1995. It was noted that Ms. M smelled like alcohol, and though she claimed to have received substance abuse counseling, she could not recall the name of her counselor or the dates she had been seen.[495]

In June 1995, Ms. M, who at this time weighed only 78 pounds, was hospitalized for exhaustion.[496] She reported that she sometimes got the "shakes," and that she drank four to six beers every other day. She said her longest period of sobriety had been for one month, and she had been in trouble with the law for public drunkenness.[497] She was diagnosed by a Certified Alcohol and Other Drugs of Addiction Counselor as meeting most of the DSM-III-R criteria for alcohol dependency.[498]

In June, which was the same month that DHS had stated it would move to terminate Ms. M's parental rights if she made no progress on her service agreement, DHS instead entered yet another service agreement that was identical to all of Ms. M's previous service agreements.[499]

A June 1995 therapeutic summary for Jamison stated that when he was given a letter written by his mother, he "became agitated, expressing his fear that he would have

Dr. Marva Lewis

to return to the home of his biological mother. He expressed the desire to stay with his present foster parents 'forever.' "[500]

On August 9, 1995, Catholic Charities, the private contract agency that was supervising Jamison's therapeutic foster home placement, recommended to DHS that Jamison's mother's parental rights be terminated and that it pursue adoptive placement in a therapeutically trained home for Jamison. Catholic Charities further recommended that if there were to be any contact between Jamison and his mother, it should be "gradual, consistent, and non-threatening as in letters for six months and then supervised visits at Catholic Charities to establish a parent-child relationship that has been severely damaged by mother's behavior/absence of consistent and appropriate nurture/structure in the home for the last several years."[501]

As of August 15, 1995, Ms. M had seen her children only twice in the past three years.[502] A September therapeutic summary for Jamison showed that he displayed hurt feelings because of his biological family's sporadic contact. [503]

On October 23, 1995, DHS, through a Foster Care Review Board dispositional hearing, changed Jamison's permanency goal from reunification to relative placement because Ms. M had not made progress on her numerous service agreements apart from attending Alcoholics Anonymous meetings several times. It recommended that the home of Ms. L, Jamison's great-aunt, be evaluated for his placement.[504] During this time, Jamison discussed in therapy his anger against his mother for physically abusing him by whipping him with an extension cord.[505] His foster parents reported that he had shredded a letter he received from his mother.[506]

DHS assisted Ms. M in being admitted to an in-patient rehabilitation center on December 18, 1995. A DHS case worker requested that the center not release Ms. M until her upcoming Youth Court date, in part because otherwise she might return to her "old drinking environments." The center refused this DHS request to keep Ms. M at the center beyond the time necessary for her to complete her program.[507]

Though Ms. M wrote Jamison many letters during this time, he wrote back to her only once after being strongly encouraged by his foster mother.[508] In December 1995, Jamison's DHS caseworker wrote to Jamison encouraging him to write to his mother.[509] Also that month, Medicaid authorized continued therapy for Jamison to address his verbal and physical aggression, impulsivity, behavioral difficulties, and abandonment issues.[510]

### E. 1996

Around January 1996, DHS performed a home study of Jamison's great aunt Ms. L, but it determined she was unsuitable.[511] DHS also entered another case plan for Ms. M that called on her to secure and maintain adequate housing; visit, call, and write to her children; and attend Alcoholics Anonymous and parenting classes.[512]

Dr. Marva Lewis

In February, Ms. M completed her alcohol rehabilitation program. The rehabilitation center discharge summary and initial treatment plan for Ms. M noted that she completed all program requirements with "moderate progress" but was in denial about the seriousness of her drinking. It also noted that she "lacks motivation to change her lifestyle or give up old friends that will enable her to continue her self-defeating lifestyle," and that the center believed she would not apply the insight she had gained about her addiction during the treatment to her life.[513]

Following her completion of the program, DHS requested that Jamison's permanency plan be changed back to reunification with his mother on the grounds that, though she had gotten off to a slow start, she had made "great progress" since the last court date.[514]

On February 27, 1996, the Youth Court changed Jamison's permanency plan for the next six months from relative placement back to reunification with his mother, with the understanding that if the plan failed, Jamison's permanency plan would revert to relative placement.[515]

Psychiatric reports for Jamison during this time observed that he continued to resist writing his mother, and said her letters brought back difficult memories, especially about being abused.[516] Jamison's foster mother confirmed that he became more agitated upon receiving letters from his mother.[517]

On May 30, 1996, a DHS worker returned to Ms. M letters she had written to her children in which she stated she had begun drinking again, with the warning that "you shouldn't write that to them because [Catholic Charities] counselors read these letters also as to screen them....You can talk to us about if you're drinking again (Hope not) but not to them okay." [518]

