> **Recommendations:**
>
> 48. DFCS, at the state and regional or county levels, should explore means of increasing funding to meet the immediate concrete needs of clients and establish guidelines that provide for their prompt use and accessibility.

### 5. Practice Issues

*Family Centered Practice and Team Decision Making*

DFCS is making efforts to move from a more traditional child centered practice approach to one that is family centered. This is a framework based on the belief that the best way to protect children in the long run is to strengthen and support their families, whether nuclear, extended, foster, or adoptive. As part of this shift, the agency is also supporting more consistent use of team decision making including family team meetings for initial service planning and as part of ongoing periodic case review. Training in family centered practice is currently underway around the state.

A move to family centered practice is supported by both research and prevailing thought among child welfare professionals (NCWRCFCP, 2000). It is viewed as a positive and staff in focus groups were enthusiastic about this shift. The agency's ability to successfully accommodate this practice shift will be reliant on the assurance of administrative support and adequate staffing as noted above. It is also important that the training, policy, and supervision that support family centered practice involves careful individualized assessment and should not mean that children are exposed to greater risk of harm.

### Concurrent Planning

Concurrent planning refers to the practice of working on an alternative permanent plan for a child at the same time that efforts are made to reunite the family. It is widely considered effective in moving children more quickly to permanency and is encouraged in DFCS policy. Caseworkers are, in fact, required to list an alternative permanent plan on case plans and the new practice guides for family team meetings that the agency has issued address fundamental principles of concurrent planning, such as being open and honest with families about all possible outcomes of the agency's intervention. In spite of this, however, both managers and caseworkers interviewed indicated that planning for permanency is most often sequential, with no real work done to effect an alternative plan until it is determined that a child cannot be returned to his or her family of origin. Managers felt that many staff do not really understand concurrent planning and are still focusing on reunification alone until it becomes clear that it will not occur. This was confirmed in focus groups with caseworkers.



EXHIBIT
8a

PENGAD-Bayonne,N.J.

**Recommendations:**

49. Training of both new and existing staff should include the basic principles of concurrent planning.

50. DFCS should use data on length of stay and permanency outcomes for children in custody to consider whether concurrent planning, including foster/adoptive placement should focus on a particular group of children.

*Placement Resources*

Staff at all levels indicated that the lack of a sufficient array and distribution of family placement resources results in the need to separate siblings and to place children farther from their families and communities than is desirable. The lack of respite services and child care were identified as the most serious impediments to recruiting and retaining qualified foster parents. Some caseworkers also expressed concern about the quality of foster parents who are approved and their willingness or capacity to care for the largely special needs population of children in out of home care. Finally, the current practice of covering the states licensing needs with staff assigned through only three regions was seen as problematic with regard to the amount of time consumed by travel and the fact that licensing personnel are not sufficiently connected to the other regions they serve to understand their needs and provide support to resource families.

In an attempt to address the need for a greater array of family placement resources, the agency in 2005 engaged technical assistance through *Adopt U.S. Kids* and conducted a statewide assessment of the agency's recruitment, response, and retention of resource families. A total of 352 stakeholders, staff, private providers, and resource families took part in the assessment in order to make recommendations to the state planning committee formed to address resource family recruitment and retention. This group developed a series of nine strategies, all of which have the potential of improving recruitment and retention of foster and adoptive families. Needs and strategies developed from this process include:

- Begin dual licensure so that applicants gain approval at the outset for both foster and adoptive parenting rather than having to undergo an additional process should they wish to adopt a child in their home or, in the case of adoptive parents, to accept a child in temporary care.

- Develop policy and practice guidelines to prevent the use of resources for the licensure of families not interested in accepting children with special needs. Currently, Mississippi has a large number of unused resource families, apparently because it is believed that any applicant who complies with regulations has a right to be licensed.

- Provide resources and authority for regions to contract with private agencies for recruitment and licensing of resource families.
- Develop regional recruitment and retention plans.
- Develop and implement additional supports for resource families.

Although the recruitment and retention plan has not been fully implemented, some of the above recommendations are already being addressed. For example, DFCS has undertaken a review of its current board payments in relation to the cost of caring for a child in the urban South as established by the United States Department of Agriculture. Plans are being made to assign licensing personnel to each region and the administration is seeking allocation of funds to provide payment for respite care for children in order to offer periodic relief to foster parents. However, there remains a need to more consistently provide child care to enable children to be placed in families where parents are employed. Currently, child care for foster families is only available under the state's federally funded child care program and foster families do not receive any priority consideration in their application for this service.

The number of licensed foster homes available for children placed by DFCS increased by 53 over the past year. It is unclear, however, the extent to which this actually represents usable additional resources as the agency reportedly continues to license families who are not interested in most of the children for whom placements are needed..

*Kinship Placements*

Caseworkers and supervisors alike expressed concern regarding the agency's inability to provide greater financial support to relatives who are caring for children in agency custody. Some indicated that more children could be placed with extended family if funds were available to pay for child care and to cover additional expenses such as clothing. Currently, policy provides that relatives may be licensed and thus receive a foster care board rate for children placed with them if they meet the same standards as an unrelated foster family. In practice, however, agency staff indicated that this is not encouraged due to concerns that dependence on the board payment will discourage relatives from accepting custody of children if they cannot return home. This concern is recognized in DFCS and funding is being sought to provide additional financial assistance to kinship placements.

> **Recommendations:**
>
> 51. Complete implementation of the recommendations of the draft recruitment and retention plan developed in June 2005.
>
> 52. Consider the use of private providers to augment agency capacity in recruitment and preparation of family resources. Private providers often are able to promote fostering and adoption among constituency unavailable to the public sector
>
> 53. Address the assessing and licensing of families who are not interested in the children for whom homes are needed. This may be a legal issue since Mississippi 43-15-5 (2) provides that if a person meets licensing requirements to operate a "child residential home" as defined in Section 43-16-3, he or she shall be granted a license. The definition in the referenced section appears to pertain to foster and adoptive families.

