# MISSISSIPPI **YOUTH JUSTICE** PROJECT

753 North Congress St.   P.O. Box 9283   Jackson, MS 39286
601 948 8882 voice   601 948 8885 fax

May 7, 2007

Mr. J. T. Noblin, Clerk
United States District Court for the
Southern District of Mississippi
United States Court House
245 East Capitol Street
Jackson, Mississippi 39201



Re:   *Olivia Y., et al. v. Barbour et al.* (Civil Action No. 3:04CV251LN)

Dear Mr. Noblin:

The Mississippi Youth Justice Project (MYJP) works to break the cycle of juvenile incarceration by making juvenile justice and education systems more responsive to the needs of children, families and the communities in which they live. Based in Jackson, we seek reform through public education, community organizing, litigation, legislative advocacy, training and technical assistance.

MYJP attorneys represent members of the *Olivia Y.* class in *Morgan v. Sproat,* (Civil Action No. J75-21(N)), a lawsuit over conditions at the Oakley Training School. The Morgan class is defined as "all present and future students confined to Oakley Training school."[1] MYJP attorneys also represent individual *Olivia Y.* class members in delinquency proceedings. We are submitting these comments to ensure that the *Olivia Y.* settlement addresses the needs of our "dual jurisdiction" clients who are involved with both the delinquency and foster care systems. We also respectfully request the opportunity to present these comments to the court at the May 17, 2007, hearing.

*Olivia Y.* class members are among the youth most likely to end up in Mississippi's juvenile justice system. Researchers have concluded that early child abuse and neglect increases the risk of juvenile arrest by 55% and increases the risk of arrest for a violent crime by 96%.[2] The same study found that abused and neglected children were much more likely to become recidivists and chronic offenders. This data shows that the juvenile justice and the foster care systems are completely failing to work together to create opportunities for at-risk youth to develop into productive adults.

---

[1] The Final order in *Morgan v. Sproat* is attached as Exhibit 1.
[2] C.S. Widom. *Research in Brief: An update on the Cycle of Violence.* U.S. Department of Justice, Office of Justice Programs, National Institute of Justice. (March 2001)

In Mississippi, dual jurisdiction youth often become involved with the juvenile justice system for extremely minor offenses related to their abuse/neglect cases. Once involved with the juvenile justice systems, our dual jurisdiction clients frequently languish in training schools and jails merely as a result of their involvement in the foster care system. The troubling circumstances of just three of MYJP's dual jurisdiction clients are described below:

*J.S.:* JS has been in state custody since he was 11-years-old. He has been bounced from foster home to group home to training school. At the age of 16, JS was adjudicated delinquent for the non-violent offense of trespassing, after he ran away from a foster home where he felt unwelcome. Given his troubled history and mental health diagnosis, he never should have entered the juvenile justice system. He was sent to training school for 10 weeks for his trespassing offense of trespassing. But as an older teen with a delinquency adjudication, the Department of Human Services struggled to find an appropriate placement for him. He spent over 10 months in training school—literally four times longer than the average commitment. The Department of Human Services insisted that no placement would accept JS.

He was released only after MYJP petitioned the youth court for a change in placement. JS was then transferred to a treatment center in Texas. And then, when his stay there was over, history repeated itself, as the Department of Human Services insisted that it could not find a placement for JS. The Texas treatment facility threatened to release him with or without a placement; and the Department of Human Services insisted no place would take him. With her 16-year-old client facing eminent homelessness in a state hundreds of miles away, an MYJP attorney functioned as a social worker, and called around to Mississippi-based group homes. Within days she secured a placement for JS and helped him complete his Job Corps application. Thankfully, JS is now thriving at Job Corps.

