

# CATHOLIC CHARITIES, INC.

200 North Congress Street, Suite 100
Jackson, Mississippi 39201
*601-355-8634  Fax 601-960-8493*



May 4, 2007

Mr. J.T. Noblin, Clerk
United States District Court for the
Southern District of Mississippi
United States Courthouse
245 East Capitol Street
Jackson, MS 39201

Catholic Charities of the Diocese of Jackson, MS is grateful to be given this opportunity to enter into partnership with the Mississippi Department of Human Services as it seeks remedies to problems brought forth by the Olivia Y., et al, v. Barbour lawsuit.

We are an agency which was incorporated in 1963. For the past 44 years we have responded to the needs of many of the most vulnerable in Mississippi – especially women and children. We possess national certification through the Council On Accreditation. As such, we must comply with all COA standards. Even as we write this, we ourselves await a site visit which will evaluate whether we are meeting national standards. This is simply good social service practice. It seems illogical to us that we as an entity in the State would be called to higher standards than the State's own provider of social/human services. We feel our credentials provide credibility to the suggestions we make here.

My own background in human services began in 1967 with what was then called the Child Welfare Division of the Mississippi Department of Public Welfare. I received my masters' degree in Social Work from Florida State University and returned to Mississippi to work for the Child Welfare Division. I worked there for five years and found it to be an outstanding Division that was directed by Mrs. Sarah Caldwell. Mrs. Caldwell was a graduate of the Columbia School of Social Work. She had an outstanding reputation both in state and across the country as she served on President Lyndon Johnson's Commission on the War on Poverty.

Because of Mrs. Caldwell's professional background and experience and her consistent leadership, the Child Welfare Division provided outstanding services for families and children. Neglect and abuse cases were appropriately followed up on in a timely manner. Children were removed when appropriate and decisions about permanent placement were made in a timely fashion. When children were able to remain with their families, the families received supervision in order to insure the safety of the child. Adoption and foster care services were offered by professional social workers as well as services for delinquent children.

*PROVIDING HELP. CREATING HOPE.*

 

*CATHOLIC DIOCESE OF JACKSON*

The employees of the Child Welfare Division had masters' degrees in social work. They were well trained and well supervised by experienced social workers with a history with the Department of Public Welfare. The Department was viewed as a career ladder for social workers so that the state had experienced well trained staff handling the cases of vulnerable children in the state's care. Leadership was stable and again families and children received quality professional services.

With Mrs. Caldwell's retirement during the seventies, this all changed. From that day forward the Department became politicized and services deteriorated rapidly. The Child Welfare Division lost its professional staff and the system became very dysfunctional as it remains today.

I say this up front because there is danger that present Administration and DHS staff might perceive the issues at hand to be about *them* and *their* leadership. In fact, this State system has suffered neglect for decades and has needed professional expertise to help put it on a path to success rather than the downhill trajectory it continues to experience. This is a wonderful opportunity for all of us in social services, but most assuredly for the Department of Human Services, to take some positive steps forward.

I took the time to describe the Child Welfare of the sixties and seventies to illustrate how a Department should function and to inform you that we once had an outstanding system that was recognized nationally. We can once again create a system that provides outstanding professional services for our states most vulnerable citizens. We can break those horrible cycles of neglect, abuse, poverty, and teen pregnancy that so inhibit our states progress.

We believe there are numerous issues needing comment and delineation. We will try, for the sake of the Court, to put these issues as clearly and as succinctly as possible.

- One of the more serious problems for DHS is its size and its broad scope of responsibilities. We believe there should be a separate agency for Children and Family Services, with its own professional governing board. Presently the dollars for programs are so mixed and matched that it is virtually impossible to get a true picture of how funding is appropriately funneled. We believe that separating the funding streams and the services for Children and Family Services from other DHS departments would allow much greater accountability from all parties.

- A major issue to be addressed is DHS being so closely aligned to the State's political system. We believe one way this could be addressed is through the creation of a professional governing Board for the Department of Human Services and/or for the a Department of Children and Family Services. We must move beyond what is best for an elected official in the 4 to 8 years he/she is in office to what is best over the long haul for the most vulnerable in our State and what most assures tax payers that their dollars are going to provide highly qualified professional services.

    o A professional governing Board would give responsibility to people who have the education and experience working with children and other vulnerable populations.

- o  A professional governing Board would monitor each program to ensure it follows the same rules and provide the same services.

- o  A professional governing Board would address how more accurate financial information and data can be made available to those who need this information.

- o  A professional governing Board would provide continuity to the Department of Human Services. The Department of Human Services has had 7 Directors in 16 years. An Executive Director appointed by a governing board would provide greater continuity and opportunities for long range strategic planning and stability than one who serves at the will and pleasure of an elected official.

- o  A professional governing board would encourage and implement a strategic plan which stretches beyond 4 year intervals with political agendas shaping programs.

