# MISSISSIPPI **YOUTH JUSTICE** PROJECT

753 North Congress St.  P.O. Box 9283  Jackson, MS 39286
601 948 8882 voice  601 948 8885 fax

May 7, 2007



SOUTHERN DISTRICT OF MISSISSIPPI
F I L E D

MAY - 7 2007

J. T NOBLIN, CLERK
BY_____DEPUTY

Mr. J. T. Noblin, Clerk
United States District Court for the
Southern District of Mississippi
United States Court House
245 East Capitol Street
Jackson, Mississippi 39201

Re:    *Olivia Y., et al. v. Barbour et al.* (Civil Action No. 3:04CV251LN)

Dear Mr. Noblin:

The Mississippi Youth Justice Project (MYJP) works to break the cycle of juvenile incarceration by making juvenile justice and education systems more responsive to the needs of children, families and the communities in which they live. Based in Jackson, we seek reform through public education, community organizing, litigation, legislative advocacy, training and technical assistance.

MYJP attorneys represent members of the *Olivia Y.* class in *Morgan v. Sproat*, (Civil Action No. J75-21(N)), a lawsuit over conditions at the Oakley Training School. The Morgan class is defined as "all present and future students confined to Oakley Training school."[1] MYJP attorneys also represent individual *Olivia Y.* class members in delinquency proceedings. We are submitting these comments to ensure that the *Olivia Y.* settlement addresses the needs of our "dual jurisdiction" clients who are involved with both the delinquency and foster care systems. We also respectfully request the opportunity to present these comments to the court at the May 17, 2007, hearing.

*Olivia Y.* class members are among the youth most likely to end up in Mississippi's juvenile justice system. Researchers have concluded that early child abuse and neglect increases the risk of juvenile arrest by 55% and increases the risk of arrest for a violent crime by 96%.[2] The same study found that abused and neglected children were much more likely to become recidivists and chronic offenders. This data shows that the juvenile justice and the foster care systems are completely failing to work together to create opportunities for at-risk youth to develop into productive adults.

---

[1] The Final order in *Morgan v. Sproat* is attached as Exhibit 1.
[2] C.S. Widom. *Research in Brief: An update on the Cycle of Violence.* U.S. Department of Justice, Office of Justice Programs, National Institute of Justice. (March 2001)

A Project of the Southern Poverty Law Center

In Mississippi, dual jurisdiction youth often become involved with the juvenile justice system for extremely minor offenses related to their abuse/neglect cases. Once involved with the juvenile justice systems, our dual jurisdiction clients frequently languish in training schools and jails merely as a result of their involvement in the foster care system. The troubling circumstances of just three of MYJP's dual jurisdiction clients are described below:

*J.S.:* JS has been in state custody since he was 11-years-old. He has been bounced from foster home to group home to training school. At the age of 16, JS was adjudicated delinquent for the non-violent offense of trespassing, after he ran away from a foster home where he felt unwelcome. Given his troubled history and mental health diagnosis, he never should have entered the juvenile justice system. He was sent to training school for 10 weeks for his trespassing offense of trespassing. But as an older teen with a delinquency adjudication, the Department of Human Services struggled to find an appropriate placement for him. He spent over 10 months in training school—literally four times longer than the average commitment. The Department of Human Services insisted that no placement would accept JS.

He was released only after MYJP petitioned the youth court for a change in placement. JS was then transferred to a treatment center in Texas. And then, when his stay there was over, history repeated itself, as the Department of Human Services insisted that it could not find a placement for JS. The Texas treatment facility threatened to release him with or without a placement; and the Department of Human Services insisted no place would take him. With her 16-year-old client facing eminent homelessness in a state hundreds of miles away, an MYJP attorney functioned as a social worker, and called around to Mississippi-based group homes. Within days she secured a placement for JS and helped him complete his Job Corps application. Thankfully, JS is now thriving at Job Corps.

*AJ:* AJ is a 15-year-old girl who was raped by her brother when she was 12-years-old. AJ's brother was adjudicated delinquent for this offense, and was then placed back in the home with AJ. The relationship between AJ and her mother deteriorated as a result of AJ reporting the rape—the mother was physically and verbally abusive. Then, AJ's mother remarried a man who sexually abused AJ's older sister. To escape this abuse, AJ ran away from home and stayed at her Godmother's house. A teacher reported this abuse to DHS, but no investigation occurred. AJ's mother filed a complaint against her for running away from home. The youth court judge—in violation of state and federal law—committed AJ to Columbia Training School. Even though the commitment violated the law, DYS accepted AJ and housed her at training school. She was incarcerated for months before MYJP attorneys became aware of her plight and immediately appealed her commitment. MYJP successfully argued for her placement with her Godmother, and AJ returned to school in time to attend her junior prom.

*BS:* BS is a 16-year-old young man from Lowndes County. He has had an open case with DHS since he was 7-years-old. During the time he lived with his mother, she was a prostitute and would leave her two sons to fend for themselves in their home, a motel room. As a result of his troubled youth, BS was diagnosed with a series of mental health issues including post-traumatic stress disorder. After years of placement in group homes,

BS was finally placed in the care of foster parents. Soon after his placement, however, his foster parents' home burned down, and the family lost everything. BS was allowed to stay with the family and he attended school—where he was frequently bullied, taunted and threatened. One day BS made the mistake of bringing a knife to school for self defense. He inflicted a surface wound on one of his tormentors, and is now charged—as an adult—with aggravated assault. MYJP represents BS in his criminal case, and successfully obtained a nominal bond for him. Unfortunately, the Department of Human Services is unwilling to pay the bond. DHS has taken the position that allowing him to remain in jail will keep him out of trouble. So now BS languishes in an adult jail, where he receives no treatment for his mental health issues, and no educational services.

Clearly, given the flaws in the current system, the needs of these dual-jurisdiction youth must be explicitly addressed in any settlement between the parties. To address the needs of dual jurisdiction youth, the *Olivia Y.* settlement should explicitly require the following[3]:

**Prioritize diversion:** For dual jurisdiction youth, the first priority should be preventing involvement with the juvenile justice system altogether. This can be done by ensuring that the Department of Human Services' community-based juvenile justice services develop specially tailored programs and protocols to meet the needs of dual jurisdiction youth. Such programs should include informal diversion programs to reduce the number of abused/neglected youth with delinquency adjudications—with a particular focus on these youth who commit status offenses and those with mental health diagnosis. Division of Youth Services community staff should receive intensive training on diverting abused/neglected youth from the juvenile justice system. The Department of Human Services must also develop protocols to ensure that it does not incarcerate youth who are not appropriately committed to training school.

**Data collection/data sharing:** The Department of Human Services should collect data regarding the number of abused/neglected youth who are also involved in the criminal/juvenile justice system. This will require coordinating with the Division of Youth Services, local youth courts and detention centers, as well as the circuit courts and adult jails who house children tried as adults.

**Mandate a coordinated response**: The Department of Human Services should develop a specific policy detailing the responsibilities of child welfare staff in the event of a client's arrest, and the role the child welfare staff should play during the child's incarceration and transition back home. Child welfare staff must engage with defense counsel, youth court counselors, prosecutors and judges regarding commitments and probation/parole agreements.

**Identify/develop appropriate supports:** The Department of Human Service should develop programs specifically for the needs of dual jurisdiction youth. This would include the diversion programs discussed above, as well as programs that will allow youth to transition successfully

---

[3] These recommendations were taken largely from Janet Wiig & John Tuell, *Guidebook for Juvenile Justice and Children Welfare System Coordination and Integration*, Child Welfare League of American (2004). (available at http://www.cwla.org/programs/juvenilejustice/jjguidebook.pdf). The undersigned strongly urge the parties and this Honorable Court to incorporate the Child Welfare League's guidelines on addressing the needs of dual jurisdiction youth in the substantive settlement.

out of the juvenile justice system, back into a less restrictive environment. Such programs must use evidenced-based practices and strength-based assessments.

 The Mississippi Youth Justice Project deeply appreciates the opportunity to address the need of our clients in the *Olivia Y.* class. We look forward to presenting these points in further detail to the court on May 17. In the meantime, please contact us at 601-948-8882 ext. 27 if we can provide any further information.

     Very truly yours,

     Sheila A. Bedi, Esq.
    Jennifer Riley Collins, Esq.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF MISSISSIPPI

JACKSON DIVISION

SOUTHERN DISTRICT OF MISSISSIPPI
FILED
MAY 26 1977
HARVEY G. HENDERSON, CLERK
BY_____ DEPUTY

KENNETH MORGAN, et al        PLAINTIFFS

VS.       CIVIL ACTION NO. J75-21(N)

DOUGLAS SPROAT, et al        DEFENDANTS

## FINAL JUDGMENT

This cause having been submitted for decision, by agreement of the parties, on stipulations, deposition testimony and documentary evidence, and the Court having heretofore filed in its Memorandum of Opinion of 19 April 1977 its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, it is, therefore,

ORDERED AND ADJUDGED that:

1.    This cause has been certified as a class action consisting of all present and future students confined at Oakley Training School, a state juvenile training school, located near Raymond, Mississippi.

