

**SYSTEMS REVIEW OF THE MISSISSIPPI DEPARTMENT OF HUMAN
SERVICES, DIVISION OF FAMILY AND CHILDREN'S SERVICES**

**FINAL REPORT**

**Submitted by
Child Welfare League of America
March 31, 2006**

Table of Contents

I.   Executive Summary ........................................................................ i

II.   Introduction .............................................................................. 1

III.   Systems Review Methodology .................................................. 6

IV.   Findings ................................................................................. 11

V.   Conclusions ........................................................................... 39

References ..................................................................................... 41

APPENDIX A Workload Study Description Analysis, and Findings.................... 44

APPENDIX B Guides for Interviews with Regional Directors ............................. 51

APPENDIX C Caseworker Service Need and Availibility Survey ....................... 56

APPENDIX D Caseworker and Supervisor Focus Group Interview Guides........ 67

APPENDIX E Consultant Vitas .......................................................... 89

# I.  Executive Summary

This report describes a systems review of the Mississippi Department of Human Services, Division of Family and Children's Services (DFCS) that was conducted by the Child Welfare League of America under contract with the Mississippi Office of the Attorney General.  This review is part of the state's response to the <u>Olivia Y., et al., vs. Haley Barbour</u> class action lawsuit which alleges that the constitutional rights of children placed in the protective custody of DFCS were violated by virtue of the state's failure to provide them with basic care and protection.  The review was conducted with the full cooperation of DFCS and in partnership with agency staff at multiple levels.  Activities were guided by the need to answer two key questions:

1.  What are the major strengths and needs of MDHS/DFCS with regard to its ability to discharge its responsibility for the well being and permanency of children who have been placed in its custody?

2.  How can MDHS/DFCS act most strategically and expeditiously to address identified deficiencies in its capacity and practice related to serving, protecting, and attaining permanency for children in its custody?

**Review Methodology**

The following activities were undertaken to collect the data on which the findings and conclusions of this study are based:

- Review of documents including agency policies, data profiles, internal and external reports, and training materials;
- Review of case records of named plaintiffs in the litigation;
- Analysis of caseworker workload;
- Group and individual interviews with administrators, managers, supervisors, and caseworkers; and
- Survey of caseworkers regarding service needs and availability.

**Major Findings**

Mississippi's child welfare system suffers from a lack of sufficient resources to support the family-centered practice approach it is attempting to undertake. Major areas of need include:

*1.  Staffing*

DFCS is under-staffed at all levels.  Many caseworkers carry workloads which are at least double the average number they can manage based on the workload analysis conducted in this review. Many supervisors also carry cases and have administrative duties in addition to providing supervision for

caseworkers.    Administrative and management staff are inadequate to provide the support needed by those responsible for service delivery.  This is particularly true with regard to staffing of the agency's policy, program management, and training units and the support of its automated data system.

The recruitment and retention of qualified staff is adversely impacted by heavy workload, low pay and lack of opportunity for advancement or cost of living adjustments.  Delays in the hiring process further contribute to the agency's inability to hire the most qualified applicants.

*2. Training*

Training resources are so limited that new caseworkers are often on the job for weeks or months before they are able to attend training.  Most supervisors have had no training specific to their supervisory role, and individual professional development plans are lacking for staff at all levels.

*3. Resources*

Agency staff are hampered in their efforts to serve children and families by a lack of resources.  This is particularly true in the area of available placements for children.  The lack of a sufficient number and variety of qualified foster family homes and supports for relative placements has forced an over-reliance on emergency shelters and the use of placements that are too far from children's families of origin.

This review confirmed several of the findings of Mississippi's federal Child and Family Services Review (CFSR) conducted in 2004.  The state has begun to address some areas of need as outlined in its federal Program Improvement Plan and indicated in DFCS initiatives that were planned or underway when the study began.  Positive action already taken or in progress includes:

- Submission of a request to the legislature for an additional $694,085.64 to fund modest pay increases for caseworker staff;

- Plans to outsource family preservation services to the private sector and shift the 49 caseworker positions allocated in DFCS for that function to delivery of services in the core child welfare programs in each county;

- Revision of foster care policy and issuance of desk references to separate policy and practice and provide easier reference for service delivery staff;

- Development of additional management reports to enable administrators and managers to track critical information such as rates of shelter care placement and case contacts;

- Development and issuance of a guide for regional action plans to identify and address specific service needs at the local level;

- Plans to achieve better results from the state's agency-university partnership funded through federal Title IVE;

- Initiation of a contract with a consulting group to maximize the state's access to federal funding; and

- Support of a shift to a family centered practice approach through issuance of a practice guide, greater emphasis on engaging and teaming with families, and delivery of training to all service delivery staff.

The level of participation of DFCS personnel in this review also reflects positively on the agency's desire to more specifically identify strengths and needs as a basis for internal planning and justification of requests for necessary resources. DFCS has begun to lay a foundation that will enable it to better respond to the needs of children and families in Mississippi. The success of these efforts will be reliant, as it is in any child welfare system, on the provision of the resources necessary to support the building of a workforce sufficient in number and skill and an organizational structure and environment that supports them in doing this very difficult and important work.

