25. Some accommodation for flexible working hours for service delivery staff should be made. Research has indicated that such flexibility is highly valued by staff and that it has the potential to improve retention (Texas PRS, 2001).

26. DFCS should seek means of obtaining cell phones for field staff as quickly as possible.

27. The agency should explore the feasibility of providing cars for field work or, at a minimum, ensure that compensation for the use of personal cars is sufficient to cover the cost incurred by personnel.

## B. Staffing

### 1. Recruitment, Hiring, and Retention of Front Line Staff

When asked to identify barriers to the recruitment, hiring, and retention of qualified front-line staff, particularly of licensed baccalaureate social workers, Regional Directors uniformly identified low salary and lack of opportunities for advancement as the most serious impediments. The significance of these factors was further confirmed in focus groups with supervisors and caseworkers. Reportedly, Mississippi's Personnel Board has refused to upgrade salaries for caseworkers in over five years. No annual or other cost of living increases are built into the existing salary scale.

All Regional Directors indicated that starting salaries were not competitive with other social work jobs in their regions. Several noted that, even in areas where other social work jobs had low entry level pay, DFCS positions were still not competitive when viewed in relation to the demands of the work. DFCS caseworkers have higher workloads, longer hours, and incur greater personal safety and liability risks than do staff in most jobs with similar requirements. All agreed that the lack of opportunity for salary increases was a major factor. Most other jobs for which applicants could qualify offer the promise of at least nominal periodic pay increases. A "career ladder" that provided for a $2,000 salary increase at two years of service and an additional $4,000 at four years was designed several years ago, but was implemented only briefly before it was eliminated due to lack of funding.

Most Regional Directors felt that licensed social workers could be recruited if working conditions and compensation were better. Some of those interviewed recalled that, up until five or six years ago, it had been easier to attract qualified staff; but as hiring freezes became more frequent and workload increased, the word spread that DFCS was a difficult place to work.

Another factor cited as problematic was the long delay often encountered in the hiring process. It is reportedly not unusual for it to take three months or longer to get authorization to fill a vacancy. As a result, applicants often give up and go to work elsewhere. This delay has been especially troublesome in hiring new social

work graduates who have prepared to work in child welfare but who cannot afford to remain unemployed during the long wait to be hired.

The DFCS administration has initiated measures intended to address at least some of the problems with hiring. These include the development of a state-level hiring pool and the introduction of legislation that would provide pay raises.

The issue of educational qualifications for caseworkers and supervisors in DFCS is concerning. Currently, there are two positions in front line service delivery, Social Worker, which requires a baccalaureate degree in social work and a basic social work license, and Child Protection Specialist, which requires only a baccalaureate degree in "social work, education, sociology, criminal justice, psychology, or a directly related field" (MS Personnel Board, 2003). Social Workers have a starting salary of $25,285.68 while Child Protection Specialists begin at $21761.10. Both positions are expected to perform essentially the same functions. Reportedly the Child Protection Specialist position was instituted in order to allow for hiring of unlicensed personnel because the agency was unable to obtain licensed bachelor level social workers in sufficient numbers. This is attributed at least in part to the low pass rates on the licensing examination. While nationally 80.6% of all those taking the basic examination pass (Association of Social Work Boards, personnel communication, January 18, 2006), it is reported that less than half of those participating in Mississippi's Title IVE sponsored social work education program in state universities passed the exam. Because of this, the agency is seeking to establish parity in salary for the Child Protection Specialist position and to develop its own licensing examination which will be open to candidates without social work degrees.

Although most states will accept related degrees, or in some instances any degree as qualifying for entry level child welfare work, a body of research provides evidence that those with social work education have more job-related competencies and remain in the work longer than do others (Albers, Reilly, & Rittner, 1993; Booz-Allen & Hamilton, 1987; Dhooper, Royse, & Wolfe, 1990; Ellett, 2000; Lieberman, Hornby, & Russell, 1988). A number of writers have suggested that there is a relationship between the myriad problems affecting child welfare practice and the de-professionalization of the field which began in the 1960s (Leighninger & Ellett, 1998; Steib & Blome, 2003-2004). Further, in several states, agency-university partnerships funded through Title IVE have been shown to produce graduates that have greater job-related skills (Fox, Burnham, Barbee, & Yankeelov, 2000; Hopkins, Mudrick, & Ruduolph, 1998; Okamura & Jones, 1998) and whose performance is more conducive to attainment of safety, permanency, and well-being goals for children (Hubener, 2003). In view of this, the move of DFCS away from professional standards is troubling. It exceeds the scope of this review to determine whether the inability of the agency to hire licensed BSW level social workers is due to the low pass rates on the licensing examination or whether those who do pass simply choose to work elsewhere. However, the best evidence to date suggests that more long term gains might come through working with universities to improve child welfare

content in their curricula and raise performance expectations than to abandon professional standards.

Several staff also expressed concern that the "Educational Benchmark" program which has now been eliminated may be a factor negatively impacting the agency's ability to hire or retain staff. This program provided agency support for employees wishing to obtain a work-related college degree and was reportedly valued by paraprofessional staff such as aides and homemakers as a means of advancing in the agency as well as by caseworkers wishing to obtain an MSW. Staff reported that such programs are available in the state's mental health agency and public schools, a fact which further contributes to their perception of being less valued than the workforce in those systems. The elimination of this program in DFCS is unfortunate as studies have shown that employees who obtain social work education through such programs are likely to remain with the agency even after they complete the period of commitment that is usually required (Jones, 2002; Robin & Hollister, 2002). Further, this program could provide a valuable opportunity to increase the number of MSW level social workers, particularly among supervisors. Although the total number of supervisors having an MSW was not made available in this review, it was noted that only two of the eighteen supervisors who participated in focus groups had an MSW.

A final issue of concern in recruitment of qualified staff is that state personnel regulations reportedly require that anyone entering agency service for the first time start at entry level. Such a policy further handicaps the agency in recruiting qualified staff by presenting an unnecessary barrier to hiring those who happen to move to Mississippi or who might wish to transfer to DFCS from other agencies.

---

**Recommendations:**

28. Compensation is a critical issue for service delivery staff in DFCS and needs to be addressed as quickly as possible. The following measures are recommended:

    a. Adding an annual cost of living increase into the current pay structure.
    b. Implementing a career ladder that provides opportunities for advancement in grade while remaining in direct service delivery. When promotions are available only by moving into management, agencies risk losing the service delivery capacity of experienced staff who may be best suited to front line work.

29. Continue to work within DFCS and with the Personnel Board to identify ways to expedite the hiring process. This should include assurance that students completing agency sponsored Title IVE stipends are hired as quickly as possible following graduation so that the agency does not risk losing them through expiration of their contractual commitment.

30. DHS/DFCS should take action to remove the restriction on starting experienced child welfare or social work professionals from other systems at higher levels in the pay scale.

31. Re-institute the "Educational Benchmarks" or a similar model that offers educational leave and tuition support, either part- or full-time for employees desiring to further their social work education in schools that have demonstrated an ability to produce graduates capable of passing the baccalaurate level social work licensing examination at an acceptable level (i.e., at least 70%) for the past two years. A similar passage rate should be required of graduate schools for those pursuing a Masters in Social Work. Further, supervisors should be given priority consideration for support in obtaining an MSW.

