IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

OLIVIA Y., *et al.*                                                                 PLAINTIFFS

v.                                                              CIVIL ACTION NO. 3:04CV251LN

HALEY BARBOUR, as Governor of the State of Mississippi, *et al.*        DEFENDANTS

### AFFIDAVIT OF JESSICA WHEELER

I, JESSICA WHEELER, being duly sworn, on oath depose and say:

1.  My name is Jessica Wheeler and I am over 21 years of age. I am of sound mind and am competent to testify as to the matters set forth in this affidavit.

2.  In my capacity as a paralegal with Children's Rights, I received over 150 phone calls from April 12 through May 10, 2007, from individuals who had received the Notice of Settlement sent by the Department of Human Services (MDHS) or who were calling on behalf of friends or relatives who had received the Notice. Only one caller expressed any opposition to the Settlement Agreement.

3.  Many of the callers made statements regarding current or former class members' experiences with MDHS. The following is a list of related issues that more than one of these individuals reported having observed or experienced.

    a)  Safety concerns for children.

        i.  Unsafe foster homes. Callers described maltreatment of children in MDHS foster homes. One caller indicated that a four-year-old foster child was removed from his foster home by MDHS after a beating there

1

required a trip to the hospital emergency room. Another caller reported that a seven-year-old child returned to his mother after placement in an MDHS foster home alleged that a man in the foster home had sexually abused him. Around the same time, the seven-year-old's three-and-a-half-year-old sister, who had been returned from the same home, began acting out sexually. An adoptive mother for two special needs children reported that her teenage son was placed in an abusive MDHS foster home through 2005 and has since been diagnosed with major psychological problems. Her twelve-year-old mentally retarded daughter has disclosed that she was sexually abused in her prior foster home.

ii. Unsafe relative placements. Other callers described unsafe conditions in relative placements. For example, one caller reported that MDHS had placed a child with his non-custodial father before performing a background check, which later revealed that the father had multiple convictions for battery and drug-related offenses. The seven-year-old child began self-mutilating in that placement and later also testified to witnessing drug use in that home. Another caller reported that the biological father from whom several class members had been removed was living in the children's grandparents' home where MDHS had placed them. This situation continued despite the facts that it had been reported to MDHS by the caller and that the father had failed to complete an anger management course as ordered. A third caller stated that the relatives with

whom several class members are placed abuse drugs and alcohol, as reported to MDHS.

iii. Unsafe residential treatment facilities. Other callers described unsafe conditions in residential treatment centers. One caller reported that a twelve-year-old child was sexually molested while placed by MDHS in such a facility. Another caller reported that a 14-year-old girl contracted a sexually transmitted form of herpes while in a treatment facility where MDHS had placed her.

iv. Unsafe reunification and unsafe delays in placing children in care. Other callers reported current or former class members having been reunified with their biological parents despite continuing danger in the home. For instance, one current relative placement to two children indicated that MDHS had returned the children to their mother a little more than a year ago and, before ultimately placing them back in custody, had left them there for between one and two months despite the children's reports to MDHS, via the caller, that their mother was using drugs and behaving negligently. A former relative placement reported that a child has been returned to his parents despite their continuing drug abuse. The mother of nine- and 11-year-old class members stated that they currently have the same social worker who managed the mother's case when she was a child in MDHS custody and who, according to the mother, returned her several times to her biological parents' home where she was then repeatedly beaten and sexually abused. Another caller reported that her

grandchildren entered custody only after their mother's boyfriend placed one of the children, who is currently four years old, in scalding water, requiring extensive skin grafts, despite repeated previous reports to MDHS that the boyfriend was physically abusing the child. The grandmother has been trying to adopt the children for two years but the adoption is not yet finalized.

b) Insufficient caseworker visitation. Callers reported intervals of months with no caseworker visits to class members. A toddler placed in a pre-adoptive home by MDHS was seen in the home by MDHS on only three occasions in a two-and-a-half- to three-year period: twice when other foster children were being placed in the home and once after Hurricane Katrina.

c) Inadequate parental visitation. Biological parents reported few or no visits with their children in foster care despite the parents' adherence to service agreements.

d) Inadequate financial support for class members' care. Callers reported foster parents' difficulty in obtaining board payments or reimbursement for medical care from MDHS on behalf of class members. One caller described withdrawing her application to be a foster parent as a result of the lack of support foster parents appeared to receive. Relatives caring for class members reported receiving no financial support or insufficient financial support from MDHS. One caller reported that MDHS had placed relative foster children with her for two years without providing any financial assistance for their care and then removed the children because, MDHS workers told her, she was not financially able to care for them.

