IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

OLIVIA Y., *et al.*                                                              PLAINTIFFS

v.                                                    CIVIL ACTION NO. 3:04CV251LN

HALEY BARBOUR, as Governor of the State of Mississippi, *et al.*      DEFENDANTS

### AFFIDAVIT OF TALIA KRAEMER

I, TALIA KRAEMER, being duly sworn, on oath depose and say:

1.      My name is Talia Kraemer and I am over 21 years of age.  I am of sound

mind and am competent to testify as to the matters set forth in this affidavit.

2.      In my capacity as a paralegal at Children's Rights, I attended meetings

with Plaintiffs' counsel in Jackson, Hattiesburg, and Gulfport, Mississippi on May 2 and

May 3, 2007, the purpose of which was to provide community members who work with

class member children the opportunity to comment on the proposed Settlement

Agreement.  Participants at these meetings included foster parents, service providers,

child advocacy attorneys, mental health professionals, school officials and nurses, law

enforcement officials, a Chancery Court judge, and former Mississippi Department of

Human Services (MDHS) social workers and supervisors.

3.      These meetings were attended by a combined total of over 60 participants.

Most of the participants made statements based on their experiences with MDHS that

were supportive of the Settlement Agreement and the need for reform at MDHS.  None of

the participants expressed opposition to the Settlement Agreement.

1

4.      What follows is a list of problem areas identified by the participants.

        a)      Safety concerns for foster children.  Participants reported that
MDHS does not adequately protect children in its care.  In one case, a foster
parent reported caring for a one-year-old who was unable to move her legs due to
prior neglect.  In the foster parent's care, the child received intensive therapeutic
services, which resulted in the child being able to walk.  MDHS then began
weekend visits with the child's 18-year-old aunt.  The child returned from these
visits with cigarette burns and cuts on her body, yet MDHS removed her from the
foster home and placed her full-time with the aunt.  Four months later, the child
re-entered foster care because the aunt's family had no food, money, or place to
live.  The child's therapeutic services had ceased during this time, and the child,
who was placed in yet another foster home, is now deemed disabled.  In another
example, MDHS placed several children with their grandmother despite her
history of four suicide attempts.  Within three months of their removal from that
placement, the grandmother ultimately did commit suicide.  Children are
frequently placed with relatives, including in out-of-state placements, before the
required background checks and/or Interstate Compact for the Placement of
Children (ICPC) paperwork are completed.  Participants reported children being
placed in homes only to be removed shortly thereafter when the background
checks revealed a problem, such as the previous felony conviction of a household
member.  Foster children are also placed in overcrowded foster homes.  One
participant described a FEMA trailer that is currently housing nine or ten foster
children.  Another identified a FEMA trailer with five teenagers housing an

2

additional two foster children.  Participants also reported that MDHS transports small children without car seats.  On one occasion, MDHS also allowed the biological parent of four young foster children, all under the age of three, to pick the children up from the MDHS office in a single-cab pick-up truck without car seats.

b)  Inadequate child abuse/neglect investigations.  Participants reported that investigations are conducted by new workers who are not trained as investigators of child abuse/neglect.  One participant identified four separate cases of alleged sexual abuse in which the person sent by MDHS to investigate the allegation was not a trained investigator.  Investigations, if conducted at all, are not timely.  On one occasion, a hospital contacted MDHS regarding an infant with a broken femur and collar bone.  Due to safety concerns, the hospital refused to allow the biological parents to take the baby home with them, yet MDHS did not respond for several days.  One participant estimated that MDHS is contacted by doctors at his hospital regarding drug-addicted newborns between 10 and 30 times per month, but MDHS responds to only three to five of these reports.  It was also reported that MDHS frequently lists abuse/neglect reports as "unsubstantiated" in their records, when in fact an investigation was never made or completed.  Participants recommended that criteria for screening abuse/neglect reports be standardized.  It was also requested that MDHS inform reporters of abuse/neglect of the outcomes of investigations, so that, for example, a hospital that has dealt multiple times with an abusive mother can know to alert MDHS if the mother gives birth to another child.  Finally, participants raised concerns regarding the

