

Mr. J. T. Noblin, Clerk
United States District Court
for the Southern District of Mississippi
United States Courthouse
245 East Capitol Street
Jackson, MS 39201

Objections to the proposed settlement of *Olivia Y., et al. v. Barbour, et al.*,
No. 3:04cv251-L-N
submitted by George Whitten, Jr., general counsel at MDHS until today.

The class action lawsuit is provoked by and attempts to improve two shortages:

1. The shortage of foster parents and adoptive parents,
2. The shortage of well-motivated social workers.

Terms have been presented for approval of the Court which, when taken together, will make both shortages worse. The settlement will have the opposite consequences of what the lawsuit claimed to intend.

## I. Shortage of foster parents and adoptive homes.

Five terms will discourage the most desirable candidates from even applying for foster home licensure.

**1.** Home-schooling is off-limits.

The proposed Settlement would require all foster children of school age to be enrolled in "accredited schools." Page 28, II.B.8.b. This excludes teaching a foster child at home where the rest of his or her foster-siblings are taught.

If public schooling preserves "continuity" and "keep[s] the child in a familiar or current school" (quoting the succeeding paragraph, Page 28, part II.B.8.c), then DFCS can insist that the particular foster child remain in public school. But if the foster placement will produce a switch from one school district to another anyway if the child were sent to a public school, then teaching him at home causes no more break in continuity or loss of a familiar school than the switch in districts does.

**2.** Administering Psychotropic, Mood-Altering, or Anti-Psychotic Drugs to Children.

The proposed Settlement would require every foster child over the age of 4 years to be evaluated by a mental health professional for an emotional disturbance, mental illness, psychological syndrome, disorder, or phobia. Page 26, part II.B.7.f.

Mental health professionals lean heavily on the crutch of medication. Under this term of the Settlement, whatever drugs are recommended by the mental health professional who assesses a given foster child, the foster parents must administer such drugs to the child regardless of the parents' concern about the side effects, or their goal to avoid the intended effect of a drug.

Plenty of scientific evidence supports parental reluctance to allow mood-altering or psychotropic medications to be given to children. The worst side effect is that several drugs in these classes have a high incidence of putting adolescents and teenagers into a suicidal frame of mind. See, *e.g.*, "Why Ritalin Rules," by Mary Eberstadt, in *Policy Review*, No. 94, April – May, 1999; and Home Alone America, a more recent book by the same author. The lack of testing of the effects of anti-psychotic drugs on children justifies refusal to medicate children with them. "More Kids Taking Behavioral Meds," *Clarion-Ledger*, p. 7A, March 17, 2006.

When universal, mandatory mental health assessments of foster children result in a recommendation and prescription that a child take mood-altering drugs or psychotropic drugs, foster parents will be obligated to make the foster child take those drugs. "Each foster child shall receive recommended mental health services pursuant to his/her assessment." Page 26, part II.B.7.f. "Each foster child requiring therapeutic . . . foster care . . . because of a diagnosis of significant . . . emotional or behavioral problems . . . shall be provided with . . . services in accordance with the plan." Page 29, part II.B.9.a.

Many good foster parents will oppose administering such drugs to a child. Married couples who offer to take a foster child into their home out of a ministry motive, hoping to nurture and improve the child's life, want to deal with the real child in his un-drugged state in order to discern the roots of his problems. These foster parents do not want to medicate the child with drugs that mask symptoms; they want to help the child build character.

When foster parents disagree with the professional recommendation to give such drugs to a child, CRI or the Monitor can insist that DFCS remove the child from that foster home because the parents fit the definition of *neglectful*:

> " 'Neglected child' means a child . . . [w]ho, for any reason, lacks the special care made necessary for him by reason of his mental condition, whether said mental condition be mentally retarded or mentally ill."

*Miss. Code* §43-21-105(l)(iii). Therefore, foster parents who are determined to protect the foster child from the suicidal tendencies caused by psychotropic drugs when given to children can be caught in violation of the child neglect law.

(The exemption for "treatment by spiritual means" in §43-21-105(l) is confined to birth and adoptive parents; it offers no protection to "guardians or custodians" such as foster parents.) Foster parents are left at the mercy of whatever treatment a given mental health professional recommends.

The most desirable kind of foster parents offer to serve in that capacity out of a ministry motive to deal with root causes instead of masking over symptoms. But a psychotropic or mood-altering drug interferes with or defeats the foster parents' purpose to minister to the child as he really is and help him develop character instead of medicating him in a way that merely turns off warning signals.

**3.** Maximum family size of five children. Page 21, part II.B.5.b.

This edict will exclude parents with large hearts and masterful home-management skills. This is another proposal that excludes highly desirable families from the placement options for a foster child.

