IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

OLIVIA Y., *et al.*                                                    PLAINTIFFS

v.                                                    CIVIL ACTION NO. 3:04CV251LN

HALEY BARBOUR, as Governor of the State of Mississippi, *et al.*        DEFENDANTS

---

## MISSISSIPPI SETTLEMENT AGREEMENT AND REFORM PLAN

---

### INTRODUCTION

This Settlement Agreement and Reform Plan (the "Plan") shall resolve all remaining claims in the above-captioned case, *Olivia Y. v. Barbour, et al.* Paragraph 1 of the Stipulated Settlement Agreement approved by the Court on May 17, 2007, is hereby incorporated into this Plan.

The United States District Court for the Southern District of Mississippi, Jackson Division, shall have continuing jurisdiction to enforce the terms of this Plan and any annual implementation plans required herein.

## I.  REFORM PLANNING AND IMPLEMENTATION

Defendants shall meet the standards and outcome measures in Sections II and III of this Plan within five years of the Court's approval or within any earlier interim timelines that are specified herein.

**A.** For every 12-month period following Court approval of this Plan, Defendants shall develop an annual implementation plan with COA and Plaintiffs that sets forth the steps that must be taken in that 12-month period in order to meet that Period's interim benchmarks and make the progress necessary within that Period to achieve overall compliance with the Plan within five years. Each annual implementation plan shall be Court enforceable and include specific steps and timelines to achieve compliance with this Plan.

**B.** The first 12-month implementation plan is incorporated herewith at Appendix A. Each subsequent annual implementation plan shall be developed jointly with the Parties and COA 90 calendar days prior to the end of the previous 12-month period. Each annual implementation plan will be incorporated into this Plan.

**Exhibit 1**

1

**C.** Defendants do not speak for the Mississippi Legislature, which has the power under Mississippi law to determine the appropriations for the State's child welfare programs. However, at least annually after Court approval of this Plan, and consistent with existing state budgetary practices and legal requirements, Defendants shall request state funds and any federal/special fund authorization sufficient to effect the provisions and outcome measures set forth in this Plan in connection with any budget, funding, or allocation request to the executive or legislative branches of State government. To the extent that it is anticipated that the funding of critical needs shall be met, in whole or in part, by way of federal fund sources, Defendants shall request federal fund authorization in amounts which are determined to be realizable and consistent with regular budgetary needs assessments. Nothing in this paragraph in any way limits Defendants' obligations under this Plan.

Such budgetary requests, which shall be provided to the Monitor, shall, among other things, identify for the executive and legislative branches of State government, with sufficient particularity, the known and anticipated costs to the State for the timely implementation of the reforms and outcome measures provided for herein.

Defendants shall maximize available federal funding opportunities.

**D.** Nothing in this Plan shall be construed as infringing on the authority of the State courts of Mississippi to exercise their jurisdiction over individual class members. Defendants will not be held accountable for the State courts' exercise of such jurisdiction in any individual case, as long as Defendants requested that the State court exercise its jurisdiction consistent with the requirements of the Plan in that individual case.

## II.    STANDARDS

The following standards shall be met within five years of Court approval of this Plan, or earlier as specified below.

### A.  Administration and Management Standards

#### 1.  Agency Leadership

    a. The director of DFCS shall be qualified by: an advanced degree from an accredited college or university in a field related to the agency's mission and services; five years of related experience at minimum; competence in administering and providing services to individuals, families, and/or children; management skills in addressing human resources and financial matters; and the ability to coordinate the agency's services with other community resources.

    b. Within 90 calendar days of Court approval of this Plan, DFCS will hire and maintain a director for DFCS who meets the Plan's qualification requirements for the position.

2. **Human Resources Management**

   a. **Workforce:**

   1) No DFCS caseworker shall carry a caseload that exceeds the following:

   - 9 for dedicated adoption workers (counted by child)
   - 14 for dedicated child protection workers (counted by investigation)
   - 14 for dedicated ongoing foster care workers (counted by child)
   - 15 for dedicated new application licensing workers (counted by home)
   - 17 for dedicated in-home protection workers (counted by family)
   - 25 for dedicated in-home dependency/prevention workers (counted by family)
   - 36 for dedicated renewal licensing workers (counted by home)
   - 118 for dedicated abuse and neglect intake workers (counted by intake).

   2) Individual DFCS caseworkers with generic caseloads shall not carry a mixed caseload requiring more than 6,960 minutes of case-related work per month as measured in accordance with Dr. Sue Steib's time study standards as reproduced below.

   - Adoption:  807 min. per case/per month
   - Child protection investigation:  484 min. per case/per month
   - Foster care:  507 min. per case/per month
   - Licensing – new application: 470 min. per case/per month
   - In-home dependency – protection:  410 min. per case/per month
   - In-home dependency – prevention:  275 min. per case/per month
   - Licensing – renewal: 191 min. per case/per month
   - General intake:  59 min. per case/per month
   - Intra-state home studies – 282 min. per case/per month
   - Interstate Compact for the Placement of Children (ICPC) – 106 min. per case/per month
   - Courtesy interviews – 65 min. per case/per month

   3) The parties acknowledge that the above time study standards are based on averages and that any individual case may require more or fewer minutes of case-related work per month.

   4) Individual caseloads shall be measured monthly.

   5) No DFCS supervisor shall be directly responsible for supervising more than five caseworkers.

6) No supervisor shall be assigned primary responsibility for providing direct casework services for any case, except in cases of extenuating circumstances which shall last no more than four (4) weeks and have been approved in writing by the director of DFCS after consultation with the supervisor's Regional Director to ensure the continued proper supervision of the impacted direct service workers.

By the end of implementation Period 1:

7) At least 30% of DFCS caseworkers shall carry a caseload that does not exceed Plan caseload requirements. No more than 30% of caseworkers shall carry a caseload exceeding twice the Plan caseload requirements. No caseworkers shall carry a caseload exceeding three times the Plan caseload requirements.

8) No more than 30% of supervisors who are responsible for supervising DFCS caseworkers shall be responsible for supervising more than five caseworkers.

9) Caseworkers shall have access to a supervisor by telephone 24 hours a day.

By the end of implementation Period 2:

10) At least 50% of DFCS caseworkers shall carry a caseload that does not exceed Plan caseload requirements. No more than 20% of caseworkers shall carry a caseload exceeding twice the Plan caseload requirements.

11) No more than 20% of supervisors who are responsible for supervising DFCS caseworkers shall be responsible for supervising more than five caseworkers.

12) Supervisors will no longer be assigned primary responsibility for providing direct casework for any cases, unless under the extenuating circumstances exception as described above.

By the end of implementation Period 3:

13) At least 75% of DFCS caseworkers shall carry a caseload that does not exceed Plan caseload requirements. No more than 10% of caseworkers shall carry a caseload exceeding twice the Plan caseload requirements.

14) No more than 10% of supervisors who are responsible for supervising DFCS caseworkers shall be responsible for supervising more than five caseworkers.

By the end of implementation Period 4:

15) At least 95% of DFCS caseworkers shall carry a caseload that does not exceed Plan caseload requirements. No caseworkers shall carry a caseload exceeding twice the Plan caseload requirements.

16) No more than 5% of supervisors who are responsible for supervising DFCS caseworkers shall be responsible for directly supervising more than five caseworkers.

**b. Worker and Supervisor Qualifications:**

1) DFCS shall hire only foster care workers who have an advanced degree in social work or a comparable human services field, or a B.A. in social work or a comparable human service field with two years of related experience. Should the related COA standards change, the new COA worker qualifications standards will govern.

2) DFCS shall hire or promote to the position of caseworker supervisor only persons with an advanced degree in social work or a comparable human service field and two years of experience working with children and families, preferably in foster care. Should the related COA standards change, the new COA caseworker supervisor qualifications standards will govern.

**c. Training:**

1) DFCS shall maintain a Training Unit, headed by a qualified director of training. The Training Unit shall have sufficient staffing, funding, and other resources to assure that it can provide comprehensive child welfare training to enable all caseworkers, supervisors, and other child welfare agency employees to comply with the relevant mandates of this Plan, DFCS policy, and reasonable professional standards.

2) Subsequent to Court approval of this Plan, all new caseworkers hired by DFCS shall receive a minimum of 270 hours of pre-service training, including instructional training and supervised field training, prior to assuming any case responsibilities; all new caseworker supervisors hired or promoted by DFCS shall receive a minimum of 40 hours of in-service training directed specifically at the supervision of child welfare caseworkers prior to assuming any supervisory responsibilities; all caseworkers shall receive a minimum of 40 hours of ongoing in-service training each year; and all supervisors shall receive a minimum of 24 hours of ongoing in-service training each year.

3) The caseworker training shall be based on clearly identified learning objectives and culminate in competency-based testing, which will need to be

5

successfully completed for the training to be credited. The curriculum shall be drawn from current research and data.

By the end of implementation Period 1:

4) DFCS shall establish and maintain a Training Unit, headed by a qualified director of training, with sufficient staffing and resources to provide comprehensive child welfare pre-service and ongoing training to all caseworkers and supervisors. Supervisory personnel will no longer be detailed from the field to provide training.

5) All new caseworkers and supervisors will complete their service training consistent with the Plan requirements before they assume their respective responsibilities for carrying cases and supervising.

6) The ongoing training curriculum for caseworkers and supervisors will be completed and ongoing training will have been initiated.

By the end of implementation Period 2:

7) All caseworkers shall receive a minimum of 40 hours of ongoing in-service training each year, and all supervisors shall receive a minimum of 24 hours of ongoing in-service training each year.

**d. Contract Agency Requirements:**

By the end of implementation Period 2:

In the event that private agencies provide protective, preventive, foster care, or adoption case work services under contract with DFCS, DFCS shall require the contract agencies to abide by all related terms of the Plan, including, but not limited to, provisions regarding training curricula, minimum training hours, and caseload standards. DFCS shall implement and maintain a performance-based contracting system to evaluate annually contract agency compliance with the terms of the Plan. DFCS shall take reasonable steps to ensure contract agency remediation of any identified deficiencies.

**3. Performance and Quality Improvement**

By the end of implementation Period 1:

a. DFCS shall begin implementing a separate continuous quality improvement (CQI) system.

By the end of implementation Period 2:

b.  DFCS shall implement and maintain a separate CQI system that can identify areas of needed improvement and require improvement plans in support of achieving performance targets, program goals, client satisfaction, and positive client outcomes. The CQI system shall include monitoring and evaluating the quality of social and human services provided by independent contractors and other provider organizations and ensuring contractor remediation of any identified deficiencies.

c.  DFCS shall comply with the public child fatality reporting requirements of the Child Abuse Prevention Act, 42 U.S.C. § 5106a(b)(2)(A)(x).

**4. Legal and Regulatory Compliance**

DFCS shall comply with applicable federal, state, and local laws and regulations.

**5. Information Management and Use**

a.  DFCS shall have a Mississippi Automated Child Welfare Information System (MACWIS) appropriate to its size and complexity that permits (1) timely access to information about persons served by any part of the organization, or by other practitioners within the organization, to support child safety and continuity of care across settings and services; (2) capturing, tracking, and reporting of financial, compliance, and child welfare information, including federally required AFCARS elements; (3) longitudinal reporting and comparison of performance over time; (4) the use of clear and consistent formats and methods for reporting and disseminating data, including system-wide reports; (5) the collection of data necessary to monitor compliance with the Plan; (6) DFCS county staff access to a computerized database of the placement resources currently available for placement statewide; (7) notification to caseworkers when a foster care provider for a child assigned to the worker is under investigation, or that provider's foster care license has expired or been revoked; (8) notification to caseworkers investigating a report of abuse of subsequent reports of abuse concerning the same child or alleged perpetrator; (9) caseworkers to access information on available services statewide; and (10) review of prior (i.e. historical) case documents including Individual Service Plans.

By the end of implementation Period 1:

b.  DFCS shall provide to all county agency staff with child welfare responsibilities access to basic computer services, consisting of access to MACWIS, word processing, and electronic mail.

c.  MACWIS data related to compliance with the Plan's Foster Care Service Standards II.B.1-12 will be collected, analyzed, and disseminated at least monthly to DFCS regional and county staff.

By the end of implementation Period 2:

d.  DFCS county staff shall have access to a MACWIS database of the placement resources available for placement statewide at any given time. The database shall permit staff to determine whether a given placement is suitable for a given child needing placement by allowing access to current caretaker placement information, including capacity limitations, current census, the placement's suitability for children by age, sex, and special needs, and any related licensing and maltreatment investigations information.

e.  DFCS shall take reasonable steps to ensure data integrity and user accountability in MACWIS. The system shall have the necessary controls to decrease the risk of duplication of data and to reduce the risk of incorrect or invalid data. The system shall provide a visible trail to the database administrators of all information entered, added, deleted, or modified, and shall have necessary security to protect data integrity. This system shall be audited at least annually to ensure the accuracy and validity of the data in the system. Necessary actions identified by the MACWIS data accuracy and validity audit to correct MACWIS data errors shall be implemented annually.

## 6.  Case Recordings

a.  DFCS caseworkers shall compile, maintain, and keep current complete child welfare case records.

By the end of implementation Period 3:

b.  At least 90% of child welfare case records will be current and complete.

By the end of implementation Period 4:

c.  At least 95% of child welfare case records will be current and complete.

