Case 3:04-cv-00251-TSL-JCS Document 441 Filed 12/10/2007 Page 1 of 3

# PACT
## Professionals Advocating for Children Together

December 6, 2007

Mr. J. T. Noblin, Clerk
United States District Court
Southern District of Mississippi
United States Courthouse
245 East Capitol Street
Jackson, MS 39201




Dear Mr. Noblin,

Professionals Advocating for Children Together, PACT, formed in 2002, to find ways to help the Department of Human Services, Division of Family and Children Services, with its tremendous responsibility of safe guarding the health and welfare of the children of our state.

Our group is dedicated to improving the services available to children at risk in our community, county, and state. We have met with every civic, community, professional, governmental, and interest group which answered our request to meet or asked us to meet with them. Over the past six years we have benefitted by learning the perspectives of many diverse groups, and each one has added to the substantial experience our group brought to the issues ( the members of PACT have over 170 years combined experience in working with neglected and abused children).

We recognize that *Olivia Y. et al. v. Barbour* has the great potential to set the standards for our state for the protection of children for the foreseeable future in much the same way that *Gates v. Collier* in 1974 set the standard for the Mississippi Department of Corrections.

The members of PACT have read and studied the Settlement Agreement and Reform Plan. We commend the Governor and the Department of Human Services and Children's Rights for reaching agreement. The members of PACT are in full support of the adoption of the Agreement.

Members of PACT plan to attend the hearing on January 4, 2008, and respectfully request to address the Court to speak in favor of the proposed settlement.

If you have any questions, or if we can be of any service to you, please do not hesitate to contact any of the members of PACT listed below.

Sincerely yours,

PACT Members

Cindy Alexander, Court Administrator Harrison County Youth Court, Ph. # 228-865-7000

**Exhibit 4**

Margaret Alfonso, Judge Chancery Court, Hancock, Harrison & Stone Counties, Ph # 228-865-4096

Beth Casey, Harrison County Youth Court Intake Counselor, Ph. # 228-865-7000

Betty Elias, Retired Area Social Worker Supervisor, Harrison County DHS

Shelley Foreman, Director of Family and Children's Services
Gulf Coast Mental Health Center, Ph. # 228-863-1132

Freida Kaletsch, Social Worker, Chancery Court, Ph. # 228-865-4096

H. Gordon Myrick, H. Gordon Myrick, Contractor

pc: Governor Haley Barbour
Colonel Don Taylor
Eric Thompson, Esquire, Children's Rights
Rusty Fortenberry, Esquire
Baker, Donelson, Bearman, Caldwell and Berkowitz

PACT
P. O. Box 1446
Gulfport, MS 39502









Mr. J. T. Noblin, Clerk
United States District Court
Southern District of Mississippi
United State Courthouse
245 East Capitol Street
Jackson, MS 39201

3920132403 C001




**CATHOLIC DIOCESE OF JACKSON**

237 AMITE STREET • P.O. BOX 2248
JACKSON, MISSISSIPPI 39225-2248

OFFICE OF THE BISHOP

601-969-1880
FAX 601-960-8455
joseph.latino@jacksondiocese.org

December 17, 2007




Mr. J.T. Noblin, Clerk
United States District Court for the
Southern District of Mississippi
United States Courthouse
245 East Capitol Street
Jackson, MS 39201

Dear Mr. Noblin: 3:04cv251

Thank you for the opportunity to make a **Comment to the Court concerning the Olivia Y. Settlement**. For too long our children have suffered in Mississippi's foster care system. It is a shame that a lawsuit had to be filed in order to draw attention to the crisis innocent children are facing as ward's of the State.

For years now the Division of Family and Children Services (DFCS) has been understaffed and this has led to neglect and abuse of children. I support the settlement as long as it is strictly enforced and adhered to by the State and the Department of Human Services' DFCS. From what has been the experience of our Catholic Charities' Therapeutic Foster Care Counselors, DFCS is not only understaffed but there is also a lack of trained and qualified leadership from the top down. This must be addressed in the enforcement of the settlement.

I would hope that the best interest of the children in Mississippi's foster care system will be the driving force behind the settlement and its enforcement. It would be a travesty to waste this opportunity to fix a broken system. Our children deserve better.

Sincerely,

+Joseph N. Latino

Joseph N. Latino
Bishop of Jackson

Case 3:04-cv-00251-TSL-JCS Document 442 Filed 12/18/2007 Page 2 of 2

**CATHOLIC DIOCESE OF JACKSON**
OFFICE OF THE BISHOP
P.O. BOX 2248 • JACKSON, MISSISSIPPI 39225-2248

Mr. J.T. Noblin, Clerk
United States District Court for the
Southern District of Mississippi
United States Courthouse
245 East Capitol Street
Jackson, MS 39201





# CATHOLIC CHARITIES, INC.

200 North Congress Street, Suite 100
Jackson, Mississippi 39201
*601-355-8634 Fax 601-960-8493*




December 14, 2007

Mr. J. T. Noblin, Clerk
United States District Court for the
Southern District of Mississippi
United States Courthouse
245 East Capitol Street
Jackson, MS 39201

3:04cv251

Catholic Charities of the Diocese of Jackson, MS is grateful once again to be given the opportunity to comment on the proposed settlement brought forth by the Olivia Y., et. al. v. Barbour lawsuit.

