IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION


OLIVIA Y., *et al.*                                                PLAINTIFFS


v.                                          CIVIL ACTION NO. 3:04CV251LN


HALEY BARBOUR, as Governor of the State of Mississippi, *et al.*        DEFENDANTS

---

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
FINAL APPROVAL OF MISSISSIPPI SETTLEMENT AGREEMENT AND
REFORM PLAN**

---

Plaintiffs respectfully submit this memorandum of law in support of Plaintiffs'
Motion for Final Approval of Mississippi Settlement Agreement and Reform Plan. The
Mississippi Settlement Agreement and Reform Plan (the "Agreement") is attached as
Exhibit 1 to Plaintiffs' Motion and was preliminarily approved by this Court on
November 8, 2007.

The Agreement is a detailed and binding commitment from the state of
Mississippi to implement wholesale reforms of every aspect of Mississippi's harmful
foster care system, the Division of Family and Children's Services ("DFCS"), which is
run by the Department of Human Services ("DHS"). The Agreement requires DFCS to
accept expert assistance from and become accredited by the Council on Accreditation
("COA"), which is an independent national organization that establishes accreditation
standards for the provision of child welfare services. The Agreement also requires
Defendants to achieve concrete and substantial improvements to ensure the safety and

well-being of the Plaintiff children in DFCS custody, and to secure them permanent families. The Agreement is fair, reasonable, and adequate. Plaintiffs request that this Court approve the Agreement in its entirety pursuant to Rule 23(e) of the Federal Rules of Civil Procedure and enter it as a consent decree.

## I.    BACKGROUND

### A.    Summary of Litigation

On March 30, 2004, Plaintiffs filed this class action suit alleging that through mismanagement, underfunding, and deliberate indifference, Defendants knowingly allowed DFCS, the state's child welfare system charged with protecting children, to collapse, thereby endangering the thousands of Mississippi children dependent upon the system for their safety. Plaintiffs sought recourse from the federal court following years in which the State ignored increasingly dire warnings from knowledgeable state and federal officials, including the state Attorney General and a statewide Council of Youth Court Judges, that DFCS was harming the health and jeopardizing the safety of the very children it was charged with safeguarding. (Compl. ¶ 5) (Docket No. 1).

The Complaint, which was amended on May 17, 2004, alleged that DFCS cycled children who were placed in the foster care system through numerous unsuitable foster care placements or institutions where their medical, dental, and psychological needs were left unmet and where they had little chance of finding a permanent family. (Am. Compl. ¶¶ 7, 145-47, 149-51, 153-55, 161-69) (Docket No. 25). On March 11, 2005, the Court certified this case seeking declaratory and injunctive relief for class action treatment pursuant to Federal Rule of Civil Procedure 23(b)(2). (Docket No. 84.)

The Amended Complaint was followed by years of highly contentious litigation and extensive class-wide discovery. Well over 40 motions were filed, including several motions to dismiss, cross-motions for summary judgment, and a motion to exclude expert testimony. Class Counsel reviewed hundreds of thousands of pages of documentary evidence, deposed 27 fact witnesses, and assembled a team of experts who conducted extensive examinations of various aspects of DFCS operation and issued detailed reports of their findings, all of which confirmed Plaintiffs' allegations.

In November 2006, during a pretrial conference, the parties informed this Court that they were engaged in settlement discussions. After five months of arm's-length negotiation, the parties reached an agreement as to liability (the "Stipulated Settlement") in which Defendants agreed to no longer contest that DFCS operated in a manner that harmed Plaintiff children in violation of their constitutional rights, and to work with outside experts and Plaintiffs' Counsel to create a detailed remedial order. The Stipulated Settlement as to liability was approved by this Court at a Rule 23(e)(2) fairness hearing on May 17, 2007. (Minute Entry attached hereto as Ex. A.) In accordance with the Stipulated Settlement, the parties spent the six months following the fairness hearing vigorously negotiating the terms of an acceptable remedial plan. Through these efforts, the proposed Agreement was reached.

On November 8, 2007, this Court granted preliminary approval of the Agreement, directed that Defendants give court-approved notice to the Class and interested parties, and set the matter down for a fairness hearing on January 4, 2008. (Docket No. 439) (Ex. 2 to Pls.' Mot.). On December 4, 2007, Defendants certified that notice of the proposed settlement terms and of the January 4, 2008 hearing at which objections to those terms

would be heard had been provided to all Class members and other concerned parties as directed by the Court. (Docket No. 440) (Ex. 3 to Pls.' Mot.).

