

**SYSTEMS REVIEW OF THE MISSISSIPPI DEPARTMENT OF HUMAN
SERVICES, DIVISION OF FAMILY AND CHILDREN'S SERVICES**

**FINAL REPORT**

**Submitted by
Child Welfare League of America
March 31, 2006**

Exhibit G

Table of Contents

I.   Executive Summary ........................................................................................ i

II.   Introduction ................................................................................................. 1

III.   Systems Review Methodology .................................................................. 6

IV.   Findings..................................................................................................... 11

V.   Conclusions ............................................................................................... 39

References ........................................................................................................ 41

APPENDIX A Workload Study Description Analysis, and Findings.................... 44

APPENDIX B Guides for Interviews with Regional Directors ............................ 51

APPENDIX C Caseworker Service Need and Availibility Survey ...................... 56

APPENDIX D Caseworker and Supervisor Focus Group Interview Guides........ 67

APPENDIX E Consultant Vitas .......................................................................... 89

# I.  Executive Summary

This report describes a systems review of the Mississippi Department of Human Services, Division of Family and Children's Services (DFCS) that was conducted by the Child Welfare League of America under contract with the Mississippi Office of the Attorney General.  This review is part of the state's response to the Olivia Y., et al., vs. Haley Barbour class action lawsuit which alleges that the constitutional rights of children placed in the protective custody of DFCS were violated by virtue of the state's failure to provide them with basic care and protection.  The review was conducted with the full cooperation of DFCS and in partnership with agency staff at multiple levels.  Activities were guided by the need to answer two key questions:

1.  What are the major strengths and needs of MDHS/DFCS with regard to its ability to discharge its responsibility for the well being and permanency of children who have been placed in its custody?

2.  How can MDHS/DFCS act most strategically and expeditiously to address identified deficiencies in its capacity and practice related to serving, protecting, and attaining permanency for children in its custody?

**Review Methodology**

The following activities were undertaken to collect the data on which the findings and conclusions of this study are based:

- Review of documents including agency policies, data profiles, internal and external reports, and training materials;
- Review of case records of named plaintiffs in the litigation;
- Analysis of caseworker workload;
- Group and individual interviews with administrators, managers, supervisors, and caseworkers; and
- Survey of caseworkers regarding service needs and availability.

**Major Findings**

Mississippi's child welfare system suffers from a lack of sufficient resources to support the family-centered practice approach it is attempting to undertake. Major areas of need include:

*1. Staffing*

DFCS is under-staffed at all levels.  Many caseworkers carry workloads which are at least double the average number they can manage based on the workload analysis conducted in this review. Many supervisors also carry cases and have administrative duties in addition to providing supervision for

caseworkers. Administrative and management staff are inadequate to provide the support needed by those responsible for service delivery. This is particularly true with regard to staffing of the agency's policy, program management, and training units and the support of its automated data system.

The recruitment and retention of qualified staff is adversely impacted by heavy workload, low pay and lack of opportunity for advancement or cost of living adjustments. Delays in the hiring process further contribute to the agency's inability to hire the most qualified applicants.

*2. Training*

Training resources are so limited that new caseworkers are often on the job for weeks or months before they are able to attend training. Most supervisors have had no training specific to their supervisory role, and individual professional development plans are lacking for staff at all levels.

*3. Resources*

Agency staff are hampered in their efforts to serve children and families by a lack of resources. This is particularly true in the area of available placements for children. The lack of a sufficient number and variety of qualified foster family homes and supports for relative placements has forced an over-reliance on emergency shelters and the use of placements that are too far from children's families of origin.

This review confirmed several of the findings of Mississippi's federal Child and Family Services Review (CFSR) conducted in 2004. The state has begun to address some areas of need as outlined in its federal Program Improvement Plan and indicated in DFCS initiatives that were planned or underway when the study began. Positive action already taken or in progress includes:

- Submission of a request to the legislature for an additional $694,085.64 to fund modest pay increases for caseworker staff;

- Plans to outsource family preservation services to the private sector and shift the 49 caseworker positions allocated in DFCS for that function to delivery of services in the core child welfare programs in each county;

- Revision of foster care policy and issuance of desk references to separate policy and practice and provide easier reference for service delivery staff;

- Development of additional management reports to enable administrators and managers to track critical information such as rates of shelter care placement and case contacts;

- Development and issuance of a guide for regional action plans to identify and address specific service needs at the local level;

- Plans to achieve better results from the state's agency-university partnership funded through federal Title IVE;

- Initiation of a contract with a consulting group to maximize the state's access to federal funding; and

- Support of a shift to a family centered practice approach through issuance of a practice guide, greater emphasis on engaging and teaming with families, and delivery of training to all service delivery staff.

The level of participation of DFCS personnel in this review also reflects positively on the agency's desire to more specifically identify strengths and needs as a basis for internal planning and justification of requests for necessary resources. DFCS has begun to lay a foundation that will enable it to better respond to the needs of children and families in Mississippi. The success of these efforts will be reliant, as it is in any child welfare system, on the provision of the resources necessary to support the building of a workforce sufficient in number and skill and an organizational structure and environment that supports them in doing this very difficult and important work.

## II. Introduction

### A.  Agency Request for Consultation

The Child Welfare League of America (CWLA) was asked to provide consultation to the Mississippi Department of Human Services, Division of Family and Children in connection with the Olivia Y., et al., v. Haley Barbour lawsuit which had been filed in March, 2004.  This lawsuit alleges that the constitutional rights of children in the custody of MDHS have been violated by the state's failure to provide basic care, including health, mental health, and educational services, to children in its custody. It is further alleged that children are placed in unsafe, unlicensed family homes or facilities that fail to protect them from harm or to provide the least restrictive placement.  Additionally the suit alleges that these children are not provided with the timely and appropriate services needed to ensure that they are safely reunited with their families or, when that is not possible or advisable, moved to another permanent home.

After a period of discussion and negotiation, a contract between the Mississippi Office of the Attorney General and CWLA was finalized on June 16, 2005. Specific work to be performed under the terms of this agreement included the following:

- Review MDHS/DFCS' policies, procedures, and organizational structures in order to understand MDHS/DFCS' system and how they can maximize their resources through both staffing and current financial budgetary funding.

- Analyze the structure, caseload, workflow, case management and capacity of MDHS/DFCS' staff who serve children in its custody. Make recommendations for needed changes in these areas based upon prior models and studies of others similarly situated states, and provide assistance in developing and crafting a program evaluation tool in these areas to be used by MDHS/DFCS.

- Provide expert testimony as to the issues before the United States District Court for the Southern District of Mississippi in the case styled Olivia Y., et al. v. Haley Barbour, as Governor of the State of Mississippi, et al., Civil Action No. 3:04-cv-25 ILN. This testimony will include, but not be limited to information gathered through review and analysis of MDHS/DFCS' policies, procedures, organizational structures, caseload, workflow, case management, and capacity of MDHS/DFCS' staff to meet and serve the needs of the children who are in the custody of MDHS/DFCS.

The goals of the systems review and workload and workflow analysis were to provide information that would inform and support the efforts of the current administration to address systemic barriers to effective service delivery, especially in the area of foster care services as these are the focus of the class action lawsuit.

1

At the request of MDHS/DFCS and the attorneys representing the Office of the Attorney General, this review focused most strongly on issues related to workload, professional development, and the practices and processes that characterize services to children in the foster care system and their families. This report provides the findings of that review and the recommendations for changes based on those findings.

It should be noted that this review was conducted in the months immediately following the state's having been hit by Hurricane Katrina, the most devastating storm in United States history. The storm virtually wiped out large portions of the coastal regions, effecting heavy damage through the entire lower half of the state, displacing many DFCS offices, courts, and offices of service providers, and calling for deployment of staff throughout the state to emergency duty for several weeks. Even in the northern portions of Mississippi less directly affected by the storm, communities faced a large influx of storm refugees. In light of the obvious impact of this event, it is possible that some aspects of this review are not reflective of regular agency operation.

## B. CWLA Capacity

The Child Welfare League of America is the nation's oldest and largest membership-based child welfare organization. It is well-known and respected as a champion for children, advocating on their behalf since 1920. As the nationally recognized standard-setter for child welfare services, CWLA provides direct support to agencies that serve children and families, improving the quality of the services that they provide to more than 9 million children every year. Through its programs, publications, research, conferences, professional development, and consultation, CWLA speaks with authority and candor about the status and the needs of America's children, young people, and families. CWLA staff possess broad expertise in child welfare and related fields, including direct service delivery, public and private agency administration, research, and data technology systems.

This systems review was led by two CWLA consultants. Their vitas are included in Appendix E.

## C. Agency Overview

Child welfare services in the state are administered by the Division of Family and Children's Services (DFCS) within the Mississippi Department of Human Services (DHS). The stated mission of the social service system, including private non-profit providers, local government agencies, and state agencies is to protect vulnerable children and adults from abuse, neglect or exploitation; support family preservation and community living; and prevent family violence and disruption.

Mississippi is a largely rural state comprising 82 counties. More urban areas include the capital city of Jackson which is centrally located, larger towns in the

coastal area just east of New Orleans, Louisiana, and the area in the northwest part of the state where towns make up the metropolitan area of Memphis, Tennessee.

Most child welfare services are delivered at the county level through 84 offices that are part of a nine-region organizational structure.  County staff provide intake, child protection investigation, foster care, and in-home services to families in which children have been deemed in need of protection.  Currently, personnel responsible for adoptions and licensing of child placement agencies and resource families are assigned to three regions which cover the entire state for these functions.  Each of the nine regions is administered by a Regional Director who reports to the Director of Field Operations in the DFCS State Office.  The Director of Field Operations reports to the DFCS Director as does a Director for Data and Fiscal Operations.  Programmatic functions are managed through unit managers for Prevention, Protection, and Placement.

At the end of federal fiscal year 2005, there were 3,288 children in the custody of MDHS/DFCS, an increase of 368 over the previous year (MS CFSR Data Profile, December 8, 2005).  The agency uses a "primary client" designation as a means of counting cases.  Currently, it employs approximately 265 caseworkers who serve about 11,674 primary clients or an average of about 44 primary clients per worker.

## D.  Mississippi's Child and Family Services Reviews (CFSR)

Given that current state efforts toward child welfare systems reform are largely driven by the federal CFSR standards, it is useful to consider where Mississippi stands with regard to these indicators and how it compares with other Southern states.  The CFSRs, which are conducted by the U.S. Children's Bureau in the Department of Health and Human Services, assess states' performance in relation to seven outcomes related to child safety, permanency, and well-being.  This is done based on the state's self-assessment, extensive interviews with persons involved in and with the child welfare system, and reviews of a sample of 50 cases in each state.  A series of six quantitative measures related to (1) the incidence of repeat child maltreatment; (2) incidence of maltreatment of children in foster care; (3) re-entry of children into foster care within twelve months of a prior discharge; (4) length of time to required to achieve family reunification; (5) stability of foster care placements; and (6) length of time required to finalize adoptions are reviewed.  State programs are also reviewed on seven systemic factors designed to determine the extent to which the state agency has implemented state plan requirements that build the capacity to deliver services leading to improved outcomes.  These systemic factors include: (1) statewide information systems; (2) a case review system; (3) a quality assurance system; (4) staff and provider training; (5) service array; (6) agency responsiveness to the community; and (7) foster and adoptive parent licensing, recruitment and retention.

Mississippi's review was conducted in February 2004 and the final report issued in May 2004.  The state met the national standard for two of the six quantitative measures, those pertaining to repeat maltreatment and re-entry of children into foster care.  Their performance on these measures as compared to other Southern states and as compared to the federal standard is shown in Table 1 below.  It was also found to be in compliance with two of the seven systemic factors, those of agency responsiveness to the community and foster and adoptive parent licensing, recruitment, and retention.  It was not found to be in substantial compliance with any of the seven outcomes related to safety, permanency, and well-being, although it was noted that performance varied considerably with some strengths apparent in each.

**Table 1: Southern States' Performance on Six Quantitative CFSR Measures**

| State | Repeat Maltreatment 6.1% | A/N in FC .57% | FC Re-entry 8.6% | Reunification 76.2% | Adoption 32% | Place. Stability 86.7% |
|---|---|---|---|---|---|---|
| AL | 5.20 | 0.15 | 7.90 | 63.00 | 13.10 | 96.40 |
| AR | 4.22 | 0.29 | 10.57 | 83.38 | 26.02 | 68.63 |
| GA | 4.22 | 1.08 | 4.43 | 63.05 | 23.05 | 92.29 |
| LA | 6.80 | 0.58 | 7.80 | 65.00 | 11.60 | 83.30 |
| MS | 4.60 | 0.59 | 4.60 | 56.70 | 19.00 | 55.00 |
| NC | 7.98 | 0.83 | 1.19 | 57.66 | 25.96 | 61.29 |
| SC | 3.4 | 0.51 | 6.60 | 82.10 | 14.00 | 76.00 |
| TN | 2.80 | .60 | 10.10 | 61.30 | 10.50 | 61.10 |

*Shading indicates that the state met or exceeded the federal measure.*

**Table 2: Compliance with Seven CFSR Outcomes/Systemic Factors**

| State | Outcomes | Systemic Factors |
|---|---|---|
| AL | 1 | 6 |
| AR | 1 | 7 |
| GA | 0 | 7 |
| LA | 1 | 7 |
| MS | 0 | 2 |
| NC | 0 | 7 |
| SC | 1 | 5 |
| TN | 0 | 4 |

All states must develop a Program Improvement Plan (PIP) to address deficiencies identified in the CFSR.  Mississippi's PIP was approved by the U.S. Children's Bureau in May 2005.  The plan identifies family-centered practice as its foundational principle and is organized around six priority goals for program improvement:

- Ensure that the safety of children is the first priority.

- Achieve timely permanency outcomes.

4

- Enhance families' capacity to care for children and be actively engaged in the decision-making process.

- Increase community involvement and shared responsibility for the well-being of children and families.

- Improve the quality and consistency of practice statewide by actively engaging and supporting staff at the local level.

- Enhance quality assurance methods to reinforce practice and inform staff.

Key strategies identified to achieve the above goals are

- Increased use of family team meetings;

- Streamlining of cumbersome policy manuals;

- Development of user-friendly practice guidebooks;

- Development of Regional Action Plans that identify and address local service needs;

- Development and implementation of additional caseworker and supervisory training;

- Development of new screening and assessment tools;

- Development of a new statewide recruitment and retention plan for family placement resources;

- Enhancements to the automated data system (MACWIS); and

- Development of community collaboratives for service coordination.

Work was begun on several of these initiatives during the spring and summer of 2005. A national group (Adopt U.S. Kids) was engaged to assess the need for family placements and consult on the development of a resource family recruitment and retention plan. The PIP relies heavily on technical assistance from the U. S. Children's Bureau's National Child Welfare Resource Centers, particularly in the development of training and resource guides. A training manual and guide for family centered practice was developed with assistance from the National Resource Center for Family Centered Practice and the University of Southern Mississippi School of Social Work, and the National Resource Center for Child Protective Services assisted in creating a screening and assessment tool.

Work on the plan came to a standstill for a period after Hurricane Katrina hit the state in August, 2005. Subsequently, the U.S. Children's Bureau offered an opportunity for the state to renegotiate its plan to better reflect its needs and capacity in the wake of the storm. Federal officials met with DFCS administrators and managers in January, 2006 and the new plan is currently being drafted.

**E. State Foster Care Data Profile**

It is generally considered better for children in out-of-home care to be placed with families rather than in group care.  The CFSR Data Profile of December 8, 2005 shows that, on the last day of federal fiscal year 2005, 74% of the children in MDHS/DFCS custody were in family placements, an increase of 4% from the prior year, and of 23% over 2003.  About 25% of children are in some type of congregate care (group homes or institutions), down from 28% in 2004, but an increase over the 23% recorded in 2003.  These data on the number of children entering care during the past three federal fiscal years show a greater increase in family care placements from 45% in FY 2003 to 95% in FY 2005 as depicted in Table 3 below.

**Table 3: MS Children in Family Placements – Entry Cohort**

| Federal FY 2003 | Federal 2004 | Federal 2005 |
|---|---|---|
| 46% | 69% | 95% |

The last year for which comparative data is publicly available is 2003.  Table 4 depicts MS in relation to other Southern states on length of stay in foster care and placement stability.

