a pattern of losing potential foster families through failure to process foster parent applications in a timely manner due to insufficient recruitment staff,[237] it had failed to add, or even seek, more recruitment staff, or to keep track of how long applications lie dormant.[238]

In its second quarter PIP progress report, for July-September 2005, DFCS admits that "[t]he State has failed to meet or exceed the established baseline [for proximity of foster care placement] for two consecutive quarters." For July-September 2005, 64% of children in custody were placed in close proximity of their original homes, a dramatic 20% drop in performance from the preceding April-June 2005 quarter, where 83.8% of children in custody were placed in close proximity to their original homes.[239]

<div style="text-align:center">(x)    <b>Children are Subjected to Multiple Moves</b></div>

Children are also subjected to multiple moves preventing them from achieving any sense of stability and permanency. As acknowledged in the MDHS Policy Manual, a "foster child who moves many times, or who constantly fears that he/she may have to move, can suffer devastating effects on his/her emotional health."[240] As reported in the May 2004 CFSR Final Report, however, in 40% of the foster care cases reviewed "[t]he child experienced placement changes that were not for the purpose of meeting the child's needs or attaining the child's goals."[241]

The Hess Case Record Review found that 82.7% of children in custody have been moved between one and 57 times during their most recent stay in custody. For these children, the average number of moves was 5.8. When examined by length of stay in custody, more than a third of these children averaged three or more moves per year. Some of the youngest children were subjected to the highest average number of moves per year of any age group: infants less than one year of age (4.1 moves per year) and three year olds (4.3 moves per year).[242] Similarly, the Self Assessment acknowledges that many of the children in MDHS custody are subjected to a large number of placement moves, with over 200 children in care experiencing nine or more placements.[243]

<div style="border:1px solid black; display:inline-block; padding:5px"><b>Exhibit H-2</b></div>

MACWIS data from November 2005, indicates that children in MDHS custody have undergone an average of 3.4 placement moves during their time in care.  236 of the children out of the 3,277 reported have had 9 or more placement moves, 54 have had 8 placement moves, 82 have had 7 placement moves, 128 have had 6 placement moves, and 212 have had 5 placement moves.[244]



**Number of placements for children in MDHS custody**



Most recently, the Foster Care Review Program found that in the first quarter of SFY 2006 (July – September 2005), 43% of children reviewed changed placement, 57% of whom experienced two or more placement moves in just those three months.[245]

Many of these damaging placement moves could have been avoided.  The Hess Case Record Review found that over 90% of the time DFCS failed to make efforts to offer or provide supportive services to either the child or the caregiver to maintain the placement and prevent a move.[246]  MDHS concedes in the Self Assessment that support and training for foster parents to help them address the needs of foster children – a deficiency noted in the 1995 federal review[247] – continues to be problem.[248]  The May 2004 CFSR Final Report likewise determined that there is "no formal support system in place for foster parents," and that in 25% of the applicable foster care cases reviewed

"needed services were not provided to foster parents."[249]  It notes with concern that in cases of multiple placement disruptions due to the child's behavior "there was no evidence that the agency provided support to foster parents to help maintain the placement when there was a threat of disruption due to behavioral acting out."[250]  MDHS does not even have any system for respite care, whereby another licensed caretaker may watch a foster child on a short-term basis.[251]  The CFSR further found that, insofar as "most of these children should be in therapeutic foster care or other therapeutic settings, [] these types of placement are not available."[252]  In this same vein, the Hess Case Record Review finds that 45.7% of placement moves were related to the child's mental health or behavioral needs or difficulties, or the unmet need for a different level of care.[253]

Since the CSFR noted that MDHS does an inadequate job of matching children with placements, which sets the stage for those placements to disrupt, MDHS has made no changes to its matching process.[254] In November/December 2005, ACF reviewed Mississippi's second quarterly PIP progress report for July-September 2005, and found that DFCS had not yet completed any of the action steps due in the first two quarters of PIP implementation related to enhancing and expanding foster and adoptive parent support groups and services. [255]

This expert foresees that placements will remain unstable without radical reform of the State's placement procedures, a dramatic increase in the pool of placement resources available to MDHS, and the development of adequate supportive services and training programs for foster parents.

### (xi)     MDHS Fails to Supervise and Screen Children's Placements

The harm to children caused by MDHS's placement of them in inappropriate and/or distant placements is compounded by MDHS's inability to consistently monitor their welfare.  MDHS policy and national practice standards require monthly supervision of children in their placements, including face-to-face contact with children.[256]  Former Director Mangold confirmed that the Social

Worker to whom a foster child is assigned is responsible for monitoring the child's ongoing safety in the placement, including in situations in which the child is placed in a private placement.[257] The Director of the State Office Placement Unit testified, however, that while it would be "best practice" for Social Workers to visit foster children in their placements and make observations about whether that setting is safe and meets children's health needs, her understanding of MHDS policy did not require that visits be in person or that Social Workers lay eyes on the homes where the children on their caseload are being held in state custody.[258] In further contradiction of MDHS policy and accepted professional standards, Regional Director McDaniel testified that MDHS is relieved of its obligation to make face-to-face contact with children in its custody when it places them out of state, even if the state in which MDHS has placed the children has refused to visit them.[259]

The Hess Case Record Review finds that 87.6% of children in custody failed to receive at least one face-to-face contact per month by their caseworker or supervisor during the one-year period prior to June 1, 2005, and that 13.5% were deprived of *any* such contact during the entire year. Social workers/supervisors only made an average of less than half of the required monthly visits to children.

---

**Case Example**

*Siblings Lashana, James, Thomas and Kaleb came into foster care in December 2000, at the ages of 1, 5, 7 and 14. A February 2005 Foster Care Review notes that these children "have not been seen by a social worker since their placement in their maternal grandparents home" in 2000, and that there was "insufficient documentation" to assess the safety of the children's placement. The Foster Care Reviewer also reports that the children's individualized service plans lack any medical, dental, psychological or immunization records. Periodic Administrative Determination, February 22, 2005, DHS 064088.*

---

Due to a lack of staff, MDHS has resorted to using social work aides, homemakers, and clerical staff "to do much of the same duties" as Social Workers, even though "[f]ormalized training is not available for case aides and homemakers."[260] For example, the agency has waived the requirement that a child's assigned Social Worker maintain face-to-face contact with children in custody, allowing unqualified and

untrained MDHS homemakers and case aides to make these critical visits.[261]  Of course this defeats the purpose of hiring trained Social Workers, a reform that was instituted in 1994 in direct response to prior agency failures.[262] In any event, even counting face-to-face contacts made by unqualified and untrained MDHS staff, including clerks, children in MDHS custody still averaged only 9.9 contacts for the year, and 8.4% of children failed to receive *any* MDHS contact for the entire year prior to June 1, 2005.  Moreover, *none* of the children's foster parents were seen face-to-face in their homes by a Social Worker or supervisor on a monthly basis for the entire year prior to June 1, 2005, and for 32.6% of the children, MDHS staff did not visit the caretakers in their home *even once* during that year.[263]

   The Foster Care Review Program similarly found that in the first quarter of FY 2006, 20% of the children reviewed had been visited by a caseworker "or other responsible party" either less than monthly or not at all.[264]  And though the March 2005 PIP acknowledges "the importance and the impact that caseworker visitation [with children] can have on improved outcomes for families and children," MDHS admits in it that staffing and caseloads issues are impacting DFCS' ability to make monthly visits.  MDHS itself reports that from July to December 2004, an average of only 67.1% of children statewide had monthly face-to-face contacts with their Social Worker.[265]  And recent MDHS aggregate reporting indicates that as of November 2005, of the 3423 children reported in custody, 880 (25.71%) had not had contact with their Social Worker in at least 30 days.[266]   It is significant that this level of failure to regularly lay eyes on children in custody is despite the statewide waiver of agency policy allowing the required face-to-face contacts "to be made by agency Homemakers and Social Work Aides as well as Social Workers."[267]

> **Case Example**
>
> *Siblings Michele and Sam, ages nineteen months and four years old, have been in care since August 2004. In the children's January 2005 Foster Care Review, the reviewer reports that she is unable to assess the safety or appropriateness of the children's placement because:* "**There is no placement information**" *and no documentation of face to face contact with these children in either the placement home or in the office. Periodic Administrative Determination, January 10, 2005, DHS 063837.*

56

**Number of Children Not Seen by MDHS Staff in Last 30 Days**



268

Every month that a MDHS Social Worker fails to see the children on their caseload is a lost opportunity to assess the child's safety, well-being and progress towards permanency and prevent further maltreatment. Although the March 2005 PIP acknowledges "the importance and the impact that caseworker visitation [with children] can have on improved outcomes for families and children," MDHS characterizes its plan to increase the percentage of minimum monthly face-to-face worker contacts with children in custody by only 6% over two years as "ambitious due to the staffing and caseloads issues impacting casework."[269] Regional Director Zadie Rogers testified that throughout her five years in that position, her staff had never succeeded in making the required visits to all children in care.[270] As another Regional Director testified when asked about the impact that repeated denials of her requests for more staff had had on her staff's ability to make required visits, "I regret that we cannot do that because we really need it, we really need it. But if we can't, we can't."[271]

| Case Example |
| --- |

*Brian is three years old and has been in custody for almost half his life. A December 2005 Foster Care Review notes that evidence seems to "indicate that this is a child with some special needs who may require more frequent contact." However, Brian's individualized service plan had not been updated in five months and the reviewer notes that "there is no documentation that agency staff persons have had face to face contact with [Brian] since [October 12, 2005]." In addition, despite the fact that "[c]ourt orders filed in the case record show the court ordered on [September 28, 2005] that the agency pursue termination of parental rights and then adoption for this child," a TPR petition had not been filed. Periodic Administrative Determination, December 19, 2005, DHS 090291.*

The Licensure Unit of DFCS is responsible for the licensing of foster homes, child placing agencies, and residential child caring facilities. As of January 12, 2005, MDHS active placement resources included 859 homes and 33 facilities with MDHS child placements.[272] At one time the Unit had fifteen Foster Home Licensure Specialists, but in the FY 2006 Budget Request it was noted that the number had been reduced to eleven to cover the entire state.[273] The May 2004 CFSR Final Report finds that while "[p]olicy requires licensing staff to visit each foster home one time per month[, t]his standard is not met due to the high caseloads of staff."[274]

MDHS's Self Assessment acknowledges, furthermore, that private child caring agencies have limited access to Central Registry background check information on past abuse and neglect incidents involving childcare staff and foster parent applicants. Instituting "a policy to require annual criminal background checks and child abuse checks on foster parents and adoptive parents" is recommended,[275] but MDHS has yet to issue such a policy. The Self Assessment also acknowledges that "due to significant staff turnover and several reorganizations," a planned revision of the 1986-88 standards for child placing agencies and residential child caring facilities has yet to be completed and issued.[276] The May 2004 CFSR Final Report cited "staffing issues in the licensing unit" for the continued failure to issue these new standards as planned.[277]

> ### Case Example
>
> *A foster care reviewer observed and reported in June 2005 that a one-year-old medically fragile child with a severe heart defect who came into care June 18, 2004 has been placed in a foster home in Arkansas. There is no documentation that any Arkansas social service staff has had face-to-face contact with the child since she has been placed there, and the last face-to-face contact with a Mississippi social worker was six months prior to the review, in January 2005. Foster Care Review Monthly Case Status Report (Issues Observed During Foster Care Review), July 7, 2005, at DHS 047704*

> ### Case Example
>
> *An April 2005 foster care review notes that "[t]he DFCS Jackson County ASWS stated to the Reviewer [] that Jackson County DFCS staff can no longer visit Mississippi foster children placed in Alabama except for children placed at Wilmer Hall in Mobile." As a result, two young Mississippi foster children (ages 3 and 2) placed with their grandmother in Alabama had not been seen by a Mississippi or Alabama social worker in at least eight months. (Foster Care Review Monthly Case Status Report (Issues Observed During Foster Care Review) for April 2005, at DHS 047653).*

### (xii)  Children Are Maltreated In Foster And Adoptive Placements

Keeping children safe is a primary responsibility of MDHS. State policy requires child abuse and neglect referrals to be classified and, if accepted, responded to within 24 hours. Case investigation must be complete within 30 days of the referral.[278] In practice, however, MDHS does not respond in a timely fashion to protect children, nor does it appear to have operationalized or even formulated a consistent or coordinated response to allegations of maltreatment of children already in foster care.* Of most significant concern to this reviewer is the fact that an unacceptably high percentage of children in MDHS custody are being exposed to maltreatment and corporal punishment in their placements.

During the first nine months of 2005, the average maltreatment rate of children in MDHS custody was 3.2%, according to MDHS's own case reviews of 342 children in custody. This is more than five times the allowable federal standard of 0.57% on this critical child safety measure. During

---

* Many of the maltreatment reports on foster children recorded by the Protection Unit were not evidenced. The validity of those findings cannot be assessed at this time as MDHS did not produce the investigation reports until several days ago.

