IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

OLIVIA Y., *et al*.                                                                          PLAINTIFFS

v.                                                                          CIVIL ACTION NO.  3:04CV251LN

HALEY BARBOUR, as Governor of the State of Mississippi, *et al.*                DEFENDANTS

---

**THE COURT MONITOR'S REPORT TO THE COURT REGARDING
DEFENDANTS' PROGRESS TOWARD MEETING PERIOD-1 REQUIREMENTS**

---

**Table of Contents, Report Narrative,
Index to Exhibits, and Appendix: Exhibits 1A – 19D**

**June 5, 2009**

**TABLE OF CONTENTS**

I.      INTRODUCTION AND SUMMARY OF FINDINGS ............................................2

II.     BACKGROUND ......................................................................................................7
        A.  Structure of the Settlement Agreement...................................................7
        B.  Relevant Procedural Background.............................................................8

III.    METHODOLOGY ................................................................................................10

IV.     FINDINGS ............................................................................................................12

        Settlement Agreement §I. Reform Planning and Implementation............................12
            Settlement Agreement §I.C...............................................................................12
                Status of Progress, Settlement Agreement §I.C....................................13
            Period 1 IP §I..................................................................................................16
                Status of Progress, Period 1 IP §I.........................................................16
        Settlement Agreement §II. Standards ......................................................................21
            Settlement Agreement §II.A. Administration and Management Standards. .........21
                Status of Progress, Settlement Agreement §II.A.1.a. and b.......................22
            Period 1 IP §I.1...............................................................................................23
                Status of Progress, Period 1 IP §I.1. .....................................................23
            Settlement Agreement §II.A.2.a........................................................................25
                Status of Progress, Settlement Agreement §II.A.2.a. ................................26
            Period 1 IP §I.2.a............................................................................................35
                Status of Progress, Period 1 IP §I.2.a....................................................35
            Period 1 IP §I.2.b............................................................................................36
                Status of Progress, Period 1 IP §I.2.b. ..................................................37
            Settlement Agreement §II.A.2.c. ......................................................................39
                Status of Progress, Settlement Agreement §II.A.2.c.4. ...............................39
                Status of Progress, Settlement Agreement §II.A.2.c.5. ...............................42
                Status of Progress, Settlement Agreement §II.A.2.c.6. ...............................44
            Period 1 IP §I.2.c............................................................................................45
                Status of Progress, Period 1 IP §I.2.c....................................................46
            Period 1 IP §I.2.d............................................................................................48
                Status of Progress, Period 1 IP §I.2.d ...................................................48
            Settlement Agreement § II.A.3. .......................................................................49
                Status of Progress, Settlement Agreement §II.A.3. ....................................49
            Period 1 IP §I.3...............................................................................................50
                Status of Progress, Period 1 IP §I.3. .....................................................51
            Settlement Agreement §II.A.4. ........................................................................51
                Status of Progress, Settlement Agreement §II.A.4. ....................................51
            Settlement Agreement §II.A.5. ........................................................................51
                Status of Progress, Settlement Agreement §II.A.5.b. .................................52
                Status of Progress, Settlement Agreement §II.A.5.c. .................................53
            Period 1 IP §I.5...............................................................................................55

Status of Progress, Period 1 IP §I.5. .......................................................55
Period 1 IP §I.6. ............................................................................................56
    Status of Progress, Period 1 IP §I.6. .......................................................56
Settlement Agreement §II.A.7. ......................................................................56
    Status of Progress, Settlement Agreement §II.A.7.a. ...............................56
    Status of Progress, Settlement Agreement §II.A.7.b. ...............................57
Period 1 IP §I.7. ............................................................................................57
    Status of Progress, Period 1 IP §I.7. .......................................................57
Period 1 IP §II. .............................................................................................57
    Status of Progress, Period 1 IP §II. .........................................................57
Period 1 IP §II. .............................................................................................59
    Status of Progress, Period 1 IP §II. .........................................................59
Period 1 IP §II.1. ..........................................................................................60
    Status of Progress, Period 1 IP §II.1. ......................................................60
Period 1 IP §II.2. ..........................................................................................61
    Status of Progress, Period 1 IP §II.2. ......................................................61
Period 1 IP §II.3.a.1.-2. .................................................................................62
    Status of Progress, Period 1 IP §II.3.a.1.-2. ............................................62
Period 1 IP §II.3.c. ........................................................................................62
    Status of Progress, Period 1 IP §II.3.c. ...................................................62
Period 1 IP §II.3.d. ........................................................................................65
    Status of Progress, Period 1 IP §II.3.d. ...................................................65
Period 1 IP §II.3.e. ........................................................................................66
    Status of Progress, Period 1 IP §II.3.e. ...................................................66
Settlement Agreement §II.B.3.f. ...................................................................70
    Status of Progress, Settlement Agreement §II.B.3.f.3. .............................70
    Status of Progress, Settlement Agreement §II.B.3.f.4. .............................71
    Status of Progress, Settlement Agreement §II.B.3.f.5. .............................73
Period 1 IP §II.3.f. ........................................................................................74
    Status of Progress, Period 1 IP §II.3.f. ....................................................74
Settlement Agreement §II.B.4. ......................................................................76
    Status of Progress, Settlement Agreement §II.B.4.d. ...............................77
    Status of Progress, Settlement Agreement §II.B.4.e. ...............................78
    Status of Progress, Settlement Agreement §II.B.4.f. ................................78
    Status of Progress, Settlement Agreement §II.B.4.g. ...............................78
    Status of Progress, Settlement Agreement §II.B.4.h. ...............................79
    Status of Progress, Settlement Agreement §II.B.4.i. ................................80
    Status of Progress, Settlement Agreement §II.B.4.j. ................................80
Period 1 IP §II.4. ..........................................................................................81
    Status of Progress, Period 1 IP §II.4. ......................................................81
Settlement Agreement §II.B.5. ......................................................................83
    Status of Progress, Settlement Agreement §II.B.5.i. ................................83
    Status of Progress, Settlement Agreement §II.B.5.j. ................................84
    Status of Progress, Settlement Agreement §II.B.5.k. ...............................84
Period 1 IP §II.5. ..........................................................................................85
    Status of Progress, Period 1 IP §II.5. ......................................................85

Period 1 IP §II.6. ...........................................................................................86
    Status of Progress, Period 1 IP §II.6. ...................................................86
Period 1 IP §II.7. ...........................................................................................86
    Status of Progress, Period 1 IP §II.7. ...................................................86
Period 1 IP §II.8. ...........................................................................................86
    Status of Progress, Period 1 IP §II.8. ...................................................87
Period 1 IP §II.10. .........................................................................................87
    Status of Progress, Period 1 IP §II.10. .................................................87
Period 1 IP §II.11. .........................................................................................87
    Status of Progress, Period 1 IP §II.11. .................................................87
Settlement Agreement §II.B.13. ...................................................................88
    Status of Progress, Settlement Agreement §II.B.13.e...........................89
    Status of Progress, Settlement Agreement §II.B.13.g.. .........................89
    Status of Progress, Settlement Agreement §II.B.13.h. ..........................90
Period 1 IP §II.13. .........................................................................................90
    Status of Progress, Period 1 IP §II.13. .................................................90
Period 1 IP §III.A. .........................................................................................91
    Status of Progress, Period 1 IP §III.A. .................................................91
Period 1 IP §III.B. .........................................................................................92
    Status of Progress, Period 1 IP §III.B. .................................................92

V.     CONCLUSION .............................................................................................92

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

OLIVIA Y., *et al*.                                               PLAINTIFFS

v.                                             CIVIL ACTION NO.  3:04CV251LN

HALEY BARBOUR, as Governor of the State of Mississippi, *et al.*          DEFENDANTS

---

**THE COURT MONITOR'S REPORT TO THE COURT REGARDING
DEFENDANTS' PROGRESS TOWARD MEETING PERIOD-1 REQUIREMENTS**

---

This report summarizes the Court Monitor's ("Monitor") assessment of defendants'

progress toward meeting the first-year requirements of the Mississippi Settlement Agreement and

Reform Plan ("Settlement Agreement") approved by the Court on January 4, 2008, including the

requirements contained in the first implementation plan ("Period 1 IP").[1]  It was provided to the

parties and to representatives from the Council on Accreditation ("COA")[2] in draft form for

review and comment on April 29, 2009.  The Monitor has considered and addressed all

comments, as appropriate, in this final version of the report.

The report is divided into five sections.  The Introduction and Summary of Findings

outlines the progress that has been made during Period 1 as well as the primary initiatives that are

underway to promote the required reforms.  It also identifies certain challenges that will need to

be overcome in order for the defendants to make continued progress.  The Background section

---

[1]  The Settlement Agreement refers to the first-year implementation plan as both the "Year 1 Implementation Plan" and the "Period 1 Annual Implementation Plan."  For purposes of this report, the term "Period 1 IP" refers to the first-year implementation plan incorporated into the Settlement Agreement at Appendix A.
[2]  COA is an independent, non-profit, accrediting organization that accredits human services entities, including child and family services agencies in the public sector.

describes how the Settlement Agreement is structured and presents the relevant procedural history. The Methodology section explains the process used to evaluate defendants' progress. The Findings section presents the Monitor's assessment of the progress that has been made toward meeting each of the Period 1 requirements. The Conclusion is followed by an appendix that includes the report's exhibits, which, as appropriate, have been redacted in the final version of the report to delete information that identifies individual children, their family members and/or other caregivers, and, in limited case-specific instances, the names of caseworkers and their supervisors.

The pace of progress during Period 1 did not meet the Settlement Agreement's requirements. As a result, defendants will need to accelerate and intensify their efforts to accomplish the required systemic reforms within the prescribed five-year timetable. Nonetheless, there have been some significant accomplishments. In addition, several key initiatives have been introduced and are being managed by a newly-installed and experienced executive team of child welfare professionals who are committed to the reform process. The efforts and motivation of this promising leadership team, coupled with the strengths and talents of their staff, should result in substantial progress during Period 2, provided that this reform initiative is adequately resourced and appropriately managed. Defendants' accomplishments, and the challenges that must be overcome, are described in detail in this report.

## I. <u>INTRODUCTION AND SUMMARY OF FINDINGS</u>

The Period 1 requirements focused on building the capacity of the Mississippi Department of Human Services ("MDHS") Division of Family and Children's Service ("DFCS") to achieve the Settlement Agreement's goals and outcomes. A lynchpin of Period 1 was the requirement that defendants appoint a qualified leader for DFCS who could recruit a

management team capable of assisting with the reform process.  In recognition of the fact that systemic changes are not anticipated to substantially alter case practice during the initial stage of the reform process, Period 1 requirements also included interim safeguards to promote child safety.

As the management team was established, the Period 1 requirements contemplated that defendants would build key elements of the DFCS infrastructure through either specifically defined initiatives or a prescribed planning process.  Pivotal capacity-building steps required during Period 1 included: 1) finalizing policies and procedures; 2) implementing a method for tracking caseworker and supervisory workloads; 3) establishing a Training Unit for employees; and, 4) adopting an independent continuous quality improvement system ("CQI").  As an adjunct to these initiatives, Period 1 requirements also called for a planning process based on assessments of DFCS's administrative and management operations, including an assessment of the Mississippi Automated Child Welfare Information System ("MACWIS"),[3] and of the service delivery system.[4]  In most instances, the goal of these assessments was to identify any critical shortcomings in the administrative, management and service delivery systems and to use these data to plan the remedial strategies that were required to be introduced during Period 1 or, as specified, Period 2.

The evidence shows that despite considerable early efforts by DFCS management and staff, progress toward meeting Period 1 requirements was limited until July 2008 when the then-newly appointed executive director of MDHS began to recruit an experienced leadership team to

---

[3]  In addition to MACWIS, assessments of the workforce, training curricula, contracting practices, the CQI system, and fiscal and financial management were required by the Period 1 IP.

[4]  Specific assessments of foster care services include reunification, independent living, foster care support, medical, dental and mental health services; case processing and practices related to termination of parental rights ("TPR"), parent/child and sibling visitation and reports of child maltreatment; and, the array of DFCS placements.

manage DFCS. In part, as a result of the delay in establishing the DFCS management team, many Period 1 requirements were not met and are now required to be completed during Period 2. This outcome should be considered in light of the progress that has occurred, the initiatives that are now underway, and the formidable challenges that defendants will need to overcome, most of which are described below.

Since July 2008, MDHS has been led by a seasoned public manager who actively supports the goals of the Settlement Agreement, and has made them a priority. A newly-established MDHS deputy position is responsible for overseeing DFCS. The MDHS deputy, appointed in September 2008, is an experienced child welfare professional with the credentials, commitment and vision to lead the reform effort. Under this new leadership, DFCS has been reorganized and restructured to eliminate certain historical impediments to reform: an organizational structure reflecting 13 instead of seven regions has been established to more readily institute new management initiatives and to strengthen accountability; an executive management structure more closely aligned with family-centered practice has been created; and, a career ladder designed to bolster the recruitment and retention of social workers has been developed and approved, albeit, as noted below, it remains unfunded.

In the wake of a significant DFCS budget increase, which in itself is an important accomplishment, defendants report that there was a net statewide increase of approximately 115 social workers and 12 supervisors during Period 1. In addition, a qualified and committed core team of child welfare professionals is now managing DFCS. As of May 2009, most, but not all, key DFCS management positions in the MDHS state office were filled, and all of the six new regional directors were hired. In addition, two key operational units within DFCS were

4

established: the CQI Unit and the Training Unit.  It is anticipated that both units will fuel the reform effort, but they must be adequately staffed and resourced to do so.

Defendants also made progress toward meeting initial COA accreditation requirements during Period 1.  In December 2007, COA was engaged by MDHS to begin the accreditation process outlined in the Settlement Agreement.  Staff and managers received COA training on accreditation and performance quality improvement.  Ongoing technical assistance related to the accreditation process was provided to DFCS by a COA consultant, and COA conducted two assessments to determine DFCS's readiness for accreditation.  In mid-March 2009, COA determined that the defendants successfully met the initial series of COA accreditation standards for Period 1.  The defendants recently reorganized the DFCS management of the accreditation process in order to strengthen executive management oversight and internal coordination of pre-accreditation tasks and activities.

In addition to these accomplishments, there has been recent progress on several other key capacity-building projects which are underway and expected to be completed during Period 2. During January 2009, defendants engaged a national expert to work with DFCS on the development of a family-centered practice model that will serve as the conceptual framework for required improvements in case practice.  In order to bolster their efforts to promote the implementation of the practice model, the defendants applied through a competitive process for federally-funded technical assistance from a team of national experts.  At the end of May 2009, DFCS was notified that it has been selected to participate in this project.[5]  Moreover, during

---

[5]  On May 27, 2009, defendants were notified that DFCS had been selected to participate in the first round of  a two-year implementation project with the Atlantic Coast Child Welfare Information Center ("ACCWIC"), a training and technical assistance center established by the U.S. Department of Health and Human Services, Administration for Children and Families, Children's Bureau ("Children's Bureau") to provide in-depth and long-term consultation in implementing change strategies to state and tribal child welfare agencies.  The project will focus on the (continued…)

January 2009 defendants launched an inter-related project, engaging an experienced child welfare consultant to review and revise the DFCS policy manual to ensure its conformity with the requirements of the Settlement Agreement.  These projects must be completed in order to finalize the pre-service and in-service training curriculum for caseworkers and supervisors – a Period 1 requirement that must be completed during Period 2.

During early 2009, defendants also began to plan the Period 1 special safety reviews. Two experienced social workers, who were hired to conduct the reviews, started working at DFCS in January 2009.  Thereafter, safety review instruments were developed and piloted. Despite challenges in identifying the specific homes and facilities subject to this requirement, the safety reviews of foster homes and congregate facilities are underway.

Many of the required administrative and management assessments and foster care services assessments were not completed during Period 1.  Thus, key aspects of the reform planning process contemplated by the Period 1 requirements were delayed and must be completed during Period 2.  However, now that most of the core DFCS management team is in place, it is anticipated that they will benefit from and contribute to the planning and assessment process.  This should enhance the quality of the assessments and the quality of the remedial plans that are developed in response to the assessments.  Moreover, it may help to promote timely implementation of the strategies that are developed to address any shortcomings identified by the assessment process.

Despite the delay in completing many Period 1 requirements, there have been demonstrable accomplishments that evidence progress toward building the capacity necessary to support this reform effort.  In order to make measureable progress that can be sustained over

_____

implementation of the new practice model in Harrison and Forrest counties with an ultimate goal of developing strategies and methodologies to promote the institutionalization of the practice model on a statewide basis.

time, the defendants must resolve several formidable challenges, which have impeded the reform

process.  These challenges are described more fully in Section IV of this report.  Key obstacles

defendants must overcome are listed below:

- <u>First</u>, defendants must bolster the current capacity of MDHS and DFCS administrative operations, including processes related to federal revenue maximization; processing, tracking and reporting, accurately and in real-time, on hiring and other personnel actions; and contracting and procurement functions.

- <u>Second</u>, defendants must invest in the DFCS workforce by funding and hiring a sufficient number of qualified employees, including caseworkers and supervisors, and providing them with the required pre-service and in-service training and the equipment necessary to appropriately serve class members.

- <u>Third</u>, defendants must implement CQI and performance management systems. Substantial improvement in the quality and accuracy of the information that is available to guide management decisions and promote improvements in individual case practice will be needed.  Among other measures, this includes resolving significant shortcomings in the DFCS management information system, MACWIS, so that it produces accurate, complete and reliable data related to the requirements in this case, which can be analyzed and validated.

## II.  <u>BACKGROUND</u>

### A.  Structure of the Settlement Agreement

The Settlement Agreement includes standards and outcomes the defendants are required

to meet by January 4, 2013, or earlier as specified in the Settlement Agreement, through an

incremental remedial process that measures progress in terms of annual benchmarks and interim

milestones.  The benchmarks are established by the Settlement Agreement.  Interim milestones –

the steps with corresponding timelines that must be accomplished each year to achieve the

benchmarks and ultimately overall compliance with the Settlement Agreement – are contained in

annual implementation plans that the defendants are required to develop jointly with plaintiffs

and COA.  Each implementation plan is incorporated into the Settlement Agreement.[6]  Such a structure permits the parties and the Court to measure progress over time according to clearly defined standards, and affords the flexibility to develop annual requirements based on real-time information about defendants' progress.

Among other substantive provisions, the Settlement Agreement requires DFCS to meet standards related to the administration, management and delivery of foster care services, and certain outcome measures related to child well-being, safety and permanency.  In addition, the Settlement Agreement requires that DFCS achieve COA accreditation pursuant to relevant COA management and service standards.[7]  The first-year requirements are reflected in the Settlement Agreement's first-year benchmarks and in the Period 1 IP's interim milestones.  The Settlement Agreement includes the Period 1 IP.[8]  It has been superseded by the Period 2 Implementation Plan ("Period 2 IP") which was filed by the parties on May 4, 2009 and covers the period May 1, 2009 through April 31, 2010.   The findings presented herein, were submitted initially to the parties in outline form during February 2009, and used to inform the development of the Period 2 IP.

### B.  Relevant Procedural Background

On October 21, 2008, the Monitor filed a preliminary status report,[9] summarizing defendants' accomplishments and certain shortcomings, which are described more fully below. The Monitor reported that the delay in hiring a key administrator resulted in a much slower than anticipated start to the Period 1 reform process.[10]  This, in turn, delayed defendants' self-

---

[6]  Settlement Agreement §I.B.
[7]  *Id.* §IV.
[8]  *Id.* at Appendix A.
[9]  The Court Monitor's Preliminary Status Report, October 21, 2008 [hereinafter October 21, 2008 Status Report].
[10]  *Id.* at 4.

assessment, as well as certain aspects of the Monitor's assessment of progress during Period 1. Because formulation of the Period 2 IP was contingent upon a comprehensive assessment of progress during Period 1, the parties filed a motion to extend the time to file the Period 2 IP.[11] Pursuant to a consent order filed on January 6, 2009, the court enlarged the deadline for filing the Period 2 IP to April 1, 2009, and also extended the term of the Period 1 IP until such time as the Period 2 IP would be signed by the parties and thereby incorporated into the Settlement Agreement.[12]

The January 6, 2009 consent order required the parties to develop a Period 2 IP based on Period 1 compliance data submitted to the parties by the Monitor during February 2009.[13] On February 12, 2009, the Monitor provided the parties with an initial outline of her Period 1 findings. Thereafter, the parties continued their negotiation of the Period 2 IP in consultation with COA and the Monitor. A subsequent consent order granting a consent motion for an additional extension of time enlarged the deadline for filing the Period 2 IP to May 1, 2009.[14] The Period 2 IP was filed on May 4, 2009.[15]

---

[11]  Agreed Motion for Consent Order Extending Time to File the Year Two Implementation Plan, December 30, 2008.

[12]  Consent Order, January 6, 2009 ¶¶ 6 - 7.

[13]  *Id.* ¶6.

[14]  Consent Order, March 27, 2009.

[15]  The parties attempted to file the Period 2 IP on May 1, 2009, as required; however, due to technical difficulties related to the ECF system, they were unable to do so. Instead, the Period 2 IP was transmitted to the Court's chambers via electronic mail on May 1, 2009 and filed in the record on May 4, 2009. *See* Declaration of Technical Difficulties, filed May 4, 2009.

### III. __METHODOLOGY__

The Monitor's assessment of defendants' progress toward meeting the Period 1 IP requirements included site visits to regional and county offices[16] as well as interviews with MDHS and DFCS managers, supervisors, and caseworkers.  In addition, interviews were conducted with foster and adoptive parents, service providers from private agencies that contract with DFCS, youth court judges and staff, attorneys and others who practice in the youth court, representatives from university social work programs, members of child welfare organizations and advocacy groups, representatives from COA, and other public and private child welfare system stakeholders.  The Monitor convened and participated in periodic meetings with the parties and COA representatives and also received informal status updates from defendants and their counsel on a regular basis.

Relevant documents, memoranda and other records were reviewed and analyzed, including the following: budget documents; staffing reports; procurement data, including requests for proposals ("RFPs") and contracts; federal audit reports and related corrective action plans; reports and other data generated by the DFCS foster care review program; reports and memoranda prepared by COA; training curricula and related materials for DFCS caseworkers, supervisors and resource parents;[17] MACWIS data such as monthly and special reports, change order requests, a draft user manual and training materials; DFCS policies and practice guides; personnel data, including position descriptions, vacancy postings, and resumes; survey data related to staff qualifications; individual case records; serious incident reports; investigative

---

[16]  Site visits to DFCS offices included county offices in Hinds, Hancock, Jackson, Harrison, Forrest, and East Bolivar as well as offices located in Tunica, Grenada, Greenville and Tupelo.  The Monitor expects to increase the number and frequency of such site visits during Period 2.
[17]  The term "resource parents" is used to refer to both foster and adoptive parents.

reports; DFCS submissions to COA; licensure requirements for resource families and private agencies; and, materials provided to youth in the independent living program. The Monitor also consulted with various child welfare system experts and a statistician during Period 1.

In certain instances noted in the Findings section of this report, the Monitor has indicated that the defendants' performance will be evaluated through a case record review process that will be conducted during Period 2. The Monitor began planning for the Period 2 case record reviews during early 2009. Two separate case record review instruments were developed in consultation with child welfare and statistical experts, and they are currently in draft form. The instruments will be finalized by the Monitor in consultation with the parties, field tested, piloted, and modified, as appropriate. Thereafter, the Monitor expects to conduct two distinct case record reviews in coordination with DFCS.

The first case record review will assess baseline performance related to the Settlement Agreement's child safety standards through an in-depth review of a representative statewide sample of investigative and licensure files. The second will assess baseline performance related to most of the Settlement Agreement's other foster care services standards through an in-depth review of a representative statewide sample of the individual case records of children in foster care. Each review will be conducted by a team composed of both independent and DFCS reviewers. The Monitor will analyze the results of the case record reviews and report to the Court and the parties on her findings, as appropriate.

As contemplated by the Settlement Agreement and explained more fully below, until MACWIS can produce accurate, complete and reliable data related to the requirements in this

case, that can be independently analyzed and validated,[18] periodic case record reviews must be undertaken to measure defendants' progress.[19]  The Monitor plans to structure the Period 2 case record reviews in a manner that will promote the development of defendants' capacity to conduct case record reviews and analyze the results subject to the Monitor's independent validation.

