**Ex. 2**

# MISSISIPPI DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES



## ACCREDITATION READINESS ASSESSMENT, PART 1



*Prepared by the
Council on Accreditation*

 

# COA ACCREDITATION READINESS ASSESSMENT, MISSISIPPI DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES, PART I

## I: PREFACE

This report covers the first part of the COA Accreditation Readiness Assessment (ARA) of the Mississippi Department of Family and Children's Services (DFCS). It focused on specific administrative standards in the state DFCS office and one DFCS county office. Later visits in the ARA process will focus on the rest of the administrative standards at state DFCS and administrative and specific service standards at county DFCS offices around the state. This ARA visit involved a full-time two-person ARA team and the COA Manager of Accreditations Operations, as well as the COA Mississippi Coordinator on a part-time basis.

## II: PURPOSE OF THE COA ACCREDITATION READINESS ASSESSMENT

COA's Accreditation Readiness Assessment (ARA) is designed to evaluate and define where an organization is with regard to COA standards at the beginning of the accreditation process and offer recommendations as to how it can work to meet those standards. It can be tailored to an organization's circumstances but will always:

1. assess an organization's policy and/or practice based on COA's Administration and Management and Service Delivery Administration standards;
2. define human, financial, and physical resources needed for accreditation;
3. clarify which administration and management, and service delivery administration standards should be reviewed at the central office, local offices, or both;
4. clarify whether needed improvements to meet COA standards might come from the central office, local offices, or both;
5. describe the organizational environment and demographics (including the relationship between local and central offices) and how these factors may help or hinder the accreditation process; and
6. note standards problems (if any) that the COA Peer Review Team may encounter when they visit the agency and suggest ways to make improvements.

ARA's first emphasis is administration and management, and service delivery administration rather than specific service standards. However the process can be adapted to review specific services as well.

## III: MISSISSIPPI DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES ACCREDITATION READINESS ASSESSMENT; DESCRIPTION, ACTIVITIES

The ARA for the Mississippi Department of Family and Children's Services (DFCS) is unique in




that:

1. it is influenced to some degree by the Mississippi Settlement Agreement and Reform Plan (Settlement Agreement);
2. it will cover DFCS's central office, regional offices, and selected county offices;
3. it will involve multiple visits within the DFCS system, during which the focus of the visits will change from DFCS central office administrative standards to county offices and limited administrative plus specific service standards;
4. information will be collected on delivery of services on the first visit for the COA Mississippi Coordinator to be used in subsequent ARA visits; and
5. tasks will be identified for the COA Mississippi Coordinator to assist DFCS in ongoing efforts to prepare for accreditation.

However, like all ARAs, the primary focus of the review is defined and driven by COA's 8th Edition Standards.

This report covers ARA activities including:

1. pre-visit activities including:
   a. completion of an Accreditation Self Assessment questionnaire by over 50% of direct service and supervisory staff at Hinds County DFCS;
   b. review of a variety of material on DFCS administration, contracting, and services;
   c. multiple contacts with state DFCS to frame the visit and provide additional information; and
   d. teleconference meetings with the ARA Team to clarify tasks and share information;
2. on-site visit (June 23-26, 2008);
3. Settlement Agreement mandated assessments (based on COA standards) of a number of DFCS central office systems including:
   a. the DFCS computer system (MACWIS);
   b. fiscal and financial management;
   c. a workforce assessment (gap analysis) of the agency's plans to improve staffing;
   d. quality improvement systems;
   e. contracting practices; and
   f. training curricula and training unit;
4. review, based on COA standards, of draft material submitted by the agency as Settlement Agreement 180 day deliverables;
5. review of a variety of DFCS procedures, reports, and statistics to identify issues for interviews with staff;
6. interviews with a variety of DFCS central office and regional staff regarding:
   a. their roles and interactions;
   b. their relationship with other parts of the Department of Human Services, with other state government department; and with county governments;
   c. their relationship with DFCS county offices;
   d. their relationship with the court system and other social, educational, and medical



services;
   e.  planning how the COA Mississippi Coordinator will work with DFCS; and
   f.  providing background material on the actual delivery of child protective services
       (CPS), ongoing, foster care, and adoption services for use in later ARA reviews;
7.  interviews with state and regional DFCS staff including:
   a.  Kate McMillin, DFCS Director;
   b.  Karla Steckler, Director, Field Operations;
   c.  Mary Pittman, COA Coordinator;
   d.  Mary Fuller, Director, Program Improvement Unit;
   e.  Robin Wilson, Special Projects Officer;
   f.  Tricia Shannon, Director Administration/Prevention Unit;
   g.  Vivian Charleston, Random Moments Survey;
   h.  Jo Ann Love, Personnel Unit;
   i.  Mechille Henry, Recruiter;
   j.  Rob Hamrick, Foster Care Review Coordinator;
   k.  Jill Dent, Director MACWIS;
   l.  Nancy Meaders, Senior Business Analyst, MACWIS;
   m.  Denise Rouse, Training;
   n.  Dana Gearhart, General Counsel, DHS;
   o.  Anita Bell-Muhammad, Director Protection Unit;
   p.  Barbara Proctor, Director Placement Unit;
   q.  six Regional Directors; and
   r.  heads of nine work groups to meet Settlement Agreement requirements.
8.  an assessment of DFCS Work Groups as to their structure, focus, schedules, and how they
    will work with the COA Mississippi Coordinator;
9.  since DFCS services are delivered on a county level, a review of the Hinds County DFCS
    office including interviews with:
   a.  the Regional Director (who serves as the Hinds County DFCS Director) and
       regional staff;
   b.  DFCS supervisors (ASWS);
   c.  a selection of direct service staff;
   d.  local finance staff;
   e.  county personnel responsible for the DFCS space requirements; and
   f.  ASWS on the flow of CPS, ongoing, foster care, and adoption services;
10.  individuals/groups interviewed at Hinds County DFCS included:
   a.  Maggie Mixon, Regional Director;
   b.  Mary Jones, Regional ASWS (for case record review);
   c.  Rosie Thomas, Accounting Clerk;
   d.  Linda Robinson, Hinds County Fiscal Coordinator;
   e.  a group of Hinds County DFCS ASWSs (supervisors);
   f.  individual Hinds County ASWSs (to discuss case flow); and
   g.  a group of Hinds County DFCS direct service staff.
11.  a schedule and form review of Hinds County DFCS CPS investigation, ongoing and
     foster care case records case records regarding:
   a.  screening processes;




      b.  assessment processes;
      c.  service planning; and
      d.  monitoring processes;
12. a health and safety walk-through of DFCS central and Hinds County offices; and
13. further post-visit contacts with state DFCS staff to clarify and obtain additional information for this report.

The ARA team wishes to thank state and Hinds County DFCS staff for their candidness and cooperation in helping the ARA team complete this study.

## IV: AGENCY ENVIRONMENT/STRUCTURE

In 2006 the state of Mississippi had a population estimated at 2,910,540 (all figures from 2000 Census and updates). Population had increased by 2.3% since 2000. Four of the state's eighty three counties had a population of over 100,000. Forty four counties had a population under 25,000. Most of the state's population growth has been in the coastal counties driven by casino gambling; however, hurricane damage has slowed this growth.

Children under 18 make up 26.1 % of the Mississippi population (24.6% nationwide). In 2005, Mississippi's poverty rate was 16.8% up from 14.2% in 2000. Comparable national numbers were 9.3% to 10.2%. In 2005, median family income for Mississippi was $40,917 compared with $55,834 nationwide.

Mississippi counties ranged in size from 401 to 1,043 square miles. However almost three quarters of counties were in the 400 to 700 square mile range.

DFCS presently has seven regional offices and eighty four county offices (several smaller counties have two offices). In March 2008 these offices had 381 staff (including 27 supervisors (ASWSs)) with caseloads. Forty one of the staff with caseloads is temporary, hired under a contract with Social Work PRN (PRN) primarily to serve coastal counties that suffered hurricane damage. PRN's contract ends in early Fall 2008. Total DFCS non-contract staff in March 2008 was 459. About 10% of allocated positions were vacant.

In calendar 2007 DFCS received 29,579 child abuse and neglect (CAN) referrals. It screened in (accepted for investigation) 18,262 (62%) of them (MACWIS print-out).

In May 2008, there were 3,306 children in DFCS custody. Over the previous year, children in custody had remained in the 3,200-3,300 range.

Children in custody by county (MACWIS print-out March 2008) ranged from zero (three counties) to 369 (Harrison County). In general Region 7 (coastal counties) was overrepresented in terms of children in custody. Statewide an average of 0.46% of children under 18 were in custody (range 0.0% - 1.31%). Sixteen counties had more than one and one half times the average percentage (0.69> %) in custody. They included most of the larger counties (but not the largest, Hinds County) but also six counties with populations under 25,000.

 

Caseloads in DFCS county offices generally are a mix of CPS investigation, ongoing, foster care, and kinship care (although some counties have entirely CPS and foster/kinship caseloads). Special regional staff handles adoption actions while regular line staff continues to serve children while they are still in foster care homes.

Responsibility for children in foster care is divided between staff in counties of origin (who review cases, handle court activities) and county of placement (who maintain contact with the child). Staff report that children often are in foster care placement outside of their home counties.

### *Issues and Recommendations*

After review of a variety of agency reports, policies, procedures, and statistics as well as interviews with state, regional, and county level staff, ARA reviewers defined three major environmental/structural issues facing DFCS. These issues go beyond the Settlement Agreement but definitely impact how well DFCS delivers services and whether it can meet COA standards.

### ISSUE 1: Inconsistencies in the Child Welfare Courts

There is no uniform system of child welfare courts in Mississippi. All courts are county-based. In twenty counties with County Courts, their judges also can serve as Youth Court judges. In counties without such courts Chancery Judges (20 Chancery Courts in the state, covering from one to eight counties) can hear Youth Court matters. They also may appoint any lawyer to act in a judicial capacity of a Youth Court Referee. Finally one small city has its own Municipal Youth Court. Thus:

1. most Youth Court Judges/Referees are not specialists in family/juvenile law;
2. judges serving in Youth Court may see family/juvenile cases as a distraction from more pressing criminal or civil actions;
3. judges are elected - fear of negative publicity could affect their decisions regarding placement/return of children;
4. until recently there has not been a uniform code for Youth Court practice.

Unfortunately agency staff notes that DFCS recommendations often are ignored by local judges or referees handling child welfare cases. These judges tend to be too eager to remove children from the home, reluctant to return children from foster care to their families, and reluctant to terminate parental rights. This contradictory set of attitudes often puts children in foster care limbo. Children in such situations are more likely to act out and need to be re-placed.

Judges and referees also may lack knowledge as to the ability of various kinds of placements to handle disturbed children. Some judges/referees tend to assign DFCS responsibility for placing Division of Youth Services (DYS) cases rather than referring these children to DYS facilities. DFCS believes that these children are most likely to fail in placements and need to be placed again. This lowers agency compliance with Federal standards regarding stability of placement.

*Accreditation Readiness Assessment Report*       6




Clearly DFCS is not in a position to change the Mississippi judicial system. Fortunately the Chief Justice of the Mississippi Supreme Court had realized the needs of Youth Courts. He has brought together a committee of legal, social, medical, and educational services and law enforcement which has drafted Uniform Rules of Youth Court Practices. The DFCS Director of Field Operations attends monthly meetings on judicial reform.

The agency does need to identify and quantify problems with the judicial system and prepare its staff to work with local judges/referees and courts. It has started efforts in both areas.

MACWIS is now building an interface with the Administrative Office of Courts to identify DYS children in DFCS facilities. It then will be able to confirm whether these children move more often and whether their court ordered placements are appropriate. Also, it should explore how to identify cases where courts went against DFCS recommendations regarding removal of children, return of children from foster care, and termination of parental rights. It could use this information in reports to the legislature or Chief Justice.

Training for line staff on how to prepare cases for court will be offered this summer.

**ISSUE 2: Intake into the DFCS System**

Almost all intakes come through CAN referrals. The majority of these allegations come through county offices. County line staff generally take these allegations/referrals, enter them on MACWIS, and they and their ASWS make the final decision to screen in or out.

DFCS is contracting with PRN for a central reporting office to handle all weekend and evening CAN referrals. Referrals received will be forwarded to county DFCS offices.

In the development of the RFP for a central reporting office there apparently was some feedback from county DFCS offices that they should continue to screen CAN allegations. Apparently, county offices opposed an overall central referral system. They believed that their knowledge of local environment and even of specific families gave them an advantage in screening allegations.

The ARA team was able to look at MACWIS print-outs on screened-in and screened-out CAN referrals by region and county for calendar year 2007. As noted above, in 2007 DFCS received 29,579 CAN referrals and screened-in (accepted for investigation) 18,262 (62%) of them. Screen-in rates ranged from 58% in Region V to 69% in Region VII.

Within regions, there was considerable variation in county screen-in rates. The following table notes the lowest and highest screen-in percentages for county DFCS offices in each region.

**LOWEST/HIGHEST COUNTY CPS SCREEN-IN RATES BY REGION CALENDAR 2007**




| REGION | LOWEST COUNTY SCREEN- IN PERCENTAGE | HIGHEST COUNTY SCREEN- IN PERCENTAGE |
|--------|-------------------------------------|--------------------------------------|
| I | 46% | 80% |
| II | 26% | 78% |
| III | 36% | 67% |
| IV | 46% | 74% |
| V | 39% | 75% |
| VI | 48% | 75% |
| VII | 66% | 74% |

It could be argued that most regions are relatively large and counties within them may be some distance from each other and in different social and economic environments. This might affect screen in rates. However in three regions, the counties with the highest and lowest screen in rates were contiguous. In three other regions they were within twenty miles of each other.

Screen in and screen out of CAN referrals is probably the most crucial decision made in child welfare. It also is the most structured with specific guidelines and checklists. The material noted above raises questions about the uniformity of standards for CAN screening at DFCS county offices.

There are several arguments for handling initial referrals in county offices. Staff are more knowledgeable about local situations and referral sources may feel more comfortable in referring to someone they know. However there are more and stronger arguments for a central referral system for all Mississippi child abuse/neglect allegations.

The first argument is logistics. To have staff theoretically available all week, trained in intake, with updated training, with ASWSs available to review decisions in a timely manner in 84 different offices would be difficult in any system. Is it possible considering the resources available to DFCS?

The second argument is expertise. Personnel become expert at screening referrals by screening referrals. Fewer CAN referrals make mistakes more likely (and many Mississippi counties have very few referrals). Staff at a central reporting office can be trained and retrained easily; they have regular supervision on site.

The third argument is consistency.  One of the greatest problems in any protective service is to keep subjectivity out of the screening process/decision. Line staff, without close supervision, may be influenced by such subjective factors as other demands of their caseload, previous relations with referral sources, previous relations with alleged perpetrators, and personal values. In a central reporting system staff can be trained, monitored, and supervised to reduce subjectivity.

The fourth argument is economy. Central referral systems generally are less expensive to operate.

 

In DFCS a central referral system would free up county staff for investigations and ongoing and foster care cases. It would be especially valuable in freeing up ASWS time.

DFCS should seriously explore a central referral system to cover all CAN referrals.

Through MACWIS, DFCS should be able to look at the amount of time line staff now spends on screening referrals. It also needs to factor in supervisory time. It can monitor screen in/out rates historically. An analysis of local vs. central referrals including both cost and service factors should be developed.

DFCS can utilize the COA Mississippi Coordinator to contact other states that have shifted to central referral systems for CAN referrals for input on advantages and disadvantages.

DFCS may want to consider setting up a time-limited pilot project where referrals from one region go to a central reporting office to test this new approach and work out any problems.

A central referral system would involve major cultural changes for DFCS and for its referral sources. Staff input into the design of the central reporting office would be encouraged. Staff orientation would need to emphasize the positive nature of this change. Job descriptions and training of line staff in county offices would have to be redefined. Regular referral sources would need to be re-educated on making referrals. A major educational campaign would be necessary for the general public.

DFCS should explore and implement a central referral office as part of a strategic plan (see PQI).

**ISSUE 3: DFCS county office size, administration, and staffing**

DFCS March 2008 statistics noted that total staff per county office ranged from 1 to 31. This included direct service and ASWS staff, PRN staff, and special adoption and foster care review workers. Ten county offices had nine or more direct service staff. Forty seven offices had one to three direct service staff. Twenty three offices did not have an ASWS.

A major indices of child welfare activity is CAN referrals and investigations. In 2007 a total of fifty three DFCS county offices had less than 300 CAN referrals annually (25 per month); twenty nine of these had less than 150 referrals annually (12.5 per month). These offices screened in (accepted for investigation) a total of 4,865 CAN referrals (405 per month). Thus these fifty three DFCS county offices investigated an average of 7.7 CAN referrals monthly.

In 3/08 primary client caseloads of direct service staff by county office ranged from 1.0 to 90.1 with an average of 37.0. Understaffing in some regions was a major reason for this discrepency. . However the number of potential clients (children under 18) also impacted caseload. That population by county ranged from 629 to 70,065.

County based caseloads and supervision do not promote:




1. staff utilization;
2. equalization of caseload;
3. span of supervision;
4. uniformity/quality of services;
5. line staff specialization (e.g., investigations, foster care);
6. the optimal assignment of new staff; and
7. the development of the systems necessary to meet COA service delivery standards.

DFCS is cognoscente of the inefficiency of the current system. On occasion it does allow line staff from one county to assist with overflow cases from neighboring counties. It has some ASWSs with supervisees in several counties.

DFCS might utilize its staff better if it maintains its county offices (although they might not be staffed full time), it defines geographically contiguous service areas. It could then cluster line staff into units under one or two ASWSs (5-10 line staff). Line staff could be based in a cluster office (probably one of the existing county offices with more space) along with their ASWS. They would meet regularly with their unit and ASWS to review cases or supervision. They might spend several days per week in county offices visiting clients and handling legal matters.

With generic caseloads individual line staff in cluster offices could handle most of the cases from their home counties but could also handle cases from other counties to equalize caseloads. However, cluster offices might also decide to have specialized staff for CPS, ongoing, and foster care (but trained and available to handle overflow in other areas).

Larger counties (9+ staff) might be unchanged or could be merged with adjacent smaller counties.

Combining county caseloads could reduce the number of staff needed for direct services (especially in conjunction with centralized CPS referrals). Forming units could lower the number of ASWSs needed for direct supervision. These extra staff might serve as regional floaters handling surges in county caseloads, as specialists on more difficult cases, as trainers, or in any number of other roles.

Clustering of staff/supervision would be a major break for DFCS. Clearly the desire of counties (especially the courts) to have local staffing, the habits (and residences) of current staff, the need to maintain contacts that workers have developed in counties, and travel cost/time would need to be considered. However the agency could:

1. develop guidelines and plans for a clustering project with input from local staff and community agencies;
2. educate county courts, other social services and the legislature as to the advantages of clustering;
3. identify counties where clustering would be most advantageous;
4. establish one or more pilot projects and monitor their operations and how/if they increased service efficiency; and/or

 

    5.  even while establishing pilots, explore how clustering would work statewide.

This also is an initiative that should be part of DFCS's strategic plan (see PQI). .

In recent reports,the agency's Foster Care Review Program has noted problems related to supervision and coordination (see PQI). These reports may reflect the lack of regular supervision in some county offices. As noted, there are dramatic differences by county in the proportion of children under eighteen in DFCS custody (from 0.0% to 1.94%). This also could reflect difficulties in supervising and monitoring inherent in the present county system.

Under the current county system of staffing it will be difficult for DFCS to meet COA standards especially regarding supervision and case planning. Exploration of some system to cluster line staff for better supervision and work balance should be an agency priority.

## V: AGENCY ADMINISTRATION

ARA reviewers explored DFCS administration both in the central office and in the seven regions.

The Director of DFCS, Kate McMillin, is relatively new at the agency. She was hired as a quality assurance director in 1/07 and promoted to Executive Director in 1/08. Prior to her employment by the state she had been a policy coordinator with a local child advocacy organization. She has a MSW.

Ms. McMillin currently reports to the DHS Deputy Administrator of Operations, Ricky Berry. She meets with him as needed. A major focus of their meetings has been efforts to expand DFCS staff. Ms. McMillin had not yet been evaluated.

A new Deputy Administrator position, with focus on DFCS, is being created. This position will monitor overall DFCS operations and changes resulting from the Settlement Agreement. S/he will be the connection between the new DHS Director, Don Thompson, and Ms. McMillin. The agency is now reviewing applicants for this new position. Ms. McMillin reports that some applications have been received from individuals with child welfare experience in other states.

Ms. McMillin defines her management team as her six unit directors. These include Placement (foster care/adoption), Protective (CPS), Administration (including finance and contracts), Field (representing seven regions), MACWIS (DFCS computer system), and Performance Improvement. Her team meets weekly to discuss emerging issues and project updates. She also meets with individual unit directors, as needed.

The Director reports that she tries to have meetings monthly with her management team plus the seven Regional Directors. These meetings also review work groups activities (Regional Directors are all assigned to such work groups) and offer feedback on needs and accomplishments in the field.

Ms. McMillin notes that there has been considerable turnover at state DFCS and in the Regional




Director positions. She believes that this has been a positive development in bringing in new ideas but that some experience and continuity has been lost. She notes that her management team is overload with regular administrative work plus meeting the requirements of the Plan. She believes that morale on all levels is still low but turnover is down and staff is pleased by the new career ladder plan (see Human Resources Management: Work Assessment).

The Director sees communications as good within the state office and between state and regional offices. She notes that there is not enough communication between state and county offices but that these offices generally have followed initiatives from state DFCS. She has tried to involve staff from county offices in DFCS work groups.

Ms. McMillin notes that DFCS does not have a positive reputation in the community at large. They are seen as "child snatchers" when removing children from their homes without reason. Because of confidentiality rules, the agency is often unable to defend itself.  She sees Regional Directors as DFCS's representatives in local communities.

The Director of Field Operations, Karla Steckler, supervisors the seven Field Directors. She has been in her present position for over two years. She previously led a local child advocacy organization and had worked in child welfare services in Georgia. She has a MA in Art Therapy. Ms. Steckler reports to Ms. McMillin with whom she meets at least weekly. She has spent much of the last year visiting regional and county offices. Ms. Steckler has not yet been evaluated.

