Ex. 10A

# MYCIDS
## Mississippi Youth Court Information Delivery System

**Youth Court Case Management System - Overview**

| | | |
|---|---|---|
| **Intake**  |  | • Record all youth intake information, including identifying information and photos.<br>• Track all persons associated with the child, including parents, relatives, attorneys, guardians, case workers, and others.<br>• Document all allegations and referrals.<br>• Record intake officer's recommendation, and the Court's official order for each referral.<br>• Maintain a complete history for each child brought into the system.<br>• Track custom changes and history. |
| **Court** |  | • Create and track petitions, amended petitions, and petition-related documents.<br>• Management of petitions, orders, and docket calendar.<br>• Schedule hearings and other court events.<br>• Track all hearing information, including attendees, court actions, summons process, and related documents.<br>• Case docket to record all significant court actions chronologically.<br>• Alert feature that serves as a tickler system for due dates and deadlines.<br>• Streamlines the minute book process with the Electronic Minute Book feature.<br>• Easily transfer cases between Youth Courts. |
| **Integrated Document Management** |  | • Scan paper documents or attach electronic documents directly to a case, hearing, or petition.<br>• Generation of petitions, orders, summons, and notices.<br>• Ability to edit generated documents.<br>• Standard text feature for court specific language that can be easily inserted into orders.<br>• Route documents to other users for action or signature.<br>• Digitally sign orders with state-of-the-art, hardware-based security.<br>• View documents for any case, any time. |
| **Database Features** |  | • Data and web services are centralized at the Supreme Court.<br>• Securely access data over the internet.<br>• Share case information with other Youth Courts.<br>• Search for cases by youth, mother, father, victim, DHS number, court specific reference number, or local cause number.<br>• Secure nightly backup of data and documents, and offsite storage. |

1

| | | |
|---|---|---|
| **Flexible Reporting** |  | • Built-in Information Packet lets users easily prepare detailed reports for any case.<br>• Statistical reports for data analysis.<br>• Reporting for case activity, hearing activity, and referral activity.<br>• Reporting for referral totals, referral code totals, disposition code totals.<br>• Reporting for the TPR process.<br>• Other types of reports. |
| **Security** |  | • Strong, transparent encryption ensures privacy, even when communicating across the internet.<br>• Comprehensive user-based security provides exceptional levels of control.<br>• System features and data access can be limited on a court-by-court basis. |
| **Licensing** |  | • Source code, database, design, and data own by the State of Mississippi.<br>• Software development, support, and maintenance by the Supreme Court/AOC I.T. Department<br>• No associated fees or cost |

For information on automating your Youth Court program with MYCIDS, contact the Administrative Office of Courts at 601-354-7451 or the Information Technology Department at 601-359-3709.

**Ex. 10B**



MYCIDS
2/26/2009

MYCIDS

Current Sites
Proposed Sites
Training Scheduling in Progress
Demo Scheduled / Scheduling
in Progress

**Ex. 10C**

**MACWIS**

# Memo

**To:**   Mike Jones and MYCIDS programming staff

**From:**  Jaworski Davenport

**Date:**  6/28/2007

**Re:**   Letter of understanding for MYCIDS data files exchange. (Meeting date 12-21-06)

Per the meeting held on December 21, 2006, it is the understanding of DFCS MACWIS staff that the exchange of data information will begin when DFCS county staff is in the investigation phase of intake. During this phase of intake, county staff will have received a referral via hotline, phone, walk-in, correspondence, court, other. It was further agreed upon that only confirmed information will be sent over to the MYCIDS system. The following information will have been gathered at intake:

General

- ➢ Report type
- ➢ County
- ➢ Report Source
- ➢ Report date and time
- ➢ Intake worker
- ➢ Intake method

Report Summary

- ➢ **Unconfirmed** name, age, sex, race, household status and role of people involved in the report
- ➢ Location information
- ➢ Description of maltreatment

*Person detail information (when this is completed)*

- ➢ ***Confirmed*** *name, age, sex, race, household, household status and role of people involved*
- ➢ *Correct address and phone number*

Allegation/living arrangement

- ➢ Alleged perpetrator's relationship to the alleged victim and the maltreatment type
- ➢ Living arrangement of the alleged victim.

At this point, the intake will be screened by a worker and sent to a supervisor for final decision. The supervisor will make the decision if the intake will become an investigation or not.

> ➢ If the intake is screened out by the supervisor, the intake will be shut down and no further action will be required by DFCS.
> ➢ If the intake is screened in for investigation, the investigation will be assigned to a worker for completion.

At this point, the worker will conduct interviews with the necessary people involved to complete the investigation. This will include gathering information from the family to confirm them under person detail if this has not been completed already.

Based on the circumstances found during the investigation, a child may come into custody at the onset of an investigation, if this happens:

> ➢ The worker will notify the ASWS of the circumstance
> ➢ DFCS will contact youth court Judge or designee
> ➢ Custody will be granted
> ➢ Worker will recommend continuing services
> ➢ ASWS will open case
> ➢ Worker will create youth court tracking to enter court information **(milestone)**

When this happens, there is still an ongoing investigation and the findings for the investigation has not been submitted by the worker or approved by the ASWS. Worker will still have thirty days (30) from the date of the intake to complete and submit the findings for the ASWS to approve.

At this milestone, the youth should be confirmed and valid demographic information regarding the youth in custody should be available to send to MYCIDS. Information from the general, report summary, and the allegation living arrangements tabs of the intake will also be sent at this time. If the custody start date **(milestone)** is entered on the day the youth court tracking is created, the custody start date will also come over. This will be considered as **"new"**.

If there is no custody granted or needed during the investigation, the worker will have thirty (30) days to complete the investigation. When the investigation is completed, worker will create the youth court tracking (milestone) which will include:

> ➢ County
> ➢ Court allegation
> ➢ Court activity type
> ➢ Judge name

For DFCS and MYCIDS data exchange purposes, the creation of the youth court tracking will be the milestone to trigger information. It should be noted and reminded that the information that will be shared will only include intake/investigation information. The information will be limited to the youth demographics, and the demographics of the people included in the intake plus information from the general, report summary and the allegation/living arrangements tabs.

If a case is opened after the investigation is completed and the child is taken into custody at a later date, when the custody start date is entered **(milestone)**, this will be considered an **"update"**.

Additional items that were discussed were:

> ➢ Mike Jones will send Jaworski Davenport a copy of their updated XML file layout.
> ➢ For validation purposes, MACWIS will send youth court tracking number + intake ID number including an underscore as the MACWIS docket number.

● Page 2

➢ All DFCS investigation will be sent over to MYCIDS. It should be understood that all investigations do not become DFCS cases.

If any information in this memo needs clarification or is found to be in error of the meeting that was held on December 20, 2006, please inform me as soon as possible.

Thank you for the time and attention that has been put into this effort to make this project a success and work in the most efficient way.

JTD/jtd

CC: Lori Gambrell
    Cheryl Joiner

● Page 3

**Ex. 11A**

**Median Case Processing Times for Certain Children in Custody for 15 Consecutive Months Ending on March 14, 2009 in the Four Counties with the Highest Caseloads**

Prepared by the Office of the Court Monitor Based on MACWIS Report MWZ0141B

| | TPR REQUEST MADE | | | | TPR REQUEST NOT MADE |
| | Legally Freed | | Not Legally Freed | | Not Legally Freed*** |
| | Median Time From Custody Date to TPR Request Date | Median Time from TPR Request Date to Legally Freed Date | Median Time From Custody Date to TPR Request Date | Median Time From TPR Request Through 3/14/09 | Median Time from Custody To 3/14/09 |
|---|---|---|---|---|---|
| Forrest* | No Cases | No Cases | 4.7 Years (n=13) | .6 Years (n=13 Youth) | 3.3 Years (n=61) |
| Harrison | 1.2 Years (n=12) | .4 Years (n=12) | 1.4 Years (n=95) | 1.3 Years (n=95) | 1.9 Years (n=15) |
| Hinds | 1.7 Years (n=2) | .6 Years (n=2) | 1.6 Years (n=59) | 1.2 Years (n=59) | 1.9 Years (n=70) |
| Jackson** | 1.3 Years (n=12) | .7 Years (n=12) | 1.8 Years (n=75) | 1.4 Years (n=75) | 2.0 Years (n=66) |

* Four children excluded from analysis because of apparent errors in the data provided.
** Two children excluded from the analysis because of apparent errors in the data provided.
***Unable to determine whether there is a documented ASFA exception in the record.

**Ex. 11B**

County|Forrest



### Certain Case Processing Times for Children in Custody for 15 Consecutive Months Ending on March 14, 2009, by Child* - Forrest County
Prepared by Office of the Court Monitor based on MACWIS Report MWZ0141B

* Four children were excluded from the analysis because of apparent inaccuracies in the data provided.

**Ex. 11C**

County|Harrison

## Certain Case Processing Times for Children in Custody for 15 Consecutive Months Ending on March 14, 2009, by Child - Harrison County

Prepared by Office of the Court Monitor based on MACWIS Report MWZ0141B



Data
- ■ Sum of Days from TPR Request To Legally Freed Date or 3/14/09 (if not legally freed)
- ▣ Sum of Days from Custody to TPR Request Date or Through 3/14/09 (if no TPR Request was made)

# Ex. 11D

County Hinds



## Certain Case Processing Times for Children in Custody for 15 Consecutive Months Ending on March 14, 2009, by Child - Hinds County

Prepared by Office of the Court Monitor based on MACWIS Report MWZ0141B

**Ex. 11E**

County Jackson

## Certain Case Processing Times for Children in Custody for 15 Consecutive Months Ending on March 14, 2009, by Child* - Jackson County

Prepared by Office of the Court Monitor based on MACWIS Report MWZ0141B



* Two children were excluded from the analysis because of apparent inaccuracies in the data provided.

**Ex. 11F**

Report:
Date of Report:    **MWZ078RB (Listing of Children Currently in Custody with a Conference Date More Than 6 Months Overdue)**
Date of Report:    04-04-2009
Region:    2-W

**According to MACWIS staff**, AFCARS Elements 22 & 57 indicates Timeliness Errors. Element 22 is the Start Date of Custody compared against the date the information was entered into MACWIS. #57 is Exit Date of Custody compared against the date the information was entered into MACWIS. The children that remain in the system who are actually no longer in custody are being counted on the Custody Contact Report, the Dormant Case Report, Permanency Hearing Report, and ultimately the Program Improvement Plan (PIP) data which reflect these children who should not be counted as "in custody" at all. Any error hindering the closure of a custody record can be resolved through the MACWIS Help Desk.

| Child(ren)'s Name(s) | County | Caseworker/ASWS | Cause |
|---|---|---|---|
| ▬▬▬ | Washington | ▬▬▬ | According to a 11-06-08 narrative in MACWIS, this youth is no longer in agency custody due to emancipation. A county conference was not scheduled. ~~The youth's custody record has not been end dated in MACWIS by the county staff.~~<br><br>**Washington Co. responded 02-12-09**: *I have submitted a MACWICS Incident report regarding this case on 02-04-09. We have tried to remove this case from the workers workload. Also this child had two entry dates into custody. The first entry into custody ended on 12-20-96. I inadvertently looked over the last entry that had a start date of 08-31-98. This start date does not have a end date. I was under the impression that we had a end date of custody but just unable to close the case. However when I attempted to end the date the following message appeared:*<br><br>*"You Cannot End The Custody Record At This Time. Please Complete or Correct The Placement Direct Services and/or adoption COS End Dates and Outcomes for This Person Prior To Closure. One or more of these is still open or without an Outcome."*<br><br>*On the 02-04-09 MACWIS Incident Report it was reported that I was unable to remove this case from the workers workload. I did not indicate that I was unable to end date the custody, because when I looked at the screen I saw a end date but I did not closely note the date 12-20-96. I can add the above information to the MACWIS Incident report that was sent on 02-04-09 and resubmit if needed. I have also requested a Heat Ticket Number.(87932)*<br><br>*Also this is the same case if you remember that on 02-05-09 you asked me to* |



*remind you that I had sent a MACWIS Incident because at that time the issue was active case no ISP.*

***Thanks!***

▓▓▓▓▓▓▓ *LSW*

▓▓▓▓▓▓▓▓▓▓

*Division of Family and Children's Services*

Pc:    Viedale Washington, Regional Director (Region 2-W)
       Mike Gallarno, Performance Improvement Director
       MACWIS Unit
       Christine Townsend, FCR Program Administrator
       Kiki Williams-Butler, FCR

**Ex. 11G**

According to MACWIS staff, AFCARS Elements 22 & 57 indicates Timeliness Errors. Element 22 is the Start Date of Custody compared against the date the information was entered into MACWIS. #57 is Exit Date of Custody compared against the date the information was entered into MACWIS. The children that remain in the system who are actually no longer in custody are being counted on the Custody Contact Report, the Dormant Case Report, Permanency Hearing Report, and ultimately the Program Improvement Plan (PIP) data which reflect these children who should not be counted as "in custody" at all. Any error hindering the closure of a custody record can be resolved through the MACWIS Help Desk.

| Child(ren)'s Name(s) | County | Caseworker/Reviewer | Cause |
|---|---|---|---|
| ▓▓▓▓▓ | Hinds | ▓▓▓▓▓ | **Custody End Date:** The 10-20-08 county conference was canceled by the Reviewer (▓▓▓▓) after being told by county staff that the child is no longer in agency custody. The county has not end dated the child's custody record in MACWIS. |
| ▓▓▓▓▓ | Hinds | ▓▓▓▓▓ | **Custody End Date:** The 02-11-09 county conference was canceled by the Reviewer (▓▓▓▓) after being told by county staff that the child is no longer in agency custody. The county has not end dated the child's custody record in MACWIS. |
| ▓▓▓▓▓ | Hind | ▓▓▓▓▓ | **Custody End Date:** The 01-30-09 county conference was canceled by the Reviewer (▓▓▓▓ ) after being told by county staff that the child is no longer in agency custody. The county has not end dated the child's custody record in MACWIS. |
| ▓▓▓▓▓ | Hinds | Worker Not Found/▓▓ | **Custody End Date:** The Reviewer was told by the ASWS that the children are no longer in agency custody and did not schedule a county conference. The ASWS told the Reviewer there is an eligibility problem that is preventing them from end dating the custody. |
| ▓▓▓▓▓ | Hinds | ▓▓▓▓▓ | **Custody End Date:** FCR ▓▓▓ was informed by ASWS ▓▓▓▓ that child was no longer in custody as of 1/26/08. The scheduled conference was canceled. The child's custody record has not been end dated in MACWIS by the county. |
| ▓▓▓▓▓ | Hinds | ▓▓▓▓▓ | **Transaction Date Error:** Child came into custody on 08-01-08 but was not entered into MACWIS by the county until 03-16-09. A county conference has now been scheduled for 05-09-09. |
| ▓▓▓▓▓ | Hinds | ▓▓▓▓▓ | **Custody End Date:** The 02-18-09 county conference was canceled by the Reviewer (▓▓▓▓ ) after being told by county staff that the child is no longer in agency custody. The county has not end dated the child's custody record in MACWIS. |

Pc:    Maggie Mixon, Regional Director (Region 3S)
       Mike Gallarno, Performance Improvement Director
       MACWIS Unit
       Christine Townsend, FCR Program Administrator
       Beverly Strong FCR (Hinds)

**Ex. 11H**

Report:      **MWZ078RB (Listing of Children Currently in Custody with a Conference Date More Than 6 Months Overdue)**
Date of Report:    04-04-09
Region:      7-East

**According to MACWIS staff,** AFCARS Elements 22 & 57 indicates Timeliness Errors. Element 22 is the Start Date of Custody compared against the date the **information was entered into MACWIS. #57 is Exit Date of Custody compared against the date the information was entered into MACWIS. The children that remain in the system who are actually no longer in custody are being counted on the Custody Contact Report, the Dormant Case Report, Permanency Hearing Report, and ultimately the Program Improvement Plan (PIP) data which reflect these children who should not be counted as "in custody" at all. Any error hindering the closure of a custody record can be resolved through the MACWIS Help Desk.**

| Child(ren)'s Name(s) | County | Caseworker/ASWS | Cause |
|---|---|---|---|
| ▓▓▓▓▓▓ | Jackson | ▓▓▓▓▓ | **Custody End Date:** The scheduled county conference on 12-04-08 was canceled due to a loss of custody but the county has not end dated the children's custody records in MACWIS. |
| ▓▓▓▓▓▓ | Jackson | ▓▓▓▓▓ | **Custody End Date:** The scheduled county conference on 02-10-09 was canceled due to a loss of custody but the county has not end dated the children's custody records in MACWIS. |
| ▓▓▓▓▓▓ | Jackson | ▓▓▓▓▓ | **Custody End Date:** The scheduled county conference on 02-23-09 was canceled due to a loss of custody but the county has not end dated the children's custody records in MACWIS. |
| ▓▓▓▓▓▓ | Jackson | ▓▓▓▓▓ | **Custody End Date:** The scheduled county conference on 02-23-09 was canceled due to a loss of custody but the county has not end dated the child's custody record in MACWIS. |
| ▓▓▓▓▓▓ | Jackson | ▓▓▓▓▓ | **Custody End Date:** The scheduled county conference was canceled due to a loss of custody but the county has not end dated the children's custody records in MACWIS. |

Pc:    Director of Field Operations
        Brenda Wess, Regional Director (Region7-E )
        Mike Gallarno, CQI Director
        MACWIS Unit
        Ann Terrell, FCR

# Ex. 12A



**STATE OF MISSISSIPPI**
HALEY REEVES BARBOUR, GOVERNOR
**DEPARTMENT OF HUMAN SERVICES**
DONALD R. TAYLOR
EXECUTIVE DIRECTOR

BULLETIN: 6115          DIVISION OF FAMILY AND
                       CHILDREN'S SERVICES

TO:          DFCS Deputy Directors
             DFCS Unit Directors
             DFCS Regional Directors
             DFCS Area Social Work Supervisors
             DFCS Social Workers Advanced
             DFCS Social Workers
             DFCS Resource Family Unit (Adoption/Licensure)
             DFCS Independent Living Staff
             DFCS Training staff
             DFCS MACWIS staff
             All Volume IV Holders

FROM:        Rickie Felder, Director
             Division of Family and Children's Services

DATE:        October 29, 2007

SUBJECT:     **Final Rule Resource Family/Licensure Policy**

Attached is final rule (policy) on Resource Family/Licensure Policy. This policy will replace
Sections F and K of your Volume IV Policy Manual. Please place these pages in the appropriate
sections of your manual (see top right hand corner of policy pages).

