**Ex. 1A**

# L I N D A   H .   S O U T H W A R D ,   P H . D . , A C S W

107 Pine Ridge Circle, Starkville, MS.39759

E-MAIL: lindasouthward@yahoo.com

## EDUCATION

Bachelor of Science in Sociology, 1978          University of Southern Mississippi
Social Work Concentration                                  Hattiesburg, MS

Master of Social Work (M.S.W.), 1979          University of Southern Mississippi
                                                                         Hattiesburg, MS

Ph.D.  Social Work, 1994                              University of Alabama
                                                                         Tuscaloosa, AL

## PROFESSIONAL EXPERIENCE

2007- May 2009 Coordinator, MS KIDS COUNT Program

2000- May,2009 Research Professor, Research Fellow and Coordinator, Family and Children Research Unit, Social Science Research Center, Mississippi State University

2001-2006          Liaison, Social Science Research Center, Mississippi State University to Center for Child Health Research, American Academy of Pediatrics

1996-2000          Coordinator, Family and Children Research Unit (Part-Time through June, 2000), Social Science Research Center, Mississippi State University

1994-1999          Social Work Program Director and Associate Professor, Department of Sociology, Anthropology & Social Work, Mississippi State University

1989-1994          Field Coordinator & Assistant Professor, Department of Sociology, Anthropology & Social Work, Mississippi State University

1987-1989          District Social Work Supervisor, Northeast Mississippi Public Health District II, Mississippi State Department of Health, Tupelo, Mississippi

1988-1989          Adjunct Instructor, School of Social Work, University of Southern Mississippi

1987-1989          Social Work Instructor, Part-time, Department of Sociology and Anthropology, Mississippi State University

1986-1987          Social Work Instructor temporary appointment, Department of Sociology and Anthropology, Mississippi State University

1985-1986          Project Faculty, Social Work Department, University of Mississippi

1985-1986          District Social Work Supervisor, Tombigbee Public Health District IV, Mississippi Department of Health, Starkville, Mississippi

1982-1985          Program Director, Tishomingo County Special Services, Tishomingo, Mississippi

1982-1982          Acting Director/Social Worker,
                          Tishomingo County Special Services, Tishomingo, Mississippi

1979-1982        Social Worker, Tishomingo County Special Services, Tishomingo, Mississippi

## PUBLICATIONS

Southward, L.H., Robertson, A., Edelstein, B., Hanna, H., Wells-Parker, E., Baggett, D., Eklund, N. and Crall, J. "Oral Health of Young Children In Mississippi Delta Child Care Centers: A Second Look at Early Childhood Caries Risk Assessment" *Journal of Public Health Dentistry* (*In Press*)

Gupta, R., Pascoe, J., Blanchard,T., Langkamp, D., Duncan, P., Gorski, P., and Southward, L.H., " Child Health in Child Care: A Multi-State Survey of Head Start and Non-Head Start Child Care Directors" *Journal of Pediatric Health Care* (In Press)

Mississippi 2007 KIDS COUNT Databook (January, 2008) Prepared by MS KIDS COUNT Team. Family & Children Research Unit, Social Science Research Center, Mississippi State University.

Southward, L.H., Wells-Parker, B., Eklund, N., Crall, J., Edelstein, B, Silberman, S., Baggett, D., Parrish, D. and Hanna, H. (2006). "Oral Health Status of Mississippi Delta 3-5 year olds in Child Care: An exploratory study of dental health status and risk factors for dental disease and treatment needs" *Journal of Public Health Dentistry.(Vol. 66, .No.2,pp.131-137).*

Kavanaugh, M., McMillen, R.C., Pascoe, J.M., Southward, L.H., Winickoff, J.P., and Weitzman, M. (2005). "The Co-occurrence of Maternal Depressive Symptoms and Smoking in a National Survey of Mothers" *Ambulatory Pediatrics.* (Vol 5, No.7. pp 341-348).

Cosby, A,. Greenberg, R., Southward, L.H. & Weitzman, M. (Eds)  About Children: An authoritative resource on the state of childhood today, American Academy of Pediatrics, Chicago, IL. Fall, 2004.

Southward, L.H , Robertson, A & Smith, N. "Research Partnerships with a Native American Tribe: Creating Opportunities for Appreciation and Understanding" *New Global Development* XVII (1 & 2), pp.87-91, 2001.

Southward, L.H., **"**Family Preservation and Family Support Project" pp.175-176 in Celebrating 50 Years of Excellence, 1950-2000, K Keller, Ed. Harmony House. (2000).

Southward, L.H.  Mississippi State Social Work Program Self-Study Document, Volumes I & II Department of Sociology, Anthropology & Social Work,  Mississippi  State University prepared for Council on Social Work Education, Commission on Accreditation for re-affirmation**.** 1999-2000.

Tompkins, P &  Southward, L.H., "Geographic Information Systems: Promoting Social & Economic Justice," pp. 209-226 in Information Technologies:  Teaching to Use---Using to Teach, Frank B. Raymond, Leon Ginsberg & Debra Gohagen, Eds., Haworth Press. (1999).

Tompkins, P & Southward, L.H., " Geographic Information Systems: Promoting Social & Economic Justice," *Computers in Human Sciences*, (Vol. 15. Nos. 2/3) 1998.

Crudden, A,  Bryant, C.,  Southward, L.H. "Team Teaching in Social Work Education: Forging a New Allegiance within the Social Work Program," *Journal of Baccalaureate Social Work*, (Vol. 5, No. 1),1999.

Southward, L.H. & Gray-Ray, P  "Voices from the Deep South" in Everyday Acts Against Racism: Raising Children in a Multicultural World,  M. Ready, Ed.  Seal Press, 1996.

Southward, L.H. "Partner Abuse and Pregnancy Outcomes," Dissertation. University of Alabama, 1994.

Washington, C &  Southward, L.H. "Prohibition of Preventive Health Care:  An Analysis of Medicaid Non-Reimbursement for Indigent Women,  *Journal of Health and Social Policy*. 5 (1),1993.

Book Review, Southward, L.H.  No Place to be a Child:  Growing Up in a War Zone.  *Journal of Comparative Family Studies.* (1992).

Southward, L.H.   & Washington, C. "Prohibition of Preventive Health Care:  An Analysis of Medicaid Non-Reimbursement for Indigent Women", in Health Care for the Poor and Uninsured: Preventive Health Care in Implementing Healthy People 2000, proceedings of University of Tennessee Regional Health Care Conference. pp. 175-202.  Kevin T. Kavanaugh, (Ed.), 1991.

Southward, L.H.   Mississippi State Social Work Program Student Handbook, Student Field Practicum Manual and Field Instructors Manual  Department of Sociology, Anthropology & Social Work,  Mississippi State University prepared for Council on Social Work Education, Commission on Accreditation. 1991.

Southward, L.H.  "Expanding Medicaid for Mississippi's Mothers and Babies through Perinatal High Risk Management", in Focus the Future, proceedings of the Bi-Regional Conference for Public Health Social Workers, pp. 48-54.  Regions IV and VI, Bureau of Maternal and Child Health.  Pat Conway and Jeanne Cook, (Eds.) United States Department of Health and Human Services, 1989.


**POLICY BRIEFS**
Southward, L.H., Mosca, N., Silberman, S., Eklund, N., Curtis, D. & Lane, C.  "Children's Oral Health in Mississippi: Addressing a Silent Epidemic." Health Policy Brief, Mississippi Health Policy Research Center, Social Science Research Center, MSU, November, 2003.

"Mississippi Students Displaced by Hurricane Katrina:  Preliminary Estimates" with Robert McMillen and Heather Hanna, 2005.

"Mississippi Children in Child Care Displaced by Hurricane Katrina:  Preliminary Estimates" with Humphrey Costello and Heather Hanna, 2005.

"Who Expels and Why: Understanding Expulsion and Discontinuity in U.S. Child Care Settings" with Troy Blanchard and Heather Hanna, 2005.

"Economic Vulnerability in U.S. Child Care Settings" with Humphrey Costello and Heather Hanna, 2005.


**SUBMITTED REPORTS**

Southward, L.H., Blanchard, T., Hanna, H., Buffum, L. Forces that Divide: How Comprehensive is Your Child's Care? A Chartbook of the Child Health, Early Education & Child Care Consortium. Submitted to the National Center on Rural Early Childhood Learning Initiatives, July,2006.

Southward, L.H., Blanchard, T., Hanna, H., Buffum, L. Economic Volatility and Expulsion in U.S. Child Care Settings: Multi-State Survey.  A Chartbook of the Child Health, Early Education & Child Care Consortium.  Submitted to the National Center on Rural Early Childhood Learning Initiatives. 2005.

Southward, L.H., Blanchard, T., Hanna, H., & Buffum, L. Early Education and Child Care Directors' Perspectives of Children's Health and Well-being:  A Multi-state Survey.  A Chartbook of the Child Health, Early Education & Child Care Consortium.  Submitted to the National Center on Rural Early Childhood Learning Initiatives. 2005.

Parrish, D. & Southward, L.H. <u>Enhancing the Capacities of a National Pediatric Practice-Based Research Network:  Reaching Minority and Underserved Populations</u>, Final Report to Pediatric Research in Office Settings, Center for Child Health Research, American Academy of Pediatrics, October, 2001.

Southward, L.H., Robertson, A.  <u>Ansell-Casey Life Skills Assessment Reliability Study</u>, Final Report to Casey Family Programs, October, 2000.

Southward, L.H., Robertson, A. <u>Behavioral Health Needs Assessment</u>, Final Report to the Mississippi Band of Choctaw Indians, 1999.

Southward, L.H., Baird, C. & Haug R. "Resource Assessment for Individuals with Traumatic Brain Injury," Final Report to the Mississippi Department of Rehabilitation Services, 1998.

Southward, LH,  Carr, J., Evans, S., Baird, C. & Tsai, T. "Adoption, Foster Care Analysis Reporting System (AFCARS) Project," Technical Report prepared for Mississippi Department of Human Services, 1997.

Southward, L.H., Rodgers, C., JOBS Evaluation," Final Report, Social Science Research Center, Mississippi State University prepared for Mississippi Department of Human Services, 1997.

Southward, L.H., Haug, R.  "Proceedings of Strategic Planning Meeting: Family and Children Research Unit," Social Science Research Center, Mississippi State University, 1996.

Southward, L.H., Rodgers, C.,  "Children's Trust Fund Training Program: Proposal Writing Workbook," Technical Report prepared for Children's Trust Fund, 1996.

Southward, L.H.  "Mississippi 5-Year Plan: Family Preservation/Family Support Services," Social Science Research Center, Mississippi State University for the Department of Human Services, 1995. Final Report (One of a large team of SSRC authors).

McMillen, D. & Southward, L.H., "Family Preservation/Family Support Program: Second Phase: Enhancement Options, " Final Report, Social Science Research Center, Mississippi State University for the Department of Human Services. 1995

Washington, Charles,  Southward, Linda H.,  "Strengthening the Family:  Policy Imperatives for the Future," proceedings of the Southeast Regional Seminar on Rural Poverty and the Family, John C.

Stennis Institute of Government, Mississippi State University, prepared for the Lower Mississippi Delta Development Commission, 1990.

Southward, Linda H., "Administration and Personnel Management in Child Care Facilities," Part III, pp. 1-30, Training and Evaluation Manual: A Comprehensive Child Abuse Prevention Training Program. University of Mississippi, 1986.

**WORKING PAPERS:**

Hanna, H., Southward, L.H., Cross, G., Aird, L., Kotch, J., Blanchard, T., Duncan, P., Costello, H., Cosby, A. "Use of Child Care Health Consultants and Provision of Health Services As Reported in a National Survey of Child Care Directors" Submitted to *Pediatrics (*Under Review*)*

Wells-Parker, E., Cross, G., Southward, L.H., Hanna, H., Baggett, D., Edelstein, B., Eklund, N., Fawad, L., Crall, J. "Screening for Urgent Treatment Needs and Presence of Caries in High-Risk Children attending Child Care Centers in the Mississippi Delta: The Utility of Various Risk Predictors in Non-Clinical Settings" (Manuscript preparation to be submitted Fall, 2008 to *Journal of Public Health Dentistry)*

"Who Expels & Why? Findings From the First National Survey of Licensed Child Care Directors" with Humphrey Costello, Heather Hanna and Troy Blanchard to be submitted Fall, 2008.

## FUNDED PROPOSALS

MS Chapter, American Academy of Pediatrics (Role P.I.) for the Pediatric Oral Health Project, funding through the Dental Trade Alliance Foundation. $5,000 March 1, 2008-May 31, 2008

American Academy of Pediatrics (Role Co-P.I.) for the National Child Care Directors' Pandemic Influenza Survey, funding by the Centers for Disease Control $32,000 March 1,2008- July, 2008

University of Chicago, Harris School of Public Policy (Role Co-P.I. with Patricia Dill) for the "Development of an Environmental Food Index Risk Assessment for Children Attending Child Care Centers in the Mississippi Delta" through RIDGE program funded $19,962

Mississippi KIDS COUNT (Role: P.I.) Awarded $75,000 January 1, 2007-December 31,2007 proposal to the Annie E. Casey Family Foundation

Mississippi KIDS COUNT (Role: P.I.) Supplemental Award $5,000 for website design.

HealthWorks! Evaluation Plan (Role: P.I.) July 1, 2007-June 30, 2008 Awarded $70,947 North Mississippi Health Services Foundation

College of Veterinary Medicine (Role: Co-P.I.) July 1, 2007-June 30, 2008 Awarded $74,963

Blue Cross & Blue Shield Corporation of Mississippi (Role P.I.) September 1, 2007- January,2008 Awarded ($15,000) for Mississippi KIDS COUNT Summit

Mississippi Delta Child Health and Well-being Research Program proposal to the Delta Health Alliance (Role: P.I.) Awarded $487,804, July 1, 2006-June 30, 2008

"Brief Intervention ---Smoking Cessation to Caregivers of Preschool Children," Linda H. Southward, Co-PI, with Myra Muramoto (PI), University of Arizona School of Medicine, and Patricia Dill, Social Science Research Center, Mississippi State University subcontract funded by National Institutes of Health, National Cancer Institute ($94,280).

"Mississippi Building Research Infrastructure Capacity,"---Phase II,  Linda H.Southward, Principal Investigator funded by Agency for Health Care Research & Quality, $570,000 October, 2003-September, 2006.

"Research in Early Education and Child Care Settings (RECES)," Linda H. Southward, Principal Investigator funded by National Center on Learning Initiatives,  $40,000, January 1, 2006-May 31, 2006.

"Research in Early Education and Child Care Settings (RECES)," Linda H. Southward, Principal Investigator funded by National Center on Learning Initiatives,  $70,000, September 1, 2004-December 31, 2005.

 "Child Care Center Directors' Perspectives on Children's Health and Well-being: A Multi-State Survey," funded by SSRC's Rural Health, Safety and Security Institute, University of South Florida Lawton Chiles Center and Wright State University, Children's Hospital, Department of Pediatrics (approximately $60,000), February 2004 – February 2005.

"Health as An Economic Engine," Teresa Waters & David Mirvis (University of Tennessee-Memphis), Kate Stewart (University of Arkansas) and Linda H. Southward & Ron Cossman (Mississippi State University) a team of investigators for the submission and awarding of a $50,000 conference grant to UT-Memphis for a regional health conference, November 2004.

 "Mississippi Safe Havens Training Grant," L.H. Southward, Principal Investigator, funded by Family Communications, Inc, $30,000, April, 2003.

"Mississippi Health Policy Research Center," funded by The Bower Foundation, L.H. Southward, one of several SSRC contributors to grant application with Arthur G Cosby (PI) $1,500,000---April, 2003.

"Mississippi Building Research Infrastructure Capacity,"  L.H. Southward, Principal Investigator funded by Agency for Health Care Research & Quality, $592,000 October, 2001-September, 2003.

"The Atlas of American Children," L.H. Southward Co-PI, with Arthur G. Cosby (PI),  funded by Phil-Hardin Foundation, $75,000. October, 2001

"The Atlas of American Children," L.H. Southward, Co-PI, with Arthur G. Cosby (PI), funded by The Bower Foundation, $435,500, July, 2002.

"Enhancing the Capacities of a National Pediatric Practice-Based Research Network:  Reaching Minority and Underserved Populations," LH Southward, Principal Investigator funded through a subcontract with Pediatric Research in Office Settings, Center for Child Health Research, American Academy of Pediatrics through Agency for Health Care Research & Quality, $7,500. January 2001-September, 2001.

 "Ansell-Casey Life Skills Assessment Reliability Study", LH Southward, Principal Investigator, Casey Family Programs, $20,000 September, 2001-October, 2001.

"Child Rural Health Consortium", LH Southward, Principal Investigator, a project of Rural Health Safety & Security Institute, Social Science Research Center, MSU and Center for Child Health Research, American Academy of Pediatrics, $254,188 December, 2000-June, 2002.

"School Nurse Evaluation," Connie Baird (PI)  LH Southward, Co-P.I. with Greg Dunaway &  Ruth Haug, funded by the Mississippi Department of Health Tobacco Pilot Project, $300,000, 1999-2000.

"Comprehensive Mental Health Needs Assessment," LH Southward, Project Director and Co-P.I. with Angela Robertson, funded by the Mississippi Band of Choctaw Indians, $64, 905 for six (6) month project, 1998-1999.

"Early Childhood Brain Research Dissemination Project," LH Southward, Project Director and P.I., funded by CREATE Foundation, $2,588 for six (6) month project, 1998.

"Resource Assessment for Persons with Traumatic Brain Injuries," LH Southward, Co-P.I. with Ruth Haug, funded by the Mississippi Department of Rehabilitation Services,$68,891 for 12 month project, 1997-1998.

"AFCARS Project," L.H. Southward, Project Director and Co-P.I. with Jon Carr, funded by the Mississippi State Department of Human Services, $86,309 for six (6) month project, 1997.

"JOBS Evaluation: Qualitative Analysis," LH Southward, Project Director and Co-P.I. with Jon Carr & Connie Baird, funded by the Mississippi State Department of Human Services, (Overall $170,844, evaluation component $ 26,726) 1996.

"Children's Trust Fund Training Program," L.H. Southward, Project Director & P.I., funded by the Mississippi Department of Human Services, $15,000 for seven (7) month project, 1995-1996.

Recipient of Schilling Special Teaching Award, L.H. Southward, funded through Mississippi State University for Women's Resource Center, $2,500, 1996.

Recipient of Schilling Special Teaching Award, L.H. Southward and Phyllis Gray-Ray, Mississippi State University, $2,500, 1994.

Recipient of Schilling Special Teaching Award, L.H. Southward, funded by Mississippi State University, $550. 1990

"Lee County Health Department Volunteer Coordination Project," L.H. Southward, Project Director and P.I., funded by Tupelo United Way,  $12,500, 1990.

"Lee County Health Department Volunteer Coordination Project," L.H. Southward, Project Director and P.I., funded by the Appalachian Regional Commission, $15,000, 1989.

"Lee County Health Department Volunteer Coordination Project," L.H. Southward, Project Director and P.I., funded by the Appalachian Regional Commission, $25,000, 1988.

"A Comprehensive Training Curriculum for Prevention of Child Abuse," L.H. Southward, consultant, Coordinated by the University of Mississippi Division of Continuing Education, funded by the Governor's Office of Federal-State Programs, $131,000, 1985.

Preschool Education Incentive Grants, L.H. Southward, Project Director and P.I., funded by the State Department of Education, approximately $5,000 each year, 1983-1985.

1982-1985: Title XX Child Care Grants, L.H. Southward, Project Director & P.I. Sponsor: Mississippi State Department of Public Welfare. Funding:  approximately $116,000 each year for four (4) years.

**PROFESSIONAL PRESENTATIONS (SELECTED)**

Greenberg, R., Cosby, A.,  Southward, L.H. "A National Survey of U.S. Licensed Child Care Directors: Importance of Child Health Consultants." Poster presentation (by Greenberg & Southward) at the European Society of Social Pediatrics, Trieste, Italy. September 13, 2007

Southward, L.H. A National Survey of U.S. Licensed Child Care Directors: Importance of  Child Health Consultant. Poster presentation (Invited, American Academy of Pediatrics, Provisional Section on Early Care & Education), San Francisco, CA. October 27, 2007    (presented by Laura Aird)

Edelstein, B., Robertson, A., & Southward, L.H. Assessing Risk for Early Childhood Caries in Child Care Settings: Policy and Program Implications" American Public Health Association Meeting, November, 2007 (presented by Burton Edelstein)

"An Exploratory Study of Dental Health Status and Risk Factors for Dental Disease: Findings from a Network of Child Care Centers in the Mississippi Delta" with David Parrish. Child Health Services Research Meeting, Boston, MA, June 2005.

"Mississippi Delta Preschool Children: An exploratory study of Parental predictors of children's oral health status"  with Valerie Jones, Neva Eklund, & Angela Robertson, AAPD 58th Annual Session, Orlando, FL, May 2005.

"Mississippi Delta Preschool Children: An exploratory study of dental health status." with Roderick L. Coleman, Neva Eklund, and Angela Robertson, AAPD 58th Annual Session, Orlando, FL, May 2005.

 "Research in Early Care and Education Settings (RECES): Creating a National Network of Head Start and Child Care Directors" with Robert E. Greenberg & Gayle Cunningham. NHSA's 32nd Annual Training Conference, Orlanda, FL May 2005.

"Social Work and Oral Health: Something to Smile About" with Neva P. Eklund & Nicholas Mosca. National Association of Social Workers, MS Chapter, Annual Program Meeting, Jackson, MS, March 2005.

"Involving Rural Childcare Providers in Health Research" Region IV Head Start Association Annual Training Conference, Atlanta, GA, February, 2005.

"Child Care Directors' Survey: A Multi-state Study" with Robert Greenberg and David Parrish, Early Child Health and Education Consortium of the Center for Child Health Research, American Academy of Pediatrics' Annual Meeting, San Francisco, CA, October 2004.

"Healthy/Unhealthy Places" on behalf of Dr. Arthur Cosby, School of Public Health, Harvard, Cambridge, MA. Consortium on Health and Economic Development Delta Region, Spring 2004.

"The Collaborating Centers for Child and Family Health Research," with Paula Duncan, It's My Life Conference, Casey Family Programs, Austin, TX, October 2003.

"Social Climate of Early Child Health and Well-Being: A National Survey," (with John Pascoe & Robert McMillen), International Child Health Services Research Meeting, at the 5th International Conference on the Scientific Basis of Health Services: Global Evidence for Local Decisions (Poster session), Washington, D.C., September 2003.

"Correlates of Mothers' Spanking Beliefs: Findings from a National Survey", (with John Pascoe and Robert McMillen), Pediatric Academic Society Meeting (Poster Session), Seattle, WA. May 2003.

"Correlates of Mothers' Depressive Symptoms: Findings from a National Survey, 2002 (with John Pascoe and Robert McMillen), Pediatric Academic Society Meeting (Poster Session), Seattle, WA. May 2003.

"Women's Oral Health Attitudes, Beliefs and Practices: Findings from a National Survey" (presented by Robert McMillen, co-authored with John Pascoe), National Rural Health Association Meeting, May 2003.

"Ansell-Casey Life Skills Assessment Reliability Study," (with A. Chris Downs and Angela Robertson), Society for Research on Adolescents,  (Poster Session), New Orleans, LA., April 2002.

"A Profile of Mississippi's Uninsured", at the Governor's Health Care Summit for the Uninsured, plenary session, Jackson, MS., June, 2001  & August 2001 (Invited).

"Rural Child Health Consortia," at the Maternal and Child Health Leadership Program  Meeting, American Academy of Pediatrics, Chicago, IL. May 2001. (Invited).

"School Health Nurses: Evaluating Impact of Tobacco Settlement Funds," Poster Session, American Public Health Association, Boston, MA. November 2000.

"Ansell-Casey Life Skills Assessment Reliability Study: Preliminary Findings" Presented to the Evaluators Summit for Casey Family Programs, Dallas, TX. October 2000. (Invited).

"Research Partnerships with a Native American Population:   Creating Opportunities for Appreciation and Understanding" (with A Robertson & N Smith) University of South Carolina Diversity Conference, Charleston, SC., October 1999.

## RECENT PROFESSIONAL SERVICE
*(Related to Hurricane Katrina--Selected)*
Supervised the creation and dissemination of a Mental Health Screening and Referral Kit, developed in conjunction with the Mississippi Chapter of the American Academy of Pediatrics and the Mississippi Academy of Family Physicians.  This kit was a post-Hurricane Katrina guide for early education and child care professionals as well as physicians.

Conducted a Mississippi Emergency Temporary Shelter survey to assess children's needs in the wake of Hurricane Katrina.  Results used to inform immediate and future relief efforts.

Assisted with acquisition of needed items, as listed by the Mississippi Chapter of the American Academy of Pediatrics, for the care of Mississippi children after Hurricane Katrina.  Cultivated and connected donations from Child Health, Early Education and Child Care Consortium members nationwide with the Mississippi AAP Chapter.

Planning committee, Hurricane Katrina Summit (150 Days) for American Academy of Pediatrics leadership February 10-12, 2006, New Orleans, Louisiana & Biloxi, MS.

"Mississippi Chapter, American Academy of Pediatrics: A Lighthouse of Hope" in Pediatric Terrorism and Disaster Preparedness Resource, American Academy of Pediatrics for Agency for Health Care Research & Quality. (2005) Linda H. Southward on behalf of Disaster Preparedness Committee members of Mississppi Chapter, AAP.

## HONORS

| | |
|---|---|
| 2006 | Mississippi Research Impact Award, Mississippi Agriculture and Forestry Experiment Station, Mississippi State University |
| 2005 | Sustained Grantsmanship Award, Mississippi Agriculture and Forestry Experiment Station, Mississippi State University |
| 2004 | Fulbright-Hays Professional Development Seminar "Changing Roles of Women, Children and Families in South Africa" |
| 2002 | Grantsmanship Award, Mississippi Agriculture and Forestry Experiment Station, Mississippi State University |
| 1999 | Child Health Congress Leadership Program, Center for Child Health Research, American Academy of Pediatrics, University of Rochester |
| 1995 | Social Work Educator of the Year, Alabama-Mississippi Social Work Education |
| 1991 | Social Work Merit Award, Mississippi Conference on Social Welfare |
| 1988 | Who's Who Among Human Service Professionals |
| 1987 | Community Health Services Award, Mississippi Public Health Association |

## PROFESSIONAL AFFILIATIONS AND MEMBERSHIPS

| | |
|---|---|
| 1979- present | Member, *National Association of Social Workers* (NASW) |
| 1982-present | *Academy of Certified Social Workers* |
| 1986-present | *Licensed Certified Social Worker*, State of Mississippi |
| 1991-1999 | *Council on Social Work Education*,  Member |
| 1990-1991; 1993-1999 | Executive Committee Member, Mississippi Chapter NASW |
| 1994-1999 | *Baccalaureate Program Directors*, Membership committee |
| 1997-1999 | Member, Council of Presidents, NASW |

| | |
|---|---|
| 1997-1999 | President, Mississippi Chapter NASW, |
| 1995-1996 | President-Elect, Mississippi Chapter NASW |
| 1993-1995 | Member, Membership Services Chapter, Mississippi Chapter NASW |
| 1993-1994 | Board Member-At-Large, Mississippi Chapter NASW |
| 1989-1991 | Nominations and Leadership Identification Committee Chair, Mississippi Chapter NASW |
| 1988-1991 | Northern Regional Representative, Mississippi Conference on Social Welfare |
| 1988, 1989 | Regional Conference Chair, Mississippi Conference on Social Welfare |
| 1987-1988 | *Mississippi Conference on Social Welfare*, Policy Chair |
| 1986, 1988 | Committee Member, Continuing Education, Starkville Program Unit, Charter Member; Tupelo Program Unit, Charter Member |
| 1986- 1987 | *Alabama/Mississippi Social Work Education Conference*, Treasurer |

## ADVISORY COUNCILS AND COMMITTEES

INTERNATIONAL
2006        Planning committee for 2008 International Child Care Health & Safety Conference, American Academy of Pediatrics

NATIONAL

| | |
|---|---|
| 2007----present | Prevention 1st National Advisory Board (member) |
| 2004—present | Health, Early Education and Childcare Consortium (Chair) American Academy of Pediatrics |
| 2001-2004 | About Children Editorial Co-Chair—a signature project of the Center for Child Health Research, American Academy of Pediatrics & Social Science Research Center, MSU, 2001-2004. |
| 2003, 2004 | Study Panel Member, Agency for Healthcare Research and Quality's Minority Research Infrastructure Support Program |
| 2002- 2004 | Health, Early Education and Childcare, Executive Steering Committee and Member, Center for Child Health Research, American Academy of Pediatrics |
| 2000-2002 | Children's Rural Health Consortia, Chair---one of five consortia of the Center for Child Health Research of the American Academy of Pediatrics |
| 1989-1990 | Southeast Regional Coordinator and National Advisory Board Member, The Nelson A. Rockefeller Institute of Government project--"Linking the Public and Private Sectors to Support Rural Families." |

STATE LEVEL: MISSISSIPPI

| | |
|---|---|
| 2007- present | Mississippi Oral Health Health Coalition Alliance, Charter Member |
| 2001-present | Mississippi State Department of Health, Pregnancy Risk Assessment Monitoring System (PRAMS) Steering Committee Member |
| 1991-1994 | Children's Trust Fund, Grant Reviewer |
| 1989-1991 | Developmental Disabilities Planning Council, Member, State of Mississippi |
| 1989 | Mississippi Planning Committee for Meeting of National Advisory Committee on Rural Health, Office of Rural Health Policy, Department of Health & Human Services |
| 1986-1987 | Mississippi State Department of Health, Family Planning Advisory Board |
| 1984-1985 | Mississippi State Department of Public Welfare, Foster Care Review Board |
| 1983-1985 | Mississippi Board of Education, Title XX, Kindergarten Advisory Board |

UNIVERSITY LEVEL: MISSISSIPPI STATE UNIVERSITY

| | |
|---|---|
| 2005- 2006 | Member, Faculty Research Advisory Council |
| 1997-2003 | Member, Faculty Research Advisory Council |
| 1997-1998 | Chair, President's Commission on the Status of Women |
| 1996 | Chair, Committee to establish the Ellen Bryant Women's Resource Center |
| 1996 | Curriculum Committee, Scholarship Committee |
| 1995-1997 | Chair & Advisor, Women's Studies Program |
| 1992-1993 | Member, Human Resources Development Council |
| 1992-1993 | Member, Science and Technology Council |
| 1991-1992 | Member, MSU Police Department, Policy and Procedures Committee |
| 1991, 1992 | CIS[3] Mentor, Miss. State University, Summer Scholars |

**Ex. 1B**

# Stacy Ferraro

**4 Devonshire Way Flora, MS 39071◆ 601.624.2690 (cell)◆ stacy@watervalley.net**

MS BAR # 100263, admitted September 2001
Mississippi Supreme Court, admitted September 2001
United States District Court for the Northern District of Mississippi, admitted Sept. 2001
United States District Court for the Southern District of Mississippi, admitted Sept. 2001
United States Court of Appeals for the Fifth Circuit, admitted October 2001

## Education

Juris Doctor May 2001, *cum laude*, University of Mississippi School of Law, Oxford, MS
GPA: 3.48/4.0 CLASS RANK: 12/139
J.P. Coleman Scholarship in Law
Bankruptcy Moot Court Team

Sarah Lawrence College, Bronxville, NY
Post-graduate Studies in Women's History, 1992-1994
William Randolph Hearst Fellowship at the Abigail Adams Smith Museum

A.B. 1989, Duke University, Durham, NC
Major: History, Certificate in Women's Studies
National Merit Scholarship, Dean's List 1986

## Legal Experience

05/09-Present  Private Practice as a Mitigation Specialist, Flora, MS
Prepare mitigation case and witnesses for penalty phase of capital murder trials; investigate clients' background for potential defenses; interview clients, clients' families, and other witnesses; construct detailed social histories; secure documentary evidence; obtain signed statements; prepare mitigation, fact and expert witnesses for trial; identify exhibits needed for trial; mentor investigators and mitigation specialists who are working with public defenders on capital murder cases.

05/08-05/09    Mississippi Office of Capital Post-Conviction Counsel, Jackson, MS
Drafted motions,  memoranda  and post-conviction petitions; investigated capital post-conviction claims; interviewed clients, witnesses and jurors; constructed detailed social histories; secured documentary evidence; obtained signed statements; conducted legal research; worked with expert witnesses; supervised law student interns.

01/03-05/08    Office of Capital Defense Counsel, Jackson, MS
        Prepared mitigation case and witnesses for penalty phase of capital murder trials; interviewed clients, clients' families, and other witnesses; investigated clients' background for potential defenses; prepared mitigation, fact and expert witnesses for trial; identified and researched legal issues; prepared motions and memoranda for consideration by the court; made pretrial court appearances on clients' behalf; identified exhibits needed for trial; attended and assisted lead trial attorney with jury selection and with trial strategy; prepared jury instructions; assisted in researching post-trial motions and memoranda; supervised law student interns.

08/01-01/03    Mississippi Office of Capital Post-Conviction Counsel, Jackson, MS
        Investigated capital post-conviction claims; interviewed clients, witnesses and jurors; constructed detailed social histories; secured documentary evidence; obtained signed statements; conducted legal research; drafted motions and memoranda for post-conviction petitions; worked with expert witnesses; supervised law student interns; indexed and organized files.

## Administrative and Marketing Experience

03/96-04/98
        Sales and Marketing Manager, Green Dragon Creations, Inc., Water Valley, MS
        Responsible for marketing local internet access service, national software development business and original software titles; worked with artists to design website, advertisements, and promotional items; supervised packaging design; represented company at trade shows; supervised technical support staff

09/94-03/96
        Catalog Coordinator, University of Mississippi, Oxford, MS
        Edited the Southern Culture Catalog, a documentary film catalog; negotiated contracts with filmmakers; responsible for marketing, sales and customer service; maintained customer database; supervised student workers.

07/90-12/92
        Production Editor, Media Projects, Inc., New York, NY
        Performed graphic design for cookbooks and other publications; established a database for food publications; conducted historical research for potential books; copy edited texts.
        Principal Writer - *Presidents of a World Power,* one of a six-volume set of biographies on the United States presidents.

09/89-5/90
        Associate in the Management Development Program, Chase Manhattan Bank, New York, NY
        Co-edited and designed internal newsletter, quarterly financial reports and marketing brochures; supervised collection operations; received training in financial reporting, customer service, credit, and other banking operations.

**Ex. 1C**

# Curriculum Vitae
November 2008

Troy Blanchard
Department of Sociology
126 Stubbs Hall
Louisiana State University
Baton Rouge, LA 70803
Work Phone:(225) 578-5123  Fax: (225) 578-5102 Email: troy@lsu.edu

## Education:

BA, 1995; Louisiana State University; Sociology
MA, 1999; Louisiana State University; Sociology
PhD, 2001; Louisiana State University; Sociology

## Doctoral Dissertation

"The Mediating Effects of Civic and Economic Structures on the Relationship Between Concentrated Disadvantage and Black and White Rates of Violent Crime, 1980-1990" Investigation of the effect of civic engagement and locally oriented economies on race specific rates of homicide mortality in metropolitan and nonmetropolitan counties between 1980 and 1990.  (Dr. Forrest Andrew Deseran, chair, Dr. Charles Tolbert, co-chair).

## Fields of Interest

Social Demography; Community; Religion; Organizations and Markets; Stratification and Inequality

## Awards and Fellowships

1997          ICPSR Fellowship to Attend Summer Program in Statistics
1995          Fred Frey Award for Outstanding Undergraduate Paper

## Current Professional Appointments

2007-Present   Associate Professor of Sociology
               Department of Sociology
               Louisiana State University

2001-2007      Assistant to Associate Professor of Sociology
               Department of Sociology, Anthropology, and Social Work,
               Mississippi State University

2001-Present   Research Fellow
               Social Science Research Center, Mississippi State University

2000-Present   Research Associate (Special Sworn Status)
               Center for Economic Studies, Washington D.C.
               Census Research Data Center, Chicago Federal Reserve
               U.S. Bureau of the Census, Department of Commerce

## Publications

### **Peer Reviewed Journal Articles**

Gupta, Ruchi, John Pascoe, Troy Blanchard, Diane Langkamp, Paula Duncan, Peter Gorski, and Linda Southward.  2008.  "Child Health in Child Care: A Multi-State Survey of Head Start and Non-Head Start Child Care Directors."  *Journal of Pediatric Health Care* (In Press).

Berthelot, Emily R., Troy Blanchard, and Timothy Brown.  2008.  "Scots-Irish Women and the Southern Culture of Violence: The Influence of Scots-Irish Females on High Rates of Southern Violence."  *Southern Rural Sociology* 23(2):157-170.

Blanchard, Troy, John Bartkowski, Todd Matthews, and Kent Kerley.  2008.  "Faith, Morality, and Mortality: The Ecological Impact of Religion on Population Health."  *Social Forces* 86(4):1591-1620.

Morton, Lois Wright and Troy Blanchard.  2007.  "Starved for Access: Life in Rural America's Food Deserts."  *Rural Realities* 1(4):1-10.

Cossman, Jeralynn, Ronald Cossman, Wes James, Carol Campbell, Troy Blanchard, and Arthur Cosby.  2007.  "Persistent Clusters of Mortality in the U.S."  *American Journal of Public Health* 97(12):2148-2150.

Cossman, Ronald, Jeralynn Cossman, Wes James, Troy Blanchard, Richard Thomas, Louis Pol, and Arthur Cosby.  2007.  "Evaluating Heart Disease Prescriptions-Filled as a Proxy for Heart Disease Prevalence Rates for Small Geographic Areas."  *Journal of Health and Human Services Administration* 30(4):503-528.

Blanchard, Troy.  2007.  "Conservative Protestant Congregations and Racial Residential Segregation: Evaluating the Closed Community Thesis in Metropolitan and Nonmetropolitan Counties."  *American Sociological Review* 72(3):416-433.

Blanchard, Troy and Todd Matthews.  2006.  "The Configuration of Local Economic Power and Civic Participation in the Global Economy."  *Social Forces* 84(4):2241-2258.

Kerley, Kent, Todd Matthews, and Troy Blanchard.  2005.  "Religiosity, Religious Participation, and Negative Prison Behaviors."  *Journal for the Scientific Study of Religion* 44(4):443-457.

Blanchard, Troy, Martin Levin, and Jeralynn Cossman. 2005.  "Data Sources for the Estimation of Hierarchical Models of Individual Mortality Outcomes."  *Journal of Economic and*

2

*Social Measurement* 29(4):473-485.

Irwin, Michael, Troy Blanchard, Charles Tolbert, Thomas Lyson, and Alfred Nucci. 2004. "Why People Stay: The Impact of Community Context on Nonmigration in the USA." *Population* 59(5):567-592. <Lead Article>

Blanchard, Troy, Jeralynn Cossman, and Martin Levin. 2004. "Multiple Meanings of Minority Concentration: Incorporating Contextual Explanations into the Analysis of Individual-Level U.S. Black Mortality Outcomes." *Population Research and Policy Review* 23(3):309-326.

James, Wesley, Ronald Cossman, Jeralynn Cossman, Carol Campbell, and Troy Blanchard. 2004. "A Brief Visual Primer for the Mapping of Mortality Trend Data." *International Journal of Health Geography* 3:7.

Tolbert, Charles, Forrest Deseran, and Troy Blanchard. 2003. "Communities of Interest, Social Justice, and Congressional Redistricting: The Case of Louisiana's Fourth District in the 1990's." *Social Justice* 30(4):91-107.

Blanchard, Troy, Michael Irwin, Charles Tolbert, Thomas Lyson, and Alfred Nucci. 2003. "Suburban Sprawl, Regional Diffusion, and the Fate of Small Retailers in a Large Retail Environment, 1977-1996." *Sociological Focus* 36(4):313-331.

**Peer Reviewed Book Chapters**

Blanchard, Troy and Todd Matthews. 2007. "Retail Concentration, Food Deserts, and Food Disadvantaged Communities in Rural America", in *Remaking the North American Food System*, Claire Hinrichs and Thomas Lyson eds. Lincoln: University of Nebraska Press.

Cossman, Ronald E., Cossman, Jeralyn S., James, Wesley L., Blanchard, Troy C., and Cosby, Arthur. 2004. "Mortality Rates Across Time: Does Persistence Suggest "Healthy and Unhealthy Places" in the United States?" In *WorldMinds: Geographical Perspectives on 100 Problems*, edited by Janelle, D.G., Warf, B., and Hansen, K. Amsterdam: Kluwer Press.

**Policy Publications**

Troy C. Blanchard and Matthew R. Lee. 2008. "Poverty Estimates for Baton Rouge and New Orleans, 2007" CAPER Fact Sheet #9: August 2008.

Troy C. Blanchard. 2008. "Population Estimates by Age, Race, Sex and Hispanic Origin for East Baton Rouge, Ascension, and Livingston Parishes." CAPER Fact Sheet #8: August 2008.

Blanchard, Troy and Thomas Lyson. 2006. *Food Availability and Food Deserts in the Nonmetropolitan South*. Food Assistance Needs of the South's Vulnerable Population, Number 12.

Blanchard, Troy and Thomas Lyson. 2003. *Retail Concentration, Food Deserts, and Food Disadvantaged Communities in Rural America.* Final Report for Food Assistance Grant Program, Southern Rural Development Center-Economic Research Service, USDA.

Blanchard, Troy and Thomas Lyson. 2002. *Access to Low Cost Groceries in Nonmetropolitan Counties: Large Retailers and the Creation of Food Deserts.* Proceedings of the Rural Diversity Conference, November 2002.

Tolbert, Charles, Troy Blanchard, Michael Irwin, Thomas Lyson, and Alfred Nucci. 2001. "Engaging Business: Civic Engagement and Locally Oriented Firms." *Southern Perspectives* Volume 5, Number 2.

## Funded Research

Blanchard, Troy. The Social Context of Mortality: Evaluating the Link Between Community Organization and U.S. Life Expectancy. LSU Faculty Research Grant Program. $7,525. Funded August 1, 2008-July 31, 2009.

Weil, Fredrick and Troy Blanchard. The Contribution of Social Capital and Social Organization to Disaster Recovery. National Science Foundation. $210,000. Funded March 1, 2008-February 28, 2010.

Blanchard, Troy and Charles Tolbert. Collaborative Research on Organizational Determinants of Job Mobility: An Analysis of U.S. Longitudinal Employer-Employee Data. National Science Foundation. $149,082. Funded September 1, 2006-August 31, 2009.

Blanchard, Troy and Charles Tolbert. Rural Retail Firms and Workers in the Age of the Big Box: Evidence from the Longitudinal Employer-Household Dynamics Program. USDA National Research Initiative. $267,300. Funded August 15, 2006-August 14, 2009.

Southward, Linda and Troy Blanchard. Research in Early Care and Education Settings (RECES)—Phase II. Early Childhood Learning Institute and the U.S. Department of Health and Human Services. $100,000. Funded April 1, 2005-May 31, 2006.

Southward, Linda and Troy Blanchard. Research in Early Care and Education Settings (RECES)—Phase I. Early Childhood Learning Institute and the U.S. Department of Health and Human Services. $70,000. Funded September 1, 2004-March 31, 2005.

Cossman, Ronald, Lynne Cossman, and Troy Blanchard. Estimating Morbidity with Prescription Data. Office of Rural Health Policy, U.S. Department of Health and Human Services. $129,000. Funded September 1, 2004-August 31, 2005.

Blanchard, Troy. Food Deserts in the U.S.: A Multilevel Analysis of Food Deserts and Nutrition Related Outcomes. Office of Rural Health Policy, U.S. Department of Health and Human Services. $65,026. Funded July 1, 2003-June 30, 2004. Co-PI.

Blanchard, Troy. Sizing Up the Big Box Retailer: The Impact of Large Retailing on Local Rural Economies. Research Initiation Program, Mississippi State University. $9,985. Funded January 2003-December 2003. PI.

Tolbert, Charles and Troy Blanchard. Delineation of U.S. Commuting Zones with 2000 Census Data. Economic Research Service, USDA. $32,900. Funded October 1, 2002-September 30, 2003. Co-PI.

Blanchard, Troy and Thomas Lyson. Retail Globalization and Food Access in the South. Southern Rural Development Center and Economic Research Service, USDA. $29,000. Funded October 1, 2002-September 30, 2003. PI.

Irwin, Michael and Troy Blanchard. Rural Civic Community and Population Stability: Linking Civic Structure and Individual Migration Behavior. National Research Initiative Competitive Grants Program, USDA. $132,000. Funded December 1, 2002-November 31, 2005. Co-PI.

Cossman, Lynne, Troy Blanchard, and Martin Levin. Contextual Correlates of Mortality II. Office of Rural Health Policy, U.S. Department of Health and Human Services. $77,248. Funded July 1, 2002-June 30, 2003. Co-PI.

Cossman, Lynne, Troy Blanchard, and Martin Levin. Contextual Correlates of Mortality. Office of Rural Health Policy, U.S. Department of Health and Human Services. $75,037. Funded July 1, 2001-June 30, 2002. Co-PI.

## Conference Presentations

Troy C. Blanchard. 2007. LEHD and Possibilities for Research on Job Mobility, Stratification and Inequality, and the Potential for Linking to Health Data. Paper Presented at the Southern Demographic Association Meetings.

Tolbert, Charles M., Michael D. Irwin, Troy C. Blanchard, and Alfred R. Nucci. 2006. Nonmetro Bound: Attributes and Correlates of Metropolitan Adults Who Migrate to Rural America. Paper Presented at the Southern Demographic Association Meetings.

Cossman, Ronald E., Jeralynn S. Cossman, Wesley L. James, Troy Blanchard, Richard Thomas, Louis G. Pol, Arthur G. Cosby. 2006. Comparing Dissimilar Health Data Sets. Paper Presented at the Southern Demographic Association Meetings.

Cossman, Jeralynn S., Ronald E. Cossman, Wesley L. James, Troy Blanchard, Richard Thomas, Louis G. Pol, Arthur G. Cosby. 2006. Testing Prescription Data as a Proxy Measure for County-Level Diabetes Prevalence. Paper Presented at the Southern Demographic Association Meetings.

Matthews, Todd and Troy Blanchard. 2005. Patterns of Spatial Inequality in U.S. Poverty Rates. Paper Presented at the Southern Demographic Association Meetings.

Cossman, Ronald, Jeralynn Cossman, Wesley James, Arthur Cosby, Troy Blanchard, Richard Thomas, and Louis Pol.  2005.  Chronic Illness Versus Death: Do These Patterns Match?  Paper Presented at the Southern Demographic Association Meetings.

Irwin, Michael D., Troy Blanchard, Alfred R. Nucci, Charles M. Tolbert, and Thomas A. Lyson.  2004.  The Effect of Life Course Transitions on Mobility: Comparisons Between 1990 and 2000.  Paper Presented at the Southern Demographic Association Meetings.

Blanchard, Troy C. and Michael Irwin.  2004.  Community Capital or Creative Capital? The Role of Social Context on the Flow of Talent in the U.S.  Paper Presented at the Southern Sociological Society Meetings.

Matthews, Todd and Troy C. Blanchard.  2004.  The Forgotten Debate over Community Power in the Social Sciences and its Enduring Relevance Today.  Paper Presented at the Southern Sociological Society Meetings.

Tolbert, Charles, Troy Blanchard, and Alex Trouteaud.  2004.  U.S. Commuting Zones for 2000.  Poster Presented at the Population Association of America Meetings.

Blanchard, Troy and Thomas Lyson. 2003. Food Access and Nutrition Related Outcomes in the Rural South. USDA, Economic Research Service, Food Assistance Conference, Washington D.C. Invited Presentation.

Blanchard, Troy. 2003. The Contextual Effect of Income Inequality and Civic Community on the Individual Risk of Mortality for U.S. Adults.  Paper Presented at the Southern Demographic Association Meetings.

Tolbert, Charles, Troy Blanchard, Michael Irwin, Thomas Lyson, and Alfred Nucci. 2003. A Spatial Model of Rural Labor Market Inequality.  Paper Presented at the Rural Sociological Society Meetings.

Blanchard, Troy.2003. Multi-Level Explanations of Rural Nutrition and Health Related Outcomes.  Paper Presented at the Rural Sociological Society Meetings.

Blanchard, Troy, Jeralynn Cossman, and Martin Levin. 2003. Data Sources for the Estimation of Hierarchical Models of Individual Mortality Outcomes. Paper Presented at the Population Association of America Meetings.

Cossman, Ronald, Jeralynn Cossman, Troy Blanchard, Wesley James, and Carol Campbell. 2003. Spatial Implications of Different Mortality Standardization Schemes. Poster Presented at the Population Association of America Meetings.

Blanchard, Troy. 2003. Community Context and U.S. Mortality. Paper Presented at the Southern Sociological Meetings.

Tolbert, Charles, Troy Blanchard, and Alfred Nucci. Your Place or Mine? The Plausability of

6

Place and Other Sub-County Typologies.  Paper Presented at the 2002 Measuring Rural Diversity Conference. Invited Presentation.

Blanchard, Troy and Thomas Lyson. 2002. Access to Low Cost Groceries in Nonmetropolitan Counties: Large Retailers and the Creation of Food Deserts. Paper Presented at the 2002 Measuring Rural Diversity Conference. Invited Presentation.

Blanchard, Troy C. 2002. Who Benefits from the Rural-Urban Gap in Mortality: A Race Disaggregated Analysis of Mortality in U.S. Counties, 1970-1990.  Paper Presented at the Rural Sociological Society Meetings.

Irwin, Michael, Troy Blanchard, Charles Tolbert, Alfred Nucci, and Thomas Lyson.  2002. Civic and Economic Structure and Individudal Migration Patterns.  Paper Presented at the American Sociological Association Meetings.

Irwin, Michael, Troy Blanchard, Charles Tolbert, Alfred Nucci, and Thomas Lyson. 2002. Leaving Home: Modelling the Effect of Civic and Economic Structure on Individudal Migration Patterns.  Paper Presented at the Population Association of America Meetings.

Cossman, Jeralyn Sitting, Troy Blanchard, and Martin Levin. 2002. Contextual Correlates of Mortality: Are There Healthy Places to Live? Poster Presented at the Population Association of America Meetings.

Blanchard, Troy, and Madelyn Wagner. 2002. Civic Infrastructure, Income Inequality, and Mortality in U.S. Counties, 1990. Paper Presented at the Southern Sociological Society Meetings.

Kerley, Kent, Jeralyn Sitting Cossman, and Troy Blanchard. 2002. Family Capital, Delinquency, and Illicit Drug Use.  Paper Presented at the Southern Sociological Society Meetings.

Cossman, Jeralyn Sitting, Troy Blanchard, and Martin Levin. 2002. Contextual Correlates of Mortality: Are There Healthy Places to Live?  Paper Presented at the Southern Sociological Society Meetings.

Irwin, Michael, Troy Blanchard, Charles Tolbert, Thomas Lyson, and Alfred Nucci. 2001. Dwelling Together: Community Civic Structure and Residential Integration.  Paper Presented at the Southwestern Social Science Meetings.

Irwin, Michael, Troy Blanchard, Alfred Nucci, Charles Tolbert, and Thomas Lyson. 2001. Modeling the Effect of Civic and Economic Structure on Individual Migration Patterns. Paper Presented at the Southern Demographic Association.

Blanchard, Troy C., Charles Tolbert, Michael Irwin, Thomas Lyson, and Alfred Nucci. 2001. Do the Costs Outweigh the Benefits?: The Effects of Large Retailers on Local Business Environments. Paper Presented at the Annual Meeting Rural Sociological Society.

Blanchard, Troy, Carson Mencken, and Asha Luthra. 2001. Concentrated Disadvantage and Homicide in the Nonmetro U.S.: A Race Specific Analysis of Homicide in Nonmetro Counties. Paper Presented at the Annual Meetings of the Southern Sociological Society.

Manning, Amy, Charles Tolbert, Troy Blanchard, and Fredrick Weil. 2001. What if the South has Plenty of Social Capital, But Not the Kind that Benefits It?: The Case of Baton Rouge. Paper Presented at the Annual Meetings of the Southern Sociological Society.

Blanchard, Troy. 2000. Residential Exposure and Civic Community Structure: An Analysis of Residential Exposure in Selected U.S. Counties, 1990.  Paper Presented at the Annual Meetings of the American Sociological Association.

Irwin, Michael, Troy Blanchard, Charles Tolbert, Thomas Lyson, and Alfred Nucci. 2000. Civic Community and Rural Inequality: Racial Segregation and Civic Structures.  Paper Presented at the Annual Meetings of the American Sociological Association.

Deseran, F.A. and Troy Blanchard. 2000. Who's Next? Social Capital, Occupational Attachment, and Succession in the Louisiana Shrimp Industry.  Paper Presented at the Annual Meetings of the Rural Sociological Association.

Mencken, Carson, Charles Tolbert, and Troy Blanchard. 2000. Inequality and Spatial Autocorrelation in Mid-South Counties. Paper presented at the Annual Meetings of the Southern Sociological Association.

Deseran, Travis and Troy Blanchard. 1999. Class and Gender: Changes in the U.S. Class Structure for Men and Women, 1980 to 1990. Paper Presented at the Annual Meetings of the Southern Sociological Society.

Blanchard, Troy. 1999. The Effect of Contingent Labor on Earnings and Earnings Disparities in the U.S. Labor Market.  Paper Presented at the Annual Meetings of the Southern Sociological Society.

Blanchard, Troy. 1998. Earnings Differentials and Contingent Labor in the U.S. Labor Market. Paper Presented at the Annual Meetings of the Southern Sociological Society.

Deseran, F.A., Deborah Tootle, and Troy Blanchard. 1997. Home or Just a Place to Work: Community Satisfaction and Occupational Satisfaction among Louisiana Shrimpers.  Paper presented at the Annual Meetings of the Rural Sociological Society.

Blanchard, Troy. 1997. Earnings Determination and High Tech Employment. Paper Presented at the Annual Meetings of the Southern Sociological Society.

## Professional Activities

**Peer Review Activities**

8

Ad hoc Reviewer, *American Sociological Review*
Ad hoc Reviewer, *Social Problems*
Ad hoc Reviewer, *Social Forces*
Ad hoc Reviewer, *Rural Sociology*
Ad hoc Reviewer, *Agriculture and Human Values*
Ad hoc Reviewer, *Sociological Focus*
Ad hoc Reviewer, *Sociological Spectrum*

## Organizational Service

Secretary-Treasurer, Southern Demographic Association, 2007-2009.
Listserv Manager, Southern Sociological Society, 2003-2007.
Assistant Secretary Treasurer of the Southern Sociological Society, 2001-2007.
Chair of Graduate Student Business Meeting, Rural Sociological Society, 2001-2002.
Faculty Liaison, Sociology Graduate Student Association, Louisiana State University 2000-2001.
President, Sociology Graduate Student Association, Louisiana State University, 1997-1999.

## National Media Interviews

July 4, 2004  "Rural Poor Struggle to Find Healthy Food" Associated Press National Release
June 7, 2004  "Not Too Rich or Too Thin" in *Time Magazine*
May 3, 2004  "Are You Rich Enough to be Thin?" in *USA Today*

## Departmental/University Teaching and Service

## Students Advised

| | |
|---|---|
| 2008-Present | Raymond Barranco, Doctoral Student, Committee Member |
| 2007-Present | Shaun Thomas, Doctoral Student, Committee Member |
| 2006-Present | Rosa Nigro, Doctoral Student, Committee Member |
| 2006-Present | Jeremy Porter, Doctoral Student, Committee Member |
| 2006-2007 | Wesley James, Doctoral Student, Committee Member |
| 2004-2007 | Todd Matthews, Doctoral Student, Committee Member |
| 2006-2007 | William Sansing, Doctoral Student, Committee Member |
| 2002-2007 | Penelope Blankenship, Doctoral Student, Committee Member |
| 2003-2007 | Debjani Chakrabarti, Doctoral Student, Committee Member |
| 2003-2006 | Michael Taquino, Doctoral Student, Committee Member |
| 2003-2007 | Michelle Estis-Sumerel, Doctoral Student, Committee Member |
| 2001-2004 | Madelyn Wagner, Master's Student, Major Professor |
| 2003-2006 | Angelo Gaspard, Master's Student, Major Professor |
| 2005-2006 | Rachelle Graham, Master's Student, Major Professor |
| 2003-2005 | Albert Jiminez, Master's Student, Committee Member |

| | |
|---|---|
| 2003-2005 | Wesley James, Master's Student, Committee Member |
| 2002-2005 | Yousef Al-Mlaifi, Doctoral Student, Committee Member |
| 2003-2005 | Paulette Meikle-Yaw, Doctoral Student, Committee Member |
| 2001-2005 | Steve Grice, Doctoral Student, Committee Member |
| 2002-2004 | Madalla Al-Iblei, Doctoral Student, Committee Member |
| 2002-2004 | Jeff Schultz, Doctoral Student, Committee Member |
| 2002-2003 | Laura Sun, Doctoral Student, Committee Member |
| 2002-2003 | Thomas Kerson, Doctoral Student, Committee Member |

## Departmental/University Activities

*Louisiana State University*
Member, Advisory Committee, 2007-
Member, Faculty Recruitment Committee, 2007-2008

*Mississippi State University*
Member, Department Head Search Committee, 2006-2007
Member, University Faculty Senate, 2004-2007
Member, Department Appeals Committee, 2004-2005
Member, Graduate Admissions Committee, 2004-2007
Faculty Advisor, Alpha Kappa Delta Student Association, 2002-2004
Chair, Demography Area Committee, 2003-2004,
Member, Demography Area Committee, 2005-2007
Member, Qualifying Exam Committee, 2002-2006.
Member, Graduate Policy and Procedures Committee, 2002-2004
Departmental Website Manager, 2002-Present
Alternate Representative to the Arts and Science Council, 2001-2003
Assistant Professor Representative to the Advisory Committee, 2001-2002
Member, Undergraduate Sociology Committee, 2001-2003

## Courses Taught

Introductory Sociology, Undergraduate Level
Methods of Social Research, Undergraduate Level
Social Research Practice, Undergraduate Level
Population Problems, Split Level
Research Design, Graduate Level
Seminar in Social Stratification, Graduate Level
Data Management in the Social Sciences, Graduate Level
Demographic Techniques, Graduate Level
Seminar in Population, Graduate Level
Seminar in Labor Markets, Graduate Level
Multilevel Analysis-Spatial Regression, Graduate Level
Sociology of Religion, Split Level

## Memberships

Alpha Kappa Delta Sociology Honors Society
American Sociological Association
Southern Sociological Society
Rural Sociological Society
Population Association of America
Southern Demographic Association

## References

Charles Tolbert, Department of Sociology and Anthropology, Baylor University, Waco, Texas 76798. Phone: (254) 710-1165, Fax: (254) 710-1175, Email: charlie_tolbert@baylor.edu

John Bartkowski, Department of Sociology, Anthropology, and Social Work, Mississippi State University, Mississippi State, MS 39762. Phone: (662) 325-8621, Fax: (662) 325-4564, Email: bartkowski@soc.msstate.edu

**Ex. 1D**

# Reporting Workload Summary

1.  Overview ........................................................................................................ 2
    1.1   Service Type Processes and Reports ................................................ 3
    1.2   Table of Service Types .................................................................... 4
    1.3   Workload Summary record layout ................................................... 5
2.  Direct Service file Service Types ............................................................ 6
    2.1   List of Service Types retrieved from the Direct Service file (MW-DIR-SRVC) ..................................................................................... 6
    2.2   Direct Service file Service Types .................................................... 7
3.  Intake Report file Service Types ............................................................. 8
    3.1   List of Service Types retrieved from the Intake Report file (MW-INT-REPORT) ........................................................................................... 8
    3.2   How do we find the Service Types on the Intake Report file? ........... 8
        3.2.1   Case Management Intake ........................................................ 9
        3.2.2   Court Ordered Relative Application ..................................... 10
        3.2.3   ICPC Application .................................................................. 11
        3.2.4   Child Investigation Level 2 .................................................. 12
        3.2.5   Child Investigation Level 3 .................................................. 13
        3.2.6   Protective Service/Adult Investigation ................................ 14
        3.2.7   Resource Inquiry .................................................................. 15
4.  Resource file Service Types .................................................................. 17
    4.1   List of Service Types retrieved from the Resource file (MW-RESRC-DIR)   17
    4.2   How do we find the Service Types on the Resource file? ................ 17
        4.2.1   Adoption Addendum – create when resource type is 'LFOSH' 18
        4.2.2   Foster Home Addendum – when resource type is 'LFOSH' ..... 19
        4.2.3   Resource Home Study – when resource type is 'RESHM' ........ 21
        4.2.4   Resource Home Supervision – when resource types are 'LADPH', 'LFOSH', and 'RESHM' ........................................... 22
        4.2.5   Resource Renewal – when resource types are 'LFOSH' and 'RESHM' .............................................................................. 23

# Reporting Workload Summary

The run time for all four report processes was moved to the same date, the 5th of each month. The SSBG Worksheet and Performance Measurements data is needed before the 10th of the month.

Our dataset does include Adult service types and we control where they are used by checking for Service Group 'Adult'. Currently they are only used on the SSBG Worksheet.

## 1.2    Table of Service Types

| No. | Service Group | Service Type | File of Origin | Minutes | Hours |
|---|---|---|---|---|---|
| 1 | Direct Service | Adoption COS | Direct Service | 807 | 13.45 |
| 2 | Adult | Prot Service/Adult | Direct Service | 126 | 2.1 |
| 3 | Direct Service | ICPC Incoming | Direct Service | 106 | 1.77 |
| 4 | Direct Service | ICPC Outgoing | Direct Service | 36 | 0.6 |
| 5 | Direct Service | Placement COR | Direct Service | 132 | 2.2 |
| 6 | Direct Service | Placement R&S | Direct Service | 507 | 8.45 |
| 7 | Direct Service | Placement COS | Direct Service | 375 | 6.25 |
| 8 | Direct Service | Prevention COR | Direct Service | 60 | 1.0 |
| 9 | Direct Service | Prevention COS | Direct Service | 215 | 3.58 |
| 10 | Direct Service | Prevention R&S | Direct Service | 275 | 4.58 |
| 11 | Direct Service | Protective Serv COR | Direct Service | 60 | 1.0 |
| 12 | Direct Service | Protective Serv COS | Direct Service | 351 | 5.85 |
| 13 | Direct Service | Protective Serv R&S | Direct Service | 410 | 6.85 |
| 14 | Other | Case Mgt Intake | Intake Report | 36 | 0.6 |
| 15 | Other | Court Ord Rtv Appl | Intake Report | 282 | 4.7 |
| 16 | Other | ICPC Application | Intake Report | 282 | 4.7 |
| 17 | Other | Investigation Lvl 2 | Intake Report | 480 | 8.0 |
| 18 | Other | Investigation Lvl 3 | Intake Report | 480 | 8.0 |
| 19 | Adult | Prot Serv/Adult Inv | Intake Report | 480 | 8.0 |
| 20 | Resource | Resource Inquiry | Intake Report | 338 | 5.63 |
| 21 | Resource | Adoption Addendum | Res Directory | 191 | 3.18 |
| 22 | Resource | Foster Home Addendum | Res Directory | 191 | 3.18 |
| 23 | Resource | Resource Home Study | Res Directory | 132 | 2.2 |
| 24 | Resource | Resource Home Sup | Res Directory | 60 | 1.1 |
| 25 | Resource | Resource Renewal | Res Directory | 191 | 318 |

**Ex. 2**



Caseworker and Area Social Work Supervisor
Hiring, Attrition, and Workforce Size
FY 2007 - FY 2010
[Prepared by the Office of the Court Monitor Based on Data Provided by DFCS Personnel Unit]
Number of Caseworkers and Supervisors Hired or Who Left the Agency During FY
Total Number of Caseworker and Supervisor Positions Filled at the End of the Fiscal Year
25% increase in filled FTEs between July 2008 and June 2010
250
200
150
100
50
0
-50
-100
-150
900
800
700
600
500
400
300
200
100
0
712
616
705
769
202
163
1
Data Not Available
Data Not Available
2007
2008
2009
2010
-97
-113
-99
Terminations
Hires
Total Caseworkers and Supervisors at end of FY

**Ex. 3**



**Number of Caseworkers and Supervisors Employed by MDHS/DFCS on May 31, 2010 Hired by State Between May 1, 2009 and April 30, 2010, by Year and Month Hired***

[Prepared by the Office of the Court Monitor Based on Data Provided by DFCS Personnel Unit]

* Data reflect only caseworkers and supervisors employed by DFCS on May 31, 2010 hired by the State between May 1, 2009 and April 30, 2010. Caseworkers and supervisors who assumed their positions at DFCS during the period but were previously emplyed by the State in a different capacity do not appear in the totals because these data were not available from MDHS/DFCS.

**Ex. 4**



**Ex. 5**



**Year that Area Social Work Supervisors and Caseworkers Employed by
State of Mississippi as of May 31, 2010 Were Hired***

[Prepared by the Office of the Court Monitor Based on Data Provided by DFCS Personnel Unit]

As of May 31, 2010
Percentage of Supervisors Hired Since 2007 = 15%

As of May 31, 2010
Percentage of Caseworkers Hired Since 2007 = 66%

Area Social Work Supervisor

Caseworker

* The years listed reflect when the employees were hired by the State of Mississippi. DFCS staff were not able to provide comprehensive data regarding the specific date that each employee began working at MDHS/DFCS.

**Ex. 6**



Status of Caseworker Positions as of May 31, 2010, by County
[Prepared by the Office of the Court Monitor Based on Data Provided by DFCS Personnel Unit]
Average County Vacancy Rate = 17%
Number of Positions
0
10
20
30
40
50
60
Vacant
Filled
HINDS
WASHINGTON
JACKSON
HARRISON
FORREST
RANKIN
DESOTO
ADAMS
LAUDERDALE
LEE
MONROE
PEARL RIVER
JONES
HANCOCK
SIMPSON
UNION
PIKE
MADISON
PONTOTOC
BOLIVAR
LINCOLN
YAZOO
WALTHALL
CHICKASAW
COPIAH
PRENTISS
TIPPAH
ALCORN
NESHOBA
MARSHALL
STONE
GRENADA
WARREN
SUNFLOWER
CLAY
TISHOMINGO
JASPER
LOWNDES
COAHOMA
LAMAR
SCOTT
OKTIBBEHA
COVINGTON
LAFAYETTE
ITAWAMBA
CALHOUN
HUMPHREYS
MARION
LEFLORE
WAYNE
TATE
WINSTON
PANOLA
MONTGOMERY
CLARKE
WEBSTER
ATTALA
JEFFERSON DAVIS
LAWRENCE
HOLMES
YALOBUSHA
TALLAHATCHIE
AMITE
CLAIBORNE
CARROLL
BENTON
GEORGE
WILKINSON
NEWTON
QUITMAN
PERRY
LEAKE
FRANKLIN
SMITH
JEFFERSON
CHOCTAW
NOXUBEE
TUNICA
ISSAQUENA
KEMPER
SHARKEY
Caseworker
County

**Ex. 7**



Status of Area Social Work Supervisor Positions
as of May 31, 2010, by County
[Prepared by the Office of the Court Monitor Based on Data Provided by DFCS Personnel Unit]
Number of Positions
12
10
8
6
4
2
0
Average County Vacancy Rate = 3%
Vacant
Filled
HINDS
HARRISON
FORREST
ADAMS
JACKSON
WASHINGTON
RANKIN
DESOTO
LEE
PEARL RIVER
SIMPSON
PIKE
LAUDERDALE
OKTIBBEHA
MADISON
TATE
COAHOMA
WALTHALL
HANCOCK
COVINGTON
BOLIVAR
TISHOMINGO
JASPER
CLARKE
JEFFERSON DAVIS
NESHOBA
JONES
STONE
COPIAH
TIPPAH
LEFLORE
UNION
LINCOLN
WARREN
LOWNDES
WINSTON
YAZOO
MONROE
SUNFLOWER
HOLMES
CARROLL
GRENADA
MARSHALL
KEMPER
ITAWAMBA
NEWTON
BENTON
LAFAYETTE
WEBSTER
PANOLA
LAMAR
ALCORN
TALLAHATCHIE
PERRY
LEAKE
AMITE
CALHOUN
PONTOTOC
JEFFERSON
PRENTISS
WAYNE
CHICKASAW
HUMPHREYS
SCOTT
GEORGE
MARION
Area Social Work Supervisor
County

**Ex. 8**



## Caseworker and Area Social Work Supervisor Positions, by Status, for 20 Counties Employing Largest Number of MDHS/DFCS Staff

**[Prepared by the Office of the Court Monitor Based on Data Provided by Personnel Unit]**

**Ex. 9**

MDHS-DIVISION OF FAMILY AND CHILDREN'S SERVICES

# WORKFORCE PLAN

## STATE FISCAL YEAR 2010

---

## RECRUITMENT AND RETENTION

### DRAFT
#### REVISED AS OF 1/20/10

JM GNL 831999 V1

2902819-000001 01/21/2010

# WORKFORCE PLAN

## RECRUITMENT

---
### CURRENT DATA
---

Recruitment is essential to the success of any organization, but is vital to the success of Family and Children's Services. Child welfare is not a glamorous field and requires vast recruitment techniques. In fact, ninety percent of states reported having difficulty in recruiting and retaining child welfare workers due to low salaries, high caseloads, administrative burdens, risk of violence, limited supervision, and insufficient training (NASW, 2004). In order to better understand what recruitment methods are successful with our staff, we have polled all workers hired in the 2008 calendar year. Of those workers polled, 70 percent knew that we were hiring from the Mississippi State Personnel Board Website. Other common sources were current employees, career fairs, and college courses. Twenty-one percent of those hired in 2008 had completed their field placement or internship with us at some time. This is the breakdown of how new employees stated they were made aware MDHS-Division of Family and Children's Services (DFCS) was hiring:



The new employees were also polled regarding why they wanted to work for Family and Children's Services. They were given the options of state benefits, stable employment, working with children, working with families, opportunity for advancement, and educational opportunities. Respondents could choose more than one answer for this question. Working with children and working with families were the most common reasons why new employees wanted to work for Family and Children's Services with 75 percent of new employees choosing both reasons. All of the above-mentioned reasons for employment were selected with 58 percent of respondents choosing stable employment, 52 percent choosing state benefits, 47 percent choosing opportunity for advancement, and 39 percent choosing educational opportunities.

2

## CURRENT RECRUITMENT METHODS

At this time, the agency is using many recruitment techniques. The agency has had or will have a display at all of the thirteen 2009 Governor's Job Fair Network career fairs, other sponsored job or career fairs, social work conferences, as well as local community colleges and universities. These fairs take place in different regions within the state, and all regions have had the opportunity to participate in a job or career fair. Employees have found these fairs to be productive and several applicants were interviewed as a result of the fairs. Many employees have had the opportunity to present to social work courses at several Mississippi universities. Employees have also presented at several conferences and used the opportunity to recruit potential employees. At the recent MDHS-DFCS Strategic Planning Conference which was held February 3, 2009, employees discussed the need for more staff and gave out contact information for anyone interested in applying to work for MDHS.

In addition to participating in the university career fairs, the agency has also been active in the University Consortium and contacted the universities individually. The agency is seeking proposals from the universities for child welfare specific programs that would provide students the opportunity to develop knowledge and tools to be better prepared for entering the child welfare workforce. The agency will use these programs to interest students in the field of child welfare, increase the number of students completing field placements with the department, and to hire better prepared employees following graduation from these programs. The agency is also working with the universities to develop flexible programs to help our current employees obtain a bachelor's or master's degree in social work. The University of Southern Mississippi currently offers courses on weekends and on compressed days off to better accommodate the growing number of MDHS employees entering their programs. Also, the agency is currently pursuing title IV-E dollars to offer to students in the social work program in return for a specified length of employment with the department.

The agency is utilizing several public recruitment methods including radio spots which focus on social worker recruitment and several employees have been guests on radio shows to explain the critical need for more social workers in the department. The agency has also had television spots and newspaper ads to recruit social workers. There is currently one recruitment billboard in the state, and the agency is working on several more in high need areas. The agency recently printed a child abuse awareness packet that has a section focusing on recruitment of social workers. The MDHS website and the Mississippi State Personnel Board Website are additional recruitment tools. In addition, the department mailed out a recruitment letter and application to all licensed social workers in the state and sent letters to recent graduates urging them to consider employment with the department.

## RECRUITMENT PLANS

The agency plans to increase recruitment efforts and improve current recruitment techniques. The agency is seeking additional title IV-E funding which can be used to pay for social work students' education in return for employment. The agency also plans to engage social work bodies such as the National Association of Social Workers and the Mississippi Conference on Social Welfare to assist with recruitment effort of social workers specifically, as recent research has shown that social workers in child welfare are more satisfied with their jobs than their non-social work colleagues (NASW, 2004). The agency has ordered new display boards and recruitment tools for a more professional appearance at job and career fairs. The University of Mississippi has expressed interest in developing a child welfare specific program with flexible hours, and the agency will work with the university to develop this program. Lastly, the agency plans to make the employment opportunities

3

more visible on the website to ensure that potential employees are made aware of vacancies and how to apply. The Annie E. Casey Foundation found in a recent study that social services pays its workers less than any other sector that hires similarly qualified people for similar jobs (Annie E. Casey Foundation, 2003). Due to this fact, the agency has worked with the State Personnel Board to approve a career ladder for social workers that would result in competitive pay with other social work jobs. At this time, the career ladder has not been funded, but the department will implement a career ladder as soon as it is funded.

# RETENTION

## CURRENT DATA

Although recruitment is important in the field of child welfare, retention is vital. Unfortunately, the work climate in the child welfare setting leads to high rates of turn-over and worker burn out. It is very difficult for child welfare agencies to keep employees, especially large public agencies. High caseloads, organizational inefficiency, threats to safety, and more, create an environment that leads most workers to quit after two years in the child welfare setting (GAO, 2003). Not only does turn-over negatively affect the organization, it is been shown to decrease the time that workers can conduct meaningful home visits, establish relationships with families and children, and make thoughtful and well-supported decisions regarding placements (GAO, 2003). In order to plan appropriately for increased retention of employees, it is important to understand the department's data regarding retention.

The following chart shows the percentage of employees who separated from the agency from 2004 through 2009 (calendar year).



4

The following chart shows the reason given for separation from the agency for those employees who separated from 2004 through 2009 (calendar year).



It appears that the agency has improved retaining employees within the last two years. We are not far enough into 2009 to be able to account for this year, but a significant decline in the percentage of those separating from 2007 to 2008 is apparent. Although the numbers may have decreased in that year, the reasons given for separation have remained fairly constant for the last five years as indicated in the chart above. The most common reason for separating is resignation to leave state government. Although resignation is hardly uncommon for state agencies, the agency needs to increase efforts to compete with the private sector. Another common reason for separating is employees who never reported to work. Slow hiring practices and lower salaries are areas that the agency strives to decrease the number of employees who do not report. Some of the reasons for separation are unavoidable, such as retirement and death. The agency intends to use data in succession planning to reduce the impact of unavoidable separation reasons.

5

The University of Southern Mississippi School of Social Work surveyed staff in 2006 and 2008 regarding their intention to remain employed in child welfare (2008). The following charts show the most significant changes in the 2008 survey from the 2006 survey:

**Personal and professional benefits outweigh the difficulties and frustrations**



**I frequently think about quitting my job**



**Actively seeking other employment outside the field of child welfare**



**My intention to remain in child welfare is stronger than that of my colleagues**



In 2009, agency staff participated in an Annual Job Satisfaction Survey, in another effort to better understand how to retain our current staff. This survey allowed the leadership to identify issues that needed correction and strengths of the agency. The following information that was gained from the survey can be used in developing retention plans:

-   20.7% agree they are being paid a fair amount for the work they do.
-   57% agree they would be more likely to remain with DFCS if the agency assists them in obtaining a higher degree.
-   34.5% agree there are adequate resources in their community to help them meet the needs of their clients.
-   50% agree communication between levels in the agency appears to be good.

6

- 60% agree they are supported in their work by the State Office.
- 48.4% agree their workload is manageable and allows them to do quality work with families.
- 63.2% agree adequate opportunities for training are offered to them.
- 68% agree their physical office environment is pleasant and conducive to a productive work day.
- 69.3% agree the emotional impact of their work is manageable and acceptable to them.
- 75.2% agree their work assignments are fully explained and understandable to them.
- 77.7% agree they are overall satisfied with their job.
- 83.5% agree their supervisor supports them.
- 87.4% agree their supervisor is fair with them.
- 88.4% agree their job allows them to enjoy a sense of professionalism.
- 91.3% agree they feel a sense of pride in doing their job.

## CURRENT RETENTION METHODS

At this time, understanding the importance of retention, the agency is working on several different ways to encourage employees to remain employed with the department for a career. The department is training our staff how to select qualified candidates. This training focuses on selection of candidates, interviewing, and clearly defining expectations up front to help potential employees make informed decisions regarding their employment with MDHS.

Since many employees leave the agency for jobs in the private sector, the agency has worked with the State Personnel Board to approve a career ladder for social workers in an attempt to retain employees. At this time, the career ladder has not been funded, but the department will implement a career ladder as soon as it is funded.

Currently, the agency is working to create an environment that is compatible with high morale and positive outcomes for families and children. The agency is providing educational assistance for current employees to obtain a master's degree in social work. According to the National Association of Social Workers, "Research has found that holding a degree in social work correlates with higher job performance and lower turnover rates among child welfare workers" (2004). The following numbers indicate the number of employees working towards their MSW degrees who are receiving reimbursement for tuition and books:

Fall Semester 2008 - 4
Spring Semester 2009 - 12
Summer Semester 2009 - 16
Fall Semester 2009 - 40
Spring Semester 2010 estimate - 47

DFCS currently has contractual agreements with three Universities who have developed a series of classes specifically to meet the needs of our child welfare, full time employed, student population. Contracts are currently in place with the University of Mississippi, Jackson State University and the University of Southern Mississippi. The DFCS currently has 175 employees who indicate that they are currently enrolled in school. Of these 175, 123 are seeking Master of Social Work Degrees.

39 ASWS's are currently enrolled in school.
65 ASWS's are either currently enrolled in school or plan to enroll in school.

Anticipated dates of graduation:
2010 (5)

2

2011 (5)
2012 (19)
2013 (18)
A total of 47 ASWS's indicated an anticipated graduation date.
18 ASWS's who plan to return to school did not indicate an anticipated graduation date.

As the agency continues to hire additional social workers, worker caseloads and supervisory caseloads decrease. The agency understands lower caseloads are crucial in retaining employees. The agency also increased the number of regions from seven to thirteen. This is part of a strategic plan to reduce supervisors' and direct service workers' workloads and improve communication.

## RETENTION PLANS

The agency plans to retain employees by increasing training, educational opportunities, career ladder, succession planning, overall organizational improvements, and decreasing caseloads. In a recent GAO audit, it was found that half of newly-hired child welfare workers leave their jobs before completing their first year due to insufficient training and support (2003). Because of this, the agency has recently required all employees to have at least 40 hours of annual training specific to their job duties. The agency is developing training and expanding the training unit to offer more training opportunities to staff. The agency is also diligently seeking title IV-E funding which can be used to better training efforts. The agency is targeting training specifically as research has shown that social workers find issues confronting children and families the most challenging and the most rewarding aspect of the job (NASW, 2004). The agency will continue to promote the educational assistance program with current staff and continue to foster relationships with universities to create child welfare specific programs that are flexible for non-traditional students.

Succession planning is a high priority for the agency. The agency encourages all employees to develop a document that details their specific job functions in case they can no longer perform them, ensuring that there are no gaps in services due to unforeseen vacancies. As always, social workers will be required and encouraged to maintain their records and have frequent case staffings so that any turnover does not lead to negative outcomes for families and children. The agency encourages workers who are not yet supervisors to obtain a master's degree and to attend the State Personnel Board supervisory training, ensuring that employees advance quickly when promoted to supervisory positions.

As we know from much research done on child welfare agencies, one significant complaint is an overall inefficiency or bureaucracy of the organization. The agency is addressing several issues to decrease noted inefficiencies within our system. Communication is an issue within the agency. The agency is developing a new organizational chart to help employees understand the chain of command and line of supervision with greater clarity. The agency is developing communication systems that allow all employees to receive pertinent information. One example of this is that all vacant positions are emailed to all staff ensuring receipt of all notices. The training unit has developed an agency wide monthly newsletter that is emailed to all staff, and the agency will continue to build on the newsletter to better communicate with staff. The supervisory learning labs have also addressed the issue of communication and will continue to build on this theme. The agency leadership has expressed a desire to change the culture of the department to one in which people are urged to speak up regarding questions and concerns and to be innovative in problem solving and suggestions. The agency has developed a suggestions email account (suggestions@mdhs.ms.gov) so that all employees, as well as the community, can provide feedback to the agency's senior management team. Focus has

3

been placed on shortening the time it takes for an applicant to be hired. Additional assistance and support will be given to Human Resources in the hiring of more staff and streamlining the hiring process. The agency also hopes to create a better tracking system to make the hiring process as efficient as possible.

Lastly, the agency plans to reduce the caseloads of workers and supervisors. Focused efforts on recruitment and retention will greatly advance our progress on this goal. The agency will also work on clustering to decrease the caseloads of workers in active areas and provide staff with more supportive supervision.

# GOALS AND RESOURCES REQUIRED

## SHORT TERM GOALS, LONG TERM GOALS, & FINANCIAL RESOURCES

### Overview of Pins

Permanent Pins Available: 938    Permanent Pins Filled: 716   Permanent Pins Vacant: 222
Time Limited Pins Available: 266              Time Limited Pins Filled: 212   Time Limited Pins Vacant: 54

Current Front line Position Summary:

| OCCUPATIONAL TITLE | TOTAL POSITION | FILLED POSITION | VACANT POSITION | PERCENT |
|---|---|---|---|---|
| DHS-Family Protection Worker I | 134 | 81 | 53 | 40% |
| DHS-Family Protection Worker II | 51 | 47 | 4 | 8% |
| DHS-Family Protection Specialist | 383 | 356 | 27 | 7% |
| DHS-Family Protection Specialist, Sr. | 33 | 25 | 8 | 24% |
| DHS-Family Protection Specialist, Adv. | 172 | 124 | 48 | 28% |
| Totals | 773 | 633 | 140 | 18% |

ASWS Positions:    137 Filled    10 vacant

For the state fiscal year 2010, the agency asked the legislature to fund all of the remaining vacant pins and was granted this request. The agency feels very confident in its goal to fill the remaining vacant frontline and supervisor positions. Currently, the State of Mississippi has more front line workers and supervisors employed than ever in the history of Mississippi. The retention rate seems to improving and the pool of applicants and new hires are beginning to evidence more social work degreed professionals. The agency plans to continue to build upon this success in recruitment and retention.

For the state fiscal year 2011, the agency has asked the legislature to fund the realignment package for social work staff. This package will greatly benefit the agency's ability to recruit and retain employees.

4

## REFERENCES:

Annie E. Casey Foundation. (2003). *The unsolved challenge of system reform: The condition of the frontline human services workforce.* Baltimore.

Lee, J.; Forster, M.; Rehner, T.; & Reynolds, J. (2008). *Intention to remain employed in child welfare: A comparision: 2006 survey and 2008 survey.*

National Association of Social Workers. (2004). *The national association of social workers' child welfare specialty practice section members describe their experiences in child welfare.* Washington, DC: Author.

United States General Accounting Office. (2003). *Child welfare: HHS could pay a greater role in helping child welfare agencies recruit and retain staff.* GAO-03-357.

5

| OCCU | OCCUNAME | #PINs | #Emp | Cur Start | MQs | Change? | MQs | Proposal | New Salary |
|---|---|---|---|---|---|---|---|---|---|
| 4554 | DHS-Family Protection Worker I | 152 | 62 | 23643.58 | BS | RLGN | BS | DHS-Family Protection Worker I | |
| 1317 | Youth Serv. Counselor Trainee | 31 | 23 | 24823.68 | BS | RLGN | BS | Youth Services Counselor Trainee | |
| | | | | | | NEW | BS | Social Services Assistant I | $26,489.74 |
| 1320 | Youth Serv. Counselor I | 25 | 9 | 27036.12 | MS | RLGN | MS | Youth Services Counselor I | |
| 4555 | DHS-Family Protection Worker II | 52 | 48 | 27615.55 | BS + 1 | RLGN | BS+1 | DHS-Family Protection Worker II | |
| | | | | | | NEW | BS+1 | Social Services Assistant II | |
| 4556 | DHS-Family Protection Specialist | 373 | 219 | 27615.55 | LSW | RLGN | LSW | DHS-Family Protection Spec. | |
| 309 | Social Worker Inst. | 148 | 117 | 26785.68 | LSW | NEW | LSW | Social Worker I | |
| 2225 | Social Worker | 10 | 4 | 26785.68 | LSW | " | " | " | $29,138.72 |
| 1321 | Youth Services Counselor II | 26 | 25 | 29611.45 | MS + 1 | RLGN | MS+1 | Youth Services Counselor II | |
| 568 | Social Worker Inst. Adv. | 31 | 20 | 30959.88 | LMSW | NEW | LMSW | Social Worker II | $32,052.59 |
| 1322 | Youth Serv. Counselor III | 46 | 40 | 32507.44 | MS + 2 | RLGN | MS+2 | Youth Services Counselor II | |
| 4557 | DHS-Family Protection Spec, Sr | 38 | 33 | 30049.94 | LSW + 2 | RLGN | LSW + 2 | DHS-Family Protection Spec. Sr. | |
| 2657 | Social Worker Sr. | 3 | 2 | 28189.32 | LSW + 2 | NEW | LMSW+1 | Social Worker III | $35,257.85 |
| 4558 | DHS-Family Protection Spec., AD | 187 | 139 | 32700.43 | LSW + 4 | RLGN | LSW + 4 | DHS-Family Protection Spec., AD | |
| 2227 | Social Worker Adv. | 81 | 63 | 30959.88 | LSW + 3 | NEW | LMSW+3 | Social Worker IV | |
| 1696 | Socail Work Supv. Inst. | 20 | 16 | 33177.13 | LMSW + 2 | " | " | " | $38,783.63 |
| 2222 | Social Work Consultant | 4 | 2 | 35412.73 | LMSW + 2 | NEW | LMSW+5 | Social Worker V | |
| 4626 | DHS-Family Protection Train. Coord. | 7 | 5 | 39511.76 | LSW + 6 | RLGN | LSW + 6 | DHS-Family Protection Train. Coord. | $42,662.00 |
| 3745 | DHS-Area Social Work Supv. | 151 | 102 | 37511.76 | LSW + 5 | NEW | LMSW+7 | Social Work Supervisor | $46,928.20 |
| 957 | Youth Serv. Counselor, Reg. Supv. | 7 | 7 | 40890.84 | MS + 3 | RLGN | MS+3 | Youth Serv. Counseor, Reg. Supv. | |
| 3867 | DH-Social Service Program Dir. | 1 | 0 | 40829.73 | LMSW + 5 | NEW | LMSW+9 | Social Services Director | |
| 2808 | Social Work Dir., Inst. | 6 | 5 | 40829.73 | LMSW + 4 | " | " | " | |
| 3754 | Social Services Regional Dir. | 19 | 15 | 40890.84 | LSW + 7 | " | " | " | |
| 4627 | DHS-Family Protection Train. Dir. | 1 | 1 | 43020.84 | LSW + 8 | " | " | " | $53,967.43 |

**Benchmark: Social Worker Advanced (LMSW)**

Current Start       $30,959.88

Weighted Average

| NAME | TITLE | EMP | START |
|---|---|---|---|
| Gulf Coast Mental Health Center | Mental Health Clinicians | 56 | 26000 |
| Georgia Merit System | Social Service Provider II | 79 | 29400 |
| City of Jackson-Personnel Mgt | Social Worker | 10 | 26818 |
| Baptist Medical Center | Social Worker | 10 | 27040 |
| Magnolia Regional Health Center | Social Worker Case Coordinator | 2 | 28142 |
| Oklahoma Office Personnel Mgt | Social Svc Spec III | 51 | 28288 |
| Southwest Mississippi Regional | Social Worker Licensed | 3 | 28500 |
| Laurelwood Community Living Cent | Social Service Director | 1 | 29000 |
| Lexington Manor | SOCIAL SERVICE DIRECTOR | 1 | 29000 |
| Ocean Springs Mediacl Center | SSSW | 1 | 29120 |
| Arkansas Dept of Finance & Admin | Social Worker II | 41 | 32683 |
| South Carolina Office of HR | Social Worker III | 203 | 30274 |
| Lakeview Nursing Center | Licensed Social Worker | 1 | 30333 |
| St Dominic Hospital | Social Worker, MSW | 9 | 31200 |
| Grenada Living Center | Social Worker | 2 | 31200 |
| Lakeland Health Care Center | Social Services Director | 1 | 31200 |
| Virginia Dept HR Management | Clinical Social Worker | 175 | 31352 |
| Louisiana Dept of Civil Service | Social Worker 3 | 141 | 31680 |
| Kentucky Personnel Cabinet | Social Services Clinician | 100 | 32042 |
| Tennessee Dept of Personnel | Social Worker 2 | 51 | 32484 |
| Cottage Grove Nursing Home | Social Worker | 1 | 33280 |
| Whitfield Nursing Home Inc | Social Worker | 1 | 33280 |
| Meridian Community Living Center | Social Worker | 1 | 34320 |
| Meridian Convalescent Home | Social Worker Advanced | 1 | 34320 |
| Alabama Personnel Department | Senior Social Worker | 156 | 34387 |
| University-Mississippi Med Cente | Social Worker Advanced | 32 | 34400 |
| Missouri Office of Admin | Clinical Casework Pract II | 47 | 34644 |
| Care Inn-Alcorn County | Social Worker | 1 | 35360 |
| North Carolina Office Personnel | Social Worker III | 133 | 36685 |
| Forrest General Hospital | Social Worker-LCSW | 3 | 37232 |
| Calhoun Health Services | Licensed Social Worker | 2 | 37440 |
| Memorial Hospital | Social Worker | 29 | 37502 |

1345

Wgt Avg           32052.59

**Ex. 10**



**Average Salaries of Caseworkers Employed by
MDHS/DFCS as of May 31, 2010, by Year Hired***

[Prepared by the Office of the Court Monitor Based on Data Provided by DFCS Personnel Unit]

Overall Average Caseworker Salary = $29,488

Average Salary

Caseworker
**Year Hired by State**

* The years listed reflect when the employees were hired by the State of Mississippi. MDHS/DFCS staff were not able to provide comprehensive data regarding the specific date that each employee began working at MDHS/DFCS.

**Ex. 11**



## Average Salaries of Area Social Work Supervisors Employed by MDHS/DFCS as of May 31, 2010, by Year Hired*

[Prepared by the Office of the Court Monitor Based on Data Provided by DFCS Personnel Unit]

Overall Average Supervisor Salary = $41,672

Area Social Work Supervisor

**Year Hired by State**

* The years listed reflect when the employees were hired by the State of Mississippi. MDHS/DFCS staff were not able to provide comprehensive data regarding the specific date that each employee began working at MDHS/DFCS.

**Ex. 12**



* The years listed reflect when the employees were hired by the State of Mississippi.  MDHS/DFCS staff were not able to provide comprehensive data regarding the specific date that each employee began working at MDHS/DFCS.

**Ex. 13**



Class Specification
Occu Code: 3745
Rev: 06/06
Page 1

## DHS-AREA SOCIAL WORK SUPERVISOR

### CHARACTERISTICS OF WORK:

This is professional social work of a supervisory nature. Incumbents are responsible for the supervision of social service program for families, children, and adults and maintenance of program operations. Work is performed under the general supervision of the Social Services Regional Director. Incumbents remain on-call on a 24 hour basis.

### MINIMUM QUALIFICATIONS:

These minimum qualifications have been agreed upon by Subject Matter Experts (SMEs) in this job class and are based upon a job analysis and the essential functions. However, if a candidate believes he/she is qualified for the job although he/she does not have the minimum qualifications set forth below, he/she may request special consideration through substitution of related education and experience, demonstrating the ability to perform the essential functions of the position. Any request to substitute related education or experience for minimum qualifications must be addressed to the State Personnel Board in writing, identifying the related education and experience which demonstrates the candidate's ability to perform all essential functions of the position.

### EXPERIENCE/EDUCATIONAL REQUIREMENTS:

**Education:**
Must be licensed to practice Master's Level Social Work (LMSW) in the State of Mississippi;

**AND**

**Experience:**
Four (4) years of experience in social work.

**OR**

**Education:**
Must be licensed to practice Bachelor's Level Social Work (LSW) in the State of Mississippi and must have completed thirty (30) semester hours of graduate level social work education;

**AND**

**Experience:**
Four (4) years of experience in social work.

**OR**

**Education:**
Must be licensed to practice Bachelor's Level Social Work (LSW or above) in the State of Mississippi;

AND

**Experience**:
Five (5) years of experience in social work.

**Documentation Required**:

Applicant must attach a copy of his/her current wallet-size license in Social Work.

**Note**:

Incumbent must have a valid driver license and proof of insurance which will be verified by the hiring agency.

## PHYSICAL REQUIREMENTS:

These physical requirements are not exhaustive, and additional job related physical requirements may be added to these by individual agencies on an as needed basis. Corrective devices may be used to meet physical requirements. These are typical requirements; however, reasonable accommodations may be possible.

**Moderate Work:** May frequently exert force equivalent to lifting up to approximately 25 pounds and/or occasionally exert force equivalent to lifting up to approximately 50 pounds.

**Vision:** Requires the ability to perceive the nature of objects by the eye.

**Near Acuity:** Clarity of vision at 20 inches or less.
**Midrange:** Clarity of vision at distances of more than 20 inches and less than 20 feet.
**Far Acuity:** Clarity of vision at 20 feet or more.
**Peripheral:** Ability to observe an area that can be seen up and down or left and right while eyes are fixed on a given point.
**Depth Perception:** Three-dimensional vision. Ability to judge distances and spatial relationships so as to see objects where and as they actually are.
**Ability to adjust focus:** Ability to adjust the eye to bring an object into sharp focus.

**Speaking/Hearing:** Possesses the ability to give and receive information through speaking and listening skills.

**Taste/Smell:** Possesses the ability to use the sense of smell to recognize and distinguish odors. Possesses the ability to use the sense of taste to recognize and distinguish flavors.

**Motor Coordination:** While performing the duties of this job, the incumbent is regularly required to use hands to finger, handle, or feel objects, tools, or controls; and reach with hands and arms. The incumbent is frequently required to sit; stand; and walk. The incumbent is occasionally required to stoop, kneel, crouch, or bend; and climb or balance.

## COMPETENCIES:

The following competencies describe the knowledge, skills, abilities, and attributes that lead to a successful employee in this position. An applicant will be expected to exhibit these competencies or the ability to reach competency achievement within a specified time. These competencies are linked to the essential functions of the job. Employees in this position may be evaluated on these competencies as part of the performance appraisal system. Example behaviors are listed below

each competency and are used for illustrative purposes only. Specific behaviors may be identified and included later by the hiring agency. It is understood that some of these behaviors might not be acquired until a reasonable time after hire. Failure of an employee to successfully demonstrate some or all of these competencies, as deemed important by his or her reporting official, may result in the employee being placed on a performance improvement plan. If after a reasonable period of time, usually three (3) months, the employee fails to demonstrate successful performance, the employee may be terminated. These competencies include, but are not limited to, the following:

## PUBLIC SECTOR COMPETENCIES:

**Integrity and Honesty:** Demonstrates a sense of responsibility and commitment to the public trust through statements and actions.

Models and demonstrates high standards of integrity, trust, openness, and respect for others. Demonstrates integrity by honoring commitments and promises. Demonstrates integrity by maintaining necessary confidentiality.

**Work Ethic:** Is productive, diligent, conscientious, timely, and loyal.

Conscientiously abides by the rules, regulations, and procedures governing work.

**Service Orientation:** Demonstrates a commitment to quality public service through statements and actions.

Seeks to understand and meets and/or exceeds the needs and expectations of customers. Treats customers with respect, responding to requests in a professional manner, even in difficult circumstances. Provides accurate and timely service. Develops positive relationships with customers.

**Accountability:** Accepts responsibility for actions and results.

Is productive and carries fair share of the workload. Focuses on quality and expends the necessary time and effort to achieve goals. Demonstrates loyalty to the job and the agency and is a good steward of state assets. Steadfastly persists in overcoming obstacles and pushes self for results. Maintains necessary attention to detail to achieve high-level performance. Deals effectively with pressure and recovers quickly from setbacks. Takes ownership of tasks, performance standards, and mistakes. Has knowledge of how to perform one's job. Knows the organization's mission and functions and how it fits into state government.

**Self Management Skills:** Effectively manages emotions and impulses and maintains a positive attitude.

Encourages and facilitates cooperation, pride, trust, and group identity; fosters commitment and team spirit; works effectively and cooperatively with others to achieve goals. Treats all people with respect, courtesy, and consideration. Communicates effectively. Remains open to new ideas and approaches. Avoids conflicts of interest. Promotes cooperation and teamwork. Continuously evaluates and adapts; copes effectively with change. Allows self and others to make mistakes and learns from those mistakes. Adheres to high ethical standards.

**Interpersonal Skills:** Shows understanding, courtesy, tact, empathy, and concern to develop and maintain relationships.

Class Specification
Occu Code: 3745
Rev: 06/06
Page 4

Demonstrates cross cultural sensitivity and understanding. Identifies and seeks to solve problems and prevent or resolve conflict situations. Encourages others through positive reinforcement. Models appropriate behavior. Recognizes and develops potential in others; mentors.

**Communication Skills**: Receives, attends to, interprets, and responds to verbal messages and expresses information to individuals or groups effectively.

Receives other cues such as body language in ways that are appropriate to listeners and situations. Takes into account the audience and nature of the information; listens to others, attends to nonverbal cues, and responds appropriately. May make oral presentations. Communicates ideas, suggestions, and concerns, as well as outcomes and progress throughout the process of an activity. Provides thorough and accurate information.

**Self-Development**: Adapts behavior or work methods in response to new information, changing conditions, or unexpected obstacles.

Seeks efficient learning techniques to acquire and apply new knowledge and skills; uses training, feedback, or other opportunities for self-learning and development. Develops and enhances skills to adapt to changing organizational needs. Remains open to change and new information and ideas.

**TECHNICAL COMPETENCIES:**

**Assessment**: Assigns cases to Social Workers to determine the social needs of children and adults.

Supervises and is administratively in charge of the area of service and the area social workers. Gathers relevant data. Identifies, assesses, and analyzes information. Communicates effectively with family. Conducts intake interviews and refers for public assistance, family, and children services, and related services. Investigates immediately all reports of neglect, abuse, or exploitation of children.

**Social Work Supervision**: Coordinates a group of social workers engaged in providing and securing appropriate social services

Provides technical assistance to social workers. Ensures maintenance of acceptable standards of social work practice in geographic area of responsibility. Provides in-service and on-the-job training. Assists county staffs in the development and utilization of resources necessary for carrying out programs. Develops and maintains a plan and program of service for each family applying for or receiving support. Refers clients to agencies that provide services enabling heads of families or older children within the family to become self-supporting members of society. Discusses family planning with families and individuals as needed. Assists those wishing such services to find and utilize appropriate resources. Assists families and individuals in planning and securing appropriate services related to their social, medical, financial, child care, home management, and emotional needs.

**Placement Supervision**: Supplies protective and placement services for homeless, dependent, or neglected children.

Places and supervises children requiring foster home placement. Recruits, studies, and recommends foster homes for approval. Initiates placement of neglected, abused, or exploited of children as needed.

**Case Management:** Supervises social workers engaged in managing caseloads of children or vulnerable adults.

Ensures accurate documentation of all cases. Remains on-call on a 24-hour basis. Prepares reports documenting information on a step-by-step basis. Prepares reports and trend analyses on the operations of geographic area of responsibility. Assists the area social workers in difficult cases when needed. Assists social workers in preparing for court. Testifies in court. Conducts home studies for placement purposes.

## MANAGEMENT COMPETENCIES:

**Emotional Maturity:** Conducts oneself in a professional, consistent manner when representing the organization.

Has the ability to work through adversity and hold self and others accountable for work actions.

**Macro Oriented:** Exercises good judgment; makes sound, well-informed decisions.

Understands and appropriately applies procedures, requirements, and regulations related to specialized areas of expertise.

**Working Through Others:** Supports, motivates, and is an advocate for staff.

Reinforces and rewards team efforts and positive behaviors. Is fair, yet firm with others. Monitors workloads and provides feedback.

**Results Oriented:** Plans effectively to achieve or exceed goals; sets and meets deadlines.

## ESSENTIAL FUNCTIONS:

**Additional essential functions may be identified and included by the hiring agency. The essential functions include, but are not limited to, the following:**

1.    Provides supervisory and administrative duties for social workers and general clerks.

2.    Provides technical assistance to county staff for various problems.

3.    Reviews and improves client services.

## EXAMPLES OF WORK:

**Examples of work performed in this classification include, but are not limited to, the following:**

Ensures maintenance of acceptable standards of social work practice in geographic area of responsibility.

Supervises and is administratively in charge of the area of service and the area social workers.

Provides performance evaluations and performance improvement plans as needed.
Provides in-service and on-the-job training.

Assists the area social workers in difficult cases when needed, particularly where life/health, public contact, and community organization are concerned.

Class Specification
Occu Code: 3745
Rev: 06/06
Page 6

Prepares reports and trend analyses on the operations of geographic area of responsibility.

Makes presentations to community, civic, and church groups on abuse/neglect and other timely topics.

Assists county staffs in the development and utilization of resources necessary for carrying out programs.

Performs related or similar duties as required or assigned.

**INTERVIEW REQUIREMENTS:**

Any candidate who is called to an agency for an interview must notify the interviewing agency in writing of any reasonable accommodation needed prior to the date of the interview.

**Ex. 14**

Mississippi Department of Human Services
Division of Family and Children's Services

**WORKER and SUPERVISOR QUALIFICATION PLAN**

**Settlement Agreement Requirements**:

b. Worker and Supervisor Qualifications (pg. 5)

    1)    DFCS shall hire only foster care workers who have an advanced degree in social work or a comparable human services field, or a B.A. in social work or a comparable human service field with two years of related experience.  Should the related COA standards change, the new COA worker qualifications will govern.

    2)    DFCS shall hire or promote to the position of caseworker supervisor only persons with an advanced degree in social work or a comparable human service field and two years of experience working with children and families, preferably in foster care.  Should the related COA standards change, the new COA caseworker supervisor qualifications standards will govern.

**Workload and Staffing Analysis**:

January 2010

Overview:  Total DFCS PINs (Includes all PINs allocated to DFCS)

Permanent PINs Available: 938     Permanent PINs Filled: 716     Permanent PINs Vacant:  222

Time Limited PINs Available: 266     Time Limited PINs Filled: 212     Time Limited PINs Vacant: 54

Current:  Front line Position Summary:

| OCCUPATIONAL TITLE | TOTAL POSITION | FILLED POSITION | VACANT POSITION | PERCENT |
|---|---|---|---|---|
| DHS-Family Protection Worker I | 134 | 81 | 53 | 40% |
| DHS-Family Protection Worker II | 51 | 47 | 4 | 8% |
| DHS-Family Protection Specialist | 383 | 356 | 27 | 7% |
| DHS-Family Protection Specialist, Sr. | 33 | 25 | 8 | 24% |
| DHS-Family Protection Specialist, Adv. | 172 | 124 | 48 | 28% |
| **Totals** | **773** | **633** | **140** | **18%** |

ASWS Positions:     137 Filled     10 vacant

1

**Professional Enhancement** :

A Professional Enhancement Plan was developed and implemented Fall Semester 2008. The first reimbursement to students was made for Fall Semester 2008.

This Plan provided for reimbursement of tuition and books for DFCS staff, who meet requirements, who pursue a master's degree in social work. Requirements include successful completion of the class or classes and the submission of supporting documentation.

The Professional Enhancement Plan further involved working with universities in the state to create targeted cohorts of child welfare professionals. Three universities are now in partnership contracts with DFCS in an effort to encourage higher education attainment pursuit by the DFCS Child Welfare Staff. The University of Mississippi, the University of Southern Mississippi and Jackson State University currently partner in this project. The universities have developed specialized MSW cohorts that meet on compressed days (every other Monday or Friday) and/or meet on nights/late afternoon or weekends to allow their students (our employees) to continue to work full time and attend school. DFCS workers participating in the Professional Enhancement Program commit to working for DFCS for time periods in accordance with amounts of total reimbursement.

The universities are also working closely with DFCS to specialize field placements within the Agency for our employees (their students) that will serve to expand and deepen the capacity of our agency and the learning experience of their students. A splinter effect of this initiative has been an increased level of communication and involvement between DFCS and the University Partner.

DFCS is actively seeking social work interns. The partnership is making DFCS much more visible in the social work programs across the state.

The following chart indicates the number of employees receiving reimbursement for tuition and books. All are working toward their MSW degrees.

| | |
|---|---|
| Fall Semester 2008 - | 4 |
| Spring Semester 2009 - | 12 |
| Summer Semester 2009 | 16 |
| Fall Semester 2009 - | 40 |
| Spring Semester 2010 (est) | 47 |

DFCS now has 175 employees who indicate that they are currently enrolled in school. Of these, 123 are seeking Master of Social Work Degrees.

39 ASWS's are currently enrolled in school
65 ASWS's are either currently enrolled in school or plan to enroll in school

2

Anticipated dates of graduation:

      2010 (5)

      2011 (5)

      2012 (19)

      2013 (18)

      47 ASWSs indicated an anticipated graduation date.

      18 ASWSs who plan to return to school did not indicate an anticipated graduation date.

<u>Note:</u>

Of the 65 ASWS's who do not have a "higher degree" as required by the Settlement Agreement:

      10 will have MSWs by 2011

      29 will have MSWs by 2012

      47 will have MSWs by 2013

Based on the graduation dates of the 47 ASWS's who listed a date, DFCS will reduce the number of non-master's level ASWS to:

      82 in 2010

      77 in 2011

      58 in 2012

      40 in 2013

**Caseworker/Supervisor Qualifications:**

The Settlement Agreement directs DFCS (by the end of the Agreement) to hire or promote to the position of caseworker supervisor only those persons with advanced degrees in social work or with a comparable human services field plus two years of experience working with children and families, preferably in foster care.  Should the related COA standards change, the new COA caseworker supervisor qualifications standards will govern.

DFCS has been hiring only those with 2+ years experience, licensed at least at LSW level and either has a master's degree, is enrolled in a master's degree program or has in place a definite plan of enrollment in a master's degree program. (Effective: Fall Semester 2009)

The reasoning behind this is that DFCS would like to continue to foster the education of our current state child welfare employees and provide promotional opportunities for those staff willing to pursue this higher degree and commit to remaining employed with DFCS for a specified time period.

The next phase will be to hire only those with a Master's degree and a license to practice social work. (Effective:  Fall 2010)

ASWS current status:

Of 124 ASWS positions, including 5 acting ASWSs:

      22 have Master's degrees and LMSW license.
      12 have a Master's degree and a LSW license.
      87 have no master's degree but do have a LSW License.
          65 of these are in school or plan to return to school
          22 of these do not indicate a plan to return to school
      3 have neither a Master's degree nor a license and none plan to return to school
          (2 in IIE and I in IIIN)

**Foster Care Worker Qualifications:**

The Settlement Agreement requires that DFCS hire only foster care workers who have advanced degrees in social work or a comparable human services field, or a B.A. in social work or a comparable human service field with two years of related experience. Should the related COA standards change, the new COA worker qualifications will govern.

DFCS moved toward the hiring of social work degreed staff. (Effective: October 1, 2009) Consideration was given to those applying who were enrolled in an MSW program or had evidence of planned enrollment. (Exceptions were made for critical needs counties.)

DFCS is practicing intense screening and evaluation of every application for direct service provision. Emphasis at this time is being placed on the hiring of licensed, social work degreed staff. (Effective: January 1, 2010) (Exceptions may be granted on a case by case basis in the most critical needs counties.)

DFCS plans to request changing existing vacant FPW-I and FPW-II PINs to the Family Protection Specialist Series, which requires a degree in social work (Effective: July 1, 2011) and requesting elimination of the hiring of FPW-I and FPW-II series .

      825: Total staff in the Regions
      568: Total staff available to carry caseloads
          Of these, 403 have degrees in social work and are licensed or are eligible to
          become licensed.

DFCS representatives have been meeting regularly with the University Consortium members and NASW regarding the numbers of "unlicensed" social work degreed employees DFCS now employs. NASW has agreed to explore alternate licensing routes. DFCS is communicating with its university partners regarding the need for the universities to produce graduates who can pass the licensure exam. DFCS will continue these efforts.

4

**Workforce Development Plans:**

- Recruit degreed, licensed staff with heavy emphasis on solid internship placements

- Heavy recruitment strategies in critical needs counties
          (most severely understaffed Regions:  VII-W, VII-E, V-E)

- Use part time positions to fill gaps in coastal counties - for resource development

- Continue professional enhancement program – reimburse cost of education

- Pursue realignment package for social work line of workers / retention

- Interview and selection – improve practice in these areas

- Improve/Enhance training provided to new hires

- Offer more training opportunities to current staff

- Move away from the hiring of related degrees

- Move away from the hiring of social work degreed applicants with no license.

- Enhance training to supervisors and provide strengthened ongoing training to supervisors

- Continue partnership/contractual agreements with universities

- Raise the penetration rate -- to draw down IVE training dollars

January 21, 2010

**Ex. 15**



Total MDHS/DFCS Agency Positions as of May 31, 2010, by Status
[Prepared by the Office of the Court Monitor Based on Data Provided by DFCS Personnel Unit]
Number of Positions
900
800
700
600
500
400
300
200
100
0
Total Filled Positions = 1008
Total Vacant Positions = 196
TOTAL POSITIONS = 1204
5 or Fewer Total Positions Per Position Title
Vacant
Filled
620
142
66
25
28
16
16
13
10
9
8
6
3
4
3
4
3
4
3
1
2
1
1
2
2
2
2
1
1
1
1
1
1
1
1
1
1
1
1
Caseworker
Area Social Work Supervisor
CLERK TYPIST SENIOR
DHS-PROGRAM SPECIALIST
DHS-HOMEMAKER
SECRETARY PRINCIPAL
PROJECTS OFFICER IV,SPECIAL
SOCIAL SERVICES REGIONAL DIR
DHS-PROGRAM MANAGER
DIVISION DIRECTOR II
SOCIAL WORKER AIDE
DHS-FAMILY PROTECTION TNG COORD
SOCIAL WORK CONSULTANT
CLERK
BUREAU DIRECTOR II
DHS-PROGRAM ADMINISTRATOR
DHS-PROGRAM ADMOR SR
BUSINESS SYSTEMS ANALYST I
DHS-FINANCIAL COORDINATOR
ACCOUNTING CLERK
SYSTEMS ADMINISTRATOR II
ADMIN ASSISTANT IV
SENIOR BUSINESS SYSTEMS ANALYST
PROJECTS OFFICER II,SPECIAL
ADMIN ASSISTANT V
CLERK TYPIST
OFFICE DIRECTOR II
DIVISION DIRECTOR I
OP/MGMT ANALYST SENIOR
PROJECTS OFFICER III,SPECIAL
DHS-FAMILY PROTECTION TNG DIR
DATABASE ANALYST II
PROPERTY OFFICER IV
DHS-DEPUTY ADMINISTRATOR
STAFF OFFICER II
SENIOR NETWORK SPECIALIST
SYSTEMS MANAGER II
SENIOR PROGRAMMER ANALYST
BUREAU DIRECTOR I
LEAD PROGRAMMER ANALYST
BUSINESS SYSTEMS ANALYST II
Position

**Ex. 16**



**Number of Employees Working for MDHS/DFCS on May 31, 2010 Hired by State Between May 1, 2009 and April 30, 2010, by Year, Month, and Position***

[Prepared by the Office of the Court Monitor Based on Data Provided by DFCS Personnel Unit]

Total Employees Hired = 184

Percentage of Workforce on May 31, 2010 Hired During Period 2 = 18%

* Data reflect only personnel employed by DFCS on May 31, 2010 hired by the State between May 1, 2009 and April 30, 2010. Personnel who assumed their positions at DFCS during the period but were previously emplyed by the State in a different capacity do not appear in the totals because these data were not available from MDHS/DFCS.

**Ex. 17**

Mississippi, Volume IV
Section A
Revised October 2009                                                              Page 1024

# ADMINISTRATION
# STAFF DEVELOPMENT/TRAINING

**POLICY**

All DFCS staff shall receive orientation to the Department of Human Services, Division of Family and Children's Services, pre-service training, and in-service training in accordance with the policies of the Department of Human Services, the Division of Family and Children's Services and State and Federal rules, regulations, and laws. As employees accept new assignments, they must complete all new professional development and training associated with the new assignment.

**DEFINITIONS**

DFCS training programs shall be designed to meet the wide range and variety of training needs of the staff to ensure the continuation of a highly qualified and competent DFCS workforce.

- **On-the Job Training** (OJT) – This training includes training in the techniques, procedures, and skills essential to a particular position and is the responsibility of the immediate supervisor or his/her designee. It will include shadowing of seasoned staff.

- **Pre-service Training –** This training is competency based and tested at the end of the four weeks of training. It is required prior to assuming any assigned job duties. This training is done in conjunction with the OJT training.

- **On-going Training –**This is formal job related training that provides opportunities for learning and skill enhancement. It includes educational courses, workshops, and seminars.

Mississippi, Volume IV
Section A
Revised October 2009                                                    Page 1025


# ADMINISTRATION
# STAFF DEVELOPMENT/TRAINING


## STAFF DEVELOPMENT/TRAINING REQUIREMENTS

All new caseworkers and Area Social Work Supervisors hired by DFCS shall receive a
minimum of 270 hours of pre-service training, including instructional training and
supervised field training, prior to assuming any assigned job duties.  Any caseworker or
Area Social Work Supervisor who returns to the agency after a period of separation of
more than 12 months will be required to complete the 270 hours of pre-service training
prior to being allowed to assume responsibility for a caseload or supervisory duties.

The Director of Family and Children's Services has the authority to consider exceptions,
and document the justification for those exceptions in the employee's training record.

All Area Social Work Supervisors hired or promoted by DFCS shall complete the MDHS
State Personnel Board Child Welfare Supervisory Training course prior to assuming any
supervisory responsibilities.


## NEW EMPLOYEE ORIENTATION

Within the first months of employment, a new employee will be oriented to the mission,
philosophy, goals, and services of the Mississippi Department of Human Services'
Division of Family and Children's Services. The employee's supervisor or his/her
designee will orient the employee to the agency's place in the community, the cultural
and socioeconomic characteristics of the clients we serve, and the chain of command
within the agency. The employee will be provided with the Mississippi State Employee
Handbook and the new hire On-the-Job Training Manual. During this time the
employee's supervisor and/or his/her designee will provide on-the-job training.

Mississippi, Volume IV
Section A
Revised October 2009                                                 Page 1026

# ADMINISTRATION
# STAFF DEVELOPMENT/TRAINING

## PRE-SERVICE TRAINING / CWPD TRAINING

Within the first three months of employment, a new DFCS employee must attend the
Child Welfare Professional Development Training. This training is four weeks of
intensive training that addresses:

- Core Professional Relationship Skills in the Child Welfare Setting
- Assessment in the Child Welfare Setting
- Case Planning and Family Engagement in the Child Welfare Setting
- Working with Sexually Abused Children and their Families in the Child Welfare
  Setting

This training is competency based and will be tested at the end of the 4 weeks of
instructional training. Trainees must receive a score of 70 or above on the competency
based test. Should they fail to make a 70 on the exam they will be given another
opportunity to take the exam. If they are still not able to successfully pass the exam after
their second attempt, they will no longer be eligible for their position.

## CWPD ELIGIBILITY/ ATTENDANCE REQUIREMENTS

In order to be eligible to attend the CWPD training a new employee must meet the
following CWPD training eligibility requirements:

- New employee must complete three weeks of on-the-job training or have been a
  student intern within the last six months or has previously been employed by the
  Division of Family and Children's Services as a contract provider within the last
  six months.

- New employee must have an assigned and active Mississippi Automated Child
  Welfare System (MACWIS) number.

Mississippi, Volume IV
Section A
Revised October 2009                                                     Page 1027

# ADMINISTRATION
## STAFF DEVELOPMENT/TRAINING

**CWPD EILIGIBILITY/ ATTENDANCE REQUIREMENTS (Continued)**

When the new employee meets these requirements, the Regional Director, Area Social
Work Supervisor or his/her designee will complete the Regional New Hire Listing and
forward it to the Regional Training Coordinator. In the event the Regional Training
Coordinator position is vacant the form should be forwarded to the DFCS Training
Director. All fields on the Regional New Hire Listing must be complete (the "start date"
is the date the individual reported to work and the "name of the individual shadowed"
should include all individuals involved in mentoring the new employee). The form must
be received by the Regional Training Coordinator or Training Director a minimum of ten
working days prior to the 1st day of training in order for the new employee to be
considered for the specific workshop. If special accommodations are required for a new
employee, the Regional Training Coordinator should be notified at the time of the
Regional New Hire Listing submission. Should over night lodging be required, the new
employee should complete the "Training Unit Hotel Reservation Request Form" and
forward it to the Regional Training Coordinator.

**STAFF DEVELOPMENT /ON-GOING TRAINING**

All caseworkers are required to obtain a minimum of 40 hours of on-going job-related
training annually in order to remain eligible for their position. Caseworkers are to
understand it is their obligation to maintain proficiency in the performance of their job
duties by attending professional trainings and/or workshops. They should further
understand it is their responsibility to submit verification of such training to the DFCS
Training Unit. Failure on the part of the caseworker to complete the 40 hours of annual
training for any reason will be grounds for termination of employment.

All Area Social Work Supervisors are required to obtain a minimum of 24 hours of on-
going in-service training annually to remain eligible for their position. Supervisors are to
understand it is their obligations to maintain proficiency in the performance of their job
duties by attending professional trainings and/or workshops. It is the responsibility of
supervisors to submit verification of such training to the DFCS Training Unit. Failure on
their part to complete the 24 hours of annual training for any reason will be grounds for
termination of employment. No supervisory personnel shall be detailed to the Training
Unit as an instructor; however, supervisory personnel are expected to mentor all staff
they supervise.

Mississippi, Volume IV
Section A
Revised October 2009                                                          Page 1028

# ADMINISTRATION
# STAFF DEVELOPMENT/TRAINING

## STAFF DEVELOPMENT /ON-GOING TRAINING (Contd.)

The following agency- sponsored trainings are mandatory for all DFCS workers
annually:
- Non-Violent Crisis Intervention Training
- Age Appropriate Passenger Restraints System Training
- Blood-borne Pathogens

All other DFCS personnel shall annually receive, at a minimum, one training opportunity
related to his or her job functions.

## STAFF DEVELOPMENT / TRAINING REQUEST

Employees are encouraged to attend on-going training courses, workshops, and seminars
from sources outside the Agency. These training opportunities should be directly related
to an employee's present job duties and responsibilities or those which reasonably could
be expected to be related in the near future.

An employee planning to attend staff development training not provided by the agency is
required to submit a Travel Authorization (Form MDHS-AF-13-20-20) at least two (2)
weeks in advance to his/her immediate supervisor. The supervisor will then forward the
form to the Regional Director for approval /disapproval.

The Regional Director will review the Form MDHS-AF-13-20-20 for accuracy and
compliance with policy and, when necessary, will consult with the DFCS Training
Director with respect to items in question prior to approval.

## FINANCIAL OBLIGATION/PAYMENTS/REIMBURSEMENT

The Regional Director is authorized to approve any request for On-going Staff
Development/Training for time only. Any staff development/training requiring the
expenditure of funds must be submitted to the employee's immediate supervisor, who
will forward it to the Regional Director, who will forward it to the Division Director for
final approval.

Mississippi, Volume IV
Section A
Revised October 2009                                                  Page 1029

# ADMINISTRATION
# STAFF DEVELOPMENT/TRAINING

DFCS may pay for all or any part of training costs, depending on the availability of funds as authorized by the Family and Children's Services' Division Director. Requests for reimbursement of approved expenses for staff development/training should be submitted with the proper documentation in a timely manner and in accordance with MDHS-Administrative Policy 19.

## STAFF DEVELOPMENT/ ON-GOING TRAINING WAIVER REQUEST

With the exception of job orientation for new employees, the DFCS Training Director may issue a waiver for any course of study validated (e.g. BSW and MSW course of study) as meeting the DFCS requirements of on-going training. The employee must be enrolled in an accredited college, university, or a school in candidacy for CSWE status and the course must be above the employee's current academic status in order to be considered. An employee must submit his/her request for a waiver in writing to his/her supervisor for review. The request must include the course title, name of the college, university, or school, course dates, certificate of completion with a final grade of "B" or better, course description and objectives and number of academic semester hours. If the employee's request meets the requirements, the supervisor will forward the request to the DFCS Training Director for approval.

## DOCUMENTATION OF STAFF DEVELOPMENT/TRAINING

Copies of  any proof of staff development training (i.e., training hours required by profession, DFCS required or mandatory training, record of MSW college course completion, certificate of completion, course certifications i.e., First Aid, CPR, AIDS training etc.) shall be forwarded to the Regional Training Coordinator for documentation to ensure credit for professional development training hours.  Do Not Send Originals of any proof of training to the Regional Training Coordinator .   The Originals should be kept in the employee's file.

Mississippi, Volume IV
Section A
Revised October 2009                                          Page 1030

# ADMINISTRATION
# STAFF DEVELOPMENT/TRAINING

**PROFESSIONAL ENHANCEMENT SCHOLARSHIP QUALIFICATIONS**

**Prior to applying for the Professional Enhancement Scholarship (P E Scholarship) the employee should read the Administrative Policy Manual, AP-7.**  The MDHS-PER-214 form and instructions for the Cover/Justification letter are located in the AP-7. The application process must be completed for each semester.

To be eligible for consideration for the scholarship program, an employee must have a current PAR rating of at least 2.0 and at least three years of full-time continuous employment with the Agency immediately prior to making application.  The three year employment requirement with the Agency may be waived for an applicant for part-time graduate level education and will be considered on a case-by-case basis.  All DFCS employees are encouraged to apply irregardless of their length of employment with the Agency.  The employee must be seeking a degree in Social Work.

**PROFESSIONAL ENHANCEMENT SCHOLARSHIP REQUIREMENTS**

Applications will be accepted three times per year.  The following deadlines must be adhered to, or your application may be denied:
- The First Week in April for Summer Semester
- The First Week in July for Fall Semester
- The First Week in November for Spring Semester

The application packet for the P E Scholarship must include:
- MDHS-PER-214 form with original signatures signed in blue ink
- MDHS-PER-214 form must be signed by the applicant and immediate supervisor.
- MDHS-PER-214 form must be approved or disapproved by the supervisor
- Cover/Justification Letter
- Current PAR rating with a copy of the 800-1 form
- Copy of Admissions Letter if first semester of attendance

Mississippi, Volume IV
Section A
Revised October 2009                                                        Page 1031

# ADMINISTRATION
# STAFF DEVELOPMENT/TRAINING

**PROFESSIONAL ENHANCEMENT SCHOLARSHIP REQUIREMENTS (cont.)**

Applicants will be notified in writing.  Notification may not be received until close to the end of the award semester.  The notification letter will contain the Agency's decision and additional information if warranted.  Please read and follow the instructions in your letter.  If an employee is awarded a P E Scholarship the employee will need to read the contract thoroughly prior to submitting **an original and three copies** of the following documents.  Paper clip each set individually (no staples).  You will be given a deadline which you must adhere to, or your reimbursement may be denied.

- Your grade report (a minimum of a "B" average is required for each semester)
- Itemized receipts for tuition, fees, and books with proof of payment
- Signed and notarized Contract
- Memo or letter stating amounts and type of reimbursements requested (no copies needed)

The payback for the P E Scholarship begins the day the employee graduates.  Agency obligation is one (1) year for $3,999 or less,  two (2) years for $4,000-9,999,  three (3) years for $10,000-15,999, four (4) years for $16,000-21,999, and five (5) years for $22,000- and above.  The applicant should read the Contract for instructions regarding repayment if an employee becomes ineligible or is terminated from either the Professional Enhancement Program or the Mississippi Department of Human Services' Division of Family and Children's Services.

Application packets (after signature of immediate supervisor) and scholarship contract packets must be submitted directly to the Educational Liaison.  Supervisors should review application packets for completeness and accuracy prior to signing.

**Ex. 18**

# 2010 TRAINING UNIT PLAN
# DIVISION OF FAMILY AND CHILDREN'S SERVICES

The Mississippi Department of Human Services, through the Division of Family and Children's Services Training Unit, provides a training and professional development program which prepares DFCS personnel to assume their responsibilities and enhances their knowledge, skills, and abilities through many training opportunities offered within the unit.

The Training Unit currently consists of a Director, six Training Coordinators, one Program Specialist, one Curriculum Designer, one Educational Liaison, one eLearning Manager, Special Projects Officer and a Clerk Typist Senior.  A seventh Training Coordinator has been recommended through Human Resources.  In an effort to close in the gaps DFCS will utilize a Training Team that consists of the Training Coordinator, the Regional ASWS and a Regional Family Protection Specialist Advanced.  The Training Team will work to ensure that all staff has ample training opportunities in each region.

The following responsibilities are carried out by the Training Unit:

- Provide pre-service training for all DFCS new hires within 90 days of the hire date, and prior to their assuming their responsibilities
- Provide pre-service training for all newly hired or promoted supervisors prior to their assuming any supervisory responsibilities
- Provide fiscal training for all newly hired DFCS clerical staff and caseworkers.
- Provide MACWIS training as part of the pre-service training and a MACWIS Refresher course to follow up and reinforce learning.
- Provide ongoing training for county workers, state office staff, resource workers, all ASWSs, and regional directors
- Update curriculum as needed when new policies and practice guides are issued
- Manage Professional Enhancement Program to encourage staff to seek graduate social work education
- Liaise with university schools of social work for recruitment of trained social workers to the agency
- Publish monthly DFCS Training Unit newsletter
- Maintain standard of excellence in all training to meet NASW standards for designated providers
- Continuously assess training needs
- Ensure documentation in MACWIS of all Training Sessions for each participant
- Coordinate the COA Training & Supervision Workgroup to ensure deliverables are completed and ready for submission

- Special Projects have included CFSR, IV-E PIP and Court Improvement Activities

Training Currently Provided:
- Pre-service training for all DFCS new hires – mandatory 4 week training classes (2 groups run concurrently)
- MACWIS Training – both introductory course and a MACWIS Refresher
- Training for all newly hired DFCS clerical staff
- Supervisory training for all newly hired DFCS Supervisors and those preparing to become supervisors, conducted in cooperation with the State Personnel Board (Basic Supervisory Course)
- Level I Supervisory Training (One-on-One Mentoring model)
- Level II Supervisory Training (Learning Labs model) for supervisors (provided by USM Training Academy)
- Court Improvement- Advanced Professional Development for Court Procedures
- Court Improvement – ICPC, IV-E, Uniform Rules of Youth Court Practice
- Child and Families Services Review Training
- Bloodborne Pathogens – Universal Precautions for Working With Children is presented to new hires during Week IV.
- Non-Violent Crisis Intervention Training is provided to all staff by the MDHS Human Resources Staff Development Program

Scheduled Training
- Quality Visits Training from the National Resource Center for Permanency and Family Connections
- Adoption Competency Training from the National Resource Center for Adoption

The DFCS Training Unit has a key role in the implementation of the newly released Practice Model which is to begin implementation in 2010. Additional staff positions will be filled to assist with the training of staff in the regions where the Practice Model will be implemented. In addition, there will need to be a review and revision of all training curriculum to reflect the Practice Model. Support staff will be hired as needed in the counties to coincide with the implementation of the Practice Model. The specified support staff will coach and mentor the new counties during the beginning phase of implementation.

Training Unit staff review the Training Program on an ongoing basis, and it is revised as needed, with an assessment of the agency's training needs through interviews with the state office program staff, evaluations of training sessions completed by the participants and an annual survey which is sent to all DFCS employees to provide feedback about job satisfaction and training needs.

2

We anticipate the new eLearning Program will be ready for implementation in 2010 and think this will be a great tool for workers and supervisors to utilize for enhancement of their knowledge, skills and practice.  The eLearning will be cost effective as workers will be able to access it from their offices and will not have to travel to a training site.  This will be a supplement to on-site offerings and will enable workers to learn at their own speed.  Approval will be sought from the social work licensing board to enable staff that are licensed social workers to obtain 20 hours of social work CE's through eLearning. In addition to child welfare related topics, it will offer courses on business and professional related items as well as software skills courses.

## SHORT TERM GOALS – WITHIN THE NEXT 6 MONTHS

- To maximize successful delivery of on-going training, The Deputy for Family and Children's Services has approved a plan to have a Training Team in each region that includes the Training Coordinator, the Regional ASWSs and Regional Family Protection Specialists Advanced. The Regional ASWS and Regional Family Protection Specialists Advanced have been providing training to the field staff in the OJT segment of the pre-service training and the Child Welfare Supervisory Training Level One.  This role is being expanded at this time to include providing on-going training opportunities within regions.   Neither of these positions carries a caseload nor supervises other staff.
- The Training Coordinators' primary responsibility will be to continue to coordinate the pre-service training for new workers.
- Social Work Consultants will be hired to be the lead trainers of the Practice Model in the various regions as the Practice Model is implemented.
- Continue to update CWPD curriculum as new policies are issued and to include the Practice Model.
- Continue to have concurrent Pre-Service training classes, beginning every other month as needed.
- Delivery of training to all county and regional staff on Quality Visits, using curriculum from the National Center for Permanency and Family Connections. The NRC will conduct a Facilitator's Training including a coaching session with each team that consists of a Training Coordinator, Regional ASWS and FPS Advanced.
- Conduct a Facilitator's Training session for the Regional ASWSs and Regional Family Protection Specialists Advanced on the advanced curriculum which is to be used for ongoing training of staff.
- Delivery of training to regional resource units in Child Assessment and Preparation and Family Assessment and Preparation, using curriculum from the National Resource Center for Adoption.
- Develop and deliver job orientation for the Regional Directors and the Field Directors.

- Continue to deliver Supervisory Course in collaboration with Mississippi State Personnel Board.
- Develop a training curriculum for Supervisor's Training for MACWIS that reinforces supervisory case review and investigation staffing skills and the appropriate documentation in MACWIS.  Regional Directors can be included in this training.
- Continue to have quarterly staff meetings of training unit staff and weekly individual conferences.
- Continue with development of eLearning program.
- Continue to partner with the Universities for specialized training for staff and supervisors.  This includes the collaboration of the Learning Labs provided by the USM Training Academy.
- Collaborate with other states to determine an on-going training that meets the same COA and Settlement requirements that the Non-Violent Crisis Training meets.  Once a curriculum is approved, the Training Team will receive instructor training and begin offering the training annually in each region to all DFCS staff.
- Establish a month for the consistent refresher training of all staff on Universal Precautions for Working with Children.
- Establish annual refresher training on Age Appropriate Passenger Restraints System and ensure that all new workers receive the initial training.


## LONG TERM GOALS

- Regular staff meetings of training unit staff held quarterly
- Deliver 40 hours of in-service training to county workers and 24 hours to ASWSs annually.
-  Annual written plan of training offerings with topics to be delivered each month in each region
- A training calendar will be issued quarterly via the Training Newsletter outlining the pre-service and in-service trainings available to DFCS staff, with details re: location, date, time, etc.
- eLearning will be fully functional, enabling staff to obtain some of the required training without traveling away from their offices.
- Continue to develop and deliver curriculum on required and pertinent topics for skill-building of all DFCS staff.
- Training Coordinators will be skilled trainers who will inspire workers with enthusiasm and the desire to do the best job they can in working with families and children.
- Tracking system for training that will enable workers, supervisors and training unit staff to determine which workers have received all the required hours of training.

- Offer training to mental health professionals state wide on the impact of neglect and abuse on children in the child welfare system, including separation and attachment issues as they pertain to foster children.
- Establish a process for consistent evaluation and immediate feedback to Trainers regarding trainer competencies such as: communication, conceptual knowledge/skills, self-management, group process and instructional management.

12/14/09
MAE

5

**Ex. 19**



**Months Between Hiring and Start of Training Reported by Caseworkers
Hired Between May 1, 2009 and February 16, 2010, by Region***

(Prepared by the Office of the Court Monitor)

*Hiring data provided to the Court Monitor on February 17, 2010 by MDHS Personnel Unit. Analysis based on 40 telephone interviews conducted by the Office of the Court Monitor with 40 of the 152 caseworkers hired between May 1, 2009 and February 16, 2010.

**Ex. 20**



**Reported Work Assignments for Caseworkers Hired Between May 1, 2009 and February 16, 2010 Prior to Completion of Training***

**(Prepared by the Office of the Court Monitor)**

*Hiring data provided to the Court Monitor on February 17, 2010 by MDHS Personnel Unit. Analysis based on 40 telephone interviews conducted by the Office of the Court Monitor with 40 of the 152 caseworkers hired between May 1, 2009 and February 16, 2010.

**Ex. 21**

## *Practice Guidelines on Documenting Caseworker Visits with Children*

Caseworker visits with children are a key indicator for ensuring the safety and well-being for all children in care. To support the Olivia Y settlement agreement and the practice model, DCFS is working on validating this data report in MACWIS, so ASWS's, Regional Directors, and other key stakeholders will have an accurate gauge of the extent to which children are being seen by COR and COS workers in any given month. To help ensure consistency among workers, below are some guidelines on how these visits should be captured and documented in MACWIS.

This report is numbered MWZC5D2 and is located on the P: Drive in the reports folder where it is developed monthly. Caseworkers are being asked to review the report as it pertains to their work, and verify the face to face visit information it contains May 17, 2010. Moving forward, please use these guidelines when documenting caseworker visits in MACWIS.

Location of Visit
- ♦ Please ensure that all visits are labeled with a location
- ♦ Do not label a visit as a 'home' visit unless the worker actually enters the home. Dropping a child off outside or spending time outside the house (front porch, etc) should be labeled as an 'other' visit

Participants
- ♦ If an event is an attempted contact, do not list the child as a participant.
- ♦ If the child is not present, they should not be listed as a participant
- ♦ If the event is a 'foster parent contact' or a 'parent contact' and the children happen to be in the house, do not list them as a participant in this contact, as that is not the intended focus of the event. The worker most likely will have interaction with the child, and label a face to face visit with the child separately.

Type of Visit
- ♦ If a child is being transported to a visit (family, parent child, etc) by the worker, the worker then monitors the visit, and then transports the child home, this should not be labeled as 3 separate visits.

General Documentation Points
- ♦ Ideally, a child's name should be listed as a participant only once per event in a single day, unless there is a completely separate event being captured. Please see the examples below:

    Example 1: Worker picks up child at school, and transports child to a family visit at the office. While the child has been seen in two separate venues/capacities, this is one event, and child should be listed as a participant only once.

<u>Example 2</u>: Worker visits with child after IL class. Later that night, child is taken to the emergency room, and worker visits with child in hospital. This is 2 separate events, and it should captured as such.

♦ If someone is listed as a participant in a face to face event, then the narrative text should reflect at a minimum an observation of each participant.

♦ While more time consuming, narratives should never be copied and pasted from one visit to the next. If the event is not distinct enough to warrant a new narrative description, it shouldn't be labeled as a separate event.

♦ Please note policy states narratives should be entered into MACWIS within 5 days of the event. This is to ensure that the information is accurately reflected in the report.

**Ex. 22**

# SECTION V:  CONTINUOUS QUALITY IMPROVEMENT (CQI) RECOMMENDATIONS

## *Purposes and background of the CQI recommendations*

We are making recommendations for the MDHS Continuous Quality Improvement (CQI) process in conjunction with the practice model because monitoring is a central feature of the model.   In describing each component of the practice model, we have reviewed current monitoring processes for the extent to which they addressed and reinforced the components, identified strengths and gaps in existing monitoring processes, identified performance indicators that we recommend for monitoring each component, and described some of the key roles and responsibilities of the Department's leadership, supervisors, and CQI staff pertaining to monitoring the practice model.

Achieving the full implementation of the practice model is not likely to occur without a great deal of support and reinforcement for staff in the field.  The use of monitoring processes that operate in a non-punitive reinforcing manner will help staff retain a focus on the key practices and outcomes that comprise the practice model.  Similarly, defining supervisory oversight roles in ways that complement formal monitoring processes will help ensure that reinforcement of practices in the model will occur on a regular basis and not just when scheduled CQI reviews occur.

Since MDHS does not currently have an existing CQI process in place and is required by the terms of the *Olivia Y* settlement agreement and COA standards to implement one, it makes sense to develop the monitoring process in conjunction with the practice model and put it into place as the practice model is rolled out in the regions.  The reason for this is that the monitoring process should mirror the practices that the Department expects of staff in the field, i.e., we should monitor for the things we want to reinforce.  As the practices are implemented from region to region, the concurrent implementation of CQI in those regions will provide an integrated means of reinforcing and supporting the practice.  It will also provide a baseline of performance and a means of gauging progress in implementing the practice model and achieving improved outcomes for children and families.

The *Olivia Y* settlement agreement requires that the Department's CQI system become the means of monitoring performance upon termination of the implementation plan for the agreement.[1] Therefore, we are making recommendations that will assist the Department in conforming to the monitoring requirements of the settlement agreement.  Further, the agreement (at Section VII-C) requires the monitor to determine that the Department's CQI system is adequately monitoring a number of plan provisions prior to transferring monitoring responsibility to CQI.  Later in this section, we provide a crosswalk of those plan provisions to the monitoring components of our recommended CQI process.  Although our recommendations are not for CQI to be a highly legalistic, compliance-based process, but rather a reinforcing supportive process for practice in

---

[1] Mississippi Settlement Agreement and Reform Plan, Section VI-G.

the field, we understand the legal requirements of the settlement agreement for CQI and are attempting to ensure that our recommendations are consistent with the requirements in the agreement.

As MDHS is pursuing accreditation through the Council on Accreditation (COA) as part of the implementation of the *Olivia Y* settlement agreement, we are also taking care to crosswalk the COA accreditation standards with our recommended approach to the CQI process. The chart later in this section illustrates the crosswalk.

**Characteristics of CQI**

Our recommendations call for a CQI process that includes the following characteristics:

- *CQI should reinforce positive practice at the case level.* We suggest that the CQI process serve as a means of reinforcing the practices within the practice model, which also addresses the many requirements of the settlement agreement, COA standards, and the CFSR. By making a clear connection between practice and monitoring, MDHS will have a much stronger opportunity to improve practice and outcomes. Monitoring should also be conducted in ways that provide constructive case-specific feedback to staff in addition to providing higher level analyses of information, in order to help staff understand the relationship between their practice and the outcomes for children and families. Monitoring should serve a supportive, helpful function to staff rather than being a compliance-based exercise that does not directly benefit workers in the field in their daily work.

- *CQI should provide analysis of findings at a high enough level to inform the ongoing development and maintenance of the practice model.* In addition to case-level feedback, the aggregated findings of CQI at county, regional, and statewide levels should be sufficient for the Department's leadership to determine whether goals are being attained, what factors are supporting or inhibiting goal attainment, and whether changes to the model or systemic factors need to be implemented to stay on course.

- *CQI should evaluate the capacity of the system to support quality casework practice.* In addition to monitoring practice and outcomes, the CQI process should also monitor for the effectiveness of systemic factors, such as training, policy, resources, and caseloads to support practice that is consistent with the practice model. It should provide information to the MDHS administration that will be useful in decision making, resource allocation, and technical assistance initiatives.

- *CQI should be an inclusive process.* In order to be effective and thoroughly integrated into the Department's operations, CQI should reach all levels of MDHS staff and should include stakeholders outside of the Department as well as inside. Both the statewide and local practice model implementation teams should have some responsibility for receiving and reviewing CQI information, and for providing some measure of oversight for the implementation of required program improvement plans resulting from the CQI reviews.

- *CQI should be coordinated with other oversight and review processes and improvement efforts.*  The CQI system should be broad enough to include other monitoring activities, such as the Foster Care Review (FCR) process, Federal CFSR and title IV-E eligibility reviews, and the oversight of the *Olivia Y* court monitor.  The goals and objectives of the various oversight processes should be similar in focus and approach, and the goals, objectives, and activities associated with improvement strategies resulting from any of the reviews should be coordinated around the goals of systemic change within MDHS.  Also, in order to address other CQI reporting requirements, there should be coordination with the MDHS units responsible for financial management, foster care licensure, and contracting, since these units will have information needed for the State CQI reports.

- *CQI should be focused on identifying strengths and needs of practice and supports and making needed improvements.*  As a result of the CQI reviews, both the strengths and needs of the agency's practice and systemic supports should be identified and described.  Where the need is indicated, County Departments should be required to develop and implement program improvement plans that address areas needing improvement in the CQI process.  Counties should be held accountable for implementing needed improvements, with some oversight responsibility provided by the local practice model implementation teams in addition to State Office administrative oversight.

- *CQI should be integrated into the ongoing work of staff in County Departments, rather than being regarded as a special or periodic effort.*  Although the State CQI unit will only have the capacity to conduct formal reviews of each County Department at periodic intervals, there should be processes in place between State Office reviews that ensure monitoring on a frequent basis.  While monitoring is built into supervisory roles and responsibilities, more defined and formal monitoring activities should occur frequently and similarly to State CQI reviews.

- *CQI should focus on accountability and improvement.*  The ultimate objective of CQI should be to improve practice and outcomes.  The information from CQI reviews should identify both the strengths and areas needing improvement within county practice and systemic factors, and should guide the development of program improvement plans that address areas needing improvement.  A system of accountability for addressing needed improvements should be integral to the CQI plan.  The analysis of information collected through CQI should help to identify associations among practice, systemic factors, and outcomes that can be used statewide and locally to develop effective improvement strategies.  Further, as the systemic reforms evolve over time, the CQI information should be used to make any needed adjustments in the State's approach to implementing the practice model.

## What CQI monitors

We recommend that the State CQI reviews consist of a review of information from multiple sources, including data reports that track individual performance indicators at the county, regional, and statewide levels, and an onsite review that includes case reviews of families served by the county/region, supplemented by interviews with key parties to each case.  The onsite reviews should also include interviews with stakeholders internal and external to MDHS in order

to evaluate the systemic capacity of the county/region to support practice consistent with the practice model. A more detailed discussion of these components of the CQI reviews follows below.

In order to be effective at improving outcomes for children and families, CQI should monitor *quantitative information* that provides data on the status of identified indicators, such as numbers of children and families served in various ways, the time frames for critical activities and goal achievement, and the level of available resources. It should also monitor *qualitative information* in order to provide information on how well children and families are served, how appropriate various interventions are, and how the values and principles underlying the practice model are integrated into casework practice. Reviewing for one or the other will only provide a partial view of interventions and outcomes for children and families.

**Quantitative information**

Although there are many concerns about the validity and reliability of data reported through the MACWIS system, it is imperative that the CQI system have access to aggregate data to monitor and evaluate indicators and outcomes. While some of the concerns about data and reports in the MACWIS system are attributable to the capacity of MACWIS itself, some issues with regard to the quality of data are attributable to data entry by users (or lack thereof). When the data become the sources of information used to evaluate performance through CQI, it is likely that some of the user concerns may be addressed and will help to increase the accuracy and reliability of MACWIS information.

Among the critical reports needed at statewide and county levels (this is not intended to be an exhaustive list), are the following:

- Reports reflecting outcomes for children in foster care, including the Federal CFSR indicators. This information is needed to track progress in meeting Federal review requirements and in evaluating outcomes associated with the practice model, such as:
  - Time to permanency through adoption, reunification and other permanency outcomes
  - Stability for children in foster care (numbers of placement settings and reasons for moves)
  - Safety of children in-home and in foster care (initial and recurrent maltreatment, and maltreatment in foster care)

- Process-oriented reports that indicate the extent to which improved practices are actually reaching the children and families served by MDHS, such as:
  - Numbers of families with family team meetings
  - Frequency of caseworker visits and with which family members
  - Caseloads of caseworkers in County Departments
  - Screenings and assessments completed
  - Permanency plans completed within 30 days of foster care entry
  - Dates of case plans/updates, reviews, hearings

- Reports that identify the status of children relative to identified outcomes, such as:
  - o Children for whom petitions to terminate parental rights petitions have been filed and/or for whom exceptions have been documented in the case file
  - o Length of stay in foster care
  - o Educational status

- Reports that describe the population of children and families served by MDHS, such as:
  - o Families served in-home and in foster care
  - o Demographic characteristics of families and children
  - o Children in placement by placement types and location
  - o Children served through various programs such as independent living, shelter care, hospitalization
  - o Children served according to special needs (in foster care and in home)
  - o Medications provided to children under MDHS care and supervision

- Reports of services provided to children and families, such as:
  - o Reunification services
  - o Medical, dental, and mental health care
  - o Independent living services
  - o Therapeutic services

In using quantitative data to evaluate performance, the system needs the capacity to produce reports that reflect not only point-in-time data on the child welfare population, but also foster care entry cohort profiles. This information will be especially useful in evaluating the extent to which the implementation of the practice model is having the desired effects on outcomes. The production and longitudinal analysis of foster care entry cohorts will provide a basis for determining if the outcomes and experiences of children newly entering foster care in counties that have implemented the practice model differ notably from the cohorts of children who entered foster care either prior to the practice model or in counties that have not yet implemented the model. These data will help local implementation/CQI teams, administrators, and other staff and stakeholders evaluate their efforts over time relative to the practice model and use the information to make needed adjustments in strategies, resources, and so forth.

It is very important that the reports are produced for individual counties and for regions within the State, so that administrators and CQI liaisons may track performance over time and make informed decisions about resource development, program improvement efforts, technical assistance, and so forth. It should be a prominent role of Regional Directors and ASWSs to review county and regional-level reports routinely, to address them in staff meetings, and with local CQI teams, in order to evaluate performance, consistency of practice with the practice model, and monitor the resources needed for effective child welfare practice.

**Qualitative information**

In combination with qualitative information, the CQI system should review for the quality of interventions with children and families, the services they receive, and the adequacy of the systemic supports. The primary means of collecting and reviewing this information should be

through regular case reviews that sample families receiving in-home and foster care services, and through structured interviews with individuals that have first-hand knowledge of the issues under review.

An underlying value attached to our recommendations regarding qualitative information is that children and families served by the child welfare system should have a voice in how they are served. Although providing children and families with the opportunity to voice their concerns, strengths, needs, and preferences regarding services is very important, it does not imply that the agency abdicates its legal responsibilities to protect children and to carry out its legal responsibilities. It simply means that case planning and service delivery are often more effective when they are based on information provided directly by children and families. When the CQI process demonstrates the importance of family input into how they are served, it should serve as reinforcement for including children and families in the actual practice of case planning and service delivery.

Case reviews should cover, at a minimum, the six practice areas included in the practice model, with specific indicators that address the activities and interventions associated with each component. For example, in reviewing for the *involving children and parents in case planning and decision making* component of the practice model, the case reviews should include:

- How effectively relevant family members are included in assessment activities;
- How effectively critical events such as family team meetings occur at the appropriate times;
- How effectively the appropriate family members were identified and supported in attending meetings;
- Whether relevant parties, including foster caretakers are notified of events, such as case planning meetings, FCR meetings, other reviews and hearings, etc.;
- How effectively and timely the information in the meetings was used to inform the case plan or decisions being made;
- How effectively the critical issues related to achieving the permanency plan were appropriately addressed;
- How effectively the relevant family members are involved in changes to plans and activities over time; and,
- How effectively parents are involved in carrying out parenting responsibilities while their children are in foster care.

In developing the specific indicators to be monitored for each component, the CQI unit may reference the crosswalk of *Olivia Y* and CFSR requirements and COA standards included in Appendix A.

*Case level information:* CQI should monitor for the effectiveness of casework practice at the individual case level. In order to be as accurate as possible in evaluating practice, reviews should include information obtained from documented case files, but also from interviews with parents, children, foster caretakers, service providers, and caseworkers. Together, the information should provide an accurate description of how well each of the six practice model components functions within the individual case. In addition to the information needed to

evaluate conformity with the practice model, the review of individual cases should also include indicators that pertain to Federal or State requirements not specifically identified within the practice model.

Cases reviewed should include both in-home and foster care cases. Although most of the requirements of the *Olivia Y* settlement agreement pertain specifically to foster care services, the practice model is intended to guide casework practice in both in-home and foster care cases. In order to promote application of the practice model across all cases, those cases monitored should be selected randomly and in proportion to the size of the county being reviewed. For example, a larger county will have more cases reviewed than a smaller county. The CQI unit, once established, will need to develop detailed sampling guidance that includes case selection criteria, numbers of cases to be reviewed by type and size of county, and so forth.

Where families and children are served through purchased services, the quality of those services, the fit of the services to identified needs, and the accountability and responsiveness of service providers should be part of the case review process.

*Systemic factors:* In evaluating systemic performance, the CQI system should gauge the capacity of the child welfare "system" to support interventions with children and families that are consistent with the practice model and to help them achieve positive outcomes. Among the systemic factors that should be monitored are:

- *Training of staff and providers.* CQI should conduct evaluations of the extent to which pre-service and ongoing training are being provided and are providing the skills needed for staff and providers to carry out their roles and responsibilities.

- *Service array.* CQI should evaluate the extent, accessibility, flexibility, and responsiveness of the State and local service array to address the individualized needs of children and families on a routine basis, and should identify gaps in the service array.

- *Placement resources.* CQI should evaluate the array, accessibility, and responsiveness of the foster care placement options within the counties to meet the individualized placement needs of children in foster care, and identify gaps.

- *Caseloads.* CQI should monitor the conformity of county departments to caseload standards and supervisory ratios.

- *Oversight and monitoring.* CQI should evaluate the effectiveness of supervision and administration in monitoring and reinforcing practice that is consistent with the practice model and in providing the necessary systemic supports. It should also monitor for the functioning and effectiveness of local CQI processes in place.

- *Court processes.* CQI should review the effectiveness of court-related procedures, such as holding timely and meaningful reviews and hearings, notifying appropriate parties of proceedings, filing for TPR timely, and so forth.

- *Data Quality and Usage.* CQI should monitor the accuracy and thoroughness of MACWIS data at the county level, particularly given the Department's reliance on MACWIS data to determine if critical benchmarks of progress have been made, and to evaluate the outcomes of practice.

In each county/regional onsite review, CQI reviewers should interview the appropriate stakeholders who have first-hand knowledge of these systemic areas, and should review supporting documentation. For example, in evaluating the *service array* systemic factor, reviewers should interview service providers, caseworkers, supervisors, and consumers to determine the extent to which needed services are in place, are readily accessible to children and families, and can be tailored to meet their individualized needs. Information derived from case reviews on the provision of services should be used to supplement information from the stakeholder interviews.

The CQI reports of county/regional reviews should identify the findings of case reviews and data reports as well as findings pertaining to systemic factors. Although these systemic factors are relevant to most all of the practice model components, CQI should ensure that the systemic factors that pertain to each individual component are reviewed.

For example, in reviewing for *involving children and parents in case planning and decision making,* CQI should take care to review:

- The provision of pre-service and ongoing training of staff and supervisors in this area of practice;
- The provision of training to providers to support family involvement in case planning and decision making, and in sharing parenting responsibilities while children are in foster care;
- Notification processes for including parties in case planning meetings, hearings, and reviews;
- The oversight of casework practice pertaining to this component; and
- Services available to support family and caretaker involvement in case planning and decision making.

*Consumer satisfaction:* Evaluating consumer satisfaction with their experience with the agency and providers is one of the COA standards for a CQI process. Currently, the Foster Care Review process includes a consumer satisfaction survey, and we recommend that the information from these surveys be used to evaluate consumer satisfaction for families involved in foster care services. We recommend that a similar satisfaction survey be developed for families receiving in-home services and administered as part of the State and local CQI review process. Together, information from both sources should be compiled and described in CQI reports. Both surveys should include satisfaction with the agency's responsiveness to the child's and family's needs and also with the responsiveness of any relevant service providers. Although consumer satisfaction is not always an indicator of the agency's effectiveness, it is an important source of information in identifying the strengths and needs of casework practice and service provision.

### *Structure of CQI*

In our recommendations, we refer to counties and regions alternatively. Since MDHS administers its child welfare services under the direction of Regional Directors responsible for multiple counties, it is probably reasonable to carry out CQI functions regionally also. With 82 counties in the State, many of which have small child welfare populations, it may not be reasonable for State CQI to review each individual county routinely. Therefore, we recommend that the State CQI consider reviewing smaller counties within regions as a cluster, rather than individually, and conduct individual county reviews in the more urban and highly populated counties. For example, within an individual region consisting of nine counties, the reviews might consist of an individual review of the larger urban county and two reviews consisting of cluster of three smaller counties each. In order to address individual differences in performance among counties, county-specific data reports and stakeholder interviews should be used where clustered reviews occur.

Our recommendations on the structure of the CQI process include the following components:

- State Office CQI Unit
- Local (county) CQI processes
- State CQI Team (that is either the State level practice model implementation team or a sub-group thereof)
- Local CQI Teams (that are either the county practice model implementation teams or a sub-group thereof)

Descriptions of the functions of each of these components are as follows:

### State Office CQI Unit

Although there is a distinct function of the Foster Care Review process and it fulfills a Federal requirement to review the case plans of children in foster care every six months, it is the closest process that MDHS has to a quality assurance process in place. It has also taken on additional responsibilities that are more akin to quality assurance than strictly to foster care review. Since both FCR and CQI will be reviewing cases of children and families served by MDHS on an ongoing basis, we recommend that they be co-located organizationally within the State Office and in the regions. This will ensure complementarity of functions, avoidance of duplicated effort, and consolidation of findings into comprehensive reports that describe the status of children and families served by MDHS.

We recommend that the State Office CQI unit maintain responsibility for coordinating CQI work statewide and specifically carry out the following responsibilities:

- Developing and updating the instruments and tools needed to carry out CQI responsibilities, such as review tools, procedures manual, sampling criteria, and so forth;
- Conduct regular CQI reviews of County Departments of Human Services;
- Provide training to participants on the CQI process, including State and local participants;

- Provide case-level feedback to county staff on cases reviewed, and provide feedback to supervisors and administrators on county-wide performance, and to State-level staff on county, regional, and statewide performance;
- Analyze the findings of reviews, including qualitative and quantitative analyses, and compile results into periodic reports that identify the strengths and areas needing improvement identified in the reviews;
- Assist Regional Directors in reviewing and approving county program improvement plans resulting from the reviews, and in determining if the goals and progress measures identified in the plans have been achieved;
- Ensuring that other oversight and monitoring functions within MDHS are coordinated and aligned; and,
- Conduct special studies as needed or requested to evaluate performance and outcomes in specific areas.

We recommend that staffing of the State Office CQI unit include, at a minimum, a manager, a data analyst, a report writer, and CQI liaisons to each of the MDHS 13 regions. This is in addition to FCR staff. We are basing these recommendations on the need to have adequate capacity to reinforce the practice model effectively within regions and statewide. In order to coordinate the functions of the Foster Care Review process, we also recommend that FCR reviewers be based in each region with the CQI liaisons.

Given the nature of CQI as the monitor of quality practice, the CQI manager should be an individual with recognized expertise in child welfare practice, requirements, and measurement techniques. County staff will need to be confident that their work is being reviewed professionally and objectively, and the manager will be one of the most visible representatives of the review process. Because of the ties between CQI and the practice model, the CQI manager should also be someone who is strongly committed to the practices and underlying values of the model, who can articulate them effectively, and has the communication skills to help staff at all levels, along with community stakeholders, make the connections among values, practices, and outcomes.

In order to identify correlations and associations between practice and outcomes, and thus to reinforce the practices that support more positive outcomes, there is a need for a data analyst to review results, run analyses, and identify strengths and needs for inclusion in CQI reports and other feedback. The data analyst should have an in-depth understanding of child welfare practice issues, and should also be skilled in analytical tools such as SPSS, SAS, or comparable analytical software. The analysis of data and qualitative information obtained from the reviews will be essential in making CQI findings useful to the field and of value to the Department's administration.

The local CQI liaisons are essential if CQI is to be integrated into the routine work of staff in County Departments. There will be a need for interim CQI review activity in counties and regions between formal State reviews, and the liaisons should be charged with facilitating those processes. The regional CQI liaisons can also serve in reviewer roles in reviews of other counties/regions in the State. CQI should not be viewed as a State vs. county process, but as an integrated function that concerns all MDHS staff. Local liaisons should help to facilitate that

view of CQI by working closely with Regional Directors and ASWSs to make needed improvements in practice and capacity. At the same time, having the local liaisons report to the State CQI unit will provide uniformity in monitoring and reinforcing the components of the practice model, and in ensuring that all counties implement the requirements of the settlement agreement consistently.

Because of the emphasis on feedback in our CQI recommendations, a report writer who is devoted to providing timely and relevant information on the CQI reviews will greatly assist County Departments and the State Office in using CQI information. Without a dedicated report writer, the likelihood of incurring delays in providing for detailed feedback is high, as other staff of the CQI unit will be involved in ongoing reviews. A relatively short time frame should be in place to produce and disseminate written reports following the review of a County Department, e.g., 45-60 days, so as to maintain momentum generated by the reviews.

The staff of the CQI unit will be directly involved in identifying needs for improvement in child welfare practice and assisting in developing and monitoring improvement plans and activities, and therefore should be recognized as knowledgeable in child welfare practice issues within the Department. Seasoned staff members that are articulate with regard to the practice model and its underlying values will be valuable in promoting the kind of CQI process that leads to improved practices and outcomes, and will encourage staff in the field to view CQI as a helpful and supportive process and to trust the feedback that comes from the reviews. Also, because CQI will examine practice and systemic factors across the range of MDHS programs and interventions, staff should have a broad base of experience and knowledge that crosses program lines within child welfare.

**Local CQI processes**

In order for CQI to be integrated into the routine work within counties and regions, it is necessary to have more frequent CQI activity locally to supplement formal State CQI activities. We recommend that MDHS adopt a process of ongoing reviews in each county following the same basic protocols of State CQI reviews, and facilitated by the local CQI liaisons. There are at least two options that we recommend the State consider in choosing how to conduct ongoing local CQI reviews.

*Option 1: County CQI committees*
In this option, local committees composed primarily of volunteers from the counties meet at least monthly to review selected cases, using the CQI protocol. Volunteers may include stakeholders in the child welfare system, foster parents, youth and parents served by the agency in the past, law enforcement officials, educational representatives, or interested community residents, including former DHS staff where appropriate. In order to help ensure that county staff participate in the CQI process and are connected to improvement efforts within the county, county child welfare staff should serve on the county CQI committees on a rotating basis.

The local CQI liaison could facilitate monthly meetings and the review process, which should include random case selection of a number of cases to be determined by MDHS in accordance with the size of the county. For example, in many rural counties of the State, the committee

might review one randomly selected case per month, while in the more highly populated counties it might review up to 4 or 5 cases per month. Over time, the findings from the cases reviewed by the CQI committee could be incorporated into formal State CQI reviews for a broad view of practice in the counties over time.

An emphasis should be placed on using the committee to support staff in decision-making and offering constructive feedback on interventions, so as to help staff view the process as positive and helpful in improving practice. Direct and prompt feedback should always be provided to caseworkers and supervisors whose cases are selected for review. Committees should also conduct follow-up reviews or request status reports on how their recommendations have been addressed in the cases reviewed.

*Option 2: Peer review*

In this option, a team of peer reviewers, i.e., supervisors and/or caseworkers, would review randomly selected cases from another caseload using the CQI protocol. Since the concept of peer review is not new to MDHS staff, this option might be preferable to the Department. It would assist in including a broader range of staff in the CQI process over time, and help staff reviewing cases to become more knowledgeable of how to practice in accordance with the practice model themselves.

In a peer review approach, it is preferable to have staff review cases from counties other than their own but within their regions. This would permit more objectivity in the reviews while permitting the local CQI liaisons to arrange reviews regionally and support practice improvements within the region, particularly as the implementation of the practice model is occurring at a regional level.

**Other CQI Components**

*Supervisory protocols for case reviews*

Supervision is an important aspect of assuring high quality casework practice. While the supervisor fulfills roles other than assuring quality of work, supervisory reviews of cases should be consistent with CQI in helping to ensure that the practices within the model are implemented effectively. Therefore, we recommend the development of a supervisory review protocol that reflects the components of the practice model and is designed to offer staff constructive feedback on their interventions with children and families.

As the implementation of the practice model is rolled out, technical assistance should be provided to support supervisors and strengthen their capacity in reviewing for the components of the practice model, providing feedback to staff, and reinforcing the practices in the model.

*CQI Procedures Manual*

A procedures manual is needed to define CQI procedures, roles, and responsibilities clearly and to provide guidance on topics such as case reviews, case sampling procedures, feedback processes, development of reports, use of CQI findings to develop program improvement plans, and logistical issues in CQI.

*CQI Training*

Training at various levels is important to ensuring that CQI processes and functions are clearly understood and executed. Training of CQI unit staff will be central to consistent implementation of review activities, especially if liaisons are to be based regionally instead of centrally. Training of all staff is needed to orient them to the purposes of CQI and their roles in the process, and should be incorporated into pre-service training for casework staff. Similarly, training should be provided to supervisors and administrators on their roles in reviewing cases and reports, monitoring performance, providing effective feedback, and using CQI information in decision-making and management practices. Depending upon which option MDHS chooses for local CQI activities, training of peer reviewers and/or local CQI committees on the completion of a review will be needed.

*Process for coordinating various reviews and planning activities*

A defined process for ensuring that the functions of the Foster Care Reviews and CQI are well coordinated logistically and functionally is important. The two processes should be viewed as complementary, with both focused on improving the quality of practice and outcomes even though the FCR meets a specific review requirement for oversight of case plans of children in foster care.

*Review of incidents, accidents, and grievances*

COA standards require that CQI monitor incidents, accidents, and grievances with regard to child welfare services. We recommend that MDHS develop a clear definition of the incidents and accidents that fall within the monitoring and reporting responsibility of CQI. For example, deaths, near deaths, and serious injuries to children under the Department's care and responsibility should be included in this definition. As well, similar incidents regarding children for whom MDHS has an open service case or a recently closed case should be included in the definition. All grievances received by MDHS from consumers and stakeholders should be included in the definition.

We recommend that the regional CQI liaisons assume responsibility for tracking such incidents, accidents, and grievances. Regional Directors and ASWSs should have the responsibility for resolving concerns raised, but tracking and monitoring of the receipt of information and how the issues were resolved should reside with CQI. Locally, each CQI liaison should agree with the Regional Directors an ASWSs on a process for providing the CQI liaison with information as it is received, and each CQI liaison should have an internal process for tracking and following up on the investigation and resolution of issues reported within their regions.

Unless there is another body charged with the responsibility for investigating reports of child deaths, near deaths, and/or serious injuries, we recommend that the local CQI committees review these incidents/accidents. If there is another body charged with this responsibility, we recommend that a representative of the local CQI committee either participates in the review of the incident/accident or that the written report of the investigation by the authorized review body be provided to the local CQI committee and CQI liaison.

Where trends are identified within counties or regions, CQI liaisons should bring the information to the attention of Regional Directors for addressing through improvement strategies. We recommend that the CQI liaisons issue quarterly reports to Regional Directors, local and State CQI committees, and the State Office on the status of incidents, grievances, and accidents within their regions. If there are situations where concerns about incidents, accidents, and grievances constitute a pattern of concerns, the CQI liaison should recommend to the local CQI committee and Regional Director that a special study into the area of concern be conducted, in which case the CQI unit may take on that responsibility.

### *Implementation Plan*

We recommend that the State CQI reviews roll out concurrently with the implementation of the practice model, in order to make clear the connections between practice, monitoring, and outcomes. By designing a CQI process that tracks the practice model, the reviews will become a primary means of supporting and reinforcing the practices in the model. They will also provide a means for MDHS to gauge its success in actually changing practice and meeting the benchmarks of progress set forth in the settlement agreement.

As indicated in the implementation section of the practice model, we recommend that MDHS conduct a baseline CQI review of counties/regions as they begin implementation of the practice model. This will provide a basis for measuring progress and should also identify where technical assistance is needed the most to support changes in practice and systemic factors. Approximately, one year after the county/region has begun implementation activities, we recommend that a follow-up CQI review occur to identify early progress and barriers, and to inform any changes needed in the implementation plan for the county. The time line chart in the implementation section illustrates the sequence in which the baseline and follow-up CQI reviews should occur. Afterwards, the counties/regions implementing the practice model should be placed on a rotating review schedule with others in the State.

An approximate example of the schedule of State CQI reviews that might occur during the implementation phases follows:

| Months 1-8 | Months 9-16 | Months 17-24 | Months 25-32 | Months 33-40 | Months 41-48 |
|---|---|---|---|---|---|
| Baseline reviews in group one | | Follow up reviews in group one | | | |
| | Baseline reviews in group two | | Follow-up reviews in group two | | |
| | | Baseline reviews in group three | | Follow-up reviews in group three | |
| | | | Baseline reviews in group four | | Follow-up reviews group four |
| | | | | Baseline | Follow- |

| | | | | reviews in group five | | up in group five |
|---|---|---|---|---|---|---|

As State CQI reviews are being implemented in counties/regions according to their implementation schedule, local CQI activities may be implemented concurrently within counties and regions not yet beginning the practice model. This will serve a dual purpose of providing CQI activities in all counties early and also helping to prepare counties/regions in the latter stages of the practice model schedule for implementing the practices within the model.

We recognize that MDHS may not be able to staff CQI as we have recommended fully in the beginning. Phasing in of CQI activities with the rollout of the practice model may help in addressing immediate staffing issues by permitting the Department to gradually staff up to full capacity.

### Reports and feedback

Providing timely and useful feedback will be essential to making use of CQI findings to gauge progress and make needed improvements. We recommend CQI reports and feedback at several levels, as follows:

- *Individual caseworker feedback:* Caseworkers will naturally have some concerns about the oversight responsibilities of CQI reviewers and committees. In order to make the process as constructive as possible, we recommend that CQI reviewers (from local CQI teams and State CQI reviewers) provide immediate feedback to caseworkers and supervisors whose cases are reviewed. Feedback can be verbal and should include an identification of strengths and weaknesses in the review findings, and helpful recommendations about how practice might be improved. Where serious concerns emerge for child safety, permanency, or well being emerge through reviews, each local CQI committee and State CQI should have a protocol for notifying responsible parties and requesting immediate action.

- *County/regional feedback on reviews:* Following State CQI reviews and at intervals in local CQI teams' review activities, verbal feedback should be provided to administrators that identifies strengths and weaknesses in practice and systemic functioning. Administrators should be fully engaged in review activities and receive the benefits of immediate feedback in order to monitor performance and systemic capacity within the scope of their responsibilities.

- *County/regional reports of CQI reviews:* Written reports of State CQI reviews should be provided promptly to counties, Regional Directors, State MDHS staff, county/regional implementation and CQI teams, and to the State implementation and CQI teams. The reports should describe the strengths and weaknesses of practice and systemic capacity identified in the reviews, along with recommendations for needed improvements. Where responsibilities for making needed improvements lie with stakeholders outside of MDHS, those needs should also be clearly identified in the reports. At periodic intervals, local CQI committees should also summarize the findings of their reviews for the same purposes.

- *State CQI report:*  At least every six months, we recommend that State CQI issue a comprehensive report of its findings from reviews conducted during the preceding six-month period[2], along with the status of counties/regions in the State on performance indicators identified through data and other reports.  These reports should have a broad distribution within and outside MDHS, including the Department's administration and external stakeholders, particularly advisory groups and implementation teams at the State and local levels.  The State CQI report should include information from sources other than CQI reviews that also evaluate performance, such as the findings of the Foster Care Reviews, other State and Federal reviews/audits, and pertinent findings from the Court Monitor's reviews.  A combined report of monitoring efforts across MDHS will present a more comprehensive picture of the status of children and families served by the Department than only reporting on the findings of CQI reviews.

   A number of requirements that should be included in the State CQI report are addressed by the FCR process and reports, and that information will be needed for the State CQI reports. Further, in order to address reporting requirements for other functions and processes not directly monitored by CQI, there should be coordination and information sharing with the MDHS units responsible for financial management (for information on expenditures of Federal funds), foster care licensure (for information on licensing issues and child safety while in foster care), and contracting (for information on contractors' compliance with settlement agreement provisions), all of which should be included in the State CQI reports.

- *Dashboard data reports:*  A number of States have implemented "dashboard" data reports that provide current data on a small number of selected performance indicators to staff and stakeholders on a frequent basis.  These reports permit frequent and updated tracking of outcomes for children and families statewide and locally more often than comprehensive CQI reports.  We recommend that CQI adopt some type of reporting similar to this concept that reaches all levels of MDHS, including front-line staff.  The data indicators identified for inclusion in the reports should be relevant to the work of the staff in the field, e.g., the CFSR data indicators, and should be county-specific and comparable to statewide performance so that staff can easily see how their performance and outcomes compare to the State's performance and outcomes.  One possible way of disseminating this information is to develop the report as an opening screen when staff sign into MACWIS and update it monthly or quarterly.  A process for disseminating it to the Department's key stakeholders should also be identified, ideally by posting the statewide reports on the Department's website. Using data in this way should also have some effect on the quality of data entered into the MACWIS system.

---

[2] The *Olivia Y* settlement agreement requires six month public reports following the transfer to monitoring responsibility to CQI, so we are recommending that six month reports be issued from the beginning. However, absent this six-month requirement in the settlement agreement, we would most likely recommend annual reports given our recommended CQI focus on quality improvement and the time needed in general to realize results from improvement strategies, i.e., meaningful changes in performance and outcomes are more likely to be detected annually rather than every six months.

### Accountability

The findings of CQI should be used to guide improvement activities where needs are identified. We recommend that counties/regions be required to develop and implement program improvement plans that reflect the findings of CQI reviews, beginning with the follow-up reviews after the first year of implementing the practice model, and continuing thereafter. The CQI reviews should help counties/regions identify practice and systemic issues needing attention to achieve and sustain improved practice. Regional Directors and local CQI liaisons, in collaboration with local CQI teams, should develop a plan with specific strategies and time frames for addressing identified needs, subject to the approval of the State CQI unit.

The process of monitoring the implementation of program improvement plans should lie with the Regional Director and local CQI team, and the State MDHS should institute a process for ensuring accountability to implement the plans and make needed improvements, e.g., ties to performance evaluations.

MDHS should make technical assistance available to counties/regions in developing effective strategies to make improvements and in implementing the strategies. Where possible, peer assistance from within MDHS should be used in order to share knowledge and capacity across counties and regions, and to build internal capacity to sustain progress over time. For example, counties/regions that have made strides in one area might assist other counties/regions struggling in those same areas. External technical assistance should also be provided where it is needed.

As MDHS identifies its strengths and needs through the CQI process, goals and activities of improvement efforts should be aligned with the goals and activities of other major initiatives, including compliance with the *Olivia Y* settlement agreement, COA standards, the State's five-year Child and Family Service Plan, the State's IV-E plan, and CFSR program improvement plans. In involving the courts in these efforts, and in complying with Federal requirements, the goals and activities resulting from CQI should also be coordinated with Mississippi's Court Improvement Program plan.

As MDHS moves forward toward implementing all of the requirements of the settlement agreement, the accreditation standards, and the CFSR, the CQI process should serve as the vehicle for keeping the core practices, values, and principles in front of staff at all levels. If implemented properly and supported, it will become the Department's main source of sustaining the progress that it makes over time.

### Conformity to Olivia Y monitoring requirements

The first chart that follows cross-references the *Olivia Y* plan provisions that the court monitor must ensure that the CQI process is monitoring adequately prior to transferring monitoring responsibility to CQI at the termination of the implementation plan.

### Conformity to COA standards

The second chart that follows cross-references the requirements of the COA standards to provisions included here for the CQI plan. MDHS will still need to complete an official plan for submission to COA that includes some details not included here, but this represents our recommendations for the basic structure and functioning of the CQI process.

## Crosswalk of Olivia Y Monitoring Requirements to CQI Recommendations

| Olivia Y Plan Reference | Olivia Y Plan Requirement | CQI Recommendation |
|---|---|---|
| II.A.1 | Agency leadership (qualified director) | Report changes in State CQI report |
| II.A.2.a | Workforce (caseload standards) | Included in *Caseloads* systemic factor in CQI reviews |
| II.A.2.b | Worker and supervisor qualifications | |
| II.A.2.c | Training (training unit, pre-service, ongoing training) | Included in *Training* systemic factor in CQI reviews |
| II.A.2.d | Contract agency requirements | Coordinated reporting with licensure unit in CQI reports |
| II.A.3 | Performance and quality improvement | Included in *Monitoring and Oversight* systemic factor in CQI reviews |
| II.A.4 | Legal and regulatory compliance | Coordination with FCR reviews, which evaluate Federal foster care requirements; CQI reviews for CFSR requirements |
| II.A.5 | Information management and use | Included in *Data Quality and Usage* systemic factor in CQI reviews |
| II.A.6 | Case recordings | Case reviews are included in all CQI reviews; report in local CQI reports |
| II.A.7 | Financial management | Coordinated reporting with financial management division in CQI reports |
| II.B.1 | Screening and assessments | Included in CQI case reviews (*Strengths and Needs Assessments* component of practice model) |
| II.B.2 | Service planning and monitoring | Included in CQI case reviews (*Involving Children and Parents in Case Planning and Decision Making* component of practice model) |
| II.B.3.a | Permanency plan | Included in CQI case reviews (*Individualized Case Planning* component of practice model), plus coordination with FCR reviews of plans of all children in foster care |
| II.B.3.b | Concurrent planning | Included in CQI case reviews (*Individualized Case Planning* component) |
| II.B.3.c | Permanency plan updating and review | Function carried out by FCR process; coordinated reporting with FCR reviews of all children in foster care in State CQI report |
| II.B.3.d | Reunification services | Included in CQI case reviews (*Involving Children and Parents in Case Planning and Decision Making* and *Mobilizing Appropriate Services Timely* components of practice model) |

**Mississippi Practice Model**

| | | |
|---|---|---|
| II.B.3.e | Termination of parental rights | Included in CQI case reviews (*Individualized Case Planning* component of practice model); coordinated reporting with FCR reviews in State CQI report |
| II.B.3.f | Adoption | Included in CQI case reviews (*Individualized Case Planning* and *Mobilizing Appropriate Services Timely* components of practice model) |
| II.B.4 | Child safety | Included in CQI case reviews (*Safety Assurance and Risk Management* component of practice model); coordinated reporting with licensure unit on reports of maltreatment in foster care |
| II.B.5 | Child placement | Included in CQI case reviews (*Strengths and Needs Assessments, Individualized Case Planning,* and *Mobilizing Appropriate Services Timely* components of practice model); resource issues included in *Placement Resources* systemic factor of CQI reviews; coordinated reporting with FCR reviews in State CQI report |
| II.B.6 | Developing and maintaining connections | Included in CQI case reviews (*Preserving Relationships and Connections* component of practice model) |
| II.B.7 | Physical and mental health care | Included in CQI case reviews (*Strengths and Needs Assessments* and *Mobilizing Appropriate Services Timely* components of practice model) |
| II.B.8 | Educational services | Included in CQI case reviews (*Strengths and Needs Assessments, Preserving Relationships and Connections,* and *Mobilizing Appropriate Services Timely* components of practice model) |
| II.B.9 | Therapeutic services | Included in CQI case reviews (*Strengths and Needs Assessments, Individualized Case Planning,* and *Mobilizing Appropriate Services Timely* components of practice model); resources monitored through *Service Array* systemic factor in CQI reviews |
| II.B.10 | Worker contact and monitoring | Included in CQI case reviews (*Involving Children and Parents in Decision Making and Case Activities* component of practice model) |
| II.B.11 | Transition to independent living | Included in CQI case reviews (*Strengths and Needs Assessments, Individualized Case Planning,* and *Mobilizing Appropriate Services Timely* components of practice model) |
| II.B.12 | Case closure and aftercare | Included in CQI case reviews (*Strengths and Needs Assessments, Individualized Case Planning,* and *Mobilizing Appropriate Services Timely* components of practice model) |



| II.B.13 | Recruitment and retention of foster families and therapeutic service providers | Included in *Service Array, Training,* and *Placement Resources* systemic factors in CQI reviews; support services included in CQI case reviews (*Mobilizing Appropriate Services Timely* component of practice model) |
|---------|---------|---------|
| II.B.14 | Durable legal custody | Included in CQI case reviews (*Individualized Case Planning* component of practice model) |
| III.A.1 | Reunification outcome measure | Included in recommended CQI data reports (CFSR measure) |
| III.B.1 | Adoption outcome measure | Included in recommended CQI data reports (CFSR measure) |
| III.C.1 | Number of placements outcome measure | Included in recommended CQI data reports (CFSR measure) |
| III.D.1 | Abuse/Neglect/Maltreatment in Care | Included in recommended CQI data reports (CFSR measure) |

### Crosswalk of COA Standards to CQI Recommendations

| COA Standard Number | COA Standard | MS CQI Component |
|---|---|---|
| PA-PQI 1 | The agency's leadership promotes a culture that values service quality and ongoing efforts by the full agency, its partners, and contractors to achieve strong performance, program goals, and positive results for service recipients. | • See Roles and Responsibilities of administrators regarding CQI in each component of the practice model |
| PA-PQI 1.01 | The agency's leadership sets forth quality expectations and broad goals that merit ongoing monitoring. | • See Roles & Responsibilities of administrators in each component of the practice model. |
| PA-PQI 1.02 | The agency head endorses a culture that promotes excellence and continual improvement; implementation of an agency-wide PQI framework; constructive use of data to promote a high-learning, high-performance, results-oriented agency; involvement of a wide range of managers and staff in the PQI process; inclusion of external stakeholders and community members; and an annual scorecard or summary reports of gains made against goals. | • See Roles & Responsibilities of administrators in each component of the practice model.<br>• State CQI report<br>• State and local CQI teams |
| PA-PQI 1.03 | Senior managers promote a culture of quality by using short-term/annual plans that support long-term strategic quality goals; setting expectations for use of quality and performance improvement results to change policy and practice; encouraging service delivery processes that have been shown to contribute to good outcomes; focusing on customer satisfaction and outcomes; and recognizing staff contributions to performance and quality improvement. | • See Roles and Responsibilities of administrators in each component of the practice model<br>• Roll-out schedules for CQI and practice model<br>• Performance indicators<br>• Use of CQI reports locally and statewide<br>• Feedback process<br>• Recommendations for program improvement plans resulting from CQI reviews |
| PA-PQI 1.04 | Sufficient resources are allocated to lead and facilitate collection and analysis of data. | • Recommendations regarding staffing of State Office CQI unit, local liaisons, data analyst, report writer |

| PA-PQI 2 | The infrastructure that supports performance and quality improvement is sufficient to identify agency-wide issues, implement solutions that improve overall efficiency, and promote accessible, effective services in all regions and sites. | • See Structure of CQI section, i.e., recommendations for staffing the unit, and Roles and Responsibilities of CQI staff<br>• Recommendation for county program improvement plans resulting from CQI reviews<br>• Emphasis on accountability as a principle of the CQI process |
|---|---|---|
| PA-PQI 2.01 | The PQI program takes into account all of the agency's regions and sites, and all individuals and families served. | • Rollout plan for CQI and practice model<br>• Reviews in-home and foster care cases<br>• Sampling processes |
| PA-PQI 2.02 | A PQI plan which operationalizes the agency's PQI program assigns responsibility for implementation and coordination of PQI activities and technical assistance; sets forth the purpose and scope of PQI activities; establishes a periodic review of essential management and service delivery processes consistent with quality priorities; outlines methods and timeframes for monitoring and reporting results; and includes provision for an assessment of the PQI program's utility, including any barriers to and supports for implementation. | • See Roles & Responsibilities of CQI in each component of the practice model<br>• Review of systemic factors in addition to practice<br>• Recommended review schedule<br>• Recommendation that CQI review the systemic factor, *monitoring and oversight*, that includes the functioning of the CQI process |
| PA-PQI 2.03 | The agency in its PQI plan defines its stakeholders and specifies how different stakeholder groups will be involved in the PQI process. | • State and local CQI teams include external stakeholders<br>• Inclusion of stakeholders as interviewees in reviews |
| PA-PQI 2.04 | The agency describes the steps in an improvement cycle, including determining if an implemented change is an improvement. | • Data analysis capacity<br>• Program improvement plan requirements<br>• Outcome measures in reviews |
| PA-PQI 2.05 | Staff responsible for PQI are qualified by education and experience to engage people throughout the agency; systematically collect information and analyze data; and communicate results and recommendations to various key audiences. | • See Structure of CQI and staffing recommendations<br>• Recommendation for data analyst and regional CQI liaisons |
| PA-PQI 3 | | • CQI is outcome based, will specify outcomes and |

| | | |
|---|---|---|
| | An inclusive approach to establishing measured performance goals, client outcomes, indicators, and sources of data ensures broad-based support for useful performance and outcomes measurement. | performance measures<br>• Data sources include MACWIS, case reviews, interviews |
| PA-PQI 3.01 | Senior managers and supervisors set forth performance and outcome expectations in a supportive manner and allay concerns about possible repercussions of identifying areas in need of improvement. | • Constructive feedback process at State and local levels<br>• Reinforces quality practice; not punitive |
| PA-PQI 3.02 | Staff throughout the agency and stakeholders, including partners and contractors, work together to develop key outcomes and outputs; develop relevant qualitative and quantitative indicators; and identify data sources, including measurement tools and instruments. | • Major outcomes/indicators defined by *Olivia Y*, COA, CFSR requirements<br>• State and local CQI committees review/respond to findings<br>• Tools will mirror practice model |
| PA-PQI 3.03 | The agency selects performance measurement indicators that relate to operations and management, program results, and client outcomes. | • Same as above<br>• Reviews for systemic factors also |
| PA-PQI 4 | The PQI plan describes how measurable data will be obtained and used on a regular basis to further monitor actual versus desired: functioning of operations, that influence the agency's capacity to deliver services; quality of service delivery; program results; client satisfaction; and client outcomes. | • See What CQI Monitors, i.e., qualitative and quantitative indicators, case reviews, systemic factors<br>• Performance indicators will reflect standards, such as CFSR standards and *Olivia Y* benchmarks |
| PA-PQI 4.01 | Collection of service delivery information focuses on key quality factors, including appropriateness; effectiveness; and any or all of the dimensions of quality. | • Case reviews will focus on quality of work and conformity to practice model |
| PA-PQI 4.02 | The agency aggregates and reviews several sources of information to identify patterns and trends, including: quarterly case record review reports; quarterly review of | • Will produce periodic aggregated reports<br>• Reports on each review<br>• State CQI report<br>• FCR satisfaction surveys in place |

| | | |
|---|---|---|
| | incidents, accidents, and grievances; customer satisfaction data, usually annually; customer outcomes data, usually annually; and management and operations data and reports. | • Add satisfaction surveys for in-home services cases in CQI reviews<br>• CQI liaisons will track incidents, grievances, and accidents on report on them quarterly |
| PA-PQI 4.03 | Quarterly reviews of case records: evaluate the presence, clarity, quality and continuity of required documents using a uniform tool to ensure consistency; and include a random sample of both open and closed cases. | • Offices will be reviewed according to a review schedule<br>• Standard case review tool<br>• Local CQI teams review cases monthly |
| PA-PQI 4.04 | The agency integrates the findings of external review processes, including licensing reviews, information related to compliance with federal, state, and department requirements, governmental audits, accreditation, and other reviews into its PQI process, where appropriate. | • State CQI report combines multiple sources of information<br>• Coordination with FCR<br>• Coordination with CFSR instruments and court monitor's instrument<br>• Coordination of goals in local PIPs with practice model and with CFSR PIP, State plan goals and objectives |
| PA-PQI 5 | Findings based on improvement efforts are disseminated to personnel and stakeholders and are used to improve programs and practice. | • Distribution schedule for CQI reports |
| PA-PQI 5.01 | The agency: reviews results; identifies areas of needed improvement; implements and evaluates improvements on a small or broad scale; modifies implemented improvements as needed; and keeps staff informed and involved throughout the cycle. | • Requirement for program improvement plans<br>• Review/use of PIPs by State and local CQI teams |
| PA-PQI 5.02 | Senior managers regularly review and discuss PQI reports to: identify areas of needed improvement; set | • Use of CQI reports by management to make decisions<br>• CQI integrated into all agency operations |

| | improvement activity priorities; and manage their operations and programs. | |
|---|---|---|
| PA-PQI 5.03 | Internal and external stakeholders review performance data and outcomes results in order to: identify strengths and areas of positive practice; and provide feedback about areas of needed improvement. | • State and local CQI committees<br>• State and local practice model implementation committees |
| PA-PQI 5.04 | The agency's leadership, including advisory members and PQI personnel communicate with staff and stakeholders about achievements relative to desired outcomes, indicators, and benchmarks or targets. | • See Structure of CQI and roles of CQI manager and liaisons<br>• Roles of CQI implementation teams (State and local) |
| PA-PQI 6 | Staff and stakeholders receive information and support that increases their capacity to participate in, conduct, and sustain performance and quality improvement activities. | • Role of feedback and reports of information from CQI reviews<br>• Recommendations for program improvement plans resulting from CQI reviews |
| PA-PQI 6.01 | Information about the agency's PQI program is provided to stakeholders that: describes the agency's PQI philosophy; explains how PQI is structured; defines stakeholders and how they participate in the PQI process; and includes a brief summary description of what the agency is measuring. | • State and local CQI committees include external stakeholders<br>• Recommendations for dissemination of CQI reports |
| PA-PQI 6.02 | PQI training for personnel includes: an overview of the agency's PQI program at new staff orientation; and specialized and/or ongoing training, as appropriate to individual roles and responsibilities. | • Recommendations for training caseworkers and supervisors on CQI<br>• Recommendations for training CQI staff |
| PA-PQI 6.03 | Senior managers and department and program heads: include PQI relevant short and long-term goals in their work plans and keep PQI on the agenda of staff meetings. | • Coordination of CQI results with CFSR and title IV-E PIPs, the MDHS five-year Child and Family Service Plan, and *Olivia Y* implementation plans |

Mississippi Practice Model

| | | • See Roles and Responsibilities of administrators in each component of the practice model |
|---|---|---|



**Ex. 23**



# *Continuous Quality Improvement*

## Introduction

Over the past year, the Mississippi Department of Human Services (MDHS), with the help of the Center for the Support of Families (CSF), embarked on developing a child welfare practice model that will help to ensure consistent family-centered practice with children and families statewide. A key feature of implementing the practice model will be the development of a statewide Continuous Quality Improvement (CQI) process that will be one of the primary ways that MDHS will reinforce and support the practice model. The State is required under the *Olivia Y* settlement agreement to develop a monitoring system that will monitor casework activities beyond the current court monitoring activities, and to help ensure the safety, permanency and well-being of children known to MDHS. We believe that tying the CQI process and activities to the implementation of the practice model will help all staff use the monitoring process to develop the skills and interventions needed to serve children and families as effectively as possible.

## What is CQI?

Continuous Quality Improvement (CQI) is a comprehensive and multi-faceted way to ensure quality case practice and monitoring to achieve desired outcomes statewide. In Mississippi, the CQI system will:

♦ *Reinforce child welfare interventions by reviewing for the practices in the practice model and providing helpful feedback to social workers, supervisors, and others on the strengths and needs of our work;*
♦ *Provide county, regional, and statewide analysis of findings to inform the development and maintenance of the practice model and the supports needed in the field to work effectively with children and families;*
♦ *Identify the strengths of our work and those areas where improvements are needed to increase our effectiveness; and*
♦ *Help us all to be accountable to our family-centered principles and values and to the requirements that guide our programs.*

CQI will include a combination of both *quantitative* (data) and *qualitative* (case review, interview) information. We will develop reports detailing child permanency outcomes and utilization rates of tools and services, such as family team meetings and independent living services for example, to help track progress towards achieving our over-arching goals as an agency. We will emphasize accurate and timely data entry by staff in order to provide accurate and complete data on the work we do. We will also use more qualitative information in our CQI activities. The primary means of collecting and reviewing this information, both at the case and systemic level, will be through regular case reviews of families receiving in-home and foster care services, and through structured interviews with individuals that have first-hand knowledge of the issues under review, such as MDHS staff, children and families, foster families, service providers, the courts, and others.

## How will CQI affect MDHS staff?

All staff will be involved with CQI and affected by it at some level. The following activities are examples of how CQI activities will affect staff:

♦ ***Data Review and Analysis***: CQI will use data reports from MACWIS to track and evaluate indicators of our work and the outcomes of our services to children and families. We expect that data will be used at the individual worker level, unit and county levels, regionally and statewide in order to evaluate both the



# *Continuous Quality Improvement*

strengths and areas needing improvement at all levels. As part of the CQI process, Regional Directors and supervisors will use data to help bring practice within all counties and regions in line with the practice model and to develop plans to improve practice where needed.

♦ ***Case Reviews***: Case reviews and complementary interviews will be conducted by the State Office at periodic intervals, and by local supervisors and/or CQI staff on an ongoing basis. We will emphasize providing useful feedback to social workers, supervisors, and directors on the findings of case reviews so that the information can be used to strengthen our work with children and families. We will strive to have ongoing case reviews and the feedback process to be integral parts of our work at MDHS and to help us all continually evaluate our activities.

♦ ***Program Improvement Plans:*** Where needed, CQI reviews will lead to the development and implementation of program improvement plans that build on a county or region's identified strengths and include measure to improve areas of need. These plans will help all staff to move in a coordinated manner toward full implementation of family-centered practice with all families statewide.

## How will CQI be structured?

In order to ensure the comprehensive monitoring of activities statewide, CQI activities will occur at both the State and county/regional levels. Statewide CQI activities will include:
♦ *Coordinate CQI work statewide, including developing tool and procedures needed for CQI activities;*
♦ *Conduct CQI reviews, provide CQI training, provide case level feedback on the results; and*
♦ *Analyze data and case review information, identify strengths and areas for improvement; and*
♦ *Conduct special studies as needed.*

Local CQI activities will include:
♦ *Assist in ensuring that CQI is integrated into the routine work of county staff;*
♦ *Communicate and coordinate local issues and improvement efforts regarding practice and capacity;*
♦ *Facilitate and participate in ongoing case review activities; and*
♦ *Provide direct and prompt feedback to ASWSs and caseworkers whose cases are reviewed.*

## How will CQI be implemented?

We plan to implement some CQI activities in phases by regions, corresponding with the implementation of the practice model. However, we also plan to implement some CQI activities statewide before all regions adopt the practice model. Some of the activities that will follow the implementation of the practice model include:
♦ *Hire and train CQI staff to conduct reviews and coordinate local CQI functions;*
♦ *Conduct baseline CQI reviews in regions beginning practice model implementation and follow-up reviews approximately one year after implementation has begun; and*
♦ *Implement program improvement activities in regions implementing the practice model.*

Among the activities that we will implement statewide are the following:
♦ *Integrate CQI monitoring activities into ongoing supervision activities;*
♦ *Involve staff statewide in conducting CQI reviews; and*
♦ *Integrate CQI with other monitoring activities, such as Foster Care Review.*



# *Continuous Quality Improvement*

The following timeline is an approximate schedule for implementing the CQI system.

| | Dec. 2009 | Feb. 2010 | Apr. 2010 | June 2010 | Aug. 2010 | Oct. 2010 | Dec. 2010 | Feb. 2011 | Apr. 2011 | June 2011 |
|---|---|---|---|---|---|---|---|---|---|---|
| State identifies the initial two regions to begin practice model implementation | ■ | | | | | | | | | |
| Planning period for initial two regions and state wide | | ■■■ | | | | | | | | |
| Data Reports developed in MACWIS | | ■■■ | | | | | | | | |
| Training of CQI staff | | ■ | | | | | | | | |
| Baseline CQI reviews in initial two regions | | | ■ | | | | | | | |
| Implementation period in initial two regions | | | | | ■■■■■ | | | | | |
| Planning period for second two regions | | | | | ■■■ | | | | | |
| Baseline CQI review in second two regions | | | | | | | ■ | | | |
| Follow up review in initial two regions | | | | | | | | | | ■ |
| Implementation period for second two regions | | | | | | | | ■■■ | | |

**Ex. 24**

o



# DRAFT

### *Note, this plan was drafted prior to the current DFCS QA Director (Mike Gallarno) being hired on 09-16-08. This draft has been submitted to him and is awaiting his approval and further input.

# Fiscal Year 2009

# Continuous Quality Improvement Operational Plan

DHS
267862

## Introduction and Background

This plan outlines and describes the implementation of the Continuous Quality Improvement (CQI) process within the Mississippi Division of Family and Children's Services (DFCS). The primary purpose for engaging in CQI activities is to achieve positive outcomes and the highest quality of services for the children and families served by the division. To achieve this goal, it is essential for the division to: 1) institute structured processes in order to examine, evaluate, and act on quality issues within our agency and (2) involve all division staff as well as stakeholders in these processes.

## Definitions

Implementing a performance improvement process requires a clear understanding and consensus on the terminology of "Quality Assurance" and "Quality Improvement". As it relates to the DFCS PQI process, these terms are defined as follows:

*Quality Assurance:* Those processes that measure compliance against identified standards. These activities may include but are not limited to case record reviews or program evaluation.

*Quality Improvement:* Actions taken that lead to incremental improvements in the provision of services or in the services provided to consumers. These actions are usually conceptualized and implemented by staff.

Continuous Quality Improvement (CQI) is an approach to quality management that builds upon traditional quality assurance methods by emphasizing the organization and systems.

- CQI focuses on "process" rather than the individual;
- CQI utilizes teams of process owners to develop improvement solutions;
- CQI promotes the need for objective data to analyze and improve processes;
- CQI implies that a process and its service outcomes are never optimized;
- CQI establishes baselines of current performance;
- CQI measures performance over time;
- CQI compares the baseline performance to the actual performance; and
- CQI identifies common causes of any performance variations.

Performance Quality Improvement (PQI) is a comprehensive, ongoing management system with five steps: 1) identifying the reason for improvement; 2) recognizing the current situation; 3) analyzing the current situation; 4) creating an action plan to improve the situation; and 5) looking at the results. Then the process starts over again with a new reason for improvement. PQI includes:

- Intensive stakeholder involvement;
- Systematic data collection and analysis;
- Information sharing; and
- Corrective action.

## Purpose of the CQI Operational Plan

The CQI Operational Plan 1) assigns responsibility for coordination/implementation of CQI activities, and provision of technical assistance in using the CQI process; 2) sets forth the purpose and scope of CQI activities; 3) establishes how the Agency periodically reviews essential management and service delivery processes consistent in light of quality priorities; 4) defines stakeholders and how stakeholders will participate in the CQI process; 5) outlines methods and timeframes for monitoring and reporting

activities; and 6) includes provision for an assessment of the utility of the PWI program, including any barriers and supports for implementation.

- **The CQI Operational Plan assigns responsibility for coordination/ Implementation of CQI activities, and provision of technical assistance in using the CQI process and sets forth the purpose and scope of CQI activities**

**Informal PQI Process**

The DFCS first initiated its informal PQI process in 2007 by developing a Performance Improvement Unit (PIU), which oversees the Settlement Agreement, the Children and Family Services Plan (CFSP), Children and Family Services Review (CFSR), the Annual Performance Services Review (APSR), the Council of Accreditation (COA) process, Foster Care Review (FCR), Quality Assurance, Legislation, complaints/reports from the public regarding the handling of a specific case, and all data reported from DFCS. Review and the MDHS Child Fatality Review Team were moved under this unit this past year.

- **Establishes how the Agency periodically reviews essential management and service delivery processes consistent in light of quality priorities**

**Foster Care Review**

The enactment of the Adoption Assistance and Child Welfare Act of 1980 (Public Law 96-272) amended the Social Security Act to require that the Agency conduct a case review at least every six months for each foster child in Agency custody.  Pursuant to Section 43-15-13 of the Mississippi Code of 1972, Annotated, the Agency is required to administer a system of individualized plans and bi-annual reviews for children in its custody and in the custody of licensed public and private agencies. The intent of both laws is to promote permanency planning for children by returning the children to their own home, placing them with relatives, or freeing them for adoptive placement.

The Foster Care Reviews are conducted by a Foster Care Reviewer who is an experienced, licensed social worker (Family Protection Specialist Advanced). Throughout the month, the Foster Care Review Program Supervisor compiles a report of any issues of concern observed by the Foster Care Reviewer during the course of a case review and reports to the Regional Directors, the agency's Unit Directors, and the agency's Director and Deputies. The Monthly Foster Care Review Issues Report contains a case specific listing of the issues cited and the aggregate data on the issues most commonly cited each month. The Regional Directors forward the information to the appropriate county staff for a response. A response is due to the Foster Care Review Program supervisor within 30 days of the report.

The following is a summary of Foster Care Review Issues observed for state fiscal year 2008:
- The information collected shows 4,008 cases have been reviewed.
  - Of the 4,008 cases reviewed, 629 have been cited with issues (15.7%).
  - 84.3% of the cases reviewed were <u>NOT</u> cited with issues.

|  | 1st Qtr | 2nd Qtr | 3rd Qtr | 4th Qtr | Total |
|---|---|---|---|---|---|
| **Total Cases Reviewed** | 1,020 | 941 | 1,038 | 1,009 | 4,008 |
| **Cases Cited w/Issues** | 131 | 115 | 153 | 230 | 629 |
| **%** | 12.8% | 12.2% | 14.7% | 22.8% | 15.7% |
| **% w/no Issues** | 87.2% | 87.8% | 85.3% | 77.2% | 84.3% |

**PIP, CFSR, CFSP**

DHS 267864

3

The Performance Improvement Plan entered into as a result of the last CFSR was completed and approved in 2008. The next CFSR is scheduled for 2010. Plans are in process for the CFSP/Title IV B Five Year Strategic Plan in early 2009.

**Formal CQI Process**

The DFCS first initiated its formal CQI process in 2008 by developing a CQI structure involving all levels of staff, beginning implementation of peer record reviews statewide, restructuring consumer surveys, instituting yearly staff surveys and developing approximately twenty critical outcome measures used to monitor services provided to children and families.

Despite insufficient staffing and lack of fiscal funding, the division has continued to recognize the importance of preserving these CQI processes and staff has continued to participate and see achievements, both at a local and statewide level, through the CQI process. In 2008, the director of the DFCS was able to hire a Quality Assurance Manager whose focus is exclusively on CQI processes and activities. The division's prior achievements through CQI and this renewed commitment to quality improvement are a testament to the cultural change occurring within the division which is focused on becoming a learning and growing organization.

- **The CQI Operational Plan defines stakeholders and how stakeholders will participate in the CQI process**

The stakeholders are defined as any agency (public or private) that serves the families and children of Mississippi and works in conjunction with DFCS. These stakeholders will be identified and will be involved in the planning of the 5 Year Strategic plan as well as all review boards, panels and conferences. It is imperative that these stakeholders be involved as they are instrumental in DFCS's mission. A good working relationship must be maintained with these stakeholders as this has not been the case in the past. All efforts will be made to include them in all aspects of DFCS services.

A list of these stakeholders will be submitted when all of them have been identified. This list is in the process of being completed at this time.

- **The CQI Operational Plan outlines methods and timeframes for monitoring and reporting activities**

**Federal Monitor**

Children's Rights, Inc. filed the *Olivia Y. v. Barbour* lawsuit in the U.S. District Court for the Southern District of Mississippi in 2004, alleging violations of the rights of children living in the child welfare system. The Mississippi Department of Human Services (MDHS), Division of Family and Children's Services (DFCS) reached a Settlement Agreement with the Plaintiffs on January 4, 2008. The Settlement Agreement and Reform Plan sets out benchmarks to be completed in five implementation periods from January 4, 2008 through January 3, 2013.

The parties agreed that Grace Lopes would be the Monitor of Defendants' compliance with the Mississippi Settlement Agreement and Reform Plan and the annual implementation plans. The Monitor's duties are to confirm independently the data reports and statistics provided pursuant to this Plan and the annual implementation plans; conduct independent case record and other qualitative reviews; review all plans and documents to be developed and produced by Defendants pursuant to this Plan; and report on Defendants' compliance in implementing the terms of the Plan and the annual implementation plans, and the achievement of the improved outcomes set forth therein. The Monitor shall prepare reports that will address these issues and be released periodically, but no less than every six months.
The intent of the parties is that the Monitor shall develop a plan to transfer the primary monitoring function to DFCS' CQI Unit upon the termination of this Plan, or at such earlier time as provided for in

4

DHS
267866

Section VII.C of the Settlement. The Monitor shall work in collaboration with Defendants to build DFCS' CQI capacity.

**Accreditation**

A part of the Settlement mandated accreditation through the Council on Accreditation (COA) within five years. Although mandated, funding for this endeavor must be approved through legislative appropriations each year. Despite possible funding challenges in the future, the division will continue working toward accreditation with the recognition that accreditation and the CQI process are neither singular events nor one-time initiatives. Rather, accreditation and CQI together will continue to serve the division as a fully integrated and ongoing journey aimed at structuring and focusing efforts on quality issues and meeting best practice standards.

- **The CQI Operational Plan includes provision for an assessment of the utility of the CQI program, including any barriers and supports for implementation**

**Self-Assessment**

From the beginning, DFCS leadership set a course for systemic improvement through self assessment and long term and short term strategic planning. To address immediate need and short term planning, leadership immediately began developing a process and protocols for individualized, self assessment.

The Self-Assessment, scheduled for __to be determined_____ will involve each county identifying its strengths and challenges in providing high quality, family-focused, child protection services. The self-assessment areas for evaluation include: 1) demographics; 2) circuit structure; 3) circuit staffing; 4) management; 5) PQI process; 6) personnel practices; 7) facilities; 8) juvenile court structure and relationships; 8) community partnering; 9) service array; 10) case work practice; 11) case work and documentation; 12) outcomes; 13) training needs; 14) circuit strengths and challenges. These assessments served as a basis for strategic planning to effect positive improvements toward measurable outcomes. The assessments identified needs for technical assistance, resources and support.

Case reviews and outcomes monitoring are continuous and are conducted in conjunction with local community partners. Ongoing local committees provide independent community advice, advocacy, and accountability. These partners help guide the DFCS toward its goal of imbedding best practice into the fabric of the organization to achieve safety, stability, permanency, and well-being for children and their families.

**Program Improvement Plan**

In April, 2008, the DFCS finalized its Program Improvement Plan (PIP). This long term plan was developed in response to the federal Child and Family Services Review (CFSR) conducted May 2004. The final report issued in April, 2008 provided information on strengths and areas needing improvement for services provided by the DFCS. The recommendations contained in the CFSR final report provided the DFCS with rich data to develop strategies for enhancing practice. The Performance Improvement Plan (PIP) was developed in partnership with numerous stakeholders including the Office of State Courts Administrator, universities, service providers, and child welfare colleagues, The PIP provides a framework for achieving systemic improvement in practice and ultimately improved outcomes for Mississippi's children and families.

CQI, PQI, the PIP and COA best practice standards are intricately tied to one another. The division will utilize the PIP as a roadmap for practice improvement with the CQI/PQI process functioning as a vehicle for change. During this time, the division remains cognizant of developing solutions which meet best practice standards which are in alignment with our mission and principles.

**Community Engagement**

A strength of the Mississippi DFCS is its strong value for partnering with families and communities. The agency has worked diligently to develop partnerships with communities and to be accountable to our citizens. The DFCS is committed to openness, accountability, data driven decision making and working with our partners to improve services and outcomes for children and families. In Mississippi's PIP, many actions steps include partnerships with the Office of State Court Administrators, Department of Mental Health, Department of Health, state universities, community partnerships and others.

The DFCS is partnering with the courts to pilot court improvement projects which include creation of Uniform Youth Court Rules (currently up for public review and thereafter for approval by The Mississippi Supreme Court), as well as a collaborative effort with Court Improvement Plan to develop Court Curriculum for staff development (implemented October 1, 2008) and by 2009 Court Curriculum for court personnel. One of the employees of the Court Improvement Project is also employed by the Hinds County District Attorney's Office and specializes in child abuse cases. A cross training summit is in the planning stages between the courts and the DFCS.

There are numerous ways in which the DFCS engages community partners and stakeholders. In addition to the CFSR, reviews by the Governor, legislators, judiciary and state auditor provide the DFCS with rich data to develop strategies for enhancing practice. The Children's Justice Task Force is composed of public figures who advocate for children and families in Mississippi and serves as an avenue for change for the DFCS.

**Organizational Structure**

After an extensive review of its organizational needs the DFCS is focused on practice excellence that includes: 1) a clearly articulated vision and mission for the DFCS; 2) a new organizational structure that is aligned with judicial circuits and supports circuits through cross-functional teams at the state, regional, and local levels; 3) strong partnerships with communities, courts, law enforcement and treatment providers; 4) high quality training for all staff; 5) a mentoring program for new staff; and 6) flexible funding to meet the unique needs of children and families.

The following organizational chart briefly illustrates the present DFCS structure under the informal Performance Improvement Unit. INSERT NEW CHART WHEN AVAILABLE. The new CQI Unit will be within the _____ structure assuring quality assurance activities are closely coordinated with and supportive of the PIP and COA activities.

DHS
267867



DHS
267868

DHS
267869

### The Quality Assurance Unit

The Quality Assurance Unit is composed of a Quality Assurance Unit Manager and one vacant Program Development Specialist position based in the division's central office. Also housed within this unit are seven regional Quality Assurance Specialists. The QA Specialists are supervised day-to-day by the seven field administrators but take strategic direction from the Quality Assurance Unit Manager in central office. Although there are inherent difficulties due to this type of supervision, the Quality Assurance Manager and Regional Field Administrators remain committed to partnering in meeting both regional and statewide quality assurance needs.

### *QA Unit Supervision and Training*

The QA Specialists have conference calls with the QA Unit Manager at least monthly. Additionally, the QA Specialists meet monthly with the QA Manager. These meetings are typically two to three days long focusing on training topics relevant to statewide QA work which compliments their regional activities. Trainings scheduled in 2005 cover basic Quality Assurance Concepts (QA 101), Excel Charting and Initial Data Analysis, PQI Train-the-Trainer, Advanced Excel Training, PDR Train-the-Trainer, PDR Technical Assistance Training, Survey of Organizational Excellence Analysis Training, PowerPoint Training, and Peer Record Review Training. Other training needs will be addressed as identified during the course of the year.

### The Quality Improvement and Field Support Unit

This unit is under the Practice Development and Field Support section of the division and is composed of one Unit Manager and six Program Development Specialist (PDS) all located in the division's central office. Five of the PDS are each assigned to one region of the state to support quality improvement activities as needed. The Quality Improvement Unit and Quality Assurance Unit work closely together to ensure compliance against set standards and that plans for improvement are operationalized.

### Practice Enhancement Teams (PET)

As previously indicated, circuit self assessment will be followed by circuit strategic improvement planning. Each circuit will assess PIP identified data measures, monitor them on an ongoing basis, and develop strategies to address areas needing improvement and access technical assistance as needed through Practice Enhancement Teams. Practice Enhancement Teams may include a quality improvement leader, quality assurance specialist, program specialist, trainer and other ad hoc members based on the issue of concern. The plan is to establish Practice Enhancement Teams geographically, however, teams may be deployed across regions based on expertise and identified needs. Staff will be supported in completing the self assessment and resulting strategic improvement plans through the cross-functional Practice Enhancement Teams.

## DFCS Mission and Principles Supports PQI

The mission of the DFCS has been affirmed as follows:

> The Mississippi Department of Human Services (MDHS) Division of Family and Children's Services' mission *is* a primary link between families and individuals with specific needs vital to their survival and the services available to meet those needs. The mission of MDHS/DFCS is to provide services for people in need by optimizing all available resources to sustain the family unit and to encourage traditional family values thereby promoting self-sufficiency and personal responsibility for all Mississippians.

The guiding principles for the DFCS are:

**Partnership:** Families, communities and government share the responsibility to create safe, nurturing environments for families to raise their children. Only through working together can better outcomes be achieved.

**Practice:** The family is the basic building block of society and is irreplaceable. Building on their strengths, families are empowered to identify and access services that support, preserve and strengthen their functioning.

**Prevention:** Families are supported through proactive, intentional activities that promote positive child development and prevent abuse and neglect.

**Protection:** Children have a right to be safe and live free from abuse and neglect.

**Permanency:** Children are entitled to enduring, nurturing relationships that provide a sense of family, stability and belonging.

**Professionalism:** Staff are valued, respected and supported throughout their career and in turn provide excellent service that values, respects and supports families.

Clearly articulating the Division's mission, guiding principles and practice model is foundational to building an infrastructure that supports practice excellence and results in improved outcomes for children and families.

## Philosophy of CQI

CQI is a process by which *all staff* is involved in the evaluation of the effectiveness of services provided to participants by the DFCS. Evaluation involves the examination of the Division's internal systems, procedures, and outcomes; the examination of input from participants, and the examination of relationships and interactions between DFCS and other stakeholders. CQI is intended to be a process that is creative, inclusive, regular, structured, solution focused, efficient, empowering, action oriented, and common sense driven. Tenants of the PQI process include:

- CQI allows service providers to look at their activities and task performance and create plans for improvement.
- CQI is different from traditional quality assurance in that its focus is self-directed, self determined change rather than change imposed by an external entity.
- CQI determines whether services meet predetermined expectations of quality and outcomes.
- CQI attempts to correct observed deficiencies identified through the CQI process
- Every person is part of a CQI Team.
- The PCI process involves multiple levels of team meetings.
- Each team sends one representative to the next level meeting.
- All CQI meetings and team members are equal in importance.
- 90% of the issues are resolved at the level that first identified the issue.
- A continuous feedback loop ensures the continuity of the process.

CQI teams are *decision-making teams*. The teams must remain solution focused. Meetings result in the identification of needs, goals, and available resources, as well as strengths of the program, the staff, and the participants. Plans are formulated that build on those strengths. Areas needing improvement are identified and discussed, action plans are developed, and strategies are implemented to improve service

DHS
**267870**

delivery. Team members have the responsibility for advocating for their proposed improvements.

The first level CQI team is able to implement an action plan for 90% of all issues identified by resolution. Through this process, needs are met by those most directly affected and by those with the most knowledge about the needs and the solutions.

The following graphic represents how issues (dots) are resolved through the four levels of CQI.



## Quality Assurance and CQI

All of the quality assurance activities in which the Division engages feed into the CQI process. The information and data from all of these sources is used to drive decision making in Central Office, Regional Office, each County and in the field. Several avenues have been developed for quality assurance through peer reviews, consumer and staff surveys, and grievance and outcome data, all of which feed into the overall CQI System.

### Outcome Reports
Reports on child welfare outcome measures monitor agency performance and guide future initiatives. The outcomes are the results the agency desires to achieve and reflect a condition of well-being for children, adults, families, and communities. The outcome measures cross all program lines and are quantifiable information which indicates the degree to which desired outcomes are being achieved and provide a mechanism for evaluation of performance. The following outcome measures fit into one of the domains of safety or permanency.

Safety

    Improve Timeliness of Initial Child Contact Improve Timeliness of
    Completion of Reports Reduce Recurrence of Abuse
    Reduce Incidence of Child Abuse in Foster Care
    Reduce Recurrence of Child Abuse/Neglect (after reunification)

DHS
267871

Enhance Service Delivery to Prevent Child Abuse/Neglect in Intact Families Enhance Service Delivery to Prevent Child Abuse/Neglect

Permanency

Reduce Time in Foster Care
Children Active in DFS Custody by Children Active in DFS Custody by Age
Increase Permanency for Children in Foster Care (children exiting by exit reason)
Increase Permanency for Children in Foster Care (children exiting by exit reason and race)
Increase Permanency for Children in Foster Care (children exiting by exit reason and age)
Increase Permanency for Children in Foster Care (children exiting by exit reason and length of time to exit)
Reduce Time in Foster Care (Entry to Reunification, total) Reduce Time in Foster Care (Entry to Reunification, by race) Reduce Time in Foster Care (Entry to Reunification, by age) Reduce Time in Foster Care (Entry to Adoption, total) Reduce Time in Foster Care (Entry to Adoption, by race) Reduce Time in Foster Care (Entry to Adoption, by age)
Increase the Number of Family Support Team Meetings (timely completion of FSTM)
Reduce the Number of Placements Children Experience in Foster Care Reduce the Number of Placements Children Experience in Foster Care (Children in Care Less than 12 Months)
Reduce Re-entry into Foster Care
Reduce Adoption Disruptions
Increase the Number of Family Resource Providers
Increase the Number of Children Placed with Relatives/Kinship Providers Increase the Number of Children Residing in Their Communities
Reduce the number of Children Residing in Residential Treatment Facilities Reduce the Number of Families with FCS Cases Open Over 12 Months

As most of the outcome data is reported out quarterly, six of the outcomes are used as proxy measures for the six National Standards so progress in the PIP can be tracked on a quarterly basis. Believed to be reflective of good practice and the goals already established by the agency, the outcomes are reported out by each county, region, and at a state level and are distributed at all Senior Management meetings.

**Supervisory Consultation and Oversight**

Supervisors are the most visible and accessible role models for DFCS social service workers. By actions and words, supervisors can implicitly and explicitly establish the limits of permissible behavior. Effective methods of supervision are adapted to the individuality of each DFCS social service worker and to the group as a whole. Based on the need and experience of the worker, individual supervisory conferences are provided on a weekly, bi-monthly, or monthly basis by plan, or by request. Monthly group meetings or conferences provide the opportunity to review memorandums, new policies and policy updates.

DHS
267872

DHS
267873

**Peer Review**

The Peer Review process is an action-oriented learning process that provides a way of knowing what is working/not working in practice for selected children and families receiving services. This process is new for MDHS/DFCS, beginning in May 2008.

The purpose of the Peer Review process is to determine the extent to which the Department is working together with families and supports and services, to produce results that show progress toward family independence, child well-being and permanency, and timely case closure.

Currently, one placement, one in home (prevention), an investigation, and two screened out cases are randomly selected from a county within a region and assigned for review. The reviews are done monthly for selected cases and each region is assigned the aforementioned cases from another region to review. The review instruments are included as Attachment D.

**Supervisory Administrative Reviews**

The newly developed Supervisory Administrative Review (SAR) is also capturing this information during the formal case review process at periodic intervals within the life of a case. The difference in the FCR and the SAR is that the FCR only reviews a sampling of foster care cases per month while the SAR must be completed on all cases that are open. The SAR is completed at the 90 day mark of being opened and again in the 15th month.

**Consumer Surveys**

In order to improve the quality of services, it is important to receive feedback from the children and families served by the Division. Input from consumers is obtained through surveys which are system generated and mailed from the Foster Care Unit. A self-addressed stamped envelope accompanies the survey to facilitate a higher response rate and assure confidentiality. Information from returned surveys is entered into a database, aggregated, and sent in report form to the county and regional offices for review through the Performance Quality Improvement (PQI) process.

**Staff Survey**

Assessment of employee satisfaction is a way to gather vital information from our organization's most valuable resource, our employees. The Worker Satisfaction Survey allows detailed and comprehensive organizational information to be obtained from all division staff for use in the development of strategies to improve on identified areas of need. The survey is an online survey designed to link scores on the survey to issues impacting the organization. Survey questions are drawn from empirical and theoretical literature on organizations and specifically examine five key dimensions of life within the organization: work team, work setting, general organizational features, communication patterns, and personal demands.

**Grievance Data**

There are two avenues by which the DFCS gathers grievance data; through the Service Delivery Grievance Process and through the Constituent Unit.

**The Service Delivery Grievance Process**

In order to maintain a continuous quality improvement culture within the organization, it is important to ensure that all youth and families served are informed of their rights and have a formal process to voice their concerns. The Service Delivery Grievance Process is a structured process by which consumer service delivery issues can be addressed at the State Office level, allowing families the opportunity to

express concerns regarding any perceived inequities, unfair treatment, or dissatisfaction with agency actions or behaviors.

The need to track outcomes and the means by which they were achieved is an important part of the quality improvement process. The information received from *Level One* through *Level Three* of the grievance process is entered into the statewide Service Delivery Grievance Database. Although specific grievances cannot be viewed by all staff, aggregate information for the state and each county is available to staff for use during PQI meetings. Each PQI team is reviews the data and looks for trends related to the quality of services being delivered, program issues, communication, etc. that led to the grievances.

**Quality Assurance Mandated Settlement**

Children's Rights, Inc. filed the *Olivia Y. v. Barbour* lawsuit in the U.S. District Court for the Southern District of Mississippi in 2004, alleging violations of the rights of children living in the child welfare system. The Mississippi Department of Human Services (MDHS), Division of Family and Children's Services (DFCS) reached a Settlement Agreement with the Plaintiffs on January 4, 2008. The Settlement Agreement and Reform Plan sets out benchmarks to be completed in five implementation periods from January 4, 2008 through January 3, 2013.

**Types of Reviews**

- **Licensing Review:** The review monitors the timeliness of the licensure activity, including determining if the foster home meets state regulations for safety, all training requirements have been met, and that a Child Abuse/Neglect (CAIN) and criminal background check have been completed on the perspective foster parent(s) prior to initial or within 90 days of re-licensure.
- **Maltreatment of children in foster homes-**This review looks at all children who were alleged victims of abuse/neglect or inappropriate discipline in a licensed alternative care provider's home. This review monitors the compliance of timeliness of reporting the incident, timeliness of completing the report, if a staffing is held to determine any corrective action plan or revocation for the foster home, and the timeliness of the Program Administrator's approval or modification of the corrective action plan. The review also identifies the children who had been placed in homes on suspension for substantiated hotlines of abuse/neglect or inappropriate discipline.
- **Monthly PDR for Medical/Dental, Planning and Service Provision:** The FCR gathers information to determine the timeliness of dental examinations and required follow up services, timeliness of medical examinations and required follow up services, timeliness of case planning conferences and timeliness of the provision of identified services. In addition, the reviewers are asked to determine whether or not the case goal matches the circumstances of the case, whether the child has been the subject of an allegation of abuse/neglect or inappropriate discipline by an alternative care provider, and if the child's health care information has been provided to the appropriate identified parties.
- **Serious Medical Case Review:** The entire universe of children who are identified as having a serious medical condition are reviewed to determine if health care plans are completed within 30 days of entry into alternative care or identification as a serious medical child. The plans are assessed to determine if the required elements are present. Also, timely review and revision of the health care plan is determined.
- **Workload Summary/Caseload Compliance:** The Settlement establishes caseload sizes for any caseload including an alternative care child. A caseload report is provided each month, based on a random date, and each case load is assessed to determine if it falls within the standards outlined in the Consent Decree.

**CQI Team Participation** ███████████████████████

DHS
267874

DHS
267875

It is vital to the implementation and success of the CQI process for ALL staff to use their knowledge, vision, and skills. The CQI process involves teams of administrative staff and service delivery staff and community partners. Service delivery staff range from those who provide direct participant services to those who provide service support staff. Service support staff may include clerical personnel, transportation aides, and social services aides who provide day-to-day assistance and resources to either administrative or service delivery staff or both. Service support staff is vital members of CQI teams and participate as appropriate on the team in which their input can be most beneficial.

The success of a CQI process is dependent upon the degree to which the agency and team members are committed to the process. *All staff become members* of a *CQI team.* The expectation is that the quarterly team meeting is used to evaluate the agency services and outcomes and in turn create and implement plans to improve services.

## CQI vs. Supervision

- The CQI process is not intended to be a replication of the existing agency hierarchy. • CQI is NOT intended to replace supervision. As Fotena Zirps, an expert on the CQI process has stated, "CQI and Supervision provide complementary functions to the agency. The supervisor's charge is to provide personal feedback to staff and to work with employees on remediating weaknesses and building on strengths."

- "The CQI process looks at a different piece of the work environment. Its job is to look at processes and programs and to remove barriers that exist in doing the work. The specific work of the individual workers is not the focus, but rather the system that all workers function within."

- CQI uses case related data in an aggregate, non-identifying way to provide feedback and accountability to staff in a timely fashion. Individual workers and supervisory units can then use the information to go back and look at their individual and unit strengths and weaknesses.

- CQI provides a time to reflect on events and processes that have occurred over the past three months. Staff have uninterrupted time to consider what works, what does not, and how to improve without the interruption of day to day activity.

- The CQI process is NOT a quick fix for all problems. No matter what level within the agency looks at a problem, successful resolution of the issues requires careful and thoughtful consideration given to all possible solutions. Some problems may lend themselves to immediate resolution once identified while others may require research, evaluation, and careful development of solutions within different levels of the agency.

- CQI provides a chance to create and look at new and unique ways of resolving one-time or ongoing problems, and to build on agency and program strengths.

- CQI provides a chance to learn and develop by identifying training needs and possible changes in policy and procedure.

- CQI is NOT a replacement of existing methods of agency communication or the lines of authority within the agency. It simply provides an additional method for systematically looking at all types of issues that affect the effective operation of the agency.

*CQI meetings are mandatory in that they must be scheduled for each level, every quarter and all staff are required to attend.* The meetings allow everyone an opportunity for regular input. It is recommended that an annual calendar be created for every level meeting. For ease in coordination, meetings at each level are held during the same time frame each quarter. According to the PQI calendar, meetings take place every month during the year at some level which relates to quality improvement. The process of

issue resolution occurs during the meetings and between the meetings as well.

**First level Teams**

The teams are composed of approximately 8-12 peers. The number of First Level Teams in a county depends on the size of the office. Extremely small counties (3-4 staff) may have their own meetings or join with another county of similar size to form a larger First Level Team. The First Level Teams consist of peers (I.e. frontline workers will meet with frontline workers, supervisors will meet with supervisors, etc.) Whatever the composition, all levels of staff are included in a team. Central office staff form their own First Level Teams based on the same guidelines.

First Level Teams are composed only of agency staff to allow for free-flowing discussion and decision making on local issues. In addition, they identify policies or issues that impact local avoids external influence from other agencies or community parties.

The First Level Teams meet within the last two weeks of the first month of each quarter. The meetings are scheduled for 90 minutes and may be held in lieu of or in conjunction with a regular staff meeting. A PQI agenda is used and distinct minutes recorded for the PQI portion of the meeting using the PQI Activity Log.

**Second level Teams**

Second Level Teams provide an opportunity to address issues that impact a particular Judicial Circuit and any unresolved issues presented by the Leaders of the First Level Team. The Second Level Team meets within the first two weeks of the second month of each quarter. The Second Level Team meetings are also scheduled for 90 minutes, yet may last slightly longer, if community representatives are included. Locations for the Second Level Team meetings may rotate in multi-county sites as the team desires.

The Second Level Teams are composed of approximately 8-12 members. This level meeting may be completely an internal staff process or also may include community representatives. Second Level Team members may include:
- Leader from each First Level Team
- Juvenile Court Representative
- Foster Parent
- Youth Consumer
- Adult Consumer
- Service Provider
- Site coordinator or unit manager
- Circuit Manager or unit supervisory staff
- Income Maintenance staff

**Rural Areas** may use Judicial Circuits to define this level meeting. Many Judicial Circuits have continued to hold regular site meetings to address ongoing practice issues.
Metropolitan Areas and Central Office Units may wish to use the Second Level Team as a way to encourage greater internal communication among units. Thus, the inclusion of outside parties may be inappropriate at this level of the PQI process.

Third Level Teams

Third Level Teams provide an opportunity to address regional issues and consolidate information and issues from all teams in the region or issues from the previous quarterly State Level Team meetings. Third Level Team meetings are held within the last two weeks of the second month of each quarter. The time frame for this level meeting may exceed 90 minutes as community representative will be present and they may require time to become familiar with the topics of discussion. Time for travel must be planned therefore advanced scheduling is necessary.

The teams are composed at a minimum of the following members:
- Leaders from the First and Second Level T earns

DHS
267876

15

- Regional DFCS Administrative/Program Staff
- Regional Representative to the State Foster Parent Advisory Board
- Representative from the Area Youth Advisory Board
- Juvenile Court Representative
- Adult Consumer
- DMH Representative
- Family Support Division Representative
- Department of Health and Senior Services Representative

State Level Team

The State Level Team provides an opportunity to address statewide issues and consolidate information and issues from all other levels of teams. State Level Team meetings are held in the second or third week of the third month of each quarter. This level meeting is also scheduled for an expanded time period as community representatives are present. Advanced scheduling is made to assure attendance is at a maximum.

The State Team is composed at a minimum of the following members:

- Leaders from all of the Third Level Team Meetings
- Regional Directors or DFCS Administrators
- Representative from the Economic Assistance and Child Support Divisions
- Representative from the State Foster Parent Advisory Board
- Representative from the State Youth Advisory Board
- Representative from the State Court Administrators Office
- Representative from Citizens for Mississippi's Children
- Representative from the School of Social Work
- Adult consumer

Community Partners and Consumer Participation

The agency and its staff interact on a daily basis with others in an effort to provide quality services to families. In order for the PQI process to truly reflect a complete picture of the service delivery system, these partners must also be a part of the process. Therefore, the expectation of the PQI process is that community partners and consumers be involved at least by the Third Level, if not sooner.

The division will pay community partners and consumers mileage for attendance at the PQI meetings. They will be required to complete the travel voucher and turn it in to the designated PQI team leader. The division will also pay day care costs for foster and birth families for their attendance at the meetings. This should also be paid from the travel voucher.

**Community Partners** are individuals with whom the division works in conjunction to provide holistic services. Examples of community partners may include but are not limited to:

- Juvenile Court Representatives
- Foster Parents
- Residential or Counseling Service Providers
- Department of Mental Health
- Division of Economic Assistance
- Division of Child Support
- Guardians ad litem
- Attorneys
- School Personnel
- Health Care Professionals
- Community or Child Advocates

DHS
267877

- Community Partnership Representatives
- Law Enforcement Representatives

Community partners are selected based on their ability to assist in the process of generating solutions. Participants are purposefully selected who are very familiar with the policy, procedures and practice of the division. This will help avoid spending a substantial amount of time orienting them to the agency.

**Consumers** are identified as adults and youth involved with the DFCS. Their involvement begins at the same level as community partners. The selection of these participants is done very carefully with a goal of selecting individuals who have enough knowledge of at least a part of the DFCS system to actively participate. It is recognized that many consumers initially have a difficult time interacting in the meetings. It is suggested that a staff person who knows the individual serve as a coach to assist them in understanding their role. Consumers may be either current or past division participants. It may be more comfortable for a consumer who is no longer receiving services to actively participate in the process. Youth are selected from the Independent Living Programs or other groups, although ILP participation is not a requirement.

**Leadership Roles for Team Operation**
Each Region will have designated persons to serve as regional *CQI* coaches. These individuals will posses advanced knowledge of the CPQI process and assist the CQI teams in being effective and efficient.

Each team, at every level, must have three persons agree to take on roles of Scribe, Facilitator, and Leader. Roles generally should rotate each year. If there are sufficient members on the team, it is recommended that a second person be selected for each role to serve as alternates. The alternates may assume the role at the beginning of the next year and the team would then select new replacement alternates. If the team leader cannot attend the next level meeting for some reason, the alternate leader will take his/her place.

*Quality Improvement Coaches*
Each Region has designated one or more persons to serve as regional CQI coaches. CQI Coaches duties may include:

- Being familiar with the basic CQI process
- Understanding the roles of the team members
- Assisting the teams in their meetings as necessary:
    - Helping scribes set up the notebook for recording minutes
    - Assisting facilitators in preparing for meetings
    - Modeling for the facilitator methods to obtain full inclusion and group cohesion
    - Reinforcing team members for their efforts
    - Serving as a sounding board for teams regarding improvement ideas
    - Meeting with other coaches to support one another
    - Helping teams collect and analyze data
    - Assisting community partners and consumers in becoming familiar with the process

*Scribe Role.*

The scribe must be able to separate him/herself from the discussion of the meeting and focus on recording the wisdom and comments of the team members.

*Qualities* of a *scribe:*
- Listens well
- Can separate what is salient in the overall discussion
- Willing to ask for clarification when needed
- Writes legibly

DHS
267878

17

DHS
267879

- Ignores side issues and distractions
- Can fill out the Meeting Activity Log form
- Organized
- Has a place that the notebook *can* be kept that is accessible to staff but where confidentiality can be maintained

*Tasks* of a *scribe:*
- Maintain the PQI notebook and ensure necessary data is present in the notebook
- Prepare the agenda with the facilitator
- Ensure the team has a place that is appropriate to meet
- Take legible notes
- Capture all of the pieces of the action plan, check with team for accuracy
- Make sure that the leader can read and understand the PQI Activity Log
- Copy the PQI Activity Log for the next level meeting
- Copy any materials that team members need for the meeting

*\*Facilitator Role*
The facilitator needs the ability to separate himself/herself from the meeting and focus on the process of the meeting rather than the content.

*Qualities* of a *facilitator:*
- Observant
- Inclusive of all members
- Able to draw out input from quiet members
- Focused on time parameters
- Willing to redirect
- Mindful of diversions and distractions
- Knowledgeable about the tools for running a meeting
- Will give the signal of silence to run-on members

*Tasks* of a *facilitator:*
- Will set up the agenda with the scribe
- Will introduce the agenda to the group with the time parameters
- Will pay attention to the time limits on the meeting
- Draw out opinions of quiet members
- Curb run-on members or stifle distractions
- Keep members focused on the task
- Summarize with the scribe the action plan agreed upon by the team
- Train the next facilitator at the end of the year

*\*Leader Role*
The leader's role is to reinforce the work of the team and to represent the team in the next level of PQI.

*Qualities* of a *leader:*
- Positive
- Willing to praise good effort
- Able to read the scribe's writing
- Assertive
- Supportive of the PQI process

*Tasks* of a *leader:*
- Provide opening remarks and introductions to the meeting
- Support and reinforce the team for productivity and idea generation
- Ensure that the issues are well understood so they can be presented to the next level meeting

18

- Read through the PQI Activity Log with the scribe, ensuring clarity
- Assist team members with their portions of the action plan

## The CPQI Meeting and Agenda Format

At every level, CQI teams use the CQI Activity Log for their agenda and for recording of the minutes. This facilitates consistency of minutes across the state.

Each team meeting has an agenda set in advance. This assures the meetings are productive and task focused. The agenda items listed below are always considered yet may not be pertinent at every meeting. The First Level Team include as many of the following as are relevant. At all levels the agenda is set and prioritized by the Facilitator and Scribe who seek input from team members as needed. It is important that the Scribe and Facilitator be mindful not to overload the agenda with too many issues for one meeting. Agendas will include some or all of the following:

- Quarterly CQI newsletter
- Summary and analysis of all Peer Record Reviews and Practice Development Reviews
- Review of data regarding participant, stakeholder, and staff satisfaction
- Program evaluation-demographics, process, outcomes, and other issues
- Review and development of strategic plans including training needs
- Updates on CQI projects underway and proposals of new projects
- Past issues unresolved.
- Review of incidents, accidents and participant grievances.
  - -The purpose of including these reviews is to determine specific immediate actions that may be necessary at the level of the incident, accident, or participant grievance to prevent further occurrences. It may also be necessary to refer incidents, accidents or participant grievance to the next level or an administrative team for the development of circuit, regional, or statewide action planning. Review the Incidents and Accidents Recording Form. This will assist in determining if there are any trends the teams should discuss.

Incidents and Accidents
Incident: Unusual or critical incidents are events that occur placing either consumers or staff at risk of harm. This harm may be physical or emotional.
    Examples:
- Child throws a brick through a TV at the foster home
- A client swears at the receptionist
- Windows are broken in the foster home
- Two clients begin fighting at an in-home session
- A client threatened a worker if the worker did not leave
- Foster child runs from worker on a busy street during transportation to visit

Accident: Accidents are events that have happened and already led to physical harm.
    Examples:
- Employee tripped over loose rug and was injured
- Employee was involved in a car accident
- Client fell down icy steps in front of the office
- Child fatality or serious injury to a child
- Infant was accidentally burned during bathing by foster parent

For the Second, Third, and State Level CQI teams, issues for the agenda primarily come from unresolved issues passed up from a lower level team. Additionally, issues identified by consumers and community partners may be a significant part of the agenda. Additional individuals are invited to attend meetings to provide details on specific agenda items.

DHS
267880

Special Project Work Groups

Special project work groups may be formed to work on tasks identified at a CQI meeting that need further information gathering, research, or solution building. If teams identify issues requiring further action, the team should first determine whether they are the correct group to initiate the action or whether the issue should be taken to the next level team.

While each level CQI team may identify one or more special project(s) for further discussion, it is NOT mandatory that any team undertake a special project. A useful tool to accomplish the goals of each CQI team may be the formation of work groups.

The CQI team that has identified a project will choose the members to participate on that particular work group. Each CQI team has the flexibility to request task force members outside the originating team to participate in a work group for a specific project.

The scope of the project will determine the number of volunteers that participate on the CQI work group. It is best if the initial projects are such that they can be completed within one quarter. As each CQI team enjoys success in achieving the goals of each project, it may then move to longer and more complex projects.

Each CQI team should, therefore, takes the following steps in identifying and selecting CQI special projects, and in the formation of work groups to carry out its goals:

1. List all potential Quality Improvement activities proposed by team members.

2. Instruct each CQI team member to rank each suggested project in order of importance. The most important project should receive the highest score. Collect and tally the scores from all CQI team members, then list the top choices.

3. The CQI team should agree on how many projects can reasonably be undertaken at one time. Consideration should be given, at a minimum, to the number of team members involved, their available time, and to the scope and nature of each project. It is suggested that initially only one project is identified by a team, so as not to overwhelm team members.

4. Each CQI team shall specify who will be in charge of each project and what individuals, including non-agency personnel, will work on the project. Each CQI work group will work independently of the PQI team, and will identify a leader and a scribe.

5. Each CQI Team shall determine the due date for completion of each special project. Adjustments can be made as requested by the work group.

6. Each CQI team should specify the evidence of project completion. Such evidence may consist of a written report from the PQI work group members and/or an oral presentation by the work group members to PQI team members at the next quarterly team meeting.

7. As the CQI special project is completed, each CQI team is suggested to recognize and acknowledge the work group for their commitment in some positive manner.

CQI Minutes: Format, Process of Recording and Distribution

Minutes shall be recorded using the CQI Activity Log. During CQI meetings the minutes are read to the team by the scribe. All members listen carefully to determine if the recorded words accurately reflect the key points of each issue and plan for action. The team may wait until the end of the meeting and review all the minutes. It may be more practical to approve items continuously, especially if there was lengthy discussion on a particular agenda item. For example, the team may stop after completing several simple

DHS
267881

issues and approve the minutes regarding those issues. The team may stop after a difficult or lengthy agenda item and read the minutes, amend as necessary, and approve them prior to moving on to the next item for consideration.

*Consensus*
The goal is to agree on the disposition of each agenda item. This agreement should be reached by consensus through clear and thoughtful discussion and consideration. One feature of the consensus process is that when an individual finds *s/he* is unable to agree with a decision that seems clear and appropriate to the group in general *s/he* may "stand aside" so that an action may be taken and the process may continue. The group members share a responsibility to listen to each agenda item. Generally this process is more unifying than taking an actual vote.
It is recognized that there may be some issues when consensus cannot be reached.
Depending on the issue, resolution may be tabled to allow more study of the issue or the issue may be referred to another level to request feedback.

*Distribution and Feedback*
The scribe will print out and copy the minutes and distribute them to all team members within one week. A copy is to be sent to the scribe of the next level team so s/he can formulate their agenda. A copy of the minutes should be placed in the PQI Notebook along with any supporting papers. The leader will also be responsible for bringing minutes back to the original group from the next level meeting and placing them in the PQI notebook.

*The CQI Notebook*
Each team should have a notebook maintained by the scribe. It needs to be kept in a location accessible by all staff.

*Implementation of Solutions*
As First Level Teams develop solutions, they feel can be implemented without going to the next level team, they share them with other First Level Teams within the office, if any exist. This helps to maintain a consistency and spirit of cooperation within the office. In addition, the team should present their solutions and implementation strategies to office managers (Supervisor and Circuit Manager) for approval if they are not involved on the decision making team. If no solution or implementation strategy can be reached, the issue is discussed at the next level team meeting.

*Confidentiality*
Confidentiality can become an issue during the CQI process as sensitive information may be shared. In order to assure confidentiality of staff and families served, the scribe refrains from recording specific names if they are discussed in a meeting. Staff also refrains from use of family names when community partners and consumers are present in a meeting. Information related to incidents, accidents, and grievances is discussed in a manner that protects the confidentiality of all involved.

Community partners and consumers must sign a Confidentiality Statement prior to the start of a CQI meeting. These are kept on file in the CQI notebook.

*Information Sharing*
First Level Teams, including Management and Central Office First Level Teams, are encouraged to develop a method of sharing CQI meeting information with other First Level Teams in their building and Circuit. Methods used should be very visible to staff. Suggestions may include an internal newsletter via print or email which shares highlights, each meeting, or a bulletin board to post highlights. The possibilities of learning from each other are great. Each Regional Office should develop methods to share key ideas/solutions from First and Second Level Teams across the Region.

Focusing the PQI Process

A quarterly CQI newsletter is issued by the Quality Assurance Unit during the first two weeks of each quarter. This newsletter focuses on one to two pertinent data elements as determined by the Division's Program Improvement Plan (PIP).

DHS
267883

The following flow chart illustrates how the PIP is used to focus the PQI process:



1.  Using the PIP as a compass, it drives statewide focus on certain data elements to be examined in PQI by the whole state.

2.  Using the PQI newsletter as a mechanism to focus the PQI meetings on the identified specific elements above, thus focusing all staff at one time on salient issues in the PIP. The PQI newsletter goes out one week before the first level PQI meetings begin.

3.  Ongoing elements of the newsletter include:

    - Message from the director
    - Statewide trend chart on data element with discussion of COA best practice associated with this element and how it affects consumers
    - Links to trend charts for data element for each circuit.
    - CQI calendar for the quarter
    - CQI success section
    - Statewide PQI meeting minutes link and summary of decisions made at state level from last quarter
    - Power of Prevention-quarterly article about success due to accessing early childhood services

25

DHS
267884

- Accreditation update
- PDR calendar
- Mission statement
- PIP update for the next quarter

DHS
267885

4. As a state, staff uses PQI Quarterly as an agenda/guide in PQI meetings thus focusing all staff at one time on salient issues in the PIP.

5. Local and state level solutions are developed and fed back into the next quarter's PQI newsletter.

6. Solution development leads to improvement in the PIP.

The CQI quarterly newsletter is meant to provide guidance for the CQI Teams. While teams are encouraged to use the PQI Newsletter in their meetings, teams are not limited to discussing newsletter items only. **Any service delivery issue is appropriate for discussion during PQI meetings.**

**Summary**

The DFCS is committed to becoming a learning and growing organization. Further enhancing and fully actualizing our Performance Quality Improvement process, plays a critical role in the carrying out and fulfilling the division's mission. This plan will be reviewed and evaluated on an annual basis as part of the statewide PQI process and a report will be generated at the end of each fiscal year.

**Goals**

At its most basic, CQI is a process to determine if something being done is effective or not. As far as the Department of Human Services is concerned, CQI provides the mechanism to determine whether or not the actions, services, and interventions by DHS and other service providers are helpful to the children and families being served.

The purpose of this CQI is broken down into five component parts. These are: 1) To act as a tool to monitor and improve the quality of interventions and services that are provided to the many children and families that are served on a daily basis by this Agency; 2) To provide a process to measure outcomes and show general trends and patterns as related to safety, permanency, and well-being for children and families in a county, a region, and for the State as a whole; 3) To monitor, evaluate, and provide feedback to the agency and the surrounding community on the performance of a system of care; 4) To determine if services provided are of sufficient intensity, scope and quality to meet individual needs of children and families; and 5) To support social workers, supervisors, and management personnel at every level within the agency, as well as support the development, implementation, and improvement of a service delivery system.

The process involved in this CQI is to gather information, analyze and evaluate the information, distribute the information, and then develop and implement action plans based on the information. The information will be gathered through the use of surveys (a Client Satisfaction Survey and a Community Partners' Survey) and a schedule of case record reviews. The action plans will be developed and implemented through Project Homestead, a local county based community partnership system. The information will be gathered on a county-by-county basis by two individuals -- a County Community Partnership Coordinator and a Regional CQI Coordinator. As part of the Region I East Pilot program, there was a Community Partnership Coordinator in each

24

of the three pilot counties (Prentiss, Union, and Lee), and one Regional CQI Coordinator for the pilot. The information that was gathered was evaluated, analyzed and distributed by the Regional CQI Coordinator. In addition to gathering information, the County Community Partnership Coordinator worked with the local Project Homestead and the county DHS to develop and implement action plans based on the information that had been gathered.

In 2008 many of the forms for the case record reviews, the Client Satisfaction Survey, and the Community Partners' Survey were developed/revised and refined.

DHS
**267886**

**Ex. 25**

# MISSISSIPPI DIVISION OF FAMILY AND CHILDREN'S SERVICES



# PERFORMANCE AND QUALITY IMPROVEMENT OPERATIONAL PLAN

# SFY 2010

DHS
268705

# THE PERFORMANCE AND QUALITY IMPROVEMENT (PQI) OPERATIONAL PLAN MISSION

- Assigns responsibility for coordination/implementation of Performance and Quality Improvement (PQI) activities, and provision of technical assistance in using the PQI process;

- Sets forth the purpose and scope of PQI activities;

- Establishes how the Agency periodically reviews essential management and service delivery processes consistent in light of quality priorities;

- Defines stakeholders and how stakeholders will participate in the PQI process;

- Outlines methods and timeframes for monitoring and reporting activities; and

- Includes provision for an assessment of the utility of the PQI program, including any barriers and supports for implementation.

This plan outlines and describes the implementation of the PQI process within the Mississippi Division of Family and Children's Services (DFCS). The primary purpose for engaging in PQI activities is to promote positive outcomes for the children and families served by the division by reinforcing the principles of family centered practice and assuring high quality of services. To achieve this goal, it is essential for the division to: 1) institute structured processes in order to examine, evaluate, and act on quality issues within our agency and (2) involve all division staff as well as families and stakeholders in these processes.

## **Definitions**

Implementing any performance improvement process requires a clear understanding and consensus on the terminology of "Quality Assurance" and "Quality Improvement." As it relates to the DFCS PQI process, these terms are defined as follows:

**Quality Assurance:** Those processes that measure the conformity of child welfare practice with the goals, mission, and values of MDHS, and compliance with the standards that guide the work of MDHS with children and families. These activities may include but are not limited to case record reviews, program evaluation, input from families and stakeholders, and use of well-defined performance indicators.

**Quality Improvement:** Actions taken that lead to incremental improvements in the provision of services or in the services provided to consumers. These actions are usually conceptualized and implemented by staff and stakeholders, based on information gained through review activities. Providing constructive feedback to the staff will help assure that the PQI process actually leads to improved practice and outcomes.

DHS 268706

# DFCS' VISION FOR PQI

Our vision for a functioning PQI process in Mississippi is based on our commitment to the mission and values of the Division of Family and Children's Services (DFCS).

## DFCS Mission Statement
- Our Mission is to lead Mississippi in protecting children and youth from abuse, neglect and exploitation by providing services to promote safe and stable families.

## Purpose of DFCS:
The Mississippi Department of Human Services, Division of Family and Children's Services has identified six values that will be honored in working with clients, community partners and each other.

## These are:
- **Competence** - To be competent we have technical skills and knowledge; we work with common sense; we make informed decisions; and we follow through to achieve successful outcomes.
- **Integrity** - To act with integrity we are honest in our interactions; we are accountable for our actions and we do the right thing.
- **Responsibility** - To be responsible we do what we say we are going to do; we take initiative.
- **Respect** - To be respectful we treat others with kindness, compassion, dignity, and the differences of our clients and each other.
- **Personal Courage** - To be courageous we are loyal to the Mission of the MDHS/DFCS; we advocate for our clients; we lead by example even when doing so carries risk.
- **Collaboration** - To collaborate we make decisions for the common good; we share resources based on need; we work together effectively in teams; and work with a collective knowledge of all programs and services.

As we move to implement the provisions of the *Olivia Y.* settlement agreement, the Council on Accreditation (COA) standards, and practices within the Child and Family Services Review (CFSR) these values will guide the work that we do with children and families throughout the state. They will provide a framework that allows us to integrate policy, practice, and monitoring activities in ways that provide consistency in our work, and help assure that all children and families have the opportunity for the highest quality of interventions regardless of which county in the state serves them.

Our vision for PQI is one that is thoroughly integrated into our ongoing work and serves primarily as a means of reinforcing the practices that we are currently implementing in the state. We view PQI as a means of keeping our mission and vision in clear focus for staff in the field and as a primary means of sustaining the improvements that we achieve in practice and outcomes over time. In order for it to serve that function, it must actually monitor the practices that we put into place and provide sufficient feedback to staff to inform practice, decision making, and resource allocation.

In developing strategies for implementing the many requirements of the *Olivia Y.* settlement agreement and the COA standards, we understand that we must present these requirements in ways that caseworkers and supervisors in the field can understand them in relation to their work with children and families and in relation to our mission and values. We want these many requirements to lead to measurable improvements in the outcomes of our work with children and families, rather than simply being put into place as a compliance process. Therefore, we are currently engaged in framing these requirements within a child welfare practice model that will change the way we interact with children and families and fulfill our compliance obligations at the same time.

We envision that our PQI process will then be designed in accordance with the practice model, and thereby support its implementation and sustainability. To design a monitoring process that is not fully synchronized with our practice model would be counterproductive to the goals of the *Olivia Y.* settlement agreement and the COA standards, and would not provide us with a thoroughly integrated and consistent way of serving children and families.

There are other specific characteristics of the PQI system that we envision, including:

***Involvement of all staff:*** PQI should be a process involving *all staff* in the evaluation of the effectiveness of services provided to participants by DFCS. Evaluation involves the examination of the Division's internal systems, procedures, and outcomes; the examination of input from participants; and the examination of relationships and interactions between DFCS and other stakeholders.

DFCS first initiated a formal PQI process in 2008 by developing a PQI structure involving all levels of staff, beginning implementation of peer record reviews statewide, restructuring consumer surveys, instituting yearly staff surveys and developing critical outcome measures used to monitor services provided to children and families.

The division has continued to recognize the importance of preserving these PQI processes and staff has continued to participate and see achievements, both at a local and statewide level, through the PQI process. In 2008, the director of DFCS was able to hire a Director of the DFCS Office of Performance and Quality Improvement whose focus is exclusively on PQI processes and activities. The division's prior achievements through PQI and this renewed commitment to quality improvement are a testament to the cultural change occurring within the division which is focused on becoming a learning and growing organization.

It is vital to the implementation and success of the PQI process for ALL staff to use their knowledge and skills to support DFCS mission and values in their work with children and families. The PQI process involves teams of administrative staff and service delivery staff and community partners. Service delivery staff range from those who provide direct participant services to those who provide service support staff. Service support staff may include clerical personnel, transportation aides, and social services aides who provide day-to-day assistance and resources to either administrative or service delivery staff or both. Service support staff are vital members of PQI teams and participate as appropriate on the team in which their input can be most beneficial.

DHS
268708

The success of a PQI process is dependent upon the degree to which the agency and team members are committed to the process. *All staff become members of a PQI team*. The expectation is that the team meeting is used to evaluate the agency services and outcomes and in turn create and implement plans to improve services.

***Principle driven:***   In addition to assuring that the substance of review activities reflects the mission and values of DFCS, we intend for the operation of our PQI process to be creative, inclusive, regular, structured, solution focused, efficient, empowering, action oriented, and common sense driven. This framework includes the following concepts:

- Promote excellence and continuous improvement;
- Broad-based, organization-wide, inclusion of staff and stakeholders;
- Support for strategic priorities and goals;
- Addresses organizational performance and program and client outcomes;
- Covers all programs and services;
- Results oriented organization;
- Purpose is ongoing quality improvement not discipline of staff.

***Integrated with supervision:***   The PQI process is not intended to be a replication of the existing agency hierarchy. PQI is not intended to replace supervision, although front-line supervision is probably the primary source of assuring quality in child welfare practice and should, therefore, reflect the same goals and principles as PQI activities. The supervisor's charge is to provide personal feedback to staff and to work with employees on remediation of weaknesses and building on strengths.

Both PQI and supervision must be concerned with the quality of casework practice and must be coordinated in reviewing for similar practices and outcomes. They both should be constructive in nature and not punitive. They both should provide timely and appropriate feedback to staff so that staff perceives supervision and PQI as helpful and supportive of their interest in doing good work.  They both should relate practice back to the guiding mission, values, and principles that the agency is committed to, and should reinforce a consistent model of practice so long as it leads to positive outcomes for children and families.

Supervision provides the day-to-day hands-on monitoring and feedback functions for caseworkers and other staff who serve children and families.  Supervisors arguably have more influence on the work of staff in the field than anyone else within the agency.  Therefore, coordinating what they review for and how they provide feedback and coaching with PQI substance and process is essential.

PQI goes beyond front-line supervision by also examining the systemic factors that affect the agency's ability to practice effectively with children and families.  It uses information from a variety of sources to examine outcomes and systemic operations, including aggregate data, case level data, information from knowledgeable stakeholders and families, and other sources in order to provide a holistic review.  It presents information in ways that permit individual caseworkers, supervisors, units, county departments, and other administrative units to identify and resolve problems, build on their strengths, and learn from their practice.  It is not a quick fix for systemic problems, but provides the information needed to

gauge the agency's capacity to fulfill its mission and develop strategies to make improvements where they are needed.

## PROPOSED FRAMEWORK FOR PQI

DFCS envisions a PQI structure that consists of multiple components:

- State-level QA function
- Foster Care Reviews
- Peer reviews
- PQI meetings

DFCS is proposing to develop PQI instruments and processes that are coordinated with and integrated into the practice model that we are developing. As the practice model is completed, we will develop specific outcome measures and instruments that include the components of the practice model. For example, although the components of the practice model are not yet finalized and have not yet been approved by MDHS, one broad area of focus in the model is involving children and parents in case planning activities and decision making. Many of the requirements in the *Olivia Y.* Agreement, the COA standards, and the CFSR directly relate to child and family involvement, and that is also consistent with DFCS' mission and values. A few examples of these requirements and activities associated with involving children and families in case planning include:

- Interviewing parents to complete assessments (*Olivia Y.*);
- Conducting team meetings within 30 days to develop individualized service plans (ISP) (*Olivia Y.*);
- Involving parents in ISP development (*Olivia Y.*, COA, CFSR);
- Involving age appropriate children in ISP development (*Olivia Y.*, COA, CFSR);
- Update ISP through family team meeting within 30 days if placement changes or other significant changes (*Olivia Y.*); and
- Worker and family regularly review progress and sign revisions to ISP (COA)

As we develop PQI instruments and procedures for obtaining information, we will want to be sure that we are routinely monitoring these practices that will be a part of the practice model, so that we have a basis for determining our conformity to practice requirements, but also to use the PQI process to reinforce these practices on an ongoing basis at the local level.

Similarly, the settlement agreement, COA standards, and the CFSR include requirements that are less oriented toward direct practice and more oriented toward the agency's capacity to support good practice in the field. With regard to this same category of practice, involving children and families in case planning, a few examples of the systemic requirements include:

- Pre-service and ongoing training in individual and family team meeting protocols (*Olivia Y.*);
- Permanency plans are reviewed by court or administratively every 6 months (*Olivia Y.*, CFSR, COA);
- Yearly dispositional/permanency hearings (*Olivia Y.*, CFSR, COA); and

6

DHS
268710

- Parents, foster parents, and other professionals are given notice of hearings/reviews (CFSR, COA).

In designing a PQI process that examines agency supports and capacity in addition to outcomes, we will also want to be sure that we include processes that allow us to review for these systemic areas and provide appropriate feedback locally and statewide.

PQI meetings are mandatory in that they must be scheduled for each level, every quarter and all staff are required to attend. The meetings allow everyone an opportunity for regular input. The process of issue resolution occurs during the meetings and between the meetings as well.

PQI teams are solution focused. Meetings result in the identification of needs, goals, and available resources, as well as strengths of the program, the staff, and the participants. Plans are formulated that build on those strengths. Areas needing improvement are identified and discussed, action plans are developed, and strategies are implemented to improve service delivery.

## First/County Level Teams
The number of First Level Teams in a county depends on the size of the office. Extremely small counties (3-4 staff) may have their own meetings or join with another county of similar size to form a larger First Level Team. The First Level Teams consist of peers (i.e. frontline workers will meet with frontline workers; supervisors will meet with supervisors). Whatever the composition, all levels of staff are included in a team.

## Second/Regional Level Teams
Second Level Teams provide an opportunity to address issues that impact a particular region and any unresolved issues presented by the leaders of the First/County Level Team or issues identified by upper management.

## State Level Team
The State Level Team provides an opportunity to address statewide issues and consolidate information and issues from all other levels of teams.

## Responsibility of Oversight of PQI

Tenants of the PQI process include:

- Focuses on the outcomes of the agency's interventions and the quality of practice;
- Utilizes teams of process owners to develop improvement solutions;
- Promotes the need for objective data to analyze and improve processes;
- Implies that a process and its service outcomes are never optimized;
- Establishes baselines of current performance;
- Measures performance over time;
- Compares the baseline performance to the actual performance;
- Identifies common causes of any performance variations;
- Allows service providers to look at their activities and task performance and create plans for improvement;

- Is different from traditional quality assurance in that its focus is self-directed, self determined change rather than change imposed by an external entity;
- Determines whether services meet predetermined expectations of quality and outcomes;
- Attempts to correct observed deficiencies identified through the PQI process;
- Every person is part of a PQI Team;
- The PQI process involves multiple levels of team meetings;
- Each team sends one representative to the next level meeting;
- All PQI meetings and team members are equal in importance;
- 90% of the issues are resolved at the level that first identified the issue; and
- A continuous feedback loop ensures the continuity of the process.

Performance Quality Improvement (PQI) is a comprehensive, ongoing management system with five steps: 1) identifying the reason for improvement; 2) recognizing the current situation; 3) analyzing the current situation; 4) creating an action plan to improve the situation; and 5) looking at the results. Then the process starts over again with a new reason for improvement. PQI includes:

- Intensive stakeholder involvement;
- Systematic data collection and analysis;
- Information sharing; and
- Corrective action.

The PQI process monitors for the results DFCS wants from the field to reinforce and keep desired outcomes in the minds of staff. This process will also provide feedback that is constructive - PQI then becomes Quality Improvement. A corrective action plan is then developed after issues are identified. The PQI plan will be based on the state's practice model, as good practice gives quality services to clients.

# STAKEHOLDERS

The PQI process should be more than obtaining information from the numbers. Interviews with other resources such as clients, staff, and stakeholders should also be used to obtain data. The stakeholders are defined as clients, staff, as well as any entity (public or private) that serves the families and children of Mississippi and works in conjunction with DFCS. These stakeholders will be identified and will be involved in the planning of the 5 Year Strategic plan as well as all review boards, panels and conferences. It is imperative that these stakeholders be involved as they are instrumental in DFCS' mission. A good working relationship must be maintained with these stakeholders as this has not been the case in the past. All efforts will be made to include them in all aspects of DFCS services.

## Staff, Clients, Community Partners and Agency Staff:

The agency and its staff interact on a daily basis with others in an effort to provide quality services to families. In order for the PQI process to truly reflect a complete picture of the service delivery system, these partners must also be a part of the process. Therefore, the expectation of the PQI process is that community partners and consumers be involved at least by the Third Level, if not sooner.

8

DHS
268712

Community Partners are individuals/entities with whom the division works in conjunction to provide holistic services to the populations we serve. Examples of community partners may include but are not limited to:

- Juvenile Court Representatives
- Foster Parents
- Service Recipients
- Residential or Counseling Service Providers
- Department of Mental Health
- Division of Economic Assistance
- Division of Child Support
- Guardians ad Litem
- Attorneys
- School Personnel
- Health Care Professionals
- Community or Child Advocates
- Community Partnership Representatives
- Law Enforcement Representatives

### Methods for involving stakeholders and how they are involved in PQI:

A strength of the Mississippi DFCS is its strong value for partnering with families and communities. The agency has worked diligently to develop partnerships with communities and to be accountable to our citizens through committees such as the Citizen's Review Board, the Children's Justice Act Panel and the Mississippi Association of Child Caring Agencies. DFCS is committed to openness, accountability, data driven decision making and working with our partners to improve services and outcomes for children and families. In Mississippi's CFSR PIP, many actions steps included partnerships with the Office of State Court Administrators, Department of Mental Health, Department of Health, state universities, community partnerships and others. DFCS anticipates continued involvement with these entities.

DFCS is partnering with the courts in pilot court improvement projects which include creation of uniform Youth Court Rules which were effective January 2009, as well as a collaborative effort with Court Improvement Plan to develop Court Curriculum for staff development (implemented October 1, 2008) and by 2009 Court Curriculum for court personnel. One of the employees of the Court Improvement Project is also employed by the Hinds County District Attorney's Office and specializes in child abuse cases. A cross training summit is in the planning stages between the courts and DFCS.

There are numerous ways in which DFCS engages community partners and stakeholders. In addition to the CFSR, reviews by the Governor, legislators, judiciary and state auditor provide DFCS with rich data to develop strategies for enhancing practice. Input is invited from legislative, judiciary, state auditors, local and regional law enforcement, universities, medical providers, mental health providers, the Mississippi Department of Health and, the Mississippi Department of Education, etc. The Children's Justice Task Force is composed of public figures who advocate for children and families in Mississippi and serves as an avenue for change for DFCS, and is a legislative mandate.

Community partners are selected based on their ability to assist in the process of generating solutions. Participants are purposefully selected who are very familiar with the policy, procedures and practice of the division. This will help avoid spending a substantial amount of time orienting them to the agency.

Consumers (clients) are identified as adults and youth involved with DFCS. Their involvement begins at the same level as community partners. The selection of these participants is done very carefully with a goal of selecting individuals who have experience with and knowledge of DFCS. If necessary a staff person who knows the individual may serve as a coach to assist them in understanding their role. Consumers may be either current or past clients. It may be more comfortable for a consumer who is no longer receiving services to actively participate in the process. Youth are selected from the Independent Living Programs (ILP) to provide input through the Strategies for Assessing Independent Living Skills (SAILS) Committee.

# MEASURES AND OUTCOMES

## Long Term Strategic Goals and Objectives:

Senior managers which include agency heads, Regional Directors, Unit Directors, and Program Administrators include PQI relevant short and long term goals in their work plans (and keep PQI issues on the agenda of their staff meetings through monthly data reports, case review results/reports (FCR reports, Peer Reviews), and regularly scheduled unit/division meetings.

## Overview of Legal and Regulatory Mandates Regarding Measurements of Outputs and Outcomes:

DFCS is subject to certain mandates and as a portion of the planning, the PQI plan will include the following:

- **Child and Family Services Review (CFSR) and Program Improvement Plan (PIP)**

The Program Improvement Plan (PIP) entered into as a result of the last Child and Family Services Review (CFSR) was completed and approved in 2008. The next CFSR is scheduled for 2010. DFCS remains cognizant of developing solutions which meet best practice standards which are in alignment with our mission and principles.

- **Five Year Strategic Plan**

DFCS' long term goals and objectives for the five year strategic plan are established by employing the Children's Bureau (CB) requirements and stakeholder, community partner, and consumer involvement. Meetings have been held on state and regional levels in February and March 2009.

- **Annual Progress and Services Report (APSR)**

The APSR is submitted annually to the CB updating them on progress of DFCS' goals and any new objectives that DFCS has established.

DHS
268714

- **Adoption and Foster Care Analysis Reporting System (AFCARS)**

AFCARS is a federally mandated report provided to the Department of Health and Human Services (DHHS) on a six month basis. This data file includes all children entering, exiting, and currently in out of home care for which DFCS has care and placement responsibility. This file reports placement settings, number of placement moves, and many other required elements. DHHS uses this file in conjunction with the National Child Abuse and Neglect Data System (NCANDS) to compile the state's data profile used for the CFSR. All validation utilities provided by DHHS are monitored for needed corrections of programmatic and system data entry and system adjustments within the Mississippi Automated Child Welfare Information System (MACWIS).

- **National Child Abuse and Neglect Data System (NCANDS)**

NCANDS is a federally mandated report that is submitted every federal fiscal year to DHHS. Included in this file are all abuse and neglects intakes/allegations by child and reports all findings, perpetrators, and if these children have received services prior to the intakes/allegations. These are just a few examples of the data included in this file. The file is used in conjunction with the AFCARS file to determine the safety profile component of the state's data profile for CFSR purposes. All validation utilities provided are monitored for needed corrections of programmatic and system data entry and system adjustments within the Mississippi Automated Child Welfare Information System (MACWIS).

- **Title IV-E Eligibility Review and Program Improvement Plan (PIP)**

The Children's Bureau (CB), within the Administration for Children's and Families (ACF), in collaboration with DFCS, conducted a primary eligibility review of Mississippi's Title IV-E foster care program during the week of July 14, 2008. The review team also included cross state reviewers and staff from ACF's Region IV Office of Grants Management.

The purpose of the Title IV-E foster care eligibility review was:
1. To determine whether Mississippi was in compliance with the eligibility requirements as outlined in regulation and statute at 45 CFR 1356.71 and Section 472 of the Social Security Act; and
2. To validate the basis of Mississippi's financial claims to ensure that appropriate payments were made on behalf of eligible children placed in licensed or approved foster family homes and child-caring institutions.

During the on-site review, each child's case file in the selected sample was reviewed to determine Title IV-E eligibility. The providers' files were examined to ensure that the foster home or child care institution in which the child was placed during the period under review was licensed or approved and the safety considerations were appropriately addressed. Payments made on behalf of each child were also reviewed to verify that the expenses were allowable under Title IV-E. Efforts were made to identify any underpayments that may have existed in the reviewed sample cases. In

addition, CB and DFCS agreed that subsequent to the on-site review Mississippi could submit additional child and provider documentation for any case that was found to be in error, in pending status, or to have an ineligible payment. As a result of the provision of additional documentation, a number of case and payment determinations were modified.

Pursuant to 45 CFR 1356.7(i), Mississippi is required to develop a Program Improvement Plan (PIP) designed to correct those areas needing corrective action as identified by the CB. DFCS has developed a PIP which will bring the Title IV-E's foster care maintenance program into compliance.

- ## *Olivia Y.* Settlement Agreement/Court Monitor

Children's Rights, Inc. filed the *Olivia Y. v. Barbour* lawsuit in the U.S. District Court for the Southern District of Mississippi in 2004, alleging violations of the rights of children living in the child welfare system. The Mississippi Department of Human Services (MDHS), Division of Family and Children's Services (DFCS) reached a Settlement Agreement with the Plaintiffs on January 4, 2008. The Settlement Agreement and Reform Plan sets out benchmarks to be completed in five implementation periods from January 4, 2008 through January 3, 2013.

The parties agreed on a Monitor of Defendants' compliance with the Mississippi Settlement Agreement and Reform Plan and the annual implementation plans. The Monitor's duties are to confirm independently the data reports and statistics provided pursuant to this Plan and the annual implementation plans; conduct independent case record and other qualitative reviews; review all plans and documents to be developed and produced by Defendants pursuant to this Plan; and report on Defendants' compliance in implementing the terms of the Plan and the annual implementation plans, and the achievement of the improved outcomes set forth therein. The Monitor shall prepare reports that will address these issues and be released periodically, but no less than every six months. The intent of the parties is that the Monitor shall develop a plan to transfer the primary monitoring function to DFCS' PQI Unit upon the termination of this Plan or at such earlier time as provided for in Section VII.C of the Settlement. The Monitor shall work in collaboration with Defendants to build DFCS' PQI capacity.

- ## Accreditation

A part of the *Olivia Y.* Settlement Agreement mandated accreditation through the Council on Accreditation (COA) within five years. Although mandated, funding for this endeavor must be approved through legislative appropriations each year. Despite possible funding challenges in the future, the division will continue working toward accreditation with the recognition that accreditation and the PQI process are neither singular events nor one-time initiatives. Rather, accreditation and PQI together will continue to serve DFCS as a fully integrated and ongoing journey aimed at structuring and focusing efforts on quality issues and meeting best practice standards along with the state's practice model.

- ## Foster Care Review

The Foster Care Reviews are conducted by a Foster Care Reviewer who is an experienced, licensed social worker (Family Protection Specialist Advanced).

12

DHS
268716

Throughout the month, the Foster Care Review Program Director compiles a report of any issues of concern observed by the Foster Care Reviewer during the course of a case review and reports these issues to the Regional Directors, the agency's Unit Directors, and the agency's Director and Deputies. The Monthly Foster Care Review Issues Report contains a case specific listing of the issues cited and the aggregate data on the issues most commonly cited each month. The Regional Directors forward the information to the appropriate county staff for a response. A response is due to the Foster Care Review Program Director within 30 days of the report.

- **Special Safety Review Team**

The *Olivia Y.* Settlement Agreement requires DFCS to undertake a special safety review, including an unannounced site visit, of all currently licensed resource homes with two or more reports of maltreatment, including corporal punishment, within the last three years to determine whether any children placed in these homes are at risk of harm in any licensing standards related to child safety are not being met. For groups homes and other residential facilities that house children in custody that have three or more reports of maltreatment, including corporal punishment, within the last two years to determine whether any children placed in these facilities are at risk of harm or any licensing standards related to child safety are not being met. Any necessary corrective actions will be identified and tracked.

- **The Mississippi Change Management Implementation Project**

Mississippi DFCS was awarded The Mississippi Change Management Implementation Project through the Atlantic Coast Child Welfare Implementation Center (ACCWIC) and is a project geared toward the full and ongoing institutionalization of a family-centered practice culture in the Mississippi Department of Human Services, Division of Family and Children Services, the public child welfare organization in the State of Mississippi. Such institutionalization will occur through the development of a model strategy of organizational and systems development applicable to and replicable in public child welfare agencies in general. This model strategy will be developed through the in-depth analysis and implementation efforts focused on two critical, high profile counties in Mississippi.

The project request is for two years, beginning in October, 2009. The proposal seeks change management tools necessary for effective implementation and sustainability of a Practice Model project recently initiated and currently underway designed to bring about the occurrence of family-centered practice consistently and ongoing throughout the State child welfare system. Technical assistance is requested in bringing about this change. The proposal includes requests for technical assistance in the development of methodologies for systems change, including analysis and assessment, goal development, strategic planning, change management, action planning, and evaluation.

The State of Mississippi is proposing a project of innovative and creative strategy through the focus on two specific counties with historical and current characteristics which are, though different from one another, extreme, unique, and challenging in any effort, present, past, or future, to implement and sustain a family-centered practice environment and culture. The proposal anticipates as an ultimate outcome of the project the development and design of a replicable approach and methodology for

organizational analysis and development geared toward the sustained institutionalization of a culture in which the embodiment and internalization of specific desirable values, principles, and philosophy has occurred within the organization and among stakeholders and partners connected to the organization in efforts to achieve desirable outcomes. The proposal anticipates a landmark study and analysis and the development of an innovative, creative, model methodology for understanding organizations and bringing about desired change.

Specific project success in Mississippi will be the full, statewide implementation of the family-centered practice model and the existence of a model methodology and strategy for the institutionalization of a family-centered practice culture within the Division of Family and Children's Services.

## Identified Strategies for Meeting Long Term Goals

From the beginning, DFCS leadership set a course for systemic improvement through self assessment and long term and short term strategic planning. To address immediate need and short term planning leadership immediately began developing a process and protocols for individualized, self assessment.

As previously stated, DFCS' long term goals and objectives have been defined in the Five Year Strategic Plan and through constant monitoring any successes or areas needing improvement can be identified. Any goals and objectives can be modified and updated as programmatic concerns arise and federal regulations are issued to the state.

Case reviews and outcomes monitoring are continuous and are conducted in conjunction with local community partners. Ongoing local committees provide independent community advice, advocacy and accountability. These partners help guide the DFCS toward its goal of imbedding best practice into the fabric of the organization to achieve safety, stability, permanency, and well-being for children and their families.

## ITEMS SUBJECT TO MEASURE

### Management/Operations Performance Outcomes

DFCS regularly reviews essential management and service delivery processes through MACWIS management reports, data tables, Foster Care Review reports, and senior management meetings. Various task forces and administrative teams such as the Citizens' Review Panel, Child Fatality Review Board, Children's Justice Act, the Director's Advisory Committee on Permanency Planning (DACOPP), Strategies for Assessing Independent Living Services Committee (SAILS), and the COA Steering Committee and workgroups are responsible for these essential processes.

### Workforce Stability

A worker gap analysis is done on a monthly basis to determine areas throughout the state in need of additional staffing and supervision. The reorganization of the regional lines within the state has provided opportunity for more regional directors, second and third level supervision. The worker gap analysis also allows the state to determine areas in need of more licensure and adoption workers in order to

DHS
268718

meet timely permanency goals for children in out-of-home care.

## Safety and Security

### Incidents and Accidents

Incident: Unusual or critical incidents are events that occur placing either consumers or staff at risk of harm. This harm may be physical or emotional.

Accident: Accidents are events that have happened and already led to physical harm.

These issues will be discussed and resolutions will be sought through the First/County Level Review Team. If no resolution can be found, the issue will progress through the Teams until a resolution is determined.

### Safety, Permanency and Well-Being

Reports on child welfare outcome measures monitor agency performance and guide future initiatives by following the state's practice model. The outcomes are the results the agency desires to achieve and reflect a condition of well-being for children, adults, families, and communities. The outcome measures cross all program lines and are quantifiable information which indicates the degree to which desired outcomes are being achieved and provide a mechanism for evaluation of performance. The outcome measures fit into one of the domains of safety, permanency or well-being.

### Program/Service Delivery Effectiveness

- **Supervisory Consultation and Oversight**

Supervisors are the most visible and accessible role models for DFCS social service workers. By actions and words, supervisors can implicitly and explicitly establish the limits of permissible behavior. Effective methods of supervision are adapted to the individuality of each DFCS social service worker and to the group as a whole. Based on the need and experience of the worker, individual supervisory conferences are provided on a weekly, bi-monthly, or monthly basis by plan, or by request. Monthly group meetings or conferences provide the opportunity to review memoranda, new policies and policy updates.

- **Peer Review**

The Peer Review process is an action-oriented learning process that provides a way of knowing what is working/not working in practice for selected children and families receiving services. This process was new for DFCS, beginning in May 2008.

The purpose of the Peer Review process is to determine the extent to which the Department is working together with families and supports and services, to produce results that show progress toward family independence, child well-being and permanency, and timely case closure.

Currently, one placement, one in home (prevention), an investigation, and two screened out cases are randomly selected from a county within a region and assigned

for review. The reviews are done monthly for selected cases and each region is assigned the aforementioned cases from another region to review.

- **Supervisory Administrative Reviews**

The newly developed Supervisory Administrative Review (SAR) is also capturing this information during the formal case review process at periodic intervals within the life of a case. The SAR is completed at the 90 day mark of a case being opened and again in the 15th month.

- **Consumer Surveys**

In order to improve the quality of services, it is important to receive feedback from the children and families served by DFCS. Currently, input from consumers who are served through out-of-home care services is obtained through surveys which are mailed to the Foster Care Review Program. A self-addressed stamped envelope accompanies the survey to facilitate a higher response rate and assure confidentiality. Information from returned surveys is entered into a database, aggregated, and sent in report form to the county and regional office for review through the Performance Quality Improvement (PQI) process.

DFCS will develop consumer surveys based on all programmatic areas.

- **Staff Survey**

Assessment of employee satisfaction is a way to gather vital information from our organization's most valuable resource, our employees. The Worker Satisfaction Survey allows detailed and comprehensive organizational information to be obtained from all division staff for use in the development of strategies to improve on identified areas of need. The survey is an online survey designed to link scores on the survey to issues impacting the organization. Survey questions are drawn from empirical and theoretical literature on organizations and specifically examine five key dimensions of life within the organization: work team, work setting, general organizational features, communication patterns, and personal demands.

- **Grievance Data**

In order to maintain a continuous quality improvement culture within the organization, it is important to ensure that all youth and families served are informed of their rights and have a formal process to voice their concerns.

There are two avenues by which DFCS gathers grievance data; through the Service Delivery Grievance Process and through the Constituent Unit.

### 1. The Service Delivery Grievance Process

All youth and families served are informed of their rights and have a formal process to voice their concerns. The Service Delivery Grievance Process is a structured process by which consumer service delivery issues can be addressed at the State Office level, allowing families the opportunity to express concerns regarding any perceived inequities, unfair treatment, or dissatisfaction with agency actions or behaviors.

## 2. Constituent Unit

MDHS also has a Constituent Unit that is located in the Executive Director's office. Complaints are received in this office and are forwarded to DFCS's' assigned person in order for that person to research the grievance/complaint and a response is sent back to the Executive Director's Office. An agency representative actively communicates with the complainant in order to effectively resolve the complainant's problem. A response is prepared and submitted to the complainant.

The need to track outcomes and the means by which they were achieved is an important part of the quality improvement process. The information received from the Level One/County Teams through the State Level Teams of the grievance process will be entered into the statewide Service Delivery Grievance Database. Although specific grievances will not be able to be viewed by all staff, aggregate information for the state and each county will be available to staff for use during PQI meetings. Each PQI team will review the data and look at trends related to the quality of services being delivered, program issues, communication, etc. that led to the grievances.

# PQI OPERATIONAL PROCEDURES

## Overview of PQI Data Collection Process

A multitude of reports and data profiles are provided statewide though the MACWIS system, the FCR process, the PQI Unit and many other divisions/units within DFCS. These reports are discussed at Senior Management meetings, unit meetings, director's meetings, workgroup meetings and regional and county staff meetings.

## What is Being Measured

DFCS will identify performance measures for the PQI process that address our major mandates, such as the CFSR, COA standards and *Olivia Y.* requirements. We will focus on outcome measures that track our progress in addressing these requirements, plus our effectiveness in achieving child safety, permanency and well being items. We will include measures that will mirror to the extent possible, federal outcome measures and the court monitor's measures, so the PQI system will be useful at multiple levels. Also, consistent with the terms of the *Olivia Y.* settlement agreement that requires the PQI system to provide the monitoring for court oversight after 5 years, DFCS will begin measures now that will serve that function. The measures that we adopt will also track progress in implementing the practice model and serve to reinforce child welfare practice consistent with the model.

## Why Is It Being Measured

This data is being measured in order to provide the most effective services and to assure programmatic changes are being implemented to the greatest or highest degree of quality possible to promote safety, permanency and well-being to our families and children based on the state's practice model.

DHS
268721

**Data Source**

All data, reports and evaluations are provided from many sources such as MACWIS, FCR, Peer Reviews, the PQI Unit, State Data Profiles, AFCARS, NCANDS, and county/regional staff.

**Who is Responsible**

This data is evaluated on a monthly basis by the Regional Directors, Area Social Work Supervisors (ASWS), Unit Directors and senior management staff. Recommendations based on any anomalies in the data are discussed and action plans are developed in order to implement changes. County staff is responsible for the input of data into MACWIS in order to enable the system to capture the information needed for these reports. The ASWS is responsible for ensuring the information in the cases is entered accurately and timely. They must also validate the data entered by the county workers.

**How Data Will Be Collected**

As discussed above, data is collected through many systems and reviewed by all levels of management. While the state's practice model is being developed, regional visits will be made by PQI Teams to interview workers, stakeholders, licensure staff, adoption staff, clients, and any other person as needed to determine what needs to be improved. After these practice issues are identified a new instrument will be developed that will address and measure the items that were identified in the regional meetings so that DFCS can track progress of these items as they relate to the practice model.

**Who Will Implement/Oversee Recommended Changes**

The Director of the Monitoring and Evaluation within the PQI Unit will ultimately be responsible for the implementation and oversight of any recommended changes that result from the regional PQI Team visits. Each Regional Director will report to the Director of Evaluation and Monitoring to ensure the items identified are being measured and addressed for appropriate feedback. The PQI teams identified earlier will also play a role in ensuring implementation of the recommendations at all levels.

**Reporting Data**

It is important that the data is reported in a clear, concise and accurate manner that is easy for all to understand, interpret and analyze. In an effort to track the progress of these items, trends will be identified according to the practice model.

**Process for Aggregating Data**

Many reports to be used in the PQI process are already developed in an aggregate form by MACWIS. Such as the aggregate data reports, other reports for the PQI process that address new indicators and qualitative information will be developed by the PQI Unit and will be distributed at all levels routinely. We will produce reports that reflect local, regional and statewide issues and findings.

**Report Formats**

DFCS has no set standard for formatting a report at this time. MACWIS reports use a standard business rule to sort, aggregate and print the report produced by that system. Each person who develops a report uses their own style at this point. Efforts will be made to standardize the report format for the ease of the users.

## Data Review and Analysis Process:

Routine actions are taken to identify areas of needed improvement, implement the improvement on a small or broad scale, review the results, modify or discontinue the improvement process, and keep staff informed and involved throughout the cycle.

**Review Data/Reports**

Data reports (MACWIS management reports, FCR reports, data probes, monthly unit reports, etc.) are reviewed on a monthly basis at regional staff meetings, senior management meetings, and weekly Unit Directors/Division Directors meetings.

**Analyzing and Interpreting Data/Reports**

During the above mentioned meetings these reports and data therein are reviewed, analyzed, and interpreted to determine and track trends, strengths, progress, as well as areas needing improvement. At this point in the process, decisions and determinations regarding any needed modification of policy and/or practice are discussed for possible changes and implementation in order to improve these processes.

**Re-establish Benchmarks**

At any point during this PQI process, benchmarks can be re-established based on data trends and situational occurrences within the counties, regions, and state. These benchmarks should not be re-established solely to meet a requirement or standard but used to evaluate or improve services to families and children as well as comply with the state's practice model.

## Communicating Results:

All data, policy, and practice information must be shared with stakeholders and other interested parties within the communities to continue to keep them involved in the PQI process. Without providing positive feedback, the results of PQI cannot be used to make needed improvements. Therefore a strong feedback process is central to the plan.

**Using Data for Implementing Improvement**

Upon disbursement of any information, comments and recommendations will be solicited by DFCS from any involved party may it be management, stakeholders, or consumers.

DHS
268723

The following chart shows the PQI feedback loop:



**Focus on specific data elements monthly and periodic case reviews** (1)

**PQI focusing on data in relation to outcomes and casework practice** (2)

**PQI meetings to analyze data and other findings and make recommendations** (3)

**Reports developed and distributed to communicate recommendations** (4)

**Regional/Local/State level solutions developed and reported to PQI** (6)

**Feedback Regarding Success of Solutions Evaluated**

**Services to Families & Children**

## <u>Summary</u>

Mississippi's DFCS is committed to becoming a learning and growing organization. Further enhancing and fully actualizing our Performance Quality Improvement process, plays a critical role in the carrying out and fulfilling the division's mission. This plan will be reviewed and evaluated on an annual basis as part of the statewide PQI process and a report will be generated and updated at the end of each fiscal year.

DHS
268724

**Ex. 26**

## CHILD AND FAMILY SERVICES REVIEWS
## ONSITE REVIEW INSTRUMENT
### Face Sheet

| Name of county or region: | Case name: | Period under review: |
|---|---|---|

| Reviewer: | Date case reviewed: |
|---|---|

| Target Child | Child(ren)'s name(s): | Race and/or ethnicity: | Date(s) of birth (MM/DD/YY): | Gender: |
|---|---|---|---|---|
| ☐ | | | | |
| ☐ | | | | |
| ☐ | | | | |
| ☐ | | | | |
| ☐ | | | | |
| ☐ | | | | |

Type of case reviewed:
☐ Foster Care Case     ☐ In-home Services Case

Was this case opened for reasons other than child abuse and neglect?          Yes ☐  No ☐

Date of most recent case opening for all cases (MM/DD/YY):

Date of the child's most recent entry into foster care (MM/DD/YY):          Not Applicable ☐

Date of discharge from foster care for the most recent foster care episode (MM/DD/YY):

Not Applicable ☐          Not Yet Discharged ☐

Date of case closure (for all cases) (MM/DD/YY):

Case not closed by time of review ☐

Reason for agency involvement:

☐ Physical abuse          ☐ Child's behavior                    ☐ Substance abuse by child
☐ Sexual abuse            ☐ Abandonment                        ☐ Domestic violence in child's home
☐ Emotional maltreatment  ☐ Mental/physical health of parent   ☐ Child in juvenile justice system
☐ Neglect (not including                                        ☐ Other (specify)
medical neglect)          ☐ Mental/physical health of child
☐ Medical neglect         ☐ Substance abuse by parent(s)

N. Persons interviewed by the reviewers (list below):

| Relationship to Case | Date of Interview | Type of Interview | |
|---|---|---|---|
| | | ☐ In-Person | ☐ Phone |
| | | ☐ In-Person | ☐ Phone |
| | | ☐ In-Person | ☐ Phone |
| | | ☐ In-Person | ☐ Phone |

*Assuring Safety and Managing Risk*

## Timeliness of initiating investigations of reports of child maltreatment

| | | | | | | | | | Number |
|---|---|---|---|---|---|---|---|---|---|
| CFSR | How many reports of suspected abuse or neglect have been received on any child(ren) in the family (including those that were screened out by the agency) during the life of the case? | | | | | | | | |
| CFSR | How many accepted reports alleging abuse or neglect were received on any child(ren) in the family during the period under review (i.e., they were not screened out)? | | | | | | | | |

| | ReportDate | First Name of Child | Allegation | Priority Level (if Applicable) | Date Assigned for an Investigation or Assessment | Date Investigation or Assessment Initiated | Date of Face-to-Face Contact With Child | Relationship of Alleged Perpetrator to Child | Disposition |
|---|---|---|---|---|---|---|---|---|---|
| CFSR | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

| | | Number | | |
|---|---|---|---|---|
| CFSR | In how many of the reports listed above was the investigation NOT initiated in accordance with the MDHSs timeframes and requirements for a report of that priority? | | | |
| CFSR | In how many of the reports listed above was face-to-face contact with the child(ren) who is the subject of the report NOT made in accordance with the State's timeframes and requirements for a report of that priority? | | | |
| CFSR | For all reports identified above, were the reasons for the delays due to circumstances beyond the control of the agency? | Yes | No | NA |
| CFSR | Identify any reasons why a response was not initiated within established timeframes or face to face contact was not made (if applicable and reason is available): | | | |

## Repeat maltreatment

| | | | | |
|---|---|---|---|---|
| CFSR | Was there at least one substantiated or indicated maltreatment report involving any child in the family? | Yes | No | |
| CFSR | Was there at least one maltreatment report involving any child in the family that was referred for an assessment and the decision was made to open the case for services to address concerns relevant to the safety of at least one of the children in the family (this decision may have been made by the agency or by a private provider under contract with the agency)? | Yes | No | |
| CFSR | If Yes, within a 6-month period before or after any maltreatment report identified, was there at least one additional substantiated or indicated maltreatment report involving any child in the family? | Yes | No | |
| CFSR | If Yes, was there at least one additional maltreatment report involving any child in the family that was handled by an alternative response and resulted in a decision to open the case for services to address concerns relevant to the safety of at least one of the children in the family (the case may have been opened for services by the agency or by a private provider under contract with the agency)? | Yes | No | |
| CFSR | If Yes, did the report(s) identified above involve the same or similar circumstances? | Yes | No | NA |

*Assuring Safety and Managing Risk*

| | | | | |
|---|---|---|---|---|
| CFSR<br>CFSR | If Yes, did any of the reports involve maltreatment of the child by the foster parents, members of the foster parents' family, other children in the foster home or facility, or facility staff members? | Yes | No | NA |
| | If there was maltreatment recurrence, document the circumstances related to maltreatment incidents including information related to the perpetrators, and indicate why the reviewers determined that the two incidents did or did not involve the same circumstances: | | | |
| CFSR | Describe the circumstances related to any substantiated or indicated reports of maltreatment (if relevant) involving the foster parents, members of the foster parents' family, other children in the foster home or facility, or facility staff members: | | | |
| PM | For cases where reports of maltreatment occurred in the foster home, but the children were not removed, please describe what additional actions were taken by the caseworker to ensure the safety of children, including frequency of visitation and interventions provided: | | | |
| PM | For cases where repeat maltreatment did occur, what interventions and actions were taken by the caseworker and ASWS to try and prevent maltreatment of the child(ren): | | | |

## Services to Protect Child(ren)

| | | | | |
|---|---|---|---|---|
| CFSR | For the period under review, did the agency make concerted efforts to provide or arrange for appropriate services for the family to protect children and prevent their entry into foster care or re-entry into foster care after a reunification? | Yes | No | |
| CFSR | If, during the period under review, any child was removed from the home without providing or arranging for services, was this action necessary to ensure the child's safety? | Yes | No | NA |
| CFSR | Please identify the services that were needed by the family to address safety issues and describe how those services were or were not provided by the agency during the period under review: | | | |
| CFSR | Please note the reason for removing the child from the home during the period under review without providing services (if relevant and reason is available) and provide the reviewers' reasons for determining whether the reason was appropriate or inappropriate: | | | |
| CFSR | Identify the activities undertaken to monitor participation in safety-related services (or the absence of activities to monitor service participation): | | | |

## Risk assessment and safety management

*Assuring Safety and Managing Risk*

| | | | | |
|---|---|---|---|---|
| CFSR | If the case was opened during the period under review, did the agency conduct an initial assessment of the risk to the target child in foster care and/or any child(ren) in the family remaining in the home? | Yes | No | NA |
| CFSR | During the period under review, did the agency conduct ongoing assessments of the risk to the target child in foster care and/or any child(ren) in the family remaining in the home? | Yes | No | NA |
| CFSR | If the case was opened during the period under review for either foster care or in-home services, did the agency: (1) conduct an initial assessment of the safety of the target child in foster care and/or any child(ren) remaining in the home, and (2) develop a | Yes | No | NA |
| CFSR | During the period under review, did the agency: (1) conduct ongoing safety assessments of the target child in foster care and/or any child(ren) remaining in the home, and (2) continually monitor and update the safety plan, including encouraging family engagement in services designed to promote achievement of the goals of the safety plan? | Yes | No | NA |
| CFSR | During the period under review, were there safety concerns pertaining to the target child in foster care or any child(ren) in the family remaining in the home that were not adequately or appropriately addressed by the agency? | Yes | No | NA |
| CFSR | During the period under review, was there a safety concern related to the target child in foster care during visitation by parents or other family members that could be attributed to not providing sufficient monitoring of visitation, permitting unsupervised visitation when it was not appropriate, or court-ordered visitation against agency recommendations? | Yes | No | NA |
| CFSR | During the period under review, was there a concern for the target child's safety related to the foster parents, members of the foster parents' family, other children in the foster home or facility, or facility staff members that was not adequately or appropriately addressed by the agency? (Foster parents include pre-adoptive parents and nonlicensed relatives providing care to a child in State custody.) | Yes | No | NA |
| CFSR | During the period under review, if the target child was discharged from foster care to be reunited with parents or relatives or returned home on a trial home visit, did the agency conduct a thorough safety assessment? | Yes | No | NA |
| CFSR | Describe the circumstances of the case that indicate risk concerns related to the child(ren): | | | |
| CFSR | Describe the circumstances of the case that indicate safety concerns related to the child(ren): | | | |
| CFSR | Describe the characteristics of the risk assessment(s) and safety assessment(s) (was one conducted, how was it conducted, when it was conducted, how comprehensive was it, what did it include or not include): | | | |
| CFSR | If applicable, describe the nature of the safety concerns related to the child(ren) during visitation, including a description of the visitation (for example, was it unsupervised, and if so, was this appropriate?): | | | |
| CFSR | If applicable, describe the nature of the safety concerns related to the child(ren) from foster care providers and MDHS's activities with regard to addressing safety. | | | |

*Assuring Safety and Managing Risk*

| | |
|---|---|
| CFSR | Was there a report substantiating that the foster care provider(s) maltreated the child during the period under review? If Yes, describe the circumstances of that report, whether the agency might have prevented the maltreatment, and the agency's response: |
| PM | How did the supervisor support the caseworker in helping to assure the safety of child(ren) and the mitigation of risk: |

**Conclusion**

Based on the above results, please rate the case overall for assuring the safety of children and managing risk:

☐ Substantial Conformity
☐ Partial Conformity
☐ No Conformity

Please feel free to provide any clarifying comments with regards to this case's conformity to this component of the Practice Model:

*Assessing Strengths and Needs*

| | Needs and services of child, parents, and foster parents | | | |
|---|---|---|---|---|
| CFSR & PM | During the period under review, did the agency conduct (1) a formal or informal initial comprehensive assessment of the child(ren)'s strengths and needs (if the case was opened during the period under review), or (2) an ongoing assessment to provide updated information regarding the child(ren)'s needs for case planning purposes (if the case was opened before the period under review)? | Yes | No | |
| PM | If case was opened during PUR, was the initial children's strengths and needs assessment conducted within the first 30 days? | Yes | No | NA |
| PM | Document the strengths of the child(ren) identified by the agency: | | | |
| CFSR | Document the method that the agency used to assess the child's needs: | | | |
| CFSR | Document the needs of the child(ren) identified by the agency: | | | |
| CFSR | Document the needs that were present but were not identified by the agency: | | | |
| CFSR & PM | During the period under review, did the agency conduct (1) a formal or informal initial comprehensive assessment of the mother's strengths and needs (if the case was opened during the period under review) or (2) an ongoing assessment to provide updated information regarding the mother's needs for case planning purposes (if the case was opened before the period under review)? | Yes | No | NA |
| PM | Document the strengths of the mothers identified by the agency: | | | |
| CFSR | During the period under review, did the agency conduct (1) a formal or informal initial comprehensive assessment of the father's needs (if the case was opened during the period under review) or (2) an ongoing assessment to provide updated information regarding the father's needs for case planning purposes (if the case was opened before the period under review)? | Yes | No | NA |
| PM | During the period under review, did the agency conduct (1) a comprehensive assessment of the father's strengths? | Yes | No | |
| PM | Document the strengths of the fathers identified by the agency: | | | |
| PM | If case was opened during PUR, was the initial family's strengths and needs assessment conducted within the first 30 days? | Yes | No | |
| CFSR | Please indicate any reason why a needs assessment did need to be completed on either the mother or father: | | | |

*Assessing Strengths and Needs*

| | | | | |
|---|---|---|---|---|
| CFSR | Document the mother's needs identified by the agency, and additionally indicate any needs not identified by the agency: | | | |
| CFSR | Document the father's needs identified by the agency, and additionally indicate any needs not identified by the agency: | | | |
| PM | Were the birth parents interviewed prior to the completion of the strengths and needs assessment? | Yes | No | NA |
| PM | Is there clear evidence of familial involvement and input in the strengths and needs assessment? | Yes | No | NA |
| PM | Please describe any needed medical, dental, mental health or other therapeutic and supportive services children are receiving as identified through a comprehensive family assessment | | | |
| PM | Is the child has been assessed with special needs, are they placed in a placement that can meet their therapeutic, educational and medical needs? | Yes | No | NA |

## Educational needs of the child

| | | | | |
|---|---|---|---|---|
| CFSR | During the period under review, did the agency make concerted efforts to assess the child(ren)'s educational needs? | Yes | No | |
| PM | Were the child's educational needs assessed within 30 days of entry into foster care? | Yes | No | NA |
| CFSR | During the period under review, did the agency engage in concerted efforts to address the child(ren)'s educational needs through appropriate services? | Yes | No | NA |
| CFSR | If not explained in the "reason for rating" section, document the process used for educational assessment, if relevant: | | | |
| PM | If the child is 3 years of age or younger, did they receive a developmental assessment within 30 days of foster care entry? | Yes | No | NA |

## Physical health of the child

| | | | | |
|---|---|---|---|---|
| CFSR | During the period under review, did the agency assess the child's physical health care needs? | Yes | No | NA |
| PM | If the child came into care during the PUR, did the child receive an initial screening within 24 hours? | Yes | No | NA |
| PM | Did the child receive a comprehensive health screening within 30 days of foster care entry? | Yes | No | NA |
| CFSR | During the period under review, did the agency assess the child's dental health care needs? | Yes | No | NA |

## *Assessing Strengths and Needs*

| | | Yes | No | NA |
|---|---|---|---|---|
| PM<br>CFSR | Did the child, if over 3, receive an initial dental examination within 90 days of entry into care or within 90 days of their 3rd birthday if occurring during stay in foster care and every 6 months thereafter? | | | |
| | If not explained in the "reason for rating" section, identify the evidence of physical or dental health assessment (for example, what type of needs assessment was conducted, and what kind of information was in the case file or missing from the case file that is relevant to an assessment of physical or dental health needs?): | | | |

## Mental/behavioral health of the child

| | | Yes | No | |
|---|---|---|---|---|
| CFSR | During the period under review, did the agency conduct an assessment of the child(ren)'s mental/behavioral health needs either initially (if the child entered foster care during the period under review) or on an ongoing basis to inform case planning decisions? | | | |
| PM<br>CFSR | Did the child, age 4 and older, receive an initial mental health screening within 30 days of entry into care and/or within 30 days of their **4th** birthday if occurring during stay in foster care? | Yes | No | NA |
| CFSR | Note whether or not there is evidence of a mental/behavioral health (including substance abuse) assessment. For example, (1) what type of needs assessment was conducted, and (2) what kind of information was in the case file or missing from the case file that is relevant to an assessment of mental/behavioral health needs? Indicate if a formal assessment was conducted, and, if so, note the diagnosis: | | | |
| CFSR | If the agency did not conduct initial and/or ongoing mental/behavioral health (including substance abuse) assessments, document the reasons why the assessments should have been provided during the period under review and were not. Also, determine whether any initial mental/behavioral health assessment arranged for by the agency was done so in accordance with State policy timeframes: | | | |

## Conclusion

Based on the above results, please rate the case overall for assessing strengths and needs:

| |
|---|
| Substantial Conformity |
| Partial Conformity |
| No Conformity |

Please feel free to provide any clarifying comments with regards to this case's conformity to this component of the Practice Model:

# *Involving Children and Families in Case Planning and Decision Making*

## Visitation

| 1 | CFSR | For each applicable relationship, document concerted efforts (for example, establishing written visitation plans, providing or arranging for transportation, encouraging visits, arranging for flexible hours or meeting locations), or lack of efforts to promote frequent visitation. If visitation was not possible or limited by circumstance (for example, parents are out of State or incarcerated), document efforts or lack of efforts to promote contact through telephone or mail. If any relationship is identified as Not Applicable, document the reason why it was determined by the reviewers to be Not Applicable. |
|---|---|---|

Mother:

Father:

Sibling(s):

Other Issues:

## Child and family involvement in case planning

| CFSR | During the period under review, did the agency make concerted efforts to actively involve the child in the case planning process? | Yes | No | NA |
|---|---|---|---|---|
| CFSR | During the period under review, did the agency make concerted efforts to actively involve the mother in the case planning process? | Yes | No | NA |
| CFSR | During the period under review, did the agency make concerted efforts to actively involve the father in the case planning process? | Yes | No | NA |

| CFSR | Document the ways in which each party listed below was or was not involved in case planning (for example, identifying needs and services, establishing goals, evaluating progress, etc.) If the involvement of the child, mother, or father is determined by the reviewers to be Not Applicable, document the reasons for this determination (including any evidence of efforts to locate absent parents). |
|---|---|

Child:

Mother:

Father:

## *Involving Children and Families in Case Planning and Decision Making*

| | | | | |
|---|---|---|---|---|
| PM | Extended Family: | | | |
| PM | Were family team meetings utilized to engage the family in the development of the case plan? | Yes | No | NA |
| PM | Were Family team meetings conducted according to stipulated timeframes (within first 30 days, every 90 days, and prior to closure? | Yes | No | NA |
| PM | Is there evidence that the family was informed of and prepared to actively participate in case events, including the FTMs, case plan development, and court events? | Yes | No | NA |
| | Please explain your answer: | | | |
| PM | Is there evidence that caseworkers utilized input from children and families in case planning and decision making? | Yes | No | NA |
| | Please explain your answer: | | | |
| PM | If families were not adequately involved in case planning, please indicate reviewer's perceptions of why that is the case (for example, lack of training, understanding, families would not engage with caseworkers, case circumstances, etc.): | | | |
| PM | Were the service plans signed by the parents or guardians? | Yes | No | NA |
| PM | Were the service plans signed by the children, aged 6 and up? | Yes | No | NA |
| PM | Were there documented discussions of concurrent planning with the birth parents? | Yes | No | NA |
| PM | Did the families attend the County Conferences? | Yes | No | NA |

## Caseworker visits with child

| | | | |
|---|---|---|---|
| CFSR | During the period under review, was the frequency of the visits between the caseworker (or other responsible party) and the child(ren) sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals? | Yes | No |
| CFSR | During the period under review, what was the most typical pattern of visitation between the caseworker or other responsible party and the child(ren) in the case? (Select the box that describes the usual pattern of visitation.) | ☐ More than once a week<br>☐ Once a week<br>☐ Less than once a week, but at<br>☐ Less than twice a month, but at<br>☐ Less than once a month<br>☐ Never | |
| PM | Did the caseworker visits occur 2 times a month, with at least one in the home? | Yes | No |
| CFSR | During the period under review, was the quality of the visits between the caseworker and the child(ren) sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals (for example, did the visits between the caseworker or other responsible party and the child(ren) focus on issues pertinent to case planning, service delivery, and goal achievement)? | Yes | No |
| CFSR | Please document barriers to more frequent visiting (if relevant): | | |

## *Involving Children and Families in Case Planning and Decision Making*

| | | | | | |
|---|---|---|---|---|---|
| CFSR & PM | Did the caseworker visits with children seem effective in their intended purpose of engaging the child, using visits to assess progress towards goals, identify barriers, and ensure the safety of children? | | | Yes | No | NA |
| CFSR | Please detail the reasoning for your above answer: | | | | | |
| CFSR | Document the aspects of the caseworker visits with the child that contributed to high quality visits (if relevant) or why caseworker visits were not of high quality (if relevant): | | | | | |

### Caseworker visits with parents

| | | | | | |
|---|---|---|---|---|---|
| CFSR | During the period under review, was the frequency of the visits between the caseworker (or other responsible party) and the mother sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals? | Yes | No | NA |
| CFSR | During the period under review, what was the most typical pattern of visitation between the caseworker or other responsible party and the mother of the child(ren)? | ☐ More than once a week<br>☐ Once a week<br>☐ Less than once a week, but at<br>☐ Less than twice a month, but at<br>☐ Less than once a month<br>☐ Never |
| CFSR | During the period under review, was the frequency of the visits between the caseworker (or other responsible party) and the father sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals? | Yes | No | NA |
| CFSR | During the period under review, what was the most typical pattern of visitation between the caseworker or other responsible party and the father of the child(ren): | ☐ More than once a week<br>☐ Once a week<br>☐ Less than once a week, but at<br>☐ Less than twice a month, but at<br>☐ Less than once a month<br>☐ Never |
| CFSR | During the period under review, was the quality of the visits between the caseworker and the mother sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals? | Yes | No | NA |
| CFSR | During the period under review, was the quality of the visits between the caseworker and the father sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals? | Yes | No | NA |
| CFSR | Please describe barriers to more frequent visiting with the mother (if relevant) and father (if relevant): | | | |
| CFSR | Describe the general quality of the caseworker visits with the mother and the father, and the issues that were or were not addressed during caseworker visits (if relevant): | | | |
| PM | If regular visitation is not occuring due to parents not being involved or found, are there documented diligent efforts to locate parents? | Yes | No | NA |

# *Involving Children and Families in Case Planning and Decision Making*

## Conclusion

Based on the above results, please rate the case overall for involving children and families:

|  |  |
|--|--|
|  | Substantial Conformity |
|  | Partial Conformity |
|  | No Conformity |

Please feel free to provide any clarifying comments with regards to this case's conformity to this component of the Practice Model:

*Individualizing Case Planning*

## Permanency goal for child

| | | | | | Goal 1 | | Goal 2 | |
|---|---|---|---|---|---|---|---|---|
| CFSR | What is (are) the child's current permanency goal(s) (or if the case was closed during the period under review, what was the permanency goal before the case was closed)? | | | | | | | |
| CFSR | Is (are) the child's permanency goal(s) specified in the case file? | | | | Yes | No | | |
| PM | Was a permanency plan developed within the childs first 30 days in care? | | | | Yes | No | | |
| CFSR | Were all permanency goals in effect during the period under review established in a timely manner? | | | | Yes | No | | |

| | Permanency Goal | Date Established | Time in Foster Care Before Goal | Date Goal Changed | Reason for Goal Change |
|---|---|---|---|---|---|
| CFSR | | | | | |
| | | | | | |
| | | | | | |

| | | | | |
|---|---|---|---|---|
| CFSR | Were all permanency goals in effect during the period under review appropriate to the child's needs for permanency and to the circumstances of the case? | Yes | No | |
| CFSR | If not, does the child meet other Adoption and Safe Families Act (ASFA) criteria for termination of parental rights (TPR)? | Yes | No | NA |
| CFSR | If yes, did the agency file a TPR petition before the period under review or in a timely manner during the period under review? | Yes | No | NA |
| CFSR | If no TPR has been filed, does an "exception" or compelling reason for not filing for TPR specified in the case file? | Yes | No | NA |
| CFSR | Please document the reasons the reviewers determined that the goals were not timely and/or appropriate (if relevant): | | | |
| CFSR | If the caseworker reported an "exception" or a compelling reason for not filing for TPR, but it was not in the case file, provide any information obtained about the exception/compelling reason: | | | |
| PM | If the child has a goal of reunification, does the case record documentation reflecting active concurrent permanency planning consistent with Plan requirements | Yes | No | NA |
| PM | If the child(ren) have been in care for at least six months, during the PUR did they have a timely court or administrative case review consistent with Plan requirements during the Period | Yes | No | NA |
| PM | If the children were in custody at least 12 months during the Period shall have a timely annual court review consistent with Plan requirements during the Period | Yes | No | NA |
| PM | If the child has a permanency goal of reunification during the Period shall have service plans for their parents that identify those services DFCS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care and case record documentation that DFCS made those identified services available directly or through referral | Yes | No | NA |

## *Individualizing Case Planning*

### Other planned permanent living arrangement

| | | | | | |
|---|---|---|---|---|---|
| CFSR | What is the child's other planned permanent living arrangement goal (check the goal that most closely reflects the one in the case file)? | ☐ Emancipation/ Independence: <br><br> ☐ Long-term foster care <br><br> ☐ Long-term foster care with kin <br><br> ☐ Placement in a long-term <br> ☐ Other (specify): | | | |
| CFSR | For children with an other planned permanent living arrangement permanency goal who are expected to eventually exit foster care to independence, were concerted efforts made to provide the child with services to adequately prepare the child for independent living when the child leaves foster care? Independent living | Yes | No | NA | |
| CFSR | Were concerted efforts made to achieve the goal of other planned permanent living arrangement in a timely manner by placing the child in a living arrangement that is "permanent," that is, the child will remain in the living arrangement until discharge from foster care? | Yes | No | | |
| CFSR | Date of the child's most recent entry into foster care: | | | | |
| CFSR | Time in care (in months) at the time of the onsite review: | | | | |
| CFSR | Date of documentation regarding "permanency" of the child's living arrangements | | | | |
| CFSR | Date of discharge from foster care | | | | |
| CFSR | If the child is not in a living arrangement that can be considered permanent, were concerted efforts made during the period under review to achieve this type of living arrangement for the child? | Yes | No | NA | |
| CFSR | Please document the efforts made to achieve the child's goal, including the appropriateness and effectiveness of the efforts, and barriers to achieving the goal: | | | | |
| CFSR | Document the services provided, or not provided, to adequately prepare the child for independent living: | | | | |

### Case Planning

| | | | | |
|---|---|---|---|---|
| PM | Was a family team meeting used in the development and monitoring of case plans? | Yes | No | NA |
| PM | Did the have team meetings, at which time their service plans shall be updated, quarterly and within 30 calendar days of any placement or other significant change, consistent with Plan requirements | Yes | No | NA |
| PM | Is there evidence of family involvement and input in the development of the case plan? | Yes | No | NA |
| PM | Is the case plan signed by the parents and child(ren) (if appropriate)? | Yes | No | NA |
| PM | Were the children placed in the least restrictive setting that meets their individual needs consistent with Plan requirements | Yes | No | NA |
| PM | If the child has a goal of reunification, has their assigned DFCS caseworker met monthly with the child's biological parents, consistent with Plan requirements, as documented in the child's case record | Yes | No | NA |

### *Individualizing Case Planning*

| | | Yes | No | NA |
|---|---|---|---|---|
| PM | If the child is 14-20 years old during the PUR shall be provided with Independent Living services as set forth in their service plan | | | |

**Conclusion**

Based on the above results, please rate the case overall for individualizing case planning:

| |
|---|
| |
| |
| |

Substantial Conformity

Partial Confomity

No Conformity

Please feel free to provide any clarifying comments with regards to this case's conformity to this component of the Practice Model:

*Mobilizing Services Timely*

## Stability of Reunification, Guardianship or Permanent Placement

| | | | | | |
|---|---|---|---|---|---|
| CFSR | Did any of the child's foster care entries during the period under review occur within 12 months of the child's discharge from a prior foster care episode? | | | Yes | No | |
| CFSR | If the answer to question A is Yes, was there evidence that concerted efforts were made to prevent re-entry? | | | Yes | No | NA |
| CFSR | Document the circumstances related to the re-entry within 12 months: | | | | | |

| | | | | Permanent Placement With Relatives |
|---|---|---|---|---|
| CFSR | What is/was the child's most recent permanency goal? (Select the appropriate response.) | Reunification | Guardianship | |
| CFSR | Are the agency and court making (or did they make) concerted efforts to achieve the goal (or these goals, if there are concurrent goals) in a timely manner? | | | Yes | No | |
| CFSR | Document efforts made to achieve goal, including the appropriateness and effectiveness of the efforts, and, barriers to achieving the goal (for example, agency, court, or other factors that prevented or are preventing timely achievement of the goal): | | | | | |
| | Please document any contributing factors to the case in both the circumstance of the goal of reunification or permanent placement with relatives was not achieved or is not likely to be achieved within 12 months, or if the permanency goal was achieved within 12 months: | | | | | |
| PM | If the goal is to return to a relative placement or parent's home, did the family have or are there plans for a 90 day trial home visit? | | | Yes | No | NA |
| | Please explain your answer: | | | | | |
| PM | For children with a goal of reunification, have parental service plans identified those services DFCS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care | | | Yes | No | NA |

## Stability of Foster Care Placement

| | | Number |
|---|---|---|
| CFSR | How many placement settings did the child experience during the period under review? | |

| Placement Date | Placement Type | Reason for Change in Placement |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

| | | | | |
|---|---|---|---|---|
| CFSR | If there was more than 1 placement, were all placement changes during the period under review planned by the agency in an effort to achieve the child's case goals or to meet the needs of the child? | Yes | No | NA |

## *Mobilizing Services Timely*

| | | | | |
|---|---|---|---|---|
| CFSR | Is the child's current placement setting (or most recent placement if the child is no longer in foster care) stable? | Yes | No | |
| CFSR | If applicable, indicate why the placement changes were or were not planned in an effort to achieve the child's case goals or to meet the needs of the child: | | | |
| CFSR | If applicable, provide your reasons for determining that the child's current placement (or most recent placement if the child is no longer in foster care) is or is not stable: | | | |
| CFSR | During the period under review, did the agency conduct an assessment of the needs of the foster or pre-adoptive parents on an ongoing basis (with respect to services they need in order to provide appropriate care and supervision to ensure the safety and well-being of the children in their care)? | Yes | No | NA |
| CFSR | Document the foster parent(s)' needs identified by the agency: | | | |
| CFSR | Document the foster parents' needs that were not identified by the agency: | | | |

## Adoption

| | | | | |
|---|---|---|---|---|
| CFSR | Are the agency and court making (or did the agency and court make) concerted efforts to achieve the goal of adoption in a timely manner? | Yes | No | |
| CFSR | Date of the child's most recent entry into foster care (this should be the same date as in Section J on the Face Sheet): | | | |
| CFSR | Time in care (in months) at the time of the onsite review (this is the number of months that the child was in foster care from the date of the most recent entry into foster care to the beginning of the onsite review week or from the date of the most recent entry into foster care to the time of adoption finalization or discharge from foster care): | | | |
| CFSR | Date of adoption finalization (if relevant) (this is the date that the court legally established the adoption and transferred care and placement responsibility or supervision from the State to the adoptive parent(s); this should be the same date as in Section K on the Face Sheet; if the adoption has not been finalized, enter Not Applicable (NA)): | | | |
| CFSR | Please document efforts made to achieve the child's goal of adoption, including the appropriateness and effectiveness of the efforts, and barriers to achieving the goal of adoption (for example, agency- or court-related factors that prevented or are preventing achievement of the goal in a timely manner): | | | |
| PM | If the child has been in care for 15 of the last 22 months and a TPR has not been filed, has an exception been documented in the case file? | Yes | No | NA |
| PM | If an exception has not been documented, do circumstances in the case exist? | Yes | No | NA |
| CFSR | Please document special circumstances in the case which are contributing to the child either likely to achieve the goal of adoption within 24 months or not: | | | |

## *Mobilizing Services Timely*

| | | | | |
|---|---|---|---|---|
| PM | Does the child have an assigned adoption specialist and an adoption plan that identifies the child-specific activities that DFCS will undertake to achieve adoption, and receiving regular adoption status meetings consistent with plan requirements | Yes | No | NA |

### Provision of Services Based on Needs

| | | | | |
|---|---|---|---|---|
| CFSR | During the period under review, were appropriate services provided to meet the child's identified needs? | Yes | No | NA |

CFSR  Document the services provided to the child(ren):

CFSR  Document the services that were needed but not provided:

| | | | | |
|---|---|---|---|---|
| CFSR | During the period under review, did the agency provide appropriate services to the mother to meet identified and assessed needs (with respect to services the mother needs in order to provide appropriate care and supervision to ensure the safety and well-being of her children)? | Yes | No | NA |
| CFSR | During the period under review, did the agency provide appropriate services to the father to address identified and assessed needs (with respect to services the father needs in order to provide appropriate care and supervision to ensure the safety and well-being of his children)? | Yes | No | NA |

CFSR  Document the services that were provided to the mother:

CFSR  Document the services that the mother needed, based on an assessment, but that were not provided:

CFSR  Document the services provided to the father:

CFSR  Document the services that the father needed, based on an assessment, but that were not provided:

| | | | | |
|---|---|---|---|---|
| CFSR | During the period under review, were the foster or pre-adoptive parents provided with appropriate services to address identified needs that pertained to their capacity to provide appropriate care and supervision and ensure the safety and well-being of the children in their care? | Yes | No | NA |

CFSR  Document the services provided to the foster parent(s):

CFSR  Document the services that the foster parent(s) needed, based on an assessment, but that were not provided:

CFSR  Document in the chart below the services provided or not provided to address the child's educational needs. Services would include advocacy on the part of foster parents as well as the caseworker; ensuring that the child received special education classes; making provisions for the child to receive tutoring or educational mentoring; or arranging for the child to be enrolled in early intervention preschool classes, such as Head Start:

## *Mobilizing Services Timely*

| Educational Needs | Services Provided | Services Needed |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

| | |
|---|---|
| CFSR | If there are services that were not or are not being provided, document agency efforts, or lack of agency efforts, to provide those services: |

| | | | | |
|---|---|---|---|---|
| PM | Was the child enrolled in an accredited school within 3 days of custody or placement change? | Yes | No | NA |
| PM | Were educational service needs assessed within 30 days of placement? | Yes | No | NA |
| CFSR & PM | During the period under review, did the agency ensure that appropriate services were provided to the child to address all identified physical health needs within required timeframes? | Yes | No | NA |
| CFSR & PM | During the period under review, did the agency ensure that appropriate services were provided to the child to address all identified dental health needs within required timeframes? | Yes | No | NA |

| | |
|---|---|
| CFSR | Did the child receive periodic, age-appropriate physical and dental health examinations to ensure ongoing assessment of needs? If not, document the reasons why the agency did not conduct this ongoing assessment: |
| CFSR | Document in the chart below the services that were or were not provided to address physical or dental health needs and link those services to identified needs: |

| Identified Physical or Dental | Services Provided | Services Needed |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

| | |
|---|---|
| CFSR | If there are services that were not provided, document why the services were not provided (for example, lack of agency efforts to secure services, lack of service availability in the community, lack of transportation for foster parents to take child to appointments, etc.): |

| | | | | |
|---|---|---|---|---|
| CFSR & PM | During the period under review, did the agency provide appropriate services to address the child(ren)'s mental/behavioral health needs within required timeframes? | Yes | No | NA |

| | |
|---|---|
| CFSR | Identify in the chart below the services that were or were not provided to address mental/behavioral health needs and link those services to identified needs: |

| Identified Mental/Behavioral Health Needs | Services Provided | Services Needed but Not Provided |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

| | |
|---|---|
| CFSR & PM | If there are services that were not or are not being provided based on the assessment of needs, describe why the services were not provided (for example, lack of agency efforts to secure services, lack of service availability in the community, no transportation for foster parents to take child to appointments, parent's unwillingness to engage child in services, etc.). If the services were not available due to lack of availability, or reviewer notices other services not available in the community, please describe in detail: |

*Mobilizing Services Timely*

| Case Planning | | | | |
|---|---|---|---|---|
| PM | Based on information provided and obtained, how effective are the services being delivered, as detailed on the ISP: | Yes | No | NA |
| | Please explain your answer: | | | |
| PM | Is there evidence that child(ren) and or parent(s) were involved in choosing services included on their case plan? | Yes | No | NA |

**Conclusion**

Based on the above results, please rate the case overall for mobilizing appropriate services timely:

| |
|---|
| Substantial Conformity |
| Partial Confomity |
| No Conformity |

Please feel free to provide any clarifying comments with regards to this case's conformity to this component of the Practice Model:

### *Preserving and Maintaining Connections*

| **Proximity of foster care placement** | | | | |
|---|---|---|---|---|
| PM | Was the child placed in the same county as they were removed? | Yes | No | |
| CFSR | Is the child's current or most recent placement close enough to his or her parents or other potential permanent caregiver to facilitate permanent frequent face-to-face contact between the child and the parents while the child is (or was) in foster care? | Yes | No | |
| CFSR | If No, was the reason for the location of the child's current or most recent placement based on the child's needs and intended to ensure that the child's case plan goals are achieved? | Yes | No | NA |
| CFSR | Describe the relationship between the child's current or most recent placement and the location of the parents or of a family member with whom the child is likely to be reunified (for example, the child will be reunified with a grandmother): | | | |
| CFSR | If the reviewers determine that the child's placement is not sufficiently close to the parent(s) to facilitate frequent contact, document the reasons for this determination (and identify any reasons provided by the agency): | | | |
| PM | Did the child remain in the same school they attended prior to foster care placement? | Yes | No | |

| **Placement with siblings** | | | | |
|---|---|---|---|---|
| CFSR | During the period under review, was the child placed with all siblings who also were in foster care? | Yes | No | NA |
| CFSR | If No, was there a valid reason for the child's separation from the siblings (for example, the separation was necessary to meet the needs of one of the siblings, to address safety concerns for one or more of the siblings, or to accommodate a large sibling group)? | Yes | No | |
| CFSR | Reason for Separation (if applicable): | | | |

| **Visiting with parents and siblings in foster care** | | | | |
|---|---|---|---|---|
| PM | Was a visitation plan developed in the first 30 days, updated every 90, and included all visitation (caseworker, parents, siblings, connections, etc) | Yes | No | NA |
| CFSR | During the period under review, were concerted efforts made to ensure that visitation (or other forms of contact if visitation was not possible) between the child and his or her mother was of sufficient frequency to maintain or promote the continuity of the relationship? | Yes | No | NA |
| CFSR | Check the box next to the statement that best describes the usual frequency of visits between the mother and the child: | ☐ More than once a week <br> ☐ Once a week <br> ☐ Less than once a week, but at <br> ☐ Less than twice a month, but <br> ☐ Less than once a month <br> ☐ Never | | |
| CFSR | During the period under review, were concerted efforts made to ensure that visitation (or other forms of contact if visitation was not possible) between the child and his or her father was of sufficient frequency to maintain or promote the continuity of the relationship? | Yes | No | NA |
| CFSR | Check the box next to the statement that best describes the usual frequency of visits between the father and the child: | ☐ More than once a week <br> ☐ Once a week <br> ☐ Less than once a week, but at <br> ☐ Less than twice a month, but <br> ☐ Less than once a month | | |

## *Preserving and Maintaining Connections*

|  |  | | | |
|---|---|---|---|---|
|  | ☐ Never | | | |
| CFSR | During the period under review, were concerted efforts made to ensure that the quality of visitation between the child and the mother was sufficient to maintain or promote the continuity of the relationship? | Yes | No | NA |
| CFSR | During the period under review, were concerted efforts made to ensure that the quality of visitation between the child and the father was sufficient to maintain or promote the continuity of the relationship? | Yes | No | NA |
| CFSR | During the period under review, were concerted efforts made to ensure that visitation (or other forms of contact if visitation was not possible) between the child and his or her sibling(s) was of sufficient frequency to maintain or promote the continuity of the relationship? | Yes | No | NA |
| CFSR | Check the box next to the statement that best describes the usual frequency of visits between the siblings and the child: | ☐ More than once a week<br>☐ Once a week<br>☐ Less than once a week, but at<br>☐ Less than twice a month, but<br>☐ Less than once a month<br>☐ Never | | |
| CFSR | During the period under review, were concerted efforts made to ensure that the quality of visitation between the child and his or her sibling(s) was sufficient to promote the continuity of their relationships? | Yes | No | NA |
| PM | Is there evidence in the case record of shared parenting responsibilities between the birth and resource parents? | Yes | No | NA |
| PM | Did the child have a visit with their parents within 24 hours of placement, or at a minimum a phone call with relatives within first 24 hours? | Yes | No | NA |
| PM | Did a meeting occur between the birth parents and resource parents within the first month of placement? | Yes | No | NA |
| PM | How many FTMs have occurred? | | | |
| PM | How many FTMs have been attended by both the birth and resource parents? | | | |

## Preserving connections

|  |  | | | |
|---|---|---|---|---|
| CFSR | During the period under review, were concerted efforts made to maintain the child's important connections (for example, neighborhood, community, faith, language, extended family members including siblings who are not in foster care, school, tribe, and/or friends)? | Yes | No | |
| CFSR | Was a sufficient inquiry conducted with the parent, child, custodian, or other interested party to determine whether the child may be a member of, or eligible for membership in, an Indian tribe? | Yes | No | NA |
| CFSR | If the child may be a member of, or eligible for membership in, an Indian tribe, during the period under review, was the tribe provided timely notification of its right to intervene in any State court proceedings seeking an involuntary foster care placement or termination of parental rights (TPR)? | Yes | No | NA |
| CFSR | If the child is a member of, or eligible for membership in, an Indian tribe, was the child placed in foster care in accordance with the Indian Child Welfare Act (ICWA) placement preferences or were concerted efforts made to place the child in accordance with ICWA placement preferences? | Yes | No | NA |
| CFSR | Document the child's important connections and how the child's placement does or does not promote maintaining these important connections. | | | |

## *Preserving and Maintaining Connections*

| | | | | |
|---|---|---|---|---|
| CFSR | Document agency efforts or lack of efforts to help children maintain important connections when these are not being maintained through the placement itself: | | | |
| CFSR | During the period under review, were concerted efforts made to promote, support, and otherwise maintain a positive and nurturing relationship between the child in foster care and his or her mother? | Yes | No | NA |
| CFSR | During the period under review, were concerted efforts made to promote, support, and otherwise maintain a positive and nurturing relationship between the child in foster care and his or her father? | Yes | No | NA |
| CFSR | If not explained in the "reason for rating" section, document efforts or lack of efforts to support or maintain a positive mother-child, and or father-child relationship. (The focus should be on activities such as the ones listed in the instructions, rather than on visitation). Foster parent activities may be considered equivalent to "agency" activities in responding to this question: | | | |
| PM | Is the child involved in extracurricular activities, like sports, church events, clubs, etc? | Yes | No | NA |
| PM | Are the families engaged in services to promote constructive parent-child visitation? | Yes | No | NA |

## Relative placement

| | | | | |
|---|---|---|---|---|
| CFSR | During the period under review, was the child's current or most recent placement with a relative? | Yes | No | |
| CFSR | If Yes, is (or was) this placement stable and appropriate to the child's needs? | Yes | No | NA |
| CFSR | If No, did the agency, during the period under review, make concerted efforts to identify, locate, and evaluate maternal relatives as potential placements for the child, with the result that maternal relatives were ruled out as, or were unwilling to be, placement resources? | Yes | No | NA |
| CFSR | If No, did the agency, during the period under review, make concerted efforts to identify, locate, and evaluate paternal relatives as potential placements for the child, with the result that paternal relatives were ruled out as, or were unwilling to be, placement resources? | Yes | No | NA |
| CFSR | If the child is placed with a relative, identify the relationship of that relative to the child and provide details of the placement; for example, appropriateness, how long the child has been in that placement, etc.: | | | |
| CFSR | Document agency efforts or lack of efforts to locate and evaluate maternal relatives (including reasons why relatives were not considered as placement resources, if relevant) if appropriate, during the period under review: | | | |
| CFSR | Document agency efforts or lack of efforts to locate and evaluate paternal relatives (including reasons why relatives were not considered as placement resources, if relevant) if appropriate, during the period under review: | | | |

## Permanency Planning

| | | | | |
|---|---|---|---|---|
| PM | If the child was discharged during PUR, was an aftercare plan developed prior to discharge? | Yes | No | NA |
| PM | If the child was discharged during PUR and was reunified, was there a 90 day trial home visit? | Yes | No | NA |
| PM | Is there evidence that the resource family has been informed of available subsidies, including post-adoptive subsidies? | Yes | No | NA |

### *Preserving and Maintaining Connections*

| PM | How long has the child been in the current resource home? | | | |
|---|---|---|---|---|
| PM | If longer than 12 months, is there evidence that the resource parents have been engaged on discussions regarding adoption? | Yes | No | NA |
| PM | If the child is over 14 and involved with ILS, how long have they consistently been attending ILS classes? | | | |

## Conclusion

Based on the above results, please rate the case overall for preserving and maintaining connections:

Substantial Conformity

Partial Confomity

No Conformity

Please feel free to provide any clarifying comments with regards to this case's conformity to this component of the Practice Model: