**Ex. 27**

# Statewide Impact of CQI Implementation

## Overview

The Center for the Support of Families (CSF) recommended that the Mississippi CQI system, a requirement of the *Olivia Y* settlement, be developed and implemented in conjunction with the implementation of the new child welfare practice model.  The rationale for concurrent implementation of CQI and the practice model serves not only to provide a baseline for monitoring the success of the practice model's implementation but to reinforce the principles and concepts of the practice model. Tying the CQI process to the components of the practice model will help ensure that the practices in the model, and the requirements of the settlement agreement, are front and center moving forward and will be the primary means of sustaining improved practice over time.  CSF recommended that MDHS conduct baseline CQI case reviews in each region implementing the practice model during the initial planning phase for the region, followed by follow-up reviews approximately one year after the initial implementation period and thereafter on a regular CQI review schedule.  As the practice model implementation expands to all regions, the baseline and follow-up case reviews will also expand statewide.  CSF also recommended that local CQI teams conduct ongoing interim case reviews in each region between formal state CQI reviews so that the process becomes integrated into the routine work of staff in the field and provides consistent and frequent reinforcement of the practice model. In order to avoid having counties and regions wait until "their turn" to implement CQI activities, CSF also made additional recommendations for statewide CQI activities from the beginning, as illustrated below.

### CQI Activities-Year 1



**Statewide**

Statewide CQI overview and orientation

MACWIS data analysis, monitoring, and reporting

Statewide peer review of implementing regions

Foster Care Review revisions

Statewide CQI reporting and data dashboards

Development of state practice model/CQI implementation team

**Regions I-S and II-W** CQI Baseline case reviews

Supervisory Administrative Review and revised protocol

## How will Mississippi regions and counties be involved in CQI prior to implementing the practice model?

As illustrated in the graphic above, every region in the state will be involved in CQI prior to implementing the practice model, as described below.

♦ <u>General Engagement and Introductory Presentations</u>: A comprehensive CQI system is a relatively new concept for Mississippi DHS. As such, general orientation to its purposes and activities will be crucial to its success, and staff statewide will receive an orientation to CQI and its principles in a couple of ways. State Office staff have begun a process of going into each region and meeting with staff explaining what CQI is, what activities will be involved, and how it will help improve practice across the state. In addition, the CQI plan calls for the hiring of regional Evaluation and Monitoring liaisons statewide that will pair with Foster Care Review (FCR) reviewers to assist in the monitoring and analysis of data and outcomes and help regional staff become familiar with the connection between practice and outcomes. The Evaluation and Monitoring liaisons and FCR reviewers will become the nucleus of CQI activity for each region. We will share CQI lessons learned with non-implementing regions through the Department's newsletters, staff meetings, learning labs, and so forth.

♦ <u>State and Local Implementation Teams</u>: The CQI plan calls for dedicated staff to facilitate CQI activities locally and statewide CQI staff to manage and administer the process, although hiring all the recommended staff will probably occur in phases. As State CQI reviews are being implemented in counties/regions according to the practice model implementation schedule, some local CQI activities will be implemented concurrently within counties and regions not yet beginning the practice model. This will serve a dual purpose of initiating CQI activity statewide early and also helping to prepare counties/regions in the latter stages of the practice model schedule for implementing the practices within the model. These local CQI activities will also include both an enhanced Supervisory Administrative Review (SAR) and some revisions to the Foster Care Reviews:

    o <u>Supervisory Administrative Review</u>: We proposed that the SAR tool be enhanced to include a focus on the quality of work being conducted that supports the six components of the practice model. Area Social Work Supervisors would be required to conduct a SAR on a random sample of each of their worker's cases on a monthly basis. This information would be used not only to teach and reinforce quality case practice principles to line staff, but also would be reported to Regional Directors who will have the added responsibility to monitor outcomes. Examples of case practices that would be covered in the SAR, and paralleling the larger CQI case review instrument:

        ▪ The extent to which children and families have been engaged in case planning;
        ▪ Thoughtful, well planned case plans that reflect both the strengths and areas needing improvement of both children and families;
        ▪ The ability of case workers to ensure children maintain important connections when they are placed; and
        ▪ Demonstrated efforts of reinforcing skills learned by adolescents through Independent Living Services.

o <u>Foster Care Review</u>: In addition to the SAR, the enhanced Foster Care Review (FCR) tool will also serve a key activity to support the entire CQI system prior to the implementation of the Practice Model and baseline case reviews. The FCR tool currently tracks various issues relating to compliance with Federal and state policy and quality casework practice. We proposed adding elements to the FCR to help align it with key outcome measures identified in the MACWIS data reports, *Olivia Y* settlement and the practice model. Constructive feedback and corrective action processes will also be developed, once again engaging Regional Directors and state and local CQI staff to monitor the outcomes, along with the other sources listed above.

♦ <u>Peer Involvement in CQI Case Reviews</u>: As CQI case reviews are initiated as regions begin implementation of the practice model, we proposed to include staff of other regions and counties as reviewers on the CQI teams. As such, identified staff statewide will be trained in the CQI review tool instrument which is structured around the practice model and linked to outcomes, and will be able to take this knowledge back to their own regions.  We expect that this process will help prepare regions both for the implementation of the practice model, orient them to the qualitative case review aspect of the CQI system, and help those regions to initiate practice model practices before the formal implementation process begins.

♦ <u>MACWIS Data Reports</u>: The CQI system calls for both the qualitative and quantitative monitoring of key outcomes for children and families. MACWIS data reports focusing on these key outcomes are currently being identified and will be utilized in all regions throughout the state to assess practice and compliance issues, and to assist in evaluating workload and resource issues tracked by MDHS. Regional Directors and Area Social Work Supervisors will be involved in looking at this information, alongside state and local CQI staff, and utilizing the information to guide improvements in the quality of child welfare practice. This information will be especially useful in evaluating the extent to which the implementation of the practice model is having the desired effects on outcomes, and will provide a basis for determining if the outcomes and experiences of children newly entering foster care in counties that have implemented the practice model differ notably from the cohorts of children who entered foster care either prior to the practice model or in counties that have not yet implemented the model. Among some of the proposed reports:

o *Reports reflecting outcomes* for children in foster care, including the Federal CFSR indicators.  This information is needed to track progress in meeting Federal review requirements and in evaluating outcomes associated with the practice model, such as time to permanency, stability for and safety of children.
o *Process-oriented reports* that indicate the extent to which improved practices are actually reaching the children and families served by MDHS.
o *Reports that identify the status* of children relative to identified outcomes, such as TPR filings, length of stay in foster care, and educational status.
o *Reports that describe the population* of children and families served by MDHS, such as demographic, placement, and special needs information.
o *Reports of services provided* to children and families, such as reunification services, medical care, independent living services, and therapeutic services.

♦ <u>Statewide CQI Reporting and Data Dashboards</u>: A key statewide CQI recommendation is the early development of a statewide CQI report that provides information on the status of practice and outcomes in all counties of the state, not only those implementing the practice model. The statewide CQI report should consolidate information from the baseline and follow-up CQI reviews, FCR reviews, and MACWIS data into a broad-based picture of child welfare in the state and, in doing so, frame monitoring and tracking procedures in terms of the practice model and the state's mandates. This will place CQI reporting in the position of reinforcing the direction of improvement in the state and bringing all counties/regions together under common goals, practices, and measures. It will also help to consolidate and coordinate the various components of the state's broader CQI process, e.g., CQI reviews, FCR reviews, data reporting, supervisory reviews, and so forth.

Consistent with this approach, CSF has recommended that MDHS implement a data dashboard that will be available to all staff statewide through the MACWIS system. The data dashboard, similar to those used in a number of other states, should track a relatively small number of key indicators related to child safety, permanency, and well being, and should provide a statewide picture of the measures on a regularly updated schedule, as well as the ability to "drill down" to local performance on the measures for the sake of comparison and evaluation. We are conscious of the concerns about the accuracy of data in the MACWIS system, but content that the Department will actually need to use the data in the system in ways such as the dashboard, which will be broadly available within and outside the Department, before measurable improvements in the data quality will occur.

**Ex. 28**

## CQI REVIEWS
## ONSITE REVIEW INSTRUMENT
### Face Sheet

| Name of county and region: | Case name: | Period under review: |
|---|---|---|

| Reviewer: | Date case reviewed: |
|---|---|

| Target Child | Child(ren)'s name(s): | Race and/or ethnicity: | Date(s) of birth (MM/DD/ YY): | Gender: |
|---|---|---|---|---|
| ☐ | | | | |
| ☐ | | | | |
| ☐ | | | | |
| ☐ | | | | |
| ☐ | | | | |
| ☐ | | | | |

Type of case reviewed:
☐ Foster Care Case          ☐ In-home Services Case

Was this case opened for reasons other than child abuse and neglect?          Yes ☐  No ☐

Date of most recent case opening for all cases (MM/DD/YY):

Date of the child's most recent entry into foster care (MM/DD/YY):          Not Applicable ☐

Date of discharge from foster care for the most recent foster care episode (MM/DD/YY):

Not Applicable ☐          Not Yet Discharged ☐

Date of case closure (for all cases) (MM/DD/YY):

Case not closed by time of review ☐

Reason the agency is working with the family (initial and evolving):

| | | |
|---|---|---|
| ☐ Abandonment | ☐ Alcohol Abuse-Child | ☐ Alcohol Abuse-Parent | ☐ Caretaker Inability to Cope |
| ☐ Child's behavior problem | | ☐ Child Disability | ☐ Court Directed |
| ☐ Death of Parent(s) | ☐ Drug Abuse-Child | ☐ Drug Abuse-Parent | ☐ Domestic violence in child's home |
| ☐ Emotional abuse | ☐ Exploitation | ☐ Inadequate Family Support | ☐ Inadequate Food Supply |
| ☐ Physical abuse | ☐ Inadequate Housing | ☐ Inadequate Income | ☐ Inadequate Parenting Skills |
| ☐ Incarceration of Parent | ☐ Lack of Child Care | ☐ Neglect | ☐ Relinquishment |
| ☐ Sexual abuse | ☐ Runaway | ☐ School Dropout | ☐ Truancy |
| ☐ Unemployment | ☐ Other (specify): | | |

Persons interviewed by the reviewers (list below):

| Relationship to Case | Date of Interview | Type of Interview |
|---|---|---|
| | | ☐ In-Person   ☐ Phone |
| | | ☐ In-Person   ☐ Phone |
| | | ☐ In-Person   ☐ Phone |
| | | ☐ In-Person   ☐ Phone |

*Assuring Safety and Managing Risk*

## 1: Timeliness of initiating investigations of reports of child maltreatment

| Question # | | Number |
|---|---|---|
| 1 | How many reports of suspected abuse or neglect have been received on any child(ren) in the family (including those that were screened out by the agency) during the life of the case? | |
| 2 | How many accepted reports alleging abuse or neglect were received on any child(ren) in the family during the period under review (i.e., they were not screened out)? | |

| ReportDate | First Name of Child | Allegation | Priority Level (if Applicable) | Date Assigned for an Investigation | Date Investigation Initiated | Date of Face-to-Face Contact With Child | Relationship of Alleged Perpetrator to Child | Disposition |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

| | | Number |
|---|---|---|
| 3 | In how many of the reports listed above was the investigation NOT initiated in accordance with the MDHSs timeframes and requirements for a report of that priority? | |
| 4 | In how many of the reports listed above was face-to-face contact with the child(ren) who is the subject of the report NOT made in accordance with the State's timeframes and requirements for a report of that priority? | |

| | | | | |
|---|---|---|---|---|
| 5 | For all reports identified above, were the reasons for the delays due to circumstances beyond the control of the agency? | Yes | No | NA |

| 6 | Identify any reasons why a response was not initiated within established timeframes or face to face contact was not made (if applicable and reason is available): |
|---|---|

Section 1 is rated:_____. Please elaborate on any findings:


## 2: Repeat maltreatment

| | | | | |
|---|---|---|---|---|
| 7 | Was there at least one evidenced maltreatment report involving any child in the family during the period under review? | Yes | No | |
| 8 | If Yes, within a 6-month period before or after any maltreatment report identified, was there at least one additional evidenced maltreatment report involving any child in the family? | Yes | No | NA |
| 9 | If Yes, did the report(s) identified above involve the same or similar circumstances? | Yes | No | NA |
| 10 | If Yes, did any of the reports involve maltreatment of the child by the foster parents, members of the foster parents' family, other children in the foster home or facility, or facility staff members? | Yes | No | NA |
| 11 | If there was maltreatment recurrence, document the circumstances related to maltreatment incidents including information related to the perpetrators, and indicate why the reviewers determined that the two incidents did or did not involve the same circumstances. Also indicate the dates of all maltrreatment reports occuring within the 6-month period: | | | |

## *Assuring Safety and Managing Risk*

| 12 | Describe the circumstances related to any evidenced reports of maltreatment (if relevant) involving the foster parents, members of the foster parents' family, other children in the foster home or facility, or facility staff members: |
|---|---|

| 13 | For cases where repeat maltreatment did occur, identify interventions and actions, or absense of interventions and actions, taken by the caseworker and ASWS to try and prevent maltreatment of the child(ren): |
|---|---|

Section 2 is rated:_____. Please elaborate on any findings:

## 3: Services to Family to Protect Child(ren) in the Home and Prevent Removal or Re-Entry into Foster Care

| | | | | |
|---|---|---|---|---|
| 14 | For the period under review, did the agency make concerted efforts to provide or arrange for appropriate services for the family to protect children and prevent their entry into foster care or re-entry into foster care after a reunification? | Yes | No | NA |
| 15 | If, during the period under review, any child was removed from the home without providing or arranging for services, was this action necessary to ensure the child's safety? | Yes | No | NA |
| 16 | Please identify the circumstances that indicate a safety risk to the child and the services that were needed by the family to address safety issues and describe how those services were or were not provided by the agency during the period under review: | | | |
| 17 | Please note the reason for removing the child from the home during the period under review without providing services (if relevant and reason is available) and provide the reviewers' reasons for determining whether the reason was appropriate or inappropriate: | | | |

Section 3 is rated:_____. Please elaborate on any findings:

## 4: Risk assessment and safety management

| | | | | |
|---|---|---|---|---|
| 18 | If the case was opened during the period under review, did the agency conduct an initial assessment of the risk to the target child in foster care and/or any child(ren) in the family remaining in the home? | Yes | No | NA |
| 19 | During the period under review, did the agency conduct ongoing assessments of the risk to the target child in foster care and/or any child(ren) in the family remaining in the home? | Yes | No | NA |

*Assuring Safety and Managing Risk*

| | | | | |
|---|---|---|---|---|
| 20 | If the case was opened during the period under review for either foster care or in-home services, did the agency: (1) conduct an initial assessment of the safety of the target child in foster care and/or any child(ren) remaining in the home, and (2) develop a safety plan with the family for addressing identified safety issues? | **Yes** | **No** | **NA** |
| 21 | During the period under review, did the agency: (1) conduct ongoing safety assessments of the target child in foster care and/or any child(ren) remaining in the home, and (2) continually monitor and update the safety plan, including encouraging family engagement in services designed to promote achievement of the goals of the safety plan? | **Yes** | **No** | **NA** |
| 22 | During the period under review, were there safety concerns pertaining to the target child in foster care or any child(ren) in the family remaining in the home that were not adequately or appropriately addressed by the agency? | **Yes** | **No** | **NA** |
| 23 | During the period under review, was there a safety concern related to the target child in foster care during visitation by parents or other family members that could be attributed to not providing sufficient monitoring of visitation, permitting unsupervised visitation when it was not appropriate, or court-ordered visitation against agency recommendations? | **Yes** | **No** | **NA** |
| 24 | During the period under review, was there a concern for the target child's safety related to the foster parents, members of the foster parents' family, other children in the foster home or facility, or facility staff members that was not adequately or appropriately addressed by the agency? (Foster parents include pre-adoptive parents and nonlicensed relatives providing care to a child in State custody.) | **Yes** | **No** | **NA** |
| 25 | During the period under review, if the target child was discharged from foster care to be reunited with parents or relatives or returned home on a trial home visit, did the agency conduct a thorough safety assessment? | **Yes** | **No** | **NA** |
| 26 | Describe the circumstances of the case that indicate risk concerns related to the child(ren): | | | |
| 27 | Describe the circumstances of the case that indicate safety concerns related to the child(ren): | | | |
| 28 | Describe the characteristics of the risk assessment(s) and safety assessment(s) (was one conducted, how was it conducted, when it was conducted, how comprehensive was it, what did it include or not include), including their timing: | | | |
| 29 | If applicable, describe the nature of the safety concerns related to the child(ren) during visitation, including a description of the visitation (for example, was it unsupervised, and if so, was this appropriate?): | | | |
| 30 | If applicable, describe the nature of the safety concerns related to the child(ren) from foster care providers and MDHS's activities with regard to addressing safety. | | | |
| 31 | Identify the activities undertaken to monitor participation in safety-related services (or the absence of activities to monitor service participation): | | | |

*Assuring Safety and Managing Risk*

| 32 | Was there a report evidenced that the foster care provider(s) maltreated the child during the period under review? If Yes, describe the circumstances of that report, whether the agency might have prevented the maltreatment, and the agency's response: |
| --- | --- |

Section 4 is rated:_____. Please elaborate on any findings:

## *Assessing Strengths and Needs*

| | | | | | |
|---|---|---|---|---|---|
| **5. Needs and Services of Child, Parents, and Foster Parents** | | | | | |

| Section | # | Question | | | |
|---|---|---|---|---|---|
| **Section A** | 33 | During the period under review, did the agency conduct (1) a formal or informal initial comprehensive assessment of the child(ren)'s **strengths and** needs (if the case was opened during the period under review), or (2) an ongoing assessment to provide updated information regarding the child(ren)'s needs for case planning purposes (if the case was opened before the period under review)? | Yes | No | NA |
| | 34 | If Yes and the case was opened during PUR, was the initial children's strengths and needs assessment conducted within the first 30 days? | Yes | No | NA |
| | 35 | During the period under review, were all needed services provided to meet the child's identified needs? | Yes | No | NA |
| | 36 | Were all services provided to children in a timely manner? | Yes | No | NA |
| | 37 | Was the child interviewed prior to the completion of the strengths and needs assessment? | Yes | No | NA |
| | 38 | Is there clear evidence, other than signatures, of child involvement and input in the strengths and needs assessment? | Yes | No | NA |
| | 39 | Document the method that the agency used to assess the child's needs: | | | |
| | 40 | Document the services provided to the child(ren): | | | |
| | 41 | Document the services that were needed but not provided: | | | |
| **Section B** | 42 | During the period under review, did the agency conduct (1) a formal or informal initial comprehensive assessment of the mother's **strengths and** needs (if the case was opened during the period under review) or (2) an ongoing assessment to provide updated information regarding the mother's needs for case planning purposes (if the case was opened before the period under review)? | Yes | No | NA |
| | 43 | If Yes and the case was opened during PUR, was the initial strengths and needs assessment of the mother conducted within the first 30 days? | Yes | No | NA |
| | 44 | Were all services provided to mother in a timely manner | Yes | No | NA |
| | 45 | Was mother interviewed prior to the completion of the strengths and needs assessment? | Yes | No | NA |
| | 46 | Is there clear evidence, other than signatures, of mother involvement and input in the strengths and needs assessment? | Yes | No | NA |
| | 47 | During the period under review, did the agency provide all needed services to the mother to meet identified and assessed needs (with respect to services the mother needs in order to provide appropriate care and supervision to ensure the safety and well-being of her children)? | Yes | No | NA |

## *Assessing Strengths and Needs*

| | | | Yes | No | NA |
|---|---|---|---|---|---|
| 48 | During the period under review, did the agency conduct (1) a formal or informal initial comprehensive assessment of the father's strengths and needs (if the case was opened during the period under review) or (2) an ongoing assessment to provide updated information regarding the father's needs for case planning purposes (if the case was opened before the period under review)? | | Yes | No | NA |
| 49 | If Yes and the case was opened during PUR, was the initial strengths and needs assessment of the father conducted within the first 30 days? | | Yes | No | NA |
| 50 | During the period under review, did the agency provide all needed services to the father to address identified and assessed needs (with respect to services the father needs in order to provide appropriate care and supervision to ensure the safety and well-being of his children)? | | Yes | No | NA |
| 51 | Were all services provided to father in a timely manner | | Yes | No | NA |
| 52 | Was father interviewed prior to the completion of the strengths and needs assessment? | | Yes | No | NA |
| 53 | Is there clear evidence, other than signatures, of father's involvement and input in the strengths and needs assessment? | | Yes | No | NA |
| 54 | Please indicate any reason why a needs assessment did not need to be completed on either the mother or father: | | | | |
| 55 | Document the services that were provided to the mother: | | | | |
| 56 | Document the services that the mother needed, based on an assessment, but that were not provided: | | | | |
| 57 | Document the services provided to the father: | | | | |
| 58 | Document the services that the father needed, based on an assessment, but that were not provided: | | | | |
| 59 | During the period under review, did the agency conduct an assessment of the needs of the foster or pre-adoptive parents on an ongoing basis (with respect to services they need in order to provide appropriate care and supervision to ensure the safety and well-being of the children in their care)? | | Yes | No | NA |
| 60 | During the period under review, were the foster or pre-adoptive parents provided with all needed services to address identified needs that pertained to their capacity to provide appropriate care and supervision and ensure the safety and well-being of the children in their care? | | Yes | No | NA |
| 61 | Were all services provided to the foster/pre-adoptive family in a timely manner | | Yes | No | NA |
| 62 | Document the services provided to the foster parent(s): | | | | |
| 63 | Document the services that the foster parent(s) needed, based on an assessment, but that were not provided: | | | | |
| | Section 5 is rated:_____. Please elaborate on any findings: | | | | |

**Section C**

*Assessing Strengths and Needs*

## 6. Educational Needs of the Child

| | | | | | |
|---|---|---|---|---|---|
| 64 | During the period under review, did the agency make concerted efforts to assess and address the child(ren)'s educational needs? | | Yes | No | NA |
| 65 | If case opened during PUR, were the child's educational needs assessed within 30 days of entry into foster care? | | Yes | No | NA |
| 66 | If case opened during PUR, and the child is 3 years of age or younger, did (s)he receive a developmental assessment within 30 days of foster care entry? | | Yes | No | NA |

| | |
|---|---|
| 67 | If not explained in the "reason for rating" section, document the process used for educational assessment, if relevant: |
| 68 | Document in the chart below the services provided or not provided to address the child's educational needs. Services would include advocacy on the part of foster parents as well as the caseworker; ensuring that the child received special education classes; making provisions for the child to receive tutoring or educational mentoring; arranging for the child to be enrolled in early intervention preschool classes, such as Head Start: |

| Educational Needs | Services Provided | Services Needed but |
|---|---|---|
| | | |
| | | |
| | | |

| | | | | | |
|---|---|---|---|---|---|
| 69 | If there are services that were not or are not being provided, document agency efforts, or lack of agency efforts, to provide those services: | | | | |
| 70 | Was the child enrolled in an accredited school within 3 days of custody or placement change? | | Yes | No | NA |

Section 6 is rated:_____. Please elaborate on any findings:

*Involving Children and Families in Case Planning and Decision Making*

## 7. Child and family involvement in case planning

| | | | | |
|---|---|---|---|---|
| 71 | During the period under review, did the agency make concerted efforts to actively involve the child in the case planning process? | Yes | No | NA |
| 72 | During the period under review, did the agency make concerted efforts to actively involve the mother in the case planning process? | Yes | No | NA |
| 73 | During the period under review, did the agency make concerted efforts to actively involve the father in the case planning process? | Yes | No | NA |
| 74 | Document the ways in which each party listed below was or was not involved in case planning (for example, identifying needs and services, establishing goals, evaluating progress, etc.) If the involvement of the child, mother, or father is determined by the reviewers to be Not Applicable, document the reasons for this determination (including any evidence of efforts to locate absent parents). | | | |

Child:

Mother:

Father:

| | | | | |
|---|---|---|---|---|
| 75 | Is there evidence that the family was informed of and prepared to actively participate in case events, including the FTMs, case plan development, and court events? | Yes | No | NA |

Please explain your answer:

| | | | | |
|---|---|---|---|---|
| 76 | Is there evidence that child(ren) and or parent(s) were involved in choosing services included on their case plan? | Yes | No | NA |

Is there evidence of family involvement and input in the development of the case plan?

| | | | | |
|---|---|---|---|---|
| 77 | Mother | Yes | No | NA |
| 78 | Father | Yes | No | NA |
| 79 | Age-appropriate child/youth | Yes | No | NA |
| 80 | Were the service plans signed by the parents or guardians? | Yes | No | NA |
| 81 | Were the service plans signed by the children, aged 6 and up? | Yes | No | NA |
| 82 | Did the families attend the County Conferences? | Yes | No | NA |

Section 7 is rated:_____. Please elaborate on any findings:

*Involving Children and Families in Case Planning and Decision Making*

## 8. Caseworker visits with child

| | | | |
|---|---|---|---|
| 83 | During the period under review, was the frequency of the visits between the caseworker and the child(ren) sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals? | Yes | No |

| | | |
|---|---|---|
| 84 | During the period under review, what was the most typical pattern of visitation between the caseworker and the child(ren) in the case? (Select the box that describes the usual pattern of visitation.) | ☐ More than once a week<br>☐ Once a week<br>☐ Less than once a week, but at least twice a month<br>☐ Less than twice a month, but at least once a month<br>☐ Less than once a month<br>☐ Never |

| | | | | |
|---|---|---|---|---|
| 85 | Did the caseworker visits occur 2 times a month, with at least one in the home? | Yes | No | NA |

| | | | |
|---|---|---|---|
| 86 | During the period under review, was the quality of the visits between the caseworker and the child(ren) sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals (for example, did the visits between the caseworker and the child(ren) focus on issues pertinent to case planning, service delivery, and goal achievement)? | Yes | No |

87 Please document barriers to more frequent visiting (if relevant) or explain why less frequent visitation was still appropriate, or not:

88 Document the aspects of the caseworker visits with the child that contributed to high quality visits (if relevant) or why caseworker visits were not of high quality (if relevant), as related to the response in question 86:

Section 8 is rated:_____. Please elaborate on any findings:

## 9. Caseworker visits with parents

| | | | | |
|---|---|---|---|---|
| 89 | During the period under review, was the frequency of the visits between the caseworker and the mother sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals? | Yes | No | NA |

| | | |
|---|---|---|
| 90 | During the period under review, what was the most typical pattern of visitation between the caseworker and the mother of the child(ren)? | ☐ More than once a week<br>☐ Once a week<br>☐ Less than once a week, but at least twice a month<br>☐ Less than twice a month, but at least once a month<br>☐ Less than once a month |

## *Involving Children and Families in Case Planning and Decision Making*

| | | |
|---|---|---|
| | ☐ Not Applicable<br>☐ Never | |

| | | | | |
|---|---|---|---|---|
| **91** | During the period under review, was the frequency of the visits between the caseworker and the father sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals? | **Yes** | **No** | **NA** |

| | | |
|---|---|---|
| **92** | During the period under review, what was the most typical pattern of visitation between the caseworker and the father of the child(ren): | ☐ More than once a week<br>☐ Once a week<br>☐ Less than once a week, but at least twice a month<br>☐ Less than twice a month, but at least once a month<br>☐ Less than once a month<br>☐ Not Applicable<br>☐ Never |

| | | | | |
|---|---|---|---|---|
| **93** | During the period under review, was the quality of the visits between the caseworker and the mother sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals? | **Yes** | **No** | **NA** |
| **94** | During the period under review, was the quality of the visits between the caseworker and the father sufficient to address issues pertaining to the safety, permanency, and well-being of the child and promote achievement of case goals? | **Yes** | **No** | **NA** |
| **95** | Please describe barriers to more frequent visiting with the mother (if relevant) and father (if relevant), and discuss (if relevant) why reviewer felt less frequent visitation was appropriate: | | | |
| **96** | Describe the general quality of the caseworker visits with the mother and the father, and the issues that were or were not addressed during caseworker visits (if relevant): | | | |
| **97** | If regular visitation is not occuring due to mother not being involved or found, are there documented diligent efforts to locate mother? | **Yes** | **No** | **NA** |
| **98** | If regular visitation is not occuring due to father not being involved or found, are there documented diligent efforts to locate father? | **Yes** | **No** | **NA** |
| | Section 9 is rated:_____. Please elaborate on any findings: | | | |

## *Individualizing Case Planning*

### 10. Permanency goal for child

| | | Goal 1 | Goal 2 |
|---|---|---|---|
| 99 | What is (are) the child's current permanency goal(s) (or if the case was closed during the period under review, what was the permanency goal before the case was closed)? | | |

| | | | | |
|---|---|---|---|---|
| 100 | Is (are) the child's permanency goal(s) specified in the case file? | Yes | No | NA |
| 101 | If the child entered care during the PUR, was a permanency plan developed within the childs first 30 days in care? | Yes | No | NA |
| 102 | Were all permanency goals in effect during the period under review established in a timely manner? | Yes | No | |

| Permanency Goal | Date Established | Time in Foster Care Before Goal | Date Goal Changed | Reason for Goal Change |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

| | | | | |
|---|---|---|---|---|
| 103 | Were all permanency goals in effect during the period under review appropriate to the child's needs for permanency and to the circumstances of the case? | Yes | No | NA |
| 104 | Please document the reasons the reviewers determined that the goals were not timely and/or appropriate (if relevant): | | | |
| 105 | Has the child been in foster care at least 15 of the last 22 months? | Yes | No | NA |
| 106 | If not, does the child meet Adoption and Safe Families Act (ASFA) criteria for termination of parental rights (TPR)? | Yes | No | NA |
| 107 | If yes, did the agency file a TPR petition before the period under review or in a timely manner during the period under review? | Yes | No | NA |
| 108 | If no TPR petition has been filed, is an "exception" or compelling reason for not filing for TPR documented in the case file? | Yes | No | NA |
| 109 | If an exception has not been documented, do circumstances exist that would constitute a legal exception? | Yes | No | NA |
| 110 | If the child has a goal of reunification, does the case record documentation reflecting active concurrent permanency planning ? | Yes | No | NA |
| 111 | If the child was discharged during PUR, was an aftercare plan developed prior to discharge? | Yes | No | NA |
| | Section 10 is rated:_____. Please elaborate on any findings: | | | |

### 11. Case Planning

| | | |
|---|---|---|
| 112 | How many FTMs have occurred during the PUR? | |
| 113 | How many FTMs have been attended by both the birth and resource parents during the PUR? | |

## *Individualizing Case Planning*

| | | Yes | No | NA |
|---|---|---|---|---|
| 114 | Was a FTM used in the initial development of the case plan if the initial plan was developed during the PUR, and/or was the FTM used to update the case plans quarterly? | Yes | No | NA |
| 115 | Were there family team meetings within 30 calendar days of any placement or other significant change in the child's or family's circumstances? | Yes | No | NA |
| 116 | Were there documented discussions of concurrent planning with the birth parents? | Yes | No | NA |
| | Section 11 is rated:_____. Please elaborate on any findings: | | | |

*Mobilizing Services Timely*

## 12. Foster Care Re-Entries

| | | | | |
|---|---|---|---|---|
| 117 | Did any of the child's foster care entries during the period under review occur within 12 months of the child's discharge from a prior foster care episode? | Yes | No | NA |
| 118 | If the answer is Yes, was there evidence that concerted efforts were made to prevent re-entry? | Yes | No | NA |
| 119 | Date of child's first entry into foster care during the period under review: | | | |
| 120 | Was this entry within 12 months of a previous discharge: | | Yes | No |
| 121 | Date of diacharge, if any, within 12 months of this entry:_____        Document the circumstances related to the re-entry within 12 months: | | | |
| 122 | If there are any additional entries into foster care after a discharge during the period under review, provide the above information for each of these entries:

Section 12 is rated:_____. Please elaborate on any findings: | | | |

## 13. Reunification, Guardianship or Permanent Placement with Relatives

| | | | | |
|---|---|---|---|---|
| 123 | Does the child have a goal of reunification, guardianship, or permanent placement with rela | Yes | No | NA |

| | What is/was the child's most recent permanency goal? | Reunification | Guardianship | Perm. Placement with Relatives |
|---|---|---|---|---|
| 124 | | | | |

| | | | | |
|---|---|---|---|---|
| 125 | Are the agency and court making (or did they make) concerted efforts to achieve the goal (or these goals, if there are concurrent goals) in a timely manner during the PUR? | Yes | No | NA |
| 126 | Date of the child's most recent entry into foster care: | | | |
| 127 | Time in care (in months) at the time of the onsite review: | | | |
| 128 | Date of discharge from foster care: | | | |
| 129 | Document efforts made to achieve goal, including the appropriateness and effectiveness of the efforts, and, barriers to achieving the goal (for example, agency, court, or other factors that prevented or are preventing timely achievement of the goal): | | | |
| 130 | Please document any contributing factors to the case in both the circumstance of the goal of reunification or permanent placement with relatives was not achieved or is not likely to be achieved within 12 months, or if the permanency goal was achieved within 12 months: | | | |
| 131 | For children with a goal of reunification, have parental service plans identified those services DFCS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care? | Yes | No | NA |
| 132 | Did DCFS make those services identified available either through direct or referral service?        Mother? | Yes | No | NA |
| 133 | Father? | Yes | No | NA |
| 134 | If the child was discharged during PUR and was reunified, was there a 90 day trial home visit? | Yes | No | NA |
| | Section 13 is rated:_____. Please elaborate on any findings: | | | |

## 14. Stability of Foster Care Placement

| | | Months |
|---|---|---|
| 135 | How long has the child been in the current placement setting? | |
| 136 | | Number |
| | How many placement settings did the child experience during the period under review? | |

| Placement Date | Placement Type | Reason for Change in Placement |
|---|---|---|
| | | |
| | | |

*Mobilizing Services Timely*

| | | | | |
|---|---|---|---|---|
| | | | | |
| | | | | |
| 137 | If there was more than 1 placement, were all placement changes during the period under review planned by the agency in an effort to achieve the child's case goals or to meet the needs of the child? | Yes | No | NA |
| 138 | Is the child's current placement setting (or most recent placement if the child is no longer in foster care) stable? | Yes | No | |
| 139 | If applicable, indicate why the placement changes were or were not planned in an effort to achieve the child's case goals or to meet the needs of the child: | | | |
| 140 | If applicable, provide your reasons for determining that the child's current placement (or most recent placement if the child is no longer in foster care) is or is not stable: | | | |
| 141 | If the child has been assessed with special needs, is s(he) placed in a placement that can meet their therapeutic, educational and medical needs? | Yes | No | NA |
| 142 | Was the child placed in the least restrictive setting that meets his/her individual needs? | Yes | No | NA |
| | Section 14 is rated:_____. Please elaborate on any findings: | | | |

## 15. Adoption

| | | | | |
|---|---|---|---|---|
| 143 | Does the child have a goal of adoption? | Yes | No | NA |
| 144 | Are the agency and court making (or did the agency and court make) concerted efforts to achieve the goal of adoption in a timely manner? | Yes | No | |
| 145 | Date of the child's most recent entry into foster care (this should be the same date on the Face Sheet): | | | |
| 146 | Time in care (in months) at the time of the onsite review (this is the number of months that the child was in foster care from the date of the most recent entry into foster care to the beginning of the onsite review week or from the date of the most recent entry into foster care to the time of adoption finalization or discharge from foster care): | | | |
| 147 | Date of adoption finalization (if relevant) (this is the date that the court legally established the adoption and transferred care and placement responsibility or supervision from the State to the adoptive parent(s); this should be the same date on the Face Sheet; if the adoption has not been finalized, enter Not Applicable (NA)): | | | |
| 148 | Please document efforts made to achieve the child's goal of adoption, including the appropriateness and effectiveness of the efforts, and barriers to achieving the goal of adoption (for example, agency- or court-related factors that prevented or are preventing achievement of the goal in a timely manner): | | | |
| 149 | Please document special circumstances in the case which are contributing to the child either likely to achieve the goal of adoption within 24 months or not: | | | |
| 150 | Does the child have an assigned adoption specialist and an adoption plan that identifies the child-specific activities that DFCS will undertake to achieve adoption, and receiving regular adoption status meetings consistent with plan requirements, and was that adoption specialist assigned within 10 days of the adoption goal change? | Yes | No | NA |
| 151 | Is there evidence that the resource family has been informed of available subsidies, including post-adoptive subsidies? | Yes | No | NA |
| 152 | If the child has been in care longer than 12 months, is there evidence that the resource parents have been engaged on discussions regarding adoption? | Yes | No | NA |
| | Section 15 is rated:_____. Please elaborate on any findings: | | | |

## 16. Other planned permanent living arrangement

| | | | | |
|---|---|---|---|---|
| 153 | Does the child have a goal of other planned permanent living arrangement? | Yes | No | NA |

*Mobilizing Services Timely*

| 154 | What is the child's other planned permanent living arrangement goal (check the goal that most closely reflects the one in the case file)? | ☐ Emancipation/ Independence:<br>☐ Long-term foster care<br>☐ Long-term foster care with kin<br>☐ Placement in a long-term<br>☐ Other (specify): | | |
|---|---|---|---|---|
| 155 | For children aged 14-20 in the PUR, were concerted efforts made to provide the child with services to adequately prepare the child for independent living when the child leaves foster care, as set forth in a service plan? | Yes | No | NA |
| 156 | Were concerted efforts made to achieve the goal of other planned permanent living arrangement in a timely manner by placing the child in a living arrangement that is "permanent," that is, the child will remain in the living arrangement until discharge from foster care? | Yes | No | NA |
| 157 | Date of the child's most recent entry into foster care: | | | |
| 158 | Time in care (in months) at the time of the onsite review: | | | |
| 159 | Date of documentation regarding "permanency" of the child's living arrangements | | | |
| 160 | Date of discharge from foster care | | | |
| 161 | If the child is not in a living arrangement that can be considered permanent, were concerted efforts made during the period under review to achieve this type of living arrangement for the child? | Yes | No | NA |
| 162 | Please document the efforts made to achieve the child's goal, including the appropriateness and effectiveness of the efforts, and barriers to achieving the goal: | | | |
| 163 | Document the services provided, or not provided, to adequately prepare the child for independent living: | | | |
| 164 | If the child is over 14 and involved with ILS, how long has s(he) consistently been attending ILS classes? | | | |
| | Please explain your answer: | | | |
| | Section 16 is rated:_____. Please elaborate on any findings: | | | |

## 17. Physical Health of the Child

| 165 | In the last 12 months period, has the agency assessed the child's physical health care needs? | Yes | No | NA |
|---|---|---|---|---|
| 166 | If the child came into care during the PUR, did the child receive an initial screening within 24 hours? | Yes | No | NA |
| 167 | If the child came into care during the PUR, did the child receive a comprehensive health screening within 30 days of foster care entry? | Yes | No | NA |
| 168 | During the period under review, did the agency assess the child's dental health care needs? | Yes | No | NA |
| 169 | During the PUR, did the child, if over 3, receive an initial dental examination within 90 days of entry into care or within 90 days of his/her 3rd birthday if occurring during stay in foster care? | Yes | No | NA |
| 170 | During the period under review, did the agency ensure that appropriate services were provided to the child to address all identified physical health needs *within required timeframes*? | Yes | No | NA |
| 171 | During the period under review, did the agency ensure that appropriate services were provided to the child to address all identified dental health needs *within required timeframes*? | Yes | No | NA |
| 172 | Did the child receive periodic, age-appropriate physical and dental health examinations to ensure ongoing assessment of needs? If not, document the reasons why the agency did not conduct this ongoing assessment: | | | |
| 173 | Based on the assessment of needs, if there are services that were not provided, document why the services were not provided (for example, lack of agency efforts to secure services, lack of service availability in the community, lack of transportation for foster parents to take child to appointments, etc.): | | | |

*Mobilizing Services Timely*

Section 17 is rated:_____. Please elaborate on any findings:

## 18. Mental/Behavioral Health of the Child

| | | Yes | No | NA |
|---|---|---|---|---|
| **174** | During the PUR, did the child, age 4 and older, receive an initial mental health screening within 30 days of entry into care and/or within 30 days of the 4**th** birthday if occurring during stay in foster care? | Yes | No | NA |
| **175** | Did the agency conduct an assessment of the child(ren)'s mental/behavioral health needs on an ongoing basis or as follow-up based on indications to inform case planning decisions? | Yes | No | NA |
| **176** | During the period under review, did the agency provide appropriate services to address the child(ren)'s mental/behavioral health needs within required timeframes? | Yes | No | NA |

**177** Note whether or not there is evidence of a mental/behavioral health (including substance abuse) assessment. For example, (1) what type of needs assessment was conducted, and (2) what kind of information was in the case file or missing from the case file that is relevant to an assessment of mental/behavioral health needs? Indicate if a formal assessment was conducted, and, if so, note the diagnosis:

**178** If there are services that were not or are not being provided based on the assessment of needs, describe why the services were not provided (for example, lack of agency efforts to secure services, lack of service availability in the community, no transportation for foster parents to take child to appointments, parent's unwillingness to engage child in services, etc.). If the services were not available due to lack of availability, or reviewer notices other services not available in the community, please describe in detail:

Section 18 is rated:_____. Please elaborate on any findings:

*Preserving and Maintaining Connections*

## 19. Proximity of Foster Care Placement

| | | Yes | No | NA |
|---|---|---|---|---|
| 179 | Was the child placed in the same county as (s)he was removed? | Yes | No | NA |
| 180 | Is the child's current or most recent placement close enough to his or her parents or other potential permanent caregiver to facilitate frequent face-to-face contact between the child and the parents while the child is (or was) in foster care? | Yes | No | NA |
| 181 | If No, was the reason for the location of the child's current or most recent placement based on the child's needs and intended to ensure that the child's case plan goals are achieved? | Yes | No | NA |
| 182 | Describe the relationship between the child's current or most recent placement and the location of the parents or of a family member with whom the child is likely to be reunified (for example, the child will be reunified with a grandmother): | | | |
| 183 | If the reviewers determine that the child's placement is not sufficiently close to the parent(s) to facilitate frequent contact, document the reasons for this determination (and identify any reasons provided by the agency): | | | |
| 184 | Did the child remain in the same school (s)he attended prior to foster care placement? | Yes | No | NA |
| 185 | If no, was this appropriate based on case circumstances? | Yes | No | NA |

If No, please explain why:

Section 19 is rated:_____. Please elaborate on any findings:

## 20. Placement with Siblings

| | | Yes | No | NA |
|---|---|---|---|---|
| 186 | During the period under review, was the child placed with all siblings who also were in foster care? | Yes | No | NA |
| 187 | If No, was there a valid reason for the child's separation from the siblings (for example, the separation was necessary to meet the needs of one of the siblings, to address safety concerns for one or more of the siblings, or to accommodate a large sibling group)? | Yes | No | NA |
| 188 | Reason for Separation (if applicable)-please list sibling's name, placement setting, and the reason for separation: | | | |

Section 20 is rated:_____. Please elaborate on any findings:

## 21. Visiting with parents and siblings in foster care

| | | Yes | No | NA |
|---|---|---|---|---|
| 189 | If the child entered care during the PUR, was an initial visitation plan developed in the first 30 days of the child's placement? | Yes | No | NA |
| 190 | Was a visitation plan updated every 90 days during the PUR? | Yes | No | NA |
| 191 | Does the visitation plan include all visitation (parents, siblings, connections, etc)? | Yes | No | NA |
| 192 | During the period under review, were concerted efforts made to ensure that visitation (or other forms of contact if visitation was not possible) between the child and his or her mother was of sufficient frequency to maintain or promote the continuity of the relationship? | Yes | No | NA |
| 193 | | ☐ More than once a week ☐ Once a week | | |

## *Preserving and Maintaining Connections*

| | | |
|---|---|---|
| | Check the box next to the statement that best describes the usual frequency of visits between the mother and the child: | ☐ Less than once a week, but at least twice a month<br>☐ Less than twice a month, but at least once a month<br>☐ Less than once a month<br>☐ Never |
| **194** | During the period under review, were concerted efforts made to ensure that visitation (or other forms of contact if visitation was not possible) between the child and his or her father was of sufficient frequency to maintain or promote the continuity of the relationship? | **Yes** \| **No** \| **NA** |
| **195** | Check the box next to the statement that best describes the usual frequency of visits between the father and the child: | ☐ More than once a week<br>☐ Once a week<br>☐ Less than once a week, but at least twice a month<br>☐ Less than twice a month, but at least once a month<br>☐ Less than once a month<br>☐ Never |
| **196** | During the period under review, were concerted efforts made to ensure that the quality of visitation between the child and the mother was sufficient to maintain or promote the continuity of the relationship? | **Yes** \| **No** \| **NA** |
| **197** | During the period under review, were concerted efforts made to ensure that the quality of visitation between the child and the father was sufficient to maintain or promote the continuity of the relationship? | **Yes** \| **No** \| **NA** |
| **198** | During the period under review, were concerted efforts made to ensure that visitation (or other forms of contact if visitation was not possible) between the child and his or her sibling(s) was of sufficient frequency to maintain or promote the continuity of the relationship? | **Yes** \| **No** \| **NA** |
| **199** | Check the box next to the statement that best describes the usual frequency of visits between the siblings and the child: | ☐ More than once a week<br>☐ Once a week<br>☐ Less than once a week, but at least twice a month<br>☐ Less than twice a month, but at least once a month<br>☐ Less than once a month<br>☐ Never |
| **200** | During the period under review, were concerted efforts made to ensure that the quality of visitation between the child and his or her sibling(s) was sufficient to promote the continuity of their relationships? | **Yes** \| **No** \| **NA** |
| **201** | For each applicable relationship (Mother, Father, Sibling(s)), document concerted effrts or lack of efforts to promote frequent visitation. Also document any reasoning why a relationship is not applicable: | |
| **202** | If the child entered care during the PUR did the child have a visit with his/her parents within 24 hours of placement, or at a minimum a phone call with relatives within first 24 hours? | **Yes** \| **No** \| **NA** |
| | Section 21 is rated:_____. Please elaborate on any findings: | |

*Preserving and Maintaining Connections*

## 22. Preserving Connections

| | | Yes | No | NA |
|---|---|---|---|---|
| 203 | During the period under review, were concerted efforts made to maintain the child's important connections (for example, neighborhood, community, faith, language, extended family members including siblings who are not in foster care, school, tribe, and/or friends)? | Yes | No | NA |
| 204 | Was a sufficient inquiry conducted with the parent, child, custodian, or other interested party to determine whether the child may be a member of, or eligible for membership in, an Indian tribe? | Yes | No | NA |
| 205 | If the child may be a member of, or eligible for membership in, an Indian tribe, during the period under review, was the tribe provided timely notification of its right to intervene in any State court proceedings seeking an involuntary foster care placement or termination of parental rights (TPR)? | Yes | No | NA |
| 206 | If the child is a member of, or eligible for membership in, an Indian tribe, was the child placed in foster care in accordance with the Indian Child Welfare Act (ICWA) placement preferences or were concerted efforts made to place the child in accordance with ICWA placement preferences? | Yes | No | NA |
| 207 | Document agency efforts or lack of efforts to help children maintain important connections when these are not being maintained through the placement itself: | | | |

Section 22 is rated:_____. Please elaborate on any findings:

## 23. Relationship of Child in Care with Parents

| | | Yes | No | NA |
|---|---|---|---|---|
| 208 | Did a meeting occur between the birth parents and resource parents within the first month of placement (if placement occurred during the PUR)? | Yes | No | NA |
| 209 | Is there evidence in the case record of shared parenting responsibilities between the birth and resource parents? | Yes | No | NA |
| 210 | If not explained in the "reason for rating" section, document efforts or lack of efforts to support or maintain a positive mother-child, and or father-child relationship. (The focus should be on activities such as the ones listed in the instructions, rather than on visitation). Foster parent activities may be considered equivalent to "agency" activities in responding to this question: | | | |

Please provide a basis for your response:

Section 23 is rated:_____. Please elaborate on any findings:

## 24. Relative placement

| | | Yes | No | NA |
|---|---|---|---|---|
| 211 | During the period under review, was the child's current or most recent placement with a relative? | Yes | No | |
| 212 | If Yes, is (or was) this placement stable and appropriate to the child's needs? | Yes | No | NA |

## *Preserving and Maintaining Connections*

| | | | | |
|---|---|---|---|---|
| **213** | If No, did the agency, during the period under review, make concerted efforts to identify, locate, and evaluate maternal relatives as potential placements for the child, with the result that maternal relatives were ruled out as, or were unwilling to be, placement resources? | **Yes** | **No** | **NA** |
| **214** | If No, did the agency, during the period under review, make concerted efforts to identify, locate, and evaluate paternal relatives as potential placements for the child, with the result that paternal relatives were ruled out as, or were unwilling to be, placement resources? | **Yes** | **No** | **NA** |
| **215** | Document agency efforts or lack of efforts to locate and evaluate maternal relatives (including reasons why relatives were not considered as placement resources, if relevant) if appropriate, during the period under review: | | | |
| **216** | Document agency efforts or lack of efforts to locate and evaluate paternal relatives (including reasons why relatives were not considered as placement resources, if relevant) if appropriate, during the period under review: | | | |
| | Section 24 is rated:_____. Please elaborate on any findings: | | | |

**Ex. 29**

*Prepared for*

**Mississippi Department of Human Services**
**Division of Family and Children's Services**
**State of Mississippi**

# Mississippi Foster Care Services Assessments

# *Final Report*

**October 13, 2009**



**Center for the Support of Families, Inc. (CSF)**

1107 Spring Street, Suite 2C, Silver Spring, MD 20910 ● Phone 301-587-9622 ● Fax 301-587-9620

Mississippi Foster Care Services Assessments

# TABLE OF CONTENTS

Executive Summary ..................................................................................................................3

Introduction ...........................................................................................................................18

Methodology ..........................................................................................................................20

Assessments ...........................................................................................................................25

    Reunification Services Needs Assessment ………………………………………………26

    Medical, Dental, and Mental Health Services Needs Assessment …………………………44

    Independent Living Services Needs Assessment …………………………………………..72

    Recruitment and Retention/Foster Care Placement Needs Assessment ……………...89

    Child Safety Assessment …………………………………………………………………112

Appendices ………………………………………………………………………………131

    Appendix A:  Staff Survey ………………………………………………………132

    Appendix B:  Case review sample questions …..………………………………140

# EXECUTIVE SUMMARY

The Mississippi Department of Human Services (MDHS) is currently implementing the provisions of the *Olivia Y. vs. Barbour* Settlement Agreement, approved by the court in January 2008. The implementation activities are being carried out by the MDHS Division of Family and Children's Services (DFCS). The Period 2 Annual Implementation Plan requires that MDHS conduct several foster care services assessments in conjunction with a qualified independent consultant approved by the Court Monitor,[1] as follows:

- A reunification services needs assessment;

- A medical, dental, and mental health services needs assessment;

- An independent living services needs assessment;

- A recruitment and retention of resource families assessment;

- A termination of parental rights (TPR) assessment;

- A child safety assessment; and

- A foster care placement assessment.

MDHS contracted with the Center for the Support of Families (CSF) to coordinate the completion of the assessments. Because of the similarity of information needed and topics addressed in the recruitment and retention assessment and the foster care placement assessment, we combined those two assessments. The TPR assessment, which is due on January 1, 2010, is not included in this report, and will follow separately when it is completed. Therefore, this report includes five assessments.

The methodology used to conduct these assessments included a staff survey, a series of case reviews for each of the assessments, and a number of focus groups and structured interviews. Since CSF is also contracted to develop a child welfare practice model with MDHS, we designed these information gathering processes to provide information for the practice model and the assessments. We also reviewed policy and procedural information pertaining to each assessment, along with other information such as program descriptions of services, contractual information, and MACWIS reports.

Our major findings and recommendations from each of the assessments include the following:

## *Reunification Services Needs Assessment*

**Findings**

Based on the information above, we have made the following findings:

---

[1] Period 2 Annual Implementation Plan, Mississippi Settlement Agreement and Reform Plan, Section II: Foster Care Services Assessment and Implementation Steps, 2. Foster Care Assessments. Filed May 4, 2009.

- There is a notable lack of services in the State targeted toward reunification. MDHS staff appear to try to mobilize services, such as family preservation services that that are designed more as placement prevention services, in the absence of specific reunification services.

- The lack of services is most pronounced in rural areas of the State, although wait lists and restrictions on who may receive the services affects the accessibility of services even where they exist.

- The demand for services used to facilitate and support reunification outstrips the capacity of contract providers to provide the services, leading to wait lists or referral rejections.

- There appears to be little opportunity to individualize reunification services to the needs of particular families, owing either to the standardized design of programs, e.g., family preservation, parenting classes, or to the lack of available services and providers to match to identified needs. The services that are available, with the exception of the intensive in-home services, are categorical and standardized and may not fit with each family's needs. We believe that the effectiveness of reunification services in the State could benefit from an array that includes more in-home services that are flexible and designed to address behavioral health needs and parent support needs.

- Post-placement services to support reunification once it has occurred seem notably absent. Given the requirements in the *Olivia Y* settlement agreement for after care plans and services, this is an important finding.

- The effectiveness of services to address needs that must commonly be addressed in order to achieve and sustain reunification, such as domestic violence, substance abuse, and sexual abuse, is regarded as low by staff. Although staff rated their effectiveness in meeting the basic needs of families whose children are in foster care, e.g., food, clothing, shelter, the lack of available funds to meet these needs suggests it is an area for strengthened capacity in the way of flexible, earmarked funds for that purpose.

- Apart from contracted services, MDHS agency services/activities that support reunification need strengthening in several areas including using assessments to link services to identified needs, maintain frequent contacts among caseworkers, parents, and children, and involving both parents in case planning and service delivery.

- The involvement of birth parents in maintaining parental responsibilities to the extent that it is safe and appropriate to do so while their children are in foster care is a practice area in need of particular strengthening.

- When a number of the findings are considered together, such as the lack of specific reunification services, the lack of father involvement, the lack of capacity to respond to individual needs that are barriers to reunification, the lack of resource family involvement in reunification efforts, and some of the court-related barriers to maintaining child-parent contact, we are concerned that reunification as a viable goal requiring diligent attention may not receive the same emphasis in practice as other permanency goals, i.e., adoption. While

policy supports establishing reunification as an initial goal in most cases, we did not find policy and training that emphasize diligent and ongoing efforts to mobilize the services needed to pursue reunification actively. The new practice model will focus activities and resources heavily on proactive efforts to achieve timely and appropriate reunification which will require, in some situations, substantial shifts in perspective and approach to working with families within MDHS and among its service providers, foster caretakers, and the courts. Changing policy and training and adding to the service array will help in making this shift, but alone they will not cause staff and stakeholders to think differently about reunification and commit to addressing needs appropriately in an effort to achieve reunification. There are a number of tasks associated with elevating the importance and priority of reunification activities that will need to be addressed in order to increase effectiveness in this area.

- We did not identify MACWIS reports that provide information on reunification services provided, thus limiting the Department's ability to monitor service provision effectively.

**Recommendations**

- There is a serious need to increase the array of services in the State to be used to facilitate and sustain reunification. We are recommending that MDHS consider the following options for addressing this area:

  - Since MDHS can use Federal title IV-B funds to fund in-house staff that provides family preservation and reunification services, some consideration of this approach might be considered in order to supplement the contracted services and increase the availability of services in rural areas of the State. Since these funds are capped, this might mean diverting existing IV-B expenditures, but developing some type of in-house capacity to provide needed reunification services is worth considering as a means of making services available where they are currently unavailable.

  - We recommend that the capacity of existing contractors to provide reunification-related services be increased statewide. This can be done by increasing funding for these services as well as relaxing some of the program restrictions that now limit the access to these services by families needing reunification services. If the Department wishes to reserve family preservation families for placement prevention and reunification from short-term stays in foster care, we recommend that the expansion of services occur with intensive in-home services.

  - As also recommended in the Medical, Dental and Mental Health Services Assessment, we recommend that MDHS enter into collaborative agreements with the DMH and the State's Medicaid agency to fund mental health professionals in rural areas of the State that serve children and families served by MDHS. Since most of the families are Medicaid-eligible, we believe that the services they provide would be reimbursable through Medicaid and it would immediately increase families' access to mental health services in the State.

- We recommend that flexible funds be earmarked for use in helping to meet the basic needs of families seeking to reunify with their children in foster care, and/or that procedures for accessing available funds be clarified and simplified.

- We recommend that the State examine services and practices with established records of effectiveness in reunifying children and families timely and appropriately and, where possible, consider replicating some of those "best practices" within the State. For example, we recommend attention to the Model Youth Court program in Forest County as a means of providing services directed toward reunifying very young children in foster care with their families.

- We recommend that the reunification services provided through MDHS support be tailored to the individualized needs of the families receiving them. This can be supported in the following ways:

  - We recommend relaxing the requirements for all families to complete standardized programs regardless of their individual circumstances, strengths, and needs.

  - We recommend adding to the service array the capacity to provide more in-home services to families such as in-home behavioral health interventions as an alternative to office-based mental health counseling, and in-home parent coaching and support as an alternative to standardized parenting classes.

  - We recommend that the Department's performance-based contracting system, when implemented, support the need for providers to respond flexibly to families' needs with services that reflect their unique strengths and needs in the comprehensive family assessments and case plans.

  - We recommend strengthening both policy and practice requiring MDHS staff to coordinate case planning and service provision activities with service providers in order to ensure that services match needs, and to monitor the effectiveness of service provision in facilitating and supporting reunification.

- Consistent with other recommendations we are making with regard to implementing a child welfare practice model, we recommend that policy and training be strengthened to support improvements in practice with regard to reunification, such as the following:

  - Strengthened case planning and ISP policy and training that focus on identifying strengths and needs, matching services to needs, brokering for and obtaining needed services, and monitoring the effectiveness of services. This should include the active involvement of service providers in case planning processes whenever appropriate.

  - Strengthened policy and training with regard to visits between caseworkers and parents/children for the purposes of assessment, case planning, involvement, and case monitoring.

- Strengthened FTM policy and training that requires the bringing together of all relevant parties at frequent intervals to identify needed services, put them into place, and monitor their effectiveness.

- We recommend that as MDHS rolls out the new child welfare practice model, that leadership within the Department (statewide and regionally) develop and convey clear messages to staff, service providers, foster caretakers, and stakeholders such as the courts, with regard to the priority and importance it places on timely and appropriate reunification.

- As MDHS implements a new CQI process, we recommend that it monitor specifically for the provision of appropriate and timely reunification services, their effectiveness, and related casework activities carried out by both MDHS staff and provider staff related to reunification efforts. We also recommend that the CQI process monitor for the adequacy of the reunification-related service array statewide and provide reports and other feedback to county, regional, and State administrators on the strengths and gaps of the service array.

- We recommend that MDHS develop MACWIS reports on services provided to families with reunification as a goal that will support monitoring in this area. Reports should include, at a minimum, services provided, dates of initiating and terminating services, service provider, and case status. If possible, with the automation of the ISP, reporting on the match of needs identified in the ISP to service provided would provide an effective tool for supervisory monitoring in County Departments.

- We recommend strengthened training for resource parents in the area of supporting birth families in the reunification process, particularly in facilitating child/parent contacts and parental involvement in the care of their children while in foster care.

- We recommend active engagement of the courts around child/parent visits, given some of the concerns raised in that area. This could take the form of educational initiatives with the judiciary and/or working through the Administrative Office of Courts to facilitate discussion or training in this area. Free technical assistance from the National Resource Center for Legal and Judicial Issues should be explored in developing a strategy to address the courts' effects on the frequency of child/parent visits.

## *Medical, Dental, and Mental Health Services Needs Assessment*

### Findings

Our findings for this assessment indicate that mental health issues are predominant, although there are some important findings regarding dental services as well. Also, poor case file documentation regarding screening/evaluation for needed services and the provision of services is a concern in that it inhibits the effective provision of all these services, particularly when there is staff turnover.

*Mental Health Services Findings*

- Some mental health initiatives offer effective approaches to meeting the mental health needs of children in the child welfare system, but are limited in scope, funding, or criteria for the population served. For example, a wraparound services approach would be beneficial to all children not just those with SED, and the inter-disciplinary approach of the MAP teams could benefit children before they exhaust other available services but funding is very limited.

- Community Mental Health Centers appear to be the primary source for MDHS to provide mental health services to children and youth in its care. Across the State, the centers do not offer a consistent range of services, particularly in rural areas of the State where services are considered to be quite limited, and they are often unable to provide the level of specialization needed by children in foster care.

- Access to private providers of mental and behavioral health services is restricted, particularly in rural areas of the State, by lack of funding to pay for the services, by wait lists to obtain services even when they are available, and by a lack of providers that will accept Medicaid.

- Obtaining psychological evaluations is particularly difficult, as there are areas of the State where this service is not available.

- Mental health screenings of children are either not conducted as consistently as needed or the case file documentation was so poor that we could not determine if a screening had been conducted or not.

- There is little or no choice of providers in rural areas.

- The effectiveness of some services is generally regarded as poor, indicating a need for more choices of providers, more accountability in service provision, and strengthened ability to tailor services to meet the individualized needs of children and youth.

*Dental Health Services Findings*

- Access to dental providers in rural areas of the State appears to be the most prominent issue. A number of providers will not accept Medicaid and families/resource families often must travel long distances to access providers.

- The dental services authorized and covered by Medicaid are limited, particularly as it relates to orthodontic care.

- Dental screenings are either not conducted as consistently as needed, or there is inadequate documentation of case files to make a determination as to whether the screening was conducted or not.

*Physical Health Services Findings*

- In general, access to physical health care appears better than dental or mental/behavioral health services.

- Although the initial physical health screenings of children occur more frequently than screenings for dental and mental/behavioral health concerns, case file documentation in this area is lacking.

- Medicaid cards and medical info may not be provided to resource parents routinely, affecting their ability to seek and provide needed services.

- At least some resource parents experience difficulty in getting the necessary medical background information on children placed in their homes, and are unaware of the medical needs of the children at the time of placement.

- Some resource parents appear to have difficulty obtaining complete medical information from physicians needed to attend to the medical needs of children in their care.

- Transportation to services (medical, dental, mental health) is a major issue in rural areas, and Medicaid only reimburses in limited circumstances.

**Recommendations**

- MDHS and MDMH should develop a collaborative program to serve the mental health needs of foster care children statewide, including specialty services, e.g., psychological examinations, treatment for abuse and neglected children and youth, etc. This should include the possibility of hiring qualified mental health professionals to be based in DHS regional offices to serve counties where the service population is the greatest or where gaps in services are the most prevalent, for example, in many of the rural areas of the State. Programs of this nature can offer a diverse range of services and can be structured to enable Medicaid billing to cover a majority of the staffing and administrative costs. The participation of the State Medicaid Agency should be pursued to explore further creation of these types of innovative programs along with funding arrangements.

- In cooperation with the colleges and universities in the State, MDHS and the State Board of Dental Examiners should intensify efforts to recruit dentists to provide services to children and youth in foster care, as well as to children served in their own homes through MDHS. This effort may be part of a more comprehensive approach to providing health care in rural and underserved areas of the State. A clinic approach that specializes in providing Medicaid-funded dental care to children can offer access that is currently unavailable, and there are models around the country to draw on in designing such a program.

- MDHS should collaborate with the State Medicaid Agency to pursue the possibility of exercising State options that could include an expansion of dental services to include orthodontic care for children and adolescents.

- MDHS collaborate with DMH and the State Medicaid Agency to establish additional waiver programs to expand its provision of mental health services to children who are placed in foster homes. The MYPAC program is one example of a waiver program that could also serve children residing in foster family homes at risk of entering PRTF's, thereby enabling these youth to receive needed services and remain in the community.

- MDHS should collaborate with the psychology and behavioral science programs of the State's post-secondary systems to explore the possibility of establishing internships and field placements within MDHS, providing opportunities for professional and academic advancement that includes direct services and interventions to children and adolescents in foster care.

- MDHS Regional Administrators and Area Social Work Supervisors should establish performance standards and monitoring practices that hold direct service staff accountable for documenting all assessment, screening, and service provision information in the case files and for maintaining current health records.

- MDHS incorporate specific measures and review processes within its CQI system to ensure that all initial screenings are conducted within established timeframes.

- MDHS should ensure that its Foster Care Reviews (FCR) include the evaluation of the provision of needed medical services as part of appropriate case planning efforts and timely achievement of case plan goals.

- MDHS should establish both supervisory practices and monitoring processes within its CQI system to ensure that resource parents are provided timely and accurate medical information that enables them to meet the needs of children in their care.

- MDHS should reimburse resource parents for transportation of children to all necessary appointments on behalf of the medical, dental, and mental health needs of children in their care.

- MDHS Regional Directors and Area Social Work Supervisors should ensure that direct staff provides health records, appropriate health referrals and relevant information about services/programs to youth exiting care and to parents or guardians at the time of case closure for the purpose of continuity of health care and service delivery. Part of the FCR process might include addressing this issue with resource families since the FCR reviews all cases of children in foster care each six months.


## *Independent Living Services Needs Assessment*

**Findings**

- The youth we spoke to who have participated in the program indicated they enjoy the program.

- Caseworkers are consistent with policy in informing youth about the Independent Living Program and encouraging them to participate.

- There are indications that the program is reaching most of the youth in foster care.

- Contracting with one agency can be beneficial, not only in developing a close rapport with one provider, but to ease MDHS' ability to provide oversight and monitor the work being done.

- We did not get the sense that the MDHS caseworker consistently reinforces the skills being taught by the service provider in the IL classes or that they consistently address IL issues with youth in their caseloads but, rather, defer to the contractor.

- Both the contractor and the Department appear to be developing IL plans for youth and we did not find indications that either of the plans was individualized to the strengths and needs of the youth, that they addressed key concerns related to achieving independence, or that they were coordinated with each other. In fact, the plans seem to be minimally completed. In the case of the MDHS plans, we did not find evidence that they were based on the findings of the Ansell-Casey Life Skills Assessment or other assessments.

- We could not find evidence that youth are actively involved in the development of either plan.

- The IL services offered are standardized and there appears to be little flexibility in the contractor's ability to tailor individual services to the strengths and needs of youth as opposed to offering the same Life Skills classes to all youth. We believe that this may be a contracting issue, in which the program requirements for the program are standardized in the contract requirements.

- Although the current contract calls for the contractor to identify 18 mentors for youth statewide, we do not believe that has occurred. Even so, 18 mentors would not begin to address the needs of the many youth in care in need of this service.

**Recommendations**

- We recommend that the contract for independent living services be modified substantially as follows:

  - The contract should permit and require diversity in the range of IL services provided, rather than requiring a standard curriculum for all youth as the core service. While we recognize the importance of the Life Skills classes, we particularly recommend that a repetition of the classes not be required and that classes be designed and tailored to individual youth's needs, strengths, level of development, and interests.

  - We recommend that the contract include the flexibility and requirement to offer a broader range of services that are identified for individual youth through the Ansell-Casey Life Skills Assessment and the MDHS comprehensive strengths and needs assessment (when this is implemented by MDHS).

- We recommend that resource family training be modified to include content on the roles and responsibilities, and the skills needed, of resource families to assist youth in their care work toward independence and transition to adulthood. MDHS should create the expectation that resource parent involvement in IL service delivery and planning is a part of the role of foster parenting for youth.

- We recommend that MDHS staff training be strengthened to address the complementary roles and responsibilities of MDHS staff and contractor staff with regard to addressing independent living for youth in care. In particular, the training should emphasize a proactive and involved role for MDHS staff that reinforces skills taught by the contractor, uses caseworker visits to address IL issues, actively engages youth in planning for independence and adulthood, and addresses the connections that youth need upon leaving foster care, such as relationships with mentors and/or families and at least one caring committed adult. The training should prepare MDHS staff to address aftercare planning and linking discharged youth with the appropriate array of services. A practice guide for MDHS staff in this area would be helpful.

- We recommend an increased emphasis on the recruitment and linking of mentors with youth in foster care. Both the Department and the contractor should be held accountable for ensuring that each youth exiting foster care is linked with at least one caring committed adult that will help the youth transition to adulthood beyond foster care. This should be a part of the contractual requirements and an item for monitoring casework practice.

- We recommend that the case planning process for youth in care be strengthened in several ways, as follows:

    - First, there should be one IL and one TL plan for each youth rather than separate plans developed by the contractor and the Department;

    - The plans should be developed in accordance with the principles of the child welfare practice model that will be implemented by MDHS which includes active involvement of the youth and the youth's significant family members and providers, including foster caretakers, in developing the plan; the plan should result from a comprehensive strengths and needs assessment which includes the Ansell-Casey Like Skills Assessment; the services in the plan should be clearly connected to the youth's strengths and needs and developmental level and capacity; and the plan should be reviewed routinely and updated as needed as the youth's needs change.

    - The plan should be developed in the context of a Family Team Meeting with the contactor and the Department working together with the youth and other participants to develop the plan.

- We recommend that MDHS develop and implement communication protocols for the contractor and MDHS staff to meet routinely with the youth to discuss progress toward goals,

Mississippi Foster Care Services Assessments

the effectiveness of services, emerging or changing needs and strengths, and critical issues to the youth's independence such as aftercare planning and needs for services, relationships with family and other individuals, and so forth.  All meetings and discussions with the youth should be clearly documented in the MACWIS case file.

- We recommend an increased emphasis and accountability for sharing information between the contractor and MDHS staff, particularly as it relates to sharing the Ansell-Casey Life Skills Assessment and other information that pertains to serving the youth in care.

- We recommend that supervisory protocols and CQI processes (when implemented) address the quality and documentation of case plans for youth in care, the existence of and use of assessment information in developing plans, the youth's involvement in developing the plans, the individualization and provision of services, after care planning, and linking youth with caring committed adults.

- We recommend an increased emphasis and accountability on case file documentation of key activities, plans, assessments, and service provision for youth in care.

## Recruitment and Retention/Foster Care Placement Needs Assessment

**Findings**

- There is some lack of consistency in procedures and requirements among the Regional Resource Units, and the practice varies from one region to another.  We could not identify coordination or collaboration from region to region.

- There is a great deal of inconsistency among regions and among counties within regions regarding the application of foster care policy and practice.

- Current policy manuals seem to be lacking, and some staff may only be aware of agency policy through word of mouth.  We could not identify a place for a staff member to obtain a complete policy manual except to copy another manual.  The "P" Drive contains bulletins with updated policy, but not a complete, current Volume IV manual.

- Compliance with policy regarding the placement of children seems very inconsistent.

- County workers seem to be working diligently to ensure that children in foster care have regular visits with their birth families and with their siblings not placed together.

- County workers do not consistently begin the process of evaluating the child during the initial investigation, while they are with their own family.  The information obtained directly from the birth parent could be valuable, and it would provide information that could be shared with the resource parents if the child has to enter care.

- Resource families are not treated as partners in decision-making and are not consistently involved in case planning activities.

- There are no recruitment plans for resource families and no funds for recruitment efforts.

- There are no funds for certain resource parent training activities, such as refreshments.

- The cost associated with applying to become a resource family in some areas (estimated at $400+[2]) is prohibitive for many families.

- There are inadequate numbers of placement options for children entering foster care.

- The MACWIS system does not produce some needed aggregate reports regarding children and placement resources.

- There is no accurate differentiation in MACWIS among foster homes, adoption only homes, and relative foster homes.

- There is no single contact which has statewide information about placement resources.

- The State Office capacity for studying State and Federal law, drafting policy, and interpreting the policy for practice needs to be strengthened.

- The current process for securing a therapeutic placement is time-consuming, ineffective, and does not ensure appropriateness of service.

- Mental health services for children in foster care are inadequate and ineffective.

- Many resource workers and resource ASWS are recently promoted and have not received placement-specific training.

**Recommendations**

- Issue current, complete DFCS Policy Manuals to all DFCS staff agency-wide.

- Provide consistent training for all DFCS staff on agency policy as it relates to foster care services.  Include appropriate training on MACWIS related to foster care.

---

[2] This is based on an estimate of $150 for each adult's medical, $30 each for TB tests and more if X-rays are required, $20 each for fire extinguishers, $7 each for smoke detectors (2), and other costs for missing work for training/getting medicals/home study visits, car seats, baby beds, and so forth.

- Coordinate resource services from the State Office level so the efforts of each Regional Resource Unit can be combined with others to achieve consistency statewide. This would include becoming familiar with Federal regulations and State laws pertaining to foster care, writing policy which conforms to the Federal regulations, consulting with regional resource staff, and supervising the resource ASWSs.

- Train Resource staff specific to preparing children for placement and preparation of foster families to accept and nurture the types of children entering care.

- Initiate a statewide recruitment effort coordinated by State Office that is focused on recruiting families for the kinds of children who are entering care. Develop a uniform plan for following up with responses to the recruitment efforts.

- Initiate the Resource Placement Committee meetings at the regional and State level as outlined in the *Olivia Y* settlement agreement.

- Consider initiating support groups for children in foster care at the local level.

- Ensure that State Office staff dealing with resource issues are licensed social workers, preferably with master's degrees and that they are thoroughly oriented to the job responsibilities and are proficient in addressing resource and placement-related issues.

- Ensure that pre-service training for resource families includes a module on the financial aspects of providing foster care, including board payment rates, Medicaid, clothing vouchers and reimbursement processes and transportation reimbursement. A sample travel voucher should be given to new resource parents during this segment.

- Modify the current referral process for therapeutic placements to permit the referrals to be made by local staff (worker or ASWS) in accordance with clearly established procedures, with payment approval residing at the State Office level.

- Streamline the travel voucher system in State Office to reimburse foster parents, removing any unnecessary points of contact.

- Offer training to mental health providers on issues related to neglect and abuse, separation and attachment, and other placement issues.

- Cross-train county workers and resource workers, ASWSs and RDs on preparation of children for placement, the roles of resource families, and the respective roles and responsibilities involved in a team approach to this area of practice.

- Produce a statewide newsletter to inform all resource families of training opportunities, resources, support groups, new policy, and so forth.

- Ensure that the training curriculum for newly hired workers includes segments on placement preparation and working in partnership with resource families.

## *Child Safety Assessment*

**Findings**

- Safety assessments in investigations of child maltreatment while in foster care seem to be conducted consistently. This is based on information from interviews and case review findings.

- Screening decisions seem to be accurate for the most part, but priority levels should be clarified in policy and practice.

- There is a need to identify service needs of children and resource families with regard to safety and risk issues, and to make appropriate referrals and link them with services during the investigation if needed.

- There is a need to ensure that the child's parents are notified of reports concerning their children while they are in foster care.

- Face-to-face contact with the children during investigations does not appear to be consistent in the investigations process.

- Supervisory review of investigations should be documented more clearly and consistently.

- Investigations of reports of maltreatment in foster care do not appear to be initiated or completed in accordance with policy requirements (based on our case reviews).

- Interviews with all required parties during the investigation process are either not consistent or not well documented.

- Documentation of investigations in general is not thorough.

**Recommendations**

- We recommend that MDHS develop a simplified safety and risk assessment tool for use with children in foster care placements. SARA and the safety checklist do not seem to apply to the circumstances of those children and may not be capturing the relevant information regarding maltreatment in foster care.

- We recommend that MDHS strengthen policy regarding who is responsible for investigating reports of maltreatment of children in foster care in the County Departments, including when and how to involve the resource worker.

**Mississippi Foster Care Services Assessments**

- We recommend that policy pertaining to the use of corporal punishment of children in foster care by their resource parents or facility staff be clarified and enforced. We heard from some sources that these incidents are coded as policy violations, but we understand that the *Olivia Y* settlement agreement requires that it be treated as a maltreatment report.

- We recommend training of all investigative and resource staff on investigating reports of maltreatment in foster care.

- We recommend that ASWSs monitor and enforce the timeliness of initiating and completing investigations of reports of maltreatment in foster care. We believe that a MACWIS report that captures this information and reports on it monthly would be helpful in monitoring and enforcing the policy.

# INTRODUCTION

The Mississippi Department of Human Services (MDHS) is currently implementing the provisions of the *Olivia Y. vs. Barbour* Settlement Agreement, approved by the court in January 2008. The implementation activities are being carried out by the MDHS Division of Family and Children's Services (DFCS). The Period 2 Annual Implementation Plan requires that MDHS conduct several foster care services assessments in conjunction with a qualified independent consultant approved by the Court Monitor,[3] as follows:

a.  A reunification services needs assessment;

b.  A service provider needs assessment with the purpose of identifying available medical, dental, and mental health services and gaps in services;

c.  An assessment of the quality and array of independent living services available to foster children ages 14-20;

d.  A recruitment and retention assessment to determine the need for additional foster care support services;

e.  A termination of parental rights (TPR) assessment for the purposes of identifying those children who have been in custody more than 15 of the previous 22 months and for whom DFCS has neither filed a TPR petition or documented an exception under the Federal Adoption and Safe Families Act (ASFA);

f.  A child safety assessment of DFCS practice for prioritizing, screening, assessing, and investigating reports of maltreatment of children to determine the extent to which DFCS investigations and decisions are based on a full and systematic evaluation of the factors that may place child at risk; and

g.  A placement assessment of current needs for achieving compliance with the placement standards set forth in Section II.B.5 of the Settlement Agreement, which shall include (1) the structure of the placement process, including the role and efficacy of the state office placement unit; (2) the services and supports available to support enhanced placement stability, including out-patient or in-home assessment and treatment services to avoid the frequent use of time-limited assessment and treatment placement programs; and (3) the placement resources needed to meet the placement needs of children in custody.

MDHS contracted with the Center for the Support of Families (CSF) to coordinate the completion of the assessments. The TPR assessment, due on January 1, 2010, is still in development and will be submitted separately from the remaining assessments.

CSF is also contracted to develop a child welfare practice model with MDHS and we designed our information gathering processes, e.g., case reviews, focus groups, staff survey, to provide information for the practice model and the assessments. Given the similarity of the assessments in paragraphs (d) and (g) above, we obtained approval to combine those two assessments,

---

[3] Period 2 Annual Implementation Plan, Mississippi Settlement Agreement and Reform Plan, Section II: Foster Care Services Assessment and Implementation Steps, 2. Foster Care Assessments. Filed May 4, 2009.

resulting in the completion of six assessments, five of which are included in this report.  This report provides a description of the methodology used to conduct the assessments, the findings of each assessment, and a summary of our major recommendations.

# SECTION I:  METHODOLOGY

## *Approach to Conducting the Assessments*

We conducted five assessments to fulfill the requirements of the *Olivia Y* settlement agreement, as follows:

- Child Safety Assessment

- Reunification Services Needs Assessment

- Medical, Dental, and Mental Health Services Assessment

- Independent Living Services Assessment

- Foster Care Placement and Support Services Assessment

With some differences owing to the particular assessment, we organized the five assessments similarly in an attempt to address the following questions pertaining to each service area:

- What are the current needs and populations concerned with the service area?

- What policies and procedures govern the application of the services?

- What does the current service array consist of?

- What is the effectiveness of the current services?

- What gaps exist in the current service array?

- What, if any, are our recommendations for strengthening the service array?

In addressing these questions for each assessment, we used a variety of information sources. Since CSF is also contracted to develop a child welfare practice model for MDHS, we combined some of the information gathering processes to collect information that would serve multiple purposes.  For example, we presented questions in a staff survey that addressed the components of the practice model and the assessments, and we asked focus group questions that pertained to multiple assessments and the practice model.

The information gathering process included the following components:

## *Staff Survey*

We designed an electronic survey with input and approval from the MDHS Central Office, and posted it on Survey Methods for completion by child welfare staff across the State.  The Central Office issued an invitation by email to staff to complete the survey over a two-week period,

which we later extended by an additional week in order to provide more opportunity for staff to participate in the survey. A copy of the survey is provided in *Appendix A*.

Although we organized the survey according to the components of the practice model, we inserted questions for each assessment area that could provide us with staff's perceptions of the agency's effectiveness in each area.

Through the two response periods, 254 staff completed the survey as follows:

- 93 (36.61 percent) responses from Family Protection Specialists, 49 (19.29 percent) from ASWS, 37 (14.59 percent) from other, 30 (11.81 percent) from State Office staff, 25 (9.84 percent) from Family Protection Workers, 11 (4.33 percent) from Resource Workers, and 9 (3.54 percent) Regional Directors;

- 74 (29.13 percent) respondents have worked at MDHS for more than 10 years, 69 (27.17 percent) have worked at MDHS for 1-3 years, 47 (18.5 percent) for 5-10 years, 24 (9.45 percent) for 6 months to one year, and 18 (7.09 percent) for less than 6 months; and

- 93 (36.47 percent) respondents had been in their current position for 1-3 years, 56 (21.96 percent) for less than 6 months, 33 (12.94 percent) for six months to one year, 30 (11.76 percent) from 3-5 years, 24 (9.41 percent) for 5-10 years, and 19 (7.45 percent) for more than 10 years.

In analyzing the results of the survey, we used Survey Methods functionality to create tables that display the results. We exported data to Microsoft Excel, manually reviewed the responses to all of the open-ended survey questions, and categorized or grouped responses according to our best understanding of what the respondents indicated in their comments. The results of the staff survey are incorporated throughout the discussion of each assessment.

## *Case Reviews*

We conducted a series of case reviews that were organized around the topics of the five assessments, although information from the case reviews was also used to inform the components of the practice model.

We selected random samples for each of five sets of case reviews using the following criteria:

- *Reunification Services Needs Assessment:* We reviewed one random sample of 30 cases that met the following criteria. We requested of MACWIS a random statewide selection of 50 cases (to provide for an oversample) of children in foster care during preceding twelve months in all placement types with reunification as permanency goal for at least 60 days during the twelve month period, regardless of the current permanency goal. We did not eliminate cases based on whether they were currently open or closed for services, but required that the cases should have been opened for at least 60 consecutive days during preceding twelve months (open for services, not just open for investigation). We requested that the sample not include siblings or duplicates of the same child, for example if there were multiple episodes of foster care for a child during the twelve month period. The sample we received was not randomized, and we used a table of random numbers to select the random sample of cases reviewed.

- *Medical, Dental, and Mental Health Services Assessment:* We reviewed one random sample of 30 cases that met the following criteria. We requested of MACWIS a random statewide sample of 50 children (to provide for an oversample) in foster care for at least 60 days during the preceding twelve months, including any placement type and any permanency goals. We did not eliminate cases based on whether they were currently open or closed for services, but required that the cases should have been opened for at least 60 consecutive days during preceding twelve months (open for services, not just open for investigation). We requested that the sample not include siblings or duplicates of the same child, for example if there were multiple episodes of foster care for a child during the twelve month period. The sample we received was not randomized, and we used a table of random numbers to select the random sample of cases reviewed.

- *Independent Living Services Assessment:* We reviewed one random sample of 30 cases that met the following criteria. We requested of MACWIS a random statewide selection of 50 youth (to provide for an oversample) ages 14-20 in foster care for at least 60 days during the preceding twelve months, including any placement types and any permanency goals. We did not eliminate cases based on whether they were currently open or closed for services, but required that the cases should have been opened for at least 60 consecutive days during preceding twelve months (open for services, not just open for investigation). We requested that the sample not include siblings or duplicates of the same child, for example if there were multiple episodes of foster care for a child during the twelve month period. The sample we received was not randomized, and we used a table of random numbers to select the random sample of cases reviewed.

- *Foster Care Placement and Support Services Assessment:* We reviewed a random sample of 30 cases that met the same criteria as the sample for the Medical, Dental, and Mental Health Services Assessment.

- *Child Safety Assessment:* We selected two separate samples of children for whom reports of maltreatment were made while the child was in a foster care placement and the perpetrator was the foster caretaker. The purpose of reviewing these cases was to determine whether full investigations were completed on reports of child maltreatment in foster care and whether or not reports were appropriately screened.

The first sample consisted of screened-out reports of maltreatment in foster care, for which we requested from MACWIS the universe of all reports screened out for investigation during preceding 12 months, where the child victim was in foster care (all placement types) and the alleged perpetrator was the foster caretaker or member of foster caretaker's household or facility staff. We requested the universe since we expected a small number of cases statewide to meet these criteria. From the universe, we used a table of random numbers to identify a random sample of 17 cases for review.

The second sample consisted of investigations of reports of maltreatment of children in foster care, for which we requested from MACWIS the universe of all completed investigations of reports of child maltreatment during preceding twelve months, where the child victim was in foster care and the alleged perpetrator was the foster caretaker or a member of household or

facility staff. From the universe, we used a table of random numbers to identify a random sample of 30 cases for review.

We developed individual case review protocols for each sample of cases reviewed. The case review protocols were automated in a Microsoft Access data base, and a list of the questions pertaining to each sample reviewed is included in Appendix B. All of the information from the case reviews was taken from electronic case records in the MACWIS system. We entered the information from the case reviews into a Microsoft Access data base which permitted us to develop reports and conduct an analysis of the responses.

## Focus Groups

We conducted a series of focus groups in order to gather information on how various stakeholders understand and perceive their roles; the extent to which their practice supports the DFCS mission and values; to clarify how practice in the field supports policy; to obtain their first-hand view of which services, programs, and initiatives support positive outcome achievement; and to determine barriers to effective, consistent practice and service delivery. We conducted focus groups with the following representatives:

- Four groups of caseworkers representing a large number of County Departments in four areas of the State (Tupelo, Hattiesburg, Jackson area, and Greenville);

- Four groups of Area Social Work Supervisors in the same locations;

- The MDHS Regional Directors;

- A group of regional resource workers;

- A group of regional resource supervisors;

- One group of parents served by MDHS;

- Three groups of foster parents; and

- A focus group of youth in foster care through MDHS.

We developed a focus group protocol that was structured around DFCS' mission and values that we used primarily with the caseworker and supervisor focus groups. For the remaining groups, we developed specific questions for which we thought they could provide first-hand information.

## Review of Policy and Procedures

For each of the assessments, we conducted a review of current policy and procedures that is documented in each assessment.

## Review of Additional Information

We reviewed a number of other sources of information in completing the assessments, including:

- A wide range of materials from the Independent Living program, such as reports of children served by the contractor, the contract for IL services, materials produced on the range of IL services, and so forth;

- Medicaid website information on the availability of medical and dental services;

- Program descriptions of various services in the State, including services provided by the community mental health centers and the State Department of Mental Health, services provided by some contractors, and so forth; and

- MACWIS reports to determine what information MDHS currently captures relevant to the assessments.

## Limitations of Our Approach

While we obtained substantial information in the course of developing the practice model, there are some limitations to the information gathered. Reviewing cases entirely from the MACWIS system poses some limitations, given concerns about the thoroughness of information in the system. Given those same concerns, we made very limited use of statewide data reports that might otherwise have informed the status of services and the populations served with regard to each assessment. Also, with additional time we would have preferred to conduct more individual interviews and focus groups with representatives outside of MDHS and with consumers.

# SECTION II:  THE ASSESSMENTS

| | |
|---|---|
| **Assessments** | *Reunification Services*<br><br>*Medical, Dental, and Mental Health Services*<br><br>*Independent Living Services*<br><br>*Recruitment and Retention of Resource Homes and Placement Assessment (Combined)*<br><br>*Child Safety* |

## *Reunification Services Assessment*

The Period 2 Annual Implementation Plan requires that MDHS engage an independent contractor to conduct a reunification services needs assessment. This report provides the findings of our assessment in this area, which includes a policy and requirements review, a staff survey, interviews and focus groups, and case reviews.

## Section 1: Applicable Standards

### A.      Policy and Requirements

### *Council on Accreditation Standards*

MDHS is pursuing accreditation from the Council on Accreditation (COA), which includes a number of standards applicable to this assessment, including the following:

- The information gathered for assessments should include the following information:

- Includes underlying conditions and environmental and historical factors that may contribute to concerns identified in initial screening, investigation and risk and safety assessments;

- Identifies child and family strengths, protective factors, and needs;

- Includes the potential impact of maltreatment on the child;

- Includes the factors and characteristics pertinent to making an appropriate placement, if necessary;

- Identifies potential family resources for the child and parents; and

- Is limited to material pertinent for providing services and meeting objectives.

- An individualized service plan developed with each family is based on the assessment and includes agreed upon goals, desired outcomes, and timeframes for achieving them; services and supports to e provided, and by whom; timeframes for valuating family progress; and the signature of the parents and the youth, if age appropriate.

- The service plan is based on the assessment and includes service goals, desired outcomes, and timeframes for achieving them; services and supports to be provided, and by whom; and the signature of the parents and, when appropriate, the child or youth.

- Service providers, foster parents, the public authority and the court work with the child, youth and family to develop a permanency plan within 30 days of placement, which specifies the permanency goal(s); a timeframe for achieving permanency; and activities that support permanency.

- The family foster care worker meets separately with the child and the parents at least once a month to assess safety and well-being; monitor service delivery; and support the achievement of permanency and other service plan goals.

## *Olivia Y Settlement Agreement Requirements*

The *Olivia Y* settlement agreement also includes a number of requirements applicable to this assessment, including the following:

- Within 30 calendar days of a child's entrance into foster care, the DFCS caseworker is to convene a team meeting with the DFCS caseworker's direct supervisor, the child's family, the foster family, and the child unless there is justification for excluding the child from the planning process. During the team meeting, service plans are to be developed for both the child and the parents with the participation of all team meeting participants.

- Each service plan is to be reviewed and updated quarterly at a team meeting with the caseworker, the caseworker's direct supervisor, the foster parent, the child's parents if appropriate, and the child unless there is justification for excluding the child from the planning process. If the child's placement changes, or there is a significant change affecting the child or his/her family, a team meeting is to be convened and the service plan must be updated within 30 calendar days of the date of change.

- Working with service providers, foster parents, the child and the family, DFCS shall develop and document in the child's case record a permanency plan within 30 calendar days of the child's initial placement that specifies the permanency goal, a timeframe for achieving permanency and activities that support permanency.

- For children with the goal of reunification, DFCS is to engage in concurrent planning consisting of early assessment of the potential for reunification; early identification of potential family resources and early placement with a potentially permanent family resource.

- A child's permanency plan is to be reviewed in a court or administrative case review at least every six months. DFCS will take reasonable steps, including written notice, to ensure the participation of the child, parents, caregivers and relevant professionals in court or administrative reviews.

- DFCS will take reasonable steps to ensure that a court review, which may be called a review, dispositional or permanency hearing, is held for each child in foster care custody within 12 months of initial placement, and annually thereafter.

- When the child's permanency goal is reunification, DFCS is to identify in the parent's service plan and make available directly or through referral those services DFCS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care and to help the parents develop strategies to facilitate permanency for the child.

Mississippi Foster Care Services Assessments

- For a child with a permanency goal of reunification, the child's assigned DFCS caseworker is to meet with the child's biological parents at least monthly to assess service delivery and achievement of service goals, to keep the family informed and involved in decisions about the child, and to remain current about the family's circumstances.

- For children with a permanency goal of reunification, the case record is to document opportunities provided to parents in support of reunification, including involvement in service planning and access to needed services; constructive visitation and on-going contact with the child, reduction of barriers to contact, visitation and involvement in the child's' care; and use of resources to prepare the family for reunification.

- Each foster child is to be placed in the least restrictive setting that meets his/her individual needs as determined by a review of all intake, screening, assessment, and prior placement information on the child available at the time of placement. In order of consideration, this means placement with relatives, foster home care within reasonable proximity to the child's home community; foster home care outside of the child's home community, group home care or institutional care.

- Each child is to be placed within his/her own county or within 50 miles of the home from which he/she was removed.

- At the time of the initial team meeting when a child enters foster care, a visitation plan for the child and his/her family is to be developed as part of the child's service plan. This visitation plan is to be developed and regularly updated in collaboration with parents, foster parents, and the child and should be appropriate to a) the child's age and developmental stage; b) the parents' strengths and needs; c) the schedules of foster parents and parents; d) the social and cultural context of the family and e) the status of the case and the permanency goal.

- Regardless of whether a child's foster care placement is being directly supervised by DFCS or by a contract agency, the assigned DFCS caseworker is to meet with the child in person and where age-appropriate, alone at least twice monthly to assess the child's safety and well-being, service delivery and achievement of permanency and other service goals.

- For each child who has a permanency goal of reunification and who is in fact placed in the home for the purpose of reunification, DFCS is to provide, subject to the approval of the youth court, such child with a 90-day trial home visit. During any trial home visit period, a DFCS caseworker or Family Preservation caseworker is to meet with the child in the home at least two times per month, and each meeting shall occur without the parent or caretaker present.

- A recommendation to return a child to his/her home or to place the child in the custody of a relative is to be made at a meeting attended by the child's DFCS caseworker, the caseworker's supervisor, the worker from the private agency if the child is placed with a private agency, the foster parents (unless DFCS determines that the foster parent's attendance would be inappropriate), the biological parents or the relative assuming custody, and the

child.  At the meeting, the participants are to devise an after-care plan that identifies all of the services necessary to ensure that the conditions leading to the child's placement in foster care have been addressed, and that the child's safety and stability will be assured.  DFCS is to take reasonable steps to provide or facilitate access to all services necessary to support the child during the trial home visit.

- Before the end of any trial home visit period, there shall be a final discharge staffing meeting, which shall include the child's caseworker, the caseworker's supervisor, the child and the parent or relative assuming custody, to determine the appropriateness of the  final discharge. If final discharge is determined to be appropriate, DFCS shall make the appropriate application to the court to be relived of custody.

## MDHS Policy

*Reasonable Efforts:* Mississippi State Law and DFCS policy maintain that "the Agency's first priority shall be to make reasonable efforts to reunify the family when temporary placement of the child occurs or shall request a finding form the court that reasonable efforts are not appropriate or have been unsuccessful."  DFCS policy defines reasonable efforts as "services provided to a family to prevent or eliminate the need for removal of the child from his/her home, unless the removal was of an emergency nature, or services provided to reunify the child safely with his/her family after placement of the child in custody".

*Permanency Plan:* DFCS recognized that foster care is to be a temporary arrangement and that permanency planning must begin immediately.  DFCS policy states, "reunification with a parent or primary caretaker should be the first choice as a permanency plan for a child in care.  It is selected so that a child can return to the parents or another individual who has been his/her primary caretaker."

DFCS policy delineates specific responsibilities of the caseworker in achieving reunification. The caseworker is to identify and assess the problem(s) which led to the need for foster care, the actions needed to correct the problem, and activities to be performed by all parties involved. When identifying a placement resource for the child every effort should be made to place the child in same county as parents or caretakers and whenever, possible and appropriate place siblings together.

The DFCS worker must engage with the family in order to develop an Individual Service Plan (ISP) with the adults and child/youth including identifying the tasks and goals needing to be completed in order to achieve reunification.  The ISP/Service Agreement for adults is to be completed within 25 calendar days of case opening and then approved by the supervisor within 5 calendar days from receiving the plan from the worker.  The ISP is then created, submitted, approved and signed every three months.  The courts must render a judicial determination if the ISP/SA is to go beyond 6 months.  There are six reasons that the ISP/SA may go beyond the prescribed 6 months including the parent being involved in parenting classes, and/or other services which are making progress but won't be completed within the six month timeframe.  As part of the planning process, a permanency plan must be selected.  Although reunification is the starting point for most cases, permanency is the ultimate plan for each child in custody.  DFCS has six permanency plan options including reunification with a parent or primary caretaker;

custody with a relative; adoption; durable legal custody or legal guardianship; living independently; and long term foster care.

*Child contacts with family members:* Policy requires that a visit occur between the child and his parent occurs within the first week after placement but does not provide any other minimum timeframes. Children in placement are to visit with their siblings at least monthly. A visitation plan is to be developed with the parent, child, resource parents and other involved parties. The case worker is to see the child monthly although a best practice tip in the policy manual recommends at least two times per month and the worker is to see the birth/legal parents/guardian face to face at least monthly.

*Concurrent Planning:* Mississippi statute requires that concurrent planning be implemented at the time of placement so that permanency can occur at the earliest opportunity. Permanency planning is an ongoing process and begins as soon as the agency received the first report and continues throughout the life of the case. Eight critical areas are identified which must be considered when determining the appropriateness of concurrent planning:

- The likelihood of prompt reunification
- The past history of the family
- The barriers to reunification being addressed by the family
- The level of cooperation of the family;
- The Resource Family's willingness to work with the family to reunite
- The willingness and ability of the Resource Family or relative placement to provide an adoptive home or long-term placement
- The age of the child; and
- Placement of siblings.

## Section II:  Services and Resources

### A.  Resources

#### Family Team Meetings

On all cases, workers are to hold an Initial Family Team Meeting (FTM) within thirty (30) days from the opening of the case. Ongoing FTMs shall be convened, at a minimum, every time the Individual Service Plan (ISP) is updated. MDHS policy defines a FTM as any face-to-face meeting with one of more family members for the purpose of assessment and case planning. A FTM involves working closely with the family to identify family members, extended family, and supportive persons the family wants to engage in the assessment and case planning process. The family members should be brought in as early as possible and actively engaged throughout the life of the case in the decision-making process." The use of the FTM can be critical to the achievement of timely reunification when that is the goal for the child and family.

#### Assessment Tools

There are currently two assessment instruments available to staff in the MACWIS system which directly impact the identification and provision of appropriate reunification services. The Safety Assessment is used during the investigation/initial assessment phase of a case identifying safety

issues which must be addressed to prevent removal or facilitate reunification if removal occurs. The Safety and Risk Assessment (SARA) instrument is required for all families on which a case is opened and is considered a comprehensive assessment tool which identifies family strengths and needs that should be used in case planning and service provision toward reunification.

## Contracted Services

### Family Preservation and Reunification

Through contracts with two providers, family preservation and reunification services are provided statewide to 350 families throughout the year. There is a family preservation coordinator at MDHS that oversees these two contracts, and the services are closely aligned with the Homebuilders' Model of family preservation services. The family preservation services component is based on a 20-week intervention with families that are deemed to be at imminent risk of having children removed from their homes. The reunification component is based on a 12-week intervention and both are federally funded through Promoting Safe and Stable Families program under title IV-B of the Social Security Act. State Office staff indicated that these programs are always at full capacity and that there is more demand for the services than can be met although there is not consistently appropriate matching of families as referrals are made.

The family preservation program was designed for intact families as a means of keeping children with their families safely and avoiding placement in foster care or for families in which a child has been in foster care for less than 12 months. Because the program requires that families complete the entire 20-week program within 12 months of a child entering foster care, any family whose child has been in foster care for more than 90 days will not qualify to receive this service. This effectively prohibits the provision of this service to families whose children have been in foster care for lengthy periods of time but for whom reunification is the goal.

We heard that caseworkers frequently refer families that are in need of services but do not have issues that rise to the level of imminent risk of removal, and the providers typically accept the referrals regardless of the current situation. Waiting lists are not currently maintained for those referrals that are turned away. Consequently it is more difficult for MDHS to have an accurate picture of the actual need for this service or of referral rates and utilization by counties. In interviews that we conducted, we heard some references to turning down 10 to 20 referrals each month due to lack of openings.

Additionally, the length of the family preservation service intervention can be problematic as families may not remain in crisis for a full 20 weeks and if they discontinue their involvement, the program's outcome criteria considers this to be a failure on the family's part for not successfully completing it in its entirety. It was noted that caseworkers are apt to want to get services in place quickly for families and do not always distinguish what is most appropriate to meet their needs. There is not yet longitudinal information that is tracked to measure the success of the reunification services so it is not known if families have remained intact as a result of receiving these services. Our understanding is that the family preservation services are offered as a standardized program and are not individualized to the particular needs of a family or child.

**Intensive In-Home Services**

Currently, there are two contracts for intensive in-home services that are provided by the same two agencies with which DFCS has a contract for family preservation and reunification services. In contrast to family preservation and reunification services, there is no cap on the number of referrals and there are no time limits in place for the length of the interventions. These services are funded through Promoting Safe and Stable Families and CAPTA dollars, and plans are underway to re-issue RFP's for these services.  These services are described as being more clinical in nature and targeted to serve families that have children with behavioral difficulties. Some of these children may be residing with relatives.  There is more of a treatment team approach in working with these families, and each team can only serve six families at a time. These services are highly valued but there is concern that there needs to be more structure in the planned length of service intervention along with a different fee schedule.  Our understanding is that because this is a clinical service, it can be adapted to the individualized needs of children and families as needed.

**Families First Resource Centers**

MDHS funds the Families First Resource Centers, which serve 15 south Mississippi counties. The Resource Centers provide parenting classes and serve parents in the classes whose children are in foster care. They provide classes for teenage and adult parents and the focus is on positive discipline, limit setting and consequences, the importance of routines, healthy nutrition, and self-esteem.  They also provide educational programs in healthy marriage, fatherhood, and character and abstinence.  Our understanding is that the parenting classes are most likely the primary service offered that is related to reunification of children in foster care with their families.

In interviews, we heard that the parenting classes are standardized six-week classes that are not typically individualized to the particular needs of parents in attendance.  While we heard positive reviews of the classes, particularly the responsiveness of the coordinators, we heard that the same classes are offered regardless of the issues prompting the referral for the service.  We also heard that MDHS staff in all counties served by the Resource Centers do not use the services, although we could not determine why this is the case.  We also heard that following reunification, services are not put into place for the families but that the case is simply closed.  Although some commenters noted that the parenting class coordinators are responsive to phone calls if needed following completion of the classes and will try to help them, there is not a formal follow-up system in place.

*Funding for Basic Needs*

We understand that there is very limited funding for basic concrete services that County Departments may use to support families who need something like rent assistance or the purchase of emergency goods.  However, the limits on the funding appear to restrict the effectiveness of this service, and we heard that some counties either do not know how to access the funds, which are provided by the county, or do not actually have the funds available.  Many families seeking to have their children returned do not have money to take care of basic needs, make basic changes at home, fix things that are broken, or pay for rent, food, and utilities.  When the cost of services is added to these basics, they are at a distinct disadvantage in their efforts to reunify with their children.   We believe there is a clear need for earmarked funds that can be

Mississippi Foster Care Services Assessments

used flexibly to support families' basic needs so that they can focus on behavioral changes needed to have their children returned.

### *Other Services*

Although we were not able to identify and evaluate all other services that might be available within the State, we did hear comments about the effectiveness of the Model Youth Court program in Forest County that focuses on children ages 0-3 in assisting with timely and appropriate reunification. We heard about the effectiveness of services provided by a contractor that receives referrals from this court and think that it bears close consideration for overall effectiveness and the possibility of replication.

## Section III:  Current Practice

We assessed the practices and services utilized by DFCS which are needed if children who have been removed from their families by DHS are to achieve reunification. The following methods were used in this assessment:

- MDHS Staff survey to identify the services available and current practice

- Focus groups with front line staff, supervisors, Regional Directors, State Office staff, and contract providers of the services described in this assessment

- Available MACWIS reports

- 30 case reviews from the cases with a goal of reunification

The following includes the information from those sources.

### *A.  Staff Survey*

We conducted a survey of MDHS child welfare staff and asked respondents to rate the agency's effectiveness of available services in several areas which are often presenting issues when a child welfare agency becomes involved with a family.  As shown in the chart below, we asked respondents to the survey to rate the agency's effectiveness with regard to services to facilitate and support reunification.  Just over half the respondents indicated that the agency is frequently or almost effective in this area (about 57 percent).  Less than half (about 48 percent) of the respondents indicated that he agency is frequently or almost always effective in providing post-placement reunification services to prevent re-entries into foster care.

| Please rate your perception of your agency's effectiveness on each area below regarding supports related to preserving connections and relationships: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Some times | Frequently | Almost Always | No Info/N A | Total |
| Availability of services to facilitate and support | 0 (0%) | 9 (5.33%) | 48 (28.4%) | 45 (26.63%) | 49 (28.99%) | 18 (10.65%) | 169 |

Mississippi Foster Care Services Assessments

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| reunification | | | | | | | |
| Post-placement reunification services to families to prevent re-entry into foster care | 3 (1.74%) | 20 (11.63%) | 42 (24.42%) | 42 (24.42%) | 41 (23.84%) | 24 (13.95%) | 172 |

As identified in the chart below, survey respondents rated the availability of specific services often needed to facilitate and sustain reunification as frequently or almost always effective between about 37 and 70 percent of the time. The services identified as the least often effective were domestic violence services being rated as frequently or almost always effective about a third of the time (about 37 percent). Respondents rated family preservation services and services to meet a family's basic needs as frequently or almost always effective about two-thirds of the time (about 68 percent and 70 percent respectively). Services to address particular needs such as substance abuse treatment, sexual abuse treatment, and therapeutic services were rated at that level of effectiveness either a little less or a little more than half the time. These ratings raise concerns since these issues are often those that must be resolved in order to achieve and sustain safe and appropriate reunification.

| Please rate effectiveness of available services to address the following areas, including the ability to initiate the service when needed and the quality of the service: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Some times | Frequently | Almost Always | No Info/NA | Total |
| Domestic violence services | 2 (1.09%) | 24 (13.04%) | 68 (36.96%) | 47 (25.54%) | 21 (11.41%) | 22 (11.96%) | 184 |
| Substance abuse treatment services | 2 (1.09%) | 15 (8.15%) | 62 (33.7%) | 54 (29.35%) | 32 (17.39%) | 19 (10.33%) | 184 |
| Sexual abuse services | 3 (1.63%) | 17 (9.24%) | 40 (21.74%) | 57 (30.98%) | 51 (27.72%) | 16 (8.7%) | 184 |
| Therapeutic services | 0 (0%) | 9 (4.92%) | 44 (24.04%) | 59 (32.24%) | 57 (31.15%) | 14 (7.65%) | 183 |
| Family preservation services | 0 (0%) | 9 (4.89%) | 31 (16.85%) | 69 (37.5%) | 58 (31.52%) | 17 (9.24%) | 184 |
| Services to meet basic needs (food, clothing, shelter) | 1 (0.54%) | 6 (3.23%) | 37 (19.89%) | 52 (27.96%) | 78 (41.94%) | 12 (6.45%) | 186 |

We asked a question specifically regarding mental health services and the worker's ability to access different levels of these services ranging from outpatient to acute and crisis services. The availability of these types of services and their effectiveness can have a profound impact on a child's reunification and subsequent stability within their own home. Respondents rated their ability to access the lower level services (e.g. outpatient counseling and evaluations) as frequently or almost always able to be accessed nearly 60 percent of the time. With the mid-level services, (e.g. medication, day treatment), 53.26 percent of the respondents indicated that they could effectively access these services frequently or almost always. In regard to the high-end services (which would less likely be utilized at the time of reunification but must be available for certain families if they are to achieve reunification) the survey participants indicated that slightly less than 50 percent of the time could these services be accessed frequently

**Mississippi Foster Care Services Assessments**

or almost always. Crisis services, which may be utilized to prevent re-entry to care was rated as frequently or almost always able to be accessed less than half the time (about 48 percent).

| With regard to mental/behavioral health services, how effectively are you able to access the following levels of services for children and families: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Some times | Frequently | Almost Always | No Info/NA | Total |
| Lower level services, e.g., outpatient counseling and evaluation, prevention services, testing: | 1 (0.54%) | 11 (5.98%) | 43 (23.37%) | 58 (31.52%) | 51 (27.72%) | 20 (10.87%) | 184 |
| Mid-level services, e.g., behavioral health medication, day treatment, more intense out-patient psychotherapy: | 3 (1.63%) | 11 (5.98%) | 49 (26.63%) | 56 (30.43%) | 42 (22.83%) | 23 (12.5%) | 184 |
| High-end/acute services, e.g., addiction and recovery services, specialized care, psychiatric services: | 3 (1.64%) | 13 (7.1%) | 51 (27.87%) | 45 (24.59%) | 46 (25.14%) | 25 (13.66%) | 183 |
| Crisis services, e.g., crisis stabilization, psychiatric hospitalization: | 4 (2.2%) | 15 (8.24%) | 49 (26.92%) | 44 (24.18%) | 44 (24.18%) | 26 (14.29%) | 182 |

We also asked survey respondents to rate the effectiveness of service providers in meeting the needs of children and families in general. Respondents rated this area as frequently or almost always effective less than half the time (about 48 percent). In open-ended questions, they identified family preservation services, MYPAC, and Intercept as strength of the service array. They identified the availability of placement resources and lack of needed services in certain geographic areas of the State as weaknesses.

In addition to the purchased or contracted services that MDHS provides to support reunification of children with their families, we know that there are services and activities provided directly by MDHS staff that address reunification. In our staff survey, we asked respondents to rate their effectiveness in several of their activities related to reunification. The chart below provides their responses. The respondents indicated their highest levels of effectiveness in maintaining children's connections with family member while in foster care and visiting between children and their families/siblings while in foster care (frequently or almost always effective about three-quarters of the time each). These are related practice areas and have established associations with timely reunification. Respondents rated their effectiveness in birth parent involvement in parenting their children while in foster care as frequently or almost always effective less than half the time (about 48 percent). The other practices related to reunification were rated as frequently or almost always effective between 60 and 64 percent of the time.

Mississippi Foster Care Services Assessments

| Please rate your perception of your agency's effectiveness in the areas below regarding practices related to preserving connections and relationships: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Some times | Frequently | Almost Always | No Info/NA | Total |
| Placing children within their own communities when appropriate: | 0 (0%) | 11 (6.32%) | 44 (25.29%) | 44 (25.29%) | 61 (35.06%) | 14 (8.05%) | 174 |
| Maintaining connections of children to family members while in foster care: | 0 (0%) | 6 (3.45%) | 25 (14.37%) | 49 (28.16%) | 80 (45.98%) | 14 (8.05%) | 174 |
| Visiting between children in foster care and their families and siblings: | 0 (0%) | 4 (2.31%) | 23 (13.29%) | 51 (29.48%) | 81 (46.82%) | 14 (8.09%) | 173 |
| Foster parent involvement in supporting child-parent visits and other contacts: | 1 (0.58%) | 16 (9.36%) | 34 (19.88%) | 50 (29.24%) | 56 (32.75%) | 14 (8.19%) | 171 |
| Birth parent involvement in helping to care for their children while in foster care: | 7 (4.09%) | 29 (16.96%) | 37 (21.64%) | 46 (26.9%) | 37 (21.64%) | 15 (8.77%) | 171 |
| Services and support to prevent placement: | 1 (0.58%) | 7 (4.09%) | 36 (21.05%) | 44 (25.73%) | 65 (38.01%) | 18 (10.53%) | 171 |

## B. Focus Groups

The focus groups that contributed information pertaining to reunification services included youth in foster care, resource parents, birth parents, Regional Directors, resource supervisors and workers, casework supervisors, and caseworkers.

All focus groups addressed the lack of appropriate, accessible services. Participants noted that the array of services varies greatly by county across the State, with consistent references to the lack of services in rural areas. Although some contacted services, such as family preservation and intensive in-home services are offered statewide, many other services needed for

reunification are limited or do not exist in rural areas. Even when services are available they often have long waiting lists.

The ability to individualize services to families' strengths and needs was the subject of a number of comments. For example, the use of parenting classes as a task on the ISP was discussed with a wide range of opinions in almost every group. Comments ranged from the classes being very good, individualized and accessible to being "cookie-cutter" and not readily accessible. It was acknowledged that parenting classes were identified for nearly every family no matter what brought their family to the attention of DFCS. Similarly, family preservation was identified as a resource used both before and after reunification. However, some participants noted that based on the set-up of the program it cannot be used for families where the children have been in placement for more than 12 months and that the services are driven by program requirements rather than individualized needs. Some focus group participants also noted the need for more reunification services with greater flexibility including post-placement services during trial visits and post-reunification. We also heard that, at times, the burden may be placed on the parent to access the services once identified and included in the ISP.

Individual interviews supported the idea that there is a limited array of services that can be used effectively for reunification and often, workers take a service because it is available and not necessarily because it is the most appropriate service that is matched to the family's strengths and needs.

In addressing the MDHS practices related to reunification, focus group participants commented on visiting between the child and family and caseworker visits with the child and family. Some commenters noted the distance from the birth family that children often were placed thus making visitation difficult. This situation is compounded by the lack of available or affordable transportation for parents. We heard about some lengthy periods without caseworker visits with children, parents, or resource parents, and varying interpretations of what constitutes a meaningful visit, for example, incidental contact as opposed to planned visits. We also heard about some courts affecting the visits between children and parents, with examples of not allowing visits prior to the first court hearing which is usually within 24 hours but could be longer; not permitting visits until the parent has one or two clean drug screens; and not permitting visits until psychological or other assessments have been completed.

In general, we heard that fathers are often not included in case planning or service delivery, particularly if they do not reside in the home with the child. Commenters noted limited attempts to involve them or to evaluate their family members as resources for the child.

Among other issues related to reunification raised in focus groups and interviews were the following:

- The training and support of resource families with regard to working with birth families was raised as a concern. Some participants noted that some resource families are at times afraid of birth families and refuse to work with them, and may or may not actively support reunification efforts.

- Some participants noted the lack of family involvement in the case planning process. They also indicated the SARA is unwieldy and not very effective in identifying needs and strengths that can be addressed in the reunification efforts.

- FTMs were identified as being an effective tool to be used to address reunification and in identifying supports needed to assure reunification occurs and is successful.

## C. Case Reviews

We conducted a review of 30 cases with a goal of reunification by reviewing the MACWIS case file. The current placement episode start dates ranged from 8/4/2004 to 4/15/2009. As of the date of our case reviews (mid August) the average amount of time these children had a goal of reunification was 435 days (14 ½ months) with the least amount of time 113 days and the longest 1,842 days or nearly six years. Only two of the 30 cases were identified as having achieved reunification.

The reasons for the family's involvement with DFCS included drug and alcohol abuse; serious neglect; physical abuse; sexual abuse; lack of housing; lack of supervision; child behavior problems; and parent arrested and no one to care for the child. The types of services identified as being recommended for caregivers included drug and alcohol services (including screenings, in-patient, out-patient, etc); psychiatric/psychological evaluation; parenting; GED assistance; assistance in securing housing, employment services; and visitation.

We found the following information to be relevant to assessing the reunification services and achievement of reunification:

- Services were identified in the plan to address the reason for involvement in 23 cases. Reviewers determined that caregivers in ten cases actually received the services, did not receive them in ten cases, and did not have enough information to make a determination in most of the remaining cases.

- Identified services were tied to identified needs in 20 cases; in five cases the services were not linked needs, and in three cases there was not enough information to determine.

- For the majority of cases the length of time that services were delivered was listed as "ongoing".

- In four cases the contact between the caseworker and parent was monthly, more often than monthly in nine cases, and less often than monthly in 14 cases.

- Contacts between the caseworker and the child occurred monthly in 12 cases, more often than monthly in 12 cases, and less often than monthly in five cases.

- In nine cases, reviewers determined that the assessment identified needs that must be addressed through services and two cases in which the assessment did not identify needs.

- The range of time for how long it took to implement services went from immediately on several cases to several months in another.

- Reviewers determined that the services provided were effective in five cases and not effective in 12 cases. The remaining cases either did not have services implemented or there was not enough information in the file to determine.

- In reference to the lack of services being delivered the responses were primarily related to the caregiver (usually mother) failing to participate with only two identifying the lack of available and accessible services as the reason.

## D. Data Reports

### Number of Children Entering State Custody and their Permanency Plan

This monthly summary report provides a breakdown by county of the number of children and their permanency plan.  For example, for the period July 1, 2009 thru July 31, 2009 statewide 189 children entered state custody and of those 189, 129 children had a goal of reunification.  A regional report is also issued monthly that provides a breakdown of this same information by region.

### Children in Custody with a Permanency Plan of Reunification – Worker/Birth and Adopted Parent Face to Face Contact

This monthly summary report is broken out by regions and by counties within each region.  There are also the statewide totals for each category.  For example, in Region 1 – North the following can be determined for the period July 1, 2009 thru July 31, 2009:

- 180 children in the region had a plan of reunification;

- 53 children in Desoto County had a goal of reunification;

- In Desoto County there were 10 face to face worker parent contacts completed for the month of July;  or 18.87 percent;

- Statewide in the month of July there were 1,751 children with a plan of reunification; and

- Statewide there were 350 worker/parent face to face contacts completed or 19.99 percent.

## Section IV:  Summary and Recommendations

## A. Summary of Findings

Based on the information above, we have made the following findings:

- There is a notable lack of services in the State targeted toward reunification.  MDHS staff appear to try to mobilize services, such as family preservation services that that are designed more as placement prevention services, in the absence of specific reunification services.

- The lack of services is most pronounced in rural areas of the State, although wait lists and restrictions on who may receive the services affects the accessibility of services even where they exist.

- The demand for services used to facilitate and support reunification outstrips the capacity of contract providers to provide the services, leading to wait lists or referral rejections.

- There appears to be little opportunity to individualize reunification services to the needs of particular families, owing either to the standardized design of programs, e.g., family preservation, parenting classes, or to the lack of available services and providers to match to identified needs. The services that are available, with the exception of the intensive in-home services, are categorical and standardized and may not fit with each family's needs. We believe that the effectiveness of reunification services in the State could benefit from an array that includes more in-home services that are flexible and designed to address behavioral health needs and parent support needs.

- Post-placement services to support reunification once it has occurred seem notably absent. Given the requirements in the *Olivia Y* settlement agreement for after care plans and services, this is an important finding.

- The effectiveness of services to address needs that must commonly be addressed in order to achieve and sustain reunification, such as domestic violence, substance abuse, and sexual abuse, is regarded as low by staff. Although staff rated their effectiveness in meeting the basic needs of families whose children are in foster care, e.g., food, clothing, shelter, the lack of available funds to meet these needs suggests it is an area for strengthened capacity in the way of flexible, earmarked funds for that purpose.

- Apart from contracted services, MDHS agency services/activities that support reunification need strengthening in several areas including using assessments to link services to identified needs, maintain frequent contacts among caseworkers, parents, and children, and involving both parents in case planning and service delivery.

- The involvement of birth parents in maintaining parental responsibilities to the extent that it is safe and appropriate to do so while their children are in foster care is a practice area in need of particular strengthening.

- When a number of the findings are considered together, such as the lack of specific reunification services, the lack of father involvement, the lack of capacity to respond to individual needs that are barriers to reunification, the lack of resource family involvement in reunification efforts, and some of the court-related barriers to maintaining child-parent contact, we are concerned that reunification as a viable goal requiring diligent attention may not receive the same emphasis in practice as other permanency goals, i.e., adoption. While policy supports establishing reunification as an initial goal in most cases, we did not find policy and training that emphasize diligent and ongoing efforts to mobilize the services needed to pursue reunification actively. The new practice model will focus activities and

resources heavily on proactive efforts to achieve timely and appropriate reunification which will require, in some situations, substantial shifts in perspective and approach to working with families within MDHS and among its service providers, foster caretakers, and the courts. Changing policy and training and adding to the service array will help in making this shift, but alone they will not cause staff and stakeholders to think differently about reunification and commit to addressing needs appropriately in an effort to achieve reunification. There are a number of tasks associated with elevating the importance and priority of reunification activities that will need to be addressed in order to increase effectiveness in this area.

- We did not identify MACWIS reports that provide information on reunification services provided, thus limiting the Department's ability to monitor service provision effectively.

## B. Recommendations

- There is a serious need to increase the array of services in the State to be used to facilitate and sustain reunification. We are recommending that MDHS consider the following options for addressing this area:

- Since MDHS can use Federal title IV-B funds to fund in-house staff that provides family preservation and reunification services, some consideration of this approach might be considered in order to supplement the contracted services and increase the availability of services in rural areas of the State. Since these funds are capped, this might mean diverting existing IV-B expenditures, but developing some type of in-house capacity to provide needed reunification services is worth considering as a means of making services available where they are currently unavailable.

- We recommend that the capacity of existing contractors to provide reunification-related services be increased statewide. This can be done by increasing funding for these services as well as relaxing some of the program restrictions that now limit the access to these services by families needing reunification services. If the Department wishes to reserve family preservation families for placement prevention and reunification from short-term stays in foster care, we recommend that the expansion of services occur with intensive in-home services.

- As also recommended in the Medical, Dental and Mental Health Services Assessment, we recommend that MDHS enter into collaborative agreements with the DMH and the State's Medicaid agency to fund mental health professionals in rural areas of the State that serve children and families served by MDHS. Since most of the families are Medicaid-eligible, we believe that the services they provide would be reimbursable through Medicaid and it would immediately increase families' access to mental health services in the State.

- We recommend that flexible funds be earmarked for use in helping to meet the basic needs of families seeking to reunify with their children in foster care, and/or that procedures for accessing available funds be clarified and simplified.

- We recommend that the State examine services and practices with established records of effectiveness in reunifying children and families timely and appropriately and, where possible, consider replicating some of those "best practices" within the State. For example, we recommend attention to the Model Youth Court program in Forest County as a means of providing services directed toward reunifying very young children in foster care with their families.

- We recommend that the reunification services provided through MDHS support be tailored to the individualized needs of the families receiving them. This can be supported in the following ways:

- We recommend relaxing the requirements for all families to complete standardized programs regardless of their individual circumstances, strengths, and needs.

- We recommend adding to the service array the capacity to provide more in-home services to families such as in-home behavioral health interventions as an alternative to office-based mental health counseling, and in-home parent coaching and support as an alternative to standardized parenting classes.

- We recommend that the Department's performance-based contracting system, when implemented, support the need for providers to respond flexibly to families' needs with services that reflect their unique strengths and needs in the comprehensive family assessments and case plans.

- We recommend strengthening both policy and practice requiring MDHS staff to coordinate case planning and service provision activities with service providers in order to ensure that services match needs, and to monitor the effectiveness of service provision in facilitating and supporting reunification.

- Consistent with other recommendations we are making with regard to implementing a child welfare practice model, we recommend that policy and training be strengthened to support improvements in practice with regard to reunification, such as the following:

- Strengthened case planning and ISP policy and training that focus on identifying strengths and needs, matching services to needs, brokering for and obtaining needed services, and monitoring the effectiveness of services. This should include the active involvement of service providers in case planning processes whenever appropriate.

- Strengthened policy and training with regard to visits between caseworkers and parents/children for the purposes of assessment, case planning, involvement, and case monitoring.

- Strengthened FTM policy and training that requires the bringing together of all relevant parties at frequent intervals to identify needed services, put them into place, and monitor their effectiveness.

- We recommend that as MDHS rolls out the new child welfare practice model, that leadership within the Department (statewide and regionally) develop and convey clear messages to staff, service providers, foster caretakers, and stakeholders such as the courts, with regard to the priority and importance it places on timely and appropriate reunification.

- As MDHS implements a new CQI process, we recommend that it monitor specifically for the provision of appropriate and timely reunification services, their effectiveness, and related casework activities carried out by both MDHS staff and provider staff related to reunification efforts. We also recommend that the CQI process monitor for the adequacy of the reunification-related service array statewide and provide reports and other feedback to county, regional, and State administrators on the strengths and gaps of the service array.

- We recommend that MDHS develop MACWIS reports on services provided to families with reunification as a goal that will support monitoring in this area. Reports should include, at a minimum, services provided, dates of initiating and terminating services, service provider, and case status. If possible, with the automation of the ISP, reporting on the match of needs identified in the ISP to service provided would provide an effective tool for supervisory monitoring in County Departments.

- We recommend strengthened training for resource parents in the area of supporting birth families in the reunification process, particularly in facilitating child/parent contacts and parental involvement in the care of their children while in foster care.

- We recommend active engagement of the courts around child/parent visits, given some of the concerns raised in that area. This could take the form of educational initiatives with the judiciary and/or working through the Administrative Office of Courts to facilitate discussion or training in this area. Free technical assistance from the National Resource Center for Legal and Judicial Issues should be explored in developing a strategy to address the courts' effects on the frequency of child/parent visits.

## *Medical, Dental, and Mental Health Services Needs Assessment*

The Period Two Implementation Plan of the Mississippi Settlement Agreement and Reform Plan requires that a foster care services assessment be completed that includes:

"A service provider needs assessment with the purpose of identifying available medical, dental, and mental health services and gaps in services."

This report provides the findings of our assessment in this area, which includes a policy and requirements review, a staff survey, interviews and focus groups, and case reviews.

### Section I: Applicable Standards

When a child is placed in custody of MDHS, the Division of Family and Children's Services (DFCS) assumes the responsibility of securing access for the child to dental, medical and mental health services. The provision of these services must be documented in MACWIS. The services listed in the following sections are usually available under Medicaid, which should be the primary source of payment. County, region and State funds can be used, with prior approval, to pay for some of these services which are unavailable under Medicaid.

#### *Dental Services*

The County of Responsibility (COR) worker will obtain a referral for a dental exam for children age three and older within 90 calendar days of the child entering custody. An exception may be made when the worker is provided with documentation from a dental clinician that dental exams and treatment are up to date. Dental checkups shall recur yearly. This referral can be obtained through Early Periodic Screening, Diagnostic, and Treatment (EPSDT) through the local Health Department or from any medical provider. The form for this referral can be located in MACWIS under the case navigation bar, EPSDT icon.

#### *Medical Services*

The COR worker shall obtain a medical examination for all children within 72 hours of custody and yearly thereafter. This examination may be obtained through EPSDT through the local Health Department or from any medical provider. The form for this referral can be located in MACWIS under the Case navigation bar, EPSDT icon.

#### *Early Intervention Program*

All children in custody, age birth up to 36 months, shall be referred to the First Steps Early Intervention program through the local Health Department for assessment and follow-up services as needed. The existence of early intervention programs is designated in Federal and State legislation. In 1986, the Education for all Handicapped Children Act (Public Law 94-142) was amended to add rights for infants, toddlers and preschool children and their families. In 1990, the Education for all Handicapped Children Act was renamed Individuals with Disabilities Education Act (IDEA). The early intervention portion of the law was referred to as Part H-Early Intervention for Infants and Toddlers with Disabilities and their Families. Part H sought to enhance the development of infants and toddlers and minimize their potential for delay, reduce

the need for special education services, enhance the capacity of the family to meet the needs of their infants and toddlers with special needs and to meet the needs of minority, low income, and rural and underserved populations. In the 1997 reauthorization of IDEA, Part H was changed to Part C. This change brought a new spirit to the law by requiring more emphasis on at risk services, services in the natural environment, family needs assessment, and transition planning. The Mississippi definition of infants and toddlers with developmental delays or disabilities is "children ages birth to 36 months who need early intervention services."

## Immunizations

Section 41-88-3 (1) of the Mississippi Code Annotated charges the  Mississippi State Department of Health (MSDH) with the responsibility "for assuring that all children in the State are appropriately immunized against vaccine-preventable diseases. In order to improve the State's immunization levels in children, the Department of Health shall enhance current immunization activities and focus on children receiving all recommended immunizations by 24 months of age. The immunizations will be administered according to the recommendations of the national Advisory Committee on Immunization Practices (ACIP)". Furthermore, Section 41-23-37 of the code makes it unlawful for any child to attend school until they have been vaccinated. In order to adhere to these laws, workers shall make every effort to assure every child in agency custody is immunized prior to enrollment in school.

The following immunizations, given as recommended by the child's physician, shall be used to guide the worker in meeting the health needs of the child in foster care. The Advisory Committee on Immunization Practices (ACIP), the American Academy of Pediatrics (AAP), and the American Academy of Family Physicians (AAFP) have all approved the following vaccinations:

- Diphtheria, Tetanus, Pertussis (DTaP, Dt, TD)
- Polio
- Measles, Mumps and Rubella (MMR)
- Hepatitis B
- Varicella (Chickenpox)

A copy of the paper immunization record must be kept in the child's case file as an extension of the child's case plan documentation.

## Mental Health Services

In order to determine if the child is in need of a psychological evaluation, a mental health assessment shall be completed as a part of the Child's Individualized Service Plan (ISP). This assessment refers to the Strengths and Risk Assessment (SARA). This assessment shall be performed on children ages four and older within 30 calendar days of child's custody. Each child who reaches the age of four in care shall be provided with a mental health assessment within 30 calendar days of his/her fourth birthday. There are 27 items on this assessment under Child Characteristics identified as areas that need further evaluation by a mental health professional.

If the worker checks one or more of these 27 items, the items checked will populate onto the child's ISP. The worker shall make a referral to a mental health facility for further evaluation of

the child. This initial screening to determine the need for further mental health assessment or referral shall be completed as indicated on the initial/review tab, even if none of the 27 items were checked by the worker.

## Other Requirements

In addition to the MDHS policies noted above, there are a number of requirements pertaining to the provision of medical, dental, and mental health services to children in foster care included in the *Olivia Y* settlement agreement (OY), the Council on Accreditation (COA) standards, and requirements of the Federal Child and Family Services Review (CFSR) as follows:

- MDHS provides, refers, contracts or arranges services including therapy, education and support, domestic violence, mental health, substance abuse treatment (CFSR/COA);

- Medical, dental, and mental health records are given to providers (OY/COA);

- Provide all children with needed mental health, developmental, substance abuse screenings and services and intensive services such as therapeutic foster care(CFSR/COA);

- Child is assisted in obtaining health insurance and health records in order to obtain needed substance abuse services, medication, and medical/mental health care after discharge (COA);

- Dental and mental health screening and services are provided if needed (OY);

- Trained and qualified providers conduct medical screenings in accordance with American Academy of Pediatrics standards (OY);

- Developmental screenings are provided for children, age three and under and mental health screenings for children age four and older within 30 days of entering foster care (OY);

- There should be an accessible service array (CFSR) and formal agreements established with medical facilities and rehabilitative providers including board certified physicians in programs if needed (COA);

- Assess and provide services to meet physical and dental health care needs (CFSR);

- Health screenings to occur within 72 hours of a child entering foster care and a comprehensive health assessment within 30 days of entering care (OY/COA);

- Dental screenings occur within 90 days of entering care for children age three and older (OY) and every six months thereafter (OY/COA);

- Health history and information is recorded and maintained and shared with providers and foster parents as appropriate (COA);

- Mental health needs are assessed and services are provided to meet needs (CFSR/COA). Children, age four and older receive mental health screenings within 30 days of entering care(OY);

- Children are assessed and provided intensive and supportive services to address developmental, emotional, or behavioral needs including placement in a therapeutic foster home (COA); and

- Potential adoptive families are advised of available subsidies including foster families caring for children who are legally free for adoption and post-adoptive services to be provided to ensure stable placements including respite, counseling, mental health treatment, crisis intervention, family preservation, and peer support (OY).

## Section II: Services

### Mental Health Services

According to information we reviewed from the FY2009 edition of the State Department of Mental Health, Division of Children and Youth Services' Directory, DMH has the responsibility for determining the mental health needs for children and youth in the State of Mississippi and for the planning and development of programs to meet those needs. These children and youth include all those in foster care needing mental health services. To do this, the DMH defines children with mental illness to be any individual, from birth up to age 21, who meets one of the eligible diagnostic categories as determined by the DMH and the identified disorder has resulted in functional impairment in basic living skills, instrumental living skills, or social skills. The need for mental health as well as other special needs services and support services is required by these children/youth and families at a more intense rate and for a longer period than children/youth with less severe emotional disorders/disturbance in order for them to meet the definition's criteria.

Children and youth defined as mentally ill by the DMH have certain characteristics. These include children with a serious emotional disorder who have problems involving a lack of awareness and/or understanding of self and environment of such duration, frequency or intensity as to result in an inability to control behavior or express feelings appropriately thereby significantly impairing performance (e.g., school, home, play, etc.). DMH criteria provide a great deal of information on children's behaviors and affect that may indicate mental illness, such as depression, aggressive, and self-abusive behaviors, physical symptoms, unrealistic fears, difficulty building or maintaining satisfactory interpersonal relationships, and significant deficits in social/emotional/educational functioning. The criteria also address risk factors that may predispose children to developing serious emotional disorders including some factors common to children served by the child welfare system, such as families who have experienced alcoholism or drug addiction or mental illness and children and adolescents who have been subject to child abuse, neglect, or sexual abuse.

The model for the 15 community mental health centers in Mississippi includes the following major components:

- Community-based prevention and identification services

- Community-based nonresidential treatment services

- Community-based residential services

- Inpatient

- Operational services

- Advocacy and protection

- Other support services

According to the DMH 2009 Directory, there is a range of community mental health services provided by the regional centers, although we understand that all of these services may not be available in all locations of the State, and that capacity for existing services varies across the State. From our individual interviews, we learned that the services that are *required* to be provided by each mental health center include diagnosis and evaluation, outpatient services, day treatment, case management, and psychiatric services. The full range of services identified in the directory includes the following:

*Prevention programs:* These programs provide services to vulnerable at-risk groups prior to the development of mental health problems.

*Early intervention programs:* Early intervention includes programs for all ages of children and adolescents and implies intervention is implemented as early or as soon as problems are suspected and/or identified.
*Crisis intervention/emergency response:* This type of emergency response can range from immediate brief response by appropriate mobile mental health response personnel up to several hours. Triage is typical in this type of immediate response.

*Diagnostic and evaluation services:* These services encompass appropriate formal early diagnostic and evaluation services, i.e., psychiatric and psychological evaluations, and social histories that must be performed to develop in the most appropriate service plan for each child.

*Outpatient services:* These services include individual, group, and family therapy and parent education classes, as well as home-based services which may or may not be crisis oriented. Home based services are intensive and include short-term therapy which is provided in the home on a 24-hour basis to families with an entire family.

*Therapeutic support services:* These include staff training, transportation, and volunteer services provided by or through the mental health provider which are critical to accessing or implementation of mental health services.

*Day treatment:* This treatment is the most intensive of the non-residential services that usually continues over a longer period of time. Children typically remain in day treatment for at least one school year although some programs provide for shorter lengths of participation. The most common day treatment model is an integrated set of intensive therapeutic services with family intervention and support services involving a child/youth for at least two hours a day, twice a week up to five hours a day, five times each week.

*Respite services:* This service is planned temporary care for a period of time ranging from a few hours within a 24-hour period to an overnight or weekend stay up to as much as 90 days depending on program guidelines.

*Emergency short-term placement:* Emergency placements of up to 72 hours in a crisis situation occur outside the home and could include crisis counseling as well as emergency evaluations if they are needed.

*Therapeutic foster homes:* These provide residential mental health services to emotionally disturbed children or adolescents in a family setting, utilizing specially trained foster parents. *Therapeutic group homes:* This treatment provides residential mental health services to children and adolescents with serious emotional disorders who are capable of functioning in a group home setting. Services are provided in homes that serve from five to ten youth with an array of therapeutic interventions provided by program staff and mental health professionals.

*Residential treatment for the substance abusing adolescent:* The purpose of the treatment is to provide a therapeutic environment in a program to treat chemically dependent adolescents. It is provided in facilities which typically serve from five to ten adolescents and provides an array of therapeutic interventions and treatment.

*Residential treatment center:* A Residential Treatment Center usually provides 24-hour per day treatment to severely emotionally disturbed children and adolescents, including a medical component and individual, group, and family therapy; behavior modification; special education and recreational therapy.

*Inpatient psychiatric hospital care*: This service may be designed to provide either acute, short-term (90 days or less) or longer-term intensive psychiatric services to more severely disturbed children or adolescents in a hospital-based residential setting. Inpatient psychiatric hospital care is reserved for extreme situations which include children and youth who demonstrate serious acute disorders or particularly perplexing and difficult ongoing problems or are an immediate danger to themselves or others.

*Inpatient alcohol and drug treatment*: These programs provide treatment for drug and alcohol abuse, operate on a 24-hour, seven day basis, and provide a structured daily schedule that typically includes individual counseling, group therapy, recreational activities, educational activities, and opportunities for family counseling. The average length of stay for inpatient treatment ranges from 30 to 45 days.

*Case management:*  This involves brokering and advocacy services for individual children and youth, ensuring that an adequate treatment plan is developed and implemented, reviewing progress, and coordinating services.

*Transitional services:*  These services are designed to help adolescents make the transition to independent living and preparation for paid employment, including providing individuals with the information and skills to manage financial, medical, housing, transportation, special/recreational, and other daily living needs.

*Family education and support services:*  This includes services to families of children with mental health needs that address educational, economic, health, vocational, family education, and other support needs.

*Advocacy and protection and support services:*  Advocacy and support are provided through agencies such as the Mississippi Families As Allies Parent network, the Mississippi Chapter of the National Alliance on Mental Illness, and the Mississippi Protection and Advocacy Center. *Multidisciplinary assessment and planning (MAP):*  The DMH has developed an interagency agreement for MAP teams to serve the following children and youth (up to age 21) with serious emotional/behavioral disorders or serious mental illness who are at risk for institutional placement due to lack of access to or availability of needed services and supports in the home and community (first priority group for receiving the service). Other criteria for providing this service include children who are Seriously Emotionally Disturbed (SED) who are returning to a primary caregiver in the community from an inpatient acute psychiatric hospital or psychiatric residential treatment facility; children/youth who are SED or Seriously Mentally Ill (SMI) who are of transition age (14-21) and need assistance with resource planning to remain in the community; and younger children (ages 3-5 years) who have been identified as being most at-risk of later SED, according to the MAP Team At-Risk Screening Checklist. MAP Teams identify community-based services that may divert children and youth from an inappropriate 24 hour institutional placement and facilitate the provision and coordination of services across agencies/entities. There is some funding to provide services for children and youth through the MAP teams. Currently, that is $550,000 that can be used as flexible funds, e.g., respite care, after school care, utilities, school needs, and so forth.  Considering that this program serves children and youth who have exhausted other, less expensive options, the funding level appears low to serve a large number of children and youth.

The DMH's Division of Children and Youth Services also pursues funding to establish special initiatives to meet the needs of children and their families, including foster care children and youth.  Currently, there are three projects that the Division manages or partners with another DMH division or other agency, as follows:

*Fetal Alcohol Spectrum Disorder (FASD) diagnosis and treatment initiative:*  This is an initiative operated by DMH with funding from 2008-2012.  The goal is to improve the functioning and quality of life of children and youth and their families by diagnosing those with an FASD and providing interventions based on the diagnosis. The initiative targets children birth to seven years old who are referred to the MAP Teams because the child is at risk of out-of-home placement or other intensive treatment.  The project includes screening, diagnosis, and treatment of children

ages 0 to seven who are found to have a FASD and includes funding to help cover the cost of services and treatment not otherwise covered for the children who will be screened and diagnosed. Our understanding is that the FASD program is not fully operational, but that MAP teams will ultimately be responsible for ensuring that children who are diagnosed with an FASD receive the recommended treatments and interventions. The Community Mental Health Centers will be responsible for collecting FASD-specific data from the MAP Teams and for submitting this data to the FASD project staff at MDMH in the form of monthly reports or other special reports.

*Youth suicide prevention:* The Mississippi Hurricane Katrina-Related Youth Suicide Prevention and Intervention Project is implementing an awareness campaign for suicide prevention and intervention, training gatekeepers in recognizing the signs and symptoms of suicide, training gatekeepers and community partners in how to apply a suicide intervention model, and training mental health clinicians in evidenced-based practices to effectively treat trauma. In an effort to reduce the number of youth suicide attempts, the project includes goals structured into three main components: awareness, training, and prevention.

*CommUNITY Cares:* CommUNITY cares is a collaborative effort between DMH, Families as Allies, and Pine Belt Mental Healthcare Resources (Region 12 CMHC) to deliver a coordinated network of community-based services and supports in the Pine Belt area. This initiative helps youth (ages 10-18) in Forrest, Lamar and Marion Counties with serious emotional needs and substance misuse issues and is made up of various partners which include youth, families, schools, health departments, family and child service agencies, juvenile justice, law enforcement, doctors, and many others. One evidence-based practice used is wraparound services, which is a family-centered, community-oriented, strengths-based planning process designed to help youth and families meet their needs and remain in their neighborhoods and homes. Families and youth are full partners in their treatment plans by setting their own goals, partnering in decisions and choosing their supports, services and providers. They are also involved in evaluating the effectiveness of treatment.

In addition to these three initiatives, the Mississippi Youth Programs Around the Clock (MYPAC) program, funded by a Mississippi Division of Medicaid waiver is part of the mental health service array in the State.

*MYPAC:* The MYPAC is a home and community-based Medicaid waiver program. MYPAC provides an array of services for Mississippi youth with SED, including alternate services to traditional Psychiatric Residential Treatment Facilities (PRTF). Services provided by MYPAC include intensive case management, wraparound services, and respite services. An ISP will be developed by each participant, parent/guardian and the MYPAC provider which will be used to identify and address participants' and their families' individual needs. Providers will be expected to be available to participants and their families around the clock. Youth may be eligible for the MYPAC program if they meet the clinical criteria for PRTF admission, are under age 21, and they meet the financial criteria for Medicaid. Family Support Specialists, who are parents or guardians of a child with SED act as advisors to children/families receiving this service. There are currently two contract providers of MYPAC services in the State.

## *Medical and Dental Services*

In order to provide an assessment of the level of medical and dental providers in the State, we used the Division of Medicaid's *Mississippi Envision Web Portal*[4] to look up providers that have an open Mississippi Medicaid provider number.  As noted on the website, appearing on the lists does not mean that the provider is available to accept new patients, may not have notified the Division of Medicaid to close their Medicaid account number, or for other reasons may not be accepting patients.  However, we believe that the information provides some sense of the overall number of key providers in the State.  As indicated in the chart below, we used the search tool on the website to identify the number of dentists with Medicaid provider numbers by county and the number of those dentists listed as pediatric dentists.  We also identified the number of "physician or related" providers with a Medicaid provider number by county (which should include all physician types, specialist and general practitioners), and the number of those physicians identified as pediatricians.  In the chart we have organized the counties by region to provide a picture of how the various regions compare with regard to Medicaid providers, and we have also included the number of children in foster care by county in order to provide some context of what the volume of need for these services might be.

---

[4] Accessed at https://msmedicaid.acs-inc.com/msenvision/providerSearch.do

| Distribution of Medicaid Providers by County/Region | | | | | |
|---|---|---|---|---|---|
| County/Region | Dentists | Pediatric Dentists[5] | Physicians[6] | Pediatricians[7] | Number of Children in Foster Care[8] |
| **Region 1-North** | | | | | |
| Alcorn | 11 | 0 | 129 | 9 | 48 |
| Benton | 0 | 0 | 3 | 0 | 1 |
| Desoto | 11 | 0 | 181 | 11 | 91 |
| Marshall | 5 | 0 | 15 | 0 | 41 |
| Tippah | 4 | 0 | 18 | 0 | 42 |
| Tishomingo | 3 | 0 | 29 | 0 | 63 |
| Prentiss | 7 | 0 | 27 | 4 | 48 |
| **Total** | **41** | **0** | **402** | **24** | **334** |
| | | | | | |
| **Region 1-South** | | | | | |
| Calhoun | 1 | 0 | 11 | 0 | 10 |
| Chickasaw | 8 | 0 | 29 | 3 | 28 |
| Itawamba | 3 | 0 | 14 | 0 | 18 |
| Lafayette | 12 | 0 | 144 | 18 | 25 |
| Lee | 26 | 2 | 351 | 30 | 37 |
| Monroe | 7 | 0 | 75 | 16 | 66 |
| Pontotoc | 0 | 0 | 16 | 0 | 41 |
| Union | 2 | 0 | 55 | 9 | 69 |
| **Total** | **59** | **2** | **695** | **76** | **294** |
| | | | | | |
| **Region II-East** | | | | | |
| Carroll | 0 | 0 | 4 | 0 | 13 |
| Grenada | 8 | 0 | 76 | 6 | 4 |
| Leflore | 11 | 0 | 110 | 4 | 18 |
| Montgomery | 3 | 0 | 19 | 0 | 6 |
| Panola | 9 | 0 | 42 | 3 | 33 |
| Quitman | 1 | 0 | 7 | 0 | 4 |
| Tallahatchie | 1 | 0 | 8 | 0 | 6 |
| Tate | 8 | 0 | 24 | 7 | 10 |
| Tunica | 2 | 0 | 14 | 0 | 16 |
| Yalobusha | 4 | 0 | 7 | 0 | 5 |
| **Total** | **47** | **0** | **311** | **20** | **115** |
| | | | | | |

[5] This is a sub-group of all dentists.
[6] This includes all physician types, generalist and specialist.
[7] This is a sub-group of all physicians
[8] This is based from the MACWIS report ***MWZCCURD_09152009-Children Currently in Custody by Age Race Sex Detail***, noting children in custody for the date range 8/1/2009-8/31/2009

Mississippi Foster Care Services Assessments

| Distribution of Medicaid Providers by County/Region | | | | | |
|---|---|---|---|---|---|
| County/Region | Dentists | Pediatric Dentists[5] | Physicians[6] | Pediatricians[7] | Number of Children in Foster Care[8] |
| **Region II-West** | | | | | |
| Bolivar | 12 | 1 | 60 | 9 | 28 |
| Coahoma | 13 | 0 | 69 | 5 | 24 |
| Humphreys | 1 | 0 | 12 | 0 | 25 |
| Sunflower | 9 | 0 | 27 | 1 | 14 |
| Washington | 14 | 0 | 124 | 8 | 61 |
| **Total** | **49** | **1** | **292** | **23** | **152** |
| | | | | | |
| **Region III-North** | | | | | |
| Attala | 5 | 0 | 24 | 1 | 12 |
| Holmes | 6 | 0 | 20 | 0 | 10 |
| Issaquena | 0 | 0 | 0 | 0 | 0 |
| Leake | 4 | 0 | 13 | 0 | 8 |
| Madison | 31 | 2 | 118 | 19 | 22 |
| Rankin | 50 | 2 | 298 | 19 | 57 |
| Scott | 9 | 0 | 23 | 1 | 40 |
| Sharkey | 2 | 0 | 9 | 0 | 0 |
| Yazoo | 5 | 0 | 24 | 0 | 74 |
| **Total** | **112** | **2** | **529** | **40** | **223** |
| | | | | | |
| **Region III-South** | | | | | |
| Hinds | 127 | 3 | 1279 | 183 | 357 |
| Warren | 21 | 0 | 118 | 16 | 71 |
| **Total** | **148** | **3** | **1397** | **199** | **428** |
| | | | | | |
| **Region IV-North** | | | | | |
| Choctaw | 6 | 0 | 10 | 0 | 7 |
| Clay | 2 | 0 | 25 | 6 | 31 |
| Kemper | 1 | 0 | 1 | 0 | 6 |
| Lowndes | 12 | 1 | 154 | 17 | 62 |
| Neshoba | 9 | 0 | 48 | 8 | 65 |
| Noxubee | 4 | 0 | 9 | 0 | 4 |
| Oktibbeha | 7 | 1 | 90 | 3 | 12 |
| Webster | 1 | 0 | 10 | 4 | 14 |
| Winston | 6 | 0 | 14 | 0 | 19 |
| **Total** | **48** | **2** | **361** | **38** | **220** |
| | | | | | |
| **Region IV-South** | | | | | |
| Clarke | 3 | 0 | 9 | 0 | 13 |

Mississippi Foster Care Services Assessments

| Distribution of Medicaid Providers by County/Region | | | | |
|---|---|---|---|---|
| County/Region | Dentists | Pediatric Dentists[5] | Physicians[6] | Pediatricians[7] | Number of Children in Foster Care[8] |
| Jasper | 3 | 0 | 8 | 1 | 9 |
| Jones | 12 | 0 | 136 | 29 | 33 |
| Lauderdale | 13 | 1 | 326 | 46 | 172 |
| Newton | 4 | 0 | 24 | 7 | 15 |
| Wayne | 2 | 0 | 22 | 3 | 17 |
| **Total** | **37** | **1** | **525** | **86** | **259** |
| | | | | | |
| **Region V-East** | | | | | |
| Copiah | 8 | 0 | 30 | 1 | 93 |
| Covington | 7 | 0 | 13 | 0 | 38 |
| Jefferson Davis | 5 | 0 | 16 | 0 | 34 |
| Lawrence | 5 | 0 | 16 | 1 | 17 |
| Lincoln | 7 | 0 | 62 | 10 | 41 |
| Simpson | 10 | 0 | 41 | 0 | 37 |
| Smith | 5 | 0 | 7 | 0 | 22 |
| **Total** | **47** | **0** | **185** | **12** | **282** |
| | | | | | |
| **Region V-West** | | | | | |
| Adams | 5 | 1 | 91 | 14 | 96 |
| Amite | 7 | 0 | 5 | 0 | 10 |
| Claiborne | 1 | 0 | 9 | 0 | 4 |
| Franklin | 2 | 0 | 9 | 3 | 7 |
| Jefferson | 0 | 0 | 9 | 0 | 17 |
| Pike | 23 | 1 | 105 | 21 | 37 |
| Walthall | 1 | 0 | 19 | 1 | 19 |
| Wilkinson | 5 | 0 | 17 | 0 | 3 |
| **Total** | **44** | **2** | **402** | **39** | **193** |
| | | | | | |
| **Region VI** | | | | | |
| Forrest | 31 | 0 | 329 | 53 | 132 |
| Lamar | 15 | 1 | 216 | 17 | 30 |
| Marion | 1 | 0 | 20 | 3 | 14 |
| Pearl River | 5 | 0 | 79 | 8 | 111 |
| Perry | 5 | 0 | 8 | 0 | 10 |
| Stone | 5 | 0 | 16 | 0 | 81 |
| **Total** | **62** | **1** | **668** | **81** | **378** |
| | | | | | |
| **Region VII-East** | | | | | |
| George | 9 | 0 | 26 | 3 | 3 |

**Mississippi Foster Care Services Assessments**

| Distribution of Medicaid Providers by County/Region | | | | | |
|---|---|---|---|---|---|
| County/Region | Dentists | Pediatric Dentists[5] | Physicians[6] | Pediatricians[7] | Number of Children in Foster Care[8] |
| Greene | 4 | 0 | 4 | 0 | 2 |
| Jackson | 10 | 0 | 297 | 39 | 368 |
| **Total** | **23** | **0** | **327** | **42** | **373** |
| | | | | | |
| **Region VII-West** | | | | | |
| Hancock | 10 | 0 | 64 | 8 | 156 |
| Harrison | 29 | 3 | 520 | 62 | 158 |
| **Total** | **39** | **3** | **584** | **70** | **314** |
| | | | | | |

*Dentists:*  42 counties (50 percent) have five or fewer dentists that will accept Medicaid in the county, and five counties have no dentists. Among the regions, IV-South, VII-East, and VII-West have the fewest dentists with less than 40 each in the entire region.  There are only 17 pediatric dentists in the entire State.  Four regions have none and the others have one, two, or three for the region.

*Physicians:*  There is a tremendous range of physicians among the counties and regions, and this category covers all physician types, general and specialists.  The range is from 185 in V-East to 1397 in III-South which includes Hinds County.  The next highest region below III-South is I-South (includes Tupelo) with 695.  As a sub-group of all physicians, the number of pediatricians ranges from 12 in V-East to 199 in III-South which includes Hinds County.  The next highest region below III-South is IV-South (includes Meridian) with 86.  Four regions have less than 25 pediatricians in the entire region, with each region covering from five to ten counties each.

We also obtained data from the Mississippi Division of Medicaid detailing Medicaid usage rates by county and service. The Division of Medicaid does not currently monitor usage rates for children in foster care specifically, thus the table below represents Medicaid costs by claims for all children aged birth through twenty for the last year.

| Billing Provider | Total Claim Count | Total Recipient Count | Percent Of Total |
|---|---|---|---|
| Unknown | 202 | 115 | 0.0039% |
| Adams | 67,031 | 29,026 | 1.2791% |
| Alcorn | 129,754 | 34,625 | 2.4760% |
| Amite | 6,706 | 2,529 | 0.1280% |
| Attala | 28,151 | 11,929 | 0.5372% |
| Benton | 5,885 | 2,197 | 0.1123% |

Mississippi Foster Care Services Assessments

| Billing Provider | Total Claim Count | Total Recipient Count | Percent Of Total |
|---|---|---|---|
| Bolivar | 96,692 | 37,294 | 1.8451% |
| Calhoun | 20,008 | 7,422 | 0.3818% |
| Carroll | 1,281 | 384 | 0.0244% |
| Chickasaw | 24,341 | 10,162 | 0.4645% |
| Choctaw | 8,673 | 4,283 | 0.1655% |
| Claiborne | 17,764 | 7,310 | 0.3390% |
| Clarke | 13,142 | 6,091 | 0.2508% |
| Clay | 33,744 | 15,373 | 0.6439% |
| Coahoma | 106,690 | 38,062 | 2.0359% |
| Copiah | 37,543 | 15,324 | 0.7164% |
| Covington | 22,472 | 9,759 | 0.4288% |
| Desoto | 104,464 | 42,359 | 1.9934% |
| Forrest | 245,559 | 77,504 | 4.6858% |
| Franklin | 6,665 | 2,726 | 0.1272% |
| George | 39,052 | 15,728 | 0.7452% |
| Greene | 6,628 | 2,528 | 0.1265% |
| Grenada | 43,394 | 19,818 | 0.8281% |
| Hancock | 27,245 | 11,815 | 0.5199% |
| Harrison | 228,744 | 98,200 | 4.3650% |
| Hinds | 683,173 | 331,895 | 13.0365% |
| Holmes | 45,318 | 19,013 | 0.8648% |
| Humphreys | 16,400 | 7,590 | 0.3130% |
| Issaquena | - | - | 0.0000% |
| Itawamba | 14,274 | 5,134 | 0.2724% |
| Jackson | 140,474 | 54,028 | 2.6806% |
| Jasper | 17,132 | 6,604 | 0.3269% |
| Jefferson | 9,510 | 4,166 | 0.1815% |
| Jefferson Davis | 12,001 | 5,514 | 0.2290% |
| Jones | 112,159 | 48,065 | 2.1403% |
| Kemper | 3,364 | 1,189 | 0.0642% |
| Lafayette | 81,871 | 36,382 | 1.5623% |
| Lamar | 90,363 | 40,725 | 1.7243% |
| Lauderdale | 219,794 | 73,810 | 4.1942% |
| Lawrence | 8,862 | 4,527 | 0.1691% |
| Leake | 31,493 | 13,014 | 0.6010% |
| Lee | 208,120 | 80,313 | 3.9714% |
| Leflore | 141,804 | 43,837 | 2.7060% |

Mississippi Foster Care Services Assessments

| Billing Provider | Total Claim Count | Total Recipient Count | Percent Of Total |
|---|---|---|---|
| Lincoln | 61,484 | 29,080 | 1.1733% |
| Lowndes | 90,038 | 40,665 | 1.7181% |
| Madison | 88,407 | 36,357 | 1.6870% |
| Marion | 35,029 | 13,323 | 0.6684% |
| Marshall | 30,369 | 12,952 | 0.5795% |
| Monroe | 51,118 | 20,993 | 0.9755% |
| Montgomery | 16,194 | 6,698 | 0.3090% |
| Neshoba | 45,225 | 18,798 | 0.8630% |
| Newton | 29,714 | 13,147 | 0.5670% |
| Noxubee | 20,390 | 7,918 | 0.3891% |
| Oktibbeha | 127,921 | 27,307 | 2.4410% |
| Panola | 46,309 | 21,635 | 0.8837% |
| Pearl River | 71,128 | 26,161 | 1.3573% |
| Perry | 10,764 | 4,463 | 0.2054% |
| Pike | 90,695 | 46,093 | 1.7307% |
| Pontotoc | 24,130 | 9,643 | 0.4605% |
| Prentiss | 34,196 | 12,266 | 0.6525% |
| Quitman | 15,389 | 6,380 | 0.2937% |
| Rankin | 245,084 | 52,434 | 4.6768% |
| Scott | 39,143 | 17,481 | 0.7469% |
| Sharkey | 13,091 | 6,206 | 0.2498% |
| Simpson | 59,359 | 22,682 | 1.1327% |
| Smith | 9,760 | 3,544 | 0.1862% |
| Stone | 19,606 | 7,722 | 0.3741% |
| Sunflower | 57,460 | 23,856 | 1.0965% |
| Tallahatchie | 15,249 | 6,149 | 0.2910% |
| Tate | 41,868 | 17,086 | 0.7989% |
| Tippah | 23,463 | 9,201 | 0.4477% |
| Tishomingo | 17,269 | 6,267 | 0.3295% |
| Tunica | 9,746 | 3,659 | 0.1860% |
| Union | 49,199 | 22,908 | 0.9388% |
| Walthall | 12,473 | 5,532 | 0.2380% |
| Warren | 115,708 | 37,972 | 2.2080% |
| Washington | 121,707 | 47,080 | 2.3225% |
| Wayne | 29,971 | 11,589 | 0.5719% |
| Webster | 13,389 | 5,794 | 0.2555% |
| Wilkinson | 16,256 | 6,667 | 0.3102% |
| Winston | 24,659 | 11,120 | 0.4706% |

Mississippi Foster Care Services Assessments

| Billing Provider | Total Claim Count | Total Recipient Count | Percent Of Total |
|---|---|---|---|
| Yalobusha | 10,904 | 4,038 | 0.2081% |
| Yazoo | 44,734 | 18,602 | 0.8536% |
| Chickasaw-W | 16 | 16 | 0.0003% |
| Alabama | 43,714 | 25,383 | 0.8342% |
| Louisiana | 13,824 | 8,026 | 0.2638% |
| Tennessee | 71,062 | 33,709 | 1.3560% |
| All Other States | 75,291 | 49,665 | 1.4367% |
| **Total** | **5,240,447** | | **100.0000%** |
| **Average** | **17,763** | | **2.2472%** |

Although this information provides little insight into Medicaid usage by children in foster care in Mississippi, it is evident that Hinds County provides the most Medicaid services to children in general of all the counties in Mississippi. In addition, Forrest, Harrison, Lauderdale, Lee and Rankin each provided more than 200,000 Medicaid services to children last year, representing nearly one-third (30.5647 percent) of all Medicaid services to children last year.

We also obtained data detailing specific Medicaid services by the Division for Medicaid's codes for children in foster care, as detailed below. Please note that these numbers may not reflect the total foster care child population since some children in foster care receiving Medicaid services may not be identified as a child in foster care, for example, children receiving SSI who enter foster care may retain their SSI classification as opposed to a foster care designation.

| Header Type Description | Code Description[9] | Count Distinct TCNs[10] | Distinct Count Beneficiaries | Total Reimbursement Amount |
|---|---|---|---|---|
| Dental | Protected Foster Care; DHS Foster Care | 2,894 | 1,221 | $2,634,539.12 |
| Clinics | Protected Foster Care; DHS Foster Care | 1,942 | 730 | $343,846.60 |
| Services | Protected Foster Care; DHS Foster Care | 2,310 | 713 | $564,368.15 |
| Inpatient | Protected Foster Care; DHS Foster Care | 490 | 289 | $26,499,211.04 |

---

[9] Protected Foster Care and DHS Foster Care are two different Medicaid eligibility codes for children in foster care in the State. Our contact at the Division of Medicaid was unable to provide us with a clear distinction in the eligibility criteria for these two codes.

[10] TCN refers to Transaction Control Number, which uniquely identifies an individual Medicaid claim.

| | | | | |
|---|---|---|---|---|
| Outpatient | Protected Foster Care; DHS Foster Care | 2,701 | 1,058 | $4,555,905.44 |
| Mental Health | Protected Foster Care; DHS Foster Care | 333 | 24 | $34,446.13 |
| Pharmacy (Rx) | Protected Foster Care; DHS Foster Care | 15,769 | 897 | $2,990,618.12 |
| Vision and Hearing | Protected Foster Care; DHS Foster Care | 18,358 | 1,641 | $1,603,034.14 |
| Laboratory and X-ray | Protected Foster Care; DHS Foster Care | 1,039 | 682 | $473,590.71 |
| Medical Supplies | DHS Foster Care | 140 | 50 | $47,733.36 |
| Medicare Part B Crossover | DHS Foster Care | 9 | 6 | $757.00 |
| Practitioner/ Physician | Protected Foster Care; DHS Foster Care | 9,292 | 1,704 | $2,173,075.42 |
| Nursing Facility & Long Term Care | Protected Foster Care; DHS Foster Care | 867 | 164 | $7,884,600.23 |
| Transportation (includes Ambulance) | Protected Foster Care; DHS Foster Care | 122 | 87 | $51,913.02 |
| | **Total** | **56,266** | **9,266** | **$49,857,638.48** |

The costs for Inpatient care for foster children represent over half (53.1 percent) of all service costs. The second highest cost is Nursing Facility/Long Term Care (15.8 percent), followed by Outpatient care (9.1 percent). Routine care (Dental, Practitioner/Physician and Vision and Hearing) represents only 12.9 percent of reimbursed costs for children in foster care coded in the Medicaid system last year.


## Section III: Current Practice

We assessed the practices employed by MDHS to address medical, dental and mental health services to children in its custody, as well as perceptions of the effectiveness of the current array of services to meet identified needs. The following methods were used in this assessment:

- Staff survey to describe the usefulness of tools and current practice;

- Focus groups with front line staff, supervisors, Regional Directors, youth in foster care, resource workers and supervisors, and parents served by MDHS;  and

- Individual interviews with MDHS staff and representatives of other programs including DMH; and

- 30 case reviews of children served by MDHS.

 The following includes the information from those sources.

## A. Staff Survey

We conducted a survey of MDHS child welfare staff and asked respondents to rate the effectiveness of available services to address a range of needs of children and families involved in the child welfare system. Included in the survey were items pertaining to services that support the agency's capacity to conduct initial assessments of the needs of children in the context of a broader comprehensive family assessment. The survey also included additional items that specifically related to the availability, accessibility, and quality of services to meet the medical, dental, and mental health needs of children on an ongoing basis, and addressed issues such as the availability of specialized professional evaluations and screenings along with the timeliness of the referral process for securing needed services.

As indicated in the chart below, respondents rated the effectiveness of services to meet physical health needs as almost always or frequently effective nearly 70 percent of the time. They rated the effectiveness of dental care services slightly higher, with nearly 73 percent of the respondents indicating the agency is almost always or frequently effective. They rated the effectiveness of substance abuse treatment services much lower. Less than half of the respondents (about 47 percent) indicated that the services were frequently or almost always effective.

| Please rate effectiveness of available services to address the following areas, including the ability to initiate the service when needed and the quality of the service: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Some times | Frequently | Almost Always | No Info/NA | Total |
| Physical health services | 0 (0%) | 11 (6.01%) | 29 (15.85%) | 59 (32.24%) | 68 (37.16%) | 16 (8.74%) | 183 |
| Dental health services | 0 (0%) | 11 (5.95%) | 25 (13.51%) | 66 (35.68%) | 68 (36.76%) | 15 (8.11%) | 185 |
| Substance abuse treatment services | 2 (1.09%) | 15 (8.15%) | 62 (33.7%) | 54 (29.35%) | 32 (17.39%) | 19 (10.33%) | 184 |

The survey included several questions related to the accessibility of mental health services by the type and level of services, as indicated in the chart below. Overall, respondents did not rate access to mental/behavioral services as very effective. However, they rated the access to less intense services, such as outpatient counseling and evaluation, the most effective with about 59 percent of the respondents indicating these services were frequently or almost always effective. As the level of services increased, the effectiveness ratings decreased. Mid-level services such as medication, day treatment, and more intense therapy were rated as frequently or almost always effective about 53 percent of the time. Higher end services, such as specialized care and psychiatric services were rated as frequently or almost always effective only half the time (about 50 percent), and less than half of the respondents (about 48 percent) rated crisis intervention services as frequently or almost always effective.

### Mississippi Foster Care Services Assessments

| With regard to mental/behavioral health services, how effectively are you able to access the following levels of services for children and families: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Some times | Frequently | Almost Always | No Info/NA | Total |
| Lower level services, e.g., outpatient counseling and evaluation, prevention services, testing: | 1 (0.54%) | 11 (5.98%) | 43 (23.37%) | 58 (31.52%) | 51 (27.72%) | 20 (10.87%) | 184 |
| Mid-level services, e.g., behavioral health medication, day treatment, more intense out-patient psychotherapy: | 3 (1.63%) | 11 (5.98%) | 49 (26.63%) | 56 (30.43%) | 42 (22.83%) | 23 (12.5%) | 184 |
| High-end/acute services, e.g., addiction and recovery services, specialized care, psychiatric services: | 3 (1.64%) | 13 (7.1%) | 51 (27.87%) | 45 (24.59%) | 46 (25.14%) | 25 (13.66%) | 183 |
| Crisis services, e.g., crisis stabilization, psychiatric hospitalization: | 4 (2.2%) | 15 (8.24%) | 49 (26.92%) | 44 (24.18%) | 44 (24.18%) | 26 (14.29%) | 182 |

A key component to the capacity to screen and assess a child's need for medical, dental, and mental health services is the ability to access professional evaluations, screenings, examinations, and testing in the course of conducting a more comprehensive family assessment. As described in the chart below, survey respondents rated the agency's work in conducting initial screenings for physical health issues higher than screening in other areas. They indicated that the agency is frequently or almost always effective in screening for physical health issues about 80 percent of the time. They rated initial screenings for mental and behavioral health issues as frequently or almost always effective about two-thirds of the time (about 67 percent). They rated initial screenings for therapeutic needs and developmental needs as frequently or almost always effective about 70 percent of the time each.

| Please rank your perception of your agency's effectiveness in conducting initial screenings of children to identify needs in the following areas: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Some times | Frequently | Almost Always | No Info/NA | Total |
| Mental/behavioral health: | 0 (0%) | 6 (3.53%) | 34 (20%) | 50 (29.41%) | 64 (37.65%) | 16 (9.41%) | 170 |
| Physical health: | 0 (0%) | 2 (1.18%) | 18 (10.59%) | 44 (25.88%) | 92 (54.12%) | 14 (8.24%) | 170 |
| Therapeutic needs: | 0 (0%) | 4 (2.33%) | 33 (19.19%) | 58 (33.72%) | 62 (36.05%) | 15 (8.72%) | 172 |
| Developmental levels and concerns: | 0 (0%) | 4 (2.34%) | 34 (19.88%) | 45 (26.32%) | 74 (43.27%) | 14 (8.19%) | 171 |

As indicated in the chart below, survey respondents rated the agency's effectiveness in obtaining timely professional evaluations as part of the process of conducting family strengths

**Mississippi Foster Care Services Assessments**

and needs assessments. About two-thirds of the respondents (about 68 percent) indicated the agency was frequently or almost always effective in this area, and about 17 percent indicated that they were sometimes able to access these services on a timely basis.

| Please rate your perception of your agency's effectiveness in each area below regarding practices related to strengths and needs assessments: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Some times | Frequently | Almost Always | No Info/NA | Total |
| Obtaining timely professional specialized assessments when needed, e.g., psychological, drug evaluations, educational assessments, etc.: | 0 (0%) | 7 (4.19%) | 29 (17.37%) | 50 (29.94%) | 63 (37.72%) | 18 (10.78%) | 167 |

We also asked survey respondents to rate the effectiveness of several specific types of services that relate to the mental health resource continuum, specifically domestic violence, sexual abuse, and therapeutic services. As indicated in the chart below, respondents rated the effectiveness of therapeutic services highest, with about 63 percent indicating the services are frequently or almost always effective. Slightly fewer (about 59 percent) rated the availability of sexual abuse services as frequently or almost always effective. Respondents rated the availability of domestic violence services considerably lower, with only about 37 percent indicating those services were frequently or almost always effective.

| Please rate effectiveness of available services to address the following areas, including the ability to initiate the service when needed and the quality of the service: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Some times | Frequently | Almost Always | No Info/NA | Total |
| Domestic violence services: | 2 (1.09%) | 24 (13.04%) | 68 (36.96%) | 47 (25.54%) | 21 (11.41%) | 22 (11.96%) | 184 |
| Sexual abuse services: | 3 (1.63%) | 17 (9.24%) | 40 (21.74%) | 57 (30.98%) | 51 (27.72%) | 16 (8.7%) | 184 |
| Therapeutic services: | 0 (0%) | 9 (4.92%) | 44 (24.04%) | 59 (32.24%) | 57 (31.15%) | 14 (7.65%) | 183 |

We asked the survey respondents to comment further regarding the practice and tools related to accessing medical, dental, and mental health services. Several responses indicated that there has been an increase in the number of providers who deliver these services and there is more diversity in the types of available services such as home-based interventions. The highest number of comments regarding existing barriers to accessing needed services pertained to the lack of available providers or services in close geographical proximity to families, followed by barriers related to waiting lists for services. Respondents noted that the lack of certain types of services was more evident in the rural areas of the State.

## B. Focus Groups and Interviews

The focus groups that contributed information pertaining to the medical, dental and mental health service array for children in foster care included resource parents, MDHS resource supervisors, Regional Directors, MDHS caseworkers, and youth placed in care. We also conducted individual interviews with MDHS Central Office staff from different program areas that are responsible for licensing and placement approval, issuing proposals and developing contracts for specific services, or have oversight of county operations.  We conducted additional interviews with several providers from therapeutic group homes and therapeutic foster home programs and also with staff from the Department of Mental Health.

Among the central issues that repeatedly surfaced throughout the focus groups and interviews was the lack of available mental health services in the rural areas of the State. Focus group participants and interviewees described the necessity of traveling distances to obtain these services and delays occurring if there were waiting lists for the services.  There were numerous comments regarding the difficulty in obtaining psychological examinations due to the reliance on the local mental health centers and the high costs of using private providers, many of which do not accept Medicaid. Some participants commented on the inconsistency in quality of the mental health services in some of the counties.  In one focus group, we heard that it is often more expeditious to obtain a psychological examination and testing through placement of a child in an acute psychiatric setting than experience the delays in obtaining one through referral to the local mental health center.  There were also reports from some participants that timely screening to assess the appropriateness of psychotropic medications can be difficult along with obtaining the necessary follow-up and monitoring of children and adolescents for whom these medications have been prescribed.  Many of these same participants indicated that substance abuse services for adults are not readily available but is not as difficult to obtain for youth if needed.

In several of the interviews we heard concerns about accessing and/or providing quality mental health services because of the lack of available Medicaid providers in some of the locations of the state.  There were repeated concerns among the provider interviews that the rates paid for their services to children in out of home care were inadequate to meet their needs, particularly in regard to the provision of therapeutic treatment services.

We learned that each of the 15 Community Mental Health Centers operate independently from the Department of Mental Health and each has its own advisory board.  There is some funding for crisis interventions, though not funded by Medicaid.  There is also a plan being developed to amend the State's Medicaid plan to provide respite care which is not currently being funded.  There are 36 MAP teams across the State, and Mississippi State law requires these teams cover children with multiple needs that cross the lines of agencies' services.  These teams meet once a month to review children and youth who are at risk of institutional placement in a mental health facility.  These teams develop wrap-around plans to keep children in their communities.  Each agency represented on the team provides services to the child or youth, plus there is funding to use it for respite care, after school care, utilities, schools needs, etc.

Individual interviews indicated that some Community Mental Health Centers, such as Pine Belt Behavioral Resources in Hattiesburg offer a wide range of services, while other community

mental health centers offer limited services, i.e., only the minimum required. There are barriers to obtaining therapists and psychiatrists to work in rural parts of the State.

We heard that some private providers offer some services but these providers often have waiting lists and their services are not available in the more rural counties. Most mental health services are provided by local mental health centers and there are frequent waiting lists for many of the needed services. We heard that there is not sufficient oversight of the local mental health centers and the quality of mental health services varies tremendously. Also, interviewees noted that it is sometimes impossible to identify a provider who has expertise in a specific problem and that there is no choice when it comes to choosing a provider.

We also learned from our interviews that if a family involved in family preservation services has mental health needs, the contract provider will attempt to link the family to public mental health services. If a family is receiving another service from the family preservation provider, e.g., therapeutic foster care or intensive in-home services, the contractor will provide the needed mental health services. We heard that some regional mental health centers will refuse service to a family if the family is involved with the family preservation service contractor they consider it a duplication of services. The regional mental health services are "bundled" and they must provide all services or none.

With regard to physical health services, most interviewees indicated that access to medical services is not as significant an issue as mental health because the local health departments and private providers are available to screen and treat adults and children. A few interviewees noted that in smaller and rural counties there are fewer providers and travel is sometimes necessary to obtain those services.

Among the concerns we heard with regard to medical services were expired Medicaid cards; resource parents not receiving medical information from the worker on the children in their homes; and workers making appointments at the last minute in order to meet an agency or court-imposed dead-line and expecting the resource parents to address needs with little notice. We also heard that some doctors will not provide the resource parents with information about the child's examination, so they don't know how to treat the child at home.

Most interviewees concurred that dental care is difficult to obtain because there are few dentists across the State that accept Medicaid and because of the limits on dental services covered by Medicaid. Resource parents may have to drive long distances to access dental care for children in their homes, although this was not identified as a problem in urban areas of the State. We heard that orthodontic care is especially problematic because it is not covered by Medicaid. Finally, we heard that MDHS staff seemed to lack knowledge about the need for regular vision and hearing services and mentioned that Medicaid provided only limited costs for glasses, contact lenses, and hearing aids, especially if any of these are lost or broken.

## C. Case Reviews

We conducted a review of MACWIS case files for a sample of 30 children in foster care for this assessment to determine if initial physical, dental, and mental health screenings were obtained

and if needed follow-up services were provided on a timely basis. We also reviewed cases to determine if there were specialized services that were not available to meet identified needs and if services were provided to other children in the family beyond the identified child in the case review sample. In tabulating the ratings, we noted that several of the case files did not contain sufficient documentation to make a determination regarding timely service provision. In some cases, a rating was not applicable for one reason or another. The findings from the case reviews are as follows:

### Initial Screenings

Of the 30 cases reviewed we found the following:

- Initial health screenings were conducted in 25 of the cases. There was not sufficient information or documentation in the remaining five cases to make a determination.

- Initial dental screenings were completed in 17 of the cases, and not completed in one of the remaining 13 cases. No determination could be made in 11 of these cases due to a lack of information while one case was determined to be not applicable.

- Twelve of the cases indicated that an initial mental health screening had been completed and was not completed in one case. Of the sample, 15 of the cases were determined to be not applicable and two cases did not have sufficient information to indicate that a screening had been done.

### Ongoing Examinations and Screenings

The case reviews also included an assessment of ongoing evaluation of medical, dental, and mental health services, when indicated, with consideration of whether the services were deemed to be timely and accessible. Of the cases reviewed we found the following:

- Ongoing medical screenings/care had taken place in 15 cases, and had not occurred in one of the cases. Seven of the cases had ratings of not applicable and seven cases did not have sufficient documentation to make a determination.

- Eight cases were found to have ongoing dental screenings while one of the cases did not. Fifteen of the cases reviewed for this were determined as not applicable and six did not have enough documentation.

- In regard to ongoing mental health services, three of the cases reviewed received additional mental health services beyond the initial screening while two cases did not. Nineteen of the cases reviewed were deemed to be not applicable for this item and six did not have enough documentation to determine if additional mental health services had been provided.

### Follow Up Appointments and Services

As a result of the screenings to determine if there are any presenting medical, dental, or mental health needs, the case reviews explored whether follow-up appointments were made and services were provided. Of the 30 cases reviewed we found the following:

- Six cases had follow-up appointments made for additional service needs, 18 were deemed as not applicable and six cases did not enough information to determine if a follow-up appointment was needed and/or made.

- In determining whether services were then provided as a follow-up in the cases that were reviewed, we found that in seven of the cases services were provided to meet identified needs. Seventeen of the cases were determined to be not applicable for this item and six of the cases did not have sufficient documentation to make a determination that services had been provided.

### *Availability of Specialized Treatment*

In the case reviews, we rated the availability of specialized treatment for its impact on services to children in foster care. Of the cases reviewed, seven of the cases were determined to have specialized treatment available and 17 of the cases were determined to be not applicable. In three of the cases, there was not enough information to make a determination, and in the remaining three cases the question was unanswered.

### *Timely and Appropriate Services*

We also rated the timeliness of services and the matching of services to needs and found the following:

- Services were provided to address identified needs in 14 of the cases reviewed and were not provided in three of the cases. Eight of the cases were rated as not applicable and five cases did not have enough information on which to base a determination.

- In reviewing for the timeliness of service provision, eleven of the cases were determined to have needs addressed in a timely manner while four were not addressed. Of the remaining cases, eight were determined to be not applicable for this rating and seven of the cases did not have sufficient information to make a determination for this item.

- In reviewing for the appropriateness of services to the *child*, children in ten of the cases reviewed were determined to have received appropriate services based on identified needs, while one case was not. Nine of the cases were rated as not applicable and ten of the cases did not have enough documentation or information to support a rating on this item.

- In reviewing for the appropriateness of services to the *family*, reviewers determined that in 11 of the cases, services to the family were delivered that matched their identified needs while the families in two cases were found to have not received services that were matched to their needs. Three of the cases were rated as not applicable and 14 of the cases did not have enough information to make a determination regarding this item.

### *Service Provider Accessibility*

The reviewers also evaluated the accessibility of the service provider to the child receiving services and determined that in eleven of the cases, the service provider was found to be accessible and in one case was not. Eight of the cases were rated as not applicable and ten cases did not have enough information to make a finding.

## *Unmet Needs for Services*

As a part of the assessment, reviewers evaluated not only whether the subject child of the case received services to meet identified needs but also whether the family as a whole, including other children in the family, received needed services. The findings indicated the following:

- For the subject child of the case reviews, needed services were provided in 13 of the cases and not in one case. Seven of the cases were rated as not applicable and nine of the cases did not have enough documentation to rate this item.

- For services needed by the family and siblings to the child, needed services were provided in 12 cases, but not in four of the cases. One case was rated as not applicable and 13 of the cases did not contain sufficient information to make a determination.

## Section IV: Findings and Recommendations

### *Findings*

Our findings for this assessment indicate that mental health issues are predominant, although there are some important findings regarding dental services as well. Also, poor case file documentation regarding screening/evaluation for needed services and the provision of services is a concern in that it inhibits the effective provision of all these services, particularly when there is staff turnover.

### *Mental Health Services Findings*

- Some mental health initiatives offer effective approaches to meeting the mental health needs of children in the child welfare system, but are limited in scope, funding, or criteria for the population served. For example, a wraparound services approach would be beneficial to all children not just those with SED, and the inter-disciplinary approach of the MAP teams could benefit children before they exhaust other available services but funding is very limited.

- Community Mental Health Centers appear to be the primary source for MDHS to provide mental health services to children and youth in its care. Across the State, the centers do not offer a consistent range of services, particularly in rural areas of the State where services are considered to be quite limited, and they are often unable to provide the level of specialization needed by children in foster care.

- Access to private providers of mental and behavioral health services is restricted, particularly in rural areas of the State, by lack of funding to pay for the services, by wait lists to obtain services even when they are available, and by a lack of providers that will accept Medicaid.

- Obtaining psychological evaluations is particularly difficult, as there are areas of the State where this service is not available.

- Mental health screenings of children are either not conducted as consistently as needed or the case file documentation was so poor that we could not determine if a screening had been conducted or not.

- There is little or no choice of providers in rural areas.

- The effectiveness of some services is generally regarded as poor, indicating a need for more choices of providers, more accountability in service provision, and strengthened ability to tailor services to meet the individualized needs of children and youth.

## Dental Health Services Findings

- Access to dental providers in rural areas of the State appears to be the most prominent issue. A number of providers will not accept Medicaid and families/resource families often must travel long distances to access providers.

- The dental services authorized and covered by Medicaid are limited, particularly as it relates to orthodontic care.

- Dental screenings are either not conducted as consistently as needed, or there is inadequate documentation of case files to make a determination as to whether the screening was conducted or not.

## Physical Health Services Findings

- In general, access to physical health care appears better than dental or mental/behavioral health services.

- Although the initial physical health screenings of children occur more frequently than screenings for dental and mental/behavioral health concerns, case file documentation in this area is lacking.

- Medicaid cards and medical info may not be provided to resource parents routinely, affecting their ability to seek and provide needed services.

- At least some resource parents experience difficulty in getting the necessary medical background information on children placed in their homes, and are unaware of the medical needs of the children at the time of placement.

- Some resource parents appear to have difficulty obtaining complete medical information from physicians needed to attend to the medical needs of children in their care.

- Transportation to services (medical, dental, mental health) is a major issue in rural areas, and Medicaid only reimburses in limited circumstances.

## Recommendations

- MDHS and MDMH develop a collaborative program to serve the mental health needs of foster care children state wide, including specialty services e.g., psychological examinations, treatment for abuse and neglected children and youth, etc. This should include the possibility of hiring qualified mental health professionals to be based in DHS regional offices to serve counties where the service population is the greatest or where gaps in services are the most prevalent, for example, in many of the rural areas of the State. Programs of this nature can offer a diverse range of services and can be structured to enable Medicaid billing to cover a majority of the staffing and administrative costs. The participation of the State Medicaid Agency should be pursued to explore further creation of these types of innovative programs along with funding arrangements.

- In cooperation with the colleges and universities in the State, MDHS and the State Board of Dental Examiners should intensify efforts to recruit dentists to provide services to children and youth in foster care, as well as to children served in their own homes through MDHS. This effort may be part of a more comprehensive approach to providing health care in rural and underserved areas of the State. A clinic approach that specializes in providing Medicaid-funded dental care to children can offer access that is currently unavailable, and there are models around the country to draw on in designing such a program.

- MDHS should collaborate with the State Medicaid Agency to pursue the possibility of exercising State options that could include an expansion of dental services to include orthodontic care for children and adolescents.

- MDHS collaborate with DMH and the State Medicaid Agency to establish additional waiver programs to expand its provision of mental health services to children who are placed in foster homes. The MYPAC program is one example of a waiver program that could also serve children residing in foster family homes at risk of entering PRTF's, thereby enabling these youth to receive needed services and remain in the community.

- MDHS should collaborate with the psychology and behavioral science programs of the State's post-secondary systems to explore the possibility of establishing internships and field placements within MDHS, providing opportunities for professional and academic advancement that includes direct services and interventions to children and adolescents in foster care.

- MDHS Regional Administrators and Area Social Work Supervisors should establish performance standards and monitoring practices that hold direct service staff accountable for documenting all assessment, screening, and service provision information in the case files and for maintaining current health records.

- MDHS incorporate specific measures and review processes within its CQI system to ensure that all initial screenings are conducted within established timeframes.

- MDHS should ensure that its Foster Care Reviews (FCR) include the evaluation of the provision of needed medical services as part of appropriate case planning efforts and timely achievement of case plan goals.

- MDHS should establish both supervisory practices and monitoring processes within its CQI system to ensure that resource parents are provided timely and accurate medical information that enables them to meet the needs of children in their care.

- MDHS should reimburse resource parents for transportation of children to all necessary appointments on behalf of the medical, dental, and mental health needs of children in their care.

- MDHS Regional Directors and Area Social Work Supervisors should ensure that direct staff provides health records, appropriate health referrals and relevant information about services/programs to youth exiting care and to parents or guardians at the time of case closure for the purpose of continuity of health care and service delivery. Part of the FCR process might include addressing this issue with resource families since the FCR reviews all cases of children in foster care each six months.

Mississippi Foster Care Services Assessments

## *Independent Living Services Assessment*

The Period 2 Annual Implementation Plan requires that MDHS conduct the following assessment:

"An assessment of the quality and array of independent living services available to foster children ages 14-20."

This is the report of our assessment and includes a review of policy, relevant program materials, interviews and focus groups with key stakeholders, a staff survey, and the review of sample of independent living cases.

## Section I: Applicable Standards and Requirements

### *MDHS Independent Living Policy*

The Foster Care Independence Act was signed into law in December 1999, with the express purpose of planning for and supporting youth in foster care. According to the Children's Bureau, "this legislation helps ensure that young people involved in the foster care system get the tools they need to make the most of their lives. They may have opportunities for additional education or training, housing assistance, counseling and other services." Among some of the listed provisions, the Foster Care Independence Act "provides for flexible funding for distribution to States through grants for program services for youth and enables youth to make better choices and accept greater responsibility for their own lives."

The MDHS has detailed policies relating to the Independent Living Services Program. Of particular interest, children aged 14 and older are required to participate in the program. Policy states "all youth must have an opportunity to participate in the Independent Living Program (ILP), without regard to the youth's permanent plan.  Refusal by the youth to participate is not a valid reason for non-participation.  Independent Living Services are mandatory and not optional for all youth in care who are at least 14 years or less than 21 years old." Policy also describes several roles and responsibilities for the caseworker and supervisor to follow in order to ensure youth are involved with this mandated program:

- When the youth reaches his/her 14th birthday, an Independent Living Plan must be completed in MACWIS.  This Independent Living Plan must include a description of all programs and services that will help the youth prepare for transition from foster care to independent living. At the youth's 16th birthday, an ISP must include a documented Transitional Living Plan (TLP) based on an assessment of the youth's needs.  The COR worker and the youth shall be involved in the development of the ISP, Independent Living Plan, and the TLP. The caseworker is responsible for carrying out the plan as established in the ISP;

- The caseworker will provide recommendations to the Youth Court Judge during review hearings that identify specific services being provided and services needed to help the youth transition from foster care to living independently;

- The caseworkers must inform the youth of all independent living activities and arrange for participation, including transportation.  The transportation plan must include who will transport the youth to all of the independent living activities;

- Caseworkers must input into MACWIS the data (life skills modules) sent from the independent living specialist, which may include the worker's professional knowledge of the youth's comprehension of life skills; and

- The supervisor is responsible for reviewing and approving the youth's ISP and TLP in MACWIS. This includes all submissions for approval under the independent living plan icon.

While there are several strengths in this policy, including requirements that the youth is to be involved in the development of the Independent and Transitional Living Plans and supervisor review, oversight and approval of all plans and requests for older youth, there are some gaps that should be noted. It does not appear to be a requirement that the caseworkers conduct any assessment prior to completing the Independent Living Plan (we do understand that the IL contractor must conduct the Ansell-Casey assessment). Without explicit requirements regarding the use of an assessment to develop the plan, there is the risk that the Department's plan will not be informed by the individual needs of the youth. In addition, there is no description of what assessment is conducted to inform the TLP developed at age 16. We did not find requirements for the service provider to be involved in the development of the plan, even though they will be predominantly working with the youth. Finally, there is no notation of a role or responsibility of caseworkers to reinforce the knowledge and skills being learned in Life Skills class with the youth during their visits.

Through funding from the Chafee Foster Care Independence Act of 1999 (PL 106-169), MDHS provides the following stipends:

- <u>Pre-Assessment Stipend (Initial)</u>: A $25 stipend is available to all youth who complete a Life Skills Pre-Assessment form.

- <u>Post-Assessment Stipend (Final)</u>: A $25 stipend is available to all youth who participate in the Independent Living Program and complete a Post-Assessment.

- <u>Life Skills Training Group Stipend</u>: A $20 stipend can be earned for the completion of ten (10) Skills Hours.

- <u>Youth Opportunity Training Stipend</u>: A $20 stipend can be earned for attending a Youth Opportunity Training.

- <u>Youth Conference Stipend</u>: A youth will receive a $30 cash stipend for successful completion of participation in the annual conference and a $200 Youth Conference Clothing Allowance prior to attending the Youth Conference.

- <u>Newsletter Stipend</u>: A $15 stipend is available to youth who submit an article, poem or other creative writing, as well as a letter to the editor, or an editorial to the State Independent Living Coordinator for consideration for publication in any MDHS publication.

- <u>Senior Year Stipend</u>: A $350 stipend is available to help defray senior/final year expenses for youth receiving a diploma, GED or a Certificate of Attendance at the close of the school/program year in which the stipend is requested.

- <u>High School Graduation Stipend</u>:  A $200 Graduation Stipend is available to all youth in custody who receive a high school diploma.

- <u>GED (General Education Diploma)/Certificate of Attendance Stipend</u>:  A $150 Stipend is available to all youth in custody who receive a Certificate of Attendance, or pass the GED (General Equivalency Diploma).

- <u>College Bound Stipend</u>:  A $600 College Bound Stipend is available to youth in care who plan to attend a post-secondary education program.

- <u>College Graduation Stipend</u>:  A $300 stipend is available for youth until their 21st birthday who complete a two-year community college, four-year college/university or full completion of a vocational program.

- <u>Start-Up Stipend</u>:  A $1000 Start-Up Stipend is available to youth who leave care after turning age sixteen (16) and who have participated in the available Independent Living Program activities.

- <u>Youth Trainer Stipend</u>:  A $20 stipend is available to youth for assisting in various training activities.  The State Independent Living Coordinator, based on recommendations from the SAILS Advisory Board, will select youth.

- <u>Aftercare Survey Stipend</u>:  A $25 stipend is available to youth upon completion and return of an Aftercare Survey.  This stipend will be paid by the contractor.

- <u>Personal Enhancement Stipend</u>:  A discretionary stipend may be awarded to a youth in custody, who has attained age 14, based on documented needs and contingent upon available funds.  The stipend cannot exceed $1,000 and must be paid to the vendor(s).

- <u>County Conference Stipend</u>:  A $25 stipend can be earned by a youth, age 14 years or older, for attending and participating in his/her FCR County Conference.

### *Olivia Y Settlement Standards*

The *Olivia Y* Settlement Agreement detailed several standards with regards to Independent Living Services:

- The Independent Living Plan is required for youth from age 14-20 to be reviewed and updated every 90 days.  DCFS directly provides, refers, contracts or otherwise arranges for needed therapeutic, educational and support services for youth in the Independent Living Program.

- There must be prompt and adequate independent living and transitional living services to youth in foster care.  The children in the ILP are supported through collaborative efforts between foster parents, parents, educators, and foster care worker.
- DCFS must ensure that youth transitioning to independence have an adequate living arrangement, a source of income, and health care.

- DCFS must provide educational and training vouchers and assistance in locating/enrolling in educational or vocational programs for youth in ILP.

- DCFS is to assist youth in obtaining documents necessary to function as independent adults.

- Youth are to be given 6 months advance notice of cessation of health, financial, or other benefits that will occur at time of transition.

- Emancipation can only be goal for 16 yrs old with court approval and ruling out all other goals.

- DCFS to ensure youth has access to at least one committed, caring adults and to cultural supports and positive peer support (this is a Federal requirement).

- Services are linked to individualized needs identified through the assessment and case plan.

- Children must receive age-appropriate education and support.  To ensure this service is met an array of educational and vocational services and resources for financial aid and housing must be available.

## Council on Accreditation Standards

A number of requirements in the *Olivia Y* settlement agreement are mirrored in COA standards, but in addition to the requirements noted above, COA standards also require the following:

- DCFS is to transfer or terminate custody and provide information about a range of services to the youth across systems.

- DCFS and family are to develop an aftercare plan in advance of case closing and identify steps for obtaining any needed services that are identified.

- Age appropriate children must receive education and support regarding pregnancy prevention, responsible parenting, and prevention of sexually transmitted diseases and assistance in obtaining medical insurance, medical records, and needed medical, developmental, substance abuse, and mental health services.

- Children are assisted in obtaining health insurance and health records in order to obtain needed substance abuse svc, medication, and medical/mental health care after discharge.

- Age-appropriate children must be involved in case plan development and signatures are required on the plan.

- Youth are to be assisted in developing social networks, meaningful relationships with caring individuals including extended family and persons with whom there was a prior relationship such as members of the child's faith community or tribe.

- Planning must place a value on the development of the youth's social support networks including mentors, community and friends.

## *Independent Living Service Provider Requirements*

DFCS currently contracts with one service provider to provide all independent living service programs to youth across the state. Their goal as it relates to ILS is 'to provide resources, education and preparation to adolescents to enable them to become fully functional citizens upon their departure from the foster care system.' They are required to:

- Provide services to youth living in foster homes, emergency shelters, group homes, relative placements, residential treatment centers, therapeutic group homes, training schools located in Mississippi and the Mobile, Alabama area.

- Distribute and announce any and all activities for the Independent Living Program, to youth placed in the designated geographic areas The contractor's staff shall serve as training and technical support for all independent living practice approaches, with an emphasis on the Ansell-Casey Life Skills Assessment on-line resource, to all placement facilities licensed by MDHS and/or who place MDHS youth that provide independent living skills activities, if requested from the facility.

- Provide resource family training in conjunction with MDHS foster/adopt staff and training unit. The contractor's staff will attend a minimum of two scheduled foster/adoptive parent training sessions per Adoption District during the contract period to increase awareness of the needs of older youth. IL specialists will contact MDHS adoption administrators to obtain resource family training calendars.

- Utilize data collected and furnished by MDHS to ensure that independent living skills assessments, based on the Ansell-Casey Life Skills assessment tool, are administered to each appropriate youth who is eligible. Provide monthly statistical reports by region and by counties to include the number of eligible youths for independent living services, the number of skills groups offered, the number of youth actually participating and the percentages of participation.

- Provide weekly and monthly activity reports that reflect unduplicated numbers of youth to whom services were given and the nature of the services.

- Develop a functioning after care program and develop and disseminate after care brochures, flyers, resource materials and other documents.

- Develop and implement events to enhance youth leadership including the development of selection criteria and providing supervision at the events.

- Increase Education and Training Vouchers (ETV) requests by 10%.

While DFCS is required to complete an independent and transitional living plan for all youth, SCSCY is also required to develop a separate independent living plan. The plan is developed

after the completion of the Ansell-Casey Independent Living Assessment/Intake process, through which the staff will learn about the youth's needs. The plan will be reassessed as necessary, and once it is signed by the worker, it is forwarded to the DFCS worker. It does not appear that the youth is involved in the development of the plan, as the program states "once the specialist establishes the ILP, he/she will discuss desired goals and objectives with the youth."

## Section III: Services and Resources

In order to best serve the youth in the state in preparing them for living independently upon transitioning out of foster care, DFCS, through the IL contractor and other vendors, offers an array of services and resources to youth, as described below from their program materials.

- *Life Skills Training Groups:*  The skills training is based on a nationally recognized curriculum approved by the agency.  Skills training are based on assessments, personal contact, the ILP and the TLP.  The curriculum contains the following components: Community Resources and Transportation, Communication Skills and Social Development, Employment, Money Management, Decision Making and Study Skills, Housing, Daily Living Skills, Self-Care, and Youth Law issues.  Additional curriculum units have been developed and added to include soft skills such as sexuality and social skills. These groups are scheduled monthly, by the Independent Living Specialists (contractor), in identified locations, throughout the State.  We understand that the complete cycle of Life Skills classes is offered repeatedly to youth in care, and that after a youth completes the first cycle of classes (s)he would start over with the classes again, going into greater depth on the same topics.  Our understanding is that a youth in care could go through the cycle of Life Skills classes four times if (s)he remained in care from age 14 through 18.

- *Youth Opportunity Trainings:* Formerly known as youth retreats, these are held throughout the State.  Some of these are open to youth ages 14-15, while others are open to youth ages 16 to their 21st birthday.  Overnight Youth Opportunity Trainings are held each year covering all geographical areas of the state.  The purpose of these trainings is to enhance the life skills learned in the scheduled skills groups discussed under the Life-Skills Training Groups section.  Additional life skills include, but are not limited to:  team building, leadership development, sexual responsibility, positive self expression, socialization, self esteem, and positive values.

- *Statewide Youth Conferences*:  These are held annually to benefit youth from ages $16\text{-}21^{st}$ birthday.  The purpose of the Youth Conferences is to reinforce the life skills presented throughout the year at the scheduled life skills training groups and Youth Opportunity Trainings.  Youth conferences include various life skill building activities and motivational speakers.

- *Computer Camp*: One computer camp will be arranged by the contractor. PREPARE staff will act as chaperones for these events. Funds have been included in the contract to cover the cost of these camps.

- *Wildlife Event*:  One wildlife event for youth 14-15 years old is held during the summer months. The event shall not exceed 30 youth.

- *Transitional Independent Living Placements*:  These are available to youth ages 18 to their 21st birthday, upon approval from the SAILS Advisory Board.  Youth 17 years of age who have obtained a high school diploma, General Education Diploma (GED), or Certificate of Completion will also be considered for placement.

- *Newsletters*:  These contain information about the Independent Living Program is provided periodically to youth statewide.  Submissions from the youth may be included in the newsletter.

- *Handbook for Youth in Care*:  The handbook is available to all youth in the custody of the MDHS who attain the age of fourteen (14) or older when entering custody.  The handbook highlights programs, services, brochures, and guideline information for the youth while in care.  This handbook is available through the county where the youth resides and in conjunction with the Independent Living Specialist (contractor) upon the youth attending their first Life Skills group session.

- *Education and Training Voucher Program*:  The vouchers help youth make the transition to self-sufficiency and to help youth receive the education, training and services necessary to obtain employment.

- *SAILS Advisory Board*:  The **S**trategies for **A**ccessing **I**ndependent **L**iving **S**ervices (SAILS) is an advisory board composed of the State Independent Living Coordinator, MDHS staff members from each of the regions in the State, the contracted Program Director, Mississippi Board of Choctaw Indians representatives, stakeholders, and youth leaders.  The Board meets monthly to help in the decision making for recommendations of the Independent Living Program services.

- *HOPE Forum*:  The **H**elp **O**urselves **P**rosper **E**qually (HOPE) is a youth advisory group, which consists of members who are participating in the Independent Living Program.  Meetings are held at least once a quarter for the youth to discuss improvements or challenges with the Independent Living Program.

- *Aftercare Services (the PREPARE program)*:  These services are available to youth who leave care on or after their 18th birthday.  Special financial assistance will be provided for youth ages 18 until their 21st birthday who left custody on or after attaining age 18.  These services are available to youth in crisis who need additional temporary assistance to continue in the process of transitioning towards self-sufficiency.  The benefits can be distributed quarterly as long as the youth remains in crisis.  These services may include rent deposits, rent, utility payments, food and household supplies and child care.  Payment must be made to the vendor and receipts kept in the county agency file.

- *Big Brothers and Big Sisters of Mississippi:*  This mentoring program is available to youth in care ages 14-16, in selected areas of the State.

We understand that a provision in the current IL contract is for the contractor to recruit and link 18 mentors with youth in foster care statewide, but that has not been achieved at this point.  Given the Federal requirements that youth exiting foster care have a significant connection with

Mississippi Foster Care Services Assessments

at least one caring, committed adult, we are concerned first that the mentors are not in place and also that the number required is very low compared to the volume of youth potentially needing this service.

## Section III: Current Practice

### A. Staff Survey

Older youth face several challenges in foster care, especially as it relates to finding an appropriate placement to meet their needs in the least restrictive and most supportive environment possible. According to the survey that was completed by staff throughout the State, over 57 percent of the respondents indicated that they have the most difficulty in finding appropriate placements for  teenagers, as opposed to other age groups of children.  They also noted concern with being able to provide appropriate supportive services, particularly transitional and independent living services to help prepare older youth for their transition into adulthood.

| Please rate your perception of your agency's effectiveness in the following areas of practices: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Some times | Frequently | Almost Always | No Info/NA | Total |
| Tailoring IL and transitional living services to youth in care: | 1 (0.57%) | 16 (9.2%) | 34 (19.54%) | 47 (27.01%) | 50 (28.74%) | 26 (14.94%) | 174 |
| Availability and accessibility of services to transition children into adult services systems when appropriate: | 3 (1.73%) | 23 (13.29%) | 34 (19.65%) | 44 (25.43%) | 41 (23.7%) | 28 (16.18%) | 173 |

As indicated in the chart above, when asked about DFCS' performance in tailoring and individualizing independent and transitional services to youth, just over half (about 56 percent) indicated that the Department was frequently or almost always effective. Just under half (about 49 percent) indicated that DFCS was frequently or almost always effective in accessing services to assist in transitioning children into adult service system when needed.  One respondent in particular noted when asked about barriers to individualizing services to youth that the Independent Living program needs to work on individualizing their services, particularly not focusing quite so much on abstinence. We also heard this comment in other forums.

Another important way to support the transition of youth in care to adulthood is through involving them in case planning, to ensure that they are engaged and agree with the plan to support them and teach them the skills they need for independence.   As indicated in the chart below, just over half of the survey respondents indicated that DFCS was frequently or almost always effective in involving age-appropriate youth in developing case plans (about 58 percent) and in reviewing, updating, and revising case plans (about about 57 percent).  Respondents indicated slightly more effectiveness in using caseworker visits to involve youth in case planning and decision making (about 65 percent rated this frequently or almost always

Mississippi Foster Care Services Assessments

effective), using information from youth to guide case planning and decision making (about 63 percent frequently or almost always effective), and in using information from youth to identify the services they need for successful transitions to adulthood (about 62 percent frequently or almost always effective).

| Please rate your perception of your agency's effectiveness in the following areas of practices: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Some times | Frequently | Almost Always | No Info/NA | Total |
| Involvement of age-appropriate children and youth in developing case plans: | 0 (0%) | 16 (9.64%) | 35 (21.08%) | 40 (24.1%) | 57 (34.34%) | 18 (10.84%) | 166 |
| Involvement of age-appropriate children and youth in reviewing, updating and revising case plans, goals, and services: | 0 (0%) | 13 (7.78%) | 40 (23.95%) | 44 (26.35%) | 52 (31.14%) | 18 (10.78%) | 167 |
| Use of caseworker visits with children and youth to involve them in case planning and decision making (frequency and quality of visits): | 0 (0%) | 5 (2.99%) | 36 (21.56%) | 46 (27.54%) | 62 (37.13%) | 18 (10.78%) | 167 |
| Use of information/requests from age appropriate children and youth to guide the development of the case plan, select services, and establish goals: | 0 (0%) | 10 (5.99%) | 32 (19.16%) | 43 (25.75%) | 62 (37.13%) | 20 (11.98%) | 167 |
| Involvement of youth in identifying services and supports they need to transition to adulthood: | 0 (0%) | 13 (7.98%) | 26 (15.95%) | 48 (29.45%) | 53 (32.52%) | 23 (14.11%) | 163 |

## B. Focus Groups and Interviews

We conducted several focus groups and key stakeholder interviews across the State to obtain first-hand information to inform the independent living services assessment. Among the focus group and interview participants were social workers, supervisors, Regional Directors, resource parents, individuals who directly work with the independent living program, and youth in foster care. Comments made in several of the focus groups directly relate to the independent living services program and its effectiveness in supporting older children in care and preparing them for adulthood. All youth who participated in the focus groups indicated that ILS a good program and they had all been informed about ILS by their caseworker. The one common complaint about the program from the youth related to the money received, with nearly all youth indicating that it took too long to process the payments. The youth also indicated that their caseworkers talked about the same things over and over again when they saw them, and that the youth would like more one-on-one visitation with their caseworker.

Other focus group participants had many positive comments about the program while noting some key areas that needed improvement. One focus group in particular noted that independent living services were effective in assessing and identifying the strengths of youth in care. Other focus groups commented that the services are particularly helpful for receptive youth, assist in helping children attend college, and cover general issues important in adulthood. Key informant interviews supported these claims, while adding that not only do the IL skills class workers relate well to the children and the retreats and conferences in particular are of high quality. However, several gaps were also identified. Some groups noted that the IL program is more classroom-based and not reality-based, and that even after completing the program, youth are not prepared for independent living.  Another theme noted in focus groups was the stipends received by youth for attending. Several participants indicated that youth are less receptive to the meetings and services offered through IL, but more interested in the money received.

The standardization of the program offered and of the Like Skills curriculum was the subject of several comments. Interviews indicated that there is little to no individualization of the skills classes provided, but that all the youth, regardless of their individual circumstances, go through the same regimen of Life Skills classes.  There are opportunities for some school and extra-curricular or employment activities to serve as a substitute for attending the classes, but we could not identify any tailoring of the actual IL services offered to individual youth.  Some interviewees noted a need to be able to offer the classes more flexibly to the youth who could benefit from them the most and to take a different approach with youth whose needs or developmental levels are different.  We also heard concerns raised about repeating the Life Skills classes and requiring youth to attend the same cycle of classes again.

In other focus groups, we received mixed reviews of the ILS program. For example, all resource family participants who had children in the age group stated those youth had been served. Some resource families indicated that the independent living services are helpful, but many indicated a need for more practical skills training for the youths, such as shopping at the grocery store, parenting skills and balancing a check book. Key informant interviews also revealed a need for resource parents to be trained on the skills needed for youth to successfully transitioned into adulthood. This is particularly interesting, as per policy and contract, resource parents are supposed to receive this training. In addition, some focus group participants indicated that the IL program did not do enough to reinforce the importance of education for youth, and requested that counselors encourage the youths to stay in school, go to a vocational school or get a GED. Several interviewees and focus group participants noted the lack of youth involvement in the development of plans.

Several focus group participants and individual interviewees commented on the lack of coordination between MDHS and the ILS service provider. The assessments, which are conducted by the provider, may not be shared with MDHS, and MDHS may not be requesting copies of them. In addition, MDHS and the IL provider each develop separate IL and TL plans which may not be shared with one another consistently. This lack of coordination highlights a significant concern, as there may be issues not being addressed with youth and each agency may assume the other is addressing a specific need.  We heard from some participants that with the contract in place, MDHS staff do not consistently take an active role in addressing IL issues with the youth in their caseloads but, rather, leave it to the contractor to address.

Another common area of concern noted in several focus groups was the over-emphasis on abstinence in the IL program. Considering that some of the youth already have children, there were concerns about the relevance of this emphasis in the curriculum as opposed to addressing the issues these youth are currently facing.

## C. Case Reviews

In addition to the survey and focus groups/interviews, we conducted a random sample of 30 MACWIS case reviews on youth who were receiving some form of independent living service, the results of which will be described in the first section below. In addition, we randomly selected 10 of the 30 cases, and conducted a case review from the service provider files for the purpose of comparing the information obtained by each party, which is described in the second section.

### MACWIS Case File Findings

We reviewed the MACWIS cases of 30 randomly selected youth in foster care between the ages of 14-20 for the presence of independent living services. The following represents some of the major findings from the MACWIS case reviews (note that these are the MDHS case files, not the files of the contractor).

- The average age of the youth in the case review was 16, and they had been in care an average of 2.2 years.

- Over the 30 cases, a total of 63 independent living services were received by the youth, as follows: 30 (47.6 percent of all services) Life Skills Classes or IL Hours Stipend; 11 (17.5 percent of all services) Youth Conferences; eight (12.7 percent of all services) other; seven (11.1 percent of all services) Youth Retreat; six (9.5 percent of all services) County Conference Stipends; and one (1.6 percent of all services) Educational Training Vouchers.

- In 96.7 percent of the cases (29 out of 30 cases), services were not connected to the identified needs of the child or there was either not enough information to determine the link between services and needs. Of the 63 IL services noted, in 44 (69.8 percent) services there was not enough information available to determine if the services met the needs of the child, with reviewers determining that the services met the needs of children in 15 (23.8 percent) of the services provided.

- In all of the MACWIS cases reviewed, it was unclear whether an Ansell-Casey Life Skills Assessment was conducted, and whether that information was used to develop the case plan.

- In four of 30 cases (13.3 percent), the child was involved in the development of either the MDHS or the service provider case plan. There was not enough information to determine their involvement in the remaining cases.

- It was unclear, based on the documentation in MACWIS, how frequently children attended ILS classes and what was involved in those classes.

Mississippi Foster Care Services Assessments

- ILS and Transitional Living (TL) plans were minimally completed, and several were completely blank. Of the TL plans that were completed, much of the information tended to reflect the current circumstances of the child, or goals that would not be realistically obtained by children. For example, one plan noted SSI/SSA and family gifts as the financial plan for the child, which did not address emancipation, and the planned living arrangement plan was to live with family though it appeared from the narrative that the child had minimal if any contact with their relatives.

- In a couple of cases, there were instances where the child routinely expressed interest in or asked questions about educational, vocational or employment opportunities that did not appear to be followed through by the caseworker according to the case documentation.

### Service Provider Case File Comparison

In addition to reviewing 30 MACWIS cases reviewed, we identified ten of the 30 cases randomly and reviewed the IL contractor's files for those ten children using the same case review protocol as for the MACWIS case reviews. We then compared the findings of the MACWIS reviews and the contractor's file reviews for those ten children. The table below represents the comparison of findings for those ten youth.

|  | Service Provider's File | MACWIS file |
|---|---|---|
| Did the child regularly participate in services? | 5-Yes<br>5-No, Not Enough Info | 2-Yes<br>8-No, Not Enough Info |
| Did the child complete services? | 0-Yes<br>10-No, Not Enough Info | 1-Yes<br>9-No, Not Enough Info |
| Were the services connected to the needs? | 7-Yes<br>3-No, Not Enough Info | 0-Yes<br>10-No, Not Enough Info |
| Was the child involved in the development of either case plan? | 0-Yes<br>10-No, Not Enough Info | 0-Yes<br>10-No, Not Enough Info |
| Were there any apparent services not identified in the case plan? | 1-Yes<br>9-No, Not Enough Info | 4-Yes<br>6-No, Not Enough Info |
| Were there any apparent needs for which services were not provided? | 3-Yes<br>7-No, Not Enough Info | 4-Yes<br>6-No, Not Enough Info |

While there are some questions where similar information was found in each case file, it is clear from these varied responses that each entity, while serving the same youth, are either operating with different information and perspectives or that both are not documenting information in the files. This concern was reconfirmed when we compared the qualitative responses between the two sources of information, as follows:

- Neither the MACWIS files nor the contractor's files documented the impact of the IL service on the youth or whether it in fact met the needs of the youth. For example, in one case the MACWIS IL plan noted the youth was attending Life Skills classes regularly and gaining general skills to help support independence. However, the service provider file noted that the child had attended three Life Skills classes in the last three months, all of

Mississippi Foster Care Services Assessments

which occurred prior to conducting the Ansell-Casey Life Skills Assessment which is conducted once annually in August.

- From the responses above, we were able to determine from the contractor's files that more needs of the youth were connected to the services, whereas we could not determine that from the MACWIS files.

- We did not find thorough case plans in either the MACWIS files or the contractor's files, nor could we identify coordination between the two plans. The MACWIS IL plans we reviewed were not routinely completed, and often only seemed to indicate which sections of the IL curriculum the youth had completed. The service provider plan appeared to be more of a checklist that notes the child's competency in each area of the curriculum. We could not identify documentation in either of the plans about the particular skills the youth needed and what are other areas that needed to be addressed.

## D. Monitoring

### DFCS Monitoring

#### MACWIS Reports

MACWIS has two tickler systems relating to independent and transitional living services. First, MACWIS has a tickler system which notifies caseworkers when a child in their caseload reaches age 14, so they will know when to refer children to ILS provider. Second, the State Office director of ILS receives a monthly report from MACWIS of all eligible children who are not receiving ILS. Those children are then referred to the ILS service provider to determine why they are not receiving services and to contact them if needed for services. The receipt of services is defined as having attended at least one Life Skills class during the reporting period. The IL coordinator reported to us that the Department has about a 96 percent rate of reaching and involving youth in the program.

#### Foster Care Reviews

In addition to MACWIS reports, certain issues pertaining to older youth and the Independent Living Program are monitored through the Foster Care Reviews (FCR), as detailed in the table below. The percentages listed represent the percent of all cases cited for an issue in the FCR that are cited for that particular issue.

| | Percent of Cases Cited | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | YTD Total |
| Issues cited related to children with a plan of Living Independently or Long Term Foster Care for which other permanent plan options have | 1.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 1.2 | 1.4 | 0.0 | 3.2 | 0.0 | 0.6 |

Mississippi Foster Care Services Assessments

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| not been considered and ruled out. | | | | | | | | | | | | |
| Issues cited due to a lack of Independent Living/Transitional Living services being provided to eligible youth in state's custody. | 6.4 | 8.3 | 5.8 | 7.5 | 6.6 | 10.3 | 7.3 | 2.8 | 8.5 | 12.9 | 6.6 | 7.4 |
| Issues cited due to children for whom there is no evidence they have received allowances they are eligible for. | 10.6 | 16.7 | 12.6 | 21.5 | 16.5 | 3.8 | 15.9 | 16.9 | 15.5 | 21.0 | 13.1 | 14.8 |

Very few cases (0.6 percent YTD) during the FCR in the past year have been cited for issues concerning the permanency option of Living Independently or Long Term Foster Care without ruling out all other permanency options. The FCR found that of all issues cited, 7.4 percent were cited for eligible children not receiving independent or transitional living services. This is a relatively high percentage, considering that the only cases for which this issue can occur are children age 14 and older, as opposed to the entire child welfare population having FCRs. While 14.8 percent of all issues cited relate to no evidence of children receiving all of the allowances they are eligible for, this may include the older youth population not receiving various stipends, as well as younger children, who receive allowances for their birthday as well as other allowances.

### *Provider Monitoring*

The service provider contracted to provide Independent Living Services also monitors the provision of IL services. According to program materials, eligible youth are identified and tracked by data collected by MDHS and a computer based tracking system maintained by the contractor. The identification of eligible youth will be determined from information in the MACWIS information system maintained by MDHS and submitted to program staff on a monthly basis. This information will be utilized to allow youth to receive services more promptly rather than relying upon the MDHS county social worker to provide a notice that a youth has entered care. The tracking system will also be utilized to track youth serviced and to enable staff to submit monthly and annual data to MDHS. It is unclear how successful this tracking program is, or if MDHS has conducted a comparison of tracking information maintained by MDHS and the contractor.

## Section IV: Findings and Recommendations

### *Findings*

Based on the foregoing assessment, we have made the following findings regarding the Independent Living Program:

Mississippi Foster Care Services Assessments

- The youth we spoke to who have participated in the program indicated they enjoy the program.

- Caseworkers are consistent with policy in informing youth about the Independent Living Program and encouraging them to participate.

- There are indications that the program is reaching most of the youth in foster care.

- Contracting with one agency can be beneficial, not only in developing a close rapport with one provider, but to ease MDHS' ability to provide oversight and monitor the work being done.

- We did not get the sense that the MDHS caseworker consistently reinforces the skills being taught by the service provider in the IL classes or that they consistently address IL issues with youth in their caseloads but, rather, defer to the contractor.

- Both the contractor and the Department appear to be developing IL plans for youth and we did not find indications that either of the plans was individualized to the strengths and needs of the youth, that they addressed key concerns related to achieving independence, or that they were coordinated with each other.  In fact, the plans seem to be minimally completed.  In the case of the MDHS plans, we did not find evidence that they were based on the findings of the Ansell-Casey Life Skills Assessment or other assessments.

- We could not find evidence that youth are actively involved in the development of either plan.

- The IL services offered are standardized and there appears to be little flexibility in the contractor's ability to tailor individual services to the strengths and needs of youth as opposed to offering the same Life Skills classes to all youth.  We believe that this may be a contracting issue, in which the program requirements for the program are standardized in the contract requirements.

- Although the current contract calls for the contractor to identify 18 mentors for youth statewide, we do not believe that has occurred.  Even so, 18 mentors would not begin to address the needs of the many youth in care in need of this service.

### *Recommendations*

- We recommend that the contract for independent living services be modified substantially as follows:

  - The contract should permit and require diversity in the range of IL services provided, rather than requiring a standard curriculum for all youth as the core service.  While we recognize the importance of the Life Skills classes, we particularly recommend that a repetition of the classes not be required and that classes be designed and tailored to individual youth's needs, strengths, level of development, and interests.

  - We recommend that the contract include the flexibility and requirement to offer a broader range of services that are identified for individual youth through the Ansell-

Casey Life Skills Assessment and the MDHS comprehensive strengths and needs assessment (when this is implemented by MDHS).

- We recommend that resource family training be modified to include content on the roles and responsibilities, and the skills needed, of resource families to assist youth in their care work toward independence and transition to adulthood. MDHS should create the expectation that resource parent involvement in IL service delivery and planning is a part of the role of foster parenting for youth.

- We recommend that MDHS staff training be strengthened to address the complementary roles and responsibilities of MDHS staff and contractor staff with regard to addressing independent living for youth in care. In particular, the training should emphasize a proactive and involved role for MDHS staff that reinforces skills taught by the contractor, uses caseworker visits to address IL issues, actively engages youth in planning for independence and adulthood, and addresses the connections that youth need upon leaving foster care, such as relationships with mentors and/or families and at least one caring committed adult. The training should prepare MDHS staff to address aftercare planning and linking discharged youth with the appropriate array of services. A practice guide for MDHS staff in this area would be helpful.

- We recommend an increased emphasis on the recruitment and linking of mentors with youth in foster care. Both the Department and the contractor should be held accountable for ensuring that each youth exiting foster care is linked with at least one caring committed adult that will help the youth transition to adulthood beyond foster care. This should be a part of the contractual requirements and an item for monitoring casework practice.

- We recommend that the case planning process for youth in care be strengthened in several ways, as follows:

  - First, there should be one IL and one TL plan for each youth rather than separate plans developed by the contractor and the Department;

  - The plans should be developed in accordance with the principles of the child welfare practice model that will be implemented by MDHS which includes active involvement of the youth and the youth's significant family members and providers, including foster caretakers, in developing the plan; the plan should result from a comprehensive strengths and needs assessment which includes the Ansell-Casey Like Skills Assessment; the services in the plan should be clearly connected to the youth's strengths and needs and developmental level and capacity; and the plan should be reviewed routinely and updated as needed as the youth's needs change.

  - The plan should be developed in the context of a Family Team Meeting with the contactor and the Department working together with the youth and other participants to develop the plan.

- We recommend that MDHS develop and implement communication protocols for the contractor and MDHS staff to meet routinely with the youth to discuss progress toward goals, the effectiveness of services, emerging or changing needs and strengths, and critical issues to the youth's independence such as aftercare planning and needs for services, relationships with family and other individuals, and so forth. All meetings and discussions with the youth should be clearly documented in the MACWIS case file.

- We recommend an increased emphasis and accountability for sharing information between the contractor and MDHS staff, particularly as it relates to sharing the Ansell-Casey Life Skills Assessment and other information that pertains to serving the youth in care.

- We recommend that supervisory protocols and CQI processes (when implemented) address the quality and documentation of case plans for youth in care, the existence of and use of assessment information in developing plans, the youth's involvement in developing the plans, the individualization and provision of services, after care planning, and linking youth with caring committed adults.

- We recommend an increased emphasis and accountability on case file documentation of key activities, plans, assessments, and service provision for youth in care.

Mississippi Foster Care Services Assessments

## *Recruitment and Retention Assessment and Placement Assessment (Combined)*

The Period Two Implementation Plan of the Mississippi Settlement Agreement and Reform Plan requires a foster care services assessment be completed that includes:

"A recruitment and retention assessment to determine the need for additional foster care support services."

"A placement assessment of current needs for achieving compliance with the placement standards set forth in Section II.B.5 of the Settlement Agreement, which shall include (1) the structure of the placement process, including the role and efficacy of the state office placement unit; (2) the services and supports available to support enhanced placement stability, including out-patient or in-home assessment and treatment services to avoid the frequent use of time-limited assessment and treatment placement programs; and (3) the placement resources needed to meet the placement needs of children in custody."

This report provides the findings of our assessment in this area, which includes a policy and standards review, a staff survey, interviews, focus groups, and case reviews.

## Section I:  Applicable Standards

The *Olivia Y* settlement agreement includes a number of requirements applicable to this assessment, as follows:

- DFCS shall make available, either directly or through contract, a sufficient number of appropriate placements for all children in its physical and legal custody.

- DFCS shall make available foster parent training classes beginning every 60 calendar days in every region with individualized training available as needed, at times convenient for the foster family.

- DFCS shall secure services for foster parents to prevent and reduce stress and family crisis.

- DFCS shall ensure that all licensed resource families (regardless of whether they are supervised directly by DFCS or by private providers) receive at least the minimum reimbursement rate for a given level of service as established pursuant to the Plan.

- Placements are to be made in the least restrictive setting which can meet the needs of the child identified in a comprehensive assessment.  In order of consideration, this means placement with relatives, foster care home within reasonable proximity to the child's home community; foster care home outside of the child's home community; group home care; or institutional care.

- Each child shall be placed within his/her own county or within 50 miles of the home from which he/she was removed.

- Children with special needs shall be matched with placement resources that can meet their therapeutic, medical, and educational needs.

- DFCS shall ensure that each county office has access to the placement specialist within its region having the ability to ascertain the placement resources available and their suitability for each particular child needing placement.

- Siblings who enter placement at or near the same time shall be placed together, unless certain circumstances are present.

- No child shall be placed in more than one emergency or temporary facility within one episode of foster care, unless an immediate placement move is necessary to protect the safety of the child or others as certified in writing by the Regional Director.

- No child under 10 years of age shall be placed in a congregate care setting (including group homes and shelters), unless exceptional needs are present which cannot be met in a family home setting, with Regional Director approval.

- Foster homes cannot have more than 3 foster children in the home, for a total of 5, (including foster, biological and adoptive children). No more than 2 foster children can be under the age of 2 or have therapeutic needs.

- No later than at the time of placement, DFCS shall provide foster parents or facility staff with the foster child's currently available medical, dental health, educational and psychological information, including a copy of the child's Medicaid card. DFCS shall gather and provide to foster parents and facility staff all additional information within 15 days of placement.

- No foster child shall be moved from his/her existing placement to another foster placement unless DFCS specifically documents in the child's case record justifications for that move and the move is approved by a DFCS supervisor.

- DFCS shall take all reasonable steps to avoid the disruption of an appropriate placement and ensure placement stability for children. If a caseworker has knowledge that a placement may disrupt, the caseworker shall immediately convene a meeting with the DFCS supervisor, the foster parents, and, if appropriate, the child to determine the following: the cause of the potential disruption; whether the placement is appropriate for the child; whether additional services are necessary to support the placement; whether the child needs another placement; and, if another placement is necessary, what that placement should be.

MDHS is pursuing accreditation through the Council on Accreditation (COA), which also has a number of standards applicable to this assessment, as follows:

- A sufficiently diverse group of foster families is recruited, prepared, and supported to meet the needs of the children in care, and their families.

- Recruitment and training efforts involve key stakeholders including, foster care alumni, current foster parents, foster care workers, community leaders, and other organizations in the community.

- Recruitment efforts are planned, implemented, and evaluated to ensure a suitable family is available for each child entering care.

- The agency determines the appropriate amount of mandatory pre-service and in-service education necessary to ensure that foster parents understand the agency's mission, philosophy, goals, and services; the needs of abused and neglected children; how to integrate the child into the family; the importance of culture and ethnicity for children and their families; the partnership role foster parents play in supporting the family; how to assist with visitation; sensitive and responsive practices to use with biological parents; and the use of foster care as a temporary intervention.

- Foster parents receive pre-service training on rights and responsibilities including specific duties of foster parents; identification and reporting of abuse and neglect; reimbursement for services and compensation for damages caused by children placed in the home; notice of and participation in any review or hearing regarding the child; complaint procedures; and circumstances that will result in closing a home.

- Foster parents are trained in basic first aid, medication administration, CPR, recognizing and responding to child behaviors that jeopardize health and well-being, and medical or rehabilitation interventions and operation of medical equipment required for a child's care.

- Foster parents sign a statement agreeing to refrain from the use of corporal and degrading punishment, and receive initial and ongoing training and support to promote behavior and use appropriate discipline techniques.

- Each foster family develops or uses the agency's protocols for responding to emergencies including accidents, run-away behavior, serious illness, fire and natural disasters.

- The agency provides opportunities for peer support among foster parents.

- Foster parents have access to services to prevent and reduce stress and family crisis including child care, respite care, counseling, and recreational activities.

- Each foster family receives an annual evaluation to identify areas of strength and concern, and a plan is developed to address needs for support or training.

- Foster children are placed with foster families who can meet their needs for safety, permanency, stability, and well-being.

- All foster homes are licensed, approved, or certified according to state or local regulation.

- A process that examines child and caregiver characteristics, strengths, needs, and resources is used to identify the most suitable, safe, and nurturing home for the child.

- A placement that can meet the child's needs is selected in accordance with the following priorities with siblings, with kin, or with a family that resides within reasonable proximity to the child's family and home community.

- Indian children are placed according to the placement preferences specified in the Indian Child Welfare Act.

- The home environment is considered when identifying a family for the child, and foster care homes have no more than: five children with no more than two children under age two; or two foster children with therapeutic needs.

- Placement moves are prevented to minimize trauma through supporting the child during the removal and placement process; avoiding the use of cyclical placements and minimizing other planned or administrative disruptions; providing child-specific information to the prospective foster family; arranging opportunities for the child and prospective foster family to meet when possible; and responding proactively to challenges associated with placement and assessing the need for services or placement changes.

- Children that experience multiple placements receive additional supports and services to improve stability and well-being, including sufficient advanced notice prior to a placement move to plan for and support the child through the transition; identification of new foster parents with suitable skills and characteristics to meet the child's needs or referral for temporary placement in treatment facility when the child's needs cannot be met in a home setting; and assessment and referral to additional therapeutic or other needed services.

Finally, DFCS policy on foster care services contains the following information on these matters as follows:

- Recruitment methodologies include but are not limited to using the media, including the internet, to create a positive perception of the Agency and to create public awareness about the need for foster parents; contacting one public group a month in each region to inform them of criteria to become a resource family; engaging existing resource families as part of the recruitment process; engaging the faith community; engaging the business community; engaging existing agency staff; working closely with a child or his/her family to identify a family resource already connected to the child by kinship or other established relationship; and using recruitment packets.

- Each region will develop a recruitment plan that will be reviewed and modified quarterly as needed. In addition, Resource Family Placement Committee meetings will be held on a regional and statewide basis to identify potential families from the approved pool of available resource homes and the need for child specific recruitment.

**Mississippi Foster Care Services Assessments**

- Applicants to be resource parents are required to attend 15 hours of pre-service training, focusing on the following areas: team work and the children served; separation and attachment; developmental stages; behavior management; and permanent connections.

- Resource parents sign a statement agreeing not to use corporal punishment with children.

- Resource parents are required to obtain 5 hours of in-service training per year. (Foster Parent Support Groups, available statewide, offer in-service training hours.)

- Recertification of a resource home is done every 3 years. (Two memoranda were issued in the fall of 2008, stating resource parents will be re-certified annually. No policy has been issued which addresses this.)

- Resource homes can provide foster care for three children, and can have no more than five children in the home, including their biological or adopted children, and no more than two children under age two, or who have therapeutic needs. (Exceptions can be made for sibling groups).

- Retention is a result of having a strong agency staff, birth family and resource family relationship. Resource families continue to provide care if they believe that they are a vital and respected part of the team.

- The child should be placed in the least restrictive setting. In order of consideration, this means placement with relatives or tribal members, resource family home, group home and institution.

- The child must be placed in close geographical proximity to his/her parents' home. MDHS considers close geographical proximity to be within a fifty (50) mile radius of the child's original home.

- Siblings should be placed together and if they are not, diligent efforts must be made to place them together as expeditiously as possible. Siblings not placed together need to have regular contact.

- Prior to placement, the worker shall share the following information with the resource parents or staff of a group facility: child's name and date of birth; current medical and dental health, existing illnesses, medications, dates of medical or dental appointments, special care needs, and psychological information; education; reason for placement; permanent plan; and visitation plan with birth family.

- Following the decision to place the child, if possible, at least one pre-placement visit of the child to the resource home or child caring facility should be arranged.

- Prior to placement, the worker shall identify information such as the child's daily routine, preferred foods and activities, needed therapeutic or medical care, allergies, cultural practices and educational information.

- The worker shall explain to the child about why he/she is in care; the worker's role in the process; placements for siblings (if siblings have separate placements); feelings of separation and loss; and the visitation plan with the biological family, including siblings.

- On the actual date of placement in a resource family home, the worker should take a copy of the Court Order, Medicaid card, and other personal belongings to the resource home. Arrangements must be made for initial clothing by giving the resource parents a purchase order or by making some other arrangements. Efforts shall be made to provide the foster child with a significant toy or other personal item from his home.

## Section II:  Current Recruitment Efforts

The following sources were used to obtain information about the current efforts to recruit resource families:

- Focus groups with county staff, ASWSs, Regional Directors, resource ASWSs, resource workers, and resource parents.
- Staff Survey
- Interviews with State Office staff

Information from all of these sources agreed there are not enough placement resources for the children entering care.   Some comments suggested that the State Office's primary foster care role is processing referrals for therapeutic placements as opposed to recruiting and other foster care responsibilities.

There was confusion among some county staff about who is responsible for recruitment, with some staff indicating the resource units were primarily responsible for recruitment of resource homes and others indicating that everyone is responsible for recruitment.  County staff indicated that the best recruitment tool is current foster parents and word of mouth in the communities. Some resource workers go to special events in the community, such as festivals and church functions, and some speak at churches or club meetings.  Occasionally, county workers will assist the resource worker in attending a special event to recruit foster parents.

There is a toll free line in the placement unit at State Office that was originally installed for potential adoptive applicants to inquire about adoption or to respond to child-specific recruitment.  The person who answers the line obtains basic information about callers who are interested in foster care and/or adoption, then routes the information via MACWIS to the county office, instead of referring them to the resource supervisor in the regional office.

We could not identify a consistent approach to handling initial inquiries from people interested in becoming resource families.  When a call comes in to the county office, the intake workers may tell the caller to contact the resource worker and may or may not pass the inquiry along to the resource worker or enter the information into MACWIS.  When the resource workers receive a message about an inquiry call, instead of calling the applicant to discuss their interest, a packet of information is mailed out which includes the schedule for the pre-service training required of all applicants.

There has also been a shortage of resource staff in some areas and applications are backed-up, as many as 150 in one county according to some comments. Staff sees the hiring of additional

resource supervisors and resource workers as a positive sign that more recruitment will occur, resulting in more resource homes being available for children entering care.

A concern voiced in some of the groups was the issue of the roles and responsibilities of the county worker and the resource worker. Some comments suggested that following licensure, the county workers believe they have responsibility for the resource homes and have concerns about resource parents discussing with the resource worker issues pertaining to the children in their care, such as not having received a clothing allowance, a Medicaid card, or a board payment. Other comments indicated concerns about the level of respect shown to resource families by county staff. Most of the comments we received indicated a need for more clearly defined teamwork, roles, and responsibilities between county workers and resource workers, and for a clear delineation of responsibilities for recruiting resource families.

## Section III:  Current Structure of the Placement Process

DFCS Policy outlines the following array of placement resources:

- *Emergency Shelters:* These are short term (45 day maximum) interim placement resources, designed to provide time to evaluate the home situation and to work with the family for the immediate return of the child; to identify and evaluate relative resources; and gather information about the child to ensure a more appropriate foster care placement if this becomes necessary.

- *Relative Resource Home:*  These are placements with the child's extended family. The family and the physical environment must have a safety assessment and a criminal background check prior to the child being placed in the home.  The relatives become licensed as a resource home within 60 days of placement.

- *Resource Family Home:* This is the home of a person or family group, unrelated to the children placed there, which is licensed by DFCS for the temporary care of children. Resource parents receive a board payment for caring for the child.

- *Emergency Resource Home:*  This is a home designated for short-term care for children who come into care on an emergency basis.  The resource parent receives a per diem payment for each child placed in the home.  An emergency resource home shall be prepared to accept a foster child, according to the capacity and terms of the Resource Home License, 24 hours per day, 7 days per week, and shall not refuse a placement if space is available and the child is appropriate for the home.  An emergency foster parent shall transport the child for medical examinations, psychological testing, counseling, DHS approved visitations and any other services needed to assist the worker in making appropriate assessments for permanent placement.

- *Therapeutic Resource Family Home:*  This is a home designed to care for children with severe behavioral, emotional and psychological impairments.  The therapeutic resource home shall receive a comprehensive therapeutic rate based on the child's special needs.  No more than one special needs child can be placed in these homes.  Workers must visit these homes a minimum of two times per month.  Placement must be approved by State Office staff.

- *Respite Resource Family Home:*  These homes provide short-term care for a child whose regular foster parents need a break from the day-to-day care of the child.

- *Licensed Child Caring Facility:*  These are staffed 24-hour residential care facilities where children are in care apart from their parents, relatives, or guardians.  These facilities are subject to licensure certification.

- *Institution:*  This is a 24-hour facility for the care and confinement of individuals with disabling conditions such as mental, physical, and emotional handicaps which provides therapeutic or medical services to enhance the quality of life for the individual in a restricted setting.

- *Resource Home (Adoptive):* These resources are only for children who are free for adoption or whose goal or concurrent plan is adoption.

- *Special Needs Resource Home:*  These homes provide care and services for children with special medical needs.

Information about the current structure of the placement process was obtained from the following sources:

- Staff Survey
- Interviews with Placement Unit staff in State Office
- Focus groups with county workers, county ASWS's, Regional Directors, resource ASWS's, resource workers, and resource parents
- Interviews with private agency placement providers

### Focus Groups and Interviews

Comments from most of the focus groups indicated that when a child comes in to care, the worker calls licensed resource homes in the county until a vacancy is located, and that a vacancy may not correspond to the needs of the child or license limitations regarding age or sex of children desired.  Commenters suggested that young children with permanent plans of reunification are often placed with families who want only to adopt, and these families may be resistant to making the efforts for visitation with the birth family.  Some comments indicated that county workers often know little about a child entering care and are not able to obtain information until the child has had medical and psychological assessments completed.  Some counties utilize emergency shelters when a child first enters care so the assessments can be completed, clothing purchased, and some thought given to the most appropriate placement for the child, based on the assessments. We also heard that acute residential care is often used as a short-term placement because the county does not have a resource home available.  These placements are used to buy time to find a placement resource, and these referrals are not required to go through State Office.

A number of commenters raised concerns about the referral process for therapeutic group homes and therapeutic foster homes.  These referrals are required to go to the placement unit in the State Office.  From our interviews, the process used by the placement unit begins when they receive

the referral from the county worker with a psychological evaluation recommending therapeutic services, (the psychological assessment can be no more than one year old). The unit sends the referral to all group homes and agencies which provide therapeutic care for the age and sex of the child being referred. The placement resources respond directly to the county worker. If there is no response, the assumption is made that the resource is not interested in the child. Either the county worker or the placement agency notifies the State Office staff of the date of placement so an authorization for payment can be initiated.

We heard a number of concerns about this process, including the following:

- A number of commenters indicated that they receive no assistance from the placement unit other than sending out the referrals to all the therapeutic resources without regard for the type of therapeutic resource that might be most appropriate.

- They expressed concerns about a lack of follow-up with the referrals and not advising county workers of the status of the referrals.

- Concern was expressed about the lack of consideration of the geographical distance from the referring county.

- We heard about delays from the State Office in getting placement referrals to providers. Some participants indicated that by the time a referral reaches a provider, the county may have placed the child elsewhere, and there was general dissatisfaction with the process.

- Commenters also indicated a need to ensure that the staff that screen and refer children for therapeutic placements should have training and knowledge of the clinical issues presented by the children in order to make the most appropriate referrals.

Our interviews indicated that the State Office does not have responsibility for the placement of children in placement resources other than therapeutic group homes or foster homes, and that is tied to the funding of the placement. The foster care and adoption programs were moved to the regional level several years ago, leaving no responsibility with State Office for coordination, policy writing, or assistance to agency field staff in these program areas.

Some commenters expressed the concern that therapeutic foster homes are not therapeutic, and that some "regular" foster parents may do a better job. Several instances were cited about applicants for resource homes being rejected by MDHS, only later to be approved as a therapeutic foster home with another agency. Some staff indicated they often do not make referrals for therapeutic foster care because the process is so cumbersome.

We heard that in some regions, the county worker contacts the resource supervisor and/or the resource worker for the region to request assistance in identifying a placement resource. In other regions this is not the case, and some county workers and supervisors stated they were not aware of how to contact the resource worker. Some commenters indicated that generally, the regional resource units are not accepted in the region; therefore, they are not utilized for assistance in identifying an appropriate placement resource for a particular child, although we also heard that resource workers have information about the resource families which could be helpful to the county workers in locating placement resources.

Some focus group participants expressed concern about resource parents not receiving information about a child being placed in their home. Some participants were of the opinion that workers may withhold information because they are fearful the foster parents will not take the

Mississippi Foster Care Services Assessments

child if they are given the information. Some comments suggested that resource families could do a much better job with the children placed in their homes if they were given complete information, particularly medical and behavioral issues, and that all children coming in to care should have a complete physical, dental and psychological exam immediately after coming in to care with the results being shared with the resource parents. We also heard that Medicaid eligibility should be activated immediately after placement so the child can receive needed services. The children need a clothing allowance at the time of placement so that resource parents can purchase clothing as children most often come in to care with nothing. One group suggested that children in foster care need support groups as they will often talk to each other but will not talk to the resource parents about what they are thinking or feeling. Interesting points made by the groups was that the workers should try to match the child's needs with the skills of the resource parents. They were in agreement that workers should listen to the resource family regarding the behaviors they can manage.

We heard one example of a worker sharing information with a youth in care about three group homes which she had contacted. Together, they visited all three, and the youth was allowed to choose the home he wanted.

## *Staff Survey*

In the staff survey, we asked staff to rate the agency's effectiveness in several areas regarding placement procedures and support resource families to help ensure placement stability. As indicated in the chart below, respondents indicated the agency is frequently or almost always effective in supporting foster families and ensuring placement stability about two-thirds of the time (about 65 percent). However, they indicated that the agency is frequently or almost always effective in placing children in placements that match their needs only about half the time (about 52 percent) even though they rated monitoring to placements are appropriate as frequently or almost always effective about two-thirds of the time (about 68 percent). They rated current procedures for identifying and obtaining access to the appropriate placement for a child as frequently or almost always effective just over half the time (about 57 percent).

| Please rate your perception of your agency's effectiveness in each area below in practices related to mobilizing services: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Some times | Frequently | Almost Always | No Info/NA | Total |
| Effectiveness of services to support foster families and assure placement stability: | 1 (0.53%) | 8 (4.23%) | 43 (22.75%) | 53 (28.04%) | 70 (37.04%) | 14 (7.41%) | 189 |
| Effectiveness in placing children in placements that are matched to their needs: | 4 (2.13%) | 11 (5.85%) | 62 (32.98%) | 42 (22.34%) | 56 (29.79%) | 13 (6.91%) | 188 |
| Monitoring to ensure placements are appropriate and meeting the needs of children: | 0 (0%) | 8 (4.32%) | 32 (17.3%) | 56 (30.27%) | 69 (37.3%) | 20 (10.81%) | 185 |

Mississippi Foster Care Services Assessments

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Effectiveness of current procedures for identifying and obtaining access to the appropriate placement for children entering foster care (e.g., who selects placement resource, timeliness of selecting resource, etc.): | 2 (1.07%) | 12 (6.42%) | 54 (28.88%) | 50 (26.74%) | 56 (29.95%) | 13 (6.95%) | 187 |

Asked to rate the agency's work in recruiting and retaining placement options for children in foster care, survey respondents indicated that the agency is frequently or almost always effective in recruiting appropriate placement options for children about 38 percent of the time. Similarly, they rated their ability to retain placement options for children as frequently or almost always effective about 41 percent of the time.

| Please rate your perception of your agency's effectiveness in each supports area below related to mobilizing services: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Some times | Frequently | Almost Always | No Info/NA | Total |
| Ability to recruit qualified and appropriate placement options for children: | 2 (1.08%) | 26 (13.98%) | 65 (34.95%) | 45 (24.19%) | 25 (13.44%) | 23 (12.37%) | 186 |
| Ability to retain qualified and appropriate placement options for children: | 1 (0.54%) | 18 (9.73%) | 69 (37.3%) | 44 (23.78%) | 31 (16.76%) | 22 (11.89%) | 185 |

When asked to provide explanatory comments on the strengths, barriers, and supports needed in this area, survey respondents identified caseworkers' efforts to work with resource families and to obtain needed services as one of the most commonly cited strengths. They also cited their efforts to monitor resource homes regularly as a strength of practice, and some respondents noted an effective working relationship between county staff and resource workers as a strength of practice.

The two most commonly cited barriers to effective practice in this area were the lack of resource homes that workers can match to children's needs and the lack of services to support placements. By far, most of the comments addressed the dearth of an appropriate pool of resource homes where they are needed. Many respondents addressed service-related barriers in terms of no services in some areas of the State, lack of geographic access, and concerns about the quality of some services. The supports that survey respondents indicated are most needed in this area correspond to the barriers they identified, i.e., more placement resources and more support services.

### Case Reviews

We reviewed the cases of 30 children in foster care to evaluate the provision of support services to the facilities/resource families and made the following findings:

- The 30 children had an average of 2.47 placements during their current episode in foster care.

- About three-quarters of the children (22 of 30, or about 73 percent) had no unplanned placement disruptions; of those that did, they had an average of 2.25 unplanned disruptions.

- About half (14 of 29 children) of the children were in related foster homes.

- Reviewers determined that the services provided to the resource families were appropriate in about two-thirds of the cases (20).

- Caseworkers visited in the resource home on a monthly basis about two-thirds of the time (19 of 30 cases). In only three of 30 cases, were the visits less frequent than monthly.

- Siblings were placed together in 17 of 30 cases, were not placed together in seven of 30 cases, and the issue was not applicable in six of 30 cases.

- Reviewers indicated that the placement setting matched the child's needs in 26 of 30 cases.

- The current placements did not seem to present threats of disruption in 25 of the 30 cases. In five cases, there were threats of disruption present.

- Where issues were present that threatened the stability of the placement (five cases), the agency had addressed the issues in two cases, had not addressed them in two cases, and there was not enough information to determine in one case.

- Services were being provided to the caretaker in 18 of 30 cases. Some of these services were provided directly to the children, e.g., therapy, medical care, clothing, and other services were provided directly to the provider, e.g., respite. Reviewers determined that services implemented in a timely manner in 18 cases – in only one case where services were needed were they not provided in a timely manner.

- Reviewers identified three of the cases where there were unmet needs for services to preserve the placement (in two cases there was not enough information to determine, and in 21 cases there were no identified unmet needs).

Apart from these specific findings, our case reviews found no narrative recording about placement disruptions, and no indication a conference was held to discuss the disruption and the need for additional services. The child evaluations were not completed in MACWIS in the majority of the cases. There was no indication in the case records that children had any preparation for placements or pre-placement visits when the child was moved from one placement to another or prior to entering care.

### Section IV: Services/Supports in Place to Support Placement Stability and Retain Foster Parents

The following sources were used to obtain information about the services which support placement stability and retain resource families:

- DHS policy
- Focus groups with resource parents, resource workers, resource supervisors, Regional Directors, and youth in foster care
- Staff survey
- Interviews with State Office staff
- Case reviews
- MACWIS reports
- Interviews with service providers.

The following supports and services are in place to support placement stability and retain foster families:

## Board Payments

Board payments were increased significantly, in most cases more than double the previous rate, with adequate legislative funding effective July 1, 2009, and in response to the requirements of the *Olivia Y* settlement agreement to increase board payment rates. The rates are based on the age of the child and the extent of care needed from the care giver. These rates include room and board, monthly clothing allowance and the child's personal allowance. The Department is currently evaluating, through contract, the rates paid on behalf of special needs children in foster family homes and all children in congregate care settings.

Adoption assistance rates were not increased, so they remain at the level of foster board payments prior to July 1, 2009. These payments are less than half the foster board payment rate, which could serve as a disincentive for some resource families to adopt children in their care.

## Special Clothing Allowances for Children in Foster Care

- An initial allowance, based on the age of the child, is allotted at the time of placement in the home to provide the child with a basic wardrobe.

- School clothing at the start of each school year is based on the age of the child.

- Special event clothing is sometimes provided for children.

- Youth involved in Independent Living Skills programs and who attend the annual Foster Teen's Conference sometimes receive a clothing allowance for the conference. Funds were not available in 2009 for this service.

## Respite Care

MDHS contracts with one agency for a statewide respite segment specifically designed to assist resource families. Resource families request the service through their county worker or directly from the contractor, but the worker must approve the respite service. Families are eligible for three sessions of respite in a six-month period. Although the provider requests several days to arrange the service, emergency needs are accommodated whenever possible. Foster families approved by the contractor provide the respite service. The provider publicizes this service through its quarterly newsletter which is sent to all resource families receiving a board payment or adoption assistance benefits. Some resource parents prefer to use their own family members

or other resource families whom they know, and others indicated they were unaware of the service.

## Support Groups

Support groups are offered throughout the State by contract with a private agency. Thirty-one different groups meet monthly and are facilitated by the contractor's staff. Activities include short educational segments, more intense sessions which count toward the families' in-service training requirements, opportunities for networking, and special events. Most resource families indicated that they find these groups very helpful and a source of comfort and experience-based knowledge about fostering. Although the support groups are listed in the provider's newsletter, many of the resource families stated they were unaware of the groups and would like to be involved.

## On-Going Training

Participants in several of the focus groups indicated in-service training for resource families is a support for them. In addition to the educational benefit, many find the networking and camaraderie among the participants to be very helpful.

## Resource Family Special Events

Several conferences/retreats are provided for the resource families. A statewide conference "Lookin' to the Future", sponsored by DHS through a grant to a contractor, is open to DHS staff, social workers from other agencies, resource families, and youth in foster care. A limited number of scholarships are available for families and youth. During the July 2009 conference, full scholarships were given to 61 DHS resource parents and 32 youth in foster care. There was a special workshop track for the youth. Participants are chosen from each DHS region.

One week-end retreat is held each year and is open to all resource families in the state. This event is also funded through DHS's contract with a private agency. The retreat is publicized with an insertion in the board and adoption assistance checks. Participants register by paying $25, which is refunded when they arrive at the conference. In 2009, there were 452 participants with 49 DHS staff volunteering their time to facilitate groups and provide activities for the children who came with their foster families. Provision for child care is considered essential to allow parents to fully participate in the program.

Staff in some counties organize picnics, foster parent recognition dinners, or other local events, which make resource families feel more appreciated. There is no money allocated for these activities and workers seek donations from the community to fund these events.

## Women, Infants, and Children (WIC) Program

Resource parents who care for small children find the WIC program to be very helpful in providing nutrition for the children by providing food and supplies for their use in caring for the children.

## Child Care Vouchers

Children in foster care are potentially eligible for child care services and receive a high priority rating. Resource parents must meet the work/education criteria but are not required to meet the income criteria.

Mississippi Foster Care Services Assessments

### *Transportation*

Some county offices are able to provide transportation services for resource families.  When children are to be taken to medical appointments or family visitation, either the county worker or a homemaker/aide may drive the child.  Although most resource families want to be present for medical appointments, working resource parents appreciate the availability of DHS staff to provide this service. When resource families provide transportation for these trips, they may request reimbursement for mileage based on the same rate as agency staff.

### *Local Newsletters*

At least one area of the State (the northeastern Region I) produces its own monthly newsletter which is sent to all licensed DHS resource parents in that region, regardless of whether they are receiving a board payment.  The newsletter includes segments on policy changes, upcoming training and support group sessions, a recognition article on a specific resource family, and other items of interest.

### *In-Home Services*

MDHS offers in-home services through contracts with two agencies.  These services are the Intercept program and Intensive In-home Services.  These services are offered to intact families in an effort to prevent removal of children from the home. They could also be used with resource families to prevent disruption of a current placement.  During Federal Fiscal Year 2008, one adoptive family with three children was served.  From October 2008 until early September 2009, two adoptive families, involving four children, received services. No foster families received the service.

### Section V:  Services/Supports Needed to Support Placement Stability and Retain Foster Parents

The following sources were used to obtain information about the services needed to support placement stability and retain resource families:

- DHS policy
- Focus groups with resource parents, resource workers, resource supervisors, Regional Directors, and youth in foster care
- Staff survey
- Interviews with State Office staff
- Case reviews
- Foster Care Review (FCR) reports
- PATH Curriculum  (Pre-service training for resource families)
- MACWIS reports
- Interviews with service providers
- DFCS Significant Weekly Activity report

### *Information Sharing*

DHS policy requires a full disclosure to the resource family of all medical, dental, psychological and appropriate background information on the child prior to placement.  Policy also requires the

worker to share the child's permanency plan, visitation plan, and the process to secure clothing with the resource family.

Several focus groups report resource parents are unaware of the needs of the children at the time of placement. Comments indicated that children are left with them with only the clothes they are wearing and no plan for obtaining more clothes. We heard that resource parents frequently do not know medical conditions, medication regimens, or plans for securing medical assessments or treatment, and that there have been instances in which the children had infectious or contagious diseases which put the resource family at risk, and the parents were not told. We heard that one family was given incorrect names for its foster children, which led to much confusion until the resource family and children were able to determine the problem.

We also heard that resource families are sometimes given conflicting information by workers. Workers in the county of service may expect the resource family to contact the county of responsibility worker for approval for expenditures or information about the children. We heard of one resource family that gave the worker ample notice to notify the judge of a planned vacation out of State, as required by policy. When no approval came for the trip, the worker admitted no request was made to the court but gave the family permission to take the foster child on vacation, a policy violation.

Another inconsistency in practice reported by the focus groups is the varying requirements used for licensing resource homes. Some regions may require a comprehensive medical assessment, while another may require only a vital signs check and statement of general good health from the physician.

### Team Membership

Family centered practice principles indicate that the resource parent should be a participant in planning and decision-making concerning the children in their care. They should be involved in FCR conferences, FTMs where appropriate, and court hearings. Resource parent pre-service training includes a segment on being a team member.

However, we heard from some focus group participants that resource parents are generally not seen as members of the team; rather they are seen as outsiders and not included in planning for the child. Some resource parents indicated they feel like baby sitters for the agency's children. Agency policy requires workers to invite resource families to the FCR conferences and FTMs yet we heard that many resource parents have never been invited to a review conference or a FTM. Some have been informed about court hearings, but may be told they should not attend or are not required to attend.

### Mental Health Therapy for Children

Many children in foster care have emotional and behavioral issues that indicate the need for mental health services. There are private providers in the larger metropolitan areas, but these services in other areas of the State are usually secured through the community mental health centers. Mental health therapy was generally considered to be ineffective by focus group participants due to lack of knowledge and training on the part of the therapist about the needs of children in foster care and about specific disorders common to many of these children.

We heard that many resource families are willing to work with children with difficult-to-manage behaviors, but they need the help of well-trained knowledgeable professionals who can teach the

resource families techniques and methodologies to work with the children.  The providers must be easily accessible to the families.

## *Prompt Financial Reimbursement*

Resource families receive financial support in the form of board checks, Medicaid, and reimbursement for clothing and transportation expenses.  The families must often expend much money at the placement of a child.  Some commenters reported long delays, as much as six months, in receiving board payments, and that many months may pass before Medicaid eligibility is established and medical assessments can be completed.  Some focus group participants indicated that the county worker may place a low priority on establishing eligibility for payments and that they may not understand the financial stress this places on the resource family.

The amount of the initial clothing allowance for children is based on the child's age and is established in policy.  The policy requires the worker to give this information to the resource parent and make plans for clothing purchase at the time of placement.  Among the problems noted in focus groups related to clothing purchases were the following:

- Workers make no plans with the family for the purchase of clothing at placement.

- Resource parents are required to use a specific store which is more costly than other stores. Parents think they can get more clothing for the same amount of money if permitted to shop at other stores.

- Workers instruct resource families to purchase a certain amount of clothing, and then the supervisor does not approve the amount.  The family must absorb the cost of the expenditure.

  Funds are designated to reimburse resource families for mileage to transport children in their care to medical examinations, family visitation, court hearings and other agency requests. Comments indicated that the reimbursement process is cumbersome, resulting in late payments due to the following:

- The travel request form is complicated and often returned for corrections.  We heard that if the county worker prepares a sample of how to complete the form that is useful to the resource parents.

- Travel reimbursement forms are checked and approved by the county worker and the ASWS. We heard that the forms are sent to the State Office where at least seven different entities handle the form before the payment voucher is sent to the Department of Finance and Administration for payment.

- We heard that at times, county workers may insist that resource families change their schedules for a last-minute appointment arranged by the worker without consideration of the resource parents' schedule.

## SECTION VI.  PLACEMENT RESOURCES NEEDED

The following sources were used to obtain information about the placement resources needed:

- DHS policy
- Focus groups with resource parents, resource workers, resource supervisors, Regional Directors, and youth in foster care
- Staff survey
- Interviews with State Office staff
- Case reviews
- FCR Reports
- MACWIS reports
- Monthly Regional Resource Reports
- Interviews with service providers
- Manual lists of licensed facilities.

In general, we found agreement on the types of children and/or behaviors for whom it is difficult to find appropriate placements, as follows:

- Large sibling groups which require a large home with a family who can financially manage without board payment or reimbursement for several months.

- Sexually abused children, as some families are afraid they will be falsely accused of molestation of the child.

- Children who act out sexually or are sexually active are difficult to place.  Resource parents worry about the other children in the home due to the behaviors of the one.

- Pregnant girls who plan to keep the baby in the foster home.  There are no funds to purchase baby furniture, clothing, or diapers to prepare for the baby.  The board rate for the young parent after the baby is born has been increased by over $800 monthly, so this rate change may have a positive effect on the issue.

- Children with severe behavioral problems.  Resource families feel they are an inappropriate placement with no therapeutic support for the child.  DHS staff state some therapeutic group homes choose not to accept children with the more difficult-to-handle behaviors, but these children are not disturbed enough for more intensive residential treatment facilities.

- Teenagers of both sexes are considered difficult to place in a family setting.

- Children with physical, emotional or intellectual challenges.  The only aggregate data available is the Adoption and Foster Care Analysis and Reporting System (AFCARS) data for April – October 2008, which shows 515 children in foster care (11.68 percent) had a disability.  The type of disability was not identified.  Disabilities for children who were

Mississippi Foster Care Services Assessments

adopted were identified as follows:  of a total population of 161, two (1.24 percent) were visual/hearing impaired; 14 (8.7 percent) were emotionally disturbed; and 19 (11.8 percent) had other medical conditions requiring special care. No children were identified as being developmentally delayed or physically disabled.

A major issue for family-centered practice is the placement proximity to the birth family. Focus group participants indicated that the youth who lived in the same county with the birth family had contacts and the others did not.  We heard that some youth were placed several hundred miles away and never saw their families.

We also heard that the availability of resource families varies from one area of the State to the next.  The chart below indicates the number of children in foster care, licensed resource homes, and pending applications for each region.  The data on children was gathered from MACWIS.  The information regarding resource families was supplied manually by each regional resource supervisor monthly to staff in the State Office.  MACWIS has the data but is unable to generate a report at this time.  Additionally, a cursory review of the MACWIS information in only two counties showed closed homes as still being active and some duplication of homes, so we have some concerns about the accuracy of the MACWIS information.  Reliable breakdown by type of resource home is not available in MACWIS.  The system allows resource homes to be catalogued as foster homes, adoptive homes, resource homes or child specific.  There are no homes listed in the "child specific" directory, so this is not being used to indicate a relative foster home.

| Region | Number of Children in Foster Care | Number of Resource Homes | Ratio | Number of Resource Home Applications |
|---|---|---|---|---|
| I North | 327 | 165 | 2/1 | 82 |
| I South | 284 | 157 | 1.8/1 | 57 |
| II East | 109 | 65 | 1.7/1 | 26 |
| II West | 148 | 70 | 2/1 | 10 |
| III North | 216 | 90 | 2.3/1 | 64 |
| III South | 407 | 126 | 3/1 | 96 |
| IV North | 211 | 10 | 2/1 | 14 |
| IV South | 249 | 115 | 2.1/1 | 40 |
| V West | 184 | 40 | 4.5/1 | 1 |
| V East | 256 | 156 | 1.75/1 | 80 |
| VI | 369 | 120 | 3/1 | 151 |
| VII E & W | 774 | 221 | 3.5/1 | 424 |

An analysis of these data indicates a large number of pending resource applicants on the coast (Region VII). Following Hurricane Katrina, services on the coast were hampered by loss of staff and increased workload.  The number of pending applicants in this area is actually larger than the number of licensed families. The agency has made efforts to assist in the processing of these applications.  Six staff members from throughout the State spent 1-2 weeks in Region VII, processed 34 home studies, and disposed of over 100 pending applications.

The river counties in the southwest (Region V West) have the largest dearth of resource homes with 4 ½ times more children than homes, and it also has the smallest number of pending

applications (one).  The coast has 3 ½ times more children, and Region V has three times more children than homes.

There is a statewide group home capacity for 501 youth.  Of this number, 193 are located in Hinds County (Jackson), with the other homes located in only 16 other counties.  A large section of the delta and central Mississippi (Regions II West and III North) have no group homes, so children going into group care from these areas must necessarily be placed a long distance from families.

There are five private agencies offering therapeutic foster family care.  Currently 264 therapeutic resource homes are approved by the agencies to provide care for one child each.  There had been no compilation of data on these services until most recently. The State Office is now working with the agencies to provide monthly data regarding vacancies.  Some concerns were expressed that the private agencies are placing more than one child in the therapeutic home and requesting approval after the fact.  Other commenters indicated that the therapeutic home pre-service training may be less thorough than that received by the DHS parents.

## Section VI:  Summary and Recommendations

### A.  Summary of Findings

Based on the information above, we have made the following findings:

- There is some lack of consistency in procedures and requirements among the Regional Resource Units, and the practice varies from one region to another.  We could not identify coordination or collaboration from region to region.

- There is a great deal of inconsistency among regions and among counties within regions regarding the application of foster care policy and practice.

- Current policy manuals seem to be lacking, and some staff may only be aware of agency policy through word of mouth.  We could not identify a place for a staff member to obtain a complete policy manual except to copy another manual.  The "P" Drive contains bulletins with updated policy, but not a complete, current Volume IV manual.

- Compliance with policy regarding the placement of children seems very inconsistent.

- County workers seem to be working diligently to ensure that children in foster care have regular visits with their birth families and with their siblings not placed together.

- County workers do not consistently begin the process of evaluating the child during the initial investigation, while they are with their own family.  The information obtained directly from the birth parent could be valuable, and it would provide information that could be shared with the resource parents if the child has to enter care.

- Resource families are not treated as partners in decision-making and are not consistently involved in case planning activities.

- There are no recruitment plans for resource families and no funds for recruitment efforts.

- There are no funds for certain resource parent training activities, such as refreshments.

- The cost associated with applying to become a resource family in some areas (estimated at $400+[11]) is prohibitive for many families.

- There are inadequate numbers of placement options for children entering foster care.

- The MACWIS system does not produce some needed aggregate reports regarding children and placement resources.

- There is no accurate differentiation in MACWIS among foster homes, adoption only homes, and relative foster homes.

- There is no single contact which has statewide information about placement resources.

- The State Office capacity for studying State and Federal law, drafting policy, and interpreting the policy for practice needs to be strengthened.

- The current process for securing a therapeutic placement is time-consuming, ineffective, and does not ensure appropriateness of service.

- Mental health services for children in foster care are inadequate and ineffective.

- Many resource workers and resource ASWS are recently promoted and have not received placement-specific training.

## B.  Recommendations

- Issue current, complete DFCS Policy Manuals to all DFCS staff agency-wide.

- Provide consistent training for all DFCS staff on agency policy as it relates to foster care services.  Include appropriate training on MACWIS related to foster care.

---

[11] This is based on an estimate of $150 for each adult's medical, $30 each for TB tests and more if X-rays are required, $20 each for fire extinguishers, $7 each for smoke detectors (2), and other costs for missing work for training/getting medicals/home study visits, car seats, baby beds, and so forth.

- Coordinate resource services from the State Office level so the efforts of each Regional Resource Unit can be combined with others to achieve consistency statewide. This would include becoming familiar with Federal regulations and State laws pertaining to foster care, writing policy which conforms to the Federal regulations, consulting with regional resource staff, and supervising the resource ASWSs.

- Train Resource staff specific to preparing children for placement and preparation of foster families to accept and nurture the types of children entering care.

- Initiate a statewide recruitment effort coordinated by State Office that is focused on recruiting families for the kinds of children who are entering care. Develop a uniform plan for following up with responses to the recruitment efforts.

- Initiate the Resource Placement Committee meetings at the regional and State level as outlined in the *Olivia Y* settlement agreement.

- Consider initiating support groups for children in foster care at the local level.

- Ensure that State Office staff dealing with resource issues are licensed social workers, preferably with master's degrees and that they are thoroughly oriented to the job responsibilities and are proficient in addressing resource and placement-related issues.

- Ensure that pre-service training for resource families includes a module on the financial aspects of providing foster care, including board payment rates, Medicaid, clothing vouchers and reimbursement processes and transportation reimbursement. A sample travel voucher should be given to new resource parents during this segment.

- Modify the current referral process for therapeutic placements to permit the referrals to be made by local staff (worker or ASWS) in accordance with clearly established procedures, with payment approval residing at the State Office level.

- Streamline the travel voucher system in State Office to reimburse foster parents, removing any unnecessary points of contact.

- Offer training to mental health providers on issues related to neglect and abuse, separation and attachment, and other placement issues.

- Cross-train county workers and resource workers, ASWSs and RDs on preparation of children for placement, the roles of resource families, and the respective roles and responsibilities involved in a team approach to this area of practice.

- Produce a statewide newsletter to inform all resource families of training opportunities, resources, support groups, new policy, and so forth.

- Ensure that the training curriculum for newly hired workers includes segments on placement preparation and working in partnership with resource families.

# Child Safety Assessment

The Period Two Implementation Plan of the Mississippi Settlement Agreement and Reform Plan requires that a foster care services assessment be completed that includes:

"A child safety assessment of DFCS practice for prioritizing, screening, assessing, and investigating reports of maltreatment of children to determine the extent to which DFCS investigations and decisions are based on a full and systematic evaluation of the factors that may place child at risk."

This report provides the findings of our assessment in this area, which includes a policy and requirements review, a staff survey, interviews and focus groups, and case reviews.

## Section I: Applicable Standards

### A. Policy and Requirements

MDHS is pursuing accreditation through the Council on Accreditation (COA), which includes a number of standards applicable to this assessment, including the following:

- The agency maintains a well publicized, 24 hour access line to receive reports of suspected abuse and neglect;

- Standardized decision-making criteria are used, in consultation with supervisory personnel to determine if the report meets statutory and agency criteria, and if the case will be screened out, referred for alternative response services, investigated, and/or reported to other authorities;

- Cases are assigned for investigation, referred, or screened out within 24 hours;

- The investigator conducts a comprehensive evaluation of risk and protective factors that include child safety, family strengths and needs, and history and impact of prior child abuse or neglect, domestic violence, or substance abuse and family connections; and

- The information gathered for assessments includes underlying conditions and environmental and historical factors that may contribute to concerns identified in initial screening, investigation, and risk and safety assessments; identifies child and family strengths, protective factors and needs; includes the potential impact of maltreatment on the child; includes factors and characteristics pertinent to making an appropriate placement, if necessary; identifies potential family resources for the child and the parents; and is limited to material pertinent for providing services and meeting objectives.

The *Olivia* Y settlement agreement also includes a number of requirements applicable to this assessment, including the following:

- DFCS shall maintain a well publicized 24-hour statewide child abuse hotline for reporting of abuse and/or neglect;

- Upon receipt of a report of child maltreatment in a group home, emergency shelter, or private group home, DFCS shall undertake a licensure investigation that is additional to,

and independent of, any child protective investigation, that shall include an onsite inspection of the facility or home to determine the contract provider's compliance with DFCS licensure standards;

- All allegations of maltreatment of a child in custody, including corporal punishment, shall be investigated by a caseworker who has received training in the investigation of maltreatment in out-of-home placements and has no ongoing connection to the foster care case;

- DFCS shall assure that standardized decision-making criteria are used for prioritizing, screening and assessing all reports of maltreatment, including corporal punishment, of children in DFCS custody; and

- All investigations into reports of maltreatment, including corporal punishment, of children in DFCS custody must be initiated within 24 hours and completed within 20 calendar days, including supervisory approval. DFCS shall assure that such investigations and decisions are based on a full and systematic evaluation of the factors that may place a child in DFCS custody at risk.

The settlement agreement contains additional protective measures to be implemented after maltreatment investigations and assessments have been completed.

DFCS policy and practice address this area of practice in the following ways:

- Intake requests for services are accepted at all county offices of the Division of Family and Children's Services within the Mississippi Department of Human Services. Section 43-21-353 of the Mississippi Code details how intake reports of suspected child abuse/neglect are made and the actions that shall be taken by the agency.

- Maltreatment, including the use of corporal punishment, by a resource parent (relative or not) on foster children is strictly forbidden by policy. If any DFCS staff has suspicion that a child in DHS custody is being maltreated or that corporal punishment is being used within a resource home, a formal report must be made.

- The supervisor will determine if a report may be screened out during the intake process using the policy guidance that provides general guidance on situations that allow screen outs, such as reports on dirty houses and no indications of life or health threatening conditions, inappropriately dressed children, allegations about parental behaviors rather than children's conditions, crowded homes, inappropriate expenditure of money/benefits, reports applicable to other agencies (e.g., lack of school attendance), reports lacking sufficient information, reports on children over age 18, reports on unborn children, sexual activity of children over age 16 that meet certain criteria, reports of rape or exploitation that meet certain criteria including no involvement by the parent or caretaker, reports involving lack of immunizations, suicidal threats where no parental/caretaker abuse or neglect is involved, physical injury of a child by another child under certain conditions, and requests for assistance with material needs and other services. In most of these circumstances, policy requires actions or referrals by the agency to address needs other than treating the information as a report of child maltreatment.

Mississippi Foster Care Services Assessments

### *Screening Reports and Assigning Response*

A supervisor must determine if there is adequate information to locate family; if the alleged perpetrator is a parent or guardian; if the report meets state defined maltreatment; and if the child is in immediate harm. If the first three criteria are met but there is not enough evidence to determine harm, the supervisor will instruct the worker to complete a safety assessment with the family. If there is enough information to determine, the supervisor will instruct the worker to complete a safety assessment with the family. If there is enough information to determine the child is at risk, the supervisor will assign the case for investigation. Within 24 hours of receipt of report, the supervisor will use one of the following levels to determine the disposition of the report and assign it to a worker:

1. *Level One:* The report is screened out for child protective services and may receive a referral for information or a referral for services.

2. *Level Two:* The report is screened in and assigned to a worker who must initiate a safety assessment within 72 hours of assignment of the report. The worker has 7 days from initiation to complete the safety assessment and send it to the supervisor for approval.

3. *Level Three:* The report is screened in and assigned for a full investigation. The worker has 24 hours to initiate the investigation and 30 days to complete the investigation. A safety assessment and any safety plan shall be completed within 7 days from initiation.

A supervisor who receives a report by phone, in person, or in writing that a child has been maltreated in certain ways e.g., intentionally burned or tortured, seriously injured or where serious injury was attempted, sexually abused, or otherwise abused in a felony manner, must immediately call the law enforcement agency in whose jurisdiction the crime occurred and give all information available.

### *Procedure for Notification of Potential Child Abuse/Neglect*

After the supervisor screens in the report, the assigned worker has timeframes that must be followed for notifying the following professionals:

- The appropriate prosecutor and law enforcement in the jurisdiction where the abuse occurred shall be notified immediately.

- After the investigation is initiated, DFCS and law enforcement shall file the "Preliminary Report" with appropriate prosecutor's office within 24 hours.

- Advise the youth court and youth court prosecutor within 72 hours after the report, and continue to update this information as it becomes available.

### *Same Reports*

In order to classify a report as the same report and to screen it out for investigation, the supervisor must determine if the new information includes the same alleged perpetrator, the same victim(s), the same types of maltreatment, and the same incident. If a prior investigation has

been completed, the supervisor must always make sure the prior report was thoroughly investigated. Information on the same report will be entered into MACWIS and the system will attach this information to the previous information that was entered.

The agency sometimes receives additional information regarding an incident or situation that is already being investigated. If the worker is involved in an investigation and observes or receives information about additional maltreatment to the victim or another victim in the household, the worker should discuss this new maltreatment with the supervisor within 24 hours. The supervisor will determine if the new information is entered as a post-allegation investigated to determine if additional safety factors are present or if it is entered as a new report.

## False Reports

An intentional false report is a report in which it is concluded that not only is there no evidence under the state law or policy that a child was maltreated or at risk of maltreatment, but the reporter knew the allegation was false. The worker should request that the reporter verify that the allegations made were false.

## Investigation of Suspected Child Abuse/Neglect

Any report that is not a felony crime under state law, must be initiated within timeframes allowed for the level assigned to the report. This assessment is completed in MACWIS within 7 days of the report being assigned. When the worker completes an investigation, a determination is made to support the disposition of the report. This determination is made based upon:

- Evidence criteria

- MDHS-SS-442-B, Safety Assessment

- Information gathered and entered in MACWIS

- Direct observation/Medical or Psychological information

The investigating worker must complete a safety assessment to submit to the supervisor within 7 days of report assignment. If the determination is made that a child is unsafe, the worker must ensure a safety plan or whatever intervention is needed to make the child safe. Report findings are either "no evidence" or "evidence of abuse/neglect." Report information must be entered in MACWIS on appropriate screens as information is received.

The Worker has 25 days to complete the investigation from date of assignment of report. The Supervisor has 5 days to review and approve or disapprove the investigation.

## Safety Assessment and Safety Plan

The policy below was released in June 2009 to describe risk and safety assessments for all investigations, to include maltreatment of children in DFCS custody.

The safety assessment is used in situations when the report has been assigned a Level Two or Level Three investigation. This assessment is completed in MACWIS within seven (7) days of the report being assigned. In circumstances where safety issues are identified, a safety plan will be developed with the family, documented in MACWIS, and will be implemented immediately. In cases where no safety issues are identified, the report is closed after the supervisor approves of closure.

## *Risk Assessment*

The risk assessment must be completed simultaneously with the safety assessment. During this assessment, the worker should be assessing the well-being of the child and the risk factors for abuse and neglect. This assessment must be completed within the same 7 day time span applied to the safety assessment.

The risk assessment should identify and document certain information, including the caretaker's response regarding the initial report; any history of child abuse and/or neglect; any current family stressors; the caretaker's level of functioning; current health concerns of household members; how each child functions in school; family support systems; family strengths; family relationships; and a summary of combined information and risks noted during the assessment. Workers are directed to be sensitive to cultural practices within the home during the assessment. Risk assessments must be entered into MACWIS within 7 days from assignment of an investigation. All identified risks must be addressed within the safety plan.

## *Resource Family Homes*

The following policy addresses reports of maltreatment of child in resource family homes. When an abuse/neglect report is received in intake that involves a resource family home (foster, adoptive, kinship/relative) the worker shall:

- Immediately notify his/her Supervisor, who will in turn :
    - Notify the Regional Director for the county where the home is located, County Service (COS), and the Regional Resource Family Supervisor.
    - Notify the Regional Director and Supervisor for the County of Responsibility (COR), and the Regional Resource Family Supervisor for the county where the victim lives.
    - The Regional Director of the COR shall determine whether or not the child(ren) should be removed from the home or further recommendations be made.
    - Notify the parent(s) of the alleged abuse or neglect unless parental rights have been terminated, or the child has been released for adoption. The supervisor will disclose to the parents the allegations of abuse/neglect, as well as the nature of any action taken to prevent further abuse or neglect of the child.
    - Notify parent(s) as to the outcome of the investigation.
- Immediately notify law enforcement and the district attorney's office of jurisdiction, if the report involves felony child abuse/neglect. This notification to law enforcement may also be a request for them to accompany the worker, if deemed necessary.
- Immediately give the report, by telephone, to the COS supervisor, if appropriate.
- Notify the supervisor who, in turn, shall:
    - Notify the Protection Unit. The Protection Unit will log the report and notify the Division Director, the Deputy Administrators, the Placement Unit Director and Regional Resource Family Supervisors of the report and the nature of the allegations of abuse/neglect in the agency home.

The Regional Director for the county where the report originated will assign agency staff to complete a full investigation and monitor the completion of the investigation final report. The worker who licensed the resource family will not take an active role in the investigation but mat accompany the assigned worker on the investigation. The licensing worker's role will be that of a mediator, if necessary, between the resource family and the assigned worker.

The alleged victim(s) must be interviewed the on the same day that the report is received to insure immediate safety. The child victim(s) is to be interviewed individually, privately, and preferably away from the resource family home. No additional children are to be placed in the home pending completion of the investigation.

## Licensed Placements for Facilities

The agency will investigate reports on other licensed placements such as group homes, emergency shelters and private child placing agency foster homes. The Regional Director shall assign a worker to investigate, which may be a supervisor, COR staff or COS staff. The Regional Director shall also notify the Protection Unit, Placement Unit Director, Licensure Director, and the Division Director. If the report involves felony child abuse, law enforcement must be notified immediately. The licensing agency is to accompany or otherwise support the assigned worker on the initial visit with the facility director or the child placing agency director.

## Special Safety Review Team

The *Olivia Y.* Settlement Agreement requires DFCS to undertake a special safety review, including an unannounced site visit, of all currently licensed resource homes with two or more reports of maltreatment, including corporal punishment, within the last three years to determine whether any children placed in these homes are at risk of harm in any licensing standards related to child safety are not being met. For groups homes and other residential facilities that house children in custody that have three or more reports of maltreatment, including corporal punishment, within the last two years to determine whether any children placed in these facilities are at risk of harm or any licensing standards related to child safety are not being met. Any necessary corrective actions will be identified and tracked.

To meet this requirement, two licensed social workers were hired to conduct Special Safety Reviews on resource homes having two or more reports of abuse or neglect in a three-year time frame and group homes and other residential facilities which house children in DHS custody and have three or more reports of abuse and neglect in a two-year time frame. The purpose of these reviews is to determine whether any children placed in those homes or facilities are at risk of harm and/or any licensing standards related to child safety are not being met. The Special Safety Reviews on resource homes are to be completed by October 1, 2009 and the Special Safety Reviews on facilities are to be undertaken by December 1, 2009. The reviews on homes and facilities are almost completed. It was determined that reviewers would visit all facilities which house children in DHS custody, not just the ones meeting the settlement criteria. Children and adults were interviewed in regard to safety, permanency, and well-being. Children, resource parents, and facility staff welcomed reviewers and were pleased to express their opinion regarding current placements and hopes for the future. Reports are written on the reviews and sent to other divisions in the agency, such as licensure unit, independent living unit, and regional directors, so that issues disclosed can be addressed and resolved. Once all reviews are

conducted, data from the reports will be gleaned from them and used to improve policy and practice.

## Section II: Current Tools

### A. Policy

DFCS uses several tools or instruments in addressing safety and risk of children, including the following:

#### Maltreatment Intake Tool

The MACWIS intake screen records the date and time of maltreatment reports, provides a summary of the allegations, lists complainant, victim(s), perpetrator(s), household members, roles and relationships, locations and living arrangements. Special handling is documented for maltreatment of children in custody and these reports are automatically assigned Level 3 status for a 24 hour response.

#### Screening Tool

The screening tool contains five general screening filters: (1) Is it a duplicate of the same report, (2) Can the family be located, (3) Is the alleged perpetrator the parent, guardian, custodian or other person responsible for the child's care and support, (4) Is there an allegation of child abuse and/or neglect meeting the legal definition in Mississippi code, and (5) Are there other allegations of abuse/neglect that require intervention.

After the intake worker secures available information and makes a screening recommendation, the recommendation is sent automatically to the Regional Director for screening approval and assignment, as appropriate. The Regional Director's decision is documented by time and date, and the Regional Director gives additional justification for the screening decision by narrative and by selection from check boxes of a number of more specific issues that may apply such as duplicate reports; reports of dirty homes; abuse/neglect occurring before, but reported after a person reaches age 18. At this point law enforcement and district attorney referrals are generated and sent, if applicable.

After screening, the Regional Director assigns the investigation to a staff member not directly involved in the case. The screening/ assignment tool lists the time and date of the assignment with provision for a narrative of special instructions by the Regional Director.

#### Safety Assessment Tool

The safety assessment tool contains a list of 20 general questions and a number of conditions which document safety concerns. These include:

1. A child has received serious physical harm or injury that appears to be inflicted (non-accidental).

2. A child has physical injuries resulting from use of instruments (e.g. cigarette burns, hot water, belts, sticks) to inflict severe pain upon a child or injuries due to dangerous acts (e.g. choking, shaking of an infant, or cruelty).

Mississippi Foster Care Services Assessments

3.   A child has a serious physical injury and the caregiver has given an explanation that is inconsistent, insufficient, or will not explain.

4.   A child has exceptional or special needs, behaviors or medical concerns that are not being met or managed, and failure to do so is resulting in the child being in danger of serious harm.

5.   The caregiver has not, cannot, or will not protect the child from potential serious harm (dangerous persons, situations, or conditions), and/or caretaker overtly rejects any safety intervention.

6.   Caregiver or other person currently threatening to seriously harm child.

7.   The behavior of any member of the household or other person having access to the child is violent and/or out of control and this behavior places the child in danger of serious harm.

8.   Caretaker perceives the child in extremely negative terms and that perception/belief places the child in danger of serious harm.

9.   Caretaker has extremely unrealistic expectations of the child, and these perceptions place the child in danger of serious harm.

10.  Drug and/or alcohol use by any member of the household or other person having access to the child places the child in danger of serious hare (incapacitation, aggression, or missing).

11.  Behavior(s) of any member of the household or any person having access to the child is symptomatic of mental or physical illness or disability and this condition is uncontrolled and places the child in danger of serious harm.

12.  Caretaker is unwilling, unable to meet the child's needs for sufficient supervision, food, clothing, and/or shelter to protect child from danger of serious harm.

13.  Caretaker is unwilling or unable to meet the immediate physical or mental health needs of a child whose condition is fragile due to physical or mental handicaps and failure to do so may result in the child being in danger of serious harm.

14.  Household environmental hazards or living conditions place a child in danger of serious harm.

15.  Acts of domestic violence (e.g. family violence or batterer violence) have occurred that places the child in danger of serious harm.

16.  Sexual abuse/exploitation is suspected and circumstances suggest that a child may be in danger of serious harm.

17.  A child is exposed to dangerous activities or environments (e.g. the manufacture and distribution of drugs, drug trafficking or sale of illegal drugs, DUI with child in car) that places a child in danger.

18.  There is reason to believe a child is in danger of serious harm and the family refuses access to the child, the child's whereabouts cannot be ascertained, caregiver's whereabouts cannot be ascertained or there is reason to believe the family will flee.

19.  A child is fearful of caregiver(s), other family members, or other people living in or having access to the home and there is an indication of a credible threat.

20.  Other, please explain.

The safety assessment concludes with a safety assessment summary and a safety plan. These are narrative accounts intended to furnish a summary of safety issues and concerns and a plan to address those concerns. A safety checklist is completed and is supposed to be given to parents of children 0-5 years of age.

## Risk Assessment

The risk assessment is supposed to be completed simultaneously with the safety assessment. During this assessment, the worker should be assessing the well-being of the child and the risk factors for abuse and neglect.   This assessment is to be completed within the same 7 day time span applied to the safety assessment. This risk assessment was just released in July 2009 and was not included in the sample cases reviewed. Policy does not indicate specifically where the worker is supposed to document the following risk issues. Perhaps these would be documented in the safety assessment narrative, but there needs to be clarification on this point.

The following is supposed to be documented during the risk assessment:

- Describe the caretaker's response regarding the initial report;

- Describe any history of child abuse and/or neglect;

- Describe any current family stressors;

- Describe the caretaker's level of functioning;

- Describe any current health concerns of household members;

- Describe how each child functions in school (grade level, attendance, parental support);

- Describe family support systems;

- Identify and describe family strengths;

- Describe family relationships; and

- Complete a summary of combined information and risks noted during the assessment.

## Investigations Overview

The Safety Assessment and Safety Plan are components of the Investigations Overview screen which, in addition to the safety assessment information, provides for documentation of medical evidence, evidence criteria, contributing factors, worker's findings, supervisor's approval of findings and recommendations for services. Some of the documentation provided on this tool

includes substantiation criteria (specified in policy), contributing factors, the worker's findings, the supervisor's approval of the findings, and recommendations for services.

## Section III: Current Practice

We assessed the tools and practices employed by DFCS to prioritize, screen, investigate and assess reports of maltreatment of children in DFCS custody to determine the extent to which DFCS investigations and decisions are based on a full and systematic evaluation of the factors that may place a child at risk. The following methods were used in this assessment:

- staff survey to describe the usefulness of tools and current practice

- focus groups with front line staff, supervisors, Regional Directors and state office staff

- available MACWIS reports

- 30 case reviews of the total of reports investigated and assessed, and 15 reviews of the total of reports screened out

  The following includes the information from those sources.

### A.  Staff Survey

We conducted a survey of MDHS child welfare staff and asked respondents to rate the agency's effectiveness in addressing practices pertaining to ensuring the safety of children who are in foster care.  The safety practices addressed in the survey addressed issues such as screening and prioritizing reports, monitoring for safety and risk, addressing safety and risk at key points, and the investigation process for reports of maltreatment of children in foster care.

As indicated in the chart below, respondents rated the agency's effectiveness in these safety related practices as almost always or frequently effective between about 74 and 83 percent of the time, mostly indicating that the agency was frequently or almost effective about three-quarters of the time.  Respondents gave their highest ratings to monitoring safety of children in foster care, monitoring the risk of harm to children in foster care, and conducting safety and risk assessments with regard to reunification (respectively, about 86 percent, 83 percent, and 80 percent frequently or almost always effective).

Staff responding to the survey addressed the actual handling of reports of maltreatment of children in foster care by indicating that the agency was frequently or almost always effective in screening and prioritizing incoming reports, initiating and completing investigations timely, and conducting thorough investigations between 75 and 78 percent of the time.

| Please rate your perception of your agency's effectiveness in each area below of practices relating to ensuring child safety for children in foster care: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Some times | Frequently | Almost Always | No Info/NA | Total |
| Screening foster families for safety related issues prior to placing children, e.g., conducting | 3 (1.44%) | 4 (1.91%) | 14 (6.7%) | 45 (21.53%) | 113 (54.07%) | 30 (14.35%) | 209 |

**Mississippi Foster Care Services Assessments**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| background checks on all family members age 14 and older: | | | | | | | |
| Monitoring the safety of children while in foster care: | 0 (0%) | 3 (1.42%) | 8 (3.77%) | 59 (27.83%) | 124 (58.49%) | 18 (8.49%) | 212 |
| Monitoring the risk of harm to children in foster care: | 0 (0%) | 3 (1.42%) | 13 (6.16%) | 59 (27.96%) | 116 (54.98%) | 20 (9.48%) | 211 |
| Safety and risk assessments in reunification: | 0 (0%) | 3 (1.42%) | 15 (7.11%) | 63 (29.86%) | 105 (49.76%) | 25 (11.85%) | 211 |
| Safety and risk assessments in visitation: | 0 (0%) | 6 (2.84%) | 26 (12.32%) | 57 (27.01%) | 99 (46.92%) | 23 (10.9%) | 211 |
| Screening incoming reports of maltreatment to accept for investigation for children in foster care: | 5 (2.39%) | 2 (0.96%) | 8 (3.83%) | 48 (22.97%) | 114 (54.55%) | 32 (15.31%) | 209 |
| Prioritizing incoming reports of maltreatment for children in foster care, i.e., assigning the correct priority based on the allegations: | 4 (1.9%) | 4 (1.9%) | 13 (6.19%) | 41 (19.52%) | 117 (55.71%) | 31 (14.76%) | 210 |
| Timeliness of initiating investigations: | 0 (0%) | 3 (1.43%) | 18 (8.57%) | 45 (21.43%) | 117 (55.71%) | 27 (12.86%) | 210 |
| Timeliness of completing investigations: | 1 (0.48%) | 5 (2.39%) | 20 (9.57%) | 55 (26.32%) | 101 (48.33%) | 27 (12.92%) | 209 |
| Thoroughness of investigations involving children in foster care, e.g., interviewing all parties, using prior history information, etc..: | 0 (0%) | 6 (2.87%) | 17 (8.13%) | 42 (20.1%) | 115 (55.02%) | 29 (13.88%) | 209 |
| Addressing the safety of all children in the foster home, as opposed to only the child who is the subject of the report: | 0 (0%) | 11 (5.34%) | 10 (4.85%) | 47 (22.82%) | 112 (54.37%) | 26 (12.62%) | 206 |

We also asked survey respondents to rate the agency's effectiveness with regard to certain systemic supports associated with ensuring the safety of children while in foster care as well as the safety of children in their own homes.  Respondents gave their highest ratings to providing families and children with services to address safety issues and to supervisory oversight of safety and risk issues, rating the agency as frequently or almost always effective in these two areas about three-quarters of the time (about 77 percent and 76 percent respectively).  Respondents indicated that the agency's training regarding safety and risk issues was less effective, rating pre-service and in-service training as frequently or almost always effective about 59 percent and 56 percent of the time.  They also rated the SARA and quality assurance monitoring of safety and risk related issues as frequently or almost always effective a little more than half the time (about 59 percent and 61 percent respectively).

**Mississippi Foster Care Services Assessments**

Respondents to the survey were asked to comment of current tools and practices related to assuring child safety. The largest number of comments described the safety and risk assessment tools they use as strengths of practice in this area. While most comments did not differentiate between the safety checklist and SARA, some did, and they seemed to reflect general satisfaction with the thoroughness of the tools if they are used correctly. There were also indications that both tools could be improved. A few respondents cited family team meetings as effective mechanisms for ensuring child safety. One respondent specifically commented on the need for improved assessment of foster homes while children are in placement.

In commenting on the barriers to more effective practice regarding the safety of children and managing risk, most respondents also cited the safety and risk assessment tools (safety checklist and SARA). Those respondents identifying the tools as barriers most often described the length of SARA as a problem, the lack of applicability to the circumstances of some children and families, the forcing of answers that may not apply, the lack of applicability to children in foster care, staff not using the instruments correctly, and the lack of attention to risk issues.

Apart from the comments on the safety and risk assessment tools, other comments were spread among issues pertaining to the courts as barriers, the lack of priority given to children placed out of their county of residence, and the lack of safety-related services.

| Please rate your perception of your agency's effectiveness in each area below of supports relating to assuring safety and managing risk for both in-home and foster care: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Some times | Frequently | Almost Always | No Info/NA | Total |
| Providing families and children with the appropriate services to address safety issues: | 0 (0%) | 2 (0.94%) | 28 (13.21%) | 65 (30.66%) | 99 (46.7%) | 18 (8.49%) | 212 |
| Effectiveness of supervision in addressing safety and risk-related issues: | 0 (0%) | 6 (2.84%) | 25 (11.85%) | 59 (27.96%) | 102 (48.34%) | 19 (9%) | 211 |
| Effectiveness of the safety assessment as a tool to identify safety and risk-related issues during investigations: | 1 (0.48%) | 7 (3.33%) | 42 (20%) | 56 (26.67%) | 84 (40%) | 20 (9.52%) | 210 |
| Effectiveness of SARA in identifying risk: | 5 (2.42%) | 16 (7.73%) | 38 (18.36%) | 58 (28.02%) | 65 (31.4%) | 25 (12.08%) | 207 |
| Use of case plans to eliminate safety threats and reduce risk: | 0 (0%) | 7 (3.32%) | 26 (12.32%) | 64 (30.33%) | 89 (42.18%) | 25 (11.85%) | 211 |
| Pre-service staff training on safety and risk: | 2 (0.98%) | 10 (4.88%) | 42 (20.49%) | 65 (31.71%) | 56 (27.32%) | 30 (14.63%) | 205 |
| In-service staff training on safety and risk: | 3 (1.46%) | 9 (4.39%) | 53 (25.85%) | 58 (28.29%) | 56 (27.32%) | 26 (12.68%) | 205 |
| Usefulness of policy on safety and risk-related issues: | 1 (0.49%) | 6 (2.94%) | 40 (19.61%) | 67 (32.84%) | 67 (32.84%) | 23 (11.27%) | 204 |

**Mississippi Foster Care Services Assessments**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Monitoring of safety-related practices and outcomes, e.g., quality assurance: | 1 (0.49%) | 16 (7.8%) | 36 (17.56%) | 60 (29.27%) | 65 (31.71%) | 27 (13.17%) | 205 |

In commenting on supports needed to enable workers to effectively ensure the safety of children and manage risk, survey respondents identified the most needs with regard to training, followed by improved safety-related services, improved safety and risk assessment tools, improved placement options for children in foster care, automation support, and policy changes.

The training related comments indicated a need for more in-service training, and training devoted to the process of safety and risk assessment. Some respondents commented on the need for training on the use of assessment tools and using the information to develop case plans. Others requested training on policy and resources available to serve children and families with safety-related needs.

Comments related to improved safety-related services highlighted the lack of services in some counties in the State, indicating a need for more services in general. In particular, a number of respondents indicated the need for more family-preservation services without wait lists, and services that can be provided in families' homes. Several respondents indicated a need for concrete services and access to services in emergency situations.

The comments regarding the safety and risk assessment tools generally reflected a desire for more user-friendly tools that can be used in the field and tools that apply to children within certain age ranges. Comments regarding placement options generally indicated a need for a broader array of foster homes to be able to place children appropriately, and for homes that are well prepared to care for children in the Department's custody. Only a few respondents commented on the need for automation support and improved policy.

## B. Focus Groups

The focus groups that contributed information pertaining to the safety of children in foster care included the groups of parents served by MDHS, resource parents, MDHS resource supervisors, Regional Directors, and MDHS caseworkers.

Participants in at least two of the focus groups noted that reports are often made on resource families. One group noted that many of these reports pertain to licensing violations. One group also noted that incidents of corporal punishment of children in care are coded as policy violations. In one group, we heard about children being maltreated in foster care and the parents not being made aware of it, but heard of it in a court hearing.

Focus group participants indicated that workers check foster homes for compliance with safety standards, including making unannounced visits. There were also descriptions of workers, including those of child-placing agencies making frequent visits to the homes, but there was uncertainty about the extent to which these visits actually involved assessing for safety-related issues.

MDHS staff in focus groups indicated that assessing maltreatment in foster care is much improved, and that investigations are conducted consistently when reports are received.  There were some concerns indicated about the thoroughness of the investigations and indications that who is assigned to conduct investigations of reports of maltreatment in foster care may vary by region, including resource workers, senior caseworkers, and staff from other areas.

Concerns were also raised about the usefulness of SARA regarding maltreatment in foster care, and we heard that SARA is not completed on children in foster care.  Similar concerns about SARA in general were raised in focus groups as in the survey, e.g., the length and complexity of the tool, the inapplicability of the questions to many situations, and so forth.

Some concerns were raised about the resource workers' involvement in reports of maltreatment of children in foster care.  Some comments indicated that resource workers may not always be aware that reports have been received or the disposition of the reports.  These participants were concerned that policy is not followed in that respect and indicated they should be given the information and the opportunity to accompany the investigator to the resource home.

## C.  Case Reviews

We conducted a review of MACWIS case files for two samples of children for this assessment.  We reviewed the cases of 17 children with reports of maltreatment in foster care that had been screened out for the purpose of assessing the criteria for screening out these reports.  We also reviewed the cases of 30 children with investigated reports of maltreatment in foster care for the purpose of assessing the investigation process.

### Screened-Out Findings

In the 17 reports we reviewed, all 17 appeared to be treated as a new report and appropriately screened.  All were prioritized at Level One.  All 17 reports were reviewed by either the Area Social Work Supervisor or the Regional Director. Perpetrators in ten of the 17 reports were either foster caretakers or facility staff.

The allegations in these screened out reports included emotional maltreatment (2), neglect (7), physical abuse (4), and sexual abuse (4).  Seven of the children were in unrelated foster homes, two were in related foster homes, and the remaining children were in various congregate care facilities or unlicensed relative care.

Reviewers agreed with the screening decisions in 12 of the 17 reports, did not agree with two decisions, and did not have enough information to make a decision in three reports.  In explaining their reasons for disagreeing with the screening decisions or not having enough information to make a decision, reviewers cited disagreement with the *reasons* for screening the report out rather than actually screening them out, inadequate documentation of addressing the allegations, or allegations not meeting the legal definitions of maltreatment.

## *Investigations Findings*

Of the 30 children for whom investigations of maltreatment in foster care were conducted, 26 were placed in foster family homes and the remainder was in group care (2), kin foster care (4), or residential care (1). Twenty-six of the reports were Level Two priority and four were Level Three priority.

The investigations were initiated within policy timeframes in only 8 of the 30 investigations. The investigations were concluded within policy timeframes in 13 of the 30 investigations (one case lacked documentation of the concluding date). The average time frame between case assignment and initiation of the investigations was 1.76 days, and the average time frame between initiating and concluding the investigations was 30.59 days. Reviewers disagreed with screening decisions on 22 of the 30 reports, all due to assigning the priority as Level Two when they thought it should have been assigned as Level Three.

In terms of the quality of the investigations, we found the following:

- A full investigation was conducted in 23 of the 30 investigations, and not in six. There was insufficient information to make a determination in one investigation. In the investigations where the reviewers indicated a full investigation was not conducted, reviewers cited the lack of interviews with all appropriate parties.

- The investigator conducted a visit to the home in 28 of the 30 investigations.

- The method of initiating the investigation was an unannounced home visit in 13 of the investigations; in15 of the investigations the method was "other."

- The investigator had face-to-face contact with the child on the same day of the report in only 10 of the 30 investigations. However, the investigators interviewed the children privately during the investigation in 23 of the 30 investigations.

- The child's caretaker was the alleged perpetrator in 28 of the investigations, and the investigator interviewed the perpetrator in 25 of the 30 investigations.

- The investigator had face-to-face contact with the child's caretaker in 28 of the 30 investigations.

- Collateral contacts were interviewed by the investigator in 23 of the 30 investigations.

- A safety assessment of the child was conducted in all 30 investigations.

- There was evidence of supervisory review in 24 of the 30 investigations.

- Safety and risk issues were addressed for all children in the resource home (not just for the child who was the subject of the report) in 16 of the investigations, and not in 10 of the investigations. In the remaining 4 investigations it was either not applicable or there was not enough information to make a determination.

- Reviewers were not able to identify any safety or risk issues that the investigator failed to identify in 15 of the 30 investigations. In ten of them, there were unidentified safety or risk factors.

- In 10 of the 30 investigations, there were no indications that the investigator distinguished between immediate safety issues and risk issues. In 13 of the investigations, the investigator made this distinction. In the remaining investigations, there was some combination of addressing risk and/or safety issues.

In regard to procedural issues, we found the following in reviewing the investigations:

- Reviewers could determine that biological parents were notified of the reports in five of the 30 investigations. In 17, there was not enough information in the record to make a determination, and in the remaining cases, they either did not notify the parents (four) or it was not applicable (four).

- The child was removed from the resource home in nine of the 30 investigations.

- Medical resources, legal resources, law enforcement, and other State agencies were involved appropriately in the investigations with only a slight deviation regarding medical resources (three investigations) and law enforcement (one investigation).

  With regard to the outcomes of the investigations, we found the following:

- Of the 30 investigations, the dispositions included 24 "no evidence," three "policy violations," and three "evidence."

- A safety plan or safety-related services was required by the child or resource family to address safety and/or risk issues in 14 of the investigations.

- The resource families were referred for services where the need was indicated in eight of the 30 investigations, and not referred in 11. The issue was not applicable in nine investigations and there was inadequate documentation to make a determination in two investigations. Where services seemed to be indicated but not received, reviewers noted identified needs of either the child or resource parents for which service referrals were not made, and inadequate assessment of needs in order to determine what services would have been helpful.

- The actions taken by the agency mitigated the safety and/or risk concerns in 18 of the 30 investigations, did not mitigate in two, and either was not applicable or there was inadequate documentation in the remaining investigations.

- The child's case plan was not changed in 28 of the investigations as a result of the report.

- The reviewers agreed with the investigators' dispositions of the reports in 21 of the 30 investigations. The reviewer disagreed with six of the dispositions, and there was not enough information to make a decision on the remaining investigations. Where reviewers did not agree with the dispositions, they generally commented that the dispositions were based on incomplete information, such as not interviewing all parties.

## D. Data Reports

### Children with Alleged Maltreatment While in Agency Custody

A monthly summary report is generated from the MACWIS system "Children with Alleged Maltreatment While in Agency Custody." This report contains the following data: Unduplicated count of children, total number of intakes, average intakes per child, findings (evidence or no evidence), findings with evidence and percent of findings with evidence. For a period of January 1, 2008 through May 31, 2009 the following statewide statistics were reported:

- Unduplicated count of children with maltreatment reports – 952

- Total number of intakes – 1182

- Average number of intakes per child – 1.24

- Total findings – 1364 (more than one type of maltreatment)

- Findings with evidence – 352

- Percent of findings with evidence – 25.8%

A monthly individual report is generated for each child who was the subject of maltreatment reports. This report is sorted by county and region and contains the following data: child's name, intake date, investigation findings, maltreatment type(s), maltreatment finding(s).

### Licensed Resource Homes with ANE Findings

Monthly reports are generated through MACWIS data to report resource homes with one ANE complaint, and a separate report for two or more ANE complaints. These two reports contain the following information: name of resource home, status of home (active or inactive), number of reported ANE and number of evidenced ANE reports.

In addition, two summary reports by county, region and state detail the number of resource homes, number of reports and number of reports evidenced.

The data from July 1, 2008 through June 30, 2009 indicate that 144 homes were reported with only one ANE complaint. Of these 32 were evidenced. During this same time period, 37 resource homes were reported for two or more ANE reports. There were a total of 85 ANE reports for these 37 homes. Of these 37 homes, 8 were evidenced.

### Licensed Facilities with ANE Findings

Similar reports are generated on licensed facilities with ANE reports. The individual monthly reports contain the name of the licensed facility, status, number of ANE reports and number of reports evidenced.

Two summary reports are generated, both collecting a summary of all reports made since June 1, 2007 until the present reporting month. One report contains the facilities on which one ANE report has been made. For these facilities there have been 14 facilities during this period, 14 total reports and 3 evidenced. The second report of facilities with 2 or more ANE complaints indicates that there are 15 identified facilities, 56 total reports and 11 reports evidenced.

### *Screen-outs of ANE of Children in Custody*

A specific MACWIS report is not currently in production to indicate the screened-out ANE involving children in custody. A recent special report pulled from MACWIS data shows that from June 1, 2008 till June 30, 2009 there have been 1612 total maltreatment **report types** of children in custody, of which 245 or 15% were screened out.

## Section IV: Summary and Recommendations

### *A.  Summary of Findings*

Based on the information above, we have made the following findings:

- Safety assessments in investigations of child maltreatment while in foster care seem to be conducted consistently.  This is based on information from interviews and case review findings.

- Screening decisions seem to be accurate for the most part, but priority levels should be clarified in policy and practice.

- There is a need to identify service needs of children and resource families with regard to safety and risk issues, and to make appropriate referrals and link them with services during the investigation if needed.

- There is a need to ensure that the child's parents are notified of reports concerning their children while they are in foster care.

- Face-to-face contact with the children during investigations does not appear to be consistent in the investigations process.

- Supervisory review of investigations should be documented more clearly and consistently.

- Investigations of reports of maltreatment in foster care do not appear to be initiated or completed in accordance with policy requirements (based on our case reviews).

- Interviews with all required parties during the investigation process are either not consistent or not well documented.

- Documentation of investigations in general is not thorough.

## B. Recommendations

- We recommend that MDSH develop a simplified safety and risk assessment tool for use with children in foster care placements. SARA and the safety checklist do not seem to apply to the circumstances of those children and may not be capturing the relevant information regarding maltreatment in foster care.

- We recommend that MDHS strengthen policy regarding who is responsible for investigating reports of maltreatment of children in foster care in the County Departments, including when and how to involve the resource worker.

- We recommend that policy pertaining to the use of corporal punishment of children in foster care by their resource parents or facility staff be clarified and enforced. We heard from some sources that these incidents are coded as policy violations, but we understand that the *Olivia Y* settlement agreement requires that it be treated as a maltreatment report.

- We recommend training of all investigative and resource staff on investigating reports of maltreatment in foster care.

- We recommend that ASWSs monitor and enforce the timeliness of initiating and completing investigations of reports of maltreatment in foster care. We believe that a MACWIS report that captures this information and reports on it monthly would be helpful in monitoring and enforcing the policy.

## *Appendices*

**Appendix A:  Staff Survey**

**Appendix B:  Case review sample questions**

## Appendix A:  Mississippi Practice Model and Assessment Staff Survey

### Assuring Safety and Managing Risk (Child Safety Assessment)

Please rate your perception of your agency's effectiveness in each area below in ensuring child safety.

(**Not at all, Rarely, Sometimes, Frequently, Almost Always, No Information/Not Applicable**)

*Practice related to children in their own homes (not children in foster care):*

- Screening incoming reports of maltreatment to accept for investigation
- Prioritizing incoming reports of maltreatment, i.e., assigning the correct priority based on the allegations
- Initial safety assessments
- Initial risk assessments
- Ongoing safety assessments in open protective services cases
- Ongoing risk assessments in open protective services cases
- Timeliness of initiating investigations
- Timeliness of completing investigations
- Thoroughness of investigations, e.g., interviewing all parties, using information on history of prior maltreatment, identifying relevant issues, evaluating protective capacities of parents
- Identification of underlying issues related to maltreatment, such as substance abuse, domestic violence, other family dynamics
- Timely identification of services needed to address safety
- Investigating reports of maltreatment on children in cases already opened for services (in-home protective services cases)
- Use of safety plans
- Addressing the safety of all children in the home, as opposed to only the child who is the subject of the report
- Evaluating safety and risk factors at the time of case closure

*Practice related to children in foster care:*

- Screening foster families for safety related issues prior to placing children in their homes, e.g., conducting child welfare and criminal background checks on all family members age 14 and older.
- Monitoring the safety of children while in foster care
- Monitoring the risk of harm to children in foster care
- Screening incoming reports of maltreatment to accept for investigation for children in foster care
- Prioritizing incoming reports of maltreatment for children in foster care, i.e., assigning the correct priority based on the allegations
- Timeliness of initiating investigations
- Timeliness of completing investigations

- Thoroughness of investigations involving children in foster care, e.g., interviewing all parties, using information on history of prior maltreatment, identifying relevant issues
- Addressing the safety of all children in the foster home, as opposed to only the child who is the subject of the report

*Supports related to assuring safety and managing risk (for in-home and foster care):*

- Providing families and children with the appropriate services to address safety issues
- Timeliness of initiating services to address safety
- Effectiveness of supervision in addressing safety and risk-related issues
- Effectiveness of the safety checklist as a tool to identify safety and risk-related issues during investigations
- Pre-service staff training on safety and risk
- In-service staff training on safety and risk
- Usefulness of policy on safety and risk-related issues
- Monitoring of safety-related practices and outcomes, e.g., quality assurance

*Open Ended Questions*

- Please describe any **strengths** in current tools and practice in assuring the safety of children and managing risk
- Please describe any **barriers** in current tools and practice in assuring the safety of children and managing risk
- Please note any **supports needed** (tools, services, practices) to better enable workers to effectively assure the safety of children and manage risk in the home

## Mobilizing Appropriate Services Timely (Reunification Assessment, Medical/Dental/Mental Health Services Assessment, Independent Living Services Assessment, and Recruitment/Retention/Foster Care Placement Assessments)

Please rate your perception of your agency's effectiveness in each area below in mobilizing appropriate services timely.
**(Not at all, Rarely, Sometimes, Frequently, Almost Always, No Information/Not Applicable**)

*Practice related to mobilizing services:*

- Ability to access services to meet safety-related needs of children and families during an investigation
- Quality of safety-related services provided to children and families
- Effectiveness of services to address the following areas (includes ability to initiate the service when needed and the quality of the service):
  - o Domestic violence services
  - o Substance abuse treatment services
  - o Therapeutic services
  - o Family preservation services

- o Physical health services
- o Dental health services
- o In-home services
- o Post-adoption support services
- o Services to meet basic needs (food, clothing, shelter)
- o Independent living services for youth in care ages 14-20
- o Transitional living services for youth in care

- With regard to mental/behavioral health services, how effectively are you able to access the following levels of services for children and families:
  - o Lower level services, e.g., outpatient counseling and evaluation, prevention services, testing
  - o Mid-level services, e.g., behavioral health medication, day treatment, more intense out-patient psychotherapy
  - o High-end/acute services, e.g., addiction and recovery services, specialized care, psychiatric services
  - o Crisis services, e.g., crisis stabilization, psychiatric hospitalization for children
- Effectiveness of services to support foster families and assure placement stability
- Effectiveness in placing children in placements that are matched to their needs
- Effectiveness of current procedures for identifying and obtaining access to the appropriate placement entering foster care (e.g., who selects placement resource, timeliness of selecting resource, etc.)

*Supports related to mobilizing services:*

- Ability to recruit qualified and appropriate placement options for children
- Ability to retain qualified and appropriate placement options for children
- Array of service providers to meet identified needs of children and families (identify in open-ended questions those that are effective and those that are not)
- Training to match services to identified needs
- Supervisory oversight of service provision
- Monitoring to ensure placements are appropriate and meeting the needs of children
- Monitoring to ensure services and service providers are available, appropriate and meeting the needs of children

*Open Ended Questions*

- Please describe any **strengths** in current tools and practice in mobilizing appropriate services for children and families in a timely manner:
- Please describe any **barriers** in current tools and practice in mobilizing appropriate services for children and families in a timely manner:
- Please note any **supports needed** (tools, services, practices) to better enable workers to effectively mobilize appropriate services for children and families in a timely manner:
- What services do resource families need the most for themselves in order to help them provide stable placements for children in their care?

- To what extent are those services available and accessible?
- What services do children in foster care need in order to maintain the stability of their placements and avoid disruptions?
- To what extent are those services available and accessible?
- Identify the availability of services to support reunification in your area, and indicate the effectiveness of these services in achieving timely reunification of children in foster care.

| Service | Level of Effectiveness (Almost always, frequently, etc.) |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |

## Individualized Case Planning (Medical/Dental/Mental Health Services Assessment, Independent Living Services Assessment, Termination of Parental Rights Assessment, and Recruitment/Retention/Foster Care Placement Assessments)

Please rate your perception of your agency's effectiveness in each area below in individualizing case planning.

(Not at all, Rarely, Sometimes, Frequently, Almost Always, No Information/Not Applicable)

*Practice related to individualized case planning:*

- Use of assessments to determine individualized needs
- Use of assessments to guide decisions about services
- Effectiveness of case planning process in addressing individualized needs
- Concurrent planning for children in foster care
- Cultural responsiveness of services
- Making timely decisions about TPR and adoption
- Determining and documenting exceptions to filing TPR petitions for children in foster care 15 of 22 months
- Ability to tailor services to individual children and families
- Tailoring IL and transitional living services to youth in care
- Availability and accessibility of services to transition children into adult services systems when appropriate
- Availability and accessibility of services to youth post-transition out of DCF care

*Supports needed to individualize case planning:*

- Adequate array of placement resources that are matched to children's needs
- Flexibility of service providers to address unique needs of children and families
- Flexibility of funding and contracting procedures to purchase individualized services

*Open Ended Questions*

- Please describe any ***strengths*** in current tools and practice in individualizing case planning for children and families:
- Please describe any ***barriers*** in current tools and practice in individualizing case planning for children and families:
- Please note any ***supports needed*** (tools, services, practices) to better enable workers to effectively individualize case planning for children and families:
- Identify the types of children for whom you have the most difficulty making the most appropriate placement in foster care:

## Preserving Connections and Relationships (Reunification Assessment and Recruitment/Retention/Foster Care Placement Assessments)

Please rate your perception of your agency's effectiveness in each area below in preserving connections and relationships.

**(Not at all, Rarely, Sometimes, Frequently, Almost Always, No Information/Not Applicable**)

*Practices related to preserving connections and relationships:*

- Identifying and addressing cultural issues relevant to families and children
- Post-placement reunification services to families to prevent re-entry into foster care
- Identification and use of relatives as placement resources
- Placing siblings together in same foster care setting
- Placing children within their own communities when appropriate
- Maintaining connections of children in foster care to family members while in foster care
- Visiting between children in foster care and their families and siblings
- Maintaining tribal relationships and connections for Native American children in foster care
- Providing that youth in foster care have connections to at least one committed, caring adult to aid in the youth's transition from foster care
- Maintaining children in their same school setting when placed in foster care
- Foster parent involvement in supporting child-parent visits and other contacts
- Birth parent involvement in helping to care for their children while in foster care

*Supports related to preserving connections and relationships:*

- Pre-service training on preserving connections and relationships
- On-going training on preserving connections and relationships
- Foster parent training on preserving connections and relationships
- Policy on preserving connections and relationships, including policy on parent-child visiting while in foster care and policy related to use of relatives as placement resources
- Availability of services to facilitate and support reunification

*Open Ended Questions*
- Please describe any ***strengths*** in current tools and practice in preserving connections and relationships:

Mississippi Foster Care Services Assessments

- Please describe any *barriers* in current tools and practice in preserving connections and relationships:
- Please note any *supports needed* (tools, services, practices) to better enable workers to effectively preserve connections and relationships:

### *Strengths and Needs Assessments (Medical/Dental/Mental Health Services Assessment, Independent Living Assessment, Child Safety Assessment, and Recruitment/Retention/Foster Care Placement Assessments)*

Please rate your perception of your agency's effectiveness in each area below in assessing strengths and needs.

(**Not at all, Rarely, Sometimes, Frequently, Almost Always, No Information/Not Applicable**)

*Practices related to strengths and needs assessments:*

- Conducting initial screenings of children to identify needs in the following areas:
    - Mental/behavioral health (Effectiveness rating for each one)
    - Physical health
    - Therapeutic needs
    - Education
    - Developmental levels and concerns
- Conducting initial comprehensive strengths and needs assessments of children and families prior to developing a case plan
- Conducting on-going assessments of strengths and needs throughout the life of the case
- Assessing the strengths and needs of non-custodial parents
- Assessing the strengths and needs of custodial parents
- Assessing the strengths and needs of all children in the home
- Assessing foster caretakers' ability to provide safe and appropriate care for children
- Assessing educational needs of children
- Obtaining timely professional specialized assessments when needed, e.g., psychological, drug evaluations, educational assessments, etc.

*Supports needed for strengths and needs assessments:*

- Pre-service training on assessing strengths and needs
- On-going training on assessing strengths and needs
- Policy on assessing strengths and needs
- Effectiveness of the strengths and needs assessment tool (SARA)
- Availability of providers to conduct effective specialized assessments

*Open Ended Questions*

- Please describe any *strengths* in current tools and practice in assessing the strengths and needs of children and families:
- Please describe any *barriers* in current tools and practice in assessing the strengths and needs of children and families:

- Please note any ***supports needed*** (tools, services, practices) to better enable workers to effectively assess the strengths and needs of children and families:

## *Involving Children and Families in Decision Making (Reunification Assessment, Independent Living Assessment, and Recruitment/Retention/Foster Care Placement Assessments)*

Please rate your perception of your agency's effectiveness in each area below in involving children and families in case activities and decision making.

(**Not at all, Rarely, Sometimes, Frequently, Almost Always, No Information/Not Applicable**)

*Practices related to involving children and parents in decision making:*

- Effectiveness of efforts to identify and locate non-custodial parents to determine whether they should be involved in case planning and decision making
- Involvement of custodial parents in developing case plans
- Involvement of non-custodial parents, when appropriate, in developing case plans
- Involvement of age-appropriate children and youth in developing case plans
- Involvement of custodial parents in reviewing, updating and revising case plans, goals, and services
- Involvement of non-custodial parents, when appropriate, in reviewing, updating and revising case plans, goals, and services
- Involvement of age-appropriate children and youth in reviewing, updating and revising case plans, goals, and services
- Use of family team meetings or conferences as the means of involving parents and children in case planning and decision making
- Use of caseworker visits with parents, including non-custodial parents when appropriate, to involve them in case planning and decision making (frequency and quality of visits)
- Use of caseworker visits with children and youth to involve them in case planning and decision making (frequency and quality of visits)
- Use of information/requests from parents to guide the development of the case plan, select services, and establish goals
- Use of information/requests from age appropriate children and youth to guide the development of the case plan, select services, and establish goals
- Ability to identify and address cultural issues of children and parents, including language barriers, that affect their involvement in case planning and decision making
- Involvement of youth in identifying services and supports they need to transition to adulthood

*Supports needed to involve children and parents in decision making:*

- Pre-service training on involving children and families in decision making
- On-going training on involving children and families in decision making
- Foster parent training on how to involve children and families
- Policy on involving children and families in decision making
- Use of family team meetings as a forum for case planning activities

**Mississippi Foster Care Services Assessments**

- Availability of culturally appropriate services for children and families that support their involvement in case planning and decision making

*Open Ended Questions*
- Please describe any ***strengths*** in current tools and practice in involving children and families in decision making:
- Please describe any ***barriers*** in current tools and practice in involving children and families in decision making:
- Please note any ***supports needed*** (tools, services, practices) to better enable workers to effectively involve children and families in decision making:

Mississippi Foster Care Services Assessments

## Appendix B:  Case Review Sample Questions

| Screened Out Investigations of Child Maltreatment Sample | |
|---|---|
| **Question** | **How to Fill Out/Drop Down Options** |
| Case Number | Enter Case Number |
| Date of Report | Enter date of report |
| Victim Child 1-5 | Note suffix of child (as assigned from previous Basic Information Page). Options for 5 Victim children in report (maximum number of kids to be in foster home) |
| Perpetrator Relationship to Each Child | For victim child, note the relationship of the perpetrator to the child. Note that there is the possibility of 2 relationships for each child (i.e., a perpetrator can be noted as both a relative and a foster mother, should that apply). Drop Down Box: Adoptive Father, Adoptive mother, Biological Father, Biological Mother, Father's Partner- In Home, Foster Father, Foster Mother, Grandfather-maternal, Grandfather-paternal, Grandmother-maternal, Grandmother-paternal, Group home staff, Legal Guardian, Mother's Partner-In Home, Relative, Sibling-Brother, Sibling-Sister, Step-father, Step-mother, Unrelated Caretaker-In Home, Unrelated Caretaker-Out of Home, NA, No Documentation, Other Person, Unknown |
| Perpetrator Allegations for Each Child | For each victim child and each perpetrator, note the allegations of the report. There are two perpetrator options and two allegation options per perpetrator. Drop Down Box: Congenital Drug Addiction, Death, Emotional Maltreatment, Failure to Thrive, Neglect, Physical Abuse, Sexual Abuse, NA, No Documentation |
| What was the type of placement where report was received? | Drop Down Box: Emergency Placement, Foster Home, Group Home, Inpatient Facility, Kin Foster Home, Residential Facility, Supervised independent living, Unlicensed kin placement |
| Was it treated as a new report and screened accordingly? | Drop Down Box: Yes, No, Not Enough Information |
| Screening disposition? | Drop Down Box: Level 1, Level 2, Level 3, No Documentation |
| Was the screening decision reviewed by a ASWS or RD? | Drop Down Box: Yes, No, Not Enough Information |
| Does reviewer agree with screening decision? | Drop Down Box: Yes, No, Not Enough Information |
| Investigations of Child Maltreatment Sample | |
| **Question** | **How to Fill Out/Drop Down** |
| Case Number | Enter case Number |
| Placement Type | Drop Down Box: Emergency Placement, Foster Home, Group Home, Inpatient Facility, Kin Foster Home, Residential Facility, Supervised independent living, Unlicensed kin placement |

## Mississippi Foster Care Services Assessments

| | |
|---|---|
| Date of Report | Enter date of report |
| Level of Report | Drop Down Box: Level 1, Level 2, Level 3, No Documentation |
| Does reviewer agree with screening disposition? | Drop Down Box: Yes, No, Not Enough Information |
| Reason disagree with screening disposition: | Open-ended to field to explain answer |
| Was the full investigation conducted? | Drop Down Box: Yes, No, Not Enough Information |
| If not, describe how the report was addressed? | Open-ended to field to explain answer |
| Date assigned for investigation | Enter date |
| Date investigation initiated | Enter date |
| Initiated within required timeframe? | Drop Down Box: Yes No NA |
| Date investigation concluded | Enter Date |
| Within policy requirements? | Drop Down Box: Yes No NA |
| Method of initial contact for investigation? | Drop Down Box:  Mail, Phone call, Unannounced home visit, NA, No documentation, Other |
| Was the safety assessment conducted during investigation? | Drop Down Box: Yes, No, Not Enough Information |
| Was a law enforcement referral made? | Drop Down Box: Yes, No, Not Enough Information |
| If yes, what was the reason for referral? | Drop Down Box: Abuse that would be a felony, Intentional burns, Intentional torture, Serious injury/attempted serious injury, Sexual abuse |
| Investigation outcome | Drop Down Box: Continue Case Management Services, No Services Required, Refer for Services, No Documentation |
| Disposition supported? | Drop Down Box:  All Supported, All Unsupported, None Unsupported, Some Supported, NA, No Documentation |
| Reviewer agree w disposition? | Drop Down Box: Yes, No, Not Enough Information |
| Reason disagree with disposition: | Open-ended to field to explain answer |
| Was there a home visit during investigation? | Drop Down Box: Yes No NA |
| Face to face contact with children in report | Drop Down Box: Yes No NA |
| Was the victim child interviewed individually, privately? | Drop Down Box: Yes, No, Not Enough Information |
| Were the biological parents notified of the report? | Drop Down Box: Yes, No, Not Enough Information |
| Were the biological parents notified of the invest finding? | Drop Down Box: Yes, No, Not Enough Information |
| Face to face contact other children in HH | Drop Down Box: Yes No NA |
| Reason for no contact with each child in the home | Open-ended to field to explain answer |
| Face to face contact with caregiver | Drop Down Box: Yes No NA |
| Was caretaker perpetrator? | Drop Down Box: Yes, No, Not Enough Information |
| Interview with perpetrator | Drop Down Box: Yes No NA |
| Interview with collaterals | Drop Down Box: Yes No NA |
| Evidence of adequate supervisory review | Drop Down Box: Yes No NA |
| Investigator evaluated safety/risk issues | Drop Down Box:  All children, None of the children, Some children, NA, No Documentation |
| Reason no safety/risk evaluated | Open-ended to field to explain answer |
| Was the child removed from the foster home during investigation? | Drop Down Box: Yes No NA |
| Investigator refer the perpetrator to DA or law attention | Drop Down Box: Yes No NA |
| Medical professionals involved | Drop Down Box: Yes No NA |

**Mississippi Foster Care Services Assessments**

| | |
|---|---|
| Medical professionals involved appropriately | Drop Down Box: Yes No NA |
| Legal professionals involved | Drop Down Box: Yes No NA |
| Legal professionals involved appropriately | Drop Down Box: Yes No NA |
| Law enforcement involved | Drop Down Box: Yes No NA |
| Law enforcement involved appropriately | Drop Down Box: Yes No NA |
| Other State Agencies involved | Drop Down Box: Yes No NA |
| Other State Agencies involved appropriately | Drop Down Box: Yes No NA |
| Distinguish, address immediate safety issues vs risk factors | Drop Down Box:  No (neither risk nor safety), Yes (risk and safety), Yes (risk only), Yes (safety only), NA not applicable, No Documentation |
| Child & res family needed immediate services to address S&R | Drop Down Box:  No (neither risk nor safety), Yes (risk and safety), Yes (risk only), Yes (safety only), NA not applicable, No Documentation |
| If yes, were safety services received by all who required? | Drop Down Box: Yes, No, Not Enough Information |
| Was the case plan changed as a result of the safety issues identified? | Drop Down Box: Yes, No, Not Enough Information |
| Was a safety plan/safety services required during investigation? | Drop Down Box: Yes, No, Not Enough Information |
| Did actions (safety plan/removal) mitigate? | Drop Down Box: Yes, No, Not Enough Information |
| Were safety and risk issues of all kids in res home? | Drop Down Box: Yes, No, Not Enough Information |
| Resource family referred to service where needs identified | Drop Down Box: Yes No NA |
| Unidentified needs safety or risk of harm | Drop Down Box: Yes No NA |
| Caregiver S&R services not received | Open-ended to field to explain answer |
| Reported children S&R services not received | Open-ended to field to explain answer |
| Other children in HH  S&R services not received | Open-ended to field to explain answer |
| Other persons S&R services not received | Open-ended to field to explain answer |

| Foster Care Support Services Sample | |
|---|---|
| **Question** | **How to Fill Out/Drop Down Box** |
| Case Number | Enter Case Number |
| How many placements during current episode? | Please enter the total  number of placements the child has experienced during the current episode (including any emergency or other placements) |
| How many of the changes in placement were due to unplanned disruptions? | Please enter the number, based on your opinion |
| Were all prior placements in episode in foster care setting | Drop Down Box: Yes No NA |
| If no, please explain | Open ended field where reviewer can explain their answer |
| How long has child been in current placement | Please answer question in weeks, months, years |
| What is the frequency of visitation in the home by the case worker? | Drop Down Box: At least bi-weekly, At least monthly, At least once a week, Less than Monthly, Less than quarterly, Monthly, More than monthly, Quarterly |
| How long has the foster caretaker been licensed to care for foster children? | Please answer question in weeks, months, years |
| Is this a kin foster placement? | Drop Down Box: Yes No NA |
| If no, has the child been placed prior in a kin home? | Drop Down Box: Yes No NA |
| If no, why? If yes, explain what happened? | Open ended field where reviewer can explain their answer |

Mississippi Foster Care Services Assessments

| | |
|---|---|
| Does the placement match the identified needs of the child? | Drop Down Box: Yes, No, Not Enough Information |
| Please Explain: | Open ended field where reviewer can explain their answer |
| Does the placement seem free of threats of disruption for foreseeable future? | Drop Down Box: Yes, No, Not Enough Information |
| Please Explain: | Open ended field where reviewer can explain their answer |
| How many children are in the home? | Please enter number of children, including subject child |
| Are any siblings of subject child in home? | Drop Down Box: Yes No NA |
| What are the identified needs of the child in foster care? | Open ended field where reviewer can explain their answer |
| Have any issues arisen with the child threatening the stability of the placement? | Drop Down Box: Yes, No, Not Enough Information |
| Please Explain: | Open ended field where reviewer can explain their answer |
| If yes, have the issues been addressed | Drop Down Box: Yes, No, Not Enough Information |
| Please Explain: | Open ended field where reviewer can explain their answer |
| Are any services being provided to the foster caretaker? | Drop Down Box: Yes, No, Not Enough Information |
| If yes, please describe the services: | Open ended field where reviewer can explain their answer |
| Are the services appropriate, based on needs in home: | Based on Reviewer opinion<br>Drop Down Box: Yes No NA |
| Were they implemented in a timely fashion? | Based on Reviewer opinion<br>Drop Down Box: Yes No NA |
| Please describe any impact you can see of the services, including quality of services: | Open ended field where reviewer can explain their answer |
| Are there any unmet service needs to support placement? | Drop Down Box: Yes, No, Not Enough Information |
| If yes, please describe: | Open ended field where reviewer can explain their answer |
| Why have these services not been implemented? | Open ended field where reviewer can explain their answer |
| Did the foster caretaker refuse any service offerings? | Drop Down Box: Yes No NA |

| Reunification Services Sample | |
|---|---|
| **Question** | **How to Fill Out/Drop Down Box Options** |
| Case Number | Enter case number |
| Date goal changed to reunification | Enter date of goal change |
| Date of another goal change, reunification, or date of review | Enter date if goal changed to something else after reunification; date of reunification if achieved; or current date (if child is still in care and goal is still reunification). This will be used to help calculate how long they received any potential reunification services |
| Was reunification achieved? | Drop Down Box: Yes No NA |
| What was the initial reason for removal? | Describe the reason the child was removed from their home |
| Were services identified in case plan to address reasons? | Drop Down Box: Yes, No, Not Enough Information |
| Were identified services tied to needs? | Drop Down Box: Yes, No, Not Enough Information |
| If no, why not? | Open Ended field for reviewer to explain their answer |
| What services were recommended for caregivers? | Open Ended field for reviewer to explain/describe their answer |
| Did they receive services? | Drop Down Box: Yes, No, Not Enough Information |

Mississippi Foster Care Services Assessments

| If yes, what was the length of services? | Please enter length of time in weeks or months |
|---|---|
| How long did it take to implement services? | Please enter length of time in weeks or months |
| If no, or they were not completed, please explain: | Open Ended field for reviewer to explain/describe their answer |
| What services were recommended for removal child(ren) | Open Ended field for reviewer to explain/describe their answer |
| Did they receive services? | Drop Down Box: Yes, No, Not Enough Information |
| If yes, what was the length of services? | Please enter length of time in weeks or months |
| How long did it take to implement services? | Please enter length of time in weeks or months |
| If no, or they were not completed, please explain: | Open Ended field for reviewer to explain/describe their answer |
| What services were recommended for non-removed siblings? | Open Ended field for reviewer to explain/describe their answer |
| Did they receive services? | Drop Down Box: Yes, No, Not Enough Information |
| If yes, what was the length of services? | Please enter length of time in weeks or months |
| How long did it take to implement services? | Please enter length of time in weeks or months |
| If no, or they were not completed, please explain: | Open Ended field for reviewer to explain/describe their answer |
| What services were recommended for other adult household members? | Open Ended field for reviewer to explain/describe their answer |
| Did they receive services? | Drop Down Box: Yes, No, Not Enough Information |
| If yes, what was the length of services? | Please enter length of time in weeks or months |
| How long did it take to implement services? | Please enter length of time in weeks or months |
| If no, or they were not completed, please explain: | Open Ended field for reviewer to explain/describe their answer |
| Were the services located in their community? | Drop Down Box: Yes, No, Not Enough Information |
| If no, please explain: | Open Ended field for reviewer to explain/describe their answer |
| In your opinion, were the services effective? | Drop Down Box: Yes, No, Not Enough Information |
| If no, please explain: | Open Ended field for reviewer to explain/describe their answer |
| How frequent were caregiver/child visitation? | Drop Down Box: At least bi-weekly, At least monthly, At least once a week, Less than Monthly, Less than quarterly, Monthly, More than monthly, Quarterly |
| How frequent was face to face contact between SW and caregiver? | Drop Down Box: At least bi-weekly, At least monthly, At least once a week, Less than Monthly, Less than quarterly, Monthly, More than monthly, Quarterly |
| How frequent was face to face contact between SW and child? | Drop Down Box: At least bi-weekly, At least monthly, At least once a week, Less than Monthly, Less than quarterly, Monthly, More than monthly, Quarterly |
| How frequent was contact between SW and service provider? | Drop Down Box: At least bi-weekly, At least monthly, At least once a week, Less than Monthly, Less than quarterly, Monthly, More than monthly, Quarterly |
| If any visitation was not regular, please explain: | Open Ended field for reviewer to explain/describe their answer |
| Was a comprehensive strengths and needs assess on all relevant | Drop Down Box: Yes, No, Not Enough Information |
| If yes, please describe the assessment used? | Open Ended field for reviewer to explain/describe their answer |
| Did the assessment identified needs that must be addressed through services prior to reunification? | Drop Down Box: Yes, No, Not Enough Information |
| If not, who did not receive an assessment? | Open Ended field for reviewer to explain/describe their |

Mississippi Foster Care Services Assessments

| | answer |
|---|---|
| Were there apparent needs for services but no services were provided? | Drop Down Box: Yes, No, Not Enough Information |
| Why or why not? | Open Ended field for reviewer to explain/describe their answer |
| What services were provided by MDHS worker? | Open Ended field for reviewer to explain/describe their answer |
| What services were provided by contracted provider (specify who) | Open Ended field for reviewer to explain/describe their answer |

**Medical, Dental, and Mental Health Services Sample**

| Question | How to Fill Out/Drop Down Options |
|---|---|
| Case Number | Enter case number |
| Was there an initial health screening exam completed? | Drop Down Box: Yes, No, Not Enough Information |
| How long after case opening was it completed? | Please enter time in days, weeks, months |
| Who was the provider of the screening | Please name the provider who conducted the screening, and type of professional |
| Was there an initial dental screening exam completed? | Drop Down Box: Yes, No, Not Enough Information |
| How long after case opening was it completed? | Please enter time in days, weeks, months |
| Who was the provider of the screening | Please name the provider who conducted the screening, and type of professional |
| Was there an initial mental health screening evaluation completed? | Drop Down Box: Yes, No, Not Enough Information |
| How long after case opening was it completed? | Please enter time in days, weeks, months |
| Who was the provider of the screening | Please name the provider who conducted the screening, and type of professional |
| Please detail any reasoning noted for delays in screenings: | Open ended field for reviewer to explain their answer |
| Were follow up appointments made/kept for specialized treatment? | Drop Down Box: Yes No NA |
| Was specialized treatment available? | Drop Down Box: Yes, No, Not Enough Information |
| Were services provided? | Drop Down Box: Yes, No, Not Enough Information |
| Please describe any barriers to accessing special treatment, inc payment | Open ended field for reviewer to explain their answer |
| Was there ongoing health screenings? | Drop Down Box: Yes, No, Not Enough Information |
| Who was the provider of the screening/exam? | Please name the provider who conducted the screening, and type of professional |
| Did the ongoing health updates appear to be timely? | Drop Down Box: Yes No NA |
| Was there ongoing dental screenings? | Drop Down Box: Yes, No, Not Enough Information |
| Who was the provider of the screening/exam? | Please name the provider who conducted the screening, and type of professional |
| Did the ongoing dental updates appear to be timely? | Drop Down Box: Yes No NA |
| Was there ongoing mental health screenings? | Drop Down Box: Yes, No, Not Enough Information |
| Who was the provider of the screening/exam? | Please name the provider who conducted the screening, and type of professional |
| Did the ongoing mental health updates appear to be timely? | Drop Down Box: Yes No NA |
| How accessible were the health, dental, MH | Open ended field for reviewer to explain their answer |

**Mississippi Foster Care Services Assessments**

| | |
|---|---|
| providers? Please Explain | |
| During course of case, were any treatment needs identified: | Drop Down Box: Yes No NA |
| If yes, please describe: | Please briefly describe the needs |
| Were services provided to address identified needs? | Drop Down Box: Yes, No, Not Enough Information |
| Were needs addressed in timely manner? | Drop Down Box: Yes, No, Not Enough Information |
| Were services provided appropriate | Drop Down Box: Yes, No, Not Enough Information |
| Was service provider accessible to child? | Drop Down Box: Yes, No, Not Enough Information |
| Were any services needed but not provided to subject child? | Drop Down Box: Yes No NA |
| Please describe: | Open ended field for reviewer to explain their answer |
| Were any services needed but not provided to other family/siblings? | Drop Down Box: Yes No NA |
| Please describe: | Open ended field for reviewer to explain their answer |
| Did the worker accurately match needs to services for all family | Drop Down Box: Yes No NA |
| Please Explain: | Open ended field for reviewer to explain their answer |
| Identify the provider of the services, e.g., private physician, | Please name the provider who conducted the screening, and type of professional |
| Was the lack of accessibility to providers a factor in the child | Open ended field for reviewer to explain their answer |

| | |
|---|---|
| **Independent Living Services Sample** | |
| **Question** | **How to Fill Out/Drop Down Boxes** |
| Case Number | Enter case number |
| Age of child | Enter age of child in years and months (ie 14.6) |
| Current Placement Type | Drop Down Box: Emergency Placement, Foster Home, Group Home, Inpatient Facility, Kin Foster Home, Residential Facility, Supervised independent living, Unlicensed kin placement |
| Date entered FC in current episode | Enter date enter care |
| Date left care or today's date | Enter date child left care (if child has left care) or date reviewer is reviewing case. This will be used to help calculate time in care |
| Permanency Goal | Drop Down Box: Adoption, Independent Living, Long-term Foster Care, No Documentation, Reunification |
| What was the reason the child was placed? | Please describe the reason why the child was placed |
| What were the identified needs of the child re: IL or Transitional Living? | Open Ended field for reviewers to explain their answer |
| Did the child complete the services? | Drop Down Box: Yes, No, Not Enough Information |
| Were the services connected to the identified needs? | Drop Down Box: Yes, No, Not Enough Information |
| Please Explain: | Open Ended field for reviewers to explain their answer |
| Please describe the IL specific services provided:1-4 | Reviewers will have the opportunity to describe up to 4 different IL services provided to the child, and answer the following 5 questions for each service. Drop Down Box: Educational Training Vouchers, Life Skills Classes, Other, Retreats |
| If other service, please specify:1-4 | If service described is not one of the drop down options, please describe it |

**Mississippi Foster Care Services Assessments**

| | |
|---|---|
| At what age did they begin?1-4 | Enter age of child in years and months (ie 14.6) |
| Based on review of plan, were these services consistent and appropriate based on the identified needs?1-4 | Drop Down Box: Yes, No, Not Enough Information |
| Were services initiated in a timely manner? 1-4 | Drop Down Box: Yes, No, Not Enough Information |
| Please explain your answers: 1-4 | Open Ended field for reviewers to explain their answer |
| How accessible were the services to the child? Please explain | Open Ended field for reviewers to explain their answer |
| Did the child regularly participate? | Drop Down Box: Yes, No, Not Enough Information |
| Please explain you answer | Open Ended field for reviewers to explain their answer |
| Was the Ansell Casey assessment completed? | Drop Down Box: Yes, No, Not Enough Information |
| Were the results of this assessment used to develop the IL plan? | Drop Down Box: Yes, No, Not Enough Information |
| Was the child involved in the development of either case plan? | Drop Down Box: Both Case Plans, MDHS Case Plan, Neither Case Plan, Not Enough Information, Svc Provider Case Plan |
| Were there any apparent IL or Transitional Living services not identified in the assessment or plan? | Drop Down Box: Yes, No, Not Enough Information |
| Please explain your answer: | Open Ended field for reviewers to explain their answer |
| Were there any identified IL or Transitional living needs for which services were not provided? | Drop Down Box: Yes, No, Not Enough Information |
| Please explain your answer: | Open Ended field for reviewers to explain their answer |

**Ex. 30**

## MACWIS ACCOMPLISHMENTS
## September 2009 – July 2010

**TABLE OF CONTENTS**

_____

2     Statewide Wyse Terminal Distribution
3     Statewide User Connectivity
4     Development of DFCS Web-Based Applications
5     MACWIS Staffing
6     Citrix Version Upgrade
7     Citrix License Capacity
8     RFP – MACWIS Systems Alternatives Analysis
9     MACWIS Helpdesk and User Communication

**APPENDIX**

A     Survey Results – November 2009
B     DFCS Statewide Wyse Terminal Distribution Schedule
C     MACWIS Helpdesk Procedures / MACWIS Incident Report

## Statewide WYSE Terminal Distribution

In order to ensure all users were equipped with a computer in each state office, on November 24, 2009, ASWS in each county were asked to complete an online survey which included questions related to users without access to their own computer. From the results of this survey, a list was compiled (see Appendix A) reporting the counties in need and given to MACWIS hardware/network. Beginning December 2009, working with the Wyse terminals in stock, terminals were configured and delivered to the counties in need.

During the December – February timeframe as these terminals were being distributed, the Economic Assistance division began upgrading to a newer model Wyse terminal statewide and DFCS was fortunate to inherit V90 terminals from EA for a statewide DFCS upgrade. The newer model terminal is expected to provide system performance improvement to users who especially are using the older model Wyse terminals. In March, 2010, the two hardware/network staff – Randy Reed and Bill Suthoff, began upgrading counties as Economic Assistance finished upgrading counties and transferred the V90 Wyse terminals to DFCS.

### Current Status

As of 06/28/2010, upgrades were completed in 26 counties by Bill Suthoff and Randy Reed. With the Systems Administrator II staff addition on June 21, 2010 in MACWIS to assist with this effort, since 06/28/2010, 18 additional counties have been upgraded to the V90 Wyse terminals for a total of 44 counties. The team of three working on this effort are: Bill Suthoff - setting up the Wyse terminal image for each county from State Office; Randy Reed and David Roberts – installing upgraded terminals in each county, transferring inventory for each Wyse terminal from EA to DFCS, transporting remaining terminals to State Office for inventory transfers. MACWIS staff continues to remain ahead of target on the Wyse terminal distribution schedule (see Appendix B). The completion of the statewide upgrade is set for September 24, 2010.

### WYSE Terminal Maintenance/Replacement

For broken and non-functioning Wyse terminals, DFCS Regional Directors are responsible for reporting via email or phone call to MACWIS HelpDesk and the MACWIS Director for pickup and replacement. For any new hires in which a computer is needed, DFCS Regional Directors are responsible for reporting via email or phone call to MACWIS HelpDesk and the MACWIS Director for installation to be scheduled.

## Statewide User Connectivity

On January 11, 2010, Venture Technologies network engineer began working with MIS/MACWIS to analyze and resolve statewide issues concerning printing, email and system login problems. Printing and email issues were resolved in March 2010. In early April 2010, after further infrastructure and server analysis, Venture Technologies made recommendations to address the system login/connectivity issues. In May, 2010, Venture began additional work on the MACWIS Citrix Server farm (the servers that allow users to connect to the MACWIS application) in an effort to resolve the slow login problems statewide.

The work plan for the MACWIS Citrix server farm consisted of: 1) adding two additional login servers to the server farm which would allow users to be split among three servers for login purposes. Currently all users were funneling through one login server. With the additional staff DFCS has added, one server was not adequate, hence the login/connectivity issues. 2) purchasing additional hard drives to add to the login servers for more capacity. Four hard drives were required to provide maximum capacity for the three login servers. 3) restructuring SAN Storage space to accommodate DFCS' needs. 4) re-purposing two additional servers to add to the Citrix server farm. 5) converting from roaming profiles to local profiles for state office users only.

### Current Status

During the week of May 10 –16, the counties of Covington and Simpson were chosen as 'pilot' counties. Venture Technologies moved the users in the pilot counties to a separate login server. During the week of May 17-21, 2010, MACWIS Helpdesk staff contacted users in the pilot counties to verify their login time had improved. The login times showed drastic improvement.

During the weeks of May 31 – June 18, MIS was engaged in verifying a complete and accurate list of DFCS users to ensure all users to be moved to the login servers were currently employed users.

During the week of June 21 – 27, Venture Technologies completed moving all users located in Regions II-E, II-W, IV-N, IV-S, V-E and V-W (which affected 422 users) to one of the three designated login servers. On June 29, MACWIS Helpdesk staff contacted all users in these regions to verify their login time had improved. The login times showed drastic improvement. Hard drives arrived in house to be installed on the login servers allowing maximum capacity.

During the week of June 28 – July 5, Venture Technologies completed moving all users located in Regions I-N, I-S, VI, VII-E, and VII-W (which affected 406 users) to one of the three designated login servers. On July 8, MACWIS Helpdesk staff contacted all users in these regions to verify their login time had improved. The login times showed drastic improvement.

During the week of July 12 – 18, Venture Technologies completed moving all users located in Region III (which affected 347 users) to one of the three designated login servers. On July 20, MACWIS Helpdesk staff contacted all users in these regions to verify their login time had improved. The login times showed drastic improvement. As of July 19, all DFCS users have been spread across three login servers to improve user connectivity/login times statewide. Additional network SAN storage space was configured for DFCS. State office user profiles were reconfigured from 'roaming' (which requires more server resources that could be freed up for field staff users)  to 'local' (which requires less server resources).

## Development of DFCS Web-Based Applications

Development of several web-based applications has been in progress since January 2010. These web-based applications will be helpful to users in making their jobs easier. The applications in which development is currently in progress are:

1) Online Serious Incident Report (SIR) – allows users to submit the SIR form to state office for approval via web browser. State office approval of submitted forms is an automated process. State office staff is able to add additional information in the database for the SIR reports as well as run reports at any given time.

2) CQI Review Instrument – allows CQI reviewers to input CQI review data into a database via web-based application. The CQI review instrument is complex in that there are a multitude of questions. The development of this instrument as a web-based application will save users time and save the agency the cost of producing these large documents on paper. The fact that the scoring process is programmed into the CQI review instrument is also a huge time savings for the CQI reviewers.

3) DFCS Intranet – allows users access to division-wide documents and information. Users will be able to access the intranet via Wyse terminals for division forms, links to MACWIS reports, policy as well as other division information. The development of a division intranet will allow statewide sharing of information and a central location for all division documents.

**Current Status**
1) Online Serious Incident Report (SIR) – the online SIR was moved into production and available to users statewide on 07/07/2010. The MACWIS Director sent an email to all Regional Directors to pass on to their staff as notification that the online form could now be utilized.
2) CQI Review Instrument – development continues on the web-based CQI review instrument. MACWIS staff has been working with CQI staff for requirements and MIS staff in the development and test phases. As of 07/15/2010, CQI staff was given the link to the web-based instrument for the first testing phase to identify form navigational issues and make recommendations.
3) DFCS Intranet – development continues on the DFCS intranet. The MACWIS Director is developing the intranet and is working with DFCS bureau and division directors to gather requirements and information for inclusion on the intranet. This work in progress will be developed in two phases. Phase I will include links to all informational DFCS documents to make them available to all users, hence replacing the use of the network P:/ drive. This will give a central location for documents. Phase II will include the automation of division forms to conserve paper and make the forms submission process to state office flow smoother.

**Web-Based Applications - Maintenance**
To report any problems with any DFCS web-based application, users will be requested to call the MACWIS HelpDesk and their call will be logged and routed to the appropriate support staff.

Any modifications or enhancements to any DFCS web-based applications will need to be submitted to MACWIS HelpDesk for assignment, requirements gathering and prioritization.

## MACWIS STAFFING

In accordance with the *Olivia Y* Bridge Plan requirements, the MACWIS Director, Cindy Greer, and CQI Director, Mike Gallarno have moved forward in the hiring process for three MACWIS positions: 1) Systems Administrator II, 2) Senior Business Systems Analyst, 3) Business Systems Analyst I.

**Current Status**
As of 06/21/2010, the Systems Administrator II position has been filled. Charles David Roberts was hired for this position and currently reports directly to the MACWIS Director.

As of 07/14/2010, an offer was made and accepted by O'Ouida Starling for the Business Systems Analyst I position. The applicant is slated to report to the MACWIS Director on 08/02/2010. All paperwork is currently being processed in MDHS HR Department.

As of 07/19/2010, an offer was made and accepted by Tracy Aynes for the Senior Business Systems Analyst position. The applicant is a current MDHS DFCS employee and has already begun to assume this role. All paperwork is currently being processed in MDHS HR Department and scheduled to be finalized by 08/02/2010.

## CITRIX VERSION UPGRADE

The MACWIS Director has been working with MIS since March 4, 2010 on the Citrix version upgrade after notification from MIS procurement that the annual license renewal was due and the purchase of additional licenses would require a Citrix version upgrade.

**Current Status**

June 2010 – On June 4, 2010, approval was given to move forward in the purchase of the Citrix version upgrade software along with the additional Citrix licenses purchase. MIS worked with vendors gathering additional information on pricing, Citrix licenses/version upgrade for review and consideration. On June 28, 2010 a purchase order was issued for the purchase of Citrix XenApp (version 4.5).

As of July 26, 2010 – Venture Technologies network engineer is working on loading the upgrade version 4.5 of Citrix on test servers.

## CITRIX LICENSE CAPACITY

The MACWIS Director has been working with MIS since March 4, 2010 on Citrix license capacity after notification from MIS procurement that the annual license renewal was due.

April 2010 – Continued to receive updates from MIS regarding the license capacity via server log reports. MIS network staff continued to monitor the Citrix license server to disconnect users that had not logged out of the system properly and therefore were holding a license instance causing the license count to be skewed upward.

May 2010 – Due to the fact the current number of licenses had reached the point of maximum capacity on some days due to additional staff and additional contractors accessing the system, the MACWIS Director began working with MIS to research additional options to increase the license count.

June 2010 – On June 4, 2010, approval was given to move forward in the purchase of additional Citrix licenses. MIS worked with vendors gathering additional information on pricing, Citrix licenses/version upgrade for review and consideration. On June 28, 2010 a purchase order was issued for the purchase of 1520 additional Citrix licenses. On June 30, 2010, MIS received the license keys. With the purchase of the additional 1520 licenses, after implementation, this will give DFCS a total of 2280 Citrix licenses.

**Current Status**
Due to the slow login/connectivity issues, users were attempting to login to the system multiple times which actually tied up instances of licenses. Since the end of June when the work began on the servers to move users across three login servers, the license capacity issue has diminished. MIS network staff continues to monitor the license server daily to ensure we are not reaching maximum license capacity. Currently on peak days the capacity is estimated at 86%.

July 2010 – In order to utilize the newly purchased licenses, the upgraded version of Citrix (XenApp – Version 4.5) must be loaded on DFCS servers. As of July 26, 2010, Venture Technologies network engineer is working on loading the upgrade version 4.5 of Citrix on test servers.

## RFP – MACWIS SYSTEMS ALTERNATIVES ANALYSIS

DFCS has made significant progress on the development and release of a Systems Alternatives Analysis RFP for the MACWIS system. This initiative, although met by obstacles in 2009, is nearing completion as the RFP is scheduled for release on July 27, 2010, pending the final approval from our federal partners, Administration for Children and Families (ACF).

In November, 2009, the newly appointed MACWIS director rewrote and restructured the RFP due to lack of continuity. The new version of the RFP was inclusive of more detailed verbiage pertaining to the *Olivia Y* lawsuit settlement agreement and was broken down into three phases: 1) Systems Alternatives Analysis, 2) Development of the RFP to acquire services for a systems development contractor, 3) Development of the RFP to acquire services for an IV&V vendor.  For review and comment, a draft of this RFP was sent to Grace Lopes, Children's Rights Inc. attorneys, the National Resource Center for Child Welfare Data Technology analysts, the *Olivia Y* lawyers representing MDHS, and the state's Information Technology Services agency (ITS). Upon review and recommendations from these entities, a draft of the RFP was sent to ACF on April 23, 2010 for review.

On April 29, 2010, ITS presented the MACWIS Systems Alternatives Analysis RFP to the ITS board for approval to release. The board voted in favor of the release of this RFP.

On May 7, 2010, a formal submission of the RFP was sent to ACF requesting approval to release by May 18, 2010. On May 13, 2010 ACF, DFCS, MIS and ITS representatives engaged in a conference call. ACF requested the RFP be condensed to only include the systems alternatives analysis phase and possibly the IV&V RFP development as a separate pricing option. Working with ITS, the final version was completed and sent back to ACF to request approval on June 30, 2010.

**Current Status**
As of 07/19/2010, ACF is currently reviewing the RFP and DFCS currently awaits feedback on the request for approval to release. To release the RFP without ACF's approval would mean no federal funding for system development.

As of 07/20/2010, ACF analyst contacted the MACWIS Director for an update. ACF has some minor wording changes to request from DFCS for the RFP. ACF will be sending a formal response by end of this week. They ask that DFCS make the RFP changes, send an informal copy of the updated RFP back to ACF and continue with our 07/27/2010 release of the RFP. The MACWIS Director has worked with ITS' Debra Spell to make the requested ACF changes. The RFP is in the process of being released to the public today, July 27, 2010. The RFP will be available via ITS and MDHS websites today, July 27, 2010.

## MACWIS HELPDESK AND USER COMMUNICATION

The MACWIS Director has made progress on improvement of communication between MACWIS Staff and Field Staff. MACWIS HelpDesk is a statewide customer service unit and all MACWIS staff have been made aware of the proper customer service attitude we must have when speaking with any users via phone or email. These accomplishments have been made in the area of MACWIS HelpDesk:

1) MACWIS Staff are available from 7:30a.m. until 5:00p.m. to answer phone calls and receive emails from users statewide concerning MACWIS system problems.

2) All MACWIS users received an updated MACWIS HelpDesk Procedures document via email on April 07, 2010. Included in this document was a copy of the MACWIS Incident Report to be used to report any system issues (see Appendix C).

3) May, 2010 - MACWIS HelpDesk staff began tracking all phone calls into the HelpDesk line. A monthly phone call log is kept by all DFCS HelpDesk, hardware, cell phone, and network staff and reported to the MACWIS Director at the first of each month.

4) Communication between MACWIS staff and MIS staff has improved tremendously. Both work together daily to resolve user issues and communicate to field staff as needed.

5) The MACWIS Director works with the MIS MACWIS Project Manager for details of all MACWIS system releases. Once systems releases are moved to production, the MACWIS Director notifies all MACWIS users via email of the system changes. The email includes a detailed document explaining the changes to users.

6) The MACWIS Director notifies all MACWIS users of any system outages that occur in which the system will be unavailable for use.

7) The MACWIS Director works with Regional Directors to prioritize MIS work in the event a HEAT ticket needs immediate attention.

# SurveyMonkey - Survey Results 2009

| Region | County | # of Supv Staff Housed | # of Field Staff in this offfice | # of other staff (clerical, secretarial) | Total DFCS Staff Housed in this office | Users Without WYSE Terminals |
|---|---|---|---|---|---|---|
| 5West | Adams | 5 | 14 | 5 | 24 | 0 |
| 1North | Alcorn | 2 | 7 | 4 | 13 | 0 |
| 5West | Amite | 1 | 2 | 2 | 5 | 0 |
| 3North | Attala | 1 | 3 | 4 | 8 | 0 |
| 1North | Benton | 1 | 3 | 3 | 7 | 0 |
| 2West | Bolivar West | 1 | 4 | 1 | 6 | 3 |
| 2West | Bolivar East | | | | | 0 |
| 1South | Calhoun | 1 | 5 | 1 | 7 | 1 |
| 2East | Carroll | 1 | 2 | 3 | 6 | 0 |
| 1South | Chickasaw East | 1 | 2 | 1 | 3 | 0 |
| 1South | Chickasaw West | 2 | 5 | 2 | 8 | 1 |
| 4North | Choctaw | 1 | 1 | 2 | 4 | 0 |
| 5West | Claiborne | 1 | 3 | 2 | 5 | 0 |
| 4South | Clarke | | | | | 0 |
| 4North | Clay | 1 | 5 | 1 | 7 | 1 |
| 2West | Coahoma | | | | | 0 |
| 5East | Copiah | 2 | 7 | 3 | 9 | 5 |
| 5East | Covington | 2 | 3 | 0 | 5 | 2 |
| 1North | DeSoto | 4 | 19 | 3 | 30 | 3 |
| 5West | Franklin | 0 | 2 | 0 | 2 | 0 |
| 6 | Forrest | 6 | 19 | 9 | 34 | 0 |
| 7East | George | | | | | 0 |
| 7East | Greene | | | | | 0 |
| 2East | Grenada | 2 | 3 | 5 | 10 | 0 |
| 7West | Hancock | 2 | 11 | 2 | 15 | 0 |
| 7West | Harrison | 9 | 29 | 6 | 44 | 11 |
| 3South | Hinds | 9 | 33 | 16 | 58 | 4 |
| 3North | Holmes | 1 | 5 | 1 | 7 | 0 |
| 2West | Humphreys | 1 | 6 | 1 | 7 | 1 |
| 3North | Issaquena | 0 | 1 | 0 | 1 | 0 |
| 1South | Itawamba | | | | | 0 |
| 7West | Jackson | | | | | 0 |
| 4South | Jasper | | | | | 0 |
| 5West | Jefferson | 1 | 2 | 2 | 5 | 1 |
| 5East | Jefferson Davis | 2 | 2 | 1 | 5 | 2 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 4South | Jones | | | | | 0 |
| 4North | Kemper | 1 | 1 | 0 | 2 | 0 |
| 1South | Lafayette | 1 | 6 | 1 | 8 | 0 |
| 6 | Lamar | 1 | 5 | 1 | 7 | 0 |
| 4South | Lauderdale | 3 | 12 | 5 | 20 | 0 |
| 5East | Lawrence | 1 | 5 | 0 | 7 | 3 |
| 3North | Leake | 1 | 3 | 1 | 5 | 0 |
| 1South | Lee | 5 | 12 | 5 | 22 | 3 |
| 2East | Leflore | 2 | 4 | 1 | 7 | 0 |
| 5East | Lincoln | 2 | 8 | 1 | 11 | 1 |
| 4North | Lowndes | 3 | 5 | 2 | 10 | 2 |
| 3North | Madison | 3 | 5 | 4 | 12 | 5 |
| 6 | Marion | 0 | 5 | 2 | 8 | 0 |
| 1North | Marshall | 1 | 6 | 8 | 9 | 0 |
| 1South | Monroe Aberdeen | 1 | 6 | 1 | 7 | 1 |
| 1South | Monroe Amory | 2 | 8 | 1 | 13 | 1 |
| 2East | Montgomery | 1 | 3 | 3 | 7 | 0 |
| 4North | Neshoba | 2 | 6 | 2 | 10 | 1 |
| 4South | Newton | 1 | 2 | 1 | 4 | 0 |
| 4North | Noxubee | 0 | 2 | 1 | 3 | 0 |
| 4North | Oktibbeha | 2 | 4 | 2 | 9 | 3 |
| 2East | Panola | 1 | 5 | 2 | 8 | 2 |
| 6 | Pearl River | 3 | 13 | 15 | 22 | 0 |
| 6 | Perry | 1 | 3 | 1 | 5 | 0 |
| 5West | Pike | 4 | 10 | 3 | 17 | 0 |
| 1South | Pontotoc | 2 | 10 | 1 | 13 | 0 |
| 1North | Prentiss | | | | | 0 |
| 2East | Quitman | 1 | 2 | 2 | 5 | 1 |
| 3North | Rankin | 3 | 14 | 2 | 19 | 0 |
| 3North | Scott | 1 | 5 | 0 | 6 | 0 |
| 3North | Sharkey | 0 | 1 | 0 | 1 | 0 |
| 5East | Simpson | 3 | 8 | 1 | 12 | 7 |
| 5East | Smith | 1 | 2 | 1 | 4 | 1 |
| 6 | Stone | 1 | 9 | 1 | 10 | 2 |
| 2East | Tallahatchie | 1 | 3 | 2 | 6 | 0 |
| 2East | Tate | 2 | 2 | 1 | 6 | 0 |
| 1North | Tippah | 4 | 6 | 2 | 12 | 0 |
| 1North | Tishimingo | | | | | 0 |
| 2East | Tunica | 0 | 2 | 0 | 2 | 0 |
| 1South | Union | 2 | 10 | 1 | 14 | 0 |
| 5West | Walthall | 2 | 4 | 3 | 10 | 0 |
| 3South | Warren | | | | | 0 |
| 2West | Washington | 5 | 35 | 4 | 44 | 9 |
| 4South | Wayne | | | | | 0 |
| 4North | Webster | 1 | 1 | 1 | 3 | 0 |
| 5West | Wilkinson | 1 | 1 | 1 | 2 | 0 |
| 4North | Winston | 1 | 3 | 1 | 6 | 0 |
| 2East | Yalobusha | 1 | 3 | 2 | 6 | 0 |
| 3North | Yazoo | 1 | 2 | 1 | 6 | 6 |

# APPENDIX B

| DFCS STATEWIDE WYSE TERMINAL DISTRIBUTION WEEKLY SCHEDULE BEGIN DATE 06/29/2010 END DATE 09/24/2010 By: C Greer 06/28/2010 |
|---|

**As of 07/30/2010, Wyse terminals have been distributed to the counties highlighted in yellow below.**

| WEEK | COUNTIES |
|---|---|
| | |
| June 29 – July 2 | Jones, Wayne, Perry, Greene, Rankin |
| July 6 – July 9 | Holmes, Humphreys, Attala, LeFlore |
| July 12 – July 16 | Winston, Noxubee, Neshoba, Kemper |
| July 19 – July 23 | Lowndes, Oktibbeha, Choctaw, Montgomery |
| July 26 – July 30 | Carroll, Sunflower, Washington, Bolivar |
| August 2 – August 6 | Yazoo, Madison, Forrest, Marion |
| August 9 – August 13 | Webster, Calhoun, Chickasaw, Monroe, Clay |
| August 16 – August 20 | Grenada, Yalobusha, Tallahatchie, Panola, Quitman |
| August 23 – August 27 | Coahoma, Tunica, Tate, Marshall, Lafayette |
| August 30 – September 3 | Benton, Alcorn, Tishomingo, Tippah, Prentiss |
| September 6 – September 10 | Itawamba, Lee, Union, Pontotoc |
| September 13 – September 17 | Pearl River, Stone, George |
| September 20 – September 24 | Hancock, Harrison, Jackson |

The above schedule is determined in regard to the number of terminals we are acquiring from EA in comparison to the number of DFCS users per county. Some counties with a larger user base are scheduled later due to lack of enough terminals to service those counties until more terminals are acquired.

As of 06/28/2010, Wyse terminals have already been distributed to the following counties:

DeSoto, Issaquena, Sharkey, Leake, Warren, Hinds, Scott, Newton, Lauderdale, Claiborne, Copiah, Simpson, Smith, Jasper, Clarke, Jefferson, Adams, Franklin, Lincoln, Lawrence, Jefferson Davis, Covington, Wilkinson, Amite, Pike, Walthall

## APPENDIX C

## MACWIS HELP DESK PROCEDURES

Reporting a MACWIS Problem

1. The MACWIS Help Desk staff is available Monday through Friday 7:30 a.m. – 5:00 p.m. and should be considered the **first line** of assistance in any MACWIS/DFCS system, cell phone, computer hardware or computer network outage problem. Help Desk staff is also available to answer any questions concerning the status of any MACWIS Incident Reports.  Please refrain from contacting any MIS staff directly unless you are experiencing e-mail or e-leave problems – **ALL** other calls should originate through the MACWIS Help Desk to ensure they are tracked correctly. (NOTE: Help Desk can forward your calls for e-mail or e-leave problems if you are unsure who to contact.)

2. If your problem is a security issue (such as a password reset) call the Help Desk at 1-877-244-2528 (select Option #1 if voice message) and they will refer you to the proper MIS personnel.  For security issues, please remember the Password Reset Protocol - only ASWS, RD or Unit Directors may request a password reset.

3. Most MACWIS problems and requests for assistance require the completion of a MACWIS Incident Report (MIR) - Form MACWIS – 200 (revised 06/26/08).  The form is available on the MACWIS Web in the MACWIS Download Center as well as on the Public Drive at P/Social_S/Forms and Templates/MACWIS Incident Report. A MACWIS Incident Report is also included below for your reference.

4. When completing a MACWIS Incident Report, if possible, please type the information and attach any screen shots that will aid the Help Desk in understanding the issue.
    a. Please be as specific as possible for Help Desk to identify and understand the issue. A complete MIR includes a detailed description of the problem and a requested solution. Please include Head of Household and/or Person name and ID#, case ID#, MACWIS module (i.e., Case, Demographics, Court, Eligibility, etc.) Check boxes have been provided on the form for quick identification. Including this information is extremely helpful to the Helpdesk in assisting with your request.

    b. MACWIS Incident Reports which do not include sufficient information require the MACWIS Help Desk staff to contact you; this causes extra work for you as well as the MACWIS staff and may also cause a delay in the resolution of your issue.  Please

include as many details as possible about your problem – the steps taken prior to an error message, which screens you were navigating to/from, etc… as this will be very helpful information to MIS and MACWIS in duplicating/addressing your problem.

   c. Send the incident report and any attachments via e-mail to helpdesk.MACWIS@mdhs.ms.gov . If e-mail is not operational, please Fax the MIR form to: 1.877.244.2706. Please note that faxed screen shots are extremely difficult to read so the preferred method of sending screen shots is as an e-mail attachment.

5. **MACWIS Incident Reports are NOT worked in the order in which they are received.** Urgent requests take priority. Urgent requests are those relating to: Placement, Eligibility, Intake or Finance.

## HEAT TICKET INFORMATION

When a User receives e-mail notification of a *HEAT ticket # for an MACWIS Incident Report submitted, if MIS involvement is required, this notification means that the MACWIS Help Desk has completed the **first step** in assisting the User. Our present MACWIS system most often requires MIS involvement. (*HEAT is the acronym for the software used by MACWIS support staff and MIS to log and track requests created from MACWIS Incident Reports received from users.)

1. When a HEAT ticket is created, the 'MDHS Priority' field is required. MDHS Priority is categorized by number to indicate urgency of the request; number categorization is between 1 and 4, 1 being the most urgent. The MACWIS Help Desk staff categorizes Finance, Eligibility, Placement and Intake as well as any MACWIS issue that would cause a delay in protection, placement, payment and reporting of results as category 1. There could be many category 1 HEAT tickets in the queue to be worked – therefore, a category 1 HEAT does not mean the issue will be resolved immediately.

2. Ticklers are classified as category #4, indicating the least urgent. Users may be assured that once the MACWIS Help Desk staff receives an Incident Report requesting purging of tickler(s), the MIR is placed in queue with other ticklers by receipt date. Ticklers are investigated and entered into HEAT as quickly as possible and forwarded to MIS. The next steps in purging ticklers depend upon the MIS queue.

3. MACWIS Help Desk staff sends an e-mail notification to the requestor once a HEAT ticket has been entered and forwarded to MIS. This e-mail contains the HEAT ticket number for reference. A follow up e-mail is also

sent to the requestor upon notification from the MIS department that the HEAT ticket has been completed.

4.  Help Desk staff is available to answer any questions concerning the status of HEAT Tickets. Please feel free to call (1-877-244-2528) or e-mail helpdesk.MACWIS@mdhs.ms.gov for any questions you may have.

MISSISSIPPI
Form MACWIS – 200
Revised  06/26/08

# MACWIS INCIDENT REPORT

E-mail: **HelpDesk.MACWIS@mdhs.ms.gov**
**Contact Number: 1-877-244-2528**
**Fax Number:  1-877-244-2706**
P.O. Box 352 Jackson, MS 39205

**IT IS MANDATORY THAT ALL FIELDS BE COMPLETED.**
Press the F1 key for help on a specific field.

| MACWIS USER ID: MW_____ | User Name: _____ |
|---|---|
| Supervisor's Name: _____ | Phone: _____ |
| County: _____ | Region: _____ |

**Issue:** ☐ MACWIS   ☐ Security   ☐ Hardware   ☐ E-Mail   ☐ Other
_____

**Head of Household Name: _____**

**Detailed Description of Problem: _____**

**Mark the MACWIS Module where the problem is occurring:**

☐ Workload   ☐ Intake   Personnel ☐   ☐ Finance   ☐ Eligibility   ☐ Resources

☐ Investigation        ☐ Case              ☐ Court
☐ Safety Assessment    ☐ Placement         ☐ Legal History
                       ☐ Demographics      ☐ County Conference
                       ☐ Risk Assessment
                       ☐ Relationships     ☐ Other
                       ☐ Visitation Plan
                       ☐ IL/TL Plan

**Security:**        ☐ Windows/Citrix Password   ☐ MACWIS Password

**Hardware:** ☐ Mouse ☐ Monitor ☐ Keyboard   WYSE/Other Serial#: _____

FOR STATE OFFICE USE
ONLY
COMPLETED BY
_____

DATE_____

**Ex. 31**



**Interior of DFCS Hancock County Trailer #18**

Photographed by Grace M. Lopes
May 5, 2010

**Ex. 32**

## **Methodology for Validating MACWIS Data Reports**

As part of the implementation of the Practice Model, it is important that MDHS monitor key indicators of child welfare practice in order to ensure children and their families receive and benefit from consistent and quality case practice and services to meet their needs. MACWIS currently contains over 200 developed data reports on various child welfare indicators, however there is widespread concern about the accuracy of these reports due to either systemic or user entry issues. In order to begin to address this concern, a small number of data reports of practice indicators was identified to use in tracking progress in the practice model implementation, and CSF has recommended that MDHS focus efforts on ensuring the accuracy of these reports. CSF is suggesting the following methodology for verifying and validating the data on these reports/indicators.

The validation of data will be addressed at three separate levels: first, by Ronnie Crawford, an independent consultant assigned to the Performance and Evaluation unit; second, by CSF, another independent consultant; and third, through the MACWIS unit, where CSF recommended that an additional data analyst be hired who will be dedicated to work on the reports specifically needed to monitor both the Olivia Y settlement and the Practice Model implementation. None of these entities are in the line of authority of any staff whose work will be reported on, and can therefore be an objective third party.

Validation will address two aspects of the reports:  the information system's ability to collect the correct data from case files and include it in reports, and user issues in recording correct and thorough information.  Within the MACWIS unit, we propose that the dedicated data analyst primarily validate all of the reports for the systemic issues pertaining to the reports by reviewing an identified sample of case files within MACWIS to determine if the reports are properly capturing data when it is recorded in the appropriate fields.  This level of validation should also be responsible for:

- ♦ Comparing reports across reporting periods, and
- ♦ Validating changes within cases that occur from one report to the next in order to determine if the system is properly capturing changes or dropping information in ways that would suggest attention to systemic issues.

Within the Performance and Evaluation Unit and CSF, primary validation activities will focus on data entry issues, e.g., determining whether the data in the MACWIS case files conform to data captured on the reports and whether the information in the case files/reports appear accurate within the context of the case.  Inevitably, we expect that this level of validation by the two parties will also indirectly address systemic issues in capturing information from case files in the reports. Any systemic issues identified in this process, will be forwarded to the MACWIS unit for correction. We propose that both the Performance and Evaluation Unit and CSF independently validate each report on the targeted list initially and compare findings, and that an adjusted schedule for joint validation be established following the initial validation of the reports.

The approach by all three of these entities will be to review a non-duplicative sample of cases on each of the targeted reports, ensuring that three to five percent (depending on the size of the population in the report) of the cases included on the report have been verified prior to official report validation. Once 'officially validated', reports will be periodically reviewed again approximately every six months, to ensure continued accuracy.

If, in the initial validation process, systemic errors are identified, the validation entities will meet with the identified IS developer to discuss concerns and determine what changes need to be made in the report structure. Once IS has made changes, the validation process will continue until the report has been validated, and no systemic anomalies are identified.  Validation concerns that are user-oriented will be addressed through policy and/or practice guidance to county staff regarding correct data entry, the reports re-run as often as needed and re-validated until there is a minimum of user error identified in the reports.

**Ex. 33**

| Practice Guide | |
|---|---|
| **Strengths and Needs Assessments** | |
| **OUTCOMES** | • All families receiving services will participate in an ongoing and continuous comprehensive family assessment that identifies the strengths and needs of each member and addresses the underlying conditions that necessitate child welfare intervention.<br>• Each family's assessment will inform case planning activities and service provision. |
| **R E Q U I R E M E N T S** | • Complete comprehensive assessment within 30 days of opening a case or child's entry into foster care and prior to the development of the case plan.<br>• Initiate assessment within 72 hours of placement. Interview parents & foster parents within 14 days (10 days if placed in therapeutic foster care).<br>• Health screening of all children is done within 72 hours of placement, followed by comprehensive health examination within 30 days.<br>• Developmental screening for children 3 years old and younger, and mental health screening for children, 4 years of age and older, is completed within 30 days after placement. Secure early intervention services and/or a full mental health examination if results indicate the need.<br>• Educational screening is done for children within 30 days of placement; enroll in accredited school within 3 days of placement. Services are provided based on assessment of educational needs.<br>• Dental screenings for all children 3 yrs. old within 90 days of placement and then every six months.<br>• Assessment evaluates child's needs for intensive and supportive services, including placement in a therapeutic foster home.<br>• As part of ongoing assessment, visit children in foster care twice per month, at least once in the placement to include separate interviews with the child; visit biological parents at least once per month; interview foster parents at least once per month.<br>• Document the assessment in case file and maintain health histories and records to disseminate to caregivers, health care professionals, and youth when appropriate.<br>• Supervisors document written approval of the assessment prior to the development of the case plan. |

| ACTIVITY | WHERE IN THE LIFE OF THE CASE | PRACTICE GUIDANCE |
|---|---|---|
| Initiate comprehensive family assessment that builds on initial safety/risk assessments | • Prior to developing case plan | • Review historical case information, court documents, school reports, and mental health and medical evaluations.<br>• Review initial safety/risk assessment and identify strengths, safety concerns, and risk issues to be included in the assessment.<br>• Obtain initial medical, dental, mental health, and educational screenings.<br>• Meet with the family to discuss purpose of assessment and gather information relating to key life domains, strengths and needs, and capacities/resources.<br>• Observe & note conditions in the home, attitudes & behaviors of family members, and how they relate to each other & the caseworker. Explore the family's connections with other individuals that may affect future case planning.<br>• Interview relatives, noncustodial parents, and other relevant caregivers and collaterals for information on the family's strengths and needs.<br>• Organize and analyze the areas that must improve, including underlying issues, and what resources will best enable the family to make changes.<br>• Document the assessment in the case record for case planning & future updates. |
| Engage and involve parents and children to identify strengths and needs in assessments | • Prior to developing case plan<br>• At all caseworker visits with family members<br>• At assessment updates & prior to 6-month case plan | • Prepare family members to participate in the assessment by explaining what it is about, how the information will be used, how they can contribute to it, etc.<br>• Ask children to identify family strengths and needs in accordance with their developmental and intellectual capacity; ask of all youth in care.<br>• Identify non-custodial parents, relatives, other family members, their locations, and evaluate need to involve. Make contacts with others who need to be involved.<br>• Use assessment findings to solicit family's input on each member's assets, issues causing difficulty, & how to improve their circumstances. |

PAGE 1

| | updates | • In visits with family members, review their strengths and needs and update status of issues in assessment, progress, emerging concerns. |
|---|---|---|
| **Conduct specialized screenings, obtain additional evaluations, and make needed referrals for services** | • Prior to developing case plan<br>• When assessments and case plans are updated | • Use information from medical, dental, mental health, and educational screenings, assessment, & case file information to identify need for more in-depth evaluations<br>• Discuss needs for specialized screenings/evaluations with parents and relevant family members; determine providers/locations that can best serve them<br>• Assess individual health, dental, developmental, mental health, and educational needs of children and families<br>• Make prompt referrals for additional evaluations and needed services as soon as need is identified. Involve family in decisions about where to obtain the services<br>• Clarify with providers the precise needs for screening/evaluation or services and ensure provider has the information needed to proceed<br>• Identify & provide assistance the family may need in participating in evaluations<br>• Obtain copies from service providers of the results of the evaluations<br>• Discuss assessment findings and recommendations with the family and seek their views and perspectives about the information and any conclusions that are drawn.<br>• Document the family's current circumstances, status of progress in achieving goals, & new findings that need to be incorporated into updated assessment.<br>• Provide copies of medical, dental, education, mental health information on children in care to their foster caretakers – update as needed |
| **Use assessment to develop case plan** | • When case plan is developed | • Meet with family to discuss findings from the assessments and initial impressions regarding the most pressing and critical issues to be addressed in the case plan.<br>• Sort and analyze all information and assessment findings<br>• Come to meetings understanding the issues from assessments that must be addressed in case plans; know what is negotiable and not negotiable, e.g., safety/risk issues must be addressed; know what to prioritize<br>• Discuss with family the relevant issues in assessments that should be addressed, solicit input from family members on how to address, steps & activities involved, etc. Assure that all relevant issues are included in case plan<br>• Ensure that assessment info for all relevant family members is addressed in plan<br>• Solicit information from foster caretakers on strengths and needs of children/youth in their care to include in the assessment |
| **Update assessments on a regular basis** | • At least every six months<br>• Prior to updating case plan<br>• Whenever family or individual circumstances change substantially | • In visits with family members, ask about changes in strengths/needs with regard to assessment issues and identify emerging issues that need assessing<br>• Meet individually with family members, including relevant non-custodial parents, to observe and discuss strengths/needs with regard to assessment issues<br>• Track and make referrals for ongoing periodic screenings and assessments, e.g., EPSDT, and follow-up assessment activities for other screenings/evaluations, e.g., re-testing for educational status, re-evaluation of mental health issues<br>• Make prompt and clearly defined referrals for additional or updated specialized evaluations needed as circumstances change or new needs emerge<br>• Obtain copies of new/updated screenings/evaluations and use in revising plans<br>• Make direct contacts with providers of assessments/evaluations (with family's consent) to evaluate progress, identify needs, etc.<br>• Discuss progress/needs with relevant family members and foster caretakers |
| **Conduct a current assessment prior to case closure** | • When case closure is being considered | • Gather information from child, family, caregivers, & service providers on progress in achieving goals & correcting underlying issues contributing to needs.<br>• Meet with family to discuss readiness and preparation for proposed case closure.<br>• Identify presenting safety/risk issues and future risk of harm in the foreseeable future relating to the child's living situation and responsible caregivers<br>• Obtain needed supports and make referrals for services that can ensure the safety and stability of the child and family when the case is closed.<br>• Provide documents to the child, family, and/or caregiver regarding health, education, identification, and entitlements to services that can assist in the future.<br>• Document the updated assessment information in the record prior to case closure. |

PAGE 2

# Ex. 34



**STATE OF MISSISSIPPI**
HALEY REEVES BARBOUR, GOVERNOR
*DEPARTMENT OF HUMAN SERVICES*
DON THOMPSON
EXECUTIVE DIRECTOR

BULLETIN: 6276        DIVISION OF FAMILY AND
CHILDREN'S SERVICES

TO:            DFCS Deputy Directors
DFCS Unit Directors
DFCS Regional Directors
DFCS Area Social Work Supervisors
DFCS Family Protection Specialists
DFCS Family Protection Workers
DFCS Resource Specialists
DFCS Independent Living Staff
DFCS Training staff
DFCS MACWIS staff
DFCS Foster Care Reviewers
All Volume IV Holders

FROM:       Linda Millsap, Director
Division of Family and Children's Services

DATE:       October 1, 2009

SUBJECT:    Revised Intake Policy

**Effective immediately, the requirements contained within this bulletin are hereby set forth in DFCS' policy.**

Attached is policy located within Section B of the Volume IV Policy Manual. Please take out the pages 2010-2019 of the current policy and add the new Intake Policy to the identified section of your policy manual in accordance with the page numbers in the top right corner of the page.

**LM:SC:nl**

Mississippi, Volume IV
Revised October 2009

Section B
Page 2010

# CHILD PROTECTIVE SERVICES
# PROCEDURE FOR SERVICE ACTIVITY

## INTRODUCTION

### Working Principles

Intake requests for services are accepted and screened through Mississippi Centralized Intake (MCI). Section 43-21-353 of the Mississippi Code details how intake reports of suspected child abuse/neglect are made and the actions that shall be taken by the Agency.

An intake request for services may be voluntary or involuntary. It is considered voluntary when the applicant is either the person requesting the services for him/herself and/or any dependant(s) or another person who is acting responsibly in the applicant's behalf. Involuntary applications include requests for intervention from courts of competent jurisdiction, reports from concerned citizens on alleged neglect, abuse or exploitation of an adult/child, or any other source seeking agency assistance in assessing the family situation.

Family-Centered Practice identifies family strengths, support systems, and community services that will assist families in acquiring the resources, taking action, making decisions, and developing the skills they need to safely take care of their children and reduce the risk of future maltreatment. Strength-based assessment is an assessment protocol that evaluates families' capabilities, strengths, and resources throughout the life of the case, supporting the development of strategies built on competencies, assets, and resources. Reports of child abuse or neglect or other intakes received by DFCS are subjected to a strength-based, structured intake process which allows for the concerns of the reporter to be heard, documented, and screened by intake workers. An effective intake process enhances both the quality and consistency of the information collected and emphasizes the strengths of the family about whom the report is being made. The initial relationship developed within a DFCS case is the relationship developed with the reporter. Reporters should feel valued, supported, and understood as the information provided by reporters regarding the circumstances being reported and about the family significantly affects DFCS' response.

### What is an intake?

DFCS is the Public Child Welfare entity in the State of Mississippi, and the organization's mission, role, and purpose relates to child welfare. Intakes are forms of communication received by DFCS that require a response. Intakes may come in the form of reports of suspicion of child abuse or neglect, in the form of requests for assistance, in the form of a desire to help others or to become Resource Parents, or in a variety of other forms. Intakes concerning issues other than child welfare are considered outside the statutory authority provided to the Agency. Such intakes are handled by explaining to the intake reporter the reason why the intake is statutorily inappropriate for the Agency and referral to an appropriate resource if possible. Intakes which indicate a suspicion of abuse or neglect of a child require immediate official response by DFCS.

## CHILD PROTECTIVE SERVICES
## PROCEDURE FOR SERVICE ACTIVITY

**What is an Intake?** (Continued)

Other intakes pertaining to child welfare, child safety in general, issues of prevention of abuse or neglect or child endangerment, requests for assistance related to the safety and well-being of children, or requests to provide services on behalf of children or become Resource Parents require various responses by DFCS. Intakes meeting statutory criteria are accepted for assignment for services. Services which might be provided include case management services, information and referral services, resource application services, and other child welfare services.

All intakes types, including reports of abuse and neglect, are received by and processed through the Mississippi Centralized Intake Unit (MCI). **No formal or official response to an intake of suspected abuse or neglect can be made by DFCS unless the intake is channeled through MCI for screening and assignment, although other types of intakes may be received in county offices as well as by MCI.** MCI is accessed by individuals by telephone or internet. Screening of intakes and decisions regarding the appropriate response by DFCS are based on the essential and foundational issues of the promotion and maintenance of the safety, permanency, and well-being of children. Information is gathered by MCI staff from individuals contacting DFCS with these issues in the forefront of the information-gathering and screening process. The individual contacting MCI with information is a key component in the action taken and response of the Agency to the intake. The intake process is an individualized, culturally sensitive, and strengths-based approach that attempts to gather information which identifies and draws upon the strengths of children, families, and communities in solving problems.

**What are the types of reports received at intake?**

Abuse, Neglect, and Exploitation or ANE

The majority of intakes received by DFCS are reports of suspicion of child abuse or neglect. Such reports are subject to DFCS screening procedure and, if statutory criteria are met, require official DFCS response. The legal responsibility of DFCS is to protect children from harm in the context of the family or caretaking environment in which the child lives. Mississippi law requires DFCS to investigate reports of abuse and neglect and report findings to the Youth Court. Law requires that reports of abuse and neglect which indicate that the maltreatment constitutes a felony crime be reported immediately to law enforcement, in addition to a DFCS investigation and report.

Section 43-21-105 defines a neglected child as one "whose parent, guardian or custodian or any person responsible for his care or support, neglects or refuses, when able so to do, to provide for him proper and necessary care or support, or education as required by law, or medical, surgical, or other care necessary for his well-being; provided, however, a parent who withholds medical treatment from any child who in good faith is under treatment by spiritual means alone through prayer in accordance with the tenets and practices of a recognized church or religious denomination by a duly accredited

# CHILD PROTECTIVE SERVICES
## PROCEDURE FOR SERVICE ACTIVITY

**What are the types of reports received at intake?** (Continued)

practitioner thereof shall not, for that reason alone, be considered to be neglectful under any provision of this chapter." It describes an abused child as one "whose parent, guardian or custodian or any person responsible for his care or support, whether legally obligated to do so or not, has caused or allowed to be caused upon said child sexual abuse, sexual exploitation, emotional abuse, mental injury, non-accidental physical injury or other maltreatment" and defines sexual abuse as "obscene or pornographic photographing, filming or depiction of children for commercial purposes, or the rape, molestation, incest, prostitution or other such forms of sexual exploitation of children under circumstances which indicate that the child's health or welfare is harmed or threatened."

A DFCS investigation is not simply a matter of gathering evidence to determine whether maltreatment did or did not occur and to identify the perpetrator of such maltreatment, but is rather an assessment of a family or caretaking environment for the purpose of keeping a child or children safe from harm and keeping the family stable and intact. Some harm may have already occurred. The purpose of DFCS intervention is to prevent additional harm from occurring and assist families in securing services to aid in healing the damage done from previous harm. DFCS seeks to solve problems in families resulting in children being safe from harm.

Information and Referral

People often call the Agency for assistance or a question regarding an issue that is outside of the Agency's scope of services. In this situation, the Agency is also responsible for assisting the public by sharing information or referring them to any needed services. The Information and Referral intake type, "I&R," is to be used in these circumstances.

Case Management

Another common reason that people may call the Agency is for financial assistance. Sometimes the Agency is able to help with finances, and, in these circumstances, the Case Management intake type is to be used.

CHINS/Voluntary Placement/Safe Baby/Unaccompanied Refugee Minors

Children may enter into custody directly by order of the court without a report having been made. Youth Court may deem a child as being a "Child in Need of Supervision" (CHINS) in which case, there is not an allegation of abuse or neglect, but the child meets the legal definition of a CHINS. Parents may also, under certain circumstances, voluntarily place children within Agency custody for 180 days by signing Voluntary Placement Agreements. Parents may also drop off children within 72 hours of birth at Emergency Medical Services in accordance with the Safe Baby Act. Additionally, minors that are brought to the U.S without their parents or who come as a result of human trafficking

## CHILD PROTECTIVE SERVICES
## PROCEDURE FOR SERVICE ACTIVITY

**What are the types of reports received at intake?** (Continued)

or exploitation are considered to be Unaccompanied Refugee Minors. When reports of previously mentioned instances are received, this intake type must be used, and the report will automatically go into an open case upon approval.

<u>Resource Inquiry</u>

When individuals desire to become licensed as Resource Homes, including relatives, a Resource Inquiry must be entered in order to begin the licensure process. Once a Resource Inquiry is entered, the Agency may begin the process of completing steps to licensing the home (**See Volume IV, Section F**).

**Reports on Native American Children**

The Federal Indian Child Welfare Act (ICWA) was passed in 1978 and grants Indian tribes extensive jurisdiction in child welfare cases involving Native American children. Because of this Act's existence, the Agency has no jurisdiction to <u>investigate allegations of abuse or neglect occurring on Native American tribal lands</u>, but the Agency has and will continue to receive reports of abuse/neglect regarding Native American children whether they live on or off tribal lands. Should MCI receive such a report, a determination shall be made as to whether:

1. The child is a member of a Native American Tribe and falls under the purview of ICWA;

2. The child resides on land where an Indian tribe has jurisdiction.

The Mississippi Band of Choctaw Indians has tribal land in Neshoba, Attala, Jones, Kemper, Leake, Newton, Scott, and Winston County.

If a **child is a member of the Choctaw tribe and lives on tribal land**, the MCI worker will immediately notify the COR Intake Supervisor, who will in turn notify the Mississippi Band of Choctaw Indians at their Social Services Department in Neshoba County. The contact information for the Mississippi Band of Choctaw Indians may be located on MACWIS Web.

MDHS permits the tribe an opportunity to assess the report and to provide services as it deems appropriate for the children and/or their families. If the tribe requests DFCS to initiate the investigation, that Worker must confirm that the family is of the Choctaw heritage. If the answer is yes, these additional five questions must be asked:

1. Is the parent eligible for tribal membership?
2. Is the parent registered with a Native American tribe?
3. Is the child eligible for tribal membership?

Mississippi, Volume IV
Revised October 2009

Section B
Page 2014

# CHILD PROTECTIVE SERVICES
# PROCEDURE FOR SERVICE ACTIVITY

**Reports on Native American Children** (Continued)

    4.  Is the child been registered with a Native American tribe?
    5.  Does the family live on tribal land?

**NOTE:** Reports involving children who are determined to be members of another tribe should be shared with the District Worker, Bureau of Indian Affairs, Eastern Area Office, and Washington, D.C. If the tribe is unknown, the Agency shall contact the Mississippi Band of Choctaw Indians who is willing to help identify the child's tribe and refer appropriately.

In those situations involving **children who do not live on tribal lands,** or they are not located on tribal lands at the time of the report, DFCS staff shall conduct an investigation and reasonable efforts must be made to coordinate the investigative activities, excluding emergency situations, with the child's tribe when possible. The DFCS Worker must ask the five questions listed above.

For these children, the Mississippi Band of Choctaw Indians or any other Indian tribe to which the child belongs has the right to accept or deny jurisdiction of the said child and to help with placement resources.

The tribe must be notified of any court hearings involving an Indian child. Notification is to be provided immediately, by telephone and certified letter, to the tribe when a Choctaw child, or other Indian child, is taken into MDHS custody. The same timeframes for completion of the investigation apply as those established for regular investigations.

On the Safety Assessment in MACWIS, the worker shall document any tribal referrals that were made by MDHS.

## REPORTING ABUSE, NEGLECT OR EXPLOITATION

### Who May Make a Report?

In accordance with Section 43-21-353 of the Mississippi Code of 1972 any person who has reason to suspect the abuse of a child must make a report by telephone to MCI at 1-800-222-8000, by phone to MCI at the local Division of Family and Children's Services (DFCS) office, or electronically at www.msabusehotline.mdhs.ms.gov. When a reporter comes to the county DFCS office to make a report, he/she shall be educated on the report process and allowed to use an Agency phone to call MCI. If the reporter does not choose to make a report from the office phone, the county staff shall enter the information for the report at www.msabusehotline.mdhs.ms.gov.

## CHILD PROTECTIVE SERVICES
## PROCEDURE FOR SERVICE ACTIVITY

**Who May Make a Report?** (Continued)

There are also <u>Professional Mandated Reporters</u> who are required by law to report abuse or neglect. These include, but are not limited to, any attorney, physician, dentist, intern, resident, nurse, psychologist, social worker, family protection worker, family protection specialist, child caregiver, minister, law enforcement officer, public or private school employee or any other professional who, in the course of professional counseling or treatment of a child, becomes aware of information leading them to believe abuse or neglect to a child has occurred.

Professional mandated reporters are required to provide written reports of suspected child abuse or neglect, in addition to any verbal reports. These written reports should be forwarded to the DFCS as soon as possible after the oral report is made. Professional mandated reporters are encouraged to report suspected abuse and neglect electronically which will allow them to eliminate sending a separate, written report. Section 43-21-257 of the Mississippi Code requires that any records involving children, including valid and invalid complaints, be kept confidential and not be disclosed except as provided by Section 43-21-261(6).

Maltreatment, including the use of corporal punishment, by a Resource Parent (relative or not) on foster children is strictly forbidden by the Mississippi Department of Human Services, Division of Family and Children's Services' policy. If any DFCS staff has suspicion that a child in DHS custody is being maltreated or that corporal punishment is being used within a Resource Home, a **formal report** must be made.

### Immunity from Liability

Any attorney, physician, dentist, intern, resident, nurse, psychologist, social worker, family protection worker, family protection specialist, child caregiver, minister, law enforcement officer, school attendance officer, public school district employee, nonpublic school employee, licensed professional counselor or any other person participating in the making of a required report pursuant to Section 43-21-355 of the Mississippi Code, participating in the judicial proceeding resulting there from, shall be presumed to be acting in good faith. Any person or institution reporting in good faith shall be immune from any liability, civil or criminal, that might otherwise be incurred or imposed.

### Anonymous Reporters

The Agency does not require the identity of a reporter as a condition for reporting suspected child abuse, neglect or exploitation.

Reporters may be reluctant to share their identities due to fear of personal repercussions or other factors. This does not permit an opportunity for future contact by the Agency; therefore, it is crucial that the intake worker gather as much information as possible before the intake call is terminated.

Mississippi, Volume IV
Revised October 2009

Section B
Page 2016

# CHILD PROTECTIVE SERVICES
# PROCEDURE FOR SERVICE ACTIVITY

**INTAKE PROTOCOL**

**Abuse, Neglect and Exploitation Reports**

The MCI staff shall be responsible for gathering as much information as possible pertaining to abuse/neglect reports based on the following:  1) how to locate the family, 2) whether or not the alleged abuse and/or neglect is caused by the person caring for the child, 3) the nature of the abuse and/or neglect, 4) if this report falls under the statutes of our state law as abuse and/or neglect, and 5) whether or not the family being reported has any tribal affiliation.  MCI staffs shall also inform reporters of the Agency's responsibilities including: 1) protection of reporter's identity; 2) screening and investigation process and any on-going communication with the reporter; 3) Confidentiality/Disclosure of records; and 4) determining whether the victim is a Native American and/or resides on Native American tribal lands.  All reports of abuse/neglect received in the county DFCS offices shall be sent to MCI through www.msabusehotline.mdhs.ms.gov.

The county staff shall be responsible for sending reports received in the office to MCI at www.msabusehotline.mdhs.ms.gov.

Initial reports of ANE can be pended by the MCI Supervisor if the report meets statutory criteria but additional information is needed to avoid screening out the report.  The pending selection can only be used for the following reasons:
a.  Reporter will respond with additional information
b.  MCI Supervisor or Worker is seeking additional information

Although the report may be pended, it must be screened within 24 hours of receipt.  Both the MCI Worker and Supervisor will receive ticklers if the report has not been screened within 24 hours.

All investigations of abuse that should be considered a felony crime under state or federal law shall be initiated immediately upon receipt by the COR Worker.

**<u>After hours and Emergency Reports</u>**

When the Agency receives an emergency or after hours report from law enforcement, court, hospital, etc., the COR worker is to immediately respond to the report.  After the initial response, the worker will enter the report at www.msabusehotline.mdhs.ms.gov or call the report into MCI.

**Information and Referrals**

MCI and DFCS employees are both responsible for receiving and entering requests for information and referral.  If someone calls centralized intake to request information or a referral, MCI is responsible for providing them with that information or for referring them to someone who can provide them with the information.  MCI must enter this information into MACWIS.  If someone

Mississippi, Volume IV
Revised October 2009

Section B
Page 2017

## CHILD PROTECTIVE SERVICES
## PROCEDURE FOR SERVICE ACTIVITY

**Information and Referrals** (Continued)

calls or comes into a county office, DFCS staff is also responsible for providing them with that information or for referring them to someone who can provide them with the information. DFCS must enter this information into MACWIS.

**Case Management**

MCI and DFCS employees are both responsible for receiving requests for case management. If someone calls centralized intake to request case management, MCI is responsible for taking the information, entering it into MACWIS as an Information and Referral, and emailing the county intake supervisor to make them aware of the request. MCI should notify the reporter of this process and that the county will be made aware that case management services are needed.

DFCS staff should read all information and referrals and offer case management services as necessary. If services are given, DFCS should enter the information as a case management intake. DFCS is also responsible for receiving, entering, and providing services for those who call or come into the county office. **DFCS employees are also responsible for making reports of ANE observed during provision of services.**

**CHINS/Voluntary Placement/Safe Baby/Unaccompanied Refugee Minors**

MCI and DFCS employees are both responsible for receiving and entering reports of CHINS/Voluntary Placement/Safe Baby/Unaccompanied Refugee Minors. If someone calls centralized intake regarding a CHINS/Voluntary Placement/Safe Baby/Unaccompanied Refugee Minors report, MCI is responsible for entering this information into MACWIS. If someone calls or comes into a county office, DFCS staff is also responsible for entering this information into MACWIS and taking the appropriate actions.

**Resource Inquiries**

MCI and DFCS employees are both responsible for receiving and entering requests from individuals desiring to become licensed as Resource Parents. If someone calls centralized intake inquiring about becoming a Resource Parent, MCI is responsible for entering this information into MACWIS. If someone calls or comes into a county office, DFCS staff is also responsible for entering this information into MACWIS and taking the appropriate actions.

Mississippi, Volume IV
Revised October 2009

Section B
Page 2018

# CHILD PROTECTIVE SERVICES
# PROCEDURE FOR SERVICE ACTIVITY

**Duties of the MCI staff**

The MCI staff shall be responsible for gathering information.   The information gathered and expected duties include but are not limited to:

- history on family/household;
- history/ability of caregiver;
- history of ANE;
- potential safety risks for COR Worker;
- prior criminal history of household members if known;
- information on the victim (mental & physical capabilities/limits, age, school, etc..);
- location of victim and family;
- access of alleged perpetrator to the alleged victim;
- information about the ANE (severity, duration, type of maltreatment, etc.);
- general dynamics of the family, if known (traditions, culture differences, strengths and weaknesses);
- identify Native American children at intake, if known;
- prior MDHS involvement (METTS, MSSIS, MAVERICS and MACWIS);
- diligent search to identify the absent parent (METTS, MSSIS, MAVERICS and MACWIS);
- utilize standardized decision making criteria to determine the screening of the report;
- screened reports are entered into MACWIS and sent to the county of responsibility within one hour of receipt;
- information to be entered for out-of-home reports shall be received, entered into MACWIS and forwarded to the county;
- forward complaints to DFCS Complaints Unit; and
- contact the language line for assistance when working with reports having language barriers.

**Reports That May be Screened Out at Intake**

Certain reports may be screened out when there is no eminent danger indicated. Reports that may be screened out in MACWIS will generally fall into following categories:

- Victims age 18 or older with prior abuse;
- No documentation of ANE within report;
- Lack of child immunizations;
- Crowded conditions within homes;
- Dirty homes or children;
- Inappropriate sexual contact with someone who is not a caregiver;
- Inappropriate clothing;
- Misuse of assistance;
- One child injuring another;
- Out-of-Home setting;
- Inappropriate parent behavior;
- Peer sexual relations for children older than 16;
- Suicide attempt/threat-child
- Teen pregnancy;
- Truancy; or
- Unable to locate the child/family

Mississippi, Volume IV                                             Section B
Revised October 2009                                              Page 2019

## CHILD PROTECTIVE SERVICES
## PROCEDURE FOR SERVICE ACTIVITY

**Screening Reports and Assigning Response**

The MCI staff will determine if there is: 1) adequate information to locate family; 2) if the alleged perpetrator is a parent or guardian; 3) if the report meets state defined maltreatment; and 4) if the child is in danger of imminent harm. If there is enough information to determine the child is at risk, the MCI staff shall screen the report for investigation. Within 24 hours of receipt of report, the MCI staff will use one of the following Levels to determine the disposition of the report and send it to the county supervisor for assignment to a Worker:

1. **Level One-** The report is screened out for child protective services and may receive a referral for information or a referral for services.
2. **Level Two-** The report is screened in and assigned to a Worker who must initiate the investigation within 72 hours of assignment of the report. The Worker has 7 days from initiation to complete the Safety Assessment and send it to the Supervisor for approval and 25 days to complete and submit the investigation. Refer to **INVESTIGATION OF SUSPECTED CHILD ABUSE/NEGLECT** for more information about Safety Assessments and Safety Plans.
3. **Level Three-** The report is screened in and assigned for a full investigation. The COR Worker has 24 hours to initiate the investigation and 25 days to complete the investigation. A Safety Assessment and any Safety Plan shall be completed within 7 days from initiation.

*All reports of ANE that are considered a felony crime under state or federal law shall be initiated upon receipt by the COR Worker.*

**All reports of ANE regarding foster children shall be screened in as Level 3 investigations.**

The COR Supervisor who receives a report that a child has been: 1) Intentionally burned (any burn, including but not limited to, cigarette burns and burns from hot water); 2) Intentionally tortured (with or without physical harm, i.e. locked in a dark closet for several hours, tied up, left for a significant period of time without food and water, etc.); 3) Seriously injured or that serious injury was attempted; 4) Sexually abused (any sexual abuse); or 5) Abused in any other way that would be a felony crime under state or federal law (i.e. child pornography, etc.), **is to immediately call the law enforcement Agency in whose jurisdiction the crime occurred and give all information available, including the name and address of the person who made the report** pursuant to Section 43-21-353 of the Mississippi Code of 1972.

If at any time during the investigation it becomes apparent that the case does not involve serious physical injury, burning, torture, sexual abuse, or any other felony crime, the COR Worker then follows the steps outlined for these types of abuse.

Mississippi, Volume IV
Revised October 2009

Section B
Page 2020-A

# CHILD PROTECTIVE SERVICES
## PROCEDURE FOR SERVICE ACTIVITY

**Reconsideration of Screenings**

After reports are Screened In or Out to the county by the MCI staff, the COR ASWS will have the ability to reconsider the decision based on one of the following circumstances:

1. No allegation of harm or imminent danger;
2. There is a question of jurisdiction of assigned report;
3. County staff has additional information that might result in a change in the screening level; or
4. A foster child is identified as a victim within a screened out report.

**Procedure for Notification of Potential Child Abuse/Neglect**

After the MCI staff screens in the report, the assigned COR ASWS has timeframes that must be followed for notifying the following professionals according to Section 43-21-353 of the Mississippi Code of 1972:

1. The appropriate law enforcement and the district attorney in the jurisdiction where the abuse occurred shall be notified immediately.

2. After the investigation is initiated, DFCS and law enforcement shall file the "Preliminary Report" with district attorney's office within 24 hours.

3. Advise the youth court and youth court prosecutor within 72 hours after the report, and continue to update this information as it becomes available.

4. For Out-of-Home Reports, the Licensing Agency must be notified immediately.

***The notifications listed above must be completed for ALL Out-of-Home Reports regardless of screening status.***

**Same Reports**

In order to classify a report as the same report and to screen it out for investigation, the Supervisor must determine if the new information includes:

        a. Same alleged perpetrator(s);

        b. Same victim(s);

        c. Same types of child maltreatment(s); and

        d. Same incident

If the prior investigation has been completed, the COR Supervisor must always make sure the prior report was thoroughly investigated. Information on the same report will be entered into MACWIS and the system will attach this information to the previous information that was entered.

# CHILD PROTECTIVE SERVICES
## PROCEDURE FOR SERVICE ACTIVITY

**Additional Information on Existing Investigations**

The Agency sometimes receives additional information regarding an incident or situation that is already being investigated. If the assigned COR Worker is involved in an investigation and observes or receives information about additional maltreatment to the victim or another victim in the household, the Worker should discuss this new maltreatment with the COR Supervisor within 24 hours. The Supervisor will determine if the new information is entered as a <u>post-allegation</u> and investigated to determine if additional safety factors are present or if it is entered as a new report at www.msabusehotline.mdhs.ms.gov. In cases where there are felony reports, refer back to **Procedure for Notification of Potential Child Abuse/Neglect.** COR Worker will be notified by e-mail of any post-allegation information received through the hotline.

**False Reports**

An intentional false report is a report in which it is concluded that not only is there no evidence under the state law or policy that a child was maltreated or at risk of maltreatment, but the reporter knew the allegation was false. According to Mississippi Code, Section 43-21-353(7), "anyone who willfully violates any provision of this section [with false reporting], shall be, upon being found guilty, punished by a fine not exceed Five Thousand Dollars ($5,000.00), or by imprisonment in jail not to exceed one (1) year, or both."

## INVESTIGATION OF SUSPECTED CHILD ABUSE/NEGLECT

Any report that is not a felony crime under state law, must be initiated within timeframes allowed for the level assigned to the report. The Safety Assessment is completed in MACWIS within 7 days of the report being assigned.

In circumstances where safety issues are identified, a Safety Plan will be developed with the family and will be implemented immediately.

In cases where no safety issues are identified or no evidence of ANE is found, the report is closed after the Supervisor approves of the closure.

The Safety Plan will be documented in MACWIS and may be printed as necessary.

**Request for Law Enforcement to Accompany**

The Mississippi Code of 1972, Section 43-21-353(6) specifies:

"In any investigation of a report made under this chapter of abuse or neglect of a child defined in section 43-21-105(m), the Department of Human Services may request the appropriate law enforcement office with jurisdiction to accompany the Department on its investigation, and in such cases the law enforcement officer <u>shall</u> comply with such requests."

Mississippi, Volume IV                                         Section B
Revised October 2009                                           Page 2022-A

## CHILD PROTECTIVE SERVICES
## PROCEDURE FOR SERVICE ACTIVITY

**Request for Law Enforcement to Accompany** (Continued)

Each county enters into a written agreement with the local law enforcement agency on form MDHS-441-Protective Service Agreement, and updates when changes occur or at least annually. The original MDHS-441 is filed in the county office with copies given to the law enforcement agency who signed the form, the Regional Director of the county and the Prevention/Protection Unit at the state office.

**Reports Involving More than One County**

When the alleged perpetrator (maybe non-custodial parent) lives in another county, a request is made immediately after the alleged victim is interviewed to the county of residence of the alleged perpetrator to interview the perpetrator and others as appropriate. County of residence of alleged perpetrator is to give verbal report and enter appropriate documentation into MACWIS.

When a referral is made to the county (intake county) on a child who resides in another county, county of legal residence of child coordinates the investigation and takes jurisdiction. Jurisdiction with law enforcement is the county where the alleged incident occurred.

1. Responsibilities of the intake county:

   a. Accept referral;

   b. Contact county of legal residence for coordination;

   c. Initiate investigation as requested by county of legal residence (if child is still temporarily in the intake county, the child and others may need to be interviewed in the intake county);

   d. Assist county of legal residence, if legal action has been initiated, such as removing child from situation;

   e. Initiate legal activity as appropriate for child's protection, if county of legal residence is unable to initiate.

Mississippi, Volume IV
Revised October 2009

Section B
Page 2023-A

# CHILD PROTECTIVE SERVICES
# PROCEDURE FOR SERVICE ACTIVITY

**Reports Involving More than One County** (Continued)

2.  Responsibilities of child's county of legal residence:

    a.  Accept report from intake county;

    b.  Coordinate investigation;

    c.  Arrange treatment services for child and family as appropriate in county of residence;

    d.  Initiate legal action, as needed for child's protection;

    e.  Coordinate ongoing legal/court intervention;

    f.  Complete investigation in MACWIS.

3.  Responsibilities of alleged perpetrator's county of legal residence:

    a.  Interview alleged perpetrator;

    b.  Report verbally and enter statements into MACWIS.

**Abused Child from another State**

When the child, who is the subject of an allegation of abuse, is a resident of another state and the abuse occurred in that state, the MCI Worker receiving the report will:

1.  Complete the Information and Referral (I&R) and notify the MCI Supervisor, MDHS/DFCS Protection Unit Director and e-mail and/or fax the information to the other state.

2.  If services are needed, the COR Supervisor's contact information shall be forwarded to the requesting state and the abovementioned parties and the COR Regional Director and Intake Supervisor shall be notified.

This information may be forwarded directly to the other state. The state where the abuse occurred will be responsible for completing the investigation.

Mississippi, Volume IV
Revised October 2009

Section B
Page 2024-A

# CHILD PROTECTIVE SERVICES
## PROCEDURE FOR SERVICE ACTIVITY

**Mississippi Child Abused in another State**

When the child who is the subject of an allegation of abuse is a resident in Mississippi and has been allegedly abused in another state, the MCI Worker shall:

1. Complete the requested data on the MACWIS Intake Screens and forward the information to COR Intake Supervisor. (The contact information for the state in which the alleged abuse occurred will be listed within the location information of the MACWIS Intake.)

2. Make an oral report to the Child Protective Service Unit in the state where the abuse allegedly occurred.

3. Request the other state's assistance in completing the investigation.

**Child on Child Reports**

In order for a child to be investigated as a perpetrator, he/she <u>must be at least 12 years old</u> and one or more or the following must exist:

1. They are in a caretaker role;

2. They are 36 months older than the victim; or

3. They forcibly overpower the victim.

If one or more of these conditions exist, this <u>does not preclude</u> the Agency from completing a safety assessment or making a referral for services. The MCI staff must assess the possibility of parental neglect having contributed to one child harming another. Any report that meets the criteria listed above must be referred to Youth Services by the COR intake supervisor.

**Ex. 35**

*Prepared for*

**Mississippi Department of Human Services
Division of Family and Children's Services
State of Mississippi**

# Termination of Parental Rights Assessment

# *Final Report*

**November 24, 2009**



**Center for the Support of Families, Inc. (CSF)**

1107 Spring Street, Suite 2C, Silver Spring, MD 20910 ● Phone 301-587-9622 ● Fax 301-587-9620

# TABLE OF CONTENTS

**Executive Summary** ...............................................................................................................3

**Introduction** .........................................................................................................................7

**Methodology** ...................................................................................................................... 8

**Termination of Parental Rights Assessment** ................................................................... 12

**Appendices** .................................................................................................... 25

    **Appendix A:  Staff Survey** ................................................................... 26

    **Appendix B:  Case review sample questions** ...................................................... 34

    **Appendix C:  Functional Requirements Document** ............................................... 35

    **Appendix D:  MACWIS Reports for Termination of Parental Rights Assessment** ......44

# EXECUTIVE SUMMARY

The Mississippi Department of Human Services (MDHS) is currently implementing the provisions of the *Olivia Y. vs. Barbour* Settlement Agreement, approved by the court in January 2008. The implementation activities are being carried out by the MDHS Division of Family and Children's Services (DFCS). The Period 2 Annual Implementation Plan requires that MDHS conduct several foster care services assessments in conjunction with a qualified independent consultant approved by the Court Monitor,[1] as follows:

- A reunification services needs assessment;

- A medical, dental, and mental health services needs assessment;

- An independent living services needs assessment;

- A recruitment and retention of resource families assessment;

- A termination of parental rights (TPR) assessment;

- A child safety assessment; and

- A foster care placement assessment.

MDHS contracted with the Center for the Support of Families (CSF) to coordinate the completion of the assessments. This report includes only the TPR assessment. The remaining assessments were previously provided to MDHS.

The methodology used to conduct the TPR assessment includes a staff survey, case reviews, a number of focus groups and structured interviews, a review of policy and training, and development and review of MACWIS data and reports. Since CSF is also contracted to develop a child welfare practice model with MDHS, we designed the information gathering processes to provide information for both the practice model and the assessments.

## Findings

Through the two new MACWIS reports and subsequent 40 case reviews, we were able to validate the accuracy of the reports in capturing properly recorded information. However, the absence of relevant TPR information in the correct MACWIS screens affects the Department's ability to identify each and every child in care for 15 of the most recent 22 months for whom a TPR petition has been filed, who is legally free, or for whom an exception to filing a TPR petition has been duly documented. To some extent, we can attribute this to the recent addition of a MACWIS field for the TPR petition date and the unfamiliarity of staff with the new field. In other circumstances, complete TPR-related information is affected by not documenting case information in the appropriate fields according to MDHS procedure or not evaluating information pertinent to TPR on a regular basis, as the case may be for exceptions to filing a petition.

---

[1] Period 2 Annual Implementation Plan, Mississippi Settlement Agreement and Reform Plan, Section II: Foster Care Services Assessment and Implementation Steps, 2. Foster Care Assessments. Filed May 4, 2009.

The accuracy of the reports in capturing TPR petition dates improved substantially between the two rounds of case reviews that we conducted, although the difference in capturing exception information was minimal.  We believe that the most recent reports will provide MDHS with a basis for moving forward in addressing the permanency needs of children in foster care for 15 of 22 months, and that the usefulness of the reports will increase as they become increasingly accurate over time through the implementation of our recommendations below.

Based on our assessment of TPR proceedings, we made the following additional findings:

- Through the new MACWIS reports, we identified 973 children that had no exceptions noted, but had been in foster care for at least 15 of the previous 22 months. The results of the sub-sample of 22 cases indicate that errors appear to be the result of data entry, and staff may be less likely to input a TPR petition filed date if there is already a legally freed date for the case.

- Through the new MACWIS reports, we identified 185 children in foster care for at least 15 of 22 months with no recorded TPR petition filed, no legally freed date, and no MACWIS-documented exceptions.  The results of the sub-sample of 18 of these 185 children indicated that while MDHS is actively pursuing TPR filings in several cases, in a little under half of the cases (eight), circumstances that would qualify as exceptions to filing TPRs do appear to exist but are not documented as exceptions in the case file. Relatively few cases (two) reviewed indicate no circumstances that would warrant exceptions and no progress toward filing a TPR petition.

- Through the new MACWIS reports, we identified 612 children in foster care for at least 15 of the most recent 22 months with documented exceptions to filing a TPR petition recorded in the County Conference/Recommendations reasons.  The most commonly recorded reason for not filing a TPR petition was that it was not in the best interests of the child, accounting for 60.1% percent of the exceptions.

- The Federal requirement for documenting exceptions to filing a TPR petition is that the exception be recorded in the child's case plan.  We are not confident that the case plan is the typical place in which staff records this information, since we obtained it from the County Conference/Recommendations tab in MACWIS.

- There is not currently a reliable process for determining the date of filing the TPR petition uniformly across the State, since the AGs office files the petitions in most circumstances and we understand that there is not a process in place to communicate that information to County Departments for entry into MACWIS.  This situation is complicated because County Courts can accept petitions without going through AGs office.

- The only systematic monitoring of filing of TPR petitions timely or documenting exceptions seems to be through the Foster Care Review (FCR) on individual children.  There has not been a broader process for monitoring to ensure that petitions are filed timely and appropriately as evidenced by our difficulty in obtaining accurate information on the petitions. Discrepancies between our findings in the MACWIS reports and in the case

reviews, e.g., presence or absence of legally freed dates, indicates a need for a broader monitoring process that includes accountability measures that ensure timely and accurate activities and recording of information.

- While the new reports developed by MACWIS provide an accurate means for identifying relevant dates and information in MACWIS, issues concerning users' uniform input of the data and communication that ensures they have the data to input will need to be resolved before this is a totally reliable reporting process.

- We identified some areas in which we believe that policy and training could be strengthened to support practice in the area of decision-making and procedures regarding TPR. For example, we are not sure that caseworkers always correctly identify appropriate exceptions to filing TPR petitions. Simply because we identified circumstances in cases that could meet the criteria for an exception, even when those circumstances were not documented as exceptions, does not mean that the caseworkers would always consider those same circumstances as valid exceptions to filing a TPR petition or that the circumstances were currently evaluated in light of TPR filing requirements. Further, the MACWIS reports pick up exceptions to filing a TPR petition only if they are recorded in the *most recent* County Conference. On the surface, having a documented exception in an earlier County Conference but not in the most recent one might appear to be a documentation oversight. However, in the absence of current documentation we cannot be sure that previously identified exceptions are being evaluated and re-considered at all County Conferences or in the general case planning for a child. Finally, the Federal requirement is that exceptions to filing the TPR petition be documented in the child's case plan and that does not seem to happen as frequently as the exceptions are documented in the County Conference.

## Recommendations

Based on our findings, we are making the following recommendations:

- We recommend that MDHS issue guidance to County Departments regarding the new TPR petition date fields in MACWIS and directions regarding entering dates in the system. The guidance should include information pertaining to petitions filed by County Departments in County Court as well as petitions filed by the AGs office and should advise staff to enter dates and other information in the required uniform fields on a timely basis.

- We recommend that for the next several months, MDHS continue validating the MACWIS reports through random case reviews in order to strengthen the accuracy of the reports.

- We recommend that MDHS develop a protocol with the AG's office that ensures regular communications with County Departments on the dates that TPR petitions are filed, so that the information can be entered into MACWIS promptly by the county worker.

- We recommend that MDHS review and strengthen its policy regarding the TPR process as needed, and clarify policy with County Departments, for example, in the area of identifying and documenting appropriate exceptions to filing a TPR petition at each County Conference.

**Mississippi Foster Care Services Assessments**

- We recommend that the CQI process and enhancements to supervision address the timeliness and appropriateness of TPR practice and procedures, e.g., that decision are made timely and accurately, that referrals are made timely, that exceptions are appropriate to the child's/family's circumstances, and that all information is recorded accurately in MACWIS.

- We recommend that when the FCR reviews an individual child's case each six months at the time of County Conferences that the FCR reviewers compare the information pertaining to TPR identified in the review with the information recorded in MACWIS, both in the case plan and the court history fields, and note the conformity or lack of conformity in its feedback/reports to the county[2].

- We recommend that the TPR reports developed by MACWIS be actively used in evaluating county performance, and be distributed monthly to Regional Directors and ASWSs, as a means of monitoring their accuracy and consistency and in promoting accountability for complete information.  We recommend that for children identified in the reports in care for at least 15 of the most recent 22 months without either a petition filed date or an exception documented, that the ASWS provide a written report to the RD explaining the circumstances of the case and the reasoning behind neither a filing a petition nor documenting an exception.

- We recommend that a supervisory protocol be developed to use the TPR reports in the supervision of caseworkers, to ensure that exceptions are appropriate, documented correctly and routinely evaluated, and that TPR petitions are filed timely based on Federal requirements.  Supervisors should be required to validate the accuracy of the TPR information in the MACWIS reports on a monthly basis in order to ensure accurate information on children in care 15 of 22 months going forward.

- Finally, we recommend that MDHS strengthen training on TPR proceedings and decision making as a means of ensuring that practice in this area is appropriate.  Training should address the issue of children who object to adoption by helping build the skills of staff to discuss adoption appropriately with children in foster care, identifying strategies to address the concerns expressed by children/youth, and ensuring that permanency goals are re-evaluated and re-considered over time.

---

[2] We understand that this occurs currently to some extent, but are unclear on how corrective actions are pursued in response to the FCR findings.

# INTRODUCTION

The Mississippi Department of Human Services (MDHS) is currently implementing the provisions of the *Olivia Y. vs. Barbour* Settlement Agreement, approved by the court in January 2008. The implementation activities are being carried out by the MDHS Division of Family and Children's Services (DFCS). The Period 2 Annual Implementation Plan requires that MDHS conduct several foster care services assessments in conjunction with a qualified independent consultant approved by the Court Monitor,[3] as follows:

a. A reunification services needs assessment;

b. A service provider needs assessment with the purpose of identifying available medical, dental, and mental health services and gaps in services;

c. An assessment of the quality and array of independent living services available to foster children ages 14-20;

d. A recruitment and retention assessment to determine the need for additional foster care support services;

e. A termination of parental rights (TPR) assessment for the purposes of identifying those children who have been in custody more than 15 of the previous 22 months and for whom DFCS has neither filed a TPR petition or documented an exception under the Federal Adoption and Safe Families Act (ASFA);

f. A child safety assessment of DFCS practice for prioritizing, screening, assessing, and investigating reports of maltreatment of children to determine the extent to which DFCS investigations and decisions are based on a full and systematic evaluation of the factors that may place child at risk; and

g. A placement assessment of current needs for achieving compliance with the placement standards set forth in Section II.B.5 of the Settlement Agreement, which shall include (1) the structure of the placement process, including the role and efficacy of the state office placement unit; (2) the services and supports available to support enhanced placement stability, including out-patient or in-home assessment and treatment services to avoid the frequent use of time-limited assessment and treatment placement programs; and (3) the placement resources needed to meet the placement needs of children in custody.

MDHS contracted with the Center for the Support of Families (CSF) to coordinate the completion of the assessments. This report includes only the TPR assessment, since we submitted the remaining assessments to MDHS previously. The report provides a description of the methodology used to conduct the assessment, the findings of the assessment, and a summary of our major recommendations.

---

[3] Period 2 Annual Implementation Plan, Mississippi Settlement Agreement and Reform Plan, Section II: Foster Care Services Assessment and Implementation Steps, 2. Foster Care Assessments. Filed May 4, 2009.

# SECTION I: METHODOLOGY

## *Approach to Conducting the Assessment*

Since CSF is contracted to develop a child welfare practice model for MDHS, we combined some of the information gathering processes to collect information that would serve multiple purposes. For example, we presented questions in a staff survey that addressed the components of the practice model and the TPR assessment, and we asked focus group questions that pertained to multiple assessments and the practice model.

The information gathering process included the following components:

## *Staff Survey*

We designed an electronic survey with input and approval from the MDHS Central Office, and posted it on Survey Methods for completion by child welfare staff across the State. The Central Office issued an invitation by email to staff to complete the survey over a two-week period, which we later extended by an additional week in order to provide more opportunity for staff to participate in the survey. A copy of the survey is provided in *Appendix A*.

Although we organized the survey according to the components of the practice model, we inserted questions for each assessment area, including the TPR assessment, which could provide us with staff's perceptions of the agency's effectiveness in each area.

Through the two response periods, 254 staff completed the survey as follows:

- 93 (36.61 percent) responses from Family Protection Specialists, 49 (19.29 percent) from ASWS, 37 (14.59 percent) from other, 30 (11.81 percent) from State Office staff, 25 (9.84 percent) from Family Protection Workers, 11 (4.33 percent) from Resource Workers, and 9 (3.54 percent) Regional Directors;

- 74 (29.13 percent) respondents have worked at MDHS for more than 10 years, 69 (27.17 percent) have worked at MDHS for 1-3 years, 47 (18.5 percent) for 5-10 years, 24 (9.45 percent) for  6 months to one year,  and18 (7.09 percent) for less than 6 months; and

- 93 (36.47 percent) respondents had been in their current position for 1-3 years, 56 (21.96 percent) for less than 6 months, 33 (12.94 percent) for six months to one year, 30 (11.76 percent) from 3-5 years, 24 (9.41 percent) for 5-10 years, and 19 (7.45 percent) for more than 10 years.

In analyzing the results of the survey, we used Survey Methods functionality to create tables that display the results. We exported data to Microsoft Excel, manually reviewed the responses to all of the open-ended survey questions, and categorized or grouped responses according to our best understanding of what the respondents indicated in their comments. The results of the staff survey are incorporated throughout the discussion of each assessment.

## MACWIS Data Reports

We worked with the MDHS MACWIS staff to develop two reports for children in foster care in the State for at least 15 of the most recent 22 months.  One report identified those children with documented exceptions to filing a TPR petition, and the other report identified those children without a documented exception and without having a TPR petition date filed.  Because MDHS had not previously tracked the TPR petition date in MACWIS nor defined 15 of 22 months in accordance with the Federal definition, it was necessary to design the new reports to define 15 of 22 months in foster care according to the Federal definition. In order to collect information on the date of filing the TPR petition, MDHS staff reviewed monthly reports submitted by the Attorney General's office listing children for whom TPR petitions were pending, identified the petition dates, and manually entered those dates into the new MACWIS report. For one county, Forest County which does not use the AG's office to file TPR petitions, Forest County manually reviewed the reports, collected the data and State Office staff entered the data into MACWIS.

After re-running the reports with the data that had been manually entered, we conducted an initial review of 30 children's cases, drawn from the report of children in care for 15 of 22 months with no exceptions and no TPR petition filed dates.  The purpose of that initial review was to validate the information in the MACWIS report and to gain some insights into why petitions had not been filed in those cases. The initial case review showed that there was information in the files pertaining to filing TPR petitions that had not been captured by the MACWIS reports due to the information being recorded in fields other than those from which the MACWIS report was pulling the data, i.e., there were data entry issues affecting the accuracy of the report. Following that case review, we worked with MDHS central office staff to issue written instructions to all child welfare staff advising them to review the new reports which had been posted on the MACWIS "P Drive," verify that the information in the reports was accurate, and enter correct information in the relevant fields.  We provided a two-week period for staff to enter the correct data before re-running the reports.  Those re-created reports that included the information entered by staff at the request of the MDHS central office served as the basis for this assessment after we determined through a second case review that the reports are capturing TPR information when entered in the correct MACWIS fields.

## Case Reviews

We conducted two sets of case reviews, including a 30-case sample from the initial MACWIS reports and a 40-case sample from the corrected MACWIS reports for the TPR Assessment. For the case review drawn from the initial MACWIS reports, we reviewed a sample of 30 children that the report indicated had neither a documented exception nor a TPR petition filed in order to gain some understanding of the circumstances of those children. That case review yielded several results, as highlighted below:

- Although we selected the sample to reflect children who had neither a TPR petition filed nor a termination of parental rights, we found in the case review that in 15 of the 30 cases, either a TPR petition had been filed (two cases) or TPR had been granted by the court (13 cases); and

- In at least seven cases, we noted that parental rights had been terminated but the date of the TPR had not been picked up in the MACWIS report due to caseworkers not entering the TPR dates in the correct screen in MACWIS.

After the correction and re-creation of the TPR reports, we conducted a second case review of a total of 40 cases, including cases with dates on the MACWIS reports for TPR petitions filed and for Legally Freed dates (TPR achieved), as well as those with no TPR request dates (the date the central office approves a request to file a TPR petition), as a way to validate the reports based on the information contained in MACWIS. In the second review, we found a higher level of concurrence between the information in the MACWIS reports and the case reviews than in the initial review. Based on the second review, we concluded that the MACWIS reports were collecting accurate information from the designated fields, but that some discrepancies remain due to the timing of data entry relative to the run dates of the reports and due to other data entry issues.

We developed individual case review protocols for each sample of cases reviewed. The case review protocols were automated in a Microsoft Access data base, and a list of the questions pertaining to the TPR case sample is included in Appendix B. All of the information from the case reviews was taken from electronic case records in the MACWIS system. We entered the information from the case reviews into a Microsoft Access data base which permitted us to develop reports and conduct an analysis of the responses.

## Focus Groups

We conducted a series of focus groups in order to gather information on how various stakeholders understand and perceive their roles; the extent to which their practice supports the DFCS mission and values; to clarify how practice in the field supports policy; to obtain their first-hand view of which services, programs, and initiatives support positive outcome achievement; and to determine barriers to effective, consistent practice and service delivery. We conducted focus groups with the following representatives:

- Four groups of caseworkers representing a large number of County Departments in four areas of the State (Tupelo, Hattiesburg, Jackson area, and Greenville);

- Four groups of Area Social Work Supervisors in the same locations;

- The MDHS Regional Directors;

- A group of regional resource workers;

- A group of regional resource supervisors;

- One group of parents served by MDHS;

- Three groups of foster parents; and

- A focus group of youth in foster care through MDHS.

We developed a focus group protocol that was structured around DFCS' mission and values that we used primarily with the caseworker and supervisor focus groups. For the remaining groups, we developed specific questions for which we thought they could provide first-hand information.

## Review of Policy and Procedures

For each of the assessments, we conducted a review of current policy and procedures that is documented in each assessment.

## Limitations of Our Approach

While we obtained substantial information in the course of developing the practice model, there are some limitations to the information gathered. Reviewing cases entirely from the MACWIS system poses some limitations, given concerns about the thoroughness of information in the system. Given those same concerns, we also acknowledge that the thoroughness and accuracy of some TPR-related data in any given MACWIS report will be affected by the timeliness of data entry and the entry of data in the correct MACWIS fields.

# SECTION II:  THE TERMINATION OF PARENTAL RIGHTS ASSESSMENT

The Period 2 Annual Implementation Plan requires that MDHS conduct the following assessment:

"A termination of parental rights (TPR) assessment for the purposes of identifying those children who have been in custody more than 15 of the previous 22 months and for whom DFCS has neither filed a TPR petition nor documented an exception under the Federal Adoption and Safe Families Act (ASFA)."

## Section I: Applicable Standards

### A.  Policy and Requirements

DFCS is bound by several legal mandates regarding requirements for filing petitions for terminations of parental rights (TPR). Specifically, the requirements of the Child and Family Services Review (CFSR) and the *Olivia Y* Settlement Agreement, and the Council of Accreditation (COA) standards all address this issue, as follows:

- The CFSR monitors for Federal statutes that require States to file petitions to terminate parental rights on behalf of children who have been in care for 15 of the most recent 22 months.  The Federal requirements are located in the Social Security Act at Section 475 (5)(E) as follows:

  *(E) in the case of a child who has been in foster care under the responsibility of the State for 15 of the most recent 22 months, or, if a court of competent jurisdiction has determined a child to be an abandoned infant (as defined under State law) or has made a determination that the parent has committed murder of another child of the parent, committed voluntary manslaughter of another child of the parent, aided or abetted, attempted, conspired, or solicited to commit such a murder or such a voluntary manslaughter, or committed a felony assault that has resulted in serious bodily injury to the child or to another child of the parent, the State shall file a petition to terminate the parental rights of the child's parents (or, if such a petition has been filed by another party, seek to be joined as a party to the petition), and, concurrently, to identify, recruit, process, and approve a qualified family for an adoption, unless-*

  *(i) at the option of the State, the child is being cared for by a relative;*

  *(ii) a State agency has documented in the case plan (which shall be available for court review) a compelling reason for determining that filing such a petition would not be in the best interests of the child; or*

  *(iii) the State has not provided to the family of the child, consistent with the time period in the State case plan, such services as the State deems necessary for the safe return of the child to*

*the child's home, if reasonable efforts of the type described in section 471(a)(15)(B)(ii) are required to be made with respect to the child;*

- Both the *Olivia Y* settlement agreement requirements and Council on Accreditation (COA) standards also require that the agency file TPR petitions on behalf of children in foster care for 15 of the most recent 22 months unless a legal exception applies.

- The *Olivia Y* settlement agreement also requires that the TPR packet is to be sent to the Attorney General for review within 30 days of establishing adoption as plan, and that the supervisor must meet with the caseworker to provide documentation to the Attorney General's office for approval to file TPR and to resolve issues for filing through monthly meetings.

MDHS has an extensive policy regarding when TPR referrals should be considered, how they should be processed and the exceptions to filing a TPR petition. Policy states that every family's situation is to be assessed and evaluated separately to determine if TPR is the most appropriate action. Policy notes that one or more of seven factors should exist as legal grounds for making a TPR referral:

1) A parent has deserted or abandoned the child(ren) and cannot be found;

2) The parents have had no contact with the child(ren) in care for six months, if the child is under the age of three, and one year if the child is over the age of three;

3) Parents are responsible for several abusive incidents perpetrated on at least one child;

4) Child(ren) are in care for over one year and their parents have not made themselves available for visits or fails to implement their reunification plan;

5) The parents have a diagnosable, ongoing behavior related to alcohol, drug abuse, mental illness, or physical limitation that is not likely to change, or the parents do not end the behavior if it is within their control to do so;

6) Child(ren) have severe antipathy to the parent, or there has been a significant erosion of the child-parent relationship due to prison, lack of communication, or visitation while the child was in care; and

7) The parent has been convicted of: rape of a child, sexual battery of a child, touching a child for lust, exploitation of a child, felony abuse or battery of a child, carnal knowledge of a step or adopted child or a child of a cohabitating partner, murder of a child, or child has been adjudicated and the court has determined reunification is not appropriate.

Based on the above grounds for filing a TPR, policy requires caseworkers to submit a TPR referral packet to the placement unit in the State Office once the referral for TPR has been approved by both the ASWS and the Regional Director. The placement unit then finalizes the referral process with the Attorney General. Policy identifies several timeframes for caseworkers

to initiate TPR proceedings, ranging from one month from the time the child is placed in care to a child being in care over a year, as follows:

- The child has been in foster care for 15 of the last 22 months. This does not have to be consecutive time, and does not include trial home visits or runaway status;

- The child has been in custody for six months and parents have not made efforts to complete the ISP. In cases where the child is under the age of three, the referral for TPR is to initiated within the first two months after parents have failed to complete the ISP;

- The child has been abandoned as an infant. The TPR petition is to be initiated within the first 30 days in this instance;

- The parent has been convicted of the felonies listed in the grounds for TPR (rape of a child, sexual battery of a child, touching a child for lust, exploitation of a child, felony abuse or battery of a child, carnal knowledge of a step or adopted child or a child of a cohabitating partner, or murder of a child); and

- The court of jurisdiction orders the agency to proceed with a TPR petition.

If the above circumstances in the case exist, there are a few exceptions which exist where caseworkers may choose to forego referring for a TPR, as follows:

- The child is placed with a relative;

- The agency documents compelling reasons why it is not in the best interests of the child to have a TPR referral;

- The agency has not provided the services deemed necessary for the parents due to either the services not being available or not being accessible; and

- Parents are making regular, meaningful visitation with the child, and therefore it is not in the best interest of the child to have a TPR petition filed.

While policy is detailed about the different instances in which caseworkers should initiate TPR proceedings, there are some concerns about the current policy which should be explored. First, while the Adoption and Safe Families Act (ASFA) includes the requirement of filing a TPR petition if the child has been in care for 15 of the 22 months, MDHS policy references this rule as stated in Mississippi Code 43-15-13(3), which actually states this rule applies to any child who was in care prior to July 1, 1998, which may cause confusion for children who entered care after that date. MDHS might consider clarifying that this policy applies to all children in care, regardless of when they entered.

Second, the TPR policy could be strengthened with additional guidance on when caseworkers should not file the TPR petition based on the allowable circumstances for an exception. For example, some additional guidance would be helpful on what constitutes "compelling reasons"

that would cause a caseworker to determine TPR was not in the child's best interest, or circumstances when a child is placed with a relative that affect the decision to file the TPR petition.

Time frames in policy could also be clarified regarding filing petitions on behalf of abandoned infants. For example, policy requires that a TPR referral is to be submitted within 30 days if the child abandoned as an infant, but caseworkers are also required to diligently search for any interested relative for the child's first two months in care.

## B. Training

In order to ensure that DFCS accurately and consistently refers cases for TPR when it is deemed appropriate to do so by policy, staff should be effectively trained on policy, protocol, and procedure. We did not find TPR training addressed significantly in the new worker training. However, as part of the on-the-job training (OJT), workers are required to spend part of week one and two reading Section D of policy, which covers TPR procedures and legal requirements. In addition, during week eight of OJT which occurs in the classroom, one of the skills taught is the steps of the TPR process and the use of critical thinking to determine if the caseworker should refer their case for a TPR.

TPR is also briefly discussed in week three of the pre-service training curriculum, which focuses on case planning. As part of this module, new caseworkers are given a work sheet in which they are to detail the definition of TPR, the legal basis for TPR, when to refer, the grounds and exceptions for TPR and what documents go into the referral packet, per policy. It is unclear what the discussion is around the worksheet, or if worker's skill and knowledge of TPR practice and process is based on their reading of the policy manual in OJT. Policy, protocol and procedure regarding TPR referrals and exceptions are not covered in the advanced skills training for caseworkers.

## C. Monitoring

While DFCS does not currently have a comprehensive CQI system, the FCR process monitors TPR issues. Of the 46 issues that are monitored as part of FCR and County Conference process, two in particular relate to referrals for TPR and exceptions for not doing so, the statewide results of which are detailed in the table below.

| Percent of FCR Cases Cited for TPR-Related Issues | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | YTD Total |
| Issues cited due to children who have been in state's custody for 15 of the most recent 22 months; their case has not been referred for termination of parental rights and there is documentation lacking in their ISP of compelling reasons why pursuing TPR would not be in their best interests. | 7.4 | 1.2 | 5.8 | 1.1 | 3.3 | 2.6 | 3.7 | 7.0 | 0.0 | 3.2 | 3.3 | 3.6 |
| Issues cited related to children with a plan of adoption for which there are no documented efforts to finalize the plan of adoption within a reasonable time frame (i.e., a | 6.4 | 7.1 | 6.8 | 8.6 | 5.5 | 5.1 | 6.1 | 11.3 | 7.0 | 8.1 | 14.8 | 7.6 |

| lack of a TPR referral; no actions taken by adoption unit) | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Very few of the issues noted on all FCR during the past year have related to TPR concerns. Only 3.6 percent of all issues cited in the FCR related to children who had not been referred for a TPR after 15 months and no exceptions had been noted. Slightly higher, 7.6 percent of all issues cited during the FCR were related to children with a goal of adoption where efforts were not being made to finalize, a possible reason for which could be a lack of a TPR referral.

We could not identify monitoring practices in place that address filing for TPR sooner than 15 of 22 months where indicated by the child's/family's circumstances.

We identified a substantial gap in monitoring TPR practice related to MACWIS. Prior to initiating this assessment, there was no screen/field in the MACWIS system to enter the date of the TPR petition and therefore, these dates were not being captured in the system. We also could not identify an alternate system within MDHS that identified the petition dates. We learned that there is a monthly report sent to MDHS by the Attorney General's (AG) office that provides status information on the children that have been referred to the AG for TPR proceedings. However, that report also did not include the date the petition was filed[4].

## Section III: Current Practice

### A. Staff Survey

We conducted a staff survey to determine their perceptions on how well DFCS is at referring for TPR in a timely fashion, as well as documenting exceptions in the case plan. The table below details the results from the survey:

| Please rate your perception of your agency's effectiveness in the following areas of practices: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Some times | Frequently | Almost Always | No Info/NA | Total |
| Making timely decisions about TPR and adoption: | 0 (0%) | 14 (8%) | 41 (23.43%) | 40 (22.86%) | 56 (32%) | 24 (13.71%) | 175 |
| Determining and documenting exceptions to filing TPR petitions for children in foster care 15 of 22 months: | 2 (1.16%) | 9 (5.2%) | 37 (21.39%) | 40 (23.12%) | 57 (32.95%) | 28 (16.18%) | 173 |

DFCS staff indicated that the agency is frequently or almost always effective in making timely decisions about TPR and adoption about half the time (about 55 percent). They indicated about the same measure of effectiveness in determining and documenting exceptions to filing for TPR at 15 of 22 months (about 57 percent).

---

[4] During this assessment, MDHS staff worked with the AGs office to add the date the petition was filed to the report.

## B. Data Reports

There were no existing MACWIS reports that identified children in foster care for 15 of the most recent 22 months according to the Federal definition, or that captured the dates of the TPR petition or exceptions to filing a petition. In order to identify children who had been in care for 15 of the most recent 22 months and who had a TPR petition filed on their behalf or had an exception noted, we requested that MACWIS staff develop data reports that capture the needed information. The reports are attached to this report as Appendix D.

The Functional Requirements Document found in Appendix C provides information used to create the new report. It achieves several things, as follows:

- It identifies children in custody of the Department for at least 15 of the most recent 22 months;

- It creates a new field in MACWIS for workers to enter the date the TPR petition is filed;

- It creates a tickler for workers in the field when the child has been in foster care for 13 of the most recent 22 months to alert them to either submit the TPR package to the State Office or document an exception; and

- It captures the exceptions documented in the case file for not filing the TPR petition by picking up reasons recorded in MACWIS on the County Conference/Recommendation Reasons 3 tab. (The County Conference is held within six months of a child coming into custody and every six months thereafter while the child is in custody.)

Although the report was created providing a field to record the date the TPR petition was filed, there was no information in MACWIS to populate that field, and we could not identify an aggregate source for that information. Working from the most recent monthly report provided to MDHS from the Attorney Generals' (AG) office on the status of pending referrals for TPR, State Office staff manually pulled the TPR petitions to record the dates and then entered those dates in the new field in MACWIS. (We understand that the AGs report has now been modified to include the date the petition is filed.) For the one county that does not use the AGs office to file TPR petitions, Forest County, we asked county staff to manually validate the report and provide relevant dates, which State Office staff also entered into the new field in MACWIS. We have concerns about the accuracy of the information due to several reasons. We understand that it is possible for counties to file TPR petitions directly in County Court, rather than going through the AGs office, and therefore all children for whom a petition is filed may not be included in the AGs report even thought using the AGs office seems to be the most common means of filing the petitions. Second, we believe there are serious data quality issues regarding users entering all needed information appropriately in MACWIS and that TPR might have occurred some time ago for some children who do not appear on the AGs reports of pending referrals. As noted in the methodology section, we attempted to correct the issues that surfaced with the initial MACWIS data report runs by re-running and re-validating the reports.

Mississippi Foster Care Services Assessments

The two tables below represent the aggregate information obtained from both the initial and the second versions of the MACWIS reports, run on August 17, 2009 and October 27, 2009, respectively. We are relying on data from the second set of MACWIS reports for this assessment, but are showing data from both sets of reports to demonstrate the changes that occurred in correcting the reports with more current and properly entered data.

| *Children with no exception noted*[5] | First Round MACWIS Reports | Second Round MACWIS Reports |
|---|---|---|
| Children statewide in foster care for 15 of the most recent 22 months with no exceptions noted | 1008 | 973 |
| Children with a TPR Request Date, indicating the TPR pursuit has been approved by the State Office | 816 (81.0%) | 849 (87.3%) |
| Children with a TPR petition filed date | 177 (17.6%) | 357 (36.7%) |
| Children with a 'Legally Freed' date, indicating a TPR had occurred | 266 (26.4%) | 431 (44.3%) |
| Children with neither a TPR petition filed date or Legally Freed date | 565 (56.1%) | 185 (19.0%) |

The numbers of children with a TPR petition filed and legally freed increased substantially between the two MACWIS data report runs, and the number of children with neither a TPR petition filed date or a legally freed date decreased dramatically from 565 children down to 185 children.

| *Children with an exception noted*[6] | First Round MACWIS Reports | Second Round MACWIS Reports |
|---|---|---|
| Children statewide in foster care for 15 of the most recent 22 months with an exception recorded in the file | 619 | 612 |
| Children with an exception of being cared for by a relative | 215 (34.7%) | 219 (35.8%) |
| Children with an exception that the TPR was not in the best interests of the child | 371 (59.9%) | 368 (60.1%) |
| Children with an exception that services were needed but not provided | 31 (5.0%) | 26 (4.2%) |
| Children with an exception that the child was age 14 or older and objected to adoption | 185 (29.9%) | 175 (29.1%) |
| Children with an exception that the parent was maintaining regular visits with the child | 236 (38.1%) | 214 (35.0%) |

---

[5] It is possible for children to have one or more of these dates; therefore the percentages cited exceed 100 percent.

[6] The report allows for recording more than one exception per child, so many children will have multiple exceptions noted and the percentages cited below exceed 100 percent.

Mississippi Foster Care Services Assessments

Unlike the Children with No Exceptions report, the numbers and percentages for children with exceptions noted did not change substantially between the two MACWIS data report runs.

## C. Case Reviews

The information below is based on our second round case review of a sample of 40 cases from the revised data report of children in foster care for 15 of 22 months with no TPR petition filed date and no exception documented. We selected a sample of 30 children from among the 973 children with no exceptions noted, and an additional 10 children who had no TPR request date, TPR petition filed date, or legally freed date. We checked to ensure that there were no duplicates between the first round and second round of case reviews, as well as no siblings that were separately reviewed. The 40 children in this sample had been in care in their current episode an average of 3.04 years. All 40 cases were opened in MACWIS at the time of the case review, and 39 of the 40 children had only one episode in the last 22 months, with the remaining child having two episodes. The chart below describes the breakdown of permanency goals for these 40 children, showing two-thirds (27) of the 40 children with a goal of adoption, and the rest with goals of independent living, relative placement, or reunification.

| Number of Children in Sample by Permanency Goal | |
|---|---|
| **Goal** | **Number of Children** |
| Adoption | 27 |
| Independent Living | 3 |
| Relative Placement | 2 |
| Reunification | 8 |
| **TOTAL** | **40** |

The table below details the TPR status findings on the 40 children in the sample as reflected in the MACWIS reports compared to information from the case reviews:

| TPR Status | Number of Children- MACWIS Report | Number of Children-Case Review |
|---|---|---|
| TPR Petition Filed Date only | 4 | 5 |
| Legally Freed Date only | 9 | 9 |
| TPR Petition Filed Date & Legally Freed Date | 5 | 8 |
| No TPR Petition Filed Date or Legally Freed Date | 22 | 18 |
| **TOTAL** | **40** | **40** |

Some discrepancies continued to exist between the information from the MACWIS report and the second round of case reviews. We were able to attribute some, but not all, discrepancies to data entry that occurred after the reports were generated and others to recording information in places other than where the MACWIS reports capture the information. To analyze the results of the case review in conjunction with the TPR report, we divided the case review analysis into those cases where the case review yielded either a date for filing the TPR petition or for achieving TPR (22 children) and those where no TPR petition had been filed (18 children).

## *Review of Cases with Either a TPR Petition Filed Date or Legally Freed Date*

Twenty-two cases that we reviewed were found to have either a TPR petition filed date or a legally freed date. Of the 22 cases, we found through the case reviews that TPR petitions had been filed in thirteen cases, but the filing dates did not show up on the MACWIS report in four of the thirteen cases for the following reasons:

- In two of the four cases, the TPR petition filed dates were entered into MACWIS after the report had been run on October 28, 2009;

- In one of the four cases, the court event was labeled 'petition filed' and detailed in the comments section that it was a TPR filed, as opposed to being correctly recorded as 'TPR filed', and therefore did not show up in the MACWIS report; and

- In the final case, the TPR petition filed date was entered with a tracking number not attached to the custody case, which explains why it was not captured by the report.

Of the 22 cases, the case records included legally freed dates in nine cases that had no TPR petition filed date in the MACWIS report. Of these nine cases, the MACWIS report did not show a legally freed date for three children, which we determined to be due to staff not recording the legally freed dates in the correct "TPR History" MACWIS screen, and the MACWIS report correctly included the legally freed dates for six children.


## *Review of Cases with no TPR Petition Filed Date*

We reviewed eighteen cases where TPR petitions had not been filed, nor had TPR occurred[7].

- In eight of the eighteen cases, MDHS appeared to be actively pursuing TPR, and were in the process of preparing the TPR packet to be filed. In one of these cases, the agency has been trying to file the TPR petition for nearly six months but the judge does not favor TPR even though the permanency goal for the child has changed to adoption.

- In eight of the eighteen cases, we identified circumstances in the cases that could constitute possible exceptions to filing a TPR petition, as follows, although no exceptions were documented in the most recent County Conference tab[8] and, thus, were not reflected in the MACWIS report:

  - In five cases, the parents remain actively involved, either through regular phone contact, visitation, or in one case, a trial home visit; and

  - In three cases, the child is currently placed with a relative.

---

[7] In one case, a child had a legally freed date from her adoption show up in the MACWIS report. In this case, the child had been placed in care from the adoptive home, and the agency is making plans to file a TPR petition against the adoptive mother.

[8] Three of these eight cases had a history of possible exceptions noted in previous County Conference recommendations.

- In two of the eighteen cases, we could not identify a possible exception based on the cases as they were documented. In one of the cases, the parents have not complied with court ordered services in the last couple of years, and based on the narrative, there do not appear to be any parent-child visits. In the second case, the child entered care at age 16, has a goal of independent living, and the case record did not reflect any discussion of adoption or the teen objecting to adoption.

For these eighteen cases, we also looked into the history of County Conference recommendations, where exceptions to TPRs are noted, to determine if the reason these children did not have a TPR filed could be due to data entry issues. We found a compelling reason not to file a TPR in *previous* County Conference recommendations in eight of the 18 cases and that TPR is now being pursued in five of those eight cases. The MACWIS report captures exceptions noted in the most recent County Conference, not in earlier conferences. This suggests to us that by and large, exceptions are not being routinely entered into MACWIS County Conference recommendations from conference to conference, even though a basis for the exception may exist. In the remaining three cases, the historical exceptions noted in the County Conference recommendations still exist in the case, further confirming concerns over accurate data entry.

## Section IV: Summary and Recommendations

### A. Summary of Findings

Through the two new MACWIS reports and subsequent 40 case reviews, we were able to validate the accuracy of the reports in capturing properly recorded information. However, the absence of relevant TPR information in the correct MACWIS screens affects the Department's ability to identify each and every child in care for 15 of the most recent 22 months for whom a TPR petition has been filed, who is legally free, or for whom an exception to filing a TPR petition has been duly documented. To some extent, we can attribute this to the recent addition of a MACWIS field for the TPR petition date and the unfamiliarity of staff with the new field. In other circumstances, complete TPR-related information is affected by a failure to document case information in the appropriate fields according to MDHS procedure or to evaluate information pertinent to TPR on a regular basis, as the case may be for exceptions to filing a petition.

The accuracy of the reports in capturing TPR petition dates improved substantially between the two rounds of case reviews that we conducted, although the difference in capturing exception information was minimal. We believe that the most recent reports will provide MDHS with a basis for moving forward in addressing the permanency needs of children in foster care for 15 of 22 months, and that the usefulness of the reports will increase as they become increasingly accurate over time through the implementation of our recommendations below.

Based on our assessment of TPR proceedings, we made the following additional findings:

- Through the new MACWIS reports, we identified 973 children that had no exceptions noted, but had been in foster care for at least 15 of the previous 22 months. The results of the sub-sample of 22 cases indicate that errors appear to be the result of data entry, and staff may be less likely to input a TPR petition filed date if there is already a legally freed date for the case.

**Mississippi Foster Care Services Assessments**

- Through the new MACWIS reports, we identified 185 children in foster care for at least 15 of 22 months with no recorded TPR petition filed, no legally freed date, and no MACWIS-documented exceptions.  The results of the sub-sample of 18 of these 185 children indicated that while MDHS is actively pursuing TPR filings in several cases, in a little under half of the cases (eight), circumstances that would qualify as exceptions to filing TPRs do appear to exist but are not documented as exceptions in the case file. Relatively few cases (two) reviewed indicate no circumstances that would warrant exceptions and no progress toward filing a TPR petition.

- Through the new MACWIS reports, we identified 612 children in foster care for at least 15 of the most recent 22 months with documented exceptions to filing a TPR petition recorded in the County Conference/Recommendations reasons.  The most commonly recorded reason for not filing a TPR petition was that it was not in the best interests of the child, accounting for 60.1% percent of the exceptions.

- The Federal requirement for documenting exceptions to filing a TPR petition is that the exception be recorded in the child's case plan.  We are not confident that the case plan is the typical place in which staff records this information, since we obtained it from the County Conference/Recommendations tab.

- There is not currently a reliable process for determining the date of filing the TPR petition uniformly across the State, since the AGs office files the petitions in most circumstances and we understand that there is not a process in place to communicate that information to County Departments for entry into MACWIS.  This situation is complicated because County Courts can accept petitions without going through AGs office.

- The only systematic monitoring of filing of TPR petitions timely or documenting exceptions seems to be through the FCR on individual children.  There has not been a broader process for monitoring to ensure that petitions are filed timely and appropriately as evidenced by our difficulty in obtaining accurate information on the petitions. Discrepancies between our findings in the MACWIS reports and in the case reviews, e.g., presence or absence of legally freed dates, indicates a need for a broader monitoring process that includes accountability measures that ensure timely and accurate activities and recording of information.

- While the new reports developed by MACWIS provide an accurate means for identifying relevant dates and information in MACWIS, issues concerning users' uniform input of the data and communication that ensures they have the data to input will need to be resolved before this is a totally reliable reporting process.

- We identified some areas in which we believe that policy and training could be strengthened to support practice in the area of decision-making and procedures regarding TPR.  For example, we are not sure that caseworkers always correctly identify appropriate exceptions to filing TPR petitions.  Simply because we identified circumstances in cases that could meet the criteria for an exception, even when those circumstances were not documented as exceptions, does not mean that the caseworkers would consider those same circumstances as

valid exceptions to filing a TPR petition or that the circumstances were currently evaluated in light of TPR filing requirements. Further, the MACWIS reports pick up exceptions to filing a TPR petition only if they are recorded in the *most recent* County Conference. On the surface, having a documented exception in an earlier County Conference but not in the most recent one might appear to be a documentation oversight. However, in the absence of current documentation we cannot be sure that previously identified exceptions are being evaluated and re-considered at all County Conferences or in the general case planning for a child. Finally, the Federal requirement is that exceptions to filing the TPR petition be documented in the child's case plan and that does not seem to happen as frequently as the exceptions are documented in the County Conference.

## B. Recommendations

Based on our findings, we are making the following recommendations:

- We recommend that MDHS issue guidance to County Departments regarding the new TPR petition date fields in MACWIS and directions regarding entering dates in the system. The guidance should include information pertaining to petitions filed by County Departments in County Court as well as petitions filed by the AGs office and should advise staff to enter dates and other information in the required uniform fields on a timely basis.

- We recommend that for the next several months, MDHS continue validating the MACWIS reports through random case reviews in order to strengthen the accuracy of the reports.

- We recommend that MDHS develop a protocol with the AG's office that ensures regular communications with County Departments on the dates that TPR petitions are filed, so that the information can be entered into MACWIS promptly by the county worker.

- We recommend that MDHS review and strengthen its policy regarding the TPR process as needed, and clarify policy with County Departments, for example, in the area of identifying and documenting appropriate exceptions to filing a TPR petition at each County Conference.

- We recommend that the CQI process and enhancements to supervision address the timeliness and appropriateness of TPR practice and procedures, e.g., that decision are made timely and accurately, that referrals are made timely, that exceptions are appropriate to the child's/family's circumstances, and that all information is recorded accurately in MACWIS.

- We recommend that when the FCR reviews an individual child's case each six months at the time of County Conferences that the FCR reviewers compare the information pertaining to TPR identified in the review with the information recorded in MACWIS, both in the case plan and the court history fields, and note the conformity or lack of conformity in its feedback/reports to the county[9].

---

[9] We understand that this occurs currently to some extent, but are unclear on how corrective actions are pursued in response to the FCR findings.

**Mississippi Foster Care Services Assessments**

- We recommend that the TPR reports developed by MACWIS be actively used in evaluating county performance, and be distributed monthly to Regional Directors and ASWSs, as a means of monitoring their accuracy and consistency and in promoting accountability for complete information.  We recommend that for children identified in the reports in care for at least 15 of the most recent 22 months without either a petition filed date or an exception documented, that the ASWS provide a written report to the RD explaining the circumstances of the case and the reasoning behind neither a filing a petition nor documenting an exception.

- We recommend that a supervisory protocol be developed to use the TPR reports in the supervision of caseworkers, to ensure that exceptions are appropriate, documented correctly and routinely evaluated, and that TPR petitions are filed timely based on Federal requirements.  Supervisors should be required to validate the accuracy of the TPR information in the MACWIS reports on a monthly basis in order to ensure accurate information on children in care 15 of 22 months going forward.

- Finally, we recommend that MDHS strengthen training on TPR proceedings and decision making as a means of ensuring that practice in this area is appropriate.  Training should address the issue of children who object to adoption by helping build the skills of staff to discuss adoption appropriately with children in foster care, identifying strategies to address the concerns expressed by children/youth, and ensuring that permanency goals are re-evaluated and re-considered over time.

# APPENDICES

**Appendix A:  Staff Survey**

**Appendix B:  Case review sample questions**

**Appendix C:  Functional Requirements Document**

**Appendix D:  MACWIS Reports for Termination of Parental Rights Assessment**

- *MWZ014S1:  Children who have been in custody for 15 of the most recent 22 months "with no" ASFA exception noted:  County/Region/State Summary Totals*

- *MWZ014D1:  Children who have been in custody for 15 of the most recent 22 months "with no" ASFA exception noted*

- *MWZ014S2:  Children who have been in custody for 15 of the most recent 22 months "with" ASFA exception noted:  County/Region/State Summary Totals*

- *MWZ014D2:  Children who have been in custody for 15 of the most recent 22 months "with no" ASFA exception noted:  County/Region/State Summary Totals*

## Appendix A:  Mississippi Practice Model and Assessment Staff Survey

### Assuring Safety and Managing Risk (Child Safety Assessment)

Please rate your perception of your agency's effectiveness in each area below in ensuring child safety.

**(Not at all, Rarely, Sometimes, Frequently, Almost Always, No Information/Not Applicable)**

*Practice related to children in their own homes (not children in foster care):*

- Screening incoming reports of maltreatment to accept for investigation
- Prioritizing incoming reports of maltreatment, i.e., assigning the correct priority based on the allegations
- Initial safety assessments
- Initial risk assessments
- Ongoing safety assessments in open protective services cases
- Ongoing risk assessments in open protective services cases
- Timeliness of initiating investigations
- Timeliness of completing investigations
- Thoroughness of investigations, e.g., interviewing all parties, using information on history of prior maltreatment, identifying relevant issues, evaluating protective capacities of parents
- Identification of underlying issues related to maltreatment, such as substance abuse, domestic violence, other family dynamics
- Timely identification of services needed to address safety
- Investigating reports of maltreatment on children in cases already opened for services (in-home protective services cases)
- Use of safety plans
- Addressing the safety of all children in the home, as opposed to only the child who is the subject of the report
- Evaluating safety and risk factors at the time of case closure

*Practice related to children in foster care:*

- Screening foster families for safety related issues prior to placing children in their homes, e.g., conducting child welfare and criminal background checks on all family members age 14 and older.
- Monitoring the safety of children while in foster care
- Monitoring the risk of harm to children in foster care
- Screening incoming reports of maltreatment to accept for investigation for children in foster care
- Prioritizing incoming reports of maltreatment for children in foster care, i.e., assigning the correct priority based on the allegations
- Timeliness of initiating investigations
- Timeliness of completing investigations

**Mississippi Foster Care Services Assessments**

- Thoroughness of investigations involving children in foster care, e.g., interviewing all parties, using information on history of prior maltreatment, identifying relevant issues
- Addressing the safety of all children in the foster home, as opposed to only the child who is the subject of the report

*Supports related to assuring safety and managing risk (for in-home and foster care):*

- Providing families and children with the appropriate services to address safety issues
- Timeliness of initiating services to address safety
- Effectiveness of supervision in addressing safety and risk-related issues
- Effectiveness of the safety checklist as a tool to identify safety and risk-related issues during investigations
- Pre-service staff training on safety and risk
- In-service staff training on safety and risk
- Usefulness of policy on safety and risk-related issues
- Monitoring of safety-related practices and outcomes, e.g., quality assurance

*Open Ended Questions*

- Please describe any **strengths** in current tools and practice in assuring the safety of children and managing risk
- Please describe any **barriers** in current tools and practice in assuring the safety of children and managing risk
- Please note any **supports needed** (tools, services, practices) to better enable workers to effectively assure the safety of children and manage risk in the home

## Mobilizing Appropriate Services Timely (Reunification Assessment, Medical/Dental/Mental Health Services Assessment, Independent Living Services Assessment, and Recruitment/Retention/Foster Care Placement Assessments)

Please rate your perception of your agency's effectiveness in each area below in mobilizing appropriate services timely.
**(Not at all, Rarely, Sometimes, Frequently, Almost Always, No Information/Not Applicable)**

*Practice related to mobilizing services:*

- Ability to access services to meet safety-related needs of children and families during an investigation
- Quality of safety-related services provided to children and families
- Effectiveness of services to address the following areas (includes ability to initiate the service when needed and the quality of the service):
  - o  Domestic violence services
  - o  Substance abuse treatment services
  - o  Therapeutic services
  - o  Family preservation services

Mississippi Foster Care Services Assessments

- o  Physical health services
- o  Dental health services
- o  In-home services
- o  Post-adoption support services
- o  Services to meet basic needs (food, clothing, shelter)
- o  Independent living services for youth in care ages 14-20
- o  Transitional living services for youth in care

- With regard to mental/behavioral health services, how effectively are you able to access the following levels of services for children and families:
  - o  Lower level services, e.g., outpatient counseling and evaluation, prevention services, testing
  - o  Mid-level services, e.g., behavioral health medication, day treatment, more intense out-patient psychotherapy
  - o  High-end/acute services, e.g., addiction and recovery services, specialized care, psychiatric services
  - o  Crisis services, e.g., crisis stabilization, psychiatric hospitalization
- for children Effectiveness of services to support foster families and assure placement stability
- Effectiveness in placing children in placements that are matched to their needs
- Effectiveness of current procedures for identifying and obtaining access to the appropriate placement entering foster care (e.g., who selects placement resource, timeliness of selecting resource, etc.)

*Supports related to mobilizing services:*

- Ability to recruit qualified and appropriate placement options for children
- Ability to retain qualified and appropriate placement options for children
- Array of service providers to meet identified needs of children and families (identify in open-ended questions those that are effective and those that are not)
- Training to match services to identified needs
- Supervisory oversight of service provision
- Monitoring to ensure placements are appropriate and meeting the needs of children
- Monitoring to ensure services and service providers are available, appropriate and meeting the needs of children

*Open Ended Questions*

- Please describe any ***strengths*** in current tools and practice in mobilizing appropriate services for children and families in a timely manner:
- Please describe any ***barriers*** in current tools and practice in mobilizing appropriate services for children and families in a timely manner:
- Please note any ***supports needed*** (tools, services, practices) to better enable workers to effectively mobilize appropriate services for children and families in a timely manner:
- What services do resource families need the most for themselves in order to help them provide stable placements for children in their care?

Mississippi Foster Care Services Assessments

- To what extent are those services available and accessible?
- What services do children in foster care need in order to maintain the stability of their placements and avoid disruptions?
- To what extent are those services available and accessible?
- Identify the availability of services to support reunification in your area, and indicate the effectiveness of these services in achieving timely reunification of children in foster care.

| Service | Level of Effectiveness (Almost always, frequently, etc.) |
|---------|----------------------------------------------------------|
|         |                                                          |
|         |                                                          |
|         |                                                          |
|         |                                                          |

## Individualized Case Planning (Medical/Dental/Mental Health Services Assessment, Independent Living Services Assessment, Termination of Parental Rights Assessment, and Recruitment/Retention/Foster Care Placement Assessments)

Please rate your perception of your agency's effectiveness in each area below in individualizing case planning.

(**Not at all, Rarely, Sometimes, Frequently, Almost Always, No Information/Not Applicable**)

*Practice related to individualized case planning:*

- Use of assessments to determine individualized needs
- Use of assessments to guide decisions about services
- Effectiveness of case planning process in addressing individualized needs
- Concurrent planning for children in foster care
- Cultural responsiveness of services
- Making timely decisions about TPR and adoption
- Determining and documenting exceptions to filing TPR petitions for children in foster care 15 of 22 months
- Ability to tailor services to individual children and families
- Tailoring IL and transitional living services to youth in care
- Availability and accessibility of services to transition children into adult services systems when appropriate
- Availability and accessibility of services to youth post-transition out of DCF care

*Supports needed to individualize case planning:*

- Adequate array of placement resources that are matched to children's needs
- Flexibility of service providers to address unique needs of children and families
- Flexibility of funding and contracting procedures to purchase individualized services

*Open Ended Questions*

- Please describe any ***strengths*** in current tools and practice in individualizing case planning for children and families:
- Please describe any ***barriers*** in current tools and practice in individualizing case planning for children and families:
- Please note any ***supports needed*** (tools, services, practices) to better enable workers to effectively individualize case planning for children and families:
- Identify the types of children for whom you have the most difficulty making the most appropriate placement in foster care:

## Preserving Connections and Relationships (Reunification Assessment and Recruitment/Retention/Foster Care Placement Assessments)

Please rate your perception of your agency's effectiveness in each area below in preserving connections and relationships.

(**Not at all, Rarely, Sometimes, Frequently, Almost Always, No Information/Not Applicable**)

*Practices related to preserving connections and relationships:*

- Identifying and addressing cultural issues relevant to families and children
- Post-placement reunification services to families to prevent re-entry into foster care
- Identification and use of relatives as placement resources
- Placing siblings together in same foster care setting
- Placing children within their own communities when appropriate
- Maintaining connections of children in foster care to family members while in foster care
- Visiting between children in foster care and their families and siblings
- Maintaining tribal relationships and connections for Native American children in foster care
- Providing that youth in foster care have connections to at least one committed, caring adult to aid in the youth's transition from foster care
- Maintaining children in their same school setting when placed in foster care
- Foster parent involvement in supporting child-parent visits and other contacts
- Birth parent involvement in helping to care for their children while in foster care

*Supports related to preserving connections and relationships:*

- Pre-service training on preserving connections and relationships
- On-going training on preserving connections and relationships
- Foster parent training on preserving connections and relationships
- Policy on preserving connections and relationships, including policy on parent-child visiting while in foster care and policy related to use of relatives as placement resources
- Availability of services to facilitate and support reunification

*Open Ended Questions*
- Please describe any ***strengths*** in current tools and practice in preserving connections and relationships:

- Please describe any *barriers* in current tools and practice in preserving connections and relationships:
- Please note any *supports needed* (tools, services, practices) to better enable workers to effectively preserve connections and relationships:

### *Strengths and Needs Assessments (Medical/Dental/Mental Health Services Assessment, Independent Living Assessment, Child Safety Assessment, and Recruitment/Retention/Foster Care Placement Assessments)*

Please rate your perception of your agency's effectiveness in each area below in assessing strengths and needs.

**(Not at all, Rarely, Sometimes, Frequently, Almost Always, No Information/Not Applicable)**

*Practices related to strengths and needs assessments:*

- Conducting initial screenings of children to identify needs in the following areas:
  - Mental/behavioral health (Effectiveness rating for each one)
  - Physical health
  - Therapeutic needs
  - Education
  - Developmental levels and concerns
- Conducting initial comprehensive strengths and needs assessments of children and families prior to developing a case plan
- Conducting on-going assessments of strengths and needs throughout the life of the case
- Assessing the strengths and needs of non-custodial parents
- Assessing the strengths and needs of custodial parents
- Assessing the strengths and needs of all children in the home
- Assessing foster caretakers' ability to provide safe and appropriate care for children
- Assessing educational needs of children
- Obtaining timely professional specialized assessments when needed, e.g., psychological, drug evaluations, educational assessments, etc.

*Supports needed for strengths and needs assessments:*

- Pre-service training on assessing strengths and needs
- On-going training on assessing strengths and needs
- Policy on assessing strengths and needs
- Effectiveness of the strengths and needs assessment tool (SARA)
- Availability of providers to conduct effective specialized assessments

*Open Ended Questions*

- Please describe any *strengths* in current tools and practice in assessing the strengths and needs of children and families:
- Please describe any *barriers* in current tools and practice in assessing the strengths and needs of children and families:

- Please note any ***supports needed*** (tools, services, practices) to better enable workers to effectively assess the strengths and needs of children and families:

## *Involving Children and Families in Decision Making (Reunification Assessment, Independent Living Assessment, and Recruitment/Retention/Foster Care Placement Assessments)*

Please rate your perception of your agency's effectiveness in each area below in involving children and families in case activities and decision making.

**(Not at all, Rarely, Sometimes, Frequently, Almost Always, No Information/Not Applicable)**

*Practices related to involving children and parents in decision making:*

- Effectiveness of efforts to identify and locate non-custodial parents to determine whether they should be involved in case planning and decision making
- Involvement of custodial parents in developing case plans
- Involvement of non-custodial parents, when appropriate, in developing case plans
- Involvement of age-appropriate children and youth in developing case plans
- Involvement of custodial parents in reviewing, updating and revising case plans, goals, and services
- Involvement of non-custodial parents, when appropriate, in reviewing, updating and revising case plans, goals, and services
- Involvement of age-appropriate children and youth in reviewing, updating and revising case plans, goals, and services
- Use of family team meetings or conferences as the means of involving parents and children in case planning and decision making
- Use of caseworker visits with parents, including non-custodial parents when appropriate, to involve them in case planning and decision making (frequency and quality of visits)
- Use of caseworker visits with children and youth to involve them in case planning and decision making (frequency and quality of visits)
- Use of information/requests from parents to guide the development of the case plan, select services, and establish goals
- Use of information/requests from age appropriate children and youth to guide the development of the case plan, select services, and establish goals
- Ability to identify and address cultural issues of children and parents, including language barriers, that affect their involvement in case planning and decision making
- Involvement of youth in identifying services and supports they need to transition to adulthood

*Supports needed to involve children and parents in decision making:*

- Pre-service training on involving children and families in decision making
- On-going training on involving children and families in decision making
- Foster parent training on how to involve children and families
- Policy on involving children and families in decision making
- Use of family team meetings as a forum for case planning activities

**Mississippi Foster Care Services Assessments**

- Availability of culturally appropriate services for children and families that support their involvement in case planning and decision making

*Open Ended Questions*

- Please describe any ***strengths*** in current tools and practice in involving children and families in decision making:
- Please describe any ***barriers*** in current tools and practice in involving children and families in decision making:
- Please note any ***supports needed*** (tools, services, practices) to better enable workers to effectively involve children and families in decision making:

Mississippi Foster Care Services Assessments

## Appendix B:  Case Review Sample Questions

| Termination of Parental Rights Sample | |
|---|---|
| **Question** | **How to Fill Out/Drop Down Options** |
| Case Number | Enter Case number |
| Current Date | Enter today's date (to be used to help calculate length of time from information captured on previous Basic Information form) |
| Length of time in care over past 22 months | Enter the number of months in care over past 22 months |
| Number of episodes over past 22 months | Enter the number of episodes (in and out of care) over past 22 months |
| Current placement type | Drop Down Box: Emergency Placement, Foster Home, Group Home, Inpatient Facility, Kin Foster Home, Residential Facility, Supervised Independent Living, Unlicensed relative placement |
| Has a TPR petition been filed? | Drop Down Box: Yes No NA |
| If yes, when was it filed? | Enter date of TPR petition filed |
| If no, is there a documented exception? | Drop Down Box: Yes No NA |
| If yes, what is the exception? | Drop Down Box: Child is placed with relative, Compelling reasons, State has not provided services |
| If exception is 'compelling reasons', please describe | Open ended field for review to explain answer |
| Where was the exception documented? | Drop Down Box: Case narrative, Case plan, Court order, Other |
| If other, please explain: | Open ended field for review to explain answer |
| Has the court been made aware of the exception? | Drop Down Box: Yes No NA |
| What is the permanency goal? | Drop Down Box: Adoption, Independent Living, Long-term Foster Care, No Documentation, Reunification |
| If an exception not explicitly documented, do any conditions exist where there is an exception in case? | Drop Down Box: Yes, No, Not Enough Information |
| Please Explain: | Open ended field for review to explain answer |

Mississippi Foster Care Services Assessments

*Appendix C:  Functional Requirements Document*



# MACWIS

## *Mississippi Automated Child Welfare Information System*

15 of 22 percentages/tickler for Lawsuit
Functional Requirements Document

September 2008
Revised April 2009

TABLE OF CONTENTS

MACWIS ....................................................................................................... 36
Mississippi Automated Child Welfare Information System ............................. 36
PROCESS DESCRIPTION ............................................................................. 38
FUNCTIONAL REQUIREMENTS ................................................................. 38
USER PROFILES ........................................................................................... 42
A.     COR Worker .......................................................................................... 42
B.     COR Supervisor .................................................................................... 42
C.     COR Region Director ........................................................................... 43
D.     State Office TPR Reviewer .................................................................. 43
Appendix ........................................................................................................ 43
Reports ........................................................................................................... 43
Glossary ......................................................................................................... 43
Supporting Documents................................................................................... 43

# PROCESS DESCRIPTION

There are several requirements in the lawsuit that have to be reported on at the end of each year period. Most have to be reported on starting with the end of the first year which will be January 4, 2009. A certain percentage of compliance has to be met for each year with each successive year requiring a higher percentage of compliance.

One of these is to be able to report the percentage of children in custody for 15 out of 22 months with a TPR petition filed or who have an ASFA exception documented. According to the lawsuit, this must be done within the thirteenth month of custody.

## FUNCTIONAL REQUIREMENTS

| Rqmt. # | Requirement Description | |
|---------|---------|---------|
| **F001** | The system shall provide a means to report the percentage of children in custody 15 out of 22 months with a TPR petition filed or with ASFA exceptions documented. | |
| | **1.1** | It was discovered recently that the existing reports, Program name – MWZ0141B Detail and Summary are not pulling children correctly. We will use these reports and modify them for our current need. |

Mississippi Foster Care Services Assessments

| Rqmt. # | | Requirement Description |
|---|---|---|
| | 1.2 | Examples of children that should have been on the existing report run February 2009:

Pers ID ▇▇▇

**Current Custody Periods**

| Custody Type | Start Date | End Date |
|---|---|---|
| Court Ordered | 05/13/2007 | |

**Custody History**

| Custody Type | Start Date | End Date |
|---|---|---|
| Court Ordered | 11/05/2004 | 05/16/2006 |

Pers ID ▇▇▇

**Current Custody Periods**

| Custody Type | Start Date | End Date |
|---|---|---|
| Court Ordered | 05/13/2007 | |

**Custody History**

| Custody Type | Start Date | End Date |
|---|---|---|
| Court Ordered | 11/05/2004 | 05/16/2006 |

▇▇▇

**Current Custody Periods**

| Custody Type | Start Date | End Date |
|---|---|---|
| Court Ordered | 05/13/2007 | |

**Custody History**

| Custody Type | Start Date | End Date |
|---|---|---|
| Court Ordered | 11/05/2004 | 05/16/2006 |

▇▇▇

**Current Custody Periods**

| Custody Type | Start Date | End Date |
|---|---|---|
| Court Ordered | 05/13/2007 | |

**Custody History**

| Custody Type | Start Date | End Date |
|---|---|---|
| Court Ordered | 11/05/2004 | 05/16/2006 |

This sibling was on the report:

▇▇▇

**Current Custody Periods**

| Custody Type | Start Date | End Date |
|---|---|---|
| Court Ordered | 06/20/2007 | |

She had no prior custody.

The trigger for the tickler should be set from the custody start date to generate a tickler on the first day of the thirteenth month of custody. This tickler should go to the COR worker. |

Mississippi Foster Care Services Assessments

| Rqmt. # | Requirement Description |
|---|---|
| 1.3 | The report needs to include every child who has a currently active custody and has been in custody for 15 out of the most recent 22 months and does not have an ASFA exception documented (this will be explained later). This includes any child, regardless of prior custody records. This also includes children who had prior custody records within the most recent 22 months, have a current custody and the child has been in custody for 15 out of the most recent 22 months. |
| 1.4 | The format of the report will be the same for the detail report as the MW14017D, Court Ordered TPR Children, with a few modifications. |
| 1.5 | Please remove the Case Open column. This information is not needed. If a child leaves custody the month the report is being run, do not include the child in the report. |
| 1.6 | Please add a column between the TPR Request Date column and the Legally Freed column. This will be called TPR Petition Filed Date. (TPR Petition Filed is discussed in Section 03) |
| 1.7 | The county summary at the end of information for each county should include the total children who have been in custody for 15 of the most recent 22 months with no ASFA exception noted. |
| 1.8 | The county summary should show the percentage of children on the report with a TPR Petition Filed. (TPR Petition Filed is discussed in Section 03) |
| 1.9 | The county summary should show the percentage of children on the report with a TPR request date. |
| 1.10 | The county summary should show the percentage of children on the report with a Legally Freed date. |
| 1.11 | The name of the report will change to 'Children who have been in custody for 15 of the most recent 22 months with no ASFA exception noted', |
| 1.12 | The report should run on the 15th day of the month. |
| 1.13 | A Regional Summary and a State Summary are both needed formatted like the existing MW14017R and MW14017S reports but with the new information. |
| 02 | The system shall provide a means to alert the COR worker when it is time to complete the Termination of Parental Rights packet or document the ASFA (Adoption and Safe Families Act) exceptions. |

**Mississippi Foster Care Services Assessments**

| Rqmt. # | | Requirement Description |
|---------|------|-------------------------|
| | 2.1 | A new tickler type needs to be added. "Worker needs to complete TPR request or document reason not to TPR for *child's name.*" |
| | 2.2 | This will be an action tickler. The tickler should open to the TPR Request screen. |
| | 2.3 | This tickler should be created by the batch report mentioned in section 01. |
| | 2.4 | The tickler should be generated so that the worker receives this on the first day of the thirteenth month of the most recent 22 months that the child is in custody. So if the child has been in custody for 12 months of the most recent 22 months when the report is run, the tickler should be generated to the COR worker. |
| | 2.5 | The worker should complete the TPR Request and submit it within 10 days. On the 11th day, the tickler should change to red (color). |
| | 2.6 | Also on the 11th day the ASWS should get a tickler. "*Child's Name* TPR Request or ASFA exception overdue by worker." |
| | 2.7 | On the 16th day the RD should get the tickler. "*Child's Name* TPR Request or ASFA exception overdue by worker." |
| | 2.8 | At this same time the ASWS tickler will change to red (color). |
| | 2.9 | Check to see on the current active custody if an ASFA exception is documented on the child's most recent County Conference/Rec/ Reasons 3 tab under 'For those children for whom TPR is not recommended, check all that apply'. If anything under this section is checked, the ticklers should not generate. |
| | 2.10 | The ticklers should purge when the TPR request is submitted by the COR worker, when the County Conference with the ASFA exception is completed by the COR or when the custody is ended. |
| *03* | | The system shall provide a means for the worker to show that a TPR petition has been filed by the Attorney General's office. |
| | 3.1 | We will need to add a new court activity type to the Legal History/Detail tab. This will be TPR petition filed. |
| | 3.2 | The pop-up for entering this information will be just like the Petition filed pop-up. |
| | 3.3 | This activity will be added to the Detail tab grid. |
| *04* | | The system shall provide a means to report the percentage of children in custody 15 out of 22 months with an ASFA exception documented. |

Mississippi Foster Care Services Assessments

| Rqmt. # | | Requirement Description |
|---|---|---|
| | 4.1 | This report will be formatted like the report in section 01. |
| | 4.2 | Check to see on the current active custody if an ASFA exception is documented on the child's most recent County Conference/Rec/ Reasons 3 tab under 'For those children for whom TPR is not recommended, check all that apply'. If anything under this section is checked, the child will be included on the report. |
| | 4.3 | The TPR Requested date, Legally Freed date and Petition Filed date columns are not needed. |
| | 4.4 | Please add an ASFA Exception column. This information will include a list of the checked items under the 'For those children, for whom TPR is not recommended, check all that apply' section. |
| | 4.5 | The county summary should show total number of children with an ASFA Exception. |
| | 4.6 | A Regional Summary and a State Summary are both needed formatted like the existing MW14017R and MW14017S reports but with the new information. |
| | 4.7 | The State summary should show the percentage of children in custody 15 out of the most recent 22 months with an ASFA exception documented. This will include all children from both the report in section 01 and this report. |

# USER PROFILES

User Profiles describe the proposed solution's users and their important characteristics. These characteristics identify what the users are doing that the solution will facilitate. These characteristics are expressed in terms of activities.

## A.    COR Worker

- Completes the County Conference worker section (tabs 5 through 8).
- Creates the TPR Request.
- Completes the Social Worker Summary tab the Witness tab and submits.

## B.   COR Supervisor

- Reviews the County Conference worker section.
- Makes comments on the Agency Assessment tab if needed.
- Locks the County Conference.

- Reviews the TPR Request from the COR Worker.
- Completes the Supervisor Comments tab and submits.

## C.    COR Region Director

- Reviews the TPR Request from the COR Worker and Supervisor.
- Completes the RD Comments and submits.

## D.    State Office TPR Reviewer

- Reviews the TPR Request from COR Worker, Supervisor, and RD.
- Completes the State Office Comments.
- Completes the TPR Checklist.
- Enters the AG Sent date.
- Enters the TPR Petition Filed date.


# Appendix

**Reports**
The reports needed are described in the functional requirements.

**Forms / Documents**

No new forms or documents will be produced at this time.

**Glossary**
DFCS - Department of Family and Children's Services
ASWS – Area Social Work Supervisor
ASFA – Adoption Safe Families Act
TPR – Termination of Parental Rights


**Supporting Documents**
Settlement Agreement


_____    _____

**Nancy Meaders, Sr. BA**                **Date**
**DFCS**




_____    _____

**Cheryl Joiner, MIS Lead**               **Date**

## Appendix D:  MACWIS Data Reports for Termination of Parental Rights Assessment

- **MWZ014S1:  Children who have been in custody for 15 of the most recent 22 months "with no" ASFA exception noted:  County/Region/State Summary Totals**

- **MWZ014D1:  Children who have been in custody for 15 of the most recent 22 months "with no" ASFA exception noted**

- **MWZ014S2:  Children who have been in custody for 15 of the most recent 22 months "with" ASFA exception noted:  County/Region/State Summary Totals**

- **MWZ014D2:  Children who have been in custody for 15 of the most recent 22 months "with no" ASFA exception noted:  County/Region/State Summary Totals**

# Ex. 36

# DFCS investigation of October 16, 2009 report regarding maltreatment of S.S.

# (Motion to File Under Seal, filed with this report)

**Ex. 37**

**DFCS investigation of August 14, 2009 report
regarding maltreatment of J.A.**

**(Motion to File Under Seal,
filed with this report)**

**Ex. 38**

**DFCS investigation of May 26, 2009 report
regarding maltreatment of A.W.**

**(Motion to File Under Seal,
filed with this report)**

**Ex. 39**

**DFCS investigation of May 21, 2009 report regarding maltreatment of D.C. and K.P.**

**(Motion to File Under Seal, filed with this report)**

# Ex. 40

# DFCS investigation of December 7, 2009 report regarding maltreatment of J.W. and J.W.

# (Motion to File Under Seal, filed with this report)

**Ex. 41**

**DFCS investigation of February 8, 2010
report regarding maltreatment of P.O.**

**(Motion to File Under Seal,
filed with this report)**

# Ex. 42

## DFCS investigation of November 16, 2009 report regarding maltreatment of R.R., E.R. and R.R.

## (Motion to File Under Seal, filed with this report)

# Ex. 43

# DFCS investigation of June 12, 2009 report regarding maltreatment of S.T.

# (Motion to File Under Seal, filed with this report)

# Ex. 44

## DFCS investigation of October 22, 2009 report regarding maltreatment of D.S. and M.S.

## (Motion to File Under Seal, filed with this report)

# Ex. 45

# DFCS investigation of February 4, 2010 report regarding maltreatment of N.M.

## (Motion to File Under Seal, filed with this report)

**Ex. 46**

**DFCS investigation of April 5, 2010 report regarding maltreatment of J.B.**

**(Motion to File Under Seal, filed with this report)**

# Ex. 47

# DFCS investigation of February 11, 2010 report regarding maltreatment of S.H.

# (Motion to File Under Seal, filed with this report)

**Ex. 48**



**STATE OF MISSISSIPPI**
HALEY REEVES BARBOUR, GOVERNOR
**DEPARTMENT OF HUMAN SERVICES**
**DON THOMPSON**
EXECUTIVE DIRECTOR

BULLETIN: 6200                 DIVISION OF FAMILY AND
                               CHILDREN'S SERVICES

TO:            DFCS Deputy Directors
               DFCS Unit Directors
               DFCS Regional Directors
               DFCS Area Social Work Supervisors
               DFCS Family Protection Specialists
               DFCS Family Protection Workers
               DFCS Resource Specialists
               DFCS Independent Living Staff
               DFCS Training staff
               DFCS MACWIS staff
               DFCS Foster Care Reviewers
               All Volume IV Holders

FROM:          Linda Millsap, Director LM
               Division of Family and Children's Services

DATE:          June 4, 2009

SUBJECT:       Family Team Meetings and Individual Team Meetings

**Effective immediately, the requirements contained within this bulletin are hereby set forth
in DFCS' policy.**

The attached policy is a revised version of policy currently located in Section D of the Volume
IV Policy Manual. Please remove Bulletin 5995 found in Section D, page 3308 of your Volume
IV Policy Manual and replace it with the attached bulletin in your Volume IV according the
assigned page number in the top right hand corner of the page.


LM: PPWG: nl


Attachment

Mississippi, Volume IV
Revised June 2009

Section D
Page 3308

## FOSTER CARE SERVICES
## FAMILY CENTERED PERMANENCY PLANNING

**FAMILY TEAM MEETINGS**

On all cases, a Family Team Meeting (FTM) shall be conducted within thirty (30) calendar days of opening a case. During the FTM an Initial Individual Service Plan (ISP) (Adult and Child) and a Visitation Plan shall be developed. The case is considered open when the Area Social Work Supervisor makes a decision to continue services and opens a line of service for the household in MACWIS. The County of Responsibility (COR) Worker assigned to the case shall facilitate the meeting and secure arrangements for the meeting. The COR Worker shall invite the Area Social Work Supervisor (ASWS) assigned to the case, the Resource Parent, the child's family (if appropriate), and the child. The planning process shall proceed regardless of the Worker's ability to locate one or both parents. If there is any reason for one of the above mentioned parties' absence from the FTM, justification will need to be documented in MACWIS. Whenever the whereabouts of one or both parents is unknown, a diligent search shall commence immediately **(See Volume IV, Section D, page 3244).**

Each FTM should be individualized, strengths-based, family-focused, and culturally responsive. During each FTM, Individual Service Plans (ISP) shall be developed for both the child and the parents with the participation of each team member. The team shall also develop the visitation plan during this meeting.

Ongoing Family Team Meetings shall be convened, at a minimum, once every ninety (90) calendar days in which the ISP shall be reviewed and updated. The COR Worker assigned to the case shall invite the ASWS, Resource Parent(s), the child's parents (if possible), and the child. In instances in which one or both parents are unable to attend, the FTM shall proceed in the absence of the parent(s). Reasons for excluding the child and/or parent from the planning process shall be documented in MACWIS. The COR Worker shall hold a within thirty (30) calendar days of any change affecting the child or his/her family to discuss the decisions to be made as a result of necessary changes. The ISP shall be updated to reflect the decisions made during the meeting. The COR Worker shall document shall document each FTM within five (5) days of completion.

**Definition of Family Team Meeting**

A Family Team Meeting is any face-to-face meeting held with one or more family members for the purpose of assessment and case planning. It involves working closely with the family to identify family members, extended family, and supportive persons the family wants to engage in the assessment and case planning process. The family members should be brought in as early as possible and actively engaged throughout the life of the case in the decision making process.

---
*Best Practice Tip*
It is strongly suggested that the COR Worker should hold a FTM, when possible, during the investigative phase of each case in which adverse safety and risk factors are identified. If a Worker holds a FTM during the Safety Assessment/Investigation, it is possible that suitable family members may be identified who will help DFCS make the best safety plan for the child(ren).
---

Mississippi, Volume IV
Revised June 2009

Section D
Page 3309-A

# FOSTER CARE SERVICES
## FAMILY CENTERED PERMANENCY PLANNING

**SCREENING AND ASSESSMENT**

Immediately after taking a child into custody, Division of Family and Children's Services (DFCS) shall begin a thorough screening of the child. During the screening and assessments, Workers shall gather the following information:

1. Family background information (e.g., culture, religious preference)

2. Strengths, protective factors and needs

3. Information that may assist in selecting an appropriate placement

4. The impact the abuse or neglect may have had on the child

5. Current resources for the child and parent(s)

6. Any information that may be helpful in completing the ISP

Screening and Assessment shall be used to gather information that will guide the Worker in selecting an appropriate placement, providing for needed services, and permanency planning. It shall be completed within thirty (30) calendar days of a child entering custody. The screening and assessment should be well documented in MACWIS.

**Individual Team Meetings**

An Individual Team Meeting (ITM) is any face-to-face meeting with any of the following: father, mother, child, primary caretaker, legal guardian and/or Resource Parent, for the purpose of gathering internal, external and historical factors that contribute to concerns identified in the intake, the Safety Assessment or the Strength and Risk Assessment (SARA). Individual Team Meetings should also occur when Prevention, Protection and Placement Direct Services are being provided and the Worker discusses strengths, protective factors and/or needs, impact of maltreatment on the child, placement factors and to inform individuals of upcoming court hearings and/or other meetings.

The assessment process shall be initiated through an ITM. The assigned COR Worker shall have an ITM with a child in custody within 72 hours of his/her initial placement. An ITM should also be held within 72 hours of each placement change by the COR Worker. The assigned Worker shall have an ITM with the child's parents within the first two weeks of initial placement. Workers shall have an ITM with the foster care provider within two weeks of any placement. The COR Worker shall document each ITM within five (5) days of completion.

**Ex. 49**

| Practice Guide |
| --- |

| Mobilizing Appropriate Services Timely |
| --- |

| **OUTCOMES** | • All children and families involved with DFCS will have Individual Service Plans that include services that are tailored to their individual strengths and needs.<br>• DFCS has developed an array of services that allow for the delivery of services that are tailored to meet the individual strengths and needs of the child and family. |
| --- | --- |
| **R<br>E<br>Q<br>U<br>I<br>R<br>E<br>M<br>E<br>N<br>T<br>S** | • *General:* Prompt provision of services to manage risk, assure safety, and prevent recurrence/ obtained immediately if there are basic unmet needs/ provide for services incl therapy, MH, education, DV, MH, substance abuse /Link services to identified needs/Services must be related to permanency goal<br>• Provide support services to children in placement to stabilize, support and minimize moves.<br>• Medical, dental, and MH records are given to providers.<br>• Provide all children with needed MH, developmental, substance abuse screenings & services, and intensive services such as TFC.<br>• *Reunification:* Timely and appropriate efforts to achieve reunification/Final discharge team meeting before closing a case/Provide aftercare services to children and parents when reunification occurs<br>• *Adoption:* Prompt efforts to achieve adoption/Weekly status meetings with consultant, adoption specialist, supervisor & worker in cases involving infants/Monthly conferences for other children awaiting adoption.<br>• *Independent Living:* IL Plan for youth ages 14–20/Review & and update every 90 days/Prompt and adequate IL and transitional living services to youth in foster care/Ensure youth transitioning to independence has adequate living arrangement, a source of income and health care/Provide educational and training vouchers and assistance in locating & enrolling in educational or vocational programs/Provide information about a range of services to the youth across systems/Develop an aftercare plan in advance of case closing and identify steps for obtaining any needed services that are identified/Assist youth in obtaining documents & services necessary to function as independent adults, i.e., health insurance & records/ Youth to be given 6 months advance notice of cessation of health, financial, or other benefits that will occur at time of transition/ Provide age-appropriate education and support regarding pregnancy prevention, responsible parenting, sexually transmitted diseases and assistance in obtaining medical insurance, medical records and needed medical, developmental, substance abuse, and MH services.<br>• *Caseworker visits:* Frequent visits of high quality between caseworker and children/ At least twice monthly visits with child including once monthly in placement & privately with child/Provider visits children in Therapeutic Foster Care (TFC) every 2 weeks/At least monthly visits with parents/Visits are made during 1st month child is in care and after any change in placement to assess child's adjustment. |

| **ACTIVITY** | **WHERE IN THE LIFE OF THE CASE** | **PRACTICE GUIDANCE** |
| --- | --- | --- |
| *Link services to individual needs in case planning* | • Assessment<br>• Prior to developing case plan<br>• At caseworker visits & FTMs<br>• When family's situation changes | • Review & use information from safety assessment, strengths & needs assessment, all case record information, reports from providers<br>• Link IL and TL needs/plans with family's case plan to identify need for individual IL services<br>• Identify & locate all relevant family members whose needs/services should be addressed<br>• Prepare children/families to participate in case plan meetings by explaining what will happen, importance of plan, encourage to consider their strengths & needs<br>• Facilitate FTMs by encouraging family/child input on strengths/needs and identifying service needs, preferences for providers, and locations of services. Identify relevant cultural, tribal, background issues to be considered in mobilizing appropriate services.<br>• Identify needs before considering the availability of services.<br>• Identify services in collaboration with child and family that will best meet identified needs. |
| *Engage with service providers* | • Prior to developing case plan<br>• During FTMs & case reviews<br>• During case | • Identify service providers that meet family's needs/preferences/locations/cultural concerns<br>• Obtain necessary Release of Information forms from youth/parent/service provider.<br>• Include relevant service providers in FTMs with permission of child/family<br>• Ensure providers tailor services to, incl frequency, intensity, level, & location of services<br>• Contact service providers frequently for reports on child/family's participation in services and |

PAGE 1

| | monitoring | progress toward goals/require written reports specific to referral needs |
|---|---|---|
| | | • Advise service providers of any significant changes affecting delivery of services. |
| *Clarify specific service needs when making referrals* | • At case plan development & reviews<br>• At service referrals<br>• Caseworker visits and FTMs<br>• When situation changes | • Select providers whose array of services match the child's/family's needs<br>• Provide written referrals for services that identify needs of family members, goals of the service, time frames to complete services/achieve goals, barriers to receiving services.<br>• Clarify jointly with family members and service providers the expectations of services, including frequency, level, location, goals, and duration of services.<br>• Document service referrals and reviews of services provided in case plan.<br>• Make payment for services contingent upon delivery of services specified in referral.<br>• As circumstances change &/or family progresses, review progress jointly with family members & providers, adjust services as needed, confirm in writing, document in case plan. |
| *Provide services promptly & early to address safety & risk issues* | • During investigation<br>• Assessment<br>• Prior to case plan development | • Use safety & risk assessment to identify immediate needs to protect children<br>• Use strengths & needs assessment to identify immediate needs to protect children<br>• Make verbal & written referrals to appropriate service providers when needs for services are identified, i.e., during investigation, during assessment, prior to case plan development<br>• Immediate follow-up with providers to ensure response to referrals/mobilizing of services<br>• Document service referrals/provision in case file & review/revise as needed in case plan |
| *Provide services on an ongoing basis to address permanency goal.* | • At case plan reviews & updates<br>• At caseworker visits and FTMs<br>• At court hearings & reviews<br>• When situation changes | • Update assessment/review case plan at required intervals & evaluate progress toward achieving permanency goals/use updated information to evaluate need for services<br>• Monitor service provision to ensure conformity with case plan/identified needs<br>• Evaluate with child/family/service provider the effectiveness of current services & adjust service levels, intensity, type, location, duration as needed.  Change providers if indicated.<br>• In FTMs and caseworker visits, ensure that services are directly linked to overcoming barriers to achieving permanency goals within prescribed time frames.<br>• Make prompt written service referral as soon as need is indicated/specify level, intensity, duration, type of service requested.<br>• Revise case plan with child/family when new services are implemented/ link to goals.<br>• Notify service providers of significant events/changes with child/family or changes in goal |
| *Use caseworker visits to mobilize services* | • Caseworker visits | • Visit with individual family members at required intervals or more frequently if indicated<br>• Discuss effectiveness/satisfaction with services, progress toward goals, emerging issues, changes/Identify needs for changes in service delivery with family members<br>• Determine need to convene FTM or involve service providers in discussions |
| *Provide services to children in placement* | • At case plan development/ revision<br>• Re-assessmt<br>• Caseworker visits | • Identify child's strengths & needs in initial & updated assessments/refer or provide services<br>• Match placement setting to child's individual needs<br>• Identify resource parents' needs for services to care for child/refer or provide services<br>• Provide resource parents with all information about child and service needs<br>• Visit frequently in resource home/interview resource parents & child separately/evaluate effectiveness of services, need to revise services or implement new services. |
| *Monitor and evaluate the effectiveness of services* | • Case plan reviews<br>• Caseworker visits & FTMs<br>• When situation changes | • Review case plan quarterly for continuing appropriateness of services provided<br>• During visits, discuss with individual family members effectiveness of services/other needs<br>• Meet with service providers frequently/discuss effectiveness of services/progress/new needs<br>• With family's approval, invite the service provider to any Family Team Meetings<br>• Make changes in services indicated by lack of progress/info obtained/changes in goals |
| *Provide services at the time of discharge and case closure.* | • At final FTM<br>• Re-assessm't<br>• 6 months before discharging youth from foster care<br>• Case closure | • Identify post-discharge/closure needs for services in updated assessments<br>• Convene discharge FTM with youth/family/significant parties at least 6 months in advance of discharge/case closure to identify needs/develop after care plan with services specified<br>• Make written service referrals and follow-up with providers<br>• Provide youth/family with documentation/information needed to secure needed services<br>• Link family/youth with community resources for general support/ongoing services<br>• Provide contact information for youth/family to contact agency as needed |

PAGE 2

**Ex. 50**

| Practice Guide |
| --- |
| **Individualized Case Planning** |

| | |
| --- | --- |
| **OUTCOMES** | • All children and families involved with DFCS will have Individual Service Plans with services that are tailored to their individual strengths and needs.<br>• Decisions about permanency & stability are made promptly & based on individualized case plans/services.<br>• All individualized service plans will be targeted toward helping children/families achieve their goals. |
| R<br>E<br>Q<br>U<br>I<br>R<br>E<br>M<br>E<br>N<br>T<br>S | • *Service plans.* Service plan are based on assessment and exploration of benefits of service, cultural relevance, and alternatives of planned services along with the family's social network/Therapeutic services (TFC) to be delivered through an individualized, strengths-based treatment plan that is reviewed weekly by a treatment team, at 30 days after placement and every 90 days to evaluate continued need for TFC.Services are linked to individualized needs identified through assessment and plan.<br>• *Permanency planning.* Prompt identification of permanency goals – plan developed within 30 days/Ongoing review of permanency goal/ Requires concurrent planning to address potential for reunification, possible permanent relative placement and monthly contact between worker and parents to address progress and involve them in decisions regarding children/ Adoption specialist assigned within 10 days of establishing goal and adoption plan developed within 15 days and an external adoption consultant assigned for children legally free for 6 months.<br>• *Services to achieve permanency goal.* Timely decision making regarding TPR- agency to send packet to AG within 30 days of establishing plan of adoption. DFCS to file for children in care 15 of the last 22 months unless legal exception applies/ Prompt efforts to achieve adoption.<br>• *Planning for foster care stability.* Stable foster care placements, made according to children's needs/Place in least restrictive setting according to needs in order of relatives, foster home in proximity to home, foster home outside child's community, group home and institution/No child < 10 years in congregate care without exception/ Meetings to prevent disruptions, and if disruption occurs meet within 5 days regarding appropriateness of new placement and services needed/Only one temporary or emergency placement within foster care episode – child cannot spend more than 12 hours at DFCS or non-residential facility.<br>• *Using caseworker visits in individual case planning.* Weekly contacts with therapeutic foster parents and twice monthly visits with children, one in placement setting/ Frequent visits of high quality between caseworker and children/ Visits between the worker and child occur twice monthly regardless of whether child is being supervised by DFCS or a provider. Visit must be made to the child's placement and worker must meet separately with the child/Children in Therapeutic Foster Care (TFC) are to be visited by the TFC provider every 2 weeks/Worker to meet frequently with child's biological parents and at least monthly/Visits are made during 1ˢᵗ month child is in care and after any change in placement to assess child's adjustment.<br>• *Planning for case closure.* Final discharge meeting to be held before case closure/Children discharged from TFC to have follow up services agreed upon by the team |

| **ACTIVITY** | **WHERE IN THE LIFE OF THE CASE** | **PRACTICE GUIDANCE** |
| --- | --- | --- |
| **Link services to individual strengths and needs of each relevant family member** | • Assessment<br>• Prior to developing case plan<br>• At caseworker visits & FTMs<br>• When family's situation changes | • Use caseworker visits, FTMs, & other case planning meetings/activities to identify individual strengths & needs of family members & match services to strengths & needs<br>• Review & use information from safety assessment, strengths & needs assessment, all case record information, reports from providers<br>• Review IL and TL needs/plans to identify and match individual IL services<br>• Identify & locate all relevant family members whose needs/services should be addressed<br>• Identify needs of all relevant individual family members<br>• Collaborate with family members to determine which services are most appropriate for their needs/Identify needs before considering the availability of services.<br>• Identify services in collaboration with child and family that will best meet identified needs. |
| **Address individual strengths & needs in case plans** | • At case plan development<br>• At case plan updates<br>• When the | • Prepare children/families to participate in case plan meetings by explaining what will happen, importance of plan, encourage to consider their strengths, needs, & service preferences<br>• Ensure active participation in case planning meetings & activities by family members |

PAGE 1

**Mississippi Practice Model**

| | child's or family's situation changes | • Facilitate FTMs by encouraging family/child input on strengths/needs and identifying service needs, preferences for providers, and locations of services. |
|---|---|---|
| | | • Identify relevant cultural, tribal, background issues to be considered in mobilizing appropriate services. |
| | | • Solicit information from child/youth & family members regarding the services they think will best address their needs/preferences for providers & locations |
| | | • Address strengths/needs/services for relevant non-custodial parents & children who are not the subject of maltreatment reports, in addition to target children & custodial parents |
| | | • Use information from family members to prepare written case plans & identify services (while assuring the agency's responsibilities for protecting the child and achieving permanency) |
| | | • Document case plans in case record with signatures of family members. |
| **Engage with service providers** | • Prior to developing case plan<br>• During FTMs & case reviews<br>• During case monitoring | • Identify service providers that meet family's needs/preferences/locations/cultural concerns |
| | | • Obtain necessary releases of information forms from youth/parent/service provider. |
| | | • Include relevant service providers in FTMs with permission of child/family |
| | | • Ensure providers tailor services to, incl frequency, intensity, level, & location of services, e.g., through specific service referrals/expectations, monitoring of services, linking payment to service delivery |
| | | • Ensure that residential care services to children and youth are based on the child/youth's individual needs rather than standard service programs. |
| | | • Contact service providers frequently for reports on child/family's participation in services and progress toward goals/require written reports specific to referral needs |
| | | • Advise service providers of any significant changes affecting delivery of services. |
| | | • If services are not available to address the family's unique needs, work with the service provider to develop needed services or identify another provider. |
| **Use caseworker visits in individualizing case plans** | • Caseworker visits | • Hold individual visits with family members at required intervals or more frequently if indicated/visit privately with children in placement/discuss child's needs with foster parents |
| | | • Discuss progress toward goals, emerging issues, changes/Identify needs for changes in service delivery with family members or changes in goals/activities/steps in case plans |
| | | • Determine need to convene FTM or involve service providers in discussions |
| **Conduct individualized case planning outside of FTMs** | • At case plan development & reviews<br>• Caseworker visits | • When FTMs are not possible/appropriate, meet with individual family members or smaller groups of family members to plan for services/Use same approaches as in FTMs |
| | | • Inform family members that meetings/interviews are for developing case plans |
| | | • Document input of all family members in completed case plans/share & obtain signatures |
| **Monitor case plans & revise as needed** | • Re-assessm't<br>• Case plan reviews<br>• Caseworker visits<br>• Case plan monitoring<br>• FTMs | • Meet with the family and child at required intervals/more frequently if needed/ Ask child and family members if they are participating in the service(s) identified in the plan; evaluate effects of services on identified needs/progress toward goals |
| | | • Review case plans at least quarterly for ongoing appropriateness of permanency goals/outcomes/activities/steps/time frames |
| | | • Review re-assessments/services reports/information from family to determine if TPR petitions should be filed at 15 of 22 months or earlier or if an exception is applicable |
| | | • Meet with family/children/youth to discuss intent to file for TPR |
| | | • Review youth with goals of emancipation to determine if other goals have been ruled out or may now be appropriate to pursue |
| | | • Have frequent contact with service providers to ensure individualized service delivery/expected progress & identify needs for changes in services or method of delivery |
| | | • Determine need to consider revising case plan and/or services |
| | | • Convene FTMs or conduct individualized case planning to make needed changes to case plans in order to reflect individual strengths/needs/goals – Document case plan revisions |
| **Link ongoing case planning to individual strengths & needs** | • Case monitoring<br>• Case plan updates<br>• Re-Assessm't | • Use re-assessments to re-evaluate strengths & needs of family members, based on changing circumstances, progress in achieving goals, emerging issues |
| | | • Evaluate with family, foster caretakers, service providers continuing responsiveness & relevance of current services in achieving designated permanency goals, resolving needs |
| | | • Make indicated changes to services jointly with family members/providers |

PAGE 2