# Ex. 51

Page 9

Case 3:04-cv-00251-HSO-ASH    Document 503-3    Filed 09/08/10    Page 2 of 70
Division of Family and Children's Services
Child Welfare Professional Development

Volume 2, Issue 5

# MACWIS –CASES NOT BEING COUNTED

When looking at online reports MWWP1P7B CHILDREN IN MDHS CUSTODY DUE/UPCOMING FOR PERMANENCY HEARING, we have observed that even though a lot of cases are up-to-date regarding their permanency hearings, **they are not being counted** because the data was not entered completely in MACWIS.

When entering hearing details in the court section of MACWIS, the worker needs to be sure and put the hearing date in the **COURT ORDER DATE** field. This is the field that the report **MWWP1P7B CHILDREN IN MDHS CUSTODY DUE/UPCOMING FOR PERMANENCY HEARING** looks at to record if a child is overdue for permanency hearing. It is also important to note that the following hearing types are counted as "permanency hearing": **Dispositional, Six Month Review and Permanency**.





Excerpt from Mississippi Department of Human Services Division of Family and Children's Services, Child Welfare Professional Development Unit, Newsletter, Vol. 2, Issue 5, May 2010

**Ex. 52**

# ADOPTION SPECIALIST JOB DUTIES

Draft – 06-26-09
MAE

Position is a DHS Social Worker Advanced and education/experience qualifications are specified in the State Personnel Board job description – preferred candidate will be licensed to practice Master's Level Social Work (LMSW).

1. Recruits agency resource families for special needs children in need of placement.

2. Facilitates, in cooperation with the Regional Placement Specialist, the group preparation process for all resource family applicants.

3. Completes  home studies for families electing to be solely adoptive resource families.

4. Participates as the Adoption County of Service Worker for children whose primary permanency goal is adoption and/or who are legally free for adoption.
   ❖ Assists the child's worker with the development of an Adoption Plan.
   ❖ Ensures the adoption plan is child specific with detailed activities to be completed and time frames for the completion of the activities.
   ❖ Attends the weekly/monthly Adoption Status meetings with the child's worker and the worker's supervisor to review the progress being made with the Adoption Plan.

5. Makes a determination of the child's eligibility for Adoption Assistance.

6. Evaluates child's readiness for adoption. (Child Evaluation)

7. Assists child's worker in obtaining background information on the birth family and developing a Life Book with the child.

8. Prepares written Background Information on the child to be adopted.

9. Completes an adoption-readiness evaluation on the foster parents who have applied to adopt a particular child.  Summary will include an evaluation of the child's readiness for adoption.

10. Presents information on a child in need of placement to the Adoption Placement Committee.

Adoption Specialist
06-26-09 MAE

11.  Presents information about the child to the potential adoptive family.

12.  Participates in the development of a schedule for pre-placement visits between the child and the potential adoptive family.

13.  Participates in the pre-placement visits and assesses the family's response to the child and the child's response to the family after each visit.

14.  Facilitates the actual placement of the child with the adoptive family and obtains signatures on appropriate agency documents.

15.  Provides supervision of adoptive placements and prepares written reports of each visit.

16. Assists the adoptive parents in completing the appropriate Adoption Assistance Forms.

17.  Assists in the preparation of the legal documents necessary to finalize the adoption and routes them to the attorney handling the adoption finalization.

18.  Assists adoptive families in obtaining post-adoption services, if needed.

19.  Completes adoption home studies and supervises adoptive placements made through the Interstate Compact on the Placement of Children.

20.  Completes adoption home studies and provides supervision for independent adoptions as ordered by the Chancery Court.

21.  Receives all closed case files on the child whose adoption has been finalized and prepares the record for archival.

# Ex. 53

**PROTOCOL FOR ADOPTION MEETINGS**

**Resource Family Placement Committee:**  This regional committee, composed of all adoption specialists,  the Resource Area Social Work Supervisors, (ASWS) and representatives from the licensed private adoption agencies, meets quarterly.  These meetings are scheduled in advance by the lead ASWS, but interim meetings may be called if there is a need. Information and photographs of children free for adoption or are eligible for a legal risk placement are presented to the committee.  Information and photographs of approved adoptive families are also presented.  The Placement Committee considers the child's strengths and needs and selects one or more families as possible placements.

If the Placement Committee is unable to select an adoptive family for the child, the Resource ASWS will refer the child to the other regional offices to be presented at the other placement committees.

**Adoption Planning Meeting:**  This county committee includes the County of Responsibility worker, the County of Service worker, (if different), the Adoption Specialist assigned to the child and the appropriate ASWSs.  Other staff may be invited to participate.  The meetings are scheduled within fifteen days after the ASWS approves the primary permanent plan of adoption.

The purpose of this meeting is to develop separate service plans for the child, the birth family and the adoptive family.  Each plan includes goals, desired outcomes, services to be performed and time frames.  Issues which might be addressed in the service plans include comprehensive child assessment, the future role of birth family in child's future, life book preparation, completion of any medical or dental treatments for the child, termination of parental rights either voluntarily or through court action, compilation of documents needed for legal action, and discussion with resource family regarding their interest in adopting the child.  The Adoption Specialist reviews the plan implementation and monitors progress toward achieving goals.

**Status Meeting:**  The Status Committee's membership is the same as those involved in child's Adoption Planning Meeting.  The Status Committee has three primary responsibilities: (1) to review the progress of the adoption plan, (2) to identify barriers and (3) to develop strategies to overcome them in order to achieve the goal of adoption. If the child is twelve months or younger, the committee meets weekly.  For all other children, the meeting is held monthly.

If a child has been free for adoption for six months and no adoptive home has been identified, an external adoption consultant will be assigned by DFCS to work with the committee.  The consultant must be a licensed master's level social worker with experience in adoption services who can be both a case manager and advocate for the child.

**Ex. 54**

## EXTERNAL ADOPTION CONSULTANT

The external adoption consultant will be either a Licensed Certified Social Worker
(LCSW) or a Licensed Master Social Worker (LMSW) with experience in adoption
issues. The external consultant will meet with the Status Committee when a child has
been freed for adoption for six months and no adoptive home has been identified. The
first meeting will be face-to-face, and subsequent meetings may be by telephone if
distance is an issue.

The responsibilities of the external adoption consultant shall include:
- to review, amend and approve the strategic plans to accomplish the goal of
  adoption,
- to ensure the plan is implemented,
- to provide assistance for the recruitment of adoptive homes.


Contracting for the external consultants could be with qualified private practioners and/or
with licensed child-placing agencies which could assign staff to be consultants.

Several qualified private practioners have been identified but have not been contacted
and, therefore, cannot be listed.

Licensed child-placing agencies which would be given an opportunity to contract with
DFCS for this service include:


REDACTED

**Ex. 55**



**STATE OF MISSISSIPPI**
HALEY REEVES BARBOUR, GOVERNOR
**DEPARTMENT OF HUMAN SERVICES**
DONALD R. TAYLOR
EXECUTIVE DIRECTOR

BULLETIN: 6154                 DIVISION OF FAMILY AND
                              CHILDREN'S SERVICES

TO:        DFCS Deputy Directors
           DFCS Unit Directors
           DFCS Regional Directors
           DFCS Area Social Work Supervisors
           DFCS Family Protection Specialists
           DFCS Family Protection Workers
           DFCS Resource Family Unit (Adoption/Licensure)
           DFCS Independent Living Staff
           DFCS Training staff
           DFCS MACWIS staff
           All Volume IV Holders

FROM:      Kate McMillin, Director
           Division of Family and Children's Services

DATE:      January 24, 2008

SUBJECT:   Mandatory Reporting Requirement

**Effective immediately, the requirements contained within this bulletin are hereby set forth in DFCS' policy.**

**Maltreatment and Corporal Punishment of Children in Custody**

Maltreatment, including the use of corporal punishment, by a resource parent (relative or not) on foster children is strictly forbidden by the Mississippi Department of Human Services, Division of Family and Children's Services' policy. If any DFCS staff has suspicion that a child in DHS custody is being maltreated or that corporal punishment is being used within a resource home, a **formal report** must be made.

KM: PPWG: nl

**Ex. 56**

**Mississippi Department of Human Services
Division of Family and Children's Services**



**Volume 2, Issue 2
February 2010**



MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
DIVISION OF FAMILY AND CHILDREN'S SERVICES

# Child Welfare
# Professional Development Unit

## MANDATED REPORTING REMINDER

### Inside this issue:

| | |
|---|---|
| *Worker & Supervisor Qualification...* | 2 |
| *2010 Census* | 3 |
| *Youth Retreat* | 3 |
| *CFSR Timeline* | 4 |
| *Court Improvement Video* | 4 |
| *Health Help for Kids* | 5 |
| *Surviving Hard Times Conference* | 5 |
| *Children's Justice Center Training Opportunities* | 6 |
| *Stop the Hurt Conference* | 5 |
| *Wounds, Bruises & Scars* | 6 |
| *Financial Unit Tips* | 7 |

**From Lori Woodruff,
Deputy Administrator
DFCS:**

**As child welfare professionals we are mandated to report suspicions of child abuse or neglect.**

Please review Mississippi Code of 1972 as amended: Sec. 43-21 -353. This code states that (1) Any attorney, physician, dentist, intern, resident, nurse, psychologist, **social worker,** child care giver, minister, law enforcement officer, public or private school employee or **ANY OTHER PERSON** having reasonable cause to **suspect** that a child is a neglected child or an abused child, shall cause an oral report

to be made immediately by telephone or otherwise and followed as soon thereafter as possible by a report in writing to the Department of Human Services.....

*Further, our settlement agreement specifically points out that as mandated reporters DFCS staff are required to formally report any suspicions of maltreatment, including suspicion of or knowledge of the use of corporal punishment, regarding any child in the custody of DFCS in any type of placement setting. If the child is in DFCS custody and you have cause to suspect that this child is being*

*subject to the use of corporal punishment or being maltreated in any way, you are required to report this suspicion formally to DFCS/ MDHS.*

Bulletin 6154 addresses the above guideline in relation to suspicion of the use of corporal punishment or maltreatment in resource homes. This bulletin is being revised to reflect this mandate pertaining to all children in our custody regardless of their placement setting.

If you have questions regarding this mandate, please discuss your concerns and/or questions with your ASWS or Regional Director.

Excerpt from Mississippi Department of Human Services Division of Family and Children's Services, Child Welfare Professional Development Unit, Newsletter, Vol. 2, Issue 2, February 2010

**Ex. 57**

**Social Work p.rn.**
**Central Intake, 24-Hour Hotline & Disaster Preparedness Plan**
**Scope of Services**

Social Work p.r.n. will provide required services for the MDHS Centralized Intake and 24-Hour Hotline and Disaster Preparedness Plan by establishing a telephone hotline based in Jackson, Mississippi. The call center will be adequately staffed 24 hours/day, 7 days/week, to include weekends and holidays, and any other official office closing. Social Work p.r.n. would ensure that all calls are received and handled effectively throughout the state.

The services related to the Central Intake and 24-hour Hotline will include, but not be limited to:

- Receiving and recording all allegations of child and vulnerable adult abuse/neglect reported throughout the state;
- Screening all calls according to a required protocol upon which all staff have been trained;
- Based on screening, referring all reports not related to allegations of abuse or neglect will be referred to the appropriate referral source;
- Obtaining specified information from calls concerning allegations of abuse or neglect according to required protocol;
- Entering specified information into the Mississippi Automated Child Welfare Information System (MACWIS);
- Referring those reports of abuse or neglect screened in for investigation to the appropriate MDHS staff

Social Work p.r.n. will include three (3) 8-hour shifts with the largest crisis line social work staff coverage on shifts that have the highest call volume. Social Work p.r.n. recognizes that circumstances may necessitate an adjustment in shift schedules and will make changes according to the need. This plan is designed to allow for the institution of overlapping shifts to accommodate changes in call volume. There would be shift differential for crisis line social work staff working night shifts.

