**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**JACKSON DIVISION**


OLIVIA Y., by and through her next friend, James D. Johnson;
JAMISON J., by and through his next friend, Clara Lewis;
DESIREE, RENEE, TYSON, and MONIQUE P.,
by and through their next friend, Sylvia Forster;
JOHN A., by and through his next friend, James D. Johnson;
CODY B., by and through his next friend, Sharon Scott;
MARY, TOM, MATTHEW, and DANA W.,
by and through their next friend, Zelatra W.; AND
SAM H., by and through his next friend, Yvette Bullock;
on their own behalf and behalf of all others similarly situated          PLAINTIFFS,


v.                                                          CIVIL ACTION NO. 3:04CV251LN


HALEY BARBOUR, as Governor of the State of Mississippi;
DONALD TAYLOR, as Executive Director of the Department
of Human Services; AND BILLY MANGOLD,
as Director of the Division of Family and Children's Services          DEFENDANTS.


## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR CONTEMPT AND FOR THE APPOINTMENT OF A RECEIVER

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... iii

PRELIMINARY STATEMENT .................................................................................. 1

STATEMENT OF THE FACTS ................................................................................. 6

ARGUMENT ............................................................................................................ 11

I.    DEFENDANTS ARE OUT OF COMPLIANCE WITH THE CONSENT DECREE
      AND ARE IN CONTEMPT OF COURT ........................................................ 11

      A.    The Standard Applicable To Civil Contempt ...................................... 11

      B.    The Standard For Contempt Is Easily Met Here ................................. 12

II.   DEFENDANTS HAVE VIOLATED AND CONTINUE TO VIOLATE CLEAR
      PROVISIONS OF THE SETTLEMENT AGREEMENT AND THE PERIOD TWO
      IMPLEMENTATION PLAN ESTABLISHED TO PROTECT PLAINTIFF
      CHILDREN FROM HARM WHILE IN STATE CUSTODY ............................ 14

      A.    Defendants Have Violated And Continue To Violate The Clear Staffing
            Requirements Of The Settlement Agreement And The Period Two
            Implementation Plan ........................................................................... 15

      B.    Defendants Have Violated And Continue To Violate Clear Staff Training,
            Supervision, And Resource Requirements Of The Settlement Agreement
            and The Period Two Implementation Plan ........................................... 17

            1.    Staff Training Requirements Remain Unmet .............................. 17

            2     Defendants Have Violated The Prohibition On Supervisors Serving
                  As Trainers ................................................................................ 19

            3.    Staff Resource Requirements Remain Unmet ............................ 20

      C.    Defendants Have Violated And Continue To Violate Clear Requirements Of
            The Settlement Agreement And The Period Two Implementation Plan
            Regarding The Development Of An Adequate Array Of Foster Care
            Placements And Improving Placement Case Practice ........................... 21

      D.    Defendants Have Violated And Continue To Violate Clear Requirements Of
            The Settlement Agreement And The Period Two Implementation Plan
            Regarding Health Services ................................................................... 24

      E.    Defendants Have Violated And Continue To Violate The Clear
            Reunification And Adoption Service Requirements Of The Settlement
            Agreement And The Period Two Implementation Plan ......................... 25

      F.    Defendants Have Violated And Continue To Violate The Clear Child Data
            And Quality Assurance System Requirements Of The Settlement Agreement
            And The Period Two Implementation Plan ........................................... 27

            1.    Required Reforms To The Mississippi Automated Child Welfare
                  Information System Remain Unmet ........................................... 27

            2.    Quality Assurance System Requirements Remain Unmet ............ 28

i

G.  Defendants Have Violated And Continue To Violate Clear Fiscal Practices And Planning Requirements Of The Settlement Agreement And The Period Two Implementation Plan ..................................................................29

III.  DEFENDANTS HAVE FAILED TO MEET THE CONCRETE SETTLEMENT REQUIREMENTS DIRECTED AT REDUCING THE FREQUENCY AT WHICH CHILDREN ARE ABUSED AND NEGLECTED AFTER HAVING BEEN PLACED IN FOSTER CARE FOR THEIR PROTECTION ...........................................30

A.  Requirements Regarding The Investigation Of Maltreatment Remain Unmet .....31

B.  Requirements Regarding The Immediate Safety Check Of At-Risk Children Remain Unmet ......................................................................................33

C.  Requirements Regarding Child Abuse Intake Procedures Remain Unmet ..........33

D.  Requirements That Defendants License All Unlicensed Foster Homes Remain Unmet ......................................................................................34

E.  The Rate At Which Foster Children Are Abused Remains Unnecessarily High......................................................................................................35

IV.  DEFENDANTS' MINIMAL REFORM EFFORTS DO NOT MEET ANY RECOGNIZED DEFENSE TO CONTEMPT....................................................36

V.  A RECEIVER IS NECESSARY TO REMEDY DEFENDANTS' CONTEMPT AND PROTECT PLAINTIFF CHILDREN FROM HARM............................................39

A.  The Legal Standard For Receivership..................................................................39

B.  A Receiver Is The Only Effective Way To Protect Plaintiff Children From Future Harm ......................................................................................42

1.  Defendants' Noncompliance Is Caused By Their Leadership And Management Failings..............................................................................42

2.  Receivers Have Been Appointed In Similar Situations To Catalyze A Moribund Reform Effort........................................................................45

3.  Safeguards Built Into The Settlement Agreement Have Proven Ineffective At Ensuring Defendants' Compliance, And Alternative Remedies Will Be Futile .......................................................................49

CONCLUSION..........................................................................................................52

# **TABLE OF AUTHORITIES**

## **CASES**                                                                                         **Page(s)**

*Am. Airlines, Inc. v. Allied Pilots Ass'n,*
    228 F.3d 574 (5th Cir. 2000) ....................................................................40

*In re Baum,*
    606 F.2d 592 (5th Cir. 1979) ....................................................................36

*Cabrera v. Municipality of Bayamon,*
    622 F.2d 4 (1st Cir. 1980) ........................................................................38

*Carty v. Farrelly,*
    957 F. Supp. 727 (D.V.I. 1997) ...............................................................39

*Chicago Truck Drivers Union Pension Fund v. Bhd. Labor Leasing,*
    207 F.3d 500 (8th Cir. 2000) ....................................................................37

*Cobell v. Babbitt,*
    37 F. Supp. 2d 6 (D.D.C. 1999) ...............................................................36

*Colorado v. New Mexico,*
    467 U.S. 310 (1984)..................................................................................12

*Commodity Futures Trading Comm'n v. Wellington Precious Metals, Inc.,*
    950 F.2d 1525 (11th Cir. 1992) ................................................................38

*Dixon v. Barry,*
    967 F. Supp. 535 (D.D.C. 1997)..........................................40-41, 45-46, 51

*Florida Steel Corp. v. Nat'l Labor Relations Bd.,*
    648 F.2d 233 (5th Cir. 1981) ....................................................................40

*G.L. v. Zumwalt,*
    No. 77-0242-CV-W-1 (W.D. Mo. Dec. 7, 1992).....................................38-39

*In re Galindo,*
    No. H-05-4384, 2006 WL 2168125 (S.D. Tex. July 31, 2006) .........................37

*Gary W. v. Louisiana,*
    No. 74-2412, 1990 WL 17537 (E.D. La. Feb. 26, 1990).....................46-47, 51

*Glover v. Johnson,*
    934 F.2d 703 (6th Cir. 1991) ....................................................................41

*Ho v. Martin Marietta Corp.,*
    845 F.2d 545 (5th Cir. 1988) ....................................................................11

*Int'l Union v. Bagwell*,
    512 U.S. 821 (1994)................................................................................11

*J.B. v. Barbour*,
    No: 3:10-153 (S.D. Miss. filed Mar. 10, 2010)..............................................25

*LaShawn A. v. Kelly*,
    887 F. Supp. 297 (D.D.C. 1995),
    *aff'd sub nom. LaShawn A. v. Barry*,
    107 F.3d 923 (D.C. Cir. 1996) ...................................................38, 41, 47, 52

*Lelsz v. Kavanagh*,
    673 F. Supp. 828 (N.D. Tex. 1987) ......................................................12, 39

*Martin v. Trinity Indus.*,
    959 F.2d 45 (5th Cir. 1992) ..................................................................12

*McComb v. Jacksonville Paper Co.*,
    336 U.S. 187 (1949)............................................................................36

*McCord v. Maggio*,
    927 F.2d 844 (5th Cir. 1991) ................................................................38

*Morgan v. McDonough*,
    540 F.2d 527 (1st Cir. 1976)..........................................................40-41, 48

*Morgan v. McDonough*,
    456 F. Supp. 1113 (D. Mass. 1978) ........................................................49

*Nat'l Labor Relations Bd. v. Caroline Mills, Inc.*,
    167 F.2d 212 (5th Cir. 1948) ................................................................38

*Natural Gas Pipeline Co. v. Energy Gathering, Inc.*,
    86 F.3d 464 (5th Cir. 1996) ..................................................................11

*Oriel v. Russell*,
    278 U.S. 358 (1929)............................................................................37

*Perez v. Bos. Hous. Auth.*,
    400 N.E.2d 1231 (Mass. 1980) ........................................................41, 47

*Petitpren v. Taylor Sch. Dist.*,
    304 N.W.2d 553 (Mich. Ct. App. 1981) ....................................................41

*Petroleos Mexicanos v. Crawford Enters., Inc.*,
    826 F.2d 392 (5th Cir. 1987) ............................................................13, 36

*Plata v. Schwarzenegger*,
     No. C01-1351, 2005 WL 2932253 (N.D. Cal. Oct. 3, 2005) ............................................46

*Plata v. Schwarzenegger*,
     No. C01-1351, 2009 WL 799392 (N.D. Cal. Mar. 24, 2009) ..................................... 45-46

*Shaw v. Allen*,
     771 F. Supp. 760 (S.D. W. Va. 1990) ............................................................. 40-41, 44, 51

*Sizzler Family Steak Houses v. Western Sizzlin Steak House, Inc.*,
     793 F.2d 1529 (11th Cir. 1986) ......................................................................................37

*Test Masters Educ. Servs., Inc. v. Singh*,
     428 F.3d 559 (5th Cir. 2005) ..................................................................................... 39-40

*Thyssen, Inc. v. S/S Chuen On*,
     693 F.2d 1171 (5th Cir. 1982) .......................................................................................11

*United States v. Alcoa, Inc.*,
     533 F.3d 278 (5th Cir. 2008) ................................................................................. 11-12, 40

*United States v. Alcoa, Inc.*,
     No. A-03-CA-222, 2007 WL 5272187 (W.D. Tex., Mar. 14, 2007),
     *aff'd*, 533 F.3d 278 (5th Cir. 2008) .................................................................................40

*United States v. Alisal Water Corp.*,
     326 F. Supp. 2d 1010 (N.D. Cal. 2002) ..........................................................................46

*United States v. City of Jackson*,
     318 F. Supp. 2d 395 (S.D. Miss. 2002) .....................................................................37, 39

*United States v. Detroit*,
     476 F. Supp. 512 (E.D. Mich. 1979) ..............................................................................41

*United States v. Guam*,
     No. 02-00022, 2008 WL 732796 (D. Guam Mar. 17, 2008) ...........................................48

*United States v. Guam*,
     No. 02-00022, 2008 WL 4682183 (D. Guam Oct. 22, 2008) ..........................................48

*United States v. Rylander*,
     460 U.S. 752 (1983) ........................................................................................................37

*United States v. Sorrells*,
     877 F.2d 346 (5th Cir. 1989) ..........................................................................................37

*United States v. United Mine Workers of Am.*,
     330 U.S. 258 (1947) ........................................................................................................40

## **FEDERAL RULES OF CIVIL PROCEDURE**

Fed. R. Civ. P. 66..................................................................................................40

Fed. R. Civ. P. 70..................................................................................................11

## **ADDITIONAL AUTHORITIES**

12 Charles Alan Wright, Arthur R. Miller, & Richard L. Marcus,
    *Federal Practice and Procedure* (2d ed. 2010)................................................41

## PRELIMINARY STATEMENT

Plaintiffs submit this memorandum of law in support of their motion to find Defendants, Haley Barbour, Governor of the State of Mississippi, Donald Thompson, Executive Director of the Mississippi Department of Human Services ("MDHS"), and Lori Woodruff, the MDHS Deputy Administrator for the Division of Family and Children's Services ("DFCS")[1] in noncompliance with and hold them in contempt of court for failing to implement the terms of the Settlement Agreement and Reform Plan ("Settlement Agreement") entered into by the Parties and approved by Order of this Court on January 4, 2008, and the Period Two Annual Implementation Plan ("Period Two IP") agreed upon by the Parties and made an enforceable component of the Settlement Agreement. This motion is brought pursuant to Federal Rule of Civil Procedure 70(e), section VII.B of the Settlement Agreement, and paragraph 11 of a corrective action plan ("the Bridge Plan") agreed upon by the Parties pursuant to section VII.B of the Settlement Agreement and entered by this Court on June 10, 2010.

