# Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

OLIVIA Y., *et al*.                                                    PLAINTIFFS

v.                                              CIVIL ACTION NO.  3:04CV251LN

HALEY BARBOUR, as Governor of the State of Mississippi, *et al*.        DEFENDANTS

---

**THE COURT MONITOR'S REPORT TO THE COURT REGARDING
DEFENDANTS' PROGRESS TOWARD MEETING PERIOD 2 REQUIREMENTS**

---

**Table of Contents, Report Narrative,
Index to Exhibits, and Appendix: Exhibits 1A – 63H\***

**September 8, 2010**

\*Because a motion to file Exs. 36-47, 58, and 59 under seal was filed on September 8, 2010, these exhibits are not
included in the Appendix to this report.

# TABLE OF CONTENTS

I.     INTRODUCTION AND SUMMARY OF FINDINGS ................................2

     A. The First Implementation Plan ................................................4
     B. The Second Implementation Plan ...........................................5
     C. The Bridge Plan ...................................................................7

II.    BACKGROUND ....................................................................9

III.   METHODOLOGY .................................................................12

IV.   FINDINGS ............................................................................16

     A. Court Monitor's Findings Related to Settlement Agreement and Period 2
        Implementation Plan Requirements ........................................16

     Period 2 IP §I.1.a. .................................................................16
        Status of Progress, Period 2 IP §I.1.a. ..................................17
        Status of Progress, Period 2 IP §I.1.a., Relevant COA Standards ...............18
     Settlement Agreement §II.A.2.a. ..............................................18
        Status of Progress, Settlement Agreement §II.A.2.a. ...............18
     Period 2 IP §I.2.a. .................................................................25
        Status of Progress, Period 2 IP §I.2.a. ..................................26
     Period 2 IP §I.2.b. .................................................................28
        Status of Progress, Period 2 IP §I.2.b. ..................................28
        Status of Progress, Period 2 IP §I.2.b., Relevant COA Standards ...............28
     Period 2 IP §I.2.c. .................................................................28
        Status of Progress, Period 2 IP §I.2.c. ..................................29
     Settlement Agreement §II.A.2.c. ..............................................30
        Status of Progress, Settlement Agreement §II.A.2.c. ...............30
           Background Related to Settlement Agreement §II.A.2.c. ...............30
           In-Service Training ......................................................32
           Progress During Period 2 ..............................................33
     Period 2 IP §I.2.d.1. ..............................................................38
        Status of Progress, Period 2 IP §I.2.d.1. ...............................39
     Period 2 IP §I.2.d.2. ..............................................................39
        Status of Progress, Period 2 IP §I.2.d.2. ...............................39
     Period 2 IP §I.2.d.3. ..............................................................40
        Status of Progress, Period 2 IP §I.2.d.3. ...............................40
     Period 2 IP §I.2.d.4. ..............................................................41
        Status of Progress, Period 2 IP §I.2.d.4. ...............................41
           Background Related to Period 2 IP §I.2.d.4. ......................41
           Pre-Service Training for Caseworkers...............................42
           Pre-Service Training for Supervisors................................45
     Period 2 IP §I.2.d.6 ................................................................46

Status of Progress, Period 2 IP §I.2.d.6. ...........................................................46
Period 2 IP §I.2.d.7 ..........................................................................................47
   Status of Progress, Period 2 IP §I.2.d.7. ...........................................................47
   Status of Progress, Period 2 IP §I.2.d.1.-7., Relevant COA Standards.........49
Settlement Agreement §II.A.2.d. .....................................................................50
   Status of Progress, Settlement Agreement §II.A.2.d. ..................................50
Period 2 IP §I.2.e. ............................................................................................50
   Status of Progress, Period 2 IP §I.2.e...............................................................50
   Status of Progress, Period 2 IP §I.2.e., Relevant COA Standards ...............51
Period 2 IP §I.3.a. ............................................................................................51
   Status of Progress, Period 2 IP §I.3.a. ...............................................................51
Settlement Agreement §II.A.3.b. .....................................................................54
   Status of Progress, Settlement Agreement §II.A.3.b. ..................................54
Period 2 IP §I.3.c. ............................................................................................54
   Status of Progress, Period 2 IP §I.3.c. ...............................................................55
   Status of Progress, Period 2 IP §I.3.a.-c., Relevant COA Standards ...........55
Settlement Agreement §II.A.3.c. .....................................................................55
   Status of Progress, Settlement Agreement §II.A.3.c. ..................................56
Status of Progress, Period 2 IP §I.4.a., Relevant COA Standards .......................57
Settlement Agreement §II.A.5.d. .....................................................................57
   Status of Progress, Settlement Agreement §II.A.5.d. ..................................57
Settlement Agreement §II.A.5.e. .....................................................................59
   Status of Progress, Settlement Agreement §II.A.5.e. ..................................59
Period 2 IP §I.5.a. ............................................................................................60
   Status of Progress, Period 2 IP §I.5.a. ...............................................................60
Period 2 IP §I.5.b. ............................................................................................64
   Status of Progress, Period 2 IP §I.5.b. ...............................................................64
Period 2 IP §I.5.c. ............................................................................................66
   Status of Progress, Period 2 IP §I.5.c. ...............................................................66
Period 2 IP §I.5.d. ............................................................................................66
   Status of Progress, Period 2 IP §I.5.d. ...............................................................66
Period 2 IP §I.6.a. ............................................................................................66
   Status of Progress, Period 2 IP §I.6.a. ...............................................................67
   Status of Progress, Period 2 IP §I.6.a., Relevant COA Standards ...............67
Period 2 IP §I.7.a. ............................................................................................68
   Status of Progress, Period 2 IP §I.7.a. ...............................................................68
Period 2 IP §I.7.b. ............................................................................................69
   Status of Progress, Period 2 IP §I.7.b. ...............................................................69
Status of Progress, Period 2 IP §I.8., Relevant COA Standards ...........................69
Status of Progress, Period 2 IP §I.9., Relevant COA Standards ...........................70
Status of Progress, Period 2 IP §I.10., Relevant COA Standards .........................70
Period 2 IP §II.1. ..............................................................................................70
   Status of Progress, Period 2 IP §II.1..................................................................70
Period 2 IP §II.2.a.-d. .......................................................................................72
   Status of Progress, Period 2 IP §II.2.a.-d. ..........................................................72
Period 2 IP §II.2.e.-g. .......................................................................................74

Status of Progress, Period 2 IP §II.2.e.-g. ..................................................74
Settlement Agreement §II.B.1.e. ..................................................................79
    Status of Progress, Settlement Agreement §II.B.1.e. ...............................79
Settlement Agreement §II.B.1.f. ..................................................................80
    Status of Progress, Settlement Agreement §II.B.1.f. ...............................80
Settlement Agreement §II.B.1.g. ..................................................................80
    Status of Progress, Settlement Agreement §II.B.1.g. ..............................80
Settlement Agreement §II.B.1.h. ..................................................................81
    Status of Progress, Settlement Agreement §II.B.1.h. ..............................81
Period 2 IP §II.3.a. ......................................................................................81
    Status of Progress, Period 2 IP §II.3.a. ....................................................81
    Status of Progress, Period 2 IP §II.3.a,, Relevant COA Standards.............82
Settlement Agreement §II.B.2.d. ..................................................................82
    Status of Progress, Settlement Agreement §II.B.2.d. ..............................82
Settlement Agreement §II.B.2.e. ..................................................................82
    Status of Progress, Settlement Agreement §II.B.2.e. ..............................83
Period 2 IP §II.4.a.-c. ..................................................................................83
    Status of Progress, Period 2 IP §II.4.a.-c. ................................................83
    Status of Progress, Period 2 IP §II.4.a.-c., Relevant COA Standards...........84
Settlement Agreement §II.B.3.a.5. ...............................................................84
    Status of Progress, Settlement Agreement §II.B.3.a.5. ...........................84
Settlement Agreement §II.B.3.a.6. ...............................................................84
    Status of Progress, Settlement Agreement §II.B.3.a.6. ...........................84
Period 2 IP §II.5.a.1. and 2. ........................................................................85
    Status of Progress, Period 2 IP §II.5.a.1. and 2. .....................................85
    Status of Progress, Period 2 IP §II.5.a., Relevant COA Standard ..............85
Settlement Agreement §II.B.3.b.2. ...............................................................86
    Status of Progress, Settlement Agreement §II.B.3.b.2. ...........................86
Settlement Agreement §II.B.3.c.3. ...............................................................86
    Status of Progress, Settlement Agreement §II.B.3.c.3. ...........................86
Settlement Agreement §II.B.3.c.4. ...............................................................86
    Status of Progress, Settlement Agreement §II.B.3.c.4. ...........................87
Period 2 IP §II.5.b.1. ...................................................................................87
    Status of Progress, Period 2 IP §II.5.b.1. .................................................87
Settlement Agreement §II.B.3.d.4. ...............................................................87
    Status of Progress, Settlement Agreement §II.B.3.d.4. ...........................88
Period 2 IP §II.5.c.1. ...................................................................................88
    Status of Progress, Period 2 IP §II.5.c.1. .................................................88
    Status of Progress, Period 2 IP §II.5.c.1., Relevant COA Standard ............88
Settlement Agreement §II.B.3.e.3. ...............................................................88
    Status of Progress, Settlement Agreement §II.B.3.e.3. ...........................89
Settlement Agreement §II.B.3.e.4. ...............................................................89
    Status of Progress, Settlement Agreement §II.B.3.e.4. ...........................89
Period 2 IP §II.5.d.1. ...................................................................................90
    Status of Progress, Period 2 IP §II.5.d.1. .................................................90
Period 2 IP §II.5.d.2. ...................................................................................90

Status of Progress, Period 2 IP §II.5.d.2. ....................................................91
Settlement Agreement §II.B.3.f.6. ................................................................91
    Status of Progress, Settlement Agreement §II.B.3.f.6. ...............................92
Settlement Agreement §II.B.3.f.7. ................................................................92
    Status of Progress, Settlement Agreement §II.B.3.f.7. ...............................92
Period 2 IP §II.5.e.1. ...................................................................................92
    Status of Progress, Period 2 IP §II.5.e.1. ..................................................93
Period 2 IP §II.5.e.2. ...................................................................................93
    Status of Progress, Period 2 IP §II.5.e.2. ..................................................94
Period 2 IP §II.5.e.3. ...................................................................................94
    Status of Progress, Period 2 IP §II.5.e.3. ..................................................94
Period 2 IP §II.5.e.4. ...................................................................................94
    Status of Progress, Period 2 IP §II.5.e.4. ..................................................95
Period 2 IP §II.5.e.5. ...................................................................................95
    Status of Progress, Period 2 IP §II.5.e.5. ..................................................95
Period 2 IP §II.5.e.6. ...................................................................................95
    Status of Progress, Period 2 IP §II.5.e.6. ..................................................95
    Status of Progress, Period 2 IP §II.5.e., Relevant COA Standards ...............95
Settlement Agreement §II.B.4.k. ..................................................................96
    Status of Progress, Settlement Agreement §II.B.4.k. ..................................96
Period 2 IP §II.6.a. ......................................................................................97
    Status of Progress, Period 2 IP §II.6.a. ....................................................97
Period 2 IP §II.6.b. ......................................................................................97
    Status of Progress, Period 2 IP §II.6.b. ....................................................97
Period 2 IP §II.6.c. ......................................................................................99
    Status of Progress, Period 2 IP §II.6.c. ....................................................99
Period 2 IP §II.6.d. ......................................................................................99
    Status of Progress, Period 2 IP §II.6.d. ....................................................99
Period 2 IP §II.6.e. ....................................................................................101
    Status of Progress, Period 2 IP §II.6.e. ..................................................101
Period 2 IP §II.6.f. .....................................................................................104
    Status of Progress, Period 2 IP §II.6.f. ...................................................104
Period 2 IP §II.6.g. ....................................................................................106
    Status of Progress, Period 2 IP §II.6.g. ..................................................106
Period 2 IP §II.6.h. ....................................................................................110
    Status of Progress, Period 2 IP §II.6.h. ..................................................110
Period 2 IP §II.6.i. .....................................................................................111
    Status of Progress, Period 2 IP §II.6.i. ...................................................111
Period 2 IP §II.6.j. .....................................................................................111
    Status of Progress, Period 2 IP §II.6.j. ...................................................111
    Status of Progress, Period 2 IP §II.6.a.-j., Relevant COA Standards ........111
Settlement Agreement §II.B.5.l. ..................................................................112
    Status of Progress, Settlement Agreement §II.B.5.l. .................................112
Settlement Agreement §II.B.5.m. ................................................................112
    Status of Progress, Settlement Agreement §II.B.5.m. ...............................113
Settlement Agreement §II.B.5.n. .................................................................113

Status of Progress, Settlement Agreement §II.B.5.n. ................................113

Settlement Agreement §II.B.5.o. ................................................................113

Status of Progress, Settlement Agreement §II.B.5.o. ................................114

Settlement Agreement §II.B.5.p. ................................................................114

Status of Progress, Settlement Agreement §II.B.5.p. ................................114

Settlement Agreement §II.B.5.q. ................................................................115

Status of Progress, Settlement Agreement §II.B.5.q. ................................115

Period 2 IP §II.7.a. ....................................................................................115

Status of Progress, Period 2 IP §II.7.a. ..................................................115

Period 2 IP §II.7.b. ....................................................................................116

Status of Progress, Period 2 IP §II.7.b. ..................................................116

Period 2 IP §II.7.c. ....................................................................................116

Status of Progress, Period 2 IP §II.7.c. ..................................................116

Period 2 IP §II.7.e. ....................................................................................117

Status of Progress, Period 2 IP §II.7.e. ..................................................117

Period 2 IP §II.7.f. .....................................................................................117

Status of Progress, Period 2 IP §II.7.f. ...................................................117

Period 2 IP §II.7.j. .....................................................................................117

Status of Progress, Period 2 IP §II.7.j. ...................................................118

Status of Progress, Period 2 IP §II.7.a.-j., Relevant COA Standards .........118

Settlement Agreement §II.B.6.d. ................................................................118

Status of Progress, Settlement Agreement §II.B.6.d. ................................118

Period 2 IP §II.8.a. ....................................................................................118

Status of Progress, Period 2 IP §II.8.a. ..................................................118

Status of Progress, Period 2 IP §II.8.a., Relevant COA Standards.............119

Settlement Agreement §II.B.7.h. ................................................................119

Status of Progress, Settlement Agreement §II.B.7.h. ................................119

Settlement Agreement §II.B.7.i. .................................................................119

Status of Progress, Settlement Agreement §II.B.7.i. .................................120

Settlement Agreement §II.B.7.j. .................................................................120

Status of Progress, Settlement Agreement §II.B.7.j. .................................120

Settlement Agreement §II.B.7.k. ................................................................120

Status of Progress, Settlement Agreement §II.B.7.k. ................................120

Settlement Agreement §II.B.7.l. .................................................................120

Status of Progress, Settlement Agreement §II.B.7.l ..................................121

Settlement Agreement §II.B.7.m. ...............................................................121

Status of Progress, Settlement Agreement §II.B.7.m. ...............................121

Period 2 IP §II.9.a. ....................................................................................121

Status of Progress, Period 2 IP §II.9.a. ..................................................121

Status of Progress, Period 2 IP §II.9.a., Relevant COA Standards.............121

Settlement Agreement §II.B.8.d. ................................................................122

Status of Progress, Settlement Agreement §II.B.8.d. ................................122

Settlement Agreement §II.B.8.e. ................................................................122

Status of Progress, Settlement Agreement §II.B.8.e. ................................122

Period 2 IP §II.10.a. ..................................................................................122

Status of Progress, Period 2 IP §II.10.a. ................................................123

Period 2 IP §II.10.b. ......................................................................123
    Status of Progress, Period 2 IP §II.10.b. ...................................123
    Status of Progress, Period 2 IP §II.10.a. and b., Relevant COA Standards 123
Settlement Agreement §II.B.9.b. ...................................................123
    Status of Progress, Settlement Agreement §II.B.9.b. ................123
Settlement Agreement §II.B.10.f. ..................................................124
    Status of Progress, Settlement Agreement §II.B.10.f. ...............124
Settlement Agreement §II.B.10.g. .................................................124
    Status of Progress, Settlement Agreement §II.B.10.g. ..............124
Settlement Agreement §II.B.10.h. .................................................124
    Status of Progress, Settlement Agreement §II.B.10.h. ..............125
Period 2 IP §II.11.a. .....................................................................125
    Status of Progress, Period 2 IP §II.11.a ...................................125
    Status of Progress, Period 2 IP §II.11.a., Relevant COA Standards...........125
Settlement Agreement §II.B.11.e. ..................................................126
    Status of Progress, Settlement Agreement §II.B.11.e. ...............126
Settlement Agreement §II.B.11.f. ...................................................126
    Status of Progress, Settlement Agreement §II.B.11.f. ...............126
Period 2 IP §II.12.a. .....................................................................127
    Status of Progress, Period 2 IP §II.12.a. ..................................127
Period 2 IP §II.12.b. .....................................................................127
    Status of Progress, Period 2 IP §II.12.b. ..................................127
Period 2 IP §II.12.c. .....................................................................127
    Status of Progress, Period 2 IP §II.12.c. ..................................127
Status of Progress, Period 2 IP §II.13., Relevant COA Standards......................127
Settlement Agreement §II.B.12.d. .................................................128
    Status of Progress, Settlement Agreement §II.B.12.d. .............128
Settlement Agreement §II.B.13.i. ...................................................128
    Status of Progress, Settlement Agreement §II.B.13.i. ..............128
Period 2 IP §II.14.a. .....................................................................128
    Status of Progress, Period 2 IP §II.14.a. ..................................129
Period 2 IP §II.14.b. .....................................................................131
    Status of Progress, Period 2 IP §II.14.b. ..................................131
Period 2 IP §II.14.c. .....................................................................131
    Status of Progress, Period 2 IP §II.14.c. ..................................131
Period 2 IP §II.14.d. .....................................................................131
    Status of Progress, Period 2 IP §II.14.d. ..................................131
Period 2 IP §II.14.e. .....................................................................131
    Status of Progress, Period 2 IP §II.14.e. ..................................132
Period 2 IP §II.14.f. ......................................................................132
    Status of Progress, Period 2 IP §II.14.f. ...................................132
    Status of Progress, Period 2 IP §II.14.a.-f., Relevant COA Standards .......132
Settlement Agreement §III.A.2. .....................................................132
    Status of Progress, Settlement Agreement §III.A.2. .................132
Settlement Agreement §III.B.2. .....................................................133
    Status of Progress, Settlement Agreement §III.B.2. .................133

Settlement Agreement §III.C.2. ........................................................................133

    Status of Progress, Settlement Agreement §III.C.2. ...................................133

Settlement Agreement §III.D.2. ......................................................................133

    Status of Progress, Settlement Agreement §III.D.2. .................................134

Period 2 IP §III.1. ...........................................................................................134

    Status of Progress, Period 2 IP §III.1. ...............................................134

Period 2 IP §III.2. ...........................................................................................134

    Status of Progress, Period 2 IP §III.2. ...............................................134

B. COA Findings Related to COA Standards in Period 2 Implementation Plan. ...135

V.      CONCLUSION ......................................................................................164

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

OLIVIA Y., *et al*.                                                    PLAINTIFFS

v.                                          CIVIL ACTION NO.  3:04CV251LN

HALEY BARBOUR, as Governor of the State of Mississippi, *et al.*          DEFENDANTS

---

**THE COURT MONITOR'S REPORT TO THE COURT REGARDING
DEFENDANTS' PROGRESS TOWARD MEETING PERIOD 2 REQUIREMENTS**

---

This report sets forth the Court Monitor's ("Monitor") findings regarding defendants'
progress toward meeting the requirements of the January 4, 2008 Mississippi Settlement
Agreement and Reform Plan ("Settlement Agreement"), including the requirements contained in
the Period 2 Annual Implementation Plan ("Period 2 IP").  A draft version of this report was
provided to the parties for review and comment on August 5, 2010.  All written comments
regarding the draft were submitted to the Monitor by August 26, 2010.[1]  Based on the parties'
comments, it does not appear that there are any contested factual issues.  The Monitor has
considered the parties' comments, and to the extent appropriate, addressed them in this revised
report.

The report is divided into five sections.  The Introduction and Summary of Findings
section provides an overview of the progress that has been made since the time the Settlement
Agreement was approved by the Court.  The Background section describes how the Settlement

---

[1]  The Monitor conducted limited follow up investigation and has had several discussions with each party in response
to their respective comments.

Agreement is structured and presents the relevant procedural history. The Methodology section

explains the process used by the Monitor to evaluate defendants' progress. The Findings section

is divided into two parts. The first part presents the Monitor's assessment of the progress that has

been made toward meeting each of the Period 2 requirements. In addition, it summarizes the

Council On Accreditation's ("COA")[2] findings regarding the accreditation standards that the

defendants were required to meet during Period 2. The second part presents each specific COA

finding regarding whether the policy-related documents defendants were required to submit to

COA during Period 2 satisfied each of the applicable COA standards. The Conclusion is

followed by an Appendix that includes the report's exhibits, which, as appropriate, have been

redacted in the final version of the report to delete information that falls within the purview of the

August 5, 2004 Confidentiality Order.[3]

## I. __INTRODUCTION AND SUMMARY OF FINDINGS__

The Settlement Agreement anticipates that mandated reforms will be completed within a

five-year period, culminating in measureable outcomes that ensure the safety and well-being of

the children in defendants' custody as well as their placement in permanent and nurturing homes.

As of the filing date of this report, defendants are beyond the half-way mark in the reform

process, and they have been required to satisfy requirements in two annual implementation plans

and a short-term corrective action plan.

Among other critical accomplishments, by this point in the remedial process, the

Settlement Agreement contemplates that the Mississippi Department of Human Services

---

[2] COA is an independent, non-profit, accrediting organization that accredits human services entities, including public sector child and family services agencies.

[3] *See* Confidentiality Order, August 5, 2004. Several exhibits have been redacted and a motion to place certain exhibits (*i.e.*, Exs. 36-47, 58 and 59) under seal was filed along with this report. Thus, the exhibits that are the subject of the motion are not included in the Appendix to this report and will be filed under seal assuming the Court issues an order granting the pending motion.

("MDHS") Division of Family and Children's Services ("DFCS") would have built key parts of the infrastructure necessary to initiate and advance the reform process. Indeed, the Settlement Agreement anticipates that by now DFCS policies and practice guides would have been revised to conform to the requirements of the Settlement Agreement, the training curriculum for caseworkers and their supervisors would have been modified to reflect these changes, and a comprehensive and adequately resourced staff training program would have been underway. Also anticipated by the Settlement Agreement is that prescribed assessments of MDHS/DFCS administrative and management functions and foster care services would have been completed, plans to address issues identified by the assessments would have been developed, and a remedial process related to the findings from the assessments would have been ongoing to address systemic factors implicated in the reform process.

According to the Settlement Agreement, by the half-way mark, the defendants would have the fundamental management tools and resources in hand to inform, shape and direct the reform process. For example, the Settlement Agreement contemplates that for the past 18 months, the DFCS management information system ("MACWIS") would have been collecting appropriate data and generating accurate reports related to all of the Settlement Agreement's foster care services standards and a continuous quality improvement ("CQI") system would have been implemented. Moreover, by now, the Settlement Agreement anticipates that DFCS would have implemented a performance based contracting system as well as a program to maximize the federal funding needed to help subsidize the expansion of essential services for children and their families.

These and other required initiatives were designed to ensure the safety of the children in defendants' custody and to improve the array and quality of the services and supports provided to

them and their families. As described in this report, defendants' progress at the half-way mark

has fallen significantly short of the Settlement Agreement's required schedule. In fact, with the

possible exception of a limited number of data reports generated within the past four-month

period, none of the basic management tools contemplated by the Settlement Agreement are in

hand. This has critical implications for the sequencing and the pace of the mandated five-year

remedial process.

### A. **The First Implementation Plan**

The first implementation plan, referred to as the Period 1 IP, focused on building

defendants' capacity to achieve the goals and outcomes of the Settlement Agreement. It required

the defendants to establish a DFCS management team and build key elements of the DFCS

infrastructure through specifically defined initiatives and a prescribed planning process based on

assessments of administrative and management operations, including assessments of MACWIS[4]

and the DFCS service delivery system.[5] In most instances, the goals of these assessments were

to provide a baseline assessment of performance and to identify shortcomings in actual

performance relative to the Settlement Agreement's requirements. The Settlement Agreement

contemplates that the data derived from the assessments would have been used to inform plans

for various remedial strategies that were required to be implemented during Period 1 or Period 2.

Among other specific initiatives, the Period 1 IP also required the defendants to revise DFCS

policy and practice guides to conform to the Settlement Agreement and implement a performance

based contracting system.

---

[4] In addition to MACWIS, assessments of the workforce, training curricula, contracting practices, the CQI system, and fiscal and financial management were required by the Period 1 IP.
[5] Specific assessments of foster care services required by the Period 1 IP included reunification, independent living, foster care support, medical, dental and mental health services; case processing and practices related to termination of parental rights [hereinafter TPR], parent/child and sibling visitation and reports of child maltreatment; and, the array of DFCS placements.

The defendants made progress on a limited number of Period 1 requirements.  As described in the Monitor's June 2009 report, defendants restructured the DFCS executive management team to align it more closely with the principles of family-centered practice and reorganized the management structure of the agency from seven regions into 13 regions in order to strengthen accountability and more readily institute new management initiatives.[6]  As the result of a substantial budget increase, defendants enhanced DFCS social worker and supervisory staffing levels and most, but not all, required management positions were filled.  Moreover, defendants established, but did not adequately staff or resource, Training and CQI Units in DFCS.  There was also progress toward meeting many, but not all, initial COA accreditation requirements during Period 1.  However, at least in part because of the delay in establishing the DFCS executive management team, most of the Period 1 capacity-building and assessment requirements were not completed.  As a result they were incorporated into the Period 2 IP.[7]

**B. The Second Implementation Plan**

As this report demonstrates, during Period 2 the defendants filled the few remaining DFCS management vacancies and continued their efforts to increase caseworker and supervisory staffing levels.  Indeed, by May 31, 2010, 53 percent of DFCS caseworkers and 11 percent of their supervisors had been hired since 2008.  In the 12-month period ending April 30, 2010 alone, defendants hired 151 out of 620, or 24 percent, of the caseworkers employed by the agency at that time.  However, during Period 2 the defendants were not able to deliver required training to all newly hired caseworkers on a timely basis nor ensure that they had reasonable and consistent access to MACWIS, the system which stores each case record they are responsible to maintain.

---

[6]  *The Court Monitor's Report to the Court Regarding Defendants' Progress toward Meeting Period 1 Requirements* [hereinafter June 2009 Report], filed June 5, 2009, at 4.  Defendants also developed a career ladder to bolster the recruitment and retention of social workers.  The career ladder was approved, but it has not been funded.
[7]  *Id.*

The defendants improved their management of COA accreditation activities during Period 2. On a quarterly basis, DFCS staff submitted policies and related documents applicable to the 146 COA standards addressed by the Period 2 IP to COA in a timely fashion. All of the applicable standards that were not satisfied in Period 1 were satisfied during Period 2,[8] and with very few exceptions, all of the Period 2 COA standards were satisfied. According to the COA project director who evaluated whether the documents defendants submitted complied with the applicable COA standards, the DFCS submissions were made on a timely basis, generally very well done, and included the appropriate supporting documentation. In the limited instances in which COA required remedial action, the project director reports that the defendants were very responsive. COA does not conduct an assessment of actual practices until a later stage of the accreditation process.

In many instances the defendants made efforts to satisfy specific Period 2 requirements, but as this report establishes, as a general matter, these efforts were belated and at least in certain respects they were not minimally adequate.[9] In a few instances, there is no evidence that defendants made credible efforts to comply with certain specific Period 2 requirements,[10] including requirements that had been part of the Period 1 IP.[11]

The Monitor's June 2009 report emphasized that in order for the defendants to make measureable progress that could be sustained over time, it would be necessary for the defendants

---

[8]  Thirty-five standards that defendants did not meet during Period 1 were included in the Period 2 IP. COA found that defendants submitted documentation evidencing compliance or substantial compliance with 34 of the standards. COA determined one standard was not applicable to DFCS.

[9]  *See, e.g.,* narratives related to Period 2 IP §I.2.d.1. (submission of training plan that does not address the plain language of the applicable Period 2 requirement) *infra* pp. 38-39; Period 2 IP §I.2.c. (submission of a worker and supervisor qualification requirement plan that does not address most of the enumerated elements of the applicable Period 2 requirement) *infra* pp. 28-30; Period 2 IP §I.2.a. (submission of a workforce development plan that does not address most of the specified elements of the applicable Period 2 requirement) *infra* pp. 26-28.

[10]  *See, e.g.,* Period 2 IP §II.14.c., Period 2 IP §II.14.e., Period 2 IP §II.14.f.

[11]  *See, e.g.,* Period 2 IP §II.5.e.4. *infra* pp. 94-95 and Period 1 IP §II.3.f. (requiring adoption specialists); Period 2 IP §II.5.e.3. *infra* p. 94 and Period 1 IP §II.3.f. (requiring external adoption consultants).

to bolster the capacity of MDHS and DFCS administrative operations;[12] invest in the DFCS

workforce by funding and hiring a sufficient number of qualified employees and providing them

with the training and the equipment necessary to appropriately serve class members; and

implement CQI and performance management systems.  The Monitor's June 2009 report

addressed the critical need for substantial improvement in the quality and accuracy of the

information available to guide management decisions and promote improvements in individual

case practice.[13]  The report emphasized the need to address significant shortcomings in

MACWIS, so that it could produce accurate, complete and reliable data related to the

requirements in this case.  Except for the progress defendants have made increasing DFCS

staffing levels, none of these issues were resolved during Period 2.  Simply put, at this juncture,

the defendants do not have many of the basic tools in place to manage and promote the reform

effort effectively and thereby provide a reasonable assurance the Settlement Agreement's

requirements will be satisfied.

### C.  __The Bridge Plan__

Because of the shortcomings in defendants' performance during Period 2, a corrective

action process established by the Settlement Agreement was triggered.[14]  In June 2010, the Court

issued an order approving a Bridge Plan that was proposed by the parties.  The Bridge Plan is

limited to a four-month performance period that ended on September 1, 2010.  By its terms, the

Bridge Plan requires the defendants to demonstrate the capacity to implement a narrow subset of

unmet Period 2 requirements, including requirements for validated data reports corresponding to

a series of required performance measures.  In a July 23, 2010 status report, the Monitor found

---

[12]  These operations include functions related to federal revenue maximization, personnel processing and tracking, and contracting and procurement.

[13]  June 2009 Report at 7.

[14]  *See infra* pp. 10-11 for additional detail regarding this matter.

there was demonstrable progress in virtually all of the areas addressed in the Bridge Plan.  The

Monitor is required to report more fully on defendants' performance during the full four-month

term of the Bridge Period later this month.  Due to the efforts associated with completing this

report, and the volume of data implicated by the Bridge Plan, the Monitor anticipates filing a

motion to extend the current deadline for submission of her report on the Bridge Plan.

The Bridge Plan required the defendants to bolster their management and planning

capacity by contracting with the Center for the Support of Families ("CSF") for technical

assistance.  Defendants contracted with CSF during early 2009 to develop a practice model and

implementation plan that could serve as a framework for improving the quality of casework.  A

CSF executive manager, Jerry Milner, developed the practice model.  The model is intended to

promote child safety, permanency, and well-being through integrated processes that guide

casework.  Various legal requirements related to DFCS case practice, including requirements

imposed by the Settlement Agreement, are infused into the model.  Mr. Milner made

recommendations about the infrastructure necessary to support the practice model as part of a

comprehensive set of recommendations issued on September 30, 2009.[15]  DFCS policy and

practice guides, as well as staff training curricula, will require significant revisions to incorporate

the practice model.  Mr. Milner and other consultants from CSF are currently working with the

defendants on implementing the practice model in two regions on a pilot basis.

The practice model constitutes the centerpiece of defendants' reform strategy.

Defendants invested substantial executive-level attention and other resources during Period 2

developing the practice model and collaborating with CSF on initial implementation planning

initiatives.  These crucial activities were not captured by the Period 2 IP.  Defendants expect to

---

[15]  Mississippi Practice Model, Final Report [hereinafter Practice Model Report], September 25, 2009.

phase-in implementation of the practice model on a regional basis over a 48-month period that exceeds the Settlement Agreement's five-year timetable. Except for the fact that the timeline is inconsistent with the Settlement Agreement, the implementation plan that was developed for the practice model represents the first credible plan of action for improving the quality and consistency of case practice. However, the plan will not be viable without the basic administrative and management tools and the other resources that are required by the Settlement Agreement, but not yet in place.

In less than four months, at the end of the 2010 calendar year, there will be two years remaining in the anticipated five-year reform process. The parties must confront this fact and the issues outlined above as they consider options for the next steps in this remedial process.

## II.  **BACKGROUND**

The Settlement Agreement includes standards and outcomes the defendants are required to satisfy by January 4, 2013, through an incremental remedial process that measures progress in terms of annual benchmarks and interim milestones. Annual implementation plans, which the parties are required to develop jointly, are incorporated into the Settlement Agreement.[16] These plans measure progress over discrete time periods, according to clearly defined standards.

The first implementation plan, referred to as the Period 1 IP, extended from January 4, 2008 to April 30, 2009.[17] As detailed in the Monitor's June 2009 Report, the pace of progress

---

[16]  Settlement Agreement §I.B.

[17]  The parties filed a joint motion to extend the time to file the Period 2 IP. Agreed Motion for Consent Order Extending Time to File the Year Two Implementation Plan, December 30, 2008. In a consent order filed on January 6, 2009, the Court enlarged the deadline for filing the Period 2 IP to April 1, 2009 and extended the term of the Period 1 IP until such time as the Period 2 IP was signed by the parties and incorporated into the Settlement Agreement. Consent Order, January 6, 2009 ¶¶ 6-7. A March 27, 2009 consent order further enlarged the deadline for filing the Period 2 IP to May 1, 2009. The parties attempted to file the Period 2 IP on May 1, 2009, but due to technical difficulties related to the ECF system, it was not filed in the record until May 4, 2009. *See* Declaration of Technical Difficulties, filed May 4, 2009.

during Period 1 did not meet the Settlement Agreement's requirements.[18]  For this reason, the report noted that the defendants would need to accelerate and intensify their efforts to achieve the required systemic reforms within the Settlement Agreement's anticipated five-year timetable. Because MDHS/DFCS had a relatively new and promising leadership team, the Monitor concluded that substantial progress during Period 2 was likely if the reform initiative was adequately resourced and appropriately managed.[19]

Period 2 began on May 1, 2009 and ended on April 30, 2010.  An outline of the Monitor's preliminary findings related to Period 2 was submitted to the parties on February 12, 2010.  The outline indicated that as of mid-February 2010, the majority of Period 2 requirements had not been satisfied.  On April 9, 2010, pursuant to §VII.B. of the Settlement Agreement,[20] plaintiffs provided defendants with written notice of noncompliance with the Settlement Agreement and the Period 2 IP.  Thereafter, as contemplated by the Settlement Agreement, the parties finalized an agreement related to corrective action that is referred to as the "Bridge Plan."  The Court approved the Bridge Plan in an Agreed Order dated June 10, 2010.[21]

The Bridge Plan requires specified corrective action measures between May 1 and September 1, 2010, a time period that is referred to as the "Bridge Period."[22]  Assuming plaintiffs

---

[18] June 2009 Report at 2.
[19] *Id.*
[20] This provision states:

> If Plaintiffs believe that Defendants have failed to comply with any obligation under this Plan or an annual implementation plan, Plaintiffs will, prior to seeking judicial action to enforce the terms of this Plan or an annual implementation plan, give written notice of non-compliance to the State.  Within 30 calendar days of Plaintiffs' notice of non-compliance, Defendants shall submit a written response to Plaintiffs. Plaintiffs agree to work in good faith with the State to agree on necessary corrective actions and avoid enforcement action, and may not initiate court action for 60 days from the date of Plaintiffs' non-compliance notice.  However, in case of an emergency posing an immediate threat to the health or safety of youths, Plaintiffs may omit the notice and cure requirements herein before seeking judicial action.

Settlement Agreement §VII.B.
[21] Agreed Order [hereinafter June 10, 2010 Agreed Order], filed June 10, 2010.
[22] *Id.* at 1.

determine that the defendants substantially complied with the Bridge Plan, the parties will be required to negotiate the terms of the Period 3 Implementation Plan ("Period 3 IP"). However, in specified emergency circumstances, or if plaintiffs determine defendants are not substantially complying with any provision of the Bridge Plan, they may, without further notice, proceed with enforcement action. The Bridge Plan also recognizes that plaintiffs may proceed with an enforcement action for any violation of Period 2 requirements following the conclusion of the Bridge Period or following initiation of any enforcement action related to any provision of the Bridge Plan or related to specified emergencies.

A core requirement in the Bridge Plan is that defendants contract with CSF for additional technical assistance in management and planning activities associated with meeting the requirements of the Settlement Agreement and for a fiscal assessment related to federal funding. This requirement is intended to address key factors that contributed to the critical shortcomings in defendants' performance during Period 2. As noted above, defendants' efforts to implement the Bridge Plan have been bolstered by the involvement of consultants from CSF.[23] In a status report which addressed defendants' progress as of July 23, 2010, the Monitor found that there had been demonstrable progress in virtually all of the areas addressed in the Bridge Plan.[24] Pursuant to the Bridge Plan, the Monitor is required to submit a report on defendants' performance during the full four-month Bridge Period.

---

[23] *See* related discussion *supra* p. 8.
[24] Defendants' progress on the Bridge Plan is summarized in *The Court Monitor's Status Report to the Court Regarding the June 10, 2010 Agreed Order for Corrective Action* [hereinafter July 23, 2010 Report], filed July 23, 2010, at 4-6.

### III. __METHODOLOGY__

The Monitor's assessment of defendants' progress toward meeting Period 2 IP requirements included site visits to DFCS's regional and county offices[25] and the office of the private vendor responsible for operating the centralized statewide Hotline for reporting allegations of child abuse or neglect.[26] In addition, face-to-face interviews were conducted with over 60 MDHS and DFCS managers, supervisors and caseworkers[27] as well as Hotline supervisors and their staff. Structured telephone interviews with 40 newly hired caseworkers and supervisors also were conducted.[28] Foster and adoptive parents, service providers from private agencies that contract with DFCS, class members and their biological parents, attorneys and others who practice or work in the Youth Court, representatives from university social work programs, members of child welfare organizations and advocacy groups, representatives from COA,[29] and other public and private child welfare system stakeholders also were interviewed. The Monitor also attended meetings of foster parent support groups[30] and convened periodic meetings with the parties and COA representatives.

Informal status updates were provided by the defendants and their counsel on a periodic basis. In addition, defendants submitted two written status updates to the Monitor and Plaintiffs'

---

[25] Site visits to DFCS county offices during Period 2 included Alcorn, Hancock, Harrison, Hinds, Jackson, Jones, Lee, Rankin, Walthal, Warren and Yazoo counties.

[26] As explained *infra* pp. 97-101, 134-135, during Period 2 defendants contracted with a vendor to operate a centralized Hotline for the intake and screening of abuse and neglect reports.

[27] Structured face-to-face interviews were conducted between October 7, 2009 and May 25, 2010 with over 60 DFCS staff and managers. Some staff and managers were interviewed on multiple occasions. Although a number of interviews were conducted in less than one hour, many were several hours in duration.

[28] The telephone interviews were conducted following the conclusion of Period 2, during late June and July 2010.

[29] As explained *infra* pp. 135-136, pursuant to the Settlement Agreement, defendants were required to achieve specific COA accreditation standards during Period 2.

[30] Meetings with foster parent groups during Period 2 were attended by the Monitor and two Mississippi-based consultants, Dr. Linda Southward and Stacy Ferraro, Esq., who have performed various monitoring activities during Period 2. Their credentials and experience are well-known to the parties and are set forth in the Appendix to this Report. *See* Ex. 1A, resume of Dr. Linda Southward; Ex. 1B, resume of Stacy Ferraro, Esq. Dr. Southward attended the majority of meetings with foster parent support groups in various regions of the state.

counsel on progress related to Period 2 requirements.[31]  Relevant documents, memoranda and

other records maintained by MDHS/DFCS were reviewed and analyzed, including the following:

electronic and paper case records for resource families and children in foster care and their

biological parents; serious incident reports ("SIRs"), including reports of maltreatment and

fatalities in care; maltreatment investigation reports; reports concerning safety reviews and

related records;[32] staffing and personnel data, including organizational charts and records related

to hiring and attrition; requests for proposals ("RFPs") and contract documents; foster care

review records and reports; training records, curricula and other documents concerning training

provided to caseworkers, supervisors and resource parents;[33] data related to MACWIS such as

monthly reports, change order requests and tracking information, a draft user manual, training

materials, and system assessments; policies and practice guides; personnel data, including

position descriptions, vacancy postings, and staffing rosters.  The Monitor reviewed federal audit

reports and related corrective action plans as well as defendants' submissions to COA and related

standards/memoranda prepared by COA.  The Monitor also consulted with various child welfare

system experts and other consultants during Period 2.

The Monitor conducted a case record review related to the Settlement Agreement's child

safety standards during Period 2.[34]  The case record review was based on an initial sample of 240

case records randomly selected from 797 reports of maltreatment of children in care statewide

during a one-year period.  Defendants were asked to submit to the Monitor all MACWIS reports

---

[31]  These updates did not provide fully accurate information about defendants' progress.  This shortcoming appears
related to deficits in defendants' capacity to manage their obligations in this lawsuit and monitor their progress.
Some of the corrective action undertaken during the Bridge Period is intended to bolster these capacities.  *See* July
23, 2010 Report at 5.
[32]  Defendants were required to conduct special safety reviews for foster homes and facilities that had received
reports of maltreatment within specified time periods.  Each review resulted in the issuance of a report, and it is these
reports that were reviewed and analyzed.  *See* Period 2 IP §II.6.e.-f. and *infra* pp. 101-106.
[33]  The term "resource parents" is used to refer to both foster and adoptive parents.
[34]  A preliminary summary of the findings from the case record review was provided to the parties on April 5, 2010.

of maltreatment of children in foster care between June 1, 2008 and June 30, 2009. Although defendants made substantial efforts to produce these reports, they acknowledged difficulties identifying all cases responsive to the request. As explained in Section IV.A. of this report,[35] the case record review revealed errors in the designation of some reports as reports of maltreatment of children in DFCS custody. For this reason, the Monitor is not confident that a complete list of all maltreatment reports entered in MACWIS during the review period was produced.[36]

Ultimately, defendants provided the Monitor with a final list that identified 797 reports of maltreatment of children in care recorded in MACWIS during the review period. A random sample of 240 case records selected from the 797 reports was assessed during the record review process.[37] Fifty-five of the 240 case records reviewed were excluded from the analysis because they did not meet the criteria for review.[38] The remaining 185 case records constitute a statistically valid sample designed to produce a $\pm$ 6.32 percent margin of error with 95 percent confidence in the results.

A structured instrument was used for data collection. The instrument was developed during 2009 by the Monitor in collaboration with the parties, their designees, and several expert consultants engaged by the Monitor to assist with this project.[39] Final revisions to the instrument were made after it was pilot-tested by DFCS staff and by the Monitor's staff and consultants.

---

[35] *See* Ex. 60, *infra* note 357.
[36] DFCS staff assigned to conduct safety reviews pursuant to Period 2 IP §II.6.e.-f. reported similar difficulties obtaining an accurate list of maltreatment investigations covering this and other time periods. *See infra* pp. 101-106 for the narrative related to the Period 2 safety review requirements.
[37] The term "case record" in this context refers to the electronic case record maintained in MACWIS and the corresponding paper record.
[38] For example, case records were excluded because they did not contain a report of maltreatment in care; there was no information in MACWIS about the intake; the report of maltreatment was screened-in (*i.e.,* accepted for investigation) but it was a duplicate report; the alleged perpetrator was a parent and the report was based on allegations that occurred during a trial home placement or an unsupervised visit; or, alleged abuse by a parent-perpetrator occurred before the child was in MDHS custody.
[39] The Monitor engaged Judith Meltzer, the co-director of the Center for the Study of Social Policy in Washington, D.C., to provide consultative services related to this project. Ms. Meltzer, an expert in child welfare systems, and

On September 14 and 15, 2009, a review team comprised of 13 DFCS employees[40] participated in an eight-hour training session on the instrument and the case record review process. The training curriculum was designed and facilitated by the Monitor's consultants in consultation with DFCS staff. The training focused on a review of the data collection instrument as well as the relevant navigation in MACWIS and in the paper case record. Trainees conducted an in-depth review of a sample case record in order to promote uniformity in the reviewer decision-making process.

During the review, all paper records were collected from the county offices and stored on-site at the MDHS state office under the supervision of a designated DFCS staff member. The paper records were inventoried and tracked by a designated member of the Monitor's staff. Case records were reviewed between September 22 and 30, 2009 by a seven-person team at the MDHS state office. The review process was supervised by a three-person quality assurance ("QA") team led by one of the Monitor's expert consultants, a member of the Monitor's staff and a DFCS manager with extensive experience supervising the DFCS case record review process. QA team members checked data collection instruments for completeness and consistency prior to data entry and analysis. All records reviewed by the review team were subject to a second review process by the QA team to ensure accuracy, consistency and an appropriate level of inter-rater reliability. The non-DFCS staff members on the QA team remained on-site until October 2, 2009 to conduct a supplementary review of the 55 excluded records.

---

two of her staff, Sarah Morrison and Rachel Joseph, have substantial experience conducting case record reviews in similar contexts. *See* www.cssp.org. In addition, a sociologist, Dr. Troy Blanchard, an associate professor at Louisiana State University, was also engaged to perform various statistical analyses related to the case record review. Dr. Blanchard's experience and credentials are set forth in the Appendix to this report. Ex. 1C, curriculum vitae of Dr. Troy Blanchard.

[40] The employees were selected by MDHS/DFCS management.

Subsequent to the on-site review, the data collection instruments were coded and analyzed using the standard Statistical Package for the Social Sciences ("SPSS") program. Apparent discrepancies revealed by the analyses required further review of certain case records to confirm or otherwise reconcile seemingly discrepant data. These supplemental reviews, which were conducted by the Monitor's staff, were successful in resolving questions about the data that emerged from the statistical analyses. Additional data analyses were conducted as a result of the supplemental reviews. The Monitor's findings from the case record review are presented in Section IV.A. of this report.

## IV.  <u>FINDINGS</u>

This section is divided into two parts. The first part presents the Monitor's assessment of the progress that has been made toward meeting each of the Period 2 requirements and also summarizes the COA findings regarding the accreditation standards that the defendants were required to meet during Period 2. The second part presents each specific COA finding regarding whether the policy-related documents defendants were required to submit to COA during Period 2 satisfied each of the applicable COA standards.

### A. Court Monitor's Findings Related to Settlement Agreement and Period 2 Implementation Plan Requirements

The Monitor's findings related to Period 2 requirements in the Settlement Agreement and the Period 2 IP follow below. All requirements are set out *verbatim* in bold type-face. The Monitor's findings are summarized in the narrative that appears below the entries for each requirement.

> **Period 2 IP §I.1.a.**
> **I.  Administration and Management Implementation Steps**
>   **1.  Agency Leadership and Administration**
>     **a.  With the exception of the MACWIS Director position, by September 1, 2009, DFCS will have filled all unit director positions with qualified**

individuals.  By November 1, 2009, DFCS will hire a qualified
MACWIS Director.

**Status of Progress, Period 2 IP §I.1.a.:**  As explained below, the MACWIS director and

an additional unit director were hired in advance of the required deadlines.  All of the remaining

positions were filled during Period 2, within several months following the prescribed deadline.

DFCS has three management levels: office directors, bureau directors, and division

directors.  During Period 1, defendants were required to hire a new DFCS director[41] and

assemble a management team capable of assisting with the reform efforts.[42]  A significant

recruitment effort was conducted and a new director, the MDHS deputy director for family and

children's services, began working at the agency in early September 2008.  At the end of Period

1, DFCS had 12 division director positions, four of which were vacant.  By June 2009, following

a reorganization and realignment process, the office director positions and nearly all of the

bureau director positions were filled.[43]  Pursuant to the Period 2 IP, except for the November 1,

2009 deadline for hiring the MACWIS director, defendants were required to fill the remaining

management vacancies by September 1, 2009.[44]

Defendants hired a well-qualified MACWIS director who began working at DFCS on

September 1, 2009, in advance of the specified November 1, 2009 deadline.  One additional

management vacancy was filled before the applicable September 1, 2009 deadline.[45]  The

---

[41]  Settlement Agreement §II.A.1.a. and b.
[42]  Period 1 IP §I.1.
[43]  The relevant background is detailed in the June 2009 Report at 21-23.
[44]  Data submitted by the DFCS personnel unit indicate the following division director II positions were vacant at the start of Period 2: evaluation and monitoring; congregate care and therapeutic placement; primary prevention; and tertiary services.  The data submitted also indicate that the contracts and grants management portion was filled on May 1 2009 and became vacant on June 30, 2010.  The November 2009 deadline for hiring the MACWIS director takes into account the difficulties defendants encountered identifying experienced candidates for this pivotal position.
[45]  According to a report submitted by the DFCS personnel unit, the division director for congregate care and therapeutic placements began employment on June 29, 2009.

remaining vacancies were filled by February 2, 2010.[46]  As would be expected in any large

organization, there has been turnover in some division director positions since the start of

Period 2.[47]

> **Period 2 IP §I.1.a.**
> **Relevant COA Standards:  PA-AM 2.01, PA-AM 3.04, PA-AM 6.01, PA-AM 6.02, PA-AM 7.01, PA-**
> **AM 7.02, PA-FC 5.**

**Status of Progress, Period 2 IP §I.1.a., Relevant COA Standards:**  Based on the

documentation submitted by defendants to COA, COA found the documents were in compliance

with six standards and in substantial compliance with one standard.  The COA's findings are

addressed in further detail in Section IV.B. of this report.[48]

> **Settlement Agreement §II.A.2.a.**
> **II.  Standards**
>     **A.  Administration and Management Standards**
>         **2.  Human Resources Management**
>             **a.  Workforce:**
>                 **By the end of implementation Period 2:**
>                 **10)  At least 50% of DFCS caseworkers shall carry a caseload that**
>                       **does not exceed Plan caseload requirements.  No more than**
>                       **20% of caseworkers shall carry a caseload exceeding twice the**
>                       **Plan caseload requirements.**
>                 **11)  No more than 20% of supervisors who are responsible for**
>                       **supervising DFCS caseworkers shall be responsible for**
>                       **supervising more than five caseworkers.**
>                 **12)  Supervisors will no longer be assigned primary responsibility**
>                       **for providing direct casework for any cases, unless under the**
>                       **extenuating circumstances exception as described above.**

**Status of Progress, Settlement Agreement §II.A.2.a.:**  Defendants have made notable

progress increasing caseworker and supervisory staffing levels since 2008.  This is a significant

accomplishment.  However, there is evidence of continued critical staffing shortages in some

counties, particularly counties with a high number of children in DFCS custody.  Moreover, the

defendants have not tracked and reported on caseworker and supervisory workloads as

---

[46]  The tertiary services position was filled on November 7, 2009; the evaluation and monitoring position was filled
on January 21, 2010; and the primary prevention position was filled on January 18, 2010.

[47]  For example, the division director for tertiary services recently assumed a bureau director position, leaving the
tertiary services position vacant.  Defendants reported recruiting efforts to fill that position as well as the division
director vacancy in primary prevention were ongoing.

[48]  *Infra* pp. 136-137.

contemplated by the Settlement Agreement and required by the Period 2 IP.[49]  Significant

limitations in data collection, recording and analysis systems, and practices related to caseworker

and supervisory workloads prevented the Monitor from making a determination about whether

Period 1 workload requirements were satisfied.[50]  These limitations, which are described in the

Monitor's June 2009 Report,[51] were not corrected during Period 2.  Accordingly, defendants

were required to submit validated workload data consistent with the Settlement Agreement's

requirements during the Bridge Period.[52]  The Monitor is evaluating the data that has been

submitted by the defendants and will report on this matter in her forthcoming report on the

Bridge Plan.  These issues are described more fully below.

Historically, as explained in the Monitor's June 2009 Report, an insufficient number of

caseworkers and supervisors has contributed to high caseloads, fueling attrition levels and

creating formidable recruitment challenges.[53]  This has had a critical impact on the ability to

serve class members adequately.[54]  The workload requirements in the Settlement Agreement

were intended to address DFCS's chronic staffing deficits by establishing four types of workload

limitations: 1) caseload ceilings for caseworkers with dedicated caseloads; 2) caseload ceilings

for caseworkers with mixed caseloads; 3) limitations regarding the maximum number of

caseworkers each DFCS supervisor may supervise; and 4) restrictions on supervisors providing

direct casework services.[55]

---

[49]  Settlement Agreement §II.A.2.a.; Period 2 IP §I.5.b.
[50]  June 2009 Report at 25-35.
[51]  *Id.*
[52]  June 10, 2010 Agreed Order at ¶ 7.a., Ex. App. 1-2.
[53]  June 2009 Report at n. 79 and related text.
[54]  *Id.* at n. 78.
[55]  Settlement Agreement §II.A.2.a.1.-2., 3.-6.

For caseworkers with dedicated caseloads, the Settlement Agreement lists eight unique service categories, each with different caseload requirements.[56]  Most DFCS caseworkers have mixed caseloads instead of dedicated caseloads.  For caseworkers with mixed caseloads, the Settlement Agreement identifies 11 distinct service categories and specifies the number of minutes per month that a case within each category should be allotted for purposes of calculating a caseworker's caseload.[57]  Each caseworker's mixed caseload may not exceed a total of 6,960 minutes of case-related work per month, which is computed according to the minute allotments that are prescribed by the Settlement Agreement for each service category.[58]

Because nearly all DFCS caseworkers carry mixed caseloads, defendants must track caseload data according to the 11 service categories and the corresponding minute requirements that are defined in the Settlement Agreement.  Defendants use MACWIS to record and track these data.  As explained in the Monitor's June 2009 Report, MACWIS enables defendants to track caseworker workloads according to 26 different service types.[59]  Five of the service types in MACWIS are for casework services not specified in the Settlement Agreement, and two additional service types are not used by DFCS employees.[60]  Caseworkers use the remaining 19 service types to record their work according to the categories reflected in the Settlement Agreement.  One casework service in the Settlement Agreement is not tracked, nor is it trackable

---

[56]  These categories are adoption, child protection, ongoing foster care, new application licensing, dedicated in-home protection, dedicated in-home dependency/prevention, dedicated renewal licensing, and dedicated abuse and neglect. Settlement Agreement §II.A.2.a.1.

[57]  The service categories identified for mixed caseloads are adoption, child protection investigation, foster care, licensing-new application, in-home dependency-protection, in-home dependency-prevention, licensing, general intake, intra-state home studies, inter-state compact for the placement of children [hereinafter ICPC], and courtesy interviews.  *Id.* §II.A.2.a.2.

[58]  For example, child protection investigations are allotted 484 minutes per case per month and foster care cases are allotted 507 minutes per case per month.  *Id.*  Although the Settlement Agreement defines what constitutes a case for purposes of the dedicated caseload calculation, it is silent about what constitutes a case for purposes of the generic caseload calculation.  *Compare Id.* §II.A.2.a.1. *with Id.* §II.A.2.a.2.

[59]  Ex. 1D, Draft – Reporting Workload Summary, August 18, 2008, excerpt pp. 1, 4.  The draft manual lists 25 service types.

[60]  This is based on information provided by MACWIS staff with substantial experience working with the system.

as a service in the current version of MACWIS.[61]  The table below, which is reproduced from the

Monitor's June 2009 Report, lists each of the Settlement Agreement service types with cross

references to the service types that DFCS's employees can record in MACWIS.

| Settlement Agreement Type | Minutes Per Month Required by Settlement Agreement | MACWIS Service Type | Minutes Assigned in MACWIS |
|---|---|---|---|
| Adoption | 807 | Adoption COS | 807 |
| Child protection investigation | 484 | Investigation Level 2; or | 480 |
| | | Investigation Level 3 | 480 |
| Foster care | 507 | Placement COR; and | 132 |
| | | Placement COS | 375 |
| | | -------------OR------------- | ------- |
| | | Placement R&S | 507 |
| Licensing | 470 | Resource Inquiry; and | 338 |
| | | Resource Home Study | 132 |
| In-home dependency—protection | 410 | Protective Service COR; and | 60 |
| | | Protective Service COS | 351 |
| | | -------------OR------------- | ------- |
| | | Protective Service R&S | 410 |
| In-home dependency—prevention | 275 | Prevention COR; and | 60 |
| | | Prevention COS | 215 |
| | | -------------OR------------- | ------- |
| | | Prevention R&S | 275 |
| Licensing—renewal | 191 | Resource Renewal | 191 |
| General intake | 59 | General Intake | 60 |
| Intra-state home studies | 282 | Court Ord Rltv Appl; or | 282 |
| | | ICPC Application | 282 |
| Interstate Compact for the Placement of Children (ICPC) | 106 | ICPC Incoming | 106 |
| Courtesy Interviews | 65 | Not captured in MACWIS | 0 |

In June 2009, the Monitor reported that there are at least two ways in which MACWIS

stores casework data that significantly reduce the accuracy of the data.[62]  First, MACWIS over-

counts caseload minutes for five of the services specified in the Settlement Agreement.[63]  For

these service groups, MACWIS does not pro-rate the number of minutes that a caseworker works

on a case according to the day of the month the case worker is assigned to the case and the day of

the month the caseworker closes the case.  Rather, if a caseworker's caseload includes an

assigned case that falls within one of these five service categories for one or more days in a given

---

[61]  Courtesy interviews are not tracked.
[62]  June 2009 Report at 31-33.
[63]  The services for which minutes are over-counted are: adoption, ICPC, foster care, in-home dependency prevention, and in-home dependency protection.

month, the caseworker's caseload calculation reflects the entire minute allotment for the case for that month. MACWIS's method of counting caseworker minutes results in an overstatement of the number of minutes used to calculate individual caseloads, which in turn could result in an understatement of the number of caseworkers working at or below the levels prescribed by the Settlement Agreement.

A second problem with the data collected in MACWIS that also is described in the June 2009 Report is that certain casework services are not accurately accounted for in all of the months a caseworker is assigned to and required to be working on a case. Specifically, the minute allocations for four categories of services[64] are not accounted for on a pro-rated basis or otherwise during each of the months a caseworker is assigned to one of these types of cases. Rather, the monthly minute allocation established by the Settlement Agreement is recorded in a caseworker's workload data only in the month that the case is closed in MACWIS. The minutes are not proportionately allocated across the months in which the case is assigned to the caseworker. If a caseworker began and completed the casework in a single calendar month, this would not create a problem. However, if the casework extended over two or more calendar months, as is often the case, the caseworker's workload data in MACWIS only would reflect the case assignment in the month the case was closed in MACWIS. Thus, in some months the caseworker's caseload would be under-counted, and in others it would be over-counted.

There are other limitations in how MACWIS stores caseload data, as well as in recording and analysis systems and practices that are described in the June 2009 Report. These limitations affected the accuracy of MACWIS workload data and defendants' ability to produce workload

---

[64] The service types that are not accounted for are: intra-state home studies, child protective investigations, licensing, and licensing-renewal.

reports that conform to the Settlement Agreement's requirements during Period 1.[65]  In an effort

to address some of these concerns, the Monitor recommended that the parties consider modifying

the Settlement Agreement's caseload requirements during Period 1.  Although negotiations

concerning a modification proposal were conducted during Period 2,[66] an agreement has not been

finalized.[67]  Moreover, the limitations in MACWIS that were described in the Monitor's June

2009 have not been corrected.

During the Bridge Period, defendants reported that they can now produce accurate and

validated workload reports that conform to the Settlement Agreement's requirements by relying

on data obtained for MACWIS and other sources.  Defendants have explained that they are

waiting for the caseload modification proposal to be finalized before changing how MACWIS

collects, records and analyzes workload data.  The Monitor expects to review defendants'

alternative methodology and report on this matter in her forthcoming report on the Bridge Plan.

Despite the limitations in MACWIS, defendants have made progress increasing staffing

levels for caseworkers and supervisors since 2008.  According to MDHS/DFCS staffing reports,

between July 1, 2008 and June 30, 2010 staffing levels for caseworkers and supervisors increased

in the aggregate by approximately 25 percent.[68]  Approximately 151 new caseworkers and five

---

[65]  For example, defendants report that the minutes allocated in MACWIS and reflected in the Settlement Agreement for adoption and placement cases do not reflect current business practice and result in inaccurate workload computations.  *See also* June 2009 Report at 33-34.

[66]  *Id.* at 34.

[67]  In the June 2009 Report, the Monitor noted that the Settlement Agreement's caseload requirements use caseworkers as the basic unit of analysis (*i.e.,* the percentage of caseworkers who are at or below defined workload standards).  This structure provides some incentive to distribute workloads among caseworkers in a manner that may satisfy the Settlement Agreement's caseload standards but undercuts improvements in case practice.  A modification to caseload requirements could address this issue and ensure a reasonable distribution of cases among caseworkers. Focusing on cases as the unit of analysis rather than caseworker workloads may provide a more direct and robust measure of whether cases are managed by caseworkers who have reasonable workloads.  *Id.* at 35 n. 104.

[68]  Ex. 2, Chart prepared by the Office of the Court Monitor, Caseworker and Area Social Work Supervisor Hiring, Attrition, and Workforce Size, FY 2007 - FY 2010.  This chart shows caseworker and supervisory staffing levels increased from 616 to 769 employees.  In addition, the chart reflects that for the last two fiscal years caseworker and supervisory hiring has outpaced attrition.  Based on DFCS data, it appears that the agency hired one new caseworker

new supervisors hired during Period 2 were employed at DFCS as of May 31, 2010.[69] As of May 31, 2010, DFCS had 142 supervisory staff and 620 caseworkers.[70] Fifteen percent of the supervisors and 66 percent of the caseworkers were hired since the end of the 2007 calendar year,[71] and in Period 2 alone 24 percent of the caseworkers and approximately four percent of the supervisors were hired.

As of May 31, 2010, there were five vacant supervisory positions and 153 vacant caseworker positions at DFCS. At the start of Fiscal Year 2011 ("FY11"), which began July 1, 2010, defendants changed the staffing pattern relative to Fiscal Year 2010 ("FY10") for caseworkers and supervisors. Defendants increased by 25 positions the number of funded, vacant supervisory positions and decreased by 35 positions the number of funded, vacant caseworker positions. To achieve the increase in supervisory positions, 25 of the 153 vacant, funded caseworker positions were converted to supervisory positions. Two other vacant caseworker positions were reallocated to MDHS/DFCS central office positions. Defendants also report that eight additional caseworker positions were eliminated as part of a legislative requirement to reduce the size of the DFCS workforce by 15 full-time employees in FY11.[72]

Defendants did not fill all funded caseworker and supervisory vacancies during Period 2. As of May 31, 2010, the average county caseworker vacancy rate was 17 percent,[73] and

---

or supervisor in FY 2008 but lost 97, hired 202 new caseworkers or supervisors in FY 2009 but lost 113, and hired 163 new caseworkers or supervisors in FY 2010 but lost 99.

[69] Ex. 3, Chart prepared by the Office of the Court Monitor, Number of Caseworkers and Supervisors Employed by MDHS/DFCS on May 31, 2010 Hired by State Between May 1, 2009 and April 30, 2010, by Year and Month Hired.

[70] Ex. 4, Chart prepared by the Office of the Court Monitor, Status of Caseworker and Area Social Work Supervisor Positions as of May 31, 2010 and July 22, 2010.

[71] Ex. 5, Chart prepared by the Office of the Court Monitor, Year that Area Social Work Supervisors and Caseworkers Employed by the State of Mississippi as of May 31, 2010 Were Hired. The MDHS/DFCS Personnel Unit was not able to provide data regarding the date each caseworker and supervisor began working at DFCS.

[72] *See* Ex. 4, *supra* note 70.

[73] Ex. 6, Chart prepared by the Office of the Court Monitor, Status of Caseworker Positions as of May 31, 2010, by County. This chart shows the number of vacant and funded caseworker positions in each county as of May 31, 2010.

the average supervisory vacancy rate was three percent.[74] Among the 20 counties that employ the largest number of caseworkers and supervisors, there were only two supervisory vacancies on May 31, 2010.[75] This shortage in supervisory positions helps to explain why DFCS reallocated 25 vacant caseworker positions to supervisory positions at the start of FY11.[76]

As noted above, defendants reported during the Bridge Period that they had developed an alternative method for calculating caseloads that does not rely exclusively on MACWIS data. According to defendants' calculations, as of May 31, 2010, notwithstanding increased hiring, there were significant staffing deficits in a number of counties, especially counties with high caseloads.[77] These deficits have continued.

> **Period 2 IP §I.2.a.**
> **I. Administration and Management Implementation Steps**
>   **2. Human Resources Management**
>     **a. Work force:**
>       **By September 1, 2009, Defendants shall develop and begin implementing a written Workforce Plan to recruit and retain sufficient DFCS professional and support staff as necessary to comply with the caseload requirements specified in section II.A.2.a of the Settlement Agreement. The Workforce Plan shall identify the specific steps, strategies, financial resources, and short- and long-term staffing goals with related timeframes that are necessary to meet the staffing requirements of the Settlement Agreement.**

---

[74]  Ex. 7, Chart prepared by the Office of the Court Monitor, Status of Area Social Work Supervisor Positions as of May 31, 2010, by County.  This chart also shows the number of vacant and funded supervisory positions in each county as of May 31, 2010.

[75]  One of the vacancies was in Harrison County, and one was in Desoto County.  However, defendants report that supervisory and other position vacancies may be reassigned among county offices on an as-needed basis.  Ex. 8, Chart prepared by the Office of the Court Monitor, Caseworker and Area Social Work Supervisor Positions, by Status, for 20 Counties Employing the Largest Number of MDHS/DFCS Staff.

[76]  Although the sample size is limited, it is noteworthy that five supervisors from four different counties (Harrison, Hinds Jones and Lee), out of the 16 supervisors from eight different counties who were interviewed face-to-face, reported supervising between six and nine caseworkers.  Moreover, four of six newly hired supervisors who were interviewed by telephone (two of whom were also interviewed face-to-face), reported supervising between six and eight caseworkers at the start of their supervisory tenure.

[77]  For example, according to data provided to the Monitor by the defendants on July 22, 2010, as of May 31, 2010, Hinds County had 29 caseworker vacancies out of 55 allocated positions, Harrison County had 10 caseworker vacancies out of 32 allocated positions, Jackson County had 10 caseworker vacancies out of 38 allocated positions, and Adams County had six vacancies out of 21 allocated positions.  Not surprisingly, caseworkers in these counties report having high caseloads.  Moreover, some supervisors have reported carrying their own cases to ensure cases are covered, or assisting with casework on specific cases to help overworked caseworkers.  One supervisor in Hinds County recently reported a current caseload of 20 cases as well as responsibility for supervising six caseworkers.

25

**Status of Progress, Period 2 IP §I.2.a.:** The Workforce Plan was not developed and implemented by September 1, 2009, as required. This finding is explained below.

A Workforce Plan marked "Draft," which states it was revised on January 20, 2010, was submitted to the Monitor on January 22, 2010.[78] The submission does not meet Period 2 requirements for the following reasons: 1) it does not address the number of professional and support staff necessary to meet caseload requirements; and 2) it does not correlate timeframes with specific steps, strategies, financial resources and short- and long-term staffing goals, as required. Moreover, the draft appears to rely on stale information related to recruitment and retention of caseworkers and is silent with respect to supervisory and support staff.[79]

Although certain recruitment and retention strategies are identified in the draft, they are not keyed to goals and action steps and thus do not indicate a viable plan was being developed. For example, the draft refers to the unfunded career ladder and realignment package as retention methods. Although approved by the State Personnel Board ("SPB") in 2008, the career ladder and realignment package were not funded. A viable plan would address the reasons why funding was not approved and outline the strategies and related action steps necessary to obtain funding that correspond to specific time periods. Alternative strategies to substitute for the incentive provided by the career ladder and realignment package, given the fact that funding has not been authorized, would also be described.[80]

---

[78] Ex. 9, MDHS-Division of Family and Children's Services, Workforce Plan, State Fiscal year 2010, DRAFT, revised as of 1/20/2010. The pagination of this document is not sequential. It goes from pages two to six and then continues with pages two to five; however, the document appears to be complete.

[79] The draft relies on information obtained from a poll of workers hired in 2008 as well as retention data from 2007 and 2008.

[80] The Monitor has analyzed salary data for both caseworker and supervisor positions. The Monitor's analysis of salary data for caseworkers employed by DFCS as of May 31, 2010 indicates the overall average salary for all caseworkers was $29,488. Among caseworkers hired since 2008, the average salary was $27,847. Ex. 10, Chart prepared by the Office of the Court Monitor, Average Salaries of Caseworkers Employed by MDHS/DFCS as of May 31, 2010, by Year Hired. This chart also depicts the average salary for caseworkers based on year hired. The analysis also revealed that the average overall salary for supervisors employed by DFCS as of May 31, 2010 was

Additionally, and of equal concern, the draft states the agency "feels very confident in its goal to fill the remaining vacant and frontline supervisor positions."[81]  However, the draft reports that there were a combined total of 150 vacant frontline and supervisory positions for the fiscal year ending June 30, 2010, and it ignores the fact that DFCS does not have the infrastructure to achieve a net gain of 150 new professional staff.  If attrition rates remain consistent with FY10 levels, DFCS would need to hire nearly 200 employees within six months to achieve a net gain of 150 employees.  A viable recruitment and retention plan would identify and consider the infrastructure limitations and present realistic hiring goals that are correlated to and informed by an infrastructure development strategy.  Indeed, retention goals are undermined by insufficiencies in the infrastructure to support existing and newly-hired personnel.  As explained more fully herein, these insufficiencies created significant challenges for the defendants during Period 2, contributing to delays in providing pre-service training,[82] a shortage of adequate office space and limitations in reasonable access to computer equipment and services for newly hired staff in at least some counties,[83] and persistent limitations in caseworker and supervisory access to MACWIS.[84]

---

$41,672.  Among supervisors hired since 2008, the average salary was $39,518.  Ex. 11, Chart prepared by the Office of the Court Monitor, Average Salaries of Area Social Work Supervisors Employed by MDHS/DFCS as of May 31, 2010, by Year Hired.  Like Ex. 10, this chart depicts the average salary for supervisors based on year hired.  In addition, the Monitor's analysis indicates that the average budgeted salaries for vacant caseworker positions as of May 31, 2010 was $27,721, which is commensurate with the salaries of caseworkers hired since 2008.  Ex. 12, Chart prepared by the Office of the Court Monitor, Average Salaries of MDHS/DFCS Caseworkers Hired by State in 2008-2010 vs. Average Budgeted Salaries for Caseworker Vacancies as of May 31, 2010.

[81]  *See* Ex. 9, *supra* note 78, at 4.
[82]  The delays in delivering pre-service training are described i*nfra* pp. 43-46.
[83]  These issues are addressed i*nfra* pp. 60-64, note 221.
[84]  *Id.*

**Period 2 IP §I.2.b.**
  **I. Administration and Management Implementation Steps**
    **2. Human Resources Management**
      **b. Supervisor Access:**
        **By July 1, 2009, caseworkers shall have access to a supervisor by telephone 24 hours a day.**

    **Status of Progress, Period 2 IP §I.2.b.:** This requirement has been satisfied. The current ASWS job description indicates that supervisors are required to be on-call on a 24-hour basis.[85] The Monitor's interviews with caseworkers and their supervisors in various DFCS county offices establish that on-call practices conform to this policy requirement. Generally, supervisory on-call schedules are established on a rotational basis and communicated to caseworkers who rely upon them to contact supervisors during weeknights and on the weekends, particularly with respect to new intakes.

**Period 2 IP §I.2.b.**
**Relevant COA Standards: PA-HR 3.01, PA-HR 3.02, PA-HR 6.01, PA-HR 6.02, PA-HR 7.01, PA-HR 7.03, PA-TS 3.01, PA-TS 3.03.**

    **Status of Progress, Period 2 IP §I.2.b., Relevant COA Standards:** Based on the documentation submitted by defendants to COA, COA found the documents were in compliance with five standards and in substantial compliance with two standards. COA did not evaluate one of the standards during Period 2. The COA's findings are addressed in further detail in Section IV.B. of this report.[86]

**Period 2 IP §I.2.c.**
  **I. Administration and Management Implementation Steps**
    **2. Human Resources Management**
      **c. Worker and Supervisor Qualifications:**
        **Defendants shall develop and begin to implement a plan with timeframes and specific action steps for bringing its current staff into compliance with the worker and supervisor qualification requirements mandated by section II.A.2.b of the Settlement Agreement and by COA standards, including PA-AS 13.02; PA-CPS 14.02; PA-AS 13.01; PA-CPS 14.01; PA-FC 19.01; PA-FC 19.05; and PA-CPS 10.02. Such plan shall be developed by September 1, 2009.**

---

[85] Ex.13, DHS-Area Social Work Supervisor, position description, at 5.
[86] *Infra* pp. 137-139.

**Status of Progress, Period 2 IP §I.2.c.:** The Worker and Supervisor Qualification Requirement Plan was not developed and implemented by September 1, 2009, as required. A Plan was submitted to the Monitor on January 22, 2010.[87] As explained below, the submission does not meet Period 2 requirements.

Neither timeframes nor specific action steps for bringing the current DFCS staff into compliance with the qualification requirements of the Settlement Agreement are included in defendants' submission. For example, the submission lists 13 bulleted topics under the title "Workforce Development Plans,"[88] but only some of these topics relate to strategies for bringing the current staff into compliance with the qualification requirements, albeit in a general way.[89] The required action steps and timelines related to these general strategies are not addressed by the Plan. Additionally, the draft includes "move away from hiring of related degrees" as an apparent goal, but it does not list the action steps necessary to accomplish this goal.[90]

Other topics listed under the "Workforce Development Plans" heading do not address qualification requirements. For example the draft cites "heavy recruitment strategies in critical needs counties (most severely understaffed regions VII-W, VII-E, V-E)" and "use part time positions to fill gaps in coastal counties – for resource development" under this heading.[91] These are not strategies that address the worker and supervisor qualification requirements.

---

[87] Ex. 14, Mississippi Department of Human Services, Division of Family and Children's Services, Worker and Supervisor Qualification Plan, January 21, 2010.

[88] *Id.* at 5.

[89] For example, among the 13 items, the following general strategies are listed: 1) continue professional enhancement program-reimburse costs of education; 2) offer more training opportunities to current staff; 3) enhance training to supervisors and provide strengthened ongoing training to supervisors; and 4) continue partnerships/contractual agreements with universities.

[90] *Id.*

[91] *Id.*

Settlement Agreement §II.A.2.c.[92]
II. Standards
    A. Administration and Management Standards
        2. Human Resources Management
           c. Training:
              By the end of implementation Period 2:
              7) All caseworkers shall receive a minimum of 40 hours of ongoing
                 in-service training each year, and all supervisors shall receive a
                 minimum of 24 hours of ongoing in-service training each year.

**Status of Progress, Settlement Agreement §II.A.2.c.:** This requirement was not

satisfied during Period 2 because DFCS does not offer comprehensive in-service child welfare

training to all caseworkers and supervisors as required by the Settlement Agreement. As

explained below, DFCS did not operate an in-service training program during Period 2. Instead,

the agency offered limited in-service training opportunities related to Settlement Agreement

requirements to caseworkers and supervisors. The few in-service courses offered by DFCS were

not integrated with, nor did they build upon, the pre-service training curriculum. And while

additional in-service training opportunities were offered to supervisors during Period 2, these

programs, which have some significant limitations, were not part of a cohesive and

comprehensive training program. Moreover, even if the in-service training program were

adequate, because defendants did not fully implement a required system to track staff

participation in training, neither the defendants nor the Monitor can determine readily what type

of training each individual DFCS caseworker and supervisor received during Period 2.

**Background Related to Settlement Agreement §II.A.2.c.**

The staff training program is essential to the reform effort.[93] The viability of the program

is contingent on several factors, including skilled leadership, experienced trainers, a

comprehensive curriculum (based on a clearly defined practice model, sound policy and practical

---

[92] The identical requirement is included in §I.2.d.5. of the Period 2 IP.
[93] The Monitor addressed the critical role training plays in her June 2009 Report. June 2009 Report at 39-41.

guidance, and CQI data), an adequate supply of instructional supplies and equipment, and the tools to track and monitor employee participation in such a program.[94]

The Settlement Agreement includes requirements addressing both pre-service and in-service training hours for caseworkers and supervisors.[95]  Pursuant to the Settlement Agreement, defendants are required to maintain a Training Unit that has "sufficient staffing, funding, and other resources to assure it can provide comprehensive child welfare training to enable all caseworkers, supervisors and other child welfare agency employees to comply with the relevant mandates of [the Settlement Agreement], DFCS policy, and reasonable professional standards."[96]

The Training Unit was understaffed during Period 1 and remained understaffed during Period 2, without the other resources necessary to deliver the comprehensive training required by the Settlement Agreement.  The impact of these deficiencies was exacerbated by the increased demands placed on the Training Unit by virtue of the fact that at least 15 percent of the total DFCS staff employed as of May 31, 2010 were hired during Period 2.[97]  As explained below, these limitations impeded progress toward meeting many, albeit not all, Period 2 requirements related to caseworker and supervisory training.

Defendants expected to increase staffing levels in the Training Unit by July 1, 2009, by adding 13 additional training coordinator positions, including six new trainers for each of the six new regions that were established during Period 1[98] as well as at least five additional trainers to

---

[94] These factors are referenced in the June 2009 Report.  *Id.* at 39.

[95] Settlement Agreement §II.A.2.c.2.

[96] *Id.* §II.A.2.c.1.

[97] *Compare,* Ex. 15, chart prepared by Office of the Court Monitor, Total MDHS/DFCS Agency Positions as of May 31, 2010, by Status, showing that as of May 31, 2010 there were 1204 positions allocated to the DFCS workforce of which 1008 were filled, *with* Ex. 16, chart prepared by the Office of the Court Monitor, Number of Employees Working for DFCS on May 31, 2010 Hired by State Between May 1, 2009 and April 30, 2010, by Year, Month, and Position.

[98] As described *supra* p. 5, during Period 1 defendants changed DFCS's administrative and management structure, expanding from seven to 13 regions.  June 2009 Report at 4.

conduct supervisory and resource worker training statewide.[99] The pre-service training capacity of the Training Unit was not augmented by either hiring staff to fill these additional positions, or supplementing in-house training capacity by other means, despite the high number of caseworkers and supervisors who were hired during Period 2. This increase in newly-hired staff presented considerable challenges for the DFCS Training Unit.[100]

As described more fully below, a required training plan was not developed, and there were substantial delays in conducting pre-service training for many newly-hired staff during Period 2.[101] The delays in training new staff had a significant impact on case practice in county offices that were understaffed. Moreover, staff report that class sizes often exceeded the number of students for which the training sessions were designed.[102] In addition to being understaffed, shortages of basic supplies and equipment exacerbated the challenges that confronted the Training Unit during Period 2.[103] Further, neither the in-service training program nor the tracking system required by the Settlement Agreement were implemented during Period 2.

**In-Service Training**

The Settlement Agreement's in-service[104] training requirements are set forth below:

> c. Training:
> 2) Subsequent to Court approval of this Plan, . . . all caseworkers shall
> receive a minimum of 40 hours of ongoing in-service training each

---

[99] *Id.* at 40-41.

[100] At the end of Period 2, the Training Unit had six trainers. An additional trainer position and a training supervisor position were both vacant throughout Period 2. As of July 26, 2010, the positions had not been filled. A supervisory position in the Training Unit also remained unfilled during Period 2. Thus, in addition to the six trainers, the Training Unit was staffed during Period 2 with one clerk, one e-learning manager, one curriculum designer, and one recruitment/university liaison. Although the e-learning position was filled, the defendants do not have an e-learning program. The Monitor has been informed that there is no current system capacity to support such a program.

[101] These matters are addressed *infra* pp. 43-46.

[102] According to staff, although the pre-service training classes for caseworkers are designed for 12 to 14 students, many enrolled nearly double that number during Period 2.

[103] According to staff, because basic supplies have been in short supply, it is not unusual for trainers to purchase supplies out-of-pocket. Staff report that there are significant delays in obtaining reimbursement. The June 2009 Report provides additional background related to these issues. June 2009 Report at 41.

[104] The Settlement Agreement uses the terms "ongoing in-service training" and "ongoing training" interchangeably to refer to in-service training. This report uses the term "in-service training" to refer to both.

> year; and all supervisors shall receive a minimum of 24 hours of
> ongoing in-service training each year.
> 3) The caseworker training shall be based on clearly identified learning
> objectives and culminate in competency-based testing, which will
> need to be successfully completed for the training to be credited.
> The curriculum shall be drawn from current research and data.

Settlement Agreement §II.A.2.c.2.-3.

Defendants were required to establish a Training Unit, complete the in-service training curriculum, and initiate in-service training for caseworkers and supervisors by the end of Period 1.[105] As described in the Monitor's June 2009 Report, the curriculum for the in-service training program was not developed during Period 1. Although the Training Unit was established, it offered very limited in-service training opportunities.[106] The Monitor's June 2009 Report noted that even if the curriculum had been finalized, unless the Training Unit was appropriately resourced, the defendants would be unable to administer and manage an in-service training program that meets Settlement Agreement requirements.[107]

In an attempt to address the staffing deficits in the Training Unit, defendants supplemented the DFCS in-house training capacity for an in-service training course that was offered statewide during the latter part of Period 2 by assigning responsibility for conducting the training to 14 DFCS staff members who were employed in either supervisory or family protection specialist positions.[108] As explained below, this practice is inconsistent with the intent of the Settlement Agreement.

### Progress During Period 2

As noted above, the Settlement Agreement requires defendants to maintain an adequately staffed Training Unit that delivers comprehensive training to the DFCS workforce.[109] The intent of this requirement is to ensure the Training Unit "can provide comprehensive child welfare

---

[105] Settlement Agreement §II.A.2.c.6.
[106] June 2009 Report at 44-45.
[107] *Id.*
[108] Some members of the DFCS Training Unit also provided this training.
[109] *Supra* p. 31.

training to enable all caseworkers, supervisors and other child welfare agency employees to comply with the relevant mandates of [the Settlement Agreement], DFCS policy, and reasonable professional standards."[110]  Because of the historical reliance on supervisory personnel to perform training functions, the Settlement Agreement and Period 2 IP expressly prohibit defendants from detailing[111] supervisory personnel of any type to the Training Unit to provide training.[112]

The in-service training curriculum was not developed during Period 2; however, a very limited number of in-service training courses for caseworkers and supervisors were offered through the Training Unit during Period 2.[113]  Defendants augmented the in-service training capacity of the Training Unit during Period 2 by assigning a group of 14 supervisors and family protection specialists to conduct training on quality visits for staff in their respective regions. Except for one staff member, this duty was assigned to these supervisors and family protection specialists in addition to their regular job responsibilities.[114]

Interviews with 11 of the 14 staff members who were assigned to provide the quality visit training during Period 2 indicate that the majority spent approximately two full weeks on this

---

[110]  Settlement Agreement §II.A.2.c.

[111]  The term, "detail," represents an administrative action whereby a staff member is reassigned temporarily to perform job duties that are outside of the duties specified in his/her job description.  A detail may be full-time or part-time.

[112]  Settlement Agreement §II.A.2.c.4.; Period 2 IP §I.2.d.3.  *See infra* p. 40 for the text of this Period 2 requirement.

[113]  According to the Training Director, a workshop in court procedures was provided for all staff statewide during the last quarter of 2009.  Moreover, the Training Director reports that 64 training sessions on quality visits were conducted for caseworkers and supervisors on a statewide basis.  As explained in the accompanying text of this report, in order to deliver the quality visit training, a group of 14 supervisors and family protection specialists were assigned to assist the Training Unit by conducting at least part of the training sessions.  An additional 18 sessions related to the federal government's child and family services review process were conducted for both caseworkers and supervisors.  Other training offered by the Training Unit during Period 2, such as MACWIS training for DFCS state-office staff, is not subject to the Settlement Agreement's in-service training requirements.

[114]  One of the staff members was relieved of other job responsibilities in anticipation of a position transfer to the Training Unit that did not materialize.

project.[115] Eight of the 11 staff members interviewed were supervisors, and three were family

protection specialists.[116] One of the family protection specialists reported carrying a caseload,

and at least two others had responsibility for conducting investigations related to allegations of

maltreatment in care. Several staff members reported difficulty juggling their regular job

responsibilities with the training assignment. Some staff members reported that they also were

assigned to provide in-service training related to Bridge Plan requirements to DFCS staff during

the Bridge Period.[117]

     The assignment of supervisory personnel to provide the quality visit training is

inconsistent with Period 2 IP §I.2.d.3., which is intended to ensure that training is not

accomplished at the expense of service delivery. Assigning supervisors to provide the quality

visit training in addition to their regular job duties diverts supervisors from their assigned duties,

a phenomenon that Period 2 IP §I.2.d.3 was crafted to eliminate. In addition, the assignment of

family protection specialists, especially those with case-related job duties, to conduct training in

their regions, is inconsistent with the intent of the Settlement Agreement's workload

requirements,[118] which were fashioned to ensure that caseworkers maintain a workload that

provides a reasonable assurance that the Settlement Agreement's minimum foster care services

standards are satisfied. Moreover, the practice of assigning supervisors and caseworkers to

conduct the quality visit training is also inconsistent with the intent of the Settlement

---

[115] The staff assigned to provide the training reported that during January 2010 they participated in a three-day training that addressed how to train the staff in their respective regions. Thereafter, the majority spent approximately eight to 11 work days delivering the training to DFCS staff. The training sessions were conducted during February and March 2010.

[116] All of the supervisors were Regional Area Social Work Supervisors, one of whom was serving as an acting Regional Director at the time of the assignment.

[117] The Bridge Plan required defendants to provide statewide training in maltreatment investigations and in development and implementation of safety plans to all caseworkers engaged in maltreatment investigations by September 1, 2010. June 10, 2010 Agreed Order at ¶ 7.b. The Monitor will address this requirement in her forthcoming report on the Bridge Plan.

[118] *See, e.g.,* Settlement Agreement §II.2.a.1.-2.

35

Agreement's training requirements, which contemplate that in-service training will be delivered by staff who are dedicated to this function.[119]

In October 2009, defendants revised DFCS training policy to reflect the hours designated for caseworker and supervisor pre-service and in-service training that are required by the Settlement Agreement.[120]  The policy was not finalized during Period 2, and as of August 2010, the final version of the policy had not been issued.  As explained below, the draft policy and current practice are not consistent with the Settlement Agreement's in-service training requirements.

Defendants currently permit caseworkers and supervisors to participate in external training courses, which are credited toward the fulfillment of their in-service training obligations.[121]  Guidance on the content of the external coursework for which credit may be received is limited.[122]  Staff are instructed that the coursework ". . . should be directly related to

---

[119]  Settlement Agreement §II.A.2.c.1., 4., 7.

[120]  Ex. 17, Excerpt from DFCS Policy Manual, Volume IV, Section A, Revised October 2009, Administration Staff Development/Training, pp.1024-1031.

[121]  The draft policy conforms to current practice, stating that staff  "are encouraged to attend on-going training courses, workshops and seminars from sources outside the Agency."  *Id.* at 1028.

[122]  According to the Training Director and other DFCS managers, staff receive instruction on these requirements that is consistent with the guidelines included in the draft policy.  In relevant part, the draft policy states:

> All caseworkers are required to obtain a minimum of 40 hours of on-going job-related training annually in order to remain eligible for their position. Caseworkers are to understand it is their obligation to maintain proficiency in the performance of their job duties by attending professional trainings and/or workshops.  They should further understand it is their responsibility to submit verification of such training to the DFCS Training Unit. Failure on the part of the caseworker to complete the 40 hours of annual training for any reason will be grounds for termination of employment.

> All Area Social Work Supervisors are required to obtain a minimum of 24 hours of on-going in-service training annually to remain eligible for their position. Supervisors are to understand it is their obligations to maintain proficiency in the performance of their job duties by attending professional trainings and/or workshops.  It is the responsibility of supervisors to submit verification of such training to the DFCS Training Unit. Failure on their part to complete the 24 hours of annual training for any reason will be grounds for termination of employment. No supervisory personnel shall be detailed to the Training Unit as an instructor; however, supervisory personnel are expected to mentor all staff they supervise.

> The following agency- sponsored trainings are mandatory for all DFCS workers annually:
> * Non-Violent Crisis Intervention Training
> * Age Appropriate Passenger Restraints System Training
> * Blood-borne Pathogens

36

an employee's present job duties and responsibilities or those which reasonably could be expected to be related in the near future."[123] This *ad hoc* approach is not contemplated by the Settlement Agreement. Indeed, the required reform process contemplates that the existing workforce will receive extensive in-service training on mandated changes in policies and procedures as well as on the practice skills necessary to achieve the Settlement Agreement's requirements. Participation in external courses that "relate" or "reasonably could relate to present job duties" does little, if anything, to advance these goals.

As noted in the Monitor's June 2009 Report, defendants offer additional in-service training to DFCS supervisors through mentoring and peer-to-peer learning programs. The mentoring program, which is offered for the first 24 weeks of employment, is intended for new supervisors. According to DFCS managers and supervisory staff, it has not been implemented consistently throughout DFCS's 13 regions. Some regions have implemented the model on a consistent basis, and others have not.[124] The peer-to-peer learning program, which is referred to as the Learning Lab, is provided through a contract with the University of Southern Mississippi ("USM"). The Learning Lab is offered to DFCS supervisors in six-hour sessions that occur approximately seven times per year. The Learning Lab is not integrated with the DFCS training program. It is designed to promote peer-to-peer learning opportunities, develop support networks among supervisors, and validate learning and supervision experiences. Staffing and other resources for the Learning Labs were not modified to support recent increases in DFCS

---

All other DFCS personnel shall annually receive, at a minimum, one training opportunity related to his or her job functions.
*Id.* 1027-1028.
[123] *Id.* at 1028. As noted *supra* note 122, defendants report that the revised draft of the training policy is consistent with instructions that staff received during Period 2.
[124] The program is based on an individual plan between a supervisor and her/his mentor. They are expected to meet face-to-face once each week for six months and monthly thereafter for an additional six-month period. The 24-week curriculum includes topics such as the transition from worker to supervisor, case review and case staffing, team development planning, time management and staff retention.

supervisory staffing levels.  Although the mentoring and the peer-to-peer learning programs may offer supervisors some training in some of the policies, procedures and practice skills necessary to achieving the Settlement Agreement's requirements, neither program is based on an in-service training curriculum that incorporates the Settlement Agreement's requirements.[125]

The in-service training courses offered by the DFCS Training Unit, and the additional in-service training that is provided for supervisors, represent a fractured approach to staff development.  The courses do not build on the pre-service training curriculum and are not integrated with each other.  Defendants report that they are working to address this limitation in the regions that are implementing the practice model.  In light of the incremental implementation of the practice model,[126] defendants must bolster the in-service training program for all staff on a much more expedited schedule in order to make the necessary advances in case practice that are contemplated by the Settlement Agreement's timetable.

Moreover, even if defendants operated an in-service training program that satisfied Settlement Agreement requirements during Period 2, they did not track staff training in a manner that would enable tracking and reporting as required by the Period 2 IP.  This matter is addressed in the narrative related to Period 2 IP §I.2.d.7.[127]

> **Period 2 IP §I.2.d.1.**
> **I.  Administration and Management Implementation Steps**
>     **2.  Human Resources Management**
>         **d.  Training:[128]**
>            **1)  By September 1, 2009, DFCS shall develop and begin implementing**
>                **a written plan to provide comprehensive child welfare pre-service**
>                **and in-service training to all caseworkers and supervisors in**
>                **accordance with the training requirements set forth in section**
>                **II.A.2.c of the Settlement Agreement.  The training plan shall**
>                **include action steps and timelines to hire and train staff, update the**

---

[125]  A review of the training materials used for these programs has identified some substantive limitations in the content of the training, including the failure to rely fully on current data and research in certain instances.

[126]  Implementation of the practice model is addressed *supra* pp. 8-9.

[127]  This provision is addressed *supra* pp. 47-49.

[128]  The on-going training requirements in §I.2.d.5. of the Period 2 IP are identical to the on-going training requirements in §II.A.2.c. of the Settlement Agreement which are addressed *supra* pp. 30-38.

> training curriculum, and to procure all additional resources needed
> to operate a training unit that delivers the training required by the
> Settlement Agreement.

**Status of Progress, Period 2 IP §I.2.d.1.:** The Training Plan was not developed and implemented by September 1, 2009, as required by this subsection. Although a plan was submitted to the Monitor on January 22, 2010,[129] it does not meet Period 2 requirements. Contrary to the plain language of this subsection, the plan does not address action steps and timelines to hire and train staff, update the curriculum, or procure the additional resources needed to operate a program that can provide the training required by the Settlement Agreement. Among other shortcomings in defendants' submission, the training plan states that the Settlement Agreement's in-service training requirements and its mandated system for tracking staff training are long-term goals.[130] The characterization of these requirements as long-term goals contradicts the express terms of the Period 2 IP, which establishes that both "goals" should have been met during Period 2.[131]

> **Period 2 IP §I.2.d.2.**
> I. **Administration and Management Implementation Steps**
>   2. **Human Resources Management**
>     d. **Training**
>       2) **DFCS will have revised the training curriculum to reflect the
>          updated Practice Guide and Policy Manual.**

**Status of Progress, Period 2 IP §I.2.d.2.:** As explained below, the training curriculum was not revised to reflect the updated practice guide and policy manual. Although some revisions in the training curriculum, practice guides and policy manual were made, defendants did not complete the comprehensive revisions to the DFCS policy manual and practices guides required by Period 2 IP §II.1.[132] This shortcoming is addressed by the Bridge Plan.[133]

---

[129] Ex. 18, 2010 Training Unit Plan, Division of Family and Children's Services.
[130] *Id.* at 4.
[131] Period 2 IP §I.2.d.1. and 7.
[132] This requirement is addressed *infra* pp. 70-71.
[133] June 10, 2010 Agreed Order at ¶ 7.c. and d.

The Settlement Agreement contemplates that the training curricula for caseworkers and supervisors would incorporate modifications to the DFCS policy manual and practice guides during Period 1. Because defendants did not revise the DFCS policy manual and practice guides and make the associated modifications to the caseworker and supervisor training curricula during Period 1,[134] these requirements were incorporated into the Period 2 IP. Thus, the Period 2 IP requires defendants to revise the training curriculum in light of required revisions to underlying policies and practice guides.[135]

Defendants revised some policies and practice guides during Period 2,[136] and made some modifications to the corresponding sections of the curriculum that are used for the pre-service training provided to caseworkers. However, because the comprehensive revision of the DFCS policy manual and practice guides required by the Period 2 IP was not completed during Period 2, defendants are required to implement corrective action related to the policy manual and practice guides during the Bridge Period.[137] Thereafter, defendants will be poised to modify the training curriculum.

> **Period 2 IP §I.2.d.3.**
> **I. Administration and Management Implementation Steps**
>     **2. Human Resources Management**
>         **d. Training**
>             **3) No supervisory personnel shall be detailed to the training unit to provide training.**

**Status of Progress, Period 2 IP §I.2.d.3.:** For the reasons set forth in the narrative related to Settlement Agreement §II.A.2.c.,[138] this requirement was not satisfied during Period 2.[139]

---

[134] Period 1 IP §II.; *see also* June 2009 Report at pp. 57-59.

[135] Period 2 IP §II.1., *infra* pp. 70-71.

[136] For example, the curriculum used for caseworker pre-service training was updated to include a new section, "The Social Worker's Guide to Family-Centered Practice."

[137] June 10, 2010 Agreed Order at ¶ 7.b.-c. The Monitor will report on this matter in the forthcoming report on the Bridge Plan.

[138] *Supra* pp. 30-38.

Period 2 IP §I.2.d.4.
I. **Administration and Management Implementation Steps**
  2. **Human Resources Management**
    d. **Training**
      4) **All new caseworkers and supervisors will complete their service training consistent with the Settlement Agreement requirements before they assume their respective responsibilities for carrying cases and supervising.**

**Status of Progress, Period 2 IP §I.2.d.4.:** The Period 2 IP requires that all caseworkers and supervisors complete the Settlement Agreement's pre-service training requirements before assuming their respective responsibilities for supervising and carrying cases. Limitations in the hiring data and training records produced by the defendants that implicate the requirements of Period 2 IP §I.2.d.7. affected the Monitor's ability to calculate precise compliance levels related to this subsection.[140] However, as explained below, the evidence that the Monitor has collected indicates that this requirement was not met during Period 2 for the following reasons: 1) the pre-service training curriculum does not satisfy the requirements of the Settlement Agreement; 2) caseworkers and supervisors did not receive the required training consistently on a timely basis; 3) there was an absence of written policy and clear direction regarding the specific case-related duties that caseworkers and supervisors could be assigned to perform prior to completing the training; and 4) in at least the relatively small number of instances identified by the Monitor, newly-hired staff were assigned to perform casework and supervise caseworkers before completing the pre-service training program.

**Background Related to Period 2 IP §I.2.d.4.**

The Settlement Agreement's substantive requirements concerning pre-service training for caseworkers and their supervisors, in relevant part, provide:

    c. Training:
      2) Subsequent to Court approval of this Plan, all new caseworkers hired by DFCS shall receive a minimum of 270 hours of pre-service

---

[139] As described *supra* pp. 34-36, supervisors were detailed to perform in-service training functions during Period 2.
[140] *See infra* pp. 47-49 for a summary of these limitations.

> training, including instructional training and supervised field training, prior to assuming any case responsibilities; all new caseworker supervisors hired or promoted by DFCS shall receive a minimum of 40 hours of in-service training directed specifically at the supervision of child welfare caseworkers prior to assuming any supervisory responsibilities; . . . .

Settlement Agreement §II.A.2.c.2.

As described in the Monitor's June 2009 Report, historically, DFCS caseworkers have been assigned to cases, and supervisors have been assigned to supervise caseworkers, before completing pre-service training programs.[141]  This began to change during Period 1, and there was continued progress during Period 2.  However, as explained below, additional progress is needed in order for this requirement to be satisfied.

### Pre-Service Training for Caseworkers

Defendants began to implement a 270-hour pre-service training program for all newly-hired caseworkers at the end of the 2008 calendar year.[142]  This training, which is referred to as the Child Welfare Professional Development ("CWPD") pre-service training,[143] is a 10-week course designed to deliver 270 hours of training.  The course consists of a four-week workshop of classroom instruction[144] and six weeks of on-the-job training ("OJT").

The CWPD training is designed to start with a three week OJT segment that is conducted by the caseworker's supervisor in the county office in which the caseworker is assigned.[145]

---

[141]  June 2009 Report at 42-44.

[142]  Defendants report that this training is also required for newly-hired supervisors who have not worked previously as caseworkers at DFCS.

[143]  The CWPD curriculum, including all instructional materials, trainers' manuals, associated PowerPoint presentations, tests and answer keys, has been reviewed by Dr. Linda Southward, a social work professional with over 30 years combined experience in social work practice, teaching and research, who has provided consulting services to the Monitor during the course of Period 2.  *See supra* note 30 and Ex. 1A for further information related to Dr. Southward's credentials and experience.  Dr. Southward also has reviewed the curricula used for the Learning Lab and for the mentoring training provided to DFCS supervisors.

[144]  Classroom time is 8:30 a.m. to 4:30 p.m., Monday through Thursday, and 8:30 a.m. to 2:00 p.m. on Fridays, with a one-hour lunch break each day.

[145]  Interviews with supervisors and caseworkers during Period 2 indicate that the OJT component of the CWPD training is not implemented uniformly, and in some instances it is not being implemented at all in various regions throughout the state.  Some supervisors responsible for providing this training to newly hired caseworkers reported that they were unaware of the existence of a training manual that they are expected to follow for the OJT component of the pre-service training.  These representations were corroborated during interviews with caseworkers.  Many

42

Following the OJT portion, the curriculum anticipates that caseworkers will begin the classroom component of the training, rotating on a weekly basis for the next seven weeks between the classroom instruction and the additional OJT segment in the county office in which they are assigned.[146]

The Period 2 IP requires caseworkers to complete pre-service training before assuming case-carrying responsibilities.[147] Defendants report that 12 CWPD workshops were conducted during Period 2.[148] The evidence shows that there were substantial delays between the time that caseworkers started employment at DFCS and the time they began the classroom component of the CWPD training.[149] During this period, and during the period that caseworkers participated in the classroom component of the training, the evidence indicates that in at least some counties newly-hired case workers performed clinical case-related work such as conducting home visits by themselves or with another newly-hired caseworker. In some instances new caseworkers were also assigned to conduct investigations and carry cases prior to completing the CWPD training successfully.[150] This practice has serious implications with respect to the quality of supervision

---

caseworkers indicated that they received little to no orientation at the start of their employment, and they described the OJT component of the training as unstructured.

[146] Dr. Southward identified limitations in the pre-service training curriculum that are unrelated to the failure to incorporate each of the Settlement Agreement's substantive requirements related to foster care services. For example, she found that there is a lack of continuity between the first three weeks of OJT and the first week of classroom training. The worksheets used for the first three weeks of OJT do not flow logically or sequentially from the activities in the field setting to the activities or objectives that are indentified by the curriculum and training guide for the first week of classroom training.

[147] Period 2 IP §I.2.d.4.

[148] According to Training Unit staff, the workshops were conducted in Hattiesburg, Canton, Gulfport, Tupelo, Greenville, Louisville, Greenwood, Mendenhall, and Oxford.

[149] During telephone interviews with 40 of 152 caseworkers hired by DFCS between May 1, 2009 and February 16, 2010, 17 of the 38 workers (45 percent) who knew the date they started training reported that over two months elapsed between their hire dates and the start of the classroom component of the CWPD training. Ex. 19, chart prepared by the Office of the Court Monitor, Months Between Hiring and Start of Training Reported by Caseworkers Hired Between May 1, 2009 and February 16, 2010, by Region, presents these findings in terms of DFCS region and the reported monthly intervals that elapsed between the hire date and the start of the classroom sessions. These delays appear consistent with information elicited during the course of face-to-face interviews with caseworkers, supervisors and Training Unit staff.

[150] During Period 2, training coordinators reported to DFCS managers that newly-hired caseworkers revealed that they had been assigned to conduct maltreatment investigations, carry their own cases, or visit children alone or with

43

and services afforded to children and families,[151] and also with respect to the accuracy of certain data recorded in MACWIS.[152]

This problem was brought to the attention of DFCS senior management by both the Monitor and by DFCS managers during 2009. And while it appears that defendants have taken steps to address at least some of the related data accuracy issues,[153] defendants have not issued a clear policy directive to supervisors and caseworkers which defines precisely what job duties newly-hired caseworkers may perform prior to the completion of the pre-service training program.[154]

It appears that several factors contributed to caseworkers being assigned to undertake case-related responsibilities for which they were unqualified prior to completing pre-service training during Period 2, including: the absence of clear policy guidance; the failure to implement

---

another newly-hired caseworker during the course of training sessions. In addition, the Monitor advised defendants that she had received similar reports during the course of face-to-face interviews with caseworkers in some county offices. In fact, four of 27 caseworkers from Hinds, Jones and Rankin counties who were interviewed face-to-face reported working on cases before completing pre-service training. Three of the four indicated that they had carried a caseload during this time period. During telephone interviews with 40 of 152 caseworkers hired by DFCS between May 1, 2009 and February 16, 2010, 10 workers (25 percent) reported that they received case-related assignments before completing the pre-service training program. These assignments ranged from shopping for children and providing transportation to conducting home visits, intakes, and maltreatment investigations. Ex. 20, Chart prepared by the Office of the Court Monitor, Reported Work Assignments for Caseworkers Hired Between May 1, 2009 and February 16, 2010 Prior to Completion of Training, shows the range of case-related assignments that were reported by the caseworkers who were interviewed.

[151] Newly-hired caseworkers who have not completed pre-service training are not qualified to carry caseloads, conduct investigations, or assume responsibility for many of the case-related services that they have been assigned to perform.

[152] For example, MACWIS records the visits with children that are conducted by caseworkers in each case that has been assigned to them. At a minimum, these visits can help to ensure the safety of children who are in DFCS custody if they are conducted by trained caseworkers who are appropriately supervised and who have developed a relationship with the children on their caseloads. The Settlement Agreement requires the assigned caseworker to visit each child on their caseload twice monthly and to document each visit. Settlement Agreement §II.B.10.f. In instances in which these visits are conducted by newly-hired caseworkers who have not completed their pre-service training, the data recorded in MACWIS does not appear to indicate that the visit was conducted by someone other than the caseworker assigned to the case.

[153] *See, e.g.,* Ex. 21, Practice Guidelines on Documenting Caseworker Visits with Children, issued in response to the data validation effort required by the Bridge Plan. This document was distributed to DFCS Regional Directors [hereinafter RDs] on April 28, 2010. The transmittal indicates that the RDs were instructed to provide the guidelines to both supervisors and workers on an immediate basis.

[154] Additionally, the Monitor has been unable to confirm whether there are standards for caseload assignments immediately following the completion of training. Newly-hired caseworkers in some counties have reported initial assignments to a very high number of cases.

the OJT component of the CWPD training curriculum in all regions; substantial delays between the date newly-hired caseworkers began working at DFCS and the date they completed the pre-service training; and the critical shortage of caseworkers in some county offices.

**Pre-Service Training for Supervisors**

During the latter part of 2008, a 40-hour pre-supervisory service training curriculum was developed for all new supervisors by DFCS in collaboration with the State Personnel Board ("SPB"). The training is designed to take place over a five-day period. The first four days of training are conducted by SPB staff and include instruction on basic supervisory skills. The fifth day, conducted by the DFCS training director, focuses more specifically on child welfare topics and DFCS practices.[155] Because newly hired and promoted supervisors continued to perform supervisory duties without participating in the pre-supervisory service training required by the Period 1 IP, the Period 2 IP requires the cessation of this practice.[156]

According to data provided by the DFCS personnel unit, at least five supervisors hired during Period 2 were working at the agency as of May 31, 2010.[157] A review of the training rosters maintained by the SPB for the pre-service supervisory training sessions conducted during Period 2 indicates that four of the five supervisors hired during Period 2 participated in the pre-service supervisory training.[158] The Monitor has identified two other DFCS employees subject

---

[155] The training is divided into five segments. A review of the curriculum indicates that most of the training is generic and applies to all state employees. One segment related to family-centered supervision is specifically geared to DFCS and addresses topics such as intake screening, safety assessments, individual service plans, supervisory administrative reviews, random moment surveys, and OJT for new caseworkers and supervisors. According to Dr. Southward, the segment applicable to DFCS includes a series of topics that cannot be addressed in appropriate depth in the time allotted.

[156] A review of the training rosters maintained by the SPB indicates that 70 percent of the 142 supervisors employed by DFCS as of May 31, 2010 participated in pre-service training between February 2009 and March 2010. An undetermined number of the other 30 percent of the supervisors employed at DFCS as of May 31, 2010 may have received the training during Period 1.

[157] *See* Ex. 3, *supra* note 69, for a presentation of the relevant data.

[158] These training sessions were conducted on May 18-22, 2009, June 1-5, 2009, September 28-October 2, 2009, January 11 and February 16-19, 2010, and March 22-26, 2010.

to the supervisory pre-service training requirements. According to the training rosters, both employees received the pre-service training.[159] Of the six supervisors who were trained, one reports that she was assigned to supervise caseworkers before she completed the pre-service supervisory training.[160]

> Period 2 IP §I.2.d.6.
> **I. Administration and Management Implementation Steps**
> **2. Human Resources Management**
> **d. Training**
> **6) Defendants shall implement competency-based testing to assess knowledge acquisition of newly hired staff following the completion of pre-service training, including newly hired or newly promoted supervisors following the completion of supervisory training. Training credit shall only be given to those new hires who demonstrate sufficient knowledge acquisition.**

**<u>Status of Progress, Period 2 IP §I.2.d.6.</u>:** The pre-service training for caseworkers and supervisors includes testing that staff are required to complete successfully.[161] The evidence establishes that defendants have implemented the testing component of the pre-service training. Dr. Southward has reviewed the testing that is conducted and concluded that it should be strengthened to ensure that trainees have acquired the basic competencies necessary to fulfill their job responsibilities, including competencies in interviewing, critical thinking skills, and documentation skills related to assessment and to preparing case summaries for submission to court. The Monitor expects to discuss Dr. Southward's assessment and recommendations with the parties in the near term.

---

[159] The two DFCS employees include a caseworker who was assigned to supervise in an acting capacity and received the pre-service supervisory training belatedly, and an additional supervisor hired during Period 2. It is possible that there were other supervisors who were either hired during Period 2, or who served as supervisors in an acting capacity, but were not identified by the Monitor.

[160] This supervisor, who has been working in an acting supervisory capacity since June 2009, did not participate in the pre-service supervisory training until the September 28 - October 2, 2009 training session. She reports that sometime before the training, she was assigned full supervisory responsibilities.

[161] The pre-service training for caseworkers includes testing after the first, second and third week of the classroom training. Testing related to the fourth week of classroom training is incorporated into the final pre-service training test. The supervisors are tested at the conclusion of the pre-service training classes. All tests are in multiple choice format.

**Period 2 IP §I.2.d.7.**
**I. Administration and Management Implementation Steps**
   **2. Human Resources Management**
      **d. Training**
         **7) Defendants shall implement a system to track staff participation in**
            **all required training.**

**__Status of Progress, Period 2 IP §I.2.d.7.__:** Because this requirement was not satisfied during Period 1, it was included in the Period 2 IP.[162] As explained below, although defendants have made some progress developing the requisite tracking system, such a system was not being operated by DFCS during Period 2.

Defendants report that by the end of Period 2 they were able to enter into MACWIS all pre-service and in-service training received by caseworkers and supervisors.[163] However, a major limitation is that MACWIS does not generate reports yet that can be used to track the pre-service and in-service training that each caseworker and supervisor is required to complete.[164] As a result, defendants cannot adequately assess and manage workforce training needs, much less conduct the type of planning that is necessary to comply with the Settlement Agreement's requirements. Defendants report that their efforts to generate these reports have been delayed due to the need to prioritize the processing of change orders associated with the data reports required by the Bridge Plan.

Because of these limitations, the Monitor reviewed the paper records that are used by DFCS to document pre-service training for newly-hired caseworkers to determine whether the records could be used as a substitute for the electronic tracking system, or at least as a basis for

---

[162] Period 1 IP §I.2.c.
[163] Starting in March 2010, defendants report that the training coordinators were required to record into MACWIS the CWPD training session they conducted and the attendees who participated in each training.
[164] Defendants report that the electronic data can be accessed on an employee-by-employee basis by DFCS staff in the personnel unit and by the direct supervisors of individual employees. Neither the training director nor the regional directors have access to these data except with respect to staff they directly supervise.

determining whether newly-hired caseworkers received the requisite pre-service training.[165]  As

a threshold matter, Training Unit staff report that the hire dates reflected on employee rosters

transmitted to the Training Unit by the Personnel Unit are not always consistent with hire dates

entered in MACWIS and/or with a separate notification of new hires form that is submitted to the

training director.  These types of discrepancies are consistent with the Monitor's observations

and compromise the ability to identify accurately the dates by which new staff must receive pre-

service training.

   The paper training records for pre-service caseworker training are filed by training

session date and not by date of hire, name of employee, or region.  The training session records

include daily sign-in sheets and individual trainee performance data such as answer sheets for

tests conducted during the training, worksheets, self assessments, the graduation date and a copy

of the certificate that is issued when an employee successfully completes the training.  A review

of training records maintained for the period between January 1, 2009 and April 1, 2010 that was

conducted by Dr. Southward indicated that many of these training records were incomplete and

inconsistently maintained.

   On March 31 and April 1, 2010, Dr. Southward reviewed the available pre-service

training records for 38 of 188 caseworkers listed on an employee roster that was provided to the

Monitor by the DFCS Personnel Unit.  According to the roster, there were 188 caseworkers hired

between January 1, 2009 and February 16, 2010.  Of the 188 employees on the list, every 10th

record was requested for review.  As of March 29, 2010, for caseworkers hired between January

4, 2010 and February 1, 2010, the review indicated that five caseworkers successfully completed

---

[165]  If accurate information concerning hiring dates can be produced by the MDHS/DFCS personnel unit, it appears
that the training records maintained by the SPB for the pre-service supervisory training can serve as a basis for
determining whether all newly-hired supervisors received pre-service training.

pre-service training; six caseworkers completed one week of pre-service training; and, six caseworkers completed week two of pre-service training. One caseworker, who was listed on the roster with a hire date of January 16, 2010, was never employed by DFCS. Another caseworker, who was listed on the roster with a hire date of January 19, 2010, had a MACWIS hire date of March 8, 2010 and had not begun training. A caseworker who completed one week of training had three different hire dates: January 16, 2010, the week of February 8-12, 2010, and March 6, 2010.

In light of these findings, an additional 19 records for caseworkers listed on the same roster were requested for review. This review revealed that the training records for nine caseworkers were incomplete (*e.g.*, one, two or three weeks of training records and/or test scores were not included, but the Training Unit reported that all had completed training); training records for seven caseworkers were complete, documenting that pre-service training was satisfactorily completed; one caseworker started training late, due to illness; one caseworker did not graduate; and one caseworker with a hire date of January 20, 2009 never participated in pre-service training. These findings were reported to the Training Unit director and in turn to DFCS management. The Monitor subsequently confirmed that the worker with the January 20, 2009 hire date was assigned to carry a caseload in March 2009 and received the pre-service training 14 months later, in May 2010, after the Monitor brought this finding to defendants' attention.

**Period 2 IP §I.2.d.1.-7.**
**Relevant COA Standards: PA-TS 2.02, PA-TS 2.03, PA-TS 1.01, PA-TS 1.02, PA-TS 1.03, PA-TS 2.01, PA-TS 2.04, PA-BSM 3.01, PA-BSM 3.02, PA-BSM 3.03.**

<u>**Status of Progress, Period 2 IP §I.2.d.1.-7., Relevant COA Standards:**</u> Based on the documentation submitted by defendants to COA, COA found the documents were in compliance

49

with seven standards and in substantial compliance with three standards. The COA's findings

are addressed in further detail in Section IV.B. of this report.[166]

> **Settlement Agreement §II.A.2.d.**
> **II. Standards**
> > **A. Administration and Management Standards**
> > > **2. Human Resources Management**
> > > > **d. Contract Agency Requirements:**
> > > > **By the end of implementation Period 2:**
> > > > **In the event that private agencies provide protective, preventive, foster care, or adoption case work services under contract with DFCS, DFCS shall require the contract agencies to abide by all related terms of the Plan, including, but not limited to, provisions regarding training curricula, minimum training hours, and caseload standards. DFCS shall implement and maintain a performance-based contracting system to evaluate annually contract agency compliance with the terms of the Plan. DFCS shall take reasonable steps to ensure contract agency remediation of any identified deficiencies.**

**Status of Progress, Settlement Agreement §II.A.2.d.:** Defendants were required to

satisfy both the requirement related to contract agencies and the requirement related to

performance-based contracting during Period 1.[167] They did not do so.[168] Neither requirement

was satisfied during Period 2.

> **Period 2 IP §I.2.e.**
> **I. Administration and Management Implementation Steps**
> > **2. Human Resources Management**
> > > **e. Contract Agency Requirements:**
> > > > **1) DFCS shall, in conjunction with a qualified independent consultant approved by the Monitor, begin developing a plan for a performance-based contracting system with the capacity to monitor and enforce contract performance on all related terms of the Settlement Agreement.**

**Status of Progress, Period 2 IP §I.2.e.:** Defendants were required to design and begin

implementing a performance based contracting system during Period 1.[169] Because this was not

accomplished,[170] the Period 2 IP required the defendants to begin developing a plan for a

---

[166] *Infra* pp. 139-141.
[167] Period I IP §I.2.d.
[168] June 2009 Report at 48-49.
[169] Period 1 IP §I.2.d.
[170] June 2009 Report at 48-49.

performance-based contracting system in conjunction with a qualified independent consultant. During Period 2, the defendants developed at least two draft Requests for Proposals ("RFPs") to hire a consultant to develop the requisite plan. A draft RFP, which was submitted to the Monitor for review and comment on January 31, 2010, had substantial deficiencies and was withdrawn by the defendants on February 3, 2010. Thereafter, defendants reported that they had conducted additional research and consulted with experts regarding the development and implementation process. However, defendants did not engage the expert nor begin to develop the plan during Period 2.

> **Period 2 IP §I.2.e.**
> **Relevant COA Standards: PA-RPM 9.02, PA-RPM 9.03, PA-RPM 10.02, PA-RPM 10.03, PA-RPM 10.04.**

**<u>Status of Progress, Period 2 IP §I.2.e., Relevant COA Standards</u>:** Based on the documentation submitted by defendants to COA, COA found the documents were in compliance with one standard and in substantial compliance with three standards. COA did not evaluate one of the standards during Period 2. The COA's findings are addressed in further detail in Section IV.B. of this report.[171]

> **Period 2 IP §I.3.a.**
> **I. Administration and Management Implementation Steps**
> **   3. Performance and Quality Improvement**
> **      a. By September 30, 2009, Defendants, in conjunction with a qualified independent consultant approved by the Monitor, shall develop and begin implementing a written plan with specific steps and timeframes for the implementation of a separate continuous quality improvement ("CQI") system that meets COA standards and Settlement Agreement requirements.**

**<u>Status of Progress, Period 2 IP §I.3.a.</u>:** As explained below, although there was significant progress conceptualizing the design, structure and implementation of a CQI system

---

[171] *Infra* pp. 141-142.

that meets the Settlement Agreement's substantive requirements, a written plan consistent with the Settlement Agreement's timelines was not finalized during Period 2.

On September 30, 2009 defendants produced the CSF report on the Mississippi Practice Model.[172]  A section of the report presents detailed recommendations concerning the design and implementation of the DFCS CQI system.[173]  The following topical areas, among others, are addressed: characteristics of the CQI system; scope and content of specific monitoring activities; general requirements related to the quantitative data and qualitative information used to evaluate performance; administrative and operational structure; staffing; development of a procedures manual and training; coordination processes and planning activities; relevant Settlement Agreement requirements, including COA standards; reporting and feedback; and, accountability.

As addressed above, the practice model report recommends the incremental implementation of the practice model on a region-by-region basis over the course of a 48-month period,[174] and the introduction of what appears to be a carefully-designed CQI program in each region as it implements the practice model.  Statewide CQI activities are also contemplated, but with a more limited CQI program operating in each region until the practice model is implemented.[175]  The recommended schedule for full implementation of the practice model and the CQI program exceeds the time-frame that is contemplated by the Settlement Agreement for the completion of the reform process.[176]

On January 22, 2010, the defendants submitted several documents to the Monitor and plaintiffs' counsel in response to the requirements of this subsection: 1) the CQI section from the

---

[172]  Mississippi Child Welfare Practice Model Final Report, September 25, 2009, Center for the Support of Families, Inc.  The report is an impressive document that describes, *inter alia*, the principles that defendants expect to adopt to guide the reform effort.  Further information regarding the practice model is included *supra* pp. 8-9.

[173]  *Id.* at 251-273.

[174]  *Supra* pp. 8-9.

[175]  *Id.* at 264.

[176]  *Compare* Settlement Agreement §VII.C. *with* practice model implementation schedule, *supra* pp. 8-9.

final report on the Mississippi Practice Model;[177] 2) a three-page document titled "Continuous Quality Improvement;"[178] 3) a document titled "Draft Fiscal Year 2009 Continuous Quality Improvement Operational Plan;"[179] 4) Mississippi Division of Family and Children's Services, Performance and Quality Improvement Operational Plan, SFY 2010;[180] and 5) an instrument for reviewing case records.[181] Most of these documents were in draft form, including the CQI recommendations excerpted from the report on the practice model, which was stamped "draft." No explanation regarding how these documents relate to each other was provided, and with one exception, the content of each is, at least in part, inconsistent with the others.[182]

In late January 2010, the CSF consultant who developed the CQI recommendations for the defendants submitted a document outlining how each DFCS region and county office will be involved in CQI activities prior to implementing the practice model.[183] In combination this document, and the "draft" CQI recommendations from the practice model report, represent a thoughtful and comprehensive approach to the development of a CQI system that would meet the requirement of the Settlement Agreement if the implementation schedule were adjusted to conform with Settlement Agreement requirements.

---

[177] Ex. 22, Section V, pp.1-26, excerpt, Mississippi Practice Model Final Report, August 7, 2009, Center for the Support of Families, Inc. Except for the date and the fact that it is stamped "DRAFT," this document appears identical to Section V in the September 25, 2009 Practice Model Final Report that was submitted by defendants to the Monitor. *See supra* note 172.

[178] Ex. 23, three-page document submitted to the Monitor and plaintiffs' counsel on January 22, 2010 titled, Continuous Quality Improvement. This document includes a timeline that is described as "an approximate schedule for implementing the CQI system." The schedule indicates that it will take defendants over 18 months to implement the CQI system in four of DFCS's 13 regions. It does not address implementation activities elsewhere, including the other nine regions. *Id.* at 3.

[179] Ex., 24, Draft Fiscal Year 2009 Continuous Quality Improvement Operational Plan. The cover page on this document in relevant part states: "*Note, this plan was drafted prior to the current DFCS QA Director (Mike Gallarno) being hired on 09-16-08. This draft has been submitted to him and is awaiting his approval and further input."

[180] Ex. 25, Mississippi Division of Family and Children's Services, Performance and Quality Improvement Operational Plan, SFY 2010, Draft.

[181] Ex. 26, Child and Family Services Reviews Onsite Review Instrument.

[182] The Monitor later learned that the case record review instrument was a draft of an instrument that was being developed to conduct CQI baseline reviews in the regions that would be implementing the practice model.

[183] Ex. 27, Statewide Impact of CQI Implementation, submitted to the Monitor on January 28, 2010.

On March 1, 2010, defendants reported that they were reconciling the various draft plans

that had been submitted to the Monitor in consultation with their expert consultants.  In response

to an inquiry from the Monitor, defendants indicated that the final version of the CQI plan was

nearly complete and would be submitted to her in the near term.  The Monitor received the final

version of the CQI plan from the defendants on August 2, 2010.[184]  The Monitor has not

completed her review of this recent submission.  She is scheduled to discuss the Plan with the

DFCS manager responsible for the CQI program later this month.

> **Settlement Agreement §II.A.3.b.[185]**
> **II.  Standards**
>     **A.  Administration and Management Standards**
>         **3.  Performance and Quality Improvement**
>             **By the end of implementation Period 2:**
>                 **b.  DFCS shall implement and maintain a separate CQI system that**
>                 **can identify areas of needed improvement and require**
>                 **improvement plans in support of achieving performance targets,**
>                 **program goals, client satisfaction, and positive client outcomes.**
>                 **The CQI system shall include monitoring and evaluating the**
>                 **quality of social and human services provided by independent**
>                 **contractors and other provider organizations and ensuring**
>                 **contractor remediation of any identified deficiencies.**

**Status of Progress, Settlement Agreement §II.A.3.b.**:  As explained in the narrative

related to Period 2 IP §I.3.a.,[186] defendants did not implement a CQI system that meets the

Settlement Agreement's requirements during Period 2.

> **Period 2 IP §I.3.c.**
> **I.  Administration and Management Implementation Steps**
>     **3.  Performance and Quality Improvement**
>         **c.  Defendants shall, in conjunction with a qualified independent**
>         **consultant approved by the Monitor, develop and begin implementing**
>         **a CQI assessment tool that measures compliance with the Settlement**
>         **Agreement's management and foster care service standards at sections**
>         **II.A.1-7 and II.B.1-14, respectively.**

---

[184]  Mississippi Division of Family and Children's Services Continuous Quality Improvement Plan, State Fiscal Year 2011, submitted August 2, 2010.  Because the Monitor has not made any findings related to this document, it is not included in the Appendix to this report.
[185]  The identical requirement is included in §I.3.b. of the Period 2 IP.
[186]  *Supra* pp. 51-54.

**Status of Progress, Period 2 IP §I.3.c.:** Defendants did not begin implementing the required assessment tool during Period 2. However, a comprehensive case record review instrument was developed during Period 2 in collaboration with the defendants, by the CSF consultant engaged to assist defendants with the development and implementation of the practice model.[187] Defendants began to use the instrument during June 2010 for baseline reviews that have been conducted in the two regions that are currently implementing the practice model.[188] The instrument represents a thoughtful and careful approach to a very important aspect of the qualitative review process that will be used to promote improvements in case practice.

> Period 2 IP §I.3.a.-c.
> Relevant COA Standards: PA-PQI 2.02, PA-PQI 2.01, PA-PQI 1.01, PA-PQI 1.02, PA-PQI 2.04, PA-PQI 2.05, PA-PQI 3.02, PA-PQI 4.01, PA-PQI 4.02, PA-PQI 5.01, PA-PQI 6.01, PA-PQI 6.02.

**Status of Progress, Period 2 IP §I.3.a.-c., Relevant COA Standards:** Based on the documentation submitted by defendants to COA, COA found the documents were in compliance with seven standards, in substantial compliance with three standards, in partial compliance with one standard, and out of compliance with one standard. The COA's findings are addressed in further detail in Section IV.B. of this report.[189]

> Settlement Agreement §II.A.3.c.[190]
> II. Standards
>   A. Administration and Management Standards
>     3. Performance and Quality Improvement
>       By the end of implementation Period 2:
>         c. DFCS shall comply with the public child fatality reporting requirements of the Child Abuse Prevention Act, 42 U.S.C. §5106a(b)(2)(A)(x).

---

[187] Ex. 28, CQI Reviews, OnSite Review Instrument, submitted to the Monitor on July 12, 2010. Detailed written instructions for the reviews and a document reflecting the proposed scoring for the review instrument have also been developed. These documents have been reviewed by the Monitor, but they are not included in the Appendix to this report. *See also* Ex. 26, *supra* note 181; *supra* note 182.

[188] The sample size for the initial reviews is very limited. The initial reviews are intended to provide information to help inform strategies related to the early implementation of the practice model and are not intended to serve as the basis for statistically valid findings related to case practice.

[189] *Infra* pp. 142-144.

[190] The identical requirement is included in §I.4.a. of the Period 2 IP.

**Status of Progress, Settlement Agreement §II.A.3.c.:** In order for a state to be eligible to receive a federal grant under the Child Abuse Prevention and Treatment and Adoption Reform General Program ("CAPTA"), 42 U.S.C. 5106a(b)(2)(A)(x), it must allow for "public disclosure" of "information about the case of child abuse or neglect which has resulted in a child fatality or near fatality."[191] According to the U.S. Department of Human Services' Child Welfare Policy Manual, disclosure of information related to child fatalities or near fatalities is mandatory.[192]

Mississippi law codifies this requirement in two provisions of the Mississippi Code. Miss. Code Ann. § 43-21-257 states the general rule: "any record involving children . . . shall be kept confidential and shall not be disclosed except as provided in Section 43-21-261." The relevant exception within § 43-21-261 specifies that:

> (17) In every case where there is any indication or suggestion of either abuse or neglect and a child's physical condition is medically labeled as medically "serious" or "critical" or a child dies, the confidentiality provisions of this section shall not apply. In cases of child deaths, the following information may be released by the Mississippi Department of Human Services: (a) child's name; (b) address or location; (c) verification from the Department of Human Services of case status (no case or involvement, case exists, open or active case, case closed); (d) if a case exists, the type of report or case (physical abuse, neglect, etc.), date of intake(s) and investigation(s), and case disposition (substantiated or unsubstantiated).

---

[191] Child Abuse Prevention and Treatment and Adoption Reform General Program, 42 U.S.C. 5106(b)(2)(A)(x) (2010). The statute states:
   § 5106a. Grants to States for child abuse and neglect prevention and treatment programs
   (b) Eligibility requirements.
   (2) Coordination. A State plan submitted under paragraph (1) shall, to the maximum extent practicable, be coordinated with the State plan under part B of title IV of the Social Security Act [42 USCS §§ 620 et seq.] relating to child welfare services and family preservation and family support services, and shall contain an outline of the activities that the State intends to carry out using amounts received under the grant to achieve the purposes of this title [42 USCS §§ 5101 et seq.], including--
   (A) an assurance in the form of a certification by the chief executive officer of the State that the State has in effect and is enforcing a State law, or has in effect and is operating a Statewide program, relating to child abuse and neglect that includes--
   (x) provisions which allow for public disclosure of the findings or information about the case of child abuse or neglect which has resulted in a child fatality or near fatality.

[192] U.S. Dep't of Health and Human Servs., Administration of Children and Families, Child Welfare Policy Manual § 2.1A.4, Question 4, http://www.acf.hhs.gov/programs/cb/laws_policies/laws/cwpm/policy_dsp.jsp?citID=68#1540.
   The State does not have discretion in whether to allow the public access to the child fatality or near fatality information; rather, the public has the discretion as to whether to access the information. In other words, the State is not required to provide the information to the public unless requested, but may not withhold the facts about a case unless doing so would jeopardize a criminal investigation." *Id.*

> Notwithstanding the aforesaid, the confidentiality provisions of this section shall
> continue if there is a pending or planned investigation by any local, state or federal
> governmental agency or institution.[193]

In 2008 the Supreme Court of Mississippi adopted this provision as part of its Uniform Rules of

Youth Court Practice.[194]  The relevant DFCS policy that addresses this subject matter is silent

with respect to near fatalities and will need to be revised to conform fully with the requirements

of this subsection.

> **Period 2 IP §I.4.a.**
> **Relevant COA Standards: PA-BSM 1.01, PA-AS 2.04.**

**Status of Progress, Period 2 IP §I.4.a., Relevant COA Standards:**  Based on the

documentation submitted by defendants to COA, COA found the documents were in compliance

with one standard and out of compliance with one standard.  The COA's findings are addressed

in further detail in Section IV.B. of this report.[195]

> **Settlement Agreement §II.A.5.d.**
> **II.  Standards**
>     **A.  Administration and Management Standards**
>        **5.  Information Management and Use**
>           **By the end of implementation Period 2:**
>             **d.  DFCS county staff shall have access to a MACWIS database of**
>                **the placement resources available for placement statewide at any**
>                **given time.  The database shall permit staff to determine whether**
>                **a given placement is suitable for a given child needing placement**
>                **by allowing access to current caretaker placement information,**
>                **including capacity limitations, current census, the placement's**
>                **suitability for children by age, sex, and special needs, and any**
>                **related licensing and maltreatment investigations information.**

**Status of Progress, Settlement Agreement §II.A.5.d.:**  This requirement was not

satisfied during Period 2 due to limitations in the capacity of the current MACWIS database and

other operational shortcomings.  These matters are explained below.

DFCS staff did not have access to a MACWIS database of placement resources that

meets the Settlement Agreement's requirements during Period 2.  MACWIS does not have the

---

[193]  Miss. Code Ann. § 43-21-261 (2009).
[194]  In re Unif. Rules of Youth Court Practice, 2008 Miss. LEXIS 616 (Miss. 2008).
[195]  *Infra* p. 144.

capacity to collect all of the required data.[196] Moreover, the placement data in MACWIS are not consistently accurate.[197] This fact is well-known to DFCS caseworkers and supervisors. The caseworkers that the Monitor has interviewed report that they rely on the placements they have used in the past as well as word-of-mouth among the staff in their offices to find placements for specific children.[198] In some counties, caseworkers report that resource supervisors help to identify appropriate placements on an *ad hoc* basis.

According to DFCS caseworkers, because of the shortage of appropriate placements, placements are selected almost exclusively on the basis of their availability and not because a certain placement is suitable for a specific child.[199] This issue has enormous implications for the children in defendants' care.[200] However, even if an adequate number and array of placements were available, caseworkers would be unable to match children with suitable placements unless they had access to a placement database that meets the requirements of this subsection. In

---

[196] For example, data related to the placement's suitability for children by the required categories are not collected in MACWIS.

[197] *See, e.g.,* Ex. 29, Mississippi Foster Care Services Assessments, Final Report [hereinafter Assessment Report], at 107. The placement assessment that is included in the report relies on placement data regarding resource homes that are collected manually. The report recognizes that MACWIS has the capacity to collect the data, but it does not generate a report. Additionally, the report points out that MACWIS does not breakdown resources homes by type reliably. The report explains that resource homes are captured in MACWIS in one of four categories: foster homes, adoptive homes, resource homes or child specific homes, noting that the child specific category (*e.g.,* relative placements) does not list any homes. In addition, the report raises concerns about the accuracy of placement data concerning resource homes, explaining that a cursory review in two counties showed closed homes as still active as well as some duplication of homes. As described *infra* pp. 102, 105, these limitations presented a significant challenge for the DFCS social workers who conducted the special safety reviews required by the Period 2 IP.

[198] This is consistent with the information defendants' consultant obtained from DFCS staff who were interviewed during the placement assessment. According to the Assessment Report, participants in most of the focus groups that were conducted ". . . indicated that when a child comes in to care, the worker calls licensed resource homes in the county until a vacancy is located, and that a vacancy may not correspond to the needs of the child or license limitations regarding age or sex of children desired." *Id.* at 96. Among other findings, the Assessment Report concludes that "[t]here is no single contact which has statewide information about placement resources." *Id.* at 109.

[199] The Assessment Report concludes that the number of placement options for children entering foster care is inadequate. *Id.* at 109.

[200] For example, caseworkers and supervisors have told the Monitor that they place children in acute care residential placements even when these placements are not indicated because of the shortage of licensed resource homes. Information obtained by defendants' consultant during the placement assessment is consistent with these representations. The Assessment Report indicates that during the assessment DFCS staff reported "that acute residential care is often used as a short-term placement because the county does not have a resource home available." *Id.* at 96.

58

addition to correcting shortcomings in the capacity of the placement database, defendants will

need to address other factors that contribute to inaccuracies in the placement data recorded in

MACWIS.[201]

> **Settlement Agreement §II.A.5.e.**
> **II. Standards**
>> **A. Administration and Management Standards**
>>> **5. Information Management and Use**
>>>> **By the end of implementation Period 2:**
>>>>> **e. DFCS shall take reasonable steps to ensure data integrity and user accountability in MACWIS. The system shall have the necessary controls to decrease the risk of duplication of data and to reduce the risk of incorrect or invalid data. The system shall provide a visible trail to the database administrators of all information entered, added, deleted, or modified, and shall have necessary security to protect data integrity. This system shall be audited at least annually to ensure the accuracy and validity of the data in the system. Necessary actions identified by the MACWIS data accuracy and validity audit to correct MACWIS data errors shall be implemented annually.**

**Status of Progress, Settlement Agreement §II.A.5.e.:** These requirements were not

satisfied during Period 2 largely because of limitations inherent in MACWIS. According to

MDHS/DFCS managers responsible for MACWIS, the system does not have sufficient controls

to decrease the risk of data duplication and incorrect or invalid data entry. In addition, the

system cannot track transactions on a historical basis and is not designed to provide a visible trail

of all information that is entered, added, deleted or modified. Absent this capacity, defendants'

ability to ensure data integrity, protect against security violations, and promote user

accountability is limited. Moreover, MACWIS has not been audited on an annual basis to ensure

the accuracy and validity of the data in the system.

---

[201] Many factors contribute to inaccuracies in placement data, including limitations in the ability of workers to access MACWIS and correct erroneous entries. Delays in processing eligibility determinations associated with Title IV-E of the Social Security Act, 42 U.S.C. 672, which provides for federal matching funds to reimburse certain foster care expenses that a state has already paid, also contribute to limitations in the placement data because specific placements cannot be entered into MACWIS until the eligibility determination has been made. There is also a need to strengthen the MACWIS training for new caseworkers to mitigate the incidence of user error. Related issues are addressed more fully *infra* pp. 60-64.

Period 2 IP §I.5.a.
I. **Administration and Management Implementation Steps**
    5. **Information Management and Use**
        a. **By July 1, 2009, DFCS shall provide to all county agency staff with
           child welfare responsibilities access to basic computer services,
           consisting of access to MACWIS, word processing, and electronic mail.**

   **Status of Progress, Period 2 IP §I.5.a.:**  County agency staff, including caseworkers and

supervisors, did not have reasonable access to MACWIS and electronic mail on a consistent basis

during Period 2.  This finding is explained below.

   In an effort to enhance access to basic computer services for DFCS staff, the DFCS

MACWIS unit surveyed county office staff during the latter part of November 2009 to determine

the number and location of staff in county offices who did not have their own computers.[202]

According to the survey, 83 users (11 percent) out of 755 users in the county offices did not have

their own computers.[203]  Thereafter, between December 2009 and February 2010, computers

were distributed to the county offices that had reported the shortages.[204]  At about this time,

another division of MDHS, which had begun to replace its computers with updated models,

started to transfer its older inventory to DFCS.[205]  Because the transferred computers represented

an upgrade for many DFCS users, in March 2010 defendants used the transferred inventory to

replace some of the oldest DFCS terminals in the county offices.  Defendants report that the

replacement process will be completed on a statewide basis by late September 2010.[206]

   In addition to the users identified during defendants' November 2009 survey, there is

other evidence indicating the defendants did not provide reasonable access to computer services

---

[202]  *See* Ex. 30, MACWIS Accomplishments, September 2009-July 2010 at 2.  This document is a summary of various remediation initiatives related to MACWIS that were undertaken between September 2009 and July 2010. The summary was prepared at the request of the Monitor by the DFCS MACWIS director.  It includes a description of the survey results.  *Id.* at 10-11.

[203]  During face-to-face interviews conducted by the Monitor with 43 caseworkers and supervisors, seven employees (16.3 percent) from Hancock and Harrison counties indicated that they did not have their own computers.  *Id.*

[204]  *Id.* at 2.  Interviews with DFCS staff establish that computers were configured, delivered and installed during this period.

[205]  The transferred inventory was received from the Economic Assistance division of MDHS.

[206]  *Id.*

on a shared basis or otherwise to all county office staff with child welfare responsibilities during Period 2, including during the time period that followed the delivery of the computers to the counties that reported the shortages. Face-to-face interviews conducted by the Monitor with caseworkers and supervisors during the course of Period 2, and more recent telephone interviews conducted during late June and July 2010, indicate that at least some caseworkers in counties with high caseloads have not had reasonable access to computer services.[207] Moreover, although the majority of county agency staff had their own computers, defendants did not provide them with reasonable access to MACWIS on a routine basis during Period 2 due to the failure to properly maintain the DFCS information technology ("IT") infrastructure.[208]

Since the time of the Monitor's appointment in this case in January 2008, DFCS caseworkers, supervisors and managers have identified a series of chronic problems that undercut their ability to access and/or use MACWIS,[209] including: 1) lengthy delays of up to several hours in logging into MACWIS; 2) difficulty staying logged on to MACWIS; 3) loss of data entered into MACWIS; 4) slow response times; and 5) system freezes.[210] Because of these issues, and the defendants' lack of progress toward satisfying MACWIS-related requirements in Period 1,

---

[207] In June and July 2010, during telephone interviews with 40 caseworkers and supervisors hired between May 2009 and February 2010, five employees (13 percent) from Washington and Harrison counties reported that they did not have their own computers. The employees from Washington County noted that a small number of laptop computers were stored in the county office on a check-in/check-out basis. One employee reported that some of the laptops were not operational and another indicated that the number of laptops was insufficient to support the number of staff who did not have computers. There also are uncorroborated reports that the electrical system in some county offices simply cannot support the additional equipment.

[208] There have been reports that the DFCS e-mail system consistently was not reliable during Period 2. Defendants indicate that they took steps to address this issue on a statewide basis in January 2010 and the problems were corrected by March 2010. Ex. 30, *supra* note 202, at 3.

[209] The Monitor has observed many of the same problems that were reported by DFCS staff.

[210] Many users also report difficulty navigating through MACWIS because the system is not user-friendly. They point out that the case records are not always accurate, but because of how the system is designed, users cannot readily correct errors.

during January 2009 the Monitor and an expert engaged by the Monitor[211] met with various high-level MDHS/DFCS managers with job responsibilities related to MACWIS. Among other matters, the problems with access to MACWIS that DFCS staff reported, as well as the agency's plans to replace MACWIS with a web-based system, were discussed.[212] Defendants provided assurances that remedial efforts were underway to address these and other critical MACWIS-related problems. However, there was little progress during the balance of Period 1. Thus, the Monitor's June 2009 Report identified limitations in MACWIS as a key obstacle to the reform process.[213] DFCS staff continued to experience significant difficulties accessing MACWIS throughout Period 2. Defendants have reported that these problems were exacerbated by staffing increases, which intensified the demands on the system.[214]

In January 2010 defendants hired a vendor to address MACWIS login and connectivity issues.[215] By early April 2010, the vendor concluded that server capacity for connecting to the MACWIS application was inadequate to support the number of DFCS system users. Thus, the vendor recommended that the agency triple, from one to three, the number of login servers in operation.[216] In addition to an insufficient number of login servers, defendants report that login problems also were exacerbated during Period 2 by the fact that MDHS/DFCS did not have a

---

[211] The consultant, Harold Beebout, Ph.D., is the former Chief Information Officer of the District of Columbia Child and Family Services Agency ("CFSA"). He led CFSA's successful effort to achieve tier 2 certification at the federal level for its automated child welfare information system.

[212] The discussions focused on the following matters: 1) connectivity; 2) data retention; 3) system security; 4) equipment shortages; 5) reporting limitations; and 6) the backlog of change orders for report and/or system modifications. The reporting limitations and backlog of change orders are addressed *infra* pp. 64-66.

[213] June 2009 Report at 7, 55.

[214] *See* Ex. 30, *supra* note 202, at 7; *see also* Ex. 2, *supra* note 68, showing that as of July 2008 there were 616 filled caseworker and supervisory positions and as of June 2010 there were 769 filled positions.

[215] Ex. 30, *supra* note 202, at 3.

[216] *Id.* DFCS was using one login server at the time of the vendor's assessment. Among other recommendations, the vendor suggested adding two additional servers.

sufficient number of software licenses to accommodate all MACWIS users.[217]  Notwithstanding

the fact that DFCS had more users than licenses during Period 2, additional software licenses

were not procured until June 28, 2010.  The delay in procurement of the licenses has protracted

further the resolution of this problem.[218]  Defendants have been testing the software for the newly

acquired licenses in order to ensure it will be compatible with MACWIS.  MDHS/DFCS

managers have not indicated when the software will be operable on a statewide basis; however,

according to a document that the defendants submitted to the Monitor on June 30, 2010, it

appears the timetable will extend beyond November 1, 2010.  Defendants report the two

additional login servers were operable by mid-July 2010, and that this has improved statewide

login times significantly.[219]  Defendants expect additional improvement by late September 2010

when the statewide replacement of the older computers in the county offices will be

completed.[220]

> The login and connectivity problems experienced by DFCS staff have been long standing

and persistent throughout Period 2.  These deficits impact the ability of caseworkers and

supervisors to maintain accurate case records.  Defendants must ensure that the limitations in

access to MACWIS that staff experienced during Period 2 are corrected and that the IT system is

---

[217]  Defendants maintained 760 software licenses during Period 2.  The number was insufficient to support the workforce which now has over 1000 users.  Defendants have reported that when the user load was equivalent with the number of licenses DFCS maintained, the system would not allow additional users to login.  In turn, the users who were denied access made serial attempts to log in, which defendants report "tied up" licenses.  *Id.* at 7 *supra* note 202.

[218]  Defendants have informed the Monitor that bids for additional licenses were considered during March 2010.  However, MDHS did not finalize the procurement for the licenses until June 28, 2010.  Instead of simply purchasing the licenses and software necessary to support the additional users, DFCS managers report that the agency has purchased upgraded software and licenses for all existing licensed users, as well as for the additional users for whom licenses are needed, because the software to support the existing licenses – which was available in March 2010 – is no longer available.  This has resulted in increased costs, and will contribute to implementation delays because there is a need to test the upgraded software to ensure it is compatible with MACWIS.  Defendants have been unable to provide a clear and complete timetable for the installation of the software.

[219]  Some DFCS staff have reported very recent improvements in login times.  However, at least through early July, staff in several counties reported continued login delays to the Monitor, albeit of somewhat shorter duration.

[220]  *Id.* at 2, 12.  *See supra* p. 60 for a discussion related to the replacement process.

maintained appropriately so that these problems do not reoccur. DFCS staff must have the basic

tools necessary to perform their duties in a manner that is contemplated by the Settlement

Agreement.[221]

> **Period 2 IP §I.5.b.**
> **I. Administration and Management Implementation Steps**
>    **5. Information Management and Use**
>       **b. By November 1, 2009 and by April 30, 2010, DFCS will verify**
>         **MACWIS data to identify the number of children in custody, face to**
>         **face contacts, caseloads, timeliness of investigations, and placements.**

**<u>Status of Progress, Period 2 IP §I.5.b.:</u>** Defendants were required to collect, analyze

and disseminate MACWIS data related to compliance with all of the Settlement Agreement's

Foster Care Service Standards during Period 1.[222] Because this Period 1 requirement was not

satisfied, it was addressed by this subsection of the Period 2 IP, which required defendants to

verify a much smaller subset of MACWIS data during Period 2. Defendants made timely efforts

to meet the Period 2 requirement; however, because these efforts were ill-informed, the data were

not validated. For this reason, the June 10, 2010 Agreed Order requires defendants to produce

over 20 data reports, including the reports required by this subsection, during the Bridge

---

[221] In addition to limitations in access to computer services, some DFCS staff have reported shortages in necessary supplies and equipment, such as printers and cameras. Moreover, in some counties, office space is inadequate and in certain instances it appears unlikely to satisfy the governing COA standard, which requires a work environment " . . . that is conducive to effectively providing services to individuals and families in a private and confidential manner, as needed." ASE 1.05. For example, in Harrison, Hancock, Rankin and Hinds counties, staff report sharing offices in circumstances that raise concerns about confidentiality, and in Harrison and Hancock counties there are staff who report they do not have their own desks. Staff in Hancock County have been operating out of two trailers for the last several years because the county office was destroyed by Hurricane Katrina. Because of limitations in the physical plant, it is not possible to have confidential discussions in the trailers. Caseworkers share a cramped trailer that does not afford minimally adequate workspace. *See, e.g.*, Ex. 31, photograph of interior of DFCS Hancock County trailer #18, taken by Grace M. Lopes, May 5, 2010. Moreover, there are an insufficient number of telephone lines to support the number of DFCS staff who work in the trailers; however, DFCS staff report that the trailers do not have the capacity to support any additional telephone lines. In response to these concerns, defendants rely upon Miss. Code Ann. §43-1-9, which requires the county Board of Supervisors to provide office space for DFCS county office staff. The Monitor has not had an opportunity to determine what efforts, if any, defendants have made to address shortcomings in DFCS office space that may implicate COA requirements with the county Board of Supervisors or otherwise.

[222] Period I IP §II.A.5.c. *See also* June 2009 Report at 52-55 for a discussion related to this Period 1 requirement.

Period.[223]  Defendants developed a methodology for validating data reports in consultation with their expert consultants during the Bridge Period.  Pursuant to the Bridge Plan, a series of data reports were produced following what at least preliminarily appears to be an appropriate validation process.[224]  The Monitor will address the data reports that defendants submitted during the Bridge Period in her forthcoming report on the Bridge Plan.

Although defendants have attempted to improve MACWIS capacity to collect and report on certain data relevant to compliance with the Settlement Agreement's foster care service standards during the Bridge Period, defendants do not have sufficient staff with the correct skill set to perform the programming and validation activities that will be needed to report accurately on all of the data requirements implicated by the Settlement Agreement.  The reports produced during the Bridge Period alone have presented enormous challenges for DFCS managers and staff.  The MACWIS unit currently has pending orders for system changes and/or reporting modifications that date back to 2008.[225]

There is a critical need to address the limitations in MACWIS on a more expedited basis.  Incomplete or inaccurate data in MACWIS, like the types revealed during the Monitor's case record review,[226] could result in decision making related to child placements that presents an unreasonable risk of harm to children in defendants' custody.  For example, MACWIS fails to link prior reports of maltreatment in a way that provides the full history of prior maltreatment reports.  Further, MACWIS contains inaccurate and incomplete dispositional data related to

---

[223]  June 10, 2010 Agreed Order at ¶ 7.a.  Defendants are required to produce the reports at staggered intervals, and thereafter on a monthly basis, during the Bridge Period.

[224]  The methodology that was developed by defendants' consultants to validate the data during the Bridge Period, which is included in the Appendix to this report, is appropriate.  *See* Ex. 32, Methodology for Validating MACWIS Data Reports, submitted to the Monitor on July 12, 2010.

[225]  *See, e.g.*, heat ticket no. 85970: family team meeting and ISP 30-day rule change, as of July 30, 2010 MACWIS staff report no progress since November 2009; heat ticket nos. 86706 and 86719: tracking mechanism for medical, dental, mental health and education information provided to resource placement, request received by DFCS/MIS unit in November 2008 and as of July 30, 2010 on hold as low priority.

[226]  *See* Ex. 60, *infra* note 357, at 2 for a summary of these limitations.

maltreatment reports.  In the absence of complete and accurate information, caseworkers cannot

conduct adequate assessments nor make informed decisions about child placements.  More

generally, in order to guide and assess performance with this reform effort, agency executives

and managers need current and accurate data to inform management decisions.  In the absence of

a reliable data system that collects and reports data on a statewide, regional and county basis,

assessing progress is inefficient at best, and impossible at worst.

> **Period 2 IP §I.5.c.**
> **I.  Administration and Management Implementation Steps**
>    **5.  Information Management and Use**
>       **c.  DFCS shall issue a RFP for the comprehensive analysis of the
>         MACWIS system and its ability to perform the computer functions
>         required by section II.A.5.a of the Settlement Agreement and for
>         recommendations of remedial efforts necessary to enable MACWIS to
>         perform those Settlement Agreement requirements.  DFCS shall
>         undertake all reasonable efforts to expeditiously issue such RFP, which
>         shall issue by September 1, 2009.**

**Status of Progress, Period 2 IP §I.5.c.:**  This requirement was not met during Period 2,

and as a result it is addressed by the June 10, 2010 Agreed Order, which requires defendants to

issue the RFP for a MACWIS assessment by September 1, 2010.[227]  The RFP was issued on July

27, 2010.  It requires responsive proposals to be submitted by September 15, 2010.

> **Period 2 IP §I.5.d.**
> **I.  Administration and Management Implementation Steps**
>    **5.  Information Management and Use**
>       **d.  DFCS shall execute a contract pursuant to the RFP.  Such contract
>         shall require that the contracting agent provide the final MACWIS
>         assessment and recommendations no later than 12 calendar months
>         from the date of contract.**

**Status of Progress, Period 2 IP §I.5.d.:**  As noted above, the RFP associated with this

contract was not issued during Period 2, and therefore a contract was not executed during Period

2.  Defendants anticipate the contract will be executed by January 1, 2011.

> **Period 2 IP §I.6.a.**
> **I.  Administration and Management Implementation Steps**
>    **6.  Case Recording and Information**

---

[227]  December 10, 2010 Order at ¶ 5.

   a.  **Defendants shall implement a system to regularly review whether
       DFCS child welfare case records are current, complete, made by the
       appropriate caseworker, signed and dated by the person who provided
       the service, and signed and dated by supervisors, where appropriate, in
       accordance with federal and state law and regulations.**

**Status of Progress, Period 2 IP §I.6.a.:**  This requirement was not met during Period 1,

and as a result it is included in the Period 2 IP.[228]  Defendants routinely review case records as

part of the federally-mandated administrative review process.  These reviews include a

determination regarding whether most of the specific elements of the case record addressed by

this requirement are current and complete.  In February 2010, a new manager for the

administrative review program was hired.  The manager reported in May 2010 that the review

process was being modified to conform with the practice model and to address issues that were

identified by the child safety assessment that was conducted by CSF during Period 2.[229]  The

Monitor has not had an opportunity to determine the current status of these initiatives and has not

audited individual DFCS administrative review records to determine the extent to which

implementation of the review process during Period 2 conformed to the requirements of this

subsection.

   **Period 2 IP §I.6.a.**
   **Relevant COA Standards: PA-RPM 7.02, PA-RPM 7.03, PA-RPM 7.04, PA-PQI 4.03, PA-RPM 7.05,
   PA-RPM 7.06, PA-RPM 7.07, PA-RPM 8.01, PA-CR 2.04, PA-AS 12.05, PA-AS 12.06, PA-RPM 5.01,
   PA-RPM 5.02, PA-RPM 6.01, PA-RPM 6.02.**

**Status of Progress, Period 2 IP §I.6.a., Relevant COA Standards:**  Based on the

documentation submitted by defendants to COA, COA found the documents were in compliance

with seven standards, in substantial compliance with five standards, and in partial compliance

---

[228]  Period 1 IP §I.6.; *see also* June 2009 Report at 56.
[229]  *See infra* pp. 76-79 for a summary of the findings of the child safety assessment conducted pursuant to Period 2
IP §II.2.f.

with three standards.  The COA's findings are addressed in further detail in Section IV.B. of this

report.[230]

> **Period 2 IP §I.7.a.**
> **I. Administration and Management Implementation Steps**
>   **7. Financial Management**
>     **a. By January 1, 2010, Defendants shall contract for an external**
>     **assessment, to be conducted by a qualified independent consultant, of**
>     **actual and anticipated federal funding levels, and for the development**
>     **of a plan to establish the resources and infrastructure necessary to**
>     **maximize the amount of federal funds received by the State.  The**
>     **selection of this qualified independent consultant shall be subject to**
>     **approval by the Monitor.**

    **Status of Progress, Period 2 IP §I.7.a.:**  The defendants did not contract for the required

external assessment during Period 2.  Defendants' efforts to satisfy this requirement are described

below.

    Because the assessment of actual and anticipated federal funding levels was not

performed by the defendants during Period 1,[231] the Period 2 IP required defendants to engage an

expert to conduct the assessment and to develop a plan to establish the resources and

infrastructure necessary to maximize federal funding.  A draft RFP was submitted to the Monitor

and plaintiffs' counsel in early December 2009.  Among other concerns, the draft was, in part,

inconsistent with the requirements of this subsection.  Following several revisions, defendants

issued the RFP related to the assessment on March 22, 2010.  At the time the RFP was issued,

negotiations related to the Bridge Plan were underway.  In order to promote efficiencies and

maximize the efficacy of the assessment, the Monitor suggested that the parties consider

incorporating the assessment into the contemplated technical assistance addressed by the Bridge

Plan.  Thus, the Bridge Plan required that defendants finalize contract documents related to the

---

[230] *Infra* pp. 144-147.
[231] Settlement Agreement §II.A.7.a.; *see also* June 2009 Report at 56.

assessment by September 1, 2010.[232]  The Monitor will report on this matter in her forthcoming

report on the Bridge Plan.

      This is a pivotal requirement.[233]  Absent the resources and infrastructure that will enable

defendants to maximize federal funding, it is likely that the minimum requirements imposed by

the Settlement Agreement will not be achieved.[234]

> **Period 2 IP §I.7.b.**
> **I.  Administration and Management Implementation Steps**
>    **7.  Financial Management**
>       **b.  Funds realized as a result of revenue maximization activities shall not**
>          **supplant appropriated state funds but shall be used in furtherance of**
>          **the reforms and outcome measures provided for herein and to improve**
>          **child welfare services.**

      **<u>Status of Progress, Period 2 IP §I.7.b.</u>:**  As a predicate to assessing compliance with

this requirement, the external assessment required by Period 2 IP §I.7.a. must be completed, and

a revenue maximization initiative must be undertaken.

> **Period 2 IP §I.8., Ethical Practice**
> **Relevant COA Standards: PA-ETH 1.01, PA-EH 1.02, PA-ETH 2.01, PA-ETH 5.01, PA-ETH 5.02,**
> **PA-ETH 5.03, PA-CR 1.02, PA-CR 1.06.**

      **<u>Status of Progress, Period 2 IP §I.8., Relevant COA Standards</u>:**  Based on the

documentation submitted by defendants to COA, COA found the documents were in compliance

with six standards, in substantial compliance with one standard, and in partial compliance with

---

[232]  June 10, 2010 Agreed Order at ¶ 5.

[233]  Recent DFCS budget shortfalls underscore the urgency of this initiative.  *See, e.g.*, Consent Order, dated March 29, 2010, imposing limitations on the number of furloughs for DFCS employees during the fiscal year ending June 30, 2010.

[234]  This is especially likely with respect to the necessary expansion in the array and improvement in the quality of the services that DFCS provides to children and their families.  The foster care services assessments conducted during Period 2, *see* discussion *infra* pp. 72-79, describes these issues.  In order to fill critical gaps in services, the defendants must develop the funding plan contemplated by this subsection.  Currently, defendants require service providers to assume sole fiscal responsibility for matching the federal funds that are used to subsidize the costs for various foster care services.  According to child welfare experts the Monitor has consulted, this practice is very unusual and it will not be sustainable.

one standard.  The COA's findings are addressed in further detail in Section IV.B. of this

report.[235]

**Period 2 IP §I.9., Community Involvement and Advocacy**
**Relevant COA Standards: PA-AM 4.01, PA-AM 4.02, PA-CPS 2.01.**

<u>**Status of Progress, Period 2 IP §I.9., Relevant COA Standards**</u>:  Based on the

documentation submitted by defendants to COA, COA found the documents were in compliance

with two standards and in substantial compliance with one standard.  The COA's findings are

addressed in further detail in Section IV.B. of this report.[236]

**Period 2 IP §I.10., Administrative and Service Environment**
**Relevant COA Standards: PA-HR 4.01, PA-HR 4.03, PA-AM 5.01, PA-RPM 2.01, PA-RPM 2.02, PA-**
**RPM 2.04, PA-ASE 6.01, PA-ASE 8.01, PA-ASE 8.02, PA-ASE 1.02, PA-ASE 4, PA-ASE 7.01, PA-**
**ASE 7.03.**

<u>**Status of Progress, Period 2 IP §I.10., Relevant COA Standards**</u>:  Based on the

documentation submitted by defendants to COA, COA found the documents were in compliance

with six standards, in substantial compliance with five standards, and in partial compliance with

two standards.  The COA's findings are addressed in further detail in Section IV.B. of this

report.[237]

**Period 2 IP §II.1.**
**II.  Foster Care Services Assessment and Implementation Steps**
   **1.  Policy and Practice Guide**
       **Defendants shall revise DFCS policies and practice guides as necessary to**
       **reflect the COA foster care services standards and the requirements set**
       **forth in Section II.B of the Settlement Agreement, and identify any related**
       **training needs.**

<u>**Status of Progress, Period 2 IP §II.1.:**</u>  The required revisions were not completed

during Period 2, and all related training needs were not identified.  Defendants' progress toward

meeting this requirement is summarized below.

---

[235] *Infra* pp. 147-148.
[236] *Infra* pp. 148-149.
[237] *Infra* pp. 149-151.

Because the defendants did not complete the comprehensive review and revisions to DFCS policies and practice guides during Period 1, this requirement was included in the Period 2 IP.[238] However, progress has been limited. The June 10, 2010 Agreed Order requires defendants to develop several practice guides and revise specified sections of the DFCS policy manual during the Bridge Period.[239] The order also requires defendants to produce a schedule by which each section of the policy manual will be developed and finalized.[240] The schedule defendants have submitted states that all required revisions to the policy manual will be completed May 1, 2011.[241]

During Period 2, the CSF consultant who developed the practice model also crafted, in consultation with the defendants, six practice guides associated with the initial implementation of the practice model.[242] In addition, the defendants revised a number of DFCS policies; however, an initial review indicates certain inconsistencies with key Settlement Agreement requirements.[243]

---

[238] In mid-January 2009, defendants engaged an experienced child welfare professional to coordinate the required policy review. At the outset of Period 2, defendants reported that the review and revision process was ongoing and that they expected it to be completed by September 2009. Several additional assurances that the revisions would be completed during Period 2 were provided. Defendants have explained recently that additional time to develop the policy is necessary in order to ensure it is consistent with the practice model.

[239] June 10, 2010 Agreed Order at ¶¶ 7.d.and e.

[240] *Id.* at ¶ 7.d.1.

[241] Defendants submitted the schedule to plaintiffs' counsel and the Court Monitor on June 10, 2010.

[242] Practice Model Report at Appendix B. Because the report is voluminous, it is not included in the Appendix to this report. The report includes the following practice guides: Mobilizing Appropriate Services Timely; Assuring Safety and Managing Risk; Involving Children and Families in Case Activities and Decision Making; Strengths and Needs Assessments; Preserving and Maintaining Connections; and Individualized Case Planning. These documents are impressive; however, they ultimately must be tied to corresponding revisions in the DFCS policy manual. *See, e.g.,* Ex. 33, Practice Guide, Strengths and Needs Assessments, Practice Model Report, Appendix B.

[243] *See, e.g.,* Ex. 34, Bulletin 6276, Revised Intake Policy, October 1, 2009, Child Protective Services Procedure for Service Activity, Mississippi, Volume IV, Section B, 2010-2024-A. This policy requires Hotline staff to conduct a screening of all maltreatment reports within 24 hours of receipt and at that point submit the report to the appropriate DFCS supervisor for assignment. The policy states that after the report of maltreatment of a child in DFCS custody is screened in and assigned for a full investigation, the assigned caseworker has 24 hours to initiate the investigation. *Id.* at 2019. This suggests that the caseworker has 48 hours from the time the report is received by the Hotline to initiate investigations of maltreatment reports for children in DFCS custody. These provisions are inconsistent with the Settlement Agreement, which requires that all reports of maltreatment of children in custody must be initiated within 24 hours. Settlement Agreement at §II.B.4.e. An additional shortcoming in the policy concerns the

Period 2 IP §II.2.a.-d.

II. **Foster Care Services Assessment and Implementation Steps**

   2. **Foster Case Assessments**

      **Defendants shall conduct Foster Care Services Assessments in conjunction with a qualified independent consultant approved by the Monitor. The following Foster Care Services Assessments will be completed by October 1, 2009:**

      **a. A reunification services needs assessment;**

      **b. A service provider needs assessment with the purpose of identifying available medical, dental, and mental health services and gaps in services;**

      **c. An assessment of the quality and array of independent living services available to foster children ages 14-20; and**

      **d. A recruitment and retention assessment to determine the need for additional foster care support services.**

**<u>Status of Progress, Period 2 IP §II.2.a.-d.</u>:** Defendants engaged the CSF consultants who developed the practice model to conduct each of the required assessments. The final assessment report was submitted to the Monitor and plaintiffs' counsel on October 14, 2009.[244] The findings from the assessments were the result of a thorough evaluative process that sought to examine current needs, relevant policies and procedures, the existing service array, the efficacy of current services, gaps in the current service array, and recommendations for strengthening the service array.[245] Data were collected from several sources, including an electronic survey, a series of case record reviews, multiple focus groups with various child welfare system stakeholders, and a review of relevant DFCS policies and procedures.[246]

    The assessment report includes detailed findings related to the services that are available to the children in DFCS custody and their families. Among other findings, the report documents a critical shortage in individualized and effective reunification services statewide;[247] pervasive

---

identification of prior reports of maltreatment during the intake screening process. This issue, as it relates to the centralized Hotline that was implemented in November 2009, is discussed *infra* pp. 99-101. Defendants reported that pursuant to the requirements of the June 10, 2010 Agreed Order, the policy would be revised to conform with Settlement Agreement requirements by September 1, 2010. The Monitor will report on this matter in her forthcoming report on the Bridge Plan.

[244] The full report is included in the Appendix. Ex. 29, *supra* note 197.

[245] *Id.* at 20.

[246] *Id.* at 20-24.

[247] *Id.* at 39-41.

deficits in case file documentation related to medical, dental and mental health screening and evaluation that can impact the efficacy of services;[248] substantial limitations in access to an adequate array of mental health services;[249] significant shortcoming in access to dental services, particularly in rural areas;[250] the failure to document somatic health screenings in case files;[251] the failure to provide resource parents with Medicaid cards and with relevant health-related information concerning the medical needs of the children placed in their homes;[252] the failure to develop and implement individualized independent living plans or to provide individualized services tailored to each eligible in-custody youth's strengths and needs;[253] inconsistent implementation of foster care policy and practice among regions and counties within regions;[254] the failure to treat resource parents as partners in decision making;[255] an inadequate number of placement options for children entering foster care;[256] application costs which serve as a financial barrier to the recruitment of foster families;[257] the absence of recruitment plans for resource families;[258] a lack of funding to support initiatives for recruiting resource families;[259] failure to establish a single contact with statewide information about placement resources;[260] and the absence of an efficient and effective process to ensure appropriate therapeutic placements and services.[261]

---

[248] *Id.* at 68-69.
[249] *Id.*
[250] *Id.* at 69.
[251] *Id.*
[252] *Id.*
[253] *Id.* at 86.
[254] *Id.* at 108.
[255] *Id.* at 109.
[256] *Id.*
[257] *Id.*
[258] *Id.*
[259] *Id.*
[260] *Id.*
[261] *Id.*

Detailed recommendations for addressing each of these issues are included in the assessment report. The report's findings are consistent with data collected by the Monitor during Period 1 and 2. In light of the magnitude of these systemic deficits, there is an urgent need for defendants to develop and implement a well-considered strategic plan that addresses each of these limitations in tandem with the fiscal planning contemplated by Period 2 IP §I.7.b. and practice model implementation strategies.[262]

> **Period 2 IP §II.2.e.-g.**
> **II.  Foster Care Services Assessment and Implementation Steps**
>   **2.  Foster Case Assessments**
>      **The following Foster Care Services Assessments will be completed by January 1, 2010:**
>      **e.  A termination of parental rights ("TPR") assessment for the purposes of identifying those children who have been in custody more than 15 of the previous 22 months and for whom DFCS has not filed a TPR petition or documented an available exception under the federal Adoption and Safe Families Act ("ASFA") as required;**
>      **f.  A child safety assessment of DFCS practice for prioritizing, screening, assessing, and investigating reports of maltreatment of children to determine the extent to which DFCS investigations and decisions are based on a full and systematic evaluation of the factors that may place a child at risk; and**
>      **g.  A placement assessment of current needs for achieving compliance with the placement standards set forth in Section II.B.5 of the Settlement Agreement, which shall include (1) the structure of the placement process, including the role and efficacy of the state office placement unit; (2) the services and supports available to support enhanced placement stability, including out-patient or in-home assessment and treatment services to avoid the frequent use of time-limited assessment and treatment placement programs; and (3) the placement resources needed to meet the placement needs of children in custody.**

**Status of Progress, Period 2 IP §II.2.e.-g.:** The CSF consultants who developed the practice model also completed the termination of parental rights ("TPR"), child safety and placement assessments. The placement assessment was combined with the recruitment and retention assessment. The central findings from that assessment are described in the preceding

---

[262] *See also* discussion related to Period 2 IP §I.7.a. *supra* pp. 68-69.

narrative related to Period 2 IP §II.2.a.-d.[263]  Both the TPR and the child safety assessments were submitted to the Monitor and plaintiffs' counsel on a timely basis.[264]

The TPR assessment was based on a review and analysis of MACWIS reports, systematic efforts to validate MACWIS data through two sets of case record reviews, a staff survey, focus groups with various child welfare system stakeholders, and a review of DFCS policy and procedures.  The assessment found substantial limitations and inaccuracies in the data recorded in MACWIS,[265] which affect DFCS's ability to identify all children in care for 15 of the most recent 22 months for whom a TPR petition has been filed, who are legally free, or for whom a documented exception to the filing requirement is reflected in the case record.[266]  During the course of the assessment, MACWIS reporting was modified to ensure necessary data are captured and correctly reported; however, the assessment report notes that modifications to existing policy, enhanced staff training and other ongoing efforts will be necessary to ensure data are input correctly.[267]

The assessment also revealed that the circumstances that qualify as exceptions to filing TPRs are not documented as exceptions in the child's case plan or elsewhere in the case record.[268]  The assessment found that a reliable and uniform process for determining the date

---

[263] *Supra* pp. 72-74.
[264] The TPR assessment is described in a report dated November 24, 2009 that was submitted to the Monitor and plaintiffs' counsel on December 31, 2009.  Ex. 35, Termination of Parental Rights Assessment, Final Report, November 24, 2009, Center for the Support of Families, Inc. (redacted).  The findings related to the safety assessment were submitted to the Monitor and plaintiffs' counsel on October 14, 2009.  Ex. 29, *supra* note 197.
[265] Ex. 35 at 3-4.  A serious effort was made to validate and improve the quality of the data recorded in MACWIS during the course of the assessment, *Id.* at 9; however, the reviewers found minimal documentation related to the applicability of exceptions pursuant to the Adoption and Safe Families Act of 1997 [hereinafter ASFA], Pub. L. No. 105-89, 111 Stat 2115, despite an effort to improve recording and documentation practices during the assessment process.  Ex. 35 at 9-10.
[266] *Id*. at 21.
[267] *Id*. at 22.
[268] *Id*.  The assessment report notes that documentation in the case plan is required by federal law.  The report indicates that staff may not recognize when specific circumstances constitute exceptions to the filing requirement.

TPR petitions are filed has not been established.[269]  Moreover, systemic monitoring to ensure timely filing and appropriately documented exceptions is limited.[270]  The report includes recommendations for addressing each of these issues.[271]

The safety assessment included a review of relevant DFCS policy and procedures for prioritizing, screening, assessing and investigating reports of maltreatment in care, related COA standards and other Settlement Agreement requirements.  The assessment considered policy and practice related to the scope and content of the maltreatment intake and screening tools, safety and risk assessment tools, and the investigative process.  Data derived from a survey of DFCS staff, various child welfare system stakeholders, case reviews,[272] and MACWIS reports informed the assessment's findings.  Because the assessment preceded the introduction of the centralized Hotline, which defendants introduced on a statewide basis on November 1, 2009,[273] current intake and screening practices were not evaluated.

Among other findings, the assessment concluded that pre-Hotline screening decisions generally were accurate.  Moreover, the assessment found that safety assessments during investigations of maltreatment reports were conducted on a consistent basis.[274]  However, the assessment identified key limitations related to certain aspects of the investigative process, including:

> 1) the need to identify service needs concerning safety and risk issues, make appropriate referrals, and link children and resource families to services during the investigative process;
> 2) the need to ensure parents of children in foster care are notified of maltreatment reports related to their children;

---

[269]  *Id.*

[270]  *Id.*

[271]  *Id.* at 23-24.

[272]  Two samples were reviewed: reports of maltreatment in care that were screened out and reports of maltreatment in care that were screened in and investigated.  Ex. 29, *supra* note 197, at 125-128.

[273]  *See* narrative related to Period 2 IP § III.2., *infra* pp. 134-135.

[274]  *Id.* at 129.

3) the absence of a consistent practice of face-to-face contacts with
children who are alleged victims during the investigative process;

4) delays in the timeliness of initiating and completing investigations;[275]

5) shortcomings in the quality of investigations as evidenced by the failure
to interview all required parties;

6) deficits in documentation related to investigations, including
documentation related to supervisory reviews;

7) the use of a safety and risk assessment tool that is not tailored to
allegations of maltreatment in care and therefore may not capture
relevant information; and

8) the failure to clarify and enforce Settlement Agreement requirements
related to the use of corporal punishment by resource parents or facility
staff.[276]

The findings from the assessment are consistent with the Monitor's ongoing review of

maltreatment investigations,[277] as well as findings from the Monitor's case record review related

to maltreatment reports, which was conducted during the latter part of 2009.[278]

The assessment report includes a series of recommendations to address the issues

identified by the safety assessment.[279] Among other initiatives, the report recommends training

on investigating reports of maltreatment for all investigative and resource staff.[280] The Monitor's

ongoing review of investigative reports concerning allegations of maltreatment in care

underscores the critical need for defendants to bolster the quality of maltreatment investigations

---

[275] *See infra* pp. 106-110 for the narrative related to Period 2 IP §II.6.g., which includes a summary of relevant findings from the Monitor's case record reviews.

[276] *Id.* at 129-130.

[277] The Settlement Agreement requires that all reports of maltreatment concerning children in foster care must be initiated within 24 hours. Settlement Agreement §II.B.4.e.; Period 2 IP §II.6.g. The Monitor's review of the 136 serious incident reports documenting allegations of maltreatment in care, and the corresponding investigative reports that were transmitted to the Monitor during Period 2, indicates that 82 (60.3%) of the investigations were initiated within 24 hours; 20 (14.7%) of the investigations were initiated sometime between 24 and 48 hours; 19 (14.0%) of the investigations were initiated between three and seven days; and 4 (3%) of the investigations were initiated within eight to 12 days. In 11 (8.0%) instances, there was no documentation of a private face-to-face interview/contact with the victim. The lack of documentation was due to either the absence of an investigative report or the lack of a documented face-to-face interview/contact with the alleged victim.

[278] The complete findings from the case record review are summarized in Ex. 60, *infra* note 357.

[279] Ex. 29, *supra* note 197, at 129-130.

[280] *Id.* at 130.

77

through enhanced training and appropriate management oversight.[281]  Defendants have made

recent progress toward strengthening training related to the investigative process pursuant to the

_____

[281]  The Monitor reviews maltreatment investigation reports on an ongoing basis.  The maltreatment investigative reports that are described below, Exs. 36-47, contain information that falls within the purview of the August 5, 2004 Confidentiality Order, and thus the Monitor has moved to file them under seal.  The motion is pending.  Therefore, these exhibits are not included in the Appendix.  The reports raise many concerns about the timeliness and quality of the investigations that are conducted by caseworkers and approved by their supervisors.  For example, the investigative reports indicate that in some instances delays in face-to-face interviews/contacts with alleged victims place children at an unreasonable risk of harm.  *See, e.g.,* Ex. 36, DFCS investigation of October 16, 2009 report regarding maltreatment of S.S. (four-day delay between date of report and date alleged victim was interviewed when allegations included physical abuse, *i.e.*, whipping with a belt; caseworker observed bruising on child, concluded there was evidence to substantiate report and moved four children from foster home); Ex. 37,  DFCS investigation of August 14, 2009 report regarding maltreatment of J.A. (four-day delay between the date the alleged victim reported physical abuse, *i.e.*, whippings with belts, paddles and spanking spoons, to his DFCS caseworker and date of interview); Ex. 38, DFCS investigation of May 26, 2009 report regarding maltreatment of A.W. (seven-day delay between date alleged victim was interviewed and report by grandmother that her grandson and another youth were forced to sleep outside a group home for the night due to a curfew violation); Ex. 39, DFCS investigation of May 21, 2009 report regarding maltreatment of D.C. and K.P. (children, ages three and four, were not interviewed until seven days after it was reported that children stated they had been spanked and a relative of resource mother stated that she had been told by resource mother to spank the children with a belt).  In some instances the investigative reports document information that directly contradicts the investigative findings.  *See, e.g.,* Ex. 40,  DFCS investigation of December 7, 2009 report regarding maltreatment of J.W. and J.W. (report states that during a team meeting, two siblings described being put in a choke hold, landing on the floor and being kicked by the resource mother; report states resource mother did not deny allegations, but denied kicking the child stating she moved the child on the floor with her foot, demonstrated what she did and also admitted throwing water on the face of one of the children on another occasion as a reaction to the child cursing her; the report characterizes allegation as physical neglect, not physical abuse, and there was no substantiated finding of physical neglect or abuse).  Other investigative reports evidence inadequacies in the investigations that have been conducted.  *See, e.g.,* Ex. 41, DFCS investigation of February 8, 2010 report regarding maltreatment of P.O. (biological mother reported that her child had a black eye, bruise on her forehead, swollen ankle and hand, and burn on her hand; some marks were observed by investigator; foster mother explained that black eye and head bruise resulted from the child running into a dresser while the DFCS worker was present; based on the documentation in the report the DFCS worker who was allegedly present and the biological mother/reporter were not interviewed).  In addition, the reports demonstrate that corporal punishment of children in care by resource parents is not considered to be maltreatment.  *See supra* Ex. 37, DFCS investigation of August 14, 2009 report regarding maltreatment of J.A. (child reported physical abuse, *i.e.,* whippings with belts, paddles and spanking spoons; resource parents admitted to spanking the child, but stated they never left marks or bruises; investigation resulted in finding that the foster parents violated corporal punishment policy but no evidence of physical abuse); Ex. 42, DFCS investigation of November 16, 2009 report regarding maltreatment of R.R., E.R., and R.R. (children reported that they were whipped by resource mother's daughter with a paddle; resource mother admitted that she asked her daughter to whip the children and she admitted to "spanking on them"; investigation finds no evidence of physical abuse, and report states that corporal punishment is a policy violation);  Ex. 43, DFCS investigation of June 12, 2009 report regarding maltreatment of S.T. (child reported that she was whipped with a ruler; resource mother admitted to hitting child with ruler; report finds no evidence of physical abuse, but evidence of violation of corporal punishment policy).  Investigative reports also indicate there are at times significant inadequacies in identifying and/or documenting the risk of harm to children and developing appropriate safety plans during the course of maltreatment investigations.  *See, e.g.,* Ex. 44, DFCS investigation of October 22, 2009 report regarding maltreatment of D.S. and M.S. (child alleged that after mother of resource parent made him strip down to his underwear, and while brother-in-law of resource parent held him upside down by his feet, mother of resource parent took more than one switch and "switched" him on his calves and back; child also complained of being forced to sleep "downstairs with the rats and fleas"; caseworker found that child and his brother had marks from being disciplined with a switch, and resource parent admitted whipping and allowing a relative to use corporal punishment

Bridge Plan.  By September 1, 2010, defendants were required to develop a new training

curriculum, with the assistance of the CSF consultants who developed the practice model, and to

provide training on a statewide basis to all caseworkers engaged in maltreatment

investigations.[282]  An enhanced curriculum was developed during the Bridge Period, and as of

July 2010, the training process was underway.  The Monitor will report on this training initiative

in her forthcoming report on the Bridge Plan.  In addition to strengthening training related to

investigations, defendants also have made recent improvements in some of the DFCS

administrative processes that are used to provide notification of maltreatment reports related to

children in foster care.[283]

> Settlement Agreement §II.B.1.e.
> II.  Standards
>     B.  Foster Care Service Standards
>         1.  Screening and Assessments
>             By the end of implementation Period 2:
>             e.  All caseworkers carrying active cases and their supervisors will
>                 have undergone training on the individual and family team
>                 meeting protocols.[284]

**Status of Progress, Settlement Agreement §II.B.1.e.:**  The Period 2 IP required

defendants to develop individual and family team meeting protocols.[285]  The protocols were not

developed during Period 2.  Instead, in June 2009 defendants revised DFCS policy related to

---

on the children; safety plan states that worker has been trying to get approval to place the children in the father's
home and "is planning a transition move into that home soon"; however, there is no discussion of interim safety
plans for children); Ex. 45, DFCS investigation of February 4, 2010 report regarding maltreatment of N.M. (report
stated that youth went to a hotel with a girl who later told him that she was pregnant; investigator found that the
facility was neglectful due to failing to inform the child's caseworker that the youth had run away; safety plan stated
"the child will remain in DHS custody until appropriate placement is located for the child."; no indication of safety
plan pending a new placement).  Finally, many investigative reports present a disjointed chronology that results in an
inability to follow the course of the investigation.  *See, e.g.*, Ex. 46, DFCS investigation of April 5, 2010 report
regarding maltreatment of J.B.; Ex. 47, DFCS investigation of February 11, 2010 report regarding maltreatment of
S.H.
[282]  June 10, 2010 Agreed Order at ¶ 7.b.
[283]  DFCS uses Serious Incident Report forms [hereinafter SIRs] to document serious incidents, including reports of
maltreatment in care.  Defendants recently finalized a written protocol related to SIR processing and distributed a
revised SIR form to staff that is now available in an electronic format.  Although further improvements in SIR
documentation and tracking are warranted, these efforts are noteworthy.
[284]  The identical requirement is included in §II.3.b. of the Period 2 IP.
[285]  Period 2 IP §II.3.a.  *See infra* pp. 81-82 for a discussion of this requirement.

individual and family team meetings and report that they incorporated the revision into the

annual training on court procedure that is provided to DFCS staff.[286]  For the reasons set forth in

the narrative related to Period 2 IP §II.3.a.,[287] the policy cannot serve as a protocol for individual

and family team meetings.  Therefore, in the absence of the required protocols, the training could

not be conducted.

> **Settlement Agreement §II.B.1.f.**
> **II. Standards**
>    **B. Foster Care Service Standards**
>       **1. Screening and Assessments**
>         <u>**By the end of implementation Period 2:**</u>
>           **f. At least 40% of children entering custody during the Period shall have a thorough screening and assessment, consistent with Plan requirements, within 30 calendar days of entering custody.**

**Status of Progress, Settlement Agreement §II.B.1.f.:**  Defendants did not produce

validated data reports related to this subsection during Period 2 as contemplated by the settlement

agreement, and thus the Monitor was not able to assess whether this requirement was satisfied.

> **Settlement Agreement §II.B.1.g.**
> **II. Standards**
>    **B. Foster Care Service Standards**
>       **1. Screening and Assessments**
>         <u>**By the end of implementation Period 2:**</u>
>           **g. At least 40% of children entering custody or subject to a placement move during the Period shall have an individual team meeting (1) with the child and the assigned DFCS caseworker within the first 72 hours of initial placement or any subsequent placement moves; (2) with the child's parents and the assigned DFCS caseworker within the first two weeks of initial placement; and (3) with the foster care provider and the assigned DFCS caseworker within the first two weeks of any placement.**

**Status of Progress, Settlement Agreement §II.B.1.g.:**  Defendants did not produce

validated data reports related to this subsection during Period 2 as contemplated by the

Settlement Agreement, and thus the Monitor was not able to assess whether this requirement was

satisfied.

---

[286]  *See* Ex. 48, *infra* note 289, for the revised policy.
[287]  *Infra* pp. 81-82.

Settlement Agreement §II.B.1.h.
II.  Standards
    B.  Foster Care Service Standards
        1.  Screening and Assessments
            By the end of implementation Period 2:
            h.  In at least 40% of placement cases in which the whereabouts of
                one or both parents is unknown, DFCS shall have immediately
                instituted a diligent search for the parent(s), which shall be
                documented in the child's case record.

<u>**Status of Progress, Settlement Agreement §II.B.1.h.:**</u>  Defendants did not produce

validated data reports related to this subsection during Period 2 as contemplated by the

Settlement Agreement, and thus the Monitor was not able to assess whether this requirement was

satisfied.

Period 2 IP §II.3.a.
 II.  Foster Care Services Assessment and Implementation Steps
     3.  Screening and Assessments
         a.  By September 30, 2009, DFCS shall develop a protocol and training
             module for both individual and family team meetings as described in
             II.B.1.b of the Settlement Agreement.  The training module shall be
             incorporated into the pre-service and in-service training curricula.

<u>**Status of Progress, Period 2 IP §II.3.a.:**</u>  As addressed in the narrative related to

§II.B.1.e. of the Settlement Agreement,[288] the required protocol was not developed during Period

2.  In response to the requirements of this subsection, defendants revised DFCS policy related to

individual and family team meetings in June 2009;[289] however, defendants plan to make

additional revisions to the policy to make it consistent with the practice model.  Defendants

report that related modifications to the DFCS pre-service training curriculum were made on a

timely basis.  In addition, the DFCS training director reports that the June 2009 policy has been

incorporated into the advanced development in the court procedure curriculum that is offered to

DFCS staff on an annual basis.[290]

---

[288] *Supra* pp. 79-80.
[289] Ex. 48, Bulletin 6200, Family Team Meetings and Individual Team Meetings, June 4, 2009, Mississippi, Volume
IV, Revised June 2009, Section D, pp. 3308-3309-A.
[290] The Monitor has not had an opportunity to corroborate this report.

81

It is evident from a review of the June 2009 policy revision that it cannot serve as a protocol for individual and family team meetings.[291] The policy does not provide adequate guidance to caseworkers on the principles that undergird individual and family team meetings or on applied practices, including information related to the role and associated responsibilities of the caseworker prior to, during, and subsequent to the meetings; the scope, content, and goals of the meetings; available resources; documentation requirements; and facilitation methods, including strategies for resolving disputes that may occur during the meetings.

> **Period 2 IP §II.3.a.**
> **Relevant COA Standards: PA-FC 1.01, PA-CPS 7.02, PA-FC 2.02, PA-AS 2.05, PA-FC 8.01.**

**Status of Progress, Period 2 IP §II.3.a., Relevant COA Standards:** Based on the documentation submitted by defendants to COA, COA found the documents were in compliance with one standard and in substantial compliance with four standards. The COA's findings are addressed in further detail in Section IV.B. of this report.[292]

> **Settlement Agreement §II.B.2.d.**
> **II. Standards**
>     **B. Foster Care Service Standards**
>         **2. Service Planning and Monitoring**
>           **By the end of implementation Period 2:**
>             **d. At least 40% of children entering custody during the Period shall**
>               **have a team meeting with service plans developed for both the**
>               **child and the parents, consistent with Plan requirements, within**
>               **30 calendar days of entry into foster care.**

**Status of Progress, Settlement Agreement §II.B.2.d.:** Defendants did not produce validated data reports related to this subsection during Period 2 as contemplated by the Settlement Agreement, and thus the Monitor was not able to assess whether this requirement was satisfied.

> **Settlement Agreement §II.B.2.e.**
> **II. Standards**
>     **B. Foster Care Service Standards**

---

[291] The policy is somewhat confusing at least in part because it does not track case processing chronologically.
[292] *Infra* pp. 152-153.

> **2. Service Planning and Monitoring**
> **By the end of implementation Period 2:**
> **e. At least 40% of children in custody during the Period shall have team meetings, at which time their service plans shall be updated, quarterly and within 30 calendar days of any placement or other significant change, consistent with Plan requirements.**

**Status of Progress, Settlement Agreement §II.B.2.e.:**  Defendants did not produce

validated data reports related to this subsection during Period 2 as contemplated by the

Settlement Agreement, and thus the Monitor was not able to assess whether this requirement was

satisfied.

> **Period 2 IP §II.4.a.-c.**
> **II. Foster Care Services Assessment and Implementation Steps**
> **4. Service Planning and Monitoring**
> **The revised policies and practice guides shall require that each service plan and revision of such plan meets the requirements of section II.B.2 of the Settlement Agreement and:**
> **a. is based on the assessment required by section II.B.1 of the Settlement Agreement;**
> **b. includes: service goals, desired outcomes, and timeframes for achieving them; services and supports to be provided, and by whom; and the signature of the parents and, when appropriate, the child or youth; and**
> **c. addresses, as appropriate: unmet service and support needs that impact safety, permanency, and well-being; maintaining and strengthening relationships; educational needs and goals; and the need for culturally responsive services and the support of the family's informal social network.**

**Status of Progress, Period 2 IP §II.4.a.-c.:**  As noted previously,[293] defendants have not

revised the DFCS policy manual as required.  However, during Period 2, the consultants who

developed the practice model also developed a practice guide, in consultation with the

defendants, which addresses service planning in a methodical and comprehensive manner.[294]  As

contemplated by the Settlement Agreement, a related policy, training program, and adequate

---

[293]  *See* discussion related to Period 2 IP §II.1. *supra* pp. 70-71.
[294]  Ex. 49, Practice Guide, Mobilizing Appropriate Services Timely, excerpt, Practice Model Report, Appendix B, *supra* note 172.

service array will need to be developed in order for the service plans to be developed and

implemented in an appropriate fashion.[295]

> **Period 2 IP §II.4.a.-c.**
> **Relevant COA Standards: PA-CPS 8.03, PA-CPS 8.01, PA-CPS 8.05, PA-FC 3.07.**

**Status of Progress, Period 2 IP §II.4.a.-c., Relevant COA Standards:** Based on the

documentation submitted by defendants to COA, COA found the documents were in compliance

with two standards and in substantial compliance with two standards. The COA's findings are

addressed in further detail in Section IV.B. of this report.[296]

> **Settlement Agreement §II.B.3.a.5.**
> **II. Standards**
>   **B. Foster Care Service Standards**
>     **3. Child and Youth Permanency**
>       **a. Permanency Plan**
>         **By the end of implementation Period 2:**
>           **5. A least 50% of children entering care during the Period shall**
>              **have a permanency plan within 30 calendar days of their entry**
>              **into care consistent with Plan requirements.**

**Status of Progress, Settlement Agreement §II.B.3.a.5.:** Defendants did not produce

validated data reports related to this subsection during Period 2 as contemplated by the

Settlement Agreement, and thus the Monitor was not able to assess whether this requirement was

satisfied.

> **Settlement Agreement §II.B.3.a.6.**
> **II. Standards**
>   **B. Foster Care Service Standards**
>     **3. Child and Youth Permanency**
>       **a. Permanency Plan**
>         **By the end of implementation Period 2:**
>           **6. At least 50% of children in custody during the Period shall have**
>              **a permanency plan that is consistent with Plan requirements.**

**Status of Progress, Settlement Agreement §II.B.3.a.6.:** Defendants did not produce

validated data reports related to this subsection during Period 2 as contemplated by the

---

[295] The findings from the foster care services assessments, *supra* pp. 70-79, indicate this will be a substantial undertaking.
[296] *Infra* p. 153.

Settlement Agreement, and thus the Monitor was not able to assess whether this requirement was

satisfied.

> **Period 2 IP §II.5.a.1. and 2.**
> **II. Foster Care Services Assessment and Implementation Steps**
>    **5. Child and Youth Permanency**
>      **a. Permanency Plan**
>       **The revised policies and practice guides shall require that:**
>       **1) All permanency plans contain specific information about:**
>         **i. How the permanency goal will be achieved;**
>         **ii. What services are necessary to make the accomplishment of the goal likely;**
>         **iii. Who is responsible for the provision of those services;**
>         **iv. When the services will be provided; and**
>         **v. The date by which the permanency goal is likely to be achieved.**
>       **2) All services documented in the case record as necessary for the achievement of the permanency goal are provided within the time period in which they are needed, by either providing those services directly, contracting with a private provider for those services, or referring to an existing service provider for the provision of those services.**

**Status of Progress, Period 2 IP §II.5.a.1. and 2.:** As noted previously,[297] defendants

have not revised the DFCS policy manual as required. However, during Period 2, the consultants

who developed the practice model developed a practice guide, in consultation with the

defendants, which addresses permanency planning and services to achieve the permanency goal.

The practice guide is comprehensive and practice steps are presented in a methodical manner.[298]

As contemplated by the Settlement Agreement, the related policy and an appropriate service

array will need to be developed.[299]

> **Period 2 IP §II.5.a.**
> **Relevant COA Standard: PA-FC 4.01.**

**Status of Progress, Period 2 IP §II.5.a., Relevant COA Standard:** Based on the

documentation submitted by defendants to COA, COA found the documents were in substantial

---

[297] *Supra* pp. 70-71.
[298] Ex. 50, Practice Guide, Individualized Case Planning, excerpt, Practice Model Report, Appendix B; *see supra* note 172.
[299] *See* findings from the foster care services assessments, *supra* pp. 70-79.

compliance with this standard. This COA finding is addressed in further detail in Section IV.B.

of this report.[300]

> **Settlement Agreement §II.B.3.b.2.**
> **II. Standards**
>    **B. Foster Care Service Standards**
>       **3. Child and Youth Permanency**
>          **b. Concurrent Planning**
>          <u>**By the end of implementation Period 2:**</u>
>          **2. At least 50% of children in custody during the Period with the goal of reunification shall have case record documentation reflecting active concurrent permanency planning consistent with Plan requirements.**

<u>**Status of Progress, Settlement Agreement §II.B.3.b.2.:**</u>  Defendants did not produce

validated data reports related to this subsection during Period 2 as contemplated by the

Settlement Agreement, and thus the Monitor was not able to assess whether this requirement was

satisfied.

> **Settlement Agreement §II.B.3.c.3.**
> **II. Standards**
>    **B. Foster Care Service Standards**
>       **3. Child and Youth Permanency**
>          **c. Permanency Plan Updating and Review**
>          <u>**By the end of implementation Period 2:**</u>
>          **3. At least 50% of children in custody at least six months during the Period shall have a timely court or administrative case review consistent with Plan requirements during the Period.**

<u>**Status of Progress, Settlement Agreement §II.B.3.c.3.:**</u>  Defendants did not produce

validated data reports related to this subsection during Period 2 as contemplated by the

Settlement Agreement, and thus the Monitor was not able to assess whether this requirement was

satisfied.

> **Settlement Agreement §II.B.3.c.4.**
> **II. Standards**
>    **B. Foster Care Service Standards**
>       **3. Child and Youth Permanency**
>          **c. Permanency Plan Updating and Review**
>          <u>**By the end of implementation Period 2:**</u>

---

[300] *Infra* pp. 153-154.

    **4. At least 50% of children in custody at least 12 months during
the Period shall have a timely annual court review consistent
with Plan requirements during the Period.**

**Status of Progress, Settlement Agreement §II.B.3.c.4.:**  Defendants did not produce

validated data reports related to this subsection during Period 2 as contemplated by the

Settlement Agreement, and thus the Monitor was not able to assess whether this requirement was

satisfied.  Because the Bridge Plan requires defendants to submit validated data reports related to

this requirement,[301] the Monitor expects to report on annual reviews in her forthcoming report on

the Bridge Plan.

> **Period 2 IP §II.5.b.1.**
> **II.  Foster Care Services Assessment and Implementation Steps**
>     **5.  Child and Youth Permanency**
>         **b.  Permanency Plan Updating and Review**
>             **1.  By July 1, 2009, Defendants shall implement a system to
> facilitate a court review for every foster child within 12 months of
> initial placement and annually thereafter. That system shall include
> the capacity to: (1) track scheduled annual court reviews, and notify
> the Youth Court with jurisdiction over the child of any reviews that
> need to be scheduled or re-scheduled so as to meet the requirements
> of section II.B.3.c of the Settlement Agreement; (2) ensure that the
> Youth Court with jurisdiction is provided with a detailed up-to-date
> report on the current status of the child's placement, visitation,
> permanent plan progress, and service needs no later than 30
> calendar days before a scheduled court review or at a time otherwise
> directed by the Court; and (3) ensure that the child's assigned
> caseworker or supervisor attends any such scheduled court review.**

**Status of Progress, Period 2 IP §II.5.b.1.:**  The required system was not implemented

during Period 2.  However, there is evidence of defendants' efforts to improve the quality of the

data that are recorded in MACWIS during Period 2.[302]

> **Settlement Agreement §II.B.3.d.4.**
> **II.  Standards**
>     **B.  Foster Care Service Standards**
>         **3.  Child and Youth Permanency**
>             **d.  Reunification Services**
>                 <u>**By the end of implementation Period 2:**</u>

---

[301]  June 10, 2010 Agreed Order at Ex. A. p. 2.
[302]  *See, e.g.* Ex. 51, Mississippi Department of Human Services Division of Family and Children's Services, Child
Welfare Professional Development Unit, Newsletter, Vol. 2, Issue 5, May 2010, at 9 (redacted excerpt).

    **4. At least 40% of children with a permanency goal of reunification during the Period shall have service plans for their parents that identify those services DFCS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care and case record documentation that DFCS made those identified services available directly or through referral.**

**Status of Progress, Settlement Agreement §II.B.3.d.4.:** Defendants did not produce validated data reports related to this subsection during Period 2 as contemplated by the Settlement Agreement, and thus the Monitor was not able to assess whether this requirement was satisfied.

    **Period 2 IP §II.5.c.1.**
    **II. Foster Care Services Assessment and Implementation Steps**
      **5. Child and Youth Permanency**
        **c. Reunification Services**
          **1. Defendants, in conjunction with a qualified independent consultant approved by the Monitor, shall develop and begin implementing a written plan to meet the needs identified in the required Foster Care Services Reunification Needs Assessment, with specific steps and timetables for addressing gaps in the availability of effective services. Such plan shall be developed by January 1, 2010.**

**Status of Progress, Period 2 IP §II.5.c.1.:** The required plan was not developed during Period 2.

    **Period 2 IP §II.5.c.1.**
    **Relevant COA Standard: PA-FC 8.02.**

**Status of Progress, Period 2 IP §II.5.c.1., Relevant COA Standard:** Based on the documentation submitted by defendants to COA, COA found the documents were in substantial compliance with this standard. This COA finding is addressed in further detail in Section IV.B. of this report.[303]

    **Settlement Agreement §II.B.3.e.3.**
    **II. Standards**
      **B. Foster Care Service Standards**
        **3. Child and Youth Permanency**
          **e. Termination of Parental Rights**
            <u>**By the end of implementation Period 2:**</u>

---

[303] *Infra* p. 154.

> 3. **At least 40% of children in custody reaching the point at which they have spent 15 of the previous 22 months in foster care during the Period shall have a petition for TPR filed on their behalf or an available exception under the federal ASFA documented by the end of their fifteenth month in care.**

**Status of Progress, Settlement Agreement §II.B.3.e.3.:** Although substantial efforts were made to validate data reports implicated by this subsection as part of the TPR assessment that was conducted during Period 2,[304] defendants did not produce validated data reports related to this subsection as contemplated by the Settlement Agreement. Until the defendants address the shortcomings revealed by the assessment,[305] it will not be possible to identify all children in care who fall within the purview of this requirement. Thus, the Monitor was not able to assess whether this requirement was satisfied during Period 2. Pursuant to the Bridge Plan, defendants are required to produce validated data reports related to this subsection.[306] Accordingly, the Monitor expects to report on defendants' progress in her forthcoming report on the Bridge Plan.

> Settlement Agreement §II.B.3.e.4.
> II. Standards
>    B. Foster Care Service Standards
>       3. Child and Youth Permanency
>          e. Termination of Parental Rights
>            <u>By the end of implementation Period 2:</u>
>            4. **At least 40% of children in custody during the Period who have spent more than 15 of the previous 22 months in foster care without a TPR petition filed on their behalf or an available ASFA exception documented by the end of their fifteenth month in care shall have such a petition filed or an available exception documented within the Period.**

**Status of Progress, Settlement Agreement §II.B.3.e.4.:** The status of progress related to this requirement is reflected in the preceding narrative related to Settlement Agreement §II.B.3.e.3.

---

[304] The TPR assessment is addressed *supra* pp. 74-76.
[305] *Id*.
[306] June 10, 2010 Agreed Order at Ex. A, p. 1.

Period 2 IP §II.5.d.1.
II. Foster Care Services Assessment and Implementation Steps
    5. Child and Youth Permanency
        d. Termination of Parental Rights/Special Permanency Reviews
            1. By January 4, 2010, DFCS shall begin the implementation of a "tickler" system for notifying caseworkers and caseworker supervisors when a case assigned to them has reached the following milestones: 12 months after a child entered custody; 30 calendar days after the establishment of adoption as the primary permanency goal; 30 calendar days after a TPR referral has been made; and 10 calendar days after a TPR packet has been returned to DFCS because of a legal deficiency.

**Status of Progress, Period 2 IP §II.5.d.1.:** Defendants report that the system was completed on March 8, 2010 and implemented during Period 2. There is evidence that staff were notified about the introduction of some aspects of the required tickler system; however, the Monitor has not had an opportunity to corroborate this evidence or to determine the extent to which the tickler system is operational.

Period 2 IP §II.5.d.2.
II. Foster Care Services Assessment and Implementation Steps
    5. Child and Youth Permanency
        d. Termination of Parental Rights/Special Permanency Reviews
            2. By December 1, 2009, DFCS shall have held a special permanency review for each child in DFCS custody who had, as of January 4, 2008, been in foster care more than 15 of the previous 22 months, and for whom DFCS has not filed a TPR petition or documented an available ASFA exception. For each child who reaches more than 15 of the previous 22 months in foster care after January 4, 2008, and for whom DFCS has not filed a TPR petition or documented an available ASFA exception, DFCS shall begin holding special permanency reviews. Such permanency reviews shall include the DFCS caseworker, the caseworker's direct supervisor, and at least one individual with expertise in permanency planning who has not held direct casework or supervisory responsibility for the case. The review will produce a written plan of action setting forth the steps to be taken by DFCS, the contract agency, and/or any other provider of services, in order to move the child to permanency as quickly as possible. Such permanency reviews shall be documented in the child's case record, and reconvened monthly until all barriers to permanency have been resolved, a TPR petition has been filed, or an available ASFA exception has been documented in the child's case record.

**Status of Progress, Period 2 IP §II.5.d.2.:** As described in the narrative related to

Period 2 IP §II.2.e.,[307] the TPR assessment that was conducted during Period 2 determined that

there are significant limitations in the accuracy of data collected in MACWIS. The assessment

identified an apparent systemic failure to properly document ASFA exceptions, which was

attributed, at least in part, to the failure of field staff (and presumably their supervisors) to

recognize when exceptions exist. The absence of a reliable and uniform process that is used on a

statewide basis to determine the date TPR petitions are filed was identified as an additional

capacity deficit which, according to the defendants, was corrected in February 2010.[308] Among

other remedial initiatives, the assessment report recommends modifications in DFCS policy as

well as staff training to address these issues.[309] Pursuant to the Bridge Plan,[310] the defendants are

required to provide validated data reports that identify the cohort of children subject to the

requirements of this subsection. Until the data reports establish that defendants can identify the

correct cohort of children for whom permanency reviews are required, a reliable assessment of

defendants' performance cannot be conducted.

> Settlement Agreement §II.B.3.f.6.
> **II. Standards**
>> **B. Foster Care Service Standards**
>>> **3. Child and Youth Permanency**
>>>> **f. Adoption**
>>>>> **By the end of implementation Period 2:**
>>>>> **6. At least 75% of children in custody with the primary permanency goal of adoption during the Period shall have an assigned adoption specialist and an adoption plan that identifies the child-specific activities that DFCS will undertake to achieve adoption, and shall receive regular adoption status meetings consistent with Plan requirements.**

---

[307] *Supra* pp. 74-76.
[308] Defendants report that since February 5, 2010 these data have been collected and disseminated by the Office of the Attorney General [hereinafter OAG]. The Monitor has reviewed one of the reports produced by the OAG, and it appears to address the necessary data; however, the Monitor has not had an opportunity to determine the validity of the data or to determine how they are used.
[309] *Supra* p. 75.
[310] June 10, 2010 Agreed Order at Ex. A., p.1.

**Status of Progress, Settlement Agreement §II.B.3.f.6.:** As a threshold matter, the Monitor has been unable to confirm representations made by DFCS managers regarding the availability of adoption specialists on a statewide basis during Period 2 who performed the functions specified by this subsection. The Monitor requested that defendants submit the evidence to support these representations during the comment period on the draft version of this report. The evidence was not submitted. Additionally, defendants did not produce validated data reports related to this requirement during Period 2 as contemplated by the Settlement Agreement and thus the Monitor was unable to assess defendants' progress related to this requirement.

> **Settlement Agreement §II.B.3.f.7.**
> **II. Standards**
>   **B. Foster Care Service Standards**
>     **3. Child and Youth Permanency**
>       **f. Adoption**
>         **By the end of implementation Period 2:**
>         **7. At least 75% of children in custody during the Period who are legally free for adoption but are not in a home with approved adoptive parents within six months after being legally freed for adoption shall have an assigned external adoption consultant consistent with Plan requirements to ensure the adoption plan is implemented.**

**Status of Progress, Settlement Agreement §II.B.3.f.7.:** The defendants did not engage external adoption consultants during Period 2, and thus did not have the capacity to satisfy this requirement.

> **Period 2 IP §II.5.e.1.**
> **II. Foster Care Services Assessment and Implementation Steps**
>   **5. Child and Youth Permanency**
>     **e. Adoption**
>       **1. By July 1, 2009, DFCS shall define the job description, responsibilities, and qualifications for the position of adoption specialist. The adoption specialist's responsibilities shall include consulting with private and public professionals and identifying and ensuring the provision of targeted services necessary for the child to be adopted.**

**Status of Progress, Period 2 IP §II.5.e.1.:** A draft position description dated June 26, 2009 was submitted to the Monitor by DFCS management.[311] The position description does not include the job responsibilities required by this subsection. Based on reports from DFCS managers, it appears that defendants did not finalize the position description because a determination was made to use existing resource workers to perform the duties of the adoption specialists. However, it does not appear that this course of action was implemented on a statewide basis. Resource workers assist with adoptive placements and are also responsible for recruiting and licensing resource homes. Based on reports from DFCS county office staff, the backlog of relative placements that remained unlicensed during Period 2,[312] and the systemic shortage of licensed resource homes, it does not appear DFCS had a sufficient number of resource workers on a statewide basis that could be reassigned to serve as adoption specialists during Period 2.

> Period 2 IP §II.5.e.2.
> **II. Foster Care Services Assessment and Implementation Steps**
> **5. Child and Youth Permanency**
> **e. Adoption**
> **2. By July 1, 2009, DFCS shall develop a protocol for adoption meetings, which are to be held to review the progress being made in achieving the goal of adoption for legally free children.**

---

[311] Ex. 52, Adoption Specialist Job Duties, Draft 06-26-09.
[312] Pursuant to Settlement Agreement §II.B.5.j., defendants were required to develop and implement a process for expedited licensure of relative caregivers during Period 1. Because the requirement was not satisfied, the Period 2 IP required defendants to develop and implement a plan to license all unlicensed caregivers by the end of Period 2. *See* Period 2 IP §II.7.b. It also required the development and implementation of an expedited process for licensing screened relative caregivers during Period 2, Period 2 IP §II.7.c. Because these requirements were not satisfied during Period 2, the Bridge Plan requires defendants to take corrective action. June 10, 2010 Agreed Order at ¶ 7.f.

**Status of Progress, Period 2 IP §II.5.e.2.:**  A protocol for adoption meetings was developed during Period 2.[313]  This document does not provide sufficient information to guide case practice.

> **Period 2 IP §II.5.e.3.**
> **II.  Foster Care Services Assessment and Implementation Steps**
>    **5.  Child and Youth Permanency**
>       **e.  Adoption**
>          **3.  By July 1, 2009, DFCS shall have identified external adoption**
>             **consultants who DFCS can contract with to provide adoption**
>             **recruitment assistance to children who have been free for adoption**
>             **for six or more months and who are not yet placed in an approved**
>             **adoptive home.**

**Status of Progress, Period 2 IP §II.5.e.3.:**  Defendants reported that they had identified external adoption consultants with whom they could contract in order to obtain the required external consultative services; however, they noted that these external entities were not contacted regarding their interest in, and availability for, providing these services.[314]  This Period 2 requirement contemplates that defendants would engage in concrete planning activities to determine whether a pool of appropriately qualified individuals/entities actually were available by the July 1, 2009 start of the then-new fiscal year to provide required consultative services. The identification of entities who might be contacted does not meet the spirit of this requirement.

> **Period 2 IP §II.5.e.4.**
> **II.  Foster Care Services Assessment and Implementation Steps**
>    **5.  Child and Youth Permanency**
>       **e.  Adoption**
>          **4.  DFCS shall take reasonable steps to hire (or promote) and train a**
>             **sufficient number of adoption specialists to meet the adoption**
>             **requirements of Section II.B.3.f of the Settlement Agreement.**
>             **Adoption status meetings consistent with the Settlement Agreement**
>             **will start being held.**

---

[313]  Ex. 53, Protocol for Adoption Meetings, submitted to the Monitor by DFCS management during Period 2.  The Monitor has been unable to confirm the date this document was finalized and has not been able to determine whether it has been distributed to staff.

[314]  Ex. 54, External Adoption Consultant (redacted), submitted to the Monitor by DFCS management during Period 2.  This document in relevant part states:  "several qualified private practitioners have been identified but have not been contacted and, therefore, cannot be listed."  The document also lists licensed child-placing agencies "which would be given an opportunity to contract with DFCS…."  *Id.*

**Status of Progress, Period 2 IP §II.5.e.4.:** As noted in the narrative related to Settlement Agreement §II.B.3.f.6.,[315] the Monitor has been unable to confirm representations made by DFCS managers regarding the availability of adoption specialists to perform the functions specified by this subsection on a statewide basis during Period 2. The Monitor requested that defendants submit evidence supporting these representations during the comment period on the draft version of this report. No evidence was submitted.

> **Period 2 IP §II.5.e.5.**
> **II. Foster Care Services Assessment and Implementation Steps**
> **5. Child and Youth Permanency**
> **e. Adoption**
> **5. By October 1, 2009, DFCS shall develop and begin implementing a process for making legal risk placements that assures that children for whom the permanency plan is adoption but who are not yet legally free for adoption are placed in appropriate adoptive homes.**

**Status of Progress, Period 2 IP §II.5.e.5.:** The required process was not developed during Period 2.

> **Period 2 IP §II.5.e.6.**
> **II. Foster Care Services Assessment and Implementation Steps**
> **5. Child and Youth Permanency**
> **e. Adoption**
> **6. By October 1, 2009, DFCS shall implement a process for advising all potential adoptive families, including any foster family caring for a child who has become legally available for adoption, of the availability of adoption subsidies. This notification shall be documented in the child's record, and the family's access to such subsidies shall be facilitated.**

**Status of Progress, Period 2 IP §II.5.e.6.:** The required process was not implemented during Period 2.

> **Period 2 IP §II.5.e.**
> **Relevant COA Standards: PA-AS 8.05, PA-AS 2.03, PA-AS 8.01, PA-AS 7.02, PA-AS 3.02, PA-AS 3.04, PA-AS 11.01, PA-AS 11.02.**

**Status of Progress, Period 2 IP §II.5.e., Relevant COA Standards:** Based on the documentation submitted by defendants to COA, COA found the documents were in compliance

---

[315] *Supra* pp. 91-92.

with two standards and in substantial compliance with six standards. The COA's findings are addressed in further detail in Section IV.B. of this report.[316]

> **Settlement Agreement §II.B.4.k.**
> **II. Standards**
>    **B. Foster Care Service Standards**
>      **4. Child Safety**
>       **By the end of implementation Period 2:**
>       **k. For investigations of agency group homes, emergency shelters, and private child placing agency foster homes, the Licensure Unit shall undertake a separate investigation of the contract provider's compliance with DFCS licensure standards.**

**Status of Progress, Settlement Agreement §II.B.4.k.:** As explained below, this requirement was not satisfied during Period 2.

Separate investigations of the contract provider's compliance with DFCS licensure standards are not conducted routinely in large part because defendants do not have the capacity to do so. DFCS maintains a state office licensure unit that is responsible for the licensure, renewal and monitoring of over 100 group homes, emergency shelters and private child-placing agency foster homes that are operated by nearly 50 separate private agencies throughout the state. A licensure unit director was hired in 2009. In addition to the director, the unit currently has two staff members.[317] The unit is not staffed to conduct the required investigations.

Nonetheless, the licensure unit tracks investigations related to reports of maltreatment in care concerning the facilities and therapeutic foster homes implicated by this subsection. Licensure unit staff review the investigative reports related to maltreatment investigations and respond on an *ad hoc* basis, by conducting site visits and, at times, requiring corrective action. Additional resources will be required in order for the licensure unit to develop the capacity to conduct the licensure investigations that are required by this subsection.

---

[316] *Infra* pp. 154-155.
[317] A third staff member recently accepted a position in the DFCS CQI unit.

**Period 2 IP §II.6.a.**
**II. Foster Care Services Assessment and Implementation Steps**
    **6. Child Safety**
        **a. By May 1, 2009, Defendants shall instruct all DFCS staff that as mandated reporters they are required to formally report any suspicions of maltreatment, including corporal punishment, of children in custody.**

**Status of Progress, Period 2 IP §II.6.a.:** Because this requirement was not satisfied during Period 1,[318] it was included in the Period 2 IP. As described in the Monitor's June 2009 Report,[319] defendants issued a policy bulletin in January 2008 instructing all DFCS staff that as mandated reporters they were required to report formally any suspicious of maltreatment, including corporal punishment, of children in resource homes.[320] Because the bulletin was limited to resource homes, and did not address other settings, the Monitor reported that it did not satisfy Period 1 requirements.[321] Thereafter, in February 2010, defendants provided written guidance to DFCS staff that incorporated the requirements of this subsection.[322] The related policy was revised during the Bridge Period and defendants expect to issue it in the near term. The Monitor has reviewed the revision, and it comports with the requirements of this subsection.

**Period 2 IP §II.6.b.**
**II. Foster Care Services Assessment and Implementation Steps**
    **6. Child Safety**
        **b. By January 1, 2010, DFCS shall assure that standardized decision-making criteria are used for prioritizing, screening, and assessing all reports of maltreatment, including corporal punishment, of children in DFCS custody.**

**Status of Progress, Period 2 IP §II.6.b.:** As explained below, although there has been progress, this requirement has not been satisfied.

---

[318] Period 1 IP §II.4.
[319] June 2009 Report at 81-82.
[320] Ex. 55, MDHS, DFCS, Bulletin 6154, Mandatory Reporting Requirement, January 24, 2008.
[321] June 2009 Report at 82.
[322] Ex. 56, Mississippi Department of Human Services Division of Family and Children's Services, Child Welfare Professional Development Unit, Newsletter, Vol. 2, Issue 2, February 2010, Mandating Reporting Reminder, at 1 (excerpt).

Pursuant to Period 2 requirements,[323] during the last quarter of 2009, defendants began to operate a centralized Hotline for reporting all allegations of child abuse and neglect on a statewide basis. As a matter of policy, Hotline intake workers screen reports of maltreatment according to standardized criteria; however, DFCS supervisors are permitted to reconsider these screening decisions in several circumstances, including if staff in the DFCS county office have "additional information that might result in a change in the screening level."[324] Thus, by its express terms, DFCS policy during Period 2 did not comport with the requirements of this subsection.[325]

Interviews with Hotline supervisors and staff, as well as with DFCS managers and county office staff, indicate that case practice is consistent with these policy directives. According to the interview data, county office staff and/or their supervisors at times override the Hotline intake workers' screening determinations based on subjective judgments, including judgments that are informed by independent knowledge of the child and/or family. The frequency of this practice is difficult to determine because the historical record related to individual screening decisions has not been available.[326] However, the Monitor has interviewed DFCS managers and supervisory staff who have confirmed their reliance on their own subjective judgments to override screening decisions that have been made by the Hotline's intake workers. This is precisely the type of circumstance that the requirement for utilizing standardized decision-making criteria is intended to prohibit. Defendants must address this issue in order to ensure the intake screening process meets the requirements of the Settlement Agreement.

---

[323] Period 2 IP §II.B.6.d. A similar Period 2 requirement is included in Period 2 IP §III.2.
[324] *See* Ex. 34, *supra* note 243, at 2020-A.
[325] Defendants reported that the policy was revised during the Bridge Period. The Monitor will report on this matter in her forthcoming report related to the June 10, 2010 Agreed Order.
[326] Defendants have been working to develop a reliable method for tracking and reporting on these data.

In addition, the assessment of maltreatment reports is not standardized.[327] As described above,[328] defendants are required to take corrective action to strengthen the assessment of maltreatment reports during the Bridge Period.[329]

> **Period 2 IP §II.6.c.**
> **II. Foster Care Services Assessment and Implementation Steps**
>   **6. Child Safety**
>     **c. By January 1, 2010, Defendants shall revise DFCS policies and procedures for screening and investigating reports of child maltreatment, including corporal punishment, to incorporate the child safety standards and requirements set forth in Section II.B.4 of the Settlement Agreement.**

**<u>Status of Progress, Period 2 IP §II.6.c.</u>:** As noted above,[330] DFCS policies and procedures have not been revised to incorporate the Settlement Agreement's child safety standards and requirements. Pursuant to the Bridge Plan, defendants are required to develop certain policy documents and practice guides related to the requirements of this subsection.[331] Accordingly, the Monitor will report on defendants' progress in her forthcoming report on the Bridge Plan.

> **Period 2 IP §II.6.d.**
> **II. Foster Care Services Assessment and Implementation Steps**
>   **6. Child Safety**
>     **d. By September 1, 2009, all calls to the hotline shall immediately be entered into the statewide computer information system, and the worker or supervisor receiving the report shall use the information system to determine whether there have been prior reports of abuse and/or neglect in that family or concerning that child. If a report is screened in, information regarding any prior reports shall immediately be made available to the worker to whom the case has been assigned for investigation.**

**<u>Status of Progress, Period 2 IP §II.6.d.</u>:** Defendants made significant progress toward meeting this requirement during Period 2 by establishing a statewide Hotline for reporting child abuse and neglect. However, because of critical limitations in MACWIS, which compromise the

---

[327] This matter is addressed *supra* note 281 and related text.
[328] *Supra* p. 79.
[329] June 10, 2010 Agreed Order at ¶ 7.b.
[330] *Supra* p. 70-71.
[331] June 10, 2010 Agreed Order at ¶ 7.c. and d.

ability to access accurate and complete data regarding prior maltreatment reports, defendants currently do not have the capacity to provide a reasonable assurance that information regarding prior maltreatment reports is available immediately to the assigned DFCS investigator. In addition, even if this capacity deficit was resolved, the Monitor's review of DFCS policy and of the training materials developed by DFCS staff for the Hotline's intake workers indicates that insufficient direction and guidance is provided with respect to the responsibility of Hotline workers to determine whether there have been prior reports of abuse or neglect and to transmit this information so that it is immediately available to the assigned investigator. For these reasons, defendants have not satisfied the requirements of this subsection. These matters are explained more fully below.

As a threshold matter, MACWIS does not link prior reports of maltreatment in a way that provides the full history of prior maltreatment reports, and it contains inaccurate and incomplete dispositional data related to maltreatment reports. Unless this limitation is corrected, defendants will not have the capacity to meet this Period 2 requirement.

The statewide operation of the centralized Hotline commenced on November 1, 2009. Pursuant to DFCS policy[332] and the MDHS/DFCS contract with the vendor responsible for operating the Hotline, all reports of suspected maltreatment must be entered into MACWIS and referred to the appropriate county within one hour of receiving the report.[333] DFCS managers responsible for the Hotline report that intake workers are required to use MACWIS to determine

---

[332] *See* Ex. 34, *supra* note 243, at 2018.
[333] Ex. 57, Scope of Services, Social Work p.r.n., Central Intake, 24-Hour Hotline and Disaster Preparedness Plan at 2. As described *infra* p. 134, some DFCS staff report that in certain circumstances DFCS county office staff accept reports of maltreatment in the county office, interview the reporter, and thereafter contact the Hotline intake worker themselves to report the allegation of maltreatment. The evidence indicates that this practice is ongoing. The DFCS policy related to intake processing does not provide direction and guidance to county office staff with respect to their roles and responsibilities via-a-vis intake processing. Moreover, the Period 2 IP requires that defendants maintain a centralized intake system that receives and screens all reports of child maltreatment and forwards the screened-in reports to the appropriate county office. *See* Period 2 IP §III.2.

whether there is any history of prior maltreatment reports involving the child or family and to include this information with the transmission of the report. The relevant DFCS policy indicates that the Hotline intake worker is responsible for gathering information in MACWIS related to prior maltreatment reports.[334] The policy includes a summary of screening procedures applicable to the Hotline intake worker.[335] The procedures do not address the Hotline intake worker's responsibilities for gathering and disseminating data related to prior maltreatment reports.[336] A review of the training manual that was developed by DFCS for the Hotline's intake workers indicates that further written guidance and training related to this duty is warranted because the training manual does not address this intake function.

> **Period 2 IP §II.6.e.**
> **II. Foster Care Services Assessment and Implementation Steps**
>   **6. Child Safety**
>     **e. By October 1, 2009, DFCS shall complete a special safety review, including an unannounced site visit, of all currently licensed foster homes with two or more reports of maltreatment, including corporal punishment, within the last three years to determine whether any children placed in those homes are at risk of harm and/or any licensing standards related to child safety are not being met. Any necessary corrective actions will be identified and tracked.**

**Status of Progress, Period 2 IP §II.6.e.:** Defendants made demonstrable progress toward meeting this requirement during Period 1.[337] However, because the required safety reviews were not completed, this requirement was included in the Period 2 IP. The special safety reviews were conducted during Period 2; however, in certain instances necessary corrective action was not tracked. These findings are explained below.

---

[334] *See* Ex. 34, *supra* note 243, at 2018 for the limited reference in the policy to this job duty. Among other responsibilities, the policy states that the Hotline worker is responsible for gathering information about "prior MDHS involvement (METSS, MSSIS, MAVERICS and MACWIS)." *Id.* No further information with respect to this responsibility is included in the policy or in the training materials that have been submitted to the Monitor.
[335] *Id.* at 2019.
[336] The Monitor has been advised by the DFCS manager who has responsibility for this function that written procedures regarding these intake responsibilities have not been developed.
[337] Settlement Agreement §II.B.4.i.; *see* June 2009 Report at 79-80 for a discussion of defendants' progress during Period 1.

During Period 1, defendants hired two experienced social workers to conduct the safety reviews. In addition, protocols and instruments to guide the scope and content of the reviews were developed and piloted. The reviewers targeted homes with two or more reports of maltreatment between May 1, 2006 and May 1, 2009; however, they encountered substantial challenges identifying the specific homes subject to this requirement. Because of limitations in MACWIS reporting, the reviewers supplemented data reported by MACWIS with data derived from manual reviews conducted by regional and county office staff to develop the list of resource homes subject to the required safety reviews. The reviewers also obtained relevant data from private agencies that provide therapeutic foster home placements to children in care.

According to the data submitted to the Monitor by the safety reviewers, a total of 91 resource homes were identified initially as meeting the criteria for review. Further investigation by the reviewers revealed that many of these homes were closed or inactive. Resource homes were deemed to be inactive if a child was not placed in the home during the time the reviews were conducted.[338] Safety reviews related to 29 resource homes were conducted between March 12, 2009 and September 17, 2009.

A consultant who has assisted the Monitor with evaluating the safety review process accompanied the reviewers on two site visits and has briefed the Monitor on her findings and impressions.[339] The Monitor also has interviewed the safety reviewers and reviewed a series of relevant documents, including: 1) MACWIS reports and reports from county and regional offices that were relied upon to identify the resource homes targeted for review; 2) the tracking log

---

[338] The reviewers checked periodically to determine if a child had been placed in an inactive resource home; however, there was no mechanism established for alerting the reviewers to the fact that a child had been placed in a resource home that was characterized as inactive. Thus, it is possible that some resource homes that were deemed inactive served as placements at some point during the period that the reviews were conducted.

[339] The consultant, Stacy Ferraro, has substantial experience in conducting complex investigations in other contexts. *See* Ex. 1B, *supra* note 30, for a summary of Ms. Ferraro's background and experience. Ms. Ferraro attended a site visit of a resource home and a site visit of a facility.

developed by the safety reviewers to track their work on each resource home subject to review; and 3) the investigative reports prepared for each review that was conducted.

The reviewers report that they conducted unannounced site visits to each home targeted for review, and they prepared for the site visits by reviewing all relevant case files in MACWIS, including records related to prior reports of maltreatment concerning the resource home. During the site visits, the reviewers follow a protocol that was developed for this purpose. Interviews are conducted with the resource parent. Additionally, the child who is placed in the home is interviewed privately. The reviewers observe interactions between the child and resource parent and conduct a walk-through of the home. A safety checklist derived from the licensing standards is used to ensure the standards are satisfied.

The investigative reports prepared by the safety reviewers demonstrate that the safety reviewers identified and addressed a number of issues during the reviews,[340] mostly related to violations of licensing standards that present a risk of harm.[341] A formal system for notification concerning urgent issues identified during specific safety reviews, as well as a system for tracking and ensuring that corrective actions related to the findings from the safety reviews are completed, has not been developed.[342] And although there is some evidence of follow-up on the findings from many of the reviews, there is no evidence that defendants have established a system that ensures accountability and requires corrective action within specific time periods.

---

[340] However, the reports do not describe the circumstances concerning the prior reports of maltreatment nor do they indicate whether related issues were explored during the safety review. This is a limitation the Monitor has discussed with the reviewers and their supervisor that should be addressed.

[341] *See. e.g.,* March 26, 2009 safety review for JH home, improper storage of unloaded gun corrected on-site by reviewer; July 21, 2009 safety review for TD home, uncovered electrical outlet and kitchen cabinets not child proofed.

[342] Reviewers report that immediate problems are brought to the attention of their supervisors, and, on occasion, county office staff.

103

Defendants have made significant progress toward developing the capacity to conduct the required safety reviews. In addition to the need for defendants to collect and report accurate data related to prior maltreatment reports, defendants must focus on establishing a defined system for ensuring corrective actions are undertaken and appropriately tracked on a timely basis. Nonetheless, the reviews have helped to ensure the safety of children, and they have revealed important data about DFCS case practice that could advance the current reform process.[343]

> Period 2 IP §II.6.f.
> **II.  Foster Care Services Assessment and Implementation Steps**
>   **6.  Child Safety**
>     **f.  By December 1, 2009, DFCS shall undertake a special safety review, including an unannounced site visit, of all group homes and other residential facilities that house children in custody with three or more reports of maltreatment, including corporal punishment, within the last two years to determine whether any children placed in those facilities are at risk of harm and/or any licensing standards related to child safety are not being met. Any necessary corrective actions will be identified and tracked.**

**Status of Progress, Period 2 IP §II.6.f.:** Like the required safety reviews of resource homes addressed in the preceding section of this report, defendants made progress toward meeting this requirement related to group homes and other residential facilities during Period 1.[344] However, because the safety reviews were not completed, this requirement was included in the Period 2 IP. During Period 2, the reviewers targeted facilities with three or more reports of maltreatment between May 1, 2006 and May 1, 2009, capturing a broader cohort of facilities than required by this subsection. In order to develop the list of facilities targeted for review, the reviewers supplemented data reported by MACWIS with data obtained from surveying private

---

[343] For example, reviewers report receiving multiple complaints about lack of contact with caseworkers and have documented a pattern of inconsistencies in the allowances that children receive. The reviewers indicate that they record this information in individual case records. It also may be possible to readily capture and analyze the data derived from the safety reviews so it can be used to inform CQI initiatives.
[344] Settlement Agreement §II.B.4.j.; *see* June 2009 Report at 79-80 for a discussion of defendants' progress during Period 1.

agencies that provide therapeutic congregate placements, as well as data derived from manual reviews that were conducted by regional and county office staff.

Facilities with three or more reports of maltreatment between May 1, 2006 and May 1, 2009 were targeted for review. Although nine congregate facilities were identified as falling within this criteria, the reviewers attempted to conduct safety reviews for the 57 different facilities that house children in DFCS custody. Ultimately, safety reviews related to 47 facilities, including the nine facilities that satisfied the criteria of this subsection, were conducted between April 28, 2009 and November 23, 2009. Defendants should be commended for this effort, which went significantly beyond the scope of this subsection.

At the time of the site visits, many of the facilities housed more than one child in DFCS custody. The site visits were unannounced, and the reviewers attempted to interview each child in custody who was placed at the facility at the time of the site visit. However, the placement data that the reviewers used were not consistently accurate, and thus they relied on the representations of facility administrators with respect to whether a specific child was still in the placement at the time of the site visit. The reviewers toured each facility and interviewed staff as well as many of the children in custody who were in these placements during the site visits.[345]

The investigative reports related to these safety reviews reveal many issues that implicate licensure requirements.[346] The tracking data maintained by reviewers indicate that the DFCS licensure unit followed up on many of these issues and required various corrective actions. A chronological mechanism for tracking these actions has not been maintained by the reviewers, and thus the Monitor cannot, at this point, assess the timeliness of the corrective action process. The Monitor has not had an opportunity to evaluate the licensure unit's involvement, but expects

---

[345] Some children at the facilities were not interviewed.
[346] These issues include failure to provide youth with required allowances and various physical plant issues.

to do so in the near term.  The limited tracking data related to the licensure unit's activities that have been provided to the Monitor are encouraging.

In certain limited instances, the investigative reports indicate that the reviewers did not recognize the risk of harm to children that was evident during the site visits.[347]  The Monitor has discussed this concern with the reviewers and DFCS management.  Additional training and enhanced supervision is indicated in order to ensure these issues are identified and addressed in the future.

> **Period 2 IP §II.6.g.**
> **II.  Foster Care Services Assessment and Implementation Steps**
>    **6.  Child Safety**
>      **g.  By December 1, 2009, all investigations into reports of maltreatment, including corporal punishment, of children in DFCS custody must be initiated within 24 hours of the report and completed within 30 calendar days, including supervisory approval.  DFCS shall assure that such investigations and decisions are based on a full and systematic evaluation of the factors that may place a child in DFCS custody at risk.**

**Status of Progress, Period 2 IP §II.6.g.:**  Because defendants did not produce validated data reports related to this requirement during Period 2 as required by the Period 2 IP,[348] they are

---

[347]  The safety review reports that are described below, Exs. 58 and 59, contain information that falls within the purview of the August 5, 2004 Confidentiality Order, and thus the Monitor has moved to file them under seal.  The motion is pending.  Therefore, these exhibits are not included in the Appendix.  *See, e.g.,* Ex. 58, Special Safety Review – Group Home/Residential Facility, MACWIS Resource ID Number:  000008648 (report indicates that a 17-year-old boy threatened to kill himself on the day of the reviewer's visit and had assaulted another child the previous day; staff member in group home reported to reviewer that child had expressed suicidal thoughts and had been crying hysterically; although the report states that the director of the program thought the child was in need of a residential therapeutic hospital placement, while the reviewer was present the director spoke to law enforcement in order to have the child escorted to a juvenile detention center; it is unclear from the report who advised the director to contact law enforcement; the safety reviewer failed to address the child's mental health needs and failed to ensure that correct procedures were in place to secure appropriate supervision and care for the child.); Ex. 59, Special Safety Review – Group Home/Residential Facility, MACWIS Resource ID Number:  000041084.  (In the interview section of the report, it is noted that a 13-year-old girl has "a flat affect and seemed to be under a heavy dose of medication" and a 15-year-old boy appeared to be "in a daze" under the influence of medication, and his speech was difficult to understand; in the "Significant Concerns Noted/Recommendations" section, it merely states "[c]oncerns were noted regarding the specific situations of each youth.  See interviews for details"; there is no description of necessary corrective action.  The administrators interviewed were not questioned regarding the children's mental status, and there is no indication that the DFCS worker contacted the psychiatrist or reviewed any mental health records or treatment plans developed for these children.)

[348]  *See* requirement and related text regarding Period 2 IP §I.5.b., *supra* pp. 64-66.

required to do so during the Bridge Period.[349]  Accordingly, the Monitor will report more fully on

defendants' progress in her forthcoming report on the Bridge Plan.  As described above,[350]

however, the safety assessment that was conducted during Period 2 identified significant

limitations in the timeliness of the investigative process related to maltreatment reports.[351]  These

findings are corroborated by the case record review the Monitor conducted during Period 2 that is

described below.[352]

Pursuant to the Settlement Agreement, by the end of Period 1, defendants were required

to initiate all investigations into reports of maltreatment of children in custody within 24 hours

and to complete the investigations within 20 calendar days.[353]  The case record review found

significant shortcomings in the timeliness of the investigative process under the applicable Period

1 requirements as well as under the applicable Period 2 requirements, which enlarged the time for

completing investigations during Period 2 to 30 days.[354]  The relevant analysis of the data

obtained from the Monitor's review of 185 randomly selected screened-in reports of

maltreatment in care received by DFCS between June 1, 2008 and June 30, 2009 is set forth

below.

---

[349]  June 10, 2010 Agreed Order, Ex. A, p.1.

[350]  *Supra* pp. 76-77.

[351]  The assessment found delays in both the initiation and the completion of the investigations.

[352]  *Infra* pp. 108-110.

[353]  Settlement Agreement §II.B.4.e.  The initiation requirement remained the same during Period 2; however, the time for completion of investigations was modified for purposes of Period 2 implementation.  According to the Period 2 IP, by December 1, 2009, defendants were required to initiate investigations within 24 hours and complete them within 30 calendar days.  Period 2 IP §II.6.g.

[354]  *Id.*

- **Assignment to investigator:** Over 30 percent of the cases reviewed documented that investigations were not assigned to an investigator in time to promote timely initiation of the investigative process. The 134 screened-in maltreatment reports were assigned to an investigator within the following time periods:

    o Within one day: 89 (66.4%)
    o Within two days: 10 (7.5%)
    o Within three days: 12 (9%)
    o Within four to six days: 12 (9%)
    o Within seven to 10 days: 5 (3.7%)
    o  >10 days: 6 (4.2%)



- **Initiation:** The alleged child-victim was interviewed in 126 of the 134 screened-in reports.[355] Except in two instances, the interviews were conducted on a face-to-face basis. Over half of the case records document that the alleged child-victim was not interviewed within 24 hours as required to satisfy the Settlement Agreement's initiation standard. The time periods between intake and the interviews of the child-victims are set out below:

    o Within one day: 59 (46.8%)
    o Within two days: 14 (11.1%)
    o Within three days: 7 (5.6%)
    o Within four to six days: 16 (12.7%)
    o Within seven to 10 days: 8 (6.3%)
    o  > 10 days: 22 (15.5%)[356]

---

[355] For purposes of the case record review, a child under three years of age was deemed to be interviewed if there was documentation in the case record that the investigative worker visited and observed the child during the investigation.
[356] These 22 instances ranged from a minimum of 11 days to a maximum of 272 days.

- **Submission to supervisor:** The investigative reports for the 134 screened-in maltreatment reports were submitted to a supervisor for review within the time periods following the date of intake that are set out below:

    o Within one to three days: 4 (3%)
    o Within four to six days: 1 (0.7%)
    o Within seven to 10 days: 9 (6.7%)
    o Within 11-15 days: 18 (13.4%)
    o Within 16-20 days: 18 (13.4%)
    o Within 21-30 days: 41 (30.6%)
    o Within 31-45 days: 19 (14.2%)
    o Within 46-60 days: 10 (7.5%)
    o  > 60 days: 14 (10.4%)



- **Time to Completion:** Pursuant to the Settlement Agreement, the date of supervisory approval of the investigative findings constitutes the date the investigation is deemed to be completed. Nearly 27 percent of the investigations were completed within 20 days and just over 53 percent of the investigations were completed within 30 days. The time periods between the date of intake and the date of supervisory approval of the investigative findings related to the 134 screened-in reports of maltreatment are set out below:

    o Within one to 20 days: 36 (26.9%)
    o Within 21-30 days: 35 (26.2%)
    o Within 31-50 days: 39 (29.1%)
    o  >50 days: 24 (17.9%)



109

- **Time between submission to supervisor and supervisory approval:** The time periods between the submission of completed investigative reports to a supervisor and supervisory approval of the investigative findings related to the 134 screened-in reports of maltreatment are set out below:

  o One to three days: 88 (65.7%)
  o Four to 10 days: 25 (18.7%)
  o 11 to 20 days: 12 (9%)
  o > 20 days: 9 (6.7%)



Additional findings from the Monitor's case record review related to maltreatment reports are set forth in a summary that is included in the Appendix to this report.[357]

> **Period 2 IP §II.6.h.**
> **II. Foster Care Services Assessment and Implementation Steps**
>   **6. Child Safety**
>     **h. By December 1, 2009, any foster child who remains in the same out-of-home placement following an investigation into a report that he or she was maltreated, or subject to corporal punishment, in that placement shall be visited by a DFCS caseworker twice a month for three months after the conclusion of the investigation to assure the child's continued safety and well-being.**

**<u>Status of Progress, Period 2 IP §II.6.h.</u>:**  Because defendants did not produce validated data reports related to this requirement during Period 2 as required,[358] they are required to do so during the Bridge Period.[359]  Accordingly, the Monitor expects to report on defendants' progress in her forthcoming report on the Bridge Plan.

---

[357]  Ex. 60, Summary of the Court Monitor's Findings from Case Record Review Conducted during Period 2 - Investigations Related to Reports of Maltreatment In Care.  The summary restates the methodology used to conduct the review, which is also set forth in the Methodology section of this report, *supra* pp. 13-16.

[358]  *See* Period 2 IP §I.5.b. and related text *supra* pp. 64-66, which requires defendants to verify MACWIS data related to face-to-face contacts.

[359]  June 10, 2010 Agreed Order, Ex. A, p. 4.

Period 2 IP §II.6.i.
**II. Foster Care Services Assessment and Implementation Steps**
  **6. Child Safety**
   **i.** By December 1, 2009, when a maltreatment investigation involves a
   foster home, DFCS shall file a copy of the approved final investigative
   report and any recommendations and/or corrective actions DFCS has
   deemed necessary in the case record of the foster child, in the file of the
   foster or adoptive parents with a copy of the letter of notification to the
   foster or adoptive parents, and in the DFCS State Office. DFCS shall
   also provide those records to the Youth Court Judge with jurisdiction
   over the child and to the Monitor.

**Status of Progress, Period 2 IP §II.6.i.:** The Monitor has not had an opportunity to

assess defendants' compliance with each provision of this requirement during Period 2 and will

report on this requirement as indicated.[360]

Period 2 IP §II.6.j.
**II. Foster Care Services Assessment and Implementation Steps**
  **6. Child Safety**
   **j.** By December 1, 2009, when a maltreatment investigation involves an
   agency group home, emergency shelter, private child placing agency
   foster home, or other facility licensed by DFCS, a copy of the final
   investigative report shall be filed in the child's case record, in the
   facility licensing file, and in the DFCS State Office. DFCS shall provide
   the report to the Youth Court Judge with jurisdiction over the child
   and to the Monitor.

**Status of Progress, Period 2 IP §II.6.j.:** The Monitor has not had an opportunity to

assess defendants' compliance with each provision of this requirement during Period 2 and will

report more fully on this requirement as indicated.[361]

Period 2 IP §II.6.a.-j.
Relevant COA Standards: PA-CPS 4.05, PA-CPS 5.05, PA-CPS 6, PA-CPS 14.06, PA-ASE 6.03.

**Status of Progress, Period 2 IP §II.6.a.-j., Relevant COA Standards:** Based on the

documentation submitted by defendants to COA, COA found the documents were in compliance

---

[360] The Monitor expects to discuss this requirement and related reporting with the parties following the submission
of this report, and anticipates these discussions will inform the scheduling of reporting on findings related to Period
2 requirements that are not included in this report.
[361] *See supra* note 360 for the process the Monitor expects to adopt with respect to prospective reporting related to
this requirement.

with two standards and in substantial compliance with three standards.  The COA's findings are

addressed in further detail in Section IV.B. of this report.[362]

> **Settlement Agreement §II.B.5.l.[363]**
> **II. Standards**
>   **B. Foster Care Service Standards**
>     **5. Child Placement**
>       **By the end of implementation Period 2:**
>       **l.  No child shall spend more than 12 hours at a time in a DFCS office**
>       **or other non-residential facility that provides intake functions.  No**
>       **child shall be placed in more than one emergency or temporary**
>       **facility within one episode of foster care, unless an immediate**
>       **placement move is necessary to protect the safety of the child or of**
>       **others as certified in writing by the Regional Director.**

**Status of Progress, Settlement Agreement §II.B.5.l.:**  Defendants did not produce

validated data reports related to this requirement during Period 2 as required.[364]  They are

required to produce validated data reports related to placements in emergency or temporary

facilities within one episode of foster care during the Bridge Period.[365]  Accordingly, the Monitor

expects to report on this aspect of defendants' performance in her forthcoming report on the

Bridge Plan.  During Period 2, defendants did not collect data that track the time children spend

in a DFCS office or other nonresidential facility that provides intake functions.  They will need to

do so as a prerequisite to satisfying this aspect of the requirements of this subsection, which is

not addressed by the Bridge Plan.

> **Settlement Agreement §II.B.5.m.[366]**
> **II. Standards**
>   **B. Foster Care Service Standards**
>     **5. Child Placement**
>       **By the end of implementation Period 2:**
>       **m.  No child under 10 years of age shall be placed in a congregate**
>       **care setting (including group homes and shelters) unless the child**
>       **has exceptional needs that cannot be met in a relative or foster**
>       **family home or the child is a member of a sibling group, and the**
>       **Regional Director has granted express written approval for the**

---

[362] *Infra* p. 156.
[363] The identical requirement is included in §II.7.g. of the Period 2 IP.
[364] *See* Period 2 IP §I.5.b. and related text *supra* pp. 64-66, which requires defendants to verify MACWIS data regarding placements.
[365] June 10, 2010 Agreed Order, Ex. A, p.3.
[366] The identical requirement is included in §II.7.h. of the Period 2 IP.

> congregate-care placement. Such approval shall be based on the
> Regional Director's written determination that the child's needs
> cannot be met in a less restrictive setting and can be met in that
> specific facility, including a description of the services available in
> the facility to address the individual child's needs.  Sibling groups
> in which one or more of the siblings are under the age of 10 shall
> not be placed in congregate care settings for more than 45 days.

**Status of Progress, Settlement Agreement §II.B.5.m.:**  Because defendants did not

produce validated data reports related to this requirement during Period 2 as required,[367] they are

required to do so during the Bridge Period.[368]  Accordingly, the Monitor will report more fully on

defendants' progress in her forthcoming report on the Bridge Plan.

> Settlement Agreement §II.B.5.n.[369]
> II.  Standards
>    B.  Foster Care Service Standards
>      5.  Child Placement
>       <u>By the end of implementation Period 2:</u>
>       n.  No foster child shall be moved from his/her existing placement to
>          another foster placement unless DFCS specifically documents in
>          the child's case record justifications for that move and the move is
>          approved by a DFCS supervisor.

**Status of Progress, Settlement Agreement §II.B.5.n.:**  Defendants did not produce

validated data reports related to this requirement during Period 2 as required, and thus the

Monitor was not able to assess whether this requirement was satisfied.[370]

> Settlement Agreement §II.B.5.o.[371]
> II.  Standards
>    B.  Foster Care Service Standards
>      5.  Child Placement
>       <u>By the end of implementation Period 2:</u>
>       o.  All relative placements approved for expedited placement shall
>          undergo the full licensing procedure within 60 calendar days of the
>          child's placement in the home.

---

[367] *See* Period 2 IP §I.5.b. and related text *supra* pp. 64-66, which requires defendants to verify MACWIS data regarding placements.

[368] June 10, 2010 Agreed Order, Ex. A, p. 3.

[369] The identical requirement is included in §II.7.i. of the Period 2 IP.

[370] *See* Period 2 IP §I.5.b. and related text *supra* pp. 64-66, which requires defendants to verify MACWIS data regarding placements.

[371] The identical requirement is included in §II.7.d. of the Period 2 IP.

**Status of Progress, Settlement Agreement §II.B.5.o.:** This requirement was not satisfied during Period 2.  Because defendants are required to take corrective action during the Bridge Period,[372] the Monitor will report on these licensure procedures in her forthcoming report on the Bridge Plan.

> **Settlement Agreement §II.B.5.p.**
> **II.  Standards**
>    **B.  Foster Care Service Standards**
>      **5.  Child Placement**
>        <u>**By the end of implementation Period 2:**</u>
>        **p.  At least 50% of children in DHS custody placed in a new**
>           **placement during the Period shall have their currently available**
>           **medical, dental, educational, and psychological information**
>           **provided to their foster parents or facility staff no later than at the**
>           **time of any new placement during the Period.**

**Status of Progress, Settlement Agreement §II.B.5.p.:** Defendants did not produce validated data related to this requirement during Period 2 as contemplated by the Settlement Agreement.  Nonetheless, both the foster care services assessments conducted during Period 2,[373] as well as data obtained by the Monitor from interviews with foster parents and caseworkers during Period 2, indicate that foster parents are not provided with this information on a routine basis.  For example, during meetings with over 92 foster parents between December 2009 and May 2010,[374] the primary area of concern expressed by foster parents was the fact that they received limited or no background information on the children placed in their homes prior to or at the time of placement.

Foster parents have reported that they do not receive any psycho-social histories for children prior to or at the time of placement, including background data related to somatic and behavioral health, current treatment and medications, immunization records, Medicaid data,

---

[372] June 10, 2010 Agreed Order ¶ 7.f.
[373] The assessment findings are addressed *supra* pp. 72-73.
[374] Meetings of six resource parent support groups in Hazelhurst, Van Cleave, Biloxi, Pearl, Canton and Kosciusko, Mississippi, were attended by Dr. Southward, one of the consultants who has worked with the Monitor on this project during Period 2.  In addition, the Monitor has met with foster parent support group members and individual foster parents during the course of Period 2.

social security numbers, school records and birth certificates.  The overwhelming majority of

foster parents reported that it takes months to obtain a social security number and a Medicaid

card for the children placed in their care.  As a result, they have encountered substantial

difficulties accessing medical care for children and enrolling them in school.[375]  There is a

critical need for the defendants to address these issues.

> **Settlement Agreement §II.B.5.q.**
> **II.  Standards**
>    **B.  Foster Care Service Standards**
>       **5.  Child Placement**
>          **By the end of implementation Period 2:**
>          **q.  At least 30% of children in custody known by DFCS to be subject to a potential or actual placement disruption during the Period shall receive a meeting to address placement stability consistent with Plan requirements.**

**Status of Progress, Settlement Agreement §II.B.5.q.:**  Defendants did not produce

validated data reports related to this requirement during Period 2 as contemplated by the

Settlement Agreement, and thus the Monitor was not able to assess whether this requirement was

satisfied.

> **Period 2 IP §II.7.a.**
> **II.  Foster Care Services Assessment and Implementation Steps**
>    **7.  Child Placement**
>       **a.  By May 1, 2009, all foster care settings, including relative placements, shall be screened prior to the initial placement of foster children to ensure that children receive safe, sufficient, and appropriate care. Additional screens shall be completed at least once annually thereafter and within two weeks of a reported change in the residents of a foster home.  Screens shall include criminal and child welfare background checks of all household members who are at least 14 years old.  No foster child shall be placed in a home prior to DFCS receipt of the background check results.**

**Status of Progress, Period 2 IP §II.7.a.:**  Defendants did not produce validated data

reports related to this requirement during Period 2 as contemplated by the Settlement Agreement,

and thus the Monitor was not able to assess whether this requirement was satisfied.

---

[375]  The absence of the immunization record is a barrier to enrollment.

**Period 2 IP §II.7.b.**
**II. Foster Care Services Assessment and Implementation Steps**
    **7. Child Placement**
        **b. Defendants shall develop and begin the implementation of a written plan to ensure the speedy licensing of all current unlicensed caregivers. All such current unlicensed caregivers shall be licensed.**

    **Status of Progress, Period 2 IP §II.7.b.:** The required plan was not developed during Period 2. As described in this report, there is a statewide shortage of licensed resource homes.[376] During Period 1, defendants were required to develop and implement a process for expedited licensure of relative caregivers.[377] The requirement was not satisfied. Thus, the Period 2 IP required defendants to develop the plan required by this subsection and the process required by Period 2 IP §II.7.c., which incorporates the Period 1 requirement for expedited relative licensure.[378] Because these requirements were not satisfied during Period 2, the Bridge Plan requires the defendants to take corrective action.[379] The Monitor will report on defendants' progress in her forthcoming report on the Bridge Plan.

**Period 2 IP §II.7.c.**
**II. Foster Care Services Assessment and Implementation Steps**
    **7. Child Placement**
        **c. By December 1, 2009, DFCS shall develop and implement an expedited process for licensing screened relative caregivers to enable a child to be placed quickly with relatives upon entering placement. No foster child entering custody will be placed in an unlicensed relative placement, subject to the allowance of the emergency licensing process that allows 60 days for the licensing process to take place.**

    **Status of Progress, Period 2 IP §II.7.c.:** As noted in the preceding narrative related to Period 2 IP §II.7.b., because defendants did not satisfy this requirement during Period 2, they are required to do so during the Bridge Period.[380] Accordingly, the Monitor will report more fully on defendants' progress for licensing relative caregivers in her forthcoming report on the Bridge Plan.

---

[376] The findings from the foster care services placement assessment address this limitation. *See supra* pp. 72-73.
[377] Settlement Agreement §II.B.5.j.
[378] *See* June 2009 Report at 84.
[379] June 10, 2010 Agreed Order at ¶ 7.f.
[380] *Id.*

116

Period 2 IP §II.7.e.
II.  **Foster Care Services Assessment and Implementation Steps**
    7.  **Child Placement**
        e.  **Defendants, in conjunction with a qualified independent consultant approved by the Monitor, shall develop and begin implementing a plan with specific action steps and timeframes to address policy and structural changes to the placement process that the placement assessment has identified as necessary to comply with the placement requirements set forth in Section II.B.5 of the Settlement Agreement. That plan shall also include the development of the position of placement specialists in each region, and a protocol for the placement stability meetings that the Settlement Agreement requires that DFCS hold when a worker has knowledge that a placement is at risk of disruption.**

    **Status of Progress, Period 2 IP §II.7.e.:**  The required plan was not developed during Period 2.

Period 2 IP §II.7.f.
II.  **Foster Care Services Assessment and Implementation Steps**
    7.  **Child Placement**
        f.  **By December 1, 2009 and continuing thereafter, no foster child shall remain in an emergency or temporary facility for more than 45 calendar days, unless, in exceptional circumstances, the Division Director has granted express written approval for the extension that documents the need for the extension.**

    **Status of Progress, Period 2 IP §II.7.f.:**  Because defendants did not produce validated data reports related to this requirement during Period 2 as required,[381] they are required to do so during the Bridge Period.[382]  Accordingly, the Monitor will report more fully on the duration of placements in emergency and temporary facilities in her forthcoming report on the Bridge Plan.

Period 2 IP §II.7.j.
II.  **Foster Care Services Assessment and Implementation Steps**
    7.  **Child Placement**
        j.  **By September 30, 2009, DFCS shall implement a formalized protocol to provide foster parents with all appropriate and available information about a child prior to or at the time of placement and for supplementing that information as further information is gathered.**

    **Status of Progress, Period 2 IP §II.7.j.:**  The required protocol was not implemented during Period 2.

---

[381] *See* Period 2 IP §I.5.b. and related text *supra* pp. 64-66, which requires defendants to verify MACWIS data regarding placements.
[382] June 10, 2010 Agreed Order, Ex. A, p. 3.

Period 2 IP §II.7.a.-j.
Relevant COA Standards: PA-KC 1.01, PA-KC 1.02, PA-FC 17.01, PA-FC 17.02, PA-KC 6.05, PA-CPS 11.02, PA-KC 6.01, PA-KC 2.03, PA-CPS 10.03, PA-CPS 11.01, PA-FC 6.05, PA-FC 16.05, PA-FC 6.03, PA-FC 16.06, PA-FC 9.01, PA-BSM 1.02, PA-BSM 2.01, PA-BSM 2.03.

**Status of Progress, Period 2 IP §II.7.a.-j., Relevant COA Standards:**  Based on the

documentation submitted by defendants to COA, COA found the documents were in compliance

with 13 standards, in substantial compliance with two standards and out of compliance with three

standards.  The COA's findings are addressed in further detail in Section IV.B. of this report.[383]

Settlement Agreement §II.B.6.d.
II.  Standards
    B.  Foster Care Service Standards
        6.  Developing and Maintaining Connections
          <u>By the end of implementation Period 2:</u>
            d.  At least 40% of children in custody during the Period shall be
               provided with contacts with their parents and with any siblings not
               in the same placement consistent with Plan requirements.

**Status of Progress, Settlement Agreement §II.B.6.d.:**  Defendants did not produce

validated data reports related to this requirement during Period 2 as contemplated by the

Settlement Agreement, and thus the Monitor was not able to assess whether this requirement was

satisfied.

Period 2 IP §II.8.a.
II.  Foster Care Services Assessment and Implementation Steps
    8.  Developing and Maintaining Connections
        a. The Settlement Agreement requirements and standards at section
          II.B.6 for developing and maintaining connections through parent-
          child and sibling visitation will be included in the Practice Guide.  Pre-
          service and on-going training shall specifically address case practice
          associated with parent-child and sibling visitation, and regular
          supervisory reviews shall specifically include an evaluation of such
          practice.

**Status of Progress, Period 2 IP §II.8.a.:**  The practice guide was developed during

Period 2, in consultation with the defendants, by the consultant who designed the practice model.

---

[383] *Infra* pp. 156-160.

It is included in the appendix to the Practice Model Report.[384] The practice guide is well-designed and satisfies the requirements of this subsection. The Monitor has not had an opportunity to determine whether the practice guide has been incorporated into the DFCS training curriculum.

> **Period 2 IP §II.8.a.**
> **Relevant COA Standards: PA-FC 7.03, PA-FC 7.05.**

**Status of Progress, Period 2 IP §II.8.a., Relevant COA Standards:** Based on the documentation submitted by defendants to COA, COA found the documents were in compliance with one standard and in partial compliance with one standard. The COA's findings are addressed in further detail in Section IV.B. of this report.[385]

> **Settlement Agreement §II.B.7.h.**
> **II. Standards**
>   **B. Foster Care Service Standards**
>     **7. Physical and Mental Health Care**
>       <u>By the end of implementation Period 2:</u>
>       **h. At least 40% of children entering custody during the Period shall receive a comprehensive health assessment consistent with Plan requirements within 30 calendar days of entering care.**

**Status of Progress, Settlement Agreement §II.B.7.h.:** Defendants did not produce validated data reports related to this requirement during Period 2 as contemplated by the Settlement Agreement, and thus the Monitor was not able to assess whether this requirement was satisfied.

> **Settlement Agreement §II.B.7.i.**
> **II. Standards**
>   **B. Foster Care Service Standards**
>     **7. Physical and Mental Health Care**
>       <u>By the end of implementation Period 2:</u>
>       **i. At least 40% of children in custody during the Period shall receive periodic medical examinations and all medically necessary follow-up services and treatment consistent with Plan requirements.**

---

[384] Ex. 61, Mississippi Practice Model, Final Report, Appendix B/Practice Guide, Preserving and Maintaining Connections, September 25, 2009
[385] *Infra* p. 160.

**Status of Progress, Settlement Agreement §II.B.7.i.:** Defendants did not produce validated data reports related to this requirement during Period 2 as contemplated by the Settlement Agreement, and thus the Monitor was not able to assess whether this requirement was satisfied.

> Settlement Agreement §II.B.7.j.
> II. Standards
>    B. Foster Care Service Standards
>       7. Physical and Mental Health Care
>          By the end of implementation Period 2:
>          j. At least 40% of children three years old and older entering custody
>             during the Period or in care and turning three years old during the
>             Period shall receive a dental examination within 90 calendar days
>             of foster care placement or their third birthday, respectively.

**Status of Progress, Settlement Agreement §II.B.7.j.:** Defendants did not produce validated data reports related to this requirement during Period 2 as contemplated by the Settlement Agreement, and thus the Monitor was not able to assess whether this requirement was satisfied.

> Settlement Agreement §II.B.7.k.
> II. Standards
>    B. Foster Care Service Standards
>       7. Physical and Mental Health Care
>          By the end of implementation Period 2:
>          k. At least 40% of children in custody during the Period shall receive
>             a dental examination every six months consistent with Plan
>             requirements and all medically necessary dental services.

**Status of Progress, Settlement Agreement §II.B.7.k.:** Defendants did not produce validated data reports related to this requirement during Period 2 as contemplated by the Settlement Agreement, and thus the Monitor was not able to assess whether this requirement was satisfied.

> Settlement Agreement §II.B.7.l.
> II. Standards
>    B. Foster Care Service Standards
>       7. Physical and Mental Health Care
>          By the end of implementation Period 2:
>          l. At least 40% of children four years old and older entering custody
>             during the Period or in care and turning four years old during the

120

> **Period shall receive a mental health assessment by a qualified**
> **professional within 30 calendar days of foster care placement or**
> **their fourth birthday, respectively, and all recommended mental**
> **health services pursuant to their assessment.**

**Status of Progress, Settlement Agreement §II.B.7.l.:** Defendants did not produce

validated data reports related to this requirement during Period 2 as contemplated by the

Settlement Agreement, and thus the Monitor was not able to assess whether this requirement was

satisfied.

> **Settlement Agreement §II.B.7.m.**
> **II. Standards**
> **B. Foster Care Service Standards**
> **7. Physical and Mental Health Care**
> <u>**By the end of implementation Period 2:**</u>
> **m. At least 40% of children in custody ages birth through three**
> **during the Period, and older children if factors indicate it is**
> **warranted, shall receive a developmental assessment by a qualified**
> **professional and all needed developmental services.**

**Status of Progress, Settlement Agreement §II.B.7.m.:** Defendants did not produce

validated data reports related to this requirement during Period 2 as contemplated by the

Settlement Agreement, and thus the Monitor was not able to assess whether this requirement was

satisfied.

> **Period 2 IP §II.9.a.**
> **II. Foster Care Services Assessment and Implementation Steps**
> **9. Physical and Mental Health Care**
> **a. Defendants, in consultation with state Medicaid and mental health**
> **officials, shall, by December 1, 2009, develop and begin implementing**
> **specific and focused regional plans to recruit and develop service**
> **providers in areas identified in the needs assessment as having gaps in**
> **required services.**

**Status of Progress, Period 2 IP §II.9.a.:** This requirement was not satisfied during

Period 2.

> **Period 2 IP §II.9.a.**
> **Relevant COA Standards: PA-FC 2.04, PA-FC 10.03, PA-FC 10.04, PA-KC 10.04.**

**Status of Progress, Period 2 IP §II.9.a., Relevant COA Standards:** Based on the

documentation submitted by defendants to COA, COA found the documents were in compliance

with all four standards.  The COA's findings are addressed in further detail in Section IV.B. of

this report.[386]

> **Settlement Agreement §II.B.8.d.**
> **II.  Standards**
>> **B.  Foster Care Service Standards**
>>> **8.  Educational Services**
>>>> **By the end of implementation Period 2:**
>>>>> **d.  At least 40% of school-age children entering custody during the Period shall be screened for general and special educational needs within 30 calendar days of their entry into foster care.**

**Status of Progress, Settlement Agreement §II.B.8.d.:**  Defendants did not produce

validated data reports related to this requirement during Period 2 as contemplated by the

Settlement Agreement, and thus the Monitor was not able to assess whether this requirement was

satisfied.

> **Settlement Agreement §II.B.8.e.**
> **II.  Standards**
>> **B.  Foster Care Service Standards**
>>> **8.  Educational Services**
>>>> **By the end of implementation Period 2:**
>>>>> **e.  At least 40% of school-age children entering custody or subject to a change in schools due to a placement move during the Period shall be registered for and attending an accredited school within three business days of the initial placement or placement change, including while placed in shelters or other temporary placements, unless delayed by the Youth Court.**

**Status of Progress, Settlement Agreement §II.B.8.e.:**  Defendants did not produce

validated data reports related to this requirement during Period 2 as contemplated by the

Settlement Agreement, and thus the Monitor was not able to assess whether this requirement was

satisfied.

> **Period 2 IP §II.10.a.**
> **II.  Foster Care Services Assessment and Implementation Steps**
>> **10.  Educational Services**
>>> **a.  DFCS shall develop and implement a protocol for conducting a general and special education screen of children entering foster care.**

---

[386] *Infra* pp. 160-161.

**Status of Progress, Period 2 IP §II.10.a.:** This requirement was not satisfied during

Period 2.

> **Period 2 IP §II.10.b.**
> **II. Foster Care Services Assessment and Implementation Steps**
>   **10. Educational Services**
>     **b. DFCS shall develop and begin implementing a plan for providing,**
>       **either directly or through contract, the following educational services**
>       **in each county: tutoring; preparation for a general equivalency**
>       **diploma ("GED"); and college preparation.**

**Status of Progress, Period 2 IP §II.10.b.:** The required plan was not developed during

Period 2.

> **Period 2 IP §II.10.a. and b.**
> **Relevant COA Standards: PA-FC 9.04, PA-FC 11.02.**

**Status of Progress, Period 2 IP §II.10.a. and b., Relevant COA Standards:** Based on

the documentation submitted by defendants to COA, COA found the documents were in

compliance with one standard, and the other standard was determined to be not applicable for

DFCS. The COA's findings are addressed in further detail in Section IV.B. of this report.[387]

> **Settlement Agreement §II.B.9.b.**
> **II. Standards**
>   **B. Foster Care Service Standards**
>     **9. Therapeutic Services**
>       <u>**By the end of implementation Period 2:**</u>
>       **b. At least 40% of children in custody during the Period requiring**
>         **therapeutic and/or rehabilitative foster care services because of a**
>         **diagnosis of significant medical, developmental, emotional, or**
>         **behavioral problems shall be provided with a treatment plan and**
>         **services in accordance with their plan.**

**Status of Progress, Settlement Agreement §II.B.9.b.:** Defendants did not produce

validated data reports related to this subsection during Period 2 as contemplated by the

Settlement Agreement, and thus the Monitor was not able to assess whether this requirement was

satisfied.

---

[387] *Infra* p. 161.

123

> Settlement Agreement §II.B.10.f.
> II. Standards
>   B. Foster Care Service Standards
>     10. Worker Contact and Monitoring
>       By the end of implementation Period 2:
>       f. At least 30% of children in custody shall receive documented
>          twice-monthly in-person visits by the assigned DFCS caseworker
>          during the Period, consistent with Plan requirements.

**Status of Progress, Settlement Agreement §II.B.10.f.:** Because defendants did not

produce validated data reports related to this requirement during Period 2 as required,[388] they are

required to do so during the Bridge Period.[389] Accordingly, the Monitor will report more fully on

the frequency of documented in-person visits by DFCS caseworkers with children in custody in

her forthcoming report on the Bridge Plan.

> Settlement Agreement §II.B.10.g.
> II. Standards
>   B. Foster Care Service Standards
>     10. Worker Contact and Monitoring
>       By the end of implementation Period 2:
>       g. At least 40% of children with a goal of reunification shall have
>          their assigned DFCS caseworker meet monthly with the child's
>          biological parents, consistent with Plan requirements, as
>          documented in the child's case record.

**Status of Progress, Settlement Agreement §II.B.10.g.:** Because defendants did not

produce validated data reports related to this requirement during Period 2 as contemplated by the

Settlement Agreement, they are required to do so during the Bridge Period.[390] Accordingly, the

Monitor will report more fully on defendants' progress in her forthcoming report on the Bridge

Plan.

> Settlement Agreement §II.B.10.h.
> II. Standards
>   B. Foster Care Service Standards
>     10. Worker Contact and Monitoring
>       By the end of implementation Period 2:
>       h. At least 30% of foster parents with at least one foster child
>          residing in their home during the Period shall have a DFCS

---

[388] *See* Period 2 IP §I.5.b. and related text *supra* pp. 64-66, which requires defendants to verify MACWIS data related to face-to-face contacts.

[389] June 10, 2010 Agreed Order, Ex. A, p. 1.

[390] *Id.*

> worker visit the home twice a month (therapeutic foster homes) or
> monthly (non-therapeutic foster homes), consistent with Plan
> requirements, as documented in the children's case records.

**Status of Progress, Settlement Agreement §II.B.10.h.:**  Defendants did not produce validated data reports related to this subsection during Period 2 as required by the Settlement Agreement,[391] and thus the Monitor was not able to assess whether this requirement was satisfied.

> Period 2 IP §II.11.a.
> **II.  Foster Care Services Assessment and Implementation Steps**
>    **11.  Worker Contact and Monitoring**
>       **a.  Defendants' revised policies and practice guides shall reflect the issues
>       to be addressed during worker contacts with parents, children, and
>       foster care providers.  Defendants shall revise DFCS training as
>       necessary to ensure instruction on the quality, frequency, purpose, and
>       structure of meeting with foster children, biological parents, and foster
>       care providers.  The training shall specifically address communicating
>       with, interviewing, and observing foster children.**

**Status of Progress, Period 2 IP §II.11.a.:**  A practice guide was developed during Period 2, in consultation with the defendants, by the consultant who designed the practice model. It is included in the appendix to the Practice Model Report.[392]  The practice guide is well-designed and satisfies the requirements of this subsection.  The Monitor has not had an opportunity to determine whether the practice guide has been incorporated into the DFCS training curriculum.

> Period 2 IP §II.11.a.
> Relevant COA Standards: PA-CPS 9.04, PA-FC 12.01, PA-FC 12.02.

**Status of Progress, Period 2 IP §II.11.a., Relevant COA Standards:**  Based on the documentation submitted by defendants to COA, COA found the documents were in compliance

---

[391]  *See* Period 2 IP §I.5.b. and related text *supra* pp. 64-66, which requires defendants to verify MACWIS data related to face-to-face contacts.

[392]  Ex. 62, Mississippi Practice Model, Final Report, Appendix B/Practice Guide, Involving Children and Families in Case Activities and Decision Making, September 25, 2009.

with two standards and in substantial compliance with one standard. The COA's findings are addressed in further detail in Section IV.B. of this report.[393]

> **Settlement Agreement §II.B.11.e.**
> **II. Standards**
>   **B. Foster Care Service Standards**
>     **11. Transition to Independent Living**
>       <u>**By the end of implementation Period 2:**</u>
>       **e. At least 60% of children in custody 14-20 years old during the Period shall be provided with Independent Living services as set forth in their service plan.**

**<u>Status of Progress, Settlement Agreement §II.B.11.e.</u>:** Because defendants did not produce validated data reports related to this requirement during Period 2 as contemplated by the Settlement Agreement, they are required to do so during the Bridge Period.[394] Accordingly, the Monitor will report more fully on independent living services in her forthcoming report on the Bridge Plan.

> **Settlement Agreement §II.B.11.f.**
> **II. Standards**
>   **B. Foster Care Service Standards**
>     **11. Transition to Independent Living**
>       <u>**By the end of implementation Period 2:**</u>
>       **f. At least 60% of children in custody transitioning to independence during the Period shall have available an adequate living arrangement, a source of income, health care, independent living stipends, and education and training vouchers. DFCS shall also assist such children in obtaining, prior to transitioning to independent living, the necessary documents and information identified in the COA standards for emancipating youth.**

**<u>Status of Progress, Settlement Agreement §II.B.11.f.</u>:** Defendants did not produce validated data reports related to this requirement during Period 2 as contemplated by the Settlement Agreement, and thus the Monitor was not able to assess whether this requirement was satisfied. However, data that defendants are required to produce during the Bridge Period may facilitate the Monitor's ability to evaluate defendants' progress.[395]

---

[393] *Infra* p. 162.
[394] June 10, 2010 Agreed Order, Ex. A, p. 3.
[395] *Id.*

**Period 2 IP §II.12.a.**
**II. Foster Care Services Assessment and Implementation Steps**
    **12. Transition to Independent Living**
        **a. Defendants shall develop and begin implementing a written plan to
           address independent living service gaps identified in the Foster Care
           Independent Living Services Assessment.**

<u>**Status of Progress, Period 2 IP §II.12.a.:**</u>  The plan was not developed during Period 2.

**Period 2 IP §II.12.b.**
**II. Foster Care Services Assessment and Implementation Steps**
    **12. Transition to Independent Living**
        **b. Defendants shall develop and begin implementing a system for
           ensuring that emancipating youth have obtained, prior to transitioning
           to independent living, the necessary documents and information
           identified in the COA standards for such youth.**

<u>**Status of Progress, Period 2 IP §II.12.b.:**</u>  The system was not developed during

Period 2.

**Period 2 IP §II.12.c.**
**II. Foster Care Services Assessment and Implementation Steps**
    **12. Transition to Independent Living**
        **c. DFCS will develop for each region the capacity and current resource
           guides necessary to assist youth in locating and/or enrolling in
           educational or vocational programs appropriate to their needs,
           interests, abilities, and goals, such as high school or GED programs;
           colleges or universities; vocational training programs; and special
           education services.**

<u>**Status of Progress, Period 2 IP §II.12.c.:**</u>  Neither the capacity nor the resource guides

were developed during Period 2.

**Period 2 IP §II.13., Case Closing and Aftercare**
**Relevant COA Standards: PA-AS 10.01, PA-CPS 13.02, PA-FC 14.03, PA-FC 15.01, PA-KC 15.04.**

<u>**Status of Progress, Period 2 IP §II.13., Relevant COA Standards:**</u>  Based on the

documentation submitted by defendants to COA, COA found the documents were in compliance

with one standard, in substantial compliance with two standards, out of compliance with one

standard, and defendants response to COA is pending regarding one standard.  The COA's

findings are addressed in further detail in Section IV.B. of this report.[396]

---

[396] *Infra* pp. 162-163.

**Settlement Agreement §II.B.12.d.**
**II. Standards**
    **B. Foster Care Service Standards**
        **12. Case Closing and Aftercare**
            <u>By the end of implementation Period 2:</u>
            **d. At least 40% of children in custody who are reunified during the Period shall receive a 90-day trial home visit period or have case record documentation reflecting the Youth Court's objection to such a trial home visit. During that trial home visit period, the child's caseworker or a Family Preservation caseworker shall meet with the child in the home at least two times per month, and DFCS shall provide or facilitate access to all services identified in the child's after-care plan, consistent with Plan requirements.**

    <u>**Status of Progress, Settlement Agreement §II.B.12.d.:**</u> Because defendants did not

produce validated data reports related to this requirement during Period 2 as contemplated by the

Settlement Agreement, they are required to do so during the Bridge Period.[397] Accordingly, the

Monitor will report more fully on defendants' progress in her forthcoming report on the Bridge

Plan.

**Settlement Agreement §II.B.13.i.**
**II. Standards**
    **B. Foster Care Service Standards**
        **13. Recruitment and Retention of Foster Families and Therapeutic Service Providers**
        <u>By the end of implementation Period 2:</u>
        **i. The rate structure recommended by the consultant for foster care providers to special needs children and for facilities providing congregate care, as agreed upon by the Parties or determined by the Court, shall be fully implemented.**

    <u>**Status of Progress, Settlement Agreement §II.B.13.i.:**</u> The rate structure has not been

implemented. The status of this matter is explained in the narrative related to Period 2 IP

§II.14.a.[398]

**Period 2 IP §II.14.a.**
**II. Foster Care Services Assessment and Implementation Steps**
    **14. Recruitment and Retention of Foster Families and Therapeutic Service Providers**
        **a. By November 1, 2009, the consultant shall deliver to the Parties and the Monitor a written report setting forth (1) findings regarding the adequacy of the current schedule of foster care maintenance payments made to foster care providers serving special needs children and**

---

[397] June 10, 2010 Agreed Order, Ex. A, p. 4.
[398] *Infra* pp. 128-131.

> facilities providing congregate foster care in relation to the
> requirements of 42 U.S.C. § 675(4)(A) and the actual cost in the state of
> Mississippi to provide such care; (2) the methodology utilized to
> determine the actual costs in the state of Mississippi to provide such
> care; and (3) a schedule of recommended rates for foster care providers
> serving special needs children and facilities providing congregate foster
> care. Plaintiffs shall have 30 days to raise any written objection to the
> schedule of recommended rates as determined by the consultant.
> Should Plaintiffs raise objections and should the Parties be unable to
> reach agreement, the consultant's schedule and Plaintiffs' objection
> shall be submitted to the Court for final determination.

**Status of Progress, Period 2 IP §II.14.a.:** Defendants contracted with CSF to conduct

the required assessment. CSF produced a report, the Mississippi Rate Setting Final Report

("Rate Setting Report"), which was transmitted to plaintiffs' counsel and the Monitor on

November 2, 2009.

The Rate Setting Report includes findings regarding the adequacy of the schedule of

foster care maintenance payments made to foster care providers serving special needs children

and facilities providing congregate foster care in relation to the requirements of 42

U.S.C.§675(4)(A) and regarding the actual cost in the state of Mississippi to provide such care;

details the methodology used to determine the actual costs to provide such care; and provides

recommended rates for foster care providers serving special needs children and for facilities

providing congregate foster care.

The Rate Setting Report analyzed separately the cost of foster care providers serving

special needs children and the cost of certain services provided by child care institutions and

child placing agencies: emergency shelters; therapeutic group homes; and therapeutic foster

homes. In a December 1, 2009 letter, plaintiffs' counsel objected to the Rate Setting Report's

finding regarding the per diem rate calculation for therapeutic group homes on three grounds.

First, plaintiffs objected to the general approach of using providers' *de facto* costs as the basis of

calculating the "actual cost" of providing therapeutic group home services. Plaintiffs noted the

wide variance of reported provider costs within cost categories and object to the use of median costs rather than assessing whether certain providers' costs represented different and more appropriate goods or service levels.  Second, plaintiffs contended that reporting errors could confound the category-specific median cost calculations.  Finally, plaintiffs objected to the exclusion of certain data points in the calculation of median costs.

Plaintiffs raise valid objections regarding the limitations of the cost study.  The range of costs among the various providers reported in the Rate Setting Report may reflect different program cost structures (*e.g.,* different fixed cost levels among providers), different program utilization levels, or differences in service quality among providers that should be accounted for in the per diem rate calculation.  Nevertheless, in the absence of robust performance outcome data and consistently collected cost data for each service provider, parsing the sources of the cost variability and the cost of different quality outcomes may not be possible.  In the absence of such data, it is not clear that another methodology would yield a more reasonable per diem rate at this juncture.  Defendants can begin to address this by requiring uniform cost reporting by service providers, and ultimately by instituting outcome-based performance contracts.  Over time, this will enable defendants to calculate more accurately the cost of providing appropriate levels and quality services.

The Monitor shares plaintiffs' concerns regarding the omission of certain reported costs, which CSF deemed to be "outliers."  The use of median, category-specific costs in developing an overall constructed median, by itself, is one way to address the problem of outliers.  Excluding values deemed to be outliers and then calculating a median value may inappropriately skew the analysis.  Using the data provided by CSF in the Rate Setting Report, the Monitor recalculated the constructed median for therapeutic group homes, including the data that were excluded in

CSF's calculation of a recommended rate of $90.57.  The revised rate was $95.11, a five percent

increase over the rate recommended in the Rate Setting Report.

      The Monitor anticipates further discussion with the parties regarding these issues.

> **Period 2 IP §II.14.b.**
> **II.  Foster Care Services Assessment and Implementation Steps**
>    **14.  Recruitment and Retention of Foster Families and Therapeutic Service Providers**
>      **b.  Defendants, in conjunction with a qualified independent consultant approved by the Monitor, shall develop and begin implementing a written plan for targeted recruitment and development of a range of family and facility placements that will adequately meet the placement needs of the foster care population.**

      <u>**Status of Progress, Period 2 IP §II.14.b.:**</u>  The required plan was not developed during

Period 2.

> **Period 2 IP §II.14.c.**
> **II.  Foster Care Services Assessment and Implementation Steps**
>    **14.  Recruitment and Retention of Foster Families and Therapeutic Service Providers**
>      **c.  Defendants shall develop and begin implementing a written plan to provide services for foster parents in every county to prevent and reduce stress and family crisis.**

      <u>**Status of Progress, Period 2 IP §II.14.c.:**</u>  The required plan was not developed during

Period 2.

> **Period 2 IP §II.14.d.**
> **II.  Foster Care Services Assessment and Implementation Steps**
>    **14.  Recruitment and Retention of Foster Families and Therapeutic Service Providers**
>      **d.  In consultation with Mississippi foster parents, DFCS shall identify additions and revisions to the current foster parent training curriculum that are necessary to adequately train foster parents to meet the needs of the children placed in their care.  Foster parent training classes based upon the revised curriculum shall be available in every region.**

      <u>**Status of Progress, Period 2 IP §II.14.d.:**</u>  The additions and revisions to the training

curriculum were not completed during Period 2.

> **Period 2 IP §II.14.e.**
> **II.  Foster Care Services Assessment and Implementation Steps**
>    **14.  Recruitment and Retention of Foster Families and Therapeutic Service Providers**
>      **e.  DFCS shall create a resource family workgroup (consisting of staff and resource families) to develop and implement resource family practices**

131

and protocols that address the types of information that should be
provided to resource families prior to taking a child into the home,
what type of training is needed, what emergency procedures need to be
in place for resource families, what strategies are effective in recruiting,
and how resource families can be included in case planning.

**Status of Progress, Period 2 IP §II.14.e.:** The workgroup was not established during

Period 2.

Period 2 IP §II.14.f.
II.  Foster Care Services Assessment and Implementation Steps
    14.  Recruitment and Retention of Foster Families and Therapeutic Service
         Providers
        f.  DFCS shall regionalize its recruitment and retention efforts, and for
            each region have in place a stakeholder recruitment and retention team
            to identify local needs and develop and implement plans for recruiting,
            supporting, and utilizing foster and adoptive parents.

**Status of Progress, Period 2 IP §II.14.f.:** This initiative was not undertaken by the

defendants during Period 2.

Period 2 IP §II.14.a.-f.
Relevant COA Standards: PA-FC 16.03, PA-FC 16.04, PA-FC 18.01, PA-FC 18.05, PA-KC 12.03.

**Status of Progress, Period 2 IP §II.14.a.-f., Relevant COA Standards:** Based on the

documentation submitted by defendants to COA, COA found the documents were in compliance

with all five standards.  The COA's findings are addressed in further detail in Section IV.B. of

this report.[399]

Settlement Agreement §III.A.2.
III.  Outcome Measures
    A.  Reunification
        <u>By the end of implementation Period 2:</u>
        2.  At least 30% of children who are discharged from custody and
            reunified with their parents or caretakers in the last year shall be
            reunified within 12 months of the latest removal from home.

**Status of Progress, Settlement Agreement §III.A.2.:** Defendants did not produce

validated data reports related to this subsection during Period 2 as contemplated by the

---

[399] *Infra* pp. 163-164.

Settlement Agreement, and thus the Monitor was not able to assess whether this requirement was

satisfied.

> **Settlement Agreement §III.B.2.**
> **III.  Outcome Measures**
> > **B.  Time to Adoption Finalization**
> > > <u>**By the end of implementation Period 2:**</u>
> > > > **2.  At least 15% of children who were discharged in the last year upon**
> > > > **finalization of an adoption shall have had the adoption finalized**
> > > > **within 24 months of the latest removal from home.**

**<u>Status of Progress, Settlement Agreement §III.B.2.:</u>**    Defendants did not produce

validated data reports related to this subsection during Period 2 as contemplated by the

Settlement Agreement, and thus the Monitor was not able to assess whether this requirement was

satisfied.

> **Settlement Agreement §III.C.2.**
> **III.  Outcome Measures**
> > **C.  Number of Placements**
> > > <u>**By the end of implementation Period 2:**</u>
> > > > **2.  In the last year, at least 40% of children in care less than 12 months**
> > > > **from the time of latest removal from home shall have had two or**
> > > > **fewer placements.**

**<u>Status of Progress, Settlement Agreement §III.C.2.:</u>**  Because defendants did not

produce validated data reports related to this requirement during Period 2 as required by the

Settlement Agreement,[400] they are required to do so during the Bridge Period.[401]  Accordingly,

the Monitor will report more fully on defendants' progress in her forthcoming report on the

Bridge Plan.

> **Settlement Agreement §III.D.2.**
> **III.  Outcome Measures**
> > **D.  Abuse/Neglect/Maltreatment in Care**
> > > <u>**By the end of implementation Period 2:**</u>
> > > > **2.  The rate of abuse or maltreatment in care in the last year shall not**
> > > > **exceed 1.14%.**

---

[400]  *See* Period 2 IP §I.5.b. and related text *supra* pp. 64-66, which requires defendants to verify MACWIS data regarding placements.
[401]  June 10, 2010 Agreed Order, Ex. A, p. 1.

**Status of Progress, Settlement Agreement §III.D.2.:** Because defendants did not produce validated data reports related to this requirement during Period 2 as contemplated by the Settlement Agreement, they are required to do so during the Bridge Period.[402] Accordingly, the Monitor will report more fully on defendants' progress in her forthcoming report on the Bridge Plan.

> **Period 2 IP §III.1.**
> **III. Council on Accreditation Readiness Assessment**
> **Defendants shall implement the following recommendations from the COA**
> **Accreditation Readiness Assessment, Part I, issued July 21, 2008:**
>
> **1. By September 1, 2009, Defendants shall identify DFCS offices where cross-county clustering would be beneficial, and Defendants shall create cross-county office clusters in those locations in order to provide more supervision to line staff and to equalize caseloads; and**

**Status of Progress, Period 2 IP §III.1.:** The Monitor has not had an opportunity to assess defendants' compliance with this requirement during Period 2 and will report on this requirement as indicated.[403]

> **Period 2 IP §III.2.**
> **III. Council on Accreditation Readiness Assessment**
> **Defendants shall implement the following recommendations from the COA**
> **Accreditation Readiness Assessment, Part I, issued July 21, 2008:**
>
> **2. By November 1, 2009, Defendants shall create a centralized intake system that receives and screens all reports of child maltreatment and that forwards all screened-in reports to the appropriate DFCS office.**

**Status of Progress, Period 2 IP §III.2.:** As described above,[404] defendants began to operate the centralized intake system by establishing a statewide Hotline for reporting child abuse and neglect on November 1, 2009. The Hotline does not receive all reports of maltreatment in the first instance. DFCS staff in county offices have continued to process intakes in what appear to be limited circumstances by interviewing reporters and forwarding the reports

---

[402] *Id.*
[403] *See supra* note 360 for the process the Monitor expects to adopt with respect to prospective reporting related to this requirement.
[404] *Supra* pp. 97-98.

to the Hotline intake workers to enter into MACWIS. Defendants should take steps to address this practice promptly through careful planning, the development of clear policy guidance, staff training, and appropriate outreach to community stakeholders.

### B. COA Findings Related to COA Standards in Period 2 Implementation Plan

The Settlement Agreement requires defendants to be accredited by COA pursuant to COA's relevant management and service standards.[405] As required by the Settlement Agreement, the annual implementation plans have been developed jointly by the parties and COA.[406] The initial stages of the COA accreditation process involve a review of DFCS policies and related documents to ensure conformity with COA standards. Thus, the Period 1 and Period 2 implementation plans list the COA standards that the defendants are required to comply with by demonstrating that the terms of relevant policy and related documents conform to the standards. COA does not assess actual agency practices to determine compliance with COA standards until a later stage in the accreditation process.

Defendants had difficulty managing accreditation activities during Period 1, and as a result 35 COA standards required by the Period 1 IP were incorporated into the Period 2 IP.[407] In addition, the Period 2 IP included 111 additional COA standards. Thus, during Period 2 the defendants were required to submit to COA documentation related to a total of 146 COA standards for a determination about whether the written submissions conform to the applicable standards. COA makes five types of findings related to the documentation: partial compliance, substantial compliance, compliance, noncompliance, and out of compliance. In instances in which a determination is made that the documents are out of compliance or noncompliant, a

---

[405] Settlement Agreement §IV.
[406] *Id.* §I.A. and B.
[407] COA determined that one of the 35 Period 1 standards was not applicable to DFCS.

135

remedial process is triggered, requiring superseding and/or supplemental submissions that conform to the targeted standard.

As set forth below, during Period 2 the defendants submitted documentation that satisfied all of the outstanding Period 1 COA standards, and with very few exceptions, all of the Period 2 standards were satisfied. The COA project director who evaluated defendants' submissions has reported that all of the submissions were timely, generally very well done, and included the appropriate supporting documentation. In the limited instances in which COA required remedial action, the project director has indicated that the defendants were very responsive.

COA's findings with respect to the documentation the defendants submitted in support of each of the 146 COA standards included in the Period 2 IP are set forth below.

**I. Administration and Management Implementation Steps**

    **Period 2 IP §I.1.: Agency Leadership and Administration**

        **PA-AM 2.01**
        **The agency head promotes a clear understanding and implementation of agency values, including expectations for quality service delivery and effectiveness, expressed through:**
        **a.    service delivery practices;**
        **b.    human resources practices; and**
        **c.    staff training and supervision.**

**COA Finding:** In compliance - August 4, 2009 COA report[408]

        **PA-AM 3.04**
        **The agency's performance goals, and outcomes appropriate for clients and programs, are clearly articulated**.

**COA Finding:** In substantial compliance - March 1, 2010 COA report[409]

        **PA-AM 6.01**
        **The administrative team establishes in writing:**
        **a.    responsibilities;**
        **b.    a process for assessing and implementing responsibilities, such as establishing task forces/committees; and**
        **c.    under what conditions and to whom interim authority can be delegated.**

**COA Finding:** In compliance - August 4, 2009 COA report

---

[408] Ex. 63A, COA, DFCS First Quarter Deliverables Report, Year 2 Implementation Plan, August 4, 2009.
[409] Ex. 63B, COA, DFCS Third Quarter Deliverables Report, Year 2 Implementation Plan, March 1, 2010.

**PA-AM 6.02**
**Administrative team members:**
a.      **receive an orientation to the agency's mission, history, goals, objectives, structure, methods of operation; and**
b.      **are familiarized with agency activities and are introduced to key staff members.**

**COA Finding:**  In compliance - August 6, 2009 e-mail correspondence[410]

**PA-AM 7.01**
**Strategic planning responsibilities include:**
a.      **envisioning and setting the agency's strategic direction; and**
b.      **active support for inclusive, management-directed, agency-wide involvement in long term planning that occurs every 4-5 years.**

**COA Finding:**  In compliance - August 4, 2009 COA report

**PA-AM 7.02**
**The agency's management team reviews and approves the long-term plan framework, to ensure that planning encompasses:**
a.      **a review of the agency's mission, values, and mandates;**
b.      **an assessment of strengths and weaknesses;**
c.      **measurable goals and objectives that flow from its mission and mandated responsibilities; and**
d.      **appropriate strategies for meeting identified goals, including consideration of the agency's continued development and sustainability and possible need to redirect, eliminate, or expand service to respond to changing community demographics and needs.**

**COA Finding:**  In compliance - March 1, 2010 COA report

**PA-FC 5**
**The program is guided by a service philosophy that:**
a.      **provides a logical approach for how program activities will meet the needs of families;**
b.      **is culturally grounded; and**
c.      **is based on program goals and the best available evidence of service effectiveness for the identified service population**.

**COA Finding:**  In compliance - March 1, 2010 COA report

**Period 2 IP §I.2.b.: Human Resources Management, Supervisor Access**

**PA-HR 3.01**
**Job descriptions and selection criteria:**
a.      **state the qualifications, essential functions, responsibilities for each position or group of like positions, and job expectations;**
b.      **include sensitivity to the service population's cultural and  socioeconomic characteristics; and**
c.      **are reviewed and updated regularly.**

---

[410]  Ex. 63C, August 6, 2009 e-mail correspondence from James Mooney to Jenni Murray regarding Year 2 First Quarter Deliverables.

137

**COA Finding:** In compliance - March 1, 2010 COA report

>  **PA-HR 3.02**
>  **Recruitment and selection procedures include:**
>  a. notifying personnel of available positions;
>  b. verifying references and credentials of personnel and independent  contractors;
>  c. providing applicants with a written job description;
>  d. giving final candidates the opportunity to speak with currently-employed personnel;
>  e. retaining hiring records for at least one year; and
>  f. using standard interview questions that comply with employment and labor laws.

**COA Finding:** In compliance - March 1, 2010 COA report

>  **PA-HR 6.01**
>  **Every full-time and part-time employee and volunteer receives a written annual performance review conducted by the person to whom s/he reports.**

**COA Finding:** In compliance - November 12, 2009 COA report[411]

>  **PA-HR 6.02**
>  **Performance evaluations assess job performance, and emphasize self-development and professional growth, in relation to:**
>  a. specific expectations defined in the job description;
>  b. agency-wide expectations for personnel;
>  c. objectives established in the most recent evaluation and objectives for future performance as they relate to the agency's mission and goals;
>  d. developmental and professional objectives;
>  e. recommendations for further training and skill building; and
>  f. knowledge and competence related to the characteristics and needs of service recipients, if applicable.

**COA Finding:** COA did not evaluate this requirement during Period 2.

>  **PA-HR 7.01**
>  **Personnel records are updated regularly, and contain:**
>  a. identifying information and emergency contacts;
>  b. application for employment, hiring documents including job postings and interview notes, and reference verification;
>  c. job description;
>  d. compensation documentation, as appropriate;
>  e. pre-service and in-service training records; and
>  f. performance evaluations and all documentation relating to performance, including disciplinary actions and termination summaries, if applicable.

**COA Finding:** In substantial compliance - November 12, 2009 COA report

>  **PA-HR 7.03**
>  **Access to personnel records is limited to authorized personnel on a need-to-know basis.**

---

[411] Ex. 63D, COA, DFCS Second Quarter Deliverables Report, Year 2 Implementation Plan, November 12, 2009.

**COA Finding:** In substantial compliance - November 12, 2009 COA report

> **PA-TS 3.01**[412]
> **Supervisors have sufficient time to provide individual or group supervision as appropriate to individual needs or program type, and to conduct evaluation and training activities.**

**COA Finding:** In compliance - August 4, 2009 COA report

> **PA-TS 3.03**[413]
> **Supervisors are responsible for:**
> a.      **delegating and overseeing work assignments;**
> b.      **ensuring that service delivery is performed according to the agency's mission, policies and procedures, and service philosophy;**
> c.      **providing case consultation and in-service training as appropriate;**
> d.      **identifying unmet training needs;**
> e.      **ensuring case reviews are conducted at least quarterly; and**
> f.      **conducting performance evaluations.**

**COA Finding:** In compliance - August 4, 2009 COA report

> **Period 2 IP §I.2.d.: Human Resources Management, Training**

> **PA-TS 2.02 -** *365 Day Standard due July 1, 2009*
> **All personnel who have regular contact with clients receive training on legal issues, including:**
> a.      **mandatory reporting and the identification of clinical indicators of suspected abuse and neglect, as applicable;**
> b.      **reportable criminal behavior including criminal, acquaintance, and statutory rape;**
> c.      **duty to warn;**
> d.      **the agency's policies and procedures on confidentiality and disclosure of service recipient information, and penalties for violation of these policies and procedures;**
> e.      **the legal rights of service recipients; and**
> f.      **any requirements associated with consent decrees.**

**COA Finding:** In compliance - July 10, 2009 COA memorandum[414]

> **PA-TS 2.03 -** *365 Day Standard due July 1, 2009*
> **All personnel receive training on proper documentation techniques and the maintenance and security of case records.**

**COA Finding:** In compliance - July 10, 2009 COA memorandum

> **PA-TS 1.01**
> **The agency implements a training and development program that enhances the knowledge, skills, and abilities of personnel and prepares personnel to assume their responsibilities.**

---

[412] The Period 2 IP states: "This requirement shall be interpreted to be consistent with Period 2 Annual Implementation Plan § I.2.d.3, which requires: 'No supervisory personnel shall be detailed to the training unit to provide training.'" Period 2 IP at 4.

[413] The Period 2 IP states: "This requirement shall be interpreted to be consistent with Period 2 Annual Implementation Plan § I.2.d.3, which requires: 'No supervisory personnel shall be detailed to the training unit to provide training.'" Period 2 IP at 5.

[414] Ex. 63E, July 10, 2009 memorandum from James Mooney to Jenni Murray regarding 365 Day Deliverables.

**COA Finding:** In compliance - November 12, 2009 COA report

> **PA-TS 1.02**
> **The personnel training and development program:**
> **a.** promotes cooperation among personnel;
> **b.** includes an education and training program that provides opportunities for learning and skill enhancement;
> **c.** encourages creativity and innovation in program development and service delivery;
> **d.** promotes awareness of, and sensitivity to, cultural backgrounds and needs; and
> **e.** rewards and acknowledges the contributions of personnel.

**COA Finding:** In compliance - November 12, 2009 COA report

> **PA-TS 1.03**
> **The personnel training and development program:**
> **a.** is reviewed annually and revised in accord with an assessment of the agency's training needs;
> **b.** outlines specific expectations regarding training required of personnel in different positions and categories;
> **c.** provides the opportunity for personnel to fulfill the continuing education requirements of their respective professions; and
> **d.** provides opportunities to support advancement within the agency and profession.

**COA Finding:** In compliance - March 1, 2010 COA report

> **PA-TS 2.01**
> **New personnel are oriented within the first three months of hire to:**
> **a.** the agency's mission, philosophy, goals, and services;
> **b.** the cultural and socioeconomic characteristics of the service population;
> **c.** the agency's place within its community;
> **d.** the agency's personnel manual; and
> **e.** lines of accountability and authority within the agency.

**COA Finding:** In compliance - March 1, 2010 COA report

> **PA-TS 2.04**
> **Direct service personnel demonstrate competence in, or receive training on, as applicable:**
> **a.** the establishment of rapport and responsive behaviors with service recipients;
> **b.** the needs of individuals and families in crisis including special service needs of victims of violence, abuse, or neglect and their family members;
> **c.** basic health and medical needs of the service population;
> **d.** procedures for working with foreign language speakers and persons with communication impairments; and
> **e.** public assistance and government subsidies.

**COA Finding:** In compliance - November 12, 2009 COA report

**PA-BSM 3.01 -** *365 Day Standard due July 1, 2009*
**All personnel and foster parents receive initial and ongoing competency-based training, appropriate to their responsibilities, on the agency's behavior support and management intervention policies, procedures, and practices.**

**<u>COA Finding:</u>** In substantial compliance - September 17, 2009 e-mail correspondence[415]

**PA-BSM 3.02 -** *365 Day Standard due July 1, 2009*
**Personnel and foster parents receive training that includes:**
**a.    recognizing aggressive and out-of-control behavior, psychosocial issues, medical conditions, and other contributing factors that may lead to a crisis;**
**b.    understanding how staff behavior can influence the behavior of service recipients; and**
**c.    limitations on the use of physical techniques.**

**<u>COA Finding:</u>** In partial compliance - July 10, 2009 COA memorandum
                  In substantial compliance - September 17, 2009 e-mail correspondence

**PA-BSM 3.03 -** *365 Day Standard due July 1, 2009*
**Training addresses methods for de-escalating volatile situations, including:**
**a.    listening and communication techniques, such as negotiation and mediation;**
**b.    involving the person in regaining control and encouraging self-calming behaviors;**
**c.    separation of individuals involved in an altercation;**
**d.    offering a voluntary escort to guide the person to a safe location;**
**e.    time out to allow the person to calm down; and**
**f.    other non-restrictive ways of de-escalating and reducing episodes of aggressive and out-of-control behavior.**

**<u>COA Finding:</u>** In partial compliance - July 10, 2009 COA memorandum
                  In substantial compliance - September 17, 2009 e-mail correspondence

**Period 2 IP §I.2.e.: Human Resources Management, Contract Agency Requirements**

**PA-RPM 9.02**
**The pursuit of contracts for services is consistent with the agency's mission and purpose, and the agency:**
**a.    establishes a system of standardized contracting practices;**
**b.    conducts due diligence in contracting activities, including review of possible risks; and**
**c.    assigns a qualified individual to oversee contracts.**

**<u>COA Finding:</u>** In compliance - March 1, 2010 COA report

**PA-RPM 9.03**
**Written contracts contain all significant terms and conditions in accordance with applicable law.**

---

[415] Ex. 63F, September 17, 2009 e-mail correspondence from James Mooney to Jenni Murray regarding Official Resubmission of BSM. Mr. Mooney's September 17, 2009 e-mail addressed COA standards BSM 3.01, 3.02 and 3.03. The e-mail states: "[t]he information which you sent and accompanying documentation generally meets the requirements of the standards and resubmission request." On September 1, 2010 the Monitor's staff clarified this finding with Mr. Mooney, who stated that DFCS was in "substantial compliance" with COA standards BSM 3.01, 3.02 and 3.03.

**COA Finding:** COA did not evaluate this requirement during Period 2.

> **PA-RPM 10.02**
> **The agency routinely monitors contractor progress toward fulfilling the terms of the contract.**

**COA Finding:** In substantial compliance - May 18, 2010 COA report[416]

> **PA-RPM 10.03**
> **Contracts for social and human services include:**
> **a.      service quality, client satisfaction, and outcomes that accord with the agency's expectations;**
> **b.      criteria for evaluating vendor performance; and**
> **c.      protocols for routine communication of related data.**

**COA Finding:** In substantial compliance - May 18, 2010 COA report

> **PA-RPM 10.04**
> **When areas of concern are identified, the agency:**
> **a.      develops an improvement plan in conjunction with the contractor; and**
> **b.      ensures contractor follow-up and remediation.**

**COA Finding:** In substantial compliance - May 18, 2010 COA report

**Period 2 IP §I.3.: Performance and Quality Improvement**

> **PA-PQI 2.02 -** *365 Day Standard due July 1, 2009*
> **A PQI operational plan:**
> **a.      assigns responsibility for coordination and implementation of PQI activities, and provision of technical assistance in using the PQI process;**
> **b.      sets forth the purpose and scope of PQI activities;**
> **c.      establishes how the agency periodically reviews essential management and service delivery processes consistent in light of quality priorities;**
> **d.      defines stakeholders and how stakeholders will participate in the PQI process;**
> **e.      outlines methods and timeframes for monitoring and reporting activities; and**
> **f.      includes provision for an assessment of the utility of the PQI program, including any barriers and supports for implementation.**

**COA Finding:** In substantial compliance - July 10, 2009 COA memorandum

> **PA-PQI 2.01 -** *365 Day Standard due July 1, 2009*
> **The PQI framework takes into account all of the agency's regions and sites, and all individuals and families served.**

**COA Finding:** In substantial compliance - July 10, 2009 COA memorandum

> **PA-PQI 1.01**
> **The agency's senior management sets forth quality expectations and broad goals that merit ongoing monitoring.**

---

[416] Ex. 63G, COA, DFCS Fourth Quarter Deliverables Report, Year 2 Implementation Plan, May 18, 2010.

**COA Finding:** In compliance - March 1, 2010 COA report

> **PA-PQI 1.02**
> **The agency head endorses:**
> a.  a culture that promotes excellence and continual improvement;
> b.  implementation of an agency-wide PQI framework;
> c.  a dedicated PQI function;
> d.  collection and constructive use of data to promote a high-learning, high-performance, results-oriented agency;
> e.  involvement of a wide range of managers and staff in the PQI process;
> f.  inclusion of external stakeholders and community members; and
> g.  an annual "score-card" or summary report of gains made against goals.

**COA Finding:** In compliance - November 12, 2009 COA report

> **PA-PQI 2.04**
> **Quality expectations are reflected in key documents including:**
> a.  budgets;
> b.  policy and procedures manuals;
> c.  new staff training material;
> d.  communications to staff, family members, consumers, and volunteers; and
> e.  service provider contracts.

**COA Finding:** In compliance - March 1, 2010 COA report

> **PA-PQI 2.05**
> **Staff responsible for PQI are qualified by education and experience to:**
> a.  engage people throughout the agency;
> b.  systematically collect information and analyze data; and
> c.  communicate results and recommendations to various key audiences.

**COA Finding:** In compliance - November 12, 2009 COA report

> **PA-PQI 3.02**
> **Staff throughout the agency and stakeholders, including partners and contractors, work together to develop key outcomes and indicators, and identify sources of various types of reliable data including characteristics, service delivery experience, and outcomes for children, youth, adults, and families being served.**

**COA Finding:** In compliance - March 1, 2010 COA report

> **PA-PQI 4.01**
> **Collection of service delivery information focuses on key quality factors, including appropriateness, efficacy, and effectiveness, and any or all of the dimensions of quality.**

**COA Finding:** In partial compliance - March 1, 2010 COA report

> **PA-PQI 4.02**
> **The agency aggregates and reviews several sources of information to identify patterns, including:**
> a.  quarterly case record review reports;
> b.  quarterly review of incidents, accidents, and grievances;
> c.  customer satisfaction data, usually annually;
> d.  customer outcomes data, usually annually;

e.     internal and external evaluations of agency programs; and
f.     management and operations data and reports.

**COA Finding:**  In substantial compliance - March 1, 2010 COA report

**PA-PQI 5.01**
The PQI plan outlines routine actions taken to identify areas of needed improvement, implement the improvement on a small or broad scale, review the results, modify or discontinue the improvement process, and keep staff informed and involved throughout the cycle.

**COA Finding:**  In compliance - March 1, 2010 COA report

**PA-PQI 6.01**
An information packet is developed for stakeholders that explains the PQI framework, how PQI functions at the agency, and forms and measures the agency uses to study and improve operations, service delivery, and customer results.

**COA Finding:**  Out of compliance - March 1, 2010 COA report

**PA-PQI 6.02**
An explanation of PQI function and structure is included in new hire packets and reviewed at new staff orientation.

**COA Finding:**  In compliance - May 18, 2010 COA report

**Period 2 IP §I.4.: Legal and Regulatory Compliance**

**PA-BSM 1.01**
The agency's behavior support and management policies and practices comply with federal, state, and local legal and regulatory requirements.

**COA Finding:**  Out of compliance - March 1, 2010 COA report

**PA-AS 2.04**
The agency identifies Indian children and collaborates with the tribe or Indian organization to:
a.     determine the applicability, and ensure compliance with, the Indian
       Child Welfare Act;
b.     determine jurisdiction;
c.     assess the child's needs;
d.     provide the family with information regarding their rights under the
       Indian Child Welfare Act;
e.     determine the most appropriate plan for the child; and
f.     maintain connections between the child and his or her tribe.

**COA Finding:**  In compliance - August 4, 2009 COA report

**Period 2 IP §I. 6.: Case Recordings and Information**

**PA-RPM 7.02**
Case records comply with all legal requirements and contain information necessary to provide services, including:
a.     demographic and contact information;

     b.     **the reason for requesting or being referred for services;**
     c.     **up-to-date assessments;**
     d.     **the service plan, including mutually developed goals and objectives;**
     e.     **copies of all signed consent forms;**
     f.     **a description of services provided directly or by referral;**
     g.     **routine documentation of ongoing services;**
     h.     **documentation of routine supervisory review;**
     i.     **discharge or aftercare plan;**
     j.     **recommendations for ongoing and/or future service needs and assignment of aftercare or follow-up responsibility, if needed; and**
     k.     **a closing summary entered within 30 days of termination of service.**

**<u>COA Finding:</u>** In substantial compliance - November 12, 2009 COA report

**PA-RPM 7.03**
**The case record contains essential legal and medical information, including, as applicable:**
     a.     **psychological, medical, toxicological, diagnostic, or other evaluations;**
     b.     **copies of all written orders for medications or special treatment procedures; and**
     c.     **court reports, documents of guardianship or legal custody, birth or marriage certificates, and any legal directives related to the service being provided.**

**<u>COA Finding:</u>** In compliance - November 12, 2009 COA report

**PA-RPM 7.04**
**Case record entries are made by authorized personnel only, and are:**
     a.     **specific, factual, relevant, and legible;**
     b.     **kept up to date from intake through case closing;**
     c.     **completed, signed, and dated by the person who provided the service; and**
     d.     **signed and dated by supervisors, where appropriate.**

**<u>COA Finding:</u>** In partial compliance - November 12, 2009 COA report

**PA-PQI 4.03**
**Quarterly reviews of case records evaluate the presence, clarity, and continuity of required documents utilizing a uniform tool to ensure consistency.**

**<u>COA Finding:</u>** In substantial compliance - March 1, 2010 COA report

**PA-RPM 7.05**
**Progress notes comply with legal requirements, and are entered:**
     a.     **at least quarterly; or**
     b.     **monthly, or as required by law or regulation for individuals receiving protective services, out-of-home care, day treatment, or frequent or intensive counseling or treatment.**

**<u>COA Finding:</u>** In compliance - March 1, 2010 COA report

**PA-RPM 7.06**
**Service recipients may add a statement to their case records, and:**
     a.     **any response by personnel is added with the service recipient's knowledge; and**
     b.     **the service recipient is given the opportunity to review and comment on such additions.**

**<u>COA Finding:</u>** In partial compliance - May 18, 2010 COA report

145

**PA-RPM 7.07**
**At case closing, case records are reviewed and unsummarized notes, personal observations, and impressions are expunged.**

**COA Finding:** In partial compliance - May 18, 2010 COA report

**PA-RPM 8.01**
**Access to confidential case records meets legal requirements, and is limited to:**
a.      the service recipient or, as appropriate, a parent or legal guardian;
b.      personnel authorized to access specific information on a "need-to know" basis;
c.      others who are permitted access;
d.      former service recipients;
e.      requests for records of deceased service recipients; and
f.      auditors, contractors, and licensing or accrediting personnel consistent with the agency's confidentiality policy.

**COA Finding:** In compliance - November 12, 2009 COA report

**PA-CR 2.04**
**The release form for disclosure of confidential information includes the following elements:**

a.      the name of the person whose information will be released;
b.      the signature of the person whose information will be released, or the parent or legal guardian of a person who is unable to provide authorization;
c.      the specific information to be released;
d.      the purpose for which the information is to be used;
e.      the date the release takes effect;
f.      the date the release expires, not to exceed 90 days from when authorization is given for a one time release of information, and not to exceed one year, or as the law or court order requires, when a contracted or cooperating service provider requires the release of information for ongoing service provision;
g.      the name of the person to whom the information is to be released;
h.      the name of the person within the agency who is providing the confidential information; and
i.      a statement that the person or family may withdraw their authorization at any time.

**COA Finding:** In substantial compliance - March 1, 2010 COA report

**PA-AS 12.05**
**Records are retained for the period required by applicable law, or in the absence of such law for at least 99 years, and the agency has a plan for transfer of records if the adoption program is closed.**

**COA Finding:** In compliance - November 12, 2009 COA report

**PA-AS 12.06**
**All releases of identifying information about adopted persons, birth parents, and adoptive families are in accordance with individual preferences and applicable regulation.**

**COA Finding:** In substantial compliance - March 1, 2010 COA report

146

**PA-RPM 5.01 -** *365 Day Standard due July 1, 2009*
**Personnel can rapidly access paper and electronic information.**

**COA Finding:** In compliance - July 10, 2009 COA memorandum

**PA-RPM 5.02 -** *365 Day Standard due July 1, 2009*
**Electronic and paper records can be located at all times.**

**COA Finding:** In compliance - July 10, 2009 COA memorandum

**PA-RPM 6.01**
**The agency protects confidential and other sensitive information from theft, unauthorized use, damage, or destruction by:**
**a.      limiting access to authorized personnel on a need-to-know basis;**
**b.      backing up electronic data, with copies maintained off premises;**
**c.      using firewalls, anti-virus and related software, and other appropriate safeguards; and**
**d.      maintaining paper records in a secure location.**

**COA Finding:** In compliance - November 12, 2009 COA report

**PA-RPM 6.02**
**Case records are maintained and disposed of in a manner that protects privacy and confidentiality, and the agency:**
**a.      maintains case records for at least seven years after case closing unless otherwise mandated by law; and**
**b.      properly disposes of records in the event of the agency's dissolution.**

**COA Finding:** In substantial compliance - November 12, 2009 COA report

**Period 2 IP §I. 8.: Ethical Practice**

**PA-ETH 1.01**
**The public has access to clear, timely, accurate information about the agency's programs, activities, service recipients, and finances.**

**COA Finding:** In compliance - August 6, 2009 COA addendum

**PA-ETH 1.02**
**The agency accurately portrays its mission in all communications that contain such a representation.**

**COA Finding:** In compliance - August 4, 2009 COA report

**PA-ETH 2.01**
**A conflict of interest policy is tailored to the agency's specific needs and characteristics, and:**
**a.      defines conflict of interest;**
**b.      identifies groups of individuals within the organization covered by the policy;**
**c.      addresses transactions between board members and the agency;**
**d.      addresses policy enforcement;**
**e.      provides a framework for evaluating situations that may constitute a conflict; and**
**f.      invests management with developing procedures that facilitate disclosure of information to prevent and manage potential and apparent conflicts of interest.**

147

**COA Finding:** In compliance - August 4, 2009 COA report

    **PA-ETH 5.01**
    **Personnel know and follow the code of ethics of their respective professions.**

**COA Finding:** In compliance - March 1, 2010 COA report

    **PA-ETH 5.02**
    **The agency prohibits:**
    **a.    making or accepting payment or other consideration in exchange for referrals;**
    **b.    steering, directing referrals to, or giving preference to clients easier or less costly to serve for specific agencies and practitioners within the agency;**
    **c.    unfairly steering or directing referrals to, or "creaming" clients for specific network service provider agencies, such as network owners, or individual practitioners within the network, as applicable to networks; and**
    **d.    steering or directing referrals to private practices in which personnel, consultants, or the immediate families of personnel and consultants are engaged.**

**COA Finding:** In compliance - March 1, 2010 COA report

    **PA-ETH 5.03**
    **The agency prohibits preferential treatment of members, community partners, advisory groups, personnel, or consultants in applying for and receiving the agency's services.**

**COA Finding:** In compliance - March 1, 2010 COA report

    **PA-CR 1.02**
    **A written summary of client rights and their responsibilities is posted in the reception areas of all service delivery locations.**

**COA Finding:** In substantial compliance - August 4, 2009 COA report

    **PA-CR 1.06**
    **The agency accommodates the written and oral communication needs of clients by:**
    **a.    communicating, in writing and orally, in the languages of the major population groups served;**
    **b.    providing, or arranging for, bilingual personnel or translators or arranging for the use of communication technology, as needed;**
    **c.    providing telephone amplification, sign language services, or other communication methods for deaf or hearing impaired persons;**
    **d.    providing, or arranging for, communication assistance for persons with special needs who have difficulty making their service needs known; and**
    **e.    considering the person's literacy level.**

**COA Finding:** In partial compliance - May 18, 2010 COA report

**Period 2 IP §I.9.: Community Involvement and Advocacy**

    **PA-AM 4.01**
    **The agency conducts an ongoing program of community public education to communicate:**
    **a.    its mission, role, functions, and capacities; and**
    **b.    the strengths, needs, and challenges of the individuals, families, and groups it serves.**

**COA Finding:**  In compliance - November 12, 2009 COA report

> **PA-AM 4.02**
> **The agency collaborates with the community to advocate for issues of mutual concern, such as:**
> **a.      improvements to existing services;**
> **b.      filling gaps in service;**
> **c.      the full and appropriate implementation of applicable laws and regulations regarding issues concerning the service population; and**
> **d.      improved supports and accommodations for persons with special needs.**

**COA Finding:**  In compliance - November 12, 2009 COA report

> **PA-CPS 2.01**
> **The agency's leadership works with the leadership of other organizations to identify common issues, develop opportunities for collaboration, and resolve administrative conflicts and other issues that inhibit service collaboration and use.**

**COA Finding:**  In substantial compliance - November 12, 2009 COA report

**Period 2 IP §I.10.: Administrative and Service Environment**

> **PA-HR 4.01 -** *365 Day Standard due July 1, 2009*
> **The agency promotes open communication and collaboration among disciplines and staff levels by:**
> **a.      holding regular team, agency, and divisional meetings, as appropriate to the agency; and**
> **b.      providing feedback to personnel about their suggestions and recommendations.**

**COA Finding:**  In compliance - July 10, 2009 COA memorandum

> **PA-HR 4.03 -** *365 Day Standard due July 1, 2009*
> **The agency annually establishes personnel satisfaction and retention goals and measures rate of personnel turnover and personnel satisfaction.**

**COA Finding:**  In compliance - July 10, 2009 COA memorandum

> **PA-AM 5.01**
> **Oversight entities:**
> **a.      reflect the demographics of the communities served;**
> **b.      represent the interests of the communities served;**
> **c.      link the agency and the public or community; and**
> **d.      ensure that the agency's policies and performance uphold the public trust.**

**COA Finding:**  In compliance - August 4, 2009 COA report

> **PA-RPM 2.01 -** *365 Day Standard due July 1, 2009*
> **Management conducts an internal assessment of overall risk at least annually that includes:**
> **a.      compliance with legal requirements, including licensing and mandatory reporting laws, and fiscal accountability;**
> **b.      insurance and liability;**
> **c.      health and safety, including use of facilities:**
> **d.      contracting practices and compliance;**

149

e.     staff training regarding areas of risk;
f.     volunteer roles and oversight;
g.     research involving program participants and other clients' rights issues;
h.     security of information, including client confidentiality;
i.     financial risk;
j.     fundraising;
k.     conflict of interest;
l.     employment practices; and
m.     interagency collaborations.

**COA Finding:** In substantial compliance - July 10, 2009 COA memorandum

**PA-RPM 2.02 -** *365 Day Standard due July 1, 2009*
**The agency conducts a quarterly review of immediate and ongoing risks that includes a review of incidents, accidents, and grievances related to:**
a.     administering, dispensing, or prescribing medications;
b.     service modalities or other organizational practices that involve risk or limit freedom of choice;
c.     the use of restrictive behavior management interventions, such as seclusion and restraint;
d.     facility safety issues; and
e.     situations where a person was determined to be a danger to himself/herself or others.

**COA Finding:** In compliance - July 10, 2009 COA memorandum

**PA-RPM 2.04 -** *365 Day Standard due July 1, 2009*
**Individuals qualified by knowledge and experience are responsible for risk prevention and management functions.**

**COA Finding:** In substantial compliance - July 10, 2009 COA memorandum

**PA-ASE 6.01 -** *365 Day Standard due July 1, 2009*
**The agency assesses its safety and security needs and:**
a.     takes appropriate measures to protect the safety of all persons who are in its facilities or on its grounds;
b.     develops safety and communication protocols for staff that work off-site;
c.     trains staff on potential risks they may encounter on-site, in the community, or in clients' homes;
d.     trains staff on self-protection techniques, as necessary; and
e.     has security systems to deter facility break-ins.

**COA Finding:** In substantial compliance - July 10, 2009 COA memorandum

**PA-ASE 8.01 -** *365 Day Standard due July 1, 2009*
**The agency minimizes the risk of exposure to contagious and infectious disease by:**
a.     adhering to CDC and OSHA guidelines;
b.     consulting with the local health department or an individual qualified to provide such information; and
c.     annually training program personnel on universal disease precautions.

**COA Finding:** In substantial compliance - July 10, 2009 COA memorandum

150

**PA-ASE 8.02 -** *365 Day Standard due July 1, 2009*
**The agency:**

a.   consults with local and state public health and licensing authorities to determine the need to test personnel who are in direct contact with service recipients who may be at high risk for tuberculosis or other air and blood-borne pathogens; and

b.   as necessary, implements a targeted testing program that is consistent with public health authority recommendations.

**COA Finding:**   In substantial compliance - July 10, 2009 COA memorandum

**PA-ASE 1.02**
**The agency develops and implements a policy to prohibit smoking in all areas of its buildings except in specified circumstances and in locations environmentally separate from administrative and service areas.**

**COA Finding:**   In compliance - November 12, 2009 COA report

**PA-ASE 4**
**All facilities in which the agency operates are properly maintained through:**

a.   regular inspections;

b.   preventive maintenance by a qualified professional;

c.   a monthly review of the physical plant's heating, fire extinguishers, fire safety, lighting, and other systems;

d.   a review of vehicle safety inspections;

e.   installation of window guards, where necessary; and

f.   quick responses to emergency maintenance issues and potentially hazardous conditions.

**COA Finding:**   In compliance - March 1, 2010 COA report

**PA-ASE 7.01**
**The agency develops an emergency response plan that addresses:**

a.   coordination with appropriate local, state, and federal governmental authorities;

b.   coordination with emergency responders;

c.   coordination and communication with service recipients;

d.   evacuation of persons with mobility challenges and other special needs;

e.   accounting for the whereabouts of staff and service recipients;

f.   options for relocating service recipients; and

g.   situations involving the threat of harm or violence, or actual harm or violence.

**COA Finding:**   In partial compliance - August 4, 2009 COA report

**PA-ASE 7.03**
**The emergency response plan includes arrangements for:**

a.   a temporary work site in the event of facility closure;

b.   communicating with senior management, personnel, service recipients, the public, and the media; and

c.   notifying parents or legal guardians, as appropriate.

**COA Finding:**   In partial compliance - August 4, 2009 COA report

II.      **Foster Care Services Assessment and Implementation Steps**

   **Period 2 IP §II.3.: Screening and Assessments**

   **PA-FC 1.01**
   **Prompt, responsive screening practices:**
   a.      **ensure equitable treatment;**
   b.      **examine the child's ability to participate in family and community life without danger to themselves or others;**
   c.      **give priority to urgent needs and emergency situations; and**
   d.      **support timely initiation of services.**

   <u>**COA Finding:**</u>  In compliance - November 12, 2009 COA report

   **PA-CPS 7.02 -** *365 Day Standard due July 1, 2009*
   **The information gathered for assessments:**
   a.      **includes underlying conditions and environmental and historical factors that may contribute to concerns identified in initial screening, investigation, and risk and safety assessments;**
   b.      **identifies child and family strengths, protective factors, and needs;**
   c.      **includes the potential impact of maltreatment on the child;**
   d.      **includes factors and characteristics pertinent to making an appropriate placement, if necessary;**
   e.      **identifies potential family resources for the child and the parents; and**
   f.      **is limited to material pertinent for providing services and meeting objectives.**

   <u>**COA Finding:**</u>  In substantial compliance - July 10, 2009 COA memorandum [417]

   **PA-FC 2.02 -** *365 Day Standard due July 1, 2009*
   **The information gathered for assessments:**
   a.      **includes internal, external, and historical factors that may contribute to concerns identified in initial risk and safety assessments and initial screenings;**
   b.      **identifies child and family strengths, protective factors, and needs;**
   c.      **includes the impact of maltreatment on the child;**
   d.      **includes factors and characteristics pertinent to selecting an appropriate placement;**
   e.      **identifies family resources for the child and the parents; and**
   f.      **is limited to material pertinent for meeting service objectives.**

   <u>**COA Finding:**</u>  In substantial compliance - July 10, 2009 COA memorandum

   **PA-AS 2.05**
   **Information is gathered from birth parents and maintained for the child's future use, including:**
   a.      **the child's medical and social history;**
   b.      **contact information for organizations, medical facilities, or others involved in services to the birth parents and the child;**
   c.      **all available information about the medical and social history of the birth parents and the pregnancy; and**
   d.      **photographs or a physical description of birth parents.**

   <u>**COA Finding:**</u>  In substantial compliance - November 12, 2009 COA report

---

[417]   In the July 10, 2009 COA memorandum, the standard is erroneously referred to as PA-CPS 7.05; however, there is no COA standard with that designation, and the language of the standard comports to PA-CPS 7.02.

**PA-FC 8.01**
**Parents receive information about foster care services that includes:**
**a.      an orientation to the foster care service and the child's need for a permanent, safe, stable home;**
**b.      parental rights and responsibilities;**
**c.      the importance of parental involvement and contact with the child and the agency, according to the service plan; and**
**d.      the legal implications if reunification efforts are unsuccessful.**

## COA Finding:  In substantial compliance - May 18, 2010 COA report

**Period 2 IP §II.4.: Service Planning and Monitoring**

**PA-CPS 8.03 - *365 Day Standard due July 1, 2009***
**An individualized service plan developed with each family is based on the assessment and includes:**
**a.      agreed upon goals, desired outcomes, and timeframes for achieving them;**
**b.      services and supports to be provided, and by whom;**
**c.      timeframes for evaluating family progress; and**
**d.      the signature of the parents and the youth, if age appropriate.**

## COA Finding:  In substantial compliance - July 10, 2009 COA memorandum

**PA-CPS 8.01**
**Service planning is family centered, and includes, as appropriate:**
**a.      the child;**
**b.      family members;**
**c.      additional service providers; and**
**d.      tribal representatives.**

## COA Finding:  In substantial compliance - March 1, 2010 COA report

**PA-CPS 8.05**
**Service plans are completed within timeframes established by the agency.**

## COA Finding:  In compliance - March 1, 2010 COA report

**PA-FC 3.07**
**The foster care worker and a supervisor, or a clinical, service, or peer team review the case quarterly to assess:**
**a.      service plan implementation;**
**b.      progress toward achieving service goals and desired outcomes; and**
**c.      the continuing appropriateness of the agreed upon service goals.**

## COA Finding:  In compliance - November 12, 2009 COA report

**Period 2 IP §II.5.a: Child and Youth Permanency, Permanency Plan**

**PA-FC 4.01 - *365 Day Standard due July 1, 2009***
**Service providers, foster parents, the public authority, and the court work with the child, youth, and family to develop a permanency plan within 30 days of placement, which specifies:**
**a.      the permanency goal(s);**

153

b.     a timeframe for achieving permanency; and
c.     activities that support permanency.

**COA Finding:** In substantial compliance - July 10, 2009 COA memorandum

Period 2 IP §II.5.c: Child and Youth Permanency, Reunification Services

**PA-FC 8.02**
Foster care workers maintain regular contact with the child's family to:
a.     keep the family informed and involved in decisions about the child; and
**b.**     remain current about the family's circumstances.

**COA Finding:** In substantial compliance - March 1, 2010 COA report

Period 2 IP §II.5.e: Child and Youth Permanency, Adoption

**PA-AS 8.05**
When a child is placed prior to termination of parental rights, the agency:
a.     informs the prospective adoptive parents of the substantial risks involved and limitations on confidentiality;
b.     requires written agreements between the organization and the prospective adoptive parents, stating the mutual intention that the adoption take place, if legal matters are resolved; and
c.     makes diligent efforts to remove legal and other barriers to the adoption.

**COA Finding:** In compliance - July 5, 2010 e-mail correspondence[418]

**PA-AS 2.03 -** *365 Day Standard due July 1, 2009*
An age-appropriate child study is conducted to assess the child's readiness for adoption, and includes:
a.     an evaluation of the child's ability to bond and develop relationships;
b.     history of maltreatment and prior placements;
c.     prenatal history and developmental screening of infants and young children;
d.     current medical and dental health examinations; and
e.     a psychological evaluation, if needed.

**COA Finding:** In substantial compliance - July 10, 2009 COA memorandum

**PA-AS 8.01**
A process that examines the child's needs and interests, and the prospective adoptive parents' interpersonal and parenting skills, identifies an adoptive family that:
a.     is most suitable to meet the child's needs; and
b.     can advance the child's best interests.

**COA Finding:** In substantial compliance - July 5, 2010 e-mail correspondence

**PA-AS 7.02**
Age-appropriate services that prepare the child for adoption include:
a.     opportunities to visit prospective adoptive parents, and preparation and support for such visits;

---

[418] Ex. 63H, July 5, 2010 e-mail correspondence from James Mooney to Jenni Murray regarding Year 2 Fourth Quarter Deliverables.

b.        **counseling to help the child understand the adoption and cope with separation, loss, and birth family loyalty issues;**

c.        **consideration of continued contact with the birth parents, siblings, extended family, and the child's tribe when one has been identified; and**

d.        **the development of a lifebook that describes the child's personal history.**

**COA Finding:**  In substantial compliance - March 1, 2010 COA report

**PA-AS 3.02**
**The homestudy includes an assessment of:**
a.        **family relationships and functioning;**
b.        **education, employment, and financial status;**
c.        **parenting abilities and experiences;**
d.        **the home environment;**
e.        **physical and mental health status;**
f.        **cultural sensitivity and a willingness to support the child's cultural ties; and**
g.        **interest in adoption.**

**COA Finding:**  In compliance - March 1, 2010 COA report

**PA-AS 3.04 -** *365 Day Standard due July 1, 2009*
**The home-study is a collaborative process that helps the family decide if adoption is an appropriate goal, and includes:**
a.        **one or more visits to the prospective adoptive family's home;**
b.        **reference checks;**
c.        **criminal background and child abuse and neglect registry checks    according to applicable legal requirements; and**
d.        **preparation of a home-study report with a recommendation regarding the family's ability to meet the needs of an adopted child.**

**COA Finding:**  In substantial compliance - July 10, 2009 COA memorandum

**PA-AS 11.01**
**When the need for post-adoption services is identified, the agency and the individual or family jointly develop a plan that specifies steps for obtaining these services.**

**COA Finding:**  In substantial compliance - March 1, 2010 COA report

**PA-AS 11.02**
**Children, birth parents, adoptive parents, and adopted persons have access to needed post-adoption services that are culturally relevant and include:**
a.        **assessments;**
b.        **information and referral;**
c.        **case management;**
d.        **early intervention for children with developmental delays;**
e.        **educational services;**
f.        **counseling, mental health treatment, and crisis intervention services;**
g.        **family preservation and stabilization services;**
h.        **peer support;**
i.        **transportation; and**
j.        **respite services and out-of-home care**

**COA Finding:**  In substantial compliance - March 1, 2010 COA report

**Period 2 IP §II.6.: Child Safety**

> **PA-CPS 4.05 -** *365 Day Standard due July 1, 2009*
> **Cases are assigned for investigation, referred, or screened out, within 24 hours.**

## COA Finding: In substantial compliance - July 10, 2009 COA memorandum

> **PA-CPS 5.05 -** *365 Day Standard due July 1, 2009*
> **The investigator conducts a comprehensive evaluation of risk and protective factors that include:**
> **a.      child safety;**
> **b.      family strengths and needs;**
> **c.      history and impact of prior child abuse or neglect, domestic violence, or substance use; and family connections.**

## COA Finding: In substantial compliance - July 10, 2009 COA memorandum

> **PA-CPS 6**
> **Safety assessments are conducted at defined intervals and milestones, and safety plans are developed and updated as necessary.**

## COA Finding: In compliance - November 12, 2009 COA report

> **PA-CPS 14.06**
> **Supervisory personnel are involved in all decisions related to child safety and permanency, and workers have access to a supervisor by telephone 24 hours a day.**

## COA Finding: In compliance - August 4, 2009 COA report

> **PA-ASE 6.03 -** *365 Day Standard due July 1, 2009*
> **An agency that transports service recipients in its vehicles or permits transportation in vehicles that belong to the agency's personnel, foster parents, volunteers, or contractors requires:**
> **a.      the use of age-appropriate passenger restraint systems;**
> **b.      adequate passenger supervision, as mandated by statute or regulation;**
> **c.      proper maintenance of agency vehicles;**
> **d.      current registration and inspection of vehicles;**
> **e.      annual validation of licenses and driving records; and**
> **f.      proper insurance for vehicles and passengers.**

## COA Finding: In substantial compliance - July 10, 2009 COA memorandum

**Period 2 IP §II.7.: Child Placement**

> **PA-KC 1.01**
> **Families are screened and informed about:**
> **a.      how well the family's request matches the agency's services; and**
> **b.      what services will be available, and when.**

## COA Finding: In compliance - March 1, 2010 COA report

> **PA-KC 1.02**
> **Prompt, responsive screening practices:**
> **a.      ensure equitable treatment;**

b.    give priority to urgent needs and emergency situations;

c.    support timely initiation of services or immediate contact with the referral source when the child and family cannot be served; and

d.    examine the child's ability to participate in family and community life without danger to themselves or others.

**COA Finding:** In compliance - March 1, 2010 COA report

**PA-FC 17.01**
Homestudies are completed prior to placement, and are updated:

a.    within two weeks of a reported change in the home composition; and

b.    at least once annually.

**COA Finding:** In compliance - May 18, 2010 COA report

**PA-FC 17.02**
The homestudy includes an assessment of factors that may impact the ability of prospective foster parents to provide care, protection, and experiences that enhance healthy development including:

a.    personal characteristics;

b.    motivation for providing foster care;

c.    willingness to provide care for a child or youth of a different race, ethnicity, culture, or sexual orientation;

d.    cultural sensitivity and a willingness to support the child's cultural ties;

e.    family and marital functioning;

f.    mental health;

g.    parenting skills and experiences;

h.    social support networks; and

i.    the home environment.

**COA Finding:** In compliance - May 18, 2010 COA report

**PA-KC 6.05**
A regular assessment of each home verifies basic health and safety requirements are met, including:

a.    appropriate sleeping arrangements;

b.    adequate heat, light, water, refrigeration, cooking, and toilet facilities;

c.    functional smoke detectors;

d.    intact doors, steps, windows, and window guards where necessary;

e.    no exposed wiring;

f.    no rodent or insect infestation; and

g.    walls and ceilings free of holes and lead paint.

**COA Finding:** In compliance - May 18, 2010 COA report

**PA-CPS 11.02**
The child is placed with siblings whenever possible, and is referred to an out-of-home care program that can provide the most appropriate placement that is in close proximity to the child's parents and allows the child to maintain his or her cultural connections.

**COA Finding:** In compliance - March 1, 2010 COA report

157

**PA-KC 6.01**
**The agency works with the child and parents to identify kin that can be a resource to the child.**

<u>**COA Finding:**</u> In compliance - November 12, 2009 COA report

**PA-KC 2.03**
**Family members are engaged, as appropriate, in a comprehensive assessment to determine:**
**a.      the strength of kinship bonds;**
**b.      relationships between the child, the parents, and the caregivers;**
**c.      caregiver readiness, capacity, and commitment to provide care; and**
**d.      caregiver willingness and ability to facilitate an ongoing relationship with the parents.**

<u>**COA Finding:**</u> In compliance - March 1, 2010 COA report

**PA-CPS 10.03 -** *365 Day Standard due July 1, 2009*
**The agency minimizes the negative effects removal can have on a child by:**
**a.      providing age-appropriate information about the removal process;**
**b.      identifying personal items the child will bring;**
**c.      collecting information about the child's daily routine, preferred foods and activities, needed therapeutic or medical care, and education;**
**d.      discussing how the child can maintain contact with the family; and**
**e.      discussing separation and loss.**

<u>**COA Finding:**</u> In substantial compliance - July 10, 2009 COA memorandum

**PA-CPS 11.01**
**All information available from intake, screening, assessment, and placement history are considered to identify the most family-like, least restrictive type of out-of-home care suitable to provide for the child's safety, permanency, stability and well being.**

<u>**COA Finding:**</u> In substantial compliance - March 1, 2010 COA report

**PA-FC 6.05 -** *365 Day Standard due July 1, 2009*
**The home environment is considered when identifying a family for the child, and foster care homes have no more than:**
**a.      five children with no more than two children under age two; or**
**b.      two foster children with therapeutic needs.**

<u>**COA Finding:**</u> In compliance - July 10, 2009 COA memorandum

**PA-FC 16.05 -** *365 Day Standard due July 1, 2009*
**Foster parents are trained in:**

**a.      basic first aid;**
**b.      medication administration;**
**c.      cardio-pulmonary resuscitation;**
**d.      recognizing and responding to child behaviors that jeopardize health and well-being; and**
**e.      medical or rehabilitation interventions and operation of medical equipment required for a child's care.**

<u>**COA Finding:**</u> In compliance - July 10, 2009 COA memorandum

158

**PA-FC 6.03**
**A placement that can meet the child's needs is selected in accordance with the following priorities:**
**a.**      **with siblings;**
**b.**      **with kin; or**
**c.**      **with a family that resides within reasonable proximity to the child's family and home community.**

## COA Finding: In compliance - May 18, 2010 COA report

**PA-FC 16.06 -** *365 Day Standard due July 1, 2009*
**Foster parents sign a statement agreeing to refrain from the use of corporal and degrading punishment, and receive initial and ongoing training and support to promote positive behavior and use appropriate discipline techniques.**

## COA Finding: In compliance - July 10, 2009 COA memorandum

**PA-FC 9.01**
**Foster parents provide each child in care with:**
**a.**      **a pleasant and safe atmosphere and nurturing family relationships that promote positive attachment;**
**b.**      **a physical environment and materials that support the child's development;**
**c.**      **nutritious meals and snacks;**
**d.**      **age-appropriate boundaries, supervision, and discipline;**
**e.**      **an orderly daily schedule that promotes positive participation in age-appropriate educational, social, recreational, and community activities; and**
**f.**      **basic personal needs and an allowance, as appropriate.**

## COA Finding: In compliance - May 18, 2010 COA report

**PA-BSM 1.02**
**Behavior support and management policies cover:**
**a.**      **practices used to maintain a safe environment and prevent the need for restrictive behavior management interventions;**
**b.**      **whether isolation, manual or mechanical restraint, or locked seclusion are permitted as emergency safety measures;**
**c.**      **other practices that may be used and under what circumstances; and**
**d.**      **prohibited practices.**

## COA Finding: Out of compliance - March 1, 2010 COA report

**PA-BSM 2.01**
**The agency:**
**a.**      **provides an explanation for and offers a copy of its written behavior support and management philosophy and procedures to service recipients or their parents or legal guardians at admission;**
**b.**      **informs service recipients or parents or legal guardians of strategies used to maintain a safe environment and prevent the need for restrictive behavior management interventions;**
**c.**      **has procedures that address harassment and violence towards other service recipients, personnel, and, as applicable, foster parents;**

d.   obtains the service recipient's or parent's or legal guardian's consent when restrictive behavior management interventions are part of the treatment modality; and

e.   when the service recipient is a minor, notifies the parents or legal guardians promptly when manual restraint, mechanical restraint, or locked seclusion were used.

## COA Finding: Out of compliance - March 1, 2010 COA report

PA-BSM 2.03
The agency prohibits:
a.   the use of restrictive behavior management interventions by service recipients, peers, or any person other than trained, qualified staff, or foster parents;
b.   chemical restraint;
c.   excessive or inappropriate use of restrictive behavior management interventions as, for example, a form of discipline or compliance, or for the convenience of staff or foster parents; and
d.   use of restrictive behavior management interventions in response to property damage that does not involve imminent danger to self or others.

## COA Finding: Out of compliance - March 1, 2010 COA report

Period 2 IP §II.8.: Developing and Maintaining Connections

PA-FC 7.03
A visitation plan is developed and updated in collaboration with parents, foster parents, and the child and is appropriate to:
a.   the child's age and developmental stage;
b.   the parents' strengths and needs;
c.   the schedules of foster parents and parents;
d.   the social and cultural context of the family; and
e.   the status of the case and the permanency goal.

## COA Finding: In compliance - November 12, 2009 COA report

PA-FC 7.05
Agency policy prohibits cancellation of visits as a disciplinary action.

## COA Finding: In partial compliance - March 1, 2010 COA report

Period 2 IP §II.9.: Physical and Mental Health Care

PA-FC 2.04 - *365 Day Standard due July 1, 2009*
The child receives an initial health screening from a qualified medical practitioner within 72 hours of entry into care to identify the need for immediate medical or mental health care, and assess for infectious and communicable diseases.

## COA Finding: In compliance - July 10, 2009 COA memorandum

PA-FC 10.03 - *365 Day Standard due July 1, 2009*
Qualified professionals provide the child with age-appropriate health services including:
a.   medical examinations according to well child guidelines;
b.   dental examinations every 6 months;

160

      c.      **developmental, mental health, and alcohol and drug screenings within 30 days after entry into care, and when indicated to identify the need for further diagnostic assessment; and**

      d.      **needed therapeutic and treatment services.**

**<u>COA Finding:</u>** In compliance - July 10, 2009 COA memorandum

**PA-FC 10.04**
**Youth receive age appropriate support and education regarding:**
      a.      **pregnancy prevention and responsible parenthood; and**
      b.      **prevention and treatment of sexually transmitted diseases.**

**<u>COA Finding:</u>** In compliance - May 18, 2010 COA report

**PA-KC 10.04**
**Qualified professionals provide the child with age-appropriate health care services including:**
      a.      **medical examinations according to well-child guidelines;**
      b.      **dental examinations every 6 months;**
      c.      **developmental, mental health, and alcohol and drug screenings within 30 days after entry into care, and when indicated to identify the need for further diagnostic assessment; and**
      d.      **needed therapeutic and treatment services.**

**<u>COA Finding:</u>** In compliance - March 1, 2010 COA report

**Period 2 IP §II.10.: Educational Services**

**PA-FC 9.04**
**The child receives support to achieve his/her full educational potential through:**
      a.      **appropriate communication and collaboration between the foster care worker, educators, foster parents, and parents;**
      b.      **efforts to keep the child enrolled in a familiar school or, if change is unavoidable, to enroll the child in the best educational setting available;**
      c.      **educational assessments and an individual education plan when needed;**
      d.      **early childhood care and development and early intervention services;**
      e.      **tutoring; and**
      f.      **advocacy.**

**<u>COA Finding:</u>** In compliance - March 1, 2010 COA report

**PA-FC 11.02 -** *365 Day Standard due July 1, 2009*
**The treatment team develops an individualized treatment plan that:**
      a.      **specifies a diagnosis;**
      b.      **identifies current and anticipated needs, and specifies short- and long-term therapeutic interventions;**
      c.      **is reviewed by the treatment team weekly to coordinate an effective response to current issues and behaviors; and**
      d.      **is reviewed within 30 days of placement, and every 90 days, to evaluate continued need for therapeutic foster care.**

**<u>COA Finding:</u>** Not applicable for DFCS - July 10, 2009 COA memorandum

**Period 2 IP §II.11.: Worker Contact and Monitoring**

**PA-CPS 9.04 -** *365 Day Standard due July 1, 2009*
**Frequency and type of face-to-face visits with the child and family are appropriate to the family's needs and risk to the child, and visits occur at least once a month, to:**
a. **establish effective working relationships;**
b. **assess safety and well-being;**
c. **monitor service delivery; and**
d. **measure and support the achievement of agreed upon goals.**

<u>**COA Finding:**</u> In substantial compliance - July 10, 2009 COA memorandum

**PA-FC 12.01 -** *365 Day Standard due July 1, 2009*
**The family foster care worker meets separately with the child and the parents at least once a month to:**
a. **assess safety and well-being;**
b. **monitor service delivery; and**
c. **support the achievement of permanency and other service plan goals.**

<u>**COA Finding:**</u> In compliance - July 10, 2009 COA memorandum

**PA-FC 12.02**
**The foster care worker regularly communicates with the foster parents and visits the home at least once a month to:**
a. **share all relevant and legally permissible information concerning the child;**
b. **evaluate safety, needs, and well-being; and**
c. **monitor service delivery and achievement of service and permanency plan goals.**

<u>**COA Finding:**</u> In compliance - November 12, 2009 COA report

**Period 2 IP §II.13.: Case Closing and Aftercare**

**PA-AS 10.01**
**Case closing is a clearly defined process that involves the worker, the individual or family receiving services, and others, as appropriate.**

<u>**COA Finding:**</u> Defendants' response to COA pending - May 18, 2010 report and July 5, 2010 e-mail

**PA-CPS 13.02**
**Planning for case closing:**
a. **is a clearly defined process that includes assignment of staff responsibility;**
b. **begins at intake;**
c. **involves the family and others, as appropriate; and**
d. **includes discussion with the family about the successful changes in behaviors and conditions that reduced risk to the child, and plans and strategies for maintaining those changes.**

<u>**COA Finding:**</u> Out of compliance - March 1, 2010 COA report

**PA-FC 14.03**
**Upon case closing, the agency notifies any collaborating service providers, including the courts and tribal governments, as appropriate.**

**COA Finding:** In substantial compliance - May 18, 2010 COA report

**PA-FC 15.01**
**The agency and the family develop an aftercare plan sufficiently in advance of case closing that specifies services needed or desired, and the steps for obtaining these services.**

**COA Finding:** In substantial compliance - May 18, 2010 COA report

**PA-KC 15.04**
**The agency follows up on the aftercare plan, as appropriate, when possible, and with the permission of the family.**

**COA Finding:** In compliance - May 18, 2010 COA report

**Period 2 IP §II.14.: Recruitment and Retention of Foster Families and Therapeutic Service Providers**

**PA-FC 16.03**
**The agency determines the appropriate amount of mandatory pre-service and in-service education necessary to ensure that foster parents understand:**
a.     **the agency's mission, philosophy, goals, and services;**
b.     **the needs of abused and neglected children;**
c.     **how to integrate the child into the family;**
d.     **the importance of culture and ethnicity, and methods to maintain the child's connection to his or her cultural community or tribe;**
e.     **the partnership role foster parents play in supporting the family;**
f.     **how to assist with visitation;**
g.     **sensitive and responsive practices to use with biological parents; and**
h.     **the use of foster care as a temporary intervention.**

**COA Finding:** In compliance - May 18, 2010 COA report

**PA-FC 16.04**
**Foster parents receive pre-service training on rights and responsibilities including:**
a.     **specific duties of foster parents;**
b.     **identification and reporting of abuse and neglect;**
c.     **reimbursement for services and compensation for damages caused by children placed in the home;**
d.     **notice of and participation in any review or hearing regarding the child;**
e.     **complaint procedures; and**
f.     **circumstances that will result in closing a home.**

**COA Finding:** In compliance - May 18, 2010 COA report

**PA-FC 18.01**
**Outreach strategies connect foster parents with respite care before they become overwhelmed with care-giving responsibilities.**

**COA Finding:** In compliance - May 18, 2010 COA report

163

**PA-FC 18.05**
**Close supervision of children ensures their safety and improves service quality, and respite care provider homes have no more than:**
a.      **five children with no more than two children under age two; or**
b.      **two foster children with therapeutic needs.**

**COA Finding:** In compliance - May 18, 2010 COA report

**PA-KC 12.03**
**Caregivers receive help obtaining support services including:**
a.      **financial assistance;**
b.      **legal services;**
c.      **housing assistance;**
d.      **transportation;**
e.      **food and clothing;**
f.      **physical and mental health care;**
g.      **homemaker services; and**
h.      **respite care.**

**COA Finding:** In compliance - May 18, 2010 COA report

## V.  CONCLUSION

The defendants are beyond the halfway mark in the five-year remedial process mandated by the Settlement Agreement.  Among other reforms, the Settlement Agreement anticipated that by this point the DFCS policy and procedure manual would be revised, an adequately resourced staff training program would be implemented, and specified improvements in case practice – fueled by a functional CQI system – would be underway on a statewide basis.  According to the Settlement Agreement, defendants should be implementing plans to improve the quality and array of services afforded to children in DFCS custody and their families, bolstered by a performance based contracting system and initiatives to increase federal revenue.  The Settlement Agreement contemplated that by now defendants should have the ongoing capacity to measure accurately required performance indicators related to case practices and service delivery.  As this report demonstrates, progress has been limited.

Since 2008, DFCS has been reorganized and restructured under a new management team with a committed workforce that cares deeply about the children in defendants' custody. Critically-needed funding has been appropriated to subsidize increases in social worker and supervisory staffing levels, and the management of COA accreditation activities has improved. There also has been progress implementing some, but not all, of the required initiatives intended to ensure child safety.

Nevertheless, in the broader context of the required reform effort, both the pace and the breadth of defendants' progress are inconsistent with the Settlement Agreement's requirements. In many instances, the defendants made efforts to satisfy specific Settlement Agreement requirements, but as a general matter, these efforts were belated, and in some respects, they were not minimally adequate. In a few instances, there is no evidence that defendants made credible efforts to comply with specific requirements by the end of Period 2, including requirements that should have been satisfied during the first year of the reform process.

The assessments of foster care services conducted by the defendants' consultants have identified significant deficits in DFCS case practice and service delivery. Defendants have worked with their consultants on the development of a practice model, which constitutes the centerpiece of defendants' strategy to improve case practice. The practice model will be phased-in on a regional basis over a 48-month period that extends beyond the Settlement Agreement's five-year timetable. In the wake of a six-month planning process, efforts have been underway since July 2010 to implement the practice model in two of DFCS's 13 regions. Although the schedule is inconsistent with the Settlement Agreement's timetable, the implementation plan for the practice model represents the first credible plan for improving the quality and consistency of case practice. However, its success is dependent on a number of reforms in management and

administrative capacity that were anticipated by the Settlement Agreement, but have not occurred.

The September 1, 2010 deadline for defendants to satisfy requirements in a corrective action plan crafted to address a narrow subset of the unmet Period 2 requirements has lapsed. The Monitor will evaluate and report on defendants' performance, as required; however, regardless of the outcome of that assessment, the parties must confront the fact that at the end of this calendar year, there will be two years left in the required five-year reform process, and there is an apparent misalignment between the Settlement Agreement's requirements and the implementation strategy that the defendants have adopted as well as the results that the defendants have achieved to date.

/s/ Grace M. Lopes_____
Grace M. Lopes (MBN 45693 *pro hac vice*)
Court Monitor
1350 Connecticut Avenue, N.W.
Suite 1000
Washington, D.C.  20036
(202) 232-8311
gmlopes@oymonitor.org

## CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2010, the Court Monitor's Report to the Court Regarding Defendants' Progress Toward Meeting Period 2 Requirements was transmitted electronically to the following counsel of record in this matter:

Dewitt L. ("Rusty") Fortenberry Jr.
Kenya Key Rachal
Ashley Tullos Young
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
428 I-55 North
Meadowbrook Office Park
Jackson, Mississippi  39211

Harold E. Pizzetta, III
Assistant Attorney General
General Civil Division
Carroll Gartin Justice Building
430 High Street
Jackson, MS 39201

W. Wayne Drinkwater, Jr.
BRADLEY ARANT ROSE & WHITE LLP
188 East Capital Street, Suite 450
Jackson, Mississippi  39201

Marcia Robinson Lowry
Shirim Nothenberg
Jessica Polansky
CHILDREN'S RIGHTS
330 Seventh Avenue
New York, New York  10001

John Lang
John Piskora
LOEB & LOEB LLP
345 Park Ave.
New York, New York  10154

/s/ Grace M. Lopes

**The Court Monitor's Report to the Court Regarding Defendants'
Progress Toward Meeting Period 2 Requirements
Index to Exhibits**

Ex. 1A          Resume of Linda Southward, Ph.D., ACSW

Ex. 1B          Resume of Stacy Ferraro, Esq.

Ex. 1C          Curriculum vitae of Troy Blanchard, Ph.D.

Ex. 1D          Draft – Reporting Workload Summary, August 18, 2008, excerpt

Ex. 2           Chart prepared by the Office of the Court Monitor, Caseworker and Area
                Social Work Supervisor Hiring, Attrition, and Workforce Size, FY 2007 –
                FY 2010

Ex. 3           Chart prepared by the Office of the Court Monitor, Number of
                Caseworkers and Supervisors Employed by MDHS/DFCS on May 31,
                2010 Hired by State Between May 1, 2009 and April 30, 2010, by Year
                and Month Hired

Ex. 4           Chart prepared by the Office of the Court Monitor, Status of Caseworker
                and Area Social Work Supervisor Positions as of May 31, 2010 and July
                22, 2010

Ex. 5           Chart prepared by the Office of the Court Monitor, Year that Area Social
                Work Supervisors and Caseworkers Employed by State of Mississippi as
                of May 31, 2010 Were Hired

Ex. 6           Chart prepared by the Office of the Court Monitor, Status of Caseworker
                Positions as of May 31, 2010, by County

Ex. 7           Chart prepared by the Office of the Court Monitor, Status of Area Social
                Work Supervisor Positions as of May 31, 2010, by County

Ex. 8           Chart prepared by the Office of the Court Monitor, Caseworker and Area
                Social Work Supervisor Positions, by Status, for 20 Counties Employing
                Largest Number of MDHS/DFCS Staff

Ex. 9           Draft – MDHS - Division of Family and Children's Services, Workforce
                Plan, State Fiscal Year 2010, Recruitment and Retention, Revised as of
                1/20/10  (The pagination of this document is not sequential.  It goes from
                pages two to six and then continues with pages two to five;  however, the
                document appears to be complete.)

Index - 1

Ex. 10    Chart prepared by the Office of the Court Monitor, Average Salaries of Caseworkers Employed by MDHS/DFCS as of May 31, 2010, by Year Hired

Ex. 11    Chart prepared by the Office of the Court Monitor, Average Salaries of Area Social Work Supervisors Employed by MDHS/DFCS as of May 31, 2010, by Year Hired

Ex. 12    Chart prepared by the Office of the Court Monitor, Average Salaries of MDHS/DFCS Caseworkers Hired by State in 2008-2010 vs. Average Budgeted Salaries for Caseworker Vacancies as of May 31, 2010

Ex. 13    DHS - Area Social Work Supervisor – Position Description

Ex. 14    Mississippi Department of Human Services, Division of Family and Children's Services, Worker and Supervisor Qualification Plan, January 21, 2010

Ex. 15    Chart prepared by the Office of the Court Monitor, Total MDHS/DFCS Agency Positions as of May 31, 2010, by Status

Ex. 16    Chart prepared by the Office of the Court Monitor, Number of Employees Working for MDHS/DFCS on May 31, 2010 Hired by State Between May 1, 2009 and April 30, 2010, by Year, Month, and Position

Ex. 17    DFCS Policy Manual, Volume IV, Section A, Revised October 2009, Administration Staff Development/Training Policy, excerpt

Ex. 18    2010 Training Unit Plan, Division of Family and Children's Services

Ex. 19    Chart prepared by the Office of the Court Monitor, Months Between Hiring and Start of Training Reported by Caseworkers Hired Between May 1, 2009 and February 16, 2010, by Region

Ex. 20    Chart prepared by the Office of the Court Monitor, Reported Work Assignments for Caseworkers Hired Between May 1, 2009 and February 16, 2010 Prior to Completion of Training

Ex. 21    Practice Guidelines on Documenting Caseworker Visits with Children

Ex. 22    Section V: Continuous Quality Improvement (CQI) Recommendations, excerpt, Mississippi Practice Model Final Report, August 7, 2009, Center for the Support of Families, Inc., Draft

Ex. 23    MDHS, Continuous Quality Improvement

Ex. 24      Draft – Fiscal Year 2009, Continuous Quality Improvement Operational Plan

Ex. 25      Mississippi Division of Family and Children's Services, Performance and Quality Improvement Operational Plan, SFY 2010, Draft

Ex. 26      Child and Family Services Reviews Onsite Review Instrument

Ex. 27      Statewide Impact of CQI Implementation

Ex. 28      CQI Reviews, Onsite Review Instrument

Ex. 29      Mississippi Foster Care Services Assessments, Final Report, October 13, 2009, Center for the Support of Families, Inc.

Ex. 30      MACWIS Accomplishments, September 2009 – July 2010

Ex. 31      Photograph of interior of DFCS Hancock County trailer #18, taken by Grace M. Lopes, May 5, 2010

Ex. 32      Methodology for Validating MACWIS Data Reports

Ex. 33      Mississippi Practice Model, Final Report, Appendix B/Practice Guide, Strengths and Needs Assessments, September 25, 2009

Ex. 34      Bulletin 6276, Revised Intake Policy, October 1, 2009, Child Protective Services Procedure for Service Activity, Mississippi, Volume IV, Section B

Ex. 35      Termination of Parental Rights Assessment, Final Report, November 24, 2009, Center for the Support of Families, Inc. (redacted)

Ex. 36      DFCS investigation of October 16, 2009 report regarding maltreatment of S.S. (Motion to File Under Seal pending)

Ex. 37      DFCS investigation of August 14, 2009 report regarding maltreatment of J.A. (Motion to File Under Seal pending)

Ex. 38      DFCS investigation of May 26, 2009 report regarding maltreatment of A.W. (Motion to File Under Seal pending)

Ex. 39      DFCS investigation of May 21, 2009 report regarding maltreatment of D.C. and K.P. (Motion to File Under Seal pending)

Ex. 40      DFCS investigation of December 7, 2009 report regarding maltreatment of J.W. and J.W. (Motion to File Under Seal pending)

Ex. 41    DFCS investigation of February 8, 2010 report regarding maltreatment of
          P.O. (Motion to File Under Seal pending)

Ex. 42    DFCS investigation of November 16, 2009 report regarding maltreatment
          of R.R., E.R., and R.R. (Motion to File Under Seal pending)

Ex. 43    DFCS investigation of June 12, 2009 report regarding maltreatment of
          S.T. (Motion to File Under Seal pending)

Ex. 44    DFCS investigation of October 22, 2009 report regarding maltreatment of
          D.S. and M.S. (Motion to File Under Seal pending)

Ex. 45    DFCS investigation of February 4, 2010 report regarding maltreatment of
          N.M. (Motion to File Under Seal pending)

Ex. 46    DFCS investigation of April 5, 2010 report regarding maltreatment of J.B.
          (Motion to File Under Seal pending)

Ex. 47    DFCS investigation of February 11, 2010 report regarding maltreatment of
          S.H. (Motion to File Under Seal pending)

Ex. 48    Bulletin 6200, Family Team Meetings and Individual Team Meetings,
          June 4, 2009, Mississippi, Volume IV, Revised June 2009, Section D

Ex. 49    Mississippi Practice Model, Final Report, Appendix B/Practice Guide,
          Mobilizing Appropriate Services Timely, September 25, 2009

Ex. 50    Mississippi Practice Model, Final Report, Appendix B/Practice Guide,
          Individualized Case Planning, September 25, 2009

Ex. 51    Excerpt from Mississippi Department of Human Services Division of
          Family and Children's Services, Child Welfare Professional Development
          Unit, Newsletter, Vol. 2, Issue 5, May 2010 (redacted)

Ex. 52    Adoption Specialist Job Duties, Draft 06-26-09

Ex. 53    Protocol for Adoption Meetings

Ex. 54    External Adoption Consultant (redacted)

Ex. 55    MDHS, DFCS, Bulletin 6154, Mandatory Reporting Requirement,
          January 24, 2008

Ex. 56    Excerpt from Mississippi Department of Human Services Division of
          Family and Children's Services, Child Welfare Professional Development

Unit, Newsletter, Vol. 2, Issue 2, February 2010, Mandating Reporting Reminder

Ex. 57    Scope of Services, Social Work p.r.n., Central Intake, 24-Hour Hotline and Disaster Preparedness Plan

Ex. 58    Special Safety Review – Group Home/Residential Facility, MACWIS Resource ID Number:  000008648 (Motion to File Under Seal pending)

Ex. 59    Special Safety Review – Group Home/Residential Facility,, MACWIS Resource ID Number: 000041084 (Motion to File Under Seal pending)

Ex. 60    Summary of the Court Monitor's Findings from Case Record Review Conducted During Period 2 – Investigations Related to Reports of Maltreatment In Care

Ex. 61    Mississippi Practice Model, Final Report, Appendix B/Practice Guide, Preserving and Maintaining Connections, September 25, 2009

Ex. 62    Mississippi Practice Model, Final Report, Appendix B/Practice Guide, Involving Children and Families in Case Activities and Decision Making, September 25, 2009

Ex. 63A   COA, DFCS First Quarter Deliverables Report, Year 2 Implementation Plan, August 4, 2009

Ex. 63B   COA, DFCS Third Quarter Deliverables Report, Year 2 Implementation Plan, March 1, 2010

Ex. 63C   August 6, 2009 e-mail correspondence from James Mooney to Jenni Murray regarding Year 2 First Quarter Deliverables

Ex. 63D   COA, DFCS Second Quarter Deliverables Report, Year 2 Implementation Plan, November 12, 2009

Ex. 63E   July 10, 2009 memorandum from James Mooney to Jenni Murray regarding 365 Day Deliverables

Ex. 63F   September 17, 2009 e-mail correspondence from James Mooney to Jenni Murray regarding Official Resubmission of BSM

Ex. 63G   COA, DFCS Fourth Quarter Deliverables Report, Year 2 Implementation Plan, May 18, 2010

Ex. 63H   July 5, 2010 e-mail correspondence from James Mooney to Jenni Murray regarding Year 2 Fourth Quarter Deliverables