# Exhibit J

# FILE COPY

## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| G. L., et al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | Case No.: 77-0242-CV-W-1 |
| | ) | |
| John Zumwalt, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

This action was brought by and on behalf of children in the custody of the Jackson County office of the Division of Family Services (DFS) in 1977. Plaintiffs alleged that DFS's practices and policies violated plaintiffs' right to be protected from harm while in state custody, a right secured to them by the United States Constitution,

In 1983, the parties agreed to settle the case and by Order dated March 21, 1983, this court approved a Consent Decree mandating comprehensive reform of Jackson County's foster care system. G. L. v. Zumwalt, 564 F. Supp. 1030 (W. D. Mo. 1983). In 1985 plaintiffs moved to hold defendants in contempt contending defendants had failed to implement the Consent Decree. In response Defendants moved to modify the Consent Decree in twelve areas. The parties settled their disputes and entered into a Supplemental Consent Decree on July 29, 1985.

01 APR 23 PM 1:27

CHILDREN'S RIGHTS, INC.
RECEIVED

DOC #

The Supplemental Consent Decree modified several sections of the Consent Decree in ways suggested by defendants, and established a three-person Committee to monitor defendants' compliance with the Consent Decree.    It empowered the Committee to conduct extensive reviews of defendants' records, to issue a report, at least twice yearly, regarding the extent of defendants' compliance with the Decree and the reasons for any noncompliance, and to make recommendations to assist defendants in achieving compliance.

In 1987, a subcommittee of the Committee, whose membership was approved by the parties, developed a methodology to be used by the Committee to measure defendants' compliance with the Consent Decree.    The methodology set forth how certain provisions of the Consent Decree would be defined.    It also provided that the Committee would determine defendants' compliance in some areas by reviewing and  compiling certain data gathered from DFS computer reports and in other areas through the Joint Audits.    The Joint Audits were to be conducted by representatives of the Committee and DFS, who would read periodically a random sample of DFS case records and, using the methodology's definitions, determine whether the events required by the Consent Decree had occurred. Stipulation of Uncontested Facts, Jan 21, 1992 ¶ 8; letter of June 16, 1987 from Kay Wallick to Hansen and Zierdt, attached to Stipulation, March 15, 1988.

In a written submission to this Court, the parties characterized the methodology as "a method for measuring compliance {with the Consent Decree} to which all parties agreed."    They

further stated that the methodology "agreed upon allows us to obtain data that all parties acknowledge as accurate" Stipulation of Uncontested Facts, Jan 21, 1992 ¶ 8; Joint Response, Jan 11, 1988.

At the Court's suggestion, the parties entered into a Stipulation formalizing their agreement on the methodology and attaching as an exhibit the definitions, the items to be reviewed to determine defendants' compliance, and the manner in which they would be reviewed. Stipulation, Mar 15, 1988.

The methodology was subsequently modified, on consent, by court orders dated March 7, 1990 and March 1, 1991. The modifications did not alter the definitions, the items reviewed, the manner in which they were reviewed, or the questions asked. They simply changed the size of the case record samples, the time period that was analyzed and the frequency with which the case records were read.

The Committee has been monitoring compliance with the Consent Decree pursuant to the stipulated methodology since late 1987.

Every report produced by the Committee has found continued levels of non-compliance with the Consent Decree. Joint Exhs. 2, 3, and 8; Plaintiffs Exh. 6; Stipulation of Uncontested Facts, Jan 21, 1992, §23-106.

In June, 1989, at the court's direction, plaintiffs served defendants with an extensive Notice of Non-compliance. Plaintiffs, members of the Committee, defendants and certain high-level DFS officials met extensively between July, 1989 and January, 1990, in

3

an effort to resolve the areas of non-compliance.  The meetings were not successful and in January 1990, plaintiffs moved to hold defendants in contempt of the Consent Decree §§ I.F.5,  II.C.1-2, II.D.1-2, III.B., IV. D.1-3, IV. E.1, IV.F, IV. G.3, IX.A, IX.B.1 and XIII.B.5.

In August, 1991, plaintiffs moved to hold defendants in contempt of Consent Decree §§ XIII.C.6-11.  Both motions were the subject of a hearing held by this court on January 30 and 31, 1992.

The plaintiff presented evidence to explain how the records of DFS were reviewed in accordance with the agreed methodology and the areas where defendants were not in compliance.  The defendants then presented evidence which in the main challenged and attacked the methodology used in arriving at the statistics which showed continued non-compliance with the Consent Decree by defendants. The plaintiffs also introduced evidence showing that it is possible for the defendants to comply with the Consent Decree if defendants properly approach their responsibility of providing foster care for the children of Jackson County.  Defendants also presented evidence from the state director of the Division of Social Services to show the defendants lack of adequate funding by the State Legislature to allow defendants to adequately fund and staff the Kansas City office.

From the evidence presented at the two day hearing  by way of testimony and exhibits, the Stipulation of Uncontested Facts and the reports of the Committee,  the Court finds the non-compliance is shown by the following evidence.

SECTIONS I.F.5 AND II.C.2
(Re-licensing of foster parents who
have not completed the required training)

Section I.F.5 of the Consent Decree states:

    No foster parent shall have his/her license
renewed if he/she has not completed the
requisite number of foster parent training
courses.

Section II.C.2 of the Consent Decree states:

    No foster parent's license may be renewed
unless they have received the requisite number
of hours of training.

The Committee's Licensing Case Review Joint Audits indicate that the following percentage of foster parents had completed the required training prior to relicensure:

| | |
|---|---|
| 8/87 | 31% |
| 3/88 | 40% |
| 11/88 | 44% |
| 5/89 | 50% |
| 3/90 | 53% |

Nov 1987 Licensing Case Rev. Joint Audit, at 10;  Mar 1988 Licensing Case Rev. Joint Audit, at 19; Nov. 1988 Licensing Case Rev. Joint Audit, at 16;  Oct. 1989 Compl. Rpt., Appendix B, at B-9; Aug 1990 Compl. Rpt., at 14, and Appendix I-5, at 5.

SECTIONS II.C.1, II.D.1, and II.D.2
(Foster parent training)

Section II.C.1 of the Consent Decree provides:

    All foster parents must receive at least ten
(10) hours of foster parent training per year.

Section II.D.1 of the Consent Decree states:

    Within two (2) years after this decree is
entered, all presently licensed foster parents
shall take a thirty (30) hour course in the
prevention of abuse and neglect of foster
children and appropriate methods of discipline.

5

Section II.D.2 of the Consent Decree states:

> All foster parents licensed after the signing of this decree shall take such a course (course described in II.D.1) within the first year after being licensed.

Section II.D.3 of the Consent Decree states:

> The foregoing provision shall be contingent upon the availability of the National Foster Care Education Program or another mutually agreed upon program to assist the Division of Family Services in the development of the training.

### 30-Hour Abuse and Neglect Training

DFS computer reports entitled "Foster Parent In-Service Training" reveal that the following percentages of licensed foster parents had completed 30 hours of abuse and neglect training requirement as of the date indicated:

| | |
|---|---|
| 9/1/88 | 57% |
| 3/1/89 | 61% |
| 9/1/89 | 65% |
| 3/1/90 | 63% |
| 9/1/90 | 65% |
| 3/1/91 | 61% |
| 9/1/91 | 62% |

Dec. 1990 Compl. Rpt., at 10 as modified by memo received on Feb. 13, 1991, from Seaman to Hansen, Rich and Dahlberg; Compl. Rpt. (July 1991), Compl. Rpt. (Jan. 1992 draft).

DFS computer reports entitled "Foster Parent In-Service Training" do not state whether the foster parents who completed the 30-hour abuse and neglect training completed that training within one year of licensure as required by Sections II.D.1 and II.D.2 of the Consent Decree.

