# Exhibit L

# EXHIBIT F



FILE COPY

Marcia Robinson Lowry
President &
Executive Director

Board of Directors
Alan C. Myers
Chairman & Treasurer
Robin L. Dahlberg
Secretary
Daniel H. Galpern
Jeffrey B. Gracer
Harvey Keitel
Melissa G. Salten
Hershel B. Sarbin
Robert B. Shapiro
Anne Strickland Squadron

September 11, 2003

**VIA FACSIMILE 203-741-0462 AND REGULAR MAIL**

D. Ray Sirry, Court Monitor
DCF Court Monitor's Office
300 Church Street, 4th Floor
Wallingford, CT 06492

    Re:    Plaintiffs' Assertion of Substantial Non-Compliance with the <u>Juan F.</u>
<u>Transition/Exit Plan and Request for Additional Remedies</u>

Dear Ray:

    Pursuant to Section X(B) of the <u>Performance and Outcome Measures, Transition and Exit</u>
<u>Plan</u> so-ordered on February 19, 2002 (the "Transition/Exit Plan"), as modified by the Modification of Performance and Outcome Measures, Transition and Exit Plan, dated May 29, 2002 (the "Modification to Exit Plan"), Plaintiffs assert Defendants' substantial non-compliance with a significant number of fundamental issues of safety, well being and permanency, as set forth below. The factual bases for the asserted non-compliance include, but are not limited to, the Monitor's Comprehensive Case Review Report dated August 12, 2003 (the "Record Review"); the Monitor's Review of a Cohort of Children in DCF Custody Whose Parental Rights Had Been Terminated and Who Had a Goal of Adoption as of March 31, 2003, dated August 1, 2003 (the "Adoption Report"); the Monitor's Preliminary Case Review Report dated November 1, 2002 (the "Preliminary Record Review"); Monitor's Component Five: Investigation Sub-sample Case Review dated August 1, 2003 ("Investigations Review"); and the DCF Report for Outcome Measures Due July 15, 2003 (the "DCF Outcomes Report"). As relief, Plaintiffs seek a finding of contempt of court and the imposition of a Court-appointed receiver, as explained more fully below.

**I.    FACTUAL BASES FOR ASSERTION OF NON-COMPLIANCE**

    **A.    RECENT FINDINGS BY MONITOR AND DEPARTMENT-GENERATED DATA**

        1.    **ADOPTIONS**

    As part of the comprehensive case record review required by the Transition/Exit Plan, the Monitor conducted a review of a cohort of 155 children whose parental rights had been

404 Park Avenue South, New York, NY 10016
Tel: 212-683-2210 • Fax: 212-683-4015 • info@childrensrights.org • www.childrensrights.org

terminated and who had a permanency goal of adoption as of March 31, 2002. The timely adoption of children who are freed for adoption and whose permanency goal is adoption is plainly a "fundamental" issue within the meaning of Section VI of the Transition/Exit Plan. In the Adoption Report, the Monitor found (1) the time the cohort children spent waiting for adoption was "excessive" (Adoption Report at 9); (2) children's problems became "more severe" during the time they spent in the Department's custody (id. at 10); (3) the Department was in non-compliance with the visitation standards (see infra at 6); (4) children had their goals changed to independent living "only because of the multiple traumas and delays the children had suffered since entering DCF custody. Earlier DCF action, preceded by a more thorough assessment, more decisive and co-coordinated decision-making by DCF, and more thorough planning with all involved parties, probably would have made a family based outcome possible" (id. at 11); and (5) "[r]elatively simple needs of young children entering DCF custody that went unaddressed ultimately led to more complex needs for which available sources and resources were inadequate" (id. at 13).

The Monitor stated: "The conclusion drawn by the reviewers and the Monitor's Office is unambiguous. When these children first entered DCF custody, the issues and problems confronting them were relatively simple in the majority of cases. However, the multiple traumas associated with long lengths of stay in DCF custody, such as multiple placements, separations from siblings, abuse in custody, and multiple social workers, worsened their emotional and mental health." Adoption Report at 10; emphasis added.

