**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION**

OLIVIA Y., et al.                                                                            PLAINTIFFS


v.                                                                        CIVIL ACTION NO. 3:04CV251LN


HALEY BARBOUR, as Governor of the State of Mississippi, et al.            DEFENDANTS

<u>**DECLARATION OF SHIRIM NOTHENBERG**</u>

1. I, Shirim Nothenberg, am a member of the Bar of New York and admitted to practice in
   this Court *pro hac vice*.  I am a staff attorney at Children's Rights, and serve as co-
   counsel for the Plaintiff Class in this case, along with W. Wayne Drinkwater, of Bradley
   Arant Boult Cummings LLP; John Lang, Attorney at Law; John Piskora and Chris
   Carbone, of Loeb & Loeb, LLP; and other attorneys at Children's Rights.  Together we
   have represented the Plaintiff Children in the above-captioned class action litigation since
   the filing of the Complaint in 2004.

2. Two and one-half years after Defendants entered into a wide-ranging court-ordered
   agreement to reform Mississippi's constitutionally deficient and harmful foster care
   system, Defendants have reneged on virtually all of their commitments to Plaintiff
   Children. The State has repeatedly demonstrated that it is both unwilling and incapable of
   protecting children by doing what is required to meet its court-ordered obligations.  With
   more than half of the reform period squandered, a finding of contempt and the
   appointment by this Court of a receiver is the only reasonable and appropriate means of

providing Plaintiffs with the protection to which the State agreed, and to which they deserve.

3. Plaintiffs in this action are a class of all children who are or will be in the legal and/or physical custody of the Mississippi Division of Family and Children's Services ("DFCS"), the state's child welfare agency.  Plaintiff Children brought this class action suit in 2004 alleging that Defendants were operating a foster care system in crisis that was harming the very children it was meant to protect because of a chronic lack of staffing, training, resources, and accountability.

4. In January 2008, the Parties entered into a Settlement Agreement ("Settlement Agreement"), a copy of which is attached to Plaintiffs' Memorandum Of Law In Support Of Their Motion For Contempt And For The Appointment Of A Receiver ("Pls.' Mem.") as Exhibit F, that requires DFCS to ensure that foster children are protected from further maltreatment once in DFCS custody; are provided necessary medical, dental, and mental health care; are no longer shuffled among multiple homes and facilities; and are placed in permanent homes without delay.  (*Id.* §§ II.B.3, II.B.4, II.B.7.)

5. The Settlement Agreement also requires DFCS to meet professional standards by providing specified, manageable caseloads for DFCS caseworkers, frequent caseworker visits to foster children, and continuous oversight of its programs.  (*Id.* §§ II.A.2, II.A.3, II.B.10.)  In addition, the Settlement Agreement requires Defendants to contract with a fiscal expert to maximize their federal child welfare funds, and to be accredited by the Council on Accreditation ("COA"), an independent national organization that establishes accreditation standards for the provision of child welfare services.  (*Id.* §§ II.A.7, IV.)

6.  As required under the Settlement Agreement, for the last two years the Parties have entered into Annual Implementation Plans that set forth more concrete and specific obligations necessary to implement reform.  (Period 1 Annual Implementation Plan ("Period One IP") (attached to Pls.' Mem. as Exhibit G); Period 2 Annual Implementation Plan ("Period Two IP") (attached to Pls.' Mem. as Exhibit H.))

7.  The focus of the first implementation plan was on significantly strengthening the management of DFCS and building a basic child welfare infrastructure, including a training unit, a quality assurance program, and an improved child welfare computer system.  The Period One IP also required Defendants to assess available foster care resources, child welfare case practice, and DFCS administration, and to develop remedial plans to address the deficiencies identified in those assessments.  (Pls.' Mem. Ex. G [Period One IP].)

8.  In the Court Monitor's Report to the Court Regarding Defendants' Progress Toward Meeting Period 1 Requirements ("Period One Monitoring Report," attached to Pls.' Mem. as Exhibit D), issued on June 5, 2009, the Monitor found Defendants significantly out of compliance with the requirements of the Period One IP.  According to the Monitor, "at least in part because of the delay in establishing the DFCS executive management team, most of the Period 1 capacity-building and assessment requirements were not completed." (The Court Monitor's Report to the Court Regarding Defendants' Progress Toward Meeting Period 2 Requirements ("Period Two Monitoring Rpt") at 5 (attached to Pls.' Mem. as Exhibit C); *see also* Pls.' Mem. Ex. D [Period One Monitoring Rpt] at 4.) For example, Defendants failed to conduct any of the required needs assessments or to

plan how to address any deficiencies. (Pls.' Mem. Ex. D [Period One Monitoring Rpt]
13, 16-17, 35-37, 65, 86.)

9.   Although Defendants' lack of progress was substantial, because Defendants had begun
to take the steps to restructure the management of the agency and to increase staffing as
was necessary to support the reform efforts, Plaintiffs agreed to enter into a Period Two
IP. Given Defendants' failures during Period One, the Period Two Plan incorporated the
vast majority of the Period One IP requirements necessary to build a basic child welfare
infrastructure. (*Compare* Pls.' Mem. Ex. G [Period One IP] *with* Pls.' Mem. Ex. H
[Period Two IP].)

10.  At the beginning of Period Two, Defendants contracted with the child welfare experts at
The Center for the Support of Families ("CSF"), which conducted the required needs
assessments and developed a Child Welfare Practice Model that lays out both the
framework and specific action steps necessary to improve DFCS case practice in order to
bring the agency into compliance with the mandates of the Settlement Agreement. (*See*
Mississippi Child Welfare Practice Model Final Report ("Practice Model"), September
25, 2009 (attached as Exhibit 1).)

11.  The Monitor has deemed the practice model "the first credible plan of action for
improving the quality and consistency of case practice." (Pls.' Mem. Ex. C [Period 2
Monitoring Rpt] at 9.) The practice model is not scheduled to be fully implemented
within the five-year timeframe established by the Settlement Agreement. (*Id.* at 8-9.)

12. On April 9, 2010, pursuant to section VII.B of the Settlement Agreement, Plaintiffs
provided Defendants written notice of their noncompliance with the Settlement
Agreement and the Period Two IP based on the Monitor's preliminary findings regarding

widespread noncompliance during Period Two.  Letter from Marcia Lowry, Exec.

Director, Children's Rights, to Rusty Fortenberry, Lead Counsel for Defendants (April 9,

2010) (a true and correct copy is attached as Exhibit 2).

13. The Parties negotiated a short-term corrective action plan, approved by this Court in June

2010, that covered a four-month period from May 1, 2010 to September 1, 2010.

(Agreed Order ("Bridge Plan"), Docket No. 501 (attached to Pls.' Mem. as Exhibit I).)

14.  The Bridge Plan provides that "[n]othing in this Order shall be construed to preclude

Plaintiffs from seeking judicial relief for any violation of the Period 2 Annual

Implementation Plan or the Period 2 requirements of the Settlement Agreement and

Reform Plan at any time following the conclusion of the Bridge Period or following the

initiation of an enforcement action by Plaintiffs pursuant to paragraph 10 of this Order."

(Pls.' Mem. Ex. I [Bridge Plan] § 11).

15. I along with co-counsel have undertaken extensive efforts on behalf of Plaintiffs to work

with Defendants to resolve the important, systemic issues plaguing the State's child

welfare system, but our efforts have failed. (*See generally* ¶¶ 124 - 137, *infra.*)

**Plaintiffs Established During Litigation That DFCS Deficiencies Caused Children Harm**

16. During the course of litigation, Plaintiffs established that Defendants had failed to meet

their basic constitutional duty to protect children in their custody from harm.  Plaintiffs'

uncontested expert review of a representative sample of Mississippi foster children's case

records, conducted by Plaintiffs' social work expert Dr. Peg Hess, confirmed the

allegation that Plaintiff Children were subjected to a high rate of maltreatment in care.

Dr. Hess found that:

- 4.9% of foster children – more than **nine times** the national standard – were the victims of substantiated abuse or neglect while in DFCS custody;

- one in four children (24%) had some DFCS documentation that they or another foster child in their placement were being abused or neglected, but many of those indications of maltreatment were never investigated; and

- even when maltreatment of foster children was substantiated, DFCS left the children in the abusive placement a majority of the time.

(Pls.' Mem. of Law in Support of Mot. For Summ. J. on Liability ("Pls.' Mem. for Summ. J.") Ex. 4, Hess Expert Rpt, at 1-2.)

