# Exhibit 1

*Prepared for*

**State of Mississippi**
**Department of Human Services**
**Division of Family and Children's Services**



# Mississippi Child Welfare

## Practice Model

## *Final Report*

**September 25, 2009**



*Center for the Support of Families, Inc. (CSF)*

1107  Spring  Street,  Suite  2C,  Silver  Spring,  MD  20910  ●  Phone  301-587-9622  ●  Fax  301-587-9620

# TABLE OF CONTENTS

EXECUTIVE SUMMARY ......................................................................................................................... 1

INTRODUCTION ................................................................................................................................... 11

I. METHODOLOGY ............................................................................................................................. 12

    A. PRACTICE MODEL COMPONENTS ..................................................................................... 13
    B. LOGIC MODEL APPROACH ............................................................................................... 15
    C. STAFF SURVEY ................................................................................................................. 16
    D. CASE REVIEWS ................................................................................................................ 16
    E. FOCUS GROUPS ................................................................................................................ 17
    F. REVIEW OF POLICY AND TRAINING INFORMATION ........................................................... 17
    G. REVIEW OF ADDITIONAL INFORMATION ........................................................................... 18
    H. LIMITATIONS OF OUR APPROACH ..................................................................................... 18

II. THE PRACTICE MODEL .................................................................................................................. 19

    A. THE PRACTICE MODEL IS A CLINICAL INTERVENTION MODEL, NOT A CASE MANAGEMENT MODEL .............. 19
    B. THE MODEL EMPHASIZES CLINICAL SUPERVISION AS A KEY ELEMENT IN IMPROVING PRACTICE, AS OPPOSED TO ADMINISTRATIVE SUPERVISION .............................................................................. 19
    C. ALL OF THE COMPONENTS OF THE PRACTICE MODEL ARE INTERCONNECTED ..................... 20
    D. THE PRACTICE MODEL IS INTEGRATED WITH KEY FUNCTIONS WITHIN MDHS .................... 20
    E. DEFINITIONS OF PRACTICE MODEL COMPONENTS .............................................................. 20
        *Mobilizing Appropriate Services Timely* ............................................................... 20
        *Safety Assurance and Risk Management* ................................................................ 21
        *Involving Children and Families in Case Planning and Decision Making* ............... 21
        *Strengths and Needs Assessments of Children and Families* ................................ 22
        *Preserving Connections and Relationships* ........................................................... 23
        *Individualized and Timely Case Planning* ............................................................. 23
    F. AN INTEGRATED PRACTICE MODEL ................................................................................... 26

III. COMPONENTS OF THE PRACTICE MODEL ...................................................................................... 29

    A. COMPONENT ONE: MOBILIZING APPROPRIATE SERVICES TIMELY ..................................... 30
        *Section 1: Inputs* .................................................................................................. 31
        *Section 2: Outputs* ............................................................................................... 53
        *Section 3: Outcomes and Indicators* ..................................................................... 61
    B. COMPONENT TWO: SAFETY ASSURANCE AND RISK MANAGEMENT ................................... 67
        *Section 1: Inputs* .................................................................................................. 70
        *Section 2: Outputs* ............................................................................................... 91
        *Section 3: Outcomes and Indicators* ..................................................................... 99
    COMPONENT THREE: INVOLVING FAMILY MEMBERS IN DECISION-MAKING AND CASE ACTIVITIES ................... 105
        *Section 1: Inputs* .................................................................................................. 106
        *Section 2: Outputs* ............................................................................................... 123
        *Section 3: Outcomes and Indicators* ..................................................................... 130
    COMPONENT FOUR: STRENGTHS AND NEEDS ASSESSMENTS OF FAMILY MEMBERS ................... 135
        *Section 1: Inputs* .................................................................................................. 136
        *Section 2: Outputs* ............................................................................................... 151
        *Section 3: Outcomes and Indicators* ..................................................................... 163
    COMPONENT FIVE: PRESERVING CONNECTIONS AND RELATIONSHIPS ................................... 168
        *Section 1: Inputs* .................................................................................................. 169
        *Section 2: Outputs* ............................................................................................... 189
        *Section 3: Outcomes and Indicators* ..................................................................... 197
    COMPONENT SIX: INDIVIDUALIZED AND TIMELY CASE PLANNING ....................................... 203
        *Section 1: Inputs* .................................................................................................. 204
        *Section 2: Outputs* ............................................................................................... 223

**Mississippi Practice Model**

*Section 3: Outcomes and Indicators* ..................................................................................229

**IV. IMPLEMENTATION STRATEGY** ........................................................................**235**

   A. COUNTY/REGIONAL IMPLEMENTATION ACTIVITIES ..............................................237
     *Phase 1: Planning Phase* ...........................................................................237
     *Phase 2: Initial Implementation Phase* ......................................................238
     *Phase 3: Evaluation and Revision* .............................................................239
     *Phase 4: Continued Implementation and Ongoing Evaluation* ...................240
   B. STAFFING THE IMPLEMENTATION PROCESS ...........................................................241
     *Implementation Manager* ..........................................................................241
     *Resource Development Specialists* ..............................................................242
     *Training Staff* .........................................................................................242
     *Policy Staff* ............................................................................................242
   C. DETERMINING THE ORDER OF IMPLEMENTATION ..................................................242
   D. IMPLEMENTATION TIME FRAMES AND OUTCOMES ................................................244
     *Short-Term Outcomes (0 – 12 Months)* .....................................................244
     *Mid-Term Outcomes (12 – 24 Months)* ......................................................245
     *Long-Term Outcomes (24 – 48 Months)* .....................................................246
   E. MEASURING PROGRESS .....................................................................................246
   F. IMPLEMENTATION TIME LINE FOR MISSISSIPPI PRACTICE MODEL ..........................247
   G. TECHNICAL ASSISTANCE (TA) ..........................................................................248
     *Planning for Implementation* ....................................................................248
     *Training* ................................................................................................248
     *Policy Development* ..................................................................................248
     *Resource Development* ..............................................................................248
     *Supervision* ............................................................................................248
     *Practice Coaching* ...................................................................................248
     *CQI Implementation* ................................................................................249
     *Stakeholder Engagement* ..........................................................................249
     *Data* .....................................................................................................249

**V. CONTINUOUS QUALITY IMPROVEMENT (CQI) RECOMMENDATIONS** ...............**251**

   A. PURPOSES AND BACKGROUND OF THE CQI RECOMMENDATIONS ...........................251
     *Characteristics of CQI* .............................................................................252
   B. WHAT CQI MONITORS ....................................................................................253
     *Quantitative Information* ..........................................................................254
     *Qualitative Information* ............................................................................255
   C. STRUCTURE OF CQI ........................................................................................258
     *State Office CQI Unit* ...............................................................................259
     *Local CQI Processes* ...............................................................................261
     *Other CQI Components* ............................................................................262
   D. IMPLEMENTATION PROCESS ..............................................................................264
   E. REPORTS AND FEEDBACK .................................................................................265
     *Individual Caseworker Feedback* ..............................................................265
     *County/Regional Feedback on Reviews* ......................................................265
     *County/Regional Reports of CQI Reviews* ..................................................265
     *State CQI Report* ....................................................................................265
     *Dashboard Data Reports* .........................................................................266
   F. ACCOUNTABILITY ............................................................................................266
   G. CONFORMITY TO OLIVIA Y MONITORING REQUIREMENTS ....................................267
   H. CONFORMITY TO COA STANDARDS ...................................................................267

**APPENDIX A: LOGIC MODELS** ..............................................................................**274**

**APPENDIX B: PRACTICE GUIDES** ..........................................................................**281**

# EXECUTIVE SUMMARY

The Mississippi Department of Human Services (MDHS) is in the second year of implementing the terms of a settlement agreement, approved by the court in January 2008 pursuant to the *Olivia Y. vs. Barbour* class action lawsuit. The settlement agreement requires that MDHS change its practice of child welfare in many significant ways and also requires that MDHS implement or strengthen a number of systemic improvements to support improved practice in the field.  It also calls for MDHS to contract with an independent consultant to make recommendations about the design of a Continuous Quality Improvement (CQI) process that will monitor performance in serving children and families over time.  As part of the settlement agreement, MDHS is also seeking to become accredited through the Council on Accreditation (COA).  COA accreditation includes a set of multiple requirements that the State must meet for compliance with accreditation standards, many of which relate to or overlap with some of the settlement agreement requirements regarding child welfare practice in the field or the agency/systemic supports needed to sustain practice requirements. MDHS is also preparing for its second Federal Child and Family Service Review (CFSR), which is scheduled to occur in May 2010. Many of the Federal requirements reviewed in the CFSR correspond to requirements and standards within the *Olivia Y* settlement agreement and COA criteria.

In preparing to make the major changes to the child welfare system in Mississippi needed to comply with its various mandates, MDHS chose to frame the requirements within a child welfare practice model that would provide an integrated context for implementing the changes in the field and reflect the mission and goals of the Department in serving children and families. The Center for the Support of Families, Inc. (CSF) was awarded a contract to develop the practice model in February 2009 and this report describes the model we are recommending for MDHS, along with our recommendations for the CQI process.

In developing the practice model, we first conducted an assessment of policy, training, monitoring activities, resources and practice, gathering information from the following sources:

♦ An electronic survey administered to MDHS child welfare staff;

♦ A series of focus groups and individual interviews that included social workers, supervisors, Regional Directors, parents, service providers, youth in foster care, resource families, and central office staff;

♦ The court monitor's report for the *Olivia Y* settlement agreement;

♦ Reports from the Council on Accreditation; and

♦ A review of MDHS child welfare policy, training curricula, and Foster Care Review (FCR) findings.

We approached the development of the practice model in a principle-based and outcome-oriented manner.  First and foremost, the practice model is grounded in the mission statement and values of the MDHS Division of Family and Children's Services, which include the following:

**Mission Statement:**

*Our mission is to lead Mississippi in protecting children and youth from abuse, neglect and exploitation by providing services to promote safe and stable families.*

The values underlying the mission statement are:

| | | |
|---|---|---|
| ♦ Competence | ♦ Respect | |
| ♦ Integrity | ♦ Personal Courage | |
| ♦ Responsibility | ♦ Collaboration | |

Second, we understand clearly that family-centered practice is a very important concept within MDHS and among its staff and stakeholders. In the focus groups and interviews, the concept of family-centered practice was always raised as the ideal that the system was striving for. Therefore, we attempted to frame the practice model within a family-centered approach in order to help MDHS bring its ideals and vision closer to reality.

Finally, we also attempted to conform the practice model to the requirements and underlying principles of the *Olivia Y* settlement agreement. In the report, we have cross-referenced these requirements with the components of the practice model. By framing the practice model within a set of guiding principles, it provides a common basis for staff and stakeholders to understand MDHS' approach to serving children and families; for guiding decisions regarding policy, planning, and resources; and for integrating the various programs and services that MDHS offers. The framework that we have developed includes some key features, as noted below:

*The practice model is a clinical intervention model, not a case management model.* The model focuses on the substance of casework activities that MDHS and its providers perform, and emphasizes the importance of particular interventions, such as performing substantive strengths and needs assessments that address presenting issues and their underlying causes; involving children and parents in case planning activities and decision making; and tailoring case plans and interventions to the individual needs of children and families.

*The model emphasizes clinical supervision as a key element in improving practice, as opposed to administrative supervision.* We acknowledge the importance of supervision in strengthening child welfare practice with children and families. In each component of the model, we identify the appropriate roles for supervisors in terms of reviewing, guiding, coaching, and mentoring with regard to assuring qualitative casework practices and strengthening staff capacity.

*All of the components of the practice model are interconnected.* The components are not designed as stand-alone modules but, rather, as part of a comprehensive approach to serving children and families. Implementing one component independent of the others is not likely to lead to improvements in overall practice or outcomes.

*The practice model is integrated with key functions within MDHS.* The framework that we have provided integrates training, policy, resources and service array, and monitoring around similar concepts in order to provide a holistic approach to serving children and families, and to

ensure that the principles and values upon which we have based the practice model are integrated throughout all of the support functions of the agency.

By grouping together the major requirements of the settlement agreement, considering recognized best practices in child welfare, and operationalizing the Mission Statement and values above, we were able to identify six broad categories of activities in working with children and families that comprise the practice model.  They are as follow:

### Mobilizing Appropriate Services Timely

In defining appropriate and timely services, we are referring to a process whereby services are designed and delivered pursuant to a careful assessment of children's and parents' needs.  This concept emphasizes the need for a broad array of services and supports that are individualized to meet the specific needs of the children and families, provided in the least restrictive setting appropriate for the child and accessible to all jurisdictions within the State.

### Safety Assurance and Risk Management

Safety and risk-related interventions are designed to help children remain safely at home whenever possible and appropriate.  Assuring child safety begins with the first report to MDHS that someone believes a child is being maltreated and continues through initiating investigations of maltreatment; initial safety and risk assessment; ongoing safety and risk assessment; developing a case plan; assuring safety during placement; reunification; and case closure.  Safety and risk interventions are applicable for all children within a home, not only for a child for whom a report of maltreatment has been received.

### Involving Children and Families in Case Planning and Decision Making

This component includes active involvement of age-appropriate children, families, and youth in identifying their unique strengths, needs, and service requests, and in developing plans that address their needs, establish and attain their goals, and support safe and appropriate relationships within families while children are in foster care.  It includes all relevant family members, whether in the household or not, preparing them for and supporting their participation in meetings, reviews, and other processes that affect them.

### Strengths and Needs Assessments of Children and Families

Comprehensive family assessment is the ongoing and continuous process of gathering, organizing, and analyzing information for the purpose of informed decision making and service planning concerning the safety, permanency, and well-being of children, youth, and families. Beyond an assessment of risks, safety and the circumstances leading to agency involvement, the assessment includes a broader focus of the strengths and needs of all individual family members along with underlying conditions affecting the family.

### Preserving Connections and Relationships

This component of the practice model emphasizes the normalizing of connections and relationships for children in foster care to the extent that it is safe and appropriate to do so.  The

focus is on keeping children safe and stable within placement settings that permit them to retain important relationships with family members, retain normalized sibling relationships and friendships, important traditions and connections that define them culturally, and continue being a part of the social institutions that nurture them, such as school, religion, and so forth.

### Individualized and Timely Case Planning

An individualized case plan should start with information from the comprehensive family assessment and should continue to be informed by the assessment throughout the life of the case. Individualized case plans should be developed *with* the family not *for* the family; occur early in the casework process, address underlying issues that contribute to the presenting needs; include the safety plan; demonstrate the family's culture and level of functioning; be flexible and change as the family's needs and progress toward achieving the identified goals change; include independent living goals and specific plans and tasks for age appropriate youth; and be reviewed and updated regularly with the family.

The six components of the practice model are tied together and support each other in providing a comprehensive family-centered approach to child welfare interventions with children and families, as depicted in the graphic below:



As illustrated in the graphic, all the agency's interventions revolve around the family, which is at the core of the practice model. At its most fundamental level, the practice model is concerned with assuring child safety and managing the risk of harm. The activities that comprise the other components are designed to protect the child and support the family's capacity to care for the child safely and appropriately, while also meeting the child's needs for permanency, stability, and well being. At any point in time, each of the components of the practice model may be at play and as the model is defined, it is important that the agency emphasize and support all components simultaneously. While each of the practice model components includes unique skills and activities and requires particular systemic supports to function, they are also highly interrelated and should be implemented in an integrated manner in order to be effective in improving outcomes for children and families. Further, the Continuous Quality Improvement (CQI) process supports the practice model by monitoring for the practices within the model. It reinforces the model by providing feedback on how the agency's interventions with children and families contribute to improved outcomes.

The components of the practice model are more than ideals and concepts. They comprise specific activities, roles, and responsibilities that will affect the work of caseworkers, supervisors, Regional Directors, service providers, resource parents, and Central Office staff in various ways.

### *What Does it Mean to Caseworkers?*

Implementing the practice model in Mississippi will mean that all MDHS caseworkers will strengthen their skills and begin to intervene with all children and families in a family-centered way that reflects the components of the practice model. The chart that follows provides an overview of the major casework activities associated with each component of the practice model.

**Mississippi Practice Model**

## Mississippi Practice Model Components and Key Activities

| Mobilizing Appropriate Services Timely | Safety Assurance & Risk Management | Involving Family Members in Decision Making & Case Activities | Strengths and Needs Assessments | Preserving Connections and Relationships | Individualized and Timely Case Planning |
|---|---|---|---|---|---|
| Link services to individualized needs in case plans | Conduct initial safety and risk assessments | Involve in strengths and needs assessments | Assess strengths and needs before developing case plans | Use assessment information to identify relationships/connections | Link services to the individual strengths and needs of each family member |
| Engage service providers | Initiate investigations of maltreatment | Involve in developing the case plan | Involve all family members and foster caregivers in assessment | Identify and locate relevant family members | Address individual strengths & needs in case plans |
| Caseworker visits | Caseworker visits | Caseworker visits | Caseworker visits | Caseworker visits | Caseworker visits |
| Clarify service needs when referring for and monitoring services | Initiate services to address safety and risk | Involve in family team meetings | Conduct ongoing specialized assessments | Family meetings | Engage service providers |
| Provide services promptly and early in interventions to address safety and risk | Conduct ongoing safety and risk assessment | During foster care placements | Conduct initial physical, dental, mental health, development and education screenings | Support family involvement with children in care | Conduct individualized case planning activities outside of a FTM when indicated |
| Provide ongoing services needed to attain permanency goals | Address safety and risk in case plans | | Update assessment at key intervals | Address relationships and connections issues in initial and updated case plans | Link ongoing case planning to individual strengths and needs |
| Provide services to children in placement | Address in reviewing case plans | | Use assessment to make decisions on case closure | Identify/support tribal and other cultural backgrounds | Monitor case plans and revise as needed |
| Provide services at the time of discharge or case closure | Ensure children are safe while in placement | | | Advocate for school consistency | |
| Monitor and evaluate the effectiveness of services | Ensure safety at reunification | | | Place children in settings that support connections. | |
| | Ensure safety at case closure | | | Identify and evaluate relative resources early | |

**Mississippi Practice Model**

## *What Does it Mean to Supervisors?*

In each component of the practice model, we describe the roles and responsibilities of supervisors in implementing the model. Among the cross-cutting responsibilities are the following:

♦ Reviewing caseworkers' work for the quality and substance of the work, rather than only reviewing to see if tasks have been completed;

♦ Providing direct and constructive feedback to staff on the quality of their work in order to identify strengths and needs of practice and facilitate professional development;

♦ Monitoring for activities that comprise the practice model, such as involving all appropriate family members in decision making, ensuring that case plans are individualized, and that appropriate services are put into place timely;

♦ Coaching staff in effective approaches and methods that are consistent with the practice model;

♦ Identifying systemic needs, such as training, services, and policy that are essential to maintaining the practice model and advocating for those needs; and

♦ Serving as part of the broader continuous quality improvement process.

## *What Does it Mean to Regional Directors?*

♦ Implementing the practice model means that Regional Directors will also need to tailor their roles and responsibilities to support practice in the following ways:

♦ Serving as a visible spokesperson and advocate within their regions for improved casework practice through implementation of the practice model;

♦ Managing to the outcomes associated with the Olivia Y settlement, COA standards, and the CFSR that are included in the practice model, by monitoring data related to outcomes and practices that are consistent with the model;

♦ Identifying the strengths and needs of the region's capacity to implement and maintain the practice model, and advocating with communities and others within MDHS for needed resources and supports;

♦ Working closely with service providers and placement resources to help ensure consistency of approach and common principles in intervening with children and families, in part by ensuring their ongoing involvement in implementation and maintenance of the model;

♦ Leading the design and implementation of program improvement efforts where the need is identified; and

♦ Holding staff and providers within the region accountable for consistently engaging in family-centered practice and for the outcomes indicated by the child welfare reforms underway in Mississippi.

**Mississippi Practice Model**

### *What Does it Mean for Continuous Quality Improvement Staff?*

As MDHS implements a CQI process simultaneously with the practice model, there are implications for the roles and responsibilities of CQI staff as follows:

◆ The CQI process should serve as a reinforcement for practice that is consistent with the model and a support to staff in the field;

◆ CQI staff should regularly monitor the quality of work associated with the practice model and the outcomes for children and families that result from MDHS interventions;

◆ CQI should provide case-level and broader level feedback that helps staff at various levels identify the strengths and needs of their work with children and families and understand better how their interventions affect outcomes;

◆ CQI should provide periodic comprehensive reports that address counties, regions, and statewide effectiveness in implementing the model and improving outcomes;

◆ CQI should monitor for the capacity of the child welfare system to support improved practice in the field, for example through the service array, training, information system capacity, and so forth;

◆ CQI should monitor services provided both by MDHS and other providers in order to reinforce consistency in approach;

◆ CQI should include stakeholders outside of MDHS in order to facilitate broad community ownership in service to children and families and facilitate coordination among stakeholders;

◆ CQI should coordinate with other monitoring and oversight functions, such as supervision and the FCR in order to provide for an integrated, consistent approach to reinforcing work in the field; and

◆ CQI should identify needs for improvement in practice and systemic capacity and support counties, regions, and the Central Office in designing and implementing improvement strategies.

### *What Does it Mean to Others?*

There are other responsibilities associated with practice model that are essential to successful implementation and improved outcomes.  The following is just a few of the key roles:

◆ State Office leadership will carry a large responsibility for communicating the messages of child welfare reform in the State to MDHS staff and stakeholders and for encouraging the active support of key stakeholders, such as the provider community, the courts, and others;

◆ Resource families and placement facility staff will need to support efforts to include parents in the lives of their children while in placement and to involve them in decision-making and planning activities;

◆ Service providers will need to develop their capacity to respond flexibly to the individual needs of children and families rather than offering a pre-set menu of services and programs that may or may not be matched to individual needs;

- State Office resource development staff will need to examine funding and contracting procedures in ways that solicit the services needed by children and families and to allow providers to develop their capacity to respond flexibly;

- Training staff will need to revise and develop training that is skills-based and supports the needs of staff for intervening with children and families in family-centered ways; and

- Policy staff will need to revise and develop policies that similarly encourage and guide staff in family-centered practice consistent with the practice model.

## How Will the Practice Model be Implemented?

*In developing the practice model, we used a logic model approach that identifies the following:*

- The inputs needed in order to implement the practice model, including existing policy, training, monitoring, and resources and new or revised policy, training, monitoring, and resources;

- The outputs that will be produced through implementing the model, including work products related to training, policy, monitoring, and resources; roles and responsibilities of key participants, and the casework activities associated with each component of the practice model; and

- The outcomes and indicators associated with each component, including benchmarks of progress, stages of implementation, and performance indicators to be used in monitoring implementation.

The implementation plan recommendations that are included in Section IV of this report provides a plan for addressing and developing the inputs and outputs, and a schedule for working toward the outcomes and indicators. We have recommended a staged approach to implementing the practice model region-by-region within the State in order to bring up the entire integrated practice model regionally rather than attempting to implement it piecemeal statewide. There are several key features to our recommended implementation strategy, including the following:

- Each region would have a six to eight month planning phase to develop implementation plans, engage stakeholders, and prepare to implement the model;

- The planning phases will be followed by an initial 12-month implementation period that includes intense technical assistance and coaching to adopt the practices in the model;

- Each region will begin implementation with a baseline CQI review to establish a base for evaluating progress over time, followed by a follow-up CQI review approximately a year after the initial implementation process begins in order to evaluate progress and adjust implementation plans as needed; and

- Regions will continue to receive technical assistance beyond the initial implementation period in order to completely adopt the practice model and adapt its practices and systemic capacity.

We have recommended criteria for identifying the order of implementation and for staff the implementation process, including hiring an implementation manager and liaisons to the field, who will provide ongoing support to counties and regions in shaping practice and improving

outcomes.  We have also provided a projected time line for implementation activities that will ensure that all regions are engaged in implementing the practice model within four years.  It is important to recognize that the practice model, because it is shaped by the requirements of an encompassing settlement agreement, represents major systemic reform of child welfare in Mississippi and will take time to change practice in ways that can be sustained over time.

## *Continuous Quality Improvement Recommendations*

In supporting the implementation of the practice model, this report also includes a section of recommendations on developing the CQI process required by the Olivia Y settlement agreement. As noted, we have recommended a CQI process that reinforces and supports practice rather than a strict compliance-based process.  It should be an inclusive process that includes stakeholders outside of MDHS, and provides feedback at the individual case level at regional and statewide levels through reports that identify the strengths and needs of practice and the status of outcomes. In order to ensure that MDHS adopts a CQI process that is consistent with the principles and requirements of COA and the Olivia Y settlement agreement, we have cross-referenced those requirements to the proposed CQI process in Section V of this report.

The CQI process that we propose will review both qualitative and quantitative information.  It will examine individual cases periodically and solicit input from the children, families, caseworkers, service providers, and foster caretakers in individual cases.  We recommend a review instrument that mirrors the components of the practice model.  We also recommend that CQI identify needed aggregate data reports and review those for outcomes.  A part of the CQI process also should be the periodic review of systemic capacity within regions needed to support improved practice and outcomes.

The proposed process includes a State Office unit that will lead CQI activities statewide.  We have recommended a State CQI director and liaisons for each region in the State to staff the unit, along with a data analyst and report writer.  We have proposed that the State implementation team and regional/county implementation teams for the practice model double as State and local CQI coordinating bodies so that the practice model and CQI remain integrated and consistent.

The proposed plan calls for CQI to be implemented statewide concurrently with the practice model.  In each region beginning to implement the practice model, CQI would conduct a baseline review and a subsequent review approximately a year later.  In order not to exclude regions in the State from CQI activities until they begin implementing the practice model, however, we have also recommended interim CQI activities that can be implemented statewide early on and remain in place between regularly scheduled CQI reviews.  These interim activities may take the form of either peer reviews or reviews by county CQI teams, with either option following the protocols of the CQI process.

In order to ensure that accountability is built into the CQI process, we recommend that counties/regions develop and implement program improvement plans that address the strengths and needs of practice and systemic factors identified in CQI reviews.  The State Office should adopt accountability measures to ensure completion of needed program improvement plans, and Regional Directors and CQI staff should be charged with responsibilities pertaining to monitoring the completion of the plans.

# INTRODUCTION

The Mississippi Department of Human Services (MDHS) is implementing the terms of a settlement agreement, approved by the court in January 2008 pursuant to the *Olivia Y. vs. Barbour* class action lawsuit. The State is in the second year of implementing the many requirements of the agreement. The settlement agreement requires that MDHS change its practice of child welfare in many significant ways and also requires that MDHS implement or strengthen a number of systemic improvements to support improved practice in the field. As part of the settlement agreement, MDHS is also seeking to become accredited through the Council on Accreditation (COA). COA accreditation includes a set of multiple requirements that the State must meet for compliance with accreditation standards, many of which relate to or overlap with some of the settlement agreement requirements regarding child welfare practice in the field or the agency/systemic supports needed to sustain practice requirements. MDHS is also preparing for its second Federal Child and Family Service Review (CFSR) which is scheduled to occur in May 2010. MDHS underwent the CFSR in February 2004, implemented a Program Improvement Plan (PIP) in April 2005, and subsequently successfully completed the PIP. Many of the Federal requirements reviewed in the CFSR correspond to requirements and standards within the *Olivia Y* settlement agreement and COA criteria.

The *Olivia Y* settlement agreement also calls for MDHS to contract with an independent consultant to make recommendations about the design and implementation of a quality assurance process, which we refer to as Continuous Quality Improvement (CQI) that will monitor its performance in serving children and families. The quality assurance process should also guide the Department's efforts in sustaining progress and in making needed improvements over time.

In preparing to make the major changes to the child welfare system in Mississippi needed to comply with its various mandates, MDHS chose to frame the requirements within a child welfare practice model that would provide an integrated context for implementing the changes in the field and reflect the mission and goals of the Department in serving children and families. The Center for the Support of Families, Inc. (CSF) was awarded a contract to develop the practice model in February 2009. Since then, we have reviewed extensive information about MDHS' interventions with children and families, and considered the perspectives of many participants in the system, including MDHS staff, providers, and consumers.

The practice model we have developed provides a conceptual framework for the Department's work with children and families and is grounded in the values and principles that underlie the mission and principles of the MDHS Division of Family and Children's Services and the principles addressed in the *Olivia Y* settlement. This report includes a description of our approach to developing the practice model, including the methodology, a description of the entire practice model, a detailed discussion of each component of the model, and our recommended plan for implementing the model statewide. Given the need to establish strong links between practice, monitoring, and program improvement, we are also providing our recommendations for the CQI system and its implementation within the State.

# I. METHODOLOGY

Although the *Olivia Y* settlement agreement does not require a practice model to implement the many requirements in the agreement, MDHS chose to frame the requirements of the agreement, along with the COA standards and CFSR requirements into a practice model that could be easily understood by staff in the field.  The desire of the MDHS has been to use the requirements in its mandates to improve child welfare practice and in doing so, to improve the outcomes of its interventions with children and families.  Rather than moving forward in an approach simply complying with a large number of requirements, MDHS chose to consolidate the requirements into a set of practices that reflect its mission and principles.  The practice model is intended to ensure consistency and quality of MDHS interventions to meet the needs of children and families. This work is not intended to be a new initiative or a stand-alone "project," but is intended to provide a conceptual framework to organize and guide interventions that address the safety, permanency, and well-being of children involved with MDHS. CSF guided its framework for the practice model grounded on the following assumptions:

♦   The practice model provides a framework for all casework activities with children and families.  It provides both a conceptual and a practical framework that guides staff in their interventions with all children and families;

♦   The practice model is based upon and clearly reflects MDHS' mission and guiding principles. It also is consistent with the underlying values and principles in the *Olivia Y* settlement agreement;

♦   The practice model comprises an integrated approach to serving children and families by encompassing practices and activities that address safety, permanence, and well-being, and by providing a consistent approach to child welfare interventions across programs that serve children and families;

♦   The practice model provides a basis for MDHS to engage stakeholders whose activities affect the population of children and families served by MDHS in active coordination and alignment of activities, so that the broader child and family-serving system of providers and agencies may have a common foundation and perspective;

♦   The practice model links MDHS' processes for assuring accountability in child welfare practice and outcomes for children and families, by incorporating recommendations for a CQI process that is aligned with practice; and

♦   The practice model provides a guide for strengthening and maintaining capacity within MDHS' infrastructure by linking systemic needs, such as training, service array and delivery, information and reporting, supervision, and other supports directly to the implementation and maintenance of the practice model in the field.

The mission of the MDHS Division of Family and Children's Services (DFCS) is detailed below.

*Our mission is to lead Mississippi in protecting children and youth from abuse, neglect, and exploitation by providing services to promote safe and stable families.*

The values that DFCS has adopted along with the mission are as follow:

*Competence:*  To be competent we have technical skills and knowledge; we work with common sense; we make informed decisions; and we follow through to achieve successful outcomes*.*

*Integrity:*  To act with integrity we are honest in our interactions; we are accountable for our actions; and we do the right thing.

*Responsibility:*  To be responsible we do what we say we are going to do; we take initiative.

*Respect:*  To be respectful we treat others with kindness, compassion, dignity, and honor differences of our clients and each other.

*Personal Courage:*  To be courageous we are loyal to the Mission of the MDHS/DFCS; we advocate for our clients; we lead by example even when doing so carries risk.

*Collaboration:*  To collaborate we make decisions for the common good; we share resources based on need; we work together effectively in teams; and work with a collective knowledge of all programs and services.

In addition to using the DFCS mission and values as a foundation for developing the practice model, we analyzed the *Olivia Y* settlement agreement for common themes and underlying values among its many requirements.  This categorization also helped us to identify the primary components of the practice model.

In order to evaluate the status of current practice and systemic supports in Mississippi, we gathered and analyzed information from multiple sources, including:

♦  An electronic survey administered to MDHS child welfare staff;

♦  A series of focus groups consisting of social workers, supervisors, foster families, Regional Directors, parents served by the system, and youth in foster care;

♦  A review of reports provided through the Foster Care Review process, court monitor reports, and COA reports;

♦  A review of child welfare policy and training curricula; and

♦  Interviews with various stakeholders.

## A.  *Practice Model Components*

Based on reviewing and analyzing information from the sources identified above, and based on our knowledge of current developments in child welfare practice across the country, we identified broad categories of interventions with children and families that appeared essential in operationalizing DFCS's mission and values and in addressing the requirements of the settlement agreement. The six categories of practice were not designed to represent particular models of interventions, such as specific safety and risk assessment tools, etc.  Rather, they represent broad sets of activities that we deemed necessary for DFCS to use in ensuring that its work with children and families reflects its mission and values and supporting its conformity with *Olivia Y*

and Federal requirements through the CFSR. The six practice model components we identified are:

♦ Mobilizing appropriate services timely;

♦ Safety assurance and risk management;

♦ Involving family members in decision making and case activities;

♦ Strengths and needs assessments;

♦ Preserving connections and relationships; and

♦ Individualized and timely case planning.

Although the DFCS' mission and each of the values relates to all components of the practice model, the most direct links are depicted below:

| Practice Model Component | DFCS Mission & Values |
|---|---|
| Mobilizing appropriate services timely | Competence, Responsibility, Personal Courage, Collaboration |
| Safety assurance and risk management | Mission Statement, Personal Courage |
| Involving family members in decision making and case activities | Integrity, Responsibility, Respect, Collaboration |
| Strengths and needs assessments | Competence, Respect, Collaboration, Responsibility |
| Preserving connections and relationships | Mission Statement, Respect |
| Individualized and timely case planning | Respect, Collaboration |

We also wanted to ensure that the practice model is linked to the requirements of the Federal CFSR, so that as MDHS makes changes to its practice it will also be working toward conformity with the requirements reviewed in the CFSR. The crosswalk between the practice model components and the Federal CFSR items reviewed is depicted below:

| Practice Model Component | Federal CFSR Items Reviewed |
|---|---|
| Mobilizing appropriate services timely | Items 8, 9, 10, 19, 20, 21, 22, 23 |
| Safety assurance and risk management | Items 1, 2, 3, 4, 19, 20 |
| Involving family members in decision making and case activities | Items 18, 19, 20 |
| Strengths and needs assessments | Items 4, 17, 19, 20 |
| Preserving connections and relationships | Items 11, 12, 13, 14, 15, 16, 19, 20 |
| Individualized and timely case planning | Items 6, 7, 19, 20 |

The chart below presents an example of how those requirements are linked to one component of the practice model, *mobilizing appropriate services timely*.

| Mobilizing Appropriate Services Timely |
|---|
| ◆ Prompt provision of services to manage risk, assure safety, and prevent recurrence (CFSR) |
| ◆ Case plan developed within 30 days of child entering FC (OY) |
| ◆ Services obtained immediately if there are basic unmet needs – most beneficial and least intrusive services to maintain safety (CFSR/COA) |
| ◆ MDHS provides, refers, contracts or arranges services including therapy, education and support, DV, MH, substance abuse treatment (CFSR/COA) |
| ◆ Provide support services to children in placement to stabilize, support, and minimize moves (COA) |
| ◆ Timely and appropriate efforts to achieve reunification(CSFR/COA) |
| ◆ Prompt and adequate IL and transitional living services to youth in foster care (CFSR/OY) |
| ◆ Prompt efforts to achieve adoption (CFSR) |
| ◆ DFCS to assist youth in obtaining documents necessary to function as independent adults (OY/COA) |

## B. *Logic Model Approach*

To assist in understanding what is needed to implement the practice model, and to clarify the goals and activities associated with the model, we framed the practice model within logic models for each of the individual components. The logic model approach permitted us to conduct a gap analysis and to evaluate current provisions that support the practice model, and what is needed to ensure successful implementation. We identified the inputs, outputs, and outcomes that reflect our recommendations for an implementation strategy for the practice model, as follow.

◆ The **inputs** represent an analysis of the supports needed for the practice model, including training, policy, monitoring activities, and resources.  The inputs also identify the gaps in policy, training, monitoring, and resources that should be addressed to support the model.

◆ The **outputs** detail the *products* (training, policies, protocols), *activities* (specific practices), and *roles and responsibilities* of key stakeholders in each component of the model. The *activities* section of each component's logic model will be the most visible representation of the practice model in MDHS' ongoing work with children and families.

◆ The **outcomes** represent our recommended implementation plan for the practice model, including short-term, mid-term, and long-term outcomes.  We have also identified performance indicators that we believe will assist MDHS in the long-term to monitor the effectiveness of the practice model in reaching its goals of improved outcomes.  These performance indicators are linked to *Olivia Y* benchmarks and to CFSR standards in an effort to make the practice model compatible with those requirements, and they are also included in the CQI recommendations.

Since CSF is also contracted with MDHS to coordinate seven assessments required by the *Olivia Y* settlement agreement[1], much of our information gathering processes were designed to capture information that would be applicable to both the practice model and the assessments. Details of the sources of information and methodology used to frame both the inputs and the outputs of the logic models are described below.

## C. Staff Survey

We designed an electronic survey with input and approval from the MDHS Central Office, and posted it on Survey Methods for completion by child welfare staff across the State. The Central Office issued an invitation by email to staff to complete the survey over a two-week period, which we later extended by an additional week in order to provide more opportunity for staff to participate in the survey.

Through the two response periods, 254 staff completed the survey as follows:

♦ 93 (36.61 percent) responses from Family Protection Specialists, 49 (19.29 percent) from ASWS, 37 (14.59 percent) from other, 30 (11.81 percent) from State Office staff, 25 (9.84 percent) from Family Protection Workers, 11 (4.33 percent) from Resource Workers, and 9 (3.54 percent) Regional Directors;

♦ 74 (29.13 percent) respondents have worked at MDHS for more than 10 years, 69 (27.17 percent) have worked at MDHS for one-to-three years, 47 (18.5 percent) for 5-10 years, 24 (9.45 percent) for 6 months to one year, and 18 (7.09 percent) for fewer than 6 months; and

♦ 93 (36.47 percent) respondents had been in their current position for one-to-three years, 56 (21.96 percent) for fewer than 6 months, 33 (12.94 percent) for 6 months to one year, 30 (11.76 percent) from three-to-5 years, 24 (9.41 percent) for 5-10 years, and 19 (7.45 percent) for more than 10 years.

In analyzing the results of the survey, we used Survey Methods functionality to create tables that display the results. We exported data to Microsoft Excel, manually reviewed the responses to all of the open-ended survey questions, and categorized or grouped responses according to our best understanding of what the respondents indicated in their comments. The results of the staff survey are incorporated throughout the discussion of each practice model component.

## D. Case Reviews

We conducted case reviews that were organized around the topics of the seven assessments that CSF is coordinating for MDHS through the Olivia Y settlement agreement, although information from the case reviews was used to inform the components of the practice model.

We selected random samples for each of six sets of case reviews. We reviewed a total of 167 cases for reunification services, independent living services, medical/dental/mental health

---

[1] The seven assessment address reunification services, independent living services, medical/dental/mental health services, safety services for children in foster care, support services needed by foster caretakers, foster home retention and recruitment, and termination of parental rights. They are referenced in the Foster Care Services Assessment and Implementation Steps section, paragraphs (a) through (g) of the *Olivia Y* Year 2 Implementation Plan.

services, safety of children in foster care (two separate samples), support services to foster caretakers, and termination of parental rights. We reviewed a sample of 30 cases for each topic area, with the exception of safety of children in foster care, for which we reviewed a total of 47 cases covering two separate samples.  We developed individual case review protocols for each sample of cases reviewed.  All of the information from the case reviews was taken from electronic case records in the MACWIS system.

We entered the information from the case reviews into a Microsoft Access data base which permitted us to conduct an analysis of the responses.

## E. Focus Groups

We conducted a series of focus groups in order to gather information on how various stakeholders understand and perceive their roles; the extent to which their practice supports the DFCS mission and values; to clarify how practice in the field supports policy; to obtain their first-hand view of which services, programs, and initiatives support positive outcome achievement; and to determine barriers to effective, consistent practice and service delivery. We conducted focus groups with the following representatives:

♦   Four groups of caseworkers representing a large number of County Departments in four areas of the State (Tupelo, Hattiesburg, Jackson area, and Greenville);

♦   Four groups of Area Social Work Supervisors in the same locations;

♦   The MDHS Regional Directors;

♦   One group of parents served by MDHS;

♦   Three groups of foster parents; and

♦   A focus group of youth in foster care through MDHS.

We developed a focus group protocol that was structured around DFCS' mission and values that we used primarily with the caseworker and supervisor focus groups.  For the remaining groups, we developed specific questions for which we thought they could provide first-hand information.

## F.  Review of Policy and Training Information

We reviewed current child welfare policy and training as they relate to the practice model. The purpose of this was to assist MDHS to determine which of its policies, procedures, and training support the practice model and its underlying family-centered values. For the policies and training we reviewed, we identified the areas that support each practice model component and gaps that should be addressed in order to provide more thorough support for the model.

We reviewed the Department's child welfare policy manual and a number of bulletins that have been released.  We reviewed the pre-service training curricula, the advanced skills training curricula, and the PATH training for resource families.  We also examined the resources available in the field (primarily services) to support the practice model with our information pertaining to resources being provided by interviews with Central Office staff and some providers, and multiple focus groups with stakeholders inside and external to MDHS.

## G. *Review of Additional Information*

We reviewed reports from the Foster Care Reviews that are the Department's means of satisfying the Federal requirement that case plans of children in foster care be reviewed by the courts or an administrative body at least every six months. We reviewed the most recent report issued by the Court Monitor for the Olivia Y settlement agreement, and the COA readiness report.

## H. *Limitations of Our Approach*

While we obtained substantial information in the course of developing the practice model, there are some limitations to the information gathered. Reviewing cases entirely from the MACWIS system poses some limitations, given concerns about the thoroughness of information in the system. Given those same concerns, we made very limited use of statewide data reports that might otherwise have informed the status of practice in the field with regard to the practice model. Also, with additional time we would have preferred to conduct more individual interviews and focus groups with representatives outside of MDHS and with consumers.

# II.  THE PRACTICE MODEL

As noted in the Methodology section, the six practice model components that we have developed in collaboration with MDHS are as follow:

- Mobilizing appropriate services timely;

- Safety assurance and risk management;

- Involving family members in decision making and case activities;

- Strengths and needs assessments;

- Preserving connections and relationships; and

- Individualized and timely case planning.

These six categories of activities are applicable to all of MDHS' child welfare interventions with children and families and reflect its mission and values. There are some important features of this conceptual framework that should be noted.

## A.  The Practice Model is a Clinical Intervention Model, Not a Case Management Model

The practice model assumes that the interventions of social workers, parole officers, and others have a tremendous effect on the outcomes for children and families.  In framing it as a clinical model, we focused on the substance of casework activities that MDHS and its providers perform, and emphasize the importance of particular interventions such as performing substantive strengths and needs assessments that address presenting issues and their underlying causes, early identification of developmental and other concerns with children and families and addressing them in case planning, providing services that are matched to individual needs, and intervening early to address behavioral health issues before they become reflected in more serious behaviors.

## B.  The Model Emphasizes Clinical Supervision as a Key Element in Improving Practice, as Opposed to Administrative Supervision

In social services, the importance of effective supervision in strengthening practice has been widely acknowledged.  Throughout each component of the practice model, we have identified the appropriate roles for supervisors in terms of reviewing, guiding, coaching, and mentoring with regard to assuring qualitative casework practices and strengthening staff capacity.  We treat the supervisory function as the first level of reinforcement and support for the interventions included in the practice model and the skills needed to implement them, such as critical thinking and analysis, thorough information gathering, meaningful involvement of children and families, and making informed and appropriate decisions.

## C.  All of the Components of the Practice Model are Interconnected

The components are not designed as stand-alone modules but, rather, as part of a comprehensive approach to serving children and families.  Implementing one component independent of the others is not likely to lead to improvements in overall practice or outcomes.  For example, safety is woven throughout MDHS' interventions and should be addressed through assessments, in making decisions, and in individualizing services.  Similarly, the effectiveness of individualizing services and involving children and families in decision making is dependent upon an accurate assessment of the family members' strengths and needs.

## D.  The Practice Model is Integrated With Key Functions Within MDHS

A framework that guides the work of the three divisions requires certain functions, such as training, policy, service array, information system capacity, and monitoring to be based on similar concepts and actively support practice.  For each component, we identified the inputs needed to support it, many of which already exist within MDHS, and some that will need to be developed. We also linked the following four areas that are associated with the level of systemic change that this practice model represents.

First, the practice model is based on *Mission, Vision, and Values* that include the DFCS mission statement and values.  Together with an analysis of common values and themes reflected in the *Olivia Y* settlement agreement, this provides the principle-based framework that connects everything associated with the practice model, and provides staff and stakeholders with a common understanding of the model.  Second, it includes *Practices* associated with the model that reflect the DFCS mission and values and the purposes of the settlement agreement, COA standards, and CFSR requirements. Third, it includes *Infrastructure Supports* needed to implement and sustain the practices, such as training, policy, and resources.  We identified the existing supports that are consistent with the practice model components and those needing to be developed or strengthened. Fourth, we included *Monitoring* as part of each component of the practice model, and have also described an overall plan for CQI that is designed to reinforce the practices, infrastructure supports, and mission and values in the model.

## E.  Definitions of Practice Model Components

In addition to the casework activities with children and families related to each component, the individual descriptions of each component that follow identify the work products that will be needed for implementation and the roles and responsibilities of the major participants in each component's activities.  Further, our definitions of the practice model components focus on quality and outcomes rather than a checklist of activities to be completed.  The definitions are as follow.

## <u>Mobilizing Appropriate Services Timely</u>

In our definition of appropriate and timely services for purposes of the practice model, we are referring to a process whereby services are designed and delivered pursuant to a careful assessment of children's and parents' needs.  The assessment should identify both the strengths of the children and parents with regard to the issues requiring interventions, and their needs with regard to ensuring safety, permanency, and well-being.  Needs should not be confused with services, as they sometimes are in case planning.  In order to provide appropriate and timely

services to children and parents, there is a need to think beyond what is available in the service array so as to avoid offering a standard menu of services that may or may not match the unique needs of some parents and children. The concept of appropriate services in our definition emphasizes that services should be comprehensive, incorporating a broad array of services and supports that are individualized to meet the specific needs of the children and families, provided in the least restrictive setting appropriate for the child and accessible to all jurisdictions within the State.

The following practice principles linked to this component:

♦ Services are designed and delivered pursuant to a careful assessment of the children's and parents' needs;

♦ Services and supports are individualized to meet the unique needs of the children and parents;

♦ Services are based on needs, not on availability;

♦ Services are delivered when they are needed and in locations that are accessible to the children and parents who need them; and

♦ Children and families are treated as partners to assure joint decision making about the services that they need.

## Safety Assurance and Risk Management

Safety and risk-related interventions are designed to help children remain safely at home whenever possible and appropriate. Assuring child safety begins with the first report to MDHS that someone believes a child is being maltreated and continues through initiating investigations of maltreatment; initial safety and risk assessment; ongoing safety and risk assessment; developing a case plan; assuring safety during placement; reunification; and case closure. Safety and risk interventions are applicable for all children within a home, not only for a child for whom a report of maltreatment has been received.

The following practice principles linked to this component:

♦ Safety and risk assessment practice guides casework activities with regard to safety, permanency, and well-being;

♦ Safety and risk assessments are used to address case plans and service delivery;

♦ Safety and risk assessment occurs throughout the life of a case;

♦ Family-centered practice principles apply to safety and risk interventions; and

♦ Safety and risk are addressed within the cultural background of the children and families being served.

## Involving Children and Families in Case Planning and Decision Making

This component includes active involvement of age-appropriate children, families, and youth in identifying their unique strengths, needs, and service requests, and in developing plans that address their needs, establish and attain their goals, and support safe and appropriate

relationships within families while children are in foster care. It includes all relevant family members, whether in the household or not, preparing them for and supporting their participation in meetings, reviews, and other processes that affect them. It also includes using information from safety and risk assessments and comprehensive strengths and needs assessments to determine negotiable and non-negotiable aspects of case planning, casework activity, and levels of family involvement.

The following practice principles are linked to this component:

♦ Parents, age-appropriate children, and youth are actively involved in developing or modifying all plans that pertain to them;

♦ Parents who do not reside in the home of the children are involved in developing and modifying plans that pertain to their children whenever it is safe and appropriate to do so;

♦ When safe and appropriate, parents are involved in the care of their children in foster care and in their children's activities; and

♦ Safety of children is not compromised through involving children and parents in case planning and decision making.

## Strengths and Needs Assessments of Children and Families

Comprehensive family assessment (CFA) is the ongoing and continuous process of gathering, organizing, and analyzing information for the purpose of informed decision-making and service-planning concerning the safety, permanency, and well-being of children, youth, and families. Beyond an assessment of risks, safety and the circumstances leading to agency involvement, the CFA includes a broader focus of the strengths and needs of all individual family members along with underlying conditions affecting the family. Collaboration with key professionals throughout the process is critical.

The following practice principles are linked to this component:

♦ All families have unique strengths and needs;

♦ Families are participants in identifying their strengths and needs and in requesting services;

♦ Assessment includes strengths and needs regarding safety, permanency, and well-being;

♦ Assessment addresses underlying conditions in addition to presenting issues;

♦ All relevant family members' strengths and needs should be assessed;

♦ Assessment information is used to guide case planning and decision making;

♦ Families are best understood in the context of their culture;

♦ Early identification of concerns that can lead to emotional and behavioral disturbance is prioritized in assessments; and

♦ Assessments should be multidisciplinary.

## Preserving Connections and Relationships

When children enter foster care, they often become separated from the people and places that are the most familiar and comforting to them. This component of the practice model emphasizes the normalizing of connections and relationships for children in foster care to the extent that it is safe and appropriate to do so. The focus is on keeping children safe and stable within placement settings that permit them to retain important relationships with family members, retain normalized sibling relationships and friendships, maintain important traditions and connections that define them culturally, and continue being a part of the social institutions that nurture them, such as school, religion, and so forth.

The following practice principles are linked to this component:

♦ Foster care should support the family instead of substitute for the parents whenever possible and appropriate;

♦ Healthy child/parent relationships should be supported and maintained throughout a foster care episode if safe and appropriate to do so;

♦ Children in foster care have important connections and relationships that help to define them as individuals and members of a family, community, and culture;

♦ Caseworkers should work to normalize the connections and relationships for children in foster care to the extent that it is safe and appropriate to do so;

♦ Children should be allowed to retain important relationships with extended family, siblings, and other friendships as deemed safe and appropriate; and

♦ Agencies should ensure that important traditions, identity with social institutions and cultural connections are maintained.

## Individualized and Timely Case Planning

An individualized case plan will start with information gathered from the comprehensive family assessment and should continue to be informed by the assessment throughout the life of the case. The development of the case plan, the review of the case plan and the overall planning process must involve all relevant family members, including parents who may not reside in the home and age-appropriate children and youth. Individualized the case plans must be developed *with* the family not *for* the family; occur early in the casework process, address the underlying issues that contribute to the presenting needs; include the safety plan; be written clearly in simple, straightforward language; demonstrate the family's culture and level of functioning; be flexible enough to change as the family's needs and progress toward achieving the identified goals changes; include independent living goals and specific plans and tasks for age appropriate youth; and be reviewed and updated regularly *with* the family.

The following practice principles are linked to this component:

♦ Timely decisions about goals and activities are made in collaboration with children, youth, and parents;

♦ The case plan is a guide for the agency's and service providers' work with children and families, and not simply a requirement to be met;

◆  The family's progress is monitored regularly in order to make timely decisions with regard to changing or continuing goals and services, or to take other actions to assure the safety, permanency and well-being of children; and

◆  Information from all available sources should be used to ensure any placement is the most appropriate for the child in order to assure timely permanency.

The chart that follows depicts the six components of the practice model and the major activities associated with each component.

**Mississippi Practice Model**

## Mississippi Practice Model Components and Key Activities

| Mobilizing Appropriate Services Timely | Safety Assurance & Risk Management | Involving Family Members in Decision Making & Case Activities | Strengths and Needs Assessments | Preserving Connections and Relationships | Individualized and Timely Case Planning | Mobilizing Appropriate Services Timely |
|---|---|---|---|---|---|---|
| Link services to individualized needs in case plans | Conduct initial safety and risk assessments | Involve in strengths and needs assessments | Assess strengths and needs before developing case plans | Use assessment information to identify relationships/connections | Link services to the individual strengths and needs of each family member | Link services to individualized needs in case plans |
| Engage service providers | Initiate investigations of maltreatment | Involve in developing the case plan | Involve all family members and foster caregivers in assessment | Identify and locate relevant family members | Address individual strengths & needs in case plans | Engage service providers |
| Caseworker visits | Caseworker visits | Caseworker visits | Caseworker visits | Caseworker visits | Caseworker visits | Caseworker visits |
| Clarify service needs when referring for and monitoring services | Initiate services to address safety and risk | Involve in family team meetings | Conduct ongoing specialized assessments | Family meetings | Engage service providers | Clarify service needs when referring for and monitoring services |
| Provide services promptly and early in interventions to address safety and risk | Conduct ongoing safety and risk assessment | During foster care placements | Conduct initial physical, dental, mental health, development and education screenings | Support family involvement with children in care | Conduct individualized case planning activities outside of a FTM when indicated | Provide services promptly and early in interventions to address safety and risk |
| Provide ongoing services needed to attain permanency goals | Address safety and risk in case plans | | Update assessment at key intervals | Address relationships and connections issues in initial and updated case plans | Link ongoing case planning to individual strengths and needs | Provide ongoing services needed to attain permanency goals |
| Provide services to children in placement | Address in reviewing case plans | | Use assessment to make decisions on case closure | Identify/support tribal and other cultural backgrounds | Monitor case plans and revise as needed | Provide services to children in placement |
| Provide services at the time of discharge or case closure | Ensure children are safe while in placement | | | Advocate for school consistency | | Provide services at the time of discharge or case closure |
| Monitor and evaluate the effectiveness of services | Ensure safety at reunification | | | Place children in settings that support connections. | | Monitor and evaluate the effectiveness of services |
| | Ensure safety at case closure | | | Identify and evaluate relative resources early | | |

## *F.  An Integrated Practice Model*

The diagram below illustrates the interrelationships among the six components of the practice model.  None are designed to operate independently of the others and together, they comprise an integrated approach to serving children and families in a holistic, family-centered manner.



As illustrated in the graphic, all the agency's interventions revolve around the family, which is at the core of the model.  At its most fundamental level, the practice model is concerned with assuring child safety and managing risks associated with the child's safety.  The activities that comprise the other components are designed to protect the child and support the family's capacity to care for the child safely and appropriately, while also meeting the child's needs for permanency, stability, and well being.

The remaining five components of the model represent the day-to-day interventions with children and families that define a family-centered approach and address their specific needs with the appropriate services.  Although these interventions might appear to be linear in function – moving from assessment to involving families in decision making, developing individualized case plans, preserving important connections, and mobilizing the appropriate services timely – they are actually circular and closely interrelated.

**Comprehensive assessments** of the strengths and needs of all relevant family members is a necessary step in developing appropriate goals, plans, and interventions. The assessment is also necessary in order to identify services that are appropriately matched to the family members' strengths and needs. Accurate assessments cannot be completed most often, however, without the active **involvement of family members** whose needs are being assessed, since we must assume that family members know their circumstances better than anyone else. Further, simply completing an assessment of strengths and needs is futile unless that information is then used to inform case planning activities.

**Involving children and parents in decision making** about how best to use the information from assessments is central to developing goals and strategies that family members can commit to and assume responsibility for achieving and leads to **individualized case plans** and casework activities that reflect individual strengths and needs. Although involving parents and children can occur through a variety of settings and approaches, the constant here is consistently providing the family with the opportunity to identify their needs, determine their goals, request services, and evaluate their progress, and using their information to guide planning activities. This occurs and re-occurs over the life of the case. The assessment should guide the development of case plans and activities, and the family's involvement in both assessing and planning are important practices in ensuring accuracy and relevance.

When family members are actively involved in decision making and when case plans reflect individualized strengths and needs, the likelihood is increased that the **services can be mobilized that are appropriate** for the family's circumstances. Through their involvement in decision making and the agency's willingness to bring them to the planning table, family members can identify those services that can best help them to achieve their goals, rather than being reliant upon someone else to make decisions for them.

Further, without having completed an accurate assessment of strengths and needs, matching services to what a family actually needs is very difficult and may result in families being offered what is available rather than what they need. Either completing assessments without using the information to guide decision regarding services, or attempting to provide services without the benefit of an assessment are both likely to be unsuccessful and ineffective in supporting families to care safely for their children.

When strengths and needs have been correctly evaluated and identified, family members have provided meaningful input into the plans to which they are accountable, and when services have been tailored to their individualized needs, agencies are better situated to make timely and appropriate decisions regarding the outcomes of the agency's involvement with families, for example, permanency decisions, case closure decisions, decisions to re-evaluate or re-configure services, and so forth. This ability stands in contrast to decision-making that is based on other factors, such as the family's lack of engagement, the lack of measurable improvements resulting from mismatched services, or simply the passage of time without reaching designated goals. When all of the necessary supports have been provided appropriately and timely, the agency can accurately evaluate the family's ability to care for its children and work with the family to make informed decisions that will affect its future.

Back to the cyclical nature of these components, the comprehensive assessment process occurs throughout the life of the agency's work with children and families, and is not a singular event at

the start of casework activity.  Assessment informs timely decision making and the effectiveness of services.  Similarly, the family's involvement does not simply occur when an initial case plan is developed, but in initial assessments and re-assessments, when important decisions are made, and throughout service provision.  At any point in time, each of these four major components of the practice model may be at play and as the model is defined, it is important that the agency emphasize and support all components simultaneously.

At the outer circle of the model, there are provisions for monitoring and reinforcing positive casework practice within each component of the model.  Monitoring, reinforcing, providing feedback through **continuous quality improvement activities** are essential to encouraging consistent practice and fidelity to the practice model.  Encompassing routine supervision as well as more formal quality assurance activities, monitoring activities promote consistency with the principles of the practice model, help staff and providers continually make the connections between values and interventions, evaluate the effectiveness of interventions and systemic supports, and provide the basis, when needed, to make systemic changes and strengthen practice. Implementing the practice model without a strong reinforcement process that is based on constructive feedback and interaction with all levels of the service delivery system increases the risk that the components will become perfunctory and ineffective.  Implementing the practice model as we have defined it, will be a process of skill development and capacity building over time.  An effective, non-punitive monitoring system will inform that process and help to keep it moving in the desired direction.

Also at the outer circle, **support** for the practice components through the child welfare infrastructure is also critical to effective implementation.  For example, **mobilizing appropriate services timely** will not be possible without the commitment and engagement of service providers, whose flexibility and responsiveness are central to this component.  Similarly, **involving family members in decision making and case activities** and **preserving relationships and connections**, as we have defined them, cannot occur unless foster caretakers are trained and committed to support parents in maintain some level of parenting responsibility while their children are in foster care and to support frequent visits and other contacts with family members, and unless the agency has the resources to place children appropriately near their homes and communities.  Support of the practice model and reinforcement of its principles and practices are also heavily dependent upon the ability of the MDHS administration to articulate its commitment to the model and to form effective relationships with key stakeholders within the State's communities.

Therefore, while each of the practice model components includes unique skills and activities and requires particular systemic supports to function, they are also highly interrelated and should be implemented in an integrated manner in order to be effective in improving outcomes for children and families.

The section that follows provides detailed information on each component of the practice model, following the logic model format (inputs, outputs, outcomes and indicators).  We have developed logic model charts for each component that summarize this information that are included in *Appendix A*.  We have also developed practice guides for each of the six components for use in implementing the practice model which are included in *Appendix B*.

# III. COMPONENTS OF THE PRACTICE MODEL

**Components**

*Mobilizing Appropriate Services Timely*

*Safety Assurance and Risk Management*

*Involving Family Members in Decision-Making and Case Activities*

*Strengths and Needs Assessments*

*Preserving Connections and Relationships*

*Individualized and Timely Case Planning*

**Mississippi Practice Model**

## A.  Component One:  Mobilizing Appropriate Services Timely

For children who have been victims of abuse and/or neglect, it is critical that the appropriate services are available to the child and his/her family in a timely manner.  Traditionally, agencies have relied on a standard menu of services for families that has varied little depending upon family dynamics or the reasons for involvement with the child welfare system.  Over time, child welfare has come to understand that individualized service plans with tailored services to meet the child's or family's unique needs are more likely to achieve positive outcomes for the child and his or her family.  In ensuring that services are appropriate and individualized, the service provider system must be sufficiently flexible to respond to unique needs, must be located in the communities where the services are needed and the agency's processes for purchasing services must be accessible to staff who are developing plans with families and making decision about which services are needed. This all has implications for financing, purchase of services, the services array and accessibility of services.

Caseworkers must have the skills to engage families effectively from a strength-based, family-focused perspective, along with the resources to deliver (or purchase) services that are tailored to meet the child's or family's needs.  The capacity to address children's specific well-being and placement needs is crucial to preventing placement whenever possible, stability while in foster care, preserving important connections and relationships, prompt reunification, and expediting alternate permanency plans when necessary.  The capacity to meet parents' specific needs is crucial to strengthening their capacity to care for their children safely and appropriately, preventing unnecessary family separation, and ensuring that their children have permanency and stability in their lives even when placement is necessary.  When paired, the extent of parental commitment as a participant in the case plan and the appropriateness of services in relationship to children's needs are key to achievement of positive child safety, permanency and well-being outcomes.[2]  Services should also be accessible and available in a timely manner in order to meet the needs of children and their parents.

In our definition of appropriate and timely services for purposes of the practice model, we are referring to a process whereby services are designed and delivered pursuant to a careful assessment of children's and parents' needs.  The assessment should identify both the strengths of the children and parents with regard to the issues requiring interventions, and their needs with regard to ensuring safety, permanency, and well-being.  Needs should not be confused with services, as they sometimes are in case planning.  For example, a parent may *need* to control his or her reactions to a child's behaviors, but the parent does not *need* parenting classes, which is a service.  Although a service such as parenting classes may be appropriate to address the needs of some parents, for other parents a careful assessment and involvement of the parent in decision making about which services could best help him/her may lead to another service that is more appropriately matched to the parent's need, developmental level, and cognitive abilities, such as an in-home coach or counselor to help and model for the parent in dealing with risky situations as they arise.

In order to provide appropriate and timely services to children and parents, there is a need to think beyond what is available in the service array so as to avoid offering a standard menu of

---

[2] Achieving Successful Outcomes for Children National Resource Center for Organizational Improvement April 2008.

services that may or may not match the unique needs of some parents and children. The concept of appropriate services in our definition emphasizes that services should be comprehensive, incorporating a broad array of services and supports that are individualized to meet the specific needs of the children and families, provided in the least restrictive setting appropriate for the child and accessible to all jurisdictions within the State. Children and families should be treated as full partners to ensure joint decision making with families and children about which services can best meet their needs, how those services are delivered, who delivers them and so forth. The most effective approach will be child-centered and family-focused with the needs of the child and family directing the types and mix of services to be delivered. Services must be responsive to the child's and family's cultural background, which may go beyond sharing a common language. They may involve the development of new services that are not readily available in order to respond to a child's or family's needs. They require flexible providers who can respond to unique and changing needs, and they rarely involve standardized, one-size-fits-all approaches to serving children and families. For example, a standardized residential program that requires all children entering to progress through the same treatment program regardless of the reasons the agency is intervening with them would be inconsistent with this definition of appropriate and individualized services.

Services are delivered on two levels. First, the services provided by the public child welfare system (DFCS) and second, by those resources outside of the formal system including but not limited to community-based organizations, placement resources, mental health treatment resources, physical health resources, counseling and educational resources. Informal supports, e.g., extended family, church, neighbors, should also be considered when developing the service plan and subsequent services. In Mississippi, many of the services that a family will need to ensure both the safety and well-being of the children they serve will be provided by someone other than their DFCS social worker. Therefore, the concept of timely and appropriate services will be highly relevant both to DFCS staff and the service providers it uses to serve children and families.

## Section 1: Inputs

### a. Training

#### Strengths

The primary training modules which discuss the provision of services in a timely manner are *Core Relationship Skills in the Child Welfare Setting, Social Worker's Guide to Family Centered Practice, Assessment in the Child Welfare Setting: Overview of Youth Court, Assessment in the Child Welfare Setting: Child Development* and *Case Planning and Family Engagement in the Child Welfare Setting*. There are several key activities critical to the achievement of appropriate and timely services which are addressed in training.

♦ Worker's ability to obtain services immediately if the family has unmet needs is addressed in the *Core Relationship Skills in the Child Welfare Setting, Social Worker's Guide to Family Centered Practice.* Several key concepts addressed in the training are:

   o Services and activities that are needed to mitigate the identified needs must be prioritized;

- o If the family does not require services from the formal child welfare system but is in need of other services, than referrals are to be made for community based services and supports; and

- o If a child can remain in the home but there is a need for a safety plan then family preservation services are to be initiated.

- ♦ The prompt provision of services to manage risk, assure safety and prevent recurrence of abuse or neglect is discussed in *Assessment in the Child Welfare Setting: Overview of Youth Court* and *Case Planning and Family Engagement in the Child Welfare Setting*

  - o The *Assessment in the Child Welfare Setting: Overview of Youth Court* training provides information on reasonable efforts (RE) which may involve the provision of services that are relevant to alleviate the specific harm; are available when needed and accessible and acceptable. All service activities must show RE by the caseworker to help families remedy those conditions that will enable the child to stay in or return to the family home.

  - o *Case Planning and Family Engagement in the Child Welfare Setting addresses:*

    - • the provision of services through the use of a family team meeting (FTM) which is the mechanism for identifying the natural supports of a family and the services that can be wrapped around the family to create a safe environment for the child;

    - • the importance of holding a FTM prior to the child's removal or as soon after removal as possible in order to identify and mobilize the necessary services in a timely manner; and

    - • the requirement that FTM must be held within 30 days of case opening to develop the Individual Service Plan (ISP) with the family.

- ♦ The linking of services to identified needs is addressed in *Assessment in the Child Welfare Setting: Child Development* as it presents information on the need for services in a timely manner when there are development delays or regression in the child's behavior.

  - o It gives some examples of specific services to be offered including medical examinations, hearing and vision assessments, special day care or respite and parent education to help parents work with children of specific ages or with specific needs.

### Gaps

While there are numerous critical areas that are addressed in the training there remain several areas which either are not addressed at all or would benefit from further expansion in the training.

- ♦ The *Social Worker's Guide to Family Centered Practice* appeared to be more philosophical about the need to provide services rather than providing participants with specific practices on how to actually prioritize, refer or obtain services.

- ♦ The training curriculum does not address specifics in how to determine which services would best meet the family/child's needs, or how to obtain and then monitor the services. All of which will be critical to effectively mobilizing services.

- ♦ There did not appear to be any staff training modules or content specific to the program areas of reunification and adoption which are critical components of child welfare practice and are

areas.  Workers would benefit from receiving training on the concepts and best practices related to the delivery of those services.

♦ The training on Independent Living (IL)  appeared to be limited to a small segment in the intensive training, however, a new initiative is about to start which will involve a trainer from the contractor agency training DFCS staff on IL plan and the social worker's role.  The contract requires the contract specialist to attend the foster parent training each year and review the IL program, but this is not monitored by DFCS to know if it is happening.  While IL services are mentioned in PATH, the training for foster parents, the role of the foster parent in the provision of IL and transitional services did not appear to be emphasized.

♦ While the concept of family team meetings is introduced in the *Case Planning and Family Engagement in the Child Welfare Setting Module,* the training does not cover how to conduct a meeting or who is to be involved.

♦ There did not appear to be any training modules that specifically addressed the broader issues of the array of services necessary to effectively work with children and families including:

o Specific information on identifying and accessing services/supports to address reunification services, placement related services, independent living, working with youth including teen pregnancy and parenting, adoption, mental health and substance abuse; and

o Guidance in how to access services and how to prepare the child/family for services.

♦ Visitation with the child, their legal family as well as foster family and extended family members will be important to the identification and delivery of appropriate services.  Training did not address the issue of visits, how often they should occur, who should be involved nor what should happen during the visit.

We asked respondents to the staff survey to rate the agency's effectiveness in providing training to staff on matching services to identified needs.  They rated this area as frequently or almost always effective less than half the time (about 45 percent).

### b. Policy

The mission of the Department of Human Services begins by addressing the provision of services for people in need and to optimize <u>all</u> available resources to sustain the family.  In order to be able to implement the mission, DFCS must have clear and concise policy which addresses not only the delivery of services, but ensures the development of an array of services which can be readily accessible and meet the needs of the children and family involved with DFCS.  Our review of policy focused primarily on *Chapter B: Child Protective Services* and *Chapter D: Foster Care Services* as they seemed the most relevant to the delivery of child welfare services.  We also reviewed various policy updates which we were provided.

In policy, the goals and objectives of *Family-Centered Practice* are defined as "to protect and serve the best interest of the child by strengthening and preserving families to enable children to live safely at home with their parents or relatives.  Family Centered Practice is based on identifying and building on strengths."   It is the expectation that specific services are to be offered to identify, treat, prevent child abuse and neglect and protect children from harm.

## Strengths

There are several key areas which policy should focus on in order to support family-centered practice and the delivery of appropriate services in a timely manner.

### Visits

Visits, not only between the child and their parent/family but also between the worker and the child/family/foster family are critical to assure that the appropriate type and level of services are being developed to address the issues which brought the family to the attention of the child welfare system and to monitor the delivery of those services. DFCS policy discusses the importance of visits in maintaining connections, has requirements for minimum visits (see detail under gaps below) and addresses the development of a visitation plan which is to specify the time and location of visits.

### Individual Service Plan/Planning Process

The second area would be the Individual Service Plan (ISP) and planning process. The ISP is the tool used to:

♦ Address the target problems;

♦ Identify goals to be accomplished;

♦ Identify the tasks by which the goals will be accomplished; and

♦ Includes timeframes to achieve the identified goals and tasks.

Policy requires that the plan be developed together with the family by evaluating the information gathered during the investigation including the assessment of risk and any safety plan that is created as well as information from the Strengths and Risk Assessment (SARA.)

The components of the ISP (both adult and child) are identified in policy and in reference to services include the following:

♦ The adult ISP should address the reasons for services and what services were provided.

♦ The child's ISP should include a discussion of the reasons for services and what services were provided.

Not only is the identification and delivery of services critical but once the services have been initiated it is imperative that their effectiveness be monitored regularly. DFCS identifies the ISP as the venue to monitor the plans on a regular basis. The plans are to be developed within 30 days of the child entering out-of-home care. The plans are to be used to assess the progress towards the permanency goals and services. Adult plans are reviewed every 90 days and the child's plan is reviewed at 90 days after placement and every 180 days thereafter. This is done in part through regular home visits (required once a month in policy) and contact with the child, their parents/caregivers and other service providers. Policy discusses the use of the ISP as the focus for the work with the family as it allows the family to understand what has been accomplished and what must be completed to ensure that their child is no longer at risk.

*Identification of Needs*

The DFCS social worker is to carefully evaluate the situation to determine what services are needed to be provided for the safety of the children. This will be discussed in more detail in the *Strengths and Needs Assessments* section but warrants mentioning here. Without the appropriate and thorough assessment of a child and their parents/caregivers strengths and needs, it will be impossible to determine what services are necessary to address those areas which brought the family to the child welfare system.

*Service Array*

*Chapter B: Child Protective Services* identifies three "types" of services:

♦ *Concrete Services*:  help in locating housing, food, medical treatment.

♦ *Educational Services*:  learning what their children are capable of doing at certain ages; how to discipline without abusing; how to provide safe supervision; how to cope with stress more effectively; parenting training.

♦ *Therapeutic Services*:  such as mental health counseling to address interpersonal relationship problems (marital, self-esteem, self-nurturance, life crisis).  Although many abusive and neglectful parents have similar problems in caring for their children, the Service Plan individualizes where changes are needed for one particular family.

Respondents to the staff survey indicated that the agency was frequently or almost always effective in its timeliness of initiating services to address safety post-investigation about two-thirds of the time (about 66 percent).  Also, as shown in the chart below, survey respondents were asked to consider the effectiveness of available services to address specific issues, and their responses varied significantly.  They rated the effectiveness of available services the highest with regard to family preservation services and physical health services (each about 69 percent frequently or almost always effective), services to meet basic needs (about 70 percent), dental health services (about 72 percent), and independent living services (about 75 percent).  The services that they rated the least effective were domestic violence services (about 37 percent frequently or almost always effective) and substance abuse treatment services (about 47 percent).  They did not rate any of the individual services as frequently or almost always effective more than three-quarters of the time (independent living services).

| Please rate effectiveness of available services to address the following areas, including the ability to initiate the service when needed and the quality of the service: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Some times | Frequently | Almost Always | No Info/NA | Total |
| Domestic violence services: | 2 (1.09%) | 24 (13.04%) | 68 (36.96%) | 47 (25.54%) | 21 (11.41%) | 22 (11.96%) | 184 |
| Substance abuse treatment services: | 2 (1.09%) | 15 (8.15%) | 62 (33.7%) | 54 (29.35%) | 32 (17.39%) | 19 (10.33%) | 184 |
| Sexual abuse services: | 3 (1.63%) | 17 (9.24%) | 40 (21.74%) | 57 (30.98%) | 51 (27.72%) | 16 (8.7%) | 184 |
| Therapeutic services: | 0 (0%) | 9 (4.92%) | 44 (24.04%) | 59 (32.24%) | 57 (31.15%) | 14 (7.65%) | 183 |
| Family preservation services: | 0 (0%) | 9 (4.89%) | 31 (16.85%) | 69 (37.5%) | 58 (31.52%) | 17 (9.24%) | 184 |
| Physical health services: | 0 (0%) | 11 (6.01%) | 29 (15.85%) | 59 (32.24%) | 68 (37.16%) | 16 (8.74%) | 183 |
| Dental health services: | 0 (0%) | 11 (5.95%) | 25 (13.51%) | 66 (35.68%) | 68 (36.76%) | 15 (8.11%) | 185 |
| In-home services: | 1 (0.54%) | 11 (5.95%) | 40 (21.62%) | 67 (36.22%) | 51 (27.57%) | 15 (8.11%) | 185 |
| Post-adoption support services: | 2 (1.12%) | 13 (7.3%) | 35 (19.66%) | 56 (31.46%) | 33 (18.54%) | 39 (21.91%) | 178 |
| Services to meet basic needs (food, clothing, shelter): | 1 (0.54%) | 6 (3.23%) | 37 (19.89%) | 52 (27.96%) | 78 (41.94%) | 12 (6.45%) | 186 |
| Independent living services for youth in care ages 14-20: | 0 (0%) | 8 (4.37%) | 22 (12.02%) | 47 (25.68%) | 90 (49.18%) | 16 (8.74%) | 183 |
| Transitional living services for youth in care: | 2 (1.12%) | 15 (8.38%) | 33 (18.44%) | 51 (28.49%) | 57 (31.84%) | 21 (11.73%) | 179 |

*Chapter D: Foster Care Services* discusses two types of services that are offered to assist families when children have been placed or are being returned home after placement. Those services are:

♦ *Supportive Services:* involve casework counseling and other activities by the Worker and other efforts to maintain the family's ability to cope with stress of increased parenting responsibilities.

♦ *Supplementary Services:* these services are informal in that they are provided by neighbors, relatives, and friends in the family's behalf. Provisions of emergency transportation or child care supervision by an informal network, for example, may be equally as effective as more formal service providers and can fill a gap in areas where structured resources do not exist.

There is policy which discusses a program through the Mississippi State Department of Health which provides medical, information and educational services through a Family Planning program. This service supports teens in delaying childbearing until they are physically, emotionally and economically prepared to have children.

*Placement Services*

*Chapter D: Foster Care Services* deals with many of the issues related to the placement of a child. It discusses the procedures for placement, the types of placements available and requirements regarding contact by the worker with the child and their family as well as contact between family members.

*Adoption*

DFCS policy provides information on the termination of parental rights process as well as the roles and responsibilities of the social worker in achieving adoption. In regards to mobilizing timely individualizing services, DFCS has created a "resource specialist " whose responsibilities include consulting with public and private professionals and identifying and ensuring the provision of targeted services necessary for the child to be adopted. A meeting with the DFCS worker and supervisor and the resource specialist is to occur monthly for children over 12 months of age (weekly for younger) to review the progress and ensure that strong efforts are in place to achieve permanency for the identified child. This should give extra emphasis to the child's circumstances and move the case forward in a timelier manner.

*Independent Living (IL)*

When youth reach age 14 they are required to have an Independent Living plan in addition to their ISP. The IL plan is to include a description of all programs and services that will help the youth prepare for his/her transition from foster care to independence. Additionally, youth in care ages 16 or older are required to have a Transitional Living Plan as well. This plan documents how the youth will move from the state's custody in to other programs or self-sufficiency.

Youth in the care of DHS are required to participate in all IL services based on certain eligibility criteria. Examples of the services include Life Skills Training Groups which utilize assessments, personal contact and monthly meetings. There is a statewide conference held annually which provided life skills training and motivational speakers; and the Youth Opportunity Trainings which are held throughout the state. The purpose of these trainings is to enhance the life skills learned in the Life Skills Training Groups as well as provide opportunities for leadership development, socialization and self-esteem building activities. Mississippi participates in the federal Education and Voucher program and has specific policy guiding this program. The DHS policy manual also includes information on 16 different stipends that may be available for youth participating in the IL program ranging from 25.00 for completing a Life Skills Pre-Assessment form to $600.00 for a college bound youth in foster care.

## Gaps

*Visits*

Policy says that frequent visitation between the parent and the child should occur but does not define "frequent." It also requires monthly face to face contact in the placement setting with every child in DFCS custody. There is a "best practice tip" that strongly suggests the worker visit at least two times per month but this is a "tip" not policy. Additionally there is no discussion regarding how to use the visit with the family to assess the effectiveness and appropriateness of the services being delivered.

*Individualized Service Plan*

Policy is less clear on how to identify what services a family may need and how to access those services. A part of the SARA is to be utilized to identify if mental health services or additional assessments are needed. But other areas which may benefit from additional screenings do not appear to be addressed in policy including substance abuse and domestic violence.

An aftercare plan, separate from the ISP, which will assist the family in making the transition to life without a social worker and include steps to obtain the necessary services is not mentioned in policy.

A question which arises when reviewing the policy regarding the planning process involves the Independent Living Plan and the Transitional Living Plan; the differences in the plans and if two plans are necessary or if the areas addressed in each could not be combined into one document.

*Identification of Needs*

There did not appear to be additional information to support the worker in determining what services would be most appropriate to meet the needs of the families on their caseloads nor information about how to access the services. There did not appear to be a strong emphasis on how to individualize the services to meet the unique needs of the child or adult family member. Additionally, there did not appear to be any specific information on substance abuse services/screenings and only a brief mention of mental health assessments (not services) which the need for should be identified through one section of the SARA.

*Service Array*

Policy did not address the wide range of ancillary services which are needed to support children and families who are part of the child welfare system including but not limited to:

- ◆ Medical services

- ◆ Substance abuse services

- ◆ Mental health services.

It is not only important to have services that address the myriad of issues which families deal with but the services but must be responsive to the child's and family's cultural background and be developmentally appropriate to the individual's level of functioning. This did not seem to be addressed in policy.

Policy did not address the issue of timeliness for services except as it relates to the filing of a TPR by identifying as a response for not filing the issue of services necessary for the safe reunification of the family not being provided.

*Placement Services*

As discussed above there is limited policy which directly assists the worker in determining what individualized services the child/family may benefit from once a child has been removed to assure a stable placement or the services they may need to support the reunification of the child.

*Supervisory Policies*

There is a need for policy that requires a regular supervisory conference between the supervisor and social worker to review each case and discuss the appropriateness and timeliness of services.

### c. Monitoring

The monitoring of practice and in particular the delivery and quality of services is critical to the achievement of positive outcomes for children and families. DFCS does not have an extensive monitoring process currently in place but they have several activities which allow for monitoring of certain components of their child welfare system. Those activities and the specific areas which they address related to the mobilization of services are described below.

### Foster Care Reviews (FCR)

One mechanism that DFCS has in place which could be used to monitor the mobilization of services is the FCR process. There are 10 areas which are measured which link to the delivery of services. The table below describes each of these areas, and presents findings of the FCRs for the period of July 2008 to May 2009. The numbers represent the percentage of cases reviewed that were cited (approximately 20% of cases reviewed each month are cited with at least one issue) for that particular issue.

| | Percent of Cases Cited | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | YTD Total |
| Issues cited related to children with a plan of Adoption for which there are no documented efforts to finalize the plan of adoption within a reasonable time frame (i.e., a lack of a TPR referral: no actions taken by adoption unit) | 6.4 | 7.1 | 6.8 | 8.6 | 5.5 | 5.1 | 6.1 | 11.3 | 7.0 | 8.1 | 14.8 | 7.6 |
| Issues cited due to a lack of Independent Living/Transitional Living services being provided to eligible youth in state's custody. | 6.4 | 8.3 | 5.8 | 7.5 | 6.6 | 10.3 | 7.3 | 2.8 | 8.5 | 12.9 | 6.6 | 7.4 |
| Issues cited due to parents/primary caretakers who are found to have identified needs for which services are not being provided. | 0.0 | 1.2 | 0.0 | 1.1 | 0.0 | 0.0 | 0.0 | 1.4 | 2.8 | 0.0 | 0.0 | 0.6 |
| Issues cited due to resource parents who are found to have identified needs for which services are not being provided. | 0.0 | 0.0 | 1.0 | 0.0 | 1.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.2 |

| | Percent of Cases Cited | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | YTD Total |
| Issues related to children who are placed in a non-licensed or non-court ordered placement. | 1.1 | 0.0 | 1.0 | 1.1 | 2.2 | 1.3 | 3.7 | 4.2 | 2.8 | 1.6 | 0.0 | 1.7 |
| Issues related to children who are not placed within close proximity of their original home and the reason for the placement does not appear to be related to the achievement of their case plan goals. | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Issues related to children who are in placements that do not appear to be free from disruption. | 1.1 | 0.0 | 0.0 | 2.2 | 1.1 | 0.0 | 2.4 | 1.4 | 0.0 | 3.2 | 0.0 | 1.0 |
| Issues related to children who are placed separately from their siblings who are also in state's custody and the reason for the placement does not appear to be necessary for the goals of their case plan. | 0.0 | 0.0 | 0.0 | 0.0 | 2.2 | 0.0 | 1.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.3 |
| Issues cited due to children for whom there is no evidence they have received allowances they are eligible for. | 10.6 | 16.7 | 12.6 | 21.5 | 16.5 | 3.8 | 15.9 | 16.9 | 15.5 | 21.0 | 13.1 | 14.8 |

Two areas that closely address the mobilization of services would be those that measure the cases where resource parents and parents have identified needs for which services are not being provided. In the cases reviewed less than one percent for each area was cited.

### Settlement Agreement/Court Monitor - General

Mobilizing timely and appropriate services will also be monitored by the court monitor for the *Olivia Y* settlement agreement, although parts of the monitoring process are still in development, such as the case reviews. The areas within the monitoring of the settlement agreement that address the mobilization of services are identified in the chart below, along with the status of monitoring them by the Court Monitor.

| Standards Related to Mobilizing Appropriate Services Timely | Status |
|---|---|
| A reunification services needs assessment | Initiated but not completed |
| Defendants shall, in conjunction with COA, develop and begin implementing a written plan to meet the needs identified in the required Foster Care Services Reunification Needs Assessment, with specific steps and timetables for addressing gaps in the availability of effective services. | Assessment not done, so not completed |
| No foster child shall remain in an emergency or temporary facility for more than 45 calendar days, unless, in exceptional circumstances, the Division Director has granted express written approval for the extension | Current policy inconsistent |

**Mississippi Practice Model**

| Standards Related to Mobilizing Appropriate Services Timely | Status |
|---|---|
| that documents the need for the extension. | |
| A service provider needs assessment to identify available medical, dental, and mental health services and gaps in services | Initiated but not completed |
| A termination of parental rights (TPR) assessment to identify those children who have been in custody more than 15 of the previous 22 months and for whom DFCS has not filed a TPR petition or documented an available exception under the federal Adoption and Safe Families Act (ASFA) as required | Initiated but not completed |
| A placement assessment of current needs for achieving compliance with the placement standards set forth in Section II.B.5 of the Plan, which shall include (1) the structure of the placement process, including the role and efficacy of the state office placement unit; (2) the services and supports available to support enhanced placement stability, including out-patient or in-home assessment and treatment services to avoid the frequent use of time-limited assessment and treatment placement programs; and (3) the placement resources needed to meet the placement needs of children in custody | Initiated but not completed |
| A recruitment and retention assessment to determine the need for additional foster care support services. COA may, at its discretion, refer to and utilize | Initiated but not completed |
| All services documented in the case record as necessary for the achievement of the permanency goal are provided within the time period in which they are needed, by either providing those services directly, contracting with a private provider for those services, or referring to an existing service provider for the provision of those services. | Not completed |
| DFCS shall begin the implementation of a "tickler" system for notifying caseworkers and caseworker supervisors when a case assigned to them has reached the following milestones: 12 months after a child entered custody; 30 calendar days after the establishment of adoption as the primary permanency goal; 30 calendar days after a TPR referral has been made; and, 10 calendar days after a TPR packet has been returned to DFCS because of a legal deficiency. | Not begun |
| DFCS shall provide and maintain an approval process by which foster parents and adoptive parents may be approved simultaneously, so that whenever possible and appropriate, placement moves can be minimized and foster parents can be eligible to adopt the children for whom they have been providing foster care. A foster parent who has been providing foster care for a child for 12 months shall be given preference as an adoptive parent for that child should he/she become legally available for adoption, unless DFCS documents why the placement is unsuitable for adoption. | Largely compliant already |
| DFCS shall establish and maintain a system of post-adoptive services to stabilize and maintain adoptive placements. All adoptive families eligible for adoption subsidies shall have access to these services, which shall include respite services; counseling, mental health treatment, and crisis intervention; family preservation and stabilization services; and peer support. | Assessment not complete, so this is not done |
| DFCS shall implement and maintain a process for making legal risk placements that assures that children for whom the permanency plan is adoption, but who are not yet legally free for adoption, are placed in appropriate adoptive homes. | Not satisfied |
| Within 180 calendar days of Court approval of the Plan, DFCS, in conjunction with COA, shall develop a protocol for adoption meetings, which are to be held to review the progress being made in achieving the goal of adoption for legally free children. | Not satisfied |
| Within 180 days of Court approval of the Plan, no foster child entering custody will be placed in an unlicensed relative placement, subject to the allowance of the emergency licensing process that allows 120 days for the licensing process to take place. | Not satisfied |
| Defendants shall, in consultation with state Medicaid and mental health officials, develop and begin implementing specific and focused regional plans to recruit and develop service providers in areas identified in the needs assessment as having gaps in required services. | Plan not developed |
| DFCS shall develop and begin implementing a plan for providing, either directly or through contract, the following educational services in each county: tutoring, preparation for a general equivalency diploma (GED), and college preparation. | Plan not developed |
| Defendants shall develop and begin implementing a written plan for targeted recruitment and development of a range of family and facility placements that will adequately meet the placement needs of the foster care population as identified by DFCS's previous regional self-assessments and the assessment required herein. | Not undertaken |
| Defendants shall develop and begin implementing a written plan to provide services for foster parents in every county to prevent and reduce stress and family crisis. | Not undertaken |

The only area that has been identified as compliant relates to the approval process by which foster parents and adoptive parents are simultaneously approved which can lead to more timely permanency for children. Five of the areas have been initiated but not completed while three were identified as not satisfied.

### Supervisory Administrative Review (SAR)

As a part of the SAR, the supervisor reviews the electronic and paper files of a case as well as conducts an individual conference with the assigned worker. This review is to ensure progress is being made toward completion of the service goals which should include addressing the type of services identified, the availability of services and the progress or lack of progress which the family has experienced. Several of the questions on the SAR relate to mobilizing services timely, that merit a strength in practice (though it should be noted that it doesn't appear that all questions need to be answered.) Those questions include:

- Has the ISP been completed?

- Is there evidence that the family was involved in the creation of the ISP?

- What is the educational stats (ie school, IEP, records)?

- Are the tasks relevant to the presenting problem?

- What tasks have been completed?

- What tasks need to be completed?

- Does child have a permanency and concurrent plan?

- Were reasonable efforts made to finalize the child's permanent plan and does the court order reflect those efforts?

- Could (the current placement) be a permanent placement?

- Are the medical conditions addressed?

- Is there an Independent Living Plan for the youth? and

- Are siblings placed together?

### Gaps

There are several areas of concern being addressed in the FCR process including:

- The reviews only pertain to children in substitute care so the services being provided to the children and families receiving in-home services are not being monitored;

- 7.6 percent of the cases reviewed were cited due to children with a plan of adoption that had no documented efforts to finalize the plan of adoption within a reasonable time frame (i.e. lack of a TPR referral, no actions taken by the adoption unit); and

- 7.4 percent of the cases cited identified that eligible youth in state custody were not receiving Independent Living/Transitional Living services.

In regard to the monitoring which is occurring through the Settlement agreement, there are three areas related to service delivery which were not satisfied:

- DFCS shall implement and maintain a process for making legal risk placements that assures that children for whom the permanency plan is adoption, but who are not yet legally free for adoption, are placed in appropriate adoptive homes.

- Within 180 calendar days of Court approval of the Plan, DFCS, in conjunction with COA, shall develop a protocol for adoption meetings, which are to be held to review the progress being made in achieving the goal of adoption for legally free children.

- Within 180 days of Court approval of the Plan, no foster child entering custody will be placed in an unlicensed relative placement, subject to the allowance of the emergency licensing process that allows 120 days for the licensing process to take place.

There are two areas directly related to the delivery of services (one related to the recruitment and development of mental health services and the second related to educational services) which do not yet have a plan developed on how to meet those criteria.

Based on the information we reviewed, there does not appear to be any standardized mechanism which monitors the quality or appropriateness of services delivered to the child and/or their family. The SAR would be one opportunity to review for this level of information. While it may occur there does not appear to be any specific guidance regarding including in the review process any discussion of the services that have been mobilized (other than placement, should it exist), whether those services are appropriate based on strengths and presenting needs, what the quality of the services that are delivered and whether there were services that were needed but have not been implemented.

We asked survey respondents to rate the agency's effectiveness in regard to supervision and monitoring in the area of mobilizing appropriate services timely. As indicated in the chart below, respondents rated supervision of service provision as about 50 percent frequently or almost always effective. They rated monitoring of appropriate placements for children in care and monitoring of appropriate service provision to children as frequently or almost always effective about two-thirds of the time (about 68 percent and 65 percent respectively).

| Please rate your perception of your agency's effectiveness in each supports area below related to mobilizing services: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Some times | Frequently | Almost Always | No Info/NA | Total |
| Supervisory oversight of service provision: | 0 (0%) | 14 (7.69%) | 45 (24.73%) | 47 (25.82%) | 44 (24.18%) | 32 (17.58%) | 182 |
| Monitoring to ensure placements are appropriate and meeting the needs of children: | 0 (0%) | 8 (4.32%) | 32 (17.3%) | 56 (30.27%) | 69 (37.3%) | 20 (10.81%) | 185 |
| Monitoring to ensure services and providers are available, appropriate and meeting the needs of children: | 0 (0%) | 8 (4.35%) | 38 (20.65%) | 50 (27.17%) | 69 (37.5%) | 19 (10.33%) | 184 |

## d. Resources and Practice

A discussion on resources in conjunction with the mobilization of services one must go beyond simply having services but working towards an array of services that are grounded in four practice principles from the Federal Child and Family Services Reviews (CFSR). Those principles require that services:

♦ Be family-centered, working with the family as a collective unit;

♦ Be community-based, mobilizing community resources for the support of the family;

♦ Be individualized to meet the specific needs of each child and family

♦ Enhance parental capacity so that families can care for their own children's safety, permanency and well-being[3].

### *Array of Services*

The array of reunification services and how the services are used varies widely from county to county. Reunification services are delivered by a variety of providers and vary across the state. Reunification and family preservation services cannot meet the demand and frequently turn away referrals. For example, one provider agency indicated that family preservation services are at times used as reunification services, but the program requirements prohibit them from working with children who have been in care more than 90 days because they would not be able to complete the 20-week program in less than 12 months and children in care for more than 12 months are ineligible for the service. Several interviewees indicated that intensive in-home services are used in place of reunification services as a way to get around the waiting lists and some indicated that the intensive services often better matched the needs of the families. In 17 of the 29 cases reviewed for reunification services, we identified services that were needed but not delivered.

The Statewide Independent Living program is administered by a contractor which has seven staff based throughout the State. While the initial and revised IL plans should be sent to DFCS by the contractor, we are not sure that the case plans are going to the counties or that the county staff is asking for the plans from the contractor on a consistent basis. Often times, the contract specialist and the DFCS worker both end up preparing an IL plan.

Getting youth committed to participating in the IL program can be difficult. Youth who participate in extra-curricular activities at their school or have a part-time job can be excused from IL but count toward the participation rate. One area of concern noted was the lack of commitment to addressing IL services by social workers due to their caseload sizes and viewing IL as a low priority since there is a contractor to handle these services. Another gap was in the area of mentors. The contract requires that 18 mentors be identified statewide and this has not yet happened. DFCS does offer a wide range of stipends for youth participating in various components of the IL program.

---

[3] National Child Welfare Resource Center for Organizational Improvement – *Assessing and Enhancing the Services Array in Child Welfare* Downloaded July 16, 2009.

**Mississippi Practice Model**

The IL coordinator receives a report from MACWIS which identified any youth who are not referred for IL services. The identified youth are then referred to the provider to determine why they are not receiving services.   We located little information regarding the impact that services had on the youth or, what the youth thought about IL through the review of 30 IL cases.  The information in MACWIS was spotty at best.  The narrative may have noted that the child was transported to IL classes but rarely was there any documentation into the content of the classes or the youth's impressions of them.  The Independent Living Plan and the Transitional Living Plans were inconsistently filled out in MACWIS and never included any information beyond what was in the drop down boxes.

Focus group participants indicated that youth were informed about IL.  Focus group participants also indicated that IL was good for receptive youth but if the youth wasn't committed to participating it did little for them.  Many indicated that youth (and this was supported by some of the youth) attended simply to get the money and were therefore, not really committed to gaining anything from their attendance.  There was a concern that there were not enough capacity and that the Life Skills curriculum did not provide the skills the youth really needed to live on their own.  It was suggested (by participants from all of the different focus groups) that the curriculum needed more hands-on classes where the youth received more than just class room instruction.

As we looked at the resources available to the child welfare system we identified several strengths including:

- There are statewide contracts for intensive in-home services; family preservation services; reunification services; and post-adoption services;

- The majority of youth in out-of-home care attend public school settings in the communities in which they live;

- ILP services are structured with a focus on the ages of the youth and their case plan goals;

- The number of staff and providers trained to conduct forensic interviews is increasing; although it is not yet sufficient to meet the demand for this type of service; and

- Many of the group homes and therapeutic foster care programs that are used have been certified by the Department of Mental Health using pre-identified standards of care.

The following areas were also identified as gaps:

- Intensive in-home, family preservation, reunification and post-adoption services are often times unable to meet the demand for their respective services;

- There are an insufficient number of foster family homes across the State.

- There are insufficient number of providers to meet the service needs of the children/families served by DFCS;

- There are waiting lists for many of the services statewide but particularly in the rural and coastal regions of the State;

- The quality and accessibility of services offered through the mental health centers varies significantly depending upon which county families reside in;

◆ Behavioral management services and outpatient therapy services are not available consistently throughout the State;

◆ Domestic violence assessments are very limited and not available in smaller counties or rural areas of the State;

◆ Substance abuse evaluations and treatment are only available through the mental health center or through providers who accept Medicaid and it is insufficient to meet the need for services; and

◆ The Placement Unit at DFCS Central Office provides screening and review of referrals for placement in a TFC home and therapeutic group homes and shelters, which takes that responsibility away from those who know the child best, the individual workers.

While a fairly wide range of services were identified as being used by social workers it also was very clearly stated in the focus groups that more resources were needed in all locations; resources that are more readily accessible to the families (particularly outside of a few larger counties) and more tailored to meet the families' needs. For example, we heard in one area that Family Preservation services were readily available and in another that the slots needed to be triaged to assure that there were available slots for DFCS families. As a whole any service that was identified as a practice that was used in one area, was most likely identified as either not available or not accessible in another. There was no service that we received statewide consensus that the service was accessible in a timely manner. The list below identifies the services identified by focus group participants as being utilized by DFCS social workers:

| | |
|---|---|
| Family Preservation | Intensive In-Home Services |
| MYPAC | Homemakers (case aides) |
| Parenting classes | Teen placements including mother/infant |
| Mental Health assessments | Appropriate placements (i.e. mental health |
| Mental Health treatment services | medically fragile) |
| Services for youth with specialized | Services for sex offenders |
| issues | Suicide prevention and emergency crisis services |
| Mobile services, dental, psychological, | Shelters for adults with families |
| medical | Transportation |
| Services for immigrant population | LEA that are trained to do sexual abuse |
| In-patient drug treatment | investigations |
| Anger management classes | Resource workers |

Based on the comments heard during the focus groups and interviews with key individuals the following conclusions were drawn regarding the general availability and quality of services:

◆ There are not enough quality services available to meet the needs of the children and families served by DFCS;

◆ It is often very difficult to obtain the necessary mental health assessments and treatment services needed to address the issues of the children and families;

◆ If treatment services are available, there are often long waiting lists;

◆ Services are more standardized than individualized; and

◆ Services in the rural areas are sparse compared to the more urban areas.

In reference to specific types of services, it was generally agreed that often times the only mental health/substance abuse services will come from the local mental health clinic and that the services are not often tailored to meet the individual's needs. Just as with other services, the quality of the service provided by the local mental health center can vary significantly depending upon the location. Psychological evaluations were identified as being very expensive and must be paid for by DHS thus often inhibiting their use. Some counties use the "county funds" which can be obtained through the County Board of Supervisors but those funds are limited. Adams County was identified as having a good drug court program and a drug screening program that is accessible and inexpensive.

Another area of concern is the availability of resources, examinations, assessments and treatment for the victims of sexual abuse and their families. The lack of Medicaid providers for any type of services was also noted across the State with the exception of the urban areas. Families often have to travel to another county to obtain services provided by a Medicaid provider. Another problem noted with Medicaid was obtaining initial Medicaid coverage or expired Medicaid cards. Obtaining dental care including orthodontics is a serious problem in most parts of the State.

| With regard to mental/behavioral health services, how effectively are you able to access the following levels of services for children and families: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Some times | Frequently | Almost Always | No Info/NA | Total |
| Lower level services, e.g., outpatient counseling and evaluation, prevention services, testing: | 1 (0.54%) | 11 (5.98%) | 43 (23.37%) | 58 (31.52%) | 51 (27.72%) | 20 (10.87%) | 184 |
| Mid-level services, e.g., behavioral health medication, day treatment, more intense out-patient psychotherapy: | 3 (1.63%) | 11 (5.98%) | 49 (26.63%) | 56 (30.43%) | 42 (22.83%) | 23 (12.5%) | 184 |
| High-end/acute services, e.g., addiction and recovery services, specialized care, psychiatric services: | 3 (1.64%) | 13 (7.1%) | 51 (27.87%) | 45 (24.59%) | 46 (25.14%) | 25 (13.66%) | 183 |
| Crisis services, e.g., crisis stabilization, psychiatric hospitalization: | 4 (2.2%) | 15 (8.24%) | 49 (26.92%) | 44 (24.18%) | 44 (24.18%) | 26 (14.29%) | 182 |

As indicated in the chart above, respondents to the staff survey rated the access to mental health services for children and families as frequently or almost always effective barely half the time. They rated access to lower level services the highest at about 59 percent frequently or almost

always effective, followed by mid-level services (about 53 percent), high end and acute services (about 50 percent), and crisis services (about 48 percent).

In reference to medical services, respondents indicated that it was easier to access medical services than dental, and in general services were more available in the urban areas. Local public health clinics are often used to screen and treat adults and children. But once again, the small rural counties even have trouble using the public health clinics as they are only in their counties certain day(s) each week. It would seem that traveling long distance impacts many of the smaller counties for any type of service.

As indicated in the chart below, when asked to rate the agency's effectiveness with regard to certain services, respondents rated both the access to safety-related services and the quality of safety services as about 70 percent frequently or almost always effective. They rated services to foster families to stabilize placements as frequently or almost always effective about 65 percent of the time. They gave the lowest rating for being able to place children in placement setting that match their needs and the process for identifying placement resources (about 52 percent and 57 percent respectively rated as frequently or almost always effective).

| Please rate your perception of your agency's effectiveness in each area below in practices related to mobilizing services: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Some times | Frequently | Almost Always | No Info/NA | Total |
| Ability to access services to meet safety-related needs of children and families during an investigation: | 1 (0.53%) | 5 (2.66%) | 33 (17.55%) | 60 (31.91%) | 72 (38.3%) | 17 (9.04%) | 188 |
| Quality of safety-related services provided to children and families: | 0 (0%) | 5 (2.66%) | 39 (20.74%) | 60 (31.91%) | 71 (37.77%) | 13 (6.91%) | 188 |
| Effectiveness of services to support foster families and assure placement stability: | 1 (0.53%) | 8 (4.23%) | 43 (22.75%) | 53 (28.04%) | 70 (37.04%) | 14 (7.41%) | 189 |
| Effectiveness in placing children in placements that are matched to their needs: | 4 (2.13%) | 11 (5.85%) | 62 (32.98%) | 42 (22.34%) | 56 (29.79%) | 13 (6.91%) | 188 |
| Effectiveness of current procedures for identifying and obtaining access to the appropriate placement for children entering foster care (e.g., who selects placement resource, timeliness of selecting resource, etc.): | 2 (1.07%) | 12 (6.42%) | 54 (28.88%) | 50 (26.74%) | 56 (29.95%) | 13 (6.95%) | 187 |

We also asked survey respondents to address some of the systemic issues that affect mobilizing services. Respondents rated their perceptions of the agency's effectiveness in each support area as indicated in the chart below. They rated the agency's ability to recruit and retain qualified and

appropriate placement options for children as frequently or almost effective only about 38 percent and 41 percent of the time respectively. They rated the array of service providers to meet the identified needs of children and families as frequently or almost always effective just less than half the time (about 48 percent).

| Please rate your perception of your agency's effectiveness in each supports area below related to mobilizing services: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Some times | Frequently | Almost Always | No Info/NA | Total |
| Ability to recruit qualified and appropriate placement options for children: | 2 (1.08%) | 26 (13.98%) | 65 (34.95%) | 45 (24.19%) | 25 (13.44%) | 23 (12.37%) | 186 |
| Ability to retain qualified and appropriate placement options for children: | 1 (0.54%) | 18 (9.73%) | 69 (37.3%) | 44 (23.78%) | 31 (16.76%) | 22 (11.89%) | 185 |
| Array of service providers to meet identified needs of children and families (identify in open-ended questions below those that are effective and those that are not): | 2 (1.1%) | 22 (12.09%) | 51 (28.02%) | 54 (29.67%) | 34 (18.68%) | 19 (10.44%) | 182 |

## Placement Resources

All participants in focus groups and stakeholder interviews agreed that there are not enough out-of-home placement resources and that placements are often made based on bed availability rather than based on matching the needs of the child. Nearly every type of placement possible was identified as needing more resources but especially placements for teens. Interestingly, the case reviews seemed to indicate that the supports/resources were there to match the needs of the child/youth which was not supported by the focus groups or the stakeholder interviews. The case reviewers determined that in 26 of the 30 cases the placement matched the identified needs of the child.

Some concerns were raised regarding the therapeutic foster homes. Several participants said they would rather place in a traditional foster home then the TFC homes and that in fact, there were instances when DFCS closed a foster home and the family became a TFC home. Another issue of concern was the placement process for TFC. Numerous participants indicated that the process was too cumbersome and did not lead to good placements. This type of placement must be completed through the State Office's Placement Unit. Strong feelings were evident that this process supports a placement based strictly on what is written down or in MACWIS rather than using the worker and the intangibles that they have regarding the situation as a result of their relationship with the child and his/her family.

## Independent Living (IL)

DFCS operates an Independent Living program which is available for all youth involved with DFCS age 14 – 20. MACWIS generates monthly reports that identify the youth receiving the services. A recent report identified only 48 youth out of over 1,000 in care as not receiving

services. Opinions from the participants of the focus groups regarding the effectiveness of the Independent Living program varied from those who indicated that it was very helpful to some who said it needed to be more concrete and give youth more hands-on experience. Some participants voiced concerns about the content of the Life Skills program with two primary issues: 1) sessions focused too heavily on abstinence and 2) the content of the program had not changed in many years. Many believed that the program needed to be more concrete with actually doing hands-on work with youth to develop the skills needed to become a contributing adult (i.e. money management – take them to the bank and open an account; create a budget, etc.) There was also some concern that the services were not individualized to allow lower functioning youth and developmentally disabled teens to benefit from their participation. It is important to note that a small group of foster care youth participated in a focus group and most acknowledged participating in IL and all stated their worked had informed them of the services. The only consistent complaint about IL was the money with several saying it takes to long to get the stipends and another saying he had actively participated in the program since age 14 (he is now 17) and has only received $20.00.

The case reviews of Independent Living youth found limited information in MACWIS regarding their participation in IL. By reading the narratives we would occasionally see a comment that the youth was transported to IL or that worker saw youth when in the office for IL but very rarely ever expanded on what occurred at the Life Skills classes or what the youth thought about the program. Our review of MACWIS found the tasks in the ILP or TLP checked but rarely expanded upon in the plan and never in the narrative section of MACWIS. One could not get a clear picture of IL by reviewing case records.

We also learned through interviews and focus groups that some of the services used by MDHS are not administered through contracts that specify what is to be delivered or at what levels. This is true of the congregate care placements used by MDHS and some other services. In the absence of clear contractual obligations, providers are left without guidance and the Department is not in a position to expect certain deliverables. As MDHS moves toward implementing a practice model that is based on responding to the individualized needs of children and families and on family-centered practice, it will be very important to have service providers be a part of that process, and the quality of contracting procedures will contribute to their ability to do so.

### e. Summary of Inputs

The information below identifies the strengths and gaps that we identified in the training, policy, monitoring, and resources related to mobilizing appropriate services timely.

### *Training*

The following are identified as strengths in the training curricula:

♦ In *Case Planning and Family Engagement*, the concept of Family Team Meetings is introduced with the expectation that the FTM will be the mechanism for identifying the natural supports of a family; and

♦ In *Assessment in the Child Welfare Setting: Child Development* the idea of linking services to the identified needs is introduced and provides some examples of specific services to be offered to families.

♦ The following gaps were identified based on our review of the curricula:

♦ The training does not help participants develop the skills to use the information from assessments to develop an effective ISP and link the child(ren) and families to the most appropriate services;

♦ The *Social Worker's Guide to Family Centered Practice* appeared to be more philosophical about the provision of services rather than providing concrete tools and suggestions for the workers to use; and

♦ There are several areas which would benefit from an emphasis in the pre-service training and individual modules in the ongoing training including but not limited to:

　　o Visitation including developing visitation plans and how to conduct the actual visit;

　　o Reunification Services;

　　o Placement Related Services;

　　o Independent Living Program;

　　o Issues surrounding working with youth including teen pregnancy and parenting;

　　o Adoption;

　　o Family Team Meetings;

　　o Mental Health; and

　　o Substance Abuse.

♦ A supervisory curriculum is needed that focuses on clinical supervision to support the social worker in the identification and delivery of appropriate services.

## Policy

From reviewing current policies, the following strengths were identified as critical to the implementation of this component of the practice model:

♦ The policy on the development of the ISP requires that the plan be developed with the family by evaluating the information gathered during the investigation. The ISP is required to address the reasons for services and what services were provided to both the child and the family.

♦ ISP policy further promotes using the plan as the focus of the delivery of services as it allows the family to understand what has been accomplished and what must be completed to ensure that their child is no longer at risk.

♦ The utilization of a "resource specialist" for those children available for adoption. This specialist will consult with public and private professionals and ensuring the provision of targeted services necessary to assure the child is adopted.

♦ Youth age 14 and up are required to have an Independent Living Plan and receive IL services. Once a child reaches age 16 a Transitional Living Plan must be developed.

♦ In addition to the strengths, we identified the following gaps in the review of policies related to the mobilization of services:

- While policy is positive in that it addresses the importance of visits, it does not go far enough and address how visits can be used to assess the delivery of services and whether the services are matched with the needs of the child/family member.

- The ISP policy should also include specific guidelines for how to assess the effectiveness, appropriateness and timeliness of the services that are being provided to the family.

- The policy should address the wide range of ancillary services which are needed to support the children and families who are part of the formal child welfare system.

- Policy should be developed in order to implement performance-based contracting.

## Monitoring

After reviewing the current processes in place to monitor the child welfare system, the following strengths were noted:

- The FCR includes at least 10 areas which are linked to the delivery of services including but not limited to:
  - Independent living/transitional living services;
  - Delivery of services to the primary caretaker;
  - Children placed in non-licensed or non-court ordered placements;
  - Children who are placed separately from their siblings; and
  - TPR.

- The *Olivia Y* settlement agreement will provide the opportunity to monitor the mobilization of appropriate services in several ways including but not limited to:
  - Use of emergency and temporary facilities;
  - Timeliness of TPRs;
  - Development of resource parents rather than foster or adoptive parents;
  - Development and recruitment of service providers; and
  - Targeted recruitment plan for out-of-home resources that meet the placement needs of the foster care population.

Just as there are strengths, we have also identified some gaps in the monitoring process:

- The FCR only pertains to children in substitute care so the services to children in their own homes are not being monitored, and the process is not designed to provide comprehensive monitoring of services;

- The SAR does not specifically address a review of the services to assure they are appropriate and linked to the identified needs of the child and family members; and

- There is no ongoing quality improvement process that monitors for mobilizing services, including the quality of the services and providers' responsiveness to the identified needs of children and parents.

### Resources

Among the strengths in this area are:

♦ The larger more urban counties have an array of services to more closely meet the identified needs of the child and family members, and services are readily accessible to the families.

♦ The following services are provided through a statewide contract that reaches all counties in the State:

o Independent Living Services;

o Intensive in-home Services;

o Family Preservation Services; and

o Adoption Services.

Among the gaps in resources that we identified are the following:

♦ The smaller, less populated counties do not have the same array of services and must often travel or accept services that are not tailored to the family's identified needs.

♦ Even with statewide contracts there is a waiting list for most services in some areas of the State.

♦ The Department is very limited in its ability to recruit and retain appropriate placement resources for children, and subsequently in its ability to place children according to their individualized needs.

♦ The access to and quality of mental health services is highly variable across the State.

♦ The ability to individualize services to children and families is limited by the array of services, particularly in rural areas of the State.

♦ Some specific services were noted as especially difficult to access, including children's psychiatric services, dental services, and domestic violence services.

♦ The process of obtaining some services, especially placement resources, should be simplified and based on specific needs of children and families.

♦ There is not a contracting process in place for some of the Department's most important services, such as placement resources for children.

## Section 2:  Outputs

### a. Work Products

### Training

While the current training supports the mobilization of appropriate services in a timely manner, we have identified additional skills-based training that is needed to ensure the practical application of this component of the practice model.

## Pre-Service Training

♦ Pre-service training should address how caseworker visits with the child, family, and foster family are used to identify and monitor service provision. Training should address the issue of visits, how often they should occur, who should be involved and what should happen during the visit and how to utilize the information gathered during the visit.

♦ The FTM process should be introduced in the pre-service training so that workers will be prepared for the process from the beginning. This training should include the philosophy behind the team meeting approach as well as the concrete skills needed to use FTM as an effective family engagement tool.

♦ Skills-based and strengths-based training is needed to assure that social workers know how to work effectively with families to identify individual strengths and needs, matching the most appropriate services to meet their needs; how to prepare the family for services (referral readiness;) and how to obtain and then monitor the services.

## Ongoing Training

♦ The section on Family Team Meetings in "Case Planning and Family Engagement in the Child Welfare Setting" module should be a supplement to what is taught on FTM in the pre-service curriculum. Workers should walk away from both trainings with an understanding of the philosophy behind the use of FTMs as well as the skills to conduct such meetings.

♦ Training modules on the key social issues which impact the children and families should be developed. Examples of the topic areas which warrant their own module include:
  o Adoption
  o Teen pregnancy issues including teen parenting
  o Substance abuse and behavioral health issues; and
  o Sexual Abuse.

## Supervisory Training

♦ In order to ensure that supervisors can support their workers in the assessment of services and the determination of the appropriate services, CSF recommends developing or focusing supervisory training on clinical supervision, including monitoring service provision and matching services to individualized needs.

## Policy

In order for the mobilization of services in a timely manner to occur, policy needs to be enhanced to support the full implementation of the practice model. We identified the following work products that we would recommend DFCS develop to implement this component:

♦ Policy and procedures should be developed to assure that the referral process for congregate care placements is effective and streamlined to support the timely identification of the most appropriate placement for a child.

♦ Policy should clearly define how often visitation between the parent and the child should occurs as well as how often contact between the child and the social worker is to occur. The policy must define the length, the location of visits as well as what to cover during a visit.

♦ Policy should address what criteria to use to determine if a child/family member needs a screening and for what areas (i.e. mental health, substance abuse, domestic violence.) Consideration should be given to the development of additional tools to use in the assessment process.

♦ The components of the ISP should be reviewed and revised to incorporate an Independent Living Plan for age appropriate youth. This plan should cover the period up to and including a youth's transition out of DFCS custody. There should only be one plan rather than the current IL and separate Transition Plan. Further, the plans developed and used by MDHS should be the same plans developed and used by the IL contractor.

♦ Policy should identify when to develop an aftercare plan and what should be included in the plan. It should also explain how the plan links to the ISP.

♦ Assessment tool for determining what services would be most appropriate to meet the needs of the families on their caseloads, how to access the services and how to monitor the effectiveness of the services should be developed. Policy must emphasize the importance of individualizing the services to meet the unique needs of the child or adult family member.

♦ Policy should address the wide range of ancillary services which are needed to support children and families who are part of the child welfare system including but not limited to:
  o Medical services
  o Substance abuse services
  o Mental health services
  o Reunification services and
  o Placement services.

It should include the process for accessing the services as well as eligibility criteria for services. Policy must emphasize the criticality of services being responsive to the child's and family's cultural background and being developmentally appropriate to the individual's level of functioning.

### Monitoring

In order to ensure that the practices associated with this component of the practice model are implemented similarly across the state, it will be important that a variety of monitoring processes be established across DFCS.

#### Continuous Quality Improvement (CQI)

In order to effectively implement a CQI process there are several measures and outcome indicators directly related to the mobilization of services which must be considered, including:

♦ Evaluation of the extent, accessibility, flexibility and responsiveness of the state and local service array on a routine basis, and identification of any gaps in the array of services;

♦ Evaluation of the array, accessibility and responsiveness of the out-of-home placement options within the counties to meet the placement needs of children in out-of-home care and identification of any gaps in the placement resources;

◆ Monitoring for the effectiveness of casework practice at the individual case level should involve the review of the documented case file as well as interviews with parents, children, foster caretakers, service providers and caseworkers.

◆ Monitoring to assure that an effective array of services has been developed should involve interviewing service providers, caseworkers, supervisors and the children and families receiving the services. This information should be used by management to make decisions regarding service contracts and resource allocation.

*Foster Care Reviews*

◆ The FCR only pertains to children in substitute care so the services to children in their own homes are not being monitored, and the process is not designed to provide comprehensive monitoring of services, therefore either it should be expanded to include a sample of in-home cases or a similar parallel process should be developed.

*Supervision*

◆ The SAR should be expanded to address a review of the services to assure they are appropriate and linked to the identified needs of the child and family members; and

◆ A supervisory protocol should be developed for use during a regular Supervisory Conference that includes monitoring for individualized services and their effectiveness, the frequency and process of monitoring, and providing coaching and feedback to staff in this area

*Contracting*

◆ Revised contracting procedures should require service providers to deliver an array of services that is flexible, adaptable, and that can be individualized to the unique needs of children and families, as identified through assessments and case plans. This should be required for in-home services providers as well as for placement providers and should include providers of child welfare, juvenile justice and behavioral health services.

◆ Revise contracting procedures to embrace a performance based contracting process for all foster care agencies which will assure a focus on outcomes rather than process.

## Resources

In order to work towards an array of services across the entire state, there are several key factors to be considered:

◆ The number of service providers available to meet the unique needs of the children and families being served by DFCS must be adequate to meet the demand and not result in lengthy wait lists;

◆ Quality mental health assessment and services, both in-patient and outpatient, should be available no matter where one lives within the state of Mississippi;

◆ Quality domestic violence assessments and services, for both the victim and abuser, must be available no matter where one lives within the state of Mississippi;

◆ Quality substance abuse assessments and services, both in-patient and outpatient, must be available no matter where one lives within the state of Mississippi; and

♦ There must be adequate placement resources, including foster homes, for the children needing placement.

In order to achieve the factors identified above effectively, there are several key actions which DFCS must consider. They are:

♦ DFCS should identify all resources and their locations (via a resource mapping process) and develop a resource directory.

♦ DFCS should develop and implement a thorough recruitment and retention plan for all out-of-home resources. This plan should target those resources which are best matched to the identified needs of the children entering out-of-home care. DFCS should strive toward having available enough out-of-home resources so that the social worker makes a placement that meets the child's needs not simply provides the child a bed.

♦ DFCS should initiate a performance-based contracting (PBC) process that will link payment for services to the ability of the provider to respond according to DFCS expectations. PBC should require service providers to:

   o Develop an appropriate array of services (both in-home and out-of-home) that matches the individualized needs of the children served by DFCS;

   o Respond timely and appropriately to all referrals;

   o Assure a "no-reject/no eject" policy when children are referred appropriately;

   o Coordinate service delivery with MDHS case planning and monitoring activities; and

   o Provide detailed reports of the services delivered to DFCS.

♦ DFCS should develop of pool of service providers that must be flexible enough to ensure the development of services to meet the unique needs of the children and families being served by the child welfare system.

### b. Activities

The following activities are associated with mobilizing appropriate services timely:

***Link services to individualized needs in case plans***. Through the assessment process and through caseworker visits with all relevant family members including non-custodial parents, the identification of individualized needs is central to this component of the practice model. Case plans should be developed within 30 days of case opening and should identify services that are linked to individualized needs. For youth age 14 and older, an independent living plan must be developed and routinely updated (every 90 days at least). The services identified in the case plan should reflect the needs identified in the assessment and the family should have an active voice in identifying the services that they think are needed to help them address their needs. Among the services that should routinely be provided are screenings for mental health needs, substance abuse issues, and developmental needs of children. When services are not having the desired effect or if needs change within the family, the case planning process which includes the family's active participation, should be the venue for making decisions about changes to services.

FTMs should be utilized to bring the family and any identified supports, both formal and informal, together to develop a plan for the child and family to address the identified areas of

concerns while assuring the child's safety. The focus of the FTM should be the development and monitoring of the Individual Service Plans. Families input, which includes age-appropriate children, into their strengths and needs and the type, level and intensity of services needed is a central activity within the team meeting. Children who are not subject of the report and non-custodial parents should be included in the FTM process as appropriate. At the end of any family team meeting the family should walk away with an understanding of where they are starting (reason for involvement with the agency); what they need to achieve (goals and objectives); what tasks/services they must participate in /accomplish in order to achieve the identified goals and objectives (action steps.)

***Engage with service providers.*** Service providers must be engaged in the decision making and service planning processes in order to allow for the tailoring of the services to meet the identified needs and strengths of the child and or family. This means including them in family team meetings where appropriate and in the process of matching services to the individualized needs of children and families. It also means coordinating services and plans with service providers and MDHS caseworkers maintaining an active role with the child, family, and provider even if the provider is handling service delivery.

***Caseworker visits.*** Caseworker visits with the child and other significant family members are the primary mechanism for assessing the child and family's need, for engaging them in services, and for monitoring service delivery. During service delivery, the caseworker for the child or family (not another worker) should be the one to visit, engage, evaluate, monitor, and interact with the child, family, and provider.

***Clarify specific service needs when making referrals and monitoring for service provision.*** It is important for MDHS staff to understand which specific services are needed and to be specific in making referrals in order to ensure that the services provided are the ones needed. As service provision is monitored, staff should also be careful to ensure that ongoing service provision matches the referral requests, and continues to address the family's needs.

***Provide services promptly and early in the intervention process in order to address safety and risk issues.*** When needed, referrals for services should be made during the investigation process to ensure the child's safety and to manage identified risks, and follow up conducted to assure timely initiation of services. Safety and risk related services should continue to be provided throughout the life of the case as the assessments identify the needs.

***Provide services on an ongoing basis needed to attain identified permanency goals.*** This includes providing prompt services that will help the family achieve reunification when that is the goal; will help the child achieve adoption when that is the goal; and to become fully prepared for independent living when that is the goal, including transitional living services and the provision of documents and assistance for youth moving into independent living.

Services provided should be comprehensive, incorporating a broad array of services and matched to the specific individualized needs of children and other family members involved in the case, including parents who may not live in the home. Services should be accessible, culturally sensitive and developmentally appropriate. Services may be provided directly by MDHS staff, through contract with other providers, or by referral to other agencies when appropriate. In particular, services should be provided that address needs for therapy, educational support, domestic violence, mental health, substance abuse treatment. Age-appropriate children and

youth should be provided services on pregnancy prevention, sexually transmitted diseases, medical issues, and so forth.

***Provide services to children in placement.*** This includes providing the most appropriate placement resource, including therapeutic foster family care when that is most appropriate for a child's individualized needs. It also includes providing services to ensure that foster care placements remain stable and free from unplanned disruptions, support services to foster families in caring for the children in their homes, and providing medical and educational records to foster care providers.

***Provide services at the time of discharge or case closure.*** This includes convening a discharge team meeting to determine what needs the child and family may have post-discharge/case closure and developing an after care plan that identifies those services. Youth in care should be notified at least six months in advance, and preferably earlier, of the termination of certain services that will end upon discharge, and should be assisted to acquire health insurance and other needed services post-discharge.

***Monitor and evaluate the effectiveness of services.*** The provision of services should be monitored to be certain they are provided promptly and in accordance with the case plan. Workers should use caseworker visits with parents and children to evaluate their use of services, identify barriers to effective service utilization, the fit of services to needs, and the effectiveness of services in addressing needs and resolving concerns. Workers also should maintain frequent contact with service providers to evaluate service provision and effectiveness, and should require detailed reports from service providers that describe the level of service delivery and progress toward helping family members meet their goals.

### c. Roles and Responsibilities

#### Social Workers

♦ Social workers are responsible for engaging family members in identifying the individualized strengths and needs of all relevant family members through completing comprehensive assessments that address safety, permanency and well-being.

♦ Social workers are responsible for using that information to identify with the family the type, level, and intensity of services that will be best matched with their strengths and needs to meet the identified outcomes, and for identifying with the family the appropriate service providers, including placement settings and providers for children in foster care.

♦ Social workers are responsible for monitoring the implementation of the ISP and the effectiveness of services through regular ongoing contact with the family and service providers, and through ongoing strengths and needs assessment activities. When services are not meeting identified needs and objectives, the social worker is responsible for identifying and procuring alternate services. All of which should be accomplished in consultation with the family.

♦ Social workers are responsible for using assessment information to identify out-of-home placements for children that are appropriately matched to their needs.

♦ Social workers are responsible for identifying the appropriate family members to include in planning and service delivery, including absent parents.

◆ Social workers are responsible for engaging with service providers in planning and discussions about the services needed and in monitoring and evaluating progress.

◆ Social workers are responsible for knowing the array of services available to support children and families in their geographic area.

## *Supervisors*

◆ Supervisors are responsible for monitoring the quality of work of their social workers, and ensuring that family input has been solicited and utilized at all critical junctures in case activities.

◆ Supervisors are responsible for monitoring individual case activity, including determining the need to involve the Regional Directors or other appropriate consultation to assist in identifying individualized needs and help in identifying or procuring appropriate services.

◆ Supervisors are responsible for gauging the availability and responsiveness of service providers and of the service array in general, and for advocating with Regional Directors for needed services.

◆ Supervisors are responsible for coaching social workers and modeling effective approaches with regard to identifying and addressing individualized needs and for working with providers to assure responsiveness to individualized needs.

◆ Supervisors should participate in some team meetings and FCRs as a management tool to observe, support, and assist the social worker in the delivery of services.

## *Regional Directors (RD)*

◆ Regional Directors are responsible for managing the change effort involved with implementing the model of practice, and ensuring that all policies, trainings, and case activities are implemented and support the fidelity of the model.

◆ Regional Directors are responsible for assuring that DFCS staff and community providers work collaboratively and according to the same principles and procedures in individualizing services to children and families.

◆ Regional Directors have the responsibility of becoming actively engaged in the CQI process in order to continually monitor any data reports, as well as reviews for progress in identified critical case practice outlined not only through the *Olivia Y* settlement agreement but also the COA process to identify their offices' strengths and needs with regard to the mobilization of appropriate and timely services.

◆ Regional Directors should be the spokespersons for the components of the practice model in their Regions, and as such, should continually reinforce the values and principles associated with the mobilization of appropriate and timely services to children and families.

◆ Regional Directors are responsible for monitoring supervisory oversight of casework activity and promoting effective monitoring procedures within their offices.

◆ Regional Directors are responsible for being aware of service needs within their Regions in order for staff to assure the mobilization of appropriate and timely services to children and families, and for acting to fill gaps that may exist through advocacy, procurement of

additional services, development of local resources, or consultation with providers. This includes monitoring for emerging needs over time.

♦ Regional Directors are responsible for assuring that they have a well-trained staff of social workers and supervisors.

## Continuous Quality Improvement (CQI)

♦ The role of the CQI reviewer is to monitor and evaluate the quality of social work practice in regard to the mobilization of appropriate services and to provide constructive feedback on the effectiveness of this component of the practice model at the worker, unit, county office and statewide levels.

♦ CQI should monitor for the identification of individualized needs through comprehensive assessments, incorporation into the ISP, identification and mobilization of appropriate services as well as the effectiveness of the services.

♦ CQI should monitor and evaluate the extent to which assessments are used to guide case planning and the delivery of services to children and families.

♦ CQI should evaluate and report on systemic capacity within counties and regions to mobilize and deliver services that are a part of this component.

♦ CQI should review the extent to which service providers are engaging in assessment activities that are coordinated and consistent with MDHS assessments, and that service delivery reflects the issues identified in assessments.

♦ CQI is responsible for soliciting input from children and families on whether their individualized needs and strengths were identified and addressed effectively.

♦ In conjunction with other issues monitored, CQI should issue local and statewide reports that clearly indicate the extent to which the services identified and delivered meet the individual and unique strengths and needs of the families being served.

♦ CQI should coordinate its review of assessment activities with the Department's other major review of case planning activities including the FCR process.

♦ CQI should identify the services needed at a systemic level, based on case reviews and systemic factors and for elevating identified needs to the DFCS administration.

## Section 3:  Outcomes and Indicators

### a.  Short-Term Goals (0-12 Months)

### Training

*Interim Training Module:*  DFCS should develop an interim training module on individualizing services that will incorporate the basic skills and activities needed for the first two regions to implement the practice model.  Among the skills needed are:

♦ Referral readiness which involves preparing not only the family but also the provider for the referral and ultimately the services;

◆ Gathering and analyzing information from visits, providers and assessments to match the family's and child's needs to the most appropriate, individualized services; and

◆ Evaluating the timeliness, quality and effectiveness of services.

### Develop Practice Guides

◆ *Mobilizing appropriate services timely:*  A practice guide in this area will assist staff in the techniques of identifying unique needs and matching services to needs.  It should include information on areas of service delivery that are negotiable and non-negotiable, e.g. child safety, and how to work with families and to solicit useful information as well as emphasizing the importance of understanding and responding to a child's sense of time..

◆ *Procure and evaluate services:* A protocol in this area will assist staff in linking services to needs, ensuring the use of services, and in evaluating the quality of services to the child and family, and in negotiating changes in service providers.

◆ *Interim supervisory protocol:*  A protocol for the supervisor to use to evaluate the effectiveness and individuality of the services provided to the children and families will assist in focusing supervisors on the clinical aspects of this component of the practice model. The protocol should include using ongoing supervisory conferences in addition to the SAR, to evaluate and monitor the services being delivered to families and children, and to assist caseworkers in ensuring that appropriate services are provided.

### Quality Assurance and Monitoring

◆ *Local county office resource development:*  For the regions involved in the initial implementation of the practice model, DFCS should develop a plan to ensure that service providers are capable of developing an array of flexible services that can be tailored to the unique strengths and needs of children and families.

◆ *Local quality assurance capacity:*  DFCS should ensure that local offices have the skills, knowledge and ability to monitor the implementation of the practice model which provides for the development of services to meet the unique needs of the children and families.

## b.  Mid-Term Goals (12-24 Months)

### Develop Training Modules and Curricula

• *Skills-based training development and enhancement:*  In order to ensure a service delivery system which is capable of developing in a timely manner individualized services tailored to meet the unique needs of the children and families being served by the child welfare system, the training skills and modules which support the development, evaluation and monitoring of service delivery must be incorporated into the pre-service and on-going training curriculum.

• *Review existing on-going training:*  DFCS should review its on-going curricula to ensure that the concept of timely and individualized service delivery is incorporated as appropriate into all curricula.  A TOL component will also support staff in translating the information learned in the classroom environment to their actual work with children and families.

• *Develop individual modules on teen pregnancy, substance abuse, behavioral health, adoption and sexual abuse:*  While these topics are addressed within other training modules,

staff will likely benefit from having more focus on identifying behaviors related to these topics areas and the skills needed to engage the children and families affected by these issues and identify the type and level of services best suited to address the issues.

- *Develop an individual module on family team meetings:* This module should provide both the policy and procedures for utilizing this family engagement tool. It should also have a strong practice and TOL component to support staff in incorporating FTMs into their daily work.

## Policy Development

♦ *Develop policy that supports and encourages individualized services:* DFCS should make the recommended policy changes throughout DFCS policy to ensure consistency in the development, evaluating and monitoring of services which will meet the individualized needs of the children and families.

♦ *Incorporate supervisory protocols into ongoing policy:* Supervisory policy must include requirements regarding the frequency and content of supervisory conferences as well as guidance on providing clinical supervision with regard to individualized services to children and families.

## Resources

♦ Implement a performance-based contracting process. Plans are underway to develop and implement a performance-based contracting process and that should be completed early in the implementation process.

## Monitoring

♦ Implement a continuous quality improvement process (CQI). In order to establish ongoing monitoring of the mobilization of appropriate services timely, a permanent CQI process should be implemented that includes this component.

### c. Long-Term Goals (24-48 Months)

## Full Implementation of Modules

♦ Within this time frame, all regions will have begun implementation of the practice module.

♦ Full implementation of all training curricula, policy revisions and monitoring procedures will have been achieved.

♦ A focus of activity should be on coaching and supporting the practices associated with this component.

♦ An additional focus should be on assuring the systemic supports needed for this component are refined and fully in place, such as flexible and inclusive service provider system, comprehensive training for social workers, supervisors, regional directors and resource families, foster parents who support this component, supervisory and quality assurance processes that capture and use information on this component and a planning process that supports child(ren) and family involvement.

### Monitoring Practice Model Implementation Success

In order to assess the success of the implementation of the mobilizing appropriate services component of the practice model, the following indicators should be monitored:

*CFSR Measures:*

♦ Safety Outcome 2*: Children are safely maintained in their homes whenever possible and appropriate.*
  o Item 3:  Services to family to protect child(ren) in the home and prevent removal or re-entry into foster care.

♦ Permanency Outcome 1*: Children have permanency and stability in their living situations*
  o Item 8: Reunification, guardianship or permanent placement with relatives
  o Item 9:  Adoption
  o Item 10:  Other planned permanent living arrangement

♦ Well-Being Outcome 1*: Families have enhanced capacity to provide for their children's needs*
  o Item 17:  Needs and services for children, parents, and foster parents
  o Item 19:  Caseworker visits with child
  o Item 20:  Caseworker visits with parents

♦ Well-Being Outcome 2*: Children receive appropriate services to meet their educational needs*
  o Item 21:  Educational needs of the child

♦ Well-Being Outcome 3*: Children receive adequate services to meet their physical and mental health needs.*
  o Item 22: Physical health of the child
  o Item 23:  Mental/behavioral health of the child

*Olivia Y Measures*

♦ Percent of children with a permanency goal of reunification that have  service plans for their parents that identify those services DFCS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care;

♦ Percent of children with a permanency goal of reunification, the child's assigned DFCS caseworker shall meet with the child's biological parents at least monthly to assess service delivery and achievement of service goals;

♦ Percent of children in custody reaching the point at which they have spent 15 of the previous 22 months in foster care shall have a petition for TPR filed on their behalf or an available exception under the federal ASFA documented by the end of the month of their fifteenth month;

♦ Percent of children in custody who have spent more than 15 of the previous 22 months in foster care without a TPR petition filed on their behalf or an available ASFA exception documented by the end of their fifteenth month in care shall have such a petition filed or an available exception documented within the period;

**Mississippi Practice Model**

- Percent of children in custody with the primary permanency goal of adoption shall have an assigned adoption specialist and an adoption plan that identifies the child-specific activities that DFCS will undertake to achieve adoption, and shall receive regular adoption status meetings consistent with plan requirements;

- Percent of families receiving an adoption subsidy that have access to services (i.e. respite services, counseling, mental health treatment, and crisis intervention; family preservation and stabilization services and peer support;

- Percent of children who have undergone initial health screening within 72 hours of entering care;

- Percent of children who have received full health examination within 30 days of entry into care;

- Percent of children in custody who have received periodic medical examinations and all necessary medical follow-up services and treatment;

- Percent of children, age 3 and younger, who have received developmental assessment within 30 days of entering foster care;

- Percent of children, age 4 and older, who have received initial mental health assessment within 30 days of entry into care and/or within 30 days of their 4th birthday if occurring during stay in foster care;

- Percent of children, age 3 and older who received initial dental examination within 90 days of entry into care or within 90 days of their 3rd birthday if occurring during stay in foster care and every 6 months thereafter;

- Percent of children whose educational needs have been screened within 30 days of entry into foster care;

- Percent of school age children entering custody or experiencing a placement move will be registered for and attending an accredited school within three business days of the placement or placement change;

- Percent of children receiving therapeutic and rehabilitative foster care services who received needed medical, dental, mental health or other therapeutic and supportive services as identified through the treatment plan;

- Percent of monthly visits that have occurred between caseworkers and biological parents;

- Percent of twice monthly visits that have occurred between caseworkers and children;

- Percent of twice monthly visits that have occurred between caseworkers and therapeutic foster parents with at least one foster child residing in their home;

- Percent of monthly visits that have occurred between caseworkers and foster parents with at least one foster child residing in their home ;

- Percent of youth age 14 -20 years old who have been provided with Independent Living services as identified in their plan;

- Percent of youth in custody transitioning to independence who have an adequate living arrangement, a source of income, health care, independent living stipends, and education and training vouchers;

- Percent of children with a permanency goal of reunification who have a 90 day trial home visit; and

- Percent of children with a recommendation to return to their home or placement with a relative who have a meeting attended by the DFCS caseworker and supervisor, the private agency worker, the foster parents (if appropriate), the biological parents or relative assuming custody and the child.

## *Foster Care Reviews*

- Issues cited due to children who have been in state's custody for 15 of the most recent 22 months; their case has not been referred for TPR and there is documentation lacking in their ISP of compelling reasons why pursuing TPR would not be in their best interests

- Issues cited related to children with a plan of Adoption for which there are no documented efforts to finalize the plan of adoption within a reasonable time frame (i.e., a lack of a TPR referral; no actions taken by adoption unit

- Issues cited due to a lack of Independent Living/Transitional Living services being provided to eligible youth in state's custody

- Issues cited due to parents/primary caretakers who are found to have identified needs for which services are not being provided

- Issues cited due to resource parents who are found to have identified needs for which services are not being provided

- Issues related to children who are placed in a non-licensed or non-court ordered placement

- Issues related to children who are not placed within close proximity of their original home and the reason for the placement does not appear to be related to the achievement of their case plan goals.

- Issues related to children who are in placements that do not appear to be free from disruption

- Issues related to children who are placed separately from their siblings who are also in state's custody and the reason for the placement does not appear to be necessary for the goals of their case plan.

- Issues cited due to children for whom there is no evidence they have received allowances for which they are eligible.

In the Department's CQI process, the following items should be reviewed pertaining to in-home services:

- The effectiveness of services delivered as a result of the ISP;

- The level of involvement of the children and family in the case planning process; and

- The use of Family Team Meetings as a tool for engaging the family and developing and monitoring the ISP.

## B.  Component Two:  Safety Assurance and Risk Management

Safety and risk-related interventions are designed to help children remain safely at home whenever possible and appropriate.  Assuring child safety begins with the first call to the DFCS Hotline because someone believes a child is being maltreated and continues through screening the report for safety assessment or full investigation of maltreatment; safety assessment and initial strengths and risk assessment; development of a safety plan, ongoing safety and risk assessment and management; development of a case plan; assuring safety during placement; reunification; and case closure.

Safety assurance and risk management is a central and essential component of the child welfare system.  The process of assessing safety and responding to safety factors involves all aspects of the case: the call to the hotline or other referral of suspected abuse or neglect where potential safety factors inform response time and level of response; at the investigation to determine if safety factors are present and require safety actions and the level of risk of future maltreatment to the child(ren); at the conclusion of the investigation, the existence of safety factors or risk factors will inform the decision to open a case for ongoing services; at any time during the life of the case, safety will inform the decision to place a child in out of home care; safety will inform the reunification decision; safety factors that cannot be resolved after appropriate intervention will inform permanency decisions, and finally safety will also inform the decision to close a case.

Our definition of safety assurance and risk management assumes that children should live in a safe and permanent home with their own families whenever possible, and that agency interventions should assist families to care for and nurture their children.  When the adults responsible for the care of children present a danger or are unwilling or unable to protect them, the agency should take necessary actions to assure the child's safety.   When appropriate, the agency should provide a range of preventive and/or supportive services to families having difficulty providing a safe and permanent environment, recognizing that better outcomes for children are achieved by engaging families in the safety and risk assessment process and supporting them to care safely for their own children.

Child maltreatment encompasses physical abuse, sexual abuse, neglect, and psychological maltreatment and various levels of severity of harm inflicted or threatened on a child by the child's responsible caregiver. When considering child safety, information should be gathered regarding the current behaviors or conditions that are placing a child, or have the potential to place a child in immediate danger of serious harm. Such behaviors or conditions comprise safety factors.  The presence of safety factors represents a clear warning that one or more children may be in immediate danger of serious harm.  Safety becomes the concern of the public child welfare agency, such as DFCS.

While a critical component of any public child welfare agency's practice is assuring child safety and managing risk of maltreatment, it is crucial for safety and risk to be well defined in policy, training and through the use of decision support and documentation tools, and for the application of the process of safety assurance and risk management to be consistent among workers and

across the agency as a whole.  Safety assurance and risk management relies on commonly held definitions:[4]

***Safe*** *is a condition in which the threat of serious harm is not present or imminent or the protective capacities of the family are sufficient to protect the child.*

***Unsafe*** *is a condition in which the threat of serious harm is present or imminent and the protective capacities of the family are not sufficient to protect the child.*

***Risk*** *refers to the likelihood that the maltreatment may occur in the future.*

***Child vulnerability*** *refers to a child's capacity for self-protection. It is the degree, to which a child can avoid, negate or modify safety threats, or compensate for the caregiver's missing or insufficient protective capacities. Child vulnerability encompasses child attributes such as age; developmental level and mental disability; physical disability and illness; whether a child acts provocatively or passively; whether a child seems powerless or defenseless, the visibility of a child to others; a child's ability to communicate; a child's ability to meet basic needs; and, whether the child is seen as a scapegoat.*

***Protective capacities*** *refer to the individual and family strengths, resources or characteristics that mitigate threats of serious harm to a child or demonstrate that the child is being adequately protected by his or her caregiver(s).  In this context, family strengths or resources refer only to those characteristics that directly affect the safety of the child. Protective capacities must be present and must be reliably deployed by the family or others that have caregiver responsibilities and/or provide essential family supports. Protective capacities include personal, behavioral, cognitive and emotional characteristics such as intellectual skills, physical care skills, motivations to protect, positive attachments, social connections; and resources such as income, employment, housing or environment.*

The assessment of protective capacities involves more than identifying the strengths of individual caregivers or the list of resources the family may have available. Protective capacities must be relevant and dynamically involved in offsetting the risks related to abuse/neglect.[5] Protective capacities need to be consistently used to compensate for a condition, or behavior that has contributed to risk and safety factors.  The case plan should be specific about protective capacities that need enhancement and strategies to do so. For example, if the caregiver uses discipline that demonstrates a lack of understanding of child development and places a child in danger, then the protective capacity that needs to be enhanced would be the parents' knowledge of child development and the adjustment of discipline to the stage of development.  The caregiver may have some protective capacities in place such as the recognition of the need to change and the willingness to seek support. The corresponding action step may be for parent education specific to understanding child development and practicing non physical discipline that is appropriate to the child's stage of development.  Behavior that would indicate the enhancement of this protective capacity would be the parent viewing discipline in broader socializing ways and seeing the purpose of discipline as learning rather than punishment, being

---

[4] National Association of Public Child Welfare Administrators, *A Framework for Safety in Child Welfare,* 2009.

[5] Schene, Patricia, Comprehensive Family Assessment Guideline for Child Welfare, 2005.

more aware of his or her parenting style and demonstration of appropriate emotional control especially when disciplining the child.

The existence of protective capacities in families such as good communication skills, the provision of help and support the child, parental monitoring of child's behavior, involvement with homework and the school, and positive parental role modeling specifically around smoking, drinking and drug use are directly correlated to positive adolescent outcomes such as avoiding risky behaviors, school performance, and social competency.[6]

Safety factors are seen in the context of present danger, requiring immediate action. Such immediate actions are intended to control the immediate threat. The underlying conditions and contributing factors that led the caregiver's behavior to cause harm or a threat of harm may not be immediately ascertainable, but will be the focus for activities or interventions intended to change caregiver behavior. Risk refers to the probability that any form of child maltreatment, regardless of severity, may occur or recur in the future. When referring to risk, it is wise to distinguish risk of future maltreatment from other risks, such as the risk of foster care, the risk of truancy or other poor educational outcomes, or the risk of juvenile delinquency. Immediacy, severity, and child vulnerability will separate safety from risk. As such the focus of the safety plan is controlling safety factors in the present while case plans focus on accessing appropriate services, utilizing family and community support, resolving the underlying issues and contributing factors resulting in behavior change on the part of the caregiver resulting in enhanced protective capacities and/or behavior change on the part of the child, decreasing vulnerability. Risk assessment is also an important process in assuring child safety. While not every family will have immediate safety factors present, many will have risk factors that need attention. Unresolved risk factors can easily lead to safety factors emerging in the near future. Many risk assessment tools address the underlying issues and contributing factors that lead to the presence of safety factors. The degree to which issues such as substance abuse, domestic violence, and behavioral health issues impact adult and child functioning in the future must be considered to comprehensively assure safety and manage risk.

Safety assessment is the process that the child welfare worker uses to gather relevant information about the family conditions, behaviors, perceptions, motivations and situation, and analyzes the information to determine  how variables interact thus creating a safe or unsafe situation for each child. Risk assessment includes gathering information on behaviors and circumstances that contribute to the likelihood that a child may be abused or maltreated in the future. This includes information on family strengths and needs, child maltreatment dynamics, the analysis of that information, and decision-making concerning the level of risk of future maltreatment. Risk assessment is used to determine whom to serve and the focus of service to the family. There are a number of structured safety and assessment models available.

Making a decision that a child is unsafe is one critical piece of the component of safety assurance and risk management. The safety response or protection plan is the process of working with the family and their formal and informal supports to develop a plan or set of safety actions that specifically controls and manages the danger. The parent/caregiver's promise to change

---

[6] Moore, K., Whitney, C. & Kinukawa, A. Exploring the Link Between Family Strengths and Adolescent Outcomes, Child Trends Research Brief, 2009.

behaviors or circumstances is not a sufficient safety plan. Safety interventions should also be as least intrusive and restrictive as possible. If a safety plan allows for the child to remain in their home, placement in out of home care can be avoided.  Safety plans must be able to be immediately implemented.  They should have a monitoring component to test that the safety actions are effectively protecting the child; they remain sufficient and are being implemented as agreed upon by all responsible parties. Service plans focus on the behavior change that lead to risk reduction.

Safety assessment does not end when a child enters out-of-home care.  The threshold for placing a child in out –home care is that present danger of serious harm to a vulnerable child is immediate, serious, and beyond the control of any of the caregivers.  The threshold for a child placed in out-of-home care is significantly more stringent, in that no harm should come to this child.  Children placed in out-of-home care have likely suffered trauma as a result of abuse, neglect and separation from their family.  The need for the foster child to have an emotionally and physically safe and nurturing home is paramount. Resource parents should demonstrate concern for the child's well-being, and demonstrate physical, emotional and cognitive capacity to protect and supervise the child.  Resource parents will be closely bonded to their own children and should be highly aware of how the placement will affect the child being placed in their home as well as how it will affect other children residing in their home. This should be demonstrated through discipline that is intended to teach rather than punish and should never involve corporal punishment.  This should be further demonstrated through supervision that does not allow physical altercations or bullying among children in the home.

It is the responsibility of DFCS to visit frequently in the foster home and meet individually with the child(ren) to monitor that the child(ren) are safe from harm and that their emotional, educational and physical needs are being adequately met. It is also the responsibility of DFCS to identify and respond to reports of alleged maltreatment of children in foster care with the same diligence as for children residing in their own homes, e.g., through timely and thorough investigations and interventions.

## Section 1:  Inputs

### a.  Policy

In reviewing DFCS' policies, there are policies covering intake and screening of reports, safety and risk assessment, initiating services to address safety and risk, assuring safety when children are in out-of-home placement, and assuring safety and managing risk at reunification and case closure.

CPS policy defines risk as exposure to the chance of injury or loss the future likelihood that the child will be abused or neglected.  Risk includes three levels:

- *Low risk*:  The child's risk of harm in the future is not significantly greater than risk faced by the general population from this area.

- *Medium risk*:  The child's risk of harm in the future is at a higher than average level of risk than most children in their area.

- *High risk*: The child's risk of harm in the future is significantly higher than most children in their area.

CPS policy defines safety as the present security and well-being of a child has been assessed as being at risk of maltreatment. The levels of safety are:

- *Safe*: There are no present threats of harm/when the protective factors in the family can adequately manage foreseeable threats to safety.

- *Unsafe*: The child is in imminent danger of significant harm without an intervention.

Intake workers take the reports of abuse, neglect or exploitation at the hotline, gathering information from the reporter, using the MACWIS intake screen to record the date and time of maltreatment reports, a summary of the allegations, lists complainant, victim(s), perpetrator(s), household members, roles and relationships, locations and living arrangements. Special handling is documented for maltreatment of children in custody and these reports are automatically assigned Level 3 status for a 24 hour response.

Case reviews of a sample of 30 investigations of maltreatment of children in custody revealed that 26 of the 30 cases were given a Level 2 priority.

The screening and assignment of the report is then completed by the supervisor. The supervisor will determine:

- Is there adequate information to locate the family?

- Is the alleged perpetrator a parent or guardian?

- Does the report meet the definition of maltreatment?

- Is the child in imminent danger of harm?

If none of these are met, the report will become a Level 1, which is screened out for CPS but may be referred elsewhere. If the first three are met, but the child is not in imminent danger of harm or harm cannot be determined, the report will become a Level 2, requiring a safety assessment to be completed. Level 2 requires the report be assigned to a worker who will initiate the investigation within 72 hours and complete the safety assessment within 7 days. If all four of the screening criteria are met, the report will be assigned Level 3, which requires a full investigation that must be initiated with 24 hours, with a safety plan completed within 7 days and the full investigation competed within 30 days, with the worker completing the investigation in 25 days and allowing 5 days for the supervisor to review and approve. Assignment of reports takes place within 24 hours of the call to the Hotline.

A supervisor who receives a report by phone, in person, or in writing that a child has been maltreated in certain ways, e.g., intentionally burned or tortured, seriously injured or where serious injury was attempted, sexually abused, or otherwise abused in a felony manner, must immediately call the law enforcement agency in whose jurisdiction the crime occurred and give all information available.

In rating their effectiveness in screening incoming reports of maltreatment to accept for investigation, respondents to the survey indicated that they are frequently or almost always

effective almost 78 percent of the time.  Respondents also rated prioritizing incoming reports of maltreatment effective slightly more than 78 percent of the time.

| Please rate your perception of your agency's effectiveness in each area below in practices related to ensuring safety for children in their own homes. | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Sometimes | Frequently | Almost Always | No Info/ NA | Total |
| Screening incoming reports of maltreatment to accept for investigation: | 8 (3.76%) | 1 (0.47%) | 13 (6.1%) | 38 (17.84%) | 127 (59.62%) | 26 (12.21%) | 213 |
| Prioritizing incoming reports of maltreatment, i.e. assigning the correct priority based on allegations: | 5 (2.36%) | 1 (0.47%) | 14 (6.6%) | 46 (21.7%) | 120 (56.6%) | 26 (12.26%) | 212 |

An investigation must be initiated by having personal contact with the child, caretaker, and siblings in the home, other household members or collaterals within 24 hours when present danger is suspected.  All children in the home must be interviewed. There must be at least one visit with any child at risk in the home and with the family.

The safety assessment contains 20 safety factors that require a yes or no answer.  These 20 safety factors are statements that represent a condition, behavior, thought, feeling, or perception that if answered in the affirmative would place a child in danger of serious harm.  They include characteristics of the caregiver that create danger.  For all factors checked require a narrative description of the behaviors, conditions and circumstances associated with the safety factor.  If any safety factors are checked yes, a full investigation and the development of a safety plan is required  When all safety factors are checked no, the maltreatment findings section must be completed, describing the determination of the allegations of abuse or neglect, contacts made, observations, statements, collateral contacts and other concerns identified during the safety assessment. All safety assessments require supervisory review and sign-off.  When there are children in the home ages 0-5, the Safety Checklist for Children is completed.  This contains primarily environmental type issues, such as fire hazards, drowning hazards, firearms and poisons in the home, car safety and household cleanliness.

Risk assessment is required within 7 days,  in conjunction with the safety assessment, which includes family strengths and needs, history, and  family connections, family stressors, caretaker functioning, health concerns of household members, and school functioning.

As indicated in the chart below, survey respondents rated the agency's use of initial safety assessments to ensure child safety of children in their own home as effective frequently or almost always about 77 percent of the time and risk assessments 76 percent of the time.  Several open ended responses to the survey indicated that the safety and risk assessment tools were thorough, and provided an accurate and consistent way to assess the family, including family history when used correctly.  The safety checklist was seen as a good prompt for the worker to carefully observe the home.  There was some concern expressed about the thoroughness of the safety assessment completed within seven days on Level 2 reports, and whether that was enough time

to adequately complete it. Many respondents expressed the need for additional on-going training on safety assessment and risk management. Survey respondents identified the agency as effective in the timeliness of initiating investigations frequently or almost always 77 percent of the time. About 71 percent of the survey respondents identified the agency as frequently or almost always effective in the timeliness of completing investigations. The thoroughness of investigations was rated frequently or almost always effective about 72 percent of the time. Respondents to the survey identified addressing safety of all of the children in the home, not just the report subject child frequently or almost always effective about 77 percent of the time.

| Please rate your perception of your agency's effectiveness in each area below in practices related to ensuring safety for children in their own homes. | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Some Times | Frequently | Almost Always | No Info/NA | Total |
| Initial safety assessments: | 0 (0%) | 2 (0.94%) | 24 (11.32%) | 41 (19.34%) | 123 (58.02%) | 22 (10.38%) | 212 |
| Initial risk assessments: | 0 (0%) | 2 (0.95%) | 25 (11.85%) | 50 (23.7%) | 111 (52.61%) | 23 (10.9%) | 211 |
| Timeliness of initiating investigations: | 0 (0%) | 2 (0.96%) | 25 (11.96%) | 38 (18.18%) | 123 (58.85%) | 21 (10.05%) | 209 |
| Timeliness of completing investigations: | 0 (0%) | 6 (2.84%) | 34 (16.11%) | 52 (24.64%) | 99 (46.92%) | 20 (9.48%) | 211 |
| Thoroughness of investigations, i.e. interviewing all parties, using prior history information, etc. | 0 (0%) | 7 (3.3%) | 31 (14.62%) | 50 (23.58%) | 102 (48.11%) | 22 (10.38%) | 212 |
| Addressing safety of all children in the home, not just report subject child: | 0 (0%) | 5 (2.43%) | 19 (9.22%) | 50 (24.27%) | 109 (52.91%) | 23 (11.17%) | 206 |

As indicated in the following chart, survey respondents identified the effectiveness of the safety assessment as a tool to identify safety and risk issues during investigation frequently or almost always about 67 percent of the time. Focus group participants commented that the safety checklist for children ages 0-5 was helpful, and some counties have developed checklists for other age ranges. Focus group participants recommended completing the safety checklist for all children. The use of the SARA to identify risk was rated as effective frequently or almost always about 59 percent of the time. Survey respondents commented that the SARA is too long, and does not always apply to the family's situation. There was also confusion as to how to use the SARA for children in placement. Focus group participants were more positive about the SARA, commenting that it was helpful but time consuming. Some focus group participants reported that SARA was put in place of the narrative risk assessment format in MACWIS, which some

preferred.  They also noted that the quality of the SARA is inconsistent and largely dependent upon the skill of the individual worker and supervisor.

| Please rate your perception of your agency's effectiveness in each area below of supports to assuring and managing risk for both in-home and foster care. | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Sometimes | Frequently | Almost Always | No Info/ NA | Total |
| Effectiveness of the safety assessment as a tool to identify safety and risk-related issues during investigations: | 1 (0.48%) | 7 (3.33%) | 42 (20%) | 56 (26.67%) | 84 (40%) | 20 (9.52%) | 210 |
| Effectiveness of SARA in identifying risk: | 5 (2.42%) | 16 (7.73%) | 38 (18.36%) | 58 (28.02%) | 65 (31.4%) | 25 (12.08%) | 207 |

A safety plan is developed and implemented immediately once safety factors are identified. A FTM is held during the investigation so that family members can be identified to make the best safety plan for the child. Safety plans are completed in MACWIS, triggered by any yes responses on the safety assessment.  There is not a paper safety plan that is completed with the family that requires their signature.  Focus group participants reported that it is frequently a verbal agreement with the family and often used when the child will be placed informally outside the family's home. Some Survey respondents identified the safety plan as a valuable tool to work with the family to resolve problems discovered during the investigation without taking custody of the child(ren). Others, expressed concern that the lack of a structure to the safety plan resulted in plans that do not actually protect children. Survey respondents rated their effectiveness in the use of safety plans frequently or almost always effective 75 percent of the time.

At the conclusion of the investigation, if there are safety factors the case will be opened for services if the children are in placement or remaining in their own home. The social worker will carefully evaluate the situation to determine what services need to be provided for the safety of the children. There are three types of services identified in policy:

◆ Concrete services such as housing, food, or medical treatment;
◆ Educational services such as parenting, learning how to discipline without abusing a child, and providing safe supervision; and
◆ Therapeutic services such as mental health counseling to address interpersonal problems.

Practice guidance suggests that the treatment plan follows the completion of a thorough assessment and replaces the safety plan and addresses the needed changes in family functioning including the elements that created danger.  The Family Team Meeting is used as a tool to assist with the development of the treatment plan.

As indicated in the chart below, survey respondents rated the agency's effectiveness as frequently or almost always effective in the identification of underlying issues related to maltreatment such as substance abuse, domestic violence, sexual abuse, mental health or other family dynamics about 67 percent of the time.  About 75 percent of respondents rated the timely identification of services needed to address safety frequently or almost always effective.  The use

**Mississippi Practice Model**

of the risk and safety assessment and safety plan to develop the case plan was rated frequently or almost always effective about 74 percent of the time. Survey respondents expressed concern that the policy requires approval of the youth court judge when making a safety plan to avoid placement.  They indicated that not all judges want to be contacted if the case is not open in court.  The recommendation was to update the policy so that the judge's actions do not place the worker out of compliance with policy.

Survey respondents rated the discussion of safety and risk issues during the FTM as frequently or almost always effective about 78 percent of the time.  FTMs were repeatedly described as an effective tool for identifying and addressing safety and risk factors and engaging the entire family in the treatment planning.  Focus group participants identified the FTM as a positive way for families to be accountable. They noted very positive improvements in the frequency and quality of the FTM which is resulting in improvements in case outcomes.

| Please rate your perception of your agency's effectiveness in each area below in practices related to ensuring safety for children in their own homes. | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Sometimes | Frequently | Almost Always | No Info/ NA | Total |
| Identification of underlying issues related to maltreatment, such as substance abuse, domestic violence, sexual abuse, mental/behavioral health, cognitive impairment, or other family dynamics: | 0 (0%) | 6 (2.83%) | 28 (13.21%) | 59 (27.83%) | 97 (45.75%) | 22 (10.38%) | 212 |
| Timely identification of services needed to address safety: | 1 (0.47%) | 2 (0.94%) | 29 (13.62%) | 62 (29.11%) | 98 (46.01%) | 21 (9.86%) | 213 |
| Use of risk and safety assessment and safety plan in developing the case plan: | 0 (0%) | 8 (3.81%) | 23 (10.95%) | 52 (24.76%) | 104 (49.52%) | 23 (10.95%) | 210 |
| Discussion of safety and risk issues during the Family Team Meeting: | 0 (0%) | 5 (2.44%) | 14 (6.83%) | 61 (29.76%) | 100 (48.78%) | 25 (12.2%) | 205 |

When a case is open for services and the children are in the home the policy requires at least one monthly visit within the home, but best practice suggests that the worker visit the child at least two times per month.  At those visits the home environment and its safety are assessed.  The

safety of the children should also be assessed through observations. These are requirements for as long as the case remains open.

Ongoing safety assessment in open protective cases was rated by respondents to the survey as frequently or almost always effective about 79 percent of the time. They noted there is no requirement of complete the safety assessment tool beyond the investigation, but that ongoing risk assessments are required by policy to be completed every 90 days. Survey respondents identified ongoing risk assessments in open protective cases as frequently or almost always effective about 79 percent of the time. Investigations of reports of maltreatment of children in open protective cases were rated as frequently or almost always effective about 75 percent of the time. Respondents to the survey rated the monitoring of safety plans in open in home cases frequently or almost always effective about 74 percent of the time.

| Please rate your perception of your agency's effectiveness in each area below in practices related to ensuring safety for children in their own homes. | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Sometimes | Frequently | Almost Always | No Info/ NA | Total |
| Ongoing safety assessments in open protective services cases: | 0 (0%) | 5 (2.36%) | 35 (16.51%) | 49 (23.11%) | 97 (45.75%) | 26 (12.26%) | 212 |
| Ongoing risk assessments in open protective services cases: | 0 (0%) | 8 (3.76%) | 31 (14.55%) | 49 (23%) | 99 (46.48%) | 26 (12.21%) | 213 |
| Investigating reports of maltreatment on children in cases already opened for in-home protective services: | 0 (0%) | 8 (3.83%) | 18 (8.61%) | 58 (27.75%) | 100 (47.85%) | 25 (11.96%) | 209 |
| Monitoring of safety plans in cases open for in-home services: | 0 (0%) | 7 (3.33%) | 23 (10.95%) | 62 (29.52%) | 94 (44.76%) | 24 (11.43%) | 210 |

When children are in placement, policy directs the worker to visit the child one time per month in the placement setting but best practice "strongly" recommends two visits per month, with one outside of the placement setting to allow child to freely express his or her self. Policy also requires that there is monthly face to face contact with the child's parent. As indicated below, respondents to the survey identified the monitoring of the safety of children while in foster care frequently or almost always effective about 86 percent of the time. Monitoring the risk of harm to children in foster care was identified by survey respondents as frequently or almost always effective about 84 percent of the time. Safety and risk assessments in visitation were rated as frequently or almost always effective 74 percent of the time. Survey respondents reported that they are monitoring foster homes and children more now than in the past. They reported workers seeing children in foster care once or twice a month. Resource families that participated

in focus groups reported that social workers made home visits to the resource home monthly or more frequently, unless they had the opportunity to see the child outside of the resource home during that month, such as in the office. If the child was seen outside of the resource home, the monthly visit to the resource home may not take place.  Resource parents reported that when the worker came to the home they generally saw the children in a group, unless a child requested a private meeting.

| Please rate your perception of your agency's effectiveness in each area below of practices relating to ensuring safety for children in foster care. | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Sometimes | Frequently | Almost Always | No Info/ NA | Total |
| Monitoring the safety of children while in foster care: | 0 (0%) | 3 (1.42%) | 8 (3.77%) | 59 (27.83%) | 124 (58.49%) | 18 (8.49%) | 212 |
| Monitoring the risk of harm to children in foster care: | 0 (0%) | 3 (1.42%) | 13 (6.16%) | 59 (27.96%) | 116 (54.98%) | 20 (9.48%) | 211 |
| Safety and risk assessments in visitation: | 0 (0%) | 6 (2.84%) | 26 (12.32%) | 57 (27.01%) | 99 (46.92%) | 23 (10.9%) | 211 |

 If a DFCS staff person has suspicion that a child in DFCS custody is being maltreated or that corporal punishment is being used within a resource home, policy requires that a formal report must be made. When a report to the Hotline involves a resource family, the RD for the COS and the Regional Resource Family Supervisor, the RD and supervisor for the COR, and the Regional Resource Family Supervisor where the victim lives are notified immediately.  It is the responsibility of the RD for the county where the report originated to assign staff to complete a full investigation.  The worker who licensed the resource family may not have a role in the investigation but may accompany the investigative worker.  It is the responsibility of the RD of the COR to determine if the child(ren) should be removed from the resource home.  The parents of the child(ren) must be notified of the allegations, actions taken to prevent further abuse or neglect and the outcome of the investigation.

The alleged victims must be interviewed on the same day the report is received and must be interviewed individually, privately and away from the resource home.  No additional children may be placed in this home pending the completion of the investigation.  We reviewed a sample of 30 reports of abuse, neglect or exploitation of children in foster care and found that two-thirds of the children were not interviewed on the same day of the report (20 of 30 children), and in about two-thirds of the cases children were interviewed individually, privately and away from the resource home (21 of 30 children).

Some focus group participants indicated that there are a lot of reports on resource homes, mostly resulting from policy violations.  They indicated that the resource worker for the home is not always notified of the report or given the opportunity to accompany the investigation worker to the resource home.  Additionally, the resource worker is not always informed of the results of the investigation as directed in policy. Other focus group participants indicated that the practice of

appropriately assessing reports of maltreatment of children in foster care is much improved. They commented that there is now consistency in conducting investigations on screened-in reports. They also recognized that some of these investigations were not consistently completed in a thorough manner. We heard that RDs now make efforts to assign these investigations to the most qualified and experienced staff, although some are assigning these investigations to the resource or licensing worker.

We heard from some focus group participants about children who were abused in the foster home, with parents not being notified directly by the agency but in a court hearing. In our case reviews, we found the following about notifying parents of maltreatment of their children in foster care:

♦ We could determine that the parents were notified of the report in five of the 30 cases. In four, they had not been notified, and we could not find enough information in the file to make a determination in 17 cases. Notification was not applicable for four cases.

♦ We could determine that the parents were notified of the findings of the investigation in three of the 30 reports, that they were not notified in four, that notification was not applicable in four, and there was insufficient information in the record to make a determination in 18 cases.

Respondents to the survey indicated that screening incoming reports of maltreatment to accept for investigation for children in foster care were effective frequently or almost always about 75 percent of the time. Prioritizing incoming reports of maltreatment for children in foster care was rated effective frequently or almost always by survey respondents about 77 percent of the time. Likewise, survey respondents rated timeliness of initiating investigations effective about 77 percent of the time. About 74 percent of the survey respondents rated timeliness of completing these investigations as frequently or almost always effective. Thoroughness of investigations involving children in foster care was rated frequently or almost always effective slightly more than 75 percent of the time. About 76 percent of the survey respondents rated assessing the safety of all children in the foster home as frequently or almost always effective.

| Please rate your perception of your agency's effectiveness in each area below of practices relating to ensuring safety for children in foster care. | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Sometimes | Frequently | Almost Always | No Info/ NA | Total |
| Screening incoming reports of maltreatment to accept for investigation for children in foster care: | 5 (2.39%) | 2 (0.96%) | 8 (3.83%) | 48 (22.97%) | 114 (54.55%) | 32 (15.31%) | 209 |
| Prioritizing incoming reports of maltreatment for children in foster care, i.e., assigning the correct priority based on the allegations: | 4 (1.9%) | 4 (1.9%) | 13 (6.19%) | 41 (19.52%) | 117 (55.71%) | 31 (14.76%) | 210 |

**Mississippi Practice Model**

| Please rate your perception of your agency's effectiveness in each area below of practices relating to ensuring safety for children in foster care. | | | | | | | |
|---|---|---|---|---|---|---|---|
| Timeliness of initiating investigations: | 0 (0%) | 3 (1.43%) | 18 (8.57%) | 45 (21.43%) | 117 (55.71%) | 27 (12.86%) | 210 |
| Timeliness of completing investigations: | 1 (0.48%) | 5 (2.39%) | 20 (9.57%) | 55 (26.32%) | 101 (48.33%) | 27 (12.92%) | 209 |
| Thoroughness of investigations involving children in foster care, e.g., interviewing all parties, using prior history information, etc.: | 0 (0%) | 6 (2.87%) | 17 (8.13%) | 42 (20.1%) | 115 (55.02%) | 29 (13.88%) | 209 |
| Addressing the safety of all children in the foster home, as opposed to only the child who is the subject of the report: | 0 (0%) | 11 (5.34%) | 10 (4.85%) | 47 (22.82%) | 112 (54.37%) | 26 (12.62%) | 206 |

In a review of 17 screened-out reports of alleged maltreatment of children in foster care, our case reviews found that all 17 reports were treated as a new report and screened accordingly and reviewed by an ASWS or RD. Our reviewers indicated agreement with the screening decisions, based on the information we had available through the MACWIS files in 12 of the 17 reports, did not agree with two of the reports, and did not have enough information in the file to make a determination in three of the reports.

According to MDHS policy, upon reunification a 90 day trial placement should be sufficient with approval from the court to determine if the child is receiving minimally acceptable care. Trial placement cannot exceed six months. In evaluating the effectiveness of safety and risk assessments in making reunification decisions, survey respondents indicated that the agency is frequently or almost always effective about 80 percent of the time.

At the time of case closure, the closing decision should be based upon evidence that the original problems causing the abuse or neglect have been resolved to the point that the family can protect the child. The policy discusses "weaning" the family from the social worker as they develop other supports in preparation for closure. When the family has accomplished the goals in the ISP the worker determines whether to continue or terminate involvement is based upon whether the children will be in a harmful situation. Survey respondents identified the agency as frequently or almost always effective in evaluating safety and risk factors at the time of case closure about 71 percent of the time.

There were numerous comments from survey respondents on the usefulness of policy on safety and risk related issues. Survey respondents rated policy as frequently or almost always effective about two-thirds of the time (about 66 percent). Respondents identified the need for an updated

policy manual. There was also concern that because policy was changed in pieces through bulletins, there was inconsistency from county to county.

### b. Training

DFCS puts considerable effort into pre-service training, including both classroom and on-the-job (OJT) training. There is a ten week pre-service training which includes four full weeks of classroom training. Focus group participants expressed some concern that supervisors do not have time to participate in OJT for new workers, so some new workers are not adequately prepared for their job. DFCS also offers limited on-going training unit which is not mandatory. A survey conducted by the training unit found that over 50 percent of DFCS staff respondents reported that additional and ongoing training were needed in these areas:

♦ CPS: Safety Assessment and Findings;

♦ Risk Determination in CPS;

♦ Putting the Pieces Together to See the Whole
   o What is the resulting risk of abuse or neglect of the child?
   o Out of all this information – "what is my determination? What do all of the data mean?
   o What are the findings?
   o How can I put all the pieces together to see the whole?

Additionally the survey found that:

♦ 68 percent stated they had a need to learn more about ongoing case planning and evaluating progress toward reunification; and

♦ 62 percent stated they had a need to learn about case planning content and process.

The primary training modules which address safety assurance and risk management are *Core Relationship Skills in the Child Welfare Setting, Social Worker's Guide to Family Centered Practice,* and *Intake Introduction, Assessment in the Child Welfare Setting: Intro to Assessment, Overview of Youth Court, Assessment Application, Child Development, Case Planning and Family Engagement in the Child Welfare Setting, Working with Sexually Abused Children and their Families in the Child Welfare Setting, Basic Supervisory Course, Advanced Skills Training: Assessment and PATH.*

Training is specific regarding the type of information and the interpersonal skills the caseworker is to use when interviewing the reporter to gather information regarding the report. MACWIS requirements for documenting intake and screening are clear, but there does not seem to be a protocol to guide information gathering, particularly regarding adult and child functioning. OJT activities provide practice and shadowing. Examples of situations where present danger exists requiring an immediate response and examples of situations that do not rise to the level of a report are presented.

Training is also specific regarding the role of the ASWS regarding:

♦ Screening the report to determine if an investigation is needed;

**Mississippi Practice Model**

- Agreeing with the automated response level assigned or overriding the response level;

- Assigning and staffing Level 2 and 3 reports with a worker for investigation, within 24 hours of the call;

- Determining if an immediate response is necessary; and

- Determining if a referral to law enforcement is necessary.

During the initial and ongoing assessment, training puts more emphasis on assessing child safety and helping families to live together safely and less emphasis on investigation and substantiation. This is because safety assessment focuses on how the family interacts, what supports they have, what they need help with, and how they solve simple problems. Training differentiates between risk and safety and between control and change.

The initial assessment of safety which is only completed during investigation, not ongoing through the life of the case, using of the safety assessment tool (442B) includes:

- Identification of Native American heritage, and procedures consistent with the ICWA;

- The identification of safety factors;

- Description of safety factors present within the family, requiring a full investigation;

- Maltreatment findings when there are no safety factors present;

- Timeframes for completing the safety assessment, initially within 7 days to address present danger;

- Information gathered regarding the extent of maltreatment, circumstances surrounding the maltreatment, adult functioning, child functioning, general parenting practices, and disciplinary practices within the family;

- Requirements for supervisory review;

- Timeframe for developing a safety plan; and

- Assessment of the family's capacity to carry out a protection plan.

The definitions of physical abuse, sexual abuse, neglect and psychological maltreatment and physical and behavioral indicators of each are included however the criteria used when determining that evidence of maltreatment in each of the categories is not provided. Also, the findings for all accepted reports are reported to the Youth Court, but the information that should be contained in this court report is not provided.

The SARA tool which is used to gather comprehensive information to assess child safety and risk of future harm when child maltreatment is alleged or known to have occurred, considers:

- Prior history of child abuse and neglect and any current incidents of abuse or neglect;

- The characteristics of the child and his/her vulnerability;

- Past and present parenting functioning of the caregiver;

♦ Familial, social and economic factors that are stresses, supports or resources; and

♦ The overall risk rating based upon the 17 factors.

When SARA was introduced there was a mandatory training for all staff. Focus group participants indicated that staff are well trained on the SARA process.

Training covers the use of safety plans and FTMs in addressing safety issues. It also addresses Individual Team Meetings (ITM) and their use in gathering information on internal, external, and historic factors that contribute to concerns identified at intake screening, safety assessment and strengths and risk assessment to develop a service plan with goals directly related to the reduction of risk and the improvement of child well-being. Timeframes for having an ITM when placement has occurred are very aggressive, with the biological caregivers < 2 weeks, resource families < 2 weeks and the child, < 72 hours.

When a placement is required to assure child safety, a shelter care hearing will be held. Training describes the information required at a shelter care hearing and the content of the report to the court for a shelter care hearing which includes:

♦ Update on health and developmental issues;

♦ A description of the child's current placement and behavior; and

♦ A description of the services provided to the child, the progress the child has made and issues that still need to be addressed.

Assessment and monitoring of the safety of children in out of home care is not included in the pre service or ongoing training. There is some discussion of it in the PATH training, which is the pre-service training for resource families. Safety of children in out of home care is completed through caseworker visits to the child in the resource home. There is no protocol used during contacts with the child and there is no screening of children completed to determine if they pose a threat to other children in the home and if a safety plan needs to be put in place. During PATH training, foster parents are cautioned that no corporal punishment is allowed and the results of such a policy violation. During PATH training prospective resource families learn they may be the subject of a report of maltreatment.

Training regarding assuring safety and managing risk at reunification emphasizes that case plans require goals that address the factors that led to placement and the criteria for reunification decisions. Requirements for initial and ongoing visitation should be made specific in case plans. Reasonable efforts require the caseworker to help families remedy those conditions that will enable the child to return to the family home.

Survey respondents rated the agency's effectiveness of pre-service staff training on safety and risk to be frequently or almost always effective just over half the time (about 59 percent). The training related comments indicated a need for more in-service training, and training devoted to the process of safety and risk assessment. Some respondents commented on the need for training on the use of assessment tools and using the information to develop case plans. Others requested training on policy and resources available to serve children and families with safety-related needs.

| Please rate your perception of your agency's effectiveness in each area below of supports relating to assuring safety and managing risk for both in-home and foster care: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Sometimes | Frequently | Almost Always | No Info/ NA | Total |
| Pre-service staff training on safety and risk: | 2 (0.98%) | 10 (4.88%) | 42 (20.49%) | 65 (31.71%) | 56 (27.32%) | 30 (14.63%) | 205 |
| In-service staff training on safety and risk: | 3 (1.46%) | 9 (4.39%) | 53 (25.85%) | 58 (28.29%) | 56 (27.32%) | 26 (12.68%) | 205 |

### c. Resources

This section examines DFCS' current capacity to provide services to support families in keeping children safe in their own home targeted toward resolving underlying issues and unmet needs that create safety and risk factors. It also examines DFCS services that support reunification of children in placement with their parents safely. This will include supervised visitation services which are integral to reunification.

DFCS has a statewide contract for family preservation and in-home services through two providers with a capacity of 350 families per year. Family preservation services are aligned with the Homebuilders Model, providing a 20 week intervention with families deemed to be at imminent risk of having children removed from their homes. Family preservation provides concrete services and support services with flexible funds, parent training and education and behavior management. These services are not available to children who have been in care over 12 months. Survey respondents indicated that Family Preservation services were excellent to assist with risk and safety issues. Although the intensive in-home services were designed to serve only children with Serious Emotional Disturbances (SED), they are in fact used for some reunification services. Both programs are consistently at full capacity with demand greater than availability, although no waiting lists are maintained. Some focus group participants expressed some dissatisfaction with the services, indicating that the services are not always driven by the family's needs. Stakeholder interviews indicate that there may not be enough reunification services to meet the needs statewide, and they vary widely from county to county. Some focus group participants noted the need for more reunification services with greater flexibility including post-placement services during trial visits and post reunification.

DFCS has a contract for supervised visitation in two sites of the state, Jackson and Starkville, for cases where there is court ordered supervision of visits between parents and children placed in out of home care. This service provides a family friendly visitation room with staff who supervises and support the child and family during the visits. This service has excess capacity. Where available, these services fill a need for workers who do not have time to supervise visits due to high caseloads.

Domestic violence, frequently a contributing factor to risk and safety issues, is another service need identified in stakeholder interviews. Rural areas lack appropriate services to address domestic violence and local mental health centers may not have the capacity to be responsive to unique needs.

Survey respondents rated the agency's effectiveness in providing families and children with services to address safety issues to be frequently or almost always effective about 77 percent of the time. Specific services noted by survey respondents as needed were transportation, parenting skills classes, anger management, and increased availability of family preservation services. Focus groups with parents indicated that services prior to placement were not provided. Focus group participants were not able to identify any formal services put in place during investigation with the exception of the FTM.

### d. Monitoring

DFCS currently engages to a certain extent in both compliance and quality case practice monitoring through its four primary monitoring activities: the FCR, the court monitoring of the *Olivia Y.* settlement agreement, supervision, and MACWIS data reports.

### Foster Care Reviews

Although the FCR is primarily an administrative review of case plans for children in foster care, the chart below identifies the issues it monitors that have some relevance to assuring safety and managing risk[7]. The area cited with the highest frequency (14.6 percent), pertained to lack of face-to-face caseworker contract with the child in the placement setting.

| | Percent of Cases Cited in FCR | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | YTD Total |
| Cases cited due to issues related to a lack of face-to-face contact between the assigned caseworker and the child(ren). | 2.1 | 0.0 | 0.0 | 0.0 | 2.2 | 5.1 | 11.0 | 2.8 | 2.8 | 6.5 | 0.0 | 2.8 |
| Issues related to cases cited due to a lack of face-to-face contact with the foster child(ren) in their placement setting. | 10.6 | 4.8 | 4.9 | 9.7 | 22.0 | 24.4 | 22.0 | 19.7 | 21.1 | 19.4 | 6.6 | 14.6 |
| Issues related to children who are missing, abducted, or on active runaway status for | 0.0 | 2.4 | 1.0 | 2.2 | 0.0 | 2.6 | 1.2 | 1.4 | 0.0 | 0.0 | 1.6 | 1.1 |

---

[7] Please note that these issues are the results of what are monitored each month on the Periodic Administrative Review (ie there is a direct correlation of each 'issue' to a question on the review tool).

| | Percent of Cases Cited in FCR | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | YTD Total |
| which efforts to locate them are needed in case record documentation. | | | | | | | | | | | | |
| Issues related to children who are placed out of state; there is no ICPC case with the placement state and there is a lack of at least quarterly face-to-face contacts with the children by the Mississippi caseworker. | 0.0 | 4.8 | 0.0 | 1.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.6 |
| Issues related to children placed out of state for whom there is an approved ICPC case with the other state but there is no documentation of regular supervisory reports from the placement state. | 0.0 | 2.4 | 1.9 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.4 |

Respondents to the survey noted that the monitoring of safety-related practices and outcomes through quality assurance mechanisms was frequently or almost always effective about 61 percent of the time. The FCR process was seen as helpful to review risk and safety issues according to focus group participants.

## Settlement Agreement/Court Monitor

A more comprehensive review of assuring safety and managing risk will occur through the court monitor's reviews of the *Olivia Y* settlement agreement requirements, although parts of the monitoring process are still in development, such as the case reviews. The areas that address assuring safety and managing risk are identified in the chart below, along with the status of monitoring them by the court monitor.

**Mississippi Practice Model**

| Standards Related to Assuring Safety/Managing Risk | Status |
|---|---|
| A child safety assessment of DFCS practice prioritizing, screening, assessing, and investigating reports of maltreatment of children to determine the extent to which DFCS investigations and decisions are based on a full and systematic evaluation of the factors that may place a child at risk | Initiated but not completed |
| DFCS shall assure that standardized decision-making criteria are used for prioritizing, screening, and assessing all reports of maltreatment, including corporal punishment, of children in DFCS custody. | Not satisfied |
| All investigations into reports of maltreatment, including corporal punishment, of children in DFCS custody must be initiated within 24 hours and completed within 20 calendar days, including supervisory approval. DFCS shall assure that such investigations and decisions are based on a full and systematic evaluation of the factors that may place a child in DFCS custody at risk. | Monitor did not conclude |
| Any foster child who remains in the same out-of-home placement following an investigation into a report that he or she was maltreated, or subject to corporal punishment, in that placement shall be visited by a DFCS caseworker twice a month for three months after the conclusion of the investigation to assure the child's continued safety and well-being. | Not completed |
| When a maltreatment investigation involves a foster home, DFCS shall file a copy of the approved final investigative report, and any recommendations and/or corrective actions DFCS has deemed necessary, in the case record of the foster child, in the file of the foster or adoptive parents with a copy of the letter of notification to the foster or adoptive parents, and in the DFCS State Office. DFCS shall also provide those records to the Youth Court Judge with jurisdiction over the child and to the Monitor. | Not monitored yet (through CM case review process) |
| When a maltreatment investigation involves an agency group home, emergency shelter, private child placing agency foster home, or other facility licensed by DFCS, a copy of the final investigative report shall be filed in the child's case record, in the facility licensing file, and in the DFCS State Office. DFCS shall provide the report to the Youth Court Judge with jurisdiction over the child and to the Monitor. | Not monitored yet (through CM case review process) |
| DFCS shall undertake a special safety review, including an unannounced site visit, of all currently licensed foster homes with two or more reports of maltreatment, including corporal punishment, within the last three years to determine whether any children placed in those homes are at risk of harm and any licensing standards related to child safety are not being met. Any necessary corrective actions will be identified and tracked. | Started but not completed (safety reviews) |
| DFCS shall undertake a special safety review, including an unannounced site visit, of all group homes and other residential facilities that house children in custody with three or more reports of maltreatment, including corporal punishment, within the last two years to determine whether any children placed in those facilities are at risk of harm and any licensing standards related to child safety are not being met. Any necessary corrective actions will be identified and tracked. | Started but not completed (safety reviews) |
| Within 30 calendar days of Court approval of the Plan, Defendants shall instruct all DFCS staff that as mandated reporters they are required to formally report any suspicions of maltreatment, including corporal punishment, of children in custody. | Not monitored yet (through CM case review process) |
| Defendants, in conjunction with COA, shall revise DFCS policies and procedures for screening and investigating reports of child maltreatment, including corporal punishment, to incorporate the child safety standards and requirements set forth in Section II.B.4 of the Plan. | Not monitored yet (through CM case review process) |
| Within 180 calendar days of Court approval of the Plan, all calls to the hotline shall immediately be entered into the statewide computer information system, and the worker or supervisor receiving the report shall use the information system to determine whether there have been prior reports of abuse and/or neglect in that family or concerning that child. | Not monitored yet (through CM case review process) |
| If a report is screened in, information regarding any prior reports shall immediately be made available to the worker to whom the case has been assigned for investigation. | Not monitored yet (through CM case review process) |
| All foster care settings, including relative placements, shall be screened prior to the initial placement of foster children to ensure that children receive safe, sufficient, and appropriate care. Additional screens shall be completed at least once annually thereafter and within two weeks of a reported change in the residents of a foster home. Screens shall include criminal and child welfare background checks of all household members who are at least 14 years old. No foster child shall be placed in a home prior to DFCS receipt of the background check results. | Policy changed to support this, will monitor through CM case review process |

The Court Monitor's role is to assure that DFCS meets the mandates of the settlement agreement and puts into place the necessary supports required by the agreement, and cannot reasonably be expected to serve as the Department's ongoing quality assurance process. The Monitor also reviews for the ultimate safety outcomes for which DFCS is accountable under the agreement. What does not appear to be included in this monitoring is an assessment of the quality of casework practice and supervisory oversight in relation to safety and risk related interventions. There also does not appear to be an assessment of the quality of services needed/provided to address safety and risk related concerns. We understand that the Monitor's case review protocols are still in development and may, in fact, address these areas when completed. As with any effective monitoring process, it is also very important to provide useful feedback to staff on the results of monitoring so that they can use that information to improve practice.

The *Olivia Y* settlement agreement requires a tracking system for all maltreatment reports on resource homes. This is currently maintained by the Prevention Unit within the Central Office at DFCS. Corporal punishment by foster parents is interpreted by some as maltreatment although DFCS has been considering this a policy violation which is addressed with each foster home individually. Focus group participants indicated that there is not sufficient time for resource unit staff to follow up on some of these violations. There is further evidence of the need to improve the monitoring of child safety in out-of-home placement. During the period of January 1, 2008 through May 31, 2009 the following statewide statistics found there were 952 unduplicated children reported maltreated while in agency custody.

## *Supervision*

DFCS currently uses supervision to monitor case practice. The Basic Supervisory Training course specifically identifies two tasks supervisors have related to assuring safety:

♦ To help workers analyze case information and correctly identify threats to child safety;

♦ To assist in identifying difficulties in establishing sufficient safety/service plans.

Several activities related to assuring safety and managing risk also require supervisory review and sign off such as the safety assessment, risk assessment, investigation, and ISP. Supervisory approvals are recorded in MACWIS.

The SAR is used to review all open cases within 90 days after opening such cases, regardless of service type as a part of the SAR, the supervisor will review the electronic and paper files of a case as well as conduct an individual conference with the assigned worker. This review is to ensure progress is being made toward completion of the service goals. Any SAR completed by the supervisor must be printed, signed and filed in the paper case.

The SAR is mainly a checklist to ensure certain practices have been completed. However, some of the questions asked do relate more specifically to assuring safety and managing risk:

♦ Were reasonable efforts made to maintain the child in his/her home and does the court order reflect those efforts?

♦ Were there aggravated circumstances that did not require reasonable efforts?

♦ Are there compelling reasons for extending custody?

These questions relate to efforts to mitigate safety factors with an in home plan to prevent placement, egregious abuse or neglect that would not warrant reasonable efforts or unresolved safety and risk factors that would place the child in danger upon reunification.

Focus group participants identified supervision as a support to practice and reported that supervisors address risk and safety concerns within cases during weekly supervisory conferences.  Survey respondents reported that supervision in addressing safety and risk related issues was frequently or almost always effective about 76 percent of the time.

### e.  Summary of Inputs

#### Policy

From reviewing the current policies, the following strengths were identified regarding this component of the practice model:

- The criteria that the supervisor uses to screen reports is clear and supported in MACWIS;

- The assignment of reports takes place within 24 hours of the call to the Hotline;

- An investigation must be initiated by having personal contact with the child, caretaker, and siblings in the home, other household members or collaterals within 24 hours when present danger is suspected;

- Safety assessments are completed within seven days for all Level 2 or 3 reports.  The identification of any of the 20 safety factors requires a full investigation and the development of a safety plan.  All safety assessments require supervisory review and sign-off;

- Risk assessment is required within seven days,  in conjunction with the safety assessment, which includes family strengths and needs, history, and  family connections, family stressors, caretaker functioning, health concerns of household members, and school functioning;

- A safety plan is developed and implemented immediately once safety factors are identified. FTM is held during the investigation so that family members can be identified to make the best safety plan for the child;

- All allegations of maltreatment of a child in custody, including corporal punishment, must be investigated by a caseworker who has received training in the investigation of maltreatment in out-of-home placements and has no ongoing connection to the foster care case;

- The case closing decision should be based upon evidence that the original problems causing the abuse or neglect have been resolved to the point that the family can protect the child.

The gaps in the policies relating to assuring safety and managing risk are noted below:

- The safety assessment tool does not include protective capacities and the policy does not include guidance for completing the safety assessment tool;

- Policy does not state that the safety plan requires a caregiver signature or how it is shared with the caregiver;

◆ For open cases where the child remains in the home, policy requires at least one monthly visit with the family as long as the case remains open, which is less than the twice monthly recommended;

◆ Practice guidance suggests that the treatment plan replaces the safety plan, which does not follow with the intent of the safety plan which is to control safety factors while the treatment plan is intended to change behavior, so replacing one with the other may leave a child without a safety plan when active safety factors are in place. Policy does not contain direction as to updating the safety plan once it has been created;

◆ While the idea of assuring safety is somewhat implied it is never stated clearly that during visits with the child in the placement setting and other contacts, the child's safety should be continually assessed;

◆ There is no assessment tool for assessing safety and risk in the child's placement setting which would include a focus on adult behavior, life changes that may impact the caregiver's ability to meet the child's needs, safety concerns posed by other children in the home, quality of child and caregiver's interactions, the type of discipline used, the child's functioning and adjustment to the placement.

◆ When there are reports of maltreatment of children in agency custody, the reports should be given a priority 3, but that does not happen consistently. The investigations of these reports should be completed within 20 days.

◆ Policy does not require the screening of children to determine if they pose a threat to other children in the home and whether a safety plan is needed;

◆ Trial placement policy does not specifically address visits such as two visits to the home each month to interview the child without the parent present as recommended;

◆ Policy does not require the completion of a safety assessment prior to case closure.

### *Training*

Strengths that were noted in the review of the training curricula are listed below:

◆ Training covers a combination of policy, procedural requirements and best practice, including practice guides in several areas and contains a strong focus on safety;

◆ Family Centered Practice and FTMs are woven throughout much of the training with emphasis on assessing risk and safety related to how the family interacts, the supports available to them and the kind of help they need to solve problems and strengthen their family;

◆ Training emphasizes that case plans require goals that address the factors that led to placement and the criteria for reunification decisions. Case plans also require time frames for initial and ongoing visitation be specific.

The following gaps were also noted in the current training:

◆ When a safety plan is initiated it is important for the family and DFCS to know the duration of the plan and how it will be monitored so that it controls the safety factors in the least

intrusive manner.  Monitoring and management of the safety plan are not a part of this training.

♦ There is not much instruction or practice on how to create a safety plan which allows the child to stay in the home by building upon protective capacities of the parents/caregivers or providing the family with supports. There is no example or copy of the safety plan or requirements for supervisory review and signature in the classroom training, but it is referenced in the OJT. The sexual abuse training does provide an opportunity to develop a safety plan with a non-offending caregiver;

♦ The criteria for opening a case for services are contradictory.  The best practice workflow from the Social Worker's Guide to Family Centered Practice indicates that the decision to open a case for services is based upon the child risk and family needs.  The Level 2 & 3 report disposition flowchart indicates that the decision to open a case for services is based upon the presence of safety factors or the substantiation of the allegations;

♦ Training provided reasons for a FTM but did not provide instruction on how to facilitate a FTM;

♦ Training does not provide information on how safety in out of home care is assessed and monitored.

### Monitoring

After reviewing the current processes for monitoring system performance and case specific outcomes, the following strength was identified:

♦ Compared to the other practice model areas, relatively few cases cited for the factors that relate to assessing safety and risk.  It should be noted, however, that the FCR does not appear to directly address safety and risk, given the scope of the FCR responsibilities and its primary functions.

The following gaps were also noted:

♦ The most frequent issue relating to assuring safety and managing risk that was identified through the FCR is face-to-face contact with children in their foster care setting.  This implies that potential safety and risk related concerns for children in out-of-home placement may be overlooked.

♦ Current monitoring initiatives, i.e., FCR and court monitoring, only pertain to children in foster care, not to children who may not have been removed and are being served in their own homes where safety and risk issues should also be monitored;

♦ The FCR, since it is primarily the foster care administrative review process, does not address the quality, timeliness, utility of assessments conducted (SARA or Safety);

♦ Safety and risk may not be continually assessed on an ongoing basis.

### Resources

The following lists strengths found in the resource array that supports assuring safety and managing risk:

- ◆ DFCS is developing a larger pool of trained staff and other professionals to conduct forensic interviews. Forensic interviews are used in cases involving sexual abuse;

- ◆ Efforts are currently underway to acquire additional resources through RFP's and contracted services through private providers targeted toward preventing placement and reunification.

The gaps that were identified in the resource array to assure safety and manage risk:

- ◆ There are a limited number of services available to victims of domestic violence;

- ◆ Family preservation services and services to support reunification are generally at capacity and unable to accept referrals on a timely basis. As far as we can tell, there is not a waiting list or prioritization of referrals. If services are needed and family preservation is unavailable, another service may be put in place, even if it is not the most appropriate service for the identified need;

- ◆ Respite for developmentally delayed children is not available statewide and offers only three hours of respite, three days per week;

- ◆ Supervised visitation is only available in Jackson and Starkville.

- ◆ While policy states that the worker will within the first 7 days of the investigation, develop a safety plan or provide whatever intervention is needed to make the child safe, services during investigation are not routinely provided.

## Section 2:  Outputs

### a. Activities

Addressing safety and risk issues can be expected to occur in the following activities:

- ◆ *Initiate investigations of maltreatment:* At the initiation of a report of child maltreatment, the child welfare agency has the legal right and responsibility for child protective service involvement and for initiating its involvement on a timely basis. At this time there may or may not be threats of serious harm. However the need to gather information at the time of the report regarding possible present danger is essential for determining the response time. There are other circumstances or conditions that may also necessitate an immediate response: child under age two; child with a handicapping condition; the family's risk of flight; recent substantiated reports of maltreatment; and reports involving children in agency custody. All reports should be assigned with 24 hours and face t face contact with the children should occur within 72 hours.

- ◆ *Conduct initial safety and risk assessments:* At the initiation of the investigation a preliminary safety assessment should be completed to determine if present danger exists. In keeping with a family-centered approach, the evaluation of safety and risk should occur for all children in a home, and not only for the child that is the subject of a report. At the conclusion of the investigation, a more comprehensive safety assessment should be completed which includes information gathered from records checks that indicate previous maltreatment or criminal behavior, interviews, observations, home visits, collateral contacts, and evaluations by medical or behavioral health providers. This should provide a comprehensive view of adult and child functioning, parenting practices, discipline methods,

the nature and extent of the maltreatment and the likelihood of future maltreatment and the presence of protective factors. Investigations should be completed within 30 days and have a disposition. At the conclusion of the investigation, the safety assessment and the risk assessment will guide decisions regarding the need to open a case for ongoing services; in home or placement. Cases with existing safety threats should not be closed. Cases with a high level of risk should also not be closed. A moderate level of risk requires careful consideration before case closure.

♦   *Initiate services to address safety and risk:* In situations where there are safety and risk issues that require intervention, the agency should ensure that appropriate services are initiated timely, including during an investigation period if needed. This may be accomplished through the initiation of a safety plan with the family. Intensive therapeutic interventions early in the case may prevent the need for restrictive and costly residential services and result in better outcomes for children. If the family is not amenable to in home services, the aid of the court may be required to assure child safety either in the home or through out of home placement.

♦   *Conduct ongoing safety and risk assessment:* From the first contact with the family and at every subsequent contact safety assessment should take place. Contact to assess safety and needs should take place minimally two times per month for in home cases and one time per month for placement cases. Safety plans will be updated as necessary. At specific decision points within the case a more formal assessment of safety should occur to ensure that safety is the primary focus and provides a basis for permanency and well-being decisions. Ongoing evaluation of risk and protective factors should also be completed at specific decision points within the case as well because assuring child safety addresses not only immediate safety threats but the potential for safety threats to emerge in the near future.

♦   *Use caseworker visits to address safety and risk:* Caseworker visits with the child, parents, and foster caretakers are important mechanisms for identify, observing, and evaluating safety and risk factors. During visits, caseworkers should meet with the relevant individuals, including children and parents, individually to identify the status of safety and risk concerns and the parents' protective capacities, the ongoing effectiveness of safety plans in addressing safety and managing risk, and the emergence of new safety and risk factors. Activities include:

o   Frequent visits (twice monthly) of high quality between the case worker and the child.

o   Visits between the caseworker and the child's parents should take place at least monthly.

o   When child are in placement, the visit is made the first month the child is in care and after any change in placement to assess the child's adjustment.

♦   *Address safety and risk in case plans:* Once a case is opened for services, in home or placement services, the case plan should reflect proposed activities and services that are intended to resolve both the contributing and underlying threats that brought the child and family to the attention of the protective services. The plan should identify and monitor the goals, tasks and services implemented to ensure the child's safety, reduce safety threats to the point that the family's protective capacities are sufficient; resolve safety threats by enhancing caregiver's protective capacities; change the dynamics that contribute to child maltreatment or present serious harm or threats of serious harm. In some situations, the case plan may include goals that reduce child vulnerability, such as diminishing provocative behavior. If

**Mississippi Practice Model**

any children are unsafe, a safety plan will continue to be required and updated as necessary in concert with the case plan.

♦ *Review case plans:* Assuring child safety also requires the formal assessment of safety at other case decisions. Case plans should be reviewed and updated at specific times, such as every three to six months. This will include supervisory consultation using standard criteria. Progress in areas such as improvement in the caregiver's capacity to protect, reduced child vulnerability, efficacy of less intrusive safety interventions, increased involvement and responsibility by the caregiver and risk reduction provide guidance in changes to case plans moving forward. Through case review, goals that were relevant to enhancing protective capacities to the extent that the caregiver can effectively protect the child may allow for reunification or case closure. When sufficient change has not occurred after a specified period of time and sufficient change has not occurred so that safety threats continue to exist, another permanency goal for the child should be considered so that the child may live in a safe and nurturing family.

♦ *Ensure safety while children are in placement:* For children in placement it is also necessary to assure their safety. When DFCS makes the decision to separate a child from his or her caregiver and with the approval of the court places the child in out of home placement, the agency assumes the responsibility that no harm comes to the child. The safety of the placement needs to be ensured over and above a positive home study and home licensing. Safety in the context of the child's needs, the out-of-home caregiver, and the caregiver's family's ability to provide for the child's needs, should be assessed prior to and reviewed soon after placement.[8] Family composition including other children placed in the home should be considered in light of the child's developmental level, functioning, and vulnerability. This will include screening children to determine if they pose a threat to other children in the home and whether a safety plan is required. The capacity of the resource family to support the child's family of origin through visitation and simultaneously protect the child during visitation should be carefully considered. Children with special needs require additional care that must be within the capacity and motivation of the resource family. When assessing the safety of the child in the placement setting, physical safety is not the only consideration. Emotional safety and well being needs must be met as well. Continual assessment of child functioning is part of assuring child safety.

♦ *Ensure safety at reunification:* Assuring child safety continues at another crucial decision point, reunification. When safety cannot be assured in the home and a child has been placed in out of home care, the family dynamics may change. While the bar should not be higher for reunifying a child than for placing a child, it is more complicated to determine if the child will be free from present danger and danger in the foreseeable future post-reunification. In addition to determining if the conditions that led to placement have been resolved, it is also necessary to determine if new conditions have arisen in the family which would create danger in the future resulting in re-entry into placement. Changes in family composition or the functioning of the child should be carefully considered. The level of support the family will need upon reunification should also be taken into account. The use of home based wrap around services for children with or at risk of developing serious emotional and behavioral

---

[8] Guiding questions for determining out-of-home placement suitability may be found in *Caregiver Protective Capacities and Family Protective Resources,* (July 2008) pp. 7 – 9.

conditions will lead to more successful safe reunification and lessen the need to continue residential placement when safety and risk assessment indicate reunification is appropriate. The duration, frequency and quality of visitation provide valuable information in determining if a child can safely be reunified. A safety plan upon reunification should also be developed when necessary. There should be a 90 day trial visit if reunification occurs and two visits to the home each month to interview the child without the parent present.

♦ *Ensure safety at case closure:* Another crucial decision in assuring child safety is the decision to close the case. Since case closure removes the involvement of DFCS it is important to determine if the family has the formal and informal community supports in place prior to case closure. At this time the DFCS worker must say with certainty that removing DFCS involvement is not likely to result in serious harm or the threat of serious harm or repeat maltreatment in the foreseeable future.

## b. Products

### Policy

♦ There is a need to adopt a policy related to safety that goes beyond the current safety assessment and to incorporate an assessment of protective factors that can mitigate them.

♦ The existing safety plan needs to be revised to have more structure, possibly a triplicate NCR type form completed with the family, with one copy left with the family, another copy left with safety providers, and one for DFCS.

♦ A revised safety plan should identify actions that will control identified safety factors, the person responsible for each safety intervention, the timeframe for the plan, the method for monitoring the plan and the capacity of those providing safety interventions, and the capacity of the person with monitoring authority to do so.

♦ The safety checklist that is currently used for child under age 5 should be revised to include a checklist which is appropriate for children of all ages.

♦ The new requirement to complete risk assessment with all investigations within seven days needs to be reconciled with the SARA guidelines as they exist now. Seven days is not generally enough time to complete the SARA, to use it as intended.

♦ There needs to be a safety assessment and risk assessment for children in out-of-home care, to assure that these children have an emotionally and physically safe place. Safety and risk assessments for resource homes need to be implemented. Presently there is no way to assess if the child in a resource home is safe from or a threat to others in the home.

♦ Policy regarding notification of parents when there is a report of maltreatment in a resource home and the findings of that investigation should be consistently adhered to.

♦ The criteria for opening a case for services should be clarified.

♦ Adopt policy regarding the use of safety and risk assessments at reunification and case closure.

## Training

♦ Training is needed regarding the safety assessment and the safety plan, specifically around the development of the safety plan with the family.

♦ Training is needed regarding the use of the FTM to engage families in the development of safety and service plans.

♦ Training should include the use of safety assessment at crucial decision points such as reunification and case closure.

♦ Training should address the assessment of maltreatment of children in agency custody specifically around the use of corporal punishment in resource homes.

♦ Training is needed regarding assessing the safety of children in out-of-home care.

♦ Training is needed regarding existing policy for the screening, investigation and determinations on reports of children maltreated while in agency custody.

## Resources

♦ There is a need for evaluation services for families to identify domestic violence needs, and DV services to support them including shelter placements that include parents and children.

♦ There is a need for substance abuse screenings and treatment that is affordable and accessible.

♦ There is a need for increased availability of supervised visitation resources that are accessible.

♦ Transportation for family members that allow services, visitation, and regular contact with the social worker is needed.

♦ There is a need for greater accessibility to mental health screenings and treatment for adults and children that is accessible and affordable.

♦ There is a need for increased capacity of family preservation and reunification services to address safety and risk issues of children in their own homes or being reunified with their families.

## Monitoring

♦ Development of a Continuous Quality Improvement system which meets both the requirements of the *Olivia Y* settlement agreement and the COA standards for accreditation is needed.  There should be specific qualitative measurements and outcome indicators relating to assuring safety and managing risk which include the following:

   o Timely and appropriate responses to reports of alleged maltreatment of children in foster care and in their own homes;

   o Interventions to prevent the recurrence of maltreatment;

   o The appropriate and timely use of risk and safety assessments to support service planning and decision making, including appropriate identification of safety and risk factors and protective capacities;

- o Linking safety and risk assessment information to comprehensive family assessments and case plans; and
- o Linking of services that will assist families in resolving the underlying conditions and contributing factors which lead to safety and risk concerns.

♦ Revision of the SAR to provide further exploration of the quality of safety assessments, safety plans and risk assessments and the extent to which they address the underlying conditions and contributing factors leading to the need for DFCS involvement.  This would include additional questions such as:

- o Did safety plans provide interventions that were the least intrusive and most appropriate to control safety factors?
- o Were safety plans monitored to ensure that safety factors were being controlled?
- o Did services target the build upon strengths and protective capacities within the family?
- o Was a FTM held that encouraged the family to identify their support network and the role of their support network in keeping children safe?
- o Were appropriate services put in place to address underlying conditions and contributing factors identified through assessments?
- o Were services having the desired result?
- o Are children safe in foster care placement as evidenced through the lack of reports of maltreatment or policy violations in the resource home?

♦ Develop a MACWIS report which identifies open investigations involving children in agency custody by name and case number that are open more than 20 days.

♦ Use of the findings of from all monitoring efforts, including CQI, FCR, SAR, and MACWIS reports to identify trends in safety-related practice and the need for further attention through training, policy supervision and the service array.

## c. Roles and Responsibilities

In order to implement the practice model effectively, a number of individuals have specific roles and responsibilities in assuring child safety and managing risk. Collaboration among these individuals helps to ensure that efforts are well coordinated and that these roles and responsibilities are understood and carried out to achieve defined objectives.

### Caseworkers

♦ Caseworkers are responsible for gathering information at hotline, during investigation, as part of the case planning process, during the monitoring of service delivery for both in home and placement cases, during reassessments, at reunification and at case closing.  The information gathered should include the areas of extent of the abuse or neglect; the circumstances which surrounded the abuse or neglect; the functioning of the child; the functioning of the caregivers and other adults in the home; and the parenting practices within the family including the ways that discipline is incorporated into parenting practices. Information gathering will also include family history of abuse or neglect in the present family composition or others, prior service episodes and the effectiveness of previous service interventions, attitudes of family members regarding the helpfulness of services, and their feelings about the need for change.

◆ Caseworkers are responsible for making timely face-to-face contacts with all children in the home, the caregiver, and the perpetrator during the investigation, and for visiting in accordance with policy time frames otherwise. They are responsible for using contacts to continually assess safety and risk, and for documenting their contacts and the information obtained.

◆ Caseworkers are responsible for initial and ongoing safety and risk assessments based upon the information gathered to guide decisions regarding the need for immediate placement or another less intrusive safety plan. The assessment of the child's vulnerability and the caregiver's protective capacities will provide a foundation for the safety and risk assessment decisions.

◆ Caseworkers are responsible for the development of safety plans with the family to mitigate safety factors so that children can remain in the home while treatment plans are developed and implemented.

◆ Caseworkers are responsible for developing service plans, with the family, based upon the information gathered to support the safety and risk decisions and to identify the areas of greatest need which are impacting safety and risk of child(ren) and the available strengths to be used in identifying the objectives of the service plan, the action steps to achieve these goals and the services needed to influence the changes needed to achieve the service plan objectives.

◆ Caseworkers are responsible for monitoring and managing plans to assure that safety factors are mitigated and risk is reduced by enhancing protective capacities so that progress can be evaluated by the family, DFCS, service providers, resource families and the court to shape the direction of future plans and services and support decisions regarding reunification and case closure.

◆ Caseworkers are responsible for making regular and frequent visits to foster homes and other placement settings to ensure that the children are safe in those placements and that their physical, emotional, social and educational needs are being met. The caseworker is also responsible for ensuring that resource families are acting in support of the permanency planning goals and the objectives of the treatment plan.

◆ Caseworkers are responsible for properly reporting any information that constitutes alleged maltreatment of children in foster care and for responding to such reports with the same timely and appropriate diligence as with reports of alleged maltreatment of children in their own homes.

◆ Caseworkers are responsible for facilitating FTMs with the family, the resource parents and service providers to develop safety and service plans. This would allow other service providers to engage in the monitoring and management of safety plans as well as provide a broad range of services to the family to meet complex and overarching service needs in a cohesive manner.

◆ Caseworkers are responsible for documenting their work timely and thoroughly in MACWIS in order to promote accurate reports of performance indicators and complete file information.

## Area Social Work Supervisor (ASWS)

♦ Supervisors have a requirement to sign off on decisions in cases and should use this opportunity to indicate that their signature certifies that the requirements have been met or return the document requiring their signature for additional documentation, clarification, etc when not in agreement.

♦ Supervisors are responsible for monitoring the quality of the caseworker's work on individual cases in the area of assuring child safety and managing risk. This includes ensuring caseworkers are well trained in safety and risk and are demonstrating that knowledge by documenting in MACWIS.

♦ Supervisors use case staffing and the SAR as opportunities to provide clinical supervision, coaching and mentoring to their casework staff in the area of assuring child safety and managing risk.

♦ Supervisors should use safety-related data and information from their case reviews to direct their management priorities and to identify and address the strengths and needs of safety-related practice within their units, for example they should use data from MACWIS reports, the SAR, CQI, and FCRs to evaluate individual and unit performance, provide individual and group feedback, establish priorities and strategies for improvement, and to inform the RD's overall management strategies.

♦ Supervisors use supervision to provide constructive feedback to staff on the strengths and needs in the area of assuring child safety and managing risk.

♦ Supervisors keep the RD informed regarding the quality of practice in their units and any trends that indicate the need for training or policy clarification from the administration and/or state office.

♦ Supervisors review cases as required by policy and more frequently as needed to assure child safety and risk management in individual cases and provide coaching and technical assistance to staff in needed areas.

## Regional Directors (RD)

♦ The RD has the responsibility to promote the family-centered principles and value basis underlying safety and risk practices within their counties/regions, among allied stakeholders, and within the communities they serve.

♦ RDs have the responsibility of continually monitoring the data available to them from the FCR, CQI, and MACWIS reports around issues of risk and safety at all stages of the case, including when children are in out-of-home placement. They should use this information to identify trends, strengths, and needs regarding practices, resources, and outcomes and to establish priorities and strategies for making needed improvements.

♦ RDs have the responsibility to identify areas of policy and training that are not sufficient and bring that to the attention of the MDHS leadership with specific suggestions for improvement in assuring that needed training and TA are put into place.

♦ RDs are responsible for monitoring the assignment and notification of reports of maltreatment for children in agency custody so the COR, COS and the Placement Unit

Director and Regional Resource Family supervisors coordinate efforts to make an appropriate and thorough investigation and address policy violations with individual resource families.

♦ RDs are responsible for monitoring the adequacy of the services and supports available to address safety and risk-related issues for children in their regions/counties, and for promoting the attainment of adequate resources or the appropriate responses from existing providers in order to support the safety-related goals of the Department.

♦ Where indicated by the results of CQI or FCRs or from the RDs own monitoring activities, the RD is responsible for ensuring the County Departments develop and implement appropriate program improvement strategies related to safety of children.

### *Continuous Quality Improvement (CQI) Staff*

♦ The role of the CQI reviewer is to monitor and evaluate whether assuring child safety and managing risk are completed initially and ongoing throughout the life of the case.

♦ CQI is responsible for assisting in developing and supporting interim QA activities as needed for evaluating safety and risk that are not part of existing FCR.

♦ CQI is responsible for identifying statewide issues regarding safety and risk that require a statewide systemic response rather than a local response, including the investigation of reports of maltreatment to children in agency custody.

♦ In reviewing for systemic factors, CQI should monitor the status of local services and resources essential to ensuring safety of children, such as the availability of appropriate screening and evaluation services for parents and children, appropriate and accessible interventions to assist parent in strengthening their protective capacities.

♦ CQI has a responsibility to clearly identify the issues of risk and safety requiring attention at the State office level and assisting county and regional administrators and staff in identifying the needed corrective actions, and for monitoring the implementation of the actions.

♦ CQI is responsible to provide feedback at the individual case level and at progressively more aggregated levels in order to inform practice and assist staff at all levels in using CQI findings to build on strengths and address weaknesses related to safety and risk of harm to children.

## Section 3:  Outcomes and Indicators

### *a. Short-Term Goals (0-12 Months)*

### *Policy*

♦ *Develop practice guide on assuring safety and managing risk.*  As a precursor of making all recommended policy changes to support this component, a practice guide that provides basic direction to staff on the key activities associated with assuring safety and managing risk should be developed and used in the initial regions implementing the practice model.

♦ *Clarify policy regarding risk assessment.* In June there was a change to policy regarding the timeframe for completing the risk assessment.  There needs to be a clarification of the risk

assessment tool to be used and documented within seven days, at the conclusion of the investigation, at case opening and at major milestones within the case.

♦ *Develop a safety assessment for children in out of home care.* Presently it is assumed that during required visits to children in foster care, both in the placement setting and outside the placement setting, safety is being assessed. A formalized assessment is needed to ensure safety in placement and to protect children from other children in the placement setting.

♦ *Develop a new safety plan.* Presently the safety plan is a narrative field in MACWIS with no requirements. In order to assure that safety plans are in place when needed and that the family is fully involved in developing them, a more formalized safety plan is needed which includes:

♦ Identification of the safety factor identified through safety assessment

♦ Identification o f the specific actions that will have an immediate impact to control present danger

♦  Determination that safety interventions are always accessible

♦ Identification of the time period the plan will remain in effect

♦ Identification of  the responsible parties in carrying out the plan

♦ Assessment of the suitability and reliability of the responsible parties

♦ No promissory statements are included in the plan

♦ Signature of parents and other responsible parties

♦ Signature of the caseworker

♦ A copy of the plan is in the possession of the family, responsible parties and the case record.

## *Training*

♦ *Interim training module on safety and risk assessment.* In order for newly hired staff and experienced staff to be more consistent in the assessment of safety and risk and the development of safety plans with families, a new training module will need to be developed prior to the implementation of the practice model. The training will incorporate parts of existing modules that address safety assessment, safety planning and risk assessment, but will put more emphasis on assessing protective capacities, developing a more comprehensive safety plan with the family, and completing the initial risk assessment and incorporating the results of these assessments into the CFA.

♦ *Refresher training for staff on investigations of maltreatment of children in agency custody.* In order to improve the consistency of investigations of reports of maltreatment of children in agency custody, there needs to be some training for staff on existing policy.

♦ *Interim training module for assessing safety of children in out-of-home care.* In order for both newly hired and experienced staff to conduct an assessment of children in out-of-home care, a new training module will need to be developed prior to implementation of the practice model. The training will incorporate the use of the new safety assessment for children in out-of-home care and the policy requirements related to its completion.

## Monitoring

♦ *Baseline CQI reviews in initial two regions implementing the practice model.* A baseline review of all counties within the two regions prior to implementation of the practice model will identify the strengths, needs and trends regarding current practice, particularly in the area of assuring safety and managing risk.  In doing so, plans can be made to address specific issues and challenges while also building on the achievements and positive factors that can contribute to the successful implementation.  The review will also provide for a baseline of current performance against which future reviews can be compared in measuring the success of the practice model.  Critical to this activity will be continued efforts to ensure data integrity within MACWIS to support effective CQI processes.

♦ *Supervisory monitoring of investigations of maltreatment of children in agency custody.* ASWS and RD's have responsibility to monitor the investigations of reports of maltreatment of children in agency custody to ensure they are conducted in accordance with existing agency policy, including screening, initiating of investigations, same day face to face contact with the child and all required notifications.  This should occur statewide.

♦ *Revisions to SAR.* Make revisions to the SAR tool to include more emphasis on assuring safety and managing risk prior to the implementation of the practice model. Implement the use of the revised SAR in the counties in the two regions.

## Resources

♦ *Identify needed safety/risk related services and resources in initial implementation regions.* As part of the planning phase of implementing the practice model in the initial regions, an assessment of the availability of essential safety-related services and resources should be conducted to identify developmental needs.

♦ *Targeted resource development and allocation in selected regions.* As part of an overall resource development plan to secure services to implement the assuring safety and managing risk component of the practice model effectively, MDHS should target the development of capacity for family preservation and reunification services, substance abuse screenings and treatment and sexual abuse examinations in the two regions where implementation of the practice model is first occurring, along with other essential services identified in the assessment above.

## b. Mid-Term Outcomes (12-24 Months)

## Training

♦ *Incorporate new training modules into New Worker Training Curriculum:*  The newly developed training modules that were developed as an interim approach for implementing the practice model should be fully incorporated into the new worker training curricula and integrated throughout the ongoing training modules, reinforcing the comprehensive use of safety and risk assessments and safety plans.

♦ *Develop training module on assessing protective capacities.* In order to continue to develop staff skills and competencies in working with families to resolve the underlying conditions and contributing factors that result in uncontrolled safety threats, a new training module to

assess protective capacities and provide interventions to enhance protective capacities to promote, safety permanency and well being.

♦ *Enhanced and revised supervisory training modules.* In order to move to a more defined clinical model of supervision and to balance the role of assuring compliance with *Olivia Y* requirements, ASWS's will need additional training to enhance their skills in using individual conferences, group conferencing, and structured learning activities to direct strategies and interventions that influence positive case outcomes. Supervisors should also participate in the safety and risk training modules prior to or simultaneously with casework staff in order to develop the capacity of staff to integrate safety and risk assessment and safety planning into case practice.

### Policy

♦ *Integrate new procedures, practices and tools supporting the practice model.* Based on the experiences of staff in the regions involved as part of the initial phases of implementation, more formal policies and procedures should be developed and integrated into the existing policy framework, building on lessons learned from the initial implementation of the practice model.

### Monitoring

♦ *Conduct baseline CQI reviews along with current CQI reviews.* In addition to conducting baseline CQI reviews in the next set of regions to implement the practice model, there should also be new CQI reviews conducted in the initial set of regions where implementation first occurred. The CQI reviews should focus on current practice and related outcomes and allow for comparison and analysis of the impact of the practice model in this set of regions.

♦ *Expand the use of the revised SAR.* Introduce the use of the revised SAR to the next set of regions to implement the practice model.

### Resource Development

♦ *Continue ongoing evaluation of resources and services targeted to assuring safety and managing risk.* Evaluate the success of expanded resource capacity in the regions where implementation of the practice model began. Based upon the successful use of resources, adjust capacity in the next set of regions.

### c. Long-Term Goals (24-48 Months)

### Full Implementation of the Practice Model

♦ Within this time frame, the last three regions will have begun implementation of the practice model.

♦ Full implementation of all training curricula, policy revisions, finalized tools, and monitoring practices will have been achieved.

♦ A focus of activity should be on coaching and supporting the practices associated with this component.

♦ An additional focus should be on assuring the systemic supports needed for this component are refined and fully in place, such as the availability of diagnostic screenings and evaluations, appropriate services to assure safety and manage risk, supervisory and quality improvement processes that capture information on this component.

### Monitoring Practice Model Implementation and Success

In order to gauge the success of the full implementation of the practice model in achieving substantial improvements in the in the outcomes for children and families involved in the child welfare system, the following indicators provide measures for assessing progress relating to assuring safety and managing risk:

### CFSR Measures

♦ Safety Outcome 1: *Children are first and foremost protected from abuse and neglect*
   o Item 1: Timeliness of initiating investigations of reports of child maltreatment
   ▪ Timeliness of initiating investigations (including ARS cases) in accordance with case type and priority levels defined in state and county policy & face-to-face contact with all of the children in the family who are the subject of the report as part of investigation
   o Item 2: Repeat maltreatment
   ▪ Frequency of substantiated or indicated repeat maltreatment of children (same perpetrator, same general circumstances) including cases receiving ARS
   ▪ Agency's interventions to prevent repeat maltreatment and the response to the repeat maltreatment report

♦ Safety Outcome 2: *Children are safely maintained in their homes whenever safe and appropriate*
   o Item 3: Services to the family protect children in the home and prevent removal
   ▪ Appropriateness of services provided to families including family preservation, family support and other placement prevention services
   o Item 4: Risk of harm to child
   ▪ Use of services and activities to target the identified risks
   ▪ Use of risk assessments and safety plans
   ▪ Appropriateness of case closing

### Olivia Y Measures

♦ Percentage of children with a permanency goal of reunification that have service plans for their parents that identify the services to address the behaviors or conditions resulting in the child's placement in foster care.

♦ Percentage of investigations into reports of maltreatment, including corporal punishment, of children in DFCS custody initiated within 24 hours and completed within 20 calendar days, including supervisory approval.

**Mississippi Practice Model**

♦ Percentage of children in foster care who remain in the same out of home placement following an investigation into a report of maltreatment or corporal punishment who are visited twice a month for three months after the conclusion of the investigation to assure the child's safety and well-being.

♦ Percentage of case files with all required documentation concerning the investigation, including required notifications.

♦ Percentage of children in custody who are reunified and receive a 90 day trial home visit period during which the worker meets with the child in the home at least two times per month.

♦ Rate of abuse or maltreatment in care.

## *Component Three: Involving Family Members in Decision-Making and Case Activities*

Involving children and families in decision making and case activities is a critical component to child welfare practice, as it empowers families to advocate for themselves and take an active role in ensuring the safety, permanency and well-being of their children and family members. It also helps to ensure the family's commitment to carrying out activities and reaching goals that are involved in their work with agency, since they have a voice in determining what activities and goals will be most helpful to them. Further, it promotes the effectiveness of other components in the practice, such as helping to ensure the important relationships and connections for children in foster care are maintained by involving parents in the care of their children while in foster care.

Involving the family in decision making and case activities begins with a family's first interaction with the state child welfare agency, and continues throughout the agency's involvement with the family. This casework practice is not defined by caseworkers reviewing and explaining plans to parents, or by simply asking for family members to sign case plans. It involves actively encouraging and enabling parents and age-appropriate children to take an active role in all critical decisions that affect them, and charges State staff with the tasks of both soliciting and using the input of children and families in casework decisions.

Child and family involvement includes the involvement of age-appropriate children, families, and youth in:

- Assessment activities in order to identify their strengths, needs, and service requests;

- Initial development of case plans (activities, goals, steps, etc.);

- Re-evaluations and updates of case plans;

- Progress evaluations; and

- All meetings pertaining to them, such as court hearings and reviews, and case planning meetings.

- It also requires caseworkers to:

- Solicit, facilitate, and use the family and child's input in formulating case plans, determining goals, identifying their strengths and needs, determining appropriate services and preferred providers;

- Use comprehensive needs and strengths assessment and safety/risk assessment information to frame level and nature of involvement;

- Prepare relevant family members to provide input and participate in case planning activities; and

- Provide the necessary supports to enable attendance and participation in planning meetings and events.

# Section 1:  Inputs

## a.  Training

### *Strengths*

### Pre-Service Training

Training for new and seasoned caseworkers and supervisors is critical to not only supporting consistent case practice, but also facilitating the implementation of the practice model. DFCS currently has several aspects in their existing training relating to involving children and families in case activities and decision making.

In *Assessment in the Child Welfare Setting: Overview of Youth Court,* the training provides tips on how to prepare family members for a court hearing, which is a key opportunity for family members to voice their opinions and concerns at a critical decision making point in a case. The training *Core Relationship Skills in the Child Welfare Setting, Social Worker's Guide to Family Centered Practice* has two focuses which support this component of the practice model. First, this training provides caseworkers with a philosophy on why involving families in decision making and case activities is good social work practice. Second, this training instructs on the critical case events that provide opportunity a Family Team Meeting (FTM), a tool and opportunity for families to advocate and make decisions for them:

- Any move of the child;

- Resource family asks for a FTM—as they are struggling with the child and do not want the placement to disrupt;

- The family is not making progress toward the definition of "success";

- The family is making progress and the services are no longer needed;

- The family asks for a meeting; and

- The child asks for a meeting to talk about their lives.

In addition, the Best Practice Workflow in conjunction with this training indicates that FTM is done prior to placement as a way to prevent placement when possible, and when completing initial service plan.

*Case Planning and Family Engagement in the Child Welfare Setting* training introduces Individual Team Meetings (ITM) and Family Team Meetings (FTM), who is included in each, the time frames, the purpose and how to prepare family members to participate prior to the meeting with the tag line. The thesis for this module is that "real work will not be done by the client unless the client is involved in the plan."

### Advanced Skills Training

The *Advanced Skills Training* has several modules which currently support involving children and families in case activities and decision making. The *Client Engagement* module puts emphasis on starting where the family is by using preparatory empathy,  obtaining as much knowledge about the family, family situation, possible resources, etc. prior to the first meeting.

This is critical to engaging the family early on in the case, and empowering them to make decisions for themselves and their families. This component delves into a discussion about how workers should interact with clients, including being respectful, seek common ground with the client, and actively listen to what they have to say. The *Client Engagement* component also leads a discussion on how many workers will not like or get along with the families they work with, or feel they are hopeless and won't change, and the impact that such an attitude may have on families. The *Assessment* module uses activities on engaging family members in the assessment, and debriefs the activities with questions on how family members are engaged in decision making. Among the questions asked:

♦   Is it possible to enter into a working relationship with each of the family members?

♦   What does the worker need to do to engage each family member?

♦   Was it evident that all the family members were engaged by the worker during the assessment process?  If not, who was left out?  Is there justification for not engaging this person?

Finally, the *Case Planning* module of *Advanced Skills Training* is family-centered and strengths-based, using solution focused techniques to engage family members. This training provides an opportunity for practice in engaging the family in case planning.

### Supervisor Training

Supervisors also receive some training that currently instructs on how to ensure children and families are involved in case activities and decision making. In the *New Child Welfare Supervisor Training,* it directs the supervisor to:

♦   Monitor workers interactions with clients, and for each worker, sit in on an interview with a family member or go out on a home visit;

♦   Assess the worker interaction with the family. Did the worker show empathy? Did the worker allow the family member to be a part of the decision making process?; and

♦   Discuss what the supervisor saw while shadowing the worker regarding the worker allowing the family member to make decisions.

### PATH Training

The PATH training, required for all resource parents, covers several key aspects of this component of the practice model.  The training focuses on the fact that the birth family, resource family and the social worker are a team, and that resource families are asked and encouraged to participate in both the family team meetings and the county conferences. Regarding visits and face to face contact, the PATH training emphasizes the need for the resource family and birth family to meet, as well as the fact that visitation between the birth parents and children should begin as soon as possible, with the support of resource families to facilitate visits. Resource families also learn about older youth in the PATH training, particularly the available independent living services, when they begin, and the rules of when a child can be emancipated or leave care. This is important so resource families have a time frame to know how they can support older children and youth prepare for transitioning out of care and making decisions for themselves.

**Mississippi Practice Model**

In addressing the effectiveness of training on involving children and families in decision making, survey respondents rated the pre-service and ongoing training as frequently or almost always effective just over half the time (about 55 percent and 52 percent respectively). They rated foster parent training similarly (about 52 percent frequently or almost always effective).

| Please rate your perception of your agency's effectiveness in each area below regarding supports needed to involve children and families in decision making: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Sometimes | Frequently | Almost Always | No Info/ NA | Total |
| Pre-service training on involving children and families in decision making: | 2 (1.21%) | 5 (3.03%) | 45 (27.27%) | 39 (23.64%) | 52 (31.52%) | 22 (13.33%) | 165 |
| On-going training on involving children and families in decision making: | 2 (1.2%) | 11 (6.59%) | 44 (26.35%) | 43 (25.75%) | 45 (26.95%) | 22 (13.17%) | 167 |
| Foster parent training on how to involve children and families: | 1 (0.61%) | 15 (9.2%) | 27 (16.56%) | 39 (23.93%) | 45 (27.61%) | 36 (22.09%) | 163 |

These results are reflected in additional comments provided by respondents to the survey. One of the eighteen comments on the strengths of practice in this component noted the training's discussion of how to conduct FTMs and involve parents, and one comment noted as a barrier the lack of training for resource families. For the question asked about what supports are needed to effectively involve children and families in case activities and decision making, four of eighteen comments noted the need for more intensive training, specifically focused on teaching workers how to engage and encourage families to become active members of the team.

## Gaps

### Pre-Service Training

While the trainings do provide some important instruction related to this module of the practice module, there are some key concepts that should be addressed. In the *Assessment in the Child Welfare Setting: Overview of Youth Court* training, while there is a discussion about preparing families for court, the focus is more on preparing families for what will happen as opposed to involving them in the decisions that DFCS will recommend to the court. The *Case Planning and Family Engagement in the Child Welfare Setting* training goes into detail about when a worker may want to hold a FTM in the life of the case, but it does not provide much guidance on how to

actually conduct the FTMs, particularly how to engage and empower the families and ensure that the FTMs achieve their intended goals. There are some crucial concepts critical to a worker's ability to involve children and families in case activities and decision making which are not currently covered in the pre-service training curriculum. There is no training discussing what is and is not negotiable with the family in the case planning process, in order to engage and involve families in decision making while still ensuring safety and mitigating risk of harm to children placed in care. There is also no pre-service training that covers how to involve and engage either non-custodial parents or age-appropriate youth in decision making and case planning activities.

*Advanced Skills Training*

The *Advanced Skills Training: Case Planning* cites that even though best practice is that workers and families work on and develop case plans together, workers cannot help but have some idea of what will be part of an Individual Service Plan prior to the first meeting for case planning purposes. This indicates that families may have less impact on what is included in the case plan, and may not be as involved in decision making as they could be. In addition while this training does discuss FTMs to a certain extent, it does not explore how the FTMs should be conducted and how the family members should be prepared and engaged to get the most of the FTM process.

In addition to these trainings, there are a couple concepts critical to involving children and families in case activities and decision making that do not appear to be addressed in any of the trainings currently offered by DFCS:

- ♦ The importance/occurrence of consistent and regularly involving families and age-appropriate youth in updating case plans; and

- ♦ The importance of having a team meeting and prior to placement with a relative to support and ensure safety, and developing an after care plan with all pertinent parties prior to that placement.

- ♦ Focus group participants identified several areas of training that did not adequately address issues or do not currently exist which impact involving children and families in case activities and decision making. Among those highlighted by focus group participants:

- ♦ Strengthen existing training so caseworkers and supervisors understand the link between utilizing the information from the FTM and translating it into the ISP;

- ♦ A comprehensive training to cover the life of the case;

- ♦ Foster parents who are qualified and well trained on issues of supporting and respecting the birth families;

- ♦ Practical-based training on how to conduct interviews with both adults and children; and

- ♦ More training on MACWIS, particularly with regards to navigating the system on SARA and the ISP.

*PATH Training*

While the PATH training for resource families covers some critical issues relating to involving children and families in case activities and decision making, there are some skills and activities that are not currently covered by PATH from which resource parents could benefit. First, there is no discussion in the PATH training on concurrent planning and how it works, the related importance of regular meetings between all case parties to discuss the options and progress in concurrent planning, and how to involve and support birth parents in decision making surrounding concurrent planning. Second, there is no discussion on the frequency or importance of caseworker and child visits, and how the resource parents should help facilitate this access. Third, resource parents are trained in specific skills on recognizing when and how to involve birth parents in their children's lives through case activities like church and educational events. Finally, the PATH training does not discuss how resource parents are to actively support the tasks and goals of the service and permanency plans for children and their parents.

## b. Policy

### Strengths

MDHS' policy has several sections that directly pertain to how children and families should be involved in case activities and decision making and the importance of doing so.

*Case Planning*

Several of the existing policies that support this component of the practice model relate to planning throughout the course of the case, especially the development of the Individual Service Plan (ISP) and how families should be involved in case planning processes.
Case planning is critical to ensuring that the services and goals in place will build upon family strengths and also address their areas of concern. Assessing the family's strengths and needs is crucial and the policy on developing and completing the ISPs on children and adults discusses the importance of the Strengths and Risk Assessment (SARA) for being strength based, culturally sensitive and to be developed with family.

For adult/parent ISPs, policy states that caseworker will help develop an ISP with the adults, listing tasks and goals needed to facilitate reunification. ISP policy also specifies that this case plan with adults is an explicit written agreement jointly between the worker and parents or primary caretakers of children in foster care, addressing target problems, goals to be accomplished, plans/tasks by which those goals will be accomplished, achievement criteria, and timeframes for all parties.  It also states that an ISP must be signed by an adult to be valid.

Policy also dictates how children should be involved with ISP creation, noting that if a child is age and or developmentally appropriate each child/youth should be included in developing his/her ISP, and they are to sign the ISP each time it is updated. Included in the ISP is an independent living plan for youth fourteen and older and a transitional living plan for youth sixteen and older. In addition for children who are emancipated after age 18, there are specific guidelines that must be in place for this to occur, including detailing that the youth has a safe place to live, as well as a means to support themselves.

## Family Team Meetings

Family Team Meetings (FTM) are one of the most important tools currently available to DFCS to engage children and families in decision making in a thoughtful and meaningful way. Per policy, the initial FTM occurs within 30 days from opening a case, and convened at a minimum every time an ISP is updated (every 90 days). As described in policy, a FTM is any face-to-face meeting with one or more family members for the purpose of assessment and case planning. A FTM involves working closely the family to identify family members, extended family, and supportive persons the family wants to engage in the assessment and case planning process, as well as in the lives of their children who are placed outside the home. The family members identified, connected and engaged as early as possible in the decision making process, and continually for the duration of the case.

## Reunification

One of the most compelling reasons to ensure that children and families are involved in decision making and case activities is to facilitate the process of reunifying the child in foster care with their families when that is the appropriate goal. There are several existing policies at DFCS that support this concept. The importance of reunification and keeping families involved in decision making and the lives in their children is even discussed in the Mississippi statute, which notes "restoring to their families children who have been removed, by the provision of services to the child and the families when the child can be cared for at home without endangering the child's health and safety." (Section F, p. 4504) and "cooperating with any plan to reunite the foster child with his birth family and work with the birth family to achieve this goal…" (Section F, p. 4508).

## Meetings and Engagement

There are a few other policies at DFCS that should be identified as strengths and will assist in the implementation of the practice model. According to policy, parents are required to be invited to County Conference, where the progress and permanency plans for children in care are discussed and which provides an opportunity for parents to be involved in decision-making. If the parents' whereabouts are unknown, diligent efforts must be made to locate them at a minimum of every six months, and must be documented in each case. Identifying and engaging caretakers is a key policy in facilitating the family's ability to be involved in case activities and decision making. Policy states that diligent efforts to locate caretakers must be made, including checking with the Division of Economic Assistance and Child Support, utilizing a parent locator service, contacting local utilities and LEA, searching telephone directories, contacting relatives, and writing to last known address and post office forwarding.

In rating the Department's policy on involving children and families in decision making, survey respondents rated it as frequently or almost always effective about two-thirds of the time (about 65 percent).

## Gaps

While there are several existing policies that will support the implementation of this component of the practice model, some of the policies only partially address the tenets of involving children and families in case activities and decision making, in addition to the absence of some critical policies in their entirety.

**Mississippi Practice Model**

*Case Planning*

The case planning policy has a few aspects which do not suggest a full engagement of family members in the development of the ISPs. While the introduction to the adult ISP policy discusses family engagement and how the caseworkers should help develop an ISP with adults and facilitate a team meeting, the actual ISP policy section does not say the ISP should be developed with the adult. Rather, it just requires the adult's signature. Policy should be strengthened to ensure that adults and children are consistently involved and engaged in case planning and development. Another aspect of case planning policy that warrants attention is that while an individual service plan is completed for everyone in the home, there are no family service plans, which would provide a more comprehensive road map for the family, and emphasize the importance of everyone being engaged together in case activities and decision making.

Another gap identified in case planning relates to Independent and Transitional Living Service Plans. The MACWIS case reviews of 30 children receiving Independent Living Services indicated that the 30 youth received a total of 65 IL services. They also revealed that the IL plans are minimally completed in MACWIS, which limited our ability to make firm conclusions about the services these youth received. We should note here that in addition to the 30 MACWIS cases reviewed for IL services, we selected ten of those 30 cases and also reviewed the case files of the IL contractor and compared the findings. Among our findings, we noted the following:

- Of the 65 services delivered to the 30 children in the sample cases, it was either unclear if the services met the needs of the children or it was clear that the services did not meet the needs of the children in 50 (83.3%) of the identified services;

- It was unclear if the child participated in the development of the service plan in 26 (86.7%) of the 30 cases. In the ten contractor files, it was unclear in all ten; and

- In all cases, it was unclear from the MACWIS reviews if there was an Ansell-Casey Assessment completed, and if the results of any assessment was used in the development of the IL plan. In the ten cases in which we reviewed the contractor's files, it was clear that the Ansell-Casey Assessment had been completed. However, that lack of that information in the MACWIS files and the lack of clarity on whether it was used to guide the MDHS IL plan is a concern.

In addition, several qualitative comments from the MACWIS case review noted that IL plans were often blank, and TL plans often did not reflect realistic goals for the future, or detail the child's current circumstances.

*Family Team Meetings*

Family Team Meetings are the primary activity detailed in policy with the intended purpose of involving children and families in planning for their case as well as decision making. Although policy details the minimum frequency for convening the meetings and who should be invited to the meetings, we could not identify direction about the content of the meetings, what topics should be covered, how they should be conducted, or how to engage family members in making the most of the meetings. This level of direction is important to ensuring consistent and meaningful involvement of family members in case planning and decision making. A practice

guide on conducting family team meetings that covers some of these issues would be a helpful supplement to the policy.

*Reunification*

MDHS policy allows for long term foster care to be a permanency goal, whereby the agency retains custody until the child can live independently. While it is not to be used unless all other alternative permanency options have been ruled out, we recommend that a more suitable goal that offers children in care greater opportunity for permanence and stability replace the long term foster care goal, and that parents and children be actively involved in establishing such goals and in reviewing them periodically for their ongoing appropriateness.

In other reunification policy, we noted the requirement for children who are returning to their home that a final ISP should be done prior to leaving care, but we did not identify any requirements regarding an after-care plan. An aftercare plan is a critical opportunity for engaging family members and ensuring that they are prepared for the return of their children.

### c. Monitoring

Monitoring practice to ensure that children and families are being served effectively and appropriately engaged by the State is very important in reinforcing the practice and supporting the consistent use of the practice model. Although MDHS does not currently have a formal quality assurance process that covers all case types, the quality of practice with regard to involving children and parents in decision making and case activities are addressed to some extent in the Foster Care Reviews (FCR), the *Olivia Y* court monitoring activities, and in some supervisory activities.

### Foster Care Reviews[9]

Of the 46 issues that are monitored as part of the FCR, 6 (15%) relate to case practices related to this component of the practice model, as detailed below in the chart depicting the FCR results for July 2008 through May 2009.

| Percent of All Cases Cited for a FCR Issue with an Issue Relating to Involving Children and Families in Decision Making and Case Activities | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | YTD |
| Issues related to cases cited due to a lack of face-to-face contacts with applicable foster children pertaining to case planning, service delivery, and goal attainment. | 1.1 | 3.6 | 3.9 | 2.2 | 0.0 | 0.0 | 1.2 | 0.0 | 0.0 | 0.0 | 0.0 | 1.2 |

---

[9] Please note that these issues are the results of what are monitored each month on the Periodic Administrative Review (ie there is a direct correlation of each 'issue' to a question on the review tool).

**Mississippi Practice Model**

| Percent of All Cases Cited for a FCR Issue with an Issue Relating to Involving Children and Families in Decision Making and Case Activities | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Issues related to cases cited due to county conference notification issues. | 43.6 | 35.7 | 35.0 | 37.6 | 34.1 | 38.5 | 40.2 | 43.7 | 15.5 | 17.7 | 49.2 | 35.8 |
| Issues cited due to applicable children for whom there is evidence lacking as to their involvement in case planning activities. | 1.1 | 2.4 | 2.9 | 2.2 | 1.1 | 0.0 | 3.7 | 0.0 | 0.0 | 1.6 | 0.0 | 1.5 |
| Issues cited due to adult ISP issues | 11.7 | 15.5 | 18.4 | 15.1 | 18.7 | 23.1 | 29.3 | 16.9 | 16.9 | 8.1 | 6.6 | 16.7 |
| Issues related to a lack of parental/primary caretaker involvement in case planning issues. | 0.0 | 1.2 | 1.9 | 2.2 | 0.0 | 2.6 | 1.2 | 0.0 | 0.0 | 1.6 | 0.0 | 1.0 |
| Issues cited due to caseworker/parent or primary caretaker contacts not focusing on case planning, goal attainment, service delivery (quality of caseworker/parent or primary caretaker contacts). | 0.0 | 0.0 | 0.0 | 1.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 1.6 | 0.2 |

Of the areas reviewed by the FCR that pertain to involving family members, very few concerns were identified regarding caseworker contacts, with only 1% (YTD) of all issues cited relating to parental contacts, and 1.2% (YTD) relating to caseworker contacts with children in foster care. Further, only .2% (YTD) of issues cited related to contacts not focusing on case planning and goals, and 1% (YTD) cited concerns about the parent or caretaker being involved in case planning.

On the other hand, the FCR identified substantially more concerns about notifying participants of county conferences (35.8% YTD), and concerns relating to adult ISPs (16.7% YTD). According to the instructions provided to FCR reviewers, this relates mainly to having an ISP signed by adults in the home, and not necessarily to whether the tasks and goals are appropriate for facilitating the reunification of children with their caretakers. Similarly, our understanding of the review of whether age appropriate children were involved in case planning activities also focused more on determining if the child signed the actual ISP, as opposed to their actual involvement in developing the plans.

We understand that the purpose of the FCR is to periodically review foster care case plans and not to serve as the Department's primary quality assurance activity for all cases, including in-home services to children and families. We believe that the FCR reviews what it is intended to review well, but there are gaps in monitoring areas that it is not designed to review.

### Settlement Agreement Monitoring

There are a number of requirements in the *Olivia Y* agreement and in the COA standards that are a part of the Department's compliance with *Olivia Y* that pertain to involving children and parents in decision making and case activities. For example, there are requirements pertaining to identifying and locating absent parents, caseworker visits that relate to involvement, convening family team meetings, and developing and updating case plans with parent and child involvement. Given that the State is still early in the implementation process, our understanding is that court monitoring of all of these areas is not yet fully in place, in addition to the fact that the court monitor is still in the process of developing review instruments. There are some systemic supports needed to facilitate and sustain child and parental involvement in case planning that are being examined, or are in the process of being examined, as indicated in the chart below.

| Standards Related to Involving Children and Families in Decision Making | Status |
|---|---|
| Within 180 calendar days of Court approval of the Plan, DFCS, in conjunction with COA, shall develop a protocol for both individual and family team meetings and develop a training module on such protocols that shall be incorporated into the pre-service and in-service training curricula. | Initiated, but not complete |
| Defendants' revised policies and practice guides shall reflect the issues to be addressed during worker contacts with parents, children, and foster care providers. Defendants shall revise DFCS training as necessary to ensure instruction on the quality, frequency, purpose, and structure of meeting with foster children, biological parents, and foster care providers. The training shall specifically address communicating with, interviewing, and observing foster children. | Still in draft form |
| DFCS will develop for each region the capacity and current resource guides necessary to assist youth in locating and/or enrolling in educational or vocational programs appropriate to their needs, interests, abilities, and goals, such as high school or GED programs; colleges or universities; vocational training programs; and special education services. | Not met |

Although the court monitoring process will undoubtedly begin to cover the actual practice of involving children and parents in case planning over time, it will be important that the Department address this component of the practice model in its own quality assurance processes, especially since at some point the court monitoring process will transition to the Department's quality assurance system.

### Supervision

While the Supervisory Administrative Review (SAR) appears to be primarily a checklist to ensure that certain practices have been completed, some of the questions relate specifically to involving children and families in decision making:

♦ Have we documented a family team meeting?

♦ Is there evidence that the family was involved in the creation of the ISP?

◆ Have we documented discussion with each parent about the federal and state laws related to the length of time a child may remain in foster care?

◆ Is there a visitation plan?

Although these relevant questions are included in the SAR, we are not clear as to whether all questions must be answered by the supervisor or what information is used to answer the questions. For example, while it is important to document a family team meeting, it is also important that all pertinent people were invited, that it was planned and structured in a meaningful way, that all participants were engaged and involved in the topics discussed, and that decisions were made about how to plan for the family's reunification.

### d. Current Practice and Resources

#### Strengths

##### Family Team Meetings

According to focus group participants in the supervisory and caseworker focus groups, Family Team Meetings (FTM) are considered the cornerstone of family involvement case practice, and is a well utilized and appreciated resource for case workers. They indicated that it is very effective when families engage, that it is critical that children are actively involved and their opinions are respected, and that the FTM allows family members to know that they have support as they go through this trying time in their family's life. They also noted that not only can it help keep children out of custody, but it allows the family to help set the agenda for a critical case meeting, and they get to choose who is invited which gives them a sense of power and control.

Survey respondents indicated that family team meetings were frequently or almost always effective in involving children and parents in decision making about three-quarters of the time (about 73 percent).  They indicated that the meetings were frequently or almost always effective as a forum for case planning about 69 percent of the time.

| Please rate your perception of your agency's effectiveness in each area below regarding practices related to involving children and families in decision making: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Sometimes | Frequently | Almost Always | No Info/ NA | Total |
| Use of family team meetings as the means of involving parents and children in case planning and decision making: | 0 (0%) | 3 (1.8%) | 24 (14.37%) | 52 (31.14%) | 70 (41.92%) | 18 (10.78%) | 167 |
| Use of family team meetings as a forum for case planning activities: | 1 (0.6%) | 5 (2.99%) | 27 (16.17%) | 47 (28.14%) | 68 (40.72%) | 19 (11.38%) | 167 |

## Case Planning

In addressing case planning and the development of child and adult ISPs, supervisor and caseworker focus group participants indicated that ISPs are completed on each individual in a family, that it is developed with both the family and the child, and that it gives the parents an opportunity to discuss what they need to do to get their children back.

We asked survey respondents to rate the agency's effectiveness in several areas related to child and family involvement in case planning, including involving custodial and non-custodial parents and age-appropriate children in developing and updating case plans. The chart below shows their responses.

| Please rate your perception of your agency's effectiveness in each area below regarding practices related to involving children and families in decision making: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Sometimes | Frequently | Almost Always | No Info/ NA | Total |
| Effectiveness of efforts to identify and locate non-custodial parents to determine whether they should be involved in case planning and decision making: | 0 (0%) | 11 (6.59%) | 37 (22.16%) | 42 (25.15%) | 58 (34.73%) | 19 (11.38%) | 167 |
| Involvement of custodial parents in developing case plans: | 0 (0%) | 4 (2.38%) | 25 (14.88%) | 50 (29.76%) | 71 (42.26%) | 18 (10.71%) | 168 |
| Involvement of non-custodial parents, when appropriate, in developing case plans: | 0 (0%) | 17 (10.12%) | 37 (22.02%) | 44 (26.19%) | 51 (30.36%) | 19 (11.31%) | 168 |
| Involvement of age-appropriate children and youth in developing case plans: | 0 (0%) | 16 (9.64%) | 35 (21.08%) | 40 (24.1%) | 57 (34.34%) | 18 (10.84%) | 166 |
| Involvement of custodial parents in reviewing, updating and revising case plans, goals, and services: | 0 (0%) | 7 (4.22%) | 30 (18.07%) | 52 (31.33%) | 59 (35.54%) | 18 (10.84%) | 166 |
| Involvement of non-custodial parents, when appropriate, in reviewing, updating and revising case plans, goals, and services: | 0 (0%) | 21 (12.73%) | 37 (22.42%) | 39 (23.64%) | 49 (29.7%) | 19 (11.52%) | 165 |
| Involvement of age-appropriate children and youth in reviewing, updating and revising case plans, goals, and services: | 0 (0%) | 3 (7.78%) | 40 (23.95%) | 44 (26.35%) | 52 (31.14%) | 18 (10.78%) | 167 |

**Mississippi Practice Model**

| Please rate your perception of your agency's effectiveness in each area below regarding practices related to involving children and families in decision making: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Sometimes | Frequently | Almost Always | No Info/ NA | Total |
| Use of information/requests from parents to guide the development of the case plan, select services, and establish goals: | 0 (0%) | 7 (4.29%) | 33 (20.25%) | 40 (24.54%) | 64 (39.26%) | 19 (11.66%) | 163 |
| Use of information/requests from age appropriate children and youth to guide the development of the case plan, select services, and establish goals: | 0 (0%) | 10 (5.99%) | 32 (19.16%) | 43 (25.75%) | 62 (37.13%) | 20 (11.98%) | 167 |

In addressing the agency's effectiveness in involving parents and age-appropriate children in developing case plans, they rated their involvement as frequently or almost always effective in this order: custodial parents (about 72 percent), age-appropriate children (about 58 percent), and non-custodial parents (about 57 percent). Their ratings regarding involvement in updating and revising case plans followed the same pattern but were slightly lower than for the initial case plans. In using the information obtained from parents and children to actually guide the development of the case plan, respondents indicated the agency is frequently or almost effective less than two-thirds of the time (about 64 and 63 percent respectively).

*Other Case Activities*

The practice of reviewing and signing the family's rights and responsibilities at the outset of a case was highlighted as a positive practice in all focus groups. Also noted was the agency's move toward family-centered practice, and the fact that caseworkers were really embracing and excelling in this methodology. Foster Care Reviews (FCR) were also seen as good case practice for involving children and families in decision making, and were seen as supported by the State through the fact that families receive $25 for attending the County Conference. In addition, the FCR was indicated as a strength in focus groups as it is a critical opportunity to review what is happening in a case and what else the family may need, as well as includes the parents, service providers and extended family, having all key participants together to support the family.

In other practices related to involving children and parents in decision making and case activities, survey respondents indicated that caseworker visits with parents and children to involve them was frequently or almost always effective about two-thirds of the time (about 66 percent and 65 percent respectively). They rated their ability to identify cultural issues that affect involvement and their engagement of youth in identifying services needed for transitioning to adulthood slightly less effective (respectively, about 60 percent and 62 percent frequently or almost always effective).

| Please rate your perception of your agency's effectiveness in each area below regarding practices related to involving children and families in decision making: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Sometimes | Frequently | Almost Always | No Info/ NA | Total |
| Use of caseworker visits with parents, including non-custodial parents when appropriate, to involve them in case planning and decision making (frequency and quality of visits): | 0 (0%) | 6 (3.59%) | 34 (20.36%) | 49 (29.34%) | 61 (36.53%) | 17 (10.18%) | 167 |
| Use of caseworker visits with children and youth to involve them in case planning and decision making (frequency and quality of visits): | 0 (0%) | 5 (2.99%) | 36 (21.56%) | 46 (27.54%) | 62 (37.13%) | 18 (10.78%) | 167 |
| Ability to identify and address cultural issues of children and parents, including language barriers, that affect their involvement in case planning and decision making: | 1 (0.6%) | 10 (5.95%) | 32 (19.05%) | 49 (29.17%) | 52 (30.95%) | 24 (14.29%) | 168 |
| Involvement of youth in identifying services and supports they need to transition to adulthood: | 0 (0%) | 13 (7.98%) | 26 (15.95%) | 48 (29.45%) | 53 (32.52%) | 23 (14.11%) | 163 |

## *Gaps*

We identified several gaps in practice and resources that may impede the successful implementation of this component of the practice model.

### *Resources and Case Activities*

As noted earlier in the survey results, focus group participants also commented about the lack of involvement by fathers. Focus group participants stated that in general, many workers do not 'deal with the dads'. They commented that fathers are harder to engage, and some fathers may be frustrated over child support issues and hesitant to become involved. Some focus group participants noted that workers may let the mother decide if she wants the father involved in the case and the children's lives.

Another gap in practice identified by focus group participants pertained to involving children and youth in court-related practices. While noting much variance in this area among counties, some of the concerns noted were as follows:

- Some county courts never ask kids to be present in court;

- Often times children are outside court rooms but judges do not talk to them; and

- Some guardians ad litem do not talk to children, and act on written materials.

A resource gap identified in the survey was the availability of culturally appropriate services. Respondents indicated that the availability of such services to support family involvement was frequently or almost always effective only about half the time (about 50 percent).

### Family Team Meetings

Several focus groups noted the need and desire to have specific guidelines for documenting the meetings. We also identified some confusion among focus group participants about when the FTMs should be conducted. Among the answers provided:

- At least one time a month;

- As needed;

- Within 30 days;

- Try to do one during investigation;

- Every 6 months;

- When a case is opened;

- Within 14 days of opening a case; and

- Any change in the ISP.

### Case Planning

We identified some confusion among focus group participants relating to the ISP, and particularly when children are supposed to sign the document.  Among the responses were the following:

- Only the parent's ISP is printed out to sign;

- Children only sign if they have tasks and goals assigned to them;

- Must be signed by 3 or 4 year olds; and

- School aged children (8 and older).

A few other issues with the ISP were brought up in the focus groups. Several participants noted that regardless of the reason for the child coming into State care, parenting classes are pretty standard for including in the ISP. Difficulty was also noted with the SARA results printing on the ISP, as they are too general and as families do not agree. Caseworkers then spend must explain that it may not all apply to them, and may need to redline the ISP so that families are in agreement.

### e. Summary of Inputs

Involving children and families in case activities and decision making is paramount to institutionalizing a family-focused, strengths-based child welfare system within MDHS. MDHS has several provisions in place that support this practice, and there are also some areas where additional inputs are needed.

## Training

We identified the following strengths in training related to this component of the practice model:

♦ In the *Core Relationship Skills in the Child Welfare Setting* training, there is a detailed discussion of both why involving families in case planning and decision making is good case practice, as well as what are the opportunities to conduct Family Team Meetings, including a child moving or enough or not enough progress in a case.

♦ The *Advanced Skills Training* have several modules focusing on this component including engaging clients from the very beginning of a case, training activities on how to engage families around the assessment, as well as case planning.

♦ The *New Child Welfare Supervisory* training instructs new supervisors to not only monitor and assess caseworker interactions with clients, but also to shadow workers in the field and debrief with them about their interactions and the case decisions that were made.

We identified the following gaps in training that should be addressed in order to ensure that the involvement of children and families becomes more fully institutionalized in casework practice:

♦ The *Case Practice and Family Engagement in a Child Welfare Setting* training does not provide guidance to trainees on how to conduct a FTM or empower and engage families through the FTM process.

♦ Regarding the development of the ISP, while the *Advanced Skills Training* notes this should be done with the adults, the training could be strengthened by focusing on how the worker should actually engage the parents in developing the ISP an using their input in the ISP.

♦ Several important aspects of involving children and families in case activities and decision making do not appear to be covered in training, including the consistent reviewing and updating of case plans, the importance of concurrent planning, and the development and monitoring of aftercare plans.

♦ There are several training needs that were identified by staff throughout the state needed to support this component, including:

  ○ Connecting the case practice of FTMs and how they inform the ISP;

  ○ A comprehensive training to cover the life of the case; and

  ○ Practical-based training on how to conduct interviews with both adults and children.

## Policy

MDHS has extensive policy that helps direct practice in the field. We identified the following strengths in policy related to this component of the practice model:

- The various policies relating to case planning focus on how families are and should be involved in the development of the ISPs, and that specifically adult ISPs should focus on what specifically they need to do to be reunified with their children.

- Family Team Meetings are detailed in policy to be conducted early on in a case, and at a minimum on a regular basis, and requires the caseworker to work closely with the family.

- Policy mandates that parents must be invited to the County Conference, which is the opportunity for review and discussion of a child's permanency plan, and that diligent efforts must be made to locate parents, should their whereabouts be unknown.

We identified the following gaps in policy pertaining to this component of the practice model:

- While each family member has an individual service plan, there is no family service plan, which would aid in the connecting of all of the individual tasks assigned to people, and provide an overall roadmap to reunification.

- Policy does not provide any direction for consistency and content of the Family Team Meetings.

- While there are restrictions on the use of Long Term Foster Care as a permanency plan for children, it is still an option available to children who are in foster care.

### Monitoring

We identified the following strengths in monitoring case practice for family and child involvement:

- FCR monitors some important issues related to this component, including unfocused case contacts, non-involvement in case activities, and caseworker contacts with case parties.

- Several questions that are part of the Supervisory Administrative Review relate to involving children and families in decision making, including whether there is evidence of their involvement in ISP development and informed of their rights and responsibilities while their children are in care.

We identified the following gaps with regard to monitoring this component of the practice model:

- In addressing family involvement in the ISP process, the FCR appears to monitor primarily for adults signing the ISP, which may not be an indicator of their actual involvement in developing the ISP. Qualitative issues related to practice should be covered in the Department's development of a CQI process.

- The SAR appears to monitor for process-related issues, such as whether an FTM is documented, rather than for more qualitative issues, such as how the meetings are planned and structured and how the caseworkers ensure that family members were invited and engaged in a meaningful way.

- There is not a monitoring process for cases involving in-home services to children and families, since both the FCR and court monitoring are primarily concerned with foster care

services. Therefore, involvement of children and families who are served in their own homes is not monitored except through supervision.

### *Current Practices and Resources*

We identified several strengths in current case practice and resources currently available that relate to this component of the practice model.

♦ The Family Team Meetings are viewed as a resource for allowing families to identify and engage their support system, and identify for the Department what they need to be able to ensure the safety and welfare of their children.

♦ Caseworker visits with custodial parents to involve them was more of a strength than a weakness in practice.

♦ Custodial parents seem to be involved frequently in case planning activities.

We also identified the following gaps in practice and resources with regard to involving children and families in case activities and decision making.

♦ There is confusion on existing policies and practices on when to conduct a FTM and when children are to sign their ISP.

♦ The involvement of non-custodial parents and age-appropriate children in case planning does not appear to be very strong.

## Section 2: Outputs

### *a. Products*

### *Training*

While the current training supports the importance of involving children and families in case activities and decision making, we have identified the following additional skills-based training that is needed to assure the practical application of this component of the practice model:

♦ Skills-based and strengths-based training in the pre-service curriculum is needed on using caseworker visits with parents and children to focus on progress in meeting case plan goals, obtaining and using family input into case plans and decisions, and identifying critical points in casework activities where the need to involve families is especially important, e.g., when family circumstances change, when expected progress is not being made, and when goals are reached. Additional trainings with regard to this topic should be included in the ongoing training curriculum.

♦ Families themselves are the experts on what they need to be involved in case planning, how they can be better engaged by MDHS staff, and what barriers they currently face in becoming full partners with state staff. MDHS might consider increasing family involvement in training development by including parents and caretakers as co-trainers with regard to this component.

♦ Pre-service and ongoing trainings for both caseworkers and supervisors should be further developed on the topics of individual and family team meetings. Going beyond the current

training of when to conduct these meetings, the trainings should cover how to prepare children and families for the meetings as well as how caseworkers themselves should prepare, how the meetings should be structured and conducted, skills for workers to ensure that meetings stay on track and that the tasks and goals of the meeting are addressed.

♦ Resource parent training should be updated to better support this component of the practice model. Included in this revised curriculum would be a discussion of how to communicate with birth parents about their children, how to support their involvement in decision making effecting their children, like consultation on after school or other activities, and how to ensure that resource parents themselves are working off of the service plan which has been developed by the birth parents and caseworkers.

### *Policy*

In order for the practice of involving children and families to be infused throughout MDHS, policy needs to be enhanced to support the full implementation of the practice model. We identified the following policy work products that we recommend MDHS develop to implement this component:

♦ Policy should clearly define family involvement as it pertains to MDHS. The definition should include active participation of custodial and non-custodial parents in case planning and activities, engaging extended family and other familial supports, participation of parties in meetings, court proceedings, and case reviews, and ensure the appropriate addressing of any language barriers that may exist. It is important that the definition of family involvement go beyond inviting their participation in FTMs, County Conferences and court events, and include the facilitation of their active involvement whenever it is appropriate to do so.

♦ Practice standards for family involvement should be developed and implemented at all stages of casework activity. This includes not only the identification of opportunities for family involvement in the life of the case, but also standards of frequency and quality for these interactions.

♦ Policy on how to structure and conduct family team meetings should be developed, to ensure all families are provided with consistent practice and standardized opportunities to participate in a key decision making opportunity. This would include the co-development and distribution of an agenda to all FTM invitees, the development of general rules for the meetings, the development of end goals for the conclusion of the meetings, and the assigning of tasks and responsibilities to each FTM participant.

♦ Policy should be developed to mandate the development of a formal after care plan for children and families at a family team meeting within 2 weeks of discharging custody. Along with the after care plan, policy should detail contact information for prevention and emergency services to help try and mitigate any need for further future involvement by MDHS.

♦ Strengths-based and family involvement language should be standardized across all existing policies and policies to be developed to help ensure uniformity of practice.

## *Monitoring*

In order to ensure that the practices associated with this component of the practice model are implemented similarly across DFCS, it will be important that similar monitoring processes be established in all counties and regions. We have identified the following work products pertaining to monitoring for this component:

♦ As part of the CQI plan to be developed, CQI staff should monitor to ensure that children and families are involved in case activities and decision making through case reviews. The case review protocols to be developed by MDHS should include items relating to family involvement, especially how effectively the family is informed of upcoming case events such as FTMs, case plan development and court events, the extent of their active participation in those events, and how the information is used by the caseworker to move the case forward. The reviews should also address training to staff and providers on involvement of families in case planning, notification procedures, and the services/supports available to support families in this component.

♦ Monthly reports should be developed in MACWIS and distributed to all regional and county staff detailing outcomes, performance measures and key indicators associated with this component of the practice model.

Specifically with regard to supervisory oversight, we recommend the following work products pertaining to involving children and families in decision making:

♦ Clear supervisory standards should be established for monitoring family involvement in cases.  Standards should include the frequency of monitoring, the issues being monitored, and a process for providing ongoing feedback to staff based on the supervisor's observations.

♦ The standards should address specific levels of family involvement to be monitored as they pertain to activities that families should participate in, including service plan development and updates, FTMs, county conferences, and court events.

♦ A process is needed to ensure that supervisory oversight and conformity to the standards described above are implemented and carried out regularly, since supervisors will exercise more day-to-day influence over the implementation of the practice model than CQI oversight.

With regard to tracking the performance outcome measures pertaining to family involvement, we recommend the following:

♦ The current measures pertaining to family involvement in the *Olivia Y* exit plan should be incorporated into an ongoing CQI processes (Case Review and supervision) and should be tracked beyond MDHSs exit from *Olivia Y* in order to assure sustained improved performance in this component.

♦ A process and format for reporting on the measures tracked together with the qualitative reviews conducted by supervisors and case reviews should be developed in order to provide a comprehensive picture of involving children and families and more effective reinforcement of the practice component over time.

### Practice and Resources

In order for this component of the practice model to be implemented fully, protocols or practice guides that guide family involvement should be developed and utilized by all service providers, as well as caseworker staff. The protocols for service providers should include, but not be limited to:

♦ Protocols that assure that service plans used by service providers, including service plans developed by placement facilities for children in their care, support the MDHS service plan and include the same level of family and child involvement as MDHS's service plans; and

♦ Protocols that provide for service providers to be involved in developing and reviewing MDHS service plans, as determined appropriate on a case-by-case basis.

The following protocols and practice guides should be developed to guide caseworkers through family involved case practice:

♦ MDHS should develop a practice guide that guides caseworkers through the process of implementing family involvement policy and procedures in developing and finalizing service plans.

♦ A protocol or practice guide that identifies key decisions and provisions of case planning that are and are not negotiable in involving families in case planning, i.e., assuring child safety is not negotiable but how safety is assured is subject to family input.

♦ A practice guide for initiating and conducting family team meetings with children and families, to ensure consistency in practice and family engagement in this case activity.

### b. Activities

The specific activities where this component of the practice model can be expected to occur are as follows:

♦ *Strengths and needs assessments:* Although this is covered in the assessment component of the practice model, it is crucial that age-appropriate children and youth, in addition to families, are involved in assessments that are conducted in order to help families identify their own strengths and areas where they may need to improve and to assure their input into service requests made on their behalf. This also includes caretakers' active involvement in any mental health or heath assessments conducted on behalf of the children in their care.

♦ *Develop the case plan*: Developing the case plan is the most obvious activity where family involvement occurs. Within our definition of family involvement, case plans should always be developed with family input. This means that the plans should not be developed prior to soliciting input from the parents, age-appropriate children, and other relevant family members identified by the parents. Plans should be developed jointly with the parents and age appropriate children. While the agency actively solicits the input of parents, including non-custodial or absent parents where appropriate, and age-appropriate children, the agency maintains its responsibility to assure child safety, permanency, and well being in the provisions of the plan.  It also means that when plans are updated or revised, they are changed with family involvement just as if it were an initial plan.

**Mississippi Practice Model**

The case planning process should also address the changing needs of families and family members and fully engage them in how the agency will address those changing needs.  For example, as the needs of youth in foster care who will be emancipating shift to the transition to adulthood, youth should be involved in assuring that the case plan adequately addresses those needs with appropriate services and activities.  When the service planning process operates in this manner, the need for additional meetings to address the needs of adolescents in foster care should be minimal.

In all case planning activities, the involvement of family members should include their self-identification of strengths related to the agency's involvement in their lives, their perceptions of their needs that warrant the agency's involvement, and their perceptions of the services that can best address their needs. This includes determining if the children and families have any preferred providers. Services should be available to enable participation by family members in case activities and decision making, including translation services, advocates, mentors, and parenting coaches.

- ◆ *Visits with children and families:*  In order for families to participate actively in the service plans, assessments, and progress evaluations, caseworkers should continuously solicit and utilize family input in developing the plans, determining goals, assessing strengths and needs, and determining what services will be most useful for the families in order to ensure the safety and well-being of children. This requires regular visits in convenient and comfortable locations and being accessible to the children and families to address any questions and concerns as they may arise.  Caseworkers should visit with family members and children frequently enough to monitor their progress and know when to make appropriate decisions (the CFSR standard for visiting frequency is at least once per month and more often if the child's needs indicate it).  Further, the visits should be purposeful, related to the provisions of the service plan, and used to involve family members in ongoing assessment of their circumstances.

- ◆ *Family Meetings:*  Although we do not prescribe any particular "model" of family meetings where the involvement of family members would occur, we would expect that some form of initial family meetings to develop these service plans will occur unless there are credible reasons not to bring the family together. In addition to meeting with the family to develop the initial service plan, family meetings should occur at all service plan updates, changes in plans, and at regular intervals to monitor progress in families, and address any barriers as soon as they may arise. A final family meeting should occur prior to case closure to develop an aftercare plan with children and families and to ensure they are best prepared for ensuring the safety and well-being of children beyond the involvement of MDHS. Invitations to these meetings should be sent to all relevant family members as identified by the caretaker, including non-custodial parents when appropriate, to participate in service planning meetings, and be scheduled at a mutually convenient time.

Caseworkers should take the time prior to each formal family meeting to prepare the family on how they should participate in case planning activities. This includes discussing/developing what the agenda will look like, what topics will be covered, what information may come out, and what are the goals and objectives of the meeting. Preparing families for meetings goes beyond just

family meetings for service plan reviews, and includes preparation for court hearings and FCRs/County Conferences.

♦   *During foster care placements.*  Part of this component includes helping parents to remain involved in the parenting of their children whenever it is safe and appropriate to do so while the child is in foster care placement.  This can take different forms, from having routine and frequent parental visits to children in the foster care setting to having parents actually come into the foster care setting to assist with the daily care of their children, assist with school activities, and so forth.  The agency should evaluate all foster care placements for the appropriate level of parental involvement with their children in placement and assist both the parents and foster caretakers to support the level of involvement that is safe and that will help to maintain the integrity of the parent-child relationship during episodes of foster care.  Plans for the appropriate level of involvement should be discussed at FTMs and included in case plans, always with the involvement of the foster caretaker and parents.

### c.  Roles and Responsibilities

In order to implement this component of the practice model, we recommend defining the roles and responsibilities of key team members as follows:

### Caseworkers

♦   Caseworkers should be responsible for conducting frequent and meaningful visitation with both children and families throughout the duration of their involvement with MDHS. Visits with children should occur at a minimum of two times a month, and visits with birth families should occur at least one time a month.

♦   In addition to visiting and case management responsibilities, caseworkers should be responsible for engaging and preparing children and families to participate in case activities and meetings, including family meetings, service planning, court hearings and County Conferences. Caseworkers should prepare families by informing them about the meetings well in advance, explaining who will be there and what the purposes/goals of those meetings are, what information will be discussed and how that information will be used, and how families can be involved to influence decisions that are made.

♦   Caseworkers should be responsible for facilitating the involvement of children and family in case activities and decision making, including developing service plans and determining service needs of children. This can be done by identifying and addressing barriers to participation, such as transportation, child care, or inconvenient scheduling of case activities. Caseworkers are to ensure that all plans are signed by family caretakers and children over the age of six, with the understanding that service plans cannot be approved unless this is done.

♦   Caseworkers should be responsible for facilitating the timely referral and initiation of services based on the strengths and needs assessment and case plan strategies.

♦   Caseworkers should be responsible for monitoring the service delivery for families for quality, progress, and the effects that the services are having on the child and family. This includes soliciting input from family members on their satisfaction with the services they are receiving and their needs for additional or other services.

## Supervisors

♦ Supervisors should be responsible for monitoring the quality of work of caseworkers, and ensuring that family input has been solicited and utilized at all critical junctures in case activities. This includes ensuring that caseworkers are well trained and understand the critical points in the life of the case where family involvement is needed and appropriate, and are actually putting this knowledge into practice.

♦ The supervisors' role includes monitoring individual case activity, including determining the need to involve resource groups or other services available in the community to meet children and family's needs, and providing feedback to caseworkers on how they are implementing the model of practice. Supervisors have a responsibility for helping to assure that caseworkers are able to mobilize the services needed by families and children in their caseloads.

♦ Supervisors should attend periodic FTMs conducted by their workers in order to evaluate their capacity to conduct effective meetings and, where needed, to model the facilitation process.

♦ A key supervisory role is coaching caseworkers and modeling appropriate social work techniques for caseworkers to learn from and implement in their own practice. This should be done through individual and group supervision, and where needed, in actual casework activities such as family conferences and visits.

## Regional Directors (RD)

♦ Regional Directors are responsible for providing the leadership, direction and implementation of the model of practice, assessing the agency's capacity to support child and family involvement.

♦ Regional Directors have the responsibility of continually monitoring data reports and qualitative reviews through such sources as the CQI case review process, MACWIS monthly reports and *Olivia Y* monitoring processes, for the purpose of tracking their agency's performance on the indicators associated with this component of the practice model.

♦ Regional Directors are responsible for managing the change effort involved with implementing the model of practice, and ensuring that all policies, trainings, and case activities are implemented and support the fidelity of the model.

♦ They should be visible spokespersons for the components of the practice model in their region, and as such, should continually reinforce the values and principles that underlie the model.

♦ Regional Directors are responsible for assuring that the supervisors routinely review for the quality of work and provide constructive feedback to staff to make certain that children and families are playing an integral role.

♦ They should also ensure that staff and supervisors have the training and other tools needed to involve families in case activities. Regional Directors should solicit staff feedback on the skills and supports needed to involve children and families consistently and effectively.

### Continuous Quality Improvement (CQI) Staff

♦ CQI staff should monitor for the quality of casework practice and outcomes, and provide constructive feedback to staff, providers, and regional directors on the strengths and needs of its findings.

♦ CQI staff should ensure they are available to meet with staff, supervisors and regional directors for follow up on any areas of concern noted through the various CQI processes, and monitor any corrective action plans initiated as a result.

♦ CQI staff should monitor for specific interventions that support this component of the practice model, such as the identification and engagement of extended family members including non-custodial parents, the invitations of family members to participate in case activities, the actual participation of family members in planning meetings, and joint development of service plans.

♦ CQI staff should be responsible for soliciting independent feedback from children, families, providers, and foster caretakers on their experiences with MDHS and the extent to which they were engaged as equal and active team members.

## Section 3:  Outcomes and Indicators

### a.  Short-Term Goals (6-9 Months)

The following items represent the outcomes of the short term implementation of the Involving Children and Families in Decision Making component of the practice model.

### Training

♦ *Interim Training Module*: DFCS should develop an interim training module on Involving Children and Families in Decision Making that incorporates the basic skills and activities needed to implement the model of practice. The module should focus on the activities, roles, and responsibilities identified for this component and should be skills-based in its content. Among the skills needed for this component are:

　o　Using information obtained in visits to support progress toward service plan goals;

　o　Obtaining and utilizing family input into service plans and decision making;

　o　Identifying critical points in casework activities to involve families;

　o　Supporting families having a voice in team meetings; and

　o　Identifying and engaging extended and non-custodial family in case activities.

### Develop Practice Guides

♦ *Case Planning:* As a short-term strategy to facilitate implementing this component, and short of making broad policy revisions, MDHS should develop a protocol for involving families in case plan development.  The protocol should describe the relevant roles and responsibilities associated with this component and guide the work of implementing this component and should supplement current policy by providing the additional activities needed to support family involvement in case planning.

♦ *Provider Input in Case Plans:* Develop protocol for all service providers identified on a case, including resource parents, facility and acute care staff, and therapeutic and other service providers, to be involved in the development of the case plan and attending any case planning meetings, to ensure that all team members are on the same page, families are to be engaged in services, and that those services will support building upon their strengths and addressing their needs.

♦ *Involving Children and Families Practice Guide:* MDHS should develop a practice guide on involving children and families in case activities and decision making that will serve as a proxy for more defined policy for implementing the model. Included in the practice guide should be specifics on:

  o When families and children are to be engaged throughout the life of the case, and how to solicit and utilize their input;

  o Frequency of visits with custodial, non-custodial and extended family;

  o How to utilize the information obtained from those visits; and

  o Guidance on convening and utilizing family meetings.

♦ *Interim Supervisory Protocol*: MDHS should develop an interim supervisory protocol for of the implementation of the practice model, detailing both their roles in the transfer of knowledge of how to involve children and families in case activities and decision making, as well as how they should monitor to ensure active family involvement. This should include:

  o Using supervisory administrative reviews to monitor and discuss issues regarding involving children and families;

  o Using supervisory techniques, such as shadowing case workers, modeling, and coaching staff; and

  o Using supervision as a first-line quality assurance technique that helps to assure child and family involvement.

## Quality Assurance and Monitoring

♦ *Local CQI Capacity*: MDHS should ensure that county and regional CQI staff have the skills, knowledge and ability to monitor the implementation of the practice model, including involving children and families.

♦ *Develop Practice Model Implementation Review Process:* MDHS should plan for a review strategy for CQI staff to gauge the status of implementation of the practice model. This should include a review of how each recommended training, policy and protocol has been created and utilized for each component of the practice model, the barriers encountered in early implementation efforts, and progress toward full implementation.

## Resource Development

♦ *Regional Resource Development*: MDHS and Regional Directors should ensure that appropriate service providers are available, and trained on the practice model's vision of how to involve children and families in case planning and practices.

♦ *Centralized Resource List*: DFCS state office should begin to compile a list of all available resources throughout the state available for both caseworkers and birth parents to access to

support this component of the practice model. Included in this list will be information regarding limitations and requirements to access services, including fees, insurance, and time commitments.

♦ *Preparation of resource parents:*  In the short term and prior to revising the resource parent training, foster caretakers should be prepared and supported to address their roles and responsibilities pertaining to involving children and parents, including opening communication to birth parents, if deemed appropriate, and keeping them abreast of any changes with the children.

## b. Mid-Term Goals (9-24 Months)

### Develop Training Modules and Curriculum

♦ *Skills Based Training Enhancement*: In order to support caseworkers ability to actively and meaningfully involve children and families in case activities and decision making, MDHS should incorporate the skills-based training elements identified in this component into the pre-service and on-going training curriculum.

♦ *Review of Existing On-Going Training*: MDHS should review its current on-going training curricula for opportunities to make the training more skills-based in regard to involving children and parents, and make needed revisions.

### Policy Development

♦ *Define family involvement in policy*: MDHS should make the recommended changes to policy to ensure consistency in the definition and implementation involving children and custodial and non-custodial parents in decision making, meetings, and court hearings and reviews.

♦ *Family Meeting Policy:* MDHS should formalize its policy regarding family meetings, specifically how they should be prepared for and conducted with families, in order to standardize the practice across counties.

♦ *CQI Policy:* To support the new CQI process, MDHS should formalize all procedures and processes associated with the new CQI system, including the case reviews, MACWIS monthly reports and county/regional reporting.

### Develop Ongoing Monitoring Processes

♦ *CQI*: In addition to the new policies and procedures associated with the new CQI plan, MDHS should also ensure they develop a process to provide feedback to caseworkers and supervisors whose cases are reviewed through various CQI and FCR activities in order to provide a better understanding of the quality of the work they are doing with regard to involving children and families.

♦ *Supervisory Standards of Monitoring:* MDHS should make any needed changes to the supervisory protocol and formalize standards for how supervisors will monitor case work to ensure the active and meaningful involvement of children and families in case planning.

### c. Long-Term Goals (24-48 Months)

#### Full Implementation of Modules

♦ Within this time frame, all counties will have begun implementation of the practice model.

♦ Full implementation of all training curricula, policy revisions, and monitoring procedures will have been achieved.

♦ A focus of activity, particularly for supervisors, should be on coaching and supporting the practices associated with this component.

♦ An additional focus should be on assuring the systemic supports needed for this component are refined and fully in place, such as a flexible and inclusive service provider system, foster caretakers who support this component, supervisory and CQI processes that capture and use information on this component, and functional service planning processes that support child and family involvement.

#### Monitoring Practice Model Implementation and Success

For purposes of monitoring the processes that support this component of the practice model, MDHS may also choose to monitor for:

♦ Percentage of children and families attending court events;

♦ Percentage of individual service plans signed by parents; Percentage of individual service plans signed by children, age six and up;

♦ Percentage of service plans developed from a family team meeting;

♦ Percentage of County Conferences with familial attendance; and

♦ Percentage of cases with documented discussion of concurrent planning with birth parents, discussing permanency options including reunification and permanent relative placement.

#### Olivia Y Measures

♦ Percent of all birth parents that were interviewed prior to the completion of the strengths and needs assessment;

♦ Percent of FTMs within 30 days of case opening to develop the service plan, every 90 days with a service plan update, and final Family Team Meeting prior to reunification to develop an aftercare plan;

♦ Percent of cases with Long Term Foster Care chosen as the permanency goal;

♦ Percent of cases where emancipation has been granted for children under age 16;

♦ Percent of caseworker-child visits occurring twice monthly, at least one time in placement and caseworker-birth parent visits occurring at least monthly; and

♦ Percent of cases with documented diligent efforts to locate absent parents.

**Mississippi Practice Model**

*CFSR Measures*

♦ Permanency Outcome 2: *Continuity of Family Relationships and Connections is Preserved for Children*
   o Item 11: Proximity of Foster Care Placement
   o Item 12: Placement with Siblings
   o Item 13: Visiting with Parents and Siblings
   o Item 14: Preserving Connections
   o Item 15: Relative Placement
   o Item 16: Relationship of Child with Parents

♦ Well Being Outcome1: *Families Have Enhanced Capacity to Provide for Their Children's Needs*
   o Item 17: Needs and Services of Child, Parents and Foster Parents
   o Item 18: Child and Family Involvement in Case Planning
   o Item 19: Caseworker Visits with Child
   o Item 20: Caseworker Visits with Parents

## *Component Four: Strengths and Needs Assessments of Family Members*

In family-centered practice, families are best understood and respected as a result of an assessment that focuses on the strengths and needs of all of the family members within the context of the family and their community. Comprehensive family assessment (CFA) is the process of gathering, organizing, and analyzing information for the purpose of informed-decision making and service planning concerning the overall safety, permanency, and well-being of children, youth, and families. It begins at the first contact with the family and continues on an ongoing basis until a case is closed. The focus of a comprehensive family assessment moves beyond the presenting issues at a specific point in time to identify the underlying conditions that contribute to the reason for child welfare involvement. In doing so, it addresses not only the primary concerns regarding the immediate safety and risks of future maltreatment, but also has a broader scope, incorporating information about each family member's strengths and needs, the existence of protective factors, and family supports. As circumstances change during the course of working with a family, the process of assessment evolves over time and reflects important and relevant information which guides service planning and intervention.

Families are often the best source of information about themselves. They are "experts" at knowing their own family and have an "inside track" on viable solutions to their problems. Therefore, engaging the family at the initial stage in the assessment process reinforces the importance of their involvement and participation and further promotes effective case planning towards desired outcomes. Family engagement in the CFA entails the involvement of members of the family who do not reside in the same household, including non custodial parents and other individuals with significant connections to the parents, youth, and children. A core element of joining with the family is the exploration and identification of the individual strengths and needs of each of its members with an awareness of and respect for how these have been shaped by the culture and community to which they belong. This includes identifying strengths and needs of all family members regardless of whether the parent resides outside the home or the children have been the subject of maltreatment. Strengths, for the purpose of the comprehensive family assessment, are defined as those attributes, characteristics, and resources that exist within the family and provide a foundation for family members to carry out their roles effectively and appropriately, including providing a safe and nurturing environment for children in the family. These strengths provide the basis for determining strategies and action steps to achieve established goals and objectives in subsequent case planning activities. A significant focus of the CFA is to develop an understanding of the underlying causal factors that contribute to the current problems in the family. Needs, in this context, are defined as universal physical and psychological conditions that are generally expressed through behaviors. The behaviors that the family exhibits usually represent underlying conditions that contribute to the presenting issues that place their children at risk and interfere with family functioning. Often, patterns of behavior that create problems for the family represent underlying conditions that affect their safety, permanency, and well-being and are actually symptoms of unmet needs. Families are helped to view their needs as behaviors to change, and problems are reframed to give attention to what they would like to improve or do differently in order to be able to provide safe and appropriate care to their children or to carry out their roles within the family. Reinforcing their strengths provides them with motivation that they have the capacity to make needed changes.

**Mississippi Practice Model**

In the CFA, there is a strong relationship between needs and risks.  The CFA encompasses not only information pertaining to risks and safety concerns but also addresses broader issues impacting the family's ability to constructively meet its needs over time.  While risk assessments focus on presenting issues regarding the immediate safety and potential of future child maltreatment, the CFA gives additional attention to the impact of child maltreatment, the implications of trauma, and the long-range view of the family's stability and well-being.

This broad spectrum of information and the compilation of strengths and needs address the following life domains:

◆ Family history of agency involvement

◆ Family functioning/family dynamics

◆ Parent-child relationship

◆ Marital relationship

◆ Parental and/or caregiver family background and childhood

◆ Educational and intellectual history and status of family members

◆ Psychological/emotional/behavioral history and status of family members

◆ Medical/health history and status of family members

◆ Employment/ vocational/financial information

◆ Legal history/military history

◆ Housing/home environment

◆ Social/peer relationships/community and cultural affiliation

◆ Family support/resources

With a thorough identification of the needs of the family along with its strengths and resources, the likelihood of developing a service plan based on an overall understanding of the family is greatly enhanced.

The practice of assessing family strengths and needs is supported through an infrastructure that is largely built on policy, training, resources, and ongoing monitoring and evaluation.   Based on a review of DFCS' current practice along with its systemic supports, the following summary provides an overview of how these areas support the practice of comprehensive family assessments and where they need to be strengthened.

## Section 1:  Inputs

### a.  Policy

As a result of the Olivia Y. Settlement, including its requirement that MDHS achieve accreditation with the standards set forth by the Council on Accreditation (COA), DFCS is currently in the process of drafting and/or revising a number of policies and procedures in order to comply with the provisions of the Settlement Agreement.  There will be a heightened focus in

practice on the utilization of standardized tools and decision-making criteria to guide assessments and interventions with families. Consequently, some of the existing policies will undergo substantial modifications.

In reviewing DFCS' policies, there are primarily two existing policies that encompass a vast array of case activities and have particular relevance to the practice of comprehensive family assessment. The following examines these policies in closer detail.

### *Child Protective Services*

This policy encompasses requirements, procedures, and practice guidelines relating to investigations of reports of child maltreatment and to ongoing protective services for families deemed to be at potential risk for future maltreatment. Included in this policy are procedural requirements pertaining to an assessment of safety and risk through the use of specific tools as part of a safety and risk management framework.  At the conclusion of the investigation, the CPS policy directs that a case be opened for services if there are any safety concerns present and that ongoing assessment process should continue.   In July 2007, DFCS implemented a revised assessment process known as the Strengths and Risk Assessment (SARA).  Although the CPS policy has not yet been revised to include the SARA process in its current version, policy bulletins have been issued to direct that the SARA take the place of the ongoing assessment referenced in the CPS policy.  Further directions in policy bulletins regarding the SARA, including its documentation in the automated child welfare information system, MACWIS, indicate that it builds on the Safety Assessment/Risk Assessment process that takes place during the investigation of child maltreatment. Within the CPS policy are guidelines stating that the ongoing assessment should be strengths-based, culturally sensitive, and developed with the family and should focus on helping them to recognize and remedy the conditions so that children can safely remain in their own homes. From the point in time in which a case is opened for services, the policy directs that the following occur:

◆   A comprehensive assessment will be completed within 30 days of the case opening.  The worker will complete the assessment within 25 days, allowing five additional days for supervisory review and approval.

◆    A service plan will be developed in conjunction with the completion of the comprehensive assessment.

The SARA is comprised of three interrelated documents that include an optional Interview and Documentation Guide, the Strengths and Risk Assessment Rating Reference, and the Strengths and Risk Assessment Tool. The intent of the entire SARA process is to assist the worker in making appropriate decisions about the level and type of intervention required by the family, using observable indicators of risks and strengths/protective factors. In doing so, the assessment is a more detailed exploration of the presenting conditions and issues relating to the caregivers and the children that were the subject of the report of child maltreatment.   The policy does not explicitly address the inclusion of non-custodial parents, maternal and paternal relatives, or stakeholders in the assessment process except as noted in the provisions regarding actions to be taken in the event that removal of the child is likely.  The family's strengths are identified from a checklist and are not specifically identified or labeled as strengths within the SARA documents. In contrast to the full spectrum of conditions listed under each sections of the Rating Reference,

the number of strengths that are listed is quite limited.  Moreover, it is not clear in the policies how the family's own identification of their strengths are incorporated or re-framed into the specific checkboxes on the instrument.  The SARA does not include a conceptual framework of identifying needs as the basis for the behaviors that the individual family members may be exhibiting, and these are framed as risks throughout the SARA tools and processes.

The broad categories that comprise the determination of the score and associated level of risk derived at through the use of the Strength and Risk Assessment Tool are delineated in five sections with 17 risk factors that are associated with child maltreatment.

The five sections are:

♦   *Baseline Level of Risk:* Considers the prior history of child abuse and neglect and current incident of abuse and/or neglect.

♦   *Child Characteristics:* Considers the vulnerability of the child.

♦   *Caregiver Characteristics:* Considers the past and present parenting functioning of the child's caregiver.

♦   *Familial, Social and Economic Factors:* Considers factors such as family stress, social support, economic resources and domestic violence.

♦   *Overall Level of Risk:* Considers the cumulative ratings of the 17 factors reach a determination of the overall level of risk to the most vulnerable child in the family.

In its entirety, the SARA documents are fairly expansive.  The Strengths and Risk Rating Reference alone consists of 526 factors to be evaluated and assigned a score which then is computed to a risk level using the Strengths and Risk Assessment Tool.  The section, Child Characteristics, captures information relating to the child or children who are the subject of the report or are considered to be vulnerable or at risk, and therefore, the strengths of all of the children within the family are not included in the assessment.  Within the Child Characteristics section, there is a list of 68 descriptors, and 27 of these items comprise a mental health screening of the child.   Information relating to the SARA indicates that if any one of these 27 descriptors of conditions is present, further mental health evaluation is necessary and is to be addressed in the service plan.  Because the current CPS policy does not yet include the procedural requirements and guidelines relating to the SARA, it is not clear how the mental health screening will be utilized with families receiving protective service interventions.

Although the SARA is intended to be a comprehensive assessment of the family that builds on the initial assessment from the investigation, it primarily examines the presenting circumstances relating to the family's current level of functioning rather than more fully exploring the underlying needs and conditions that affect their ability to function effectively.  The policy bulletins relating to CPS interventions do contain some reference to the dynamic nature of the assessment process, requiring that the SARA be updated every 90 days as part of the process for ongoing case plan review.  Supervisory review of the updated assessment and revised case plans is required.  Moreover, a current SARA assessment is required for all cases prior to case closure.

It is pertinent to note that input received from focus groups with supervisors revealed some concern about the use of the SARA adversely impacting the worker's efforts towards critical thinking and analysis of the information that has been gathered in the assessment. Consequently, they observed some tendency of staff to focus on the completion of checkboxes in order to complete a task rather than to guide a thoughtful analysis of the underlying issues within a family. Input received from focus groups with the workers also included some mixed responses as to the effectiveness of the SARA as a tool for assessing families. Some commented on the length of the process for entering information and said that the scoring was not always congruent with the issues facing the family. Additionally, input was also received from a focus group with Regional Directors who said that revisions to the ongoing assessment process and accompanying tools went too far and the SARA "got out of hand." From all three of these focus groups, there were preferences by several in attendance for reverting to the previous ongoing assessment tools and required documentation in the narrative format in MACWIS.

### *Foster Care*

The requirements, procedures, and practice guidelines contained in the foster care policies are heavily child-focused and provide for comprehensive assessment activities across a broad spectrum of life domains and functioning. The foster care policies were revised in February, 2009, to incorporate the SARA tools and processes into the requirements that a comprehensive family assessment guide all planning for children who have entered the foster care system. These policies provide a more expansive set of requirements regarding a range of assessment activities concerning all children placed in out-of-home care. The following list details the specific requirements pertaining to the comprehensive assessment process when a child has been placed into foster care:

- A comprehensive assessment must be initiated and completed within 30 days of the child's entry into care.

- As a part of the comprehensive assessment, a mental health assessment must be conducted within 30 days of the child's placement for all children, ages 4 and above, or within 30 days of their 4th birthday while in care. The SARA rating reference tool is to be used for the initial screening of mental health issues and if any of the 27 specific issues or conditions are present, a referral must be made to a mental health professional for a more thorough evaluation.

- A medical examination must be conducted within 72 hours of placement for any child that enters foster care and on an annual basis thereafter.

- An assessment for early intervention services must be conducted for all children in care, from birth to 36 months.

- A referral for a dental examination must be obtained within 90 days of entry into care for all children over the age of 3 years followed by annual visits after that time.

- The comprehensive assessment is submitted for supervisory approval within 30 days of the child's entry along with separate individual service plan for the child and the adult, and both are to be updated every 90 days.

- Children in foster care are to be visited at least once per month by the worker as part of the ongoing assessment of their safety and well-being while in out-of-home care. Children that

are placed in therapeutic foster care are to be visited twice per month to ensure that their needs are being met.

◆ The service needs for youth who are 14 years of age and 16 years of age will be assessed to consider appropriate plans to advance independent living skills.

The foster care policies place a strong emphasis on the assessment of medical, dental, developmental, and mental health needs of children placed in out-of-home care but do not have the same thorough focus on their educational functioning.  There is a component within the Foster Care Policies entitled, Assessing Educational Needs.  The focus of this particular component is on the procedures relating to school attendance and the needs of the exceptional child that  may require special services as determined by competent professionals in such disciplines as medicine, psychology, special education, speech pathology, social work) through the Individualized education Program (IEP).  The policy does not specifically address educational screenings as a part of the comprehensive assessment, and the Child Characteristics section within the SARA provides only minimal descriptors relating to the child's educational status and history.  The SARA does not include an assessment of dental needs although it is referenced as a requirement in the policies. On the other hand, the policies give considerable attention to assessing the needs of youth, age 14 and older, as they prepare for independent living and transition from the foster care system.  However, it is not clear how the specialized assessment tools for developing an independent living plan are integrated into the overall comprehensive assessment utilizing the SARA tools to guide case planning activities. Respondents to the survey indicated that the SARA is frequently or almost always effective in assessing strengths and needs about 53 percent of the time.  Among the concerns noted by staff in the survey were that the protocol is too lengthy and does not lend itself to completion with the family.

In rating their effectiveness in conducting initial screenings of children, respondents to the survey indicated that they are frequently or almost always effective in screening for therapeutic, education, and developmental concerns about 70-73 percent of the time.  They indicated slightly less effectiveness in screening of mental and behavioral health needs (67 percent frequently or almost always), and slightly more effective in screening for physical health needs (80 percent frequently or almost always).  Some respondents indicated that there are too many distinct and separate assessments and screenings and others noted that these assessments ensure that the specialized needs of children are clearly identified.  Regarding the effectiveness of conducting initial screenings, resource parents were less positive about the consistency of this practice.  In focus groups with resource parents, there were a number of concerns shared that initial screenings do not take place within the timeframes required by the policies.  Several of the resource parents commented that this is due, in part, to the lack of dental and mental health services in many of the areas of the state.  A major concern for many of the resource parents is the lack of information that is shared with them regarding the results of these screenings. Although the policies require that health records be maintained and provided to foster parents and caregivers, several of the resource parents in the focus group indicated that information about the health of children in their care is not shared with them at the time of the initial placement or after screenings and evaluations are conducted.

**Mississippi Practice Model**

The findings from the case reviews that were conducted of a sample of 30 children in foster care revealed that MDHS often conducts initial screenings to identify the needs of children regarding their medical, dental, and mental health.  In some instances, the needs are not explicitly documented in the case record and are not consistently addressed with timely service intervention in accordance with policy requirements.  Of the 30 cases we reviewed, we found the following:

♦ Initial health screenings were conducted in 25 of the cases. There was not sufficient information or documentation in the remaining five cases to make a determination.

♦ Initial dental screenings were completed in 17 of the cases, and not completed in one of the remaining 13 cases. No determination could be made in 11 of these cases due to a lack of information while one case was determined to be not applicable.

♦ Initial mental health screenings were completed in 12 of the cases and were not completed in one case.  Fifteen cases were determined to be not applicable and two cases did not have sufficient information to indicate that a screening had been done.

| Please rank your perception of your agency's effectiveness in conducting initial screenings of children to identify needs in the following areas: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Sometimes | Frequently | Almost Always | No Info/ NA | Total |
| Mental/behavioral health: | 0 (0%) | 6 (3.53%) | 34 (20%) | 50 (29.41%) | 64 (37.65%) | 16 (9.41%) | 170 |
| Physical health: | 0 (0%) | 2 (1.18%) | 18 (10.59%) | 44 (25.88%) | 92 (54.12%) | 14 (8.24%) | 170 |
| Therapeutic needs: | 0 (0%) | 4 (2.33%) | 33 (19.19%) | 58 (33.72%) | 62 (36.05%) | 15 (8.72%) | 172 |
| Education: | 0 (0%) | 2 (1.18%) | 29 (17.16%) | 43 (25.44%) | 80 (47.34%) | 15 (8.88%) | 169 |
| Developmental levels and concerns: | 0 (0%) | 4 (2.34%) | 34 (19.88%) | 45 (26.32%) | 74 (43.27%) | 14 (8.19%) | 171 |

Beyond the initial screenings, respondents to the survey also rated their effectiveness in assessment activities.  As indicated in the results below, they indicated that they are frequently or almost always effective in conducting most assessment activities about two-thirds of the time. They rated their effectiveness strongest in assessing the needs of custodial parents (about 70 percent almost always or frequently effective) and in assessing the needs of foster caretakers (about 71 percent almost always or frequently effective).  They rated themselves the weakest in assessing the needs of non-custodial parents (about 67 percent frequently or almost always effective.   Several of the respondents indicated that it would be helpful to have more assessment tools that are "field-based" as much of this work is currently completed and documented in MACWIS when they return to their offices.

The results from the 30 case reviews indicated that MDHS frequently assessed the needs of custodial parents as part of the development of the case plan and ongoing involvement with the family. We could find very little documentation concerning the assessment of non-custodial parents.  The findings from the case reviews also lend support to the staff's concerns regarding

documentation as many of the cases did not contain sufficient documentation regarding the assessments and follow-up referrals and services.

| Please rate your perception of your agency's effectiveness in each area below regarding practices related to strengths and needs assessments: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Sometimes | Frequently | Almost Always | No Info/ NA | Total |
| Conducting initial comprehensive strengths and needs assessments prior to developing a case plan: | 0 (0%) | 2 (1.18%) | 36 (21.18%) | 52 (30.59%) | 60 (35.29%) | 20 (11.76%) | 170 |
| Conducting on-going assessments of strengths & needs: | 0 (0%) | 3 (1.75%) | 35 (20.47%) | 51 (29.82%) | 60 (35.09%) | 22 (12.87%) | 171 |
| Assessing non-custodial parents: | 0 (0%) | 14 (8.28%) | 38 (22.49%) | 49 (28.99%) | 48 (28.4%) | 20 (11.83%) | 169 |
| Assessing custodial parents: | 0 (0%) | 2 (1.18%) | 29 (17.16%) | 56 (33.14%) | 63 (37.28%) | 19 (11.24%) | 169 |
| Assessing all children in the home: | 0 (0%) | 8 (4.71%) | 30 (17.65%) | 52 (30.59%) | 61 (35.88%) | 19 (11.18%) | 170 |
| Assessing foster caretakers' ability to provide safe & appropriate care for children: | 0 (0%) | 4 (2.35%) | 28 (16.47%) | 50 (29.41%) | 70 (41.18%) | 18 (10.59%) | 170 |
| Assessing educational needs of children: | 0 (0%) | 4 (2.34%) | 34 (19.88%) | 44 (25.73%) | 72 (42.11%) | 17 (9.94%) | 171 |
| Obtaining timely professional specialized assessments e.g., psychological, drug, educational: | 0 (0%) | 7 (4.19%) | 29 (17.37%) | 50 (29.94%) | 63 (37.72%) | 18 (10.78%) | 167 |

A number of the provisions in the foster care policies pertain to service planning requirements that are closely related to the practice of assessing the individual strengths and needs of family members on an ongoing basis throughout the life of the case. There are guidelines related to the family team meetings and the inclusion of the parents, age appropriate children, relatives, and other individuals that the family would like to be a part of the assessment and planning processes. Permanency planning requirements are covered in great detail. The policies also include provisions pertaining to reunification, including the need to address underlying conditions that resulted in the child's placement into care as part of the service provision directed towards reunification efforts. There is also additional information in the foster care policies that addresses the need to assess and evaluate visits as part of the determination of progress in achieving permanency goals. In the provisions related to identifying and matching appropriate placements to meet the needs of a child, the importance of assessing the child's needs and the caregiver's capacity is underscored. The individual service plan for the child and the adult

should include documentation of the specific issues that have been identified as part of the ongoing comprehensive assessment along with the services to address each of them.

Overall, respondents to the survey indicated that the Department's policy on assessing strengths and needs was frequently or almost always effective about 55 percent of the time.

### b. Training

### Pre-Service Training

DFCS provides new caseworkers with 10 weeks of training, four of which are classroom-based and are held in conjunction with an on-the-job component that allows for coaching and practice of the developing skills set. The training curricula contains several modules relating to the needed skills, knowledge, and competencies for conducting strengths-based, comprehensive family assessment with an emphasis on family engagement. The following modules are specifically relevant to the practice of comprehensive family assessment:

♦ *Core Relationship Skills in the Child Welfare Setting, Social Worker's Guide to Family Centered Practice:* This module underscores the importance of the identification of strengths as the foundation for engaging families and facilitating desired changes. The module also gives some focus on working with families to identify needs and to prioritize these with specific services and activities that are the most meaningful for the family through service planning;

♦ *Assessment in the Child Welfare Setting: Intro to Assessment:* The module provides a foundation for conducting an assessment and reinforces a strengths/needs-based approach to understanding families along with methods for reframing negative behaviors in the development of case planning goals and priorities. The training module also provides for exploration of the role that culture plays throughout the family assessment process.

♦ *Assessment in the Child Welfare Setting: Assessment Application:* This module introduces the SARA and instructs participants how to use it as part of the assessment process, including its relationship to the development of the ISP. The *Family Centered Strengths and Risk Assessment Guidebook* is provided as a part of this training and some of the policy requirements related to the SARA are covered as well.

Two other training modules provide some additional information related to family assessment. *Assessment in the Child Welfare Setting: Visualizing the Family and its Support System* provides training on the use of several techniques and tools for conducting family assessments. Instruction is given to participants on using the eco-map to assist in family assessment, including the opportunity to practice this approach. The module on *Assessment in the Child Welfare Setting: Child Development* provides information on how to assess the child's developmental functioning with specific attention to developmental delays, regression and the biological and environmental factors and trauma that have contributed to them. DFCS also offers a training module, *Assessment in the Child Welfare Setting: Overview of Youth Court* which gives some focus on using the assessment for case planning and references the client's assets and strengths. There is some language regarding the use of a problem statement in the ISP, and it does not include a more positive framework of looking at behaviors as a reflection of underlying needs but some of

the other elements of building on strengths for the development of goals and intervention strategies are covered in this module.

### Advanced Skills Training

DFCS offers three curricula for advanced skills training to staff for experienced staff, but there do not appear to be any requirements regarding standards for ongoing professional development. Although there is a training module that is available that further addresses the practice of family assessment, it is not clear whether staff consistently participate in this training.  The two-day module, *Advanced Skills Training: Assessment,* covers a broad array of interviewing skills and gives further attention to understanding the various types of specialized assessment tools and processes, including forensic interviews. The other two modules offer advanced skills building in family engagement and case planning.  More advanced training in developing specialized skills and expertise in understanding families with substance abuse issues, domestic violence or mental illness does not appear to be available.

### Supervisory Training

Currently, newly-appointed DFCS supervisors receive one week of basic supervisory training that is supplemented with the use of a 24 week training guide of professional readings and activities that shape the mentoring process that takes place between the supervisor and an assigned mentor.  This training does not appear to be expansive enough to build skills for coaching and developing staff or for enhancing the skills of supervisors to provide clinical supervision in order to direct positive outcomes in assessment and case planning activities with families.

It is worth noting that many of the current training modules do not address a number of specific policy requirements that have been issued as a result of the *Olivia Y* settlement and COA standards.  For instance, the requirements regarding specific assessment activities for children upon entry into foster care do not appear to be emphasized and reinforced in training and many of these activities have tight timeframes.  Moreover, approaches for integrating various assessment processes with the overall SARA framework as the model for comprehensive family assessment and case planning are not readily apparent from reviewing the training materials.

Respondents to the survey indicated that the pre-service and ongoing training they receive on assessing strengths and needs is frequently or almost always effective just over half the time (53 percent and 51 percent respectively for pre-service and ongoing training).  However, a number of the respondents indicated that while there is continued availability of ongoing training, they see a need for additional training regarding the use of the assessment tools along with more intensive training in assessing the needs of children and families.

| Please rate your perception of your agency's effectiveness in each area below regarding supports related to strengths and needs assessments: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Sometimes | Frequently | Almost Always | No Info/ NA | Total |
| Pre-service training on assessing strengths and needs: | 2 (1.19%) | 10 (5.95%) | 45 (26.79%) | 40 (23.81%) | 49 (29.17%) | 22 (13.1%) | 168 |
| Ongoing training on assessing strengths and needs: | 1 (0.6%) | 16 (9.52%) | 45 (26.79%) | 42 (25%) | 44 (26.19%) | 20 (11.9%) | 168 |

## c. Resources

The *Olivia Y* settlement requires that an extensive array of services be available for children that are placed in out-of-home care to ensure their safety and well-being, preserve connections and promote reunification when appropriate, and to develop permanent placements for any child that cannot return home.  In order to develop the expansive array of services that are required by the settlement, there are additional provisions in place regarding systemic supports to be established including caseload standards, resource specialists, adoption consultants, performance-based contracting, and continuous quality improvement to track, monitor, and evaluate service delivery. Although DFCS has not yet hired all of the staff to handle those specialized responsibilities outlined in the settlement related to resource development, there are a number of efforts underway to acquire additional services through requests for proposals and the re-issuance of contracts that will amplify existing services or include modifications or diversification in the type of services provided and how they are delivered.  However, many of the statewide and community services are not currently procured through contractual agreements and are purchased through less formal agreements without a great deal of negotiation of rates, service approaches and treatment modalities, specific timeframes and planned length of intervention, and expected outcomes and results of these services.  The following examines the capacity of DFCS' current service array as it relates to the resources needed to support the practice of comprehensive family assessment, including those professional screenings and evaluations that augment the capacity to identify the strengths and needs of each individual member of the family:

### Medical, Mental Health, and Substance Abuse Services

DFCS relies heavily on the Medicaid provider network for its medical, dental, mental health and psychiatric services to meet the needs of all families and children with whom they have involvement.  The local mental health centers are the primary source for many of the specialized assessment and evaluations and they are not able to meet the needs of all families across the state. Consequently, there is a shortage of available providers and frequently, there are waiting lists for mental health screenings and psychological examinations and this is also true for accessing providers who can provide dental examinations and services.  Additionally, there are some areas of the state where medical evaluations are not readily available. The local public health departments are often the first option for medical exams and EPSDT screenings, and there are some satellite offices that have limited working hours and days of operation.   In some instances, these services are not available at all or are very limited, necessitating lengthy travel for families and staff. For the most part, rural areas of the state have few resources and may have

to go to other counties to access medical, dental, or mental health services.  In particular, the coastal areas have the fewest resources.  Outpatient substance abuse services are extremely limited and drug screenings are costly because private providers have to be utilized for this service. This impacts DFCS's capacity to obtain additional evaluations that are needed to conduct a thorough and comprehensive family assessment.

### Educational Services

DFCS staff, along with several providers and stakeholders, reported that it is extremely difficult to obtain timely educational evaluations for school-age children who may be in need of specialized education services.  Therefore, this area of the child's functioning is not consistently addressed in the comprehensive family assessment process and subsequently, in case planning. There were also reports from staff about difficulties with the Individualized Educational Planning Processes (IEP) regarding the involvement of DFCS and the assigned surrogate parent for children in out-of-home care.  This issue also impacts how the comprehensive family assessment process can successfully drive the service planning process.

### Placement Services

DFCS's capacity to assess and match appropriate placements based on the identified needs of children is significantly hindered by the lack of placement resources, and consequently, staff must sometimes use a less appropriate placement for a child to obtain needed evaluations or assessments that are otherwise unavailable.  Input from the focus groups with DFCS staff indicated that acute psychiatric placements are sometimes the only means for obtaining a timely psychological examination or medication evaluation that is covered by Medicaid.  The lack of available foster homes across the state creates substantial hardship for workers to assess the child's adjustment to the placement in the foster home, the impact of separation from the birth family, and the capacity of the foster parents to meet the child's needs.

### Coordination of Assessment and Planning Activities

For youth receiving independent living services, DFCS has a statewide contract for a full range of services.  The contractor administers the Ansell-Casey Inventory to assess the youth's strengths and needs in order to develop an appropriate case plan that addresses the goals regarding independent living.  DFCS staff report not always receiving a copy of the provider's assessment of the youth to incorporate it into the ongoing comprehensive assessment process. We also heard that DFCS does not always request copies of the assessment.  As a result, there appears to be two distinct assessment and case planning approaches for serving the youth.  From the case reviews that were conducted involving a sample of 30 youth that are eligible for independent living services, we found that the MACWIS files do not contain copies of the Ansell-Casey Inventory.  Furthermore, the lack of documentation in the files presented concerns that the ILP assessment is not utilized in the development of the case plan.  However, in reviewing a sample of ten of the service provider's case files, we found a copy of the Ansell-Casey Inventory in each of the records.

This need for further coordination does not appear to be limited to the ILP assessment process. Several of the local mental health centers also utilize specific assessment and evaluation tools such as the CAFUS but this practice varies from county to county. DFCS staff indicated that they do not always receive copies of progress reports and assessments from other providers,

particularly some of those who serve children in out-of-home care and therefore, they are unable to include this information in order to have an accurate assessment of the child's progress and any issues needing attention or resolution. It is not clear whether DFCS has requested these and when needed, obtained confidentiality releases from parents and guardians in order to secure copies of these assessments and reports.

DFCS's current challenges in accessing needed services for children and families directly impact the ability to link the comprehensive family assessment to the appropriate and timely delivery of services. Survey respondents rated the availability of providers to conduct specialized assessments as frequently or almost always effective less than half the time (about 46 percent). They noted significant difficulty in accessing qualified professionals, citing waiting lists and a lack of available resources, particularly for mental health evaluations and treatment. From the focus group with resource parents, they, too, commented on the significant lack of dental and mental health services and noted that frequently, accessing these services is challenging due to the costs and time involved in traveling long distances to the more urban settings where these services are available.

### d.  Monitoring

Monitoring is an essential activity for all child welfare agencies. While the focus of some monitoring activities must include compliance with Federal and State mandates, there should also be a focus on monitoring of qualitative measures and outcomes as part of ongoing system improvement in child welfare practice. As part of the requirements for compliance with the *Olivia Y.* Settlement and the COA Standards, DFCS must develop a system for continuous quality improvement within the timeframes established in the implementation plan, and work is underway to develop a framework to meet this requirement. DFCS currently monitors case-specific outcomes and systemic performance through three primary efforts- Foster Care Reviews, The *Olivia Y.* Settlement Monitoring/Reporting Requirements, and Supervision.

### Foster Care Reviews

While there are questions on the FCR guide that relate to the practice of assessing the individual strengths and needs of all family members, there is not a specific question that rates whether the assessment was conducted or if the assessment was timely, accurately identified the family's strengths, needs, and resources, and whether the assessment supported the case plan goal and services. It is also not clear whether families and stakeholders are asked about the quality of the family assessment, including information related to their participation in identifying their strengths and needs. While there are policy provisions related to county conferences, there is not a specific policy regarding the FCR and the procedures manual has not been updated in a considerable period of time.

### Olivia Y Settlement Monitoring and Reporting

Much of the reporting, at this stage of implementation, relates to the required assessments of particular areas of the child welfare system as a baseline for what will be captured in subsequent reporting measures. At the present time, the only measure related to comprehensive family assessment pertains to the educational needs of children in foster care and our understanding is that the court monitor is still in the process of developing the review protocol that will evaluate DFCS' performance in this area.

## Supervision

There are several questions on the SAR that directly relate to the practice of assessing the individual strengths and needs of family members that go beyond asking if an assessment was completed and looks further at its content and quality. The particular items on the SAR that are relevant to comprehensive family assessment are listed below:

♦ Does the strengths and risk assessment indicate further evaluation by a mental health professional?

   o What are the child characteristics (vulnerability/self protective skills) as noted in SARA

   o What are the child characteristics (special needs/behavioral problems) as noted in SARA

♦ Are tasks relevant to the presenting problems?

♦ What tasks have been and need to be completed?

It should be noted that these questions only address one particular child within a family, presumably the child that was the subject of the initial report of child maltreatment or one who has been deemed at risk or vulnerable and does not give consideration to all of the children. It does not appear that there are additional questions in the SAR pertaining to other aspects of a comprehensive family assessment, including : 1) whether family members fully participated in the assessment and had input into identification of their strengths and needs, 2) whether non-custodial parents, relatives, and other significant participated and provided information regarding the strengths and needs of the family, 3) whether underlying conditions that resulted in the need for child welfare intervention have been identified and addressed, 4), whether the assessment is ongoing and reflects changes within the family since the initial assessment was conducted, and 5) whether the case plan was developed to address the key issues identified during the assessment process.

As a supervisory tool for monitoring qualitative aspects of case practice beyond those that pertain solely to case management, the use of the SAR provides some opportunities to specifically direct individual case activities, and provide clinical supervision in order to facilitate positive outcomes for children and families. However, input from the focus group with the supervisors revealed that some staff find the SAR to be overly focused on compliance rather than a more meaningful examination of specific issues and dynamics of case practice. Supervisory monitoring needs further refinement to support the overall approach to comprehensive family assessment that this practice model proposes. Moreover, it is not clear how the supervisor monitors the worker's actions and the progress of case planning after issuing the supervisory feedback.

### e. Summary of Inputs

## Policy

From reviewing the current policies, the following strengths were identified regarding this component of the practice model:

♦ The policies address the timeliness of assessment activity by requiring that it be conducted within 30 days of the case opening in order to support the development of the case plan. It

further directs that the ongoing assessment should build on the initial assessment of safety and risks conducted during the investigation of child maltreatment, thereby establishing continuity.

♦ The policies reflect a commitment to an ongoing comprehensive family assessment process that is strengths-based, culturally-sensitive, and inclusive of the family's input and involvement.

♦ The policies underscore the dynamic and continuous nature of the comprehensive family assessment by requiring that it be updated every 90 days as part of the case planning review process.

♦ The policies, particularly the Foster Care Policies, emphasize the importance of early identification of the physical and mental health needs of children as part of the comprehensive assessment process. The requirements for specific health and mental health screenings and evaluations, along with specific timeframes, ensure that these issues that affect the well-being of children are addressed, along with potential risks, as a part of the comprehensive family assessment process.

The gaps in the policies relating to the comprehensive family assessment component are noted below:

♦ There is a lack of clarity in the policies relating to the implementation of the Strengths and Risk Assessment as the CPS policies have not yet been revised to reflect this change in practice. For example, it is not clear how DFCS will address the mental health screening component of the SARA in working with families receiving protective services.

♦ The policy provisions regarding the use of the SARA tools during the ongoing assessment process do not clearly define how the family's identification of their strengths and needs is reflected in the documents. Moreover, it does not appear that strengths and needs are identified for all family members or that any family members and stakeholders who reside outside the home are necessarily involved in the assessment process. For the most part, the concept of "needs" is not evident in the current approach to assessing families.

♦ The overall SARA framework and tools, although expansive, are heavily focused on risks and the presenting circumstances that necessitate child welfare intervention. The underlying issues affecting the well-being and long-term stability of the family and each of its members are not given sufficient focus in the current implementation of the SARA. The checkboxes on the Rating Reference are not conducive to individualizing the strengths and needs of all family members, and the particular listing of strengths comprise a significantly smaller proportion in relation to the numerous and detailed descriptions of maltreatment as well as the characteristics of the caregiver and child deemed to be at risk. As a whole, the broad spectrum of life domains that relate to the overall family's functioning are not fully assessed in the SARA framework. Feedback from the focus groups with both workers and supervisors noted that the language and content of the SARA tools are not "family friendly" and that some families have found it to be offensive when the terminology from the SARA is later referenced in the case plan. Because the use of SARA does not easily lend itself to engaging the family in the assessment process, there is a risk of staff completing the assessment as part

of the required documentation in MACWIS without having meaningful involvement and participation from the family.

## Training

Strengths that were noted in the review of the training curricula are listed below:

♦ The importance of family assessment as the foundation of child welfare practice is woven throughout the various modules and is the focus of most of the skills set and competencies to be developed throughout the curricula.

♦ The training places an emphasis on the identification of strengths and protective capacities in the comprehensive family assessment process and provides opportunities for applying the family's strengths as strategies are developed in case planning.

♦ The value of having families engaged and involved in the assessment and case planning processes and techniques for achieving this are highlighted in a number of the modules.

The following needs were noted in the current training:

♦ There is not an emphasis on the assessing the underlying conditions of families who come to the attention of the child welfare agency or a conceptual framework regarding needs-based practice.

♦ Advanced training is very limited and is not mandatory for staff to further develop their skills and competencies on an ongoing basis.

♦ The Supervisor Training Module does not appear to be of sufficient depth to develop supervisors' capacity for coaching staff, monitoring performance, and providing a model of clinical supervision to support a comprehensive family assessment model of practice with families.

♦ A number of policy requirements are not covered in training which may be intentional if the purpose is solely skill-building but given the necessity for DFCS to issue new policies and revise several existing policies, reinforcement of the relationship between policy guidelines and practice seems indicated as a need for training.

## Resources

The following lists strengths found in the resource array that support the practice of comprehensive family assessment:

♦ DFCS is aware of its limitations in securing specialized screenings, assessments, and evaluations, and seeks out all available services to meet these needs.

♦ The larger counties do have a richer array of services including providers that offer specialized evaluations and screenings that enhance the quality of the comprehensive family assessments.

The needs that were noted were previously described fully under this section but are summarized below:

◆ There are insufficient resources to meet the needs of children and families to be screened, evaluated, and treated for developmental delays, dental care, mental health services, substance abuse issues, sexual abuse victimization, domestic abuse and trauma, and other concerns that affect their functioning.

◆ There is a lack of coordination and collaboration among the provider stakeholders and DFCS in working to ensure a smooth and integrated approach to assessing the strengths and needs of children and families.  Providing copies of assessments and evaluations on a timely basis along with progress notes are essential to the integrity of the comprehensive family assessment process and the dynamic nature of case planning. Additionally, the sharing of health, psychological, and educational information with resource parents does not appear to occur consistently.  In order to meet the needs of children in their care, resource parents should have copies of relevant health records and should be continuously informed about the status of the children's health, emotional, and educational well-being.

### Monitoring

After reviewing the current processes for monitoring system performance and case-specific outcomes, the following strengths were identified:

◆ There are some established mechanisms for regular feedback to various levels of the organization regarding case status and system performance. The Foster Care Review system provides information to the Regional Directors and supervisors regarding strengths and recommendations in specific cases, and the use of case conferences and the Supervisory Administrative Review tool provide further direction to the worker that is more directly related to the practice of comprehensive family assessment.

◆ The consumer satisfaction surveys provide an opportunity for families to provide feedback to DFCS on their experiences and involvement in the assessment and case planning processes.

The following gaps were also noted:

◆ There are very few indicators or outcome measurements relating to the quality of comprehensive family assessments in any of the current methods for monitoring practice across the child welfare system.  The Foster Care Review process only addresses foster care cases and there is not a parallel review process for in-home cases where the quality of comprehensive family assessments is also very important.

◆ Much of the current approach to monitoring centers on compliance with requirements and does not fully address more qualitative aspects of practice.

## Section 2:  Outputs

### a.  Products

### Policy

◆ *Adopt a comprehensive family assessment process.*  There is a need to adopt an approach to comprehensive family strengths and needs assessment that goes beyond assessing safety and risk, and more fully addresses other domains that include permanency, physical and mental

health, educational status, and underlying issues that led to DFCS involvement, such as domestic violence, substance abuse, etc.  This should serve as the foundation for family engagement, case planning, and service provision, and would lead DFCS to expand its current approach to assessment in several ways:

o   The starting point for the CFA should begin with the gathering of information during an investigation or referral and become formalized with the decision to open a case.

o   The use of a distinct assessment tool for determining risks and taking appropriate actions to ensure safety should be used as a part of the broader comprehensive family assessment process.

o   The family's strengths and needs concerning permanency and stability and physical, emotional and educational well-being are evaluated and addressed with the same thoroughness as safety and risk issues.

o   The assessment should be firmly based on an awareness of and sensitivity and respect for the importance of culture, ethnicity, race, and language in developing an understanding of families.

o   The assessment should identify underlying issues such as substance abuse, domestic violence, mental health conditions, child development and so forth at the earliest stage in case planning in order to ensure that they are addressed promptly with sufficient intensity in case planning and service provisions.

o   *Integrate assessment activities into policy.*   There is a need to integrate policy that guides the use of the comprehensive assessment throughout all casework activities with children and families. The policy requirements and guidelines regarding the CFA appropriately fit with the CPS policies and are further referenced in the provisions regarding assessment and case planning activities in the foster care policies. As DFCS issues new policies and procedures and revises others, the CFA should be central to all provisions related to ongoing assessment throughout the life of the case.  Our recommendations for both new and revised policy regarding the CFA  should address the following areas:

- Consider discontinuing the full utilization of the SARA assessment processes and tools.  If the SARA is utilized to assess ongoing risks and safety issues as part of the broader CFA, modifications should be made to its length and its content in order to make it more conducive to adapt its use with families.

- Documentation of the CFA should be in a consistent format, either as a distinct, formal document or recorded in the narrative with appropriate headings that capture all of the needed information across the life domains.

- The CFA should serve as part of the ongoing communication with the family and be updated at regular intervals as a part of case plan review activities to reflect progress, changes in the family's circumstances, determinations about service provision, changes in permanency goals, and other dynamics occurring in the case.

- In the event that a child is placed in foster care, the CFA should remain the mechanism for ongoing assessment that incorporates other processes such as the child's health and developmental screenings, mental health examinations, educational testing, and the Ansell-Casey Inventory to assess the strengths and needs of adolescents in order to develop a plan for independent living.

- All cases that are open for services should have a CFA that is conducted prior to the development of the individual service plan in order to guide planning and decision making.

- Family involvement should be required at the beginning of the assessment and efforts should be made to ensure their full participation in the identification of their individual strengths and needs, including non-custodial parents and those caregivers who do not reside in the household.

- The CFA should be based on information gathered from interviews along with a thorough review of the case record and any written materials, reports, evaluations, and professional assessments that exist or are needed to develop a thorough understanding of the family and the underlying conditions that necessitate the agency's involvement and intervention.

- The CFA should be reviewed and approved by the supervisor prior to the initial individual service plan and before ISP reviews/updates.

- On an ongoing basis, the CFA should be updated to reflect changes in the family's circumstances, progress in achieving goals, revisions in service delivery, changes in placements, decisions regarding permanency plans and other events that have significance for the family and treatment planning.

- *Revise SARA if it will continue to be used.* If the SARA tools and assessment processes continue to be utilized in the context of the broader CFA model, the SARA Implementation Training Guide should be revised. Our specific recommendations in this area include:

  o SARA should continue to follow the initial Safety Assessment/Risk Assessment that is completed during the investigation that establishes the baseline level of risks present at that time. Substantial reduction in the length of the tools should be considered.

  o Continued use of the SARA tools to reassess risks on a quarterly basis for children remaining in their own home and for children whose plan is reunification if removal has occurred.

  o Continued use of the SARA for conducting the initial mental health screening for children that is part of the assessment included in the listing of child characteristics.

  o Revise SARA to capture relevant assessment information on children that have been placed in foster care.

  o Beyond the risks assessment and mental health screening in the SARA tools, the policy should direct that the identification of the family's individual strengths and needs should be folded into the comprehensive family assessment.

- *Revise other policies to include comprehensive assessment.* Other policies that should be revised to include the CFA because of the applicability it has to the procedures and requirements are referenced below:

  o *Foster care policies:* The CFA should serve as the core assessment tool for guiding decisions in case planning activities related to permanency goals, placement options, visitation plans, health and educational services, and will be complementary to the use of any tools such as the Ansell-Casey Inventory for independent living and the mental health screening which are required by the settlement agreement.

o *One case plan for the child and family:* DFCS should develop one case plan for the child and family to ensure continued integration of the CFA with case goals and all service provision as revisions and updates occur throughout the life of the case.

## Training

In order to develop the depth of skills and competencies to conduct quality comprehensive family assessments as outlined in this model, some new training modules will need to be developed along with some modifications in the new worker training curriculum, the advanced training modules and the supervisory training in order to fully establish a more integrated model for assessing families throughout the life of the case.

◆ *New training module for comprehensive family assessment.* As part of the new worker training curriculum, a new module should be developed to expand the skills and core competencies needed to support the capacity for conducting a broad CFA. This will build on the current modules regarding skills and competencies in the areas of family engagement and the identification of individual strengths and needs of family members but will also focus on capacities needed to assess underlying conditions affecting the family's ability to function without agency involvement. Additionally, the new module should include using the initial risk assessments conducted during the investigation and opening of a case as part of a more unified and integrated approach to ongoing and comprehensive family assessment. This module should also incorporate an increased focus on the development of analytical skills and critical thinking regarding the implications of those complex issues within the family in order to gain an understanding of the link between assessment, case planning, and intervention.

◆ *New training modules on the implications of working with families regarding issues of mental health, substance abuse, domestic violence, and trauma.* In order to develop clinical skills and understanding of the complexities of families in need of child welfare intervention, specific training modules on the topical issues of mental health, substance abuse, domestic violence and trauma-related conditions should be inserted into the new worker training curriculum and also added to the advanced training as a part of ongoing professional development. A key focus of these training modules will be to highlight the importance of professional evaluation and screening in the overall exploration and analysis of family strengths and needs. Central to these assessment activities is the need to identify the potential for emerging conditions and impairment in functioning for children and adults in order to ensure prompt attention to these needs and the appropriate referral for services.

◆ *Revisions/modifications to current training:* Within the new worker training, the current module relating to the use of the SARA as the model for comprehensive family assessment should be revised. The module should provide skills for assessing risks within the broader framework of a comprehensive family assessment that moves beyond presenting issues and circumstances to encompass an expansive array of life domains relative to all members of the family regardless of whether they reside within the household. If the SARA tools continue to be utilized, the module will need to address how it is to be incorporated into the framework of the broader CFA that will encompass a more expansive identification of the family's individual strengths and needs.

♦ *Revisions to the supervisory training*: Supervisors should be trained in the CFA process prior to their staff, and the training module for new supervisors should be revised to incorporate the use of the CFA as the foundation of all case planning activities. The revised training module will need to give additional focus to the development of supervisory skills and competencies at providing a more clinical model of supervision to directly influence outcomes for families. A part of the training should focus on the skills needed to model and coach staff to conduct a quality CFA and to utilize the assessment to develop meaningful case plans with families. Additionally, training should address how they will monitor staff performance in this area through supervisory conferences, use of data, participation in treatment planning conferences, and other activities that support effective monitoring.

In order to ensure sufficient attention to the ongoing professional development of staff, standards should be established regarding requisites for a minimum number of hours of advanced training each year and for specialized training for staff based on their assigned responsibilities.

## *Monitoring*

♦ *Develop a continuous quality improvement system:* DFCS is required to establish a continuous quality improvement system as part of the Settlement and compliance with COA standards for accreditation. Within these processes, there should be specific qualitative measurements and outcome indicators relating to comprehensive family assessments to include the following:

  o Identification of individual family members' strengths and needs as part of a comprehensive family assessment

  o Engagement of the family in the CFA and evidence of family input in the CFA process

  o Attention to the physical, mental, and educational needs of children in the CFA

  o Linking of services to meet identified needs in the CFA

♦ *Include assessment standards in performance-based contracting*: In order to ensure that qualitative outcomes occur as a result of services that are procured to meet identified needs of children and families, formal processes are needed to develop contractual arrangements with providers to establish specific outcomes to be achieved, measures and indicators that reflect performance related to the outcomes, and standards relating to the quality of services and how they are to be delivered, including desired lengths of service, approaches to treatment modalities and therapeutic interventions, location of the service, and the provider's participation in and support for DFCS' overall assessment and case planning activities. This would include setting expectations for providers to coordinate their assessments with MDHS so that there is integration with the CFA. Additionally, requirements should be set to ensure that there is timely and appropriate documentation by the providers of their assessments and evaluations along with progress notes that are regularly provided to MDHS.

Until there is a functional CQI system, there will need to be an interim monitoring process to reinforce practice with regard to conducting and using comprehensive strengths and needs assessments. One mechanism for achieving this is supervisory review. As part of this effort, the following tools provide the means for monitoring and providing feedback to front-line staff.

♦ *Revise the Supervisory Administrative Review*:  The SAR should be revised to provide further exploration and review regarding the quality of comprehensive family assessments that reflect a broader framework beyond attention to risks and safety to further examine:

   o  The level of participation of family members in the assessment process.

   o  The extent to which family members were involved in the identification of their strengths and needs and assessed and whether non-custodial parents, relatives, and other significant stakeholders participated in the assessment.

   o  The degree to which underlying conditions that resulted in the necessity of child welfare intervention has been thoroughly regarding the strengths and needs of the family,

   o  The extent to which the assessment is ongoing and reflects changes within the family since the initial assessment was conducted, and,

   o  The adequacy of the case plan in addressing the key issues identified during the assessment process.

♦ *Modify the Foster Care Review:* The Foster Care Review process should provide further attention and evaluation to the direct link between the assessment of families and the appropriateness of case plan goals in addressing identified needs of individual members with timely service provision.  This would include:

   o  Revision to the consumer satisfaction survey to inquire whether all family members, including non-custodial parents and fathers, were fully involved in the identification of their strengths and needs as part of the overall CFA.

   o  Use the findings from the FCR to illustrate trends in practice that need further attention through training, policy, supervision, and the service array.

## Resources

♦ *Improved access to critical evaluation services.* There are several areas where development of the service array is critical to the Department's capacity to conduct highly functional comprehensive family assessments that guide effective case planning.  Some of the needed resources exist currently, with the issues being access, particularly in rural areas of the State, and with the level of specialization needed to ensure that the needs of children and families involved in the child welfare system are assessed adequately.  The resources that are most needed to ensure that additional external evaluations are available to support a thorough and ongoing assessment of families include improved access to psychological examinations, dental examinations, developmental/early intervention screening, sexual abuse assessments, affordable substance abuse evaluations and drug screening, and educational/vocational evaluation.

These additional professional evaluations provide essential information that should be incorporated into the overall comprehensive family assessment, contributing to the depth of understanding of the family and the implications for therapeutic intervention.  Currently, MDHS has very limited accessibility to providers that conduct psychological examinations, dentists that will accept Medicaid, affordable substance abuse testing, evaluation, and treatment outside the local mental health centers, and trained forensic interviewers and counselors that are knowledgeable about sexual abuse issues.  Additionally, educational testing and referral services are frequently inaccessible in numerous schools systems.  For the most part, the service

continuum that provides the additional supports to enable strong comprehensive family assessments is primarily located in the largest metro area and in several of the more urban settings. Even when services are available, such as health and developmental screenings through the local public health departments, the hours of operation of each department may vary across counties, with rural areas typically having less accessibility to these programs.

♦ *Formal service agreements and/or contractual arrangements.* Arrangements are needed with other agencies and individual providers to ensure that these additional assessments are easily accessible and meet specific guidelines and requirements as noted in the referral process. As an example, there is a need to work with the Department of Mental Health to ensure adequate mental health evaluation resources are located in all areas of the State.

♦ *Standards for coordination and integration of assessments.* Standards should be set with providers and contractors to ensure coordination and integration of all assessment activities with the overall CFA and to focus on consistency in the approach to working with children and families in case planning. As an example, there is a need to ensure that MDHS staff and IL contractors are coordinated in assessing the needs of youth in foster care and using assessment information to guide case planning. Furthermore, there should be standards in place to ensure the providers' use of assessments in delivering services and evaluating progress toward identified outcomes.

## b. Activities

Comprehensive family assessment should be reflected in many casework activities as noted below:

♦ *Conduct a comprehensive strengths and needs assessment with all families prior to developing a case plan:* Current policy requires that an ongoing assessment should be completed within 30 days of opening a case for services and for children that have entered foster care, an ongoing assessment must be completed within 30 days after their entry into care. These policies are consistent with the *Olivia Y* settlement requirements and COA standards regarding timelines for conducting a comprehensive assessment. However, the Settlement requires that the CFA be initiated within 72 hours of the child's placement in out-of-home care. The information that is gathered should follow an established format and process and be documented in the case record. Standardized assessment tools may be utilized in gathering the depth of information that is needed for this purpose. This activity should precede the development of a case plan in order to ensure that the plan accurately reflects the family members' strengths and needs, internal, external, historical factors, and family resources along with the possible effects of child maltreatment. The comprehensive family assessment incorporates information from the initial Safety Assessment/Risk Assessment and the SARA into the broader assessment framework.

♦ *Involve all family members and caregivers/foster parents in the CFA:* Engagement of family members should begin at the onset of the assessment with consistent efforts made to involve children and parents in all assessment activities, including the identification of their strengths and needs. For foster cases, the *Olivia Y* settlement requires that interviews be conducted with parents and foster parents within 14 days of the child's placement and in the event that a child is placed in a therapeutic foster home, an interview with the foster parents should take place within 10 days after entry into foster care. Children should be interviewed within the

first 72 hours of placement and involved in a number of specialized assessment activities that further identify and address individual issues and needs.

♦ *Secure/conduct initial screenings to assess physical, dental, mental health, and developmental needs to be addressed in case planning:* The *Olivia Y* settlement requires that a child receive a health screening within 72 hours after placement into out-of-home care and a comprehensive medical examination should be conducted within 30 days of entry. For children that have entered foster care who are three years of age and older, a dental screening should be conducted within 90 days of entering care and every six months thereafter. All children, ages 3 and younger, should have a developmental screening within 30 days of the initial placement to assess the need for early intervention services and other therapeutic interventions. For any child that is 4 years old and above, an initial mental health screening should be done within the first 30 days of placement, through using either the the SARA tools to assess if any of the conditions under the Child Characteristics are evident or some other screening process. If any condition or symptom is present, the child will be referred for further evaluation by a qualified mental health professional and for substance abuse screening, if indicated. The information that is obtained from these initial screenings informs areas of strength and needs, and provides guidance to staff in knowing when to request more in-depth professional assessments and follow-up services.

♦ *Secure initial educational screenings and school placement/services:* As part of the overall comprehensive family assessment, the educational strengths and needs of children are identified through obtaining information and school records from their parents, caregivers, and other individuals from the educational system including teachers, guidance counselors, tutors, and principals. The *Olivia Y* settlement requires that all school-age children who have been placed in out-of-home care should be enrolled in an accredited school program within 3 days of entering care. Within the first 30 days of placement as part of the overall CFA, an educational screening should be conducted to determine whether there is a need for further services that may include tutoring, individualized educational plans, and early intervention services. Efforts must be made to enroll children in a familiar school setting whenever possible and to include educators and school personnel in the assessment activities and development of the case plan.

♦ *Conduct ongoing specialized assessments and interventions-* As part of the continuous process of assessing the individualized strengths and needs of all family members and in response to changing circumstances and dynamics within the family, the CFA should address the recommendations and findings from the initial screenings to ensure the following:

  o The case plan addresses the issues and needs that have been identified across the various assessments and examinations.

  o Referrals for follow-up evaluations and therapeutic interventions are promptly initiated.

  o Intensive and supportive services are provided to address mental health, developmental, and behavioral needs of children, including substance abuse services or placement in a therapeutic foster home, when appropriate.

  o Ongoing standards of physical health care are met and appropriate health records are maintained for children placed in foster care. Foster parents and caregivers are provided health records and health histories for children in their care to ensure that they adequately provide for their physical well-being.

♦ *Update the assessment periodically as families make use of services, case plans are updated, and at other key intervals*: As the family's circumstances and needs change, the assessment process continues to evolve and is periodically updated in the case record to reflect the family's response to services and progress towards achieving priorities and goals established within the case plan.  In advance of case planning reviews that occur every 90 days and prior to changes in placement, service provision, changes in permanency goals, and any emerging concerns, updates to the assessment are critical for informing all case planning activities. Service provision will be shaped by the degree of progress that has been made in achieving identified goals based on both written and verbal feedback from the providers and other individuals involved in assisting the family.

♦ *Maintain frequent contact with parents, children, foster parents, and caregivers:* Ongoing communication with the family and key stakeholders that occurs through visits, phone calls, conferences, and written progress reports helps to ensure that the assessment is continually reflective of the most current and relevant issues concerning the family. Visits between the worker and the parents should focus on reinforcing the parental role and involvement in the child's life and the importance of maintaining the connections between the child and the family.  COA standards necessitate that visits between the worker and birth parents occur at least once per month.  The *Olivia Y* settlement requires that the worker conduct visits with children in out-of-home care at least twice per month and that one of these visits take place in the child's placement.  This provides a critical opportunity for the worker to ensure the child's safety, evaluate the child's adjustment to the placement, assess the impact of separation from the family, determine if there are any emerging needs that need further attention, and explore the foster parent's capacity to care for the child.  Meeting with the foster parent or caregiver during visits to the placement setting enables the worker to assess whether additional supports are needed to ensure placement stability for the child.

♦ *Use the assessment to make decisions regarding case closure and follow up services needed:* The SARA currently includes assessment tools to address risks and safety as part of an evaluation of the appropriateness of placement for children remaining in their own homes and for those for whom reunification is the goal.  Prior to planned case closure, the information from the SARA or any alternative process for examining risks/safety, along with the broader perspective of the CFA should take into consideration other factors beyond those presenting risks to the child in order to foresee and project a long-term view regarding the well-being and stability of the family and child.  In assessing the family's capacity to function without DFCS involvement, the need for other community referrals or supportive follow-up services should be explored to ensure that decisions to close the case are timely and appropriate based on a current understanding of the family along with recognition of what may be needed in the foreseeable future.

### c. Roles and Responsibilities

In order to implement the practice model effectively, a number of individuals have specific roles and responsibilities in the comprehensive family assessment process.  Collaboration among these individuals helps to ensure that efforts are well-coordinated and that these roles and responsibilities are understood and carried out to achieve defined objectives.

## *Caseworker*

♦ The caseworker has direct responsibility for conducting the CFA and for updating, revising, and utilizing it to guide and inform all phases of case planning and service provision

♦ The caseworker is responsible for thoroughly reviewing the entire case record and related documents and/or data including the investigation, court documents, professional assessments, medical evaluations, legal reports, and identifying information about the family composition, history of involvement with the agency, prior service provision, and other pertinent information that is already available about the family.

♦ The caseworker is responsible for engaging the family and seeking their input and participation in the identification of their individual strengths and needs while also exploring individual and family functioning across an expansive scope of life domains.

♦ Whenever appropriate, the caseworker is responsible for actively soliciting involvement from non-custodial parents, particularly fathers, and gathering information from other individuals who have connections with the family, such as paternal and maternal relatives and other individuals that are significant to the family and children including those who play a role in care giving outside the home.

♦ It is the role of the caseworker to seek guidance and consultation from other professionals to gain their expertise in gathering, sorting, and understanding the range of issues impacting the family. Certain behaviors, life experiences, cognitive and physical deficits, and family dynamics that are noted in the initial mental health screening should trigger the caseworker to make referrals for professional evaluations and to seek further direction from the assigned supervisor to ensure that the family's strengths and needs are adequately understood and that appropriate and timely decisions are made regarding case planning and service provision.

♦ The caseworker is responsible for analyzing information gathered in order to identify conditions within the family that may hasten or impede goal achievement.

♦ The caseworker is responsible for preparing the family and other stakeholders for the family team meeting by sharing the key elements of the assessment to surface priority areas and desired changes and improvements.

♦ The caseworker is responsible for maintaining ongoing and regular communication with the family members and all involved stakeholders to discuss the current circumstances, assess progress in achieving goals, address issues needing attention and resolution, and provide feedback at critical stages in the life of the case. The caseworker maintains regular communication with service providers and other individuals that are providing support for the family's plan. In doing so, the caseworker maintains a focus on the assessment of child safety and risk management while paying close attention to other cues relating to the mental and physical well-being of all family members.

♦ The caseworker is responsible for making frequent visits to children in placement to assess the child's adjustment to the placement including the impact of separation from the family, the capacity of the foster parent to meet the child's needs, and any emergent concerns related to the child's physical, developmental, and emotional or behavioral status. The caseworker also has responsibility for structuring visits between the parents, siblings, and the child and these visits should not only provide a support for maintaining connections and for achieving

therapeutic benefits, but should also be utilized by the caseworker to assess the quality of interaction between the parents and children, sibling relationships, parental capacities, coping and adaptive behaviors of the children, and demonstrable progress in achieving case plan goals.

◆ The caseworker is responsible for updating the assessment periodically, reflecting the most current information and analysis of its meaning and implications. Documentation of the ongoing discussions and interviews should be recorded in the case narrative and reflected as updates and changes to maintain the comprehensive family assessment as current and relevant.

## Area Social Work Supervisor (ASWS)

◆ The supervisor has responsibility for ensuring that the caseworker conducts a thorough assessment including the identification of individual strengths and need for each family member. This includes assisting the caseworker in identifying the appropriate individuals who should be involved in the assessment and whether sufficient and appropriate information has been gathered.

◆ The supervisor ensures that the caseworker accesses additional professional evaluations and makes referrals to obtain needed examinations and screenings as part of the family assessment.

◆ The supervisor is responsible for monitoring and evaluating the caseworker's completion of an assessment within established timeframes.

◆ The supervisor has a key role in building the capacity in caseworkers to assess family members' strengths and needs along with the underlying conditions that necessitate intervention from MDHS. This should include regular and structured case conferences that focus on individualization of interventions with families and the quality of the interaction between the caseworker and family.

◆ The supervisor is responsible for reviewing case plans to ensure that key areas of the assessment are adequately addressed in the plans and that services relate to the strengths, needs, and underlying conditions within the family.

◆ In order to promote critical thinking and analytical skills in the assessment process, the supervisor should use a variety of approaches to develop these competencies among staff, such as individual supervisory conferences along with the SAR, record reviews, written and oral feedback, modeling through home visits, case planning conferences, and interviews, and other structured learning activities.

◆ The supervisor carries the responsibility for making certain that the caseworker has received adequate training and preparation to conduct quality family assessments.

◆ One of the primary roles of the supervisor is to assure that the appropriate level and quality of information has been gathered in the assessment, as opposed to filling out the assessment form. This should include reviewing to see that assessment information addresses the developmental needs of children, abilities of parents to participate in services, and so forth. Also, the supervisor should assure that when the need is indicated, additional evaluations are secured and incorporated into the assessment process.

## Regional Director (RD)

♦ The Regional Director has the responsibility for demonstrating a commitment to intervening in families' lives with a thorough understanding of their strengths and needs based on a comprehensive assessment. Furthermore, the Regional Director establishes expectations that County Departments within the region will carry forth the responsibilities for conducting quality family assessments on an ongoing basis throughout the interventions by the agency.

♦ The Regional Director also has the role of communicating with key stakeholders outside the agency to facilitate their understanding of the CFA approach to working with families and to enlist their support for this effort in the capacity that best fits this model.

♦ The role of the Regional Director in supporting the CFA model is to disseminate policies, secure training and technical assistance, to procure adequate services and local resources, and to establish protocols and structures for interagency and intra-agency collaboration in the region in order to integrate the activities related to assessment, case planning and service provision on behalf of children and families.

♦ The Regional Director is responsible for monitoring county performance and outcomes for the region through tracking indicators and reviewing data, and after careful and ongoing evaluation, taking corrective action to ensure needed improvements. This responsibility includes advocating and securing sufficient systemic supports to enable staff to practice effectively with families.

## Continuous Quality Improvement (CQI) Staff

♦ The role of the CQI reviewer is to monitor and evaluate whether comprehensive family assessments are completed initially and updated an ongoing basis for all relevant family members.

♦ CQI should monitor and evaluate the extent to which assessments are used to guide case planning and interventions with children and families.

♦ The CQI reviewer is responsible for providing timely feedback to caseworkers, providers, and supervisors, designed to improve the capacity to conduct quality comprehensive family assessments that guide all case planning and service delivery activities.

♦ CQI should evaluate and report on systemic capacity within counties and regions to obtain screening and evaluation services that are a part of this component.

♦ CQI should review the extent to which service providers are engaging in assessment activities that are coordinated and consistent with MDHS assessments, and that service delivery reflects the issues identified in assessments.

♦ In conjunction with other issues monitored, CQI should issue local and statewide reports that clearly indicate the extent to which assessment activities are functioning and serving their intended purposes.

♦ CQI should coordinate its review of assessment activities with the Department's other major review of case planning activities, the Foster Care Review process.

♦ CQI should assist county and regional staff in identifying strengths and needs of assessment practices and using that information to develop and implement program improvement plans designed to strengthen assessment practice.

## Section 3:  Outcomes and Indicators

### a.  Short-Term Goals (0-12 Months)

### Training

♦ *Interim training module in comprehensive family assessment.*  In order for both newly hired staff and more experienced staff to be prepared to conduct CFAs, a new training module will need to be developed prior to implementation in the first two regions of county offices. This training will incorporate components of the existing modules that address family assessment but will provide additional focus on skills and competencies.  In order to ensure that supervisory staff is prepared to support caseworkers in this new model of comprehensive family assessment, the interim training module should first be provided to the Area Social Work Supervisors.  The module should focus on the following skills and competencies:

   o Gathering and compiling historical and current information and integrating other assessments into a unified and organized format;

   o Involving families as full participants in the assessment process, particularly the identification of their individual strengths and needs and capacities across a spectrum of life domains;

   o Exploring underlying causes and conditions within the family beyond presenting issues relating to risks and safety;

   o Identifying and understanding physical, developmental, and behavioral conditions and characteristics in adults and children that indicate the need for further professional evaluations;

   o Synthesizing, analyzing, and drawing conclusions as part of critical thinking and evaluation of information gathered throughout all assessment activities; and

   o Applying and transferring skills and knowledge to link the family assessment to developing and updating the case plan and identifying appropriate services.

♦ *Orientation to and training in the CFA for service providers and community stakeholders.* For key stakeholder groups who will not directly have responsibilities for conducting CFA's, an orientation and CFA overview should be developed and provided to support their specific roles in the process and provide a general understanding of its importance in case planning and service provision. For those providers who will have direct role in supporting CFA's through additional evaluations and screenings and/or  the delivery of services, training should be developed to ensure role clarification, coordination of assessment activities, and a clear understanding of the strengths/needs-based and family- centered practice model that is being implemented by MDHS.

### Practice Guides

♦ *Practice guide for conducting comprehensive family assessments.*  In order to support the capacity of staff to conduct the CFA that encompasses a thorough and ongoing exploration of

the family's functioning across broad spectrum of life domains, a practice guide is needed to address the core activities and procedures. A practice guide has been developed and is included as part of the entire practice model. MDHS will also need to develop additional practice guides to serve as interim policies and procedures that support the components in areas that are closely related. These should include the following:

♦ *Protocols and guidelines for soliciting input from service providers.* As part of the ongoing CFA process, input from service providers is critical to the relevance and integrity of the CFA. Protocols and practice guides should be developed to address provider involvement in the assessment activities and the importance of obtaining timely written and verbal feedback, progress notes and reports, along with their participation in case plan development and reviews.

♦ *Protocols and guidelines for working with the educational system to meet identified needs of children.* In order to obtain timely educational assessments and appropriate services, protocols and working agreements should be developed with local and state school systems to support the necessary exchange of information, reports, and records to facilitate the referral process. Additionally, these protocols can support the participation and involvement of school-related stakeholders in the case plan development and reviews.

## Monitoring

*Baseline CQI reviews in initial two regions implementing the practice model.* A baseline review of all counties within the two regions prior to implementation of the practice model will identify the strengths, needs, and trends regarding current practice, particularly in the area of ongoing family assessment activities. In doing so, plans can be made to address specific issues and challenges while also building on the achievements and positive factors that can contribute to the successful implementation. The review will also provide for a baseline of current performance against which future reviews can be compared in measuring the success of the practice model. Critical to this activity will be continued efforts to ensure data integrity within MACWIS to support effective CQI processes.

## Resource Development

*Targeted resource development and allocation in selected regions.* As part of an overall resource development plan to secure a wide array of needed services to implement all six components of the practice model effectively, MDHS should target the development of resources to address the most significant gaps in the service array in the two regions where implementation of the practice model is first occurring. Of greatest significance to the implementation of the CFA component are the tremendous needs for dental services, psychological examinations, substance abuse screening/drug testing, sexual abuse examinations, educational and vocational testing, placement resource continuum, and geographic proximity.

## b. Mid-Term Outcomes (12-24 Months)

## Training

♦ *Incorporate new CFA training module into new worker curricula.* The newly developed training module that was developed as an interim approach for implementing the practice model should be fully incorporated into the new worker training curriculum and integrated

throughout the topical and advanced training modules, reinforcing the CFA as the central assessment approach for working with families.

◆ *Develop specialized and advanced training modules.* In order to continue to develop staff skills and competencies in working with families that have complex issues and needs, new modules and curricula should be developed to promote capacity to assess conditions and implications for treatment related to the following areas: 1) Mental Illness, 2) Domestic Violence and Trauma, 3) Substance Abuse and Addiction, 4) Sexual Abuse, and 5) Child Development and Disorders.

◆ *Enhanced and revised supervisory training.* In order to move to a more defined clinical model of supervision and to balance the role of assuring compliance with *Olivia Y* requirements, supervisors in the two regions that first implement the practice model will need additional training to enhance their skills in using individual case conferences, group conferencing, and structured learning activities to direct strategies and interventions that influence positive case outcomes.  Supervisors should also participate in the CFA training module prior the attendance of direct service staff in order to coach, model, and develop capacities in staff to integrate all assessment activities and tools into this unified and comprehensive assessment model.

## Policy

*Integrate new procedures and practices supporting the practice model.* Based on the experiences of staff in the regions involved as part of  the initial phases of implementation, more formal policies and procedures should be developed and integrated into the existing policy framework, building on the interim policies and practice guides along with additional guidelines that may be needed.

## Monitoring

*Conduct baseline CQI reviews along with current CQI reviews.* In addition to conducting baseline CQI reviews in the next set of regions to implement the practice model, there should also be new CQI reviews conducted in the initial set of regions where implementation first occurred.  These CQI reviews will give focus on the current practice and related outcomes and allow for some comparison and analysis of the impact of the practice model and the CFA in this set of regions.

## Resource Development

*Continue ongoing evaluation of resource needs and issues impacting the overall service array.* As part of the overall plan for developing statewide resources to support the full implementation of the practice model, attention should be given to the findings of the CQI reviews of all of the counties that are in some phase of the process.  These findings, along with an ongoing review of data and other performance measures, will further inform MDHS of any emerging needs and trends in practice as well as any issues or concerns with particular services and/or providers in any given region.

### c. Long-Term Goals (24-48 Months)

#### Full Implementation of the Practice Model

♦ Within this time frame, the last two regions will have begun implementation of the practice model.

♦ Full implementation of all training curricula, policy revisions, and monitoring procedures will have been achieved.

♦ A focus of activity should be on coaching and supporting the practices associated with this component.

♦ An additional focus should be on assuring the systemic supports needed for this component are refined and fully in place, such as the availability of specialized assessments and diagnositic screenings, appropriate placement resources, supervisory and quality improvement processes that capture information on this component, and case planning activities that are based on an integrated CFA.

#### Monitoring Practice Model Implementation and Success

In order to gauge the success of the full implementation of the practice model in achieving substantial improvements in the outcomes for children and families involved in the child welfare system, the following indicators provide measures for assessing progress relating to comprehensive family assessments:

*CFSR Measures*

♦ Safety Outcome 2*: Children are safely maintained in their homes when possible and appropriate*
  o Item 4 Initial and Ongoing Risk Assessment

♦ Well-Being Outcome 1: *Families have enhanced capacity to provide for children's needs*
  o Item 17-Needs, services of child, parents, and foster parents
  o Item 18-Child/Family Involvement in Case Planning
  o Item 19-Caseworker Visits with Child
  o Item 20-Caseworker Visits with Parents

♦ Well-Being Outcome 2: *Children receive services to meet their educational needs*
  o Item 21-Educational Needs of Child

♦ Well-Being Outcome 3-*Children receive services to meet their physical and mental health needs-*
  o Item 22- Physical Health of Child
  o Item 23- Mental Health of Child

*Olivia Y Measures*

♦ Percent of families with a comprehensive family assessment conducted within 30 days of case opening;

**Mississippi Practice Model**

- Percent of children with a comprehensive screening and assessment within 30 days of entry into foster care;

- Percent of children who have undergone initial health screening within 72 hrs. of entering care;

- Percent of children who have received full health examination within 30 days of entry into care;

- Percent of children, age 3 and younger, who have received development screening within 30 days of entering foster care;

- Percent of children, age 4 and older, who have received initial mental health screening within 30 days of entry into care and/or within 30 days of their 4**th** birthday if occurring during stay in foster care;

- Percent of children, age 3 and older who received initial dental examination within 90 days of entry into care or within 90 days of their 3rd birthday if occurring during stay in foster care and every 6 months thereafter;

- Percent of children whose educational needs have been assessed within 30 days of entry into foster care;

- Percent of children receiving needed medical, dental, mental health or other therapeutic and supportive services as identified through a comprehensive family assessment;

- Percent of children with special needs matched with placement that can meet their therapeutic, educational and medical needs;

- Percent of monthly visits that have occurred between caseworkers and biological parents; and

- Percent of twice monthly visits that have occurred between caseworkers and children.

## *Component Five: Preserving Connections and Relationships*

When children enter foster care, they often become separated from the people and places that are the most familiar and comforting to them. Not only do they often leave behind family members who are an important part of their sense of self and identify, they lose touch with their communities, friends, school, tribe (if applicable), and teachers, just to name a few. For children who have been neglected or maltreated in some way, the loss of these important connections and relationships can add to the trauma and sense of loss that comes with foster care placement. Although child welfare agencies generally have provisions in place for children in foster care to visit with parents and/or siblings on some type of schedule, these periodic visits are often insufficient to preserve a natural sense of the child's place within the family and community from which he or she comes. The foster care home or facility and the community in which it is located often becomes a substitute for what the child is familiar with and feels connected to.

We know from years of research that the healthy development of children is, in many ways, associated with their sense of belonging to family and community. We also know that, for children in foster care, the maintenance and nurture of critical family relationships is closely associated with achieving timely permanency and stability in their lives. For example, many studies have pointed to the frequency and quality of parental visits with children in foster care as a predictor of timely reunification. Yet, our child welfare interventions with children entering foster care often do not address relationships with parents who do not live in the home, they create barriers to healthy interaction between children and their parents in as normalized a manner as possible, they allow siblings to become separated, and they often remove children from the physical surroundings and cultural traditions in which they are the most comfortable.

In defining this component of the practice model, we are emphasizing the normalizing of connections and relationships for children in foster care to the extent that it is safe and appropriate to do so. The focus is on keeping children safe and stable within placement settings that permit them to retain important relationships with family members, retain normalized sibling relationships and friendships, important traditions and connections that define them culturally, and continue being a part of the social institutions that nurture them, such as school, religion, and so forth.

For casework practice, this suggests a proactive role for caseworkers in identifying crucial connections and relationships, making decisions jointly with the child and family about the best ways to preserve them, placing children in settings that permit and encourage their preservation, and providing services that take these connections and relationships into account. Among the key aspects of this area of the practice model, the following activities are included:

- ♦ Conducting thorough searches to identify all familial resources that could be available to the child, including non-custodial parents, and their families;

- ♦ Assuring that all relevant family members, including non-custodial or absent parents are involved in the routine life of the child whenever safe and appropriate to do so;

- ♦ Ensure that family members are considered first, if placement outside of the home is necessary, and that siblings are placed together unless their individual needs contraindicate placement together;

♦ Ensure that children are placed within the communities from which they come whenever safe and appropriate to do so;

♦ Ensure that children are able to maintain connections to their home community through school, church and other community connections, as possible; and

♦ Ensure that parents are involved in the care of their children in foster care to the extent that it is possible, safe, and appropriate to do so.

## Section 1: Inputs

### a. Training

Training new social workers and offering skills-based training of seasoned workers is key to ensuring consistency in case practice and efficacy to policy and practice of core values important to Mississippi. Training is also crucial to implementing the practice model successfully, facilitating the transfer of knowledge and skills necessary to support children and families in Mississippi in a cohesive manner.

### Strengths

Mississippi's Division of Families and Children Services (DFCS) offers several core training modules that support the best practice of preserving and maintaining connections with families for children who need to be placed outside of the home. The *Social Worker's Guide to Family Centered Practice*, offered to new social workers in the first week of pre-service training, provides discussion/transfer of learning of several core relationship skills and practices needed to facilitate the preserving and maintaining of familial connections, particularly as it relates to preparing for the potential placement of children in a familial setting and facilitating the relationship between resource and birth families:

♦ During the safety assessment and throughout the life of the case, it is crucial that DFCS learns about maternal and paternal kin, as well as informal (not related) kin, so that if a child has to be placed, they are placed with people the child knows in a familiar setting.

♦ DFCS must ensure that practice reflects cultural norms of families. This can be done through the communication of the child's culture to caregivers if the child is in placement and encouraging them to celebrate the child's cultural and ethnic rituals and heritage including religion.

♦ When children are placed, the birth families and resource families are partners in shared parenting, and resource families should serve as a support and role model to the birth family. This includes participation in a Family Team Meeting (FTM) within 30 days, participation in visitation, and role modeling for the birth family.

♦ Frequent and consistent visitation between the parent and the child and the child and his/her siblings and visits with extended family must occur.

♦ Integrated recruitment, orientation, and training with the same home study for resource families rather than separate home studies for foster and adoptive families.

**Mississippi Practice Model**

Another training module that emphasizes some core concepts of preserving and maintaining connections is *Assessment in the Child Welfare Setting*, especially as it relates to the coordination with other systems to help maintain connections with the birth family and community. In particular this training leads a discussion on the importance of determining if a child is part of a Native American Tribe at intake and during the safety assessment, and if this is found to be the case, to coordinate with the tribe in completing safety assessment. This training also emphasizes the need to have court findings specify the terms of parental visitation, to ensure that families, if deemed appropriate, will have regular and consistent access to their children.

The *Case Planning and Family Engagement in the Child Welfare Setting* training currently in practice puts much emphasis on preserving and maintaining connections with family, and will be a strength in facilitating the implementation of this component of the practice module. In addition to stressing the importance of the foster and resource families' relationship and child placement in proximity to the birth family, this module also focuses on the need for frequent, consistent and meaningful visitation not only between the family and child, but also with the caseworker. Among the specific skills and practices highlighted in this training that supports the preserving and maintaining connections module:

◆ FTMs provide a way for staff to establish a relationship between the birth family and the foster family, allowing them to share information child's needs, likes, dislikes, sleeping schedules, napping, favorite food, medical history, etc. FTMs also should be used to identify others who can help the child stay connected with family, teachers, and friends; and to discuss ongoing interaction between the child and their family and how to remain connected;

◆ The agency has responsibilities regarding visitation, including creating a plan with parents and caretaker, child, siblings, relatives and other kin. Responsibilities for parents and resource parent in visitation are clearly spelled out, and include:

  o For parents, being responsible during the visitation for ensuring the emotional and physical safety of children, taking the parental role during visits, and planning an activity to participate in with the child during visits; and

  o For resource parents, being responsible for supporting the child's contact with their parents and siblings and modeling effective parenting techniques during visitation, if appropriate;

◆ This training also includes an activity for participants aimed at determining where a child should be placed when being placed in an out of home setting. The emphasis of this exercise is on the least restrictive, most appropriate, and closest proximity placement, and encourages trainees to consider the following in their decision making:

  o Age of Child;

  o Sibling groups should be placed together;

  o Keeping the child in the same school;

  o Keeping the child connected to own community;

  o Culture of child;

  o Visitation with parents/caregiver/relatives;

  o Temperament and personality of child regarding fit with placement setting; and

  o Religion of the child, factoring in will child be able to practice own faith.

♦ Individual Team Meetings are also crucial in establishing and maintaining connections, and are to be held at the following times:
  o With the child and the worker within the first 72 hours of initial placement or subsequent moves,
  o With the child's father and mother within the first two weeks of initial placement, and
  o With the resource parent(s) within the first two weeks of placement.

Another training module that supports preserving and maintaining connections is *Advanced Skills Training in Case Planning,* through its identification of the reasoning and importance of concurrent permanency planning:

♦ All children have a need for and right to continuity and stability.

♦ Children need a stable home environment in which to grow.

♦ Children do better when they are in situations perceived as having permanence.

♦ Children deserve to be secure.

♦ All children have a basic need to belong.

♦ Foster homes are often more easily disrupted than permanent homes.

♦ Even good foster care has the disadvantage of stigmatizing the child, who knows he/she is different from his/her peers.

The PATH training, which is provided to all potential and current resource parents, also has several components which support preserving and maintaining connections between the birth family and other supports, and the child in their care. The training is introduced with the mission of *Open Your Heart and Home to a Child: Become Part of a Team to Restore a Family,* as well as noting that they are members of the team because their goal is to help reunify the child to their home. PATH also instructs that resource parents will be available to meet birth parents and act as a mentor and support. In addition to training resource parents on the policies around visitation, older youth transitioning into adulthood, and adoption versus durable legal custody, PATH instructs that resource families must be informed of court hearings and their right to attend. They will also be invited to participate in county conferences by the FCR process, FTMs and review hearings. PATH also instructs participants in the use of ecomaps and Life Books as ways to help children think about and maintain their connections. The PATH training also provides resource parents with a handout entitled *Visitation with the Birth Family.* It asks several questions of the resource parents pertaining to preserving connections, and then as part of an activity, they discuss the answers. The questions asked include:

♦ How can I prepare the child for visits?

♦ How can I prepare other members of my family for visits?

♦ What do I need from the social worker to help plan the visit?

♦ How can I work in partnership with the birth family?

♦ How do I promote connections through visits?

In rating the effectiveness of pre-service and going staff training with regard to preserving connections and relationships, survey respondents indicated that the training was frequently or almost always effective less than half the time (about 49 percent for pre-service and about 46 percent for ongoing).

| Please rate your perception of your agency's effectiveness on each area below regarding supports related to preserving connections and relationships: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Sometimes | Frequently | Almost Always | No Info/ NA | Total |
| Pre-service training on preserving connections and relationships | 1 (0.59%) | 17 (10%) | 44 (25.88%) | 40 (23.53%) | 44 (25.88%) | 24 (14.12%) | 170 |
| Ongoing training on preserving connections and relationships | 1 (0.6%) | 28 (16.67%) | 37 (22.02%) | 40 (23.81%) | 38 (22.62%) | 24 (14.29%) | 168 |
| Foster parent training on preserving connections and relationships: | 1 (0.6%) | 15 (8.98%) | 26 (15.57%) | 39 (23.35%) | 48 (28.74%) | 38 (22.75%) | 167 |

While more respondents indicated that they had no information on foster parent training, those that responded rated the effectiveness of foster parent training in preserving connections and relationships only slight higher than staff training in this area (52 percent frequently or almost always effective).

## Gaps

While current training curricula cover several important concepts that support this component of the practice model, there are several gaps in existing training that only partially address important skills and practices critical to preserving and maintaining connections. First, the importance of consistent visitation is covered in the *Social Worker's Guide to Family Centered Practice* and *Case Planning and Family Engagement in the Child Welfare Setting* training, however we could not identify content in the training that specifies how frequently the visitation should be between parent and child, between siblings, or even between the caseworker and children and birth parents.

Second, the *Social Worker's Guide to Family Centered Practice* notes the importance of identifying all maternal and paternal kin at the outset of the case during the safety assessment in the investigation and on a continual basis, but this appears to be the only reference to identifying non-custodial parents and their families for resources and maintaining connections. It does not indicate what is to be done with the information on non-custodial parents and their kin, or how they should be engaged to be involved in the child's life in foster care, should it be deemed appropriate to do so.

Third, the screening and safety assessment training conducted at the hotline addresses seeking out and exploring a working relationship with a child's tribal community should one exist, but we could not identify other policies in place for ongoing cases regarding consultation with or involvement of the tribal community if one was identified. This includes involving them in case planning, visitation plans, or family team meetings, where they could be instrumental in

preserving and maintaining connections for children and easing the trauma children may experience when entering state care. In addition, we could not identify a policy to routinely follow up on identifying whether a child in custody is tribal affiliated, should that information not have been available during the screening process.

Fourth, the *Case Planning and Family Engagement in the Child Welfare Setting* does not explain how to facilitate a FTM so that the meetings can be used to foster the relationships. While responsibilities for visitation are established, parents are responsible for their own transportation and FTMs should be convenient for the parent and the foster parent. This training also stresses the importance of having an appropriate placement for children, but does not specify the distance from the removal home, though an on-the-job training activity requires the worker to read the policy manual and we assume placement proximity is likely to be addressed there.

Fifth, the concept of involving parents in caring for their children while in out of home care and the importance of doing that is only partially addressed in current training. Various trainings currently utilized discuss the following concepts:

♦ Resource parents should serve as a role model for birth family and is an active support for reunification through visitation and teaching;

♦ When children are placed, the birth families and resource families are partners in shared parenting and resource families serve as a support and role model to the birth family; and

♦ Visitation should occur in settings that are most conducive to bonding and family members enjoying one another, meaning that the visits should not happen in the office unless absolutely necessary.

While training seems to identify the importance of birth families parenting their child while they are living out of the home, it does not seem to cover how workers are to ensure that this done, how to determine when it is safe and appropriate to do so, and how to monitor resource homes as partners in this endeavor.

Finally, there are some incomplete concepts relating to preserving and maintaining connections in the PATH resource parent training which should be noted as a gap. Though PATH notes that resource parents should be informed of all upcoming court events and their right to attend court hearings, PATH also acknowledges that each judge conducts court differently, so the capacity to attend and be heard will be up to the individual judge. The importance of being a team with birth parents is a focus of this training but PATH also notes that arrangements for meetings between birth parents and resource families is at the discretion of the resource family and the social worker and dependent upon the ability to schedule. While there is a handout dedicated to visitation with the birth family, its importance, and how to prepare for it, there is also a lengthy section on potential problems with these visits, as well as a section on why resource families wish the birth family would disappear because of the resource family's feelings regarding the birth family.

In addition to MDHS pre-service and ongoing caseworker training that partially addresses this component's content, there are a few important concepts critical to preserving and maintaining connections that do not appear to be addressed in the training. First, there is no discussion

relating to planning for reunification, both in preparing the child and family for reunification, as well as aftercare planning with setting families up for services to support reunification efforts. Second, several concepts to placement and prioritization of placement factors are not discussed in training. This includes all potential uses of relatives as placement, visiting and support resources, as well as attempting to keep children in the same school both if they need to be placed as well as if they need to change placement. Third, there appears to be little training on facilitating emotional connections for both children and families should children need to be placed outside of the home. This includes the importance of maintaining social networks for children and youth, as well as ensuring children and youth have access to supportive adults with whom they can develop meaningful relationships. This gap in training topics is supported by a recent survey conducted by MDHS and discussed in the Advanced Skills Training, on advanced training needs, in which 34 percent of child welfare workers reported that they needed to learn more about separation, attachment and identity issues during placement. Finally, there are several concepts critical to preserving and maintaining connections which are not covered in the PATH training with resource parents, including maintaining relationships, reuniting and facilitating regular sibling visits for siblings placed separately in care, and being a mentor or creating a connection for a youth with another adult who will provide cultural and positive peer support.

## b. Policy

Having clear and thorough policies is critical to the implementation of the practice model. For preserving and maintaining connections, it is important that the rights of parents and relatives regarding involvement in their children's lives are clearly reflected in the State's policies in order to help ensure that families across the State are treated similarly in this area.

### Strengths

DFCS policies currently contain multiple regulations and guidance that will support the successful implementation of this component of the practice model. The regulations can be categorized into four general areas relating to the State's ability to preserve and maintain connections. The following represents the policies currently in place that support the component of preserving and maintaining connections.

*Placements*

A child's particular foster care placement is an important consideration in preserving connections and relationships, including proximity and the match of the placement to the child's needs. The list below represents policies that support placements conducive to preserving and maintaining connections:

◆ The child is to be placed in least restrictive setting - in the following order of consideration: placement with relatives, kin or tribal member, resource family, group home, institutional care;

◆ Specific, pertinent information is to be shared with resource parent including but not limited to current medical and dental health information, education information and the custody case plan;

- ◆ Regulations indicating that it is preferable for a child to be removed from foster care through prior planning by the caseworker and Area Social Work Supervisor. The child should be involved in the planning and kept informed of the progress toward meeting the established goals in order to leave foster care;

- ◆ If the child must be placed away from their parents or guardians, the worker must consider a placement in close geographical proximity to his/her parent's home:

- ◆ If siblings are not placed together must be justified in MACWIS. If siblings aren't placed together initially, diligent efforts must be made to place them together as expeditiously as possible; and

The child's ISP is to contain assurances that the child's placement takes into account the proximity to the school in which the child was enrolled at the time of placement.

### *Planning for Leaving Care*

The goal of a child welfare agency should be to ensure that children spend only the amount of time in foster care that is needed to permit a safe and stable reunification with family or achievement of another permanency goal.  Since reunification is the identified permanency goal for most children in foster care, preserving and maintaining connections is critical to ensure smooth transition back into the home. Even if the goal is something other than reunification, the importance of preserving relationships and connections is very important for children, since they are integral to the child's sense of identity and belonging. The list below represents policies and concepts from policies that support planning for leaving care:

- ◆ Prior to any child leaving the system, except through death or through running away, the caseworker in the County of Responsibility (COR) should discuss the plans with ASWS;

- ◆ Most children leave foster care and return to their parents, and planning for the move is crucial. As such, parents should be helped to understand that it is normal for their children to experience a conflict in the process of returning home;

- ◆ Trial placement cannot exceed six months unless ordered by court;

- ◆ Except in unusual situations, a ninety day trial placement should be sufficient with approval from the court to determine if child is receiving minimally acceptable care;

- ◆ Resource specialists supervise all children in MDHS custody who are free for adoption and placed by the agency in an adoptive resource home. A major role of the Resource Specialist during this supervisory period is to provide support to the adoptive family.  A minimum of six months supervision is required for each agency adoptive placement;

- ◆ After placement is made in an adoptive resource placement, the private agency staff may conduct as many home visits as necessary each month but one of these visits shall be face-to-face with the child. The Resource Specialist or County Worker will accompany the private agency worker on this face-to-face visit so that the family is not caused undue stress by too many different professionals visiting the home. The private agency staff will send monthly reports to the Resource Specialist noting the progress of the placement;

◆ Permanency planning is a systemic process of carrying out a set of plans and goal directed activities within a time limited period. These activities are designed to help children live in families that offer continuity of lifetime relationships; and

◆ When a child's goal is reunification, caseworkers are responsible for developing a visitation plan with the parent, child, resource parents, and other involved parties, and the visitation schedule must be clearly documented in MACWIS.

*Visitation*

Visiting between family members and children in foster care is one of the primary ways in which family relationships are maintained, including parent/child visits and sibling visits when they are separated. The following list represents policies that support preserving and maintaining connections through visitation regulations.

◆ When siblings are not placed together it is very important that regular contacts be maintained, unless the case record justifies that this is not in the best interest of the children. The sibling's visitation plan and any visits between siblings must be included in MACWIS;

◆ Visitation with kin will be held at the discretion of COR. Every effort should be made to provide visitation, on a case by case basis, if not related to the child within 3rd degree, but there is a shown connection through community, school, church, etc, or if the child expresses connection to an individual they consider kin;

◆ Contact between the child and their family shall occur within the first week after placement. If this cannot be face-to-face, then a telephone call will occur;

◆ Visits must be made to the family home to assess the home environment and its safety. Observations must be made to clearly assess the safety of the child(ren) in the home and continue as long as case is open;

◆ A visitation plan should be developed with children/youth in custody, their mother and father, primary caretaker, siblings and kin. Resource families may also be included. The plan should specify the time and location of visits. The caseworker, parents/guardian/primary caretakers, resource parents and the child, if age appropriate, shall be involved in the development of this schedule; and

◆ The worker shall document visits in MACWIS on the visitation screen using the visitation log to record each visit or contact between parent/primary caretakers and child. An evaluation of the visit shall be documented in narratives.

*Familial Involvement*

Similar to visitation, connections to family cannot be supported completely without familial involvement in the child's life in other ways while in foster care. Emotional connections through familial involvement in the life of the child are also crucial for children to be able to preserve connections to their community. The following list details policies and concepts of policies that support this aspect of preserving and maintaining connections:

◆ A *Family Team Meeting* is any face-to-face meeting with one or more family members for the purpose of assessment and case planning. A FTM involves working closely the family to identify family members, extended family, and supportive persons the family wants to

engage in the assessment and case planning process. The family members should be brought in as early as possible and actively engaged throughout the life of the case in the decision making process;

♦ Caseworkers must resolve the issue of Indian heritage as soon as possible after contact is made with the family either through a report of abuse/neglect or a referral for services. The caseworker is to ask certain specific questions to gain knowledge in deciding what is in the best interest of the child. The tribe must be notified of any court hearings involving an Indian child. Notification is to be provided immediately, by telephone and certified letter to the tribe when a Choctaw child or other Indian child is taken into MDHS custody. Specific policy regarding procedure for reports involving a Native American child. Procedures are different dependent upon if the child is a member of the Choctaws living on tribal land, not living on tribal lands or member of other tribes; and

♦ Parents must be invited to the County Conference but if their whereabouts are unknown, diligent efforts to locate them at least every six months must be documented in the case file. Examples of how to search for parents include: checking with Divisions of Economic Assistance and Child Support, utilizing a parent locator service, contacting local utilities and LEA, searching telephone directories, contacting relatives, and writing to last known address and post office forwarding.

In rating the effectiveness of policy on preserving connections and relationships (including policy on parent-child visiting and the use of relatives as placement resources) respondents to the survey indicated that the policy was frequently or almost always effective about 69 percent of the time.

## Gaps

While there are several existing policies that will support the implementation of the preserving and maintaining connections component of the practice model, there are several policy areas that will need enhancement, clarification, or development.

### Appropriate and Most Suitable Placement

Policy does not appear to address placement of children in proximity to original schools or maintaining them in their original schools when considering placement locations other than addressing school in the ISP. Policy considers a 50 mile radius to be within close proximity of the home, which could mean placement well outside of the child's community.

Although policy states that diligent efforts should be made to place siblings together and that decisions not to place siblings together must be approved by the supervisor and regional director, we thought the policy should be stronger in actually requiring sibling placements together unless specifically contraindicated by the children's needs. We also did not identify policy directing how to handle situations where only one sibling was moved from a placement and not other siblings.

### Planning for Leaving Care

We identified a couple of policy gaps regarding children for whom reunification is the goal. First, while there is a discussion in policy to plan for a child leaving care, it does not require an

**Mississippi Practice Model**

actual after care plan, only to do a final ISP within ten days of terminating services. In order to facilitate a smooth transition out of State care, a case-specific aftercare plan should be developed with the family in advance of case closing.

Second, with regard to trial home visits, there is a policy regarding trial home visits to support reunification but the policy does not specifically address the need to conduct monitoring visits in the trial reunification home, or interviewing both the child and the caregiver separately as appropriate. This is a crucial component to ensure that returning to the reunification is in the best interest of the child.

Third, we did not identify policy that addresses the importance and expectations of the relationship between foster and birth parents in maintaining connections for the child. The eligibility requirements for a home study state that foster parents must cooperate with any plan to reunite the child with their family and work with that family to do so as well as should explore the attitudes of applicants to birth parents, but we thought that policy should go further in identifying how this should occur, how the two families should actually work together, and how the expectations should be monitored or enforced.

*Visitation*

Policy indicates that children have a right to visits with the family and that a visitation plan is required in the child's ISP, but there are several items that are not addressed in the policy. First, the visitation plan lists the time and location of visits to occur, but policy does not provide direction on how to create the plan. Second, the policy does not address updating the visitation plan, only that it is included in the ISP, which is updated at 90, then every 180 days. Third, policy does not give specification of how frequently visitation should occur between children and caregivers, which is critical for maintaining connections, particularly for younger children and infants, where bonding with parental figures is a critical developmental issue. Fourth, policy notes monthly face-to-face visits among siblings who are not placed together must occur monthly, it notes that phone or in writing may occur if face to face cannot be scheduled, and more frequent visitation may be scheduled if approved by a supervisor. Visits among siblings who are not placed together should be more frequent in order to preserve familial connections unless contraindicated by their individual needs. Finally, while it is noted in FTM policy that extended family and supportive persons should be engaged early on and throughout the life of the case, policy notes that visitation with kin will only be held at the discretion of the COR, which leaves some opportunity for those connections to be weakened.

*Familial Involvement*

While existing policy requires workers to determine if a child is of Native American heritage, it does not discuss how, when, and the importance of maintaining the child's Native American culture, as well as other cultural backgrounds from which children in foster care may come.

We could not identify policy that details familial involvement in the daily lives of children while they are in foster care whenever it is safe and appropriate. FTM policy notes that family members should be actively engaged throughout the life of the case and in decision making, but does not address this crucial day-to-day aspect of parenting.

It is important for the worker to prepare all family members with support and guidance before and after visits to ensure that they are meaningful and assist in addressing the concerns that led the child to be placed. While there is a visitation policy detailing how often to visit with various family members, we could not identify guidance on how to prepare and support family members to maximize their visitation in policy.

Regarding emotional support, there is policy discussing mentors as part of the Transitional Living Plan and in order for emancipation to occur, the policy does not identify how this resource is to be accessed or used, only that it is required in some specific circumstances.

Policy currently requires that children with a goal of long term foster care have a plan for continued contact with parents/primary caretaker, siblings, relatives and other connections, but we thought the policy should actually require efforts to maintain these connections unless contraindicated by the child's needs.

### c. Monitoring

Monitoring practice to ensure that children and families are being served effectively and appropriately by the State is a crucial component to all child welfare practice, and in particular to ensuring connections are preserved and maintained for families with children in foster care. While DFCS does not have a comprehensive quality assurance process in place, it has some activities in place that support the monitoring of quality case practice aimed at preserving and maintaining connections for children in foster care.

**Strengths**

*Foster Care Reviews[10]*

The FCR is the primary methodology by which DFCS conducts quality assurance reviews on current case practice. As part of the County Conferences which occur every six months, third party reviewers conduct the FCR and complete the Periodic Administrative Review tool, which includes 46 case practice questions for reviewers to consider on specific cases. This information is then reported back to the Director of FCR, who monitors trends and monthly compliance issues related to the FCR. Over the last year, an average of 21.5 percent of cases reviewed was found to have one or more issues which needed to be addressed by the caseworker and supervisor. The table below represents the ten questions/issues found that relate to the monitoring of preserving and maintaining connections issues.

---

[10] Please note that these issues are the results of what is reviewed on the Periodic Administrative Review (i.e., there is a direct correlation of each 'issue' to a question on the review tool). In addition, these percentages represent the percent of cases reviewed that month where any issues (one or more) were found in cases.

**Mississippi Practice Model**

| Percent of All Cases Cited for an FCR Issue with an Issue Relating to Preserving & Maintaining Connections: | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | YTD |
| Issues related to children placed out of state with no outgoing ICPC request made to the state of placement. | 1.1 | 1.2 | 0.0 | 0.0 | 1.1 | 1.3 | 2.4 | 0.0 | 0.0 | 0.0 | 0.0 | 0.7 |
| Issues cited due to a lack of caseworker/parent or primary caretaker monthly contacts. | 5.3 | 6.0 | 6.8 | 17.2 | 15.4 | 15.4 | 14.6 | 11.3 | 22.5 | 9.7 | 11.5 | 12.1 |
| Issues related to a lack of regular, documented efforts to locate parents / primary caretakers whose whereabouts are unknown. | 5.3 | 8.3 | 7.8 | 6.5 | 3.3 | 0.0 | 3.7 % | 4.2 | 8.5 | 1.6 | 0.0 | 4.7 |
| Issues cited due to a lack of monthly visitation between foster children and their parents | 4.3 | 6.0 | 3.9 | 2.2 | 2.2 | 6.4 | 1.2 | 2.8 | 0.0 | 0.0 | 1.6 | 2.9 |
| Issues related to children who are not having regular monthly visits with their siblings who are placed separately in custody. | 6.4 | 9.5 | 1.9 | 7.5 | 1.1 | 7.7 | 9.8 | 5.6 | 2.8 | 4.8 | 1.6 | 5.4 |
| Issues related to a lack of an ICWA contact with the family | 12.8 | 10.7 | 19.4 | 23.7 | 22.0 | 28.2 | 22.0 | 9.9 | 19.7 | 22.6 | 13.1 | 18.7 |
| Issues related to children for whom efforts have not been made to locate relatives for possible placement. | 5.3 | 1.2 | 3.9 | 8.6 | 1.1 | 0.0 | 3.7 | 0.0 | 1.4 | 3.2 | 0.0 | 2.8 |
| Issues related to cases where it appears primary connections are not being preserved for the child(ren) in custody. | 4.3 | 1.2 | 0.0 | 3.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 1.6 | 0.0 | 1.0 |
| Issues cited due to a lack of notification to foster parents and grandparents to review/permanency hearings. | 5.3 | 1.2 | 6.8 | 2.2 | 2.2 | 1.3 | 2.4 | 2.8 | 0.0 | 0.0 | 1.6 | 2.6 |
| Issues related to children who are not placed within close proximity of their original home and the reason for the placement does not appear to be related to the achievement of their case plan goals. | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |

As indicated in the table above, the issues monitored that relate to preserving and maintaining connections center around visitation while children are in care and remaining in contact with family members while children are in care. On average, 5.7 percent (based on YTD totals) of all cases cited with some issues were cited with issues relating to preserving and maintaining connections. This is relatively minimal considering that issues monitored for this component represent 19.6 percent of all issues monitored. The number of issues monitored in this area, proportional to the total number of issues monitored, indicates that preserving and maintaining connections is a clear priority for monitoring through the FCR. In addition, the majority of the

specific issues cited fell well below the YTD average of 5.7 percent, indicating a low incidence of citation, and a current strength in case practice. The issue least frequently cited for issues is proximity of placement, with 0% of cases reviewed being cited. However, it should be noted that this is based on policy's 50 mile radius, which is likely inadequate for actually placing a child in their own community.

### Settlement Agreement/Court Monitor

Another way in which DFCS' practice is monitored is through the *Olivia Y* settlement agreement, whose mandates are to be monitored on a quarterly basis by the Court Monitor. There are four mandates that relate to preserving and maintaining connections, as detailed in the table below.

| Standards Related to Preserving and Maintaining Connections | Status[11] |
| --- | --- |
| An assessment of case practice associated with parent/child and sibling visitation to identify barriers to meeting the visitation standards set forth in Section II.B.6 of the Plan | Initiated but not completed |
| DFCS shall develop and implement an expedited process for licensing screened relative caregivers to enable a child to be placed quickly with relatives upon entering placement. All relative placements approved for expedited placement shall undergo the full licensing procedure within 120 calendar days of the child's placement in the home. | Policy changed to support this, to be monitored through CM case review process |
| Defendants, in conjunction with COA, shall develop and begin the implementation of a written plan to ensure the speedy licensing of all current unlicensed caregivers to be phased in by the end of the second implementation period. | Not satisfied |
| Defendants will develop and begin implementing a written plan to address the barriers identified in the visitation practice assessment. | Plan not developed |

Similar to the FCR, these standards predominantly relate to the proximity of placement to their removal home and visitation with family members. While none of the standards have currently been met, the majority of them have been initiated indicating the importance placed on these issues by DFCS. For an additional level of monitoring, it should be noted that the Court Monitor intends on conducting case reviews for several of the mandated standards, which will assist in the development of more comprehensive quality assurance activities.

### Supervision

Monitoring also occurs at the supervisory level, predominantly through the Supervisory Administrative Review (SAR). While the SAR is mainly a checklist to ensure that certain practices have been completed, it should be noted as a framework for conducting quality reviews on case practice. A few of the questions asked on the SAR relate specifically to preserving and maintaining connections, though it should be noted that it doesn't appear that all questions need to be answered:

- ◆ Were reasonable efforts made to maintain the child in his/her home and does the court order reflect those efforts?

- ◆ Are siblings placed together?

---

[11] As of last Court Monitor's Report.

♦ Have relatives been explored for placement?

♦ Have diligent searches for relatives/absent parents been explored?

Again, similar to the other monitoring activities that currently exist in Mississippi, the questions asked relating to preserving and maintaining connections revolve around issues of visitation and proximity of a child's placement.

### Gaps

There are a couple of gaps in the monitoring of case practice through the FCR which should be highlighted. It should be noted first and foremost, the FCR was not designed to be a comprehensive QA system, but in the absence of a formalized system, has gradually assumed this broader role, instead of serving solely as an administrative review to meet the Federal requirement of a periodic review of case plans for children in foster care. Acknowledging this, the FCR is not designed to (and does not) monitor the resource family's role in promoting and supporting the maintenance of connections and relationships. Also, the issues most frequently cited relate to identifying and establishing an ICWA connection (18.7 percent YTD), and the process is not designed to monitor the maintenance of other social and cultural networks.

Regarding the Settlement Agreement/Court Monitor's efforts, the focus is correctly on determining whether or not DFCS achieves the outcome measures specified in the settlement agreement, and we did not identify monitoring standards relating to the responsibilities of caseworkers and resource families to ensure meaningful and regular visitation.[12] As DFCS develops its internal CQI process, it will be important to address the practice issues that support and encourage meaningful and frequent visits. We could only identify minimal instruction for supervisors with regard to their monitoring of quality casework practice, including visiting. Specifically in the SAR, we did not identify discussion or questions regarding whether connections have been are preserved while children are in care, and if the efforts to do so have been made by the caseworker.

## d. Current Practices and Resources

### Strengths

While it is important to have infrastructure in place such as training, policy, and monitoring, how those tools translate into practice is critical to understanding how DFCS currently supports preserving and maintaining connections for children in care. DFCS has several strengths in this practice model component which should be highlighted.

### Support Services

DFCS currently has statewide contracts for services that support family preservation and reunification which address preserving connections. Family preservation services were particularly noted as a strength in Mississippi in multiple focus groups around the state. In addition, intensive in-home services, such as MYPAC and Intercept, are provided to children

---

[12] We understand that the Court Monitor is in the process of finalizing a case review instrument to address the issues monitored for the settlement agreement, and that casework practice in relation to visiting may well be a part of that instrument when it is finalized and implemented.

**Mississippi Practice Model**

residing in their own homes and the homes of relatives, should they need to be removed from their homes. DFCS also has homemakers in some counties which focus group participants found to be extremely helpful in facilitating visitation with parents, siblings, and extended kin, which is critical to maintaining connections.

In rating the effectiveness of services pertaining to preserving and maintaining connections, survey respondents rated services to prevent placement as the most effective (about 64 percent frequently or almost always effective), although that is less than two-thirds of the time. They rated reunification and post-reunification services as less effective (about 56 percent and about 48 percent frequently or almost always effective respectively).

| Please rate your perception of your agency's effectiveness on each area below regarding supports related to preserving connections and relationships: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Sometimes | Frequently | Almost Always | No Info/ NA | Total |
| Services and support to prevent placement: | 1 (0.58%) | 7 (4.09%) | 36 (21.05%) | 44 (25.73%) | 65 (38.01%) | 18 (10.53%) | 171 |
| Availability of services to facilitate and support reunification: | 0 (0%) | 9 (5.33%) | 48 (28.4%) | 45 (26.63%) | 49 (28.99%) | 18 (10.65%) | 169 |
| Post-placement reunification services to families to prevent re-entry into foster care: | 3 (1.74%) | 20 (11.63%) | 42 (24.42%) | 42 (24.42%) | 41 (23.84%) | 24 (13.95%) | 172 |

## Cultural and Supportive Connections

Focus group participants including social workers and supervisors, noted many ways in which they help preserve and maintain connections to community through supporting children culturally and spiritually. To assist with language and other cultural barriers, workers and supervisors indicated they research cultures on-line, engage in grassroots efforts to access language assistance and connecting children in foster care with adults from similar backgrounds who can speak their native languages, i.e., language teachers in schools and other community resources. Local churches and their community events were noted as important to maintaining connections and accessing resources spiritually and emotionally for children. In addition, focus group participants discussed identifying and contacting Native American communities as a way that they currently preserve and maintain connections for children in care.

In rating the agency's effectiveness in maintaining tribal relationships and connections for Native American children in foster care, less than half of the survey respondents indicated that the agency was frequently or almost always effective (about 47 percent). A little more than half of the respondents indicated that the agency was frequently or almost always effective in providing for a caring, committed adult to assist youth transition from foster care (about 61 percent) and in identifying and addressing relevant cultural issues for families and children (about 54 percent).

| Please rate your perception of your agency's effectiveness on each area below regarding supports related to preserving connections and relationships: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Sometimes | Frequently | Almost Always | No Info/ NA | Total |
| Maintaining tribal relationships and connections for Native American children in foster care: | 3 (1.78%) | 9 (5.33%) | 17 (10.06%) | 30 (17.75%) | 50 (29.59%) | 60 (35.5%) | 169 |
| Providing that youth in foster care have connections to at least one committed, caring adult to aid in the youth's transition from foster care: | 0 (0%) | 19 (10.98%) | 25 (14.45%) | 47 (27.17%) | 59 (34.1%) | 23 (13.29%) | 173 |
| Identifying and addressing cultural issues relevant to families and children: | 1 (0.57%) | 12 (6.9%) | 47 (27.01%) | 48 (27.59%) | 47 (27.01%) | 19 (10.92%) | 174 |

*Visitation and Placement Practices*

Both caseworkers and supervisors noted that a primary way that they maintain connections for children is through their various visitation policies. As noted above, proximity of placement is important to maintaining important connections for children, particularly their schools. Supervisors in the focus group noted that some county schools will transport kids wherever they are from, as a way of maintaining that crucial connections. Another promising practice that exists in some counties, according to some focus group participants, is the requirement of licensed social workers doing the walk through and approval of informal kin placements.

In rating their effectiveness with regard to other practices relating to preserving connections and relationships for children in foster care, respondents to the survey rated the use of relatives as placement resources, placing siblings together, and supporting visits with parents and siblings the highest, indicating they were frequently or almost always effective in these areas about three-quarters of the time (about 78 percent, 75 percent, and 76 percent respectively). They rated keeping children in the same school setting when placed in foster care and birth parent involvement in caring for their children in care the least effective, indicating these areas of practice were frequently or almost always effective less than half the time (about 45 percent and 49 percent respectively).

**Mississippi Practice Model**

| Please rate your perception of your agency's effectiveness on each area below regarding supports related to preserving connections and relationships: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Sometimes | Frequently | Almost Always | No Info/ NA | Total |
| Identification and use of relatives as placement resources: | 0 (0%) | 3 (1.71%) | 20 (11.43%) | 51 (29.14%) | 85 (48.57%) | 16 (9.14%) | 175 |
| Placing siblings together in same foster care setting: | 0 (0%) | 4 (2.31%) | 26 (15.03%) | 57 (32.95%) | 72 (41.62%) | 14 (8.09%) | 173 |
| Placing children within their own communities when appropriate: | 0 (0%) | 11 (6.32%) | 44 (25.29%) | 44 (25.29%) | 61 (35.06%) | 14 (8.05%) | 174 |
| Maintaining connections of children to family members while in foster care: | 0 (0%) | 6 (3.45%) | 25 (14.37%) | 49 (28.16%) | 80 (45.98%) | 14 (8.05%) | 174 |
| Visiting between children in foster care and their families and siblings: | 0 (0%) | 4 (2.31%) | 23 (13.29%) | 51 (29.48%) | 81 (46.82%) | 14 (8.09%) | 173 |
| Maintaining children in their same school setting when placed in foster care: | 0 (0%) | 28 (16.09%) | 51 (29.31%) | 41 (23.56%) | 38 (21.84%) | 16 (9.2%) | 174 |
| Foster parent involvement in supporting child-parent visits and other contacts: | 1 (0.58%) | 16 (9.36%) | 34 (19.88%) | 50 (29.24%) | 56 (32.75%) | 14 (8.19%) | 171 |
| Birth parent involvement in helping to care for their children while in foster care: | 7 (4.09%) | 29 (16.96%) | 37 (21.64%) | 46 (26.9%) | 37 (21.64%) | 15 (8.77%) | 171 |

## *Gaps*

There are some gaps in current practice that limit children in care effectively maintaining connections with their own family and community.

### *Placements*

Several of the gaps or barriers to maintaining connections for children in care revolve around placement issues. According to some interviews, there is a current backlog of pending foster home studies in certain areas of the State, and some of these may be relatives interested in becoming licensed. In addition, there are insufficient numbers of foster homes for children to remain in their own communities and/or to be placed with their siblings on a consistent basis. The difficulty in placing sibling groups together was supported by both the supervisory and caseworker focus groups around the State. Another issue noted by focus group participants is the fact that the State Office maintains access to therapeutic resource homes, which can be difficult for efficiently placing children in the best home available to support their connections while in care.

Another concern noted in preserving and maintaining connections is the distance of resource homes from a child's community. Focus group participants estimated that they are only able to

place children within the 50 mile requirement 50% of the time, which is already a barrier since 50 miles may well lie outside the child's known community. Related to this issue are the numerous transportation barriers that exist for parents, as well as workers' ability to facilitate connections from children who are placed further away.

While most focus groups commented that licensing relatives as foster care providers has increased and was seen as helpful, they commented that it often takes three months or longer to get a license. Focus group participants also noted the financial requirements that the State has for foster homes as well as the marital status requirement, which sometimes precludes placement with relatives. Participants did note that the State is looking into lessening the restrictions for kin placements, including counting board payments in their financials, but this policy is not yet in effect.

Some focus group participants also addressed the relationships between resource families and birth parents. Participants noted that there is the expectation that foster families will work with birth families, maintaining a relationship with birth family if the child is to be reunified or supporting a continued relationship with the birth family if child can't be reunified, but they noted that some foster parents resist this practice and do not support birth parent involvement. Focus group participants noted that while foster parent training addresses this concept, the practice is not consistently in place.

## Fathers

Focus group participants identified the lack of involvement of fathers with children in care. In general, focus groups noted that they don't always do a good job of engaging fathers, and that it is critical that staff value the importance of fathers in a child's life. Participants noted that fathers may be hesitant to become involved due to custody or child support issues, and if the mother does not know or will not say who the father is, establishing paternity is an expensive practice and the workers may not pursue it.

## Visitation

While focus group participants indicated visitation as a primary way in which they preserve and maintain connections, results from the reunification services case review suggest visitation may not be occurring frequently enough to maintain connections. Of the 30 cases selected in this case review, 13 (43.3 percent) cases had visitation between the child and their caregiver more than monthly, another 13 (43.3 percent) had child-caregiver visitation between monthly and quarterly, and the remaining four cases (13.4 percent) had visitation quarterly or some other time frame. Frequent visitation between child and caregiver is critical to maintain connections, is of particular importance for younger children. For caseworker-caregiver visitation, the case review found that 15 (50 percent) had visits at least monthly, with the other 50 percent occurring less frequently than monthly. When case reviewers were asked to clarify any infrequent visitation, seven of the 18 comments (38.9 percent) noted infrequent visitation due to distance of child placement from their birth home. Non-existent visitation was noted in five of the 18 comments: two with no sibling visitation, two with no caseworker-caregiver visitation, and one with a conflicting visitation plan. Four (22.2 percent) comments cited non-engaged caregivers for lack of consistent visitation, and the final two comments (11.1 percent) related to court limiting visitation.

Some focus group participants also identified court practices as a barrier to having consistent visitation among family members. Among the areas of concern noted in the focus groups:

♦ Courts can deny visitation;

♦ Some judges may order that no visitation may occur until the first court hearing, which is usually 24-48 hours, but could be longer;

♦ Some judges may order that no visitation may occur until a parent or relative has one or two clean drug screens, regardless of the age of the child; and

♦ Some judges may order a psychological evaluation or other assessment on the parents before allowing visits to occur.

*Language Barriers*

An issue identified by focus group participants was in regard to language barriers and the lack of resources to address these issues. All focus group participants noted a growing Hispanic population in particular, as well as other populations. They also noted minimal to non-existent translation services, few bilingual caseworkers, and few bilingual resource homes to serve the children and thus help to preserve connections to the child's background. While some caseworkers have accessed resources at local universities to help address this deficit, this is a costly practice and presents confidentiality issues.

### e. Summary of Inputs

### *Training*

We identified the following strengths in training related to this component of the practice model:

♦ Pre-service training has several modules and discussions relating to the separation issues children may face and the importance of making connections with family early on in a case;

♦ Training stresses the importance of visitation, as well as fostering a relationship between resource and birth parents.

♦ The PATH training for resource parents emphasizes working with the birth parents to facilitate reunification, sharing the parenting role with parents, and facilitating visitation between the children and birth parents.

We identified the following gaps in training that should be addressed in order to ensure that the connections are preserved and maintained, and becomes more fully institutionalized in casework practice:

♦ There is not training on how or if to consult with tribal community on an ongoing basis beyond information obtained in investigations;

♦ There is not training on planning for reunification or aftercare planning for both children leaving care and birth parents;

♦ There is not detailed training on how to engage non-custodial parents and their kin in a child's life, only to consistently search for them;

♦ While training notes that parents having access to their children for parenting purposes while they are in foster care is important, there is no discussion of how workers should determine if it is safe to do so, and if it is safe, how workers should facilitate this happening;

♦ Current training does not discuss the creating and maintaining of emotional connections for children, including social networks and mentors for children and youth; and

♦ The PATH training does not cover the facilitation of sibling connections should children be placed in separate resource homes.

## Policy

DFCS has extensive and accessible policy that helps direct practice in the field. We identified the following strengths in policy related to this component of the practice model:

♦ Policy focuses on the prioritization of placements with kin as well as sibling placements in the least restrictive placement possible;

♦ The importance of visitation with parents, siblings and kin is also stressed throughout the policy manual.

We identified the following gaps in policy pertaining to this component of the practice model:

♦ A 50 mile radius is not close enough to ensure that, if appropriate, children are placed in their home community where they have established connections;

♦ Extended kin and other supportive resources are to be involved with the case and allowed visitation at the discretion of the County of Responsibility;

♦ There is no policy on how to involve families in their children's day to day lives if they are placed in care.

♦ Frequent visiting between parents and children in care, and between siblings separated in foster care should be strengthened in policy.

## Monitoring

We identified the following strengths in monitoring case practice for preserving and maintaining connections:

♦ Several of the issues monitored through the FCR process relate to preserving connections with family and community; and

♦ Supervisors are taught to play a role in monitoring caseworker practice to ensure these relationships are preserved.

We identified the following gaps with regard to monitoring this component of the practice model:

♦ There is no current comprehensive QA system, and reliance on the FCR is not sufficient for ensuring connections are preserved and maintained for children who are placed outside of the home.

## *Current Practice and Resources*

We identified the following strengths in current case practice for preserving and maintaining connections:

♦ Prevention and preservation services, including Family Preservation, MYPAC and Intercept are very useful and effective;

♦ Importance is placed on identifying any Native American connections at the outset of cases;

♦ Current practice emphasizes close placements and frequent visitation.

We identified the following gaps with regard to current case practice for this component of the practice model:

♦ Placement resources are lacking, causing placements to be far away from children's communities, and impacting visitation with family and other connections;

♦ Fathers are not being involved to the extent they should be.

## Section 2:  Outputs

The review of current training, policy, monitoring and case practice revealed both strengths and gaps regarding the preserving and maintaining connections. In order to implement fully this component of the practice model, we have identified the following work products, activities, and roles and responsibilities for staff and stakeholders that should be implemented:

### a. Products

### *Training*

While the current training supports several aspects of the practice model component of preserving and maintaining connections, we have identified the following additional skills-based training that is needed to assure the practical application of this component of the practice model:

♦ Training content is needed for resource families and caseworkers that focuses on involving parents in the parenting of their children while in foster care whenever it is safe and appropriate to do so.  This may present a major conceptual departure away from viewing foster care as a substitute for the parents to more of a support to the family, and training can assist in this conceptual shift as well as provide the skills needed for implementation. This should include helping parents and resource families to work as allies, increasing parental participation in the parenting and upbringing of their children, and supporting the development of their parenting skills.

♦ Caseworker and supervisory training should have content focusing on how to prepare children, birth families, resource families and extended family for reunification and aftercare planning for all parties. This would include at what point in the life of the case these issues are discussed, how to engage in conversations with all pertinent parties on both reunification and aftercare planning, and how to support both children and resource families with the straining of the emotional bond formed while the children have been in their care.

◆ Expanding current training on identifying all familial resources to include a focus on how to actively engage non-custodial parents in the lives of their children while in care, particularly fathers.

◆ Caseworker and resource parent training should cover the importance maintaining of existing emotional connections for children who are in care, including social networks, and creating new mentors for children and youth to provide additional support. This training should cover how to engage children at the beginning of their time in foster care to determine what relationships are important to them, and how to identify and fill any void, including cultural connections, that may have been severed due to the circumstances of their placement.

◆ Training on CQI is needed for caseworkers, Area Social Work Supervisors, Regional Directors, and CQI staff on the activities involved with CQI and their importance, how outcomes are measured by CQI staff and how the day to day work of caseworkers directly relates to the outcomes of quality assurance measures.

## *Policy*

In order for the practice of preserving and maintaining connections to be infused throughout DFCS, policy needs to be enhanced to support the full implementation of the practice model. We identified the following work products that we recommend DFCS develop to implement this component:

◆ Policy should clearly define family involvement and the importance of maintaining connections to family while a child is in foster care. The definition should include active participation of custodial and non-custodial parents in the child's activities, engaging extended family and other familial supports, and ensure the appropriate addressing of any language barriers that may exist. The definition should include parental participation in parenting their children while in foster care.  It is important that the definition of family involvement go beyond inviting their participation and include the facilitation of their active involvement whenever it is appropriate to do so.

◆ Policy should be strengthened to require placement within the child's community whenever possible and appropriate, as defined by proximity to the parents, school, extended family, and other social supports, rather than the current 50-mile radius.

◆ CQI policy should be developed and disseminated supporting this component of the practice model. Specifically included in the CQI plan should be procedures regarding CQI case reviews and how to monitor case practice to ensure that children's connections are preserved and maintained.

◆ Policy should be developed for DFCS and contracted service providers prohibiting the cancellation of visits between parents, extended family, siblings and children in foster care as a disciplinary action. Courts should also be informed of this policy. Particularly at the outset of the case and if the child is young, consistent and frequent visitation is critical to maintaining emotional connections.

◆ Existing policy should be strengthened to mandate that the caseworker is required to meet with the biological parents at least monthly, as long as the permanency goal is reunification, and consistent maintain contact with the parents should the permanency goal change. Visitation between siblings who are placed in different placements, regardless of their

permanency goal, should be required as the children's needs indicates, and at a minimum of one time a month.

♦ Policy regarding parental visitation should be strengthened to include that parents be allowed to visit with their child within 24 hours of placement unless deemed inappropriate, and children should be allowed a phone call with relatives within 24 hours of placement if the parental visit does not occur.

### *Monitoring*

In order to ensure that the practices associated with this component of the practice model are implemented similarly across the State, it will be important that similar monitoring processes be established in every county. We have identified the following work products pertaining to monitoring for this component:

♦ An additional item should be added to the FCR to evaluate the extent of parental involvement in parenting their children while in foster care. This item would evaluate such activities as parents visiting in foster homes when appropriate, assisting with homework and attending school activities, participating in medical and other appointments with their children, and generally sharing parenting responsibilities with foster caretakers to the extent that it is appropriate and safe to do so.

♦ The development of a comprehensive CQI system incorporating the preserving and maintaining connection component is critical to the monitoring of case practice. This component will be monitored for quality case practice through CQI case reviews and the monitoring of data through MACWIS.

With regard to supervisory oversight, we recommend the following work products pertaining to this component:

♦ Concise and clearly stated supervisory standards should be established for their monitoring of preserving and maintaining connections in their caseworker's cases. Included in the standards should be the frequency of the case monitoring, the issues to be monitored, and a process of a feedback mechanism for caseworkers to hear, understand, and learn from the supervisor's observations.

♦ A process is needed to ensure that supervisory oversight and conformity to the standards are implemented and carried out regularly, as supervisors have more consistent influence over the implementation of the practice model than the CQI staff.

### *Practice*

In order for this component of the practice model to be implemented fully, protocols or practice guides that guide family involvement should be developed and utilized by all contractors and service providers, as well as caseworker staff. These protocols for contractors and service providers should include, but not be limited to:

♦ Protocols that assure that service plans used by contractors and service providers, including treatment plans developed by placement facilities for children in their care, are coordinated with and support the DFCS case plan. Both plans should address and include the same level of family and child involvement.

- ◆ Protocols that provide for service providers and contractors to be involved in developing DFCS case plans, as determined appropriate on a case-by-case basis.

- ◆ DFCS should develop an alternate process for county staff to refer children for placement in therapeutic settings, especially therapeutic foster family homes and group homes, in order to ensure that information from strengths and needs assessments, involvement of the child and family in decision making, and in case planning activities is used to drive the selection of and referral to appropriate placement resources.  In order to facilitate this process, DFCS should provide access to all needed information about these placement resources to county staff so that they can make informed decisions about appropriate placements and making only appropriate referrals, and minimize the practice of  "scattershot" referrals to all available facilities.

- ◆ In keeping with the foregoing bullet, DFCS should develop and/or maintain a process for approval and gatekeeping of the most restrictive placement settings, such as in-patient psychiatric hospitalization, in order to prevent children from going into settings more restrictive than their needs require.

The following protocols and practice guides should be developed to guide caseworkers in preserving family connections through case practice:

- ◆ A practice guide for identifying, locating, and engaging relevant family members, including non-custodial or absent parents, for inclusion in their children's lives is needed to help assure implementation of policy and procedures.

- ◆ A practice guide for caseworkers in how to assist youth develop and maintain social networks and support relationships children and youth had with prior to placement in foster care. These social networks and relationships may pertain to the children and youths school, faith, or culture. This practice guide should include how caseworkers can try to maintain a child's current school placement when entering foster care, including transportation options and a prioritization of available placements, based on proximity to the school, should it be deemed safe.

### b.  Activities

The specific activities where this component of the practice model can be expected to occur are as follows:

- ◆ *Identify and locate relevant family members:* DFCS should ensure active efforts to identify and locate all relevant family members, including non-custodial parents, upon initial case opening, and to solicit their involvement with the family whenever appropriate.  This should occur at a minimum prior to the development of the initial treatment plan, and re-emphasized over time as circumstances change and new information becomes available.

- ◆ *Caseworker visits with children and families:*  In order for families to be able to participate actively in the lives of their children in care, caseworkers should continuously solicit and utilize family input in assessing strengths and needs and determining what services will be most useful for the families in order to ensure the safety and well-being of children. This requires regular visits in convenient and comfortable locations and being accessible to the children and families to address any questions and concerns as they may arise.  Caseworkers

should visit with family members and children frequently enough to monitor their progress and know when to make appropriate decisions (the CFSR standard for visiting frequency is at least once per month and more frequently if needed).  Further, the visits should be purposeful, related to the provisions of the case plan, and used to involve family members in ongoing assessment of their circumstances. The visitation plan should be a formal document, developed at the initial case plan meeting within the first 30 days of placement, and regularly monitored and updated.

♦ *Use comprehensive strengths and needs assessment information to identify relationships and connections.*  The assessment process should include an exploration and identification of important relationships, connections, and affiliations for the child and family.  The worker should be familiar with this information and use it in working with the child and family to develop plans and interventions that support the connections.

♦ *Family meetings*: Family meetings are the cornerstone of preserving and maintaining connections for children placed in foster care. While CSF does not subscribe to any one specific type of family meeting, there are certain tenants which should be paramount. Prior to a case escalating to needing to place a child outside of the home, family meetings should occur frequently in order to prevent placement. Should a child need to be placed outside of the home, a family meeting should occur within the first two weeks of placement, and monthly thereafter as long as the goal remains reunification, and if the goal changes, every 90 days. The family should help determine who is invited to the meetings, develop the agenda with the assistance of the caseworker, as well as goals for outcomes of the meeting.

♦ *Support family involvement with children in care:* Family supports are crucial to not only helping families ensure the safety and well-being of their children, but also to empower families to become active partners in caring for their children in foster care, whenever possible and appropriate. As such, parents should be supported to play an active role in the children's out of home care, as deemed appropriate based on the circumstances of the case. This goes beyond simply facilitating family visitation while children are in out of home care, but also involvement in children's activities like school and church, as well as child rearing opportunities in the foster homes. PATH training would need to be enhanced to support foster parents participating in this area.

♦ *Address relationships and connections issues in initial and updated case plans.*  Issues pertaining to the child's relationships and connections should be identified and plans developed to support them in all case plans and updates.  This should include visiting arrangements and schedules; placement proximity; maintenance in community, school, and activities; relationships with friends; tribal ties; and other identified connections.  This activity applies to youth in foster care and the need to identify caring adult relationships and/or mentors to assist youth in transitioning to adulthood.

♦ *Identify and support tribal affiliations or Indian heritage and other cultural background.* Workers should identify early whether a child/family has a tribal affiliation or Indian heritage or another cultural affiliation, and if the information is not obtained early, workers should pursue it during initial case planning activities.  Where indicated, tribes should be properly notified of the agency's involvement with the child/family and provided the opportunity to have input into case planning and decision making, including notification of court and case

planning meetings. Services provided should be culturally appropriate and supportive and should be identified and reviewed periodically through the case planning process.

♦ *Advocate for school consistency.* Workers should take active steps to maintain children in their original school settings upon placement in foster care, unless their needs indicate otherwise. This includes advocacy with the school system and securing services needed to maintain the child in the school setting.

♦ *Place children in foster care settings that support their connections.* This includes placing children within their communities when safe and appropriate to do so, placing siblings together unless their needs indicate otherwise, and placing children in family-based settings whenever appropriate to their needs so that their families can be involved with them during placement.

♦ *Identify and evaluate relative placement resources early.* This includes identifying potential maternal and paternal relatives as possible placement resources, evaluating them early in the casework process, and making decisions about the appropriateness of placing children in their homes.

### c. Roles and Responsibilities

In order to implement this component of the practice model, we recommend defining the roles and responsibilities of key team members as follows:

#### Caseworkers

♦ In addition to visiting and case management responsibilities, caseworkers should be responsible for engaging families and preparing children for their time in foster care. Caseworkers should prepare families by informing them of their rights regarding contact and how they can and should be involved with their children while they are placed out of the home. Caseworkers should prepare children for their time away from their home, and talk with them about their families, schools, churches and other community events, as appropriate.

♦ Caseworkers should facilitate the foster child's active involvement in any important family or home community event as appropriate, particularly if they are placed far from the home.

♦ Caseworkers should have regular, consistent and meaningful contact with custodial, non-custodial, and extended family, providing regular updates on the foster child, and ensuring that they themselves are gaining access to their child, as appropriate.

♦ Caseworkers should prepare birth parents, resource parents, siblings and the child with support and guidance for a productive and meaningful visitation before each visit occurs. Caseworker should also meet with all parties after visits occur to discuss what was observed and learned, and how that information can be used to strengthen connections and help move the child closer towards reunification.

♦ They should be responsible for ensuring the active parenting for adults while their children are in foster care. Facilitating parental involvement with their children in foster care includes preparing and supporting foster parents to include parents and encouraging parental involvement.

- Caseworkers are responsible for engaging in case planning activities that identify and address important connections through the agency's interventions with the child and family.

- Caseworkers are responsible for coordinating planning activities and interventions with other service providers, including child placing agencies and other placement facilities that ensure that important connections and relationships are supported and nurtured.

### Area Social Work Supervisors (ASWS)

- ASWS are responsible for monitoring the quality of casework practice and work of caseworkers. This includes shadowing, mentoring, and holding regular individual and team meetings with all caseworkers that report to them.

- As part of their monitoring role, ASWS should have some degree of contact with the families in their caseworkers' caseloads, being available to answer questions and receive feedback.

- Supervisors should also perform regular, formal reviews of cases utilizing a standard protocol, and monitoring cases for quality case practice and ensuring that caseworkers are making diligent efforts to ensure that connections are being preserved for children.

- ASWS should support their caseworkers by ensuring and facilitating their access to ongoing trainings offered by the State and other partners, particularly skills based trainings related to preserving and maintaining connections. ASWS should assist caseworkers with their workload in order to ensure that they are able to attend trainings. ASWS should also debrief with caseworkers what was learned in training, not only to facilitate transfer of learning, but to ensure consistency in message.

- If child is placed outside their community, it is the ASWS's responsibility to actively support the caseworker in trying to place the child within their community, if it is deemed appropriate to do so.

- In order to support the successful implementation of this component of the practice model, the ASWS should hold regular team meetings to discuss issues of preserving and maintaining connections, have workers bring examples from their own cases, do role plays with workers, and bring in experts on forming emotional connections, as well as current and former parents to share their experiences from their perspective.

- ASWS should assist their caseworkers in accessing resources and services in the community to promote and support constructive parent-child visitation.

### Regional Directors (RD)

- Regional Directors should serve as visible and vocal proponents of supporting the relationships of children in foster care, by advocating for attention to this area among county/regional staff, service providers, and foster caretakers.

- Regional Directors should actively pursue the development and/or diversification of services within their regions that support this component of the practice model.

- Regional Directors should monitor and actively work to resolve barriers to preserving connections that rise to their attention, including distance of placement resources from

children's communities, and the lack of available support services relevant to a child's particular cultural or faith background or faith.

♦ Regional Directors should review data reports from both case reviews and MACWIS for monitoring of quality case practice in this area, and should hold all staff accountable for addressing this component in their work with children and families. They are also responsible for disseminating information to county staff, and should hold regular meetings if there are practice concerns that need to be addressed.

♦ Regional Directors should supervise the ASWS and ensure that they are performing their role as a supporter, mentor and monitor of caseworkers. To this end, they should hold regular meeting with all regional ASWS.

♦ Regional Directors should be responsible for notifying all county staff of changes to, updates on and new policies that are developed as part of the implementation of the practice model. They should ensure that the information is readily available and accessible to all staff.

♦ They should monitor the training received by all caseworkers and ASWS, to ensure they are in compliance with ongoing training requirements. Regional Directors should also ensure the scheduling and availability of training to county staff on issues related to this component of the practice model.

♦ Where indicated through reviews (e.g., CQI, FCR, court monitoring) Regional Directors should take the lead in developing strategies to improve performance with regard to maintaining relationships and connections, and should monitor performance to ensure conformity with the improvement plans.

### Continuous Quality Improvement (CQI) Staff

♦ CQI staff will be responsible for conducting quality assurance case reviews routinely and monitoring for quality case practice as it relates to the implementation of the model of practice, including the preserving and maintaining connections component.

♦ CQI staff should provide case level feedback to workers and supervisors on both the strengths and needs of practice observed in the reviews with regard to preserving relationships and connections, and assist staff in addressing concerns through their practice.

♦ CQI staff should identify strengths and needs of the activities of service providers, placement providers, and foster caretakers in addressing relationships and connections, and provide feedback to the agency and providers verbally and in writing to either reinforce positive practices or help strengthen weaknesses in practice.

♦ CQI staff should analyze the results and develop local reports on the results as they relate to each component of the practice model, including maintaining connections and relationships. CQI staff should be responsible for the distribution of the case review data reports to all regional directors.

♦ Where there are needs identified to develop county/regional program improvement plans to strengthen practice in this area, CQI staff should provide technical assistance to the county/region in identifying appropriate strategies and interventions, in approving plans to address weaknesses, and in monitoring progress in implementing the plans.

♦ If any problems are identified during the case review and analysis process relating to this component, CQI staff will be responsible for convening a meeting with the Regional Director, ASWS and related caseworker(s) to discuss areas of concern and help create solutions.

♦ In addition to the case reviews, CQI staff will also be responsible for monitoring data reports in MACWIS, as it relates to preserving and maintaining connections.

♦ CQI staff will be responsible for immediately notifying Regional Directors of any concerns that have arisen through either the CQI case reviews or the MACWIS data reports.

## Section 3:  Outcomes and Indicators

### a.  Short-Term Goals (0-12 Months)

The following items represent the outcomes of the short term implementation of the preserving and maintaining connections component of the practice model.

### Training

♦ *Interim Training Module*: DFCS should develop an interim training module on Preserving and Maintaining Connections that incorporates the basic skills and activities needed for the first wave to implement the model of practice. The module should focus on the activities, roles, and responsibilities identified for this component and should be skills-based in its content.  Among the skills needed to implement this component are:

   o Supporting the relationship between birth and foster families, and ensure birth families have an active role in the lives of their children.

   o Preparing families, children, and resource families for visits and debriefing with them after each visit.

   o Developing supportive social networks for youth in foster care.

   o Identifying opportunities to involve parents in the lives of their children who are placed in foster care.

### Develop Practice Guides

• *Preserving relationships and connections:*  A practice guide is needed on the broad area of preserving relationships and connections in order to guide staff in implementing this component prior to making all the needed policy revisions identified for this component. The practice guide should address the key activities noted for this component and provide guidance on carrying out those activities.

• *Visitation Planning:* DFCS should develop a practice guide detailing not only the frequency of visitation to be required among birth parents, extended family, resource parents, siblings and children but how caseworkers are to prepare for the visits, as well as debrief after them. Among the items to be detailed in the practice guide:

   o Parental visitation within 24 hours of placement. If not possible, telephone call with extended family within 24 hours of placement;

   o Sibling visitation, regardless of permanency goal, once a month; and

- o  Preparing all parties prior to visitation and debriefing with them after visitation.

- ◆  *Interim Supervisory Protocol*: DFCS should develop an interim supervisory protocol for counties in the short-term of the implementation plan, detailing both their roles in the transfer of knowledge of how to ensure connections are preserved and maintained for children, as well as how they should monitor case activity for this component. This should include:
  - o  Using ASWS meetings with caseworkers to monitor and discuss issues regarding connections;
  - o  Using supervisory techniques, such as shadowing case workers, modeling, and coaching staff; and
  - o  Using supervision as a first-line quality assurance technique that helps to assure children's connections to their family and community are maintained.

## Quality Assurance and Monitoring

- ◆  *Local CQI Capacity*: CQI staff should be made available at a minimum in each region to support the monitoring of the implementation of the practice model. They should be trained in how to conduct the case reviews and monitor MACWIS data, and how to prepare reports for dissemination.

- ◆  *Implement the CQI process to monitor practice model implementation.* DFCS State Office should begin implementation of the CQI process in the first set of regions to implement the practice model, including conducting baseline reviews to determine the status of preserving connections and relationships in casework practice in those regions.   This review will inform the implementation efforts and assist DFCS in preparing for subsequent phases of implementation.

- ◆  *FCR Enhancement:* DFCS state office, in conjunction with the CQI director, will develop additional measures to be added to the FCR relating to this component, including the existence of shared parenting responsibilities between resource and birth parents and birth parent attendance at school activities and medical appointments. The FCR measure on preserving connections should be amended to include a more detailed definition of preserving and maintaining connections, beyond parental visitation.

## Resource Development

- ◆  *County Resource Development*: An inventory of existing resource home, support services, facilities and contracted service providers should be conducted to determine any gaps in the current service and resource array in every county. This information should then be provided to the State Office.

- ◆  *Engage service providers.*  Early in the implementation process, service providers locally should be engaged, oriented, and assisted to commit to delivering services consistent with this component of the practice model.  Collaboration between MDHS and the provider community should focus on developing a common vision and common approaches to serving children and families, and concrete strategies for implementing this component, including identifying roles and responsibilities.

- ◆  *Prepare resource parents:*  In the short term and prior to revising the resource parent training, resource caretakers for the initial implementation in counties should be prepared and

supported to address their roles and responsibilities pertaining to involving parents in the lives of their children

### b. Mid-Term Goals (12-24 Months)

#### Develop Training Modules and Curriculum

♦ *Skills Based Training Enhancement*: DFCS should develop new training curricula that focus on skills critical for both caseworkers and resource parents on preserving and maintaining connections.

♦ *Foster and Adoptive Parent Training Enhancement:* The current resource parent training curriculum should be updated to include a focus on the skills needed for resource parents to include birth families in the parenting of their children while they are away from their home, and how to model parenting skills for parents.

♦ *Review of Existing On-Going Training*: DFCS should review existing training and update the curricula to ensure that concepts critical to preserving and maintaining connections are infused throughout. This includes:

  o The importance of consistent, frequent and meaningful visitation;

  o Caseworkers and resource parents facilitating the active parenting of children in foster care by birth families; and

  o Creating supportive networks for children and youth, factoring in connections through culture and faith.

#### Policy Development

♦ *Revise policies.* During this period, the agency should incorporate the policy revisions and develop the new policies identified in this component throughout its existing policy manual.

♦ *Implement contracting procedures to ensure conformity of practice by service providers.* MDHS should implement contracting procedures with service providers and child placing agencies that include performance standards relating to this component of the practice model. This will help ensure coordinated MDHS/provider approaches to preserving relationships and connections, and fidelity to the principles of the practice model.

#### Develop Ongoing Monitoring Processes

♦ *FCR Enhancement*: During this time period, the FCR should have been amended and all FCRs to begin to include monitoring of preserving connection activities especially sharing parenting responsibilities with foster caretakers to the extent that it is appropriate and safe to do so.

♦ *Implement CQI process.* The CQI process should become more fully implemented during the period of time in accordance with the CQI recommendations in this report. Regions that began implementation of the practice model during the first year will have follow-up reviews during this period and where needed, program improvement strategies will be in place.

♦ *Supervisory Standards of Monitoring:* The supervisory standards of monitoring, as described above, should become fully implemented and institutionalized during this time period.

Supervisory and regional directors will be sufficiently trained in their roles as it relates to monitoring, and all supportive protocols to support supervisory efforts will be available for use.

### c. Long-Term Goals (24-48 Months)

#### Full Implementation of Modules

♦ Within this time frame, the last two regions will have begun implementation of the practice model.

♦ Full implementation of all training curricula, policy revisions, and monitoring procedures will have been achieved.

♦ A focus of activity should be on coaching and supporting the practices associated with this component.

♦ An additional focus should be on assuring the systemic supports needed for this component are refined and fully in place, such as the availability of placement resources to place children close to their homes and communities, fully engaged foster caretakers, agreements with schools to maintain children in their original schools, and contracting procedures for service providers and child placing agencies.

#### Monitoring Practice Model Implementation and Success

In order to gauge the success of the full implementation of the practice model in achieving substantial improvements in the outcomes for children and families involved in the child welfare system, the following indicators provide measures for assessing progress relating to comprehensive family assessments:

*Olivia Y Measures*

*Placement Resources*

♦ Percent of children placed within their own county;

♦ Percent of siblings placed together in out of home care;

♦ Percent of case records where siblings are not placed together but documented diligent efforts are being made to reunite siblings;

♦ Percent of cases where children are placed directly with relatives.

*Permanency Planning*

♦ Percent of cases where an aftercare plan is developed prior to case closure;

♦ Percent of cases with a 90 day trial home visit prior to reunification;

♦ Percent of resource families advised of available subsidies and post-adoptive services provided;

♦ Percent of children in the same resource home for 12 months or more, whose resource parents have been engaged on discussions regarding adoption.

*Visitation*

♦ Percent of cases where child has a visit with parents within the first 24 hours of placement, or at a minimum a telephone call with relatives in the first 24 hours;

♦ Percent of cases where parent-child visitation occurs at least two times a month;

♦ Percent of cases with a minimum of one visit a month among siblings who are not placed in the same placement;

♦ Percent of cases with caseworker-child visitation two times a month, with one visitation occurring at the placement;

♦ Percent of cases with caseworker-birth parent visitation at least one time a month;

♦ Percent of cases with a visitation plan developed in first 30 days, updated every 90 days, and including all visitation between child and worker, parents, siblings and extended family.

*Facilitating Connections*

♦ Percent of youth actively involved in extracurricular activities, including church events, camps, sports teams, and other groups;

♦ Percent of children placed in foster care who remain at their same school;

♦ Percent of all resource and birth parents meeting in the first month of child's placement;

♦ Percent of families engaged in services to promote constructive parent-child visitation;

♦ Percent of cases with documented diligent search for absent parents.

## CFSR Measures

♦ Safety Outcome #2*: Children are safely maintained in their homes when possible and appropriate-*
  o Item #3:  Services to protect children in their own homes

♦ Permanency Outcome #2:  *The continuity of family relationships and connections is preserved for children.*
  o Item #11:  Proximity of foster care placement
  o Item #12:  Placement with siblings
  o Item #13:  Visiting with parents and siblings in foster care
  o Item #14:  Preserving connections
  o Item #15:  Relative placement
  o Item #16:  Relationship of child in care with parents

♦ Well-Being Outcome #1: *Families have enhanced capacity to provide for children's needs-*
  o Item #17-Needs, services of child, parents, and foster parents
  o Item #18-Child/Family Involvement in Case Planning
  o Item #19-Caseworker Visits with Child
  o Item #20-Caseworker Visits with Parents

**Mississippi Practice Model**

---

- ◆ Well-Being Outcome #2: *Children receive services to meet their educational needs*
  - ○ Item #21-Educational Needs of Child
- ◆ CFSR Permanency Composite #3: *Permanency for children in foster care for extended time periods.*

*Additional Measures*

- ◆ Frequency of family meetings with both birth and resource parent attendance.

Frequency of attendance of independent living skills class for at least three months.

**Mississippi Practice Model**

## *Component Six:  Individualized and Timely Case Planning*

A child welfare agency's interventions with abused and neglected children and their families must be planned, purposeful and directed toward the achievement of safety, permanency and well-being.  A case plan (in Mississippi the case plan would be the Individual Service Plan) provides the road map for a child and family to achieve a safe and permanent home for the child. The case planning process should:

♦   Identify the strategies that will help address the effects of the neglect and/or abuse while lessening the risk of further abuse and neglect;

♦   Provide a clear and specific guide for the social worker and the family for changing the behaviors and conditions that impact the risk to the child and their overall safety;

♦   Provide a benchmark for measuring client progress toward achieving identified goals and outcomes; and

♦   Provide a framework for decision-making with the family.

Safety plans, concurrent permanency plans and independent living plans for older youth should be incorporated into the case planning process as needed.  Flexibility is critical to developing and implementing individualized case plans. The use of creativity helps in developing new approaches to tackle difficult and sometimes unique problems.  It is critical that workers approach planning as a dynamic process and not just the completion of a written document.

An individualized case plan will start with information gathered from the comprehensive family assessment (CFA), and the planning process should continue to be informed by the CFA as the assessment process continues throughout the life of the case.  The development of the case plan, the review of the case plan and the overall planning process must involve all relevant family members, including parents who may not reside in the home and age-appropriate children in order to identify unique strengths and needs and strategies that offer promise of leading to measurable improvements.  The extended family and other participants should be included as indicated by the circumstances and/or input of any particular child and family. Plans should not be developed in the office and then "presented" to the family.  Instead, they must be a collaborative process driven by the family's needs and strengths while adhering to the statutory requirements that govern the agency's work with children and families.

In order for the case planning processing and case plans to be individualized the case plan must:

♦   Be developed *with* the family not *for* the family;

♦   Be developed early in the casework process, i.e., within 30 days of agency involvement with the family;

♦   Address both immediate and long-standing needs/issues which brought the family to the agency's attention;

♦   Address the underlying issues that contribute to the presenting needs;

♦   Include the safety plan, when appropriate, to address any immediate threats of harm to the children;

- Include specific tasks and goals that fit the individual family and their strengths and needs rather than generalized, boilerplate tasks and goals;

- Include tasks and goals that are reasonable and achievable, given the family's circumstances and strengths;

- Include benchmarks for measurable, behavioral change;

- Be written clearly in simple, straightforward language rather than standardized or bureaucratic jargon;

- Demonstrate an understanding of the family's culture and level of functioning;

- Be flexible enough to change as the family's needs and progress toward achieving the identified goals changes;

- Include independent living goals and specific plans and tasks for age appropriate youth; and

- Be reviewed and updated regularly *with* the family.

Visits with the family members, the child, the caretakers and other supports will be the caseworker's most effective tool in ensuring the plans are individualized and monitored to meet the family's needs while working towards the achievement of positive outcomes.

Another effective tool for developing individualized case plans and monitoring the status of the plans is the Family Team Meeting (FTM). This provides the opportunity to bring together both informal (the family, including non-custodial parents as appropriate, extended family members, friends and other informal community supports) and formal supports (representatives from education, mental health, physical health, substance abuse, etc who may be involved with or needed by the family) for the family to identify supports and services which will assist the family in achieving positive outcomes and ultimately reaching a life without the formal child welfare's intervention. Once the initial plan is developed the FTM provides the forum to regularly review the child and family's status, progress and results to ensure that the case plan maintains relevance, integrity and appropriateness.

## Section 1: Inputs

### a. Training

Based on a review of the curriculum utilized by DFCS, the following strengths and gaps have been identified.

### Strengths

### Pre-Service Training

In the *Case Planning and Family Engagement in the Child Welfare Setting* module the "Individual Team Meeting" (ITM) is introduced. The ITM is used to determine the progress on tasks in the Individual Service Plan/Service Agreement (ISP) and assess the father and/or mother's needs, strengths and protective factors as well as any services needed or being provided to the child(ren.) The training includes requirements for when the ITM should be held. The

concept of a FTM is also introduced in this training with information on who to include, timeframes for holding FTMs, the purpose of the meetings and how to prepare the family for the meeting. FTMs are to be used to review the ISP quarterly. The training also identifies what events will trigger the FTM, all of which have an impact on the ISP. Some examples of triggers are:

◆ Any move of the child;

◆ Family is not making progress toward the goals of the plan;

◆ Family is making progress and the services are no longer needed; and

◆ The child asks for a meeting to discuss their situation.

This training module also introduces concurrent planning which is required by Mississippi statute. Concurrent planning is defined as "to work toward reunification while at the same time establishing a backup plan and implementing primary and alternate plans simultaneously." The principles of concurrent planning are spelled out in this training. The reasons for concurrent planning include a child's need for and right to continuity and stability including the need for a stable home environment.

The training includes a discussion on how to determine the most appropriate placement setting for the child. Factors to be considered included the child's age, siblings, community connections, culture, temperament and personality.

The *Assessment in the Child Welfare Setting: Assessment Application* module explains that the Strengths and Risk Assessment (SARA) is tied to the child's ISP and must be completed each time the ISP is reviewed. The SARA should provide critical information necessary to develop an individualized and appropriate ISP.

## Advanced Skills Training

The Advanced Skills Training addresses the case planning process by identifying when case plans are to be completed and with whom (i.e. when the children are placed an ISP is done with the child(ren) and a separate one with the adult(s) in the home.) Trainees are given opportunities to practice writing goals related to the factors that contributed to the involvement of the child welfare agency in the family's life with action steps that both reduce risk and are connected to why the agency is involved with the family. An emphasis was placed on changing the goal(s) as circumstances within the family changes.

Just as in the pre-service training the concept of concurrent planning is introduced with the principles of concurrent planning and the reasons it is to be used. During the role play activities participants are encouraged to address both the permanency goal and the concurrent permanency goal.

## Supervisor Training

In week six of the *New Child Welfare Supervisor Training* supervisors are introduced to the following components, all of which have a direct impact on the case planning process:

- Approval of case plans;

- Family Team Meetings planning and facilitation;

- Case review by the supervisor;

- Case staffing by the supervisor; and

- Case closure.

## PATH Training

Resource families are required to receive 15 hours of pre-service training (PATH) which contains some information specifically related to the case planning process including the importance of the resource family, the birth family and the social worker to be working as a team.  It also discusses the importance of visits between the birth family and the child and the resource family's role to facilitate visits.  Working as a team and supporting visits are two ways which will provide information regarding the effectiveness and appropriateness of the case plan.

## Gaps

### Pre-Service Training

While several key concepts are introduced in the pre-service training modules, there are several which either are missing or need expansion.  The training identifies when the ITM must first occur, but it does not address the frequency of visits between the caseworker and the child nor between the caseworker and the biological family which should occur on a regular basis throughout the life of the case.  The purpose of the ITM is for the worker to gather internal, external and historical factors that contribute to concerns identified in the intake screening, the safety assessment and the SARA.  This information is all critical to the development of an individualized case plan which is tailored to the individual strengths and needs of the child and family.

The FTM concept is introduced in the pre-service training but it does not provide the detail needed to truly utilize this tool.  Workers need information about how to effectively engage families in the FTM process and use it as a tool for the development of a plan that is unique to the family's needs and strengths as well as how to use it as a monitoring tool to gage the effectiveness and appropriateness of the plan on an ongoing basis.

The training does not address the importance of ensuring the child's proximity to the family or the preferred order of placement type (i.e. relative, foster home within their community, foster home outside of their community, group home, or institution.)  The emphasis on placing with the child's family or at least within the community in the least restrictive type is critical to the implementation of a family centered model of practice.

### Advanced Skills Training

The *Advanced Skills Training: Client Engagement* places an emphasis on starting where the family is and obtaining as much knowledge about the family, its situation and possible resources prior to the first meeting.  This information will be critical to the development of an

individualized plan because without understanding the family one will not be able to assist them in identifying their strengths or their needs.

The *Advanced Skills Training – Case Planning in the Child Welfare Setting* training includes some issues with the development of the ISP (such as removal from a grandparent or when working with a child who has two parents involved in his life that do not life together) that are handled differently across units, counties and regions. Consistency with who is required to have an ISP is critical to assuring individualized and appropriate case planning. Additionally, children and families should have access to the same level of services and expectations no matter what section of the state they may live in.

It was noted in this training module that responses to a recent survey on advanced training needs showed child welfare workers reporting:

♦ 68 percent of respondents stated they had a need to learn more about ongoing case planning and evaluating progress toward reunification and

♦ 62 percent of respondents stated they had a need to learn about case planning content and process.

Case planning must be utilized throughout the life of the case and therefore, training with specific direction and practice on case planning and monitoring of plans throughout the life of the case will be critical. For example, how to use a case plan in determining when/if a termination of parental rights should be considered or how to use the case plan/planning process in working with adolescents in the Independent Living program will prove invaluable to workers.

While the training introduces the concept of concurrent planning and has participants practice developing concurrent goals, it does not go far enough in working with the participants to support them in being able to comfortably address the development of two plans with the family and how to monitor the plans to assure the child achieves timely permanency. Additionally, there did not appear to be information regarding working with the reluctant or hostile family. If the family is reluctant or hostile, it may seem easier for the worker to simply develop the plan alone and present it to the family, but this would be inconsistent with the principles of family-centered practice and runs the risk of alienating or disengaging the family further. Therefore, training on how to engage the family in the case planning process is critical.

The Assessment in the Child Welfare Setting: Assessment Application does not provide extensive detail on how to use the information gathered to develop individualized plans.

With Independent Living being such a critical, mandated component of the service array, the development of the independent living and transitional living plans should be introduced in the pre-service training and a separate module on the IL program with an emphasis on the case development and monitoring process included.

*Supervisor Training*

The supervisory training would benefit from expansion to include additional time spent on the case planning process including how to support the worker in assuring the case plan is

individualized; how to monitor the plan to determine that the goals/tasks are directly related to the family's strengths and needs and how to monitor the plan to assure it continues to be appropriate based on the child and family's current strength and needs.

Supervisors would also benefit from training on clinical supervision to provide them the skills to better work with their caseworkers in identifying the strengths and needs of a family which should lead to an ISP that links the appropriate services to the family's needs and their strengths.

## PATH Training

As noted above, the PATH training discusses the importance of visits between the birth family and the child and the resource parent's role in facilitating the visits as a way to monitor the progress being made on the goals/tasks of the ISP. However, the training does not seem to emphasis specifically what the resource family can do or what to look for when participating in the visits. There was not a lot of specific information for resource families on how the child's needs are assessed beyond their responsibility for understanding the child's level of development and helping them meet developmental milestones. The resource family interacts with the child on a daily basis and has valuable information which will be useful to the caseworker and the entire family team as they assess the effectiveness, appropriateness and the progress of the plan.

Concurrent planning assumes that every child will be placed in a home that can become his/her permanent home if reunification is not possible. Therefore, agencies need a pool of families who are willing to support reunification efforts and if those efforts are not successful, provide a permanent home for the child. The training for resource families should include information regarding concurrent planning to assure they understand the requirements and mandates the agency is working within and can support and accept whatever goals are identified for the child.

## b. Policy

### Strengths

MDHS' policy has several sections that directly pertain to how the case plan and the planning process should be individualized to meet the specific strengths and needs of the children and families served by the child welfare system.

## Case Planning

DFCS policy states that service planning, which is to begin immediately, is a goal-oriented service focused on behavior outcomes. The plan is to, at a minimum, describe the problems that face the family, the risks to the child, and the strengths of the family and the child. Additionally, it must detail the services and actions needed to achieve desired outcomes. Families are to be full partners in the development of their plans. The plans are described as "an explicit written agreement jointly between the worker and the parents or primary caretakers of children in foster care."

The adult ISP/Service Agreement is to be created and submitted within 25 calendar days of case opening and approved by the supervisor within five days. Policy then requires them to be reviewed every three months. The requirements for developing the child's ISP are the same as

described above for the adult. The policy should support the development of individualized and timely case plans. Permanency options include:

♦ Reunification with parent or primary caretaker;

♦ Custody with relative;

♦ Adoption;

♦ Durable legal custody or legal guardianship;

♦ Living independently; and

♦ Long term foster care.

In an effort to assure timely permanency, policy provides the family with a six month period to meet the ISP/SA and states that, at the end of the six months, the courts may direct DFCS to begin procedures to terminate parental rights or instruct the county to continue to work with the parent for return of the child to his or her home.

*Independent Living*

According to DFCS policy all youth must have the opportunity to participate in independent living preparations, without regard to the youth's permanent plan. Independent Living Services are mandatory and not optional for all youth in care who are at least 14 years old or less than 21 years old. When the youth reaches 14 years of age, an Independent Living Plan (ILP) is to be completed in MACWIS. It is to include a description of all programs and services that will help the youth prepare for transition from foster care to independent living. When the youth reaches his/her 16th birthday, an ISP must include a documented Transitional Living Plan (TLP) based on an assessment of the youth's needs. Policy states that youth are to be involved in the development of the ISP, Independent Living Plan, and the TLP. Policy defines the TLP as a plan that documents how a youth will move from State's custody into other programs or to self-sufficiency. The plan has drop down boxes in MACWIS from which to identify the youth's post-custody living arrangement, means of support, educational/vocational, food and clothing, health, transportation and mentor/resource family. The ILP and TLP are part of the youth's ISP and are to be updated when the ISP is. The County of Responsibility supervisor is responsible for reviewing and approving the youth's ISP and TLP in MACWIS.

*Concurrent Planning*

Mississippi code states that at the time of placement, DFCS shall implement concurrent planning so that permanency may occur at the earliest opportunity. Policy defines *concurrent planning* as working toward the permanency plan while at the same time establishing a backup plan and implementing primary and alternate plans simultaneously. The Mississippi Code requires the agency to consider the following factors when determining appropriateness of concurrent planning:

♦ The likelihood of prompt reunification;

♦ The past history of the family;

♦ The barriers to reunification being addressed by the family;

♦ The level of cooperation of the family;

♦ The Resource Family's willingness to work with the family to reunite;

♦ The willingness and ability of the Resource Family or relative placement to provide an adoptive home or long-term placement;

♦ The age of the child; and

♦ Placement of sibling.

## Family Team Meetings

Policy defines a FTM as any face-to-face meeting with one or more family members for the purpose of assessment and case planning. The FTM involves working closely with the family to identify family members, extended family, and supportive persons the family wants to engage in the assessment and case planning process. FTMs provide the opportunity for the development of an ISP which is to be tailored to the specific strengths and needs of the individual child and family members. Information can be gathered from all participants to assure an understanding of the family's history and functioning. FTMs are to occur within 30 days of case opening and every time the ISP is updated.

## Gaps

There are several areas where the policy would benefit from revision in order to support individualized case planning more completely, including the areas identified below.

## Case Planning

Policy states that the family must be engaged and that the ISP is written jointly between the worker and the parents but the section of the policy specific to the actual development of the adult ISPs is silent on the family's involvement. The child ISP policy does say that if the child is age and/or developmentally appropriate each child should be included in developing his/her ISP. The language in child policy is certainly stronger then the adult but both would benefit from a more direct emphasis on the role of the family member in the actual development of the plan.

Policy does not address what information or how to use the information obtained through case work visits, from other providers or any assessments in the development of the case plans. Social workers need direction in how to actually develop the case plan beyond the topic areas to be included in the plans that are currently identified in the policy. There also needs to be specific policy and procedures regarding how to monitor the plan(s) for appropriateness and effectiveness.

## Independent Living

The policy on Independent Living requires a plan but as noted above the plan is in MACWIS and includes drop down boxes for both the ILP and TLP. There is a box for comments but based on the case review we found very little information in those boxes or they simply repeated the information in the drop down boxes. Neither the case review nor focus groups provided concrete information that indicated substantial youth involvement in the development of the plans. In fact, during the youth focus group it was noted that only some youth knew what a case plan was and nearly all indicated they had never been involved in the development of their plans. The involvement of youth in a plan that is not only individualized but also useful to their specific

circumstances is critical if youth are to develop the skills necessary to function as independent adults. The plans should utilize information from the investigation if the agency became involved in the family's life near or at the time the youth became eligible for IL services, from the ongoing services provided to the youth and family and from any assessments completed on the youth. It must be a strengths based plan that focuses on the child's needs and interests. Policy is silent on how to develop the plan and what to include beyond using the template in MACWIS.

### Family Team Meetings

The concept of an ITM which is introduced in training is not addressed in policy, rather policy discusses visits and when they must occur and with whom. Neither the training nor policy provides detailed guidance on how to conduct a family visit nor how to use the information gathered to develop and or monitor the plan. There is no specification as to precisely what should be covered during the visits or how to use the visits to gather information which will support the development of an individualized plan and assist in the monitoring of the plan.

Similar to visits or ITMs, FTMs provide the opportunity for the development of an ISP which is tailored to the specific strengths and needs of the individual child and family members however policy provides no direction on how to use the FTM (or any contact with the family) to monitor the family's progress or lack of progress in meeting the demands of the ISP. Family meetings should be used to identify the appropriate services to address the concerns identified and then to monitor the services to assure that they continue to be the most appropriate for that particular family at that specific time in their life.

### Supervision

We were unable to find any policy that specifically addresses supervision. There are no specific guidelines regarding how often the worker must meet with their supervisor and what is to be addressed during any sessions. Specific requirements which establish regular supervisory conferences with staff should be established. The requirements should include the timeframes for the conferences and what is to be addressed.

There are, however, some references to the supervisor's responsibilities in regard to the tasks in the field throughout policy. (i.e., the ISP/Service Agreement shall be reviewed and approved by the supervisor within five (5) calendar days of receiving it from the worker.)

### Concurrent Planning

While State policy mandates the use of concurrent planning the policy does not provide much direction in how to use it as an effective tool in achieving timely permanency for children. The importance of full disclosure with the family is not addressed and is critical to an honest and open relationship between the agency and the family. Full documented disclosure with parents regarding the concerns and issues they are facing, the potential changes that may be needed, the requirements regarding their child's safety, and timeframes that must be met are critical for building trust. Discussing with a family what will happen if they do not comply with the plan can be very difficult and social workers need explicit policy and training on this issue.

### c. Monitoring

The monitoring of practice and in particular the development of an individualized case plan in a timely manner is critical to the achievement of positive outcomes for children and families. While there is not an extensive monitoring process currently in place there are several activities (FCR, settlement agreement and supervision) which support some level of monitoring. The specific component(s) of those activities are described below.

### Foster Care Reviews[13]

A primary tool currently being used to monitor case activity is the FCR. Based on recent data the following results have been identified which impact the case planning process.

| | Percent of Cases Cited | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | YTD Total |
| Cases cited due to child ISP issues related to ISPs overdue for review and/or lacking vital information such medical/dental/ educational/mental health services received, visitation plans, placement information, etc. | 42.6 | 57.1 | 55.3 | 62.4 | 64.8 | 57.7 | 75.6 | 67.6 | 66.2 | 66.1 | 59.0 | 60.8 |
| Issues cited due to children who are found to have identified medical, mental health, or educational needs for which services are not being provided. | 4.3 | 2.4 | 2.9 | 7.5 | 1.1 | 0.0 | 3.7 | 2.8 | 7.0 | 4.8 | 0.0 | 3.4 |
| Issues cited related to children with a plan of Living Independently or Long Term Foster Care for which other permanent plan options have not been considered and ruled out. | 1.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 1.2 | 1.4 | 0.0 | 3.2 | 0.0 | 0.6 |
| Cases cited for which there is a serious concern regarding appropriateness of child's permanent plan. | 0.0 | 2.4 | 1.0 | 3.2 | 4.4 | 6.4 | 12.2 | 5.6 | 2.8 | 1.6 | 3.3 | 3.8 |
| Issues cited due to children who have been in state's custody for 15 of the most recent 22 months; their case has not been referred for | 7.4 | 1.2 | 5.8 | 1.1 | 3.3 | 2.6 | 3.7 | 7.0 | 0.0 | 3.2 | 3.3 | 3.6 |

---

[13] Please note that these issues are the results of what are monitored each month on the Periodic Administrative Review (i.e., there is a direct correlation of each 'issue' to a question on the review tool).

| | Percent of Cases Cited | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | YTD Total |
| termination of parental rights(TPR) and there is documentation lacking in their ISP of compelling reasons why pursuing TPR would not be in their best interests. | | | | | | | | | | | | |

The FCR process monitors 46 issues, five of which are related to the case planning process. The table above provides a month-to-month breakdown of the percentage of cases cited out of the universe of cases reviewed for the period July 2008 through May 2009. The most frequent citing of issues relevant to this practice model component of individualizing case planning pertained to child ISP issues. These case citations were tied to overdue reviews and incomplete ISPs for children. January had 75.6 percent of the cases reviewed cited for this issue and the year to date total as of May 31, 2009 for cases cited as a result of the case plan stood at 60.8 percent of all cases reviewed. An area of strength identified was related to the use of long term foster care and independent living meeting the requirement that all other permanency options must first be ruled out. There were only four months which had any cases cited and only .6 percent of cases from July 2008 through May 2009.

Another area related to the case planning process is citing of cases that do not have documentation in the file explaining why the case has not been referred for TPR. Parents have a six-month period of time to work with the agency and complete the requirements of the adult ISP. If the requirements are not met within that timeframe and there are no compelling reasons then a TPR must be initiated. Documentation of decisions made that are specific to this child and his/her situation must be documented. The number of cases cited for this category ranged from a high of 7.4 percent in July to no cases cited in March 2009. In addition to what is identified during the FCR, a question on the electronic staff survey that we administered addressed the same issue. Survey respondents indicated that the agency was frequently or almost always effective in determining and documenting exceptions to filing TPR petitions for children in foster care 15 of 22 months only slightly more than half the time (about 56 percent). Similarly, when asked about the agency's effectiveness in making timely decisions about TPR and adoption, respondents indicated that the agency was frequently or almost always effective just over half the time (about 55 percent).

| Please rate your perception of your agency's effectiveness in the following areas of practices related to individualized case planning: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Sometimes | Frequently | Almost Always | No Info/ NA | Total |
| Making timely decisions about TPR and adoption: | 0 (0%) | 14 (8%) | 41 (23.43%) | 40 (22.86%) | 56 (32%) | 24 (13.71%) | 175 |
| Determining and documenting exceptions to filing TPR petitions for children in foster care 15 of 22 months: | 2 (1.16%) | 9 (5.2%) | 37 (21.39%) | 40 (23.12%) | 57 (32.95%) | 28 (16.18%) | 173 |

Referring back to the FCR results, the appropriateness of the child's permanent plan was measured with a relatively low number of cases cited (January showed the highest with 12.2 percent and the total for the year was 3.8 percent.) One area of concern is that the most formalized process for quality assurance (FCR) is designed to review only children in out-of-home care and there is not a review process for children who have not been removed from their home or have been reunified. Another area of concern directly related to this component of the practice model is that there is no QA monitoring of what services are included in the ISP or whether the services are appropriately based on the child or family members' strengths and needs.

## Settlement Agreement Monitoring

The *Olivia Y* settlement agreement requires a wide range of monitoring some of which are related to the case planning process.

| Standards Related to Individualized Case Planning | Status |
|---|---|
| An assessment of the quality and array of independent living services available to foster children ages 14-20 | Initiated but not completed |
| The revised policies and practice guides shall require that each service plan and revision of such plan include the elements and meet the requirements of COA Standards PA-FC 2.06, 3.01, 3.04, and 3.05, as well as incorporate and track the child's educational needs and goals | Not stated |
| All permanency plans contain specific information about: How the permanency goal will be achieved: What services are necessary to make the accomplishment of the goal likely: Who is responsible for the provision of those services: When the services will be provided: and The date by which the permanency goal is likely to be achieved. | Not stated |
| For each child who has been, or reaches, more than 15 of the previous 22 months in foster care, for whom DFCS has not filed a TPR petition or documented an available ASFA exception, DFCS shall begin holding special permanency reviews. Such reviews shall include the DFCS caseworker, the caseworker's direct supervisor, and at least one individual with expertise in permanency planning who has not held direct casework or supervisory responsibility for the case. The review will produce a written plan of action setting forth the steps to be taken by DFCS, the contract agency, and/or any other provider of services, in order to move the child to permanency as quickly as possible. Such permanency reviews shall be documented in the child's case record, and reconvened monthly until all barriers to permanency have been resolved, a TPR petition has been filed, or an available ASFA exception has been documented in the child's case record. | Not begun |

**Mississippi Practice Model**

| Standards Related to Individualized Case Planning | Status |
|---|---|
| DFCS shall implement and maintain a process for advising all potential adoptive families, including any foster family caring for a child who has become legally available for adoption, of the availability of adoption subsidies. This notification shall be documented in the child's record, and the family's access to such subsidies shall be facilitated. | Not satisfied |
| Defendants shall develop and begin implementing a written plan to address identified independent living service gaps. | Not met |
| Defendants shall develop and begin implementing a system for ensuring that emancipating youth have obtained, prior to transitioning to independent living, the necessary documents and information identified in the COA standards for such youth. | Not met |

The majority of standards relate to independent living services, appropriate placements, and permanency plans and goals. DFCS did not meet the standard which required the implementation of a written plan to address independent living services gaps nor has it developed a system for ensuring that emancipating youth have the necessary documents and information as required by COA standards.

## Supervision

The Supervisory Administrative Review (SAR) is mainly a checklist to ensure that certain practices have been completed. Several of the questions relate more specifically to individualized case planning including:

♦ Is there evidence that the family was involved in the creation of the ISP?

♦ Has a goal been identified?

♦ Are the medical conditions addressed?

♦ Are the tasks relevant to the presenting problems?

♦ Is the child participating in independent living? Is there a plan?

However, the effectiveness of the SAR will rest with the level of review and discussion as the SAR is completed, i.e., by actually having a dialogue about responses and issues identified in the case review as opposed to using the tool to provide simple yes or no responses. If there is a dialogue between the supervisor and caseworker, it is more likely that the supervisory review will be able to identify and bring to the fore information concerning how case plans and case planning are individualized.

Focus group participants tended to indicated that the SAR is more focused on compliance than quality of casework practice.

### d. Current Practice and Resources

#### Strengths

*Case Planning*

Based on information gathered from the focus groups and interviews, some participants indicated that the policy requirements regarding when to complete the ISP and how often it needed to be

reviewed was seen as positive and leading to timely case plans. Comments indicated that ISPs for both adults and children were completed on each individual in the family with that person's input. Participants agreed that having regular and consistent contact with family members individually and as a unit was critical to developing and accurately monitoring the plan.

Several questions on the staff survey addressed the agency's effectiveness related to individualized case planning. For instance, about two-thirds of the respondents indicated that the agency is frequently or almost always effective in using assessments to determine individualized needs and in addressing individualized needs in the case planning process (about 67 and 68 percent respectively). About 62 percent of the respondents indicated the agency was similarly effective in using assessments to make decisions about services. Almost three-quarters of the respondents (about 73 percent) rated the use of concurrent planning as frequently or almost always effective. Fewer respondents rated the cultural responsiveness of services and the ability to tailor services to individualized needs as frequently or almost always effective (about 61 percent each). In contrast to the survey ratings, focus group and interview participants indicated serious concerns about the availability and effectiveness of services to meet the family's individualized needs.

| Please rate your perception of your agency's effectiveness in the following areas of practices related to individualized case planning: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Sometimes | Frequently | Almost Always | No Info/ NA | Total |
| Use of assessments to determine individualized needs: | 0 (0%) | 5 (2.82%) | 33 (18.64%) | 47 (26.55%) | 72 (40.68%) | 20 (11.3%) | 177 |
| Use of assessments to guide decisions about services: | 0 (0%) | 7 (3.95%) | 42 (23.73%) | 43 (24.29%) | 66 (37.29%) | 19 (10.73%) | 177 |
| Effectiveness of case planning process in addressing individualized needs: | 0 (0%) | 4 (2.27%) | 32 (18.18%) | 53 (30.11%) | 67 (38.07%) | 20 (11.36%) | 176 |
| Concurrent planning for children in foster care: | 0 (0%) | 6 (3.39%) | 23 (12.99%) | 41 (23.16%) | 88 (49.72%) | 19 (10.73%) | 177 |
| Cultural responsiveness of services: | 1 (0.57%) | 11 (6.25%) | 36 (20.45%) | 54 (30.68%) | 53 (30.11%) | 21 (11.93%) | 176 |
| Ability to tailor services to individual children and families: | 0 (0%) | 8 (4.57%) | 40 (22.86%) | 52 (29.71%) | 54 (30.86%) | 21 (12%) | 175 |

We also reviewed a random sample of 30 cases to identify strengths and needs related to the foster care placement needs of children in foster care and the support services needed by foster care providers to meet the individualized needs of children in their homes. The review found that in 26 of the 30 cases the placement matched the identified needs of the child. Thirteen of these cases were relative placements. In 21 of the 30 cases, we determined that there were no unmet needs to support the placement and in three there were needs. The remaining cases were either found to be not applicable or there was not enough information to make the determination.

**Mississippi Practice Model**

*Family Team Meetings (FTM)*

FTMs were consistently identified as a positive tool to be used to engage the family and develop the plan in focus groups and interviews. In more than one focus group site it was noted that the workers develop the agenda and identify who the participants will be jointly with the parent. Participants indicated that it was very effective when the families actively engaged in the process but that too often the family is resistive. They also identified FTMs as a mechanism to monitor the effectiveness of the case plan.

*Independent Living*

The purpose of independent living services is to provide youth in foster care with an array of services and resources that will assist and guide them in the transition to becoming independent adults. According to a recent MACWIS report, out of 1,000 plus youth in care, only 48 youth were not receiving services.

Only a little more than half the survey respondents indicated that the agency was frequently or almost always effective in tailoring independent living and transitional living services to youth in care (about 56 percent). Less than half (about 48 percent) indicated that the availability and accessibility of these services were frequently or almost always effective (about 48 percent). A similar percentage (about 48 percent) indicated that level of effectiveness in providing services to youth beyond their transition from foster care.

| Please rate your perception of your agency's effectiveness in the following areas of practices related to individualized case planning: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Sometimes | Frequently | Almost Always | No Info/ NA | Total |
| Tailoring IL and transitional living services to youth in care: | 1 (0.57%) | 16 (9.2%) | 34 (19.54%) | 47 (27.01%) | 50 (28.74%) | 26 (14.94%) | 174 |
| Availability and accessibility of services to transition children into adult services systems when appropriate: | 3 (1.73%) | 23 (13.29%) | 34 (19.65%) | 44 (25.43%) | 41 (23.7%) | 28 (16.18%) | 173 |
| Availability and accessibility of services to youth post-transition out of DFCS care: | 4 (2.31%) | 21 (12.14%) | 36 (20.81%) | 44 (25.43%) | 39 (22.54%) | 29 (16.76%) | 173 |

## Gaps

We identified several gaps in practice and resources that may impede the successful implementation of this component of the practice model.

*Case Planning*

Across the board, focus group and interview participants agreed that it was difficult to individualize case plans because of the limited resources available. A few individuals said that

they were able to get parenting classes that were individualized for the family and at times provided one on one service, but the majority indicated that parenting classes almost always followed a pre-established format and agenda. They also said most ISPs had parenting identified as a task no matter why the family was involved with the agency or the individual strengths and needs of the family. Certain services were identified as being excellent and able to adapt to the families needs, e.g., Family Preservation or Intercept, but that they often had wait lists or were not available across the State. There was a definite consensus that both the quality and quantity (number of slots or providers) for substance abuse services, domestic violence programs, and specialized services for victims of sexual abuse are lacking in many parts of the State resulting in families not accessing the services that would be most appropriate for their individual circumstances. Some concern was voiced regarding the reunification-related services which are provided by two contractors, stating that the services seem to be more driven by the program and not necessarily by the needs of the families.

In addressing the ability of the service array to adapt to individualized needs, fewer than half the survey respondents indicated that the agency was frequently or almost always effective in providing for an adequate array of placement resources that are matched to children's needs (about 42 percent). About 43 percent of the respondents rated the flexibility of service providers to address individualized needs at that level of effectiveness. Only about a third of the respondents (about 38 percent) rated the flexibility of funding and contracting procedures to purchase individualized services as frequently or almost always effective.

| Please rate your perception of your agency's effectiveness in the following areas of supports needed to individualize case planning: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Sometimes | Frequently | Almost Always | No Info/ NA | Total |
| Adequate array of placement resources that are matched to children's needs: | 5 (2.89%) | 31 (17.92%) | 46 (26.59%) | 35 (20.23%) | 37 (21.39%) | 19 (10.98%) | 173 |
| Flexibility of service providers to address unique needs of children and families: | 2 (1.16%) | 22 (12.79%) | 55 (31.98%) | 39 (22.67%) | 35 (20.35%) | 19 (11.05%) | 172 |
| Flexibility of funding and contracting procedures to purchase individualized services: | 4 (2.31%) | 26 (15.03%) | 51 (29.48%) | 32 (18.5%) | 35 (20.23%) | 25 (14.45%) | 173 |

Comments from some focus group participants indicated that the ISPs were developed without parental input and that parents were sometimes told to complete the tasks with little or no assistance in finding the resources needed. These participants indicated that the parenting classes were helpful, yet they also described them as standardized and not tailored to individual needs of the participants. Some of the foster youth who participated in the focus group did not know what a "case plan" was and could not recall participating in the development of plans.

In a review of 20 cases from various counties we found that the majority of ISPs had standardized, generic language under the possible results section and only two had specific goals for the parent.  While a few plans may have had some specific tasks for the child/youth and the worker most of the time even these tasks were somewhat generic.  The plans had updates regarding the status of the case and other required information (educational record, medications, etc) there did not seem to be any real planning or goal and task development.

There also was a general consensus across all focus groups and interviews that while the agency tries to make placements that are matched to the child's unique needs, often they must take the only bed available.  When asked if children/youth sign the case plans, we received a wide range of answers from everyone, ranging from children/youth of certain ages only signing to only obtaining signatures if they have specific tasks.  There was some discussion in the focus groups regarding the policy changing in the near future to requiring even very young children to sign the plans.  Another issue identified was in regard to the incorrect or inadequate assessments that are completed and how this information impacts the services provided.  It was stated that often the information, accurate or inaccurate, will continue to be used as a basis for services for the child for the entirety of their interaction with DFCS.

There were several needs identified in regard to training.  Additionally, through the focus groups we learned that staff thought that training on how to include families in identifying the services and supports and working with uncooperative families would be of benefit to staff. A general comment repeated in both the focus groups and comments from the survey was a preference for training that is more practice-based than theoretical.

We understood from focus group participants that county funds should be available for services that are needed, but all counties do not have the funds available or the staff does not know how to access them.  They also noted that the amounts of the funds are very limited.

*Family Team Meetings (FTM)*

An issue identified by focus group and interview participants was dealing with the reluctant family or individual who did not want to participate in a FTM and refused to identify (or did not have anyone) any family or community supports to participate in the meeting.  Some participants stated that if they face this situation they do not attempt to work with the parent to convene a meeting.

In our case reviews, we noted that individual visits or a telephone call with parents or the child/youth were sometimes identified as a "family team meeting." We also identified some inconsistency in understanding when a FTM should be initiated, with responses ranging from:

- At least one time a month;
- As needed;
- Every 6 months; and
- Whenever the ISP changes.

### e. Summary of Inputs

Assuring that case plans and the overall case planning process is both timely and individualized to the unique needs of the children and families is critical to the implementation of a family-centered, strengths based child welfare system. The following identifies some of the key strengths and gaps identified which impact the implementation of the modal of practice.

### Training

As a result of a review of the training, we identified the following strengths:

♦ In the Case Planning and Family Engagement in the Child Welfare Setting module the FTM concept is introduced including who to include, timeframes for meetings; how to prepare the family for the meeting and the purpose of the meetings.

♦ In the Case Planning and Family Engagement in the Child Welfare Setting module the principles of concurrent planning are introduced.

♦ The Advanced Skills Training: Case Planning addresses the case planning process including when and with whom the plans must be completed. The training provides opportunities for the participants to practice developing ISPs.

♦ The Assessment in the Child Welfare Setting: Assessment Application describes how to assess families by gathering comprehensive information to assess child safety and risk of future harm using the Strengths and Risk Assessment (SARA) tool. Timeframes for completing the SARA and use of the Family Centered Strengths and Risk Assessment Guidebook are explained including ways to ask questions, success factors on which you can build and considerations and areas to explore . OJT activity requires the completion of a strengths and risk assessment.

♦ The New Child Welfare Supervisor Training introduces the new supervisor to several of the key child welfare practice components, all of which have a direct impact of the case planning process.

♦ The PATH curriculum for resource families stresses the importance of working as a team (resource parent, agency worker, child and family) and the role of the resource parent in supporting parent/child visitation.

We identified the following gaps in training regarding this component:

♦ With the exception of the initial ITM, the Case Planning and Family Engagement in the Child Welfare Setting training did not address how often the worker should have contact with the child/family nor how important the visits are in regards to achieving positive outcomes.

♦ In the Case Planning and Family Engagement in the Child Welfare Setting the FTM is introduced but the training does not go far enough in helping workers develop the skills to engage the family effectively in this process and ultimately, in cooperation with the family, to develop and monitor a plan that is uniquely matched to the child and family's strengths and needs.

♦ The Advanced Skills Training: Case Planning training introduces concurrent planning and its principles but does not provide the workers with the concrete skills needed to introduce this

concept to the family and how to monitor the ongoing plans to assure the child achieves timely permanency.

♦ The Assessment in the Child Welfare Setting: Assessment Application does not provide extensive detail on how to use the information gathered to develop individualized plans.

♦ The current supervisory training module is for new supervisors only. It does not allow the more experienced supervisor to participate nor does it spend adequate time on the case planning process and the supervisor's role in supporting the worker in developing individualized plans and the monitoring of the plans to assure they address the family's strengths and needs.

♦ The need for a supervisory module focused on clinical supervision which would teach the necessary skills for working with social workers in identifying the strengths and needs of a family which are needed to support the development of individualized plans.

♦ There is no module dedicated to the Independent Living program. Engaging youth can be challenging and a module specifically about youth, how to engage them and maintain a working relationship, the services available and how to access the appropriate services, etc., are important skills a worker needs if they are to achieve positive outcomes.

## *Policy*

We identified the following strengths in the policy which will support the implementation of this component of the practice model:

♦ The policy identifies what the plan should include by identifying the problems the family faces, the risks to the child and the strengths of the family and child.

♦ Policy states that families are to be full partners in the development of the plan and that it is an explicit written agreement between the worker and the child/family.

♦ Mississippi statute requires the use of concurrent planning from the time of placement.

♦ FTMs are introduced as one of the tools that can be used to gather information for assessments and case planning.

The following gaps in policy pertinent to this component of the practice model were identified:

♦ The role of the family and the level of their involvement in the development and monitoring of the case plan should be strengthened in policy.

♦ Policy must include detail regarding the use of visits (ITMs) and FTMs in the identification of the family's strengths and needs and then for the ongoing monitoring of the plans to assure that they continue to be accurately matched to the strengths and needs of the child and family members.

♦ Policy should address the importance of full disclosure with the family to assure a complete understanding of their situation and the consequences of not working jointly with the agency to address the identified issues.

♦ Policy should include guidance on using the information obtained in all assessments including the SARA to identify the strengths and needs of the individual family members and

then translate those strengths and needs to specific tasks and goals within the ISP, the ILP and the TLP.

## *Monitoring*

We identified the following strengths in monitoring the case plans to assure they match the family's strengths and needs with the requirements of the plan:

♦ The FCR includes five issues that are directly related to the case planning process including reviewing cases to determine if cases have been reviewed timely and if the plans are appropriate based on family's needs. The FCR also reviews for the appropriate permanency plan and appropriate referral for termination of parental rights.

♦ There are questions on the SAR tool that address the case planning process including whether there is evidence of family involvement, if a goal has been identified and if the tasks on the ISP are relevant to the identified problems.

The following gaps were identified as they relate to the monitoring of this practice model component:

♦ There is no formalized process for completing a quality assurance review of in-home cases.

♦ There is no monitoring of the quality or appropriateness of services put in place in response to the ISP.

♦ While the SAR has several questions linked to the case planning process, the policy does not specify what is to be discussed or the level of review which must take place other than to say "the review is to ensure progress is being made toward completion of the service goals."

## *Current Practice and Resources*

We identified several strengths in current case practice and resources currently available that relate to this component of the practice model.

♦ There is specific policy regarding when to complete the ISP and how often the plan is to be reviewed.

♦ The case planning process was seen as being effective in the majority of the cases based on comments from the survey.

♦ FTMs were viewed as an effective tool to be used to engage the family and develop the plan.

We identified the following gaps in practice and resources related to this component:

♦ The consensus appeared to be that it was difficult to individualize case plans due to the limited array of services available across the State.

♦ There were numerous comments as well as support from the case reviews that the services and the plans did not seem to be tailored to the unique need of the individual youth. There does not appear to be consistent coordination between the DFCS worker and the IL contractor worker to assure they are working with the youth on the same issues.

## Section 2:  Outputs

### a.  Products

#### Training

♦ Both pre-service and advanced training should be revised to address caseworker visits and their importance to the overall casework process.  The training should provide the knowledge and practice skills on how to engage family members including the child/youth; how to gather information needed to develop an individualized plan; how to use the visit to monitor progress on the ISP and how to determine when it is appropriate to close the case.  A portion of the time should be spent on how to engage the hostile or non-cooperative client to assure effective case planning.

♦ Advanced training should include an in-depth discussion and practice opportunities on how to develop and monitor individualized case plans.

♦ Supervisory training should be revised to include a module on clinical supervision to support their work with caseworkers in identifying the strengths and needs of a family to assist in the development of an individualized plan and the ongoing monitoring of the case plan to assure it continues to meet the needs of the child and family.

♦ A module is needed on how to conduct FTMs and utilize them to develop and monitor case plans.

♦ A module is needed on concurrent planning to assure workers know how to effectively use concurrent planning in achieving timely permanence.

♦ A module dedicated to IL program including the development of the ILP and TLP and information about the services available as well as how to tailor services to meet the individual needs and level of the youth is needed.

♦ Training for resource families should be revised to include a module on reunification, concurrent planning, the resource parent's role in achieving timely permanence and information regarding the Independent Living Program and services and how the resource family can support the skills classes and other activities beyond providing transportation.

#### Policy

In order to assure the effective and timely implementation of the practice model, policy should be revised/enhanced in the following ways:

♦ Policy should place a stronger emphasis on the involvement of the family, including non-custodial parents when appropriate, to assure the child's individual needs are identified and the plans are tailored to the child/family's strengths and needs.

♦ Policy should be expanded to address caseworker visitation beyond when it is to first occur.  It should include how to use visits to identify family strengths and needs and then how to use any information gathered and incorporate into the plan.  There should be specific requirements for the minimum number of visits, where they are to occur and what specifically must be addressed.

♦ Policy should address the importance of full disclosure with the family and its impact on the overall case process.

♦ Policy should be enhanced to include how to use the information gathered from the various assessments (including IL) to develop plans and services that are individually tailored to meet the needs of the child/youth and their family.

## Monitoring

Monitoring for effective case planning will be critical to the achievement of positive outcomes for children and families. As DFCS implements a Continuous Quality Improvement (CQI) process there are several factors which will impact individualized case planning:

♦ A protocol is needed for use during the FCR to ensure the plans are individualized to meet the needs and support the strengths of the child and family.

♦ The development of a monitoring process for both in-home and foster care cases is needed in order to monitor for the process and quality of interventions to individualize case planning. This should include the family's involvement in the development and monitoring of the plan, along with the use of assessment information to identify strengths and needs and develop plans, and the match of services to specific needs.

♦ The monitoring process should assess the effectiveness and appropriateness of the services from both a case specific and a systemic perspective;

♦ A supervisory protocol is needed that includes the monitoring of cases for timely case plans where tasks/services are matched to the identified strengths and needs of the family as well as their reason for involvement with the child welfare system and the underlying factors leading to their involvement with child welfare.

## Resources and Practice

If the case planning component is to be effectively implemented then there are several work products which should be considered:

♦ If case plans are to be individualized to meet the unique needs of the children and families served by the child welfare system, there must be an adequate service array that is flexible and capable of responding to individualized needs. These services range from those services needed to maintain children in their home to services for children with serious behavioral health needs. (See Mobilizing Services Component for further detail on service array.)

♦ Contracting mechanisms are needed to ensure that services provided are individualized to the unique strengths and needs of families, children, and youth. Contracting provisions should also focus on ensuring coordinated case planning between providers and MDHS so that there is one case plan driving interventions with the family. Examples of needed coordination of planning and case plans include the independent living program and residential treatment services.

♦ FTMs should be clearly defined and implemented within the case planning process, so that routine visits and other contacts that may not constitute an actual FTM are not counted as such.

## b. Activities

The specific activities where this component of the practice model can be expected to occur are as follows:

♦ *Link services to the individual strengths and needs of each family member.*  Through the assessment process and through caseworker visits with all relevant family members, including non-custodial parents and age-appropriate children and youth, the caseworker should identify the individual strengths and needs of family members related to the agency's involvement with the child/youth/family.  The case planning process should address the roles, strengths, and needs of all individual family members whose involvement in the family is relevant to achieving the goals associated with the agency's interventions.

♦ *Address individual strengths and needs in case plans.*  The initial case plan should be highly individualized to the needs of the individual family members and to the family as a whole. Although the case plan is expected to be dynamic and revised as circumstances change, the initial case plan sets the stage for the agency's primary interventions and is central to establishing appropriate goals, mobilizing the correct services, and timely achievement of goals. As a general rule, FTMs should be utilized to bring the family and any identified supports, both formal and informal, together to develop a plan for the child and family to address the identified areas of concerns while assuring the child's safety.  Families' input, which includes age-appropriate children, into their strengths and needs and the type, level and intensity of services needed should be a central activity within the team meeting. Children who are not subject of the report and non-custodial parents should be included in the FTM process as appropriate.  Case plans should be developed within 30 days of case opening and should identify services that are linked to the child or adult's individualized needs.  The services identified in the case plan should reflect the needs identified in the assessment and the family should have an active voice in identifying the services that they think are needed to help them address their needs.  At the end of any FTM the family should walk away with an understanding of where they are starting (reason for involvement with the agency); what they need to achieve (goals and objectives); what specific tasks/services they must participate in /accomplish in order to achieve the identified goals and objectives (action steps).

♦ *Engage with service providers.*  Service providers must be engaged in the decision making and service planning processes in order to allow for the tailoring of the services to meet the identified needs and strengths of the child and or family.  This means including them in FTMs where appropriate and in the process of matching services to the individualized needs of children and families.  It also means coordinating services and plans with service providers and MDHS caseworkers maintaining an active role with the child, family, and provider even if the provider is handling service delivery.

♦ *Use caseworker visits in individualizing case plans.*  Caseworker visits with the child and other significant family members are the primary mechanism for assessing the child and family's need, for engaging them in services, and for monitoring service delivery.  During service delivery, the caseworker for the child or family (not another worker) should be the one to visit, engage, evaluate, monitor, and interact with the child, family, and provider. Without this ongoing interaction the planning process will not be able to be tailored to the unique strengths and needs of the family.

♦ *Conduct individualized case planning activities outside of a FTM when indicated:* In situations where a FTM is not possible or there is an appropriate reason for not holding one, individualized case planning that builds on strengths and needs of individualized family members and tailors services to those needs should still occur in other ways and should be clearly documented. For example, visits with individual family members or smaller groups of family members and relevant stakeholders, when focused on developing and monitoring case plans, may result in an individualized case plan in the absence of a FTM.

♦ *Monitor case plans and revise as needed.* Workers should routinely review the case plans and goals for families and youth in care to ensure their continued appropriateness and relevance. The provision of services should be monitored to be certain they are provided promptly and in accordance with the case plan and continue to respond to individual strengths and needs. Workers should use caseworker visits with parents and children as well as information from providers and placement resources to evaluate their use of services, identify barriers to effective service utilization, the fit of services to needs, and the effectiveness of services in addressing needs and resolving concerns. Case plan revisions should be based on the individual circumstances of the family members. For example, the plan should be revised when emerging needs not previously identified are identified, reaching benchmarks of progress, not achieving expected progress, or other changes in the family's situation. Also, workers should review all assessment, re-assessment information, service provider reports, and information from family members to determine if TPR petitions are indicated at 15 of 22 months, or earlier if indicated, and either file the petition or document a legal exception in the case plan.

♦ *Link ongoing case planning to individualized strengths and needs.* Caseworkers should use re-assessments to re-evaluate strengths & needs of family members and determine the continuing appropriateness of goals, activities, time frames, and services. Workers should evaluate with family, foster caretakers, and service providers the continuing responsiveness and relevance of current services in achieving designated permanency goals and in resolving identified needs. They should make the indicated changes to services jointly with family members and providers. For youth in foster care with a goal of emancipation, those goals should be monitored closely to ensure that other goals, such as adoption, reunification, or relative placement continue to be inappropriate, particularly if the child's/family's circumstances have changed.

### c. Roles and Responsibilities

In order to implement this component of the practice model, we recommend defining the roles and responsibilities of key team members as follows:

#### *Social Workers*

♦ Social workers are responsible for identifying and engaging relevant family members in developing the ISP.

♦ Social workers are responsible for preparing individual family members to participate in case planning activities.

♦ Social workers are responsible for developing an ISP jointly with the parents, age appropriate children, other relevant family members and community supports that is based on the full

involvement of the family and children whenever appropriate to do so. The plan must be developed within specific timeframes as defined by policy and should be tailored to the identified strengths and needs of the child and individual family members, as well as linked to the reasons for agency involvement.

♦ Social workers are responsible for using all information gathered through the investigation, any assessments, reports and visits with the family to identify with the family the type, level, and intensity of services that will be best matched with their strengths and needs to meet the identified outcomes, and for identifying with the family the appropriate service providers, including placement settings and providers for children in foster care.

♦ Social workers are responsible for monitoring the implementation of the ISP and the appropriateness of services through regular ongoing contact with the family and service providers, and through ongoing strengths and needs assessment activities. When services are not meeting identified needs and objectives, the social worker is responsible for identifying and procuring alternate services. All of this is completed in consultation with the family.

♦ Social workers are responsible for using assessment information to identify out-of-home placements for children that are appropriately matched to their needs.

♦ Social workers are responsible for engaging with service providers in planning and discussions about the services needed and in monitoring and evaluating progress to assure the services meet the child and family's unique needs.

♦ Social workers are responsible for knowing the array of services available in order to assure that services selected best meet the strengths and needs of the children and families.

### Area Social Work Supervisors (ASWS)

♦ Supervisors are responsible for monitoring the quality of work of their social workers, and ensuring that family input has been solicited and utilized to develop and monitor the ISP.

♦ Supervisors are responsible for monitoring individual case activity, including determining the need to involve the Regional Directors or other appropriate consultation to assist in identifying individualized needs and help in identifying or procuring appropriate services.

♦ Supervisors are responsible for coaching social workers and modeling effective approaches with regard to identifying and addressing individualized needs and for working with providers to assure responsiveness to individualized needs.

♦ Supervisors are to participate in FTMs and all foster care reviews as a critical management tool to support and assist the social worker in the delivery of services tailored to meet the individualized needs of the children and families they serve.

### Regional Directors (RD)

♦ Regional Directors have the responsibility of becoming actively engaged in the CQI process in order to continually monitor any data reports, as well as reviews for progress in identified critical case practice outlined not only through the *Olivia Y* settlement agreement but also the COA process to identify their offices' strengths and needs with regard to assuring an adequate array of services that can meet the individual needs of the children and families served.

♦ Regional Directors should be the spokespersons for the components of the practice model in their Regions, and as such, should continually reinforce the values and principles associated with a case planning process that embraces family engagement and the development of ISPs that are tailored to meet the specific needs and strengths of the children and families.

♦ Regional Directors are responsible for monitoring supervisory oversight of casework activity and promoting effective monitoring procedures within their offices.

♦ Regional Directors are responsible for assuring that they have a well-trained staff of social workers and supervisors.

♦ Regional Directors are responsible for managing to this and other components of the practice model, by monitoring outcomes, relating practice to outcomes, providing feedback to staff and providers, and taking needed steps to assure conformity with practice standards and expected outcomes.

♦ Regional Directors are responsible for leading program improvement planning and implementation, based on information provided by CQI and oversight of program operations.

### Continuous Quality Improvement (CQI) Staff

♦ The role of the CQI reviewer is to monitor and evaluate the quality of social work practice in regard to the development of individualized case plans and to provide constructive feedback on the effectiveness of this component of the practice model at the worker, unit, county office and statewide levels.

♦ CQI should monitor for the identification of individualized needs through comprehensive assessments, and the incorporation of the needs into the ISP.

♦ CQI should monitor and evaluate the extent to which assessments are used to guide case planning and the delivery of services to children and families.

♦ CQI should evaluate and report on systemic capacity within counties and regions to assure the development of individualized case plans in a timely manner and the ability to provide services to meet the goals and tasks in the plans.

♦ CQI should review the extent to which service providers are able to develop and deliver services that match the unique needs of the children and families.

♦ CQI is responsible for soliciting input from children and families on whether their individualized needs and strengths were identified and addressed effectively.

♦ In conjunction with other issues monitored, CQI should issue local and statewide reports that clearly indicate the extent to which the services identified and delivered meet the individual and unique strengths and needs of the families being served.

♦ CQI should coordinate its review of case planning activities including the FCR process.

♦ CQI should identify the services and resources needed at a systemic level, based on case reviews and systemic factors and for elevating identified needs to the DFCS administration.

## Section 3:  Outcomes and Indicators

### a.  Short-Term Goals (0-12 Months)

#### Training

The following items represent the outcomes of the short term implementation of the Individualized and Timely Case Plans component of the practice model.

♦ *Review existing pre-service and in-service training:*  DFCS should review its curricula to ensure that the concept of family-centered, strengths-based case planning is incorporated throughout.  A TOL component will be important for staff to develop and refine the skills necessary to develop, implement and monitor case plans that are tailored to the individual needs and strengths of the children and families.

♦ *Develop interim training module on individualized case planning:*  Prior to being able to incorporate the recommended revisions for this component into the pre-service and in-service training curricula, we recommend that MDHS develop an interim training module on this component to be used in the initial regions/counties implementing the practice model.  This will provide the basic information on the elements of this component and a foundation to begin implementation while the Department's training curricula are being revised.

#### Policy

♦ *Develop interim policy on supervisory conferences*:  Supervisors and social workers must incorporate supervisory conferences into their regular work.  Policy regarding how often and what to address must be developed.  This conference will provide a regular opportunity for the supervisor to assure that the worker is engaging in family-centered case planning and to review the case plan to assure it continues to meet the needs of the child and family.

♦ *Practice guide on case planning process and individualizing case plans*:  A practice guide in this area will assist staff in the techniques needed to actively engage family members, both immediate and extended, as well as community supports to assure the development of an individualized case plan that respects the individuality of all parties involved.

♦ *Practice guide on use of visits to assure the development, implementation and monitoring of the case plan:*  A practice guide in this area will assist staff in how to make effective use of the child and family visits in order to assure the case plan's tasks and goals are meeting/addressing their individual strengths and needs.

♦ *Protocol on the use of the supervisory conference in the review of the case plans*:  A protocol for supervisors to use during the supervisory conference to evaluate the timeliness and individuality of each ISP.   The protocol will address issues such as who to involve in the case planning process, when the plans must be completed, and what to look for to assure the services are individualized.

#### Quality Assurance and Monitoring

♦ *Conduct baseline CQI review in initial regions/counties to implement the practice model.*  This will provide a measure of existing practice and effectiveness in developing

individualized case plans, and a basis for measuring progress in implementing this component over time.

♦ *Local county office monitoring of available services.* In order for workers to develop plans that are unique to the individual family, there must be an array of services and placement resources to choose from that can be matched to the child and family's needs and strengths. For the regions involved in the initial implementation of the practice model, DFCS should develop a plan to ensure that service providers are capable of developing an array of services that will be able to meet the varying strengths and needs of the children and families involved with the agency.

♦ *Local quality assurance capacity*: DFCS should ensure that local offices have the skills, knowledge, and ability to develop and monitor ISPs and the overall planning process to assure that the child and family's individual needs and strengths are being recognized and respected as the plan is developed, implemented and monitored.

♦ *SAR and FCR*: MDHS should make the recommended changes to the SAR and FCR early on in the implementation process in order to use these tools most effectively in implementing the practice model.

## Resource Development

♦ *Familiarize service providers with the practice model and expectations regarding individualized case plans:* In order to begin implementation of the practice model in the initial regions/counties, efforts must be made to orient and enlist the support of service providers whose case planning activities affect this component of the model. For example, protocols should be put into place to ensure that case plans pertaining to independent living services developed by contractors are synchronized with individualized case planning protocols used in MDHS. Similar protocols should be established with providers of residential care and therapeutic foster care services.

♦ *Coordinate individualized case planning approaches with legal and judicial community:* As MDHS moves to an individualized case planning process, the family's involvement and the types of services authorized will vary from existing practice in many situations. It is important that the courts and legal representatives who influence outcomes and interact closely with children and families understand and concur with this approach to case planning, and MDHS will need to enlist their support early in the implementation process.

## b. Mid-Term Goals (9-24 Months)

## Develop Training Modules and Curricula

♦ *Skills-based training development and enhancement:* In order to ensure a case planning process that involves the children, their families (both immediate and extended), and applicable community supports (both formal and informal) and results in individualized plans, the training skills and modules which support a family-centered, strengths-based planning process must be incorporated into the pre-service and ongoing training curriculum.

♦ *Develop an individual module on clinical supervision:* Clinical supervision will provide supervisors with the skills to support their social workers in identifying the strengths and needs of a family which is critical to the development of an individualized plan.

♦ *Develop an individual module on family team meetings:* This module should provide both the policy and procedures for utilizing this family engagement tool. It should also have a strong practice and TOL component to support staff in the incorporation of FTMs into their daily work.

♦ *Develop an individual module on concurrent planning:* Concurrent planning is a required process in Mississippi and an effective tool in the achievement of timely permanency.

♦ *Develop an individual module on the Independent Living program and services:* The Independent Living program is both mandated and necessary if positive outcomes are to be achieved for the older youth. Additionally, working with adolescents requires a different set of skills and knowledge then working with younger children.

### Policy

♦ *Develop policy that supports and encourages family-centered, strengths based case planning the development of individualized case plans*: DFCS should make the recommended changes throughout their policy to ensure consistency in the case planning process.

♦ *Incorporate supervisory protocols into ongoing policy*: Supervisory policy must include requirements regarding the frequency and content of supervisory conferences as well as guidance on providing clinical supervision with regard to the case planning process and development of case plans. They should also include direction on how to use the SAR as a mechanism to assure timely case planning based on the child and family's individual strengths and needs.

### Quality Assurance and Monitoring

♦ *Conduct initial CQI reviews in next group of regions to implement the practice model:* As regions are added to the implementation schedule, CQI should conduct the baseline CQI reviews to determine the current status of practice and provide a basis for measuring progress over time.

♦ *Conduct follow-up CQI reviews in initial implementation regions.* Following the first twelve months of initial implementation in the first regions, CQI should conduct follow-up CQI reviews to evaluate progress in implementing this component of the practice model. Based on information from the follow-up review(s), local implementation committees should adjust the implementation plans for the counties/regions as indicated.

### Resource Development

♦ *Implement performance-based contracting procedures to promote consistency between service delivery and practice:* In order to help ensure that all parties involved with the children and families are practicing similarly and adopting the same principle-based approaches to individualized case planning, contracts with providers that support MDHS should be revised to reflect goals, expectations, and so forth.

♦ *Develop protocols to ensure that staff are familiar with all the resources available to the children and families;*   As the array of services is expanded to address the needs of the system it will be imperative that social workers in the field are aware of the services available and know the various referral processes for the individual services to assure timely access.

## c. Long-Term Goals (24-48 Months)

### Full Implementation of Modules

♦ Within this time frame, all regions in the State will have begun implementation of the practice model.

♦ Full implementation of all training curricula, policy revisions, and monitoring procedures will have been achieved.

♦ A focus of activity should be on coaching and supporting the practices associated with this component.

♦ An additional focus should be on assuring the systemic supports needed for this component are refined and fully in place, such as a full array of services that can be tailored to meet the unique needs of children and families, foster caretakers who support this component, supervisory and quality assurance processes that capture and use information on this component, and functional treatment planning processes that support individualized case planning processes.

### Monitoring Practice Model Implementation and Success

In order to assess the success of the implementation of the individualized case planning component of the model of practice, the following indicators should be monitored:

### CFSR Measures

♦ Permanency Outcome 1*: Children have permanency and stability in their living situations*
  o Item 7: Permanency Goal for child
  o Item 8:  Reunification, Guardianship, or Permanent Placement with Relative
  o Item 9:  Adoption
  o Item 10:  Other planned permanent living arrangement

♦ Well-Being Outcome 1*: Families have enhanced capacity to provider for their children's needs*
  o Item 17:  Needs and services of child, parents and foster parents
  o Item 18:  Child and family involvement in case planning
  o Item 19:  Caseworker visits with child
  o Item 20:  Caseworker visits with parents

♦ Systemic Factor*: Case Review System*
  o Item 25:  The state provides a process that ensures that each child has a written case plan to be developed jointly with the child's parent(s) that includes the required provisions.

- o Item 26:  The State provides a process for the periodic review of the status of each child, no less frequently than once every 6 months, either by a court or administrative review.

- ◆ Systemic Factor: *Service Array and Resource Development*
  - o Item 37:  The services in item 35 can be individualized to meet the unique needs of children and families served by the agency.

## Olivia Y Settlement Agreement

- ◆ Percent of children entering custody during the period shall have a team meeting with service plans developed for both the child and the parents consistent with Plan requirements within 30 calendar days of entry into foster care;

- ◆ Percent of children in custody during the Period shall have team meetings, at which time their service plans shall be updated, quarterly and within 30 calendar days of any placement or other significant change, consistent with Plan requirements;

- ◆ Percent of children entering care during the Period shall have a permanency plan within 30 calendar days of their entry into care consistent with Plan requirements;

- ◆ Percent of children in custody during the Period with the goal of reunification shall have case record documentation reflecting active concurrent permanency planning consistent with Plan requirements;

- ◆ Percent of children in custody at least six months during the Period shall have a timely court or administrative case review consistent with Plan requirements during the Period;

- ◆ Percent of children in custody  at least 12 months during the Period shall have a timely annual court review consistent with Plan requirements during the Period;

- ◆ Percent of children with a permanency goal of reunification during the Period shall have service plans for their parents that identify those services DFCS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care and case record documentation that DFCS made those identified services available directly or through referral;

- ◆ Percent of children in custody  reaching the point at which they have spent 15 of the previous 22 months in foster care during the Period shall have a petition for TPR filed on their behalf or an available exception under the federal ASFA documented by the end of their fifteenth month in care;

- ◆ Percent of children in custody during the Period who have spent more than 15 of the last 22 months in foster care without a TPR exception filed on their behalf or an available ASFA exception documented by the end of their fifteenth month in care shall have such a petition filed or an available exception documented within the Period;

- ◆ Percent of children in custody known by DFCS to be subject to a potential or actual placement disruption during the Period shall receive a meeting to address placement stability consistent with Plan requirements;

- ◆ Percent of children with special needs shall be matched with placement resources that can meet their therapeutic, medical  and educational needs;

- Percent of the children in DHS custody shall be placed in the least restrictive setting that meets their individual needs consistent with Plan requirements;

- Percent of siblings who entered DFCS custody at or near the same time shall be placed together consistent with Plan requirements;

- Percent of children in custody during the Period shall be provided with contacts with their parents and with any siblings not in the same placement consistent with Plan requirements;

- Percent of children in custody shall receive documented twice monthly in-person visits by the assigned DFCS caseworker during the Period, consistent with Plan requirements;

- Percent of children with a goal of reunification shall have their assigned DFCS caseworker meet monthly with the child's biological parents, consistent with Plan requirements, as documented in the child's case record;

- Percent of foster  parents with at least one foster child residing in their home during the Period shall have a DFCS worker visit the home twice a month (therapeutic foster homes) or monthly (non-therapeutic foster homes), consistent with Plan requirements, as documented in the children's case records; and

- Percent of children in custody 14-20 years old during the Period shall be provided with Independent Living services as set forth in their service plan.

## Foster Care Reviews

- Cases cited due to child ISP issues related to ISPs overdue for review and/or lacking vital information such as medical/dental/educational/mental health services received, visitation plans, placement information, etc

- Issues cited due to children who are found to have identified medical, mental health or educational needs for which services are not being provided;

- Issues cited related to children with a plan of Living Independently or Long Term Foster Care for which other permanent plan options have not been considered and ruled out;

- Cases cited for which there is a serious concern regarding the appropriateness of the child's permanency plan; and

- Issues cited due to children who have been in state's custody for 15 of the most recent 22 months, their case has not been referred for termination of parental rights (TPR) and there is documentation lacking in their ISP of compelling reasons why pursuing TPR would not be in their best interests.

# IV.  IMPLEMENTATION STRATEGY

Our recommended strategy for implementing the Mississippi Practice Model is based on implementing the entire model by regions in the State, in which groups of counties will begin planning and implementation activities together at designated times.  Each regional group will have a six to eight month planning period to prepare for implementation, followed by a year of initial implementation activities supported from the State Office through intense technical assistance before moving into a continued implementation phase.  In recommending this strategy, we acknowledge that full implementation of a comprehensive practice model will require a lengthy period of time to become fully incorporated into MDHS' front-line practice with children and families.  It is highly unlikely that within any short period of time, e.g., six months to a year, the practice model will become fully functional as we have described the components.  However, it is practical to focus efforts on implementing the entire model in stages among the regions so that the period of time in which different regions might be practicing differently or operating under different protocols is minimal.  This plan also requires focused attention and assistance to County Departments within regions during the initial implementation efforts, and some degree of ongoing assistance that permits them the time needed to incorporate the model fully into their work.

Our reasons for recommending this particular approach are as follows:

♦ *The components of the model are interconnected.*  We designed the various components of the model to build upon one another and, together, to comprise a continuum of practices that supports the DFCS mission and guiding principles.  Implementing any one of them separately will create gaps in practice and in the ways in which children and families experience DFCS' interventions.  For example, implementing the assessment component, which identifies the strengths and needs of families and the most appropriate services and interventions, will not lead to improved outcomes unless the component pertaining to involving children and parents in decision making and the component pertaining to mobilizing services are also implemented.

♦ *Staging permits the opportunity to learn and adjust.*  The earliest staged regions will provide an opportunity to capitalize on lessons learned, and will assist in informing the systemic supports needed for full implementation.

♦ *Staging permits focused resources and technical assistance.*  There will be a need to address issues on several fronts during implementation, e.g., training, supervision, services and resources, and policy.  There will also be a need to introduce new practice approaches and to provide hands-on coaching and support of staff in adopting new practices.  Staging the implementation process geographically will allow MDHS to focus its resources and help assure that staff and stakeholders in each region receive the support they need to adopt the practice model, and will help assure the broad base of community support needed to help ensure its success.

♦ *The change management process will be enhanced.*  Change management is an important consideration in adopting a standard practice model, particularly among staff that might be skeptical or stakeholders that may use approaches that differ from the practice model.  In

permitting staff and stakeholders to see how the entire process will affect practice and outcomes, there is a greater likelihood of buy-in than if they only see fragments of the process.

♦ *Staging will permit MDHS to predict outcomes.* MDHS can plan the order of regional implementation along several lines, such as achieving early successes, providing more time for anticipated barriers, and effects on statewide outcomes. It will also permit the State to predict and plan for achieving the numerous benchmarks of progress prescribed by the *Olivia Y* settlement agreement.

In addition to the advantages of this approach, there are some concerns that this implementation strategy will need to account for, including the following:

♦ *Different processes for different regions and counties during implementation.* For some period of time, the County Departments implementing the practice model will likely adhere to different protocols and interventions than County Departments that are not yet implementing the model.

♦ *The experience of children and families across counties and regions may vary initially.* Children and families will experience different casework processes, depending upon which County Department serves them, pending statewide implementation.

♦ *The process of changing policy and training will be affected by a staged implementation.* Changes regarding policies, resources, training, and other systemic supports will be affected by the different operations of County Departments, pending statewide implementation, i.e., MDHS' revisions of policy and training to reflect the model will need to consider how the revisions affect County Departments not yet in the implementation cycle.

In describing the schedule and benchmark activities that comprise our recommended implementation plan below, we should note that implementing the practice model includes more than a series of steps, time frames, and activities. Changing child welfare practice in the field will be a major reform effort for MDHS. It is not simply a process of training staff and changing policies. It includes addressing the fundamental values and principles underlying service to children and families among staff and stakeholders. In many situations, it will require a shift in thinking about how families are served and the roles and responsibilities of the agency and its stakeholders. For this reason, communication from the Department's leadership to the field about the changes and priorities is extremely important in ensuring a successful shift to consistent family-centered practice. Leadership from the State Office and Regional Directors will be a key element in helping staff and stakeholders adopt the principles of the practice model and commit to practicing within the parameters of each component of the model.

Communication strategies of this nature are not limited to short-term, mid-term, or long-term activities. They are ongoing. The values and principles underlying the practice model should be routinely raised and reinforced from the State Office leadership and Regional Directors, and through CQI activities and front-line supervision. They should be reflected in the Department's contracts with providers, in its expectations of foster caretakers, and in its planning activities with all stakeholders. Communicating these key messages will be a major responsibility of the

MDHS and should be woven throughout the various planning and implementation phases described below.

## *A.  County/Regional Implementation Activities*

For each implementation group of counties, we recommend a series of four phases of activities, as follows:

## Phase 1:  Planning Phase

Changing practice on a broad scale will require careful planning and preparation locally and statewide in order to help assure success in improving outcomes.  We suggest that the initial activities in each of the regions beginning implementation of the practice model consist of planning activities within the counties, regions, and the State Office.  The planning phase for each new group of counties beginning implementation should provide for six months to eight months to address pivotal issues, including the following:

♦ *County/Regional Implementation Teams:* The region(s) involved in implementation of the practice model should establish county or regional implementation teams that will guide local implementation activities.  The functions of the local implementation teams should be similar to those of the statewide implementation team, and should include both agency staff and key external stakeholders.  The local implementation teams should serve as an advisory body to MDHS and to technical assistance providers in ensuring that the appropriate representatives are involved, that adequate preparations for implementation are made, that all necessary activities are put into place, and that anticipated progress is made.  A sub-group of these local implementation teams, or the team as a whole, should also serve as an inclusive body that reviews CQI reports and findings in order to evaluate progress made locally in implementing the practice model and improving outcomes for children and families.  The team should work closely with the County Departments in developing and monitoring program improvement plans that result from CQI reviews.

♦ *Develop Local Implementation Plans:*  The development of local implementation plans will be very important in managing the many activities and changes that will come with the practice model.  Prior to actually beginning implementation activities, implementation plans should be developed at either the county or regional level and should include time frames for all activities, training schedules, work product development, roll-out plans, responsible parties, and roles and responsibilities of the various stakeholders.  As part of the planning process, potential barriers to effective implementation should be identified, in collaboration with community stakeholders, and plans to address barriers should be included in the implementation plan.  The plan should address not only the activities needed to bring about practice changes in the county or region, but activities associated with strengthening the capacity of the county or region to support improved practice, such as strengthening the service array, recruiting and retaining an adequate pool of family-based placement resources, changes in process or procedure, training needs, and oversight through supervision and continuous quality improvement.  The implementation plan should be a dynamic document that guides implementation activities, and it should be reviewed and modified over time as needed.

- ◆ ***Engage Local Stakeholders:*** Consistent with the implementation team and the implementation plan, local venues implementing the practice model should make planned efforts to engage stakeholders, such as the courts, service providers, foster parents, schools, and others in the change effort. Specifically, efforts should be made to educate the key stakeholders about the practice model, how it will affect work with children and families, and how the functions of stakeholders relate to the model. Rather than a one-time engagement activity, the work with stakeholders should be planned as a continuous set of efforts and opportunities designed to keep them engaged over time, help them to see progress made in terms of outcomes for children and families, and support them in making needed changes within the scope of their responsibility as needed to support the practice model implementation.

- ◆ ***Conduct baseline CQI Review:*** In collaboration with the State Office the regions/counties initiating implementation activities should conduct an initial CQI review to determine the current status of practice and outcomes. Information derived from the baseline review will help to inform the development of the local implementation plans by identifying areas of practice needing attention. It will also establish a baseline against which to measure progress in implementing the practice model over time. The local implementation teams should be involved in the CQI reviews, either in reviewer roles or as stakeholders interviewed as part of the review process. They should receive a report of the findings of the CQI review.

## Phase 2:  Initial Implementation Phase

The initial implementation phase of activities consists of twelve months of focused technical assistance designed to change practice within the region in accordance with the model. We recommend that as regions enter the implementation phase, that MDHS make intense technical assistance available to the County Departments within the regions to support changes in practice, strengthen supervision, and assist in strengthening the systemic capacity of the county to support and sustain practice changes. Key activities during this phase include the following:

- ◆ ***Training Staff:*** One of the primary tasks in implementing the practice model will be to train staff on the key skills associated with each of the components. Using the training modules developed for this purpose, we recommend that supervisors in each County Department receive the training prior to training staff. The reason is that supervisory commitment to the model is essential to workers adopting the practices. Regardless of the length of time any individual has been employed by MDHS or in their current positions, we strongly recommend that they receive the training.

- ◆ ***Training Providers:*** It is equally important to provide training and orientation to key partners whose involvement with the children and families served by MDHS is key to successful implementation of the practice model. Examples of the training we recommend include training foster parents on supporting parent-child relationships during episodes of foster care and training service providers on responding to the individualized needs of children and families referred to them by MDHS.

- ◆ ***Phase-in of Casework Activity to the Practice Model:*** Over the course of the initial implementation phase, counties will start to use the practice model components as children and families enter the system, and with those already in the system. Presumably, each

county's implementation plan will describe how the county will approach phasing in the practice model throughout its caseload.

♦ ***Coaching for Practice Improvements:*** Practice in the field will not necessarily change simply because policy changes or because staff are trained in new procedures. However, these steps combined with focused coaching of staff on the application of new practices will assist staff in transferring the concepts of the practice model to their routine work with children and families. Part of the technical assistance provided to County Departments in the initial implementation phase should include coaching for practice improvement in all components of the model. This can take the form of having seasoned practitioners sit in on family team meetings with staff and subsequently provide feedback and guidance on how to make the meetings more effective, staffing cases with staff to explore how the practice model applies to a variety of circumstances, and preparing staff to engage in critical practice model-related activities. Coaching should also include supervisors and strengthening their capacity to support their staff in practicing within the parameters of the model.

♦ ***Resource Development:*** Changing practice in the field will not lead to improved outcomes for children and families unless the needed services are available to support practice changes. There is a need within communities for a sufficient array of services to respond to the individualized needs of children and families, and providers must be sufficiently flexible to adapt to unique and changing needs in order to avoid limiting the options that families have for service delivery. There is also a tremendous need to assure that placement resources needed by children entering foster care are available within the communities from which children are coming into care in order to place children in the most appropriate settings suited to their needs and to preserve important connections and relationships. County Departments will need to focus intensive efforts on strengthening and modifying the array of services and placement options as they implement the practice model.

♦ ***Build Internal Capacity to Complete Implementation and Sustain Progress:*** The process of implementing the practice model fully will be lengthy and cannot realistically become reliant upon external sources of technical assistance for extended periods of time. Building the capacity of administrators, supervisors, and CQI to promote, reinforce, and monitor the implementation and sustaining of the model is a critical part of the initial implementation phase. External technical assistance providers will need to focus on assisting administrators and supervisors in leading the change effort and supporting staff and providers to work differently with children and families. Likewise, an investment in building local CQI capacity to monitor and provide feedback on practice and outcomes will be essential tasks during this phase.

## Phase 3: Evaluation and Revision

This phase, which should begin approximately one year after the initial implementation phase begins will provide an opportunity to evaluate progress during the first twelve months of implementation, review the implementation process, identify the status of existing barriers and address emerging barriers, and make needed modifications to the longer term implementation plan. It is important that the local implementation team be involved in this phase's activities so as to ensure coordinated and well-informed revisions.

- ◆ ***Follow-up CQI Review:*** The State Office CQI unit, in collaboration with the local CQI process, should conduct a follow-up review of the counties/regions engaged in implementation activities, similar to the initial CQI review. Results of the follow-up review should be compared to the baseline results in order to evaluate progress regarding outcomes for children and families. The process of implementation should also be examined to determine successful and unsuccessful approaches and how well barriers have been addressed. The results of the follow-up CQI review should be made available broadly in order to inform activities at the statewide level as well as activities in other counties and regions. Within the County Departments being reviewed, the results should be provided in ways that will help staff and stakeholders understand how their practices are affecting outcomes, and support them in making any needed changes. Similar to the baseline CQI review, the local implementation team should be a part of this process and receive copies of the report and findings of the review.

- ◆ ***Revise Implementation Plan as Needed:*** Based on the findings of the follow-up CQI review, the local agencies, in collaboration with their implementation teams, should make any needed revisions to the implementation plan. This should include attention to new or emerging barriers, replication of successful approaches in the initial implementation phase, engagement of essential stakeholders, and next steps in completely implementing the practice model. Where progress has been identified, the revised implementation plan should also include measures for sustaining progress over time.

## Phase 4:  Continued Implementation and Ongoing Evaluation

Beyond the initial implementation phase, counties will need additional time to ensure complete integration of the practice model into all casework activity and to ensure the system's capacity to support improved practice. Information obtained through ongoing review and evaluation should be used to gauge progress and make needed adjustments over time. Monitoring of performance indicators associated with the practice model will be very important in this phase as the outcomes for children and families begin to change as a result of implementing the practice model and increasing systemic supports. In order for the practice model to remain viable, focused efforts on sustaining progress, use of monitoring to reinforce practice, and making needed adjustments based on monitoring should become major areas of emphasis.

- ◆ ***Ongoing, but Less Intense Technical Assistance:*** After the counties within a region have completed the initial implementation phase, which will include a focus on building local capacity to continue and sustain implementation, we suggest that technical assistance remain in place, but become less intense as the State Office supports new regions entering the initial implementation phase with its technical assistance resources. We also suggest that focused activities on sustaining progress be implemented during this phase, such as greater stakeholder involvement, use of monitoring and reporting, accountability measures, and peer support among counties and regions that are at similar phases in adopting the practice model.

- ◆ ***Regular CQI Reviews:*** During this phase, counties should become part of a more routine cycle of CQI reviews, in addition to ongoing CQI activities beyond formal reviews (see CQI plan for more details). The State Office and County Departments should collaborate to conduct regular CQI reviews and to use the information to inform staff, stakeholders, and the State Office about strengths and weaknesses in practice and systemic supports. Ongoing monitoring will become a key mechanism for sustaining progress and reinforcing the practice

model over time if constructive feedback is provided to those staff and providers who interact with children and families on a routine basis. Performance indicators associated with the practice model should be monitored closely and analyzed for associations with practices that affect the indicators. Reports of CQI reviews should be shared broadly in order to maximize the investment of stakeholders in the agency's practices and outcomes. The local implementation team should be a part of the review process and monitoring for progress and improvements.

## B. *Staffing the Implementation Process*

MDHS has been fortunate to obtain some badly needed resources to hire staff at the State Office and in County Departments. Much of the new State Office staff permits the Department to cover program administration and support activities that would be expected for normal operations and maintenance of effort. However, implementing major changes such as those included in the *Olivia Y* settlement agreement and the practice model will require additional staff to manage the change process.

In order to ensure that the Department's leadership has the time to devote to managing and communicating the change process among staff and stakeholders, there must be sufficient staffing for key implementation functions that, otherwise, will fall to the Department's highest-level administrators and Regional Directors and prevent them from exercising the communication and facilitation roles and responsibilities that we have described for them. We are, therefore, recommending the following positions to assist in the implementation of the practice model and to support County Departments in moving toward full implementation of the requirements of the settlement agreement and COA standards. These are in addition to the staffing recommendations for implementing the CQI process included in the CQI section of this report.

## Implementation Manager

We recommend that an Implementation Manager be hired to manage the overall process of implementing the practice model. This should include working with the MDHS administration, the State and local implementation teams, and program divisions with MDHS to assure that all activities are coordinated and that the implementation plan is put into place. The manager should be the director of activities concerning technical assistance, resource development, and practice coaching and should coordinate efforts to identify and prepare counties/regions for implementing the practice model and to work with Regional Directors and stakeholders to plan and implement activities.

*Field Practice Liaisons:* As MDHS implements major practice changes in each County Department, having on-site technical assistance available for coaching staff and assisting in the transfer of learning from training to practice is very important. Although external technical expertise and assistance in these areas is important to implementing the practice changes effectively, MDHS' ability to build its own capacity and to sustain changes over time, as well as to reduce long-term reliance on external consultation, will rest to some extent with its ability to have its own staff fulfill the TA role on an ongoing basis. We recommend that the Department initially hire five practice liaisons to support the initial regions implementing the model, and to evaluate the numbers needed after the first implementation year. These staff should report to the

Implementation Manager, but should spend most of their time in the counties/regions implementing the practice model, providing hands-on assistance in changing practice, modeling appropriate practice, mentoring local staff and supervisors, and learning from external consultants with whom they would be paired.

## Resource Development Specialists

Supporting the capacity of local service providers to offer a sufficient array of flexible services that can be individualized to meet the needs of children and families will require special attention. We recommend that the State Office hire a small unit of resource development specialists whose primary responsibilities are to support counties/regions in diversifying and broadening the array of child welfare services. In some situations, this will involve assisting in contracting and purchasing procedures, but should also include direct work with service providers helping them to tailor services to identified needs. This unit might also take on the responsibility for statewide recruitment of foster families in order to support the placement-related components of the practice model.

## Training Staff

With the many recommendations for training development and delivery included in the practice model, we recommend that MDHS hire additional trainers to support curriculum development, re-training of staff according to the practice model, and to ensure that staff in counties and regions implementing the practice model receive timely training to support implementation without limiting the training unit's ability to provide ongoing pre-service and in-service training as required.

## Policy Staff

The practice model includes many recommendations for new or revised policy. We recommend that MDHS hire one or two additional policy developers or ensure ongoing contracted TA in policy development in order to address the policies needed to support full implementation of the practice model.

## C. Determining the Order of Implementation

Because the implementation of the practice model will serve as a significant vehicle for implementing the practice-related requirements of the *Olivia Y* settlement agreement in the counties and regions, the order and pace of implementation will affect the Department's conformity with benchmarks of progress in the settlement agreement. The settlement agreement is specific about percentages of compliance with various requirements that must be achieved statewide in each year of implementation of the agreement. The caseloads of counties and regions complying with the requirements of the agreement will have an effect on whether the Department reaches those benchmarks.

At the same time, the long-term success of the practice model in achieving improved outcomes for children and families and the Department's capacity to sustain improvements over time are both dependent upon the quality of work that comes from implementing each component of the practice model. Focusing on the quality of work and how the practice model can best be

implemented statewide present criteria for the order of implementation that are not solely targeted toward achieving the annual benchmarks. For example, checking off that staff have convened family team meetings in a certain percentage of cases will be an easier task than ensuring that each of those family team meetings involves preparation of family members, inclusion of all relevant family members, use of the meetings to identify strengths and needs, use of the meetings to develop family-centered case plans, and so forth.

As MDHS establishes the criteria for determining the order in which counties and regions will implement the model, we recommend that it focus on ensuring the quality of implementation so that it has the best opportunity to carry out the spirit and intent of the settlement agreement and to establish practices that will serve children and families well over time, including beyond the settlement agreement. Taking this approach may require mutual agreement of the parties, but we believe it is important in avoiding implementing the practices and requirements in a compliance-oriented, checklist manner.

We recommend the following criteria for determining the order of implementation:

♦   We recommend that MDHS ask regions to develop proposals for their order of implementing the practice model that are developed jointly with county/regional DHS staff and their key stakeholders, including the courts and service providers. The proposals should include information about the regions' capacity, staff and stakeholder commitment, and readiness to implement the practice model. It will provide MDHS with a region's self assessment of its readiness to implement, and will provide County Departments, Regional Directors, and stakeholders with a voice in the selection process.

♦   In order for staff statewide to move from a conceptual to a practical understanding of the practice model, it will be important to see all components of the model in operation. We recommend that the first two regions identified to implement the model include at least one region where the opportunity for early success is most likely, in terms of available resources, stakeholder commitment, and general capacity. This will help establish a site in the State early on that others in the State can look to as a point of reference for what the practice model "looks like" and will help to create local champions of the model among MDHS staff and stakeholders.

♦   We recommend that the first two counties to implement the model also include a region where there are more challenges and that represents much of the State in terms of being rural with more limited resources. Since MDHS will clearly have to address these kinds of issues as it implements the practice model, it should begin to address them early and identify ways to address the resource issues for the latter implementation stages.

♦   We recommend that MDHS begin to phase in regions that present more complex issues for implementation in the second and third groups of counties. For example, regions whose resources were seriously affected by the hurricanes, regions where more focused attention is needed to ensure stakeholder involvement, and regions with larger and more urban populations. Including them in the second and third phases of implementation will allow MDHS and its technical assistance resources to acquire some measure of experience in implementing the model in the first phase, and it will allow MDHS the first year of

implementation to plan with the second and third groups to identify barriers to implementation and begin to address barriers prior to taking on the practice model.

## D. Implementation Time Frames and Outcomes

We recommend that the 13 regions in the State be scheduled for geographically staged implementation, whereby the entire practice model will be put into place region-by-region. We recommend that initially, two regions begin the implementation process simultaneously, followed by two more regions, then followed by three groups of three regions each, with each staged group beginning implementation planning approximately six months apart. According to this time line, all regions in the State will be engaged in initial planning activities by the 24th month following the initiation of the implementation schedule, and by the 48th month all regions will be well engaged in implementation activities (see the time line chart that follows).

Following this time frame, we project the following short-term, mid-term, and long-term time frames and outcomes:

## Short-Term Outcomes (0 – 12 Months)

Most of the outcomes in the first year will be process outcomes and the development of supports needed for implementation in the counties/regions, as follows:

♦ During the first year, an initial group of two regions should complete their planning phase and begin initial implementation activities.

♦ A second group of two regions should begin their planning phase.

♦ A Statewide planning committee, or steering committee, should be convened that provides guidance and oversight for implementation activities. We recommend that the committee be established early in the initial planning phase, and that it include representatives from within MDHS (county, regional, and statewide) along with stakeholders whose involvement in the practice of child welfare is critical to the success of the model. For example, we recommend that the committee include both congregate care foster care providers and foster parents, service providers, court representatives, tribal representatives, training academy representatives, funding and financial representatives, and state-level quality assurance representatives, among others. The committee should provide broad-based input into planning activities, receive and respond to reports of progress and barriers on a regular basis, evaluate outcomes of the implementation activities, and serve as liaisons to various components of the child welfare community to assist in coordination and collaborative activities needed across the spectrum of stakeholders. The statewide planning committee, or a sub-group thereof, should also serve in a statewide advisory capacity to the CQI process, reviewing results and findings of all CQI reviews, monitoring the implementation of program improvement efforts resulting from the reviews, and providing feedback to the administration and CQI staff on using the CQI process to improve outcomes for children and families served by MDHS.

♦ The State should finalize its plan for the order of implementation by regions, including finalizing the criteria it will use to determine the order in which regions will implement the practice model and a process for identifying the region(s) that will begin in the first and subsequent cycles.

♦ The State should develop training modules for each component of the practice model in order to prepare staff in the counties. In order to avoid delays in implementing the model due to the time it would take to modify the State's pre-service and in-service training curricula to incorporate the skills-based training needed for each module, we suggest that "interim" training modules for each component be developed and used to train the first few counties in the implementation schedule. Later, the State can incorporate these modules into its established training curricula with the benefits of lessons learned during the early implementation experiences.

♦ The State should implement its CQI process in order to monitor for the success of the practice model in improving outcomes for children and families is an important consideration in implementation planning. We suggest an integration of the implementation processes for CQI and the practice model in order to assure consistency between practice and monitoring. During the initial planning phase, and in each subsequent planning phase, MDHS will have the opportunity to conduct a "baseline" review of the regions/counties about to begin implementation which will serve two primary purposes. First, the baseline review will identify the strengths and needs of current practice within the regions/counties which should inform implementation planning, priorities, and activities. Second, the review will provide for a baseline of current performance against which future reviews can be compared in measuring the success of the practice model.

♦ The State should develop a resource development plan to strengthen the array of resources needed to support front line practice. We know that some critical services throughout the State are in short supply and that many areas of the State do not have ready access to the services they need to serve children and families effectively. Further, in a number of situations, providers are limited to the point that County Departments have few, if any, options available in tailoring services to the individualized needs of children and families. The availability of sufficient foster family homes also limits the ability of MDHS to place children according to their needs and in close proximity to their families and communities.

♦ The State should develop practice guides to fill gaps in policy and assist staff in the field in understanding how to practice in accordance with the models. Later, the State Office can focus on revising policies to support the practice model fully, but in the initial planning phase, developing the practice guides will address this need. We have prepared practice guides for the six components of the practice model, but there are a number of activities and interventions associated with each component that will also require guidance for effective practice, and additional guides (ultimately, policy) will be needed in those areas.

## Mid-Term Outcomes (12 – 24 Months)

♦ The second group of two regions and a third group of three regions will complete the planning phase and begin initial implementation activities. At the end of 24 months, a total of seven regions will be engaged in implementation activities.

♦ A fourth group of three regions will begin the planning phase.

♦ During this second year, the State should begin to incorporate the training developed specifically for implementation into its pre-service and ongoing training curricula. Similarly,

the recommended policy revisions and others that become apparent during the first year should be incorporated into policy and procedure.

♦ The State will conduct baseline CQI reviews of the counties entering the planning phase of implementation, and conduct follow-up reviews in the first group of two counties completing the initial implementation phase.

♦ The State's more intense technical assistance activities will be focused on the regions in the initial implementation phase, while continuing to provide less intense to the first group of regions engaged in continued implementation activities.

## Long-Term Outcomes (24 – 48 Months)

♦ In the third and fourth years of implementation, the last group of three regions will begin and complete the planning phase, and all counties/regions will be actively involved in implementation activities. This will make it possible for some counties in the earlier implementation groups to provide mentoring and guidance to those beginning the process later.

♦ The State should be well into monitoring progress through identified performance indicators, and assisting counties to make revisions in implementation strategies where barriers to progress are identified and where CQI reviews identify the need for different approaches.

♦ The State should focus evaluation and monitoring efforts on identifying associations between practices in the model and outcomes for children and families, in order to make adjustments in practice as needed.

♦ CQI activities and supervision should serve as the key reinforcers of the practice model and its underlying principles and values for staff and stakeholders. Without reinforcing the practices and the underlying principles and integrating the reinforcement into the routine work in the field, the danger of not sustaining progress over time is greatly increased. The State should focus its technical assistance and supports to County Departments on quality assurance activities, feedback to staff, and support of supervisors.

## E. *Measuring Progress*

For each component of the practice model, we have identified the relevant CFSR and *Olivia Y* settlement agreement measures that pertain to the component. In very few instances, we have added some additional measures that we recommend adding to either the FCR or to the CQI process when implemented. Since the practice model is designed to capture the requirements of the CFSR and settlement agreement, we believe that the existing measures associated with the CFSR and settlement agreement are adequate for tracking progress in implementing the practice model over time.

**Mississippi Practice Model**

## *F. Implementation Time Line for Mississippi Practice Model*

| Months | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | → | 48 |

**Stage I Regions (2 Regions)**

| Planning Phase & Baseline CQI Review | Initial Implementation | Evaluation and revision | Continued Implementation |
|---|---|---|---|

**Stage II Regions (2 Regions)**

| | Planning Phase & Baseline CQI Review | Initial Implementation | → |
|---|---|---|---|

**Stage III Regions (3 Regions)**

| | Planning Phase & Baseline CQI Review | Initial Implementation | → |
|---|---|---|---|

**Stage IV Regions (3 Regions)**

| | Planning Phase & Baseline CQI Review | → |
|---|---|---|

**Stage V Regions (3 Regions)**

| | Planning Phase & Baseline Review | → |
|---|---|---|

## *G. Technical Assistance (TA)*

Successful implementation of the practice model will depend in part on the provision of technical assistance in several areas, as identified below.

## Planning for Implementation

TA will be needed to assist in developing implementation plans at the statewide and regional levels, such as assisting DFCS to determine the order of implementation among its regions and in evaluating the readiness of counties/regions to undertake implementation. Counties and regions will benefit from TA in identifying barriers to effective implementation and developing strategies to address them, as well as in preparing their staff and stakeholders for the changes inherent in adopting the practice model.

## Training

TA will be needed to develop interim training modules on each component of the practice model and in delivering the training to staff in counties/regions initiating implementation of the model. TA will be helpful to the DFCS training division as it incorporates materials regarding the practice model into its pre-service and advanced training curricula, and addresses the training recommendations in this report.

## Policy Development

TA will be needed in developing the practice guides that will provide a framework and guidance for implementing the components of the practice model prior to revising policies. TA resources can also assist DFCS' policy staff in incorporating the revisions and developing the policies needed to support full and ongoing implementation of the practice model.

## Resource Development

Developing the array of services needed to support the practice model is critical to the success of the model in improving outcomes for children and families. TA will be needed to work with providers to develop and diversify their services and to facilitate their capacity to respond to individualized needs of children and families. Within this area of TA, assistance in implementing a contracting process that supports the goals and objectives of DFCS will most likely be needed.

## Supervision

Strengthening the capacity of supervisors to support and reinforce their staff in practicing according to the practice model is an area where TA will be very helpful in building capacity within county offices to sustain progress over time.

## Practice Coaching

The transfer of learning from training to practice will not occur simply by training staff in the components of the practice model. Onsite assistance will be needed to assist staff in implementing the practices with children and families, modeling the practices for them, and providing feedback on interventions. We recommend that practice "coaches" be an integral part of implementation activities in counties/regions, particularly during the initial 12 months of

implementation and to a lesser extent thereafter.  Practice coaches should also be paired with DFCS staff in order to build the Department's capacity to support practice over time and limit its reliance on outside sources of TA.

## CQI Implementation

Since the CQI process must be developed almost completely, TA can assist DFCS in structuring the process, training CQI staff, developing tools and instruments, building analytical and reporting capacity, modeling the review process, establishing feedback processes, and engaging staff and stakeholders in the process.

## Stakeholder Engagement

Stakeholder involvement will be critical to the success of the practice model.  In particular, service providers will need to be fully engaged, as well as the courts, foster caretakers, and others.  TA can be directed toward assisting particular stakeholders to understand and commit to the practice model and its underlying principles.  We recommend that peer assistance be provided to assist the courts in this area, and that targeted TA be provided to service providers and foster caretakers to assist them in defining their roles and responsibilities within the practice model.

## Data

The reliability and validity of data used to establish baselines and measure progress over time is essential to evaluating the effectiveness of the model in improving outcomes for children and families.  Also, the ability to generate reports easily and to analyze information gathered in the implementation and CQI processes are central to long-term success.  DFCS has considerable limits in this area currently and TA in strengthening the capacity of the information system and user input will be very important.

The technical assistance matrix that follows below is intended to assist the Department in coordinating its technical assistance resources by identifying the type of TA needed, where it is needed (State Office, County Department/Regions, or both), and the provider of the technical assistance (to be completed by MDHS).  The Department currently has multiple sources of TA available and it is important to coordinate those resources so that all identified needs are met, to avoid duplication, and to ensure that TA is provided when and where it is needed without conflicting schedules among the TA providers.

Mississippi Practice Model

## Technical Assistance Needs

| Type of Technical Assistance | State Office | County Region | Source of Technical Assistance | Time Frame for Technical Assistance |
|---|---|---|---|---|
| Implementation Planning | X | X | (To be determined by MDHS) | Initial planning phase and each subsequent regional planning phase |
| Training | X | X | (To be determined by MDHS) | Initial planning phase and through second year of implementation |
| Policy Development | X | | (To be determined by MDHS) | Initial planning phase and through second year of implementation |
| Resource Development | X | X | (To be determined by MDHS) | Initial planning phase and each subsequent regional planning phase |
| Supervision | | X | (To be determined by MDHS) | Initial planning phase and each subsequent regional planning phase |
| Practice Coaching | | X | (To be determined by MDHS) | Throughout implementation |
| CQI Implementation | X | X | (To be determined by MDHS) | Initial planning phase and each subsequent regional planning phase |
| Stakeholder Engagement | X | X | (To be determined by MDHS) | Throughout implementation |
| Data | X | X | (To be determined by MDHS) | Initial planning phase and through second year of implementation |

# V. CONTINUOUS QUALITY IMPROVEMENT (CQI) RECOMMENDATIONS

## A. *Purposes and Background of the CQI Recommendations*

We are making recommendations for the MDHS Continuous Quality Improvement (CQI) process in conjunction with the practice model because monitoring is a central feature of the model.   In describing each component of the practice model, we have reviewed current monitoring processes for the extent to which they addressed and reinforced the components, identified strengths and gaps in existing monitoring processes, identified performance indicators that we recommend for monitoring each component, and described some of the key roles and responsibilities of the Department's leadership, supervisors, and CQI staff pertaining to monitoring the practice model.

Achieving the full implementation of the practice model is not likely to occur without a great deal of support and reinforcement for staff in the field.  The use of monitoring processes that operate in a non-punitive reinforcing manner will help staff to retain a focus on the key practices and outcomes that comprise the practice model.  Similarly, defining supervisory oversight roles in ways that complement formal monitoring processes will help ensure that reinforcement of practices in the model will occur on a regular basis and not just when scheduled CQI reviews occur.

Since MDHS does not currently have an existing CQI process in place and is required by the terms of the *Olivia Y* settlement agreement and COA standards to implement one, it makes sense to develop the monitoring process in conjunction with the practice model and put it into place as the practice model is rolled out in the regions.  The reason for this is that the monitoring process should mirror the practices that the Department expects of staff in the field, i.e., we should monitor for the things we want to reinforce.  As the practices are implemented from region to region, the concurrent implementation of CQI in those regions will provide an integrated means of reinforcing and supporting the practice.  It will also provide a baseline of performance and a means of gauging progress in implementing the practice model and achieving improved outcomes for children and families.

The *Olivia Y* settlement agreement requires that the Department's CQI system become the means of monitoring performance upon termination of the implementation plan for the agreement.[14] Therefore, we are making recommendations that will assist the Department in conforming to the monitoring requirements of the settlement agreement.  Further, the agreement (at Section VII-C) requires the monitor to determine that the Department's CQI system is adequately monitoring a number of plan provisions prior to transferring monitoring responsibility to CQI.  Later in this section, we provide a crosswalk of those plan provisions to the monitoring components of our recommended CQI process.  Although our recommendations are not for CQI to be a highly legalistic, compliance-based process, but rather a reinforcing supportive process for practice in

---

[14] Mississippi Settlement Agreement and Reform Plan, Section VI-G.

the field, we understand the legal requirements of the settlement agreement for CQI and are attempting to ensure that our recommendations are consistent with the requirements in the agreement.

As MDHS is pursuing accreditation through the Council on Accreditation (COA) as part of the implementation of the *Olivia Y* settlement agreement, we are also taking care to crosswalk the COA accreditation standards with our recommended approach to the CQI process. The chart later in this section illustrates the crosswalk.

## Characteristics of CQI

Our recommendations call for a CQI process that includes the following characteristics:

- *CQI should reinforce positive practice at the case level.* We suggest that the CQI process serve as a means of reinforcing the practices within the practice model, which also addresses the many requirements of the settlement agreement, COA standards, and the CFSR. By making a clear connection between practice and monitoring, MDHS will have a much stronger opportunity to improve practice and outcomes. Monitoring should also be conducted in ways that provide constructive case-specific feedback to staff in addition to providing higher level analyses of information, in order to help staff understand the relationship between their practice and the outcomes for children and families. Monitoring should serve a supportive, helpful function to staff rather than being a compliance-based exercise that does not directly benefit workers in the field in their daily work.

- *CQI should provide analysis of findings at a high enough level to inform the ongoing development and maintenance of the practice model.* In addition to case-level feedback, the aggregated findings of CQI at county, regional, and statewide levels should be sufficient for the Department's leadership to determine whether goals are being attained, what factors are supporting or inhibiting goal attainment, and whether changes to the model or systemic factors need to be implemented to stay on course.

- *CQI should evaluate the capacity of the system to support quality casework practice.* In addition to monitoring practice and outcomes, the CQI process should also monitor for the effectiveness of systemic factors, such as training, policy, resources, and caseloads to support practice that is consistent with the practice model. It should provide information to the MDHS administration that will be useful in decision making, resource allocation, and technical assistance initiatives.

- *CQI should be an inclusive process.* In order to be effective and thoroughly integrated into the Department's operations, CQI should reach all levels of MDHS staff and should include stakeholders outside of the Department as well as inside. Both the statewide and local practice model implementation teams should have some responsibility for receiving and reviewing CQI information, and for providing some measure of oversight for the implementation of required program improvement plans resulting from the CQI reviews.

- *CQI should be coordinated with other oversight and review processes and improvement efforts.* The CQI system should be broad enough to include other monitoring activities, such as the Foster Care Review (FCR) process, Federal CFSR and title IV-E eligibility reviews, and the oversight of the *Olivia Y* court monitor. The goals and objectives of the various

oversight processes should be similar in focus and approach, and the goals, objectives, and activities associated with improvement strategies resulting from any of the reviews should be coordinated around the goals of systemic change within MDHS. Also, in order to address other CQI reporting requirements, there should be coordination with the MDHS units responsible for financial management, foster care licensure, and contracting, since these units will have information needed for the State CQI reports.

♦ *CQI should be focused on identifying strengths and needs of practice and supports and making needed improvements.* As a result of the CQI reviews, both the strengths and needs of the agency's practice and systemic supports should be identified and described. Where the need is indicated, County Departments should be required to develop and implement program improvement plans that address areas needing improvement in the CQI process. Counties should be held accountable for implementing needed improvements, with some oversight responsibility provided by the local practice model implementation teams in addition to State Office administrative oversight.

♦ *CQI should be integrated into the ongoing work of staff in County Departments, rather than being regarded as a special or periodic effort.* Although the State CQI unit will only have the capacity to conduct formal reviews of each County Department at periodic intervals, there should be processes in place between State Office reviews that ensure monitoring on a frequent basis. While monitoring is built into supervisory roles and responsibilities, more defined and formal monitoring activities should occur frequently and similarly to State CQI reviews.

♦ *CQI should focus on accountability and improvement.* The ultimate objective of CQI should be to improve practice and outcomes. The information from CQI reviews should identify both the strengths and areas needing improvement within county practice and systemic factors, and should guide the development of program improvement plans that address areas needing improvement. A system of accountability for addressing needed improvements should be integral to the CQI plan. The analysis of information collected through CQI should help to identify associations among practice, systemic factors, and outcomes that can be used statewide and locally to develop effective improvement strategies. Further, as the systemic reforms evolve over time, the CQI information should be used to make any needed adjustments in the State's approach to implementing the practice model.

## B. What CQI Monitors

We recommend that the State CQI reviews consist of a review of information from multiple sources, including data reports that track individual performance indicators at the county, regional, and statewide levels, and an onsite review that includes case reviews of families served by the county/region, supplemented by interviews with key parties to each case. The onsite reviews should also include interviews with stakeholders internal and external to MDHS in order to evaluate the systemic capacity of the county/region to support practice consistent with the practice model. A more detailed discussion of these components of the CQI reviews follows below.

In order to be effective at improving outcomes for children and families, CQI should monitor *quantitative information* that provides data on the status of identified indicators, such as numbers

of children and families served in various ways, the time frames for critical activities and goal achievement, and the level of available resources. It should also monitor *qualitative information* in order to provide information on how well children and families are served, how appropriate various interventions are, and how the values and principles underlying the practice model are integrated into casework practice. Reviewing for one or the other will only provide a partial view of interventions and outcomes for children and families.

## Quantitative Information

Although there are many concerns about the validity and reliability of data reported through the MACWIS system, it is imperative that the CQI system have access to aggregate data to monitor and evaluate indicators and outcomes. While some of the concerns about data and reports in the MACWIS system are attributable to the capacity of MACWIS itself, some issues with regard to the quality of data are attributable to data entry by users (or lack thereof). When the data become the sources of information used to evaluate performance through CQI, it is likely that some of the user concerns may be addressed and will help to increase the accuracy and reliability of MACWIS information.

Among the critical reports needed at statewide and county levels (this is not intended to be an exhaustive list), are the following:

- ◆ Reports reflecting outcomes for children in foster care, including the Federal CFSR indicators. This information is needed to track progress in meeting Federal review requirements and in evaluating outcomes associated with the practice model, such as:
  - o Time to permanency through adoption, reunification and other permanency outcomes;
  - o Stability for children in foster care (numbers of placement settings and reasons for moves); and
  - o Safety of children in-home and in foster care (initial and recurrent maltreatment, and maltreatment in foster care).

- ◆ Process-oriented reports that indicate the extent to which improved practices are actually reaching the children and families served by MDHS, such as:
  - o Numbers of families with family team meetings;
  - o Frequency of caseworker visits and with which family members;
  - o Caseloads of caseworkers in County Departments;
  - o Screenings and assessments completed;
  - o Permanency plans completed within 30 days of foster care entry; and
  - o Dates of case plans/updates, reviews, hearings.

- ◆ Reports that identify the status of children relative to identified outcomes, such as:
  - o Children for whom petitions to terminate parental rights petitions have been filed and/or for whom exceptions have been documented in the case file;
  - o Length of stay in foster care; and
  - o Educational status.

- ◆ Reports that describe the population of children and families served by MDHS, such as:
  - ○ Families served in-home and in foster care;
  - ○ Demographic characteristics of families and children;
  - ○ Children in placement by placement types and location;
  - ○ Children served through various programs such as independent living, shelter care, hospitalization;
  - ○ Children served according to special needs (in foster care and in home); and
  - ○ Medications provided to children under MDHS care and supervision.
- ◆ Reports of services provided to children and families, such as:
  - ○ Reunification services;
  - ○ Medical, dental, and mental health care;
  - ○ Independent living services; and
  - ○ Therapeutic services.

In using quantitative data to evaluate performance, the system needs the capacity to produce reports that reflect not only point-in-time data on the child welfare population, but also foster care entry cohort profiles. This information will be especially useful in evaluating the extent to which the implementation of the practice model is having the desired effects on outcomes. The production and longitudinal analysis of foster care entry cohorts will provide a basis for determining if the outcomes and experiences of children newly entering foster care in counties that have implemented the practice model differ notably from the cohorts of children who entered foster care either prior to the practice model or in counties that have not yet implemented the model. These data will help local implementation/CQI teams, administrators, and other staff and stakeholders evaluate their efforts over time relative to the practice model and use the information to make needed adjustments in strategies, resources, and so forth.

It is very important that the reports are produced for individual counties and for regions within the State, so that administrators and CQI liaisons may track performance over time and make informed decisions about resource development, program improvement efforts, technical assistance, and so forth. It should be a prominent role of Regional Directors and ASWSs to review county and regional-level reports routinely, to address them in staff meetings, and with local CQI teams, in order to evaluate performance, consistency of practice with the practice model, and monitor the resources needed for effective child welfare practice.

## Qualitative Information

In combination with qualitative information, the CQI system should review for the quality of interventions with children and families, the services they receive, and the adequacy of the systemic supports. The primary means of collecting and reviewing this information should be through regular case reviews that sample families receiving in-home and foster care services, and through structured interviews with individuals that have first-hand knowledge of the issues under review.

An underlying value attached to our recommendations regarding qualitative information is that children and families served by the child welfare system should have a voice in how they are served. Although providing children and families with the opportunity to voice their concerns, strengths, needs, and preferences regarding services is very important, it does not imply that the agency abdicates its legal responsibilities to protect children and to carry out its legal responsibilities. It simply means that case planning and service delivery are often more effective when they are based on information provided directly by children and families. When the CQI process demonstrates the importance of family input into how they are served, it should serve as reinforcement for including children and families in the actual practice of case planning and service delivery.

Case reviews should cover, at a minimum, the six practice areas included in the practice model, with specific indicators that address the activities and interventions associated with each component. For example, in reviewing for the *involving children and parents in case planning and decision making* component of the practice model, the case reviews should include:

♦ How effectively relevant family members are included in assessment activities;

♦ How effectively critical events such as family team meetings occur at the appropriate times;

♦ How effectively the appropriate family members were identified and supported in attending meetings;

♦ Whether relevant parties, including foster caretakers are notified of events, such as case planning meetings, FCR meetings, other reviews and hearings, etc.;

♦ How effectively and timely the information in the meetings was used to inform the case plan or decisions being made;

♦ How effectively the critical issues related to achieving the permanency plan were appropriately addressed;

♦ How effectively the relevant family members are involved in changes to plans and activities over time; and

♦ How effectively parents are involved in carrying out parenting responsibilities while their children are in foster care.

## Case Level Information

CQI should monitor for the effectiveness of casework practice at the individual case level. In order to be as accurate as possible in evaluating practice, reviews should include information obtained from documented case files, but also from interviews with parents, children, foster caretakers, service providers, and caseworkers. Together, the information should provide an accurate description of how well each of the six practice model components functions within the individual case. In addition to the information needed to evaluate conformity with the practice model, the review of individual cases should also include indicators that pertain to Federal or State requirements not specifically identified within the practice model.

Cases reviewed should include both in-home and foster care cases. Although most of the requirements of the *Olivia Y* settlement agreement pertain specifically to foster care services, the

practice model is intended to guide casework practice in both in-home and foster care cases. In order to promote application of the practice model across all cases, those cases monitored should be selected randomly and in proportion to the size of the county being reviewed. For example, a larger county will have more cases reviewed than a smaller county. The CQI unit, once established, will need to develop detailed sampling guidance that includes case selection criteria, numbers of cases to be reviewed by type and size of county, and so forth.

Where families and children are served through purchased services, the quality of those services, the fit of the services to identified needs, and the accountability and responsiveness of service providers should be part of the case review process.

### Systemic Factors

In evaluating systemic performance, the CQI system should gauge the capacity of the child welfare "system" to support interventions with children and families that are consistent with the practice model and to help them achieve positive outcomes. Among the systemic factors that should be monitored are:

♦ *Training of staff and providers.* CQI should conduct evaluations of the extent to which pre-service and ongoing training are being provided and are providing the skills needed for staff and providers to carry out their roles and responsibilities.

♦ *Service array.* CQI should evaluate the extent, accessibility, flexibility, and responsiveness of the State and local service array to address the individualized needs of children and families on a routine basis, and should identify gaps in the service array.

♦ *Placement resources.* CQI should evaluate the array, accessibility, and responsiveness of the foster care placement options within the counties to meet the individualized placement needs of children in foster care, and identify gaps.

♦ *Caseloads.* CQI should monitor the conformity of county departments to caseload standards and supervisory ratios.

♦ *Oversight and monitoring.* CQI should evaluate the effectiveness of supervision and administration in monitoring and reinforcing practice that is consistent with the practice model and in providing the necessary systemic supports. It should also monitor for the functioning and effectiveness of local CQI processes in place.

♦ *Court processes*. CQI should review the effectiveness of court-related procedures, such as holding timely and meaningful reviews and hearings, notifying appropriate parties of proceedings, filing for TPR timely, and so forth.

♦ *Data Quality and Usage.* CQI should monitor the accuracy and thoroughness of MACWIS data at the county level, particularly given the Department's reliance on MACWIS data to determine if critical benchmarks of progress have been made, and to evaluate the outcomes of practice.

In each county/regional onsite review, CQI reviewers should interview the appropriate stakeholders who have first-hand knowledge of these systemic areas, and should review supporting documentation. For example, in evaluating the *service array* systemic factor, reviewers should interview service providers, caseworkers, supervisors, and consumers to

determine the extent to which needed services are in place, are readily accessible to children and families, and can be tailored to meet their individualized needs. Information derived from case reviews on the provision of services should be used to supplement information from the stakeholder interviews.

The CQI reports of county/regional reviews should identify the findings of case reviews and data reports as well as findings pertaining to systemic factors. Although these systemic factors are relevant to most all of the practice model components, CQI should ensure that the systemic factors that pertain to each individual component are reviewed.

For example, in reviewing for *involving children and parents in case planning and decision making,* CQI should take care to review:

- The provision of pre-service and ongoing training of staff and supervisors in this area of practice;

- The provision of training to providers to support family involvement in case planning and decision making, and in sharing parenting responsibilities while children are in foster care;

- Notification processes for including parties in case planning meetings, hearings, and reviews;

- The oversight of casework practice pertaining to this component; and

- Services available to support family and caretaker involvement in case planning and decision making.

### Consumer Satisfaction

Evaluating consumer satisfaction with their experience with the agency and providers is one of the COA standards for a CQI process. Currently, the Foster Care Review process includes a consumer satisfaction survey, and we recommend that the information from these surveys be used to evaluate consumer satisfaction for families involved in foster care services. We recommend that a similar satisfaction survey be developed for families receiving in-home services and administered as part of the State and local CQI review process. Together, information from both sources should be compiled and described in CQI reports. Both surveys should include satisfaction with the agency's responsiveness to the child's and family's needs and also with the responsiveness of any relevant service providers. Although consumer satisfaction is not always an indicator of the agency's effectiveness, it is an important source of information in identifying the strengths and needs of casework practice and service provision.

## C. Structure of CQI

In our recommendations, we refer to counties and regions alternatively. Since MDHS administers its child welfare services under the direction of Regional Directors responsible for multiple counties, it is probably reasonable to carry out CQI functions regionally also. With 82 counties in the State, many of which have small child welfare populations, it may not be reasonable for State CQI to review each individual county routinely. Therefore, we recommend that the State CQI consider reviewing smaller counties within regions as a cluster, rather than individually, and conduct individual county reviews in the more urban and highly populated counties. For example, within an individual region consisting of nine counties, the reviews

might consist of an individual review of the larger urban county and two reviews consisting of cluster of three smaller counties each. In order to address individual differences in performance among counties, county-specific data reports and stakeholder interviews should be used where clustered reviews occur.

Our recommendations on the structure of the CQI process include the following components:

♦ State Office CQI Unit;

♦ Local (County) CQI processes;

♦ State CQI Team (that is either the State level practice model implementation team or a sub-group thereof); and

♦ Local CQI Teams (that are either the county practice model implementation teams or a sub-group thereof).

Descriptions of the functions of each of these components are as follow.

## State Office CQI Unit

Although there is a distinct function of the Foster Care Review process and it fulfills a Federal requirement to review the case plans of children in foster care every six months, it is the closest process that MDHS has to a quality assurance process in place. It has also taken on additional responsibilities that are more akin to quality assurance than strictly to foster care review. Since both FCR and CQI will be reviewing cases of children and families served by MDHS on an ongoing basis, we recommend that they be co-located organizationally within the State Office and in the regions. This will ensure complementarity of functions, avoidance of duplicated effort, and consolidation of findings into comprehensive reports that describe the status of children and families served by MDHS.

We recommend that the State Office CQI unit maintain responsibility for coordinating CQI work statewide and specifically carry out the following responsibilities:

♦ Developing and updating the instruments and tools needed to carry out CQI responsibilities, such as review tools, procedures manual, sampling criteria, and so forth;

♦ Conducting regular CQI reviews of County Departments of Human Services;

♦ Providing training to participants on the CQI process, including State and local participants;

♦ Providing case-level feedback to county staff on cases reviewed, and provide feedback to supervisors and administrators on county-wide performance, and to State-level staff on county, regional, and statewide performance;

♦ Analyzing the findings of reviews, including qualitative and quantitative analyses, and compile results into periodic reports that identify the strengths and areas needing improvement identified in the reviews;

♦ Assisting Regional Directors in reviewing and approving county program improvement plans resulting from the reviews, and in determining if the goals and progress measures identified in the plans have been achieved;

♦ Ensuring that other oversight and monitoring functions within MDHS are coordinated and aligned; and

♦ Conducting special studies as needed or requested to evaluate performance and outcomes in specific areas.

We recommend that staffing of the State Office CQI unit include, at a minimum, a manager, a data analyst, a report writer, and CQI liaisons to each of the MDHS 13 regions. This is in addition to FCR staff. We are basing these recommendations on the need to have adequate capacity to reinforce the practice model effectively within regions and statewide. In order to coordinate the functions of the Foster Care Review process, we also recommend that FCR reviewers be based in each region with the CQI liaisons.

Given the nature of CQI as the monitor of quality practice, the CQI manager should be an individual with recognized expertise in child welfare practice, requirements, and measurement techniques. County staff will need to be confident that their work is being reviewed professionally and objectively, and the manager will be one of the most visible representatives of the review process. Because of the ties between CQI and the practice model, the CQI manager should also be someone who is strongly committed to the practices and underlying values of the model, who can articulate them effectively, and has the communication skills to help staff at all levels, along with community stakeholders, make the connections among values, practices, and outcomes.

In order to identify correlations and associations between practice and outcomes, and thus to reinforce the practices that support more positive outcomes, there is a need for a data analyst to review results, run analyses, and identify strengths and needs for inclusion in CQI reports and other feedback. The data analyst should have an in-depth understanding of child welfare practice issues, and should also be skilled in analytical tools such as SPSS, SAS, or comparable analytical software. The analysis of data and qualitative information obtained from the reviews will be essential in making CQI findings useful to the field and of value to the Department's administration.

The local CQI liaisons are essential if CQI is to be integrated into the routine work of staff in County Departments. There will be a need for interim CQI review activity in counties and regions between formal State reviews, and the liaisons should be charged with facilitating those processes. The regional CQI liaisons can also serve in reviewer roles in reviews of other counties/regions in the State. CQI should not be viewed as a State vs. county process, but as an integrated function that concerns all MDHS staff. Local liaisons should help to facilitate that view of CQI by working closely with Regional Directors and ASWSs to make needed improvements in practice and capacity. At the same time, having the local liaisons report to the State CQI unit will provide uniformity in monitoring and reinforcing the components of the practice model, and in ensuring that all counties implement the requirements of the settlement agreement consistently.

Because of the emphasis on feedback in our CQI recommendations, a report writer who is devoted to providing timely and relevant information on the CQI reviews will greatly assist County Departments and the State Office in using CQI information. Without a dedicated report

writer, the likelihood of incurring delays in providing for detailed feedback is high, as other staff of the CQI unit will be involved in ongoing reviews. A relatively short time frame should be in place to produce and disseminate written reports following the review of a County Department, e.g., 45-60 days, so as to maintain momentum generated by the reviews.

The staff of the CQI unit will be directly involved in identifying needs for improvement in child welfare practice and assisting in developing and monitoring improvement plans and activities, and therefore should be recognized as knowledgeable in child welfare practice issues within the Department. Seasoned staff members that are articulate with regard to the practice model and its underlying values will be valuable in promoting the kind of CQI process that leads to improved practices and outcomes, and will encourage staff in the field to view CQI as a helpful and supportive process and to trust the feedback that comes from the reviews. Also, because CQI will examine practice and systemic factors across the range of MDHS programs and interventions, staff should have a broad base of experience and knowledge that crosses program lines within child welfare.

## Local CQI Processes

In order for CQI to be integrated into the routine work within counties and regions, it is necessary to have more frequent CQI activity locally to supplement formal State CQI activities. We recommend that MDHS adopt a process of ongoing reviews in each county following the same basic protocols of State CQI reviews, and facilitated by the local CQI liaisons. There are at least two options that we recommend the State consider in choosing how to conduct ongoing local CQI reviews.

### Option 1: County CQI Committees

In this option, local committees composed primarily of volunteers from the counties meet at least monthly to review selected cases, using the CQI protocol. Volunteers may include stakeholders in the child welfare system, foster parents, youth and parents served by the agency in the past, law enforcement officials, educational representatives, or interested community residents, including former DHS staff where appropriate. In order to help ensure that county staff participate in the CQI process and are connected to improvement efforts within the county, county child welfare staff should serve on the county CQI committees on a rotating basis.

The local CQI liaison could facilitate monthly meetings and the review process, which should include random case selection of a number of cases to be determined by MDHS in accordance with the size of the county. For example, in many rural counties of the State, the committee might review one randomly selected case per month, while in the more highly populated counties it might review up to 4 or 5 cases per month. Over time, the findings from the cases reviewed by the CQI committee could be incorporated into formal State CQI reviews for a broad view of practice in the counties over time.

An emphasis should be placed on using the committee to support staff in decision-making and offering constructive feedback on interventions, so as to help staff view the process as positive and helpful in improving practice. Direct and prompt feedback should always be provided to caseworkers and supervisors whose cases are selected for review. Committees should also

conduct follow-up reviews or request status reports on how their recommendations have been addressed in the cases reviewed.

### Option 2: Peer Review

In this option, a team of peer reviewers, i.e., supervisors and/or caseworkers, would review randomly selected cases from another caseload using the CQI protocol. Since the concept of peer review is not new to MDHS staff, this option might be preferable to the Department. It would assist in including a broader range of staff in the CQI process over time, and help staff reviewing cases to become more knowledgeable of how to practice in accordance with the practice model themselves.

In a peer review approach, it is preferable to have staff review cases from counties other than their own but within their regions. This would permit more objectivity in the reviews while permitting the local CQI liaisons to arrange reviews regionally and support practice improvements within the region, particularly as the implementation of the practice model is occurring at a regional level.

## Other CQI Components

### Supervisory Protocols for Case Reviews

Supervision is an important aspect of assuring high quality casework practice. While the supervisor fulfills roles other than assuring quality of work, supervisory reviews of cases should be consistent with CQI in helping to ensure that the practices within the model are implemented effectively. Therefore, we recommend the development of a supervisory review protocol that reflects the components of the practice model and is designed to offer staff constructive feedback on their interventions with children and families.

As the implementation of the practice model is rolled out, technical assistance should be provided to support supervisors and strengthen their capacity in reviewing for the components of the practice model, providing feedback to staff, and reinforcing the practices in the model.

### CQI Procedures Manual

A procedures manual is needed to define CQI procedures, roles, and responsibilities clearly and to provide guidance on topics such as case reviews, case sampling procedures, feedback processes, development of reports, use of CQI findings to develop program improvement plans, and logistical issues in CQI.

### CQI Training

Training at various levels is important to ensuring that CQI processes and functions are clearly understood and executed. Training of CQI unit staff will be central to consistent implementation of review activities, especially if liaisons are to be based regionally instead of centrally. Training of all staff is needed to orient them to the purposes of CQI and their roles in the process, and should be incorporated into pre-service training for casework staff. Similarly, training should be provided to supervisors and administrators on their roles in reviewing cases and reports, monitoring performance, providing effective feedback, and using CQI information in decision-

making and management practices.  Depending upon which option MDHS chooses for local CQI activities, training of peer reviewers and/or local CQI committees on the completion of a review will be needed.

### Process for Coordinating Various Reviews and Planning Activities

A defined process for ensuring that the functions of the Foster Care Reviews and CQI are well coordinated logistically and functionally is important.  The two processes should be viewed as complementary, with both focused on improving the quality of practice and outcomes even though the FCR meets a specific review requirement for oversight of case plans of children in foster care.

### Review of Incidents, Accidents, and Grievances

COA standards require that CQI monitor incidents, accidents, and grievances with regard to child welfare services.  We recommend that MDHS develop a clear definition of the incidents and accidents that fall within the monitoring and reporting responsibility of CQI. For example, deaths, near deaths, and serious injuries to children under the Department's care and responsibility should be included in this definition.  As well, similar incidents regarding children for whom MDHS has an open service case or a recently closed case should be included in the definition.  All grievances received by MDHS from consumers and stakeholders should be included in the definition.

We recommend that the regional CQI liaisons assume responsibility for tracking such incidents, accidents, and grievances.  Regional Directors and ASWSs should have the responsibility for resolving concerns raised, but tracking and monitoring of the receipt of information and how the issues were resolved should reside with CQI.  Locally, each CQI liaison should agree with the Regional Directors an ASWSs on a process for providing the CQI liaison with information as it is received, and each CQI liaison should have an internal process for tracking and following up on the investigation and resolution of issues reported within their regions.

Unless there is another body charged with the responsibility for investigating reports of child deaths, near deaths, and/or serious injuries, we recommend that the local CQI committees review these incidents/accidents.  If there is another body charged with this responsibility, we recommend that a representative of the local CQI committee either participates in the review of the incident/accident or that the written report of the investigation by the authorized review body be provided to the local CQI committee and CQI liaison.

Where trends are identified within counties or regions, CQI liaisons should bring the information to the attention of Regional Directors for addressing through improvement strategies.  We recommend that the CQI liaisons issue quarterly reports to Regional Directors, local and State CQI committees, and the State Office on the status of incidents, grievances, and accidents within their regions.  If there are situations where concerns about incidents, accidents, and grievances constitute a pattern of concerns, the CQI liaison should recommend to the local CQI committee and Regional Director that a special study into the area of concern be conducted, in which case the CQI unit may take on that responsibility.

## D.  Implementation Process

We recommend that the State CQI reviews roll out concurrently with the implementation of the practice model, in order to make clear the connections between practice, monitoring, and outcomes.  By designing a CQI process that tracks the practice model, the reviews will become a primary means of supporting and reinforcing the practices in the model.  They will also provide a means for MDHS to gauge its success in actually changing practice and meeting the benchmarks of progress set forth in the settlement agreement.

As indicated in the implementation section of the practice model, we recommend that MDHS conduct a baseline CQI review of counties/regions as they begin implementation of the practice model.  This will provide a basis for measuring progress and should also identify where technical assistance is needed the most to support changes in practice and systemic factors.  Approximately, one year after the county/region has begun implementation activities, we recommend that a follow-up CQI review occur to identify early progress and barriers, and to inform any changes needed in the implementation plan for the county.  The time line chart in the implementation section illustrates the sequence in which the baseline and follow-up CQI reviews should occur.  Afterwards, the counties/regions implementing the practice model should be placed on a rotating review schedule with others in the State.

An approximate example of the schedule of State CQI reviews that might occur during the implementation phases follows:

| Months 1-8 | Months 9-16 | Months 17-24 | Months 25-32 | Months 33-40 | Months 41-48 |
|---|---|---|---|---|---|
| Baseline reviews in Group One | | Follow-up reviews in Group One | | | |
| | Baseline reviews in Group Two | | Follow-up reviews in Group Two | | |
| | | Baseline reviews in Group Three | | Follow-up reviews in Group Three | |
| | | | Baseline reviews in Group Four | | Follow-up reviews Group Four |
| | | | | Baseline reviews in Group Five | Follow-up in Group Five |

As State CQI reviews are being implemented in counties/regions according to their implementation schedule, local CQI activities may be implemented concurrently within counties and regions not yet beginning the practice model.  This will serve a dual purpose of providing CQI activities in all counties early and also helping to prepare counties/regions in the latter stages of the practice model schedule for implementing the practices within the model.

We recognize that MDHS may not be able to staff CQI as we have recommended fully in the beginning.  Phasing in of CQI activities with the rollout of the practice model may help in

addressing immediate staffing issues by permitting the Department to gradually staff up to full capacity.

## E.  Reports and Feedback

Providing timely and useful feedback will be essential to making use of CQI findings to gauge progress and make needed improvements.  We recommend CQI reports and feedback at several levels, as follows:

### Individual Caseworker Feedback

Caseworkers will naturally have some concerns about the oversight responsibilities of CQI reviewers and committees.  In order to make the process as constructive as possible, we recommend that CQI reviewers (from local CQI teams and State CQI reviewers) provide immediate feedback to caseworkers and supervisors whose cases are reviewed.  Feedback can be verbal and should include an identification of strengths and weaknesses in the review findings, and helpful recommendations about how practice might be improved.  Where serious concerns emerge for child safety, permanency, or well being emerge through reviews, each local CQI committee and State CQI should have a protocol for notifying responsible parties and requesting immediate action.

### County/Regional Feedback on Reviews

Following State CQI reviews and at intervals in local CQI teams' review activities, verbal feedback should be provided to administrators that identifies strengths and weaknesses in practice and systemic functioning.  Administrators should be fully engaged in review activities and receive the benefits of immediate feedback in order to monitor performance and systemic capacity within the scope of their responsibilities.

### County/Regional Reports of CQI Reviews

Written reports of State CQI reviews should be provided promptly to counties, Regional Directors, State MDHS staff, county/regional implementation and CQI teams, and to the State implementation and CQI teams.  The reports should describe the strengths and weaknesses of practice and systemic capacity identified in the reviews, along with recommendations for needed improvements.  Where responsibilities for making needed improvements lie with stakeholders outside of MDHS, those needs should also be clearly identified in the reports.  At periodic intervals, local CQI committees should also summarize the findings of their reviews for the same purposes.

### State CQI Report

At least every six months, we recommend that State CQI issue a comprehensive report of its findings from reviews conducted during the preceding six-month period[15], along with the status

---

[15] The *Olivia Y* settlement agreement requires six month public reports following the transfer to monitoring responsibility to CQI, so we are recommending that six month reports be issued from the beginning. However, absent this six-month requirement in the settlement agreement, we would most likely recommend annual reports given our recommended CQI focus on quality improvement and the time needed in general to realize results from improvement strategies, i.e., meaningful changes in performance and outcomes are more likely to be detected annually rather than every six months.

of counties/regions in the State on performance indicators identified through data and other reports. These reports should have a broad distribution within and outside MDHS, including the Department's administration and external stakeholders, particularly advisory groups and implementation teams at the State and local levels. The State CQI report should include information from sources other than CQI reviews that also evaluate performance, such as the findings of the Foster Care Reviews, other State and Federal reviews/audits, and pertinent findings from the Court Monitor's reviews. A combined report of monitoring efforts across MDHS will present a more comprehensive picture of the status of children and families served by the Department than only reporting on the findings of CQI reviews.

A number of requirements that should be included in the State CQI report are addressed by the FCR process and reports, and that information will be needed for the State CQI report. Further, in order to address reporting requirements for other functions and processes not directly monitored by CQI, there should be coordination and information sharing with the MDHS units responsible for financial management (for information on expenditures of Federal funds), foster care licensure (for information on licensing issues and child safety while in foster care), and contracting (for information on contractors' compliance with settlement agreement provisions), all of which should be included in the State CQI reports.

## Dashboard Data Reports

A number of States have implemented "dashboard" data reports that provide current data on a small number of selected performance indicators to staff and stakeholders on a frequent basis. These reports permit frequent and updated tracking of outcomes for children and families statewide and locally more often than comprehensive CQI reports. We recommend that CQI adopt some type of reporting similar to this concept that reaches all levels of MDHS, including front-line staff. The data indicators identified for inclusion in the reports should be relevant to the work of the staff in the field, e.g., the CFSR data indicators, and should be county-specific and comparable to statewide performance so that staff can easily see how their performance and outcomes compare to the State's performance and outcomes. One possible way of disseminating this information is to develop the report as an opening screen when staff sign into MACWIS and update it monthly or quarterly. A process for disseminating it to the Department's key stakeholders should also be identified, ideally by posting the statewide reports on the Department's website. Using data in this way should also have some effect on the quality of data entered into the MACWIS system.

## *F. Accountability*

The findings of CQI should be used to guide improvement activities where needs are identified. We recommend that counties/regions be required to develop and implement program improvement plans that reflect the findings of CQI reviews, beginning with the follow-up reviews after the first year of implementing the practice model, and continuing thereafter. The CQI reviews should help counties/regions identify practice and systemic issues needing attention to achieve and sustain improved practice. Regional Directors and local CQI liaisons, in collaboration with local CQI teams, should develop a plan with specific strategies and time frames for addressing identified needs, subject to the approval of the State CQI unit.

The process of monitoring the implementation of program improvement plans should lie with the Regional Director and local CQI team, and the State MDHS should institute a process for ensuring accountability to implement the plans and make needed improvements, e.g., ties to performance evaluations.

MDHS should make technical assistance available to counties/regions in developing effective strategies to make improvements and in implementing the strategies. Where possible, peer assistance from within MDHS should be used in order to share knowledge and capacity across counties and regions, and to build internal capacity to sustain progress over time. For example, counties/regions that have made strides in one area might assist other counties/regions struggling in those same areas. External technical assistance should also be provided where it is needed.

As MDHS identifies its strengths and needs through the CQI process, goals and activities of improvement efforts should be aligned with the goals and activities of other major initiatives, including compliance with the *Olivia Y* settlement agreement, COA standards, the State's five-year Child and Family Service Plan, the State's IV-E plan, and CFSR program improvement plans. In involving the courts in these efforts, and in complying with Federal requirements, the goals and activities resulting from CQI should also be coordinated with Mississippi's Court Improvement Program plan.

As MDHS moves forward toward implementing all of the requirements of the settlement agreement, the accreditation standards, and the CFSR, the CQI process should serve as the vehicle for keeping the core practices, values, and principles in front of staff at all levels. If implemented properly and supported, it will become the Department's main source of sustaining the progress that it makes over time.

## G. Conformity to Olivia Y Monitoring Requirements

The first chart that follows cross-references the *Olivia Y* plan provisions that the court monitor must ensure that the CQI process is monitoring adequately prior to transferring monitoring responsibility to CQI at the termination of the implementation plan.

## H. Conformity to COA Standards

The second chart that follows cross-references the requirements of the COA standards to provisions included here for the CQI plan. MDHS will still need to complete an official plan for submission to COA that includes some details not included here, but this represents our recommendations for the basic structure and functioning of the CQI process.

**Mississippi Practice Model**

### Crosswalk of Olivia Y Monitoring Requirements to CQI Recommendations

| *Olivia Y* Plan Reference | *Olivia Y* Plan Requirement | CQI Recommendation |
|---|---|---|
| II.A.1 | Agency leadership (qualified director) | Report changes in State CQI report |
| II.A.2.a | Workforce (caseload standards) | Included in *Caseloads* systemic factor in CQI reviews |
| II.A.2.b | Worker and supervisor qualifications | |
| II.A.2.c | Training (training unit, pre-service, ongoing training) | Included in *Training* systemic factor in CQI reviews |
| II.A.2.d | Contract agency requirements | Coordinated reporting with licensure unit in CQI reports |
| II.A.3 | Performance and quality improvement | Included in *Monitoring and Oversight* systemic factor in CQI reviews |
| II.A.4 | Legal and regulatory compliance | Coordination with FCR reviews, which evaluate Federal foster care requirements; CQI reviews for CFSR requirements |
| II.A.5 | Information management and use | Included in *Data Quality and Usage* systemic factor in CQI reviews |
| II.A.6 | Case recordings | Case reviews are included in all CQI reviews; report in local CQI reports |
| II.A.7 | Financial management | Coordinated reporting with financial management division in CQI reports |
| II.B.1 | Screening and assessments | Included in CQI case reviews (*Strengths and Needs Assessments* component of practice model) |
| II.B.2 | Service planning and monitoring | Included in CQI case reviews (*Involving Children and Parents in Case Planning and Decision Making* component of practice model) |
| II.B.3.a | Permanency plan | Included in CQI case reviews (*Individualized Case Planning* component of practice model), plus coordination with FCR reviews of plans of all children in foster care |
| II.B.3.b | Concurrent planning | Included in CQI case reviews (*Individualized Case Planning* component) |
| II.B.3.c | Permanency plan updating and review | Function carried out by FCR process; coordinated reporting with FCR reviews of all children in foster care in State CQI report |
| II.B.3.d | Reunification services | Included in CQI case reviews (*Involving Children and Parents in Case Planning and Decision Making* and *Mobilizing Appropriate Services Timely* components of practice model) |
| II.B.3.e | Termination of parental rights | Included in CQI case reviews (*Individualized Case Planning* component of practice model); coordinated reporting with FCR reviews in State CQI report |
| II.B.3.f | Adoption | Included in CQI case reviews (*Individualized Case Planning* and *Mobilizing Appropriate Services Timely* components of practice model) |

**Mississippi Practice Model**

| Olivia Y Plan Reference | Olivia Y Plan Requirement | CQI Recommendation |
|---|---|---|
| II.B.4 | Child safety | Included in CQI case reviews (*Safety Assurance and Risk Management* component of practice model); coordinated reporting with licensure unit on reports of maltreatment in foster care |
| II.B.5 | Child placement | Included in CQI case reviews (*Strengths and Needs Assessments, Individualized Case Planning,* and *Mobilizing Appropriate Services Timely* components of practice model); resource issues included in *Placement Resources* systemic factor of CQI reviews; coordinated reporting with FCR reviews in State CQI report |
| II.B.6 | Developing and maintaining connections | Included in CQI case reviews (*Preserving Relationships and Connections* component of practice model) |
| II.B.7 | Physical and mental health care | Included in CQI case reviews (*Strengths and Needs Assessments* and *Mobilizing Appropriate Services Timely* components of practice model) |
| II.B.8 | Educational services | Included in CQI case reviews (*Strengths and Needs Assessments, Preserving Relationships and Connections,* and *Mobilizing Appropriate Services Timely* components of practice model) |
| II.B.9 | Therapeutic services | Included in CQI case reviews (*Strengths and Needs Assessments, Individualized Case Planning,* and *Mobilizing Appropriate Services Timely* components of practice model); resources monitored through *Service Array* systemic factor in CQI reviews |
| II.B.10 | Worker contact and monitoring | Included in CQI case reviews (*Involving Children and Parents in Decision Making and Case Activities* component of practice model) |
| II.B.11 | Transition to independent living | Included in CQI case reviews (*Strengths and Needs Assessments, Individualized Case Planning,* and *Mobilizing Appropriate Services Timely* components of practice model) |
| II.B.12 | Case closure and aftercare | Included in CQI case reviews (*Strengths and Needs Assessments, Individualized Case Planning,* and *Mobilizing Appropriate Services Timely* components of practice model) |
| II.B.13 | Recruitment and retention of foster families and therapeutic service providers | Included in *Service Array, Training,* and *Placement Resources* systemic factors in CQI reviews; support services included in CQI case reviews (*Mobilizing Appropriate Services Timely* component of practice model) |
| II.B.14 | Durable legal custody | Included in CQI case reviews (*Individualized Case Planning* component of practice model) |
| III.A.1 | Reunification outcome measure | Included in recommended CQI data reports (CFSR measure) |
| III.B.1 | Adoption outcome measure | Included in recommended CQI data reports (CFSR measure) |
| III.C.1 | Number of placements outcome measure | Included in recommended CQI data reports (CFSR measure) |
| III.D.1 | Abuse/Neglect/Maltreatment in Care | Included in recommended CQI data reports (CFSR measure) |

**Mississippi Practice Model**

## Crosswalk of COA Standards to CQI Recommendations

| COA Standard Number | COA Standard | MS CQI Component |
|---|---|---|
| PA-PQI 1 | The agency's leadership promotes a culture that values service quality and ongoing efforts by the full agency, its partners, and contractors to achieve strong performance, program goals, and positive results for service recipients. | • See Roles and Responsibilities of administrators regarding CQI in each component of the practice model |
| PA-PQI 1.01 | The agency's leadership sets forth quality expectations and broad goals that merit ongoing monitoring. | • See Roles & Responsibilities of administrators in each component of the practice model. |
| PA-PQI 1.02 | The agency head endorses a culture that promotes excellence and continual improvement; implementation of an agency-wide PQI framework; constructive use of data to promote a high-learning, high-performance, results-oriented agency; involvement of a wide range of managers and staff in the PQI process; inclusion of external stakeholders and community members; and an annual scorecard or summary reports of gains made against goals. | • See Roles & Responsibilities of administrators in each component of the practice model.<br>• State CQI report<br>• State and local CQI teams |
| PA-PQI 1.03 | Senior managers promote a culture of quality by using short-term/annual plans that support long-term strategic quality goals; setting expectations for use of quality and performance improvement results to change policy and practice; encouraging service delivery processes that have been shown to contribute to good outcomes; focusing on customer satisfaction and outcomes; and recognizing staff contributions to performance and quality improvement. | • See Roles and Responsibilities of administrators in each component of the practice model<br>• Roll-out schedules for CQI and practice model<br>• Performance indicators<br>• Use of CQI reports locally and statewide<br>• Feedback process<br>• Recommendations for program improvement plans resulting from CQI reviews |
| PA-PQI 1.04 | Sufficient resources are allocated to lead and facilitate collection and analysis of data. | • Recommendations regarding staffing of State Office CQI unit, local liaisons, data analyst, report writer |
| PA-PQI 2 | The infrastructure that supports performance and quality improvement is sufficient to identify agency-wide issues, implement solutions that improve overall efficiency, and promote accessible, effective services in all regions and sites. | • See Structure of CQI section, i.e., recommendations for staffing the unit, and Roles and Responsibilities of CQI staff<br>• Recommendation for county program improvement plans resulting from CQI reviews<br>• Emphasis on accountability as a principle of the CQI process |
| PA-PQI 2.01 | The PQI program takes into account all of the agency's regions and | • Rollout plan for CQI and practice model |

| COA Standard Number | COA Standard | MS CQI Component |
|---|---|---|
| | sites, and all individuals and families served. | • Reviews in-home and foster care cases<br>• Sampling processes |
| PA-PQI 2.02 | A PQI plan which operationalizes the agency's PQI program assigns responsibility for implementation and coordination of PQI activities and technical assistance; sets forth the purpose and scope of PQI activities; establishes a periodic review of essential management and service delivery processes consistent with quality priorities; outlines methods and timeframes for monitoring and reporting results; and includes provision for an assessment of the PQI program's utility, including any barriers to and supports for implementation. | • See Roles & Responsibilities of CQI in each component of the practice model<br>• Review of systemic factors in addition to practice<br>• Recommended review schedule<br>• Recommendation that CQI review the systemic factor, *monitoring and oversight*, that includes the functioning of the CQI process |
| PA-PQI 2.03 | The agency in its PQI plan defines its stakeholders and specifies how different stakeholder groups will be involved in the PQI process. | • State and local CQI teams include external stakeholders<br>• Inclusion of stakeholders as interviewees in reviews |
| PA-PQI 2.04 | The agency describes the steps in an improvement cycle, including determining if an implemented change is an improvement. | • Data analysis capacity<br>• Program improvement plan requirements<br>• Outcome measures in reviews |
| PA-PQI 2.05 | Staff responsible for PQI are qualified by education and experience to engage people throughout the agency; systematically collect information and analyze data; and communicate results and recommendations to various key audiences. | • See Structure of CQI and staffing recommendations<br>• Recommendation for data analyst and regional CQI liaisons |
| PA-PQI 3 | An inclusive approach to establishing measured performance goals, client outcomes, indicators, and sources of data ensures broad-based support for useful performance and outcomes measurement. | • CQI is outcome based, will specify outcomes and performance measures<br>• Data sources include MACWIS, case reviews, interviews |
| PA-PQI 3.01 | Senior managers and supervisors set forth performance and outcome expectations in a supportive manner and allay concerns about possible repercussions of identifying areas in need of improvement. | • Constructive feedback process at State and local levels<br>• Reinforces quality practice; not punitive |
| PA-PQI 3.02 | Staff throughout the agency and stakeholders, including partners and contractors, work together to develop key outcomes and outputs; develop relevant qualitative and quantitative indicators; and identify data sources, including measurement tools and instruments. | • Major outcomes/indicators defined by *Olivia Y*, COA, CFSR requirements<br>• State and local CQI committees review/respond to findings<br>• Tools will mirror practice model |

**Mississippi Practice Model**

| COA Standard Number | COA Standard | MS CQI Component |
|---|---|---|
| PA-PQI 3.03 | The agency selects performance measurement indicators that relate to operations and management, program results, and client outcomes. | • Same as above<br>• Reviews for systemic factors also |
| PA-PQI 4 | The PQI plan describes how measurable data will be obtained and used on a regular basis to further monitor actual versus desired: functioning of operations, that influence the agency's capacity to deliver services; quality of service delivery; program results; client satisfaction; and client outcomes. | • See What CQI Monitors, i.e., qualitative and quantitative indicators, case reviews, systemic factors<br>• Performance indicators will reflect standards, such as CFSR standards and *Olivia Y* benchmarks |
| PA-PQI 4.01 | Collection of service delivery information focuses on key quality factors, including appropriateness; effectiveness; and any or all of the dimensions of quality. | • Case reviews will focus on quality of work and conformity to practice model |
| PA-PQI 4.02 | The agency aggregates and reviews several sources of information to identify patterns and trends, including: quarterly case record review reports; quarterly review of incidents, accidents, and grievances; customer satisfaction data, usually annually; customer outcomes data, usually annually; and management and operations data and reports. | • Will produce periodic aggregated reports<br>• Reports on each review<br>• State CQI report<br>• FCR satisfaction surveys in place<br>• Add satisfaction surveys for in-home services cases in CQI reviews<br>• CQI liaisons will track incidents, grievances, and accidents on report on them quarterly |
| PA-PQI 4.03 | Quarterly reviews of case records: evaluate the presence, clarity, quality and continuity of required documents using a uniform tool to ensure consistency; and include a random sample of both open and closed cases. | • Offices will be reviewed according to a review schedule<br>• Standard case review tool<br>• Local CQI teams review cases monthly |
| PA-PQI 4.04 | The agency integrates the findings of external review processes, including licensing reviews, information related to compliance with federal, state, and department requirements, governmental audits, accreditation, and other reviews into its PQI process, where appropriate. | • State CQI report combines multiple sources of information<br>• Coordination with FCR<br>• Coordination with CFSR instruments and court monitor's instrument<br>• Coordination of goals in local PIPs with practice model and with CFSR PIP, State plan goals and objectives |
| PA-PQI 5 | Findings based on improvement efforts are disseminated to personnel and stakeholders and are used to improve programs and practice. | • Distribution schedule for CQI reports |

**Mississippi Practice Model**

| COA Standard Number | COA Standard | MS CQI Component |
|---|---|---|
| PA-PQI 5.01 | The agency: reviews results; identifies areas of needed improvement; implements and evaluates improvements on a small or broad scale; modifies implemented improvements as needed; and keeps staff informed and involved throughout the cycle. | • Requirement for program improvement plans<br>• Review/use of PIPs by State and local CQI teams |
| PA-PQI 5.02 | Senior managers regularly review and discuss PQI reports to: identify areas of needed improvement; set improvement activity priorities; and manage their operations and programs. | • Use of CQI reports by management to make decisions<br>• CQI integrated into all agency operations |
| PA-PQI 5.03 | Internal and external stakeholders review performance data and outcomes results in order to: identify strengths and areas of positive practice; and provide feedback about areas of needed improvement. | • State and local CQI committees<br>• State and local practice model implementation committees |
| PA-PQI 5.04 | The agency's leadership, including advisory members and PQI personnel communicate with staff and stakeholders about achievements relative to desired outcomes, indicators, and benchmarks or targets. | • See Structure of CQI and roles of CQI manager and liaisons<br>• Roles of CQI implementation teams (State and local) |
| PA-PQI 6 | Staff and stakeholders receive information and support that increases their capacity to participate in, conduct, and sustain performance and quality improvement activities. | • Role of feedback and reports of information from CQI reviews<br>• Recommendations for program improvement plans resulting from CQI reviews |
| PA-PQI 6.01 | Information about the agency's PQI program is provided to stakeholders that: describes the agency's PQI philosophy; explains how PQI is structured; defines stakeholders and how they participate in the PQI process; and includes a brief summary description of what the agency is measuring. | • State and local CQI committees include external stakeholders<br>• Recommendations for dissemination of CQI reports |
| PA-PQI 6.02 | PQI training for personnel includes: an overview of the agency's PQI program at new staff orientation; and specialized and/or ongoing training, as appropriate to individual roles and responsibilities. | • Recommendations for training caseworkers and supervisors on CQI<br>• Recommendations for training CQI staff |
| PA-PQI 6.03 | Senior managers and department and program heads: include PQI relevant short and long-term goals in their work plans and keep PQI on the agenda of staff meetings. | • Coordination of CQI results with CFSR and title IV-E PIPs, the MDHS five-year Child and Family Service Plan, and *Olivia Y* implementation plans<br>• See Roles and Responsibilities of administrators in each component of the practice model |

# APPENDIX A:  LOGIC MODELS

Logic Models follow behind this page.

**Mississippi Practice Model**

## Child Welfare Practice Model Component: Mobilizing Appropriate Services Timely

**Value Basis:** Safety/Permanence/Well Being of children and families; Safe and stable families; Competence; Responsibility; and Collaboration

**Practice Principle:** Individualized service plans with tailored services to meet the child's or family's unique needs are more likely to achieve positive outcomes. Services are designed and delivered pursuant to a careful assessment of the children's and parent's strengths and needs. Services and supports are individualized to meet the unique needs of the child(ren) and parents. Social Workers must have the skills to engage the family effectively from a strengths-based, family-focused perspective, along with the resources to deliver (or purchase) services that are tailored to meet their needs.

**Description of this component:** Children and families are treated as partners to ensure joint decision making about which services can best meet their needs, how those services are delivered, who delivers the services and when they are delivered. Services are designed and delivered to meet the unique needs of the children and families served and not selected from a standard menu of services that may or may not match their needs. DFCS develops a broad array of services and supports that are individualized to meet the specific needs of the children and families and provided in the least restrictive setting appropriate for the child and family. Services are delivered when & where needed.

| Inputs | Outputs: Products | Outputs: Activities | Outputs: Roles and Responsibilities | Short-Term Outcomes & Indicators | Mid-Term Outcomes & Indicators | Long Term Outcomes & Indicators |
|---|---|---|---|---|---|---|
| **Current policy** <br> • ISP policy <br> • Resource specialists for adoption <br> • Requirement for IL plans for youth 14 y.o. <br> **Needed policy** <br> • Policy on how to utilize visits and the ISP to assess if services are effective, appropriate and timely <br> • Policy to support a performance-based contracting process (PBC) <br> • Policy to address the wide range of services that are needed <br> **Current training** <br> • Pre-service Training includes FTM <br> • Advanced Skills Training addresses the linkage of services to needs <br> **Needed training** <br> • Separate modules on visitation, FTM , IL <br> • Clinical supervision training <br> **Current monitoring** <br> • FCR data elements <br> • *Olivia Y* monitoring elements <br> **Needed monitoring** <br> • Comprehensive CQI system <br> • Monitor in-home services <br> • SAR to review for services <br> **Current Resources** <br> • IL, Intensive in-home, FPS and adoption <br> **Needed Resources** <br> • Increased placement resources <br> • Access to services throughout the state <br> • Improved MH and DV services <br> • Improved access to therapeutic placement resources <br> • Increased ability to individualize services | **Training** <br> • Use of caseworker visits to identify and monitor service provision <br> • Skills-based FTM training <br> • Training to identify strengths & needs <br> • Expanded substance abuse, sexual abuse, teen issues and adoption <br> • Clinical supervisory curriculum <br> **Policy** <br> • Referral process for congregate care <br> • Visitation policy <br> • Screening & referrals for MH, substance abuse, and DV screenings <br> • Strengthened ISP and IL policy <br> • Individualizing services <br> **Monitoring** <br> • Comprehensive CQI process <br> • In-home services monitoring <br> • Revisions to FCR <br> • Revisions to SAR <br> • Performance-based contracting/monitoring <br> **Resources** <br> • Expansion of the number of service providers to meet the demand for services <br> • Resource Directory <br> • Recruitment and retention plan for all out-of-home resources <br> • PBC process | • Identify the individualized needs of children <br> • Engage with service providers <br> • Caseworker visits with children and families <br> • Use of FTM to identify individualized needs <br> • Clarify service needs @ referral and in monitoring services <br> • Provide services early & promptly <br> • Provide ongoing services <br> • Link services to permanency goals <br> • Provide services at discharge/case closure <br> • Address services in the case planning process <br> • Monitor and evaluate the effectivenss of services | **Caseworkers** <br> • Engage family members & providers <br> • Identify with the family the type, level and intensity of services <br> • Monitor the implementation of the ISP and the effectiveness of the services <br> • Use assessments to identify services <br> • Identify appropriate placements <br> • Know service array <br> **Supervisors** <br> • Monitor the quality of casework practice <br> • Engage RD as needed <br> • Monitor availability/responsiveness of service providers/advocate for services <br> • Observe FTMs and FCRs <br> • Coach caseworkers <br> **Regional Directors** <br> • Manage change efforts/promote practice principles <br> • Spokesperson for practice model <br> • Coordinate with providers <br> • Monitor outcomes, progress, & supervision <br> • Address service and resource gaps <br> • Ensure trained staff <br> • Lead improvement efforts <br> **CQI Staff** <br> • Monitor & evaluate services by agency and providers <br> • Provide feedback at multiple levels <br> • Provide reports of findings (strengths & needs) <br> • Identify systemic issues affecting services <br> • Coordinate with other review efforts | • Develop interim training module on individualized services <br> • Develop practice guides on mobilizing services, <br> • Protocol on how to procure and evaluate services <br> • Interim supervisory protocol <br> • Develop local county office plan to ensure service providers are able to develop an adequate array of services <br> • Develop local quality assurance capacity | • Skills based training development and enhancement <br> • Review ongoing training for content on individualizing services <br> • Training on teen pregnancy, behavioral health, substance abuse, sexual abuse and adoption <br> • Develop policy that supports and encourages appropriate services <br> • Incorporate supervisory protocol into policy <br> • Implement performance based contracting process <br> • Implement a CQI process | • Full implementation of all training curricula, policy revisions, and monitoring procedures <br> • Focus on coaching and supporting the practices within this component <br> • Assuring the Systemic supports for this component are refined and in place <br> • Use of all CQI monitoring processes to evaluate outcomes and measures outlined in *Olivia Y*, CFSR, and CQI system. |

**Mississippi Practice Model**

## Child Welfare Practice Model Component: Safety Assurance and Risk Management

**Value Basis:** Safety, permanency, and well-being of children & families; Safe and stable families; Responsibility; Competence; Personal Courage
**Practice Principles:** Safety and risk assessment practice guides casework activities with regard to safety, permanency, and well being; Safety and risk assessments are used to address case plans and service delivery; Safety and risk assessment occurs throughout the life of a case; Family centered practice principles apply to safety and risk interventions; Safety and risk are addressed within the cultural background of the children and families being served.
**Description of this component:** Safety and risk related interventions are designed to help children remain safely at home whenever possible and appropriate Assuring child safety and managing risk begins with the report to DFCS after someone believes a child is being maltreated and continues for the following activities: initiating investigations of maltreatment; initial safety and risk assessment; initiating services to address safety and risk; ongoing safety and risk assessment; developing a case plan; reviewing case plans; while children are in placement: reunification; and case closure.

| Inputs | Outputs: Products | Outputs: Activities | Outputs: Roles & Responsibilities | Short Term Outcomes & Indicators | Medium Term Outcomes & Indicators | Long Term Outcomes & Indicators |
|---|---|---|---|---|---|---|
| **Current policies** <br>• Criteria and time frames for screening, assigning, & completing reports <br>• Contact with child required <br>• Immediate safety plan & FTM <br>• Maltreated children in foster care must be seen same day <br>• Case closure based on safety & risk factors <br>**Needed policies** <br>• Add protective capacities <br>• Stronger visiting policy <br>• Share plan with caregiver <br>• Update safety plan at intervals, incl at case closure <br>• Safety assessment for children in placement <br>**Current training** <br>• Extensive pre service training and OJT re safety/risk <br>**Needed Training** <br>• Developing safety plans <br>• Conducting the FTM <br>• Monitor safety in foster care <br>**Current Monitoring** <br>• SAR and FCR <br>**Needed Monitoring** <br>• CQI reviews, incl in-home services <br>• Monitor safety in foster care <br>• Face-to-face contacts with children <br>**Current Resources** <br>• Increased staff & resources <br>**Needed Resources** <br>• Expanded service array for DV, family pres, respite, supervised visits <br>• Ability to provide services during investigation | **Policy** <br>• Protective capacity assessment <br>• Revise existing safety plan <br>• Revise existing safety checklist for children of all ages <br>• Reconcile initial risk assessment with SARA <br>• Safety and risk assessment for children in out of home care <br>• Policy on notification of parents of children maltreated in foster care <br>• Policy on case opening <br>• Policy on safety and risk assessment at reunification and case closure <br>**Training** <br>• Training on safety assessment and safety plan <br>• Training on the FTM <br>• Training on assessing, reporting, investigation reports of children maltreated in foster care <br>**Resources** <br>• DV assessment & evaluation services <br>• Substance abuse screenings and treatment <br>• Supervised visitation <br>• Strengthened MH assessment and treatment services <br>• Increased family preservation and reunificaiton services <br>**Monitoring** <br>• CQI system that incl in-home services <br>• Revisions to SAR to address safety <br>• New and revised MACWIS reporting to support safety <br>• Use all monitoring to assess safety issues | • Assure safety and manage risk when initiating investigations of maltreatment <br>• Assure safety in initial safety and risk assessment <br>• Initiate appropriate and timely services to address safety and risk <br>• Conduct ongoing safety and risk assessment <br>• Address safety and risk issues in case plans <br>• Address safety and risk issues when reviewing case plans <br>• Assure child safety and manage risk while children are in foster care placement <br>• Address child safety and risk at reunification <br>• Assess child safety and risk at case closure and plan accordingly | **Caseworkers** <br>• Gather information on ASE, child functioning and vulnerability, adult functioning and protective capacities. <br>• Face-to-face contacts to assess safety and risk <br>• Develop and manage safety plans. <br>• Develop service plans that address safety and risk. <br>• Visits to assure safety in out of home placement. <br>• Facilitate FTM <br>• Report alleged maltreatment of children in foster care <br>• Document thoroughly in MACWIS <br>**ASWS** <br>• Monitor the quality of casework/assure attention to safety and risk factors <br>• Clinical supervision using SAR <br>• Monitor practice through SAR, FCR, CQI, MACWIS <br>• Evaluate performance/provide feedback <br>• Identify needs and advocate for resources <br>**Regional Directors** <br>• Monitor data & outcomes to assure child safety <br>• Promote family centered principles re child safety <br>• Identify/advocate for needed changes to policy & training & needs for additional resources <br>• Lead program improvement efforts re safety <br>**CQI** <br>• Monitor safety & risk issues <br>• Provide case level feedback <br>• Monitor/identify statewide/systemic issues re safety/risk <br>• Report on outcomes/systemic factors re safety/risk <br>• Identify needs for program improvement | • Practice guide on assuring safety & managing risk <br>• Clarify risk assessment policy <br>• Safety assessment for children in foster care <br>• Develop new safety plan <br>• Clarify policy on risk assessment <br>• Interim training module on safety and risk <br>• Refresher training for staff on investigations of maltreatment in out of home care <br>• Interim training re assessing safety in foster care <br>• Baseline CQI reviews in initial 2 regions <br>• Supervisory monitoring of investigation of maltreatment in agency custody <br>• Revise SAR <br>• Identify safety services needed in initial 2 regions <br>• Target resource development in initial 2 selected regions | • Incorporate new training modules into New Worker Training Curriculum <br>• Develop training module on assessing protective capacities <br>• Enhanced and revised supervisory training modules <br>• Integrate new procedures, practices and tools supporting the practice model <br>• Conduct baseline CQI reviews along with current CQI reviews <br>• Expand the use of the revised SAR <br>• Continue ongoing evaluation of resources and services targeted to assuring safety and managing risk | • Implement the practice model in the remaining regions <br>• Fully implement all training curricula, policy revisions, finalized tools, and monitoring practices <br>• A focus of activity should be on coaching and supporting the practices associated with this component <br>• Assure the systemic supports are fully in place to support this component <br>• Ongoing monitoring of safety and risk statewide, using performance indicators in *Olivia Y*, CFSR, and COA |

**Mississippi Practice Model**

## Child Welfare Practice Model Component: Involving Children and Families in Case Activities and Decision Making

**Value Basis:** Integrity, Responsibility, Respect, Collaboration

**Practice Principles:** Empowering families to advocate for themselves; Families take responsibility for ensuring the safety permanency and well-being of their children; Families will engage in case activities and achieving goals as they had a role in developing them; Assists in the implementation of other practice model components including preserving and maintaining connections and individualizing case planning.

**Description of this component:** It is critical that the working partnership with children and families begin at the first meeting with the caseworker, and continue throughout the agency's involvement with the family. Family members are encourage to take an active role in all critical decisions that affect them, and charges caseworkers with the tasks of both soliciting and using the input of children in casework decisions. There are several opportunities throughout the life of the case to do this, including assessment activities, developing and updating the case plans, and all meetings pertaining to them (court hearings, case reviews, family team meetings). To successfully do this, caseworkers must prepare relevant family members to provide input and participate in case planning activities and Provide the necessary supports to enable attendance and participation in planning meetings and events.

| Inputs | Outputs: Products | Outputs: Activities | Outputs: Roles and Responsibilities | Short Term Outcomes & Indicators | Medium Term Outcomes & Indicators | Long Term Outcomes & Indicators |
|---|---|---|---|---|---|---|
| **Current Policies**<br>• Case planning policy<br>• FTM policy<br>• County Conference policy<br>**Needed Policies**<br>• Family Service Plans<br>• FTM re: consistency & content<br>• Eliminate use of LTFC<br>**Current Training**<br>• Involving families in Core Relationship Skills<br>• Engaging families in Advanced Skills Training<br>• Monitoring caseworker interactions in Supervisory<br>**Needed Training**<br>• How to conduct an FTM<br>• Soliciting input on ISP<br>• Conducting interviews with adults and children<br>• Updating case plans<br>• Importance of concurrent planning<br>• Developing aftercare plan<br>**Current Monitoring**<br>• FCR<br>• SAR<br>**Needed Monitoring**<br>• Comprehensive CQI system<br>**Current Resources/Practices**<br>• FTM<br>• Caseworker visits<br>• Custodial parents involved<br>**Needed Resources/Practices**<br>• Clarity on FTM and ISP<br>• Non-custodial and child involvement | **Training**<br>• Utilizing caseworker visits<br>• Obtaining and using family input in case plans<br>• Identifying critical points in case activities to involve<br>• Family involvement in training development<br>• Ind. and Family Team Meetings<br>• Resource parent training update<br>**Policy**<br>• Define family involvement across policy, utilizing strengths-based language<br>• Practice standards for family involvement<br>• FTM-consistency and quality<br>• Formal aftercare plan<br>**Monitoring**<br>• CQI case review protocol<br>• MACWIS monthly reports<br>• Supervisory standards and system for oversight developed<br>• Olivia Y measures into CQI ongoing system<br>**Practice**<br>• Protocols for service plan coordination among parties, and co-development with providers<br>• Practice guide assisting caseworkers implement policy<br>• Protocol identifying key non-negotiable case planning activities<br>• Practice guide on initiating and conducting FTM | Identification of all areas where involving children and families is required and how to do it:<br><br>• Engage and involve families in the assessment process<br><br>• Involve families in developing the case plan<br><br>• Use caseworker visits to involve child and family<br><br>• Engage children and family members in Family Team Meetings<br><br>• Facilitate parent's involvement with children during foster care placements | **Caseworkers**<br>• Conduct frequent and meaningful visits<br>• Engage and prepare families for all case activities and meetings<br>• Facilitate child and family involvement in case planning and identifying needs<br>• Facilitate timely referral and initiation of service<br>• Monitor service delivery and solicit feedback from families<br>**Supervisors**<br>• Monitor for quality of work and provide constructive feedback<br>• Monitor individual case activity<br>• Attend periodic FTMs to evaluate caseworker capacity to conduct meetings<br>• Coaching and modeling appropriate social work techniques<br>**Regional Directors**<br>• Leadership in change effort and implementation of practice model<br>• Monitor data reports/ qualitative reviews<br>• Monitor supervision<br>• Assure staff access to trainings<br>• Solicit feedback on skills and supports needed<br>**CQI**<br>• Monitor quality of practice/outcomes for agency and providers<br>• Provide feedback and be available to county staff<br>• Monitor for specific interventions including identifying extended family, inviting family to events, and actual attendance<br>• Solicit feedback from families and providers | • Develop interim training module on using information from visits, obtaining and using family input in case plans, identify critical case points, supporting family voice, engage extended family and non-custodial<br>• Develop practice guides on case planning, provider input in plans, involving children and families, and interim supervisory protocol<br>• Ensure local CQI capacity<br>• Develop practice model implementation process<br>• Inventory community resources<br>• Engage service providers<br>• Prepare resource families for practice model implementation, and their newly defined roles | • Develop/modify training modules and curriculum on: skills based and resource/adoptive parent trainings<br>• Conduct review of existing ongoing training to determine extent of involving children and families focus<br>• Revise policies in manual with family involvement definition<br>• Revise FTM policy<br>• Develop CQI policy<br>• Implement CQI process<br>• Fully implement Supervisory standards of monitoring | • Full implementation of all training curricula, policy revisions and monitoring procedures<br>• Focus activities on ensuring systematic supports in place and supervisory coaching<br>• Monitor 19 *Olivia Y* Outcome Measures regarding FTMs, visitation and identifying family<br>• Monitor preserving connections through CFSR Outcomes: Permanency Outcome 2, Well-Being Outcome 1; & Items 11-20<br><br>Monitor implementation through following indicators:<br>• Percentage of children & families attending court events;<br>• Percentage of ISPs signed by parents and children age 6 and up;<br>• Percentage of service plans developed from a FTM;<br>• Percentage of County Conferences with familial attendance;<br>• Percentage of cases with documented discussion of concurrent planning with birth parents |

**Mississippi Practice Model**

## Child Welfare Practice Model Component: Strengths and Needs Assessments of Family Members

**Value Basis:** Competence, Respect, Collaboration, Responsibility

**Practice Principles:** All families have unique strengths & needs; families are participants in identifying their strengths & needs and requesting services; assessment includes strengths & needs regarding safety, permanency, and well being; assessment addresses underlying conditions and presenting issues; all relevant family members' strengths and needs should be assessed; assessment information is used to guide case planning and decision making; families are best understood in the context of their culture; early identification of concerns that can lead to emotional and behavioral disturbance is prioritized in assessments; assessments should be continuous and ongoing.

**Description of this Practice Component:** Comprehensive family assessment (CFA) is the ongoing and continuous process for gathering, organizing, and analyzing information for the purpose of informed decision-making and service planning concerning the safety, permanency, and well-being of children, youth, and families. Beyond assessment of risks, safety and the circumstances leading to agency involvement, the CFA includes a broader focus of the strengths and needs of all individual family members along with underlying conditions affecting the family. Collaboration with key professionals throughout the process is critical.

| Inputs | Outputs: Products | Outputs: Activities | Outputs: Roles and Responsibilities | Short-Term Outcomes & Indicators | Mid-Term Outcomes & Indicators | Long-Term Outcomes & Indicators |
|---|---|---|---|---|---|---|
| **Current Policies**<br>• Foster care policy on timely initial assessment & updates<br>• CPS policy on ongoing assessment after safety/risk assessment<br>• Foster care policy on early ID of physical and mental health needs and screenings<br>**Needed policies**<br>• Clarify use of SARA<br>• Strengthen family involvement in assessment<br>• Strengthen SARA to address individual strengths and needs, underlying conditions, and broaden its scope<br>**Current Training**<br>• Pre-Service training emphasizes assessment, ID of strengths & family engagement<br>**Needed Training**<br>• CFA training module, including underlying conditions<br>• Mandatory advanced training<br>• Clinical supervisory training<br>**Current Monitoring**<br>• FCR & SAR address assessment<br>• Family satisfaction surveys<br>**Needed QA**<br>• CQI System<br>• Strengthened supervisory monitoring<br>• Performance Measures<br>• Data Integrity<br>**Current Resources**<br>• Services in larger counties<br>**Needed Resources**<br>• More screening/evaluation resources<br>• Stakeholder coordination | **Training**<br>• CFA Training Module<br>• Training on assessing for mental health, trauma, DV, substance abuse<br>• Enhanced pre-service and advanced training curriculum to address specialized needs<br>• Clinical supervisory training<br>**Policy**<br>• Adopt CFA process<br>• New CFA Policy<br>• Policy for one case plan<br>• Integrate assessment activities into policy<br>• Revised SARA implementation guide (if SARA will continue)<br>• Revise CPS and FC policies<br>• Related Policies Revised<br>**Monitoring**<br>• Incorporate CFA into MACWIS<br>• Development of CQI system<br>• Include assessment in performance based contracting<br>• Revisions to SAR & FCR<br>• Clinical supervision model<br>• Use of assessments by providers<br>**Resources**<br>• Improved access to evaluation services<br>• Agreements/contracts with providers<br>• Standards for assessments | • Conduct CFA as integrated family assessment in all cases before developing case plan<br><br>• Involve relevant family members in CFA<br><br>• Initial screenings for medical, dental, developmental and mental health issues/needs<br><br>• Obtain professional external evaluations and assessments as indicated by CFA or screening<br><br>• Incorporate assessment into case plan<br><br>• Update assessments periodically<br><br>• Use caseworker visits to assess strengths and needs<br><br>• Use assessments to make decisions on case closure and follow-up services | **Caseworker**<br>• Conduct/update CFA<br>• Review all pertinent case materials<br>• Involve family in completing CFA<br>• Conduct/obtain initial screenings<br>• Seek external guidance/evaluation<br>• Analyze information<br>• Prepare families to participate<br>• Caseworker visits/communicate with family<br>• Document the CFA<br>• Use CFA to develop case plan.<br><br>**Supervisor**<br>• Assure thorough & timely assessments<br>• Review CFA for quality<br>• Coach, model, Provide Feedback<br>• Direct and monitor use of external evaluations<br>• Facilitate professional development of staff<br><br>**Regional Director**<br>• Disseminate policies and training<br>• Reinforce QA and monitoring<br>• Secure resources<br>• Communicate with key stakeholders<br><br>**CQI/QA Reviewer**<br>• Monitor, evaluate, provide feedback<br>• Coordinate with other review processes, e.g., FCF, SAR<br>• Assist in designing and monitoring program improvements | • Implementation of comprehensive family assessment process in first set of regions<br>• Develop CFA Training Module and provide to staff in selected regions with supervisors trained prior to caseworkers<br>• Provide orientation and training overview to providers and stakeholders<br>• Utilize practice guide to enable staff to conduct CFA and integrate current policies and practices.<br>• Develop any needed requests for proposals for services to ensure appropriate resources to conduct screenings and address physical, developmental, and mental health needs of children and families.<br>• Conduct baseline CQI reviews in selected counties/regions to assess current practice and performance. | • Implement CFA model in next group of Regions<br>• Issue New CFA policy and make revisions in CPS, foster care, and related policies<br>• Revise other training modules and include CFA training in pre-service training curriculum.<br>• Develop clinical supervisory training.<br>• Monitor and evaluate implementation of CFA in the first set of Regions and make needed adjustments in subsequent phases.<br>• Conduct baseline CQI reviews in second set of regions and current reviews in initial region. | • All Regions involved in implementing integrated CFA process component<br>• Full implementation of policy, training, monitoring recommendations<br>• Use of all CQI monitoring processes to evaluate outcomes *and* measures outlined in Olivia Y, CFSR and CQI system. |

## Child Welfare Practice Model Component: Preserving and Maintaining Connections

**Value Basis:** Protect children from abuse and neglect; Promote safe and stable families; Integrity; Respect; Collaboration

**Practice Principles:** Foster care should support the family instead of substitute for the parents when safe & appropriate; Healthy child/parent relationships should be supported & maintained throughout a foster care episode when safe & appropriate; Children in foster care have important connections & relationships that define them as individuals & members of a family, community, & culture; Agencies should normalize connections & relationships for children in foster care when safe & appropriate; Agencies should ensure important traditions, identity with social institutions and cultural connections are maintained

**Description of this component:** Conducting thorough searches to identify all familial resources that could be available to the child, including non-custodial parents, and their families; Assuring that all relevant family members, including non-custodial or absent parents are involved in the routine life of the child whenever safe and appropriate to do so; Ensure that family members are considered first, if placement outside of the home is necessary, and that siblings are placed together unless their individual needs contraindicate placement together; Ensure that children are placed within the communities from which they come whenever safe and appropriate to do so; Ensure that children are able to maintain connections to their home community through school, church and other community connections, as possible; and Ensure that parents are involved in the care of their children in foster care to the extent that it is possible, safe, and appropriate to do so.

| Inputs | Outputs - products | Outputs - activities | Outputs - roles and responsibilities | Short Term Outcomes & Indicators | Medium Term Outcomes & Indicators | Long Term Outcomes & Indicators |
|---|---|---|---|---|---|---|
| **Current Policies**<br>• Visitation policy<br>• Prioritization of kin placements<br>**Needed Policies**<br>• Placement proximity<br>• Involving caregivers in child's life<br>• Strengthened language on kin and sibling visitation<br>**Current Training**<br>• Family centered practice<br>• Adv Skills Training<br>• Supervisory<br>• PATH<br>**Needed Training**<br>• Planning for reunification/ aftercare<br>• Engaging non-custodial parents, kin, tribes<br>• Creating and maintaining emotional connections<br>• Shared parenting<br>• PATH re sibling ties<br>**Current Monitoring**<br>• FCR<br>• Supervisory role<br>**Needed Monitoring**<br>• Comprehensive CQI system<br>**Current Resources/Practices**<br>• Prevention Services<br>• Identifying Native heritage<br>• Visitation<br>**Needed Resources/Practices**<br>• Placement Resources<br>• Father Involvement | **Training**<br>• Preparing kids and families for reunification<br>• Resource & caseworker training on involving while in care<br>• Engaging non-custodial parents<br>• Maintaining emotional ties<br>• All staff training on CQI and Outcome Measures<br>**Policy**<br>• Define family involvement and connections, focus on active involvement in child's life<br>• Require placement in child's community, if safe<br>• CQI Policy<br>• Visitation policy strengthened with frequency requirements, no cancellation due to compliance<br>**Monitoring**<br>• Expand FCR to include parental involvement<br>• Develop CQI System<br>• Supervisory standards and system for oversight developed<br>**Practice**<br>• Protocols for service plan coordination among parties, and co-development<br>• Alternate process for accessing therapeutic placements<br>• Practice guide on identifying and engaging family members<br>• Practice guide on assisting social network development and relationship maintenance for children | Identification of all areas where preserving connections is required and how to do it:<br>• Identify, locate and involve relevant family members<br>• Frequent, regular and meaningful caseworker visits with families<br>• Use of comprehensive strengths and needs plan to identify relationships and connections<br>• Support active family involvement in child's life in foster care<br>• Family team meetings at all case plan updates, changes in plan, and at intervals to monitor progress, facilitated by caseworkers<br>• Address relationships and connections issues in initial and updated case plans<br>• Identify and support tribal affiliations or Indian heritage and other cultural background<br>• Advocate for school consistency<br>• Place children in foster care settings that support their connections<br>• Identify and evaluate relative placement resources early | **Caseworkers**<br>• Engage and prepare children and families for their time in care<br>• Facilitate child activity in social, family, cultural & community events<br>• Facilitate regular visits/ prepare all parties for meaningful visits<br>• Facilitate active parenting for adults' children in care<br>• Use case planning to identify connections & plan for them<br>• Coordinate with providers<br>**Supervisors**<br>• Monitor for quality of work and provide constructive feedback<br>• Coach and model casework techniques<br>• Facilitate caseworker access to trainings<br>• Maintain contact with caseworkers' caseload<br>• Conduct case reviews/hold unit meetings<br>• Assist workers in accessing resources and finding proximity placements<br>**Regional Directors**<br>• Leadership in change effort and implementation of practice model<br>• Monitor data reports/ qualitative reviews<br>• Monitor supervision<br>• Actively pursue regional service provider development<br>• Lead improvement efforts<br>**CQI**<br>• Monitor quality of practice/outcomes for agency and providers<br>• Provide feedback<br>• Identify strengths and needs of agency, service providers, resource parents<br>• Identify improvement needs & strategies | • Develop interim training module on supporting relationships, preparing for visits, develop social networks, and active parenting of foster children<br>• Develop practice guides on preserving connections, visitation planning, supervisory protocol<br>• Ensure local CQI capacity<br>• Implement CQI process<br>• Enhance FCR<br>• Inventory community resources<br>• Engage service providers<br>• Prepare resource families for practice model implementation, and their newly defined roles | • Develop/modify training modules and curriculum on: skills based and resource/adoptive parent trainings<br>• Conduct review of existing ongoing training to determine extent of preserving connections focus<br>• Revise policies in manual<br>• Implement contracting procedures to ensure conformity of practice by service providers<br>• FCR practice to include enhanced standards<br>• Implement CQI process<br>• Fully implement Supervisory standards of monitoring | • Full implementation of all training curricula, policy revisions and monitoring procedures<br>• Focus activities on ensuring systematic supports in place<br>• Monitor 19 *Olivia Y* Outcome Measures regarding placement resources, permanency planning, visitation, and facilitating connections<br>• Monitor preserving connections through CFSR Outcomes: Safety Outcome 2, Permanency Outcome 2, Well-Being Outcome 1 and 2; Items 11-21; and CFSR Permanency Composite 3<br>• Monitor implementation through indicator: Frequency of family meetings with both birth and resource parent attendance.<br>• Monitor implementation through indicator: Frequency of attendance of independent living skills class for at least 3 months.<br>• Monitor implementation through indicator: % of FCRs with familial attendance. |

**Mississippi Practice Model**

## Child Welfare Practice Model Component: Individualized Case Planning

**Value Basis:** Ensuring safety, permanency, well being of children and families; Safe and stable families; Respect; Collaboration

**Practice Principles:** Developing, reviewing, and revising case plans involves all relevant family members, including absent and age-appropriate children and youth; Individualized case plans are developed *with* the family not *for* the family. The strengths and needs of individual family members are identified through comprehensive assessments and incorporated into case plans; Timely decisions about the goals and activities in the plans are made in collaboration with the children/youth and parents; The case plan is the guide for the agency's and service providers' work with the children and families and is not simply a requirement to be met. Case plans are dynamic, working documents that change as the family progresses or as circumstances change.

**Description of this component:** This component includes actively involving age-appropriate children/youth and their family members in identifying their unique strengths and needs and in developing plans that address their needs. The plans match appropriate services to individualized needs, establish clear permanency goals, and delineate clear activities and time frames for achieving goals and completing activities. The case planning process should identify the strategies that address safety and risk factors and the underlying issues affecting the family's ability to care for its children safely and appropriately. The strengths and needs of all relevant family members are addressed in the case plans in collaboration with family members, appropriate providers and caretakers, and others as needed or requested by the family.

| Inputs | Outputs: Products | Outputs: Activities | Outputs: Roles and Responsibilities | Short Term Outcomes & Indicators | Mid-Term Outcomes & Indicators | Long Term Outcomes & Indicators |
|---|---|---|---|---|---|---|
| **Current Policies**<br>• ISP requirements and timeframes<br>• Family involvement in case plans<br>• Concurrent planning & FTMs<br>**Needed Policies**<br>• More needed on engagement, caseworker visits, full disclosure, and assessments in case planning<br>**Current Training**<br>• Pre-service: FTM and concurrent planning.<br>• Advanced Skills: case planning process and assessment<br>• Supervisory training<br>• PATH re teamwork & visits<br>**Needed Training**<br>• More on visits, concurrent plans, developing case plans, engagement<br>• IL training<br>• Strengthened supervisory skills<br>**Current Monitoring**<br>• FCR and SAR<br>**Needed Monitoring**<br>• Comprehensive CQI system, including in-home services<br>• Enhanced SAR<br>**Current Resources**<br>• Family Team Meetings<br>• ISP<br>**Needed Resources**<br>• Wider array of services<br>• Plans that are tailored to the individual needs of the child and family | **Training**<br>• Stronger emphasis on caseworker visits<br>• In-depth training on case plan development<br>• Clinical supervision re case plans<br>• Modules on FTMs, concurrent planning, and IL<br>• Resource family training on reunification, concurrent planning & IL<br><br>**Policy**<br>• Stronger policy on family involvement<br>• Policy on use of visits in case planning<br>• Full-disclosure and concurrent planning policy<br>• Policy on use of assessments in case plan development<br><br>**Monitoring**<br>• FCR review of individualization of plans<br>• Review of in-home service delivery<br>• Supervisory protocol for monitoring timely & individualized case plans<br>• Review of effectiveness and appropriateness of services delivered (case specific & systemic)<br><br>**Resources**<br>• Strengthened array of flexible services<br>• Contracting mechanisms to ensure that services provided are individualized to the unique needs of the families served<br>• Clearly defined FTM process | • Link services to the individual strengths and needs of each family member.<br>• Address individual strengths and needs in case plans<br>• Engage with service providers in case planning activities<br>• Use caseworker visits in individualizing case plans<br>• Conduct individualized case planning activities outside of the FTM when indicated<br>• Monitor case plans and revise as needed<br>• Link ongoing case planning to individual strengths and needs. | **Caseworkers**<br>• Identify and engage family members in ISP<br>• Prepare family members to participate in ISP<br>• Develop ISP jointly with parents, children and other relevant individuals<br>• Gather/use information from assessment &other sources in developing plans<br>• Engage service providers<br>• Monitor the implementation of the ISP<br>• Know the array of services available<br>**Supervisors**<br>• Monitor quality of work & provide feedback<br>• Coach and model appropriate techniques<br>• Observe in FTMs and FCRs<br>• Advocate for needed training & supports<br>**Regional Directors**<br>• Actively engage in the CQI process/manage for outcomes<br>• Serve as advocate for practice model<br>• Monitor supervisory oversight of casework activity<br>• Ensure a well-trained workforce<br>• Monitor outcomes, relate practices to outcomes and provide feedback to staff and providers<br>• Lead improvement efforts<br>**CQI Staff**<br>• Review the quality of practice as it relates to this component<br>• Evaluate/report on practice and systemic issues for this component<br>• Coordinate CQI with other review activities<br>• Review coordination with service providers regarding this component<br>• Identify needs for improvement in practice & systemically | • Review pre-service& in-service training for family centered practice<br>• Interim training module on case planning<br>• Interim policy & protocol on supervisory conferences<br>• Practice guide on individualized plans<br>• Practice guide on use of visits in ISP process<br>• Conduct baseline CQI review<br>• Evaluate/address local service array in initial counties to implement model<br>• Establish local CQI capacity<br>• Orient & coordinate service providers/ensure their capacity to provide needed services<br>• Orient & coordinate legal & judicial community<br>• Modify FCR & SAR | • Incorporate training recommendations into pre-service and advanced curricula<br>• Develop individual module on clinical supervision<br>• Develop individual module on FTM<br>• Develop individual module on concurrent planning<br>• Develop individual module on IL<br>• Incorporate recommended policy changes into policy manual<br>• Incorporate supervisory protocols into policy<br>• Conduct initial CQI in next group of counties to implement model<br>• Conduct follow-up CQI in initial implementation regions<br>• Implement performance-based contracting process<br>• Ensure that staff are familiar with all the resources available | • Full implementation of all training curricula, policy revisions and monitoring procedures<br>• Focus activities on coaching and supporting practices<br>• Assure that the systemic supports needed for this components are refined and fully in place.<br>• Use of all CQI monitoring processes to evaluate applicable outcomes and measures identified in *Olivia Y*, FCR, CFSR and CQI system. |

# APPENDIX B:  PRACTICE GUIDES

Practice Guides follow behind this page.

**Mississippi Practice Model**

| Practice Guide | | |
|---|---|---|
| **Mobilizing Appropriate Services Timely** | | |
| **OUTCOMES** | • All children and families involved with DFCS will have Individual Service Plans that include services that are tailored to their individual strengths and needs. <br>• DFCS has developed an array of services that allow for the delivery of services that are tailored to meet the individual strengths and needs of the child and family. | |
| **R E Q U I R E M E N T S** | • *General:* Prompt provision of services to manage risk, assure safety, and prevent recurrence/ obtained immediately if there are basic unmet needs/ provide for services incl therapy, MH, education, DV, MH, substance abuse /Link services to identified needs/Services must be related to permanency goal <br>• Provide support services to children in placement to stabilize, support and minimize moves. <br>• Medical, dental, and MH records are given to providers. <br>• Provide all children with needed MH, developmental, substance abuse screenings & services, and intensive services such as TFC. <br>• *Reunification:* Timely and appropriate efforts to achieve reunification/Final discharge team meeting before closing a case/Provide aftercare services to children and parents when reunification occurs <br>• *Adoption:* Prompt efforts to achieve adoption/Weekly status meetings with consultant, adoption specialist, supervisor & worker in cases involving infants/Monthly conferences for other children awaiting adoption. <br>• *Independent Living:* IL Plan for youth ages 14–20/Review & update every 90 days/Prompt and adequate IL and transitional living services to youth in foster care/Ensure youth transitioning to independence has adequate living arrangement, a source of income and health care/Provide educational and training vouchers and assistance in locating  & enrolling in educational  or vocational programs/Provide information about a range of services to the youth across systems/Develop an aftercare plan in advance of case closing and identify steps for obtaining any needed services that are identified/Assist youth in obtaining documents & services necessary to function as independent adults, i.e., health insurance & records/ Youth to be given 6 months advance notice of cessation of health, financial, or other benefits that will occur at time of transition/ Provide age-appropriate education and support regarding pregnancy prevention, responsible parenting, sexually transmitted diseases and assistance in obtaining medical insurance, medical records and needed medical, developmental, substance abuse, and MH services. <br>• *Caseworker visits:*  Frequent visits of high quality between caseworker and children/ At least twice monthly visits with child including once monthly in placement & privately with child/Provider visits children in Therapeutic Foster Care (TFC) every 2 weeks/At least monthly visits with parents/Visits are made during 1st month child is in care and after any change in placement to assess child's adjustment. | |
| **ACTIVITY** | **WHERE IN THE LIFE OF THE CASE** | **PRACTICE GUIDANCE** |
| *Link services to individual needs in case planning* | • Assessment <br>• Prior to developing case plan <br>• At caseworker visits & FTMs <br>• When family's situation changes | • Review & use information from safety assessment, strengths & needs assessment, all case record information, reports from providers <br>• Link IL and TL needs/plans with family's case plan to identify need for individual  IL services <br>• Identify & locate all relevant family members whose needs/services should be addressed <br>• Prepare children/families to participate in case plan meetings by explaining what will happen, importance of plan, encourage to consider their strengths & needs <br>• Facilitate FTMs by encouraging family/child input on strengths/needs and identifying service needs, preferences for providers, and locations of services. Identify relevant cultural, tribal, background issues to be considered in mobilizing appropriate services. <br>• Identify needs before considering the availability of services. <br>• Identify services in collaboration with child and family that will best meet identified needs. |
| *Engage with service providers* | • Prior to developing case plan <br>• During FTMs & case reviews <br>• During case | • Identify service providers that meet family's needs/preferences/locations/cultural concerns <br>• Obtain necessary Release of Information forms from youth/parent/service provider. <br>• Include relevant service providers in FTMs with permission of child/family <br>• Ensure providers tailor services to, incl frequency, intensity, level, & location of services and <br>• Contact service providers frequently for reports on child/family's participation in services and |
| | | PAGE 1 |

**Mississippi Practice Model**

| | monitoring | progress toward goals/require written reports specific to referral needs<br>• Advise service providers of any significant changes affecting delivery of services. |
|---|---|---|
| *Clarify specific service needs when making referrals* | • At case plan development & reviews<br>• At service referrals<br>• Caseworker visits and FTMs<br>• When situation changes | • Select providers whose array of services match the child's/family's needs<br>• Provide written referrals for services that identify needs of family members, goals of the service, time frames to complete services/achieve goals, barriers to receiving services.<br>• Clarity jointly with family members and service providers the expectations of services, including frequency, level, location, goals, and duration of services.<br>• Document service referrals and reviews of services provided in case plan.<br>• Make payment for services contingent upon delivery of services specified in referral.<br>• As circumstances change &/or family progresses, review progress jointly with family members & providers, adjust services as needed, confirm in writing, document in case plan. |
| *Provide services promptly & early to address safety & risk issues* | • During investigation<br>• Assessment<br>• Prior to case plan development | • Use safety & risk assessment to identify immediate needs to protect children<br>• Use strengths & needs assessment to identify immediate needs to protect children<br>• Make verbal & written referrals to appropriate service providers when needs for services are identified, i.e., during investigation, during assessment, prior to case plan development<br>• Immediate follow-up with providers to ensure response to referrals/mobilizing of services<br>• Document service referrals/provision in case file & review/revise as needed |
| *Provide services on an ongoing basis to address permanency goal.* | • At case plan reviews & updates<br>• At caseworker visits and FTMs<br>• At court hearings & reviews<br>• When situation changes | • Update assessment/review case plan at required intervals & evaluate progress toward achieving permanency goals/use updated information to evaluate need for services<br>• Monitor service provision to ensure conformity with case plan/identified needs<br>• Evaluate with child/family/service provider the effectiveness of current services & adjust service levels, intensity, type, location, duration as needed.  Change providers if indicated.<br>• In FTMs and caseworker visits, ensure that services are directly linked to overcoming barriers to achieving permanency goals within prescribed time frames.<br>• Make prompt written service referral as soon as need is indicated/specify level, intensity, duration, type of service requested.<br>• Revise case plan with child/family when new services are implemented/ link to goals.<br>• Notify service providers of significant events/changes with child/family or changes in goal |
| *Use caseworker visits to mobilize services* | • Caseworker visits | • Visit with individual family members at required intervals or more frequently if indicated<br>• Discuss effectiveness/satisfaction with services, progress toward goals, emerging issues, changes/identify needs for changes in service delivery with family members<br>• Determine need to convene FTM or involve service providers in discussions |
| *Provide services to children in placement* | • At case plan development/revision<br>• Re-assessmt<br>• Caseworker visits | • Identify child's strengths & needs in initial & updated assessments/refer or provide services<br>• Match placement setting to child's individual needs<br>• Identify resource parents' needs for services to care for child/refer or provide services<br>• Provide resource parents with all information about child and service needs<br>• Visit frequently in resource home/interview resource parents & child separately/evaluate effectiveness of services, need to revise services or implement new services. |
| *Monitor and evaluate the effectivenes s of services* | • Case plan reviews<br>• Caseworker visits & FTMs<br>• When situation changes | • Review case plan quarterly for continuing appropriateness of services provided<br>• During visits, discuss with individual family members effectiveness of services/other needs<br>• Meet with service providers frequently/discuss effectiveness of services/progress/new needs<br>• With family's approval, invite the service provider to any Family Team Meetings<br>• Make changes in services indicated by lack of progress/info obtained/changes in goals |
| *Provide services at the time of discharge and case closure.* | • At final FTM<br>• Re-assess'mt<br>• 6 months before discharging youth from foster care<br>• Case closure | • Identify post-discharge/closure needs for services in updated assessments<br>• Convene discharge FTM with youth/family/significant parties at least 6 months in advance of discharge/case closure to identify needs/develop after care plan with services specified<br>• Make written service referrals and follow-up with providers<br>• Provide youth/family with documentation/information needed to secure needed services<br>• Link family/youth with community resources for general support/ongoing services<br>• Provide contact information for youth/family to contact agency as needed |

PAGE 2

Mississippi Practice Model

| Practice Guide | | |
|---|---|---|
| **Assuring Safety and Managing Risk** | | |
| OUTCOMES | • Children are first and foremost protected from abuse and neglect.<br>• Children are safely maintained in their homes whenever safe and appropriate.<br>• Children in out-of-home placement are safe and protected from maltreatment. | |
| R E Q U I R E M E N T S | • *Safety and risk assessments.* Initial safety assessments must be completed/Conduct evaluation of risk & protective factors/Ongoing safety assessments must be completed over life of the case/Ongoing evaluation of risk & protective factors must be completed/<br>• *Investigation of reports.* All reports must be assigned for investigation or screened out within 24 hours/Face-to-face contact with children occurs within 72 hours of the report/ Investigations must be completed within 30 days, within 20 days for reports of children in agency custody, including supervisory approval/ Evaluate all children in the home for safety and risk<br>• *Safety plans.* Develop initial safety plans and update as necessary/ Screen children to see if they pose threat to other children in home and whether they need safety plan<br>• *Safety in out-of-home care.* Monitor safety of children in foster care placements/If report is for child in congregate care or therapeutic foster family home, undertake a licensure investigation in addition to CPS investigation/reports of corporal punishment in foster care are investigated by worker with training in maltreatment in foster care who has no connection to the case/If child remains in the foster care placement following report of maltreatment or corporal punishment, worker visits twice monthly for three months/File copy of report in record of child and resource parent and facility licensing file & copy of letter notifying resource parent goes in file and to State Office, and provide records/report to judge and court monitor.<br>• *Caseworker visits.* Twice monthly caseworker visits with children in foster care and children remaining in their own home to assess safety and needs/Worker meets frequently with the child's biological parents and at least monthly /Visits are made during the first month the child is in care and after any change in placement to assess child's adjustment<br>• *Discharge/aftercare.* Ninety- day trial visit if reunification occurs and two visits to the home each month to interview the child (ren) without the parent(s) present/Develop after-care plan identifying services needed to ensure child's safety and stability/Take steps to ensure access to needed services | |

| ACTIVITY | WHERE IN THE LIFE OF THE CASE | PRACTICE GUIDANCE |
|---|---|---|
| *Initiate Investigations of maltreatment* | • Intake<br>• Investigation | • Gather information from reporter to determine if report meets definition of maltreatment.<br>• Gather information from the reporter & others on extent & circumstances of maltreatment, vulnerability of child, location of child & perpetrator, & whether child is in present danger<br>• Determine the response time for the report<br>• Make face-to-face contact with child within required time frames/interview child privately<br>• Interview all required parties, including alleged perpetrators<br>• Consult supervisor to determine priority and other procedures |
| *Conduct initial safety and risk assessments* | • Investigation | • Conduct background check on family members/Review historical information in MACWIS, Central Registry, & case files<br>• Gather information through observations & interviews to determine if child is in danger<br>• Gather information from family members & collaterals about the extent of maltreatment, circumstances of maltreatment, adult & child functioning, parenting & discipline practices<br>• Identify parents' protective capacities and use in evaluating safety and risk<br>• Complete safety & risk assessment instruments and document in case file<br>• Use assessment findings to determine if a safety plan is required & if services are needed |
| *Initiate services to address safety and risk* | • Investigation<br>• Case plan development | • Evaluate need for immediate services to protect child or manage risk during investigation/ make appropriate referrals/follow-up with providers to ensure prompt response<br>• If child remains in home, identify services needed immediately to support safety plan/Refer and follow up for prompt response<br>• If case opened for services, conduct FTM to determine ongoing services needed to |

PAGE 1

**Mississippi Practice Model**

| | | address identified safety and risk factors/Link services to safety threats and risk factors |
|---|---|---|
| Conduct ongoing safety and risk assessment | • Caseworker visits<br>• Case plan reviews<br>• When family's situation changes<br>• Reunification/ case closure | • Conduct and document risk and safety assessments in MACWIS at regular intervals<br>• Review safety and risk factors, vulnerability, and protective capacities during visits with family members & with child in placement/Identify new or emerging safety & risk factors/Evaluate caregiver's progress in resolving safety & risk factors<br>• Use safety & risk re-assessments in comprehensive strengths & needs re-assessments to provide broad perspective on safety and risk and parental capacity to care for child safely<br>• Identify conditions required for a child to be safe at home to use in evaluating safety/risk<br>• Evaluate effectiveness of safety plan in protecting child from harm/managing risk<br>• Determine changes needed to safety or service plan/revise with family & child/Document |
| Address safety and risk in case plans | • Within 30 days of placement or case opening | • Analyze information from safety and risk assessments and comprehensive strengths and needs assessments to identify safety & risk issues that must be addressed in case plan.<br>• At FTM, discuss findings from the assessments, non-negotiable safety & risk concerns, and assist family to identify goals and service needs to protect child.<br>• Identify ongoing safety plans provisions with family and incorporate into case plan.<br>• With family, develop case plan goals & objectives that will assist child's caregiver identify, understand & change behaviors, attitudes or relationships that produce or maintain safety concerns, & to strengthen those that increase & sustain protective capacities |
| Review & update case plans | • At least every 6 months<br>• Whenever family or individual circumstances change | • At least quarterly, review information from child, family, caregivers & providers on caregiver's progress in protecting child, strengthening protective capacities, changes in child's vulnerability to harm, needs for revision to safety/case plan, effectiveness of services, identification of new issues<br>• Use FTM to determine appropriateness of existing plans & services and needed changes.<br>• With family and providers, make needed changes to plans based on safety and risk factors/document in case file/obtain signatures |
| Use caseworker visits to address safety & risk | • Caseworker visits | • Visit with child, parents, foster caretakers at required intervals/more frequently if needed<br>• Meet privately with child to discuss safety and risk concerns<br>• Review safety and risk concerns with family members, & participation in services, effectiveness of services, progress toward goals, needs for changes in goals or plans.<br>• Document all visits in case file |
| Address safety & risk while children are in placement | • Caseworker visits with child/parents and resource family<br>• Investigation of reports of maltreatment in care | • Evaluate safety & risk issues in foster care placement at all caseworker visits to facility and with child/Observe conditions in home or facility and evaluate for safety & risk<br>• Complete safety & risk assessments for children in care<br>• Meet privately with children to discuss safety and risk concerns<br>• Meet privately with resource parents/facility staff to identify safety threats, such as hazards, supervision, interactions with other children or adults, child behaviors<br>• Identify and discuss with parents any safety or risk concerns for child in placement<br>• Complete investigations as required<br>• Consult frequently with licensing staff about resource homes & facilities/ Notify & involve licensing staff in reports and investigations<br>• Document safety assessments & investigations in MACWIS |
| Reunification | • FTMs<br>• Caseworker visits<br>• Reunification | • Gather information from child, family, caregivers and service providers on progress in achieving goals and resolving safety and risk factors that led to the need for placement.<br>• Ensure that any new or emerging safety & risk factors are resolved or controlled<br>• Complete safety and risk assessments and use them to guide the decision to reunify<br>• Use assessment findings to determine if in-home safety plan is needed to reunify.<br>• Develop after-care plan including needed services/Plans for trial visit & caseworker visits Make service referrals/follow-up with providers/Facilitate access to services/Document |
| Case Closure | • When making a decision to close the case | • Gather information from child, family, caregivers and service providers on progress in achieving goals and eliminating safety factors and reducing risk sufficiently<br>• Meet with the family to discuss their readiness and prepare the family for case closure.<br>• Complete safety & risk assessments to determine that safety threats no longer exist & sufficient change has occurred so that caregiver can effectively protect the child.<br>• Identify future risk of harm in the foreseeable future and the family's protective capacities which will prevent such harm/Include in after care plan<br>• Develop after-care plan that includes needed services/Make service referrals/follow-up with providers/Facilitate access to services/Document in case file |
| | | PAGE 2 |

**Mississippi Practice Model**

| Practice Guide | | |
|---|---|---|
| **Involving Children and Families in Case Activities and Decision Making** | | |
| **OUTCOMES** | • Families are empowered to advocate for themselves and take an active role in ensuring the safety, permanency and well-being of their children and other family members. <br> • Families are actively committed to participating in and completing activities, and reaching their goals by being part of the planning process. | |
| **R E Q U I R E M E N T S** | • Interview with parents required to complete an assessment. <br> • Parents & all children six and older must be involved in the development of the case plan/sign case plan <br> • Develop case plan within 30 days/Review every 90 days/FTM within 30 days of opening to develop plan. <br> • Update case plan through FTM within 30 days if placement changes or other significant changes in the case/caseworker & family regularly review progress & sign case plan revisions/At least quarterly, caseworker and supervisor review case plan with parents & discuss progress, options, timelines for permanency <br> • FTM & aftercare plan developed prior to placement with relative to support the family and ensure child safety. <br> • The permanency option of long term foster care is not allowed, but durable legal custody is allowed. <br> • Emancipation can only be a goal for children 16 years old(er) with court approval/ after ruling out other goals. <br> • Concurrent planning must address the potential for reunification, possible permanent relative placement and monthly contact between the caseworker and parents to address progress and involve them in decisions. <br> • Diligent efforts are to be made to locate and involve absent parents in case planning. <br> • Frequent, high quality visits are to occur between caseworker and child twice monthly, one of these must be in the child's placement, and the caseworker must meet with the child separately/children in treatment foster care are to be visited by the treatment foster care provider every 2 weeks/caseworker must meet with the child's biological parents at least monthly. <br> • Make visits during first month a child is in care & after any placement change to assess child's adjustment. <br> • There must be documented efforts of diligent searches for absent parents. | |

| ACTIVITY | WHERE IN THE LIFE OF THE CASE | PRACTICE GUIDANCE |
|---|---|---|
| *Engage and involve families in the assessment process* | • Prior to developing case plan <br> • At caseworker visits with family members <br> • At assessment updates & prior to 6-month case plan updates | • Identify/locate relevant family members who should be involved in the plan and whose strengths and needs should be assessed, including absent parents, extended family. <br> • Prepare family members to participate in the assessment by explaining what it is about, how the information will be used, how they can contribute to it. <br> • Ask individual children and youth to identify their strengths and needs. <br> • Ask parents to identify individual and family strengths and areas of need <br> • Identify cultural/background issues that affect parenting or service delivery <br> • Explore underlying issues with parents & age-appropriate youth, such as domestic violence, substance abuse, mental health issues, developmental concerns <br> • Review strengths and needs on a regular basis during visitation with each family member, and update status of issues, progress, emerging concerns in assessment. <br> • Advise/consult with parents about specialized assessments, e.g., mental health, health, developmental, etc., for them or their children/ involve them in the evaluation process. <br> • Consult with youth about assessments for independent living/transitional living <br> • Coordinate with IL service providers to ensure all assessment information is available to youth and for developing case plan <br> • Inform parents of results of strengths and needs assessments and specialized assessments and discuss implications for case plans, services, goal achievement |
| *Involve families in developing case plan* | • Within first 30 days of placement <br> • Every 90 days after | • Identify relevant family members who should participate in meetings to develop case plans, including extended family, non-custodial parents. <br> • Provide families the opportunity to include others in case plan meetings, e.g., advocates, mentors, close friends, service providers |

PAGE 1

**Mississippi Practice Model**

| | | |
|---|---|---|
| | • initial case plan<br>• When placements or family's situation change | • Provide services to support participation, e.g., transportation, flexible schedule, child care<br>• Always include youth in foster care in planning unless documented reasons not to.<br>• Inform children and family of case plan meetings; explain purpose, roles, responsibilities.<br>• Prepare family members to participate, e.g., how to provide input, importance of the plan.<br>• Identify and discuss with family any non-negotiable issues prior to the case plan meeting, such as ensuring the child's safety or court-ordered case plan provisions.<br>• Come to case plan meetings knowledgeable of assessment information and the child's & family's circumstances/prepare to develop plan in the meeting, not in advance.<br>• Facilitate case plan meetings purposefully, identify issues, listen to and include children and families, clarify strengths and needs.<br>• Discuss independent /transitional living plan issues with older youth and their parents/caretakers, and solicit their input on services.<br>• Encourage family members to identify strengths, their perceptions of their needs & services that can address needs, preferences for service providers, locations of services<br>• Ensure case plans reflect family input<br>• Document case plan promptly/ all family members sign the case plan. |
| *Use caseworker visits to involve child and family* | • At assessment<br>• Prior to developing case plan<br>• At least two times a month with children<br>• At least one time a month with birth family | • Visit in convenient and comfortable locations at reasonable times for family members<br>• Meet with children in placement and at home privately and discuss services, needs, other issues relative to their case plan/ permanency goals. Solicit their input on progress, concerns, needs, and quality of services.<br>• Have frequent private meetings with youth to discuss participation in and satisfaction with independent living/transitional living services/goals/needs.<br>• Meet with parents privately to discuss progress, goals, services, needs, concerns<br>• Raise issues with parents/children/youth that arise between visits or through contacts with service providers, foster caretakers, or other collateral contacts<br>• Ensure that visits relate to the provisions of the plan/opportunity for family member input<br>• Document all visits in case file, including substance of visits and issues raised by children and parents relative to case plan, services, goals, etc. |
| *Engage children and family members in Family Team Meetings* | • At initial case plan<br>• At all case plan updates<br>• When placements, family's situation, or goals change<br>• At case closure | • Identify and notify all family members who should participate in meetings. Identify other participants of the family's choosing and notify.<br>• Schedule meetings at convenient times/locations for the family. Provide needed services to facilitate their participation, e.g., transportation, child care.<br>• Prepare the family to participate in meetings, e.g., explain purpose, roles, responsibilities, agenda, how information will be used<br>• Plan for discussion of sensitive information and how it may affect children during meetings<br>• Facilitate meetings, providing all family members opportunities to participate; manage disputes/disagreements by lessening tension & moderating discussion<br>• If the meeting is occurring for case plan development, ensure that all pertinent family members sign the case plan at the conclusion of the meeting. |
| *Facilitate parent's involvement with children during foster care placements* | • At assessment<br>• At initial case plan<br>• During visits<br>• At case plan updates | • Assess for level of parental involvement with children that is safe & appropriate<br>• Attempt to place children in close proximity to parents to facilitate their involvement<br>• Consult/include foster caretakers about parental involvement & encourage their support<br>• Facilitate meetings between parents and foster caretakers when they are both agreeable<br>• In consultation with & having approval from foster caretakers and parents, help them to develop plans for specific activities in which parents can participate<br>• Discuss parental involvement in FTMs, preferably with foster caretakers involved<br>• Include levels of participation/specific activities in case plans<br>• Monitor involvement closely/visit frequently in foster care setting/ discuss with caretakers/parents/children<br>• Evaluate safety and risk to children at all visits<br>• Modify plans as needed and promptly address safety/risk issues |

PAGE 2

**Mississippi Practice Model**

| Practice Guide | |
|---|---|
| **Strengths and Needs Assessments** | |
| **OUTCOMES** | • All families receiving services will participate in an ongoing and continuous comprehensive family assessment that identifies the strengths and needs of each member and addresses the underlying conditions that necessitate child welfare intervention.<br>• Each family's assessment will inform case planning activities and service provision. |
| **R E Q U I R E M E N T S** | • Complete comprehensive assessment within 30 days of opening a case or child's entry into foster care and prior to the development of the case plan.<br>• Initiate assessment within 72 hours of placement. Interview parents & foster parents within 14 days (10 days if placed in therapeutic foster care).<br>• Health screening of all children is done within 72 hours of placement, followed by comprehensive health examination within 30 days.<br>• Developmental screening for children 3 years old and younger, and mental health screening for children, 4 years of age and older, is completed within 30 days after placement. Secure early intervention services and/or a full mental health examination if results indicate the need.<br>• Educational screening is done for children within 30 days of placement; enroll in accredited school within 3 days of placement. Services are provided based on assessment of educational needs.<br>• Dental screenings for all children 3 yrs. old within 90 days of placement and then every six months.<br>• Assessment evaluates child's needs for intensive and supportive services, including placement in a therapeutic foster home.<br>• As part of ongoing assessment, visit children in foster care twice per month, at least once in the placement to include separate interviews with the child; visit biological parents at least once per month; interview foster parents at least once per month.<br>• Document the assessment in case file and maintain health histories and records to disseminate to caregivers, health care professionals, and youth when appropriate.<br>• Supervisors document written approval of the assessment prior to the development of the case plan. |

| ACTIVITY | WHERE IN THE LIFE OF THE CASE | PRACTICE GUIDANCE |
|---|---|---|
| *Initiate comprehensive family assessment that builds on initial safety/risk assessments* | • Prior to developing case plan | • Review historical case information, court documents, school reports, and mental health and medical evaluations.<br>• Review initial safety/risk assessment and identify strengths, safety concerns, and risk issues to be included in the assessment.<br>• Obtain initial medical, dental, mental health, and educational screenings.<br>• Meet with the family to discuss purpose of assessment and gather information relating to key life domains, strengths and needs, and capacities/resources.<br>• Observe & note conditions in the home, attitudes & behaviors of family members, and how they relate to each other & the caseworker. Explore the family's connections with other individuals that may affect future case planning.<br>• Interview relatives, noncustodial parents, and other relevant caregivers and collaterals for information on the family's strengths and needs.<br>• Organize and analyze the areas that must improve, including underlying issues, and what resources will best enable the family to make changes.<br>• Document the assessment in the case record for case planning & future updates. |
| *Engage and involve parents and children to identify strengths and needs in assessments* | • Prior to developing case plan<br>• At all caseworker visits with family members<br>• At assessment updates & prior to 6-month case plan | • Prepare family members to participate in the assessment by explaining what it is about, how the information will be used, how they can contribute to it, etc.<br>• Ask children to identify family strengths and needs in accordance with their developmental and intellectual capacity; ask of all youth in care.<br>• Identify non-custodial parents, relatives, other family members, their locations, and evaluate need to involve. Make contacts with others who need to be involved.<br>• Use assessment findings to solicit family's input on each member's assets, issues causing difficulty, & how to improve their circumstances. |

PAGE 1

**Mississippi Practice Model**

| | updates | • In visits with family members, review their strengths and needs and update status of issues in assessment, progress, emerging concerns. |
|---|---|---|
| *Conduct specialized screenings, obtain additional evaluations, and make needed referrals for services* | • Prior to developing case plan<br>• When assessments and case plans are updated | • Use information from medical, dental, mental health, and educational screenings, assessment, & case file information to identify need for more in-depth evaluations<br>• Discuss needs for specialized screenings/evaluations with parents and relevant family members; determine providers/locations that can best serve them<br>• Assess individual health, dental, developmental, mental health, and educational needs of children and families<br>• Make prompt referrals for additional evaluations and needed services as soon as need is identified. Involve family in decisions about where to obtain the services<br>• Clarify with providers the precise needs for screening/evaluation or services and ensure provider has the information needed to proceed<br>• Identify & provide assistance the family may need in participating in evaluations<br>• Obtain copies from service providers of the results of the evaluations<br>• Discuss assessment findings and recommendations with the family and seek their views and perspectives about the information and any conclusions that are drawn.<br>• Document the family's current circumstances, status of progress in achieving goals, & new findings that need to be incorporated into updated assessment.<br>• Provide copies of medical, dental, education, mental health information on children in care to their foster caretakers – update as needed |
| *Use assessment to develop case plan* | • When case plan is developed | • Meet with family to discuss findings from the assessments and initial impressions regarding the most pressing and critical issues to be addressed in the case plan.<br>• Sort and analyze all information and assessment findings<br>• Come to meetings understanding the issues from assessments that must be addressed in case plans; know what is negotiable and not negotiable, e.g., safety/risk issues must be addressed; know what to prioritize<br>• Discuss with family the relevant issues in assessments that should be addressed, solicit input from family members on how to address, steps & activities involved, etc. Assure that all relevant issues are included in case plan<br>• Ensure that assessment info for all relevant family members is addressed in plan<br>• Solicit information from foster caretakers on strengths and needs of children/youth in their care to include in the assessment |
| *Update assessments on a regular basis* | • At least every six months<br>• Prior to updating case plan<br>• Whenever family or individual circumstances change substantially | • In visits with family members, ask about changes in strengths/needs with regard to assessment issues and identify emerging issues that need assessing<br>• Meet individually with family members, including relevant non-custodial parents, to observe and discuss strengths/needs with regard to assessment issues<br>• Track and make referrals for ongoing periodic screenings and assessments, e.g., EPSDT, and follow-up assessment activities for other screenings/evaluations, e.g., re-testing for educational status, re-evaluation of mental health issues<br>• Make prompt and clearly defined referrals for additional or updated specialized evaluations needed as circumstances change or new needs emerge<br>• Obtain copies of new/updated screenings/evaluations and use in revising plans<br>• Make direct contacts with providers of assessments/evaluations (with family's consent) to evaluate progress, identify needs, etc.<br>• Discuss progress/needs with relevant family members and foster caretakers |
| *Conduct a current assessment prior to case closure* | • When case closure is being considered | • Gather information from child, family, caregivers, & service providers on progress in achieving goals & correcting underlying issues contributing to needs.<br>• Meet with family to discuss readiness and preparation for proposed case closure.<br>• Identify presenting safety/risk issues and future risk of harm in the foreseeable future relating to the child's living situation and responsible caregivers<br>• Obtain needed supports and make referrals for services that can ensure the safety and stability of the child and family when the case is closed.<br>• Provide documents to the child, family, and/or caregiver regarding health, education, identification, and entitlements to services that can assist in the future.<br>• Document the updated assessment information in the record prior to case closure. |

PAGE 2

**Mississippi Practice Model**

| Practice Guide |
| --- |
| **Preserving and Maintaining Connections** |

| OUTCOMES | • All children in out-of-home care will maintain relationships with family & other persons with whom they have a strong connection, their tribe, community, & school, whenever safe and appropriate.<br>• Families actively participate in the parenting and rearing of their children if safe while in foster care. |
| --- | --- |
| **R E Q U I R E M E N T S** | • Children are placed in this priority order: with siblings, with kin, or foster home in proximity to family.<br>• Provide all relevant information to resource parents/facilities; resource parents & birth parents meet.<br>• Provide services to promote constructive parent-child visitation and to remove barriers to contact.<br>• Aftercare plan developed and finalized in advance of case closing to ensure orderly transition.<br>• 90 day trial home visit & aftercare plan prior to reunification/ visits to home twice monthly to interview child without parent or caregiver present.<br>• Advise potential adoptive families of subsidies & post-adoption services.<br>• Place children within county or 50 miles of home unless approved exception.<br>• Place siblings together unless unsafe, exceptional needs, or large sibling group size/Diligent efforts to reunite separated siblings/Monthly visits between separated siblings unless court limits<br>• Prioritize relatives as resources for placement, visiting and support/phone calls within 24 hours if no visit<br>• Contacts between parents/child/separated siblings; visits within 24 hours of placement unless reasons not to/phone call if no visit; Provide support to preserve relationships & parenting skills; Document visits<br>• Minimum of two visits per month between parents/child unless limited by court order/Visitation plan at FTM within 30 days based on child's needs and goals & parents' schedule, and updated every 90 days<br>• Assist youth to develop social networks and relationships with caring individuals (family, tribe, faith); Ensure youth has access to at least one committed, caring adult and to cultural supports.<br>• Maintain child's current school placement for child entering foster care.<br>• Adoption preference given to foster parents caring for a child for 12 months or longer unless unsuitable<br>• Caseworker visits with children (at least twice monthly, once in placement setting, meet separately with child, twice monthly visits by therapeutic FC provider, visit in 1st month & after placement change)<br>• Diligent efforts to notify tribal authorities.<br>• Caseworker meets at least monthly with parents/documents diligent efforts to locate absent parents |

| ACTIVITY | WHERE IN THE LIFE OF THE CASE | PRACTICE GUIDANCE |
| --- | --- | --- |
| • *Identify and locate relevant family members*<br>• *Identify other important connections*<br>• *Identify and evaluate relative placement resources early* | • At investigation<br>• At assessment<br>• Prior to placement<br>• Prior to developing case plan<br>• At routine intervals, e.g., at case plan updates | • Review all case file documentation for info on family, connections, contact info<br>• During investigation, ask caregivers to identify all relevant family members for potential placement resources and for connections, including contact information.<br>• Ask parents/caregivers for family members with whom they feel supported, for the purposes of involvement in family team meetings and other case events.<br>• Ask parents/caregivers about non-custodial parents/obtain contact information.<br>• Search for non-custodial parents & their family members through case files, phone directories, child support system, info provided by family<br>• Contact and evaluate non-custodial parents/relatives and determine interest & suitability for involvement in case planning, decision making<br>• Ask parents/children about heritage/school/ friends/ traditions/ family members/ faith<br>• Re-evaluate family members and connections at regular intervals (case plan updates)<br>• Observe family relationships and how the family and child relate to each other.<br>• Document information obtained from children and family members in case file. |
| *Use caseworker visits to preserve connections* | • At caseworker visits with family & resource parents<br>• At assessment | • Prepare for caseworker visits by knowing about important connections, visiting schedules, and so forth<br>• Meet with children/parents privately & discuss satisfaction with relationships, contacts, reactions, quality of visits, support needs to strengthen contacts/interaction |

PAGE 1

**Mississippi Practice Model**

| | | |
|---|---|---|
| **and relationships** | and case plan updates | • Follow-up on identified needs for more or less contact/interaction<br>• Interview foster caretakers privately about child's needs for connections/interaction<br>• Observe children's interaction with family members and others/note needs for casework attention and service provision |
| **Use strengths and needs assessment information to identify relationships & connections** | • At assessment<br>• Prior to developing case plan<br>• Assessment & case plan updates | • Identify important connections and relationships of children during initial assessments (in assessing both children and parents)<br>• Assess individual children's connections & relationships<br>• Update and re-evaluate connection/relationship information at assessment updates<br>• Identify potential caring individuals for youth in foster care; obtain contact information<br>• Evaluate youth's interests, plans, needs and the connections that support them |
| **• Use FTMs to develop plans to preserve relationships and connections**<br>**• Address connections in initial and updated case plans** | • When case plan is developed<br>• At all FTMs<br>• At all case plan updates | • Ensure that all relevant family members are invited and supported to attend FTMs, including non-custodial parents and age-appropriate children/youth<br>• Hold FTMs at least every 90 days to review ISPs; more often if circumstances change<br>• Include in FTMs persons with strong connections/ties to the child as appropriate & with family's permission, e.g., mentors, family advocates, etc.<br>• Develop detailed visitation plan in FTM; include family and other relevant parties<br>• Monitor & update visitation plan every 90 days<br>• Ensure that relationship/connections issues and plans are included in initial case plans; re-evaluate, update at each case plan update, based on new assessment info<br>• Address involvement of caring adults for youth in IL/TL plans; monitor & update at least every six months<br>• Identify services/supports needed to maintain connections/relationships in case plans |
| **Support family involvement with children in care** | • Within 24 hours of placement<br>• In initial case plans<br>• In updated case plans<br>• At FTMs<br>• When family or individual circumstances change | • Prepare family members prior to visits on what to expect & how to support each other.<br>• Arrange early initial visits after placement (within 24 hours)<br>• Plan for multiple means of contact where appropriate (visits, calls, other contacts)<br>• Discuss/prepare resource parents to support child's contacts and relationships<br>• Make visiting plans in FTMs and jointly with parents and resource parents<br>• Facilitate meetings and planning between parents and resource parents on opportunities for parental involvement in parenting their children in foster care<br>• Monitor/discuss contacts and reactions, and adjust plans as needed<br>• Provide support services to enable parental/family contact/interaction<br>• Provide supervision of contacts/interaction based on safety/risk needs |
| **Identify and support tribal affiliations or Indian heritage & other cultural background** | • At investigation<br>• At assessment<br>• At initial case plan/updates | • Identify Indian & other cultural affiliations in assessment<br>• Notify relevant tribes of the agency's involvement during investigation & at placement<br>• Follow-up with tribes if necessary to ensure notification<br>• Seek assistance from Tribe in locating Native foster homes<br>• Include resource parents in case planning, and address activities steps to maintain tribal or other cultural heritage in the plan<br>• Monitor compliance with plans and revise as needed |
| **Advocate for school consistency** | • At assessment<br>• At case plan<br>• During case monitoring | • Place children in proximity to current school<br>• Identify appropriateness of/need to maintain school placement in assessment<br>• Enlist parent/resource parents in supporting school placement, e.g., transportation<br>• Meet and plan with school officials to maintain school placement<br>• Monitor, review plans, and revise as needed to support school placement |
| **Place children in foster care settings that support their connections** | • At assessment<br>• At placement<br>• At case plan & updates | • Use relative resources as placements when appropriate/ask Tribes for assistance<br>• Place in proximity to home, community, school<br>• Engage parents/resource parents in case plans to support connections/relationships<br>• Facilitate relationships between foster caregivers, parents, other family members<br>• As needed, plan for regular contacts with members of Tribe, faith, community, friends<br>• If siblings are separated, actively plan to place together unless not appropriate |

PAGE 2

**Mississippi Practice Model**

## Practice Guide

### Individualized Case Planning

| OUTCOMES | • All children and families involved with DFCS will have Individual Service Plans with services that are tailored to their individual strengths and needs.<br>• Decisions about permanency & stability are made promptly & based on individualized case plans/services.<br>• All individualized service plans will be targeted toward helping children/families achieve their goals. |
|---|---|
| R E Q U I R E M E N T S | • *Service plans.* Service plan are based on assessment and exploration of benefits of service, cultural relevance, and alternatives of planned services along with the family's social network/Therapeutic services (TFC) to be delivered through an individualized, strengths-based treatment plan that is reviewed weekly by a treatment team, at 30 days after placement and every 90 days to evaluate continued need for TFC.Services are linked to individualized needs identified through assessment and plan.<br>• *Permanency planning.* Prompt identification of permanency goals – plan developed within 30 days/Ongoing review of permanency goal/ Requires concurrent planning to address potential for reunification, possible permanent relative placement and monthly contact between worker and parents to address progress and involve them in decisions regarding children/ Adoption specialist assigned within 10 days of establishing goal and adoption plan developed within 15 days and an external adoption consultant assigned for children legally free for 6 months.<br>• *Services to achieve permanency goal.* Timely decision making regarding TPR- agency to send packet to AG within 30 days of establishing plan of adoption.  DFCS to file for children in care 15 of the last 22 months unless legal exception applies/ Prompt efforts to achieve adoption.<br>• *Planning for foster care stability.* Stable foster care placements, made according to children's needs/Place in least restrictive setting according to needs in order of relatives, foster home in proximity to home, foster home outside child's community, group home and institution/No child < 10 years in congregate care without exception/ Meetings to prevent disruptions, and if disruption occurs meet within 5 days regarding appropriateness of new placement and services needed/Only one temporary or emergency placement within foster care episode – child cannot spend more than 12 hours at DFCS or non-residential facility.<br>• *Using caseworker visits in individual case planning.* Weekly contacts with therapeutic foster parents and twice monthly visits with children, one in placement setting/ Frequent visits of high quality between caseworker and children/ Visits between the worker and child occur twice monthly regardless of whether child is being supervised by DFCS or a provider. Visit must be made to the child's placement and worker must meet separately with the child/Children in Therapeutic Foster Care (TFC) are to be visited by the TFC provider every 2 weeks/Worker to meet frequently with child's biological parents and at least monthly/Visits are made during 1st month child is in care and after any change in placement to assess child's adjustment.<br>• *Planning for case closure.*  Final discharge meeting to be held before case closure/Children discharged from TFC to have follow up services agreed upon by the team |

| ACTIVITY | WHERE IN THE LIFE OF THE CASE | PRACTICE GUIDANCE |
|---|---|---|
| *Link services to individual strengths and needs of each relevant family member* | • Assessment<br>• Prior to developing case plan<br>• At caseworker visits & FTMs<br>• When family's situation changes | • Use caseworker visits, FTMs, & other case planning meetings/activities to identify individual strengths & needs of family members & match services to strengths & needs<br>• Review & use information from safety assessment, strengths & needs assessment, all case record information, reports from providers<br>• Review IL and TL needs/plans to identify and match  individual  IL services<br>• Identify & locate all relevant family members whose needs/services should be addressed<br>• Identify needs of all relevant individual family members<br>• Collaborate with family members to determine which services are most appropriate for their needs/Identify services before considering the availability of services.<br>• Identify services in collaboration with child and family that will best meet identified needs. |
| *Address individual strengths & needs in case plans* | • At case plan development<br>• At case plan updates<br>• When the | • Prepare children/families to participate in case plan meetings by explaining what will happen, importance of plan, encourage to consider their strengths, needs, & service preferences<br>• Ensure active participation in case planning meetings & activities by family members |

PAGE 1

| | child's or family's situation changes | • Facilitate FTMs by encouraging family/child input on strengths/needs and identifying service needs, preferences for providers, and locations of services.<br>• Identify relevant cultural, tribal, background issues to be considered in mobilizing appropriate services.<br>• Solicit information from child/youth & family members regarding the services they think will best address their needs/preferences for providers & locations<br>• Address strengths/needs/services for relevant non-custodial parents & children who are not the subject of maltreatment reports, in addition to target children & custodial parents<br>• Use information from family members to prepare written case plans & identify permanency (while assuring the agency's responsibilities for protecting the child and achieving permanency)<br>• Document case plans in case record with signatures of family members. |
|---|---|---|
| *Engage with service providers* | • Prior to developing case plan<br>• During FTMs & case reviews<br>• During case monitoring | • Identify service providers that meet family's needs/preferences/locations/cultural concerns<br>• Obtain necessary releases of information forms from youth/parent/service provider.<br>• Include relevant service providers in FTMs with permission of child/family<br>• Ensure providers tailor services to, incl frequency, intensity, level, & location of services, e.g., through specific service referrals/expectations, monitoring of services, linking payment to service delivery<br>• Ensure that residential care services to children and youth are based on the child/youth's individual needs rather than standard service programs<br>• Contact service providers frequently for reports on child/family's participation in services and progress toward goals/require written reports specific to referral needs<br>• Advise service providers of any significant changes affecting delivery of services.<br>• If services are not available to address the family's unique needs, work with the service provider to develop needed services or identify another provider. |
| *Use caseworker visits in individualizing case plans* | • Caseworker visits | • Hold individual visits with family members at required intervals or more frequently if indicated/visit privately with children in placement/discuss child's needs with foster parents<br>• Discuss progress toward goals, emerging issues, changes/identify needs for changes in service delivery with family members or changes in goals/activities/steps in case plans<br>• Determine need to convene FTM or involve service providers in discussions |
| *Conduct individualized case planning outside of FTMs* | • At case plan development & reviews<br>• Caseworker visits | • When FTMs are not possible/appropriate, meet with individual family members or smaller groups of family members to plan for services/Use same approaches as in FTMs<br>• Inform family members that meetings/interviews are for developing case plans<br>• Document input of all family members in completed case plans/share & obtain signatures |
| *Monitor case plans & revise as needed* | • Re-assessm't<br>• Case plan reviews<br>• Caseworker visits<br>• Case plan monitoring<br>• FTMs | • Meet with the family and child at required intervals/more frequently if needed/ Ask child and family members if they are participating in the service(s) identified in the plan; evaluate effects of services on identified needs/progress toward goals<br>• Review case plans at least quarterly for ongoing appropriateness of permanency goals/outcomes/activities/steps/time frames<br>• Review re-assessments/services reports/information from family to determine if TPR petitions should be filed at 15 of 22 months or earlier or if an exception is applicable<br>• Meet with family/children/youth to discuss intent to file for TPR<br>• Review youth with goals of emancipation to determine if other goals have been ruled out or may now be appropriate to pursue<br>• Have frequent contact with service providers to ensure individualized service delivery/expected progress & identify needs for changes in services or method of delivery<br>• Determine need to consider revising case plan and/or services<br>• Convene FTMs or conduct individualized case planning to make needed changes to case plans in order to reflect individual strengths/needs/goals – Document case plan revisions |
| *Link ongoing case planning to individual strengths & needs* | • Case monitoring<br>• Case plan updates<br>• Re-Assessm't | • Use re-assessments to re-evaluate strengths & needs of family members, based on changing circumstances, progress in achieving goals, emerging issues<br>• Evaluate with family, foster caretakers, service providers continuing responsiveness & relevance of current services in achieving designated permanency goals, resolving needs<br>• Make indicated changes to services jointly with family members/providers |

PAGE 2