IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION


OLIVIA Y., *et al*.                                                    PLAINTIFFS


v.                                                    CIVIL ACTION NO.  3:04CV251LN


HALEY BARBOUR, as Governor of the State of Mississippi, *et al.*          DEFENDANTS

---

**THE COURT MONITOR'S NOVEMBER 23, 2010 REPORT TO THE COURT
REGARDING THE JUNE 10, 2010 AGREED ORDER FOR CORRECTIVE ACTION**

---

**Table of Contents, Report Narrative,
Index to Exhibits, and Appendix: Exhibits 1 - 45**


**November 23, 2010**

# TABLE OF CONTENTS

I.     INTRODUCTION AND SUMMARY OF FINDINGS ...............................................2

II.    BACKGROUND ........................................................................................................6

III.   THE JUNE 10, 2010 AGREED ORDER ....................................................................9

IV.    METHODOLOGY ....................................................................................................11

V.     FINDINGS ................................................................................................................12

   June 10, 2010 Agreed Order, ¶3 ...............................................................12
    Status of Progress, Agreed Order ¶3 ...........................................................12
   June 10, 2010 Agreed Order, ¶4 ...............................................................14
    Status of Progress, Agreed Order ¶4 ...........................................................14
   June 10, 2010 Agreed Order, ¶5 ...............................................................15
    Status of Progress, Agreed Order ¶5 ...........................................................15
   June 10, 2010 Agreed Order, ¶6 ...............................................................17
    Status of Progress, Agreed Order ¶6 ...........................................................17
   June 10, 2010 Agreed Order, ¶7.a. ...........................................................18
    Status of Progress, Agreed Order ¶7.a. ........................................................18
   June 10, 2010 Agreed Order, ¶7.b.i. ..........................................................23
    Status of Progress, Agreed Order ¶7.b.i. ......................................................23
   June 10, 2010 Agreed Order, ¶7.b.ii. .........................................................26
    Status of Progress, Agreed Order ¶7.b.ii. .....................................................26
   June 10, 2010 Agreed Order, ¶7.b.iii. ........................................................27
    Status of Progress, Agreed Order ¶7.b.iii. ....................................................27
   June 10, 2010 Agreed Order, ¶¶7.c.i., ii., and iii. ......................................34
    Status of Progress, Agreed Order ¶¶7.c.i., ii., and iii. ..................................34
   June 10, 2010 Agreed Order, ¶7.d.i. ..........................................................36
    Status of Progress, Agreed Order ¶7.d.i. ......................................................36
   June 10, 2010 Agreed Order, ¶7.d.ii. .........................................................37
    Status of Progress, Agreed Order ¶7.d.ii. .....................................................37
   June 10, 2010 Agreed Order, ¶7.d.iii. ........................................................38
    Status of Progress, Agreed Order ¶7.d.iii. ....................................................38
   June 10, 2010 Agreed Order, ¶7.e. ............................................................39
    Status of Progress, Agreed Order ¶7.e. ........................................................39
   June 10, 2010 Agreed Order, ¶7.f.i. ...........................................................42
    Status of Progress, Agreed Order ¶7.f.i. .......................................................42
   June 10, 2010 Agreed Order, ¶7.f.ii.a. ........................................................46
    Status of Progress, Agreed Order ¶7.f.ii.a. ...................................................46
   June 10, 2010 Agreed Order, ¶7.f.ii.b. ........................................................48
    Status of Progress, Agreed Order ¶7.f.ii.b. ...................................................48
   June 10, 2010 Agreed Order, ¶7.f.iii.a. .......................................................48
    Status of Progress, Agreed Order ¶7.f.iii.a. ..................................................49

June 10, 2010 Agreed Order, ¶7.f.iii.b.................................................................49
    Status of Progress, Agreed Order ¶7.f.iii.b. .................................49
June 10, 2010 Agreed Order, ¶7.f.iv.a.................................................................50
    Status of Progress, Agreed Order ¶7.f.iv.a. .................................50
June 10, 2010 Agreed Order, ¶7.f.iv.b.................................................................51
    Status of Progress, Agreed Order ¶7.f.iv.b. .................................51
June 10, 2010 Agreed Order, ¶7.g. ......................................................................52
    Status of Progress, Agreed Order ¶7.g. ........................................52
June 10, 2010 Agreed Order, ¶7.h. ......................................................................59
    Status of Progress, Agreed Order ¶7.h. ........................................59
June 10, 2010 Agreed Order, ¶8. .........................................................................62
    Status of Progress, Agreed Order ¶8. ...........................................62

VI.     CONCLUSION.................................................................................................63

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION


OLIVIA Y., *et al*.                                        PLAINTIFFS


v.                                        CIVIL ACTION NO.  3:04CV251LN


HALEY BARBOUR, as Governor of the State of Mississippi, *et al.*        DEFENDANTS

---

**THE COURT MONITOR'S NOVEMBER 23, 2010 REPORT TO THE COURT
REGARDING THE JUNE 10, 2010 AGREED ORDER FOR CORRECTIVE ACTION**

---

This report summarizes the Court Monitor's ("Monitor") findings regarding the extent to which defendants' actions comport with their obligations under the June 10, 2010 Agreed Order ("Agreed Order"), which also is referred to as the "Bridge Plan."  A draft copy of this report was provided to the parties for review and comment on November 9, 2010.  All written comments regarding the draft were submitted to the Monitor by November 16, 2010.  The Monitor has considered the parties' comments, and to the extent appropriate, addressed them in this revised report.

The report is divided into six sections.  The Introduction and Summary of Findings section provides contextual data and an overview of the progress that has been made since the time the Agreed Order was approved by the Court.  The Background section describes the structure of the Mississippi Settlement Agreement and Reform Plan ("Settlement Agreement"), approved by the Court on January 4, 2008, and the Agreed Order and presents the relevant

procedural history.  The Methodology section explains the process used by the Monitor to evaluate defendants' progress.  The Findings section presents the Monitor's findings regarding the extent to which defendants' actions comport with their obligations under each provision of the Agreed Order.  The Conclusion is followed by an Appendix that includes the report's exhibits, which, as appropriate, have been redacted in the final version of the report to delete information that falls within the purview of the August 5, 2004 Confidentiality Order.[1]

## I.  <u>INTRODUCTION AND SUMMARY OF FINDINGS</u>

The Settlement Agreement is intended to help ensure the safety and well-being of the children in defendants' custody as well as their placement in permanent and nurturing homes.  It mandates a five-year reform process that measures progress through requirements that are developed collaboratively by the parties and the Council on Accreditation ("COA")[2] in a series of annual implementation plans.  Defendants did not meet the majority of requirements imposed by the first implementation plan, and made limited progress toward satisfying many of the requirements in the second implementation plan.  Thereafter, as contemplated by the Settlement Agreement, the parties reached agreement on the terms of a four-month corrective action plan. The corrective action plan was approved by the Court in the Agreed Order.  This report describes defendants' progress toward meeting the requirements of the Agreed Order.

The Agreed Order obligated the defendants to satisfy a series of requirements, including a narrow subset of unmet requirements from the first and second implementation plans.  In effect, the requirements in the Agreed Order focus on two inter-related initiatives that are reflected in the Settlement Agreement: 1) building the capacity of the Mississippi Department of Human

---

[1] *See* Confidentiality Order, August 5, 2004.
[2] COA is an independent, non-profit, accrediting organization that accredits human services entities, including public sector child and family services agencies.

Services ("MDHS") Division of Family and Children's Services ("DFCS") to implement the reforms required by the Settlement Agreement; and 2) instituting certain immediate safeguards to address child safety while the reform process is underway.  In stark contrast to their prior performance, defendants satisfied most of the Agreed Order's requirements on a timely basis. Moreover, in nearly all of the instances in which defendants' performance fell short, there was demonstrable progress coupled with recognition of and a credible effort to address shortcomings in performance.

The Agreed Order's capacity building requirements address policy development, data collection and reporting, staffing increases, training, and contracting for a fiscal assessment and a related strategic plan to maximize federal funding.  Other requirements relate to planning for the expansion of the DFCS workforce as well as for mandated improvements in both the array and the quality of services and placements that are available for the children in defendants' custody. The lynchpin of these capacity building initiatives is a requirement for the defendants to contract with the Center for the Support of Families ("CSF") for technical assistance in management and planning activities.

As capacity building initiatives were undertaken, the Agreed Order obligated the defendants to take specified corrective action measures related to child safety.  Thus, during the corrective action period, defendants were required to identify the children in DFCS custody who were placed with relative caregivers and, on an expedited basis, license all of the unlicensed relative placements or waive non-safety related licensure requirements for those placements with caretakers who had prior evidenced maltreatment reports.  If licensure or waiver were inappropriate, defendants were obligated to move the child to a licensed placement by a date certain.  In addition, the Agreed Order called for the defendants to identify the children in

3

custody who received intensive in-home services during a specific time period and to provide therapeutic services to those children whose services were discontinued for non-therapeutic reasons.  Finally, the Agreed Order mandated that defendants develop a training program for maltreatment investigations and deliver the training on a statewide basis to all caseworkers who are assigned to conduct the investigations.

The evidence shows that the defendants satisfied most, but not all, of the Agreed Order's requirements on a timely basis.  For example, with the technical assistance provided by CSF, defendants filled 16 critical management and line staff positions; issued a Request for Proposals ("RFP") related to an assessment of the Mississippi Automated Child Welfare Information System ("MACWIS"); developed, validated, and produced a large number of data reports related to DFCS operations and performance; designed a training curriculum for maltreatment investigations and safety plans; formulated strategic plans for the development of mental health and reunification services as well as for the recruitment and retention of therapeutic and non-therapeutic resource home placements; and contracted for a fiscal assessment and plan to maximize federal revenue streams.

As this report documents, there were some instances in which defendants made demonstrable progress, but ultimately did not satisfy specific requirements in the Agreed Order. In these cases, defendants are working to address the shortcomings in their performance.  For example, defendants developed required policy and practice guides, but they still are undergoing a review and revision process to ensure conformity with the Settlement Agreement's requirements.  Additionally, since June 2010, over 700 DFCS staff participated in maltreatment investigation training sessions; however, defendants did not provide the complete required training program to all staff assigned to conduct maltreatment investigations.  Efforts are

4

underway to ensure all staff receive the requisite training in the near term. Similarly, the defendants recognize and are working to address limitations in the staff recruitment and retention plan that was submitted pursuant to the Agreed Order. Although this plan improved upon defendants' Period 1 and 2 submissions, it had substantial shortcomings.

Defendants also made significant efforts to identify all children in unlicensed relative homes, a predicate to satisfying the Agreed Order's licensure requirements, but they were unable to do so because they did not make adjustments for known limitations in DFCS's information management systems. Nonetheless, during the corrective action period, an expedited licensure process for relative placements was developed and many, but not all, placements subject to the requirements of the Agreed Order were licensed. The evidence shows that following the conclusion of the Bridge Period, the licensure process was strengthened. Moreover, defendants began to address the systemic issues that have affected their ability to identify accurately all unlicensed relative placements. Currently, the licensure of relative placements has become an operational priority for DFCS managers who have begun to hold staff accountable for meeting licensure requirements on an expedited basis. This is an important achievement.

The information presented in this report is intended to provide an understanding of the factors that have contributed to defendants' progress as well as the limitations that have resulted in shortcomings in their performance during the corrective action period mandated by the Agreed Order. The evidence shows that during the corrective action period, the defendants made demonstrable progress, which led to significant accomplishments. Defendants' efforts to implement the requirements of the Agreed Order have been bolstered by the technical assistance provided through CSF. And, as this report documents, in the instances in which defendants' efforts have fallen short, their performance has been undercut by significant deficiencies in

5

planning processes and/or by the failure to recognize and make adjustments for limitations in DFCS's administrative and management systems.

## II. <u>BACKGROUND</u>

The Settlement Agreement includes standards and outcomes the defendants are required to satisfy by January 4, 2013, through an incremental remedial process that measures progress in terms of annual benchmarks and interim milestones. Annual implementation plans, which the parties are required to develop jointly, are incorporated into the Settlement Agreement. These plans enable the Court and the parties to measure progress over discrete time periods, according to clearly defined standards.

The first implementation plan, referred to as the Period 1 IP, extended from January 4, 2008 to April 30, 2009.[3] As detailed in the Monitor's June 2009 report, the pace of progress during Period 1 did not meet the Settlement Agreement's requirements.[4] For this reason, the report noted that the defendants would need to accelerate and intensify their efforts to achieve the required systemic reforms within the Settlement Agreement's five-year timetable. Because the MDHS DFCS had a relatively new and promising leadership team, the Monitor concluded that substantial progress during Period 2 was likely if the reform initiative was resourced adequately and managed appropriately.[5]

---

[3] The parties filed a joint motion to extend the time to file the Period 2 Implementation Plan [hereinafter Period 2 IP]. Agreed Motion for Consent Order Extending Time to File the Year Two Implementation Plan, December 30, 2008. In a consent order filed on January 6, 2009, the court enlarged the deadline for filing the Period 2 IP to April 1, 2009 and extended the term of the Period 1 IP until such time as the Period 2 IP was signed by the parties and incorporated into the Settlement Agreement. Consent Order, filed January 6, 2009 ¶¶6-7. A March 27, 2009 consent order further enlarged the deadline for filing the Period 2 IP to May 1, 2009.

[4] *The Court Monitor's Report to the Court Regarding Defendants' Progress toward Meeting Period-1 Requirements* [hereinafter June 2009 Report], filed June 5, 2009, at 2. There were no contested factual issues related to the June 2009 Report.

[5] *Id.*

6

Period 2 began on May 1, 2009 and ended on April 30, 2010.  An outline of the Monitor's preliminary findings related to Period 2 was submitted to the parties during February 2010.  The outline indicated that the majority of the Period 2 requirements subject to assessment by the Monitor were not satisfied.[6]  On September 8, 2010, the Monitor filed a final report on defendants' progress toward meeting Period 2 requirements.[7]  The report recognized that the five-year remedial process mandated by the Settlement Agreement was beyond the halfway mark.  It noted that although the defendants made progress in several key areas,[8] when viewed in the broader context of the required reform effort, both the pace and the breadth of defendants' progress were inconsistent with the Settlement Agreement's requirements.[9]  As detailed in the report, the defendants' efforts to satisfy specific Period 2 requirements were belated, and with respect to some matters, they were not minimally adequate.[10]  In a few instances, there was no evidence that the defendants made credible efforts to comply with specific requirements by the end of Period 2, including requirements that should have been satisfied during Period 1.[11]  For these and other reasons described in the report, the Monitor concluded that many of the basic

---

[6]  The outline did not address Period 2 requirements related to the COA standards that are incorporated into the Settlement Agreement.  In the first instance, defendants' performance with respect to the COA standards is subject to review and assessment by COA.  *See, e.g.,* Settlement Agreement §III.A.  As noted *infra* note 8, by the end of Period 2, COA found that defendants' written submission satisfied all outstanding Period 1 accreditation standards and with very few exceptions, all of the Period 2 accreditation standards.

[7]  *The Court Monitor's Report to the Court Regarding Defendants' Progress Toward Meeting Period 2 Requirements* [hereinafter September 2010 Report], filed September 8, 2010.  There were no contested factual matters related to the September 2010 Report.

[8]  The September 2010 Report describes defendants' progress in the following areas: 1) reorganizing and restructuring DFCS under a new management team with a workforce deeply committed to serving the children in defendants' custody, *id.* at 165; 2) obtaining critically needed appropriations to subsidize increases in caseworker and supervisory staffing levels, *id.* at 23-24; 3) satisfying 35 unmet Period 1 COA standards, and, with few exceptions, also satisfying 146 required Period 2 COA accreditation standards, by producing timely and appropriate written submissions to COA, *id.* at 135-164; and 4) implementing some, but not all, of the required initiatives intended to ensure child safety, s*ee, e.g., id.* at 76-78, 96-111.

[9]  *Id.* at 165.

[10]  *Id.* at 5-7.

[11]  *See, e.g., id.* at note 11.

7

tools needed to manage and promote the reform effort, and thereby provide a reasonable assurance the Settlement Agreement's requirements would be met, were not in place.[12]

On April 9, 2010, pursuant to §VII.B. of the Settlement Agreement,[13] following the issuance of the Monitor's February 10, 2010 preliminary findings related to Period 2, plaintiffs provided defendants with written notice of noncompliance with the Settlement Agreement and the Period 2 IP. Thereafter, as contemplated by the Settlement Agreement, the parties finalized an agreement related to corrective action, which, as noted above, is referred to as the "Bridge Plan." The Court approved the agreement in the Agreed Order. Pursuant to the Agreed Order, the defendants were required to complete specified corrective action measures between May 1 and September 1, 2010.[14] This corrective action period is referred to as the "Bridge Period."[15]

According to the terms of the Agreed Order, if plaintiffs determine that the defendants complied substantially with the Agreed Order, the parties are required to negotiate the terms of the Period 3 Implementation Plan ("Period 3 IP").[16] However, in specified emergency circumstances, or if plaintiffs determined defendants were not complying substantially with any provision of the Agreed Order, they could, without further notice, proceed with enforcement

---

[12] *Id.* at 7.

