**Ex. 26**

## Schedule for Revising Mississippi Child Welfare Policy Manual
## 06.10.2010

### Sections of the Current Policy Manual

Section A:  Administration
Section B:  Protection and Prevention (Safety)
Section C:  Family Preservation (will expanded to include all in-home services policy)
Section D:  Permanency (Foster Care)
Section E:  Eligibility (IV-E)
Section F:  Adoption and Licensure
Section G:  Services to Unmarried Parents (will be deleted from the manual)
Section H:  ICPC
Section I:  Volunteer Services (will be incorporated into Section A)
Section J:  Appeals
Section S:  Forms

### Time Frames for Completing Sections of the Policy Manual

| Section | Date Developed and Finalized by DFCS |
|---|---|
| Section B:  Protection and Prevention (Safety) | September 1, 2010 |
| Section D:  Permanency (Foster Care) | September 1, 2010 |
| Section C:  Family Preservation (In-Home Services) | December 1, 2010 |
| Section E:  Eligibility (IV-E) | December 1, 2010 |
| Section F:  Adoption and Licensure | March 1, 2011 |
| Section H:  ICPC | March 1, 2011 |
| Section J:  Appeals | March 1, 2011 |
| Section A:  Administration | May 1, 2011 |
| Section S:  Forms | Incrementally, as relevant sections are completed |

**Ex. 27**

STATE OF MISSISSIPPI
DEPARTMENT OF HUMAN SERVICES
DIVISION OF FAMILY AND CHILDREN'S SERVICES

# Section B:  Protection Policy

## Revisions June 2010

**MDHS-Division of Family and Children's Services**

**8/6/2010**

This document represents the work of the Section B policy work group convened by Carolyn Townes on May 25-27, 2010 with support from the Center for the Support of Families and the University of Southern Mississippi.

1

DHS
286262

I.    Child Protective Services Overview ...................................................................5
   A.   Introduction and Scope of services ...........................................................5
   B.   Goals ...........................................................................................................5
   C.   Legal Basis for Authority ...........................................................................5
      1.    State Laws .............................................................................................5
      2.    Federal Laws ........................................................................................7
         a)    Child Abuse Prevention and Treatment Act (CAPTA) ..............7
         b)    The Adoption and Safe Families act of 1997 (ASFA) ...............7
         c)    Indian Child Welfare Act (ICWA) .............................................7
      3.    Exceptions & Limitations .....................................................................7
II.   Child Protective Services Procedures for Service Activity ................................7
   A.   Family Centered Practice Principles ..........................................................8
   B.   Definitions .................................................................................................8
   C.   Centralized Intake ....................................................................................10
      1.    Who May Make a Report ....................................................................10
         a)    Mandated Reporters .................................................................10
         b)    Immunity from Liability ...........................................................10
         c)    Anonymous Reporters ..............................................................11
      2.    Types of reports .................................................................................11
         a)    Abuse, Neglect and Exploitation or ANE................................11
         b)    Information and Referrals .........................................................11
         c)    Case Management.....................................................................11
         d)    CHINS/Voluntary Placement/ Safe Baby/Unaccompanied Refugee Minors..........11
         e)    Resource Inquiries ...................................................................12
      3.    Maltreatment Definitions ...................................................................12
      4.    Intake Procedures...............................................................................14
         a)    Centralized Intake Procedures .................................................14
         b)    County Intake Procedures.........................................................15
         c)    ANE Intakes That Require Special Handling ...........................15
            1. Reports of Maltreatment in Foster Care ...............................15
            2. Resource Reports ...............................................................16
            3. Special Investigations ........................................................16
            4. Reports on Native American Children (CPS 4.03) ...............17
            5. Unaccompanied Refugee Minor .........................................17
            6. Handling Reports of Safe Babies .......................................17
            7. Child Death...........................................................................17
   D.   Screening ..................................................................................................18
      1.    Screening Process ...............................................................................18
      2.    ScreeningReports and Assigning Response                          18
         a)    Screening Out of Home Reports................................................19
         b)    Duplicate Reports .....................................................................19
         c)    Child on Child Reports ..............................................................19
         d)    Reports involving more than one county....................................20
         e)    Reports Involving Foster Children .............................................20
         f)    Screening Special Investigations ..............................................20

E.   Investigations and Assessments.................................................................20
  1.   MDHS Request for Law Enforcement to Accompany ................................20
  2.   Initiation of Investigation .........................................................................21
    a)   Interview with Child Victim .................................................................22
    b)   Interviewing in the School Setting .......................................................22
    c)   Interview with Parent/Guardian, Custodian, Caretaker or Alleged Perpetrator: .....22
    d)   Examination and Photographs of the Victim.........................................23
    e)   Medical/Mental Health Examination ....................................................24
  3.   Safety and Risk Assessment ......................................................................24
    a)   Safety Assessment ................................................................................24
    b)   Safety Plan ...........................................................................................25
    c)   Removals ..............................................................................................26
    d)   Risk Assessment ..................................................................................26
  4.   Investigations Requiring Special Protocols ...............................................27
    a)   Investigations of Meth Labs ................................................................27
    b)   Reports Involving More than one county ..............................................28
    c)   Abused Child from an Other State ........................................................29
    d)   Mississippi Child Abused in Another State...........................................29
    e)   Family Moves out of State ....................................................................29
    f)   Protective Services Alert .....................................................................29
    g)   Requests from an Other State ...............................................................30
  5.   Decision Making and Evidence .................................................................30
    a)   Substantiation Criteria ..................................................................... 31-33
    b)   Supervisory Responsibilities in the Investigations, Reviews, etc..........................34
    c)   Investigation Reports & Notifications to Youth Court, District Attorney and law Enforcement when applicable.................................................................35
    d)   Appeals Procedure ...............................................................................36
    e)   False Reports .......................................................................................36
F.   CPS Investigations/Assessments Requiring Special Handling.........................37
  1.   Introduction................................................................................................37
    a)   Legal Base ...........................................................................................37
    b)   Policy ...................................................................................................37
    c)   Purpose ................................................................................................37
    d)   Procedures ............................................................................................38
  2.   Resource Reports .......................................................................................38
    a)   Resource Homes ..................................................................................38
    b)   Licensed facilities ................................................................................40
  3.   Investigations Requiring Special Handling ................................................41
    a)   Division Employees .............................................................................41
    b)   Medical Neglect of Handicapped Infants ..............................................41
    c)   Death of a Child ............................................................................. 42-43
    d)   Out of Home .........................................................................................44
III.   Family Centered Practice ................................................................................45
  A.   Family Team Meeting ...................................................................................45
  B.   Mobilizing Services ......................................................................................45
    1.   The Individual Service Plan (ISP) ..............................................................46

       a)    Components of the Plan...................................................................... 46-47

       b)    Implementing the Plan ............................................................47

   2.    Services.............................................................................................47

   3.    Home Visits and Parent-Related Contacts .............................................48

C.    Supervisory Administrative Reviews .............................................49

D.   Disposition of Cases .........................................................................49

   1. Cases in which the Family's Whereabouts Become Unknown before Completion of
Services.................................................................................................49

   2.    Transfer of an Active Service Case to another County ...............................49

   3.    Decision to Terminate a Case ..............................................................50

       a)    Termination Process ......................................................................50

       b)    Termination of Long-Term Cases without Achievement ......................51

IV.   Appendices ...................................................................................52

DHS
286265

# I.   Child Protective Services Overview

*The Mississippi Department of Human Services, Division of Family and Children's Services (DFCS) heretofore will be known as the Division.*

## A. Introduction and Scope of services

The basic task of child welfare practice is the protection of children from harm.  This task includes protection from harm that occurs as a result of separation from family members.  This approach requires that the family be considered as the client, and that the Worker's goal is to help the family solve problems so that children can safely remain within their homes whenever possible.

The Division is responsible for evaluating the allegations of abuse or neglect in which the alleged perpetrator is identified as:

- a parent;
- a guardian or custodian; or
- any person responsible for the child's care or support.  This shall include, but is not limited to step parents, foster parents, non-licensed baby sitters or other similar persons responsible for the child. *(Miss. Code Ann. §43.21.105)*

## B. Goals

The primary goals of child protective services are to:

- Ensure the safety, permanency and well-being of children who have been abused, neglected, and/or exploited.
- Enable families to recognize behaviors that harm or threaten the well-being of their children.
- Offer services to parents/persons responsible for the care and support of children to promote change in their parenting behaviors to permit independent care of children.
- Enable children to remain in their own homes; and if they are unable to remain in their home, make reasonable efforts to place them in the least restrictive setting which meets their needs  such as with relatives, kin or in other settings to meet their emotional and physical needs.

## C. Legal Basis for Authority

### 1. State Laws

The Mississippi Code of 1972, Annotated, Section 43-15-3, entitled the Powers and Duties of State Department, authorizes, empowers, and directs the Division to fully cooperate with the United States Children's Bureau and Secretary of Labor in establishing and strengthening child welfare services for the protection and care of the homeless, dependent and neglected child and

children in danger of becoming delinquent. The Division is further authorized, empowered and directed to cooperate with the United States Children's Bureau and Secretary of Labor in developing plans for said child welfare services and extending any other cooperation necessary under Section 521 of Public Law No. 271-74th Congress of the United States.

The Mississippi Code of 1972, Annotated, Section 43-21-353, outlines the duty of individuals having reasonable cause to suspect that a child is a neglected or abused child to notify MDHS immediately and MDHS will notify the Youth Court Intake Unit.

The Mississippi Youth Court Law, Mississippi Code of 1972, Annotated, Sections 43-21-101 et seq. outlines the definitions for abuse and neglect; child abuse and neglect intake procedure; reporting requirements for child abuse and neglect; immunity for reporting; confidentiality provisions for children's case records; the jurisdiction of the Youth Court; the conditions under which a child may be taken into protective custody; and the authority and responsibilities of the court, Division law enforcement officials in protecting children.

The Youth Court Law mandates the Division to conduct investigations and provide services when reports of suspected abuse and/or neglect are made. The Division has the authority to initiate an investigation unsolicited by the family.

The Youth Court Law permits the Division to take a child into custody without a court order for no longer than 24 hours when there is probable cause to believe:

- the child is in immediate danger of personal harm, or
- the parent, guardian, or custodian is not available to provide care and supervision to the child, or
- no reasonable alternative to custody can be found.

The Mississippi Code of 1972, Annotated, Sections 97-5-1 et seq. outlines the offenses affecting children and further identifies which offenses constitute misdemeanors or felonies and the penalties for the commission of crimes against children.

The Mississippi Code of 1972, Annotated, Section 43-21-259 requires all records involving children and the contents thereof, including the identity of the reporter, to be kept confidential except as provided in Section 43-21-261.

Mississippi Code of 1972, Annotated, Section 43-21-354 requires a statewide incoming telephone service to be maintained by the Division on a twenty-four-hour seven (7) days a week basis for the purpose of reporting abuse or neglect of a child pursuant to Section 43-21-353.

DHS
286267

### 2. Federal Laws

#### a) Child Abuse Prevention and Treatment Act (CAPTA)

CAPTA was originally enacted in 1974 (P.L. 93-247), and has been amended several times. The act was most recently amended and reauthorized on June 25, 2003 by the *Keeping Children and Families Safe Act of 2003* (P.L. 108-36). Key components of P.L. 108-36 concerned with child safety and risk assessment and response include:

- Minimum standards for defining child abuse and neglect;
- Requirements for state procedures for the immediate screening, risk and safety assessment, and prompt investigation of child abuse and neglect reports; and
- Required procedures for immediate steps to be taken to ensure and protect the safety of abused or neglected children and of any other child under the same care.

#### b) The Adoption and Safe Families act of 1997 (ASFA)

ASFA of 1997 (P.L. 105-89) focuses on the safety, permanency and well-being of children in foster care and establishes the framework for the current child welfare system. Significant parts of this law relating to safety establish that:

- Child health and child safety are identified as the paramount concerns for child protective services (CPS) decision-making, including making reasonable efforts to prevent placement.
- Safety must be addressed in safety plans or integrated into case plans and services must address conditions related to safety.
- Case reviews must consider child safety in placement and potential dates upon which a child can return home safely.
- Responsible agencies must conduct concurrent planning that involves working toward reunification and simultaneously working on other permanency options based on permanency and safety considerations to accelerate the permanent placement of children in care.

#### c) Indian Child Welfare Act (ICWA)

This Act grants Indian Tribes extensive jurisdiction in child welfare cases involving Indian children to prevent disruption to the integrity of the Indian Tribe. ICWA establishes: minimum standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture.

### 3. Exceptions & Limitations

A Worker cannot enter a home without permission of the occupant, except by court order.

## II. Child Protective Services Procedures for Service Activity

## A. Family Centered Practice Principles

The primary and essential component of the methodological technology of Family- Centered Practice is the engagement of and the development of a relationship with the family through the active embodiment and personification by the social worker of a practice approach. This approach recognizes the value and dignity of the family, consistently and genuinely displaying respect and consideration for all family members, encouraging and allowing families to make their own decisions and solve their own problems. The major practice techniques causing effective engagement and resulting in meaningful relationships are Family Team Meetings and Individualized service planning through a family case planning process. The object is to solve family problems so children can grow up safe and sound at home.

The technology of the Mississippi Division of Family and Children's Services is Family-Centered Practice. The values, philosophy, and principles- the underlying foundation described above- must drive actions and decisions across the entire spectrum of practice from Intake to Permanency. Relationships must be built with families from initial engagement through case closure-relationships built on faith, belief, and trust. Relationships must be formed, built, nurtured, and maintained. Strengths must be identified and emphasized.

Reports of child abuse or neglect, and other intakes received by the Division are subject to a strength-based, structured intake process which allows for the concerns of the reporter to be heard, documented, and screened by intake workers. An effective intake process enhances both the quality and consistency of the information collected and emphasizes the strengths of the family about whom the report is being made. Information provided by reporters regarding the circumstances being reported and about the family involved significantly affects Division response.

## B. Definitions

Safe
*A child is safe when there are no immediate threats of serious harm due to the caregivers' actions or inactions, or the protective capacities of the family are able to mitigate these threats.*

Unsafe
*A child is unsafe when the caregivers' actions or inactions present immediate threats of serous harm to a vulnerable child and the family's protective capacities are diminished.*

Risk
*A child is at risk when there is a likelihood that maltreatment will occur in the future.*

Safety vs. Risk
*Risk and safety are not interchangeable terms. Safety applies to the need for action based on an immediate threat. Risk refers to the likelihood of future maltreatment even when the immediate safety threats are not present, and is seen on a continuum from low to high. Assuring child safety begins with the report of maltreatment and continues through the investigation, initial safety and*

*risk assessment; ongoing safety and risk assessment; developing a case plan; assuring safety during placement; reunification and case closure. Safety and risk interventions are applicable for all children within a home.*

Harm
- *Harm is the effect of child abuse or neglect. The Division must address children at all levels of harm resulting from identified or alleged maltreatment.*
- *Harm is the consequence of enacting the threat.*
- *When a child is physically abused, it is the abuse or injury that is the harm.*
- *Harm may be physical, psychological or mental, or emotional.*
- *The extent of damage to a child who has been harmed depends on the nature of the harm, the severity of the injury, the dynamics and characteristics of the family, and the vulnerability and sensitivity of the child.*
- *The harm to the child of abuse or neglect by parents or caretakers must be weighed against the harm to the child and family of the Agency intervention strategy, particularly removal of the child from the home.*

Threat
*The threat is the caregiver's underlying condition or contributing factor and insufficient protective capacities that led to serious harm or threatened serious harm. To assess the safety threat, the seriousness of the harm must be assessed.*

Protective Capacities
*Individual or family strengths, or resources that reduce, control and/or prevent threats of serious harm from arising or having an unsafe impact on a child are strengths that are specifically relevant to child safety. They fall under the following categories:*
- *Personal*
- *Behavioral*
- *Cognitive*
- *Emotional characteristics and/or Resources*
*Protective capacities must be accessible and actionable.*

Maltreatment
*An act, or failure to act or pattern of behavior that results in death, physical, medical, sexual, emotional harm or mental injury or presents imminent threat of harm to a child.*

Imminent Danger
*Clearly observable behavior or a situation that is actively occurring, is about to occur, or is likely to occur in the present time and cause serious harm.*

Emerging Danger
*A safety consideration that arises when the underlying conditions and contributing factors associated with a danger related risk element in the family are escalating and/or protective capacities are diminishing.*

DHS
286270

## C. Centralized Intake

### 1. Who May Make a Report

**Requirement**: *Year 2 II.6.a.*
In accordance with Section 43-21-353 of the Mississippi Code of 1972 any person who has reason to suspect the abuse of a child must make a report by telephone to Mississippi Centralized Intake (MCI), the Division's 24 hour statewide Child Abuse Hotline for the reporting of abuse and/or neglect at 1-800-222-8000, or electronically at www.msabusehotline.mdhs.ms.gov. When a reporter comes to the county office to make a report, he/she shall be educated on the report process and allowed to use a Division phone to call MCI.  If the reporter does not choose to make a report from the office phone, the county staff shall make the report to MCI immediately. All calls to the hotline are entered into MACWIS.

#### a) Mandated Reporters

There are **Professional Mandated Reporters** who are required by law to report suspicion of abuse or neglect.  These include, but are not limited to, any attorney, physician, dentist, intern, resident, nurse, psychologist, social worker, family protection worker, family protection specialist, child caregiver, minister, law enforcement officer, public or private school employee or any other professional who, becomes aware of information leading them to believe abuse or neglect to a child has occurred.

Professional Mandated Reporters are required to provide written reports of suspected child abuse or neglect, in addition to any verbal reports.  These written reports should be forwarded to the Division as soon as possible after the oral report is made.  Professional Mandated Reporters are encouraged to report suspected abuse and neglect electronically because it will eliminate the need to send a separate, written report. Section 43-21-257 of the Mississippi Code requires that any records involving children, including valid and invalid complaints, be kept confidential and not be disclosed except as provided by §43-21-261(6).

**As child welfare professionals, we are mandated to report any suspicions of child abuse or neglect.**  Maltreatment, including the use of corporal punishment by a Resource Parent (relative or not) on foster children, is strictly forbidden by the Mississippi Department of Human Services, Division of Family and Children's Services' policy.

 If any Division staff has suspicion that a child in DHS custody is being maltreated in any way or that corporal punishment is being used within any placement type, the DFCS staff member, as a mandated reporter will formally report any suspicions of maltreatment, including corporal punishment.

#### b) Immunity from Liability

Any attorney, physician, dentist, intern, resident, nurse, psychologist, social worker, family protection worker, family protection specialist, child caregiver, minister, law enforcement

DHS
286271

officer, school attendance officer, public school district employee, nonpublic school employee, licensed professional counselor or any other person participating in the making of a required report pursuant to Section 43-21-355 of the Mississippi Code, participating in the judicial proceeding resulting there from, shall be presumed to be acting in good faith. Any person or institution reporting in good faith shall be immune from any liability, civil or criminal, that might otherwise be incurred or imposed.

### c) Anonymous Reporters

The Division does not require a reporter to identify him or herself as a condition for reporting suspected child abuse, neglect or exploitation. The MCI worker should encourage anonymous reporters to leave contact information so the Worker who will be responsible for responding to the report can contact the reporter for any information which would be helpful in assessing the report and working with the family.

Reporters may be reluctant to share their identities due to fear of personal repercussions or other factors. Anonymous reporting does not permit an opportunity for future contact by the Division; therefore, it is crucial that the intake worker gather as much information as possible before the intake call is terminated.

## 2. Types of reports

### a) Abuse, Neglect and Exploitation or ANE

The ANE intake type is used to report suspicion of child maltreatment through MCI. Reports are subject to Division screening procedure and, if statutory criteria are met, require official Division response.

### b) Information and Referrals

The Information and Referral intake type (I&R) is used for assisting the public by sharing information or referring them to any needed services not provided by the Division. These referrals are entered into MACWIS by county staff and MCI.

### c) Case Management

The Case Management intake type is used to provide concrete services when a need is identified or a request is received. Concrete services are provided when possible and appropriate.

### d) CHINS/Voluntary Placement/ Safe Baby/Unaccompanied Refugee Minors

This intake type is used in the following circumstances:

**(1) CHINS:** Child in Need of Supervision means a child who has reached his/her seventh birthday and is in need of treatment or rehabilitation because the child:
- Is habitually disobedient of reasonable and lawful commands of his/her parents, guardian or custodian and is ungovernable; or

11

DHS
286272

- While being required to attend school, willfully and habitually violates the rules thereof or willfully and habitually fails to attend school;
- Runs away from home without good cause; or
- Has committed a delinquent act or acts.

**(2)Voluntary Placement** is an agreement between parents and custodians and the Division where children are placed in Division custody for up to 180 days by signing the Voluntary Placement Agreement.

**(3) Safe Baby** is a child who is younger than 72 hours old and is surrendered by a parent to a licensed hospital which operates as an emergency department or an adoption Division duly licensed by the Division. (MS Code 43-15-201-209)

**(4) Unaccompanied Refugee Minors:** Minors brought to the United States without their parents or who come as a result of human trafficking or exploitation. This intake type should be used only by staff in Hinds County designated to handle URM intakes.

### e) Resource Inquiries

This intake type is used when individuals request information regarding licensure as Resource Parents.  For cases involving Resource Inquiries the following information should be obtained:

**(1) For Foster/Adopt Resource Inquiries:**
- Age, gender, and race of child applicant resource family is interested in fostering or adopting.
- Income of applicant
- Availability of space in the home for additional children
- If the applicant is interested in fostering, adopting or fostering to adopt
- Marital status of the applicant
- If the applicant has previous parenting experience
- If the applicant is working with another Division to license their home

**(2) For Relative Inquiries:**
- County of responsibility
- County of responsibility worker
- Name and age of foster child
- Relation to the child
- Date the child was placed in the home, if applicable
- Reason the child was taken into custody

## 3. Maltreatment Definitions

Types of Maltreatment include:

Abandonment

*If the father, mother or caregiver of a child under age 3 years has no contact for 6 months and for a child age 4 or older has no contact for 1 year.*

Emotional Abuse/Neglect
*Any acts and/or threatening statements made and/or allowed, or failure on a periodic or continuing basis, regardless of cause, to provide adequate nurture to meet the child's needs which results in a substantial impairment of intellectual, psychological or emotional well-being and functioning of the child. Section 43-21-105. It describes emotional abuse, mental injury, and other types of maltreatment" (43-21-105)*

Exploitation
*Illegal or improper use of an individual or his/her resources for another's profit or advantage.*

Medical Neglect
*A neglected child who, for any reason, lacks the special care made necessary for him or her by reason of mental condition, whether mentally ill or mentally retarded; or as one "whose parent, guardian or custodian or any person responsible for his care or support, neglects or refuses, medical, surgical, or other care necessary for his well-being; provided, however, a parent who withholds medical treatment from any child who in good faith is under treatment by spiritual means alone through prayer in accordance with the tenets and practices of a recognized church or religious denomination by a duly accredited practitioner thereof shall not, for that reason alone, be considered to be neglectful. Disabled infants less than one year of age who have life threatening conditions who have appropriate nutrition, hydration and/or medication withheld" (42-21-105)*

Physical Abuse
*Parent or guardian who has caused or allowed to be caused upon said child non-accidental physical injury. Provided however, that physical discipline, including spanking, performed on a child by a parent, guardian or custodian in a reasonable manner shall not be deemed abuse under this section. (42-21-105)*

Physical Neglect
*A neglected child as one whose parent, guardian or custodian or any person responsible for his care or support, neglects or refuses, when able so to do, to provide for him proper and necessary care or support, or education as required by law; or a child who is without proper care, custody, supervision or support. (42-21-105)*

Sexual Abuse
*A sexually abused child is a child "whose parent, guardian or custodian or any person responsible for his care or support, whether legally obligated to do so or not, has caused or allowed to be caused upon said child sexual abuse, sexual exploitation, including obscene or pornographic photographing, filming or depiction of children for commercial purposes, exposing a child to sexually explicit conduct including sexual intercourse, bestiality, masturbation, sadistic or masochistic abuse, lascivious exhibition of the genitals or pubic area of any person, or fondling or other erotic touching of the genitals, pubic area, buttocks, anus, or*

*breasts, or the rape, molestation, incest, prostitution or other such forms of sexual exploitation of children. (97-5-31)*

### 4. Intake Procedures

#### a) Centralized Intake Procedures

**CPS 4.02, CPS 4.03**
Mississippi Centralized Intake accepts the following intake types: ANE; I&R; Case Management, CHINS/Safe Baby/Unaccompanied Refugee Minors/Voluntary Placement; Resource Inquiries.

**All intakes must be documented in MACWIS upon receipt.**

The MCI staff shall be responsible for gathering as much information as possible from the reporter of the abuse or neglect allegations, including, but not limited to:

- how to locate the family;
- whether or not the alleged abuse and/or neglect is caused by the person caring for the child;
- access of alleged perpetrator to the alleged victim;
- the nature of the abuse and/or neglect (severity, duration, type of maltreatment, etc.);
- if the report falls under the statutes of our state law as abuse and/or neglect;
- history on family/household;
- history/ability of caregiver;
- history of ANE;
- potential safety risks for COR worker;
- prior criminal history of household members, if known;
- information on the victim (mental & physical capabilities/limits; age; school, etc.);
- general dynamics of the family, if known (traditions, culture differences, strengths and weaknesses;
- if the family being reported has any tribal affiliation.

MCI staff shall also inform reporters of the Division's responsibilities including:

- protection of reporter's identity;
- screening and investigation process and any on-going communication with the reporter;
- confidentiality/disclosure of records; and
- determining whether the victim is a Native American and/or resides on Native American tribal lands.

Initial reports of ANE may be pended by the MCI supervisor if additional information is needed to avoid screening out the report. The pending selection can only be used for the following reasons:

- Reporter will respond with additional information
- MCI supervisor or worker is seeking additional information

Although the report may be pended, it must be screened within 24 hours of receipt. Both the MCI worker and supervisor will receive ticklers if the report has not been screened within 24 hours.

Intake duties of the MCI staff after taking a report include but are not limited to:

- search for prior MDHS involvement (METTS, MSSIS, MAVERICS and MACWIS); including but not limited to reports of abuse and neglect;
- diligent search to identify the absent parent (METTS, MSSIS, MAVERICS and MACWIS);
- forward complaints to DFCS Complaints Unit;
- contact the language line for assistance when working with reporters having language barriers; and
- notify the appropriate county office or on-call worker immediately when a request for immediate assistance is made by law enforcement, judges, or hospitals.

### b) County Intake Procedures

All reports of abuse/neglect including an emergency or after hours report from law enforcement, court, hospital, etc. received in the county offices or by an on-call worker must be sent to MCI prior to responding to the report, when possible, or immediately thereafter.

Each county office accepts the following intake types: I&R; Case Management, CHINS/SafeBaby/Unaccompanied Refugee Minors/Voluntary Placement; and Resource Inquiries.

### c) ANE Intakes That Require Special Handling

#### 1. Reports of Maltreatment in Foster Care

All reports of maltreatment, including corporal punishment, involving children in custody must be reported through MCI and entered as ANE. All other calls to MCI or the county regarding children in custody that do not rise to the level of a report of ANE or allege corporal punishment will be entered as I&R and sent to the COR for any further action.

If information gathered from the reporter or a diligent search of MACWIS identifies the alleged victim as a child in custody, the intake worker will:

1) Confirm the identity of the child.

2) Confirm all household members that are identified at intake and who have prior history in MACWIS.
3) Assign the intake to the child's county of residence.

After it is determined the alleged victim is a child in custody, the report should be entered into MACWIS using the following guidelines:

1) If a report of maltreatment, including use of corporal punishment by a Resource Parent is received, the report should be entered as a Resource Report.
2) If the maltreatment occurred outside of the Resource setting, the report should be entered as an ANE with the appropriate alleged perpetrator identified as the primary caretaker at intake.
3) If the maltreatment occurred in the child's own home, the report should be entered and the alleged perpetrator identified as the primary caretaker at intake.

## 2. Resource Reports

The Resource Report option in MACWIS should be selected only in the following instances:

- If a report of maltreatment, including corporal punishment, by a Resource Parent is received on a child in custody.
- If a report is received on a child in custody in which alleged maltreatment occurred in the Resource Home.
- If a report is received on a child in custody in which alleged maltreatment is a result of the Resource Family's actions or inactions.
- If a report of maltreatment is received involving a licensed or non-licensed facility.
- If a report of maltreatment is received involving a child (biological or adopted) in an ACTIVE Resource Home.

## 3. Special Investigations

The Special Investigation option in MACWIS should be used only in the following instances:

a. Reports in which an Division staff person, at intake, meets one of the following criteria:
- named as alleged perpetrator
- named as alleged victim
- reported as being otherwise involved with the alleged maltreatment
- reported as being closely involved with the reporter, perpetrator or other involved parties
- reported as having a conflict of interest in the handling of the report of maltreatment.

b. Reports in which the alleged perpetrator or his/her immediate family member is in a position of authority, including, but not limited to: government officials, community leaders, local Division and/or department heads.

### 4. Reports on Native American Children (CPS 4.03)

The Federal *Indian Child Welfare Act (ICWA)* was passed in 1978 and grants Indian tribes extensive jurisdiction in child welfare cases involving Native American children.  Because of this Act's existence, the Division has no jurisdiction to investigate allegations of abuse or neglect occurring on Native American tribal lands.  However, the Division has and will continue to receive reports of abuse/neglect regarding Native American children whether they live on or off tribal lands.  Should MCI receive such a report, a determination shall be made as to whether:

- The child is a member of a Native American Tribe and falls under the purview of ICWA;
- The child resides on designated tribal lands where an Indian tribe has jurisdiction.

The Mississippi Band of Choctaw Indians has tribal land in Neshoba, Attala, Jones, Kemper, Leake, Newton, Scott, and Winston counties.

If a child is identified at Intake as a member of the Choctaw tribe and lives on tribal land, the MCI worker will immediately notify the COR Intake Supervisor, who will in turn notify the Mississippi Band of Choctaw Indians at their Social Services Department in Neshoba County. The contact information for the Mississippi Band of Choctaw Indians is  located on  the MACWIS Web.

MDHS permits the tribe an opportunity to assess the report and to provide services as it deems appropriate for the children and/or their families.

### 5. Unaccompanied Refugee Minor

All ANE reports involving an Unaccompanied Refugee Minor (URM) should follow the same intake procedure for reports of maltreatment in foster care.

### 6. Handling Reports of Safe Babies

Safe Babies should be reported through MCI.  If the report comes directly to the county office, the worker is responsible for making the report through the MCI system. The report shall be assigned through MCI to the county where the child is surrendered.

### 7. Child Death

If a report is made that a child has died as a result of abuse or neglect, the intake worker should indicate this by selecting "Yes" to the related question on the Allegations/Living Arrangement Tab in MACWIS.