A mental health assessment of Ms. M from July 10, 1996, noted that she had drunk a six-pack of beer the night before, that her boyfriend at the time drank heavily and abused her, and that she had had suicidal thoughts after he beat her. It further recorded that she had attempted suicide five times with pills and had tried to shoot herself. It also noted that her mother, Ms. D, had physically abused her and was an alcoholic.[519]

By the summer of 1996, Ms. M had ceased complying with her service agreement. In addition to her admission to DHS that she had been drinking, she was failing to call or write letters to Jamison. Catholic Charities wrote a letter to DHS warning that Ms. M's behavior was damaging to Jamison and requested a team meeting before Ms. M was allowed an in-person visit with the children.[520]

In August 1996, DHS notes show that it entered into another service agreement with Ms. M.[521] It continued to support keeping the permanency goal as reunification.[522] The records do not show that the February 27 court order for reassessment of Jamison's case plan was performed, or what grounds DHS used to officially justify maintaining the plan of reunification.

105

Dr. Marva Lewis

An August 1996 therapeutic report for Jamison stated he was anxious about his family of origin and called his mother a "stranger."[523] In September 1996, Jamison began demonstrating increased anxiety and concern over the prospect of having to leave the foster family he had lived with for two years. The foster mother reported that he removed a photograph of his mother from his dresser mirror and became angry when it was put back.[524] He demonstrated confusion and ambivalence about visits with his mother. Catholic Charities noted that on October 24, 1996, Jamison expressed shock, sadness, anger, and loneliness related to a cancelled visit by his mother.[525]

### F. 1997

Jamison spent time with Ms. M during a home visit over the holidays. Upon his return in January, Jamison displayed an increase in disruptive behavior.[526] It was also discovered that month that his school had not administered his noon dosage of Ritalin for four weeks.[527]

DHS entered another case plan with Ms. M in January that repeated that she needed to secure and maintain adequate housing and regularly contact her children, and continue alcohol/drug counseling.[528]

In the spring of 1997, DHS notes show that Ms. M was arrested after she apparently stabbed her boyfriend in self-defense. All charges were later dropped. She remained unemployed and was inconsistent in her contact with Jamison.[529]

Jamison told Catholic Charities that he had asked his foster parents to adopt him, and that he was anxious and had safety concerns about returning to live with his mother.[530] At this time, DHS obtained Youth Court approval for unsupervised weekend and holiday visits between Jamison and his mother.[531] DHS records show that TM's foster mother expressed concern about the upcoming unsupervised visits, stated that TM required careful supervision and that Ms. M would have to watch TM closely due to her adolescent sexual curiosity.[532]

During a Foster Care Review hearing on June 5, 1997, Board members renewed their concern about whether Ms. M could ever successfully parent Jamison and TM.[533] The Board cited the "slow and minimum progress being made by the mother" and stated that "no child should have to endure 5.3 years of foster care." The Board "respectfully request[ed]" that the Court reconsider DHS's recommendation of reunification so that the children could have permanency.[534] That same month, around June 12, 1997, Jamison's current foster parents, Mr. and Mrs. B, expressed interest in keeping Jamison for the long term.[535]

On August 7, 1997, a worker with DHS's Permanency Planning Unit spoke to Jamison's caseworker about freeing him for adoption and about the Bs' desire to adopt him. Jamison's caseworker responded that his permanency goal would remain reunification because his mother was currently attending alcohol and drug sessions and

Dr. Marva Lewis

parenting courses. The caseworker further stated it would be impossible for the Bs to adopt Jamison because it appeared that reunification would be accomplished.[536] There is no indication that the worker divulged to the Permanency Unit Jamison's mother's spotty contact with him or the fact that she had experienced a relapse.

A November 1997 Foster Care Review Conference Report stated that 5.8 years in care "appears to be more than sufficient time for Mother to conclude reunification efforts, and too much time for [Jamison] and [TM] to spend in foster care."[537]

### G. 1998-1999

In January 1998, Jamison's 13-year old sister TM reported to DHS that she was raped by a 30-year-old friend of her mother's during an unsupervised Christmas visit at her mother's home. A DHS caseworker later characterized the incident as a consensual sexual encounter, despite TM's allegation. Apparently responding to Catholic Charities' concerns about the unsupervised nature of the visits, the caseworker also wrote:

> I would like to know who told you that DHS would be willing to allow these children to have unsupervised visits. This is not true. These children are a ward of the State of Mississippi. They MUST be supervised. They have NEVER had an unsupervised visit since I have been their supervisor. They will not have an unsupervised visit until ordered by the court.[538]

At this time, Catholic Charities warned DHS that Jamison would need a lot of supervision and support if he were reunified with his mother, and that he experienced problems after visits with her. DHS scheduled a trial reunification with the mother for part of the summer of 1998.[539] If everything went well during the summer, DHS intended to return Jamison and his sister permanently to their mother.[540] As the date for trial reunification approached, Jamison exhibited anxiety about visitation and placement issues.[541] From late June to mid-July, Jamison and TM were sent on a home visit with their mother in preparation for reunification later that summer.[542] There is no documentation of any consistent DHS supervision of the mother's home or the children during this time.