*Expediting Permanency*

Examination of work processes revealed several areas which appear to be especially prone to delays that slow the attainment of permanency for children. A particular area of concern is the termination of parental rights process. Although voluntary relinquishments are frequently obtained in those instances in which children cannot be returned to their families, caseworkers indicated that this usually does not occur until after a petition to terminate parental rights have already been filed.

Particular points in which delays were identified in the termination process include (1) the completion of the required information packet by caseworkers; (2) state level review; and (3) preparation of the petition by staff attorneys in the Office of the Attorney General.

> **Recommendations**
> *Delays in the termination process may be mitigated by the above recommendations regarding agency legal representation, as well as by more consistent implementation of concurrent planning and family-centered practice which might be expected to support earlier alternative planning for permanency and eliminate the need for involuntary terminations in some instances. The following additional steps are suggested:*
>
> 54. Review the information packet currently required to determine whether it can be streamlined, particularly when a termination is requested on a sibling group.
>
> 55. Consider whether the review and approval process that is now conducted at the state level can be expedited or moved to the regional level.

## V. Conclusions

Every effort has been made in this systems review to evaluate objectively the current MDHS/DFCS system and to communicate the concerns that were raised to the Director of DFCS. Although many, if not most, of the needs identified in this review might be found at some level in any child welfare system in the United States, the Mississippi system does present a picture of having been chronically under-resourced, seriously so in several areas.

This document lists 55 recommendations for systems improvement. While all are considered important, some are viewed as foundational in a comprehensive effort to create a child welfare system that is fully responsive to the needs of children and families in Mississippi. The most pressing needs in DFCS are in the following areas:

1. Increased numbers of skilled professional staffing at all levels, but particularly in the area of direct service delivery;
2. Training and ongoing professional development for service delivery staff; and
3. Additional family placement resources for children in the agency's custody.

Staffing is critical at all levels, particularly in service delivery and in the training and organizational support of direct service personnel. A recommendation for an exact number of additional staff is reliant upon factors which exceed the scope of this review, such as the existence of backlogged or inactive cases. However, the workload analysis conducted with the assistance of DFCS personnel suggests that most caseloads should be less than half of the standard of 40 primary clients currently set by the agency. Staffing of the agency at an acceptable level will require a multi-faceted initiative that includes attention to equitable compensation and opportunities for advancement, a system for ongoing review of workload, training and staff development, skilled and supportive supervisors, and outreach to schools of social work and social work organizations in the state to inform them of the changes being made in the agency and enlist their help in the recruitment of new applicants.

The ability of DFCS to effectively address needs related to training and placement resources is also dependent upon staffing. In these areas as in service delivery, it is critical that the focus be not just on numbers of personnel, but on their quality and the way in which they are supported by the organization. Adding positions will be of little benefit to needy children and families in Mississippi if staff lack the skills and supports they need to work effectively and if turnover remains high. This document outlines recommendations for working with universities and professional organizations to enlist their support and help in attracting and preparing personnel who have the requisite knowledge and skills for this very important work.

It is important to acknowledge that many of the needs identified in this review have been recognized by the current administration and that plans to address them were either underway at the time this study was initiated or have since been implemented.   Further, DFCS staff at all levels have demonstrated an eagerness to provide the information which contributed to this evaluation.   The cooperation and commitment of agency personnel is important, but it will be futile if the economic supports and needed cooperation in other areas of state government are not forthcoming.

## References

Albers, E., Reilly, T., & Rittner, B. (1993).  Children in foster care: Possible factors affecting permanency planning.  *Child and Adolescent Social Work Journal, 10*(4), 329-341.

Arkansas Department of Human Services, Division of Children and Family Services (2002).  *Training and Retention of Family Service Workers.*  Little Rock, Arkansas: Author.

Bernatovicz,  F. (1997).  *Retention of child welfare caseworkers: A report.*  Portland, ME: National Center for Organizational Improvement.  Available at: www.muskie.usm.edu/hellpkids/pubstext/retention.html.

Booz-Allen & Hamilton, Inc. (1987).  *The Maryland social work services job analysis and personnel qualifications study.*  MD:Author.

Brank, E.M., Williams, A.L., Weisz, V. & Ray, R.E. (2001).  Parental compliance: Role in termination of parental rights cases.  *Nebraska Law Review, 80,* 335-353.

Chambless, D.L., Ollendick, T.H. (2001). Empirically supported psychological interventions: controversies and evidence. *Annual Review of Psychology.* Vol. 52, Issue 1, 685-716.

Child Welfare League of America (2001).  *The child welfare workforce challenge: Results from a preliminary study.*  In conjunction with Alliance for Children and Families and American Public Human Services Association.  Washington, DC: Author.

Cicero-Reese, & Black (1998).  Research findings suggest why child welfare workers stay on job. *Partnerships for Child Welfare, 5*(5).

Corcoran, J. (2000).  Family interventions with child physical abuse and neglect: A critical review. *Children and Youth Services Review, 22*(7), 563-591.

Dawson, K. & Berry, M. (2002).  Engaging families in child welfare services: An evidence-based approach to practice.  *Child Welfare, 81*(2), 293-317.

Dhooper, S., Royse, D., & Wolfe, L. (1990).  Does social work education make a difference? *Social Work, 35*(1): 57-61.

Dickinson, N.S. & Perry, R.E. (2003).  Factors influencing retention of specially educated public child welfare workers.  *Journal of Health & Social Policy 15(3/4)*, 89-103.