*AJ:* AJ is a 15-year-old girl who was raped by her brother when she was 12-years-old. AJ's brother was adjudicated delinquent for this offense, and was then placed back in the home with AJ. The relationship between AJ and her mother deteriorated as a result of AJ reporting the rape—the mother was physically and verbally abusive. Then, AJ's mother remarried a man who sexually abused AJ's older sister. To escape this abuse, AJ ran away from home and stayed at her Godmother's house. A teacher reported this abuse to DHS, but no investigation occurred. AJ's mother filed a complaint against her for running away from home. The youth court judge—in violation of state and federal law—committed AJ to Columbia Training School. Even though the commitment violated the law, DYS accepted AJ and housed her at training school. She was incarcerated for months before MYJP attorneys became aware of her plight and immediately appealed her commitment. MYJP successfully argued for her placement with her Godmother, and AJ returned to school in time to attend her junior prom.

*BS:* BS is a 16-year-old young man from Lowndes County. He has had an open case with DHS since he was 7-years-old. During the time he lived with his mother, she was a prostitute and would leave her two sons to fend for themselves in their home, a motel room. As a result of his troubled youth, BS was diagnosed with a series of mental health issues including post-traumatic stress disorder. After years of placement in group homes,

out of the juvenile justice system, back into a less restrictive environment. Such programs must use evidenced-based practices and strength-based assessments.

The Mississippi Youth Justice Project deeply appreciates the opportunity to address the need of our clients in the *Olivia Y.* class. We look forward to presenting these points in further detail to the court on May 17. In the meantime, please contact us at 601-948-8882 ext. 27 if we can provide any further information.

Very truly yours,

Sheila A. Bedi, Esq.
Jennifer Riley Collins, Esq.

BS was finally placed in the care of foster parents. Soon after his placement, however, his foster parents' home burned down, and the family lost everything. BS was allowed to stay with the family and he attended school—where he was frequently bullied, taunted and threatened. One day BS made the mistake of bringing a knife to school for self defense. He inflicted a surface wound on one of his tormentors, and is now charged—as an adult—with aggravated assault. MYJP represents BS in his criminal case, and successfully obtained a nominal bond for him. Unfortunately, the Department of Human Services is unwilling to pay the bond. DHS has taken the position that allowing him to remain in jail will keep him out of trouble. So now BS languishes in an adult jail, where he receives no treatment for his mental health issues, and no educational services.

Clearly, given the flaws in the current system, the needs of these dual-jurisdiction youth must be explicitly addressed in any settlement between the parties. To address the needs of dual jurisdiction youth, the *Olivia Y.* settlement should explicitly require the following[3]:

**Prioritize diversion:** For dual jurisdiction youth, the first priority should be preventing involvement with the juvenile justice system altogether. This can be done by ensuring that the Department of Human Services' community-based juvenile justice services develop specially tailored programs and protocols to meet the needs of dual jurisdiction youth. Such programs should include informal diversion programs to reduce the number of abused/neglected youth with delinquency adjudications—with a particular focus on these youth who commit status offenses and those with mental health diagnosis. Division of Youth Services community staff should receive intensive training on diverting abused/neglected youth from the juvenile justice system. The Department of Human Services must also develop protocols to ensure that it does not incarcerate youth who are not appropriately committed to training school.

**Data collection/data sharing:** The Department of Human Services should collect data regarding the number of abused/neglected youth who are also involved in the criminal/juvenile justice system. This will require coordinating with the Division of Youth Services, local youth courts and detention centers, as well as the circuit courts and adult jails who house children tried as adults.

**Mandate a coordinated response:** The Department of Human Services should develop a specific policy detailing the responsibilities of child welfare staff in the event of a client's arrest, and the role the child welfare staff should play during the child's incarceration and transition back home. Child welfare staff must engage with defense counsel, youth court counselors, prosecutors and judges regarding commitments and probation/parole agreements.

**Identify/develop appropriate supports:** The Department of Human Service should develop programs specifically for the needs of dual jurisdiction youth. This would include the diversion programs discussed above, as well as programs that will allow youth to transition successfully

---

[3] These recommendations were taken largely from Janet Wiig & John Tuell, *Guidebook for Juvenile Justice and Children Welfare System Coordination and Integration*, Child Welfare League of American (2004). (available at http://www.cwla.org/programs/juvenilejustice/jjguidebook.pdf). The undersigned strongly urge the parties and this Honorable Court to incorporate the Child Welfare League's guidelines on addressing the needs of dual jurisdiction youth in the substantive settlement.

3