- Negotiations must assure that the largest Social Service agency in the state has persons in leadership both at the top and at every level who meet the <u>professional, educational, and experiential</u> standards of a social service agency. At the very least, their professional standards should match what is set forth for those accredited agencies in the state who work with DHS to provide social services. In this context, DHS should develop a career path for these professionals to follow so they are enticed to stay with the agency instead of using it as a training ground before going elsewhere.

- DHS can and must guide the agency through a process of reorganization and restructuring. We believe this task demands a new vision provided by highly competent professionals respected by their peers.

- Highly competent professionals will use all the talents of those who surround them. To that end, we would hope that a new spirit of partnership will emerge from these negotiations. Key partnerships should include education and mental health professionals as well as not-for-profit agencies.

- The Department of Human Services must ensure **all** staff have appropriate professional education and experience. All workers should receive on-going training in effective and/or evidenced based practices to be able to determine and respond in the highest professional manner to those who come to them for services.

- DHS should seek partnerships with Institutions of Higher Learning with Schools of Social Work to help with this most important endeavor of staff training. This should include worthwhile field work experiences utilizing effective evidence based practices. We believe educated staff means educated families. Educated staff means moving beyond maintaining the status quo in a broken system. Educated staff demonstrates an ability to apply best practices.

- There must be a process put in place to maximize and utilize all funds and services. Presently, Mississippi does not draw down all the dollars available to it through the federal government. It has long been a concern for providers why the poorest state in

the nation does not draw down all the help available to it to both serve the vulnerable and to help its people move out of poverty.

- Currently, protective caseloads in some counties are 3 to 4 times the recommended number. Our social worker case load is described nationally as "beyond dangerous". The Agency must meet national case work standards to ensure safety for our children. The agency must impose *realistic and standardized* work loads on its social workers.

- In conjunction with having enough qualified social workers; DHS must do more in the prevention of child abuse and investigation of **all** reports rather than its present method of triage.

- DHS must do more to support placement of abused and neglected children with extended family when appropriate, with monetary support when needed and with much greater supervision of the placement.

- DHS should place abused and neglected children in homes only after a home study is done – much as they do with children in the foster care system. This home study should be done by professional social workers who have been trained in assessments, thus assuring appropriate, safe placements.

- DHS should take equal care to assess the *child's* needs *prior* placing that child in a home. The state needs to require that trauma-informed assessments be completed on every child entering custody and that these assessments be used to match the child with the proper placement option. Unless we address underlying trauma issues, we will only perpetuate co-morbid conditions such as ADHD, depression, oppositional defiant behaviors, etc. This would certainly assure a more appropriate placement and avoid multiple placements.

- DHS must address moving a child into a permanent setting in a timely manner.

- DHS must recognize the importance of continuity of care for children in the foster care system.

    o It is crucial that we limit the number of social workers assigned to a child's case to ensure that the child feels connected to his/her custodial agency and county of origin.

    o It is also imperative that DHS structure services so that mental health providers follow children as they move into permanent placements (i.e., foster care agency provide therapeutic services for a period of time following transition into an adoptive home or reunification). This would provide the most successful strategy in helping a child make such an important transition.

- DHS must work more directly with biological parents and family members after a child has been removed to help the family with reunification. Without adequate case management services and support for biological families, termination of parental rights will too often happen prematurely and/or without necessity.

- DHS must address terminating parental rights in a timely manner lest children continue to be abused and/or neglected by parents who have addictions or other problems. Once parents' rights are terminated, DHS must not rescind that termination. Doing this in the past has caused children to move in and out of family structures often being returned to birth parents who cannot care for them. Children can and should remain in contact with birth parents whenever possible, but placing them in the home with the birth parent may be harmful to the child. We point out here again that only qualified, trained social workers are in a position to make these assessments and make recommendations to the Court what is in the best interest of the child.

- The Department of Humans Services must create a review process to measure the outcomes of each family and child. When programs are evaluated, appropriate adjustments can be made to ensure the best use of money. A professional governing Board could assist in this effort. By reviewing DHS services, both successful programs and less efficient ones could be identified and the needed adjustments could be made.

In closing, let me say that this agency is more than willing to work in partnership with the Mississippi Department of Human Services. We cannot continue to waste energy and time addressing conflicts between us.

According to its own mission statement, the Department of Human Services exists "to provide services for people in need by optimizing all available resources to sustain the family unit and to encourage traditional family values thereby promoting self-sufficiency and personal responsibility for all Mississippians."

We would add that all this can best be done by professionally trained individuals who can move beyond political agendas and can gather the best practices and best experiences of their peers. Catholic Charities stands ready to cooperate in furthering our mutual goal of making this Department of Human Services the best in the nation.

Sincerely,

*Linda Raff*

Linda Raff
Executive Director


Copy:

Eric Thompson
Children's Rights
330 Seventh Ave., 4th floor
New York, New York 10001

Rusty Fortenberry
Baker, Donelson, Bearman, Caldwell
&  Berkowtiz, PC
4268 I-55 North
Meadowbrook Office Park
Jackson, MS 39211