2.    Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Harold Cooper and John Grubbs, the present Assistant Superintendents of Oakley Training School, are substituted as party-defendants in place of John Davis and Wayne Middleton, and Odessa Waldrop and Kenneth Draper, present members of the Board of Trustees of the Mississippi Department of Youth Services, are substituted as party-defendants in place of Mrs. J. C. Burrow and H. A. Kroeze, former members of said Board of Trustees.

3.    Douglas Sproat, Superintendent of Oakley Training School, Harold Cooper and John Grubbs, Assistant Superintendents of Oakley Training School, Jimmy R. Russell, Executive Director of the Mississippi Department of Youth Services, and William W. Ferguson, Mrs. Gilbert Mason, Thomas Watts, Jr., Odessa Waldrop and Kenneth Draper, members of the Board of Trustees of the

EXHIBIT "A"

Mississippi Department of Youth Services, their agents, employees and successors in office, are permanently enjoined with regard to the operation of Oakley Training School, a training school for juveniles in the State of Mississippi:

A.   From the date of this judgment from using the Intensive Training Unit (ITU) as an isolation or confinement unit except under the following conditions:  (1) Students may be placed in ITU only where there is substantial evidence that they constitute an immediate threat to the physical well being of themselves or others; (2) Confinement may not exceed 24 hours and must be approved within one hour of confinement by the superintendent, one of the assistant superintendents, the chief counselor, or a staff psychologist; (3) No student shall be placed in the ITU whose psychological, emotional or intellectual status makes isolation inappropriate; (4) Students in the ITU must be visited at least once every three hours during the day by the chief counselor, the student's own counselor or a licensed psychologist; (5) The cells in ITU must be provided with transparent windows, lights, mattresses, blankets, sheets, pillows, small tables for reading, chairs, soap and towel; (6) Unless a contrary program is indicated in an individual case by licensed psychologist, students placed in ITU must be permitted to sleep a reasonable time during the day, have reading materials, to send and receive mail and to have visitors; (7) Students in ITU must receive daily at least one hour's physical exercise outside of the ITU or in the gym; (8) Students in ITU must be allowed to eat their meals outside of their cells; (9) The ITU shall not be used for punishment, but only for the uses set forth in (1) above; (10) A central record of the ITU shall be maintained by the defendants giving the name of each student placed in ITU, the date and time of such placement, the date and

Time of such release, a detailed statement of reasons
for placement, the name of the person referring the
student to ITU, the name of the person approving the
placement and time of such approval, a record of all
visits by counselors or psychologists to the student
and the time of such visits; and such information shall
also be placed in each individual student's file at
the training school; (11) the ITU shall not be used
until attorneys for plaintiffs have had a reasonable
opportunity to inspect the physical changes set forth
in (5) above; (12) Defendants shall promulgate insti-
tutional regulations consistent with this judgment to
be distributed to Oakley staff before any further use
of ITU.  (13) No other facility at Oakley shall be
used as an isolation or confinement unit unless it
complies with (1)-(12) above.

B.  With regard to individualized programs for
students at Oakley:  (1) Within 45 days from the date
of this judgment, the defendants shall submit a plan
to the Court for approval to establish a complete diag-
nostic and evaluation procedure for all incoming stu-
dents and all present Oakley students who have been at
the school less than 90 days prior to 19 April 1977.
Such procedure shall include evaluation by qualified
personnel to obtain basic educational, medical, psy-
chological and vocational information, (including the
obtaining of the cumulative school records on each
student from the community from which they came) to
identify incoming students with special emotional pro-
blems who should not be assigned to Oakley, but to
another institution, and to identify students who have
contagious diseases or who need medical attention; the
medical evaluation shall also include screening for eye-
sight, hearing and dental problems and immunization

status; (2) Within 120 days from the date of this judg-
ment, defendants shall formulate individualized written
treatment plans for all students at Oakley Training
School and continue to formulate such treatment plans
for all students, in accordance with generally accepted
professional standards, describing in precise terms the
school's long-term and short-term objectives for the
student, the full range of services to be provided, and
procedures, and timetables and staff assignments for the
implementation of such treatment plan; (3) Within 120
days from the date of this judgment, defendants shall de-
termine cottage placement on the basis of students' in-
dividual needs and programs as set forth in the treatment
plan; at that time defendants' placement plan shall be
filed with this Court for approval; (4) Within 150 days
from the date of this judgment defendants shall insti-
tute a program of monthly periodic staff reviews and
evaluations of each student's progress under his indi-
vidualized treatment plan and of the appropriateness of
the plan itself and defendants' plan for such review
shall at that time be filed with this Court for approval;
(5) All of the foregoing procedures shall be supervised
and coordinated by a licensed psychologist.

    C.  With regard to staff and personnel at Oakley
Training School, (1) Within 60 days from the date of
this judgment defendants shall employ a full-time
licensed staff psychologist (or psychiatrist) at Oakley
Training School to supervise the school's evaluation
and treatment programs; (2) Either through reduction
in the student population or the employment of addi-
tional counselors, there shall be a maximum counselor/
student ratio at Oakley of 1:30 by 1 September 1977
and a maximum counselor/student ratio of 1:20 by 1
January 1978; (3) All counselors hired from the date

of this judgment shall have at least a Master's Degree
in social work, counseling, or one of the behavioral
sciences; within three years from the date of this judg-
ment, all counselors shall have at least such a Master's
Degree; (4) Either through reduction in the student
population or the employment of additional houseparents,
there shall be a maximum houseparent/student ratio at
Oakley of 1:30 by 1 August 1977 and a maximum houseparent/
student ratio of 1:20 by 1 November 1977 on duty at all
times, except when the students are asleep, at which
time there shall be at least one houseparent per cottage;
(5) All houseparents hired from the date of this judg-
ment shall have at least a high school degree and, within
one year from the date of this judgment, all houseparents
shall have at least a high school degree; (6) Defendants
shall submit for Court approval within 45 days from the
date of this judgment a plan for a program of preservice
and regular inservice training for counselors and cottage
parents at Oakley Training School; (7) Defendants shall
provide all of the consultant services necessary to meet
the needs of Oakley students, including psychiatric,
neurological, medical, and eye and ear services.

    D.  Defendants are enjoined from the date of this
judgment from the continued operation of the "progressive
phase system" and the system outlined in the "Differential
Classification:  A Pilot Program," filed with this Court
on 30 November 1976, or any other system whereby student
progress through the school is based on their avoidance
of unacceptable behavior.  The defendants are ordered to
submit a plan for Court approval within 90 days from the
date of this judgment for the determination of student
progress at Oakley Training School in conjunction with
the individual treatment plans required in paragraph B
above, including students' readiness for parole or

release from the institution.  Until the approval and
implementation of this plan, the Honorable John M. Roper,
United States Magistrate, is appointed Special Master to
rule on the petition of any student who has been confined
at Oakley for more than 150 days and feels that he is
entitled to parole.

E.  Defendants shall immediately institute at
least an annual program of fire inspection of the Oakley
Training School facility by qualified governmental au-
thorities, and a report of compliance of the first such
inspection shall be filed with this Court within 30 days
from the date of this judgment.

F.  The parties having informed the Court that the
requests by the defendants for appropriations for the
construction of new residential cottages at Oakley
Training School were not approved by the Mississippi
Legislature during its 1976 or 1977 sessions, the defen-
dants are ordered to submit for Court approval, within
45 days, interim and long-range plans, for the housing
of students at Oakley Training School in accordance
with the following criteria:  at least 80 square feet
per student for sleeping area; at least 40 square feet
per student for day room area; free access by students
to their own possessions; provision for individual
student privacy; and eventual reduction in the size of
the student population in each housing unit to no more
than 25 students.

G.  With respect to education at Oakley Training
School, defendants shall within 30 days from the date
of this judgment submit a plan for Court approval which
shall include specific steps (1) to provide a complete
educational assessment of each incoming student, in-
cluding identification of students with learning dis-
abilities or other educational problems which need spe-
cial attention; (2) to provide special education services

and programs to all students who are diagnosed as needing such special services, including special education services or classes for the trainable mentally retarded, for students with specific learning disabilities, for emotionally handicapped youth, and for hearing and visually impaired students, which meet the standards set forth by the special education unit of the Mississippi State Department of Education; (3) for the establishment of an inservice training program for all teaching staff; (4) for the hiring of a teaching staff certified to teach in the fields to which they are assigned; (5) for bringing Oakley high school programs into compliance with state requirements for public high schools; (6) for the institution of a periodic testing program for the determination of the educational progress made by individual students; (7) for the obtaining of sufficient instructional materials for individualized programs of instruction that provides for awards for academic progress and for the establishment of such individualized programs of instruction; (8) for the provision of instruction in the event of absence of regular teachers, and (9) to report to this Court within 30 days of this judgment on the action taken by the Mississippi State Legislature on the defendants' request for funds to construct a new school building at Oakley Training School and, if such action has been favorable, to submit at that time a timetable for the construction of such a facility.

H.  With respect to vocational training at Oakley Training School, defendants shall within 90 days from the date of this order submit a plan for Court approval which shall include specific steps (1) to enable all Oakley students who are determined by their initial evaluation (as set forth in paragraph B above) to be

in need of vocational training to receive such training
for a period of not less than four hours a day; (2) to
expand the present vocational curriculum to include a
wider variety of training programs and an orientation
program for younger students; and (3) to employ suffi-
cient vocational counselors to achieve a maximum
counselor/student ratio of 1:75.