## II. Introduction

### A. Agency Request for Consultation

The Child Welfare League of America (CWLA) was asked to provide consultation to the Mississippi Department of Human Services, Division of Family and Children in connection with the <u>Olivia Y., et al., v. Haley Barbour</u> lawsuit which had been filed in March, 2004.  This lawsuit alleges that the constitutional rights of children in the custody of MDHS have been violated by the state's failure to provide basic care, including health, mental health, and educational services, to children in its custody. It is further alleged that children are placed in unsafe, unlicensed family homes or facilities that fail to protect them from harm or to provide the least restrictive placement.  Additionally the suit alleges that these children are not provided with the timely and appropriate services needed to ensure that they are safely reunited with their families or, when that is not possible or advisable, moved to another permanent home.

After a period of discussion and negotiation, a contract between the Mississippi Office of the Attorney General and CWLA was finalized on June 16, 2005. Specific work to be performed under the terms of this agreement included the following:

- Review MDHS/DFCS' policies, procedures, and organizational structures in order to understand MDHS/DFCS' system and how they can maximize their resources through both staffing and current financial budgetary funding.

- Analyze the structure, caseload, workflow, case management and capacity of MDHS/DFCS' staff who serve children in its custody. Make recommendations for needed changes in these areas based upon prior models and studies of others similarly situated states, and provide assistance in developing and crafting a program evaluation tool in these areas to be used by MDHS/DFCS.

- Provide expert testimony as to the issues before the United States District Court for the Southern District of Mississippi in the case styled <u>Olivia Y., et al. v. Haley Barbour, as Governor of the State of Mississippi, et al.</u>, Civil Action No. 3:04-cv-25 ILN. This testimony will include, but not be limited to information gathered through review and analysis of MDHS/DFCS' policies, procedures, organizational structures, caseload, workflow, case management, and capacity of MDHS/DFCS' staff to meet and serve the needs of the children who are in the custody of MDHS/DFCS.

The goals of the systems review and workload and workflow analysis were to provide information that would inform and support the efforts of the current administration to address systemic barriers to effective service delivery, especially in the area of foster care services as these are the focus of the class action lawsuit.

At the request of MDHS/DFCS and the attorneys representing the Office of the Attorney General, this review focused most strongly on issues related to workload, professional development, and the practices and processes that characterize services to children in the foster care system and their families. This report provides the findings of that review and the recommendations for changes based on those findings.

It should be noted that this review was conducted in the months immediately following the state's having been hit by Hurricane Katrina, the most devastating storm in United States history. The storm virtually wiped out large portions of the coastal regions, effecting heavy damage through the entire lower half of the state, displacing many DFCS offices, courts, and offices of service providers, and calling for deployment of staff throughout the state to emergency duty for several weeks. Even in the northern portions of Mississippi less directly affected by the storm, communities faced a large influx of storm refugees. In light of the obvious impact of this event, it is possible that some aspects of this review are not reflective of regular agency operation.

## B.  CWLA Capacity

The Child Welfare League of America is the nation's oldest and largest membership-based child welfare organization. It is well-known and respected as a champion for children, advocating on their behalf since 1920. As the nationally recognized standard-setter for child welfare services, CWLA provides direct support to agencies that serve children and families, improving the quality of the services that they provide to more than 9 million children every year. Through its programs, publications, research, conferences, professional development, and consultation, CWLA speaks with authority and candor about the status and the needs of America's children, young people, and families. CWLA staff possess broad expertise in child welfare and related fields, including direct service delivery, public and private agency administration, research, and data technology systems.

This systems review was led by two CWLA consultants. Their vitas are included in Appendix E.

## C.  Agency Overview

Child welfare services in the state are administered by the Division of Family and Children's Services (DFCS) within the Mississippi Department of Human Services (DHS). The stated mission of the social service system, including private non-profit providers, local government agencies, and state agencies is to protect vulnerable children and adults from abuse, neglect or exploitation; support family preservation and community living; and prevent family violence and disruption.

Mississippi is a largely rural state comprising 82 counties. More urban areas include the capital city of Jackson which is centrally located, larger towns in the

2

coastal area just east of New Orleans, Louisiana, and the area in the northwest part of the state where towns make up the metropolitan area of Memphis, Tennessee.

Most child welfare services are delivered at the county level through 84 offices that are part of a nine-region organizational structure.  County staff provide intake, child protection investigation, foster care, and in-home services to families in which children have been deemed in need of protection.  Currently, personnel responsible for adoptions and licensing of child placement agencies and resource families are assigned to three regions which cover the entire state for these functions.  Each of the nine regions is administered by a Regional Director who reports to the Director of Field Operations in the DFCS State Office.  The Director of Field Operations reports to the DFCS Director as does a Director for Data and Fiscal Operations.  Programmatic functions are managed through unit managers for Prevention, Protection, and Placement.

At the end of federal fiscal year 2005, there were 3,288 children in the custody of MDHS/DFCS, an increase of 368 over the previous year (MS CFSR Data Profile, December 8, 2005).  The agency uses a "primary client" designation as a means of counting cases.  Currently, it employs approximately 265 caseworkers who serve about 11,674 primary clients or an average of about 44 primary clients per worker.