32. Institute a multi-faceted initiative to attract the best social workers in Mississippi to work in DFCS. This would include, at a minimum:

   a. Following through with recommendations to lower workload to manageable levels, institute more equitable compensation, and provide stronger supervisory and administrative support and publicizing these efforts through the media, schools of social work and the state chapter of NASW.

   b. Establishing requirements for Title IVE contracting with universities to include:

      i. A passage rate threshold of at least 70% on the baccalaureate licensing examination within two years;

      ii. Inclusion of specific child welfare practice content in the required course content for stipend students as has been done in IVE programs in Kentucky, Georgia, and Louisiana.

## 2. Workload

The workload of front line staff is among the most critical of the concerns identified in this review. Although a few caseworkers interviewed in focus groups indicated that their current caseloads were manageable, most viewed excessive workload as a major impediment in doing their jobs effectively. Many DFCS staff routinely carry caseloads in excess of 40 foster children and/or in-home cases, with some caseloads reported to be substantially higher. Supervisors report that they often carry cases as well or that the largest share of their time is devoted to casework activities rather than to supervision. Further, Regional Directors acknowledge that most social work staff are expected to give priority to child protection investigations, resulting in their having insufficient time for services to foster children and, in some instances, delegating responsibility for required contacts with children to paraprofessional support staff such as homemakers and case aides. This practice is prohibited by a recent revision in agency policy, but

24

where workloads remain unmanageable, adherence to the new policy may be a practical impossibility.

A workload study was a major part of this systems review. This study examined the case-related job functions of DFCS caseworkers and the amount of time required to complete activities and sub-activities associated with each function in order to determine the number of cases that might comprise a reasonable workload for a single caseworker. The process began in September, 2005 with a review of agency program policies, job descriptions, and other key documents included in the listing in Section B.1. of this report. A workgroup of agency representatives was organized in October, 2005 and worked through January, 2006 identifying activities associated with distinct job functions and using a structured process to arrive at the most accurate estimations of the time required for these activities.

Due to limitations in the contract for this project and to circumstances in the state at the time of the study, a structured estimation methodology, rather than an actual time study, was used as a basis for determining workload. As a result of the previously mentioned storm, a time study measuring "business as usual," which is usually considered optimal in workload analysis, was not feasible within the time frame needed. The structured or "expert" estimation process employed in this study has been used effectively in other jurisdictions to examine workload (Washington DSHS, 1997).

A detailed description of the study process and supporting documentation are contained in Appendix A. The key findings of the study are the amount of time required to manage each type of case in accordance with current agency policy for one month as depicted in Table 5 on page 26.

Recommendations regarding reasonable workload are based on two key factors: the estimated time an individual caseworker has available to perform case-related activities and the amount of time required to complete the activities associated with carrying a particular case during a month. Any determination of reasonable workload must consider the time actually available for an individual caseworker to perform case-related activities. This means that time consumed by administrative activities (training, general staff meetings, leave, breaks, holidays, and any other activities not case related) must be excluded to derive the base amount of time available for casework. In this study, the general "one third rule" (Tooman & Fluke, 2002) derived from numerous workload studies in child welfare and related human services, was applied to represent administrative time and to obtain the figure of 116 hours for the time available for an individual caseworker to complete case-related activities. Using this figure with the time estimates in the table below yields the following monthly caseload standard in each category:

- Intakes - 118

- Child Protection Investigations - 14

- Foster Care - 14
- Adult Protective Services - 27
- In-home Dependency – Prevention - 25
- In-Home – Protection – 17
- Adoption – 9
- Licensing – New Application – 15
- Licensing – Renewal - 36

**Table 5**

| Major County Job Functions | Estimated Time Per Month Per Case |
| --- | --- |
| General Intake | 59 minutes |
| Child Protection Investigation (CPI) | 484 minutes; 8 hrs./4 min. |
| Adult Protective Services (APS) | 254 minutes; 4 hrs./14 min. |
| In-Home Dependency – Prevention | 275 minutes; 4 hrs./35 min. |
| In-Home Dependency – Protection | 410 minutes; 6 hrs./50 min. |
| Foster Care | 507 minutes; 6 hrs./50 min. |
| Associated County Job Functions | Estimated Time Per Month Per Case |
| Interstate Compact (ICPC) | 106 minutes; 1 hr./46 min. |
| Intra-State Home Studies | 288 minutes; 4 hrs./48 min. |
| Courtesy Interviews | 65 minutes; 1 hr., 5 min. |
| Regional Job Functions | Estimated Time Per Case Per Month |
| Adoption | 807; 13 hrs./27 min. |
| Licensing – New Application | 470 minutes; 7 hrs./50 min. |
| Licensing – Renewal | 191 minutes; 3 hrs./11 min. |

*Application of Workload Study Findings*

The above-listed time estimations make it possible for caseworker needs to be calculated for the state as a whole, as well as for regions and counties, based on the case count in each identified job function. Individual caseload assignment is somewhat more complicated, however, as most county offices of DFCS use generic caseload assignment.  This system is supported by Mississippi law and allows a single caseworker to maintain continuous responsibility for serving a family rather than requiring a change of caseworkers as a family moves through different programs in the service continuum.  However, because any given caseworker is subject to carrying an ever-changing mixture of case types, individual workloads will need to be monitored from month to month.  This is done by applying the total time required for cases carried by a caseworker to the approximately 116 hours, or 6960 minutes, available for case related work. For example, a caseworker having a mixed caseload may carry 20 cases one month (4 FC, 6 Prevention, 4 CPI, 3 Protection, and 2 ICPC for a total of 6,860 minutes) and be within the acceptable workload and only 15 the following month (6 CPI, 5 FC, and 4 Protective for a total of 7,079 minutes) and be slightly over the

standard. This means that regulation of workload will require careful monitoring by supervisors.

It is to be expected that workloads will vary somewhat, with some staff slightly exceeding the standard one month and falling slightly below it in others. In order to use these standards effectively in overall planning, DFCS should establish a margin which would trigger re-evaluation and possible re-allocation of staff in a particular county or region or in the state overall. The state of Delaware, for example, has legislation that requires some action be taken when average caseloads exceed the caseload standard by ten percent (personal communication Keith Zirkle, Delaware of Children, Youth, and Their Families, December, 2004).

*Additional Considerations in Workload Management*

The caseload allocations suggested by this study are substantially lower than those currently being carried by DFCS caseworkers and, with the exception of in-home prevention services, closely approximate the recommendations in the standards of the Child Welfare League of America. The application of these standards will do much to move DFCS forward in its capacity to deliver an acceptable level of services to needy children and families in Mississippi. There are, however, a number of factors related to this study as well as to other issues that should be considered in undertaking a comprehensive effort to achieve equitable and manageable workloads for service delivery staff in DFCS.

First, time estimations derived from this study are based on the mid-range of the individual estimates given by members of the study group or by the colleagues from whom they solicited information. Although there was generally remarkable convergence in time estimations among group participants, this may mean that there are a few counties in which the standards developed by the work group are not fully applicable. There were some outlier estimations which were most often attributed to the impact of individual court practices on agency staff time. A few courts, for example, require that review hearings be held more frequently, demand more frequent reports, require that DFCS staff, rather than other county or court personnel, serve legal documents to clients, or schedule hearings in a way that results in more court waiting time for caseworkers and/or supervisors. Counties named by group members as having particularly intensive court involvement include Alcorn, Forrest, Harrison, Madison, Rankin, and Yazoo. Activities impacted by court requirements may warrant additional study in these counties in order to achieve reasonable and equitable workloads. Once clearly identified and measured, issues such as court waiting time that far exceeds the norm may be raised with the Administrative Office of the Court for possible attention in the state's Court Improvement Project or in another venue with the Youth Court judges. If this cannot be done successfully, it may be necessary to apply a unique workload standard to these counties.