Adoptive parents and/or relatives with durable legal custody also reported receiving insufficient financial support from MDHS.

e) Inadequate medical care. Callers reported situations in which children in foster care have not received medical attention in a timely manner for serious complaints or in which no one has ensured that class members' prescribed medications are consistently administered. One caller reported that an 11-year-old child recently required surgical intervention for continuing ear problems resulting from an untreated ear infection in an MDHS foster home. Another caller related that a foster child with a history of heart surgery who complained of chest pains was denied medical attention for at least several days when the child's MDHS caseworker could not be reached.

f) Inadequate management of class member information. Foster parents reported delays of years in obtaining documents such as birth certificates and social security cards for their foster children from MDHS. One adoptive mother reported that she did not receive the medical records for her special needs son until after the adoption was finalized despite repeated prior requests. Callers reported recent instances of MDHS inquiring after foster children at placements from which MDHS had removed them months previously. In Defendants' "alphabetical list (including name and all available contact information) of all persons who, according to Defendants' records, appear to be class member and all persons to whom Notice to Class Members has been mailed" provided to Plaintiffs pursuant to the Court's April 3, 2007 Order, two class members appear at the address of a foster parent who reports that MDHS removed them approximately a year ago. Furthermore, a number of

children identified by callers as current class members do not appear at all in the list, and three of the named Plaintiff W. children, as well as their foster mother for the past year, are also missing from Defendants' list.

    g) Unmanageable caseworker workloads. Foster parents reported that caseworkers appear "overwhelmed."

4. Also in my capacity as a paralegal with Children's Rights, I attended a meeting in northern Mississippi with Plaintiffs' counsel on May 9, 2007, the purpose of which was to provide community members who work with class member children the opportunity to comment on the proposed Settlement Agreement. Participants in this meeting were service providers.

5. The meeting was attended by 10 participants. Most of the participants at this meeting made statements supportive of the Settlement Agreement and the need for reform at MDHS based on their experiences with MDHS. None of the participants expressed opposition to the Settlement Agreement.

6. What follows is a list of areas of needed reform at MDHS as identified by the participants.

    a) Safety concerns for children. Participants reported that MDHS is leaving children in or returning them to dangerous situations to keep them out of foster care. For instance, a suicidal grandmother with placement of four children threatened to kill herself and all four children, explaining that she needed to kill the children too because she could not "get anyone to take them." MDHS returned the children to her home, where they remain, after sending them to a facility for two weeks. In another instance, a six-month-old baby was raped and murdered by her mother's boyfriend, who, like the mother, abused drugs; the mother then had another baby, at which time she was still abusing drugs and her new

boyfriend was doing the same, yet MDHS refused to place the new baby in custody because the child had not yet been abused. One participant was told by an MDHS caseworker that MDHS has stopped investigating reports of child abuse and neglect unless maltreatment that constitutes a felony is reported.

    b)  Inadequate caseworker contact and availability. Participants reported that MDHS often places a child in a shelter and leaves him or her there for weeks without following up. Often MDHS contact is made only when the shelter staff calls the caseworker. Participants also described their frequent inability to reach anyone at all at MDHS offices, the telephone lines being answered by answering machines even during business hours.

    c)  Inappropriate placements. Participants stated that class members should be better assessed upon entering care so that they can be properly matched with placements and placement disruptions can be prevented. Participants stated that caseworkers often make inappropriate placement and permanency recommendations at Youth Court hearings without ever having seen the children in question. For instance, a caseworker recommended inpatient care for a child who had stabilized and displayed no behavior problems in a shelter placement. Participants reported instances of foster children running away from placements because the placements were inappropriate.