3

safety risks in MDHS' practice of "diversion," in which children who are the subject of abuse/neglect reports are removed from the home by MDHS and placed with relatives without a complete investigation or an MDHS case being opened.

    c)      Inadequate array of placements for foster children. Children are currently placed according to availability, not based on their needs, due to the lack of necessary types and inadequate number of available placements. Children are kept in training schools because of a lack of alternative placements. One foster parent reported that when she contacted MDHS to ask for a child's removal because his needs were too high for her capabilities, she was told that the child could not be removed because no other placement was available. Participants stated that the number of foster homes needs to be increased statewide, and that a larger segment of the population should be targeted for foster parent recruitment.

    d)      Inability to appropriately match children's needs with available placements. It was reported that the DFCS State Office personnel currently responsible for matching children to therapeutic placements are not trained to understand psychological evaluations, and thus are unable to properly match children referred for therapeutic care with facilities appropriate to their needs.

    e)      Poor mental health services for children. Participants, including mental health providers, reported that when children are given basic psychological evaluations upon entering care, there is no correlation between these evaluations and the services subsequently received by the children. It was repeatedly stressed that children entering MDHS custody should receive trauma-informed evaluations, instead of basic psychological evaluations identifying the

4

child's IQ. Mental health providers reported that referrals by MDHS for the provision of mental health services to foster children have dropped drastically in recent years and that when children are referred for treatment, the providers receive little information regarding the child's history and/or there is no follow-up of any kind by MDHS. Participants also reported a need for access to additional outpatient services.

f)     Inadequate independent living services. Participants reported that the quality of independent living services received by children currently depends heavily on the county of service. In Forrest County, there is no formal independent living program at all.

g)     Inadequate family preservation services. Participants reported that there is currently no family preservation unit at MDHS, and this lack of family preservation services leads to poor outcomes for children. In one case, a sibling group of four was removed from a family in need of support services that was otherwise unable to raise all four children. One of these children was moved around numerous foster homes and group facilities. The youth was then killed in a fight with other youth in one of these facilities.

h)     Poor quality visits from social workers. Participants stated that some "visits" consist of no more than a social worker peering in at the foster children through the screen door of the foster home. A shelter care provider stated that children are frequently dropped off at the shelter with no subsequent visitation or even contact from MDHS for up to three weeks.

i)      Poor case planning. Participants stressed that case planning must occur before a child is placed, and that children should be placed in safe environments based on an adequate assessment of their needs. Currently, children experience multiple placements. One foster parent cared for twins who had lived in 10 homes in four years. Another foster parent cared for a sibling pair who had lived in seven different placements in the span of seven months. Participants also cited several incidents in which poor case planning caused children to experience harm. In one case, a child was removed from a foster home and returned inappropriately to his biological mother. After the child had to be removed from his mother's custody again, he was placed with yet another foster family. Shortly thereafter, the child committed suicide at the age of 11.

j)      Lack of permanency planning. Participants stated that MDHS currently does not follow federal laws regarding timeframes for achieving permanency for children. In one case, a child was removed from the foster parent with whom he had been living for five years, and who had submitted an application for his adoption, so that he could be moved to the foster home in which his siblings were placed. Participants also cited the need for improved post-adoption services. Termination of Parental Rights (TPR) was reported to be an area in need of reform. Many foster parents reported caring for foster children for periods of three to five years before the biological parents' rights were terminated. In one case, a foster parent reported that she has cared for a foster child for nearly two years, since the child was three months old. The child's biological mother has not seen the child for 16 months, has not complied with her

service agreement, and does not appear at Youth Court hearings; yet her rights have still not been terminated.  Participants also reported that TPR is sometimes "rescinded," or children are placed with their biological parents even after the parents' rights have been terminated.