It also treats social workers, who make judgments about everything else as they do home studies and issue licenses to foster homes, as if they were incapable of exercising discretion in selecting which parents can handle several children, and which ones probably cannot.

**4.** Corporal punishment is forbidden.

This is already the written policy of MDHS. However, it is our rule, not a state statute, nor a consent decree issued by a court. MDHS made the rule, and MDHS can make exceptions to the rule. Currently, various social workers and various county offices of DFCS let ordinary spankings slide.

Under the proposed Settlement, a report of corporal punishment is to be treated the same as a child abuse report. Corporal punishment will bring swift investigation, standardized criteria for assessing the foster parent's conduct, and systematic evaluation. Pages 19 – 20, parts II.B.4.c., d., e. and f.; COA Standard FC 16.06. This means all reports of spanking will be handled the same with the same outcome; exceptions are eliminated.

Also, COA standard PA-FC 16.06 will exclude foster parents unless they "sign a statement agreeing to refrain from the use of corporal . . . punishment . . . ." In the name of protecting children, the Defendant agency is depriving foster children of the most desirable families they could live with other than their own. Abuse of the freedom to spank can be dealt with on a case-by-case basis instead of banning it across the board. Social workers's main function and role in the system is to make subjective judgment calls about each case based on the unique persons involved. The system relies on their discretion, and the need for individualized, tailored, ad hoc decisions is why the social worker position exists.

Since school principals and teachers are permitted to administer corporal punishment to students in Mississippi schools, then, as a general rule, foster parents should be permitted to administer corporal punishment to most children placed in their care. Of course, it is a privilege that can be forfeited by certain foster parents. And a battered child who comes into foster care from a cruel parent who beat him should warrant a complete (but temporary) ban against spanking as to that child until the foster parents have proved to the child in other ways that they operate for his good, not his harm. Tailor-made rules for each case are a large reason social workers exist.

When my own sister and her husband underwent training to become foster parents in Mississippi, they were home-schooling their own children and applying punishment to the seat of learning when persistent disobedience deserved it and loving concern that the misbehavior not become a lifelong handicap demanded it. The DFCS supervisor who spoke to the class of foster-parent-candidates told my sister that spanking was to be kept to a minimum, and depending on which social worker was assigned to her, spankings could be overlooked when the misbehavior warranted the punishment and a judicious degree of spanking was administered.

Under the proposed regime, if a social worker or supervisor lets a spanking slide, she will jeopardize her employment. After any report of corporal punishment, a child protection caseworker will visit every two weeks and ask the foster child if he or she has received a spanking. (And the child will answer truthfully, because most foster parents who administer proper spanking also teach their foster children to tell the truth even when it brings hardship.)

Few ministry-minded couples are going to offer to undertake the responsibility of raising a foster child when DFCS strictly withholds from them the authority necessary to fulfill the responsibility.

The Monitor and her full-time staff will be patrolling to uncover any breach of the ban against spanking. DFCS may be asked to inform foster children upon placement that they should call the Child Abuse Hotline if they are spanked by their foster parents.

5. Loss of Privacy and Confidentiality

For MDHS to turn over a complete list of all foster parents' names, home address, and home telephone number to Children's Rights, Inc., is to violate the confidentiality promised by statute. It exposes the family to crusaders who want to save children from the sort of foster parents and potential adoptive parents who home school, who build character in their children instead of sedate them, who love their children enough to do the difficult duty of spanking them when necessary, who love children enough to have a lot of them, or who do all of the above.

The foregoing features of the Settlement Reform Plan will drive away good foster parents. The better response to this lawsuit is to expand the pool of potential candidates who will be good influences on children in custody. The best known, national Christian non-profit ministries in the United States have in the past year or two made the case for Christian parents to bring needy children into their homes by foster care or adoption. Series of programs on nationwide radio broadcasts, (*e.g.*, "Focus on the Family," "In the Studio with Michael Card," and "Family Life Today") have promoted adopting and offering to be foster parents. Becoming an adoptive or foster home has been one of the top three emphases this year in publications and broadcasts from Focus on the Family. This Settlement Agreement, however, proposes restrictions and uniform, strict enforcement thereof that turn away prime candidates to take children under the shelter of their wings.

## II. Shortage of Caseworkers

The second shortage is of caseworkers willing to deal with child abuse and neglect cases and policing the substitute placements found for those children. Difficulties of the job include wading through false reports, and trying to think up a way to fix heartless parenting.

### A. Experience

By statute, DFCS employs caseworkers who are not licensed social workers and who do not have a degree in social work or a related human services field. *Miss. Code* §43-1-55. DFCS employs college graduates fresh out of school who come to DFCS out of the necessity to acquire two or three years' experience before they are employable anywhere else. The reason most applicants apply to DFCS is to get experience.