## 7.  Financial Management

By the end of implementation Period 1:

a.  Defendants shall conduct an external assessment of actual and anticipated federal funding levels and create an implementation program to increase federal funding available to DFCS.

b.  Funds realized as a result of revenue maximization activities shall not supplant appropriated state funds but shall be used in furtherance of the reforms and outcome measures provided for herein and to improve child welfare services.

8

**B. Foster Care Service Standards**

**1. Screening and Assessments**

a. Upon taking a child into custody, DFCS shall engage in a thorough screening of the child and an individualized, strengths-based, family-focused, and culturally responsive assessment of the family, with the family's participation. Information gathered during the screening and assessment shall consist of (1) internal, external, and historical factors that may contribute to concerns identified in initial risk and safety assessments and initial screenings; (2) child and family strengths, protective factors, and needs; (3) the impact of maltreatment on the child; (4) factors and characteristics pertinent to selecting an appropriate placement; (5) family resources for the child and the parents; and (6) any other material pertinent for meeting service objectives. The screening and assessment shall inform the selection of an appropriate placement, the provision of needed services, and permanency planning, and shall be completed within 30 calendar days of the child's entrance into custody and documented in the child's case record.

b. DFCS shall initiate the assessment process through individual team meetings (1) with the child and the assigned DFCS caseworker within the first 72 hours of initial placement or any subsequent placement moves; (2) with the child's parents and the assigned DFCS caseworker within the first two weeks of initial placement; and (3) with the foster care provider and the assigned DFCS caseworker within the first two weeks of any placement, or within different timeframes as required by COA standards.

c. In all cases in which the whereabouts of one or both parents is unknown, DFCS shall immediately institute a diligent search for the parent(s), which shall be documented in the child's case record.

d. In instances in which it is impossible to meet with one or both parents, the assessment process will proceed as described above, notwithstanding the parent's absence.

By the end of implementation Period 2:

e. All caseworkers carrying active cases and their supervisors will have undergone training on the individual and family team meeting protocols.

f. At least 40% of children entering custody during the Period shall have a thorough screening and assessment, consistent with Plan requirements, within 30 calendar days of entering custody.

g. At least 40% of children entering custody or subject to a placement move during the Period shall have an individual team meeting (1) with the child and the assigned DFCS caseworker within the first 72 hours of initial placement or any subsequent placement moves; (2) with the child's parents and the assigned DFCS

caseworker within the first two weeks of initial placement; and (3) with the foster care provider and the assigned DFCS caseworker within the first two weeks of any placement.

h.  In at least 40% of placement cases in which the whereabouts of one or both parents is unknown, DFCS shall have immediately instituted a diligent search for the parent(s), which shall be documented in the child's case record.

By the end of implementation Period 3:

i.  At least 80% of children entering custody during the Period shall have a thorough screening and assessment, consistent with Plan requirements, within 30 calendar days of entering custody.

j.  At least 80% of children entering custody or subject to a placement move during the Period shall have an individual team meeting (1) with the child and the assigned DFCS caseworker within the first 72 hours of initial placement or any subsequent placement moves; (2) with the child's parents and the assigned DFCS caseworker within the first two weeks of initial placement; and (3) with the foster care provider and the assigned DFCS caseworker within the first two weeks of any placement.

k.  In at least 80% of placement cases in which the whereabouts of one or both parents is unknown, DFCS shall have immediately instituted a diligent search for the parent(s), which shall be documented in the child's case record.

By the end of implementation Period 4:

l.  At least 90% of children entering custody during the Period shall have a thorough screening and assessment, consistent with Plan requirements, within 30 calendar days of entering custody.

m.  At least 90% of children entering custody or subject to a placement move during the Period shall have an individual team meeting (1) with the child and the assigned DFCS caseworker within the first 72 hours of initial placement or any subsequent placement moves; (2) with the child's parents and the assigned DFCS caseworker within the first two weeks of initial placement; and (3) with the foster care provider and the assigned DFCS caseworker within the first two weeks of any placement.

n.  In at least 90% of placement cases in which the whereabouts of one or both parents is unknown, DFCS shall have immediately instituted a diligent search for the parent(s), which shall be documented in the child's case record.

10

## 2. Service Planning and Monitoring

a. Within 30 calendar days of a child's entrance into foster care, the DFCS caseworker shall convene a team meeting with the DFCS caseworker's direct supervisor, the child's family if appropriate, the foster family, and the child unless there is a justification for excluding the child from the planning process. During the team meeting, service plans shall be developed for both the child and the parents with the participation of all team meeting participants.

b. Each service plan shall be reviewed and updated quarterly at a team meeting with the caseworker, the caseworker's direct supervisor, the foster parent, the child's parents if appropriate, and the child unless there is a justification for excluding the child from the planning process. If the child's placement changes, or there is a significant change affecting the child or his/her family, a team meeting shall be convened and the service plan must be updated within 30 calendar days of the date of change.

c. In instances in which it is impossible to meet with one or both parents, the planning process will proceed as described above, notwithstanding the parent's absence.

By the end of implementation Period 2:

d. At least 40% of children entering custody during the Period shall have a team meeting with service plans developed for both the child and the parents, consistent with Plan requirements, within 30 calendar days of entry into foster care.

e. At least 40% of children in custody during the Period shall have team meetings, at which time their service plans shall be updated, quarterly and within 30 calendar days of any placement or other significant change, consistent with Plan requirements.

By the end of implementation Period 3:

f. At least 80% of children entering custody during the Period shall have a team meeting with service plans developed for both the child and the parents, consistent with Plan requirements, within 30 calendar days of entry into foster care.

g. At least 80% of children in custody during the Period shall have team meetings, at which time their service plans shall be updated, quarterly and within 30 calendar days of any placement or other significant change, consistent with Plan requirements.

By the end of implementation Period 4:

h.  At least 90% of children entering custody during the Period shall have a team meeting with service plans developed for both the child and the parents, consistent with Plan requirements, within 30 calendar days of entry into foster care.

i.  At least 90% of children in custody during the Period shall have team meetings, at which time their service plans shall be updated, quarterly and within 30 calendar days of any placement or other significant change, consistent with Plan requirements.

## 3. Child and Youth Permanency

### a.  Permanency Plan:

1)  Working with service providers, foster parents, the child, and the family, DFCS shall develop and document in the child's case record a permanency plan within 30 calendar days of the child's initial placement that specifies the permanency goal, a timeframe for achieving permanency, and activities that support permanency.

2)  DFCS may assign a permanency goal of durable legal custody to a child for whom it has not made adoption efforts only if an appropriate person, with preference given to relatives, has been identified; such person is willing to assume long-term responsibility for the child but has articulated a reasonable basis for not adopting the child; and it is in the child's best interests to remain in the home of such person rather than be considered for adoption by another person. In such circumstances, there shall be in place a long-term placement agreement signed by DFCS and the relative or other appropriate person ensuring the permanency and stability of this placement barring emergency circumstances that dictate the removal of the child.

3)  No child shall be assigned a permanency goal of permanent foster care.

4)  If DFCS concludes, after considering reunification, adoption, durable legal custody, and permanent placement with a relative, that these permanency plans are inappropriate or unavailable for a child, DFCS may assign a permanency goal of emancipation for the child. In such circumstances, a) the child must be at least 16 years old and b) DFCS must document to the Youth Court a compelling reason why this permanency goal is in the best interest of the child and more appropriate than reunification, adoption, durable legal custody, or permanent placement with a relative.

12

By the end of implementation Period 2:

5) A least 50% of children entering care during the Period shall have a permanency plan within 30 calendar days of their entry into care consistent with Plan requirements.

6) At least 50% of children in custody during the Period shall have a permanency plan that is consistent with Plan requirements.

By the end of implementation Period 3:

7) A least 90% of children entering care during the Period shall have a permanency plan within 30 calendar days of their entry into care consistent with Plan requirements.

8) At least 90% of children in custody during the Period shall have a permanency plan that is consistent with Plan requirements.

By the end of implementation Period 4:

9) At least 95% of children entering care during the Period shall have a permanency plan within 30 calendar days of their entry into care consistent with Plan requirements.

10) At least 95% of children in custody during the Period shall have a permanency plan that is consistent with Plan requirements.

**b. Concurrent Planning:**

1) For children with the goal of reunification, DFCS shall engage in concurrent planning consisting of early assessment of the potential for reunification; early identification of potential family resources; and early placement with a potentially permanent family resource.

By the end of implementation Period 2:

2) At least 50% of children in custody during the Period with the goal of reunification shall have case record documentation reflecting active concurrent permanency planning consistent with Plan requirements.

By the end of implementation Period 3:

3) At least 90% of children in custody during the Period with the goal of reunification shall have case record documentation reflecting active concurrent permanency planning consistent with Plan requirements.

By the end of implementation Period 4:

4) A least 95% of children in custody during the Period with the goal of reunification shall have case record documentation reflecting active concurrent permanency planning consistent with Plan requirements.

c. **Permanency Plan Updating and Review:**

1) A child's permanency plan shall be reviewed in a court or administrative case review at least every six months. DFCS will take reasonable steps, including written notice, to ensure the participation of the child, parents, caregivers, and relevant professionals in court or administrative reviews.

2) DFCS will take reasonable steps to ensure that a court review, which may be called a review, dispositional, or permanency hearing, is held for each child in foster care custody within 12 months of initial placement, and annually thereafter.

By the end of implementation Period 2:

3) At least 50% of children in custody at least six months during the Period shall have a timely court or administrative case review consistent with Plan requirements during the Period.

4) At least 50% of children in custody at least 12 months during the Period shall have a timely annual court review consistent with Plan requirements during the Period.

By the end of implementation Period 3:

5) At least 90% of children in custody at least six months during the Period shall have a timely court or administrative case review consistent with Plan requirements during the Period.

6) At least 90% of children in custody at least 12 months during the Period shall have a timely annual court review consistent with Plan requirements during the Period.

By the end of implementation Period 4:

7) At least 95% of children in custody at least six months during the Period shall have a timely court or administrative case review consistent with Plan requirements during the Period.

8) At least 95% of children in custody at least 12 months during the Period shall have a timely annual court review consistent with Plan requirements during the Period.

**d. Reunification Services:**

1) When the child's permanency goal is reunification, DFCS shall identify in the parents' service plan and make available directly or through referral those services DFCS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care and to help the parents develop strategies to facilitate permanency for the child.

2) For a child with a permanency goal of reunification, the child's assigned DFCS caseworker shall meet with the child's biological parents at least monthly to assess service delivery and achievement of service goals, to keep the family informed and involved in decisions about the child, and to remain current about the family's circumstances.

3) For children with a permanency goal of reunification, the case record shall document opportunities provided to parents in support of reunification, including involvement in service planning and access to needed services; constructive visitation and on-going contact with the child; reduction of barriers to contact, visitation, and involvement in the child's care; and use of resources to prepare the family for reunification.

By the end of implementation Period 2:

4) At least 40% of children with a permanency goal of reunification during the Period shall have service plans for their parents that identify those services DFCS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care and case record documentation that DFCS made those identified services available directly or through referral.

By the end of implementation Period 3:

5) At least 80% of children with a permanency goal of reunification during the Period shall have service plans for their parents that identify those services DFCS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care and case record documentation that DFCS made those identified services available directly or through referral.

By the end of implementation Period 4:

6) At least 90% of children with a permanency goal of reunification during the Period shall have service plans for their parents that identify those services DFCS deems necessary to address the behaviors or conditions resulting in the

child's placement in foster care and case record documentation that DFCS made those identified services available directly or through referral.

**e.  Termination of Parental Rights:**

1) For children who will have spent 15 of the previous 22 months in foster care, DFCS shall submit a termination of parental rights (TPR) packet to the Office of the Attorney General by the first day of the fifteenth month or document an available exception under the federal Adoption and Safe Families Act (ASFA). The Office of the Attorney General shall file the petition for termination of parental rights by the last day of the fifteenth month to ensure compliance with the ASFA.

2) When a child's primary permanency goal is established as adoption, DFCS shall submit a TPR packet to the State Office within 30 calendar days. Within 30 calendar days of receipt of the TPR packet by the State Office, the State Office shall review the packet, remedy any deficiencies, and submit a TPR referral to the Office of the Attorney General. Within 30 calendar days of such referral, the Office of the Attorney General shall either file the petition for TPR or document to DFCS a legal deficiency preventing timely filing. Within 10 working days of receiving documentation of a legal deficiency, the assigned DFCS caseworker shall document to the Office of the Attorney General the steps to be taken to address the deficiency. The DFCS caseworker and that caseworker's direct supervisor shall meet in person every 30 calendar days thereafter to document progress being made to address the legal deficiency until a TPR referral has been accepted as legally sufficient by the Office of the Attorney General, who shall file the petition for TPR within 30 calendar days.

By the end of implementation Period 2:

3) At least 40% of children in custody reaching the point at which they have spent 15 of the previous 22 months in foster care during the Period shall have a petition for TPR filed on their behalf or an available exception under the federal ASFA documented by the end of their fifteenth month in care.

4) At least 40% of children in custody during the Period who have spent more than 15 of the previous 22 months in foster care without a TPR petition filed on their behalf or an available ASFA exception documented by the end of their fifteenth month in care shall have such a petition filed or an available exception documented within the Period.

By the end of implementation Period 3:

5) At least 80% of children in custody reaching the point at which they have spent 15 of the previous 22 months in foster care during the Period shall have

16

a petition to TPR filed on their behalf or an available exception under the federal ASFA documented by the end of their fifteenth month in care.