While Catholic Charities lauds the terms of the settlement, concern remains about the qualifications of the leadership of the Department of Human Services and in particular The Division of Family and Children's Services. These leadership roles must be filled by individuals with at least a master's degree in social work or a closely related field and at least ten years of management experience in running a large complex social service agency; preferably, a state run agency responsible for the care of children who are wards of the state. Preference should also be given to individuals who have been apart of the successful reform of dysfunctional agencies. In addition, the individual must have experience in managing a diverse staff and client population and they must possess outstanding communication and interpersonal skills.

The position requires that the individual has the ability to

Inspire and manage a staff of social service professionals
Plan, organize, develop and coordinate all social services of the agency
Oversee the budget and financial affairs of the agency
Aid in securing funds to expand and improve the service delivery system
Develop and oversee a continuous quality improvement system to monitor agency performance
Maintain a positive and productive relationship with the legislature and all other state and private agencies
Insure the hiring, training, and evaluation and termination of agency personnel in order to maintain a productive, qualified, well trained staff
Communicate with the public and private organizations regarding the services and needs of the agency
Invite review and comment from the public regarding the services of the agency

Without the above qualifications the terms of the settlement cannot be met. We encourage a nation wide search for the most qualified individual to assume the grave responsibility of insuring that Mississippi's most vulnerable children are provided the care they need to become productive contributing members of society.

Sincerely,

Linda Raff

Linda Raff, ACSW. LCSW
Executive Director
Catholic Charities, Inc.

*PROVIDING HELP. CREATING HOPE.*







*CATHOLIC DIOCESE OF JACKSON*

NASW, MISSISSIPPI CHAPTER
National Association of Social Workers

December 18, 2007

Mr. J.T. Noblin, Clerk
United States District Court for the Southern District of Mississippi
United States Courthouse
245 East Capitol Street
Jackson, MS 39201




Dear Mr. Noblin,

The National Association of Social Workers, Mississippi Chapter is an advocate on behalf of children and families, and the social workers who work with them. We have supported action to improve the Mississippi Department of Human Services, Division of Family & Children's Services, (MDHS) for many years. We have been continually frustrated at the deterioration of the department and the seriousness of the continued abuse and neglect of children in our state. We are so pleased to support full implementation of the proposed Olivia Y. settlement.

We want to strongly urge that each of the seven steps of the settlement be complied with fully and without compromise. Children will continue to be neglected and harmed, and agencies will suffer retribution when speaking out for specific children, until this happens. There will need to be very timely, consistent monitoring and recording of each step, on a quarterly basis of each year, of the five year plan, with swift, unyielding response for non-compliance.

Please note that many advocates for children have supported Children's Rights efforts to bring this lawsuit to fruition. I am also a social worker who had past experience with children in the MDHS system, so from a personal perspective I know the critical need for this settlement to be fully and consistently implemented.

Thank you for the opportunity to support this settlement at this very critical time in our state. The vulnerable children continue to be at risk, and we plead for your full consideration for them.

Sincerely,

Janice Sandefur, ACSW, LCSW
Executive Director
NASW, MS Chapter

cc: Eric Thomspon, Children's Rights
Rusty Fortenberry, Bker,donelson, Bearman, Caldwell, & Berkowitz, PC

P.O. Box 5599
Pearl, MS 39288-5599
601.936.0557 601.936.0559 FAX

Case 3:04-cv-00251-TSL-JCS Document 445 Filed 12/18/2007 Page 2 of 2

NASW, MISSISSIPPI CHAPTER
National Association of Social Workers

P.O. Box 5599
Pearl, MS 39288-5599

Mr. J.T.Noblin, Clerk
US Southern District Court
United States Courthouse
245 East Capitol Street
Jackson, MS 39201





Delta State University

Department of Social Work

December 12, 2007




Mr. J. T. Noblin, Clerk
United States District Court for the
Southern District of Mississippi
United States Courthouse
245 East Capitol Street
Jackson, Mississippi 39201

3:04cv251

Re: *Olivia Y.* Settlement Agreement

Mr. Noblin:

On behalf of the Mississippi Social Work Education Consortium, composed of the ten public and private institutions of higher education offering accredited social work degrees in the state, I wish to strongly encourage the court to approve the *Olivia Y.* Settlement Agreement. The Agreement, if fully implemented, promises to correct any deep-seated problems in the state's troubled child welfare system.

The education of qualified personnel to provide services will be vital to successful implementation of the Settlement. The court should be aware that Mississippi's schools of social work stand ready to do their part in meeting this essential requirement of system reform.