> **B.      Overview of the Mississippi Settlement Agreement and Reform Plan**

The proposed Agreement requires DFCS to ensure that foster children are protected from further maltreatment once in DFCS custody, are provided necessary medical, dental, and mental health care, are no longer shuffled among multiple homes and facilities, and are placed in permanent homes without delay. The Agreement also requires DHS to meet professional standards by providing for manageable caseloads for DFCS caseworkers, frequent caseworker visits to foster children, and continuous oversight of its programs.

The Agreement establishes administrative, management, and foster care standards as well as child well-being outcome measures that Defendants must meet in no later than five years, or earlier as set out in the Agreement and in annual Implementation Plans. The annual Implementation Plans will detail the specific steps that Defendants are to accomplish each year in order to meet that year's interim benchmarks and to progress towards compliance with the Agreement within five years. The annual Implementation Plans are to be developed by Defendants with COA and Plaintiffs, with each provision of each annual Plan to be incorporated as an enforceable term of the Agreement. The Period 1 Annual Implementation Plan has been developed and agreed upon by the parties and is attached as Appendix A to the Agreement. (*See* Ex. 1 to Pls.' Mot.) Defendants' compliance with the Agreement and annual Implementation Plans will be tracked by an independent monitor.

### (1) Administration and Management Standards

The proposed settlement requires DFCS to take specific actions to comply with administration and management standards calculated to build within DFCS the infrastructure necessary for a functioning child welfare system. Among the administration and management standards that must be implemented, the Agreement provides that within 90 days of Court approval, DFCS shall hire a director who is qualified consistent with COA standards to run a child welfare system. (*See* Ex. 1 to Pls.' Mot., Agreement § II.A.1.b.) Defendants are required to implement specific limits on the number of children's cases for which individual caseworkers may be responsible (*id.* § II.A.2.a) and are prohibited from hiring caseworkers or supervisors who fail to meet minimum professional qualifications (*id.* § II.A.2.b). In order to improve the quality of services to Plaintiff children pursuant to the Agreement, all DFCS contracts for child welfare services must be performance-based (*id.* § II.A.2.d), and DFCS must implement a continuous quality improvement system to monitor agency performance and require improvement plans for identified deficiencies (*id.* § II.A.3). The Agreement provides that these aforementioned requirements are to be phased in to allow for proper implementation.

The Agreement also provides that DFCS shall develop an information system capable of tracking and reporting individual and aggregate child welfare information as well as fiscal and other management data. (*Id.* § II.A.5.) Defendants must also secure an external federal funding assessment and implement processes necessary to take advantage of all available federal funding opportunities. (*Id.* § II.A.7.)

### (2)  Foster Care Service Standards

The proposed Agreement establishes a number of concrete and significant steps that DFCS must undertake to address chronic deficiencies in case practice that result in harm to the Plaintiff Class.  Among the foster care service standards that must be implemented, the Agreement provides that all children entering custody shall receive a health screening evaluation within 72 hours after placement and a comprehensive medical examination within 30 days.  (*Id.* § II.B.7.a-b.)  DFCS must ensure that periodic dental exams are provided to foster children three years old and older and that all foster children four years old and older undergo a mental health assessment.  (*Id.* § II.B.7.e-f.)  Further, within 30 days of taking custody of a child, DFCS must complete a full screening and family assessment.  Based upon the information gathered during that screening and assessment, DFCS must develop a service plan, including a permanency plan, that is calculated to meet the child's immediate and ongoing needs and to move that child to a permanent home as expeditiously as possible.  (*Id.* §§ II.B.1.a, II.B.2.a, II.B.3.a.)  To ensure the continued well-being of foster children and that necessary steps are taken to ensure that they can be raised in a permanent family, each foster child's service plan is to be updated at least quarterly and foster children's permanency plans are to be reviewed at least every six months.  (*Id.* §§ II.B.2.b, II.B.3.c(1)-(2).)

To ensure foster children do not suffer further abuse or neglect once in DFCS care, the Agreement requires that allegations of maltreatment be investigated by DFCS within strict timeframes.  (*Id.* § II.B.4.e.)  Additionally, the Agreement requires that DFCS provide increased supervision of foster children who remain in a foster care placement following an investigation that a child was harmed in that placement, and that

DFCS undertake special safety reviews of foster care placements with repeat allegations of foster child maltreatment.  (*Id.* § II.B.4.f, i-j.)

To further ensure child safety and well-being while in DFCS custody, the Agreement requires that foster children be placed in homes that meet DFCS licensing requirements and are suited to the child's individual needs (*id.* § II.B.5.a, c-d), that siblings be placed together when appropriate (*id.* § II.B.5.f), that a child only be moved from a foster placement when justified (*id.* § II.B.5.n), and that foster homes be limited in the number of foster children placed in their care (*id.* § II.B.5.b).  Limits also apply on placing foster children for extended periods in short-term emergency placements and on placing children under 10 years of age in congregate care settings.  (*Id.* § II.B.5.k-m.) Because routine and direct contact with foster children is a necessary prerequisite for ensuring that their needs are addressed, the Agreement requires DFCS caseworkers to make twice-monthly face-to-face visits with each foster child.  (*Id.* § II.B.10.a.)