**Table 4: Median Length of Stay (LOS) and # Placements**

| State | LOS (month) | # of Placements |
|---|---|---|
| AL | 18.3 | 2.0 |
| AR | 12.6 | 3.0 |
| GA | 13.8 | 1.0 |
| LA | 14.5 | 2.0 |
| MS | 15.9 | 2.0 |
| NC | 14.0 | 4.0 |
| SC | 19.3 | 1.0 |
| TN | 11.4 | 2.0 |

# III. Systems Review Methodology

In conducting this systems review, CWLA consultants engaged people at all levels of DFCS to gain the most comprehensive understanding of the agency and its operation possible within the scope of this project.  Small representative work groups were relied on as much as possible for data collection in order to gather information with minimal disruption of regular work activities.  This was especially important in view of the impact of the recent hurricane as well as the fact that many staff across the state were involved in additional activities related to the implementation of the state's federal Program Improvement Plan.

Areas of inquiry were based on those factors which experience and research have found to be the foundational requisites of a successful child welfare system. These include:

- A service delivery workforce, particularly caseworkers and first-line supervisors, of a size sufficient to meet the needs of the service population;

- A workforce with sufficient skills to accurately assess child and family strengths and needs and engage families in the selection and use of services targeted to address their needs;

- Organizational supports that create a positive work environment, guide and sustain effective practice, and ensure accountability; and

- An array of resources that can be accessed to fulfill service needs.

**A.  Research Questions:**

1. What are the major strengths and needs of MDHS/DFCS with regard to its ability to discharge its responsibility for the well being and permanency of children?

2. How can MDHS/DFCS act most strategically and expeditiously to address identified deficiencies in its capacity and practice related to serving, protecting, and attaining permanency for children?

**B.  Data Collection**

A variety of activities were undertaken to gain a basic understanding of the structure and of the administration and management in MDHS/DFCS, its workforce, and its practices, especially those related to services provided to children in out-of-home care.  These activities are enumerated and described below:

*1.  Document Review*

CWLA consultants developed a partial document request at the outset of the project based on their knowledge of child welfare agency operation.  Additional documents were requested as their existence and relevance were disclosed either in materials already requested or in contacts with DFCS staff.  Documents reviewed included the following:

- Policies pertaining to agency administrative policy and programmatic activities;

- Written guidelines for family-centered strengths and needs assessment and family centered practice;

- Agency organizational charts;

- Agency job descriptions;

- Agency data profiles;

- Agency reports including:

  ◇ Mississippi Program Improvement Plan
  ◇ Foster Care Review
  ◇ Client Satisfaction Survey Reports
  ◇ Resource Family Recruitment and Retention (draft);

- Management documents including:

  ◇ Staff Guide to the Regional Action Plans
  ◇ Reorganization white paper

- External reports including:

  ◇ Mississippi Child and Family Services Review Final Report
  ◇ Citizen's Review Board

- Transcripts of depositions in Olivia Y.

### 2.  *Workload Review and Analysis*

Workload and other personnel issues are among the most significant challenges facing child welfare systems in the United States today.  As they attempt to serve a population that is growing in both number and complexity of need, many human service agencies, both public and private are grappling with high workloads, high turnover and vacancy rates, and the inability to recruit staff with the requisite knowledge and skill for effective practice in this demanding field.

In Mississippi, documentation provided indicates that turnover among entry level social work staff as of August 2005 was 35.36%.  The vacancy rate across all caseworker positions stood at nearly 19%.  High rates of turnover are of significant concern for two reasons.  First and most importantly, research has shown that change in caseworkers is strongly associated with delays in children's attainment of permanency outside of the foster care system (Potter & Klein-Rothschild, 2002).  Secondly, turnover is costly to agencies (Graef, & Hill, 2000).

Based on their recognition of the importance of this issue in service delivery, the MDHS/DFCS administration requested that a caseworker workload analysis and recommendations for staffing be a major focus of the CWLA systems review.  In response, CWLA consultants worked with a group of agency staff representing each region of the state to examine the case-related job functions of DFCS caseworkers and the amount of time required to complete activities and sub-activities associated with each function.

### 3.  *Training Review*

CWLA consultants reviewed the following training materials:

- Modules used in the *Intensive Training* series for new caseworkers;

8

- Documents describing a pilot *Learning Labs* training for supervisors which was tested in two regions (1 West and 1 East) in the northern part of the state; and

- A summary of the new *Family Centered Practice* training currently being delivered to staff statewide during February and March, 2006.

In addition, several university personnel involved in the agency's Title IVE training program were interviewed regarding the *Learning Labs* supervisory training and the agency training director, director of the supervisory training work group, and the Division Director were interviewed regarding plans for further training development.

### 4.   Interviews with Administrators and Managers

Two group interviews were conducted with management staff appointed by the Division Director to provide information to the CWLA consultant team.   This group included two unit directors in state office and three Regional Directors. Interviews were guided by two documents, (1) a paper that linked issues expressed in the Olivia Y. complaint with related agency initiatives and (2) with an analysis of key points in the agency's foster care program policy.

Interviews with the Regional Directors group solicited their views of strengths and needs in three areas:

> *Workforce:*  Factors that impact their ability to hire and retain staff; quality and preparation of staff

> *Placement Resources*:   Factors that impact the agency's ability to recruit, prepare, and retain an array and distribution of placement providers, particularly resource families, that meet the needs of the children in MDHS custody; and

> *Administrative Support:*   The type and degree of supports needed and received from the state level.

Interview guides for the meetings with the Regional Directors are contained in Appendix B of this report.

### 5.   Attendance at Management Meetings

CWLA consultants also participated in two meetings of management staff.  The first was a meeting of the Policy and Practice Work Group which was attended to gain a better understanding of the policy development process currently used and the status of policy changes underway in the organization.  The second was a meeting of the Regional Directors, administrators, and middle managers involved in reviewing the state's PIP in preparation for re-negotiation with the project officers in federal Region IV.   Attendance at this two day meeting provided more in-depth knowledge of the status of PIP goals and strategies and of barriers to their completion.

### 6. Caseworker Survey

Caseworkers were surveyed to determine the major service needs of children in MDHS custody and their families and the availability and accessibility of those services. These surveys were distributed through the Regional Managers, who transmitted them to their supervisors with the instruction that they be distributed to all caseworkers assigned to children in agency custody. A total of 138 usable surveys were received, representing a response rate of 52%. A copy of the survey instrument is contained in Appendix C.

### 7. Focus Groups with Caseworkers and Supervisors

In order to gain a better understanding of factors that directly affect the ability of front line staff to perform their jobs, CWLA conducted a series of focus groups around the state. Focus groups are an accepted qualitative research technique particularly suited to gathering information about the day-to-day experience, attitudes, and beliefs of persons who are related by their common involvement in a particular situation or activity, in this case employment in Mississippi's child welfare system.

Group interviews were conducted in regions II, III, and VII during the week of March 13, 2006. These regions were selected for their geographic location and rural-urban representation. The Regional Director in each was asked to randomly select eight caseworkers and eight supervisors from their staff roster to participate in the groups. One group of supervisors and one group of caseworkers was interviewed in each of the three regions. The interview questions were designed to solicit information about factors that either impede or facilitate caseworkers' and supervisors' fulfillment of their job responsibilities and to examine work flow in order to identify any areas where service delivery and facilitation of permanency for children in agency custody might be handled more efficiently.

A total of 22 caseworkers and 18 supervisors participated in the interviews. All of the caseworkers worked directly with children and families; one also recruited and trained foster and adoptive families. Five of the participating supervisors indicated that they work directly with children and families in addition to supervising caseworkers. One supervisor also recruited and trained foster and adoptive families in addition to doing direct casework and supervision of staff. Focus group interview guides and summary interview data may be found in Appendix D.

### 8. Review of Named Plaintiffs' Cases

Case record materials and additional documentation regarding services delivered to eight named plaintiffs were reviewed and analyzed. The focus of this review was to determine the adequacy of services to these children and their consistency with standards for reasonable practice at the time they were delivered. The findings of this review are provided in a separate document.

10

# IV. Findings

## A. Organizational Supports

Although effective child welfare service delivery is most directly dependent upon front line staff, it is well established that staff cannot function optimally without a full complement of administrative supports. These include accurate and up-to-date policies and practice guidelines, quality assurance and data tracking systems, and the availability of programmatic expertise to provide policy interpretation and consultation in the myriad unique situations that inevitably occur in the daily delivery of services to children and families. Policies, procedures, and organizational structures must provide clear and sufficient guidance and support to staff in making sound decisions, delivering services targeted to match the needs of the client population, and in setting and attaining reasonable goals for the protection of children.

### 1. Policy

The following policies were reviewed:

- Administrative
- Child Protection Investigations
- Adult Protective Services
- Foster Care
- In-home Services
- Interstate Compact for the Placement of Children

For the most part, DFCS policies are consistent with at least minimally acceptable expectations for child welfare practice. As in many agencies, however, policy manuals also include practice guidelines, making them too lengthy to be easily usable and creating difficulty for staff in trying to distinguish legal or regulatory requirements from practice guidance. DFCS has already recognized the need to separate practice guidelines. It is expressed in the Program Improvement Plan and this work is underway with technical assistance from several of the National Child Welfare Resource Centers. A handbook for family centered practice has already been developed and numerous policy memoranda have been issued including directives that prohibit the use of paraprofessional staff such as homemakers for making required monthly contacts with foster children.

*Policy Concerns*

The following are key areas of concern that were noted in foster care policy (Volume IV of the DFCS policy manual):

11

♦ Emergency shelter is listed first among placement resources, and considerably more content is devoted to this type of placement. This fact alone may suggest to staff, especially those working under pressure of time, that shelter placement is to be considered the option of first resort. Although policy provides that shelter placements be limited to no more than 45 days in a six month period, there are few restrictions placed on the conditions under which emergency shelter care can be used. It is stated that infants and preschool children should be placed in family care but there are no guidelines regarding its use for other children.

♦ Although policy supports concurrent planning, the practice of working on an alternative permanent plan while also pursuing family reunification as a means of expediting permanency, it does not clarify precisely to whom or when it should be applied or how decisions regarding foster-adoptive placements should be made.

♦ There is insufficient emphasis on working with families; rather the focus is on making contact with children. Both are critically important as children cannot be safely returned to their families if the parental problems that led to their removal are not addressed.

♦ There should be better clarification regarding the role of homemakers and aides in relation to casework staff. One aspect of the role that is not clear in policy is when the need to transport a child is simply a transportation event and when it is of a much more sensitive nature and should be handled by the child's social worker or perhaps by a foster parent and/or a member of the child's family. In interviews, CWLA consultants heard repeated references to paraprofessional staff transporting children for changes in placement, court appearances, and attendance at therapy. These are emotionally-charged events that represent critical points in the casework process and should not be delegated to persons not trained to assess and respond to the child's reactions.

*Policy Development and Issuance*

A finding of significant concern regarding policy development is that DFCS is understaffed for this function. Currently, only one person is assigned full time to the writing and issuance of policy and this position was only created during 2005 under the current administration through the reassignment of a Foster Care Reviewer. Further, Regional Directors and other managers are called to attend lengthy meetings to develop and write policy, taking them away from their regular work. Although input from staff at multiple levels is an important part of policy development, a system for doing this more expeditiously and with less demand on the time of other staff could be implemented if there were a policy unit with this capacity. Policy and practice guide drafts might, for example, be circulated through the Regional Directors and their comments and those of other staff

assigned to review reconciled and integrated by policy writers. The current system also results in new directives too often being issued in the form of memoranda that do not clearly delineate the parts of existing policy they replace or modify. There is concern that policy memos may not be consistently distributed to service delivery staff. This can result in some staff following obsolete policy simply because they are not aware of new issuances or do not fully understand their impact.

---

**Recommendations:**

1.  DFCS should continue its efforts to separate policy and practice and to develop practice handbooks that are easier for caseworkers and supervisors to use.

2.  Practice guides and policy revisions should address the concerns identified above with regard to foster care policy content in the areas of shelter placement, concurrent planning, working with parents, and the role of paraprofessional staff.

3.  A state level policy unit is needed. This unit should have sufficient staff with the expertise and experience required to track policy for needed revisions, solicit and organize staff input, and to write, circulate, and issue materials timely and in a manner that ensures that changes are incorporated into existing manuals and consistently distributed to all staff.

---

### 2.  Information Systems

The agency uses an automated data system, the Mississippi Automated Child Welfare Information System (MACWIS) for virtually all documentation and data tracking. The reliance on over-burdened casework staff alone to enter data into MACWIS means that record keeping is often not up to date. However, the most serious issue with MACWIS appears to be the lack of staff to manage programming and to correct problems in the system. A number of delays in implementation of new practice initiatives called for in the state's PIP are due solely to the lack of capacity to program MACWIS so that they can be documented. An additional problem is that MACWIS overwrites case histories meaning that neither caseworkers, supervisors, nor other reviewers have access to all relevant information concerning children and families.

In order for an automated data system to be reliable, those responsible for entering the data must have an investment in its accuracy. This typically occurs when a system is able to provide regular reports and responses to queries that are useful in guiding and managing the work of staff at all levels. Any lack of reliability in MACWIS' may be at least partially due to its inability to be responsive to the needs of caseworkers and middle managers.

Interviews with current administrators indicate that they have attempted to improve the quality and quantity of MACWIS reports to the regions in accordance

with the needs of Regional Directors to be better informed concerning key case management activities. Efforts have been made to understand the problems associated with MACWIS and plans are underway to add staff who can make adjustments that will enable the system to better support the work of both management and service delivery staff.

---

**Recommendations:**

4.  Pursue current plans to add staff to expedite programming, and to work as quickly as possible with a representative group of field staff to identify and correct shortcomings in MACWIS.

5.  Assure that tracking and exception reports for key activities are issued and distributed.

6.  Develop and implement a standard process for MACWIS revisions and enhancements based on input from staff at all levels.

---

### 3.  Quality Assurance

Foster Care Review (FCR) serves as the quality assurance system for services to children in out-of-home care and their families. FCR is conducted by DFCS staff. As is required by federal regulation, these reviewers do not have direct responsibility for the reviewed case. There are currently 13 positions assigned to FCR. One, however, has been allocated to the policy unit. Reviews are conducted at six month intervals for all children in agency custody. A single FCR worker reviews case record documentation, facilitates the agency's family team meeting (County Conference), and completes a standard evaluation form that assesses compliance with policy.

Lack of a quality assurance system was among the systemic factors cited as needing improvement in the CFSR. Although the agency still lacks a quality assurance system for other service programs, there have been some enhancements to FCR in the two years since the federal review. Efforts to improve the consistency and utility of the FCR process include:

*   More in-depth review of a monthly random selection of three cases per region;

*   Expansion of review instruments;

*   Systematic state level review of FCR reports and issuance of case status reports to Regional Directors so that follow-up can be made on cases with deficiencies cited; and

*   Development of a County Conference guide for reviewers and county staff.

Efforts are also underway to improve tracking of cases through MACWIS to insure that reviews are conducted on all cases. Longer range plans are for more

detailed entries of review findings into MACWIS to ensure that a complete record of all reviews is maintained. FCR has also developed a client satisfaction survey that is administered at each County Conference. Other participants such as CASA, guardians ad litem, and foster parents have an opportunity to complete these surveys.

An administrative review process such as FCR serves an important function in assuring adherence to policy requirements for children in out of home care. It does not, however, replace a comprehensive integrated quality assurance system.

---

**Recommendations:**

7.   FCR data should be incorporated into MACWIS.

8.   Feedback from reviews, including a compilation of client satisfaction surveys, should reach to the worker level as well as to supervisors and Regional Directors through regularly issued management reports.

9.   Ultimately, DFCS should establish a separate continuous quality improvement system that covers all service delivery.

---

### *4. Training*

*Intensive Training (Caseworker Pre-Service)*

The Intensive Training for new caseworkers is designed to be a four-week curriculum delivered one week at a time, with workers returning to their offices between sessions for supervised application. Curriculum materials provided to CWLA revealed that it contains significant content consistent with generally accepted practice standards. However, a number of concerns related to organization of the materials and their utility as a guide for trainers were identified in this review. Ideally, training should be based on a set of competencies and clearly identified learning objectives; these could not be discerned in the materials provided. It also appears that the curriculum is in need of updating with references to more current research and data.