January to March 2005, four out of the 135 children reviewed (3.0%) experienced abuse or neglect in MDHS custody.[279]  During April to June 2005, four of 126 children reviewed (3.2%) experienced abuse or neglect in their MDHS placements.[280]  During July to September 2005, three children out of 81 reviewed (3.7%) experienced abuse or neglect in State custody.[281]



The State Office Protection Unit, which only keeps a manual log of those cases it is notified of, is oblivious to how many children are really being maltreated in care.  The Unit's manual log documents only six substantiated cases of abuse or neglect of foster children in the whole State for all of 2005.  By contrast, during only the first nine months of 2005 Foster Care Reviewers tallied 11 cases of substantiated abuse out of a sample of only 342 foster children.[282]  Applying the actual rate of maltreatment in care recorded by the Foster Care Reviewers to the average number of children in care for the first nine months of 2005 (3323), *approximately 106 foster children would have been the victims of substantiated abuse in care during that same period.*[283]

The Director of the Protection Unit concedes that the Unit may not get notified of all reports and investigations of abuse and neglect of children in MDHS custody, and that their manual log purporting to list all allegations of abuse of children in custody is incomplete.  The Unit relies on manual notification as there is no automated reporting system.  Nonetheless, the Protection Unit

Director has never directed anyone in this State Office Unit to conduct an electronic search of MACWIS for maltreatment reports on children in custody that the Protection Unit was never notified of.[284] Thus, only the county office Social Work staff who are supposed to enter each investigation into the computer are likely to know of allegations of abuse or neglect of foster children. Even a Regional Director, charged with supervising investigations and signing off on ultimate findings, testified that she does not keep track of how many children in her region are abused while in MDHS custody.[285] Another Regional Director testified that although she had learned almost a year and a half before her deposition that 6.7% of foster children in her region had been abused or neglected while in MDHS custody, she had done nothing about it.[286]

---

### Case Example

*The first week in August 2005, Ronald H. Shiyou was arrested on four counts of sexual molestation involving two foster girls, six and eight years old, in his Hancock County home. A Sun Herald article the following week recounted these facts and stated that the "state Department of Human Services is working with Hancock investigators to determine how many children have lived with Shiyou since 2002, when the alleged sex crimes began." ("Abuse charges go up to four," Sun Herald, August 11, 2005) As of December 2005, however, the State Office Protection Unit had yet to determine who the sexually abused foster children were and whether an MDHS investigation was conducted. Where the "Allegations," "Investigative Report," and "Findings" are supposed to be noted, the 2005 MDHS Foster Home Investigations log only notes "E-mail stated possibly [Smith] children. No specific foster children named at this point and nothing in MACWIS". (DHS 091929)*

---

The Hess Case Record Review confirms that maltreatment of foster children is rampant in Mississippi's child welfare system. The review found that nearly one in four children in MDHS custody (24%) had indications in their records that they themselves, or another foster child placed in their home or facility, had been the subject of maltreatment while in custody. One in ten children in custody (11.8%) were placed in homes or facilities where maltreatment was substantiated and/or the conduct complained of was serious enough to result in a placement move. One in twenty children in custody (4.9%) were the victims of substantiated maltreatment. As alarming, for 5.6% of children,

suspected maltreatment in their placements was documented but never formally reported or investigated.[287]

According to Ms. Triplett, the Director of the Protection Unit, MDHS does not treat or investigate allegations of corporal punishment as child abuse, although MDHS policy expressly forbids the use of corporal punishment on foster children (who are often prior victims of physical and sexual abuse).[288] In reviewing an allegation that a man hit a foster child with a belt, Ms. Triplett – the MDHS administrator responsible for MDHS policy on child maltreatment and protection – stated that she "d[id] not see a report that meets the criteria for abuse and neglect" and determined that "this would not require an investigation."[289] She went on to testify that MDHS would "not necessarily" investigate whether sexual abuse had occurred if "a little girl" contracted a sexually transmitted disease while in a foster home.[290] The Director of Protection's understanding of maltreatment diverges so far from professionally acceptable standards – including the legal presumption that sex with a child below the age of consent is by definition abuse – as to shock the conscience.

Even when reports of maltreatment of foster children rise to the level necessary to trigger investigation by MDHS, the agency fails to treat those reports with urgency and protection of children may be subordinated to staffing concerns. MDHS's Self Assessment notes that in 2003 the agency had a backlog of over 2,800 incomplete abuse and neglect investigations open more than 30 days "due to insufficient staffing numbers." It also identifies a troubling connection between MDHS's staffing crisis and investigations:

> The areas of the state with chronic understaffing have a lower rate of substantiated reports per capita. In reviewing data, areas with fewer staff appear more likely to 'screen-out calls' and have fewer substantiated investigations. If the number of investigations exceeds the number that can reasonably be done by available staff, the result may be less thorough investigations."[291]

Recent aggregate MACWIS data indicates that as of November 15, 2005, there were 2754 investigations statewide open more than 30 days.[292] A September 2005 "Child Investigation

Timeliness Report – Statewide Summary" (dated 10/10/05) shows that only 75.4% of 1030 investigations were initiated within 24 hours as of October 10, 2005.[293]

The May 2004 CFSR Final Report finds that in 25% of applicable cases reviewed (both foster care and in-home cases), including the case of a maltreatment report of abuse in a treatment facility, MDHS "had not established face-to-face contact with the child subject of a maltreatment report in accordance with the State's required timeframes." It is also reported that "'follow-up' on investigations after the initial contact with the child is made often do not occur in a timely manner," and that "a large percentage of maltreatment reports . . . are not substantiated even when there is evidence to warrant substantiation."[294] In 13% of applicable foster care cases reviewed, DFCS had *not* made "diligent efforts to reduce the risk of harm to the children involved in each case." In one case it was specifically found that "[t]here was insufficient assessment of risk of harm to children in their foster homes and risk issues were not addressed." It is also reported that "maltreatment in foster care may be a result of too many children in a foster home."[295] MDHS's March 2005 PIP confirms that from July-December 2004 an average of only 67.99% of intake investigations were initiated within 24 hours, as required by Mississippi policy.[296]

---

### Case Example

*GARY entered foster care in February 2001, at the age of five. According to a July 2004 Foster Care Review, Gary was subjected to "nineteen placements" in his first two years in care. Seven of the placements were "emergency" or "temporary" facilities. Although the "Reasons for Removal" indicate that Gary was sexually molested in at least two different placements and was suffering from encopresis and sexual acting out, there is no indication that such maltreatment was ever formally reported or investigated. Gary was freed for adoption on February 13, 2003, at the age of seven, but it was no cause for celebration as he spent the next two nights in a "Holiday Inn Express" with a "sitter" because MDHS had no other placement for him. After another fifteen months in custody Gary was still not adopted, his individualized service plan was more than twenty months out-of-date and "lack[ed] physical, dental, psychological, immunization record and the correct placement." The Foster Care Reviewer had to reconstruct his placement history as only one placement was showing in his primary MDHS case file. Periodic Administrative Determination, July 29, 2004, p. 2, DHS 012178 (See below)*

---

*4253 Page 2*

█████

*Harrison County*

█████    PLACEMENTS, DATES OF PLACEMENTS, REASONS FOR REMOVAL

| | | |
|---|---|---|
| 2/13/01 | █████ *(maternal cousin)* | *Family moved from place to place, financial problems* |
| 2/12/02 | *Shelter* | *Temporary* |
| 2/21/02 | █████ *Foster Home (Pearl River County)* | █████ *had endless screaming fits when told "no"* |
| 2/25/02 | ███ *Foster Home* | *Temper tantrums, kicked a hole in wall* |
| 3/25/02 | ███ *Foster Home* | *"Pooping" in his pants three and four times a day, at this home █████ began saying his cousin █████ (see first placement) "touched" him.* |
| 6/13/02 | ███ *Foster Home* | *He would argue constantly, not a "fun" child to be around, █████ began having to take off all the time for █████ behavior at school or to take him to the doctor.* |
| 7/26/02 | *Shelter* | *Temporary* |
| 8//02 | ███ *Adoptive Home (Clark County)* | ███ *was defiant and uncontrollable* |
| 1/22/03 | *Pine Grove* | *Temporary facility, respite for the* █████ |
| 1/31/03 | ███ *Adoptive Home (Clark County)* | *Behavior uncontrollable, they didn't think he fit into their home* |
| 2//03 | *Pine Grove* | *Facility* |
| 2/7/03 | █████ *Foster Home* | █████ *put a pillow over another child with intentions of smothering him, he tried to touch the █████ granddaughter sexually* |
| 2/13/03 | *Holiday Inn Express* | *Family & Children's Services tried to get █████ into Memorial Behavior but they could not accept him. Had a sitter for him at Holiday Inn* |
| 2/15/03 | *Pine Grove* | *Temporary facility* |
| 2/25/03 | ███ *Foster Home* | *Temporary* |
| 2/27/03 | ███ *Emergency Foster Home* | *Temporary* |
| 7/3/03 | ███ *Foster Home* | *Another child in the home touching █████ sexually* |
| 7/8/03 | ███ *Emergency Foster Home* | █████ *did well in this home, had medication changed, Adoption Unit found him an Adoptive home* |
| 12/19/03 | ███ *Adoptive Home* | *They want to finalize* |

DHS
012178

---

### Case Example

*Matthew, a six-year-old child in DHS custody, was placed out of state in a Louisiana nursing home because Matthew requires around-the-clock special medical care. In February 2004, when Matthew was four years old, a MDHS Foster Care Reviewer concluded that Matthew's county of supervision "is aware that Louisiana DHS does not supervise placements in nursing homes, and it appears the county is neglecting to ensure [the child's] safety."[1] The Southdown Care Center where DHS left Matthew completely unsupervised for almost 10 months was the site of a deadly viral outbreak in 1996 that killed 10 child residents. A federal Center for Disease Control investigation found that Southdown's management failed to take basic steps to contain the virus and care for the medically needy children, who continued to get sick and die over a period of two and a half months. The facility has been cited and fined three times since 1996 for violations that endangered its residents, and found liable in 2000 for two of the deaths by a jury in a $1.2 million verdict. As of August 2005, Matthew was still placed at Southdown "Tragedy in the Children's Ward," New Orleans Times-Picayune, April 18, 2005.*

---

**B.      MDHS Fails To Provide Children With Health Care And Other Needed Services**

Children in the State's custody are required by federal law and professional standards to have their educational, medical, and mental health needs met,[297] and MDHS policy requires the Social Worker to whom each child is assigned to ensure that treatment is in fact delivered on an ongoing basis.[298] The trauma of being removed from their homes makes the importance of stable and ongoing connections with family, friends, and school even more important for these children. Children in out-of-home care are at a higher risk for emotional and behavioral problems than are children in their biological homes.[299] Without having their needs adequately assessed and met, foster children suffer continuing harm at the hands of those charged with their care.

MDHS's Self Assessment acknowledges that the federal review in 1995 had already identified as a problem that "[h]ealth records for children [were] not routinely contained in the foster child's foster care case records, and the children's "mental health needs [were] not [being] adequately identified, assessed or addressed."[300] Although the Self Assessment acknowledges that services should be available statewide, MDHS concedes that "[m]inimal services are available in most rural counties."[301]

The May 2004 CFSR Final Report likewise identifies as a key concern "a general lack of mental health services throughout the State."[302] "A key CFSR finding with regard to [Well-Being Outcome 3] was that [DFCS] is not consistent in its efforts to meet children's physical or mental health needs."[303] In 52% of the foster care cases reviewed DFCS had not met the service needs of children, parents, and foster parents; had not involved children and parents in the case planning process; and/or had not established face-to-face contact with children and parents with sufficient frequency to ensure the children's safety and well-being.[304] Yet, in both August 2005 and November/December 2005, ACF reviewed Mississippi's quarterly PIP progress reports for April-September 2005 and found that MDHS had failed to add steps and strategies for ensuring that "services are accessible to families and children in all political jurisdictions covered in the State's CFSP" and that "services can be individualized to meet the unique needs of children and families served by the agency." [305]

### (i)    Failure to Assess Children's Needs

Establishing the physical and mental health of children entering State custody is critical to the Agency's ability to provide for their needs and prevent further harm to them. It is also imperative for the Agency's ability to properly advocate for the best interests of the children in custodial proceedings to have documentation of the children's baseline condition at the time of entry into custody. MDHS policy requires that children be provided a physical health exam within seven days of entry into foster care custody; a dental exam for children ages three or older within 90 days of entry into custody; and a psychological exam for those children ages four and older, also within 90 days.[306]

All of a foster child's medical, dental and psychological information must be maintained in the child's case record,[307] and the child's complete health history, including immunization

records, must be in the child's Initial Service Plan.[308] Further, foster caregivers must be provided with the current health information of the foster children placed in their care.[309]

The Hess Case Record Review found that 84.1% of children entering custody on or after June 1, 2003, were not provided the required physical exam within seven days. Wide variation was found in County practices, with Humphreys County providing all such children a physical exam within seven days, and Harrison County only providing such exams to 4% of its children entering custody on or after June 1, 2003. DHS also failed to provide 80.8% of children three and older with the required dental exam within 90 days of entry into custody on or after June 1, 2003. Moreover, for 89.4% of children entering custody on or after June 1, 2003, health records were not provided to the child's caretaker at the time of entry into custody. MDHS also failed to maintain immunization records for 17.4% of children in custody age 0-5 years old. For 40% of the children *no* health or mental health information was included on the child's initial ISP because no ISP was even completed within 90 days of entry into custody.[310]

MDHS likewise failed to provide 57.7% of children age four and older the required psychological assessment within 90 days of entry into care on or after June 1, 2003. Over a third of children (35.5%) never received *any* evaluation. This included children who had identified behaviors of concern such as hurting other children, perpetrating sex abuse, damaging or destroying property, attempting suicide, carrying a weapon, masturbating in public, stealing, and having serious emotional and behavioral problems in school. Even for those who did receive an evaluation, 50% of those whose evaluation recommended further assessment were never provided with any further assessment. It is significant that 80.3% of those children in custody who were evaluated for mental illness or

developmental disorder were diagnosed with such an illness or disorder.[311]  This underscores how vulnerable and at risk the population of children in DHS custody truly is.