## IV.  FINDINGS

This section presents the Monitor's findings regarding the defendants' progress toward meeting the Period 1 requirements reflected in Sections I - III of the Settlement Agreement and in the Period 1 IP.  Each requirement is set out in bold type-face.  The Monitor's findings appear in the narrative section below each requirement.

### SETTLEMENT AGREEMENT:  §I. REFORM PLANNING AND IMPLEMENTATION

The first section of the Settlement Agreement, Reform Planning and Implementation, describes, *inter alia*, the annual implementation plan process as well as fiscal planning and related requirements.  The Monitor's findings regarding Period 1 fiscal planning and related requirements are addressed below.

**Settlement Agreement §I.C.**

**Defendants do not speak for the Mississippi Legislature, which has the power under Mississippi law to determine the appropriations for the State's child welfare programs.  However, at least annually after Court approval of this Plan, and consistent with existing state budgetary practices and legal requirements, Defendants shall request state funds and any federal/special fund authorization sufficient to effect the provisions and outcome measures set forth in this Plan in connection with any budget, funding, or allocation request to the executive or legislative branches of State government.  To the extent that it is anticipated that the funding of critical needs shall be met, in whole or in part, by way of federal fund sources, Defendants shall request federal fund authorization in amounts which are determined to be realizable and consistent with regular**

---

[18]  Settlement Agreement §II.A.5.a.
[19]  Settlement Agreement §VI.B., in relevant part, requires the Monitor to "confirm independently the data reports and statistics provided pursuant to this Plan and the annual implementation plans [and to] conduct independent case record and other qualitative reviews . . . ."

> **budgetary needs assessments.  Nothing in this paragraph in any way limits Defendants' obligations under this Plan.**
>
> **Such budgetary requests, which shall be provided to the Monitor, shall, among other things, identify for the executive and legislative branches of State government, with sufficient particularity, the known and anticipated costs to the State for the timely implementation of the reforms and outcome measures provided for herein.**
>
> **Defendants shall maximize available federal funding opportunities.**

**Status of Progress, Settlement Agreement §I.C.:**  As explained below, there were

certain substantive efforts to address the Settlement Agreement's fiscal planning requirements

during Period 1.  However, because the defendants did not conduct a required external

assessment of actual and anticipated federal funding levels, the Monitor cannot determine

whether the defendants' FY 2010 request for federal funding and authorization is realizable and

consistent with regular budgetary needs assessments.  This is a crucial fiscal planning

requirement that defendants must now satisfy during Period 2.

Chronic funding deficits have contributed to many of the shortcomings in DFCS's

performance that the Settlement Agreement is designed to address.[20]  The evidence shows that

defendants made demonstrable efforts to address this problem during and in anticipation of

Period 1.  However, defendants report that increased funding is needed during the fiscal year that

starts in July 2009 (FY 2010) to subsidize core capacity-building initiatives related to the

---

[20]  *See, e.g.,* Ex. 1A, State Level Citizen Review Board, DFCS Five-Year Plan Review and Recommendations, June 14, 2002, excerpt at 1 ("Severe funding and staffing shortages will undo and indeed rapidly reverse whatever gains have been achieved."); Ex. 1B, MDHS, DFCS, Child and Family Service Review, Statewide Self Assessment, December 2003, excerpt at 1987, (noting intensive training course interrupted, limited and delayed due to travel restrictions and budget shortages); Ex. 1C, MDHS, DFCS, Child and Family Service Review, Program Improvement Plan, March 24, 2005, excerpt at 4 (noting DFCF's struggle to maintain improvements due to a number of factors, including budget cuts); Ex. 1D, MDHS, DFCS, FY 2004 Budget Request, August 2, 2002, excerpt at 40 ("vacant positions have not been filled due to lack of general fund dollars . . . .Our Social Workers are working under extremely stressful conditions.  The inability to fill vacancies have resulted [*sic*] in a decrease in the quality of care and has resulted in a higher turnover because staff can't work under these conditions for long periods of time."); Ex. 1E, Deposition Transcript, March 16, 2006, testimony of Peter Boulette, director of Division of Budgets and Accounting, MDHS [hereinafter Boulette Deposition], excerpt at 20, (noting DFCS was underfunded during some years).

Settlement Agreement's requirements, including staffing increases and the establishment of a

comprehensive training program.  Absent an adequate number of caseworkers and supervisors to

deliver basic services, and the establishment of a viable training program to promote

improvements in case practice, defendants will be unable to meet the Settlement Agreement's

minimum requirements.  The Settlement Agreement's fiscal planning provisions expressly

recognize that requests for federal funding authorization must be realizable – an undertaking that

requires a strategic assessment and planning process that is not yet underway.  Each of these

matters is addressed in greater detail, below.

        To their credit, defendants have sought and obtained recent increases in the DFCS budget.

Appropriated state funds[21] have more than doubled since the outset of the 2007 fiscal year ("FY

2007")[22] to fund staffing increases, among other necessary operating expenses.[23]  The

defendants' FY 2010 budget request, which is before the legislature, proposes additional

increases in DFCS's funding,[24] while exempting DFCS, along with a number of other entities,

from a four percent across-the-board budget reduction.[25]  According to defendants' initial FY

2010 budget submission, the requested increase would fund certain critical costs associated with

the Settlement Agreement, such as increases in the monthly board rate payments for resource

providers;[26] increases in adoption subsidies;[27] upgrades to the MACWIS system;[28] and funding

---

[21] For budget purposes, state funds are characterized as "general funds."

[22] Ex. 1F, table submitted on September 26, 2008 to the Monitor by Peter B. Boulette, director of Division of Budgets and Accounting, MDHS (reflecting the increases, including an appropriation of $18,626,387 in state funds for FY 2007 and an appropriation of nearly double that sum – $37,301,243 – in state funds for FY 2009).  The table also shows an increase in DFCS's authorized positions; however, all authorized positions have not been funded.

[23] *See, e.g.,* Ex. 1G, S.B. 2495, 2007 Leg. Reg. Sess. (MS. 2007), §9, supplemental appropriation for FY 2007.

[24] Ex. 1H, MDHS, Fiscal Year 2010 Budget Request, Family and Children Services [hereinafter MDHS FY10 Budget Request], excerpt at 3.  The FY 2010 budget request is for $54,015,287 in state funds.

[25] Ex. 1I, Office of the Governor, Executive Budget Recommendation for Fiscal Year 2010, November 17, 2008 at 12, (citing this lawsuit and exempting DFCS from the four percent budget cuts).

[26] Ex. 1H, MDHS FY10 Budget Request, *supra* note 24, at 26.  These payments are for expenses such as housing, transportation, food, clothing, and other items, *i.e.*, personal care items, entertainment and reading materials. (continued…)

14

for 137 new positions to meet the caseload requirements.[29] The defendants report that pending before the legislature is a supplemental budget request for the additional funding necessary to support the DFCS reorganization and realignment that was approved by the Mississippi State Personnel Board ("SPB") during November 2008, after the submission of the initial DFCS FY 2010 budget request.[30]

Other key costs associated with funding to implement the requirements in this case have not yet been calculated; however, in certain instances, the preliminary work needed to inform some aspects of the necessary fiscal planning is underway. For example, defendants contracted for a required assessment of board rates for foster parents caring for children in foster care with special needs and for congregate care facilities.[31] In addition, DFCS is currently implementing a federally mandated Program Improvement Plan ("PIP") as the result of a finding by the Children's Bureau that defendants' foster care maintenance program is not in substantial compliance with federal eligibility requirements that trigger certain significant federal funding reimbursements.[32]

---

Payments to non-relative resource providers are referred to as foster payments; payments to relatives who are providers of foster care services are referred to as kinship payments. *See* Settlement Agreement §II.B.13.

[27] Ex. 1H, MDHS FY10 Budget Request, *supra* note 24, at 26; *See* Settlement Agreement §II.B.3.f.

[28] Ex. 1H, MDHS FY10 Budget Request, *supra* note 24, at 27; *See* Settlement Agreement §II.A.5.

[29] Defendants received position identification numbers for the 137 positions in FY 2009; however, the positions were not funded and thus they remain vacant. Ex. 1H MDHS FY10 Budget Request, *supra* note 24, at 29. *See* Settlement Agreement §II.A.2. a..

[30] The Monitor has requested, but not received, documentation related to the supplemental budget request; s*ee also infra* pp. 26-27.

[31] Settlement Agreement §II.B.13.g.; *see also infra* p. 89.

[32] Ex. 1J, MDHS, DFCS, Title IV-E Program Improvement Plan, February 2009. Foster care maintenance payments are authorized pursuant to Title IV-E of the Social Security Act, 42 U.S.C. 672, which provides for federal matching funds to reimburse certain foster care expenses that a state has already paid, including maintenance or room and board payments that have been made to licensed foster care providers. Reimbursement for certain administrative and training costs are also authorized.

Defendants' FY 2010 budget request for DFCS indicates that federal revenue will provide over double the amount of state funds during the fiscal year.[33]  As a threshold matter, in order to make a determination regarding whether such amounts are realizable and consistent with regular budgetary needs assessments, the Settlement Agreement requires the defendants to obtain an external assessment of actual and anticipated federal funding levels and to create an implementation program to increase federal funding.[34]  As noted above, the required assessment was not conducted during Period 1, and defendants are now required to engage an expert to perform the assessment by January 1, 2010.[35]  Satisfaction of this requirement is crucial to advancing the reform process.

> **Period 1 IP §I.**
> **I. Administration and Management Assessment and Implementation Steps**
>
> Within six months of Court approval of the Plan, Defendants, in conjunction with the Council on Accreditation (COA), shall conduct an assessment of DFCS administration and management capacity and needs consistent with COA Policies.  The Administration and Management Assessment shall include the following:
> a) A workforce assessment consistent with PA-HR 2,
> b) A training assessment of training curricula and the Training Unit,
> c) A DFCS contracting practices assessment,
> d) A quality improvement system assessment,
> e) A MACWIS assessment, and
> f) A fiscal and financial management assessment.

**Status of Progress, Period 1 IP §I.:**  The Period 1 IP contemplated that the assessment of administration and management functions would serve as the first phase of reform planning. Indeed, the Period 1 IP required that the needs identified by the assessments would be addressed in the Period 2 IP.[36]  Because many of the required assessments were more limited in scope and

---

[33] Ex. 1H, MDHS FY10 Budget Request, *supra* note 24, at 9.
[34] Settlement Agreement §II.A.7.a.
[35] Period 2 IP §I.7.a.
[36] Period 1 IP §I.1.

16

depth than contemplated, and thus do not satisfy the requirements of this subsection, the Period 2 IP requires assessments of administration and management functions.

Defendants planned to assess DFCS's administration and management capacity as part of the initial stage of the COA accreditation process. COA representatives report that this stage of the process evaluates an entity's readiness for accreditation, *i.e.*, whether the infrastructure necessary to support accreditation is intact. COA, in consultation with the defendants, completed the first phase of an accreditation readiness assessment during July 2008.[37] The assessment addressed each of the administrative and management functions identified by the Settlement Agreement,[38] in varying depth as described below.

a) The Workforce Assessment

COA based the workforce assessment on the following COA standard that defendants were required to meet within 180 days of the Court's approval of the Settlement Agreement:

> PA-HR 2: HUMAN RESOURCES PLANNING
> The agency reassesses its workforce as part of annual planning and prepares for future needs by:
> a. conducting a gap analysis between the current workforce composition, including number of employees, skills, and demographics, and projected workforce needs; and
> b. determining how to close gaps when possible, through recruiting, training or outsourcing.[39]

The assessment focused on whether defendants had satisfied PA-HR 2. According to the COA report, the following factors were considered: recent staffing increases; planned development of a system for tracking caseloads through MACWIS;[40] recruitment activities; delays in processing new hires; the introduction of a new career ladder program, and internship programs.[41] COA determined that a comprehensive personnel gap analysis and resulting plan for meeting staffing

---

[37] Ex. 2, Council on Accreditation, Mississippi Department of Family and Children's Services, Accreditation Readiness Assessment, Part 1, July 21, 2008 [hereinafter COA Assessment Report] (appendix omitted).

[38] *Id.* at 17-40.

[39] Period 1 IP §III.A.

[40] *See infra* pp. 25-35 for related findings concerning the tracking of caseloads/workloads.

[41] Ex. 2, COA Assessment Report, *supra* note 37, at 23-24.

needs had not yet been developed.[42]  The COA report outlines a series of recommendations for defendants to consider as they formulate the gap analysis and conduct related workforce planning.[43]  The Period 2 IP requires the defendants to develop and begin to implement a written plan to recruit and retain the DFCS professional and support staff necessary to comply with the caseload requirements of the Settlement Agreement.[44]

     b)  The Training Assessment

COA conducted a preliminary review of the pre-service and in-service employee training program,[45] commending the Training Unit for a quick start.  The assessment found that curricula and training schedules for the program had not been finalized,[46] and concluded that additional progress would be necessary in order for the Training Unit to meet COA standards.  The COA assessment report recommended that defendants address a series of elements, including quality assurance; training uniformity; on-the-job training requirements; staff evaluation; documentation and tracking; licensure requirements; and, in-service training.[47]  Because of the challenges that will be placed on the Training Unit as staffing levels for DFCS are increased, the assessment recommended that the defendants develop a plan to address these phenomena.[48]  The Period 2 IP

---

[42] *Id.* at 24.

[43] *Id.* at 24-27.  A threshold issue that is not addressed by the COA report, but fundamental to the capacity to produce a reliable gap analysis, is the need for the defendants to record and report on complete and accurate personnel and caseload/workload data.  This matter is addressed in greater detail *infra* pp. 25-35.

[44] Period 2 IP §I.2.a.; *see* Settlement Agreement §II.A.2.a. for the workload requirements and the related discussion *infra* pp. 25-35.

[45] Ex. 2, COA Assessment Report, *supra* note 37, at 36-40.

[46] *Id.* at 38.  As described *infra* pp. 39-48, the Training Unit has made progress since the COA assessment was conducted.  Nonetheless, the Training Unit is substantially under-resourced and the curriculum cannot be finalized until each of the required Period 1 policies and practice guides have been completed.  *See, e.g., infra* pp. 60-61 for a discussion of the team meeting protocols.

[47] Ex. 2, COA Assessment Report, *supra* note 37, at 38-40.

[48] *Id.* at 39; *see infra* pp. 39-48 for a summary of the current status of the Training Unit.

requires the defendants to develop and begin implementing a written plan to provide the training required by the Settlement Agreement by September 1, 2009.[49]

c) <u>Assessment of Contracting Practices</u>

COA conducted a preliminary review of contracting practices,[50] concluding that DFCS's contracting practices appeared to meet COA standards.[51] The assessment did not address the Period 1 performance-based contracting requirements.[52] In addition, the assessment report includes recommendations which are characterized as preliminary pending a more in-depth assessment.[53] The Period 2 IP requires the defendants to work in conjunction with a qualified independent consultant to develop a plan for a performance-based contracting system.[54]

d) <u>Assessment of Quality Improvement System</u>

The COA assessment of the DFCS CQI system found that some of the building blocks for such a system exist as evidenced by certain MACWIS capabilities and the foster care review process.[55] The assessment report identifies challenges that will need to be addressed, including the development of an overall DFCS strategic plan; review and analyses of trend data in formulating corrective action plans; and, the adoption of qualitative measurements and related culture changes.[56] The Period 2 IP requires the defendants, in conjunction with an independent consultant, to develop and begin to implement a written CQI plan by September 30, 2009.[57]

---

[49] Period 2 IP §I.2.d.1.; *see* Settlement Agreement §II.A.2.c.

[50] Ex. 2, COA Assessment Report, *supra* note 37, at 33-36.

[51] *Id.* at 35.

[52] *Id.* at 33-36; *see* Period 1 IP§I.2.d., requiring the design and implementation of a performance-based contracting system during Period 1.

[53] Ex. 2, COA Assessment Report, *supra* note 37, at 22 and 35.

[54] Period 2 IP §I.2.e.; *see* Settlement Agreement §II.A.2.d. for the performance-based contracting requirement and the related discussion *infra* pp. 48-49.

[55] Ex. 2, COA Assessment Report, *supra* note 37, at 30.

[56] *Id.* at 30-33. Defendants recognize that the capacity to extract and analyze reliable system performance data on an on-going basis, use it to inform remediation strategies, implement and monitor implementation of such strategies, and use the resulting data to promote improvement, is intrinsic to a successful reform process. As explained *infra*

(continued…)

e) <u>MACWIS Assessment</u>

COA found that MACWIS meets most relevant COA standards.[58]  The assessment report indicates that there are a few areas "where MACWIS might be improved/changed and where DFCS might do a better job in utilizing the information it produces."[59]  The assessment does not address the reliability of MACWIS data, or the efficacy of the management reports it generates. Moreover, the report does not address whether MACWIS meets or has the capacity to meet the ten categories of requirements defined by the Settlement Agreement.[60]  These issues are addressed below.[61]  The Period 2 IP requires defendants to validate specified MACWIS data at certain intervals and to contract for a specified assessment of MACWIS that must be completed within a defined time period.[62]

f) <u>Fiscal and Financial Management Assessment</u>

COA found that DFCS's financial practices appear to meet COA standards.[63]  The assessment report makes several recommendations, including that defendants assess the viability of its funding sources and explore additional funding streams as part of a strategic plan[64] as well as conduct a cost analysis of each DFCS program.[65]  As noted above, the Period 2 IP requires defendants to contract for an external assessment of actual and anticipated federal funding levels

---

pp. 49-50, a consultant with substantial expertise in this area is advising the defendants about the design of at least some aspects of the DFCS CQI program.

[57]  Period 2 IP §I.3.a.; *see* Settlement Agreement §II.A.3.a. for the CQI program requirements.

[58]  Ex. 2, COA Assessment Report, *supra* note 37, at 20.

[59]  *Id.*

[60]  §II.A.2.5.a. Settlement Agreement includes detailed requirements related to MACWIS which are addressed in several sections of this report, s*ee, e.g., infra* pp. 64-69.

[61]  *See infra* pp. 51-52.

[62]  Period 2 IP §I.5.b., d.; *see* Settlement Agreement §II.A.5.a. for the requirements related to MACWIS functionality.

[63]  Ex. 2, COA Assessment Report, *supra* note 37, at 22.

[64]  The assessment report does not address federal funding except to note that it has declined.  *See supra* p. 17 and *infra* p. 56 for a discussion of the required assessment.

[65]  Ex. 2, COA Assessment Report, *supra* note 37, at 22.

and to develop a plan to establish the resources and infrastructure necessary to maximize federal revenue.[66]

### SETTLEMENT AGREEMENT: §II. STANDARDS

This section of the Settlement Agreement addresses two distinct sets of standards: standards related to DFCS's administration and management functions and standards related to foster care services. The standards related to administration and management are grouped into seven categories: agency leadership; human resource management; performance and quality improvement; legal and regulatory compliance; information management and use; case recordings, and financial management. Defendants' progress toward meeting the Period 1 requirements related to the administration and management standards is described below. A discussion of progress concerning the foster care services standards follows this section.

#### Settlement Agreement §II.A. Administration and Management Standards

##### 1. Agency Leadership

The Administration and Management Standards regarding DFCS leadership address hiring requirements for the agency's director as well as for its management team. The Settlement Agreement contemplated that a qualified director would be hired during the first quarter of the 2008 calendar year and a full management team would be in place by the end of the year. This timetable was not met. As is evident from this report, the delay affected defendants' ability to meet other substantive Period 1 requirements in a timely fashion. Thus defendants must now complete many Period 1 requirements during Period 2.[67] Nonetheless, as of April 1, 2009, most

---

[66] Period 2 IP §I.7.a.
[67] As noted in the introductory section of this report, qualified leadership is a prerequisite to meeting many of the Period 1 requirements.

of the core members of the DFCS leadership team were hired and they have been working to promote this reform effort.

> a. **The director of DFCS shall be qualified by: an advanced degree from an accredited college or university in a field related to the agency's mission and services; five years of related experience at minimum; competence in administering and providing services to individuals, families, and/or children; management skills in addressing human resources and financial matters; and the ability to coordinate the agency's services with other community resources.**
> b. **Within 90 calendar days of Court approval of this Plan, DFCS will hire and maintain a director for DFCS who meets the Plan's qualification requirements for the position.**

**Status of Progress, Settlement Agreement §II.A.1.a. and b.:** There was a substantial delay in the selection of a DFCS director with the qualifications required by the Settlement Agreement.[68] Although defendants initially appointed a new DFCS director on January 22, 2008, plaintiffs' counsel objected to the appointment on the grounds that the designee did not satisfy the qualification criteria. This opinion was shared by COA's representatives. Thereafter, defendants created a new position for a deputy administrator at MDHS with responsibility for managing DFCS. The position was posted during the first half of March 2008, and it included minimum qualification requirements that generally exceeded the qualification requirements specified in the Settlement Agreement.

Shortly after Don Thompson's July 2008 appointment as the new administrator of MDHS, Lori L. Woodruff was hired as the MDHS deputy administrator for family and children's services ("deputy administrator"). Ms. Woodruff, a licensed master social worker with both master of social work ("MSW") and master of education ("M.Ed.") degrees, assumed the deputy administrator position on September 2, 2008. Ms. Woodruff is a highly regarded child welfare expert with over two decades of relevant experience. Because the deputy administrator is

---

[68] *See* the related discussion in the Monitor's October 21, 2008 Status Report at 6.

responsible for the management and oversight of DFCS, and because Ms. Woodruff's

qualifications exceed the Settlement Agreement's qualification standards for the DFCS director

position,[69] both plaintiffs' counsel and the Monitor consider Ms. Woodruff's appointment to

satisfy the spirit of the Settlement's Agreement's qualification requirements for the DFCS

director position.  Unlike the January 2008 appointment, the defendants consulted with plaintiffs'

counsel, COA representatives and the Monitor during the process that led to Ms. Woodruff's

appointment.

> **Period 1 IP §I.1.**
> **I. Administration and Management Assessment and Implementation Steps**
> **1. Agency Leadership**
> **The new DFCS director will assemble a management team capable of**
> **assisting with the reform process at DFCS.**

**Status of Progress, Period 1 IP §I.1.:**  The Period 1 IP requires the new DFCS director

to assemble a management team capable of assisting with the reform process by the end of the

first year.  As explained below, in the wake of Ms. Woodruff's appointment, following an

assessment and the approval of an agency reorganization plan by the SPB, with the exception of

two pivotal positions, most of the key DFCS management team positions were filled by April 1,

2009, before the end of Period 1.  On June 1, 2009, one of the two key remaining management

vacancies was filled.[70]

Following Ms. Woodruff's appointment, defendants hired Robert Michael "Mike"

Gallarno to serve as the DFCS director of performance and quality assurance ("CQI Director")[71]

---

[69]  A copy of Ms. Woodruff's resume is included in the Appendix as Ex. 3.

[70]  The director of the Permanency Planning and Placement Unit began employment at DFCS on June 1, 2009.

[71]  The Settlement Agreement and Period 1 IP refer to DFCS's performance and quality assurance functions in
various ways.  For purposes of this report, the acronym "CQI" will be used to refer to requirements that are referred
to in the Settlement Agreement and/or the Period 1 IP as either "performance and quality assurance" requirements or
"continuous quality improvement" requirements.

– a key management team position.[72]  Shortly thereafter, MDHS management undertook an

assessment of the DFCS organizational structure in collaboration with SPB staff.  The defendants

anticipated that the assessment would serve to inform, and in some instances define, the

composition of the DFCS management team.  Thus, recruitment of staff to fill DFCS's

management team positions was stayed pending the results of the assessment, which was

conducted on an expedited basis.  The assessment resulted in recommendations to reorganize

DFCS in two primary ways: 1) by redefining and consolidating administrative and management

functions to more closely correlate with core program areas; and, 2) by reorganizing the statewide

program for delivering child welfare services from the then-existing seven geographic regions,

each with its own regional director reporting to one field director, into 13 geographic regions,

each with its own regional director reporting to one of two field directors.[73]  The SPB approved

the reorganization on November 20, 2008.[74]

    As expected, the reorganization plan affected the composition of DFCS's management

team.  Five DFCS management positions with direct reporting responsibility to the MDHS

deputy administrator were established.[75]  All of these core management positions, as well as the

six new regional director positions and the two field director positions, were filled by April 1,

---

[72]  Mr. Gallarno assumed his position at DFCS on September 16, 2008.  Mr. Gallarno, who holds an MSW degree, is a licensed clinical social worker [hereinafter LCSW] with substantial public management experience.  His resume is attached as Ex. 4A.