Ms. Steckler notes that most of the seven Regional Directors are relatively new and have not yet been evaluated. She meets with the Regional Directors individually and together when they come to Jackson. She also confers with them when she travels to their regions.

Ms. Steckler tries to support her Regional Directors especially with regard to helping county office staff accept change and use available data to guide practice. She has helped to develop the agency's new peer review system for CPS files (see PQI). As noted, she sits on a committee headed by the state's Chief Justice regarding DFCS's ties with the courts.

Ms. Steckler has been involved in hiring new ASWSs as well as some of her Regional Directors.

Ms. Steckler says she spends a significant amount of her time consulting with Regional Directors on discipline problems in county offices. She also deals with county Directors of Economic Assistance regarding space and equipment for DFCS staff in county offices.

She notes relatively little involvement in budget, training, or (aside from the peer review system) on quality assurance.

Ms Steckler sees the seven Regional Directors as her greatest asset. However she believes that too much is asked of them. She would like to see the state divided into twelve regions (there were nine regions several years ago) so that Regional Directors' jobs would be more manageable.

The seven Regional Directors have from six to twenty five years experience at DFCS (average

 

15.3 years). Most have spent the majority of their careers with DFCS. They have been Regional Directors from one to four years (average 2 years). Four of the Regional Directors have BSWs, two MSWs, and one a BS in Psychology.

Regional Directors report that they supervise from 11 to 22 ASWSs in county offices (average 18.0). They also supervise from 0 to 4 regional staff (average 2.1). They agree that spans of supervision are not realistic.

They meet with county office ASWSs at least monthly in group sessions and sometimes individually. They also see them at training sessions. They are in regular telephone and email contact. Several Regional Directors report that their county ASWSs are experienced and need little supervision. They generally report evaluating ASWSs but look forward to a new evaluative format being developed at state DFCS.

Regional staff includes ASWSs, specialists, and trainers. Regional Directors use them for difficult cases, to cover vacant caseloads, and for training.

All Regional Directors note that it is difficult to fill ASWS vacancies. They generally are involved in interviews for these positions.

Some Regional Directors report good communications with state DFCS. All compliment the Director of Field Operations for reaching out to them. However most Regional Director note that there is a disconnect between regional/county offices and state DFCS. They complain about decisions being made without their involvement and a lack of forums for communication between county and state DFCS.

Regional Directors all note that they are spending too much time at state DFCS. This is for monthly meetings but also because of their assignment to various work groups and committees. Many of them believe that these duties keep them from necessary regional work. They generally report little input into the agency's budget and/or training.

Regional Directors say that from 10% to 50% of their time is spent putting out fires. Some of this time involves working on individual cases but much of it concerns facilities and especially personnel issues. They generally would like to spend more time at county offices.

All Regional Directors compliment MACWIS and note how it's improved. Many use it to follow individual cases but relatively few report using MACWIS to spot trends in their regions. Most complained about the slowness of the MACWIS Help Desk. With several exceptions Regional Directors note that most of their community contacts focus on problem cases or relations with county courts. They agree on the need for more outreach in this area.

Finally Regional Directors note that they generally are not involved in decisions regarding removal of children from their homes or return home from foster care. They note these decisions are mainly among the direct service worker, ASWS, and the courts. Some Regional Directors note that they do sign off on termination of parental rights (TPR) cases.

 

*Issues and Recommendations*

ARA reviewers identified four key issues in DFCS administration.

**ISSUE 1: There is relatively little administrative experience at DCFS state office or in the regions.** Many administrators have relatively short careers at DFCS and/or as administrators. This is advantageous in that they may be more flexible and innovative in responding to federal government and Settlement Agreement mandates. However there appears to be an overall lack of experience in managing a large, diverse child welfare system and how to change such a system. Relatively inexperienced administrators may have problems in dealing with other parts of state government and with voluntary agencies. They need to make extra efforts to introduce and sell themselves to local offices.

**ISSUE 2: DFCS (through DHS) is hiring a Deputy Administrator in the near future. They should hire an individual with extensive child welfare and administrative/planning experience for this position.**

The Deputy Administrator will be the bridge between the DFCS Director and DHS administration. The position will be important internally in working with the DFCS Director to:

1. prioritize agency efforts to meet federal, Settlement Agreement, and COA requirements;
2. structure and monitor these efforts or maximum results; and
3. coordinate communications, especially regarding feedback to and input from regional and county DFCS offices.

Externally the Deputy Administrator will guide the DFCS Director and agency staff in:

1. advocating for DFCS with DHS, other state agencies, and the state legislature; and
2. relating to other social services and the community at large.

The Deputy Administrator is the individual who COA will consider as the agency head of DFCS. COA standards for that position require:

1. an advanced degree in a field related to the agency's mission and services;
2. a minimum of five years of related experience;
3. competence in administrating and providing services to individuals, families, and/or children;
4. management skills in addressing human resources and financial matters; and
5. the ability to coordinate the agency's services with other community resources.

**ISSUE 3: There needs to be an increase in state DFCS staffing.** Ongoing administration of the agency, complying with Settlement Agreement requirements, and laying the ground works for COA accreditation are too much for current staff to handle. Regional and county DFCS staff should be involved in state activities (especially accreditation) but their own job demands limit

 

state involvement. State DFCS can define options for temporarily or permanently expanding its staff; however, increased staffing is necessary.

**ISSUE 4: The most crucial position in connecting state DFCS and the county offices are the Regional Directors.** They assure that services are provided and monitored and that state initiatives are implemented locally. The ARA recommends that:

1. they be offered and encouraged to accept additional educational opportunities;
2. their jobs be clearly defined with emphasis on what they do in their regions; and
3. there is an established and sufficient level of supervision between the Regional Directors and the ASWSs.

Most Regional Directors do not have advanced degrees and have little experience in administration. They may supervise staff with advanced degrees and more administrative experience. As DFCS develops more educational opportunities for its staff (see Human Resources Management: Workload Assessment), Regional Directors should be strongly encouraged to return to school for masters degrees in social work or related areas.

The duties of Regional Directors will always be tailored, to some degree, to the territory they cover. However DFCS appears to have defined the position so broadly that there are significant differences in what Regional Directors actually do. With a broadly defined position, Regional Directors may be stretched over too many tasks. DFCS needs to decide:

1. how much it can afford to utilize Regional Directors at state DFCS; Clearly Regional Directors need to be involved in management meetings and to communicate back to their regions but further involvement at state DFCS might be limited to reviewing/reacting to material produced by state DFCS staff; and
2. whether it wants Regional Director positions to be inside or outside jobs. Inside jobs for Regional Directors include supervision of ASWSs, review/sign off on case decisions, and dealing with crises. Outside jobs involve representing the region/county offices to state DFCS, communicating with line staff, providing outreach to community agencies/courts/law enforcement regarding education and cooperation, dealing with facilities/equipment, monitoring services and trends, planning, and budgeting.

This ARA recommends that Regional Director positions should be outside jobs – relating to and providing feedback from all parts of their regions. However DFCS defines the position it needs to realize that a Regional Director with both inside and outside duties will perform both poorly.

Regional Directors supervise too many people (average 18 ASWSs and 2 regional staff). Time and geography keep them from providing the supervision and oversight that all ASWSs need. There are two ways to relieve pressure on Regional Directors:

1. reduce the size of their regions by adding more regions; and
2. establish a level of supervision between them and their ASWSs.

*Accreditation Readiness Assessment Report*     *15*




Both options involve additional staff. Increasing the number of regions puts greater demands on the Director of Field Operations whose span of supervision is increased. While it would reduce the supervisory span for Regional Directors, the number of regions would have to be more than doubled for it to have an appreciable effect in this area.

Creating a level of supervision (Case Supervisors) between Regional Directors and ASWS (assuming the Regional Directors focus on outside roles) solves a number of problems.

- It reduces the span of supervision. Case Supervisors would each supervise four or five ASWSs. The Regional Director would supervise the Case Supervisors plus regional staff.
- It allows more contact with ASWS. Case Supervisors could be stationed in the same part of a region as their ASWSs and meet with them and their staff more often.
- It could allow for Masters level review of key case decisions (see Human Resources Management, Work Assessment) including placement of children, return from foster care, termination of parental rights, and adoption.
- It would provide experienced staff on the ground to handle crises.

Case Supervisors would have a higher pay level and require a MSW or related degree. DFCS would recruit them from existing staff, or other organizations.

## VI: SERVICE DELIVERY

As noted, this is the first of several ARA visits. This visit collected information on how services (CPS, ongoing, foster care, and adoption) actually are provided including:

1. components of services;
2. normal flow of services;
3. factors affecting flow of services;
4. legal aspects of service delivery; and
5. service delivery vis-à-vis COA Standards.

Interviews were conducted at state DFCS with Directors of the Protection and Placement Units and with ASWSs at Hinds County DFCS to capture this information.

Information on services and their delivery will be incorporated into subsequent ARA visits, especially with county DFCS offices. It also will be shared with the COA Mississippi Coordinator for his work with DFCS.

## VII: DFCS WORK GROUPS AND COORDINATION WITH COA

The COA Mississippi Coordinator met with the leaders of nine DFCS work groups established to explore/improve various aspects of agency operations as part of the first year implementation of the Settlement Plan. Currently, there are fourteen such groups:

1. Foster Care;



2. Resource Family;
3. Human Resources;
4. Intake Investigation;
5. Court Improvement;
6. Safety;
7. Policy and Practice;
8. Training;
9. Performance Improvement;
10. Foster Care Review;
11. Administration;
12. Worker Qualifications;
13. MACWIS; and
14. Facilities/Space/Resource Management.

The COA Mississippi Coordinator found that:

1. some groups rarely met;
2. some groups were not at full membership (the Facilities/Space/Resource Management Workgroup had one member);
3. groups generally did not have schedules/plans for items to be produced;
4. some groups did not keep minutes of meetings; and
5. there was a lack of clarity and purpose in the assignment of COA standards to the groups.

Groups do have some strengths. They have produced drafts of material which meet some COA standards. Their membership includes staff from regional and county DFCS offices as well as some other providers. However, the ARA recommends:

1. regular meeting schedules;
2. full membership, ideally with more representation from other service providers and representation from other government agencies, resource families, and clientele;
3. a structure that goes beyond initial Settlement Agreement requirements and is based on COA Administration and Management, Service Delivery Administration, and Service standards (ideally each group would be assigned one set of COA standards);
4. a system to disseminate at least some draft policies and procedures to regional and county DFCS offices for comments;
5. a newsletter to regional and county DFCS offices reporting on the accreditation work and progress of the work groups; and
6. a regular schedule of contacts with the COA Mississippi Coordinator so that he can offer input on products while they are in development rather than reacting to them once they are finished.

## VIII: SETTLEMENT AGREEMENT MANDATED ASSESSMENTS

This section of the report covers Settlement Agreement mandated assessments (based on COA standards) of a number of aspects of the DFCS central office including:




1. the DFCS computer system (MACWIS);
2. fiscal and financial management;
3. a workforce assessment (gap analysis) of the agency's plans to improve staffing;
4. quality improvement systems;
5. contracting practices; and
6. training curricula and the Training Unit.

### MACWIS Assessment (PA-PQI 4.01, PA-RPM 5, 6.01, 6.03, 6.04)

These standards focus on an agency's management information system, especially its:
1. collection of service delivery information focused on key quality factors;
2. access to service information;
3. finance reporting, compliance and other business information;
4. longitudinal reporting and comparisons over time;
5. the use of clear and consistent formats for reporting information; and
6. security of information from disaster, destruction, unauthorized use.

Observations below describe the system and cover these issues.

### MACWIS Assessment (PA-PQI 4.01, PA-RPM 5, 6.01, 6.03, 6.04) Observations

MACWIS collects a variety of information, available by county, region, and state. It includes but is not limited to:
1. population/demographics by program;
2. presenting problems on CPS referrals;
3. CPS referrals accepted for investigation;
4. CPS investigations with a finding;
5. cases without activity for 30 days;
6. proportion of initial CPS assessments meeting deadlines;
7. proportion of reassessments/reviews meeting deadlines;
8. proportion of TPR meeting deadlines;
9. cases legally freed for adoption;
10. demographics of children in custody;
11. distance from home of children in custody;
12. moves for children in custody; and
13. placement moves for children in custody.

Most of this information is available in monthly reports.

MACWIS can note line staffs' caseloads. This part of the system is now down for revisions to allow it to assess what kind of cases each line staff carries.

MACWIS staff note that regional and county DFCS offices are mixed in how they utilize the information produced by the system. The more proactive staff utilizes information to come up with correction plans and monitor areas where they have been deficient.



The MACWIS Director has a PhD in Education. Her Senior Business Analyst came from DFCS direct service.

MACWIS began development in 1997 and was implemented in 2001. A team of 13 staff, primarily from DFCS central office advised on its development. They included administrative, service, and clerical staff.

Initially there was considerable opposition from DFCS field staff who saw little value in the system and often did not enter material on it. Over time staff has begun to see the timesaving advantages of MACWIS (see interview Hinds County DFCS direct service staff). There are Helpdesk staff who can be reached by telephone for information on the system. Work Order and Network staff also help to assure that the system is utilized correctly.

Hinds County DFCS staff report continuing problems with MACWIS especially the inability to correct errors made in reports, occasional loss of information, and inability to enter information when the system is down for repairs/modifications.

The system also has developed a number of ticklers to remind staff to enter material/complete reports. Cases without activity for over a month also are identified. These are aimed at Regional Directors and ASWSs who respond with various degrees of enthusiasm. However MACWIS staff now estimates that over 90% of necessary information is entered in a timely manner.

An advisory board for MACWIS meets quarterly. It has staff from DFCS central office, regional and county office staff, and staff from IT.

The major factor driving MACWIS is federal reporting requirements, especially CFSR and the need for youth transitional data. For several years the agency's Performance Improvement Plan (PIP) has been a major influence.

MACWIS training is the responsibility of the Training Unit. The MACWIS Director understands that there is a basic skills program for new hires. However new staff at Hinds County DFCS (see interview Hinds County direct service staff) noted the need for more training in this area, preferably from people in the MACWIS program.

Agency contractors generally do not utilize MACWIS. However PRN staff (contracted to replace/supplement staff in hurricane affected areas) have been trained on MACWIS.

MACWIS staff are working to interface with related social and legal services, especially the Youth Court System. Other areas for interface are Economic Assistance, Food Stamps, and Child Support. Staff note some suspicion on the part of other systems. MACWIS currently handles referrals for adult protective services although that program is under another division.

Most DFCS case material is on MACWIS. Staff report some county DFCS offices still keep a hard copy (this was not the case in Hinds County). They currently are piloting a scan project to




copy all material. They should be able to decide whether to implement system statewide by 2009.

MACWIS does not handle DFCS payroll but does produce reports on foster care hours that result in paper check payments to resource families. Additional modules in MACWIS handle clothing payments for children and co-handle SSI funds for children. Currently, MACWIS does not handle IV B or IV E payments.

There is an anti-virus system in MACWIS. Staff need to be assigned log-on codes to access the system. Staff sign a confidentiality pledge. MACWIS material is backed up.

MACWIS case material is found on a number of different screens and modules. If COA staff are to review case records through MACWIS they'll need access codes and training on how to access relevant screens or DFCS "guides" to assist them.

MACWIS is not connected to any website. It has no privacy policy.

### MACWIS Assessment (PA-PQI 4.01, PA-RPM 5, 6.01, 6.03, 6.04) Recommendations

As it stands, MACWIS meets most relevant COA standards. Staff generally accept the system and utilize it for case recordings and reports. Failure to enter information/meet deadlines can be detected and warnings are sent out. There appears to be sufficient security for the system. MACWIS produces a wide variety of information on clients, services for clients, and timelines for services.

There are several areas within the COA rubric where MACWIS might be improved/changed and where DFCS might do a better job in utilizing the information it produces.

Line staff at DFCS actually appear to want more training in MACWIS. This is a rarity in the social service world. MACWIS can take advantage of this by:

1.  working with the Training Unit on modules for basic and continuing training on MACWIS; and
2.  offering MACWIS staff to teach basic and advanced training on the system (one complaint from Hinds County DFCS line staff was that present trainers were not always up-to-date on MACWIS).

As the agency develops a PQI plan, it probably will be asking MACWIS to add additional fields of information or to match various indicators now available. MACWIS already has started this (looking at number of children in placement by race, for example).

DFCS's state office needs to look at how regional and local offices utilize MACWIS reports, especially when they note deficiencies. They may need to require corrective action plans and monitor whether improvements occur.




*Fiscal and Financial Management Assessment (PA-FIN 1-5)*

COA standards in this area recognize that public agencies have limited ability to manage their finances since their budgets generally are determined and approved by legislative bodies and/or higher level government bureaucracies. However sound financial practices and accountability are still necessary on both state and local levels. About 95% of DFCS's budget is from federal and state funds (although a few offices receive county funding).

*Fiscal and Financial Management Assessment (PA-FIN 1-5): Observations*

DFCS operates on a State Fiscal Year (SFY) that runs July-June. Its budget for SFY 08 was $86,488,071, up from approximately $77 million in SFY 07. Funding is approximately 70% federal (including but not limited to IV B1, IV B2, IV E, Chafee, CAPTA, Educational Training Vouchers, CBCAP, Children's Justice Act, Refugee CMA, and Refugee Social Services). Federal funding has decreased slightly in the last few years. State general funds (appropriated by the Legislature) and Children's Trust Funds (from birth certificate fees) are about 30% of the budget and have been increasing.

The SFY 09 (7/08-6/09) budget for DFCS is $117,417, 423. This reflects a considerable increase in both federal (to over $80 million) and state (to over $37 million) funding. Increased state funding serves as a match and catalyzes increases in federal funding. The agency notes that most of the increase in state funding is tied to the Settlement Agreement.

DFCS maximizes federal support by automatically applying for SSI for all children in foster care. It liaisons with the Division of Child Support Enforcement to collect all child support payments owed for children in foster care. DHS drew down almost all available Hurricane Katrina funding for DFCS in the current SFY. This coming SFY DFCS should receive Adoption Incentive Funding since it met adoption goals in the current SFY. The agency is contracting with the Public Consulting Group to increase federal IV E payments.

Random moment surveys of DFCS staff activities are a major tool in determining federal billing. The surveys are completed quarterly and include most direct service DFCS staff. MACWIS, which tracks children in foster care, is also important in billing.

DFCS's Financial Director has a Masters in Business Management and has been with DFCS for three years. Her previous career was in banking.

DHS's Office of Budget supplies DFCS with monthly budget status reports. It monitors agency funds and prepares reports on a quarterly basis. It appears to meet OMB standards. DFCS also monitors its own budget monthly and does periodic budget analysis for budget modifications as needed.

Funding is distributed to regional and county DFCS offices quarterly.

The agency does distribute some funds (from SSI) to children in foster care. These funds are




segregated.

DFCS payroll is handled by the Payroll Unit of the DHS's Division of Budget and Accounting. DFCS counties and regional offices submit timesheets at the end of each pay period. The Payroll Unit provides final approval in accordance with the state Department of Finance and Administration policies and procedures. At year end reconciliation of gross pay, FICA withheld and W2s is done in conjunction with the Department of Finance and Administration.

In compliance with the single audit concept, the state Auditors Office will audit DFCS's federal expenditures. Contracts are audited separately.

As noted later, the agency has not yet developed a strategic plan which includes a review of financial risk in relation to financial capacity and resources needed to provide services. It has not conducted a cost analysis of its services including unit cost by program or by county office (service delivery site).

DFCS submits an annual budget as part of the overall DHS budget. Input for this budget generally is limited to the state office. There is very little formal input from county or regional offices; however, MACWIS reports do provide information regarding regional and local staffing needs and case activities.

DFCS contracting practices were not fully reviewed at this time. A further review will be conducted during the November review, including interviews with representatives of organizations that contract with DFCS.

### *Fiscal and Financial Management: (PA-FIN 1-5), Recommendations*

Generally DFCS financial practices appear to meet COA standards.

However, even at a time of increased funding, DFCS needs to look at financial risk. There has been a decline in federal funding both for DFCS and (through TANF) for programs it works with. How DFCS uses its current state funding increase will determine, at least partially, the willingness of the state legislature to continue it. As part of a strategic plan DFCS should assess the viability of its funding sources compared with its mission. It should look at how to measure success in utilizing current funding (new hires, staff retention, reduction in caseload, etc.). It needs to project future community and funding needs, and to explore additional funding streams.

The agency needs to conduct a cost analysis of each of its programs including unit cost of services. Especially important would be a cost analyses by county office. Many county offices, with one or two staff, do not have the advantage of economy of scale. Whether the current county based system is optimal for delivering services efficiently and economically needs to be considered, especially now that the agency has increased funding and the obligation to use it for the greatest impact on services. As noted, DFCS should explore alternate staffing arrangements including clustered staff covering several counties. Cost analysis is key in this recommendation.




Finally MACWIS and the PIP have resulted in ways for county and regional DFCS offices to quantify their needs. Good budget planning, as well as staff morale, suggests that this material along with county and regional feedback be utilized in budget development.

### Human Resources Management: Workforce Assessment (COA Standard PA-HR 2)

This standard requires that an agency reassess its workforce as part of annual planning and prepare for future needs. It is to do so by:

1. conducting a gap analysis between current workforce composition including number, skills, and demographics of current employees and projected workforce needs; and
2. determining how to close gaps, when possible, through recruiting, training, or outsourcing.

This standard ties into COA standards on strategic planning, budget development, and training and professional development (PA-AM 7, PA-FIN 3, PA-TS 1, 2).

### Human Resources Management: Work Assessment (COA Standard PA-HR 2), Observations

DFCS is fortunate in that the state legislature and governor have increased department staffing for the SFY 09 by over 140 permanently funded staff and over 60 time-limited staff.  The agency expects that most of the new positions will be direct service staff in county offices.

DFCS has utilized MACWIS to develop a system to monitor total caseload and mix of case types for all direct service staff (most county offices have mixed caseloads). This will allow them to identify county offices where the average caseload requires more than the number of case-related work minutes per month and recruit/assign new staff accordingly. This system should be implemented in August 2008.

The agency has assigned two staff members to coordinate recruitment. They have appeared at college and other job fairs. Job availability is publicized on the website and in newspapers covering counties where staff is most needed.