RF: PPWG: nl

Attachment

DHS
264121

6115

Mississippi, Volume IV
Revised November 2007

Section F
Page 4500

## RESOURCE FAMILY/LICENSURE POLICY

### I. MISSION STATEMENT

*Open Your Heart & Home to a Child: Become Part of a Team to Restore a Family*

### II. INTRODUCTION

The Mississippi Department of Human Services (MDHS), Division of Family and Children's Services, (DFCS) is designated by law, Section 43-15-5 (1) Mississippi Code Annotated, to administer and supervise the licensing and inspection of all private child placing agencies and provide for the care of dependent and neglected children in licensed resource homes. (Hereafter, when "single application" is stated, this refers to foster, adoptive and kinship care homes.) The agency is responsible for setting standards and for developing standards for a "single application" Resource Family. This includes placing children in suitable foster and adoptive homes approved by licensed child placing agencies in cases where restoration to the biological family is not safe, possible or appropriate, thus creating Resource Families within our agency, both temporary and permanent. In Mississippi, many children who are freed for adoption are adopted by their Resource Family.

The Mississippi Department of Human Services is the designated agency to provide social services under Public Law 93-647, Title XX of the Social Security Act, Title IV-A, Aid to Families with Dependent Children, Title IV B, Child Welfare Services, Title IV-E, Foster Care and Adoption Assistance, and related programs of social services. To qualify for federal funds administered through these programs, a facility that is serving children must be licensed or certified by MDHS as meeting the minimum standards, per Mississippi Code 43-15-3. Compliance with all applicable state and federal laws is required.

### III. INTENT

DFCS will work to assure that each child in its care and custody has a family who meets his/her needs for safety, permanency and well-being. Prospective Resource Parents must possess the skills, or have the potential to develop the skills, to meet the needs of children in the care and custody of MDHS.

To achieve this goal the agency has standardized requirements that are child centered and family focused, requiring "finding a family for each child, rather than finding a child for each family". Through the use of these standards, the agency seeks to develop

DHS
264122

a pool of Resource Families who reflect the diverse racial, ethnic and minority status of the children in care. The primary basis for selection is the applicant/s potential to meet the needs of children who have been abused and/or neglected and require placement with Resource Families.

DFCS recognizes that all applicants may not want to provide both foster and adoptive care. However, the same licensing process is required in either program area. Therefore, all applicants applying to become a Resource Family shall go through an initial screening, home study, training, and meet the same resource licensing requirements. Applicants must be able to meet the core requirements of care for children requiring foster or adoptive care. This policy is designed to provide children who are in the care of the agency with the basic quality of care for their safety, permanency and well-being.

## INDIAN CHILD WELFARE ACT

All custody issues and placements of children of Native American heritage shall be in compliance with the Indian Child Welfare Act (ICWA), PL 95-608 and the Indian Self-Determination and Educational Assistance Act, PL 93-638. These Acts ensure that the heritage of Indian children will be recognized, protected, and monitored in and out-of-state. The Indian Child Welfare Act provides for the Indian Tribal Council to have priority jurisdiction in the matter of custody and guardianship in the case of any child of Indian heritage. DFCS Workers (Workers) must resolve the issue of Indian heritage as soon as possible after contact is made with the family, either through a report of abuse/neglect or a referral for services. The Worker shall ask the family the following questions to gain knowledge in deciding what is in the best interest of the child and document the discussion in the narrative section of MACWIS.

1. Is parent or child of Native American heritage?
2. Is parent eligible for tribal membership?
3. Is parent registered with Native American tribe?
4. Is child eligible for tribal membership?
5. Has child been registered with Native American tribe?
6. Does the family live on tribal land?

The Mississippi Band of Choctaw Indians or any other Indian Tribe to which the child belongs has the right to accept or deny jurisdiction of the said child and to help with placement resources. The tribe must be notified of any court hearings involving an Indian child. Notification is to be provided immediately, by telephone and certified letter, to the tribe when a Choctaw child, or other Indian child, is taken into MDHS custody. Under Title I Section 101 USC 1911(a), "An Indian tribe shall have jurisdiction exclusive to any State over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation of such tribe, except where such jurisdiction is otherwise vested in the State by existing Federal law. Where an Indian child is a ward of a tribal court, the Indian tribe shall retain exclusive jurisdiction, notwithstanding the residence or domicile of the child". Title I Section 102 USC 1912(b) states "In any involuntary proceeding in a State court, where the court

knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. If the identity or location of the parent or Indian custodian and the tribe cannot be determined, such notice shall be given to the Secretary in like manner, who shall have fifteen days after receipt to provide the requisite notice to the parent or Indian custodian or tribe. No foster care placement or termination of parental rights proceedings shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe or the Secretary...." (Secretary refers to Secretary of the Interior.)

The tribal lands of the Mississippi Band of Choctaw Indians are not solely confined to Neshoba County within Mississippi. The Choctaw reside in eight counties. These counties are Neshoba, Attala, Jones, Kemper, Leake, Newton, Scott and Winston.

Information about children who are determined to be members of a tribe other than Choctaw shall be shared with the District Worker, Bureau of Indian Affairs, Eastern Area Office, Washington, D.C. If the tribe is unknown, the agency shall contact the Mississippi Band of Choctaw Indians who is willing to help identify the child's tribe and refer appropriately.

## MULTI-ETHNIC PLACEMENT ACT

The Improving America's Schools Act (P.L. 103-382) contains the Multi-Ethnic Placement Act of 1994 (MEPA). An amendment to this act took place as part of the Small Business Job Protection Act of 1996 (P.L. 104-188) and was known as the Interethnic Adoption Provisions Act of 1996 (IEP). MEPA-IEP prohibits those agencies receiving Title IV-E foster care funds from "denying or delaying an individual or couple the opportunity to be an adoptive or foster parent or delaying or denying placement of a child on the basis of race, color or national origin of the prospective foster parent or child...". These factors must be applied on an individualized basis, not by general rule in the best interest of the child. The law permits consideration of the child's cultural, ethnic and racial background and the capacity of prospective Resource Parents to meet the needs of a child of this background, but these factors must be considered in conjunction with other factors relevant to the child's best interest, must not be used in a manner that delays the placement decision, and must never be the sole determination for placement. A Resource Specialist or Worker must document all factors considered in the selection of placement for a child.

MEPA is viewed in conjunction with Title VI of the Civil Rights Act of 1964 which prohibits recipients of Federal financial assistance from discriminating based on race, color, or national origin in their programs and activities and from operating their programs in ways that have the effect of discriminating on the basis of race, color, or national origin.

MEPA as amended by IEP calls for the diligent recruitment of foster and adoptive families that reflect the racial and ethnic diversity of children in foster care. To comply with this, MDHS shall focus its recruitment process on developing a pool of potential Resource Families who are willing and able to foster or adopt the children needing

DHS
264124

placement. To accomplish this, recruitment shall be both general and targeted. All members of the community should be reached by use of general media- radio, television, and print. In addition, information should be disseminated to targeted communities through community organizations such as religious institutions, neighborhood centers, civic clubs, schools, workplaces, and medical facilities.

Section 475(5) (a.) of 42 U.S.C. 675 mandates that any child who is removed from their parent or guardians' home should be placed in the least restrictive (most family like) setting available and in close proximity to the parents' home, consistent with the best interests and special needs of the child. Therefore, priority shall be given to placing a child within a 50 mile radius from his original home, unless he/she is freed for adoption, consistent with the child's best interest and special needs.

DHS
264125

Mississippi, Volume IV
Revised November 2007

Section F
Page 4504

## IV. RECRUITMENT OF RESOURCE FAMILIES

The goal of recruitment is to create a pool of available Resource Families who reflect the racial, cultural, and ethnic heritage of the children needing care, and who are willing and qualified to meet their needs. It is important that all recruitment efforts convey the expectations for Resource Families as described in the practice statement above.

Recruitment Methodologies include but are not limited to:

1. Use of media, including the internet, to create a positive perception of the agency and to create public awareness about the need for foster parents;
2. A Resource Family Protection Specialist (Resource Specialist) in each Region will meet with one public group a month to inform them of criteria to become a Resource Family;
3. Engaging existing Resource Families as part of the recruitment process;
4. Engaging the faith community;
5. Engaging the business community;
6. Engaging existing agency staff;
7. Working closely with a child or his/her family to identify a family resource already connected to the child by kinship or other established relationship;
8. Use of recruitment packets.

Section 43-15-13(2) of the Mississippi Code states "The Department of Human Services shall establish a foster care placement program for children whose custody lies with the department, with the following objectives: (a) Protecting and promoting the health, safety and welfare of children; (b) Preventing the unnecessary separation of children from their families by identifying family problems, assisting families in resolving their problems and preventing the breakup of the family where the prevention of child removal is desirable and possible when the child can be cared for at home without endangering the child's health and safety; (c) Remedying or assisting in the solution of problems which may result in the neglect, abuse, exploitation or delinquency of children; (d) Restoring to their families children who have been removed, by the provision of services to the child and the families when the child can be cared for at home without endangering the child's health and safety; (e) Placing children in suitable adoptive homes approved by a licensed adoption agency or family protection specialist, in cases where restoration to the biological family is not safe, possible or appropriate; (f) Assuring safe and adequate care of children away from their homes, in cases where the child cannot be returned home or cannot be placed for adoption...; and (g) Providing a family protection specialist or worker or team of such specialists or workers for a family and child throughout the implementation of their permanent living arrangement plan. Wherever feasible, the same family protection specialist or worker or team shall remain on the case until the child is no longer under the jurisdiction of the youth court."

Recruitment activities are regionally based and will be reflective of the needs of each region.  Each region will develop a recruitment plan that will be reviewed and modified quarterly as needed.

In addition, Resource Family Placement Committee meetings will be held on a regional and statewide basis to identify the need for child specific recruitment.

## V. INQUIRY

All persons who contact the agency and who are interested in providing substitute care will be considered. Based on the information that is compiled during the inquiry phase, a prospective family may be "screened out" by the Regional Resource Family Area Social Work Supervisor (Resource Family ASWS) as not being appropriate to meet the needs of children entering care. If it is determined that the family should proceed in the application process, the Resource Family ASWS will assign the inquiry to the appropriate staff within 48 hours in order to conduct licensing activities. The applicant family may decide to self-select out of the process at any time.

The inquiry is the first contact a prospective applicant has with the agency requesting information about resource licensing. This inquiry can be in person, by telephone, or by mail.

The designated intake person or other appropriate staff will list basic contact information, including address and daytime phone number, ⌨ on MACWIS Inquiry screen and submit the information to the appropriate Resource Family ASWS who will assign the inquiry to the appropriate Resource Family Protection Specialist (Resource Specialist).

A Standard Packet of Information shall be provided to all inquiries in person or by mail within 48 hours of inquiry call. This packet will assist prospective resource families in making an informed choice regarding their potential to provide care.

The information in the packet will include:
1. Letter from the Executive Director
2. Brochures
3. Introduction to Agency Requirements
4. Pre-service Training Schedule
5. A Profile of Children Entering Care

The Resource Specialist will generate a letter through ⌨ MACWIS to the prospective Resource Family inviting them to the pre-service training in their area. If no response is received, two additional letters for the next two pre-service trainings will be mailed before the inquiry is closed. In an effort to ensure that as many families come to pre-service training as possible, the prospective Resource Family will be contacted by a Resource Specialist prior to closing the inquiry.

## VI. TRAINING

Section 43-15-13(6) of the Mississippi Code instructs "The State Department of Human Services, with the cooperation and assistance of the State Department of Health, shall develop and implement a training program for foster care parents to indoctrinate them as to their proper responsibilities upon a child's entry into their foster care." The Resource Family Program adopted a 15 hour pre-service training curriculum that is to be completed by the applicant before the home study is initiated. In the event the applicants cannot follow through with the application process, the pre-service training is valid for a period of 24 months. Experienced licensed Resource Families function as co-trainers/leaders in the training process. Trainers may conduct up to 8 hours of training within any 24 hour period.

The applicants are issued a "Mississippi PATH Participant's Handbook that focuses on the following areas.

Content areas of the "Participant's Handbook" include:

1. Team Work and the Children Served. (This module includes the importance of ensuring that resource families and kinship caregivers are active members of the team. Orientation to the agency is also included.)
2. Separation and Attachment (Sibling issues and connection to culture and long term need for connection to kin is addressed during this module.)
3. Developmental Stages (Understanding of the different stages of development of a child and the impact sexual abuse has on this development.)
4. Behavior Management (Discussion of different behavior problems the Resource Family will encounter with children and how to handle them).
5. Permanent Connections (Woven into this module is support of kinship caregivers and the TPR process.)

Because the agency believes in the importance of support groups and the benefit they provide, all prospective Resource Families are encouraged to attend one support group meeting during the application period.

Refer to Volume IV, Section F, VIII for in-service training policy.

DHS
264129

## VII. ELIGIBILITY REQUIREMENTS FOR HOME STUDY APPROVAL

The Mississippi Code, Section 43-15-13(12) requires licensed resource parents to be responsible for the following:

"(a) Understanding the [agency's] function in regard to the foster care program and related social service programs; (b) Sharing with the [agency] any information which may contribute to the care of foster children; (c) Functioning within the established goals and objectives to improve the general welfare of the foster child; (d) Recognizing the problems in [resource] home placement that will require professional advice and assistance and that such help should be utilized to its full potential; (e) Recognizing that the [resource] family will be one of the primary resources for preparing a child for any future plans that are made, including return to birth parent(s), termination of parental rights or [long term foster care]; (f) Expressing their view of agency practices which relate to the foster child with the appropriate staff member; (g) Understanding that all information shared with the [resource] parents about the child and his/her birth parent(s) must be held in the strictest of confidence; (h) Cooperating with any plan to reunite the foster child with his birth family and work with the birth family to achieve this goal; and (i) Attending dispositional review hearings and termination of parental rights hearings conducted by a court of competent jurisdiction, or providing their recommendations to the court in writing."

The purpose of the Home Study is to provide potential Resource Families with assistance in clarifying their ideas/feelings about the single application resource licensing and their ability to meet the special needs of children requiring MDHS custody. Additionally the intent is to:

1. Provide the agency with information necessary to decide if applicants meet the standards.
2. Provide the applicant/s with information to assist them during and after placement.
3. Provide the agency information to assist in making an appropriate placement decisions.

The agency shall consider providing a person/s with a Resource Family license when the following requirements are met:

### A. Residence

The applicant/s must show proof of being a U.S. citizen and a resident of Mississippi.

DHS
264130



**B. Age**

The applicant/s must be at least 21 years of age.

**C. Relationship Status**

Married applicants must verify that they have been legally married for at least two years. Current and previous marriages and divorces must be verified. Applicants cannot have unrelated adults living in the home.