Social Work p.r.n. would ensure that all crisis line social workers for the MDHS Centralized Intake and 24-Hour Hotline and Disaster Preparedness Plan have a master's degree in social work or a bachelor's degree in social work with two years of related experience.

Social Work p.r.n. agrees to abide by all related terms of the Settlement Agreement and Reform Plan as they are applicable to this program.

Social Work p.r.n. would maintain, operate and staff the MDHS Centralized Intake and 24-Hour Hotline and Disaster Preparedness Plan for the 84 Mississippi County offices seven (7) days a week, to include weekends, holidays, and any other official office closing.

Social Work p.r.n. would adhere to MDHS policies and procedures to ensure a consistent and effective method for receiving, screening, and handling intake calls statewide.

Social Work p.r.n. would record all calls (incoming and outgoing) using a radio recording device. All recordings will be permanently stored and accessible for review by appropriate MDHS staff and the Olivia Y. Court monitor.

Social Work p.r.n. would anticipate and accommodate the special needs of reporters by accommodating communication needs of those who are limited/non-English speaking or hearing impaired, e.g. use of interpreters, the Mississippi Relay System, TDD/TYYs, etc.

Social Work p.r.n. would provide 24-hour/7 days per week coverage to ensure the handling of any emergencies related to the functioning of the hotline and assuring delivery of any reports needing immediate response to appropriate county on-call staff of MDHS.

Social Work p.r.n. would maintain information and referral services to the public for human service providers throughout the state.

Social Work p.r.n. would ensure that all reports of suspected child/vulnerable adult abuse and/or neglect received are entered into MACWIS and referred to the appropriate county for jurisdiction within one (1) hour of receiving the complete report. As a back-up measure, if access to MACWIS is denied, Social Work p.r.n. will ensure that reports and hard copies of the applied screening tools are faxed and verbally forwarded to the responsible county office within one (1) hour of receiving the complete report and that reports are entered and screened in MACWIS as soon as accessibility is restored.

Social Work p.r.n. would ensure the MDHS on-call staff for the County of Responsibility is notified of suspected child/vulnerable adult abuse or neglect within fifteen (15) minutes of the report being received and entered into MACWIS, with the exception of legitimate telephone difficulties.

Social Work p.r.n. would guarantee all staff persons adhere to MDHS' established policies and procedures in the handling of all reports of suspected child/vulnerable abuse and neglect.

Social Work p.r.n. would inform MDHS/DFCS as soon as possible of any telephone difficulties related to the MDHS Centralized Intake, 24-hour, seven days per week Hotline and Disaster Preparedness Plan. This will occur immediately but will not exceed a 24-hour timeframe.

Social Work p.r.n. would notify MDHS/DFCS in writing of a change in business telephone, address or any other change in functionality of the MDHS 24-Hour Hotline within five (5) business days prior to this occurrence.

Social Work p.r.n. would adhere to procedures established within the MDHS Disaster Preparedness Plan to receive calls and gather information for MDHS in regard to the location and contact information for MDHS-"Displaced" resource families, licensed facility staff, and MDHS staff in the event of a disaster within the state. This information will be provided to

MDHS' designated office periodically throughout the day of the disaster and three (3) to five (5) days immediately following.

Social Work p.r.n. would require MDHS Centralized Intake training for all new and experienced employees, prior to duty. All staff persons will receive 40 hours of in-service training each year, and supervisors will receive a minimum of 24 hours of in-service training per year.

Social Work p.r.n. would complete and submit timely the required weekly and daily reports to MDHS using the submitted format. This will include collecting and compiling data on all screened-in and screened-out referrals made to the hotline and submitting the written daily and weekly reports to the MDHS program supervisor. This is to include all demographic information.

Social Work p.r.n. would be responsible for the monthly programmatic and fiscal reporting necessary to maintain the contract. An annual programmatic report will be compiled and submitted no later than 45 days after the closing of the contract with MDHS/DFCS. The programmatic report will include information from start-up of the project to the end, successes, failures, recommendations, and any other additional information pertinent to this project.

Social Work p.r.n. would determine the number of staff required to achieve measurable outcomes.

The Independent Contractor will provide access to MDHS staff and Quality        Assurance Reviewer to all calls and recordings.

**Measurable Outcomes:**

- 96% of suspected child/vulnerable adult abuse/neglect reports are answered, entered into MACWIS and screened to the appropriate county within one (1) hour of receiving the complete report.
- 96% of reports pulled for quality assurance will receive a rating of 14 or higher; 18 being the highest possibility.
- 98% of reports pulled for quality assurance will be screened in accordance to established statutes of limitations and policies.
- 98% of reports pulled for quality assurance will have confirmation of prior history attached or documentation of the lack thereof being available during the diligent search.
- 98% of resource home and child placing agency reports will be entered into MACWIS in accordance to policy with abuse/neglect history confirmed and tracked.
- 100% of both new and experienced employees will receive 40 hours of on-going training annually.
- 98% of daily, weekly and monthly programmatic and fiscal reporting will be submitted in accordance to established timeframes.
- 95% of all calls will be answered with a hold time of five (5) minutes or less.

- 98% of calls received on the social work inquiry telephone line will be answered with a hold time of three (3) minutes or less.
- 98% of suspected child/vulnerable adult abuse/neglect after hour reports are forwarded via telephone to the County of Responsibility on-call social worker within fifteen (15) minutes of screening.

# Ex. 58

# Special Safety Review – Group Home/Residential Facility, MACWIS Resource ID Number: 000008648

# (Motion to File Under Seal, filed with this report)

# Ex. 59

# Special Safety Review – Group Home/Residential Facility, MACWIS Resource ID Number: 000041084

# (Motion to File Under Seal, filed with this report)

**Ex. 60**

**Summary of the Court Monitor's Findings from Case Record Review Conducted During Period 2 - Investigations Related to Reports of Maltreatment In Care**

The Monitor requested that defendants provide all MACWIS reports of maltreatment of children in care statewide between June 1, 2008 and June 30, 2009. Defendants made substantial efforts to identify this cohort of maltreatment reports and acknowledged certain difficulties that were encountered during the process of assembling the requested data. The case record review revealed errors in the designation of some reports as reports of maltreatment of children in defendants' custody. For these reasons, the Monitor is not confident that a complete list of all maltreatment reports entered in MACWIS during the review period was produced.

Defendants provided the Monitor with a final list that identified 797 reports of maltreatment of children in care recorded in MACWIS during the review period. A random sample of 240 case records derived from the 797 reports was assessed during the case record review process.[1] Fifty-five of the 240 case records reviewed were excluded from the analysis because they did not meet the criteria for review.[2] The remaining 185 case records constitute a statistically valid sample designed to produce a $\pm$ 6.32 percent margin of error with 95 percent confidence in the results.

A structured instrument was used for data collection. The instrument was developed by the Court Monitor during 2009 over the course of several months in collaboration with the parties, their designees, and several expert consultants engaged by the Court Monitor.[3] Final adjustments to the instrument were made after it was pilot-tested by DFCS staff as well as by the Monitor's staff and consultants.

On September 14 and 15, 2009, a review team comprised of 13 DFCS employees[4] participated in an eight-hour training session on the instrument and the case record review process. The training curriculum was designed and facilitated by the Monitor's consultants in consultation with DFCS staff. The training focused on a review of the data collection instrument as well as the relevant navigation in both MACWIS and in the paper record. During the training session, trainees conducted an in-depth review of a sample case record in order to promote uniformity in reviewer decision-making.

During the review, all paper records were collected from the county offices and stored on-site at the MDHS state office under the supervision of a designated DFCS staff

---

[1] For purposes of this review, the term "case record" refers to the electronic case record maintained in MACWIS and the corresponding paper record.

[2] For example, case records were excluded because they did not include a report of maltreatment in care; there was no information in MACWIS about the intake; the report was screened-in but it was a duplicate report; the alleged perpetrator was a parent during a trial home placement or an unsupervised visit; or, alleged abuse by a parent-perpetrator occurred before the child was in DHS custody.

[3] The Court Monitor engaged child welfare system experts from the Center for the Study of Social Policy in Washington, D.C., with substantial experience conducting case record reviews in similar contexts. In addition, a sociologist, Dr. Troy Blanchard, an associate professor at Louisiana State University, was also engaged to work on this project.

[4] The employees were selected by MDHS/DFCS management.

member.  All paper records were inventoried and tracked by a designated member of the Monitor's staff during the review process.  The case records were reviewed by a seven-person review team between September 22 and 30, 2009 at the MDHS state office.  The review process was supervised by a three-person quality assurance ("QA") team led by one of the Monitor's expert consultants, a member of the Monitor's staff and a DFCS manager with extensive supervisory experience related to the DFCS case record review processes.  During the review period, the QA team members checked data collection instruments for completeness and consistency prior to data entry and analysis.  All records reviewed by the review team were subject to a second review process by the QA team to ensure accuracy, consistency and an appropriate level of inter-rater reliability.  The non-DFCS staff members on the QA team remained on-site until October 2, 2009 to conduct a supplementary review of the 55 excluded records.

Subsequent to the on-site reviews, the data collection instruments were coded and analyzed using the standard Statistical Package for the Social Sciences ("SPSS") program.  Apparent discrepancies revealed by the analyses required further reviews of certain case records to confirm or otherwise reconcile seemingly discrepant data.  These supplemental reviews, which were conducted by the Monitor's staff, were successful in resolving questions about the data that emerged from the statistical analyses.  Additional data analyses were conducted as a result of the supplemental reviews.

## FINDINGS

The findings from the case record review address MACWIS issues, maltreatment reports, screenings, the timeliness of the investigative process, and characteristics of and findings from the investigations.

## A.  Limitations in MACWIS

Significant limitations in MACWIS were identified during the course of the case record review.  In some instances, these limitations raise substantial concerns about the quality of the data that were collected.  For example, cases are not linked in a way that provides the full history of prior reports of maltreatment.  Additionally, the review revealed inaccuracies and inconsistencies in coding within MACWIS.  For example, in some places, children were listed as being placed in their "own home" when instead they were placed in an unlicensed relative placement.  In addition, the placement screen listed children as being in "child specific" placements, but in the resource directory, the placement was coded as "relative foster parent."  It did not appear that the data recorded in the electronic case record, including dispositional data related to prior reports, was accurate or complete.  This is a serious weakness in the system.  Thus, findings from the data obtained during the case record review related to prior reports of maltreatment are not included herein.

**B. Maltreatment Reports, Profile**

- **Placements:** Of the 185 reports of maltreatment in care reviewed, the majority of the children were in the following placements at the time of the allegation:

  Foster home: 84 (45.4%)
  Relative foster home: 42 (22.7%)
  Therapeutic foster home: 16 (8.6%)
  Own home: 8 (4.3%)
  Emergency shelter: 8 (4.3%)
  Residential treatment facility: 7 (3.8%)
  Other:[5] 20 (10.8%)



Placement of children at time of allegation

- **Relationship of alleged perpetrator to alleged child-victim:** The 185 reports reviewed included allegations implicating a total of 231 alleged perpetrators who had the following relationships with the alleged child-victim:

  Non-relative foster parent: 105 (45.5%)
  Relative foster parent: 53 (22.9%)
  Other: 24 (10.4%)
  Other relative: 16 (6.9%)
  Residential facility staff: 10 (4.3%)
  Unknown: 6 (2.6%)
  Sibling: 5 (2.2%)
  Biological parent: 4 (1.7%)
  Friend or neighbor: 3 (1.3%)

---

[5] The balance were in placements such as acute care, contract, child specific placements, court-ordered juvenile detention/training school or non-licensed shelters, group homes and specialized residential schools.

Adoptive parent: 3 (1.3 %)
Unrelated legal guardian: 1 (0.4%)
Child's day care provider: 1 (0.4%)



**Relationship of Alleged Perpetrators to Child**

- **Single or multiple alleged perpetrators:** 141 (76.2%) of the 185 reports
  identified one alleged perpetrator, 42 (22.7%) identified two alleged perpetrators,
  and two (1.1%) identified three alleged perpetrators.