Plaintiffs are abused and neglected foster children in Mississippi, whose safety and wellbeing are dependent upon the reforms mandated by the Settlement Agreement to rebuild the state's deeply dysfunctional foster care system. These children, many of whom have been in custody since this lawsuit was filed in 2004, remain at immediate and substantial risk of the very same harms that the settlement of this action was intended to remedy. This is a direct and foreseeable result of Defendants' failure to substantially comply with their court-ordered mandates.

---

[1] At the time this action was filed, Donald Taylor served as the Executive Director of the Department of Human Services, and Billy Mangold served as the Director of the Division of Family and Children's Services.

Defendants have been provided with two chances and significant outside assistance to meet a set of baseline requirements, yet those requirements remain unmet.  Incredibly, of the **119** requirements Defendants were obligated to undertake during the last reform period, they fully complied with only **eight**.  The Monitor appointed to assess Defendants' progress with the reform effort found that Defendants either outright failed to comply with or failed to provide data necessary to assess compliance with 102 requirements and partially complied with only nine.[2] (Ex. 1 [Compliance Requirements Chart] to Affidavit of Daniel Dobies ("Dobies Aff."), attached as Exhibit A.)  The Monitor's two consecutive reports detail at length how Defendants' near total noncompliance with their obligations is a result of critical management failures, which remain unaddressed.  The Monitor characterized Defendants' efforts to comply with its obligations as largely belated, not minimally adequate, and in some instances nonexistent.

DFCS's failure to timely meet virtually any of its obligations to Plaintiff Children has real and dire implications on Plaintiffs' day-to-day lives.  It means that children in state foster care custody are still not free from harm, are still not being provided with the services and support necessary to properly develop, and are still not timely moving to safe and stable permanent homes.  While there has been some positive change in the manner in which DFCS is structured as a result of the court-ordered settlement, Defendants' continuing noncompliance with the Settlement Agreement and Implementation Plans over the last two and one-half years has been so massive that Mississippi children remain in as much danger and continue to be subject to the same harms today as they were when this lawsuit was first filed.  Among the most egregious examples of Defendants' noncompliance are:

---

[2] Plaintiffs have characterized those instances in which the Monitor found that Defendants met some but not all aspects of a requirement as Defendants having "partially complied" with the requirement.

- over 350 children, or over 10% of the entire foster care population, are currently residing in unlicensed foster homes, despite the clear danger posed by the state's placement of children with caregivers who are not screened or trained;

- caseworkers continue to labor under caseloads that surpass what is allowed by the Settlement Agreement, and new caseworkers are still sent out into the field to provide critical child welfare services without first receiving the training mandated by the Agreement and necessary for them to properly serve children; and

- Defendants have failed to take even the first concrete steps to implement a computer information or quality assurance system, both of which are required by the Agreement as fundamental to administering a child welfare system that protects children.

Further, Plaintiff Children continue to be harmed in foster care despite the protections of the Settlement Agreement. The following are just a sample of the harms that Plaintiff Children have suffered, and remain at risk of suffering, since Defendants entered into the Settlement Agreement:

- a foster child suffered injuries to most parts of his body, including ribs, eyes, and buttocks, after visits with biological parents, which DFCS permitted in violation of a court order;

- a foster child was beaten by a foster parent with a large hard plastic spoon. DFCS confirmed that the foster child as well as three adopted children, one of whom was autistic, were being beaten. During the investigation the caseworker learned that the biological parent of some of the children in the home was caring for all of the children, although the parent had been deemed by the court to be unfit to care for her children. The DFCS worker found that this arrangement was not in the best interests of the foster child. The investigation further established that the foster parent was medically neglecting the autistic child in her care. Nonetheless, the caseworker recommended that the foster child be adopted in the home; and

- an eight-year-old foster child was forced to strip to his underwear and held down by the legs while "whipped" with switches hard enough to leave marks as a form of punishment, despite the prohibition in both DFCS regulation and the Settlement Agreement on using corporal punishment; another foster parent whipped a child hard enough to leave a 12-inch mark, and the foster child reported being scared to go home.

(Ex. 1 [Serious Incident Report 1] (filed under seal), Ex. 2 [Serious Incident Report 2] (filed under seal), Ex. 3 [Serious Incident Report 3] (filed under seal), Ex. 4 [Serious Incident Report 4] (filed under seal) to Declaration of Jessica Polansky, attached as Exhibit B.) [3]

The danger of being beaten by foster parents and of being subjected to the very same parental violence from which foster care is specifically intended to protect children continues unabated for one reason: Defendants have not engaged in the strategic planning, implementation, and resource management necessary to accomplish even the most basic requirements that were mandated to have been completed during the first year of the Settlement Agreement.  As stated by the Monitor: "Simply put, at this juncture, the [D]efendants do not have many of the basic tools in place to manage and promote the reform effort effectively . . . ."  (The Court Monitor's Report to the Court Regarding Defendants' Progress Toward Meeting Period 2 Requirements ("Period Two Monitoring Rpt"), Docket No. 503, at 7, attached as Exhibit C.)

The innumerable elements with which Defendants are out of compliance are critical to building the infrastructure that must exist before child welfare services, and thereby Plaintiff Children's lives, improve.  At the close of the First Period, the Monitor cautioned that "in order to meet the Settlement Agreement's substantive requirements and timelines, the [D]efendants need to accelerate and intensify their efforts to build the capacity to support the reform effort and address long-standing challenges."  (The Court Monitor's Report to the Court Regarding Defendant's Progress Toward Meeting Period One Requirements ("Period One Monitoring Rpt"), Docket No. 488, at 93, attached as Exhibit D.)  During Period Two, Defendants neither accelerated nor intensified their efforts at meeting their obligations to Plaintiff Children.  As the

_____

[3] Because a motion to file the Declaration of Jessica Polansky and the attached exhibits under seal was filed contemporaneously with this memorandum, the Declaration and exhibits are not attached hereto.

Monitor found, after more than two years of the reform effort, "*none* of the basic management tools contemplated by the Settlement Agreement are in hand."  (Period Two Monitoring Rpt at 4 (emphasis added).)

The magnitude of Defendants' widespread noncompliance, as well as the lack of a concerted effort by Defendants to make credible efforts to undertake various required reform steps, is overwhelmingly a failure of management.  Defendants have had more than two years to meet essentially the same first year requirements, yet have failed.  They did not start with a strategic plan to govern the reform effort; they proved incapable of developing smaller bore implementation plans, such as a plan to address caseworker shortages; they were unable to draft a single acceptable Request for Proposal necessary to develop DFCS capacity; and they were slow if not unwilling to replace weak or incompetent personnel.  As the reform period has progressed, Defendants have become increasingly reliant on an outside contractor to develop plans and policies for the agency.  This is a costly and inefficient way to address the clear management failures which are severely hobbling the reform effort.

This is not a case where Defendants had wide latitude as to how to address deficiencies within DFCS and Defendants simply chose the wrong path to reform, which could be remedied by imposing a different course of action, designing a better or smarter plan of implementation, or simply infusing the system with more resources.  Instead, the Settlement Agreement and Implementation Plans required Defendants to undertake during Period Two a combined total of 119 separate, concrete, and specific tasks tailored to build, step by step, the foundations for a functioning child welfare system.  At this late juncture, with only eight of the 119 requirements met, what is immediately needed to effectively protect children is for this Court to appoint a

receiver able to make the management decisions Defendants have proven unwilling or unable to make and to take the necessary steps to implement those decisions.

This lawsuit was brought because children's lives were at risk.  Defendants have accomplished so little in over two years that children continue to suffer and at least one former class member had died.[4]  Simply too much time and taxpayer money has been spent for these tragic results.   There is no evidence that as currently managed, Defendants have the capacity or skill to steer this reform effort back on course in the foreseeable future, even with support from a bevy of outside consultants.  Plaintiffs appeal to this Court's inherent authority to protect the integrity of its orders and its broad power to fashion remedies necessary to address Defendants' wide-ranging and substantial noncompliance.  Specifically, Plaintiffs respectfully request that this Court issue an Order:

- holding Defendants in contempt of the Settlement Agreement and the Period Two Implementation Plan for failing to substantially comply with their terms;

- appointing a general receiver with full authority to administer DFCS to bring it into compliance with the orders of this Court; and

- granting such other and further relief as this Court deems necessary and proper.

## STATEMENT OF THE FACTS

Plaintiffs in this action are a class of all children who are or will be in the legal and/or physical custody of the Mississippi Division of Family and Children's Services, the state's child welfare agency.  Plaintiff Children brought this class action suit in 2004 alleging that Defendants were operating a foster care system in crisis that was harming the very children it was meant to protect because of a chronic lack of staffing, training, resources, and accountability.  These allegations were confirmed by overwhelming evidence developed in preparation for trial,

---

[4] This circumstances around this death is more fully discussed in the Declaration of Shirim Nothenberg at ¶¶ 88-96 (attached as Exhibit E).

including Defendants' own expert review of its child welfare system.  Among the facts

established by Defendants' own documents were that Plaintiff Children in Defendants' custody

were maltreated at a rate of close to five times the federally allowable level, that a lack of an

array of suitable and safe foster care placements resulted in children being harmed in

inappropriate placements and by needless moves from placement to placement, and that

caseworkers were carrying caseloads at levels that Defendants themselves characterized as

"BEYOND DANGER!"

In January 2008, the Parties entered into a Settlement Agreement that requires DFCS to

ensure that foster children are protected from further maltreatment once in DFCS custody; are

provided necessary medical, dental, and mental health care; are no longer shuffled among

multiple homes and facilities; and are placed in permanent homes without delay.  (Mississippi

Settlement Agreement and Reform Plan ("Settlement Agreement"), Docket No. 459, §§ II.B.3,

II.B.4, II.B.7, attached as Exhibit F.)  The Settlement Agreement also requires MDHS to meet

professional standards by providing specified, manageable caseloads for DFCS caseworkers,

frequent caseworker visits to foster children, and continuous oversight of its programs.  (*Id.* at §§

II.A.2, II.A.3, II.B.10.)  In addition, the Settlement Agreement requires Defendants to contract

with a fiscal expert to maximize their federal child welfare funds and to be accredited by the

Council on Accreditation ("COA"), an independent national organization that establishes

accreditation standards for the provision of child welfare services.  (*Id.* at §§ II.A.7, IV.)  As

required under the Settlement Agreement, for the last two years the Parties have entered into

Annual Implementation Plans that set forth more concrete and specific obligations necessary to

implement reform.  (Period 1 Annual Implementation Plan ("Period One IP"), Docket No. 459,

at 1, attached as Exhibit G; Period 2 Annual Implementation Plan ("Period Two IP"), Docket No. 487, at 1, attached as Exhibit H.)

The focus of the first implementation plan was on significantly strengthening the management of DFCS and building a basic child welfare infrastructure, including a training unit, a quality assurance program, and an improved child welfare computer system. The Period One IP also required Defendants to assess available foster care resources, child welfare case practice, and DFCS administration, and to develop remedial plans to address the deficiencies identified in those assessments.

As documented in the first report by the court-appointed Monitor, because of poor management, Defendants were significantly out of compliance with the requirements of the Period One Implementation Plan. According to the September 8, 2010 report issued by the Monitor, "at least in part because of the delay in establishing the DFCS executive management team, most of the Period One capacity-building and assessment requirements were not completed." (Period Two Monitoring Rpt at 5.) For example, Defendants failed to conduct any of the required needs assessments, let alone plan how to address any deficiencies. Defendants' lack of progress was substantial. But because Defendants had begun to take the steps to restructure the management of the agency and to increase staffing as was necessary to support the reform efforts, Plaintiffs agreed to enter into a Period Two Implementation Plan. Given Defendants' failures during Period One, the Period Two Implementation Plan incorporated the vast majority of the Period One Implementation requirements necessary to build even the most basic infrastructure. (*Compare* Period One IP *with* Period Two IP.)

At the beginning of Period Two, Defendants contracted with the child welfare experts at The Center for the Support of Families ("CSF"), which conducted the required needs

assessments and developed a Child Welfare Practice Model that sets out both the framework and specific action steps necessary to bring DFCS into compliance with the mandates of the Settlement Agreement. (*See* Ex. 1, Mississippi Child Welfare Practice Model Final Report ("Practice Model"), September 25, 2009 to Declaration of Shirim Nothenberg ("Nothenberg Decl."), attached as Exhibit E.) In conducting its assessments, CSF found that as of October 2009, the Mississippi child welfare system still had the same ongoing systemic problems that led to the filing of this lawsuit and that have continued to threaten the safety of Mississippi's foster children. CSF's findings included the lack of suitable placement resources, the lack of sufficient oversight of children in their placements, the lack of critical mental health services, and the lack of permanency services necessary to move children out of foster care and into permanent homes without undue delay. (*Id.* at 45-46, 49, 90, 219; *see also* Ex. 3 to Nothenberg Decl. [Mississippi Foster Care Assessments Final Report ("CSF Assessment"), October 13, 2009] at 69, 109.)