6

The Committee, using defendants' Alternative Care Tracking System, developed a report that can capture whether foster parents complete the 30-hour abuse and neglect training within one year of licensure. That report shows that of the 254 foster parents who have been licensed more that one year as of November, 1990, 31% had completed the 30 hour abuse and neglect training within two years of the date of the Consent Decree or within one year of initial licensing. Dec. 1990 Compl. Rpt., Appendix II-3.

That report also shows that as of November, 1990, 254 (82%) of the 310 foster parent licensed at least one year as of that date had received the 30 hour training. An additional 36 (12%) foster parents had received some of the 30 hours of discipline training. Dec. 1990 Compl. Rpt., and Appendix II-3.

The Committee's Licensing Case Review Joint Audits reveal that the following percentage of licensed foster parents had completed 30 hours of abuse and neglect training as of the date indicated:

| | |
|---|---|
| 8/87 | 15% |
| 3/88 | 45% |
| 11/88 | 60% |
| 5/89 | 70% |
| 3/90 | 67% |

Oct. 1989 Compl. Rpt., at 103, and Appendix B, at B9; Aug. 1990 Compl. Rpt., Appendix I-5, at 5.

### 10-Hour In-Service Training

The Committee's Licensing Case Review Joint Audits reveal that the following percentage of licensed foster parents had completed the 30-hour abuse and neglect training within one year of licensure as required by Section II.D.1 and II.D.2 of the Consent Decree:

```
             8/87        20%
             3/88         9%
            11/88        20%
             5/89        10%
             3/90        63%
             3/91        59%
             9/91        58%
```

Oct. 1989 Compl. Rpt., at 103 and Appendix B, at B-9; Aug. 1990

Compl. Rpt., Appendix I-5, at 5 .

DFS computer reports entitled "Foster Parent In-Service

Training" reveal that the following percentage of foster parents

had received 10 hours of in-service training within a year of the

date indicated:

```
            9/1/88        72%
            3/1/89        65%
            9/1/89        64%
            3/1/90        64%
            9/1/90        64%
```

Dec. 1990 Compl Rpt., at 10, as modified by memo received on Feb.

13, 1991 from Seaman to Hansen, Rich and Dahlberg; Compl. Rpt.

(July 1991), Compl. Rpt. (Jan. 1992 draft).

A DFS computer report entitled "Training Received During the

Current License Period For Foster Parents Licensed and of 1-1-90"

reveals that of the 395 foster parents who had been licensed as

foster parents for at least one year as of January 1990, 42% had

completed the 10 hours of required in-service training for the last

year. Aug. 1990 Compl. Rpt. at 20, and Appendix II-1 at 12.

A DFS computer report entitled "Training Received During The

Current License Period For Foster Parents Licensed as of 9-1-90"

reveals that of the 311 foster parents who had been licensed as

foster parents for at least one year as of January 1990, 48% had

8

completed the required 10 hours annual in-service training for the last year. Dec. 1990 Compl. Rpt., Appendix II-1, at 16-17.

The Committee's Licensing Case Review Joint Audits reveal that the following percentage of foster parents had received the 10 hours of in-service training within the last year:

| | |
|---|---|
| 8/87 | 46% |
| 3/88 | 27% |
| 11/88 | 50% |
| 5/89 | 30% |
| 3/90 | 60% |

Oct. 1989 Compl. Rpt., Appendix B, at B8-9; Aug. 1990 Compl. Rpt., at 20 and Appendix I-5, at 5.

SECTION III.B
(Placement in conformity with licensing restriction)

Section III.B of the Consent Decree states:

> The placement of a child in a foster home shall in all cases be in conformity with the licensing restrictions for that home except for those children over the age of 18 under the continuing jurisdiction of the Juvenile Court. An exception will be allowed for these children with the foster parents' expressed consent and provided no other provision of the Consent Decree is violated.

DFS computer reports entitled "Proper Matching & Placement: Semi-Annual Report to Committee and Plaintiffs" show that, as of the date of the report, the following percentage of children residing in foster homes had been placed in conformity with the sex, age and capacity licensing restrictions of that home:

| | Sex | Age | Capacity | Cumulative Total |
|---|---|---|---|---|
| 9/1/87 | 99% | 99% | 97% | 96% |
| 3/1/88 | 99% | 98% | 96% | 94% |
| 9/1/88 | 99% | 97% | 96% | 92% |

9

| | | | | |
|---|---|---|---|---|
| 3/1/89 | 100% | 96% | 94% | 89% |
| 9/1/89 | 99% | 96% | 91% | 86% |
| 3/1/90 | 99% | 94% | 90% | 83% |
| 9/1/90 | 99% | 97% | 91% | 89% |
| 3/1/91 | 99% | 95% | 94% | 83% |
| 9/1/91 | 99% | 97% | 96% | 81% |

Oct. 1989 Compl. Rpt., at 10-13; Aug. 1990 Compl. Rpt., at 26-27; Dec. 1990 Compl. Rpt., at 12; Compl Rpt. (July 1991), Compl. Rpt. (Jan. 1992 draft).

DFS computer reports entitled "Proper Matching & Placement: Semi-Annual Report to Committee and Plaintiffs" show that over a majority of the exceptions made to licensing restrictions are capacity exceptions during planned placements.  Aug. 1990 Compl. Rpt., at 27.

DFS computer reports entitled "G.L. v. Zumwalt Exceptions Report" show that, as of the date of the report, the following percentage of children residing in foster homes had been placed in conformity with the sex and age licensing restrictions of that home:

| | |
|---|---|
| 9/1/87 | 93% |
| 3/1/88 | 97% |
| 9/1/88 | 90% |
| 3/1/89 | 89% |
| 9/1/89 | 88% |

Oct. 1989 Compl. Rpt., at 13-14; Aug. 1990 Compl. Rpt., at 28.

Prior to September 18, 1989, DFS Exceptions Reports did not indicate whether children residing in foster homes had been placed in violation of the capacity restrictions of that home.  Aug. 1990 Compl. Rpt., at 28.

After September 1, 1989, DFS computer reports entitled "G.L. v. Zumwalt Exceptions Report" show that, as of the date of the report, the following percentage of children residing in foster homes had been placed in conformity with the sex, age and capacity licensing restrictions of that home:

|          | Sex  | Age  | Capacity |
|----------|------|------|----------|
| 3/1/90   | 98%  | 87%  | 66%      |
| 9/1/90   | 89%  | 99%  | 67%      |
| 3/1/91   | 99%  | 89%  | 78%      |
| 9/1/91   | 97%  | 91%  | 77%      |

Dec. 1990 Compl. Rpt., at 14, as modified by ltr. dated Jan. 28, 1991, from Seaman to Judge Dean Whipple; Compl. Rpt. (July 1991), Compl. Rpt. (Jan. 1992 draft).

The Committee's Joint Audit Licensing Case Reviews reveal that, as of the date of the review, the following percentage of children placed in the foster homes included in the review had been placed in conformity with that home's sex, age and capacity licensing restrictions:

|        |      |
|--------|------|
| 8/87   | 53%  |
| 3/88   | 86%  |
| 11/88  | 67%  |
| 5/89   | 64%  |
| 3/90   | 83%  |
| 3/91   | 86%  |

Oct. 1989 Compl. Rpt., at 10, and Appendix B, at B10; Aug. 1990 Compl. Rpt., at 29, and Appendix I-5, at 6; Compl Rpt. (July 1991), App. I-2 at 4.

The Committee's Joint Audit Licensing Case Reviews do not attempt to identify the placement of siblings in the same foster home.