### 2. RELATIVE SEARCHES

The Monitor has identified the search for relatives or special study placements at the time of placement as a fundamental issue and measured the Department's performance in this area. The Monitor found that the Department was non-compliant in this area in that a search for relatives or special study placements at the time of placement was completed in only 70.6% of the cases. Record Review at 8.

### 3. FOSTER PARENT TRAINING

The Monitor has identified the completion of required training for licensure or re-licensure by DCF foster care providers as a fundamental issue and measured the Department's performance in this area. The Monitor found that the Department was non-compliant in this area in that required foster parent training was completed in only 25.3% of the cases. Record Review at 8. This was a decline from the 37% compliance in November 2002. Preliminary Record Review at 68.

### 4. FASU SUPPORT PLANS

The Monitor has identified the completion of the FASU support plan as a fundamental issue and measured the Department's performance in this area. The Monitor found that the

Department was non-compliant in this area in that the FASU support plan was completed in only 61.6% of cases. Record Review at 8.

### 5. TPC/ACR INVITATIONS

The Monitor has identified the sending of invitations to TPCs and ACRs at least 21 days in advance as a fundamental issue and measured the Department's performance in this area. The Monitor found that the Department was non-compliant in this area in that invitations were sent timely in only 52.6% of cases. Record Review at 8.

### 6. PROVIDER PARTICIPATION AT TPCs/ACRs

The Monitor has identified the participation of case providers in TPCs and ACRs as a fundamental issue and measured the Department's performance in this area. The Monitor found that the Department was non-compliant in this area in that appropriate providers participated in these conferences in only 31.3% of cases. Record Review at 8. This was only marginal improvement from the 27.8% in November 2002. Preliminary Record Review at 73.

### 7. COMPLETION OF INVESTIGATIONS

Outcome Measure No. 1 of the Transition/Exit Plan requires that at least 85% of open investigations of reports of maltreatment be completed within 30 days, and at least 90% within 45 days, at the 16-month mark. Transition/Exit Plan at 2. The completion of investigations is plainly "fundamental" within the meaning of Section VI of the Transition/Exit Plan. The Monitor's findings indicate that only 62.8% of the investigations met the 30-day standard. Record Review at 9. The Department's own report indicates that 50.1% of the investigations met the 30-day standard. DCF Outcomes Report at 1. The Department also failed to meet the 45-day standard; the Monitor's report indicates 82.9% compliance, and the Department's indicates 88.7%. Record Review at 9; DCF Outcomes Report at 1.

Plaintiffs note that the Department has made only marginal progress in the area of timely completion of investigations since the Transition/Exit Plan took effect. The Monitor's Preliminary Record Review found only a 43.9% compliance rate for the 30-day standard and an 83.1% compliance rate for the 45-day standard. Preliminary Record Review at 26.

Plaintiffs further note that the Monitor's Investigations Review found 38% of cases in which investigations were completed in 30 days; 37% in which investigations were completed in 31-45 days; and 25% in which investigations were completed in greater than 45 days. Investigations Review at 11. That study also found several serious qualitative problems with investigations, including failure to make required medical and educational contacts and tracking (id. at 9-10), and lapses in visitation contact as cases were transferred to Ongoing Services (id. at 11).

8. **FOSTER CARE RE-ENTRIES**

Outcome Measure No. 5 of the Transition/Exit Plan requires no more than 7% of children who enter custody during the reporting period should have been in custody one or more times in the prior 12 months. Transition/Exit Plan at 2. This is plainly a "fundamental" issue within the meaning of Section VI of the Transition/Exit Plan. The Monitor's findings indicate that 17.6% of children who entered custody during the reporting period had previously been in custody within the prior 12 months. Record Review at 13.