17. Plaintiffs' evidence confirmed that DFCS subjected foster children to multiple placement moves and inappropriate places to live. Dr. Hess' unrebutted case record review found that 82.7% of children were moved at least once from their original placement and up to 57 times, that 11.3% were moved ten or more times, and that almost two out of three (63.8%) children in MDHS custody were placed at least once in an emergency shelter or emergency foster home since their most recent entry into foster care. (*Id.* at 2.)

18. Dr. Hess also confirmed that DFCS failed to deliver basic medical, dental, and psychological care to children. Dr. Hess found in her review of a representative sample of Mississippi foster children's case records that:

- 84.1% of children were not provided a physical examination at the time of placement as required by DFCS to assess their health needs;

- 42.2% of the children ages 3 and older had not been provided even one dental examination during the two year period reviewed;

- 57.7% of foster children ages 4 and up were not provided a psychological assessment within 90 days of entering custody as required by DFCS; and

- for 50% of the children whose case files documented the identification of a mental illness or developmental disorder for which further assessment was recommended by a mental health provider, DFCS failed to provide any further assessment.

(*Id.* at 3-4.)

19. Plaintiffs' evidence further demonstrated that DFCS did not timely move children out of state custody.  Instead, foster children were left in state custody rather than either being returned to their homes where, with the provision of adequate reunification services, such a return would be safe and appropriate, or being placed in an appropriate adoptive home. According to Dr. Hess' case record review, one in five children (20.9%) had spent half or more of their lives in DFCS custody.  (*Id.* at 5.)

**Plaintiffs Established During The Litigation That Defendants Knowingly Maintained A Chronically Understaffed Foster Care System**

20. Defendants and their expert confirmed that DFCS was under-staffed at all levels and that "[m]any caseworkers carry workloads which are at least double the average number they can manage . . . ." (*Id.* Ex. 1 [Steib Expert Rpt] at i.)  Defendants' own expert found that DFCS caseworkers carried average caseloads of 44 cases, even though she concluded that a reasonable caseload would be 14.  (*Id.* at 3, 25-26.)  Their expert found that DFCS's excessive caseloads posed a risk to children's wellbeing, including the risk that if a caseworker were not able to see a child regularly, the caseworker might not know if the child were in trouble or in danger. (*Id.* Ex. 27 [Steib Dep.] at 102:4-103:16.)  These caseloads existed although Defendants characterized caseloads of 40 or higher as "BEYOND DANGER!"  (*Id.* Ex. 12 [DFCS Workload Information ("'BEYOND DANGER!' chart")] at DHS 020088.)

**Defendants Have Violated And Continue To Violate The Staffing Provisions Of The Settlement Agreement And The Period Two Implementation Plan**

21. The Settlement Agreement requires DFCS to implement specific limits on the number of children's cases for which individual caseworkers may be responsible and prohibits

Defendants from hiring caseworkers or supervisors who fail to meet minimum professional qualifications.  (Pls.' Mem. Ex. F [Settlement Agreement] §§ II.A.2.a, II.A.2.b.)

22. The Period One Implementation Plan required Defendants to undertake a workforce assessment and implement a written workforce plan that identified the strategies, timeframes, and recruitment resources to be allocated to ensure that there are sufficient DFCS professional and support staff to achieve compliance with the caseload requirements specified in the Settlement Agreement.  (*Id.* Ex. G [Period One IP] § I.2.a.)

23. Also pursuant to the Period One Implementation Plan, Defendants were to design and begin to implement a plan with specific timeframes and action steps for bringing current staff into compliance with the worker and supervisor qualifications of the Settlement Agreement.  (*Id.* § I.2.b.)

24. During Period One, the Monitor found that Defendants had failed to complete the workforce assessment that was the prerequisite to formulating the required workforce plan, and consequently the workforce plan had not been developed.  (*Id.* Ex. D [Period One Monitoring Rpt] at 35-36.)  The Monitor identified several issues that Defendants needed to resolve to comply with the workload requirements, including developing the capacity to track and report accurately on all personnel actions and on caseworker and supervisory workloads.  (*Id.* at 36.)

25.  In Period One the Monitor found that Defendants had also failed to develop a plan to bring DFCS staff into compliance with the staff qualification requirements of the Settlement Agreement.  (*Id.* at 36-37.)  These requirements were therefore made a part of the Period Two IP.  (*Id.* Ex. H [Period Two IP] § I.2.c.)

26. At the close of the second year of the reform process, although Defendants hired a number of caseworkers, they yet again failed to meet the staffing requirements set forth in the Settlement Agreement required to ensure a sufficient number of trained caseworkers.  According to the Monitor's analysis, on average, DFCS county offices have an average caseworker vacancy rate of 17%.  (*Id.* Ex. C [Period Two Monitoring Rpt] at 24.)  Further, "there is evidence of continued critical staffing shortages in some counties, particularly counties with a high number of children in DFCS custody." (*Id.* at 18.)

27.  The Monitor stated, "[h]istorically . . . an insufficient number of caseworkers and supervisors has contributed to high caseloads, fueling attrition levels and creating formidable recruitment challenges.  This has had a critical impact on the ability to serve class members adequately." (*Id.* at 19.)

28. The Monitor further found that Defendants had failed during Period Two to correct basic problems in the collection, recording, and analysis of caseload data that she had identified in her Period One report as necessary to address in order to accurately assess Defendants' compliance with Settlement Agreement obligations.  (*Id.*)

29. Defendants submitted a workforce plan during Period Two after the plan was due. According to the Monitor, the workforce plan submitted was not viable nor realistic as it lacked any concrete action steps and "appear[ed] to rely on stale information related to recruitment and retention of caseworkers and [wa]s silent with respect to supervisory and support staff." (*Id.* at 26.)  The Monitor found "of equal concern" that the draft workforce plan submitted by Defendants "ignore[d] the fact that DFCS does not have the infrastructure to achieve a net gain of 150 new professional staff" needed to fill existing

caseworker and supervisory vacancies.  (*Id.* at 27.)  "A viable recruitment and retention

plan would identify and consider the infrastructure limitations and present realistic hiring

goals that are correlated to and informed by an infrastructure development strategy."

(*Id.*)

30.  Defendants also failed to develop an adequate plan for bringing workers and supervisors

into compliance with the qualification requirements of the Settlement Agreement during

Period Two.  (*Id.* at 28-29.)  This plan was initially required to be completed in Period

One.  (*Id.* Ex. G [Period One IP] § I.2.b.)

31.  According to Monitor, the plan for bringing workers and supervisors into compliance

with the qualification requirements of the Settlement Agreement lacked any of the

required specificity or action steps, and included topics that simply did not address

qualification requirements.  (*Id.* Ex. C [Period Two Monitoring Rpt] at 29.)

**Plaintiffs Established During The Litigation That Defendants Failed To Provide
DFCS Staff With Adequate Training, Supervision, And Supplies Necessary To Keep
Plaintiff Children Safe**

32.  Plaintiffs alleged in their complaint that in addition to a severe lack of caseworkers, foster

children were also being harmed by DFCS's failure to provide adequate training and the

basic equipment necessary for caseworkers to perform their jobs.  (Am. Compl., Docket

No. 25, ¶¶ 162, 182, 183.)

33.  Defendants conceded that DFCS caseworkers were sent out into the field to work with

children before undergoing any DFCS child welfare training, a fact corroborated by

Defendants' expert, who concluded that "[t]raining resources are so limited that new

caseworkers are often on the job for weeks or months before they are able to attend

training." (Pls.' Mem. for Summ. J. Ex. 38 [Taylor Dep.] at 124:6-16; *id.* Ex. 1 [Steib Expert Rpt] at ii.)

34.  According to their own expert, Defendants also failed to establish a pre-service training curriculum for new caseworkers or any specific required in-service training for caseworkers. (*Id.* Ex. 27 [Steib Dep.] at 158:11-159:1, 140:4-18.)  The training materials that existed included citations to outdated literature and research and were so ill-presented that they were incomprehensible to the person relied upon by Defendants' expert to review the materials. (*Id.* at 142:23-143:7, 140:19-141:20.)

35.  Plaintiffs established that untrained caseworkers did not have the resources to guide them when providing child welfare services, as the DFCS policy and procedures manual was outdated, and that caseworkers lacked the basic equipment, such as access to basic computer services or cell phones, necessary to adequately serve children. (*Id.* Ex. 6 [Crabtree Expert Rpt] at 32.)