[13] This provision states:

> If Plaintiffs believe that Defendants have failed to comply with any obligation under this Plan or an annual implementation plan, Plaintiffs will, prior to seeking judicial action to enforce the terms of this Plan or an annual implementation plan, give written notice of non-compliance to the State. Within 30 calendar days of Plaintiffs' notice of non-compliance, Defendants shall submit a written response to Plaintiffs. Plaintiffs agree to work in good faith with the State to agree on necessary corrective actions and avoid enforcement action, and may not initiate court action for 60 days from the date of Plaintiffs' non-compliance notice. However, in case of an emergency posing an immediate threat to the health or safety of youths, Plaintiffs may omit the notice and cure requirements herein before seeking judicial action.

Settlement Agreement §VII.B.

[14] Agreed Order at ¶2.

[15] *Id.*

[16] *Id.* at ¶9.

action.[17]  The Agreed Order also recognized that plaintiffs could proceed with an enforcement

action for any violation of Period 2 requirements following the conclusion of the Bridge Period

or following initiation of any enforcement action related to any provision of the Agreed Order or

related to specified emergencies.[18]  On October 5, 2010, plaintiffs filed a motion requesting the

Court find defendants in noncompliance with and hold them in contempt for failing to implement

the terms of the Settlement Agreement and the Period 2 IP.[19]  The motion, which also requests

that the Court appoint a receiver to administer DFCS, currently is pending before the Court.

### III.  THE JUNE 10, 2010 AGREED ORDER

As noted above, the Agreed Order includes a series of corrective action measures which

the defendants were required to satisfy according to a prescribed schedule of deadlines staggered

between May 1 and September 1, 2010.  Conceptually, this Bridge Period was intended to serve

as a bridge between Period 2 and Period 3.  The requirements of §I.A.-B. of the Settlement

Agreement were deferred during the Bridge Period.[20]  By its terms, the Agreed Order requires

defendants to demonstrate the capacity to implement a narrow subset of unmet Period 2

requirements.  Pursuant to the Agreed Order, the Monitor was required to file an interim report

on her findings regarding the extent to which defendants' actions comported with their

obligations.[21]  The Monitor's interim report was filed on July 23, 2010.[22]  The interim report

concluded that the defendants had made very significant progress toward meeting requirements

in the Agreed Order on a timely basis.[23]

---

[17] *Id.* at ¶10.
[18] *Id.* at ¶11.
[19] Plaintiffs' Motion for Contempt and for the Appointment of a Receiver, filed October 5, 2010.
[20] Agreed Order at ¶2.
[21] *Id.* at ¶8.
[22] *The Court Monitor's Status Report to the Court Regarding the June 10, 2010 Agreed Order for Corrective Action* [hereinafter July 2010 Report], filed July 23, 2010.
[23] *Id.* at 6.

The Agreed Order requires defendants to make progress toward building the capacity that is necessary to implement the reforms required by the Settlement Agreement. In addition, it requires the defendants to begin to implement certain safeguards in the Settlement Agreement related to child safety while the reform process is underway. Thus, during the Bridge Period, the defendants were obligated to satisfy the following requirements: 1) contract with CSF for technical assistance in management and planning activities and for a fiscal assessment related to federal funding;[24] 2) fill 16 critical line staff and management positions at DFCS;[25] 3) issue an RFP related to an assessment of MACWIS;[26] 4) produce various data reports related to certain specifications;[27] 5) develop the curriculum and a corresponding implementation plan for a statewide caseworker training program related to maltreatment investigations and safety plans and conduct the training by a specified date;[28] 6) complete a series of practice guides, protocols and policies;[29] 7) develop statewide resource development plans with specified implementation schedules;[30] 8) implement measures to address the placement of foster children in unlicensed relative homes;[31] 9) provide alternative therapeutic care to foster children who received intensive in-home services that were terminated for non-therapeutic reasons;[32] 10) develop and begin implementing a detailed plan to recruit and retain sufficient DFCS professional and support staff

---

[24] Agreed Order at ¶¶3, 5.
[25] Id. ¶¶4, 7.f.iii.a. The hiring requirements relate to management, training, information technology, data analysis, and quality improvement positions.
[26] Id. ¶6.
[27] Id. ¶7.a.
[28] Id. ¶7.b.
[29] Id. ¶¶7.c.-d.
[30] Id. ¶7.e.
[31] Id. ¶7.f.
[32] Id. ¶7.g.

to comply with caseload requirements;[33] and 11) submit periodic written reports to plaintiffs'

counsel and the Court Monitor on the status of compliance with the terms of the Agreed Order.[34]

The extent to which defendants' actions comported with these obligations is described in

Section V of this report.

## IV. **METHODOLOGY**

The Monitor's assessment of the extent to which defendants' actions comported with the

obligations imposed by the Agreed Order included interviews with MDHS and DFCS managers,

supervisors, caseworkers, and contractors, including consultants from CSF and private service

providers.[35]  Relevant documents, memoranda, and other records maintained by MDHS/DFCS

were reviewed and analyzed, including the following: electronic case records for resource

families and children in foster care and their biological parents; staffing and personnel data; RFPs

and other contract documents; the maltreatment investigation training plan and curriculum as

well as related training records, such as sign-in sheets and tracking reports; data reports generated

from MACWIS and records of defendants' data validation activities; practice guides and revised

sections of the DFCS policy and procedure manual; assessment reports and related resource

development plans; data regarding unlicensed relative placements, including records concerning

defendants' efforts to identify unlicensed relative placements, MACWIS reports, licenses,

management directives, and related policy documents; data related to the delivery of intensive in-

home services, including records related to defendants' efforts to identify the cohort of children

who received these services, provider enrollment lists, and program discharge summaries; a

workforce development plan; and defendants' status report submissions.  In addition to these

---

[33]  *Id.* ¶7.h.
[34]  *Id.* ¶8.
[35]  Most interviews were conducted on an in-person basis.  However, structured telephone interviews were conducted with 12 managers who serve as DFCS regional directors.

activities, the Monitor attended a DFCS Bridge Plan management committee meeting and consulted with an expert in child welfare systems.[36]

## V. __FINDINGS__

The Monitor's findings related to the extent to which defendants' actions comport with their obligations under the Agreed Order follow below.  All requirements are set out *verbatim* in bold type-face.  The Monitor's findings are summarized in the narrative that appears below the entry for each requirement.

> **June 10, 2010 Agreed Order, ¶3**
> 3.  **Defendants will immediately contract with the Center for the Support of Families ("CSF") for additional technical assistance in management and planning activities associated with meeting the requirements of the Settlement Agreement.**

__Status of Progress, Agreed Order ¶3:__  The Agreed Order required the defendants to bolster their management and planning capacity by contracting with CSF for technical assistance.  As explained below, the required contract with CSF was finalized and implemented as required by this subsection.

Defendants had an existing contractual relationship with CSF that began during early 2009 when CSF was engaged to develop a practice model and implementation plan to serve as a framework for improving the quality of casework.  A CSF executive manager, Jerry Milner, developed the practice model, which is intended to promote child safety, permanency, and well-being through integrated processes that guide casework.  Legal requirements related to DFCS case practice, including requirements imposed by the Settlement Agreement, are infused into the model.  The design and implementation plan for the practice model and recommendations about the infrastructure necessary to support the practice model were incorporated into a report that

---

[36] The Monitor engaged Judith Meltzer, the co-director of the Center for the Study of Social Policy in Washington, D.C., to provide consultative services related to this project.  Ms. Meltzer is an expert in child welfare systems.  *See* www.cssp.org.

CSF issued in late September 2009.[37]  At the time the Agreed Order was negotiated, Mr. Milner and other consultants from CSF were working with the defendants on the initial implementation of the practice model in two of DFCS's 13 regions.[38]

During the negotiation process related to the Agreed Order, defendants modified the then-existing MDHS contract with CSF in order to obtain the required additional technical assistance associated with meeting the requirements of the Settlement Agreement.[39]  The modification was effective on May 17, 2010.[40]  It provides for technical assistance related to the following primary initiatives: 1) increasing the capacity of MDHS/DFCS State Office child welfare staff to implement and achieve the goals of the Settlement Agreement and practice model;[41] 2) developing a strategic implementation plan for achieving the requirements of the Settlement Agreement;[42] 3) formulating internal and external communications plans;[43] 4) strengthening the accuracy of data reports and indicators related to practice model and Settlement Agreement implementation;[44] 5) delivering training related to child safety and revising and strengthening the safety plans used for investigations related to reports of child

---

[37]  Mississippi Practice Model, Final Report [hereinafter Practice Model Report], September 25, 2009.

[38]  *See* September 2010 Report at 8-9 for additional background information related to the practice model.  Currently, defendants are implementing the practice model in two of DFCS's 13 regions and engaging in pre-implementation planning activities in two other regions.  As noted in the Monitor's September 2010 Report, the practice model is the centerpiece of defendants' reform strategy and it represents the first credible plan of action for improving the quality and consistency of case practice.  However, the plan will not be usable without the basic administrative and management tools and other resources that are required by the Settlement Agreement.  Moreover, the phased-in 48-month implementation schedule for the practice model that defendants adopted during late 2009 is inconsistent with the Settlement Agreement's five-year timetable.  *Id.*

[39]  Ex. 1, Modification #1 to the Agreement By and Between Mississippi Department of Human Services and Center for the Support of Families.

[40]  *Id.* at 1.

[41]  The contract requires CSF to review the functionality of the MDHS State Office child welfare units, conduct a management session on strategic planning and defining areas of responsibility, recommend revisions to the organizational chart and position functions, provide ongoing one-on-one mentoring and guidance to management staff, and recommend elements of performance appraisals.  *Id.* at 15-16.

[42]  Among other activities, the contract requires CSF to assist with establishing a process for managing activities across DFCS as well as tracking and reporting to plaintiffs' counsel and the Monitor on progress.  *Id.* at 16.

[43]  *Id.*

[44]  Also included is assistance with development of a data dashboard and a performance improvement process.  *Id.* at 18.

maltreatment;[45] 6) providing technical assistance related to resource development and support with systemic issues, including development of a statewide resource development plan incorporating the service-related requirements of the Settlement Agreement;[46] and 7) strengthening the DFCS regional leadership capacity.[47]

The technical assistance provided by CSF during the Bridge Period was instrumental in facilitating defendants' efforts to satisfy many of the Agreed Order's requirements on a timely basis. CSF consultants were able to work with the defendants to develop an overall administrative process that was used on an ongoing basis to organize, manage, and track progress toward meeting the Agreed Order's requirements.[48]

> **June 10, 2010 Agreed Order, ¶4**
> 4. **Beginning immediately and no later than September 1, 2010, Defendants, after consultation with CSF, will employ persons to fill the following positions as described in CSF's March 25, 2010, proposal at pages 2-3:**
>     a. **Field Operations Director;**
>     b. **Policy Director;**
>     c. **Resource Development Director;**
>     d. **Training Director;**
>     e. **Child Welfare Practice Specialist;**
>     f. **MACWIS staff consisting of a Senior Business Analyst, Business Systems Analyst I, and Systems Administrator II;**
>     g. **Data Analyst;**
>     h. **Four CQI Positions; and,**
>     i. **Two Practice Model Coaches/Trainers.**

**Status of Progress, Agreed Order ¶4:** The 15 targeted positions were filled in consultation with CSF, on a timely basis, generally through a competitive process.

During the negotiation of the Agreed Order, CSF presented a proposal which addressed recommendations related to the key positions defendants would need to fill in order for the

---

[45] *Id.* at 19.
[46] The contract requires CSF to provide assistance with negotiation of plans and agreements between MDHS and other public agencies such as the Mississippi Division of Medicaid, the Mississippi Department of Mental Health, and the Mississippi State Department of Health, for collaborating in funding of needed services; developing and implementing a recruitment and retention plan for foster family homes; assistance with licensing and approval processes for foster family and adoptive homes; and the development of policy and a training plan. *Id.* at 20-22.
[47] The contract requires CSF to provide technical assistance to DFCS regional directors in the use of management tools such as data reports, performance appraisals, and program improvement plans. *Id.* at 22.
[48] This process is described in the narrative related to ¶8 of the Agreed Order *infra* pp. 62-63.

14

additional technical assistance provided by CSF to succeed. These recommendations included the 15 positions identified by this subsection. The positions were filled in consultation with CSF through a combination of new hires, lateral transfers, promotions, and a demotion.[49] This was a significant accomplishment. As explained below, a number of these staff members already have made demonstrable contributions to the remedial process.

> June 10, 2010 Agreed Order, ¶5
> 5. **By September 1, 2010, Defendants will modify their contract with CSF to include the federal fiscal assessment as described in section I.7.a of the Period 2 Annual Implementation Plan.**

**Status of Progress, Agreed Order ¶5:** As required by the Agreed Order, defendants contracted with CSF on a timely basis for the fiscal assessment required by the Period 2 IP. The relevant background is explained below.

Because the required fiscal assessment was not performed during Period 1,[50] pursuant to the Period 2 IP, the defendants were required to contract for an external assessment of actual and anticipated funding levels and for the development of a plan to establish the resources and infrastructure necessary to maximize the amount of federal funds received by MDHS.[51] As detailed in the Monitor's September 2010 Report,[52] defendants issued an RFP for the required assessment during the time period in which the Agreed Order was being negotiated. In order to promote efficiencies and maximize the efficacy of the assessment, the Monitor suggested that the

---

[49] The field operations director, training director, and two of the three required MACWIS staff were newly hired employees.

[50] Settlement Agreement §II.A.7.a.; *see also* June 2009 Report at 56.

[51] Period 2 IP §I.7.a states:
> I. Administration and Management Implementation Steps
> 7. Financial Management
> a. By January 1, 2010, Defendants shall contract for an external assessment, to be conducted by a qualified independent consultant, of actual and anticipated federal funding levels, and for the development of a plan to establish the resources and infrastructure necessary to maximize the amount of federal funds received by the State. The selection of this qualified independent consultant shall be subject to approval by the Monitor.

[52] September 2010 Report at 68-69.

parties consider incorporating the fiscal assessment into the technical assistance addressed by the Agreed Order. The parties agreed with the Monitor's suggestion, and thus the Agreed Order included this subsection.[53]

The MDHS contract with CSF for the fiscal assessment and related plans was finalized in late August 2010 and effective on September 1, 2010.[54] The contract contemplates that CSF will subcontract with Hornby Zeller, an organization with substantial expertise in financial/fiscal assessment,[55] to perform the following activities: 1) assess MDHS/DFCS policies, procedures, and practices that relate to or impact securing, increasing and/or maximizing federal funding/reimbursement; 2) analyze federal funding/reimbursement that has been received as well as anticipated levels of funding/reimbursement; 3) analyze practices and fiscal policies; and 4) develop recommendations as well as an implementation plan related to revenue maximization.[56] CSF subcontracted with Hornby Zeller promptly after the contract with MDHS was finalized. Thereafter, and at their own initiatives, representatives from CSF and Hornby Zeller contacted the Monitor to discuss the assessment. Assessment activities were initiated in early September 2010, and they are ongoing. According to the contract, the required implementation plan will be completed no later than April 30, 2011.

In prior reports, the Monitor has emphasized the significance of the fiscal assessment and the associated implementation plan.[57] Unless the defendants develop the resources and infrastructure necessary to maximize federal funding levels, it is likely that the minimum requirements imposed by the Settlement Agreement will not be satisfied, particularly with

---

[53] *Id.*
[54] Ex. 2, Mississippi Department of Human Services Contract for Personal or Professional Services.
[55] *See* http://www.hornbyzeller.com.
[56] Ex. 2, *supra* note 54, at Ex. A, Scope of Services, p. 1-6.
[57] *See, e.g.,* September 2010 Report at 69.

respect to the necessary expansion in the array and improvement in the quality of services afforded to the children in DFCS custody and their families.[58]

> **June 10, 2010 Agreed Order, ¶6**
> 6.  By September 1, 2010, Defendants will issue a request for proposals for a MACWIS assessment as described in section I.5.c of the Period 2 Annual Implementation Plan.

**Status of Progress, Agreed Order ¶6:**  As required by the Agreed Order, on July 27, 2010, defendants issued an RFP that satisfies the terms of the Period 2 IP.[59]  Defendants' progress is summarized below.