See Special Investigations: Death of a Child for more information on handling these types of reports.

## D. Screening

### 1. Screening Process

After gathering as much information as possible, MCI staff uses the MACWIS screening tool, and according to selections made, the report is screened in or out by the MCI staff. This must be completed immediately upon receipt of report or pended for further information and screened within 24 hours. (See Centralized Intake Procedure for circumstances under which a report can be pended.)

Every report screened in by MCI must be assigned for investigation. If the report does not meet criteria for investigation or cannot be investigated due to a screening error, the report should be staffed by the caseworker and ASWS and a narrative should be entered into the investigative report and the report should be unsubstantiated with a full explanation and justification of the actions taken in the investigative report.

The County of Responsibility Intake Supervisor has the ability to screen in a report that has been screened out by the MCI staff if it meets the criteria for investigation. They shall not screen out a report that has been screened in by the MCI staff. When the COR Intake Supervisor determines the report meets criteria for investigation but the report was screened out by MCI staff, the supervisor changes the screening decision, documents the reason for screening the report in the screening narrative box, and submits the screening request to the Regional Director for final approval. The Intake Supervisor will notify the Regional Director that the request has been submitted for review and approval. If the RD agrees with the decision to screen in, the report goes back to the Intake Supervisor for assignment and the RD notifies the supervisor of the approval. The Regional Director shall review the screening tool used by MCI to screen out the report and document the justification used to screen the report in for investigation. This process shall be completed immediately after receipt by the Regional Director.

### 2. Screening Reports and Assigning Response

For a report, MCI staff will determine the following criteria:

- If the family can be located. If the reporter identified the county in which the family lives, adequate information exists to locate the family for screening purposes.
- If the alleged perpetrator is a parent, guardian, out of home care or foster care provider, other legal caretaker, or if the parent permits abuse or neglect to occur or fails to protect the child from maltreatment, or if the alleged perpetrator has access to the child due to the relationship with the parent or caretaker.
- If the report alleges maltreatment of the child that meets statutory and Division criteria of maltreatment.
- If the child has been harmed or is in imminent risk of being harmed.

Within 1 hour of receipt of the report, the MCI staff will enter and screen the report unless additional information is needed for a determination. If the report is pended for additional information, MCI staff shall screen the report within 24 hours.

The MCI staff will use one of the following Levels to determine the disposition of the report and send it to the county supervisor for assignment to a worker:

**Level One-** A report that does not meet the criteria listed above. The report is <u>screened out</u> for child protective services and may receive a referral for information or a referral for services.

**Level Two-** A report meets the criteria listed above, but is not considered felony child abuse as described in MS Code 43-21-353, or the alleged victim is not a foster child. The report is <u>screened in</u> and assigned to a worker who must initiate the investigation within 72 hours of being assigned the report. The Worker has 7 days from initiation to complete the Safety Assessment and send it to the Supervisor for approval and 25 days to complete the Risk Assessment and submit the investigation. CPS 4.05, CPS 5.01, Year 2 II.6.b.

See **Investigations and Assessment** for more information about Safety/Risk Assessments and Safety Plans.

**Level Three-** A report that is considered a felony as defined by MS Code 43_21-353 or involves a foster child. The report is <u>screened in</u> and assigned for investigation. The COR worker has 24 hours to initiate the investigation and 25 days to complete the investigation. A Safety Assessment and any Safety Plan shall be completed within 7 days from initiation of the investigation and the Risk Assessment is completed within 25 days.

*If the Intake Supervisor receives an intake and screening from MCI that indicates a child is in imminent danger, the Intake Supervisor will assign a Worker for immediate response.*

The COR Supervisor who receives a report that meets the definition of felony child abuse or neglect as stated in MS Code 43-21-353 *is to immediately call the law enforcement.* The Intake Supervisor reviews an out-of-home report, the supervisor is responsible for **immediately** notifying law enforcement, youth court where the setting is located, and the licensing Division when applicable.

### a) Duplicate Reports

In order to classify a report as a duplicate report and to screen it out for investigation, it must be determined if the new information includes:

1) Same alleged perpetrator(s);
2) Same victim(s)
3) Same types of child maltreatment(s); and
4) Same incident

If the prior investigation has been completed, the COR Supervisor must always make sure the prior report was thoroughly investigated.  Information on the same report will be entered into MACWIS and the system will attach this information to the previous information that was entered.

### b) Child on Child Reports

In order for a child to be considered a perpetrator, <u>he/she must be at least 12 years old</u> and one or more or the following conditions must exist;

1) They are in a caretaker role;
2) They are 36 months older than the victim; or
3) They forcibly overpower the victim.

If one or more of these conditions exist, this does not preclude the Division from completing a safety assessment or making a referral for services.  The MCI staff must assess the possibility of parental neglect having contributed to one child harming another.  Any report that meets the criteria listed above must be referred to Youth Services by the COR intake supervisor

### c) Reports involving more than one county

MCI may receive a report of child ANE when the incident occurred in one county and the child lives in another county.  The report should be screened to the county of residence (COR) of the child and the COR is responsible for notifying law enforcement and the county in the county where the incident occurred.

### d) Reports Involving Foster Children

If MCI receives a report that meets the statutory and Division criteria for maltreatment or is a report of corporal punishment and the identified victim is a foster child, the report must be screened in as a level three.  The report and the screening are sent to the RD where the Resource Home is located.  If the alleged maltreatment occurred outside of the resource setting, the report and screening are sent to the RD over the COR for the child.

### e) Screening Special Investigations

If the report is determined during intake to be a special investigation, it is screened according to normal screening procedures and sent to the RD for final decisions and assignment.

## E. Investigations and Assessments

### 1. MDHS Request for Law Enforcement to Accompany

The Mississippi Youth Court Law, Section 43-21-353 (6), specifies:
*In any investigation of a report made under this chapter of abuse or neglect of a child as defined in section 43-21-105(m), the Department of Human Services may request the appropriate law*

20

*enforcement officer with jurisdiction to accompany the Department Representative on its investigation, and in such cases the law enforcement officer shall comply with such requests.*

## 2. Initiation of Investigation

When the Intake Supervisor receives an intake and screening from MCI that indicates a child is in imminent danger, the Intake Supervisor will assign a worker for immediate response. Imminent danger is defined as clearly observable behavior, or a situation that is actively occurring, is about to occur, or is likely to occur in the present time and would cause serious harm.

Prior to initiating the investigation, the Worker should conduct an additional thorough review of any prior Division involvement with the family.  The Worker may need to look at old paper case files as well as a MACWIS records check.

 If a report is screened in, information regarding any prior reports shall immediately be made available to the worker to whom the case has been assigned for investigation.

Any investigation is considered "initiated" when face to face contact is made with the alleged victim(s) and should occur within the timeframes required by the level of the report.  The worker may be unable to see child because: the child disappeared, the family fled, the address incorrect/nonexistent, the child is not at the location, or the parent/caretaker refused to let worker interview or observe child.  This must be documented in MACWIS as part of the investigation.

Criterion for attempted contact for the initiation of an investigation are considered met when two or more locations have been checked including the child's identified home and one of the following: the neighbor, school, daycare.  Concerted efforts will continue daily to locate the child or children.  After two unsuccessful home visits the worker will leave a note or write a letter requesting that the worker be contacted.  The note or letter should not indicate the purpose of the visit.

Following contact with the alleged victim(s), other people to be interviewed include the following:

- The parent/caretakers
- Siblings who reside in the home
- All other children and other household members
- A collateral contact
- Alleged perpetrator unless otherwise instructed by law enforcement
- The reporter, if possible

Additionally, the Worker must make a visit to the home and a physical home environment narrative be entered in MACWIS.

Attempted face to face contact with the child, parent/guardian, custodian, or caretaker and efforts to locate does not end the investigation.  If the Worker cannot make face to face contact or locate the family, the Supervisor shall be notified immediately on case status.  Law enforcement will be requested to assist in locating the child and family.

21

Interviews should be held as outlined with the individuals in private.

### a) Interview with Child Victim

The Worker will notify the parent/ guardian or custodian or caretaker before interviewing the child, unless notification would endanger the child or impede the investigation.

All child(ren) should be interviewed privately with documentation addressing time and location.

If not notified prior to interviewing child(ren), the parent/caretaker should be notified immediately following the interview, unless this would endanger the child(ren).

### b) Interviewing in the School Setting

Child(ren) may be interviewed without the parent's consent.

If the principal or other school official insists on being present, advise school official(s) that they may be subpoenaed to court to testify and have him/her sign a Confidentiality Statement.  The Confidentiality Statement is filed in the case record.

### c) Interview with Parent/Guardian or Custodian or Caretaker or Alleged Perpetrator:

- The Worker will interview the parent/ guardian or custodian or caretaker and/or the alleged perpetrator separately and privately with documentation addressing time and location.
- In circumstances where the alleged perpetrator has been charged or arrested for a child abuse crime, the Worker only needs to interview the alleged perpetrator if information is needed to determine the safety of the child(ren) or risk of harm.  If the alleged perpetrator is not interviewed, the record should document the reasons.  A copy of the interview with the perpetrator by law enforcement should be obtained for Division records.
- If the parent/guardian or custodian or caretaker or alleged perpetrator has not been charged or arrested, and law enforcement, district attorney, or other appropriate official, requests the Worker not to interview the person; the Worker advises the Area Social Worker Supervisor and the Youth Court Judge of jurisdiction of the request. The safety of the child must be determined.
- During the interview with the parent/caretaker the Client's Rights and Responsibilities and Grievance procedures will be provided and discussed. The parent/ caretaker will sign the form. A copy will be provided to the parent/caretaker and a copy will be filed in the case record.
- ICWA will be addressed and documented in MACWIS.
- Information for the TANF form will be gathered.  The TANF form will be completed by the worker and submitted to the Administration Unit prior to the end of the month that the report was received.
- The Safety Checklist will be completed on all children and a copy provided to the parent/caretaker.

**d) Examination and Photographs of the Victim**

### 1. Examination of the Victim (child)

- All victims of physical abuse should be thoroughly examined for evidence of abuse (bruises, bites, burns, welts, etc.). When possible, a Worker of the same sex as the child examines child. The procedure should be explained in a non-threatening, comforting way.
- Victims of neglect should be thoroughly examined if the investigation indicates reasons to suspect physical abuse; or if there are observable signs of neglect (malnutrition, untreated accidental injuries, infestations, bug bites).
- A parent/caretaker or another adult witness must be present when child is examined.
- Worker should request that the parent/caretaker or the child, if old enough, remove the child's clothes. Worker should be sensitive to the child's feelings of undressing in front of a stranger.
- If there is reason for an examination of the genital area of any child or breasts of female children over age 6, arrangements should be made for examination by a medical professional.
- If a child or parent refuses to cooperate, court intervention is sought.
- If there is reason to suspect physical abuse of other children, examine them.

### 2. Photographs of the Victim (child)

- The investigating worker may take photographs of child, child's home, or location where the child was residing when abused/neglected to document any physical evidence of abuse/neglect. If parents do not cooperate, seek youth court or law enforcement intervention.
- A parent, another Division Worker, or another professional must always be present as a second party when photographs are taken of a child.
- Identifying information (name of the victim or other appropriate identifying information, date photograph was taken, time, and location) should be written on back of photograph or attached to it. The person's name who took photograph should be included also.
- Each photograph shall have a visible body landmark to distinguish the identity of the child, actual location, and extent of the area of injury. More than one photograph of the injury may be required to show landmark and still obtain a clear close-up of abuse.
- Photographs are filed in the case record.

### 3. Use of DVD or Video Tapes

- When interviewing individuals, the Worker may record the information. Verbal permission must be obtained for children from the parent or guardian.
- The DVD/Video Tape should be labeled with the following information:
    - (a). Name of interviewee
    - (b) Date, time and location of interview
    - (c) Name of interviewer
- The DVD/Tape becomes a part of the confidential case record and should be closely protected.

DHS
286284

**e) Medical/Mental Health Examination**

- Medical examinations of children should occur when there are specific allegations indicating injury which can be corroborated and verified by an examination; and the initial phases of the investigation reveal information indicating that a medical examination is necessary and warranted in order to determine whether or not there is evidence to substantiate any harm or maltreatment.
- Medical examinations may be needed to confirm or rule out abuse/neglect and/or to prevent removal.

The Worker will assist parent/caretaker to arrange for the examination. The parent's own physical/mental health professional, etc., may be used. If the parent/caretaker is unwilling to pay for the examination, Medicaid or other Division resources are utilized.

If a situation arises and a parent/caretaker refuses to cooperate, the Worker will consult with his/her Supervisor and court intervention may be sought. When a court orders a medical/mental health examination the Worker takes the child for the examination, even though the Division may not have custody. In this situation the court order should specify the authority of the Division to take the child for examination.

## 3. Safety and Risk Assessment

### a) Safety Assessment

The Safety Assessment is completed in all situations when the report has been assigned a Level Two or Level Three investigation. This assessment is completed in MACWIS within seven (7) days of the report being assigned. The Safety Assessment addresses the following areas:

- Physical harm or injury
- Neglect of basic needs
- Family strengths and needs
- Prior history of abuse/neglect/exploitation/domestic violence
- Protective capacity of parent/caregiver.

Reasonable efforts will be made to maintain children in their own home or with family and support services should be made available to the family. However, if adverse safety and risk factors are identified during the investigative phase, the worker should hold a Family Team Meeting to determine if there are family members or extended family who can assist the parent/caretaker in making an appropriate safety plan that is in the child/(children)'s best interest. Family Team Meetings are an integral part of Family Centered Practice which allows families to identify a support system to address issues that caused a disruption in the family. This allows the family to be a part of finding their own solutions and engaging others in building relationships built on empathy, genuineness and trust. All families are unique and different and

all have strengths that should be identified and acknowledged through the interaction of this group process.

### b) Safety Plan

Safety planning is a part of the Division making reasonable efforts to maintain children with family.  Workers must be able to report to the court the following:

- Removal is in the best interest of the child; or
- Continuation in the home would be contrary to the welfare of the child; AND
- Reasonable efforts were made to prevent removal;
- Due to an emergency situation, no reasonable efforts were made to prevent
- removal; or
- Reasonable efforts were determined not required by the court

In circumstances where safety issues are identified, a Safety Plan will be developed with the family and will be implemented immediately.  The Safety Plan incorporates all safety interventions designed to maintain children safely within their own families whenever possible. The Safety Plan is developed by the Worker with family input with supervisory approval.  The worker will fully explain to the parent/caretaker their responsibility for carrying out the specific component of the plan assigned to them.  The Safety Plan will be documented in MACWIS, printed, signed by the parent/caretaker and a copy given to parent/caretaker and filed in the case folder.   The Safety Plan will be monitored by the Worker throughout the life of the investigation.  If there is a continued need for a Safety Plan at the close of the investigation the plan will be reevaluated and a case must be opened.

The Safety Plan addresses the following:
- Identify specific serious harm or the threat of serious harm as identified in the Safety Assessment.
- What actions have or will be taken to protect each child(ren) in relation to the current safety concern?
- Will the plan involve (a) In home services? Or (b) Alternative caregiver?
- If alternative caregiver, has a background check been completed?
- Who is responsible for implementing the plan?
- How will the plan be monitored and evaluated and by whom?
- What time frames have been imposed by this plan?
- Under what conditions will termination of the Safety Plan occur?

The Safety Plan will be signed by the worker, parent/caregiver, supervisor and copy given to parent/caregiver and original placed in case file.

In cases where no safety issues are identified, the report requires a risk assessment prior to completing the investigation.  The results of the risk assessment and the report findings will be used to determine if a case should be opened for services.

### c) Removals

In cases where the child is not safe and a Safety Plan cannot be developed to mitigate safety concerns a removal of the child from the parent or caregiver's custody by order of the Youth Court may be necessary to ensure child safety.

The Worker shall devote as much time as necessary in helping the child and his parents understand the reason for removal and what to expect from the placement of their child in Division custody. The Worker shall help the parents assume as much responsibility as possible for preparing the child for placement. Whenever possible, parents should be the first to discuss placement with the child. If the child feels the parents concur in this plan for him/her, placement will be easier for him to understand and accept. Not only does the child need preparation for the placement, but the Worker may need to assist the parents in working through their conflict about placement, as well as their feelings about separation from the child.

Prior to removing a child from their home, the Worker shall identify information such as the child's daily routine, preferred foods and activities, needed therapeutic or medical care, allergies, cultural practices, and educational information. The child should be given the opportunity to collect things from his/her home that are meaningful to him/her; such as a favorite toy or a picture album.

The worker shall explain to the child:
1. Why he/she is in care;
2. The worker's role in the process;
3. Placements for other siblings (if siblings have separate placements); and
4. Feelings of separation and loss.

### d) Risk Assessment

The Risk Assessment shall be addressed simultaneously with the Safety Assessment but must be completed within 25 days. During this assessment, the Worker should be assessing the well-being of the child and the risk factors for abuse and neglect.

The following shall be identified and documented during the Risk Assessment:

- What is the exact nature of the abuse and/or neglect? Describe the parent/caretaker's initial response. Describe the maltreatment found and describe any injuries.
- If abuse and/or neglect is found, how long has it been going on and what is the impact on the child?
- How do the parents/caretakers and the children view their current situation? Describe the caregiver's ability to provide basic needs?
- Describe the parents/caretaker's level of functioning. Are the parents/caretakers capable of addressing issues related to the maltreatment?
- Describe any mental/physical health concerns of household members. Do any concerns pose danger to the child?

- Describe how each child's functioning ability as it relates to such things as age, communication skills, school performance, physical and behavioral health and fear of harm.
- Describe family's support system. What kinship resources are available to family?
- Identify and describe caregiver and family strengths, and protective capacities.
- Describe family and caregiver–child relationships. Include things such as parenting style, parenting knowledge and skill, and discipline techniques.

The worker should be sensitive to cultural practices within the home during the assessment. Risk Assessments shall be entered into MACWIS within 25 days from assignment of an investigation. All identified risks shall be addressed within the Safety Plan.

## 4. Investigations Requiring Special Protocols

### a) Investigations of Meth Labs

**Definitions:**
Active "meth lab"
*A setting wherein crystal methamphetamine is being manufactured.*

Inactive "meth lab"
*A setting wherein crystal methamphetamine has ever been manufactured, without a decontamination process being completed by the Mississippi Bureau of Narcotics (MBN), MBN affiliate, MBN designee or MBN approved source.*

### *1. Protocol for Social Workers*

- No Division Worker shall knowingly enter an active or inactive "meth lab" for any reason.
- All reports of children currently residing in "meth labs" active or inactive should be "screened in" for investigation. The appropriate local law enforcement entity and the regional MBN office must be contacted and requested to assist the investigating Worker on each "meth lab" investigation. If local law enforcement is unable or unwilling to assist, the administrative chain of command should be followed in seeking advice as to how the matter should be handled (i.e., Worker-ASWS-RD). During a "meth lab" investigation, the investigating Worker should remain outside, at least 100 feet from the "meth lab" while law enforcement officers remove the child/children from the lab unless instructed otherwise by law enforcement.
- The Worker shall request copies of any photographs taken by law enforcement at the scene and follow-up to ensure that this information is received and placed in the Division's files.
- The child/children must be decontaminated by law enforcement or medical staff either at the scene or at a medical facility. The Worker should not place the child/children into her/his vehicle without the decontamination process having been conducted.

- If the victim(s) is/are taken to a medical facility, the Worker shall make a request to receive the results of any examinations and/or tests performed on the child/children, and follow-up to ensure that this information is received and placed in the Division's files.
- If decontamination occurs on the scene, the Worker should advocate that the procedure be performed in such a way that does not further traumatize the child.
- If it is determined that a child is residing in a setting wherein an active or inactive "meth lab" exists a Family Team Meeting would be held and a Safety Plan developed.
- Recommendations for vulnerable adults should be reported to APS.

### 2.  Reasons to Consider the Removal of Children

Child(ren) may be removed for the following reasons:
    a.  If child(ren) is in imminent danger that cannot be resolved by a Safety Plan or by providing services.
    b.  If it is determined that a child is residing in a setting wherein an active "meth lab" exists, this shall be viewed as a situation in which the victim cannot remain safely in the home.

    **c.      Reports Involving More than one county** .

When a report is screened to the county of child's residence, and the incident happened in another county the responsibility of the Intake County is as follows:

(See section on Resource Investigations for children in custody)

### 1.  Responsibilities of county of residence:

- Accept report;
- Coordinate investigation with county where incident occurred;
- Arrange treatment services for child and family as appropriate in county of residence;
- Notify law enforcement if needed; Initiate legal action, as needed for child's protection;
- Coordinate ongoing legal/court intervention;
- Complete investigation in MACWIS.
- Contact alleged perpetrator's county of residence to coordinate interviews
- Coordinate interviews on a child who may be visiting in another county.

### 2.  Responsibilities of county where incident occurred:

 If a child(ren) is receiving services at a hospital or medical facility in a county other than their county of residence, and a report is received,  that county Worker where the child(ren) is located at the time of the report  shall assist in any way possible including initiating the contact with the child and assessing the safety of the child(ren). The Worker shall conduct the following interviews.

- Interview alleged perpetrator;
- Interview alleged victim or any other children who may still be in the county where incident occurred.
- Interview reporter unless he or she has chosen to remain anonymous.
- Assist with coordination of services if needed.

**b) Abused Child from another State**

When the child, who is the subject of an allegation of abuse, is a resident of another state and the abuse occurred in that state, the MCI worker receiving the report will:

- Complete the Information and Referral (I&R) and notify the MCI Supervisor, MDHS/DFCS Protection Unit Director and e-mail and/or fax the information to the other state.
- If services are needed, the Supervisor in the county where the child is currently located will coordinate services with the other state.

**c) Mississippi Child Abused in Another State**

When the child who is the subject of an allegation of abuse is a resident in Mississippi and has been allegedly abused in another state, the MCI worker shall:

- Complete the requested data on the MACWIS Intake Screens and forward the information to COR Intake Supervisor. (The contact information for the state in which the alleged abuse occurred will be listed within the location information of the MACWIS Intake.)
- Make an oral report to the Child Protective Service Unit in the state where the abuse allegedly occurred.
- Request the other state's assistance in completing the investigation.

**d) Family Moves out of State**

If a family moves out of state during an investigation of a child abuse/neglect and the family's new address can be obtained, a letter to the child protection Division in the other state must be written informing them of the report and must be sent to the Office of Protective Services, Division of Family and Children's, for the other state.  If the report indicated that there may be imminent danger of harm or threatened harm to the child, a protective service referral must be immediately by telephone to the other state and confirmed in writing through the other state's DFCS as soon as possible after making the oral report.

**e) Protective Services Alert**

Protective Service alerts are used when the family and/or victim's exact whereabouts is unknown **and** the worker is of the opinion that further harm may come to the child victim(s) unless protective services are provided.

In the case of a child fatality, when  the family has moved to another county or state while the case is under investigation, **and siblings** to the deceased child have moved with the parents, a child protective alert needs to be sent by the assigned worker and/or supervisor to the appropriate state and/or county office.

Protective Service Alerts received in the State Office from other states will be forwarded from the Protection Unit via electronic mail to each county office.

If a county needs to send a Protective Service Alert to another county or all counties within Mississippi, the county office will forward the alert to the Protection Unit to be disseminated via electronic mail to the other counties.

If a county office needs to send a Protective Service Alert to a Family and Children's Services' office in another state, the county office will forward the alert to the Protection Unit to be forwarded to the other state via electronic mail.

### f) Requests from another State

A county office may receive a request from another state for completion of a child abuse/neglect investigation when the incident occurred in that state with a child and the alleged perpetrator resides in Mississippi. An assigned worker from the county office shall interview the alleged perpetrator for the other state.

## 5. Decision Making and Evidence

When the worker completes an investigation, a determination is made to support the disposition of the report. This determination is made based upon:

1) Substantiation criteria
2) MDHS-SS-442-B, Safety Assessment
3) Risk Assessment
4) Information gathered and entered in MACWIS
5) Direct observation/Medical or Psychological information

The investigating Worker must complete a Safety Assessment and must submit it to the Supervisor within 7 days of report assignment. If the determination is made that a child is unsafe, the worker will develop a Safety Plan or take protective custody. Report findings are:
    a. substantiated
    b. unsubstantiated.

In the final analysis, the social worker will base conclusions on the totality of the evidence, not on "gut feelings" or "professional intuition." In some cases where medical evidence is strong, where there is photographic evidence or an admission by the perpetrator, or credible victim's statement, the Worker will have supporting documentation. In other cases where the medical evidence is inconclusive and the perpetrator denies the abuse, the Worker will examine the constellation of all factors in reaching the decision. In these cases, something might be lacking from the child's statement, or the witnesses may be in conflict and may be biased. The investigative finding of substantiated or unsubstantiated must reflect a careful weighing of all the facts.

DHS
286291

To evaluate whether the information supports or refutes the allegations and to what degree, the worker must understand some basic concepts about evidence. The usefulness of information depends on the validity of its source. If the evaluation of the validity of information affects the decisions one makes or recommends, it should also affect the way one documents the case. Information gathered or evaluated has the potential to become key evidence in court hearings. The following section provides a guide to evidence substantiation criteria that should assist the worker in determining the findings of an investigation.

### a) Substantiation Criteria

The worker shall document in MACWIS, the supporting information to confirm the findings of substantiated/unsubstantiated.

Proof of one or more of the following factors, may constitute "substantial and material evidence." The exception is behavioral indicators or circumstantial evidence. Both are used only to further corroborate other forms of evidence.

### 1.  Medical and or Psychological Information

This may take the form of medical documentation that a child was abused (i.e., evidence of sexual penetration of a young child or spiral fractures of long bones) or evidence which verifies the child sustained severe injuries which are medically inconsistent with the caregivers' explanation.

In sexual abuse, this includes:
- Genital, anal, or oral bruises or bleeding;
- Swollen or red cervix, vulva or perineum;
- Abnormal dilation of the urethra, vagina, or rectal openings;
- Semen on genitals, around mouth or clothing;
- Venereal (sexually transmitted) diseases;
- Pregnancy

This factor might also include psychological information which reveals a predisposition to abusive behavior on the part of the alleged perpetrator or otherwise corroborates evidence related to abuse.

An admission by the perpetrator (including a caregiver who acknowledges she or he knowingly failed to protect the child).

### 2.  Statement of Credible Witness

The investigator must be careful to evaluate fully, the credibility and potential bias of any witnesses to the act. The investigator must also consider the credibility of any witnesses which serve to refute the allegations or otherwise diminish the strength of other evidence (i.e., reliable witness who states the alleged offender was elsewhere at the time of the alleged abuse). Parent or

31

relatives, for example, who are involved in a custody dispute, could not be considered fully reliable witnesses either in support of or in disagreement with the allegations.

### 3. The Child Victim's Statement

For allegations of sexual abuse:

The child states the abuse occurred and identifies the perpetrator(s). The following elements are typical of sexually abusive situations, and should be considered in assessing the weight to be given to the child's statement in cases where sexual abuse is alleged:

**History**

a. Multiple Incidents over Time
   *Did the child indicate more than one incident occurred? This situation is most common where the alleged perpetrator is a relative, friend, or caregiver of the victim.*

b. Progression of Sexual Activity
   *Did the sexual activity progress from less severe forms to more serious? Does the child describe transitional activities which appear acceptable at first, but become sexual (i.e., sleeping with parent, tickling or wrestling leading to fondling)? This is most common where the abuse occurs in the context of a long-standing relationship.*

**Details**

a. Explicit Knowledge of Sexual Activity
   *Did child give explicit details of the sexual experience? Were these details beyond the knowledge typical of a child this age?*

b. Richness of Detail
   *When age and developmentally appropriate, could the child give the location of the incident and a time, even though specific dates were not given? Did she or he tell anyone else, if so, whom? Could she or he give any details of the environment? Such details by a preschool age child are not expected. As a child's developmental age increases, more detail may be expected.*
   *Through research on the childhood trauma, we have learned that very young children can, recall accurately, traumatic events in detail; however, they may not be able to recall details of the environment. A study by Lenore Cagen Terr states: "Even though school-age youngsters can recall amazingly rich details of their ordeals, they may remember time-related items - durations and sequence, for instance, incorrectly." She further states that "as opposed to some adults, school-age children in fact, almost all traumatized children age 4 and over - can remember."*

c. Consistency
   *If the child was interviewed more than once, were the responses consistent from one interview to the next? Were any parts of the child's story corroborated by others or by physical evidence?*

**Secrecy**

Does the child indicate that she or he was instructed to keep the abuse secret? Did it occur in a private setting?

**Coercion**
What are elements of coercion or persuasion? How did the perpetrator get the child to engage in the activity? What does the child think will happen now that they have told the story? Are they afraid of anything? (Note: These questions must be phrased in age appropriate language that is not leading).

Each of the above criteria must be evaluated separately in order to determine the status of the case. These elements are typical of many child sexual abuse cases. Yet the absence of information in some areas does not necessarily mean that the case is unsubstantiated. If information is missing in any one category, you need to explore the reason for the absence. Perhaps you did not ask the right questions to elicit the information or the child was too uncomfortable to respond. It may be possible that a particular element is not pertinent to the case in question. For example, a child who alleges fondling by a school bus driver may not report multiple incidents or progression. This aspect in and of itself does not unsubstantiate the case. You must look beyond this individual element to determine the role of other indicators in the abuse. While carefully evaluating the presence of each individual indicator, it is the constellation of symptoms which is the heart of the evaluation process.

In most cases, there will be little doubt as to the accuracy of the child's statement based on the presence of these elements. In rare cases of false allegations by children, the statements of those children will depart significantly from the criteria.

The child's statement should be weighed against any medical evidence and/or the physiological indicators. Does their explanation corroborate the medical findings or the physiological indicators as to how the injury was sustained? Whom do they say hurt them? Did anyone else know it was going on? How did they try to help? Has this type of injury ever happened before?

### 4. Indicators and Circumstances of Abuse or Neglect

1. **Physiological indicators or signs of abuse,** including, but not limited to: cuts, bruises, burns, or broken bones.
   This criteria includes physiological findings recorded on videotape or with a camera which strongly substantiate severe abuse.
2. **Physical evidence** gathered by law enforcement or observed by worker which tends to substantiate the allegations, including, but not limited to, the following:

   - Presence of child pornography or erotica such as child-oriented books, magazines, articles;
   - Video equipment, cameras, photos, negatives, slides, movies, video cassettes, drawings of children;
   - Personal letters and other correspondence from pedophile;
   - Diaries indicating sexual abuse occurred;
   - Sexual aids (as described by child);
   - Sexual "souvenirs" (e. g., panties or other similar items);
   - Lists of other victims, other offenders;
   - Weapons (as described by child);

- Bed, clothing, sheets, etc. which contain body fluids, pubic hairs, and other physical evidence;
- Torn, stained, bloody underclothing;
- Conditions apparent in the home:
  - Bare electrical wires
  - Frayed cords
  - Gas leaks
  - No railing on stairs
  - Unprotected or broken window accessible to small children
  - Medicines, cleaning compounds hot liquids within the child's reach
  - Holes in wall or floors
  - Overrun with vermin
  - Urine-soaked mattress
  - Human or animal feces on floors
  - Toilets used but not in working order
  - Garbage left to rot inside the house
  - Heating inoperable in cold weather

This evidence should be sought and seized by law enforcement investigators under a search warrant or consent to search or documented by worker with pictures or written description.