Catholic Charities notified DHS in July 1998 that Jamison had returned from the extended home visit with his mother with eight days' worth of medication not taken. The DHS caseworker said that she would remind Ms. M about Jamison's medications on future visits.[543] Catholic Charities reported that upon his return, he was lethargic, had a flat affect, was sloppily groomed, and had not eaten. He was immediately fed and given his medication and once he reached his foster mother's home, he slept for about 2 days.[544]

Catholic Charities noted in late July 1998 that Jamison's continuing needs included: individual and family therapy, psychiatric follow-up, advocacy with his school to assist with ADHD issues, and follow-up with therapy and a psychiatrist.[545] August 1998 notes by Catholic Charities observed that Jamison experienced an increase in impulsivity/irritability upon returning from visits with his mother.[546]

107

Dr. Marva Lewis

On August 4, 1998, while DHS was preparing to formally reunify Jamison with his mother, a three-year-old child who had been living with a roommate of Ms. M was beaten to death in their home.[547]  Newspapers reported that the toddler also displayed evidence of ongoing abuse in the home, such as what appeared to be cigarette burns, evidence of beatings with a belt, and severe trauma to his lips.[548]  DHS records indicate that Jamison witnessed this severe abuse against the young child during his summer visit to his mother's home.  CC-00046.  It was only after this child's homicide that DHS determined that Ms. M could not adequately care for her children and sought to change Jamison's permanency plan from reunification.[549]

In September 1998, Jamison's mental health continued to decline.  At one point, he attempted to overdose on his medications and stated that he was "gonna wake up dead."[550]  Following his increased unsafe behavior, including suicidal ideation, he was admitted to Hope Haven Adolescent Crisis Center where he remained for two weeks, and was prescribed a third drug to target "loose thought associations and impulse control." His behavior was thought to be most closely related to "reactive attachment issues."[551]

On October 27, 1998, the Youth Court ordered that Jamison's permanent plan be changed to "formalized foster care."[552]

A memorandum from Catholic Charities in late November 1998, stated that over the past eleven months, Jamison's behavior had become increasingly unpredictable. During that time, Jamison had apparently been placed for short periods in various respite centers, including Rainbow Respite, Hope Haven, and Our House Shelter.[553]

In the beginning of 1999, Jamison's mental health deteriorated further.  His behavioral problems included anger outbursts, verbal aggression, threats of harm toward others, physical altercations with peers, oppositional behavior toward authority figures, and academically performing below abilities.[554]  Jamison underwent a psychological evaluation on February 19, 1999, after which he was diagnosed with ADHD, PTSD, and Oppositional Defiant Disorder.  The doctor recommended that Jamison be provided with long-term residential treatment focused on anger management, ADHD, academic concerns, coping strategies, and his defiance, with the plan to return to his present foster placement.[555]

Rather than a residential treatment facility, in February 1999, DHS placed Jamison in a shelter in Jackson, Mississippi for about one month.[556]

A February 16, 1999 Foster Care Review Board Report noted that the Board again disagreed with the DHS recommendation that Jamison's permanency goal be long-term formalized foster care.  The Board instead recommended that Jamison be freed for adoption because he had been in custody for nearly seven years.  It stated that unless a judicial review determined a TPR was not in the best interest of the children, DHS should have begun the process of terminating Ms. M's parental rights.[557]

Dr. Marva Lewis

Jamison was placed in Millcreek Hospital, his second psychiatric hospitalization, in late March 1999.[558] After approximately seven months, Jamison was discharged from the institution on October 15, 1999 with a diagnosis of depressive disorder, oppositional defiant disorder, ADHD, and adjustment disorder, and was prescribed Adderall and Zyprexa.[559] The discharge summary recorded that his major life crises included trauma through abuse and witnessing repeated abuse, as well as "repeated losses of support."[560] Millcreek recommended that Jamison be placed in a therapeutic foster home, return to regularly seeing his counselor, and attend a self-contained classroom for the emotionally disabled.[561]