Ellett, A. J. (2000).  *Human caring, self-efficacy beliefs, and professional, organizational culture correlates of employee retention in child welfare.*  Unpublished doctoral dissertation, Louisiana State University, Baton Rouge, LA.

Ellett, A.J., Ellett, C.D.& Rugutt, J.K. (2003). *A study of personal and organizational factors contributing to employee retention and turnover in child welfare in Georgia.* Athens, GA: University of Georgia School of Social Work.

Fox, S.R., Burnham, D., Barnee, A.P., & Yankeelov, P.A. (2000). School to Work---social work that is: Maximizing agency/university partnerships inpreparing publicchild welfare workers. *The Journal of the National Staff Development and Training Association, 1*(1): 13-20.

Graef, M. & Hill, E.L. (2000). Costing child protective services turnover. *Child Welfare, 79*(5), 517-533.

Hopkins, K.M., Mudrick, N.R., & Rudolph, C.S. (1999). Impact of university/agency partnerships in child welfare on organizations, workers, and work activities. *Child Welfare, 78*(6): 749-773.

Huebner, R. (2003). *Public Child Welfare Certification Program outcomes evaluation.* Kentucky Cabinet for Families and Children, Frankfort, KY-20.

Jones, L. (2002). A follow-up of a Title IV-E program's graduates' retention rates in a public child welfare agency. *Journal of Health & Social Policy 15(3/4)*, 39-52..

Leighninger, L. & Eellett, A. (1998). *Deprofessionalization in child welfare: Historical analysis and implications for social work education.* Paper presented at the Annual Program Meeting of the Council on Social Work Educatio, Orlando, FL.

Lieberman, A., Hornby, H., & Russell, M. (1988). Analyzing the educational backgrounds and work experiences of child welfare personnel: a national study. *Social Work, 33*(6), 485-489.

Lipsey, M.W. (1992). The effect of treatment on juvenile delinquents: results from meta-analysis. In F. Losel, D. Bender & T. Bliesener (Eds.) *Psychology and Law*, New York: NY.

National Child Welfare Resource Center on Family Centered Practice (2000). A new era of family centered practice. *Next Practice/Best Practice, 1*(1), 1-18.

Okamura, A., & Jones, L. (1998). Re-professionalizing child welfare services: An evaluation of a IV-E training program. *Research in Social Work Practice, 10*(5): 607-621.

Potter, C.C.& Klein-Rothchild, S. (2002). Getting home on time: Predicting timely permanence for young children. *Child Welfare, 81*(2), 123-150.

Malm, K., Bess, R., Leos-Urbel, J., Geen, R., & Markowitz, T. (2001). Running to keep in place: The continuing evolution of our nation's child welfare system. *Assessing the New Federalism, Occasional Paper #54.* Washington, DC: The Urban Institute.

42

Mississippi Personnel Board (2002).  Class Specification, DHS-Social Worker, Occupational Code: 4227.  Jackson, MS.

Mississippi Personnel Board (2003).  Class Specification, DHS – Child Protection Specialist, Occupational code:  3045.  Jackson, MS.

Robin, S. & Hollister, C. (2002)..Career paths and contributions of four cohorts af IV-E funded MSW child welfare graduates. *Journal of Health & Social Policm 15(3/4), 53-67.*

Rooney, R.H. (1992). *Strategies for working with involuntary clients.* New York: Columbia University Press.

Rycraft, J. (1994).  The party isn't over: The agency role in the retention of public child welfare caseworkers. *Social Work, 39*(1): 75-80.

Samantrai, K.  (1992).  Factors in the decision to leave: Retaining social workers with MSWs in public child welfare. *Social Work, 37*(5), 454-458.

Scannapieco, M. & Connell-Corrick, K. (2003).  Do collaborations with schools of social work make a difference for the field of child welfare?  Practice, retention, and curriculum. *Journal of Human Behavior in the Social Environment, 7*(1/2), 35-51.

Shireman, J., Yatchmenoff, D., Wilson, B., Sussex, B., Gordon, L. Poirier, C., et al. (1998).  *Strengths/Needs Based Services evaluation.*  Portland, OR:  Portland State University, Graduate School of Social Work.

Steib, S. & Blome, W.W. (2004).  Fatal error: The missing ingredient in child welfare reform, part II.  *Child Welfare, 83*(1).

Steib, S. & Blome, W.W. (2003).  Fatal error: The missing ingredient in child welfare reform, part I.  *Child Welfare, 82*(6) , 747-750.

Texas Department of Protective and Regulatory Services. (2001).  *DASH: Delivering accountable services from home: Region 6 teleworking pilot final Evaluation.*  Austin, TX: Author.

Tooman G. & Fluke J. (2002).  Beyond caseload: What workforce studies can tell us about enduring issues in the workplace. *Protecting Children, 17*(3), 1-8.

United States General Accounting Office (2003).  *HHS could play a greater role in helping child welfare agencies recruit and retain staff.*  Washington, DC: Author.

Washington State Department of Social and Health Services (1997).  *Social worker workload study.*  Unpublished departmental report. Seattle, WA: Author.

Appendix A

WORKLOAD STUDY DESCRIPTION, ANALYSIS, AND FINDINGS

Appendix A

The following is a more detailed description of the workload study referenced in Sections III.B.2. and IV.B.2. of this document.

## A. Report of the Study

A.1.Methodology

Three DFCS Regional Directors were designated by the Division Director to work with CWLA consultants to define a process for the workload analysis and establish criteria for composition of a representative group to work with the consultants to undertake the workload analysis process which consisted of three main steps:

- ➢ Define core work functions;
- ➢ Define activities and sub-activities associated with each work function; and
- ➢ Estimate the average amount of time required for each activity and sub-activity for a single case.