I.   With respect to recreation at Oakley Training
School, defendants shall submit, within 30 days from the
date of this judgment, a plan which includes specific
steps (1) to increase the amount of recreation available
to all Oakley students to at least one-to-two hours of
recreation each week day and two-to-four hours on week-
ends; (2) to establish a physical education program
which satisfies all state standards and regulations, in-
cluding recreation supervisors and physical education
teachers appropriately certified in either recreation
therapy or physical education; and (3) to implement a
leisure time program which will provide Oakley students
opportunities to develop skills in arts, crafts, and
music.

J.   With respect to the parole and release of stu-
dents from Oakley Training School, the defendants, in-
cluding specifically, the Superintendent of Oakley Train-
ing School, shall release students from Oakley Training
School upon determination by the treatment staff at the
institution that the student has made sufficient pro-
gress in his individualized treatment plan to warrant
parole and release and specifically defendants are en-
joined from conditioning any such release or parole or
student vacation upon the approval of the committing
Youth or Family Court.  (Except that release, parole or
vacation for students committed to Oakley upon convic-
tion as adults may be conditioned upon the approval of
the Court of conviction.)

8

K.  With respect to medical and dental care at Oakley Training School, defendants shall, within 30 days of the date of this judgment, (1) present for Court approval a plan, including a specific timetable for the establishment of an overnight infirmary; (2) provide sufficient medical staff to allow at least one medical nurse or licensed practical nurse to be on duty at Oakley at all times, 24 hours a day; (3) provide a complete physical and dental examination on all students who are presently confined at Oakley and all future students when admitted; (4) provide medical and dental diagnosis and treatment for all students in need of such services, including non-emergency, preventive and maintenance dental care within two weeks after the need of such care becomes known to the school and (5) provide an appropriate innoculation program for students.

L.  With respect to access to legal assistance at Oakley Training School, defendants shall:  (1) Ascertain from each student committed to Oakley Training School whether the student was represented by an attorney in his commitment proceedings, to make a record of such ascertainment, and to advise such student orally and in writing who was not so represented that his commitment might be invalid and that if he wishes to obtain legal assistance with respect to his commitment to Oakley Training School he may contact (a) Central Mississippi Legal Services, Box 951, Jackson, Mississippi, 39205, or (b) the student's personal attorney; (2) In addition to the notice set forth in (1) above, defendants shall submit within 30 days of this judgment, for the Court's approval a summary of legal services available to Oakley students, copies of which, upon the Court's approval, shall be posted in conspicuous places in each student residence, the administration, academic and vocational buildings, and the recreation

9

hall; (3) Defendants are further ordered (a) to forward immediately to the appropriate lawyer or legal services program any written request for legal assistance made by an Oakley Training School student, (b) to inform those making oral requests for legal assistance that such requests must be in writing, and (c) if necessary, to assist those making oral requests in making such requests in writing.

3.    Copies of all plans required to be submitted to the Court by this judgment shall at the same time be provided counsel for plaintiffs, and plaintiffs shall have 30 days after receipt of such plans to file any objections or requests for modification with the Court.

4.    Until further notice of this Court, plaintiffs shall be entitled to inspect all records of Oakley Training School including student records with respect to its compliance with the orders of this Court, and to similarly inspect the physical facilities at Oakley, upon reasonable notice.

5.    Defendants shall file the following compliance reports with the Court, with copies furnished to counsel for plaintiffs. No student will be identified by name in these reports, but instead will be identified by initials and Oakley student identification number.   These reports shall be filed on June 15, July 15, August 15, September 15, and November 15, 1977; January 15, April 15, July 15, and October 15, 1978; and on February 15, June 15, and October 15, of each year thereafter until further order of this Court.   "Date of last report" refers to date of judgment for the report of June 15, 1977."

A.  List each student so confined in isolation or any disciplinary confinement along with the date placed and time of placement, date and time of release, and dates and times of all visits by counselor or psychologist.

B.  Provide the following information for each student at Oakley:  (1) Date of arrival; (2) Cottage placement and reason for such placement; (3) Date of medical

10

evaluation; (4) Date of general diagnostic and evaluation set forth in paragraph 3 B (1) of this judgment; (5) Date of receipt of cumulative school records from student's home community; (6) any psychological, psychiatric, emotional or retardation problems discovered in evaluation and the steps taken to meet such needs; (7) Any eyesight, hearing, dental, immunization, or other medical problems discovered in the evaluation process and the steps taken to meet such needs; (8) The date that an individualized written treatment plan was formulated for the student; (9) The date of monthly staff reviews and evaluations of the student's progress since the date of the last report; (10) Description of all consultant services provided the student since the date of the last report; (11) Whether the student was diagnosed as needing special educational services, including special educational services for classes for the trainable mentally retarded, classes for students with specific learning disabilities or classes for emotionally handicapped youth or classes for hearing and visually impaired students and, if so, what classes in these areas have been provided such student; (12) The date and type of testing received by the student for the determination of educational progress; (13) Whether the student has been determined by initial evaluation to be in need of vocational training and, if so, what training the student is receiving; (14) Whether the student was represented by an attorney in his commitment proceedings.

C.   The name of each counselor employed at Oakley and the highest educational degree obtained by such counselor and the field in which obtained.

D.   The name of each houseparent and the extent of education completed.

E.   Each student released from Oakley since the date of the last report and give the date of release.

11

F. List the name of the full-time licensed staff psychologist or psychiatrist employed at Oakley and state whether he/she is a psychologist or psychiatrist.

G. The name of each teacher at Oakley, the certifications held by such teacher, and the courses taught by such teachers.

H. The dates of absences of all teachers at Oakley and the names of the substitute teachers serving in their place on such dates.

I. The name of each vocational counselor employed at Oakley and his/her educational qualifications.

J. The name and educational qualifications of each recreation supervisor or physical education teacher employed at Oakley and the certification of such teacher.

K. The recreation schedule for Oakley students.

L. The leisure time program for Oakley students.

6. Any student at Oakley Training School transferred to any other training school operated by the Mississippi Department of Youth Services shall continue to receive all of the rights, benefits, services and protections provided this judgment.

7. Because of the importance of community-based care and treatment of juveniles in the juvenile justice system, as set forth by the expert witnesses testifying in this action, defendants, in the implementation of the standards and requirements at Oakley Training School set forth in this judgment and in future orders of this Court, are enjoined from any reduction of any existing community-based juvenile facilities, personnel or programs.

8. The Court maintains jurisdiction of this cause for the effectuation of the orders set forth in this judgment.

9. Costs of this cause are assessed to the defendants. Plaintiffs' request for attorneys' fees is reserved for future ruling of this Court.

ORDERED AND ADJUDGED, this 23rd day of May, 1977.

S/ Walter L. Nixon, Jr.

UNITED STATES DISTRICT JUDGE



SOUTHERN DISTRICT OF MISSISSIPPI
F I L E D

MAY - 8 2007

J T NOBLIN, CLERK
BY_____DEPUTY

Mr. J.T. Noblin, Clerk
United States District Court for the Southern District of Mississippi
United States Courthouse
245 East Capitol Street
Jackson MS 39201

*3:04cv 251*

May 3, 2007

Re: Comments on the proposed Olivia Y. settlement

I am writing this letter to the court as a life long resident of Mississippi. I have been
practicing social work in Mississippi for 28 years. I have been a licensed certified social
worker (LCSW) in Mississippi since 1990. I have experience in both the public and
private sector. I was employed with the Mississippi Department of Human Services,
Division of Family and Children's Services in the following roles: Licensing Unit
Director, Prevention Unit Director, Deputy Director, and my most recent employment
was as a contractor hired to assist the state in development and approval of the federal
Child and Family Service Review Program Improvement Plan. I provide this information
to emphasis that as a Mississippi citizen I am passionate about Mississippi's children and
committed to the quality of our child welfare system.

I have closely followed the Olivia Y lawsuit with the hope that this attention to
Mississippi's foster care system would prompt state leadership including the governor,
state legislators and Mississippi Department of Human Services Executive Director to
support the Division of Family and Children's Services in taking necessary action to
remedy the systemic problems within our child welfare system. The scope of corrective
action within the Division will require a substantial and long term financial commitment
from the state to adequately fund the necessary changes required within this Division. It
is important that the state sustain this funding commitment to support the Division of
Child and Family Services over time and not just as a one time appropriation.

I fully support the settlement agreement. I have reviewed and agree with the general
recommendations of the expert's who conducted the case record review, fiscal review,
and management review specific to Mississippi's lawsuit.

Having reviewed the revised Child and Family Service Review Program Improvement
Plan on the agencies website and the progress toward accomplishing the benchmarks and
goals, I do have concerns about the agencies capacity to implement and follow through
with the agreed upon settlement plan once finalized. Therefore, I am in agreement with
strong external oversight and monitoring throughout this process to ensure accountability
for achievement of the terms of the settlement plan. I would also strongly recommend
that the agency be provided with expert technical assistance to integrate the multiple
required agency plans with the final approved settlement plan to provide a clear strategic

map to assist the staff of DFCS in identifying priorities and implementing corrective action to help accomplish their goals and outcomes.