### D.  Mississippi's Child and Family Services Reviews (CFSR)

Given that current state efforts toward child welfare systems reform are largely driven by the federal CFSR standards, it is useful to consider where Mississippi stands with regard to these indicators and how it compares with other Southern states.  The CFSRs, which are conducted by the U.S. Children's Bureau in the Department of Health and Human Services, assess states' performance in relation to seven outcomes related to child safety, permanency, and well-being.  This is done based on the state's self-assessment, extensive interviews with persons involved in and with the child welfare system, and reviews of a sample of 50 cases in each state.  A series of six quantitative measures related to (1) the incidence of repeat child maltreatment; (2) incidence of maltreatment of children in foster care; (3) re-entry of children into foster care within twelve months of a prior discharge; (4) length of time to required to achieve family reunification; (5) stability of foster care placements; and (6) length of time required to finalize adoptions are reviewed.  State programs are also reviewed on seven systemic factors designed to determine the extent to which the state agency has implemented state plan requirements that build the capacity to deliver services leading to improved outcomes.  These systemic factors include: (1) statewide information systems; (2) a case review system; (3) a quality assurance system; (4) staff and provider training; (5) service array; (6) agency responsiveness to the community; and (7) foster and adoptive parent licensing, recruitment and retention.

Mississippi's review was conducted in February 2004 and the final report issued in May 2004.  The state met the national standard for two of the six quantitative measures, those pertaining to repeat maltreatment and re-entry of children into foster care.   Their performance on these measures as compared to other Southern states and as compared to the federal standard is shown in Table 1 below.  It was also found to be in compliance with two of the seven systemic factors, those of agency responsiveness to the community and foster and adoptive parent licensing, recruitment, and retention.  It was not found to be in substantial compliance with any of the seven outcomes related to safety, permanency, and well-being, although it was noted that performance varied considerably with some strengths apparent in each.

**Table 1: Southern States' Performance on Six Quantitative CFSR Measures**

| State | Repeat Maltreatment 6.1% | A/N in FC .57% | FC Re-entry 8.6% | Reunification 76.2% | Adoption 32% | Place. Stability 86.7% |
|-------|--------------------------|----------------|------------------|---------------------|--------------|------------------------|
| AL    | 5.20                     | 0.15           | 7.90             | 63.00               | 13.10        | 96.40                  |
| AR    | 4.22                     | 0.29           | 10.57            | 83.38               | 26.02        | 68.63                  |
| GA    | 4.22                     | 1.08           | 4.43             | 63.05               | 23.05        | 92.29                  |
| LA    | 6.80                     | 0.58           | 7.80             | 65.00               | 11.60        | 83.30                  |
| MS    | 4.60                     | 0.59           | 4.60             | 56.70               | 19.00        | 55.00                  |
| NC    | 7.98                     | 0.83           | 1.19             | 57.66               | 25.96        | 61.29                  |
| SC    | 3.4                      | 0.51           | 6.60             | 82.10               | 14.00        | 76.00                  |
| TN    | 2.80                     | .60            | 10.10            | 61.30               | 10.50        | 61.10                  |

*Shading indicates that the state met or exceeded the federal measure.*

**Table 2: Compliance with Seven CFSR Outcomes/Systemic Factors**

| State | Outcomes | Systemic Factors |
|-------|----------|------------------|
| AL    | 1        | 6                |
| AR    | 1        | 7                |
| GA    | 0        | 7                |
| LA    | 1        | 7                |
| MS    | 0        | 2                |
| NC    | 0        | 7                |
| SC    | 1        | 5                |
| TN    | 0        | 4                |

All states must develop a Program Improvement Plan (PIP) to address deficiencies identified in the CFSR.  Mississippi's PIP was approved by the U.S. Children's Bureau in May 2005.  The plan identifies family-centered practice as its foundational principle and is organized around six priority goals for program improvement:

- Ensure that the safety of children is the first priority.

- Achieve timely permanency outcomes.

4

- Enhance families' capacity to care for children and be actively engaged in the decision-making process.

- Increase community involvement and shared responsibility for the well-being of children and families.

- Improve the quality and consistency of practice statewide by actively engaging and supporting staff at the local level.

- Enhance quality assurance methods to reinforce practice and inform staff.

Key strategies identified to achieve the above goals are

- Increased use of family team meetings;

- Streamlining of cumbersome policy manuals;

- Development of user-friendly practice guidebooks;

- Development of Regional Action Plans that identify and address local service needs;

- Development and implementation of additional caseworker and supervisory training;

- Development of new screening and assessment tools;

- Development of a new statewide recruitment and retention plan for family placement resources;

- Enhancements to the automated data system (MACWIS); and

- Development of community collaboratives for service coordination.

Work was begun on several of these initiatives during the spring and summer of 2005. A national group (Adopt U.S. Kids) was engaged to assess the need for family placements and consult on the development of a resource family recruitment and retention plan. The PIP relies heavily on technical assistance from the U. S. Children's Bureau's National Child Welfare Resource Centers, particularly in the development of training and resource guides. A training manual and guide for family centered practice was developed with assistance from the National Resource Center for Family Centered Practice and the University of Southern Mississippi School of Social Work, and the National Resource Center for Child Protective Services assisted in creating a screening and assessment tool.

Work on the plan came to a standstill for a period after Hurricane Katrina hit the state in August, 2005. Subsequently, the U.S. Children's Bureau offered an opportunity for the state to renegotiate its plan to better reflect its needs and capacity in the wake of the storm. Federal officials met with DFCS administrators and managers in January, 2006 and the new plan is currently being drafted.

**E. State Foster Care Data Profile**

It is generally considered better for children in out-of-home care to be placed with families rather than in group care. The CFSR Data Profile of December 8, 2005 shows that, on the last day of federal fiscal year 2005, 74% of the children in MDHS/DFCS custody were in family placements, an increase of 4% from the prior year, and of 23% over 2003. About 25% of children are in some type of congregate care (group homes or institutions), down from 28% in 2004, but an increase over the 23% recorded in 2003. These data on the number of children entering care during the past three federal fiscal years show a greater increase in family care placements from 45% in FY 2003 to 95% in FY 2005 as depicted in Table 3 below.