It should also be recognized that it is likely that there is variation in screening and service authorization practices among counties or regions, with some using more

27

restrictive standards as a means of limiting workload. Thus the use of these study findings must be combined with uniform intake and screening practices to promote equity and consistency in service delivery across the state. DFCS has already undertaken the development of a new screening and assessment process with technical assistance from the National Child Welfare Resource Center for Child Protective Services and plans to implement this during calendar year 2006.

Members of the Workload Study Group were asked to estimate the time required to complete each activity and sub-activity as required to conform to current policy requirements. Thus, this analysis reflects the amount of time that an individual activity would require if done completely according to staff's current understanding of policy and practice. Thus these estimations may not in every instance be reflective of best practice. Any workload analysis must be regularly updated if an agency is to ensure that its capacity for effective service delivery is maintained. Caseload standards can become outdated almost overnight if work requirements change as may happen in the wake of new legislation or the imposition of additional expectations by the administration. Mississippi's federal Program Improvement Plan and training currently underway in the state are moving child welfare practice toward a more family-centered approach. This shift is consistent with both research and practice wisdom related to effective service delivery (NCWRCFCP, 2000; Rooney, 1992; Shireman, Yatchmenoff, Wilson, Sussex, & Gordon, et al., 1998). However, such practice calls for greater engagement of families, more individualized assessment and case planning, and more reliance on the development and use of informal resources. These things take time; family engagement is directly, although not solely, dependent upon time spent with families. Involving families in a thorough assessment and in case planning is more time consuming than simply writing a case plan in the office and presenting it to the family.

Several additional issues that surfaced during this study process are of concern and have implications for workload management. One is the use of the "primary client" system to count cases. With foster children this is straightforward as each child constitutes both a primary client and an individual case. With in-home cases, however, the system becomes confusing due to the fact that, in addition to heads of households normally being considered as primary clients, any other family members who are subjects of a protective order may also be so designated. Thus a family of the same size with very similar service needs may have two, three, or more primary clients in one county, and thus be weighted more heavily, and only one primary client in the other county simply because of differences in court practices related to issuance of protective orders.

The current caseload system uses a designation of "county of responsibility" and "county of service" in those instances in which children in foster care are placed outside of the county in which they entered care or when families move across county lines. Some, but not all, case contacts are made by county of service staff while duties associated with court hearings, reports, and permanency planning are conducted and coordinated by the caseworker having responsibility

for the family case.  This practice further splits responsibility for cases, creates greater need for communication and coordination, and thus increases the risk that service needs will be overlooked. Additionally, some caseworkers indicated that, in the case of children in out of home care, contact and services provided by the "county of service" worker are less intensive and consistent.

---

**Recommendations:**

33.  Using the time estimations derived from the workload study, develop a phased-in plan for adding caseworkers in sufficient numbers to achieve manageable workloads within two years.  Such a plan, to be credible, will obviously require a commitment from the legislature for funding.  It will be neither possible nor practical for DFCS to attempt to bring the number of new workers needed on board at one time.  The plan for achieving reasonable workloads will need to be aligned with implementation of the recommendations regarding training and supervision.

34.  DFCS may do well to re-think its system of case counting. One alternative would be to count the cases of foster children individually as is done now, and to count CPI and other in-home cases by family.

35.  Transfer cases of children placed across county lines would eliminate ambiguity regarding responsibility for service delivery.  The caseworker providing services to the family could then be responsible for coordinating information and permanency planning activities.

---

## 3.  Supervision

Casework supervisors are the lynchpins of front line practice.  In child welfare workforce research, no factor has been more consistently linked to agencies' ability to attract and maintain stable service delivery staff than has supervision (Arkansas DCFS, 2002; Bernatovicz, 1997; Cicero-Reese & Black, 1998; Dickinson & Perry, 2002; GAO, 2003; Rycraft, 1994; Samantrai, 1992; Scannapieco & Connell-Corrick, 2003; Yoo, 2002).  The strength of these findings suggests that agencies concerned with strategic pursuit of systemic reform can make no better investment than in the development of their supervisors.

Unfortunately, supervisors contacted by CWLA consultants in the course of this review were uniformly frustrated at what they perceive as unreasonably adverse working conditions, lack of administrative support, and inadequate compensation and benefits.  In one region, for example, supervisors indicated that they may be appointed to their position in an acting capacity but continue to receive the salary of their caseworker job, sometimes also carrying their caseload while adding supervision.  Supervisors said that they often carry cases or spend much of their time fulfilling casework activities rather than providing guidance and support for front-line staff.  This is necessitated both by the need to assist caseworkers in

managing their heavy workloads and to cover the vacant caseloads that result from the high turnover and inability to hire new staff.

It was learned that supervisors are not located in every county office. Although it is understood that some counties are too small to justify more than one or two caseworkers, this practice is of concern given what is known about the importance of supportive supervision in child welfare.

> **Recommendations:**
> *Several of the recommendations given above with regard to recruitment and retention of front line staff and workload will also impact supervisors. In addition, DFCS should consider the following:*
>
> 36. Compensation and opportunities for advancement for Area Social Work Supervisors should be re-evaluated and a system developed that allows for them to advance in their positions. This compensation plan should be at least comparable to those provided for casework supervisors in other Southern states.
>
> 37. Supervisors should receive pay for the supervisory position even when they are appointed in an acting capacity.
>
> 38. Consider consolidation of offices in small rural counties to allow for on-site supervision of caseworkers.

### 4.  Administrative Staffing

An effective child welfare agency not only needs sufficient numbers of qualified staff at the level of service delivery, but also must provide the administrative supports to ensure that those staff have the guidance, training, and oversight that they need to function well. Agency accountability to funding bodies and to the public is also dependent upon administrative capacity to assess practice, track data and expenditures, and plan for future organizational needs. Observations made in this review suggest that DFCS is understaffed at the administrative and management levels. Currently, DFCS has only one staff person assigned to policy; its MACWIS system is inadequately staffed resulting in programming delays of several months; its level of human resource support is inadequate, making it difficult even for senior management to access key data such as staff turnover rates; and it has only very limited capacity to conduct quality assurance activities. Program management staff does not have the capacity to provide functional supervision and consultation, to participate in planning and policy development, or to work with Regional Directors closely enough to bridge the gap that typically exists between state level administration and field staff in large bureaucracies. Regional Directors, for example, point out that there is a perceived lack of support from the state level and that, while there had at one time been plans for regular meetings between regional staff and program management as a means of facilitation communication and building trust, this has not occurred. Further, program managers are not in regular attendance at

key meetings, such as those with Regional Directors or work groups that involve their area of responsibility.

Levels of pay for most administrative and management jobs are in the $30,000 to $40,000 dollar range. This level of pay may not be sufficient to attract experienced staff into key administrative positions.

The current administrative structure divides program units into the categories of Prevention, Protection, and Placement. The staffing of these units, does not, however, conform to their stated functions. Foster Care Review, for example, is located in the Protection unit. Lack of clarity in the responsibility of these divisions may be confusing to staff at the regional and county levels and further contribute to problems in communication.