    d)  Inadequate array of quality placements for foster children. Participants indicated that there is an insufficient array of high-quality placements. Participants reported that this often leads MDHS to overlook placement deficiencies, including the routine use of corporal punishment, and leave class members in inappropriate placements due to lack of alternatives. Participants also indicated that in practice, there is currently "no real limit" to the number of foster children who can be placed in a given home, and that foster parents are

7

insufficiently screened for mental health problems. One participant reported a case of a foster mother with an Axis I diagnosis of schizophrenia caring for 13 foster children, two of whom have Down syndrome. Shelter staff reported being told by MDHS staff not to "love [foster children] too much," as the children should not get used to that when they are not likely to experience the same in their subsequent placements.

        e)      Inadequate foster and adoptive parent training, information, and support. Participants indicated that foster and adoptive parents often receive no information about their foster children's histories, are not prepared by MDHS to deal effectively with their foster children's problems and special needs, and receive no supportive services from MDHS. They reported that this causes placements to disrupt and discourages others from becoming foster or adoptive parents. Alternatively, the participants stated, MDHS prevents placement disruptions by pressuring foster parents to keep foster children whose needs they are not equipped to meet, rather than by providing the foster parents with the services necessary to meet those needs. Workers based in Jackson are responsible for crisis care in distant counties; this means that crisis workers are unable to travel to foster placements in a timely manner to assist with emergencies.

        f)      Inadequate respite care. Participants reported that MDHS has insufficient respite resources and overuses psychiatric facilities for respite care as a result; foster children who do not need such restrictive settings are placed in these facilities nonetheless, and their problems worsen from such multiple inappropriate placements.

        g)      Insufficient mental health services for children. Most foster children are not receiving any mental health services at all, including many who demonstrate a clear need for them. For instance, a four-year-old who watched her father be arrested and her mother be

restrained by police officers, and who is currently displaying signs of post-traumatic stress disorder, is not receiving any mental health care. A severely depressed and suicidal class member was denied placement in a psychiatric hospital because MDHS failed to secure a Medicaid card for the child or document the agency's assumption of the child's medical expenses. Other children are denied therapeutic foster care placements solely because that explicit recommendation was not included in their psychological evaluation. When MDHS does provide foster children with therapeutic services, it often sends them to Department of Mental Health centers for therapy, where many therapists are unlicensed and display a weak understanding of therapeutic techniques, and where therapist turnover is 60-70%.

      h)     Inadequate independent living services (ILS). Participants reported that only one person is responsible for providing ILS services to as many as nine counties at a time, limiting the services' availability. In one county, for example, the ILS classes are scheduled to begin before the children's school day ends to accommodate the instructor's travel schedule. Furthermore, many foster children who are supposed to be receiving ILS are not included in the required classes, which has the additional effect of disqualifying the children for available MDHS ILS funds.

      i)     Poorly managed contract services. Participants emphasized that contracted services should be provided regionally to better access and develop local resources. Furthermore, MDHS contracts should be determined through a standardized Request for Proposal process.

      j)     Inadequate service array for foster children. Participants reported providing necessary services to class members without compensation because MDHS is failing to provide them; these services include transport of class members to doctor visits, respite care,

and other supportive services for foster and adoptive parents. Participants indicated that local programs could be expanded to consistently provide these needed services and others, such as foster and adoptive recruitment and pre-placement services, but MHDS has rejected proposals to provide the necessary funding.

k) Poor casework practice. Participants asserted that most well-trained and qualified social workers have left MDHS, meaning that even promising new workers do not have models for good social work practice. One participant described receiving a phone call from a caseworker seeking information because she could not remember where she had placed an infant foster child two months previously. Another caseworker misplaced the case of an infant for six years. When the child was finally seen, the foster parents who had been caring for the child throughout those years wanted to adopt. However, termination of parental rights proceedings were further delayed because the caseworker had never drawn up a service plan or attempt reunification with the child's family. Despite a complaint to MDHS management from the Youth Court judge, the caseworker is still employed with MDHS.

l) MDHS retribution and lack of accountability. Participants reported that there is no one at MDHS with whom those concerned about the treatment of class members can communicate to help resolve their concerns; instead, such complaints generally result in retribution. Participants stated that if they complain about MDHS actions regarding a foster child in their program, the child is likely simply to be transferred elsewhere, and agencies with a history of advocating on behalf of class members are less likely to receive continued contracts and funding from MDHS. Participants indicated that if foster parents complain about the lack of adequate services provided to their foster children, MDHS removes the children. Participants reported that foster children are often threatened by MDHS employees

that they will be removed from their placements if they complain about their experiences in MDHS custody.