k)       Unmanageable worker caseloads.  Caseloads currently range from 25 to over 100 cases per worker.  It was recommended that workers not carry mixed caseloads; e.g., a worker in charge of ongoing foster care cases should not have to also conduct emergent Child Protective Services investigations.

l)       Inadequate training for workers and supervisors.  Current training is minimal, and workers are asked to perform tasks related to children's safety prior to receiving any training at all.  Some intake workers lack formal education beyond a GED.  Social work interns (students without BA degrees) are sent out alone on cases without supervision.  Former MDHS social workers stated that they were not trained in fundamental tasks such as the preparation of case narratives for abuse/neglect investigations.  Participants stressed the need for intensive training for supervisors, so that supervisors can properly support social workers and continue to teach them on the job.  It was recommended that training be ongoing and include instruction on child attachment and social work principals.  It was also stressed that training must be carried out by qualified instructors.  Currently, there is only one individual responsible for training at MDHS.

m)       Poor workforce retention.  Participants reported that social workers feel expendable and are overworked, leading to burn-out and frequent turnover.

Forrest County was identified as having a particularly high level of turnover. Participants expressed a need for adequate payment and incentives for social workers, including the possibility for workers to advance within the agency based on their qualifications and experience, rather than political appointment. Social workers are in need of better support from their supervisors and from the agency as a whole. Child welfare professionals among the participants stressed that worker turnover leads to instability and poor permanency outcomes for children.

      n)     Inadequate foster parent training, information and support. Foster parent training was reported to be inadequate. Foster parents reported receiving minimal information about the children placed with them; in one case a foster parent was not given the child's medical or personal history, Medicaid number, or even the child's last name. On another occasion, a foster parent was called to pick up a newborn baby, and was told that the child had no special needs. Upon arriving at the MDHS office to take the baby, the foster parent discovered that the infant was attached to a heart machine. MDHS was unable to give the foster parent any information regarding the infant's medical condition, medications, or food regimen. The foster parent, who was not licensed to care for special-needs children, had to take the child back to the hospital in order to receive adequate care instructions. Foster parents frequently are not notified of court hearings or conferences regarding their foster children. It was also reported that foster parents do not receiving special-needs ratings or payments for special-needs children in their care.

o)   Lack of communication and collaboration between MDHS and private agencies and service providers. A law enforcement officer reported that there has been no communication from MDHS since Hurricane Katrina for collaboration on abuse investigations. As a result, in one instance, for example, law enforcement did not get involved until a full year after the initial MDHS investigation of the incident, hampering efforts to prosecute the abuse. Participants reported that MDHS communicates little with the private agencies who handle the day-to-day lives of the children in MDHS custody, but then makes decisions regarding the children's cases without consulting the private agency workers. Service providers suggested that communication improve so that MDHS workers are aware of the array of available community-based services.

p)   Under-funding and fiscal inefficiency. Participants reported that MDHS is currently under-funded. Service providers stated that MDHS does not reimburse them for the actual costs of services for children, forcing cutbacks on the array and quality of services. Participants further reported that MDHS does not properly maximize available federal funding and lacks qualified and trained staff to access and manage those federal funds.

5.   Overall, participants emphasized that MDHS "isn't working." School officials, law enforcement, and service providers reported carrying out tasks that should be carried out by MDHS, such as making home visits when there was a concern for a child's wellbeing and referring children for needed services. Participants stated that community members have stopped reporting abuse/neglect allegations to MDHS, because they do not believe that any action will be taken.

9

FURTHER AFFIANT SAYETH NOT.

Talia Kraemer

Sworn to before me this
11th day of May, 2007

Notary Public

DANIEL W.E. HOLT
Notary Public, State of New York
No. 02HO6111265
Qualified in New York County
Commission Expires June 7, 2008