The Reform Plan's prohibition against DFCS hiring persons with a bachelor's degree **unless they have two years experience** can do nothing but choke the labor supply and exacerbate the shortage. Page 5, part II.A.2.b (1).

Likewise, the Reform Plan will reduce the number of persons eligible to supervise social workers. The Plan prohibits DFCS from hiring or promoting anyone to a supervisory position over case workers unless he or she possesses an advanced degree (a master's or doctorate) in a field related to human services. Page 5, part II.A.2.b (2).

Yet, DFCS must hire more supervisors. For every five caseworkers, DFCS must employ one supervisor. Page 3, part II.A.2.a (5).

**B**. <u>Pre-service Training</u>

Current law: 4 weeks minimum – for those who are not licensed social workers and whose college degree is in a field other than social work. Miss. Code §43-1-55(2)(b). A fifth week of training is required before interviewing a child for forensic purposes.

Proposed Reform Plan: 7 weeks minimum – for **all new hires, even though they already have two years' experience** on top of their bachelor's degree in a human services field **or already possess an advanced degree** in a human services major. Page 5, part II.A.2.c (2). The longer delay before new employees may commence work as a caseworker aggravates the shortage of workers to divide the caseload.

### The Significance of the two Shortages Combined

A worsening shortage of acceptable foster parent candidates, a shortage of "qualified" manpower to achieve caseloads as low as this Settlement would require, and performance-based, outcome measurements will build higher pressure on DFCS to approve gay or lesbian applicants who want access to foster children or who want governmental acceptance of their sexual lifestyle that licensure represents.

The shortage of trustworthy foster and adoptive homes in which to place children DHS has taken into custody and the pressure to move children into a single-family dwelling rather than a congregate care facility present a strong possibility that DFCS will quietly accept single males

to adopt children from our custody, and accept homosexual and lesbian pairs to be foster parents. The dangers of doing so are listed in my 12-page memorandum of September 26, 2007, attached as *Exhibit 4*.

### III. Conflict with the Law of the Case

This lawsuit was supposed to be confined to the foster care system. The Court dismissed the claims alleging deficiencies in how DFCS investigates abuse and neglect allegations about children who are not in DHS custody. But the proposed Reform Plan goes beyond the foster care system by limiting the caseload of child protection workers. Page 3, II.A.2.a(1). Some of these caseworkers may investigate reports only against natural parents, school employees and child care workers regarding children still under the protection of their own natural or adoptive parents. Caseload limits imposed by this lawsuit should be limited to child protection workers who deal with children in foster homes, group shelters, and other institutions where foster children reside.

The proposed Plan also limits the caseload of dedicated intake workers. Page 3, II.A.2.a(1). Intake workers do not deal primarily with children in custody. Furthermore, if intake workers simply answer telephone calls to the child abuse Hotline, it is pretentious to speak in terms of a "caseload."[1] It is more honest to speak in terms of calls answered and reports entered.

### IV. Conflict with State Law

The proposed Reform Plan addresses durable legal custody among the permanency placements. When that option can be arranged, the Reform Plan requires "a long-term placement agreement signed by DFCS and the relative . . . ." Page 12, part II.B.3.a(2). State law, however, requires a court order in order to establish durable legal custody. *Miss. Code* §43-21-105(y).

---

[1] Also, the "caseload" cap leaves unanswered whether the phone call limit is 118 intakes per month, per week, or per day.

Page 8 of 12

State law sets a higher standard. Furthermore, a court order eliminates any need for such an agreement, and renders it superfluous.

The definition of *durable legal custody* in state law eliminates the foster care board payment. (Maintenance payments are referred to herein as *board payments*.) Mississippi's definition "gives the durable legal custodian the responsibilities of physical possession of the child and the duty to provide him with care, nurture, welfare, food, shelter, education and reasonable medical care." *Miss. Code* §43-21-105(y). The legal custodian, not DFCS, becomes the source and provider of the child's material welfare. Durable legal custody removes the child from DFCS's caseload.

Yet, Page 36, part B.14 of the Settlement would allow DFCS to pay monthly support to durable legal custodians deemed to be needy. This practice might be salutary, but it conflicts with the nature of durable legal custody.

The most desirable legal custodians and foster parents are those who would volunteer no matter how meager the board payment. Foster parenting is given a bad name by those who do it for the money. What inspires the couples who become foster parents regardless of whether the board payment matches actual expenses? It is the willingness to be tools in the hands of God to transform another life just as their own lives were transformed; a willingness to take on a task that is impossibly hard for them, but is not too hard for God working through them.