6) At least 80% of children in custody during the Period who have spent more than 15 of the previous 22 months in foster care without a TPR petition filed on their behalf or an available ASFA exception documented by the end of their fifteenth month in care shall have such a petition filed or an available exception documented within the Period.

By the end of implementation Period 4:

7) At least 90% of children in custody reaching the point at which they have spent 15 of the previous 22 months in foster care during the Period shall have a petition to TPR filed on their behalf or an available exception under the federal ASFA documented by the end of their fifteenth month in care.

8) At least 90% of children in custody during the Period who have spent more than 15 of the previous 22 months in foster care without a TPR petition filed on their behalf or an available ASFA exception documented by the end of their fifteenth month in care shall have such a petition filed or an available exception documented within the Period.

**f. Adoption:**

1) When a child's primary permanency goal is established as adoption, DFCS shall, within 10 working days, assign an adoption specialist to work with the assigned DFCS caseworker to immediately begin the process of securing an adoptive placement for the child. Within 15 calendar days of the primary permanency goal change to adoption, the DFCS caseworker, along with the adoption specialist, shall draw up an adoption plan that identifies the child-specific activities that DFCS will undertake to achieve the permanency goal of adoption and the timeframes in which the activities will be undertaken. The adoption specialist shall be responsible for consulting with private and public professionals and identifying and ensuring the provision of targeted services necessary for the child to be adopted. An adoption status meeting with the DFCS caseworker, the adoption specialist, and the caseworker's direct supervisor to review the progress being made in achieving the goal of adoption shall occur weekly for infants and monthly for all other children awaiting adoption, and shall be noted in the child's case record.

2) For each child who is not in a home with approved adoptive parents within six months after being legally freed for adoption, DFCS will assign an external adoption consultant who will be contracted to work with the assigned DFCS caseworker and adoption specialist to review, amend, or approve the adoption plan and to ensure the plan is implemented. The initial meeting with the consultant to review that adoption plan shall be in person. The consultant shall also participate in the monthly or, in the case of infants, weekly adoption

17

status meetings, but may do so telephonically where geographic barriers make in-person participation impractical.

By the end of implementation Period 1:

3) DFCS shall provide and maintain an approval process by which foster parents and adoptive parents may be approved simultaneously, so that whenever possible and appropriate, placement moves can be minimized and foster parents can be eligible to adopt the children for whom they have been providing foster care. A foster parent who has been providing foster care for a child for 12 months shall be given preference as an adoptive parent for that child should he/she become legally available for adoption, unless DFCS documents why the placement is unsuitable for adoption.

4) DFCS shall implement and maintain a process for advising all potential adoptive families, including any foster family caring for a child who has become legally available for adoption, of the availability of adoption subsidies. This notification shall be documented in the child's record, and the family's access to such subsidies shall be facilitated.

5) DFCS shall establish and maintain a system of post-adoptive services to stabilize and maintain adoptive placements. All adoptive families eligible for adoption subsidies shall have access to these services, which shall include respite services; counseling, mental health treatment, and crisis intervention; family preservation and stabilization services; and peer support.

By the end of implementation Period 2:

6) At least 75% of children in custody with the primary permanency goal of adoption during the Period shall have an assigned adoption specialist and an adoption plan that identifies the child-specific activities that DFCS will undertake to achieve adoption, and shall receive regular adoption status meetings consistent with Plan requirements.

7) At least 75% of children in custody during the Period who are legally free for adoption but are not in a home with approved adoptive parents within six months after being legally freed for adoption shall have an assigned external adoption consultant consistent with Plan requirements to ensure the adoption plan is implemented.

By the end of implementation Period 3:

8) At least 90% of children in custody with the primary permanency goal of adoption during the Period shall have an assigned adoption specialist and an adoption plan that identifies the child-specific activities that DFCS will undertake to achieve adoption, and shall receive regular adoption status meetings consistent with Plan requirements.

18

9) At least 90% of children in custody during the Period who are legally free for adoption but are not in a home with approved adoptive parents within six months after being legally freed for adoption shall have an assigned external adoption consultant consistent with Plan requirements to ensure the adoption plan is implemented.

By the end of implementation Period 4:

10) At least 95% of children in custody with the primary permanency goal of adoption during the Period shall have an assigned adoption specialist and an adoption plan that identifies the child-specific activities that DFCS will undertake to achieve adoption, and shall receive regular adoption status meetings consistent with Plan requirements.

11) At least 95% of children in custody during the Period who are legally free for adoption but are not in a home with approved adoptive parents within six months after being legally freed for adoption shall have an assigned external adoption consultant consistent with Plan requirements to ensure the adoption plan is implemented.

## 4. Child Safety

a. DFCS shall maintain a well-publicized 24-hour statewide child abuse hotline for the reporting of abuse and/or neglect.

b. Upon receipt of a report of child maltreatment in a group home, emergency shelter, or private child placing agency foster home, DFCS shall undertake a licensure investigation, that is additional to, and independent of, any child protective investigation, that shall include an on-site inspection of the facility or home to determine the contract provider's compliance with DFCS licensure standards. If the provider is found to be in violation of licensure standards, it shall have 30 days to submit a Corrective Action Plan (CAP) with timeframes to rectify the violation and comply with the approved CAP and timeframes. If the provider does not comply with the licensure standards based on the approved CAP and timeframes, DFCS shall revoke the license.

c. All allegations of maltreatment of a child in custody, including corporal punishment, shall be investigated by a caseworker who has received training in the investigation of maltreatment in out-of-home placements and has no ongoing connection to the foster care case.

By the end of implementation Period 1:

d. DFCS shall assure that standardized decision-making criteria are used for prioritizing, screening, and assessing all reports of maltreatment, including corporal punishment, of children in DFCS custody.

19

e.  All investigations into reports of maltreatment, including corporal punishment, of children in DFCS custody must be initiated within 24 hours and completed within 20 calendar days, including supervisory approval. DFCS shall assure that such investigations and decisions are based on a full and systematic evaluation of the factors that may place a child in DFCS custody at risk.

f.  Any foster child who remains in the same out-of-home placement following an investigation into a report that he or she was maltreated, or subject to corporal punishment, in that placement shall be visited by a DFCS caseworker twice a month for three months after the conclusion of the investigation to assure the child's continued safety and well-being.

g.  When a maltreatment investigation involves a foster home, DFCS shall file a copy of the approved final investigative report, and any recommendations and/or corrective actions DFCS has deemed necessary, in the case record of the foster child, in the file of the foster or adoptive parents with a copy of the letter of notification to the foster or adoptive parents, and in the DFCS State Office. DFCS shall also provide those records to the Youth Court Judge with jurisdiction over the child and to the Monitor.

h.  When a maltreatment investigation involves an agency group home, emergency shelter, private child placing agency foster home, or other facility licensed by DFCS, a copy of the final investigative report shall be filed in the child's case record, in the facility licensing file, and in the DFCS State Office. DFCS shall provide the report to the Youth Court Judge with jurisdiction over the child and to the Monitor.

i.  DFCS shall undertake a special safety review, including an unannounced site visit, of all currently licensed foster homes with two or more reports of maltreatment, including corporal punishment, within the last three years to determine whether any children placed in those homes are at risk of harm and any licensing standards related to child safety are not being met. Any necessary corrective actions will be identified and tracked.

j.  DFCS shall undertake a special safety review, including an unannounced site visit, of all group homes and other residential facilities that house children in custody with three or more reports of maltreatment, including corporal punishment, within the last two years to determine whether any children placed in those facilities are at risk of harm and any licensing standards related to child safety are not being met. Any necessary corrective actions will be identified and tracked.

By the end of implementation Period 2:

k.  For investigations of agency group homes, emergency shelters, and private child placing agency foster homes, the Licensure Unit shall undertake a separate

investigation of the contract provider's compliance with DFCS licensure standards.

## 5. Child Placement

a. No foster child shall be placed in a foster care setting that has not been licensed or approved as meeting DFCS licensure standards, unless the child is placed pursuant to the following relative licensing process. The licensing process for relatives shall take place in two steps: (1) an emergency process to be developed by DFCS in conjunction with COA that enables a child to be placed with relatives as soon as the child enters placement, following an initial screen (as described at II.B.5.i below) of the relative's home, and (2) a full licensing process, to be completed no later than 60 calendar days after the child has entered placement. DFCS may waive non-safety licensing requirements for relative foster placements in individual cases, in accordance with federal regulations.

b. No foster home shall provide care for more than three foster children or for a total of more than five children (including foster, biological, and adoptive children) at any given time. No more than two children in the foster home may be under the age of two or have therapeutic needs. Notwithstanding the above, a sibling group may be placed together in the same foster home in excess of these limits, but only upon written approval by the DFCS Regional Director determining that the foster children can be maintained safely in the foster home.

c. Children with special needs shall be matched with placement resources that can meet their therapeutic, medical, and educational needs. DFCS shall ensure that each county office has access to placement specialists within its region having the ability to ascertain the placement resources available and their suitability for each particular child needing placement.

d. Each foster child shall be placed in the least restrictive setting that meets his/her individual needs as determined by a review of all intake, screening, assessment, and prior placement information on the child available at the time of placement. In order of consideration, this means placement with relatives; foster home care within reasonable proximity to the child's home community; foster home care outside of the child's home community; group home care; or institutional care.

e. Each child shall be placed within his/her own county or within 50 miles of the home from which he/she was removed. This provision shall not apply if (1) the child's needs are so exceptional that they cannot be met by a family or facility within his/her own county or within 50 miles of the home from which he/she was removed; (2) the child is placed through the ICPC consistent with its terms; (3) the child is appropriately placed with relatives or another planned permanent resource; (4) the child is ordered to be placed in a child-specific foster care setting by a court; or (5) the child is placed in an adoptive home.

f.  Siblings who enter placement at or near the same time shall be placed together unless (1) doing so would be harmful to one or more of the siblings; (2) one of the siblings has exceptional needs that can be met only in a specialized program or facility; or (3) the size of the sibling group makes such placement impractical notwithstanding diligent efforts to place the group together. If a sibling group is separated at initial placement, the caseworker shall make immediate efforts to locate or recruit a family in whose home the siblings can be reunited. These efforts will be documented and maintained in the case file.

g.  No later than at the time of placement, DFCS shall provide foster parents or facility staff with the foster child's currently available medical, dental health, educational, and psychological information, including a copy of the child's Medicaid card. DFCS shall gather and provide to foster parents or facility staff all additional current medical, dental health, educational, and psychological information available from the child's service providers within 15 days of placement.

h.  DFCS shall take all reasonable steps to avoid the disruption of an appropriate placement and ensure placement stability for children. If a caseworker has knowledge that a placement may disrupt, the caseworker shall immediately convene a meeting with the DFCS supervisor, the foster parents, and, if appropriate, the child to determine the following: the cause of the potential disruption; whether the placement is appropriate for the child; whether additional services are necessary to support the placement; whether the child needs another placement; and, if another placement is necessary, what that placement should be. If the placement disrupts on an emergency basis, the meeting shall be held no later than five days after the disruption to address whether the child needs additional supportive services and whether the new placement is appropriate.

By the end of implementation Period 1:

i.  All foster care settings, including relative placements, shall be screened prior to the initial placement of foster children to ensure that children receive safe, sufficient, and appropriate care. Additional screens shall be completed at least once annually thereafter and within two weeks of a reported change in the residents of a foster home. Screens shall include criminal and child welfare background checks of all household members who are at least 14 years old. No foster child shall be placed in a home prior to DFCS receipt of the background check results.

j.  DFCS shall develop and implement an expedited process for licensing screened relative caregivers to enable a child to be placed quickly with relatives upon entering placement. All relative placements approved for expedited placement shall undergo the full licensing procedure within 120 calendar days of the child's placement in the home.

k.  No foster child shall remain in an emergency or temporary facility for more than 45 calendar days, unless, in exceptional circumstances, the Division Director has granted express written approval for the extension that documents the need for the extension.

By the end of implementation Period 2:

l.  No child shall spend more than 12 hours at a time in a DFCS office or other non-residential facility that provides intake functions.  No child shall be placed in more than one emergency or temporary facility within one episode of foster care, unless an immediate placement move is necessary to protect the safety of the child or of others as certified in writing by the Regional Director.

m.  No child under 10 years of age shall be placed in a congregate care setting (including group homes and shelters) unless the child has exceptional needs that cannot be met in a relative or foster family home or the child is a member of a sibling group, and the Regional Director has granted express written approval for the congregate-care placement. Such approval shall be based on the Regional Director's written determination that the child's needs cannot be met in a less restrictive setting and can be met in that specific facility, including a description of the services available in the facility to address the individual child's needs. Sibling groups in which one or more of the siblings are under the age of 10 shall not be placed in congregate care settings for more than 45 days.

n.  No foster child shall be moved from his/her existing placement to another foster placement unless DFCS specifically documents in the child's case record justifications for that move and the move is approved by a DFCS supervisor.

o.  All relative placements approved for expedited placement shall undergo the full licensing procedure within 60 calendar days of the child's placement in the home.

p.  At least 50% of children in DHS custody placed in a new placement during the Period shall have their currently available medical, dental, educational, and psychological information provided to their foster parents or facility staff no later than at the time of any new placement during the Period.

q.  At least 30% of children in custody known by DFCS to be subject to a potential or actual placement disruption during the Period shall receive a meeting to address placement stability consistent with Plan requirements.