Sincerely,

Alinda Sledge

Alinda Sledge
Chair, MSWE

Box 3172• Cleveland, MS 38733 • Phone: 662-846-4407 • Fax: 662-846-4403

Case 3:04-cv-00251-TSL-JCS Document 447 Filed 12/19/2007 Page 2 of 2



Delta State University
Department of Social Work
Box 3172
Cleveland, MS 38733



$0.41
DEC 17 2007
US POSTAGE
FIRST CLASS
MAILED FROM 38733
011A0413005043




Mr. J. T. Noblin, Clerk
United States District Court for the
Southern District of Mississippi
United States Courthouse
245 East Capitol Street
Jackson, Mississippi 39201

3920132409 C001

Case 3:04-cv-00251-TSL-JCS Document 446-5 Filed 12/18/2007 Page 1 of 30

11/12/07

SOUTHERN DISTRICT OF MISSISSIPPI
FILED
DEC 18 2007
J T NOBLIN, CLERK
BY ______ DEPUTY

Case #3:04 CV25 KN

Whitney M. Johnson
Reginald D Johnson

I am writing in behalf of myself and my Brother Reginald D Johnson.

This is why I feel Violated:

1) Why did we have to be in DHS or foster care when my mother was providing???

2) My mother's parental rights was taken while incarcerated but she still provide through her VA payments.

3) My brother & I was separated and I didn't know where he was, to find out that he was in Millcreek & The Crossings being heavy medicated.

4) I was refused any school voucher after I was placed in a foster home before my sister & mother got me. DHS never contacted and because foster parent did not turn in request for what I was to have received I got cut. No voucher

5) We were just put in places and not check on. My brother has been out of DHS since 04

however the State of Ga where that sent him back to when my mom bought him from Ga to Ms. So there was no updates on the files.

6) I attended the independent living but have not recieved in monetary help.

7) My brother lived in Tenn in the Navy and DHS didn't do the paperwork for the military so we was back & forth. We lived on base 1 yr after that paperwork was not done. So when you get placed that is the end

8) my brother has not completed one yr of school for being moved and I ended up with SED.

[signature]

Case 3:04-cv-00251-TSL-JCS Document 446-5 Filed 12/18/2007 Page 3 of 30

Whitney M. Johnson
# 3:04 CV 251 LN
131 N. Tattnal St #2
Milledgeville, Ga 31061

MACON GA 312
PM
13 DEC




U.S District Court
Southern District of Ms
245 East Capitol St
Jackson Ms 39201
Attn: J T Noblin, Clerk

C001




Mr. J. T. Noblin, Clerk
United States District Court
for the Southern District of Mississippi
United States Courthouse
245 East Capitol Street
Jackson, MS 39201

Objections to the proposed settlement of *Olivia Y., et al. v. Barbour, et al.*, No. 3:04cv251-L-N
submitted by George Whitten, Jr., general counsel at MDHS until today.

The class action lawsuit is provoked by and attempts to improve two shortages:

1. The shortage of foster parents and adoptive parents,

2. The shortage of well-motivated social workers.

Terms have been presented for approval of the Court which, when taken together, will make both shortages worse. The settlement will have the opposite consequences of what the lawsuit claimed to intend.

**I. Shortage of foster parents and adoptive homes.**

Five terms will discourage the most desirable candidates from even applying for foster home licensure.

**1.** Home-schooling is off-limits.

The proposed Settlement would require all foster children of school age to be enrolled in "accredited schools." Page 28, II.B.8.b. This excludes teaching a foster child at home where the rest of his or her foster-siblings are taught.

If public schooling preserves "continuity" and "keep[s] the child in a familiar or current school" (quoting the succeeding paragraph, Page 28, part II.B.8.c), then DFCS can insist that the particular foster child remain in public school. But if the foster placement will produce a switch from one school district to another anyway if the child were sent to a public school, then teaching him at home causes no more break in continuity or loss of a familiar school than the switch in districts does.

**2**. Administering Psychotropic, Mood-Altering, or Anti-Psychotic Drugs to Children.

The proposed Settlement would require every foster child over the age of 4 years to be evaluated by a mental health professional for an emotional disturbance, mental illness, psychological syndrome, disorder, or phobia. Page 26, part II.B.7.f.

Mental health professionals lean heavily on the crutch of medication. Under this term of the Settlement, whatever drugs are recommended by the mental health professional who assesses a given foster child, the foster parents must administer such drugs to the child regardless of the parents' concern about the side effects, or their goal to avoid the intended effect of a drug.

Plenty of scientific evidence supports parental reluctance to allow mood-altering or psychotropic medications to be given to children. The worst side effect is that several drugs in these classes have a high incidence of putting adolescents and teenagers into a suicidal frame of mind. See, *e.g.*, "Why Ritalin Rules," by Mary Eberstadt, in *Policy Review*, No. 94, April – May, 1999; and Home Alone America, a more recent book by the same author. The lack of testing of the effects of anti-psychotic drugs on children justifies refusal to medicate children with them. "More Kids Taking Behavioral Meds," *Clarion-Ledger*, p. 7A, March 17, 2006.