In order to address the problem of children languishing for unnecessarily long periods of time in foster care, the Agreement requires that Defendants make available necessary services, including parent-child visitation, to facilitate reunification of foster children with their families where safe and appropriate, and that Defendants move forward without delay with adoption or other permanent placements consistent with federal law when reunification is not possible.  (*Id.* §§ II.B.3.d-f, II.B.6.)  Older foster children ages 14–20 will be provided with independent living services to prepare them for transitioning to independence.  (*Id.* § II.B.11.)

In an effort to support and enlarge the pool and array of available foster homes, the Agreement provides that by July 2009, basic monthly foster care board rates paid to

foster parents for the care of children will be increased to established, age-appropriate amounts that reflect the actual cost of caring for foster children. (*Id.* § II.B.13.f.) The Period 1 Annual Implementation Plan provides for needs assessments of a wide variety of DFCS foster care services, along with a process to begin addressing identified needs. (*See* Ex. 1 to Pls.' Mot., Period 1 Annual Implementation Plan § II.)

### (3)  Outcome Measures

The Agreement provides for Defendants to meet phased-in outcome measures regarding a number of child safety and well-being indicators consistent with federal standards. The outcome measures that Defendants have agreed to achieve include shorter periods spent by children in foster care before achieving permanency, whether by safe reunifications with their biological parents or by adoptions; a reduction in the number of times children are moved from foster placement to foster placement; and a decrease in the incidents of foster children being maltreated while in DFCS custody. (*See* Ex. 1 to Pls.' Mot., Agreement § III.)

### (4)  COA Accreditation

The Agreement requires that Defendants bring DFCS's foster care services into compliance with the relevant management and service standards established by COA and that those services be accredited by COA. (*Id.* § IV; Ex. 1 to Pls.' Mot., Period I Annual Implementation Plan § III.) Pursuant to the Period 1 Annual Implementation Plan, COA will be providing expert guidance to assist DFCS in assessing current DFCS functioning in various practice areas and in developing plans to address identified deficiencies.

### (5) The Named Plaintiffs

The parties have entered into separate Agreements on Services and Plans for each of the named Plaintiffs who remained in state foster care custody as of May 17, 2007, the date this Court approved the Stipulated Settlement.  (Attached collectively as Ex. B.)[1] These Agreements on Services and Plans require Defendants to provide permanency and independent living services to the named Plaintiffs and provide for the ongoing monitoring of their cases by Plaintiffs' Counsel.

### (6) Monitor

The parties have agreed that attorney Grace Lopes shall perform the role of independent monitor of Defendants' compliance with the Agreement and the annual Implementation Plans.  Under the Agreement, Ms. Lopes is to independently confirm the data and information provided by Defendants as evidence of compliance, conduct qualitative reviews of DFCS functioning, and issue reports no less frequently than every six months regarding her findings.  Defendants are required to provide Ms. Lopes with the resources and information necessary for Ms. Lopes to carry out her duties.  (*See* Ex. 1 to Pls.' Mot., Agreement § VI.)  The parties agree that this Court shall have continuing jurisdiction to enforce the terms of this Agreement and annual Implementation Plans. (*Id.* at 1.)

## II.    ARGUMENT

Federal courts have recognized that the public interest in favor of settlement is even greater in the context of class action lawsuits. *See Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) (recognizing "overriding public interest" in class action settlement)

---

[1]   The names and other identifying information of the named Plaintiffs and their contacts have been redacted from Exhibit B to protect their privacy.

(citations omitted).  Pursuant to Federal Rule of Civil Procedure 23(e), the "gravamen of an approvable proposed settlement is that it be 'fair, adequate, and reasonable and is not the product of collusion between the parties.'" *Newby v. Enron Corp.*, 394 F.3d 296, 301 (5th Cir. 2004) (citation omitted); *see also Ayers v. Thompson*, 358 F.3d 356, 368 (5th Cir. 2004) (requiring showing that settlement is "fair, adequate, and reasonable").

The Fifth Circuit has directed that courts consider the following six factors in determining whether a proposed class action settlement is fair, adequate, and reasonable:

> (1) [T]he existence of fraud or collusion behind the settlement; (2) the complexity, expense and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and absent class members.

*Ayers,* 358 F.3d at 369 (citation omitted).  An examination of each of these six factors readily demonstrates that the proposed Agreement is unquestionably fair, reasonable, and adequate.