A particularly troubling aspect of the current system for training new workers is that they are often unable to begin the training upon being hired. If a caseworker is hired after a session has begun, it is necessary for that individual to wait until the start of the next session to enroll. That time may be several weeks or even months. Both managerial and casework staff reported that it is common for new staff to be assigned cases prior to being trained.

The DFCS administration has described plans to institute a pre-service training curriculum that would be provided to all new caseworkers before they are actually assigned responsibility for cases. This is planned to follow a model used in several other states in which new caseworkers participate in classroom

15

training interspersed with on-the-job mentoring by a supervisor or experienced worker for a combined training period of twelve weeks. To this end, the agency has hired a training director and assigned four staff positions to the state level training unit. Plans also call for new Program Manager positions which have been requested for each region and for Area Social Work Supervisors (ASWS) to fulfill some responsibilities related to staff development.

This plan represents a significant enhancement to the agency's training capacity. However, attention should be paid to whether the new positions allocated to this function are at a level sufficient to attract experienced personnel with the unique skills needed to develop and deliver effective training curricula. Further, the agency's recent shift from nine to seven regions increases the scope of work for Regional Directors and may mean that the new Program Manager positions assigned to them will need to be primarily administrative in function, leaving little time for training activities. The expectation that a single individual will have the requisite skills to perform both training and managerial functions at an optimum level may also be unrealistic.

---

**Recommendations:**

10. Develop a trainer's guide and participant workbook using existing material and updated research findings.

11. Follow through with plans to fully staff the state level training unit.

12. If persons with child welfare experience and in-depth knowledge of the content which they are training are not available for regular training positions in the agency, training positions should be assigned administrative and coordinating functions and content experts obtained through contractual arrangements.

13. Develop materials that provide for transfer of learning, such as a structured mentoring process, self-guided learning materials, and assessment of skills and knowledge attained.

14. Design and implement a professional development process that is based on an individualized assessment of learning needs.

---

*Training of Supervisors*

A supervisory training work group established by DFCS has recommended development and implementation of a three level training program for supervisors. This will begin with Level One which will be individualized and delivered by regional directors or Program Managers through a mentoring model so as to accommodate newly hired supervisors without the necessity of waiting for several new supervisors to form a group for classroom-based training. Level Two is envisioned to provide intermediate level clinical knowledge and skills needed to guide caseworkers in service delivery and to promote a learning environment within the agency. Level Three would provide more advanced level clinical skills.

The work group has recommended that Level Two be built on the *Learning Labs* training for supervisors that was delivered in two northern regions of the state through the University of Mississippi School of Social Work under a demonstration grant. It was part of a multi-site pilot conducted by the Southern Regional Quality Improvement Center at the University of Kentucky. The pilot in Mississippi took place in Regions 1 East and 1 West and was carried out over a two year period ending in 2005. CWLA consultants were provided with an overview of the curriculum and some sample activities and agendas for review. Strengths noted in this review are that the curriculum is competency-based and uses individualized assessments of learning needs. It emphasizes clinical skills development, mentoring, and collaboration.

Participants who were interviewed viewed the curriculum very favorably, believing that it had resulted in better skills among participating supervisors and had improved both the learning environment and workplace morale of supervisors and first line staff. An overview of this training had been provided to all Regional Directors and several indicated a desire to have it delivered in their regions.

Evaluation results of the *Learning Labs* are being compiled and are scheduled to be published later in March, 2006. The University of Mississippi faculty member who is conducting the evaluation was interviewed and reported that the evaluation used a comparison of two other regions not receiving the training. Two measures were used, one of professional organizational culture, and the other of caseworker self-efficacy (Ellett, Ellett, and Rugutt, 2003). These are measures developed for use in the child welfare field and tested in other public agency studies. The pilot evaluation found a modest but significant improvement in both organizational culture and caseworker self-efficacy in the pilot regions.

---

**Recommendations:**

15.  Give priority to the development and implementation of Level One supervisory training.

16.  Commit to providing ongoing training for all supervisors. This should include not only agency-sponsored but also the opportunity to attend at least an occasional external conference or workshop.

17.  Consider adopting the *Learning Labs* training for state-wide implementation. Additional evaluation methods could be used to that would more directly assess the impact of the training on supervisor and caseworker performance and client outcomes.

18.  Ensure that any training for supervisors include a focus on their role in supporting and mentoring subordinate staff.

19.  Obtain internal expertise or work with consultants to develop more advanced training and a system that provides for ongoing professional development of supervisors based on regular assessment of their learning needs.

---

17

*Family Centered Practice Training*

Family Centered Practice training is currently being offered to both caseworkers and supervisors throughout the state. Interviews with caseworkers, supervisors, and managers indicated that this training is being well received. Several of those interviewed suggested that adoption of a family centered approach might eventually lead to lowered caseloads if they are able to engage families earlier and do a better job of connecting them with community and informal resources.

> **Recommendation:**
>
> 20. Content from the family-centered practice curriculum should be incorporated into the training curriculum for new staff and monitored and reinforced by supervisors.

## 5. Legal Representation and Support

The judicial system is heavily involved in the oversight of child welfare practice in the United States. In virtually every public agency, service delivery staff are in and out of court rooms on a regular basis and judicial decisions and the work of legal professionals have as much influence on the experiences and outcomes of the families and children who are served by the system as does the quality of agency casework. DFCS relies on legal representation through the Office of the Attorney General and local county attorneys. County and regional DFCS staff involved in this review described a variety of experiences with local courts. Some indicated that agency-court relationships work well and that the courts handle child dependency cases efficiently and effectively. Often, however, staff cited concerns related to the timeliness of hearings, quality of decisions, and/or their own experiences in the courtroom.

Agency staff in some counties are expected to perform legal functions such as the filing of documents and scheduling permanency review hearings. However, with the exception of one region which had recently received some legal training from its county attorneys, caseworkers and supervisors contacted in this review indicated that they have had no training in state laws related to child dependency, maltreatment, and custody, in court procedures, in organizing information in court reports, or in providing testimony. Several of those participating in focus groups described very negative relationships with the court in their jurisdictions. At best, these staff felt that the information they provide and their recommendations are discounted by the court; at worst, they perceive themselves as routinely experiencing rude and demeaning treatment by judges and attorneys. Most viewed themselves as completely powerless in these situations and without any support by the DFCS administration. Further, both managers and line staff indicated that they have never known of a local court decision in any of their cases being appealed and viewed this as a practical impossibility given the current system of legal representation. While appeals of lower court decisions should be undertaken very carefully, they can sometimes

18

be necessary to ensure that sound decisions are made regarding permanency for children.

Problematic relationships between juvenile courts and child welfare agencies are common, but they can be effectively addressed. This is an area of critical importance in two ways: First and most importantly, when agencies and courts do not work well together, decision making on both sides may be affected by factors that have nothing to do with the best interests of children and families. Secondly, such adversarial court relationships have been found to negatively impact the ability of the child welfare agency to attract and retain qualified staff (Dickinson & Perry, 2003; Malm, Bess, Urbel, Geen, & Markowitz, 2001).

---

**Recommendations:**

21. All DFCS staff who work with the courts should be provided with training in legal issues related to child dependency and in working with the courts. This should be provided to existing staff as well as being made a part of the initial training curriculum for all new caseworkers.

22. DFCS should request the assistance of the National Child Welfare Resource Center for Legal and Judicial Issues to identify key issues in the agency-court working relationship and to develop and implement a plan to address them.

---

### 6. Perceived Administrative Support

Interviews with caseworkers, supervisors, and managers suggested that, as a group, they perceive themselves to lack support from the state level administration. The notion that state level administrators do not understand the work that they do or the circumstances under which they do it was a recurring theme in conversations with service delivery staff. The following are among the specific staff concerns expressed regarding the level of administrative support:

- Complaints made about county staff are assumed to be founded before they are explored. Caseworkers and supervisors feel that they are put in a defensive position any time their actions are the subject of a complaint or inquiry to the state office.

- Lines of communication are poor. There is a feeling among regional and county staff that they are excluded in the decision making process and that information that affects them is not readily shared. They report that, even when they are requested to attend meetings to provide input, key state level people often do not participate, and then later question the decisions that have been made.

- So many people have been dismissed or have quit at the state level that there are not sufficient people there to provide programmatic support and

functional supervision and those who are there are not perceived as having sufficient knowledge or experience to be helpful.

- Some staff indicate having been told that, in the current administration, social workers are viewed negatively and it is considered better to have another educational degree.

- Staff perceive that the agency could do more to provide tangible or visible benefits that would demonstrate that they are valued. The following were among those suggested:

  - ✧ Cell phones for field staff. This was by far the most frequently mentioned need related to equipment with caseworkers and supervisors viewing it as a safety issue for themselves and their clients. They are often working in rural areas with no pay phones and many indicated that they use their own cell phones and have had to go to higher cost personal phone plans as a result.

  - ✧ More flexibility in the use of compensatory time. Staff indicated that it would be much easier for them to work the late and irregular hours often required of them if they had some ability to adjust their work schedules to accommodate their personal needs and those of their own families.

  - ✧ Provision of cars, or at least agency advocacy with businesses for discounts on tires and gasoline to help offset the costs associated with the use of personal cars for field travel.

Although not mentioned by the staff interviewed, it was noted during the course of this review that many caseworkers do not have access to electronic mail. Further, several reports requested, although computer generated, were not available electronically. This is of significant concern as the use of electronic mail and the ability to transmit documents electronically can save many hours of valuable staff time.

---

**Recommendations:**

23. Administrators should immediately identify and implement ways to improve communication between all levels of the organization. This should include, at a minimum, a review of regularly scheduled meetings to clarify their purpose and mandatory participants. Consideration might also be given to the institution of an electronic newsletter or other standard communication.

24. DFCS should work with counties to assess the status of their technological support in local offices and develop a plan to provide all staff with access to basic computer services.

---

25. Some accommodation for flexible working hours for service delivery staff should be made.  Research has indicated that such flexibility is highly valued by staff and that it has the potential to improve retention (Texas PRS, 2001).

26. DFCS should seek means of obtaining cell phones for field staff as quickly as possible.

27. The agency should explore the feasibility of providing cars for field work or, at a minimum, ensure that compensation for the use of personal cars is sufficient to cover the cost incurred by personnel.

## B.  Staffing

### 1.  Recruitment, Hiring, and Retention of Front Line Staff

When asked to identify barriers to the recruitment, hiring, and retention of qualified front-line staff, particularly of licensed baccalaureate social workers, Regional Directors uniformly identified low salary and lack of opportunities for advancement as the most serious impediments.  The significance of these factors was further confirmed in focus groups with supervisors and caseworkers.  Reportedly, Mississippi's Personnel Board has refused to upgrade salaries for caseworkers in over five years.  No annual or other cost of living increases are built into the existing salary scale.

All Regional Directors indicated that starting salaries were not competitive with other social work jobs in their regions.  Several noted that, even in areas where other social work jobs had low entry level pay, DFCS positions were still not competitive when viewed in relation to the demands of the work.   DFCS caseworkers have higher workloads, longer hours, and incur greater personal safety and liability risks than do staff in most jobs with similar requirements.  All agreed that the lack of opportunity for salary increases was a major factor.  Most other jobs for which applicants could qualify offer the promise of at least nominal periodic pay increases.   A "career ladder" that provided for a $2,000 salary increase at two years of service and an additional $4,000 at four years was designed several years ago, but was implemented only briefly before it was eliminated due to lack of funding.

Most Regional Directors felt that licensed social workers could be recruited if working conditions and compensation were better.  Some of those interviewed recalled that, up until five or six years ago, it had been easier to attract qualified staff; but as hiring freezes became more frequent and workload increased, the word spread that DFCS was  a difficult place to work.

Another factor cited as problematic was the long delay often encountered in the hiring process.  It is reportedly not unusual for it to take three months or longer to get authorization to fill a vacancy.  As a result, applicants often give up and go to work elsewhere.  This delay has been especially troublesome in hiring new social

work graduates who have prepared to work in child welfare but who cannot afford to remain unemployed during the long wait to be hired.

The DFCS administration has initiated measures intended to address at least some of the problems with hiring. These include the development of a state-level hiring pool and the introduction of legislation that would provide pay raises.

The issue of educational qualifications for caseworkers and supervisors in DFCS is concerning. Currently, there are two positions in front line service delivery, Social Worker, which requires a baccalaureate degree in social work and a basic social work license, and Child Protection Specialist, which requires only a baccalaureate degree in "social work, education, sociology, criminal justice, psychology, or a directly related field" (MS Personnel Board, 2003). Social Workers have a starting salary of $25,285.68 while Child Protection Specialists begin at $21761.10. Both positions are expected to perform essentially the same functions. Reportedly the Child Protection Specialist position was instituted in order to allow for hiring of unlicensed personnel because the agency was unable to obtain licensed bachelor level social workers in sufficient numbers. This is attributed at least in part to the low pass rates on the licensing examination. While nationally 80.6% of all those taking the basic examination pass (Association of Social Work Boards, personnel communication, January 18, 2006), it is reported that less than half of those participating in Mississippi's Title IVE sponsored social work education program in state universities passed the exam. Because of this, the agency is seeking to establish parity in salary for the Child Protection Specialist position and to develop its own licensing examination which will be open to candidates without social work degrees.

Although most states will accept related degrees, or in some instances any degree as qualifying for entry level child welfare work, a body of research provides evidence that those with social work education have more job-related competencies and remain in the work longer than do others (Albers, Reilly, & Rittner, 1993; Booz-Allen & Hamilton, 1987; Dhooper, Royse, & Wolfe, 1990; Ellett, 2000; Lieberman, Hornby, & Russell, 1988). A number of writers have suggested that there is a relationship between the myriad problems affecting child welfare practice and the de-professionalization of the field which began in the 1960s (Leighninger & Ellett, 1998; Steib & Blome, 2003-2004). Further, in several states, agency-university partnerships funded through Title IVE have been shown to produce graduates that have greater job-related skills (Fox, Burnham, Barbee, & Yankeelov, 2000; Hopkins, Mudrick, & Ruduolph, 1998; Okamura & Jones, 1998) and whose performance is more conducive to attainment of safety, permanency, and well-being goals for children (Hubener, 2003). In view of this, the move of DFCS away from professional standards is troubling. It exceeds the scope of this review to determine whether the inability of the agency to hire licensed BSW level social workers is due to the low pass rates on the licensing examination or whether those who do pass simply choose to work elsewhere. However, the best evidence to date suggests that more long term gains might come through working with universities to improve child welfare

content in their curricula and raise performance expectations than to abandon professional standards.

Several staff also expressed concern that the "Educational Benchmark" program which has now been eliminated may be a factor negatively impacting the agency's ability to hire or retain staff.  This program provided agency support for employees wishing to obtain a work-related college degree and was reportedly valued by paraprofessional staff such as aides and homemakers as a means of advancing in the agency as well as by caseworkers wishing to obtain an MSW.  Staff reported that such programs are available in the state's mental health agency and public schools, a fact which further contributes to their perception of being less valued than the workforce in those systems.  The elimination of this program in DFCS is unfortunate as studies have shown that employees who obtain social work education through such programs are likely to remain with the agency even after they complete the period of commitment that is usually required (Jones, 2002; Robin & Hollister, 2002).  Further, this program could provide a valuable opportunity to increase the number of MSW level social workers, particularly among supervisors.  Although the total number of supervisors having an MSW was not made available in this review, it was noted that only two of the eighteen supervisors who participated in focus groups had an MSW.

A final issue of concern in recruitment of qualified staff is that state personnel regulations reportedly require that anyone entering agency service for the first time start at entry level. Such a policy further handicaps the agency in recruiting qualified staff by presenting an unnecessary barrier to hiring those who happen to move to Mississippi or who might wish to transfer to DFCS from other agencies.

---

**Recommendations:**

28.  Compensation is a critical issue for service delivery staff in DFCS and needs to be addressed as quickly as possible.  The following measures are recommended:

   a.  Adding an annual cost of living increase into the current pay structure.
   b.  Implementing a career ladder that provides opportunities for advancement in grade while remaining in direct service delivery. When promotions are available only by moving into management, agencies risk losing the service delivery capacity of experienced staff who may be best suited to front line work.

29.  Continue to work within DFCS and with the Personnel Board to identify ways to expedite the hiring process.  This should include assurance that students completing agency sponsored Title IVE stipends are hired as quickly as possible following graduation so that the agency does not risk losing them through expiration of their contractual commitment.

30. DHS/DFCS should take action to remove the restriction on starting experienced child welfare or social work professionals from other systems at higher levels in the pay scale.