MDHS's own Foster Care Review Program found that between July and September 2005, 9% of the foster children's physical health needs were not assessed.[312]  MDHS's Self Assessment concedes that "[a]lthough policy mandates a medical review within 7 days, review of files indicates that many of these cases require additional time to complete the medical assessment."  In addition, only approximately half of reviewed cases "indicated documented evidence of the sharing of detailed [medical] information" with foster and adoptive caregivers.[313]  The Self Assessment also concedes that although all children in custody ages four and older are required to have a psychological assessment/evaluation within 90 days of custody, "for children in relative placements and in cases that have been opened less than 6 months, the psychological is missing."[314]

---

### Case Example

Siblings Caleb, Thomas, Alex and Monica, ages 14, 11, 6 and 3, entered care in January 2005.  A July 2005 Foster Care Review reports that the children still do not have individualized service plans and "[t]here are no written permanent plans." "The medical screens for all four children show that they have not had dentals, psychologicals and only [Monica] has been to the doctor.  There is no documentation that fourteen-year-old [Caleb] has been offered Independent Living Services."  The Foster Care Reviewer observed that, during the conference, Monica would "stare off into space several times before coming to herself and proceeding with her activity."  The paternal grandmother reports that Monica "does that all the time and she would like for [Monica] to see a specialist or psychologist." Periodic Administrative Determination, July 7, 2005, DHS 069619.

---

The May 2004 CFSR Final Report likewise finds that "mental health assessments are not always completed on children entering foster care despite agency policy requiring them," and that "social workers may make assessments . . . without input from mental health professionals."[315]  The CFSR Final Report also notes that the quality and availability of sexual abuse examinations are "problematic."[316]

MDHS is still unable to run a MACWIS report that tracks the provision of medical, dental and psychological assessments to children in MDHS custody.[317]  Moreover, the March 2005 PIP contains no plans to address the issue of medical documentation and health records being missing from children's case records.

---

**Case Example**

 A foster care reviewer observed and reported in March 2005 that there was no documentation that two Jackson County foster children, who entered DFCS custody in October 2004 due to sexual abuse, ever received a medical exam.  The county's response indicates that a doctor finally saw the children in April 2005, six months later. *Foster Care Review Monthly Case Status Report (Issues Observed During Foster Care Review) for March 2005, at DHS 047612*

---

    (ii)    **Failure to Provide Regular Medical and Dental Health Care**

The Hess Case Record Review found that DHS failed to provide *any* physical exam for 28.2% of the children in custody at least one year, during the two years prior to June 1, 2005.  The youngest children in custody (0-5 yrs), those for whom multiple immunizations are required and important developmental milestones occur, were the most likely not to have received any physical exam (32.4%).  DHS also failed to provide *any* dental exams to 42.2% of children ages three and older who had been in custody at least one year during the two year period prior to June 1, 2005.[318]

MDHS's own Foster Care Review Program found that between July and September 2005, one in ten of the children whose physical health assessments revealed medical needs did not receive physical health services to meet those needs.[319]  The Foster Care Review Program likewise found that between April and June 2005, 14.3% of children's ISPs reviewed did not "indicate" that the child's medical needs were being met with appropriate physical health services.[320]

The December 2003 Statewide Self Assessment similarly concedes that although "Health and Safety are paramount in planning for children in foster care," medical documentation, including immunizations and doctor visits, continues to be missing from case records. "More emphasis is [still]

```
┌─────────────────────────── Case Example ───────────────────────────┐
```

*Siblings Alan, Lana, Diana, Joshua, James and Shana entered care in November 1999, when they were aged 10, 8, 7, 5, 3 and 1. According to a November 2005 Foster Care Review, adoption was not established as the permanency plan for these children until more than five years later, on January 6, 2005. The Foster Care Reviewer notes: "no TPR referral yet forwarded to State office," further delaying the possibility of achieving the plan. In the interim, "there is no documentation [that] the physical, mental health, and educational needs of all the children have been assess[ed]. There is no psychological in the system for James or Shana; Alan's 'current' medical and dental were 18 months ago; Diana's 'current' medical and dental visits were in mid-2002 as was James's last dental visit; Lana's last dental was fourteen months ago and her current referral to a cardiologist does not appear in her health record in the system only in Narratives; the psychologicals for Diana, Joshua, Lana, and Alan were 'scheduled' for May, 2001, but there is no follow-up documented under their health records beyond 'see hard copy' so that actual needed services are not in the system." In addition, children's individualized service plans had not been updated in more than seven months and the reviewer notes that "it is not clear whether their grade levels are accurate" in the reviews, but "if they are, some may need tutoring or other educational services that do not appear on the ISPs." There is also "no indication that the agency has attempted any sibling visits since the last one documented in June, 2005." Periodic Administrative Determination, November 10, 2005, DHS 089835.*

needed to document and track the health care of children," as "medical information is not routinely entered into MACWIS, and cannot be measured through automated means."[321]  State Office Program Specialist Robin Wilson confirmed at deposition that MDHS is still unable to run a MACWIS report that tracks the provision of medical and dental services to children in MDHS custody.[322]  The May 2004 CFSR Final Report finds that in 20% of the foster care cases reviewed "there was clear evidence of [children's] health-related needs that were not being addressed by the agency."[323]  In the words of Regional Director Rogers, "[w]e have not necessarily done a really good job with making sure that medical and physical needs have been met."[324]  Having admitted that, Rogers conceded that she does not take any action to check that foster children get physicals or immunizations.[325]  The March 2005 PIP concedes that DFCS has yet to even determine a baseline statewide percentage of children who receive health services based on identified and assessed physical health needs.[326]

### (iii)    Failure to Provide Mental Health Services

The Hess Case Record Review found that of the children in custody who received a psychological evaluation, 80.3% were diagnosed with a mental illness or developmental disorder. Of these, 81% had specific treatment recommendations documented in their case records. As of June 1, 2005, however, most children were not being provided the recommended treatment by DHS, including 92.3% of those children with recommended treatment for an anxiety disorder, 69.2 % of those children with recommended treatment for a psychotic disorder, 60.8 % of those children with recommended treatment for an adjustment disorder, 54 % of those children with recommended treatment for a developmental disability, mental retardation (MR), or borderline MR, and 51.9 % of those children with recommended treatment for post-traumatic stress disorder. In 21% of the instances in which inpatient treatment – which addresses acute mental illness – was specifically recommended for a child, such treatment was not provided during the entire two-year period prior to June 1, 2005.[327]

MDHS's own Foster Care Review Program found that between July and September 2005, one out of every 10 child (11%) who were found to be in need of mental health services did not receive those services.[328] The Foster Care Review Program likewise found that between April and June 2005, 17.8% of ISPs did not contain documentation that services had been provided to meet children's mental health needs.[329] The December 2003 Statewide Self Assessment concedes that there continues to be inconsistency in the provision of mental health services, due in part to the unavailability of resources. "Services such as counseling, especially when recommended in the psychological [evaluation], are frequently absent from case recordings, even when a support service has been funded. More emphasis in documenting mental health counseling and the outcomes of this counseling are [still] needed."[330]

As conceded by MDHS in its Self-Assessment: "There are not enough therapeutic placements for foster children needing such services. Currently, there are only contracts for 250

71

therapeutic slots (Therapeutic Group Homes, Therapeutic Foster Homes, and Intensive In-Home Services)."[331]  The May 2004 CFSR Final Report confirmed that in 48% of applicable foster care cases reviewed DFCS "had not made concerted efforts to address the mental health needs of children."  In those cases "[m]ental health needs were not fully assessed, although a mental health assessment was warranted" or "[m]ental health needs were assessed but needed services were not provided."[332]  MDHS is still unable to run a MACWIS report that tracks the provision of mental health services to children in MDHS custody.[333]  MDHS's March 2005 PIP concedes that DFCS has yet to even determine a baseline statewide percentage of children who receive mental health services based on identified needs.[334]

<div align="center">

(iv)    **Failure to Provide Educational Services**

</div>

Federal law and MDHS policy require that children in custody receive appropriate services to meet their educational needs and that the child's educational records and information be included in their agency case record and provided to the child's caretakers at the time of placement.[335]

The Hess Case Record Review found that 22% of school-age children who entered custody on or after June 1, 2003, had *no* information in their MDHS case files about the child's schooling. MDHS also failed to provide school records to foster caregivers for 78.8% of school-aged children who entered custody on or after June 1, 2003, even though the majority of school-age children (58.4%) did not remain in the school they attended prior to their most recent entry into custody.  Of those children who changed schools, 63.6% had *no* information regarding their subsequent school enrollment in their MDHS files.  Of those children with school enrollment information in their files, 40.4% missed more than one week of school when first placed in custody because MDHS failed to ensure that they were enrolled in school for periods from 10 to 90 days.  Moreover, 61.9% of the school-age children with school enrollment information in their files had experienced at least one school change once in custody, with 9.1% changing school four times.  Notably, 78.3% of the

children's documented school changes while in custody were due to MDHS moving the child to another out-of-home placement.[336]

The Hess Case Record Review also found that only 18.2% of school-age children in custody were receiving special education services. One quarter of the children (24.1%) who had been referred to special education were not in special education as of June 1, 2005. Likewise, 80% of those children who had been diagnosed with mental illness or a developmental disorder were not receiving special education services. MDHS failed for 29.2% of those children receiving special education services to even maintain a copy of their current Individualized Education Plan (IEP) in their file.[337]

Although MDHS acknowledges that "educational issues and problems should be part of working with the child," "attention to educational issues with children in custody vary by county and region," and "workers do not consistently enter adequate data." The Self-Assessment acknowledges that "[d]ocumentation in the automated system is lacking, and so does not provide enough information to adequately track data." "During mock reviews, it was evident that casework addressing educational needs of the child varied considerably based on . . . the staffing resources in the DFCS county office."[338]

MDHS's March 2005 PIP acknowledges the 2004 CFSR's finding that children received appropriate services to meet their educational needs in only 75.9% of applicable cases, yet concedes that DFCS has yet to determine a baseline statewide percentage of children who receive educational services based on identified educational needs.[339] MDHS is still unable to run a MACWIS report that tracks the provision of educational services to children in MDHS custody.[340]

## C.    MDHS Fails to Plan For Children

When children cannot be kept safely in their homes and must enter foster care, the primary responsibility for the state once it assumes custody becomes establishing a permanent living situation for the child. Federal law requires that the state have a permanency plan for each foster child and

prescribes time frames that must be adhered to for reunification of the child with parents, terminating parental rights to free the child for adoption, or finalizing some other permanent placement.[341]  Long years in foster care keep children from available permanent, loving families and leave them as adults without the stability of an extended family of their own.