[73]  Ex. 4B, MDHS, DFCS, Mississippi state map depicting the 13 geographic regions approved by the SPB on November 20, 2008.

[74]  The reorganization was effective retroactively to November 1, 2008.  *See* Ex. 4C, MDHS, DFCS, Reorganization and Non-Budgeted Upward Reallocations, for further detail regarding the approved reorganization plan.

[75]  The following management team positions report directly to the MDHS deputy administrator: the director of DFCS; the CQI director; the director of administration and finance; the director of the training unit, and the accreditation coordinator.  The director of DFCS is responsible for the delivery of child welfare services statewide.  Both of the directors of field operations, the director of the prevention/protection unit and the director of permanency planning/placement report to the DFCS director.  The CQI director is responsible for the foster care review program, evaluation and monitoring, including licensure, special investigations and complaints, and MACWIS.  The director of administration and finance is responsible for budget and financial planning, contracts and grants, and revenue management.  The director of the training unit is responsible for the management of the pre-service and in-service training program.

24

2009.  As of June 1, 2009, the MACWIS director position was still vacant.  Defendants report

ongoing efforts to upgrade the position in order to recruit more qualified candidates.  Many of the

managers who were hired are either former DFCS managers or have other substantial public

sector management experience.  They are generally seasoned and appropriately credentialed

managers[76] who appear capable of assisting with the reform effort.[77]

> **Settlement Agreement §II.A.2.a.**
>    **2.  Human Resources Management**

Period 1 requirements concerning human resource management addressed DFCS's

staffing levels and the qualifications of direct service and supervisory staff; assessment and

planning measures to ensure the adequacy of the workforce; the establishment of a

comprehensive pre-service and in-service training program for direct service and supervisory

staff; and contracting matters.  These requirements constituted critical components of Period 1

capacity building.  Absent a sufficient number of qualified and properly trained staff, the

mandated case practice standards cannot be achieved.  Progress toward meeting each set of

human resources management requirements is addressed below.

> **a.  Workforce:**
>    **By the end of implementation Period 1:**
>    **7)  At least 30% of DFCS caseworkers shall carry a caseload that does not
>        exceed Plan caseload requirements.  No more than 30% of caseworkers
>        shall carry a caseload exceeding twice the Plan caseload requirements.
>        No caseworkers shall carry a caseload exceeding three times the Plan
>        caseload requirements.**
>    **8)  No more than 30% of supervisors who are responsible for supervising
>        DFCS caseworkers shall be responsible for supervising more than five
>        caseworkers.**
>    **9)  Caseworkers shall have access to a supervisor by telephone 24 hours a
>        day.**

---

[76] The Monitor has addressed a specific concern with both parties that may require further review, as appropriate, during Period 2.

[77] For example, the newly hired DFCS director is an MSW who is a seasoned manager with over a decade of experience supervising DFCS direct service staff.  *See* Ex. 4D, Resume of Linda Millsap.

**Status of Progress, Settlement Agreement §II.A.2.a.:**  Due to significant limitations in the data collection, recording and analysis systems and practices related to caseworker and supervisory workloads, the Monitor cannot determine whether the Period 1 workload requirements were satisfied.  These limitations, and defendants' efforts to remedy them, are described more fully below.

Historically, the lack of funding for a sufficient number of caseworker and supervisory positions has had a substantial impact on defendant's ability to adequately serve class members.[78] In turn, high caseloads have fueled attrition levels and raised substantial recruitment challenges.[79] The Settlement Agreement's workload requirements were crafted to address these issues.

In an effort to bolster recruitment and retention initiatives, during fall 2008, MDHS's new management supported the SPB's efforts to establish a career ladder for social workers employed throughout state government.  Effective November 1, 2008, the SPB approved a statewide career ladder for social work professionals.[80]  The SPB action addresses salary increases, minimum requirements, job specifications and a more streamlined licensure verification process for new

[78]  *See e.g.,* Ex. 5A, Kiran Chawla, *DHS Takes Hot Seat*, WJTV, December 15, 2008, at 1, http://www.wjtv.com/jtv/news/local/article/-JTV_2008_12_15_0015/9453/ (last visited on April 20, 2009) noting MDHS's acknowledgment of staff shortages over a long period of time; Ex. 5B, Julie Goodman, *Social Workers: Kids Endangered*, THE CLARION-LEADER, April 24, 2002 at 1, citing social worker's testimony at legislative hearing that staff shortages and lack of funds are endangering children and families in Mississippi; Ex 5C, Julie Goodman, *DHS, An Agency in Crisis*, THE CLARION-LEADER, June 3, 2002 at 1, reporting that MDHS was "running without 27 percent of its staff…causing the agency to scramble to protect thousands of vulnerable children across the state."; Ex. 1E, Boulette Deposition, *supra* note 20, at 70 wherein Peter Boulette, director of the Division of Budgets and Accounting, MDHS, states that DFCS had informed him of the need for more funding in FY 2006 and FY 2007 for staffing.
[79]  *See e.g.,* Ex. 5D, Patrice Sawyer and Julie Goodman, *DHS, An Agency in Crisis*, THE CLARION-LEADER, June 1, 2002 at 1, stating that "Harrison County has 22 slots for social workers, but five full-time social workers are currently handling well over 100 cases each."; Ex 5E, Beth Musgrave, *Understaffed DHS is Failing Our Children; Harrison Co. Says Money Solves Only Part of the Problem*, THE SUN HERALD, January 19, 2003 at 2, reporting that "[c]aseloads for some social workers are pushing well past 130, nearly six times what child advocates say is an acceptable amount."; Ex. 5A, *supra* note 78 at 1, noting MDHS's acknowledgment of workers' high caseloads for a long period of time and the difficulty recruiting and retaining social workers; Ex. 5B, *supra* note 78 at 1, describing social workers testimony at 2002 legislative hearing regarding heavy caseloads; Ex. 1H, MDHS FY10 Budget Request, *supra* note 24 at 13, noting "[r]ecruitment and retention of workers for the DFCS continues to be an issue."
[80]  Ex. 5F State Personnel Board, Class Establishment, Reclassification Authority, and Selection Exemption, effective November 1, 2008.

26

hires. Approval of a career ladder for DFCS social workers is encouraging; however, the salary increases that have been authorized are not yet funded.[81] As noted above, defendants report that following the SPB's approval of the career ladder, a request for the funding to implement it was made in a supplemental budget request that followed on the heels of the initial DFCS FY 2010 budget request.[82] This request is pending before the legislature.

As part of the Monitor's assessment of DFCS's caseloads, MDHS and DFCS staffing reports and other data related to hiring and attrition levels were reviewed. These data indicate that there was a demonstrable increase in caseworker and supervisory staffing levels during Period 1. However, because of the manner in which DFCS personnel data are collected and maintained, the defendants were unable to provide precise information about the number of supervisors and caseworkers hired during Period 1.[83] And while defendants reported on an "approximate" number of all newly hired supervisors, the total number of caseworkers hired during this period, or an approximation thereof, could not be readily produced.[84] The ability to accurately track and report on basic personnel data, combined with the limitations in MACWIS workload data that are described below, constitute capacity deficits which defendants will need to address in order to manage the workforce in a manner that will promote compliance with the

---

[81] A similar effort to provide recruitment and retention incentives through the establishment of a career ladder was adopted but not funded in FY 2005. *See*, Ex. 5G, Deposition Transcript, June 21, 2005 testimony of Teressa Jackson, former DFCS director of administration, excerpt at 26.

[82] As noted *supra* note 30, the Monitor has requested, but has not yet received, any documentation related to this supplemental request.

[83] The Period 1 data were requested for the timeline starting January 1, 2008 (several days before the start of Period 1) and ending March 31, 2009. Defendants produced personnel data responsive to this request on April 13, 2009. Some of the data that were produced are summarized in Ex. 5H, chart prepared by the Office of the Court Monitor, Number of Authorized, Funded and Filled Caseworker Positions, by Year, January 2004 – March 2009, based on April 13, 2009 data from DFCS Personnel Unit and Ex. 5I, chart prepared by the Office of the Court Monitor, Number of Filled and Vacant ASWS Positions, by Year, January 2004 – March 2009, based on April 13, 2009 data from DFCS Personnel Unit.

[84] Instead, defendants reported on the "approximate" number of workers hired after attrition. Defendants could not readily identify how many workers hired during this period were terminated. Ex. 5H, *supra* note 83.

27

Settlement Agreement's workload standards and, ultimately, with the Settlement Agreement's foster care services standards.

Notwithstanding the limitations in the staffing data that are described above,[85] according to defendants,[86] the number of both authorized and funded caseworker positions and the number of filled caseworker positions increased. In January 2004, 308 of DFCS's 387 authorized caseworker positions were filled. Four years later, within less than one month following approval of the Settlement Agreement, 433 of DFCS's 536 authorized caseworker positions were filled.[87] As of March 31, 2009, 549 of DFCS's 639 funded caseworker positions were filled, an increase of 78 percent since January 2004. As of March 2009, there were 137 unfunded positions.[88] Staff in the DFCS Personnel Unit report that 2009 was the first year since at least 2004 in which there were unfunded caseworker positions in DFCS. Unlike past experience, defendants report that between January 1, 2008 and March 31, 2009, hiring outpaced attrition: although the total number of newly hired caseworkers during this period is unknown, defendants report that approximately 115 new caseworkers – a subset of the total number of caseworkers hired during this period – remained employed at the agency as of March 31, 2009[89] and that during this period there were 108 terminations, mostly attributable to resignations.[90]

---

[85] These limitations raise questions about data accuracy which will need to be resolved.

[86] Ex. 5H, *supra* note 83.

[87] Because the number of funded authorized positions changed each year, it is difficult to draw conclusions from year-to-year comparisons of vacancy rates.

[88] These 137 unfunded positions are in addition to the 639 funded positions. As of March 2009, 82 of the 639 funded positions were vacant. Until these 82 positions are filled, there is no practical consequence to the lack of funding for the 137 positions; however, if DFCS continues to hire in 2009 at the same rate as 2008, the lack of funding will prevent hiring at some point during Period 2.

[89] The Monitor has not verified the entry-on-duty dates for these employees, and thus does not know what percentage of these caseworkers represent recent hires. This factor would be relevant to an assessment of retention rates.

[90] *Id.* The termination data are not reflected in Ex. 5H, *supra* note 83; these data were submitted to the Monitor along with the hiring data on April 13, 2009 by staff in the DFCS Personnel Unit.

Defendants report that there also has been a recent increase in supervisory staffing levels.[91]  According to defendants' data, in January 2004 there were 83 filled area social work supervisor ("ASWS") positions out of 90 funded positions.  The number of authorized and funded ASWS positions generally declined during the next three years to a low of 80 authorized positions of which 70 were filled in 2006, and 89 authorized and funded positions of which 60 were filled in January 2007, a decline of 28 percent over the three-year period.  According to defendants, this trend started to change during 2007, and by January 2008, DFCS filled 91 of 114 authorized ASWS positions.  As of March 31, 2009, defendants reported a continued increase in supervisory staffing with 103 of 147 authorized ASWS positions filled, a 72 percent increase over approximately two years.[92]  DFCS staff report that because of the smaller number of supervisory positions involved, more accurate hiring data for ASWS positions can be produced.

The Settlement Agreement specifies three types of requirements related to caseloads and caseworker supervision: caseloads for caseworkers with dedicated caseloads; caseloads for caseworkers with mixed caseloads; and the maximum number of caseworkers each DFCS supervisor may supervise.  As explained below, due to limitations in the accuracy and completeness of the workload data for caseworkers and supervisors that are collected and reported by MACWIS, the Monitor currently cannot assess whether the caseload requirements were met during Period 1.  Defendants are working to address these limitations.

---

[91]  Ex. 5I, *supra* note 83.
[92]  *Id.*  As with the caseworker data, because the number of authorized positions changed annually, year-to-year comparisons of vacancy rates may be misleading.

For caseworkers with dedicated caseloads, the Settlement Agreement specifies eight unique service categories, each with different caseload requirements.[93] Data provided by the defendants reflect that, as of February 2009, virtually all DFCS caseworkers had mixed caseloads instead of dedicated caseloads. For caseworkers with mixed caseloads, the Settlement Agreement identifies 11 distinct service categories.[94] For each service category, the Settlement Agreement prescribes the number of minutes per month that a case within each category should be allotted for purposes of calculating a caseworker's caseload. Each caseworker's mixed caseload may not exceed a total of 6,960 minutes of case-related work per month, computed according to the Settlement Agreement's minute allotments.[95]

Because nearly all DFCS caseworkers carry mixed caseloads, defendants must track caseload data according to the 11 service categories and the corresponding minute requirements, defined in the Settlement Agreement. Defendants use MACWIS to record and track these data. According to the draft MACWIS user manual that defendants provided to the Monitor, MACWIS enables defendants to track caseworker workloads according to 26 different service types.[96] Five of the service types in MACWIS are for casework services not specified in the Settlement Agreement, and two additional service types are not used by DFCS employees.[97] Caseworkers

---

[93] These categories are adoption, child protection, ongoing foster care, new application licensing, dedicated in-home protection, dedicated in-home dependency/prevention, dedicated renewal licensing, and dedicated abuse and neglect. Settlement Agreement §II.A.2.a.1.

[94] The service categories identified for mixed caseloads are adoption, child protection investigation, foster care, licensing-new application, in-home dependency-protection, in-home dependency-prevention, licensing, general intake, intra-state home studies, inter-state compact for the placement of children [hereinafter ICPC], and courtesy interviews. *Id.* §II.A.2.a.2.

[95] For example, adoption cases are allotted 807 minutes per case per month and foster care cases are allotted 507 minutes per case per month. *Id.* While the Settlement Agreement defines what constitutes a case for purposes of the dedicated caseload calculation, it is silent on what constitutes a case for purposes of the generic caseload calculation. *Compare Id.* §II.A.2.a.1. *with Id.* §II.A.2.a.2.

[96] *Ex.* 5J, Draft – Reporting Workload Summary, August 18, 2008, excerpt pp. 1, 4. The draft manual lists 25 service types, however, the Monitor has identified at least one additional service category that apparently was added to MACWIS after the draft manual was produced.

[97] This is based on information provided by MACWIS staff with substantial experience working with the system.

use the remaining 19 service types to record their work according to the categories in the

Settlement Agreement.  One casework service in the Settlement Agreement is not tracked, nor is

it trackable as a service in the current version of MACWIS.[98]  The table below lists each of the

Settlement Agreement service types with cross references to the service types that DFCS's

employees can record in MACWIS.

| Settlement Agreement Type | Minutes Per Month Required by Settlement Agreement | MACWIS Service Type | Minutes Assigned in MACWIS |
|---|---|---|---|
| Adoption | 807 | Adoption COS | 807 |
| Child protection investigation | 484 | Investigation Level 2; or Investigation Level 3 | 480 480 |
| Foster care | 507 | Placement COR; and Placement COS -------------OR------------- Placement R&S | 132 375 -------- 507 |
| Licensing | 470 | Resource Inquiry; and Resource Home Study | 338 132 |
| In-home dependency—protection | 410 | Protective Service COR; and Protective Service COS -------------OR------------- Protective Service R&S | 60 351 ------- 410 |
| In-home dependency—prevention | 275 | Prevention COR; and Prevention COS -------------OR------------- Prevention R&S | 60 215 ------- 275 |
| Licensing—renewal | 191 | Resource Renewal | 191 |
| General intake | 59 | General Intake | 60 |
| Intra-state home studies | 282 | Court Ord Rltv Appl; or ICPC Application | 282 282 |
| Interstate Compact for the Placement of Children (ICPC) | 106 | ICPC Incoming | 106 |
| Courtesy Interviews | 65 | Not captured in MACWIS | 0 |

There are at least two ways in which MACWIS stores casework data that significantly

reduce the accuracy of the data.  First, caseload minutes corresponding to five of the services

specified in the Settlement Agreement – adoption; ICPC; foster care; in-home dependency

prevention; and, in-home dependency protection – are over-counted in MACWIS.  MACWIS

does not prorate the number of minutes that a caseworker works on a case in these service groups

---

[98] Courtesy interviews are not tracked.

according to the day of the month the case worker is assigned to the case and the day of the month the caseworker closes the case. Rather, if a caseworker has an assigned case that falls within one of these five service categories for one or more days in a given month, the caseworker's caseload calculation reflects the entire minute allotment for the case for that month. MACWIS's method of counting caseworker minutes results in an overstatement of the number of minutes used to calculate individual caseloads, which in turn could cause an understatement of the number of caseworkers working at or below the levels prescribed by the Settlement Agreement. A preliminary review of caseworker workload data suggests that this is happening in some cases.[99]

A second problem with the data collected in MACWIS is that certain casework services are not accurately accounted for in all of the months a caseworker is assigned to and required to be working on a case. Specifically, the minute allocations for four services – intra-state home studies, child protective investigations, licensing, and licensing-renewal – are not accounted for on a pro-rated basis or otherwise during each of the months a caseworker is assigned to one of these types of cases. Rather, the monthly minute allocation established by the Settlement Agreement is recorded in a caseworker's workload data only in the month that the case is closed in MACWIS.

Unlike the other service types identified in the Settlement Agreement, for caseload computation purposes, defendants have interpreted the monthly minute allocation requirements for these four types of services to constitute both the ceiling and the floor for the number of

---

[99] For example, Ex. 5K, chart prepared by the Office of the Court Monitor, Washington County, Average Number of Hours Worked on Casework Per Week, by Caseworker, February 1-28, 2009, based on MACWIS Report No. MWASAW9D, presents MACWIS data regarding the number of minutes worked by caseworkers in Washington County during the month of February 2009. The chart reflects that 18 of the 26 caseworkers listed in the MACWIS report had caseloads that were over the limit prescribed by the Settlement Agreement, many by more than two times the limit.

minutes allocated to these service types for the duration of a caseworker's assignment to the case. However, even assuming such an interpretation of the Settlement Agreement is appropriate,[100] the minutes are not proportionately allocated across the months in which the case is assigned to the caseworker. If a caseworker began and completed the casework in a single calendar month, this would not create a problem. However, if the casework extended over two or more months, as is often the case, the caseworker's caseload data in MACWIS would only reflect the case in the month the case was closed in MACWIS. The result is that in some months the caseworker's caseload would be under-counted, and in others it would be over-counted.

Defendants produce several monthly reports that are based on MACWIS workload data. These reports do not present a reliable calculation of DFCS caseworker and supervisory workloads because in addition to the limitations in data accuracy described above, the reports do not track workload data according to each of the workload requirements of the Settlement Agreement. The reports provide workload data on a geographic basis, generally either at a county or regional level, broken down into various subcategories, including service types, number of caseworkers, number of clients served, and total number of minutes worked. Some of the reports address the percentage of caseworkers with caseloads that exceed the 6960 minute monthly limit; however, even if these calculations were computed accurately, the reported percentage cannot be readily verified. Verification will require the Monitor to analyze the underlying data upon which the reports are based in future reporting periods – a time-consuming

---

[100] The generic caseload requirements do not draw the distinctions the defendants have applied to the minute calculation for these four types of services.

process that should not be undertaken until the limitations in the accuracy and completeness of the MACWIS workload data described above are addressed.[101]

In addition, defendants' workload reports do not provide data on the percentage of caseworkers exceeding twice and three times the Settlement Agreement's caseload requirements. It appears that MACWIS collects the data that are necessary to report on these requirements; however, there is no evidence that these data have been analyzed. The same is true of the MACWIS data regarding supervisors who are responsible for supervising more than five caseworkers. The Monitor used one of defendants' management reports to perform a county-by-county analysis of supervisor-to-caseworker ratios. The analysis is based on the number of supervisors and caseworkers in each county; however, because the analysis is based on aggregate data, it was not possible to identify the actual number of caseworkers each supervisor supervised, as required by the Settlement Agreement.[102]

The Monitor has recommended that the parties consider modifying the Settlement Agreement's caseload requirements at least in part because the minute calculations complicate caseload management and reporting.[103] The parties have been working on a modification proposal. Defendants expect to modify the monthly MACWIS workload reports to incorporate

---

[101]  According to the relevant February 2009 MACWIS report, MWASA9S2, (which is based on unvalidated data reflecting the limitations described above), between February 1 and February 28, 2009, 47 percent of DFCS caseworkers were assigned to individual caseloads that exceeded the 6960 minute standard. These data show substantial variability among counties in the number of assigned caseworkers and the percentage of the caseworkers in those counties working over 6960 minutes. *See, e.g.,* Ex. 5L, chart prepared by the Office of the Court Monitor based on MACWIS Report No. MWASA9S2, Number of Caseworkers, by County, by Number Exceeding Caseload Requirements, February 1-28, 2009, showing the distribution of caseworkers across counties, broken down by those with caseloads exceeding 6960 minutes and those with caseloads under 6960 minutes during February 2009. Ex. 5M, chart prepared by the Office of the Court Monitor based on MACWIS Report No. MWASA9S2, Percentage of Caseworkers with Caseloads that Exceed 6960 Minutes, by County, February 1-28, 2009, showing the caseload data by county, broken down by the percentage of caseworkers with caseloads below the 6960 minute limit. Ex. 5M is based on the same data as Ex. 5L.

[102]  Ex. 5N, chart prepared by the Office of the Court Monitor based on MACWIS Report No. MWZPWKRB, December 1- 31, 2008, Ratio of Workers to Supervisors, By County.

[103]  If reporting could be simplified, this would promote improvements in caseload management.

34

the modification and to better align the caseload computations with the requirements of the

Settlement Agreement.  The Monitor expects to work with the parties to help ensure that the data

upon which future reports are based are recorded in a manner that is consistent with Settlement

Agreement requirements and that the data are accessible for review, validation, and analysis.[104]

Finally, the Settlement Agreement requires caseworkers to have access to a supervisor 24

hours per day.  The current ASWS job description indicates that supervisors are required to be

on-call on a 24-hour basis.[105]  Because the Monitor has not had an opportunity to evaluate the

prevalence of this practice, this requirement has been included in the Period 2 IP.[106]

> **Period 1 IP §I.2.a.**
> **I.  Administration and Management Assessment and Implementation Steps**
> **    2.  Human Resources Management**
> **        a.  Workforce:**
> **            Defendants shall, in conjunction with COA, develop and begin**
> **            implementing a written plan to meet the needs identified in the**
> **            required Administration and Management Workforce Assessment.**
> **            Such plan shall identify strategies, timeframes, and recruitment**
> **            resources to be allocated to ensure that there are sufficient DFCS**
> **            professional and support staff to achieve compliance with the caseload**
> **            requirements specified in the Plan.**

**Status of Progress, Period 1 IP §I.2.a.:**  The plan was not developed during Period 1,

and as a result, the Period 2 IP requires the defendants to develop and begin implementing a

written plan to recruit and retain the staff necessary to comply with the Settlement Agreement's

caseload requirements.[107]  The relevant background is addressed below.

---

[104]  As described above, the current caseload requirements in the Settlement Agreement use caseworkers as the basic unit of analysis (*i.e.,* the percentage of caseworkers who are at or below defined workload standards).  This structure provides some incentive to distribute workloads among caseworkers in a manner that may satisfy the Settlement Agreement's caseload standards but undercut improvements in case practice.  A modification to caseload requirements could address this issue and ensure a reasonable distribution of cases among caseworkers.  Focusing on cases as the unit of analysis rather than caseworker workloads may provide a more direct and robust measure of whether cases are managed by caseworkers who have reasonable workloads.  The Monitor plans to discuss these issues with the parties.
[105]  Ex. 5O, DHS-Area Social Work Supervisor, position description, at 5.
[106]  Period 2 IP §I.2.b.
[107]  *Id*. §I.2.a.

As explained herein,[108] the Administration and Management Workforce Assessment that is a prerequisite to formulating the required workforce plan has not been completed.[109]  Several challenges must be resolved before a viable plan to achieve compliance with the workload requirements can be formulated.  For example, the defendants will need to evaluate and adapt their business practices to the new practice model and the newly revised policy and practice guides that are under development as part of the current reform process.[110]  Implicit in such an undertaking is an assessment of the support and professional staffing necessary to maintain the new practice model.[111]  In addition, the defendants will need to develop the capacity to track and report on all personnel actions, including the employment status of all DFCS employees, in an accurate and timely fashion.[112]  Moreover, the defendants will need to develop the capacity to track and report accurately, as required, on caseworker and supervisory workloads.[113] Defendants are working currently to resolve some of these challenges.[114]

> **Period 1 IP §I.2.b.**
> **I.  Administration and Management Assessment and Implementation Steps**
>   **2.  Human Resources Management**
>     **b.  Worker and Supervisor Qualifications:**
>       **Defendants shall, in conjunction with COA, develop and begin to**
>       **implement a plan with timeframes and specific action steps for**

---

[108]  *See supra* pp. 17-18.