DFCS has identified delays in processing new hires. Currently it can take up to several months from job offer to hire. Many candidates find other positions in the interim. DFCS Personnel staff has come up with suggestions on how to reduce processing time which they plan to present to the new DHS Executive Director.

DFCS has a new career ladder program, opening up more promotion opportunities for staff and encouraging them to stay with the agency.

Finally DFCS has student intern programs with several Mississippi College BSW programs.



These programs give the agency the opportunity to:

1. assess the work skill and commitment levels of potential staff;
2. orient potential staff to the environment in which they will be working; and
3. actively encourage strong candidates to apply for DFCS positions.

### Human Resources Management: Work Assessment (COA Standard PA-HR 2) Recommendations

Despite the efforts noted above DFCS has not yet developed a comprehensive personnel gap analysis and plan to meet staffing needs. Without these items in place, the agency may waste some of the resources now available to it without meeting staffing goals noted in the Settlement Agreement.

In its staff planning the agency is not now considering demand for services. Information on increases or decreases in referrals, investigations, and findings, especially longitudinally, will help DFCS to assign staff proactively. Such information might include:

1. number of CAN referrals;
2. percentage of CAN referrals screened in (accepted);
3. type of CAN referrals screened in and investigated;
4. number of ongoing cases; and
5. number of children in custody.

MACWIS should be able to provide this material over time so that DFCS can spot trends in counties and staff accordingly.

In looking at its present staffing, especially for county offices with relatively few staff, DFCS needs to consider staff on leave (number, reason, length).

As part of its gap analysis the agency needs to consider outflow from county offices. This would include:

1. reasons for resignation/termination (DFCS does have supervisors report the reason for staff leaving and there is a voluntary return exit interview; however, this information has not yet been analyzed); and
2. tenure of resigning/terminated staff.

This information will help DFCS understand what to emphasize in staff retention efforts and whether there are tipping points where staff is more likely to leave the agency.

An analysis of outflow is the first step in developing a retention plan for DFCS staff. Such a plan can be as important as recruitment in bringing DFCS to acceptable staffing levels. It would be based on:

 

1. identifying competitors for staff;
2. a survey of competitors including:
   a. salaries;
   b. hard benefits(e.g., pension, medical insurance); and
   c. soft benefits (e.g., vacation, flextime, job security);
3. a survey of staff satisfaction, motivation for staying with or leaving the agency, and suggestions for improvement; and
4. a plan for ongoing staff education (including requirements in the Settlement Agreement).

With this information the agency should be able to analyze the costs and benefits of various approaches to keeping staff and develop a retention plan. Such a plan should include both DFCS staff and resource parents.

Related to retention (and requirements of the Settlement Agreement), the agency needs to develop a plan for staff (especially ASWSs) to return to school for MSW degrees. Such a plan would include:

1. a survey of staff regarding their interest in such a program;
2. work with state colleges with MSW programs to develop part time programs for DFCS staff;
3. defining staff qualifications (time with agency, GPA, evaluations) for admission into a program;
4. defining tuition and other educational benefits that DFCS would pay;
5. defining employment commitment required of program participants; and
6. field placements at DFCS.

Individuals already within DFCS are its greatest potential MSW resource. They know the system and child welfare and many are looking for advancement. Habitualized to the agency, they are likely to stay even after fulfilling their commitment. DFCS should develop a path for advancement as soon as possible.

DFCS notes that it is developing a plan for recruiting new staff as part of its state fiscal year workload plan. It should include:

1. the survey of competitors noted above;
2. an assessment of immediate sources of potential staff including but not limited to:
   a. BSW/MSW programs in and out of state;
   b. other social services (especially if their funding is precarious); and
   c. previous staff (especially individuals who left the agency to become parents);
3. marketing strategies for each source of staff with measures for success;
4. targeting marketing toward filling positions in certain parts of the state; and
5. exploration and expansion of internships and other programs to give students a DFCS experience.

DFCS also might explore the possibility of actively recruiting previous staff members (especially

 

with parenting responsibilities) on a part-time basis.

DFCS Regional Directors and line staff report that many new hires do not really understand the demands of child welfare work and thus soon leave the job. To avoid this, DFCS might want to add discussions between candidates and current line staff to its hiring process.

In developing a gap analysis, the agency needs to consider how efficiencies in service might reduce staffing needs. However, in doing so, it must assure that the quality of services meets COA standards.

One aspect of efficiency is how quickly services are provided and situations are resolved. This is especially relevant in child protective services investigations. If investigations are completed, without a finding, and in a timely manner line staff can accept new referrals. MACWIS currently can identify cases without activity for 30 days. DFCS should consider reducing this timeframe for review of CAN investigations (possibly to 15 days) to identify investigations that might be closed out.

Another aspect, clustering of staff, previously has been discussed as a major efficiency in service delivery (see Agency Environment/Structure).

The Mississippi Settlement Agreement and Reform Plan notes that DFCS will only hire or promote supervisors with advanced degrees in social work or a comparable human service field and two years experience. It also notes that supervisory qualifications will relate to COA standards.

COA strongly supports the professionalization of social work supervision through advanced degrees. It's accreditation agreements with other state child welfare departments have emphasized state support for staff enrollment in MSW programs and has encouraged states to work with local colleges to offer programs at times convenient to staff.

However, in its work with state child welfare departments, COA has come to understand the difficulty of attracting masters level staff to many areas, the temptation of masters level staff to leave for more remunerative and less demanding positions, and the potential disruptions that a comprehensive masters level requirement may have on service delivery systems.

COA has identified key decisions in the child welfare process where the involvement of an experienced masters level supervisor is absolutely required. Involvement means review of the material/activities leading up to the decision and participation in the decision making process. Key decisions which require masters level involvement include:

1. removal of a child from their home (CPS);
2. placement of a child in foster care;
3. return home of a child from foster care;
4. freeing of a child for adoption; and
5. finalizing an adoption.

*Accreditation Readiness Assessment Report*        26




COA allows state child welfare departments to develop their own approach to providing appropriate supervision. They might include:

1. direct supervision from a masters level person;
2. regular supervision from a bachelors level person but with an in-office masters level person participating in key decisions and providing case consultation/oversight;
3. a masters level person covering several contiguous offices and participating in key decisions; and/or
4. specific services (adoption for example) with all masters level supervisors.

Mississippi DFCS clearly needs more masters level supervisors. As noted above most of those supervisors probably will be people already within the system who return to school so an educational/advancement program is crucial. However, DFCS also needs a plan to utilize those masters levels individuals for the greatest impact on program quality.

DFCS has contracted out a number of services in the last few years. As part of its gap analysis, it needs to consider whether it can reduce staffing needs and/or relieve pressure on existing staff by:

1. contracting out certain programs/tasks (on-call night and weekend coverage would be a good example); and/or
2. utilizing contracted staff to deal with unexpected surges in referrals.

In doing so, DFCS will consider cost but also should emphasize continuity and effectiveness of services.

Certainly many of the suggestions above will take time to implement. In the meantime DFCS will need to expand hiring to fill positions, to take advantage of slots recently made available, and to meet Settlement Agreement requirements. However simply filling slots with new hires will not guarantee a stable, educated workforce providing services efficiently. To have such a workforce DFCS needs to consider the suggestions above, choose which ones are most relevant, and develop plans for implementation as soon as possible.

***Performance and Quality Improvement (PQI): System Assessment (COA Standards PA-PQI 1-6, PA-AM 7)***

PQI encourages agencies to collect and use data to develop plans and improve performance regarding program objectives, client satisfaction, and positive client outcomes. As defined by COA, it is a broad-based process including all programs and administration, and incorporating participation from staff, clients, and other stakeholders.

***Performance and Quality Improvement (PQI): System Assessment (COA Standards PA-PQI 1-6, PA-AM 7) Observations***




DFCS has many of the building blocks for a PQI plan. However it lacks expertise in leadership, some crucial components, varied inputs, and an overall plan.

MACWIS has worked to increase the variety of program information available to DFCS. It has guided the agency to a successful completion of its Program Improvement Plan in response to the federal Child and Family Service Review (CFSR).

MACWIS provides ticklers to county staff regarding review and report deadlines. It is also the conduit for incident and complaint reports which are tabulated regularly.

MACWIS provides a variety of information that can be utilized in planning. It is a flexible system that allows for combining and comparing information fields. While DFCS staff utilize MACWIS for a variety of purposes there does not appear to be an overall plan to utilize the information it produces to spot trends, discrepancies among regions, etc.

DCFS has a comprehensive service review system covering all children in DFCS custody. Over a dozen staff, stationed throughout the state, review every custody case at least bi-annually. They utilize an instrument which includes information on:

1. contacts with children;
2. participation in county conferences;
3. Individual Service Plans (ISP) regarding:
    a. completeness;
    b. involvement of all parties (including natural and resource parents);
    c. services to meet identified needs; and
    d. progress towards alleviating the causes of placement;
4. Supervisory Administrative Reviews (SAR);
5. efforts to facilitate parental contact;
6. placement of siblings;
7. TPR referrals within 15 months or an explanation of why not;
8. efforts towards finalizing adoption; and
9. efforts towards independent living or long-term foster care.

This instrument goes beyond deadlines to include the variety of participants, breadth of services; and changes in service plans to meet changes in circumstances. It comes with an extensive guide for use. The instrument has been modified over time, especially for PIP compliance.

Reviewers meet regularly to go over modifications in the instrument, offer input, and receive further training on its use.

Information on children in custody goes into a monthly report for state DFCS and its Regional Directors. The report covers both overall trends and individual cases where remediation is needed. Recent reports have noted issues (information missing from ISP, failure to notify all parties of county conferences) that relate to supervision and case coordination. The head of the review unit (and several of the Regional Directors) report a healthy competition among the

 

Regional Directors based on results noted in the report.

County office staff is not involved in the review of children in custody. However reviewers are stationed in or near the offices they review and, according to Regional Directors, are considered at least somewhat "local" by county DFCS staff.

The author of the instrument for foster care review also has developed an instrument for peer review of CPS cases including screen-ins and screen-outs for initial investigation, ongoing/in-home cases (where there is a finding but no removal and children and parents receive services in their own home), and foster care cases. Line staff reviews a small sample of cases from offices in neighboring counties. They recently tried out the instrument for the first time. Initial staff reaction in the Hinds County office was positive.

Each DFCS county office is reported to prepare a County Self Assessments to determine strengths and areas needing improvement. These go into Regional Action Plans with goals, baselines, methods of measuring progress, and projected/actual dates of completion for specific tasks. DFCS at the state level approves these plans. Regional Directors note that other demands often come in front of this planning process. Information resulting from the process has no role in developing the state DFCS budget.

The PIP process resulting from the 2003 Child and Family Service Review of DFCS, while difficult for the agency, has had several positive results;

1. it defined objectives for the agency and its programs;
2. it involved staff on all levels in meeting these objectives;
3. it got the agency in the habit of measuring its performance; and
4. it showed the agency that it could achieve objectives.

The last PIP report is complete. DFCS is working to keep the good habits resulting from the PIP as it measures compliance with the Settlement Agreement and works to meet COA standards.

A number of DFCS staff has attended COA's PQI training.

Finally, DFCS will be developing a five-year strategic plan (Child and Family Service Plan or Title IV B Plan) which is due to the federal government on June 30, 2009.

In the Accreditation Self Assessment Survey and in interviews, line staff in Hinds County DFCS reflected the efforts the agency has made in PQI. They especially noted PIP efforts. However a majority reported deficiencies in:

1. line staff involvement in setting program outcomes;
2. program identification of the systems and processes necessary to meet program outcomes;
3. reports on program performance distributed to the staff or the community; and
4. measures of client satisfaction.

 

*Performance and Quality Improvement (PQI): System Assessment (COA Standards PA-PQI 1-6, PA-AM 7) Recommendations*

As noted the agency has several key building blocks for PQI, notably MACWIS and the review of children in custody. It has started a third process for peer review of CPS cases that has the advantage of involving line staff in reviews. However this new process raises numerous questions and concerns including:

1.  there already is a working system to review cases of children in custody, is peer review at a local level duplication;
2.  what is the sample size for case reviews and does it meet COA standards;
3.  is the format too complicated and demanding for line staff whose major duty is not case review;
4.  is there a guideline for reviewing initial investigation and in-home cases like that for foster care;
5.  what training have line staff had in reviewing initial investigation and in-home cases;
6.  what systems exist to assure that staff are utilizing the same standards for case review;
7.  how will needs for ongoing training in case review be identified and met;
8.  what systems are being developed to compile material from peer reviews and utilize it in the same way that information from reviews of children in custody is utilized; and
9.  what incentives will line staff have to continue to take on the additional task of case review?

Clearly peer review is a step in the right direction – in terms of good practice and COA standards. However for it to work it will need to be developed and managed in the same planful manner as the children in custody review.

A number of challenges remain in the agency's overall PQI planning.

The first challenge is leadership. The current head of PQI is a lawyer. Despite her commitment to quality assurance, she does not have much experience in this area. Because of her legal skills she often is drawn into other agency activities. The agency needs a full time, experienced PQI leader who can:

1.  maintain and improve reports from MACWIS and the review of cases of children in custody and assure that these reports influence agency policies;
2.  develop the review of CPS cases, especially the involvement of line staff;
3.  engage people throughout the agency in PQI;
4.  communicate results/recommendations to leadership, staff, and the community; and
5.  expand the agency's quality assurance efforts into a full-scale PQI program.

The second challenge is the lack of a strategic plan. This is puzzling for an organization with as many exterior and interior challenges as DFCS. Without such a plan DFCS is a reactive organization, allowing demands (PIP, Settlement Agreement, etc.) to determine its priorities. In its Regional Action Plans the agency has learned some of the formats of strategic planning. It




needs to develop an overall strategic plan including:

1. review of the agency's mission, values, and mandates;
2. review of the agency's relationships with the courts, other parts of the state system, and voluntary and for-profit social services;
3. review of the demographic profile of the service population with past and potential changes in that population;
4. input from all levels of the organization and from a variety of community stakeholders;
5. measurable goals and objectives for both programs and administration; and
6. strategies to meet these goals and objectives.

Aside from independently defining agency goals, a strategic plan could raise DFCS's profile in the state and help it be seen as a proactive organization, seeking community input.

As noted above exploring/planning for a central reporting office and for clustering line staff for better supervision should be included in any strategic plan.
The agency already is required to develop a 5-year strategic plan for Title IV B funding. It should explore merging requirements for that plan and for COA accreditation to develop a plan that meets both sets of expectations and, equally important, serves as a guide for the agency.

The third challenge is maximizing use of information already available to the agency. The agency is good at using MACWIS information to monitor compliance to federal standards. However, it appears a little at-loose-ends about how to discover and explain trends in data. For example, this ARA has noted significant county differences in CAN screen-in rates (see Agency Environment). This is needed material for program administration. However DFCS does not really have a structure for:

1. reviewing MACWIS reports to spot trends and matters for administrative consideration;
2. analyzing resulting material as to the opportunities and threats indicated; and
3. developing and implementing corrective plans where necessary.

The fourth challenge is the present emphasis in data collection/evaluation on quantity of services and timelines in evaluations. These are important for CFSRs; their realization is a good starting point for any organization. However, COA looks beyond this set and fairly mechanistic format to quality-based performance and outcome goals for both programs and clients. Such goals:

1. are set with input from agency stakeholders (clients, other agencies, the community at large);
2. emphasize measurable changes in client behavior/attitudes;
3. emphasize measurable changes in program processes and how they work with clients; and
4. stress changes in plans if initial efforts are not working;

The fifth challenge is the lack of a culture that emphasizes Performance and Quality Improvement (PQI). The agency has a good start here. Staff are aware of and have been involved in the successful PIP effort. They are given useful information from MACWIS and some of them



utilize it. They have some structure for case evaluation and are developing more. DFCS needs:

1. a continuing message from the top down emphasizing quality in services;
2. involvement of as many staff as possible in all parts of PQI;
3. feedback to staff as to the results of PQI efforts; and
4. involvement of PQI in training efforts.

The sixth challenge is the lack of an overall PQI plan. With its strategic plan as a base, DFCS needs to take its existing building blocks and develop an overall and ongoing PQI plan including:

1. program logic models;
2. complete performance and outcome measures for programs;
3. complete performance and outcome measures for clients;
4. community input into PQI planning;
5. a comprehensive survey of community needs;
6. a system to collect and analyze data including but not limited to:
   a. client satisfaction surveys;
   b. stakeholder surveys (with an expansive view of stakeholders);
   c. quarterly random case review (ideally involving all levels of service staff);
   d. existing aggregate client and service information; and
   e. instruments to collect all of the above information;
7. a complete plan to utilize PQI information to make improvements;
8. a plan to share PQI with the community; and
9. an ongoing PQI work group.

This approach will not only meet COA standards but also help the agency to:

1. provide staff with objectives for services;
2. increase staff buy-in to the PQI process;
3. help the agency to argue for additional resources to meet emerging needs; and
4. allow the agency to show what it does and how well it does it in the stakeholder and larger communities.

Once DFCS redefines and expands its current quality assurance staff to incorporate strategic planning and PQI for programs it should consider other, related ways to use that staff. It currently is doing so by collecting incident reports through MACWIS. It could consider utilizing PQI staff for (among other things):

1. staff satisfaction surveys;
2. a significant role in developing and maintaining a risk management plan;
3. contract monitoring;
4. developing unit costs for specific services; and
5. developing material for community presentations.

Child welfare is an inherently stressful business for staff. It also is seen negatively in the




community for taking children from parents rather than for protecting children and reuniting old families or developing new (adoptive ones). PQI helps an agency with both of these problems. It:

1. is clear as to client and program objectives;
2. communicates these objectives to staff and community;
3. allows staff input in setting objectives;
4. encourages staff to measure objective achievement;
5. feeds back progress (or lack of progress) on the achievement of objectives to staff;
6. portrays the agency to the community as an evaluating, proactive organization.

Strategic planning and PQI provide the structure to do the above – not just to meet COA standards and Settlement Agreement requirements, but to maintain and improve the agency.

### *Contracting Practices Assessment (COA Standards PA-RPM 9-10)*

While PA-RPM 9-10 are the COA standards directly related to contract management, PQI standards also must be considered with regard to planning for contracts, contract content, and monitoring contract performance.

### *Contracting Practices Assessment (COA Standards PA-RPM 9-10) Observations*

All contracting is done through State DFCS. That agency has a variety of contracts for direct services to children and families. They include:

1. family preservation services;
2. preventive services;
3. time-limited reunification services;
4. post-adoptive services;
5. the nights/weekends child abuse and neglect hotline;
6. respite care services;
7. resource homes;
8. RTCs; and
9. therapeutic group homes.

In most of these areas, DFCS has a number of contractors. Approximately 30 organizations contract with DFCS for services.

There are also some smaller contracts for evaluation, conferences, and consulting.

In the last five years DFCS has increased contracting notably for family preservation and for temporary child welfare staff for hurricane devastated counties. This latter contract is scheduled to terminate in August 2008.

DFCS staff notes a number of reasons for contracting out. They include:



1. the program experience of contracted agencies;
2. a greater willingness of the legislature to support contracting out rather than adding personnel to the agency;
3. quicker start-up with contractors; and
4. greater ease in modifying programs with contractors;

DFCS generally does not do a complete cost and risk analysis of contracting versus in-house services before contracting out. The nights/weekends child abuse and neglect hotline contract was an exception in that the cost of contractor-DFCS staffing was considered although other-than-personnel cost was not.

Almost all agency contracting is through the RFP process. There is at least one sole source contract (with the Children's Justice Center for work regarding forensic interviews).

RFPs are:

1. open and public;
2. define bidder experience qualifications;
3. define bidder staff qualifications;
4. set overall costs;
5. note selection/award criteria;
6. define referral process/service eligibility; and
7. note reporting requirements.

The state Attorneys General office is involved in drafting RFPs. When proposals are received, they are reviewed by individuals in related services utilizing uniform instruments. Once awards are made it is possible for DFCS or bidders to make modifications. For example, the awardee for the nights/weekends child abuse and neglect hotline contract was asked to add a plan for maintaining services during a natural disaster.

In drafting contracts resulting from RFPs the agency has regular input from the state Attorneys General office. Proposed contracts are reviewed/approved at the DFCS and the DHS level. They go through an administrative review/program integrity process and receive confirmation of funds availability before going through a final legal review.

DFCS reports that approved contracts note:

1. services to be provided;
2. roles and responsibilities of parties;
3. performance goals;
4. duration;
5. reporting requirements;
6. funding/billing/payment; and
7. conditions for modification and termination.




Contracts generally are for one year with options for renewal. To assure timeliness, DFCS maintains a timetable for contract renewal. Modifications generally are made at renewal. The renewal approval process is similar to that of contract approval.

Expenditures are on a cost reimbursement basis. DFCS monitors expenditures throughout the contract year.

In most contracting arrangements, DFCS assigns clients to contracted programs. This generally happens through the DFCS state office.

DFCS has almost no non-contractual arrangements (Memos of Understanding or MOUs) with other organizations. Those that exist are with other state departments and an MOU (not yet finalized) with the Choctaw Nation.

### *Contracting Practices Assessment (COA Standards PA-RPM 9-10) Recommendations*

Please note that these are preliminary recommendations; a further, more in-depth assessment will be conducted as a part of the November Readiness Assessment.

DFCS contracting practices generally appear to meet COA standards. There are several areas where COA standards require more of agency practices.

DFCS needs to finalize its MOU with the Choctaw Nation – either for services through DFCS or through the nation itself.

In deciding to contract out DFCS needs to do a more sophisticated analysis of cost and risk. Cost analysis needs to be expanded to both personnel and other-than-personnel costs. It also should factor in possible changes in demand for services and in funding. Lack of certainty in demand for a service or lack of stability in funding argues for contracting, at least initially.

With regards to risk DFCS contracts often involve high-risk clients and intensive services. The agency needs to formally consider the reputation, staffing, licensure (where applicable), non-contracted resources, and stability of potential contractors. While the program integrity part of contract reviews may cover some of these issues, DFCS should realize that contracted cases may result in negative publicity – both to the contractor and to DFCS. The agency needs to assure that it can defend its contracting choices.