Resource Parents who have foster children placed in their home may, at times, experience separation or divorce. When this occurs, the County Worker and/or Resource Specialist must evaluate their circumstances to determine whether or not it is in the best interest of the children to remain in the home and whether the licensed father or licensed mother retains placement of the children when the separation occurs. The children will not be moved automatically unless there is violation of some other licensing requirement involved. The couple will need to inform their Resource Specialist and the County Worker immediately of their separation and where they and the children will be living. Within six months of the couple separating, they must show the agency proof of legal separation or divorce and that they have obtained counseling for the foster children dealing with separation and attachment. If these criteria are met, the home shall remain licensed but no additional children will be placed in the home until an assessment by the Resource Specialist shows that the family has had an adequate period of adjustment.

**D. Health of Resource Family**

The applicant/s shall possess competent physical, cognitive, mental and emotional capacities with reasonable life expectancy that is anticipated to continue through the minority of the child. DFCS may request the applicant/s or other household members to provide additional medical, mental health, or substance abuse evaluations. The Resource Family (which includes the applicant and all household members) must provide a statement from a treating physician or mental health therapist, if being treated for any physical or mental health condition, which may preclude compliance with licensing requirements.

The Resource Family applicant/s must provide a signed and dated statement, from a licensed medical practitioner who shall have examined the person within six months prior to the date of the application, and which shall:

1. Include a description of the general health of the applicant and identify any medical problem or physical condition that will prevent or limit the person from caring for a foster child, or that may negatively impact a foster child;

2. Include a list of all regularly prescribed medications and the purpose of each medication.



The applicant must attend to the health of children. No children with respiratory issues will be placed in a home where any member of the Resource Family smokes, even if they do not smoke "inside the home". Children in MDHS custody who are placed in a Resource home or other placement setting should not be subjected to second-hand smoke.

### E. Criminal History and Clearance

Any applicant or household member who has a criminal history of conviction or pending indictment of a crime, whether a misdemeanor or a felony, that bears upon an individual's fitness to have responsibility for the safety and well-being of children as set forth in Section 43-15-6 of the Mississippi Code, may not provide child care or be licensed as a Resource Family. Felony convictions include, but are not limited to, child abuse or neglect, spousal abuse, crimes against children (including child pornography), crimes involving violence which includes rape, sexual assault or homicide. If a record check reveals a felony conviction for physical assault, battery or drug-related offense, and if a court of competent jurisdiction has determined that the felony was committed within the past five (5) years, a final license shall not be granted.

Any applicant shall be fingerprinted by local law enforcement and such fingerprints shall be forwarded to the Department of Public Safety. If no disqualifying record is identified at the state level, the fingerprints shall be forwarded by the Department of Public Safety to the FBI for national criminal history record check. If there is a disqualifying record, a final license shall not be granted.

A background check shall be conducted within the agency and also with private contractors to determine any history of child abuse or neglect. A Central Child Abuse Registry check will be completed, along with county and local law enforcement background checks.

### F. References

The applicant/s shall supply four character references to the Resource Specialist. Only one of these four references may be a relative to the applicant/s. In addition to these four character references, each applicant shall supply employment validation for the last five years they were employed.

### G. Finances

The applicant must be financially self-sufficient and shall have a household income, exclusive of the foster care maintenance payment, to meet the needs of the Resource Family, which includes their own children and other household members in accordance with the current guidelines of the Mississippi Department of Human Services, Division of Economic Assistance.



## H. Employment

During the home study process, staff will discuss with the Resource Family applicant/s their plans related to employment and their willingness and ability to take time from work, as necessary, to meet the needs of the children. Applicant/s working outside the household must have a plan for safe, stable and reliable childcare as well as sufficient work flexibility to meet the needs of the children as determined by agency.

A Resource Family applicant/s shall not:

1. Conduct home business activities that prevent the applicant from caring for a child in accordance with licensing requirements. If an applicant is self-employed, or conducts a business activity within the home, the applicant shall provide a statement explaining how the activities related to this business will not interfere with care of a foster child.
2. Provide personal or foster care services in the home for unrelated adults.
3. Resource Parents who operate licensed child care services from their homes (for children not placed in their home by MDHS) are subject to the policies of the Mississippi Department of Health. A Resource Parent operating a child care business from their home may not receive payment from another source for providing child care for a foster child placed in their home by DFCS and for whom they are receiving, or expect to receive, a board payment.

## I. Parenting Abilities

The applicant/s must have knowledge and understanding of: (1) the type of children needing placement, (2) child development, (3) separation, loss, and attachment issues, and (4) appropriate child behavior management practice. The applicant must be able to protect children from harm, give and receive appropriate affection and have the ability to maintain the child's permanent connections. The applicant/s must also have the willingness and ability to commit the time necessary to provide supervision and guidance. At least one parent in the home must be able to assist a child with checking homework assignments and giving help as needed with their homework.

## J. Adult-Child Ratios

The Resource Parent/s shall provide foster care for no more than six (6) foster children in their home at any given time. There shall be no more than two teen parents or pregnant teens in the home. The parent/s shall care for no more than eight (8) children 18 years of age and under, including the Resource Parents own biological or adopted children. The home shall have no more than (2) children age 2 and under unless placement of a sibling group is required and the licensed home has adequate bed space. In such case, a waiver shall be requested by the Resource Specialist.

DHS
264133

**K. Pets**

All domesticated animals must have all shots up to date and proof of these shots. Applicant/s shall not have any animal in the home that poses a threat or health hazard.

**L. Transportation**

Resource families must be able to provide transportation for children in care. As such, at least one Resource Parent must possess a valid driver's license, proof of vehicle insurance or access to public transportation.

At all times children in MDHS custody who are in a car must be either in a car seat or must wear a seat belt according to Mississippi law.

**M. Home Environment**

1. **General Safety**
   a. The Resource Families home shall be well heated and well ventilated.
   b. At all times, the home shall have a working telephone, mobile or landline.
   c. The home shall be safeguarded, inside and outside, against hazardous chemicals, cleaning materials, toxic substances, hazardous objects and equipment, medications, and firearms.
   d. The home and premises shall be free of rodents and insects.
   e. A home shall not rely on portable space heaters as the sole source of heat and shall not use such space heaters during sleeping hours. The home's fireplaces, floor furnaces, freestanding stoves and open-faced heaters shall be screened or otherwise adequately guarded.
   f. The home shall have protective covers for all electrical outlets in use in all areas occupied by children age 6 and under or any mentally challenged child.
   g. The homes outside play area should be maintained clean and free of hazards to the health and physical well being of the family.
   h. The Resource Family's home shall have a continuous supply of clean drinking water. If the water is not from a city or community water supply, the Resource Parent/s shall provide evidence that a state or local health authority has approved the water system.
   i. All licensed homes must have a functional sewage system.
   j. The home shall have interior plumbing with running warm and cold water.

2. **Fire Safety and Prevention**
   a. Smoke detectors: The Resource Family home shall have at least one single station operable smoke detector approved by a nationally recognized testing laboratory in the home (1) in each living area in a multiple-story dwelling and (2) located in close proximity to the sleeping area. If the house floor plan has separate sleeping areas, one smoke detector should be located in each sleeping area.

Mississippi, Volume IV
Revised November 2007

b.  Fire extinguishers: In a Resource Family home where the floor space is less than 3000 square feet, at least one 2-a, 5-pound, or equivalent, fire extinguisher of the ABC type (usually red in color) shall be (1) located near an exit door of the kitchen, (2) on each level of a multiple story dwelling, and (3) readily visible and accessible according to fire code for the area.

3.  Emergencies, Exits and Evacuation
    a.  A Resource Family home shall have visible a written plan and procedure for emergencies and evacuation of the home during any type of fire or natural disaster including contact person if the family must relocate. All household members and persons who care for a foster child in the resource home shall give each foster child an age appropriate explanation of the emergency and evacuation plan. They shall ensure that the foster child can follow the plan in the event of a fire, emergency or natural disaster. This shall be done within 48 hours after the foster child has been placed in their home and posted where the child can read it.
    b.  All exits (doors, hallways, stairs) shall be maintained clear and ready for use.
    c.  A window can serve as a second exit only if: (1) it is accessible to children and caregivers; (2) it can be readily opened; and (3) it is a size and design which permits a child or caregiver to pass through it. If the licensed home has an occupied second story, a retractable ladder shall be available for the windows.
    d.  There is an emergency release mechanism installed and maintained on windows with security bars or devices.

4.  Interior Facility
    The home shall be safe and sanitary. Kitchens, bathrooms and bedrooms are discussed in detail:
    a.  Kitchen: The Resource Family home shall have a kitchen that is equipped for safe and sanitary preparation, serving and storage of food and shall have an operable refrigerator, stove and oven.
    b.  Bathrooms: The home shall have at least one flush toilet, one wash basin, and one bathtub or shower that are clean and in good working order. At least one bathroom shall be accessible without going through a bedroom.
    c.  Bedrooms, Bedding and Sleeping Arrangements: a Resource Family shall provide safe sleeping arrangements which accommodate the privacy needs of a foster child as prescribed in this section:
        i.    The bedrooms shall have a finished ceiling, floor-to-ceiling permanently affixed walls, a door, finished flooring and ventilation.
        ii.   The foster child shall have access to a bathroom without going through another bedroom.
        iii.  All bedrooms shall have doors which can be opened and closed.
        iv.   No more than four children shall share a bedroom.

v.  The Resource Family shall provide each foster child with a standard bed appropriate to the child's age and needs. A standard bed does not mean a cot, couch, convertible couch, portable bed, sleeping bag or mat.

1.  No foster child shall sleep in a bunk bed of more than two tiers. Only foster children age 7 and above shall sleep in the top bunk of the two tier bunk bed and shall have access to a ladder and protective railing on all open sides.

2.  Each child shall have his or her own bed and a place for their own belongings with one exception: two siblings of the same sex may share a full sized bed or larger, if documented as appropriate in each child's case record.

3.  Children under 18 months of age shall sleep in a crib. Children who are 18 months or older and developmentally delayed shall sleep in a bed that is appropriate to the child's age and needs. When the child is old enough to move from a crib to a regular bed, there must be an available bed for the child in the licensed home.

4.  Children over 18 months of age shall not sleep in the same room with an adult who has reached his or her 21st birthday. An exception will be allowed when it has been documented that a child has severe physical or emotional handicap that requires close attention and monitoring by the resource parent.

5.  Children over the age of 3 years shall not share a room with a child of the opposite gender.

6.  Notwithstanding any other provision of this section, a foster child who is a minor parent may share a room with her own child.

7.  A foster child shall be provided with: a sanitary mattress, a clean pillow, clean bed linens, blankets or covers as appropriate to the weather, a waterproof protective mattress cover, as needed, separate and accessible drawer space for personal belongings and sufficient closet space.

5.  Exterior Environment

a.  The play area shall be fenced if there are conditions which may pose a danger to a child playing outside. The age and developmental abilities of the child are considerations for determining risk to the child.

b.  There must be safety measures for a swimming pool or any body of water located at or near the resource family home.

1.  The home shall have safety floatation devices available.

2.  Life saving equipment and devices shall be visible, readily accessible, in good repair and ready for immediate use.

3.  A Resource Parent shall supervise a child who is in the swimming pool or near the body of water in accordance to the child's age, capabilities, and developmental level.

4.  At least one Resource Parent who is currently certified in cardiopulmonary resuscitation (CPR) shall be present in the

swimming pool area or near the body of water when a foster child age 12 and under is in the area.

The Home Study shall be completed within sixty (60) days after the Resource Family ASWS assigns it to a Resource Specialist. This home study assignment is after completion of pre-service training. If the forms to be completed by the Resource Family are not returned to the agency within 30 days following the completion of the training, the application will not be processed. A letter will be sent to the applicant stating an additional 15 days are being given to them to complete their forms before their home is denied. If an application is denied, a written explanation shall be sent to the applicant as to why it was denied.

Safe and Timely Interstate Placements for Foster Children, 42 USC 1305, states the receiving state (for an in-coming ICPC home study request) has 60 days to provide a completed home study to the requesting state. These studies can be foster, adoptive, relative or non-relative homes. Mississippi adopted the policy, through Bulletin #6059 dated October 12, 2006, that DPCS staff would be given 45 days to complete an in-coming ICPC home study and send to the ICPC unit at the State Office. This will give the ICPC unit an additional 15 days to review the study and request additional information from the county staff, if needed, before sending to the requesting state on or before the 60 day deadline. Pre-service training for in-coming ICPC may be waived for up to six (6) months.

Any waiver to the requirements stated above must be related to the needs of the child to be placed and shall be submitted in writing with a justification statement to the Resource Family ASWS if the sending state is requesting that the home be licensed or approved for adoption.

## VIII. APPROVAL PROCESS

After completion of pre-service training and all forms have been received at the last session of that training along with submission of the completed home study, the Resource Family staff will generate a Notice of Action letter ⌨ from MACWIS. The letter is sent to the applicants stating the action taken regarding approval of their home. A copy of the letter will be sent to the Resource Specialist who completed the home study. A copy of the applicants' signed contractual agreement will be maintained in the file.

If children within the approved licensing age and gender range are offered for placement into their home, but the applicant never agrees to accept a child over a three year period, the home will be closed. The County of Responsibility (COR) Worker will need to log these placement requests and refusals into ⌨ Placement Screen, Rejection Tab in MACWIS.

*Denial of an Application*

An application may be denied at any point during the Inquiry, Application Process, or Home Study. The Resource Specialist shall determine if an applicant does or does not meet licensing requirements or is not appropriate for the care of foster children. Even though an applicant may meet the physical requirements of the licensing process, the professional judgment of the agency staff shall be utilized in making a determination for licensure. Although licensed homes are needed for the care of children, it is not the agency's intent for placement decisions to cause additional pain or trauma for the child or the applicants. When a decision is made to deny an applicant:

1. The Resource Specialist shall discuss the reason for denial with the Resource Family ASWS.
2. The Resource Specialist shall discuss with the applicant the reason for denial.
3. A closing summary shall be filed in the electronic and paper file indicating reason(s) for denial.
4. A Notice of Action (MDHS-SS-432) shall be completed and submitted to the Resource Family ASWS for denial.

DHS
264138

## IX. ONGOING IN-SERVICE TRAINING

Resource Families will receive ongoing training through the support groups as well as specific training that was identified as needed by Resource Families and agency staff. They must receive no less than five (5) hours of ongoing training annually for a total of no less than fifteen (15) hours prior to the three-year recertification. A Resource Parent may receive more than fifteen (15) hours over the three year licensing period, but the extra hours may not be carried over to the next licensing period.

Training certificates, letters or verification of training shall be provided to each Resource Parent for each training session attended. Resource Parents shall be required to remain in the entire training session to be eligible to receive a certificate or letter.

Home-based or on-line training modules are available to Resource Parents, however no more than four (4) clock hours of the required fifteen (15) hours of in-service training (every three years) may be obtained through these types of training.

### A. Approved In-Service Training

Resource Parents shall be permitted to attend any training session, seminar, workshop or conference specifically dealing with children or parenting abilities that has been approved by the National Association of Social Workers, Mississippi Chapter, for Social Work Units, CWTI, training provided in support groups, or any training approved for continuing professional education. Social Work Units (SWU's) shall be converted to continuing education clock hours for in-service training hours. All in-service training must be approved by the Training Unit prior to beginning the training.



Certificates of the training provided by the support groups will be signed by the agency providing the training or by a representative of the Resource Family Program.

### B. Specialized Homes for Medically Fragile Children

A licensed Resource Family Home, specializing in medically fragile children shall comply with all foster home requirements as well as the following conditions:

1. Provide a specialized license, degree, certification, training or experience that documents and demonstrates an expertise to work with children with special medical/treatment needs, (i.e. doctor, registered nurse, licensed practical nurse, emergency medical technician, special education teacher, clinical therapist, etc);

2. Demonstrate the ability to care for children with special needs such as feeding tubes, heart monitors, oxygen, fetal alcohol syndrome, cerebral palsy, diabetes, diagnosed emotional or behavioral illnesses or disorders, etc.;



3. Verify additional 8 hours of specialized training by a certified provider. The additional hours need to include CPR training as well as first aid;

4. Agree to be licensed for no more than two special care foster children at any given time. Waivers for placement of more than two special care foster children may be considered in cases of sibling groups or other extraordinary circumstances. Waiver request must be submitted to the Resource Family ASWS for approval prior to any placement. If the specialized home is caring for the siblings of a medically fragile child, these siblings will not receive the special care board rate unless they have also been certified as eligible for that benefit;

5. Understand that medical/treatment Resource Parents shall provide transportation and accompany the special care foster child to all school, treatment, and medical appointments, as well as ensuring that any follow-up visits are kept;

6. Agree to stay in the hospital with a special care child placed in their home should the child be hospitalized;

7. Maintain a child's important records, including medical documents, immunization records, and a health journal for each special care foster child placed in their home;

8. Maintain adequate school/educational records on each special care foster child placed in their home;

9. Participate as a member of the service team through at least one of the following methods:

   a. Personal attendance at team meetings.

   b. Telephonic conference calls.

   c. Provision of a written report on the child's progress including any recommendations for service.