- **Categories of maltreatment allegations:** The 185 reports included a total of 250
  separate allegations of maltreatment related to the 231 alleged perpetrators. A
  categorical description of the allegations of maltreatment and the prevalence rates
  follow below:

  Physical abuse: 113 (45.2%)
  Physical neglect: 71 (28.4%)
  Sexual abuse: 32 (12.8%)
  Emotional abuse/neglect: 29 (11.6%)
  Medical neglect: 4 (1.6%)
  Exploitation: 1 (0.4%)

C. **Initial Screening – Disposition**

- **Screening results:** 134 (72.4%) of the 185 reports were screened in and 51 (27.6%) were screened out.

- **Screen outs:** Reports were screened out for the following reasons:

  o 20 (39.2%) ANE reports not documented
  o 9 (17.6%) duplicate report
  o 9 (17.6%) out of home setting
  o 4 (7.8 %) victim 18 or over reporting prior abuse
  o 3 (5.9%) peer sexual relations, age 16 and over
  o 2 (3.9%) inappropriate sexual contact, non-caretaker
  o 2 (3.9%) one child injuring another
  o 1 (2%) parental inappropriate behavior
  o 1 (2%) referrals, *i.e.*, delinquency, etc.

D. **Timelines Related to Investigations**

Pursuant to the Settlement Agreement, by the end of Period 1, defendants were required to initiate all investigations into reports of maltreatment of children in custody within 24 hours and to complete the investigations within 20 calendar days.[6] As detailed below, the case record review found significant shortcomings in the timeliness of the investigative process under the applicable Period 1 requirements as well as under the current Period 2 requirements, which enlarged the time for completing investigations during Period 2 to 30 days.[7]

- **Assignment to investigator:** Over 30 percent of the cases reviewed documented that investigations were not assigned to an investigator in time to promote timely initiation of the investigative process. The 134 screened-in maltreatment reports were assigned to an investigator within the following time periods:

  o Within one day: 89 (66.4%)
  o Within two days: 10 (7.5%)
  o Within three days: 12 (9%)
  o Within four to six days: 12 (9%)
  o  Within seven to 10 days: 5 (3.7%)
  o >10 days: 6 (4.2%)

---

[6] Settlement Agreement §II.B.4.e. The initiation requirement remained the same during Period 2; however, the time for completion of investigations was modified for purposes of Period 2 implementation. According to the Period 2 Implementation Plan, by December 1, 2009, defendants were required to initiate investigations within 24 hours and complete them within 30 calendar days. Period 2 IP § II.6.g.
[7] *Id.*



- **Initiation:** The alleged child-victim was interviewed in 126 of the 134 screened-in reports.[8]  Except in two instances, the interviews were conducted on a face to-face basis.  Over half of the case records document that the alleged child-victim was not interviewed within 24 hours as required to satisfy the Settlement Agreement's initiation standard.  The time periods between intake and the interviews of the child-victims are set out below:

  - Within one day: 59 (46.8%)
  - Within two days: 14 (11.1%)
  - Within three days: 7 (5.6%)
  - Within four to six days: 16 (12.7%)
  - Within seven to 10 days: 8 (6.3%)
  - > 10 days: 22 (15.5%)[9]



---

[8]  For purposes of the case record review, a child under three years of age was deemed to be interviewed if there was documentation in the case record that the investigative worker visited and observed the child during the investigation.
[9]  These 22 instances ranged from a minimum of 11 days to a maximum of 272 days.

- **Submission to supervisor:** The investigative reports for the 134 screened-in maltreatment reports were submitted to a supervisor for review within the time periods following the date of intake that are set out below:

  - Within one to three days: 4 (3%)
  - Within four to six days: 1 (0.7%)
  - Within seven to 10 days: 9 (6.7%)
  - Within 11-15 days: 18 (13.4%)
  - Within 16-20 days: 18 (13.4%)
  - Within 21-30 days: 41 (30.6%)
  - Within 31-45 days: 19 (14.2%)
  - Within 46-60 days: 10 (7.5%)
  - > 60 days: 14 (10.4%)



- **Time to Completion:** Pursuant to the Settlement Agreement, the date of supervisory approval of the investigative findings constitutes the date the investigation is deemed to be completed. Nearly 27 percent of the investigations were completed within 20 days and just over 53 percent of the investigations were completed within 30 days. The time periods between the date of intake and the date of supervisory approval of the investigative findings related to the 134 screened-in reports of maltreatment are set out below:

  - Within one to 20 days: 36 (26.9%)
  - Within 21-30 days: 35 (26.2%)
  - Within 31-50 days: 39 (29.1%)
  - >50 days: 24 (17.9%)



- **Time between submission to supervisor and supervisory approval:** The time periods between the submission of completed investigative reports to a supervisor and supervisory approval of the investigative findings related to the 134 screened-in reports of maltreatment are set out below:

  o One to three days: 88 (65.7%)
  o Four to 10 days: 25 (18.7%)
  o 11 to 20 days: 12 (9%)
  o > 20 days: 9 (6.7%)



E. **General Characteristics of the Investigations**

- **Interview of the alleged child-victim outside the presence of the caretaker:** The alleged child-victims were interviewed during the investigation of 126 of the 134 screened-in maltreatment reports. Documentation in the case record established that for 30 (23.85%) reports the child-victims were interviewed outside the presence of the caretaker and for five (4%) reports they were not. Based on the available documentation, a determination could not be made about

this aspect of the child-victim interview in the investigation of 91 (72.2%) reports. This does not necessarily indicate that the children were not interviewed outside the presence of the caretaker. Rather, that the documentation in the record does not establish whether or not the caretaker was present.



- **Interviews of other children in the home/facility:** In 124 of the 134 screened-in reports, the case record indicated other children resided in the placement. During the course of the investigation of 65 (52.4%) reports, all of the other children residing in the placement were interviewed, during the investigation of 38 (30.6%) reports some but not all of the other children residing in the placement were interviewed, and during the investigation of 21 (16.9%) reports none of the other children residing in the placement were interviewed.



- **Interviews of alleged perpetrator:** The case record indicated that all of the alleged perpetrators were interviewed in 122 (91%) of the 134 screened-in reports. In six (4.5%) of the reports, only some of the alleged perpetrators were interviewed, and in six (4.5%) other reports, the alleged perpetrator was not interviewed.



- **Interview of non-offending caretakers:** Fifty-nine of the 134 screened-in reports involved placements with non-offending caretakers. All non-offending caretakers were interviewed in 38 (64.4%) of these 59 instances, some non-offending caretakers were interviewed in 6 (10.2%) of these instances, and in 15 (25.4 %) of these instances the non-offending caretakers were not interviewed.



- **Interviews of collateral contacts:** In 114 of the 134 screened-in reports, a total of 235 collateral contacts were interviewed. Based on the documentation in the case records, in some instances the reviewer could not determine what relationship the collateral contact had to the investigation. A description of the collateral contacts follow below:

  Other family members:  67 (28.5%)
  Other:  42 (17.9%)
  School personnel:  28 (11.9%)
  Unable to determine relationship to investigation:  19 (8.1%)
  Other DFCS staff:  18 (7.7%)
  Witness:  12 (5.1%)
  Neighbors:  11 (4.7%)
  Medical providers:  10 (4.3%)
  Mental health professionals:  8 (3.4%)
  Family friend:  7 (3.0%)
  Child care provider:  6 (2.5%)
  Law enforcement:  4 (1.7%)
  Other service provider:  3 (1.3%)

- **Interviews of reporters:** In 127 of the 134 screened-in reports, the identity of the reporter was known. Forty-two (33.1%) of the 127 reporters were interviewed during the investigation and 85 (66.9%) were not.



- **Check of physical environment in current placement:** Based on the documentation in the case record, a check of the physical environment in the current placement was conducted during the course of 78 (58.2%) of the investigations. There was no documentation that the physical environment was checked in 56 (41.8%) of the investigations. This does not necessarily indicate that the check of the physical environment was not conducted, but rather that it was not documented.

11



- **Medical examinations of alleged child-victim:** In eight (6%) of the 134 screened-in reports, a medical examination of the alleged child-victim was conducted. In light of the absence of clear policy directives during the review period, it is not possible to draw any conclusions about this finding; however, it is noteworthy that there were a total of four medical neglect allegations reflected in the 134 reports, and there was no documentation in the case records related to these four allegations that the child-victim received a medical examination.

- **Behavioral/mental health assessment of alleged child-victim:** There was no documentation in any of the case records reviewed that any of the alleged child-victims received a behavioral health assessment during the course of the investigations related the 134 screened-in reports of maltreatment. As noted above, in light of the absence of clear policy directives during the review period, it is not possible to draw any conclusions related to this finding; however, it is noteworthy that the 134 screened-in reports included 22 allegations of emotional abuse/neglect and none of the case records related to these allegations included documentation of a related behavioral/mental health assessment of the child-victim.

- **Notification to resource worker:** In 98 of the 134 screened-in reports, a resource worker was assigned to the case. Based on the documentation from the review, most resource workers were not notified of the investigation; in only 29 (29.6%) of the 98 reports were the resource workers informed, and, of those, only nine (31%) of them accompanied the investigator at any point during the investigation.



**F.  <u>Investigative Findings</u>**

- **Evidenced reports:**  Twenty-four (17.9%) of the 134 screened-in reports resulted in an evidenced finding for one or more allegation of maltreatment and 110 (82.1%) were nonevidenced.



- **Licensure policy violations:**  In 48 (35.8%) of the 134 screened-in reports, 53 licensure policy violations were identified as a result of the investigation.  In the investigations of 41 (77.45%) of the reports, the licensure policy violations were categorized as corporal punishment violations.

- **Recommendations related to closure of facility or home:**  The investigation of 17 (12.7%) reports resulted in recommendations to close placements and 12 (9%) included explicit recommendations to keep the placement implicated in the investigation open.  There were no recommendations documented on the status of the placement with respect to 105 (78.3%) of the screened-in reports.



13

- **Safety assessment finding:**  In 60 (44.8%) of the 134 screened-in reports, there was a safety assessment finding of "unsafe," and in 74 (55.2%) of the reports there was a finding of "safe."  For 29 (48.3%) of the 60 reports that had a finding of "unsafe," the children were not removed from the home or facility.

- **Safety plan:**  While the case record review contained documentation that a safety plan was developed for 47 (78.3%) of the 60 reports with safety assessment findings of "unsafe," it is noteworthy that there is no confidence in the quality of the plan that was created.

- **Corrective Action Plan:**  Because the separate licensure investigations were not conducted, the case record review produced no reliable documentation of corrective action plans and implementation of the plans.