The Monitor has deemed the practice model designed by CSF to bring DFCS into compliance with the Settlement Agreement "the first credible plan of action for improving the quality and consistency of case practice." (Period Two Monitoring Rpt at 9.) However, the implementation schedule of the practice model is so attenuated that it is not even scheduled to be fully implemented within the five-year timeframe for reform established by the Settlement Agreement. (*Id.*) More critically, it depends upon financial resources, staff, and management capabilities that were required to be developed in Periods One and Two but, as found by the Monitor, simply do not exist. (*Id.* at 165-66 (finding success of the Practice Model "is dependent on a number of management reforms in management and administrative capacity that were anticipated by the Settlement Agreement, but have not occurred").)

On April 9, 2010, pursuant to section VII.B of the Settlement Agreement,[5] Plaintiffs provided Defendants written notice of their noncompliance with the Settlement Agreement and the Period Two IP based on the Monitor's preliminary findings of widespread noncompliance during Period Two.  The Parties negotiated a short-term corrective action plan, approved by this Court in June 2010, that covered a four-month period from May 1, 2010 to September 1, 2010, during which time Defendants were required to undertake a limited number of specific measures deemed necessary to address known safety concerns and to produce basic data necessary for Plaintiffs' counsel to assess the wellbeing of children in light of the stalled reform effort. (Agreed Order ("Bridge Plan"), Docket No. 501, attached as Exhibit I.)[6]  The Bridge Plan provides that, "[n]othing in this Order shall be construed to preclude Plaintiffs from seeking judicial relief for any violation of the Period Two Annual Implementation Plan or the Period Two requirements of the Settlement Agreement and Reform Plan at any time following the conclusion of the Bridge Period or following the initiation of an enforcement action by Plaintiffs pursuant to paragraph 10 of this Order."  (Bridge Plan ¶ 11.)

---

[5] This provision states:

> If Plaintiffs believe that Defendants have failed to comply with any obligation under this Plan or an annual implementation plan, Plaintiffs will, prior to seeking judicial action to enforce the terms of this Plan or an annual implementation plan, give written notice of non-compliance to the State.  Within 30 calendar days of Plaintiffs' notice of non-compliance, Defendants shall submit a written response to Plaintiffs.  Plaintiffs agree to work in good faith with the State to agree on necessary corrective actions and avoid enforcement action, and may not initiate court action for 60 days from the date of Plaintiffs' non-compliance notice.  However, in case of an emergency posing an immediate threat to the health or safety of youths, Plaintiffs may omit the notice and cure requirements herein before seeking judicial action.

Settlement Agreement § VII.B.

[6] The child welfare data elements for which Defendants are required to report are attached to the Bridge Plan as Exhibit A.

As of the conclusion of the Bridge Period in September 2010, there was still no infrastructure or demonstrable capacity within DFCS to move the reform effort out of its nascent stage, and the data, unverified by the Monitor, that Defendants have produced confirms that children are still being abused and neglected in DFCS custody, they remain in unlicensed or overly restrictive placements, and the caseworkers whose responsibility it is to oversee their care and safety remain overburdened, with some carrying caseloads exceeding twice the Settlement Agreement requirements.  ("Dobies Aff." Ex. 2 [Bridge Plan Data Chart].)  More than halfway through the reform period, Defendants are in massive noncompliance with their court-ordered obligations and totally without the capacity to implement the reforms which Mississippi's children so desperately need.  The last two and one-half years have demonstrated that the appointment of a receiver is the only way to bring Defendants into compliance with their court-ordered obligations and protect Plaintiff Children from continued harm.

## ARGUMENT

## I.    DEFENDANTS ARE OUT OF COMPLIANCE WITH THE CONSENT DECREE AND ARE IN CONTEMPT OF COURT

### A.    The Standard Applicable To Civil Contempt

Federal courts have the inherent power to enforce judicial orders through contempt proceedings.  *See, e.g., Int'l Union v. Bagwell*, 512 U.S. 821, 831 (1994); *Natural Gas Pipeline Co. v. Energy Gathering, Inc.*, 86 F.3d 464, 467 (5th Cir. 1996); *see also* Fed. R. Civ. P. 70(e) (authorizing courts to hold disobedient parties in contempt).  The purpose of civil contempt is to coerce future compliance.  *Thyssen, Inc. v. S/S Chuen On*, 693 F.2d 1171, 1173-74 (5th Cir. 1982).  This power includes the authority to enforce consent decrees and settlement agreements. *Ho v. Martin Marietta Corp.*, 845 F.2d 545, 548 (5th Cir. 1988).  Indeed, "district courts have the power and ordinarily *must* hold parties to the terms of a consent decree . . . . [and] have wide

discretion to enforce decrees and to implement remedies for decree violations" through declarations of contempt. *United States v. Alcoa, Inc.*, 533 F.3d 278, 286 (5th Cir. 2008) (emphasis added).

In order to demonstrate civil contempt, the movant must establish by clear and convincing evidence: "1) that a court order was in effect, 2) that the order required certain conduct by the respondent, and 3) that the respondent failed to comply with the court's order." *Martin v. Trinity Indus.*, 959 F.2d 45, 47 (5th Cir. 1992) (citation omitted). Contempt is appropriate where a party fails "in meaningful respects to achieve substantial and diligent compliance with a clear and unambiguous court decree." *Lelsz v. Kavanagh*, 673 F. Supp. 828, 839 (N.D. Tex. 1987) (citations and internal quotation marks omitted). Evidence is clear and convincing when it leaves the trier of fact with "an abiding conviction that the truth of [the] factual contentions are highly probable." *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984). The standard does not require a showing of willfulness or intent. *Petroleos Mexicanos v. Crawford Enters., Inc.*, 826 F.2d 392, 401 (5th Cir. 1987).

### B.    The Standard For Contempt Is Easily Met Here

The test for contempt is easily met here based on Defendants' massive noncompliance with both the Settlement Agreement and the Period Two Implementation Plan. First, there can be no dispute that a legal order was in effect. The Parties agreed to the Settlement Agreement and the Period One Implementation Plan, which the Court entered on January 4, 2008. Following the conclusion of Period One, the Parties negotiated the Period Two Annual Implementation Plan, which was filed with the Court on May 4, 2009. The Implementation Plans are incorporated into the Settlement Agreement and are court enforceable. (Settlement Agreement §§ I.A, I.B.)

Second, the Settlement Agreement and Implementation Plans created clear and definite obligations that required specific conduct by Defendants to be performed by certain deadlines. This is amply demonstrated by the two reports issued by the court-appointed Monitor in this case which enumerate each and every specific obligation Defendants were to meet, and whether those obligations were timely met. (*See generally* Period One Monitoring Rpt; Period Two Monitoring Rpt.)

Third, as set forth in greater detail in Sections II and III of this memorandum and the Declaration of Shirim Nothenberg, there are no grounds to dispute that Defendants have failed to substantially comply with this Court's orders. Despite the fact that Defendants effectively had two chances to comply with their Period Two obligations, they still have not succeeded in meeting most of those obligations. As discussed *infra*, because the Defendants failed to meet the majority of their obligations under the Period One Implementation Plan, the majority of those obligations were included as requirements of the Period Two Implementation Plan. (Period One Monitoring Rpt at 3-4; Period Two Monitoring Rpt at 5.) Nonetheless, the Monitor's report demonstrates that Defendants yet again failed to meet nearly all of those same requirements during Period Two. (Period Two Monitoring Rpt at 5-6.) As discussed more fully below, Defendants met just eight requirements during Period Two, while they partially met nine, failed to meet 52, and the Monitor could not report on Defendants' performance on 50 requirements due to Defendants' failure to provide data as required.

There are significant deficiencies across the board, all stemming from the critical managerial failings described below. As a result of these failings, Mississippi's court-ordered reform of its foster care system is moribund and children continue to live in jeopardy.

## II.    DEFENDANTS HAVE VIOLATED AND CONTINUE TO VIOLATE CLEAR PROVISIONS OF THE SETTLEMENT AGREEMENT AND THE PERIOD TWO IMPLEMENTATION PLAN ESTABLISHED TO PROTECT PLAINTIFF CHILDREN FROM HARM WHILE IN STATE CUSTODY

During the course of litigation, Plaintiffs established that Defendants had abrogated their basic constitutional duty to protect children in their custody from harm.  The undisputed evidence made clear that Defendants had knowingly failed to protect foster children from abuse and neglect while in foster care, moved them through harmful places to live, and deprived them of basic health care and treatment, causing Plaintiff Children unnecessary and avoidable suffering.  (Nothenberg Decl. ¶¶ 16-20.)

The undisputed evidence further established that the harms to which the Plaintiff foster children were being subjected resulted directly from Defendants having starved DFCS of critically needed management, staff, training, supervision, and resources.  (*Id.* ¶¶ 20, 32-35.)  To rectify these problems, the Settlement Agreement and the Period Two IP required DFCS to meet specific administration and management requirements calculated to build core organizational and resource capabilities within DFCS, including the ability to recruit and retain sufficient caseworker staff, to engage in meaningful system-wide quality assurance, and to track and report individual and aggregate child welfare information as well as fiscal and management data. (Settlement Agreement § II.A; Period Two IP §§ I.1-7.)  The Agreement also established a number of concrete steps that DFCS was required to undertake to ensure the safety of children and to improve the array and quality of placements and services.  (Settlement Agreement §§ II.B.4, 5.)  The Agreement and Period Two IP further established a number of measurable interim child safety and wellbeing outcomes that Defendants must meet.  (*See, e.g.*, Settlement Agreement § II.B.4, III; Period Two IP § II.6.)

Two and one-half years later, the undisputed findings by the Monitor make clear that, due to key managerial failings, during Period Two Defendants have met virtually none of these court-ordered requirements. The real world consequence of these failures is that the state of Mississippi fails to meet its core responsibility to keep the children it takes into custody safe.

A.    **Defendants Have Violated And Continue To Violate The Clear Staffing Requirements Of The Settlement Agreement And The Period Two Implementation Plan**

During the litigation, Plaintiff Children established that their safety was at risk, in part because Mississippi's child welfare system lacked a minimally adequate number of caseworkers. (Nothenberg Decl. ¶ 20.) Defendants' own expert found DFCS caseworkers to have average caseloads of 44 cases, even though she concluded that a reasonable caseload would be 14. (Pls.' Mem. of Law in Support of Mot. For Summ. J. on Liability ("Pls.' Mem. for Summ. J."), Docket No. 268, Ex. 1, [Steib Expert Rpt] at 3, 25-26.) These caseloads existed although Defendants themselves characterized caseloads of 40 or higher as "BEYOND DANGER!" (*Id.* Ex. 12 [DFCS Workload Information] ("'BEYOND DANGER!' chart") at DHS 020088.)

For two consecutive reform periods, Defendants have failed to undertake the steps required by the Settlement Agreement and Implementation Plans to recruit and retain sufficient professional and support staff to comply with the caseload and caseworker qualification requirements of the Agreement. (Nothenberg Decl. ¶¶ 21-31.) Accordingly, DFCS continues to operate with a shortage of trained and qualified caseworkers necessary to ensure that Plaintiff foster children are safe. While DFCS has hired some new caseworkers over the last two and one-half years (Period Two Monitoring Rpt at 5), hiring has been insufficient to meet the requirements of the Settlement Agreement.

On average, DFCS county offices have a caseworker vacancy rate of 17%. (*Id.* at 24.) Further, "there is evidence of continued critical staffing shortages in some counties, particularly

counties with a high number of children in DFCS custody." (*Id.* at 18.)  For example, in Hinds

County, which has one of the largest populations of Plaintiff foster children, more than half of

the caseworker positions are vacant, and one supervisor is not only responsible for supervising

six caseworkers, but also for providing casework on behalf of twenty children.  (*Id.* at 25 n.77.)

The Settlement Agreement both prohibits supervisors from carrying any cases, and also from

supervising more than five caseworkers.  (Settlement Agreement §§ II.A.2.a.5, 6.)

      The data produced in accordance with the Bridge Plan reveals that as of July 2010, close

to 60% of all DFCS caseworkers carried caseloads that exceeded the caseload requirements

established in the Settlement Agreement and that 15% of DFCS caseworkers were carrying

caseloads that were more than double the Agreement's requirements.  (Dobies Aff. Ex. 2 [Bridge

Plan Chart].)  Despite the continuing staffing shortage and resulting high caseloads, Defendants

eliminated eight caseworker positions during Period Two (Period Two Monitoring Rpt at 24) and

planned to institute furlough days.  It was only after Plaintiffs' counsel objected to the

furloughing of DFCS workers that Defendants agreed to limit to three the number of days DFCS

workers would be furloughed during the 2010 fiscal year.  (Consent Order, Docket No. 496.)

      The failure to meet the Period Two caseload and caseworker qualification requirements is

directly attributable to failures in management. It is not the case that there were simply no

caseworker candidates available.  Rather, for more than two years Defendants did not develop a

Workforce Plan to recruit and retain caseworkers as required under the Period One

Implementation Plan, and again in the Period Two IP.  (Period Two Monitoring Rpt at 26.)

According to the Monitor, the workforce plan eventually submitted by Defendants was not viable

nor realistic. (*Id.* at 26-27; Nothenberg Decl. ¶ 29.)  Similarly, Defendants failed to meet their

obligation to design and begin to implement an adequate plan for bringing current staff into

compliance with the worker and supervisor qualifications of the Settlement Agreement.
(Nothenberg Decl. ¶¶ 25-26.)