11

The Committee's Joint Audit Case Reviews reveal that, as of the date of the review, the following percentage of children placed in the foster homes included in the review had been placed in conformity with that home's sex, age and capacity licensing restrictions:

|        | Age  | Sex   | Capacity | Other | Cumulative Total |
|--------|------|-------|----------|-------|------------------|
| 7/87   |      |       | N/A      |       | 81%              |
| 3/88   |      |       | N/A      |       | 92%              |
| 10/88  |      |       | N/A      |       | 94%              |
| 4/89   | 90%  | 100%  | 97%      | 95%   | 82%              |
| 3/90   | 98%  | 100%  | 91%      | N/A   | 89%              |
| 3/91   |      |       |          |       | 80%              |

Oct. 1989 Compl. Rpt., at 10, and Appendix A, at A5-7; Aug. 1990 Compl. Rpt., at 29, and Appendix III-3, at 4; Compl Rpt. (July 1991), App. III-3 at 3.

By comparing various DFS computer reports, the Committee determined that during the six month period between March 1 and September 1, 1990, foster children were either placed in foster homes or moved from one foster home to a second or subsequent foster care 459 times. Eighty-nine percent (89%) of these placements were consistent with the age restrictions of the second of subsequent foster homes, and 68% were consistent with the capacity restrictions. None of the placements violated the sex restrictions. Dec. 1990 Compl. Rpt., at 13.

Defendants' current implementation plan does not prohibit the placement of children in violation of foster parent licensing restrictions. Ltr. dated July 26, 1989, from Willmarth to Hansen and Rich, at 7-8.

12

## SECTIONS IV.D.1, IV.D.2, IV.F AND IV.G.3
### (Pre-Placement Visits)

Sections IV.D.1 and D.2 of the Consent Decree state:

1.   At least one (1) pre-placement visit in the foster parents' home shall be arranged at least two (2) weeks in advance of the placement.

2.   The following persons should be present at the visit: a. The child; b. The child's social service worker; c. The child's parents, or other appropriate member of the natural family; d. Any children or other persons living in the foster home.

Section IV.F of the Consent Decree states:

The provisions of [Sections IV.D.1 and IV.D.2] shall be equally applicable to relative foster homes.

Section IV.G.3 of the Consent Decree provides, in relevant part:

In the event that an emergency situation exists which requires immediate placement or placement on less than two weeks notice, whenever possible a pre-placement visit shall nevertheless take place even if it occurs on the same day as the actual placement.

DFS computer reports entitled "Proper Matching & Placement: Semi-Annual Report to Committee and Plaintiffs" show that, as of the date of the report, the following percentage of children residing in foster homes had pre-placement visits as follows:

| | |
|---|---|
| 9/1/87 | 88% |
| 3/1/88 | 87% |
| 9/1/88 | 84% |
| 3/1/89 | 84%[1] |

---

[1]The Committee did not analyze the Proper Matching and Placement Reports for this decree section in its August 1990 and December 1990 Compliance Reports.

Oct. 1989 Compl. Rpt., at 28.

DFS Proper Matching and Placement Reports and Exceptions Reports do not measure whether pre-placement visits were made within the time periods set forth in the Consent Decree. Oct. 1989 Compl. Rpt., at 32.

DFS computer reports entitled "G.L. v. Zumwalt Exceptions Report" show that, as of the date of the report, the following percentage of children residing in foster homes had had pre-placement visits:

|         |         |
|---------|---------|
| 9/1/87  | 85%     |
| 3/1/88  | 81%     |
| 9/1/88  | 76%     |
| 3/1/89  | 70%[2]  |

Oct. 1989 Compl. Rpt., at 30.

The Committee's Joint Audit Case Reviews reveal that the following percentage of children surveyed received pre-placement visits:

|       |     |
|-------|-----|
| 7/87  | 17% |
| 3/88  | 23% |
| 10/88 | 23% |
| 5/89  | 19% |
| 3/90  | 40% |
| 11/90 | 57% |
| 3/91  | 47% |
| 9/91  | 46% |

Oct. 1989 Compl. Rpt., at 27, and Appendix A, at A15; Aug. 1990 Compl. Rpt., at 39, and Appendix III-3, at 5; Dec. 1990 Compl. Rpt., at 21, and Appendix IV-1; Compl. Rpt. (July 1991), Compl.

---

[2]The Committee did not analyze Exceptions reports for this decree section in its August 1990 and December 1990 Compliance Reports.

14

Rpt. (Jan. 1992 draft).

### SECTION IV.E.1
(Social worker/child visits)

Section IV.E.1 states:

> The child's social services worker shall visit
> the child in the foster home within twenty-
> four hours after placement, weekly for the
> first month of placement and, thereafter, at a
> minimum of an average of twice a month, with a
> minimum of seven days between visits, to
> monitor the placement.  Telephone contact is
> not an acceptable substitute for a face-to-
> face visit.  If the child is not currently
> residing in the foster parents' home, e.g. is
> in the hospital or police detention, the
> worker shall nevertheless visit the child
> according to the above time frames.  The only
> exceptions to the above shall be if the child
> is a runaway and cannot be located or is away
> on a trip authorized by DFS, in which case the
> visit shall take place as soon as possible
> after the child returns.  The worker shall
> also maintain contact with the foster parents
> during the child's absence.

G.L. v. Zumwalt, 564 F.Supp. at 1034-35, as amended by the

Supplemental Consent Decree, dated July 29, 1985, at 9.

Visitation sheets compiled by individual DFS social workers

and turned over to DFS local administrative offices on a monthly

basis reveal that the following percentage of visits required

during the relevant time period actually took place:

| | |
|---|---|
| 3/1/87 - 9/1/87 | 82% |
| 9/1/87 - 3/1/88 | 74% |
| 9/1/88 - 3/1/89 | 80% |
| 3/1/89 - 9/1/89 | 84% |
| 9/1/89 - 10/31/89 | 80% |
| 11/1/89- 12/31/89 | 80% |
| 1/1/90 - 2/28/90 | 79% |
| 3/1/90 - 4/30/90 | 79% |
| 11/1/90- 12/31/90 | 77% |
| 1/1/91 - 2/28/91 | 72% |
| 3/1/91 - 4/30/91 | 70% |
| 5/1/91 - 6/30/91 | 65% |

Oct. 1989 Compl. Rpt., at 33-35, and Appendix F; Aug. 1990 Compl. Rpt., at 45, and Appendix IV-1; Dec. 1990 Compl. Rpt., at 25, and Appendix IV-2, as modified by memo received on February 14, 1991, from Seaman to Hansen, Rich and Dahlberg; Compl. Rpt. (July 1991) at 24, Compl. Rpt. (Jan. 1992 draft), at 21.

Visitation sheets compiled by individual DFS social workers and turned over to DFS local administrative offices on a monthly basis reveal that the following percentage of required visits that were missed during the relevant time period were missed because: the DFS social worker had car failure or transportation problems; the DFS social worker was on vacation, or out of the office because of a holiday, illness, death in the family; the DFS social worker had a conflict in his or her schedule, a caseload emergency, a court appearance, required training, or administrative duties; DFS had reassigned the case; or worker and/or supervisory error, no reason given, or miscellaneous:

| | |
|---|---|
| 3/1/87 - 9/1/87 | 58% |
| 9/1/87 - 3/1/88 | 85% |
| 9/1/88 - 3/1/89 | 78% |
| 3/1/89 - 8/31/89 | 77% |
| 9/1/89 - 10/31/89 | 84% |
| 11/1/89- 12/31/89 | 68% |
| 1/1/90 - 2/28/90 | 73% |
| 3/1/90 - 4/30/90 | 83% |
| 11/1/90- 12/31/90 | 76% |
| 1/1/91 - 2/28/91 | 86% |
| 3/1/91 - 4/30/91 | 89% |
| 5/1/91 - 6/30/91 | 88% |

Oct. 1989 Compl. Rpt., at 33-35, and Appendix F; Aug. 1990 Compl. Rpt., at 45-46, and Appendix IV-1; Dec. 1990 Compl. Rpt., at 26, and Appendix IV-2, as modified by memo received on Feb. 14, 1991,

from Seaman to Hansen, Rich and Dahlberg; Compl. Rpt. (July 1991) at 26, Compl. Rpt. (Jan. 1992 draft), at 23.