9. **MULTIPLE PLACEMENTS**

Outcome Measure No. 6 of the Transition/Exit Plan requires, at a minimum, that 85% of children have two or fewer placements at the 16-month interval; 80% of the remaining 15% of children must have three or fewer placements. Transition/Exit Plan at 2-3. Multiple placements is plainly a "fundamental" issue within the meaning of Section VI of the Transition/Exit Plan. While the parties agreed that placements prior to the Effective Date of the Transition/Exit Plan would not be counted in determining performance on the outcome measure, the Monitor's findings indicate 83% with two or fewer placements and only 61.4% of the remaining children with three placements. Record Review at 14.

10. **LENGTH OF TIME IN CARE**

Outcome Measure No. 7 of the Transition/Exit Plan requires that, excluding children 18 or older, at least 70% of children in care during or at the end of the reporting period should have been in care for less than two years; at most 10% of such children should have been in care two to three years; and at most 20 percent of such children should have been in care more than three years. Transition/Exit Plan at 3. This is plainly a "fundamental" issue within the meaning of Section VI of the Transition/Exit Plan. The Monitor found that only 50.6% of children had been in care less than two years; 15.8% had been in care for two to three years; and 33.6% of children had been in care for more than three years. Record Review at 15.

11. **REUNIFICATION**

Outcome Measure No. 8 of the Transition/Exit Plan requires that at least 85% of children who are reunified with their parents or caretakers at the time of discharge from foster care be reunified within 12 months. Transition/Exit Plan at 3. This is plainly a "fundamental" issue within the meaning of Section VI of the Transition/Exit Plan. The Monitor found that only 71.4% of the studied children were reunified within 12 months. Record review at 16. The Department's data on this measure indicates only 61.8% of studied children are reunified within 12 months. DCF Outcomes Report at 2.

## 12. OVERCROWDING

Outcome Measure No. 9 of the Transition/Exit Plan requires a maximum of 4% of children who live in foster homes to live in foster homes that are over licensed capacity at the 16-month mark. Transition/Exit Plan at 2. Overcrowding is plainly a "fundamental" issue within the meaning of Section VI of the Transition/Exit Plan. The Monitor's findings indicate that 9.3% of children in foster family homes are living in homes that are overcrowded. Record Review at 17. This does not include children who are placed in overcrowded homes in order to live with their siblings. Id. at 9 n.8.

## 13. OUT-OF-STATE CHILDREN IN CONGREGATE CARE

Outcome Measure No. 10 of the Transition/Exit Plan requires a 50% reduction of the number of children placed in out-of-state congregate care facilities, excluding children in border programs within 50 miles of the state border. The measurement is from the Effective Date of the Transition/Exit Plan (March 1, 2002) to the 16-month mark. Transition/Exit Plan at 4. This is plainly a "fundamental" issue within the meaning of Section VI of the Transition/Exit Plan. The measurement could not be done by the Monitor's case record review. Record Review at 20 n.9. According to the Department's data, the reduction in this population was only 2.7%.[1] DCF Outcomes Report at 3.

## 14. OVERSTAYS IN SHELTERS

Outcome Measure No. 13 of the Transition/Exit Plan requires that no more than 10 children stay in shelters for more than 45 days during the reporting period. Transition/Exit Plan at 4. This is plainly a "fundamental" issue within the meaning of Section VI of the Transition/Exit Plan. This measurement could not be done by the Monitor's case record review. Record Review at 21 n.10. According to the Department's data, 74 children had stayed in shelters more than 45 days during the reporting period. DCF Outcomes Report at 3.

## 15. SIBLING VISITATION

Outcome Measure No. 16 of the Transition/Exit Plan requires at least 80% of children not placed with their siblings to visit with their siblings at least once a month, unless there is a court order or other documented reason why such visits are not in the child's best interest. Transition/Exit Plan at 4. This is plainly a "fundamental" issue within the meaning of Section VI of the Transition/Exit Plan. The Monitor found that only 37.8% of studied children had the required sibling visitation. Record Review at 24.