**Defendants Have Violated And Continue To Violate The Staff Training, Supervision, And Resource Provisions Of The Settlement Agreement And The Period Two Implementation Plan**

36. During Period One, Defendants were required to establish and maintain an adequately staffed training unit and ensure that caseworkers underwent required pre-service training prior to assuming case responsibilities. (Pls.' Mem. Ex. F [Settlement Agreement] §§ II.A.2.c.4-6.) Defendants were also required to implement an ongoing in-service training program for existing caseworkers. (*Id.*)  Defendants failed to meet these requirements in the first period, and so were required to meet them in Period Two, but again failed. (*Id.* Ex. D [Period One Monitoring Rpt] at 39-45; *id.* Ex. H [Period Two IP] § I.2.d; *id.* Ex. C [Period Two Monitoring Rpt] at 38-49.)

37. According to the Monitor, "[t]he viability of a training program is contingent on several factors, including skilled leadership, experienced trainers, a comprehensive curriculum, . . . instructional supplies and equipment, and the tools to track and monitor employee participation . . . ." (*Id.* Ex. C [Period Two Monitoring Rpt] at 30-31; *see also id.* Ex. D [Period One Monitoring Rpt] at 39.)

38. The Monitor found that "the Training Unit was understaffed during Period 1 and remained understaffed during Period 2, without the other resources necessary to deliver the comprehensive training required by the Settlement Agreement." (*Id.* Ex. C [Period Two Monitoring Rpt] at 31.)

39. Although Defendants anticipated hiring 13 additional training staff during Period Two, no such hiring took place:

> The pre-service training capacity of the Training Unit was not augmented by either hiring staff to fill these additional positions, or supplementing in-house training capacity by other means, despite the high number of caseworkers and supervisors who were hired during Period 2. . . . In addition to being understaffed, shortages of basic supplies and equipment exacerbated the challenges that confronted the Training Unit during Period 2. The impact of these deficiencies was exacerbated by the increased demands placed on the Training Unit by virtue of the fact that at least 15 percent of the total DFCS staff employed as of May 31, 2010 were hired during period 2 [and 66% of caseworkers have been hired since the end of 2007.]

(*Id.* at 31-32.)

40. The Monitor found that Defendants require new caseworkers with little to no training to make critical and life-altering decisions, such as whether to confirm that a child has been maltreated or whether a foster home is safe, without the requisite knowledge, skills or experience. (*Id.* at 43-44.)

41. In one instance, a caseworker was hired in January 2009, was assigned a caseload in March of 2009, but did not undergo pre-service training for 14 months after being hired. (*Id.* at 49.)

42. The practice of assigning new caseworkers caseloads without appropriate training was well known to DFCS managers during Period Two. (*Id.* at 43 n.150.) The Monitor found:

> It appears that several factors contributed to caseworkers being assigned to undertake case-related responsibilities for which they were unqualified prior to completing pre-services training during Period 2, including: the absence of clear policy guidance; the failure to implement the [on the job training] component of the [] training curriculum in all regions; substantial delays between the date newly-hired caseworkers began working at DFCS and the date they completed the pre-service training; and the critical shortage of caseworkers in some county offices.

(*Id.* at 44-45.)

43. The Monitor found that Defendants' training records are "incomplete" and "inconsistently maintained." (*Id.* at 48.)

44. Defendants have not developed or implemented a finalized policy requiring the in-service training as mandated by the Settlement Agreement and the Period Two IP. (*Id.* 36, 38-39.) The Monitor found that the in-service courses that DFCS does provide represent a "fractured approach to staff development." (*Id.* at 38.)

45. During Period Two Defendants violated the explicit prohibition established by the Settlement Agreement of pulling supervisors out of the field to provide training. (*Id.* Ex. F [Settlement Agreement] § II.A.2.c.4; *id.* Ex. H [Period Two IP] § I.2.d.3.) As reported by the Monitor, during Period Two eight supervisors and three family protection staff, who are responsible for investigating allegations of foster child maltreatment, were

assigned to provide a two-week training, while also maintaining responsibility for their caseload.  (*Id.* Ex. C [Period Two Monitoring Rpt] at 34-35.)  "Several staff members reported difficulty juggling their regular job responsibilities with the training assignment."  (*Id.* at 35.)  This practice is inconsistent with the explicit requirements of the Settlement Agreement which contemplates that in-service training will be delivered by qualified trainers dedicated to the Training Unit.  (*Id.* at 34-35; *id.* at Ex. F [Settlement Agreement] § II.A.2.c.4.)

46. Defendants were required to comprehensively review and revise their policies and procedures by the end of Period One to reflect the foster care service standards established by the Council on Accreditation and the Settlement Agreement.  (*Id.* Ex. G [Period One IP] § I.)  "Because the [D]efendants did not complete the comprehensive review and revisions to DFCS policies and practice guides during Period 1, this requirement was included in the Period 2 IP"  (*Id.* Ex. C [Period Two Monitoring Rpt] at 71; *id.* Ex. H [Period Two IP] § II.1.)  The Monitor found that Defendants did little towards accomplishing this requirement in Period Two.  (*Id.* Ex. C [Period Two Monitoring Rpt] at 70-71.)

47. Defendants have recently proposed that they will complete the revision to the Policy Manual by May 1, 2011, at nearly the end of the contemplated five-year reform effort. (Policy Manual Plan, a true and correct copy attached as Exhibit 8.)

48.  Defendants were required under Period Two to provide caseworkers and supervisors with access to basic computer services, including consistent access to the Mississippi Automated Child Welfare Information System ("MACWIS"), the child welfare database on which Defendants rely for virtually all documentation and data tracking, such as each

child's placement, case records, medical information, and prior reports of maltreatment. (Pls.' Mem. Ex. H [Period Two IP] § I.5.a.)  The Monitor found that Defendants did not meet this requirement due to faulty management decisions such as a failure to procure a sufficient number of software licenses.  (*Id.* Ex. C [Period Two Monitoring Rpt] at 60-63.)

49. According to the Monitor, "the login and connectivity problems experienced by DFCS staff have been long standing and persistent throughout Period 2.  These deficits impact the ability of caseworkers and supervisors to maintain accurate case records. . . .  DFCS staff must have the basic tools necessary to perform their duties in a manner that is contemplated by the Settlement Agreement." (*Id.* at 63-64.)

50. The Monitor also reported that following the conclusion of Period Two, "some DFCS staff have reported shortages in necessary supplies and equipment such as printers and cameras."  (*Id.* at 64 n.221.)  Caseworkers in some counties share cramped trailers that do not meet minimum professional standards.  (*Id.*)  Such conditions preclude confidential conversations, and DFCS has not acquired enough telephone lines to support the number of DFCS staff who work in trailers.  (*Id.*)

**Plaintiffs Established During Litigation That Defendants Failed To Develop A Sufficient Number And Array Of Foster Care Placements And To Develop Adequate Placement Practices To Meet The Known Needs Of Plaintiff Foster Children**

51. In their complaint Plaintiffs alleged that they were subjected to multiple placements, often in unsafe homes and/or inappropriate institutions, because Defendants failed to develop and maintain an adequate range of placement settings to serve the individual needs of foster children.  (Am. Compl. ¶¶ 143-56, 166-69.)

52. Defendants admitted that they lacked a sufficient number and variety of qualified foster placements, which resulted in DFCS placing children in institutions such as emergency shelters and precluded caseworkers from being able to match children with placements that addressed the children's individual needs. (Pls.' Mem. for Summ. J. Ex. 1 [Steib Expert Rpt] at ii; *id.* Ex. 41 [Rogers Dep.] at 190:23-191:4; *id.* Ex. 27 [Steib Dep.] at 103:24-104:3.)

53. Plaintiffs established during litigation that as a result of a lack of sufficient foster homes, DFCS placed children who would have been better served in family homes in overly restrictive institutional placements, at significant additional cost to the state. (*Id.* Ex. 6 [Crabtree Expert Rpt] at 44; *id.* Ex. 4 [Hess Expert Rpt] at 24.)

54. Plaintiffs established that Defendants over-utilized emergency shelter placements, including for very young children, and that children remained in such short-term institutional placements for long stretches of time. (*Id.* Ex. 6 [Crabtree Expert Rpt] at 44-45.)

55. Plaintiffs established during litigation that the lack of an adequate array of available foster placements also resulted in DFCS routinely placing children in overcrowded foster homes and facilities, and in homes and facilities that had not been screened or licensed. (*Id.* at 46-48; *id.* Ex. 4 [Hess Expert Rpt] at 81-82.)