The Period 2 IP required defendants to issue an RFP for a comprehensive analysis of MACWIS and its ability to perform the functions required by the Settlement Agreement, including recommendations for the remedial efforts necessary to enable MACWIS to perform as required.[60]  Because the RFP was not issued during Period 2, this requirement was included in the Agreed Order.

The RFP solicits proposals from prospective contractors for services designed to assist DFCS with determining the functional and technical requirements for MACWIS that are necessary to fulfill various legal mandates, including the requirements of the Settlement Agreement.[61]  The scope of services outlined in the RFP provides for the contractor to determine

---

[58]  *Id.* note 234 and related text.
[59]  Ex. 3, Mississippi Department of Information Technology Services, RFP No. 3583.
[60]  Period 2 IP §I.5.c states:
    I.  Administration and Management Implementation Steps
       5.  Information Management and Use
        c.  DFCS shall issue a RFP for the comprehensive analysis of the MACWIS system and its ability to perform the computer functions required by section II.A.5.a of the Settlement Agreement and for recommendations of remedial efforts necessary to enable MACWIS to perform those Settlement Agreement requirements.  DFCS shall undertake all reasonable efforts to expeditiously issue such RFP, which shall issue by September 1, 2009.
[61]  Ex. 3 at §§VII.2., VII.6.1.2.1.-7., VII.6.1.3.-8.

17

whether the current system should be modified, replaced with another system, and if so, with a federally-compliant system from another state or with another replacement option.[62]

Responses to the RFP were due by September 15, 2010.[63]  Defendants report that they have evaluated the responses that were submitted and are in the process of selecting a vendor. Because federal funding will be used to subsidize certain costs associated with the contract, it must be approved by the U.S. Department of Health and Human Services ("HHS"), Administration for Children and Families ("ACF").  Defendants report that at their request, the ACF staff member assigned to this matter has agreed to expedite review of the contract.[64]  For this reason, defendants anticipate the contract will be finalized at some point during the first two months of the 2011 calendar year.[65]  For the reasons detailed in the Monitor's prior reports, it is critical for defendants to meet this timeline.[66]

> June 10, 2010 Agreed Order, ¶7.a.
> 7.  **Beginning immediately and completed no later than September 1, 2010, Defendants, with CSF's assistance, will:**
>     a.  **Provide the reports listed in Exhibit A, attached hereto, to Plaintiffs' counsel and the Federal Court Monitor on the dates specified in Exhibit A and subsequently update each report and provide it to Plaintiffs' counsel and the Federal Court Monitor every 30 days thereafter;**

**Status of Progress, Agreed Order ¶7.a.:**  In part due to historical and pervasive limitations in the accuracy of data reflected in MACWIS reports, and in recognition of the need for more accurate data to assess system performance and measure progress, the Agreed Order required defendants to produce a defined list of 26 data reports at monthly intervals, phased in by

---

[62] *Id.* at §VII.6.1.1.1.

[63] *Id.* at 1.

[64] Defendants report that they have worked on the RFP in consultation with staff in ACF's Division of State Systems [hereinafter DSS].  DSS coordinates ACF initiatives related to statewide automated child welfare information systems [hereinafter SACWIS].

[65] The projected start date reflected in the RFP is January 1, 2011.

[66] *See, e.g.,* June 2009 Report at 52-55.

18

prescribed dates between June 10, 2010 and September 1, 2010.[67]  Defendants produced the requisite reports at the required intervals.[68]  In total, defendants submitted 82 reports during the Bridge Period.[69]

The list of reports required during the Bridge Period was developed during the negotiation of the Agreed Order.  An initial list of reports generated by CSF included those reports that would be essential to initial implementation of the new practice model.  During the negotiation of the Agreed Order, however, the list of required reports was expanded by the parties to address other categories of data.  Although some of the reports required by the Agreed Order are relevant to, and in some cases, closely align with Settlement Agreement requirements, the reports required by the Agreed Order were not, in many cases, designed to reflect or substitute for the Settlement Agreement's required performance measures.  In fact, many of the precise performance measures mandated by the Settlement Agreement are not captured by any of the reports required by the Agreed Order.  Nonetheless, the reports required by the Agreed Order were designed to capture important data regarding core DFCS operations that in many instances can be used to guide management decisions and thereby promote progress toward meeting the Settlement Agreement's performance measures.

Defendants and CSF consultants created a process by which, for each required report, a prototype report was either created, or if a version of the required report already existed in MACWIS, modified, to meet the report specifications outlined in the Agreed Order.  Once created, a small team of DFCS staff and consultants employed a data validation process for each

---

[67]  Agreed Order at Exhibit A.  In most cases, there were pre-existing MACWIS reports that defendants could use or modify to meet the requirements of the Agreed Order.  There were several instances, however, in which new, *ad hoc* reports were generated based upon MACWIS data.

[68]  Ex. 4, chart prepared by the Office of the Court Monitor, Summary of Data Reports Produced During the Bridge Period, cross-referencing the reports required by the Agreed Order with the data reports submitted by defendants during the Bridge Period.

[69]  This total includes monthly updates to the reports, which defendants also were required to produce pursuant to the Agreed Order.

report.[70]  According to defendants, the validation process was designed to determine the
following:

- whether the reports properly capture data when recorded in the
  appropriate MACWIS fields;
- whether the data in MACWIS case files conformed to data captured in
  the reports; and
- whether the information in the case files/reports appeared accurate
  within the context of the case.[71]

Defendants used a team of three people, a DFCS employee and two consultants, to
implement their report validation process.  After the DFCS staff member conducted an initial
technical validation and "acceptance testing" of the reports to ensure that they met the required
report specifications and appeared to be extracting data from the correct MACWIS data fields,
the two consultants on the team probed the content of the data reports.  According to both
consultants involved, one consultant selected a random sample of cases from each data report and
thereafter both consultants compared, for the selected cases, the content of selected data fields in
the MACWIS report against the content of the same data fields in the underlying, individual
MACWIS case records.  Based on this process, the consultants were able to calculate error rates
for each data report and report any findings to the DFCS employee on the team who conducted
the initial acceptance testing.  If any systemic problems were identified, or if the error rate in the
reports was too high, the report would be modified or reprogrammed as necessary, reproduced,
and then revalidated by the consultants.[72]  According to the defendants, their goal was to achieve
an error rate of five percent or less.

---

[70] The data report validation process was designed by CSF in consultation with the defendants.  It is described in a
two-page document.  Ex. 5, Methodology for Validating MACWIS Data Reports.  This process was not used for
validating the two reports defendants submitted regarding caseworker caseloads.  A different DFCS consultant was
responsible for validating certain elements of the caseload data.  This is addressed in greater detail *infra* p. 22.
[71] *Id.*
[72] For example, if the computer code extracting the data was the source of the problem, DFCS programmers would
reprogram the code to make the report accurate.  The reports would be rerun and the data in the new reports would
undergo the validation process.

The report production and data validation activities that occurred during the Bridge Period represent a tremendous amount of work in a relatively short time period. The process that the defendants employed is an essential step in creating an information system that MDHS/DFCS executives and managers can rely upon to inform agency policy and operations. With the reports developed and tested pursuant to the Agreed Order, defendants now can produce a set of reports on certain core agency operations and have confidence that the reports accurately reflect the data maintained in certain MACWIS fields. This is a prerequisite to the ongoing development of MACWIS as a management tool and to eventual improvement in the quality of the data contained in the system.

Despite the structured process that defendants used to validate the data in the reports produced during the Bridge Period, there are some limitations in what the parties and the Court may conclude about the accuracy and completeness of the data in the reports. It appears that the validation methodology was designed primarily to test the internal integrity of the data reports by ensuring that the reports were extracting data from relevant MACWIS case records and from the correct data fields. To the extent that the data contained in individual case records are accurate, so too are the data reflected in the reports containing that data; however, if the data stored in MACWIS records are incorrect, the validation methodology defendants employed would not be able to detect those inaccuracies consistently. For example, during October 2010, in response to the Monitor's inquiries, DFCS staff reported on inaccuracies in the placement data that had been provided to plaintiffs' counsel and the Monitor pursuant to ¶7.f. of the Agreed Order.[73] These inaccuracies involved child placements that were incorrectly entered in MACWIS as "own home" when in fact the child was in a resource home or some other type of DFCS placement as

---

[73] The narrative related to ¶7.f.i. of the Agreed Order describes how these inaccurate data affected defendants' ability to identify certain unlicensed relative placements. *See infra* pp. 42-46.

well as active cases in MACWIS without any placement listed.[74]  In the absence of a process that considers some secondary data source, the data validators would have no way to verify or any cause to question the accuracy of the placement data in these cases.

A second limitation of the methodology is that it does not test the completeness of data reports.  The samples used for validation were selected from the MACWIS reports themselves.  It is conceivable, however, that some relevant cases did not appear in the MACWIS reports either due to system errors or because an active case was not entered into MACWIS.  An assessment of the completeness of the data the system captures would require sample selection from a source that is independent of MACWIS.

Moreover, there were additional, known limitations with one of the data reports defendants produced during the Bridge Period, which related specifically to caseload data.[75]  The Court Monitor's prior reports described the limitations in the MACWIS caseload calculations.[76]  Because these shortcomings have not been corrected, the worker caseload data report produced pursuant to the Agreed Order was based on the same methodology described in the Monitor's prior reports and includes the same limitations.[77]  A DFCS consultant conducted some data validation activity related to the caseload report during the Bridge Period, but it focused specifically on ensuring the accuracy of worker assignment data using secondary data sources.  It did not take into account the accuracy of the caseload calculations presented in the reports that were provided.

---

[74]  Ex. 34, *infra* note 162 and related text.

[75]  *See* MACWIS report titled, "Workers Exceeding Plan Caseload Requirements, June 2010 (May 2010 Workload Data)" and two subsequent monthly updates.

[76]  *See, e.g.,* September 2010 Report at 20-23.  For example, MACWIS over counts caseload minutes for five of the services specified in the Settlement Agreement.

[77]  *Id.*

The limitations described above are not intended to suggest that the validation methodology was flawed.  Rather, it was limited by design in light of the broad scope of the validation effort and the short time period in which to conduct it.  The data report validation that defendants conducted during the Bridge Period will enable them to expand and deepen their efforts to improve the reliability of the data in MACWIS.  It will be important for defendants to begin to use the validated reports to guide agency operations.  Ideally, this will include using the reports to engage staff at the DFCS service delivery level.  These employees are in the best position both to act upon the information and to ensure the completeness and the accuracy of the data contained in MACWIS.  Ultimately, the quality of the data in MACWIS will depend upon these staff members being held accountable for the accuracy and completeness of the data that are input into the system according to clear standards that are codified in DFCS policy.  As set forth in the narrative related to ¶7.f. of the Agreed Order, there is encouraging evidence that the defendants have begun this process.[78]

> **June 10, 2010 Agreed Order, ¶7.b.i.**
> 7.  **Beginning immediately and completed no later than September 1, 2010, Defendants, with CSF's assistance, will:**
>    b.  **Provide training to caseworkers engaged in maltreatment investigations regarding maltreatment investigations as follows:**
>       i.  **By June 30, 2010, develop a curriculum for a statewide training, approved by CSF, regarding how to conduct a maltreatment investigation, develop a safety plan, and implement a safety plan;**

**Status of Progress, Agreed Order ¶7.b.i.:**  The required curriculum was developed on a timely basis.  The relevant background is summarized below.

---

[78] *See infra* pp. 45-46.  In addition, both during and after the Bridge Period, defendants have continued to work to improve operations related to MACWIS in other ways.  For example, in mid-August and early October, defendants issued two technical assistance bulletins notifying MACWIS users of changes to the system.  Ex. 6, MACWIS Technical Assistance Bulletin, August 19, 2010, Issue #6, redacted; Ex. 7, MACWIS Technical Assistance Bulletin, October 6, 2010, Issue #7.  Moreover, defendants have recruited and interviewed candidates for positions in the MACWIS unit in addition to the positions mandated by ¶4.f. of the Agreed Order, and they have continued to make progress on other remediation initiatives described in the September 2010 Report.  *See, e.g.,* September 2010 Report at 63.

The Agreed Order includes requirements related to curriculum development and planning for the delivery of training regarding maltreatment investigations for DFCS staff assigned to conduct the investigations.[79] The requirements related to planning for and the delivery of the training are addressed in the next sections of this report.

The Agreed Order's maltreatment investigative training requirements are rooted in the standards established by the Settlement Agreement,[80] the findings and recommendations of a safety assessment that was conducted by CSF pursuant to the Period 2 IP,[81] as well as in the Monitor's Period 2 findings.[82]  Because the assessment identified key limitations in the investigative process,[83] CSF recommended that DFCS undertake several remedial actions, including the delivery of training to all investigative and resource staff.[84]  In large part, the training requirements of ¶7.b. of the Agreed Order are intended to implement this recommendation.

The curriculum for the investigative training was developed by CSF and sent to the Monitor and plaintiffs' counsel on June 30, 2010.[85]  The curriculum is part of a training program developed by CSF to promote implementation of the practice model.[86]  The curriculum is designed to provide 10 hours of training for workers who investigate reports related to

---

[79]  Agreed Order at ¶¶7.b.i.-iii.

[80]  The Settlement Agreement requires that all allegations of maltreatment of children in custody must be investigated by a caseworker who is trained in the investigation of maltreatment in out-of-home placements. Settlement Agreement §II.B.4.c.

[81]  Period 2 IP §II.2.f.

[82]  The September 2010 Report presented additional evidence related to shortcomings in the investigative process, underscoring the need for defendants to bolster the quality of maltreatment investigations through enhanced training and appropriate management oversight.  September 2010 Report at 77-78 and Ex. 60.

[83]  The limitations identified by CSF are summarized in the Monitor's September 2010 Report.  *Id.* at 76-79.  The report that presents the CSF safety assessment is included as Ex. 29 to the Monitor's September 2010 Report.  The limitations identified by the CSF assessment were consistent with the Monitor's independent findings.  *Id.*

[84]  *Id.* at Ex. 29 p. 130.

[85]  Ex. 8, Child Welfare Practice Model Training, Facilitator's Manual, Child Maltreatment Training, Center for the Support of Families, June 2010, redacted.  The curriculum includes references to a case study which uses fictitious names.  Thus, the names have not been redacted from the curriculum.

[86]  *Id.* at 5.

maltreatment of children in out-of-home settings, which are referred to as resource investigations, and 7.5 hours of training for workers who investigate in-home reports.[87]  The additional 2.5 hours of training for resource investigations expands on the 7.5-hour curriculum in order to provide instruction on additional topics that must be addressed by DFCS investigators and other staff during the course of resource investigations, which are, by their nature, more complex.[88]

The maltreatment investigative training curriculum that was developed by CSF is well-designed and comprehensive.  The 7.5-hour training includes detailed instruction on a revised safety assessment tool, a new safety plan, a revised risk assessment instrument, interviewing, and investigative protocols and practices.  It addition, it provides guidance on how to assess and monitor child safety and risk on an ongoing basis for all children within a home.  Clarification of staff responsibilities throughout the investigative process is incorporated into the training.  The additional 2.5-hour training for resource investigations incorporates relevant substantive requirements derived from the Settlement Agreement[89] as well as the specialized protocols that are applicable to resource investigations.[90]

The facilitator's manual for the maltreatment investigative training represents a well-organized toolkit for trainers.  It provides step-by-step instructions, including conceptual summaries as well as suggestions, training guidance, and other information for trainers to consider in advance of the actual training sessions.  The manual also incorporates a series of

---

[87]  *Id.* at 2, DHS 278720-278740.  Throughout this report, in instances in which a document included in the Appendix as an exhibit does not have page numbers, the numbering system with a DHS prefix is used to identify the page references.

[88]  *Id.* at DHS 278720-278740.

[89]  *See, e.g., id.* at DHS 278720 (corporal punishment, Settlement Agreement §II.B.4.c.); DHS 278723 (assignment of the investigation to a worker outside the county who has been trained in conducting out-of-home investigations, Settlement Agreement §II.B.4.c.; DHS 278727 (alleged victims must be interviewed within 24 hours of receipt of the report of maltreatment, Settlement Agreement §II.B.4.e.).

[90]  *See, e.g., id.* at DHS 278734-278735 (the risk assessment related to resource investigations includes consideration of factors that are not relevant to other investigations).

instructional activities and outlines the core lecture points that must be addressed by the trainers during their presentations.  PowerPoint slides and hand-outs are included in the manual.