3. **Behavioral Indicators**. Child abuse often leads to behavioral manifestations in the child victim. The existence of some or all of the behavioral patterns in the chart found in Section B, Appendix D may be indicative of child abuse in a given case, and corroborate other evidence of abuse. It is particularly important to observe the parent-child interaction.

NOTE: Most of these behavioral indicators (found in Appendix D) can have numerous explanations besides child abuse. Their value is when they are linked to the abuse allegations, such as a change in school grades about the time the child alleges the abuse began or regressive behavior in anticipation of a visit with a father the child says abused her or him. A case cannot be considered substantiated based on behavioral indicators alone.

4. **Circumstantial evidence** linking the alleged perpetrator(s) to the abusive act(s) (e. g., the child was in care of the alleged perpetrator(s) at the time the abuse occurred and no other reasonable explanation of the cause of the abuse exists in the record). Circumstantial evidence may include other professional reports, such as school records, past police records, day care records, homemaker reports, etc.

### b) Supervisory Responsibilities in the Investigations, Reviews, etc.

Report information will be entered in MACWIS on appropriate screens as information is received.  The worker has 25 days to complete the investigation from date of assignment of report.  The supervisor has 5 days to review the investigation as submitted by the worker for accuracy, completeness, and for determination to:

34

DHS
286295

- Close the case with no further action;
- Close and refer the case to community providers; or
- Open the case for ongoing protective services

Once reviewed and approved the supervisor will submit the completed investigation with the Youth Court Tracking form to the Youth Court for recommendations

### c) Investigation Reports & Notifications to Youth Court, District Attorney and law Enforcement when applicable.

#### 1. Investigation Reports

The Worker investigating the report is responsible for completing a finding on all investigations in MACWIS and submitting to his/her supervisor for approval. The worker will also print the Youth Court Tracking form and forward to his/her supervisor. All completed investigations are made a part of the child's file in the MACWIS system and can be printed upon request.

#### 2. Report to the District Attorney (DA) and Law Enforcement (LE)

When a report is assigned to a worker, the initial DA report should be printed by the supervisor and forwarded to the District Attorney. Law Enforcement also receives the initial LE report when the report is a felony. When a felony investigation is completed, the investigating worker shall submit the completed report in MACWIS to the supervisor for approval. These approved reports along with the concluding DA and/or Law Enforcement reports shall be mailed or hand-delivered to the District Attorney and Law Enforcement. by the supervisor. Information submitted to the District Attorney and Law Enforcement shall be included in the court report/summary.

#### 3. Report to Youth Court

All investigations of child abuse and neglect are completed by the Worker and forwarded to the Supervisor for approval who forwards the reports to the Youth Court along with the Youth Court T racking form.

1. When immediate reporting is necessary for protection of child(ren) a report is made by telephone or in person and promptly confirmed in writing. A report is made by the Division to the Youth Court Intake Unit or judge, and where appropriate, to the Youth Court Prosecutor.

2. Mississippi Code, Section 43-21-357 states that upon completion of an investigation, a written report of any investigation is submitted to the Youth Court with recommendation of one of the following:

    a. That Youth Court take no action;

    b. That an informal adjustment be made;

c.   The DHS/DFCS monitor the child, family and other children in the same environment;

d.   That the child is warned or counseled informally; or

e.   That a petition be filed.

### 4.   Notifications

The investigation is not officially closed until the ASWS approves the investigation in MACWIS.  Once the ASWS approves the investigation notify the family of findings, any additional follow up needed, and follow up with mandated reporters.

If requested by the mandated professional reporter who made the original intake request, the assigned worker notifies the mandated professionals verbally or by letter that the report has been investigated and services rendered, if warranted.  The worker shall provide more information regarding the investigation, without a court order, to the professional reporter if that reporter has a continuing professional relationship with the child and a need for such information in order to protect or treat the child. The family shall be notified by mail of the findings of the completed investigation.

### d) Appeals Procedure

The Mississippi Department of Human Services, Division of Family and Children's Services provides individuals who disagree with Division findings or decisions covered under this policy, a right to appeal the decision. The Child Abuse Prevention and Treatment Act (CAPTA) Amendments of 1996, Pub.L. 104.235(as codified at 42 U.S.C. Section 5106a) requires states to have provisions, procedures, and mechanisms in effect by which individuals who disagree with an official of child abuse or neglect can appeal such a finding.  This requirement applies to the perpetrator of child abuse or neglect and applies to States receiving funds under a CAPTA state plan.  This requirement is to assure that individuals who have been found by the State to have committed child abuse or neglect, and the method are afforded due process.  It also requires that individuals be given written notification of their right to appeal, and the method by which they may appeal, at the time they are notified of the official finding of child abuse or neglect; and that the office or individual hearing such appeals cannot be involved in any other state of the case, and that such officer or individual has the authority to overturn a previous finding of abuse or neglect. (Section J, Policy Manual, Appeals Process).

### e) False Reports

An intentional false report is a report in which it is concluded that not only is there no evidence under state law or policy that a child was maltreated or at risk of maltreatment, but the reporter knew the allegation was false.  The worker should request that the reporter verify that the allegations were false. According to Mississippi Code, Section 43-21-353(7), "anyone who willfully violates any provision of this section [with false reporting], shall be, upon being found guilty, punished by a fine not to exceed five thousand dollars ($5000.00), or by imprisonment in jail not to exceed one (1) year. If the person whom the report is on has evidence that the report is false they should notify the Youth Court that has jurisdiction over the case and request a hearing.

## F. CPS Investigations/Assessments Requiring Special Handling

### 1. Introduction

#### a) Legal Basis

*MS Code Section 43-21-105 (v)* – "Any person responsible for care or support" means the person who is providing for the child at a given time. This term shall include, but is not limited to, stepparents, foster parents, relatives, non-licensed babysitters or other similar persons responsible for a child and staff of residential care facilities and group homes that are licensed by the Mississippi Department of Human Services.

*MS Code Section 43-21-105(x)* – "Out-of-home" setting means the temporary supervision or care of children by the staff of licensed day care centers, the staff of public, private and state schools, the staff of juvenile detention facilities, the staff of unlicensed residential care facilities and group homes and the staff of, or individuals representing, churches, civic or social organizations.

*MS Code Section 43-24-353-(8)* - If a report is made directly to the Department of Human Services that a child has been abused or neglected in an out-of-home setting, a referral shall be made immediately to the law enforcement Division in whose jurisdiction the abuse occurred and the department shall notify the district attorney's office within seventy-two (72) hours. The law enforcement Division shall investigate the reported abuse immediately and shall file a preliminary report with the district attorney's office within twenty-four (24) hours and shall file a final report with the district attorney's office within seventy-two (72) hours. If the out-of-home setting is a licensed facility, an additional referral shall be made by the Department of Human Services to the licensing Division.

*Child Abuse Amendments of 1984, Public Law 98-457* requires states to have in place procedures with State Protection Systems to respond to the reporting of medical neglect, including instances of withholding medically indicated treatment from disabled infants with life-threatening conditions.

#### b) Policy

The Mississippi Department of Human Services, Division of Family and Children Services shall conduct an investigation/assessment into all allegations of maltreatment including corporal punishment that occur while a child is in DHS custody, residing in a DFCS licensed or contract placement home/facility. These reports must be initiated within 24 hours of the report and completed within 25 days and submitted to the supervisor for approval. The supervisor must approve the investigation within 5 days of receipt of the completed investigation.

**Purpose**

The Mississippi Department of Human Services, Division of Family and Children Services is mandated by state and federal law to investigate all reports of possible abuse or neglect of children by their parents or caretakers. The caretaker may be someone who is entrusted with the care of the child, such as a foster parent, non-licensed child care providers/babysitters, scout leaders, tutor, clergy, or residential care facility staff. The Division will respond quickly and investigate allegations of child abuse and neglect in these complex cases and make every effort

to address the child's risk, safety, and well being while addressing the trauma of placement moves during the investigative/assessment process.

### c) Procedures

The standard investigative/assessment protocol applies to all CPS investigations but there are additional requirements that apply to special handling CPS investigations/assessments. Those reports that are considered to be special handling CPS investigations/assessments are: reports on resource homes, licensed facilities, Division employees, medical neglect of a handicapped infant, death of a child, and other settings.

Reports on other settings such as unlicensed child care providers/babysitters, the staff / individuals representing churches, civic or social organizations are entered as CPS regular intakes. In addition to the standard investigative/assessment protocol there are additional steps outlined under the Out-of Home section of this policy.

## 2. Resource Reports

### a) Resource Homes

The Division will initiate all allegations of maltreatment, including corporal punishment involving a child in Division custody within 24 hours of receiving the report. Upon learning or observing such maltreatment the Division employee must immediately notify their supervisor. The Division employee will then make the report to the MCI either by phone or electronically. All allegations of maltreatment in a licensed Resource Home received by the MCI shall be entered as Resource Reports for the county where the home is located. Once MCI enters and screens the intake report it will go to the Regional Director of the region where the resource home is located for assignment. In addition to the standard investigative/assessment protocol, the following procedures must be followed.

1. The Regional Director *__immediately__* notifies by phone and e-mail the county of responsibility (COR) and service, if applicable, Area Social Work Supervisor(s) and Resource ASWS of the allegations. The COR Area Social Work Supervisor(s) for all other children residing in the home should be notified as well.
2. The Regional Director will make the assignment to a worker outside the county who has been trained in doing out-of-home investigations/assessments and will notify his or her ASWS of the assignment. This worker is not to have been involved in the licensure of the Resource Home and should have no ongoing connection to the foster care case.
3. The Regional Director, county of responsibility and service, if applicable, Area Social Work supervisor(s), county of service ASWS must make a determination if the identified victim and other children should remain in the home until the investigation/assessment is completed. The investigation and decisions should be based on a full and systematic evaluation of athe factors that may place a child in Division custody at risk.The Regional Director or their designee notifies the Permanency/Placement Unit of the allegations and completes the Serious Incident Report and submits to the DFCS Division Director's Office.

4. The Permanency/Placement Unit will log all reports on Division homes and monitor completion of the investigation/assessment and the final report.
5. The ASWS will monitor the timeliness of initiating and completing investigations of reports of maltreatment in foster care on a monthly basis.
6. Within 24 hours of the allegations being made the child's county of responsibility worker shall verbally notify parents or caretaker from whom the child was removed and the Guardian ad Litem of the allegations involving the child. This notification must be documented in the child/ren's case record and the investigation/assessment report.
7. All alleged victim(s) must be seen the day the report is received and interviewed within 24 hours of receipt of the report to assess risk, safety, and wellbeing.
8. No additional children may be placed in the home pending the completion of the investigation/assessment.
9. The Resource Specialist must be invited to accompany the Investigative Worker to the home for support for the Resource Parents and the Investigative Worker.
10. The assigned investigative worker shall:
    a. Interview:
        1. Alleged victim(s); away from the home
        2. All Division children in the home; away from the home
        3. Division Worker(s) of the alleged victim
        4. Resource Specialist
        5. Former Division Staff, as appropriate
        6. Children formerly in the home, as appropriate
        7. Other professionals and collateral contact persons associated with the children in the home
        8. Other household members, as appropriate
        9. Alleged perpetrators.
    b. Review Cases of:
        1. Alleged victim(s)
        2. Other child(ren) in the home
        3. Resource Home
    c. Staff report of initial findings within 3 days with the Regional Director in the region where the home is located and advise as additional information is obtained.
    d. Provide written notice to the District Attorney within 72 hours of finding evidence that a child has been abused.
    e. Complete the safety and risk assessment for resource reports within Division timeframes.
    f. Give a verbal report to the Regional Director at the conclusion of the investigation/assessment
    g. Make a written report to the Regional Director in the region where the home is located within 25 days of receipt of the report.
11. Upon verbal report from the assigned worker, the Regional Director in the county where the Resource Home is located discusses corrective actions needed with the Resource Area Social Work Supervisor. After receipt of the written report from the assigned worker, the Regional Director makes written recommendations and outlines emergency corrective actions to be taken.

12. The complete report with investigative findings, recommendations, and emergency corrective actions are then forwarded to the Permanency/Placement Unit for final approval of the investigative report.

13. After review of the investigative findings, the Permanency/Placement Unit staff shall confer on unresolved issues, recommendations, etc. Permanency/Placement Unit staff makes the final decision regarding the continued/future use of the home and placement of children in the home. An e-mail from the Director of the Permanency/Placement Unit will be sent to the Resource ASWS within 10 days to relay approval of final report and decision regarding continued/future use of the foster /adoptive home. If the report is not approved, i.e., additional information is needed, etc., that will be conveyed to the Regional Director where the home is located.

14. Once the final report, recommendations, and corrective action plan are approved the Resource Specialist and/or ASWS will convene a findings/recommendations meeting with the resource family to notify them of the findings and recommendations.

15. A copy of the final report with recommendations and corrective action plan shall be forwarded to the Youth Court Judge with jurisdiction over the child, the Guardian Ad Litem, and to the court monitor.

16. A copy of the final investigation with recommendations and corrective actions made by the investigative Worker or Resource Specialist shall be filed in the case record of the foster child, the file of the foster/adoptive parents and in the Permanency/Placement Unit in State Office.

17. Any foster child who remains in the same out-of –home placement following an investigation/assessment into a report that he or she was maltreated, or the subject of corporal punishment in that placement shall be visited twice a month in the placement setting face to face for three months after the conclusion of the investigation to assure the child's continued safety and well-being by their assigned worker.

### b) Licensed facilities

The Division will investigate reports on other licensed placements, such as group homes, emergency shelters and private child placing Division foster homes.  The Regional Director of the region in which the placement is located, in coordination with appropriate staff, will assign an Out of Home Investigation/Assessment Worker from outside the county where the facility is located to investigate the report.  The Regional Director will notify the following of the report:

- Protection Unit Director
- Placement Unit Director
- Licensure Director
- Field Operations Director
- Division Director

If the report involves felony child abuse, law enforcement must be notified immediately.

Upon arriving at the facility, the worker will confer with the director or staff member in charge to inform them of the report.  The regular protocol for any investigation will be followed.

Upon completion of the investigation and approval of the report by Regional Director, copies of the report with recommendations for corrective action will be disbursed as follows:

- Child's case record
- Licensure Director for filing in the licensed Division's record
- Youth Court Judge having jurisdiction over the facility
- Youth Court Judge having jurisdiction over the child
- Guardian *ad litem* of the child.

The Licensure Unit shall undertake a separate investigation of the group home, emergency shelter or private child placing agency foster home's compliance with the Division's licensure standards, develop a Corrective Action Plan with the licensed facility and monitor progress of the corrective action plan. If the provider is found to be in violation of licensure standards, it shall have 30 days to submit a Corrective Action Plan with timeframes and if they do not comply DFCS shall revoke the license.

**Any foster child who remains in the same out-of-home placement following an investigation into a report that he or she was maltreated, or subjected to corporal punishment in that placement shall be visited in the Resource Home by the assigned Worker twice monthly face to face for three months after the conclusion of the investigation to assure the child's continued safety and well-being.**

## 3. Investigations Requiring Special Handling

### a) Division Employees

Any abuse/neglect report received by Intake that names an Division employee as a possible perpetrator, or victim or indicates an Division employee is somehow involved ( i.e. related, past or present relationship that is more than casual) with this report requires a special investigation/assessment. Once the intake is entered into MACWIS the Regional Director will receive a tickler concerning the intake. The Regional Director will arrange for a Worker from outside the county/region to conduct the investigation and will make the assignment in MACWIS. The assigned Worker must initiate the investigation/ assessment and document in MACWIS within 24 hours. The assigned Worker will staff the investigation/ assessment with the Regional Director throughout the investigative/assessment process. The Regional Director will staff the assessment with the Field Operations Director and the disposition of this report and the decision on how to proceed with the assessment is made by the Field Operations Director. Other than the above differences, the Assessment Worker should follow the standard protocol on special investigation/assessment.

### b) Medical Neglect of Handicapped Infants

Federal regulations (*Child Abuse Amendments of 1984, Public Law 98-457*) requires the Division to respond to reports of medical neglect, including instances of withholding of medically indicated treatment (including appropriate nutrition, hydration, and medication) from disabled infants less than one year of age with life threatening conditions.

The Division will investigate all allegations of medical neglect of a handicapped infant. Once a report of medical neglect of a handicapped infant is received by Mississippi Centralized Intake Unit (MCI) it will be screened in for the county where the child/family resides and the ASWS will be notified *immediately* by phone by the MCI Intake worker/supervisor.

5.  Area Social Work Supervisor shall
    a.  Assign the report for investigation immediately.
    b.  Notify immediately designated contact person at the health care facility and the Division's Child Protective Service Unit.
    c.  Ensure the following people are interviewed at the health care facility:
        1.  Designated contact person
        2.  Family
        3.  Others involved with the infant
        4.  Infant Care Review Committee (ICRC) if one is established at the health care facility.
    d.  Obtain an independent assessment from a medical consultant, if there is a determined need.
    e.  Review infant's medical records, if necessary with the assistance of designated contact person. If the parents or facility do not cooperate, contact the Youth Court Judge or designee for a court order.
    f.  Request an independent medical examination of the infant, if necessary, to assure an appropriate resolution of the report. If the parents or facility do not cooperate, contact the Youth Court Judge or designee for a court order.
6.  If the findings of the investigation indicate that the infant is medically neglected, the Area Social Work Supervisor must:
    a.  Contact the Youth Court Judge regarding the need for an order to:
        1.  Require parents to seek appropriate medical car, or
        2.  Give custody to the Division to obtain appropriate medical care.
    b.  Confirm Request in Writing
    c.  Assign case to a Worker.
7.  At the conclusion of the investigation, the Area Social Work Supervisor must:
    a.  Must alert within 2 weeks to the Regional Director and to the Child Protective Services Unit that includes:
        1.  Names of:
            ▪  Child
            ▪  Parents
            ▪  Alleged perpetrator
            ▪  Designated contact person
            ▪  Attending physician
        2.  Circumstances surrounding allegations of medical neglect.
        3.  Identities of persons interviewed.
        4.  Investigation/assessment information
        5.  Case disposition
        6.  Action taken, if valid report

    b.  Share the report with the Worker assigned to the case.
    c.  Send letter to the facility administrator regarding disposition.

### c) Death of a Child

The Division will investigate reports where the death of a child is caused by or is suspicious of being caused by abuse or neglect. In addition to the standard investigative/assessment protocol the following procedures must be followed:

1. Notifications
   a. The Worker immediately notifies the Area Social Work Supervisor, if not already informed.
   b. The Area Social Work Supervisor immediately notifies the Regional Director by phone.
   c. The Regional Director immediately notifies the Protection Unit by phone
   d. The Protection Unit will notify the Director of the Division of Family and Child Services.
2. Assignment
   a. If there is an active case/closed case on the victim or any member of the immediate household/family, then the Regional Director arranges for the investigation/assessment to be handled by a Worker outside the region.
3. Investigation/Assessment
   a. The assigned Worker should meet with law enforcement and others as appropriate to outline roles, responsibilities and procedures for sharing information. It is very important to coordinate the investigation/assessment with law enforcement to avoid duplication negating valuable evidence.
   b. Law requires an autopsy on all children under age two who die of unknown or suspicious causes or SIDS. For cases known or reported to the Division.
      ▪ Autopsy is done by State Medical Examiner's Office or one of its designated pathologists.
      ▪ The County Attorney should be immediately contacted to order or arrange for the autopsy if law enforcement has not, or Division staff may request autopsy by contacting the local medical examiner/Coroner's Office.
   c. If the coroner does not honor the request, the State Medical Examiner's Office should be contacted.
   d. The assigned Worker should request a verbal report from the coroner in order to aid in investigation/assessment.
      ▪ The assigned worker reports the initial findings within 24 hours to the County of Responsibility ASWS and the Regional Director if it is an active/closed case, and advise as additional information is obtained.
      ▪ The assigned worker submits a written report to the District Attorney within 72 hours of finding evidence of abuse or neglect.
      ▪ The written report and findings must be submitted within 25 days to the ASWS.
      ▪ When a child died because of abuse/neglect the County of Responsibility sets up a case record with:
         1. Referral Information

286304

43

2. Autopsy Report
3. Written report of investigation/assessment and findings.

If there is an active/closed case on the alleged victim or immediate household/family member the Regional Director will thoroughly review the case records.

**Public Disclosure**

**According to the U.S. Department of Human Services' Child Welfare Policy Manual, disclosure of information related to child fatalities or near fatalities is mandatory. Mississippi Code Annotated Sec. 43-21-257 states the general rule: "any record involving children…shall be kept confidential and shall not be disclosed except as provided in Section 43-21-261." The exception within Sec. 43-21-261 (17) specifies that:**

> **In every case where there is any indication or suggestion of either abuse or neglect and a child's physical condition is medically labeled as medically "serious" or "critical" or a child dies, the confidentiality provisions of this section shall not apply. In cases of child deaths, the following information may be released by the Mississippi Department of Human Services: (a) child's name; (b) address or location;(c) verification from the Department of Human Services of case status (no case or involvement, case exists, open or active case, case closed); (d) if a case exists, the type of report or case (physical abuse, neglect, etc.), date of intake(s) and investigation(s), and case disposition (substantiated or unsubstantiated).**

**The information specified above should be provided by the county to the Deputy Director of Family and Children's Services immediately, and the Deputy Director has the exclusive authority to release this information if requested.**

### d) Out of Home

When the Division receives a report that a child has been abused or neglected in an Out of Home setting, the county in which the Out of Home setting is located must determine that the parent or caretaker of the child was not involved in , nor contributed to the incident of abuse or neglect being reported. If the determination is made that the parent or caretaker was not involved in and did not contribute to the alleged abuse/neglect, the report should be handled as an Out of Home report as described in Section 43-24-105(x) of the Mississippi Code.

According to Section 43-24-353-(8) of the Mississippi Code, these reports of "Out of Home" abuse/neglect must be reported to the local licensing entity, law enforcement, and the district attorney's office in the appropriate jurisdiction. Reports must also be made to the appropriate youth court. Reports of alleged incidents occurring with the state's Training Schools shall be reported to the Division of Youth Services for Investigation.

Upon notification of intake it must be reported by phone or face to face immediately and printed notification within 24 hours to the following:

- Local licensing entity
- Law enforcement
- District Attorney's office in the appropriate jurisdiction
- Youth Court

The Division does not investigate reports in Out of Home settings unless ordered otherwise by the Youth Court. The Division may assist in these investigations if requested by law enforcement, etc.

## III.    Family Centered Practice

### A. Family Team Meeting

A Family Team Meeting is required during an investigation if removal is necessary for the safety of the child. This meeting should occur prior to the removal when possible, or within 24 hours of removal unless the worker is unable, after diligent efforts documented in the case record, to identify, locate, and engage the family.

A FTM is also required during an investigation when safety and risk factors are identified and a safety plan is needed.

A FTM is required during an investigation when evidence of abuse or neglect is found or if there are safety and risk factors present to warrant opening a case.

On all cases, an Initial Family Team Meeting shall be completed within thirty (30) days from the opening of the case. The case is considered open when the Area Social Work Supervisor (ASWS) makes the decision in MACWIS for continuing services. The ASWS should make a decision within five (5) calendar days of the worker's recommendation for continuing services.

Ongoing Family Team Meetings shall be convened, at a minimum, every time the Individual Service Plan (ISP) is updated. FTM's bring together of all relevant parties at frequent intervals to identify needed services, put them into place, and monitor their effectiveness. Refer to ISP/Service Agreement Timeframes for timeframes for ISP completion. (See Practice Guide for examples of other times Family Team Meetings would be appropriate.)

### B. Mobilizing Services

In providing services to the family or child, the Division should recommend services that, in collaboration with the family members, and based on assessment information, are determined to be the most beneficial and least intrusive to the family while maintaining the child's safety. This should include consideration of the ability of family members to access services as needed,

provision of needed services in the home and/or community in which the family members live, and providers that can best meet the family members' needs.

Services shall be mobilized at any point in an investigation when services are needed to maintain a child's safety or reduce risks for abuse and neglect.   The decision to mobilize services should be based on the safety and risk assessment and parental protective factors. Cases with active safety concerns requiring a safety plan or protective custody must be opened for services. Services with no active safety concerns but assessed to have a moderate or high level of risk may be opened for services.  In those situations, the worker should:

- Make decisions with the family regarding the identification of services needed, appropriate providers, and locations of services;
- Make prompt referrals to service providers; and
- Follow up to help ensure prompt service initiation.

If the case is opened for services, the worker should use the CFA and FTM to identify services that need to continue or to be initiated based on the goals, assessment, and case plan.

If the case is not opened for service, but the worker and family determine that services would benefit the family, the worker may assist the family with referrals to community based resources.

## 1. The Individual Service Plan (ISP)

Service Planning is a goal oriented service focused on behavior outcomes.  The service plan should at a minimum describe the problems that the family is facing, identify risks to the child, describe strengths of the family and child, and present the services and actions needed to achieve desired outcomes.  Through evaluation of information gathered during the investigation, the assessment of risk, safety plan and the on-going assessment, the social worker and family together identify problems in need of resolution and develop a service plan.  Families should be full partners in developing their service plan.  The Service Plan will be developed, signed and approved within 30 calendar days from the date of assignment.  In cases where children are placed in the Department's custody, each child is required to have his/her own service plan.  (See Section D, Foster Care Services)

An Individual Service Plan should be completed on the family member or members involved with the Division intervention.

The Service Plan serves as a chart for defining the department's role in working with the family as well as the family's role in working with us.  Intervention and services are required because of an overall case problem such as "this child was sexually abused by her father", or "this child has serious health needs which are not being met by his/her care givers".  However, the Service Plan should go beyond merely describing the maltreatment to clearly identifying the underlying problems that led to the abuse or neglect.  For example, in a sexual abuse case the following problem statements:  "the perpetrator has unlimited access to the child"; "the mother denied that the abuse occurred"; or "this mother does not understand the impact on her child as a result of the sexual abuse", serve to individualize the specific problems of that family on which we will focus our work with the family.  In turn, by clearly defining the problem and what we expect to change in order to adequately reduce the risk of the child, the family has a better understanding

of where they need to make changes and when the goals will be reached. The Department's social worker and supervisor also have a better defined tool for measuring whether or not change has occurred and to what extent.

### a) Components of the Plan

    a. Direct and Support Services: This includes a list of what services are needed that address unmet service and support needs that impact safety, permanency, and well being; that also strengthen relationships, educational needs and culturally responsive services and the support of the family's informal social network..

    b. Reasons for Services: What services and supports to be provided and by whom.

    c. Tasks: These are simple, clear statements that identify specifically what the parent, the social worker, and/or other service providers will do toward resolving the problems; identify the person responsible for each task; and, set a specific time frame that is realistic for completing each task.

    e. Agreed upon goals and outcomes. Timeframes for evaluating family progress.

    f. Signature of the parents and the youth, if age appropriate.

### b) Implementing the Plan

Once the specific problems within the family that are creating risk for the child have been identified, delivery of family centered practice (implementing the plan) begins. All families are different and unique and services should be individualized to best meet the family's needs. Families should be empowered to solve their own problems with guidance from the Worker and other support systems.

Services needed by parents who have been abusive or neglectful of their children may include services that are provided directly by Division staff or services that are arranged for or purchased by the Division on behalf of the client. They include such services as:

Concrete Services: help in locating housing, food, medical treatment.

Educational Services: learning what their children are capable of doing at certain ages; how to discipline without abusing; how to provide safe supervision; how to cope with stress more effectively; parenting training.

Therapeutic Services: such as mental health counseling to address interpersonal relationship problems (marital, self-esteem, self-nurturance, life crisis). Although many abusive and neglectful parents have similar problems in caring for their children, the Service Plan individualizes where changes are needed for one particular family.

## 2. Home Visits and Parent-Related Contacts

There must be at least one monthly visit with any child at risk remaining within a home and with the family, in cases where one child is in treatment etc. during the investigative stage. These visits shall continue as long as there is a case open with the household. Observations shall be made to clearly assess the safety of the child(ren) within the home. The home shall be evaluated for needed services. Visits shall be made to the home of the family to assess the home environment and its safety. These visits must be clearly documented within MACWIS. Documentation shall include detailed information in regard to the worker's observations during the visit and assessment of services needed or provided.

If a case is opened the parent's progress or lack thereof toward remedying the problems listed in the Individual Service Plan (ISP) should be evaluated <u>at least every three months and more often if needed</u>. The evaluation is not a summary of activity, but should explain the effect any changes in the family's structure, behavior, condition, or location has had on the level of risk to the child. The focus of the evaluation should be devoted to the discussion of the parent's progress. Each family issue listed on the Individual Service Plan (ISP) must be discussed in terms of what action was taken to address the problem and with what results.

The parent is an important part of the evaluation process. The social worker should discuss the future direction of the case with the parent during discussions of the Individual Service Plan (ISP).

Through regular home visits and contact with the parents and children, the social worker focuses on the tasks identified in the Individual Service Plan (ISP) and evaluates progress with the parents on changes being made. The use of the Individual Service Plan as our focus for work with the family serves to help parents understand what has been accomplished and what additionally needs to be completed to ensure their child is not at risk. <u>The importance of parents hearing from the social worker where they have made progress cannot be overemphasized.</u>

At the time of the review and evaluation of the Individual Service Plan, the On-going Assessment template should also be updated to reevaluate the risk, safety, and well-being of the child.

In those cases in which services are being provided by someone other than the social worker, regular contact and coordination with that individual or Division must be maintained and documented in the case record. The Department continues to have responsibility for decision-making in the case. Therefore, the social worker must have input from other service providers as a basis for determining if goals have been reached or if revisions in the Individual Service Plan (ISP) need to be made.

## 3. On-Going Assessment: Child Protective Services

The on-going assessment process proceeds on a continuum during which information is gathered to understand the dynamics that brought the family to the attention of the Division. It should

build on information gathered in the Initial Assessment completed during the investigation process. This on-going assessment should be strength-based, culturally sensitive and developed with the family. It should be designed to help parents recognize and remedy conditions so children can safely remain in their own home.

The on-going assessment shall be completed as required on the appropriate screen in MACWIS within 30 days of assignment of the case and in conjunction with completing the individual service plan with the family.