DHS placed Jamison in a crisis center in ████████, Mississippi from October 15 to November 2, 1999 because a therapeutic foster home was not yet available. At this point, he began to ask questions about his permanency plan, and stated that he was ready to move toward adoption because he knew it was in his best interest.[562]

DHS moved Jamison from the shelter to the H foster home, a therapeutic foster home, on November 2, 1999, where he stayed for one year.[563] He was placed at the H foster home in a neighboring county because of the lack of appropriate foster homes in his home county.[564] In mid-November 1999, Jamison discussed with his therapist his refusal to accept that the placement with the B foster home was over and that there was no longer a chance that he would be adopted by that foster family. There is no indication of any efforts made by DHS at this time to devise a service and support plan that could have allowed Jamison to return to the B's care, despite Jamison's clear emotional attachment to the family.[565]

## H. 2000-2001

A DHS Custody Case Plan dated March 1, 2000, noted that Jamison's treatment was focused on ADHD and PTSD, that he was being observed by a social worker / therapist monthly, and that he was taking Zyprexa and Adderall. DHS's permanency plan was listed as adoption.[566] A Catholic Charities report observed that Jamison had been extremely unstable lately, and his foster father reported that Jamison had become verbally assaultive.[567]

A mental health treatment plan review dated May 11, 2000, outlined Jamison's four identified issues/problems as: (1) unresolved grief issues stemming from history of abuse and repeated losses, (2) oppositional behavior and poor impulse control, (3) school difficulties, and (4) permanency issues.[568]

In May 2000, 8 years after DHS had placed Jamison in foster care, his mother's parental rights were terminated. TPR was ordered on the grounds that she was responsible for negligent incidents concerning her children, she was unable to care for them due to her alcohol addiction, her relationships with them were substantially eroded, and she had failed to implement a plan of return. The parental rights of Jamison's father, Mr. H, were terminated due to abandonment.[569]

Dr. Marva Lewis

In June 2000, without any documented explanation, Jamison ran out of his medications.[570] His doctor recommended that he continue his current medication regime.[571]

On June 28, 2000, Catholic Charities contacted DHS to request a placement move because Jamison was acting out, and his current foster father Mr. H was not interested in adopting him.[572] DHS determined at this point that Jamison required a higher level of care than a foster home,[573] but Jamison was not moved out of Mr. H's home until November 2000. Upon removal from the H foster home, Jamison was placed in the Hope Haven crisis center.[574]

Jamison reported in a therapy session in November 2000 that he felt hopeless about finding a family and described himself as homeless. He felt angry at himself and others.[575] A psychological evaluation dated November 13, 2000 recommended his placement in a long-term psychiatric residential facility, a psychiatric consultation, perhaps individual or group counseling, and additional academic assistance at school.[576] Around mid-November 2000, a serious incident report was filed with the Department of Health because Jamison did not receive at least ten of his medication doses. Packets had not been sent to his school as instructed and several times the crisis center had failed to administer them. Almost twenty reports from this time were blank regarding whether and how much medication Jamison received.[577]

DHS maintained Jamison at Hope Haven center until December. DHS then moved Jamison from the center to a residential treatment facility called Youth Villages in Memphis, Tennessee, where he remained for 4 months. NP-04549. The center observed that Jamison is "frustrated about being in this placement and realizes that he really does not have any other place to go."[578] Jamison's mother passed away on March 30, 2001. Jamison was 14 years old. Although Jamison remained at Youth Villages, he attended the funeral.[579] At this time, Jamison was currently taking Adderall, Zyprexa, and "Trampdone."[580]

In March, DHS records indicate it collected information about Jamison to place in an "Adoption Book."[581] DHS also appears to have included Jamison in a television broadcast recruiting adoptive parents for him.[582]

In April 2001, Jamison was discharged from Youth Villages and returned to the B foster home,[583] where he remained for the next two years. For six months that year, the Youth Court ordered that DHS cease efforts to find adoptive parents, other than the Bs.[584]

On August 20, 2001, Catholic Charities noted that Jamison appeared anxious about his status as a "ward of the state," and expressed feelings of sadness, frustration, and a sense of powerlessness over his future.[585]

A Catholic Charities monthly summary for Jamison on December 20, 2001, noted all his medications except Adderall had been discontinued.[586]