It was determined that they study would be conducted using a group composed of a representative from each of the nine organizational regions then existing in DFCS, and that it would include three caseworkers, three supervisors, and the three Regional Directors who took part in the initial meeting. The caseworker and supervisor representatives were designated by their respective Regional Directors who were contacted by the CWLA project leader and asked to select a representative with a breadth and depth of knowledge across service areas.

The initial meeting was held at the MDHS state office building in Jackson on October 20, 2005 with all nine committee members in attendance. CWLA consultants Sue Steib and Diana English facilitated the meeting. Subsequent meetings were held by conference call on November 2, 3, 10, 21, and December 20.

Guided by the review of agency documents as well as reports of workload studies conducted in other jurisdictions, CWLA consultants prepared a provisional listing of job functions with activities and sub-activities. The work group then reviewed this list, added some job functions, and made revisions to activities and sub-activities as necessary to accurately reflect the duties associated with each job function in DFCS. The following functions were identified:

Major County Functions
- ➢ General Intake
- ➢ Child Protection Investigation
- ➢ Adult Protective Services
- ➢ In-Home Dependency
- ➢ Out-of-Home Dependency (Foster Care)

45

Appendix A

Associated Functions

➢ Interstate Compact for the Placement of Children

➢ Intra-state home studies

➢ Courtesy Interviews (for other counties)

Regional Functions

➢ Adoption

➢ Licensing

An important point to note is that this workload analysis focuses on the activities necessary to comply with current MDHS/DFCS policy, typically referred to as a "standard one" analysis. It does not necessarily reflect the activities or time necessary to support performance at a level consistent with standards of best practice. For example, time estimates recorded for placement of children in out of home care do not include consistent use of pre-placement visits, although this is generally accepted as preferred practice. Representatives were asked to estimate the amount of time required to fully complete an activity as required by policy. Thus these average time estimations should not reflect activities that are eliminated or abbreviated due to workload demands or for other reasons.

*Structured Estimation Process*

The designation of job function activities and sub-activities and the estimation of times required for each were derived from a process in which information provided by each group member was recorded by the CWLA group leader and sent out to members in detailed notes following the meeting. Members were instructed to use these notes to share the process with their colleagues and solicit their input. This input was then reviewed and considered at the following meeting. Formal minutes were provided and were sent group members as well as to all Regional Directors and the Division Director to keep them apprised of the process.

Because of differences in their positions as well as other individual and regional differences, group members used various means of seeking participation from other staff. Some used regularly occurring meetings of staff and/or supervisors; others approached individual caseworkers and supervisors based on their experience with a given job function. In a few instances, the time required for a particular function or activity was actually measured. For example, one county representative had the intake worker in her office record the time required for job activities over one week. Another workgroup representative had staff in her region record travel time for the same period.

Times shown in the final report typically reflect mid-ranges or averages derived from the estimation process. In the great majority of cases, participants' estimates of the time required to complete activities were remarkably similar, particularly with regard to the major and associated functions performed at the

46

Appendix A

county level. However, when there was wider divergence, the mid-range was derived from the weight of responses, with outliers excluded. In some instances outliers were linked to unique circumstances, most often court practices, in a county or region.

*Time Available*

Any determination of reasonable workload must consider the time actually available for an individual caseworker to perform case-related activities. This means that time allotted for administrative activities (training, general staff meetings, leave, breaks, holidays, and any other activities not case related) must be excluded to derive the base amount of time available for casework.

The general "one third rule" (Tooman & Fluke, 2002) derived from numerous workload studies in child welfare and related human services, was applied to represent administrative time and to obtain the figure of 116 hours for the time available for an individual caseworker to complete case-related activities. The random moment sampling methodology used by Mississippi for cost allocation was reviewed to determine whether it would provide more accurate state-specific data, but such was not the case as individual coding definitions did not clearly divide case related from non-case related activities. Thus the one third rule was applied as shown in Table 1 below.

**Table 1: Time Available for Case-Related Work**

| | |
|---|---|
| Total work time per month (8 hours per day x 5 days per week x 4.33 weeks per month) | 173.2 hours |
| Less Administrative Hours (173.2 x .33) | 57.2 hours |
| Number of hours per month available for casework activity | 116.0 hours |

A.2. Time Estimations by Work Function

Not all activities apply to every cases and some activities are done only at larger time intervals than once per month. Where that was true, an attempt was made to average the time required across cases and months. Court hearings, for example, are held on all foster care cases, but do not occur each month. Thus, the monthly time for court attendance reflects the monthly pro-rated time for attending hearings initially and approximately every six months.

Estimations in the adoption and licensing job functions were most problematic. In adoptions, some activities are conducted only for foster parent or non-foster parent adoptions, others tend to apply to all children involved in the adoption rather than to individual children, and some activities are performed only once in the life of the case. The following data, obtained from the DFCS Placement Section was applied as appropriate to arrive at the most accurate average time estimates:

Appendix A

- 74% of all adoptions are by foster parents.
- The average number of children in an adoption is 2.5.
- Cases are open in adoption (from termination of parental right to case closure) an average of 34 months.

In the case of licensing, some activities, such as those associated with preparing for and delivering training and orientation, apply to groups of families. In these instances, an attempt was made to spread the time required for an activity across all of those cases to which it applies. For example, study group members estimated that, on average, 15 families are enrolled in each pre-service training. Thus, the total estimated time required for training preparation, delivery, and related activities was divided by 15 to arrive at the average time per case for this activity.

A.3.Findings

The final total time estimations for each job function are depicted in Table 2 below. Estimations for the major county and associated job functions are straightforward and, in most instances, the product of either concurrence or reasonably close estimations submitted by group members.