I also support the agency in having access to and utilizing expert consultation and technical assistance resources to assist in the development and implementation of effective outcome based child welfare models and proven best practices.

I support the agencies recent efforts for improvements such as the Supervisory Learning Labs which provides on-going training for supervisors and managers across the state. I support the targeted project in Forrest County which is attempting to correct problems within the system but also trying to develop a model county that can be replicated in other areas. I am also supportive of efforts to fully implement family centered practice as a way of doing business and utilizing Family Team Meetings as a vehicle to truly engage families in the decision making process throughout their involvement with the Division.

I would hope that the following recommendations are addressed or included as part of the settlement agreement and plan:
- Caseload Standards based on CWLA standards
- Adherence to Supervisory Ratio's based on CWLA standards
- Adequate personnel qualifications and requirements based on the professional level of job responsibilities per position
- Increase in staffing to include caseworkers, supervisors, support staff, and administrative staff within State Office program areas
- A process for advancement within the system to improve staff retention
- Training as a priority – initial and ongoing training for all staff (supervisors, managers, social workers, caseworkers, licensing, adoption, clerical, homemakers, support staff, etc.) and opportunities for continued professional staff development including participation and representation of Mississippi at federally sponsored and national conferences
- Sufficient staffing of the Training Unit by qualified trainers with the skills and abilities to teach, develop and write quality skill based curricula with the expertise and knowledge of the actual work to be able to provide on the job training
- A quality assurance system that is supported and adequately staffed and a clear system for corrective action when quality assurance issues are identified through the process
- Improved data and information management including tracking performance measures and outcomes.
- Data clean up measures to ensure accurate and correct data entry by the field
- Training and technical assistance for management and supervisory staff to understand data reports and how to use them to improve management practices
- Improved fiscal management to maximize state and federal funding
- Improved grant management including a clear long term plan for outsourcing that will maximize funding to develop needed programs and services to meet the needs of the foster care population statewide and a sustainability plan to ensure programs and services initiated do not just "go away" when the funding is no longer available

- Development of a true public/private provider partnership to create a comprehensive service array throughout the state to meet the needs of the children in foster care not just the "illusion of a partnership"
- A sufficient number of staff dedicated to licensing and adoption based on the actual workload
- Increased targeted recruitment efforts based on the needs of the children in foster care
- Services to improve retention of foster homes/families and to reduce disruptions or unplanned placement moves including therapeutic services, support services and quality training
- Increase in the number and specialized types of foster homes licensed and available to improve placement matching for children in foster care
- A standard placement matching process to ensure that foster children are placed in the most appropriate foster home placement based on their individually assessed needs rather than placement by availability
- Immediate attention to foster care policies, procedures and practices deemed unsafe and or out of compliance with federal or state mandates
- More stringent enforcement of licensing requirements and policies and clear procedures for enforcing penalties when there are violations of those requirements such as revoking the foster home license and closing the foster home to prevent additional placements in an unsafe environment

I would like to thank the court for the opportunity to provide input into this settlement process. The problems within Mississippi's child welfare system are long standing and extremely complex. It is clear there is no "quick fix" or easy solution. It will take serious commitment from the governor, state legislators, and state agencies to begin to change the foster care system. It will also take a genuine partnership among all of Mississippi's public systems in collaboration with private providers, and community stakeholders to improve safety, permanency and well-being for Mississippi's families and children. It is time for Mississippi to "do the right thing!" Our children's safety must be paramount. We need to make decisions based on what's in the "best interest" of our children and not based on politics. It is not just the responsibility of the Division of Family and Children's Services but the responsibility of every community and every citizen to become active to ensure a better and safe future for our children and our state.

*Elizabeth S Frizsell*

Elizabeth Shanks Frizsell
5846 Clubview Drive
Jackson MS 39211
Phone: 601-956-8368

cc:
Eric Thompson
Rusty Fortenberry

Fitzgerald
5846 Aubewies Dr
Jackson MS 39211

RECEIVED

MAY - 8 2007

Clerk, U.S. District Court
Southern District of Miss.

33201-23405

Mr. JT. Noblin, Clerk
United States District Court
for the Southern District of MS
United States Courthouse
245 East Capitol Street
Jackson MS 39201

JACKSON MS 392

04 MAY 2007 PM 3 T





**We build trust.**

May 3, 2007

Mr. J.T. Noblin, Clerk
United States District Court for the
Southern District of Mississippi
United States Courthouse
245 East Capitol Street
Jackson, MS 39201



SOUTHERN DISTRICT OF MISSISSIPPI
**F I L E D**

MAY - 7 2007

J. T. NOBLIN, CLERK
BY_____ DEPUTY

RE:    *Olivia Y.* Settlement

Dear Mr. Noblin:

*3:04cv 251 TSL-JCS*

    I am a general contractor from Gulfport, Mississippi and I am, and always have been, a strong advocate for children.  I belong to an organization called Professionals Advocating for Children Together (P.A.C.T.).   In regard to the above referenced, I understand that I have the right to write to you with any comments in this case. My comments pertain not only to the Foster Care System of our State but also to the Department of Children Services of DHS as a whole.

    I am concerned that Foster Care in South Mississippi is ineffective; but I am not qualified in determining what the fix needs to be.  It simply amazes me how children are moved from one home to another, at a time when we are trying to provide them some semblance of a stable environment.   There is absolutely no training for Foster Care families, no Supervision, no accountability and no expectations. Why is this?

    I have worked with P.A.C.T. for over seven years.  We usually meet once a week, and each time we meet I am saddened and depressed by all that I hear about the abuse and neglect of children in our southern counties, and the problems associated with Children Services. We have painstakingly worked hard to improve the conditions in South Mississippi and across the State in regards to Children Services.    After being involved for this period of time, I almost believe that the Department of Children Services exists in name only.  From every direction, school nurses, Superintendents of Schools systems, teachers, law enforcement agencies, mental health departments, and organizations in the community that are there to fight abuse and neglect, no longer look to the Department of Children Services for help.  The problems are massive.

*Mr. J.T. Noblin, Clerk*
*United States District Court*
*May 4, 2007*
*Page 2 of 2*

For years P.A.C.T. has fought for the unbearable caseloads the department carries and the lack of personnel to do the job. Those that go into the department get no supervision. The training is inadequate, there is no Supervisor training, and there is no accountability to the system. Some cases are being investigated one or two years after being reported.

I believe that my point could be better made if the Court would allow a few members of P.A.C.T. to come before them to voice our concerns. I want to help make things better for the children in our great State and I ask for your Help in finding a way to do that. Someday we all will be judged for what we didn't do and I want to go out fighting for what I know is good and right.

Sincerely,

H. Gordon Myrick, Jr.

P.O. Box 1479
Gulfport, MS  39502
Telephone: 228-864-9911

SOUTHERN DISTRICT OF MISSISSIPPI
F I L E D

MAY - 7 2007

J.T. NOBLIN, CLERK
BY_____ DEPUTY



We build trust.

Mr. J.T. Noblin, Clerk
United States District Court for the
Southern District of Mississippi
United States Courthouse
245 East Capitol Street
Jackson, MS   39201

H. Gordon Myrick, Inc.   ·   P.O. Box 1479   ·   Gulfport, Mississippi 39502



# CATHOLIC CHARITIES, INC.

200 North Congress Street, Suite 100
Jackson, Mississippi 39201
*601-355-8634 Fax 601-960-8493*



SOUTHERN DISTRICT OF MISSISSIPPI
**FILED**

**MAY - 7 2007**

J T NOBLIN, CLERK
BY_____DEPUTY

May 4, 2007

Mr. J.T. Noblin, Clerk
United States District Court for the
Southern District of Mississippi
United States Courthouse
245 East Capitol Street
Jackson, MS 39201

Catholic Charities of the Diocese of Jackson, MS is grateful to be given this opportunity to enter into partnership with the Mississippi Department of Human Services as it seeks remedies to problems brought forth by the Olivia Y., et al, v. Barbour lawsuit.

We are an agency which was incorporated in 1963. For the past 44 years we have responded to the needs of many of the most vulnerable in Mississippi – especially women and children. We possess national certification through the Council On Accreditation. As such, we must comply with all COA standards. Even as we write this, we ourselves await a site visit which will evaluate whether we are meeting national standards. This is simply good social service practice. It seems illogical to us that we as an entity in the State would be called to higher standards than the State's own provider of social/human services. We feel our credentials provide credibility to the suggestions we make here.

My own background in human services began in 1967 with what was then called the Child Welfare Division of the Mississippi Department of Public Welfare. I received my masters' degree in Social Work from Florida State University and returned to Mississippi to work for the Child Welfare Division. I worked there for five years and found it to be an outstanding Division that was directed by Mrs. Sarah Caldwell. Mrs. Caldwell was a graduate of the Columbia School of Social Work. She had an outstanding reputation both in state and across the country as she served on President Lyndon Johnson's Commission on the War on Poverty.