**Table 3: MS Children in Family Placements – Entry Cohort**

| Federal FY 2003 | Federal 2004 | Federal 2005 |
|---|---|---|
| 46% | 69% | 95% |

The last year for which comparative data is publicly available is 2003. Table 4 depicts MS in relation to other Southern states on length of stay in foster care and placement stability.

**Table 4: Median Length of Stay (LOS) and # Placements**

| State | LOS (month) | # of Placements |
|---|---|---|
| AL | 18.3 | 2.0 |
| AR | 12.6 | 3.0 |
| GA | 13.8 | 1.0 |
| LA | 14.5 | 2.0 |
| MS | 15.9 | 2.0 |
| NC | 14.0 | 4.0 |
| SC | 19.3 | 1.0 |
| TN | 11.4 | 2.0 |

# III. Systems Review Methodology

In conducting this systems review, CWLA consultants engaged people at all levels of DFCS to gain the most comprehensive understanding of the agency and its operation possible within the scope of this project. Small representative work groups were relied on as much as possible for data collection in order to gather information with minimal disruption of regular work activities. This was especially important in view of the impact of the recent hurricane as well as the fact that many staff across the state were involved in additional activities related to the implementation of the state's federal Program Improvement Plan.

Areas of inquiry were based on those factors which experience and research have found to be the foundational requisites of a successful child welfare system. These include:

- A service delivery workforce, particularly caseworkers and first-line supervisors, of a size sufficient to meet the needs of the service population;

- A workforce with sufficient skills to accurately assess child and family strengths and needs and engage families in the selection and use of services targeted to address their needs;

- Organizational supports that create a positive work environment, guide and sustain effective practice, and ensure accountability; and

- An array of resources that can be accessed to fulfill service needs.

**A.   Research Questions:**

1. What are the major strengths and needs of MDHS/DFCS with regard to its ability to discharge its responsibility for the well being and permanency of children?

2. How can MDHS/DFCS act most strategically and expeditiously to address identified deficiencies in its capacity and practice related to serving, protecting, and attaining permanency for children?

**B.  Data Collection**

A variety of activities were undertaken to gain a basic understanding of the structure and of the administration and management in MDHS/DFCS, its workforce, and its practices, especially those related to services provided to children in out-of-home care.   These activities are enumerated and described below:

*1.  Document Review*

CWLA consultants developed a partial document request at the outset of the project based on their knowledge of child welfare agency operation.  Additional documents were requested as their existence and relevance were disclosed either in materials already requested or in contacts with DFCS staff.  Documents reviewed included the following:

- Policies pertaining to agency administrative policy and programmatic activities;

- Written guidelines for family-centered strengths and needs assessment and family centered practice;

- Agency organizational charts;

- Agency job descriptions;

- Agency data profiles;
- Agency reports including:
    - ◇ Mississippi Program Improvement Plan
    - ◇ Foster Care Review
    - ◇ Client Satisfaction Survey Reports
    - ◇ Resource Family Recruitment and Retention (draft);
- Management documents including:
    - ◇ Staff Guide to the Regional Action Plans
    - ◇ Reorganization white paper
- External reports including:
    - ◇ Mississippi Child and Family Services Review Final Report
    - ◇ Citizen's Review Board
- Transcripts of depositions in Olivia Y.

### 2.  Workload Review and Analysis

Workload and other personnel issues are among the most significant challenges facing child welfare systems in the United States today.  As they attempt to serve a population that is growing in both number and complexity of need, many human service agencies, both public and private are grappling with high workloads, high turnover and vacancy rates, and the inability to recruit staff with the requisite knowledge and skill for effective practice in this demanding field.

In Mississippi, documentation provided indicates that turnover among entry level social work staff as of August 2005 was 35.36%.  The vacancy rate across all caseworker positions stood at nearly 19%.  High rates of turnover are of significant concern for two reasons.  First and most importantly, research has shown that change in caseworkers is strongly associated with delays in children's attainment of permanency outside of the foster care system (Potter & Klein-Rothschild, 2002).  Secondly, turnover is costly to agencies (Graef, & Hill, 2000).

Based on their recognition of the importance of this issue in service delivery, the MDHS/DFCS administration requested that a caseworker workload analysis and recommendations for staffing be a major focus of the CWLA systems review.  In response, CWLA consultants worked with a group of agency staff representing each region of the state to examine the case-related job functions of DFCS caseworkers and the amount of time required to complete activities and sub-activities associated with each function.

### 3.  Training Review

CWLA consultants reviewed the following training materials:

- Modules used in the *Intensive Training* series for new caseworkers;

- Documents describing a pilot *Learning Labs* training for supervisors which was tested in two regions (1 West and 1 East) in the northern part of the state; and

- A summary of the new *Family Centered Practice* training currently being delivered to staff statewide during February and March, 2006.

In addition, several university personnel involved in the agency's Title IVE training program were interviewed regarding the *Learning Labs* supervisory training and the agency training director, director of the supervisory training work group, and the Division Director were interviewed regarding plans for further training development.

### 4.  Interviews with Administrators and Managers

Two group interviews were conducted with management staff appointed by the Division Director to provide information to the CWLA consultant team.  This group included two unit directors in state office and three Regional Directors. Interviews were guided by two documents, (1) a paper that linked issues expressed in the Olivia Y. complaint with related agency initiatives and (2) with an analysis of key points in the agency's foster care program policy.