---

**Recommendations:**

39. MDHS/DFCS should undertake an analysis of its administrative and management needs and develop a staffing plan that ensures its ability to fulfill key functions necessary for accountability and the support service delivery staff.

40. The agency should re-evaluate its organizational structure at the administrative and program management levels to ensure the most efficient grouping and assignment of related functions and maximize responsiveness to regional and county staff.

---

## C. Practice and Resources

### 1. Service Needs and Availability

Information regarding service needs and availability was derived from the staff survey described in Section III.B.6. as well as from focus groups and interviews.

*Mental Health and Substance Abuse Services*

DFCS staff at all levels expressed a need for greater variety and availability of mental health services for clients. The most frequently requested services named by caseworkers were psychological assessment or testing (26.74%), counseling (19.28%), and individual therapy (18.77%). Twenty-one percent of those responding indicated that such services were readily available while 66% said that they were somewhat available. Just over 65% of respondents said that the most requested services were accessible to clients while 13% indicated that they were not accessible.

Family therapy headed the list of mental health services that caseworkers would like to see increased, followed by behavioral interventions, and counseling. This is consistent with findings of focus groups and interviews in which some staff expressed concern that the mental health services available may not be family focused or particularly suited to the needs of children and families involved in

child welfare.  These responses combined with those of the survey, suggest that caseworkers and supervisors may be asking for services they know are available, while recognizing that they may not be the most effective interventions for their clients.  This is understandable given the pressure on service delivery staff to "do something" even when needed services are in short supply.

Children and families involved with child welfare, not surprisingly, represent a population with greater mental health needs.  At the same time, however, it is important to consider that increased use of mental health services in child welfare may also be associated with the absence of clinically skilled service delivery staff.  When caseworkers and their supervisors have neither the knowledge, skills, nor time to conduct thorough and accurate individual and family assessments or to engage and problem solve with clients, the tendency may be to view every psychosocial need as warranting a referral for mental health evaluation or treatment.  In fact, families and children benefit most from strategic mental health services, those that answer clearly defined questions or address specifically identified needs.  A practice of routinely making general referrals for non-directed treatment is likely to expend resources without yielding real benefits (Chambless & Ollendick, 2001; Lipsey, 1992).

The most frequently requested substance abuse services were for the screening, assessment, and in-patient treatment of adults. These services appear to have somewhat greater availability than other mental health screening and treatment; 22.46% of respondents rated them as readily available and 63.77% as somewhat available.  However, 23.19% indicated that accessibility of substance abuse services is a problem for their clients, while 47.83% rated them as readily accessible.  In-patient (20.41%) and out-patient (18.66%) adult substance abuse treatment were by far the most frequently named areas needing additional resources.

> **Recommendations:**
>
> 41.  Use data from this survey as well as Medicaid utilization records of DFCS clients to assess mental health service needs in each region and work at the state level with mental health and Medicaid system officials to align resources with needs as closely as possible.
>
> 42.  Consider adding clinical capacity within DFCS in the form of licensed masters level social workers at the regional level to provide consultation in assessment and case planning in new foster care cases.  Such capacity can better ensure that referrals for additional clinical evaluation and treatment are necessary and targeted to meet specifically identified needs.

## 2.  Medical and Dental Treatment

Caseworkers named lack of financial resources and service availability as the leading barriers to obtaining medical and dental examinations for children. In

focus group questioning, they explained that few providers are willing to accept Medicaid payment rates so those that do have waiting lists. Over 20% of survey respondents named waiting lists as the chief barrier to obtaining medical treatment for children once a condition is diagnosed.

---

**Recommendations:**

43. In conjunction with state Medicaid officials, identify providers in each region and their utilization rates by children in custody to determine gaps in service availability as a basis for focused recruitment of providers.

44. Approach providers in uncovered areas to provide services for children in DFCS custody.

---

### 3. *Parent Education*

Because parent education is widely regarded as one of the most frequently applied interventions in child welfare, the survey included specific questions about this service. Caseworkers named appropriate disciplinary practices (28.31%), parental understanding of age-appropriate child behavior (21.96%), and safety and nurturing of young children as the three areas most frequently needing to be addressed in parent education. Only 17.39% indicated that parenting programs to address these needs were readily available, while 62.32% responded that they are somewhat available and 10.87% indicated that they are not available. Regarding geographic accessibility, less than half (42.03%) rated parenting programs to address identified needs as being readily accessible to clients.

Measurement of intervention effectiveness is a common area of concern in child welfare. Indeed, a small body of research has begun to identify the tendency of courts and agencies to consider compliance a proxy for successful completion of services (Brank, Williams, Weisz, & Ray, 2001). Thus, caseworkers were asked specifically what factors they considered in determining successful completion of services. The most frequently provided answer to this question was attendance (21.39%), followed by progress reports from the program (20.45%), level of participation (19.51%), parent feedback (18.39%), and observed transfer of learning (18.20%). In rating factors that are most important in gauging success, however, observed transfer of learning (36.84%) was by far the most frequently provided response.

Most parent education is offered through Mississippi's network of family resource centers. Discussion of these services in focus groups and interviews indicated that there is little knowledge among staff regarding the types of parenting interventions offered. However, the need for greater availability and accessibility was more frequently expressed than were concerns about quality. The provision of parent education through regional family resource centers is viewed as a positive in this review. Parent education and family skills building interventions

have been found helpful in addressing child maltreatment and, to an even greater extent, in helping families deal with problems related to child behavior (Corcoran, 2000). Effective programs tend to be ones that involve the entire family, use active engagement techniques, have a cognitive behavioral orientation, and focus on building skills in problem solving, communication and interpersonal relationships, and anger and stress management. Many also include a group component. There are a number of models available for replication that include these characteristics and have some degree of demonstrated effectiveness in changing parental attitudes, knowledge, and to a lesser extent, parenting behavior. Even if programs do not adhere strictly to an evidence-based model, they may be effective if they have the preceding characteristics. However, this can only be determined through an evaluation which includes some measurement of changes in knowledge and attitude and of transfer of learning into the parent-child relationship.

**Recommendations:**

45. The agency should inventory the parent education programs available to its clients to determine whether an evidence-based model is used or, alternatively, that the program has the characteristics associated with effective interventions.

46. All programs should be required to use some type of evaluation to demonstrate, at a minimum, changes in parental knowledge and attitudes, and preferably in targeted parenting behaviors.

47. Additional programs, implemented either through the resource centers, directly by agency staff, or through the use of contracted providers should be established to ensure greater availability and accessibility.

### 4. Other Supportive Services

Other service needs most often identified by caseworkers in either the survey or focus groups were transportation and concrete services such as furnishings, clothing, or utility payments which typically call for small expenditures of flexible funding. An agency's ability to provide concrete services is important factor in engaging clients as well as in meeting real immediate needs (Dawson & Berry, 2002). Each county has an allocation of flexible funds which varies depending on the extent of county support. It is also possible to request assistance from other counties that may have surplus monies available. However, many caseworkers indicated that this resource is very limited and thus tightly controlled and difficult for them to access on behalf of their clients.

> **Recommendations:**
>
> 48.  DFCS, at the state and regional or county levels, should explore means of increasing funding to meet the immediate concrete needs of clients and establish guidelines that provide for their prompt use and accessibility.