7.  Children's Rights received copies of two letters that were ostensibly submitted to the Court pursuant to the Notice but apparently never reached the Court. A true and accurate copy of a letter by class member Clayton Milar is included herewith at Exhibit 1. A true and accurate copy of a letter by Howard and Teresa Pitts is included herewith at Exhibit 2.

FURTHER AFFIANT SAYETH NOT.

_Jessica Wheeler_
Jessica Wheeler

Sworn to before me this
14th day of May, 2007

_Notary Public_

DANIEL W.E. HOLT
Notary Public, State of New York
No. 02HO6111265
Qualified in New York County
Commission Expires June 7, 20__

April 18, 2007

To the Department of Human Services,

My name is Clayton Milar. I currently live in Saucier, MS and attend Harrison Central High School.

I have been under the supervision of DHS since I was two years old. At that time, I was shipped to many places, never being allowed to develop a sense of belonging anywhere I went. Insecurity overwhelmed me in the over 40 homes I've been in. I have also stayed in hospitals, group homes, and lock-down facilities. My life has been far from easy.

It was difficult enough to lose my parents and hardly ever hear from them. I really have no memories of my parents and have no idea how to contact any real relatives. I understand my parents signed away their rights, but why were my other relatives not contacted? I've been alone and have no idea where I came from or who I am. I've never had a role model to emulate while under the supervision of DHS.

My stay in the hospitals consisted of consuming unnecessary drugs to prevent me from acting out. The people in these hospitals never took the time to get to know me personally and realize that I really didn't need their ridiculous drugs. I wasn't a criminal! I was a child without the benefit of parents. I wasn't ill! I was simply a creation of my environment. Why should I have been locked up like some sort of prisoner?

I have never had the opportunity to experience a typical, ordinary day like most children. My life has been painfully empty and void of happy memories - and these empty feelings and unhappy memories are all I have.

Children without parents obviously have special needs that should be met. They need one-on-one time with an adult or mentor. They need to go to the park, the beach, or the movies. Celebrating a birthday just isn't enough. These children will enter adulthood with a huge handicap. They are distrusting, have no support system and will find it difficult to have successful relationships.

The damage is already done and can never be repaired. I'm thankful that I have had the opportunity to spend all three of my high school years at Harrison Central. I also feel extremely fortunate that I will graduate next month. I am very proud of myself although I doubt anyone else is, other than some of my teachers.

Sincerely,

*Clayton Milar*

Clayton Milar

Exhibit 1

Cindy th miller
27516 mc Henry Rd
Baxter MS, 39571

GULFPORT MS 395
20 APR 2007 PM 2 T

Eric Thompson
Children's Rights
330 Seventh Ave., 4th Floor
New York, New York 10001

01001+5010


USA 39

To whom it may concern

I beleive as a foster parent. all foster parents should have equal rights even if related to child.

I beleive if a parent has had their parental rights revolked they should not have to sign for a child to be adopted after a certian amout of time.

The reason I say that we have had since he was 2 years old he will be 8 in November. We have asked the parents over and over they say no.

But they are futher away from getting him back then they were when he was took from them.

The child will tell you he wants to stay with us. He loves and respects us and we do him. He knows we are always there for him.

So I beleive D.H.S. should be able to adopt the child without parent concent.

Exhibit 2

I don't beleive a child should half to live in crowded arrangements or in a hazzard areas.
I beleive a child should feel loved and in a comfortable envicrment. where they feel safe.

Howard + Teresa
Pitts



Mrs. Teresa Pitts
286 Beat 4 Shubuta Rd.
Waynesboro, MS 39367-8283

HATTIESBURG MS 394
24 APR 2007 PM 1 T



Eric Thompson
Children's Rights
330 Seventh Ave., 4th Floor
New York, New York
10001