### V. Unknowns; The quest for an Open-Ended Approval

The proposed Reform Plan would last five years. Only the Implementation Plan for the first year has been negotiated. While some benchmarks for years 2 through 4 have been set forth in the body of the Reform Plan, the full terms of the implementation plans for those years are unknown. They have yet to be negotiated. The parties might agree to future implementation plans that go beyond the Reform Plan with new and extra restrictions or goals without being inconsistent with as much of the Reform Plan as is being announced now. Moreover, most or all

of the executive officers and administrators of the governmental parties (defendants named in their official capacities) will probably change before five years elapse.

Similarly, if C.O.A. accreditation standards change regarding employee qualifications, the Reform Plan specifies that the new qualification standards shall govern. Page 5, part II.A.2.b.

How can a party or any one else object to something that does not exist yet? How can the Court approve terms that have not been presented yet?

If the Court approves the proposed Reform Plan, that approval will be open-ended. It can authorize whatever the next four Implementation Plans turn out to be – unless one of the parties does not cooperate with the other party's demand and the demanding party turns to the Court for resolution of the dispute. But if both parties are cooperating, then future implementation plans can go beyond the terms presented now for approval.

The Court might consider requiring that any Reform Plan proposed be completed within the term of the incumbent governor, and requiring that each year's implementation plan be spelled out in full before the Court grants approval.

## VI. The Monitor Selected

Children's Rights Inc. represents the plaintiff class in this Mississippi lawsuit. In identical litigation in Nebraska, Children's Rights Inc. served as co-counsel with Nebraska Appleseed to represent the plaintiff class together. (See "Policy Spotlight," 3/12/2007, at Nebraska Appleseed's website, www.neappleseed.org/lrc/031207.html, attached as *Exhibit 1*; and case summary of *Carson v. Heineman* posted at National Center for Youth Law's website, www.youthlaw.org/publications/fc_docket/alpha/carsonvheinema, attached as *Exhibit 2*.)

Grace Lopes is proposed as the Monitor to determine whether DFCS achieves compliance with the proposed Settlement Agreement. Ms. Lopes used to be the Managing Director of DC Appleseed in Washington, D.C. (See page *i*, "Acknowledgments," from a publication of the HIV/AIDS project of DC Appleseed, attached as *Exhibit 3*.)

Her prior connection with one branch of the network whose other branch was a co-belligerent with Children's Rights, Inc., raises serious doubt about the independence and neutrality of the proposed monitor.

The proposed settlement is grievously unreasonable. Some standards ought never to be complied with. Other standards are predictably impossible to reach. The proposal appears to be the work product of attorneys who do not genuinely intend that the foster care system ever be fixed.

Particularly in an action brought on behalf of a certified class, and especially where that class consists of minors, and where the settlement aspires to accomplish systemic, legislative-type changes, it is incumbent upon the Court to act as more than a rubber stamp, but to weigh carefully the re-structurings proposed for a statewide, governmental function and to either revise the terms before endorsing the Settlement and Reform Plan and giving it the force of law, or to send the parties back to a more neutral table to negotiate a new settlement plan from scratch.

I am resigning from state employment in order to submit this comment to the Court. I have worn the title of general counsel to the Mississippi Department of Human Services alongside the job of legal services developer within the Division of Aging & Adult Services. I had no hand in either defending against or settling this litigation. By statute, those duties were handled by the Attorney General's Office, the private law firms with whom the Attorney General contracted, and by the DFCS division director and the executive director of MDHS without consulting me. I was allowed to sit in on two early meetings with the agency's attorneys at which I was a bystander. Apart from DFCS's commitment to seek accreditation from the Council on Accreditation (which was announced in the April 10, 2007, Public Notice), I had no knowledge of the other terms of settlement until this month, December, after Public Notice was posted again announcing the proposed Settlement Agreement and Reform Plan.

I have taken notice of the two court-ordered Notices posted on bulletin boards in the building where I work. I took the initiative to survey the COA standards back in April; and now in December I have surveyed the terms on which settlement is proposed. To remain at MDHS now that I know would be to imply that I consent.

Respectfully submitted, this 18th day of December, 2007,

*George Whitten, Jr.*
George Whitten, Jr.
P. O. Box 4773
Jackson, MS 39296
(662) 299-0800

By my signature above, I certify that I will mail today or deliver tomorrow true and correct copies of this Objection to the following attorneys:

| | |
|---|---|
| Eric Thompson | Rusty Fortenberry |
| Children's Rights, Inc. | Baker, Donelson, Bearman, Caldwell & Berkowitz, PC |
| 330 Seventh Ave., 4th Floor | 4268 I-55 North |
| New York, NY 10001 | Meadowbrook Office Park |
| | Jackson, MS 39211 |