By the end of implementation Period 3:

r.  No more than 30% of foster homes shall provide care to a number of children in excess of the Plan foster home population limitations.

s.  At least 80% of children in DHS custody placed in a new placement during the Period shall have their currently available medical, dental, educational, and psychological information provided to their foster parents or facility staff no later than at the time of any new placement during the Period.

t.  At least 70% of children in custody known by DFCS to be subject to a potential or actual placement disruption during the Period shall receive a meeting to address placement stability consistent with Plan requirements.

u.  At least 80% of children with special needs shall be matched with placement resources that can meet their therapeutic, medical, and educational needs.

v.  At least 80% of children in DHS custody shall be placed in the least restrictive setting that meets their individual needs consistent with Plan requirements.

w.  At least 80% of siblings who entered DFCS custody at or near the same time shall be placed together consistent with Plan requirements.

By the end of implementation Period 4:

x.  No foster child shall be placed or remain in a foster care setting that does not meet DFCS licensure standards consistent with Plan requirements, unless so ordered by the Youth Court over DFCS objection.

y.  No more than 10% of foster homes shall provide care to a number of children in excess of the Plan foster home population limitations.

z.  At least 95% of children in DHS custody shall have their currently available medical, dental, educational, and psychological information provided to their foster parents or facility staff no later than at the time of any new placement.

aa. At least 90% of children with special needs shall be matched with placement resources that can meet their therapeutic, medical, and educational needs.

bb. At least 90% of children in DHS custody shall be placed in the least restrictive setting that meets their individual needs consistent with Plan requirements.

cc. At least 90% of siblings who entered DFCS custody at or near the same time shall be placed together consistent with Plan requirements.

dd. At least 90% of children in custody known by DFCS to be subject to a potential or actual placement disruption during the Period shall receive a meeting to address placement stability consistent with Plan requirements.

**6. Developing and Maintaining Connections**

a. At the time of the initial team meeting when a child enters foster care, a visitation plan for the child and his/her family shall be developed as part of the child's service plan. This visitation plan shall be developed and regularly updated in collaboration with parents, foster parents, and the child and should be appropriate to a) the child's age and developmental stage; b) the parents' strengths and needs; c) the schedules of foster parents and parents; d) the social and cultural context of the family; and e) the status of the case and the permanency goal. If parental visitation is appropriate based on the above factors, this visitation plan shall include a minimum of two visits per month with the parents (unless a court order in the child's case limits such visits). For all children, regardless of permanency goal, this visitation plan shall include at least one visit per month with any siblings not in the same placement (unless a court order in the child's case limits such visits).

b. DFCS shall arrange contact for the child with his/her parents and with any siblings not in the same placement within 24 hours of foster care placement unless there are documented reasons why contact should not occur. If a visit cannot be arranged within 24 hours, a telephone call to parents, siblings, or extended family members must be provided to the child.

c. DFCS caseworkers shall take all reasonable steps to ensure the implementation of each child's visitation plan. DFCS and its contracting agencies shall implement a policy that prohibits cancellation of visits as a disciplinary action.

By the end of implementation Period 2:

d. At least 40% of children in custody during the Period shall be provided with contacts with their parents and with any siblings not in the same placement consistent with Plan requirements.

By the end of implementation Period 3:

e. At least 80% of children in custody during the Period shall be provided with contacts with their parents and with any siblings not in the same placement consistent with Plan requirements.

By the end of implementation Period 4:

f. At least 90% of children in custody during the Period shall be provided with contacts with their parents and with any siblings not in the same placement consistent with Plan requirements.

7. **Physical and Mental Health Care**

    a. Every child entering foster care shall receive a health screening evaluation from a qualified medical practitioner within 72 hours after placement that is in accordance with the health screening recommended by the American Academy of Pediatrics.

    b. Within 30 calendar days of placement in foster care, each child shall receive a comprehensive health assessment that is in accordance with the assessment recommended by the American Academy of Pediatrics.

    c. Nothing in the above paragraphs shall prohibit the initial health screening evaluation and the comprehensive health assessment from being conducted in one clinical visit. However, in such instances, this combined visit shall be conducted within 72 hours of placement.

    d. All children shall receive periodic medical examinations and all medically necessary follow-up services and treatment throughout the time they are in state custody, in accordance with the time periods recommended by the American Academy of Pediatrics.

    e. Each child three years old and older shall be provided with a dental examination within 90 calendar days of foster care placement and every six months thereafter. Each foster child who reaches the age of three in care shall be provided with a dental examination within 90 calendar days of his/her third birthday and every six months thereafter. Foster children shall receive all medically necessary dental services.

    f. Each child four years old and older shall be provided with a mental health assessment by a qualified professional within 30 calendar days of foster care placement. Each foster child who reaches the age of four in care shall be provided with a mental health assessment within 30 calendar days of his/her fourth birthday. Each foster child shall receive recommended mental health services pursuant to his/her assessment.

    g. Each foster child ages birth through three shall be provided with a developmental assessment by a qualified professional, and each child older than three shall be provided with a developmental assessment if factors indicate such an assessment is warranted. All foster children shall be provided with needed follow-up developmental services.

By the end of implementation Period 2:

    h. At least 40% of children entering custody during the Period shall receive a comprehensive health assessment consistent with Plan requirements within 30 calendar days of entering care.

26

i.   At least 40% of children in custody during the Period shall receive periodic medical examinations and all medically necessary follow-up services and treatment consistent with Plan requirements.

j.   At least 40% of children three years old and older entering custody during the Period or in care and turning three years old during the Period shall receive a dental examination within 90 calendar days of foster care placement or their third birthday, respectively.

k.   At least 40% of children in custody during the Period shall receive a dental examination every six months consistent with Plan requirements and all medically necessary dental services.

l.   At least 40% of children four years old and older entering custody during the Period or in care and turning four years old during the Period shall receive a mental health assessment by a qualified professional within 30 calendar days of foster care placement or their fourth birthday, respectively, and all recommended mental health services pursuant to their assessment.

m.   At least 40% of children in custody ages birth through three during the Period, and older children if factors indicate it is warranted, shall receive a developmental assessment by a qualified professional and all needed developmental services.

By the end of implementation Period 3:

n.   At least 80% of children entering custody during the Period shall receive a comprehensive health assessment consistent with Plan requirements within 30 calendar days of entering care.

o.   At least 80% of children in custody during the Period shall receive periodic medical examinations and all medically necessary follow-up services and treatment consistent with Plan requirements.

p.   At least 80% of children three years old and older entering custody during the Period or in care and turning three years old during the Period shall receive a dental examination within 90 calendar days of foster care placement or their third birthday, respectively.

q.   At least 80% of children in custody during the Period shall receive a dental examination every six months consistent with Plan requirements and all medically necessary dental services.

r.   At least 80% of children four years old and older entering custody during the Period or in care and turning four years old during the Period shall receive a mental health assessment by a qualified professional within 30 calendar days of foster care placement or their fourth birthday, respectively, and all recommended mental health services pursuant to their assessment.

s.  At least 80% of children in custody ages birth through three during the Period, and older children if factors indicate it is warranted, shall receive a developmental assessment by a qualified professional and all needed developmental services.

By the end of implementation Period 4:

t.  At least 90% of children entering custody during the Period shall receive a comprehensive health assessment consistent with Plan requirements within 30 calendar days of entering care.

u.  At least 90% of children in custody during the Period shall receive periodic medical examinations and all medically necessary follow-up services and treatment consistent with Plan requirements.

v.  At least 90% of children three years old and older entering custody during the Period or in care and turning three years old during the Period shall receive a dental examination within 90 calendar days of foster care placement or their third birthday, respectively.

w.  At least 90% of children in custody during the Period shall receive a dental examination every six months consistent with Plan requirements and all medically necessary dental services.

x.  At least 90% of children four years old and older entering custody during the Period or in care and turning four years old during the Period shall receive a mental health assessment by a qualified professional within 30 calendar days of foster care placement or their fourth birthday, respectively, and all recommended mental health services pursuant to their assessment.

y.  At least 90% of children in custody ages birth through three during the Period, and older children if factors indicate it is warranted, shall receive a developmental assessment by a qualified professional and all needed developmental services.

## 8.  Educational Services

a.  DFCS caseworkers shall screen each child for general and special educational needs within 30 calendar days of his/her entry into foster care.

b.  DFCS shall take reasonable steps to ensure that school-age foster children are registered for and attending accredited schools within three business days of initial placement or any placement change, including while placed in shelters or other temporary placements.

c.  DFCS shall make all reasonable efforts to ensure the continuity of a child's educational experience by keeping the child in a familiar or current school and neighborhood, when this is in the child's best interests and feasible, and by limiting the number of school changes the child experiences.

By the end of implementation Period 2:

d.  At least 40% of school-age children entering custody during the Period shall be screened for general and special educational needs within 30 calendar days of their entry into foster care.

e.  At least 40% of school-age children entering custody or subject to a change in schools due to a placement move during the Period shall be registered for and attending an accredited school within three business days of the initial placement or placement change, including while placed in shelters or other temporary placements, unless delayed by the Youth Court.

By the end of implementation Period 3:

f.  At least 80% of school-age children entering custody during the Period shall be screened for general and special educational needs within 30 calendar days of their entry into foster care.

g.  At least 80% of school-age children entering custody or subject to a change in schools due to a placement move during the Period shall be registered for and attending an accredited school within three business days of the initial placement or placement change, including while placed in shelters or other temporary placements, unless delayed by the Youth Court.

By the end of implementation Period 4:

h.  At least 90% of school-age children entering custody during the Period shall be screened for general and special educational needs within 30 calendar days of their entry into foster care.

i.  At least 90% of school-age children entering custody or subject to a change in schools due to a placement move during the Period shall be registered for and attending an accredited school within three business days of the initial placement or placement change, including while placed in shelters or other temporary placements, unless delayed by the Youth Court.

9.  **Therapeutic Services**

a.  Each foster child requiring therapeutic and rehabilitative foster care services because of a diagnosis of significant medical, developmental, emotional, or behavioral problems shall be provided with a treatment plan and shall be provided with these services in accordance with the plan.

By the end of implementation Period 2:

b. At least 40% of children in custody during the Period requiring therapeutic and/or rehabilitative foster care services because of a diagnosis of significant medical, developmental, emotional, or behavioral problems shall be provided with a treatment plan and services in accordance with their plan.

By the end of implementation Period 3:

c. At least 80% of children in custody during the Period requiring therapeutic and/or rehabilitative foster care services because of a diagnosis of significant medical, developmental, emotional, or behavioral problems shall be provided with a treatment plan and services in accordance with their plan.

By the end of implementation Period 4:

d. At least 90% of children in custody during the Period requiring therapeutic and/or rehabilitative foster care services because of a diagnosis of significant medical, developmental, emotional, or behavioral problems shall be provided with a treatment plan and services in accordance with their plan.

## 10. Worker Contact and Monitoring

a. Regardless of whether a child's foster care placement is being directly supervised by DFCS or by a contract agency, the assigned DFCS caseworker (either County of Service or County of Responsibility) shall meet with the child in person and, where age-appropriate, alone at least twice monthly to assess the child's safety and well-being, service delivery, and achievement of permanency and other service goals. At least one visit per month shall take place in the child's placement. During a child's first month in foster care and after each change of placement, the assigned DFCS caseworker shall meet with the child in person, and, where age-appropriate, alone, to assess the child's adjustment to the placement and whether more frequent visits by the caseworker are necessary. This assessment may occur at a regularly scheduled visit with the child.

b. For a child with a permanency goal of reunification, the child's assigned DFCS caseworker shall meet with the child's biological parents at least monthly to assess service delivery and achievement of service goals, to keep the family informed and involved in decisions about the child, and to remain current about the family's circumstances.

c. A DFCS foster care worker shall regularly communicate with non-therapeutic foster parents who have one or more foster children residing in their home and visit the home at least monthly to (1) share all relevant and legally disclosable information concerning the foster child; (2) evaluate the foster child's safety,

needs, and well-being; and (3) monitor service delivery and achievement of service goals.

d.  DFCS shall maintain weekly contact with therapeutic foster parents who have one or more foster children residing in their home, and shall make a minimum of two visits per month to the home to (1) share all relevant and legally disclosable information concerning the foster child; (2) evaluate the foster child's safety, needs, and well-being; and (3) monitor service delivery and achievement of service goals.

e.  All required visits and contacts shall be documented in the child's case record.

By the end of implementation Period 2:

f.  At least 30% of children in custody shall receive documented twice-monthly in-person visits by the assigned DFCS caseworker during the Period, consistent with Plan requirements.

g.  At least 40% of children with a goal of reunification shall have their assigned DFCS caseworker meet monthly with the child's biological parents, consistent with Plan requirements, as documented in the child's case record.

h.  At least 30% of foster parents with at least one foster child residing in their home during the Period shall have a DFCS worker visit the home twice a month (therapeutic foster homes) or monthly (non-therapeutic foster homes), consistent with Plan requirements, as documented in the children's case records.

By the end of implementation Period 3:

i.  At least 70% of children in custody shall receive documented twice-monthly in-person visits by the assigned DFCS caseworker during the Period, consistent with Plan requirements.

j.  At least 80% of children with a goal of reunification shall have their assigned DFCS caseworker meet monthly with the child's biological parents, consistent with Plan requirements, as documented in the child's case record.

k.  At least 80% of foster parents with at least one foster child residing in their home during the Period shall have a DFCS worker visit the home twice a month (therapeutic foster homes) or monthly (non-therapeutic foster homes), consistent with Plan requirements, as documented in the children's case records.