When universal, mandatory mental health assessments of foster children result in a recommendation and prescription that a child take mood-altering drugs or psychotropic drugs, foster parents will be obligated to make the foster child take those drugs. "Each foster child shall receive recommended mental health services pursuant to his/her assessment." Page 26, part II.B.7.f. "Each foster child requiring therapeutic . . . foster care . . . because of a diagnosis of significant . . . emotional or behavioral problems . . . shall be provided with . . . services in accordance with the plan." Page 29, part II.B.9.a.

Many good foster parents will oppose administering such drugs to a child. Married couples who offer to take a foster child into their home out of a ministry motive, hoping to nurture and improve the child's life, want to deal with the real child in his un-drugged state in order to discern the roots of his problems. These foster parents do not want to medicate the child with drugs that mask symptoms; they want to help the child build character.

When foster parents disagree with the professional recommendation to give such drugs to a child, CRI or the Monitor can insist that DFCS remove the child from that foster home because the parents fit the definition of *neglectful*:

> " 'Neglected child' means a child . . . [w]ho, for any reason, lacks the special care made necessary for him by reason of his mental condition, whether said mental condition be mentally retarded or mentally ill."

*Miss. Code* §43-21-105(l)(iii). Therefore, foster parents who are determined to protect the foster child from the suicidal tendencies caused by psychotropic drugs when given to children can be caught in violation of the child neglect law.

(The exemption for "treatment by spiritual means" in §43-21-105(l) is confined to birth and adoptive parents; it offers no protection to "guardians or custodians" such as foster parents.) Foster parents are left at the mercy of whatever treatment a given mental health professional recommends.

The most desirable kind of foster parents offer to serve in that capacity out of a ministry motive to deal with root causes instead of masking over symptoms. But a psychotropic or mood-altering drug interferes with or defeats the foster parents' purpose to minister to the child as he really is and help him develop character instead of medicating him in a way that merely turns off warning signals.

**3**. Maximum family size of five children. Page 21, part II.B.5.b.

This edict will exclude parents with large hearts and masterful home-management skills. This is another proposal that excludes highly desirable families from the placement options for a foster child.

It also treats social workers, who make judgments about everything else as they do home studies and issue licenses to foster homes, as if they were incapable of exercising discretion in selecting which parents can handle several children, and which ones probably cannot.

**4**. Corporal punishment is forbidden.

This is already the written policy of MDHS. However, it is our rule, not a state statute, nor a consent decree issued by a court. MDHS made the rule, and MDHS can make exceptions to the rule. Currently, various social workers and various county offices of DFCS let ordinary spankings slide.

Under the proposed Settlement, a report of corporal punishment is to be treated the same as a child abuse report. Corporal punishment will bring swift investigation, standardized criteria for assessing the foster parent's conduct, and systematic evaluation. Pages 19 – 20, parts II.B.4.c., d., e. and f.; COA Standard FC 16.06. This means all reports of spanking will be handled the same with the same outcome; exceptions are eliminated.

Also, COA standard PA-FC 16.06 will exclude foster parents unless they "sign a statement agreeing to refrain from the use of corporal . . . punishment . . . ." In the name of protecting children, the Defendant agency is depriving foster children of the most desirable families they could live with other than their own. Abuse of the freedom to spank can be dealt with on a case-by-case basis instead of banning it across the board. Social workers's main function and role in the system is to make subjective judgment calls about each case based on the unique persons involved. The system relies on their discretion, and the need for individualized, tailored, ad hoc decisions is why the social worker position exists.

Since school principals and teachers are permitted to administer corporal punishment to students in Mississippi schools, then, as a general rule, foster parents should be permitted to administer corporal punishment to most children placed in their care. Of course, it is a privilege that can be forfeited by certain foster parents. And a battered child who comes into foster care from a cruel parent who beat him should warrant a complete (but temporary) ban against spanking as to that child until the foster parents have proved to the child in other ways that they operate for his good, not his harm. Tailor-made rules for each case are a large reason social workers exist.

When my own sister and her husband underwent training to become foster parents in Mississippi, they were home-schooling their own children and applying punishment to the seat of learning when persistent disobedience deserved it and loving concern that the misbehavior not become a lifelong handicap demanded it. The DFCS supervisor who spoke to the class of foster-parent-candidates told my sister that spanking was to be kept to a minimum, and depending on which social worker was assigned to her, spankings could be overlooked when the misbehavior warranted the punishment and a judicious degree of spanking was administered.

Under the proposed regime, if a social worker or supervisor lets a spanking slide, she will jeopardize her employment. After any report of corporal punishment, a child protection caseworker will visit every two weeks and ask the foster child if he or she has received a spanking. (And the child will answer truthfully, because most foster parents who administer proper spanking also teach their foster children to tell the truth even when it brings hardship.)

Few ministry-minded couples are going to offer to undertake the responsibility of raising a foster child when DFCS strictly withholds from them the authority necessary to fulfill the responsibility.