## A.    The Agreement Is Not a Product of Fraud or Collusion

As this Court is aware, this case has been vigorously litigated for well over three years, during which time Class Counsel has zealously pursued the best interests of the Class and Defense Counsel has been equally diligent in its defense.  Although Defendants ultimately agreed in April 2007 to stop contesting that DFCS operated in a manner harmful to Plaintiff children in violation of their constitutional rights, it took more than six months of further protracted negotiation for the parties to reach the terms of the Agreement.

There has been no suggestion that this settlement is the product of fraud or collusion.  In contrast to Rule 23(b)(3) class cases where issues of monetary relief

predominate, the motivation for fraud and collusion is diminished in a Rule 23(b)(2) case such as this one, where the nature of the relief sought and obtained for the class is declaratory and injunctive. In addition, the Honorable Reuben V. Anderson was appointed by this Court to mediate the six months of negotiations that resulted in the proposed settlement, and his involvement in the negotiations further supports the absence of fraud or collusion.

**B.      The Complexity, Expense, and Duration of the Litigation Support the Settlement**

This case, which involves nothing less than the manner in which the State provides for the care, safety, and permanency of the approximately 3,500 foster children in its custody, is undeniably complex. In preparation for trial, counsel for both parties reviewed hundreds of thousands of documents, and 27 fact witnesses, as well as six experts, were deposed. In addition to the breadth of documentary and testimonial evidence at issue, this case presented unsettled legal questions regarding the scope of Plaintiffs' constitutional substantive due process rights.

This long-running and hard-fought case has been expensive to litigate. Defendants are represented by a team of attorneys from the Attorney General's Office, the Governor's Office, and the private firm of Baker, Donelson, Bearman, Caldwell & Berkowitz, PC, while Plaintiffs' Counsel consists of attorneys from Children's Rights, Bradley, Arant, Rose & White, LLP, and Loeb & Loeb, LLP, and attorney Stephen Leech. In pursuing and defending the rights of their clients for over three years, the parties' attorneys have expended substantial amounts of time and resources. The litigation has involved two extensively briefed motions to dismiss, a motion for class certification, and cross-motions for summary judgment, as well as numerous discovery

motions.  Class Counsel also assembled a team of five experts who conducted thorough investigations and issued detailed reports on various aspects of the Mississippi foster care system.  Defendants likewise retained an expert who conducted her own substantial review of the system and produced a detailed report.

If this suit were to have proceeded to a remedial trial, the already extensive discovery would have required expedited updating, and the trial itself would have been time consuming and expensive.  Assuming Plaintiffs were successful, after further post-trial briefing, an eventual appeal could further delay relief.  Weighing the anticipated costs and delays associated with further litigation of this complex suit against the certain, immediate, and wide-reaching terms of the Agreement, the proposed settlement is in the best interest of the Class.  *See Ayers,* 358 F.3d at 369 (finding in favor of settlement where the agreement "eliminates the transaction costs that further proceedings would impose . . . . [and] provides relief for the class sooner than continued litigation would"); *Batchelder v. Kerr-McGee Corp.*, 246 F. Supp. 2d 525, 528 (N.D.Miss. 2003) (finding case complex based upon "the sheer scope of discovery, the large number of witnesses and the reams of documentary evidence," and holding that prospect of monumental expense and duration of litigating through trial and appeal governed in favor of settlement).

### C.    The Case Has Progressed to a Stage Where the Court, Counsel, and All Affected Parties Have Ample Basis to Evaluate the Settlement

At the time the parties reached the proposed settlement, this suit was in its final stage of proceedings, and the parties were well aware of the relative strengths and weaknesses of their respective positions. The Agreement was preceded by numerous motions and extensive discovery.  The fruit of that discovery was presented to this Court

in the voluminous summary judgment record.  In adjudicating the parties' cross-motions for summary judgment, the Court had ample occasion to assess the relative merits of the parties' legal arguments, analyze the deposition testimony of numerous witnesses, and review the reports of six experts, each of which identified and detailed the systemic deficiencies in Mississippi's child welfare system and how those deficiencies inflict harm on children in the State's custody.

All of this information and the Court's rulings on each motion and case management issue are matters of public record.  The class notice provided Class members, their representatives, and all affected persons with the means to access this information.  Not a single commentator has raised any complaint with respect to the adequacy of the development of the case record.  As the case has progressed to the stage where the Court, the parties, and all interested persons are well positioned to evaluate the settlement, this factor weighs heavily in favor of a finding that the Agreement is fair, reasonable, and adequate for absent Class members.

### D.    The Likelihood of Success on the Merits Supports the Settlement

In undertaking the analysis of the likelihood of a plaintiff's success, the Court "must not try the case  . . .  because '[t]he very purpose of the compromise is to avoid the delay and expense of such a trial.'" *Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983) (quoting *Young v. Katz*, 447 F.2d 431, 433 (5th Cir. 1971)).  Because Defendants have previously conceded liability, the probability of Plaintiffs' success on the merits has been resolved, leaving open only the scope of the remedial order.