31. Re-institute the "Educational Benchmarks" or a similar model that offers educational leave and tuition support, either part- or full-time for employees desiring to further their social work education in schools that have demonstrated an ability to produce graduates capable of passing the baccalaureate level social work licensing examination at an acceptable level (i.e., at least 70%) for the past two years. A similar passage rate should be required of graduate schools for those pursuing a Masters in Social Work. Further, supervisors should be given priority consideration for support in obtaining an MSW.

32. Institute a multi-faceted initiative to attract the best social workers in Mississippi to work in DFCS. This would include, at a minimum:

   a. Following through with recommendations to lower workload to manageable levels, institute more equitable compensation, and provide stronger supervisory and administrative support and publicizing these efforts through the media, schools of social work and the state chapter of NASW.

   b. Establishing requirements for Title IVE contracting with universities to include:

      i. A passage rate threshold of at least 70% on the baccalaureate licensing examination within two years;

      ii. Inclusion of specific child welfare practice content in the required course content for stipend students as has been done in IVE programs in Kentucky, Georgia, and Louisiana.

## 2. Workload

The workload of front line staff is among the most critical of the concerns identified in this review. Although a few caseworkers interviewed in focus groups indicated that their current caseloads were manageable, most viewed excessive workload as a major impediment in doing their jobs effectively. Many DFCS staff routinely carry caseloads in excess of 40 foster children and/or in-home cases, with some caseloads reported to be substantially higher. Supervisors report that they often carry cases as well or that the largest share of their time is devoted to casework activities rather than to supervision. Further, Regional Directors acknowledge that most social work staff are expected to give priority to child protection investigations, resulting in their having insufficient time for services to foster children and, in some instances, delegating responsibility for required contacts with children to paraprofessional support staff such as homemakers and case aides. This practice is prohibited by a recent revision in agency policy, but

where workloads remain unmanageable, adherence to the new policy may be a practical impossibility.

A workload study was a major part of this systems review. This study examined the case-related job functions of DFCS caseworkers and the amount of time required to complete activities and sub-activities associated with each function in order to determine the number of cases that might comprise a reasonable workload for a single caseworker. The process began in September, 2005 with a review of agency program policies, job descriptions, and other key documents included in the listing in Section B.1. of this report. A workgroup of agency representatives was organized in October, 2005 and worked through January, 2006 identifying activities associated with distinct job functions and using a structured process to arrive at the most accurate estimations of the time required for these activities.

Due to limitations in the contract for this project and to circumstances in the state at the time of the study, a structured estimation methodology, rather than an actual time study, was used as a basis for determining workload. As a result of the previously mentioned storm, a time study measuring "business as usual," which is usually considered optimal in workload analysis, was not feasible within the time frame needed. The structured or "expert" estimation process employed in this study has been used effectively in other jurisdictions to examine workload (Washington DSHS, 1997).

A detailed description of the study process and supporting documentation are contained in Appendix A. The key findings of the study are the amount of time required to manage each type of case in accordance with current agency policy for one month as depicted in Table 5 on page 26.

Recommendations regarding reasonable workload are based on two key factors: the estimated time an individual caseworker has available to perform case-related activities and the amount of time required to complete the activities associated with carrying a particular case during a month. Any determination of reasonable workload must consider the time actually available for an individual caseworker to perform case-related activities. This means that time consumed by administrative activities (training, general staff meetings, leave, breaks, holidays, and any other activities not case related) must be excluded to derive the base amount of time available for casework. In this study, the general "one third rule" (Tooman & Fluke, 2002) derived from numerous workload studies in child welfare and related human services, was applied to represent administrative time and to obtain the figure of 116 hours for the time available for an individual caseworker to complete case-related activities. Using this figure with the time estimates in the table below yields the following monthly caseload standard in each category:

- Intakes - 118

- Child Protection Investigations - 14

- Foster Care - 14
- Adult Protective Services - 27
- In-home Dependency – Prevention - 25
- In-Home – Protection – 17
- Adoption – 9
- Licensing – New Application – 15
- Licensing – Renewal - 36

**Table 5**

| Major County Job Functions | Estimated Time Per Month Per Case |
|---|---|
| General Intake | 59 minutes |
| Child Protection Investigation (CPI) | 484 minutes; 8 hrs./4 min. |
| Adult Protective Services (APS) | 254 minutes; 4 hrs./14 min. |
| In-Home Dependency – Prevention | 275 minutes; 4 hrs./35 min. |
| In-Home Dependency – Protection | 410 minutes; 6 hrs./50 min. |
| Foster Care | 507 minutes; 6 hrs./50 min. |
| Associated County Job Functions | Estimated Time Per Month Per Case |
| Interstate Compact (ICPC) | 106 minutes; 1 hr./46 min. |
| Intra-State Home Studies | 288 minutes; 4 hrs./48 min. |
| Courtesy Interviews | 65 minutes; 1 hr., 5 min. |
| Regional Job Functions | Estimated Time Per Case Per Month |
| Adoption | 807; 13 hrs./27 min. |
| Licensing – New Application | 470 minutes; 7 hrs./50 min. |
| Licensing – Renewal | 191 minutes; 3 hrs./11 min. |

*Application of Workload Study Findings*

The above-listed time estimations make it possible for caseworker needs to be calculated for the state as a whole, as well as for regions and counties, based on the case count in each identified job function. Individual caseload assignment is somewhat more complicated, however, as most county offices of DFCS use generic caseload assignment.  This system is supported by Mississippi law and allows a single caseworker to maintain continuous responsibility for serving a family rather than requiring a change of caseworkers as a family moves through different programs in the service continuum.  However, because any given caseworker is subject to carrying an ever-changing mixture of case types, individual workloads will need to be monitored from month to month.  This is done by applying the total time required for cases carried by a caseworker to the approximately 116 hours, or 6960 minutes, available for case related work. For example, a caseworker having a mixed caseload may carry 20 cases one month (4 FC, 6 Prevention, 4 CPI, 3 Protection, and 2 ICPC for a total of 6,860 minutes) and be within the acceptable workload and only 15 the following month (6 CPI, 5 FC, and 4 Protective for a total of 7,079 minutes) and be slightly over the

standard. This means that regulation of workload will require careful monitoring by supervisors.

It is to be expected that workloads will vary somewhat, with some staff slightly exceeding the standard one month and falling slightly below it in others. In order to use these standards effectively in overall planning, DFCS should establish a margin which would trigger re-evaluation and possible re-allocation of staff in a particular county or region or in the state overall. The state of Delaware, for example, has legislation that requires some action be taken when average caseloads exceed the caseload standard by ten percent (personal communication Keith Zirkle, Delaware of Children, Youth, and Their Families, December, 2004).

*Additional Considerations in Workload Management*

The caseload allocations suggested by this study are substantially lower than those currently being carried by DFCS caseworkers and, with the exception of in-home prevention services, closely approximate the recommendations in the standards of the Child Welfare League of America. The application of these standards will do much to move DFCS forward in its capacity to deliver an acceptable level of services to needy children and families in Mississippi. There are, however, a number of factors related to this study as well as to other issues that should be considered in undertaking a comprehensive effort to achieve equitable and manageable workloads for service delivery staff in DFCS.

First, time estimations derived from this study are based on the mid-range of the individual estimates given by members of the study group or by the colleagues from whom they solicited information. Although there was generally remarkable convergence in time estimations among group participants, this may mean that there are a few counties in which the standards developed by the work group are not fully applicable. There were some outlier estimations which were most often attributed to the impact of individual court practices on agency staff time. A few courts, for example, require that review hearings be held more frequently, demand more frequent reports, require that DFCS staff, rather than other county or court personnel, serve legal documents to clients, or schedule hearings in a way that results in more court waiting time for caseworkers and/or supervisors. Counties named by group members as having particularly intensive court involvement include Alcorn, Forrest, Harrison, Madison, Rankin, and Yazoo. Activities impacted by court requirements may warrant additional study in these counties in order to achieve reasonable and equitable workloads. Once clearly identified and measured, issues such as court waiting time that far exceeds the norm may be raised with the Administrative Office of the Court for possible attention in the state's Court Improvement Project or in another venue with the Youth Court judges. If this cannot be done successfully, it may be necessary to apply a unique workload standard to these counties.

It should also be recognized that it is likely that there is variation in screening and service authorization practices among counties or regions, with some using more

restrictive standards as a means of limiting workload. Thus the use of these study findings must be combined with uniform intake and screening practices to promote equity and consistency in service delivery across the state. DFCS has already undertaken the development of a new screening and assessment process with technical assistance from the National Child Welfare Resource Center for Child Protective Services and plans to implement this during calendar year 2006.

Members of the Workload Study Group were asked to estimate the time required to complete each activity and sub-activity as required to conform to current policy requirements. Thus, this analysis reflects the amount of time that an individual activity would require if done completely according to staff's current understanding of policy and practice. Thus these estimations may not in every instance be reflective of best practice. Any workload analysis must be regularly updated if an agency is to ensure that its capacity for effective service delivery is maintained. Caseload standards can become outdated almost overnight if work requirements change as may happen in the wake of new legislation or the imposition of additional expectations by the administration. Mississippi's federal Program Improvement Plan and training currently underway in the state are moving child welfare practice toward a more family-centered approach. This shift is consistent with both research and practice wisdom related to effective service delivery (NCWRCFCP, 2000; Rooney, 1992; Shireman, Yatchmenoff, Wilson, Sussex, & Gordon, et al., 1998). However, such practice calls for greater engagement of families, more individualized assessment and case planning, and more reliance on the development and use of informal resources. These things take time; family engagement is directly, although not solely, dependent upon time spent with families. Involving families in a thorough assessment and in case planning is more time consuming than simply writing a case plan in the office and presenting it to the family.

Several additional issues that surfaced during this study process are of concern and have implications for workload management. One is the use of the "primary client" system to count cases. With foster children this is straightforward as each child constitutes both a primary client and an individual case. With in-home cases, however, the system becomes confusing due to the fact that, in addition to heads of households normally being considered as primary clients, any other family members who are subjects of a protective order may also be so designated. Thus a family of the same size with very similar service needs may have two, three, or more primary clients in one county, and thus be weighted more heavily, and only one primary client in the other county simply because of differences in court practices related to issuance of protective orders.

The current caseload system uses a designation of "county of responsibility" and "county of service" in those instances in which children in foster care are placed outside of the county in which they entered care or when families move across county lines. Some, but not all, case contacts are made by county of service staff while duties associated with court hearings, reports, and permanency planning are conducted and coordinated by the caseworker having responsibility

for the family case.  This practice further splits responsibility for cases, creates greater need for communication and coordination, and thus increases the risk that service needs will be overlooked. Additionally, some caseworkers indicated that, in the case of children in out of home care, contact and services provided by the "county of service" worker are less intensive and consistent.

---

**Recommendations:**

33. Using the time estimations derived from the workload study, develop a phased-in plan for adding caseworkers in sufficient numbers to achieve manageable workloads within two years.  Such a plan, to be credible, will obviously require a commitment from the legislature for funding.  It will be neither possible nor practical for DFCS to attempt to bring the number of new workers needed on board at one time.  The plan for achieving reasonable workloads will need to be aligned with implementation of the recommendations regarding training and supervision.

34. DFCS may do well to re-think its system of case counting. One alternative would be to count the cases of foster children individually as is done now, and to count CPI and other in-home cases by family.

35. Transfer cases of children placed across county lines would eliminate ambiguity regarding responsibility for service delivery.  The caseworker providing services to the family could then be responsible for coordinating information and permanency planning activities.

---

## 3.  Supervision

Casework supervisors are the lynchpins of front line practice.  In child welfare workforce research, no factor has been more consistently linked to agencies' ability to attract and maintain stable service delivery staff than has supervision (Arkansas DCFS, 2002; Bernatovicz, 1997; Cicero-Reese & Black, 1998; Dickinson & Perry, 2002; GAO, 2003; Rycraft, 1994; Samantrai, 1992; Scannapieco & Connell-Corrick, 2003; Yoo, 2002).  The strength of these findings suggests that agencies concerned with strategic pursuit of systemic reform can make no better investment than in the development of their supervisors.

Unfortunately, supervisors contacted by CWLA consultants in the course of this review were uniformly frustrated at what they perceive as unreasonably adverse working conditions, lack of administrative support, and inadequate compensation and benefits.  In one region, for example, supervisors indicated that they may be appointed to their position in an acting capacity but continue to receive the salary of their caseworker job, sometimes also carrying their caseload while adding supervision.  Supervisors said that they often carry cases or spend much of their time fulfilling casework activities rather than providing guidance and support for front-line staff.  This is necessitated both by the need to assist caseworkers in

managing their heavy workloads and to cover the vacant caseloads that result from the high turnover and inability to hire new staff.

It was learned that supervisors are not located in every county office. Although it is understood that some counties are too small to justify more than one or two caseworkers, this practice is of concern given what is known about the importance of supportive supervision in child welfare.

---

**Recommendations:**

*Several of the recommendations given above with regard to recruitment and retention of front line staff and workload will also impact supervisors. In addition, DFCS should consider the following:*

36. Compensation and opportunities for advancement for Area Social Work Supervisors should be re-evaluated and a system developed that allows for them to advance in their positions. This compensation plan should be at least comparable to those provided for casework supervisors in other Southern states.

37. Supervisors should receive pay for the supervisory position even when they are appointed in an acting capacity.

38. Consider consolidation of offices in small rural counties to allow for on-site supervision of caseworkers.

---

### 4.  Administrative Staffing

An effective child welfare agency not only needs sufficient numbers of qualified staff at the level of service delivery, but also must provide the administrative supports to ensure that those staff have the guidance, training, and oversight that they need to function well. Agency accountability to funding bodies and to the public is also dependent upon administrative capacity to assess practice, track data and expenditures, and plan for future organizational needs. Observations made in this review suggest that DFCS is understaffed at the administrative and management levels. Currently, DFCS has only one staff person assigned to policy; its MACWIS system is inadequately staffed resulting in programming delays of several months; its level of human resource support is inadequate, making it difficult even for senior management to access key data such as staff turnover rates; and it has only very limited capacity to conduct quality assurance activities. Program management staff does not have the capacity to provide functional supervision and consultation, to participate in planning and policy development, or to work with Regional Directors closely enough to bridge the gap that typically exists between state level administration and field staff in large bureaucracies. Regional Directors, for example, point out that there is a perceived lack of support from the state level and that, while there had at one time been plans for regular meetings between regional staff and program management as a means of facilitation communication and building trust, this has not occurred. Further, program managers are not in regular attendance at

key meetings, such as those with Regional Directors or work groups that involve their area of responsibility.

Levels of pay for most administrative and management jobs are in the $30,000 to $40,000 dollar range. This level of pay may not be sufficient to attract experienced staff into key administrative positions.

The current administrative structure divides program units into the categories of Prevention, Protection, and Placement. The staffing of these units, does not, however, conform to their stated functions. Foster Care Review, for example, is located in the Protection unit. Lack of clarity in the responsibility of these divisions may be confusing to staff at the regional and county levels and further contribute to problems in communication.

---

**Recommendations:**

39.  MDHS/DFCS should undertake an analysis of its administrative and management needs and develop a staffing plan that ensures its ability to fulfill key functions necessary for accountability and the support service delivery staff.

40.  The agency should re-evaluate its organizational structure at the administrative and program management levels to ensure the most efficient grouping and assignment of related functions and maximize responsiveness to regional and county staff.

---

## C. Practice and Resources

### 1. Service Needs and Availability

Information regarding service needs and availability was derived from the staff survey described in Section III.B.6. as well as from focus groups and interviews.

*Mental Health and Substance Abuse Services*

DFCS staff at all levels expressed a need for greater variety and availability of mental health services for clients. The most frequently requested services named by caseworkers were psychological assessment or testing (26.74%), counseling (19.28%), and individual therapy (18.77%). Twenty-one percent of those responding indicated that such services were readily available while 66% said that they were somewhat available. Just over 65% of respondents said that the most requested services were accessible to clients while 13% indicated that they were not accessible.

Family therapy headed the list of mental health services that caseworkers would like to see increased, followed by behavioral interventions, and counseling. This is consistent with findings of focus groups and interviews in which some staff expressed concern that the mental health services available may not be family focused or particularly suited to the needs of children and families involved in

child welfare. These responses combined with those of the survey, suggest that caseworkers and supervisors may be asking for services they know are available, while recognizing that they may not be the most effective interventions for their clients. This is understandable given the pressure on service delivery staff to "do something" even when needed services are in short supply.