The Hess Case Record Review found that as of June 1, 2005, the total length of time that children had been in MDHS custody ranged from less than one year to 17.9 years, with a mean length of stay of 2.8 years.  Nearly thirty percent (29.8%) of the children had been in custody three or more years, and 8.8% had been in custody for more than five years.  20.9% of the children had spent at least half of their lives in MDHS custody.[342]

MDHS MACWIS data shows that as of September 30, 2005, (736) children had been in care at least three years.[343]

### Length of Stay in Foster Care



"Unfortunately, the lack of staff may be contributing to the length of time children remain in care."[344]  As acknowledge by MDHS in its Self Assessment, "[i]t appears from the mock reviews that when a worker is able to devote more time to a case . . .  the length of time a child is in care is

shortened." "During the Mock Reviews, there was a noted concern on [sic] the amount of time workers could devote to their families."[345]  The May 2004 CFSR Final Report likewise finds that "[o]ne of the areas of greatest concern is the State's performance on Permanency Outcome 1," which measures whether children in state custody have permanency and stability in their living situations. In 64% of the foster care cases reviewed MDHS failed to establish an appropriate permanency goal for children in a timely manner and/or ensure their placement stability.[346]

### (i) Poor Permanency Planning Services

MDHS uses an Individual Service Plan (ISP) as the official method by which permanency planning for a child takes place in Mississippi.[347]  It is through this plan that the federal mandates of safety, permanency, and well-being are individually addressed for each child.  The initial child ISP is required to be completed within 30 days of the child's entry into custody, and then reviewed at least every 6 months thereafter.  Parent ISPs are also required within 30 days of the child's entry into custody.  MDHS policy requires a family team conference within 30 days of the child's entry into custody and every six months thereafter to work with the family to identify other family members, extended family, and supportive persons that the family wants to engage in the process and to bring these members into the assessment and case planning process as early as possible and actively engage the family throughout the life of the case in the decision-making process.[348]

The Hess Case Record Review found that child ISPs were not completed within 30 days for 66.7% of children entering custody on or after June 1, 2003.  Non-compliance with this requirement was particularly routine in Clarke (100%) and DeSoto (87.8%).  For 40% of the children entering custody on or after June 1, 2003, MDHS failed to provide them with an ISP within the first three months.  Even when an ISP was provided within 90 days, one out of five failed to contain a primary permanency plan, and one out four failed to contain a concurrent permanency plan.  As a result, MDHS failed to provide 61.8% of the children entering custody on or after June 1, 2003, an initial

75

ISP with an identified primary permanency plan within 90 days of placement, either because no initial ISP was provided, or the ISP provided failed to contain the required permanency plan. Two thirds of children (66.1%) failed to have a concurrent permanency plan as required within 90 days.[349]

---

**Case Example**

*Allison, age seven, has been in care since November 2003. A May 2004 Foster Care Review reports that Allison still lacks both an individualized service plan and a valid permanency plan. Though the "permanent plan mentioned in the Conference was reunification," "there is no Parental ISP approved." In addition, it is "unknown if [Allison] is safe in her placement and whether or not it is the least restrictive or most appropriate" because "the last face-to-face with [Allison] by agency staff was on December 23, 2003," "no one from DHS has seen [Allison]" since she was placed in her maternal aunt's home, and "[t]he placement listed in MACWIS incorrect." Periodic Administrative Determination, May 3, 2004, DHS 010986-010987.*

---

Moreover, MDHS failed to complete an ISP for either parent within 30 days for 56.1% of the children who entered custody on or after June 1, 2003. Another 36% of the children only had an ISP completed for one of two applicable parents. MDHS also failed to convene a Family Team Conference within 30 days for 97.5% of the children who entered custody after June 1, 2003. MDHS failed to hold even one Family Team Conference for 94.5% of all children in custody during the two-year period prior to June 1, 2005.[350]

For 95.2% of the children with a primary or concurrent goal of reunification as of June 1, 2005, MDHS social workers/supervisors failed to maintain monthly face-to-face contact with the child's mother during the prior 12-month period (92.1% non-compliance for fathers). For 45.5% of these children, MDHS failed to meet with the child's mother even once (58.5% for fathers). Moreover, 51% of these children were not even provided one visit with their mother, and 85.2% were not provided a single visit with their father, during the entire one-year period prior to June 1, 2005, despite their goal of reunification. MDHS failed to offer or provide services to 57% of the mothers and 83.4% of the fathers to facilitate reunification. Children with a primary permanency goal of reunification had been in MDHS custody for an average of 1.2 years, ranging from .8 years in Hinds to 3.4 years in Humphreys.[351]

For 23.5% of all children in custody, MDHS failed to complete or update their ISP during the six months prior to June 1, 2005. For 9.6% of those children, MDHS did not provide a single ISP during the two-year period prior to June 1, 2005. Of those who had an ISP during this period, 14% of the children's most recent ISP were missing their primary permanency goal, 46.3% were missing their concurrent permanency goal, 42% did not even have a caseworker signature, and 28.6% were missing a supervisor's signature.[352]

MDHS's own Foster Care Review Program found that between July and September 2005, 38% of children did not have an ISP developed within 30 days of their entry into custody as required by MDHS policy.[353] In the previous quarter, the Foster Care Review Program determined that 15.1% of children reviewed did not have an ISP competed within the mandated timeframe.[354] The March 2005 PIP concedes that DFCS has yet to even determine a baseline percentage for how many children in foster care have appropriate permanency plans.[355]

MDHS's Self Assessment concedes that inconsistencies in assessment and case planning has been an ongoing issue. "Case plans lack specificity and are not updated or individualized." "Notification and case planning with the parents and caretakers were noted as continuing to be problematic." Additionally, "in only approximately 50% of the cases are all dates associated with the case plan consistent with policy."[356] The 2004 CFSR likewise found that in 36% of the foster care cases reviewed MDHS "had not established an appropriate [permanency] goal for the child in a timely manner." Also, case plans are not developed jointly with the child's parents on a consistent basis.[357] Even when concurrent goals appear in the case plans, it is reported that "most of the social workers tend to work on the goals consecutively rather than concurrently." The May 2004 CFSR Final Report finds that in 58% of the foster care cases reviewed with a goal of reunification, guardianship, or permanent placement with a relative "there were avoidable delays in attaining [those] goals."[358]

77

The May 2004 CFSR Final Report also finds that in 53% of the applicable foster care cases reviewed MDHS "had not made diligent efforts to support the parent-child relationships of children in foster care," and "the frequency and/or quality of social worker visits with parents were not sufficient to . . . promote the attainment of case goals."[359]  As noted in the PIP, current policy "does not clearly address frequency of visitation with parents."[360]

The March 2005 PIP admits that while "Mississippi has understood the importance and necessity of family centered practice since the CFSR pilot review in 1995," the State has failed to consistently implement family centered practice in its casework.  "Supports necessary to reinforce this family centered approach and practice change such as on-going training for caseworkers and supervisors was [sic] not in place."[361]  The Hess Case Record Review found that MDHS failed to convene *even one* conference with family members (Family Group Conference) to make plans for the child for 94.5% of the children who entered custody on or after June 1, 2003.[362]

MDHS has in fact abandoned any pretense of "trying to replicate a formal family team conferencing model with the caseworker being responsible for the workload and activities" as it is "not feasible" due to "Mississippi's current staffing issues."[363]  Although the March 2005 PIP relies heavily on Family Centered Practice (FCP), Family Team Meetings (FTM), and County Conferences (CC) "to improve the appropriateness and timeliness" of foster children's permanency goals, it provides for FTM to be "implemented in a way that does not create additional workload for existing staff."  Practice guidelines are to be developed *not* to contain "explicit procedures and requirements," so as not to "burden" staff.[364]  It is unclear how MDHS expects that current casework practice by overwhelmed staff will improve with such studious avoidance of any measurable performance standards. Mississippi's Child and Family Services Review Data Profile, dated December 8, 2005, found that for Federal FY 2005 (ending September 30, 2005), of all

children who exited care to reunification with their parents or caretakers, only 69% exited care less than 12 months from the latest date of removal. The national standard is 76.2% or more. [365]

MDHS fails to diligently search for relatives as required by policy and practice standards.[366] The May 2004 CFSR Final Report finds that in 32% of the foster care cases reviewed MDHS "had not made diligent efforts to locate and assess relatives as potential placement resources."[367] The March 2005 PIP concedes that in FFY2004, only 33.5% of children statewide were placed in relative foster family homes, according to Mississippi's CFSR Data Profile generated December 13, 2004.[368] As the Self Assessment acknowledges, a plan for "permanently funded kinship care is needed" for those relatives that require financial support for a permanent family placement. "Because of a lack of State funding, Mississippi has not been able to effectively promote kinship care through durable legal custody as a viable option for permanency."[369]

---

**Case Example**

*Siblings Andy and Carrie entered foster care in March 2003, at the ages of nine and seven. An April 2005 Foster Care Review notes that, despite the children's young age, the permanency plan for the children is "formalized long term foster care" with a concurrent plan of "emancipation," a plan that is "inappropriate," and contrary to "agency policy," given that "the more stable permanent arrangement of adoption is the goal of choice for those children when reunification or placement with relatives is not possible." The Foster Care Reviewer also notes that an assessment of the safety and appropriateness of Andy's current placement is not possible because there was no documented face-to-face contact with the child in the previous five months. Periodic Administrative Determination, April 21, 2005, DHS 064804.*

---

(i)    **Missed Case Plan Reviews and Judicial Permanency Hearings**

Children's cases must be reviewed at least every six months, with at least one of those reviews annually being a judicial permanency hearing.[370] The Hess Case Record Review found that 85.5% of the children who had been in custody at least one year as of June 1, 2005, were not provided a 12-month judicial permanency hearing in the previous 24 months. For 5% of children, MDHS failed to even provide one six-month review during the previous 24 months.[371]

MDHS's own Foster Care Review Program reports document that between April-May 2005, 23.6% of foster children in need of an annual permanency hearing had no documentation in MACWIS that any such hearing was held.[372]  The Foster Care Review Program found that between July-September 2005, for 30% of the children who had not had a permanency hearing, "the primary reason appears to be that the agency did not request the hearing."[373]

MDHS's Statewide Self Assessment concedes that DFCS is often out of compliance with the required six-month case reviews.  "There are currently twelve (12) foster care reviewers in the State of Mississippi to cover 82 counties and conduct reviews and County Conferences on the cases of approximately 3,150 foster children."  "Currently, there are not enough Foster Care Review staff to adequately and consistently cover all areas of the state.  Those areas not consistently reviewed have noted a decrease in [the quality of] documentation, and an inability to ensure that each child in custody is reviewed every 6 months."  "Additional FCR staff are needed to ensure 100% compliance with review dates."  "[C]ounties with a full time FCR indicated that 80% of the cases were within the time frames expected, however that number was significantly lower in the counties without a full-time review staff, dropping to less than 50%."[374]  In his deposition, Mr. Hamrick – Program Administrator Senior for the Foster Care Review Program – confirmed that no new Foster Care Reviewers have been added, although he had difficulty remembering whether he had 12 or only 11 reviewers working for him at that point.[375]

The December 2003 Statewide Self Assessment acknowledges that required annual judicial permanency hearings, meant "to promote and achieve a safe and permanent setting for children within time frames that are more conducive to their physical and emotional well-being, "are not being held as required, and IV-E funding is lost due to inadequate court orders."  For example, the DFCS IV-E Eligibility Unit reported that "court reviews were missed on an estimated 8% of the cases in July through September, 2002.  It is estimated that as much as $200,000 dollars could be lost on those cases alone over the next year."  Quality Improvement reports also indicate that

"permanency compliance orders were [only] in 54.3 percent of the case records and Permanency orders found in 38.7 percent of the cases reviewed." The Self Assessment also concedes that "[a]lthough MACWIS has the ability to track" the required annual judicial permanency reviews, "inadequate information has been entered." "Accuracy and timeliness of these hearings are not currently being measured."[376]

The May 2004 CFSR Final Report likewise found that Mississippi is not in substantial conformity with the systemic factor requiring a case review system, including the following problems:

- MDHS/DFCS is "unable to consistently implement a process to ensure the periodic review of the status of each child, no less frequently than once every 6 months," either by a court or by administrative review.

- MDHS/DFCS is not consistently "ensuring that each child in foster care has a permanency hearing no later than 12 months from the date the child entered foster care and no less frequently than every 12 months thereafter."

- MDHS/DFCS does not "consistently provide a process for foster parents, preadoptive parents, and relative caregivers of children in foster care to be notified of, and have an opportunity to be in, any review or hearing with respect to the child."[377]

The March 2005 PIP, however, concedes that DFCS has yet to determine a baseline percentage of children afforded a six-month administrative review (county conference or CC) within six months of custody and every six months thereafter, or a baseline percentage of children afforded an annual 12-month Permanency Hearing.[378] Further, the March 2005 PIP plans to improve the percentage of foster children who have appropriate permanency plans, as well as increase the statewide percentage of children afforded six-month administrative reviews and annual Permanency Hearings, by "[c]ollaborat[ing] with CIP [the Court Improvement Project] and AOC [Administrative Office of Courts] to distribute monthly reports for county youth court judges that will improve the consistency of periodic review of the status of each child." The PIP plans to develop a Title IV-E Compliance Report (by June 2005) and a Periodic Review and Permanency

Hearing Report (by July 2005) "to provide to youth court judges to make them aware of Title IV-E compliance or non-compliance per county and [the] need for Permanency Hearings." Before being released to the courts, these reports will be sent to the Regional Directors and counties for review and corrections to ensure data accuracy: the initial Compliance Reports will be ready for release by July 2005 and the initial Permanency Hearing Reports by August 2005. The DFCS Division Director and CIP Director will then meet with the Mississippi Supreme Court Chief Justice to initiate the monthly reports for the youth court judges, and a cover letter to the judges explaining the reports and expectations will be sent in July 2005. Copies of the reports will then be sent to the AOC, who will then forward them on to the youth court judges and also request responses from the judges. The AOC will then forward both the reports and the judges' responses to the Mississippi Supreme Court Chief Justice. This process will occur monthly, beginning in July 2005 for the Compliance Reports and in August 2005 for the Permanency Hearing Reports. Finally, beginning in June 2005, periodic meetings between the DFCS Division Director, the CIP Director and the Mississippi Supreme Court Chief Justice will occur "to address identified trends or patterns based on the data," "responses from the Youth Court Judges related to the monthly reports," and "other court and agency issues impacting timely permanency." A schedule of these meetings and notes will indicate that these meetings have occurred.[379]