[109]  The assessment is required by Period 1 IP §I.a.

[110]  The practice model is being developed, and the policy and practice guides are being modified, to conform to or otherwise promote administrative, management and case practices that are consistent with the requirements of the Settlement Agreement.  *See infra* pp. 57-59 for a discussion of the practice model and the modified policies and practice guides.

[111]  In addition, defendants will need to consider staffing needs based on the explicit requirements of the Settlement Agreement, such as the establishment of the adoption specialist positions that were required by Period 1 IP §II.3.f., and the staffing that will be necessary to promote progress toward the Settlement Agreement's prescribed outcomes, such as staff with specialized expertise to support the performance-based contracting that was required in Period 1, *Id.* at §I.2.d., and must now be instituted in Period 2, pursuant to Period 2 IP §I.2.e., revenue maximization activities pursuant to Settlement Agreement §II.A.7., and MACWIS remediation requirements, *Id.* at II.A.5.

[112]  This includes aggregated statewide data on hiring and termination dates, leave status, assigned positions, and vacancies as well as an analysis by region and county.  *See supra* pp. 25-29 for a discussion of this issue.

[113]  *See supra* pp. 29-36 for a discussion of the certain limitations in tracking and reporting on caseworker and supervisory workloads.

[114]  *See supra* pp. 29-36.

**bringing its current staff into compliance with the worker and
supervisor qualification requirements of the Plan.**

**Status of Progress, Period 1 IP §I.2.b.:**  The required plan to bring current DFCS staff

into compliance with the qualification requirements was not developed during Period 1, and thus

defendants are now required to develop and begin to implement the plan during Period 2.[115]

Defendants' progress and related background information are summarized below.

The caseworker and supervisor qualification requirements of the Settlement Agreement

establish qualification criterion that apply to the hiring and promotion of caseworkers and

supervisors.  Pursuant to the Settlement Agreement, DFCS may only hire caseworkers who have

"an advanced degree in social work or a comparable human service field, or a BA in social work

or a comparable human service field with two years related experience."[116]  Newly hired or

promoted caseworker supervisors must have "an advanced degree in social work or a comparable

human service field and two years of experience working with children and families, preferably

in foster care."[117]  Period 1 requirements did not address qualifications for newly hired staff.

Rather, the Period 1 IP required defendants to develop and implement a plan to bring the current

workforce into compliance with the Settlement Agreement's qualification criterion for hiring and

promotion.

Although the required plan to bring current staff into compliance with the worker and

supervisor qualification requirements of the Settlement Agreement has not been developed,

defendants have made progress collecting data that are relevant to the formulation of such a plan.

During 2008, staff from the University of Southern Mississippi ("USM") School of Social Work

conducted a survey of case workers, supervisors, and other foster care program managers.  The

---

[115] Period 2 IP §I.2.c.
[116] Settlement Agreement §II.A.2.b.1.
[117] *Id*. §II.A.2.b.2.

37

results of the survey were published in an October 6, 2008 report.[118]  The survey elicited

information from 482 respondents[119] about educational status, including whether respondents

were enrolled in MSW programs and if not whether they had plans to do so.  The survey asked

respondents to identify the particular universities and types of programs *(e.g.*, evening, weekend)

they were interested in attending as well as what they perceived as the obstacles to their

enrollment.[120]

       Significantly, 11 percent of the respondents reported holding MSW degrees, six percent

of those without a degree reported current enrollment in an MSW program, three percent reported

pending applications for enrollment, 23 percent reported an intention to apply for admission into

an MSW program in the near term, 55 percent reported an intention to apply to an MSW program

at some indeterminate time in the future, and 19 percent said they had no plans to obtain an

advanced degree.[121]  Defendants report that they are presently working with several universities

to expand MSW program opportunities for DFCS staff.  As of April 2009, approximately 35

DFCS staff were enrolled in an MSW program at USM.[122]

       The data derived from the survey and the experiences of staff members who are enrolled

in an MSW program will help inform the development of the required plan.  Among other

initiatives, the defendants will need to develop, monitor and enforce hiring standards that are

consistent with the Settlement Agreement's qualification criteria as well as establish a system for

---

[118]  Ex. 6, Social Work Education Among MDHS Employees, USM, School of Social Work, Training Academy,
October 6, 2008.
[119]  The report does not address the survey's response rate.
[120]  The survey data regarding obstacles to enrollment were not analyzed.
[121]  *Id.* at 12.
[122]  According to the interim director of the School of Social Work at USM, DFCS staff members are enrolled in two
different classes.  Six hours of classes have been offered on Mondays and Fridays to accommodate the DFCS
compressed work week.  At least one on-line class will be offered in addition to regular classes during the summer
semesters.

verifying, tracking and reporting on the educational credentials and the relevant employment

history of current DFCS caseworkers and supervisors.

> **Settlement Agreement § II.A.2.c.**
> **II. STANDARDS**
>     **A. Administration and Management Standards**
>         **2. Human Resources Management**
>             **c. Training:**
>                **By the end of implementation Period 1:**
>                **4) DFCS shall establish and maintain a Training Unit, headed by
> a qualified director of training, with sufficient staffing and
> resources to provide comprehensive child welfare pre-service
> and ongoing training to all caseworkers and supervisors.
> Supervisory personnel will no longer be detailed from the
> field to provide training.**

**Status of Progress, Settlement Agreement §II.A.2.c.4.:** Although defendants made

demonstrable progress toward building the required Training Unit, these Period 1 requirements

were not satisfied and are addressed in the Period 2 IP.[123]  A Training Unit led by a qualified

director was established during Period 1.  The Training Unit is understaffed and does not have

the other resources necessary to deliver the comprehensive training required by the Settlement

Agreement.  Defendants' progress is described below.

The establishment of a staff training program is an essential component of the reform

effort, and its viability is tied to several key factors, including skilled leadership, experienced

trainers, a comprehensive curriculum (based on a clearly defined practice model, sound policy

and practical guidance, and CQI data), instructional equipment, and the tools to track and

monitor employee participation in such a program.  Despite substantial efforts by the new

training director and her staff, progress has been impeded by formidable resource limitations.

Absent the functional, integrated, pre-service and in-service training program contemplated by

---

[123]  Period 2 IP §§I.2.d.1.-7.

the Settlement Agreement, it will not be possible for the defendants to meet the Settlement Agreement's required case practice standards and outcomes.

Prior to April 2008, training for caseworkers and their supervisors was conducted on an *ad hoc* and regional basis by casework supervisors and other employees who were temporarily reassigned from direct service and other DFCS program areas to provide training to new employees. This practice began to change during the second quarter of the 2008 calendar year when Denise Brown-Rouse was assigned to serve as the permanent DFCS training director.[124] Ms. Brown-Rouse holds an MSW with a clinical specialty and has almost 15 years experience working at DFCS as a caseworker, supervisor and trainer.[125] She is responsible for the DFCS pre-service and in-service employee training program on a statewide basis.

Three training coordinators were hired shortly before Ms. Brown-Rouse's appointment. Two additional training coordinators were assigned to the Training Unit during May 2008, and a sixth training coordinator began employment during May 2009. In addition to the training coordinators, the Training Unit is staffed with a program specialist,[126] a curriculum writer,[127] and one clerk.[128] The staffing plan for the Training Unit was designed initially to correspond to the seven former DFCS geographic regions. Assuming the FY 2010 budget request is approved, defendants expect that beginning on July 1, 2009, the Training Unit will have 13 additional

---

[124] Ms. Brown-Rouse served in this position in an acting capacity between January and March, 2008, but she did not have management authority. The training director's office is maintained at the MDHS offices in Pearl River County, Mississippi.

[125] *See* Ex. 7A, Resume of Denise Brown-Rouse. After she was hired, Ms. Brown-Rouse reported to two different DFCS managers; however, she is now a member of the DFCS executive management team and reports directly to the MDHS Deputy who oversees DFCS.

[126] A program specialist works in the Training Unit to assist with training clerical staff assigned to the county offices. This training involves basic bookkeeping, payment coding, new clerk training and other administrative procedures. The program specialist conducts training statewide, but is assigned to an office in Region II.

[127] The curriculum writer started in February 2009.

[128] Also assigned to the Training Unit and working out of the Pearl River County office is a clerk who started in January 2009. The clerk provides basic administrative assistance to the training director such as the entry of staff training data into MACWIS.

training coordinator positions, including six new trainers for each of the six new regions and at least five additional trainers to conduct supervisory and resource worker training statewide.

In addition to being understaffed, the Training Unit has other basic resource deficits. Training equipment and program space are in short supply.  For example, a key section of the training curriculum centers on MACWIS case record requirements.[129]  In order to train staff on how to use MACWIS for entering and retrieving case record data, the classroom training necessarily includes hands-on sessions with a computer.  According to defendants, there are only enough laptops to provide training in three of the DFCS 13 regions.[130]  In addition, most of the regions do not have sufficient classroom space for trainings and this has both logistical and fiscal implications.[131]  Because there are an insufficient number of trainers statewide, the training coordinators have been deployed from one part of the state to another to provide training.  This practice necessitates a level of administrative support that is unavailable and contributes to travel costs that would otherwise be avoidable.

Notwithstanding significant efforts by the training director and her staff, as described more fully below, the fact that the Training Unit has been under-resourced affected defendants' ability to meet other Period 1 requirements related to the staff training program.   Moreover, DFCS policy has not yet been revised to incorporate the Settlement Agreement's training requirements – an important step toward building accountability for program delivery as well as staff participation in the required training program.

---

[129]  There are initial and refresher training modules related to MACWIS.

[130]  Defendants report an inventory of fewer than 30 functional laptop computers which are moved from site to site – a burdensome process that causes wear and tear of the equipment, some of which is already antiquated and in poor condition.  In order to provide required training, defendants estimate that a minimum of ten laptops, a PowerPoint projector, and multiple wireless routers are needed for each of the 13 regions.

[131]  Staff are diverted from substantive work in order to locate and secure suitable rentable space to serve as classrooms for the training sessions.

**By the end of implementation Period 1:**

5) **All new caseworkers and supervisors will complete their service training consistent with the Plan requirements before they assume their respective responsibilities for carrying cases and supervising.**

**Status of Progress, Settlement Agreement §II.A.2.c.5.:**  The evidence shows that there was progress toward meeting the pre-service training requirements during Period 1.  However, because the requirements were not satisfied, the Period 2 IP requires that defendants develop and implement a written plan to deliver the comprehensive training required by the Settlement Agreement.[132]  The progress defendants made during Period 1 is described below.

The Settlement Agreement's substantive requirements concerning pre-service and pre-supervisory service training for caseworkers and their supervisors, in relevant part, provide:

> c.  Training:
> 2) Subsequent to Court approval of this Plan, all new caseworkers hired by DFCS shall receive a minimum of 270 hours of pre-service training, including instructional training and supervised field training, prior to assuming any case responsibilities; all new caseworker supervisors hired or promoted by DFCS shall receive a minimum of 40 hours of in-service training directed specifically at the supervision of child welfare caseworkers prior to assuming any supervisory responsibilities; . . . .
> 3) The caseworker training shall be based on clearly identified learning objectives and culminate in competency-based testing, which will need to be successfully completed for the training to be credited. The curriculum shall be drawn from current research and data.

Settlement Agreement §II.A.2.c.2.-3.

Historically, DFCS caseworkers have been assigned to cases, and supervisors have been assigned to supervise caseworkers, before completing pre-service and/or pre-supervisory service training programs.[133]  Defendants began to implement a 270-hour pre-service training program for all newly hired caseworkers and supervisors at the end of the 2008 calendar year.  This training is referred to as the Child Welfare Professional Development ("CWPD") pre-service

---

[132]  Period 2 IP §I.2.d.1.

[133]  *See, e.g.,* Ex. 7B, MDHS Administrative Policy, AP-19, Staff Training and Employee Development Policy, January 1, 1993.  The current DFCS training policy, issued in 1993, authorizes three types of training: on-the-job; in-service, and out-service.  None contemplates that employees will be trained in policy, procedures, and case practice standards before assuming direct responsibility for casework and/or supervision of caseworkers.

training.[134]  The CWPD is a ten-week course designed to deliver 270 hours of training, consisting of a four-week workshop of classroom instruction[135] and six weeks of on-the-job ("OJT") training.[136]  During Period 1, the Training Unit conducted 14 CWPD four-week workshops.[137] The anecdotal evidence suggests that the incidence of newly hired caseworkers being assigned to cases before completing pre-service training decreased but was not eliminated, as required, during Period 1.[138]  The Period 2 IP requires caseworkers to complete pre-service training before assuming case-carrying responsibilities.[139]

During the latter part of 2008, a 40-hour pre-supervisory service training curriculum was developed by DFCS in collaboration with the SPB for all new supervisors.  The training is designed to take place over a five-day period and will be offered at the MSPB Training Center in Jackson.  The first four days, conducted by MSPB staff, includes instruction on basic supervisory skills.  The fifth day, conducted by the DFCS training director, focuses more specifically on child welfare topics and DFCS practices.  The pre-supervisory service training curriculum was piloted during February and March 2009.[140]  Based on the pilot, the curriculum was revised and a subsequent pilot session was scheduled for May 19, 2009.  Newly hired and promoted supervisors have continued to perform supervisory duties without participating in the pre-

---

[134]  Defendants provided a copy of the CWPD curriculum to the Monitor, including all instructional materials, trainers' manuals, associated PowerPoint presentations, tests and answer keys.  In addition, the Monitor received a copy of the manual used by supervisors.

[135]  Classroom time runs from 8:30 a.m. to 4:30 p.m., Monday through Thursday, and from 8:30 a.m. to 2:00 p.m. on Fridays, with a one-hour lunch break each day.

[136]  OJT takes place in the county offices under the direction of supervisors.

[137]  Four workshops were conducted in both Region I and Region VI, one workshop was conducted in Region II, three workshops were conducted in Region III, and two workshops were conducted in Region IV.

[138]  Because these training programs were only recently adopted, the Monitor has not conducted a systematic review to determine the prevalence of this practice, but expects to do so during Period 2.

[139]  Period 2 IP §I.2.d.4.

[140]  Two pilot sessions were conducted for new supervisors, acting supervisors, and acting as well as permanently appointed supervisors who assumed supervisory positions as of January 1, 2008.

supervisory service training required by the Period 1 IP.  The Period 2 IP requires the cessation of this practice.[141]

The Settlement Agreement contemplates that the curricula for the pre-service and pre-supervisory service training programs will integrate the practice model and also incorporate the DFCS policies and practice guides required during Period 1.[142]  However, because these policies and practice guides were not finalized,[143] and, in turn, the training curriculum was not revised, defendants are now required to revise the training curriculum during Period 2, after the practice model and the policies and practice guides have been completed.[144]

> **By the end of implementation Period 1:**
>
> 6) **The ongoing training curriculum for caseworkers and supervisors will be completed and ongoing training will have been initiated.**

**Status of Progress, Settlement Agreement §II.A.2.c.6.:**  As explained below, defendants are in the early stages of developing the required in-service training program, but the curriculum for the program was not completed and ongoing training was not initiated during Period 1.  Thus, defendants must satisfy this requirement during Period 2.[145]

The in-service[146] training requirements in the Settlement Agreement are set forth below:

> c. Training:
> 2) Subsequent to Court approval of this Plan, . . . all caseworkers shall receive a minimum of 40 hours of ongoing in-service training each year; and all supervisors shall receive a minimum of 24 hours of ongoing in-service training each year.
> 3) The caseworker training shall be based on clearly identified learning objectives and culminate in competency-based testing, which will need to be successfully completed for the training to be credited. The curriculum shall be drawn from current research and data.

Settlement Agreement §II.A.2.c.2.-3.

---

[141]  Period 2 IP §I.2.d.4.
[142]  *See infra* pp. 57-59 for a discussion of these inter-related projects.
[143]  *See infra* pp. 57-59.
[144]  Period 2 IP §I.2.d.2.
[145]  *Id*. §II.d.5.
[146]  The Settlement Agreement uses the terms "ongoing in-service training" and "ongoing training" interchangeably to refer to in-service training.  This report uses the term "in-service training" to refer to both.

Except for a promising advanced professional development session on court procedures,[147] the Training Unit offered limited in-service training opportunities to DFCS caseworkers and supervisors during Period 1.[148]  In December 2008, defendants announced that effective January 1, 2009, on an annual basis, caseworkers would be required to attend 40 hours of in-service training and their supervisors would be required to attend 24 hours of in-service training.[149]  However, these requirements are not yet incorporated into a comprehensive in-service training curriculum.[150]  Even if such a comprehensive curriculum is finalized, absent a Training Unit that is adequately staffed, and other necessary resources, defendants will be unable to administer and manage the in-service training program as required.

> **Period 1 IP §I.2.c.**
> **I.  Administration and Management Assessment and Implementation Steps**
> **2.  Human Resources Management**
> **c.  Training:**
> **Defendants shall, in conjunction with COA, develop and begin implementing a written plan to meet the needs identified in the required Administration and Management Training Assessment.**
>
> **Defendants shall implement competency-based testing to assess knowledge acquisition of newly hired staff following the completion of pre-service training, including newly hired or newly promoted supervisors following the completion of supervisory training.  Training**

---

[147]  The curriculum for the training was finalized in July 2008 by DFCS in collaboration with the Administrative Office of the Courts Court Improvement Program.  Twenty-one sessions were conducted on a statewide basis.  The training provides an overview of the state court system, and focuses on preparing caseworkers for court appearances.  Topics such as professional conduct, courtroom etiquette, guidance for interaction with the Court, case preparation, and various aspects of court proceedings are addressed by the curriculum.

[148]  Statewide, four MACWIS refresher trainings were held during 2008.  The training was discontinued because the server that is used for the MACWIS sessions malfunctioned.  In addition, and on a statewide basis, three training sessions were conducted for the clerical staff and two train-the-trainer sessions in resource family finance were also offered.  Defendants provide some in-service training to supervisors and managers in each region on a monthly basis through a contract with USM.  This program, which is referred to as the "Learning Lab" program, is operated independently of the Training Unit and is not part of any formal and comprehensive in-service training program.  Defendants also provide on-the-job training to supervisors using the supervisory level 1 curriculum.  The curriculum is based on a mentoring model and intended for new supervisors.  Heretofore, regional ASWSs have provided the training for new supervisors using this curriculum.  Regional ASWSs mentor and supervise the ASWSs assigned to their regions.

[149]  *See* Ex. 7C, Training Unit Newsletter, December 2008.  The announcement was not part of a policy directive.

[150]  *Id.; see also* Ex. 7D, MDHS, DFCS, Child Welfare Professional Development Unit Newsletter, Volume 1, Issue 1, January 2009.  This is the second newsletter issued by the Training Unit.  It notifies staff of various matters related to training, including a pilot of the 40-hour supervisory training.

45

**credit shall only be given to those new hires who demonstrate sufficient knowledge acquisition.**

**Defendants shall implement a system to track staff participation in all required training.**

**Status of Progress, Period 1 IP §I.2.c.:**  Defendants made progress but did not satisfy these training requirements during Period 1.  As a result, these provisions are included in the Period 2 IP.[151]  Defendants' progress during Period 1 is described below.

As noted herein, the training assessment was conducted during the nascent stages of the Training Unit's development, shortly after the training director was appointed.[152]  The assessment was preliminary and undertaken before curricula and training schedules were completed.  Nonetheless, a series of recommendations related to the training program were included in the assessment report.[153]  A written plan has not been developed to address the needs identified in the report.[154]  As explained below, competency-based testing has been instituted for the pre-service and the pre-supervisory service training programs; however, a revised testing program will need to be developed after the curriculum is modified to comport to the requirements of the Settlement Agreement and to the case practice model.  Moreover, defendants are making progress on building a system to track staff participation in the training program.

The CWPD incorporates pre-training and post-training testing.  The pre-test is administered at the beginning of the course.  Weekly tests associated with the classroom instruction are given throughout the course, and weekly worksheets are completed by trainees

---

[151]  Period 2 IP §I.2.d.1., 6., 7.
[152]  The assessment is addressed *supra* pp. 18-19 and the report is included in the Appendix as Ex. 2, COA Assessment Report, *supra* note 37.
[153]  Ex. 2, COA Assessment Report, *supra* note 37, at 38-40.
[154]  The assessment indicated that defendants would need to address the following areas: training uniformity; on-the-job training requirements; staff evaluation; documentation and tracking; licensure requirements; and, in-service training.  The assessment also recommended that defendants develop a plan for addressing the demands that would be made on the Training Unit as defendants hire new staff to meet the Settlement Agreement's caseload requirements.  *Id.*

during their participation in the OJT components of the course. The course concludes with a final comprehensive examination on principles and concepts taught in the classroom and during the OJT segments of the program. According to the training director, staff members who fail the comprehensive examination may take the examination a second time. If the staff member fails the second test, the regional director meets with the employee's supervisor to determine whether an additional re-test will be offered or whether the employee will be terminated.[155] Defendants report that the pre-supervisory service training course includes competency-based testing. The Monitor expects to review both testing programs after the pre-service and pre-supervisory service curricula are finalized and implemented. Thereafter, the Monitor will report to the Court and the parties, as appropriate.

Defendants have begun to develop a system to track staff participation in DFCS training programs. MACWIS can collect employee training data by training type, the beginning and end dates for each training program, the number of training hours an employee completes, test scores, and whether the training session was eligible for Title IV-E reimbursement.[156] Defendants report that employee training data are entered into MACWIS by certain training coordinators who have MACWIS access[157] as well as by the Training Unit's clerical staff, and that most in-house employee training records are up-to-date insofar as participation in training sessions conducted since January 2008. In addition, defendants report that the employee training data are linked to their personnel files, which are accessible to the supervisors and managers who are responsible for monitoring employee compliance with training requirements. As of March 2009, MACWIS

---

[155] As of April 2009, the training director reported that no one had failed the comprehensive examination during her tenure.
[156] Ex. 8, Personnel Menu Functions and Screens, Personnel/Master Training, Personnel/Employee Detail, screen shots from MACWIS Desk Reference Guide – V1.3, Revised August 14, 2008, training director copy.
[157] Defendants report that efforts are being made to modify MACWIS in order to allow the training coordinators who do not have the requisite MACWIS access to enter the data.

did not have the capacity to alert DFCS managers about employees with training requirements

that were past due or incomplete.  Defendants report that they are working to address this issue.

The Monitor has not audited defendants' training records, but expects to do so, and report to the

Court and parties as appropriate, after the required pre-service and in-service training curricula

are finalized and implemented.

> **Period 1 IP §I.2.d.**
> **I.  Administration and Management Assessment and Implementation Steps**
>   **2.  Human Resources Management**
>     **d.  Contract Agency Requirements:**
>
> **Defendants shall, in conjunction with COA, develop and begin implementing a written plan to meet the needs identified in the required Administration and Management Contracting Assessment.**
>
> **Defendants shall notify all private agencies that provide protective, preventive, foster care, or adoption case work services under contract with DFCS that those agencies will be required to abide by all related terms of the Plan, including, but not limited to, provisions regarding training curricula, minimum training hours, and caseload standards.**
>
> **DFCS shall design and begin implementing a performance-based contracting system with the capacity to monitor and enforce contract performance on all related terms of the Plan.**

**Status of Progress, Period 1 IP §I.2.d.:**  These requirements were not satisfied during

Period 1.  As discussed above,[158] the administrative and management contracting assessment has

not been completed.[159]  In addition, as of April 2009, private agencies that were under contract

with DFCS to provide protective, preventive, foster care, or adoption casework services had not

yet received formal notification of a contractual requirement to abide by all relevant terms of the

Settlement Agreement.  The required performance-based contracting system – a centerpiece of

the service delivery reform strategy – has not been designed.  This is a substantive undertaking

that requires significant preparation and planning, including substantial collaboration with private

---

[158] The contracting assessment is addressed *supra* p. 19.
[159] The assessment was preliminary and limited in scope, *see supra* p. 19.

providers.  Defendants report that the newly hired director of the DFCS Administration and

Financial Planning Unit has undertaken a preliminary review of performance-based contracting

practices in other jurisdictions.[160]  Further progress regarding performance-based contracting is

required during Period 2.[161]

> **Settlement Agreement §II.A.3.**
> **II.  STANDARDS**
>     **A.  Administration and Management Standards**
>         **3.  Performance and Quality Improvement**
>             <u>**By the end of implementation Period 1:**</u>
>             **a.  DFCS shall begin implementing a separate continuous quality**
>                 **improvement (CQI) system.**

<u>**Status of Progress, Settlement Agreement §II.A.3.:**</u>  A separate CQI system was not

implemented during Period 1, and as a result, the system is now required to be implemented

during Period 2.[162]  Defendants' progress is described below.