DFCS contracts appear to do an acceptable job of monitoring contact utilization and activities. They could use more specific measures of service provision and results of services. This might involve personalized service plans, changes in plans over time and the mix of resources utilized. Results would include at the minimum:

1. changes in client behavior;
2. changes in client attitudes; and




3. client satisfaction.

DFCS can utilize its PQI work group to develop such measures for its contracts.

*Training (COA Standards PA-TS 1-2)*

COA standards on training emphasize preparing incoming staff and providing employees with ongoing opportunities for professional development.

*Training (COA Standards PA-TS 1-2), Observations*

The DFCS training program is a work in progress. Intensive training for new line staff is in place as are learning labs for new ASWSs. Ongoing training for line and supervisory staff is still in development.

The Director of Training is a licensed MSW and former CPS supervisor. She has been with DFCS since 1994 but only in her present position for six months.  She lives in the southeastern part of the state but is close to the University of Southern Mississippi (USM) which developed much of the training curriculum. Since January 2008 DFCS has hired/is hiring seven training coordinators (BAs and MSWs) who will provide training in the field. The Director of Training now is developing supervisory/evaluation arrangements with these staff. USM will orient the new staff on their training curriculum.

The practice curriculum for new staff has been revised by the University of Southern Mississippi with input from DFCS's training work group. It now consists of 4 weeks of classroom practice, policy, and MACWIS training mixed with 6 weeks of on the job training (270 hours total). New staff must have 3 weeks of on the job training before going to classes. Subjects covered in the classroom training include but are not limited to:

1. client population;
2. needs of families/children;
3. cultural sensitivity/assessing values and beliefs;
4. lines of authority/accountability;
5. personnel issues;
6. mandatory reporting;
7. confidentiality;
8. documentation;
9. processes/procedures for CPS;
10. processes/procedures for foster care;
11. processes/procedures for adoption;
12. child sexual abuse;
13. advocacy resources;
14. quality assurance; and
15. MACWIS.

 

Each subject includes tests on trainee progress and an option for trainee input.

On-the-job training is somewhat less well defined but includes shadowing of line staff involved in all DFCS services and regular supervision by an ASWS.

The Training Director has tested the new curriculum with several groups of new line staff hires. She notes the need for additional training on how to manage the emotional demands of child welfare. She will be reporting to the DFCS Training Work Group regarding revisions in initial training. New staff interviewed at the Hinds County DFCS office was positive about their initial training but noted the need for more and updated MACWIS training and more training on DFCS policy and procedure.

Presently there is no set schedule or location for training of new line staff. Training may be offered in the regions or at the Jackson DFCS office depending on the location of new staff. Training is scheduled as soon as there is a large enough group of new staff available.

Training material for new line staff is still in draft format.

DFCS is just beginning to develop a program for ongoing training for line staff. It will be framed by the Settlement Agreement requirement for 40 hours of ongoing training for direct service staff and 24 hours for ASWSs.

The Training Director notes that the agency recently has provided ongoing training in case planning and supervisory administrative reviews. Present ongoing training offerings include domestic violence and identification of sexual abuse. A two-day training on court presentations is scheduled to be offered in July 2008 and training on dealing with clients with crystal meth problems is being developed. USM has been contracted to develop ongoing training modules including modules on case planning, assessment, engaging, and staff writing skills.

Presently there is no formal method for staff feedback regarding the type of ongoing training needed.

Staff can get released time for training opportunities they discover on their own but there is no reimbursement for training costs.

One source of on-going training is the Mississippi Permanency Partnership Network Conference funded annually by DFCS. It brings together consumers, advocates, public officials, and staff from DFCS and other agencies. It provides a variety of training and chances for enhancement of the statewide child welfare network.

The Settlement Agreement requires 40 hours of in-service training for new ASWSs before assuming supervisory responsibilities.

Training for new ASWSs (Level 1) is provided through 24 two-hour training modules with supervisory mentors. Material for this training was developed by USM and is in a training guide




format. Modules include but are not limited to:

1. identification of supervisory strengths;
2. transition to the supervisory role;
3. four areas of supervision;
4. crisis management;
5. contracting with staff;
6. case reviews and staffing;
7. team development;
8. planning and time management;
9. leading effective meetings;
10. performance standards;
11. professional development;
12. managing conflict;
13. staff retention; and
14. stakeholder relationships.

All regions have implemented Level 1 training for new ASWSs.

DFCS has begun to implement Level 2 supervisory training where ASWSs meet monthly within their regions in Learning Labs with a trainer and discuss issues specific to their child welfare supervision. Modules are chosen based on staff's self identified needs. They include but are not limited to:

1. community partnerships;
2. working with difficult people;
3. leadership styles;
4. interactive leadership,
5. managing  data;
6. personal and professional boundaries; and
7. liability issues.

Learning Labs also have been offered at the Mississippi Permanency Partnership Network Conference.

***Training (COA Standards PA-TS 1-2), Recommendations***

DFCS's Training Unit is to be commended for a quick start-up. It appears to meet some COA standards. That will be confirmed once curricula and training schedules are finalized. The ARA team will need to review this material during their next visit.

However, the training unit has work to do to meet other COA standards. It also needs to look at issues of quality assurance and uniformity in training.

A crucial part of initial training is on-the-job. DFCS needs to clearly define what county DFCS

 

ASWSs should cover in on-the-job training and assure that this part of training is consistent across the counties.

At present there is no uniform system for line-staff or ASWSs to provide input into the kind of ongoing training they believe is needed. The Training Unit should consult with staff involved in PQI about surveying line and supervisory staff regarding training. An annual DFCS staff survey regarding ongoing training should be instituted as soon as possible.

Initial training also should be modified to reflect changes in the agency. Once a PQI plan is developed, staff training in this area should be incorporated.

Training connects to evaluation. DFCS needs to assure that its staff evaluation tools include recommendations for training (for remediation or staff advancement) and that this information is forwarded to the Training Unit.

To meet the Settlement Agreement and COA standards, training for each staff must be documented. MACWIS might be able to develop a field where training scheduled and completed is noted for each staff. Ideally it would include a tickler system to remind staff to confirm when training is completed.

Ongoing training offerings need to relate to requirements of Mississippi's various levels of licensure. This will provide an incentive for staff to attend and confirm training.

DFCS sponsored training (with staff input) should cover most ongoing training needs. However, there will be a need for special training for some staff to handle difficult cases. The opportunity for such training may be a factor in staff retention. The Training Unit needs to identify and assess such training as to its usefulness to the agency.

DFCS would need a pool of funding to either arrange to bring special training to Mississippi or fund staff for training elsewhere. In the latter case it would depend on Regional Directors to identify staff to attend.

Distances and changes in the flow of new staff are challenges to setting a regular schedule for training new staff.

The Training Unit will be especially challenged over the next year as a large cohort of new hires enters the system. They need a plan to deal with this increased demand and should coordinate with MACWIS staff regarding the location and travel needs of new staff.

By monitoring staff turnover by region, it should be possible for the Training Unit to project training needs and locations for new line staff and ASWSs in the out years. There will always be some new staff outside the region where training is offered. DFCS will need to provide funding so they can attend training out of region and complete training within the COA standards timeframe.




Finally as training curricula are finalized, the agency needs to assure that training is offered in a uniform manner. Trainee evaluations and a random monitoring of training sessions may be useful in evaluating trainers.

## IX: SETTLEMENT AGREEMENT 180 DAYS DELIVERABLE REVIEWS

The Settlement Agreement noted a number of 180 day deliverables. Nineteen deliverables were provided before the visit and reviewed by the COA Mississippi Coordinator and the COA Manager of Accreditation Operations. Ten of these deliverables appeared to meet COA standards, another nine were returned to DFCS with specific suggestions for modification. An additional four deliverables were reviewed on site. All appeared to meet COA standards. The COA Mississippi Coordinator will continue to review additional draft material over the summer as DFCS produces it.

## X: STATE DFCS BUILDING INSPECTION

State DFCS shares a relatively new building in central Jackson with several other state social service agencies notably the Division of Economic Assistance. The building is privately owned and managed. It is clean and well-maintained. DFCS staff have offices or cubicles.

ARA staff inspected the building using a Checklist of Physical Indicators including:

1. certificate of occupancy;
2. fire inspection notice;
3. fire extinguishers;
4. emergency exit plans on walls;
5. locked room for server/computer;
6. locked/buzzer/security guard entrance to service area;
7. lights in parking area;
8. first aid kit for DFCS;
9. signs for no smoking;
10. handicapped access entrances;
11. elevator inspections; and
12. a log on facility review.

Most items were found. Evacuation charts lacked a "you are here" notice. There was not a log for building maintenance. There was no first aid kit for DFCS.

## XI: COA STANDARDS: LEVEL OF REVIEW

DFCS has central, regional, and county offices. As in most statewide administrative structures, the central office handles certain administrative roles and develops policies and procedures for regions and counties. However, c ommunications with these other offices and how they implement policies and procedures are local issues. What follows is an outline of COA administration and management, service delivery administration, and service standards with




suggestions as to the administrative level on which they should be reviewed.

<u>Administration and Management</u>: The focus here should be on state DFCS, especially the DHS Deputy Administrator over DFCS, the DFCS Director and his/her management team as well as on strategic planning; however, the Field Director, Regional Directors, and their management of county offices also should be included.

<u>Ethical Practice</u>: The focus here is on state DFCS but with feedback from county offices as to their knowledge of state policies/procedures.

<u>Finances</u>: The focus is on state DFCS but regional/local input into budget development and in situations where local offices get county funding should also be considered.

<u>Human Resource Management</u>: The focus is on state DFCS but includes county office knowledge of state policies, procedures, and practice in recruitment and selection, performance review, and personnel records.

<u>Performance and Quality Improvement</u>: The focus is on state DFCS for creation of a PQI system and selling/training staff in its use. However regional and county offices need to be included regarding participation in PQI and utilization of resulting material.

<u>Risk Prevention and Management</u>: State DFCS will develop an overall risk plan but it will be implemented in each county office. Insurance, information management, and security of information are primarily state issues as are policies on client access/additions to case records and contracts/contract monitoring.

<u>Administrative and Service Environment</u>: This is primarily a county area but with state polices (implemented locally) on health precautions and emergency responses.

<u>Behavior Support and Management</u>: State DFCS should complete sections 1-3. State DFCS and COA need to confirm whether other sections are applicable.

<u>Client Rights</u>: The state DFCS office creates policies and procedures in this area but local implementation needs to be reviewed.

<u>Training and Supervision</u>: Training is developed on the state level and implemented on the regional level with local input into development. Supervision is based on state guidelines but reviewed locally.

<u>Service Areas</u>: COA and DFCS will finalize service areas to be reviewed. They appear to include CPS (including ongoing cases), foster care, kinship care, and adoption. Review will start with state DFCS policies and procedures but will emphasize practices at the county office level.

## XII: HINDS COUNTY DFCS, ACCREDITATION READINESS ASSESSMENT

 

The Hinds County DFCS Accreditation Readiness Assessment consists of:

1. a brief schedule and form review of CPS, ongoing, and foster care case records;
2. an Accreditation Self Assessment Survey of line and supervisory staff;
3. interviews with various levels of Hinds County DFCS staff;
4. interviews with Hinds County staff responsible for DFCS space requirements; and
5. a health and safety walk through of the Hinds County DFCS office.

The framework for this part of the ARA is COA Administration and Management and Service Delivery Administration standards. It reflects the division of those standards among state, regional, and county offices noted above (see COA Standards, Level of Review). The ARA is about Hinds County DFCS compliance with standards but also about the relation between that office and state DFCS.

### Schedule and Form Review, Case Records

ARA reviewers discussed case flow (how cases progress through the child welfare system with ASWSs at the Hinds County DFCS office. Information obtained will be used in other stages of the ARA study vis-à-vis outside influences on cases (notably courts) and internal problems in case flow.

ARA reviewers were able to look at electronic (MACWIS) case records for a small number of CPS (CAN) investigations, ongoing, and foster care cases when they visited the Hinds County DFCS office. These reviews note the presence and timeliness of forms/case entries. The reviews were not comprehensive and did not look at issues of quality and appropriateness of services. However they provide an overview of record keeping and timeliness.

For CPS investigations items reviewed included:

1. identification/biographical information;
2. reason for service request/allegation;
3. safety assessments;
4. explanation of screen-in (accept) or screen-out (reject); and
5. closing (if rejected).

For CPS ongoing or foster care cases items above (except for #5) were included as were:

1. initial service plans;
2. updates in service plans;
3. documentation of ongoing contacts;
4. regular case reviews; and
5. supervisory reviews/sign-offs.

Consent forms and court orders were not reviewed since they are still on paper kept in separate files.




Fourteen CPS investigation, three CPS ongoing, and four foster care cases were reviewed. There were no concerns with the ongoing or foster care cases. However one of the CPS investigation cases lacked a sufficient explanation for screen-out and two had not been closed but reflected no activity for over a month.

Staff at Hinds County DFCS suspected that CPS investigations left in limbo had come from the caseloads of staff who left the agency without bringing their caseloads up-to-date.

This experience in schedule and form review will help COA in ongoing ARA efforts and in an actual accreditation study. The schedule and form review instrument will be revised to reflect DFCS record keeping. For further reviews COA and DFCS have the choice of obtaining access to MACWIS for COA staff and training them in its use or having DFCS staff available to go through MACWIS files. Ideally all material on paper will have been scanned by the time of the COA review. Otherwise it will need to be available for cases reviewed.

*Accreditation Self Assessment Survey*

Accreditation Self Assessment Surveys were completed by over half of line staff and ASWSs at Hinds County DFCS (N = 15). They were tabulated based on whether respondents agreed, disagreed or were unsure regarding each statement in the survey. See Appendix I for a copy of the instrument used.

Hinds Country DFCS staff are not representative of all DFCS line and supervisory staff. They work in the only real urban area in the state and have had a higher turnover of staff than other counties. As the ARA process proceeds, DFCS staff from other counties will be surveyed. However this survey does provide a first from-the-ground-up view of DFCS.

Statements in the Accreditation Self Assessment Survey are designed so that "agrees" answers reflect aspects of the agency that are positive vis-à-vis accreditation standards ("Our agency provides information regularly to the community about our programs, finances, and activities", for example). "Disagree" answers indicate that respondents do not believe the agency is meeting certain standards/objectives. "Unsure" answers indicate that respondents do not have enough information to agree/disagree. "Unsure" may be understandable in a few situations – program staff may have forgotten some policies not used in day-to-day practices or are not aware of aspects of agency administration. However "unsure" answers are much more likely to reflect a lack of knowledge in an area where staff should be knowledgeable (about program evaluation plans for example) or to be a polite way to say that an activity or procedure does not exist.

A breakdown by categories and statements where at least half (50%+) of respondents disagreed (D) and/or was unsure (U) follows.

*Mission and Goals (0 statements where 50%+ disagree/unsure in 2 statements)*

*Administration and Management (4 statements where 50%+ disagree/unsure in 7 statements)*




Our staff, volunteers, and other key stakeholders and community members provide input into agency planning (60% disagree, 6% unsure)
Communication within the agency is clear and timely (53% disagree)
The agency seeks my input about issues that involve my job (73% disagree)
The agency seeks my input in matters that concern the overall success of the agency (73% disagree, 6% unsure)

*Ethical Practices (2 statements where 50%+ disagree/unsure in 4 statements)*

Our county has a "no retaliation" or "whistleblower" policy for staff who identify problems to management (33% disagree, 20% unsure)
Our agency does not offer preferential treatment to staff or board or their friends or families in applying for and receiving services (33% disagree, 20% unsure)

*Human Resource Management (7 statements where 50%+ disagree/unsure in 29 statements)*

Our agency has a nepotism policy which is strictly followed (40% disagree, 27% unsure)
I received basic training regarding my position within the first sixty days of my employment with the agency  (53% disagree)
The agency sets personnel satisfaction and staff retention goals annually (33% disagree, 27% unsure)
The agency surveys staff annually regarding their satisfaction on the job (53% disagree, 7% unsure)
The agency responds appropriately to issues identified through staff satisfaction surveys (73% disagree)
I am asked about my training needs when new training is developed (60% disagree)
I am informed when job openings for which I may qualify become available (53%)

*Linkages (0 statement where 50%+ disagree/unsure in 3 statements)*

*Cultural Competence (1 statements where 50%+ disagree/unsure in 2 statements)*

The agency actively seeks involvement and feedback from community stakeholders with diverse perspectives (40% disagree, 20% unsure)

*Performance Improvement and Outcomes (5 statements where 50%+ disagree/unsure in 17 statements)*

In my program line staff is included in setting program outcomes (53% disagree, 7% unsure)
My program has identified the key systems and processes that are essential to meeting program outcomes (40% disagree, 13% unsure)
Agency produced reports on program performance are distributed to all staff (40% disagree, 20% unsure)
Those reports are distributed to key stakeholders in the community (27% disagree, 40% unsure)

 

The agency measures consumer satisfaction at regularly defined intervals (40% disagree, 20% unsure)

*Community Involvement and Advocacy (0 statements where 50%+ disagree/unsure in 3 statements)*

*Risk Prevention and Management (1 statements where 50%+ disagree/unsure in 6 statements)*

In general, it is agency policy that clients have access to their case records (53% disagree, 7% unsure)

*Administrative and Service Environment (3 statements where 50%+ disagree/unsure in 6 statements)*

Our agency takes appropriate measures to assure the safety of staff who work off-site (53% disagree)
Fire drills are conducted regularly at the site where I work (47%disagree, 7% unsure)
I have been trained on how to respond to medical threats and emergencies (67% disagree)

*Client Rights (2 statements where 50%+ disagree/unsure in 8 statements)*

Grievance procedures are distributed to clients at admission (53% disagree, 20% unsure)
Client grievance procedures include opportunities for at least one level of review that does not include the person about whom the complaint is being made (27% disagree 33% unsure)

Overall, of 87 statements in the Accreditation Self Assessment Survey, at least half of respondents disagreed with or was unsure about 25 or 29%. Compared with other Accreditation Self Assessment Surveys disagree/unsure percentages of 50+% are about average.  The proportion of statements with 50%+ disagrees/unsure percentages are highest (half or more of statements) in the following categories:

1. Administration and Management (4 of 7)
2. Ethical Practices (2 of 4)
3. Performance Improvement and Outcomes (12 of 17)
4. Administration and Service Environment (3 of 6)

These comments are discussed in reports of interviews with Hinds County DFCS staff. To some degree negative/unsure responses reflected ignorance or forgetfulness regarding agency policies (nepotism is not a subject that line staff think about daily). However they also reflect actual concerns or deficits at the agency.

***Review of COA Administration and Management and Administration of Service Delivery Standards for Hinds County DFCS***

*Administration and Management*




The Regional Director of Region III, where Hinds County DFCS is located, is Maggie Mixon. A MSW, she has been with DFCS for 17 years, has served as acting Regional Director on many occasions,a nd has been Regional Director officially for two years. She previously worked for the Urban League. Her regional staff includes an adoption specialist and regional ASWSs. Ms. Mixon is based in Jackson and spends about 60% of her time at Hinds County DFCS. She meets monthly with all ASWSs in her region regarding case reporting, feedback from administrative reviews, and state DFCS administrative changes. Ms. Mixon and especially regional ASWS Mary Jones meet with the six Hinds County ASWS regularly regarding administrative issues, staff assignment, and specific cases.

Ms. Mixon believes that she and Ms. Jones have good communications with Hinds County DFCS staff but there are problems in administrative communications between the local office and state DFCS. She especially notes problems in confirming financial eligibility for foster care payments.

Staff interviewed agree regarding communications on both levels. There is open communication with the Regional Director and regional ASWSs (although staff may not like the messages they receive). Line staff at Hinds County DFCS do not believe they have input into decisions made at state DFCS. They do not think they are kept informed of changes and initiatives on the state level.

Ms. Mixon report that Hinds County DFCS has a negative reputation (taking children from parents) in the larger community. There no longer is an interagency council in Hinds County so it is difficult to plan with other agencies. Hinds County DFCS does try to work with other agencies on individual cases. However, line staff report problems in obtaining information on abuse and sexual abuse cases from local hospitals.

Hinds County DFCS participates with the local Multi-Disciplinary Review Team. It has worked hard to educate its referral sources, notably Head Start.

All levels of staff report that relations with a new County Judge are problematic – he is too quick to place children and reluctant to return them home. Ms. Mixon has met with him and staff are being trained in how to prepare for court appearances. However, line staff and ASWSs note that their recommendations often are summarily rejected and they are sometimes treated with disrespect. Staff notes that state DFCS should meet with the judge if conditions do not improve.

Hinds County DFCS changed from specialized to mixed caseload units about a year ago. The change was made primarily to assure continuity in casework service. Supervisors and specifically line staff have found that this new approach disrupts making and implementing case plans. They note that CPS investigations must take priority and often delay planning meetings, preparing court material or even court appearances. These concerns have been exacerbated by continuing staff shortages/turnover at the Hinds County office. Ms. Mixon says the office might go to a model of CPS and foster care staff in the same unit. This would help with continuity (at least under the same ASWS) while allowing line staff to have specialized caseloads. However, she

 

notes that all staff must be able to take cases in all areas during an emergency.

*Ethical Practices*

This is a set of COA standards primarily covered at the state DFCS level. Hinds County line and ASWS staff are not aware of DFCS policy regarding retaliation against whistleblowers or on preferential treatment in services.

*Financial Management*

This also is an area primarily covered at the state DFCS level. Ms. Mixon reports no real input into development of the state DFCS budget.

State DFCS supplies approximately $72,000 annually to Region III for clothing/personal allowances for foster care children. Hinds County provides approximately $23,000 annually to the local office for medications, clothing, etc. for children in placement. Staff requests for both these funds are handled by a regional bookkeeper who also submits reports on expenditures to the state and county.

Hinds County also pays the salaries of fourteen support staff for Hinds County DFCS. These are case aides, homemakers, and chauffeurs for children in care. They are crucial in providing support for child welfare staff. Ms. Mixon submits an annual proposal for this staff and testifies to County Commissioners.

*Human Resource Management*

At the time of the ARA, Hinds County DFCS had 25 direct service workers and 6 ASWSs. There were four line staff vacancies.