C. **Special Provisions for Teenage Parent Foster Home**

A Resource Parent may seek and obtain a license for up to two (2) foster children who are pregnant or foster children who have parental responsibilities for their own child. The teenager's child may or may not be in agency's custody. This Resource Parent shall comply with all Resource Home licensure requirements including the following:

1. An additional 8 hours of specialized training from a professional provider who is an authority on teenage parents. These 8 hours will include:

   a. Parenting the Teenage Parent (2 Hours)
      i. Setting Boundaries
      ii. Appropriate House Rules/Expectations
      iii. Contracting and Consequences



        iv.    Communicating with Teens

    b. Teaching the Teen to Parent (4 Hours)

        i.    Teaching Financial Responsibilities

        ii.    Teaching Parental Sacrifices

        iii.    Teaching the Roles of a Parent

        iv.    Teaching Values

        v.    Teaching Child Growth and Development

        vi.    Teaching appropriate discipline

        vii.    Teaching Communication

    c. Transitioning to Independence (2 Hours)

        i.    Training with the Independent Living Specialist to receive Independent Living curriculum.

        ii.    Overview of the Independent Living Services

2. Agree to foster no more than two teenage parents at any given time. Waivers for placement of more than two teenage parents may be considered in cases of sibling groups or other extraordinary circumstances. Waiver request must be submitted to the Resource Family ASWS for approval prior to any placement;

3. Agree to provide transportation, accompany and support the teenage parent(s) in meeting parental responsibilities for their children including child care/day care, school enrollment or meetings, treatment or medical appointments, and other services based on the teenage parent(s)or child's needs;

4. Assist pregnant teenagers residing the Resource Family home with arrangement for pre-natal care, doctor appointments, follow-up medical visits and hospital arrangement for delivery in coordination with the COR Worker;

5. Model appropriate parenting methods for the teenage parent(s) and work with the teenage parent(s) to adequately care for and nurture the child/children;

6. Teach and assist the teenage parent(s) in obtaining and maintaining necessary documentation and important records, including but not limited to: birth records, medical documents, immunization records, and other relevant information for both the parent and child;

7. Demonstrate the ability not to undermine the teenage parent's care for their child, nor initiate any legal proceedings (i.e.- termination of parental rights or adoption proceedings) involving the teenage parent's child without official authorization from DFCS;

8. Participate as a member of the service team through at least one of the following methods:



    a.  Personal attendance at Family Team Meetings County Conferences, Court Reviews, etc.

    b.  Telephonic conference calls.

    c.  Provision of a written report on the teenage parent's and child's progress including any recommendation for service.

The Resource Specialist must upgrade the license status of each specialized home. During the three year re-evaluation period, these families must receive a total of 23 hours of in-service training. A minimum of eight (8) of these hours will be participation in the Independent Living Program with the teen parent.

If the Resource Parents have exceeded the required number of in-service training hours, the Resource Specialists' documentation shall reflect the actual hours.

DHS
264142



## X. RETENTION

Retention is an element and a result of having a strong agency staff, birth family, and Resource Family relationship. Retention is not the sole responsibility of the Resource Specialist. It is the responsibility of every member of the team. Resource Families continue to provide care if they believe that they are a vital and respected part of the team.

### Ongoing Support Improves Retention

The Resource Specialist will be responsible for maintaining monthly contact for supervision of licensed Resource Family homes during any period of time the Resource Family home is without placement of a child. Documentation of this monthly contact shall be included in the Resource Family's case record and in the narrative section of MACWIS. The Resource Specialist will maintain current information regarding the status of the licensed Resource Family home to assure continued compliance with licensing requirements and ensure that the needs of the Resource Families are being met.

DHS
264143

## XI. LICENSE CHANGES

Any changes that occur between recertification periods must be reported to the licensing staff for the purpose of review but a new license will not be issued. Items that require review include:

    A.  Resource Family Relocation: Change in Address/Relocation/Physical Site
    B.  Change in Number/Type of Children
    C.  Change in Marital Status
    D.  Death/Change in Household Members
    E.  Hurricane, Tornado and Other Disaster

### A. Resource Family Relocation

If the Resource Family moves, a description of the new home, including sleeping and play space, fire extinguisher and smoke alarm, and an explanation of sanitation conditions, including approval of the water and sewage disposal systems, if applicable, shall be required within sixty (60) days of the move.

If relocation involves a move to another county, the Resource Specialist in the original county shall complete the appropriate screens indicating relocation, giving the new Resource home address, and adjusting the license expiration date which shall be sixty (60) days from the date of relocation. Once this information is entered by the Resource Specialist, it shall be sent to the Resource Family ASWS for approval/disapproval.

The Resource Family home case record in MACWIS and the paper file shall then be transferred to the new county of residence following Administrative Procedures.

Since the Resource Family home update shall be required within 60 days of the move, it shall be important for the Resource home case record to be transferred in a timely manner.

### B. Licensure Change in Number/Types of Children

If the license change request is for a change in the number of children, an outline of sleeping arrangements and discussion of the family's physical and emotional capacity for additional children shall be required on the appropriate screen in MACWIS. The Resource Family ASWS has the authority to approve this request when no waiver of licensing requirements is involved. Children under age 18 months shall have a baby bed or crib for sleeping. Changes with waivers involved must go to the Regional Director for approval after approval by the Resource Family ASWS.

### C. Licensure Change in Marital Status

If a Resource Parent marries, remarries, or divorces, it shall be necessary to document these changes and to discuss the results of the interviews with the Resource Parent in an updated home study.

DHS
264144

Within one year of a new marriage, the new spouse shall complete the pre-service training. If relocation occurs because of the marriage or divorce, the designated Resource Specialist shall also include data relating to the new home. The change will be documented and routed in the manner described in Section XI, A.

### D. Death/Change in Household

If one of the Resource Parents dies, it will be necessary to discuss with the widow/widower what services they may need as a result of this loss.

Complete the appropriate screens ⌨ in MACWIS to remove the deceased person from the case. The change will be documented and routed in the manner described in Section XI, A.

### E. Policy Exceptions Related to a Disaster

All Workers must consider permanency versus safety. In a disaster, safety comes first and Resource Specialists must make sure the child is not at risk for harm if placed in a Resource Family home. Some exceptions to the Resource Family's home may not be ideal but will only be temporary until safety hazards from the disaster no longer exist. If the Resource Family is due for license renewal and has not received all their in-service training, their home will be re-licensed for one year in which time the family shall complete their training. Exceptions to a disaster include:

1. Worker will use guidelines from Section XI, A. Resource Family Relocation as well as the same time frame.

2. The Resource Family Program will allow the family to live in temporary housing such as tents, Quonset Huts, temporary housing provided by FEMA and other approved shelters, if a resource family loses their home in a disaster. There may also be situations that the family will move in with friends and family, whose homes were not destroyed. This should be reviewed on a case by case basis. The agency will accept the Corp of Engineers' approval of the temporary homes' sewage and water.

3. Background checks through law enforcement and DHS records will be conducted on all related or non-related adults in the home.

4. The Resource Family Program will not allow a child to sleep with an adult.

5. The Resource Specialist will physically observe the temporary home and obtain information about the family's sleeping arrangements. If bed space is limited, allowance will be made for mattresses, inflatable beds, cots, etc. to be used as alternative sleeping arrangements. In camper-like FEMA temporary housing, floor space is very limited. If these temporary beds are used, some floor space must be usable for easy passage around the housing.

6. The agency will make every effort to contact the authorities to request FEMA housing that is adequate for the size of the family.

7. The Federal Agency authorizing the use of FEMA temporary housing, dictates standards with which the user must comply. If licensed families are



residing in FEMA temporary housing, they must comply with these standards of this federal agency whose staff make monthly inspections of the housing.

8.   The agency will make every effort to work with the family to alleviate problems if conditions of the licensed family's home are unsafe or not up to standards. The agency's purpose is to provide safety to the child.

9.   The Regional Director, Placement Director and/or Division Director may consider a waiver on any other problems that arise as a result of a disaster.

DHS
264146

Mississippi, Volume IV
Revised November 2007

Section F
Page 4525



## XII. CLOSURES

The decision to close a Resource Family home shall be made by the Resource Specialist, the Resource Family ASWS or Family & Children's Services Division Director. Each case should be considered individually and the reasons for closure thoroughly reviewed.

The following list is not inclusive, but these are areas which shall be considered as possible reasons for closure and/or revocation of the license:

1. The family requests that their home be closed.

2. The family moves out of state.

3. The family refuses to cooperate with the regulations and policies of the DFCS, such as failure to cooperate with the implementation of the permanent plan for the child

4. The family fails to report changes regarding household members, such as an adult child or family member moves into the home, separation from a spouse, marriage or divorce.

5. The family cannot or will not take action to meet agency licensing requirements.

6. There is an evidenced report of physical, sexual or emotional abuse or neglect of a child. 

DHS
264147



## XIII. RE-LICENSING A CLOSED RESOURCE FAMILY HOME

Whenever a previously licensed Resource Family decides to reapply, use the following procedures:

### A. Licensure Closed Less Than One Year

The Resource Specialist must update the home study on homes closed less than one year and include a brief description of reasons the Resource Parents left the program as well as reasons they decided to reapply. Provide details of changes in the family and secure appropriate verifications required as a result of any changes. The following shall be forwarded to Resource Family Program:

1. One copy of verifications of training for each Resource Parent.
2. Form MDHS-SS-4404, Physical Examination of Adoptive/Foster Applicant - medical update and any other medical or psychological tests recommended by a licensed medical practitioner, shall be required for each applicant only if the previous medical or other recommended tests have expired, or if the applicant earlier withdrew from the program for medical or psychological reasons.
3. Form MDHS-SS-457, Contract for Designation of Foster Home.
4. Form MDHS-SS-457A, Affirmation of Understanding Regarding MDHS Policy Forbidding the Use of Corporal Punishment by Foster Parents.

### B. Licensure Closed Over One Year but Less than Three Years

If the home has been closed more than one year but less than three years, complete the items below:

1. Resource Family must demonstrate receipt of 15 hours of in-service training and copy of verifications. The Resource Specialist will update training information in MACWIS.
2. New application for a Home Study/Single Application License in MACWIS.
3. Form MDHS-SS-4404, Physical Examination and any other medical or psychological tests recommended by a licensed medical practitioner shall be required for each applicant only if the previous reports have expired or if applicant earlier withdrew from the program for medical or psychological reasons.
4. Form MDHS-SS-457, Contract for Designation of Foster Home.
5. Form MDHS-SS-457A, Affirmation of Understanding Regarding DHS Policy Forbidding the Use of Corporal Punishment by Foster Parents.
6. An updated Physical Home Environment shall be completed and a narrative done in MACWIS.
7. When visiting the home the Resource Specialist will specifically discuss the reasons the Resource Parents left the program and the reason for re-application.
8. If the Resource Family has relocated, a current sanitation inspection by the Resource Specialist shall be required for homes not connected to an approved

DHS
264148


Mississippi, Volume IV
Revised November 2007

Section F
Page 4527

water or sewage system.  All other items in the study guide may be omitted unless there have been changes.

## C.  Licensure Closed Over Three Years

The initial Resource Family home licensing procedures shall be followed.

## D.  Unapproved or Unlicensed Relative Homes or Unallowable Facility

Administrative costs associated with an otherwise eligible child who is in an unallowable facility or an unapproved or unlicensed relative home, and who is removed in accordance with section 472(a) from the home of a relative specified in section 406(a) (as in effect on July 16, 1996), shall be considered for expenditures:

1. for a period of not more than the lesser of 12 (twelve) months or the average length of time it takes for the State to license or approve a home as a foster home, in which the child is in the home of a relative and an application is pending for licensing or approval of the home of a foster family home; or

2. for a period of not more than 1 (one) calendar month when a child moves from a facility not eligible for payments under this part into a foster family home or child care institution licensed or approved by the State.

## XIV. RECERTIFICATION

The recertification process will occur every three years. Section 43-15-13 (6) requires licensed families to have a minimum of twelve (clock) hours of training. The agency is requiring all resource families to have 15 hours of training (5 hours per year) in order to be recertified. The expiration date following a reevaluation of a foster home license shall be on the last day of the month in which the home was originally licensed.

The recertification process will include:

1. Documentation of a complete medical examination (may use MDHS-SS-4404) current within one year of recertification, on both parents, if a two parent home;

2. Current Background Check (for all adults living in the home) In addition MACWIS and case records should be checked under the foster home name as well as the names of children in the home to determine if there have been any child abuse or neglect investigations that were not entered into the central registry. These records checks shall also be documented in the recertification package;

3. Home Visit by the Resource Specialist;
   a. Review physical environment for safety issues including septic and water systems
   b. Discuss issues and concerns in providing care
   c. Income verification
   d. Check smoke detectors and fire extinguishers

4. Sign "Forbidding Corporal Punishment" (MDHS-SS-457A) agreement;

5. Verification of in-service training;

6. Verify pet vaccinations;

7. Obtain law enforcement check;

8. Provide copy of current Driver's License and auto insurance;

9. Provide updated emergency plan.


**Waivers to Licensing Requirements at Time of Reevaluation**

Approval of Resource Family homes where waivers to the licensing requirements are necessary shall be given only by the State Licensing Authority.

For licensed Resource Family homes, the Resource Specialist shall complete the necessary⊟ MACWIS screens. This will include the Waiver Request Screen on

DHS
264150



which the Resource Specialist shall write an explanation/ justification which shall contain a clear statement of the waiver and a time frame for correcting the problem.

After reviewing the explanation/justification, the Resource Family ASWS shall make a recommendation regarding the request for a waiver of requirements and shall route the request to the Regional Director for a decision.

The Regional Director will approve or disapprove the waiver and the Resource Family ASWS shall be notified 🖥 in MACWIS. The Resource Specialist shall also be notified by MACWIS. When the Resource Specialist receives the notice of approval/disapproval in MACWIS, a Notice of Action shall be sent to the Resource Family indicating the terms of the license.

Mississippi, Volume IV
Revised November 2007

# XV. ALLEGATIONS OF ABUSE AND NEGLECT OR LICENSING VIOLATIONS

All reports involving alleged child abuse and neglect, unusual incidents and other situations or circumstances affecting the health, safety or well-being of a child including the circumstances leading up to the incident should be promptly reported to the Resource Family ASWS, Regional Director, and Placement Unit Director, Protection Unit Director, and Division Director's Office.

See the flow chart in the practice guide that depicts this process.

Specifically:

1. The Regional Director will assign a Worker from another county to conduct the investigation.
2. The Resource Specialist and Resource Family ASWS will be notified of the report and may accompany the investigating Worker, at his/her request, to the Resource home.
3. The Resource home will be made unavailable for further placements pending the outcome of the child protective investigation. MACWIS does this automatically upon entering the report as a Resource home.
4. The Resource Specialist will provide support to the Resource Family during the time that the investigation is being conducted, but may not discuss the investigation itself.
5. The investigating Worker will inform the Resource Family that the allegation has occurred and the nature of the alleged abuse or neglect.

Upon completion of the investigation:

1. The Regional Director shall notify the Resource Family in writing of the investigation findings, and whether any rules have been violated.
2. The letter will be copied to the Resource Family ASWS and State Office Licensing Authority.
3. The Resource Family Program will support the Resource Family and provide in-person explanation regarding the current status of the license.
4. Licensing actions are based on findings.

Mississippi, Volume IV
Revised November 2007



## XVI. LICENSURE APPEAL PROCESS

In the event an application for licensure or renewal of a license is denied, or a license is suspended or revoked, the aggrieved party may request an administrative hearing. The appeal process is as follows:

The aggrieved party may file an appeal by submitting in writing a request for an administrative hearing to the Division Director of Family and Children's Services within ten (10) working days of receipt of the written notification of licensure action.

When an appeal is filed by the aggrieved party, the Resource Specialist shall follow the policy and procedures as stated in MDHS Policy Manual, Volume IV.





DHS
264153

## XVII. CURRENT RESOURCE FAMILY ADOPTION

The Resource Specialist is responsible for obtaining and submitting the MDHS-form-471, Foster Parent Application to Adopt a Particular Foster Child. The Form 471 can be completed when the child has been freed for adoption and has resided in the resource home six (6) months or more.

A Contingency Plan is developed so the Adoptive parents can designate an individual or individuals to care for the child in case of death or disability of the Adoptive parent/s.

An adoption discussion must be documented in the narrative screen ▣ in MACWIS. The time the child has been in the Resource home under supervision of the County Worker will count as the supervisory period.

If the Resource Family does not follow through with the finalization in a timely manner, the Resource Family Program will initiate recruitment efforts for an Adoptive home for the child.