**Ex. 61**

| Practice Guide |
|---|
| **Preserving and Maintaining Connections** |

| OUTCOMES | • All children in out-of-home care will maintain relationships with family & other persons with whom they have a strong connection, their tribe, community, & school, whenever safe and appropriate.<br>• Families actively participate in the parenting and rearing of their children if safe while in foster care. |
|---|---|
| **R**<br>**E**<br>**Q**<br>**U**<br>**I**<br>**R**<br>**E**<br>**M**<br>**E**<br>**N**<br>**T**<br>**S** | • Children are placed in this priority order: with siblings, with kin, or foster home in proximity to family.<br>• Provide all relevant information to resource parents/facilities; resource parents & birth parents meet.<br>• Provide services to promote constructive parent-child visitation and to remove barriers to contact.<br>• Aftercare plan developed and finalized in advance of case closing to ensure orderly transition.<br>• 90 day trial home visit & aftercare plan prior to reunification/ visits to home twice monthly to interview child without parent or caregiver present.<br>• Advise potential adoptive families of subsidies & post-adoption services.<br>• Place children within county or 50 miles of home unless approved exception.<br>• Place siblings together unless unsafe, exceptional needs, or large sibling group size/Diligent efforts to reunite separated siblings/Monthly visits between separated siblings unless court limits<br>• Prioritize relatives as resources for placement, visiting and support/phone calls within 24 hours if no visit<br>• Contacts between parents/child/separated siblings; visits within 24 hours of placement unless reasons not to/phone call if no visit; Provide support to preserve relationships & parenting skills; Document visits<br>• Minimum of two visits per month between parents/child unless limited by court order/Visitation plan at FTM within 30 days based on child's needs & goals & parents' schedule, and updated every 90 days<br>• Assist youth to develop social networks and relationships with caring individuals (family, tribe, faith); Ensure youth has access to at least one committed, caring adult and to cultural supports.<br>• Maintain child's current school placement for child entering foster care.<br>• Adoption preference given to foster parents caring for a child for 12 months or longer unless unsuitable<br>• Caseworker visits with children (at least twice monthly, once in placement setting, meet separately with child, twice monthly visits by therapeutic FC provider, visit in 1st month & after placement change)<br>• Diligent efforts to notify tribal authorities.<br>• Caseworker meets at least monthly with parents/documents diligent efforts to locate absent parents |

| ACTIVITY | WHERE IN THE LIFE OF THE CASE | PRACTICE GUIDANCE |
|---|---|---|
| • *Identify and locate relevant family members*<br>• *Identify other important connections*<br>• *Identify and evaluate relative placement resources early* | • At investigation<br>• At assessment<br>• Prior to placement<br>• Prior to developing case plan<br>• At routine intervals, e.g., at case plan updates | • Review all case file documentation for info on family, connections, contact info<br>• During investigation, ask caregivers to identify all relevant family members for potential placement resources and for connections, including contact information.<br>• Ask parents/caregivers for family members with whom they feel supported, for the purposes of involvement in family team meetings and other case events.<br>• Ask parents/caregivers about non-custodial parents/obtain contact information.<br>• Search for non-custodial parents & their family members through case files, phone directories, child support system, info provided by family<br>• Contact and evaluate non-custodial parents/relatives and determine interest & suitability for involvement in case planning, decision making<br>• Ask parents/children about heritage/school/ friends/ traditions/ family members/ faith<br>• Re-evaluate family members and connections at regular intervals (case plan updates)<br>• Observe family relationships and how the family and child relate to each other.<br>• Document information obtained from children and family members in case file. |
| *Use caseworker visits to preserve connections* | • At caseworker visits with family & resource parents<br>• At assessment | • Prepare for caseworker visits by knowing about important connections, visiting schedules, and so forth<br>• Meet with children/parents privately & discuss satisfaction with relationships, contacts, reactions, quality of visits, support needs to strengthen contacts/interaction |

PAGE 1

| and relationships | and case plan updates | • Follow-up on identified needs for more or less contact/interaction<br>• Interview foster caretakers privately about child's needs for connections/interaction<br>• Observe children's interaction with family members and others/note needs for casework attention and service provision |
|---|---|---|
| *Use strengths and needs assessment information to identify relationships & connections* | • At assessment<br>• Prior to developing case plan<br>• Assessment & case plan updates | • Identify important connections and relationships of children during initial assessments (in assessing both children and parents)<br>• Assess individual children's connections & relationships<br>• Update and re-evaluate connection/relationship information at assessment updates<br>• Identify potential caring individuals for youth in foster care; obtain contact information<br>• Evaluate youth's interests, plans, needs and the connections that support them |
| • *Use FTMs to develop plans to preserve relationships and connections*<br>• *Address connections in initial and updated case plans* | • When case plan is developed<br>• At all FTMs<br>• At all case plan updates | • Ensure that all relevant family members are invited and supported to attend FTMs, including non-custodial parents and age-appropriate children/youth<br>• Hold FTMs at least every 90 days to review ISPs; more often if circumstances change<br>• Include in FTMs persons with strong connections/ties to the child as appropriate & with family's permission. e.g., mentors, family advocates, etc.<br>• Develop detailed visitation plan in FTM; include family and other relevant parties<br>• Monitor & update visitation plan every 90 days<br>• Ensure that relationship/connections issues and plans are included in initial case plans; re-evaluate, update at each case plan update, based on new assessment info<br>• Address involvement of caring adults for youth in IL/TL plans; monitor & update at least every six months<br>• Identify services/supports needed to maintain connections/relationships in case plans |
| *Support family involvement with children in care* | • Within 24 hours of placement<br>• In initial case plans<br>• In updated case plans<br>• At FTMs<br>• When family or individual circumstances change | • Prepare family members prior to visits on what to expect & how to support each other.<br>• Arrange early initial visits after placement (within 24 hours)<br>• Plan for multiple means of contact where appropriate (visits, calls, other contacts)<br>• Discuss/prepare resource parents to support child's contacts and relationships<br>• Make visiting plans in FTMs and jointly with parents and resource parents<br>• Facilitate meetings and planning between parents and resource parents on opportunities for parental involvement in parenting their children in foster care<br>• Monitor/discuss contacts and reactions, and adjust plans as needed<br>• Provide support services to enable parental/family contact/interaction<br>• Provide supervision of contacts/interaction based on safety/risk needs |
| *Identify and support tribal affiliations or Indian heritage & other cultural background* | • At investigation<br>• At assessment<br>• At initial case plan/updates | • Identify Indian & other cultural affiliations in assessment<br>• Notify relevant tribes of the agency's involvement during investigation & at placement<br>• Follow-up with tribes if necessary to ensure notification<br>• Seek assistance from Tribe in locating Native foster homes<br>• Include resource parents in case planning, and address activities steps to maintain tribal or other cultural heritage in the plan<br>• Monitor compliance with plans and revise as needed |
| *Advocate for school consistency* | • At assessment<br>• At case plan<br>• During case monitoring | • Place children in proximity to current school<br>• Identify appropriateness of/need to maintain school placement in assessment<br>• Enlist parent/resource parents in supporting school placement, e.g., transportation<br>• Meet and plan with school officials to maintain school placement<br>• Monitor, review plans, and revise as needed to support school placement |
| *Place children in foster care settings that support their connections* | • At assessment<br>• At placement<br>• At case plan & updates | • Use relative resources as placements when appropriate/ask Tribes for assistance<br>• Place in proximity to home, community, school<br>• Engage parents/resource parents in case plans to support connections/relationships<br>• Facilitate relationships between foster caregivers, parents, other family members<br>• As needed, plan for regular contacts with members of Tribe, faith, community, friends<br>• If siblings are separated, actively plan to place together unless not appropriate |

PAGE 2

**Ex. 62**

| Practice Guide |
| --- |

## Involving Children and Families in Case Activities and Decision Making

| OUTCOMES | • Families are empowered to advocate for themselves and take an active role in ensuring the safety, permanency and well-being of their children and other family members.<br>• Families are actively committed to participating in and completing activities, and reaching their goals by being part of the planning process. |
| --- | --- |
| **R E Q U I R E M E N T S** | • Interview with parents required to complete an assessment.<br>• Parents & all children six and older must be involved in the development of the case plan/sign case plan<br>• Develop case plan within 30 days/Review every 90 days/FTM within 30 days of opening to develop plan.<br>• Update case plan through FTM within 30 days if placement changes or other significant changes in the case/caseworker & family regularly review progress & sign case plan revisions/At least quarterly, caseworker and supervisor review case plan with parents & discuss progress, options, timelines for permanency<br>• FTM & aftercare plan developed prior to placement with relative to support the family and ensure child safety.<br>• The permanency option of long term foster care is not allowed, but durable legal custody is allowed.<br>• Emancipation can only be a goal for children 16 years old(er) with court approval/ after ruling out other goals.<br>• Concurrent planning must address the potential for reunification, possible permanent relative placement and monthly contact between the caseworker and parents to address progress and involve them in decisions.<br>• Diligent efforts are to be made to locate and involve absent parents in case planning.<br>• Frequent, high quality visits are to occur between caseworker and child twice monthly, one of these must be in the child's placement, and the caseworker must meet with the child separately/children in treatment foster care are to be visited by the treatment foster care provider every 2 weeks/caseworker must meet with the child's biological parents at least monthly.<br>• Make visits during first month a child is in care & after any placement change to assess child's adjustment.<br>• There must be documented efforts of diligent searches for absent parents. |

| ACTIVITY | WHERE IN THE LIFE OF THE CASE | PRACTICE GUIDANCE |
| --- | --- | --- |
| Engage and involve families in the assessment process | • Prior to developing case plan<br>• At caseworker visits with family members<br>• At assessment updates & prior to 6-month case plan updates | • Identify/locate relevant family members who should be involved in the plan and whose strengths and needs should be assessed, including absent parents, extended family.<br>• Prepare family members to participate in the assessment by explaining what it is about, how the information will be used, how they can contribute to it.<br>• Ask individual children and youth to identify their strengths and needs.<br>• Ask parents to identify individual and family strengths and areas of need<br>• Identify cultural/background issues that affect parenting or service delivery<br>• Explore underlying issues with parents & age-appropriate youth, such as domestic violence, substance abuse, mental health issues, developmental concerns<br>• Review strengths and needs on a regular basis during visitation with each family member, and update status of issues, progress, emerging concerns in assessment.<br>• Advise/consult with parents about specialized assessments, e.g., mental health, health, developmental, etc., for them or their children/ involve them in the evaluation process.<br>• Consult with youth about assessments for independent living/transitional living<br>• Coordinate with IL service providers to ensure all assessment information is available to youth and for developing case plan<br>• Inform parents of results of strengths and needs assessments and specialized assessments and discuss implications for case plans, services, goal achievement |
| Involve families in developing case plan | • Within first 30 days of placement<br>• Every 90 days after | • Identify relevant family members who should participate in meetings to develop case plans, including extended family, non-custodial parents.<br>• Provide families the opportunity to include others in case plan meetings, e.g., advocates, mentors, close friends, service providers |

PAGE 1

| | | |
|---|---|---|
| | initial case plan • When placements or family's situation change | • Provide services to support participation, e.g., transportation, flexible schedule, child care<br>• Always include youth in foster care in planning unless documented reasons not to.<br>• Inform children and family of case plan meetings; explain purpose, roles, responsibilities.<br>• Prepare family members to participate, e.g., how to provide input, importance of the plan.<br>• Identify and discuss with family any non-negotiable issues prior to the case plan meeting, such as ensuring the child's safety or court-ordered case plan provisions.<br>• Come to case plan meetings knowledgeable of assessment information and the child's & family's circumstances/prepare to develop plan in the meeting, not in advance.<br>• Facilitate case plan meetings purposefully, identify issues, listen to and include children and families, clarify strengths and needs.<br>• Discuss independent /transitional living plan issues with older youth and their parents/caretakers, and solicit their input on services.<br>• Encourage family members to identify strengths, their perceptions of their needs & services that can address needs, preferences for service providers, locations of services<br>• Ensure case plans reflect family input<br>• Document case plan promptly/ all family members sign the case plan. |
| Use caseworker visits to involve child and family | • At assessment • Prior to developing case plan • At least two times a month with children • At least one time a month with birth family | • Visit in convenient and comfortable locations at reasonable times for family members<br>• Meet with children in placement and at home privately and discuss services, needs, other issues relative to their case plan/ permanency goals. Solicit their input on progress, concerns, needs, and quality of services.<br>• Have frequent private meetings with youth to discuss participation in and satisfaction with independent living/transitional living services/goals/needs.<br>• Meet with parents privately to discuss progress, goals, services, needs, concerns<br>• Raise issues with parents/children/youth that arise between visits or through contacts with service providers, foster caretakers, or other collateral contacts<br>• Ensure that visits relate to the provisions of the plan/opportunity for family member input<br>• Document all visits in case file, including substance of visits and issues raised by children and parents relative to case plan, services, goals, etc. |
| Engage children and family members in Family Team Meetings | • At initial case plan • At all case plan updates • When placements, family's situation, or goals change • At case closure | • Identify and notify all family members who should participate in meetings. Identify other participants of the family's choosing and notify.<br>• Schedule meetings at convenient times/locations for the family. Provide needed services to facilitate their participation, e.g., transportation, child care.<br>• Prepare the family to participate in meetings, e.g., explain purpose, roles, responsibilities, agenda, how information will be used<br>• Plan for discussion of sensitive information and how it may affect children during meetings<br>• Facilitate meetings, providing all family members opportunities to participate; manage disputes/disagreements by lessening tension & moderating discussion<br>• If the meeting is occurring for case plan development, ensure that all pertinent family members sign the case plan at the conclusion of the meeting. |
| Facilitate parent's involvement with children during foster care placements | • At assessment • At initial case plan • During visits • At case plan updates | • Assess for level of parental involvement with children that is safe & appropriate<br>• Attempt to place children in close proximity to parents to facilitate their involvement<br>• Consult/include foster caretakers about parental involvement & encourage their support<br>• Facilitate meetings between parents and foster caretakers when they are both agreeable<br>• In consultation with & having approval from foster caretakers and parents, help them to develop plans for specific activities in which parents can participate<br>• Discuss parental involvement in FTMs, preferably with foster caretakers involved<br>• Include levels of participation/specific activities in case plans<br>• Monitor involvement closely/visit frequently in foster care setting/ discuss with caretakers/parents/children<br>• Evaluate safety and risk to children at all visits<br>• Modify plans as needed and promptly address safety/risk issues |