Defendants have recognized that high caseloads place Plaintiff Children "Beyond
Danger," yet year after year they have failed to take the specific steps to which they committed
to address that very danger.  Even if a viable plan were developed, Defendants have failed to
demonstrate the management capacity or ability to marshal the resources necessary to implement
it.

### B. Defendants Have Violated And Continue To Violate Clear Staff Training, Supervision, And Resource Requirements Of The Settlement Agreement and The Period Two Implementation Plan

Plaintiffs established during the litigation that foster children were subjected to harm not
only because of the severe lack of caseworkers, but also because of a failure by DFCS to provide
adequate training and basic equipment necessary for caseworkers to adequately perform their
jobs.  (*Id.* ¶¶ 32-35.)  Defendants readily conceded that DFCS caseworkers were sent into the
field to work with children before undergoing any DFCS child welfare training. (Pls.' Mem. for
Summ. J., Ex. 38 [Taylor Dep.] at 124:6-16.)  Yet, for more than two years, Defendants have
failed to meet the most basic training, supervision, and resources requirements to begin to
remedy these deficiencies.

### 1. Staff Training Requirements Remain Unmet

As recognized by the Monitor, the establishment of a "staff training program is essential
to the reform effort." (Period Two Monitoring Rpt at 30; *see also* Period One Monitoring Rpt at
39.)  During Period One, Defendants were required to establish and maintain an adequately
staffed training unit and ensure that caseworkers underwent required pre-service training prior to
assuming case responsibilities.  (Settlement Agreement § II.A.2.c.4-6.)  Defendants were also
required to implement an ongoing in-service training program for existing caseworkers.  (*Id.*)

17

Defendants failed to meet these requirements in the first period, and so were required to meet

them in Period Two, but again failed. (Period One Monitoring Rpt at 44; Period Two IP § I.2.d;

Period Two Monitoring Rpt at 38-39; *see also* Nothenberg Aff. ¶¶ 36-50.)

Defendants' failure to meet their obligations to train workers, especially when more than

half of the frontline workers are relatively recent hires, places foster children at immediate and

foreseeable risk, as new caseworkers with little to no training are called upon to make critical

and life-altering decisions such as whether to confirm that a child has been maltreated or whether

a foster home is safe, without the requisite knowledge, skills or experience.  (Period Two

Monitoring Rpt at 43-45.)  To cite just one example, a caseworker was hired in January 2009 and

was assigned a caseload in March of 2009, but did not undergo pre-service training until 14

months after being hired.  (*Id.* at 49.)

Defendants' dismal performance in providing the newly hired workforce with necessary

training is attributable to a failure in management, as much as a lack of resources.  As

documented by the Monitor, the practice of assigning new caseworkers caseloads without

appropriate training was well known to DFCS managers during Period Two yet continued to

occur because of:

> the absence of clear policy guidance; the failure to implement the
> [on the job training] component of the [] training curriculum in all
> regions; substantial delays between the date newly-hired
> caseworkers began working at DFCS and the date they completed
> the pre-service training; and the critical shortage of caseworkers in
> some county offices.

(*Id.* at 43-45.)  Defendants did not develop a training plan for two consecutive years (*id.* at 36),

did not adequately update the training curriculum to reflect requirements of the Agreement (*id.* at

36, 41), and did not even meet the most basic management task of accurately tracking which

caseworkers have undergone what training (*id.* at 47- 49; Nothenberg Decl. ¶¶ 43-44).

18

As with pre-service training, as described by the Monitor, Defendants' approach to meeting the requirements to provide caseworkers with in-service training reflects a similar vacuum in management. Defendants have not even developed, let alone implemented, a finalized policy requiring the in-service training mandated by section II.A.2.c.7 of the Settlement Agreement and section I.2.d.5 of the Period Two IP. (Period Two Monitoring Rpt at 30, 38, 35-36.) The few in-service courses that DFCS does provide represent a "fractured approach to staff development." (*Id.* at 38.) To date, more than two and one-half years after Defendants signed the Settlement Agreement, DFCS training policy and current training practice regarding in-service training remains in draft form and is not consistent with the requirements of the Agreement. (*Id.* at 36.)

The fact that Defendants did not put in place a policy prohibiting new caseworkers from undertaking case responsibilities for which they are not trained or implement a system to track caseworker training reflects Defendants' willful failure to undertake steps necessary not only to meet the requirements of the Agreement, but to also address a known risk of harm to Plaintiff Children.

### 2. Defendants Have Violated The Prohibition On Supervisors Serving As Trainers

Defendants also knowingly violated the explicit prohibition established by the Settlement Agreement of pulling supervisors out of the field to provide training. (Settlement Agreement § II.A.2.c.4; Period Two IP § I.2.d.3.) This provision exists specifically to safeguard children from having their cases go unsupervised. As reported by the Monitor, during Period Two eight supervisors and three family protection staff, who are responsible for investigating allegations of foster child maltreatment, were assigned to provide a two-week training, while also maintaining responsibility for their caseload. (Period Two Monitoring Rpt at 34-35.) This practice places

children at risk, and is inconsistent with the explicit requirements of the Settlement Agreement which contemplates that in-service training will be delivered by qualified trainers dedicated to the Training Unit.  (*Id.* at 34-35.)

### 3.    Staff Resource Requirements Remain Unmet

In addition to failing to provide its front line staff with proper training, DFCS continues to deprive caseworkers of the basic tools necessary to properly serve children.  Defendants were required to comprehensively review and revise their policies and procedures by the end of Period One to reflect the foster care service standards established by the Council on Accreditation and the Settlement Agreement.  (Period One IP § I.)  The Monitor found that Defendants did little towards accomplishing this requirement in Period One and again in Period Two.  (Period Two Monitoring Rpt at 70-71.)  Defendants recently proposed that they will complete the revision to the Policy Manual by May 1, 2011, at nearly the end of the contemplated five-year reform effort. (Nothenberg Decl. Ex. 8 [Policy Manual Plan].)  Waiting until the end of the reform period to finalize the procedures with which front-line workers must comply to ensure children's wellbeing all but assures noncompliance with the Agreement for the foreseeable future.

Defendants were also required under Period Two to provide caseworkers and supervisors with access to basic computer services, including consistent access to the Mississippi Automated Child Welfare Information System ("MACWIS"), the child welfare database upon which Defendants rely for virtually all documentation and data tracking, such as each child's placement, case records, medical information, and prior reports of maltreatment.  (Period Two IP § I.5.a.)  The Monitor found that Defendants did not meet this requirement due to poor management decisions related to "long standing and persistent" login and connectivity problems, which could have been more quickly and easily resolved.  (Period Two Monitoring Rpt at 60-

64.)[7]  Providing caseworkers with the most basic tools necessary to engage in reasonably professional case practice is a straightforward task that a competent management team could have accomplished in two and one-half years.  Defendants' ongoing failure to do so poses a daily risk to Plaintiff Children.

      **C.**      **Defendants Have Violated And Continue To Violate Clear Requirements Of The Settlement Agreement And The Period Two Implementation Plan Regarding The Development Of An Adequate Array Of Foster Care Placements And Improving Placement Case Practice**

Plaintiffs established during litigation that they were subjected to multiple placements, often in unsafe homes and/or inappropriate institutions, because Defendants failed in their basic obligation to develop and maintain an adequate range of placement settings to serve the individual needs of vulnerable foster children.  (Nothenberg Decl. ¶¶ 51-55.)  Accordingly, the Period One Implementation Plan required DFCS to undertake an assessment of available foster care placement resources and begin implementing a written plan for the targeted recruitment and development of a range of family and facility placements that were identified as necessary to adequately meet the placement needs of the foster care population.  (Period One IP § II.13.)  Defendants met none of those obligations in Period One.  (Period One Monitoring Rpt at 90-91.)  In Period Two, DFCS entered into a contract with The Center for the Support of Families to undertake all of the Foster Care Service Assessments required by the Period One IP, and then again by the Period Two IP.[8]

---

[7] The Monitor also reported that caseworkers in some counties share cramped trailers that do not meet minimum professional standards in part because such conditions preclude confidential conversations, which are a fundamental of proper case practice, and DFCS has not even acquired enough telephone lines to support the number of DFCS staff who work in trailers. (*Id.*)

[8] In addition to the Foster Care Placement Assessment, these included a Reunification Needs Assessment; a Termination of Parental Rights Assessment; a Child Safety Assessment; an Independent Living Services Assessment; and Health Care Service Provider Assessment. (Period Two IP §§ II.2.a-g.)

The findings made by CSF in its October 2009 Foster Care Placement Assessment make clear that Plaintiff Children continue to suffer from the same systemic problems caused by the lack of an array and oversight of foster care placements that existed pre-settlement. Among the CSF findings are that:

- there are an inadequate number of placement options for children entering foster care (Nothenberg Decl. Ex. 3 [CSF Assessment] at 14);

- because of a shortage of resource staff in some areas, foster home applications are not being processed. (*Id.* at 94-95.) In fact, the "number of pending [foster home] applicants [in Region VII, hit by Hurricane Katrina] is actually larger than the number of licensed families" (*id.* at 107);

- "[s]everal instances were cited about applicants for resource homes being rejected by [DFCS], only later to be approved as a therapeutic foster home with another agency" (*id.* at 97);

- "the current process for securing a therapeutic placement is time-consuming, ineffective, and does not ensure appropriateness of service" (*id.* at 14);

- "at least some resource parents experience difficulty in getting the necessary medical background information on children placed in their homes, and are unaware of the medical needs of the children at the time of placement" (*id.* at 9); and

- "when a child comes in to [sic] care, the worker calls licensed resource homes in the county until a vacancy is located, and that a vacancy may not correspond to the needs of the child or license limitations regarding age or sex of children desired." (*id.* at 96).

At the close of the second year of the reform plan process, Defendants yet again failed to make significant progress in addressing the core systemic placement problems alleged in the complaint and confirmed as still ongoing. Despite the statewide shortage of licensed foster homes, Defendants failed both in Period One and then again in Period Two to develop and begin implementing a written plan for either the recruitment of more foster homes, or the speedy licensing of currently unlicensed caregivers. (Period Two Monitoring Rpt at 116, 131.) Defendants further failed to undertake a host of obligations intended to assist in the retention of

foster parents. (Nothenberg Decl. ¶ 62.) Defendants similarly did not meet their requirements to improve the placement process (Period Two Monitoring Rpt at 117), or to produce data reflecting whether Defendants are choosing foster care placements in accordance with foster care setting requirements of the Settlement Agreement (Nothenberg Decl. ¶ 64).

Subjecting foster children to frequent, unpredictable, and unexplained moves can be seriously harmful to their mental status, ability to adjust, and any existing psychiatric conditions, and can virtually destroy their chances to successfully live in a permanent home. (Pls.' Memo for Summ. J. Ex. 5 [Hiatt Expert] at 28-29; *id.* Ex. 42 [Hiatt Dep.] at 95:21-96:25.) "[I]nstitutional settings, where children receive care from multiple caregivers and not one primary caregiver, are harmful for all children. Institutional care is especially harmful for infants, who require consistent nurturing and human touch to properly grow and thrive." (*Id.* Ex. 3 [Lewis Expert Rpt] at 11.) Yet, the data produced by Defendants pursuant to the Bridge Plan confirms that because of a lack of an array of adequate placements, Defendants continue to place children in unsuitable and potentially dangerous environments and to move them from one impermanent placement to another. In a one month period ending on August 23, 2010, close to 16% of foster children were living in a congregate setting and 12% were residing in placements that DFCS had *never* licensed. (Dobies Aff. Ex. 2 [Bridge Plan Data Chart].) Further, during that same 30-day period, close to 400 children had been placed in a shelter at least twice. Additionally, almost 750 children – over twenty percent of the population of children in foster care – had experienced an average of five or more placement moves during their time in DFCS custody. (*Id.*) Plaintiff Children remain subject to these very harms because of Defendants' failure to implement the Settlement Agreement requirements designed to address them.

**D.      Defendants Have Violated And Continue To Violate Clear Requirements Of
The Settlement Agreement And The Period Two Implementation Plan
Regarding Health Services**

In addition to Plaintiffs' uncontested finding during the pre-judgment phase of this case

that DFCS failed to deliver basic medical, dental, and psychological care to children, the

undisputed evidence further established that Defendants knowingly failed to develop or make

available a sufficient array of mental health services to meet the needs of the foster children in

their custody. (Nothenberg Decl. ¶ 66.)  To resolve this, during Period One Defendants were

required to assess the medical, dental, and mental health service needs of the foster care

population and to develop and implement plans to address service gaps.  (Period One IP § II.f.)

Having failed to meet this requirement in Period One, the assessment was again required

pursuant to the Period Two IP.  (Period Two IP § II.2.b.)  CSF undertook this assessment during

Period Two and found glaring deficiencies in case practice and available services which resulted

in foster children's medical, mental health, and dental needs not being met. (Nothenberg Decl. ¶

69.)  Despite the clear health implications to children stemming from these deficiencies,

Defendants failed to meet their obligation to design and implement a plan to address the

identified deficiencies.  (Period Two Monitoring Rpt at 72-73.)