The Court agrees with the Committee's position that none of the reasons set forth in the above paragraph are valid reasons for missing visits.  The only reasons that are acceptable for missed visits under the Consent Decree are if a child has run away or is on a DFS approved trip.  Dec. 1990 Compl. Rpt., at 26.

<u>SECTIONS IX.A and IX.B.1</u>
(Caseload Sizes)

Section IX of the Decree provides:

A.    Defendants shall prohibit excessive caseloads which prevent social service workers from providing adequate services to children and natural parents and from providing appropriate supervision and support of foster parents.  To that end defendants shall adopt and implement the following caseload limits:

B.  Caseload Size of Social Service Worker

1.  DFS social service workers should never have caseloads that exceed twenty (20) to twenty-five (25) children per social service worker.  Any exception to the provisions of this section shall be on a temporary and emergency basis.

The Committee's comparison of DFS computer reports entitled "Monthly Area Report" and "Children on PS Cases Active as of [a Certain Date]" reveal that, as of the date stated, the following percentage of social service workers had caseloads of more than 25 children:

|       |     |
|-------|-----|
| 8/89[3] | 67% |
| 9/89  | 56% |
| 10/89 | 56% |

---

[3]Caseload size was not measured prior to 8/89.

17

|       |      |
|-------|------|
| 12/89 | 61%  |
| 10/90 | 72%  |
| 11/90 | 77%  |
| 12/90 | 69%  |
| 1/91  | 73%  |
| 2/91  | 72%  |
| 3/91  | 72%  |
| 4/91  | 68%  |
| 5/91  | 67%  |
| 6/91  | 54%  |
| 7/91  | 58%  |
| 8/91  | 65%  |
| 9/91  | 68%  |

Aug. 1990 Compl. Rpt., at 92; Compl. Rpt. (July 1991) at 48, Compl. Rpt. (Jan. 1992 draft), at 46.

DFS computer reports entitled "Monthly Area Report," "Children on PS Cases Active as of [a Certain Date]" and "DFS Caseload Report of Jackson County Workers with at Least One Child who has Legal Status of 01 and Case Manager County of Jackson" reveal that as of the date stated, the average number of children in the caseload of DFS social service workers was:

|       |      |
|-------|------|
| 8/89  | 32.4 |
| 9/89  | 28.4 |
| 10/89 | 30.6 |
| 12/89 | 32.0 |
| 11/90 | 32.0 |

Aug. 1990 Compl. Rpt., at 93; Dec. 1990 Compl. Rpt., at 48.

The Committee's comparison of DFS computer reports entitled "Monthly Area Report" and "Children on PS Cases Active as of [a Certain Date]" reveal that, as of the first week of September 1989, out of 90 workers surveyed, 57 (63%) had caseload sizes in excess of 25 children. Oct. 1989 Compl. Rpt., at 89, and Appendix P.

The DFS computer report entitled "Caseload Report of Jackson County Workers with at Least One Child who has Legal Status of 01

18

and Case Manager County of Jackson" shows that as of November 9, 1990, 70 of the 96 social service workers had caseloads of more than 25 children. Dec. 1990 Compl. Rpt., at 48, and Appendix IX-1.

The DFS computer report entitled "Caseload Report of Jackson County Workers with at Least One Child who has Legal Status of 01 and Case Manager County of Jackson - AC Data as of March 1, 1991, PS Data as of March 2, 1991," shows that out of the 100 workers listed, 72 had caseloads in excess of 25 children. Some workers had caseloads exceeding 50 children.

<u>SECTION XIII.B.5.</u>
(Parent/child/sibling visits)

Section XIII.B.5 of the Consent Decree provides:

> (a)  DFS will ensure, unless it is documented to be impossible, or not in the best interest of the child, that weekly visits between the parent, child and siblings are arranged. Preferably, the visits shall take place in the natural family's or foster family's home. If this is not possible, they shall be in an appropriate, dignified setting providing a natural and homelike environment.

> (b)  Contacts by telephone or in writing, between visits shall be encouraged, but they are not replacements for visits.

<u>G.L. v. Zumwalt</u>, 564 F.Supp. at 1039.

<u>Parent/Child Visits</u>

The Case Review Joint Audits reveal that the following percentage of required weekly parent/child visits occurred during the time period reviewed:

| | |
|---|---|
| 7/87 | 0% |
| 3/88 | 0% |
| 10/88 | 5% |
| 4/89 | 8% |
| 3/90 | 11% |

19

```
11/90              27%
3/91              28%
9/91              25%
```

Oct. 1989 Compl. Rpt., at 41, and Appendix A, at A21; Aug.1990
Compl. Rpt., at 115, and Appendix III-3, at 7; Dec. 1990 Compl.
Rpt., at 59; Compl. Rpt. (July 1991), Compl. Rpt. (Jan. 1992
draft).

Of the 1,381 parent/child visits required by the Consent
Decree for the 20 children sampled by the Committee for its October
1988 Joint Audit Case Review (first reported in the April 1989
Compliance Report), 28% of the visits occurred. The case review
indicates that of the visits missed, 19% were missed because
parents missed or cancelled, 4% were missed because DFS social
workers cancelled and the reasons the remaining 76% were missed
were either unknown or not documented. Oct. 1989 Compl. Rpt., at
41, and Appendix G.

Of the 1,313 parent/child visits required by the Consent
Decree for the 21 children sampled by the Committee for its April
1989 Joint Audit Case Review, 29% of the visits occurred. Of the
visits missed, 46% were missed because parents did not appear, 12%
were missed because the DFS social worker cancelled, and the
reasons the remaining 42% were missed were either unknown or not
documented. Oct. 1989 Compl. Rpt., at 42, and Appendix G.

Of the 2,258 parent/child visits required by the Consent
Decree for the 72 children sampled by the Committee for its March
1990 Joint Audit Case Review, 44% of the visits occurred. Of the
visits missed, the following percentages were missed for the

20

following reasons: 56% reasons either unknown or not documented; 29% parents cancelled, did not appear, could not be reached, were at a mental institution, did not want visits, or were in the process of having their parental rights terminated; 9% the social worker's schedule or illness; 5% the child did not want visits; 1% child's schedule or illness; .05% the foster parent's schedule. Aug. 1990 Compl. Rpt., at 116.

Of the 379 parent/child visits required by the Consent Decree for the 11 children sampled by the Committee for its November 1990 Interim Joint Audit Case Review, 14% of the visits occurred.  Of the visits missed, 56% were because the parents either cancelled or can schedule visits as they please, 29% were missed for unknown reasons, 14% were missed because the child did not want visits, one was missed because of the child's schedule, and one was missed because of a social worker's scheduling conflicts.  Dec. 1990 Compl. Rpt., at 59, 60.

<u>Sibling/Child Visits</u>

The Committee's Joint Audit Case Reviews reveal that of the sibling visits required during the time period surveyed, the following percentage occurred:

| | |
|---|---|
| 10/88 | 29% |
| 4/89 | 23% |
| 3/90 | 52% |
| 11/90 | 10% |
| 3/91 | 37% |
| 9/91 | 25% |

Oct. 1989 Compl. Rpt., at 42; Aug. 1989 Compl. Rpt., at 117; Dec. 1990 Compl. Rpt., at 60; Compl. Rpt. (July 1991), Compl. Rpt. (Jan. 1992 draft).