---

[1] The raw data and the percentage reduction calculation in the DCF Outcomes Report do not match. The Department reports a baseline figure of 146 children and a measurement, on July 15, 2003, of 142 children, and then calculates this to be a 1% reduction. This appears to be an error, as 4/146 represents a 2.7% reduction.

Page 5 of 14

## 16. RECRUITMENT OF FOSTER FAMILY HOMES

Outcome Measure No. 18 of the Transition/Exit Plan requires at least a 15% net increase in the number of licensed or approved foster family homes from March 1, 2002, through the end of the reporting period. Transition/Exit Plan at 5. This is plainly a "fundamental" issue within the meaning of Section VI of the Transition/Exit Plan. This outcome was measured by LINK only. According to the Department, as of July 15, 2003, far from there being a net increase of 15%, there was actually a net <u>decrease</u> of 1% of family foster homes. DCF Outcomes Report at 5.

## 17. WORKER-CHILD VISITATION/IN-STATE PLACEMENT CASES

Outcome Measure No. 19 of the Transition/Exit Plan requires minimum worker-child visitation in accordance with the following schedule: for the first 30 days of custody, at least 80% of children should be visited once per week; between 30 days and the first 6-month ACR, at least 85% of children should be visited once every two weeks; and after the first 6-month ACR, at least 90% of children should be visited once a month. Transition/Exit Plan at 5. This is plainly a "fundamental" issue within the meaning of Section VI of the Transition/Exit Plan. The Monitor found that only 41.2% of children were visited once a week in their first 30 days of custody. Record Review at 27. Only 45.7% of children were visited once every two weeks between 30 days and the first 6-month ACR. Id. Only 51.7% of children were visited once a month thereafter. Id. at 8.

Additionally, the Monitor found that the Department failed to meet visitation standards for children in the adoption cohort.[2] Only 56.8% of the cohort children received the appropriate number of worker visits. Adoption Report at 31.

## 18. WORKER-CARETAKER VISITATION/IN-STATE PLACEMENT CASES

Outcome Measure No. 27, contained in the Modification to Exit Plan, requires at least 85% of caretakers to be visited at least every other week following transfer of the case to Ongoing Services until the first 6-month ACR; 90% of such caretakers must be visited at least once a month thereafter. Modification to Exit Plan at 3. Worker-caretaker visitation in in-state placement cases is plainly a "fundamental" issue within the meaning of Section VI of the Transition/Exit Plan. The Monitor found that only 31.8% of caretakers had their required visits before the first 6-month ACR, and only 37.1% received their required visits thereafter. Record Review at 36. This was a marked decline since the Monitor's November 2002 preliminary case record review, at which time he found that 67.7% of caretakers received their required visits both before and after the first 6-month ACR review. Preliminary Record Review at 63.

---

[2]The adoption cohort is a group of 155 children whose parental rights had been terminated and who had a permanency goal of adoption as of March 31, 2002.

Page 6 of 14

19. **FASU SUPPORT VISITS**

The Monitor has identified FASU worker visitation with the foster care provider as a fundamental issue and measured the Department's performance in this area. The Monitor found that the Department was non-compliant in this area in that the required visits were made in only 71.3% of cases.

20. **QUALITY OF WORKER VISITS**

The Monitor has identified the quality of worker visits as a fundamental issue and measured the Department's performance in this area. The Monitor found that the Department was non-compliant in this area in that only 37.9% of cases evidenced quality, as defined by the Monitor. Record Review at 8. This was a dramatic decrease in performance from November 2002, when the Monitor found that worker visits evidenced quality in 69.9% of cases. Preliminary Record Review at 74.