**Defendants Have Violated And Continue To Violate The Placement Provisions Of The Settlement Agreement And The Period Two Implementation Plan**

56. The Period One Implementation Plan required DFCS to undertake an assessment of available foster care placement resources and to develop and begin implementing a written plan for the targeted recruitment and development of a range of family and facility placements that were identified by the assessment as needed to adequately meet

16

the placement needs of the foster care population.  (Pls.' Mem. Ex. G [Period One IP] §

II.13.)  The Period One IP also required DFCS to develop and begin implementing a plan

to ensure the speedy licensing of all unlicensed caregivers.  (*Id.* § II.5.)

57.  Defendants failed in Period One and again in Period Two to develop and begin

implementing written plans for both the recruitment of more foster homes and for the

speedy licensing of currently unlicensed caregivers.  (*Id.* Ex. C [Period Two Monitoring

Rpt] at 116, 131.)

58. The Settlement Agreement also required that during Period One Defendants engage an

independent consultant to assess the basic monthly foster care board rates paid by the

State to foster parents caring for special needs children and to congregate care facilities to

determine the extent to which those rates covered the actual cost of care.  (*Id.* Ex. F

[Settlement Agreement] § II.B.13.g.)

59. The Settlement Agreement requires that foster children be placed in homes that meet

DFCS licensing requirements and are suited to the child's individual needs; that a child

only be moved from a foster placement when justified; and that foster homes be limited

in the number of foster children for whom they care.  (*Id.* §§ II.B.5.a-n.)  Limits also

apply on placing foster children for extended periods in short-term emergency

placements and on placing children under 10 years of age in congregate care settings.

(*Id.* §§ II.B.5.k-m.)  As regular and direct contact with foster children is a necessary

prerequisite for ensuring that their needs and welfare are addressed, the Agreement

requires DFCS caseworkers to make twice-monthly face-to-face visits with foster

children.  (*Id.* § II.B.10.a.)

60. During the first year of the reform effort, DFCS did not undertake the required

assessment of the array of available foster care placements.  (*Id.* Ex. D [Period One

Monitoring Rpt] at 59-60.)  That requirement therefore became a part of the Period Two

IP.  (*Id.* Ex. H [Period Two IP] § II.2.g.)  During Period Two, DFCS entered into a

contract with The Center for the Support of Families to undertake all of the Foster Care

Service Assessments required by the Period Two IP. Among the CSF findings were that:

- "[T]here are an inadequate number of placement options for children entering foster care. . . .  The river counties in the southwest (Region V West) have the largest dearth of resource homes with 4 1/2 times more children than homes, and it also has the smallest number of pending applications (one.)"

- "[T]here has also been a shortage of resource staff in some areas and [foster home] applications are backed-up, as many as 150 in one county according to some comments."

- The "number of pending [foster home] applicants [in Region VII] is actually larger than the number of licensed families."

- "Several instances were cited about applicants for resource homes being rejected by [DFCS], only later to be approved as a therapeutic foster home with another agency."

- "The current process for securing a therapeutic placement is time-consuming, ineffective, and does not ensure appropriateness of service."

- "Compliance with policy regarding the placement of children seems very inconsistent."

- "At least some resource parents experience difficulty in getting the necessary medical background information on children placed in their homes, and are unaware of the medical needs of the children at the time of placement."

- "[W]hen a child comes in to [sic] care, the worker calls licensed resource homes in the county until a vacancy is located, and that a vacancy may not correspond to the needs of the child or license limitations regarding age or sex of children desired."

The Center for the Support of Families, Mississippi Foster Care Services Assessment, dated October 13, 2009 ("CSF Assessment") at 9, 13-14, 94, 96-97, 107-08 (a true and correct copy attached as Exhibit 3).

61. While Defendants met the obligation to increase the basic rate paid to foster parents, they failed to adequately undertake an assessment of rates paid to congregate care providers and those caring for children with special needs during both Periods One and Two. (Pls.' Mem. Ex. D [Period One Monitoring Rpt] at 88-89; *id.* Ex. C [Period Two Monitoring Rpt] at 128-31.)

62. During Period Two Defendants also failed to meet the following obligations intended to assist in the retention of foster parents: implement a formalized protocol to provide foster parents with appropriate and available foster child information; develop a written plan to provide services for foster parents to prevent and reduce stress and family crisis; work with foster parents to identify additions and revisions to the foster parent curriculum necessary to adequately prepare foster parents; create a resource family workgroup to develop and implement resource family practices and protocols; and regionalize recruitment and retention efforts. (*Id.* Ex. H [Period Two IP] §§ II.7.j, II.14.c-f; *id.* Ex. C [Period Two Monitoring Rpt] at 117, 131-32.)

63. During Period Two Defendants also failed to develop and begin implementing a plan to address policy and structural changes to the placement process required to bring the process into conformance with Settlement Agreement standards. (*Id.* Ex. H [Period Two IP] § II.7.e; *id.* Ex. C [Period Two Monitoring Rpt] at 117.)

64. Defendants were unable to produce data related to the requirement that all foster care settings be screened prior to the initial placement of foster children; that children not

spend more than 45 days in an emergency or temporary facility; or that children be visited by their caseworker twice a month.  (*Id.* Ex. H [Period Two IP] § II.7.a, II.7.f; *id.* Ex. F [Settlement Agreement] § II.B.10.a*; id.* Ex. C [Period Two Monitoring Rpt] at 115, 117.)

65. According to the data produced by Defendants pursuant to the Bridge Plan, Defendants continue to place children in unsuitable situations.  In a one-month period ending on August 23, 2010, close to 16% of foster children were living in a congregate setting and 12% were residing in placements that DFCS had never licensed.  (Dobies Aff. Ex. 2 [Bridge Plan Data Chart].)  During that same 30-day period, close to 400 children had two or more shelter placements and almost 750 children – over 20 percent of the population of children in foster care – had experienced an average of five or more placement moves during their time in DFCS custody.  (*Id.*)

**Plaintiffs Established During Litigation That Defendants Failed To Provide Plaintiff Children With Necessary Health Services**

66. Plaintiffs established during the pre-judgment phase of this case that DFCS failed to deliver basic medical, dental, and psychological care to children.  (Pls.' Mem. for Summ. J. Ex. 4 [Hess Expert Report] at 3-4.)  The undisputed evidence further established that Defendants knowingly failed to develop or make available a sufficient array of mental health services to meet the needs of the foster children.  (*Id.*)

67. Defendants admitted that DFCS could not adequately assess the mental health needs of the children in its custody, and Defendants' expert, Dr. Steib, confirmed that some staff "did not believe that they had access to all the mental health services that they needed." (*Id.* Ex. 28, Felder Dep., at 196:25-197:3; *Id.* Ex. 27, Steib Dep., at 66:19-23.)

**Defendants Have Violated And Continue To Violate The Requirements Of The Settlement Agreement And The Period Two Implementation Plan Regarding Health Services**

68. During Period One Defendants were required to assess the medical, dental, and mental health service needs of the foster care population and to develop and implement plans to address service gaps.  (Pls.' Mem. Ex. G [Period One IP] § II.f.) Having failed to meet this requirement in Period One, the assessment was again required pursuant to the Period Two IP.  (*Id.* Ex. H [Period Two IP § II.2.b.)

69.  CSF undertook this assessment during Period Two.  Among CSF's findings were:

- Caseworkers are conducting mental health screens.  This directly violates the Settlement Agreement, which mandates that the mental health assessments be undertaken by a qualified professional.

- There are not enough mental health providers across the state. Obtaining psychological evaluations is particularly difficult, and mental health screenings of children are either not consistently conducted or poorly documented.  It is often more expeditious to obtain a psychological examination by placing a child in an acute psychiatric institution such as a psychiatric hospital rather than waiting to obtain services through a local mental health clinic.

- There are not enough dentists willing to accept Medicaid across the state, which limits dental care provided to foster children.  Dental screenings are either not consistently conducted or poorly documented.

- Physical health screenings are not consistently provided.

(Ex. 3 [CSF Assessment] at 45, 64, 66, 68-69.)

70. Defendants failed to meet their obligation to draft and implement plans to address the deficiencies identified by CSF during Period Two.  (Pls.' Mem. Ex. C [Period Two Monitoring Rpt] at 72-74.)