> **June 10, 2010 Agreed Order, ¶7.b.ii.**
> 7.  **Beginning immediately and completed no later than September 1, 2010, Defendants, with CSF's assistance, will:**
>     b.  **Provide training to caseworkers engaged in maltreatment investigations regarding maltreatment investigations as follows:**
>         ii.  **By July 16, 2010, finalize a written plan for conducting the trainings specified in 7.b.i. for each region, including identification of the following: the trainers who will conduct the training sessions, the trainees who will attend the training sessions, and the dates for each training session; and**

**Status of Progress, Agreed Order ¶7.b.ii.:**  Defendants produced an ambitious training plan on a timely basis.  However, the plan was not designed to ensure that all caseworkers engaged in maltreatment investigations received the complete training required by this subsection on a timely basis.  Defendants have begun to address this shortcoming.  The training plan is described below.

Defendants submitted the training plan to plaintiffs' counsel and the Monitor on a timely basis.[91]  According to the plan, all DFCS caseworkers, supervisors, and regional directors employed at DFCS as of July 16, 2010 were required to attend the training.[92]  Instead of limiting the training to caseworkers who conduct maltreatment investigations, as required by this subsection of the Agreed Order, defendants elected to provide the training to all caseworkers.  Because the training included a new safety plan as well as revised safety and risk assessment instruments, defendants concluded that all supervisors and regional directors also should receive the training during the Bridge Period in light of their respective supervision and oversight roles.  This expansion in the requirement imposed by the Agreed Order translated into a decision to train 752 employees within a five-week period.

---

[91]  Ex. 9, Maltreatment Investigation Training Plan, 7/16/10, redacted.  The plan was mailed to plaintiffs' counsel and the Monitor on July 16, 2010.
[92]  *Id.* at 1.

Defendants' training plan was clear with respect to the staff required to participate in the maltreatment investigation training. However, the training plan that defendants produced did not account for the additional 2.5-hour training that was required for resource investigations. As of November 16, 2010, a centralized list of all staff who are assigned to conduct resource investigations had not been finalized; however, as explained in the narrative related to ¶7.b.iii., which follows in the next subsection of this report, defendants have begun to address this issue.[93]

The training plan indicates that a CSF consultant would have responsibility for training the DFCS staff members and consultants who were selected to serve as trainers.[94] A schedule for the training sessions in each of DFCS's 13 regions, starting with a train-the-trainer session conducted by the CSF consultant on July 19, 2010 and concluding on August 26, 2010, is presented in the plan. In addition, the plan includes instructions for collecting and processing the sign-in sheets that are used by DFCS to document staff attendance at training sessions.

> **June 10, 2010 Agreed Order, ¶7.b.iii.**
> 7. **Beginning immediately and completed no later than September 1, 2010, Defendants, with CSF's assistance, will:**
>   b. **Provide training to caseworkers engaged in maltreatment investigations regarding maltreatment investigations as follows:**
>     iii. **By September 1, 2010, provide the statewide training to all caseworkers engaged in maltreatment investigations pursuant to the requirements of this subsection;**

**<u>Status of Progress, Agreed Order ¶7.b.iii.:</u>** The evidence shows that during the Bridge Period the defendants trained 97 percent of the staff identified in their training plan as participants in the maltreatment investigation training. However, because defendants were less successful in providing the full investigative training program to all caseworkers assigned to

---

[93] *Infra* p. 34.

[94] Six members of the DFCS training staff and four DFCS consultants with substantial experience as trainers were among the 19 designated trainers. Ultimately, the training was conducted by 14 of 19 trainers listed on defendants' plan. During the course of assessing defendants' performance, the Monitor discovered that the training plan incorrectly listed four state office employees as trainers. These employees had expressed an interest in attending the training, but they were not assigned to serve as trainers. Three of the four employees attended the training. A fifth employee, who was listed as a trainer on the training plan, attended the training sessions conducted by the CSF consultant, but ultimately did not serve as a trainer.

conduct resource investigations, the requirements of this subsection were not satisfied. This finding is explained below.

In order to assess whether the requirements of this subsection were satisfied, the Monitor sought to determine: 1) which DFCS staff members were required to receive the maltreatment investigative training according to the criteria established in defendants' training plan, *i.e.*, all caseworkers, supervisors, and regional directors employed by DFCS as of July 16, 2010; 2) whether each staff member who met the criteria received the 7.5-hour investigative training during the Bridge Period; 3) which staff members were required to receive the additional 2.5-hour resource investigation training; and 4) whether those staff who were required to receive the additional 2.5-hour resource investigation training received this training during the Bridge Period.

At the conclusion of the Bridge Period, defendants submitted documentation to plaintiffs' counsel and the Monitor regarding the status of employee participation in the investigative training program.[95] The documents produced included a spreadsheet with the names of regional directors, supervisory staff, and caseworkers employed at DFCS as of July 16, 2010 who defendants concluded should be trained pursuant to the criteria established in their training plan. This spreadsheet, which was current as of August 27, 2010, is used by the training unit to track staff participation in the maltreatment investigation training. It reflects which employees received the training,[96] which employees were exempt from the training,[97] and which employees

---

[95]  Ex. 10, September 1, 2010 correspondence from Kenya Key Rachal to Shirim Nothenberg at 2 (Provision 7.b.iii). Defendants submitted a tracking form, sign-in sheets and copies of two e-mails related to the training. These documents are not included in the Appendix.

[96]  According to the spreadsheet, 743 employees participated in the training as of August 27, 2010.

[97]  Defendants exempted from the training six part-time caseworkers who conduct home studies related to the licensure of resource homes. According to defendants' submission, 19 staff members no longer were employed by DFCS. This sum includes five centralized intake workers who work for the contractor responsible for operating the statewide Hotline. The intake workers do not perform maltreatment investigations.

did not attend the training.[98]  The spreadsheet does not differentiate between staff who only received the 7.5-hour investigative training and staff who received the additional 2.5-hour resource investigation training.

Rather than relying on the data provided by defendants, the Monitor reviewed the data defendants submitted and independently obtained a list of all staff employed at DFCS as of July 31, 2010 with corresponding position titles and state government hire dates.  The Monitor used this list as a basis for determining which specific employees were required to receive the maltreatment investigative training pursuant to the criteria defendants established in the training plan.

In addition to the spreadsheet, defendants submitted sign-in sheets for 22 training sessions that were conducted during the Bridge Period.[99]  A comparison of the names on the spreadsheet that the defendants submitted with the signatures on the sign-in sheets identified significant discrepancies.  The Monitor's investigation revealed that there were sign-in sheets for 17 additional training sessions that had been conducted during the Bridge Period which were not submitted by defendants as evidence of staff attendance at the trainings.  Interviews with the staff who conducted the trainings, as well as with trainees, corroborated the data in the sign-in sheets defendants produced and in those that the Monitor discovered.[100]  Using the staff list that the Monitor obtained independently, the Monitor cross-referenced the names of staff with the names on the sign-in sheets.  In addition, interviews were conducted with staff in the training unit,

---

[98]  The spreadsheet indicates that 14 employees did not participate in the training.
[99]  Ex. 10, *supra* note 95, referencing the submission titled "Sign-in Sheets related to Statewide Maltreatment Training held 7-8/10."
[100]  The sign-in sheets generally include the following data: the training activity, *i.e.*, Child Maltreatment Training; date, location, and time period covered by the training; speaker(s)/instructor(s); and participants.  The participant information is written in by each employee and includes: printed name, license number, position, and signature.  Many, but not all sign-in sheets, also include the county in which the employee is assigned.  A number of the sign-in sheets that were produced included the title and date of unrelated training activities on the bottom left-hand side of the form.  During the course of the Monitor's assessment, DFCS trainers were interviewed, and they provided a satisfactory explanation for this discrepancy.

trainers, and the trainees who participated in the investigative training, including caseworkers, resource investigators, supervisors, and regional directors.

A review of training records and interviews with DFCS staff establish that a CSF consultant conducted training sessions for the trainers on July 19-21, 2010. This three-day program covered the 7.5-hour investigative training and the additional 2.5-hour resource investigation training.[101] According to DFCS records, all of the 14 staff members and consultants who conducted the staff training during the Bridge Period attended the July 19 and 20 sessions, and eight of the 14 attended the July 21 session.[102] On July 22 and 23, 2010, the prospective trainers were afforded an opportunity to observe the CSF consultant provide the full 10-hour training program to employees who were identified by the DFCS regional directors as staff who are assigned to conduct maltreatment investigations. Aside from the earlier training for the prospective trainers, the July 22 and 23 sessions were the only training sessions conducted during the Bridge Period that incorporated the resource investigation training.

As noted in the narrative related to ¶7.b.ii, above,[103] the training plan defendants submitted listed the categories of employees by position title who were required to receive the maltreatment investigative training during the Bridge Period. According to the criteria in the training plan, a review of relevant personnel data,[104] and information provided by staff in the training unit, DFCS was required by the criteria it had established to train 752 employees during

---

[101]  The July 21, 2010 session was set aside in order for the CSF consultant to provide coaching for the prospective trainers who did not have significant experience as trainers.

[102]  Several consultants provided through a DFCS contract with the University of Southern Mississippi were assigned to serve as trainers.

[103]  *Supra* pp. 26-27.

[104]  The Monitor determined that the investigative training requirement was not applicable to 32 employees on the list provided to the Monitor by the DFCS personnel unit who were reported to occupy positions for which the training was required. *See* Ex. 11, chart prepared by the Office of the Court Monitor, DFCS Staff Required by Defendants' Training Plan to Receive 7.5 Hour Maltreatment Investigation Training, by Position Title and Training Status. The chart provides the position titles of the excluded staff and a breakdown of the reasons why they were excluded from the training.

the Bridge Period. Between July 28 and August 26, 2010, a total of 39 training sessions devoted to the 7.5-hour investigative training program were conducted in each of DFCS's 13 regions. Comparison of all sign-in sheets that the Monitor obtained for the training sessions with the list of 752 employees revealed that 731 employees,[105] or 97 percent of the employees required by defendants' training plan to be trained during the Bridge Period, received the 7.5-hour maltreatment investigative training during the Bridge Period.[106] Six additional employees who met the criteria defendants had established received the 7.5-hour training subsequent to the Bridge Period.[107] Thus, as of October 20, 2010, 737 staff members, or 98 percent of the staff required to be trained pursuant to defendants' training plan, have received the 7.5-hour maltreatment investigative training.[108] Defendants should be commended for this ambitious undertaking. This is a remarkable number of staff to train in a short period of time.

Unlike the 7.5-hour investigative training, the Monitor has been unable to determine which DFCS employees should have received the 2.5-hour resource investigation training. During the Bridge Period, there were few, if any, objective standards that set forth the qualifications for staff who are assigned to conduct resource investigations.[109] As a matter of practice, DFCS regional directors assign staff members to conduct resource investigations based on a combination of objective criteria, subjective judgment, and availability. Many regional directors report that they only assign licensed social workers to conduct maltreatment

---

[105] Four of the trainers are included among the 731 staff who received the 7.5-hour training because their position titles correspond to the position titles of staff required by defendants' training plan to attend the training. The other trainers were not required by the training plan to attend the training, and thus they are not included in this total.

[106] *Id.* The chart shows that of the 15 staff members who did not receive the training, nine were on administrative leave status. In addition, there were six signatures on the sign-in sheets that could not be associated with a DFCS staff member.

[107] *Id.* The six employees were trained on October 19, 2010.

[108] *Id.*

[109] *See* Ex. 27 at 38, *infra* note 137, for the provision in the revised DFCS protection policy that was developed pursuant to ¶7.d.ii, which relates to the qualification criteria. The policy requires that resource investigations should be assigned to workers outside the country who are trained in resource investigations and who have neither been involved in the licensure of the resource home nor have an ongoing connection to the foster care case. Defendants report that they plan to bolster these requirements.

investigations; however, several indicate that they would prefer to assign licensed staff, but that it is not always possible to do so.  Regional directors also reported that they assign investigations to staff members who are personable and have a good disposition, previously conducted what they consider to be high quality investigations, and/or do not reside in the county in which the maltreatment was alleged to have occurred.

On June 2, 2010, the regional directors were asked by the DFCS training director to provide a list of staff who primarily conduct resource investigations in their respective regions. Based on the responses to this inquiry, in late June 2010, the training unit compiled a preliminary list of 38 staff members who were designated by the regional directors to participate in the resource investigation training.[110]  According to the relevant sign-in sheets for the training that was conducted for trainers and resource investigators, a total of 37 employees who fall within the criteria established by defendants' training plan[111] received the additional 2.5 hours of resource investigation training during the Bridge Period.[112]  Subsequent to the Bridge Period, an additional seven staff members received the 2.5 hours of resource investigation training.[113]

At the conclusion of the Bridge Period, DFCS management instructed the regional directors to ensure that maltreatment investigations only were assigned to staff who completed the training.[114]  The instructions do not differentiate between resource and non-resource

---

[110]  The preliminary list did not include staff from one region who were ultimately identified by the relevant regional director before the resource training was conducted.

[111]  Included among the 37 employees who received the additional 2.5 hours of training are four of the trainers.  *See supra* note 105.

[112]  Ex. 12, chart prepared by the Office of the Court Monitor, DFCS Staff Who Received 2.5 Hours of Additional Maltreatment Investigation Training for Resource Investigations by September 1, 2010, by Position Title and Whether They Conducted a Resource Investigation Between March 1 and September 30, 2010.

[113]  The training was conducted on September 16, 2010 at the request of a regional director.  According to the sign-in sheets the defendants have produced, the training was three hours in length.

[114]  Ex. 13, August 30, 2010 e-mail from Tammy H. Miller to Terry Phillips, *et al.  See also* Ex. 14, August 27, 2010 e-mail from Tammy Miller to Trudy Miller, redacted.

investigations.[115]  Structured telephone interviews with 12 DFCS regional directors[116] indicate that an insufficient number of staff received the 2.5 hours of resource investigation training during the Bridge Period.  Indeed, four of the 12 regional directors interviewed report that they have assigned staff to conduct resource investigations who have not received the 2.5 hours of resource investigation training.[117]

In addition to the data from the telephone interviews, there is other evidence that indicates the defendants did not plan adequately to ensure that the 2.5 hours of resource investigation training was provided to all staff who should have received it during the Bridge Period. Defendants are required to submit all investigative reports related to maltreatment investigations of children in DFCS custody to the Monitor.[118]  These investigations are treated as resource investigations.  A review of the investigative reports defendants submitted to the Monitor between March 1 and September 30, 2010 shows that 29 employees conducted investigations related to maltreatment reports in out-of-home placements between March 1 and September 1, 2010.[119]  According to the sign-in sheets defendants have produced, over one-third of the 29 employees have not received the training, and two were trained after the Bridge Period lapsed.[120] Further, less than half, 17 of the 37 employees who received the additional 2.5-hour resource

---

[115]  A review of the 10 reports for investigations that were assigned between July 26, 2010, the first business day following the resource investigation training, and September 30, 2010, which were submitted to the Monitor by DFCS, indicates only one of the 10 investigations was conducted by an investigator who had not received the resource investigation training.  Ex. 15, chart prepared by the Office of the Court Monitor, DFCS Staff who Conducted a Resource Investigation Between July 26 and September 20, 2010, by Position Title and Whether They Received 2.5 Hours of Maltreatment Investigation Training for Resource Investigations.

[116]  This includes employees working in an acting capacity as regional directors.

[117]  One regional director reports that a staff member who had not received the 2.5 hours of training was assigned to start an investigation, but that as trained staff became available an employee who received the training was assigned to complete the investigation.

[118]  Settlement Agreement §§II.B.4.g.-h.

[119]  Ex. 16, chart prepared by the Office of the Court Monitor, DFCS Staff Who Conducted a Resource Investigation Between March 1 and September 1, 2010, by Position Title and Whether They Received 2.5 Hours of Resource Investigation Training for Maltreatment Investigations.

[120]  *Id.*

investigation training during the Bridge Period, conducted at least one resource investigation during this seven-month time period.[121]

Defendants report that they will provide the additional 2.5-hour training to all staff who are assigned to perform resource investigations by January 15, 2011. In addition, defendants plan to provide the additional 2.5-hour training to all other staff who received the 7.5-hour training by April 30, 2011.