## C. Supervisory Administrative Reviews

The County of Responsibility (COR) Supervisor will be in charge of completing a Supervisory Administrative Review (SAR) on all open cases, regardless of the service type, in their county. A mandatory SAR shall be completed within ninety (90) days of the case opening in order to meet the requirements of Section 43-15-13(3) of the Mississippi Code.

The Adoption and Safe Families Act of 1997 (Public Law 105-89), Section 103(E) discusses that in cases where children have been in foster care and under the responsibility of the state for fifteen (15) of the most recent (22) months a petition to terminate parental rights shall be filed unless compelling reasons are determined that that filing such a petition would not be in the best interest of the child. Therefore, the Division requires a second SAR to be completed at this fifteen (15) months, the Supervisor should review the case to determine the reason. A Supervisor may conduct a random SAR on a case to evaluate the progress or lack thereof.

As a part of the SAR, the Supervisor will review the electronic and paper files of a case as well as conduct an individual conference with the assigned Worker. This review is to ensure progress is being made toward completion of the service goals.

Any SAR completed by the Supervisor shall be printed, signed and filed in the paper case.

In MACWIS, the supervisory review and approval will be done electronically.

## D. Disposition of Cases

### 1. Cases in which the Family's Whereabouts Become Unknown before Completion of Services

It is recognized that some families with whom we are working move without notifying us. If a family moves without leaving a forwarding address and the service task and outcomes have not been achieved which would alleviate harm or imminent danger or harm, we should immediately endeavor to locate them via neighbors, family, schools, law enforcement, courts, mental health facilities, etc. We should alert the appropriate Division in the new locale. The case should be terminated upon transmittal of appropriate information. If the family cannot be located, and therefore, ceases to be eligible for services, the case should be transmitted to

that county.  If they appear I another state and that state's CPS Division requests information, the information should be sent expeditiously.

## 2. Transfer of an Active Service Case to another County

When families move from the county where there is an open Child Protective Services case, the social worker providing the service alerts the other county.

Cases in MACWIS shall be transferred electronically and if a paper file exists it shall be transferred immediately.

## 3. Decision to Terminate a Case

Terminating services in child protective services cases is a difficult decision that needs to be made jointly with all parties involved, including the social worker, the supervisor and **especially** the family/parent in keeping with Family Centered Practice.  **The ASWS must approve every case termination/closure.**

The decision to terminate a case which has received services should be based on evidence that the original issues causing the abuse or neglect have been resolved to the point that the family can protect the child. Termination of a child protective case can only occur if there are no safety concerns presently active. This emphasizes the need to keep accurate records about the original and subsequent objectives which relate to the abuse and/or neglect concerns. The records should, then carefully document that progress has been made in accomplishing those goals and objectives.

Termination is not a sudden separate process but is the last phase of effective case intervention.  The contact with the family is intense early in treatment but lessens as the time for termination nears.  If issues have been clearly identified at the beginning, and during treatment goals and objectives have addressed those problems, then the social worker and all involved should feel comfortable that the child can be reared in a safe environment at the time that the case is closed.

### a) Termination Process

When task and outcomes of the Individual Service Plan (ISP) have been met satisfactorily, the termination process should begin.  Even when the protective service involvement has not been intense, there is sometimes a certain amount of dependence and attachment exhibited by a family.  Therefore, we do not assume that families are always eager to terminate.  A large majority of parents see their social worker as a facilitator on whom they can depend indefinitely, but for many reasons this is not possible.  The social worker must recognize that with the family and prepare the family for termination weeks in advance so that the emotions associated with attachment and dependency needs can unfold and be dealt with therapeutically.  In terminating services to the parent, the social worker should follow these general guidelines:

1. There should be a gradual decrease in social worker/family contact with the family's knowledge and agreement that this is the beginning of the termination phase.

2. There should be a gradual weaning of the family's dependence on the social worker in conjunction with the parent's development of other supports.  Supports may include family, friends, neighbors, ministers, other agencies, and, especially, the parent's own improved capacity to function.

3. There should be discussion between the social worker and family regarding the progress that has been achieved, i.e., in terms of the specific goals and objectives. Emphasis should be placed on the family's strengths and positive achievements.

4. The family should be informed of available resources to contact if they are in need of outside support to help them continue to maintain the changes that have been made during treatment.

5. Closure should take place within the context of the family's capacity to function without the social worker, but the family should feel that the door is not irrevocably closed, that the Division's services are available, if needed again, in the future.

### b) Termination of Long-Term Cases without Achievement

When the social worker has been actively involved in casework services to a family for one year or longer and there has been insufficient progress in the achievement of service task and outcomes, a careful evaluation by social worker and supervisor should be made concerning the continuation of services.

1. Guidelines for this decision should include:

    a.  The family's willingness and capacity to be involved in service planning and the development of tasks and services.

    b.  The individual tasks have or have not been achieved, and what services have been provided.

    c.  Even if problems continue which concern DFCS staff and for which resolutions do not seem immediate, the primary consideration regarding termination versus continued intervention is whether or not the children remain in a harmful or imminently harmful situation.

2. If the children are not suffering harm or are not in imminent danger of harm, the termination process should be carried out with the family as clearly and as positively as possible, and the record should reflect detailed documentation validating this decision.

# IV.    Appendices

## Appendix A

## SAFETY ASSESSMENT

### Part 1:  Primary Caretaker Information

| Primary Caretaker's Name: | MACWIS #: | Date: |
|---|---|---|
| Worker's Name: | | Time: |
| Do they have Native American Heritage?  (If **YES**, proceed with instructions outlined in the Indian Child Welfare Act (ICWA) and MDHS. | | |

### Part 2:  Child Safety Assessment

The following is a list of behaviors or conditions that may be associated with a child being in danger of serious harm.

- Identify the presence of each factor by checking **YES** for all safety concerns marked **YES**.
- Describe the specific behaviors, conditions and circumstances associated with that safety concern.

| | | |
|---|---|---|
| YES ☐<br>NO ☐<br>N/A ☐ | 1. | Select YES and explain if a child has received serious physical harm or injury that appears to be inflicted (non-accidental).<br>Select NO and speak to the appropriate type of discipline used by the family and/or the physical condition of the child.<br>Select N/A if report does not concern physical harm. |
| YES ☐<br>NO ☐<br>N/A ☐ | 2. | Select YES and explain if a child has physical injuries resulting from use of instruments (e.g. cigarette burns, hot water, belts, sticks) to inflict severe pain upon a child or injuries due to dangerous acts (e.g. choking, shaking of an infant, or cruelty).<br>Select NO if the injury is considered accidental.<br>Select N/A if report does not concern physical harm. |
| YES ☐<br>NO ☐<br>N/A ☐ | 3. | Select YES and explain if the caregiver has given an explanation that is inconsistent, insufficient, or will not explain the serious physical injury, and/or if it does not match the child's explanation.<br>Select NO and note the response if the caregiver can explain that the physical injury is not due to abuse.<br>Select N/A if report does not concern physical harm. |
| YES ☐<br>NO ☐<br>N/A ☐ | 4. | Select YES and explain if a child has special needs, behaviors, or medical concerns that are not being met resulting in the child being in danger of harm.  Select NO and explain if these needs are being met.<br>Select N/A if the child has none of these issues. |
| YES ☐ | 5. | Select YES and explain if the caregiver is not protective of the child.<br>Select NO and explain the caregiver's strengths in protecting the child. |

| | | |
|---|---|---|
| NO | ☐ | |
| YES<br><br>NO | ☐<br><br>☐ | 6.  Select YES and explain if the caregiver or other person is threatening to harm the child.<br>Select NO if no one is threatening the child. |
| YES<br><br>NO | ☐<br><br>☐ | 7.  Select YES and explain if the behavior of anyone inside or outside the home is violent and this behavior places the child in danger.<br>Select NO if behavior does not place the child in danger. |
| YES<br><br>NO | ☐<br><br>☐ | 8.  Select YES and explain if the caretaker perceives the child in extremely negative terms and that perception/belief places the child in danger.<br>Select NO and explain the caretaker's positive perception/belief concerning the child. |
| YES<br><br>NO | ☐<br><br>☐ | 9.  Select YES and explain if the caretaker has extremely unrealistic expectations of the child which places the child in danger.<br>Select NO and speak to the caretakers strengths concerning realistic expectations of the child. |
| YES<br><br>NO | ☐<br><br>☐ | 10.  Select YES and explain if drug and/or alcohol use by anyone related to the report places the child in danger.<br>Select NO if substance abuse is not a factor with this family. |
| YES<br><br>NO<br><br>N/A | ☐<br><br>☐<br><br>☐ | 11.  Select YES if anyone related to the case has behaviors symptomatic of mental or physical illness or disability that are uncontrolled and places the child in danger.  Select NO and explain if there are controlled behavior issues.<br>Select N/A if no behavior issues are noted. |
| YES<br><br>NO | ☐<br><br>☐ | 12.  Select YES and explain if the caretaker is unwilling, or unable to meet the child's needs for supervision, food, clothing, and/or shelter.<br>Select NO and document the caretaker's strengths if these needs are being met. |
| YES<br><br>NO<br><br>N/A | ☐<br><br>☐<br><br>☐ | 13.  Select YES if the immediate physical and/or mental health needs of a child with physical or mental health handicaps is not being met by the caretaker.<br>Select NO and document the strength if a handicapped child's needs are being met.<br>Select N/A if the child has no physical or mental health needs. |
| YES<br><br>NO | ☐<br><br>☐ | 14.  Select YES and explain if there are household environmental hazards or living condition concerns for the child.<br>Select NO and document the strength if there are no concerns with this issue. |
| YES<br><br>NO | ☐<br><br>☐ | 15.  Select YES and explain if domestic violence was found or suspected concerning this family.<br>Select NO if there are no concerns of domestic violence with this family. |
| YES<br><br>NO | ☐<br><br> | 16.  Select YES and explain if sexual abuse/exploitation is suspected and circumstances place the child in danger.<br>Select NO and explain if this issue is suspected but the child is safe from danger.  Select |

| | | |
|---|---|---|
| N/A | ☐ ☐ | N/A if no sexual abuse/exploitation is suspected. |
| YES<br>NO | ☐ ☐ | 17. Select YES and explain if the child is exposed to dangerous activities concerning the manufacture and distribution of drugs, drug trafficking or sale of illegal drugs, or any alcohol related offense.<br>Select NO if there are no concerns related to this issue. |
| YES<br>NO | ☐ ☐ | 18. Select YES and explain if the family refuses access to the child, the child's whereabouts cannot be ascertained, caregiver's whereabouts cannot be ascertained, or there is reason to believe the family will flee.<br>Select NO if there are no concerns with this issue. |
| YES<br>NO<br>N/A | ☐ ☐ ☐ | 19. Select YES and explain if a child is fearful of caregiver(s), other family members, or other people living in or having access to the home. Speak to the credibility of the threat.<br>Select NO if the child does not relate any fear. |
| YES<br>NO<br>N/A | ☐ ☐ ☐ | 20. Select YES and explain if there are uncovered problems that cause the child to be unsafe.<br>Select NO and explain if any strength the family may have that ensures safety has not been documented.<br>Select N/A if all concerns and strengths have been covered in this assessment |

Describe safety factors checked 'YES' [in the Mississippi Automated Child Welfare System (MACWIS), each 'YES' answer will give the worker a 'pop-up' box where they can describe the safety factors.]

**If any safety factors are checked 'YES', a full Investigation must be completed. If a safety plan is needed, consult with a Supervisor and implement one immediately. (If 'YES' is check, MACWIS will take the worker automatically to the Safety Plan.)**

**Part 3:  Maltreatment Findings (Complete only if on Safety Factors checked 'YES')**

Describe what you determined regarding the allegations of abuse or neglect reported. Detail contacts made, observations made, statements related to the allegations, collateral contacts and any other concerns identified during the Safety Assessment. Detail any referrals made.

**Signatures**

Worker: _____     Date: _____

Supervisor: _____     Date: _____

**Appendix B**

**MISSISSIPPI DEPARTMENT OF HUMAN SERVICES**
**DIVISION OF FAMILY AND CHILDREN'S SERVICES**

---

**Safety Plan**
1) Safety plans should be developed only when a decision of "unsafe" has been determined and workers, with supervisory approval, assess that without the plan, the child(ren) cannot remain safely in the home.
2) Safety plans are completed during an investigation and on any Prevention or Protection case in which safety issues are identified. The safety plan must be related to the safety factors identified in the safety assessment. Describe the safety plan as follows:

---

1) Identify specific serious harm or the immediate safety threat of serious harm as identified in the Safety Assessment.


2) What actions have or will be taken to protect each child (ren) in relation to the current safety concern?


3) Will the plan involve: (a) In home services? Yes_____No____
      (b) Alternative caregiver? Yes_____ No_____

4) If yes for alternative caregiver in # 3, has a background check been completed? Yes_____ No_____


5) Who is responsible for implementing each plan component?


6) How will the plan be monitored and evaluated and by whom?


7) What time frames have been imposed by this plan?


8) Under what conditions will termination of the Safety Plan occur?

**SIGNATURES AND DATES FOR SAFETY PLAN**
**(Do not complete if child(ren) are removed from the home and placed in the Division's custody)**

**The safety plan and the ramifications of non-compliance have been discussed with the caretaker and all those who are responsible for carrying out the plan. They have agreed to enter into this agreement with the Department of Human Services (DHS) and the conditions set forth.**

DHS Worker_____ Date_____
Worker's Phone number_____
Supervisors Name and Phone Number_____

We have discussed the safety plan with the worker. We understand the contents and that it is voluntary, and agree to abide by the terms and conditions of the plan. If something happens that prevents us from carrying out the plan we will immediately notify the worker/supervisor. We understand that failure to agree to the plan or to carry out the plan may result in a reassessment of my home and possible protective custody of my child(ren) and removal from my care. I will then have the opportunity to appear in court and present my case.

Parent/Guardian_____Date_____
Other Parent/Caretaker_____Date_____
(if more than one caretaker in the home)

Person most responsible for carrying out the safety plan, if other that parent or caretaker:
Name_____Relationship_____Date:_____

**OTHER SAFETY PLAN PARTICIPANTS:**

Name_____Relationship_____Date:_____
Name_____Relationship_____Date:_____
Name_____Relationship_____Date:_____

**SAFETY PLAN MONITOR:**

**DHS WORKER/SUPERVISOR**_____ **DATE**_____

**SUPERVISORY APPROVAL OF SAFETY PLAN**

☐ **Supervisor gave verbal approval by phone**
    Name of supervisor_____Date_____Time_____

☐ **Supervisor's Approval of written plan**_____Date_____Time_____
                                                     **(Signature)**
**Supervisor's Phone:**_____

**The safety plan is in effect from** _____**until**_____.

    Original-Case file
    Copy 1-Parent/Caretaker (the parent/caregiver must both sign and be given a copy of the plan)
    Copy 2- Person most responsible if other than parent/caretaker

DHS
286319

**Appendix C**

**Risk Assessment**

1. What is the exact nature of the abuse and/or neglect?  Describe the parent/caretaker's initial response.  Describe the maltreatment found and describe any injuries.

2. If abuse and /or neglect is found how long has it been going on and what is the impact on the child?

3. How do the parents/caretakers and the children view their current situation?  Describe the caregiver's ability to provide basic needs.

4. Describe the parents/caretakers level of functioning.  Are the parents/caretakers capable of addressing issues related to the maltreatment?

5. Describe any mental/physical health concerns of household members.  Do any concerns pose danger to the child?

6. Describe how the each child's functioning ability as it relates to such things as age, communication skills, school performance, physical and behavioral health, and fear of harm.

7.  Describe the family's support system.  What kinship resources are available to family?

8.  Identify and describe caregiver and family strengths, and protective capacities.

9.  Describe family and caregiver-child relationships.  Include things such as parenting style, parenting knowledge and skill, and discipline techniques.

## Appendix D

## BEHAVIORAL INDICATORS OF ABUSE

**Preadolescent :**
1. Stylized behavior, excessive seductiveness
2. Unusual interest in sex organs of self or others (either children or adults
3. Fearful or suspicious of adults
4. Tugging at clothing in genital area
5. Tired, lethargic, sleepy appearance
6. Regressive behaviors: such as whining, negative changes in toilet habits
7. Persistent fears or overwhelming nightmares
8. Blaming or dislike of self
9. Change in school grades
10. Public or excessive masturbation
11. Developmental delays
12. Child is perceived and/or treated by parent as "bad," unusual, and/or different
13. Behavioral extremes (e.g. extremely aggressive or passive; persistent crying)
14. Child assumes parental role (i.e., caregiving of one or both parents and/or siblings beyond normal "role playing "for child's age
15. Lack of peer interaction
16. Threatens or attempts suicide
17. Psychosomatic illness

**Adolescent:**

1. Stylized behavior, excessively  provocative beyond the norm for the child
2. Shy, withdrawn, overburdened appearance
3. Change in school grades
4. Running away
5. Self-destructive behavior
6. Substance abuse that is more experimental
7. Unwillingness to participate in group activities
8. Stealing; shoplifting
9. Pregnancy wishes
10. Prostitution
11. Fear or distrust of mean, adults
12. Statements about being "bad" or "undesirable"
13. Way of/avoidance of physical contact
14. Excessive longing for affection
15. Child assumes parental role or role as spouse of parent (i.e., care giving of one or both parents and/or siblings beyond normal "role playing" for child's age)
16. Reluctance to change clothes for gym class
17. Lack of peer interaction
18. Threatens or attempts suicide
19. Psychosomatic illness

# Appendix E

Mississippi
Form MDHS-SS-437
Revised 05-01-99

## Safety Checklist for Children

Yes, No, N/A

### POISONS

_____ 1. Are dangerous/poisonous items kept out child's reach? (i.e. Medicines, lighters, matches, dye, bleach, poisons, cleansers, mothballs, motor oil, antifreeze)

### FIRE HAZARDS

_____ 2. Are utilities obtained legally?

_____ 3. If electricity/gas are off, is the means of heating and lighting safe? (i.e. candles should not be near curtains, no open flames)

_____ 4. If heating with fire place, wood heaters, etc. is there a protective barrier between the heater and the child? (i.e. gate, screen guard, etc.?)

_____ 5. Is there a safe place for the child to be while the parent is cooking or unable to give the child their full attention? (i.e. playpen, crib, high chair?)

_____ 6. Are electrical cords/plugs in good condition? (i.e. no loose wires coming out of the wall)

_____ 7. Are electrical outlet covers on all plugs not in use?

_____ 8. Is there a fire extinguisher in the home in working condition?

_____ 9. Is there a working smoke alarm in the home? (test it)

_____ 10. Is the temperature of the hot water heater between 120 and 130 degrees Fahrenheit?

### DROWNING HAZARDS

_____ 11. Is there constant supervision while the child is bathing or near water?

_____ 12. Are toilet seats kept down and do sinks and tubs drain properly to prevent unwanted collections of water? (Child can drown in less than 2 inches of water)

_____ 13. If mop buckets are used in the home, are they emptied and stored away after uses?

_____ 14. If home has a pool, is the pool properly safe guarded with a fence and life saving devices?

### FIREARM HAZARDS

_____ 15. If guns are in the home, are they locked away from children?

_____ 16. Is ammunition kept in a separate place from the firearms and is it locked away or out of child's reach?

### CAR SAFETY

_____ 17. Does the child have a car seat? (A child should use a safety seat at least until the age of five and if a child weighs more than 20 lbs., he should face forward in the automobile.)

### GENERAL SAFETY

_____ 18. Does the child have a safe and secure sleeping space? (Children have suffocated when sleeping with adults; they have fallen off adult beds and sofas and have become lodged between the wall and the bed.)

_____ 19. Is the home free of rat or roach infestation? (Both carry disease which can be harmful to adults and children.)

_____ 20. Are kitchen knives stored out of children's reach?

_____ 21. Is there a caretaker available to provide supervision if the parent has to leave the home for any amount of time? (Children should not be left without proper adult supervision.)

_____ 22. Is the inside of the home free of any hazardous debris? (Undisposed trash, cans, bottles, etc.)

_____ 23. Is the outside of the home free of any hazardous debris? (Undisposed trash, cans, bottles, glass, exposed rusty nails, tall grass and weeds, car parts, etc.)

_____        _____
Social Worker                  Parent or Caretaker

This checklist should be discussed with the parent or caretaker of all children during all investigations. It should be signed by the social worker and the parent or caretaker. A copy of the form should be left with the parent or caretaker.

DHS
286322

61

**Appendix F**
Resource Report Risk Tab
(Only activated for Resource Report)

1)      In what type of placement was the maltreatment alleged to have occurred (foster care placement or adoptive placement)?  If foster care then what type setting (foster home, group home, residential treatment, therapeutic foster home, relative placement, etc)?

2)      Who is the Alleged Perpetrator?  What is there relationship with the victim?

3)      Describe the nature, frequency, and duration of the maltreatment:

4)      What is the permanent plan for the child(ren)?  How does the child(ren) perceive the placement where the alleged maltreatment occurred?

5)      Does the Resource have a history of maltreatment with the Division?  If so, were any of the allegations substantiated? __Yes __No

6)      Is there a violation of Division policy or licensure standards?

7)      Would the child be in any danger if left in this placement? Yes__ No__
If the child is in danger in the placement the Division will address the danger with Removal __
Safety Plan only (child not removed) __ N/A__.  Explain your answers:

## Appendix G

## NOTICE OF PARENT/GUARDIAN'S RIGHTS
## INVESTIGATIONS

You have rights and responsibilities while you are involved with the Division of Family and Children's Services (DFCS) during an open investigation. The normal hours of operation for the DFCS are 8:00 a.m. until 5:00 p.m. Monday through Friday, excluding state holidays. In case of emergencies, contact may be made after hours, weekends, and/or on state holidays.

## YOU HAVE THE RIGHT TO:

1. Know what has been reported to the Division about your family.
2. Be informed that a worker has spoken to your child.
3. Help from your worker in correcting any problems discovered during the investigation.
4. Have office phone numbers and office addresses for your worker and your worker's supervisor.
5. Participate in any court hearings which may result from the investigation.
6. Know the outcome of the investigation.
7. Have your Native American (Indian) ancestry recognized and respected. We will tell the Bureau of Indian Affairs about our involvement with your family and follow the tribe's decisions for handling your investigation.
8. Be treated with dignity and respect and receive services without regard to age, race, color, creed, religion, national origin, sex, disability, or political affiliation.

_____ / _____          _____
**Client(s) initials**          **Worker initials**


## YOU HAVE THE RESPONSIBILTY TO:

1. Provide full names, dates of birth, social security numbers for household members and other necessary information requested by your worker.
2. Cooperate with your worker and participate in service decisions.
3. Ask for and be a part of all Family Team Meetings.
4. Give to your worker the names, phone numbers, and addresses of your relatives who may be able to care for your child if necessary.
5. Give your worker all requested medical and educational information about your child.
6. Pay the cost or part of the cost of some elements of the investigation (such as paying for a drug screen or a medical exam) **if requested.**

_____ / _____          _____
**Client(s) initials**          **Worker initials**

## CONFIDENTIALITY:

Your family's information is confidential and private. We will not disclose any information without your written permission or by order of the court. However, information may be shared with law enforcement or the Office of the District Attorney without your written permission. We may contact other people to assess the safety of your child.

Confidentiality laws additionally limit the information we can share with you. We are not able to name the reporter in any investigation, tell you what anyone else said, or give you a copy of any investigation.

_____ / _____          _____
**Client(s) initials**          **Worker initials**

---

*The court of your county has the authority to modify any of the statements above.*

---

**Client(s) :** _____ / _____   **Date:** _____

**Worker:** _____   **Date:** _____

**Ex. 28**

STATE OF MISSISSIPPI
DEPARTMENT OF HUMAN SERVICES
DIVISION OF FAMILY AND CHILDREN'S SERVICES

# Section D:  Foster Care Policy

## Revisions August 2010

**MDHS-Division of Family and Children's Services**
**8/25/2010**

This document represents the work of the Section D policy work group with support from the Center for the Support of Families and the University of Southern Mississippi.

The County of Responsibility Worker shall obtain an initial health screening in accordance with American Academy of Pediatrics from a qualified medical practitioner for all children within seventy-two (72) hours of custody to determine immediate health needs.

Within thirty (30) calendar days of custody and yearly thereafter, each child shall receive a comprehensive health assessment. This examination can be obtained through Early Periodic Screening, Diagnostic, and Treatment (EPSDT) through the local Health Department or from any medical provider. The form for this referral can be located in MACWIS under the Case navigation bar, EPSDT icon. The comprehensive health assessment should include a drug and alcohol screening if warranted.

If possible, the initial health screening evaluation and comprehensive health assessment may be conducted in one visit.  In such instances, this combined visit shall be conducted within 72 hours of placement.  Workers will ensure that all follow-up services recommended are provided and documented.

A developmental screening of all children, 3 & older, is required upon entering care.

### a)  Early Intervention Program

All children in custody, age birth through two years (up to 36 months), shall be referred to the First Steps Early Intervention program through the local Health Department for assessment and follow-up services as needed as designated in federal and state legislation. In 1986, the Education for all Handicapped Children Act (Public Law 94-142) was amended to add rights for infants, toddlers and preschool children and their families. In 1990, the Education for all Handicapped Children Act was renamed Individuals with Disabilities Education Act (IDEA). The early intervention portion of the law was referred to as Part H- Early Intervention for Infants and Toddlers with Disabilities and their Families. The Mississippi definition of infants and toddlers with developmental delays or disabilities is "children ages birth to 36 months who need early intervention services."

### b) Medical Records

The Social Security Act, Section 475 (1) (c), requires that the child's most recent available medical and educational records for children in custody be maintained in the child's case record. The Division worker must provide a copy the updated medical and educational records of said child to the placement provider at the time of each placement.

### c)  Immunizations

Section 41-88-3 (1) of the Mississippi Code Annotated charges the  Mississippi State Department of Health (MSDH) with the responsibility "for assuring that all children in the state are appropriately immunized against vaccine-preventable diseases. The immunizations

**g) Achievement Criteria – Living Independently**

Living independently is achieved when the Division is relieved of custody and any responsibilities regarding the youth.

**h) Long Term Foster Care**

If none of the above listed alternatives are available for the youth, the Worker will evaluate the possibility of a long term foster care arrangement with the youth's current placement resource. If this is the case, then long term foster care is the plan and the Division may retain custody until the youth can live independently. This type plan is considered appropriate only for a relatively small number of foster children.

There may be instances where, after the long term foster care plan has been made, the legal parent's or youth's circumstances may change. Under such circumstances reunification, durable legal custody or adoption becomes a more appropriate plan and long term foster care may be terminated.

If this appears to be the best plan for the child and all other permanency plan options have been explored and eliminated, a goal of Long Term Foster Care must be approved by the Worker's Supervisor and Regional Director.

**i) Children Who are Not Eligible for Long Term Foster Care**

Long Term Foster Care is not a permanency option that is available to all foster children/youth. The option shall not be assigned to the following:

- Children (younger than 14 years of age) are not eligible because a more stable permanent arrangement is the plan of choice for those children when reunification or custody with relatives or other individuals with significant connections are not possible. An exception to the age 14 criteria may be granted by the court of jurisdiction.

- Children voluntarily placed into foster care through the use of Form MDHS-SS-456 and without a formal court order are not eligible because of the temporary status of their custody.

**j) Worker's Responsibilities in Achieving Long Term Foster Care**

1. Explore and rule out all other permanency plan options.

2. Document in compelling reasons and forward to the Supervisor a summary containing the following information:

- Why the youth cannot return to parents or primary caretaker.

- Why the youth cannot be placed with relatives for custody, legal guardianship or durable legal custody.
- Why the youth cannot be freed for adoption.

- The relationship between youth and current placement resource.
- A plan of continued contact with parent(s), primary caretaker, siblings, relatives and other connections.

3. Continue to explore the possibility of a more permanent plan.
4. Help the youth maintain a relationship with parents or primary caretaker.
5. Visitation should be encouraged and addressed in the youth's ISP.

### k) Authorization for Long Term Foster Care

The Worker will document justification for the selected goal of Long Term Foster Care in MACWIS in the child's ISP, Initial/Review tab, Compelling Reasons radio button. When this plan is chosen, a tickler will be automatically sent to the Supervisor and if the goal is approved, a tickler is sent to the Regional Director for his/her approval. If the Regional Director disagrees with the permanent plan of Long Term Foster Care, he/she may either suggest a new goal for the child or call for a case staffing with the Supervisor and Worker.

### l) Achievement Criteria - Long Term Foster Care

Since Long Term Foster Care is not a plan to be achieved and offers no sense of permanence, there are no criteria for achievement

## D. Reviews

### 1. Supervisory Administrative Review

The Division Supervisory Administrative Review (SAR) is an administrative review that meets the requirements of Mississippi state law section 43-15-13(3) which require that all open cases have a supervisory review. Additionally, the Adoption and Safe Families Act of 1997 (Public Law), Section 103(e) discusses that in cases where child have been in foster care and under the responsibility of the state for fifteen of the most recent twenty-two months a petition to terminate parental rights shall be filed unless compelling reasons are determined that filing such a petition would not be in the best interest of the child.

The Supervisory Administrative Review is completed in MACWIS at the following intervals by the County of Responsibility Supervisor:

1. Initially, the SAR is required within 90 days after opening a placement case,

2. A second SAR shall be completed at the fifteen out of twenty-two month interval, and

3. At random to evaluate the progress or lack thereof on a case.

DHS
286416

91

**Ex. 29**

# The Statewide Resource Development Plans

Submitted By:

**The Mississippi Department of Human Services**
**Division of Family and Children's Services**



**September 1, 2010**

DHS
286196

# The Statewide Resource Development Plans

## Table of Contents

**Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

**Section I:  Mental Health Services** . . . . . . . . . . . . . . . . . . . . . . . . . . **6**

**Section II:  Reunification Services** . . . . . . . . . . . . . . . . . . . . . . . . . **28**

**Section III:  Recruitment and Retention of**
**Therapeutic and Non-Therapeutic**
**Resource Homes** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **47**

2

DHS
286197

# The Statewide Resource Development Plans

## Introduction

The Division of Family and Children's Services (DFCS, also referred to as the Division) of the Mississippi Department of Human Services (MDHS) has prepared three Statewide Resource Development Plans that address services that are essential for the care and protection of children involved with DFCS, regardless of whether they are being served in their own home or have been placed in foster care. In developing these plans and action steps for implementation over the next twelve months, DFCS has given careful consideration to the findings and recommendations from the Foster Care Services Needs Assessment that was conducted by the Center for Support of Families (CSF) in 2009. This assessment included an examination of needs across a range of different services including the mental health service array, reunification services, and placement services. CSF based its findings and recommendations on extensive information gathered through surveys, interviews, and focus groups with representative groups of internal DFCS staff along with interviews held with individuals from other State agencies and providers from each of these service areas. The assessment also involved a review of data reports, case records, and various resource directories and provider listings. In addition to addressing the most critical issues noted in the Foster Care Services Assessment, DFCS has considered the relationship that these 12-month Statewide Resource Development Plans have with the following other influential factors:

- **The implementation of the Practice Model:** During the 12-month period of activities described in the Statewide Resource Development Plans, Region I-South and Region II-West will be fully implementing the Practice Model in 14 counties. An additional set of 17 counties will begin full implementation in January, 2011, when Region IV-North and Region V-West complete the planning period which includes a baseline Continuous Quality Improvement (CQI) review and completion of a desk audit. With the addition of Regions I-North, III-South (which includes Hinds County), and IV-South, another set of 15 counties will begin full implementation in July, 2011, after completing their planning phase of the process. Therefore, by September 1, 2011, 46 counties will be implementing the Practice Model framework, representing over half of the counties in the state and a substantial number of families being served by DFCS with the inclusion of Hinds County during this period of time.