Dr. Marva Lewis

### I. 2002-2003

A Children Health Services treatment plan noted in April 30, 2002, that Jamison continued to possess problems with unresolved grief stemming from a history of abuse and repeated losses, oppositional behavior, and poor impulse control.[587]   On June 3, 2002, Jamison's psychiatrist stated that she did not feel medication could help Jamison's behavior.[588]   In July 2002, Catholic Charities further observed that Jamison admitted to worrying about his future and thinking a lot about where he would go if he were unable to remain in his current placement. He stated that his worrying kept him awake at night, and that he had stayed awake all night several times over the summer. He also admitted he had not been taking his prescription of Adderall regularly for several months.[589]

A September 2002 services questionnaire documented that Jamison had received psychiatry services within the past 12 months but it erroneously stated that he had never attempted suicide.[590]

Catholic Charities noted in October 2002 that the B foster home ultimately decided not to adopt Jamison.[591]   By November 13, 2002, Jamison's permanency goal had been changed from adoption to emancipation from the foster care system.[592]

From March 10 to March 24, 2003, Jamison was moved from the B foster home to a shelter in Jackson.[593]   Two weeks later, Jamison was moved again, to the M therapeutic foster home.  He appeared anxious and expressed some reservations about moving to another placement.[594]   This placement quickly disrupted when the foster mother reported that Jamison appeared unhappy and refused to follow set guidelines.[595] Catholic Charities observed that it appeared Jamison needed a higher level of care.[596]

On April 15, Jamison was returned to a shelter while awaiting foster home placement and stayed there until June 2, 2003.[597]   The shelter recommended a permanency plan for Jamison of placement within a therapeutic foster care program.[598]

A psychological evaluation done in April 2003 diagnosed Jamison as having adjustment disorder with mixed disturbance of emotions and conduct, and "family conflict, multiple foster placements." It recommended family therapy to focus on establishing familial boundaries. The evaluation incorrectly stated, however, that Jamison had never received psychiatric treatment and had suffered no major illnesses or accidents while growing up.[599]

On June 2, DHS placed Jamison at the Sunnybrook Children's Home, an institution in ████, for 11 days.[600]   He then was moved to a Sunnybrook foster home for less than a week.[601]   Next, DHS moved Jamison to an emergency shelter for approximately six weeks.[602]

A DHS Permanency Plan for Jamison in August 2003 maintained emancipation as his permanency goal and noted his goals of graduating from high school and attending college. Though it listed him as participating in therapeutic foster care, it did not identify

any specific therapeutic services apart from "general support, financial support, and permanency."[603]    A Hope Haven/Therapeutic Foster Care checklist noted, though, that Jamison fell into the eligibility category of "Child/Adolescent with Serious Emotional Disturbance" (SED), that he was impaired in the areas of instrumental living skills and social functioning, and that the severity and longevity of his problems required more frequent services than for children who did not have SED.[604]

On August 1, Jamison was discharged from the shelter, which noted that though it had prescribed medication to Jamison, DHS subsequently informed the shelter that he had not taken this medication.[605]  Jamison was moved to an emergency foster home, where he remained for four days.[606]  He was then placed with his sister's foster mother, Ms. CL, who ran a therapeutic foster home with Catholic Charities and was his sister TM's adoptive mother.[607]  A therapeutic foster care assessment and service plan dated August 14, 2003, noted that Jamison was being followed by "UMC Child/Adolescent Psychiatry," but also reported that he said he had not taken any of his prescribed medication since he left therapeutic foster care.  It stated that he requires case management services to ensure that he attends psychiatric appointments and complies with medications.[608]

In a Youth Court Hearing and Review Summary for a six-month review conference on September 25, 2003, a DHS caseworker listed that Independent Living Services were the only services the agency was providing Jamison, and he had no other needs at that point.[609]  No therapeutic services were listed.

At the end of December, Jamison was moved from the therapeutic placement with Ms. Lewis to a crisis center.[610]  Jamison was told that there were no therapeutic foster care homes available for him at the time, and DHS was seeking an alternative option.[611]

## J. 2004-2006

In January 2004, DHS requested that the Youth Court permit Jamison to be placed with his biological father, Mr. H, in Kansas, with legal custody to remain with Mississippi "pending ICPC [Interstate Compact on the Placement of Children] approval by the State of Kansas."[612]  According to Jamison's therapist at Catholic Charities, it appeared that DHS was seeking to discharge or emancipate Jamison from the foster care system, which could be done when he turned 17.5 years old, and this placement was a step towards that goal.[613]  DHS had submitted to the Kansas child welfare agency a home study request in the summer of 2003 to Kansas for his father, which Kansas rejected due to the fact that his father's parental rights had been terminated in 2000.  DHS submitted another adoptive home study request in September 2003, as well as the ICPC application to place Jamison with him in Kansas.  Before the Kansas child welfare agency responded to the ICPC application, DHS sent Jamison to Kansas.  Jamison was sent without the required home study and approval by Kansas even though DHS had in its possession numerous records that showed that Mr. H had multiple felony criminal convictions, had not been able to pay child support for Jamison because he had been incarcerated for years, and had been previously evaluated for a placement and been denied