**Table 2: Time Estimates by Job Function**

| Major County Job Functions | Estimated Time Per Month Per Case |
|---|---|
| General Intake | 59 minutes |
| Child Protection Investigation (CPI) | 484 minutes; 8 hours, 4 minutes |
| Adult Protective Services (APS) | 254 minutes; 4 hours, 14 minutes |
| In-Home Dependency, Prevention | 260 minutes; 4 hours, 20 minutes |
| In-Home Dependency, Protection | 410 minutes; 6 hours, 50 minutes |
| Foster Care | 507 minutes; 6 hours, 50 minutes |
| Associated County Job Functions | Estimated Time Per Month Per Case |
| Interstate Compact for the Placement of Children (ICPC) | 106 minutes; 1 hour, 46 minutes |
| Intra-State Home Studies | 288 minutes; 4 hours, 48 minutes |
| Courtesy Interviews | 65 minutes; 1 hour, 5 minutes |
| Regional Job Functions | Estimated Time Per Month Per Case |
| Adoption* | 807; 13 hours, 27 minutes |
| Licensing, New Application | 470; 7 hours, 50 minutes |
| Licensing, Renewal ** | 191; 3 hours, 11 minutes |

\* Does not include ICPC
\*\* Training not included

Estimations in regional job functions may require more individualized interpretation depending upon exact duties. In Licensing, for example, training activities are included only for new applications because it was reported that ongoing training was not generally being done by Licensing staff at this time. Likewise, recruitment is not included as it was not possible to obtain reliable data about just what activities this includes or the extent to which either Adoption or

48

Appendix A

Licensing staff are currently involved in recruitment. Thus, once these activities are defined and assigned, the time required should be measured and workload adjusted accordingly.

## B. Comparisons with Actual Time Studies

To provide further support to the estimation process, estimated times for core functions were compared with data from actual time studies conducted in other jurisdictions where such data were available and where it could be discerned that the activities in measured job functions approximately corresponded with those in Mississippi. It should be noted, however, that these data are used for general comparisons only; policy and procedural variations from one jurisdiction to another often result in significant disparity in job activities and the time required to perform them. Comparisons are depicted in the table below.

**Table 3**

| Job Function | MS Est. Time (in minutes) | WA Time Study | Erie County, PA | VT Intake Time Study |
|---|---|---|---|---|
| General Intake | 59 | 43 | | 69 |
| CPI | 484 | Actual 335; Recommended 443 | Actual 456; Good practice 580 | N/A |
| In-Home Dependency* | 260 Prevention; 410 Protection | Actual 214; Recommended 240 | N/A | N/A |
| Foster Care | 507 | Actual 368; Recommended 441.5 | N/A | N/A |

*Other workload studies examined did not distinguish between prevention and protection in-home dependency cases as is done in Mississippi.*

The Washington State study yielded an actual time of 335.03 minutes per investigation across 543 cases, but recommended that investigations should take 443.18 minutes in order to fully comply with policy standards. A recent study in Erie County, PA found that workers required 7 hours and 36 minutes to complete an investigation in compliance with law and policy but that 9 hours and 40 minutes would be required to conform to good practice standards.

In Washington, services as delivered to Foster Care cases at the time of the workload study required 368.39 per month. However, it was recommended that 441.50 be allocated for "standard one" or full policy compliance.

A 2002 study conducted in Allegheny County, PA (Pittsburgh) is not used for comparison purposes in the above table as the time estimates do not correspond directly to the listed job functions. That study examined cases based on the categories of *Intake* which roughly corresponds to child protection investigation,

49

Appendix A

and *Family Services*, which includes the duties associated with In-Home Dependency and Foster Care in MS. It was determined that the average time needed to complete all home visits and case related tasks for Intake cases was 7.2 hours and 6.8 hours for Family Services. This resulted in an estimated maximum caseload of 16 Intake and 17 Family Services cases (Yamatani & Engel, 2002).

Although imprecise, the above comparisons show that time estimations derived from this workload study are in most at least somewhat comparable to those established through time studies in other states. The greatest divergence was in foster care, in which the final estimate for time required each month exceeded that in the Washington study by 65.5 minutes and the Allegheny County study by 99 minutes.

## C. Analysis

The information gained in this study provides a basis for case assignment in Mississippi's child welfare agency. In terms of job functions, it means that a single caseworker can handle approximately the following numbers of cases per month:

   118 Intakes

   14 Child Protection Investigations

   14 Foster Care

   27 In-home Dependency, Prevention

   17 In-home Dependency, Protection

   9 Adoption

   15 Licensing Applications

   36 Licensing Renewals

**References**

Yamatani, H. & Engel, R. (2002). Workload assessment study, Allegheny County Office of Children, Youth and Families. Pittsburgh, PA: University of Pittsburgh School of Social Work.

Washington State Department of Social and Health Services (1997). *Social worker workload study*. Unpublished departmental report. Seattle, WA: Author.

Appendix B

GUIDES FOR INTERVIEWS WITH REGIONAL DIRECTORS

Appendix B

**Mississippi Department of Human Services
Division of Family and Children Services**

**Regional Director Group Interview Questions**

**Instructions:**
Regional Director responses to the interview questions should be recorded as presented in their own words. Questions are grouped into three areas: (1) workforce issues, (2) resource issues, and (3) administrative support issues.

Interviewer            _____

Date of interview      _____
       m/d/y

**1.0    Workforce Issues**

1.1 What are the barriers to obtaining adequate numbers of eligible staff?

1.2    From your perspective, what are the top three factors that influence agency capacity to maintain staff stability (retention of staff)?

1.3    What is your overall assessment of supervisors' level of skill in the area of:
    1.3 a.    oversight of caseworkers' case-related activities?[*]

    1.3 b. providing guidance related to the implementation and interpretation of policy?

---

[*] Oversight of case activities includes planning services, monitoring services, tracking contacts, developing plans, case reviews, and preparation of court documents and appearances.