Because of Mrs. Caldwell's professional background and experience and her consistent leadership, the Child Welfare Division provided outstanding services for families and children. Neglect and abuse cases were appropriately followed up on in a timely manner. Children were removed when appropriate and decisions about permanent placement were made in a timely fashion. When children were able to remain with their families, the families received supervision in order to insure the safety of the child. Adoption and foster care services were offered by professional social workers as well as services for delinquent children.

*PROVIDING HELP. CREATING HOPE.*




*CATHOLIC DIOCESE OF JACKSON*

The employees of the Child Welfare Division had masters' degrees in social work. They were well trained and well supervised by experienced social workers with a history with the Department of Public Welfare. The Department was viewed as a career ladder for social workers so that the state had experienced well trained staff handling the cases of vulnerable children in the state's care. Leadership was stable and again families and children received quality professional services.

With Mrs. Caldwell's retirement during the seventies, this all changed. From that day forward the Department became politicized and services deteriorated rapidly. The Child Welfare Division lost its professional staff and the system became very dysfunctional as it remains today.

I say this up front because there is danger that present Administration and DHS staff might perceive the issues at hand to be about *them* and *their* leadership. In fact, this State system has suffered neglect for decades and has needed professional expertise to help put it on a path to success rather than the downhill trajectory it continues to experience. This is a wonderful opportunity for all of us in social services, but most assuredly for the Department of Human Services, to take some positive steps forward.

I took the time to describe the Child Welfare of the sixties and seventies to illustrate how a Department should function and to inform you that we once had an outstanding system that was recognized nationally. We can once again create a system that provides outstanding professional services for our states most vulnerable citizens. We can break those horrible cycles of neglect, abuse, poverty, and teen pregnancy that so inhibit our states progress.

We believe there are numerous issues needing comment and delineation. We will try, for the sake of the Court, to put these issues as clearly and as succinctly as possible.

- One of the more serious problems for DHS is its size and its broad scope of responsibilities. We believe there should be a separate agency for Children and Family Services, with its own professional governing board. Presently the dollars for programs are so mixed and matched that it is virtually impossible to get a true picture of how funding is appropriately funneled. We believe that separating the funding streams and the services for Children and Family Services from other DHS departments would allow much greater accountability from all parties.

- A major issue to be addressed is DHS being so closely aligned to the State's political system. We believe one way this could be addressed is through the creation of a professional governing Board for the Department of Human Services and/or for the a Department of Children and Family Services. We must move beyond what is best for an elected official in the 4 to 8 years he/she is in office to what is best over the long haul for the most vulnerable in our State and what most assures tax payers that their dollars are going to provide highly qualified professional services.

  o A professional governing Board would give responsibility to people who have the education and experience working with children and other vulnerable populations.

o A professional governing Board would monitor each program to ensure it follows the same rules and provide the same services.

o A professional governing Board would address how more accurate financial information and data can be made available to those who need this information.

o A professional governing Board would provide continuity to the Department of Human Services. The Department of Human Services has had 7 Directors in 16 years. An Executive Director appointed by a governing board would provide greater continuity and opportunities for long range strategic planning and stability than one who serves at the will and pleasure of an elected official.

o A professional governing board would encourage and implement a strategic plan which stretches beyond 4 year intervals with political agendas shaping programs.

- Negotiations must assure that the largest Social Service agency in the state has persons in leadership both at the top and at every level who meet the professional, educational, and experiential standards of a social service agency. At the very least, their professional standards should match what is set forth for those accredited agencies in the state who work with DHS to provide social services. In this context, DHS should develop a career path for these professionals to follow so they are enticed to stay with the agency instead of using it as a training ground before going elsewhere.

- DHS can and must guide the agency through a process of reorganization and restructuring. We believe this task demands a new vision provided by highly competent professionals respected by their peers.

- Highly competent professionals will use all the talents of those who surround them. To that end, we would hope that a new spirit of partnership will emerge from these negotiations. Key partnerships should include education and mental health professionals as well as not-for-profit agencies.

- The Department of Human Services must ensure **all** staff have appropriate professional education and experience. All workers should receive on-going training in effective and/or evidenced based practices to be able to determine and respond in the highest professional manner to those who come to them for services.

- DHS should seek partnerships with Institutions of Higher Learning with Schools of Social Work to help with this most important endeavor of staff training. This should include worthwhile field work experiences utilizing effective evidence based practices. We believe educated staff means educated families. Educated staff means moving beyond maintaining the status quo in a broken system. Educated staff demonstrates an ability to apply best practices.

- There must be a process put in place to maximize and utilize all funds and services. Presently, Mississippi does not draw down all the dollars available to it through the federal government. It has long been a concern for providers why the poorest state in

the nation does not draw down all the help available to it to both serve the vulnerable and to help its people move out of poverty.

- Currently, protective caseloads in some counties are 3 to 4 times the recommended number. Our social worker case load is described nationally as "beyond dangerous". The Agency must meet national case work standards to ensure safety for our children. The agency must impose *realistic and standardized* work loads on its social workers.

- In conjunction with having enough qualified social workers; DHS must do more in the prevention of child abuse and investigation of **all** reports rather than its present method of triage.

- DHS must do more to support placement of abused and neglected children with extended family when appropriate, with monetary support when needed and with much greater supervision of the placement.

- DHS should place abused and neglected children in homes only after a home study is done – much as they do with children in the foster care system. This home study should be done by professional social workers who have been trained in assessments, thus assuring appropriate, safe placements.

- DHS should take equal care to assess the *child's* needs *prior* placing that child in a home. The state needs to require that trauma-informed assessments are completed on every child entering custody and that these assessments be used to match the child with the proper placement option. Unless we address underlying trauma issues, we will only perpetuate co-morbid conditions such as ADHD, depression, oppositional defiant behaviors, etc. This would certainly assure a more appropriate placement and avoid multiple placements.

- DHS must address moving a child into a permanent setting in a timely manner.

- DHS must recognize the importance of continuity of care for children in the foster care system.

  - It is crucial that we limit the number of social workers assigned to a child's case to ensure that the child feels connected to his/her custodial agency and county of origin.

  - It is also imperative that DHS structure services so that mental health providers follow children as they move into permanent placements (i.e., foster care agency provide therapeutic services for a period of time following transition into an adoptive home or reunification). This would provide the most successful strategy in helping a child make such an important transition.

- DHS must work more directly with biological parents and family members after a child has been removed to help the family with reunification. Without adequate case management services and support for biological families, termination of parental rights will too often happen prematurely and/or without necessity.

- DHS must address terminating parental rights in a timely manner lest children continue to be abused and/or neglected by parents who have addictions or other problems. Once parents' rights are terminated, DHS must not rescind that termination. Doing this in the past has caused children to move in and out of family structures often being returned to birth parents who cannot care for them. Children can and should remain in contact with birth parents whenever possible, but placing them in the home with the birth parent may be harmful to the child. We point out here again that only qualified, trained social workers are in a position to make these assessments and make recommendations to the Court what is in the best interest of the child.

- The Department of Humans Services must create a review process to measure the outcomes of each family and child. When programs are evaluated, appropriate adjustments can be made to ensure the best use of money. A professional governing Board could assist in this effort. By reviewing DHS services, both successful programs and less efficient ones could be identified and the needed adjustments could be made.

In closing, let me say that this agency is more than willing to work in partnership with the Mississippi Department of Human Services. We cannot continue to waste energy and time addressing conflicts between us.

According to its own mission statement, the Department of Human Services exists "to provide services for people in need by optimizing all available resources to sustain the family unit and to encourage traditional family values thereby promoting self-sufficiency and personal responsibility for all Mississippians."

We would add that all this can best be done by professionally trained individuals who can move beyond political agendas and can gather the best practices and best experiences of their peers. Catholic Charities stands ready to cooperate in furthering our mutual goal of making this Department of Human Services the best in the nation.

Sincerely,

Linda Raff

Linda Raff
Executive Director


Copy:

Eric Thompson
Children's Rights
330 Seventh Ave., 4th floor
New York, New York 10001

Rusty Fortenberry
Baker, Donelson, Bearman, Caldwell
    & Berkowtiz, PC
4268 I-55 North
Meadowbrook Office Park
Jackson, MS 39211



United for Children – United for Change



May 4, 2007

Mr. J.T. Noblin, Clerk
United States District Court for the
Southern District of Mississippi
United States Courthouse
245 East Capitol Street
Jackson, MS 39201

I send this mutually written letter in the name of and with the permission of the Coalition for Children's Welfare regarding the **Olivia Y., et al, v. Barbour lawsuit**. This group came together slightly four years ago (prior to this present administration) united in their concern for the children in Mississippi who consistently rank last in almost every measurement of child well being -- Family Economic Well Being; Health; Safety and Behavioral Well Being; Educational Attainment; Community Connectedness; Social Relationships; Emotional and Spiritual Well Being.

It seems the plight of our children does not get better in these areas but too often becomes worse. In areas where we have made improvements, so have other States. Our improvements do not move us beyond "band-aiding" and have not provided lasting or consistent results. We write this statement so the Court knows our concern and our willingness to support any and all efforts the Mississippi Department of Human Services makes to move beyond maintaining a system which has been broken for decades.