Interviews with the Regional Directors group solicited their views of strengths and needs in three areas:

*Workforce:*  Factors that impact their ability to hire and retain staff; quality and preparation of staff

*Placement Resources*:  Factors that impact the agency's ability to recruit, prepare, and retain an array and distribution of placement providers, particularly resource families, that meet the needs of the children in MDHS custody; and

*Administrative Support:*  The type and degree of supports needed and received from the state level.

Interview guides for the meetings with the Regional Directors are contained in Appendix B of this report.

### 5.  Attendance at Management Meetings

CWLA consultants also participated in two meetings of management staff.  The first was a meeting of the Policy and Practice Work Group which was attended to gain a better understanding of the policy development process currently used and the status of policy changes underway in the organization.  The second was a meeting of the Regional Directors, administrators, and middle managers involved in reviewing the state's PIP in preparation for re-negotiation with the project officers in federal Region IV.  Attendance at this two day meeting provided more in-depth knowledge of the status of PIP goals and strategies and of barriers to their completion.

9

### 6. Caseworker Survey

Caseworkers were surveyed to determine the major service needs of children in MDHS custody and their families and the availability and accessibility of those services. These surveys were distributed through the Regional Managers, who transmitted them to their supervisors with the instruction that they be distributed to all caseworkers assigned to children in agency custody. A total of 138 usable surveys were received, representing a response rate of 52%. A copy of the survey instrument is contained in Appendix C.

### 7. Focus Groups with Caseworkers and Supervisors

In order to gain a better understanding of factors that directly affect the ability of front line staff to perform their jobs, CWLA conducted a series of focus groups around the state. Focus groups are an accepted qualitative research technique particularly suited to gathering information about the day-to-day experience, attitudes, and beliefs of persons who are related by their common involvement in a particular situation or activity, in this case employment in Mississippi's child welfare system.

Group interviews were conducted in regions II, III, and VII during the week of March 13, 2006. These regions were selected for their geographic location and rural-urban representation. The Regional Director in each was asked to randomly select eight caseworkers and eight supervisors from their staff roster to participate in the groups. One group of supervisors and one group of caseworkers was interviewed in each of the three regions. The interview questions were designed to solicit information about factors that either impede or facilitate caseworkers' and supervisors' fulfillment of their job responsibilities and to examine work flow in order to identify any areas where service delivery and facilitation of permanency for children in agency custody might be handled more efficiently.

A total of 22 caseworkers and 18 supervisors participated in the interviews. All of the caseworkers worked directly with children and families; one also recruited and trained foster and adoptive families. Five of the participating supervisors indicated that they work directly with children and families in addition to supervising caseworkers. One supervisor also recruited and trained foster and adoptive families in addition to doing direct casework and supervision of staff. Focus group interview guides and summary interview data may be found in Appendix D.

### 8. Review of Named Plaintiffs' Cases

Case record materials and additional documentation regarding services delivered to eight named plaintiffs were reviewed and analyzed. The focus of this review was to determine the adequacy of services to these children and their consistency with standards for reasonable practice at the time they were delivered. The findings of this review are provided in a separate document.

# IV. Findings

## A. Organizational Supports

Although effective child welfare service delivery is most directly dependent upon front line staff, it is well established that staff cannot function optimally without a full complement of administrative supports. These include accurate and up-to-date policies and practice guidelines, quality assurance and data tracking systems, and the availability of programmatic expertise to provide policy interpretation and consultation in the myriad unique situations that inevitably occur in the daily delivery of services to children and families. Policies, procedures, and organizational structures must provide clear and sufficient guidance and support to staff in making sound decisions, delivering services targeted to match the needs of the client population, and in setting and attaining reasonable goals for the protection of children.

### *1. Policy*

The following policies were reviewed:

- Administrative
- Child Protection Investigations
- Adult Protective Services
- Foster Care
- In-home Services
- Interstate Compact for the Placement of Children

For the most part, DFCS policies are consistent with at least minimally acceptable expectations for child welfare practice. As in many agencies, however, policy manuals also include practice guidelines, making them too lengthy to be easily usable and creating difficulty for staff in trying to distinguish legal or regulatory requirements from practice guidance. DFCS has already recognized the need to separate practice guidelines. It is expressed in the Program Improvement Plan and this work is underway with technical assistance from several of the National Child Welfare Resource Centers. A handbook for family centered practice has already been developed and numerous policy memoranda have been issued including directives that prohibit the use of paraprofessional staff such as homemakers for making required monthly contacts with foster children.

*Policy Concerns*

The following are key areas of concern that were noted in foster care policy (Volume IV of the DFCS policy manual):

♦ Emergency shelter is listed first among placement resources, and considerably more content is devoted to this type of placement. This fact alone may suggest to staff, especially those working under pressure of time, that shelter placement is to be considered the option of first resort. Although policy provides that shelter placements be limited to no more than 45 days in a six month period, there are few restrictions placed on the conditions under which emergency shelter care can be used. It is stated that infants and preschool children should be placed in family care but there are no guidelines regarding its use for other children.

♦ Although policy supports concurrent planning, the practice of working on an alternative permanent plan while also pursuing family reunification as a means of expediting permanency, it does not clarify precisely to whom or when it should be applied or how decisions regarding foster-adoptive placements should be made.