## 5. Practice Issues

*Family Centered Practice and Team Decision Making*

DFCS is making efforts to move from a more traditional child centered practice approach to one that is family centered. This is a framework based on the belief that the best way to protect children in the long run is to strengthen and support their families, whether nuclear, extended, foster, or adoptive. As part of this shift, the agency is also supporting more consistent use of team decision making including family team meetings for initial service planning and as part of ongoing periodic case review. Training in family centered practice is currently underway around the state.

A move to family centered practice is supported by both research and prevailing thought among child welfare professionals (NCWRCFCP, 2000). It is viewed as a positive and staff in focus groups were enthusiastic about this shift. The agency's ability to successfully accommodate this practice shift will be reliant on the assurance of administrative support and adequate staffing as noted above. It is also important that the training, policy, and supervision that support family centered practice involves careful individualized assessment and should not mean that children are exposed to greater risk of harm.

### Concurrent Planning

Concurrent planning refers to the practice of working on an alternative permanent plan for a child at the same time that efforts are made to reunite the family. It is widely considered effective in moving children more quickly to permanency and is encouraged in DFCS policy. Caseworkers are, in fact, required to list an alternative permanent plan on case plans and the new practice guides for family team meetings that the agency has issued address fundamental principles of concurrent planning, such as being open and honest with families about all possible outcomes of the agency's intervention. In spite of this, however, both managers and caseworkers interviewed indicated that planning for permanency is most often sequential, with no real work done to effect an alternative plan until it is determined that a child cannot be returned to his or her family of origin. Managers felt that many staff do not really understand concurrent planning and are still focusing on reunification alone until it becomes clear that it will not occur. This was confirmed in focus groups with caseworkers.

> **Recommendations:**
>
> 49. Training of both new and existing staff should include the basic principles of concurrent planning.
>
> 50. DFCS should use data on length of stay and permanency outcomes for children in custody to consider whether concurrent planning, including foster/adoptive placement should focus on a particular group of children.

*Placement Resources*

Staff at all levels indicated that the lack of a sufficient array and distribution of family placement resources results in the need to separate siblings and to place children farther from their families and communities than is desirable. The lack of respite services and child care were identified as the most serious impediments to recruiting and retaining qualified foster parents. Some caseworkers also expressed concern about the quality of foster parents who are approved and their willingness or capacity to care for the largely special needs population of children in out of home care. Finally, the current practice of covering the states licensing needs with staff assigned through only three regions was seen as problematic with regard to the amount of time consumed by travel and the fact that licensing personnel are not sufficiently connected to the other regions they serve to understand their needs and provide support to resource families.

In an attempt to address the need for a greater array of family placement resources, the agency in 2005 engaged technical assistance through *Adopt U.S. Kids* and conducted a statewide assessment of the agency's recruitment, response, and retention of resource families. A total of 352 stakeholders, staff, private providers, and resource families took part in the assessment in order to make recommendations to the state planning committee formed to address resource family recruitment and retention. This group developed a series of nine strategies, all of which have the potential of improving recruitment and retention of foster and adoptive families. Needs and strategies developed from this process include:

- Begin dual licensure so that applicants gain approval at the outset for both foster and adoptive parenting rather than having to undergo an additional process should they wish to adopt a child in their home or, in the case of adoptive parents, to accept a child in temporary care.

- Develop policy and practice guidelines to prevent the use of resources for the licensure of families not interested in accepting children with special needs. Currently, Mississippi has a large number of unused resource families, apparently because it is believed that any applicant who complies with regulations has a right to be licensed.

- Provide resources and authority for regions to contract with private agencies for recruitment and licensing of resource families.

- Develop regional recruitment and retention plans.

- Develop and implement additional supports for resource families.

Although the recruitment and retention plan has not been fully implemented, some of the above recommendations are already being addressed. For example, DFCS has undertaken a review of its current board payments in relation to the cost of caring for a child in the urban South as established by the United States Department of Agriculture. Plans are being made to assign licensing personnel to each region and the administration is seeking allocation of funds to provide payment for respite care for children in order to offer periodic relief to foster parents. However, there remains a need to more consistently provide child care to enable children to be placed in families where parents are employed. Currently, child care for foster families is only available under the state's federally funded child care program and foster families do not receive any priority consideration in their application for this service.

The number of licensed foster homes available for children placed by DFCS increased by 53 over the past year. It is unclear, however, the extent to which this actually represents usable additional resources as the agency reportedly continues to license families who are not interested in most of the children for whom placements are needed..

*Kinship Placements*

Caseworkers and supervisors alike expressed concern regarding the agency's inability to provide greater financial support to relatives who are caring for children in agency custody. Some indicated that more children could be placed with extended family if funds were available to pay for child care and to cover additional expenses such as clothing. Currently, policy provides that relatives may be licensed and thus receive a foster care board rate for children placed with them if they meet the same standards as an unrelated foster family. In practice, however, agency staff indicated that this is not encouraged due to concerns that dependence on the board payment will discourage relatives from accepting custody of children if they cannot return home. This concern is recognized in DFCS and funding is being sought to provide additional financial assistance to kinship placements.

**Recommendations:**

51.  Complete implementation of the recommendations of the draft recruitment and retention plan developed in June 2005.

52.  Consider the use of private providers to augment agency capacity in recruitment and preparation of family resources. Private providers often are able to promote fostering and adoption among constituency unavailable to the public sector

53.  Address the assessing and licensing of families who are not interested in the children for whom homes are needed.  This may be a legal issue since Mississippi 43-15-5 (2) provides that if a person meets licensing requirements to operate a "child residential home" as defined in Section 43-16-3, he or she shall be granted a license.  The definition in the referenced section appears to pertain to foster and adoptive families.

*Expediting Permanency*

Examination of work processes revealed several areas which appear to be especially prone to delays that slow the attainment of permanency for children.  A particular area of concern is the termination of parental rights process.  Although voluntary relinquishments are frequently obtained in those instances in which children cannot be returned to their families, caseworkers indicated that this usually does not occur until after a petition to terminate parental rights have already been filed.

Particular points in which delays were identified in the termination process include (1) the completion of the required information packet by caseworkers; (2) state level review; and (3) preparation of the petition by staff attorneys in the Office of the Attorney General.

**Recommendations**
*Delays in the termination process may be mitigated by the above recommendations regarding agency legal representation, as well as by more consistent implementation of concurrent planning and family-centered practice which might be expected to support earlier alternative planning for permanency and eliminate the need for involuntary terminations in some instances.  The following additional steps are suggested:*

54.  Review the information packet currently required to determine whether it can be streamlined, particularly when a termination is requested on a sibling group.
55.  Consider whether the review and approval process that is now conducted at the state level can be expedited or moved to the regional level.

# V. Conclusions

Every effort has been made in this systems review to evaluate objectively the current MDHS/DFCS system and to communicate the concerns that were raised to the Director of DFCS. Although many, if not most, of the needs identified in this review might be found at some level in any child welfare system in the United States, the Mississippi system does present a picture of having been chronically under-resourced, seriously so in several areas.

This document lists 55 recommendations for systems improvement. While all are considered important, some are viewed as foundational in a comprehensive effort to create a child welfare system that is fully responsive to the needs of children and families in Mississippi. The most pressing needs in DFCS are in the following areas:

1. Increased numbers of skilled professional staffing at all levels, but particularly in the area of direct service delivery;

2. Training and ongoing professional development for service delivery staff; and

3. Additional family placement resources for children in the agency's custody.

Staffing is critical at all levels, particularly in service delivery and in the training and organizational support of direct service personnel. A recommendation for an exact number of additional staff is reliant upon factors which exceed the scope of this review, such as the existence of backlogged or inactive cases. However, the workload analysis conducted with the assistance of DFCS personnel suggests that most caseloads should be less than half of the standard of 40 primary clients currently set by the agency. Staffing of the agency at an acceptable level will require a multi-faceted initiative that includes attention to equitable compensation and opportunities for advancement, a system for ongoing review of workload, training and staff development, skilled and supportive supervisors, and outreach to schools of social work and social work organizations in the state to inform them of the changes being made in the agency and enlist their help in the recruitment of new applicants.