By the end of implementation Period 4:

l.  At least 90% of children in custody shall receive documented twice-monthly in-person visits by the assigned DFCS caseworker during the Period, consistent with Plan requirements.

m.  At least 90% of children with a goal of reunification shall have their assigned DFCS caseworker meet monthly with the child's biological parents, consistent with Plan requirements, as documented in the child's case record.

n.  At least 90% of foster parents with at least one foster child residing in their home during the Period shall have a DFCS worker visit the home twice a month (therapeutic foster homes) or monthly (non-therapeutic foster homes), consistent with Plan requirements, as documented in the children's case records.

**11. Transition to Independent Living**

a.  DFCS shall provide each youth transitioning to independence with at least six months' advance notice of the cessation of any health, financial, or other benefits that will occur at the time of transition.

b.  Each foster youth 14-20 years old, regardless of his/her permanency plan, shall be provided with an opportunity to participate in the creation of an Independent Living service plan for Independent Living preparation. DFCS shall provide each eligible youth with Independent Living services as set forth in his/her service plan.

c.  DFCS shall ensure that each youth transitioning to independence has available an adequate living arrangement, a source of income, health care, independent living stipends, and education and training vouchers. DFCS shall assist youth in locating and/or enrolling in educational or vocational programs appropriate to their needs, interests, abilities, and goals, such as high school or GED programs; colleges or universities; vocational training programs; and special education services.

d.  DFCS shall assist youth in obtaining or compiling documents necessary to function as an independent adult as outlined in COA standards.

By the end of implementation Period 2:

e.  At least 60% of children in custody 14-20 years old during the Period shall be provided with Independent Living services as set forth in their service plan.

f.  At least 60% of children in custody transitioning to independence during the Period shall have available an adequate living arrangement, a source of income, health care, independent living stipends, and education and training vouchers. DFCS shall also assist such children in obtaining, prior to transitioning to

independent living, the necessary documents and information identified in the COA standards for emancipating youth.

By the end of implementation Period 3:

g.  At least 90% of children in custody 14-20 years old during the Period shall be provided with Independent Living services as set forth in their service plan.

h.  At least 80% of children in custody transitioning to independence during the Period shall have available an adequate living arrangement, a source of income, health care, independent living stipends, and education and training vouchers. DFCS shall also assist such children in obtaining, prior to transitioning to independent living, the necessary documents and information identified in the COA standards for emancipating youth.

By the end of implementation Period 4:

i.  At least 95% of children in custody 14-20 years old during the Period shall be provided with Independent Living services as set forth in their service plan.

j.  At least 90% of children in custody transitioning to independence during the Period shall have available an adequate living arrangement, a source of income, health care, independent living stipends, and education and training vouchers. DFCS shall assist such children in obtaining, prior to transitioning to independent living, the necessary documents and information identified in the COA standards for emancipating youth.

**12. Case Closing and Aftercare**

a.  For each child who has a permanency goal of reunification and who is in fact placed in the home for the purpose of reunification, DFCS shall provide, subject to the approval of the youth court, such child with a 90-day trial home visit. During any trial home visit period, a DFCS caseworker or Family Preservation caseworker shall meet with the child in the home at least two times per month, and each meeting shall occur without the parent or caretaker present.

b.  A recommendation to return a child to his/her home or to place the child in the custody of a relative shall be made at a meeting attended by the child's DFCS caseworker, the caseworker's supervisor, the worker from the private agency if the child is placed with a private agency, the foster parents (unless DFCS determines that the foster parents' attendance would be inappropriate), the biological parents or the relative assuming custody, and the child. At the meeting, the participants shall devise an after-care plan that identifies all of the services necessary to ensure that the conditions leading to the child's placement in foster care have been addressed, and that the child's safety and stability will be assured. DFCS shall take reasonable steps to provide or facilitate access to all services necessary to support the child during the trial home visit.

33

c. Before the end of any trial home visit period, there shall be a final discharge staffing meeting, which shall include the child's caseworker, the caseworker's supervisor, the child, and the parent or relative assuming custody, to determine the appropriateness of a final discharge. If final discharge is determined to be appropriate, DFCS shall make the appropriate application to the court to be relieved of custody.

By the end of implementation Period 2:

d. At least 40% of children in custody who are reunified during the Period shall receive a 90-day trial home visit period or have case record documentation reflecting the Youth Court's objection to such a trial home visit. During that trial home visit period, the child's caseworker or a Family Preservation caseworker shall meet with the child in the home at least two times per month, and DFCS shall provide or facilitate access to all services identified in the child's after-care plan, consistent with Plan requirements.

By the end of implementation Period 3:

e. At least 70% of children in custody who are reunified during the Period shall receive a 90-day trial home visit period or have case record documentation reflecting the Youth Court's objection to such a trial home visit. During that trial home visit period, the child's caseworker or a Family Preservation caseworker shall meet with the child in the home at least two times per month, and DFCS shall provide or facilitate access to all services identified in the child's after-care plan, consistent with Plan requirements.

By the end of implementation Period 4:

f. At least 90% of children in custody who are reunified during the Period shall receive a 90-day trial home visit period or have case record documentation reflecting the Youth Court's objection to such a trial home visit. During that trial home visit period, the child's caseworker or a Family Preservation caseworker shall meet with the child in the home at least two times per month, and DFCS shall provide or facilitate access to all services identified in the child's after-care plan, consistent with Plan requirements.

## 13. Recruitment and Retention of Foster Families and Therapeutic Service Providers

a. DFCS shall make available, either directly or through contract, a sufficient number of appropriate placements for all children in its physical and legal custody.

34

b. DFCS shall make available foster parent training classes beginning every 60 calendar days in every region with individualized training available as needed, and at times convenient for the foster family.

c. DFCS shall secure services for foster parents to prevent and reduce stress and family crisis.

d. DFCS shall ensure that all licensed resource families (regardless of whether they are supervised directly by DFCS or by private providers) receive at least the minimum reimbursement rate for a given level of service as established pursuant to the Plan.

e. By January 2008, Defendants shall establish and begin to pay to all licensed resource families at least the following basic monthly foster care maintenance payments plus an $80 monthly clothing allowance: for each child ages 0-3, $350; for each child ages 4-5, $355; for each child ages 6-9, $355 + $30 child allowance; for each child ages 10-12, $360 + $40 child allowance; for each child ages 13-15, $370 + $50 child allowance; for each child ages 16-21, $370+ $60 child allowance.

f. By July 2009, Defendants shall establish and begin to pay to all licensed resource families at least the following basic monthly foster care maintenance payments: for each child ages 0-8, $555; for each child ages 9-15, $636; and for each child age 16 and older, $697. The parties agree that these rates satisfy the requirements of 42 U.S.C. § 675(4)(A). Defendants shall provide increases in the foster care maintenance payments every two years thereafter, based upon the rate of inflation and discussions with affected foster parent groups and congregate care providers, in order to continue complying with 42 U.S.C. § 675(4)(A).

g. Defendants shall, within 180 days of the Court's approval of the Plan, engage a qualified independent consultant to assess board payment rates currently being paid to foster parents caring for special needs foster children and to congregate care facilities to determine the extent to which those rates meet the requirements of 42 U.S.C. § 675(4)(A) and reflect the actual cost of caring for special needs foster children and children placed in congregate care facilities, including the necessary and reasonable costs of facility administration and operation. The selection of the independent consultant shall be subject to approval by the Monitor; said approval shall not be unreasonably withheld.

h. Within a year of Court approval of the Plan, the consultant shall deliver to the Parties and the Monitor a written report setting forth (1) findings regarding the adequacy of the current schedule of foster care maintenance payments made to foster care providers serving special needs children and facilities providing congregate foster care in relation to the requirements of 42 U.S.C. § 675(4)(A) and the actual cost in the state of Mississippi to provide such care; (2) the methodology utilized to determine the actual costs in the state of Mississippi to

provide such care; and (3) a schedule of recommended rates for foster care providers serving special needs children and facilities providing congregate foster care. Plaintiffs shall have 30 days to raise any written objection to the schedule of recommended rates as determined by the consultant. Should Plaintiffs raise objections and should the Parties be unable to reach agreement, the consultant's schedule and Plaintiffs' objection shall be submitted to the Court for final determination.

By the end of Implementation Period 2:

i.  The rate structure recommended by the consultant for foster care providers to special needs children and for facilities providing congregate care, as agreed upon by the Parties or determined by the Court, shall be fully implemented.

**14. Durable Legal Custody**

If adoption and/or reunification are not appropriate, consistent with the provisions of Section II.B.3.a, DHS shall, subject to legislative funding or the availability of federal funds, make monthly payments to caregivers who assume durable legal custody of a foster child, if the caregiver is found to have financial need in caring for such child.

## III. OUTCOME MEASURES

The following child welfare outcome measures shall be met within five years of Court approval of this Plan and shall be measured by the Monitor every six months. The child welfare outcomes shall be measured using a combination of longitudinal data analysis and point-in-time data analysis.

### A. Reunification

1.  At least 76.2% of children discharged from custody and reunified with their parents or caretakers in the last year shall have been reunified within 12 months of the latest removal from home.

By the end of implementation Period 2:

2.  At least 30% of children who are discharged from custody and reunified with their parents or caretakers in the last year shall be reunified within 12 months of the latest removal from home.

By the end of implementation Period 3:

3.  At least 60% of children who are discharged from custody and reunified with their parents or caretakers in the last year shall be reunified within 12 months of the latest removal from home.

By the end of implementation Period 4:

4. At least 70% of children who are discharged from custody and reunified with their parents or caretakers in the last year shall be reunified within 12 months of the latest removal from home.

**B. Time to Adoption Finalization**

1. At least 32% of children who were discharged in the last year upon the finalization of an adoption shall have had the adoption finalized within 24 months of the latest removal from home.

By the end of implementation Period 2:

2. At least 15% of children who were discharged in the last year upon finalization of an adoption shall have had the adoption finalized within 24 months of the latest removal from home.

By the end of implementation Period 3:

3. At least 25% of children who were discharged in the last year upon finalization of an adoption shall have had the adoption finalized within 24 months of the latest removal from home.

By the end of implementation Period 4:

4. At least 30% of children who were discharged in the last year upon finalization of an adoption shall have had the adoption finalized within 24 months of the latest removal from home.

**C. Number of Placements** (Temporary breaks in placement for children who run away or require emergency hospitalization or respite care not exceeding 14 days and who return to their immediately prior placement shall not count as additional placements.)

1. In the last year, at least 86.7% of children in care less than 12 months from the time of latest removal from home shall have had two or fewer placements.

By the end of implementation Period 2:

2. In the last year, at least 40% of children in care less than 12 months from the time of latest removal from home shall have had two or fewer placements.

By the end of implementation Period 3:

3. In the last year, at least 70% of children in care less than 12 months from the time of latest removal from home shall have had two or fewer placements.

By the end of implementation Period 4:

4. In the last year, at least 80% of children in care less than 12 months from the time of latest removal from home shall have had two or fewer placements.

**D. Abuse/Neglect/Maltreatment in Care** (This measure shall apply to reports of abuse, neglect, or maltreatment of children while in DFCS custody.)

1. The rate of abuse or maltreatment in care in the last year shall not exceed 0.33%.

By the end of implementation Period 2:

2. The rate of abuse or maltreatment in care in the last year shall not exceed 1.14%.

By the end of implementation Period 3:

3. The rate of abuse or maltreatment in care in the last year shall not exceed 0.57%.

By the end of implementation Period 4:

4. The rate of abuse or maltreatment in care in the last year shall not exceed 0.45%.

## IV. COA ACCREDITATION

DFCS's foster care services shall be accredited by COA pursuant to COA's relevant management and service standards.

## V. NAMED PLAINTIFFS

Each Agreement on Services and Plans for Named Plaintiffs entered into by the parties pursuant to Section 4.G of the Stipulated Settlement Agreement approved by the Court on May 17, 2007, is hereby incorporated as enforceable provisions of this Plan.

## VI. MONITORING

**A.** The parties agree that Grace Lopes shall be the Monitor of Defendants' compliance with this Plan and the annual implementation plans. Defendants shall provide the Monitor with the necessary resources to perform its duties.

**B.** The Monitor's duties shall be to confirm independently the data reports and statistics provided pursuant to this Plan and the annual implementation plans; conduct independent case record and other qualitative reviews; review all plans and documents to be developed and produced by Defendants pursuant to this Plan; and report on Defendants' compliance in implementing the terms of the Plan and the annual implementation plans, and the achievement of the improved outcomes set forth therein. The Monitor shall prepare reports that will address these issues and be released periodically, but no less than

every six months, the first report to be issued within nine months of Court approval of this Plan, unless the parties and the Monitor agree otherwise. In order to avoid duplication and to build capacity within the agency, the Monitor will look first to Defendants' data and data analysis. Accordingly, Defendants shall provide the Monitor with access to all data reports produced in the regular course of business respecting topics covered by this Plan and the annual implementation plans. Notwithstanding the existence of Defendants' data, data analysis, and reports, however, the Monitor shall have the authority to prepare new reports on all topics covered by both this Plan and the annual implementation plans, to the extent the Monitor deems necessary.