The Monitor and her full-time staff will be patrolling to uncover any breach of the ban against spanking. DFCS may be asked to inform foster children upon placement that they should call the Child Abuse Hotline if they are spanked by their foster parents.

5. Loss of Privacy and Confidentiality

For MDHS to turn over a complete list of all foster parents' names, home address, and home telephone number to Children's Rights, Inc., is to violate the confidentiality promised by statute. It exposes the family to crusaders who want to save children from the sort of foster parents and potential adoptive parents who home school, who build character in their children instead of sedate them, who love their children enough to do the difficult duty of spanking them when necessary, who love children enough to have a lot of them, or who do all of the above.

The foregoing features of the Settlement Reform Plan will drive away good foster parents. The better response to this lawsuit is to expand the pool of potential candidates who will be good influences on children in custody. The best known, national Christian non-profit ministries in the United States have in the past year or two made the case for Christian parents to bring needy children into their homes by foster care or adoption. Series of programs on nationwide radio broadcasts, (*e.g.*, "Focus on the Family," "In the Studio with Michael Card," and "Family Life Today") have promoted adopting and offering to be foster parents. Becoming an adoptive or foster home has been one of the top three emphases this year in publications and broadcasts from Focus on the Family. This Settlement Agreement, however, proposes restrictions and uniform, strict enforcement thereof that turn away prime candidates to take children under the shelter of their wings.

**II. Shortage of Caseworkers**

The second shortage is of caseworkers willing to deal with child abuse and neglect cases and policing the substitute placements found for those children. Difficulties of the job include wading through false reports, and trying to think up a way to fix heartless parenting.

A. Experience

By statute, DFCS employs caseworkers who are not licensed social workers and who do not have a degree in social work or a related human services field. *Miss. Code* §43-1-55. DFCS employs college graduates fresh out of school who come to DFCS out of the necessity to acquire two or three years' experience before they are employable anywhere else. The reason most applicants apply to DFCS is to get experience.

The Reform Plan's prohibition against DFCS hiring persons with a bachelor's degree **unless they have two years experience** can do nothing but choke the labor supply and exacerbate the shortage. Page 5, part II.A.2.b (1).

Likewise, the Reform Plan will reduce the number of persons eligible to supervise social workers. The Plan prohibits DFCS from hiring or promoting anyone to a supervisory position over case workers unless he or she possesses an advanced degree (a master's or doctorate) in a field related to human services. Page 5, part II.A.2.b (2).

Yet, DFCS must hire more supervisors. For every five caseworkers, DFCS must employ one supervisor. Page 3, part II.A.2.a (5).

**B.** Pre-service Training

Current law: 4 weeks minimum – for those who are not licensed social workers and whose college degree is in a field other than social work. Miss. Code §43-1-55(2)(b). A fifth week of training is required before interviewing a child for forensic purposes.

Proposed Reform Plan: 7 weeks minimum – for **all** new hires, **even though they already have two years' experience** on top of their bachelor's degree in a human services field **or already possess an advanced degree** in a human services major. Page 5, part II.A.2.c (2). The longer delay before new employees may commence work as a caseworker aggravates the shortage of workers to divide the caseload.

**The Significance of the two Shortages Combined**

A worsening shortage of acceptable foster parent candidates, a shortage of "qualified" manpower to achieve caseloads as low as this Settlement would require, and performance-based, outcome measurements will build higher pressure on DFCS to approve gay or lesbian applicants who want access to foster children or who want governmental acceptance of their sexual lifestyle that licensure represents.

The shortage of trustworthy foster and adoptive homes in which to place children DHS has taken into custody and the pressure to move children into a single-family dwelling rather than a congregate care facility present a strong possibility that DFCS will quietly accept single males

to adopt children from our custody, and accept homosexual and lesbian pairs to be foster parents. The dangers of doing so are listed in my 12-page memorandum of September 26, 2007, attached as *Exhibit 4*.

**III. Conflict with the Law of the Case**

This lawsuit was supposed to be confined to the foster care system. The Court dismissed the claims alleging deficiencies in how DFCS investigates abuse and neglect allegations about children who are not in DHS custody. But the proposed Reform Plan goes beyond the foster care system by limiting the caseload of child protection workers. Page 3, II.A.2.a(1). Some of these caseworkers may investigate reports only against natural parents, school employees and child care workers regarding children still under the protection of their own natural or adoptive parents. Caseload limits imposed by this lawsuit should be limited to child protection workers who deal with children in foster homes, group shelters, and other institutions where foster children reside.

The proposed Plan also limits the caseload of dedicated intake workers. Page 3, II.A.2.a(1). Intake workers do not deal primarily with children in custody. Furthermore, if intake workers simply answer telephone calls to the child abuse Hotline, it is pretentious to speak in terms of a "caseload."[1] It is more honest to speak in terms of calls answered and reports entered.