Plaintiffs believe that at the remedial trial they would have prevailed in obtaining substantial relief.  Yet, obtaining the immediate and significant entitlements available to

13

the Class under the proposed settlement is far superior to awaiting a court-ordered remedy of less certain scope that would be implemented some indefinite time in the future following a potentially protracted appeals process. *See Batchelder*, 246 F. Supp. 2d at 528 (finding that this factor weighed in favor of settlement where "[r]egardless of which side prevailed at trial, lengthy appeals and expenses could be anticipated"). In light of the current harms to which Plaintiff children are exposed, as well as the far-reaching terms of the Agreement that will protect Plaintiff children from such harms, this factor weighs strongly in favor of approval of the Agreement.

### E.    The Range of Possible Relief Supports the Settlement

In assessing this factor, the Court must "establish, in effect, the point on, or if appropriate, below, the range of possible recovery at which a settlement is fair and adequate." *In re Corrugated Container Antitrust Litigation,* 643 F.2d 195, 212 (5th Cir. 1981). The Fifth Circuit has advised that in considering this factor, the range of possible recovery need not be "charted with precision," for to do so would introduce the same uncertainty and wasteful costs of litigation that settlement is designed to avoid. *Id.*

The relief obtained in the proposed settlement is extraordinarily comprehensive, detailed, and favorable to Class members, while still respecting the role, policies, and interests of the State. The 43-page Agreement and 19-page Period 1 Annual Implementation Plan address virtually every major DFCS deficiency alleged in the Complaint without undue delay, and COA will provide expert assistance to help the State meet these requirements. The benefits of the wide-ranging guaranteed relief, weighed against the substantial burdens on the Court and the litigants of holding a remedial trial, supports a finding that the Agreement is fair, reasonable, and adequate.

**F.    The Opinions of Class Counsel, Class Representatives, and Commentators Support the Settlement**

In assessing the adequacy of a class action settlement, this Court "is entitled to rely upon the judgment of experienced counsel for the parties." *Cotton*, 559 F.2d at 1330 (citation omitted). The Class is represented by, *inter alia*, Marcia R. Lowry, who has 34 years of experience litigating this type of constitutional challenge to systemic deficiencies in state or local operation of child welfare systems, and Wayne Drinkwater and Stephen Leech, both experienced Mississippi trial counsel. In Class Counsel's collective professional judgment, this settlement is in the best interests of Class members. (*See* Lowry Decl., attached hereto as Ex. C.) All named Plaintiffs and their Next Friends also support the Agreement. *Id*.

The class notice elicited seven written submissions to the Court regarding the proposed settlement, five of which are in full support of the Agreement. One submission, which was filed by a former Class member, details the harm she and her brother experienced while in DHS custody and confirms the need for the remedial relief provided under the Agreement. Only one objection to the Agreement was received, which challenges the scope and a variety of terms of the proposed settlement. While this Court is required to review and address each legitimate objection, there is no requirement to "open to question and debate every provision of the proposed compromise." *Cotton,* 559 F.2d at 1331. Further, "[a] settlement can be fair nothwithstanding a large number of class members who oppose it." *Id*. (citation omitted). In this case, none of the approximately 3,500 Class members or their representatives has filed an objection. All submissions received by the Court are compiled and attached as Exhibit 4 to Plaintiffs' Motion for Final Approval and are addressed *seriatim*:

**(1)      Comment of Professionals Advocating for Children Together (PACT)**

As stated in its submission, Professionals Advocating for Children Together (PACT) is a Southern Mississippi organization of professionals working "to find ways to help the Department of Human Services, Division of Family and Children Services, with its tremendous responsibility of safe guarding the health and welfare of the children" in the state.  The members of PACT, having "read and studied the Settlement Agreement and Reform Plan," fully support the Agreement, which they believe "has the great potential to set the standards for our state for the protection of children for the foreseeable future."  This submission supports the fairness, reasonableness, and adequacy of the settlement for Class members.

**(2)      Comment of Bishop Joseph N. Latino for the Catholic Diocese of Jackson, MS**

Bishop Joseph N. Latino of the Catholic Diocese of Jackson, Mississippi writes to support the settlement.  The Catholic Diocese oversees Catholic Charities, an agency that contracts with DFCS to provide foster care services.  The Bishop notes that based upon "what has been the experience of our Catholic Charities' Therapeutic Foster Care Counselors, DFCS is not only understaffed but there is also a lack of trained and qualified leadership from the top down."  The Bishop notes that enforcement of the Agreement is needed to remedy this staffing problem, and closes with the statement, "It would be a travesty to waste this opportunity to fix a broken system."  This submission supports the fairness, reasonableness, and adequacy of the settlement for Class members.