Children and families involved with child welfare, not surprisingly, represent a population with greater mental health needs. At the same time, however, it is important to consider that increased use of mental health services in child welfare may also be associated with the absence of clinically skilled service delivery staff. When caseworkers and their supervisors have neither the knowledge, skills, nor time to conduct thorough and accurate individual and family assessments or to engage and problem solve with clients, the tendency may be to view every psychosocial need as warranting a referral for mental health evaluation or treatment. In fact, families and children benefit most from strategic mental health services, those that answer clearly defined questions or address specifically identified needs. A practice of routinely making general referrals for non-directed treatment is likely to expend resources without yielding real benefits (Chambless & Ollendick, 2001; Lipsey, 1992).

The most frequently requested substance abuse services were for the screening, assessment, and in-patient treatment of adults. These services appear to have somewhat greater availability than other mental health screening and treatment; 22.46% of respondents rated them as readily available and 63.77% as somewhat available. However, 23.19% indicated that accessibility of substance abuse services is a problem for their clients, while 47.83% rated them as readily accessible. In-patient (20.41%) and out-patient (18.66%) adult substance abuse treatment were by far the most frequently named areas needing additional resources.

---

**Recommendations:**

41.  Use data from this survey as well as Medicaid utilization records of DFCS clients to assess mental health service needs in each region and work at the state level with mental health and Medicaid system officials to align resources with needs as closely as possible.

42.  Consider adding clinical capacity within DFCS in the form of licensed masters level social workers at the regional level to provide consultation in assessment and case planning in new foster care cases. Such capacity can better ensure that referrals for additional clinical evaluation and treatment are necessary and targeted to meet specifically identified needs.

---

## 2. *Medical and Dental Treatment*

Caseworkers named lack of financial resources and service availability as the leading barriers to obtaining medical and dental examinations for children. In

focus group questioning, they explained that few providers are willing to accept Medicaid payment rates so those that do have waiting lists.  Over 20% of survey respondents named waiting lists as the chief barrier to obtaining medical treatment for children once a condition is diagnosed.

---

**Recommendations:**

43. In conjunction with state Medicaid officials, identify providers in each region and their utilization rates by children in custody to determine gaps in service availability as a basis for focused recruitment of providers.

44. Approach providers in uncovered areas to provide services for children in DFCS custody.

---

### 3. *Parent Education*

Because parent education is widely regarded as one of the most frequently applied interventions in child welfare, the survey included specific questions about this service.  Caseworkers named appropriate disciplinary practices (28.31%), parental understanding of age-appropriate child behavior (21.96%), and safety and nurturing of young children as the three areas most frequently needing to be addressed in parent education.  Only 17.39% indicated that parenting programs to address these needs were readily available, while 62.32% responded that they are somewhat available and 10.87% indicated that they are not available.  Regarding geographic accessibility, less than half (42.03%) rated parenting programs to address identified needs as being readily accessible to clients.

Measurement of intervention effectiveness is a common area of concern in child welfare.  Indeed, a small body of research has begun to identify the tendency of courts and agencies to consider compliance a proxy for successful completion of services (Brank, Williams, Weisz, & Ray, 2001).  Thus, caseworkers were asked specifically what factors they considered in determining successful completion of services.  The most frequently provided answer to this question was attendance (21.39%), followed by progress reports from the program (20.45%), level of participation (19.51%), parent feedback (18.39%), and observed transfer of learning (18.20%).  In rating factors that are most important in gauging success, however, observed transfer of learning (36.84%) was by far the most frequently provided response.

Most parent education is offered through Mississippi's network of family resource centers.  Discussion of these services in focus groups and interviews indicated that there is little knowledge among staff regarding the types of parenting interventions offered.  However, the need for greater availability and accessibility was more frequently expressed than were concerns about quality.  The provision of parent education through regional family resource centers is viewed as a positive in this review.  Parent education and family skills building interventions

33

have been found helpful in addressing child maltreatment and, to an even greater extent, in helping families deal with problems related to child behavior (Corcoran, 2000). Effective programs tend to be ones that involve the entire family, use active engagement techniques, have a cognitive behavioral orientation, and focus on building skills in problem solving, communication and interpersonal relationships, and anger and stress management. Many also include a group component. There are a number of models available for replication that include these characteristics and have some degree of demonstrated effectiveness in changing parental attitudes, knowledge, and to a lesser extent, parenting behavior. Even if programs do not adhere strictly to an evidence-based model, they may be effective if they have the preceding characteristics. However, this can only be determined through an evaluation which includes some measurement of changes in knowledge and attitude and of transfer of learning into the parent-child relationship.

---

**Recommendations:**

45. The agency should inventory the parent education programs available to its clients to determine whether an evidence-based model is used or, alternatively, that the program has the characteristics associated with effective interventions.

46. All programs should be required to use some type of evaluation to demonstrate, at a minimum, changes in parental knowledge and attitudes, and preferably in targeted parenting behaviors.

47. Additional programs, implemented either through the resource centers, directly by agency staff, or through the use of contracted providers should be established to ensure greater availability and accessibility.

---

### 4. Other Supportive Services

Other service needs most often identified by caseworkers in either the survey or focus groups were transportation and concrete services such as furnishings, clothing, or utility payments which typically call for small expenditures of flexible funding. An agency's ability to provide concrete services is important factor in engaging clients as well as in meeting real immediate needs (Dawson & Berry, 2002). Each county has an allocation of flexible funds which varies depending on the extent of county support. It is also possible to request assistance from other counties that may have surplus monies available. However, many caseworkers indicated that this resource is very limited and thus tightly controlled and difficult for them to access on behalf of their clients.

> **Recommendations:**
>
> 48. DFCS, at the state and regional or county levels, should explore means of increasing funding to meet the immediate concrete needs of clients and establish guidelines that provide for their prompt use and accessibility.

### 5. Practice Issues

*Family Centered Practice and Team Decision Making*

DFCS is making efforts to move from a more traditional child centered practice approach to one that is family centered. This is a framework based on the belief that the best way to protect children in the long run is to strengthen and support their families, whether nuclear, extended, foster, or adoptive. As part of this shift, the agency is also supporting more consistent use of team decision making including family team meetings for initial service planning and as part of ongoing periodic case review. Training in family centered practice is currently underway around the state.

A move to family centered practice is supported by both research and prevailing thought among child welfare professionals (NCWRCFCP, 2000). It is viewed as a positive and staff in focus groups were enthusiastic about this shift. The agency's ability to successfully accommodate this practice shift will be reliant on the assurance of administrative support and adequate staffing as noted above. It is also important that the training, policy, and supervision that support family centered practice involves careful individualized assessment and should not mean that children are exposed to greater risk of harm.

### Concurrent Planning

Concurrent planning refers to the practice of working on an alternative permanent plan for a child at the same time that efforts are made to reunite the family. It is widely considered effective in moving children more quickly to permanency and is encouraged in DFCS policy. Caseworkers are, in fact, required to list an alternative permanent plan on case plans and the new practice guides for family team meetings that the agency has issued address fundamental principles of concurrent planning, such as being open and honest with families about all possible outcomes of the agency's intervention. In spite of this, however, both managers and caseworkers interviewed indicated that planning for permanency is most often sequential, with no real work done to effect an alternative plan until it is determined that a child cannot be returned to his or her family of origin. Managers felt that many staff do not really understand concurrent planning and are still focusing on reunification alone until it becomes clear that it will not occur. This was confirmed in focus groups with caseworkers.

**Recommendations:**

49. Training of both new and existing staff should include the basic principles of concurrent planning.

50. DFCS should use data on length of stay and permanency outcomes for children in custody to consider whether concurrent planning, including foster/adoptive placement should focus on a particular group of children.

*Placement Resources*

Staff at all levels indicated that the lack of a sufficient array and distribution of family placement resources results in the need to separate siblings and to place children farther from their families and communities than is desirable. The lack of respite services and child care were identified as the most serious impediments to recruiting and retaining qualified foster parents. Some caseworkers also expressed concern about the quality of foster parents who are approved and their willingness or capacity to care for the largely special needs population of children in out of home care. Finally, the current practice of covering the states licensing needs with staff assigned through only three regions was seen as problematic with regard to the amount of time consumed by travel and the fact that licensing personnel are not sufficiently connected to the other regions they serve to understand their needs and provide support to resource families.

In an attempt to address the need for a greater array of family placement resources, the agency in 2005 engaged technical assistance through *Adopt U.S. Kids* and conducted a statewide assessment of the agency's recruitment, response, and retention of resource families. A total of 352 stakeholders, staff, private providers, and resource families took part in the assessment in order to make recommendations to the state planning committee formed to address resource family recruitment and retention. This group developed a series of nine strategies, all of which have the potential of improving recruitment and retention of foster and adoptive families. Needs and strategies developed from this process include:

- Begin dual licensure so that applicants gain approval at the outset for both foster and adoptive parenting rather than having to undergo an additional process should they wish to adopt a child in their home or, in the case of adoptive parents, to accept a child in temporary care.

- Develop policy and practice guidelines to prevent the use of resources for the licensure of families not interested in accepting children with special needs. Currently, Mississippi has a large number of unused resource families, apparently because it is believed that any applicant who complies with regulations has a right to be licensed.

36

- Provide resources and authority for regions to contract with private agencies for recruitment and licensing of resource families.

- Develop regional recruitment and retention plans.

- Develop and implement additional supports for resource families.

Although the recruitment and retention plan has not been fully implemented, some of the above recommendations are already being addressed. For example, DFCS has undertaken a review of its current board payments in relation to the cost of caring for a child in the urban South as established by the United States Department of Agriculture. Plans are being made to assign licensing personnel to each region and the administration is seeking allocation of funds to provide payment for respite care for children in order to offer periodic relief to foster parents. However, there remains a need to more consistently provide child care to enable children to be placed in families where parents are employed. Currently, child care for foster families is only available under the state's federally funded child care program and foster families do not receive any priority consideration in their application for this service.

The number of licensed foster homes available for children placed by DFCS increased by 53 over the past year. It is unclear, however, the extent to which this actually represents usable additional resources as the agency reportedly continues to license families who are not interested in most of the children for whom placements are needed..

*Kinship Placements*

Caseworkers and supervisors alike expressed concern regarding the agency's inability to provide greater financial support to relatives who are caring for children in agency custody. Some indicated that more children could be placed with extended family if funds were available to pay for child care and to cover additional expenses such as clothing. Currently, policy provides that relatives may be licensed and thus receive a foster care board rate for children placed with them if they meet the same standards as an unrelated foster family. In practice, however, agency staff indicated that this is not encouraged due to concerns that dependence on the board payment will discourage relatives from accepting custody of children if they cannot return home. This concern is recognized in DFCS and funding is being sought to provide additional financial assistance to kinship placements.

**Recommendations:**

51. Complete implementation of the recommendations of the draft recruitment and retention plan developed in June 2005.

52. Consider the use of private providers to augment agency capacity in recruitment and preparation of family resources. Private providers often are able to promote fostering and adoption among constituency unavailable to the public sector

53. Address the assessing and licensing of families who are not interested in the children for whom homes are needed. This may be a legal issue since Mississippi 43-15-5 (2) provides that if a person meets licensing requirements to operate a "child residential home" as defined in Section 43-16-3, he or she shall be granted a license. The definition in the referenced section appears to pertain to foster and adoptive families.

*Expediting Permanency*

Examination of work processes revealed several areas which appear to be especially prone to delays that slow the attainment of permanency for children. A particular area of concern is the termination of parental rights process. Although voluntary relinquishments are frequently obtained in those instances in which children cannot be returned to their families, caseworkers indicated that this usually does not occur until after a petition to terminate parental rights have already been filed.

Particular points in which delays were identified in the termination process include (1) the completion of the required information packet by caseworkers; (2) state level review; and (3) preparation of the petition by staff attorneys in the Office of the Attorney General.

**Recommendations**
*Delays in the termination process may be mitigated by the above recommendations regarding agency legal representation, as well as by more consistent implementation of concurrent planning and family-centered practice which might be expected to support earlier alternative planning for permanency and eliminate the need for involuntary terminations in some instances. The following additional steps are suggested:*

54. Review the information packet currently required to determine whether it can be streamlined, particularly when a termination is requested on a sibling group.

55. Consider whether the review and approval process that is now conducted at the state level can be expedited or moved to the regional level.

# V.  Conclusions

Every effort has been made in this systems review to evaluate objectively the current MDHS/DFCS system and to communicate the concerns that were raised to the Director of DFCS.  Although many, if not most, of the needs identified in this review might be found at some level in any child welfare system in the United States, the Mississippi system does present a picture of having been chronically under-resourced, seriously so in several areas.

This document lists 55 recommendations for systems improvement.  While all are considered important, some are viewed as foundational in a comprehensive effort to create a child welfare system that is fully responsive to the needs of children and families in Mississippi.  The most pressing needs in DFCS are in the following areas:

1. Increased numbers of skilled professional staffing at all levels, but particularly in the area of direct service delivery;

2. Training and ongoing professional development for service delivery staff; and

3. Additional family placement resources for children in the agency's custody.

Staffing is critical at all levels, particularly in service delivery and in the training and organizational support of direct service personnel.  A recommendation for an exact number of additional staff is reliant upon factors which exceed the scope of this review, such as the existence of backlogged or inactive cases.  However, the workload analysis conducted with the assistance of DFCS personnel suggests that most caseloads should be less than half of the standard of 40 primary clients currently set by the agency.  Staffing of the agency at an acceptable level will require a multi-faceted initiative that includes attention to equitable compensation and opportunities for advancement, a system for ongoing review of workload, training and staff development, skilled and supportive supervisors, and outreach to schools of social work and social work organizations in the state to inform them of the changes being made in the agency and enlist their help in the recruitment of new applicants.

The ability of DFCS to effectively address needs related to training and placement resources is also dependent upon staffing.  In these areas as in service delivery, it is critical that the focus be not just on numbers of personnel, but on their quality and the way in which they are supported by the organization. Adding positions will be of little benefit to needy children and families in Mississippi if staff lack the skills and supports they need to work effectively and if turnover remains high.  This document outlines recommendations for working with universities and professional organizations to enlist their support and help in attracting and preparing personnel who have the requisite knowledge and skills for this very important work.

It is important to acknowledge that many of the needs identified in this review have been recognized by the current administration and that plans to address them were either underway at the time this study was initiated or have since been implemented.  Further, DFCS staff at all levels have demonstrated an eagerness to provide the information which contributed to this evaluation.  The cooperation and commitment of agency personnel is important, but it will be futile if the economic supports and needed cooperation in other areas of state government are not forthcoming.

# References

Albers, E., Reilly, T., & Rittner, B. (1993).  Children in foster care: Possible factors affecting permanency planning.  *Child and Adolescent Social Work Journal, 10*(4), 329-341.

Arkansas Department of Human Services, Division of Children and Family Services (2002).  *Training and Retention of Family Service Workers.*  Little Rock, Arkansas: Author.

Bernatovicz,  F. (1997).  *Retention of child welfare caseworkers: A report.*  Portland, ME: National Center for Organizational Improvement.  Available at: www.muskie.usm.edu/hellpkids/pubstext/retention.html.

Booz-Allen & Hamilton, Inc. (1987).  *The Maryland social work services job analysis and personnel qualifications study.*  MD:Author.

Brank, E.M., Williams, A.L., Weisz, V. & Ray, R.E. (2001).  Parental compliance: Role in termination of parental rights cases.  *Nebraska Law Review, 80*, 335-353.

Chambless, D.L., Ollendick, T.H. (2001). Empirically supported psychological interventions: controversies and evidence. *Annual Review of Psychology.* Vol. 52, Issue 1, 685-716.

Child Welfare League of America (2001).  *The child welfare workforce challenge: Results from a preliminary study.*  In conjunction with Alliance for Children and Families and American Public Human Services Association.  Washington, DC: Author.

Cicero-Reese, & Black (1998).  Research findings suggest why child welfare workers stay on job.  *Partnerships for Child Welfare, 5*(5).

Corcoran, J. (2000).  Family interventions with child physical abuse and neglect: A critical review. *Children and Youth Services Review, 22*(7), 563-591.

Dawson, K. & Berry, M. (2002).  Engaging families in child welfare services: An evidence-based approach to practice.  *Child Welfare, 81*(2), 293-317.