ACF reviewed Mississippi's second quarterly PIP progress report for July-September 2005 and found that MDHS had not yet completed any of the action steps due in the first two quarters of PIP implementation related to collaborating "with the [Court Improvement Project] and the [Administrative Office of the Courts] to distribute monthly reports for county youth court judges that will improve the consistency of periodic review."[380]

### (iii)    Adoption Delays

Federal law requires that for children who have been in custody 15 of the last 22 months, a petition to terminate parental rights (TPR) be filed or an acceptable exception document.[381] The Hess Case Record Review found that 79.7% of children in custody had been in MDHS custody for at least 17 months, yet MDHS failed to file a petition to free them for adoption or document a compelling reason for not filing a petition for the termination of parental rights (TPR).  Of the children for whom a TPR petition was filed, 24.1% spent another two years or more waiting for TPR to be granted.  Half of the children with a goal of adoption (51.0%) had been in MDHS custody for a total of 3 years or more; one in five (20.7%) had been in custody for a total of between 5 and 17.9 years.  After being legally freed for adoption, 26.2% spent *another* 3 years or more in MDHS custody, up to as many as 11 years.  MDHS failed to place 36.9% of the children with the goal of adoption in an adoptive home, and for 85.5% of children with this goal, MDHS made *no* efforts to identify an adoptive family for them in the two years covered by the review.  For 34.1% of the children with the primary goal of placement or adoption *with a relative*, MDHS failed to identify *any* relative with whom the child could be placed or adopted.[382]

---

**Case Example**

*In a June 22, 2005 memorandum to a Jackson County supervisor, a foster care reviewer expressed concern at being unable to schedule nine county conferences on MACWIS for July 2005 "due to part of the Youth Court Summary not being completed by the social worker."  The foster care reviewer states, "We haven't had this many cases that I was unable to schedule in a long time. I think the last time I can remember was when we first went on-line."  As of July 5, two weeks after the problem was brought to the attention of the county supervisor, five of those nine cases were still locked, four of which were still unable to have county conferences scheduled Mem. from C. Dodge to M. Mathews, June 22, 2005, at DHS*

---

MDHS's own Foster Care Review Program found that as of the first quarter of FY 2006, more than one out of every four (26%) children who had been in custody for 15 of the past 22 months and who had not been referred for TPR had no compelling reasons documented.[383]  In the previous quarter, approximately one out of every three (32%) children who had been in custody for 15 of the past 22 months and who had not been referred for TPR had no compelling reasons documented.[384]

The Foster Care Review Program also found that as of the first quarter of FY 2006 41% of children with permanency plans of adoption did not have "steps in place" for the finalization of their adoptions within 24 months. "Agency staff was responsible for 36% of the barriers to achieving permanency through adoption within 24 months of entering states [sic] custody. These barriers include, but are not limited to, failure to complete a TPR referral, the court ordering a plan of TPR with the county completing the TPR referral in a timely manner but the referral was not process [sic] through the agency's state office in a timely manner, and county staff not appropriately returning petitions for TPR to the attorneys serving the agency in TPR matters."[385]  During the previous quarter, 22.2% of children freed for adoption had no documented involvement with the Agency's adoption unit.[386]

---

**Case Example**

An August 2005 Foster Care Review reports that the permanency plan for fifteen-year-old Cindy "continues to be reunification although there is no evidence that the mother wants Cindy back or has attempted to secure reunification" and "the child does not want to return to her mother." According to the Foster Care Reviewer, Cindy has "on several occasions," "requested that her parents' rights be terminated soon." Though Cindy has been in care since October 2004, and her mother's parental rights have been terminated with respect to Cindy's sibling and half siblings, an adoption plan was not suggested for Cindy until August 15, 2005. The Foster Care Reviewer further reports that an assessment of the safety and appropriateness of Cindy's placement cannot be made. Cindy was returned to the foster home from which she was removed after another foster child in the home had sex with her, and "there is no documentation [at this time] that she has been seen since this move or that any other contact has been attempted with either Cindy or her foster parents to check on her adjustment," or to "verify that [the other foster child] is no longer in the home or that appropriate steps were taken to assure they would not have opportunity to be alone while he remains in the home." Periodic Administrative Determination, August 18, 2005 DHS 070023.

---

Mississippi's Child and Family Services Review Data Profile, dated December 8, 2005, found that for Federal FY 2005 (ending September 30, 2005), of all children who exited care to finalized adoption, only 16.3% exited care less than 24 months from the latest date of removal. The national standard is 32% or more.[387]

MDHS's Self Assessment concedes that: "For those staff with a large caseload, the additional burden of TPR and adoption becomes secondary to crisis management. Additional staff and additional permanency training would help increase the number of finalized adoptions and lessen the ongoing caseloads in many areas."[388] The Self Assessment also notes that "many children are in foster placements that will never be adoptive resources for them. Prolonged stay in these foster resources, and the lack of adoptive resources willing to take older or more difficult to place children is increasing the length of stay for many of the children in care." Inconsistent "social work practice and case coverage from county to county [also] has an impact on attaining permanent homes in a timely manner for children."[389] Inadequate assessments of the child's background and poor matches between the child and the prospective parents also contribute to [adoption] disruptions."[390]

The May 2004 CFSR Final Report likewise finds that in 80% of the foster care cases reviewed with a goal of adoption "the State had not made concerted efforts to achieve an adoption in a timely manner." The lack of consistency in filing for TPR in a timely manner was attributed to "[DFCS] staff shortages, high caseloads, a failure to conduct diligent searches for absent parents early on in the case, and a lack of legal counsel."[391]

Aware that its TPR process is slow, MDHS still clings to a routine practice of waiting until the child is

> **Case Example**
>
> *Siblings Sandy and Shana have been in care since September 1998. A January 2005 Foster Care Review reports that "[w]hen adoption began as the plan, [Sandy] was 8 1/2 years old and [Shana] was 6 1/2. They are now 13 and 11," and TPR hearings have yet to be held. Periodic Administrative Determination, January 14, 2005 DHS 063809.*

legally freed to assign that child an Adoption Specialist.[392]  Because only Adoption Specialists recruit potentially adoptive parents, MDHS practice piggybacks on a flawed TPR process to further compound children's wait for a permanent family.  While children wait for families, approximately 50 families wait to be paired with them in the southern third of Mississippi alone.[393]  Such poor matching is the logical consequence of MDHS's decision to isolate the Social Worker responsible for foster children in every aspect except for adoption from the recruitment of adoptive parents for that child.[394]

By 2005, MDHS had acquired unfilled vacancies in the Adoption Specialist position, bringing it below the number of 18 specialists (supporting the entire statewide program) that MDHS itself deemed inadequate in its Self Assessment.[395]

---

### Case Example

A foster care reviewer observed and reported in June 2005 that the "compelling reasons given by the social worker do not appear to be appropriate reasons to not pursue TPR for" a 12-year-old foster child in agency custody for 15 of the most recent 22 months.  "The reasons given by the social worker are as follows: 'Worker has not submitted a TPR referral on [child] due to the **probability** that he would not be adopted if he were freed for adoption.  **Worker feels** that [child] would not allow himself to be adopted by anyone that would not be [child's] own choosing.  **Worker feels** [child] would make it extremely hard for himself to fit into a family if he did not choose to be adopted.'" (emphasis in original)Foster Care Review Monthly Case Status Report (Issues Observed During Foster Care Review), July 7, 2005, at DHS 047712

---

## V. CONCLUSIONS and RECOMMENDATIONS

An effectively functioning child welfare agency provides safety for children, support for families, and meets the needs of the children in foster care. This is accomplished through proper staffing and training, the development and provision of resources needed by families, and connecting the work within and across the agency so administration and communication is clear, open, and available to all employees. For the agency to remain effective in the work, performance accountability, feedback and results must be measured continuously. This review found the Mississippi child welfare agency to be dangerously under-staffed and untrained, and woefully lacking in any capacity to serve children and families. Even more frightening for children in MDHS custody is the lack of accountability or any method for effectively ensuring that children are being seen and, more importantly, kept safe.

**Recommendations**

This reviewer believes that in order for DFCS to become a successful child welfare agency <u>all</u> of the following recommendations must be completed from beginning planning stages through full implementation. In addition, an ongoing method for ensuring the maintenance of changes over time must be instituted. This reviewer does not believe that the MDHS organization is capable of meeting these recommendations without significant oversight and ongoing technical assistance.

### I. Staffing and Training

There are simply not enough people to manage the work of DFCS in Mississippi. The staffing should be addressed across the board, including social work staff, support staff and supervision staff in the counties, and administrative staff in the State Office to provide leadership and gauge effectiveness of the work. Mississippi should adopt and adhere to the CWLA

recommended caseload standards for all areas of work.  These standards are the <u>maximum</u> recommended.  Specific recommendations include the following:

A. Personnel
  1. Implement the CWLA caseload standards for child welfare as follows:
     Foster care cases = 12 to 15 children
     Child protective services cases = 12 families
     Adoption cases = 10 to 12 children
     Ongoing in-home cases = 17 families
  2. Implement the CWLA supervisor to worker ratios at 1 to 5.
  3. Increase the support staff (e.g. secretarial, case aids, transportation) necessary to properly support the direct service staff.
  4. Increase the State Office administrative staff in the program areas of Foster Care, Child Protective Services, Adoption, Licensing & Monitoring, and Quality Assurance to properly guide and support the direct service staff.
  5. Establish a streamlined hiring process that allows vacancies to be quickly filled.

B. Salaries
  1. Increase social worker salaries to bring them up to current market rates.
  2. Establish a career ladder salary range to increase the retention rate of social workers and supervisors.

C. Education
  1. Maintain or establish minimum educational requirements that direct service social work staff have a Bachelor's degree in social work and supervisory staff a Master's degree in social work.
  2. Establish and implement an educational reimbursement program for staff to pursue advanced degrees to increase the retention rate of social workers and supervisors.

D. Training
  Develop and implement a family-centered practice training program that encompasses all of the following:
  • A comprehensive and easily understood curriculum;
  • An evaluation component both for the trainee and the trainer;
  • Resource materials for reference;
  • Pre-service training with an evaluation component to be completed prior to social workers assuming caseloads.
  • A supervisory training with an evaluation component to be completed within six weeks of supervisors assuming their positions;
  • An on-the-job training (OJT) period;
  • Required ongoing, formal in-service training for Social Workers and supervisors;

- Required and ongoing in-service training for foster and adoptive parents;
- A performance feedback mechanism for measuring quality of the training; and
- A regularly scheduled review, update, and revision of the training process to remain abreast of changes in statute, policy, and practice.

## II. Administration

Leadership for this agency is one of the weakest links.  Mississippi simply cannot continue to move the same people around on the same chess board using different fingers to plug the proverbial hole in the dike.  There is a great need for competent leadership across the agency from people who are highly skilled in the field of child welfare.  DFCS requires leaders who are dedicated to the strong advocacy necessary to obtain the resources needed to stabilize the agency and provide for the children and families that DFCS serves.  It is recommended that Mississippi consider a national search for future top leadership candidates.   Specific recommendations include the following.

A. Leadership
1. Revise the State Office organization to provide a standardized communication and feedback loop among the areas of Programs, Finance, and Personnel.
2. Revise the State Office and County Office organization to provide a standardized communication and feedback loop between the State and County offices in areas of Programs, Finance, and Personnel.
3. Organize the Program structure within the State Office around the areas of Safety, Permanency, and Well-Being.
4. Increase State Office staffing and provide administrative training for new staff in the areas of Foster Care, Adoption, Child Protective Services, Licensing & Monitoring, and Quality Assurance.

B. Quality Assurance
1. Obtain technical assistance to develop and implement an ongoing quality assurance system using a standard protocol to include case file, stakeholder, and staff reviews.
2. Establish and implement meaningful outcomes to measure progress in the areas of safety, permanency, and well-being.
3. Establish and implement a process for reviewing Quality Assurance protocols and making any necessary adjustments every three years.

## III. Resources

Resources include both tangible tools to do the job as well as the funding of services for children and families. The ability to communicate quickly and process documents timely in meeting the safety, permanency, and well-being of children is an absolute necessity. The functioning of the MDHS MACWIS system is imperative so that all staff can monitor state and county staffing trends and advocate more effectively for necessary resources. To develop and access necessary resources DFCS requires funding in an amount sufficient to meet the needs of the children. Knowing what those needs are is critical to making the best use of available dollars. Specific recommendations include the following.

A. Communication Tools
1. Computer Access capability is a must for all employees. State Office and County staff must have access to E-mail and the State/Departmental Intranet. In addition, program area administrative staff should have Internet access.
2. Access to on-line reports through MACWIS and training in the use of these is necessary for State Office and County staff.
3. Glitches in the functioning and processing of information in the MACWIS system must be fixed. In particular, the inability to capture previous historical information from a family's ISP or monitor the provision of services.
4. The duplication of work in the paper file and the MACWIS file should be eliminated.