The Settlement Agreement envisions the establishment of a CQI system as an integral

part of Period 1 capacity building.  At its simplest, such a system is designed to promote

improvements in agency performance through ongoing assessments of practices and outcomes

using qualitative and quantitative measures to inform operational strategies and decision-

making.[163]  The CQI process provides a framework for informing management decisions, and

requires the active participation of agency staff and managers as well as external stakeholders.  A

crucial component of child welfare agency reform initiatives, a fully-implemented CQI program

is ultimately an indicator of defendants' capacity to sustain required reforms.  Although the

---

[160]  The director, Bryan Rushing, began working at DFCS on February 1, 2009.

[161]  Period 2 IP §I.2.e.

[162]  *Id.* §I.3.b.

[163]  For further background information on CQI systems in the child welfare context, *see*, *e.g.,* O'Brien, Mary and Watson, Peter, A Framework for Quality Assurance in Child Welfare, National Child Welfare Resource Center for Organizational Improvement, Edmund S. Muskie School of Public Service, March 2002.

defendants have not begun to implement a separate CQI system, some of the elements of the system are being developed.

A CQI Unit was established during the latter part of 2008 as part of the restructuring and reorganization of DFCS that was approved by the SPB.  The CQI Unit is managed by a seasoned director who oversees three discrete program areas: foster care review; evaluation and monitoring and MACWIS.  Currently, the foster care review section is performing certain case record review functions related to the federally-mandated administrative review process.  Defendants plan to harmonize and integrate some of these functions into the design of the CQI program.  The foster care review section is led by an experienced program manager; however, as of June 1, 2009, managers had not yet been hired for either the evaluation and monitoring or MACWIS sections. Defendants have engaged a national expert to consult with DFCS management on the design of the CQI program.[164]  The expert's recommendations are expected by September 30, 2009, and they will be used to inform the final design for the CQI program.

> **Period 1 IP §I.3.**
> **I. Administration and Management Assessment and Implementation Steps**
>    **3. Performance and Quality Improvement**
>
>    **Defendants shall, in conjunction with COA, develop and begin implementing a written plan to meet the needs identified in the required Administration and Management Quality Improvement Assessment. The plan shall include specific steps and timeframes for the implementation of a separate continuous quality improvement (CQI) system that meets COA standards and Plan requirements.**
>
>    **Defendants shall develop, in conjunction with COA, and begin implementing a CQI assessment tool that measures compliance with the Plan's management and foster care service standards.**

---

[164]  The expert hired to develop the practice model and the rate setting analysis also was engaged to provide these recommendations.  *See supra* p. 5 and *infra* pp. 58-59 for a discussion of the practice model.

**Status of Progress, Period 1 IP §I.3.:** As noted above,[165] the assessment identified a series of needs related to performance and quality improvement. Defendants did not develop the required plan to address the needs identified by the assessment, or the assessment tool, during Period 1. They are required to do so during Period 2.[166]

> Settlement Agreement §II.A.4.
> **II. STANDARDS**
>   **A. Administration and Management Standards**
>     **4. Legal and Regulatory Compliance**
>       **DFCS shall comply with applicable federal, state, and local laws and regulations.**

**Status of Progress, Settlement Agreement §II.A.4.:** There are no Period 1 requirements related to this subsection.

> Settlement Agreement §II.A.5.
> **II. STANDARDS**
>   **A. Administration and Management Standards**
>     **5. Information Management and Use**

The Settlement Agreement requires the defendants to operate an automated child welfare information system that conforms to a set of ten standards related to the timeliness of data access;[167] specifications for data collection, tracking and reporting; and certain functional capacities.[168] Period 1 requirements relate to building the capacity to operate such a system. For the most part, MACWIS does not report accurately and as required on performance related to the requirements in this case. In some instances, the system has the capacity to collect the required data, but not report on it. In others, this capacity does not exist.[169] Moreover, even in situations in which reports can be generated, the underlying data cannot be readily extracted,

---

[165] The assessment is addressed *supra* p. 19.
[166] Period 2 IP §I.3.a., c.
[167] MACWIS serves many other reporting and data collection purposes that must be considered by the defendants as they build the system's capacity to meet the requirements in this case.
[168] Settlement Agreement §II.A.5.a.(1)-(10).
[169] The Monitor has provided the parties with a table outlining these specific findings. The information in the table is derived from a review of MACWIS reports and consultation with one of defendants' senior and most knowledgeable MACWIS system analysts.

analyzed and validated as required.[170]  In addition, there is a substantial body of evidence that raises significant concerns about the reliability of the MACWIS data.[171]  As explained below, defendants have been working to address these issues which are likely to attenuate the reform process if they are not resolved within a reasonable time period.

> **By the end of implementation Period 1:**
> **b. DFCS shall provide to all county agency staff with child welfare responsibilities access to basic computer services, consisting of access to MACWIS, word processing, and electronic mail.**

**Status of Progress, Settlement Agreement §II.A.5.b.:**  There has been significant progress toward meeting this requirement; however, as explained below, additional progress is needed and it is required by the Period 2 IP.[172]

Staff and managers alike agree that access to MACWIS, word processing and electronic mail has improved significantly over time.  However, the DFCS inventory of computer equipment is old, and there are many reports of substantial delays in procuring replacement equipment.[173]  This phenomenon limits meaningful access to basic computer services, impeding, instead of facilitating, the development of adequate case records.[174]

> **c. MACWIS data related to compliance with the Plan's Foster Care Service Standards II.B.1-12 will be collected, analyzed, and disseminated at least monthly to DFCS regional and county staff.**

---

[170]  Settlement Agreement §VI.B.

[171]  *See, e.g., supra* pp. 26-32 (workload data) and *infra* pp. 67-69 (special permanency reviews).

[172]  Period 2 IP §I.5.a.

[173]  Defendants' FY 2010 budget request acknowledges this issue and in this regard states: "The Division of Family and Children's Services is requesting an increase of $557,800 in Equipment for the purpose of upgrading current staff's equipment. [sic]  The current equipment is out-dated and beginning to malfunction."  See Ex. 1H, MDHS FY10 Budget Request, *supra* note 24, at 28.

[174]  Most DFCS staff, including caseworkers, do not have voice mail on their desktop telephones.  However, defendants report that caseworkers have voice mail on the cell phones that are issued to them by DFCS and used on a routine basis to retrieve messages.  The Settlement Agreement does not require defendants to provide staff with desktop telephones with voice mail capabilities.  However, the Settlement Agreement contemplates that defendants will provide DFCS staff with the basic tools necessary to perform their duties in accordance with minimum professional standards.

**<u>Status of Progress, Settlement Agreement §II.A.5.c.:</u>**  This requirement was not satisfied during Period 1.  A strategy expected to lead toward compliance with this requirement is incorporated into the Period 2 IP.[175]  These matters are described more fully below.

Some MACWIS data related to the Settlement Agreement's foster care standards are collected, analyzed and disseminated monthly to DFCS staff on a shared network system.[176]  As noted above, the data upon which these reports are based cannot be extracted, analyzed or validated, and the reports do not generally measure compliance with the Settlement Agreement's precise requirements.[177]  Defendants have attempted to improve MACWIS capacity to collect and report on data relevant to compliance with the Settlement Agreement's foster care service standards.  However, defendants report chronic delays in processing MACWIS change requests.[178]

During January 2009, the Monitor and an information management systems expert met with defendants as part of the Monitor's assessment of Period 1 performance to identify the strengths and limitations in MACWIS's data collection, tracking and reporting capacity.  This undertaking included a review of MACWIS's capacity to collect and report on data related to 58 separate Period 1 and Period 2 requirements.  The Monitor concluded that as of February 1, 2009, MACWIS did not have the capacity to issue the required report for 45 of the 58 requirements, and with respect to 16 of the 45 requirements, MACWIS did not have the threshold capacity to collect and track the data.  At the time of the Monitor's assessment, requests to

---

[175]  Period 2 IP §I.5.

[176]  A comprehensive index of all posted reports has not been produced.  The reports generally do not include aggregated data summaries – a format that would make the information more readily accessible to managers and staff.

[177]  *See, e.g., supra* pp. 26-32.

[178]  The change requests constitute forms DFCS submits to the MDHS MIS Department, a unit in MDHS responsible for processing and managing modifications to MACWIS.

produce reports and/or modify system capacity related to 34 of the 45 requirements had been made; however, DFCS staff reported protracted delays in resolving previous modification requests. Defendants are making efforts to address these issues.

During January 2009, the MDHS deputy responsible for the agency's management information systems and the DFCS CQI director established a committee to review and manage remediation efforts related to MACWIS. Defendants report that the committee has been working to prioritize and accelerate the processing of MACWIS change orders, including change orders requesting adaptations to meet the data collection and reporting requirements in this case. This undertaking is complicated by the fact that it is likely defendants will elect to replace MACWIS with a more modern automated system that could also meet applicable federal requirements.

In consultation with staff from the Children's Bureau, defendants have been working to develop a MACWIS remediation strategy. As an initial step, defendants are collaborating with the Children's Bureau on a RFP to contract for an external assessment of MACWIS, including an evaluation of the system's capacity to function as prescribed by §II.A.5.a.(1)-(10) of the Settlement Agreement.[179] Defendants have explained that the assessment was intended to satisfy the Period 1 MACWIS assessment requirement,[180] and that it is required by the Children's Bureau as a predicate to federal funding to support any MACWIS remediation initiative. According to the defendants, the process leading to the assessment has been protracted at least in part because of certain procedural steps required by the Children's Bureau. Even after a contract for the assessment is issued, the defendants do not expect to obtain a report presenting the results of the assessment for a 12-month period. For these reasons, the Period 2 IP requires the

---

[179] Defendants provided a draft of the RFP to plaintiffs' counsel and the Monitor for review and comment in February 2009.

[180] Period 1 IP §I.e. The assessment that was undertaken during Period 1 is discussed *supra* p. 20.

defendants to undertake all reasonable efforts to expedite the RFP, and in any event, to issue the RFP by September 1, 2009, and to execute a contract for the assessment that by its terms requires the assessment to be completed within a 12-month period.[181]

The limitations in MACWIS are well known. Defendants must expedite and intensify their efforts to address these shortcomings in order for the reform process to make continued and meaningful progress. For these reasons, the Monitor has recommended that defendants consult with officials from the Children's Bureau to determine whether any of the procedural steps related to the MACWIS remediation process can be waived or accelerated.

> **Period 1 IP §I.5.**
> **I. Administration and Management Assessment and Implementation Steps**
> **    5. Information and Management Use**
>
> **Defendants shall, in conjunction with COA, develop and begin implementing a written plan to meet the needs identified in the required Administration and Management MACWIS Assessment.**
>
> **Defendants will develop and begin implementing a plan that will ensure MACWIS maintains statewide placement resource information such as current availability, capacity limitations, census, suitability by age, sex and special needs, and any related licensing and maltreatment investigations information accessible to DFCS county staff.**

**Status of Progress, Period 1 IP §I.5.:** As explained above, the assessment did not address the Settlement Agreement's specific requirements, and thus a remedial plan was not developed during Period 1.[182] Statewide placement resource information is maintained in MACWIS and readily accessible; however, there is evidence indicating the data are not routinely reliable because of both programming and user limitations.[183]

---

[181] Period 2 IP §§I.5.c.-d.

[182] *See supra* p. 20 for a discussion of the assessment.

[183] Indeed, defendants report that placement data are not always up-to-date or accurately reported in MACWIS. The incidence of inaccurate placement data reportedly increased due to the placements made pursuant to the Period 1 IP's expedited relative home licensure requirement, which could not be tracked in MACWIS for most of Period 1. *See* Period 1 IP §II.B.5.i. and the related discussion *infra* p. 84.

**Period 1 IP §I.6.**
**I. Administration and Management Assessment and Implementation Steps**
    **6. Case Recordings**
        **Defendants, in conjunction with COA, shall implement a system to regularly review whether DFCS child welfare case records are current, complete, made by authorized personnel only, signed and dated by the person who provided the service, and signed and dated by supervisors, where appropriate, in accordance with federal and state law and regulations.**

**Status of Progress, Period 1 IP §I.6.:** This requirement was not met during Period 1 and as a result it is included in the Period 2 IP.[184] However, defendants routinely review case records as part of the administrative review process. These reviews include a determination regarding whether some of the specific elements of the case record addressed by this requirement are current and complete.[185] Thus, it may be possible, without compromising the purpose of the administrative review process, for the ongoing foster care reviews to serve as a foundation for defendants' efforts to meet these requirements.

    **Settlement Agreement §II.A.7.**
**II. STANDARDS**
    **A. Administration and Management Standards**
        **7. Financial Management**
        <u>**By the end of implementation Period 1:**</u>
        **a. Defendants shall conduct an external assessment of actual and anticipated federal funding levels and create an implementation program to increase federal funding available to DFCS.**

**Status of Progress, Settlement Agreement §II.A.7.a.:** As addressed above, the required assessment was not conducted during Period 1.[186] It is now required to be performed during Period 2 and will serve as the basis for the implementation plan to increase federal funding.[187]

---

[184] Period 2 IP §I.6.
[185] *See* Ex. 9A, MDHS, DFCS, Form 4253, Periodic Administrative Determination on Children in State's Custody, revised July 1, 2008, which is the form used for the administrative case reviews that are conducted at six-month intervals for all in-custody cases; Ex. 9B, Foster Care Review Program, Periodic Administative [*sic*] Determination Concise Guide, the guidelines used to conduct the administrative case reviews.
[186] An initial fiscal assessment conducted by COA during Period 1 is addressed *supra* p. 20-21.
[187] Period 2 IP §I.7.a.

      **b. Funds realized as a result of revenue maximization activities shall
not supplant appropriated state funds but shall be used in
furtherance of the reforms and outcome measures provided for
herein and to improve child welfare services.**

**Status of Progress, Settlement Agreement §II.A.7.b.:** As a predicate to assessing

compliance with this requirement, the external assessment required by §II.A.7.a. must be

completed, and a revenue maximization initiative must be instituted. Thus, this requirement is

included in the Period 2 IP.[188]

      **Period 1 IP §I.7.**
      **I. Administration and Management Assessment and Implementation Steps**
          **7. Financial Management**
           **Defendants shall, in conjunction with COA, develop and begin
implementing a written plan to meet the needs identified in the required
Administration and Management Fiscal Assessment, including
addressing any identified deficiencies in financial management practices.**

**Status of Progress, Period 1 IP §I.7.:** As explained herein, the assessment conducted by

COA included several recommendations related to fiscal management.[189] A written plan to

address these recommendations was not developed during Period 1.

      **Period 1 IP §II.**
      **II. Foster Care Services Assessment and Implementation Steps**
          **Within 180 calendar days of Court approval of the Plan, Defendants, in
conjunction with COA, shall identify and begin revision of DFCS policies
and practice guides as necessary to reflect the COA foster care services
standards and the requirements set forth in Section II.B of the Plan, and
identify any related training needs.**

**Status of Progress, Period 1 IP §II.:** The required review and revision process was

initiated during Period 1, but it was not completed. As a result, this requirement must be satisfied

during Period 2.[190]

      This Period 1 requirement is based on the recognition that an initial step in the reform

process is for DFCS policies and practice guides to be consistent with the Settlement Agreement.

---

[188] *Id.* §I.7.b.
[189] Ex. 2, COA Assessment Report, *supra* note 37, at 22-23.
[190] *Id.* §II.1.

The DFCS policy manual represents a lengthy compendium of policy directives that are, at times, inconsistent with each other and that evidence a reactive and piece-meal approach to policy-making.  As described more fully below, defendants commenced a comprehensive review of DFCS policy during Period 1, and a related initiative to develop a practice model is proceeding on a corresponding track.[191]

In mid-January 2009, defendants engaged an experienced child welfare professional to coordinate the required policy review.  The consultant was charged with drafting proposed revisions to existing policy; he was not tasked with revising related practice guides.  The review and revision process is ongoing, and defendants predict that this project will be completed by September 30, 2009.

An inter-related project that defendants have initiated, which is not required by the Settlement Agreement, is the development of a practice model.  To defendants' credit, during early 2009, a national expert was engaged to work with DFCS on crafting a family-centered practice model and its implementation plan.  Defendants have explained that the practice model will be based on the DFCS mission, goals and values, and serves as a framework for improving the quality of casework.  It is intended to promote child safety, permanency and well being through integrated processes that guide casework.  Various legal requirements related to DFCS case practice, including requirements imposed by the Settlement Agreement, are expected to be infused into the model.  Defendants anticipate that the consultant will make recommendations about the infrastructure necessary to support the practice model, as part of a comprehensive set of recommendations that will be issued by September 30, 2009.  It is anticipated that DFCS policy

---

[191]  These projects must be concluded in order for defendants to finalize the DFCS training curriculum for caseworkers and supervisors as addressed *supra* pp. 44-45.

and practice guides, as well as staff training curricula, will require further revision after the

practice model is completed.

**Period 1 IP §II.**

**II.  Foster Care Services Assessment and Implementation Steps**
  **Within nine months of Court approval, Defendants, in conjunction with COA or a COA designee, shall conduct a Foster Care Services Assessment, which shall include:**

  a)  **A reunification services needs assessment,**

  b)  **A termination of parental rights (TPR) assessment to identify those children who have been in custody more than 15 of the previous 22 months and for whom DFCS has not filed a TPR petition or documented an available exception under the federal Adoption and Safe Families Act (ASFA) as required,**

  c)  **A child safety assessment of DFCS practice prioritizing, screening, assessing, and investigating reports of maltreatment of children to determine the extent to which DFCS investigations and decisions are based on a full and systematic evaluation of the factors that may place a child at risk,**

  d)  **A placement assessment of current needs for achieving compliance with the placement standards set forth in Section II.B.5 of the Plan, which shall include (1) the structure of the placement process, including the role and efficacy of the state office placement unit; (2) the services and supports available to support enhanced placement stability, including out-patient or in-home assessment and treatment services to avoid the frequent use of time-limited assessment and treatment placement programs; and (3) the placement resources needed to meet the placement needs of children in custody,**

  e)  **An assessment of case practice associated with parent/child and sibling visitation to identify barriers to meeting the visitation standards set forth in Section II.B.6 of the Plan,**

  f)  **A service provider needs assessment to identify available medical, dental, and mental health services and gaps in services,**

  g)  **An assessment of the quality and array of independent living services available to foster children ages 14-20, and**

  h)  **A recruitment and retention assessment to determine the need for additional foster care support services.**

  **COA may, at its discretion, refer to and utilize previous external assessments of DFCS in its completion of the above assessments.**

**Status of Progress, Period 1 IP §II.:**  The Period 1 assessments of foster care services

are intended to inform the next stage of the remedial process by providing the parties with

baseline data about key aspects of agency performance, including data related to case practices,

placements and the delivery of services to class members and their caregivers.  The required

59

assessments were not conducted during Period 1, and are now, with certain modifications, required to be performed during Period 2.[192]

> **Period 1 IP §II.1.**
> **II. Foster Care Services Assessment and Implementation Steps**
>   **1. Screening and Assessment**
>     Within 180 calendar days of Court approval of the Plan, DFCS, in conjunction with COA, shall develop a protocol for both individual and family team meetings and develop a training module on such protocols that shall be incorporated into the pre-service and in-service training curricula.

**Status of Progress, Period 1 IP §II.1.:**  As explained below, defendants made efforts to develop the required protocols, but they were not finalized during Period 1.  The Period 2 IP requires the defendants to develop the protocols and to conduct the associated training during Period 2.[193]

Shortly after the Settlement Agreement was approved, defendants established a work group structure to address various policy initiatives required by the Settlement Agreement, including policy directives and other documents related to the 180-day COA standards.  The work groups were managed by the DFCS state office staff and included the agency's managers, supervisors and other staff.[194]  A review of work group records, and interviews with work group participants, indicate that many of the work groups made substantial efforts to respond to assigned tasks, drafting policies and other documents for executive management review.  Drafts of family team meeting ("FTM") and individual team meeting ("ITM") protocols were developed through the work group process during the 2008 calendar year; however, as of June 1, 2009, the drafts were not finalized.

---

[192]  Period 2 IP §§II.2.a.-g.  The Period 2 IP requires defendants to engage a qualified independent consultant approved by the Monitor to perform the required assessments.  In May 2009, a consultant proposed by the defendants was approved by the Monitor.
[193]  *Id.* §II.3.a.
[194]  In some instances, external stakeholders participated on the work groups.

During early 2009, defendants reconfigured the management and composition of the work groups to streamline the review process, promote efficiency, maximize available resources and improve the coordination between and communication among the groups.  At least preliminarily, this effort has been encouraging.  The draft FTM and ITM protocols that were developed by the work groups in 2008 were revised in early February 2009.  Drafts of the revised protocols have been reviewed by DFCS senior management and COA representatives, and defendants report that the protocols will be issued in final form in the near term.[195]

> **Period 1 IP §II.2.**
> **II.  Foster Care Services Assessment and Implementation Steps**
> **2.  Service Planning and Monitoring**
> **The revised policies and practice guides shall require that each service plan and revision of such plan include the elements and meet the requirements of COA Standards PA-FC 2.06, 3.01, 3.04, and 3.05, as well as incorporate and track the child's educational needs and goals.**

**<u>Status of Progress, Period 1 IP §II.2.</u>:**  A draft policy addressing Individual Service Plans (ISPs) for adults and children was developed through the work group process and reviewed by DFCS senior management and COA representatives.  The policy was not finalized during Period 1,[196] and it is now required to be completed during Period 2.[197]

---

[195]  The most current drafts of the protocols that have been submitted to the Monitor are dated February 5, 2009.

[196]  The COA Standards cited by this provision include the following requirements:

   PA-FC 2.06, Assessments are completed within timeframes required by the agency, and are updated periodically;

   PA-FC 3.01,  A service plan is developed with the full participation of the child, the family and the foster parents;

   PA-FC 3.04, The service plan is based on the assessment and includes: service goals, desired outcomes, and timeframes for achieving them; services and supports to be provided, and by whom; and the signature of the parents and, when appropriate, the child or youth;

   PA-FC 3.05, The service plan addresses as appropriate: unmet service and support needs that impact safety, permanency and well being; maintaining and strengthening relationships; and the need for culturally responsive services and the support of the family's informal social network.

   Council on Accreditation, Council on Accreditation Standards, Foster Care Services, 8th Ed., (2008)

[197]  Period 2 IP §II.4.

**Period 1 IP §II.3.a.1.-2.**
**II.  Foster Care Services Assessment and Implementation Steps**
   **3.  Child and Youth Permanency**
      **a.  Permanency Plan:**
         **The revised policies and practice guides shall require that:**

         **1)  All permanency plans contain specific information about:**
            **a)  How the permanency goal will be achieved;**
            **b)  What services are necessary to make the accomplishment of the goal likely;**
            **c)  Who is responsible for the provision of those services;**
            **d)  When the services will be provided; and**
            **e)  The date by which the permanency goal is likely to be achieved.**
         **2)  All services documented in the case record as necessary for the achievement of the permanency goal are provided within the time period in which they are needed, by either providing those services directly, contracting with a private provider for those services, or referring to an existing service provider for the provision of those services.**

**Status of Progress, Period 1 IP §II.3.a.1.-2.:**  The policies and practice guides related to permanency plans were not revised during Period 1, and as a result defendants are required to completed the revisions during Period 2.[198]

**Period 1 IP §II.3.c.**
**II.  Foster Care Services Assessment and Implementation Steps**
   **3.  Child and Youth Permanency**
      **c.  Permanency Plan Updating and Review**
         **Defendants shall establish and begin implementing a system to facilitate a court review for every foster child within 12 months of initial placement and annually thereafter. That system shall include (1) tracking scheduled annual court reviews, and notifying the Youth Court with jurisdiction over the child of any reviews that need to be scheduled or re-scheduled so as to meet Plan requirements; (2) providing to the Youth Court with jurisdiction as ordered by the Court or no later than 30 calendar days before such a court review is due a detailed up-to-date report on the current status of the child's placement, visitation, permanent plan progress, and service needs; and (3) ensuring that the child's assigned caseworker or supervisor attends any such scheduled court review.**

**Status of Progress, Period 1 IP §II.3.c.:**  The system to facilitate court reviews for every foster child within 12 months of initial placement and thereafter on an annual basis has not been

---

[198]  *Id.* §II.5.a.

established.  As explained below, defendants have made certain efforts to develop a component of the required system, but progress during Period 1 was limited.