ASWS said they interviewed candidates for vacant line staff positions. They believed that many candidates did not understand the work and commitment required for DFCS positions. The Jackson area offers other opportunities for social workers, especially with MSWs. ASWSs noted that some newer staff had left for other positions, occasionally without bringing their cases up-to-date. Among the direct service staff interviewed there definitely was a split between short-term (11 staff with two or less years) and long-term (7 staff with seven or more years) staff.

Hinds County has a considerable advantage in staff recruitment because of its intern program with Jackson State University. A number of line staff had come out of Jackson State BSW and MSW programs.

ASWSs and line staff were not aware of a DFCS nepotism policy but were aware of the staff grievance policy. Staff were not aware of any DFCS staff satisfaction or retention goals or surveys of staff in these areas. In the Accreditation Self Assessment Survey over half of respondents said they were not made aware of job openings. Interviews clarified that this information, while available, was difficult to obtain.





Staff generally reported having state personnel manuals. They said they were not evaluated regularly. ASWSs mentioned that a new evaluation format was being developed at the state level. They had job descriptions but noted that their actual duties often differed from what was in job descriptions. Most personnel record material for local staff is kept at state DFCS.

When asked what kept them at DFCS, staff noted the desire to work with families and children and job security. They see changes at DFCS resulting from federal regulators and the Settlement Agreement as having the potential to make their jobs better (although some ASWSs are concerned about the MSW requirement).

When asked about factors that would push them towards leaving Hinds County, line staff unanimously noted on-call status. That said that while on-call nights and weekends, they still received new referrals and had to maintain their caseloads and that call duties disrupted their personal child-caring arrangements. They also mentioned pay and caseload as negative factors. They are frustrated at not being able to use overtime because of continuing staff shortages. ASWSs were especially frustrated at having to arrange for emergency re-placements from children, often referred by the Department of Youth Services and not suitable for DFCS placements.

Finally staff with advanced Family Protection titles said they would like to be assigned cases more commensurate with their expertise.

*Performance and Quality Assurance*

Line and supervisory staff at Hinds County DFCS are well-versed in quality assurance. PIP, MACWIS, and reviews of children in custody (one of the reviewers has space in the Hinds County office) have given them feedback on performance. Staff has just gone through their first try-out with the new CPS review instrument. They see reviews as an extra task but one with the potential to provide useful information. Hinds County may be particularly sensitive in this area since it had several fatalities last year.

Hinds County DFCS staff know little about PQI or their roles in it. They note that the feedback they get from MACWIS and case reviews is not shared with the community. Finally, they have no information on consumer satisfaction surveys.

*Risk Prevention and Management*

This is a set of COA standards primarily covered at the state DFCS level. There is no assessment of overall risk at the Hinds County office or any DFCS staff assigned to review immediate and ongoing risks. Ms. Mixon is aware of state DFCS work group on staff safety. She submits Serious Incident Reports to the state whenever there are incidents/accidents involving staff or clients. Staff are not aware of state policies on client access to case records.

*Administration and Service Environment*

 

Hinds County DFCS shares a relatively new building in northwest Jackson with several other social service agencies notably the Division of Economic Assistance. The county-owned building is managed by Linda Robinson, Hinds County Fiscal Coordinator.

ARA staff inspected the building using a Checklist of Physical Indicators (See State DFCS Building Inspection). Since this building was a service delivery site, the checklist was expanded to include:

1. locked file cabinets for case records (material not on MACWIS);
2. locked room for server/computer;
3. interview rooms;
4. family visitation rooms;
5. panic buzzers;
6. cell phones for field;
7. child car seats; and
8. a log on vehicle review.

A certificate of occupancy was said not to be needed since the building is owned by the county government. Cell phones have been assigned by DFCS since October 2007. They have panic buttons. Ms. Robinson keeps a log on facility review. DFCS staff use their own cars so a log on vehicle review is not necessary. Ms. Robinson reports an annual fire/tornado drill. DFCS staff is housed in offices or cubicles in a clean and pleasant environment. DFCS space lacks evacuation plans; they had been taken down but will be replaced. There is no first aid kit for DFCS.

Staff report that in practice they can double up on field visits in dangerous situations or call on the combined city/county police. However, neither of these practices is written in policy. Staff are concerned about safety. During interviews several mentioned that they had been mugged in the field.

Many staff report no fire drills but admit that they may have missed drills while in the field. Staff report that they have not been trained for medical emergencies.

*Client Rights*

This is a set of COA standards primarily covered at the state DFCS level. Hinds County staff note that no statement of rights and responsibilities is distributed to clients. They are generally unaware of any client grievance procedure. They are aware of procedures and forms for release of information from clients.

*Training and Supervision*

About a quarter of the Hinds County staff interviewed had been through the new DFCS core training. They liked the idea of alternating on-the-job and training time and felt they had gotten some good basic material from the training. However they had numerous suggestions for




improvement. They wanted more training on MACWIS from trainers experienced and up-to-date in its use. They also wanted more coverage of DFCS policies and procedures and less "Social Work 101" (most of the trainees had come out of BSW or MSW programs).

Staff had a variety of suggestions for improvements in ongoing training but had not been asked to offer input. Licensed staff wanted to assure that there would be enough relevant ongoing training to meet licensure requirements.

Of the ASWSs interviewed, two had MSWs, one a MS in Counseling, one a BSW, and one a BA. Three had full (five direct service staff) units while two had smaller units with vacancies that would be filled in the coming months. These supervisory spans are within COA standards. ASWSs noted that they had group supervision meetings every two weeks and had one-on-one supervisory sessions with staff monthly. Line staff determined which cases were covered at those sessions. ASWSs also mentioned that there were quarterly reviews of all foster care cases. Line staff generally confirmed this.

March 2008 stats noted Hinds County DFCS caseload at 38.0. Line staff interviewed in June 2008 reported similar or larger caseloads. Thus while supervisory spans may be within COA standards, caseloads (and the number of cases supervised) are problematic.

ASWSs note that they are responsible for decisions on removing children from/returning them to home. They note some regional ASWS involvement in freeing children for adoption. Specialized regional staff find adoptive homes.

_Recommendations_

Hinds County DFCS is the largest county office in the DFCS system. It has an advantage in recruiting staff (urban area, presence of BSW/MSW programs) but the disadvantages that come from working in an urban area with high service demand. The suggestions that follow may relate to Hind County DFCS or to state DFCS.

Ms. Mixon is considering whether to keep the practice of assigning mixed caseloads or shift to specialized caseloads or units. This is important not only for Hinds County but for developing a statewide approach useful in other relatively large counties and for cluster units if state DFCS reorganizes its service delivery system. She should seek input from local staff and the Director of Field Operations especially in setting the criteria to judge whatever approach is utilized.

Hinds County DFCS notes communication problems with state DFCS. Part of this reflects a lack of knowledge about existing policies and procedures and part a desire to know more about how state DFCS is changing. Re-distributing existing policies and procedures with a contact person available if there are questions would be helpful. State DFCS may want to consider a simple quarterly newsletter to report on its activities to county offices. State DFCS also may want to consider Hinds County DFCS as a convenient resource from which to draw staff for work groups and seek feedback on draft policies and procedures (once vacancies at the agency are filled).

_Accreditation Readiness Assessment Report_          50




Ms. Mixon has made her best efforts to orient the new Hinds County Youth Court Judge. However, staff still report problems. She may want to consult with her Director of Field Operations regarding bringing in state DFCS staff or someone from the court system to work with this judge.

On-call status is the biggest disincentive for Hinds County staff to stay with DFCS. State DFCS may want to poll other Regional Directors as to whether this is as crucial an issue in their areas. If it is, they may want to consider contracting out this service.

Hinds County DFCS staff is surprisingly positive regarding quality assurance. They are just beginning to know its cousin, PQI. State DFCS should utilize their input in developing a full PQI plan.

Once the state has developed overall policies on risk prevention Ms. Mixon might want to set up a regional risk management committee to work with counties on risk reduction and prevention activities and to do a quarterly review of incidents. The state needs to formalize practices regarding doubling up on visits and police escorts.

Once the state DFCS develops policies and formats on client rights, Ms. Mixon will need to assure that they are implemented regionally.

DFCS's training unit needs to facilitate input on training from all regions and counties.

Enough ASWSs have the right degrees to sign off on crucial child welfare decisions. However, reduction of caseloads to COA standards depends on state DFCS recruitment and assignment polices.

## XIII: CHALLENGES IN THE ACCREDITATION PROCESS

This ARA has made multiple suggestions as to changes in DFCS administration and practice. All of these proposed changes relate to the accreditation process – both to specific standards and to the structures and systems that will facilitate accreditation and better practice. Fortunately, DFCS is at the beginning of a long process to prepare for accreditation. It has time to plan and implement changes that will facilitate accreditation.

The three major changes suggested by this ARA are:

1. centralization of the CPS referral system;
2. clustering county field staff into units; and
3. developing a supervisory level between Regional Directors and ASWSs.

In reviewing/planning these changes DFCS might:

1. form a structural change group including (but not limited to) the DHS Director (or his designee), the Deputy Administrator, the DFCS Director; and DFCS's Counsel for the




Settlement Agreement;

2. set a schedule for review and decision on each of the three changes;

3. utilize MACWIS for internal information and the COA Mississippi Accreditation Coordinator to explore how state agencies that are accredited or preparing for accreditation structure their services;

4. develop models for CAN referrals, clustering staff, and supervision;

5. review benefits and possible downsides of changes in these areas (see Agency Environment);

6. define what levels of approval outside of the agency would be necessary for these changes and strategize how to get this approval; and

7. finalize the changes to be made and develop plans to implement them.

These changes will take the longest to define and implement. They are important to accreditation efforts. DFCS needs to start the process as soon as possible.

As noted in the Human Resources Management: Workforce Assessment, DFCS needs to resolve differences between COA and the Settlement Agreement expectations on how many MSW level supervisory staff are needed. However DFCS now has the opportunity to hire many additional staff. It needs to complete its work force assessment and let that assessment guide hiring. Decisions on structural changes may ultimately affect staff deployment and duties but hiring is needed now to fill vacancies and reduce caseloads. Workforce assessment based hiring should allow the agency to move towards meeting Settlement Agreement requirements and provide enough quality staff to allow for possible restructuring.

Other changes noted in this report and in the Settlement Agreement relate to specific COA standards. As reformed work groups produce drafts, the COA Mississippi Accreditation Coordinator will review them against standards. However, production of COA related policies and procedures is only a first step. Work groups need to assure that policies and procedures in a particular area (personnel policies, for example) hang together, do not contain contradictions, and apply to most situations. Some changes in policies and procedures require funding. Scholarships for agency staff to obtain MSWs is a good example. As such policies and procedures are produced, DFCS (and the legislature) need to decide how to pay for their implementation.

As policies and procedures are finalized DFCS needs to:

1. distribute them to regional and county offices;

2. train staff in implementation;

3. allow for feedback regarding implementation; and

4. monitor regional and county offices to assure that implementation is successful.

As noted, subsequent ARA visits will involve regional and county offices. COA standards stress practice. DFCS needs to assure that its new policies and procedures do not sit on a shelf.

Finally DFCS needs to build on its structure of foster care review and MACWIS to develop a full PQI program. It should start with staff (a new director with experience in child welfare and



quality assurance) and structure (strategic and PQI plans) before implementing any further quality assurance efforts.

This ARA has identified many tasks for DFCS as it approaches the accreditation process. It also has noted some important strengths:

1. a strong fiscal and financial management system;
2. a well-managed system for contracting;
3. a practical and adaptable management information system (MACWIS); and
4. a dedicated staff at state and Hinds County DFCS.

With commitment and planning at top levels of DHS/DFCS, the agency can build on these resources and prepare for accreditation.

*Danel Remine ARA Team*
*Ann Hibbert, ARA Team*
*Jim Mooney, COA Mississippi Coordinator*
*Reid Scher, COA Manager of Accreditation Operations*

*July 21, 2008*

**Ex. 3**

**Lori Lynn Woodruff, LMSW, M.Ed.**

**Home:**
33 CR 715
Stringer, MS 39481
(601) 725-4332

**Work:**
The University of Southern Mississippi
School of Social Work
118 College Drive
Drawer #5114
Hattiesburg, MS 39406
(601) 266-5956 (w)  (601) 670-5879 (c)
lori.woodruff@usm.edu

**Education:**

Mississippi College, Clinton, MS
        Master of Education, School Psychometry, May 2001

The University of Southern Mississippi, Hattiesburg, MS
        MSW Social Work, August 1989

Mississippi State University, Starkville, MS
        BSW Social Work, December 1981

**License and Certification:**

**Educator License:  License Number 173043**
Mississippi State Department of Education

AA 213  Psychometrist (K-12)
A    221  Mildly/Moderately Disabilities (K-12)
A    192  Social Studies  (7 – 12)
A    119  English  **(7-12)**

**Licensed Master Social Worker:  License Number  M0577**
Mississippi State Board of Examiners for Social Work and Marriage and Family
Therapists

**Awards and Distinctions:**

Commissioner's Award, United States Department of Health and Human Services
     For outstanding leadership and service in the prevention of child abuse and
     neglect

National Association of Social Workers – Mississippi Chapter
     1996 Social Worker of the Year

Supreme Court Judges' Commission for Child Welfare/Court Improvement.
Appointed position.  2006 – 2008

National Resource Center for Permanency Planning – Board Member (mid 1990's)
Hunter College School of Social Work, New York, NY

**Professional Affiliations:**

Commission on Children's Justice
Appointed member (current)

Children's Justice Task Force Member – 4-year term

Mississippi Conference on Social Welfare
     Past President
     Past President Elect
     Past Central District Representative
     Past Secretary
     Nominations Committee

**Current Employment:**

August 01, 2004 – present  - The University of Southern Mississippi
                School of Social Work
                Director, Child Welfare Programs

                Currently teach SWK 329 Interviewing and Recording
                SWK 474/692 Children and Families
                SWK 605 Policy

                Facilitate the Training Academy Contract – USM/DFCS
                Components:
- Forrest County DFCS Project
- Train the Trainer
- Level One Supervisory Training*
- Learning Lab – Supervisory Training (Statewide)

2

**Employment History:**

08-2001 – 08-2004    West Jasper School District
                              School Psychometrist

07-1999 – 08-2001    West Jasper School District
                              Case Manager

04-1998 – 07 – 1999  Regional Director
                              Mississippi Department of Human Services
                              Region IV – Division of Family and Children's Services
                              Responsibility for the regions Division of Family and Children's
                              Services Unit – 68 staff

12-1996 – 04-1998    Social Work Consultant
                              Mississippi Department of Human Services
                              Division of Family and Children's Services
                              Provided statewide training
                              Supervised training unit staff

1994 – 1996           Mississippi Department of Human Services
                              Division of Family and Children's Services
                              Training Unit
                              Staff development and training in the areas of:
                                        Child/adult abuse/neglect, foster care,
                                        Permanency planning, family preservation,
                                        Clerical, bookkeeping, social work supervision

1987 – 1994           Area Social Work Supervisor
                              Division of Family and Children's Services

1984-1986            County Supervisor
                              Lee County, Mississippi
                              DFCS

1982 – 1984           County Social Worker
                              Lee County Department of Human Services
                              Tupelo, MS

1982 – 1997           Other duties assigned:
                              Special Investigator:  Child Sexual Abuse
                              Special Investigator:  Child Deaths
                              Federal Review:  Team Member
                              Self-Assessment: Team Member
                              Public Awareness Initiatives
                              Numerous Committees

Child Welfare Practice Manual
Tendered as Expert Witness in a Number of Court Jurisdictions
in the area of Child Abuse/Neglect and Child Sexual Abuse

Other:                    Mississippi State University Adjunct Faculty
                          School of Social Work
                          Taught Child Welfare

**Special Training:**

*Including, but not limited to the following:*

Clinical Intervention of Sexual Abuse:  Suzanne Sgroi, M.S.
Abuse in Foster Care:  Thelma Bailey
Child Abuse Conferences:  Numerous years
Law Enforcement Training:  Law Enforcement Academy State of Mississippi
Sexual Abuse Investigation:  Ethel Amacher
Social Work Attitude, Knowledge, Skills :  The University of Southern Mississippi
MS Conference on Social Welfare:  Numerous Years
Administration Training:  DHS
Working with the Legal System:  DHS
Psychological Aspects of Supervision:  Jackson State University
Child Sexual Abuse:  Advanced Training:  Ethel Amacher
Making Adoption Work;  Kathyrn Donley
Stress Management:  Parkwood Hospital
Three Week Social Worker Certification Course:  The University of Tennessee
Child Abuse in the Youth Court/Circuit Courts:  The University of Tennessee
MS Chapter NASW: Numerous Conferences
Nonviolent Crisis Intervention:  National Crisis Prevention
Field Instructor Training: University of Southern Mississippi
Clerical Training – MDHS
Child Welfare Practice Manual Training – Thelma and Walter Bailey
Reaching at Risk Children and Youth – Collaborative Effort – State Agencies
Supervision and Systemic Accountability – DFCS/MDHS
MS Permanency Partnership – MDHS/DFCS
Substance Abuse Workshop – Dr. Dee Unterbach
Treating Sexually Abused Children Through Plan Therapy – Byron E. Norton
Working with Traumatized Children – Dottie Wardwimmer
The Managerial Parent:  Dr. John Rosemond
Children in Poverty:  University of Mississippi
The Horrors of Child Abuse, Past, Present, Future:  University of Southern Mississippi
Investigating Techniques in Child Abuse:  Laurel Police Department
Community Organization: MDHS
Social Work Supervision: Dr. Dee Unterbach
Social Work Supervision: The University of Tennessee
Social Work Supervision:  MDHS/DFCS

4

Foster Care Workshop:  Randy Hill
State of the Children Conference:  MS Families for Kids
National Association of School Psychologists – National Conference 2000
Adams and Reese – 3rd Annual Special Education Conference 1999
Adams and Reese – 4th Annual Special Education Conference 2000
Autism Conference – Biloxi, MS
Functional Behavior Assessment – Phase I
Functional Behavior Assessment – Phase II

**Specialized Autism Training:**

Division TEACCH, Ashville and Chapel Hill, North Carolina

**Fundamentals of Structured Teaching:**
        For professionals working with students with autism.  The general purpose of the training was to provide the participant with a greater understanding of autism and how it affects learning and social/communication development.  Additionally, the course offered participants specific structured teaching strategies for use with autistic children.
        15 hours instructional time

Psychological Testing with the Autistic Student and Issues Related to Assessment of High Functioning Autistic Individuals
        6 hours instructional time

**Psychoeducational Profile Testing Training**
        6 hours instructional time

**Childhood Autism Rating Scale**
        6 hours instructional time

**Treatment and Education of Autistic and Related Communication Handicapped Children**
        The general purpose of this training was to provide teachers and other professionals with a greater understanding of autism while offering them specific structured teaching strategies for use with autistic children.
        35 instructional hours

**Social Development in Autism**
        Two-day conference

**An Introduction to Autism:**  The University of Southern Mississippi

**Young Children with Autism:**  Educational Perspectives and Practical Strategies

5

**Ex. 4A**

CareerBuilder Job Application :200122216

Robert Michael (Mike) Gallarno

2104 Silver Lane  Madison, MS 39110  (601) 707 7081/(601) 359 6697

Objective
To lead a team oriented program delivering services to those in need.

Experience

Bureau Director II, Bureau of Long Term Care
December 1, 2003 – present  Mississippi Division of Medicaid, Jackson, MS
Plan, direct and oversee the activities of staff within a multi-division Bureau.
Responsible for implementation of significant components of
the Billy A (Olmsted) lawsuit settlement agreement,
particularly implementation of a pre-admission screening
tool for entry into Medicaid Long Term Care
programs. Moved from paper system to web portal based system.
Oversee policy and procedure for programs within Bureau.
Assure program compliance with Federal/Sate policies.
Write and revise policy to accommodate changes in law or
federal guidance and prepare for Executive
approval and filing per Administrative Procedures Act.
Serve as liaison to represent the Bureau
with others within the agency and outside of the agency.

Division Director II, Children's Medical Program
May 1, 1996 – November 30, 2003  Mississippi State Department of Health, Jackson, MS
Administrative responsibility for state Title V Children
with Special Healthcare Needs (CSHCN) Program.
Plan, direct and supervise statewide program components,
including clinical services and third party payer components.
Maternal and Child Health Block Grant writing
responsibilities for CSHCN program portion of $10.3 million grant.
Maintain and develop program working relationships with
public and private agencies and providers serving or
advocating for target population.
Serve as liaison to represent program within the agency and outside of the agency.

Administrator
September 1995 – April 1996  Rehabilitation Centers
Incorporated, dba Millcreek Rehabilitation Center, Magee, MS
Oversee daily operations of residential and support
services programs of 79 bed ICF/MR and 66 bed Psychiatric
Residential Treatment Center (PRTF) for
children and adolescents and associated accredited school.
Participate in short and long term planning, development
and management of budgets, staffing and rounds for three
shifts. Chief of staff of Executive Committee. Deliver reports to Board of Directors.
Assure facility compliance with Federal, State, local and
Joint Commission standards and regulations. Address patient/resident rights issues.
Serve as liaison for agency with youth courts, social
service agencies and other outside entities
such as law enforcement regarding PRTF population.

Health Care Consultant
June 1995 – September 2005  Key  Healthcare Groupealth CareH, Jackson, MS
Consultant for development of Social Work and Therapy in Home Health settings.
Principal team member in development and
start up, of Home Health Agency, Baton, Rouge, LA.
Recruitment and retention of professional staff.

Manager, Therapy Services
November 1992 – May 1995  Mississippi Methodist Rehabilitation Center, Jackson, MS
Manage delivery of comprehensive therapy (PT, OT, ST) and
Social Work services to home health patients in 16 county
area in central MS and 6 parishes in Eastern LA.
Developed and supervised transcription

CareerBuilder Job Application :200122216

services division for professional staff clinical notes.
Assure areas of responsibilities meet Joint Commission
requirements, federal (CMS) conditions of
participation and state licensure requirements.
Responsible for recruitment and retention of professional staff.
Helped develop agency home health program for children.