The Resource Family Program will provide written approval and instructions to the Resource Parents as to how to proceed with the adoption. They will also be instructed to submit a copy of the Final Decree of Adoption so the adoption case can be closed.

1. When the Final Decree of Adoption is received in the Placement Unit, a letter will be sent to the County of Responsibility requesting the closed county case be sent to the Resource Family Program.

2. DFCS shall maintain records.

The case is then closed ▣ in MACWIS

Section 93-17-207(1)(2) of the Mississippi Code states that MDHS "shall release non-identifying information, for a reasonable fee, including the actual cost of reproduction, to any of the following persons upon request made with sufficient proof of identity:

1. An adoptee eighteen (18) years of age or older;
2. An adoptive parent;
3. The guardian or legal custodian of an adoptee;
4. The offspring or blood sibling of an adoptee if the requester is eighteen (18) years of age or older."

It also states in the section that "information released pursuant to subsection (1) of this section shall not include the name and address of the birth parent, the identity of any provider of health care to the adoptee or to the birth parent and any other information which might reasonably lead to the discovery of the identity of either birth parent".
It is permissible to release the age of the parents and non-identifying medical information.

Mississippi, Volume IV
Revised November 2007

Section F
Page 4533



## XVIII. RECRUITMENT OF A NEW RESOURCE FAMILY FOR ADOPTION

If the current Resource Family is unable and/or unwilling to adopt, the Resource Family Program shall search for a permanent placement for the child. The information on the child that exists in the records as well as interviews with the child should assist in the process of finding a new family for the child. A DHS-SS-476, Adoption Exchange form will be completed in accordance with MS Code 43-15-19 that states the agency "shall maintain a Mississippi Adoption Resource Exchange registry, which shall contain a total listing of all children freed for adoption as well as a listing of all persons who wish to adopt children and who are approved by a licensed adoption agency in the state of Mississippi."

As part of the efforts to identify permanent families for children and youth, the Resource Family Placement Committee will meet quarterly to identify children waiting for permanent families and review and select an appropriate Resource Family. An aspect of the focus of the meeting is to identify child specific recruitment needs.

### A. Abandoned Infants

MS Code Section 43-15-203(1) states that "no later than the close of the first business day after the date on which an emergency medical services provider takes possession of a child the provider shall notify the Department of Human Services that the provider has taken possession of the child." The Resource Family ASWS shall be notified immediately and included in placement planning for all abandoned infants. The infant will be placed in the home of a Resource Family interested in adoption as chosen by the Resource Family Program.



### B. Supervision of Placements When a Child Is Placed In an Adoptive Home

The Resource Specialist supervises all children in MDHS custody who are free for adoption and placed by the agency in an Adoptive Resource home. A major role of the Resource Specialist during the supervisory period is to provide support to the Adoptive Family. A minimum of six months supervision is required for each agency adoptive placement.

The agency has authority to remove the child after placement and before legal adoption. This step should be considered only for reasons such as separation of the Adoptive Parents, death, mental breakdown, serious incapacitating illness, abuse/neglect, or failure in adjustments. Even in such cases, the county staff and the Resource Family ASWS and Resource Specialist must examine each situation individually to determine whether the child should be removed. Every possible resource for help should be offered the family before considering removal.



## C. Working with Private Agencies

The Resource Family Placement Committee may decide to utilize an adoptive placement with a licensed private adoption agency if it is in the best interest of the child. Once this placement is agreed upon, the private agency will make plans with a Resource Specialist, County Worker, the current caregiver (when appropriate) and the private agency foster/adoptive family. A pre-placement schedule will be given to all parties involved in the placement after it is approved by the Resource Family ASWS and/or Placement Director.

The pre-placement visitation will be supervised by the private agency and Resource Specialist. The Resource Specialist will complete the Adoption Subsidy/Assistance paperwork with the family.

After placement is made, the private agency staff may conduct as many home visits as necessary each month but one of these visits shall be face-to-face with the child. The Resource Specialist or County Worker will accompany the private agency worker on this face-to-face visit so that the family is not caused undue stress by too many different professionals visiting the home. The private agency staff will send monthly reports to the Resource Specialist noting the progress of the placement.

The private agency staff makes recommendation on behalf of the child to finalize adoption after placement has stabilized and these recommendations are sent to the Resource Family ASWS. The Resource Family ASWS shall send a letter to the family approving the finalization of the adoption. The legal documents are prepared by the DFCS State Office Resource Family staff and sent to the Adoptive Family's attorney of choice.

An approved MDHS Home Study will be released to a private agency upon receipt of payment of a fee in the amount of $350.00 payable to: Treasurer, State of Mississippi.

A Resource Family may not be licensed by MDHS and another agency or organization simultaneously.



## XIX. INDEPENDENT ADOPTIONS THROUGH CHANCERY COURT

The request for a home study in an independent (private) adoption must come from the Judge rather than from the petitioners or their attorney.

The study process should be carried out as nearly as possible in line with Agency policy on all Resource Family home studies. However, the different Judges will vary widely in the kind and amount of information required, and such studies will of necessity need to be geared to the individual wishes of the Judges.

If the Court requests follow-up supervision of the placement, this service should be provided by the County Worker. In this event, supervisory reports are made to the Court. All reports to the Court should be written with recognition of the fact that the Judge has responsibility and authority in the adjudication of the particular situation.

Fees may be charged as deemed appropriate by the agency for home studies for private adoptions as ordered by the Judge, and also for supervision of the placement. This fee also applies to Resource Parents who request that their home study be released to another agency. Checks should be made payable to: Treasurer- State of Mississippi.





DHS
264157

## XX. ADOPTION SUBSIDY/ASSISTANCE

Section 93-17-53 of the Mississippi code allows for monetary supplements to Adoptive Families. "This benefits the most appropriate adoption of each child certified by the state department of public welfare as requiring a supplemental benefit to assure adoption."

Adoption Subsidy is designed as a supplemental financial benefit to assist families adopting an eligible child with special needs who would be unlikely to be adopted otherwise. The purpose of the Adoption Subsidy is to reduce financial barriers that may impede the special needs of the child toward an opportunity to be adopted. The child must be determined eligible for Adoption Subsidy by the Resource Specialist and approved by the Resource Family ASWS. If the Adoptive Family is willing to adopt a special needs child without financial supplement, children can be adopted without subsidy.

The agency has two programs that offer various kinds of benefits:

1. Title IV-E (Federal), also called Federal Adoption Subsidy (FAS), provides a monthly maintenance payment and Medicaid. Eligibility for Medicaid benefits can be transferred to another state when Interstate Compact on Adoption Medical Assistance (ICAMA) forms have been completed.

2. Title IV-B (State), also called State Adoption Subsidy (SAS), provides a monthly maintenance payment. Eligibility for Medicaid benefits may or may not be transferred to another state. Medicaid is not guaranteed but may be determined by another state.

Deferred Adoption Subsidy occurs when a child's birth family background factors put him/her at risk for special needs. When documents are submitted of the child's special needs diagnosis linked to background, a monthly subsidy payment can occur.

1. Title IV-E Deferred provides Medicaid benefits and non-recurring expenses.

2. Title IV-B Deferred provides only non-recurring expenses. Eligibility for Medicaid cannot be deferred.

*To pursue adoption subsidy/assistance certification for the child, the following should be included in the termination of parental rights (TPR) packet:*

☑ Current and past medical evaluations.

☑ Current immunization record.

☑ Current and past dental examination reports (within the past six months). If dental repair work is needed, it must be completed before the adoption is finalized.

☑ Current psychological evaluation report as needed (within the past 12 months) or developmental assessment for children ages 0-5.

- ☑ Current school reports, special education evaluations and the most recent IEP, if child has a special education ruling.

- ☑ Department of Health form 913, "Medical and Social History".

- ☑ Current photograph of child (preferably color).

- ☑ Child's birth certificate.

- ☑ Labor and Delivery records.

- ☑ If parents have signed a 459 "Surrender of Parental Rights", immediately fax or mail a copy to the Resource Family ASWS (even if only one parent has signed) and mail the originals with the other information.

- ☑ Medical Information on parents, including any psychological diagnoses, is invaluable to the child and can support the child obtaining deferred adoption assistance.

- ☑ Death certificate, if applicable.

- ☑ Current addresses of the biological parents.

The Resource Family Program staff is responsible for compiling the information needed to determine a child's eligibility for Adoption Subsidy. For consideration all the following criteria must be met:

1. The court that holds jurisdiction determined that it was in the best interest to remove the child from the parents and the child cannot or should not be returned to their home. This must be stated in a court order.

2. The child must be determined by the agency to be a child with one or more special needs as follows:

   a. Physical disability

   b. Mental (I.Q. 70 or less), emotional, and/or developmental (25% delay) disability

   c. Age (must be six (6) years old or older)

   d. Membership of a sibling group of two (2) or more children being placed together even if adoptions are finalized at different times.

   e. Medical conditions

   f. Factors in the child's medical history or background or the medical history or background of the child's biological family, which places the child at risk of acquiring a medical condition, a physical, mental or developmental disability or an emotional disorder. This includes unknown parent, abandoned children and safe babies. Current information is required to document the above conditions.

DHS
264159

3. Significant emotional ties with Resource Family, if child is being adopted by his or her Resource Family.

4. The state made reasonable, but unsuccessful efforts, to place the child without Adoption Subsidy

## A. Initiation of IV-E Adoption Subsidy Payment

The Adoption Eligibility screen  in MACWIS must be completed by the Resource Specialist and approved by the Resource Family ASWS.

1. When the Resource Parent finalizes the adoption, the foster board payment should terminate upon finalization. Adoption Subsidy payments begin the day after finalization. A family will not receive both a board payment and an Adoption Subsidy payment for the same child.

2. When a certified special needs child is placed with resource parents, payments will begin at the time of placement, prior to the Final Decree of Adoption.

3. The amount of the Adoption Subsidy Agreement may not exceed the amount of the foster care maintenance payment that would have been paid for that specific child if the child had been in a Resource Family home.

4. The amount of the Adoption Subsidy is not based upon income. The agreed upon payment will be expected to combine with the parents resources to cover the ordinary and special needs of the child projected over an extended period of time.

5. The amount of the Adoption Subsidy payment can be adjusted up to the maximum allowable payment or reduced, with the concurrence of the Adoptive Parents when the projected needs of the child change.

6. Adoption Subsidy monthly payments are subject to the Federal and State funding provided by the State Agency. It shall be strongly emphasized to the Adoptive Parents that federal and state law governs the money payment and the availability of funding is not guaranteed. If funding is reduced, subsidy payments will be renegotiated with each family.

7. The child's ordinary and special needs are accounted for during the negotiation of the Adoption Subsidy Agreement. If the family is not receiving maximum subsidy, the only means for a return to renegotiate is if the child's special needs have changed that meet the criteria for the special board payment. A change in family circumstances can be discussed but is not the factor in renegotiations.

## B. Initiation of IV-B Adoption Subsidy Payments

The State Adoption Subsidy utilizes state funds matched with Title IV-B funds. The same criteria listed in IV-E payments apply except for the fact that the child must have been determined ineligible for IV-E foster care to receive IV-B Subsidy.

DHS
264160



## C. Private Licensed Non-Profit Child-Placing Agencies Obtaining Adoption Subsidy

The following items are needed in order for a Private Licensed Child-Placing Agency to request adoption subsidy:

1. Document/s which legally frees child for adoption and places custody with a licensed child placing agency;

2. Documentation of special needs (must be within past six months) such as (a) psychological, (b) medical reports, (c) reports from therapist, and (d) other documentation as determined by the Resource Family Program;.

3. Birth Certificate;

4. Documentation of IV-E Eligibility based on 1996 AFDC criteria;

5. Documentation of SSI eligibility (a copy of the most recent SSI award notice). The child must be under age of 18 or 21 if SSI eligible. SSI must be determined prior to final decree of adoption;

6. Date registered on the Mississippi Adoption Resource Exchange (Mississippi Code of 1972, Section 43-15-19, annotated);

7. Documentation of reasonable but unsuccessful child specific recruitment efforts made to place the child without Adoption Subsidy;

8. Documentation the child has established significant emotional ties with prospective Adoptive Parents while in their care as a foster child and it is deemed in the best interest of the child by the agency to be adopted by the Resource Parents;

9. Child's Social Security Number;

10. Child's Medicaid Number

## D. Adoption of Child by Birth Parent/s

A biological parent whose parental rights have been terminated and who later adopts his or her biological child cannot receive an Adoption Subsidy.

## E. Termination of Adoption Subsidy

Termination will occur in any of the following circumstances:

1. Adoption Subsidy payments will terminate when the child reaches the age of 18 or at State option 21. Adoption Subsidy may be provided until the child is 21 years of age if the child has a mental or physical handicap which warrants continuation. Section 93-17-67 of the Mississippi Code provides



subsidy to a child up to age 21 if the DFCS State Office Administrator determines that the treatment or rehabilitation for which payment is being paid is in the best interest of the child. The child will continue to be deemed eligible for Medicaid if they are receiving Title IV-E Adoption Assistance.

2. If the agency determines that the Adoptive Parents are no longer legally responsible (such as they relinquish custody or give custody to someone else.)

3. If the agency determines that the Adoptive Parents are no longer providing support (such as death of a child, the child marries, etc).

4. IV-E Adoption Subsidy will resume at the subsequent adoption of a child after the death of a former Adoptive Parent based on the contingency plan. The new IV-E Adoptive Parents must complete fingerprinting and law enforcement background checks as well as a Central Child Abuse Registry check.

DHS
264162

## XXI. ADOPTIVE LEGAL PROCESS

If the family is adopting a Special Needs Child who has been certified for Adoption Assistance, they have some options as to how they will handle the finalization of the adoption:

1. They may select their own attorney and pay the attorney fees, court cost, and revised birth certificate fee themselves.

2. They may select a private attorney or the Law School Project to handle the adoption and the agency will pay the non-recurring expenses such as attorney fee, court costs and fee for the revised birth certificate (maximum $600 per child).

3. The Resource Specialist will need to state which option the family has chosen and document in the "Option Form" signed by the family.

4. If the family wants to use a private attorney, the Resource Specialist will send the legal documents directly to the attorney.

5. Upon receipt of the Final Decree of Adoption and an itemized Statement from the attorney, the Resource Family ASWS will request a check be issued to pay the fees.

6. It is the Resource Specialist responsibility to obtain from the adoptive parent(s) a copy of the Final Decree of Adoption which allows the case records to be closed. It will be necessary, of course, for the Adoptive Parent(s) to request this be provided by their attorney.

7. The Social Security Act provides that an adopted child, who was or is eligible for benefits under his birth parents' coverage, may continue to be eligible to receive these benefits after adoption.

8. The adopted child who was eligible for Veteran's Benefits prior to adoption may continue to be eligible after adoption. Adoptive Parents should be made aware of this possibility. Adoptive Parents should be told that they will be notified by the Resource Specialist if their child is affected and that confidentiality will be preserved by the Department and by Veterans Administration.

Mississippi, Volume IV
Revised November 2007

## XXII. INTERNATIONAL ADOPTIONS

Many countries allow families from the United States to adopt children and some of these families adopt children with special needs. The state child welfare agency is usually only contacted if the family needs financial benefits for their special needs child and almost always this is after the adoption is finalized. The family can apply for Adoption Subsidy/Assistance without being IV-E eligible. In order to receive financial assistance, the family must prove the child had special needs prior to the adoption and the state must receive proof from the country from where child was adopted, that reasonable but unsuccessful efforts were made to place the child without subsidy. Since both are rarely proved, providing adoption subsidy/assistance to children adopted from foreign countries is also very rare.

DHS
264164



# XXIII. INTERSTATE COMPACT ON THE PLACEMENT OF CHILDREN

## A. Out of State Adoptions

Requests from out-of-state adoption agencies for Home Studies and/or placement supervision for a particular child are made to the Interstate Compact on Placement of Children, Resource Family Program. Agency policy provides for free exchange of information with public or private agencies with written consent of Adoptive Parents.

(ICPC 100A), Interstate Compact Application Request:  The State of Mississippi requires that Form ICPC-100A be secured when an unrelated child either comes into the State of Mississippi for adoption, or is placed for adoption outside the State. The procedures as outlined in the Interstate Compact on the Placement of Children in Volume IV, Section H, are to be followed.

If a child is placed for adoption in another state it is the responsibility of the COR Worker to initiate the ICPC Request for Adoption Study with the 100-A. See ICPC State Policy and Caseworker Guide to ICPC for further ICPC procedure.

## B. The Interstate Compact on Adoption and Medical Assistance (ICAMA)

The Interstate Compact on Adoption and Medical Assistance is the principal means relied upon by its members to regulate and coordinate the interstate delivery of services to adopted special needs children. The ICAMA provides that between states party to the Compact, the state where the adoptive family resides will furnish Medicaid to the special needs child. 