PAGE 2

**Ex. 63A**



**COA**
COUNCIL ON
ACCREDITATION
FOUNDED 1977

CREDIBILITY · INTEGRITY · ACHIEVEMENT

**Richard Klarberg**
President & Chief Executive Officer

**Sister Ann P. Conrad**
Chair, Board of Trustees

**Sponsoring Organizations**

Alliance for Children and Families

Association of Jewish Family and Children's Agencies

Catholic Charities USA

Children's Home Society of America

Child Welfare League of America

Foster Family-Based Treatment Association

Joint Council on International Children's Services

Lutheran Services in America

National Council For Adoption

National Foundation for Credit Counseling

National Network for Youth

National Organization of State Associations for Children

Prevent Child Abuse America

Volunteers of America

**Council on Accreditation**

120 Wall Street
11th Floor
New York, NY 10005
212.797.3000
Fax 212.797.1428

**www.coanet.org**

DFCS FIRST QUARTER DELIVERABLES REPORT
YEAR 2 IMPLEMENTATION PLAN
August 4, 2009

On July 26, 2009, DFCS submitted 16 items associated with the Year 2 Deliverables. DFCS is submitting the required Deliverables on a Quarterly basis. The following comments resulted from a review of the items in the Q1 submission.

**ADMINISTRATION AND MANAGEMENT (PA-AM)**
PA-AM 2.01:  In compliance with the COA standard.

PA-AM 2.07:  In compliance with the COA standard

PA-AM 5.01:  In compliance with the COA standard

PA-AM 6.01:  In compliance with the COA standard.

PA-AM 7.01:  In compliance with the COA standard.

Comments:  Material/documentation submitted with each item was thorough and complete.  The Five Year Strategic Plan was impressive.  PA-AM 6.02 was missing from the AM items.

**ETHICAL PRACTICE (PA-ETH)**
PA-ETH 1.02:  In compliance with the COA standard.

PA-ETH 2.01:  In compliance with the COA standard.

Comments:  PA-ETH 1.01 is missing from the ETH items. Supporting material is thorough.  The Conflict of Interest policy is 13 years old.  Has the policy been reviewed since 1996?   Is there any record of actions to revise or update the policy?

**HUMAN RESOURCES (PA-HR)**
PA-HR 1.01:  In compliance with the COA standard.

PA-HR 1.02:  In compliance with the COA standard.

Comments:  Documentation/material fully supports compliance with the standards.

**ADMINISTRATIVE SERVICE ENVIOORONMENT (PA-ASE)**
PA-ASE 7.01:  In partial compliance with the COA standard.

PA-ASE 7.03:  In partial compliance with the COA standard.

Comments:  The Safety and Security Guide is sufficient as is the Child and Parent Information Form.  However, we need to see the MDHS Disaster Operation Plan and the DFCS Disaster Preparedness Plan in order to confirm that the elements required by the standards are included in the Plan.  The attachments only included one or two pages of each plan.

**CLIENT RIGHTS (PA-CR)**
PA-CR 1.02:  In substantial compliance with the COA standard.

Comments:  the title of the document is Clients Rights and Responsibilities, yet the published statement only includes client's rights.   There are nine rights listed, but I could find no reference to client responsibilities.


**TRAINING AND SUPERVISION (PA-TS).**
PA-TS 3.01:  In compliance with the COA standard.

PA-TS 3.03:  In compliance with the COA standard.

Comments:  Supporting material very thorough.  On site review will verify whether supervisors have sufficient time for individual and group supervision.


**ADOPTION SERVICES (PA-AS).**
PA-AS 2.04:  In compliance with the COA standard.

Comments:  Protocol is thorough and responds to ICWA requirements.   On site case reviews will verify/confirm compliance.


**CHILD PROTECTIVE SERVICES (PA-CPS).**
PA-CPS 14.06:  In compliance with the COA standard.

Comments:  24 Hr response availability will be confirmed during the on site review.  CPS 14.01 and CPS 14.02 were not included with the submission.


**SUMMARY**
Twenty (20) items were due with this first quarter submission.  Sixteen (16) items were submitted and have been reviewed.   Fifteen (15) submissions responded fully to the Y2 Deliverables.  ASE-7.01/7.03 requires additional clarification through a review of the MDHS and DFCS Disaster Plans.  Four items remain to be completed:  PA-AM 6.02; PA-ETH 1.01; PA-CPS 14.01; and PA-CPS 14.02.

DFCS is to be complimented on the quality and thoroughness of the submissions and supporting material/documentation.


James J Mooney
COA Consultant

**Ex. 63B**



CREDIBILITY • INTEGRITY • ACHIEVEMENT

**Richard Klarberg**
President & Chief Executive Officer

**Sister Ann P. Conrad**
Chair, Board of Trustees

**Sponsoring Organizations**

Alliance for Children and Families

Association of Jewish Family and
Children's Agencies

Catholic Charities USA

Children's Home Society of America

Child Welfare League of America

Foster Family-Based
Treatment Association

Joint Council on International
Children's Services

Lutheran Services in America

National Council For Adoption

National Foundation for
Credit Counseling

National Network for Youth

National Organization of State
Associations for Children

Prevent Child Abuse America

Volunteers of America

**Council on Accreditation**

120 Wall Street
11th Floor
New York, NY 10005
212.797.3000
Fax 212.797.1428

**www.coanet.org**

**DFCS THIRD QUARTER DELIVERABLES REPORT
YEAR 2 IMPLEMENTATION PLAN
MARCH 1, 2010**

DFCS submitted 44 items required for the third quarter and associated with the Year 2 Deliverables.   The following comments resulted from a review of the items in the Q3 submission.


**ADMINISTRATION AND MANAGEMENT (PA-AM)**

PA-AM 3.04:  In substantial compliance with the COA standard.

PA-AM 7.02:  In compliance with the COA standard.

Comments:  Performance goals and program outcomes for DFCS programs included requirements from the settlement agreement, CFSR, and COA standards.  While the goals/outcomes are quite comprehensive, it is difficult to determine if all or only a select few apply to FY10. The display of annual goals and outcomes should be clearer for the accreditation self-study/site visit. The strategic plan is a comprehensive, well written document, signed off by DFCS management, and regional and federal authorities.


**HUMAN RESOURCES (PA-HR)**

PA-HR 3.01:  In compliance with the COA standard.

PA-HR 3.02:  In compliance with the COA standard.

Comments:  Documentation/material supporting job descriptions, and recruitment and selection criteria/protocols was complete and addresses the elements in the standards.

**ADMINISTRATIVE SERVICE ENVIRONMENT (PA-ASE)**

PA-ASE 4:  In compliance with the COA standard.

Comments:  The supporting material clearly spells out the DHS policy and protocol on regular maintenance inspections in offices/facilities.  The Walk Through Checklist is comprehensive and covers the elements in the standard as does the statement regarding transportation and accompanying checklist.

**PERFORMANCE QUALITY IMPROVEMENT (PA-PQI)**

PA-PQI 1.01:  In compliance with the COA standard.

PA-PQI 2.04:  In compliance with the COA standard.

PA-PQI 3.02:  In compliance with the COA standard

PA-PQI 4.01:  In **partial compliance** with the COA standard.

PA-PQI 4.02:  In substantial compliance with the COA standard.

PA-PQI 4.03:  In substantial compliance with the COA standard

PA-PQI 5.01:  In compliance with the COA standard.

PA-PQI 6.01  **Out of compliance** with the COA standard


Comments:  Responses to this section consisted of thorough and comprehensive descriptions of the required elements of the PQI standards. Supporting documentation generally met the requirements, but was deficient in several respects, including: review of incidents/accidents and grievances; peer case reviews; PQI committee minutes, etc.  Most of the program/services/outcomes and consumer satisfaction data is a part of the foster care review process.  These elements need to be expanded to include CPS activities, prevention and in home services, and relative placements. **PQI-6.01** described the process of involving stakeholders, but did not include documentation of the information provided to the stakeholders describing the PQI activities as requested.  **PQI-4.01** did not include the requested documentation, with the exception of a reference to the Policy Bulletin (which I have seen), to support the described activities.

### RISK PREVENTION MANAGEMENT (PA-RPM)

PA-RPM 7.05:  In compliance with the COA standard.

PA-RPM 9.02:  In compliance with the COA standard.


Comments:  Documentation and material submitted supports policies/protocols for case recording/progress notes and contracting practices. Although the contract format/language is standardized, DFCS should require providers/contractors' adherence to standards of best practice as articulated in the COA standards for services purchased under contractual agreement.  Compliance will be determined on site by review of current contracts and case record entries/MACWIS data.

### ETHICAL PRACTICE (PA-ETH)

PA-ETH 5.01:  In compliance with the COA standard

PA-ETH 5.02:  In compliance with the COA standard

PA-ETH 5.03:  In compliance with the COA standard


Comments: The new (revised) MDHS Code of Ethics (10/09) covers the elements of these standards. Staff sign acceptance of compliance and the various policies are covered in orientation.  In addition to the general MDHS Code of Ethics, DFCS should be aware of the code of ethics that specially addresses the practice of social work (NASW Code of Ethics) and assure that staff are aware of and follow them.


### TRAINING AND SUPERVISION (PA-TS)

PA-TS 1.03:  In compliance with the COA standard.

PA-TS 2.01:  In compliance with the COA standard.

Comments:  Supporting material and documentation covers the requested information and addresses the elements in the standards.  On site reviews will confirm the extent of the training and professional

development activities through the training records.  In addition it will be necessary to see formal training evaluations (individual and program) and an Annual Training Report.

## CLIENT RIGHTS (PA-CR)

PA-CR 2.04:  In substantial compliance with the COA standard.

Comments:  While the basic elements of the standard are addressed, the format leaves room for error.  In # 1, make sure the name of the agency and person/position that is providing the information is included.  In # 4, suggest that the limits of expiration be clarified (90 days/I year) in order to provide additional assurance to the client regarding the extent of validity.

## BEHAVIOR SUPPORT MANAGEMENT (PA-BSM)

PA-BSM 1.01 & 102: }

PA-BSM 2.01:          } **Out of compliance** with these four (4) COA standards.