During the first two reform periods, Defendants could not produce any validated data

related to compliance with the health services requirements of the Settlement Agreement and

Implementation Plans.  (Period Two Monitoring Rpt at 119-21, 23.)  However, data gathered

during both the Foster Care Service Assessment and by the Monitor over the span of the two

Implementation Periods provides a strong basis to find that children's basic health needs remain

unaddressed.  As found by both CSF and the Monitor, foster children continue to be deprived of

necessary and timely medical services because Defendants fail to provide their caretakers with a

Medicaid card.  (*Id.* at 115; Nothenberg Decl. Ex. 3 [CSF Assessment] at 69.)  Because

24

Defendants have not developed an appropriate array of mental health services, children lack

access to needed community-based mental health services. (Period Two Monitoring Rpt at 115,

121, 123; Nothenberg Decl. Ex. 3 [CSF Assessment] at 68.)[9]  During the Reform Period, not

only have Defendants failed to address the need to develop more community-based therapeutic

services, they in fact **discontinued** contracts providing intensive in-home services.  The failure

to renew such contracts deprived Plaintiffs of one of the precious few sources of community-

based mental health services.  (*See* Nothenberg Decl. Ex. 4 [Letter from Don Thompson].)

## E. Defendants Have Violated And Continue To Violate The Clear Reunification And Adoption Service Requirements Of The Settlement Agreement And The Period Two Implementation Plan

During litigation, Plaintiffs established that Defendants' failure to provide timely

permanency services, including providing reunification services, or freeing children for adoption

when safe reunification was not possible, resulted in children languishing in foster care

unnecessarily for years with far too many children aging out of foster care without ever having a

permanent home.  (Nothenberg Decl. ¶¶ 76-78.)  Among the initial assessments required during

Period One, Defendants were required to undertake an evaluation of their practices and services

provided to timely and safely return children to their families ("Reunification Needs

Assessment"), and to evaluate their practice of identifying children who cannot be safely

returned to their families and who therefore should be freed for adoption ("Termination of

Parental Rights Assessment").  (Period One IP §§ II.a, II.b.)  Defendants were also required to

undertake an assessment of the Independent Living Services provided to youth who, because

DFCS has failed to find them a permanent home, are aging out of foster care to live on their own.

---

[9] In fact, the State's failure to provide community-based mental health services to all children, including foster children, has become so acute that a separate lawsuit, *J.B. v. Barbour*, No: 3:10-153 (S.D. Miss.) filed Mar. 10, 2010, was brought against the Governor and various state officials alleging that the lack of such services is currently causing children great harm. (Complaint at 1-3, *J.B. v. Barbour*, No. 3:10-153 (S.D. Miss. Mar. 10, 2010).)

(*Id.*§ II.g.)  Those assessments were intended to inform the remedial measures needed to address shortcomings that resulted in children unnecessarily spending their childhoods in DFCS custody. After those assessments were completed, Defendants were required in Period Two to develop implementation plans for addressing deficiencies in permanency services identified by the assessments, and to augment their adoption processes and resources.  (Period Two IP §§ II.5.c.1, II.5.e, II.12.a.)

During Period Two, Defendants engaged CSF to undertake the required assessments of its reunification, termination of parental rights, and independent living services.   The following are but a few of the findings made by CSF regarding those services and practices:

- there is a "notable" lack of available reunification services, especially in rural areas. Available services are often not effective.  Caseworkers are therefore forced to rely on prevention services, meant for children never removed from their homes, or offer nothing at all;

- case practice around reunification is weak, marked by poor assessments and a failure to create individualized service plans;

- wide-spread inaccuracies in MACWIS data posed significant obstacles in even identifying the universe of children who should be freed for adoption or the universe who already had been so freed.  This failure was attributed at least in part to the failure by casework staff to understand when it is appropriate to move forward on freeing a child for adoption; and

- some Independent Living service plans were incomplete, and some were entirely blank.

(Nothenberg Decl. Ex. 3 [CSF Assessment] at 39-41, 83; *id.* Ex. 5 [TPR Assessment] at 82-83, 86.)

As the Monitor made clear, "[i]n light of the magnitude of these systemic deficits, there is an urgent need for [D]efendants to develop and implement a well-considered strategic plan that addresses each of these limitations in tandem with the fiscal planning contemplated by Period Two IP §1.7.b. and practice model implementation strategies."  (Period Two Monitoring Rpt at

74.)  To date, there is no evidence that such strategic planning has or is taking place or that DFCS management has the capacity to undertake such planning.  Moreover, in addition to not developing an integrated strategic plan, Defendants have also failed to undertake the specific plans, protocols, and hiring to address the service deficiencies as required during Period Two. *See* p. 43 n.10, *infra*.

      **F.**    **Defendants Have Violated And Continue To Violate The Clear Child Data And Quality Assurance System Requirements Of The Settlement Agreement And The Period Two Implementation Plan**

           **1.**    **Required Reforms To The Mississippi Automated Child Welfare Information System Remain Unmet**

Despite the critical and obvious import of reliable information concerning the status, service needs, and wellbeing of foster children, at the time this case was settled it was undisputed that MACWIS, the state's automated child welfare information system, did not contain complete and accurate information and was unable to produce aggregate data reports necessary for the management of a child welfare system.  (Nothenberg Decl. ¶ 98.)  It was also undisputed that MACWIS failures directly put foster children's safety in jeopardy.  (*Id.*)

In her report regarding Period One, the Monitor found that Defendants had not met the Period One IP MACWIS requirements, and she cautioned that "Defendants must expedite and intensify their efforts to address these shortcomings in order for the reform process to make continued and meaningful progress."  (Period One Monitoring Rpt at 55.)  No such expeditious or intensive remediation was forthcoming.  During Period Two Defendants did not meet even the most basic of the MACWIS requirements, including that they issue a Request for Proposal for a baseline analysis of MACWIS.  (Period One Monitoring Rpt at 66.)  Such a failure is particularly troubling in light of the Monitor's admonition in her Period One Report that limitations in

MACWIS were a *key obstacle* to the reform process.  (Period One Monitoring Rpt at 7 (emphasis added).)

In her Report of Period Two, the Monitor made clear the serious ramifications of Defendants' failures to meet their obligations regarding MACWIS.  The Monitor stated:

> There is a critical need to address the limitations in MACWIS on a more expedited basis.  Incomplete or inaccurate data in MACWIS, like the types revealed during the Monitor's case record review, could result in decision making related to child placements that presents *an unreasonable risk of harm to children* in [D]efendants' custody.

(Period Two Monitoring Rpt at 65 (emphasis added).)

The Monitor also made clear that Defendants do not now have the capacity to meet MACWIS requirements.  According to the Monitor, as currently staffed and structured, "[D]efendants do not have sufficient staff with the correct skill set to perform programming and validation activities that will be needed to report accurately on all of the data requirements implicated by the Settlement Agreement."  (*Id.*)

For more than half of the reform period, Defendants have failed to address "the critical need for substantial improvement in the quality and accuracy of the information available to guide management decisions and promote improvements in individual case practice."  (*Id.* at 7.) Compliance with the Settlement Agreement is inextricably entwined with and dependent upon Defendants making the substantial improvements to MACWIS that the Monitor has found they do not have the capacity to make.

## 2.    Quality Assurance System Requirements Remain Unmet

As aptly described by the Monitor, a continuous quality improvement ("CQI") system, "[a]t its simplest . . . is designed to promote improvements in agency performance through ongoing assessments of practices and outcomes using qualitative and quantitative measures to

inform operational strategies and decision-making." (Period One Monitoring Rpt at 49.) The establishment of a CQI system was "an integral" part of Period One capacity building because it not only provides a crucial framework for informing management decisions, but is "an indicator of [D]efendants' capacity to sustain required reforms." (*Id.*) As the Period One CQI requirements were not met in Period One (*id.*), they became a part of the Period Two Implementation Plan (Period Two IP § I.3.a).

As reported by the Monitor, at the end of January 2010, three months after a CQI plan was required to be developed and implemented, DFCS submitted several documents purported to be its CQI plan. The Monitor deemed these documents internally inconsistent and inadequate to meet the requirement of a CQI plan. The Monitor found that during Period Two "[D]efendants did not implement a CQI system that meets the Settlement Agreement's requirements." (Period Two Monitoring Rpt at 54.) CSF has since generated a CQI plan. Not only is there no evidence that Defendants have the capacity to implement the plan, but Defendants concede that, "it is imperative that the CQI system have access to aggregate data to monitor and evaluate indicators and outcomes." (Nothenberg Decl. Ex. 6 [CQI Plan] at 16.) DFCS currently lacks the capacity to generate accurate and timely data upon which a CQI system can rely, and there are no viable plans to correct that deficiency in the foreseeable future. *See supra* § II.F.1.

**G.** **Defendants Have Violated And Continue To Violate Clear Fiscal Practices And Planning Requirements Of The Settlement Agreement And The Period Two Implementation Plan**

Also alleged in the complaint and borne out in the evidence established for trial, Defendants failed to take advantage of available federal funding and poorly administered their finances for years. The Settlement Agreement requires Defendants to maximize all available federal funding to reduce the financial burden the state must shoulder in caring for foster children. (Settlement Agreement § I.C.)

29

Defendants were required in Period One to assess actual and anticipated federal funding levels and create an implementation plan to increase federal funding. (*Id.* § II.A.7.a.)  Because Defendants failed in Period One to meet this requirement (Period One Monitoring Rpt at 13, 56), the assessment was required again in Period Two (Period Two IP § I.7.a).  Although the Monitor has identified bolstering federal funding maximization as "key" to accomplishing the reform effort (Period One Monitoring Rpt at 7), once again, Defendants failed to meet this requirement in Period Two (Period Two Monitoring Rpt at 68).  Defendants provided the Monitor with a draft Request for Proposal for an independent contractor to undertake the financial assessment, which the Monitor found to be insufficient, in part because it was inconsistent with the requirements of the very Period Two provision it was intended to satisfy. (*Id.* at 68.)

As admonished by the Monitor, "[t]his is a pivotal requirement.  Absent the resources and infrastructure that will enable Defendants to maximize federal funding, it is likely that the minimum requirements imposed by the Settlement Agreement will not be achieved." (*Id.* at 69.)  The failure by Defendants to take the very actions that have been identified as a crux to the rest of the reform effort is particularly inexcusable in light of the recent DFCS budget shortfall and the millions of federal dollars Defendants consistently fail to claim. (*Id.* at 69 n.233.)

## III.    DEFENDANTS HAVE FAILED TO MEET THE CONCRETE SETTLEMENT REQUIREMENTS DIRECTED AT REDUCING THE FREQUENCY AT WHICH CHILDREN ARE ABUSED AND NEGLECTED AFTER HAVING BEEN PLACED IN FOSTER CARE FOR THEIR PROTECTION

The Settlement Agreement and Implementation Plans are designed to rebuild a dysfunctional and damaging child welfare agency and to improve case practice so that foster children are protected from harm and provided with appropriate care and services.  The Agreement and Implementation Plans also include very specific actions that Defendants are required to undertake to address the fact that while in state custody too many Plaintiff Children

are subjected to the very types of abuse and neglect from which foster care is intended to protect them.  (*See* Nothenberg Decl. ¶¶ 4-6.)

### A.    Requirements Regarding The Investigation Of Maltreatment Remain Unmet

As an initial matter, Defendants were required in Period One to undertake an assessment of DFCS's practice of prioritizing, screening, assessing, and investigating reports of maltreatment of foster children.  (Period One IP § II.c.)  Because Defendants did not meet this requirement, it was incorporated into the Period Two IP.  (Period One Monitoring Rpt at 59-60.) CSF, which conducted the assessment in Period Two, found that there were significant deficiencies in manner in which DFCS undertook maltreatment investigations.  The deficiencies CSF identified included:

- investigations of reports of maltreatment in foster care do not appear to be initiated or completed in accordance with policy requirements.  Interviews with all required parties during the investigation process are either not consistent or not well documented;

- face-to-face contact by DFCS investigators with children during investigations does not appear to be consistent;

- DFCS investigators used a risk assessment tool that is not suited for the investigation allegations of foster care maltreatment; and

- DFCS failed to enforce the Settlement Agreement's prohibition on the use of corporal punishment on foster children.

(Nothenberg Decl. Ex. 3 [CSF Assessment] at 123, 129-30.)  These same deficiencies in DFCS's approach to the investigation of foster child maltreatment, especially the failure to undertake investigations within the required timeframe, were confirmed by the Monitor in her case record review of DFCS in-custody abuse and neglect reports.  (Period Two Monitoring Rpt at 76-77, 107-10.)

Although Defendants could not produce validated data regarding the timeliness of investigations during Period Two, the data they subsequently provided pursuant to the Bridge

Plan reflects that the failure to timely initiate abuse investigations remains rampant.  According to that data, just a little over half of all maltreatment investigations statewide were initiated within 24 hours of being received.  (*See* Dobies Aff. Ex. 2 [Bridge Plan Data Chart].)  Of course, when investigating reports of abuse, time is of the essence as bruises and memories rapidly fade.