21

<u>Location of Parent/Child Visits</u>

The Committee's Joint Audit Case Reviews reveal that the following percentage of the parent/child visits that occurred took place at the natural parents' home:

| | |
|---|---|
| 10/88 | 59% |
| 4/89 | 30% |
| 3/90 | 35%[4] |
| 11/90 | 13% |

Oct. 1989 Compl. Rpt., at 41; Aug. 1989 Compl. Rpt., at 116; Dec. 1990 Compl. Rpt., at 59.

<u>SECTION XIII. C.6-11</u>
(Adoption )

Section XIII.C.6 requires that:

> With regard to all children for whom the permanent plan is adoption, where appropriate DFS will attempt to secure a voluntary relinquishment from the parent(s). No later than thirty (30) days after the plan of adoption has been entered in the record, and regardless of whether the social service worker is attempting to obtain a voluntary relinquishment, the worker shall forward all necessary documentation for the initiation of judicial proceedings to the appropriate legal department of DFS and the Juvenile Court. Nothing in this subparagraph shall be read to preclude the worker from attempting to obtain a voluntary relinquishment up until the time of trial.

<u>G.L. v. Zumwalt</u>, 564 F.Supp. at 1040.

According to the Joint Audit Case Reviews, DFS attempted to secure voluntary relinquishment from the parents of the following percentage of children who had a permanency planning goal of

_____

[4]This figure includes visits that occurred at the natural grandparents' and natural parents' homes.

adoption and whose case records were included in the audits:

| | |
|---|---|
| July 1987 | 71% |
| March 1988 | 71% |
| October 1988 | 67% |
| April 1989 | 20% |
| March 1990 | 65% |
| November 1990 | 14% |
| March 1991 | 40% |

Compl. Rpt. (Oct. 1989), at 89; Compl. Rpt. (Aug. 1990), at 127;
Compl. Rpt. (Dec. 1990), at 65; Compl. Rpt. (July 1991 draft), at
72.

If voluntary relinquishment is not possible, termination of
parental rights by Juvenile Court order is necessary. Court-
ordered termination requires the involvement of DFS legal staff.
In order to initiate termination proceedings, the legal department
must receive from the social workers all relevant information. The
Consent Decree requirement that necessary documentation be sent to
DFS' legal staff within 30 days after a child's permanency planning
goal has been changed to adoption ensures that the sometimes
lengthy proceedings involved in terminating parental rights can be
initiated without delay. The 30-day time frame for this in-house
referral process should be sufficient for DFS to achieve 100%
compliance without difficulty.

According to the seven Joint Audit Case Reviews, however, DFS
forwarded children's histories to the adoption unit within 5 days
of referral to Juvenile Court for the following percentage of
children who had goals of adoption and whose cases were reviewed
during the audit:

| | |
|---|---|
| July 1987 | 0% |
| March 1988 | 0% |

23

```
                 October 1988        14%
                 April 1989           0%
                 March 1990          24%
                 November 1990       84%
                 March 1991          83%
```

Compl. Rpt. (Oct. 1989), at 89; Compl. Rpt. (Aug. 1990), at 128;

Compl. Rpt. (Dec. 1990), at 65; Compl. Rpt. (July 1991 draft), at

72.

Sections C.8-10 govern actions of the DFS adoption unit.

Generally, up until 1989, DFS' rate of compliance with these

provisions was consistently at 0%. In 1989, plaintiffs and the

Committee challenged the DFS policy which delayed home-finding

efforts for a child until after a termination of parental rights

had been secured. DFS agreed to revise this policy during

negotiations which followed plaintiffs' filing of the Notice of

Noncompliance in 1989. However, low compliance rates in the

adoption unit home-finding tasks persist despite this DFS policy

change, pointing to a more fundamental problem in the agency's

functioning.

Section XIII.C.8 states:

> The adoption unit shall send at least one, and
> whenever possible, three home studies of
> appropriate prospective adoptive families to
> the social service worker no later than ten
> (10) working days after receipt of the
> material on the child, or if specific and
> identifiable facts related to this particular
> child's needs so require, within a further
> period not exceeding thirty (30) days from
> receipt of material on the child. If unable
> to identify at least one home study of an
> appropriate adoptive family, the adoption unit
> shall follow the steps indicated below [in
> Sections XIII.C.9 and .10].

G. L. v. Zumwalt, 564 F.Supp. at 1040.

24

A home study contains information about the prospective adoptive parents and is essential information for the social worker attempting to make an appropriate match between adoptive children and parents. The requirements of § XIII.C.8 expedite the social service worker's receipt of prospective adoptive home studies so that the process of matching a child to the proper home and the logistics of placement can begin immediately, thus decreasing the time during which the child remains in a temporary foster care environment.

According to the Joint Audit Case Reviews, home studies were forwarded by the adoption unit to the social service worker within the time periods prescribed by § XIII.C.8 in the following percentage of cases reviewed:

|              |      |
|--------------|------|
| July 1987    | 0%   |
| March 1988   | 0%   |
| October 1988 | 17%  |
| April 1989   | 0%   |
| March 1990   | 10%  |
| November 1990| 26%  |
| March 1991   | 50%  |

Compl. Rpt. (Oct. 1989), at 89; Compl. Rpt. (Aug. 1990), at 128; Compl. Rpt. (Dec. 1990), at 65-66; Compl. Rpt. (July 1991 draft), at 72.

The November 1990 audit reveals that in 69% of the cases reviewed there was no evidence that the DFS social service worker had either requested or received a home study from the adoption unit. Compl. Rpt. (Dec. 1990), at 66.

Section XIIII.C.9 states:

> If no home studies are sent and/or no initial
> family-child matching decision has been made
> within thirty (30) days after the material on
> the child is submitted to the adoption unit,
> specific adoptive family recruitment efforts
> in conformity with nationally recognized
> adoption recruitment techniques shall be
> undertaken immediately by the adoption unit in
> consultation with the adoption exchange of
> Missouri staff in central office (DFS). Such
> efforts shall be documented in writing.

G.L. v. Zumwalt, 564 F. Supp. at 1040.

According to the seven Joint Audit Case Reviews, § XIII.C.9's
requirement that DFS make further home-finding efforts after the
initial 30-day period was met in the following percentage of cases
reviewed:

| | |
|---|---|
| July 1987 | 0% |
| March 1988 | 0% |
| October 1988 | 0% |
| April 1989 | 0% |
| March 1990 | 33% |
| November 1990 | 17% |
| March 1991 | 40% |

Compl. Rpt. (Oct. 1989), at 89; Compl. Rpt. (Aug. 1990), at 129;
Compl. Rpt. (Dec. 1990), at 66; Compl. Rpt. (July 1991 Draft), at
72.

Section XIII.C.10 requires that:

> If a child has not been matched within an
> adoptive family within 120 days after the
> efforts described above have been undertaken
> the child shall be referred immediately
> thereafter to specialized adoption agencies
> and adoption exchanges.

According to the seven Joint Audit Case Reviews, DFS complied
with the required referral to specialized adoption agencies in the
following percentage of cases reviewed:

26

```
                    July 1987              0%
                    March 1988             0%
                    October 1988           0%
                    April 1989             0%
                    March 1990             9%
                    November 1990         17%
                    March 1991            50%
```

Compl. Rpt. (Oct. 1989), at 89; Compl. Rpt. (Aug. 1990), at 129;

Compl. Rpt. (Dec. 1990), at 66; Compl. Rpt. (July 1991 draft), at

72.