21. **WORKER-BIOLOGICAL PARENT VISITATION/IN-STATE PLACEMENT CASES WITH REUNIFICATION GOAL**

Outcome Measure No. 26, contained in the Modification to Exit Plan, requires, in in-state placement cases in which reunification is the goal, workers to visit at least 70% of biological parents every other week following the transfer of the case to Ongoing Services and before the first 6-month ACR. Modification to Exit Plan at 3. This Measure also requires workers to visit at least 80% of such parents every month following the first 6-month ACR. Id. Worker-biological parent visitation in such cases is plainly a "fundamental" issue within the meaning of Section VI of the Transition/Exit Plan. The Monitor's report indicates that only 31% of mothers, and only 9.1% of fathers, received the required visits during the first six months the case was with Ongoing Services; only 37.3% of mothers and only 25% of fathers received the required visits thereafter. Record Review at 35.

22. **WORKER-CHILD VISITATION/OUT-OF-STATE CASES**

Outcome Measure No. 28, contained in the Modification to Exit Plan, requires 90% of children in out-of-state cases to be visited at least once every three months by a DCF treatment worker, a DCF worker at the social worker level or above, or by the ICPC worker (limited to children in foster family, adoptive, or relative care placements). Modification to Exit Plan at 3. Worker-child visitation in out-of-state cases is plainly a "fundamental" issue within the meaning of Section VI of the Transition/Exit Plan. The Monitor found that only 54.5% of children received these four-times-a-year visits. Record Review at 37.

23. **WORKER-CHILD VISITATION/IN-HOME CASES**

Outcome Measure No. 24, contained in the Modification to Exit Plan, requires workers to

visit at least 85% of children who remain in their biological homes at least once a week for the first 30 days after a case is transferred to Ongoing Services; workers must visit at least 90% of such children at least once every two weeks thereafter. Modification to Exit Plan at 2. Worker-Child visitation for in-home ongoing cases is plainly a "fundamental" issue within the meaning of Section VI of the Transition/Exit Plan. The Monitor found that only 39.4% of children were visited once a week during the first 30 days after the case was transferred to Ongoing Services, and even <u>fewer</u> children, 26.1%, were visited once every two weeks thereafter. Record Review at 33.

Additionally, the Monitor's Investigations Review found that the Department failed to meet visitation standards for children transferred to Ongoing Services. Investigations Review at 11.

### 24.  WORKER-BIOLOGICAL PARENT VISITATION/IN-HOME CASES

Outcome Measure No. 25, contained in the Modification to Exit Plan, requires, in in-home cases, workers to visit at least 90% of biological parents every other week following the transfer of the case to Ongoing Services. Modification to Exit Plan at 3. Worker-Parent visitation for in-home ongoing cases is plainly a "fundamental" issue within the meaning of Section VI of the Transition/Exit Plan. The Monitor found that workers visited only 26.9% of mothers and only 12.2% of fathers in accordance with the requirements. Record Review at 34.

### 25.  MEDICAL, DENTAL, AND HEALTH SERVICES

Outcome Measure No. 20 of the Transition/Exit Plan requires that no more than 10% of children in the legal and/or physical custody of DCF during the reporting period have an unmet medical, dental, or mental health need documented in the Treatment Plan for more than 60 days, excluding emergency need situations. Transition/Exit Plan at 5. This is plainly a "fundamental" issue within the meaning of Section VI of the Transition/Exit Plan. The Monitor found that more than one-quarter, or 25.2%, of children had a documented unmet need. Record Review at 29.

### 26.  MULTI-DISCIPLINARY EVALUATIONS

Outcome Measure No. 21 of the Transition/Exit Plan requires, at the 16-month mark, that at least 90% of MDE's be conducted within 30 days of placement, for children entering legal and/or physical custody of DCF during the reporting period. Transition/Exit Plan at 6. The timely completion of MDE's is plainly a "fundamental" issue within the meaning of Section VI of the Transition/Exit Plan. The Monitor's findings indicate that only 41.7% of children received a timely MDE. Record Review at 30.