71. The Settlement Agreement provides that all children entering custody shall receive a health screening evaluation within 72 hours after placement and a comprehensive medical examination within 30 days.  (*Id.* Ex. F [Settlement Agreement] §§ II.B.7.a,

21

II.B.7.b.)  DFCS must ensure periodic dental exams are provided to foster children three years old and older and that all foster children four years old and older receive a mental health assessment.  (*Id.* §§ II.B.7.e, II.B.7.f.)  In addition, foster parents are to be provided with a foster child's current medical and psychological information.  (*Id.* § II.B.5.g.)

72. Defendants did not produce any validated data related to compliance with the health services requirements of the Settlement Agreement and Implementation Plans during Period Two.  (Pls.' Mem. Ex. C [Period Two Monitoring Rpt] at 119-21.)

73. Both CSF and the Monitor found that foster children continue to be deprived of necessary and timely medical services because Defendants fail to provide their caretakers with a Medicaid card. (*Id.* at 115; Ex. 3 [CSF Assessment] at 69.)

74. CSF and the Monitor also found that children lack access to needed community-based mental health services. (Pls.' Mem. Ex. C [Period Two Monitoring Rpt] at 73-74; Ex. 3 [CSF Assessment] at 68.)  Defendants discontinued contracts providing community-based mental health and support services to some foster children in November 2009. (Letter from Don Thompson, Executive Director, MDHS, to service provider (a true and correct copy attached as Exhibit 4).)

75. *J.B. v. Barbour*, No: 3:10-153 (S.D. Miss.), was brought against the Governor and various state officials in March 2010, alleging that there are insufficient community based mental health services and that this deficiency is harming Mississippi children, including foster children.

**Plaintiffs Established During Litigation That Defendants Failed To Timely Move Children Into Safe And Permanent Homes**

76. In their complaint Plaintiffs alleged that Defendants failed to provide Plaintiffs with timely permanency services, including freeing children for adoption and recruiting adoptive homes.  Plaintiffs further alleged that this failure resulted in children remaining in foster care unnecessarily for years, with far too many children aging out of foster care without ever having a permanent home.  (Am. Compl. ¶¶ 171-77.)

77.  During the litigation Plaintiff Children established that DFCS failed to timely provide children and their parents with Individual Service Plans ("ISPs"), which are the basic tool for providing permanency planning services, failed to update ISPs to reflect a child's change in circumstances, and failed to provide children and parents with reunification services, including face-to-face contact with the assigned DFCS caseworker necessary to safely return children to their biological families.  (Pls.' Mem. for Summ. J. Ex. 4 [Hess Expert Rpt] at 119-29; *id.* Ex. 6 [Crabtree Expert Rpt] at 75-79.)

78. Plaintiff foster children similarly established that children with a goal of adoption unnecessarily languished in foster care because DFCS failed to timely free foster children for adoption, identify adoptive placements, or finalize adoptions.  (*Id.* Ex. 4 [Hess Expert Rpt] at 131-142; *id.* Ex. 6 [Crabtree Expert Rpt] at 83-86.)

**Defendants Have Violated And Continue To Violate The Permanency Planning Provisions Of The Settlement Agreement And The Period Two Implementation Plan**

79. Among the initial assessments required during Period One, Defendants were required to undertake an evaluation of their practices and services provided to timely and safely return children to their families ("Reunification Needs Assessment") and to evaluate their practice of identifying children who cannot be safely returned to their families and should

be freed for adoption ("Termination of Parental Rights Assessment").  (Pls.' Mem. Ex. G [Period One IP] §§ II.a, b.)  Defendants were also required to undertake an assessment of the Independent Living services provided to youth who age out of foster care without a permanent home.  (*Id.* § II.g.)

80. After those assessments were completed, Defendants were required in Period Two to develop implementation plans for addressing deficiencies in permanency services identified by the assessments and to augment their adoption processes and resources.  (*Id.* Ex. H [Period Two IP] §§ II.5.c.1, II.5.e, II.12.a.)

81. Defendants did not conduct these assessments during Period One.  (*Id.* Ex. D [Period One Monitoring Rpt] at 59-60.)  During Period Two, Defendants engaged CSF to undertake the required assessments.  A true and correct copy of the Reunification Services Assessment and Independent Living Services Assessment are in the CSF Assessment attached as Exhibit 3; a true and correct copy of the Termination of Parental Rights Assessment ("TPR Assessment") is attached as Exhibit 5.

82. In their assessments, CSF found that:

- there is a "notable" lack of available reunification services, especially in rural areas.  Available services are often not effective.  Caseworkers are often forced to rely on prevention services, meant for children never removed from their homes, or not offer any services;

- parents with children in foster care are put on waitlists for services that are required in order to be reunified with their kids;

- case practice around reunification is weak, marked by poor assessments and a failure to create individualized service plans;

- wide-spread inaccuracies in MACWIS data posed significant obstacles in identifying the universe of children who should be freed for adoption or the universe who already had been so freed.  This failure was attributed at least in part to the failure by casework staff to understand when it is appropriate to move forward on freeing a child for adoption;

- there is a lack of a reliable or uniform process for determining when a child had been freed for adoption;

- caseworkers failed to document the reasons why children should not be freed for adoption;

- independent living service plans were not individualized and in 97% of the cases reviewed, the listed services were not connected to the specific needs of the youth;

- some independent living service plans were incomplete, and some were entirely blank; and

- it was unclear based upon MACWIS how frequently children attended Independent Living Skills classes and what was involved in those classes.

(Ex. 3 [CSF Assessment] at 21, 39-41, 82-83, 86; Ex. 5 [TPR Assessment] at 21-22.)

83. Defendants failed to develop the plans required by the Period Two Implementation Plan to address the significant and widespread deficits in reunification services and independent living services identified by CSF. (Pls.' Mem. Ex. H [Period Two IP] §§ II.5.c.1, II.12.a-c; *id.* Ex. C [Period Two Monitoring Rpt] at 88, 89, 127-28.)

84. In light of these systemic deficits, the Monitor found that "there is an urgent need for [D]efendants to develop and implement a well-considered strategic plan that addresses each of these limitations in tandem with the fiscal planning contemplated by Period 2 §1.7.b. and practice model implementation strategies." (*Id.* Ex. C [Period Two Monitoring Rpt] at 74.)

85. The Settlement Agreement requires that Defendants institute specific case practices to ensure that foster children do not remain in foster care unnecessarily. Within 30 days of taking custody of a child, DFCS must complete a full screening and family assessment and develop a service plan that is calculated to meet the child's immediate and ongoing needs and to move that child to a permanent home as expeditiously as possible. (*Id.*

Ex. F [Settlement Agreement] §§ II.B.1.a, II.B.2.a, II.B.3.a.)  Children and their families

are to be made a part of the permanency planning process through individual and family

team meetings, and each foster child's service plan is to be routinely updated and

reviewed.  (*Id.* §§ II.B.1.b, II.B.2.a, II.B.2.b, II.B.3.c.1, II.B.3.c.2.) Defendants are

required to timely move forward with adoption or other permanent placements consistent

with federal law when safe reunification is not possible.  (*Id.* §§ II.B.3.d-f.)

86. During Period Two Defendants failed to develop individual and family team meeting

protocols as required which are prerequisites to complying with the team meeting

requirements of the Settlement Agreement.  (*Id.* Ex. C [Period Two Monitoring Rpt] at

79-80.)  Defendants also failed to fill the positions of adoption specialists or external

adoption contractors, as required by both the Period One and Period Two IPs.  (*Id.* at 94-

95.)

87. At the close of Period Two, Defendants could not provide validated data regarding

whether children were provided individual and family team meetings (*id.* at 82); whether

children had a permanency plan consistent with the Settlement Plan requirements (*id.* at

84-85); whether their service plans were being timely reviewed (*id.* at 86-87); or whether

Defendants were taking the steps necessary to expeditiously move children who had been

freed for adoption into an adoptive placement (*id.* at 92).  In addition, Defendants were

unable to report on their compliance with the independent living service requirements of

the Period Two IP.  (*Id.* at 126.)

88. The deficiencies in DFCS's reunification services are illustrated by the case of J.R.M.

("Baby J").  (Relevant portions of Baby J's DFCS case record, which was provided to

Plaintiffs upon request, are filed under seal as Exhibits 5-17 to the Declaration of Jessica

Polansky ("Polansky Decl."). Plaintiffs can supplement this filing should the Court desire to review the entirety of the record as provided to Plaintiffs.)