> **June 10, 2010 Agreed Order, ¶¶7.c.i., ii. and iii.**
> 7. **Beginning immediately and completed no later than September 1, 2010, Defendants, with CSF's assistance, will:**
>    c. **Complete the following Practice Guides by the following dates:**
>       i. **By June 14, 2010, complete the Mobilizing Appropriate Services Timely, Individualized Case Planning, and Strengths and Needs Assessments practice guides;**
>       ii. **By July 16, 2010, complete the Assuring Safety and Managing Risks, Preserving and Maintaining Connections, and Involving Children and Families in Case Activities and Decision Making practice guides; and**
>       iii. **By September 1, 2010, complete the Interim Supervisory Protocol, Caseworker Visits, and Working with the Education System practice guides;**

**Status of Progress, Agreed Order ¶¶7.c.i., ii., and iii.:** Defendants submitted the practice guides and the supervisory protocol to plaintiffs' counsel and the Monitor by the deadlines established in the Agreed Order.[122] The practice guides and supervisory protocol were developed by CSF in consultation with the defendants. They are comprehensive, interconnected, and well thought out. However, in limited instances, some of the practice guides omit or otherwise incorrectly present certain Settlement Agreement requirements. Thus, in order to satisfy the requirements of this subsection, the practice guides and supervisory protocol should be

---

[121] *Id.*

[122] Ex. 17, Practice Guide, Mobilizing Appropriate Services Timely, submitted June 14, 2010; Ex. 18, Practice Guide, Individualized Case Planning, submitted June 14, 2010; Ex. 19, Practice Guide, Strengths and Needs Assessments, submitted June 14, 2010; Ex. 20, Practice Guide, Assuring Safety and Managing Risk (Revised), submitted June 14, 2010, revised July 23, 2010; Ex. 21, Practice Guide, Preserving and Maintaining Connections, submitted June 16, 2010; Ex. 22, Practice Guide, Involving Children and Families in Case Activities and Decision Making, submitted June 16, 2010; Ex. 23, Practice Guide, Interim Supervisory Protocol, submitted September 1, 2010; Ex. 24, Practice Guide, Social Worker Visits, submitted September 1, 2010; Ex. 25, Practice Guide, Working with the Educational System, submitted September 1, 2010.

reviewed and revised, as appropriate, to ensure consistency with the Settlement Agreement.  The relevant background is summarized below.

Because the defendants did not complete a required review and revision to the DFCS practice guides during Period 1, they were required to do so during Period 2.[123]  Thereafter, in consultation with the defendants, the CSF consultant who designed the practice model developed six practice guides as part of the practice model implementation plan that was produced and provided to the Monitor and plaintiffs' counsel during Period 2.[124]  The Agreed Order required defendants, with assistance from CSF, to complete the six practice guides that were developed during Period 2 as well as two additional practice guides and an interim supervisory protocol at staggered intervals.

During the Bridge Period, the six practice guides that were completed during Period 2 were submitted to plaintiffs' counsel and the Monitor at the required intervals.  Following its submission, one of the six practice guides was revised to correct an inconsistency with Settlement Agreement requirements.  The defendants submitted a revised version of the practice guide during the Bridge Period.[125]  Two new practice guides were developed during the Bridge Period along with the required interim supervisory protocol.  These submissions are impressive.  By clearly presenting concise guidance on expected outcomes, applicable requirements and mandated caseworker and supervisory responsibilities in each of the practice areas identified by the Agreed Order, the practice guides and supervisory protocol will serve as an invaluable

---

[123]  Period 2 IP §II.1.  *See* September 2010 Report at 70-71 for background information relevant to defendants' past performance.

[124]  The six practice guides included in the appendix to CSF's September 30, 2009 report on the practice model were: Mobilizing Appropriate Services Timely; Assuring Safety and Managing Risk; Involving Children and Families in Case Activities and Decision Making; Strengths and Needs Assessments; Preserving and Maintaining Connections; and Individualized Case Planning.  *See* Mississippi Child Welfare Practice Model Final Report [hereinafter Practice Model Report], September 25, 2009, Center for the Support of Families.  Additional information related to the Practice Model Report is included in the September 2010 Report at 52.

[125]  Ex. 20, *supra* note 122, Assuring Safety and Managing Risk, revised July 23, 2010.

resource for DFCS caseworkers and supervisors alike.  Moreover, they will promote DFCS's efforts to strengthen both the quality of case practice and workforce accountability systems.

The practice guides distill a complex body of legal requirements, harmonizing them with evidence-based standards for case practice.  In light of the time period in which the practice guides were developed, it is not unexpected that in a few key instances they omit or otherwise incorrectly present certain Settlement Agreement requirements.[126]  Accordingly, as required by this subsection of the Agreed Order, defendants should review the practice guides and supervisory protocol submitted during the Bridge Period and make all appropriate revisions to ensure consistency with the Settlement Agreement.

> June 10, 2010 Agreed Order, ¶7.d.i.
> 7.  **Beginning immediately and completed no later than September 1, 2010, Defendants, with CSF's assistance, will:**
>    d.  **Begin to revise and expand the Policy and Procedure Manual to incorporate policy consistent with the above Practice Guides, Practice Model implementation, CSF assessment recommendations, and the requirements set forth in Section II.B of the Settlement Agreement, as follows:**
>        i.  **By June 11, 2010, develop a schedule by which each section of the Policy and Procedure Manual will be developed and finalized;**

**Status of Progress, Agreed Order ¶7.d.i.:**  Defendants submitted the required schedule on a timely basis.  Relevant background and the schedule are described below.

The Settlement Agreement contemplated that the DFCS policy and procedure manual would be revised in Period 1 during the early stages of the remedial process.[127]  Because the defendants did not complete a required review and revisions to DFCS policies to ensure

---

[126] *Compare*, *e.g.,* Ex. 19 at 1, stating requirement for a developmental screening for children three years old and younger *with* Settlement Agreement §II.B.7.g, requiring developmental assessment for all children in custody from birth to three years of age, and if factors indicate an assessment is warranted, for each child older than three; *compare* Ex. 19 at 1, stating requirement for a dental screening for all children three years old within 90 days of placement and thereafter every six months *with* Settlement Agreement §II.B.7.e., also requiring each child three years old and older shall be provided with a dental examination within 90 days of placement and thereafter every six months as well as medically necessary dental services for all children in custody; *compare* Ex. 20 at 1, stating requirement for twice monthly caseworker visits with child in foster care *with* Settlement Agreement §II.B.10.a., requiring that at least one of the two monthly visits is conducted in the child's placement.

[127] Period I IP §II.

conformity with the Settlement Agreement's requirements during Period 1,[128] this requirement

was included in the Period 2 IP.[129]  Defendants revised a series of policies during Period 2;

however, substantial portions of the policy manual were not revised, and some of the newly

revised policies were inconsistent with the Settlement Agreement's requirements.[130]  Thus, this

subsection of the Agreed Order required the defendants to develop a schedule with deadlines by

which each section of the DFCS policy and procedure manual would be developed and finalized.

As explained in the narratives related to ¶¶7.d.ii.-iii., defendants also were required to revise two

major sections of the DFCS policy and procedure manual during the Bridge Period.[131]

Defendants submitted the schedule required by this subsection to plaintiffs' counsel and

the Monitor on June 10, 2010, the day the Agreed Order was approved by the Court.[132]  The

schedule provides deadlines for finalizing each section of the DFCS policy and procedure

manual.  According to the schedule, seven of the manual's nine sections will be completed by

March 1, 2011, and one section will be completed by May 1, 2011.[133]

> **June 10, 2010 Agreed Order, ¶7.d.ii.**
> 7.  **Beginning immediately and completed no later than September 1, 2010, Defendants, with CSF's assistance, will:**
>    d.  **Begin to revise and expand the Policy and Procedure Manual to incorporate policy consistent with the above Practice Guides, Practice Model implementation, CSF assessment recommendations, and the requirements set forth in Section II.B of the Settlement Agreement, as follows:**
>       ii.  **By September 1, 2010, complete the Protection section of the Policy and Procedure Manual; and**

**Status of Progress, Agreed Order ¶7.d.ii.:**  The defendants completed the revisions to

the protection section of the DFCS policy manual on a timely basis.  The section incorporates

---

[128]  *Id.*
[129]  Period 2 IP §II.1.
[130]  *See, e.g.,* September 2010 Report at note 243 for examples of these inconsistencies.
[131]  Agreed Order at ¶¶7.d.ii.-iii., *infra* pp. 37-39.
[132]  Ex. 26, Schedule for Revising Mississippi Child Welfare Policy Manual, June 10, 2010.
[133]  According to the schedule, the section that will be completed on May 1, 2011 includes templates for various forms.  Defendants report that it will be completed incrementally as the corresponding sections of the manual are completed.

relevant information from the related practice guides that are described in the narrative concerning ¶7.c., above,[134] and it is consistent with the training curriculum for maltreatment investigations that was developed during the Bridge Period.[135]  It incorporates central requirements of the Settlement Agreement as well as recommendations that were made by CSF as a result of the foster care services assessment.[136]  The revision of the protection section represents a significant improvement over the previous version; however, in order to satisfy the requirements of this subsection of the Agreed Order, it should be reviewed and revised, as appropriate, to ensure conformity with the Settlement Agreement's requirements.[137]  Defendants recognize that the revision submitted during the Bridge Period needs further refinement. Defendants report that they are continuing to revise this section of the manual and intend to submit a superseding version to the Monitor for review and comment.

> **June 10, 2010 Agreed Order, ¶7.d.iii.**
> 7.    **Beginning immediately and completed no later than September 1, 2010, Defendants, with CSF's assistance, will:**
>    d.    **Begin to revise and expand the Policy and Procedure Manual to incorporate policy consistent with the above Practice Guides, Practice Model implementation, CSF assessment recommendations, and the requirements set forth in Section II.B of the Settlement Agreement, as follows:**
>        iii.    **By September 1, 2010, complete the Permanency section of the Policy and Procedure Manual;**

**Status of Progress, Agreed Order ¶7.d.iii.:**  The defendants completed the permanency section of the DFCS policy manual on a timely basis.  This section, which is over 150 pages in

---

[134] Agreed Order at ¶¶7.c.i., ii. and iii., *supra* pp. 34-36.

[135] *Id.* at ¶7.b.i., *supra* pp. 23-26.

[136] The foster care services assessment included a safety assessment which is discussed *supra* notes 81 and 83 and the related text.  The assessment is included as Ex. 29 to the Monitor's September 2010 Report.

[137] The revision is not fully consistent with the Settlement Agreement.  For example, the Settlement Agreement requires that all investigations of reports of maltreatment of children in DFCS custody must be initiated within 24 hours of the report.  Settlement Agreement §II.B.4.e.  However, the intake procedures set out in the revised protection section provide that all reports of maltreatment must be screened by the Hotline intake worker within 24 hours, *see* Ex. 27, Section B, Protection Policy, Revisions June 2010 at 15.  The revision also provides that the assigned investigator has up to 24 hours to initiate the investigation, *id.* at 19, and that all children in custody who are alleged victims " . . . must be seen the day the report is received and interviewed within 24 hours of receipt of the report to assess risk, safety, and wellbeing."  *Id.* at 39.  If the intake worker takes up to 24 hours to screen the report, as authorized by the revised policy, the assigned investigator cannot interview the alleged victim within 24 hours of the receipt of the report.

length, addresses DFCS policy related to foster care. The Monitor's review of the revised

permanency section indicates that the text related to certain topics would benefit from further

refinement to ensure clarity. Moreover, in some instances, the permanency section is

inconsistent with the Settlement Agreement's requirements.[138] Therefore, in order to satisfy the

requirements of this subsection of the Agreed Order, the permanency section should be reviewed

and revised, as appropriate, to ensure conformity with the Settlement Agreement's requirements.

Like the protection section of the policy manual that is described in the narrative related to

¶7.d.ii.,[139] defendants recognize that the revised version of the permanency section that was

submitted at the conclusion of the Bridge Period should be revised and strengthened.

Accordingly, defendants report that revisions to this section are being made on an ongoing basis,

and that a superseding version will be submitted to the Monitor for review and comment.

> **June 10, 2010 Agreed Order, ¶7.e.**
> 7.  **Beginning immediately and completed no later than September 1, 2010, Defendants, with CSF's assistance, will:**
>     e.  **By September 1, 2010, provide detailed statewide resource development plans that include timelines for plan implementation within the twelve months following completion of the plan and action steps that address a) mental health services, b) reunification services and c) the recruitment and retention of therapeutic and non-therapeutic resource home placements;**

**Status of Progress, Agreed Order ¶7.e.:** The statewide resource development plans

were crafted by CSF in consultation with the defendants and submitted to plaintiffs' counsel and

---

[138] *See, e.g.*, Ex. 28, Section D: Foster Care Policy, Revisions August 2010, excerpt at 60, stating a developmental screening of all children three and older is required upon entering custody. This is inconsistent with the guidance in the strengths and needs assessments practice guide produced pursuant to ¶7.c.i., *supra* pp. 34-36 and with §II.B.7.g. of the Settlement Agreement which requires a developmental assessment for all children in custody from birth to three years of age, and if factors indicate an assessment is warranted, for each child older than three. *See also id.* at 90-91, authorizing long-term foster care as a permanent placement until a child can live independently in certain instances. Long-term foster care is inconsistent with core requirements of the Settlement Agreement, which prohibit the reliance on long-term foster care as a permanency goal. Settlement Agreement §II.B.3.a.3.
[139] *Supra* pp. 37-38.

the Court Monitor on a timely basis.[140]   As explained below, the plans satisfy the requirements of this subsection.

Each resource development plan provides a clear assessment of primary needs in each of the three targeted areas,[141] based, in large part, on the findings from the foster care services assessments CSF conducted during Period 2[142] and the related substantive requirements of the Settlement Agreement.[143]  Each plan identifies priority recommendations and action steps with corresponding timelines established predominantly within a one-year implementation schedule.[144]  The plans are crafted to promote management and staff accountability by assigning responsibility for overall implementation in each area to a specific executive team manager.  The action steps are derived from a well-reasoned strategic planning process.  Action steps include prescribed timelines, expected outcomes, and specific staff assignments.

The resource development plans address critical systemic barriers to service delivery through an approach that integrates other components of defendants' reform strategy.   For example, the resource development plan for mental health services recognizes the need for children and families who are served by DFCS to access mental health services in order to address the issues that gave rise to DFCS intervention.  The plan identifies a series of systemic barriers to service delivery that undercut DFCS's capacity to provide services.[145]  According to the plan, some initiatives that address the barriers to service access will be introduced in tandem

---

[140]   Ex. 29, The Statewide Resource Development Plans, submitted by the Mississippi Department of Human Services Division of Family and Children's Services, September 1, 2010, redacted.
[141]   *Id.* at 6-8 (mental health services), 28-30 (reunification services), 47-51 (recruitment and retention of therapeutic and non-therapeutic resource home placements).
[142]   *Supra* notes 81, 83 and 136 and related text.
[143]   *See, e.g.*, Settlement Agreement §§II.B.3.d., II.B.5. and II.B.7.f.
[144]   A small number of the implementation plan deadlines fall outside of the prescribed 12-month period.
[145]   For example, the plan addresses limitations in the array and quality of behavioral and mental health services available through both the public mental health system and private providers.  Ex. 29 at 6-7.

with the practice model implementation schedule,[146] and other initiatives will promote the capacity to access services in the regions that have not begun to implement the practice model.[147]

Individually, each resource development plan represents an ambitious undertaking that will address some of the core reforms embedded in the Settlement Agreement. If the plans are implemented as intended, defendants will make tangible progress toward satisfying the goals of the Settlement Agreement. Given the scope of activities contemplated by the plans, including hiring, planning, and training required within DFCS, and the level of coordination with external state agencies that will be necessary,[148] defendants will need to devote substantial and sustained management resources to implement these plans successfully.

Like the plan for mental health services, the implementation process related to the resource development plans for reunification services and for the recruitment and retention of resource home placements will be complex and challenging. In the wake of the Bridge Period, defendants received notification of a $2 million dollar boost to their efforts to recruit and retain resource home placements.[149] During October 2010, the federal government announced an award of $2 million over a five-year period to subsidize MDHS initiatives to recruit families for children in foster care who wait the longest for permanency.[150] The grant award, which was based on a proposal developed by CSF in collaboration with the defendants, is likely to serve as a catalyst in the implementation process related to the resource development plan for recruitment and retention of resource home placements.

---

[146] As noted in the September 2010 Report, defendants expect to phase in the practice model on a regional basis over a 48-month period that commenced during the second half of Period 2. September 2010 Report at 8-9.

[147] *See, e.g.,* Ex. 29 at 10 and 14.

[148] The plan contemplates ongoing collaboration with the Mississippi Department of Mental Health and the Mississippi Division of Medicaid.

[149] According to the terms of the grant, this includes kinship, foster, concurrent, and adoptive families. *See* http://www.allvoices.com/contributed-news/706810/-acf-awards.

[150] This includes children who are members of large sibling groups, have been sexually abused, teenagers, pregnant teenagers who plan to keep their babies, and children with physical, medical, intellectual, emotional, or severe behavioral challenges.