As each region of the State implements the Practice Model, a part of the initial planning process is to identify needed services within the region, convene local implementation teams that include service provider representatives, and consider ways in which needed services can be developed or enhanced during the Practice Model implementation period. This is particularly important to the success of staff in implementing regions in carrying out the requirements of the Practice Model components related to safety assurance and risk management, strengths and needs assessments, individualized and timely case planning, and mobilizing appropriate services. Therefore, DFCS is prioritizing, to some extent, the development of resources in those regions while providing steps for expanding the service array across all areas of the State.

3

- **The engagement of service providers and resource families in the design and implementation of the plan:** The Division has recently implemented a number of recent changes affecting the procurement of needed services. In addition to laying groundwork for establishing a performance-based contracting system for procuring services, new rates for foster care board payments have also been implemented over the past 18 months in accordance with the required timelines. Other recent developments underway include plans to issue new licensing standards for residential providers and child-placing agencies by January 2011. Furthermore, DFCS has initiated plans to develop several new requests for proposals for services to be delivered across the State that reflect considerable changes in programmatic expectations, both in the scope of services and in the manner in which these will be delivered. At the State level and also in the 13 DFCS regions, it is clear that over the next 12 months, increased attention is needed to build provider capacity and also support the development and diversification of a more comprehensive and responsive statewide resource array that is consistent with the principles of the Practice Model and the underlying principles of the settlement agreement. Thus, steps to achieve the full engagement of service providers and resource families need to be incremental, focused, and aligned with a long-term view of the continuum of care and how DFCS will develop an infrastructure, over time, to achieve it.

- **Maximization of Federal funding:** Currently, there are several initiatives taking place to explore ways to leverage Federal funding opportunities. One major pursuit involves efforts to increase Medicaid coverage for eligible children and adults involved with the child welfare system. The IV-E penetration rate for the State is quite low in comparison to other States in the country, particularly those with similar demographics. The Center for Support of Families is working with DFCS to evaluate cases determined to be ineligible for IV-E foster care maintenance payments and determine if increased efforts could lead to increased eligibility rates. Additionally, Casey Family Services will provide technical assistance in evaluating Medicaid eligibility for children in foster care. DFCS believes that the lack of full Medicaid coverage is contributing to an increase in expenditures of State funds for many children's services that would otherwise be covered by Medicaid, such as medical, dental, and mental health treatment. The Mississippi Division of Medicaid (DOM) is working closely with DFCS to augment the potential to cover some therapeutic services that are similar to other mental health services covered by the State Plan. The Mississippi Department of Mental Health (MDMH) is also collaborating with DFCS to move forward with new initiatives based on shared funding to increase access to mental health services for children and families involved with DFCS. DFCS also recently submitted a Federal grant proposal in collaboration with CSF that, if funded, will provided much needed support for recruiting and retaining foster and adoptive families.

It is critical to the success of these Statewide Resource Development Plans that DFCS has the capacity to maximize all available funding in order to achieve a substantial expansion of services across the State. These efforts will require the continuation of the strong degree of cooperation among all of the agencies during the next year and beyond, along with a considerable amount of time and effort spent on fiscal analysis and budgeting.

4

DHS
286199

- **Interrelatedness of mental health services, reunification services, and non-therapeutic and therapeutic resource home placements in a continuum of care:** Although reunification services and resource home placements are targeted toward children who are in the custody of DFCS, the provision of mental health services is also a critical support for children placed in out-of-home care as well as for their families, regardless of their placement settings. Effective mental health services are essential to address many of the issues and needs of children served in their own homes by DFCS. These plans recognize that across the continuum, these three areas of services need to be coordinated, flexible, and tailored to allow for an optimal level of individualization. Whether the services are delivered simultaneously or separately in the life of a case, they are all vital to both the in-home and foster care array of resources, and the Statewide Resource Development Plans focus on strategies to ensure that all are accessible when needed.

- **State-level monitoring and implementation of a continuous quality improvement system:** DFCS is actively engaged in the implementation of a CQI system and has conducted case reviews in the first two regions where the Practice Model is being implemented. As a part of the case review process, an assessment of the service array is part of the evaluation of individual child and family outcomes as well as overall system performance. Another key component to the case review process is the input obtained from children and families who are the consumers of these services. It is inherent to the CQI design as well as the Practice Model's framework that families have a voice in the determination and selection of the services that they receive. Consequently, the CQI system will serve as a mechanism for identifying strengths, gaps, and needs in the provision of these three particular types of services as part of the full resource array.

The upcoming case reviews and newly developed data reports will provide vital information that will serve to inform and shape service provision during the 12 months as part of an ongoing and continuous monitoring and evaluation process. Additionally, there is increasing capacity at the State Office to monitor compliance with licensing standards, contract performance issues, and utilization of services and tracking of placements as a result of both hiring and organizational changes. The appointment of a Director of Resource Development for DFCS will also strengthen the capacity to monitor the implementation of this plan.

The following pages describe the background, rationale, activities, and time frames associated with each of the three resource development plans required in the Bridge Plan.

5

## Section I
## Mental Health Services

The DFCS contact position responsible for tracking and monitoring the implementation of this plan is the Director of Resource Development.

*Background*

The Division is currently implementing a number of provisions regarding mental health services to children in DFCS custody. These include:

- Conducting a thorough screening of the child and an individualized, strengths-based, family-focused, culturally responsive assessment of the family within 30 days of a child entering foster care;

- Developing a permanent plan within 30 days of entry into care; the services in this plan are to be targeted to behaviors or conditions resulting in placement;

- Providing directly or through referral or contract a broad range of services to meet child and family needs and address behaviors/conditions that resulted in child's placement;

- Ensuring that mental health assessments are conducted for all children, age 4 and older, within 30 days of entering foster care and providing mental health services; and

- Ensuring that potential adoptive families are advised of post-adoptive services to be provided to ensure stable placements including respite, counseling, mental health treatment, crisis intervention, family preservation, and peer support.

For children not in the custody of DFCS, the Division also has a central role in referring and/or arranging for mental health services for adults and children who are receiving protective and prevention services. Many of the children and families receiving protective services in the State need some type of mental health services to address the issues that necessitate child welfare intervention.

The 2009 Foster Care Needs Assessment included a thorough review of the existing mental health service array and provider network. In issuing its report, CSF noted the following issues related to the Division's capacity to access needed mental health services:

- MDMH has the responsibility for determining the mental health needs for children and youth in the State and for the planning and development of programs to meet those needs. These children and youth include: 1) those in foster care needing mental health services, 2) children and adults with an open protective service case, and 3) the general population of children and families residing in their communities, if any of these groups have an identified mental disorder and meet one of the eligible diagnostic categories.

6

- MDMH's primary method for providing services is through the 15 community mental health centers in operation statewide.  These centers are DFCS's first source for accessing needed services for foster children and families receiving protective services. The services that are *required* to be provided by each mental health center include diagnosis and evaluation, outpatient services, day treatment, case management, and psychiatric services. Across the State, the centers do not offer a consistent range of services, particularly in rural areas of the State where services are considered to be quite limited, and they are often unable to provide the level of specialization needed by children in foster care.

- Although there are a number of private providers who offer mental and behavioral health services, access is restricted, particularly in rural areas of the State, by lack of funding to pay for the services, by wait lists to obtain services even when they are available, and by a lack of providers that will accept Medicaid.

- Some mental health initiatives, such as the Multidisciplinary Assessment and Planning (MAP) teams and the Mississippi Youth Programs Around the Clock (MYPAC) offer effective approaches to meeting the MH needs of children in the child welfare system, but are limited in scope, funding, or criteria for the population served.  For example, a wraparound services approach would be beneficial to all children not just those with Serious Emotional Disturbance (SED), and the inter-disciplinary approach of the MAP teams could benefit children before they exhaust other available services but funding is very limited.

- Obtaining psychological evaluations is particularly difficult, as there are areas of the State where this service is not available.

- There is little or no choice of providers in rural areas.

- The effectiveness of some services is generally regarded as poor, indicating a need for more choices of providers, more accountability in service provision, and strengthened ability to tailor services to meet the individualized needs of children and youth.

In making recommendations regarding strategies to address gaps and increase access to mental and behavioral health services, CSF provided that the following steps be considered:

- DFCS and MDMH develop a collaborative program to serve the mental health needs of foster care children state wide, including specialty services e.g., psychological examinations, treatment for abuse and neglected children and youth, etc. This should include the possibility of hiring qualified mental health professionals to be based in DHS regional offices to serve counties where the service population is the greatest or where gaps in services are the most prevalent, for example, in many of the rural areas of the State.  Programs of this nature can offer a diverse range of services and can be structured to enable Medicaid billing to cover a majority of the staffing and administrative costs.  The participation of the DOM should be

7

pursued to explore further creation of these types of innovative programs along with funding arrangements.

- DFCS should collaborate with MDMH and the DOM to establish additional waiver programs to expand its provision of mental health services to children who are placed in foster homes. The MYPAC program is one example of a waiver program that could also serve children residing in foster family homes at risk of entering Psychiatric Residential Treatment Facilities (PRTF), thereby enabling these youth to receive needed services and remain in the community.

- DFCS should collaborate with the psychology and behavioral science programs of the State's post-secondary systems to explore the possibility of establishing internships and field placements within DFCS, providing opportunities for professional and academic advancement that includes direct services and interventions to children and adolescents in foster care.

Additionally, CSF recommended that measures be taken by DFCS to strengthen supervisory practice and monitoring of casework practice in order to ensure that timely mental health screenings are conducted, mental health services are provided as needed, and documentation of services and appropriate recordkeeping is maintained. A related recommendation points to the need to establish CQI monitoring processes to track and evaluate the provision of mental health services a part of appropriate case planning and also the sharing of a child's mental and behavioral health information with resource parents and placement provider to enable those individuals caring for the child to meet his/her needs.

***Rationale for the Selected Priorities, Strategies, Action Steps and Timelines in the Plan***

Experience has proven that investing in multi-agency collaboration will yield both short and long-term benefits in program development and fiscal support. As the MDMH is the designated agency to provide a spectrum of services to individuals with mental, emotional, or behavioral disorders, maximization of their resources is essential. Medicaid coverage for mental health services is the primary means for handling the costs of these services.

The implementation of the Practice Model provides an opportunity to increase staff's skills and competencies in order to identify the underlying needs of individual family members as the foundation of case planning. Thus, staff can address the identified needs through appropriate services. Merely expanding the service array without building staff and provider capacity to assess the mental, emotional, and behavioral strengths and needs of the members of the family will not promote the most effective utilization of available resources.

Phasing in new therapeutic approaches and interventions in counties that are implementing the Practice Model will permit services to be evaluated, modified, and refined before replicating these model initiatives in other counties across the State. It will also assist DFCS in its capacity to allocate limited financial resources and garner additional funding support.

8

DHS
286203

Mental health screenings, evaluations, and assessments are critical to understanding the range of issues impacting an individual's emotional and psychological functioning and well-being. The availability of these services strengthens the diagnostic and treatment planning and subsequent crafting of interventions to address the relevant concerns.

Finally, an increase in the pool of private providers who have particular specialized areas of expertise will not only serve to augment the existing resource array but will also enable further diversification and freedom of choice for families.

In order to increase access to mental and behavioral health services and address the recommendations made by CSF, DFCS has established the following priorities with identified strategies, action steps, and timelines for the next 12 months:

---

**Priority Area One: Collaborate with other State agencies and private providers to expand access to appropriate services**

---

**Strategy: Collaborate with MDMH to establish regional mental health teams**

A collaborative program is currently in development to provide a team (one mental health therapist and one case manager) of mental health professionals to be based in those county offices for which there is an established need. The MDMH has recently held conversations with many of the 15 Community Mental Health Centers (CMHC) that are committed to collaborating with DFCS in this effort. DFCS will provide MDMH with a percentage of the salary for each team member. The team will be located in the local DFCS offices and will provide services solely for children and families served by DFCS. Each team will provide an array of services to include:

- In-home intervention including basic living skills, family support, crisis intervention

- Mental health evaluations/screening/diagnostic testing

- Individual counseling

- Family counseling

- Mental health consultation

- Intake evaluation and referral for needed psychiatric and substance abuse services as well as referrals for day treatment

As part of the agreement with MDMH, DFCS will play an active role in the hiring process and training of the team members. Team members will receive training that supports assessments and interventions related to issues widely known to affect families involved in the

9

DHS
286204

child welfare system, including substance abuse, domestic violence, family history of abuse, sexual abuse, separation and attachment, etc. The focus of training for each team will be decided upon by the DFCS regional staff. Each Region will determine how to structure the service delivery so as to provide services to the areas of greatest need and to maximize the funding available.

The teams will be implemented in conjunction with the implementation of the Practice Model, unless a greater need is established within another region. Each region will have access to one team unless additional funding becomes available to provide multiple teams within each Region. The MDHS budget request for 2012 includes funding for eight (8) teams. The 2013 budget request will include funding for thirteen (13) teams to provide coverage in each Region.

Processes will be in place to monitor the services being provided by the teams to determine if funding a portion of the team's salary is the most efficient and effective way to continue the in-house model. This process includes a modifier being added to the Medicaid billing statement. This would allow the DOM to run a detailed report of services being provided to DFCS children and therefore, a way to determine if paying the match for services being delivered or continuing to pay a percentage of the team's salary would be better financially.

## Action Steps and Timeline

| Action Steps | Responsible Positions | Time to Begin | Time to Complete | Expected Progress July 2011 |
|---|---|---|---|---|
| Conduct planning sessions with CMHC Children's Coordinators to finalize plans for teams, including; necessary legal documentation, necessary financial documents, recruitment and training plans, etc. | Director of Resource Development | September 2010 | November 2010 | Completed in I-S, II-W, IV-N, V-W, I-N, III-S, and IV-South |
| MDMH will meet with Regional Staff to determine where teams will be located and what specific services are needed | CMHCs<br><br>Director of Resource Development<br><br>Regional Directors (RD)<br><br>Area Social Work Supervisors (ASWS) | September 2010 | January 2011 | Location and services will be known for all I-S, II-W, IV-N and V-West. |

10

| Develop Memorandum of Understanding (MOU) with CMHCs | Office of Field Operations | September 2010 | July 2012 | MOU will be in place for I-S, II-W, IV-N, V-W, I-N, III-S, and IV-South. |
|---|---|---|---|---|
| MDMH and DFCS staff will work together to recruit, hire and train mental health teams. | MDMH<br><br>RD and ASWS | September 2010 | July 2011 | Teams will be in place in I-S, II-W, IV-N and V-West.<br><br>Regions I-N, III-S, and IV-South will have teams in process of hiring. |
| Develop modifier to track Medicaid billable services being delivered to DFCS children and families | DOM<br><br>Director of Resource Development | September 2010 | October 2010 | Modifier will be used by teams in I-S, II-W, IV-N, V-W, I-N, III-S, and IV-South. |
| Assess funding options | Division of Budget/Financial Planning | May 2010 | Ongoing | An initial financial assessment of funding options will be completed for use in decision making for continued funding for upcoming SFY |
| Request additional funding for the 2012 and 2013 Fiscal Years | Division of Budget/Financial Planning | July 2010 | July 2011 | Funding for 8 mental health teams will be included in the SFY 2012 budget request. |

**Strategy: Collaborate with DOM to submit State Plan amendment**

In order to leverage funding to expand mental health services, a proposal will be submitted, through continued collaboration with the DOM, to seek a State Medicaid Plan amendment to extend Medicaid eligibility for some types of therapeutic services that are currently purchased through State and Federal child welfare funds but are closely aligned with other categories of mental health services. The two central program areas in which the therapeutic services/modalities appear to meet the eligibility criteria for Medicaid reimbursement are those provided in the contracts for intensive in-home services and through the purchase of therapeutic foster care placements under the Medicaid Rehabilitation Option. As both of these programs are accessed statewide by all counties, an amendment to the State Plan would substantially increase DFCS's capacity to provide these services to more children on a statewide basis without the capitated limits that are associated with the current funding sources. In addition to intensive in-

11

DHS
286206

home services and therapeutic foster care placements, the following services have been targeted for inclusion in the amendment to the State Medicaid Plan:

- Mental health assessments conducted by professionals qualified to bill Medicaid that will take the place of the psychological evaluation except in the case of placement in a PRTF.
- Respite services
- Therapeutic Foster Care/Group Homes
- MAP team participation
- Families First Resources Centers (would not be included in this Medicaid State Plan Amendment (SPA). This would require a major overhaul of the reimbursement methodology and would hinder the progress for the other services. This will be included in an additional SPA.

The adoption of the mental health assessment in the SPA will increase the provider pool available to complete the mental health assessment within 30 days of placement, as required by the settlement agreement. Previously, psychological assessments were used as the assessment tool and could only be performed by a licensed psychiatrist or psychologist. This psychological assessment proved difficult to obtain in 30 days in most areas due to the lack of qualified providers. The psychological assessment will now only be required for children entering a PRTF, as required by Medicaid. The mental health assessment will be more appropriate and will provide DFCS staff with information on needed services for inclusion in the case planning process.

## Action Steps and Timeline

| Action Steps | Responsible Positions | Time to Begin | Time to Complete | Expected Progress July 2011 |
|---|---|---|---|---|
| Prepare proposal in collaboration with DOM to amend State Medicaid Plan to include some therapeutic services | Director of Prevention and Protection<br><br>Director of Permanency | In-process | October 2010 | Completed |
| DOM to submit State Plan Amendment to CMS for approval. | DOM | March 2011 | July 2011 | Approval received from (Federal) Children's Medical Services (CMS) |
| Provider selection and policy development | DOM<br><br>Director of Policy<br><br>Director of Resource Development | July 2011 | September 2011 | Provider selection will be in process and draft policy developed. |
| Reimbursement will be | DOM | September | Ongoing | New codes will be in |

DHS
286207

| | | | | |
|---|---|---|---|---|
| provided using new code system | | 2011 | | State Plan and DOM will be making system adjustments to begin reimbursement in September 2011. |

**Strategy: Collaborate with MDMH to increase access to quality services through the CMHCs.**

Historically, the services provided by the CMHCs have not been utilized to their full potential. This is due to many factors including the perception of poor quality of services, the lack of specialized services, lengthy wait times for appointments, and physical access. Work is currently underway to build the relationship with the CMHCs to improve access and quality of specialized services to meet the needs of DFCS' children. The CMHCs provide an existing and valuable resource to DFCS' families. The relationship between the management staff of the MDMH and MDHS has made tremendous positive strides in the last year. The momentum of this relationship should be tapped and filtered to the Regional level. The Resource Development Unit will assist in fostering the relationship between the CMHCs and the regional and county staff by facilitating meetings to include regional and county staff, CMHC mental health providers and MDMH Children's Directors, along with management staff from both DFCS and MDMH. The goal of these meetings will be to establish a working relationship and develop a strategic plan along with an MOU between the local DFCS office and the applicable CMHC to meet the needs of the families that DFCS serves. It is through careful and deliberate planning that these meetings will be structured in an effort to facilitate positive change. These meetings will be held statewide within the 12-month period.

DFCS will ensure the content of each MOU is individualized to the needs identified for the counties in the area of the applicable CMHC and addresses the issues identified as obstacles to access to quality services. The MOU will also indicate the need for specialized mental health professionals that are equipped to address issues known to be prevalent in families involved in the child welfare system such as domestic violence, substance abuse, post-traumatic stress disorder, and so forth.

**Action Steps and Timeline**

| Action Steps | Responsible Positions | Time to Begin | Time to Complete | Expected Progress July 2011 |
|---|---|---|---|---|
| Facilitate meetings between DFCS and CMHCs to begin development of strategic plans and MOUs for services. The meetings will be held e in accordance with the | Director of Resource Development | September 2010 | September 2011 | Strategic plans will be in place for those fully implemented Practice Model regions.

MOUs will be signed and in place for those |

13

| | | | | |
|---|---|---|---|---|
| Practice Model region order of implementation. | | | | fully implemented Practice Model regions.<br><br>Strategic plans and MOUs will be in draft form for all Regions. |
| Develop and implement feedback process that allows county staff to advise State Office of issues related to mental health services obtained through the CMHC | Director of Resource Development<br><br>Director of Field Operations | December 2010 | May 2010 | Feedback process developed and implemented. |
| Maintain monthly meetings with CMHCs Children's Directors to address any issues related to DFCS children and services received through the CMHC.<br><br>Sign-in sheets will be required and should be routed to the Director of Field Operations. | Director of Field operations<br><br>RDs | September 2010 | Ongoing | Regions begin holding monthly meetings upon completion of strategic plan and MOU.<br><br>Sign-in sheets will be provided to Director of Field Operations for ensuring that all required participants attend the meetings. |

**Strategy: Increase pool of private providers**

Mental health screenings, evaluations, and assessments are critical to understanding the range of issues impacting an individual's emotional and psychological functioning and well-being. The availability of these services strengthens the diagnostic and treatment planning and subsequent crafting of interventions to address the relevant concerns. An increase in the pool of private providers who have particular specialized areas of expertise will not only serve to augment the existing resource array but will also enable further diversification and choices for families.

DFCS will work to develop a pool of Medicaid-enrolled private providers, including Licensed Certified Social Workers, along with the Regional Mental Health Centers in order to conduct timely mental health assessments, screenings and treatment. These providers will offer diagnostic evaluations and treatment planning and assist with referrals for other mental health services when needed. With this pool of resources, DHS will avoid overreliance on the limited number of psychologists and/or psychiatrists to obtain evaluations and screenings.

DHS
286209

DFCS will also establish formal agreements with private providers to provide a bio-psycho-social assessment along with a set rate/fee for this service to enable early identification and screening of possible emotional or mental disorders and behavioral concerns in areas where there are limited mental health services.  The DOM will assist in developing the appropriate service definition and eligibility criteria to explore whether these types of assessments can be covered by Medicaid.

**Action Steps and Timeline**

| Action Steps | Responsible Positions | Time to Begin | Time to Complete | Expected Progress July 2011 |
|---|---|---|---|---|
| Identify target areas within the Practice Model Regions utilizing information from the Foster Care Services Assessment and the Needs Assessment Survey Results | Director of Resource Development | In-process | October 2010 | Areas within Practice Model regions will be identified. |
| Identify service providers not accepting Medicaid reimbursement in the target areas using a cross-reference of the existing Medicaid providers and the list of LMFTs, LMSWs, and LCSWs from the MS Board of Examiners. | Director of Resource Development | September 2010 | February 2010 | Providers will be identified and meetings will be scheduled for areas identified within the Practice Model regions. |
| Hold strategic planning session to develop agenda and approach for meetings with providers to include gathering the following information for presentation to provider:  the number of children in the area needing services currently unavailable in the immediate area; what specialized services are needed; how the provider could obtain the necessary training to provide the specialized services; how much time the provider could expect to spend weekly on services to DHS children;  which services are | Director of Resource Development<br><br>Director of Field Operations<br><br>RDs<br><br>MACWIS Director | October 2010 | January 2011 | Completed |

15

| | | | | |
|---|---|---|---|---|
| Medicaid billable services and which would be funded by MDHS; what service expectations DFCS has of the provider; and what expectations the provider has of DFCS staff. | | | | |
| Develop formal agreements (MOUs) to be used with private providers that include the provision to serve DFCS children on a priority basis as well as the provision of a complete mental health assessment to be used in case planning. | Director of Resource Development | October 2010 | January 2011 | The content of the MOU will be finalized and ready for signatures. |
| Conduct meetings with identified providers to present information gathered along with presentation of the MOU. | Director of Resource Development<br><br>Director of Field Operations<br><br>RDs | January 2011 | September 2011 | Dates will be set for meetings with providers statewide.<br><br>Meetings with providers in Practice Model regions will have been held and MOUs will be in place. |
| Explore tele-health or other service options in areas where private providers do not exist or are unwilling to enter into agreements with DFCS. | Office of Resource Development<br><br>Director of Field Operations | July 2011 | Ongoing | Areas with continued unmet needs will have held initial conversations with neighboring providers for implementation of tele-health or other service delivery method. |

> **Priority Area Two: Maximize existing services to provide appropriate treatment options**

**Strategy:  Increase utilization of existing MAP teams and State level case review**

In an effort to maximize funding and resources, it is important to ensure all existing resources are being utilized to the fullest extent possible.  The State of Mississippi has a System of Care

16

DHS
286211

Council which provides a vehicle for change in that this System of Care Council is responsible for making recommendations directly to the Legislature regarding the mental health services available for children and families in Mississippi.

Section 43-14-1 of Mississippi Code of 1972 establishes a System of Care that provides for the development and implementation of a coordinated interagency system of necessary services and care for children and youth up to age twenty-one (21) with serious emotional/behavioral disorders including, but not limited to, conduct disorders, or mental illness who require services from a multiple services and multiple programs system, and who can be successfully diverted from inappropriate institutional placement.

An Executive Council, the Interagency Coordinating Council for Children and Youth (ICCCY), was established to ensure that requirements set forth in State law are carried out. The ICCCY shall consist of the following membership: (a) the State Superintendent of Public Education; (b) the Executive Director of the MDMH; (c) the Executive Director of the MDH; (d) the Executive Director of the MDHS; (e) the Executive Director of the DOM, Office of the Governor; (f) the Executive Director of the State Department of Rehabilitation Services; and (g) the Executive Director of Mississippi Families as Allies for Children's Mental Health, Inc.

The Interagency System of Care Council (ISCC) was created to serve as the state management team for the ICCCY, with the responsibility of collecting and analyzing data and funding strategies necessary to improve the operation of the System of Care programs, and to make recommendations to the ICCCY and to the Legislature concerning such strategies. The System of Care Council also has the responsibility of coordinating the local Multidisciplinary Assessment and Planning (MAP) teams and may apply for grants from public and private sources necessary to carry out its responsibilities. The Interagency System of Care Council is comprised of one (1) member from each of the appropriate child-serving divisions or sections of the MDH, MDHS, MDMH, the State Department of Education, the DOM of the Governor's Office, the Department of Rehabilitation Services, a family member representing a family education and support 501(c)3 organization, a representative from the Council of Administrators for Special Education/Mississippi Organization of Special Education Supervisors (CASE/MOSES) and a family member designated by Mississippi Families as Allies for Children's Mental Health, Inc..

Within the same statute, a statewide system of local MAP resource teams was established. The MAP teams are to be comprised of one (1) representative each at the county level from the major child-serving public agencies for education, human services, health, mental health and rehabilitative services approved by respective state agencies of the Department of Education, the MDHS, MDH, MDMH, and the Department of Rehabilitation Services. Three (3) additional members may be added to each team, one (1) of which may be a representative of a family education/support 501(c)3 organization with statewide recognition and specifically established for the population of children being served. The remaining members will be representatives of significant community-level stakeholders with resources that can benefit the population of children being served.

With adequate representation on the ICCCY, the ISCC, and the MAP teams, DFCS has an

17

DHS
286212

opportunity to work directly with those agencies and stakeholders responsible for the provision of mental health services in Mississippi. In order for this strategy to be successful in increasing access and quality of mental health services, DFCS must ensure that the ICCCY, the ISCC and the MAP teams are meeting the goals as set forth in § 43-14-1 of Mississippi Code of 1972.

Each local MAP team shall serve as the single point of entry to ensure that comprehensive diagnosis and assessment occur and shall coordinate needed services through the local coordinating care entity for the children. Local children in crisis shall have first priority for access to the MAP team processes and local System of Care programs.

Within this section of law, a "System of Care" is defined as a coordinated network of agencies and providers working as a team to make a full range of mental health and other necessary services available as needed by children with mental health problems and their families. The System of Care is required by law to be:

(a) Child centered, family focused and family driven
(b) Community based;
(c) Culturally competent and responsive; and shall provide for
    (i) Service coordination or case management
    (ii) Prevention and early identification and intervention;
    (iii) Smooth transitions among agencies, providers, and to the adult service system
    (iv) Human rights protection and advocacy;
    (v) Nondiscrimination in access to services;
    (vi) A comprehensive array of services;
    (vii) Individualized service planning;
    (viii) Services in the least restrictive environment;
    (ix) Family participation in all aspects of planning, service delivery and evaluation; and
    (x) Integrated services with coordinated planning across child-serving agencies.

MAP Teams exist to serve the following children and youth (up to age 21) with serious emotional/behavioral disorders or serious mental illness who:

- Are at-risk for an inappropriate 24 *hour institutional placement due* to lack of access to or availability of needed services and supports in the home and community,

- Are returning to a primary caregiver in the community from an inpatient acute psychiatric hospital or psychiatric residential treatment facility, and/or

- Are SED and Seriously Mentally Impaired (SMI) youth of transition age (14-21) who need assistance with resource planning to remain in the community.

- Younger children (ages 3-5 years) who have been identified as being most at-risk of later SED, as per the MAP Team At-Risk Screening Checklist, can also be assisted with identifying and accessing community resources by the local MAP Team.

Primary Tasks:

18

- The first priority of the MAP teams is to review cases concerning children and youth (ages 5 to 21) who have a serious emotional/behavioral disorder or serious mental illness and who are at immediate risk for an inappropriate 24-hour institutional placement due to lack of access to or availability of needed services and supports in the home and community. Immediate risk is defined as 1) the actual consideration of being placed out of the home at the time the referral is made or 2) community resources are not meeting the needs of the child/family at the time the referral is made.

- The second priority of the MAP teams is to review cases of children (ages 3-5), who have early behavioral and peer relationship problems and two or more of the factors identified on the "MAP Team At-Risk Checklist".

- The third priority of the MAP teams is to review cases of transition-age children/youth (ages 14-21) to assist with resource planning to meet specific needs to appropriately remain in the community.

- MAP teams identify community-based services that may divert children and youth from an inappropriate 24-hour institutional placement.

- MAP teams facilitate the provision and coordination of services across agencies/entities for the target population.

- MAP teams facilitate continuity of care for children/youth with serious emotional disorders/ serious mental illness.