112

Dr. Marva Lewis

It appears from the case record that DHS sent Jamison to his father without any preparation, plan, or support services in place. There is no record that DHS followed Catholic Charities' assessment that Jamison needed psychiatric follow-up services, continuing individual therapy, family intervention and assessment, and close supervision during the attempted reunification with his father.[614]   DHS documents from the time he was placed with his father stated that his emotional/mental health was "normal" and he needed no care.[615]  A Social History from approximately January 2004 noted that the reunion with his father was not smooth.[616]

On January 9, 2004, DHS received a phone call from a Kansas child welfare official who seemed "very upset." She stated that she could not approve of Jamison's placement in Kansas because it violated the ICPC contract. According to the DHS case note, the Kansas caseworker "stated that the child was in Kansas illegally."[617]   There is no documentation that DHS notified the Mississippi Youth Court of Kansas's objections. The court signed the requested placement order on January 12, 2004.[618]

Kansas denied the ICPC application, finding Jamison's placement with this father unsuitable.[619]  After the ICPC placement denial, a Social Summary for Jamison dated February 17, 2004, stated only that DHS was seeking to remove Jamison from Kansas because he was misbehaving, but made no mention that the ICPC was denied.[620]

In February 2004, Jamison returned to Mississippi. He was placed at the Oakley Transitional Living Center, a halfway house for delinquent youth transitioning out of the Oakley Training School, even though he had never been adjudicated delinquent.[621]  The center imposed restrictive rules on Jamison's conduct while he lived there, including prohibitions on having a cellphone, dating, having a car, and having "adult music."[622]  Jamison's therapist noted that he "does not – in my opinion – require this level of supervision."[623]

Despite Jamison's expressed desire to graduate from high school and attend a four-year college, DHS's placement precluded him from attending regular high school because all youth placed at Oakley were required to attend G.E.D. courses and were not allowed to attend regular high school. The Youth Court ordered that Jamison pursue a G.E.D., as opposed to a high school diploma, and DHS repeatedly urged Jamison to take the G.E.D. as soon as possible.[624]  Jamison told DHS he wanted a high school diploma, and that he feared some colleges would not let him enroll with a G.E.D.[625]   When informed that "it looks bad if [Jamison] is smart and not in school," DHS justified its actions in part by stating that it was difficult for it to find placements for Jamison at 17 and that they were looking to his becoming independent.[626]   Because Jamison was prohibited from attending high school while he was living at Oakley, he failed the 11th grade due to his many absences from school.[627]

While Jamison resided in this placement, he was observed to be depressed, and expressed feeling victimized, punished, and "more hopeless than ever."[628]  He expressed repeatedly he did not wish to remain at TLC.[629]

113

Dr. Marva Lewis

After Jamison was placed at Oakley, Ms. JF, a former foster mother with whom Jamison had stayed as a young child, contacted DHS to see if he might be placed with her instead. Catholic Charities supported this request.[630] DHS denied her request on the grounds that her home was not a therapeutic foster home, and for unspecified past behavioral reasons. It admitted that Oakley was not a therapeutic placement, but said it "is supervised by strong males."[631] In addition, the records appear to indicate a therapeutic foster home run by Ms. DR was also willing to take Jamison,[632] but DHS did not pursue this option either.

In June 2004, DHS approved Jamison's move to Rowland Home for Boys, a group home in ███████, Mississippi. It placed him too late, however, to permit him to be enrolled in summer school to make up for his high school absences while at Oakley.[633] Before moving Jamison to the group home, he was first placed on June 23, 2004 in the unlicensed and unapproved home of his maternal grandmother, Ms. D, the same home from which DHS had removed Jamison years earlier for neglect and who had been revealed as having been abusive to Jamison's mother, Ms. M.[634] DHS did not identify this placement move in Jamison's placement history as being with Ms. D, but simply called the placement "Own Home, Own Home."[635]

On July 1, Jamison was moved from his grandmother's home and placed at the Rowland Home, where he remains.[636] This group home was at least the 28th placement for Jamison in his more than 13 years in DHS custody. He remains focused on graduating from high school.[637]

## II. CASEWORK ANALYSIS

Over the 14 years that Jamison has been in the Mississippi foster care system, there have been an astounding number of clear failures of casework practice. This analysis will highlight the most harmful practices to which DHS subjected Jamison.