52

Appendix B

1.3 c setting unit priorities

1.3 d providing support to caseworkers

1.4    How would you describe the strengths of the supervisors as a group?

1.5    What are three areas of need that would enhance supervisory skill?

1.6    What is your overall assessment of caseworkers' level of skill in:
       1.6 a conducting family and child assessments?

       1.6 b service planning and delivery?

       1.6 c developing permanency plans?

       1.6 d tracking and monitoring service utilization?

1.7    How would you describe the strengths of caseworkers as a group?

1.8    What are three areas of need that will enhance the skill of caseworkers?

1.9    From your perspective, what are the top three factors that influence high caseloads?

Appendix B

**2.0    Resources**

2.1    Based on your experience, what are the three most frequently needed placement resources?

2.2    What barriers exist that prevent or delay the provision of identified services for children?

2.3    What barriers exist that prevent or delay the provision of identified services for parents?

2.4    What barriers exist in recruiting foster families?

2.5    Is the agency prepared to respond promptly and appropriately when families express interest in fostering or adopting?  If not, why not?

2.6. What barriers exist in retaining foster families?

2.7 What barriers exist in approving/licensing kinship family homes?

2.8 Are all resource family applicants being offered the opportunity for dual licensure?   Has pre-service training been changed to incorporate the content needed for dual licensure?

2.9 Are children placed in unlicensed facilities? If so, why and under what circumstances does this occur?

54

Appendix B

2.10    To what extent is respite care provided?

2.11    To what extent is day care provided?

Appendix C

CASEWORKER SERVICE NEED AND AVAILABILITY SURVEY

Appendix C

**Mississippi Department of Human Services**
**Division of Family and Children Services**
**Data Collection Work Groups**

**Procedure Guide**

# I.  Introduction

The Mississippi Department of Human Services (MDHS) requested the assistance of the Child Welfare League of America (CWLA) in assessing policies, procedures, organizational structure, caseload, workflow, and case management issues with a view toward enhanced capacity to serve children and families. During the past several months CWLA has reviewed policy documents and conducted a workload analysis.  In order to establish more detailed knowledge of the MDHS child welfare system, specifically the Division of Family and Children Services (DFCS), it is essential to gather information from staff that has direct influence on service delivery to children and families. Several methods have been identified to gather information relevant to this goal.  Focus groups with caseworkers and supervisors will be conducted, as well as group interviews with Regional Directors.  The other method of information gathering is through DFCS work groups.  This document provides a description of DFCS work groups, their role and responsibility, and procedures for gathering information

## *DFCS Work Group Structure*
Regional Directors have lead responsibility for collecting information from staff in their districts.  The Regional Director's role is that of coordinator of information gathering activities.  Area Social Work Supervisors, using tools developed by CWLA, will be asked to work directly with staff that has access to case records and other related documents.

### *Area of Focus: Service Delivery*
The assessment of service needs, identification of relevant services, monitoring of service utilization, and the creation of a pool of services are critical to the achievement of desired child and family outcomes.  The information that the work groups will gather will focus on service selection, availability, and accessibility.  Area Social Work Supervisors will coordinate the gathering of information from their randomly selected sample of foster care staff.

The following topic areas will be explored:

- Placement,
- Mental health,
- Substance abuse,
- Parenting/family skills building, and
- Support services

CWLA consultants will conduct analysis of collected data.

Appendix C

### *Area of Focus: Case Planning*

Case plans serve as blueprints for service delivery. Ideally, they are based on a comprehensive family and child assessment. Additionally case plans should be developed with the participation of the family, age-appropriate children, relevant family members and other professionals, as appropriate. The case plan identifies goals and objectives for services and expected outcomes, including the permanency goal. Regional Directors and Area Social Work Supervisors are asked to randomly select a 10 percent sample of foster care cases in their respective regions. The issues to be explored include:

> Child and family assessments
> Initial placement decisions
> Case plan development
> Permanency plan identification
> Subsequent placement decisions
> Re-evaluation of permanency plans

The most recent case plan from each of the cases in the 10 percent sample will be forwarded to the CWLA consultants for review and analysis.

### *Use of Collected Data and Information*

Information and data gathered through the processes of staff case surveys and case plan review will be included in a larger report providing a general overview and assessment of the DFCS child welfare system. The information that specific individuals provide will be used in a final report to DFCS. However, individual responses will not be noted specifically, but will become part of a larger pool of data.

58

Appendix C

**Mississippi Department of Human Services**
**Division of Family and Children Services**

**Staff Foster Care Case Survey Instrument**

**Instructions:**
The Area Social Work Supervisor in collaboration with selected caseworkers should use this document to gather information. Responses should be recorded on the instrument using the prompts for each question. One copy of this instrument should be maintained with the District Director and the original forwarded to CWLA. Responses to the questions should be based on the caseworker's knowledge of the families and children in their caseload.

**Section 1.0 Demographic Information**

1.1  County: _____

1.2  District _____

1.3  Supervisor  _____

1.4  Caseworker  _____

1.5  Number of assigned foster care cases  _____

1.6  Survey Date _____
          m/d/y

**Section 2.0 Placement Resources**

In what type of placements are children in your caseload? ***Check all that apply and indicate the number of children beside each type of placement.***
    ❑  Family foster home (long-term)  _____
    ❑  Emergency family foster home  _____
    ❑  Group home  _____
    ❑  Residential treatment  _____
    ❑  Independent living  _____
    ❑  Kinship care home/relative placement_____
    ❑  Hospital  _____
    ❑  Shelter  _____
    ❑  Other (Please specify)  _____

What are the top three factors that influence the selection of a placement resource?
    ❑  Documented assessment of the child's needs

59

Appendix C

- ❑ Documented family assessment
- ❑ Location of resource
- ❑ Resource availability
- ❑ Court order for specific placements
- ❑ External reports of documented need
- ❑ Other (Please specify) _____

How do you determine the level of service?  Please explain.