Many of our agencies provide highly professional services to Mississippi children and their families. We are both qualified and willing to provide consultation and support as negotiations move forward. We believe these negotiations provide a ray of hope which we have not seen since the early 80's. This is a wonderful opportunity for this Administration to make a significant positive impact on our serving children and families. We would very much like to be a part of that effort.

Sincerely,

Sister Donna Gunn

Sister Donna Gunn
for
(see next sheet)

## MEMBERS OF COALITION FOR CHILDREN'S WELFARE

Catholic Diocese of Jackson
Catholic Charities of Jackson
Children's Defense Fund
(Southern Region)
Citizens for Quality Education
Coalition of Citizens with Disabilities
Congregations for Children
Episcopal Diocese of Mississippi
Friends of Children of MS (Head Start)
Luckett Maternal and Child Health --
Advocacy & Consulting Services
LIFE (Living Independently for
Everyone)
MS Deaf-Blind Project
MS Chapter – Natl. Assoc. of
Social Workers
MS Conference of the United Methodist Church
MS Families as Allies for
Children's Mental Health
MS Families for Kids
MS Human Service Coalition
MS Low Income Child Care Initiative
MS Religious Leadership Conference
MS Youth Justice Project
Parents United Together
Public Policy Center of MS
Unitarian Universalist Church/Jackson
Walker Foundation

There are additional groups who belong to this Coalition,
but their Boards do not allow those names to be used in taking a public stand

Copy:

Eric Thompson
Children's Rights
330 Seventh Ave., 4th floor
New York, New York 10001

Rusty Fortenberry
Baker, Donelson, Bearman, Caldwell
& Berkowtiz, PC
4268 I-55 North
Meadowbrook Office Park
Jackson, MS 39211



**Mississippi Children's Home Services**
*Compassionate Solutions for Children & Families℠*

FILED

MAY - 7 2007

J T NOBLIN, CLERK

BY_____ DEPUTY

**Administration**
1900 North West Street, Suite D
Jackson, MS 39202
(601) 352-7784
(601) 960-0021 (Fax)

**Adoption/Maternity Services\*\***
1900 North West Street, Suite A
Jackson, MS 39202
(601) 352-7784
(601) 960-4349 (Fax)

**ARK\***
**Substance Abuse Services**
1801 North West Street
Jackson, MS 39202
(601) 352-7784
(601) 355-3703 (Fax)

**CARES Center\***
**Psychiatric Residential Treatment**
402 Wesley Avenue
Jackson, MS 39202
(601) 352-7784
(601) 360-0585 (Fax)

**CARES School & School Day Program\***
**Jackson Campus**
402 Wesley Avenue
Jackson, MS 39202
(601) 352-7784
(601) 360-0037 (Fax)

**Intensive In-Home Services\***
15465 Oak Lane
Unit 100-J
Gulfport, MS 39503
(228) 863-4992
(228) 701-0057 (Fax)

**Powers\***
**Transitional Therapeutic Group Home**
P.O. Box 1078
Jackson, MS 39215
(601) 372-9468
(601) 346-0956 (Fax)

**RAP Team\***
**Prevention & Education Services**
1801 North West Street
Jackson, MS 39202
(601) 352-7784
(601) 355-3703 (Fax)

**South Mississippi Children's Center\*\***
P.O. Box 646
Hattiesburg, MS 39403
(601) 582-8891
(601) 582-8896 (Fax)

**Therapeutic Foster Care Services\***
15465 Oak Lane
Unit 100-J
Gulfport, MS 39503
(228) 863-4992
(228) 701-0057 (Fax)

**Warren County Children's Shelter\*\***
P.O. Box 820174
Vicksburg, MS 39182
(601) 634-0640
(601) 634-0724 (Fax)

May 7, 2007

**HAND DELIVERED**

*3:04 cv 25 1 TSL-JCS*

Mr. J.T. Noblin, Clerk
United States District Court for the Southern District of Mississippi
United States Courthouse
245 East Capitol Street
Jackson MS 39201

Re: Comments to the Clerk of Court on the proposed Olivia Y. settlement

Dear Mr. Noblin:

I am writing this letter to the court in support of the proposed Olivia Y. Settlement Agreement. I am a licensed clinical social worker with 43 years of experience in the field of child welfare and behavioral health. For the past 28 years, I have served as the Chief Executive Officer of Mississippi Children's Home Services (MCHS). Established in 1912, MCHS provides a continuum of behavioral health and social service programs to improve the lives of Mississippi's children and families. This information is provided in order to emphasis our vested interest in the safety, permanency and well-being of Mississippi's families, children and youth.

MCHS is committed to improving the quality of services for Mississippi's families. Over the years we have developed a positive interdependent relationship with the Mississippi Department of Human Services, Division of Family and Children's Services. We understand how vital a coordinated child welfare partnership is between public and private providers and communities across the state to create the most effective and efficient service delivery system possible.

We want to acknowledge the efforts of the Division of Family and Children's Services and support the positive actions that have been developed and implemented to date. We can appreciate the difficult task and extensive responsibility the Mississippi Department of Human Services has for the children in their care and their need for adequate financial and community support. We understand that many of the needed changes require firm support of state leadership, including the governor and state legislators, to remedy the systemic problems and insure sustainability.

  

*\*A Program of CARES Center, Inc., an affiliate of the Mississippi Children's Home Society*
*\*\*A Program of the Mississippi Children's Home Society*
*Mississippi Children's Home Society and CARES Center, Inc. are affiliates of Mississippi Children's Home Services, Inc.*

Mr. J.T. Noblin, Clerk
May 7, 2007
Page 2

We agree with the inclusion of agency accreditation through the Council on Accreditation (COA) and based on our experiences feel confident that this process will lead to sustainable improvements within the agency.   This national accreditation process should help the Mississippi Department of Human Services meet many of the general recommendations based on the Expert Case Record Review, Expert Fiscal Review, and Expert Management Review which were conducted as part of the lawsuit.

We agree with and support the recommendations from the Children's Bureau Child and Family Service Review which were incorporated into the Division of Family and Children's Services Program Improvement Plan.

In addition, we would like to recommend the following as part of the settlement agreement and plan:

- Development of a comprehensive community-based array of services which are regionally managed and available throughout Mississippi.

- As part of this array, a case management system, where local case management networks would coordinate the necessary and needed services for children and families to achieve the goals of safety, permanency and well-being.

- Full funding that would cover the actual cost of services that would follow the child through the system to ensure quality of services and appropriate therapeutic level of care based on individual needs

- Develop new or enhanced services to meet the changing needs of children and families including but not limited to:
  - o Improved assessment services to determine child and family needs that will drive decision making
  - o Increased number and types of quality foster homes including foster homes that can provide therapeutic and specialized services for special needs children
  - o Support for safe kinship placements and kinship care

- Institute a system of quality assurance and tracking of performance outcomes that will help the Mississippi Department of Human Services monitor its services and help insure sustainability.

- Provide sufficient funding to meet the staffing and infrastructure needs of the Mississippi Department of Human Services, to insure manageable caseloads, strengthen recruitment and retention of qualified staff, and insure appropriate supervisory ratios and ongoing training.

Mr. J.T. Noblin, Clerk
May 7, 2007
Page 3

I appreciate the opportunity to share recommendations with the court and I am committed to a
private/public partnership utilizing a collaborative approach to creating a system of care where
children and families benefit from continuity of services and care.

Sincerely,

Christopher M. Cherney
Mississippi Children's Home Services
1900 N. West Street
P.O. Box 1078
Jackson MS 39215
Phone: 601-352-7784

Enclosures:  Continuing of Care Model Document

cc:
Eric Thompson
Rusty Fortenberry

# *Achieving Safety, Permanency, and Well-Being for all Mississippi Children: A Position Paper\**

Submitted by:

Mississippi's Children Home Services

## Continuum of Care Model (CCM) for Children and Families

Mississippi's children and families represent our future; they can achieve great things, but only if we are prepared to help. The *vision* of this Continuum of Care Model (CCM) is to assure that each child and family receives the support, training, treatment, and coordinated care and services they need to thrive in a *permanent, loving* home within a *safe* and supporting community. This aspiration can only be accomplished through a coordinated child welfare partnership between communities and the public and private providers across the state.

## Espoused *Values* of the CCM

1. Mississippi's children and families face many challenges. The purpose of this CCM would be to understand and solve problems creatively in *full partnership* with the state.
2. CCM members would support the development of a coordinated, family-centered, and community-based array of services.
3. CCM members would work together in the belief that focused and collaborative activity best serves both the consumer and the state.
4. CCM members would expect to be judged by our outcomes.
5. Solutions to the problems of Mississippi's children and families should be consumer-driven and lie within the vision and experience of Mississippi's families and agencies.

## The Need for a New Look at Child Welfare in Mississippi

Despite hard work and good intentions, the needs of children and families have not been met. The objectives of supporting and protecting vulnerable children and families require that we re-think the status quo. *New ideas*, *new relationships*, and *new solutions* are needed.

Today, our service delivery system for children and families is fragmented, uncoordinated, and does not consistently yield the outcomes our children and families deserve. Our families too often lack the support, resources, empowerment, and skills they need to parent their children and create permanent, loving, and safe homes - homes where children not only survive, but thrive. Without this support, too many children are removed from their communities. The children in out-of home care are often separated from their siblings, removed from family support systems, and enter a revolving door of multiple, transient, failed placements.