♦ There is insufficient emphasis on working with families; rather the focus is on making contact with children. Both are critically important as children cannot be safely returned to their families if the parental problems that led to their removal are not addressed.

♦ There should be better clarification regarding the role of homemakers and aides in relation to casework staff. One aspect of the role that is not clear in policy is when the need to transport a child is simply a transportation event and when it is of a much more sensitive nature and should be handled by the child's social worker or perhaps by a foster parent and/or a member of the child's family. In interviews, CWLA consultants heard repeated references to paraprofessional staff transporting children for changes in placement, court appearances, and attendance at therapy. These are emotionally-charged events that represent critical points in the casework process and should not be delegated to persons not trained to assess and respond to the child's reactions.

*Policy Development and Issuance*

A finding of significant concern regarding policy development is that DFCS is understaffed for this function. Currently, only one person is assigned full time to the writing and issuance of policy and this position was only created during 2005 under the current administration through the reassignment of a Foster Care Reviewer. Further, Regional Directors and other managers are called to attend lengthy meetings to develop and write policy, taking them away from their regular work. Although input from staff at multiple levels is an important part of policy development, a system for doing this more expeditiously and with less demand on the time of other staff could be implemented if there were a policy unit with this capacity. Policy and practice guide drafts might, for example, be circulated through the Regional Directors and their comments and those of other staff

assigned to review reconciled and integrated by policy writers. The current system also results in new directives too often being issued in the form of memoranda that do not clearly delineate the parts of existing policy they replace or modify. There is concern that policy memos may not be consistently distributed to service delivery staff. This can result in some staff following obsolete policy simply because they are not aware of new issuances or do not fully understand their impact.

> **Recommendations:**
>
> 1. DFCS should continue its efforts to separate policy and practice and to develop practice handbooks that are easier for caseworkers and supervisors to use.
>
> 2. Practice guides and policy revisions should address the concerns identified above with regard to foster care policy content in the areas of shelter placement, concurrent planning, working with parents, and the role of paraprofessional staff.
>
> 3. A state level policy unit is needed. This unit should have sufficient staff with the expertise and experience required to track policy for needed revisions, solicit and organize staff input, and to write, circulate, and issue materials timely and in a manner that ensures that changes are incorporated into existing manuals and consistently distributed to all staff.

### 2. Information Systems

The agency uses an automated data system, the Mississippi Automated Child Welfare Information System (MACWIS) for virtually all documentation and data tracking. The reliance on over-burdened casework staff alone to enter data into MACWIS means that record keeping is often not up to date. However, the most serious issue with MACWIS appears to be the lack of staff to manage programming and to correct problems in the system. A number of delays in implementation of new practice initiatives called for in the state's PIP are due solely to the lack of capacity to program MACWIS so that they can be documented. An additional problem is that MACWIS overwrites case histories meaning that neither caseworkers, supervisors, nor other reviewers have access to all relevant information concerning children and families.

In order for an automated data system to be reliable, those responsible for entering the data must have an investment in its accuracy. This typically occurs when a system is able to provide regular reports and responses to queries that are useful in guiding and managing the work of staff at all levels. Any lack of reliability in MACWIS' may be at least partially due to its inability to be responsive to the needs of caseworkers and middle managers.

Interviews with current administrators indicate that they have attempted to improve the quality and quantity of MACWIS reports to the regions in accordance

with the needs of Regional Directors to be better informed concerning key case management activities. Efforts have been made to understand the problems associated with MACWIS and plans are underway to add staff who can make adjustments that will enable the system to better support the work of both management and service delivery staff.

---

**Recommendations:**

4. Pursue current plans to add staff to expedite programming, and to work as quickly as possible with a representative group of field staff to identify and correct shortcomings in MACWIS.

5. Assure that tracking and exception reports for key activities are issued and distributed.

6. Develop and implement a standard process for MACWIS revisions and enhancements based on input from staff at all levels.

---

### 3. Quality Assurance

Foster Care Review (FCR) serves as the quality assurance system for services to children in out-of-home care and their families. FCR is conducted by DFCS staff. As is required by federal regulation, these reviewers do not have direct responsibility for the reviewed case. There are currently 13 positions assigned to FCR. One, however, has been allocated to the policy unit. Reviews are conducted at six month intervals for all children in agency custody. A single FCR worker reviews case record documentation, facilitates the agency's family team meeting (County Conference), and completes a standard evaluation form that assesses compliance with policy.

Lack of a quality assurance system was among the systemic factors cited as needing improvement in the CFSR. Although the agency still lacks a quality assurance system for other service programs, there have been some enhancements to FCR in the two years since the federal review. Efforts to improve the consistency and utility of the FCR process include:

- More in-depth review of a monthly random selection of three cases per region;

- Expansion of review instruments;

- Systematic state level review of FCR reports and issuance of case status reports to Regional Directors so that follow-up can be made on cases with deficiencies cited; and

- Development of a County Conference guide for reviewers and county staff.

Efforts are also underway to improve tracking of cases through MACWIS to insure that reviews are conducted on all cases. Longer range plans are for more

14

detailed entries of review findings into MACWIS to ensure that a complete record of all reviews is maintained. FCR has also developed a client satisfaction survey that is administered at each County Conference. Other participants such as CASA, guardians ad litem, and foster parents have an opportunity to complete these surveys.

An administrative review process such as FCR serves an important function in assuring adherence to policy requirements for children in out of home care. It does not, however, replace a comprehensive integrated quality assurance system.