The ability of DFCS to effectively address needs related to training and placement resources is also dependent upon staffing. In these areas as in service delivery, it is critical that the focus be not just on numbers of personnel, but on their quality and the way in which they are supported by the organization. Adding positions will be of little benefit to needy children and families in Mississippi if staff lack the skills and supports they need to work effectively and if turnover remains high. This document outlines recommendations for working with universities and professional organizations to enlist their support and help in attracting and preparing personnel who have the requisite knowledge and skills for this very important work.

It is important to acknowledge that many of the needs identified in this review have been recognized by the current administration and that plans to address them were either underway at the time this study was initiated or have since been implemented. Further, DFCS staff at all levels have demonstrated an eagerness to provide the information which contributed to this evaluation. The cooperation and commitment of agency personnel is important, but it will be futile if the economic supports and needed cooperation in other areas of state government are not forthcoming.

## References

Albers, E., Reilly, T., & Rittner, B. (1993).  Children in foster care: Possible factors affecting permanency planning.  *Child and Adolescent Social Work Journal, 10*(4), 329-341.

Arkansas Department of Human Services, Division of Children and Family Services (2002).  *Training and Retention of Family Service Workers.*  Little Rock, Arkansas: Author.

Bernatovicz,  F. (1997).  *Retention of child welfare caseworkers: A report.*  Portland, ME: National Center for Organizational Improvement.  Available at: www.muskie.usm.edu/hellpkids/pubstext/retention.html.

Booz-Allen & Hamilton, Inc. (1987).  *The Maryland social work services job analysis and personnel qualifications study.*  MD:Author.

Brank, E.M., Williams, A.L., Weisz, V. & Ray, R.E. (2001).  Parental compliance: Role in termination of parental rights cases.  *Nebraska Law Review, 80*, 335-353.

Chambless, D.L., Ollendick, T.H. (2001). Empirically supported psychological interventions: controversies and evidence. *Annual Review of Psychology.* Vol. 52, Issue 1, 685-716.

Child Welfare League of America (2001).  *The child welfare workforce challenge: Results from a preliminary study.*  In conjunction with Alliance for Children and Families and American Public Human Services Association.  Washington, DC: Author.

Cicero-Reese, & Black (1998).  Research findings suggest why child welfare workers stay on job.  *Partnerships for Child Welfare, 5*(5).

Corcoran, J. (2000).  Family interventions with child physical abuse and neglect: A critical review. *Children and Youth Services Review, 22*(7), 563-591.

Dawson, K. & Berry, M. (2002).  Engaging families in child welfare services: An evidence-based approach to practice.  *Child Welfare, 81*(2), 293-317.

Dhooper, S., Royse, D., & Wolfe, L. (1990).  Does social work education make a difference?  *Social Work*, *35*(1): 57-61.

Dickinson, N.S. & Perry, R.E. (2003).  Factors influencing retention of specially educated public child welfare workers.  *Journal of Health & Social Policy 15(3/4)*, 89-103.

Ellett, A. J. (2000).  *Human caring, self-efficacy beliefs, and professional, organizational culture correlates of employee retention in child welfare.*  Unpublished doctoral dissertation, Louisiana State University, Baton Rouge, LA.

Ellett, A.J., Ellett, C.D.& Rugutt, J.K. (2003). *A study of personal and organizational factors contributing to employee retention and turnover in child welfare in Georgia.* Athens, GA: University of Georgia School of Social Work.

Fox, S.R., Burnham, D., Barnee, A.P., & Yankeelov, P.A. (2000). School to Work---social work that is: Maximizing agency/university partnerships inpreparing publicchild welfare workers. *The Journal of the National Staff Development and Training Association, 1*(1): 13-20.

Graef, M. & Hill, E.L. (2000). Costing child protective services turnover. *Child Welfare, 79*(5), 517-533.

Hopkins, K.M., Mudrick, N.R., & Rudolph, C.S. (1999). Impact of university/agency partnerships in child welfare on organizations, workers, and work activities. *Child Welfare, 78*(6): 749-773.

Huebner, R. (2003). *Public Child Welfare Certification Program outcomes evaluation.* Kentucky Cabinet for Families and Children, Frankfort, KY-20.

Jones, L. (2002). A follow-up of a Title IV-E program's graduates' retention rates in a public child welfare agency. *Journal of Health & Social Policy 15(3/4),* 39-52..

Leighninger, L. & Eellett, A. (1998). *Deprofessionalization in child welfare: Historical analysis and implications for social work education.* Paper presented at the Annual Program Meeting of the Council on Social Work Educatio, Orlando, FL.

Lieberman, A., Hornby, H., & Russell, M. (1988). Analyzing the educational backgrounds and work experiences of child welfare personnel: a national study. *Social Work, 33*(6), 485-489.

Lipsey, M.W. (1992). The effect of treatment on juvenile delinquents: results from meta-analysis. In F. Losel, D. Bender & T. Bliesener (Eds.) *Psychology and Law,* New York: NY.

National Child Welfare Resource Center on Family Centered Practice (2000). A new era of family centered practice. *Next Practice/Best Practice, 1*(1), 1-18.

Okamura, A., & Jones, L. (1998). Re-professionalizing child welfare services: An evaluation of a IV-E training program. *Research in Social Work Practice, 10*(5): 607-621.

Potter, C.C.& Klein-Rothchild, S. (2002). Getting home on time: Predicting timely permanence for young children. *Child Welfare, 81*(2), 123-150.

Malm, K., Bess, R., Leos-Urbel, J., Geen, R., & Markowitz, T. (2001). Running to keep in place: The continuing evolution of our nation's child welfare system. *Assessing the New Federalism, Occasional Paper #54.* Washington, DC: The Urban Institute.

Mississippi Personnel Board (2002).  Class Specification, DHS-Social Worker, Occupational Code: 4227.  Jackson, MS.

Mississippi Personnel Board (2003).  Class Specification, DHS – Child Protection Specialist, Occupational code:  3045.  Jackson, MS.

Robin, S. & Hollister, C. (2002)..Career paths and contributions of four cohorts af IV-E funded MSW child welfare graduates.  *Journal of Health & Social Policm 15(3/4), 53-67.*

Rooney, R.H. (1992).  *Strategies for working with involuntary clients.* New York: Columbia University Press.

Rycraft, J. (1994).  The party isn't over:  The agency role in the retention of public child welfare caseworkers.  *Social Work, 39*(1): 75-80.

Samantrai, K.  (1992).  Factors in the decision to leave: Retaining social workers with MSWs in public child welfare.  *Social Work, 37*(5), 454-458.

Scannapieco, M. & Connell-Corrick, K. (2003).  Do collaborations with schools of social work make a difference for the field of child welfare?  Practice, retention, and curriculum.  *Journal of Human Behavior in the Social Environment, 7*(1/2), 35-51.