**C.** Defendants agree to provide the Monitor with free and, upon request, private access to all individuals within DFCS and persons within the Executive Branch, as the Monitor chooses; to assist the Monitor in gaining access to other stakeholders in the child welfare system (including but not limited to the staff of contract providers); and to provide the Monitor with free access to all documents, data, and premises it deems relevant to its work (including but not limited to documents and data from contract agencies and courts). The Monitor agrees to respect the confidentiality of all information related to individually identifiable clients, subject to applicable law. Defendants shall take no adverse action against individuals or agencies because they shared information with the Monitor pursuant to this Plan.

**D.** The reports of the Monitor shall be public documents filed with the Court, except that any individually identifying information and any other confidential information protected from disclosure by law shall be redacted or otherwise removed from any public report. The Monitor shall provide copies of each of its reports to all named Defendants as well as to the heads of the State House and Senate Committees on Appropriations and Public Health. Any such information received by the Monitor, unless already public, shall not be made public without Defendants' prior written permission, except as incorporated into a public report of the Monitor.

**E.** The parties shall have access, through the Monitor, to all information made available to the Monitor, and to all other information related to ensuring compliance with and enforcing this Plan and the annual implementation plans, subject to the existing confidentiality order in effect in this case. The Monitor may protect the identity of confidential sources of any such information.

**F.** The parties may request that the Monitor review and issue recommendations regarding the provision of services to the Named Plaintiffs in this case.

**G.** The intent of the parties is that the Monitor shall develop a plan to transfer the primary monitoring function to DFCS's CQI unit upon the termination of this Plan, or at such earlier time as provided for in Section VII.C below. The Monitor shall work in collaboration with Defendants to build DFCS's CQI capacity.

**H.** The Monitor may periodically meet privately with the Court concerning issues related to this case, provided the parties are made aware of the occurrence of such a meeting.

**I.** If at any point the Monitor can no longer serve, the parties shall agree on another Monitor, with input and recommendations from the outgoing Monitor.

## VII. DISPUTE RESOLUTION, TERMINATION, AND EXIT

**A.** The Defendants shall implement all reforms necessary to effectuate this Plan and the annual implementation plans. The parties agree that the systemic and comprehensive nature of this Plan will require implementation and refinement of policies and programs over a number of years. The parties shall make every reasonable effort to resolve disputes prior to seeking Court intervention. Plaintiffs agree not to seek relief for isolated or minor violations, or for violations related solely to an individual child, unless that child is a Named Plaintiff.

**B.** If Plaintiffs believe that Defendants have failed to comply with any obligation under this Plan or an annual implementation plan, Plaintiffs will, prior to seeking judicial action to enforce the terms of this Plan or an annual implementation plan, give written notice of non-compliance to the State. Within 30 calendar days of Plaintiffs' notice of non-compliance, Defendants shall submit a written response to Plaintiffs. Plaintiffs agree to work in good faith with the State to agree on necessary corrective actions and avoid enforcement action, and may not initiate court action for 60 days from the date of Plaintiffs' non-compliance notice. However, in case of an emergency posing an immediate threat to the health or safety of youths, Plaintiffs may omit the notice and cure requirements herein before seeking judicial action.

**C.** The Court may terminate jurisdiction over this lawsuit if it finds that Defendants are in substantial compliance with the provisions of this Plan for two consecutive six-month reporting periods subsequent to four years from Court approval of this Plan or anytime thereafter.

At the end of five years from the date of this Plan, the monitor shall transfer to Defendants' CQI system monitoring of all the Plan provisions under the following headings or subheadings for which Defendants have sustained compliance for at least six months on all such provisions (as reflected in monitoring report data) and where the Monitor has determined that Defendants' CQI system is adequately monitoring the Plan provisions: II.A.1; II.A.2.a; II.A.2.b; II.A.2.c; II.A.2.d; II.A.3; II.A.4; II.A.5; II.A.6; II.A.7; II.B.1; II.B.2; II.B.3.a; II.B.3.b; II.B.3.c; II.B.3.d; II.B.3.e; II.B.3.f; II.B.4; II.B.5; II.B.6; II.B.7; II.B.8; II.B.9; II.B.10; II.B.11; II.B.12; II.B.13; II.B.14; III.A.1; III.B.1; III.C.1; and III.D.1. The reports of the Monitor shall identify the provisions, if any, that are to be transferred to Defendants' CQI system for the subsequent monitoring period. Plaintiffs reserve the right to object to the transfer of the monitoring of a provision to Defendants' CQI system.

Once Defendants' CQI system is responsible for the transferred monitoring of any Plan provisions, and as long as the Court retains jurisdiction, Defendants' CQI system shall issue public monitoring reports every six months on Defendants' compliance levels with any such provisions.

40

While Defendants shall make a good faith effort to maintain compliance with a provision transferred to its CQI system, a drop in compliance levels after the transfer of the monitoring of a Plan provision shall not be, by itself, grounds for a Motion to enforce the Plan to hold Defendants in contempt, or to bar future expiration of the Plan. Notwithstanding the above, Plaintiffs are not precluded from seeking to enforce transferred provisions as remedial measures in connection with Motions to enforce provisions that have not been transferred.

**D.** Defendants may seek a court-ordered modification of any provision of this Plan pursuant to Rule 60(b) of the Federal Rules of Civil Procedure if significant changes in factual conditions, beyond Defendants' control and not contemplated by the parties at the time the Plan was entered into, make the provision unworkable, make compliance substantially more onerous, or make enforcement detrimental to the public interest, and the changed circumstance occurred despite Defendants' reasonable effort to comply with the Plan.

**E.** All parties reserve all claims and defenses with respect to all claims for an award of attorneys' fees and litigation expenses for Plaintiffs, which claims shall be separately asserted and determined according to a schedule to be fixed by the Court.

**AGREED TO AND APPROVED FOR ENTRY BY:**

**FOR PLAINTIFFS:**

_Marcia Robinson Lowry_

Marcia Robinson Lowry (*pro hac vice* MBN 43991)
Eric Thompson (*pro hac vice* MBN 43993)
Shirim Nothenberg (*pro hac vice* MBN 43990)
Susan Lambiase (*pro hac vice* MBN 43992)
CHILDREN'S RIGHTS, INC.
330 Seventh Ave., 4th Floor
New York, NY 10001
(212) 683-2210

_Melody M. Anally_

Wayne Drinkwater (MBN 6193)
Melody McAnally (MBN 101236)
BRADLEY ARANT ROSE & WHITE LLP
188 East Capitol Street, Suite 450
Jackson, MS 39201
(601) 948-8000

Stephen H. Leech (MBN 1173)
P.O. Box 3623
Jackson, MS 39207

John Lang (*pro hac vice* MBN 43987)
Christian D. Carbone (*pro hac vice* MBN 43986)
John Piskora (*pro hac vice* MBN 44474)
LOEB & LOEB LLP
345 Park Ave.
New York, NY 10154

**FOR DEFENDANTS:**

Governor Haley Barbour,
State of Mississippi

Attorney General Jim Hood,
State of Mississippi

Dewitt L. ("Rusty") Fortenberry Jr., Esq. (MBN 5435)
Barry C. Campbell, Esq. (MBN 99535)
Kenya Key Rachal, Esq. (MBN 99227)
Gretchen L. Zmitrovich, Esq. (MBN 101470)
Ashley Tullos Young, Esq. (MBN 101839)
BAKER, DONELSON, BEARMAN, CALDWELL, & BERKOWITZ, PC
428 I-55 North
Meadowbrook Office Park
Jackson, MS 39211
(601) 351-2400

Harold E. Pizzetta, III, Esq. (MBN 99867)
Assistant Attorney General
General Civil Division
Carroll Gartin Justice Building
430 High Street
Jackson, MS  39201


SO ORDERED AND ADJUDGED, this the ____ day of _____, 2007.


_____
DISTRICT JUDGE

Appendix A – Year 1 Implementation Plan
Mississippi Settlement Reform Plan

## PERIOD 1 ANNUAL IMPLEMENTATION PLAN

This is the annual Implementation Plan for Period 1 required by the parties' Settlement Reform Plan (the "Plan"). The Period 1 Implementation Plan Requirements shall be met by the end of Period 1 or earlier as specified herein.

## I. Administration and Management Assessment and Implementation Steps

Within six months of Court approval of the Plan, Defendants, in conjunction with the Council on Accreditation (COA), shall conduct an assessment of DFCS administration and management capacity and needs consistent with COA Policies. The Administration and Management Assessment shall include the following:

    a) A workforce assessment consistent with PA-HR 2,
    b) A training assessment of training curricula and the Training Unit,
    c) A DFCS contracting practices assessment,
    d) A quality improvement system assessment,
    e) A MACWIS assessment, and
    f) A fiscal and financial management assessment.

The Period 2 implementation plan shall include specific timelines by which Defendants will provide for the needs identified in the Period 1 Administration and Management Assessment.

### 1. Agency Leadership

The new DFCS director will assemble a management team capable of assisting with the reform process at DFCS.

### 2. Human Resources Management

#### a. Workforce:

Defendants shall, in conjunction with COA, develop and begin implementing a written plan to meet the needs identified in the required Administration and Management Workforce Assessment. Such plan shall identify strategies, timeframes, and recruitment resources to be allocated to ensure that there are sufficient DFCS professional and support staff to achieve compliance with the caseload requirements specified in the Plan.

#### b. Worker and Supervisor Qualifications:

Defendants shall, in conjunction with COA, develop and begin to implement a plan with timeframes and specific action steps for bringing its current staff into compliance with the worker and supervisor qualification requirements of the Plan.

Appendix A – Year 1 Implementation Plan
Mississippi Settlement Reform Plan

**c. Training:**

Defendants shall, in conjunction with COA, develop and begin implementing a written plan to meet the needs identified in the required Administration and Management Training Assessment.

Defendants shall implement competency-based testing to assess knowledge acquisition of newly hired staff following the completion of pre-service training, including newly hired or newly promoted supervisors following the completion of supervisory training. Training credit shall only be given to those new hires who demonstrate sufficient knowledge acquisition.

Defendants shall implement a system to track staff participation in all required training.

**d. Contract Agency Requirements:**

Defendants shall, in conjunction with COA, develop and begin implementing a written plan to meet the needs identified in the required Administration and Management Contracting Assessment.

Defendants shall notify all private agencies that provide protective, preventive, foster care, or adoption case work services under contract with DFCS that those agencies will be required to abide by all related terms of the Plan, including, but not limited to, provisions regarding training curricula, minimum training hours, and caseload standards.

DFCS shall design and begin implementing a performance-based contracting system with the capacity to monitor and enforce contract performance on all related terms of the Plan.

**3. Performance and Quality Improvement**

Defendants shall, in conjunction with COA, develop and begin implementing a written plan to meet the needs identified in the required Administration and Management Quality Improvement Assessment. The plan shall include specific steps and timeframes for the implementation of a separate continuous quality improvement (CQI) system that meets COA standards and Plan requirements.

Defendants shall develop, in conjunction with COA, and begin implementing a CQI assessment tool that measures compliance with the Plan's management and foster care service standards.

**4. Legal and Regulatory Compliance**

Appendix A – Year 1 Implementation Plan
Mississippi Settlement Reform Plan

### 5. Information Management and Use

Defendants shall, in conjunction with COA, develop and begin implementing a written plan to meet the needs identified in the required Administration and Management MACWIS Assessment.

Defendants will develop and begin implementing a plan that will ensure MACWIS maintains statewide placement resource information such as current availability, capacity limitations, census, suitability by age, sex and special needs, and any related licensing and maltreatment investigations information accessible to DFCS county staff.

### 6. Case Recordings

Defendants, in conjunction with COA, shall implement a system to regularly review whether DFCS child welfare case records are current, complete, made by authorized personnel only, signed and dated by the person who provided the service, and signed and dated by supervisors, where appropriate, in accordance with federal and state law and regulations.

### 7. Financial Management

Defendants shall, in conjunction with COA, develop and begin implementing a written plan to meet the needs identified in the required Administration and Management Fiscal Assessment, including addressing any identified deficiencies in financial management practices.

## II. Foster Care Services Assessment and Implementation Steps

Within 180 calendar days of Court approval of the Plan, Defendants, in conjunction with COA, shall identify and begin revision of DFCS policies and practice guides as necessary to reflect the COA foster care services standards and the requirements set forth in Section II.B of the Plan, and identify any related training needs.

Within nine months of Court approval, Defendants, in conjunction with COA or a COA designee, shall conduct a Foster Care Services Assessment, which shall include:

a) A reunification services needs assessment,
b) A termination of parental rights (TPR) assessment to identify those children who have been in custody more than 15 of the previous 22 months and for whom DFCS has not filed a TPR petition or documented an available exception under the federal Adoption and Safe Families Act (ASFA) as required,
c) A child safety assessment of DFCS practice prioritizing, screening, assessing, and investigating reports of maltreatment of children to determine the extent to which DFCS investigations and decisions are based on a full and systematic evaluation of the factors that may place a child at risk,

3

Appendix A – Year 1 Implementation Plan
Mississippi Settlement Reform Plan

d) A placement assessment of current needs for achieving compliance with the placement standards set forth in Section II.B.5 of the Plan, which shall include (1) the structure of the placement process, including the role and efficacy of the state office placement unit; (2) the services and supports available to support enhanced placement stability, including out-patient or in-home assessment and treatment services to avoid the frequent use of time-limited assessment and treatment placement programs; and (3) the placement resources needed to meet the placement needs of children in custody,

e) An assessment of case practice associated with parent/child and sibling visitation to identify barriers to meeting the visitation standards set forth in Section II.B.6 of the Plan,

f) A service provider needs assessment to identify available medical, dental, and mental health services and gaps in services,

g) An assessment of the quality and array of independent living services available to foster children ages 14-20, and

h) A recruitment and retention assessment to determine the need for additional foster care support services.