**IV. Conflict with State Law**

The proposed Reform Plan addresses durable legal custody among the permanency placements. When that option can be arranged, the Reform Plan requires "a long-term placement agreement signed by DFCS and the relative . . . ." Page 12, part II.B.3.a(2). State law, however, requires a court order in order to establish durable legal custody. *Miss. Code* §43-21-105(y).

[1] Also, the "caseload" cap leaves unanswered whether the phone call limit is 118 intakes per month, per week, or per day.

State law sets a higher standard. Furthermore, a court order eliminates any need for such an agreement, and renders it superfluous.

The definition of *durable legal custody* in state law eliminates the foster care board payment. (Maintenance payments are referred to herein as *board payments*.) Mississippi's definition "gives the durable legal custodian the responsibilities of physical possession of the child and the duty to provide him with care, nurture, welfare, food, shelter, education and reasonable medical care." *Miss. Code* §43-21-105(y). The legal custodian, not DFCS, becomes the source and provider of the child's material welfare. Durable legal custody removes the child from DFCS's caseload.

Yet, Page 36, part B.14 of the Settlement would allow DFCS to pay monthly support to durable legal custodians deemed to be needy. This practice might be salutary, but it conflicts with the nature of durable legal custody.

The most desirable legal custodians and foster parents are those who would volunteer no matter how meager the board payment. Foster parenting is given a bad name by those who do it for the money. What inspires the couples who become foster parents regardless of whether the board payment matches actual expenses? It is the willingness to be tools in the hands of God to transform another life just as their own lives were transformed; a willingness to take on a task that is impossibly hard for them, but is not too hard for God working through them.

**V. Unknowns; The quest for an Open-Ended Approval**

The proposed Reform Plan would last five years. Only the Implementation Plan for the first year has been negotiated. While some benchmarks for years 2 through 4 have been set forth in the body of the Reform Plan, the full terms of the implementation plans for those years are unknown. They have yet to be negotiated. The parties might agree to future implementation plans that go beyond the Reform Plan with new and extra restrictions or goals without being inconsistent with as much of the Reform Plan as is being announced now. Moreover, most or all

of the executive officers and administrators of the governmental parties (defendants named in their official capacities) will probably change before five years elapse.

Similarly, if C.O.A. accreditation standards change regarding employee qualifications, the Reform Plan specifies that the new qualification standards shall govern. Page 5, part II.A.2.b.

How can a party or any one else object to something that does not exist yet? How can the Court approve terms that have not been presented yet?

If the Court approves the proposed Reform Plan, that approval will be open-ended. It can authorize whatever the next four Implementation Plans turn out to be – unless one of the parties does not cooperate with the other party's demand and the demanding party turns to the Court for resolution of the dispute. But if both parties are cooperating, then future implementation plans can go beyond the terms presented now for approval.

The Court might consider requiring that any Reform Plan proposed be completed within the term of the incumbent governor, and requiring that each year's implementation plan be spelled out in full before the Court grants approval.

**VI. The Monitor Selected**

Children's Rights Inc. represents the plaintiff class in this Mississippi lawsuit. In identical litigation in Nebraska, Children's Rights Inc. served as co-counsel with Nebraska Appleseed to represent the plaintiff class together. (See "Policy Spotlight," 3/12/2007, at Nebraska Appleseed's website, www.neappleseed.org/lrc/031207.html, attached as *Exhibit 1*; and case summary of *Carson v. Heineman* posted at National Center for Youth Law's website, www.youthlaw.org/publications/fc_docket/alpha/carsonvheinema, attached as *Exhibit 2*.)

Grace Lopes is proposed as the Monitor to determine whether DFCS achieves compliance with the proposed Settlement Agreement. Ms. Lopes used to be the Managing Director of DC Appleseed in Washington, D.C. (See page *i*, "Acknowledgments," from a publication of the HIV/AIDS project of DC Appleseed, attached as *Exhibit 3*.)

Her prior connection with one branch of the network whose other branch was a co-belligerent with Children's Rights, Inc., raises serious doubt about the independence and neutrality of the proposed monitor.

The proposed settlement is grievously unreasonable. Some standards ought never to be complied with. Other standards are predictably impossible to reach. The proposal appears to be the work product of attorneys who do not genuinely intend that the foster care system ever be fixed.

Particularly in an action brought on behalf of a certified class, and especially where that class consists of minors, and where the settlement aspires to accomplish systemic, legislative-type changes, it is incumbent upon the Court to act as more than a rubber stamp, but to weigh carefully the re-structurings proposed for a statewide, governmental function and to either revise the terms before endorsing the Settlement and Reform Plan and giving it the force of law, or to send the parties back to a more neutral table to negotiate a new settlement plan from scratch.

I am resigning from state employment in order to submit this comment to the Court. I have worn the title of general counsel to the Mississippi Department of Human Services alongside the job of legal services developer within the Division of Aging & Adult Services. I had no hand in either defending against or settling this litigation. By statute, those duties were handled by the Attorney General's Office, the private law firms with whom the Attorney General contracted, and by the DFCS division director and the executive director of MDHS without consulting me. I was allowed to sit in on two early meetings with the agency's attorneys at which I was a bystander. Apart from DFCS's commitment to seek accreditation from the Council on Accreditation (which was announced in the April 10, 2007, Public Notice), I had no knowledge of the other terms of settlement until this month, December, after Public Notice was posted again announcing the proposed Settlement Agreement and Reform Plan.