### (3)    Comment of Catholic Charities of the Diocese of Jackson, MS

Linda Raff, Executive Director of Catholic Charities for the Catholic Diocese of Jackson, Mississippi, writes in support of the Agreement. She "lauds the terms of the settlement" and notes the critical need for DFCS to bring in leadership who is qualified under the terms of the Agreement and able to "assume the grave responsibility of insuring that Mississippi's most vulnerable children are provided the care they need to become productive contributing members of society." Ms. Raff recommends a "nation wide search" for the most qualified individual to lead DFCS. This submission supports the fairness, reasonableness, and adequacy of the settlement for Class members.

### (4)    Comment of the National Association of Social Workers

Janice Sandefur, the Executive Director of the Mississippi Chapter of the National Association of Social Workers (NASW), writes on behalf of her organization in support of the Agreement. She notes that Mississippi's Chapter of NASW, as "an advocate on behalf of children and families, and the social workers who work with them," has supported action to improve DHS and DFCS for many years, as have many other child advocates. She states that the Chapter has been "continually frustrated at the deterioration of the department and the seriousness of the continued abuse and neglect of children in our state" and that the Chapter is "so pleased to support full implementation of the proposed Olivia Y. settlement." She cautions that until DFCS achieves full compliance with the provisions of the Agreement, "[c]hildren will continue to be neglected and harmed, and agencies will suffer retribution when speaking out for specific children." Ms. Sandefur also writes in support of the Agreement as an individual social worker who has worked with DHS and who knows "the critical need for this settlement

to be fully and consistently implemented." This submission supports the fairness, reasonableness, and adequacy of the settlement for Class members.

### 5) Comment of the Mississippi Social Work Education Consortium

Alinda Sledge, Chair of the Mississippi Social Work Education Consortium, writes on behalf of the Consortium to "<u>strongly encourage</u> the court to approve the *Olivia Y.* Settlement Agreement." The Consortium is "composed of the ten public and private institutions of higher education offering accredited social work degrees in the state." Ms. Sledge notes that "[t]he Agreement, if fully implemented, promises to correct any deep-seated problems in the state's troubled child welfare system." This submission supports the fairness, reasonableness, and adequacy of the settlement for Class members.

### 6) Additional Comments in Support

The class notice also prompted over 30 callers to contact Class Counsel regarding the settlement. (*See* Kraemer Aff., attached as Ex. 5 to Pls.' Mot.) Many of these callers had questions about the Agreement, and those who voiced an opinion supported it in its entirety. Not a single one of these callers expressed any opposition to the Agreement. *Id.*

In addition, Class Counsel participated in a forum for community members across the state who work with Class members to explain the proposed settlement and provide an opportunity for questions and comment. (*See* Nothenberg Decl., attached hereto as Ex. D.) The majority of those who spoke at the forum explicitly stated their strong support of the proposed Agreement, and not a single forum attendee expressed any opposition to it. *Id.* These responses to the proposed Agreement support a finding that it is fair, reasonable, and adequate.

### (7)     Objection of George Whitten

The sole objection to the Agreement is not from a Class member or anyone who represents a Class member.  It is filed by George Whitten, Jr., who purports to be the former General Counsel of DHS.[2]  Mr. Whitten objects to the terms of the Agreement signed on behalf of all of the Defendants, including DHS, the state agency which has responsibility for and custody of Mississippi's foster children, by Governor Haley Barbour and Attorney General Jim Hood.  His objections are based in large part on his personal beliefs in child-rearing practices that are inconsistent with the nationally recognized child welfare best practice standards incorporated into the Agreement.  He also takes issue with the scope of the Agreement, specifically with various protective measures of the Agreement that are designed to benefit the Class.  His objections are unsupported by any competent evidence and do not undermine the fairness, reasonableness, or adequacy of the Agreement.

Mr. Whitten first objects that various terms of the Agreement will discourage certain potential foster and adoptive parents from applying for foster home licensure. (*See* Ex. 4 to Pls.' Mot., Whitten letter at 1-6.)  He advocates that foster parents should be allowed to home-school and "spank" previously abused and neglected Class members. He speculates that others who share his beliefs will forego foster parenting because the Agreement requires the enrollment of children in school and because current DHS regulations against corporal punishment will now be enforced under the Agreement.  He also speculates that the Agreement's requirement that foster children be provided

---

[2]   The current DHS website does not indicate that there is a general counsel for DHS.

necessary mental health care, as required under federal law and DHS policy,[3] will discourage potential foster parents who object to administering medications prescribed by a qualified mental health professional. He further objects to limits placed by the Agreement on the number of foster children who may reside in a foster home, based on his own belief that certain foster parents are capable of caring for more than five children.