Dhooper, S., Royse, D., & Wolfe, L. (1990).  Does social work education make a difference?  *Social Work*, *35*(1): 57-61.

Dickinson, N.S. & Perry, R.E. (2003).  Factors influencing retention of specially educated public child welfare workers.  *Journal of Health & Social Policy 15(3/4)*, 89-103.

Ellett, A. J. (2000).  *Human caring, self-efficacy beliefs, and professional, organizational culture correlates of employee retention in child welfare.*  Unpublished doctoral dissertation, Louisiana State University, Baton Rouge, LA.

Ellett, A.J., Ellett, C.D.& Rugutt, J.K. (2003). *A study of personal and organizational factors contributing to employee retention and turnover in child welfare in Georgia.* Athens, GA: University of Georgia School of Social Work.

Fox, S.R., Burnham, D., Barnee, A.P., & Yankeelov, P.A. (2000). School to Work---social work that is: Maximizing agency/university partnerships inpreparing publicchild welfare workers. *The Journal of the National Staff Development and Training Association, 1*(1): 13-20.

Graef, M. & Hill, E.L. (2000). Costing child protective services turnover. *Child Welfare, 79*(5), 517-533.

Hopkins, K.M., Mudrick, N.R., & Rudolph, C.S. (1999). Impact of university/agency partnerships in child welfare on organizations, workers, and work activities. *Child Welfare, 78*(6): 749-773.

Huebner, R. (2003). *Public Child Welfare Certification Program outcomes evaluation.* Kentucky Cabinet for Families and Children, Frankfort, KY-20.

Jones, L. (2002). A follow-up of a Title IV-E program's graduates' retention rates in a public child welfare agency. *Journal of Health & Social Policy 15(3/4)*, 39-52..

Leighninger, L. & Eellett, A. (1998). *Deprofessionalization in child welfare: Historical analysis and implications for social work education.* Paper presented at the Annual Program Meeting of the Council on Social Work Educatio, Orlando, FL.

Lieberman, A., Hornby, H., & Russell, M. (1988). Analyzing the educational backgrounds and work experiences of child welfare personnel: a national study. *Social Work, 33*(6), 485-489.

Lipsey, M.W. (1992). The effect of treatment on juvenile delinquents: results from meta-analysis. In F. Losel, D. Bender & T. Bliesener (Eds.) *Psychology and Law*, New York: NY.

National Child Welfare Resource Center on Family Centered Practice (2000). A new era of family centered practice. *Next Practice/Best Practice, 1*(1), 1-18.

Okamura, A., & Jones, L. (1998). Re-professionalizing child welfare services: An evaluation of a IV-E training program. *Research in Social Work Practice, 10*(5): 607-621.

Potter, C.C.& Klein-Rothchild, S. (2002). Getting home on time: Predicting timely permanence for young children. *Child Welfare, 81*(2), 123-150.

Malm, K., Bess, R., Leos-Urbel, J., Geen, R., & Markowitz, T. (2001). Running to keep in place: The continuing evolution of our nation's child welfare system. *Assessing the New Federalism, Occasional Paper #54.* Washington, DC: The Urban Institute.

Mississippi Personnel Board (2002).  Class Specification, DHS-Social Worker, Occupational Code: 4227.  Jackson, MS.

Mississippi Personnel Board (2003).  Class Specification, DHS – Child Protection Specialist, Occupational code:  3045.  Jackson, MS.

Robin, S. & Hollister, C. (2002)..Career paths and contributions of four cohorts af IV-E funded MSW child welfare graduates.  *Journal of Health & Social Policm 15(3/4), 53-67.*

Rooney, R.H. (1992).  *Strategies for working with involuntary clients.* New York: Columbia University Press.

Rycraft, J. (1994).  The party isn't over:  The agency role in the retention of public child welfare caseworkers.  *Social Work, 39*(1): 75-80.

Samantrai, K.  (1992).  Factors in the decision to leave: Retaining social workers with MSWs in public child welfare.  *Social Work, 37*(5), 454-458.

Scannapieco, M. & Connell-Corrick, K. (2003).  Do collaborations with schools of social work make a difference for the field of child welfare?  Practice, retention, and curriculum.  *Journal of Human Behavior in the Social Environment, 7*(1/2), 35-51.

Shireman, J., Yatchmenoff, D., Wilson, B., Sussex, B., Gordon, L. Poirier, C., et al. (1998).  *Strengths/Needs Based Services evaluation.*  Portland, OR:  Portland State University, Graduate School of Social Work.

Steib, S. & Blome, W.W. (2004).  Fatal error: The missing ingredient in child welfare reform, part II.  *Child Welfare, 83*(1).

Steib, S. & Blome, W.W. (2003).  Fatal error: The missing ingredient in child welfare reform, part I.  *Child Welfare, 82*(6) , 747-750.

Texas Department of Protective and Regulatory Services. (2001).  *DASH: Delivering accountable services from home: Region 6 teleworking pilot final Evaluation.*  Austin, TX: Author.

Tooman G. & Fluke J. (2002).  Beyond caseload: What workforce studies can tell us about enduring issues in the workplace.  *Protecting Children, 17*(3), 1-8.

United States General Accounting Office (2003).  *HHS could play a greater role in helping child welfare agencies recruit and retain staff.*   Washington, DC: Author.

Washington State Department of Social and Health Services (1997).  *Social worker workload study.*  Unpublished departmental report. Seattle, WA: Author.

Appendix A

WORKLOAD STUDY DESCRIPTION, ANALYSIS, AND FINDINGS

Appendix A

The following is a more detailed description of the workload study referenced in Sections III.B.2. and IV.B.2. of this document.

## A.  Report of the Study

A.1.Methodology

Three DFCS Regional Directors were designated by the Division Director to work with CWLA consultants to define a process for the workload analysis and establish criteria for composition of a representative group to work with the consultants to undertake the workload analysis process which consisted of three main steps:

- ➢  Define core work functions;
- ➢  Define activities and sub-activities associated with each work function; and
- ➢  Estimate the average amount of time required for each activity and sub-activity for a single case.

It was determined that they study would be conducted using a group composed of a representative from each of the nine organizational regions then existing in DFCS, and that it would include three caseworkers, three supervisors, and the three Regional Directors who took part in the initial meeting.  The caseworker and supervisor representatives were designated by their respective Regional Directors who were contacted by the CWLA project leader and asked to select a representative with a breadth and depth of knowledge across service areas.

The initial meeting was held at the MDHS state office building in Jackson on October 20, 2005 with all nine committee members in attendance.  CWLA consultants Sue Steib and Diana English facilitated the meeting.  Subsequent meetings were held by conference call on November 2, 3, 10, 21, and December 20.

Guided by the review of agency documents as well as reports of workload studies conducted in other jurisdictions, CWLA consultants prepared a provisional listing of job functions with activities and sub-activities.  The work group then reviewed this list, added some job functions, and made revisions to activities and sub-activities as necessary to accurately reflect the duties associated with each job function in DFCS.  The following functions were identified:

Major County Functions
- ➢  General Intake
- ➢  Child Protection Investigation
- ➢  Adult Protective Services
- ➢  In-Home Dependency
- ➢  Out-of-Home Dependency (Foster Care)

Appendix A

Associated Functions

➢ Interstate Compact for the Placement of Children

➢ Intra-state home studies

➢ Courtesy Interviews (for other counties)

Regional Functions

➢ Adoption

➢ Licensing

An important point to note is that this workload analysis focuses on the activities necessary to comply with current MDHS/DFCS policy, typically referred to as a "standard one" analysis. It does not necessarily reflect the activities or time necessary to support performance at a level consistent with standards of best practice. For example, time estimates recorded for placement of children in out of home care do not include consistent use of pre-placement visits, although this is generally accepted as preferred practice. Representatives were asked to estimate the amount of time required to fully complete an activity as required by policy. Thus these average time estimations should not reflect activities that are eliminated or abbreviated due to workload demands or for other reasons.

*Structured Estimation Process*

The designation of job function activities and sub-activities and the estimation of times required for each were derived from a process in which information provided by each group member was recorded by the CWLA group leader and sent out to members in detailed notes following the meeting. Members were instructed to use these notes to share the process with their colleagues and solicit their input. This input was then reviewed and considered at the following meeting. Formal minutes were provided and were sent group members as well as to all Regional Directors and the Division Director to keep them apprised of the process.

Because of differences in their positions as well as other individual and regional differences, group members used various means of seeking participation from other staff. Some used regularly occurring meetings of staff and/or supervisors; others approached individual caseworkers and supervisors based on their experience with a given job function. In a few instances, the time required for a particular function or activity was actually measured. For example, one county representative had the intake worker in her office record the time required for job activities over one week. Another workgroup representative had staff in her region record travel time for the same period.

Times shown in the final report typically reflect mid-ranges or averages derived from the estimation process. In the great majority of cases, participants' estimates of the time required to complete activities were remarkably similar, particularly with regard to the major and associated functions performed at the

Appendix A

county level.  However, when there was wider divergence, the mid-range was derived from the weight of responses, with outliers excluded.  In some instances outliers were linked to unique circumstances, most often court practices, in a county or region.

*Time Available*

Any determination of reasonable workload must consider the time actually available for an individual caseworker to perform case-related activities. This means that time allotted for administrative activities (training, general staff meetings, leave, breaks, holidays, and any other activities not case related) must be excluded to derive the base amount of time available for casework.

The general "one third rule" (Tooman & Fluke, 2002) derived from numerous workload studies in child welfare and related human services, was applied to represent administrative time and to obtain the figure of 116 hours for the time available for an individual caseworker to complete case-related activities.  The random moment sampling methodology used by Mississippi for cost allocation was reviewed to determine whether it would provide more accurate state-specific data, but such was not the case as individual coding definitions did not clearly divide case related from non-case related activities.  Thus the one third rule was applied as shown in Table 1 below.

**Table 1:  Time Available for Case-Related Work**

| | |
|---|---|
| Total work time per month (8 hours per day x 5 days per week x 4.33 weeks per month) | 173.2 hours |
| Less Administrative Hours (173.2 x .33) | 57.2 hours |
| Number of hours per month available for casework activity | 116.0  hours |

A.2.Time Estimations by Work Function

Not all activities apply to every cases and some activities are done only at larger time intervals than once per month. Where that was true, an attempt was made to average the time required across cases and months.  Court hearings, for example, are held on all foster care cases, but do not occur each month.  Thus, the monthly time for court attendance reflects the monthly pro-rated time for attending hearings initially and approximately every six months.

Estimations in the adoption and licensing job functions were most problematic. In adoptions, some activities are conducted only for foster parent or non-foster parent adoptions, others tend to apply to all children involved in the adoption rather than to individual children, and some activities are performed only once in the life of the case. The following data, obtained from the DFCS Placement Section was applied as appropriate to arrive at the most accurate average time estimates:

- 74% of all adoptions are by foster parents.

- The average number of children in an adoption is 2.5.

- Cases are open in adoption (from termination of parental right to case closure) an average of 34 months.

In the case of licensing, some activities, such as those associated with preparing for and delivering training and orientation, apply to groups of families. In these instances, an attempt was made to spread the time required for an activity across all of those cases to which it applies. For example, study group members estimated that, on average, 15 families are enrolled in each pre-service training. Thus, the total estimated time required for training preparation, delivery, and related activities was divided by 15 to arrive at the average time per case for this activity.

A.3. Findings

The final total time estimations for each job function are depicted in Table 2 below. Estimations for the major county and associated job functions are straightforward and, in most instances, the product of either concurrence or reasonably close estimations submitted by group members.

**Table 2:  Time Estimates by Job Function**

| Major County Job Functions | Estimated Time Per Month Per Case |
|---|---|
| General Intake | 59 minutes |
| Child Protection Investigation (CPI) | 484 minutes; 8 hours, 4 minutes |
| Adult Protective Services (APS) | 254 minutes; 4 hours, 14 minutes |
| In-Home Dependency, Prevention | 260 minutes; 4 hours, 20 minutes |
| In-Home Dependency, Protection | 410 minutes; 6 hours, 50 minutes |
| Foster Care | 507 minutes; 6 hours, 50 minutes |
| Associated  County Job Functions | Estimated Time Per Month Per Case |
| Interstate Compact for the Placement of Children (ICPC) | 106 minutes; 1 hour, 46 minutes |
| Intra-State Home Studies | 288 minutes; 4 hours, 48 minutes |
| Courtesy Interviews | 65 minutes; 1 hour, 5 minutes |
| Regional Job Functions | Estimated Time Per Month Per Case |
| Adoption* | 807; 13 hours, 27 minutes |
| Licensing, New Application | 470; 7 hours, 50 minutes |
| Licensing, Renewal ** | 191; 3 hours, 11 minutes |

*  Does not include ICPC
** Training not included

Estimations in regional job functions may require more individualized interpretation depending upon exact duties. In Licensing, for example, training activities are included only for new applications because it was reported that ongoing training was not generally being done by Licensing staff at this time. Likewise, recruitment is not included as it was not possible to obtain reliable data about just what activities this includes or the extent to which either Adoption or

Licensing staff are currently involved in recruitment.  Thus, once these activities are defined and assigned, the time required should be measured and workload adjusted accordingly.

## B.  Comparisons with Actual Time Studies

To provide further support to the estimation process, estimated times for core functions were compared with data from actual time studies conducted in other jurisdictions where such data were available and where it could be discerned that the activities in measured job functions approximately corresponded with those in Mississippi.  It should be noted, however, that these data are used for general comparisons only; policy and procedural variations from one jurisdiction to another often result in significant disparity in job activities and the time required to perform them.  Comparisons are depicted in the table below.

**Table 3**

| Job Function | MS Est. Time (in minutes) | WA Time Study | Erie County, PA | VT Intake Time Study |
|---|---|---|---|---|
| General Intake | 59 | 43 | | 69 |
| CPI | 484 | Actual 335; Recommended 443 | Actual 456; Good practice 580 | N/A |
| In-Home Dependency* | 260 Prevention; 410 Protection | Actual 214; Recommended 240 | N/A | N/A |
| Foster Care | 507 | Actual 368; Recommended 441.5 | N/A | N/A |

*\* Other workload studies examined did not distinguish between prevention and protection in-home dependency cases as is done in Mississippi.*

The Washington State study yielded an actual time of 335.03 minutes per investigation across 543 cases, but recommended that investigations should take 443.18 minutes in order to fully comply with policy standards. A recent study in Erie County, PA found that workers required 7 hours and 36 minutes to complete an investigation in compliance with law and policy but that 9 hours and 40 minutes would be required to conform to good practice standards.

In Washington, services as delivered to Foster Care cases at the time of the workload study required 368.39 per month.  However, it was recommended that 441.50 be allocated for "standard one" or full policy compliance.

A 2002 study conducted in Allegheny County, PA (Pittsburgh) is not used for comparison purposes in the above table as the time estimates do not correspond directly to the listed job functions.  That study examined cases based on the categories of *Intake* which roughly corresponds to child protection investigation,

Appendix A

and *Family Services*, which includes the duties associated with In-Home Dependency and Foster Care in MS. It was determined that the average time needed to complete all home visits and case related tasks for Intake cases was 7.2 hours and 6.8 hours for Family Services. This resulted in an estimated maximum caseload of 16 Intake and 17 Family Services cases (Yamatani & Engel, 2002).

Although imprecise, the above comparisons show that time estimations derived from this workload study are in most at least somewhat comparable to those established through time studies in other states. The greatest divergence was in foster care, in which the final estimate for time required each month exceeded that in the Washington study by 65.5 minutes and the Allegheny County study by 99 minutes.

## C.  Analysis

The information gained in this study provides a basis for case assignment in Mississippi's child welfare agency. In terms of job functions, it means that a single caseworker can handle approximately the following numbers of cases per month:

118 Intakes

14 Child Protection Investigations

14 Foster Care

27 In-home Dependency, Prevention

17 In-home Dependency, Protection

9 Adoption

15 Licensing Applications

36 Licensing Renewals

**References**

Yamatani, H. & Engel, R. (2002). Workload assessment study, Allegheny County Office of Children, Youth and Families. Pittsburgh, PA: University of Pittsburgh School of Social Work.

Washington State Department of Social and Health Services (1997). *Social worker workload study*. Unpublished departmental report. Seattle, WA: Author.