B. Services to Children
1. A comprehensive Needs Assessment with recommendations from an outside technical resource is needed.
2. Technical assistance is needed in developing and implementing a resource development strategy for service development including a development of a standardized RFP process.
3. Licensing and monitoring of foster homes and facilities must have a standardized process developed and implemented, including an incident reporting, correction system, and penalty system.
4. Policy and procedure should be developed and implemented for criminal background checks of anyone assuming responsibility for a child's care and in direct contact with children.
5. A recruitment plan to increase the number of foster and adoptive homes should be developed and implemented.

6. Placement of children in unlicensed homes, facilities, or institutions should be prohibited with associated penalties developed.
7. Practice improvements needed include the following.
   - Decreasing the number of adoption disruptions
   - Decreasing the use of congregate care and emergency shelter care
   - Prohibiting the placement of children under age six in emergency shelter care
   - Increasing the number of siblings placed together
   - Decreasing the number of child placement moves
   - Increasing the visitation between siblings and family members

[1] Miss. Code Ann. § 43-1-51; § 43-15-5

[2] MDHS website, www.mdhs.state.us (last visited February 7, 2006)

[3] Miss. Code Ann. § 43-15-5; 43-15-3

[4] Annie E. Casey Foundation, KIDS COUNT State Level Data Online, at 31-33, available at www.kidscount.org. KIDS COUNT is a national project of the Annie E. Casey Foundation that began in 1990 and tracks ten measures related to the status of children in the United States. The best data available is used to track children's social, emotional, and educational well being for both the United States as well as the individual states. The goal of the data gathered by KIDS COUNT is to measure child outcomes and increase public accountability for children's welfare. Since 1999, Mississippi has had the worst ranking of all the states in the U.S. at number 50. See also December 2003 Statewide Self-Assessment at P 001941.

[5] Joint Legislative Committee on Performance Evaluation and Expenditure Review (PEER), A Follow-up Review of the Division of Family and Children's Services of the Department of Human Services, May 11, 1999, at cover page

[6] P 001935, from MS CFSR State Assessment

[7] Child Welfare League of America, 11/1/92, at P 001210

[8] December 2003 Statewide Self-Assessment, at P 001935

[9] December 2003 Statewide Self-Assessment, at P 001936, 001945, March 2005 PIP, at DHS 038161

[10] Joint Legislative Committee on Performance Evaluation and Expenditure Review (PEER), A Follow-up Review of the Division of Family and Children's Services of the Department of Human Services, May 11, 1999, at cover page, 15-19

[11] May 10, 1999 Letter, attached to Joint Legislative Committee on Performance Evaluation and Expenditure Review (PEER), A Follow-up Review of the Division of Family and Children's Services of the Department of Human Services, May 11, 1999, at 31

[12] DHS 062821

[13] DHS 062903

[14] August 27, 2001, P 000195.

[15] May 8, 2002 letter, P 000153-55

[16] October 2002, P 002144

[17] Child and Family Service Review – Statewide Self-Assessment, December 2003

[18] Mississippi Sun-Herald, January 24, 2004.

[19] Mississippi Sun-Herald, April 24, 2004; May 21, 2004.

[20] May 2004 CFSR Final Rpt., at 1, 3-4.

[21] DFCS FY06 Budget Request Package, Attachment C, DHS 030742-46.

[22] March 2005 PIP, at DHS 038159-038356

[23] March 2005 PIP, at DHS 038162

[24] March 2005 PIP, at DHS 038162

[25] MS PIP, ACF Response to Second Quarterly Report, Dec. 11, 2005 at DHS 091690-691

[26] DFCS FY07 Budget Request Package, DHS 053725

[27] CWLA, Standards of Excellence for Foster Care Services (1995), at 113; CWLA, Standards of Excellence for Services for Abused or Neglected Children and Their Families (1999), at 137-38; CWLA, Standards of Excellence for Adoption Services (2000), at 101; CWLA, Standards for In-Home Aide Services for Children and their Families (1990), at 46.

[28] P 001943, 2003 Self-Assessment

[29] DHS 020088, MDHS – Division of Family and Children's Services, Workload Information, October 6, 2004; Mangold 5/16/05 Dep. 66:16-67:9.

[30] Direct Service Clients By Region, August 2005, DHS 091851-52

[31] Simpson Dep. 11:4, 12:1-6

[32] Henry Dep. 58:10-18, 59:3-14

[33] DHS 053725, DFCS FY 2007 Budget Request Package

[34] McDaniel Dep. 64:24-25

[35] Mangold 5/16/05 Dep. 67:10-14.

[36] FY 2006 MDHS Budget Request

[37] Mangold 6/2/05 Dep. 63:7-64:1
[38] March 2005 PIP, at DHS 038167; Mangold Dep. 6/2/05 Dep. 32:4-20
[39] DHS 053725
[40] FY2007 Budget, DHS 053725; Direct Service Clients By Region, August 2005, at DHS 091852.
[41] DHS 091861
[42] Hess Case Record Review Report, at Sec. IV.D
[43] PIP, DHS038162
[44] P 001945
[45] Rogers Dep. 284:6-8; McDaniel Dep. 67:20-68:11, 68:19-69:12
[46] Foster Care Review Summary Report Issues in Foster Children's Cases, September 22, 2003, DHS027224
[47] PIP, DHS038162
[48] Mangold 6/2/05 Dep. 14:15-15:8, 18:16-21, 19:6-17, 22:15-17
[49] Rogers Dep. 285:18-23
[50] McDaniel Dep. 9:11-15, 11:3-7, 11:19-25, 12:9-11
[51] McDaniel Dep. 14:19-20
[52] December 2003 Statewide Self Assessment, P 001940, 001958-59, 001979; March 2005 PIP, DHS 038178 -79
[53] Mangold 8/25/04 Dep. 73:19-74:12; Triplett 6/15/05 Dep. 17:20-25, 18:1-22.
[54] December 2003 Statewide Self Assessment, P 001984-87
[55] McDaniel Dep. 110:4-18; Triplett 6/1/505 Dep. 31:24-32:21; December 2003 Statewide Self Assessment, P 001988, 1990.
[56] Triplett 6/15/05 Dep. 32:25-33:9.
[57] McDaniel Dep. 116:8-11.
[58] Triplett 6/15/05 Dep. 39:8-16.
[59] PIP, DHS038178
[60] Triplett 6/15/05 Dep. 41:14-19; March 2005 PIP, DHS 038178
[61] December 2003 Statewide Self Assessment, P 001990, 92.
[62] Triplett 6/15/05 Dep. 17:20-22, 18:14-15, 18:17-22.
[63] DHS 53709-53710, FY 2007 Budget Request Package
[64] DHS 53711-53712, FY 2007 Budget Request Package
[65] DHS 019270, State Level Citizens Review Board, May 2004
[66] CWLA Standards of Excellence for Foster Care Services (1995), 113-14
[67] March 2005 PIP, DHS 038177
[68] Triplett 6/15/05 Dep. 17:20-22, 18:14-15, 18:17-22; PIP, DHS038178
[69] McDaniel Dep. 77:6
[70] 42 U.S.C. § 675(1); MS Policy Manual, Revised 05-01-99, at DHS 00161-62
[71] Hess Case Record Review, at Sec. VII.B
[72] Foster Care Review Monthly Case Status Report (Issues Observed During Foster Care Review), June 9, 2005, at DHS 047670
[73] Foster Care Review Monthly Case Status Report (Issues Observed During Foster Care Review), June 9, 2005, at DHS 047670
[74] Rogers Dep. 265:14-266:10; Miss. Code Ann. § 210.112(4)(3); MS Policy Manual, Revised 5-1-99, at DHS 00420.
[75] Rogers Dep. 243:9-14, 244:5-8
[76] DHS 088835
[77] Mangold 6/04 Dep. 22:11-14; DHS 088835
[78] DHS 088835
[79] December 2003 Statewide Self Assessment, at P 002075
[80] Mangold 5/16/05 Dep. 68:11-25.
[81] Mangold 5/16/05 Dep. 38:21-25
[82] Mangold 6/2/05 Dep. 83:22-85:10, 85:15-21, 86:2-10
[83] Triplett 6/15/05 Dep. 98:1-99:22
[84] Mangold 6/04 Dep. 20:14-21; 22:18-25

[85] Mississippi State Personnel Board, Statewide Payroll and Human Resources System (Oct. 11, 2005); Pin History of Current and Past Employees (Sept. 30, 2005).

[86] May 2004 CFSR Final Rpt., at 78

[87] Memorandum w/ attachments, McDaniel to Felder, July 11, 2005, DHS 066328-30 (emphasis in original)

[88] December 2003 Statewide Self-Assessment, at P 001936, 001945, March 2005 PIP, at DHS 038161

[89] Mangold 6/2/05 Dep. 66:4-67:1, 69:3-22.

[90] DHS Program Improvement Plan (PIP), March 2005

[91] Dep. Billy Mangold, 8/25/04 14:19-20

[92] MS PIP, ACF Response to Second Quarterly Report, Dec. 11, 2005 at DHS 091690-691

[93] Mississippi Program Improvement Plan, ACF Response to Second Quarterly Report, December 11, 2005, at DHS091690-1

[94] Letter from C. Williams to R. Felder, November 10, 2005, at DHS091817; Email from C. Pike to R. Felder, December 13, 2005, at DHS091837.

[95] May 2004 CFSR Final Rpt., at ??

[96] May 2004 CFSR Final Rpt., at 74.

[97] Young 10/2/04 Dep. 21:7-13.

[98] December 2003 Statewide Self Assessment, P 001939, 002008, 002029, 002044

[99] December 2003 Statewide Self Assessment, P001995-96, 2033-34

[100] December 2003 Statewide Self Assessment, P001995-96, 2033-34; Mangold 6/2/05 Dep. 32:4-20

[101] December 2003 Statewide Self Assessment, P002000

[102] Brister Fiscal Report, XIV

[103] March 2005 PIP, at DHS038171

[104] Young 10/2/04 Dep. 76:25-77:1.

[105] March 2005 PIP, DHS 038172

[106] May 2004 CFSR Final Rpt., at 11, 72, 75

[107] Young 10/20/04 Dep. 16:12-17; December 2003 Statewide Self Assessment, at P002016, P001999, P002077; P001935-36, P001940, P002079-80.

[108] Rogers Dep. 81:13-17; 82:7-12; 281:15-16; McDaniel Dep. 79:5-8.

[109] 42 U.S.C. § 672

[110] Mangold 8/25/04 Dep. 66:22-67:16; 68:4-18; Young 10/20/04 Dep. 79:1-6

[111] May 2004 CFSR Final Rpt., at DHS 058975

[112] Mangold 8/25/04 Dep. 37:13-18; March 2005 PIP, at DHS 038188 .

[113] May 2004 CFSR Final Rpt., 60-61

[114] DHS 068717, September 14, 1999 PEER Report to the Mississippi Legislature, #397, p.4

[115] DHS 088995, Draft Mississippi March 2005 Site Visit Summary

[116] SACWIS Assessment Review Guide Workbook, March 2005, at DHS 089005

[117] SACWIS Assessment Review Guide Workbook, March 2005, at DHS 088912-13

[118] SACWIS Assessment Review Guide Workbook, March 2005, at DHS 089003

[119] Hess Case Record Review, Sec. VII.B

[120] Wilson 5/16/05 Dep. 60:13-61:8

[121] Wilson 5/26/05 Dep. 22:2-8, 34:23-35:3, 35:17-19, 37:3-25

[122] Mangold 6/2/05 Dep. 82:16-83:5

[123] Mangold 6/2/05 Dep. 79:11-14

[124] Mangold 8/25/04 Dep. 36:10-22; 39:8-12.

[125] March 2005 PIP, at DHS 038188

[126] Mangold 8/25/04 Dep. 98:24-99:6

[127] December 2003 Statewide Self Assessment, at P 001952-53

[128] Young 5/16/05 Dep. 26:4-5, 25:11-13

[129] McDaniel Dep. 70:6-14

[130] McDaniel Dep. 11:8-25

[131] McDaniel Dep. 80:17-81:14; Rogers Dep. 81:11-16, 82:18-83:3.