Defendants report that their long-term plan for meeting this requirement is, in large part, contingent upon the daily transfer of accurate and complete MACWIS data to the Mississippi Youth Court Information Delivery System ("MYCIDS"), a management information system currently implemented in youth courts in 42 counties by the Mississippi Supreme Court through the Administrative Office of the Courts ("AOC") and the Mississippi Court Improvement Program.[199]  According to AOC staff, as of April 2009, statewide implementation of MYCIDS was projected to occur within approximately 18 to 24 months.  The expectation is that the required tracking of all court reviews and the timely filing of all required reports will be accomplished through an electronic interface between MACWIS and MYCIDS that will initially transfer specified DFCS case data on a daily basis, and ultimately result in the exchange of data between the two systems.  As explained below, there are several obstacles to implementation of the interface that the defendants have been working to resolve.

During the latter part of 2006, MDHS staff and AOC staff started to formulate plans for the initial transfer of data from MACWIS to MYCIDS.[200]  The interface was piloted in Adams County during January 2009.  There was one reported successful exchange of test data during January 2009.  Other than this instance, as of April 2009, defendants were unable to successfully transfer MACWIS data to MYCIDS.  According to both DFCS management and AOC staff, two

---

[199]  Ex. 10A, MYCIDS, Mississippi Youth Court Information Delivery System, Youth Court Case Management System – Overview, provides a more detailed description of the basic functions of MYCIDS.  Ex. 10B, MYCIDS, February 26, 2009, annotated map of Mississippi provided by AOC staff showing, *inter alia*, current and proposed MYCIDS sites.

[200]  Ex. 10C, June 28, 2007 letter of understanding from Jaworski Davenport to Mike Jones and MYCIDS programming staff, reflecting defendants' understanding of the initial plan for the data exchange.  AOC staff report that the letter also reflects the AOC's understanding of the agreement.  The Monitor has reviewed a more detailed description of the business processes related to the interface, dated June 28, 2009, that was prepared by the Mississippi Supreme Court staff and the AOC staff.

factors have impeded the data transfers:  1) MACWIS, which is a main-frame based system, and

MYCIDS, which is web-based, are not readily compatible; and 2) the data are not accurately or

completely entered into MACWIS by DFCS staff.[201]

　　　MDHS and DFCS management have afforded substantial time and resources to resolving

this problem.  Following the comment period on the draft version of this report, the Monitor was

informed by the defendants that there has been very recent progress toward resolving some data

transfer issues.  In addition, defendants report that staff members from AOC and MDHS have

finalized the terms of a memorandum of understanding ("MOU") to clarify system and interface

issues.  Defendants expect the MOU to be executed in the near term.  Defendants also report that,

at times, caseworkers have been required by some Youth Court personnel and/or judicial officers,

to enter data into MYCIDS on a manual basis and that this has inappropriately diverted DFCS

staff from their casework duties at DFCS.[202]  It is anticipated that the MOU will define the

appropriate roles and responsibilities of DFCS staff to clarify that their duties do not include the

manual entry of data into MYCIDS.

　　　The MACWIS assessment described above,[203] is expected to include an evaluation of the

MYCIDS/MACWIS interface and recommendations to facilitate implementation of the interface.

The fact that the RFP will not be issued until September 2009 and the assessment will take a

substantial period of time to complete, coupled with the fact that MYCIDS has not been

implemented statewide, underscores the fact that the interface does not represent a viable short-

term strategy for promoting permanency by facilitating timely court reviews and adjudications.

---

[201]  Defendants report that data had not been entered in some mandatory fields.

[202]  The Monitor has not had an opportunity to determine the prevalence of such practices, but there is at least some evidence which suggests that this has occurred in more than one isolated instance.

[203]  The assessment defendants are planning is described *supra* p. 54.

Until the interface can be implemented on a statewide basis, defendants indicate that a short-term alternative is being developed. DFCS managers report that courts routinely set two hearing dates per year to account for the annual permanency hearing and case review. There are no tickler mechanisms in MACWIS to alert caseworkers to past-due or pending hearing dates and MACWIS does not have the current capacity to generate the reports necessary to track hearing dates in individual cases. A request for MACWIS to issue such reports is being processed, but defendants do not anticipate the reports can be generated until February 2010. DFCS management reports that practices for tracking hearing dates and delivering case reports to the courts are not uniform throughout the State. They recognize that a standardized system to ensure that hearings are conducted on a timely basis is needed and is not currently being implemented. Defendants are required to develop an interim resolution to these issues during Period 2.[204]

> **Period 1 IP §II.3.d.**
> **II. Foster Care Services Assessment and Implementation Steps**
> **3. Child and Youth Permanency**
> **d. Reunification Services**
> **Defendants shall, in conjunction with COA, develop and begin implementing a written plan to meet the needs identified in the required Foster Care Services Reunification Needs Assessment, with specific steps and timetables for addressing gaps in the availability of effective services.**

**Status of Progress, Period 1 IP §II.3.d.:** As indicated above, the foster care reunification needs assessment was not completed during Period 1; thus, the written plan has not been developed.[205] Defendants are required to develop and begin implementing the plan during Period 2.[206]

---

[204] Period 2 IP §II.5.b.
[205] The formulation of the plan should benefit as a result of input from the new DFCS management team as noted *supra* p. 6.
[206] Period 2 IP §II.5.c.

**Period 1 IP §II.3.e.**
**II.  Foster Care Services Assessment and Implementation Steps**
   **3.  Child and Youth Permanency**
      **e.  Termination of Parental Rights/Special Permanency Reviews**
        **For each child who has been, or reaches, more than 15 of the previous 22 months in foster care, for whom DFCS has not filed a TPR petition or documented an available ASFA exception, DFCS shall begin holding special permanency reviews.  Such reviews shall include the DFCS caseworker, the caseworker's direct supervisor, and at least one individual with expertise in permanency planning who has not held direct casework or supervisory responsibility for the case.  The review will produce a written plan of action setting forth the steps to be taken by DFCS, the contract agency, and/or any other provider of services, in order to move the child to permanency as quickly as possible.  Such permanency reviews shall be documented in the child's case record, and reconvened monthly until all barriers to permanency have been resolved, a TPR petition has been filed, or an available ASFA exception has been documented in the child's case record.**

        **DFCS shall begin the implementation of a "tickler" system for notifying caseworkers and caseworker supervisors when a case assigned to them has reached the following milestones: 12 months after a child entered custody; 30 calendar days after the establishment of adoption as the primary permanency goal; 30 calendar days after a TPR referral has been made; and, 10 calendar days after a TPR packet has been returned to DFCS because of a legal deficiency.**

    <u>**Status of Progress, Period 1 IP §II.3.e.:**</u>  Neither the special permanency reviews nor the required tickler system were instituted during Period 1, and as a result these requirements are included in the Period 2 IP.[207]  The defendants' progress is described below.

    Adaptations to MACWIS that are needed to implement the tickler system and to identify each of the children and youth who are eligible for the special permanency reviews are being developed.[208]  As of April 23, 2009, the modifications to MACWIS had not been completed. These limitations, like other limitations in MACWIS, have a significant impact on defendants' ability to allocate resources and effectively manage their efforts to address the requirements in this subsection and other case practice and processing requirements in this case.

---

[207] *Id.* §II.5.d.
[208] MACWIS is designed currently to transmit a tickler to the caseworker ten months after a child has entered custody in preparation for the 12-month permanency hearing.

The Adoption and Safe Families Act ("ASFA"),[209] includes safeguards to ensure child welfare systems focus on permanent placements for children in foster care.  Among other mandates, ASFA requires that when a child has been in foster care for any 15 of the past 22 months, the state must file a petition to terminate parental rights unless one of the following exceptions applies: 1) the child is being cared for by a relative; 2) the state has documented a "compelling reason for determining that filing such a petition would not be in the best interests of the child;"[210] 3) or, if applicable, the state has not provided the timely services deemed necessary, as documented in the case plan, to safely return the child to the home.[211]

In order to effectively manage the process and allocate the resources necessary for conducting the special permanency reviews, defendants must identify all children who have been in custody for 15 of the most recent 22 months for whom a TPR petition has not been filed or for whom an ASFA exception has not been documented.  However, MACWIS does not have the current capacity to identify each of these children, and a viable alternative method for identifying and tracking is not in place.  MACWIS undercounts the children in DFCS custody for 15 of the most recent 22 months because it only identifies children who have been in custody for a consecutive 15-month period immediately prior to the date of each MACWIS report.  In addition, although it sorts this group into three categories (*i.e.*, those who have been legally freed for adoption; those for whom a request to file a TPR petition has been made; and those for whom a request to file a TPR petition has not been made), it does not distinguish whether any of the children for whom a TPR petition has not been filed has a documented ASFA exception in their case records.

---

[209]  42 U.S.C. 670.
[210]  Compelling reasons include a determination that is supported by the evidence that adoption is not an appropriate goal for the child.  45 CFR §1356.21(i)(2)(ii)(A).
[211]  42 U.S.C. §675(5)(E).

These limitations have significant implications for case processing, case management and resource allocation. By its express terms, this subsection of the Period 1 IP requires that three staff members – the caseworker, the caseworker's direct supervisor and at least one additional individual with expertise in permanency planning – participate in each special permanency review on a monthly basis in each case implicated by this requirement until all barriers to permanency are resolved, a TPR petition is filed, or an available ASFA exception is documented in the individual case record. Absent the ability to track and accurately account for each child who is required to have a permanency review, through MACWIS or otherwise, defendants cannot allocate the staff and other resources needed to conduct the reviews, or for that matter, avert the need to conduct at least some reviews by ensuring that the required TPR requests are initiated on a timely basis.

A review of recent reports generated by MACWIS for four counties with the highest caseloads indicates that as of March 14, 2009, there was a combined total of 480 children in custody for the previous 15 consecutive months in the four counties.[212] As described above, MACWIS cannot identify which, if any, of these children have a documented ASFA exception in their case records, nor can it identify the other children, if any, in these counties who were in custody for any non-immediate and non-consecutive 15-month period within the past 22 months. In order to effectively plan and appropriately allocate the resources needed to undertake the required reviews in these counties – much less the resources needed to implement the plans generated by the reviews – DFCS managers must know the number of cases that are subject to

---

[212]  Ex. 11A, chart prepared by the Office of the Court Monitor, Median Case Processing Times for Certain Children in Custody for 15 Consecutive Months Ending on March 14, 2009 in Four Counties with the Highest Caseloads, based on MACWIS report MWZ0141B, reflecting that there were a total of 480 children and youth in the four counties who had been in custody for 15 consecutive months immediately preceding the report date and this sum was distributed as follows:  Forrest County, 74; Harrison County, 122; Hinds County, 131; and Jackson County, 153.

the reviews. If most of the 480 case records have documented ASFA exceptions, the staffing and other resources needed to conduct the special permanency reviews will be very different than the staffing and other resources needed if none of them do. Moreover, the available MACWIS data show substantial variance in case processing times both within and between the four counties.[213] A determination of the factors that contribute to these variances is crucial to developing effective strategies for accelerating case processing on a systemic basis.

The evidence indicates that programming MACWIS to capture and report accurately on the data fields relevant to this subsection will not in itself yield the accurate and complete data that can be relied upon to ensure the required permanency reviews are conducted. Defendants regularly discover cases of children in care that should have been opened, but were not opened in MACWIS, as well as cases of children in care that should have been closed, but were not closed, in MACWIS.[214] The delays in opening and closing cases on a timely basis often appear to be protracted and are attributed by defendants to user errors, supervision failures and limitations or malfunctions in MACWIS. To their credit, defendants recognize and are working to address these issues which affect the accuracy of data derived from MACWIS statewide.

---

[213]  *Id.;* Ex. 11B, chart prepared by the Office of the Court Monitor, Certain Case Processing Times for Children in Custody for 15 Consecutive Months Ending on March 14, 2009, by Child, Forrest County, based on MACWIS report MWZ0141B; Ex. 11C, chart prepared by the Office of the Court Monitor, Certain Case Processing Times for Children in Custody for 15 Consecutive Months Ending on March 14, 2009, by Child, Harrison County, based on MACWIS report MWZ0141B; Ex. 11D, chart prepared by the Office of the Court Monitor, Certain Case Processing Times for Children in Custody for 15 Consecutive Months Ending on March 14, 2009, by Child, Hinds County, based on MACWIS report MWZ0141B; Ex. 11E, chart prepared by the Office of the Court Monitor, Certain Case Processing Times for Children in Custody for 15 Consecutive Months Ending on March 14, 2009, by Child, Jackson County, based on MACWIS report MWZ0141B.

[214]  *See, e.g.,* Ex. 11F, excerpt from April 24, 2009 report, DFCS Performance Improvement Unit/Foster Care Review, MWZ078RB, April 4, 2009, Region 2-W, case record shows child emancipated on November 6, 2008, but supervisor states that as of February 12, 2009, MACWIS would not permit the case to be closed; Ex. 11G, excerpt from April 24, 2009 report, DFCS Performance Improvement Unit/Foster Care Review, MWZ078RB, April 4, 2009, Region 3-S, five cases listed as open in MACWIS that should have been closed but were not, one additional case that supervisor claimed staff tried but were unable to close, and case in which the child came into custody on August 1, 2008 but the case was not entered into MACWIS until March 16, 2009; Ex. 11H, excerpt from April 24, 2009 report, DFCS Performance Improvement Unit/Foster Care Review, MWZ078RB, April 4, 2009, Region 7-East, five cases listed in MACWIS as open that should have been closed but were not.

Settlement Agreement §II.B.3.f.
II. STANDARDS
   B. Foster Care Service Standards
      3. Child and Youth Permanency
         f. Adoption

The Settlement Agreement's Period 1 requirements related to adoption addressed licensure requirements designed to minimize placement disruptions and facilitate timely adoptions; the process for notifying prospective adoptive families of the availability of adoption subsidies; post-adoptive services; staffing requirements; and protocols for adoption meetings.

> **By the end of implementation Period 1:**
> **3) DFCS shall provide and maintain an approval process by which foster parents and adoptive parents may be approved simultaneously, so that whenever possible and appropriate, placement moves can be minimized and foster parents can be eligible to adopt the children for whom they have been providing foster care. A foster parent who has been providing foster care for a child for 12 months shall be given preference as an adoptive parent for that child should he/she become legally available for adoption, unless DFCS documents why the placement is unsuitable for adoption.**

**Status of Progress, Settlement Agreement §II.B.3.f.3.:** The current approval process is in large part consistent with the general spirit of this Period 1 requirement, but the related policy and practice guides will require certain modifications that are described more fully below.

On October 29, 2007, defendants finalized a resource family licensure policy that is currently in effect.[215] The policy, which is supplemented by a Resource Family Licensure Guide,[216] appears to provide for the same screening, interview, home study, training and background check processes for foster and adoptive families, thereby enabling foster parents to readily become adoptive parents. However, contrary to the requirements of this subsection, the policy could be interpreted to give a preference to the foster parent as an adoptive parent when

---

[215] Ex.12A, MDHS, DFCS, Bulletin 6115, Final Rule Resource Family/Licensure Policy, October 29, 2007 [hereinafter Resource Family Licensure Policy].
[216] MDHS, DFCS, Resource Family Licensure Practice Guide, September 2007. The 70-page practice guide is not included in the Appendix, but copies will be provided to the Court and the parties, upon request.

the child has been in the resource home for six months or more.[217]  As required by both  the

Period 1 and Period 2 IPs,[218] the policy and the practice guide must be reviewed, and revised, as

appropriate, to conform to the requirements in this case.[219]

> **4)  DFCS shall implement and maintain a process for advising all potential
> adoptive families, including any foster family caring for a child who has
> become legally available for adoption, of the availability of adoption
> subsidies.  This notification shall be documented in the child's record, and
> the family's access to such subsidies shall be facilitated.**

**Status of Progress, Settlement Agreement §II.B.3.f.4.:**  As explained below, this

requirement was not satisfied during Period 1.  Defendants are now required to meet the

requirements of this subsection during Period 2.[220]

According to current DFCS policy governing the licensure of resource families, adoption

subsidies will be considered if  the following eligibility criteria are satisfied:[221]  1) a written court

order states it was in the child's best interest to be removed from her/his family and the child

cannot or should not be returned home; 2) the child is determined by DFCS to have one or more

special needs;[222] 3) the child has significant emotional ties with the resource family, if the child is

---

[217]  Ex. 12A, Resource Family Licensure Policy *supra* note 215, §XVII. at 4532.

[218]  Period I IP §II.; Period 2 IP §II.1.

[219]  The policy and related practice guide will require substantive review and revision.  *Compare, e.g.,* Settlement Agreement, §II.B.5.b. (requiring that "[n]o foster home shall provide care for more than three foster children or for a total of more than five children [including foster, biological and adoptive children] at any given time.") *with* Ex. 12A, Resource Family Licensure Policy, *supra* note 215, §VII.J. at 4511. (DFCS policy, in relevant part, states: "[t]he Resource Parent/s shall provide foster care for no more than six (6) foster children in their home at any given time. . . . The parent/s shall care for no more than eight (8) children 18 years of age and under, including the Resource Parents own biological or adopted children.").

[220]  Period 2 IP §II.5.e.6.

[221]  Ex. 12A, Resource Family Licensure Policy, *supra* note 215, §XX at 4536, in relevant part states:  "[a]doption Subsidy is designed as a supplemental financial benefit to assist families adopting an eligible child with special needs who would be unlikely to be adopted otherwise.  The purpose of the Adoption Subsidy is to reduce financial barriers that may impede the special needs of the child toward an opportunity to be adopted.  [*sic*] The child must be determined eligible for Adoption Subsidy by the Resource Specialist and approved by the Resource Family ASWS. If the Adoptive Family is willing to adopt a special needs child without financial supplement, children can be adopted without subsidy."

[222]  *Id.*  The policy describes six categories of special needs: 1) physical disability; 2) mental (I.Q. of 70 or less), emotional and/or developmental (25 percent delay) disability; 3) child is six years old or older; 4) two or more siblings are placed together, even if at different times; 5) medical conditions; 6) factors in the child's or the child's

(continued…)

being adopted by the resource family; 4) reasonable but unsuccessful efforts were made to place the child without the adoption subsidy.[223]  Although the relevant DFCS policy and practice guides address the availability of adoption subsidies, the processes for notifying potential adoptive families of the availability of such subsidies, and how they can be obtained, are not clearly set out in the policy, the practice guide, or on the DFCS website.[224]

Adoptive parents are notified of the availability of the subsidies during the training that DFCS sponsors for resource families.[225]  However, the subsidy eligibility criteria described in the training curriculum is not fully consistent with the related DFCS policy and practice guides.[226] Finally, neither the policy nor the practice guides address documentation of the notification in the child's case record.  MACWIS does not have the capacity to track and report on the notice requirement, and efforts to expand the system's capacity to do so were not undertaken during Period 1.[227]

> **5)  DFCS shall establish and maintain a system of post-adoptive services to stabilize and maintain adoptive placements.  All adoptive families eligible for adoption subsidies shall have access to these services, which shall include respite services; counseling, mental health treatment, and crisis intervention; family preservation and stabilization services; and peer support.**

biological family's background or medical history, place the child at risk of acquiring a medical condition, a physical, mental or developmental disability or an emotional disorder.  The licensure policy recognizes that such factors may include, an unknown parent, abandoned children and safe babies.  However, the eligibility criteria set forth in the licensure policy are generally but not fully consistent with the eligibility criteria listed in the DFCS policy manual section that addresses this matter.  *Compare* Ex. 12B, MDHS, DFCS Policy Manual, Volume IV, excerpt, Adoption Services, Adoption Assistance, Section F [hereinafter DFCS Policy Manual] at 4603-4604 *with* Ex. 12A, Resource Family Licensure Policy, *supra* note 215, §XX at 4536.

[223]  Ex. 12A, Resource Family Licensure Policy, *supra* note 215, §XX at 4538.

[224]  *See, e.g.*, Ex. 12C, excerpts from MDHS, DFCS, September 2007 Resource Family Licensure Practice Guide; Ex. 12D, DFCS Website, Opt to adopt…, http://www.mdhs.state.ms.us/fcs_adoptall.html (last visited April 11, 2009).

[225]  The training is referred to as the "PATH" (Parents as Tender Healers) Training.

[226]  *Compare* Ex. 12E, excerpts from MDHS, DFCS, Mississippi PATH (Parents as Tender Healers), Participant's Handbook, A Curriculum for Foster, Adoptive and Kinship Care Parents (Resource Families), *with* Ex. 12A, Resource Family Licensure Policy, *supra* note 215, §XX at 4536-4538 and Ex. 12B, DFCS Policy Manual, *supra* note 222, §F at 4603-4604.

[227]  *See generally supra* pp. 53-55 for the efforts undertaken to address the MACWIS capacity issues.

**Status of Progress, Settlement Agreement §II.B.3.f.5.:**  As explained below, the

Monitor has not had an opportunity to complete the assessment related to this requirement.

Defendants have provided certain post-adoptive services intended to stabilize and

maintain adoptive and foster placements for children with special needs through a contract with a

private agency during Period 1.[228]  Services have been coordinated by the agency's seven

permanency specialists who work in consultation with DFCS staff to facilitate, and in certain

instances deliver, the following types of services statewide: crisis management; respite; an on-

call telephone service; resource coordination, including inter-agency collaboration and

information and referral services; parent and family training; and, supportive services, including

family support groups, a quarterly newsletter, an informational website and a lending library.  In

additions, the private agency has provided case management and referral services.  Referrals for

more intensive home-based therapeutic services have been made by DFCS to two providers with

whom DFCS maintains contracts to serve a combined total of 235 family cases per year.[229]

The Monitor has not had an opportunity to assess whether the contractual capacity to

deliver post-adoptive services provides meaningful access to all required services for all eligible

families.  In addition, the Monitor has not had an opportunity to determine whether eligible

families receive adequate notice of the availability of post-adoptive services.[230]  The Monitor

expects to assess both matters and report to the Court and the parties, as appropriate.

---

[228]  Ex. 12F, proposed scope of work incorporated into contract for post-adoptive services, Southern Christian
Services for Children and Youth, Inc. [hereinafter SCS], Harden House Adoption/Foster Care Program, Partners in
Permanency, Goals, Objectives, Indicators, Outcomes.

[229]  Ex. 12G, scope of services excerpted from contract for family preservation services, Youth Villages, Inc.,
January 1, 2009-September 30, 2009 (family preservation services for up to 75 family cases statewide); Ex. 12H,
scope of services excerpted from contract for family preservation services, Mississippi Children's Home Society,
October 1, 2008-September 30, 2009 (family preservation services for up to 160 family cases statewide).

[230]  DFCS staff and contractors have indicated that adoptive families receive notification regarding the availability of
services in bulletins that are mailed with the adoption subsidy checks.  The Monitor has not yet confirmed this
practice or determined whether such notification is adequate.

**Period 1 IP §II.3.f.**
**II.  Foster Care Services Assessment and Implementation Steps**
   **3.  Child and Youth Permanency**
      **f.  Adoption**
         **Within 180 calendar days of Court approval of the Plan, DFCS, in conjunction with COA, shall define the job description, responsibilities, and qualifications for the position of adoption specialist.  The adoption specialist responsibilities shall include consulting with private and public professionals and identifying and ensuring the provision of targeted services necessary for the child to be adopted.**

         **DFCS shall implement and maintain a process for making legal risk placements that assures that children for whom the permanency plan is adoption, but who are not yet legally free for adoption, are placed in appropriate adoptive homes.**

         **DFCS shall take reasonable steps to hire (or promote) and train a sufficient number of adoption specialists to meet the adoption requirements of Section II.B.3.f of the Plan.  Adoption status meetings consistent with the Plan will start being held by the end of Period 1.**

         **Within 180 calendar days of Court approval of the Plan, DFCS, in conjunction with COA, shall develop a protocol for adoption meetings, which are to be held to review the progress being made in achieving the goal of adoption for legally free children.**

         **Within a year of Court approval of the Plan, DFCS shall have identified external adoption consultants who DFCS can contract with to provide adoption recruitment assistance to children who have been free for adoption for six or more months and who are not yet placed in an approved adoptive home.**

**Status of Progress, Period I IP §II.3.f.:**  These requirements were not satisfied during Period 1 and as a result the defendants are now required to satisfy these requirements during Period 2.[231]  The defendants' progress is summarized below.