Director, Contract Therapy Services
November 1994 - May 1995 (Concurrent with preceding
position) Mississippi Methodist Rehabilitation Center, Jackson, MS
Manage contract for comprehensive rehabilitation services
in 120 bed long term care facility.
Administratively supervise delivery of PT, OT, ST and RT
services to Nursing Home residents, including utilization
of Certified Occupational Therapy Assistants (COTAs) and
licensed Physical Therapy Assistants (PTAs).
Developed Team Leader positions for peer supervision.
Agency liaison with Nursing Home
Administrator. Ensure agency compliance with contract terms.
Prepare and submit monthly billing statements.

Assistant Director for Pediatrics, Social Work Department
June 1987 - October 1992
University Hospital, University of Mississippi Medical Center, Jackson, MS
Manage/supervise delivery of Social Work services to
children and families served by UMC (Batson) Children's
Hospital, Neonatal ICU and Children's Rehabilitation Center.
Coordinated all reporting of Suspected Child Abuse/Neglect
for Hospital; liaison to Mississippi Department of Human
Services and Youth/Chancery Courts.
Upon Physician referral, coordinate Social
Work assessment of suspected child abuse/neglect cases.
Responsible for service assignments, professional and
licensure supervision of staff, on call schedules QA/CQI
monitor reporting, and meeting Joint Commission standards.

Assistant Director for Pediatrics, Social Work Department
June 1987 - October 1992   University Hospital, University
of Mississippi Medical Center, Jackson, MS   (continued)
Clinical Services responsibilities included
Pediatric HIV/AIDS, Neurosurgery and Neurology.
Particular experience and expertise in
evaluations related to skull fractures in infants and children.

Social Worker II, Neonatal Intensive Care Unit/Nursery
December 1984 - June 1987  University Medical Center
Department of Pediatrics, Division of Newborn Medicine, Jackson, MS
Assessment, referral and counseling services to families in crisis.
Particular experience and expertise with adoptions, special
needs discharge planning, crisis intervention, grief
counseling/services related to separation and loss and critical illness.
Acting NICU/Nursery Social Work Supervisor January 1986 - June 1987.

Social Worker II, Pediatrics
July 1983 - December 1984  University (Batson) Children's
Hospital , University of Mississippi Medical Center Jackson, MS
Comprehensive Social Work services to children and families
requiring inpatient, outpatient, and
emergency medical care in coordination with medical team.
Bio-psychosocial assessments, discharge planning, suspected
abuse/neglect evaluations, referral to statewide community
resources.  Particular experience and
expertise with suspected child abuse/neglect, fractures.
Clinical Services responsibilities include orthopedics,
cardiology/cardiovascular surgery, adolescent medicine, surgery, and emergency
medicine.

Career Bundle: Job Application .200122216

Social Worker II, Adult Hospital
October 1982 - June 1983
University Hospital, University of Mississippi Medical Center, Jackson, MS
Assessment and referral, discharge planning, crisis
intervention, community resource referrals, on call
emergency Social Work services to
individuals and families experiencing medical related crises.
Clinical Services responsibilities included orthopedics,
trauma, surgery, urology, ophthalmology, and amputee.
Particular experience with prosthetics, post amputation recovery and rehabilitation.

Respite Program Consultant and Trainer
May 1992 - October 1993   Foundation for Disability Resources, Inc.  Oxford, MS
Responsible fro teaching/training
prospective Respite Care workers in Universal Precautions.
Developed and administered pretest/post test instrument.
Wrote respite training manual section on Universal Precautions.

Research Assistant
July 1982 - September 1982  University of Mississippi, University, MS
Grant funded project to develop instrument to measure child
welfare worker's knowledge of policy and
procedure related to suspected child abuse and neglect.
Student academic counseling.

Graduate Social Work Intern
January 1982 - May 1982St. Jude Children's Research Hospital, Memphis, TN
Clinical Graduate Social Work Internship working with
children diagnosed with various forms of cancer and related diseases and their
families.
Particular experience with Laotian culture.

Education
University of Tennessee, Knoxville, TN
1980 - 1982
Master of Science, Social Work (MSSW)
Student Government Representative

University of Mississippi, University, MS
1975 - 1980
Bachelor of Social Work (BSW)
Minor: Political Science/Law Enforcement

Licensure
Mississippi: Licensed Clinical Social Worker (LCSW), #C0309

Publications
?      York, Glyn Y., Gallarno, Robert M., and York, Reginald O.: "Baby Doe
Regulations and Medical Judgment," Social Science and Medicine, 30(6):657-664, 1990.
?      Gallarno, R.M., "Working with Children with HIV Infection, The Need for
Respite Care," Family Time Out Respite Program Training Manual, Mississippi Department
of Human Services, Foundation for Disability Resources, Inc., 1992.
?      Gallarno, R.M. and Mooers, G. "Medical Treatment of Children and Parental
Refusal Because of Religious Beliefs," Proceedings of the 10th European Congress on
Perinatal Medicine. Edited: K. Jahrig, H.J. Worashk, F. Ropke. 315, 1986.  (ABSTRACT).
?      Gallarno, R.M., "Parental Rights," Mississippi Perinatal Update, 4(2):3,
December 1986.

Community/Professional Service
March of Dimes, Mississippi Chapter
1985 - present , Jackson, MS
Board of Directors 1995 - 2003; Board Chair 1998 - 2000
Program Services Committee 1988 - 1998, 2003 - present

Ronald McDonald Children's Charities of Mississippi
(formerly Lovebilt, Incorporated dba Ronald McDonald House of Jackson, MS)

CareerBuilder Job Application :200122216

1988 - present,   Jackson, MS
Board of Directors 1988 - 1995, 2002 -
present; Board Chair 1990 - 1991, Chair Elect 2008 - 2009

Friends of Children's Hospital
1993 - 1995  , Jackson, MS
Board of Directors

Mississippi Chapter, National Association of Social Workers
1994 - 1999  , Jackson, MS
Board of Directors

The Compassionate Friends
1986 - 1992, Jackson, MS
Professional Advisory Board

Mississippi Perinatal Association
1991 - 1993  , Jackson, MS
President

National Association of Perinatal Social Workers
1987 - 1989
Board of Directors

Awards

Public Health Administrator of the Year, Mississippi Public Health Association,
(2003).
Mississippi March of Dimes Hall of Fame (1999); Volunteer Leadership Award, (1994).
Outstanding Young Men of America, United States Jaycees, (1981).

References
References are available on request.

**Ex. 4B**

# Mississippi Department of Human Services
## Division of Family and Children's Services
### Approved 11/20/2008



II-E

II-W

III-N

III-S

IV-N

IV-S

V-W

V-E

VI

VII-E

VII-W

Tunica 22
Tate 8
Panola 25
Quitman 4
Tallahatchie 12
Yalobusha 9
Grenada 9
Leflore 24
Carroll 18
Montgomery 7
Webster 25
Clay 20
Choctaw 5
Oktibbeha 7
Lowndes 59
Holmes 10
Attala
Winston 21
Noxubee 8
Yazoo 69
Leake 1
Neshoba 76
Kemper 5
Madison 16
Scott 43
Newton 11
Lauderdale 137
Warren 76
Hinds 353
Rankin 37
Smith 12
Jasper 16
Clarke 15
Claiborne 4
Copiah 91
Simpson 18
Jefferson 12
Lincoln 37
Lawrence 6
Covington 11
Jones 42
Wayne 23
Adams 107
Franklin 12
Marion 10
Lamar 32
Forrest 148
Perry 11
Greene 1
Wilkinson 4
Amite 8
Pike 76
Walthall 24
Pearl River 91
Stone 80
George 2
Hancock 129
Harrison 313
Jackson 362
Benton 4
Tippah 39
Alcorn 44
Prentiss
Marshall
Tippah

**Ex. 4C**

*Office of Classification and Compensation*

| | |
|---|---|
| *Agency:* | *MS Department of Human Services – Family & Children Services (90651/0662)* |
| *Subject:* | *Reorganization and Non-Budgeted Upward Reallocations* |

# MS Department of Human Services – Family & Children Services
## Reorganization and Non-Budgeted Upward Reallocations

**Statement of Request:**

Reorganization of the Mississippi Department of Human Services – Family and Children's Services

Non-Budgeted Upward Reallocations:

PIN:    1070 (Filled)
From:   Bureau Director II, OCCU 4406, PR $53,600.93 - $93,801.63
To:     Office Director II, OCCU 6821, PR $63,408.35 - $110,964.61

| | |
|---|---|
| **Monthly Base Implementation Cost:** | **$   817.29** |
| **Annual Cost with Fringe:** | **$11,914.49** |

PIN:    8425 (Filled)
From:   DHS-Program Administrator Senior, OCCU 3619, PR $40,848.71 - $71,485.24
To:     Division Director II, OCCU 1959, PR $45,154.91 - $79,021.09

| | |
|---|---|
| **Monthly Base Implementation Cost:** | **$   358.85** |
| **Annual Cost with Fringe:** | **$ 5,231.36** |

| | |
|---|---|
| ***Total Monthly Base Implementation Cost:*** | ***$ 1,176.14*** |
| ***Total Annual Cost with Fringe:*** | ***$17,145.85*** |

**Justification:**

The Mississippi Department of Human Services (MDHS) – Division of Family and Children Services (DFCS) is requesting approval of the agency reorganization. At the request of the Executive Director of the Mississippi Department of Human Services, staff of the Mississippi State Personnel Board met with Mr. Don Thompson on October 9, 2008 to address his concept of redefining the DFCS's organizational structure to clearly exemplify the main agency functional responsibilities. During the months of October and November 2008, the State Personnel Board staff conducted several consultative meetings regarding the agency's organizational structure with Mrs. Lori Woodruff, Director of the Division of Family and Children Services. This

*Office of Classification and Compensation*

| | |
|---|---|
| *Agency:* | *MS Department of Human Services – Family & Children Services (90651/0662)* |
| *Subject:* | *Reorganization and Non-Budgeted Upward Reallocations* |

resulted in the above requested reorganization.

The agency's current organization is fragmented without a clear separation of the offices/bureaus based on agency function. Staff recommends the agency reorganize to consolidate a combination of existing functional units into three (3) functional offices/bureaus. Therefore, staff recommends the proposed reorganization/restructuring of the MDHS-DFCS based on the following main functions of the agency: Financial Services, Performance & Quality Improvement, and Children & Family Services. The operations of each of these functional units will be directed by an Office Director II position except for Financial Services, which will be directed by a Bureau Director I. The functional directors will report directly to the DFCS Director.

The following three (3) functional support positions/programs were also identified: Accreditation Coordination, DFCS Policy, and DFCS Training. The operations of each of these functional support positions/programs will be directed by a Staff Officer position except for DFCS Training, which will be directed by the DHS-Family Protection Training Director. Due to the consequence of error associated to the overall DFCS program effectiveness, the functional support positions/programs will report directly to the DFCS Director as well.

The agency requests the subsequent non-budgeted upward reallocations to facilitate the establishment of the proposed structure.

**Appropriateness of Request:**

As defined in *Mississippi Variable Compensation Plan, Policy Memorandum No. 2 for FY 2009*, Section D.3:

> All requests for reallocation and realignment must be justified and submitted by the requesting agency as outlined in the <u>Mississippi SPB Policy and Procedures Manual</u> for approval by the State Personnel Board or the State Personnel Director.

Staff has reviewed all pertinent documentation submitted by the agency and has determined the proposed structural modification of the agency is warranted as well as the associated reallocations. This new structure will allow the agency to meet the Olivia Y settlement agreement standards and will better define key functions within the agency.

Therefore, staff recommends approval of the reallocations listed below to classify the positions at the appropriate generic management level classification according to the assigned scope of responsibility and level of supervision. Approval will facilitate the establishment of the proposed structure.

D2

*Office of Classification and Compensation*

**Agency:**      *MS Department of Human Services – Family & Children Services (90651/0662)*
**Subject:**     *Reorganization and Non-Budgeted Upward Reallocations*

| PIN (Filled/ Vacant) | Current Title | Current Start | Proposed Title | Proposed Start | Cost with Fringe |
|---|---|---|---|---|---|
| 8330 (f) | Bureau Director II | $53,600.93 | Staff Officer I | $41,254.98 | (-$14,998.40) |
| 1070 (f) | Bureau Director II | $53,600.93 | Office Director II | $63,408.35 | $11,914.49 |
| 8425 (v) | DHS-Program Admor. Sr. | $40,848.71 | Division Director II | $45,154.91 | $5,231.36 |
| 0578 (v) | Lead Programmer Analyst | $55,274.36 | Systems Manager I | $55,274.36 | 0.00 |
| 0250 (v) | Special Projects Officer IV | $36,176.62 | Bureau Director I | $48,962.51 | $14,532.86 |
| 1056 (v) | DHS-Program Admor. Sr. | $40,848.71 | Division Director II | $45,154.91 | $5,231.36 |
| 0558 (v) | Op./Mgmt. Analyst Principal | $31,421.77 | Division Director II | $45,154.91 | $16,683.62 |
| 0576 (v) | Lead Programmer Analyst | $55,274.36 | Bureau Director II | $53,600.93 | (-$2,032.96) |
| 0158 (v) | DHS-Program Specialist | $27,615.55 | Division Director I | $41,254.98 | $16,569.78 |
| 1055 (v) | DHS-Program Admor. Sr. | $40,848.71 | Division Director II | $45,154.91 | $5,231.36 |
| 0574 (v) | Lead Programmer Analyst | $55,274.36 | Bureau Director II | $53,600.93 | (-$2,032.96) |
| 0575 (v) | Lead Programmer Analyst | $55,274.36 | Bureau Director II | $53,600.93 | (-$2,032.96) |
| 0001 (f) | Branch Director II | $39,362.72 | DHS-Family Protection Worker I | $23,643.58 | (-$19,096.30) |
| 14 PINs (v) | DHS-Family Protection Worker I | $23,643.58 | Social Work Consultant | $35,412.73 | $200,167.54 |
| 3 PINs (v) | DHS-Family Protection Worker I | $23,643.58 | Social Services Regional Director | $40,890.84 | $62,858.19 |
| | | | Total Cost with Fringe: | | $298,226.98 |

Staff assisted the agency with the identification of the following three (3) functional support positions/programs: Accreditation Coordination, DFCS Policy, and DFCS Training. Staff concurs that a Staff Officer position direct the operations of each of these functional support positions/programs except for DFCS Training, which is directed by the DHS-Family Protection Training Director. As a result of the consequence of error associated to the overall DFCS program effectiveness, the functional support positions/programs will report directly to the DFCS Director. However, PIN 8330, the DFCS Policy Director, will remain as titled until such time as the incumbent retires, resigns or accepts another position elsewhere. At that time, a request for a downward reallocation as indicated in the above list will be submitted.

Staff recommends the agency reorganize to consolidate a combination of existing functional units into the following three (3) functional offices/bureaus: Financial Services, Performance & Quality Improvement, and Children & Family Services. The operations of each of these functional units will be directed by an Office Director II position except for Financial Services,

*Office of Classification and Compensation*

| | |
|---|---|
| *Agency:* | *MS Department of Human Services – Family & Children Services (90651/0662)* |
| *Subject:* | *Reorganization and Non-Budgeted Upward Reallocations* |

which will be directed by a Bureau Director I. The functional directors will also report directly to the DFCS Director.

The *Financial Services Bureau* is directed by PIN 0250 and consists of the following divisions: Budget & Financial Planning Services, Contracts & Grants Management Services, and DFCS Revenue Management Services. Staff recommends the non-budgeted upward reallocation of PIN 0250 from Special Projects Officer IV to Bureau Director I. *Budget & Financial Planning Services* is directed by PIN 8420 and is responsible for directing all budgeting and financial planning and/or reporting for DFCS programs. *Contracts & Grants Management Services* is directed by PIN 0601 and is responsible for: managing the financial and budget concerns regarding all DFCS grants and contracts; monitoring the contracts and grants budget performance and reporting requirement; and performing approval reviews of all DFCS grants and contracts for performance based/measurable outcomes, regular and reliable reporting design requirements, and budget design/layout consistent with federal requirements. *DFCS Revenue Management Services* is directed by PIN 0103 and is responsible for coordinating all DFCS activities related to Title IV-B and IV-E revenue, monitoring DFCS federal programs financial compliance terms, and notifying appropriate staff when concerns are identified along with recommendations for corrective action. Staff recommends the operation of each of these Financial Services Bureaus will be directed by a Division Director II position, which the identified positions are currently.

The *Office of Performance & Quality Improvement* is directed by PIN 1070 and consists of the following units: Foster Care Review, Evaluation & Monitoring, and Mississippi Automated Child Welfare Information System (MACWIS). Staff recommends approval of the non-budgeted upward reallocation of PIN 1070 from Bureau Director II to Office Director II. *Foster Care Review* is responsible for the State of Mississippi Foster Care Review System and will be directed by PIN 8425. Staff recommends approval of the non-budgeted upward reallocation of PIN 8425 from DHS-Program Administrator Senior to Division Director II. *Evaluation & Monitoring* is directed by PIN 0376, which is a Division Director II, and is responsible for the Program Improvement Initiative and the Licensure Compliance Quality Assurance, as well as gathering data regarding special investigations and/or case inquiry requests and conducting data analysis. *MACWIS* is directed by PIN 0578 and is responsible for the validity and availability of electronic data, as well as the reports generated from the agency system used either for federal compliance reporting basis or in drawdown of federal funding. Staff recommends approval of the non-budgeted upward reallocation of PIN 0578 from Lead Programmer Analyst to Systems Manager I, pending review by the ITPDC.

The *Division of Children & Family Services (Social Services)* is directed by an Office Director II (PIN 0080) and consists of the following bureaus: Prevention & Protection Services, Permanency Planning Services, North Social Services Field Operations Services, and South

*Office of Classification and Compensation*

| | |
|---|---|
| *Agency:* | *MS Department of Human Services – Family & Children Services (90651/0662)* |
| *Subject:* | *Reorganization and Non-Budgeted Upward Reallocations* |

Social Services Field Operations Services.

- *Prevention & Protection Services* consists of Primary Prevention, Secondary Prevention, and Tertiary Prevention. PIN 1069, a Bureau Director II, is responsible for the overall administration of the Prevention & Protection Bureau. *Primary Prevention* focuses on services provided to the community in an effort to prevent child abuse and prevent agency involvement and is directed by PIN 1056. *Secondary Prevention* focuses on services as they relate to determining the agency's involvement in the prevention of child abuse and neglect and is directed by PIN 9967, which is a Division Director II. *Tertiary Prevention* focuses on services provided to prevent abuse of children while in custody of DHS/DCFS and is directed by PIN 0558. Staff recommends the operation of each of these Prevention & Protection Divisions be directed by a Division Director II position. Therefore, staff concurs with the non-budgeted upward reallocation of PIN 1056 from DHS-Program Administrator Senior and PIN 0558 from Operations Management Analyst Principal to Division Director II.

  PIN 0001 is currently overseeing the Fingerprinting responsibility located within the Secondary Prevention Division. It will remain as titled until such time as the incumbent retires, resigns or accepts another position elsewhere. At that time, a request for a downward reallocation from Branch Director II to DHS-Family Protection Worker I will be submitted and the position will be relocated to the Social Services Field Operations.

- *Permanency Planning Services* consists of Independent Living Services, Adoption Services, Interstate Compact Services, and Congregate Care & Therapeutic Resource Development Services. PIN 0576 is responsible for the overall administration of the Permanency Planning Services Bureau. Therefore, staff recommends the non-budgeted upward reallocation of PIN 0576 from Lead Programmer Analyst to Bureau Director II. *Independent Living Services* serves children ages fourteen to twenty-one (14 – 21) with a wide variety of federally mandated services, such as, but not limited to the following: Independent Living Preparation Program, Independent Living Transitional Living Program, College Registration & Transition to College Program, as well as the Independent Living Statewide and Regionally Based Conferences. PIN 1071, which is a Division Director I, will direct the Independent Living Services Division. *Adoption Services* is responsible for the State of Mississippi Adoption Program and is directed by PIN 8001, which is a Division Director II. *Interstate Compact Services* is responsible for the oversight tracking of all interstate compact requests for the interstate placement of children from other states and the interstate placement of children from Mississippi to other states. PIN 0158 is responsible for the overall administration of the Interstate Compact Services Division. Therefore, staff recommends the non-budgeted upward reallocation of PIN 0158 from DHS-Program Specialist to Division Director I. *Congregate Care & Therapeutic Resource Development Services* is responsible

for the placement and care of foster care children who have physical, mental, and/or emotional disabilities that require specialized caregivers and is responsible for the development of a service delivery system that is responsive to the needs of the population which is serves.  PIN 1055 is responsible for the overall administration of the Congregate Care & Therapeutic Resource Development Services Division.  Therefore, staff recommends the non-budgeted upward reallocation of PIN 1055 from DHS-Program Administrator Senior to Division Director II.

- *Social Services Field Operations Services* is responsible for the regional and county frontline operations as it relates to the safety, permanency, and well-being of the population served. DFCS has divided the state into half with a Bureau Director II position assigned to oversee the administration of each. The *North Social Services Field Operations* unit will consist of Regions I-N, I-S, II-E, II-W, III-N, and IV-N and is overseen by PIN 0574; while the *South Social Services Field Operations* unit will consist of Regions III-S, IV-S, V-E, V-W, IV, VII-E, and VII-W and is overseen by PIN 0575.  Staff concurs with the non-budgeted upward reallocations of PINs 0574 and 0575 from Lead Programmer Analyst to Bureau Director II. Approval will reduce the span of control of the Social Services Field Operations Director from supervising 7 - 10 Social Services Regional Directors to having two Social Services Field Operations Directors supervising 6 - 7 Social Services Regional Directors.

DFCS would also like to divide the state from seven (7) Regional Districts into thirteen (13) Regional Districts.  The agency currently has ten (10) Social Services Regional Directors assigned, with an additional three (3) required. Therefore, staff recommends approval of the non-budgeted upward reallocation of PINs 0732, 0733, and 0734 from DHS-Family Protection Worker I to Social Services Regional Director.  Approval will reduce the span of control of the Social Services Regional Directors from approximately twenty-one (21) DHS-Area Social Worker Supervisors to approximately eleven (11) DHS-Area Social Worker Supervisors.