DHS
264165

**Ex. 12B**

Mississippi, Volume IV                                                Section F
Revise 05-01-99                                                      Page 4603

# ADOPTIVE SERVICES
# ADOPTION ASSISTANCE

1.   In order for a child to be considered a special needs child for the purposes of the adoption assistance program, all of the following criteria must be met:

   A.   The Youth Court Judge determined that the child cannot  or should not be returned to the home of his parents.  This must be stated in a Court Order issued within 180 days of a custody order or Voluntary Surrender.

   B.   The child must be determined by the agency to be a child with one or more special needs as follows:

      1.   Physical disability

      2.   Mental disability (I.Q. of 70 or less)

      3.   Developmental disability

      4.   Emotional disturbance

      5.   Age (must be Six (6) years old or older)

      6.   Membership in a sibling group of two (2) or more children being placed together

      7.   Racial or ethnic factors

      8.   Medical conditions

      9.   Factors in the Child's Medical History or Background or the Medical History or Background of the Child's Biological Family Place the Child at Risk to Acquire a Medical Condition, Aphysical, Mental or Developmental Disability or an Emotional Disorder.  Current information is required to document the above conditions.

   C.  Significant emotional ties with foster parent(s), if child is being Adopted by his or her foster parents.

Mississippi, Volume IV
Revise 05-01-99

Section F
Page 4604

# ADOPTIVE SERVICES
## ADOPTION ASSISTANCE

The Agency must make reasonable efforts to place the child without IV-E Adoption Assistance which must be documented in the child's case record by the Adoption Unit Staff.

**Significant Emotional Ties**

EXCEPTION: When the best interest of the child would not be served by such efforts, as in the case of a child whose foster parents are applying to adopt and significant emotional ties have developed between the foster parents and child over a minimum of 6 months. This issue must be addressed by the adoption worker in the adoption home study.

**Form MDHS-SS-AU-1 Eligibility Check List for Certification of Child for Adoption Assistance**

Form MDHS-SS-AU-1, Eligibility Check List for Certification of Child for Adoption Assistance will be completed by the Adoption Unit Staff and submitted to the Adoption Administrator for approval/ disapproval.

> **Certification of Child for Adoption Assistance**
>
> Certification of Child for Adoption Assistance will be completed by the Adoption Unit Staff and entered on the appropriate screen in MACWIS. A tickler will be generated to the Adoption Administrator so she will know to review the recommendation and either approve or deny the certification.

**Criteria for Adoptive Parent(s) to Receive IV-E Adoption Assistance**

The following criteria must be met for the adoptive parent(s) to receive IV-E Adoption Assistance.

1. The applicants must be approved by the Adoption Unit or an other licensed adoption agency as adoptive parent(s).

2. The child being adopted must have been determined eligible for IV-E Adoption Assistance.

**Ex. 12C**



# RESOURCE FAMILY LICENSURE

## *PRACTICE GUIDE*



**Mississippi**
**Department of Human Services**
**Division of Family and Children's Services**
**September, 2007**

DHS
217963

DHS
217983

---
### Frequently Asked Questions about Becoming a Resource Parent
---

**Q:**  *What are the basic requirements to be a Resource Parent?*
**A:**  You must be at least 21 years of age, a US citizen and a resident of Mississippi for at least one year.  You must be able to show proof of residence in the home.  You will need to be able to meet the needs of the child placed with you.

**Q:**  *Do I need to own my own home?*
**A:**  No.  You may rent or own your home.

**Q:**  *Can single parents foster or adopt? Do I have to be married?*
**A:**  You may be single or married.  If you are married you must have been married for at least two years.  If you were previously married, you must be legally divorced or widowed (you cannot be licensed if separated from your spouse.)  You cannot have unrelated adults living in your home.

**Q:**  *Is there an income requirement?*
**A:**  You will need to have enough income to meet the needs of your own family and other household members, based on minimal government guidelines, without relying any foster care board payment or adoption subsidy you may receive for the child placed with you.

**Q:**  *Can I get help with daily living expenses for a foster or adopted child?*
**A:**  If you provide foster care you will receive a daily stipend to assist with the cost of caring for the foster child, and medical expenses are covered for the child.  Adoptive parents may receive an adoption subsidy depending on the child's needs and eligibility for subsidy programs.  Most Resource Parents find that they need to supplement this financial assistance with their own funds.

**Q:**  *Can I be employed outside the home?  Can I get help with day care for a foster or adopted child?*
**A:**  Many Resource Parents work outside the home.  You will need to have flexibility in your employment to allow you to be available to attend meetings or otherwise provide for the child's needs.  You will also need to have a plan for safe and reliable child care, which must be approved by the Agency.  The availability of funds to assist with child care varies and can be discussed more accurately when a specific child is being considered for your home.

**Q:**  *Does the child need to have his or her own room?*
**A:**  No.  Up to four (4) children of the same sex may share a room, depending on the size of the room. Each child must have his or her own bed, except that two (2) siblings of the same sex may share a full size bed.  There are a few more regulations about bedroom space and these will be reviewed with you during the training and licensing process.

**Q:**  *What types of children need homes?*
**A:**  Temporary foster care is needed for children of all ages.  Children waiting for adoption

---

# CURRENT RESOURCE FAMILY ADOPTION

## Discussion of Adoption with the Resource Family

A discussion with the Resource Family regarding their interest in adopting a child in their home must be documented in the narrative screen in ⌨ MACWIS. Once the Resource Family has expressed their desire to proceed, the County of Service staff assigns the adoption addendum to the designated Resource Specialist.

## Understanding Transitions

An important aspect of this phase of the work by the Resource Specialist is to help the Resource Parent(s) understand the transition that will occur in their lives including:

- Role of the Agency
- Potential Child Reaction
- Legal Implications
- What Adoption Means to the Resource Family's Children
- Adoption Assistance
- Contingency Plan

---

### Best Practice Tips

Discussion of the Resource Parent's role in relation to permanency planning occurs on an ongoing basis throughout each placement. This process includes helping Resource Parents with the sometimes painful task of supporting reunification, making the them aware of other permanency or placement options being considered for a child, and assisting the family as they consider the adoption of a child who cannot return to birth parents.

In terms of adoption, helpful services to Resource Families include exploring concerns regarding the child's current or future needs and working to identify services and supports that will be available once adoption occurs. Needed supports may include financial subsidies or community services, or assistance with resolving extended family issues such as sibling contact or openness with birth family members.

When Resource Parents have received the service described above yet remain unwilling or unable to make a clear commitment to be lifelong parents, youth permanency specialists recommend that they be reminded firmly but with respect that they must choose between one of only two courses of action that are in the child's best interest: They must either make a clear and timely permanency commitment or give the child emotional permission to have another family and support them as work takes place to identify an alternative permanency resource.

---

# ADOPTION SUBSIDY/ASSISTANCE

## Legal Basis

Section 93-17-53 of the Mississippi code allows for monetary supplements to adoptive families: "This benefits the most appropriate adoption of each child certified by the state department of public welfare as requiring a supplemental benefit to assure adoption."

## Purpose

Adoption Subsidy is designed as a supplemental financial benefit to assist families adopting an eligible child with special needs who would be unlikely to be adopted otherwise. The purpose of the Adoption Subsidy is to reduce financial barriers related to the special needs of the child which may impede the opportunity to be adopted. The child must be determined eligible for Adoption Subsidy by the Resource Specialist and approved by the Resource ASWS. If the Adoptive Family is willing to adopt a special needs child without financial supplement, a child can be adopted without subsidy.

## Types of Aid

The agency has two programs that offer various kinds of benefits:

1. IV-E (Federal), also called Federal Adoption Subsidy (FAS), provides a monthly maintenance payment and Medicaid. Eligibility for Medicaid benefits can be transferred to another state when Interstate Compact on Adoption Medical Assistance (ICAMA) procedures have been completed.
2. IV-B (State), also called State Adoption Subsidy (SAS), provides a monthly maintenance payment. Eligibility for Medicaid benefits may or may not be transferred to another state. Medicaid is not guaranteed but may be determined by another state.

## Deferred Adoption Subsidy/Assistance

Deferred Adoption Subsidy is available when a child's birth family background factors put the child at risk for special needs, even though the child does not evidence special needs when initial eligibility is determined. No subsidy is provided at the time of initial application. However, if the child later develops special needs linked to background, a monthly subsidy payment can be initiated. In order for deferred subsidy payments to begin, documentation will be required to verify the presence of the special need and its link to background factors.

- ☒ IV-E Deferred provides Medicaid benefits and non-recurring expenses.
- ☒ IV-B Deferred provides only non-recurring expenses. Eligibility for Medicaid cannot be deferred.

## Information Needed to Apply for Adoption Subsidy/Assistance

To pursue Adoption Subsidy/Assistance certification for the child the following should be included in the Termination of Parental Rights (TPR) packet:

- ☒ Current and past medical evaluations.
- ☒ Current immunization record.
- ☒ Current and past dental examination reports (within the past six months). If dental repair work is needed, it must be completed before the adoption is finalized.
- ☒ Current psychological evaluation report as needed (within the past twelve (12) months) or developmental assessment for children ages Birth-5.
- ☒ Current school reports, special education evaluations and the most recent IEP, if child has a special education ruling.
- ☒ Department of Health form 913, "Medical and Social History".
- ☒ Current photograph of child (preferably color).
- ☒ Child's birth certificate.
- ☒ Labor and Delivery records.
- ☒ If parents have signed a 459 "Surrender of Parental Rights", immediately fax or mail a copy to the District Program Administrator (even if only one parent has signed) and mail the originals with the other information.
- ☒ Medical Information on parents, including any psychological diagnoses, is invaluable to the child and can support the child obtaining Deferred Adoption Assistance.
- ☒ Death certificate, if applicable.
- ☒ Current addresses of the biological parents.

## Eligibility Criteria

The Resource Family Program staff is responsible for compiling the information needed to determine a child's eligibility for Adoption Subsidy. For consideration all the following criteria must be met:

1. The court that holds jurisdiction determined that it was in the best interest to remove the child from the parents and the child cannot or should not be returned to their home. This must be stated in a court order.
2. The child must be determined by the agency to be a child with one or more special needs as follows:

   a. Physical disability.
   b. Mental (I.Q. 70 or less), emotional, and/or developmental (25% delay) disability
   c. Age (must be six (6) years old or older).
   d. Membership of a sibling group of two (2) or more children being placed together even if adoptions are finalized at different times.
   e. Medical conditions.
   f. Factors in the child's medical history or background or the medical history or background of the child's biological family, which places the child at risk of acquiring a medical condition, a physical, mental or developmental disability or an emotional disorder. This includes unknown parent, abandoned children and safe babies. Current information is required to document the above conditions.

3. Significant emotional ties with Resource Parent(s), if child is being adopted by his or her Resource Family.
4. The state made reasonable, but unsuccessful efforts, to place the child without Adoption Subsidy.

## Initiation of IV-E Payments

The Adoption Eligibility screen in ⌨ MACWIS must be completed by the Adoption Specialist and approved by the Resource Family ASWS.

1. When the Resource Parent finalizes the Adoption, the foster board payment should terminate upon finalization. Adoption Subsidy payments begin the day after finalization. A family will not receive both a board payment and an adoption subsidy payment for the same child.
2. When a certified special needs child is placed with Resource Parents, payments will begin at the time of placement, prior to the Final Decree of Adoption.
3. The amount of the adoption subsidy agreement may not exceed the amount of the foster care maintenance payment that would have been paid for that specific child if the child had been in a Resource Family home.
4. The amount of the adoption subsidy is not based upon adoptive parents' income. The agreed upon payment will be expected to combine with the parents resources to cover the ordinary and special needs of the child projected over an extended period of time.
5. The amount of the adoption subsidy payment can be adjusted up to the maximum allowable payment or reduced, with the concurrence of the adoptive parents, when the projected needs of the child change.
6. Adoption Subsidy monthly payments are subject to the Federal and State funding provided by the State Agency. It shall be strongly emphasized to the adoptive parents that federal and state law governs the money payment and the availability of funding is not guaranteed. If funding is reduced, subsidy payments will be renegotiated with each family.
7. The child's ordinary and special needs are accounted for during the negotiation of the adoption subsidy agreement. If the family is not receiving maximum subsidy, the only means for a return to renegotiate is if the child's special needs have changed such that they meet the criteria for the special board payment.

### Initiation of IV-B Payments
The State Adoption Subsidy utilizes state funds matched with Title IV-B funds. The same criteria listed in Title IV-E payments apply except for the fact that the child must have been determined ineligible for Title IV-E foster care to receive Title IV-B Subsidy.

### Private Licensed Non-Profit Child Placing Agencies Obtaining Adoption Subsidy
The following items are needed in order for a Private Licensed Child-Placing Agency to request adoption subsidy for a child placed by that agency:

1. Document/s which legally frees child for adoption and places custody with a licensed child placing agency.
2. Documentation of special needs (must be within past six months) such as (a) psychological, (b) medical reports, (c) reports from therapist, and (d) other documentation as determined by the Resource Family Program.
3. Birth Certificate.
4. Documentation of IV-E Eligibility based on 1996 AFDC criteria.
5. Documentation of SSI eligibility (a copy of the most recent SSI award notice). The child must be under age of 18 or 21 if SSI eligible. SSI must be determined prior to final decree of adoption.
6. Date registered on the Mississippi Adoption Resource Exchange (Mississippi Code of 1972, Section 43-15-19, annotated).
7. Documentation of reasonable but unsuccessful child specific recruitment efforts made to place the child without adoption subsidy.
8. Documentation the child has established significant emotional ties with prospective adoptive parents while in their care as a foster child and it is deemed in the best interest of the child by the agency to be adopted by the foster parents.
9. Child's Social Security Number.
10. Child's Medicaid Number.

### Adoption of Child by Birth Parents
A biological parent whose parental rights have been terminated and who later adopts his or her biological child cannot receive an adoption subsidy.

### Termination of Adoption Subsidy/Assistance
Termination will occur in any of the following circumstances:

1. Adoption subsidy payments will terminate when the child reaches the age of 18. Adoption subsidy may be provided at State option until the child is 21 years of age if the child has a severe mental or physical handicap which warrants continuation. Section 93-17-67 of the Mississippi Code provides subsidy to a child up to age 21 if the DFCS State Office Administrator determines that the treatment or rehabilitation for which payment is being paid is in the best interest of the child. The child will continue to be deemed eligible for Medicaid if they are receiving Title IV-E Adoption Assistance.

2.  If the agency determines that the adoptive parents are no longer legally responsible (such as they relinquish custody or give custody to someone else.)

3.  If the agency determines that the adoptive parents are no longer providing support (such as death of a child, the child marries, etc).

4.  Title IV-E Adoption Subsidy will resume at the subsequent adoption of a child after the death of a former adoptive parent based on the contingency plan.  The new Title IV-E adoptive parents must complete fingerprinting and law enforcement background checks as well as a Central Child Abuse Registry check.

**Ex. 12D**

MDHS Home

FCS Home

**Public Services**          **Contact Us**                    Feedback?



# Division of Family and Children's Services
## Opt to Adopt ...

**Child Abuse Hot Line**
**1-800-222-8000 (Nationwide)**
**or (601) 359-4991**
Adoption Hotline
**1-800-821-9157**

| Foster Care | Child Abuse Central Registry | Child Abuse Prevention | Resource Families Training |
| Adoption | Residential Licensure | Citizen's Review Panel | |
| Child Protective Services | Licensed Facilities | Children's Justice Act | |
| Blue Ribbon Campaign | Children's Trust Fund of MS | Regional Directors with Map | |

| Meet Our Children Available for Adoption |
| --- |
| How to Adopt? |
| Who Can Adopt? |
| Who are the Children Waiting for Adoption? |
| Print a copy of the Adoptive Parent Application in PDF format |

**Children available for adoption are featured on Wednesday's Child, a collaboration of Mississippi Department of Human Services and WLBT Television. For more information about these children, please call (601) 359-4989.**

*How to Adopt ...*

**Step 1 Contact...**
The **Adoption Hotline** Toll-Free at **1-800-821-9157** to obtain additional information and an application.

**Step 2 Application**
Once your application has been received, it will be evaluated to determine if you meet the minimum requirements (such as age, length of marriage, sufficient income). You may be placed on a waiting list.

**Step 3 Training Sessions**
If we are able to proceed with your application, you will be invited to attend a series of five weekly training sessions. The sessions cover such topics as how children come into our custody; how to explain adoption to a child; understanding the process of separation and attachment; child development; and how to manage behavior.

**Step 4 Home Study**
You will be asked to participate in a series of interviews with a social worker. These interviews allow you and your social worker the opportunity to discuss practical as well as emotional factors surrounding adoption.

The home study helps you and your social worker determine if you and your family are ready to adopt and what type child would best fit into your family.