PA-BSM 2.03:          }

Comments:  DFCS is still formulating policies regarding their behavior management practices.  The estimated date of completion is December, 2010.  Given the number of children in out of home care, this time line seems much too long.  If it will take that long to develop and implement a definitive behavioral management policy, **DFCS should issue an interim policy that clearly prohibits the use of restrictive behavioral management practices**.  This interim policy can be disseminated to staff, foster/resource parents and contractual providers and will at least provide some protections for the children in out of home care until a more definitive and clear policy can be developed and agreed on.  DFCS should strive to reduce the projective December date by three or four months if possible.
The draft policy raises some concerns particularly regarding clarity on what will and will not be allowed.  If restrictive practices are allowed, the policy should clearly spell out what, when and how if manual, chemical and seclusion practices are acceptable.  The exception section on chemical restraints is at odds with the list of prohibited practices (#13)?

## ADOPTION SERVICES (PA-AS)

PA-AS 3.02:  In compliance with the COA standard.

PA-AS 7.02:  In substantial compliance with the COA standard.

PA-AS 11.01: In substantial compliance with the COA standard

PA-AS 11.02: In substantial compliance with the COA standard

PA-As 12.06: in substantial compliance with the COA standard

Comments: The Home Study/Assessment is complete and covers all the elements of the standard.  On-site case reviews will determine the quality and substance of the home studies.  The material supporting the other standards reflects gaps in the service practice.  DFCS should require a <u>Life Book</u> for all children being considered for adoption, and significantly increase their work/contact with the birth parents.  Pre-adoptive visits should routinely involve at least two or more visits and counseling for the children should be standard practice.   As DFCS improves its adoption practices, I am sure they will consider strengthening these components. Post adoption services should be clearly available and offered as a routine part of the process, regardless of whether DFCS provides them or contracts with community agencies for this service.  DFCS is encouraged to continue strengthening its policy on release of information on birth parents.

**CHILD PROTECTIVE SERVICES (PA-CPS)**

PA-CPS 8.01:  In substantial compliance with the COA standard.

PA-CPS 8 05: In compliance with the COA standard.

PA-CPS 10.02: In substantial compliance with the COA standard.

PA-CPS 11.01: In substantial compliance with the COA standard

PA-CPS 11.02: In compliance with the COA standard.

PA-CPS 13.02: **Out of compliance** with the COA standard.

Comments:  Documentation/descriptions of practices supports a climate of acceptable practice, however the Accreditation Preparation Reviews (APR) showed significant deficiencies and inconsistencies in the quality and content of service plans, and the family team meetings.  While service plans are completed within required time frames, tasks/goals, engagement process and service narratives were often too brief and failed to show a logical connection with the findings in the assessment.  Family involvement, while strongly encouraged by DFCS was lacking in most cases.  In **PA-10.02** the chain of decision making needs to be clearly articulated in each Region:  Who with the advanced degree (by name) is consulted and involved in the decision to remove the child? The APRs demonstrated that the case closing process **(PA-13.02)** is not a clearly defined and documented process.

**FOSTER CARE SERVICES (PA-FC)**

PA-FC 5:      In compliance with the COA standard.

PA-FC 7.05:  In **partial compliance** with the COA standard.

PA-FC 8.02:  In substantial compliance with the COA standard.

PA-FC 9.04:  In compliance with the COA standard.


Comments:  DFCS' service philosophy is clearly articulated in the presenting materials.  **PA-FC 7.05** requires a specific policy prohibiting cancellation of visits as a disciplinary action. While DFCS policies require regular contact with the child's family, the APRs reflected some gaps and inconsistencies in regular contacts with the families of children in foster care.

**KINSHIP CARE SERVICES (PA-KC)**

PA-KC 1.01:  In compliance with the COA standard.

PA-KC 1.02:  In compliance with the COS standard.

PA-KC 2.03:  In compliance with the COA standard.

PA-KC 10.04: In compliance with the COA standard.


Comments:  Supporting documentation/materials reflects comprehensive policies and procedures for screening and approving potential placements, and involving family members in the process to achieve relative placements when out of home care is needed. However, APRs show inconsistencies in the involvement of family members and the analysis of the relationships between children and relatives and parents and relatives.


**SUMMARY**

Forty four (44) items that were due for the third quarter were submitted on or before February 1, 2010. Thirty six (36) of the items were in substantial or full compliance with the COA standards, two (2) items were in partial compliance, and six (6) items were out of compliance.   Policies/procedures regarding DFCS' behavioral management practices need to be developed and implemented.   The items that reflect DFCS' compliance with policy/ procedures/protocol requirements do not necessarily reflect the quality of actual practice.   Final determination of accreditation compliance will be determined by site reviews of case records and practice activities.  DFCS' continued attention to the importance of these Deliverables is much appreciated.


James J Mooney, ACSW
COA Consultant

Ex. 63C

| From: | James J Mooney [jjmooney@bellsouth.net] |
|---|---|
| Sent: | Thursday, August 06, 2009 8:47 PM |
| To: | Jenni Murray |
| Cc: | Lori Woodruff; Linda Millsap; Mike Gallarno; Rachal, Kenya Key; Grace M Lopes; Rebecca Kinel; Richard Klarberg |
| Subject: | Year 2 First Quarter Deliverables |

Hi Jenni;

Thank you for resending the four items missing from the First Quarter Year 2 Deliverables. I don't know what happened to the original submissions. For all we know, they are still in cyberspace and may turn up when wee least expect them. my system has been doing funny things the last couple of weeks.

Here are our comments on the remaining submissions:

**PA-CPS 14.01:** In compliance with the COA standard.
**PA-CPS 14.02:** In partial compliance with the COA standard
Comments: The direct service (protective services) workers generally appear to have the appropriate degrees. While a few positions may not have the proper degree, the vast majority do. The current two levels, with an emphasis on licensing for Family Protection Specialist and the phasing out of the Family Protection Worker position is a significant step toward assuring the professionalization of the protective service worker position. However, a significant number of supervisory positions lack the required Master's degree. DFCS' emphasis on supporting advanced education, and your work on a plan to address this issue is a positive step forward . An advanced degree is essential for a professionally operated protective services program and DFCS' recognition of this fact is important.

**PA-ETH 1.01:** In compliance with the COA standard.
Comment: As you prepare for the COA self study/site visit, suggest you isolate that section of the MDHS Annual Report applicable to DFCS. Also consider adding other materials such as brochures, flyers, etc.

**PA-AM 6.02:** In compliance with the COA standard
Comment: Material fully supports the standard. Process of orientation for senior management staff is impressive.

**PA-ASE 7.01 and PA-ASE 7.03;** In compliance with the COA standards.
Comments: The DFCS disaster plan is complete and covers the elements of the standard, Suggest it be reformatted with a cover sheet and table of contents. I assume that this is the plan that is shared with all staff. The elements are also covered for MDHS in their Plan, but it was puzzling that the MDHS Plan did not reference DFCS in any of the 31 pages.

These items complete the First Quarter Year 2 submissions. Thank you ,Jenni, for your attention to the completion of this task and the excellent way in which attended to the details that were required. As always, please don't hesitate to contact me if there are any questions regarding this report. I look forward to our continuing work on the remainder of the Year 2 Deliverables.

Jim

James J Mooney, ACSW
COA Consultant

# Ex. 63D



**COA**
COUNCIL ON
ACCREDITATION

FOUNDED
1977

CREDIBILITY  •  INTEGRITY  •  ACHIEVEMENT

**Richard Klarberg**
President & Chief Executive Officer

**Sister Ann P. Conrad**
Chair, Board of Trustees

**Sponsoring Organizations**

Alliance for Children and Families

Association of Jewish Family and
Children's Agencies

Catholic Charities USA

Children's Home Society of America

Child Welfare League of America

Foster Family-Based
Treatment Association

Joint Council on International
Children's Services

Lutheran Services in America

National Council For Adoption

National Foundation for
Credit Counseling

National Network for Youth

National Organization of State
Associations for Children

Prevent Child Abuse America

Volunteers of America

**Council on Accreditation**

120 Wall Street
11th Floor
New York, NY 10005
212.797.3000
Fax 212.797.1428

**www.coanet.org**

**DFCS SECOND QUARTER DELIVERABLES REPORT**
**YEAR 2 IMPLEMENTATION PLAN**
**NOVEMBER 12, 2009**

DFCS submitted 27 items required for the second quarter and associated with the Year 2 Deliverables.   The following comments resulted from a review of the items in the Q2 submission.

**ADMINISTRATION AND MANAGEMENT (PA-AM)**

PA-AM 4.01:  In compliance with the COA standard.

PA-AM 4.02:  In compliance with the COA standard.

Comments:  Material supporting community education and collaboration was thorough and informative.  Suggest that documentation related to collaborative activities with specific organizations be available, if needed, for onsite review.

**HUMAN RESOURCES (PA-HR)**

PA-HR 6.01:  In compliance with the COA standard.

PA-HR 7.01:  In substantial compliance with the COA standard.

PA-HR 7.03:  In substantial compliance with the COA standard.

Comments:  Documentation/material supports compliance with the standards. Responsibilities of employee and supervisor in the performance appraisal process are clearly spelled out.  However DFCS must assure that these procedures are consistently applied on an annual basis. The Performance Appraisal Review System Policy hasn't been reviewed or revised since 1996. The  policies and procedures that address access to personnel meet COA requirements, however Paragraph # 6..employee adding to his or her file needs tweaking as it seems to discourage the practice rather than clearly spell out the right of the employee to add to their file if they so desire.

**ADMINISTRATIVE SERVICE ENVIORONMENT (PA-ASE)**

PA-ASE 1.02:  In compliance with the COA standard.

Comments:  The supporting material clearly spells out the DHS policy on smoking.  The DFCS Safety and Security Guide is stamped DRAFT.  This needs to be removed from future documents that will be used for the accreditation process.

**PERFORMANCE QUALITY IMPROVEMENT (PA-PQI)**

PA-PQI 1.02:  In compliance with the COA standard.

PA-PQI 2.05:  In compliance with the COA standard.

Comments: Documentation is thorough and complete in supporting the qualifications of PQI staff and the support and endorsement of the organization's leadership.

**RISK PREVENTION MANAGEMENT (PA-RPM)**

PA-RPM 6.01:  In compliance with the COA standard.

PA-RPM 6.02:  In substantial compliance with the COA standard.

PA-RPM 7.02:  In substantial compliance with the COA standard.

PA-RPM 7.03:  In compliance with the COA standard.

PA-RPM 7.04:  In partial compliance with the COA standard.

PA-RPM 8.01:  In compliance with the COA standard.

PA-RPM 9.01:  In compliance with the COA standard.

Comments:  Documentation and material submitted to support security and confidentiality of records is thorough and complete.  Case record contents' material and policies is thorough but attention needs to be paid to meeting the procedural requirements.  Reviews of case records have so far evidenced many gaps in the required elements.  Contracting process meets the COA requirements and the procurement regulations support this. The time lines for disposal of records **(PA-RPM 6.02)** need to clarify the three years destruction schedule for case management records.  The standard requires seven years (minimum) unless otherwise mandated by law.  Need to clarify the legal mandate that supports this time frame or change the time to seven years.  In **PA-RPM 7.02** attention needs to be given to requiring discharge summary/aftercare planning that is separate and apart from the running narrative in the case record.  A policy that specifically addresses case record entries **(PA-RPM 7.04)** by authorized personnel needs to be developed and shared with staff.  While the practice may generally support attention to the elements in the standard, requirements are scattered throughout various policies related to other areas of practice (i.e. Visitation, MACWIS).

**TRAINING AND SUPERVISION (PA-TS)**

PA-TS 1.01:  In compliance with the COA standard.

PA-TS 1.02:  In compliance with the COA standard.

PA-TS 2.04:  In compliance with the COA standard.

Comments:  Supporting material and documentation is very thorough and informative.  On site reviews will need to confirm the extent of the training and professional development activities through the training records.  In addition it will be necessary to see formal training evaluations (individual and program) and an Annual Training Report.

**ADOPTION SERVICES (PA-AS)**

PA-AS 2.05:  In substantial compliance with the COA standard.