When conducting an abuse or neglect investigation, it is crucial to know whether there have been previous maltreatment reports concerning the child or regarding the alleged perpetrator and whether any of those prior reports were confirmed.  Defendants are therefore required under the Period Two IP to immediately enter abuse reports into MACWIS, and DFCS investigators are to use MACWIS data to determine whether there have been prior reports of abuse in the family or of the subject child.  (Period Two IP § II.6.d.)  Yet, because of critical limitations in MACWIS and the failure by DFCS management to ensure that hotline workers transmit information of prior reports to investigators, DFCS continues to investigate allegations of child abuse and neglect without the information necessary to make informed decisions as to the safety of a child, in violation of its court-ordered obligations.  (Period Two Monitoring Rpt at 99-100; Nothenberg Decl. ¶ 131.)

A sampling of the reports of maltreatment summarized by the Monitor make clear the real and present harm to which Plaintiff foster children are subject, and the dangers associated with the continuing failure by Defendants to properly investigate such abuse.  (*See* Nothenberg Decl. ¶ 123.)  As documented by the Monitor, children in custody have been whipped with belts, paddles and spanking spoons, leaving marks and bruises; forced to sleep outside a group home overnight due to a curfew violation; and put in a choke hold, kicked, and had water thrown at them as punishment.  Moreover, not all of reports of foster child maltreatment were adequately

investigated, leaving Plaintiff Children at substantial risk of further harm. (Period Two

Monitoring Rpt at 78 n.281; Nothenberg Decl. at ¶ 132.)

**B.    Requirements Regarding The Immediate Safety Check Of At-Risk Children Remain Unmet**

Because of the danger to Plaintiff Children posed by the deficiencies in the way DFCS

conducts investigations, the Period One IP required DFCS to undertake a complete safety

review, including unannounced visits, of any placement with multiple reports of maltreatment.

(Settlement Agreement §§ II.B.4.i, II.B.4.j.) Defendants were further required to identify and

track any remedial efforts deemed necessary to address safety problems uncovered during the

review. (*Id.*) Defendants failed to conduct the required Safety Reviews in Period One, so the

requirement was incorporated into the Period Two IP. (Period Two IP §§ II.6.e, II.6.f.) Those

safety reviews, which were undertaken in Period Two, identified and addressed a number of

concerns regarding the safety of Plaintiff Children. (Period Two Monitoring Rpt at 103.) Yet,

Defendants failed to develop "[a] formal system for notification concerning urgent issues

identified during specific safety reviews" or "a system for tracking and ensuring that corrective

action related to the findings from the safety review are completed." (*Id.*) Moreover, in some

instances the safety reviewer did not identify obvious safety risks. (*Id*. at 106; Nothenberg Decl.

¶ 126.) The problematic manner in which some of these safety reviews were undertaken,

coupled with the failure to develop a system to ensure corrective action when safety concerns

were identified, undermines the very purpose of this requirement, which is to ensure that

Plaintiffs are, in fact, safe.

**C.    Requirements Regarding Child Abuse Intake Procedures Remain Unmet**

In an effort to bolster the manner in which DFCS undertakes child maltreatment

investigations, Defendants were required to assure that standardized decision-making criteria

were used for prioritizing, screening, and assessing all reports of the maltreatment of foster

children.  (Period Two IP § II.6.b.)  In an effort to comply with that requirement, Defendants

have established a single centralized hotline with dedicated staff to screen, prioritize, and assess

all reports of maltreatment made in the state using objective standardized criteria.  However,

Defendants' policy and practice regarding the intake of maltreatment reports expressly violates

the terms of the Settlement Agreement and the Period Two IP because "DFCS supervisors are

permitted to reconsider these screening decisions [made by hotline staff] in several

circumstances, including if staff in the DFCS county office have additional information that

might result in a change in the screening level."  (Period Two Monitoring Rpt at 98 (internal

quotations omitted).)

        This policy and practice by DFCS caseworkers of relying upon their own subjective

judgments to override screening decisions made by the hotline's intake workers is precisely what

the requirement for utilizing standardized decision-making criteria is intended to prohibit.  (*Id.* at

97-98.)  The management decision to allow such an override, despite the fact that it is prohibited

by the express terms of the Agreement and undermines the integrity of maltreatment

investigations, reflects a management team that is either not fully committed or not competent to

oversee the reform effort.

        **D.**    **Requirements That Defendants License All Unlicensed Foster Homes**
                **Remain Unmet**

        During the litigation, Plaintiffs established that DFCS placed numerous children in foster

care in unlicensed relative foster homes.  (Pls.' Mem. for Summ. J. Ex. 6 [Crabtree Expert Rpt]

at 47-48.)  This poses an obvious safety risk, since children are placed in homes with adults who

have never been screened or trained to serve as foster parents.  Accordingly, both the Settlement

Agreement and the Period One Implementation Plan included provisions requiring that by the

34

end of Period One Defendants develop an expedited licensing process to license relative caregivers, and that all foster care settings be screened prior to the placement of any foster child in the home. (Settlement Agreement §§ II.B.5.a, II.B.5.i, II.B.5.j; Period One IP § II.5.) As Defendants failed to meet these requirements during Period One, they were again included during Period Two. (Period Two IP §§ II.7.a-d.) Despite having more than two years to comply with these requirements, by the end of Period Two, Defendants had still failed to even develop a plan to ensure the speedy licensing of unlicensed caregivers, as required. (Period Two Monitoring Rpt at 116.) Defendants' failure to address this issue, given the severity of the risk to Plaintiff Children living in these unlicensed homes, demonstrates their unwillingness or inability to accomplish even the most basic strategic planning necessary to limit the risk to children in foster care.

    **E.**    **The Rate At Which Foster Children Are Abused Remains Unnecessarily High**

Although Defendants were unable to provide validated data regarding the rate of foster care abuse during Period Two, a number of data sources make clear that Plaintiff Children continue to suffer an unconscionable amount of harm while in Defendants' custody. The Settlement Agreement requires that by the end of Period Two the rate of abuse in foster care be 1.14% or lower, yet the preliminary data from the Children's Bureau of the Administration of Children and Families found the rate of abuse to be 1.72%, and the data provided by Defendants under the Bridge Plan reflected that 1.62% of the foster care population had been the subject of a substantiated report of abuse. (Nothenberg Decl. ¶ 136; Dobies Aff. Ex. 2 [Bridge Plan Data Chart].) In light of the fact that Defendants remain out of compliance with the maltreatment assessment and investigation case practice requirements of the Settlement Agreement as

previously demonstrated, it is very likely that the rate at which Plaintiff Children suffer

maltreatment while in DFCS custody is, in fact, even higher than reported.

In sum, Defendants' noncompliance is overwhelming.  The impact on Plaintiff Children

that results from being subjected to ongoing harm is incalculable.

## IV.    DEFENDANTS' MINIMAL REFORM EFFORTS DO NOT MEET ANY RECOGNIZED DEFENSE TO CONTEMPT

There can be no question that Defendants are in massive contempt of the Settlement

Agreement and the Period Two Implementation Plan.  As Plantiffs have established a *prima*

*facie* case, the burden now shifts to the Defendants to raise a defense that might persuade the

court to withhold the exercise of its contempt power.  *See Petroleos Mexicanos v. Crawford*

*Enters., Inc.*, 826 F.2d 392, 401 (5th Cir. 1987).  However, there are no recognized defenses that

Defendants can credibly avail themselves of here.  The Settlement Agreement and the Period

Two Implementation Plan both set out explicit obligations and can in no way be challenged as

vague or ambiguous.  *Cf. In re Baum*, 606 F.2d 592, 593 (5th Cir. 1979) (holding that court order

"must set forth in specific detail an unequivocal command") (citation omitted).  Further, a court

order is unlikely to be found to be ambiguous when it was "consented to by the contemnor."

*Cobell v. Babbitt*, 37 F. Supp. 2d 6, 16 (D.D.C. 1999).

Nor can Defendants challenge a contempt finding based on good faith.  The Supreme

Court has held that good faith is not a defense to civil contempt.  *See McComb v. Jacksonville*

*Paper Co.*, 336 U.S. 187, 191 (1949) (holding that absence of willfulness does not relieve from

civil contempt, because "[a]n act does not cease to be a violation of a law and of a decree merely

because it may have been done innocently").

Defendants have failed to substantially comply with virtually all the Period Two

obligations.  However, even if they had made more than the de minimus efforts they have here, a

36

finding of contempt would still be justified as partial compliance is not a defense to civil

contempt. "[T]he mere fact that a party may have taken steps toward achieving compliance is

not a defense to a contempt charge." *United States v. City of Jackson*, 318 F. Supp. 2d 395, 417

(S.D. Miss. 2002) (quoting *Sizzler Family Steak Houses v. Western Sizzlin Steak House, Inc.*, 793

F.2d 1529, 1534 n.5, 1535 (11th Cir. 1986) (rejecting partial compliance argument even though

defendant had cured or had taken steps to cure all violations reported at time contempt judgment

was entered)).

        Finally, Defendants here cannot contend that they are unable to comply with their

obligations.  In order to utilize an inability defense, a party must demonstrate that they are

presently unable to comply with the court order.  *United States v. Rylander*, 460 U.S. 752, 757

(1983); *see also United States v. Sorrells*, 877 F.2d 346, 348-49 (5th Cir. 1989) (noting that

defendant bears the burden of producing "credible" evidence establishing present inability to

comply with court order).  To raise an inability defense, the alleged contemnors must show: "(1)

that they were unable to comply, explaining why categorically and in detail, (2) that their

inability to comply was not self-induced, and (3) that they made in good faith all reasonable

efforts to comply."  *See, e.g.*, *Chicago Truck Drivers Union Pension Fund v. Bhd. Labor

Leasing*, 207 F.3d 500, 506 (8th Cir. 2000) (citations and internal quotations omitted); *In re

Galindo*, No. H-05-4384, 2006 WL 2168125, at *2 (S.D. Tex. July 31, 2006).  However, a pre-

existing inability is not a valid defense to civil contempt.  *See Oriel v. Russell*, 278 U.S. 358, 363

(1929) (noting that only a newly arisen inability may be considered).  To succeed on an inability

defense, an alleged contemnor must "go beyond a mere assertion of inability and establish that

he has made in good faith all reasonable efforts to meet the terms of the court order he is seeking

to avoid." *Commodity Futures Trading Comm'n v. Wellington Precious Metals, Inc.*, 950 F.2d 1525, 1529 (11th Cir. 1992) (citations and internal quotation marks omitted).

Defendants can put forward no facts to explain why they have been unable to comply with the Settlement Agreement and the Period Two IP.  Critically, budgetary constraints do not excuse Defendants' performance.  Federal courts have held that lack of funds cannot excuse constitutional violations nor contempt of court orders.  *McCord v. Maggio*, 927 F.2d 844, 847 (5th Cir. 1991) ("lack of funds is not a sufficient justification for neglect of a citizen's constitutional rights"); *Cabrera v. Municipality of Bayamon*, 622 F.2d 4, 7 (1st Cir. 1980) (affirming finding of civil contempt despite budgetary constraints).  Just as importantly, the Fifth Circuit has excused a party from contempt based on inability only extremely rarely, and in circumstances closer to true impossibility.  *See, e.g.*, *Nat'l Labor Relations Bd. v. Caroline Mills, Inc.*, 167 F.2d 212, 214 (5th Cir. 1948) ("[I]f [employer] has, in good faith, and not only pretendedly, gone out of business, the court will not hold it in contempt for not reinstating [discriminatorily discharged employee].").

Courts in numerous institutional reform lawsuits have found state officials to be in contempt in factual scenarios similar to this.  For example, in *LaShawn A. v. Kelly*, the federal district court overseeing a class action child welfare reform lawsuit held the child welfare agency of the District of Columbia in contempt because it was "radically out of compliance with the Court's orders."  887 F. Supp. 297, 313 (D.D.C. 1995).  The court specifically noted "[t]he virtual stoppage of adoption activity, the critical staffing shortages, the dearth of basic administrative supports, the severely delayed installation of the [child welfare computer system], and the inaction on revenue maximization."  *Id*. at 314.  Similarly, in *G.L. v. Zumwalt*, another child welfare class action, a federal district court found clear and convincing evidence of

contempt upon a showing of excessive and inaccurately counted caseloads, understaffing, inadequate foster parent training, insufficiently frequent visits of foster children by caseworkers, and a lethargic adoption process.  No. 77-0242-CV-W-1, slip op. at 30-33, 35-36, 38-43 (W.D. Mo. Dec. 7, 1992), attached as Exhibit J.  *See also City of Jackson*, 318 F. Supp. 2d at 417-19 (holding City of Jackson in contempt of consent decree prohibiting city from discriminating in housing decisions relative to handicapped persons because of city's denial of permit for shelter for abused and neglected handicapped children, and rejecting defenses of subsequent compliance and of good faith); *Carty v. Farrelly*, 957 F. Supp. 727, 744 (D.V.I. 1997) (holding governmental officials in contempt for failing to conform with most elements of settlement agreement requiring conditions at prison complex to be raised to constitutional minima and finding defendants noncompliant, despite improvements, because their efforts were isolated and superficial); *Lelsz v. Kavanagh*, 673 F. Supp. 828, 831-32, 863-64 (N.D. Tex. 1987) (holding defendants in contempt for failing to comply with settlement agreement governing state institution for mentally retarded persons because of, *inter alia*, unacceptable medical care, behavioral services, educational services, and number and training of staff; failure to provide appropriate individualized service planning; and unacceptable level of abuse and neglect).