According to DFS figures, children are waiting in adoptive

placements for a longer time now than they were four years ago:

| | | Months In Care | |
|---|---|---|---|
| | | Adopt. Place | Adopt. Final |
| Sept. 1986 - | March 1987 | 29.0 | 41.5 |
| March 1987 - | Sept. 1987 | 39.5 | 51.3 |
| Sept. 1987 - | March 1988 | 40.6 | 45.1 |
| March 1988 - | Sept. 1988 | 43.4 | 57.7 |
| Sept. 1988 - | March 1989 | 38.8 | 51.6 |
| March 1989 - | Sept. 1989 | 38.8 | 48.3 |
| Sept. 1989 - | March 1990 | 40.6 | 44.9 |
| March 1990 - | Sept. 1990 | 50.2 | 58.6 |
| Sept. 1990 - | March 1991 | 38.0 | 35.6 |

Compl. Rpt. (July 1991 Draft), at 69.

It is obvious from the statistics cited above that the

defendants are not and have not been in compliance with the Consent

Decree since they entered into it in 1983.  The show cause hearing

conducted by this Court resulted in defendants attempting to

challenge the manner in which the statistics were gathered and

interpreted.  The Court finds this to be an unacceptable defense to

defendants' non-compliance.

The joint audit data is collected through a process that both

parties agreed would accurately measure compliance.   Individual

case findings are determined by a data compilation process reviewed by at least two people.  Only after both agree on the results is it published in a Joint Audit.  Stipulation, March 15, 1988. §4, attached letter of June 16, 1987, Appendix A, p. 2.

The compliance audits have been taking place since 1987.  The time to have objected to the methodology was when the first audit report was made in 1987 or as soon as defendants felt there were flaws in the methodology, not after the plaintiffs' Motion for Contempt was filed.

The Consent Decree as originally entered into by the plaintiffs and defendants states in paragraph 2, "[P]laintiffs shall be protected from harm by defendants while plaintiffs are in foster care.  To secure this right the defendants shall implement the following practices and procedure."  Defendants agreed to this upon signing of the Consent Decree and non-compliance with the Consent Decree now requires this Court to find defendants in contempt of the Consent Decree as indicated by the findings contained in this document.

The Court finds that the defendants' failure to be in compliance with the provisions of the Consent Decree is because of a lack of commitment to make a good faith effort to make the Consent Decree work.

From the evidence presented, the Court finds that it is possible for defendants to obtain complete compliance with the Consent Decree, except under the parental visitation provisions

which will be determined by the conduct of the visiting parents and not the conduct of DFS.

The first step in working toward complete compliance is for the individuals who work at the state level to give their whole-hearted support to the efforts of the social service workers and the employees of the Jackson County office of the Divisions of Family Services (DFS).    This has been sporadic and sometimes lacking in the past.

The Court does not accept the position of the plaintiff that the Program Administrator of the Jackson County DFS Office Ms. Pat Brown is indifferent to making the Consent Decree work.    The Court determines that Ms. Browns' ability to comply with the Consent Decree is being hampered at the minimum by a lack of support from her supervisors in the State Office of DFS and at the maximum because of interference from her supervisors and the State Office of DFS.    The Court at this time does not wish to explore where within this spectrum of indifference/interference the problem lies.    It is time to begin the work necessary to make the Consent Decree work and to begin the process to withdraw the Court from having to oversee the DFS Foster Care program.

### CONCLUSIONS OF LAW AND ORDER OF THE COURT

The defendants, having acknowledged plaintiffs' rights in paragraph 2 of the Consent Decree and having entered into the Consent Decree, are bound to implement it.    A court-ordered consent decree, while contractual in nature, is subject to the rules generally applicable to other judgments.    Rufo v. Inmates at the

<u>Suffolk County Jail</u>, 112 S. Ct. 748. 757 (1992). The Court therefore finds the defendants to be in contempt and accordingly sets out the following directives for defendants to meet in order to achieve compliance with the Consent Decree and to purge themselves of contempt.

I.<u>Caseload</u>

(Sections IX.A. and IX. B.1)

The Court finds the excessive caseloads of Jackson County social service workers to be the single greatest hindrance to defendants' ability to comply with the provisions of the Consent Decree. Indeed, the Court's finding in this regard underlies all other findings and directives regarding non-compliance included herein. It is readily apparent from a reading of the plain language of the Consent Decree that the <u>total</u> caseload of any DFS social service worker (who has in their caseload at least one legal status I child subject to the Consent Decree) should never exceed twenty to twenty-five children. Therefore, it shall be the responsibility of all defendants in this action to ensure that every DFS social service worker (who has in their caseload at least one legal status I child subject to the Consent Decree) shall have a total case load of not more than 25 children. Moreover, in the event the defendants elect to assign any one DFS social service worker <u>only</u> legal status I children, then that worker shall have a maximum caseload of 15 children. The total caseload shall be determined by counting every child in the DFS social service worker's caseload.

Defendants contend that budget constraints have prevented them from hiring a sufficient number of DFS social service workers to comply with the 25 children caseload provision. It appears to the Court that the greatest hindrance to defendants' ability to obtain sufficient funds for personnel is their failure to make the appropriate specific line item request in their budget proposals. Accordingly, the Court directs defendants to request and lobby for a budget line item in their next budget request to the Missouri Legislature for sufficient funds to hire the number of DFS social service workers necessary to comply with the caseload requirements of the Consent Decree. Defendants are advised that in the event they fail to request or receive sufficient funding to meet the caseload provisions of the Consent Decree, the Court will be left with no alternative but to order DFS personnel transferred to Jackson County from other DFS offices located throughout Missouri to provide sufficient staff to meet the caseload requirements of the Consent Decree.

## II. RELICENSING OF FOSTER PARENTS WHO HAVE NOT COMPLETED THE REQUIRED TRAINING

(As required under Section I.F.5., II.C.2)

The Court finds that defendants' failure to comply with this provision of the Consent Decree is due to their failure to (1) properly monitor the foster parents files; (2) notify the foster parents of training requirements in a sufficient amount of time prior to their license renewal date; and (3) enforce foster parent training requirements. The Consent Decree has been in place long

enough that defendant should have this problem under control.

To remedy this failure to comply with the Consent Decree the Court orders the defendants to bring all foster parents into compliance with Consent Decree training requirements within six (6) months from the date of this Order and thereafter to suspend the licenses of all foster parents who are not up to date on their training. DFS shall immediately notify the foster parents of their license suspension and make arrangements to remove the foster child or children from the home within 60 days from the date of the foster parent license suspension.

### III. FOSTER PARENT TRAINING

(As required under Sections II.C.1, II.D.1 and II.D.2)

Likewise, the Court finds that the defendants' failure to comply with these provisions is due to their failure to properly monitor the foster parents' files and to adamantly insist that foster parents attend required training sessions. The Court orders the defendants to establish record monitoring procedures that will allow them to notify foster parents of additional training requirements in a timely fashion. The Court further orders the defendants to bring foster parent training up to date within six months from the date of this Order. At the conclusion of this six month period DFS shall suspend the license of all foster parents who are not in compliance and shall remove the foster child or children from the foster home within 60 days from the license suspension date. The foster parents shall be given 90 days from the suspension date to obtain all required training. In the event

the foster parents have not brought their training up to date within this 90-day period, their license shall be immediately revoked.

IV. <u>PLACEMENT IN CONFORMITY WITH LICENSING RESTRICTIONS</u>

(As required under Section III.B)

Defendants are in substantial compliance with the placement restrictions. The most frequent reason defendants are not in compliance is because the number of children placed in a foster home is in excess of the number of children a foster home is licensed to take.