27. **EPSDT SCREENS**

Outcome Measure No. 22 of the Transition/Exit Plan requires that at least 85% of children in the legal and/or physical custody of DCF during the reporting period have all timely EPSDT screens. Transition/Exit Plan at 6. The receipt of timely EPSDT screens is plainly a "fundamental" issue of well-being within the meaning of Section VI of the Transition/Exit Plan. The Monitor's findings indicate that only 64.0% of children received timely EPSDT screens. Record Review at 31.

B. **HISTORICAL PATTERN OF NON-COMPLIANCE BY DEFENDANTS**

The defendants' non-compliance with the Transition/Exit Plan and the Modification to the Exit Plan, as evidenced above, is part of a longstanding historical pattern of non-compliance with fundamental issues in the Consent Decree and Manuals. Indeed, over the past 10 years, numerous findings of the Monitor and orders of the Court have been required to address non-compliance, for many of the same fundamental issues for which there is continued non-compliance today. For example:

- March 1993: The Consent Decree was approved in January of 1991; the Manuals were approved in September of 1992. Barely six months later, budget cuts of over $8.7 million forced plaintiffs to assert non-compliance with four critical areas: social work support and staffing; firing of nurse practitioners; payments to foster parents and program enhancement. Defendants admitted that the budget cuts would force them into noncompliance, and offered a "revised hiring plan" which was promptly rejected by the Monitor as inadequate.

- June 1993: Judge Nevas issued an Order with a phased timetable for hiring additional personnel to achieve caseload compliance and compliance with the requirement that foster parents be reimbursed at 100% of the United States Department of Agriculture (USDA) standards.

- December 1993: The Monitor's Semi-Annual Status Report noted the defendants were in "non-compliance with the caseload standards of the Consent Decree."

- July 1994: The Monitor's Semi-Annual Status Report noted that "uneven caseload distribution continues to be a problem."

- October 1994: The Second Circuit affirmed Judge Nevas's December 1993 order and found that the "decree does not contemplate anything less than 100% compliance." 100% compliance has remained law of this case for the past nine years.

- February 1995: Again, the Monitor's Semi-Annual Status Report noted that "uneven caseload distribution continues to be a problem."

- June 1995: The Monitor's Semi-Annual Status Report stated: "Increased placement resources will have to be developed to meet the needs of these children in the manner specified in the Consent Decree. Emergency placement slots and additional approved and properly trained foster families are especially critical to meet DCF's responsibilities in loco parentis for these new wards of the system. At the same time, services must be available to families and children in a timely fashion to prevent out-of-home placement when possible."

- February 1996: The Monitor's Semi-Annual Status Report noted non-compliance with caseload standards.

- June 1996: Judge Nevas accepted the Monitor's report and recommendations that the Department was in non-compliance with 12 of 16 sections of the Resource Development Plan and ordered the Department to complete a Resource Development Plan according to certain timetables. The Court also reaffirmed that the mandate that 100% compliance is the governing standard in this lawsuit.

- July 1996: Judge Nevas issued a memorandum decision and order affirming the Monitor's findings in connection with the above-mentioned Resource Development Plan. The Court finds that "[DCF's] compliance with the Consent Decree has not been, and is not now, satisfactory." The Court further finds that "[t]he evidence is replete with instances of children waiting for services that the defendants are compelled, but have to date failed, to provide through the RDP... Such delay is harmful to children with special and urgent needs." (Citations omitted).

- April 1999: Judge Nevas issued an order approving and adopting the Monitor's recommendations needed to obtain the Department's compliance with foster home recruitment, SAFE Homes, DCF organization, and Placement Preservation Services.

- April 2000: The Monitor's Status Report noted "partial" compliance with the Staffing Agreements; non-compliance with MDE requirements; "major non-compliance" with implementation of the Quality Assurance Plan; non-compliance or partial compliance with mandates regarding adoption support services, LINK, the treatment planning process, and infant SAFE Homes recruitment.