89. Baby J was born on November 17, 2008, and was immediately removed from her mother, EK, because EK tested positive for marijuana. EK was 22 years old when she gave birth to Baby J and was caring for three other young children all under the age of five. This appears to have been the second or third time EK had tested positive for drugs at the time she gave birth. (Polansky Decl. Ex. 5; *id.* Ex. 9.)

90. In April 2008, approximately six months before Baby J's birth, EK's 1-year old daughter FK was placed in the legal custody of DFCS after she sustained an accidental burn which required her to be hospitalized. At the time of the incident FK was in the care of EK's sister-in-law, who was a minor. (*Id.* Ex. 6.) In August 2008, there was a second report concerning EK's failure to obtain adequate medical treatment for FK. (*Id.* Ex. 11.) FK was reunified with her parents in September 2008. (*Id.* Ex. 10.) EK was in the last trimester of her pregnancy and there were two other young children in the home when DFCS decided to return FK. (*Id.*)

91. When she was born, DFCS placed Baby J with a paternal great-aunt, but moved her to a non-relative foster home shortly thereafter. (*Id.* Ex. 8; *id.* Ex. 12.) Baby J, a newborn, was the seventh or eighth child living in this foster home. (*Id.* Ex. 14.) There was no evidence in DFCS records that Baby J received any immunizations while in DFCS custody.

92. A case note from March 4, 2009, more than three months after Baby J was placed in foster care, states that EK had not yet started her service plan and had been either very late or missed her weekly visits with Baby J. EK lived blocks from the DFCS office. (*Id.*

Ex. 13.)  EK reported that Baby J's father was in prison on suicide watch.  The

caseworker did not document why he was incarcerated or when he was expected to be

released. (*Id.*)

93. The next case note reflecting contact with EK was made by a different DFCS caseworker

in May 2009.  The case note states that both EK and her husband were at the DFCS office

for a foster care review, and that Baby J's father had completed his parenting class.  (*Id.*

Ex. 7.)

94. DFCS's next official visit was on August 10, 2009 when the DFCS caseworker visited

EK in a new apartment and reported that Baby J would be returned to her.  (*Id.* Ex. 15.)

There is no documentation that while visiting the home the caseworker attempted to

check on the wellbeing of Baby J's three siblings or considered whether EK might need

any support services in light of the fact that she was several months pregnant and would

be responsible for three young children and a newborn.

95. On August 25, 2009, DFCS recommended to the Youth Court that Baby J be returned to

her parents and that the case be closed without any additional services or oversight.  (*Id.*

Ex. 16.)  DFCS reported that the parents had obtained an apartment, that they had taken

substance abuse and parenting classes, and that the father was employed.  (*Id.*)  The

record does not reflect any mention by DFCS of the possibility of post-reunification

services, that the mother was 23 years old and would be caring for four young children

and was pregnant with her fifth child, that Baby J's father had recently spent time in jail,

that Baby J's parents had gone through two rounds of parenting classes, or that the family

had a prior DFCS history.

96. Approximately three months after DFCS recommended that Baby J be returned home, she was beaten to death.  (*Id.* Ex. 17.)

**Plaintiffs Established During Litigation That DFCS Operated Without An Information Or Quality Assurance System Needed To Ensure Child Safety**

97. Plaintiffs alleged in their complaint that Defendants failed to establish a comprehensive management information system capable of accurately providing essential information necessary to track, monitor, and serve children.  (Am. Compl. ¶ 189.)

98. It was undisputed that MACWIS, the State's automated child welfare information system, did not contain complete and accurate information and was unable to produce aggregate data reports necessary for the management of a child welfare system.  (Pls.' Mem. for Summ. J. Ex. 1 [Steib Expert Rpt] at 13; *id.* Ex. 4 [Hess Expert Rpt] at 99-100.) It was also undisputed that MACWIS failures directly put foster children's safety in jeopardy.  (*Id.* Ex. 28 [Felder Dep.] at 205:4-206:5; *id.* Ex. 36 [Mangold Dep.] at 20:11-22; *id.* Ex. 40 [Wilson Dep.] at 34:7-35:3.)

99. During the litigation, Plaintiffs established that Defendants did not gather and maintain reliable and up-to-date individual and aggregate child welfare data, which impeded their efforts to engage in adequate casework, strategic planning, service delivery, quality improvement, staff performance, and staff evaluation.  (*Id.* Ex. 6, [Crabtree Expert Rpt] at 28-32; *id.* Ex. 4 [Hess Expert Rpt] at 99-100.)  As Dr. Hess explained, "[g]iven the life-altering nature of decisions made within the child protection and permanency planning process, decisions based upon incomplete or inaccurate documentation are likely to be arbitrary, unwise and even life-threatening . . . ."  (*Id.* at 54.)

100.     Plaintiffs also established during litigation that DFCS lacked the ability to effectively monitor agency performance or the delivery of services, and therefore could

not identify or correct systemic deficiencies in the manner in which it provided foster

care services. (*Id.* Ex. 6 [Crabtree Rpt] at 38-41.)

**Defendants Have Violated And Continue To Violate The Child Welfare Data And Quality Assurance Requirements Of The Settlement Agreement And The Period Two Implementation Plan**

101.    Pursuant to the Settlement Agreement, Defendants are required to develop the

capacity within MACWIS to accurately capture and report on child-specific and

aggregate child welfare data.  The system is to conform to a set of ten standards related to

the type of data to be collected, caseworker access to that data, and the types of aggregate

data reports that MACWIS must be able to provide to assess child wellbeing and agency

compliance with the terms of the Settlement Agreement.  (Pls.' Mem. Ex. F [Settlement

Agreement] § II.A.5.a.)  Period One required Defendants to draft and begin to implement

the plans necessary to develop such a computer system.  (*Id.* Ex. G [Period One IP] § I.5.)

102.    According to the Monitor, following the completion of Period One, "[f]or the

most part, MACWIS d[id] not report accurately and as required on performance related to

the requirements in this case.  In some instances, the system has the capacity to collect

the required data, but not report on it.  In others, this capacity does not exist." (*Id.* Ex. D

Period One Monitoring Rpt at 51.)  The Monitor further found that "[i]n addition, there is

a substantial body of evidence that raises significant concerns about the reliability of the

MACWIS data."  (*Id* at 52.)

103.    In concluding that Period One MACWIS requirements had not been met, the

Monitor cautioned that "[t]he limitations in MACWIS are well known.  Defendants must

expedite and intensify their efforts to address these shortcomings in order for the reform

process to make continued and meaningful progress."  (*Id.* at 55.)

104.    The Period Two IP called for concrete, step-by-step scaled back requirements, including that the Defendants issue a Request for Proposal for a comprehensive analysis of MACWIS and that they take specific steps to ensure MACWIS data integrity. (*Id.* Ex. H [Period Two IP] §§ I.5.b-d.)

105.    During Period Two Defendants did not issue the required Request for Proposal and failed to adequately produce verified child welfare data. (*Id.* Ex. C [Period Two Monitoring Rpt] at 66).

106.    In the Period Two Report, the Monitor stated:

> There is a critical need to address the limitations in MACWIS on a more expedited basis. Incomplete or inaccurate data in MACWIS, like the type revealed during the Monitor's case record review, could result in decision making related to child placements that presents an unreasonable risk of harm to children in [D]efendants' custody. For example, MACWIS fails to link prior reports of maltreatment in a way that provides the full history of prior maltreatment reports. Further, MACWIS contains inaccurate and incomplete dispositional data related to maltreatment reports. In the absence of complete and accurate information, caseworkers cannot conduct adequate assessments nor make informed decisions about child placements. More generally, in order to guide and assess performance with this reform effort, agency executives and managers need current and accurate data to inform management decisions.

(*Id.* at 65-66).

107.    The Monitor found that as currently staffed and structured, "[D]efendants do not have sufficient staff with the correct skill set to perform programming and validation activities that will be needed to report accurately on all of the data requirements implicated by the Settlement Agreement. . . . The MACWIS unit currently has pending orders for system changes and/or reporting modifications that date back to 2008." (*Id.* at 65.)