**June 10, 2010 Agreed Order, ¶7.f.i.**

7.  **Beginning immediately and completed no later than September 1, 2010, Defendants, with CSF's assistance, will:**

    f.  **Address the placement of foster children in unlicensed relative homes as follows:**

        i.  **By June 16, 2010, identify all relative placements that are unlicensed and in which a foster child class member resides as of March 1, 2010, and provide, in writing, a list of each unlicensed relative placement and the name and date of birth of the foster child in that placement to the Federal Court Monitor and Plaintiffs' counsel; and**

**Status of Progress, Agreed Order ¶7.f.i.:**  As explained below, defendants made significant efforts to satisfy this requirement.  However, because they were unable to identify accurately all relative placements that fall within the purview of this subsection of the Agreed Order, the list that defendants produced did not satisfy the requirements of this subsection.  As explained below, defendants recognize this shortcoming and are working in a methodical fashion to address it.

On June 16, 2010, defendants provided a list to plaintiffs' counsel and the Court Monitor of 246 unlicensed relative placements with the names and dates of birth of 353 foster children who resided in each placement as of March 1, 2010.[151]  Because an accurate centralized list of all unlicensed relative placements did not exist at the inception of the Bridge Period, DFCS managers made intensive efforts, over a condensed time period, to identify the cohort of placements targeted by this subsection of the Agreed Order.  However, because of long-standing shortcomings in defendants' capacity to track child placement data accurately, which were not taken into account adequately in developing the methodology used to identify unlicensed relative placements during the Bridge Period, the list that defendants provided did not identify all unlicensed relative placements that fall within the scope of this subsection.

---

[151]  Ex. 30, June 16, 2010 correspondence from Kenya Key Rachal to Shirim Nothenberg with list of unlicensed relative placements in which a foster child class member resides as of March 1, 2010, redacted, including the name and date of birth of the foster children in each placement.

In order to ensure that children in foster care settings receive safe, sufficient, and appropriate care, by the end of Period 1, the Settlement Agreement required defendants to screen all foster care settings, including relative placements, prior to the initial placement of a child in each setting,[152] and to develop as well as implement an expedited process for licensing screened relative caregivers so that children could be placed promptly with relatives upon their entry into DFCS custody.[153]  Because this requirement was not satisfied during Period 1 or Period 2,[154] the Agreed Order required a series of corrective action steps.[155]

The corrective action steps related to the licensure of relative placements were structured to require the defendants to undertake specific activities according to a prescribed schedule of deadlines set at different intervals throughout the Bridge Period.  As a starting point, pursuant to this subsection, defendants were required to identify all unlicensed relative placements that had foster children residing in them as of March 1, 2010.

The evidence shows that defendants made substantial efforts during the latter part of the negotiation process related to the Agreed Order to identify unlicensed relative placements. However, as described in the Court Monitor's prior reports,[156] as well as in the placement assessment report conducted by CSF during Period 2, defendants have had well-documented and

---

[152]  Settlement Agreement §II.B.5.i.  According to this provision, screenings must be conducted annually and within two weeks of a reported change in the residents of a foster home.  Screenings include criminal and child welfare background checks for all household members who are at least 14 years old.  *Id.*

[153]  *Id.* §II.B.5.j.  Pursuant to the Settlement Agreement, the full relative licensing procedure was required to be completed within 120 calendar days of the child's placement.  *Id.*

[154]  The Period 2 IP required defendants to develop and implement a plan to license all unlicensed caregivers by the end of Period 2.  Period 2 IP §II.7.b.  It also required the development and implementation of an expedited process for licensing screened relative caregivers during Period 2.  *Id.* §II.7.c.

[155]  Agreed Order at ¶¶7.f.i.-iv.

[156]  The Settlement Agreement required defendants to maintain a statewide database for placement resources during Period 2.  Settlement Agreement §II.A.5.d.  As explained in the Monitor's September 2010 Report, this requirement was not satisfied due to limitations in MACWIS and other operational shortcomings, which rendered the placement data in MACWIS inaccurate.  September 2010 Report at 57-59.

long-standing difficulty accurately tracking child placement data in MACWIS.[157]  Interviews

with DFCS managers responsible for assembling the relative placement data responsive to the

requirements of this subsection, and a review of the underlying records that document the

process the defendants followed,[158] indicate that the methodology used to assemble the list of

---

[157]  *See, e.g.,* September 2010 Report at Ex. 29, Mississippi Foster Care Services Assessments, Final Report [hereinafter Assessment Report], at 107.  The CSF placement assessment that is included as an exhibit to the September 2010 Report relies on placement data for resource homes that were collected manually.  Among other limitations, the CSF assessment report points out that MACWIS did not break down resource homes by type, including relative placements, in a reliable manner.  In addition, the CSF report raised concerns about the accuracy of placement data for resource homes, explaining that a cursory review in two counties showed closed homes as still active as well as some duplication of homes.  *Id.*  As noted in the Monitor's September 2010 Report, many factors have contributed to inaccuracies over time in placement data stored in MACWIS, including limitations in the ability of workers to access MACWIS and correct erroneous entries.  Delays in processing eligibility determinations associated with Title IV-E of the Social Security Act, 42 U.S.C. 672, which provides for federal matching funds to reimburse certain foster care expenses that a state has already paid, also contribute to limitations in the placement data because specific placements cannot be entered into MACWIS until the eligibility determination has been made.  User error also has been a contributing factor, and there is a need to strengthen the MACWIS training for new caseworkers to mitigate this problem.  *See* September 2010 Report at 57-59.  Defendants have been working to address these issues.

[158]  Because neither MACWIS, nor any other data source, tracked unlicensed relative placements, defendants had to develop a workaround using available data sources of varying quality.  Defendants began by using the February 2010 MACWIS report, MWZWC5D2, as the basis of their analysis, which reflects worker/child face-to-face home contacts during a specified time period.  Presumably, the logic of using this report was that defendants believed the report was broad enough to include, but not be limited to, all children in unlicensed relative placements.  Using that report as a foundation for their analysis, defendants then cross-referenced the names of children reflected in the report with the names of children reflected in a second February 2010 data report, MACWIS report MWFHHP21, which lists all placements that receive board payments.  Because licensure is a prerequisite for the receipt of a board payment, defendants deduced that any children whose names appeared on both lists were in a licensed placement.  According to a chart prepared by a DFCS manager involved in this effort, based on the methodology that was used, defendants identified 1282 placements that did not receive board payments, and therefore were potentially unlicensed.  *See* Ex. 31, chart prepared by DFCS manager showing categories of all placements that did not receive a board payment according to the February 2010 foster home payment registry, redacted.  Approximately one third of the placements in this chart were categorized as "own home" – a code that at least up until recently was used by caseworkers to enter unlicensed relative placements into MACWIS because MACWIS did not have the capacity to classify resource placements by type.  *See supra* note 157.  At that point, defendants needed to isolate from the list only those children housed in resource homes.  DFCS managers reviewed the list of placements and eliminated the names of all children who were in a non-resource home placement.  On May 13, 2010, the resulting narrowed list, which included information on whether the placement was a relative placement, was sent to the regional directors.  The regional directors were asked to have the county workers verify, in a very short period of time, nine categories of information relevant to the licensure status of each placement, including the name of the placement and the relationship of the placement to the child.  The regional directors also were asked to add any "new children" who were in unlicensed placements to the list.  The May 13, 2010 instructions to the regional directors did not include a protocol for how the caseworkers should conduct the verification process.  Following receipt of the regional director's responses, a DFCS manager added column headings for specifying each child's date of birth and previous reports of maltreatment to the lists received from the regional directors.  Thereafter, on June 1, 2010, a different MDHS manager sent the lists back to each of the regional directors in spreadsheet format, asking them to fill in the empty fields within a very short period of time.  The regional directors were instructed specifically to ensure the following data were filled in: the child's date of birth, relative or placement name, disposition of any previous reports of maltreatment "on the caretaker," date of court order if a court ordered placement, and information about

44

unlicensed relative placements that defendants produced on June 16, 2010 was flawed in large part because these limitations were not taken into account during the process that generated the list of unlicensed relative placements that defendants produced and relied upon during the Bridge Period.[159]

As noted above in the narrative related to ¶4.a. of the Agreed Order,[160] in August 2010, DFCS hired a field operations director and a child welfare practice specialist.  The practice specialist reports to the field operations director.  The evidence indicates that at least since the field operations director and child welfare practice specialist assumed their respective positions, defendants have made substantial and ongoing efforts to identify properly and track accurately the licensure status of all unlicensed relative placements.[161]  The evidence demonstrates that defendants recognize the factors that contributed to inaccuracies in the placement data that they submitted during the Bridge Period, and are working to address these issues in a systematic way. In early October 2010, the new field director launched a well-considered effort to correct erroneous placement data in MACWIS.[162]  As of October 21, 2010, this initiative, combined

---

why the home was not licensed.  Structured telephone interviews conducted with the regional directors indicate that they did not follow a uniform process for collecting the data responsive to the May 13 and the June 1, 2010 e-mail requests.  Many DFCS managers and staff were involved in the process that led to the production of the list of unlicensed relative placements that defendants produced on June 16, 2010.  The evidence indicates that their efforts were fragmented and poorly coordinated.

[159] For example, because of historical limitations in MACWIS's capacity to collect accurate placement data, which may now be remedied, at least through the end of the Bridge Period, an undetermined number of relative placements were incorrectly coded as "own home" placements or entered as active cases in MACWIS without any placement listed.  *See* Ex. 34, *infra* note 162.

[160] *Supra* pp. 14-15.

[161] *See, e.g.,* Ex. 32, September 3, 2010 e-mail from Tammy H. Miller to Terry Phillips, *et al.*, redacted, with attached expedited relative placement packets; Ex. 33, September 21, 2010 e-mail from Martha Houston to Terry Phillips*, et al.*

[162] Ex. 34, October 7, 2010 e-mail from Tammy H. Miller to Terry Phillips, *et al.* (recognizing gaps in the reports from the regional directors and the placement data reflected in MACWIS reports, referring to cases in MACWIS without any placement entry except "type not found," and requiring the entry of accurate placement information in MACWIS).

with the persistent efforts of the practice specialist, resulted in the identification of nine

additional unlicensed relative placements.[163]

> **June 10, 2010 Agreed Order, ¶7.f.ii.a.**
> 7. **Beginning immediately and completed no later than September 1, 2010, Defendants, with CSF's assistance, will:**
>     f.  **Address the placement of foster children in unlicensed relative homes as follows:**
>         ii. **By July 16, 2010:**
>             a.  **For all placements identified in 7.f.i., identify all placements in which there has been a previous report of child maltreatment and provide, in writing, a list of each placement in which there has been a previous report of child maltreatment and whether it was evidenced to the Federal Court Monitor and Plaintiffs' counsel; and**

**Status of Progress, Agreed Order ¶7.f.ii.a.:**  As explained below, defendants made

significant efforts to satisfy this requirement.  However, because they were unable to identify

accurately all relative placements with a previous report of maltreatment that fall within the

purview of this subsection of the Agreed Order, the list that defendants produced did not satisfy

the requirements of this subsection.  As explained below, defendants are working to address this

issue.

The list of all relative placements with dispositional findings related to prior reports of

maltreatment was produced as required on July 16, 2010.[164]  The list reflected a total of 246

unlicensed relative placements involving 354 children.[165]  According to defendants' July 2010

submission, of the 246 placements, 42 had previous reports of maltreatment and 12 of these

reports were evidenced. The list indicates that efforts to determine whether there were previous

---

[163]  One of the placements had a prior evidenced report of maltreatment.  Defendants reported it would be licensed, or licensure requirements would be waived, and if a waiver was inappropriate, the child would be moved by November 1, 2010.

[164]  Ex. 35, July 16, 2010 correspondence from Kenya Key Rachal to Shirim Nothenberg with attached list of unlicensed relative placements as of March 1, 2010, redacted, annotated to reflect disposition of prior maltreatment reports.

[165]  The list of placements is identical to the list defendants submitted on June 16, 2010, except one child was added to the list.  *See* Ex. 30, *supra* note 151.

reports of maltreatment for 25 of the 246 placements were not conducted because this cohort of placements was classified in MACWIS as "own home."

Due to the efforts of the field director and the child practice specialist, by October 19, 2010, defendants determined that 12 of the 25 "own home" placements involving 19 children that were listed in defendants' July 16, 2010 submission, were characterized incorrectly as "own home" placements. This finding resulted in the identification of nine additional unlicensed relative placements subject to the requirements of this subsection of the Agreed Order. The practice specialist reviewed each of these placements and discovered that there was an evidenced report of maltreatment for one placement. Each of the unlicensed placements that were discovered were incorporated into the licensure schedule required by ¶7.f.iii.b.,[166] and the placement with the prior evidenced report was scheduled for an expeditious review.

In addition to the shortcomings in the methodology used to identify unlicensed relative placements during the Bridge Period, there were shortcomings in the methodology used to determine whether a particular unlicensed placement had a prior report of maltreatment. For example, it appears that in a number of instances, the determination of whether there was evidence of prior maltreatment reports was based on a search related to only one of the relative caretakers in the placement. Moreover, as noted in the Monitor's prior reports, MACWIS fails to link prior reports of maltreatment in a way that provides the full history of prior maltreatment reports, and it contains inaccurate and incomplete dispositional data related to maltreatment reports.[167] The methodology used during the Bridge Period to identify whether the caretakers in a specific unlicensed placement were the subjects of any prior reports of maltreatment failed to

---

[166] *Infra* pp. 49-50.
[167] September 2010 Report at 65-66.

take these limitations into account.  The evidence indicates that the defendants have been working to address these issues.

> **June 10, 2010 Agreed Order, ¶7.f.ii.b.**
> 7.   **Beginning immediately and completed no later than September 1, 2010, Defendants, with CSF's assistance, will:**
>   f.   **Address the placement of foster children in unlicensed relative homes as follows:**
>     ii.  **By July 16, 2010:**
>       b.   **Develop an expedited licensure process for relative placements, including waivers of non-safety related licensure standards;**

**Status of Progress, Agreed Order ¶7.f.ii.b.:**  On July 16, 2010, defendants provided plaintiffs' counsel and the Court Monitor with a document summarizing the expedited licensure process for relative placements.[168]  The document did not include emergency placement safety standards.  However, these standards were incorporated into a policy directive addressing expedited licensure of relative placements that was finalized and issued to DFCS staff on July 29, 2010.[169]  The policy addresses waiver of non-safety related licensure standards.  A review of the policy in conjunction with supplementary written procedures that were provided to DFCS staff in early September 2010,[170] following the conclusion of the Bridge Period, indicates that defendants should consider revising the policy to clarify that before a child is placed in a relative placement, the caseworker assigned to conduct the expedited licensure process must visit the home.[171]

> **June 10, 2010 Agreed Order, ¶7.f.iii.a.**
> 7.   **Beginning immediately and completed no later than September 1, 2010, Defendants, with CSF's assistance, will:**

---

[168]  Ex. 36, July 16, 2010 e-mail from Kenya Key Rachal to Shirim Nothenberg with attached document, Expedited Resource Licensure, July 15, 2010.

[169]  Ex. 37, Bulletin 6328, Division of Family and Children's Services, Expedited Resource Licensure, Mississippi Vol. IV, Section F, July 29, 2010.

[170]  *See* Ex. 32, *supra* note 161, for the expedited relative placement packet that was disseminated during September 2010 to provide guidance to staff on implementation of the policy.

[171]  The policy clearly states that no child shall be placed in a home prior to the receipt of background check results, *see* Ex. 37, *supra* note 169 at 4515, but it does not explicitly state that an additional prerequisite to initial placement is for the caseworker assigned to conduct the licensure process to visit the home to ensure, among other matters, compliance with the emergency safety checklist.

48

> f.  Address the placement of foster children in unlicensed relative
> homes as follows:
> iii.  By August 2, 2010:
> a.  Employ or otherwise permanently assign a qualified
> person to serve as a Foster Care/Adoption Unit Director;
> and

**Status of Progress, Agreed Order ¶7.f.iii.a.:**  Defendants hired the foster care adoption

unit director on a timely basis.  The foster care/adoption unit director is a 20-year DFCS

employee with substantial casework, administrative, and supervisory experience in licensure and

adoption.  This former DFCS supervisor was promoted to the unit director position on July 13,

2010, and appears well-qualified for the position by virtue of her employment experience.