- MAP teams facilitate support for children/youth with serious emotional disorders/ serious mental illness and their families.

MAP teams currently exist in the following counties: Coahoma, Quitman, Tallahatchie, Tunica, DeSoto, Lafayette, Chickasaw, Itawamba, Lee, Monroe, Pontotoc, Union, Alcorn, Bolivar, Washington, Leflore, Clay, Lowndes, Noxubee, Oktibbeha, Webster, Winston, Ranking, Hinds, Lauderdale, Adams, Franklin, Forrest, Jones, Lamar, Marion, Hancock, Harrison, Pearl River, George, Jackson, Warren and Yazoo.

Although it is not necessary for every county to have a MAP team, each county will need to have access to a MAP team that is familiar with the resources available in the immediate area. MAP teams will be accessed for knowledge of resources in the immediate and surrounding areas. Additional MAP teams will be created in those areas that do not have adequate representation concerning mental and behavioral health issues on an existing team.

### Action Steps and Timeline

| Action Steps | Responsible Positions | Time to Begin | Time to Complete | Expected Progress July 2011 |
|---|---|---|---|---|
| Ensure participation from Executive Staff on the | Deputy Administrator | September 2010 | Ongoing | Executive staff will have participated in |

DHS 286214

| ICCCY | for DFCS | | | scheduled meetings. |
|---|---|---|---|---|
| Ensure appropriate staff member is assigned to participate in the ISCC | Director of Field Operations | September 2010 | Ongoing | Appropriate staff members will have been identified and attend meetings. |
| Create feedback loop from MAP teams to inform ISCC and therefore ICCCY of any issues preventing the proper functioning of the MAP teams. | Director of CQI | September 2010 | December 2010 | ISCC should receive first report from MAP teams on successful PRTF diversions and listing of resource identified as lacking in communities. |
| Identify any additional funding to help support the services funded through the MAP teams. | Budget Division | October 2010 | January 2011 | Additional funding identified and supplied to MAP teams for distribution. |
| Work with Mental Health to ensure MAP teams have appropriate membership and to establish MAP teams in strategic locations that would provide access to those counties that do not currently have MAP team coverage | Director of Resource Development | Sept 2010 | Dec 2010 | All counties with existing MAP teams will have appropriate membership as specified in Mississippi Code.<br><br>Counties that do not have a MAP team in the county will be assigned to an existing MAP team for case presentation.<br><br>Preliminary work will be completed on establishing MAP teams |

DHS
286215

| Develop policies reflecting the following requirements: 1. All children must be presented to the local MAP team <u>prior</u> to admission to PRTF, unless he/she is an immediate risk to self or others. 2. All children being discharged from a PRTF must be presented to the MAP team within 1 week of discharge. 3. All children that meet the age and risk eligibility requirements must be presented to the MAP team. 4. DHS staff that have a child being presented to the team must participate. 5. An ASWS must attend each MAP team meeting. | Director of Policy | September 2010 | Dec 2010 | New policy will be approved by all necessary agencies. Policy will be distributed to all DFCS staff and will be discussed during the in the Resource Development presentations in the Regions. |
|---|---|---|---|---|
| DFCS staff will be informed of the process of MAP teams, including new policies through presentations made by the Resource Development Unit. | Director of Resource Development Director of Field Operations | December 2010 | July 2011 | Every Region will have been presented the information by the Resource Development Unit. |
| Develop CQI process to track and evaluate MAP Team participation as successful interventions to prevent unnecessary PRTF admissions and as vehicles to obtaining appropriate resources for children and families. | Director of CQI | December 2010 | July 2011 | Tracking system will be in place and baseline data collected. |

Another existing service promoting appropriate mental health services for families is that of the State Level Review (SLR) team. The SLR team consists of representatives from the following agencies: Mississippi Department of Education (Office of Special Education), Mississippi Families as Allies, MDHS (DFCS and Office of Youth Services), MDMH, Attorney

21

General's Office, DOM, Vocational Rehabilitation Services, as well as support and/or consultation from a Child Psychiatrist or MDMH Hospital as needed.

The primary tasks of the SLR team are to:

- Meet regularly once per month.
- Review cases of children/youth referred from local level.
- Identify what has been tried and services used.
- Recommend any modifications that are possible to obtain services with present service/system.
- Develop Recommended Service Plan (this may include existing services and informal supports/services).
- Monitor and track implementation of Recommended Service Plan and status of child/youth.
- Use information about availability of needed services; success of services with child/youth; other pertinent information gathered during the year to plan for modifications and plan further for future years.

State Level Review Target Population:

- Children and youth up to age 21 years (or above if not completed school/ed.)
- SEDs (as per MDMH definition)
- Typical history of more than one out-of-home psychiatric treatment
- Appears to have exhausted all available services/resources in the community and/or in the state
- Children and youth who have experienced numerous interruptions in delivery of services across a variety of attempted service deliverers due to frequent moves, failures to show, or reason(s) unknown

If used appropriately, the SLR team will assist DFCS in accessing appropriate mental health services. Many of the children that are placed in a PRTF are not provided with adequate transitional services to support them when they are returned to the community. The SLR team will provide input as to what services exist to support children and families during this transition that would decrease the chances of the child returning to a PRTF.

## Action Steps and Timeline

| Action Steps | Responsible Positions | Time to Begin | Time to Complete | Expected Progress July 2011 |
|---|---|---|---|---|
| Ensure that appropriate DFCS staff are represented on SLR team | Director of Field Operations | September 2010 | October 2010 | Appropriate staff will be actively participating in SLR. |
| Draft policy that supports the following:<br>1. Any child having two | Director of Policy | November 2010 | December 2010 | Completed |

DHS
286217

| | | | | |
|---|---|---|---|---|
| or more PRTF admissions must be presented to the SLR team<br>2. Caseworker and ASWS must attend SLR meeting when a child on caseload is being presented. | Director of Resource Development<br><br>Director of Field Operations | | | |
| Develop MACWIS Report to show children presented to MAP teams and SLR. | MACWIS Director<br><br>Director of Resource Development | November 2010 | April 2011 | MACWIS report will be in production |
| Develop MACWIS report to show children receiving services in a PRTF and the previous SLR and MAP team involvement | MACWIS Director<br><br>Director of Resource Development | November 2010 | April 2011 | MACWIS report will be in production |
| Develop CQI process to track and evaluate MAP team and SLR participation as successful interventions to prevent unnecessary PRTF admissions and as vehicles to obtaining appropriate resources for children and families. | Director of CQI | December 2010 | July 2011 | Tracking system will be in place and baseline data collected. |

**Strategy:  Increase appropriate utilization of the MYPAC program**

With the implementation of this plan, DFCS will fully utilize the services provided through the MYPAC Program to offer a wraparound model of care for children that have severe emotional disturbances impairment in their level of functioning. The MYPAC Program is a statewide Home and Community-Based Medicaid Waiver program that offers intensive case management, wraparound, respite, and assessment. With the lack of available resources in many areas across the state, many children and families are referred to the *only* available service in the area instead of the most *appropriate* service.  In many situations, MYPAC services were provided to families who could have received more appropriate services through another means had they been accessible.  Monthly discussions with MYPAC have revealed many situations where the DFCS worker referred the child to MYPAC only to terminate services when placement in a PRTF became available.  This inappropriate use of the MYPAC program has led to many "slots" no longer being available to more suitable children and families.  Continued monthly case staffing with MYPAC administrators will allow for the continued monitoring of

23

appropriate follow-up by the DFCS case worker and progress of the family. The MYPAC program is an excellent resource that should be reserved for those situations where is it determined to be the most appropriate service for that child and family.

The MYPAC program currently has approval for 500 slots and that number will increase to 550 for the 2012 Federal Fiscal Year. Since MYPAC services began in October 2007, only 135 children in DFCS custody have received this service. For admission to the MYPAC program, DFCS children are only required to meet the eligibility for PRTF admission. A youth is clinically approved for MYPAC services for 365 days. The parent/guardian/custodian has the legal right to choose and may discharge from the program at any time.

### Action Steps and Timeline

| Action Steps | Responsible Positions | Time to Begin | Time to Complete | Expected Progress July 2011 |
|---|---|---|---|---|
| Maintain monthly meetings with DOM to discuss:<br>1. Barriers to service delivery and/or acquisition<br>2. Appropriateness of Referrals and discharges<br>3. Identification of duplication of services<br>4. Discuss strategies to expand the waiver program to accommodate more DFCS children. | Director of Resource Development<br><br>Director of Field Operations<br><br>DOM | In process | Ongoing | The success rate for diverting children from PRTF placements through MYPAC will have increased due to better referrals and closer monitoring of the case progress. |
| MYPAC staff, along with DFCS assistance, will conduct regional orientation sessions with all DFCS staff to ensure that they are fully aware of the range of services, eligibility criteria, and referral procedures to increase the utilization of all available slots. | MYPAC Staff<br><br>Director of Resource Development | September 2010 | December 2010 | Completed |
| Develop policy that requires that:<br>1. All referrals to | Director of Policy | November 2010 | December 2010 | Policy will be finalized and distributed. |

24

|  |  |  |  |  |
|---|---|---|---|---|
| MYPAC must be routed through the appropriate In-Home Services Coordinator at State Office to determine appropriateness of referral.<br>2. Children in DFCS custody enrolled in MYPAC may not be removed from the program without the approval of the ASWS.<br>3. DFCS assigned case workers must meet with the MYPAC staff, at a minimum, once monthly to determine progress.<br>4. Worker must complete the evaluation portion of the program. |  |  |  |  |
| Review the DOM's tracking report for youth enrolled in the MYPAC program on a monthly basis to assess and monitor the appropriateness of referrals and discharges across the State and to ensure service coordination. | Director of Resource development<br><br>Director of Field Operations | In process | Ongoing | DFCS will have reviewed and identified trends in inappropriate referrals or discharges. |
| Track MYPAC services as successful interventions to prevent unnecessary PRTF admissions and as vehicles to obtaining appropriate resources for children and families. | Director of CQI<br><br>Director of Field Operations | December 2010 | July 2011 | Tracking system will be in place and baseline data collected. |

25

> **Priority Area Three: Strengthen DFCS casework and supervisory practices along with monitoring processes to ensure that appropriate mental health services are provided**

## Strategy: Strengthen DFCS child welfare practice regarding provision of mental health services

With the implementation of the Practice Model, both supervision and casework will help ensure that appropriate mental health services are obtained for children and families. Supervisors and social workers are being trained on the six components of the Practice Model as regions phase into implementation, which include conducting comprehensive assessments of the strengths and needs of children served by DFCS and mobilizing the appropriate services to meet identified needs. This will increase staff's ability to identify mental health needs more timely and accurately and to put the most appropriate services in place. During the 12-months of implementing this resource development plan, staff in four regions of the State will receive the training, and DFCS will begin the training process for three additional regions.

## Strategy: Monitor and evaluate provision of mental health services

CQI has included the monitoring of mental health services as a part of the comprehensive case review process that is already underway in the Practice Model regions. In addition to the sample of cases reviewed, a monthly desk audit will be required to be submitted to CQI on every case. The desk audit will also contain an evaluation of mental health services provided and the appropriateness of the services received in relation to the case plan. The information obtained from these case reviews will be used to inform policy and practice changes necessary to ensure appropriate mental health services are being obtained for children to address issues related to placement.

### Action Steps and Timeline

| Action Steps | Responsible Positions | Time to Begin | Time to Complete | Expected Progress July 2011 |
|---|---|---|---|---|
| Perform comprehensive case reviews that include the monitoring of provision of appropriate mental health services. | Director of CQI | In process | Ongoing | Region I-S, II-W, IV-N and V-W completed initial baseline review.<br><br>Region I-S and II-W will begin follow-up reviews. |
| Collect and analyze information obtained from monthly desk audits on all cases, to include provision of mental health services | Director of CQI | In process | Ongoing | Region I-S, II-W, IV-N and V-W completed. |

26

| | | | | |
|---|---|---|---|---|
| Provide feedback to regions based on information gathered during the County Conference Review and desk audit processes. | Director of CQI | In process | Ongoing | Reports will be completed for Regions I-S and II-W and will be distributed to the regions. |

DHS
286222

# Section II
# Reunification Services

The DFCS staff person responsible for tracking and monitoring the implementation of this plan is the Director of Prevention and Protection.

## *Background*

Mississippi State Law and DFCS policy maintain that "the Agency's first priority shall be to make reasonable efforts to reunify the family when temporary placement of the child occurs or shall request a finding from the court that reasonable efforts are not appropriate or have been unsuccessful." Moreover, DFCS is implementing additional requirements regarding casework activities and services to be provided when the permanency goal for a child placed in out-of-home care is reunification, including:

- For children with the goal of reunification, DFCS is to engage in concurrent planning consisting of early assessment of the potential for reunification; early identification of potential family resources and early placement with a potentially permanent family resource.

- At the time of the initial team meeting when a child enters foster care, a visitation plan for the child and his/her family is to be developed as part of the child's service plan.

- When the child's permanency goal is reunification, DFCS is to identify in the parent's service plan and make available directly or through referral those services DFCS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care and to help the parents develop strategies to facilitate permanency for the child.

- For a child with a permanency goal of reunification, the child's assigned DFCS caseworker is to meet with the child's biological parents at least monthly to assess service delivery and achievement of service goals, to keep the family informed and involved in decisions about the child, and to remain current about the family's circumstances.

- A recommendation to return a child to his/her home or to place the child in the custody of a relative is to be made at a meeting attended by the child's DFCS caseworker, the caseworker's supervisor, the worker from the private agency if the child is placed with a private agency, the foster parents (unless DFCS determines that the foster parent's attendance would be inappropriate), the biological parents or the relative assuming custody, and the child. At the meeting, the participants are to devise an after-care plan that identifies all of the services necessary to ensure that the conditions leading to the child's placement in foster care have been addressed, and that the child's safety and stability will be assured. DFCS is to take reasonable steps to provide or facilitate access to all services necessary to support the child during the trial home visit.

- For each child who has a permanency goal of reunification and who is in fact placed in the home for the purpose of reunification, DFCS is to provide, subject to the approval of the youth court, such child with a 90-day trial home visit.

28

DHS
286223

- Before the end of a trial home visit period, there shall be a final discharge staffing meeting to determine the appropriateness of the final discharge. If final discharge is determined to be appropriate, DFCS shall make the appropriate application to the court to be relieved of custody.

For all children entering care, reunification with a parent or primary caretaker is, in the majority of cases, the first option considered in the development of a permanent plan. As of June 30, 2010, DCFS had 3,793 children in its custody and of these, 2,136 had a permanent plan of reunification. The lack of availability of a range of services to support the Division's reunification efforts across the state has proven to be a significant issue that was highlighted in the Foster Care Assessments. CSF noted the following areas of concern in its report:

- There is a notable lack of services in the State targeted toward reunification. DFCS staff appears to try to mobilize services, such as family preservation services that that are designed more as placement prevention services, in the absence of specific reunification services.

- The lack of services is most pronounced in rural areas of the State, although wait lists and restrictions on who may receive the services affects the accessibility of services even where they exist.

- The demand for services used to facilitate and support reunification outstrips the capacity of contract providers to provide the services, leading to wait lists or referral rejections.

- There appears to be little opportunity to individualize reunification services to the needs of particular families, owing either to the standardized design of programs, e.g., family preservation, parenting classes, or to the lack of available services and providers to match to identified needs.

- Post-placement services to support reunification once it has occurred seem notably absent.

- The effectiveness of services to address needs that must commonly be addressed in order to achieve and sustain reunification, such as domestic violence, substance abuse, and sexual abuse, is regarded as low by staff.

- Apart from contracted services, the Division's services/activities that support reunification need strengthening in several areas including using assessments to link services to identified needs, maintain frequent contacts among caseworkers, parents, and children, and involving both parents in case planning and service delivery.

- The involvement of birth parents in maintaining parental responsibilities to the extent that it is safe and appropriate to do so while their children are in foster care is a practice area in need of particular strengthening.

29

- The existence of MACWIS reports that provide information on cases receiving reunification services was not evident during the assessment, thus limiting the Division's ability to monitor service provision effectively.

To address weaknesses in policies and practices and to increase access to appropriate reunification services, the recommendations provided by CSF are addressed within the following core strategies:

---

***Priority Area One:  Increase access to services specific to the goal of reunification.***

---

**Strategy:  Utilize existing non-social work licensed staff to support reunification efforts**

Efforts are underway to restructure existing DFCS homemakers to support caseworkers and aid families in need of more in-home services to achieve reunification.  These positions will be become social worker aides.  These social worker aides will assist families in gaining access to needed resources that will support the effort of reunification.  As stated in the workforce development plan, additional staff will be assigned to this job duty as licensed social work staff are hired to perform child welfare services.

### Action Steps and Timeline

| Action Steps | Responsible Positions | Time to Begin | Time to Complete | Expected Progress July 2011 |
|---|---|---|---|---|
| Utilize 28 existing homemakers to assist social workers in necessary reunification efforts. | Personnel Office<br><br>Director of Field Operations | September 2010 | January 2010 | All 28 existing homemakers will assist social workers in reunification efforts. |
| Placement of unlicensed staff in other positions within DFCS to include that of Family Pres/Reunification Assistants.  (see Worker Recruitment and Retention Plan) | RDs and Office of Human Resources | November 2010 | July 2014 | 50% of unlicensed staff placed in other positions including that of Family Pres/Reunification Assistants |
| Develop new job description including list of expected duties for the Family Pres/Reunification Assistants | Director of Field Operations<br><br>Director of Prevention | November 2010 | January 2011 | Job Description will be completed. |
| Develop new Job | ASWS | December | February | All assistants will |

DHS
286225

| | | | | |
|---|---|---|---|---|
| Content Questionnaires and Performance Appraisal Reviewss for each. | | 2010 | 2011 | have newly assigned job duties and corresponding JCQ and PAR |
| Obtain training from the National Resource Center for Permanency and Family Connections to provide training to staff transitioning to Family Pres/Reunification Assistants in practices that will support families in reunification | Director of Prevention | December 2010 | March 2011 | Training will be completed |
| Determine areas of the State that have low caseloads where caseworkers could be designated to provide intensive in-home services toward reunification. | Personnel Office Director of Field Operations | September 2010 | December 2010 | Identified low case load areas and designate available staff |

**Strategy: Contract for a new model of reunification services to be delivered statewide**

Although many families were served through the two contracts previously utilized for statewide family preservation and reunification services, the issues that arose regarding waiting lists, diminished access in rural areas, and the eligibility criteria and length of service warranted modifications in the design and delivery of these services. DHS will provide families with a more expansive array of time-limited reunification services that are intensive in nature and accessible to all counties in the State.

After issuing a request for proposals and reviewing all of those received, DFCS will negotiate a contract with ████████████████ to provide intensive in-home services for families across the State with a goal of placement prevention and and/or reunification. The contract will become effective on October 1, 2010. The scope of services to be provided through this contract include a full array of mental health and support to address the clinical and functional needs of the children, youth and families who are referred to the program. This array will consist of the following:

- Diagnostic and evaluation services;
- Cross-system care management processes;
- Individualized service plan development inclusive of caregivers;
- Community-based services provided in a clinic, office, family's home, school, primary health or behavioral health clinic, or other appropriate location, including individual, group and

family counseling services, professional consultation, and review and medication management;

- Emergency services, available 24 hours a day, 7 days a week, including mobile crisis outreach and crisis intervention;
- Intensive home-based services available 24 hours a day, 7 days a week, for children and their families when the child is at imminent risk of out-of-home placement, or upon return from out-of-home placement;
- Intensive day treatment services;
- Assistance in making the transition from the services received as a child and youth to the services received as a young adult;
- Family advocacy and peer support services delivered by trained parent/family advocates.

The home environment is the primary location for the community-based intervention for this program. The length of the designed service delivery is 4-8 weeks for families in the areas of the placement prevention (family preservation) and family reunification for children in foster care. DFCS has gathered input from Regional Directors and has reviewed the service utilization rates of the prior contract slots to assess areas of unmet need as well as "heavy users" of the services in planning for statewide implementation. This program will serve an estimated 450 families from October 1, 2010-September 30, 2011. Referrals will be made through the In-Home Service Coordinators located at the State Office, and the program will track and report on specific outcome data throughout the next year.

Within the 4-8 week timeframe, each case will be reviewed by the In-Home Services Coordinator and the Comprehensive Family Support Services Program (CFSSP) staff to determine if there is a need for continued services or if stabilization has occurred and the child can remain in the home safely with the resources that have been acquired through the program.

The delivery of services will be based on the ongoing assessment of family functioning and will be individualized to the needs of the family. This individualization of services will be monitored through the monthly case reviews conducted by the In-Home Service Coordinators.

### Action Steps and Timeline

| Action Steps | Responsible Positions | Time to Begin | Time to Complete | Expected Progress July 2011 |
|---|---|---|---|---|
| Release RFP for CFSSP | Director of Prevention<br><br>Administration Unit | Completed | Completed | RFP released |
| Review proposals and award contract for statewide services | Administration Unit<br><br>Director of Prevention | In process | September 2010 | Contract awarded and services being provided. Services will be provided |

DHS
286227

| | | | | beginning on October 1, 2010. |
|---|---|---|---|---|
| Hire an additional In-Home Services Coordinator to monitor services in the Southern half of the state. | Director of Prevention | In-process | September 2010 | Completed |
| Finalize the CFSSP Handbook that outlines the responsibilities of both DFCS staff as well as CFSSP Providers. | Director of Prevention | In process | September 2010 | Completed |
| Distribute and conduct trainings on CFSSP Handbook for provider staff as well as DFCS staff. | CFSSP Program Coordinators<br><br>Director of Field Operations | October 2010 | October 2010 | Completed |
| Monitor services through monthly meetings with the In-Home Services Coordinators and the CFSSP staff.  These meetings will consist of a review of every case and determinations will be made regarding continuation of services. Information gathered at these meetings will be compiled into quarterly reports to be used to make decisions regarding necessary changes in policies and/or practices. | Director of Prevention | November 2010 | Ongoing | Three of four quarterly reports will be available for review of success of CFSSP interventions. |

**Strategy: Expand the array of services provided by the network of Families First Resources Centers to support family preservation and reunification efforts**

Currently, MDHS, through its Division of Economic Assistance, provides financial support to the 31 established Families First Resource Centers (FFRC) covering 72 counties across the State.  As many of the families that receive services from the Centers are involved with both the economic assistance programs and the child welfare program, DFCS will collaborate with the Division of Economic Assistance and the Division of Youth Services in developing a Request for Proposal (RFP) to expand the scope of services that the Centers will provide to families to include community-based supports for family preservation and reunification.  The intent of the new RFP will be to create "a one stop shop" for families receiving services from MDHS.  The

33

DHS 286228

Federal Administration for Children and Families (ACF) will be providing technical assistance in developing a model for this new initiative, and will make a site visit in September, 2010, to initiate joint planning.

| Action Steps | Responsible Positions | Time to Begin | Time to Complete | Expected Progress July 2011 |
|---|---|---|---|---|
| DFCS will participate in technical assistance provided by ACF towards the development of a "one stop shop' model for services delivered through the FFRCs. | Director of Field Operations<br><br>Director of Resource Development<br><br>Director of Prevention | September 2010 | September 2010 | Model will be developed. |
| DFCS will participate in planning meetings to identify funding sources to increase capacity of the FFRCs and to assist in the drafting of a Request for Proposals to include a Scope of Services that will support reunification efforts such as:<br>- Individualized parenting skills classes<br>- Respite Services<br>- In-Home services (e.g. Zero to Three)<br>- Crisis intervention services for: substance abuse, domestic violence, etc. | Division of Economic Assistance<br><br>Division of Youth Services<br><br>Director of Prevention<br><br>Director of Field Operations<br><br>Director of Resource Development | In-process | January 2011 | RFP released and proposals reviewed. |
| Release RFP for services and award contract(s) to provide services statewide | Division of Economic Assistance | January 2011 | October 2011 | Services to begin in October 2011 |

34

| Continue working with the Division of Medicaid to pursue an additional amendment to the State Plan to include services offered through the FFRC | Prevention DOM | In-process | Ongoing | Regular discussions will continue to be held regarding amendment to include reimbursement for services offered through the FFRC. |
|---|---|---|---|---|

**Strategy: Collaborate with Forrest County Model Youth Court Program and the Court Improvement Project to replicate initiative statewide**

The Forrest County Youth Court was selected to participate as a National Council for Juvenile and Family Court Judges (NCJFCJ) Model Court. NCJFCJ Model Courts serve as both advocates of change and models for change in child protection cases. The Model Courts are continually assessing their child abuse and neglect case processing, focusing on barriers to timely permanency, developing and instituting plans for court improvement, and working collaboratively to effect systems change. Model Courts serve as national "laboratories" for meaningful systems change in how child abuse and neglect cases are processed through the court and through the child protection system. Moreover, Lead Judges and Model Court Team members develop expertise in a wide variety of areas related to improved court practice and systems change efforts.

Although DFCS does not have specific data on the success of children and families involved in the Forrest County program toward expedited reunification, our experience indicates that children and parents in the program tend to receive needed services faster and that the court's oversight and monitoring of progress facilitates timely and appropriate reunification. Therefore, in partnership with Forrest County Youth Court staff and the Administrative Office of Court (AOC) Court Improvement Project (CIP) staff, DFCS will work towards encouraging improved case processing throughout the County Court system statewide.

## Action Steps and Timeline

| Action Steps | Responsible Positions | Time to Begin | Time to Complete | Expected Progress July 2011 |
|---|---|---|---|---|
| Facilitate meeting to include Forrest County Model Court Project staff, the DFCS Court Improvement Workgroup and the AOC, Court Improvement Project staff. This meeting will focus ways to encourage participation of County | Director of Prevention Director of Field Operations | October | Ongoing | Meeting occurred; agreements reached on roles and responsibilities in moving forward |

35

| | | | | |
|---|---|---|---|---|
| Courts statewide in systems change similar to that of Forrest County. | | | | |
| Develop strategic plan to encourage county courts to participate in a similar self-assessment and systemic change effort that would facilitate timely reunification when appropriate. | Court Improvement Workgroup | November 2010 | March 2011 | Strategic plan complete. |
| Explore funding options through the CIP and other sources that may be available to county courts for implementing systems change. | Court Improvement Workgroup  CIP  Director of Prevention | January 2011 | Ongoing | Potential funding sources identified. Plans to secure funding in development. |
| Utilize the NCJFCJ and/or technical assistance to assist other interested county courts in implementing system change to include practices around parent/child visitation. | Court Improvement Workgroup | January 2011 | September 2011 | Technical assistance will be completed or scheduled. |
| Develop and present information to support timely permanency during the Youth Court Judges Annual Conference, if space permits. | Court Improvement Workgroup  Director of Prevention | April 2011 | September 2011 | Presentation in development phase.  Conference to be held in September 2011. |

**Strategy:   Collaborate with Casey Family Programs to host a Permanency Summit**

A Permanency Summit is currently being planned for November 3 and 4, 2010, in Natchez, MS. Casey Family Programs is sponsoring the summit, and the purpose is to bring together staff, stakeholders and invited speakers (judges, non-profit partners, community leaders) to spend two days focusing on Permanency and what it means for children and families in Mississippi.   The summit will include plenary sessions as well as breakout sessions for discussion about the issues regarding permanency including what other states are doing, what has worked in Mississippi and what has worked other places, etc.   All Regional Directors, all ASWSs (regional, resource and county), and some State Office staff will be required to participate.

36

**Action Steps and Timeline**

| Action Steps | Responsible Positions | Time to Begin | Time to Complete | Expected Progress July 2011 |
|---|---|---|---|---|
| Develop agenda for Permanency Summit | Special Consultant to DFCS Director<br><br>Casey Family Programs | September 2010 | October 2010 | Completed |
| Compile information obtained through round-table and/or breakout sessions. | Special Consultant to DFCS Director | November 2010 | January 2011 | Completed |
| Disseminate information presented and gathered during summit. | Special Consultant to DFCS Director | February 2011 | February 2011 | Completed |

---

> ***Priority Area Two: Strengthen policy and practice regarding reunification efforts***

**Strategy:  Strengthen reunification-related policy**

DFCS has recently re-written the foster care section of its policy manual (Section D) to accommodate requirements of the *Olivia Y* Settlement Agreement, the Foster Care Assessments, the Council on Accreditation (COA) standards, and to make it consistent with Practice Model. Although there are other requirements related to reunification that will be included in other policy revisions (in accordance with the previously submitted schedule for policy development), the following chart indicates the requirements and the corresponding page number where policy supporting reunification efforts can be found in Section D.  The revised foster care policy will be disseminated to all DFCS staff by December 1, 2010.