### A. DHS PLACED JAMISON IN FOSTER CARE SETTINGS THAT POSED CLEAR AND IMMEDIATE RISKS TO HIS SAFETY

When DHS first removed Jamison from his mother's custody in 1991, it placed him with his maternal grandmother, Ms. D, without performing any evaluation or

114

Dr. Marva Lewis

background check of the home. DHS workers quickly observed and documented that Ms. D could not appropriately supervise five-year-old Jamison and that her home was unsanitary, unsafe, and unsuitable for him. Despite this recognition that Ms. D's home posed the same serious risks to Jamison as had his mother's home, DHS permitted Jamison to stay with Ms. D for over three months before finally removing him. For no clear reason, DHS later returned Jamison to the same unsafe home for a week without any documented indication that the risks necessitating his earlier removal had been addressed.

DHS also returned Jamison to his mother for overnight unsupervised visits when it was clear she still could not provide for his safety. DHS knew from its previous records that Jamison's mother had a history of neglecting him, that Jamison had reported she had whipped him with an extension cord, and that she had allowed him to be beaten by her boyfriend at the time. When DHS sought these unsupervised visits with Ms. M, it had no indication that she could now safely parent Jamison. The inability of Jamison's caseworker to assess properly the risks posed to him in the unsupervised care of his mother was most clearly demonstrated by her response when Jamison's 13-year-old sister reported being raped by a 30-year-old friend of the mother while on a home visit. I am outraged that Jamison's caseworker shrugged off the sexual encounter as nothing more than "consensual" because his sister admitted that she had had an earlier sexual experience and did not report having bled during the episode. DHS maintained Jamison's visitation plan with his mother, even when he returned from her home unfed, ungroomed, sleep-deprived, and not having taken his medications. During these visits, Jamison observed the ongoing and severe abuse—reportedly resulting in cigarette burns, belt

115

Dr. Marva Lewis

marks, and severe trauma to the lips—of a three-year-old toddler who lived with Ms. M
and who was eventually murdered. Evidence from recent research suggests that children
who witness such violent events may develop emotional disturbance, including
symptoms of post-traumatic stress disorder.[638]

In addition to the unsafe homes of his mother and grandmother, DHS placed
Jamison in Kansas with his father, whose parental rights had been terminated years
before. At the time DHS shipped Jamison to this out-of-state home, it did not have the
results of any home evaluation study, and it had not performed the requisite background
and criminal checks to show his father's home was safe for Jamison. A Kansas child
welfare worker had even called DHS to inform it that the placement was illegal because it
violated the Interstate Compact on the Placement of Children (ICPC) guidelines
governing the placement of children across state lines. DHS nonetheless deposited
Jamison with his father with no preparation or support for the family and no
arrangements with the local child welfare agency to provide courtesy supervision. This
doomed placement, which was so clearly in defiance of DHS policy and standard case
practice, seriously jeopardized Jamison's safety. This was the third environment in
which DHS placed Jamison that left him as vulnerable, if not more so, than he had been
prior to being placed in DHS custody.

## B. DHS FAILED TO PROVIDE STABLE PLACEMENTS, INFLICTING PSYCHOLOGICAL HARM ON JAMISON

DHS has placed Jamison in at least 28 settings over the course of his now over
fourteen years in foster care. Jamison's placements have varied in length from days to
four years, and have included emergency shelters, group homes, crisis centers, foster

116

Dr. Marva Lewis

homes, therapeutic foster homes, and psychiatric institutions. This extraordinarily high number of placements has likely caused psychological damage to Jamison in the form of feelings of instability, insecurity, and a lack of attachment to any caregivers.

### C. DHS FAILED TO MEET JAMISON'S MENTAL HEALTH NEEDS

DHS harmed Jamison by ignoring and mishandling his mental health needs. Throughout Jamison's 28 placements, DHS either denied Jamison needed mental health care, or provided care that was erratic and inconsistent.

#### 1. DHS Failed to Provide Jamison with Psychiatric Services

From the very outset, DHS disregarded Jamison's mental health needs. His case record does not indicate that DHS arranged for an initial psychological screening, as it should have, when he was first removed from his mother's home or even when he reported to a case worker in November 1992, at around age six, that he wanted to hurt himself. While he was finally provided psychological assessments in 1993, the counselors' recommendations for therapeutic testing and evaluation do not appear to have been followed by DHS in a timely fashion. For instance, according to the case record, he was not given a full psychological evaluation until January 1994, almost five months after a therapist recommended he be provided such treatment. DHS appears to have failed to provide Jamison with ongoing out-patient therapy over the next six months despite the repeated warnings by Jamison's foster mother at the time that counseling was necessary.