_____
_____
_____
_____
_____
_____

When children have required a change in placement, what have been the primary reasons?  *Check no more than two options.*
- ❑ Move to a less restrictive setting (e.g. residential treatment to foster home setting)
- ❑ Placement with a relative
- ❑ Custody to a relative
- ❑ Placement in a juvenile justice setting
- ❑ Runaway behavior
- ❑ Behavioral management issues
- ❑ Caregiver or placement facility request
- ❑ Child's request
- ❑ Move to independent living
- ❑ Other (please specify) _____

From your experience, check three of the most frequently needed placement resources. *Check no more than three.*
- ❑ Family foster homes (long-term)
- ❑ Emergency family foster homes
- ❑ Adoptive family homes
- ❑ Group homes
- ❑ Residential treatment
- ❑ Independent living
- ❑ Other (Please specify) _____

How frequently do you have to choose an alternative placement because the optimal choice for a child is not available? *Select one option.*
Never
Sometimes, but not frequently
Frequently (50% or more of the time)
Cannot estimate/no answer

How often do you have to place a child farther from his family and community than you would like because a closer placement is not available?

60

Appendix C

*Check only one option*

Never
Some time, but not frequently
Frequently (50% or more of the time)
Cannot estimate/no answer
Other (Please specify) _____


## Section 3.0 Mental Health Services

What mental health service is most frequently requested? *Choose no more than three options.*

Psychological assessment or testing
Psychotherapy
Family therapy
Individual therapy
Group therapy
Psychiatric examination
Psychiatric hospitalization
Behavior modification
Counseling
Other (Please specify) _____

To what degree are the most frequently requested services available in the location of children or families? Available means that the service exists and can be secured within the time needed.

Readily available
Somewhat available
Not available
Other (Please explain) _____

If the most frequently requested services that you identified in 3.1 are available, are they accessible to children and families? Accessible means that the service can be easily reached.

Yes
No
Not sure
Other (Please explain)_____

What mental health services would you like to see more of for children and families? *Check no more than three options.*

Psychological assessment or testing
Psychotherapy
Family therapy
Individual therapy
Group therapy
Psychiatric examination
Psychiatric hospitalization

61

Appendix C

Behavior modification
Residential treatment
Counseling
Other (Please specify) _____

**Section 4.0 Substance Abuse**

4.1    What is the most frequently requested service related to substance abuse? **Choose no more than three options.**
Screening (child)
Screening (adult)
Assessment (child)
Assessment (adult)
Out-patient treatment (adult)
Out-patient treatment (child)
In-patient treatment (adult)
In-patient treatment (child)
Other (Please specify) _____

4.2    To what degree are the most frequently requested services available in the location of children or families? Available means that the service exists.
Readily available
Somewhat available
Not available
Other (Please explain) _____

4.3    If the most frequently requested services that you identified in 4.1 are available, are they accessible to children and families? Accessible means that the service can be easily reached.
Yes
No
Not sure
Other (Please explain)_____

4.4    What substance abuse services would you like to see more of for children and families? *Check no more than three options.*
Screening (child)
Screening (adult)
Assessment (child)
Assessment (adult)
Out-patient treatment (adult)
Out-patient treatment (child)
In-patient treatment (adult)
In-patient treatment (child)
Other (Please specify) _____

62

Appendix C

**5.0 Physical and Dental Health Services**

5.1    What barriers exist in obtaining medical examinations or assessments for children? *Check no more than three barriers*
       Availability of resources
       Accessibility of resources
       Delays due to waiting lists
       Financial or insurance availability
       Transportation
       No barriers exist
       Other (Please specify)    _____

5.2    What barriers exist in obtaining medical treatment for children when a condition has been diagnosed? *Check no more than three barriers.*
       Availability of resources
       Accessibility of resources
       Delays due to waiting lists
       Financial or insurance availability
       Transportation
       Parental consent
       Need for court order in absence of parental consent
       No barriers exist
       Other (Please specify)    _____

5.3    What barriers exist in obtaining dental assessments or examinations for children? *Check no more than three barriers.*
       Availability of resources
       Accessibility of resources
       Delays due to waiting lists
       Financial or insurance availability
       Transportation
       No barriers exist
       Other (Please specify)    _____

5.4    What barriers exist in obtaining dental treatment for children when a condition has been diagnosed? *Check no more than three barriers.*
       Availability of resources
       Accessibility of resources
       Delays due to waiting lists
       Financial or insurance availability
       Transportation
       Parental consent
       Court order in absence of parental consent
       No barriers exist
       Other (Please specify)    _____

Appendix C

**6.0 Parenting Skills**

6.1    Of the foster care cases, in how many of the families was parenting/family skill
       building identified as a need? *Check only one option.*
       (fill in the number) _____
       Unable to determine
       None
       Other (Please explain)  _____

6.2    What area of parenting skill building is most frequently identified as a need?
       *Check the top three.*
            Discipline
            Understanding age-appropriate behavior
            Setting limits
            Building child self esteem
            Understanding child development
            Advocacy
            Safety and nurturing of young children
            Creating child-friendly environments
            Not applicable, the need was not identified in any cases
            Other (Please specify)  _____

6.3    To what degree are programs available to address the most frequently identified
       area of need in the location of the parent?  Available means that the service or
       program exists.
       Readily available
       Somewhat available
       Not available
       Other (Please explain)  _____

6.4    If programs are available to address the areas of needs that you identified in 6.2,
       are they accessible to parents?  Accessible means that the program can be easily
       reached.
Yes
No
Not sure
Other (Please explain)_____