Collectively, we are strongly committed to focusing on *permanency*. We believe in the utilization of <u>all</u> options: family preservation, reunification, placement in kinship care, guardianship, and adoption. The lack of a coordinated effort has resulted in over-utilization of out-of-home placements and has siphoned valuable resources from providing permanency for our children. With the best intentions, we have set the stage for the next generation to repeat this pattern with their children.

The time has come for public agencies, providers, and communities to work hand-in-hand, to forge a new, coordinated CCM with our children and families. This private/public partnership would include a collaborative approach towards maximizing both state and federal funds. To achieve the mutual goals of safety, permanency, and well-being, together, we must create a system of care where children and families benefit from continuity of services which are:

- *community-based*
- *family-centered*
- *youth and family guided*
- *outcome informed*
- *responsive to the changing needs*
- *comprehensive in scope*
- *cost effective*
- *evidence demonstrable outcomes of safety, permanency and well-being.*

What would such a system look like?

- An array of services which are *regionally managed and available* throughout Mississippi. These coordinated regional networks would provide

  - State contracts with regional providers for case and care management of all child welfare services (assessment, out-of-home emergency care, in-home services, reunification, family preservation, foster care, and adoption services). Each region will have one main lead contractor, who subcontracts with local community providers within the region.

  - Each region will have one main lead contractor, who will provide 24-hour intake, emergency response through its own services and subcontracts with local community providers within the region

  - Case management and an array of basic services to promote safety and permanency will be available to and managed through local networks

  - Commitment to the goal - one family, one case manager

  - Other, more specialized services available through preferred providers on a state-wide basis

  - A state-wide framework for a system that includes 24-hour intake, emergency response, computerized information management and case record systems, outcome tracking, and quality assurance. The above will be the responsibility of each region.

*Attached, find Figure 1 depicting the complimentary systems and coordinated relationships necessary to achieve the central goals of safety, permanency, and well-being. Also, please find Figure 2 depicting the necessary components within a Regional Care Management system that buttress the central goals of safety, permanency, and well being.*

- A *comprehensive case management system*, where local case management networks would coordinate the necessary treatment, care and services the child and family may require achieving the goals of safety, permanency and well-being.

- *New/enhanced services* to meet the changing needs of children and families, including

    - Improved assessment services to determine what it will take to maintain children safely in their homes and communities, and to return children to safe and permanent homes

    - Increased number and utilization of prepared and supported foster homes

    - More foster homes that can service special needs children (MRDD, sex offenders, medically fragile children, substance abusers, dual diagnosis) and specialized uses, such as emergency shelter care and respite care.

    - Supports to increase safe kinship placement

    - Specialized services for low incident and high intensity cases will be created and available on a state-wide basis

- State-wide, each region would develop *contractual/affiliate agreements* with providers to deliver more highly-specialized services where necessary, to support children and families i.e., sexual offender treatment, dual diagnosis treatment, etc.

- Such a system cannot be successful without a full commitment to the kinds of *outcomes* that illustrate success for children and families, and document cost effectiveness and efficiency in the delivery of services. In order to track these outcomes, a systematic, centralized, tracking system would be developed, maintained, analyzed, and consistently reported. A sample of some of the outcomes related to safety, permanency, and well-being will include:

    - Every reasonable effort will be made to maintain children safely in their homes, as an alternative to removal

    - Services will be appropriate to the assessed need and will remain responsive to their changing needs

    - Families will be supported by intensive services and supervision to provide safe homes as an alternative to removal

    - Most of the children requiring placement are placed in a family-like setting in or near their community

    - All families will receive needed supports and interventions while children are in out-of-home care

    - Children will not experience abuse or neglect while in out-of-home placement

    - Children will be free from abuse or neglect after permanency has been achieved

    - A high percentage of children served will reach permanency within a short-time of referral

- Wherever possible children are placed with their siblings
- Beyond safety and permanency, children and families will achieve higher levels of well-being, i.e., mental health status/functioning, academic functioning, peer relationships, etc.

- The CCM will work in partnership with the state to develop outcomes and measuring performance in the key areas such as its ability to support children: remaining in their home, being served in a family like setting close to their home community, not experiencing abuse or neglect in out-of-home placement, not requiring removal from the placement once permanency has been achieved, reaching permanency quickly, being placed with their siblings, and experiencing as few number of placements as possible.

## Closing Statement

The greatest resource we have to offer the children and families of Mississippi involved with the child welfare system is the combined passion, resources, experience, knowledge, and commitment to their success found in genuine partnership between public and private providers. The CCM is committed to do just that. Each CCM member would have a strong history of tireless work on behalf of children and families. However, to realize the full impact of these efforts, a coordinated approach is required. As part of a CCM, each provider would be committed to work as full partners with the state and its communities to support strong families and safe, thriving children. Together, we can assure a bright future...*our future*...for Mississippi's children and families.

*This position paper was the result of collaborative dialogues with other private, community providers during the Spring of 2006.

# *Continuum of Care Model*: Organizational Schematic

## Regional Case Management/Service System *



* In addition to the services listed above, each of the DHS Regions would also be responsible to provide 24-hour referral and client support, as well as an information and outcome management system consistent with state-wide standards.

** **Specialized treatment services** may include, but not be limited to, sex offender treatment, A&D services, PRTF, group home care, treatment for medically fragile populations, independent living, acute hospitalization, etc.

*Figure 1*

# Regional Case Management & Service Capacity



*Figure 2*

Case 3:04-cv-00251-HSO-ASH   Document 412   Filed 05/07/2007

SOUTHERN DISTRICT OF MISSISSIPPI

FILED

MAY - 7 2007

J T NOBLIN, CLERK

BY_____ DEPUTY

Re: 3:04 cv 251 LN

Striped of all
right yet held accountable
all others.

Jerelyn Jones
912 Eastview St
Jackson, MS 39203

601-969-6738
502-3221

Please excuse my
spelling and handwriting

Thank You and have
a Blessed day.

My concerns:
May 07, 07

May 07, 07

My Name is Jerelyn Flowers Jones. I welcome this oppilunty to express my concerns with the Department of Human Servis Foster Care division of Family Children Servces.

As of April 13 or some where around this date, My daughter (1 Amber Jones) and 5 Grandchild Kyshia Jagun partin twins and Marion Joe is in there custy.

April of 2007 a social worke come to investigat a anoms call about the care of my daughter Jacqueline Joe) Children and made a statent of neglet. They assed the situation and told Use that she would get Us some and that she coud be back. She come back with 4 care of co workers and remove my familys stating the poburban

was the condition of our
home. And that we would
contacted later as too their
decision Concerning the children
. The allegation that was
to use was in a net. Drug
is part of this. My daughter
is an addict, and I m a
recoving addict.
My children was court
ordered to DHS the was
of month and no proof. no
pictures. No written statement
of from other concern rught
they all are healthy crudly
Aul home is old and it did
and still do need work on.
We ask for the help this
said but nothing mattered
we ask for supporting or
places to get help for
nothing happen.
My children was in a
together until I was told
I had to sign an agreenent

form. I did this. My daughter
D'Amber was placed in Foster
Care and been they since
I had done what they
have ask of me except
a drug test which I have
to pay and to at Metro
Counseling. I am going summit
my drug court result on
Tuesday May 8 in court.

My daughter is 9 year old
she has been moved 5 time
she has no school record
I received and Anther
Bull saying that she
was in an accident. They
deny it ever occur and
attempt to get information
through a lawyer, we never
received any information to
be truth. My was addition to
to continuous and Core
taken out In us County
on medical or I without

8

my knowledge, her medical
needs are not being met.
I'm going has not be-
replace all of this to me
is neglect.
    There is so much
more I would like say
I'm a witness.
    Please accept my letter
of concern and try to
read it best you can.

Thank You

Somuch !

Jerelyn Jones

Jerelyn Jones
912 Eastview St
Jackson MS 39203
601 969-6738
    Please, let me hear for you

4

Jerelyn Jones
912 Eastview St
Jackson MS 39203

RECEIVED

MAY - 7 2007

Clerk, U.S. District Court
Southern District of Miss.