> **Recommendations:**
>
> 7.  FCR data should be incorporated into MACWIS.
>
> 8.  Feedback from reviews, including a compilation of client satisfaction surveys, should reach to the worker level as well as to supervisors and Regional Directors through regularly issued management reports.
>
> 9.  Ultimately, DFCS should establish a separate continuous quality improvement system that covers all service delivery.

## 4. Training

*Intensive Training (Caseworker Pre-Service)*

The Intensive Training for new caseworkers is designed to be a four-week curriculum delivered one week at a time, with workers returning to their offices between sessions for supervised application. Curriculum materials provided to CWLA revealed that it contains significant content consistent with generally accepted practice standards. However, a number of concerns related to organization of the materials and their utility as a guide for trainers were identified in this review. Ideally, training should be based on a set of competencies and clearly identified learning objectives; these could not be discerned in the materials provided. It also appears that the curriculum is in need of updating with references to more current research and data.

A particularly troubling aspect of the current system for training new workers is that they are often unable to begin the training upon being hired. If a caseworker is hired after a session has begun, it is necessary for that individual to wait until the start of the next session to enroll. That time may be several weeks or even months. Both managerial and casework staff reported that it is common for new staff to be assigned cases prior to being trained.

The DFCS administration has described plans to institute a pre-service training curriculum that would be provided to all new caseworkers before they are actually assigned responsibility for cases. This is planned to follow a model used in several other states in which new caseworkers participate in classroom

training interspersed with on-the-job mentoring by a supervisor or experienced worker for a combined training period of twelve weeks.  To this end, the agency has hired a training director and assigned four staff positions to the state level training unit.  Plans also call for new Program Manager positions which have been requested for each region and for Area Social Work Supervisors (ASWS) to fulfill some responsibilities related to staff development.

This plan represents a significant enhancement to the agency's training capacity.  However, attention should be paid to whether the new positions allocated to this function are at a level sufficient to attract experienced personnel with the unique skills needed to develop and deliver effective training curricula.  Further, the agency's recent shift from nine to seven regions increases the scope of work for Regional Directors and may mean that the new Program Manager positions assigned to them will need to be primarily administrative in function, leaving little time for training activities.  The expectation that a single individual will have the requisite skills to perform both training and managerial functions at an optimum level may also be unrealistic.

---

**Recommendations:**

10. Develop a trainer's guide and participant workbook using existing material and updated research findings.

11. Follow through with plans to fully staff the state level training unit.

12. If persons with child welfare experience and in-depth knowledge of the content which they are training are not available for regular training positions in the agency, training positions should be assigned administrative and coordinating functions and content experts obtained through contractual arrangements.

13. Develop materials that provide for transfer of learning, such as a structured mentoring process, self-guided learning materials, and assessment of skills and knowledge attained.

14. Design and implement a professional development process that is based on an individualized assessment of learning needs.

---

*Training of Supervisors*

A supervisory training work group established by DFCS has recommended development and implementation of a three level training program for supervisors.  This will begin with Level One which will be individualized and delivered by regional directors or Program Managers through a mentoring model so as to accommodate newly hired supervisors without the necessity of waiting for several new supervisors to form a group for classroom-based training.  Level Two is envisioned to provide intermediate level clinical knowledge and skills needed to guide caseworkers in service delivery and to promote a learning environment within the agency.  Level Three would provide more advanced level clinical skills.

The work group has recommended that Level Two be built on the *Learning Labs* training for supervisors that was delivered in two northern regions of the state through the University of Mississippi School of Social Work under a demonstration grant. It was part of a multi-site pilot conducted by the Southern Regional Quality Improvement Center at the University of Kentucky. The pilot in Mississippi took place in Regions 1 East and 1 West and was carried out over a two year period ending in 2005. CWLA consultants were provided with an overview of the curriculum and some sample activities and agendas for review. Strengths noted in this review are that the curriculum is competency-based and uses individualized assessments of learning needs. It emphasizes clinical skills development, mentoring, and collaboration.

Participants who were interviewed viewed the curriculum very favorably, believing that it had resulted in better skills among participating supervisors and had improved both the learning environment and workplace morale of supervisors and first line staff. An overview of this training had been provided to all Regional Directors and several indicated a desire to have it delivered in their regions.

Evaluation results of the *Learning Labs* are being compiled and are scheduled to be published later in March, 2006. The University of Mississippi faculty member who is conducting the evaluation was interviewed and reported that the evaluation used a comparison of two other regions not receiving the training. Two measures were used, one of professional organizational culture, and the other of caseworker self-efficacy (Ellett, Ellett, and Rugutt, 2003). These are measures developed for use in the child welfare field and tested in other public agency studies. The pilot evaluation found a modest but significant improvement in both organizational culture and caseworker self-efficacy in the pilot regions.

**Recommendations:**

15. Give priority to the development and implementation of Level One supervisory training.

16. Commit to providing ongoing training for all supervisors. This should include not only agency-sponsored but also the opportunity to attend at least an occasional external conference or workshop.

17. Consider adopting the *Learning Labs* training for state-wide implementation. Additional evaluation methods could be used to that would more directly assess the impact of the training on supervisor and caseworker performance and client outcomes.

18. Ensure that any training for supervisors include a focus on their role in supporting and mentoring subordinate staff.

19. Obtain internal expertise or work with consultants to develop more advanced training and a system that provides for ongoing professional development of supervisors based on regular assessment of their learning needs.