Shireman, J., Yatchmenoff, D., Wilson, B., Sussex, B., Gordon, L. Poirier, C., et al. (1998).  *Strengths/Needs Based Services evaluation.*  Portland, OR:  Portland State University, Graduate School of Social Work.

Steib, S. & Blome, W.W. (2004).  Fatal error: The missing ingredient in child welfare reform, part II.  *Child Welfare, 83*(1).

Steib, S. & Blome, W.W. (2003).  Fatal error: The missing ingredient in child welfare reform, part I.  *Child Welfare, 82*(6) , 747-750.

Texas Department of Protective and Regulatory Services. (2001).  *DASH: Delivering accountable services from home: Region 6 teleworking pilot final Evaluation.*  Austin, TX: Author.

Tooman G. & Fluke J. (2002).  Beyond caseload: What workforce studies can tell us about enduring issues in the workplace.  *Protecting Children, 17*(3), 1-8.

United States General Accounting Office (2003).  *HHS could play a greater role in helping child welfare agencies recruit and retain staff.*   Washington, DC: Author.

Washington State Department of Social and Health Services (1997).  *Social worker workload study.*  Unpublished departmental report. Seattle, WA: Author.

43

Appendix A

WORKLOAD STUDY DESCRIPTION, ANALYSIS, AND FINDINGS

Appendix A

The following is a more detailed description of the workload study referenced in Sections III.B.2. and IV.B.2. of this document.

## A.  Report of the Study

A.1.Methodology

Three DFCS Regional Directors were designated by the Division Director to work with CWLA consultants to define a process for the workload analysis and establish criteria for composition of a representative group to work with the consultants to undertake the workload analysis process which consisted of three main steps:

> ➢ Define core work functions;
> ➢ Define activities and sub-activities associated with each work function; and
> ➢ Estimate the average amount of time required for each activity and sub-activity for a single case.

It was determined that they study would be conducted using a group composed of a representative from each of the nine organizational regions then existing in DFCS, and that it would include three caseworkers, three supervisors, and the three Regional Directors who took part in the initial meeting.  The caseworker and supervisor representatives were designated by their respective Regional Directors who were contacted by the CWLA project leader and asked to select a representative with a breadth and depth of knowledge across service areas.

The initial meeting was held at the MDHS state office building in Jackson on October 20, 2005 with all nine committee members in attendance.  CWLA consultants Sue Steib and Diana English facilitated the meeting.  Subsequent meetings were held by conference call on November 2, 3, 10, 21, and December 20.

Guided by the review of agency documents as well as reports of workload studies conducted in other jurisdictions, CWLA consultants prepared a provisional listing of job functions with activities and sub-activities.  The work group then reviewed this list, added some job functions, and made revisions to activities and sub-activities as necessary to accurately reflect the duties associated with each job function in DFCS.  The following functions were identified:

Major County Functions
> ➢ General Intake
> ➢ Child Protection Investigation
> ➢ Adult Protective Services
> ➢ In-Home Dependency
> ➢ Out-of-Home Dependency (Foster Care)

Appendix A

Associated Functions

➢ Interstate Compact for the Placement of Children

➢ Intra-state home studies

➢ Courtesy Interviews (for other counties)

Regional Functions

➢ Adoption

➢ Licensing

An important point to note is that this workload analysis focuses on the activities necessary to comply with current MDHS/DFCS policy, typically referred to as a "standard one" analysis. It does not necessarily reflect the activities or time necessary to support performance at a level consistent with standards of best practice. For example, time estimates recorded for placement of children in out of home care do not include consistent use of pre-placement visits, although this is generally accepted as preferred practice. Representatives were asked to estimate the amount of time required to fully complete an activity as required by policy. Thus these average time estimations should not reflect activities that are eliminated or abbreviated due to workload demands or for other reasons.

*Structured Estimation Process*

The designation of job function activities and sub-activities and the estimation of times required for each were derived from a process in which information provided by each group member was recorded by the CWLA group leader and sent out to members in detailed notes following the meeting. Members were instructed to use these notes to share the process with their colleagues and solicit their input. This input was then reviewed and considered at the following meeting. Formal minutes were provided and were sent group members as well as to all Regional Directors and the Division Director to keep them apprised of the process.

Because of differences in their positions as well as other individual and regional differences, group members used various means of seeking participation from other staff. Some used regularly occurring meetings of staff and/or supervisors; others approached individual caseworkers and supervisors based on their experience with a given job function. In a few instances, the time required for a particular function or activity was actually measured. For example, one county representative had the intake worker in her office record the time required for job activities over one week. Another workgroup representative had staff in her region record travel time for the same period.

Times shown in the final report typically reflect mid-ranges or averages derived from the estimation process. In the great majority of cases, participants' estimates of the time required to complete activities were remarkably similar, particularly with regard to the major and associated functions performed at the

county level.  However, when there was wider divergence, the mid-range was derived from the weight of responses, with outliers excluded.  In some instances outliers were linked to unique circumstances, most often court practices, in a county or region.

*Time Available*

Any determination of reasonable workload must consider the time actually available for an individual caseworker to perform case-related activities. This means that time allotted for administrative activities (training, general staff meetings, leave, breaks, holidays, and any other activities not case related) must be excluded to derive the base amount of time available for casework.

The general "one third rule" (Tooman & Fluke, 2002) derived from numerous workload studies in child welfare and related human services, was applied to represent administrative time and to obtain the figure of 116 hours for the time available for an individual caseworker to complete case-related activities.  The random moment sampling methodology used by Mississippi for cost allocation was reviewed to determine whether it would provide more accurate state-specific data, but such was not the case as individual coding definitions did not clearly divide case related from non-case related activities.  Thus the one third rule was applied as shown in Table 1 below.

**Table 1:  Time Available for Case-Related Work**

| | |
|---|---|
| Total work time per month (8 hours per day x 5 days per week x 4.33 weeks per month) | 173.2 hours |
| Less Administrative Hours (173.2 x .33) | 57.2 hours |
| Number of hours per month available for casework activity | 116.0  hours |

A.2.Time Estimations by Work Function

Not all activities apply to every cases and some activities are done only at larger time intervals than once per month. Where that was true, an attempt was made to average the time required across cases and months.  Court hearings, for example, are held on all foster care cases, but do not occur each month.  Thus, the monthly time for court attendance reflects the monthly pro-rated time for attending hearings initially and approximately every six months.

Estimations in the adoption and licensing job functions were most problematic. In adoptions, some activities are conducted only for foster parent or non-foster parent adoptions, others tend to apply to all children involved in the adoption rather than to individual children, and some activities are performed only once in the life of the case. The following data, obtained from the DFCS Placement Section was applied as appropriate to arrive at the most accurate average time estimates:

- 74% of all adoptions are by foster parents.

- The average number of children in an adoption is 2.5.

- Cases are open in adoption (from termination of parental right to case closure) an average of 34 months.

In the case of licensing, some activities, such as those associated with preparing for and delivering training and orientation, apply to groups of families. In these instances, an attempt was made to spread the time required for an activity across all of those cases to which it applies. For example, study group members estimated that, on average, 15 families are enrolled in each pre-service training. Thus, the total estimated time required for training preparation, delivery, and related activities was divided by 15 to arrive at the average time per case for this activity.

A.3.Findings

The final total time estimations for each job function are depicted in Table 2 below. Estimations for the major county and associated job functions are straightforward and, in most instances, the product of either concurrence or reasonably close estimations submitted by group members.