COA may, at its discretion, refer to and utilize previous external assessments of DFCS in its completion of the above assessments.

The Period 2 implementation plan shall include specific timelines by which Defendants will provide for the needs identified in the Period 1 Foster Care Services Assessment.

1. **Screening and Assessments**

   Within 180 calendar days of Court approval of the Plan, DFCS, in conjunction with COA, shall develop a protocol for both individual and family team meetings and develop a training module on such protocols that shall be incorporated into the pre-service and in-service training curricula.

2. **Service Planning and Monitoring**

   The revised policies and practice guides shall require that each service plan and revision of such plan include the elements and meet the requirements of COA Standards PA-FC 2.06, 3.01, 3.04, and 3.05, as well as incorporate and track the child's educational needs and goals.

3. **Child and Youth Permanency**

   a. **Permanency Plan:**

      The revised policies and practice guides shall require that:

      1) All permanency plans contain specific information about:

4

Appendix A – Year 1 Implementation Plan
Mississippi Settlement Reform Plan

a) How the permanency goal will be achieved;
b) What services are necessary to make the accomplishment of the goal likely;
c) Who is responsible for the provision of those services;
d) When the services will be provided; and
e) The date by which the permanency goal is likely to be achieved.

2) All services documented in the case record as necessary for the achievement of the permanency goal are provided within the time period in which they are needed, by either providing those services directly, contracting with a private provider for those services, or referring to an existing service provider for the provision of those services.

**b. Concurrent Planning:**

**c. Permanency Plan Updating and Review:**

Defendants shall establish and begin implementing a system to facilitate a court review for every foster child within 12 months of initial placement and annually thereafter. That system shall include (1) tracking scheduled annual court reviews, and notifying the Youth Court with jurisdiction over the child of any reviews that need to be scheduled or re-scheduled so as to meet Plan requirements; (2) providing to the Youth Court with jurisdiction as ordered by the Court or no later than 30 calendar days before such a court review is due a detailed up-to-date report on the current status of the child's placement, visitation, permanent plan progress, and service needs; and (3) ensuring that the child's assigned caseworker or supervisor attends any such scheduled court review.

**d. Reunification Services:**

Defendants shall, in conjunction with COA, develop and begin implementing a written plan to meet the needs identified in the required Foster Care Services Reunification Needs Assessment, with specific steps and timetables for addressing gaps in the availability of effective services.

**e. Termination of Parental Rights/Special Permanency Reviews:**

For each child who has been, or reaches, more than 15 of the previous 22 months in foster care, for whom DFCS has not filed a TPR petition or documented an available ASFA exception, DFCS shall begin holding special permanency reviews. Such reviews shall include the DFCS caseworker, the caseworker's direct supervisor, and at least one individual with expertise in permanency planning who has not held direct casework or supervisory responsibility for the case. The review will produce a written plan of action setting forth the steps to be taken by DFCS, the contract agency, and/or any other provider of services, in order to move the child to permanency as quickly as possible. Such permanency

5

reviews shall be documented in the child's case record, and reconvened monthly until all barriers to permanency have been resolved, a TPR petition has been filed, or an available ASFA exception has been documented in the child's case record.

DFCS shall begin the implementation of a "tickler" system for notifying caseworkers and caseworker supervisors when a case assigned to them has reached the following milestones: 12 months after a child entered custody; 30 calendar days after the establishment of adoption as the primary permanency goal; 30 calendar days after a TPR referral has been made; and, 10 calendar days after a TPR packet has been returned to DFCS because of a legal deficiency.

**f. Adoption:**

Within 180 calendar days of Court approval of the Plan, DFCS, in conjunction with COA, shall define the job description, responsibilities, and qualifications for the position of adoption specialist. The adoption specialist responsibilities shall include consulting with private and public professionals and identifying and ensuring the provision of targeted services necessary for the child to be adopted.

DFCS shall implement and maintain a process for making legal risk placements that assures that children for whom the permanency plan is adoption, but who are not yet legally free for adoption, are placed in appropriate adoptive homes.

DFCS shall take reasonable steps to hire (or promote) and train a sufficient number of adoption specialists to meet the adoption requirements of Section II.B.3.f of the Plan. Adoption status meetings consistent with the Plan will start being held by the end of Period 1.

Within 180 calendar days of Court approval of the Plan, DFCS, in conjunction with COA, shall develop a protocol for adoption meetings, which are to be held to review the progress being made in achieving the goal of adoption for legally free children.

Within a year of Court approval of the Plan, DFCS shall have identified external adoption consultants who DFCS can contract with to provide adoption recruitment assistance to children who have been free for adoption for six or more months and who are not yet placed in an approved adoptive home.

**4. Child Safety**

Within 30 calendar days of Court approval of the Plan, Defendants shall instruct all DFCS staff that as mandated reporters they are required to formally report any suspicions of maltreatment, including corporal punishment, of children in custody.

Defendants, in conjunction with COA, shall revise DFCS policies and procedures for screening and investigating reports of child maltreatment, including corporal

Appendix A – Year 1 Implementation Plan
Mississippi Settlement Reform Plan

punishment, to incorporate the child safety standards and requirements set forth in Section II.B.4 of the Plan.

Within 180 calendar days of Court approval of the Plan, all calls to the hotline shall immediately be entered into the statewide computer information system, and the worker or supervisor receiving the report shall use the information system to determine whether there have been prior reports of abuse and/or neglect in that family or concerning that child.

If a report is screened in, information regarding any prior reports shall immediately be made available to the worker to whom the case has been assigned for investigation.

## 5. Child Placement

Within 90 calendar days of Court approval of the Plan, DFCS shall implement a formalized mechanism to provide foster parents with all appropriate and available information about a child prior to or at the time of placement and for supplementing that information as further information is gathered.

Defendants shall develop and begin implementing a plan with specific action steps and timeframes to address policy and structural changes to the placement process that the placement assessment has identified as necessary to comply with the placement requirements set forth in Section II.B.5 of the Plan. That plan shall also include the development of the position of placement specialists in each region, and a protocol for the placement stability meetings that the Plan requires that DFCS hold when a worker has knowledge that a placement is at risk of disruption.

Defendants, in conjunction with COA, shall develop and begin the implementation of a written plan to ensure the speedy licensing of all current unlicensed caregivers to be phased in by the end of the second implementation period.

Within 180 days of Court approval of the Plan, no foster child entering custody will be placed in an unlicensed relative placement, subject to the allowance of the emergency licensing process that allows 120 days for the licensing process to take place.

## 6. Developing and Maintaining Connections

Defendants will develop and begin implementing a written plan to address the barriers identified in the visitation practice assessment.

## 7. Physical and Mental Health Care

Defendants shall, in consultation with state Medicaid and mental health officials, develop and begin implementing specific and focused regional plans to recruit and

7

Appendix A – Year 1 Implementation Plan
Mississippi Settlement Reform Plan

develop service providers in areas identified in the needs assessment as having gaps in required services.

**8. Educational Services**

DFCS shall develop and implement a protocol for conducting a general and special education screen of children entering foster care.

DFCS shall develop and begin implementing a plan for providing, either directly or through contract, the following educational services in each county: tutoring, preparation for a general equivalency diploma (GED), and college preparation.

**9. Therapeutic Services**

**10. Worker Contact and Monitoring**

Defendants' revised policies and practice guides shall reflect the issues to be addressed during worker contacts with parents, children, and foster care providers. Defendants shall revise DFCS training as necessary to ensure instruction on the quality, frequency, purpose, and structure of meeting with foster children, biological parents, and foster care providers. The training shall specifically address communicating with, interviewing, and observing foster children.

**11. Transition to Independent Living**

Defendants shall develop and begin implementing a written plan to address identified independent living service gaps.

Defendants shall develop and begin implementing a system for ensuring that emancipating youth have obtained, prior to transitioning to independent living, the necessary documents and information identified in the COA standards for such youth.

DFCS will develop for each region the capacity and current resource guides necessary to assist youth in locating and/or enrolling in educational or vocational programs appropriate to their needs, interests, abilities, and goals, such as high school or GED programs; colleges or universities; vocational training programs; and special education services.

**12. Case Closing and Aftercare**

**13. Recruitment and Retention of Foster Families and Therapeutic Service Providers**

Defendants shall develop and begin implementing a written plan for targeted recruitment and development of a range of family and facility placements that will adequately meet the placement needs of the foster care population as identified by DFCS's previous regional self-assessments and the assessment required herein.

8

Appendix A – Year 1 Implementation Plan
Mississippi Settlement Reform Plan

Defendants shall develop and begin implementing a written plan to provide services for foster parents in every county to prevent and reduce stress and family crisis.

In consultation with Mississippi foster parents, DFCS shall identify additions and revisions to the current foster parent training curriculum that are necessary to adequately train foster parents to meet the needs of the children placed in their care. Foster parent training classes based upon the revised curriculum shall be available in every region.

DFCS shall implement a system of dual foster/adopt licensing and any necessary policy and practice changes to prevent the underutilization of licensed and approved foster families.

DFCS shall create a resource family workgroup (consisting of staff and resource families) to develop and implement resource family practices and protocols that address the types of information that should be provided to resource families prior to taking a child into the home, what type of training is needed, what emergency procedures need to be in place for resource families, what strategies are effective in recruiting, and how resource families can be included in case planning.

DFCS shall regionalize its recruitment and retention efforts, and for each region have in place a stakeholder recruitment and retention team to identify local needs and develop and implement plans for recruiting, supporting, and utilizing foster and adoptive parents.

### III. Council on Accreditation Standards

**A.** These COA standards are applicable to children in custody and are to be implemented within 180 days of Court approval of the Mississippi Settlement Reform Plan.

**PA-HR 2: HUMAN RESOURCES PLANNING**
The agency reassesses its workforce as part of annual planning and prepares for future needs by:
   a.   conducting a gap analysis between the current workforce composition, including number of employees, skills, and demographics, and projected workforce needs; and
   b.   determining how to close gaps when possible, through recruiting, training or outsourcing.

**PA-AM 3.01**
The scope of services offered:
   a.   is defined in writing;
   b.   is adaptable and can respond to changes in the service environment, identified needs, and desired outcomes of service recipients;

9

c.    is secured through written agreement with qualified service providers, community partners, individual practitioners, and consultants; and

d.    considers allocation of resources together with available evidence of effective practice.

## PA-ETH 4: PROTECTION OF REPORTERS OF SUSPECTED MISCONDUCT

The agency prohibits employment-related retaliation against employees and others affiliated with the agency that come forward with information about suspected misconduct or questionable practices, and provides an appropriate, confidential channel for reporting such information.

## PA-HR 3.03

Screening procedures for new employees, contractors, and direct service volunteers include appropriate, legally permissible, and mandated reviews of state criminal history records and civil child abuse and neglect registries to determine the appropriateness of hiring prospective personnel who will:

a.    work in residential programs; or

b.    provide direct services to children, the elderly, or other persons determined by the agency to be vulnerable or at risk.

## PA-HR 4.04

The agency establishes a formal mechanism through which employees can express and resolve grievances, which includes:

a.    how grievances are filed and to whom, including who will make a final determination;

b.    timely written notification of the resolution and an explanation of any further appeal, rights or recourse;

c.    documenting responses and actions taken;  and

d.    maintaining a copy of the notification of resolution in the personnel record.

## PA-RPM 2.03

The agency reviews all incidents and accidents that involve the threat of or actual harm, and review procedures:

a.    establish timeframes for review;

b.    require solicitation of statements from all involved individuals;

c.    ensure an independent review; and

d.    require documentation of all actions taken.

## PA-CR 1.01

Clients receive a written summary of their rights and responsibilities at initial contact, which includes:

a.    basic expectations for use of the agency's services;

b.    hours that services are available;

Appendix A – Year 1 Implementation Plan
Mississippi Settlement Reform Plan

c.    rules, expectations, and other factors that can result in discharge or termination of services; and

d.    a clear explanation of how to lodge complaints, grievances, or appeals.

## PA-CR 3: GRIEVANCE PROCEDURES

The agency maintains a formal mechanism through which applicants, clients, and other stakeholders can express and resolve grievances, including denial of service, which includes:

a.    timely written notification of the resolution and an explanation of any further appeal, rights or recourse;

b.    at least one level of review that does not involve the person about whom the complaint has been made or the person who reached the decision under review; and

c.    the right of the consumer or a family member to be heard by a panel or person delegated to review responsibility.

## PA-CPS 4.01

The agency maintains a well-publicized, 24-hour access line to receive reports of suspected abuse and neglect.

## PA-CPS 4.04

Standardized decision-making criteria are used, in consultation with supervisory personnel, to determine if the report meets statutory and agency criteria, and if the case will be:

a.    screened out;

b.    referred for alternative response services;

c.    investigated; and/or

d.    reported to other authorities.

## PA-CPS 5.01

Every child determined during screening to be in imminent danger is seen immediately, and in all other cases children are seen within a timeframe that ensures their safety.