I have taken notice of the two court-ordered Notices posted on bulletin boards in the building where I work. I took the initiative to survey the COA standards back in April; and now in December I have surveyed the terms on which settlement is proposed. To remain at MDHS now that I know would be to imply that I consent.

Respectfully submitted, this 18th day of December, 2007,

George Whitten, Jr.
P. O. Box 4773
Jackson, MS 39296
(662) 299-0800

By my signature above, I certify that I will mail today or deliver tomorrow true and correct copies of this Objection to the following attorneys:

Eric Thompson
Children's Rights, Inc.
330 Seventh Ave., 4th Floor
New York, NY 10001

Rusty Fortenberry
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
4268 I-55 North
Meadowbrook Office Park
Jackson, MS 39211

Case 3:04-cv-00251-HSO-ASH Document 450-5 Filed 12/20/2007 Page 26 of 30
Case 3:04-cv-00251-TSL-JCS Document 443-2 Filed 12/18/2007 Page 1 of 19

# Foster Care Reform Update

# 3/12/2007

## INTRODUCTION

Welcome to the second Foster Care Reform Update! This month's update features our first "Policy Spotlight." The first Policy Spotlight provides a review of *Carson P. et. al. v. Heineman*, Appleseed's class action lawsuit seeking systemic reform of the Nebraska foster care system. The Policy Spotlight will be a recurring part of the update. This month's update also includes a special section we're calling "Behind the Update," which provides an introduction to the staff and volunteers currently working at Appleseed on child welfare issues.

EXHIBIT 1

As always, please contact us if Appleseed can be of any assistance on systemic issues that arise in your practice.

Sarah Helvey
Staff Attorney
Foster Care Reform Legal Resource Center

## POLICY SPOTLIGHT

***Carson P. et. al. v. Heineman***

Since its inception, Nebraska Appleseed's Child Welfare System Accountability Program (CWSAP) has worked for comprehensive reform in Nebraska's child welfare system. On September 19, 2005, after years of thorough investigation, Nebraska Appleseed, along with a stellar legal team, filed a long-awaited class action against the State of Nebraska in U.S. District Court on behalf of the more than 6,000 children in state foster care – *Carson P. et. al., v. Heineman, et. al., 05CV3241, (Judge Kopf) (Magistrate Judge Piester)*. The suit alleged that Nebraska's child welfare system violated the constitutional and statutory rights of foster children by, for example, moving them too frequently and to inappropriate placements, by leaving them too long in emergency shelters and temporary placements, by placing infants and other very young children in emergency shelters, by overcrowding foster homes, by allowing abuse and neglect in foster care, by overusing institutional care, and

by leaving children in state custody too long. The suit alleged that these problems resulted from a severe shortage of foster homes, high caseloads and turnover among child protection workers, lack of basic health services for foster kids, poor monitoring of child safety, poor planning and services to move children out of foster care and into permanent homes, and inadequate payments to foster care providers. Nebraska Appleseed was joined as co-counsel on the lawsuit by local and national law firms: Children's Rights, a national advocacy group, of New York City; Ogborn, Summerlin & Ogborn, P.C. of Lincoln (Gene Summerlin and Marnie Jensen); and DLA Piper Rudnick Gray Cary US LLP (partners from their Chicago office are participating). Joining the lawsuit "of counsel" were American College of Trial Lawyers, Nebraska Chapter, members from Woods & Aitken (Ed Tricker); and Gross & Welch (Tom Grennan). Cline, Williams, Wright, Johnson & Oldfather LLP was also actively involved in the lawsuit until late 2006 due to the tragic death of Kevin Colleran, the American College of Trial Lawyer member on the case from Cline Williams.

Unfortunately, in January 2007, Judge Richard Kopf chose to not to hear the claims of these young Plaintiffs and dismissed the case. Judge Kopf adopted in full what Nebraska Appleseed believes was the erroneous August 16, 2006 Report and Recommendation (R&R) issued by Magistrate Judge Piester on Plaintiffs' Motion for Class Certification and Defendants' Motion to Dismiss. Specifically, after redefining the class, the court found that the redefined class did not meet the requirements of typicality or commonality. In addition, the R&R questioned the motives, integrity, and adequacy of the earnest and caring persons serving as Next Friends for the minor Plaintiffs. With regard to the motion to dismiss, the district court employed the extraordinary measure of abstaining from the case pursuant to *Younger v. Harris*, finding, erroneously, that any injunctive relief the Court might grant in this case would unduly interfere with the Nebraska juvenile courts. The Court also found that the Plaintiffs' constitutional claims and the resulting harms could be addressed in the juvenile courts. Finally, the decision finds that there is no private right of action under the federal statutes at issue, with the exception of any claims brought under the Early Periodic Screening and Diagnostic Testing requirements of the Medicaid Act. Plaintiffs strenuously objected to the R&R and, pursuant to the Rules, filed those objections with the District Court.