Mr. Whitten's personal opinions and speculations, however, do not call into question the parties' proposed detailed remedial order that addresses the violation of Plaintiffs' constitutional rights as conceded by Defendants. The select provisions with which he personally disagrees are consistent with current child welfare best practices as reflected in professional standards promulgated by such independent organizations as the Council on Accreditation and Defendants' own expert, the Child Welfare League of America.[4] That Mr. Whitten does not personally ascribe to certain established standards—developed by a wide range of national experts and agreed to by the responsible state officials following arm's-length negotiations—is an insufficient basis on which to reject the comprehensive reform plan designed to protect Class members from further constitutional harms. His further concern regarding the alleged loss of privacy for foster parents under the Agreement is also unfounded given that the confidentiality of foster parent information is already properly protected by Order of this Court dated August 5, 2004. (Docket No. 46.)

---

[3] *See* Early Periodic Screening, Diagnosis, and Treatment, 42 U.S.C. §§ 1396a(a)(10), 1396a(a)(43), 1396d(a)(i), 1396d (a)(4)(B), 1396d(r); 42 C.F.R. § 441.56; DFCS Policy Manual, Vol. IV, § D at 3350 (attached hereto as Ex. E).

[4] *See* CWLA Standards of Excellence §§ 2.33 (limit on number of children in foster home), 2.63-64 and 2.66-67 (mental health services), 2.70 (corporal punishment), 2.72 (school enrollment) (attached hereto as Ex. F); COA Accreditation Standards PA-FC 2.04 (mental health services), PA-FC 6.05 (limit on number of children in foster home), PA-FC 9.04 (school enrollment), PA-FC 16.06 (corporal punishment), *available at* http://www.coastandards.org/standards.php?navView=public.

Similarly, Mr. Whitten's objection to mandated caseworker and supervisor minimum professional qualifications, as well as to additional pre-service training for new caseworkers, is based on pure conjecture that these requirements will only worsen the current shortage of caseworkers. (*See* Ex. 4 to Pls.' Mot., Whitten letter at 6-7.) In fact, experts for both Plaintiffs and Defendants agree that not only can such reforms be achieved, but they will improve worker retention and are necessary for DFCS to function professionally and to protect children. (*See e.g.,* Steib Expert Rpt, March 31, 2006, at 15-17, 22-24 (attached hereto as Ex. G); Crabtree Expert Rpt, February 7, 2006, at 16-18, 87-89 (attached hereto as Ex. H).) Moreover, these requirements are consistent with professional standards such as those promulgated by COA. (*See* COA Accreditation Standards PA-FC 19, PA-TS 1-2, *available at* http://www.coastandards.org/ standards.php?navView=public.) There is no basis here to reject the parties' comprehensive settlement that mandates professionally recognized standards to remedy class-wide constitutional violations.

Mr. Whitten goes on to identify several purported legal conflicts that do not withstand scrutiny. (*See* Ex. 4 to Pls.' Mot., Whitten letter at 8-9.) First, none of the provisions regarding protective services in the Agreement "conflict with the law of the case," as Mr. Whitten argues. *Id.* It is undisputed that DFCS intake and child protection workers' responsibilities include screening and investigating reports of maltreatment of Class members. Thus, the provisions relating to intake and child protection worker caseloads to which Mr. Whitten objects are directly related to remedying the violation of

Class members' rights and were in fact recommended by Defendants' own expert.  (*See* Ex. G at 25-26.)[5]

Nor is there a conflict with state law, a matter which would presumably have been of some concern to the Attorney General, a signatory to this settlement.  Mr. Whitten misunderstands the Agreement to require that a "long-term placement agreement signed by DFCS and the relative" replace a court order of durable legal custody under state law. *Id.* (quoting Agreement at § II.B.3.a(2)).  No such provision exists or is contemplated by the parties.  The Agreement simply provides for a contractual agreement between DFCS and a relative agreeing to assume durable legal custody.  (*See* Ex. 1 to Pls.' Mot., Agreement at § II.B.3.a(2).)  That such a contract may entail further financial support after the entry of a court order of durable legal custody is not inconsistent with state law. (*See* Ex. 1 to Pls.' Mot., Agreement at § II.B.14.)  Rather, state law expressly allows such payments.  *See* Miss. Code Ann. § 43-15-17(3).