Appendix B

GUIDES FOR INTERVIEWS WITH REGIONAL DIRECTORS

Appendix B

**Mississippi Department of Human Services
Division of Family and Children Services**

**Regional Director Group Interview Questions**

**Instructions:**
Regional Director responses to the interview questions should be recorded as presented in their own words. Questions are grouped into three areas: (1) workforce issues, (2) resource issues, and (3) administrative support issues.

Interviewer          _____

Date of interview         _____
          m/d/y

## 1.0    Workforce Issues

1.1 What are the barriers to obtaining adequate numbers of eligible staff?

1.2    From your perspective, what are the top three factors that influence agency capacity to maintain staff stability (retention of staff)?

1.3    What is your overall assessment of supervisors' level of skill in the area of:
     1.3 a.    oversight of caseworkers' case-related activities?[*]

     1.3 b.  providing guidance related to the implementation and interpretation of policy?

---

[*] Oversight of case activities includes planning services, monitoring services, tracking contacts, developing plans, case reviews, and preparation of court documents and appearances.

Appendix B

      1.3 c setting unit priorities

      1.3 d providing support to caseworkers

1.4    How would you describe the strengths of the supervisors as a group?

1.5    What are three areas of need that would enhance supervisory skill?

1.6    What is your overall assessment of caseworkers' level of skill in:
      1.6 a conducting family and child assessments?

      1.6 b service planning and delivery?

      1.6 c developing permanency plans?

      1.6 d tracking and monitoring service utilization?

1.7    How would you describe the strengths of caseworkers as a group?

1.8    What are three areas of need that will enhance the skill of caseworkers?

1.9    From your perspective, what are the top three factors that influence high caseloads?

Appendix B

**2.0    Resources**

2.1    Based on your experience, what are the three most frequently needed placement resources?

2.2    What barriers exist that prevent or delay the provision of identified services for children?

2.3    What barriers exist that prevent or delay the provision of identified services for parents?

2.4    What barriers exist in recruiting foster families?

2.5    Is the agency prepared to respond promptly and appropriately when families express interest in fostering or adopting?  If not, why not?

2.6.   What barriers exist in retaining foster families?

2.7    What barriers exist in approving/licensing kinship family homes?

2.8    Are all resource family applicants being offered the opportunity for dual licensure?  Has pre-service training been changed to incorporate the content needed for dual licensure?

2.9    Are children placed in unlicensed facilities? If so, why and under what circumstances does this occur?

Appendix B

2.10    To what extent is respite care provided?


2.11    To what extent is day care provided?

Appendix C

CASEWORKER SERVICE NEED AND AVAILABILITY SURVEY

Appendix C

**Mississippi Department of Human Services**
**Division of Family and Children Services**
**Data Collection Work Groups**

**Procedure Guide**

# I. Introduction

The Mississippi Department of Human Services (MDHS) requested the assistance of the Child Welfare League of America (CWLA) in assessing policies, procedures, organizational structure, caseload, workflow, and case management issues with a view toward enhanced capacity to serve children and families. During the past several months CWLA has reviewed policy documents and conducted a workload analysis. In order to establish more detailed knowledge of the MDHS child welfare system, specifically the Division of Family and Children Services (DFCS), it is essential to gather information from staff that has direct influence on service delivery to children and families. Several methods have been identified to gather information relevant to this goal. Focus groups with caseworkers and supervisors will be conducted, as well as group interviews with Regional Directors. The other method of information gathering is through DFCS work groups. This document provides a description of DFCS work groups, their role and responsibility, and procedures for gathering information

## *DFCS Work Group Structure*

Regional Directors have lead responsibility for collecting information from staff in their districts. The Regional Director's role is that of coordinator of information gathering activities. Area Social Work Supervisors, using tools developed by CWLA, will be asked to work directly with staff that has access to case records and other related documents.

### *Area of Focus: Service Delivery*

The assessment of service needs, identification of relevant services, monitoring of service utilization, and the creation of a pool of services are critical to the achievement of desired child and family outcomes. The information that the work groups will gather will focus on service selection, availability, and accessibility. Area Social Work Supervisors will coordinate the gathering of information from their randomly selected sample of foster care staff.

The following topic areas will be explored:

- Placement,
- Mental health,
- Substance abuse,
- Parenting/family skills building, and
- Support services

CWLA consultants will conduct analysis of collected data.

Appendix C

### *Area of Focus: Case Planning*

Case plans serve as blueprints for service delivery. Ideally, they are based on a comprehensive family and child assessment. Additionally case plans should be developed with the participation of the family, age-appropriate children, relevant family members and other professionals, as appropriate. The case plan identifies goals and objectives for services and expected outcomes, including the permanency goal. Regional Directors and Area Social Work Supervisors are asked to randomly select a 10 percent sample of foster care cases in their respective regions. The issues to be explored include:

> Child and family assessments
> Initial placement decisions
> Case plan development
> Permanency plan identification
> Subsequent placement decisions
> Re-evaluation of permanency plans

The most recent case plan from each of the cases in the 10 percent sample will be forwarded to the CWLA consultants for review and analysis.

### *Use of Collected Data and Information*

Information and data gathered through the processes of staff case surveys and case plan review will be included in a larger report providing a general overview and assessment of the DFCS child welfare system. The information that specific individuals provide will be used in a final report to DFCS. However, individual responses will not be noted specifically, but will become part of a larger pool of data.

Appendix C

**Mississippi Department of Human Services**
**Division of Family and Children Services**

**Staff Foster Care Case Survey Instrument**

<u>**Instructions**</u>:
The Area Social Work Supervisor in collaboration with selected caseworkers should use this document to gather information. Responses should be recorded on the instrument using the prompts for each question. One copy of this instrument should be maintained with the District Director and the original forwarded to CWLA. Responses to the questions should be based on the caseworker's knowledge of the families and children in their caseload.

**Section 1.0 Demographic Information**

1.1 County: _____

1.2 District _____

1.3 Supervisor _____

1.4 Caseworker _____

1.5 Number of assigned foster care cases _____

1.6 Survey Date _____
         m/d/y

**Section 2.0 Placement Resources**

In what type of placements are children in your caseload? ***Check all that apply and indicate the number of children beside each type of placement.***
   ❑ Family foster home (long-term)          _____
   ❑ Emergency family foster home          _____
   ❑ Group home          _____
   ❑ Residential treatment          _____
   ❑ Independent living          _____
   ❑ Kinship care home/relative placement _____
   ❑ Hospital          _____
   ❑ Shelter          _____
   ❑ Other (Please specify)     _____

What are the top three factors that influence the selection of a placement resource?
   ❑ Documented assessment of the child's needs

59

Appendix C

  ❑ Documented family assessment
  ❑ Location of resource
  ❑ Resource availability
  ❑ Court order for specific placements
  ❑ External reports of documented need
  ❑ Other (Please specify) _____

How do you determine the level of service?  Please explain.

_____
_____
_____
_____
_____
_____

When children have required a change in placement, what have been the primary reasons?  *Check no more than two options*.
  ❑ Move to a less restrictive setting (e.g. residential treatment to foster home setting)
  ❑ Placement with a relative
  ❑ Custody to a relative
  ❑ Placement in a juvenile justice setting
  ❑ Runaway behavior
  ❑ Behavioral management issues
  ❑ Caregiver or placement facility request
  ❑ Child's request
  ❑ Move to independent living
  ❑ Other (please specify) _____

From your experience, check three of the most frequently needed placement resources.  *Check no more than three*.
  ❑ Family foster homes (long-term)
  ❑ Emergency family foster homes
  ❑ Adoptive family homes
  ❑ Group homes
  ❑ Residential treatment
  ❑ Independent living
  ❑ Other (Please specify) _____

How frequently do you have to choose an alternative placement because the optimal choice for a child is not available?  *Select one option.*
  Never
  Sometimes, but not frequently
  Frequently (50% or more of the time)
  Cannot estimate/no answer

How often do you have to place a child farther from his family and community than you would like because a closer placement is not available?

Appendix C

***Check only one option***
Never
Some time, but not frequently
Frequently (50% or more of the time)
Cannot estimate/no answer
Other (Please specify) _____

## Section 3.0 Mental Health Services

What mental health service is most frequently requested?  ***Choose no more than three options.***
      Psychological assessment or testing
      Psychotherapy
      Family therapy
      Individual therapy
      Group therapy
      Psychiatric examination
      Psychiatric hospitalization
      Behavior modification
      Counseling
      Other (Please specify)  _____

To what degree are the most frequently requested services available in the location of children or families?  Available means that the service exists and can be secured within the time needed.
      Readily available
      Somewhat available
      Not available
      Other (Please explain)  _____

If the most frequently requested services that you identified in 3.1 are available, are they accessible to children and families?  Accessible means that the service can be easily reached.
Yes
No
Not sure
Other (Please explain)_____

What mental health services would you like to see more of for children and families?
      ***Check no more than three options.***
      Psychological assessment or testing
      Psychotherapy
      Family therapy
      Individual therapy
      Group therapy
      Psychiatric examination
      Psychiatric hospitalization

Appendix C

Behavior modification
Residential treatment
Counseling
Other (Please specify) _____

**Section 4.0 Substance Abuse**

4.1    What is the most frequently requested service related to substance abuse?  **Choose no more than three options.**
Screening (child)
Screening (adult)
Assessment (child)
Assessment (adult)
Out-patient treatment (adult)
Out-patient treatment (child)
In-patient treatment (adult)
In-patient treatment (child)
Other (Please specify) _____

4.2    To what degree are the most frequently requested services available in the location of children or families?  Available means that the service exists.
Readily available
Somewhat available
Not available
Other (Please explain) _____

4.3    If the most frequently requested services that you identified in 4.1 are available, are they accessible to children and families?  Accessible means that the service can be easily reached.
Yes
No
Not sure
Other (Please explain)_____

*4.4*    What substance abuse services would you like to see more of for children and families? *Check no more than three options.*
Screening (child)
Screening (adult)
Assessment (child)
Assessment (adult)
Out-patient treatment (adult)
Out-patient treatment (child)
In-patient treatment (adult)
In-patient treatment (child)
Other (Please specify) _____

Appendix C

**5.0 Physical and Dental Health Services**

5.1    What barriers exist in obtaining medical examinations or assessments for children? ***Check no more than three barriers***
      Availability of resources
      Accessibility of resources
      Delays due to waiting lists
      Financial or insurance availability
      Transportation
      No barriers exist
      Other (Please specify)    _____

5.2    What barriers exist in obtaining medical treatment for children when a condition has been diagnosed? ***Check no more than three barriers.***
      Availability of resources
      Accessibility of resources
      Delays due to waiting lists
      Financial or insurance availability
      Transportation
      Parental consent
      Need for court order in absence of parental consent
      No barriers exist
      Other (Please specify)    _____

5.3    What barriers exist in obtaining dental assessments or examinations for children? ***Check no more than three barriers.***
      Availability of resources
      Accessibility of resources
      Delays due to waiting lists
      Financial or insurance availability
      Transportation
      No barriers exist
      Other (Please specify)    _____

5.4    What barriers exist in obtaining dental treatment for children when a condition has been diagnosed? ***Check no more than three barriers.***
      Availability of resources
      Accessibility of resources
      Delays due to waiting lists
      Financial or insurance availability
      Transportation
      Parental consent
      Court order in absence of parental consent
      No barriers exist
      Other (Please specify)    _____

Appendix C

**6.0 Parenting Skills**

6.1     Of the foster care cases, in how many of the families was parenting/family skill building identified as a need?  ***Check only one option.***

(fill in the number) _____

Unable to determine

None

Other (Please explain) _____

6.2     What area of parenting skill building is most frequently identified as a need? ***Check the top three.***

Discipline

Understanding age-appropriate behavior

Setting limits

Building child self esteem

Understanding child development

Advocacy

Safety and nurturing of young children

Creating child-friendly environments

Not applicable, the need was not identified in any cases

Other (Please specify) _____

6.3     To what degree are programs available to address the most frequently identified area of need in the location of the parent?  Available means that the service or program exists.

Readily available

Somewhat available

Not available

Other (Please explain) _____

6.4     If programs are available to address the areas of needs that you identified in 6.2, are they accessible to parents?  Accessible means that the program can be easily reached.

Yes

No

Not sure

Other (Please explain)_____

6.5     What areas of parenting skill building would you like to see more available for parents? ***Check no more than three options.***

Discipline

Understanding age-appropriate behavior

Setting limits

Building child self esteem

Understanding child development

Advocacy

Safety and nurturing of  young children

Creating child-friendly environments

Not applicable, no opinion

Appendix C

Other (Please specify)  _____

6.6     What factors do you consider in determining successful completion of a parenting program or service?  **Check all that apply.**
       Attendance
       Level of participation
       Observed transfer of learning
       Parent feedback
       Progress reports from the program
       Other (Please specify)  _____

6.7     Of the factors listed in 6.6 what do you consider the most important?  ***Check no more than two.***
       Attendance
       Level of participation
       Observed transfer of learning
       Parent feedback
       Progress reports from the program
       Other (Please specify)  _____

## 7.0 Support Services

7.1     Based on your experience with your current cases, what support services do families most frequently request?
       Transportation to services
       Transportation for family visits
       Homemaker
       Advocacy with other systems (e.g. health and education)
       Other (Please specify)  _____

7.2     Which services are available to families?  **Check all that apply.**
       Transportation to services
       Transportation for family visits
       Homemaker
       Advocacy with other systems (e.g. health and education)
       Other (Please specify)  _____

7.3     Does your office have Social Work Aides?
       Yes
       No
       Do not know

7.4     How do you and Social Work Aides coordinate case information when you share the same case? ***Please describe.***
       _____
       _____
       _____

Appendix C

_____
_____
_____
_____

7.5    Is there anything else that you would like to share concerning placements and services?

_____
_____
_____
_____
_____

Thank you for taking the time to participate in this survey and sharing your experience.

Appendix D

CASEWORKER AND SUPERVISOR FOCUS GROUP INTERVIEW GUIDES

Appendix D

**Mississippi Department of Human Services**
**Division of Family and Children Services**

**Focus Group Registration Form**

**1.  Name** _____ **(optional)**

**2.  Male** _____  **Female** _____

**3.  Job Title/Position**
      Caseworker                ____
      Area Social Work Supervisor  ____

**4.  Which of the following describes you?  Check all that apply.**
      I work directly with children and families          ____
      I recruit and train resource families             ____
      I license resource family homes
      I supervise caseworkers who plan and deliver services  ____
      Other (Write in)  _____

**5.  Years of education**
      BSW                     ____
      Other bachelor's degree  ____
      MSW                    ____
      Other master's degree     ____
      Other (Please specify)     ____
            _____

**6.  Years with the agency**
      Less than one year       ____
      One year              ____
      Two to five years        ____
      Six to ten years         ____
      More than ten years    ____

Appendix D

**Mississippi Department of Human Services**
**Division of Family and Children Services**

*Focus Group*

*Statement of Informed Consent*

I, _____, agree to participate in this focus group being conducted by _____from the child Welfare League of America (CWLA).  CWLA has been retained by the Department of Human Services to conduct this study.

The purpose of the study is to gain insight into factors that influence how children in out-of-home care and their families receive services through the Division of Family and Children Services.

I understand that:
> The focus group will last no more than two and one half hours.
> My participation is voluntary and that if I wish to leave I may do so at any time without giving a reason or explanation.
> My withdrawal from the group, if I choose to do so, will have no affect on my relationship with DFCS.
> The facilitators will take notes.  These materials will be kept confidential.
> Names of individuals in the focus group will be kept confidential.
> A report summarizing the results of this and other focus groups will be presented to DFCS management.  Participant names will not be used in the report.
> It is expected that I will not repeat anything heard during this group, outside the group.

The CWLA facilitators have offered to answer questions that I have about the focus group and what I am expected to do.

I have read and understand this information and I agree to take part in this focus group.


_____              _____
Today's Date                      Your Signature

69

Appendix D

**Mississippi Department of Human Services**
**Division of Family and Children Services**

*Focus Group*

**Facilitator Agenda**

**Welcome and Introductions**
    Welcome group and thank them for their presence.
    Introduction of facilitator and recorder.
    Participant introductions

**Purpose and Topic Overview**
    Review purpose statement (gather information to increase understanding)
    Review general issues (resources, permanency, caseloads, supports)

**Provide Guidelines**
    Notes will be taken during the session.
    Anonymity is guaranteed in the recording, analysis, and reporting of the
    results.
    There are no wrong answers, just different points of view.
    Free to address remarks to each other, not just the facilitator.
    One person speaks at a time.
    Facilitator's role is to ask questions and listen.