[132] Hamrick Dep. 91:14-92:5

[133] McDaniel Dep. 182:19-22

[134] Henry Dep. 20:11-20

[135] DFCS Organizational Charts, DHS 019809

[136] Mangold Dep. 8/25/04 118:22-119:11
[137] Triplett 10/24/04 Dep. 56:5-6
[138] Triplett 6/14/05 Dep. 27:15-17, 28:1-6
[139] Triplett 6/14/05 Dep.63:20-24, 64:3-14
[140] Young 6/15/05 Dep. 23:10-19
[141] Young 6/15/05 Dep. 33:12-17, 34:6-11
[142] Young 6/15/05 Dep. 35:15-17
[143] Significant Weekly Activities Report, August 12, 2005, at DHS 061840
[144] Triplett Dep. 10/04 6:1-4, 7-23; 7:4-11
[145] Triplett Dep. 10/04 84:14-85:1; 85:18-23
[146] Rogers Dep. 8/05 71:7-14
[147] McDaniel Dep. 140:6-9, 140:24-141:14; Rogers Dep. 144:220145:8
[148] McDaniel Dep. 169:25-170:3
[149] Rogers Dep. 84:5-85:11, 86:5-19, 89:23-90:5
[150] Rogers Dep. 221:12-222:4, 12-19
[151] Young 6/15/05 Dep. 15:6-17:20, 41:24-42:25
[152] 42 USC § 9801; 45 CFR 1355.50 - 1355.57
[153] Hamrick Dep. Exb. 80, DHS 00526
[154] Wilson 5/16/05 Dep. 28:22-29:2
[155] Rogers Dep. 97:25-98:3
[156] DHS 037277-037399, Number of Children in Custody by Placement Type by Region and Statewide
[157] December 2003 Statewide Self Assessment, at P 001979
[158] December 2003 Statewide Self Assessment, at P 001979-80
[159] December 2003 Statewide Self Assessment, at P 001995.
[160] December 2003 Statewide Self Assessment, at P 002035-37
[161] December 2003 Statewide Self Assessment, at P 002040
[162] December 2003 Statewide Self Assessment, at P 002013-14
[163] May 2004 CFSR Final Rpt., at 67-69
[164] Henry Dep. 85:18-86:3
[165] Foster Care Review, at DHS 00522-00539; Hamrick Dep. 17:20-25
[166] DHS 00512 – 00539; Hamrick Dep. 27: 7-11
[167] Hamrick Dep. 80:20-81:3
[168] Hamrick Dep. 12:7-10
[21] Hamrick Dep. 23:4-21; 25:4-6; 41:4-42:2
[170] Hamrick Dep. 41:19-49:2
[171] March 2005 PIP, at DHS 038186-87, 038336-37
[172] March 2005 PIP, at DHS 038186-87, 038336-37
[173] CWLA CAN 6.3, FC 1.4, 2.69-2.70; 45 CFR § 1355.34(b)(i)(A); MS Policy Manual DHS 00473
[174] DHS 00384, DFCS policy manual, Procedural Guidelines for Placement of a Child
[175] CWLA HC 3.2; CWLA HC 3.3, 3.4; CWLA HC 3.5, 3.6, 3.7; CWLA HC 3.8, 3.9.
[176] 42 U.S.C. § 675(5)(A)); MS Policy Manual DHS 00385; 00434 ; CWLA FC 2.29
[177] MS Policy manual DHS 00384
[178] MDHS policy DHS 00392, (CWLA FC 2.55)
[179] May 2004 CFSR Final Rpt., at 1-2
[180] Rogers Dep. 126:7-18; Young 6/15/05 Dep. 90:2-91:7
[181] McDaniel Dep. 132:18
[182] McDaniel Dep. 132:12-21
[183] Mangold 5/16/05 Dep. 20:11-22
[184] Rogers Dep. 190:23-191:4
[185] Hess Case Record Review, at Sec. III
[186] Number of Children in Placements by Placement Type, November 15, 2005, at DHS 088133.
[187] December 2003 Statewide Self Assessment, P001935-36
[188] Mississippi Child and Family Services Review Data Profile, December 8, 2005, at DHS091826.
[189] Hess Case Record Review, at Sec. IV.B

[190] PIP, DHS 038177
[191] December 2003 Statewide Self Assessment, P 002064
[192] Rogers Dep. 191:5-10
[193] May 2004 CFSR Final Rpt., at 30-31
[194] Rogers Dep. 190:23-191:4
[195] Rogers Dep. 187:9-24
[196] Weekly Shelter Care Report, December 16, 2005, at DHS 092875-76
[197] Weekly Shelter Care Report for August 6 - August 12, 2005, August 16, 2005, at DHS 093248
[198] MDHS Item 6: Stability of Foster Care Placements / Emergency Shelter Care For the Month of May, 2005, June, 10, 2005, at DHS 044681-044735
[199] Mississippi Program Improvement Plan, ACF Response to Second Quarterly Report, December 11, 2005, at DHS091701-DHS091702; DHS091689-091728
[200] Hess Case Record Review, at Sec. V.C
[201] Therapeutic Foster Care Placement Log/Pending Placements, July 2005-January 2006, DHS 091892-091917
[202] Licensed Foster Homes, January 12, 2005, DHS 019272-019440
[203] May 2004 CFSR Final Rpt., at 27
[204] DHS 037277-037399 DHS Custody by Placement Type
[205] Mem. from W. Gillom to DFCS staff, February 26, 2003, DHS 047277
[206] Licensed Foster Homes, January 12, 2005, DHS 019272-019440
[207] May 2004 CFSR Final Rpt., at 80
[208] Licensed Foster Homes, January 12, 2005, at DHS019272-DHS019440
[209] MS Policy Manual DHS 00136-137; DHS 00368.
[210] NP 06369,06440,06423-06424
[211] December 2003 Statewide Self Assessment, P002057
[212] Triplett 6/14/05 Dep. 85:2-7, 14-17
[213] CWLA FC 2.30, COAS21.2.01a, S21.10.02
[214] May 2004 CFSR Final Rpt., at 40
[215] Hess Case Record Review, at Sec. VII.H
[216] May 2004 CFSR Final Rpt., at 42
[217] Hess Case record Review, at Sec. VII.G
[218] Hess Case Record Review, at Sec. VII.I.
[219] March 2005 PIP, DHS038166
[220] March 2005 PIP, at DHS 038215
[221] Foster Care Review Program Quarterly Regional Comparison Report, 1st Quarter FY 2006, at DHS 071000
[222] Foster Care Review Program Quarterly Regional Comparison Report, 4th Quarter FY 2005, at DHS 063545-46.
[223] Foster Care Review Program Quarterly Regional Comparison Report, 3rd Quarter FY 2005, DHS 047097-047098
[224] 42 U.S.C. 671§ (a)(15)
[225] MS Code of 9172 § 43-15-13; MS Polocy Manual at DHS 00397, 00416-00417, 00467
[226] Rogers Dep. 240:8-12
[227] March 2005 PIP, at DHS038215.
[228] Mississippi's Program Improvement Plan Progress Report, Second Quarter: July-September 2005, November 4, 2005, at DHS091555.
[229] March 2005 PIP, DHS 038214
[230] Foster Care Review Program Quarterly Regional Comparison Report, 4th Quarter FY 2005, at DHS 063543.
[231] Foster Care Review Program Quarterly Regional Comparison Report, 1st Quarter FY 2006, at DHS 071001.
[232] March 2005 PIP, DHS 038166
[233] May 2004 CFSR Final Rpt., at 39
[234] Young 6/15/05 Dep. 93:17-97:1
[235] May 2004 CFSR Final Rpt., at 39

[236] McDaniel Dep. 161:17-23.
[237] December 2003 Statewide Self Assessment, p. 104
[238] McDaniel Dep. 140:24-141:14; Rogers Dep. 150:4-13, 150:18-22
[239] Mississippi's Program Improvement Plan Progress Report, Second Quarter: July-September 2005, November 4, 2005, at DHS091554.
[240] MS Policy Manual DHS00405
[241] May 2004 CFSR Final Rpt., at 30-31
[242] Hess Case Record Review, at Sec. III & IV.A
[243] December 2003 Statewide Self Assessment, P002071-72.
[244] Number of Placements for Children in Active Custody as of 10/31/05, November 15, 2005, at DHS 086435.
[245] Foster Care Review Program Quarterly Regional Comparison Report, 1st Quarter FY 2006, at DHS 070992-93.
[246] Hess Case Record Review, at Sec. IV.A
[247] December 2003 Statewide Self Assessment, P001935-36
[248] December 2003 Statewide Self Assessment, P001939, 2027, 2058
[249] May 2004 CFSR Final Rpt., Ex. at 48
[250] May 2004 CFSR Final Rpt., at 31-32
[251] McDaniel Dep. 164:10-12
[252] May 2004 CFSR Final Rpt., at 31-32
[253] Hess Case Record Review, at Sec. IV.A
[254] McDaniel Dep. 147:6-10
[255] Mississippi Program Improvement Plan, ACF Response to Second Quarterly Report, December 11, 2005, at DHS091728
[256] MS Policy Manual at DHS00392, DHS 00772
[257] Mangold Dep. 5/16/05 Dep. 28:24-25:11, 30:19-22
[258] Young 6/15/-5 Dep. 73:17-74:9
[259] McDaniel Dep. 27:18-28:1
[260] Henry Dep. 53:24-54:6; May 2004 CFSR Final Rpt., at 70; Rogers Dep. 75:3-76:3
[261] MDHS Bulletin No. 5692-2000
[262] Joint Legislative Committee on Performance Evaluation and Expenditure Review (PEER): Report to the Mississippi Legislature, May 11, 1999, at 4-5
[263] Hess Case Record Review, at Sec. IV.C
[264] Foster Care Review Program Quarterly Regional Comparison Report, 1st Quarter FY 2006, at DHS 071080.
[265] March 2005 PIP, at DHS 038167, DHS 038224
[266] Custody Contact Report, November 10, 2005, at DHS 086211.
[267] Bulletin No. 5692, December 4, 2000, DHS
[268] DHS 007635-007637, DHS 040328-040330, DHS 040331-040333, DHS 040337-040339, DHS 040343-040345, DHS 072699-072701, DHS 075683-075685, DHS 079048-079050, DHS 083100-083104, DHS 086207-086211.
[269] March 2005 PIP, DHS 038224
[270] Rogers Dep. 67:11-14
[271] McDaniel Dep. 81:9-11.
[272] Licensed Foster Homes, January 12, 2005, at DHS 019272-440. Included are two "dummy homes" with addresses of "do not delete, jackson, MS."
[273] FY 2006 MDHS Budget Request
[274] May 2004 CFSR Final Rpt., at 68
[275] December 2003 Statewide Self Assessment, P002038-39
[276] December 2003 Statewide Self Assessment, P001995, 2033
[277] May 2004 CFSR Final Rpt., at 80
[278] Mississippi Child and Family Services Review Final Report, May 2004, at 20.
[279] Foster Care Review Program Quarterly Regional Comparison Report, 3rd Quarter, FY 2005, at DHS 047115

---

[280] Foster Care Review Program Quarterly Regional Comparison Report, 4th Quarter, FY 2005, at DHS 063563

[281] Foster Care Review Program Quarterly Regional Comparison Report, 1st Quarter, FY 2006, at DHS 070991

[282] Calendar Year 2005 MDHS Foster Home Investigations, DHS 01928-30

[283] DHS 047089, 063537, 070991

[284] Triplett 6/14/05 Dep. 67:1-5, 67:25-68:5

[285] McDaniel Dep. 222:25-223:4-11

[286] Rogers Dep. 108:25-109:4, 109:21-110:22

[287] Hess Case Record Review, at Secs. IV.F-H

[288] Triplett 6/14/05 Dep,. 35:8-16

[289] Triplett 6/14/05 Dep. 76:20-21, 77:6-10, 77:25-78:1

[290] Triplett 6/14/05 Dep. 79:13-17, 80:8-14

[291] December 2003 Statewide Self Assessment, P 002047, 2051

[292] Investigations Open More Than 30 Days, November 15, 2005, at DHS 088507.

[293] Child Investigation Timeliness Report – Statewide Summary, October 10, 2005, at DHS 085782.

[294] May 2004 CFSR Final Rpt., at 3, 21-23

[295] May 2004 CFSR Final Rpt., at 27

[296] March 2005 PIP, at DHS 038194-95

[297] CWLA CAN 6.3, FC 1.4, 2.69-2.70; 45 CFR § 1355.34(b)(i)(A); MS Policy Manual DHS 00473

[298] Mangold 5/16/05 Dep. 30:8-14

[299] Dore, Martha M., "Emotionally and Behaviorally Disturbed Children in the Child Welfare System: Points of Preventive Intervention," Children and Youth Services Review, 21:1, pp. 7-29, 1999

[300] December 2003 Statewide Self Assessment, at P 001935-36, 001940

[301] December 2003 Statewide Self Assessment, at P 002016

[302] May 2004 CFSR Final Rpt., at 3, 58

[303] May 2004 CFSR Final Rpt., at 9

[304] May 2004 CFSR Final Rpt., at 2

[305] Mississippi Program Improvement Plan, ACF Response to First Quarterly Report, August 31, 2005, at DHS091535; Mississippi Program Improvement Plan, ACF Response to Second Quarterly Report, December 11, 2005, at DHS091725

[306] MS Policy Manual, Revised 05-01-99, at 3216; 3350.

[307] MS Policy Manual, Revised 05-01-99, at 3350.

[308] MS Policy Manual, Revised 05-01-99, at 3288; 9007.

[309] MS Policy Manual, Revised 05-01-99, at 3234.

[310] Hess Case Record Review, at Sec. V.A & B

[311] Hess Case Record Review, at Sec. V.C

[312] Foster Care Review Program Quarterly Regional Comparison Report, 1st Quarter FY 2006, at DHS 071007.