A job description for adoption specialists was not developed during Period 1.  Instead, defendants report that a job description for resource specialists was developed.  The job description was set out in a draft document that did not include the qualifications for the position.[232]  According to the draft, the resource specialist is responsible for, among other duties,

---

[231]  Period 2 IP §§II.5.e.1.-5.
[232]  Ex. 13A, MS State Personnel Board, Performance Appraisal Review Report, Resource Specialist, revised draft, June 2008.

recruiting resource families (i.e., foster and adoptive families), planning and conducting training

for all resource families, performing resource home licensure activities, providing retention

services to resource homes, as well as providing adoption and adoption preparation services.

Defendants have explained that the resource specialist position was intended by the former

MDHS management to satisfy the requirements for the adoption specialist position.  However,

given the recognized need for the required positions, and the fact that the Period 1 requirements

prescribed a specialized and intensive function that could not be satisfied by the dual role

defendants established for the resource specialists, defendants are required to establish the

adoption specialist positions during Period 2.[233]

In addition to the job description for resource specialists, a protocol for adoption status

meetings was finalized and transmitted to DFCS managers and staff on August 18, 2008.[234]  The

protocol refers to the duties of the resource specialist, but it is inconsistent with the Settlement

Agreement's requirements regarding adoption meetings.  Defendants are required to revise the

protocol during Period 2.[235]  Because external adoption consultants with whom DFCS could

contract were not identified during Period 1,[236] and because the parties recognize that the process

governing legal risk placements would benefit from clarification, both requirements must be

satisfied during Period 2.[237]

---

[233] Period 2 IP §II.5.e.1.

[234] Ex. 13B, MDHS, DFCS, Bulletin 6176, Protocol for Adoption Status Meetings, August 18, 2008.

[235] Period 2 IP §II.5.e.2.

[236] Defendants do not currently contract for adoption consultants.  DFCS receives limited external consultation at no cost through a private agency which handles a maximum caseload of 12 to 15 children in DFCS custody.  The private agency, SCS, has been operating this program since 2006 through a grant from the Dave Thomas Foundation. A description of the program is included in Ex. 13C, SCS, Wendy's Wonderful Kids, A Signature Program of the Dave Thomas Foundation for Adoption.  The program, which finalized seven adoptions during 2008, limits its caseload to referrals received directly from MDHS pursuant to a November 15, 2007 letter agreement.  Ex. 13D, November 15, 2007 correspondence to Ms. Rita Sorenon from Donald R. Taylor and Susannah K. Cherney.

[237] Period 2 IP §II.5.e.3., 5.

Settlement Agreement §II.B.4.
II. STANDARDS
    B. Foster Care Service Standards
        4. Child Safety

The Period 1 IP included a series of requirements that were intended to promote child safety during the initial stages of the remedial process before many of the systemic reforms required by the Settlement Agreement would be instituted. As explained below, progress toward meeting these Period 1 requirements was slower than anticipated. However, since the latter part of 2008, there have been certain advancements. Because these requirements were not completed during Period 1, they are incorporated into the Period 2 IP.[238]

In order to determine baseline measurements for performance related to some of the requirements in this subsection, the Monitor will be conducting a systematic case record review of a representative statewide sample of child protection investigation and licensure records.[239] As noted above,[240] the Monitor has developed an initial draft of the case record review instrument which will be provided to the parties for comment in the near term. After the instrument is finalized, it will be field tested, and revised, if indicated. Thereafter, the Monitor will develop a training curriculum for the reviewers. The Monitor plans to establish a review team of independent reviewers who will partner with DFCS case reviewers. This collaboration is intentional and designed to promote the agency's capacity to self-monitor. The findings from the case record review process will be presented to the parties and filed with the Court. The Monitor anticipates the review will be conducted during the current calendar year and followed by a much broader review of the case records of individual class members.[241]

---

[238] *Id.* §II.6.
[239] Based on preliminary data, it appears that over 200 sets of case records will need to be reviewed.
[240] The case record review process is addressed *supra* pp. 11-12.
[241] *See supra* pp. 11-12.

The progress defendants have made toward meeting the Period 1 child safety requirements that can be assessed independently of the case record review process is described below.

> **By the end of implementation Period 1:**
> d.  DFCS shall assure that standardized decision-making criteria are used for prioritizing, screening, and assessing all reports of maltreatment, including corporal punishment, of children in DFCS custody.

**Status of Progress, Settlement Agreement §II.B.4.d.:**  This requirement was not satisfied during Period 1 and as a result it must be completed during Period 2.[242]  Defendants made progress toward building the capacity necessary to meet this requirement by introducing the first phase of a centralized intake system during Period 1.  The full implementation of the required centralized intake system,[243] which is now required to occur during Period 2, is likely to have a significant impact upon the intake screening and assessment process.[244]  Defendants are required to modify the screening and assessment process by revising relevant policy and practice guides to incorporate centralized intake protocols and to otherwise conform the process for screening and assessment of reports of maltreatment to the other requirements of the Settlement Agreement during Period 2.[245]

> e.  All investigations into reports of maltreatment, including corporal punishment, of children in DFCS custody must be initiated within 24 hours and completed within 20 calendar days, including supervisory approval. DFCS shall assure that such investigations and decisions are based on a full and systematic evaluation of the factors that may place a child in DFCS custody at risk.

---

[242] Period 2 IP §II.6.b.

[243] *See* Period 1 IP §II.4. for the Period 1 requirement governing centralized intake and the related discussion *infra* pp. 81-82.

[244] This is a pivotal requirement that must be completed during Period 2.

[245] *See* Ex. 14, MDHS, DFCS, Bulletin No. 6103, Revised Final Rule – Intake, Screening and Assessment, April 12, 2007, establishing current DFCS policy.  The related practice guidelines, Intake and Investigation Child Abuse and Neglect, October 2006, provide guidance to staff.

**Status of Progress, Settlement Agreement §II.B.4.e.:**  The Monitor's assessment of defendants' performance is not complete.  DFCS policy was not consistent with this Period 1 requirement, and instead required the caseworker to complete an investigation within 25 days of the date of assignment, and the supervisor to make an approval decision within five days thereafter.[246]  The Period 2 IP requires maltreatment investigations to be to completed within 30 calendar days.[247]  The Monitor will assess the timeliness of maltreatment investigations involving children in custody during the case record review process described above.  In addition, the Monitor expects to review and evaluate corresponding MACWIS data.  These matters will be addressed in the Monitor's report regarding the findings of the case record reviews.

> **f.  Any foster child who remains in the same out-of-home placement following an investigation into a report that he or she was maltreated, or subject to corporal punishment, in that placement shall be visited by a DFCS caseworker twice a month for three months after the conclusion of the investigation to assure the child's continued safety and well-being.**

**Status of Progress, Settlement Agreement §II.B.4.f.:**  This requirement is included in the Period 2 IP.[248]  Defendants' performance will be evaluated through the case record review process and the results, including an evaluation of the accuracy of the corresponding MACWIS data, will be addressed in the Monitor's report on the findings of the case record reviews.

> **g.  When a maltreatment investigation involves a foster home, DFCS shall file a copy of the approved final investigative report, and any recommendations and/or corrective actions DFCS has deemed necessary, in the case record of the foster child, in the file of the foster or adoptive parents with a copy of the letter of notification to the foster or adoptive parents, and in the DFCS State Office.  DFCS shall also provide those records to the Youth Court Judge with jurisdiction over the child and to the Monitor.**

**Status of Progress, Settlement Agreement §II.B.4.g.:**  Defendants' performance will be evaluated through the case record review process, and addressed in the Monitor's report on the

---

[246] *Id.* at 2022, 2024.
[247] Period 2 IP §II.6.g.
[248] *Id.* §II.6.h.

findings derived from the case record reviews.  Additionally, the Monitor has not routinely
received the final approved investigative reports.  Defendants have indicated that they are
working to improve the distribution process to ensure such reports are transmitted to the Monitor
in a timely fashion.   However, despite several assurances that the reports would be forthcoming,
they have not been transmitted to the Monitor on a regular basis.  This requirement is addressed
in the Period 2 IP.[249]  Moreover, defendants have not established a centralized system for
connecting maltreatment investigations with the corresponding final investigative reports.  The
Monitor has encouraged the defendants to adopt such a system.

> **h.  When a maltreatment investigation involves an agency group home,
> emergency shelter, private child placing agency foster home, or other facility
> licensed by DFCS, a copy of the final investigative report shall be filed in the
> child's case record, in the facility licensing file, and in the DFCS State Office.
> DFCS shall provide the report to the Youth Court Judge with jurisdiction
> over the child and to the Monitor.**

**Status of Progress, Settlement Agreement §II.B.4.h.:**  Defendants' performance will be
evaluated through the case record review process, and the results will be addressed in the
Monitor's report on the findings derived from the case record reviews.  Like the investigative
reports involving allegations of maltreatment in foster homes, the Monitor has not routinely
received the final approved investigative reports involving maltreatment investigations in
congregate and other settings.  As noted above, defendants have indicated that they are working
to improve the distribution process to ensure such reports are transmitted to the Monitor in a
timely fashion.  The Period 2 IP requires defendants to do so.[250]

> **i.  DFCS shall undertake a special safety review, including an unannounced site
> visit, of all currently licensed foster homes with two or more reports of
> maltreatment, including corporal punishment, within the last three years to
> determine whether any children placed in those homes are at risk of harm**

---

[249] *Id.* §II.6.i.
[250] *Id.* §II.6.j.

**and any licensing standards related to child safety are not being met. Any necessary corrective actions will be identified and tracked.**

**Status of Progress, Settlement Agreement §II.B.4.i.:** As explained below, the special safety reviews were initiated during Period 1, but they were not completed. Defendants are required to complete the reviews during Period 2.[251]

In order to move forward on this initiative, during the latter part of 2008, the defendants recruited two new staff members for the CQI unit who began working at DFCS on January 6, 2009. Shortly thereafter, a draft of a safety review instrument was developed in consultation with two consultants from the Training Academy at USM's School of Social Work.[252] The safety reviews were piloted on March 12, 2009. At that time, a preliminary list drawn from MACWIS identified 14 foster homes meeting the criterion for review. As of April 14, 2009, 11 reviews were completed. Because the initial list of homes targeted for review did not constitute an exhaustive list of all foster homes implicated by this requirement, a more comprehensive list of the homes subject to this requirement was developed. As of May 14, 2009, the reviews were ongoing and defendants were making continued efforts to identify each of the homes subject to this requirement.

> **j. DFCS shall undertake a special safety review, including an unannounced site visit, of all group homes and other residential facilities that house children in custody with three or more reports of maltreatment, including corporal punishment, within the last two years to determine whether any children placed in those facilities are at risk of harm and any licensing standards related to child safety are not being met. Any necessary corrective actions will be identified and tracked.**

**Status of Progress, Settlement Agreement §II.B.4.j.:** Defendants did not initiate the special safety reviews of group homes and other residential facilities until April 28, 2009, shortly before the end of Period 1. As a result, defendants are required to complete the required reviews

---

[251] *Id.* §II.6.e.
[252] Plaintiffs' counsel and the Monitor commented on the draft during February 2009.

during Period 2.[253]  The safety review instrument was developed as part of the process that was used to develop the instrument for the foster home safety reviews.  As of April 14, 2009, a list of congregate settings subject to the review had not been generated; however, an initial list was produced shortly thereafter.  Defendants are making ongoing efforts to identify the congregate facilities that are subject to this requirement.

> **Period 1 IP §II.4.**
> **II.  Foster Care Services Assessment and Implementation Steps**
> **4.  Child Safety**
> **Within 30 calendar days of Court approval of the Plan, Defendants shall instruct all DFCS staff that as mandated reporters they are required to formally report any suspicions of maltreatment, including corporal punishment, of children in custody.**
>
> **Defendants, in conjunction with COA, shall revise DFCS policies and procedures for screening and investigating reports of child maltreatment, including corporal punishment, to incorporate the child safety standards and requirements set forth in Section II.B.4 of the Plan.**
>
> **Within 180 calendar days of Court approval of the Plan, all calls to the hotline shall immediately be entered into the statewide computer information system, and the worker or supervisor receiving the report shall use the information system to determine whether there have been prior reports of abuse and/or neglect in that family or concerning that child.**
>
> **If a report is screened in, information regarding any prior reports shall immediately be made available to the worker to whom the case has been assigned for investigation.**

**Status of Progress, Period 1 IP §II.4.:**  As explained below, except for the processing of screened-in reports which will be evaluated during the case record review process, the evidence shows the defendants made progress in certain areas but did not meet these requirements during Period 1.  As a result, they must be completed during Period 2.[254]

Defendants issued a policy bulletin on January 24, 2008 to instruct all DFCS staff that as mandated reporters they were required to formally report any suspicions of maltreatment,

---

[253] *Id.* §II.6.f.
[254] *Id.* §II.6.a., c., d.

including corporal punishment, of children in custody.  The bulletin did not meet the requirements of this subsection because it was limited to maltreatment reports in resource homes and not in other types of settings.[255]  DFCS has not revised its policies and procedures for screening and investigating reports of maltreatment in conjunction with COA to incorporate the child safety standards set forth in Section II.B.4.  However, it is anticipated the relevant policies and procedures will be revised as part of the ongoing policy and practice guide review process that was initiated in Period 1 and now required to be completed in Period 2.[256]

Defendants are in the process of phasing in a 24-hour statewide hotline for reporting child abuse and/or neglect.[257]  The Period 2 IP requires implementation of the hotline by September 1, 2009.[258]  A centralized hotline that receives and records *all* abuse and/or neglect reports statewide will help to ensure that all maltreatment reports are entered into MACWIS on a timely basis, screened by trained and experienced staff in an appropriate manner through the consistent application of a structured process, and according to best practice standards.

Currently, the initial intake for reports of child abuse and/or neglect is performed during business hours by staff in each of the DFCS county offices.  Until recently, evening and weekend coverage was rotated on a monthly basis among the seven former DFCS regions.  All regions shared one cellular telephone that was used to receive all after-hours and weekend reports of abuse and neglect.  In December 2008, a private vendor assumed responsibility for staffing a centralized after-hours and weekend hotline.  Defendants view this contract as a necessary step toward implementing the 24-hour centralized hotline.

---

[255]  Ex. 15, MDHS, DFCS, Bulletin 6154, Mandatory Reporting Requirement, January 24, 2008.
[256]  This process is described *supra* pp. 57-58.
[257]  Settlement Agreement §II.B.4.a.
[258]  Period 2 IP §II.6.d.

In March 2009, defendants provided plaintiffs' counsel and the Monitor with a draft RFP for a 24-hour centralized hotline that is intended to meet the Settlement Agreement's requirements. The Monitor and plaintiffs' counsel provided comments on the draft. The RFP was subsequently issued, and defendants report that the contract is expected to be awarded by July 2009. Assuming this schedule is maintained, the hotline will be operational within the timeline established by the Period 2 IP.

During the case record review process, the Monitor will evaluate the requirement in this subsection pertaining to the immediate dissemination of information regarding prior maltreatment reports to the caseworker who is assigned to conduct the investigation. Thereafter, the Monitor will report on her findings, as appropriate.

> **Settlement Agreement §II.B.5.**
> **II. STANDARDS**
> **B. Foster Care Service Standards**
> **5. Child Placement**
> <u>**By the end of implementation Period 1:**</u>
> **i.  All foster care settings, including relative placements, shall be screened prior to the initial placement of foster children to ensure that children receive safe, sufficient, and appropriate care. Additional screens shall be completed at least once annually thereafter and within two weeks of a reported change in the residents of a foster home. Screens shall include criminal and child welfare background checks of all household members who are at least 14 years old. No foster child shall be placed in a home prior to DFCS receipt of the background check results.**

<u>**Status of Progress, Settlement Agreement §II.B.5.i.:**</u> Defendants revised the DFCS policy related to this subsection during August 2008[259] in an effort to address this requirement,[260]

---

[259] Ex. 16A, MDHS, DFCS, Bulletin 6199, Expedited Resource Home Licensure, August 18, 2008 (prohibiting the placement of foster children in any "home" prior to receipt of background check results); Ex. 16B, MDHS, DFCS, Bulletin 6177, Criminal History and Background Checks, August 14, 2008 (addressing requirements related to initial and subsequent criminal and child welfare background checks for "applicants or household members").

[260] The revised policy may be narrower than intended by this requirement which distinguishes between all foster care settings and resource homes. Ex. 16A distinguishes between foster care settings and resource homes, and by its terms prohibits placement in a "home" – as opposed to all other foster care settings – prior to receipt of the background check results. Ex. 16B appears to be limited to criminal history and background checks in resource homes as opposed to in all foster care settings. The policy distinguishes between "applicants" and "household

(continued…)

83

which has been incorporated into the Period 2 IP.[261]  The Monitor will assess screening and

placement policies and practices related to this subsection during the case record review process

and report on her findings as appropriate.

> **j. DFCS shall develop and implement an expedited process for licensing
> screened relative caregivers to enable a child to be placed quickly with
> relatives upon entering placement.  All relative placements approved for
> expedited placement shall undergo the full licensing procedure within 120
> calendar days of the child's placement in the home.**

**Status of Progress, Settlement Agreement §II.B.5.j.:**  Defendants revised the DFCS

licensure policy during August 2008, in an effort to address this requirement,[262] which has been

incorporated into the Period 2 IP.[263]  The Monitor will assess policies and practices related to this

subsection during the case record review process and report on her findings as appropriate.

> **k. No foster child shall remain in an emergency or temporary facility for more
> than 45 calendar days, unless, in exceptional circumstances, the Division
> Director has granted express written approval for the extension that
> documents the need for the extension.**

**Status of Progress, Settlement Agreement §II.B.5.k.:**  Defendants' current policy is

inconsistent with this requirement.[264]  The Period 2 IP includes the requirements in this

---

members" and could be read to require the application of different standards, at least insofar as the criminal history requirements, for applicants and household members.  The revised policy also modified the October 29, 2007 resource family licensure policy, Ex. 12A, Resource Family Licensure Policy, *supra* note 215, at 4510, by limiting the potential for exclusion as a child care provider or Resource Family to those with felonies, rather than misdemeanors, and providing that all other convictions will be considered on a case-by-case basis.  In addition, the August 14, 2008 policy limits the requirement for a background check to those over 14 years of age.  Further, the new policy provides for annual background screening for all household members and a background screening within two weeks for anyone over 14 years of age who moves into the household.

[261]  Period 2 IP §II.7.a.

[262]  Ex. 16A.  This policy requires a completed criminal and child welfare background check prior to a relative placement.  The policy is not clearly written.  It appears to require a home visit and assessment based on use of the safety checklist and a face-to-face contact.  It is unclear whether the child can be placed in the home after the safety checklist and background checks are completed, but before a required face-to-face contact.  In addition, the policy does not specify with whom the face-to-face contact should be made:  the child or the relative or both.

[263]  Period 2 IP §II.7.c.

[264]  Ex. 16C, MDHS, DFCS, Bulletin No. 5921, Emergency Shelter Extensions, December 8, 2004 (including, among other inconsistencies, a 90-day threshold for prior written approval by the Division Director).

subsection.[265]   The Monitor will assess policies and practices concerning the length of stay in

emergency or temporary placements during the case record review process and report on her

findings as appropriate.

> **Period 1 IP §II.5.**
> **II.  Foster Care Services Assessment and Implementation Steps**
> **5.  Child Placement**
> **Within 90 calendar days of Court approval of the Plan, DFCS shall implement a formalized mechanism to provide foster parents with all appropriate and available information about a child prior to or at the time of placement and for supplementing that information as further information is gathered.**
>
> **Defendants shall develop and begin implementing a plan with specific action steps and timeframes to address policy and structural changes to the placement process that the placement assessment has identified as necessary to comply with the placement requirements set forth in Section II.B.5 of the Plan.  That plan shall also include the development of the position of placement specialists in each region, and a protocol for the placement stability meetings that the Plan requires that DFCS hold when a worker has knowledge that a placement is at risk of disruption.**
>
> **Defendants, in conjunction with COA, shall develop and begin the implementation of a written plan to ensure the speedy licensing of all current unlicensed caregivers to be phased in by the end of the second implementation period.**
>
> **Within 180 days of Court approval of the Plan, no foster child entering custody will be placed in an unlicensed relative placement, subject to the allowance of the emergency licensing process that allows 120 days for the licensing process to take place.**

     **Status of Progress, Period 1 IP §II.5.:**  These requirements were not satisfied during

Period 1.  The defendants have not developed a formalized mechanism to provide foster parents

with all appropriate and available information prior to or at the time of placement and for

supplementing that information as further information is gathered.   The required plans to address

policy and structural changes to the placement process, and to ensure the speedy licensing of

unlicensed caregivers, have not been developed.  Moreover, defendants report substantial

---

[265]  Period 2 IP §II.7.f.

difficulty achieving timely licensure of unlicensed relative placements.  Defendants are now

required to meet these requirements during Period 2.[266]

> **Period 1 IP §II.6.**
> **II.  Foster Care Services Assessment and Implementation Steps**
>> **6.  Developing and Maintaining Connections**
>> Defendants will develop and begin implementing a written plan to
>> address the barriers identified in the visitation practice assessment.

**Status of Progress, Period 1 IP §II.6.:**  The required plan was not developed during

Period 1.

> **Period 1 IP §II.7.**
> **II.  Foster Care Services Assessment and Implementation Steps**
>> **7.  Physical and Mental Health Care**
>> Defendants shall, in consultation with state Medicaid and mental health
>> officials, develop and begin implementing specific and focused regional
>> plans to recruit and develop service providers in areas identified in the
>> needs assessment as having gaps in required services.

**Status of Progress, Period 1 IP §II.7.:**  The required plans were not developed during

Period 1.  Defendants are now required to meet these requirements during Period 2.[267]

Defendants initiated a strategic planning process during the latter part of Period 1 that includes

aspects of the required inter-agency consultative process.  These efforts are expected to serve as

the foundation for the planning and implementation process required by this subsection.

> **Period 1 IP §II.8.**
> **II.  Foster Care Services Assessment and Implementation Steps**
>> **8.  Educational Services**
>> DFCS shall develop and implement a protocol for conducting a general
>> and special education screen of children entering foster care.
>>
>> DFCS shall develop and begin implementing a plan for providing, either
>> directly or through contract, the following educational services in each
>> county: tutoring, preparation for a general equivalency diploma (GED),
>> and college preparation.

---

[266] *Id.* §II.7.b., c., e., j.

[267] *Id.* §II.9.

**Status of Progress, Period 1 IP §II.8.:**  Neither the protocol nor the plan were developed during Period 1.  Defendants are now required to meet these requirements during Period 2.[268]

> **Period 1 IP §II.10.**
> **II.  Foster Care Services Assessment and Implementation Steps**
>    **10.  Worker Contact and Monitoring**
>       **Defendants' revised policies and practice guides shall reflect the issues to be addressed during worker contacts with parents, children, and foster care providers.  Defendants shall revise DFCS training as necessary to ensure instruction on the quality, frequency, purpose, and structure of meeting with foster children, biological parents, and foster care providers.  The training shall specifically address communicating with, interviewing, and observing foster children.**

**Status of Progress, Period 1 IP §II.10.:**  Policies and practice guides were developed through the work group process during 2008, but remained in draft form during Period 1.  Defendants are required to finalize the policies and practice guides during Period 2.[269]

> **Period 1 IP §II.11.**
> **II.  Foster Care Services Assessment and Implementation Steps**
>    **11.  Transition to Independent Living**
>       **Defendants shall develop and begin implementing a written plan to address identified independent living service gaps.**
>
>       **Defendants shall develop and begin implementing a system for ensuring that emancipating youth have obtained, prior to transitioning to independent living, the necessary documents and information identified in the COA standards for such youth.**
>
>       **DFCS will develop for each region the capacity and current resource guides necessary to assist youth in locating and/or enrolling in educational or vocational programs appropriate to their needs, interests, abilities, and goals, such as high school or GED programs; colleges or universities; vocational training programs; and special education services.**

**Status of Progress, Period 1 IP §II.11.:**  As summarized below, defendants made progress but did not meet these requirements during Period 1.  They are required to do so during Period 2.[270]

---

[268] *Id.* §II.10.