The Social Work Consultant positions will assist the agency in complying with the settlement agreement mandate regarding Licensed Master's Level Social Work (MLSW) case supervision over field staff.  Staff recommends that a Social Work Consultant position is assigned to each Social Services Regional Office along with one assigned specifically to Hinds County and to Harrison County. The agency currently has one (1) Social Work Consultant, with an additional fourteen (14) required. Therefore, staff recommends approval of the non-budgeted upward reallocation of PINs 0717, 0719, 0720, 0721, 0722, 0723, 0724, 0725, 0726, 0727, 0728, 0729, 0730, and 0731 from DHS-Family Protection Worker I to Social Work Consultant.

Furthermore, staff recommends approval of the service-type changes from state service to non-

*Office of Classification and Compensation*

| | |
|---|---|
| *Agency:* | *MS Department of Human Services – Family & Children Services (90651/0662)* |
| *Subject:* | *Reorganization and Non-Budgeted Upward Reallocations* |

state service (X-16) as a condition of the proposed reallocations for the following eight (8) PINs: 8425, 0578, 0250, 1056, 0558, 0576, 0574, and 0575. This is in accordance with <u>Section 43-1-2 (6), Mississippi Code, as amended</u>:

> The Executive Director of Human Services shall appoint heads of offices, bureaus and divisions, as defined in <u>Section 7-17-11</u>, who shall serve at the pleasure of the executive director. The salary and compensation of such office, bureau and division heads shall be subject to the rules and regulations adopted and promulgated by the State Personnel Board as created under <u>Section 25-9-101</u> et seq. The executive director shall have the authority to organize offices as deemed appropriate to carry out the responsibilities of the department. The organization charts of the department shall be presented annually with the budget request of the Governor for review by the Legislature.

Staff has reviewed DHS-DFCS's proposed organizational structure and has determined it feasible. Staff concurs with all requested organizational changes, subsequent reallocations, and necessary service type changes, all effective November 1, 2008.

**Recommendation:**

Approval of the proposed organizational structure, effective November 1, 2008.

Approval of the non-budgeted upward reallocation of PIN 1070 from Bureau Director II, OCCU 4406, PR $53,600.93 - $93,801.63 to Office Director II, OCCU 6821, PR $63,408.35 - $110,964.61, effective November 1, 2008.

Approval of the non-budgeted upward reallocation of PIN 8425 from DHS-Program Administrator Senior, OCCU 3619, PR $40,848.71 - $71,485.24 to Division Director II, OCCU 1959, PR $45,154.91 - $79,021.09, effective November 1, 2008.

Division of Family and Children's Services
**CURRENT**

Department of Human Service
Agency 90650/0662 FY 2009
Current



DHS-Deputy Administrator
$77.7   E(X-16)   90649/0262
DFCS-Executive Director

Office Director II
$63.4   E(X-16)   0080
Family and Children Services

Admin. Assistant V
$27.7   E(X-14)   0141

Bureau Director II
$53.6   E(X-14)   1069
Administration

Bureau Director II
$53.6   E(X-14)   1070
Continuous Quality Improvement

Bureau Director II
$53.6   E(X-16)   8330
Operations

Branch Director II
$39.4   E(X-14)   0001
Administration

DHS-Program Admor. Sr
$40.8   E   8421
Personnel & Finger Printing

Staff Officer I
$49.0   E(X-14)   0203
Risk Management

Division Director II
$45.2   E(X-16)   0376
Field Operations

Division Director II
$45.2   E(X-14)   0103
MACWIS

DHS-Family Protection Tng. Dir.
$43.0   E   0606
Training

Division Director II
$45.2   E(X-16)   0601
Prevention

Division Director II
$45.2   E(X-16)   8420
Finance

Division Director II
$45.2   E(X-14)   9967
Policy

Division Director II
$45.2   E(X-16)   8001
Placement

DHS-Financial Coordinator
$38.1   E   1057
Eligibility

Division of Family and Children's Services



Legend:
- Upward Reallocation
- Downward Reallocation Vacant
- Downward Reallocation Filled
- Lateral Reallocation

DHS-Deputy Administrator
$77.7    E(X-16)    90649/0262
DFCS Executive Director

Administrative Assistant IV
$25.4    E(X-14)    0356
Admin Support

Staff Officer II
$49.0    E(X-14)    0203
Accreditation Coordinator

Staff Officer I
$41.3    E(X-10)    8800
DFCS Policy Services

DHS-Family Protection Tng. Dir.
$43.0    E    0606
DFCS Training Services

Communication

Bureau Director I
$48.3    E(X-14)    0250
Financial Services
page 2

Office Director II
Soc.    E(X-14)    1070
Performance & Quality Improvement
page 3

Office Director II
$63.4    E(X-16)    0080
Division of CFS (Social Services)
page 4

Division of Family Children's Services



Bureau Director I
$48.9    E(X-14)    0250
Financial Services

Admin. Assistant IV
$25.4    N    9034
Admin Support

Division Director II
$45.2    E(X-16)    8420
Budget & Financial Planning

Division Director II
$45.2    E(X-16)    0601
Contracts & Grants Management

Division Director II
$45.2    E(X-14)    0103
DFCS Revenue Management

Division of Family and Children's Services



Division of Family and Children's Services

```
                          ┌─────────────────────────────────┐
                          │        Office Director II        │
                          │  $63.4      E(X-16)      0080     │
                          ├─────────────────────────────────┤
                          │  Division of CFS (Social Services)│
                          └─────────────────────────────────┘

            ┌─────────────────────────────────┐
            │        Admin. Assistant. V        │
            │  $27.7      E(X-14)      0141     │
            ├─────────────────────────────────┤
            │          Admin Support            │
            └─────────────────────────────────┘
```

| Bureau Director II | Bureau Director II | Bureau Director II | Bureau Director II |
|---|---|---|---|
| $53.6    E(X-14)    1069 | $53.6    E(X-16)    0576 | $53.6    E(X-16)    0574 | $53.6    E(X-16)    0575 |
| Prevention & Protection Services | Permancy Planning Services | North Field Services | South Field Services |
| page 5 | page 6 | page 7 | page 7 |

Division of Family and Children's Services



Division of Family and Children's Services



Bureau Director II
$53.6     E(X-16)     0576
Permancy Planning Services

Secretary Principal
$19.9     E     9048
Admin Support

Division Director I
$41.3     E(X-14)     1071
Independent Living Services

Division Director II
$45.2     E(X-16)     8001
Adoption Services

Division Director
$41.3     E(X-14)     0158
Interstate Compact Services

Division Director II
$45.2     E(X-14)     1055
Congregate Care & Theraputic Resource Services

Division of Family and Children's Services



Bureau Director II
$53.6            E(X-16)
North or South Social Services Field Operations

Secretary Principal
$19.9          N
Admin Support

Social Work Consultant
$35.4   E    15 positions

DHS-Area Social Work Supervisor
$37.5            E
Resouce Regional ASWS

Social Services Regional Director
$40.8            E
13 Regional Directors

Admin. Assistant I
$19.6          N
Admin Support

Secretary Principal
$19.9          N
Admin Support

DHS-Family Protection Worker I  $23.6
DHS-Family Protection Worker II $27.6
DHS-Family Protection Specialist  $27.6
DHS-Family Protection Spec, Sr. $30.0
DHS-Family Protection Spec, Adv. $32.7

Resource Workers

DHS-Area Social Work Supvervisor
$37.5            E
County ASWS

Admin. Assistant I
$19.6          N
Admin Support

DHS-Family Protection Worker I $23.6
DHS-Family Protection Worker $27.6
DHS-Family Protection Specialist $27.6
DHS-Family Protection Spec, Sr. $30.0
DHS-Family Protection Spec, Adv. $32.7

Direct Service Workers

**Total Average Positions Assigned**
Social Services Regional Director - 6-7
Area Social Work Supervisor - 11
DHS-Family Protection Worker I - 11
DHS-Family Protection Worker II - 4
DHS- Family Protection Specialist - 28
DHS-Family Protection Specialist, Senior - 3
DHS-Family Protection Specialist Advanced - 14

CuRRent



DFCS Regions

Proposed



North

South

**Ex. 4D**

# *LINDA MILLSAP*

*77 Mattie Drive*
*Ellisville, MS 39437*
**(601) 477-9731**
*E-mail: Linda.Millsap@mdhs.ms.gov*

## OBJECTIVE

*To obtain a challenging and rewarding position in the child welfare field in which my fullest potential and intellectual ability can be utilized with an opportunity for professional growth, development, and advancement.*

## SUMMARY OF QUALIFICATIONS

- Skilled in multi-tasking, problem solving, and management
- Organized and detail oriented in managing priorities, projects, and meeting deadlines
- Excellent communication, organizational, and interpersonal skills

## EXPERIENCE

### *PROGRAM ADMINISTRATOR/AREA SOCIAL WORKER SUPERVISOR*

**Mississippi Department of Human Services**          **1999-Present**          **Laurel, MS**

- Supervise up to twenty resource workers in the following areas: recruitment activities, training resource parents, retaining resource parents, monitoring adoption services, conducting relative/foster/adoption/interstate compact home studies, preparing children for adoption, supervising adoptive placements, and determining adoption eligibility.
- Facilitate monthly support group meetings.
- Participate in family team meetings, foster care review hearings, permanency hearings, court hearings, and community task force meetings.
- Provide ongoing training such as independent living skills & discipline techniques to licensed resource parents.
- Assist county workers and resource workers with finding suitable placements for foster children
- Respond to after hour's emergency calls.
- Complete required monthly reports and submit them to state office in a timely manner.
- Interpret agency policies, rules, and regulations of assigned programs.
- Supervise and monitor resource workers' daily activities to ensure professionalism and compliance with MDHS policy, procedures, and state handbook.
- Serve on MACWIS advisory workgroup.
- Supervise one secretary principal regarding administrative duties.
- Handle complaints involving licensed resource homes, abuse and neglect, and correspond with state office management on these issues.
- Provide technical assistance to state office management and field staff.
- Review, staff, and make recommendations for reports of abuse and neglect of resource homes.
- Serve as liaison between field staff, state office management, and resource parents.
- Coordinate and work with private agencies for placement of MDHS children and to ensure their program complies with MDHS policy.
- Coordinates post-adoption services
- Facilitate training for new employees.

### *PROGRAM ADMINISTRATOR/AREA SOCIAL WORKER SUPERVISOR*
**Mississippi Department of Human Services**                    **1995-1999**              **Laurel, MS**
- Supervised adoption workers/specialist in the following areas: recruitment, training foster/adoptive parents, retaining foster/adoptive parents, monitoring adoption services, conducting relative/foster/adoptive/interstate compact home studies, and preparing foster children for adoption.
- Conducted home studies.
- Prepared and placed foster children in adoptive homes.
- Conducted annual assessment of licensed homes.
- Conducted support group meetings.
- Participated in foster care review hearings, permanency hearings, court hearings, and community task force meetings.
- Facilitated pre-service training to foster/adoptive applicants.
- Provided ongoing training to licensed foster/adoptive parents.
- Assisted county workers and adoption workers/specialist with finding suitable placements for foster children.
- Responded to after hours emergency calls.
- Completed required monthly reports in a timely manner.
- Supervised and monitored adoption workers' daily activities to ensure professionalism and compliance with MDHS policy, procedures, and state handbook.
- Served as acting program administrator senior in the absence of my supervisor at state office.

### *SHELTER WORKER-PRN*
**Domestic Abuse Family Shelter**                    **1993-1995**              **Laurel, MS**
- Responsible for supervision of shelter and overnight coverage.
- Supervised residents during the day and night hours shift.
- Managed and screened crisis calls.
- Provided management services to office director.
- Provided orientation of shelter to new residents.
- Facilitated Life Skills Groups.
- Documented residents' file.
- Provided counseling services to resident and crisis hotline.
- Referred residents to other resources and provided case management services.
- Supervised student interns.

### *GRADUATE ASSISTANCE*
**University of Southern Mississippi/School of Social Work**     **1993-1995**     **Hattiesburg, MS**
- Provided assistance to two professors with research related to Pediatrics and HIV.
- Graded papers.
- Composed examinations for undergraduate students.

### *GIRLS BASKETBALL COACH*
**Glade Elementary School**                    **1994-1995**              **Laurel, MS**
- Coached 5th and 6th grade girl basketball and softball teams.

## *MEDICAL RECORDS FILING CLERK-PRN*

**South Central Mississippi Hospital**                     **1990-1995**                     **Laurel, MS**
- Responsible for answering the telephone.
- Locating patient records and gathering information for the computer.
- Filing, routing, and pulling charts.
- Interviewed newborn parents to obtain information for the infant's birth certificate.
- Checked charts for nurse and physician signatures and coded charts for deficiencies.
- Batched charts for scanning.

## *MEDICAL RECORDS TECHNICIAN*

**Jasper County Health Department**                     **1983-1990**                     **Bay Springs MS**
- Registered patients.
- Answered telephone and scheduled appointments
- Filing.
- Balanced books and made deposits.
- Opened and processed mail.
- Organized and maintained accurate file, correspondence, and records.

## *ADMINISTRATIVE ASSISTANCE*

**US Army**                     **1981-1982**                     **Fort Jackson, SC**
- Provided administrative support to the office by performing secretarial duties such as answering the telephone, filing, and typing.

## *INTERNSHIPS*
- Mississippi Department of Human Services          1995-1995          Laurel, MS
- USM Marriage & Family Center                      1994-1994          Hattiesburg, MS
- Family Health Center                              1993-1994          Laurel , MS
- Domestic Abuse Shelter                            1992-1993          Laurel, MS

## EDUCATION
- Master of Social Work          University of Southern Mississippi          1995
- Bachelor of Social Work        University of Southern Mississippi          1993
- Associate Degree/Liberal Arts  Jones County Junior College                1987

## CERTIFICATIONS
- Licensed Masters Social Worker

## AWARDS
- Adoption Angel Award (Southern Christian Services) -2008
- Most Adoptions Finalized in the state of Mississippi-2006
- Adoption Specialist of the Year-1998

**Ex. 5A**

**DHS Takes Hot Seat**

Monday, Dec 15, 2008 - 06:13 PM Updated: 06:40 PM

**By Kiran Chawla**
E-mail | Biography

Budget problems and staff shortages are just two problems the Department of Human Services said are jeopardizing safety.

The deaths of four children under DHS supervision have state lawmakers pushing for solutions.

DHS oversees almost 3,300 Mississippi children, but the agency has just 500 case workers statewide.

DHS leaders said it has recently revamped its safety checks and home inspections in light of the recent abuse cases.

"We, as a legislation, are a partner. We're one of the large partners because it's a matter of funding all too often," said State House Public Health and Human Services Committee Chairman Steve Holland.

Economic times are taking a toll on just about everything, and the DHS is no exception.

"Part of the problem is the fact that social workers are underpaid, family protection people. We're having a time recruiting and retaining those employees. That's where the rubber meets the road with these people," said Holland.

Holland said the agency needs money to train some of their current employees and start scholarship programs to recruit new employees.

"There are so many qualified kids in our college system who would make great social workers, but would you work for an average $26,000 a year?" asked Holland.

"Case loads have been high, and we haven't had enough workers in the state over a long period of time," said DHS' Lori Woodruff.

Woodruff blames irresponsible guardians as the main reason children fall through the cracks. But she said funding has a lot to do with it. They already have authorization for another 106 positions, but they need the money for them.

The state plans to present the funding request to the Legislature when they convene January 6th.

**Ex. 5B**



Copyright 2002 The Clarion-Leader (Jackson, MS)
All Rights Reserved
The Clarion-Leader (Jackson, MS)

April 24, 2002 Wednesday

**SECTION:** MAIN; Pg. 1A

**LENGTH:** 620 words

**HEADLINE:** Social workers: Kids endangered

**BYLINE:** Julie Goodman

**BODY:**
Staff shortages, lack of funds cited at legislative hearing

By Julie Goodman

Clarion-Ledger Staff Writer

A social worker in Harrison County, which has less than a third of the child protection staff needed, showed a lawmaker graphic photographs of abused children, including one of an infant hospitalized with severe scalding burns.

Staff shortages and lack of funds are endangering children and families in Mississippi, Social Worker Freida Kaletsch told Sen. Deborah Dawkins, D-Pass Christian, during a Capitol hearing Tuesday attended by human services directors and other child advocates.

"We feel like we are in the middle of a fire and we really cannot talk about fire prevention at this point, we have to deal with the fire," said Kaletsch, who is also an administrator with the Harrison County Family Court. "The job of the social worker has become much more difficult to do."

Lawmakers were told of staffing shortages at the Department of Human Services months ago. Dawkins, a Public Health and Welfare Committee member, has decided to hold hearings to gather input from social workers and help prepare them for budget issues in the next legislative session.

Social workers testified they are carrying heavy caseloads, and their work is compounded by a recession that has family members taking stress out on each other. More social workers are leaving the profession, and fewer are being hired on. Harrison County has six workers but should have 22.

The county department is limited to investigating only the most serious cases, Kaletsch said, citing as examples, a child admitted to the hospital with first and second-degree burns to the lower body, neck and scalp, and another admitted with cardiac arrest and injuries consistent with shaking.

Of the 576 referrals the county received in the first three months of this year, it was only able to look into 261 reports.

"I want to help people but I don't want my hands tied behind me and I don't want to come to work in shackles," she said. "Social workers that are there now, that's the way they are. They are so limited in what can do because of the time."

Harrison and DeSoto counties are experiencing the highest ratio of cases to workers, said Janice Broome Brooks,

P 002205

executive director of the DHS. But the strain is felt around the state since workers from other counties are diverted to Harrison and DeSoto, and that racks up travel costs, she said.

Brooks' department, which already has 21 percent of its jobs unfilled in this current budget year, could reach a 25 percent vacancy rate in the new budget year that begins July 1. In addition to child protection, the agency also handles economic assistance, youth services, child support enforcement, and aging and adult services.

The agency, which had 3,471 employees in March, received nearly $20 million less in its budget appropriation for next fiscal year than it requested. Included in its request was $15.4 million needed to claim matching federal funds.

Joe Bennett, a DHS deputy administrator, said the cuts and reduced staffing could leave the agency open to lawsuits due to inadequate supervision, protection and medical care of children. DHS also may no longer be able to provide some of its programs, proper training for new hires and assistance to regional county programs.

Margaret Alfonso, a Harrison County Chancery Court judge, called the situation in her area "a state of emergency" and said lawmakers, who have discussed having a special session to address the Division of Medicaid deficit, should consider adding the social worker shortage to their list.

"We cannot continue to choose which children are going to be protected," she said.

PHOTO

Dawkins

**LOAD-DATE:** July 12, 2002

P 002206

**Ex. 5C**

Copyright 2002 The Clarion-Leader (Jackson, MS)
All Rights Reserved
The Clarion-Leader (Jackson, MS)

June 3, 2002 Monday

**SECTION:** MAIN; Pg. 1A

**LENGTH:** 1077 words

**HEADLINE: DHS AN AGENCY IN CRISIS**

**BYLINE:** Julie Goodman

**BODY:**
'I'm worried ... a child's going to die'

Agency working without 27% of staff

By Julie Goodman

Clarion-Ledger Staff Writer

The state Department of Human Services provides some of the state's most crucial services.

Yet the state's welfare agency is running without 27 percent of its staff, a number that could grow as employees leave and are not replaced, causing the agency to scramble to protect thousands of vulnerable children across the state.

The department could lose up to an additional 25 percent, meaning about 850 employees could be cut from the current staff of 3,400.

"I'm worried, terrified that a child's going to die," said Sue Perry, who recently resigned as director of the agency's Division of Family and Children's Services. "And God help us if it's one that could have been saved."

Perry has become part of an alarming trend within the cash-strapped department, where employees with valuable experience have left for less stressful, better-paying jobs.

Of the 900 positions at the Division of Family and Children's Services, 277 are vacant. While some former employees are continuing social work in the education or home health fields, others are leaving the profession, Perry said.

Social workers often are summoned to hospitals to sign for autopsies on abused children or sent into drug-infested homes with gun-wielding parents. They earn $24,000 a year and have seen their caseloads grow rapidly, while continuing to work on-call 24 hours a day, seven days a week.

"They go into the most dangerous situations," Perry said. "They don't carry weapons. We've had social workers beaten up. We've had one killed. We've had them stalked, their children's lives threatened."

DHS investigates child abuse allegations, reports neglectful parents and oversees 900 foster care homes and 3,500 children in state custody. It licenses foster parents, arranges adoptions and runs emergency shelters, therapeutic group homes and a refugee program for unsupervised foreign children.

P 002229

The agency has been hit with budget cuts departmentwide, prompting Executive Director Janice Broome Brooks to warn of program cuts, drastic layoffs and possible gaps in food stamp and cash assistance services in the next budget year. The agency has had a hiring freeze for more than a year.

Brooks has asked the Legislature for an additional $19.8 million to avoid the cuts. Lawmakers have said the state can't afford to provide the request, but they are showing signs that they would be willing to grant a portion of it.

Meanwhile, Gov. Ronnie Musgrove has said federal funds will be diverted toward severe social worker shortages in Harrison and DeSoto counties. The governor has not said whether he will call a special session to address the larger funding issue.

A look at the number of people the agency has lost overall in the past few years shows a heavy - and steady - flow of exiting employees.

Under Brooks, the Division of Youth Services has lost 137 people, the Division of Family and Children's Services 176 people, and the Division of Economic Assistance 294 people.

Brooks dismissed 20 employees last year, most of whom were division or bureau directors.

Under former Executive Director Bettye Ward Fletcher's administration during 2000, the Division of Youth Services, Division of Family and Children's Services and Division of Economic Assistance, lost 94, 99 and 194 people, respectively.

Former Executive Director Donald Taylor, who headed **DHS** from 1995-2000, lost 138, 94 and 215, respectively, in those same divisions.

Most of the positions were not filled.

Brooks said the department has had to capitalize on the experience that remains. "We have very capable people who have worked with the agency for a very long time ...," she said.

Perry, who has a master's degree in social work, began at DHS 13 years ago as a social worker. For the past six years, she has headed the Division of Family and Children's Services.

Few who have left have Perry's experience, but many with one or two years are leaving just as they become confident about their work, she said.

The department is losing the money it invested in their training.

Linda West, director of Mississippi Families for Kids, also expressed dire fears about the loss of personnel.

"If we don't hire some workers soon, I'm really thinking we're going to see some kids get killed," she said.

"It's almost like we're sitting here waiting for a bomb to go off."