Step 5 Placement
Placement begins with short visits between you and the child and are gradually extended to over night. When the social worker, the child and you feel everyone is ready, arrangements will be made for placement in your home.

Step 6 Post Placement
Once a child is placed in your home, your social worker will visit several times to help you and your child with the adjustment process. These visits will continue for **at least** six months until we can recommend the adoption be finalized by the court. You may choose any attorney you wish to represent you during the adoption proceedings in court.

*Top*

## ADOPTION ASSISTANCE

Applicants who adopt children with special needs are eligible to receive financial assistance until the child comes of age. A special needs child is defined as:

- o any child six years of age or older
- o siblings groups of two or more
- o children with emotional, mental or physical needs
- o children with chronic medical conditions.

*Top*

## COST

The Mississippi Department of Human Services does not charge any fees for its adoption services. However, when it is time to finalize the adoption, you are expected to pay attorney fees, only if the child does not receive Adoption Assistance.

*Who can Adopt ...*

## Requirements for Adopting

- Single Persons
- Married Couples who have been married at least two years
- Applicants who are at least 21 years of age
- Families and Individuals whose income and insurance are sufficient to meet the additional needs of an adopted child
- Individuals who meet accepted emotional, intellectual and psychological standards to be good parents.

*Top*

If you meet all of the above requirements, you may print a copy of the Adoptive Parent Application.
It is available in Portable Document Format (PDF) only.  Viewing the PDF files require Adobe Acrobat Reader.  To download the free Adobe Acrobat Reader, click here Adobe Acrobat Reader

Adoptive Parent Application - Available in PDF format.

*Who are the Children Waiting for Adoption?*

All of the children available for adoption through the Department of Human Services have one thing in common: Their biological parents are no longer able to care for them.

We have very few infants or toddlers available for adoption. Most of our children are six years of age or older. Many have brothers and sisters who are also available for adoption. Some children have emotional, mental or physical needs. Others have chronic medical conditions. All need loving parents who can accpet them as they are.

*Top*

**For information on how to adopt any of these children, please contact the Adoption Hotline at 1-800-821-9157.**

The Mississippi Department of Human Services does not discriminate on the basis of race, color, national origin, age, sex or handicap.

**Ex. 12E**

# MISSISSIPPI PATH
## (PARENTS AS TENDER HEALERS)



# PARTICIPANT'S HANDBOOK

# MDHS
# DIVISION OF FAMILY & CHILDREN'S SERVICES

# M I S S I S S I P P I   PATH
## (Parents as Tender Healers)

### A Curriculum for
### Foster, Adoptive and Kinship Care Parents
### (Resource Families)

Certain passages in each Session as well as several articles
are copied, with permission, from
Training and Resource Center > Spaulding for Children

---

Contributors: Sylvia Sessions, Barbara Proctor, Phoebe Clark, Katherine Hardy, Patricia Digby, Ken Pilarski, Rita C. Graham, Rhonda Polk, Linda Millsap, Dorothy Jacobs, Margaret Shelton, Cynthia Easley, Yvonne Funderburk, Annie Confer, Lauren Johnson, Virginia Sturgeon, (National Resource Center), and the Adoption and Licensure Specialist for the Division of Family & Children's Services.

Front and back covers and all other graphics created by Rita C. Graham

Funding through the Resource Family Unit/Adoption & Licensure

**North American Council on Adoptable Children**                     Search | Site Map

About NACAC | How to Adopt | Adoption Subsidy | Parent Groups | Post Adoption Support | Public Policy | Adoptalk Articles & Publications | Conference | Training | Links



# Mississippi State Subsidy Profile

*Updated July 2006*

### State Subsidy Contact Person

**Adoption Subsidy**

United States
- State Profiles
- Fact Sheets
- Definitions
- National Summary

Canada
- Provincial Profiles

News & Resources

FAQs

Phoebe Clark
Department of Human Services
Family and Children Services
750 North State Street
Jackson, MS 39202
Phone: 601-359-4981
Toll-free: 800-345-6347 (in state)
Toll-free: 800-553-7545 (out of state)
Fax: 601-359-4226
E-Mail: pclark@mdhs.state.ms.us

### NACAC Subsidy Representative (parent/volunteer)

Janice Huff
Family Matters of Jackson
2062 Suzanna Drive
Raymond, MS 39154
Home: 601-371-1165
E-mail: lonellandjanice@aol.com

Adoption subsidies are available for children with special needs. Federal subsidies were created by Congress (through Public Law 96-272—the Adoption Assistance and Child Welfare Act of 1980) to encourage the adoption of special needs children and remove the financial disincentives to adoption for the families. Children may receive a federally funded subsidy under Title IV-E or a state-funded subsidy as per state guidelines. Below we have outlined information related to definitions of special needs, benefits available, and procedures in your state. Answers to select questions were made available by the Association of Administrators of the Interstate Compact on Adoption and Medical Assistance (AAICAMA) through the Child Welfare Information Gateway (www.childwelfare.gov). Profiles for each state's subsidy program are available on our web site at www.nacac.org. If you have additional questions, please call the North American Council on Adoptable Children (NACAC) at 651-644-3036 or our subsidy help line at 800-470-6665, or e-mail us at adoption.assistance@nacac.org. If you have state-specific questions, please call your State Subsidy Contact Person or the NACAC Subsidy Representative (listed above) for more information.

**Adoption Resources on the Web:**

http://www.mdhs.state.ms.us/fcs howadopt.html

**Mississippi's state-specific medical assistance links:**

http://www.medicaid.state.ms.us

**Mississippi's adoption assistance links:**

http://www.mdhs.state.ms.us/fcs whoare.html

See under the heading, "Most of the children have special needs. They are…" for a description of children eligible for adoption assistance.

**1. What specific factors or conditions does your State consider to determine that a child cannot be placed with adoptive parents without providing financial assistance? ("What is your State definition of special needs?")**

A child with special needs is defined as a child that has at least one of the following needs or circumstances that may be a barrier to placement or adoption without financial assistance:

    a.   Six years of age or older

    b.   Racial or ethnic factors

    c.   Member of a sibling group of two or more children placed together for adoption

    d.   Physical disability

    e.   Mental disability (IQ of 70 or less)

    f.   Developmental disability

    g.   Emotional disturbance

    h.   Medical condition(s)

    i.   History of abuse that puts a child at risk of having special needs

**2. What are the eligibility criteria for the State-funded adoption assistance program?**

In order to be eligible for state-funded adoption assistance a child must be a special needs child as defined above.

**3. The maximum basic monthly adoption assistance maintenance payment in Mississippi is:**

Basic Rates:

| Age | Rate |
|---|---|
| 0-3 | $325 |
| 4-5 | $335 |
| 6-9 | $355 |
| 13-15 | $390 |
| 16 + | $400 |
| SSI Rate | $500 |

Note: Children receive the rate they received in foster care or would have received if they had been in foster care.

**4. Specialized rates are based on the extraordinary needs of the child, and/or the additional parenting skill needed to raise the child. If Mississippi offers these rates, the criteria used to define them are as follows:**

Specialized rates are determined based on the special rate established for the child in foster care. Specialized rates relate to the individual needs of the child. Decisions are made on a case-by-case basis. However, to qualify for specialized rates, children must generally have multiple medical needs. Rates are established while the child is in foster care. If Mississippi offers these rates, the criteria used to define them are as follows:

1. Children who have exceptional physical, mental, or emotional, or behavioral needs;
2. Children with extreme illness or disabilities requiring nursing care (excluding children in residential treatment facilities);
3. Emotionally disturbed children requiring therapeutic care;
4. Medically fragile children.

**5. Parents can receive payment or reimbursement for certain nonrecurring adoption expenses directly related to the finalization of an adoption. Below are the allowed expenses and the limit per child.**

Only the one-time expenses for which the adoptive parents are responsible are considered nonrecurring. These include: attorney fees, court costs, criminal records clearance, the adoption home study performed by a licensed child-placing agency, costs of amending a birth certificate, required medical and psychological evaluations, transportation costs for placement and pre-placement, and the reasonable costs of lodging and food necessary for the child and adoptive parents to complete the adoption process. Families adopting special needs children through licensed child-placing agencies, independent adoptions, and intercountry adoptions may be eligible for reimbursement of nonrecurring expenses. To be eligible, an adoption assistance agreement must be signed by DHS prior to finalization. Means tests are not permitted, and children need not be IV-E eligible to have access to reimbursement.

The reimbursement limit is $1,000 per child.

**Ex. 12F**

**GOALS, OBJECTIVES, INDICATORS, OUTCOMES:**

**SOUTHERN CHRISTIAN SERVICES FOR CHILDREN AND YOUTH, INC.**
**HARDEN HOUSE ADOPTION/FOSTER CARE PROGRAM**
**PARTNERS IN PERMANENCY**

| NEEDS STATEMENT OF THE GOAL | GOAL | INPUTS | TARGET GROUPS | OBJECTIVES | INDICATORS | MEASURES | OUTCOMES |
|---|---|---|---|---|---|---|---|
| **1. Crisis Intervention** | | | | | | | |
| a. Lack of awareness of available community resources when families feel threatened | Provide case management services by coordination of resources for family, such as, intensive in-home services, counseling | 1. Permanency staff 2. Staff of community agencies with available resources | Fifty Foster/adoptive families who are experiencing a crisis | 1."On-call" crisis case management 2. Family's progress "tracked" through progress notes | Reduced occurrence of family conflict | Decreased stresses of parents measured through client satisfaction surveys and/or interviews after service rendered | Parents will fully utilize the available resources to increase family commitment and maintain safety of child(ren) |
| b. Overwhelmed and desperate family stressed from prolonged crisis with child resulting in possible abuse and/or dissolution of the adoption | Provide family a temporary break from each other through respite services | 1. Trained respite providers 2. Permanency staff | Sixty Foster/adoptive families who are experiencing a crisis | Daily and/or weekend respite in homes of trained respite families | Reduced stress and restoration of continuity of the family and maintenance of the placement of the child in the home | Decreased stresses of parents measured through client satisfaction surveys and/or personal interviews after service rendered | Families exhibit increased stability and probability of abuse has decreased |
| c. Lack of adequate communication vehicle to access crisis personnel, available resources, and support | Improve mechanism for parents to access resources during crisis | 1. Permanency staff 2. Toll free telephone numbers | Fifty Foster/adoptive parents experiencing crisis | Toll Free number distributed to all foster/adoptive parents maintained 40 hours per week and on-call coverage on weekends and evenings | Communication facilitated for families to reach agency through toll free number | Families will make calls and progress measured by phone logs and activity records | Children's well-being will be enhanced through easier accessibility to resources and case management/crisis personnel |

1

## 2.  Coordination of Resources

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| a. Poor utilization of community resources to provide the best possible environment for change for the family | Through interagency advocacy, reduce fragmentation, decrease duplication of services and increase access for foster/adoptive families to resources | 1. Permanency staff 2. MS Department of Mental Health MAP Teams | Sixty-five Foster/adoptive families who are experiencing a crisis and/or who are having difficulty accessing necessary resources | Monthly collaborative meetings with MAP teams to advocate on behalf of seventy- five foster/adoptive children in families who are experiencing crisis | Increased family involvement in decision making by giving all possible resources to provide safety and well being of children in the family | Families in crisis receive requested services as provided through MAP team partners | Families exhibit increased stability and the well being of the children is enhanced |
| b. Lack of knowledge of families of available resources | Coordinate and link available resources to families | Permanency staff | Forty Foster/adoptive families who are experiencing a crisis and/or possible dissolution of the family unit | Link families with in-home intensive services, i.e. Youth Villages and MS Children's Home Services | Reduced occurrences of family conflict and maintenance of child(ren) in the home | Families in crisis receive requested services from Youth Villages, MS Children's Home Services or other available resources and the effectiveness of service measured by client satisfaction survey after service rendered | 1. Families exhibit increased stability and continuity 2. Families exhibit increased commitment |

## 3.  Training

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| a. Parenting skills are not sufficient to insure safety, permanency and well being resulting in possible abuse and/or dissolution of the adoption | Improve parenting skills in the area of discipline, communication, and relationships through group training events | 1.Permanency staff 2. Instructional training supplies 3. Other social service professionals to lead training | Two hundred fifty foster/adoptive parents | Quarterly, geographically accessible parent training classes in each of the four administrative areas | Reduced occurrences of family conflict and reduced possibility of child abuse | Increased parenting skills measured by pre- and post-tests | Families learn new parenting techniques which enhance the permanency and well being of the children and stabilize the family unit |

2

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| b. Parents lack knowledge of innovative parenting techniques in dealing with child's behaviors related to abuse/neglect and separation/grief | Improve parenting skills through intensive training events by sponsoring foster/adoptive parents to training events | 1. Permanency staff<br>2. Foster/adoptive parents<br>3. Various professionals leading workshops | Thirty-five Foster/adoptive parents for *MS Child Welfare/Lookin' to the Future Conf.* | *MS Child Welfare/Lookin' to the Future Conference* | Enhanced well-being of not only the child, but the family as a whole and prevent family conflict and abuse/neglect occurrences | Increased knowledge and parenting skills measured by pre- and post-tests | Families learn more information about adoption/foster care issues and share with other foster/adoptive parents |
| c. Parents lack knowledge of how to advocate for their child's needs and support for themselves and their children | Improve parenting skills through weekend intensive training events | 1. Permanency staff<br>2. Adoption/foster care staff<br>3. Volunteers<br>4. MDHS staff<br>5. Instructional supplies<br>6. Various agency professionals leading workshops | Seventy-five families attending intensive family training conference | One weekend training event held at local community college | Families come together to share experiences, receive training on adoptive/foster parent issues, such as advocacy, and network with each other | Increased knowledge and support measured by client evaluation at the end of weekend | Families gain support and knowledge to access during difficult circumstances and enhancement of parents' ability in decision making |

**4. Support**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| a. Families do not have adequate support system resulting in isolation and difficulty meeting the needs of children | Equip families by bringing families and children together in family support groups and encouraging activities that are psycho-educational and strength-focused | 1. Permanency staff<br>2. Adoption/foster parents<br>3. MDHS staff<br>4. Supplies | 1.One Hundred fifty foster/adoptive parents<br>2. One Hundred foster/adoptive children | Quarterly support group meetings in each of the four administrative areas with families | Promote advocacy through networking and providing information and referral services to empower families in navigating and accessing community, educational, mental health and medical services | Increased level of support and knowledge measured by evaluation after each group session | Families gain support and thereby increase stability and maintain and strengthen the family unit |

3

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| b. Families are made to feel impotent and isolated | Provide opportunity for foster/adoptive parents to network with other foster/adoptive parents at conference reception | 1. Permanency staff 2. SCSCY staff 3. Food and supplies | Thirty-five foster/adoptive parents and their children | *MS Child Welfare/Lookin' to the Future Conf.* reception | Families are supported | Families are empowered and supported and measured by evaluation after event | Families exhibit increased self esteem as a unit |
| c. Lack of knowledge by parents of training events and upcoming events related to adoption and foster care | Inform parents and MDHS staff of training events, community events, support group meetings and current events related to adoption and/or foster care | 1. Permanency staff 2. Printing company 3. Foster/adoptive parents | 1. Nineteen hundred foster/adoptive parents on mailing list 2. MDHS Social Service licensure staff | Four Quarterly newsletters distributed to foster/adoptive parents and MDHS licensure staff | Families will be knowledgeable of relative adoptive/foster care issues on the local, state and national levels | Families will become aware and attend foster/adoptive parent training events and other special events related to foster/adoptive parents | Families exhibit increased stability and permanency |
| d. Lack of communication vehicle to access state and national resources | Improve opportunity for families to access information | 1. Permanency staff 2. Internet provider | 1.Nineteen hundred Statewide Foster/adoptive parents 2. Professionals who also work with foster/adoptive parents | Updated web site with information for foster/adoptive parents on possible resources | Communication facilitated for families to access more resources, statewide and nationally | Families will visit website and will be measured by "hits" to website | Families will utilize available services as advertised on website |
| e. Lack of knowledge of how to access and how to utilize written material as well as other media material on children's behaviors | Improve parents opportunity to problem solve by conducting their own research about their children's behaviors and treatments | 1. Permanency staff 2. Multi-media supplies for library | 1. Nineteen hundred Foster/adoptive parents and their children 2. Professionals working with foster/adoptive Families | Extensive lending library available to families to request by phone, mail or internet | Families will be more informed about issues concerning their child(ren) and will be stronger partners in their child's treatment | Families will utilize lending library and will be measured by number of resources requested | Families exhibit increased stability and enhanced well-being |

4

I.    **PROPOSED SERVICES**

With an increased emphasis on placement stability, attention often focuses on the urgency of placement rather than on the maintenance of the children in their new families. Southern Christian Services for Children and Youth, Inc. is responsive to the urgent need for placement but more importantly is committed to the support of children in their new families, particularly families who adopt children with special needs. It is out of this continued commitment to permanency that Southern Christian Services for Children and Youth, Inc. proposes the continuation of the **Partners in Permanency Program** with a focus on the family and the permanency only a family can provide. Through the Partners in Permanency Program, emphasis will continue to be on the family as partners with the Permanency Specialists and the MDHS Adoption/Licensure Specialist. The program will continue to provide a comprehensive array of permanency services to adoptive/foster families who provide a home for children with special needs in Mississippi. Through the provision of permanency services rooted in practice with families, Partners in Permanency will continue to:

  o Coordinate existing resources to avoid duplication and to meet current needs;

  o Strengthen child and family functioning;

  o Preserve the adoptive family unit;

  o Reduce the incidents of out of home placements and disruptions;

  o Reduce the number of substantiated incidents of abuse and neglect by

foster/adoptive parents;

o   Identify gaps in resources and attempt to facilitate the development of new resources.