PA-AS 12.05: In compliance with the COA standard.

Comments:  Required information obtained for the child's file doesn't include picture of birth parents or information regarding the family's religious practices.  It wasn't clear if a supervisor reviews and signs off on the Background Information Report.

**CHILD PROTECTIVE SERVICES (PA-CPS)**

PA-CPS 2.01:  In substantial compliance with the COA standard.

PA-CPS 6:     In compliance with the COA standard.

Comments:  Documentation in PA-CPS 2.01 needs to be updated.  Specifically the Bulletin on ICWA (dated 2005); the Bulletin on MAP Teams (dated 2004), including Team Contacts (last updated 5 ½ years ago) and MAP Team Activity (dated FY 2004).  The procedures outlined in PA-CPS 6 are acceptable, but compliance will be determined from case reviews in the field.  We have real questions regarding the content and substance of the Safety and risk Assessments we have reviewed so far.

**FOSTER CARE SERVICES (PA-FC)**

PA-FC 1.01:  In compliance with the COA standard.

PA-FC 3.07:  In compliance with the COA standard.

PA-FC 7.03:  In compliance with the COA standard.

PA-FC 12.02: In compliance with the COA standard.

Comments:  Materials and documentation support clear policies, procedures and protocols regarding screening processes, Individual Services Plans, and medical/dental and mental health assessments.  Compliance will depend on verification through a review of case records. Policies and protocols are in place for supervisory/clinical review of cases, but again this needs to be supported by appropriate entries in the case record.  Visitation plan material is very thorough and addresses the elements in the standard.  Policies regarding required contacts with the Resource parents and child are clear and informative.  The Home Environment Checklist is a helpful tool.

**KINSHIP CARE SERVICES (PA-KC)**

PA-KC 6.01:  In compliance with the COA standard.

Comments:  Supporting documentation reflects a thorough review of and efforts to achieve relative placements when out of home care is needed. Financing of relative placements and legal status/protections are also addressed.

**SUMMARY**

Twenty Seven (27) items that were due for the second quarter were submitted on or before November 1. All items with the exception of PA-RPM 7.04 were in substantial or full compliance with the COA standards that were addressed. A policy specifically addressing case record entries by authorized personnel will need to be developed to comply with PA-RPM 7.04. Supporting documentation and materials accompanying the submissions were well organized and contributed to the efficiency of the review.  These items reflect DFCS's compliance with policy and procedures requirements.  Final determination of accreditation compliance will be determined by site reviews of case records and practice activities.  DFCS' continued attention to the importance of these Deliverables is much appreciated.

James J Mooney
COA Consultant

**Ex. 63E**



CREDIBILITY • INTEGRITY • ACHIEVEMENT

**Richard Klarberg**
President & Chief Executive Officer

**Sister Ann P. Conrad**
Chair, Board of Trustees

**Sponsoring Organizations**

Alliance for Children and Families

Association of Jewish Family and
Children's Agencies

Catholic Charities USA

Children's Home Society of America

Child Welfare League of America

Foster Family-Based
Treatment Association

Joint Council on International
Children's Services

Lutheran Services in America

National Council For Adoption

National Foundation for
Credit Counseling

National Network for Youth

National Organization of State
Associations for Children

Prevent Child Abuse America

Volunteers of America

**Council on Accreditation**

120 Wall Street
11th Floor
New York, NY 10005
212.797.3000
Fax 212.797.1428

**www.coanet.org**

July 10, 2009

To: Jenni Murray

Cc: Don Thompson; Lori Woodruff; Mike Gallarno; Grace Lopes; Kenya Key Rachal; Rusty Fortenberry; Marcia Lowry; Shirim Nothenberg; Jessica Polansky; Richard Klarberg; Rebecca Kinel

Subject:  365 Day Deliverables

Dear Jenni:

Thank you for submitting the thirty six (36) items associated with the 365 Day Deliverables, which are a part of the Year 1 Implementation Plan.  All items were received prior to the due date of July 1, 2009.  COA has reviewed each submission in terms of adequacy of response to the specific request(s) contained in the Implementation Plan and compliance with the COA standards.  Our findings and comments are grouped according to the standards in a specific section, essentially following the process you used for submission of the items.

## HUMAN RESOURCES (PA-HR)

PA-HR 4.01:  In compliance with the COA standard.  All elements of the request were addressed.

PA-HR 4.03:  In compliance with COA standard.  Work Plan covers all the necessary elements in the standard.

Comments: The Workforce Plan is thorough and presents a functional document that can be analyzed and built on in terms of annual staff recruitment and retention goals.  The Plan, however, needs to have a date or dates of coverage or Period covered….i.e. FY 2008/09 or 2009/10.

## PERFORMANCE QUALITY IMPROVEMENT (PA-PQI)

PA-PQI 2.01:  In substantial compliance with the COA standard.

PA-PQI 2.02:  In substantial compliance with the COA standard.

Comments:  The development of a PQI Operational Plan is a major step forward for DFCS.  The PQI framework and operational plan are laid out quite well and contain and define most of the pieces very clearly.  However, the Operational Plan is still a work in progress as it is short on specifics/particulars associated with various components.  As DFCS completes the Practice Model, specific processes, outcomes measures, and PQI instruments will become clearer as will the operational details of the PQI system.  DFCS' stated time, 9/30/09, for completion of the Practice Model should result in the initiation of a workable operational plan before the end of the year (December, 2009).

**RISK PREVENTION MANAGEMENT (PA-RPM)**

PA-RPM 2.01:  In substantial compliance with the COA standard.  The documentation covers the elements in the standard.

PA-RPM 2.02:  In compliance with the COA standard.  Documentation covers quarterly reports from 13 Regions and all (88) County offices.

PA-RPM 2.04:  In substantial compliance with COA standard.  However, DFCS needs to identify an individual or individuals responsible for risk prevention and management functions at the divisional level.

PA-RPM 5.01:  In compliance with the COA standard.

PA-RPM 5.02:  In compliance with the COA standard.

Comments:  The DFCS risk assessment process is described quite thoroughly.  Additional attention/detail needs to be paid to the Correction Action Plan (CAP) process—designated responsibilities; follow up timelines, etc., etc.  More clarification is needed regarding what happens to the quarterly reports sent by the Regions, what kind of follow up takes place.   How does DFCS know that corrective actions have taken place?  The individuals identified in PA-2.04 are qualified departmental administrators, but DFCS needs to identify individuals at the divisional level who are responsible for risk prevention and management functions.  Client file procedures and electronic and paper record locations will also be reviewed on site as will all the risk management functions.

**ADMINISTRATIVE SERVICE ENVIRONMENT (PA-ASE)**

PA-ASE 6.01:  In substantial compliance with the COA standard.

PA-ASE 6.03:  In substantial compliance with the COA standard.

PA-ASE 8.01:  In substantial compliance with the COA standard.

PA-ASE 8.02:  In substantial compliance with the COA standard.

Comments:  Documentation/materials substantially covered all the elements of the standard.  It is not clear if security systems are a part of all offices/facilities.  The on-site review will look for this clarification as well as evidence that support vehicle maintenance, registration, driver licenses and insurance checks.

**BEHAVIOR SUPPORT MANAGEMENT (PA-BSM)**

PA-BSM 3.01:  The response did not fully respond to the COA standard.  It is clear that resource parents receive training on behavior support and management interventions, but less clear for direct service staff and not at all clear for non direct service personnel (see comments).

PA-BSM 3.02:  This response is in partial compliance with the COA standard.  Training for resource parents (foster) is clear, but less so for direct service/non-direct service staff (see comments).

PA-BSM 3.03:  This response is in partial compliance with the COA standard.

Comments:  The documentation and materials submitted in support of these BSM standards was not sufficient to support the contention that all personnel (other than Resource Parents) receive training on DFCS behavioral support and management intervention policies, procedures and practices.  Although the Child Welfare Professional Development (CWPD) curriculum is cited as a resource for this kind of training, we could not find a reference or mention of this topic anywhere in the four week CWPD curriculum.  The CPI's Nonviolent Crisis Intervention Training Program may cover most of the elements in the standard, but the documentation supporting this training was not a detailed description of curriculum but more of a marketing flyer. There is no evidence of who attends this training and when and what the training modules contain.   Finally, DFCS needs to show what kind of training and/or orientation regarding behavioral management policies/practices is given to non-direct service personnel.

These three items:  PA-BSM 3.01; PA-BSM 3.02; PA-BSM 3.03 will need to be resubmitted with clarifying documentation/material that responds to these concerns.  **The submission should be submitted to COA no later than September 15, 2009**

### TRAINING AND SUPERVISION (PA-TS)

PA-TS 2.02:  In compliance with COA standard.

PA-TS 2.03:  In compliance with COA standard.

Comments:   Documentation covered the elements of the standard regarding legal training, as well as proper documentation and maintenance and security of case records.  These processes will be verified during the onsite review, including training records, MACWIS safe guards, and staff understanding of the code of ethics.

### CHILD PROTECTIVE SERVICES (PA-CPS)

PA-CPS 4.05:  In substantial compliance with COA standard.  Implementation of procedures will be verified during on site review.

PA-CPS 5.05:  In substantial compliance with COA standard.

PA-CPS 7.05:  In substantial compliance with COA standard.

PA-CPS 8.03:  In substantial compliance with COA standard.

PA-CPS 9.04:  In substantial compliance with COA standard.

PA-CPS 10.03:  In substantial compliance with COA standard.

Comments:  DFCS will need to complete integration in MACWIS of the risk portion with the safety portion of the Safety and Risk Assessment.  The assessment referenced in CPS 7.02 is an ongoing assessment and care should be taken to separate this assessment from the Safety and Risk Assessment.  The pre-placement guidelines (CPS 10.03) that are currently in effect need to be integrated with the CPS investigation process.

### FOSTER CARE SERVICES (PA-FC)

PA-FC 2.02:  In substantial compliance with COA standard.

PA-FC 2.04:  In compliance with COA standard.

PA-FC 3.04:  In compliance with COA standard.

PA-FC 4.01:  In substantial compliance with COA standard.

PA-FC 6.05:  In compliance with COA standard.

PA-FC 10.03:  In compliance with COA standard.

PA-FC 11.02:  This standard will carry an NA for DFCS.

PA-FC 12.01:   In compliance with COA standard.

PA-FC 16.05:   In compliance with COA standard.

PA-FC 16.06:   In compliance with COA standard.


Comments: Policies and procedures regarding assessments and service plan formats cover the elements in the referenced standards. Suggest that DFCS review their assessments in light of the COA Assessment Matrix to assure that all appropriate elements in the comprehensive assessments are included in the risk and ongoing assessments.  Final determination regarding compliance will be made after on site case record reviews.  Permanency planning (efforts/processes) will be reviewed on site as well as team meetings and individual service plans. The Individual Service Plan/Agreement (ISP) should be reformatted for needed clarity. The present format is confusing—i.e. is the agreement between DFCS and DFCS or client and DFCS? Changing the wording/format of the agreement will reflect the proper parties to the agreement.  The client should be identified as parent, relative, or other as appropriate.  Policies and procedures for health care services, medical, dental, mental health, and developmental services are thorough as are the policies for client contacts by the social worker.  **Since DFCS is seeking a "Not Applicable" (NA) for PA-FC 11.02, the proper NA request form from COA will need to be completed.  In th**e **request, please state how and by whom therapeutic foster care services are provided.  Also, elaborate on the role of the DFCS worker with the treatment team.**

The on-site review of the foster/kinship care services will include those items that are part of the case record reviews, medical and dental services, resource parent training, and discipline procedures used in the resource homes.


**ADOPTION SERVICES (PA-AS)**

PA-AS 2.03:  In substantial compliance with the COA standard.

PA-AS 3.04:  In substantial compliance with the COA standard.

Comments:  The Home Study and Child Study process appears to meet the elements of the referenced COA standards.  On site case record reviews will provide final determination regarding compliance with these and other adoption standards.