As Defendants have no defense to contempt, and for all of the reasons detailed above, Defendants are in contempt of this Court's ordered Settlement Agreement and the Period Two Implementation Plan.

## V.    A RECEIVER IS NECESSARY TO REMEDY DEFENDANTS' CONTEMPT AND PROTECT PLAINTIFF CHILDREN FROM HARM

### A.    The Legal Standard For Receivership

In the Fifth Circuit, courts have "broad discretion in assessing sanctions" to remedy a finding of contempt.  *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 582 (5th Cir. 2005)

(citing *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 585 (5th Cir. 2000)).  The court

must "consider the character and magnitude of the harm threatened by continued contumacy, and

the probable effectiveness of any suggested sanction in bringing about the result desired."

*United States v. United Mine Workers of Am.,* 330 U.S. 258, 304 (1947).  Sanctions should be

"adapted to the particular circumstances of each case."  *Florida Steel Corp. v. Nat'l Labor*

*Relations Bd.*, 648 F.2d 233, 239 (5th Cir. 1981) (citations and internal quotations marks

omitted).  "Th[e] Court has power to grant any relief it deems necessary to address violations of

a consent decree, including remedies not identical to the terms of the decree itself." *United States*

*v. Alcoa, Inc.*, No. A-03-CA-222, 2007 WL 5272187, at *4 (W.D. Tex. Mar. 14, 2007), *aff'd*,

533 F.3d 278 (5th Cir. 2008) (citations omitted).

 The court's power to effectuate compliance with its orders includes the power to appoint

a receiver.  *Morgan v. McDonough*, 540 F.2d 527, 533 (1st Cir. 1976); *see also* Fed. R. Civ. P.

66.  "[I]t is abundantly clear that a court may appoint a receiver to force public officials to

comply with court orders."  *Dixon v. Barry*, 967 F. Supp. 535, 550 (D.D.C. 1997) (citations

omitted).  "Where more traditional remedies, such as contempt proceedings or injunctions, are

inadequate under the circumstances, a court is justified . . . in implementing less common

remedies, such as a receivership, so as to achieve compliance with a constitutional mandate."

*Shaw v. Allen*, 771 F. Supp. 760, 762 (S.D. W. Va. 1990) (citations omitted).  The appointment

of a receiver must be reasonable under the circumstances.  *See, e.g.*, *Morgan*, 540 F.2d at 533;

*Dixon*, 967 F. Supp. at 550 (citations omitted).

 Courts have appointed receivers to protect constitutional and statutory rights in a variety

of circumstances. *See generally Morgan*, 540 F.2d at 533.  For example, receiverships have been

used to remedy noncompliance in cases regarding prisons, water treatment plants, public

40

housing, mental health, and school desegregation, as well as child welfare.  *See, e.g.*, *Glover v. Johnson,* 934 F.2d 703 (6th Cir. 1991) (prisons); *Morgan v. McDonough*, 540 F.2d 527 (1st Cir. 1976) (school desegregation); *Dixon v. Barry*, 967 F. Supp. 535 (D.D.C. 1997) (mental health); *LaShawn A. v. Kelly*, 887 F. Supp. 297 (D.D.C. 1995) (child welfare), *aff'd sub nom. LaShawn A. v. Barry*, 107 F.3d 923 (D.C. Cir. 1996); *Shaw v. Allen*, 771 F. Supp. 760 (S.D. W. Va. 1990) (prisons); *United States v. Detroit*, 476 F. Supp. 512 (E.D. Mich. 1979) (water treatment plant); *Perez v. Bos. Hous. Auth.*, 400 N.E.2d 1231 (Mass. 1980) (public housing).

In determining whether there is a need for a receivership, courts have considered, among other factors, the inadequacy of available legal remedies and the probability that the harm to the plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment.  12 Charles Alan Wright, Arthur R. Miller, & Richard L. Marcus, *Federal Practice and Procedure* § 2983 (2d ed. 2010) (citing authorities).  "[T]he court should consider whether there were repeated failures to comply with the Court's orders . . . if there is a lack of sufficient leadership to turn the tide within a reasonable time period, whether there was bad faith, and whether resources are being wasted [and f]inally, . . . whether a receiver can provide a quick and efficient remedy."  *Dixon*, 967 F. Supp. at 550 (citations omitted).  The most significant factor in the decision to appoint a receiver is whether any other remedy is likely to be successful.  *Id*.; *Shaw*, 771 F. Supp. at 762.  In determining whether alternative remedies are futile, courts rely on demonstrated patterns of significant noncompliance on the part of local officials.  *See, e.g.*, *Petitpren v. Taylor Sch. Dist.*, 304 N.W.2d 553, 557 (Mich. Ct. App. 1981) (receivership is appropriate when "other approaches have failed to bring compliance with a court's orders, whether through intransigence or incompetence").

**B.**  **A Receiver Is The Only Effective Way To Protect Plaintiff Children From Future Harm**

    **1.**  **Defendants' Noncompliance Is Caused By Their Leadership And Management Failings**

As demonstrated above, Plaintiff Children remain at risk because Defendants' critical management failures have resulted in more than two years of overwhelming noncompliance with their obligations under the Settlement Agreement.  A receivership with authority to administer Mississippi's child welfare system is reasonable and necessary because Defendants have proven unwilling to undertake the strategic planning and implementation steps required to implement the Settlement Agreement's reforms.  As the Monitor noted in the Period Two Monitoring Report:

> [D]efendants' progress at the half-way mark has fallen significantly short of the Settlement Agreement's required schedule.  In fact, with the possible exception of a limited number of data reports generated within the past four-month period [after the conclusion of Period Two], *none of the basic management tools* contemplated by the Settlement Agreement are in hand.

(Period Two Monitoring Rpt at 4 (emphasis added).)

Despite multiple opportunities during Periods One and Two, Defendants have failed to comply with basic management and planning activities.  The Settlement Agreement and implementation plans required Defendants to devise step-by-step strategies in specific areas such as training and workforce development that would be the blueprint of how to initiate the reform process.  Yet Defendants have failed to outline the action steps, timelines, or financial resources necessary to address even one of these areas, let alone begin implementing such reforms.

Defendants were required to develop and begin implementing a number of plans during Periods One and Two but as found by the Monitor, these plans were submitted months after they were required to be produced, if at all, and even then were significantly deficient.  Of the eleven plans that Defendants were required to develop as the very initial steps in the reform effort, *not a*

*single plan* met the requirements of the Settlement Agreement.[10]  Seven were simply not done at all, whereas four were done so poorly as to not meet the requirements of the Agreement.[11]

For example, Defendants were required to develop and begin implementing a written plan to provide comprehensive child welfare pre-service and in-service training to all caseworkers and supervisors by September 1, 2009.  (Period Two IP § I.2.d.1.)  Defendants failed to submit a plan to the Monitor until January 22, 2010, and the plan that was eventually submitted did not meet Period Two requirements:

> Contrary to the plain language of this subsection, the [training] plan does not address action steps and timelines to hire and train staff, update the curriculum, or procure the additional resources needed to operate a program that can provide the training required by the Settlement Agreement.

(Period Two Monitoring Report at 39.)

Similarly, as the Monitor reported, the workforce plan eventually submitted by Defendants was not viable or realistic because it lacked any concrete action steps, "appear[ed] to rely on stale information related to recruitment and retention of caseworkers and [wa]s silent with respect to supervisory and support staff."  (*Id.* at 26.)  The Monitor found "of equal

---

[10] Workforce Plan (Period Two IP § I.2.a) not submitted on time and did not meet requirements (Period Two Monitoring Report at 26); Training Plan (Period Two IP § I.2.d.1) not submitted on time and did not meet requirements (*id.* at 39); Staff Qualification Plan (Period Two IP § I.2.c) not submitted on time and did not meet requirements (*id.* at 29); CQI Plan (Period Two IP § I.3.a) not submitted on time and Monitor did not assess (*id.* at 51-54); Foster Care Services Plan (Period Two IP § II.5.c.1) not developed (*id.* at 88); Independent Living Services Plan (Period Two IP § II.12.a) not developed (*id. at* 127); Resource Development Plan (Period Two IP § II.14.b) not developed (*id.* 131); Foster Parent Services Plan (Period Two IP § II.14.c) not developed (*id.*); Plan to Ensure Speedy Licensing of Unlicensed Caregivers (Period Two IP § II.7.b) not developed (*id.* at 116); Placement Process Plan (Period Two IP § II.7.e) not developed (*id.* at 117); Educational Services Plan (Period Two IP § II.10.b) not developed (*id.* at 123).

[11] The CQI Plan was eventually produced, but not until months after the conclusion of Period Two.  As of the filing of the Period Two Monitoring Report, the Monitor had been unable to review the plan to assess whether it met the requirements of the Period Two Implementation Plan.  (*Id.* at 51-54.)

concern" that the plan submitted by Defendants "ignore[d] the fact that DFCS does not have the infrastructure to achieve a net gain of 150 new professional staff" needed to fill existing caseworker and supervisory vacancies. (*Id.* at 27.) "A viable recruitment and retention plan would identify and consider the infrastructure limitations and present realistic hiring goals that are correlated to and informed by an infrastructure development strategy." (*Id.*)

Even if they had viable plans, Defendants still lack the basic administration and management tools needed to implement the requirements of the Settlement Agreement and Implementation Plans. Although Defendants now – two and one-half years after entering the Settlement Agreement – have a practice model developed by an outside expert which purports to be the centerpiece of their reform effort, there is no evidence that they have the resources, management, or staffing to implement the model. As made clear by the Monitor, "the plan will not be viable without the basic administrative and management tools and the other resources that are required by the Settlement Agreement, but not yet in place." (*Id.* at 9.) DFCS, as currently managed, has proven incapable of marshaling those resources.

For example, as Defendants have historically forfeited substantial federal funds, the Period One IP required Defendants to conduct an assessment of actual and anticipated federal funding levels and create a plan to maximize federal funding. (Period One IP § I.7.) Defendants failed to conduct that assessment (Period One Monitoring Rpt at 56), and the Period Two IP established an even more basic building block, requiring Defendants to simply *contract* for such an assessment and plan (Period Two IP § I.7.a). Yet Defendants failed to comply with this requirement as well, because they were incapable of drafting an adequate request for proposal consistent with the Implementation Plan requirements. (Period Two Monitoring Rpt at 68-69.) Without the basic tools to contract, Defendants are neither able to conduct the assessment and

develop the plan themselves nor to secure an external consultant to do so on their behalf. This failing has inevitably impeded the reform effort and the benefits it is intended to create for Plaintiff Children.

There is every indication that Defendants cannot institute the necessary reforms to comply with the Settlement Agreement and future implementation plans given their practices over the last two and one-half years. "Simply put, at this juncture, the [D]efendants do not have many of the basic tools in place to manage and promote the reform effort effectively and thereby provide a reasonable assurance the Settlement Agreement's requirements will be satisfied." (*Id.* at 7.)

### 2. Receivers Have Been Appointed In Similar Situations To Catalyze A Moribund Reform Effort

The Monitor found that Defendants made only sporadic and insufficient efforts to comply with their obligations during Period Two:

> In many instances, the [D]efendants made efforts to satisfy specific Settlement Agreement requirements, but as a general matter, *these efforts were belated*, and in some respects, *they were not minimally adequate*. In a few instances, there is *no evidence that [D]efendants made credible efforts to comply* with specific requirements by the end of Period [Two], including requirements that should have been satisfied during the first year of the reform process.

(Period Two Monitoring Rpt at 165 (emphasis added).) This finding mirrors the language of other federal courts where "insufficient, ineffective and untimely" efforts justified the establishment of a receivership. *See Dixon*, 967 F. Supp. at 540. Courts have appointed receivers in a multitude of other institutional reform lawsuits where, as in this case, there has been ineffective leadership and persistent noncompliance. For example, in *Plata v. Schwarzenegger*, the court established a receivership "to take control of the delivery of medical services to all California state prisoners" three years after the entry of a consent decree. No. C01-

1351, 2005 WL 2932253, at *1 (N.D. Cal. Oct. 3, 2005).  In appointing the receiver, the court

pointed to the lack of managerial leadership, lack of accountability, poor management of

expenditures, and the practically non-existent data management.  *Id.* at *3-4.  "The Court finds

that the [prison] leadership simply has been – and presently is – incapable of successfully

implementing systemic change or completing even minimal goals toward the design and

implementation of a functional medical delivery system."  *Id.* at *5.  The court also noted that a

large part of the problem was the lack of personnel, a chronically high vacancy rate, and the

defendants' inability to recruit qualified personnel.  *Id.* at *10-11.  Additionally, the court stated:

> While blame for the deplorable condition of prison medical care in
> the state can properly be attributed to multiple causes, there is a
> *single root cause* of this crisis: *an historical lack of leadership,
> planning, and vision* by the State's highest officials during a period
> of exponential growth of the prison population.