The Court believes the problems of failing to comply with this provision is attributable to an insufficient number of foster parents and the unpredictable demands made on DFS to take children into their custody and place them in foster care. This is controlled by the Juvenile Court and its juvenile officers who at times must direct DFS to place children in emergency foster care on extremely short notice. It appears to the Court that the underlying need is for more qualified foster parents. In order to address this problem, the Court directs DFS to increase its efforts to recruit qualified foster parents. With an adequate number of foster parents DFS should have no difficulty making a proper placement of each child within the 30-day period they are in emergency foster care.

IV. <u>PRE-PLACEMENT VISITS</u>

(As required under Sections IV.D.1, IV.D.2, IV.F and IV.G.3)

Section IV. A,B C,D & G of the Decree provides for the Pre-

Placement Process of placing a child in a foster home. Section IV.D.3 provides for a pre-placement visit to the child's foster home "to the extent possible" at least one week in advance of the placement. Section IV.D.3 further provides that if defendants get less than one week's notice of a need for placement, the visit shall take place even if it is on the same day as the placement. The Court interprets this provision as requiring pre-placement visits to take place as far in advance of the actual placement as possible with the optimum time being at least one week prior to the placement. This provision does not mean that in the event defendants cannot make a pre-placement visit seven (7) days before placement they should wait until the day of placement to make the visit. A visit should take place on the date of placement only when no earlier visit is possible due to lack of notice to defendants. A pre-placement visit should take place on the same day as placement only in the defined emergency situation covered in Section IV.G.

The Court further finds that when the pre-placement visit takes place on the same day as placement the social worker must call back <u>that same day</u> to determine if the child and the foster parent are compatible. This provision is in addition to the requirement in Section IV.E.1 which requires the social service worker to visit the child within 24 hours after placement. The Court is confident that compliance with these provision will be greatly facilitated by implementation of its earlier directive regarding proper caseload size.

34

## VI. SOCIAL WORKER/CHILD VISITS

### (As required under Section IV.E.1)

The Consent Decree requires that each DFS social service worker makes a minimum of two visits per month per child in order to keep abreast of the situation of the children they have in foster care. All the parties to the Consent Decree have agreed that the minimum number of visits necessary to look after the well-being of the most trouble-free child in foster care is two visits per month. While it is obvious that no social service worker would mechanically restrict their visits to twice a month if they determined that more visits were necessary, it is a violation of the Consent Decree for a social service worker not to make the minimum twice-a-month visits. Furthermore, it is also a violation to credit any additional visits to one child toward the required number of visits of another child who had not received the minimum two visits for the month. Accordingly, defendants are hereby directed to establish within 30 days of the date of this Order a procedure to monitor social worker\foster child visits and to ensure that the minimum two visits per month take place within the foster home. The Court is confident that its earlier directive regarding proper caseload size will allow the DFS social service workers to make the twice monthly visits without any difficulty. Nevertheless, until the caseload limit is brought into compliance with the Consent Decree it is still imperative that each child receive the twice monthly visits. The Court agrees with plaintiffs that a visit should be missed only in the event a child

35

has run away from the foster home or is on a DFS-approved trip.

## VII. PARENT/CHILD/SIBLING VISITS

(As required under Section  XIII.B.5)

The Adoption Assistance and Child Welfare Act of 1980 requires that "reasonable effort will be made" to prevent removal of children from their homes and to facilitate reunification of families where removal has occurred.  42 USC § 671(a)(15).  In 1982, in response to this Act, the Missouri Legislature enacted sections 210.700 through 210.760 of the Revised Statutes of Missouri. These sections require that the Missouri Juvenile Court review the status of every child placed in foster care.  The Consent Decree addresses this law by spelling out with particularity the steps that need to be taken to enable the child to be returned home or to be made available for a new home through adoption.  Section XIII of the Consent Decree addresses the need for this "Permanency Planning."  Under the terms of the Consent Decree DFS is required to enter into a written service agreement with the custodial parent or parents of each child placed in foster care within 30 days of placement.  The written service agreement spells out what the parent or parents must do for the child to be returned to them.

The Court, having been a juvenile court judge in the state of Missouri at the time Missouri enacted the statutes in 1982, and having operated under those statutes until leaving that position in 1987, has personal knowledge of the use of written service

agreements by DFS. It is a standard condition of the written service agreement that the custodial parent visit with the child or children in foster care on a routine basis, unless there are unusual circumstances in a particular case which make it ill-advised to allow the custodial parent to have contact with the child.

Parental visits are important to demonstrate the parents' concern for the child and also serve to measure the level of a parent's interest in having the child returned to the home. While the social service worker should act as an expediter in encouraging the parents to attend the visits, it is not the responsibility of the social service worker to participate in the transportation for the visitation or to be present during the visit. The purpose of requiring the parent to visit the child is so DFS and the Court can see if the parent is interested enough in her/his child to make an effort to visit the child on a routine and consistent basis as they have agreed to in the service agreement. Because of this understanding of the parental visits, the Court does not expect one hundred percent compliance with the Consent Decree, but there should be no missed visits because of the failure of the social service worker to remind the parent of the visit.

While the social service worker perhaps need not take primary responsibility for parent\child visits, such is not the case with sibling visits. The social service worker plays a more vital role in ensuring that visitation takes place between the child in foster care and his/her siblings. The social service workers should see

37

that the weekly sibling visits take place even if the natural parents do not participate. The disinterest of the natural parent in visiting his or her child should not interfere with siblings having contact with each other on a regular basis. To this end, defendants are directed to develop and utilize procedures to ensure that all required visits between siblings take place and are documented.

Defendants argue that if the siblings all attend the same school and have contact there this should count as a visit between siblings. This argument is without merit. The structured environment of a school does not allow adequate contact between siblings. Consequently, the required number of visits between siblings should occur regardless of whether the siblings attend the same school.

<u>VIII. ADOPTION</u>

(Sections XIII.C 6-11)

Under the Decree, when the permanency plan for a child is adoption, there are six steps that DFS must perform to free the child for adoption and find an adoptive home. DFS has not been in compliance with any of the six steps since the Consent Decree was put in place. DFS' aggregate rate of compliance has never exceeded 60%. The Court finds the following corrections in DFS procedure must be made.

1. <u>Voluntary relinquishment of parental rights</u>
(Section XIII.C.6)

The Consent Decree requires the social service worker to attempt to obtain voluntary relinquishment of parental rights from

38

the parents of a child whose permanency plan is adoption. The Court cannot understand why defendants have not as yet devised a simple method which allows each DFS social service worker to note whether they have talked to the parent or parents of the child concerning voluntary relinquishment of parental rights and to make a record of any such attempts to get voluntary relinquishment of parental rights. The most simple way to address this problem as well as to ensure the other five steps take place is to produce a check list which has the six steps listed with space for the responsible worker to initial when they have completed each step. If such a check list is not in place, the Court orders that one be devised, approved by the Committee and put to use within 30 days from this order.

    2. <u>Gather material to obtain involuntary relinquishment.</u>
                (Section XIII.C.6)

If DFS is unable to obtain a voluntary relinquishment of parental rights, the material necessary to obtain an involuntary termination must be sent to the Jackson County Juvenile Court within 30 days of a Termination of Parents' Rights (TPR) staffing on the child. DFS' compliance with this provision has ranged from 14% to 70%

The Court directs DFS to make the necessary corrections in their procedures to correct this problem within 30 days of the date of this Order. The Court does not have specific evidence as to how they are now collecting the material and cannot with particularity spell out the corrections that need to be made. If DFS claims they

cannot comply, then they shall file with the Court within 30 days the exact procedure they are now following so the Court can address with particularity what must be done.