- June 2000: Judge Nevas issued an order accepting and adopting the parties' new agreement regarding caseload standards as a result of plaintiffs' assertion of non-compliance concerning caseloads.

- June 2000: Judge Nevas issued another order accepting and adopting the parties' agreement regarding health screens, which addressed the defendants' non-compliance in the area of EPSDT.

- October 2000: The Monitor's Disruption Conferences Report found that disruption conferences were occurring in only 25% of the cases in which they were required.

- November 2000: The Monitor's Foster and Adoptive Services Report found that 98% of DCF foster homes did not receive the required face-to-face visits and 96.1% did not have the required telephone contacts; more than 25% of foster homes exceeded their licensed capacity; and nearly 8% of the foster homes had expired licenses.

- December 2000: The Monitor's Analysis of DCF's Compliance with the 2000-2001 Staffing Agreement found that the monthly caseload reports for individual workers were too inaccurate to allow the Monitor to reliably determine worker's caseload sizes and types.

- December 2000: Judge Nevas issued an order accepting the parties' agreement regarding asserted non-compliance concerning unlicensed and unapproved foster homes.

- December 2000: Judge Nevas issued another order regarding relative and special study foster homes, finding that the Consent Decree requires at least one social worker for every forty foster families.

- January 2001: The Probate Case Review found that in 35% of the cases, the probate report/study did not appear to be submitted within the required timeframes, and in 38% of the cases, documentation in LINK or hard copy was insufficient to determine the who/what/where/when/why of significant case decisions.

- February 2001: In denying defendants' request for a stay of his order regarding relative and special study foster homes, Judge Nevas found that "the members of the plaintiff class, as well as the public in general, would be better served if the defendants devoted their time and resources to insuring that DCF provides the services it agreed to under the Consent Decree instead of challenging its unambiguous provisions."

- February 2001: The Monitor's Time Study of Selected Social Workers found that the workers in the study were not meeting the Consent Decree's contact and

visitation standards, and that the amount of overtime these workers performed, if typical, would require many additional social workers.

- April 2001: The Monitor's Review of the Bureau of Quality Management noted that "there is a fundamental failure to integrate and utilize the data, both within the Bureau and the agency at large. Often, work is not effectively communicated, utilized or monitored to ensure informed decision making and non-duplicative efforts. Follow-up to ensure continuation of established practices is limited by lack of clarity in responsibility and authority."

- June 2001: The Monitor's report regarding children in out-of-home custody who were waiting for adoption found (1) in 24% of the cases, workers had not seen the children within the preceding 90 days; (2) 50% of the workers exceeded the caseload median standard for treatment workers; and (3) the number of placements experienced by the children since their most recent entry into DCF custody ranged from one to 10 or more.

- July 2001: As a result of plaintiffs' motion for contempt and further remedial orders in connection with the Behavioral Health Plan and the PARA Plan, Judge Nevas issued an order approving the parties' agreement of remedies to obtain compliance.

- July 2001: The Monitor's review of the ACR and TPC process revealed that the areas of practice most frequently requiring corrective actions were lack of documented social work supervisory conferences; lack of client contacts per the visitation plan; a failure to meet Consent Decree visitation standards; and a failure to document case contacts and events in LINK, including medical and legal sections.

- November 2001: After plaintiffs assertion of non-compliance concerning caseloads and a hearing by the Monitor, Judge Nevas issued an order approving the parties' visitation and contact stipulations, which sought to obtain compliance in those areas.

- January 2002: Judge Nevas issued an order approving the parties' adoption and permanency stipulation, which addressed non-compliance in those areas.

- June 2002: Judge Nevas issued an order approving the parties' Stipulation Concerning LINK Management Information Systems and Quality Assurance.