108.     A continuous quality improvement ("CQI") system "is designed to promote

improvements in agency performance through ongoing assessments of practices and

outcomes using qualitative and quantitative measures to inform operational strategies and

decision-making."  (*Id.* Ex. D [Period One Monitoring Rpt] at 49.)  The Settlement

Agreement required the establishment of a CQI system as "an integral part of Period 1

capacity building" because it both provides a "framework for informing management

decisions" and is "an indicator of [D]efendants' capacity to sustain reforms."  (*Id.*)

109.     The Period One Implementation Plan required Defendants to begin

"implementing a . . . separate continuous quality improvement (CQI) system."  (*Id.* Ex. G

[Period One IP] § I.3; *see also id.* Ex. F [Settlement Agreement] § II.A.3.a.)  In her first

report, the Monitor found that "a separate CQI system was not implemented during

Period 1."  (*Id.* Ex. D [Period One Monitoring Rpt] at 49.)  Therefore, pursuant to the

Period Two Implementation Plan, DFCS was to develop and begin implementing a

written plan for the implementation of a CQI system that meets COA standards and the

Settlement Agreement requirements.  (*Id.* Ex. H [Period Two IP] § I.3.a.)

110.     At the end of January 2010, three months after the plan was required to be

developed and implemented, DFCS submitted several documents purported to be its CQI

plan.  The Monitor deemed these documents internally inconsistent and inadequate to

meet the requirement of a CQI plan.  The Monitor found that during Period Two

"[D]efendants did not implement a CQI system that meets the Settlement Agreement's

requirements."  (*Id.* Ex. C [Period Two Monitoring Rpt] at 54.)

111.     Defendants submitted a revised CQI Plan after the close of Period Two.

According to the proposed CQI plan, "it is imperative that the CQI system have access to

aggregate data to monitor and evaluate indicators and outcomes." (Continuous Quality

Improvement Plan at 16 (a true and correct copy attached as Ex. 6).)

**Plaintiffs Established During Litigation That Defendants Failed To Seek And Utilize Available Funding To Bring Needed Resources To DFCS**

112.    Plaintiffs alleged in their complaint and established for trial that Defendants

poorly administered their finances and that "Mississippi ha[d] also forfeited millions of

dollars in federal matching funds due to DHS and DFCS mismanagement." (Am. Compl.

¶ 185.) An expert analysis revealed that Mississippi received the lowest amount of

federal Title IV-E child welfare funds per child of any state in the nation because of its

failure to document eligibility. (Pls.' Mem. for Summ. J. Ex. 2 [Brister Expert Rpt] at 2-

3, 4.) Plaintiffs established that if Mississippi had brought its Title IV-E eligibility rate

up to the national average in 2006, it would have increased the amount of federal funds

available for services for children in foster care by over $24 million. (*Id.* at 11.) In

addition, DHS had failed to make use of millions of dollars in other available federal

matching funds. (*Id.* at 4.)

**Defendants Have Violated And Continue to Violate Fiscal Management Provisions Of The Settlement Agreement And The Period Two Implementation Plan**

113.    The Settlement Agreement requires Defendants to maximize all available federal

funding to reduce the financial burden the State must shoulder in caring for foster

children. (Pls.' Mem. Ex. F [Settlement Agreement] § I.C.) Pursuant to the Period One

Implementation Plan, Defendants were required to undertake an assessment of their fiscal

and financial management and develop and begin implementing a plan to address

deficiencies identified by that assessment. (*Id.* Ex. G [Period One IP] §§ I.f, I.7.) Such

an assessment was undertaken, but it was limited in scope, and Defendants failed to

develop or implement a remedial plan to address problems identified.  (*Id.* Ex. D [Period One Monitoring Rpt] at 13-16, 20-21, 56-57.)

114.    Defendants were also required in Period One to assess actual and anticipated federal funding levels and create an implementation plan to increase federal funding.  (*Id.* Ex. F [Settlement Agreement] § II.A.7.a.)  Because Defendants failed in Period One to meet this requirement (*id.* Ex. D [Period One Monitoring Rpt] at 13-16, 56-57), in Period Two Defendants were required to contract for the assessment and for the development of a remedial plan (*id.* Ex. H [Period Two IP] § I.7.a).  Defendants failed to meet this requirement in Period Two.  Defendants provided the Monitor with a draft Request for Proposal for an independent contractor to undertake the financial assessment, which the Monitor found to be insufficient, in part because it was inconsistent with the requirements of the Period Two provision it was intended to satisfy.  (*Id.* Ex. C [Period Two Monitoring Rpt] at 68-69.)

115.    The Monitor has identified bolstering federal funding maximization as "key" to accomplishing the reform effort.  (*Id.* Ex. D [Period One Monitoring Rpt] at 7.)  The Monitor stated: "This is a pivotal requirement.  Absent the resources and infrastructure that will enable [D]efendants to maximize federal funding, it is likely that the minimum requirements imposed by the Settlement Agreement will not be achieved."  (*Id.* Ex. C [Period Two Monitoring Rpt] at 69.)

116.    In 2010 DFCS experienced a budget shortfall and proposed the furlough of caseworkers.  (*Id.* at 69 n.233.)

117.    Plaintiffs' counsel objected to the furloughing of DFCS workers, and as a result of negotiations, Defendants agreed to limit to three the number of days DFCS workers would be furloughed during the 2010 fiscal year.  (Consent Order, Docket No. 496.)

**Defendants Have Failed To Adequately Reduce The Frequency At Which Foster Children Are Abused And Neglected**

118.    During litigation, Plaintiffs established that foster children were subject to high rates of abuse and neglect while in Defendants' custody.  Plaintiffs' expert, Dr. Hess, concluded based upon her case record review that 12% of children in DFCS foster care custody had at least one incident of suspected maltreatment that went entirely uninvestigated by DFCS.  (Pls.' Mem. for Summ. J. Ex. 4 [Hess Expert Rpt] at 59.)  7.4% of the children had at least one incident of suspected maltreatment that was not reported for investigation, and 4.3% of foster children had at least one incident of maltreatment that DFCS began to investigate, but never completed.  (*Id.*)

119.    The Settlement Agreement and Implementation Plans encompass very specific requirements targeted to improving the investigation of foster child maltreatment and to reducing the incidence of such maltreatment.  DFCS was required in Period One to undertake an assessment of DFCS's practice of prioritizing, screening, assessing, and investigating reports of maltreatment of foster children.  (Pls.' Mem. Ex. G [Period One IP] § II.c.)  Because Defendants did not meet this requirement, it was incorporated into the Period Two IP.  (*Id.* Ex. H [Period Two IP] § II.2.f.)

120.    CSF undertook the child safety assessment in Period Two and found that safety assessments were generally undertaken on a consistent basis; however, there were significant deficiencies in the manner in which DFCS undertook maltreatment investigations.  The deficiencies CSF identified included that:

- investigations of reports of maltreatment in foster care do not appear to be initiated or completed in accordance with policy requirements. Interviews with all required parties during the investigation process are either not consistent or not well documented;

- documentation of investigations in general was not thorough;

- face-to-face contact by DFCS investigators with children during investigations does not appear to be consistent;

- DFCS investigators used a risk assessment tool that is not suited for the investigation allegations of foster care maltreatment; and

- DFCS failed to enforce the Settlement Agreement's prohibition on the use of corporal punishment on foster children.

(Ex. 3 [CSF Assessment] at 123, 129-30.)

121.    In her case record review of DFCS in-custody abuse and neglect reports, the Monitor found these same deficiencies in DFCS's approach to the investigation of foster child maltreatment, including the failure to undertake investigations within the required timeframe. (Pls.' Mem. Ex. C [Period Two Monitoring Rpt] at 76-77, 107-10.)

122.    The Period Two IP required Defendants to initiate the investigation of all reports of maltreatment within 24 hours and to complete investigations within 30 days. (*Id.* Ex. H [Period Two IP] § II.6.g.) Defendants could not produce validated data regarding their performance on these measures during Period Two, but the data they subsequently provided pursuant to the Bridge Plan reflects that statewide just over half of all maltreatment investigations were initiated within 24 hours of being received. (*See* Dobies Aff. Ex. 2 [Bridge Plan Data Chart].)

123.    Among the foster care abuse and neglect reported during the reform period were that Plaintiff Children were:

- whipped with belts; paddles and spanking spoons, leaving marks and bruises;

- forced to sleep outside a group home for the night due to a curfew violation; and

- put in a choke hold, kicked, and had water thrown at them as punishment.

(Pls.' Mem. Ex. C [Period Two Monitoring Rpt] at 78 n.281.)