> June 10, 2010 Agreed Order, ¶7.f.iii.b.
> 7.  Beginning immediately and completed no later than September 1, 2010,
> Defendants, with CSF's assistance, will:
> f.  Address the placement of foster children in unlicensed relative
> homes as follows:
> iii.  By August 2, 2010:
> b.  Develop a schedule specifying the dates by which a) all
> relative placements identified in 7.f.i. that meet the
> requirements of the expedited licensure process are
> licensed, and by which b) all children who have been living
> in relative placements that do not meet the requirements of
> the expedited licensure process are moved into licensed
> and appropriate foster home placements.  The schedule
> shall ensure that all placements that have been the subject
> of a prior evidenced report of maltreatment shall be
> considered for licensure on a priority basis;

**Status of Progress, Agreed Order ¶7.f.iii.b.:**  Defendants provided a copy of the

required schedule to counsel for the plaintiffs and the Monitor on August 2, 2010.[172]  According

to the schedule, all relative placements with any evidenced report of maltreatment would be

licensed, or the child would be moved by September 1, 2010; all relative placements with prior

reports of maltreatment that were not evidenced would be licensed, or the child would be moved

by November 1, 2010; and all other unlicensed relative placements would be licensed by May 30,

---

[172]  Ex. 38, August 2, 2010 correspondence from Kenya Key Rachal to Shirim Nothenberg with attached document, Unlicensed Relative Placements with "Previous Maltreatment Reports" and "Licensed By" Dates as of March 1, 2010, redacted.  Defendants have reported that the "licensed by" date on the schedule represents the date by which the placement will be fully licensed or the child will be moved to a licensed placement.

2011.   Defendants have modified the schedule to add the relative placements that were not

identified during the Bridge Period and to address errors detected by the child welfare practice

specialist with respect to the existence and/or disposition of prior reports of maltreatment.

> **June 10, 2010 Agreed Order, ¶7.f.iv.a.**
> 7.   **Beginning immediately and completed no later than September 1, 2010, Defendants, with CSF's assistance, will:**
>    f.   **Address the placement of foster children in unlicensed relative homes as follows:**
>       iv.  **By September 1, 2010:**
>           a.   **Begin implementing the expedited licensure process outlined in 7.f.ii.b. for unlicensed relative placements consistent with the schedule developed pursuant to 7.f.iii.b.**

**<u>Status of Progress, Agreed Order ¶7.f.iv.a.:</u>**  On September 1, 2010, the defendants

submitted a licensure status report, reflecting the licensure status of the unlicensed relative

placements that had children residing in them as of March 1, 2010, as well as the custody and

current placement status of the children who were in those placements.[173]  Defendants also

submitted evidence of licensure as well as court orders and other records reflecting a change in

placement or custody status for certain children who previously had been in an unlicensed

relative placement as of March 1, 2010.  A review of the records defendants submitted and

interviews with DFCS staff responsible for the administration and management of the licensure

process establishes that defendants began to implement the expedited licensure process during

the Bridge Period.  Licensure-related activities intensified during August 2010, after the field

operations director and child welfare practice specialist were hired.

The field operations director has made implementation of the expedited relative licensure

requirement an operational priority.  A viable tracking system has been established to hold

managers accountable for ensuring that their respective staff timely license relative placements or

move children to licensed placements in circumstances in which a waiver of the licensure

---

[173]  Ex. 39, September 1, 2010 correspondence from Kenya Key Rachal to Shirim Nothenberg with attached status report on unlicensed relative placements, redacted.

requirements is inappropriate.  The child welfare practice specialist has been assigned to monitor and facilitate implementation of the relative licensure requirements, and the evidence indicates her efforts have been effective.  Moreover, in addition to providing ongoing management and oversight of the licensure process on a statewide basis, as noted above, the field operations director has adopted strategies to resolve systemic impediments to the timely entry of complete and accurate placement data into MACWIS.[174]

> **June 10, 2010 Agreed Order, ¶7.f.iv.b.**
> 7. **Beginning immediately and completed no later than September 1, 2010, Defendants, with CSF's assistance, will:**
>    f.  **Address the placement of foster children in unlicensed relative homes as follows:**
>        iv.  **By September 1, 2010:**
>             b.  **Complete the expedited licensure process outlined in 7.f.ii.b. for all unlicensed relative placements identified in 7.f.ii.a. in which there has been a previous evidenced report of child maltreatment consistent with the schedule developed pursuant to 7.f.iii.b.**

**Status of Progress, Agreed Order ¶7.f.iv.b.:**  For the reasons set forth in the narratives related to ¶¶7.f.i.[175]-ii.a.,[176] the requirements of this subsection were not satisfied on a timely basis.  According to the data submitted by defendants, there were prior evidenced reports of maltreatment that implicated caregivers in 12 unlicensed relative placements that had foster children residing in them as of March 1, 2010.[177]  On September 1, 2010, defendants submitted documentation that four of the placements were licensed, and children were either no longer in DFCS custody or residing in the other eight placements.  As noted above,[178] defendants have identified additional placements that are subject to the licensure requirements in the Agreed Order.  The evidence indicates efforts are underway to ensure these placements will be licensed,

---

[174] *See, e.g.,* Ex. 34, *supra* note 161.
[175] *Supra* pp. 42-46.
[176] *Supra* pp. 46-48.
[177] Ex. 39, *supra* note 173.
[178] *Supra* p. 47.

or in circumstances in which waivers are inappropriate, the children in these placements will be moved to an appropriate placement on a timely basis.

> **June 10, 2010 Agreed Order, ¶7.g.**
> 7.  **Beginning immediately and completed no later than September 1, 2010, Defendants, with CSF's assistance, will:**
>     g.  **By June 14, 2010, identify all foster children who received intensive in-home services in the last year and whose services were terminated for a non-therapeutic reason, and by September 1, 2010, provide all such children with alternative therapeutic care that meets the child's needs that had been served through their intensive in-home services, if those services remain therapeutically necessary; and**

**Status of Progress, Agreed Order ¶7.g.:** The evidence shows that defendants made substantial efforts to satisfy this requirement. However, because of limitations in the records defendants have produced, the Monitor has not completed her assessment and cannot make a finding regarding defendants' performance at this time. The Monitor will supplement this report after her assessment is complete. These matters are explained more fully below.

Prior to September 2009, intensive in-home services for children in defendants' custody were delivered by private service providers on a case-by-case basis pursuant to individual service agreements. In late September 2009, defendants signed contracts with two private providers to deliver intensive in-home services to promote reunification and adoption stabilization on a statewide basis. The contracts covered the period July 1, 2009 to December 31, 2009. At the time the contracts were signed, defendants anticipated that superseding contracts would be in place by January 1, 2010 to ensure continuity of services. Defendants expected that the superseding contracts would address limitations in service delivery identified by the foster care services assessments that were completed by CSF in September 2009 pursuant to Period 2 requirements. [179]

---

[179] As noted *supra* notes 83 and 136, the report summarizing the findings from these assessments, which were required by Period 2 IP §II.2., is included as an exhibit to the Monitor's September 2010 Report. September 2010 Report at Ex. 29. As explained in the Monitor's September 2010 Report, among other findings, the assessment

The contracts required the service providers to deliver a comprehensive array of intensive in-home services to children and their families for a prescribed time period. According to the contracts, the providers were required to develop treatment plans, coordinate with DFCS staff, and maintain progress notes. Because of a reported DFCS budgetary shortfall, in early November 2009, defendants notified the providers that they would be required to stop delivering services by December 31, 2009. Shortly before the Christmas holiday, however, defendants contacted the providers to inform them that sufficient funding had been identified to extend the contracts for several months. Accordingly, in late December 2009, defendants and the providers signed the first of two modifications to the September 30, 2009 contract. The modification, which included a new referral process, extended the contracts to March 15, 2010.

By all accounts, during a meeting with the service providers on February 4, 2010, DFCS managers instructed one of the providers to lower its census and to discharge all children admitted before July 2009. Because defendants determined that the RFP for the new contracts would not be issued until the summer of 2010, in late February 2010, defendants and the service providers finalized a second modification to the September 2009 contracts. The second modification, which was effective February 1, 2010, operated to extend the term set forth in the first modification until June 30, 2010 for counties in the northern part of the state. Services in the southern part of the state were addressed by a new contract which was finalized during the latter

---

report documents a critical shortage in individualized and effective reunification services statewide, *id.* at 39-41; pervasive deficits in case file documentation related to medical, dental and mental health screening and evaluation that can impact the efficacy of services, *id.* at 68-69; substantial limitations in access to an adequate array of mental health services, *id.*; the failure to provide individualized services tailored to each eligible in-custody youth's strengths and needs, *id.* at 86; inconsistent implementation of foster care policy and practice among regions and counties within regions, *id.* at 108; and the absence of an efficient and effective process to ensure appropriate therapeutic placements and services, *id.* at 109. *See also id.* at 72-74 for additional information regarding the findings from the reunification services needs assessment.

half of February 2010. The new contract was effective February 1, 2010 and ended on September 30, 2010.

Because of this piece-meal approach to contracting for therapeutic services, the parties sought to determine whether the intensive in-home services provided to any children in DFCS custody pursuant to the above-described contractual arrangements resulted in the termination of services for non-therapeutic reasons. If so, and if a determination was made that the intensive in-home services a child received remained therapeutically necessary, this subsection of the Agreed Order required defendants to provide alternative services to meet the child's needs.

Interview data and the documents defendants have submitted establish that as a first step toward identifying the children who fall within the purview of this subsection, the defendants manually reviewed all invoices for intensive in-home services that were submitted by both service providers between June 1, 2009 and May 31, 2010. The defendants cross referenced these data with enrollment lists that were provided to DFCS by the service providers. Thereafter, DFCS staff reviewed discharge summaries that were prepared by both providers at or near the time children were discharged from each program. If it appeared appropriate, defendants obtained additional information from the service providers as well as from DFCS case records and the children's caseworkers. This was a protracted and labor-intensive process that was conducted primarily by one DFCS manager.

On June14, 2010, shortly after the Bridge Period commenced, defendants submitted to plaintiffs' counsel and the Monitor a list of 38 children who were identified by defendants as recipients of intensive in-home services in the last year whose services were terminated for a

non-therapeutic reason.[180]  This list reflected each child's first and last name as well as the date

of discharge.[181]  During the course of determining whether the children on the June 14, 2010 list

were appropriately identified, the Monitor interviewed DFCS staff who had responsibility for

oversight of the provider contracts as well as the DFCS manager who had been assigned to

determine which children were discharged from an intensive in-home services program for a non-

therapeutic reason.

On June 25, 2010, following interviews with DFCS staff concerning the activities

defendants undertook to implement the requirements of this subsection, the Monitor requested

that defendants produce the primary data that defendants relied upon to identify the 38 children

on the June 14, 2010 list.  This information was necessary in order to assess whether each of the

38 children were identified properly, and to determine whether defendants' exclusion of over 200

additional children who had received intensive in-home services during the prescribed time

period was appropriate.

In correspondence that was submitted to the Monitor on July 2, 2010,[182] defendants

explained that two children on the June 14, 2010 list had been improperly identified because the

services they received were not provided within the time period established by the Agreed

Order.[183]  Accompanying the July 2, 2010 correspondence were a series of documents submitted

in response to the Monitor's June 25, 2010 request, including various lists compiled by the

---

[180]  Ex. 40, June 14, 2010 correspondence from Kenya Key Rachal to Shirim Nothenberg with attached document, All Foster Children Who Received Intensive In-Home Services in the Last Year and Whose Services Were Terminated for Non-Therapeutic Reasons, redacted.

[181]  For one child, two discharge dates were listed.

[182]  Ex. 41, July 2, 2010 correspondence from Kenya Key Rachal to Grace M. Lopes, redacted.  Because the documents submitted to the Monitor with the July 2, 2010 correspondence were voluminous, they are not included in the Appendix to this report.

[183]  Along with the July 2, 2010 correspondence, defendants resubmitted the list of 38 children with highlights to identify the names of the two children who should have been excluded from the list.  Defendants have assumed that the time period implicated by the Agreed Order is June 1, 2009 through May 31, 2010, instead of June 10, 2009 through June 10, 2010.  *Id.*

providers and by DFCS staff, of children who were reported to have received intensive in-home services from each of the providers during two different time periods.[184]  Some of the lists included information regarding the reason for discharge, which was provided to DFCS staff by the individual service provider.  This information was limited to "successful/ unsuccessful" or "therapeutic/non-therapeutic"[185] and also included a very brief explanation of the discharges that were characterized as unsuccessful and non-therapeutic.  No explanation was included for the discharges that were characterized as "successful" or "therapeutic."

Some of the lists that defendants submitted on July 2, 2010 included handwritten notations that were made by the DFCS manager who developed the June 14, 2010 list.  According to the manager, in certain instances the notes reflect information about discharge status which the manager obtained during meetings and/or telephone conversations with the providers as well as from other sources.[186]  On July 2, 2010, defendants also submitted a total of 226 discharge summaries for children enrolled in intensive in-home services.[187]  The discharge summaries were divided into three groups: one group of discharge summaries for 27 of the 38 children listed in defendants' June 14, 2010 submission for whom discharge summaries were provided and a separate group of discharge summaries from each service provider for children

---

[184]  The lists were referred to in the July 2, 2010 correspondence from defendants as "Clean 'Master' lists" and "'Master' lists" from both services providers.  The lists covered two time periods: March 2009 through April 2010 and June 1, 2009 through May 31, 2010.  During the course of the interview process, the Monitor learned that defendants had sought to identify this cohort of children during the negotiation process that led to the Agreed Order.  After the time period prescribed by this subsection was finalized, defendants modified the period covered by their review and developed superseding lists.  In an effort to respond to the Monitor's request, both sets of lists were submitted.

[185]  Very limited additional information about the discharges that are characterized as "unsuccessful" or "non-therapeutic" is included on the lists.  *See, e.g.,* Ex. 42, chart submitted by defendants, Children Served for One Year or More, June 1, 2009 - May 31, 2010, redacted, noting date of child's discharge and reason for discharge; Ex. 43, chart submitted by defendants, Children Served for One Year, June 1, 2009 - May 31, 2010, noting date of child's discharge and reason for discharge, redacted.

[186]  Generally, the notes could not be attributed to representations made by a particular individual on a specific date or to any other data source.  Thus, the notes could not be relied upon by the Monitor in her assessment of whether the appropriate children had been identified.

[187]  Ex. 41, *supra* note 182.

who received intensive in-home services between June 1, 2009 and May 31, 2010 for whom

defendants concluded services were terminated for therapeutic reasons.[188]

Subsequently, on September 1, 2010, at the conclusion of the Bridge Period, defendants

produced an expanded version of the June 14, 2010 submission, titled "All Foster Children Who

Received Intensive In-Home Services in the Last Year and Whose Services Were Terminated for

Non-Therapeutic Reasons (dates June 1, 2009 – May 31, 2010)."[189]  This document lists each of

the 38 children on the June 14, 2010 list by name, date of discharge and status.  According to the

status entries, and the accompanying documentation in the September 1, 2010 submission, of the

38 children, seven were inadvertently included on the June 14, 2010 list,[190] eight had closed DHS

cases, five were transferred to another facility, four no longer needed services, two had services

terminated for financial reasons, one was on runaway status, and one had been noncompliant

with the intensive-in-home services program.  Defendants submitted various records related to

the status entries.  The Monitor could not make a determination in 10 cases due to insufficient

documentation.

In an effort to validate the evidence defendants submitted, during September and October

2010, the Monitor requested and received additional information from DFCS staff and

defendants' counsel related to the status of children identified in defendants' September 1, 2010

submission.[191]  The Monitor also independently obtained a list of children enrolled in the

intensive in-home services program from each service provider.  According to the data obtained

---

[188]  *Id.*  In this group, there were discharge summaries for four of the 38 children identified in defendants' July 14, 2010 submission.

[189]  Ex. 44, September 1, 2010 correspondence from Kenya Key Rachal to Shirim Nothenberg with attached list, All Foster Children Who Received Intensive In-Home Services in the Last Year and Whose Services Were Terminated for Non-Therapeutic Reasons, redacted.

[190]  Two of the seven children were identified in defendants' July 2, 2010 correspondence as being outside the timeframe, Ex. 41, *supra* note 182.  According to the September 1, 2010 submission, of the remaining five children who were inadvertently on the list, four children had received post-adoptive services, one child was discharged for therapeutic reasons, and one child was no longer in need of services.

[191]  The Monitor received supplemental information from defendants as recently as October 29, 2010.

from the service providers, there were a total of 246 children who received intensive in-home services between June 10, 2009 and June 10, 2010.  Of those names, 219 appeared on the July 2, 2010 list provided by the defendants.  Twenty seven names appeared on the service providers' list, but did not appear on defendants' July 2, 2010 list.  Forty additional names appeared on defendants' July 2, 2010 list, but did not appear on the providers' list, nine of whom were outside of the required timeframe.  Thus, collectively the Monitor identified the names of 277 children who may have received intensive in-home services during the relevant time period.[192]

As described above, the evidence shows that defendants made substantial efforts to identify the children who are subject to the requirements of this subsection.  Defendants report that they requested discharge summaries for all children who received intensive in-home services from the providers and submitted all of the summaries they received to the Monitor.  However, defendants' submission included discharge summaries for only 226 of the 277 youth who may have received services.  Furthermore, in some instances the evidence defendants submitted is not dispositive because it does not describe the basis for discharge sufficiently to support a determination about whether the discharge was for therapeutic or non-therapeutic reasons, and/or because it does not provide minimally adequate information about each child's needs and the therapeutic services that have been or are being provided.  This issue is not surprising in light of limitations in defendants' contracts with the providers[193] and in light of the findings from the CSF assessment that was conducted during Period 2, which identified, among other deficiencies, pervasive deficits in documentation related to many aspects of the intensive in-home services that

---

[192]  It is possible, but the Monitor has not yet confirmed, that the reason for some discrepancies in the lists is that defendants based their determinations on children enrolled in intensive in-home services between June 1, 2009 and May 31, 2010 instead of the precise one-year period defined by the Agreed Order.
[193]  *See supra* pp. 52-54 for a description of the contracts.

were provided to children in defendants' custody during this time period.[194]  Moreover, as noted

above, some of the information that related to the defendants' decision-making about the basis

for discharge was collected by DFCS staff during meetings and telephone conferences.  These

additional data were not well-documented.