**Action Steps and Timeline**

| Recommendation/Requirement | Source | Section, page # |
|---|---|---|
| The information gathered for assessments should include the following information:<br>• Identifies child and family strengths, protective factors, and | COA | P. 48, VII B, 3. a)<br>P. 93, VII. D. |

37

| | | |
|---|---|---|
| needs;<br>• Includes the factors and characteristics pertinent to making an appropriate placement, if necessary;<br>• Identifies potential family resources for the child and parents; and<br>• Is limited to material pertinent for providing services and meeting objectives. | | 3. d)<br>P. 45-57, VII. B. |
| The family foster care worker meets separately with the child and the parents at least once a month to assess safety and well-being. | COA | P. 68, VII. B. 16.<br>P. 70, VII. B. 16. |
| The family foster care worker meets separately with the child and the parents at least once a month to assess safety and well-being; monitor service delivery; and support the achievement of permanency and other service plan goals. | COA | P. 68, VII. B. 16.<br>P. 109, VIII. |
| Strengthen Family Team Meeting (FTM) policy and training that requires the bringing together of all relevant parties at frequent intervals to identify needed services, put them into place, and monitor their effectiveness. | COA | P. 123, IX. A.<br>p.48, VII. B. 3 (a). |
| Permanency plan must be established within 30 days of placement. Concurrent planning is to be conducted in accordance with Federal and state guidelines. | COA | P. 77, VII. C. 1. b) |
| Foster care worker and family regularly review progress and sign revisions to service goals and plans. Quarterly reviews of the service plan are conducted with worker and supervisor and a clinical, service, or peer team. | COA | P. 79, VII. C. 2. b) |
| Permanency plan to be developed within 30 days of placement and reviewed quarterly by worker and supervisor, clinical, service, or peer team. Parents are to participate in process beginning with assessment and are to be fully apprised of progress, options, and timelines. | COA | P. 77, VII. C. 1. b) |
| Parents receive services that help them recognize and address the behaviors/conditions resulting in the child's placement and develop strategies to facilitate permanency for the child. Promotes a standard of providing culturally relevant services directly or through referral which could include child care, homemaker and health aide svc, parent education, respite, and other community services. | COA | P. 49-50. VII. B. 3. b)<br>P, 48, VII. B. 3. a) reference to culturally responsive |
| Families and children participate in service plan development and reviews and are to be apprised of goals, timelines, options, and legal implications. | COA | P. 49, VII. B. 3. b) |
| Concurrent planning is undertaken when appropriate and includes early assessment of the potential for reunification, full disclosure of implications, early identification and/or placement with potential permanency family resources, and counseling | COA | P. 76- 78, VII. C. 1. |

38

| | | |
|---|---|---|
| parents about relinquishment and permanency options. | | |
| Relative placements are given priority over unrelated family setting. Support is provided to the child to maintain connections with relatives while in placement through visiting and/or other forms of contact. | COA | P. 31, V. F. 1.a) P. 57. VII. B. 5 c) |
| A visitation plan is developed in collaboration with parents, foster parents, and age appropriate children that is based on the age & developmental stage of the child, parent strengths and needs, schedules of the parents and foster parents, social and cultural context of the family and the case status and permanency goal. | COA | P. 58, VII. B, 5 h) |
| Worker provides child, sibs, foster parents and parents with guidance and support before and after visits in order to learn from issues and assess relationships and parenting skills. | COA | P. 56, VII. B. 5. P. 56, VII. B. 5. a) |
| Requires qualified professionals to provide age appropriate children with developmental, mental health, and alcohol and drug screenings within 30 days after entering care and when indicated to identify the need for further diagnostic assessment. | COA | P. 58, VII. B. 6 P. 60, VII B. 7 P. 121, VIII. E. 6.f) |
| Requires that intensive and supportive services be provided to youth and children with significant medical, developmental, emotional, or behavioral needs who, with additional resources, could remain in a family setting and achieve positive growth and development. | COA | P. 138, X. C. |
| Comprehensive assessment must be conducted within 30 days of entry into care. Medical, dental and mental health screenings to be conducted and service provided when recommended. | Olivia Y settlement agreement | P. 58-60, VII. B. 6 P. 60, VII. B. 7 P. 60, VII. B. 8 |
| Full participation of family and others that the family gives consent to include in the development of the plan. Plan is to be developed in a timely manner & expedited when urgent need is identified. Plan is updated quarterly by the worker and a supervisor, or a clinical service or peer team. Service revisions and updates to the plan signed by parents. | Olivia Y settlement agreement | P. 48, VII. B. 3. a) |
| Define how often visitation should occur between the parent and the child and how other contact is to occur | Practice Model Report | P. 58, VII. B. 5. h) |
| Develop criteria to use to determine if a child/family member needs a screening and for what areas (i.e. mental health, substance abuse, domestic violence) | Practice Model Report | P. 58, VII. B. 6. P. 71, VII. B. 16 e) |
| Define how often visitation should occur between the child and | Practice | P. 55, VII. B. |

DHS
286234

| the worker including: length of visit; the location of the visit' and what to cover during a visit. | Model Report | 4. b) |
|---|---|---|
| Identify when to develop an aftercare plan, the contents of the plan including information on prevention and emergency services; and document how the aftercare plan links to the Individual Service Plan (ISP). Mandate that the aftercare plan at an FTM within two weeks of discharging custody. | Practice Model Report | P. 138, X. C. P. 48, VII. B. 3. a) (3) |
| Define the process for accessing ancillary services such as medical services, substance abuse services, mental health services, reunification services and placement services including eligibility criteria with emphasis on services being responsive to the child's and family's cultural background and developmentally appropriate to the individual's level of functioning. | Practice Model Report | P. 29, V. E. 3. (addresses cultural issue) P. 58, VII B. 6. |
| Define family involvement to include the worker's role in facilitating active participation of custodial and non-custodial parents in case planning activities, engaging extended family and other familial supports, participation of parties in meetings, court proceedings and case reviews and ensure the appropriate addressing of language barriers that may exist. Include the frequency and quality of these interactions. | Practice Model Report | P. 47-54, VII. B. 3. |
| Develop policy on how to conduct a FTM, including development and distribution of the agenda, general rules for meetings, development of goals, assigning of tasks and responsibilities for each participant. | Practice Model Report | P. 48, VII. B. 3. |
| Define family involvement to include facilitation of active participation of custodial and non-custodial parents in the child's activities, engaging extended family and other familial supports and assure the appropriate addressing of any language barriers that may exist. Include parental participation in parenting their children while in placement. | Practice Model Report | P. 47-54, VII. B. 3. |
| Require placements within the child's community whenever possible and appropriate as defined by proximity to the parents, school, extended family, and other social supports rather than the current 50 mile radius. | Practice Model Report | P. 53, VII. B. 3. d) (specific to school) P. 127, IX. E. 3. |
| Prohibit the cancellation of visitation between parents, extended family, siblings and children in placement as a disciplinary action. Inform the court of this policy | Practice Model Report | P. 56, VII. B. 5. a) |
| Require the caseworker to meet with the biological parents at least monthly as long as the permanency goal is reunification. Visitation between siblings who are placed in different placement settings, regardless of their permanency goal should be required as the child's needs indicate and at a minimum of once a month. | Practice Model Report | P. 68, VII. B 16. b) P. 56, VII. B. 5. |
| Parents are allowed to visit with their children within 24 hours | Practice | P. 56, VII. B. |

DHS 286235

| | | |
|---|---|---|
| of placement unless deemed inappropriate and children should be allowed a phone call with relatives within 24 hours of placement if the parental visit does not occur. | Model Report | 5. |
| Define how to use caseworker visits to identify family strengths and needs and how to use information gathered and incorporate it into the plan. Define the minimum number of visits, where they are to occur, and what must be addressed at visits. | Practice Model Report | P. 56, VII. B. 5. P. 68, VII. B 16. b) |
| Require DFCS staff to coordinate case planning and service provision activities with service providers in order to ensure that services match needs, and to monitor the effectiveness of service provision in facilitating and supporting reunification. | Foster Care Assessments | P. 79, VII. C. 2. b) |
| Strengthened case planning and ISP policy and training that focus on identifying strengths and needs, matching services to needs, brokering for and obtaining needed services, and monitoring the effectiveness of services. This should include the active involvement of service providers in case planning processes whenever appropriate. | Foster Care Assessments | P. 49, VII. B. 3. b) |
| Strengthened policy and training with regard to visits between caseworkers and parents/children for the purposes of assessment, case planning, involvement, and case monitoring. | Foster Care Assessments | P. 18, I. D. 5 P. 68, VII. B 16. b) |
| Strengthened FTM policy and training that requires the bringing together of all relevant parties at frequent intervals to identify needed services, put them into place, and monitor their effectiveness. | Foster Care Assessments | P. 18, I. D. 5 |
| Placements are to be made in the least restrictive setting which can meet the needs of the child identified in a comprehensive assessment. In order of consideration, this means placement with relatives, foster care home within reasonable proximity to the child's home community; foster care home outside of the child's home community; group home care; or institutional care. | Olivia Y Settlement Agreement | P. 26, V. C |
| DFCS shall take all reasonable steps to avoid the disruption of an appropriate placement and ensure placement stability for children. If a caseworker has knowledge that a placement may disrupt, the caseworker shall immediately convene a meeting with the DFCS supervisor, the foster parents, and, if appropriate, the child to determine the following: the cause of the potential disruption; whether the placement is appropriate for the child; whether additional services are necessary to support the placement; whether the child needs another placement; and, if another placement is necessary, what that placement should be. | Olivia Y Settlement Agreement | P. 46, VII. B.2. |
| A recommendation to return a child to his/her home or to place the child in the custody of a relative shall be made at a meeting attended by the child's DFCS caseworker, the caseworker's supervisor, the worker from the private agency if the child is placed with a private agency, the foster parents (if DFCS | Olivia Y Settlement Agreement | P. 142, X. I. |

DHS
286236

| | | |
|---|---|---|
| determines their attendance would be appropriate) the biological parents or the relative assuming custody, and the child. At this meeting the participants shall devise an after-care plan that identifies all of the services necessary to ensure that the conditions leading to the child's placement have been addressed, and that the child's safety and stability will be assured. DFCS shall take reasonable steps to provide or facilitate access to all services necessary to support the child during the trial home visit. | | |
| Comprehensive assessment and service plan developed within 30 days and reviewed every 90 days. Family team meeting and Service plan to be updated within 30 days if a change in placement has occurred or there is a significant change in progress or services. | Olivia Y Settlement Agreement | P. 48, VII. B. 3. a) |
| Services in plan are targeted to behaviors or conditions resulting in placement. Requires concurrent planning to address potential for reunification and to identify potential permanent relative resources and likelihood of permanent placement. Requires monthly contact between worker and parents to address progress and involve them in decisions regarding children. | Olivia Y Settlement Agreement | P. 49, VII. B. 3. b) P. 76, VII. C. 1. |
| Service Plan developed at team meeting within 30 days of entry into care and reviewed in a team meeting every 90 days. Team meeting must be held within 30 calendar days if there is a placement change or other significant changes. Requires 90 day trial home visit and after care service plan with Court approval prior to reunification. | Olivia Y settlement agreement | P. 49, VII. B. 3. a) |
| Requires that services to promote constructive parent-child visitation be documented in the case record. | Olivia Y settlement agreement | P. 56, VII. B 5. |
| Required to remove barriers to contact, visitation, and involvement in child's care and must prepare family for reunification. | Olivia Y settlement agreement | P. 70, VII. B. 16. d) |
| If reunification occurs, requires a 90 day trial home visit and two visits to the home each month to interview the child w/o parent or caregiver present. | Olivia Y settlement agreement | P. 138, X. B. |
| Requires that a final discharge team meeting be held before case closure. | Olivia Y settlement agreement | P. 138, X. C. |
| Family and child involved in determination of permanency plan within 30 days of entering care including timeframe for achieving permanency goal along with steps to support goal. | Olivia Y settlement agreement | P. 76, VII. C. 1. b) |

DHS
286237

| | | |
|---|---|---|
| Diligent efforts to locate absent parents required immediately. DFCS is required to take reasonable steps, including written notice to ensure participation of the child, parents, caregivers, and professionals in court or administrative reviews. | | |
| Required for cases where permanency goal is reunification to identify potential permanent family resource. | Olivia Y settlement agreement | P. 79, VII. C. 2. b) |
| Requires that preference be given to relatives for placement when child is placed in foster care. | Olivia Y settlement agreement | P. 29, V. E.3. |
| Must develop a visitation plan at the initial team meeting that occurs within 30 days of the child's entry into care. If parental visitation is appropriate based on factors including: child's age | Olivia Y settlement agreement | P. 458, VII.B. 3.a) (1) |
| Diligent efforts are immediately made to locate absent parents and efforts documented. Efforts are made to keep parents involved in activities and decision-making while children are in care. Efforts made to ensure participation in team meetings and service plan development and updates. Efforts must be documented. | Olivia Y settlement agreement | P. 48, VII. B. 3. a) (1) |

**Strategy:  Require *Quality Visits* training statewide on an ongoing basis.**

Through the Child and Family Service Review (CFSR) process, it was found that there is a significant positive relationship between caseworker visits with children and a number of other indicators for safety, permanency and well-being. Curriculum was developed by the National Resource Center for Permanency and Family Connections in response to that clear indication that the importance of caseworker visits to children in foster care is positively correlated to outcomes for children and families. This curriculum builds on the concepts of attachment, strengths-based assessment and planning, child and youth development, effective interviewing and organizing contacts. It allows caseworkers to practice some of the skills through role plays and preparatory activities. Seven developmental checklists are provided as tools for caseworker's to use as they begin to more intentionally structure their visits to focus on safety, permanence, and well being.

The curriculum also helps workers structure their visits with family to promote safety, well being and permanency. It provides a review of what has been learned from the CFSR about the relationship between worker/parent visits and placement stability and permanency and gives workers seven developmental checklists and questions to assess safety and well being. Workers learn how to use a four-step process to organize their visitation with family.

In January, 2010, The National Resource Center for Permanency and Family Connections conducted a Facilitator's training utilizing the curriculum described above.   From this, staff and

supervisors received the training statewide.  This training will be a requirement of all staff employed on or after September 1, 2010.

### Action Steps and Timeline

| Action Steps | Responsible Positions | Time to Begin | Time to Complete | Expected Progress July 2011 |
|---|---|---|---|---|
| Require all staff employed on or after September 1, 2010 to attend *Quality Visits Training* within 12 months of hire date. | Director of Training | In process | September 2011 | 50% of staff carrying a caseload will have received *Quality Visits Training.* |
| Maintain tracking system with documentation of training for each staff person employed on or after September 1, 2010 | Director of Training | In process | Ongoing | Tracking in progress with documentation for each staff person who attended. |

**Strategy:  Incorporate Practice Model training into the Child Welfare Professional Development (CWPD) training**

The Training Unit will begin revisions to the CWPD pre-service training to incorporate the Practice Model information.  This will begin in September 2010 and will be finalized by March 2011.  The implementation plan for the Practice Model calls for interim training of staff to be developed and occur in the initial roll-out regions prior to the incorporation of the content into the Division's regular pre-service training.  The implementation plan calls for the incorporation into the pre-service curriculum during the second year of implementation activities (January 2011-2012).

The content of the Practice Model training that most directly supports the enhancement of reunification services includes conducting strengths and needs based comprehensive family assessments, which will help staff identify the most appropriate goals, services, and time frames pertaining to children in foster care.  The module on individualized case planning will support the development of plans that are specific to the goals and needs of parents seeking to reunify with their children, and the module on mobilizing services will help ensure that parents receive the appropriate services when and where they need them the most in order to achieve reunification as soon and as effectively as possible.  In particular, the module on preserving connections and relationships will support the involvement of parents in their lives of their children while in foster care, and will promote effective partnerships (where safe and appropriate) between foster and birth parents directed toward timely and safe reunification.

44

---

**Priority Area Three: Improve the monitoring and evaluation of reunification services.**

---

**Strategy: Maintain a CQI process to monitor the provision of appropriate services toward the goal of reunification.**

The new CQI process includes the monitoring of appropriate service provision in relation to the child's permanent plan as a part of the comprehensive case review process that is already in process for the Practice Model regions. In addition to the sample of cases reviewed, an initial desk audit on every case is required in implementing counties, is updated monthly, and is submitted to CQI for tracking certain activities, such as ISPs, FTMs, and comprehensive family assessments. The desk audit will also contain an evaluation of services provided and the appropriateness of the services received in relation to the permanent plan. The information obtained from these case reviews will be used to inform policy and practice changes necessary to ensure appropriate reunification services are being obtained for children to address issues related to placement.

**Strategy: Monitor the timely achievement of reunification and, where needed, implement program improvement activities to improve performance.**

Through the data-related component of the bridge plan, DFCS has developed a MACWIS report that tracks the achievement of reunification within 12 months of a child entering foster care. The report has been validated and will now be used on an ongoing basis in CQI activities. For example, these data are being used as one of the performance indicators with regard to the Practice Model component Mobilizing Appropriate Services Timely, and will be reported in CQI reports for each region as they undergo baseline and follow-up CQI reviews. DFCS also proposes to include this indicator in a Data Dashboard to be developed under the current contract with CSF, so that the information will be publicly available at statewide, regional, and county levels.

Regions that perform below the established standards regarding timely reunification, for example the Year II *Olivia* Y Implementation Plan requirement that 30 percent of children with a goal of reunification should be reunited with their parents within 12 months of entering foster care, will be required through the CQI process to develop program improvement strategies to improve performance in that area. The State Office will provide technical assistance in the form of practice coaching (through its contract with CSF and through internal practice coaches) to staff on providing appropriate reunification services.

**Action Steps and Timeline**

| Action Steps | Responsible Positions | Time to Begin | Time to Complete | Expected Progress July 2011 |
|---|---|---|---|---|
| Perform Comprehensive Case Reviews that include the monitoring of | CQI Director | In-process | Ongoing | Regions I-S, II-W, IV-N and V-W completed initial |

| | | | | |
|---|---|---|---|---|
| provision of appropriate services to support child's permanent plan, including reunification. | | | | baseline review.<br><br>Regions I-S and II-W will begin follow-up reviews. |
| Collect and analyze information obtained from monthly desk audits on all cases, to include provision of appropriate services to support child's permanent plan, including reunification. | CQI Director | In-process | Ongoing | Regions I-S, II-W, IV-N and V-W completed. |
| Provide feedback to regions based on information gathered during the CCR and Desk Audit process. | CQI Director | September 2010 | Ongoing | Reports will be completed for Regions I-S and II-W and will be distributed to the Regions. |
| Require regions performing below established reunification standards to develop and implement program improvement strategies | CQI Director | September 2010 | Ongoing | Plans in place for regions falling below the standard |
| Provide technical assistance through coaching and training to strengthen reunification work with families | Practice Model Coaches | Currently in place | Ongoing | Coaching provided in Regions I-S, II-W, IV-N and V-W |
| Issue CQI reports that include data on timely achievement of reunification. | CQI Director | September 2010 | Ongoing | Reports issued for Regions I-S, II-W, IV-N and V-W |
| Include data on timely reunification in statewide CQI report | CQI Director | July 2011 | July 2011 | Issuance of statewide CQI report |
| Include data on timely reunification in Data Dashboard to be developed | CQI Director | October 2010 | November 2010 | Establishment of Data Dashboard |

DHS
286241

## Section III

## Recruitment and Retention of Therapeutic and Non-Therapeutic Resource Homes

The DFCS staff person responsible for tracking and monitoring the implementation of this plan is the Director of Permanency Planning and Placement.

### *Background*

In recent years DFCS modified its approach to separate licensure procedures for foster family homes and adoptive homes. Currently, there is one set of standards for both types of homes, and the homes are called resource homes to indicate their concurrent approval. Related and unrelated homes are subject to the same licensing standards, although the State is currently developing an expedited licensure process for related homes in order to avoid unnecessary placement moves for children who can be placed safely within their families. Therapeutic foster homes are licensed by Licensed Child Placing Agencies in the State, and must meet the same licensing standards as other resource homes in addition to requirements related to their provision of therapeutic care.

The *Olivia Y* settlement includes a significant number of requirements pertaining to the recruitment and retention of therapeutic and non-therapeutic resource homes. The following list summarizes these requirements along with DFCS' responsibilities in providing appropriate care to children placed in resource family homes and to those families licensed to provide for their care.

- DFCS shall make available, either directly or through contract, a sufficient number of appropriate placements for all children in its physical and legal custody.

- DFCS shall make available foster parent training classes beginning every 60 calendar days in every region with individualized training available as needed, at times convenient for the foster family.

- DFCS shall secure services for foster parents to prevent and reduce stress and family crisis.

- DFCS shall ensure that all licensed resource families (regardless of whether they are supervised directly by DFCS or by private providers) receive at least the minimum reimbursement rate for a given level of service as established pursuant to the Plan.

- Placements are to be made in the least restrictive setting which can meet the needs of the child identified in a comprehensive assessment. In order of consideration, this means placement with relatives, foster care home within reasonable proximity to the child's home community; foster care home outside of the child's home community; group home care; or institutional care.

47

- Each child shall be placed within his/her own county or within 50 miles of the home from which he/she was removed.

- Children with special needs shall be matched with placement resources that can meet their therapeutic, medical, and educational needs.

- DFCS shall ensure that each county office has access to the placement specialist within its region having the ability to ascertain the placement resources available and their suitability for each particular child needing placement.

- Siblings who enter placement at or near the same time shall be placed together, unless certain circumstances are present.

- No child shall be placed in more than one emergency or temporary facility within one episode of foster care, unless an immediate placement move is necessary to protect the safety of the child or others as certified in writing by the Regional Director.

- No child under 10 years of age shall be placed in a congregate care setting (including group homes and shelters), unless exceptional needs are present which cannot be met in a family home setting, with Regional Director's approval.

- Foster homes cannot have more than 3 foster children in the home, for a total of 5, (including foster, biological and adoptive children).  No more than 2 foster children can be under the age of 2 or have therapeutic needs.

- No later than at the time of placement, DFCS shall provide foster parents or facility staff with the foster child's currently available medical, dental health, educational and psychological information, including a copy of the child's Medicaid card.  DFCS shall gather and provide to foster parents and facility staff all additional information within 15 days of placement.

- No foster child shall be moved from his/her existing placement to another foster placement unless DFCS specifically documents in the child's case record justifications for that move and the move is approved by a DFCS supervisor.

- DFCS shall take all reasonable steps to avoid the disruption of an appropriate placement and ensure placement stability for children.  If a caseworker has knowledge that a placement may disrupt, the caseworker shall immediately convene a meeting with the DFCS supervisor, the foster parents, and, if appropriate, the child to determine the following:  the cause of the potential disruption; whether the placement is appropriate for the child; whether additional services are necessary to support the placement; whether the child needs another placement; and, if another placement is necessary, what that placement should be.

The Foster Care Services Assessments completed by CSF identified a number of issues concerning the recruitment and retention of resource home placements.  These findings are listed below:

48

- There is some lack of consistency in procedures and requirements among the Regional Resource Units, and the practice varies from one region to another. There is not a clear indication of coordination or collaboration from region to region.

- There is a great deal of inconsistency among regions and among counties within regions regarding the application of foster care policy and practice.

- Current policy manuals seem to be lacking, and some staff may only be aware of DFCS policy through word of mouth. It is not clear how staff members can obtain a complete policy manual except to copy another manual. The "P" Drive contains bulletins with updated policy, but not a complete, current Volume IV manual.

- Compliance with policy regarding the placement of children seems very inconsistent.

- County workers seem to be working diligently to ensure that children in foster care have regular visits with their birth families and with their siblings not placed together.

- County workers do not consistently begin the process of evaluating the child during the initial investigation, while they are with their own family. The information obtained directly from the birth parent could be valuable, and it would provide information that could be shared with the resource parents if the child has to enter care.

- Resource families are not treated as partners in decision-making and are not consistently involved in case planning activities.

- There are no recruitment plans for resource families and no funds for recruitment efforts.

- There are no funds for certain resource parent training activities, such as refreshments.

- The cost associated with applying to become a resource family in some areas (estimated at $400+) is prohibitive for many families.

- There are inadequate numbers of placement options for children entering foster care.

- The MACWIS system does not produce some needed aggregate reports regarding children and placement resources.

- There is no accurate differentiation in MACWIS among foster homes, adoption only homes, and relative foster homes.

- There is no single contact which has statewide information about placement resources.

49

- The State Office capacity for studying State and Federal law, drafting policy, and interpreting the policy for practice needs to be strengthened.

- The current process for securing a therapeutic placement is time-consuming, ineffective, and does not ensure appropriateness of service.

- Mental health services for children in foster care are inadequate and ineffective.

- Many resource workers and resource ASWS are recently promoted and have not received placement-specific training.

    CSF made the following recommendations in the report which shaped the direction of this plan's priorities, strategies, action steps, and timelines:

- Issue current, complete DFCS Policy Manuals to all DFCS staff agency-wide.

- Provide consistent training for all DFCS staff on DFCS policy as it relates to foster care services. Include appropriate training on MACWIS related to foster care.

- Coordinate resource services from the State Office level so the efforts of each Regional Resource Unit can be combined with others to achieve consistency statewide. This would include becoming familiar with Federal regulations and State laws pertaining to foster care, writing policy which conforms to the Federal regulations, consulting with regional resource staff, and supervising the resource ASWSs.

- Train Resource staff specific to preparing children for placement and preparation of foster families to accept and nurture the types of children entering care.

- Initiate a statewide recruitment effort coordinated by State Office that is focused on recruiting families for the kinds of children who are entering care. Develop a uniform plan for following up with responses to the recruitment efforts.

- Initiate the Resource Placement Committee meetings at the regional and State level as outlined in the *Olivia Y* settlement agreement.

- Consider initiating support groups for children in foster care at the local level.

- Ensure that State Office staff dealing with resource issues are licensed social workers, preferably with master's degrees and that they are thoroughly oriented to the job responsibilities and are proficient in addressing resource and placement-related issues.

- Ensure that pre-service training for resource families includes a module on the financial aspects of providing foster care, including board payment rates, Medicaid, clothing vouchers

DHS
286245

and reimbursement processes and transportation reimbursement. A sample travel voucher should be given to new resource parents during this segment.

- Modify the current referral process for therapeutic placements to permit the referrals to be made by local staff (worker or ASWS) in accordance with clearly established procedures, with payment approval residing at the State Office level.

- Streamline the travel voucher system in State Office to reimburse foster parents, removing any unnecessary points of contact.

- Offer training to mental health providers on issues related to neglect and abuse, separation and attachment, and other placement issues.

- Cross-train county workers and resource workers, ASWSs and RDs on preparation of children for placement, the roles of resource families, and the respective roles and responsibilities involved in a team approach to this area of practice.

- Produce a statewide newsletter to inform all resource families of training opportunities, resources, support groups, new policy, and so forth.

- Ensure that the training curriculum for newly hired workers includes segments on placement preparation and working in partnership with resource families.

### *Rationale and Goals for the Selected Priorities, Strategies, Action Steps and Timelines in the Plan*

As the comprehensive child welfare reforms underway will have a far reaching impact on children and families with whom DFCS intervenes, the approach to the recruitment and retention of therapeutic and non-therapeutic resource homes will be closely aligned with and supported by those efforts. DFCS is also preparing to respond to the findings of the recent Federal Child and Family Services Review (CFSR). Although the final report of the CFSR has not yet been released, preliminary findings from the statewide assessment and onsite review indicate needs to address the placement stability of children in foster care and recruiting and retaining a sufficient pool of foster care placements.

As of June 30, 2010, DCFS had 3,793 children (including "own home placements") under the State's custody. For the same time period, DFCS had approximately 2,235 licensed foster resource homes in the State.  This pool of resources does not permit staff in the field the opportunity to match the strengths, or even the locations, of resource homes with the needs of children entering foster care.  In regard to the therapeutic foster homes, there are approximately 214 therapeutic foster homes in the State licensed by six child placing agencies, with approximately 240 children in those homes.  Obviously, there is a need for additional family-based therapeutic resources to serve children with identified special needs.

51

DFCS' short-term goals for the recruitment and retention plan include setting up the structure needed to implement and sustain recruiting efforts as well as the capacity to respond timely and appropriately to inquiries and applications to serve children in foster care. During the initial 12 month implementation period, DFCS also has a goal of increasing the pool of non-therapeutic resources by 85 of homes, and the pool of therapeutic homes by 25 of homes statewide.

To strengthen its ability to implement a recruitment and retention initiative in conjunction with such massive systemic reforms, DFCS has applied for a Federal grant (HHS-2010-ACF-ACYF-CO-0012, Diligent Recruitment of Families for Children in the Foster Care System). If awarded, this grant will provide additional resources for hiring additional state office staff, expanded broadcast activities, and strategic recruitment using neighborhood segmentation data. However, the recruitment and retention activities described in this plan will not be dependent upon outside funding. The plan focuses on 5 priority areas that are addressed as follows:

---

*Priority Area One: Increase Staff Capacity to Recruit, Train and Retain Licensed Resource Families.*

---

**Strategy: Recruit and hire resource specialists and resource supervisors**

There is a considerable variability across the State as to the existence of full-time Resource Specialists and Resource Supervisors that are designated to recruit, train, license, and support resource families in their assigned region. Furthermore, there has been inconsistency in the training provided to the staff who fulfill these positions and a tremendous degree of variability in how these functions are carried out across each county. Over the next 12 months, DFCS will hire additional staff to assume these responsibilities at both the county and state levels. Intensive efforts will be made to recruit qualified candidates to fill vacant positions for Resource Specialists and Resource Supervisors in all regions of the State over the next 12 months. Initially, specific regions will be targeted, based on critical resource needs, existing backlogs of pending resource home studies, and the phasing in of the Practice Model. MDHS' Human Resources Division will begin to post and advertise for resource staff positions utilizing new creative, well-written job announcements to attract individuals who meet the qualifications of a resource worker– experienced, licensed, master level social worker. Beginning with the Fall Semester, 2010, and continuing throughout the Spring Semester, 2011, DFCS will provide field placements in the Resource Units for graduate level students to provide services for resource parents to prevent and reduce family stress and crisis. DFCS staff will coordinate with the State's universities and colleges that have a graduate level social work program in the assignment of students and development of responsibilities along with arranging appropriate supervision during the placements.

In order to provide some immediate supports to specific areas of the State, DFCS will hire additional resource staff in the following regions deemed to have critical needs: Regions V-E, VI, VII-E, and VII-W. This will include the use of part-time staff in Regions VII-E and VII-W. Over the next 12 months, DFCS will also hire additional resource staff to be assigned to the following regions that are or will be involved in the rollout of the Practice Model during the next

DHS
286247

year- Regions I-South, II-West, IV-North, V-West, I- North, III-South (includes Hinds County), and IV-South.

**Strategy:  Hire additional program staff in the state office to support recruitment and retention activities and serve as a liaison to the regions and resource parents**

Beginning in December, 2010, DFCS will initiate efforts to hire at least two additional State Office Staff to support statewide and regional recruitment efforts.  The plan proposes to have the additional staff report to the Director of the Resource/Adoption Unit and in place by February 28, 2011. Staff duties will include the development of recruitment materials, oversight of the Mississippi Resource Adoption Exchange, the development of a state foster parent association, and oversight of regional recruitment efforts.

**Strategy:  Develop a pool of resource specialists to assist in reducing backlogs of pending resource home studies and to expedite studies in areas of critical need**

DFCS will identify all resource specialists across the State with lower caseloads for the purpose of developing a pool of staff to be assigned to complete the backlog or initiate new studies for pending resource homes in Regions V-E, VI, VII-E, and VII-W.  By October 31, 2010, DFCS will develop a schedule and dispatch teams of available resource specialists to assist with reducing the backlog of pending resource home studies.  By December 31, 2010, an estimated 20 resource homes from the backlog of applications will become fully licensed and an additional 35 homes from that same pool will have the home study process initiated and underway by this same time. (These numbers will be counted in the projected 85 new homes by August 31, 2011.)

**Strategy:  Develop a specialized training curricula for resource specialists and supervisors**

DFCS plans to adopt a more uniform and standardized approach to preparing and training resource specialists and supervisors to carry out their work more effectively.  Using the content and framework of the training provided by the National Resource Center for Adoption staff in July, 2010, DFCS will develop by April 30, 2011, a specific in-house training curriculum for resource specialists based on their scope of responsibilities and in accordance with the requirements of the *Olivia Y* settlement, COA accreditation standards, and the Practice Model. This training will also encompass relevant materials related to policy changes and planned revisions that are forthcoming regarding the Division's approach to the orientation, preparation, and training for prospective resource families. Implementation with resource specialists and supervisors will begin June 2011. DFCS will research and select specialized training for resource staff regarding field-tested and promising practices for working with diverse cultural, racial, and economic communities by August 2011.