Starting in late 1994, Jamison fell into the category of youth who evidenced serious mental health concerns because he was diagnosed with a series of conditions

117

Dr. Marva Lewis

including PTSD, ADHD, developmental reading disorder, depressive disorder, oppositional defiant disorder, and adjustment disorder. DHS's approach to these serious mental health problems was erratic. Although Jamison appears to have been receiving regular counseling in 2003, for example, DHS abruptly ended Jamison's mental health treatment without medical consultation when it sent him to live with his father in Kansas.

DHS's inconsistent provision of treatment harmed Jamison because he was denied mental health services appropriately calibrated to his serious needs. In addition, DHS's failure to provide Jamison his needed treatment directly resulted in the disruption of at least one of his placements. Jamison's first foster mother, JF, became so frustrated after months of DHS's failure to secure needed psychiatric services for Jamison that she went to the DHS offices with all of Jamison's belongings and told the agency that she could no longer care for him. No records show that DHS attempted to stabilize the placement, which had lasted over two years, by providing the mental health services that Jamison needed.

2. DHS Failed to Monitor and Supervise Jamison's Mental Health Care

During his tenure in DHS custody, Jamison has been prescribed strong psychotropic medications. Jamison's many, many moves and frequency of change in caregivers made the need for consistent and coordinated monitoring of his treatment and medications a critical casework responsibility, one which DHS failed to undertake. On numerous occasions, DHS did not ensure that Jamison was administered his medications. Around mid-November 2000, a serious incident report was filed with the Department of Mental Health because Jamison was not being provided his medication at school or at the shelter where DHS had placed him. Documents that tracked his drug treatment were

118

Dr. Marva Lewis

blank on almost twenty occasions regarding whether and how much medication he had received. In August 2003, after Jamison told DHS he had not been taking his prescribed medications for at least two months, his case plan stated he required case management services to ensure his compliance with medication, but no DHS records show he was provided these services. Additional records from that month show that DHS had been aware that Jamison was not following his medication regimen.

DHS's failure to properly administer his strong psychotropic medications not only disrupted and delayed his much-needed treatment, but also placed him at risk of withdrawals or overdoses.

### D. DHS ENGAGED IN HARMFUL PERMANENCY PLANNING FOR JAMISON

DHS continued to pursue the goal of reunification for Jamison and his mother years after it proved harmful to him. Once reunification failed, DHS developed no other viable permanency plan.

1. DHS Relentlessly Pursued a Plan of Reunification for Years, even after it Documented the Psychological Harm that Plan was Causing Jamison

DHS pursued a plan of reunification with Jamison's mother from the time he was removed from her home in 1991 until late 1998. It was not until a small child was murdered in her home that DHS determined that reunification was no longer an appropriate plan. Remarkably, Jamison's seven-year reunification odyssey was not the result of mere inattention on the part of DHS. DHS actively took steps to protect the mother's parental rights even when it was clear that she could not safely parent Jamison, and even though DHS knew the plan was causing psychological harm to Jamison.

119

Dr. Marva Lewis

**a. DHS failed to engage in a proper and reasonable reunification plan by not changing the goal once it was clear Jamison's mother was not rehabilitating**

In the first four years that Jamison was in DHS care, Ms. M entirely failed to comply with her service agreement. Although under a continuing obligation to assess the viability of Jamison's permanency goal, DHS never once reevaluated that goal during this period. Instead, contrary to both policy and proper case practice, DHS permitted her to sign virtually identical service agreements year after year without any documentation of "extraordinary and compelling reasons" for extending the time period for compliance and in the absence of any sustained progress.

Although Ms. M attempted rehabilitation in 1995, by the summer of 1996, she had stopped complying with her service agreement by failing to contact Jamison and by admitting to a DHS worker that she had started drinking again. DHS still entered into another service agreement with Ms. M and maintained Jamison's goal of reunification for an additional two years, until a young child living in Ms. M's home was murdered.

DHS tenaciously maintained Jamison's goal of reunification in defiance of repeated recommendations by the agency charged with overseeing DHS case practice and the one charged with direct supervision of Jamison. In June 1997, the Foster Care Review Board cited the minimal progress made by Ms. M and stated that "no child should have to endure 5.3 years of foster care." In November 1997, it declared 5.8 years in care "appears to be more than sufficient time for Mother to conclude reunification efforts, and too much time for [Jamison] . . . to spend in foster care." Catholic Charities, the private agency with which DHS contracted to oversee Jamison's therapeutic foster home placement from 1994 to 1999, repeatedly echoed the Board's concerns. Because Catholic Charities had worked closely with Jamison for such a long period of time, it also

120