6.5    What areas of parenting skill building would you like to see more available for
       parents? *Check no more than three options.*
            Discipline
            Understanding age-appropriate behavior
            Setting limits
            Building child self esteem
            Understanding child development
            Advocacy
            Safety and nurturing of young children
            Creating child-friendly environments
            Not applicable, no opinion

64

Appendix C

Other (Please specify) _____

6.6    What factors do you consider in determining successful completion of a parenting program or service? **Check all that apply.**
      Attendance
      Level of participation
      Observed transfer of learning
      Parent feedback
      Progress reports from the program
      Other (Please specify) _____

6.7    Of the factors listed in 6.6 what do you consider the most important? ***Check no more than two.***
      Attendance
      Level of participation
      Observed transfer of learning
      Parent feedback
      Progress reports from the program
      Other (Please specify) _____


**7.0 Support Services**

7.1    Based on your experience with your current cases, what support services do families most frequently request?
      Transportation to services
      Transportation for family visits
      Homemaker
      Advocacy with other systems (e.g. health and education)
      Other (Please specify) _____

7.2    Which services are available to families? **Check all that apply.**
      Transportation to services
      Transportation for family visits
      Homemaker
      Advocacy with other systems (e.g. health and education)
      Other (Please specify) _____

7.3    Does your office have Social Work Aides?
      Yes
      No
      Do not know

7.4    How do you and Social Work Aides coordinate case information when you share the same case? ***Please describe.***

      _____
      _____
      _____

65

Appendix C

_____
_____
_____
_____

7.5    Is there anything else that you would like to share concerning placements and services?

_____
_____
_____
_____

Thank you for taking the time to participate in this survey and sharing your experience.

Appendix D

CASEWORKER AND SUPERVISOR FOCUS GROUP INTERVIEW GUIDES

Appendix D

**Mississippi Department of Human Services
Division of Family and Children Services**

**Focus Group Registration Form**

1.  **Name** _____ **(optional)**

2.  **Male** _____  **Female** _____

3.  **Job Title/Position**
    Caseworker                         ____
    Area Social Work Supervisor ____

4.  **Which of the following describes you?  Check all that apply.**
    I work directly with children and families              ____
    I recruit and train resource families                    ____
    I license resource family homes                          ____
    I supervise caseworkers who plan and deliver services ____
    Other (Write in)     _____

5.  **Years of education**
    BSW                          ___
    Other bachelor's degree ___
    MSW                          ___
    Other master's degree    ___
    Other (Please specify)   ___
    _____

6.  **Years with the agency**
    Less than one year       ____
    One year                     ____
    Two to five years           ____
    Six to ten years            ____
    More than ten years      ____

Appendix D

**Mississippi Department of Human Services
Division of Family and Children Services**

*Focus Group*

*Statement of Informed Consent*

I, _____, agree to participate in this focus group being conducted by _____ from the child Welfare League of America (CWLA). CWLA has been retained by the Department of Human Services to conduct this study.

The purpose of the study is to gain insight into factors that influence how children in out-of-home care and their families receive services through the Division of Family and Children Services.

I understand that:

        The focus group will last no more than two and one half hours.
        My participation is voluntary and that if I wish to leave I may do so at any time without giving a reason or explanation.
        My withdrawal from the group, if I choose to do so, will have no affect on my relationship with DFCS.
        The facilitators will take notes. These materials will be kept confidential.
        Names of individuals in the focus group will be kept confidential.
        A report summarizing the results of this and other focus groups will be presented to DFCS management. Participant names will not be used in the report.
        It is expected that I will not repeat anything heard during this group, outside the group.

The CWLA facilitators have offered to answer questions that I have about the focus group and what I am expected to do.

I have read and understand this information and I agree to take part in this focus group.


_____                    _____
Today's Date                              Your Signature


69

Appendix D

**Mississippi Department of Human Services**
**Division of Family and Children Services**

*Focus Group*

**Facilitator Agenda**

**Welcome and Introductions**
> Welcome group and thank them for their presence.
> Introduction of facilitator and recorder.
> Participant introductions

**Purpose and Topic Overview**
> Review purpose statement (gather information to increase understanding)
> Review general issues (resources, permanency, caseloads, supports)

**Provide Guidelines**
> Notes will be taken during the session.
> Anonymity is guaranteed in the recording, analysis, and reporting of the results.
> There are no wrong answers, just different points of view.
> Free to address remarks to each other, not just the facilitator.
> One person speaks at a time.
> Facilitator's role is to ask questions and listen.

**Questioning Period**
> List questions here
**Summary**
> Brief summary of main points
> Group comments, amendments, corrections

**Closure**
> Anything missed?
> Questions from the participants
> Information concerning feedback  (e.g. how results will be shared)
> Thank you to participants

Appendix D

## Mississippi Department of Human Services
## Division of Family and Children Services

*Focus Group*

## Participant Agenda

**Welcome and Introductions**

**Purpose and Topic Overview**

**Guidelines**

**Questioning Period**

**Summary Discussion**

**Wrap Up**

71

Appendix D

## Mississippi Department of Human Services
## Division of Family and Children Services

*Focus Group Questions and Reporting Form*
### Foster Care Social Workers

Focus Group Information

| Date of Focus Group | |
|---|---|
| Location of Focus Group | |
| Number and Description of Participants | |
| Facilitator | |
| Recorder | |

### Responses to Questions

### Q 1: What factors are considered in selecting shelter care as a placement option for a child.

| Summary/Key Points | Notable Quotes |
|---|---|
| | |

Comments/Observations

72

Appendix D

## Q2:  How are decisions made about the selection of other placements?

| Summary/Key Points | Notable Quotes |
|---|---|
|  |  |

Comments/Observations

|  |
|---|
|  |

Appendix D

**Q 3: How are the service needs of children and families determined?**

| Summary/Key Points | Notable Quotes |
|---|---|
|  |  |

Comments/Observations