Mr J T Noblin, Clerk
United State District Court of MS
United States Courthouse
245 E Capitol Street
Jackson MS 39201

SOUTHERN DISTRICT OF MISSISSIPPI
F I L E D

MAY - 8 2007

J T NOBLIN, CLERK
BY_____ DEPUTY

To whom it may concern,

3:04cv 251

My name is Annie Anderson, and I recently was a foster parent to my grandchildren. In June of 2005 my grandchildren was dropped off at my place of employment by their mother, but I told her to take them to my home were my daughter and son could watch them until I get off. But at the time I didn't know what was going on. I found out that alot of things was going on that just wasn't right in her household and I think someone had made some complaints to the department of human services in Tunica County which at the time was her place of residents. I think the last time was when she left the children smaller by themselves at home and one of her children were playing on the phone and called 911. So a police officer showed up at their resident and no grown ups was there with them and I guess the police called DHS and they wanted to talk to their mother, but she refused. So she brought them

to me. So her case worker Andrea, who I can't remember her last name, came to my house and talked to the children and told me to keep all 5 children until further notice. She ask me if I want to keep the children and I said yes because I didn't want them separated. Only 3 of her children are my grandchildren, but I love them all the same. Their mother was going around saying I took her kids but I didn't. I asked her relatives if they wanted to keep them, but each one of them said no. So I took in my grandchildren and loved and took care of them the best way I could. The job I have didn't pay much, but I made ends meet. The only help I had was from Andrea, who made sure the kids had plenty of food to eat and clothes to wear. I thanked her because I don't know how I was going to make it. But my daughter and son was a big help. My oldest son is the father of my grandchildren. He helped as much as he could. The only help the state gave

me was giving me food stamps. But one of the social workers from Tunica county told me that I was going to get all the help I needed, but I got nothing. My daughter and sons helped me as much as they could but I felt the state should have helped as well. Times were hard, but by God grace I made it through. I had my grandchildren from June until a week before Christmas in December 2005. I don't know what went on or said but Andrea called me and told me that the children were back in her custody. I just want whats best for those children. I love them so much. The only problem I have is the state of Mississippi doesn't help foster parents at all. And I think thats wrong. So I hope this letter helps everyone understands that despite if your suppose to get help from the state doesn't mean you get help.

Thank you,
Annie Anderson

Annie Anderson
3609 Tom Floyd Rd
Como, MS 38619

MEMPHIS TN 381

14 MAY 2007 PM 2 T

Mr. J.T. Noblin, Clerk
US District Court for the
Southern District of MS
US Courthouse
245 E. Capitol Street
Jackson, MS 39201

RECEIVED

MAY - 8 2007

Clerk, U.S. District Court
Southern District of Miss.

SOUTHERN DISTRICT OF MISSISSIPPI
FILED

MAY - 7 2007

J. T. NOBLIN, CLERK
BY _____ DEPUTY

3:04 cv 251

Teresa A Wells
381 Mill Pd Rd
Lamar Ms 38642
901-489-2988
May-2-07

I would like to be apart
of this settlement. I was
asked to care for two grand-
children by the Department
of Human Service. Was
told that they would get help
me, by giving food Stamps. I
went to the Office to apply not
able to get Food Stamps.
      I was told I had to put
my child ofather on child
Support to take care of State
children. My Child had nothing
to do with the Matter. I didn't
ask them to care for mind. I asked
on their behalf. I'm a single
parent but had to care for two
more children for them on a
very small income. I cared for
the children almost a year.
      I was promised that I
would keep the children but returned
to the same home. That's Not
Good for the children returning
into bad homes. I May not be
qualifed but I think it was unfair.
                  Teresa A. Wells

Teresa A. Wells
381 Mill Pd Rd
Lamar Ms 38642

RECEIVED

MAY - 7 2007

Clerk, U.S. District Court
Southern District of Miss.

Document 403
Case 3:04-CV-00251-TSL-JCS 3201+2403

Mr. J. T. Noblin Clerk
United State District Court for the
Southern District of Mississippi
United State Courthouse
245 East Capitol Street
Jackson, Mississippi 39201



SOUTHERN DISTRICT OF MISSISSIPPI
F I L E D

MAY - 8 2007

J T NOBLIN. CLERK
BY_____DEPUTY

Dear Mr. Noblin,

3:04 cv 261

I would like to voice my objections to the settlement agreement, because the Defendants are not agreeing to admit to the truth and validity of the claims made against them. I believe the children in the system had their constitutional rights violated, I believe they had their rights as human beings violated. I would very much appreciate a chance to speak to the judge before the Court. This is what I would like to speak about. The fact that their constitutional rights were violated and on the remedial plan.

Jean Smith
332 Nuneyer Ln.
Lumberton MS. 39455
601-795-7160

Jean Smith
332 Niemeyer Ln
Lumberton Ms 39455

RECEIVED

MAY - 8 2007

Clerk, U.S District Court
Southern District of Miss.

HATTIESBURG MS 394

04 MAY 2007 PM 1 L

Mr. J. T. Noblin, Clerk,
United States District Court
For the Southern District of Mississippi
United States Courthouse
245 East Capitol St,
Jackson Ms 39201



# PAUL MATHIS, LLP
### Attorney At Law

PAUL MATHIS, Jr.

——

Admitted also in MI and US Tax Ct.

Cypress Grove Office Building
365 West Reed Road, Suite C
Post Office Box 936
Greenville, MS 38702-0936
Telephone (662) 332-6660
Facsimile (662) 332-6668

Of Counsel To:
HARMON & DAVIES, P.C.
www.h-dlaw.com
paulmathis@bellsouth.net

May 3, 2007

RECEIVED
MAY - 8 2007
Clerk, U.S. District Court
Southern District of Miss.

FILED
MAY 0 8 2007
J T NOBLIN, CLERK
BY_____ DEPUTY

Mr. J. T. Noblin, Clerk
United States District Court for the
Southern District of Mississippi
United Stated Courthouse
245 East Capitol Street
Jackson, MS  39201

**Re:**    *Olivia Y, et al v. Barbour, et al, USDC SDMS
3:04-cv-00251-TSL-JCS*

### Our Client: Sacred Heart Ministry for Children, Inc.

Dear Mr. Noblin,

This office represents Sacred Heart Ministry for Children, Inc. and its owners, Joann Wilson and her husband, Joe Wilson (collectively referred to herein as "Sacred Heart").  We file this letter with the Court and counsel, noted on the certificate of service, for the purpose of lodging with the Court, Sacred Heart's comments and objections to the proposed settlement. They are as follows:

### I
### Comments

As early as July 2003 (my file records), we were retained by Scared Heart to represent it in its ongoing battle to receive licensure, notwithstanding its full compliance with all regulations imposed upon facilities such as it. The State, through its representatives, during this process, exhibited complete disregard for the safety, health and welfare of the wards entrusted to providers of  foster and children's care services.

It is clear based upon the history of the State with this provider and when reading, *in pari materia,* the Amended Complaint and selected records we have

Mr. J. T. Noblin, Clerk
United States District Court for the
Southern District of Mississippi
Page 2

seen, the egregious conduct of the State was not only systemic but so
calculated and purposeful as to literally drive out of business those persons

who, notwithstanding compliance, were forced to shoulder the burden of foster
case and related services on their own and in many instances without just
compensation.

The culmination of this conduct and we must assume accrorss the board ,
was to ,at least in the case of Scared Heart March of this year), force providers
to close their doors.

## II
### Objections to Proposed Settlement

1. While not a member of the certified class, Scared Heart believes the
proposed settlement, Options 1 and 2, does not give proper consideration for
the administration of and payment of services to third parties, for benefits to
members of the class.

2. More importantly, there are no provisions in the proposed settlement
for the reimbursement of past services rendered by providers, such as Sacred
Heart, *who were not compensated* for their services by the constant arbitrary
manipulation of procedures and tactics designed to avoid payment.

3. The proposed settlement does not address the necessary and
complete removal from the DHS and DFCS process those persons who are
demonstrably predisposed to continue the discriminatory conduct  occurring
over the last decade in the Division of Childrens Family Services.

4. The transition and /or remedial process over a five year period is
entirely too long and by its terms (i.e. length of time), leaves room for repeat
failures.

5. The proposed settlement should *in all respects* address and
articulate  the violation of  "service providers" (such as Scared Heart)
constitutional substantive due process rights, violated by the Defendants
which  are embodied in the evidentiary record created to date, as well as in the
agreed stipulated order and settlement ( i.e. agreed findings of fact,etc).

6. Provision must be made to the adequate and full access of all
discovery documents, records and material to service providers (Scared Heart),

Mr. J. T. Noblin, Clerk
United States District Court for the
Southern District of Mississippi
Page 3

so that each provider may, without impediment, pursue, at their option, any remedies not covered by the breath and scope of *Olivia Y v. Barbour, et al.*

Having set forth Scared Heart's Comments and Objections herein, this letter, shall further request that I, as Counsel for Sacred Heart, be permitted to appear and speak at the hearing set for May 17, 2007. I am a licensed attorney authorized to appear before this Court.

Respectfully Submitted,

PAUL MATHIS, LLP

Paul Mathis, Jr.

PMJr./tcn

## CERTIFICATE OF SERVICE

I, Paul Mathis, Jr., Attorney for Sacred Heart Ministry for Children, Inc. do hereby certify that I have this day via U. S. Postal Service, mailed postage pre-paid, a true copy of the above and foregoing instrument to the following:

Eric Thompson
Children's Rights
330 Seventh Avenue, 4th Floor
New York, NY 10001

Rusty Fortenberry
Baker, Donelson, Bearman, Caldwell
& Berkowitz, PC
4268 I-55 North
Meadowbrook Office Park
Jackson, MS 39211

This, the ___ day of May, 2007.

Paul Mathis, Jr.

G:\Clients\Scared Heart Ministry for Children,Inc\Correspondence\J.T. Noble,Clerk-ltr.doc

3

Paul Mathis, LLP
PO Box 936
Greenville, Ms. 38702-0936



Mr. J. T. Noblin, Clerk
United States District Court for the
Southern District of Mississippi
United Stated Courthouse
245 East Capitol Street
Jackson, MS 39201