*Family Centered Practice Training*

Family Centered Practice training is currently being offered to both caseworkers and supervisors throughout the state.  Interviews with caseworkers, supervisors, and managers indicated that this training is being well received.  Several of those interviewed suggested that adoption of a family centered approach might eventually lead to lowered caseloads if they are able to engage families earlier and do a better job of connecting them with community and informal resources.

> **Recommendation:**
>
> 20.  Content from the family-centered practice curriculum should be incorporated into the training curriculum for new staff and monitored and reinforced by supervisors.

### 5.  Legal Representation and Support

The judicial system is heavily involved in the oversight of child welfare practice in the United States.  In virtually every public agency, service delivery staff are in and out of court rooms on a regular basis and judicial decisions and the work of legal professionals have as much influence on the experiences and outcomes of the families and children who are served by the system as does the quality of agency casework.  DFCS relies on legal representation through the Office of the Attorney General and local county attorneys.  County and regional DFCS staff involved in this review described a variety of experiences with local courts.  Some indicated that agency-court relationships work well and that the courts handle child dependency cases efficiently and effectively.  Often, however, staff cited concerns related to the timeliness of hearings, quality of decisions, and/or their own experiences in the courtroom.

Agency staff in some counties are expected to perform legal functions such as the filing of documents and scheduling permanency review hearings.  However, with the exception of one region which had recently received some legal training from its county attorneys, caseworkers and supervisors contacted in this review indicated that they have had no training in state laws related to child dependency, maltreatment, and custody, in court procedures, in organizing information in court reports, or in providing testimony.  Several of those participating in focus groups described very negative relationships with the court in their jurisdictions.  At best, these staff felt that the information they provide and their recommendations are discounted by the court; at worst, they perceive themselves as routinely experiencing rude and demeaning treatment by judges and attorneys.  Most viewed themselves as completely powerless in these situations and without any support by the DFCS administration.  Further, both managers and line staff indicated that they have never known of a local court decision in any of their cases being appealed and viewed this as a practical impossibility given the current system of legal representation.  While appeals of lower court decisions should be undertaken very carefully, they can sometimes

18

be necessary to ensure that sound decisions are made regarding permanency for children.

Problematic relationships between juvenile courts and child welfare agencies are common, but they can be effectively addressed. This is an area of critical importance in two ways: First and most importantly, when agencies and courts do not work well together, decision making on both sides may be affected by factors that have nothing to do with the best interests of children and families. Secondly, such adversarial court relationships have been found to negatively impact the ability of the child welfare agency to attract and retain qualified staff (Dickinson & Perry, 2003; Malm, Bess, Urbel, Geen, & Markowitz, 2001).

---

**Recommendations:**

21. All DFCS staff who work with the courts should be provided with training in legal issues related to child dependency and in working with the courts. This should be provided to existing staff as well as being made a part of the initial training curriculum for all new caseworkers.

22. DFCS should request the assistance of the National Child Welfare Resource Center for Legal and Judicial Issues to identify key issues in the agency-court working relationship and to develop and implement a plan to address them.

---

### 6. Perceived Administrative Support

Interviews with caseworkers, supervisors, and managers suggested that, as a group, they perceive themselves to lack support from the state level administration. The notion that state level administrators do not understand the work that they do or the circumstances under which they do it was a recurring theme in conversations with service delivery staff. The following are among the specific staff concerns expressed regarding the level of administrative support:

- Complaints made about county staff are assumed to be founded before they are explored. Caseworkers and supervisors feel that they are put in a defensive position any time their actions are the subject of a complaint or inquiry to the state office.

- Lines of communication are poor. There is a feeling among regional and county staff that they are excluded in the decision making process and that information that affects them is not readily shared. They report that, even when they are requested to attend meetings to provide input, key state level people often do not participate, and then later question the decisions that have been made.

- So many people have been dismissed or have quit at the state level that there are not sufficient people there to provide programmatic support and

functional supervision and those who are there are not perceived as having sufficient knowledge or experience to be helpful.

- Some staff indicate having been told that, in the current administration, social workers are viewed negatively and it is considered better to have another educational degree.

- Staff perceive that the agency could do more to provide tangible or visible benefits that would demonstrate that they are valued. The following were among those suggested:

  - ✧ Cell phones for field staff. This was by far the most frequently mentioned need related to equipment with caseworkers and supervisors viewing it as a safety issue for themselves and their clients. They are often working in rural areas with no pay phones and many indicated that they use their own cell phones and have had to go to higher cost personal phone plans as a result.

  - ✧ More flexibility in the use of compensatory time. Staff indicated that it would be much easier for them to work the late and irregular hours often required of them if they had some ability to adjust their work schedules to accommodate their personal needs and those of their own families.

  - ✧ Provision of cars, or at least agency advocacy with businesses for discounts on tires and gasoline to help offset the costs associated with the use of personal cars for field travel.

Although not mentioned by the staff interviewed, it was noted during the course of this review that many caseworkers do not have access to electronic mail. Further, several reports requested, although computer generated, were not available electronically. This is of significant concern as the use of electronic mail and the ability to transmit documents electronically can save many hours of valuable staff time.

---

**Recommendations:**

23.  Administrators should immediately identify and implement ways to improve communication between all levels of the organization. This should include, at a minimum, a review of regularly scheduled meetings to clarify their purpose and mandatory participants. Consideration might also be given to the institution of an electronic newsletter or other standard communication.

24.  DFCS should work with counties to assess the status of their technological support in local offices and develop a plan to provide all staff with access to basic computer services.