**Table 2: Time Estimates by Job Function**

| Major County Job Functions | Estimated Time Per Month Per Case |
|---|---|
| General Intake | 59 minutes |
| Child Protection Investigation (CPI) | 484 minutes; 8 hours, 4 minutes |
| Adult Protective Services (APS) | 254 minutes; 4 hours, 14 minutes |
| In-Home Dependency, Prevention | 260 minutes; 4 hours, 20 minutes |
| In-Home Dependency, Protection | 410 minutes; 6 hours, 50 minutes |
| Foster Care | 507 minutes; 6 hours, 50 minutes |
| Associated County Job Functions | Estimated Time Per Month Per Case |
| Interstate Compact for the Placement of Children (ICPC) | 106 minutes; 1 hour, 46 minutes |
| Intra-State Home Studies | 288 minutes; 4 hours, 48 minutes |
| Courtesy Interviews | 65 minutes; 1 hour, 5 minutes |
| Regional Job Functions | Estimated Time Per Month Per Case |
| Adoption* | 807; 13 hours, 27 minutes |
| Licensing, New Application | 470; 7 hours, 50 minutes |
| Licensing, Renewal ** | 191; 3 hours, 11 minutes |

*  Does not include ICPC
** Training not included

Estimations in regional job functions may require more individualized interpretation depending upon exact duties. In Licensing, for example, training activities are included only for new applications because it was reported that ongoing training was not generally being done by Licensing staff at this time. Likewise, recruitment is not included as it was not possible to obtain reliable data about just what activities this includes or the extent to which either Adoption or

Appendix A

Licensing staff are currently involved in recruitment.  Thus, once these activities are defined and assigned, the time required should be measured and workload adjusted accordingly.

## B.  Comparisons with Actual Time Studies

To provide further support to the estimation process, estimated times for core functions were compared with data from actual time studies conducted in other jurisdictions where such data were available and where it could be discerned that the activities in measured job functions approximately corresponded with those in Mississippi.  It should be noted, however, that these data are used for general comparisons only; policy and procedural variations from one jurisdiction to another often result in significant disparity in job activities and the time required to perform them.  Comparisons are depicted in the table below.

**Table 3**

| Job Function | MS Est. Time (in minutes) | WA Time Study | Erie County, PA | VT Intake Time Study |
|---|---|---|---|---|
| General Intake | 59 | 43 | | 69 |
| CPI | 484 | Actual 335; Recommended 443 | Actual 456; Good practice 580 | N/A |
| In-Home Dependency* | 260 Prevention; 410 Protection | Actual 214; Recommended 240 | N/A | N/A |
| Foster Care | 507 | Actual 368; Recommended 441.5 | N/A | N/A |

*\* Other workload studies examined did not distinguish between prevention and protection in-home dependency cases as is done in Mississippi.*

The Washington State study yielded an actual time of 335.03 minutes per investigation across 543 cases, but recommended that investigations should take 443.18 minutes in order to fully comply with policy standards. A recent study in Erie County, PA found that workers required 7 hours and 36 minutes to complete an investigation in compliance with law and policy but that 9 hours and 40 minutes would be required to conform to good practice standards.

In Washington, services as delivered to Foster Care cases at the time of the workload study required 368.39 per month.  However, it was recommended that 441.50 be allocated for "standard one" or full policy compliance.

A 2002 study conducted in Allegheny County, PA (Pittsburgh) is not used for comparison purposes in the above table as the time estimates do not correspond directly to the listed job functions.  That study examined cases based on the categories of *Intake* which roughly corresponds to child protection investigation,

Appendix A

and *Family Services*, which includes the duties associated with In-Home Dependency and Foster Care in MS. It was determined that the average time needed to complete all home visits and case related tasks for Intake cases was 7.2 hours and 6.8 hours for Family Services. This resulted in an estimated maximum caseload of 16 Intake and 17 Family Services cases (Yamatani & Engel, 2002).

Although imprecise, the above comparisons show that time estimations derived from this workload study are in most at least somewhat comparable to those established through time studies in other states. The greatest divergence was in foster care, in which the final estimate for time required each month exceeded that in the Washington study by 65.5 minutes and the Allegheny County study by 99 minutes.

## C.  Analysis

The information gained in this study provides a basis for case assignment in Mississippi's child welfare agency. In terms of job functions, it means that a single caseworker can handle approximately the following numbers of cases per month:

> 118 Intakes
>
> 14 Child Protection Investigations
>
> 14 Foster Care
>
> 27 In-home Dependency, Prevention
>
> 17 In-home Dependency, Protection
>
> 9 Adoption
>
> 15 Licensing Applications
>
> 36 Licensing Renewals

**References**


Yamatani, H. & Engel, R. (2002). Workload assessment study, Allegheny County Office of Children, Youth and Families. Pittsburgh, PA: University of Pittsburgh School of Social Work.

Washington State Department of Social and Health Services (1997). *Social worker workload study*. Unpublished departmental report. Seattle, WA: Author.

Appendix B

GUIDES FOR INTERVIEWS WITH REGIONAL DIRECTORS

Appendix B

**Mississippi Department of Human Services**
**Division of Family and Children Services**

**Regional Director Group Interview Questions**

**Instructions:**

Regional Director responses to the interview questions should be recorded as presented in their own words. Questions are grouped into three areas: (1) workforce issues, (2) resource issues, and (3) administrative support issues.

Interviewer _____

Date of interview _____
            m/d/y

**1.0    Workforce Issues**

1.1 What are the barriers to obtaining adequate numbers of eligible staff?

1.2    From your perspective, what are the top three factors that influence agency capacity to maintain staff stability (retention of staff)?

1.3    What is your overall assessment of supervisors' level of skill in the area of:
       1.3 a.      oversight of caseworkers' case-related activities?[*]

       1.3 b.  providing guidance related to the implementation and interpretation of policy?

---

[*] Oversight of case activities includes planning services, monitoring services, tracking contacts, developing plans, case reviews, and preparation of court documents and appearances.

Appendix B

1.3 c setting unit priorities

1.3 d providing support to caseworkers

1.4    How would you describe the strengths of the supervisors as a group?

1.5    What are three areas of need that would enhance supervisory skill?

1.6    What is your overall assessment of caseworkers' level of skill in:
       1.6 a conducting family and child assessments?

       1.6 b service planning and delivery?

       1.6 c developing permanency plans?

       1.6 d tracking and monitoring service utilization?

1.7    How would you describe the strengths of caseworkers as a group?

1.8    What are three areas of need that will enhance the skill of caseworkers?

1.9    From your perspective, what are the top three factors that influence high
       caseloads?

53

Appendix B

**2.0     Resources**

2.1     Based on your experience, what are the three most frequently needed placement resources?

2.2     What barriers exist that prevent or delay the provision of identified services for children?

2.3     What barriers exist that prevent or delay the provision of identified services for parents?

2.4     What barriers exist in recruiting foster families?

2.5     Is the agency prepared to respond promptly and appropriately when families express interest in fostering or adopting?  If not, why not?

2.6.    What barriers exist in retaining foster families?

2.7     What barriers exist in approving/licensing kinship family homes?

2.8     Are all resource family applicants being offered the opportunity for dual licensure?  Has pre-service training been changed to incorporate the content needed for dual licensure?

2.9     Are children placed in unlicensed facilities? If so, why and under what circumstances does this occur?

Appendix B

2.10    To what extent is respite care provided?

2.11    To what extent is day care provided?