## PA-CPS 5.06

When there are concerns about a child's safety, the agency immediately initiates a safety plan, and when there are unmet basic needs, the agency immediately obtains resources or services.

## PA-CPS 10.01

When a child cannot safely remain at home, the agency collaborates with parents to establish a voluntary agreement, or otherwise petitions a court of proper jurisdiction, to obtain appropriate care.

## PA-FC 6.01

All foster homes are licensed, approved, or certified according to state or local regulation

Appendix A -- Year 1 Implementation Plan
Mississippi Settlement Reform Plan

**PA-FC 12.05**
The agency implements practices and protocols to prevent and respond to missing children and allegations of maltreatment in the foster home.

**PA-FC 16.07**
Each foster family develops or uses the agency's protocols for responding to emergencies including accidents, run-away behavior, serious illness, fire, and natural disasters.

**PA-FC 17.04**
Criminal background and child abuse registry checks are conducted for all adults in the home prior to placement, in accordance with applicable legal requirements.

**PA-FC 17.05**
Each foster home is regularly assessed to identify and address any safety concerns including, but not limited to:

a.    inadequate heat, light, water, refrigeration, cooking, and toilet facilities;
b.    malfunctioning smoke detectors;
c.    unsanitary conditions;
d.    lack of phone service;
e.    unsafe doors, steps, and windows, or missing window guards where necessary;
f.    exposed wiring;
g.    access to hazardous substances, materials, or equipment;
h.    rodent or insect infestation; and
i.    walls and ceilings with holes or lead.

**PA-FC 17.06**
Foster parents who transport children in their own vehicles:

a.    use age-appropriate passenger restraint systems;
b.    provide adequate passenger supervision, as required by statute or regulation;
c.    properly maintain vehicles and obtain required registration and inspection; and
d.    provide the agency with annual validation of current licenses, driving records, and appropriate insurance.

**PA-AS 7.01**
Custody status of the child is clearly established before the initiation of adoption services, and the agency acts in accordance with federal and state regulations for legal proceedings to terminate parental rights.

Appendix A – Year 1 Implementation Plan
Mississippi Settlement Reform Plan

B.  These COA standards are applicable to children in custody and are to be implemented within 365 days of Court approval of the Mississippi Settlement Reform Plan.

**PA-HR 4.01**
The agency promotes open communication and collaboration among disciplines and staff levels by:
    a.    holding regular team, agency, and divisional meetings, as appropriate to the agency; and
    b.    providing feedback to personnel about their suggestions and recommendations.

**PA-HR 4.03**
The agency annually establishes personnel satisfaction and retention goals and measures rate of personnel turnover and personnel satisfaction.

**PA-PQI 2.01**
The PQI framework takes into account all of the agency's regions and sites, and all individuals and families served.

**PA-PQI 2.02**
A PQI operational plan:
    a.    assigns responsibility for coordination and implementation of PQI activities, and provision of technical assistance in using the PQI process;
    b.    sets forth the purpose and scope of PQI activities;
    c.    establishes how the agency periodically reviews essential management and service delivery processes consistent in light of quality priorities;
    d.    defines stakeholders and how stakeholders will participate in the PQI process;
    e.    outlines methods and timeframes for monitoring and reporting activities; and
    f.    includes provision for an assessment of the utility of the PQI program, including any barriers and supports for implementation.

**PA-RPM 2.01**
Management conducts an internal assessment of overall risk at least annually that includes:
    a.    compliance with legal requirements, including licensing and mandatory reporting laws, and fiscal accountability;
    b.    insurance and liability;
    c.    health and safety, including use of facilities:
    d.    contracting practices and compliance;
    e.    staff training regarding areas of risk;
    f.    volunteer roles and oversight;
    g.    research involving program participants and other clients' rights issues;
    h.    security of information, including client confidentiality;

13

Appendix A – Year 1 Implementation Plan
Mississippi Settlement Reform Plan

     i.     financial risk;
     j.     fundraising;
     k.     conflict of interest;
     l.     employment practices; and
     m.    interagency collaborations.

**PA-RPM 2.02**
The agency conducts a quarterly review of immediate and ongoing risks that includes a review of incidents, accidents, and grievances related to:

    a.    administering, dispensing, or prescribing medications;
    b.    service modalities or other organizational practices that involve risk or limit freedom of choice;
    c.    the use of restrictive behavior management interventions, such as seclusion and restraint;
    d.    facility safety issues; and
    e.    situations where a person was determined to be a danger to himself/herself or others.

**PA-RPM 2.04**
Individuals qualified by knowledge and experience are responsible for risk prevention and management functions.

**PA-RPM 5.01**
Personnel can rapidly access paper and electronic information.

**PA-RPM 5.02**
Electronic and paper records can be located at all times.

**PA-ASE 6.01**
The agency assesses its safety and security needs and:

    a.    takes appropriate measures to protect the safety of all persons who are in its facilities or on its grounds;
    b.    develops safety and communication protocols for staff that work off-site;
    c.    trains staff on potential risks they may encounter on-site, in the community, or in clients' homes;
    d.    trains staff on self-protection techniques, as necessary; and
    e.    has security systems to deter facility break-ins.

**PA-ASE 6.03**
An agency that transports service recipients in its vehicles or permits transportation in vehicles that belong to the agency's personnel, foster parents, volunteers, or contractors requires:

    a.    the use of age-appropriate passenger restraint systems;
    b.    adequate passenger supervision, as mandated by statute or regulation;
    c.    proper maintenance of agency vehicles;
    d.    current registration and inspection of vehicles;

Appendix A – Year 1 Implementation Plan
Mississippi Settlement Reform Plan

  e. annual validation of licenses and driving records; and
  f. proper insurance for vehicles and passengers.

**PA-ASE 8.01**
The agency minimizes the risk of exposure to contagious and infectious disease by:
  a. adhering to CDC and OSHA guidelines;
  b. consulting with the local health department or an individual qualified to provide such information; and
  c. annually training program personnel on universal disease precautions.

**PA-ASE 8.02**
The agency:
  a. consults with local and state public health and licensing authorities to determine the need to test personnel who are in direct contact with service recipients who may be at high risk for tuberculosis or other air and blood-borne pathogens; and
  b. as necessary, implements a targeted testing program that is consistent with public health authority recommendations.

**PA-BSM 3.01**
All personnel and foster parents receive initial and ongoing competency-based training, appropriate to their responsibilities, on the agency's behavior support and management intervention policies, procedures, and practices.

**PA-BSM 3.02**
Personnel and foster parents receive training that includes:
  a. recognizing aggressive and out-of-control behavior, psychosocial issues, medical conditions, and other contributing factors that may lead to a crisis;
  b. understanding how staff behavior can influence the behavior of service recipients; and
  c. limitations on the use of physical techniques.

**PA-BSM 3.03**
Training addresses methods for de-escalating volatile situations, including:
  a. listening and communication techniques, such as negotiation and mediation;
  b. involving the person in regaining control and encouraging self-calming behaviors;
  c. separation of individuals involved in an altercation;
  d. offering a voluntary escort to guide the person to a safe location;
  e. time out to allow the person to calm down; and
  f. other non-restrictive ways of de-escalating and reducing episodes of aggressive and out-of-control behavior

Appendix A – Year 1 Implementation Plan
Mississippi Settlement Reform Plan

**PA-TS 2.02**
All personnel who have regular contact with clients receive training on legal issues, including:

    a.    mandatory reporting and the identification of clinical indicators of suspected abuse and neglect, as applicable;

    b.    reportable criminal behavior including criminal, acquaintance, and statutory rape;

    c.    duty to warn;

    d.    the agency's policies and procedures on confidentiality and disclosure of service recipient information, and penalties for violation of these policies and procedures;

    e.    the legal rights of service recipients; and

    f.    any requirements associated with consent decrees.

**PA-TS 2.03**
All personnel receive training on proper documentation techniques and the maintenance and security of case records.

**PA-CPS 4.05**
Cases are assigned for investigation, referred, or screened out, within 24 hours.

**PA-CPS 5.05**
The investigator conducts a comprehensive evaluation of risk and protective factors that include:

    a.    child safety;

    b.    family strengths and needs;

    c.    history and impact of prior child abuse or neglect, domestic violence, or substance use; and
           family connections.

**PA-CPS 7.02**
The information gathered for assessments:

    a.    includes underlying conditions and environmental and historical factors that may contribute to concerns identified in initial screening, investigation, and risk and safety assessments;

    b.    identifies child and family strengths, protective factors, and needs;

    c.    includes the potential impact of maltreatment on the child;

    d.    includes factors and characteristics pertinent to making an appropriate placement, if necessary;

    e.    identifies potential family resources for the child and the parents; and

    f.    is limited to material pertinent for providing services and meeting objectives.

**PA-CPS 8.03**
An individualized service plan developed with each family is based on the assessment and includes:

16

Appendix A – Year 1 Implementation Plan
Mississippi Settlement Reform Plan

  a. agreed upon goals, desired outcomes, and timeframes for achieving them;
  b. services and supports to be provided, and by whom;
  c. timeframes for evaluating family progress; and
  d. the signature of the parents and the youth, if age appropriate.

**PA-CPS 9.04**
Frequency and type of face-to-face visits with the child and family are appropriate to the family's needs and risk to the child, and visits occur at least once a month, to:
  a. establish effective working relationships;
  b. assess safety and well-being;
  c. monitor service delivery; and
  d. measure and support the achievement of agreed upon goals.

**PA-CPS 10.03**
The agency minimizes the negative effects removal can have on a child by:
  a. providing age-appropriate information about the removal process;
  b. identifying personal items the child will bring;
  c. collecting information about the child's daily routine, preferred foods and activities, needed therapeutic or medical care, and education;
  d. discussing how the child can maintain contact with the family; and
  e. discussing separation and loss.

**PA-FC 2.02**
The information gathered for assessments:
  a. includes internal, external, and historical factors that may contribute to concerns identified in initial risk and safety assessments and initial screenings;
  b. identifies child and family strengths, protective factors, and needs;
  c. includes the impact of maltreatment on the child;
  d. includes factors and characteristics pertinent to selecting an appropriate placement;
  e. identifies family resources for the child and the parents; and
  f. is limited to material pertinent for meeting service objectives.

**PA-FC 2.04**
The child receives an initial health screening from a qualified medical practitioner within 72 hours of entry into care to identify the need for immediate medical or mental health care, and assess for infectious and communicable diseases.

**PA-FC 3.04**
The service plan is based on the assessment and includes:
  a. service goals, desired outcomes, and timeframes for achieving them;
  b. services and supports to be provided, and by whom; and
  c. the signature of the parents and, when appropriate, the child or youth.

Appendix A – Year 1 Implementation Plan
Mississippi Settlement Reform Plan

**PA-FC 4.01**

Service providers, foster parents, the public authority, and the court work with the child, youth, and family to develop a permanency plan within 30 days of placement, which specifies:

      a.    the permanency goal(s);

      b.    a timeframe for achieving permanency; and

      c.    activities that support permanency.

**PA-FC 6.05**

The home environment is considered when identifying a family for the child, and foster care homes have no more than:

      a.    five children with no more than two children under age two; or

      b.    two foster children with therapeutic needs.

**PA-FC 10.03**

Qualified professionals provide the child with age-appropriate health services including:

      a.    medical examinations according to well child guidelines;

      b.    dental examinations every 6 months;

      c.    developmental, mental health, and alcohol and drug screenings within 30 days after entry into care, and when indicated to identify the need for further diagnostic assessment; and

      d.    needed therapeutic and treatment services.

**PA-FC 11.02**

The treatment team develops an individualized treatment plan that:

      a.    specifies a diagnosis;

      b.    identifies current and anticipated needs, and specifies short- and long-term therapeutic interventions;

      c.    is reviewed by the treatment team weekly to coordinate an effective response to current issues and behaviors; and

      d.    is reviewed within 30 days of placement, and every 90 days, to evaluate continued need for therapeutic foster care.

**PA-FC 12.01**

The family foster care worker meets separately with the child and the parents at least once a month to:

      a.    assess safety and well-being;

      b.    monitor service delivery; and

      c.    support the achievement of permanency and other service plan goals.

**PA-FC 16.05**

Foster parents are trained in:

Appendix A – Year 1 Implementation Plan
Mississippi Settlement Reform Plan

    a.    basic first aid;
    b.    medication administration;
    c.    cardio-pulmonary resuscitation;
    d.    recognizing and responding to child behaviors that jeopardize health and well-being; and
    e.    medical or rehabilitation interventions and operation of medical equipment required for a child's care.

## PA-FC 16.06

Foster parents sign a statement agreeing to refrain from the use of corporal and degrading punishment, and receive initial and ongoing training and support to promote positive behavior and use appropriate discipline techniques.

## PA-AS 3.04

The home-study is a collaborative process that helps the family decide if adoption is an appropriate goal, and includes:

    a.    one or more visits to the prospective adoptive family's home;
    b.    reference checks;
    c.    criminal background and child abuse and neglect registry checks according to applicable legal requirements; and
    d.    preparation of a home-study report with a recommendation regarding the family's ability to meet the needs of an adopted child.

## PA-AS 2.03

An age-appropriate child study is conducted to assess the child's readiness for adoption, and includes:

    a.    an evaluation of the child's ability to bond and develop relationships;
    b.    history of maltreatment and prior placements;
    c.    prenatal history and developmental screening of infants and young children;
    d.    current medical and dental health examinations; and
    e.    a psychological evaluation, if needed.