Underlying the entire R&R, and therefore, the district court decision, is the assumption that there are significant reform efforts already underway which make this class action unnecessary. While Nebraska Appleseed is generally supportive of additional efforts to improve aspects of Nebraska's failing foster care system, the efforts made thus far have not addressed the system-wide problems at the executive agency and resulting harms targeted in this lawsuit. The Plaintiff children came to the federal forum because supposed efforts at reform have failed. Prior studies and "reforms" only serve to document the long history of problems and harms to children in Nebraska.

Nebraska Appleseed is gravely disappointed with Judge Kopf's decision to dismiss this case. With this decision, the Court relegates these children to seeking systemic relief in their individual juvenile cases where that very systemic relief is not available. The child welfare system is failing the children it is legally obligated to care for. This decision tells the children that they have no recourse in the federal court even though it is the best forum for vindicating their constitutional rights and achieving the system-wide relief necessary for meaningful system change.

Nebraska Appleseed's CWSAP will continue to fight for the legal rights of these children and work for meaningful reform of this system which continues to fail the children in its care. Given the dismissal of *Carson P.*, we are particularly grateful to have the opportunity to work with practitioners who fight for these children every day in the juvenile courts.

Case 3:04-cv-00251-TSL-JCS Document 443-2 Filed 12/18/2007 Page 3 of 19



# NATIONAL CENTER FOR YOUTH LAW

*Using the law to improve the lives of poor children*

Events & Trainings | Litigation | Policy & Legislation | Publications

Home > Publications > Foster Care Reform Litigation Docket > Alphabetical Index > Carson P. v. Heineman

SITE SEARCH
SEARCH

**Child Welfare**
**Economic Security**
**Health/Mental Health**
**Juvenile Justice**

About NCYL
Press Room
Youth Law News
Stay Informed

SUPPORT NCYL

## Carson P. v. Heineman

**FILE NO., COURT, AND DATE FILED**

4:05-cv-03241-RGK-DLP (D. Neb., Sep. 19, 2005)

**CITATIONS**

None

**CLEARINGHOUSE REVIEW NO.**

None

**ATTORNEYS FOR PLAINTIFFS**

Doug Gray
Marcia Robinson Lowry
Children's Rights, Inc.
404 Park Avenue South, 11th Floor
New York, NY 10016
(212) 683-2210
Fax: (212) 683-4015
dgray(at)childrensrights.org

Milo Mumgaard
Nebraska Appleseed Center for Law in the Public Interest
941 O Street, Suite 105
Lincoln, Nebraska 68508
(402) 438-8853
Fax (402) 438-0263
mmumgaard(at)neappleseed.org

FOSTER CARE REFORM LITIGATION DOCKET

- Active Litigation
- Pending Settlement Agreement
- Damages Cases

- Alphabetical Index
- Geographical Index
- Procedural Topic Index
- Substantive Topic Index

EXHIBIT 2

**ISSUES**

Plaintiffs filed this case on behalf of five children who have suffered physical and psychological harm while in the custody of the Nebraska Division of Health and Human Services (HHS), and as a class action on behalf of 6,000 foster children in state custody in Nebraska. The complaint alleged violations of the children's constitutional rights, their rights under Title IV-E and IV-B, and their rights pursuant to the Early Periodic Screening Diagnosis and Treatment provisions of the Medicaid Act. The lawsuit charges the state with failing to address longstanding systemic problems such as a drastic shortage of foster homes, high caseloads for case workers assigned to monitor child safety, a lack of mental health care services, the lowest payments to care for foster children in the country, and a lack of services and resources to get children adopted.

**HISTORY AND STATUS**

Plaintiffs filed their complaint and a motion for class certification on September 19, 2005. The court has ordered the parties to conduct discovery into the facts and circumstances of the named plaintiffs and has indicated that it will rule on plaintiffs' class certification motion in early 2006.


© Copyright 2007 National Center for Youth Law • 405 14th St., 15th Fl. • Oakland, CA 94612 • (510) 835-8098

# ACKNOWLEDGMENTS

DC Appleseed thanks the Community Services Department at Hogan & Hartson L.L.P. for its invaluable participation in DC Appleseed's HIV/AIDS project. Hogan & Hartson attorneys – led by Pat Brannan (also a member of the DC Appleseed Board of Directors), Bob Leibenluft, and Veronica Valdivieso – have devoted over 4,000 pro bono hours assisting in the research and writing of this report. In addition, Robb Stout and Leigh Cullen of the Marketing Department at Hogan & Hartson provided assistance in the report's graphic design, layout, and production.

DC Appleseed would also like to thank its former Managing Director, Grace Lopes, for her efforts during the early stages of the HIV/AIDS project.



EXHIBIT 3