Mr. Whitten next assails the Agreement because it provides for annual Implementation Plans that are not yet determined.  What he perceives as a fault, however, is one of the unique strengths of the Agreement.  While the Agreement sets out the requirements that are to be met within five years and within earlier interim time periods, the annual Implementation Plans are to "set[] forth the steps that must be taken in that 12-month period in order to meet that Period's interim benchmarks and make the progress necessary within that Period to achieve overall compliance with the Plan within five years."  (Ex. 1 to Pls.' Mot., Agreement § I.A.)  The Implementation Plans beyond the

---

[5]  As the Agreement makes clear, individual caseloads are to be measured monthly.  (*See* Ex. 1 to Pls.' Mot., Agreement at § II.A.2.a(4).)  Defendants' CWLA expert did not distinguish between intake and investigation caseloads concerning Class members and non-Class members because Intake and Investigation workers are not designated to handle only one type of case.

Period 1 Plan will require no more of Defendants than to undertake the steps the parties jointly agree are necessary to comply with the terms of the Agreement that is before this Court. The virtue of this structure is that it will allow flexibility in the details of the implementation based upon current data and the degree of progress achieved in the prior year, but all within the parameters of the Agreement submitted to this Court for approval, and subject to the agreement of the parties and the neutral and expert participant, COA.

Finally, Mr. Whitten questions the independence and neutrality of the monitor based on her employment with D.C. Appleseed in Washington, D.C., from June 2003 to May 2004 (*see* Lopes Resume, attached hereto as Ex. I) and the fact that attorneys at Nebraska Appleseed later were co-counsel with attorneys from Children's Rights in a different case. (*See* Ex. 4 to Pls.' Mot., Whitten letter at 10-11.) First, Defendants, who were fully informed about the monitor's background, have consented to this monitor. Second, to suggest that an attorney should not be deemed independent and neutral because of her former employment with a law practice that is affiliated with, but entirely independent of, another law practice located across the country that later co-counseled in another case with Plaintiffs' Counsel is ludicrous.[6] Moreover, it is notable that among the many qualities Ms. Lopes brings to the position of monitor is her child welfare knowledge and experience gained from representing the District of Columbia *defendants* in a similar foster care class action reform suit brought by Children's Rights. (*See* Ex. I at 1.) Ms. Lopes' neutrality is unassailable.

---

[6] According to the Appleseed Centers' website, "Appleseed's 16 Centers function as independent organizations linked by the national network. Each Center recruits new staff and leadership, raises its own sources of funding, and develops its own projects and strategies for reform." *Available at* http://www.appleseednetwork.org/AppleseedCenters/AppleseedCenters/tabid/141/Default.aspx.

Mr. Whitten's objections do not provide any basis for questioning the fairness, reasonableness, and adequacy of the Agreement.

**III.**    **CONCLUSION**

The proposed terms of the Mississippi Settlement Agreement and Reform Plan are a fair, reasonable, and adequate resolution of this litigation for the Class. Accordingly, the Court should grant Plaintiffs' Motion for Final Approval and enter the proposed Mississippi Settlement Agreement and Reform Plan as an order of the Court. Respectfully submitted, this the 20th day of December, 2007.

/s Eric Thompson
Marcia Robinson Lowry (MBN 43991 *pro hac vice*)
Eric E. Thompson (MBN 43993 *pro hac vice*)
Shirim Nothenberg (MBN 43990 *pro hac vice*)
CHILDREN'S RIGHTS
330 7th Avenue, 4th floor
New York, New York  10001
Telephone:  (212) 683-2210

W. Wayne Drinkwater, Jr. (MBN 6193)
BRADLEY ARANT ROSE & WHITE LLP
188 East Capitol Street, Suite 450
Jackson, Mississippi  39201
Telephone:  (601) 948-8000
Facsimile:  (601) 948-3000

Stephen H. Leech (MBN 1173)
618 Crescent Boulevard, Suite 103
Ridgeland, MS  39157
P. O. Box 3623
Jackson, Mississippi 39207
Telephone:  (601) 607-4172

John Lang (MBN 43987 *pro hac vice*)
Christian Carbone (MBN 43986 *pro hac vice*)
John Piskora (MBN 44474 *pro hac vice*)
LOEB & LOEB LLP
345 Park Ave.
New York, New York  10154
Telephone: (212) 407-4000
*PLAINTIFFS' COUNSEL*

## CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2007, I electronically filed the foregoing Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Final Approval of Mississippi Settlement Agreement and Reform Plan with the Court using the ECF system, which sent notification of such filing to the following:

Dewitt L.  ("Rusty") Fortenberry Jr., Esq.
Kenya Key Rachal, Esq.
Gretchen L. Zmitrovich, Esq.
Ashley Tullos Young, Esq.
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC
428 I-55 North
Meadowbrook Office Park
Jackson, MS 39211
(601) 351-2400

Harold E. Pizzetta, III, Esq.
Assistant Attorney General
General Civil Division
Carroll Gartin Justice Building
430 High Street
Jackson, Mississippi  39201

*Attorneys for Defendants Haley Barbour, et al.*

/s Eric Thompson