**Questioning Period**
    List questions here
**Summary**
    Brief summary of main points
    Group comments, amendments, corrections

**Closure**
    Anything missed?
    Questions from the participants
    Information concerning feedback  (e.g. how results will be shared)
    Thank you to participants

Appendix D

**Mississippi Department of Human Services
Division of Family and Children Services**

*Focus Group*

**Participant Agenda**

**Welcome and Introductions**

**Purpose and Topic Overview**

**Guidelines**

**Questioning Period**

**Summary Discussion**

**Wrap Up**

Appendix D

**Mississippi Department of Human Services**
**Division of Family and Children Services**

*Focus Group Questions and Reporting Form*
**Foster Care Social Workers**

Focus Group Information

| | |
|---|---|
| Date of Focus Group | |
| Location of Focus Group | |
| Number and Description of Participants | |
| Facilitator | |
| Recorder | |

**Responses to Questions**

**Q 1: What factors are considered in selecting shelter care as a placement option for a child.**

| Summary/Key Points | Notable Quotes |
|---|---|
| | |

Comments/Observations

| |
|---|
| |

Appendix D

**Q2:  How are decisions made about the selection of other placements?**

| Summary/Key Points | Notable Quotes |
|---|---|
|  |  |

Comments/Observations

73

Appendix D

**Q 3: How are the service needs of children and families determined?**

| Summary/Key Points | Notable Quotes |
|---|---|
|  |  |

Comments/Observations

Appendix D

**Q 4:  Describe how you develop Individual Service Plans.**

| Summary/Key Points | Notable Quotes |
|---|---|
|  |  |

Comments/Observations

75

Appendix D

**Q 5: What barriers exist that prevent or delay the provision of identified services for children and families?**

| Summary/Key Points | Notable Quotes |
|---|---|
|  |  |

Comments/Observations

Appendix D

**Q 6: To what extent is concurrent planning practiced?  If it is not practice, why not?**

| Summary/Key Points | Notable Quotes |
|---|---|
| | |

Comments/Observations

Appendix D

**Q 7:  What can DFCS do to more consistently achieve safe and timely permanency for children?**

| Summary/Key Points | Notable Quotes |
|---|---|
|  |  |

Comments/Observations

Appendix D

**Q 8: From your perspective, are caseloads too high?  If so, what factors do you believe influence high caseloads?**

| Summary/Key Points | Notable Quotes |
|---|---|
|  |  |

Comments/Observations

Appendix D

**Q 9: What additional supports would be useful to you in carrying out your job?**

| Summary/Key Points | Notable Quotes |
|---|---|
|  |  |

Comments/Observations

Appendix D

**Mississippi Department of Human Services
Division of Family and Children Services**

*Focus Group Questions and Reporting Form*
**Area Social Work Supervisors**

Focus Group Information

| | |
|---|---|
| Date of Focus Group | |
| Location of Focus Group | |
| Number and Description of Participants | |
| Facilitator | |
| Recorder | |

**Responses to Questions**

**Q 1: Describe your role in the supervision of caseworkers.**

| Summary/Key Points | Notable Quotes |
|---|---|
| | |

Comments/Observations

| |
|---|
| |

81

Appendix D

**Q 2: What barriers exist in the recruitment and retention of staff?**

| Summary/Key Points | Notable Quotes |
|---|---|
|  |  |

Comments/Observations

Appendix D

**Q 3: From your perspective, are caseloads too high? If so, what factors are responsible?**

| Summary/Key Points | Notable Quotes |
| --- | --- |
|  |  |

Comments/Observations

Appendix D

**Q 4: How are service needs of children and families determined?**

| Summary/Key Points | Notable Quotes |
|---|---|
|  |  |

Comments/Observations

Appendix D

**Q 5: What barriers exist that prevent or delay the provision of identified services for children and families?**

| Summary/Key Points | Notable Quotes |
|---|---|
|  |  |

Comments/Observations

Appendix D

**Q 6: What can DFCS do to more consistently achieve safe and timely permanency for children in out-of-home care?**

| Summary/Key Points | Notable Quotes |
|---|---|
|  |  |

Comments/Observations

86

Appendix D

**Q 7: What additional supports would be useful to you in carrying out your job?**

| Summary/Key Points | Notable Quotes |
|---|---|
|  |  |

Comments/Observations

Appendix D

**3.0 Administrative Supports**[*]

3.1    Describe the supports, including data and management tools, that you receive from the state office?

3.2    What supports, including data and management tools from the state office would be useful to you in carrying out your job?

3.3    What would you describe as agency strengths?

3.4    What would you describe as areas of need?

Thank you for taking the time to discuss these issues.

[*] An administrative support refers to assistance and guidance to Regional Offices by the State Office.

Appendix E

CONSULTANT VITAS

Appendix E

# CURRICULUM VITA
December 2005

**Name:**              Sue Duvall Steib

**Address:**           25125 Bickham Road
                       Jackson, Louisiana 70748

**Phone:**             (225) 654-9347

**Current Position:**  Director, Research to Practice
                       Child Welfare League of America
                       440 First Street NW, Third Floor
                       Washington, DC 20001

## Education

Ph.D.:   Social Work: Social policy and research; Minor: Educational Research
             Louisiana State University, 2001

MSW:      Major: Administration; community organization
             Louisiana State University, 1983.

BA:      Major: Sociology
             Louisiana State University, 1970.

## Licensure & Certifications

- Licensed Clinical Social Worker, License #2227
- Board Approved Supervisor, Louisiana Board of Certified Social Work Examiners
- Academy of Certified Social Workers

## Professional Affiliations, Appointments & Awards

- Catholic Community Services Adoption Advisory Board, Baton Rouge, Louisiana, 2001-2004
- Distinguished Alumni Award,  Louisiana State University School of Social Work, 2004
- Louisiana Law Institute, Children's Code Advisory Committee, 2000 to present
- Louisiana Children's Cabinet, Comprehensive Planning Advisory Committee, 1999-2000
- National Association of Social Workers
- Society for Social Work and Research

Appendix E

**Sue D. Steib, page 2**

**Professional Experience**

**Child Welfare League of America**

September 2001 to present
Director of Research to Practice

CWLA's Research to Practice (R2P) initiative endeavors to bridge the gap between the research and practice communities by conducting systematic reviews of the empirical literature across the broad spectrum of child welfare and related fields, and synthesizing this information, along with its implications for practice and policy, into a format easily accessed by practice professionals.  R2P prepares annotated bibliographies and research briefs on key topics related to child welfare practice, conducts workshops on evidence-based practices at the conferences of CWLA and other human services organizations throughout the country, and provides on-site consultation and technical assistance to agencies undertaking evidence-based practice change.

**Louisiana Department of Social Services, Office of Community Services:**

Child Welfare Program Director
November, 1997 to September, 2001

Responsible for direction of planning, budgeting, resource and policy development, for the public child welfare programs in Louisiana. Served as primary legislative liaison for the agency in child welfare program issues. Supervised the administrators of the child protection, family services, foster care, and adoption programs who, along with 14 subordinate professional staff, provided functional supervision to approximately 1100 caseworkers, supervisors, and regional level staff throughout the state.

Administrator, Foster Care and Adoption
May 1991 to November, 1997

Responsible for the planning and management of a budget of over $60,000,000 annually, policy and program development. Duties included negotiation and management of contracts, coordination with other public and private agencies, provision of clinical consultation to field staff in exceptionally difficult cases, and review and analysis of legislation affecting services to children and families.  Directly supervised three support staff and six masters level social workers assigned to program management.

Appendix E

**Sue D. Steib, page 3**

Administrator, Child Protection and Family Services
February, 1987 to May, 1991

Responsible for the planning and management of a budget of approximately  $9,000,000
and development of programs, policy, and resources.  Duties included negotiation and
monitoring of contracts with private service providers, provision of clinical consultation
in referred cases, provision of input concerning legislation, coordination with other public
and private agencies.  Supervised a staff of five masters level social workers assigned to
program management and two support staff.

Social Services Supervisor
May, 1980 to February, 1987

Supervised casework staff (bachelors and masters level) providing assessment,
counseling and case management services to families to address issues of child
maltreatment and family conflict and in placement decision making and attainment of
permanency for children in foster care. Included direct counseling with families in
problem solving and case planning, relinquishment of parental rights, dependency and
child custody and permanency issues. Work with the legal system included preparation of
cases and provision of testimony in matters of child custody, placement, development of
permanent plans for children in foster care, and termination of parental rights.

Caseworker
August,1970 to May,1980

Provided casework services to children and families in child protection, child welfare
home-based services,  foster care, and adoption.

**Presentations & Publications**

*Presentations in Evidence-Based Practice:*

*Strengths-Based, Family-Centered Practice:  Applying the Evidence.* Child Welfare
Professional Development Academy, Norfolk State University, Norfolk, VA., December,
13-14, 2005.

The Child Welfare Workforce: What Research Does (and Doesn't) Tell Us About
Recruitment and Retention. Child Welfare Workforce Development and Workplace
Enhancement Institute: Knowledge Development and Application, U.S. Children's
Bureau, Arlington, VA, October 24, 2005.

**Sue D. Steib, page 4**

*Effective Interventions in Child Maltreatment.*  American Professional Society on the Abuse of Children, National Colloquium, New Orleans, LA., June 17, 2005.

*Chronic Neglect: Leveraging What We Know to Keep Children Safe*.  National Conference on Child Abuse & Neglect, Boston, MA, April 20, 2005..

*Evidence-Based Practice: What is it and What Does it Really Mean for Agencies and Practitioners?*  Child Welfare League of America National Conference, Washington, DC, March 11, 2005.

*Using What We Know: Making Research Work for Kids & Families.*  Child Welfare League of America National Conference, February 28, 2004.

*Evidence-Based Practice Across the Continuum:  Engagement & Assessment of Families.*  Child Welfare League of America National Conference, Washington, DC, February 29, 2004.

*Evidence-Based Practice Across the Continuum:  Working with Siblings*.  Child Welfare League of America National Conference, Washington, DC, February 29, 2004..

*Bringing Research to Life in Child Welfare.*  Workshop presentation at the Society for Social Work and Research National Conference, New Orleans, LA, January 19, 2004

*Using Evidence to Make Practice Decisions in Tough Times*.  National Council of Juvenile and Family Court Judges National Symposium, Kansas City, MO, September 16, 2003.

*Child Safety:  What the Evidence Supports*.  National Conference on Child Abuse & Neglect, St. Louis, MO, April 1, 2003.

*What's So Special About Specialized Foster Care?*  Foster Family Treatment Association's 16th Annual Conference, Chicago, Illinois, July 24, 2002.

*Exploring the Field:  What is Research Saying About Workforce Issues?* CWLA Finding Better Ways Conference, St. Louis, Missouri, June 11, 2002.

*"Turning Research into Meaningful Programs and Practices for Children and Families"*.  Child Welfare League of America National Conference, Washington, DC, March 8, 2002.

*"Self-efficacy Correlates of Judicial Rating of Child Welfare Caseworker Performance"*.  Society for Social Work and Research, San Diego, California, January 18, 2002.

Appendix E

**Sue D. Steib, page 5**

*"Reframing Child Welfare and the Courts: A Statewide Study with Implications For Education and Practice"*. Ellett, A. and Steib, S. Paper presented at The Annual Program Meeting of the Council on Social Work Education, New York City, N.Y., February, 28, 2000.

*"A Statewide Study of Child Welfare Practice and the Courts: Lessons Learned and Their Implications"*. Ellett, A. and Steib, S. Paper presented at The Society for Social Work and Research Annual Conference, Charleston, S. C., January 30, 2000.

*Academic Journal Publications*

Blome, W.W. & Steib, S. (in press).  Strategies for empowering the child welfare administrator facing class action litigation.  *Journal of Public Child Welfare.*

Blome, W.W. & Steib, S. (2004).  Whatever the problem, the answer is "evidence-based practice" – or is it?  *Child Welfare, 83*(6), 611-615.

Blome, W.W. & Steib, S. (2004).  Like musical chairs?  Become a child welfare worker.  *Child Welfare, 83*(4),  381-384.

Ellett, A.S. & Steib, S. (2005).  Child welfare and the courts:  A statewide study with implications for professional education and practice.  *Research in Social Work Practice, 15*(5), 339-352.

Steib, S. & Blome, W.W. (2004).  Fatal error: The missing ingredient in child welfare reform, part II.  *Child Welfare, 83*(1).

Steib, S. & Blome, W.W. (2003).  Fatal error: The missing ingredient in child welfare reform, part I.  *Child Welfare, 82*(6) , 747-750.

Appendix E

**Charlene Ingram, MSW**
49 Aberdeen Drive
Erial, New Jersey 08081

**EDUCATION**

**MSW**   1974        University of Pennsylvania, School of Social Work
**BA**      1965        Bennett College, Greensboro, North Carolina

**EMPLOYMENT EXPERIENCE**

1997 to present   **Senior Consultant, Child Welfare League of America**, providing consultation and technical assistance to public agencies and governmental bodies in a broad range of child welfare program and management areas, specializing in review and analysis of program process and procedures.  Project responsibilities have included:

Evaluation of child welfare systems; Alameda County, California, Board of Supervisors.

Development of child welfare practice standards; State of Pennsylvania Department of Public Welfare;

Technical assistance for Child and Family Service Review statewide assessment, Pennsylvania Department of Public Welfare,

Consultation to litigation team, Georgia Department of Family and Children Services

Review of child welfare programs, Westchester County, New York,

Technical assistance for kinship care policy development, Saskatchewan, Canada, Department of Social Services, Family and Youth Services Division

Review of child welfare policies and practice; Somerset County, Pennsylvania, Department of Social Services;

Training for county social services staff in preparation for implementation of New York's SACWIS system for Andersen Consulting;

Review of child protective service and practices in Montgomery County, Maryland, Department of Social Services;

Development of Kinship Care standards and practice materials for the Child Welfare League of America.

1995–1997        **Social Work Administrator**, Philadelphia Department of Human Services, Children and Youth Division.    Plan and coordinate community and family foster home development activities to facilitate child welfare reform through the Family to Family Initiative (national effort supported by the Annie E Casey Foundation); lead responsibility for building collaborative partnerships with nine private child welfare service providers; project manager for funding to private providers implementing Family to Family reforms; chair the Family to Family Steering Committee made-up of private child welfare provider mid-level managers; administrative responsibility for a staff of eleven social workers and two supervisors.

Appendix E

| | |
|---|---|
| 1990 - 94 | Administered social service delivery to families through three supervisors and seventeen social workers whose responsibilities included the assessment and service planning for families experiencing child abuse and neglect issues. |

Responsible for the administration of the in-house foster care program, which included the recruitment, and retention of foster families, training program development, and the monitoring of foster homes for regulatory compliance issues and family service plan requirements. Provided direction and guidance for three first line supervisors who oversaw the direct service provided to foster families by fifteen social workers.

Directed Juvenile Court related activities through two supervisors responsible for twelve social workers and two support staff. Formulated and coordinated court procedures with city solicitors and court personnel; trained new staff on court procedures and case responsibilities.

1981 - 90      **Social Work Supervisor**, Philadelphia Department of Human Services, Children and Youth Division. Coordinated Juvenile Court activities for social service staff; consulted with City Solicitors on Juvenile Court procedures; served as a liaison between Juvenile Court personnel and Department staff concerning problem issues. Supervised a unit of five social workers who performed assessment and planning for new cases.

1969 - 81      **Social Worker**, Philadelphia Department of Human Services, Children and Youth Division. Represented the agency at the Bar of Court in Delinquent and Dependent Courts; prepared referrals made by judges and probation officers; worked directly with children in foster care and their foster parents; executed initial intake of new families referred for services, investigated reports of abuse and neglect.

1967 - 79      **Mental Health Worker**, Philadelphia State Hospital. Screened patients for participation in a group program; designed and developed activity programs for chronic institutionalized patients, coordinated discharge planning with the social service department, conducted counseling groups.

## ORGANIZATIONS – AWARDS

Nominated for the 1993 Greater Philadelphia First Public Management Award

## PUBLICATIONS

Ingram, C. (1996). Kinship Care: From Last Resort to First Choice. <u>Child Welfare,</u> Vol. LXXXV (5) pp.

550-566