[313] December 2003 Statewide Self Assessment, at P 002080-81

[314] December 2003 Statewide Self Assessment, at P 001940, 002082

[315] May 2004 CFSR Final Rpt., at 3, 58

[316] May 2004 CFSR Final Rpt., at 57

[317] Wilson 5/16/05 Dep. 34:7-35:3.

[318] Hess Case Record Review, at Sec. V.A

[319] Foster Care Review Program Quarterly Regional Comparison Report, 1st Quarter FY 2006, at DHS 071007.

[320] Foster Care Review Program Quarterly Regional Comparison Report, 4th Quarter FY 2005, at DHS 063548.

[321] December 2003 Statewide Self Assessment, at P 001940, 002079-80

[322] Wilson Dep 5/16/05 34:7-35:3

[323] May 2004 CFSR Final Rpt., at 57

[324] Rogers Dep. 234:15-18

[325] Rogers Dep. 227:15-24

[326] March 2005 PIP, at DHS 038229

[327] Hess Case Record Review, Sec. V.C
[328] Foster Care Review Program Quarterly Regional Comparison Report, 1st Quarter FY 2006, at DHS 071008.
[329] Foster Care Review Program Quarterly Regional Comparison Report, 4th Quarter FY 2005, at DHS 063548.
[330] December 2003 Statewide Self Assessment, at P 001940, 002082
[331] December 2003 Statewide Self Assessment, at P 001939
[332] May 2004 CFSR Final Rpt., at 58-59
[333] Wilson 5/16/05 Dep. 34:7-35:3
[334] March 2005 PIP, at DHS 038230
[335] 45 C.F.R. 1355.34(a)(iii)(B); 42 U.S.C. § 675(1)(c).
[336] Hess Case Record Review, at Secs. VI.A-D
[337] Hess Case Record Review, at Sec. VI.E
[338] December 2003 Statewide Self Assessment, at P 002077
[339] March 2005 PIP, at DHS 038166-67, 038227
[340] Wilson 5/16/05 Dep. 34:7-35:3
[341] 42 U.S.C. § 675 (1)(B), (5)(C), (5)(E).
[342] Hess Case Record Review, VIII.D
[343] DHS 084966.
[344] December 2003 Statewide Self Assessment, P 002067, 002074-75
[345] December 2003 Statewide Self Assessment, P 002067, 002074-75
[346] May 2004 CFSR Final Rpt., at 1, 30-34
[347] MS POLICY MANUAL DHS 03288
[348] MS Policy Manual, DHS 00395, 3297-3290, 3447-3448
[349] Hess Case Record Review, at Sec. VII.B
[350] Hess Case Record Review, at Sec. VII.C & D
[351] Hess Case Record Review, at Secs. VII.E-G, J
[352] Hess Case Record Review, at Sec. VIII.B
[353] Foster Care Review Program Quarterly Regional Comparison Report, 1st Quarter FY 2006, at DHS 071004.
[354] Foster Care Review Program Quarterly Regional Comparison Report, 4th Quarter FY 2005, at DHS063546.
[355] March 2005 PIP, at DHS 038206-07, 038276
[356] December 2003 Statewide Self Assessment, P 001938-40, 001956
[357] May 2004 CFSR Final Rpt., at 62
[358] May 2004 CFSR Final Rpt., at 33-35
[359] May 2004 CFSR Final Rpt., at 46, 52-53
[360] March 2005 PIP, at DHS 038177
[361] March 2005 PIP, at DHS 038173-038174
[362] Hess Case Record Review, VII.D
[363] March 2005 PIP, at DHS 038181
[364] March 2005 PIP, at DHS 038181
[365] Mississippi Child and Family Services Review Data Profile, December 8, 2005, at DHS091828.
[366] MS Policy Manual 3273
[367] May 2004 CFSR Final Rpt., at 45
[368] March 2005 PIP, at DHS038219
[369] December 2003 Statewide Self Assessment, at P 00212-13
[370] MS Policy Manual, at DHS 03446
[371] Hess Case Record Review, at Sec. VIII.C
[372] Foster Care Review Program Quarterly Regional Comparison Report, 3rd Quarter FY 2005, DHS 047095
[373] Foster Care Review Program Quarterly Regional Comparison Report, 1st Quarter FY 2006, at DHS 071005
[374] December 2003 Statewide Self Assessment, at P 001958, 001960, 001965
[375] Hamrick Dep 8:20-23

[376] December 2003 Statewide Self Assessment, at P 001963, 001967-68, 001977
[377] May 2004 CFSR Final Rpt., 61-64, 66
[378] March 2005 PIP, at DHS 038236
[379] March 2005 PIP, at DHS038172-DHS038173, DHS038279-DHS038280, DHS038326-DHS038329.
[380] Mississippi Program Improvement Plan, ACF Response to Second Quarterly Report, December 11, 2005, at DHS091702
[381] 42 U.S.C. § 675(5)(E)
[382] (Hess Case Record Review, Section IX.)
[383] Foster Care Review Program Quarterly Regional Comparison Report, 1st Quarter FY 2006, at DHS 070994
[384] Foster Care Review Program Quarterly Regional Comparison Report, 4th Quarter FY 2005, at DHS 063541.
[385] Foster Care Review Program Quarterly Regional Comparison Report, 1st Quarter FY 2006, at DHS 070995.
[386] Foster Care Review Program Quarterly Regional Comparison Report, 4th Quarter FY 2005, at DHS 063541.
[387] Mississippi Child and Family Services Review Data Profile, December 8, 2005, Ex. __, at DHS091828.
[388] December 2003 Statewide Self Assessment, at P 002068
[389] December 2003 Statewide Self Assessment, at P 002027, 002075
[390] May 2004 CFSR Final Rpt., at 74
[391] May 2004 CFSR Final Rpt., at 65
[392] Millsaps Dep. 9:21-25, 12:"16-22, 24:11-18, 24:24-25:11
[393] Millsaps Dep. 79:15-80:1
[394] Mangold 5/16/05 Dep. 41:15-41:25.
[395] Mangold 5/16/06 Dep. 42:4-42:24.

*Catherine R. Crabtree*

Catherine R. Crabtree
Wetumpka, AL

February 7, 2006

# Appendix A

# CATHERINE R. CRABTREE

3949 JASMINE HILL ROAD
WETUMPKA, AL 36093

PHONE: (334) 567-0665
FAX : (334) 567-0660
E-MAIL: thegeneralshouse@aol.com

**EXPERIENCE**     **2003-Present**          **Consultant Services**
                                        **Montgomery, AL**

- Child welfare and juvenile justice expert court consultation.
- Organizational consulting, quality improvement, program development, evaluation and assessment, child advocacy assistance, mediation services, strategic planning, government relations, and business development.
- Consulting services to public and private agencies working with children and families.
- Consulting for clients in Alabama, New York, Mississippi, Georgia, Kansas, Virginia, Florida, Tennessee, and North Carolina.
- Retained as Interim Director of Quality Assurance, Alabama Department of Human Resources

**2001-2003**          **Tennessee Department of Children's Services**
                    **Nashville, TN**

**Assistant Commissioner, Compliance**

- Responsible for implementation monitoring of child welfare practice reforms through Compliance Division of the DCS federal settlement *Brian A. v. Sundquist*.
- Liaison and facilitator for DCS with federal monitor, Attorney General's office, Technical Assistance Committee for the Settlement Agreement, and Children's Rights attorneys for plaintiffs.
- Technical resource to DCS staff, outside agencies, legislators, and the general public in interpretation of the Settlement Agreement.
- Provided ongoing monitoring of the welfare of the named children in the Settlement Agreement.
- Reviewed and approved all contracts related to the Settlement Agreement.
- Finalized needs assessment expenditures related to the Settlement Agreement.
- Provided oversight for a racial disparity study, salary compensation study, graduate stipend program development, and IV-E training revenue maximization study.

**Assistant Commissioner, Program Operations**

- Responsible for child welfare, juvenile justice, and prevention programs for five regions of the state.

- Oversight of program operations in five regions including budgeting, staffing, programming, training, and resource development.

**July-December 2000**          **Science Applications International Corp.**
                               **Oak Ridge, TN**
**Director of Government Services**
- Developed and implemented organization transitional and training initiative for government and business.
- Member of team developing cultural change initiative for organizations.
- Led planning for child advocacy center perpetrator tracking system project.
- Facilitated legislative monitoring, tracking, lobbying.

**1995-2000**                   **Tennessee Department of Children's Services**
                               **Nashville, TN**
**Assistant Commissioner**
- Planned, developed, and implemented new department of state government (Department of Children's Services) merging 3000 employees and budgets totaling $370 million dollars.
- Responsible for child welfare, juvenile justice, and prevention programs for the State of Tennessee for central office and field operations.
- Oversight of staffing, budgeting, training, resource development, and administrative functioning of the twelve regions of DCS.
- Member of Governor's legislative team writing and passing key legislation including: creation of the new Department of Children's Services, inclusion of Adoption and Safe Families Act into Tennessee statute, the Tennessee Foster Parent Bill of Rights, and departmental improvement legislation resulting in an additional $15 million dollars to the DCS budget.
- Created regional Health Units across the state to improve health care access to children in state custody.
- Facilitator in development of state's first managed health care networks for TennCare (Medicaid) eligible children.
- Initiated and chaired first DCS project committee on development of federal SACWIS TNKIDS Information System.
- Created an implementation review process for monitoring and auditing casework performance in the field.

**1994-1995**                   **East Tennessee Community Health Agency**
                               **Knoxville, TN**
**Director of Children's Services**
- Administrator of a 15 county region with 75 employees for program serving children in state custody and prevention programs for those at risk of state custody.

- Developed and chaired first Regional Utilization Group in the state responsible for development of a managed care review methodology in social services child custody arena.
- Developed policy and procedure in relation to programming for child population served by the agency.
- Developed monitoring and reporting mechanisms to improve service delivery to children and families.

**1993-1994**                    **Peninsula Lighthouse**
                                 **Knoxville, TN**
**Director of Mental Health Programs**
- Developed a new service of Peninsula Psychiatric Hospital that provided an outpatient day treatment program for psychiatric patients.
- Responsible for budgeting, staffing, training, and administrative supervision of staff.
- Provided individual clinical counseling and group and family therapy to psychiatric outpatient population.

**1991-1993**                    **The Krisland Group**
                                 **Knoxville, TN**
**Vice-President**
- Group communication and facilitation training using process communication therapy as basis of work with business and industry clients.
- Outplacement counseling for employees and groups in transition from job loss.

**1987-1989**                    **Peninsula Psychiatric Hospital**
                                 **Louisville, TN**
**Director of Admissions**
- Developed the first Admissions Department for the hospital.
- Responsible for the administration of the department including budgeting, training, staffing, and liaison with surrounding area hospitals.

**1982-1987**                    **Private Practice**
                                 **Knoxville, TN**
**Psychological Examiner**
- Conducted testing and assessment using MMPI, intelligence tests, and projective tests with children, adolescents, and adults.
- Provided court consultation and testimony, and individual and group therapy with children, adolescents, and adults.
- Developed and taught seminar on Child Behavior Management for University of Tennessee Continuing Education division.

| | |
|---|---|
| **1979-1982** | **Cherokee Mental Health Center** |
| | **Morristown, TN** |

**Community Liaison**
- Provided pre-adjudication screening for juvenile courts in six counties for assessment and treatment needs of juvenile offenders.
- Administrator for Law Enforcement Planning Grant (LEPA) to provide consultation and education to local youth shelters, juvenile courts, and law enforcement agencies for juvenile offender mental health concerns.
- Provided group and individual therapy for children and adolescents.
- Provided classroom behavioral observation and consultation with local schools in a six-county area.

| | |
|---|---|
| **1977-1979** | **East Tennessee Human Resource Agency** |
| | **Knoxville, TN** |

**Program Counselor**
- Provided counseling to adolescents in a specialized program for juvenile offenders "Youth Opportunities Unlimited".
- Developed and implemented a weekend wilderness program for this same population.

**EDUCATION**

| 1977 | University of Tennessee | Knoxville, TN |
|---|---|---|

- **B.S. Education**

| 1982 | University of Tennessee | Knoxville, TN |
|---|---|---|

- **M.S. Educational Psychology**

**LICENSURE and CERTIFICATION**

Psychological Examiner, State of Tennessee; License #PE925 (inactive)
Civil Mediation certification

**PUBLICATIONS and PAPERS**

Rogers, C.R. and Wahler, R.G. *Barriers to Child Behavior Change: Insularity and Child Opposition.* Tennessee Educational Leadership, Summer 1982, Vol. IX, No.1.

Rogers, C.R. *Hidden Measurement: Preliminary Data from the Audiotape Sampling Project.* Paper presented at AABT Social Learning Symposium. Toronto, Ontario, Canada, 1981.

Rogers, C.R., and Gump, B. *MMPI Code Types, Referral Behaviors, and Recidivism in an Outpatient Adolescent Treatment Population. Unpublished monograph, 1983.*

**HONORS**

Who's Who Among Human Services Professionals, 1986-1987.