[269] *Id.* §II.11.

[270] *Id.* §II.12.

Until recently, the independent living program did not have a permanent director. Statewide two DFCS employees have managed the program. Their efforts have been augmented by a contract with a private provider for nine staff members who have been deployed statewide to deliver independent living services for youth who are 14-20 years of age.[271] A limited aftercare program has been available for emancipated youth.[272]

The required assessment of independent living services was not completed during Period 1, and the written plan to address independent living service gaps was not finalized. Initial work on the assessment commenced in 2008, including the development of a survey instrument to assess the needs of transitioning youth. The requisite system for ensuring that emancipating youth have received, prior to transitioning to independent living, the documents and information identified in COA standards, has not been implemented. Defendants revised the statewide resource guide that is used by the independent living program during 2008.[273] It provides general information on colleges and technical and vocational schools, as well as job training programs. The resource guide also includes information for accessing crisis intervention and other hotlines, somatic and mental health services and social service programs.

> **Settlement Agreement §II.B.13.**
> **II. STANDARDS**
>   **B. Foster Care Service Standards**
>     **13. Recruitment and Retention of Foster Families and Therapeutic Service Providers**
>       **e. By January 2008, Defendants shall establish and begin to pay to all licensed resource families at least the following basic monthly foster care maintenance payments plus an $80 monthly clothing allowance: for each child ages 0-3, $350; for each child ages 4-5, $355; for each child ages 6-9, $355 + $30 child allowance; for each**

---

[271] Among other services, the contractor provides strengths/needs-based assessments that are used to develop individual independent living plans as well as counseling and mentoring. A full description of the services delivered by the contractor is included in Ex. 17A, SCS, P.R.E.P.A.R.E. Independent Living Handbook. Independent living skills classes in topics such as employment, money management and housing are also provided as part of a standardized curriculum described more fully in Ex. 17B, SCS, "Just Wait"/P.R.E.P.A.R.E. Curriculum Guide.

[272] The aftercare program is described in Ex. 17C, SCS, Independent Living Aftercare Services, Prepare Program.

[273] Ex. 17D, MDHS, Resource Guide for Living Independently in Mississippi, revised 2008.

**child ages 10-12, $360 + $40 child allowance; for each child ages 13-15, $370 + $50 child allowance; for each child ages 16-21, $370+ $60 child allowance.**

**Status of Progress, Settlement Agreement §II.B.13.e.:** A policy directive that meets these requirements was issued on October 16, 2008.[274] Defendants report the policy is being implemented. The Monitor has not had an opportunity to independently verify these representations, but plans to do so and report on her findings, as appropriate.

> g. **Defendants shall, within 180 days of the Court's approval of the Plan, engage a qualified independent consultant to assess board payment rates currently being paid to foster parents caring for special needs foster children and to congregate care facilities to determine the extent to which those rates meet the requirements of 42 U.S.C. § 675(4)(A) and reflect the actual cost of caring for special needs foster children and children placed in congregate care facilities, including the necessary and reasonable costs of facility administration and operation. The selection of the independent consultant shall be subject to approval by the Monitor; said approval shall not be unreasonably withheld.**

**Status of Progress, Settlement Agreement §II.B.13.g.:** On January 20, 2009, defendants preliminarily selected an independent consultant to conduct the required assessment of board payment rates. The consultant was approved by the Monitor and the contract was finalized during February 2009.

> h. **Within a year of Court approval of the Plan, the consultant shall deliver to the Parties and the Monitor a written report setting forth (1) findings regarding the adequacy of the current schedule of foster care maintenance payments made to foster care providers serving special needs children and facilities providing congregate foster care in relation to the requirements of 42 U.S.C. § 675(4)(A) and the actual cost in the state of Mississippi to provide such care; (2) the methodology utilized to determine the actual costs in the state of Mississippi to provide such care; and (3) a schedule of recommended rates for foster care providers serving special needs children and facilities providing congregate foster care. Plaintiffs shall have 30 days to raise any written objection to the schedule of recommended rates as determined by the consultant. Should Plaintiffs raise objections and should the Parties be unable to reach agreement, the consultant's schedule and Plaintiffs' objection shall be submitted to the Court for final determination.**

---

[274] Ex. 18A, MDHS, DFCS, Bulletin 6216, Resource Board Payment Breakdown, October 16, 2008. The policy provides for each child ages 0-5, $355; for each child ages 6-8, $355 plus $30 child allowance; for each child ages 9-12, $360 plus $40 child allowance.

**Status of Progress, Settlement Agreement §II.B.13.h.:** Due to the delay in engaging the consultant, the written report was not finalized during Period 1.  The Period 2 IP requires the rate-setting assessment to be completed by November 1, 2009.[275]

> **Period 1 IP §II.13.**
> **II.  Foster Care Services Assessment and Implementation Steps**
> > **13.  Recruitment and Retention of Foster Families and Therapeutic Service Providers**
> >
> > > **Defendants shall develop and begin implementing a written plan for targeted recruitment and development of a range of family and facility placements that will adequately meet the placement needs of the foster care population as identified by DFCS's previous regional self-assessments and the assessment required herein.**
> > >
> > > **Defendants shall develop and begin implementing a written plan to provide services for foster parents in every county to prevent and reduce stress and family crisis.**
> > >
> > > **In consultation with Mississippi foster parents, DFCS shall identify additions and revisions to the current foster parent training curriculum that are necessary to adequately train foster parents to meet the needs of the children placed in their care.  Foster parent training classes based upon the revised curriculum shall be available in every region.**
> > >
> > > **DFCS shall implement a system of dual foster/adopt licensing and any necessary policy and practice changes to prevent the underutilization of licensed and approved foster families.**
> > >
> > > **DFCS shall create a resource family workgroup (consisting of staff and resource families) to develop and implement resource family practices and protocols that address the types of information that should be provided to resource families prior to taking a child into the home, what type of training is needed, what emergency procedures need to be in place for resource families, what strategies are effective in recruiting, and how resource families can be included in case planning.**
> > >
> > > **DFCS shall regionalize its recruitment and retention efforts, and for each region have in place a stakeholder recruitment and retention team to identify local needs and develop and implement plans for recruiting, supporting, and utilizing foster and adoptive parents.**

**Status of Progress, Period 1 IP §II.13.:**  With the exception of a dual licensing program, which was introduced in 2007,[276] the initiatives related to the recruitment and retention of foster

---

[275]  Period 2 IP §II.14.a.;  *see also* Ex. 18B, MDHS, DFCS, Center for the Support of Families, Inc., Practice Model/Rate Setting Analysis, Scope of Services.

families and therapeutic service providers were not undertaken during Period 1.  Defendants are

required to meet each of the above-listed requirements during Period 2.[277]

> **Period 1 IP §III.A.**
> **III.A.  Council on Accreditation Standards**
> These COA standards are applicable to children in custody and are to be
> implemented within 180 days of Court approval of the Mississippi
> Settlement Reform Plan.  [standards omitted]

**<u>Status of Progress, Period 1 IP §III.A.</u>:**  The Period 1 IP required the defendants to

implement, within 180 days of Court approval of the Settlement Agreement, a series of COA

standards, including standards related to human resource planning, employee and client rights,

grievance procedures, and intake screening.  COA found that defendants met the 180-day

standards on March 15, 2009.[278]  The fact that there has been a COA determination that the

standards have been met does not necessarily mean that the standards are being implemented.

Rather, it means that the defendants have proffered sufficient documentation of policies and

procedures that are consistent with the specified COA standards.

COA conducted several site visits during the 2008 calendar year to assess defendants'

capacity to become accredited.[279]  These site visits included interviews with MDHS and DFCS

managers and staff, interviews with pubic and private child welfare system stakeholders, visits to

several regional and county offices, and reviews of a limited number of child welfare case

records.  In addition, during the first quarter of 2008, COA assigned a child welfare expert to

coordinate the accreditation process and to consult with the defendants on a regular basis

regarding their efforts to meet the 180-day standards.  Defendants' initial efforts to meet the 180-

---

[276] *See* Settlement Agreement §II.B.3.f.3. and the related discussions *supra* pp. 70-71.

[277] Period 2 IP §§II.14.b.-f.

[278] Ex. 19A, March 15, 2009 e-mail from James J. Mooney to Jenni Murray (noting that the final 180-day deliverable requirements had been satisfied).

[279] Ex. 2, COA Assessment Report, *supra* note 37.

day standards evidenced some significant shortcomings.[280]  As a result, defendants restructured

their internal management of the accreditation process, centralizing coordination of accreditation-

related activities in a DFCS staff member who reports directly to the MDHS deputy director.

The preliminary evidence suggests that this has contributed to certain improvements, including a

better managed and coordinated internal process.[281]

    COA representatives have attended various meeting with the parties and the Monitor and

have collaborated with the parties on the development of the Period 2 IP.  During Period 2,

defendants are required to meet a host of COA accreditation standards at staggered intervals.

> **Period 1 IP §III.B.**
> **III.B.  Council on Accreditation Standards**
>      **These COA standards are applicable to children in custody and are to be**
>      **implemented within 365 days of Court approval of the Mississippi**
>      **Settlement Reform Plan.**  [standards omitted]

**Status of Progress, Period 1 IP §III.B.:**  The defendants did not meet the 365-day COA

standards during Period 1.  Defendants are working on an ongoing basis with COA

representatives in order to satisfy the 365-day standards, and they are required to do so during

Period 2.[282]


## V.  CONCLUSION

    The pace of defendants' progress during Period 1 did not match the Settlement

Agreement's required timetable.  Nonetheless, as outlined in this report, there have been some

significant accomplishments, and several key capacity-building initiatives have been instituted.

---

[280]  Ex. 19B, June 4, 2008 memorandum to Kate McMillin from Reid Scher regarding initial deliverable review; Ex. 19C, September 29, 2008 memorandum to Don Thompson, Lori Woodruff, Rusty Fortenberry and Kenya Key Rachal from Reid Scher, addressing the adequacy of certain written submissions that were revised to respond to the result of the June 4, 2008 deliverables review.

[281]  *See, e.g.,* Ex. 19D, MDHS-DFCS, COA Quarterly Report, January through March 2009 for a summary of the initiatives defendants have undertaken to better coordinate accreditation activities.

[282]  The Period 2 IP annotates the COA standards to designate each of the 365-Day Standards.  *See, e.g.,* Period 2 IP at 26, PA-FC 4.01.

However, in order to meet the Settlement Agreement's substantive requirements and timelines, the defendants need to accelerate and intensify their efforts to build the capacity to support the reform effort and address long-standing challenges.  DFCS has significant strengths, including a leadership team of experienced child welfare professionals and a committed workforce that care deeply about the children in DFCS custody.  Defendants recognize the challenges they must resolve and are working to address some of the most serious obstacles to the reform process. Assuming the achievements contemplated by the Period 1 IP are accomplished in the near term, defendants will have many of the tools necessary to realize and sustain significant progress.  The Monitor looks forward to more substantive advancement during Period 2.

Respectfully submitted,

/s Grace M. Lopes_____
Grace M. Lopes, Court Monitor
1350 Connecticut Avenue, N.W.
Suite 1000
Washington, D.C.  20036
(202) 232-8311
gmlopes@oymonitor.org

## CERTIFICATE OF SERVICE

I hereby certify that on June 5, 2009, I electronically filed with the Court, using the ECF system, the foregoing Court Monitor's Report to the Court Regarding Defendants' Progress Toward Meeting Period-1 Requirements, which sent notification of filing to the following:

Dewitt L. ("Rusty") Fortenberry Jr., Esq.
Kenya Key Rachal, Esq.
Baker, Donelson, Bearman, Caldwell &
Berkowitz, PC
428 I-55 North
Meadowbrook Office Park
Jackson, Mississippi  39211

Harold E. Pizzetta, III, Esq.
Assistant Attorney General
General Civil Division
Carroll Gartin Justice Building
430 High Street
Jackson, Mississippi  39201

Marcia Robinson Lowry
Shirim Nothenberg
Jessica Polansky
Children's Rights
330 Seventh Avenue
New York, New York  10001

W. Wayne Drinkwater, Jr., Esq.
Bradley Arant Rose & White LLP
188 East Capitol Street, Suite 450
Jackson, Mississippi  39201

Stephen H. Leech
618 Crescent Boulevard, Suite 103
Ridgeland, MS 39157
P.O. Box 3623
Jackson, Mississippi  39207

John Lang, Esq.
Christian Carbone
John Piskora
Loeb & Loeb LLP
345 Park Avenue
New York, New York  10154

/s Grace M. Lopes_____

**The Court Monitor's Report to the Court Regarding Defendants'
Progress Toward Meeting Year-One Requirements
Index to Exhibits**

Ex. 1A        State Level Citizen Review Board, DFCS Five-Year Plan Review and
              Recommendations, June 14, 2002, excerpt

Ex. 1B        Mississippi Department of Human Services, Division of Family and
              Children's Services, Child and Family Service Review, Statewide Self
              Assessment, December 2003, excerpt

Ex. 1C        Mississippi Department of Human Services, Division of Family and
              Children's Services, Child and Family Service Review, Program
              Improvement Plan, March 24, 2005, excerpt

Ex. 1D        Mississippi Department of Human Services, Division of Family and
              Children's Services, FY 2004 Budget Request, August 2, 2002, excerpt

Ex. 1E        Deposition Transcript, March 16, 2006, testimony of Peter Boulette,
              director, Division of Budgets and Accounting, Mississippi Department of
              Human Services, excerpt

Ex. 1F        Table submitted on September 26, 2008 to Grace M. Lopes by Peter B.
              Boulette, director, Division of Budgets and Accounting, Mississippi
              Department of Human Services

Ex. 1G        S.B. 2495, 2007 Leg. Reg. Sess. (MS. 2007), supplemental appropriation
              for FY 2007

Ex. 1H        Mississippi Department of Human Services, Fiscal Year 2010 Budget
              Request, Division of Family and Children's Services, excerpt

Ex. 1I        Office of the Governor, Executive Budget Recommendation for Fiscal
              Year 2010, November 17, 2008

Ex. 1J        Mississippi Department of Human Services, Division of Family and
              Children's Services, Title IV-E Program Improvement Plan, February
              2009

Ex. 2         Council on Accreditation, Mississippi Department of Family and
              Children's Services, Accreditation Readiness Assessment, Part 1, July 21,
              2008

Ex. 3         Resume of Lori Lynn Woodruff

Ex. 4A        Resume of Michael Gallarno

Ex. 4B          Mississippi Department of Human Services, Division of Family and
                Children's Services, regional map, approved November 20, 2008

Ex. 4C          Mississippi Department of Human Services – Division of Family and
                Children's Services, Reorganization and Non-Budgeted Upward
                Reallocations

Ex. 4D          Resume of Linda Millsap

Ex. 5A          Kiran Chawla, *DHS Takes Hot Seat*, WJTV, December 15, 2008

Ex  5B          Julie Goodman, *Social Workers: Kids Endangered*, The Clarion-Leader,
                April 24, 2002,

Ex. 5C          Julie Goodman, *DHS, An Agency in Crisis*, The Clarion-Leader, June 3,
                2002

Ex. 5D          Patrice Sawyer and Julie Goodman, *DHS*, *An Agency in Crisis*, The
                Clarion-Leader, June 1, 2002

Ex. 5E          Beth Musgrave, *Understaffed DHS is Failing Our Children; Harrison Co.
                Says Money Solves Only Part of the Problem*, The Sun Herald, January 19,
                2003

Ex. 5F          State Personnel Board, Class Establishment, Reclassification Authority,
                and Selection Exemption, effective November 1, 2008

Ex. 5G          Deposition Transcript, June 21, 2005, testimony of Teressa Jackson,
                former Division of Family and Children's Services, director of
                administration, excerpt

Ex. 5H          Chart of Number of Authorized, Funded and Filled Caseworker Positions,
                by Year, January 2004-March 2009, prepared by Office of the Court
                Monitor based on April 13, 2009 data produced from Personnel Unit,
                Mississippi Department of Human Services, Division of Family and
                Children's Services

Ex. 5I          Chart of Number of Filled and Vacant ASWS Positions, by Year, January
                2004-March 2009, prepared by Office of the Court Monitor based on April
                13, 2009 data produced from Personnel Unit, Mississippi Department of
                Human Services, Division of Family and Children's Services

Ex. 5J          Draft – Reporting Workload Summary, August 18, 2008, excerpt

Ex. 5K      Chart prepared by the Office of the Court Monitor based on MACWIS Report No. MWASAW9D, Washington County, Average Number of Hours Worked on Casework Per Week, by Caseworker, February 1-28, 2009, redacted version

Ex. 5L      Chart prepared by the Office of the Court Monitor based on MACWIS Report No. MWASA9S2, Number of Caseworkers, by County, by Number Exceeding Caseload Requirements, February 1-28, 2009

Ex. 5M     Chart prepared by the Office of the Court Monitor based on MACWIS Report No. MWASA9S2, Percentage of Caseworkers Working with Caseloads that Exceed more than 6960 Minutes, by County, February 1-28, 2009

Ex. 5N      Chart prepared by the Office of the Court Monitor based on MACWIS Report No. MWZPWKRB, December 1- December 31, 2008, Ratio of Workers to Supervisors, By Counties

Ex. 5O      DHS – Area Social Work Supervisor – Position Description

Ex. 6       University of Southern Mississippi, School of Social Work, Training Academy, Social Work Education Among MDHS Employees, October 6, 2008

Ex. 7A      Resume of Denise Brown-Rouse

Ex. 7B      MDHS Administrative Policy-AP-19, Staff Training and Employee Development Policy, January 1, 1993

Ex. 7C      Training Unit Newsletter, December 2008

Ex. 7D      Mississippi Department of Human Services, Division of Family and Children's Services, Child Welfare Professional Development Unit Newsletter, Volume 1, Issue 1, January 2009

Ex. 8       Personnel/Master Training, Personnel Menu Functions and Screens, Personnel/Employee Detail, screen shots from MACWIS Desk Reference Guide – V1.3, Revised August 14, 2008, Training Director Copy

Ex. 9A      Mississippi Department of Human Services, DFCS Form 4253, Periodic Administrative Determination on Children in State's Custody, revised July 1, 2008

Ex. 9B      Foster Care Review Program, Periodic Administative (sic) Determination Concise Guide

Ex. 10A       MYCIDS, Mississippi Youth Court Information Delivery System, Youth Court Case Management System – Overview

Ex. 10B       MYCIDS, February 26, 2009, map showing current and proposed MYCIDS sites

Ex. 10C       June 28, 2007 letter of understanding from Jaworski Davenport to Mike Jones and MYCIDS programming staff

Ex. 11A       Chart prepared by the Office of the Court Monitor based on MACWIS Report No. MWZ0141B, Median Case Processing Times for Certain Children in Custody for 15 Consecutive Months Ending on March 14, 2009 in the Four Counties with the Highest Caseloads

Ex. 11B       Chart prepared by the Office of the Court Monitor based on MACWIS Report No. MWZ0141B, Certain Case Processing Times for Children in Custody for 15 Consecutive Months Ending on March 14, 2009, by Child – Forrest County, redacted version

Ex. 11C       Chart prepared by the Office of the Court Monitor based on MACWIS Report No. MWZ0141B, Certain Case Processing Times for Children in Custody for 15 Consecutive Months Ending on March 14, 2009, by Child – Harrison County, redacted version

Ex. 11D       Chart prepared by the Office of the Court Monitor based on MACWIS Report No. MWZ0141B, Certain Case Processing Times for Children in Custody for 15 Consecutive Months Ending on March 14, 2009, by Child – Hinds County, redacted version

Ex. 11E       Chart prepared by the Office of the Court Monitor based on MACWIS Report No. MWZ0141B, Certain Case Processing Times for Children in Custody for 15 Consecutive Months Ending on March 14, 2009, by Child – Jackson County, redacted version

Ex. 11F       MACWIS Report No. MWZ078RB, Listing of Children Currently in Custody with a Conference Date More Than 6 Months Overdue, Region 2-W, April 4, 2009, redacted version

Ex. 11G       MACWIS Report No. MWZ078RB, Listing of Children Currently in Custody with a Conference Date More Than 6 Months Overdue, Region 3-S, April 4, 2009, redacted version

Ex. 11H       MACWIS Report No. MWZ078RB, Listing of Children Currently in Custody with a Conference Date More Than 6 Months Overdue, Region 7-East, April 4, 2009, redacted version

Ex. 12A    Mississippi Department of Human Services, Division of Family and Children's Services, Bulletin 6115, Final Rule Resource Family/Licensure Policy, October 29, 2007

Ex. 12B    Mississippi Department of Human Services, Division of Family and Children's Services Policy Manual, Adoptive Services, Adoption Assistance, Volume IV, excerpt, revised May 1, 1999

Ex. 12C    Mississippi Department of Human Services, Division of Family and Children's Services, Resource Family Licensure Practice Guide, September 2007, excerpts

Ex. 12D    Mississippi Department of Human Services, Division of Family and Children's Services, Opt to Adopt website home page

Ex. 12E    Mississippi Department of Human Services, Division of Family and Children's Services, Mississippi PATH (Parents as Tender Healers), Participant's Handbook, excerpts

Ex. 12F    Southern Christian Services for Children and Youth, Inc., Harden House Adoption/Foster Care Program, Partners in Permanency, Goals, Objectives, Indicators, Outcomes (proposed scope of work incorporated into contract)

Ex. 12G    Youth Villages, Inc., Family Preservation Service Contract, Scope of Services, January 1- September 30, 2009

Ex. 12H    Mississippi Children's Home Society, Family Preservation Program, Scope of Services, October 1, 2008 – September 30, 2009

Ex. 13A    MS State Personnel Board, Performance Appraisal Review Report, Resource Specialist, revised draft, June 2008

Ex. 13B    Mississippi Department of Human Services, Division of Family and Children's Services, Bulletin 6176, Protocol for Adoption Status Meetings, August 18, 2008

Ex. 13C    Southern Christian Services for Children and Youth, Inc., Wendy's Wonderful Kids, A Signature Program of the Dave Thomas Foundation for Adoption

Ex. 13D    November 15, 2007 correspondence to Rita Sorenon from Donald R. Taylor and Susannah K. Cherney

| Ex. 14 | Mississippi Department of Human Services, Division of Family and Children's Services, Bulletin No. 6103, Revised Final Rule – Intake, Screening and Assessment, April 12, 2007 |
| --- | --- |
| Ex. 15 | Mississippi Department of Human Services, Division of Family and Children's Services, Bulletin 6154, Mandatory Reporting Requirement, January 24, 2008 |
| Ex. 16A | Mississippi Department of Human Services, Division of Family and Children's Services, Bulletin 6199, Expedited Resource Home Licensure, August 18, 2008 |
| Ex. 16B | Mississippi Department of Human Services, Division of Family and Children's Services, Bulletin 6177, Criminal History and Background Checks, August 14, 2008 |
| Ex. 16C | Mississippi Department of Human Services, Division of Family and Children's Services, Bulletin No. 5921, Emergency Shelter Extensions, December 8, 2004 |
| Ex. 17A | Southern Christian Services for Children and Youth, Inc., P.R.E.P.A.R.E. Independent Living Handbook |
| Ex. 17B | Southern Christian Services for Children and Youth, Inc., "Just Wait"/P.R.E.P.A.R.E. Curriculum Guide |
| Ex. 17C | Southern Christian Services for Children and Youth, Inc., Independent Living Aftercare Services, Prepare Program |
| Ex. 17D | Mississippi Department of Human Services, Resource Guide for Living Independently in Mississippi, revised 2008 |
| Ex. 18A | Mississippi Department of Human Services, Division of Family and Children's Services, Bulletin 6216, Resource Board Payment Breakdown, October 16, 2008 |
| Ex. 18B | Mississippi Department of Human Services, Division of Family and Children's Services, Center for the Support of Families, Inc., Practice Model/Rate Setting Analysis, Scope of Services |
| Ex. 19A | March 15, 2009 e-mail from James J. Mooney to Jenni Murray |
| Ex. 19B | June 4, 2008 memorandum to Kate McMillin from Reid Scher |
| Ex. 19C | September 29, 2008 memorandum to Don Thompson, Lori Woodruff, Rusty Fortenberry and Kenya Key Rachal from Reid Scher |

Ex. 19D     MDHS-DFCS COA Quarterly Report, January through March 2009