The department reveled in its successful effort several years ago to recover from inadequate staffing and struggling services, a time when foster children aged out of the system without ever getting adopted, Perry said.

But since the recovery, the Division of Family and Children's Services has regressed, Perry said, and should be worried about class-action lawsuits that could be filed against the state.

"Now over the last two years, (the social workers) just felt like there's no support. I mean, if it's OK to have 277 vacancies, then obviously what we do is not important," she said.

Perry, who plans to attend law school with the goal of eventually becoming a judge, decided to resign after the stress and frustration of her job finally put her over the edge.

**P 002230**

She recalled running into a friend at the grocery store shortly after she resigned.

"She didn't recognize me. She said, 'The stress, it's just amazing. You seem more at peace,' " Perry said. "And I am. I love Family and Children's Services. It has been my life. But I have to admit, it's taken a toll on my health, on my family."

"When you're frustrated and you don't see anything that you can do, then you just have to make a decision. I just can't keep beating my head against the wall."

But for Perry, the change in her job does not change her feelings about children in Mississippi, or the staff which, she said, "would stand in front of a bullet to protect a child."

"I'm not going to forget the children. I'm not going to forget the staff because I'm committed to them," she said. "So, whatever I can do on the outside, I'll do."

PULLOUT QUOTE:

"If it's OK to have 277 vacancies, then obviously what we do is not important."

- Sue Perry former director of the Division of Family and Children's Services

PHOTO CAPTION

Sue Perry, former head of Family and Children's Services at the state Department of Human Services, is among hundreds of employees who have left the agency.

Greg Jenson/The Clarion-Ledger

LOAD-DATE: July 12, 2002

P 002231

**Ex. 5D**

Copyright 2002 The Clarion-Leader (Jackson, MS)
All Rights Reserved
The Clarion-Leader (Jackson, MS)

June 1, 2002 Saturday

**SECTION:** MAIN; Pg. 1A

**LENGTH:** 1403 words

**HEADLINE:** DHS An Agency In Crisis

**BYLINE:** Patrice Sawyer Julie Goodman

**BODY:**
Are kids safe? Overworked social workers don't know ...

Fears over plight of children prompt appeal for funding

By Patrice Sawyer

Clarion-Ledger Staff Writer

BILOXI - Two years ago, the Harrison County Department of Human Services had seven employees to investigate reports of abused, neglected or troubled children here.

Now there's just Julia Wasvick.

Wasvick has stayed despite the stress from an overwhelming caseload.

"I'm here for the kids," she said. "Children are suffering and the state is not doing its share to protect them. Someone needs to speak up for the kids because kids can't speak for themselves."

Wasvick handles 25 investigations per month. The national standard calls for a maximum of 11 per investigator each month.

About 200 more cases, left by social workers no longer with the Department of Human Services, are waiting for Wasvick to review and close. Cases of children sexually abused, battered, burned or neglected. Because Wasvick doesn't have time to get to those files, she types in the computer by each file's name "Julia Wasvick is not responsible?" just in case the unthinkable happens to a child listed in them.

Cutbacks in state funding and staffing shortages have crippled the DHS' Division of Family and Children Services, particularly in Harrison and DeSoto counties.

Harrison County has 22 slots for social workers, but five full-time social workers are currently handling well over 100 cases each.

The fear of what might happen to children has advocates, judges and DHS workers appealing to state officials for help.

"The situation that happened in Florida could happen here," said Sandy Wright, who is supposed to be in charge of making sure the state is complying with federal requirements but instead has had to assist social workers in clearing unresolved cases.

P 002232

Law enforcement officials are still searching for 5-year-old Rilya Wilson, who was taken from her Miami caretaker's

home in January 2001 and never returned. Florida Division of Children and Families didn't realize she was missing for 15 months.

Wright, who has worked on and off for DHS since 1976, said social workers should be checking on children at least once a month but that isn't happening.

Wasvick said she knows of a case where a father admitted severely abusing his baby and later regained custody, but the father is not receiving the monthly follow-up visits by social workers. The baby suffered cracked ribs and two cracked toes.

"The social worker on that case left four months ago, and I know no one has been out to check on them," Wasvick said.

Some help may be on the way. Gov. Ronnie Musgrove said this week that some federal funds will be used to hire additional social workers in Harrison County as a result of a meeting with U.S. Department of Health and Human Services officials last week. The officials had traveled to Mississippi to talk with state officials out of concern about money and staffing shortages at the state's welfare agency.

But Musgrove could not say where the money will come from, the number of social workers to be hired or how much money will be available.

"Now, that does not mean that there still won't be a money shortage for DHS, we've still got to overcome all of that," Musgrove said.

The department needs about another $20 million for the new year beginning July 1.

Musgrove didn't rule out the possibility of calling a special legislative session to address the agency's overall budget issue. "We didn't say we would or would not," he said Thursday.

On behalf of the Gulf Coast legislative delegation, Rep. Jim Simpson, R-Pass Christian, said he will ask Musgrove via a letter to call a special session on DHS.

Simpson and other coastal legislators met behind closed doors Wednesday with DHS Executive Director Janice Broome Brooks to discuss the staffing problem at the Harrison County office. They had spoken with employees at an earlier meeting.

"None of us really understands how it got in a critical situation," Simpson said of the Harrison County office. "We just got to find a way to fix it."

Brooks has asked the Legislature for an additional $19.8 million to avoid employee cuts and reductions in services, but lawmakers have said the state can't afford to fund the request. DHS requested $94 million for the fiscal year beginning July 1 and received about $75 million. The agency was also underfunded for the current budget year.

"The fact that they say they need 'X' amount of dollars is just unacceptable," House Appropriations Committee Chairman Charlie Capps said. "A lot of agencies need more money than they're operating on."

However, Capps said budget analysts have been meeting with DHS on how to restore budget cuts.          P 002233

Bridget Logan, executive director of the Center for the Prevention of Child Abuse in Gulfport, said she hopes DHS gets the money it needs, as the governor has said, because of the role the Division of Children and Family Services plays.

Logan is one of eight members of the organization Professionals Advocating for Children Together, which has talked to civic groups, the governor's office and legislators about the shortage of social workers. The group, known as PACT, also works to raise money on behalf of DHS.

"I don't think any of us can sleep at night if we don't think we're giving it our all," Logan said.

Harrison County Court Judge Michael Ward said 1,500 to 1,700 child welfare investigations are expected to be filed this year in Harrison County, and he worries what will happen with those cases if the staffing situation isn't resolved.

"Children who did not have their cases adequately investigated will be falling through the cracks. What's going to occur is those children will be going to training schools and probably our prison system," he said.

There's not enough money is the only answer he gets when he talks to **DHS** officials about the lack of employees, he said.

What's happened to the money to fill positions after workers leave? Several employees asked that question of Brooks when she met with them Wednesday.

Her explanation: If an employee quits during the year, that salary is absorbed by other budget needs in the division.

**DHS** needs more money is the bottom line, Brooks said.

"We are literally in a situation of robbing Peter to pay Paul. What we need is to be in a position such that we can get adequate staff so we can reduce the high number of social worker-to-case ratios," she said.

To assist social workers in Harrison County, social workers from other counties come in to help. They stay for two-week intervals, except weekends, and the state picks up the tab.

The visiting workers receive a $35 per diem, and the state pays for their hotel accommodations. DHS didn't have a price tag on how much money has been spent on bringing in temporary help over the last year.

Brooks said she is working with legislators to resolve the funding situation, and she asked employees to be patient a while longer.

"We know that you're pulling extra loads. We know you're taking on extra hours. We know that you're taking stress home," she said. "Remain as dedicated as you are, and hold on."

Wright said state officials should find the money to hire the proper personnel to help children and to relieve overburdened social workers.

"There's just no time to adequately investigate and to work with these families. The decisions (social workers) are making are literally life and death situations," she said.

Staff writer Julie Goodman contributed to this report.

PHOTO CAPTION

Janice Broome Brooks, executive director of the Mississippi Department of Human Services, discusses the **DHS** money deficit with employees at the Harrison County **DHS** office.

Barbara Gauntt/The Clarion-Ledger

PHOTO CAPTION

Social workers deal with such cases as this one of a burned baby. Harrison County **DHS** lacks workers to staff some cases.

Special to The Clarion-Ledger

**P 002234**

PHOTO CAPTION

Harrison County social worker Sandy Wright shows file cabinets filled with cases that have no one assigned to them because the office is severely understaffed.

Barbara Gauntt/The Clarion-Ledger

PHOTO CAPTION

Harrison County Department of Human Services investigator Julia Wasvick sits in on a supervised visit of a mother with her children in a group home. Wasvick is the only DHS investigator for the entire county.

Barbara Gauntt/The Clarion-Ledger

**LOAD-DATE:** July 12, 2002

**P 002235**

**Ex. 5E**

Copyright 2003 Biloxi Sun Herald (Biloxi, MS)
All Rights Reserved

# THESUNHERALD

Found on SunHerald.com

Biloxi Sun Herald

January 19, 2003 Sunday

SECTION: A; Pg. 1

LENGTH: 1468 words

HEADLINE: Understaffed DHS is failing our children;
Harrison Co. says money solves only part of problem

BYLINE: By BETH MUSGRAVE; THE SUN HERALD

BODY:

'Children will die'

Child advocates say that if more state social workers aren't hired for Harrison County, children will die.

The state Department of Human Services office in Harrison County has nine social workers. It had 20 social workers in 1999 and is supposed to have 22.

In 2002, there were an estimated 1,695 reports of child abuse and neglect in the county.

The department has 315 children in custody and supervises 900 families.

Social workers interested in applying for a position in Harrison County should call 432-0225.

Child advocates say that a fully staffed DHS can save the state money. If caseworkers have time to spend with families and work on parenting and life skills, they can keep families together. Removing children from homes is costly.

To illustrate, child advocates calculated the cost of one actual case. "Yesterday" was removed from his home by DHS when he was 3 years old. He was placed in foster care, residential homes and finally an acute-care facility, which can cost as much as $1,200 to $1,500 a day. By the time he was 18, the state had spent more than $5 million for room and board, medical care and treatment. He is now in prison in Alabama, where that state is spending more than $30,000 a year to house him.

- MISSISSIPPI DEPARTMENT OF HUMAN SERVICES

The stack of dusty papers on a counter in Beth Casey's office tell stories few people want to hear.

A neighbor says a teen-age mother isn't feeding her baby.

Hospital staff members say a mother hasn't visited her 7-year-old son in months.

A teacher reports that a mentally handicapped student says he was hit for getting a glass of juice without asking.

"I don't know what happened to any of these kids," said Casey, an intake counselor at the Harrison County Youth

P 002259

Court.

None of these reports, some going back as far as 2001, have been completed.

Social workers in Harrison County just have too much to do. There are only nine social workers to do the work of 22. Caseloads for some social workers are pushing well past 130, nearly six times what child advocates say is an acceptable amount.

After nine months of focusing on issues such as Medicaid, a new Nissan plant and tort reform, state leaders finally have turned their attention to the Department of Human Services' critical shortage of social workers. Legislation proposed this week would give DHS at least $650,000 to hire more social workers.

But giving the agency more money is only half the battle.

The Department of Human Services has an agencywide vacancy rate of about 20 percent. The needs of Harrison County will have to be weighed against those of other counties.

The agency oversees child protection, food stamps, youth-offender programs and child support collection, all of which have serious staffing shortages.

And even if the department receives the money for more social workers, it has to find people who want to work in Harrison County. The department has struggled in past months to fill positions it already has.

"These are our kids," Casey said. "When they are taken into custody of the state, they are the responsibility of the taxpayers. We should demand that these kids get the services they deserve."

"I've been working for the Youth Court for 34 years and I've never seen DHS in such poor shape," said Freida Kaletsch, Youth Court administrator for Harrison County.

"It's sad. Harrison County used to be the model," Kaletsch said. "When other counties needed help, Harrison County social workers would go."

Kaletsch, Casey, other court employees and social workers formed a group called PACT, or Professionals Advocating for Children Together, in February after the number of social workers dropped to six.

At the time, school employees who reported abuse to DHS were getting no response.

**P 002260**

"I have kids who come into my office who say they haven't seen their social worker in a year," said Shelley Foreman, PACT member and director of family and children services at Gulf Coast Mental Health Center.

The Legislature cut DHS funding the past two years. To make ends meet, DHS state leaders didn't replace social workers when they left.

This year the department had to abolish those positions that weren't funded, including vacancies in Harrison County. DHS leaders have been working to bring more social workers to Harrison County by transferring positions from other counties.

DHS Interim Director Thelma Brittain and Wanda Gillom, deputy director of the Division of Family and Children, met with members of PACT last week. Both Brittain and Gillom stressed that they were working hard to recruit more social workers for Harrison County.

DHS and state universities also have worked out an innovative partnership that would allow social-work students to intern at DHS. With help from some grants, DHS will help pay for their schooling. In return, social workers agree to work for DHS for two years.

"We've got 10 interns right now and I've been begging them to come to Harrison County," Gillom said.

The Senate unanimously passed a bill Thursday that would give $650,000 to DHS to hire more social workers. The bill says more than $100,000 of that would go to counties with caseloads of more than 100 clients per social worker. Only Harrison and Stone counties meet this criteria.

The House version of the bill would appropriate $1.1 million for new social workers in counties with caseloads of more than 50 clients per social worker. Social workers hired to work in high-caseload counties would receive a 5-percent raise over the starting salary. Social workers in Mississippi earn an annual salary between $24,685 and $28,859.

But Harrison County won't know how many more social workers it will get until a final version of the bill is passed, hopefully sometime in the next week.

But this would be a one-time appropriation, a Band-Aid to a problem that will take more than just money to fix, many say.

Some of the ideas to reform DHS include:

Loosening the education requirements for social workers so those who don't have degrees in social work can take the licensing exam.

Increasing pay for social workers who decide to work in areas with high caseloads.

Creating an advisory board of professionals to help oversee DHS.

Establishing statewide standards for the number of cases assigned to each caseworker.

A bill is in the works that would create an advisory board for DHS, something that both legislators and child advocates support.

Almost all other state agencies have boards, said Dorothy McEwen, president-elect of the National Association of Social Workers and a PACT member.

McEwen and the NASW would like to see the board take an active role in helping governors select the DHS director.

"Even if you have the best person in that position, when a new governor comes in, they get rid of them," Kaletsch said. "In an agency that is complicated and so huge, you don't need that constant change."

The state does not have standards on the acceptable number of cases per social worker. NASW would like to see the number of cases per social worker dip to 25, which is slightly higher than the Child Welfare Defense League's recommendation of no more than 16 active cases.

"We need to figure out exactly how many social workers we need and where," McEwen said.

P 002261

Members of the state workers union, which represents DHS workers, agree.

http://www.nexis.com/research/search/submitViewTagged                    12/8/2003

"Our major concern is that the funding is focused on the front-line workers," said Brenda Scott, president of the Mississippi Alliance of State Employees/Communications Workers of America.

"We really need to look at what our priorities are," Scott said. "There's nothing wrong with spending money on education, but if you have a kid in a classroom that is hungry or abused, that kid can't learn."

Since PACT's crusade began in February, the group has received a crash course in politics and government. They've held candlelight vigils, conducted letter-writing campaigns, circulated petitions and have talked to government groups.

They've been demanding.

But they finally got people's attention.

"We're not going to shut up until we get those 22 positions returned," Foreman said.

The Sun Herald today is publishing a series of disturbing photographs supplied by Harrison County Youth Court, depicting the horror and crisis facing our community's children. While these images are disturbing, we believe printing them is necessary for readers to understand the abuse that is visited on our children, in part because of Mississippi's failure to provide adequate support for the severely understaffed Department of Human Services.

All of the children pictured are from Harrison County.

Beth Musgrave can be reached at 896-2331 or at bamusgrave@sunherald.com

**LOAD-DATE:** January 19, 2003

P 002262

**Ex. 5F**

*Office of Classification and Compensation*

| | |
|---|---|
| *Agency:* | *State Personnel Board (90160)* |
| *Subject:* | *Class Establishment and Reclassification Authority* |

# State Personnel Board
## Class Establishment, Reclassification Authority, and Selection Exemption

**Statement of Request:**

**Class Establishment**
Social Services Assistant I, Occu NEW, Pay Range $26,489.74 - $46,357.04
Social Services Assistant II, Occu NEW, Pay Range $29,138.72 - $50,992.76
Social Worker I, Occu NEW, Pay Range $29,138.72 - $50,992.76
Social Worker II, Occu NEW, Pay Range $32,052.59 - $56,092.03
Social Worker III, Occu NEW, Pay Range $35,257.85 - $61,701.23
Social Worker IV, Occu NEW, Pay Range $38,783.63 - $67,871.35
Social Worker V, Occu NEW, Pay Range $42,662.00 - $74,658.50
Social Worker Supervisor, Occu NEW, Pay Range $46,928.20 - $82,124.35
Social Services Director, Occu NEW, Pay Range $53,967.43 - $94,443.00

**Reclassification Authority**
Social Services Assistant I and II
Social Worker I – V

**Justification:**

The Interim State Personnel Director is requesting the establishment of the Social Services Assistant and the Social Worker series, effective November 1, 2008. These series will distinguish between individuals working in the social services realm either who possess a degree in social work or who are licensed social workers. Currently there are ten (10) job classifications, which are used for social services/social work functions. However, these current classifications do not accurately describe the functions being performed, are not usable across all agencies, and do not represent a viable career ladder for social work professionals.

Approval of the above listed classifications will create a career ladder for social workers and related paraprofessionals, ensuring the recruitment and retention of these critical staff in the agencies.

D12

*Office of Classification and Compensation*

| | |
|---|---|
| *Agency:* | *State Personnel Board (90160)* |
| *Subject:* | *Class Establishment and Reclassification Authority* |

**Appropriateness of Request:**

As defined in the <u>Mississippi State Personnel Board Policy and Procedures Manual, Section 5.01.2</u>:

> The State Personnel Board shall have the sole authority to create new occupational classes. In order to discourage the proliferation of unnecessarily similar occupational classes, requests for new occupational classes shall be approved by the Board only upon the production of compelling documentation in support of the need to create new classes. In the absence of compelling documentation, such requests shall result in the position being assigned to an already existing occupational classification in the State Personnel Board's schedule of occupational classes.

Currently, six (6) agencies employ licensed social workers and social services paraprofessionals. These agencies include the Department of Human Services (972), the Department of Mental Health (207 positions), the Department of Health (96 positions), the Veterans Affairs Board (4 positions), the Division of Medicaid (4 positions), and the Department of Education (1 position). These agencies combined have a 33% vacancy rate among social worker classifications.

Staff has met with various personnel from the user agencies as well with professionals in the social work community to discuss the recruitment and retention difficulties of the current classifications. These individuals have reviewed the establishment of this new career ladder and concur with the proposed salaries, minimum requirements, and job specifications.

The proposed classification series and reclassification authority will enable an individual with a social services degree to begin his/her career with one of the agencies as a Social Services Assistant. An agency will then have the ability to provide the employee with the incentives to move up within the social work field, thus creating a workforce of seasoned and experienced staff.

The proposed starting salaries for the new classifications represent a 3.5% increase for the first-level master's degree, licensed social worker, and comparable increases throughout the career ladder. The new classification series, coupled with reclassification authority, will provide career ladder opportunities spanning approximately ten (10) years, at a minimum.

Finally, staff is recommending these new classifications be exempt from the State Personnel Board selection process. State statute requires individuals practicing social work in Mississippi to be licensed by the Board of Social Workers and Marriage and Family Therapists. The State Personnel Board must verify licensure prior to placing individuals on the list of eligibles.

*Office of Classification and Compensation*

| | |
|---|---|
| *Agency:* | *State Personnel Board (90160)* |
| *Subject:* | *Class Establishment and Reclassification Authority* |

Ultimately, agencies must verify licensure prior to appointment of an individual to a position. Because possession of state licensure is the major criteria for meeting the minimum qualifications, exemption from the selection process is warranted. Exemption of these classifications would give the hiring agency sole responsibility for verification of licensure. In addition, exemption would allow agencies to move beyond traditional recruitment methods and make on-the-spot job offers. This would significantly reduce the time necessary to recruit and fill vacant positions.

Exemption of these classifications from the State Personnel Board selection process does not relieve the agency of its responsibility to ensure its workforce is in compliance with all state and federal laws, guidelines, and court orders regarding Equal Opportunity Employment.

Based upon the above analysis, staff recommends approval of the nine (9) new classifications, approval of reclassification authority of the Social Services Assistant I and II and the Social Worker I-V, and exemption of the new classifications from the selection process, all effective November 1, 2008.

**Recommendation:**

Approval of the class establishment of Social Services Assistant I, Occu NEW, Pay Range $26,489.74 - $46,357.04, effective November 1, 2008.

Approval of the class establishment of Social Services Assistant II, Occu NEW, Pay Range $29,138.72 - $50,992.76, effective November 1, 2008.

Approval of the class establishment of Social Worker I, Occu NEW, Pay Range $29,138.72 - $50,992.76, effective November 1, 2008.

Approval of the class establishment of Social Worker II, Occu NEW, Pay Range $32,052.59 - $56,092.03, effective November 1, 2008.

Approval of the class establishment of Social Worker III, Occu NEW, Pay Range $35,257.85 - $61,701.23, effective November 1, 2008.

Approval of the class establishment of Social Worker IV, Occu NEW, Pay Range $38,783.63 - $67,871.35, effective November 1, 2008.

Approval of the class establishment of Social Worker V, Occu NEW, Pay Range $42,662.00 - $74,658.50, effective November 1, 2008.

D14

*Office of Classification and Compensation*

**Agency:** **State Personnel Board (90160)**
**Subject:** **Class Establishment and Reclassification Authority**

Approval of the class establishment of Social Worker Supervisor, Occu NEW, Pay Range $46,928.20 - $82,124.35, effective November 1, 2008.

Approval of the class establishment of Social Services Director, Occu NEW, Pay Range $53,967.43 - $94,443.00, effective November 1, 2008.

Approval of reclassification authority for Social Services Assistant I and II, effective November 1, 2008.

Approval of reclassification authority for Social Worker I – V, effective November 1, 2008.

Approval of exemption from the selection process for the Social Services Assistant I and II, the Social Worker I – V, the Social Worker Supervisor, and the Social Services Director, effective November 1, 2008.