The Partners in Permanency Program will be implemented by seven (7) Permanency Specialists who will insure that services are delivered throughout the state in a timely manner. This is an increase from the previous grant year. More attention will be given to the Delta area where services are quite limited. The Specialists will be located in Tupelo, Itta Bena, Batesville, Hattiesburg, Gulfport and two (2) in Jackson.

**A.    COMPONENTS**

**1. CRISIS INTERVENTION**

**a.  Crisis Management Services -** Families who adopt and/or foster children with special needs sometimes find themselves in situations that appear to be beyond their control. Resources must be in place to help families respond to crises in order to prevent a breakdown in the placement. The Partners in Permanency staff will continue to serve as "on-call" crisis managers and will communicate with Mississippi Department of Human Services to coordinate appropriate and available resources, such as intensive in-home services, mental health counseling, medical services, and other services to alleviate the crisis. The Partners in Permanency staff will continue to "track" the family's progress and maintain an open case file on the family until the crisis has passed.

**b.  Respite -** During a family crisis in an adoptive/foster home, it can be helpful for many family members to have a temporary separation from each other. Many

families have indicated they would benefit from this temporary break, also known as "respite."  Due to the overwhelming requests for respite services, Partners in Permanency Program proposes to add a full time Respite Coordinator to facilitate respite services to families in a more efficient, effective manner so families can receive services quicker.  The Respite Coordinator and the Permanency Specialists will continue to train respite providers on behavioral issues and family dynamics.  Respite care providers will continue to receive certification as CPR and First-Aid providers.  The Permanency Specialists and the Coordinator will continue to utilize a Respite Care Curriculum certified by the Department of Mental Health through MS Families as Allies. Partners in Permanency staff will continue to screen potential respite providers by completing the following:  a child abuse registry check, criminal history check, a reference check using no less than three references with one of those references being their previous adoptive/foster care social worker, and a home visit prior to approving the family as a respite provider.  Approximately 75 adoptive families have already received training to offer respite care services to adoptive families who are in crisis.

**c.  Toll Free Number -** In order to facilitate communication, a toll free number will continue to be available at each of the Partners in Permanency offices in Gulfport, Jackson, Itta Bena, Hattiesburg, Batesville and Tupelo, MS.  On-call staff will handle crisis calls on evenings and weekends

## 2. COORDINATION OF RESOURCES

**a. Interagency Collaboration –** Partners in Permanency staff will continue to coordinate efforts with already established interagency MAP teams across the state in order to reduce fragmentation, decrease duplication of services, and increase access for the adoptive/foster families to as many of the available resources as possible. The MAP teams are sponsored by the MS Department of Mental Health and include representatives from other state agencies, such as the Department of Education, Department of Health, Law Enforcement, etc. The MAP teams are a collaborative effort of consultation and coordination of resources for families who are in crisis. The Partners in Permanency staff will continue to act as advocates for foster/adoptive families during these MAP team meetings. Partners in Permanency staff will continue to maintain a current directory of community resources in all locations.

**b. Information and Referral Services -** Problems and challenges associated with parenting children from the foster care system do not dissipate in a steady, predictable fashion. They occur in a succession of achievements and setbacks over time. Thus it is important to help foster/adoptive families by identifying resources and referral information to offer support well beyond the initial placement of a child. Partners in Permanency staff will continue to identify statewide resources, such as intensive in-home services, crisis intervention, educational services, legal services, independent living services, psychological and psychiatric services, etc. for families who have adopted and/or fostered children with special needs.

Partners in Permanency staff will continue to serve as a coordinator and link to these services to prevent duplication and to assure the family is receiving the services they need.  Specifically, Partners in Permanency staff has and will continue to establish linkages on behalf of the families with Youth Villages and Mississippi Children's Home Services for intensive in-home services.  The office in Tupelo is shared by the Partners in Permanency Specialists, Adoption and Therapeutic Foster Care staff and PREPARE Independent Living Specialists.  The office in Hattiesburg is also shared by the Partners in Permanency Specialist, Adoption and PREPARE Independent Living Specialist.  It is proposed that the office in Batesville will be shared with the PREPARE Independent Living Specialist.

**3. TRAINING**

a. **Adoption Specific Parent Education** – The support groups sponsored by Partners in Permanency will continue to offer MDHS approved continuing education hours on various topics to educate parents.  Topics that continue to be of importance to the families and their community partners include, but are not limited to, the following:

1. Obtaining appropriate educational services

2. First Aid/CPR

3. Child development and adolescent issues

4. Separation and attachment

5. Trauma

9

6. Grief and loss

7. Abstinence Education

8. Fetal Alcohol Spectrum Disorder

9. Emotional/behavioral disorders

10. Substance abuse issues

11. Independent living preparation and financial services for higher

education

These educational hours will continue to be obtained through programs presented

by the Permanency Specialists and/or other approved professionals. Permanency

Specialists will continue to meet with families and MDHS in the target areas to

determine training needs. Training shall be developed at a level and format that

meets the needs of the adoptive/foster families.  Training will continue to be

accessible in the target areas and will be culturally sensitive and coordinate with

any existing training by other resources in the area.

Permanency Specialists will continue to collaborate with their Family Advisory

Committees (FAC) in each area to assist in determining training needs.  The

Family Advisory Committee is comprised of the following: a Partners in

Permanency staff member, 2-3 adoptive/foster parents and a MDHS staff member.

**b.  Parent Training Conference Scholarships -** For the past six years, Harden

House Adoption Program has been active in the establishment of an Adoption

Track at the *Lookin' to the Future Conference* with speakers who are specialists in

the entire continuum of adoption services.  This intensive training event will be

10

held during the summer of 2009. Permanency Partners Program again proposes to sponsor scholarships for registration, mileage and lodging for thirty (35) adoptive/foster parents to the *Lookin' to the Future/MS Child Welfare Conference*. This year's conference includes workshops on topics such as: Psychotropic Medications, Independent Living, Law Related Education, Effective Parenting Practices, School Refusal Behaviors, Understanding & Managing Stress for Children & Adolescents. The Partners in Permanency staff will also attend the *Lookin' to the Future/MS Child Welfare Conference* as well.

**c. Intensive Family Training Conference -** Partners in Permanency proposes to offer adoptive/foster families the opportunity to come together during the summer of 2009 for an intensive training experience. Families receive MDHS approved training hours to contribute to their licensing requirements. Not just the parents, but also the youth, are able to network with each other during the weekend conference. Not only training workshops for the parents, but also therapeutic activities for the whole family will be included for the weekend.

**4. SUPPORT**

**a. Family Support Groups -** Permanency Specialists will continue to serve as resources to the support groups already active across the state as well as assist with the establishment of additional support groups as needed. Support groups are important because they help strengthen the adoption/foster care process, bring families and children closer, and encourage activities that are psycho-educational and strength-based. The groups are co-led by an adoptive/foster parent and staff

11

of the Partners in Permanency Program, with a representative of MDHS included as an active member. The majority of the support groups will meet at least quarterly. Teen support groups will be developed as needed. The exception will be during the summer months and other months when there are statewide adoption/foster care activities planned, such as the adoption picnic and family training weekends. There will be planned activities, such as educational training opportunities, as well as opportunities for informal sharing. The foster/adoptive family support groups will also serve to promote advocacy through networking with each other and providing information and referral services to empower families in navigating and accessing community, educational, mental health, medical services, etc.

**b. Foster/Adoptive Family Reception –** Partners in Permanency proposes once again to host a reception in honor of the adoptive/foster parents and their children at the *Lookin' to the Future/MS Child Welfare Conference* in Summer 2009. This will give the foster and adoptive parents an opportunity to network with other foster and adoptive parents at the conference to prevent isolation during the conference. The reception will offer encouragement and appreciation to the parents for providing excellent care to Mississippi's children. It will also serve as a means of recruitment of other foster and adoptive parents. Parents will also have the opportunity to meet executive and administrative staff of MDHS, SCSCY and Harden House Adoption Program.

**c. Quarterly Newsletter -** Partners in Permanency Program will continue to

publish and distribute a quarterly newsletter (see attachment for an example) in order to assist with public awareness for adoption services provided by MDHS and Harden House Adoption Program, as well as other private agencies across the state.  The newsletter will continue to be distributed to families who have adopted and/or fostered children with special needs and to the Mississippi Department of Human Services licensure staff.  It will contain information on scheduled training events, community events, support group meetings, and current events related to adoption and foster care, both nationally and locally.  The newsletter will contain an MDHS recruitment section to assist in the recruitment of adoptive homes for children who are awaiting placement.  Partners in Permanency will publish four newsletters during this contract period.

**d.  Web Site -** Harden House Adoption Program has developed a web site for adoption information.  Partners in Permanency information will be available on this site.  Any links to the webpage deemed resourceful for families will be added regularly.   Partners in Permanency staff will assist in maintaining this webpage.

**e.  Lending Library -** Southern Christian Services for Children and Youth, Inc. offers a library which includes materials on adoption, child development, behavior management, law related education, independent living information, and other topics related to youth and family education.  In addition to this extensive collection, Harden House Adoption Program has also purchased additional printed materials and multimedia materials.  There is a large lending library available at the Partners in Permanency office in Tupelo, MS.  These materials are catalogued

13

upon arrival and listed in the lending library directory available on the website, as well as the MDHS offices and Family Resource Centers. Partners in Permanency Program proposes once again to add new materials to the library and maintain an updated catalogue listing. Families are able to request materials from the lending library via phone, e-mail, or mail. Catalogues of resources in the library are available at the support group meetings and the families are encouraged to utilize these valuable resources. Books, videos, cassettes, etc. can be checked out and distributed to adoptive/foster families who return them when finished in postage paid envelopes provided by Partners in Permanency Program. This service has proven to be quite valuable to families who are researching information about their children's behaviors.

**B.      TARGET POPULATION**

The targeted population of the grant will be families who have adopted and/or fostered children with special needs from MDHS, or any public or private agency who are in need of prevention and/or crisis related services. These services will be available as needed by foster/adoptive families prior to and after legalization of the adoption at various times throughout a child's development, until the child reaches the age of majority. Services will continue to be available statewide and will be accessible to meet the variety of needs presented by adoptive/foster parents and their children, including but not restricted to, limited English-speaking families, families in urban as well as rural and isolated geographical areas of Mississippi, families with limited economic and/or transportation resources, families with ADA limitations, and other special circumstances that may be a barrier to receiving permanency services. Partners in Permanency will

14

partner with the local community leaders to develop resources needed by foster/adoptive families. In developing training curriculum and leading support groups, specific attention will be given to trauma, grief and loss issues.

In 2007-2008, there were approximately 2,600 post finalization clients who have adopted Mississippi's children with special needs on the adoption assistance ledger and foster families on the foster board roster. Partners in Permanency proposes to serve these families statewide with permanency services. In the 2003-2004 grant period, there were approximately 1,500 post finalization clients served as of the end of September 2004. In the 2004-2005 grant period, ASAP served 1,830 clients. In the 2006-2007 grant period, Partners in Permanency served 6,000 clients. As of the submission of this grant, 4,500 clients have been served with many more expected by the end of July 2007. Partners in Permanency proposes to serve 4,000 clients in the August 1, 2008 through July 31, 2009 grant period.

C.    **PUBLIC AWARENESS:**

The Partners in Permanency Program will be marketed primarily to foster/adoptive parents, MDHS Adoption staff, Licensure staff and county social work staff. The program will be marketed through the use of an informational brochure, quarterly newsletter and agency displays at local conferences. The program will continue to be presented regularly at MDHS regional staff meetings, at regular support group meetings and at PATH training sessions for pre-

15

adoptive/foster parents. The Partners in Permanency Program will be marketed further through the use of media kits that are mailed to media outlets statewide and include brochures, press releases, program descriptions and locations of program sites, and any other interesting facts related to the Partners in Permanency Program. The SCSCY agency annual report is also a productive and highly effective marketing tool. The SCSCY annual report is mailed to donors and is often distributed at special events, conferences, meetings, retreats, and media events and is used often in the proposals for funding. The Agency and its services are often highly visible and receive positive recognition through the local NBC affiliate in Jackson, WLBT-TV. Anchor and nationally known advocate for adoption Maggie Wade works tirelessly to support adoption of children with special needs and post adoption services. She will assist in any means possible to market the services for permanency for Mississippi's children.

**D.    EVALUATION:**

Client satisfaction will continue to be measured through the use of a client satisfaction questionnaire that will be administered to foster/adoptive families on a quarterly basis by the Partners in Permanency services. These questionnaires will be administered in a manner that will allow confidentiality for the client. Training evaluations will be conducted at the end of each training   event involving foster/adoptive parents and any other professionals to determine the clients' level of usefulness of the information shared at the training event. This material will be shared with the SCSCY staff, Board of Directors and the

16

Department of Human Services on a monthly basis. The annual evaluation report of this grant will be filed with the Mississippi Department of Human Services immediately after the expiration of the contract period. This report will include numerical data and narrative descriptions. Outcome measures on the following will be included:

a.     Number of permanency clients served

b.     Number of clients utilizing respite services

c.     Number of families trained to provide respite services

d.     Number of clients utilizing the crisis management services

e.     Number of quarterly newsletters distributed

f.     Number of training events for foster/adoptive families

g.     Number of foster/adoptive parents attending training events

h.     Number of support groups held

i.     Number of foster/adoptive parents attending support groups

j.     Number of participants at the intensive family training conference

k.     Number of resources utilized from the resource lending library

At the end of the project year, the Partners in Permanency Program will undergo a process evaluation based on the goals, tasks and time line as indicated in the attachment. Process evaluation activities answer questions about how the program was intended to operate and how it actually operated. The process evaluation of Partners in Permanency will document program activities and program outputs, i.e., the direct products of program activities, such as the number

17

of foster/adoptive parents trained on adoption specific training events, etc. An outcome evaluation answers the question, "Does the program work?". Outcomes are benefits or changes for individuals participating in program activities. Partners in Permanency is expected to result in long-term outcomes, such as family preservation and placement stability for those foster/adoptive families who participate in supportive services over an extended period of time. However, to measure these long-term outcomes, the Partners in Permanency evaluation will focus on more immediate or short-term outcomes. Specifically, a collection of evidence of knowledge and skill enhancement of training participants will be obtained. Satisfaction with support services including crisis management services, respite programs, etc. will also be collected.

## II.    KEY STAFF

The Executive Director Susannah K. Cherney will insure the delivery of the services requested. She has a Master's Degree in Education with over 20 years experience administering social service programs. Patricia Digby, LMSW, the Director of the Division of Adoption and Foster Care, is responsible for supervision of the day-to-day operations of the Adoption/Foster Care Services Division. Ms. Digby has extensive experience and training in adoption and foster care. Ms. Digby has been employed at Southern Christian Services for Children and Youth for 16 years. She will employ, train and supervise the Senior Permanency Specialist and monitor program operations and outcomes. The Senior Permanency Specialist will employ, train and supervise the six Permanency Specialists and the Respite Coordinator. The Permanency Specialists will

18

have the primary responsibility of planning, implementing, evaluating and marketing all facets of the "Partners in Permanency Program. The Respite Coordinator will specialize in the recruitment, training and coordinating respite services for foster/adoptive parents. (See Attached Job Descriptions for qualifications and specific job responsibilities). The Senior Permanency Specialist, the Permanency Specialists and the Respite Coordinator will conduct at least a forty-hour work week. These hours may vary due to evening training events, support groups being held after office hours, crisis situations with families, travel, etc. The Permanency Specialists and Respite Coordinator will have a Bachelor's Degree in Social Work or a related field. The Senior Permanency Specialist will have a Bachelor's Degree in Social Work or a related field and significant experience working with families of children with special needs or a Master's Degree in Social Work or a related field.   The Director of the Division of Adoption and Foster Care will spend 50% of her time on the post adoption program with the other 50% on the adoption program and therapeutic foster care. The seven Permanency Specialists and Respite Coordinator will spend 100% of their time on the permanency services in the grant project