**SUMMARY**

DFCS submitted 36 items associated with the 365 day Deliverables.  Of these submissions, 33 items were found to be in full or substantial compliance with the applicable COA standards. Three (3) items: PA-BSM 3.01; PA-BSM 3.02; PA-BSM 3.03 were determined to be out of compliance and are being requested for re-submission with additional clarifying material. DFCS is to be complimented on the presentation of their Deliverables.  The submission format and accompanying documentation reflects the serious work of staff and their commitment to the importance of the material.

Thank you, Jenni, for your valuable work with this project and for making sure the submissions not only arrived on schedule, but responded appropriately and thoroughly as possible to the standards being considered.


James J Mooney, ACSW
COA Consultant

**Ex. 63F**

To: "Jenni Murray" <Jenni.Murray@mdhs.ms.gov>
From: "James J Mooney" <jjmooney@bellsouth.net>
Date: 09/17/2009 07:16PM
cc: "Lori Woodruff" <Lori.Woodruff@mdhs.ms.gov>, "Linda Millsap" <Linda.Millsap@mdhs.ms.gov>, "Mike
Gallarno" <Mike.Gallarno@mdhs.ms.gov>, "Rachal, Kenya Key" <krachal@bakerdonelson.com>, "Grace
M Lopes" <gmlopes@oymonitor.org>, "Rebecca Kinel" <rkinel@coanet.org>, "Richard Klarberg"
<Rklarberg@coanet.org>
Subject: Official re-Submission of BSM

Hello Jenni,

Thank you for the re-submission of the Behavior Support Management (BSM) standards which were pending from the
365 Day Deliverables for Year 1.

The information which you sent and accompanying documentation generally meets the requirements of the standards and
the resubmission request. Although the memorandum states that all staff, direct and non-direct, are required to complete
the Non-Violent Crisis Intervention Training, it will be necessary to see a policy to this effect. If this currently exists,
please send a copy to me. If not, DFCS should create one.

I noticed in the March 23, 2009 memorandum regarding training workshops that **Orientation to Our Agency** is
mandatory for all MDHS employees. Could there be a mandatory requirement for all DFCS staff, direct and non-direct, in
**#9-- Non-Violent Crisis Intervention** ?

Thank you for your submission and accompanying documentation.

Jim

James J Mooney, ACSW
COA Consultant.

**Ex. 63G**



**C**REDIBILITY   •   **I**NTEGRITY   •   **A**CHIEVEMENT

**Richard Klarberg**
President & Chief Executive Officer

**Sister Ann P. Conrad**
Chair, Board of Trustees

**Sponsoring Organizations**

Alliance for Children and Families

Association of Jewish Family and
Children's Agencies

Catholic Charities USA

Children's Home Society of America

Child Welfare League of America

Foster Family-Based
Treatment Association

Joint Council on International
Children's Services

Lutheran Services in America

National Council For Adoption

National Foundation for
Credit Counseling

National Network for Youth

National Organization of State
Associations for Children

Prevent Child Abuse America

Volunteers of America

**Council on Accreditation**

120 Wall Street
11th Floor
New York, NY 10005
212.797.3000
Fax 212.797.1428

**www.coanet.org**

**DFCS FOURTH QUARTER DELIVERABLES REPORT**
**YEAR 2 IMPLEMENTATION PLAN**
**May 18, 2010**

DFCS submitted 25 items required for the fourth quarter and associated with the Year 2 Deliverables.   The following comments resulted from a review of the items in the Q4 submission.

## HUMAN RESOURCES (PA-HR)

PA-HR 5:02:  In compliance with the COA standard.

Comments:  Employee handbook covers all the elements in the standard, including those that are listed in the interpretation section. Process for acknowledging receipt of the manual is clear.  On site verification of compliance will be through personnel file reviews.

## PERFORMANCE QUALITY IMPROVEMENT (PA-PQI)

PA-PQI 6.02:  In compliance with the COA standard.

Comments:  Training protocol is comprehensive and presents a generalized picture of the DFCS Continuous Quality Improvement Program. Suggest that the training include more specifics on staff and stakeholder involvement and corrective actions that can result from the process. Current emphasis is too much "audit" like, with focus on accountability/monitoring.

## RISK PREVENTION MANAGEMENT (PA-RPM)

PA-RPM 7.06:  In **partial** compliance with the COA standard.

PA-RPM 7.07:  In **partial** compliance with the COA standard.

PA-RPM 10.02: In substantial compliance with the COA standard

PA-RPM 10.03: In substantial compliance with the COA standard.

PA-RPM 10.04: In substantial compliance with the COA standard

Comments:  Documentation and material submitted supports policies/protocols for monitoring contracts. The initiation of Performance Based Contracting will assure a tightening of the process, particularly regarding service quality, client satisfaction, and performance outcomes.  DFCS needs to show evidence of procedures/information provided to service recipients regarding their specific right to add a statement to their case record (PA-RPM 7.06).  Response to RPM 7.07 seems to confuse record destruction with the removal of unsummarized notes and informal personal observations/impressions that may be in the file. This standard addresses informal/extemporaneous materials that are not a

continuing part of the official file.  Generally this process takes place by the worker or supervisor or both during a final review before closing the file.

## CLIENT RIGHTS (PA-CR)

PA-CR 1.06:  In **partial** compliance with the COA standard.

Comments:  While some of the basic elements of the standard are addressed in practice, the policy is outdated (11 yrs old) and needs to be more specific in terms of communication assistance for persons with special needs and responding to the bilingual needs of clients.  Using family members or friends to translate during therapy sessions, team meetings or court hearings is inappropriate in terms of possible confidentiality violations and risk of the wrong or inaccurate information being shared.  If a DHS policy change is not possible, perhaps DFCS could create their own policy that responds more directly to the standard and provides guidance for staff.

## ADOPTION SERVICES (PA-AS)

PA-AS 8.01:  Response Pending

PA-AS 8.05:  Response Pending

PA-AS 10.01: Response Pending

PA-AS 13.01: In compliance with the COA standard

PA-AS 13.02: In **partial** compliance with the COA standard

Comments:  **PA-AS 8.01, 8.05, and 10.01 need to be responded to**.  The standard requires that Foster Care to Adoption programs complete this section (although the section has been inadvertently omitted from the definition section).  Adoption direct service workers meet the requirements of personnel standard (13.01).  The attached roster of staff reflects that all direct service workers have BSW or related degrees, and all but three staff are licensed as required by DFCS.  Of the 13 supervisory staff, four have advanced degrees (13.02).  Of the remaining nine ASWS staff, a significant number are either enrolled or planning to enroll in a Master's program.  DFCS is encouraged to continue supporting its ASWS staff in their pursuit of an advanced degree.

## FOSTER CARE SERVICES (PA-FC)

PA-FC 6.03   In compliance with the COA standard.

PA-FC 8.01:  In substantial compliance with the COA standard.

PA-FC 9.01:  In compliance with the COA standard.

PA-FC 10.04: In compliance with the COA standard.

PA-FC 14.03: In substantial compliance with the COA standard

PA-FC 15.01: In substantial compliance with the COA standard

PA-FC 16.03: In compliance with the COA standard

PA-FC 16.04: In compliance with the COA standard

PA-FC 17.01: In compliance with the COA standard

PA-FC 17.02: In compliance with the COA standard

PA-FC 18.01: In compliance with the COA standard

PA-FC 18.05: in compliance with the COA standard

Comments: Documentation and materials submitted in support of compliance are thorough and address the elements of the standards. The DFCS Handbook for Parents of Children in Foster Care (PA-FC 8.01) is quite comprehensive and provides the information needed to understand the foster care process. Suggest that DFCS remove the DRAFT status and operationalize the handbook.  DFCS' case closing/post placement planning services are clearly articulated in the presenting materials (PA-FC 14.03, 15.01).  Again, the policy needs to be finalized and implemented.  Also suggest that the case record contain a separate entry for case closing and aftercare planning.   Mandatory pre-service and in-service curriculum is comprehensive, follows the Practice model, and responds to the elements in the standard (FC 16.03 & 16.04).  Home studies completion policies and procedures (FC 17.01) are thorough and respond to the intention of the standard.  The Homestudy Guide (FC17.02) is comprehensive and covers all the elements addressed in the standard. Respite Care is addressed by DFCS (FC 18.01 & 18.05) for a variety of situations that call for care taker relief   **Full compliance and implementation of these foster care standards will be determined by case record reviews, on-site observations and interviews with resource parents.**

### KINSHIP CARE SERVICES (PA-KC)

PA-KC 6.05:  In compliance with the COA standard.

PA-KC 12.03: In compliance with the COS standard.

PA-KC 15.04: In compliance with the COA standard.

Comments:  Supporting documentation/materials reflects comprehensive policies and procedures for home environment assessments, emergency placements, and safety checks of out of home care environments. Material submitted in support of each of these standards is thorough and comprehensive. Case closing and aftercare planning processes should follow the procedures outlined for resource homes. Again, compliance/implementation will be determined through on-site reviews, case records, and resource parent interviews.

### SUMMARY

Twenty Eight (28) items were due for the fourth quarter. Twenty Five (25) were submitted on or before May 1, 2010.  Three (3) items are pending as a result of a misinterpretation of the COA requirements. These items: **PA-AS 8.01; PA-AS 8.05; PA-AS 10.01** should be addressed and submitted by July 1, 2010.  Twenty One (21) of the submitted items were in substantial or full compliance with the COA standards, and four (4) items were in **partial** compliance.   The items that reflect DFCS' compliance with policy/ procedures/protocol requirements do not necessarily reflect the quality of actual practice.   Final determination of accreditation compliance will be determined by site reviews of case records and practice activities, and staff/stakeholder/client interviews.  DFCS' continued attention to the importance of these Deliverables is much appreciated.

James J Mooney, ACSW
COA Consultant

**Ex. 63H**

To: "Jenni Murray" <Jenni.Murray@mdhs.ms.gov>
From: "James J Mooney" <jjmooney@bellsouth.net>
Date: 07/05/2010 10:27AM
cc: "Lori Woodruff" <Lori.Woodruff@mdhs.ms.gov>, "Linda Millsap"
<Linda.Millsap@mdhs.ms.gov>, "Mike Gallarno" <Mike.Gallarno@mdhs.ms.gov>, "Rachal,
Kenya Key" <krachal@bakerdonelson.com>, "Grace M Lopes" <gmlopes@oymonitor.org>,
"Richard Klarberg" <Rklarberg@coanet.org>, "Rebecca Tedesco" <rtedesco@coanet.org>
Subject: Year 2 Fourth Quarter Deliverables

Hi Jenni,

Hope your 4th has proven to be a fun, safe, and relaxing holiday.

Thank you for submitting the three (3) items remaining from the fourth quarter Y2 deliverables report.
Here are our comments on these submissions;

- PA-AS 8.01: In substantial compliance with the COA standard.
- PA-AS 8.05: In compliance with the COA standard
- PA-AS 8.10: In substantial compliance with the COA standard

Comments: Descriptions of processes involved in each of these standards are clear and supporting
materials are very helpful. In **AS-8.01** , suggest that the Child Evaluation include child/birth family
religious practices (if any), and the stationery (outline for Preparting (Preparing??) be updated to reflect
current Governor and DHS director. In **AS-8.05** the referenced Draft policy needs to be finalized and
implemented. In **AS-10.01** , suggest you include an assurance that the case record will include a
closing/discharge summary. As with previous Deliverable submissions, final compliance determination
will depend on evidence of implementation from case record reviews, interviews, and other materials that
show these policies/procedures are being followed.

These items complete the Fourth Quarter, Year 2 Deliverables. A separate report has been provided for
each Quarterly Report in Year 2. Thank you, Jenni, for your consistent and professional attention to the
completion of these deliverables. I look forward to our continuing work on Year 3 deliverables.

Jim

James J Mooney, ACSW
COA Consultant