*Id.* at *29 (emphasis added) (citations omitted).  Three and one-half years later, the court noted

the significant improvements established by the receivership.  2009 WL 799392 (N.D. Cal. Mar.

24, 2009).

Other courts have similarly utilized receivers where the defendants have demonstrated a

lack of managerial competence.  *See, e.g.*, *United States v. Alisal Water Corp.*, 326 F. Supp. 2d

1010, 1013, 1023-24 (N.D. Cal. 2002) (appointing receiver where defendants lacked sufficient

managerial competence to comply and noting that determination to appoint receiver "focus[es]

on defendants' actual ability to manage their facilities in compliance with the law"); *Dixon*, 967

F. Supp. at 544 (appointing receiver over Commission of Mental Health Services because

defendant "has repeatedly been unable to comply with the Court's orders" and because of the

"persistent lack of leadership . . . that is focused on compliance"); *Gary W. v. Louisiana*, No. 74-

2412, 1990 WL 17537, at *32 (E.D. La. Feb. 26, 1990) (noting that in other cases where courts

46

appointed receivers "state or local officials had shown an inability to comply substantially with court remedial orders. . . . The findings in this case evince a similar pattern of ineffective leadership, an inefficient bureaucratic structure, and a plain inability of the defendants to get the job done in several critical respects.") (citations and internal quotations omitted); *Perez v. Bos. Hous. Auth.*, 400 N.E.2d 1231, 1237, 1251 (Mass. 1980) (citing "massive trouble with eliciting performance of injunctive orders" and "demonstrated inability of [] top level management to manage and operate [housing agency] adequately" and to carry out court orders in appointing receiver).

The use of receivers has been shown to be effective in the child welfare context. For example, in *LaShawn A. v. Kelly*, the court imposed a receivership over the District of Columbia's child welfare system four years after the entry of a consent decree in order to address "the very concerns that are foremost in the plaintiff and Monitors' mind, that is, infrastructure and leadership." 887 F. Supp. 297, 314 (D.D.C. 1995) (citation and internal quotation marks omitted). The court noted a "pattern of delay and inaction that has characterized this case for the last few years" and the "urgent need for a new, more fundamental approach to change." *Id*. at 315, 317. Likewise, in order to resolve an assertion of noncompliance and contempt in *Juan F. v. Rowland*, due to the defendants' "longstanding historical pattern of non-compliance with fundamental issues in the Consent Decree and Manuals," the parties agreed to transfer to a Task Force "all decision-making authority having a substantial impact on the safety and welfare of members of the *Juan F.* class, which authority is otherwise reserved solely to the Commissioner of [the Connecticut child welfare agency]."[12] Subsequently, the court monitor noted "the

---

[12] No. H-89-859 (D. Conn. October 7, 2003), Stipulation Regarding Monitoring Order, Docket No. 447 (attached as Ex. K); Pls' Mem. of Law in Opp'n to Defs' Mot. to Vacate Consent

tremendous progress that has been documented in meeting the Exit Plan Outcome Measures" during the Task Force's tenure.  (*Juan F. v. Rell* Exit Plan Quarterly Report, Docket No. 513, 6, attached as Exhibit M.)  Of the 22 outcome measures, 15 significantly improved while under the responsibility of the Task Force.  *Id.* at 5.  For example, before the creation of the Task Force, more than 30% of caseworkers had caseloads that exceeded the Exit Plan requirements.  Two years later, 100% of caseworker caseloads met those same requirements.  *Id.*

Receiverships have been similarly successfully in other institutional reform litigation where the agency has proven unable or unwilling to comply.  For example, in *United States v. Guam*, the court appointed a receiver after noting that "[t]he problem of a highly dysfunctional, largely mismanaged, overly bureaucratic, and politically charged solid waste system . . . is beyond correction by conventional methods."  No. 02-00022, 2008 WL 732796, at *1 (D. Guam Mar. 17, 2008).  The court noted the government's history of noncompliance with federal law, lack of financial commitment, historical failure of leadership, and lack of tangible progress.  *Id*. at *5-9.  Seven months later, the court praised the "remarkable" impact of the receiver and noted the "substantial progress" made under the receiver's management.  2008 WL 4682183, at *2 (D. Guam Oct. 22, 2008).  *See also Plata*, 2009 WL 799392, at *2-*3 (noting significant improvements during receiver's three and one-half year tenure).

In another federal lawsuit, *Morgan v. McDonough*, the First Circuit affirmed the entry of an order appointing a receiver due to the failure of school officials to fully integrate a public high school pursuant to a citywide desegregation plan.  540 F.2d 527, 529-30 (1st Cir. 1976).  The court noted that black students at the school "were not receiving a peaceful, desegregated education.  Rather, they were subject to insult, intimidation and continued segregation."  *Id.* at

---

Decree and Exit Plan Pursuant to Federal Rule 60(b)(5) Ex. F [Letter from Pls' Counsel to Monitor D. R. Sirry], Docket No. 619-6 at 9 (attached as Ex. L).

532 (internal quotation marks omitted).  In its order terminating the receivership two years later, the court noted the dramatic progress of the receiver in desegregating public schools and the absolute transformation of the school conditions.  *Morgan v. McDonough*, 456 F. Supp. 1113, 1115 (D. Mass. 1978).  The court noted: "Almost without exception, the[] problems [warranting the appointment of the receiver] have disappeared. . . . These favorable developments underlie the court's confidence that the fruits of the temporary receivership at South Boston High School will be preserved without continuing court intervention."  *Id.*  As these cases make clear, receivers can appropriately and successfully address the major obstacle to the reform effort here – a lack of effective leadership and managerial competence.

> **3.      Safeguards Built Into The Settlement Agreement Have Proven Ineffective At Ensuring Defendants' Compliance, And Alternative Remedies Will Be Futile**

Nothing short of the appointment of a receiver will be effective to address Defendants' significant management and leadership failures.  Various intermediate remedies that would be available to the Court to assist in the reform of the Mississippi foster care system and to build within DFCS the infrastructure necessary for a functioning child welfare system have already been incorporated into the Settlement Agreement yet have failed to ensure Defendants' compliance.  For example, the Settlement Agreement requires that the Parties develop annual implementation plans, which are tailored to reflect Defendants' past performance and which set forth in detail the specific steps that Defendants are to accomplish each year in order to develop needed infrastructure and to progress annually towards interim benchmarks and ultimate compliance.  As set out by the Monitor, "among other critical accomplishments, by this point in the remedial process, the Settlement Agreement contemplates that [DFCS] would have built key parts of the infrastructure necessary to initiate and advance the reform process," including:

- DFCS policies and practice guides would have been revised to conform to the requirements of the Settlement Agreement, and the training curriculum would have been updated to reflect these changes;

- a comprehensive and adequately resourced staff training program would have been underway; and

- plans along with a remedial process to address systemic deficiencies identified by the assessments of DFCS administrative and management functions and foster care services would have been developed.

(Period Two Monitoring Rpt at 2-3.) No additional planning, timelines, or remedial processes would assist Defendants in complying with their obligations, as those requirements are already built into the Settlement Agreement and have proven ineffective.

Additionally, explicitly built into the Settlement Agreement is the position of an independent Monitor, who is charged with validating the data provided by Defendants as evidence of compliance, conducting qualitative reviews of DFCS functioning, and issuing reports regarding her findings. (Settlement Agreement § VI.B.) Further, the Settlement Agreement requires that Defendants accept expert assistance from and become accredited by the Council on Accreditation. Under the first two Implementation Plans, COA was to provide expert guidance to assist DFCS in assessing its functioning in various practice areas and in developing plans to address identified deficiencies. Accordingly, additional technical assistance and court monitoring would not remedy Defendants noncompliance if imposed, as those are incorporated within the Settlement Agreement's requirements.

Yet despite all of these provisions specifically intended to create a sturdy infrastructure and provide the support upon which to create a functioning child welfare system, because of a lack of competent leadership, the reform effort has sputtered for years without ever creating the necessary foundation to achieve better outcomes for Plaintiff Children. In numerous instances courts eventually appointed receivers after first unsuccessfully instituting other interim

safeguards, such as appointing a monitor, mandating technical assistance, or creating

intermediate benchmarks. *See, e.g.*, *Dixon*, 967 F. Supp. at 549 (appointing receiver after first

unsuccessfully appointing special master and noting that special master's "limited power and

authority inhibited [his] ability to affect change" and institute reforms; also discussing failure of

technical assistance to improve conditions for classmembers); *Shaw v. Allen*, 771 F. Supp 760,

763-64 (S.D. W. Va. 1990) (appointing receiver in prison reform litigation after previous

contempt motion was resolved by appointing monitor with limited results); *Gary W.*, 1990 WL

17537, at *9, *29, *32 (finding appointment of receiver justified in lawsuit challenging out-of-

state institutionalization of children with disabilities, after previous unsuccessful orders

appointing monitor, appointing special master, and mandating timeline for compliance).

However, these are the very same safeguards that are already incorporated into the *Olivia Y.*

Settlement Agreement to no avail. A receiver is needed here because other measures commonly

used to remedy noncompliance are already built into the Settlement Agreement yet have proven

to be futile. *Cf. Dixon*, 967 F. Supp. at 550 (receiver appropriate if other remedies unlikely to be

successful); *Shaw*, 771 F. Supp. at 762 (same).

     Now is the time for a receiver to be appointed in order to institute the Settlement

Agreement reforms intended to protect children from harm. It is more than halfway through the

reform period with virtually no results. As the Monitor noted, "the parties must confront the fact

that at the end of this calendar year, there will be two years left in the required five-year reform

process, and there is an apparent misalignment between the Settlement Agreement's

requirements and the implementation strategy that the [D]efendants have adopted as well as the

results that the [D]efendants have achieved to date." (Period Two Monitoring Rpt at 166.) As

set forth above, because of Defendants' failures, children in Mississippi's foster care system

remain at risk of harm – the very same harms they complained of when filing their lawsuit in 2004.  Another court noted when appointing a receiver: "It is all too evident that the plaintiff children face great danger in the present system, and the Court intends for its ruling [appointing a receiver] to provide the children and the defendants with the opportunity to begin again." *LaShawn A.*, 887 F. Supp. at 317.  Plaintiff Children should not have to wait any longer to ensure that they are protected from harm by the very system charged with protecting them.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that this Court find that Defendants are in noncompliance with the Settlement Agreement and the Period Two Implementation Plan and in contempt of court, appoint a general receiver with full authority to administer Mississippi's child welfare system to bring it into compliance with the orders of this Court, and grant such other and further relief as this Court deems necessary and proper.


Respectfully submitted, this 5th day of October, 2010.


/s      Shirim Nothenberg
Marcia Robinson Lowry (MBN 43991 *pro hac vice*)
Shirim Nothenberg (MBN 43990 *pro hac vice*)
Jessica Polansky (MBN 45356 *pro hac vice*)
CHILDREN'S RIGHTS
330 7th Avenue, 4th floor
New York, New York  10001
Telephone: (212) 683-2210
E mail: mlowry@childrensrights.org

W. Wayne Drinkwater, Jr. (MBN 6193)
BRADLEY ARANT BOULT CUMMINGS LLP
One Jackson Place, Suite 400
188 East Capitol Street
Jackson, Mississippi  39201
Telephone:  (601) 948-8000

Facsimile:  (601) 948-3000
E mail: wdrinkwater@babc.com

John Lang (MBN 43987 *pro hac vice*)
    Attorney at Law
    60 East 42nd Street
    Suite 4600
    New York, NY 10165
    Telephone: (212) 300-0646
    E mail: john.lang@attorneylang.com

Christian Carbone (MBN 43986 *pro hac vice*)
John Piskora (MBN 44474 *pro hac vice*)
    LOEB & LOEB LLP
    345 Park Ave.
    New York, New York 10154
    Telephone: (212) 407-4000
    E mail: ccarbone@loeb.com

*Plaintiffs' Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on October 5, 2010, I electronically filed the foregoing Plaintiffs'
Memorandum Of Law In Support Of Their Motion For Contempt And For The Appointment Of
A Receiver with the Court using the ECF system, which sent notification of such filing to the
following:

> Dewitt L. ("Rusty") Fortenberry Jr., Esq.
> Kenya Key Rachal, Esq.
> Gretchen L. Zmitrovich, Esq.
> Ashley Tullos Young, Esq.
> BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC
> 428 I-55 North
> Meadowbrook Office Park
> Jackson, MS 39211
> (601) 351-2400
>
> Harold E. Pizzetta, III, Esq.
> Assistant Attorney General
> General Civil Division
> Carroll Gartin Justice Building
> 430 High Street
> Jackson, Mississippi 39201
>
> *Attorneys for Defendants Haley Barbour, et al.*
>
>
> /s      Shirim Nothenberg