3.  <u>Profile of child must be sent to the adoption unit within 5 days of the TPR staffing by the child's social service worker.</u>
(Section XIII.C.7)

DFS' compliance with this provision has ranged from 14% to 72%.  Again, the Court orders defendants to take the steps it deems necessary to bring compliance to 100 percent within 30 days of the date of this Order or to file with the Court within 30 days the exact procedure currently employed in order to allow the Court to address with particularity what must be done.

4.  <u>Adoption worker must send home studies to social service worker within 10 days.</u>
(Section XIII.C.8)

Within ten (10) days after receiving the child's file, the adoption worker must begin to look for a prospective adoptive home and, if any are located, send home studies of such families back to the child's alternative care worker.  Compliance with this provision of the Decree has been from 17 percent to 50 percent.

The Court has no information on the average time it takes to do a home study by DFS.  It can only assume that home studies are done as families apply to DFS to be considered as prospective parents.  If home studies are done as prospective parents are identified, DFS should have a good supply of home studies available to review and to try and match with a child.  If home studies are not done on an ongoing basis, DFS should change its procedure to handle adoptive home studies in this manner.  If the Court's

assumption is incorrect, then DFS should advise as to the procedure they are now following and why they cannot conduct home studies on a continuous basis as prospective parents apply.  DFS shall make said report within 30 days from the date of this Order.

     5.  <u>If a potential matching home study is not made within 30 days the adoptive worker should begin recruitment.</u>
(Section XIII.C.9)

If a home study is not located within 10 days, the adoptive worker must continue to look for an appropriate match.  If one is not found within 30 days of the referral to the adoption unit, the adopting worker is to begin specific recruitment efforts for the child.  DFS's compliance rate with this section of the Decree is from 0 percent to 60 percent.  The corrective measure for this provision will be addressed in conjunction with the next paragraph.

     6. <u>If an adoptive home has not been found within 120 days the child shall be referred to  specialized adoption agencies and adoption exchanges</u>.
(Section XIII.C.10)

Compliance  with this section of the Decree has been from 0 percent to 50 percent.  Moreover, the number of months children are awaiting adoptive placement has increased from a low of 29 months in 1987 to 45 months for the period of March 1991 through September 1992.  This is yet another telling statistic indicative of the failure of DFS to comply with the adoption provisions of the Consent Decree.  In order to facilitate and accelerate the finding of an appropriate adoptive home for the children, the Court directs that in any case where DFS fails to find an adoptive home from their office files within 30 days as prescribed by Section

41

XIII.C.8, they shall immediately commence the searches required in Sections XIII.C. 9 and XIII.C.10. DFS shall contact all appropriate agencies available to them from a list provided by the G.L. v. Zumwalt Audit Committee and file a report each six months with the Committee as to the contacts they have made for each child for whom they are seeking an adoptive home.

### Other adoption procedures

It has come to the attention of the Court that occasionally DFS will place a child otherwise eligible for adoption on a "No Adoption Planning" list. The Court finds that the assignment of an adoptive child to a "No Adoption Planning" list is not in compliance with the Consent Decree and directs that such practice be stopped immediately.

### SUBSTITUTE AND ADDITIONAL PARTIES

In their motion for contempt filed January 22, 1990, plaintiffs request that additional parties be added as defendants and other parties be substituted for present defendants because the individuals in the offices have changed. The Court determines it is necessary to add additional accountable parties as defendants to insure that the orders of the Court are acted upon by the officials who are responsible for the operation of the Missouri Division of Family Services. The Court grants plaintiffs' motion in part. The Court adds as defendants the present Director of the Missouri Department of Social Services, Gary Stangler and the Deputy Director of Children's Services for the Division of Family Services, Richard Matt. The Court substitutes as parties defendant

the current Director of the Missouri Division of Family Services, Carmen K. Schulze and the current acting Social Services Director of Jackson County, Missouri, Pat Brown.

The Court, having found defendants not to be in compliance with the Consent Decree and thus, in contempt, Orders that defendants institute the following procedure to purge themselves of contempt:

1. Every social service worker who has assigned to them one or more legal status I children who are subject to this Decree shall have a total caseload of not more than twenty-five (25) children. This determination shall be made by counting every child in a social service worker's caseload;

2. In the event any one social service worker has only legal status I children, then that worker shall have a maximum caseload of 15 children. This determination shall be made by counting every child in the social service worker's caseload;

3. Defendants shall request and lobby for a budget line item in their next budget request to the 1993 Missouri Legislature for sufficient funds to hire the number of social service workers necessary to permit DFS to comply with the caseload requirement of the Consent Decree;

4. Defendants shall bring all foster parents into compliance with the training requirements of the Consent Decree within six (6) months from the date of this Order;

5. Defendants shall establish a records monitoring procedure to allow defendants to notify foster parents that they need to take

43

additional training;

6.    Defendants shall ensure that pre-placement visits take place as far in advance of the actual placement with the optimum time being at least one week prior to the placement;

7.    Defendants shall ensure that each child in foster care is visited a minimum of twice monthly by their social service worker;

8.    Defendants shall establish a monitoring procedure within 30 days of the date of this Order that will allow defendants to ensure that the required two visits per month by the social service worker take place;

9.    Defendants shall produce and implement a check list for use in adoptions so accountability for performance of each of the required six steps is possible;

10.    If defendants cannot find a suitable adoptive home for a child from their office files within 30 days as prescribed by Section XIII.C.8, they shall immediately commence the searches required in Sections XIII.C.9 and XIII.C.10;

11.    Defendants shall take all additional steps necessary to comply with all provisions of the Consent Decree beyond those set forth in the above paragraphs.    Moreover, the Court retains jurisdiction to amend and file additional directives under this contempt finding as determined necessary to assist defendants in complying with this Contempt Order and the Consent Decree. Accordingly, the Court takes under advisement the assessment of any additional sanctions or penalty for defendants' contempt.    It is further

44

defendants in their official capacity:

Gary Stangler, Director of Missouri Department of Social Services; and

Richard Matt, Deputy Director of Children's Services for the Division of Family Services. It is further

ORDERED that Carmen K. Schulze, Director of Missouri Division of Family Services be substituted for her predecessors-in-office, John Zumwalt and Paula Willmarth; and

Pat Brown, acting Social Services Director for Jackson County be substituted for her predecessors-in-office, Sherrell Hunt and Gail Horsey.

IT IS SO ORDERED.

_____
Dean Whipple
United States District Judge

Date: _____, 1992

B.102

# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI WESTERN DIVISION

FILED
DEC 15 1992

G. L., et al.,                    )
                                  )
                Plaintiff,        )
                                  )
V.                                )    Case No.: 77-0242-CV-W-1
                                  )
John Zumwalt, et al.,             )
                                  )
                Defendants.       )

## ORDER

It has come to the attention of the Court that one line of the Order entered December 7, 1992 in the above-styled action was inadvertently omitted from the top of page 45.

Accordingly, it is

ORDERED that page 45 of the Order entered December 7, 1992 is hereby amended by the addition of the following line at the top of the page:

**ORDERED that the following individuals be added as party**

It is further

ORDERED that the Clerk of the Court mail an amended page 45 (a copy of which is attached hereto) to each of the parties to this action.

_____
Dean Whipple
United States District Judge

Date: _Dec. 15_, 1992

ORDERED that the following individuals be added as party defendants in their official capacity:

Gary Stangler, Director of Missouri Department of Social Services; and

Richard Matt, Deputy Director of Children's Services for the Division of Family Services.  It is further

ORDERED that Carmen K. Schulze, Director of Missouri Division of Family Services be substituted for her predecessors-in-office, John Zumwalt and Paula Willmarth; and

Pat Brown, acting Social Services Director for Jackson County be substituted for her predecessors-in-office, Sherrell Hunt and Gail Horsey.

IT IS SO ORDERED.

_____
Dean Whipple
United States District Judge

Date: _Dec 7_, 1992

45