- April 2003: The Monitor's Status Report stated: "The preliminary data also indicate that the Department is falling far short of agreed upon measures with a number of key outcome measures including overcrowding in foster homes,

overstays in shelters, home studies approved within 120 days, recruitment of foster homes, multi-disciplinary exams and EPSDT screens. In addition, the preliminary case review identified a significant problem with treatment plans. . . .While some improvement has been noted, problems persist with both the completion of Treatment Plans and the Treatment Planning Conference and Administrative Case Review process as a whole."

- <u>July 2003:</u> Following a hearing before the Monitor, the Court issued an order adopting the Monitor's findings that the Defendants were in significant non-compliance with (1) caseload requirements and (2) maintenance of effort requirements for staffing.

This history of findings and further orders required to obtain defendants' compliance is instructive, given the current state of non-compliance today, often on many of the same issues. This history, and the current status of non-compliance, support the serious remedies requested below.

On behalf of the thousands of abused and neglected children that comprise the <u>Juan F.</u> Class, Plaintiffs assert that it is clear that the Defendants have been and remain unable to provide for and ensure the safety, permanency and well being of these children as mandated by law and the court-ordered Consent Decree in this case. As concluded by the Monitor in the Record Review, "[t]he modest improvements documented in [the Record Review] suggests the Defendants, Plaintiffs and the Monitor should take a different approach to the implementation of the <u>Juan F. Consent Decree</u>." Record Review at 38.

## II. REQUEST FOR RELIEF

Plaintiffs hereby assert that, as a result of defendants' substantial non-compliance with a significant number of fundamental issues of safety, well-being, or permanency under the performance standards, outcomes measures and issues addressed in the case record reviews pursuant to the Transition/Exit Plan, additional remedies after the Transition Period are required.

Accordingly, Plaintiffs request findings and recommendations from the Monitor that the Court should issue an order:

(1) Finding Defendants in contempt of court for failing to comply with a significant number of fundamental issues in the Consent Decree and Manuals, and more specifically outlined in the Transition/Exit Plan and the Modification to Exit Plan;

(2) Directing that the case shall not proceed under Section X(A) of the Transition/Exit Plan and Modification to Exit Plan and that these so-ordered agreements shall become null and void;

(3) As a remedy for Defendants' contempt, directing the imposition of a full receivership over the state's child welfare system as it pertains to the Juan F. Class, with instructions and all necessary authority to bring the Defendants into 100% compliance with (a) the Final Outcome and Performance Measures as defined in the Transition/Exit Plan and Modification to Exit Plan, including the renegotiation of final outcome measures in the area of permanency planning and adoption, and (b) the Court's order of July 29, 2003. The Receivership shall continue until such time as the Receiver is able to bring Defendants into full compliance with (a) the Final Outcome and Performance Measures (and the additional measures on permanency planning and adoption), and (b) the Court's order of July 29, 2003, after which time the Receivership shall be vacated and the parties shall make a good faith effort to negotiate a new plan for the eventual exit from court jurisdiction over the Consent Decree. The Court will direct further proceedings and issue further orders concerning the selection of the Receiver and the implementation of the Receivership.

(4) As an alternative remedy for Defendants' contempt, directing the imposition of fines as follows: after 3 months, during which there shall be no fines imposed, Defendants shall be imposed a fine of $25,000 for every week that they fail to achieve full compliance with the Final Outcome and Performance Measures. The Monitor shall determine the means of measuring compliance. The fines imposed shall be directed into an account for the sole purpose of establishing a "Children's Extras Fund," which shall provide uncovered costs to enhance the quality of life of foster children.

\* \* \*

If you have any questions or concerns, please do not hesitate to contact us.

Sincerely,

Marcia Robinson Lowry
Ira P. Lustbader
Erik S. Pitchal
CHILDREN'S RIGHTS, INC.

Martha Stone
CENTER FOR CHILDREN'S ADVOCACY

Attorneys for Plaintiffs

cc: Ann H. Rubin, Esq.