**Requirements Regarding The Immediate Safety Check Of At-Risk Children Remain Unmet**

124.    The Period One IP required DFCS to undertake a complete safety review, including unannounced visits, of any placement with multiple reports of maltreatment. (Pls.' Mem. Ex. F [Settlement Agreement] §§ II.B.4.i, II.B.4.j.)  Defendants were further required to identify and track any remedial efforts deemed necessary to address safety problems uncovered during the review.  (*Id.*)  Defendants failed to conduct the required Safety Reviews in Period One, so the requirement was incorporated into the Period Two IP.  (*Id.* Ex. H [Period Two IP] §§ II.6.e, II.6.f.)

125.    The safety reviews, which were undertaken in Period Two, identified a number of concerns regarding the safety of Plaintiff Children.  (*Id.* Ex. C [Period Two Monitoring Rpt] at 103.)

126.    According to the Monitor, Defendants failed to meet the requirement that they develop "[a] formal system for notification concerning urgent issues identified during specific safety reviews" or "a system for tracking and ensuring that corrective action related to the findings from the safety reviews are completed."  (*Id.*)  Moreover, as recounted by the Monitor, in some instances the safety reviewer was not able to identify obvious safety risks.  Examples cited by the Monitor include the following:

- A Special Safety Review Report indicated that a 17-year-old boy threatened to kill himself on the day of the special safety reviewer's visit to the institution where he was living and had assaulted another child the previous day.  A staff member in the group home reported to the special safety reviewer that the child had expressed suicidal thoughts and had been crying hysterically.  The special

37

safety report states that the director of the program thought the child was in need of a residential therapeutic hospital placement; however, while the reviewer was present the director spoke to law enforcement in order to have the child escorted to a juvenile detention center. The safety reviewer failed to address the child's mental health needs and failed to ensure that correct procedures were in place to secure appropriate supervision and care for the child.

- A DFCS special safety reviewer reported encountering a 13-year-old girl in a group home/facility review who had "a flat affect and seemed to be under a heavy dose of medication" and a 15-year-old boy who appeared to be "in a daze" under the influence of medication and whose speech was difficult to understand.  In the "Significant Concerns Noted/Recommendations" section of the Special Safety Review Report, the reporter merely stated "[c]oncerns were noted regarding the specific situations of each youth. See interviews for details."  There is no description of necessary corrective action, the administrators interviewed were not questioned regarding the children's mental status, and there was no indication that the DFCS worker contacted the psychiatrist or reviewed any mental health records or treatment plans developed for these children.

(*Id.* at 106 n.347.)

**Requirements Regarding Child Abuse Intake Procedures Remain Unmet**

127.    To bolster the manner in which DFCS undertakes child maltreatment investigations, during Periods One and Two Defendants were required to assure that standardized decision-making criteria were used for prioritizing, screening, and assessing all reports of the maltreatment of foster children.  (*Id.* Ex. G [Period One IP] § II.c; *id.* Ex H [Period Two IP] § II.6.b.)

128.    Defendants have established a single centralized hotline with dedicated staff to screen, prioritize and assess all reports of maltreatment made statewide using objective standardized criteria.  (*Id.* Ex. C [Period Two Monitoring Rpt] at 98.)

129.    The Monitor found that Defendants' policy and practice regarding the intake of maltreatment reports expressly violated the terms of the Settlement Agreement and Period Two IP because "DFCS supervisors are permitted to reconsider these screening decisions [made by hotline staff] in several circumstances, including if staff in the DFCS

county office have additional information that might result in a change in the screening level." (*Id.* (internal quotations omitted).)

130.     The Monitor found that the policy and practice by DFCS caseworkers of relying upon their own subjective judgments to override screening decisions made by the hotline's intake workers is precisely what the requirement for utilizing standardized decision-making criteria is intended to prohibit. (*Id.* at 97-98.)

**Requirements Regarding The Investigation Of Maltreatment Remain Unmet**

131.     Pursuant to the Period One and Two IPs, Defendants are required to immediately enter abuse reports into MACWIS, and DFCS investigators are required to use MACWIS data to determine whether there have been prior reports of abuse in the family or of the subject child. (*Id.* Ex. H [Period Two IP] § II.6.d.)  The Monitor found that "because of critical limitations in MACWIS, which compromise the ability to access accurate and complete data regarding prior maltreatment reports, [D]efendants currently do not have the capacity to provide a reasonable assurance that information regarding prior maltreatment reports is available immediately to the assigned DFCS investigator." (*Id.* Ex. C [Period Two Monitoring Rpt] at 99-100.)  The Monitor stated that "insufficient direction and guidance [are] provided with respect to the responsibility of Hotline workers to determine whether there have been prior reports of abuse or neglect and to transmit that information . . . ." (*Id.* at 100.)

132.     The Monitor found that some foster child maltreatment reports were inadequately investigated, leaving Plaintiff Children at risk of further harm.  Among the Monitor's findings was that there were undue and lengthy delays in face-to-face interviews/contacts with alleged victims, that documented information in investigative reports was directly

contradicted by the investigative findings, and that the beating of children with belts and spoons by foster parents was not being considered as maltreatment, despite the clear direction by the Settlement Agreement that it be treated as such. (*Id.* at 78 n.281.)

**Requirements That Defendants License All Unlicensed Foster Homes Remain Unmet**

133.    During the litigation, Plaintiffs established that DFCS placed numerous children in foster care in unlicensed relative foster homes. (Pls.' Mem. for Summ. J. Ex. 6 [Crabtree Expert Rpt] at 47-48.) Both the Settlement Agreement and the Period One Implementation Plan include provisions requiring that by the end of Period One Defendants develop an expedited licensing process to license relative caregivers and that all foster care settings be screened prior to the placement of any foster child in the home. (Pls.' Mem. Ex. F [Settlement Agreement] §§ II.B.5.i, II.B.5.j; *id.* Ex. G [Period One IP] § II.5; *see also id.* Ex. F [Settlement Agreement] § II.B.5.a.)

134.    Defendants failed to meet the licensing requirements during Period One, and those requirements were again included during Period Two. (*Id.* Ex. H [Period Two IP] §§ II.7.a, II.7.b.) At the end of Period Two, Defendants had failed to develop a plan to ensure the speedy licensing of unlicensed caregivers, as required. (*Id.* Ex. C [Period Two Monitoring Rpt] at 116.)

135.    At the end of Period Two, Defendants failed to produce any data with regard to the screening of foster placements. (*Id.* at 115.)

**Requirements Regarding Abuse In Care Remain Unmet**

136.    The Settlement Agreement requires that by the end of Period Two the rate of abuse in foster care be 1.14% or lower. (*Id.* Ex. F [Settlement Agreement] § III.D.) Defendants were unable to provide validated data regarding the rate of abuse during

Period Two.  (*Id.* Ex. C [Period Two Monitoring Rpt] at 133-34.)  Preliminary data from

the Children's Bureau of the Administration of Children and Families found the rate of

abuse to be 1.72% (Mississippi Child and Family Services Review Exit Conference

Presentation at 14 (a true and correct copy attached as Exhibit 7).)  The data provided by

Defendants under the Bridge Plan reflects that as of August 2010, 1.62% of the foster

care population had been the subject of a substantiated report of abuse.  (Dobies Aff. Ex.

2 [Bridge Plan Data Chart].)

137.    Plaintiff Children dependent upon Defendants for their safety and wellbeing

remain at daily risk of harm because Defendants have proven unwilling and incapable of

taking the very steps that they agreed were imperative to reforming the state's child

welfare system.  Not only have Defendants failed to build the infrastructure required as

necessary to improve the care and services provided to Plaintiffs, but they have also

engaged in actions known to put children at critical risk of harm.  These actions include

having newly hired caseworkers engage in casework for which they have not received

training, allowing county workers to override the decisions regarding the screening of

maltreatment reports made by trained maltreatment hotline workers, failing to timely

investigate reports of maltreatment, and having caseworkers undertake the required

mental health screening assessment of foster children which the Settlement Agreement

requires be undertaken by a qualified mental health professional.  These are management

failures that cannot be remediated with simply an infusion of resources or a new plan of

action.  At this late juncture, only a court-appointed receiver with the authority to make

the management decisions and institute the safeguards that Defendants have been

unwilling to undertake can bring the State into compliance with the Settlement

Agreement as is necessary to protect the State's most vulnerable children.

Executed this 5th day of October, 2010.

_____
Shirim Nothenberg

Sworn to before me this
5th day of October, 2010

_____
Notary Public

IRA LUSTBADER
NOTARY PUBLIC-STATE OF NEW YORK
No. 02LU6225027
Qualified in Nassau County
My Commission Expires August 23, 2014

42