The Monitor has discussed her concerns related to the shortcomings in the evidence that

has been produced with the parties.  In addition, the Monitor has had preliminary discussions

with the relevant managers responsible for the intensive in-home services programs that were

operated by the private providers during the time period implicated by this subsection of the

Agreed Order.  They have agreed to provide the Monitor with more specific information about

the reason for discharge in individual cases upon request.  Accordingly, in the instances in which

a determination cannot be made on the basis of the evidence defendants have produced, the

Monitor intends to request additional data from the providers.  Thereafter, the Monitor will

complete the assessment contemplated by this subsection and supplement this report as

appropriate.

**June 10, 2010 Agreed Order, ¶7.h.:**
> 7.  **Beginning immediately and completed no later than September 1, 2010, Defendants, with CSF's assistance, will:**
>> h.  **By August 2, 2010, develop and begin implementing a detailed plan to recruit and retain sufficient DFCS professional and support staff as necessary to comply with the caseload requirements specified in section II.A.2.a of the Settlement Agreement.  The plan shall identify specific steps, strategies, financial resources, and short-and long-term staffing goals with related timeframes.**

**Status of Progress, Agreed Order ¶7.h.:**  The defendants submitted the required

recruitment and retention plan on August 2, 2010.  The plan includes a report on implementation

activities.  As explained below, the plan represents a significant improvement over the plan that

was submitted during Period 2.  However, the plan has substantial shortcomings, which

---

[194]  *See supra* note 179 for additional information regarding some of the findings in the CSF assessment report.

defendants recognize and are working to address.[195]  These matters are described in further detail below.

The Period 2 IP required defendants to develop and begin implementing a plan to recruit and retain sufficient professional and support staff necessary to meet the requirements of the Settlement Agreement.  Because the plan that defendants submitted during Period 2 did not meet the Settlement Agreement's requirements, the Agreed Order required defendants to develop and begin implementing a staff recruitment and retention plan during the Bridge Period.  On August 2, 2010, the defendants submitted a "workforce development plan" to plaintiffs' counsel and the Monitor.[196]  The plan summarizes defendants' long term goals; restates relevant Settlement Agreement requirements; summarizes the significant progress defendants have made during the past two years increasing DFCS management, supervisory, and caseworker staffing levels;[197] describes strategies to address workforce development; and lists activities that defendants have undertaken to implement the plan.

The plan presents the following strategies to address staff recruitment: 1) targeted recruitment of qualified staff; 2) partnerships with universities; and 3) transitioning non-social work licensed staff to appropriate positions.  While the strategies may be appropriate, insufficient information is provided to assess their potential efficacy.  For example, the plan states that the use of support staff for the current year will be secured through a contractual arrangement and that defendants will request 30 additional support staff positions in FY 2012.[198]  The related action step states: contract for support staff in those counties and regions needing clerical

---

[195]  Period 2 IP §I.2.a.  *See* September 2010 Report at 25-27 for additional information related to defendants' Period 2 submission.
[196]  Ex. 45, MDHS/DFCS Workforce Development Plan, July 2010.
[197]  The Monitor addressed these accomplishments, in detail, in the September 2010 Report.  *See* September 2010 Report at 5, 23-25.
[198]  Ex. 45, *supra* note 196 at 3.

support. Contrary to the requirements of this subsection, the specific financial resources to support the contracts are not identified. Moreover, no information is presented regarding the basis for determining which counties and regions need clerical support and why funding for 30 positions, as opposed to some other number, is appropriate.

In addition, some activities that are listed in the plan as action steps do not constitute viable action steps. For example, under targeted recruitment strategy, the defendants list the following, among other, action steps: recruit and hire staff statewide to maintain caseload standard.[199] This is not an action step – it is a required goal of the workforce development plan.[200] The plan limits its description of retention strategies to the need to increase salaries in order to compete with both public and private sector employers. Neither a market analysis that supports this conclusion, nor a description of the financial resources that would be needed to achieve competitive salaries are provided.

As noted above, pursuant to ¶4.d. of the Agreed Order, defendants hired a training director during the Bridge Period. The defendants have determined that this manager will now serve as the DFCS director of professional development with oversight of staff recruitment and retention, training, and the development and implementation of a learning management system. This is an important organizational innovation that, if properly resourced, has the potential to promote the staffing and training goals of the Settlement Agreement. The director of professional development has been revising the recruitment and retention plan that defendants submitted during the Bridge Period as part of her efforts to develop an integrated work plan for each of the three operational areas that she will oversee. Defendants report that they recognize the limitations in the workforce development plan that was submitted during the Bridge Period.

---

[199] *Id*. at 5.
[200] As a preliminary matter, defendants must determine how many staff they will need in order to satisfy the Settlement Agreement's caseload standards. *See supra* p. 22.

They anticipate that these shortcomings will be addressed in the professional development work plan which they expect to complete during December 2010. As conceptualized, the professional development work plan has the potential to serve as an effective management tool for both recruitment and retention initiatives as well as for guiding the development of a pre-service and in-service training program that can meet the standards imposed by the Settlement Agreement.

> **June 10, 2010 Agreed Order, ¶8**
> 8. **Defendants shall report to Plaintiffs and the Federal Court Monitor on their status regarding the provisions of this Order prior to the close of business on the sixteenth day of each month beginning June 16, 2010, and on September 1, 2010.**

**Status of Progress, Agreed Order ¶8:** As required, defendants submitted monthly status reports to the Monitor and plaintiffs' counsel. The status reports evidence significant improvements in defendants' ability to manage and track their progress toward meeting the requirements in this lawsuit. In addition to the status reports, defendants established a Bridge Plan management committee that was convened on a regular basis throughout the Bridge Period to manage, address and resolve implementation issues. For the most part, it appears this structure focused and facilitated defendants' progress, resulting in the timely submission of the documents defendants produced to demonstrate their implementation efforts.

As noted above,[201] defendants report that they recognize and are addressing shortcomings in certain aspects of their performance during the Bridge Period. However, with few exceptions, the entries in the status reports that defendants submitted do not reflect these limitations. The findings in this report indicate that defendants must make continued progress toward developing the capacity to identify, correct, and at least during the pendency of this lawsuit, timely report

---

[201] *See, e.g., supra* pp. 34, 38, 39 and 45.

shortcomings in their performance.[202]  This is especially important in light of the breadth and depth of the reform effort contemplated by the Settlement Agreement.

## VI. <u>CONCLUSION</u>

In the wake of two implementation plans spanning two and one-half years during which defendants made inadequate progress in meeting court-ordered requirements, the Agreed Order represented a set of initiatives that were intentionally limited by the four-month duration of the corrective action period.  As described in this report, while defendants did not satisfy every requirement in the Agreed Order, they met most of its requirements.  In the instances in which a requirement was not satisfied, defendants made demonstrable progress and are working to address shortcomings in their performance.

The record in this case suggests that where defendants have been most successful in meeting requirements, implementation was achieved by a small, often centralized, number of staff.  For example, during the Bridge Period, defendants were able to draft numerous plans, conduct training, and design, validate, and produce a substantial number of MACWIS reports.  These activities were managed by a relatively small number of individuals who could control the process.  Defendants have been challenged by satisfying requirements that are contingent upon greater coordination of and implementation by larger numbers of DFCS staff.  This is not surprising.  Reform requires modifying work practices for staff at every level of DFCS, which in turn is dependent upon extensive planning, training, and active supervision.  To achieve greater progress in this case, defendants must move from the planning and training phases into implementation and supervision.  And, while the evidence shows defendants have entered the

---

[202]  There is no evidence that defendants deliberately sought to conceal the shortcomings in their performance. However, with few exceptions, they are not reflected in the status reports that were submitted pursuant to the Agreed Order.  The Monitor plans to work with the parties to clarify expectation related to this matter on a prospective basis.

implementation and supervision stage with respect to the licensure of relative placements, their efforts must be expanded into the other areas of DFCS operations that are implicated by the Settlement Agreement.

As described in the Monitor's September 2010 Report, nearly three years have elapsed since the start of this reform effort.  The progress that defendants made during the four-month corrective action period is encouraging, and it has resulted in tangible accomplishments. However, defendants' progress has been limited in scope by virtue of the Agreed Order's design. Assuming the parties consider negotiating a third implementation plan, they must confront the fact that there are only two years left in the required reform process with substantial progress yet to be made.  The parties also must decide how to proceed in light of the defendants' plans to implement the practice model incrementally, on a regional basis.  The practice model is the centerpiece of the DFCS reform strategy, and it represents the first credible plan of action for improving the quality and consistency of case practice.  However, the parties must address the fact that the implementation schedule for the practice model is not consistent with the Settlement Agreement's timetable.

Respectfully submitted,

_____ / s / _____
Grace M. Lopes (MBN 45693 *pro hac vice*)
Court Monitor
1350 Connecticut Avenue, N.W.
Suite 1000
Washington, D.C.  20036
(202) 232-8311
gmlopes@oymonitor.org

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 23, 2010, I electronically filed with the Court, using the ECF system, the Court Monitor's November 23, 2010 Report to the Court Regarding the June 10, 2010 Agreed Order for Corrective Action, which sent notification of filing to the following counsel:

Dewitt L. ("Rusty") Fortenberry Jr.
Kenya Key Rachal
Ashley Tullos Young
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
428 I-55 North
Meadowbrook Office Park
Jackson, Mississippi  39211

Harold E. Pizzetta, III
Assistant Attorney General
General Civil Division
Carroll Gartin Justice Building
430 High Street
Jackson, MS 39201

W. Wayne Drinkwater, Jr.
BRADLEY ARANT ROSE & WHITE LLP
188 East Capital Street, Suite 450
Jackson, Mississippi  39201

Marcia Robinson Lowry
Shirim Nothenberg
Jessica Polansky
CHILDREN'S RIGHTS
330 Seventh Avenue
New York, New York  10001

John Lang
John Piskora
LOEB & LOEB LLP
345 Park Ave.
New York, New York  10154

_____/ s /_____
Grace M. Lopes

65

**Index to Exhibits**

Ex. 1        Modification #1 to the Agreement By and Between Mississippi
             Department of Human Services and Center for the Support of Families

Ex. 2        Mississippi Department of Human Services, Contract for Personal or
             Professional Services

Ex. 3        Mississippi Department of Information Technology Services,
             RFP No. 3583

Ex. 4        Chart prepared by the Office of the Court Monitor, Summary of Data
             Reports Produced During the Bridge Period

Ex. 5        Methodology for Validating MACWIS Data Reports

Ex. 6        MACWIS Technical Assistance Bulletin, August 19, 2010, Issue #6,
             redacted

Ex. 7        MACWIS Technical Assistance Bulletin, October 6, 2010, Issue #7

Ex. 8        Child Welfare Practice Model Training, Facilitator's Manual, Child
             Maltreatment Training, Center for the Support of Families, June 2010,
             redacted

Ex. 9        Maltreatment Investigation Training Plan, 7/16/10, redacted

Ex. 10       September 1, 2010 correspondence from Kenya Key Rachal to Shirim
             Nothenberg

Ex. 11       Chart prepared by the Office of the Court Monitor, DFCS Staff Required
             by Defendants' Training Plan to Receive 7.5 Hour Maltreatment
             Investigation Training, by Position Title and Training Status

Ex. 12       Chart prepared by the Office of the Court Monitor, DFCS Staff Who
             Received 2.5 Hours of Additional Maltreatment Investigation Training for
             Resource Investigations by September 1, 2010, by Position Title and
             Whether They Conducted a Resource Investigation Between March 1 and
             September 30, 2010

Ex. 13       August 30, 2010 e-mail from Tammy H. Miller to Terry Phillips, *et al.*

Ex. 14       August 27, 2010 e-mail from Tammy H. Miller to Trudy Miller, redacted

Ex. 15       Chart prepared by the Office of the Court Monitor, DFCS Staff who Conducted a Resource Investigation Between July 26 and September 30, 2010, by Position Title and Whether They Received 2.5 Hours of Maltreatment Investigation Training for Resource Investigations

Ex. 16       Chart prepared by the Office of the Court Monitor, DFCS Staff Who Conducted a Resource Investigation Between March 1 and September 1, 2010, by Position Title and Whether They Received 2.5 Hours of Resource Investigation Training for Maltreatment Investigations

Ex. 17       Practice Guide, Mobilizing Appropriate Services Timely, submitted June 14, 2010

Ex. 18       Practice Guide, Individualized Case Planning, submitted June 14, 2010

Ex. 19       Practice Guide, Strengths and Needs Assessments, submitted June 14, 2010

Ex. 20       Practice Guide, Assuring Safety and Managing Risks (Revised), submitted June 14, 2010, revised July 23, 2010

Ex. 21       Practice Guide, Preserving and Maintaining Connections, submitted June 16, 2010

Ex. 22       Practice Guide, Involving Children and Families in Case Activities and Decision Making, submitted June 16, 2010

Ex. 23       Practice Guide, Interim Supervisory Protocol, submitted September 1, 2010

Ex. 24       Practice Guide, Social Worker Visits, submitted September 1, 2010

Ex. 25       Practice Guide, Working with the Educational System, submitted September 1, 2010

Ex. 26       Schedule for Revising Mississippi Child Welfare Policy Manual, June 10, 2010

Ex. 27       Section B: Protection Policy, Revisions June 2010

Ex. 28       Section D:  Foster Care Policy, Revisions August 2010, excerpts

Ex. 29       The Statewide Resource Development Plans, submitted by the Mississippi Department of Human Services Division of Family and Children's Services, September 1, 2010, redacted

Ex. 30        June 16, 2010 correspondence from Kenya Key Rachal to Shirim Nothenberg with list of unlicensed relative placements, redacted

Ex. 31        Chart prepared by DFCS manager showing categories of all placements that did not receive a board payment according to the February 2010 foster home payment registry, redacted

Ex. 32        September 3, 2010 e-mail from Tammy H. Miller to Terry Phillips, *et al.*, redacted

Ex. 33        September 21, 2010 e-mail from Martha Houston to Terry Phillips, *et al.*

Ex. 34        October 7, 2010 e-mail from Tammy H. Miller to Terry Phillips, *et al.*

Ex. 35        July 16, 2010 correspondence from Kenya Key Rachal to Shirim Nothenberg with list of unlicensed relative placements, redacted

Ex. 36        July 16, 2010 e-mail from Kenya Rachal to Shirim Nothenberg with attached document, Expedited Resource Licensure, July 15, 2010

Ex. 37        Bulletin 6328, Division of Family and Children's Services, Expedited Resource Licensure, Mississippi Vol. 4, Section F, July 29, 2010

Ex. 38        August 2, 2010 correspondence from Kenya Key Rachal to Shirim Nothenberg with attached document, Unlicensed Relative Placements with "Previous Maltreatment Reports" and "Licensed By" Dates as of March 1, 2010, redacted

Ex. 39        September 1, 2010 correspondence from Kenya Key Rachal to Shirim Nothenberg with attached status report on unlicensed relative homes, redacted

Ex. 40        June 14, 2010 correspondence from Kenya Key Rachal to Shirim Nothenberg with attached document, All Foster Children Who Received Intensive In-Home Services in the Last Year and Whose Services Were Terminated for Non-Therapeutic Reasons, redacted

Ex. 41        July 2, 2010 correspondence from Kenya Key Rachal to Grace M. Lopes, redacted

Ex. 42        Chart submitted by defendants, Children Served for One Year or More, June 1, 2009 – May 31, 2010, redacted

Ex. 43        Chart submitted by defendants, Children Served for One Year, June 1, 2009 – May 31, 2010, redacted

Ex. 44          September 1, 2010 correspondence from Kenya Key Rachal to Shirim
                Nothenberg with attached list, All Foster Children Who Received
                Intensive In-Home Services in the Last Year and Whose Services Were
                Terminated for Non-Therapeutic Reasons, redacted

Ex. 45          MDHS/DFCS Workforce Development Plan, July 2010