DHS
286248

**Action Steps and Timeline**

| Action Steps | Responsible Position | Start Date | Completion Date |
|---|---|---|---|
| Provide Human Resources with creative, well-written job announcements to attract individuals who meet the qualifications of a resource worker – experienced, licensed, master level social worker | Director of Permanency Special Consultant to DFCS Director Director of Adoption and Resources | 09/01/2010 | 09/30/2010 |
| Provide field placements in the Resource Units for graduate level students to provide services for resource parents to prevent and reduce family stress and crisis | Director of Permanency Special Consultant to DFCS Director Resource ASWSs | Fall, Spring, Summer Semesters 2010-2011 | Ongoing |
| Hire additional resource staff in regions rolling out the Practice Model | MDHS Deputy Director for DFCS DFCS Director RDs Resource ASWSs | Ongoing | Ongoing |
| Employ additional state office staff to support statewide and regional recruitment efforts | Director of Permanency Director of Adoption and Resources | December 2010 | February 2011 |
| Hire additional resource staff in critical need areas: V-E, VI, VII-E, VII-W including use of part-time staff in VII-E and VII-W | MDHS Deputy Director for DFCS DFCS Director RDs Resource ASWSs | September 2010 | February 2011 |
| Develop and implement a schedule by which teams of available resource specialists will be dispatched to critical need areas to assist with reducing the backlog of pending resource home studies. (See below) | MDHS Deputy Director for DFCS Director of Field Operations Practice Specialist | September 2010 | October 2011 |

54

| | Director of Permanency Special Consultant for DFCS Director | | |
|---|---|---|---|
| Initiate home study process for at least 35 homes in those four regions and complete the process to full licensure for 20 others. | Resource ASWSs Resource Specialists | October 2010 | December 2010 |
| Continue quarterly meetings between state office staff and resource staff | Director of Permanency Special Consultant for DFCS Director Director of Adoption and Resources | Ongoing | Ongoing |

**Priority Area Two: Re-design the model for resource home licensure**

**Strategy: Revise the training curriculum for prospective resource families**

As a result of the Settlement and the implementation of the Practice Model, the roles and responsibilities of both the caseworker and the resource parent have been further defined in relation to case planning activities and services on behalf of children that have been placed in out-of-home care.  Consequently, prospective resource families need to be fully informed, prepared, and trained in order to provide care for children in accordance with these new requirements, practice principles, and policies and procedures.  DFCS will evaluate and make needed revisions and modifications to the resource home orientation/preparation/training (Mississippi PATH training) by April 2011.  As a part of this action, DFCS will establish a standardized approach to the training of prospective resource homes, including specific guidelines regarding the training model and requirements concerning the delivery of the training curriculum, criteria for participants, home study formats, etc.  As Section F (Resource Licensing and Adoption) of the DCFS policy manual will be revised by March, 2011, the training will incorporate: a) revised policies, procedures, and practice guidelines, b) relevant settlement agreement requirements, COA standards, and an emphasis on the role of resource parents in working with birth parents toward reunification.

In order to assess and monitor the effectiveness of resource family training on an ongoing basis DFCS will review the participant evaluations developed by State Office staff, beginning in January, 2011, in order to make appropriate changes and adjustments in delivery, training

content, location, etc . On a monthly basis, completed participant evaluations will be submitted to the trainers, Resource ASWS, and State Office Permanency Unit.

**Strategy:  Implement a timely and effective approach for resource family licensing**

As resource homes are in critical need and vital to the service array, it is essential that DFCS consistently demonstrate a timely response to initial inquiries from prospective resource parents. Over the next twelve months, DFCS plans to initiate measures to reduce the length of time from the point in which an inquiry is received from a prospective resource parent until licensure is issued, if appropriate.  Strategies previously referenced, such as increases in staffing and utilizing a pool of resources to complete home studies in targeted areas, will play a key role in reducing potential delays in the licensure process.  Nevertheless, DFCS will also establish internal protocols and tracking systems for timely contacts, delivery of training, and initiation and completion of home studies.

As there are a number of prospective resource homes across the state that have been waiting substantially long periods of time for the licensure process to be initiated, DFCS will need to prioritize reducing this backlog prior to implementing new standards and timelines for the licensure process.  Beginning in October, 2010, DFCS will conduct a series of informational meetings in regions with a high number of overdue inquiries to determine if applicants want to proceed with the application process. During these sessions, staff will provide information about specific types of children in need of placement, requirements and benefits of licensure, the application process and the role of the resource parent in working with birth parents toward reunification. Inquiries of those who do not wish to proceed will be closed.

In December, 2010, DFCS will convene a workgroup comprised of State staff and ASWS's to develop procedures and protocols for tracking the licensure process to assess timelines across all phases.  By March, 2011, the plan proposes to identify average length of licensure process at key junctures and compare timeframes across counties and regions.  DFCS will then identify contributing factors causing delays and possible solutions and strategies to address.  By August 31, 2011, DFCS will establish timelines and standards to ensure that persons who inquire about becoming a resource family are contacted within 5 working days and that no applicant has to wait longer than one month to begin the licensure process.  DFCS will develop case action ticklers and supervisory controls to monitor this requirement.  DFCS plans to initiate new resource family training on a monthly basis in every region.  Training schedules and assignment of trainers will be developed in advance in order to provide sufficient coverage of these responsibilities.

56

The goals of these strategies are to ensure that persons who inquire about the requirements to become a resource family are contacted by DFCS within 5 working days, and that no applicant has to wait longer than one month to begin the licensure process.

### Action Steps and Timeline

| Action Steps | Responsible Position | Start Date | Completion Date |
|---|---|---|---|
| Conduct a series of informational meetings in regions with a high number of overdue inquiries to determine if applicants want to proceed with the application process. Share information about types of children in need of placement, requirements and benefits of licensure, the application process and the role of the resource parent in working with birth parents toward reunification. Inquiries of those who do not wish to proceed will be closed. | Director of Permanency Special Consultant to DFCS Director Resource ASWSs | September 2010 | December 2010 |
| Revise Section F (Licensure and Adoption) of the DFCS Policy Manual | Director of Permanency Special Consultant to DFCS Director Director of Adoption and Resources Director of Policy Policy Workgroup | November 2010 | March 2011 |
| Develop protocol and procedures for tracking how long it takes an applicant to be licensed – from inquiry to license. | Director of Adoption and Resources Resource ASWSs | September 2010 | December 2010 |
| Revise Mississippi PATH/Resource Parent Training to include revised policy, relevant settlement agreement requirements, COA Standards, and an emphasis on the role of resource parents in working with birth parents toward reunification | Director of Adoption and Resources Special Consultant to DFCS Director Resource ASWSs Resource Parent Workgroup | February 2011 | April 2011 |
| Consistently use participant evaluations developed by state office staff. Copies of completed evaluations should given to trainer, Resource ASWS and state office | Director of Adoption and Resources Resource ASWSs | January 2011 | Ongoing |

57

| | | | |
|---|---|---|---|
| Assess average time it takes to complete licensure process from inquiry to licensure – statewide and by region | Director of Adoption and Resources | March 2011 | March 2011 |
| Offer resource family training on a monthly basis in every region | Director of Permanency Special Consultant to DFCS Director RDs Resource ASWS | March 2011 | Ongoing on monthly basis |
| Decrease time it takes to complete licensure process from inquiry to approval for licensure. This includes setting performance standards for resource unit staff and implementing tracking and reporting procedures that identify timely and overdue contacts with resource home applicants. DFCS will also work with the CQI unit to ensure that part of the monitoring/oversight functions address timeliness in responding to resource family applicants. | Director of Adoption and Resources | March 2011 | August 2011 |
| Train resource staff on working with diverse cultural, racial, and economic communities. | Director of Permanency Special Consultant to DFCS Director CSF Consultants | October 2011 | Ongoing |

> **Priority Area Three: Initiate a three-pronged recruitment strategy with activities specific to general recruitment, targeted recruitment and child-specific recruitment.**

**Strategy: Conduct general recruitment activities across the State**

DFCS will initiate a general recruitment approach that is designed to reach all parts of the community and ensure that prospective resource families have access to the home study process. Media messages and recruitment activities will be initiated that are statewide in scope. Specific messages and activities will be designed and will focus on the families needed to care for the particular children in DFCS custody in need of homes, e.g., older children, children with special needs, children of various racial and ethnic backgrounds, sibling groups. Information will be made available to prospective resource families on the MDHS web site or an alternate web site. This will also serve as a means of identifying the types of children for whom resource homes are needed, and a ready source of information for applicants. The website will also be used to post training and other support information for resource families.

DHS
286253

**Strategy: Implement a phased-in approach for targeted recruitment activities**

Targeted recruitment activities will follow the roll-out schedule for the Practice Model and CQI process, so that the project will benefit from the region-specific planning that occurs prior to implementing the Practice Model, and so that DFCS staff and resource families will have benefit of training and preparation to serve children and families together in accordance with Practice Model concepts. DFCS will focus recruitment efforts in the communities and neighborhoods from which children are entering foster care. By maintaining a child's important ties and connections to family and community, DFCS will be able to promote concurrent planning and permanency for children and older youth who otherwise might not be willing to sacrifice birth family ties and connections in order to achieve permanency with another family.

Based on the concept of the Tupperware Party, DFCS will recruit host resource families in communities identified for recruitment activities to host events in their homes or the homes of others. A kit will be created for the families to host parties that include fun, interactive games and activities which educate potential resource families about the need for foster and adoptive families in their community. These parties can be hosted for larger groups (the parties can be run as an in-service or workshop for churches, employment groups, medical facilities, etc.) or for private audiences (host families inviting friends and neighbors to their home).

**Strategy: Conduct child-specific recruitment activities**

DFCS will reinstitute the Mississippi Adoption Exchange. Although there has been a State Adoption Exchange in place for some years, it has not been widely used and will need re-vamping to become a more useful child-specific tool in the State. Additionally, there will be continued use of other methods of child-specific recruitment such as Wednesday's Child (television), Tuesday's Child (newspaper), and AdoptUSKids web site

Another child-specific approach will be initiated as DFCS will fully implement expedited licensure process for kinship homes. DFCS has begun to develop an expedited licensure process for related families that wish to serve as resource families. This will permit the use of related homes faster and easier.

Additionally, as the Practice Model is in full implementation in 14 counties, intensive training and coaching activities will take place, giving focus to the early identification of relatives for children as potential placement resources. In order to maximize the use of relatives and to preserve family connections for children in foster care, child welfare practice upon a child's entry into foster care must be strengthened to quickly identify maternal and paternal relatives, evaluate their interest and suitability to care for the child, and proceed with licensure. Over the next 12 months, there will be 32 additional counties involved in Practice Model implementation.

DHS
286254

**Action Steps and Timeline**

| Action Steps | Responsible Position | Start Date | Completion Date |
|---|---|---|---|
| Develop Regional Recruitment Teams which will include resource staff, county staff, resource parents and community leaders to support planning and implementation. Roll out with the Practice Model. | Director of Permanency Special Consultant to DFCS Director Director of Adoption and Resources Resource ASWSs Practice Model Implementation Teams | September 2010 | September 2011 |
| Establish baseline data to inform targeted recruitment based on children's needs in each region, include children placed outside of 50 mile radius and siblings not placed together | Director of Permanency Special Consultant to DFCS Director Director of Adoption and Resources MACWIS Director | September 2010 | October 2010 |
| Develop printed materials to be used at the county, regional and state levels. | Special Consultant to DFCS Director Director of Adoption and Resources MDHS Communications Director | September 2010 | November 2010 |
| Conduct a one recruitment campaign for new resource homes in 4 regions with a goal of a net gain of 5 new licensed homes in each of the regions | Director of Permanency Special Consultant to DFCS Director Director of Adoption and Resources Resource Parent Workgroup | December 2010 | February 2011 |
| Conduct a second recruitment campaign in | Director of | January | March 2011 |

60

| | | | |
|---|---|---|---|
| two additional regions with a goal of a net gain of 5 new licensed homes in each of these regions | Permanency Special Consultant to DFCS Director Angie Williams Director of Adoption and Resources Resource Parent Workgroup | 2011 | |
| Plan and implement a statewide recruitment campaign to kickoff in May 2011 for National Foster Care Month including regional activities | Director of Permanency Special Consultant to DFCS Director Director of Adoption and Resources CSF Consultants Resource Parent Workgroup | February 2011 | May 2011 |
| Develop an informational power point presentation on resource homes and foster care to premier on the MDHS web site in April 2011 for Child Abuse Prevention Month | Director of Permanency Special Consultant to DFCS Director Resource ASWSs MDHS Communications Director | March 2011 | April 2011 |

> **_Priority Area Four: Establish ongoing supports to retain resource families_**_._

**Strategy:   Provide a State-level support system and network for resource families**

Through the newly created Resource Development Unit, resource families will have access to staff whose responsibilities include identifying and accessing needed services to prevent an reduce stress and family crisis. In addition to this unit, the DFCS Permanency Division will also initiate a number of activities to support resource families over the next 12 months.  These planned activities include issuing a statewide quarterly newsletter to resource families to strengthen communication and provide information regarding training opportunities, available services and resources, new policies and procedures, etc.  The staff will also solicit input from resource parents by conducting a survey twice per year to assess a range of issues affecting resource family retention, and these survey results will be provided to MDHS leadership.  Staff

DHS
286256

from with the DFCS Permanency Division will convene workgroups designed to develop working protocols and practices that will improve procedures regarding placements and assist in needed policy revisions. They will also develop a power point presentation intended for newly hired staff regarding partnering with resource families and will work with the Office of Training to coordinate the dissemination of this tool.

DFCS also plans to work with ███████████████ to develop strategies for increasing supports to resource families through a strengthened respite program and resource parent support groups. ███████████████ currently provides post-adoption placement support services which may offer a model for expansion of supports and services to resource families.

## Strategy: Reinstate the State Foster Parent Association

In years past, DFCS had a statewide foster parent association that has not been active in some time. By revitalizing this association, DFCS plans to work in collaboration with the association to identify needs and strategies to support recruitment and retention of families interested in serving as resources for children in need of placement. Contact will be made with the National Foster Parent Association to seek information regarding membership, organizational structure, procedural guidelines, and by-laws, etc. Responsibility for this task will be assigned to new state office staff, and by May 2011, a relationship will be established between DFCS and the National Foster Parent Association.

## Strategy: Create a State level resource parent liaison/advocate position

DFCS will work with the Statewide Foster Parent Association to identify an individual who will serve as a resource parent liaison. This resource parent will have office space provided by DFCS at the State Office and will have planned monthly meetings with a designated office days. This position will provide representation and input into policy, training, and resource development and enable greater advocacy on behalf of resource families regarding needed supports and services and participating in solution-focused strategies for addressing these issues. DFCS will involve leadership from ███████████████ to solicit input into the development of the role of the Resource Parent Liaison.

## Strategy: Ensure supervisory review of resource parent involvement in case planning

DFCS is currently making some revisions to its Supervisory Administrative Review (SAR) as part of the implementation of the Practice Model and establishment of a CQI system. In the next four months, DFCS will revise policy guidelines to require the County ASWS to make contact with the resource family as part of the SAR for each child in custody on their workload. Resource workers will also be required to make quarterly contacts by phone or face-to-face with all resource families on their workload in addition to the 6 month safety review and annual re-evaluations.

Other approaches that will support this strategy include issuing an interim supervisory protocol (until more comprehensive changes are made to supervisory training) which will focus

DHS
286257

on supervisory oversight of the components of the Practice Model. This will focus more supervisory attention on engagement of all relevant parties, including resource parents, in case planning activities. Also, as DFCS seeks to ensure that the Foster Care Review (FCR) process and protocol are fully aligned with CQI and Practice Model activities, DFCS will have an opportunity to address this critical area in the FCR review of all children in foster care.

## Action Steps and Timeline

| Action Steps | Responsible Position | Start Date | Completion Date |
|---|---|---|---|
| Host preliminary meeting with leadership of ▓▓▓▓▓▓▓▓▓ to address: respite care, support groups, and introduce the concept of Resource Family Advocate.<br><br>Convene a joint meeting of ▓▓▓▓▓▓ staff and DFCS Resource Staff for the purpose of redesigning respite care, support groups, and creating structure for Resource Family Advocate | Director of Permanency Special Consultant to DFCS Director<br><br>Director of Adoption and Resources | September 2010<br><br>October 2010 | October 2010<br><br>November 2010 |
| Make contact with National Foster Parent Association to gain a better understanding of current affiliation, membership requirements and benefits. | Special Consultant to DFCS Director Director of Adoption and Resources | September 2010 | October 2010 |
| Develop power point presentation on supporting resource families, treating them with respect and as partners in the provision of child welfare services. To be used in Child Welfare Professional Development training for all new hires and in county/regional offices. | Director of Adoption and Resources Resource ASWSs | October 2010 | November 2010 |
| Revise DFCS policy to require County ASWS to make contact with resource family as part of Supervisory Administrative Review and require resource workers to make quarterly contacts by phone or face-to-face with resource families in addition to 6 month safety review and annual re-evaluations. | Director of Permanency Special Consultant to DFCS Director Director of Adoption and Resources Director of Policy | November 2010 | December 2010 |
| Develop a resource family workgroup to develop and implement practices and protocols that address issues specific to placement, training, crisis, recruitment and case planning. | Director of Permanency Special Consultant to DFCS Director Director of | January 2011 | March 2011 |

63

DHS
286258

| | | | |
|---|---|---|---|
| | Adoption and Resources Resource ASWSs Private Child Placing Agencies | | |
| Implement a quarterly statewide newsletter for resource families: February, May, August, October 2011. | Director of Permanency Special Consultant to DFCS Director Director of Adoption and Resources | December 2011 | Ongoing |
| Implement Resource Parent Survey to be conducted twice per year: January and June 2011<br><br>Report results of survey to DFCS leadership | Special Consultant to DFCS Director Director of Adoption and Resources Resource ASWS Private Child Placing Agencies | November 2010 | March & August 2011 |
| Develop or access online training for in-service hours for resource parents | Director of Permanency Director of Adoption and Resources Director of Training MACWIS Director | March 2011 | May 2011 |
| Issue Interim Supervisory Protocol | DFCS Director Director of Field Operations | October 2010 | November 2010 |
| Revise FCR protocol | CQI Director | October 2010 | December 2010 |

> **Priority Area Five: Implement formal agreements and contractual arrangements with child placing agencies to increase the number of available therapeutic resource home placements statewide**

**Strategy: Engage private child placing agencies in developing a recruitment campaign for additional therapeutic resource home placements.**

Over the next three months, DFCS will convene a meeting of child-placing agencies and the MDMH to enlist their involvement in developing a recruitment campaign for additional therapeutic resource homes. This group will have an initial target of developing 25 new

DHS
286259

therapeutic resource homes and will periodically meet to assess progress towards that goal.  This workgroup will also address steps to increase the quality of therapeutic services provided to children placed with therapeutic resource families.

**Strategy**: **Implement formal agreements with child-placing agencies regarding processes for approving families**

DFCS has identified a need to ensure that therapeutic resource family applicants are not only screened for criminal history background and Central Registry clearance but are also assessed for prior application and/or licensure with DFCS or any other agency.  DFCS will develop formal agreements and working protocols with child-placing agencies for obtaining concurrence for approval of any home that was not rendered a license by DFCS or for whom DFCS closed their home.

**Strategy:  Develop performance-based contracts with licensed child placing agencies for recruitment and preparation of therapeutic resource homes.**

In order to provide for an adequate number of therapeutic foster homes in the State and ensure that contract providers practice in accordance with the Practice Model, DFCS will issue a request for proposals for therapeutic resource homes and develop performance-based contracts with child-placing agencies whose programs will provide the desired scope of services and the capacity to license therapeutic resource homes statewide.  DFCS will work closely with the MDMH as the State agency that certifies therapeutic foster care programs in defining the scope of services along with the training requirements, DFCS policies to which therapeutic resource homes will adhere, case management and supervision, and rates for therapeutic services and daily room and board.

### Action Steps and Timeline

| Action Steps | Responsible Position | Start Date | Completion Date |
|---|---|---|---|
| Devise written protocol and procedures to be distributed to private child placing agencies for screening resource family applicants for previous service with DFCS or another agency.<br><br>Devise written protocol and procedures to allow approval of an applicant previously denied or closed by DFCS | Director of Permanency Director of Congregate Care | September 2010 | December 2010 |
| Convene DFCS, MDMH and private child placing agencies to develop a recruitment campaign for therapeutic resource homes. Group will also address quality of therapeutic services provided. | Director of Permanency Director of Congregate Care DOM MDMH | September 2010 | December 2010 |

DHS
286260

| | Resource Development Unit | | |
|---|---|---|---|
| Meet with DFCS administration/finance staff to begin planning for release of RFP for therapeutic foster care services | Director of Permanency Director of Adoption and Resources Director of Congregate Care Director of Administration /Finance | September 2010 | Ongoing |
| Meet with workgroup to assess progress in recruiting new therapeutic resource homes. Target goal of at least 25 new homes. | Director of Permanency Director of Adoption and Resources | March 2011 | March 2011 |
| Release RFP for therapeutic foster care services.

Proposals due to DFCS.

Contracts will be awarded. | Director of Permanency Director of Congregate Care Director of Adoption and Resources Director of Administration /Finance | March 2011 | March 2011

June 2011

October 2011 |

66

**Ex. 30**

BAKER
DONELSON
BEARMAN, CALDWELL
& BERKOWITZ, PC

4268 I-55 NORTH
MEADOWBROOK OFFICE PA
JACKSON, MISSISSIPPI 3921
PHONE:    601.351.2400
FAX:      601.351.2424
MAILING ADDRESS:
P. O. BOX 14167
JACKSON, MISSISSIPPI 3923

www.bakerdonelson.com

KENYA KEY RACHAL., ESQ.
Direct Dial: (601) 351-8940
Direct Fax: (601) 974-8940
E-Mail Address: krachal@bakerdonelson.com

June 16, 2010

**VIA ELECTRONIC & UNITED STATES MAIL**

Shirim Nothenberg
Children's Rights Incorporated
330 Seventh Avenue, 4th Floor
New York, NY 10001

> RE:   *Olivia Y., et al. v. Haley Barbour, et al*; In the United States District Court for the
> Southern District of Mississippi, Jackson Division; Cause No. 3:04CV251LN

Dear Shirim:

Enclosed please find the following documents DFCS is producing in accordance with the Bridge
Plan provisions indicated below:

**Provision 7.c.ii.**
Practice Guides:  Assuring Safety and Managing Risks (DHS277892-277893), Preserving and
Maintaining Connections (DHS 277894-277895), and Involving Children and Families in Case
Activities and Decision Connections (DHS 277896-277897)

**Provision 7.f.i.**
List of unlicensed relative placements in which a foster child class member resides as of March
1, 2010 including the name and DOB of the foster children in those placements (DHS 277898-
277904)

**Provision 8**
Bridge Plan Status Report (DHS 277905-277915).

Sincerely,

Kenya Key Rachal

cc: Grace Lopes

ALABAMA  •  GEORGIA  •  LOUISIANA  •  MISSISSIPPI  •  TENNESSEE  •  WASHINGTON, D.C.  •  BEIJING, CHINA
Representative Office,
BDBC International, LLC

| Region | County | Placement | Child Name (DOB) |
|---|---|---|---|
| | | **Unlicensed Relative Placements**<br>**as of March 1, 2010** | |
| 1N | Alcorn | | |
| | Alcorn | | |
| | Alcorn | | |
| | DeSoto | | |
| | DeSoto | | |
| | DeSoto | | |
| | DeSoto | | |
| | Desoto | | |
| | DeSoto | | |
| | DeSoto | | |
| | DeSoto | | |
| | Marshall | | |
| | Prentiss | | |
| | Prentiss | | |
| | Tishomingo | | |
| | Tishomingo | | |
| | Tishomingo | | REDACTED |
| | Tishomingo | | |
| 1S | Calhoun | | |
| | Calhoun | | |
| | Lafayette | | |
| | Lafayette | | |
| | Lafayette | | |
| | Lafayette | | |
| | Lee | | |
| | Monroe | | |
| | Monroe | | |
| | Pontotoc | | |
| | Union | | |
| | W. Chickasaw | | |
| | W. Chickasaw | | |
| 2E | Panola | | |

DHS 277898

| Region | County | Placement | Child Name (DOB) |
|---|---|---|---|
| 2W | Humphreys | | |
| | Washington | | |
| | Washington | | |
| 3N | Holmes | | |
| | Madison | | |
| | Madison | | |
| | Scott | | |
| | Scott | | |
| | Scott | | |
| | Yazoo | | |
| | Yazoo | | |
| | Yazoo | | |
| 3S | Hinds | | |
| | Hinds | | |
| | Hinds | | |
| | Hinds | | |
| | Hinds | | |
| | Hinds | | |
| | Hinds | | |
| | Hinds | | REDACTED |
| | Hinds | | |
| | Hinds | | |
| | Hinds | | |
| | Hinds | | |
| | Hinds | | |
| | Hinds | | |
| | Hinds | | |
| | Hinds | | |
| | Hinds | | |
| 4N | Choctaw | | |
| | Lowndes | | |
| | Lowndes | | |
| | Lowndes | | |
| | Lowndes | | |
| | Lowndes | | |
| | Noxubee | | |
| | Noxubee | | |
| | Noxubee | | |

| Region | County | Placement | Child Name (DOB) |
|--------|--------|-----------|------------------|
|        | Lauderdale |        |                  |
|        | Lauderdale |        |                  |
| 4S     | Lauderdale |        |                  |
|        | Lauderdale |        |                  |
|        | Lauderdale |        |                  |
|        | Copiah |          |                  |
|        | Copiah |          |                  |
|        | Copiah |          |                  |
|        | Copiah |          |                  |
|        | Copiah |          |                  |
|        | Covington |       |                  |
|        | Covington |       |                  |
|        | Covington |       |                  |
|        | Covington |       |                  |
|        | Jeff Davis |      | REDACTED         |
|        | Jeff Davis |      |                  |
|        | Jeff Davis |      |                  |
|        | Jeff Davis |      |                  |
|        | Jeff Davis |      |                  |
|        | Jeff Davis |      |                  |
|        | Jeff Davis |      |                  |
|        | Jeff Davis |      |                  |
| 5E     | Jeff Davis |      |                  |
|        | Lawrence |        |                  |
|        | Lawrence |        |                  |
|        | Simpson |         |                  |
|        | Simpson |         |                  |
|        | Simpson |         |                  |
|        | Simpson |         |                  |
|        | Simpson |         |                  |
|        | Simpson |         |                  |
|        | Simpson |         |                  |
|        | Simpson |         |                  |
|        | Simpson |         |                  |
|        | Simpson |         |                  |
|        | Simpson |         |                  |
|        | Smith |           |                  |
|        | Smith |           |                  |
|        | Smith |           |                  |
|        | Smith |           |                  |

DHS
277900

| Region | County | Placement | Child Name (DOB) |
|--------|--------|-----------|------------------|
| 5E | Smith | | |
| | Smith | | |
| | Smith | | |
| 5W | Adams | | |
| | Adams | | |
| | Adams | | |
| | Adams | | |
| | Amite | | |
| | Pike | | |
| | Pike | | |
| | Pike | | |
| 6 | Forrest | | |
| | Forrest | | |
| | Forrest | | REDACTED |
| | Forrest | | |
| | Forrest | | |
| | Forrest | | |
| | Forrest | | |
| | Forrest | | |
| | Forrest | | |
| | Marion | | |
| | Stone | | |
| | Stone | | |
| | Stone | | |
| | Stone | | |
| | Stone | | |
| | Stone | | |
| | Stone | | |
| | Stone | | |
| | Stone | | |
| | Stone | | |

DHS
277901

| Region | County | Placement | Child Name (DOB) |
|--------|--------|-----------|------------------|
| | Pearl River | | |
| | Pearl River | | |
| | Pearl River | | |
| | Pearl River | | |
| | Pearl River | | |
| | Pearl River | | |
| | Pearl River | | |
| | Pearl River | | |
| | Pearl River | | |
| | Pearl River | | |
| | Pearl River | | |
| | Pearl River | | |
| 6 | Pearl River | | REDACTED |
| | Pearl River | | |
| | Pearl River | | |
| | Pearl River | | |
| | Pearl River | | |
| | Pearl River | | |
| | Pearl River | | |
| | Pearl River | | |
| | Pearl River | | |
| | Pearl River | | |
| | Pearl River | | |
| | Pearl River | | |
| | Pearl River | | |
| | Pearl River | | |
| | Pearl River | | |
| | Pearl River | | |
| | Pearl River | | |
| | Jackson | | |
| | Jackson | | |
| 7E | Jackson | | |
| | Jackson | | |
| | Jackson | | |

| Region | County | Placement | Child Name (DOB) |
|--------|--------|-----------|------------------|
|    | Jackson |  |  |
|    | Jackson |  |  |
|    | Jackson |  |  |
|    | Jackson |  |  |
|    | Jackson |  |  |
|    | Jackson |  |  |
| 7E | Jackson |  |  |
|    | Jackson |  |  |
|    | Jackson |  |  |
|    | Jackson |  |  |
|    | Jackson |  |  |
|    | Jackson |  |  |
|    | Jackson |  |  |
|    | Jackson |  |  |
|    | Jackson |  |  |
|    | Jackson |  | REDACTED |
|    | Hancock |  |  |
|    | Hancock |  |  |
|    | Hancock |  |  |
|    | Hancock |  |  |
|    | Hancock |  |  |
|    | Hancock |  |  |
|    | Hancock |  |  |
|    | Hancock |  |  |
| 7W | Hancock |  |  |
|    | Hancock |  |  |
|    | Hancock |  |  |
|    | Hancock |  |  |
|    | Hancock |  |  |
|    | Hancock |  |  |
|    | Hancock |  |  |
|    | Hancock |  |  |
|    | Hancock |  |  |
|    | Harrison |  |  |
|    | Harrison |  |  |

DHS
277902

| Region | County | Placement | Child Name (DOB) |
|---|---|---|---|
| | Harrison | | |
| | Harrison | | |
| | Harrison | | |
| | Harrison | | |
| | Harrison | | |
| | Harrison | | |
| | Harrison | | |
| | Harrison | | |
| | Harrison | | |
| | Harrison | | |
| | Harrison | | |
| 7W | Harrison | | |
| | Harrison | | REDACTED |
| | Harrison | | |
| | Harrison | | |
| | Harrison | | |
| | Harrison | | |
| | Harrison | | |
| | Harrison | | |
| | Harrison | | |
| | Harrison | | |
| | Harrison | | |
| | Harrison | | |
| | Harrison | | |
| | Harrison | | |
| | Harrison | | |
| | Harrison | | |
| | Harrison | | |
| | Harrison | | |
| | Harrison | | |
| | Harrison | | |
| 7W | Harrison | | |
| | Harrison | | |
| | Harrison | | |
| | Harrison | | |
| | Harrison | | |

DHS 277904