


FILED

COPY

DISTRICT OF UTAH

BY: _____
DEPUTY CLERK

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

### CENTRAL DIVISION

|  |  |  |
|---|---|---|
| DAVID C., et al., | : | MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT AGREEMENT AND APPOINT RECEIVER |
|         Plaintiffs, | : | |
|   -vs- | : | |
| | : | |
| MICHAEL LEAVITT, et al., | : | |
|         Defendants. | : | Civil No. 93-C-206W |
| | : | |

Plaintiffs David C., et al. ("Plaintiffs") move the court to enforce the Settlement Agreement between the parties and to appoint a receiver over the Division of Child and Family Services ("DCFS"). The court heard oral argument on January 31, 1997. Being fully advised of the law and facts relating to this motion, the court enters the following Memorandum Decision and Order.

EXHIBIT

A

tabbies

## I.    BACKGROUND

A.    The Complaint and the Settlement Agreement

On February 25, 1993, Plaintiffs initiated this class-action lawsuit against the governor of the State of Utah and other state officials involved in Utah's child-welfare system (collectively referred to as "Defendants").  The plaintiff class is (1) all children who are now or will be in the custody of the Department of Human Services ("DHS") and who have been or will be placed by DHS in a shelter-care facility, foster-family home, group home, or institutional care; and (2) all children who are or will be known to DHS by virtue of a report of abuse or neglect. Plaintiffs brought this suit pursuant to 42 U.S.C. § 1983 and sought declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

Plaintiffs alleged in their complaint that Utah's child-welfare system fails to protect children in its custody from further harm and to ensure that they receive adequate food, clothing, shelter, education, and medical and other proper care. Plaintiffs argued that these failures violate their rights guaranteed by the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution, the Federal Adoption Assistance and Child Welfare Act, and the Federal Child Abuse Prevention and Treatment Act.

2

After substantial negotiation, the parties entered into a Settlement Agreement (the "SA") on May 17, 1994. By entering into the SA, Plaintiffs gave up their right to a trial and the opportunity to seek immediate relief against Defendants, and in return, Defendants agreed to implement the provisions of the SA. The court gave the SA final approval on August 29, 1994, and directed Defendants to ensure that DHS and DCFS comply with the SA.[1] The SA is to be effective until August 29, 1998. (Settlement Agreement § XI.M.)

The SA sets forth ninety-three provisions for Defendants to implement which are designed to overhaul the policies and practices governing Utah's child-welfare system.[2] In general, these provisions relate to the screening and investigation of abuse and neglect complaints; the improvement of shelter care, family services, health care, and education for foster children; the improvement of support given to foster parents; the preparation of treatment plans; and the training and supervision provided to caseworkers and foster parents. The SA also establishes a Monitoring Panel (the "Panel") to monitor

---

[1]  The court issued two related orders on August 29, 1994. For purposes of this memorandum decision and order, these two orders are referred to jointly as the "August 29 Order."

[2]  This number does not includes section V.B.1 (computerized systems), which has an implementation date of 1998.

3

Defendants' implementation of the ninety-three SA provisions and to publish quarterly reports documenting Defendants' compliance or noncompliance with these provisions.[3]  (Settlement Agreement § XI.A-D, G.)

In addition, the SA provides for a "Corrective Action Period" (or "Corrective Action Process") in which a "Corrective Action Plan" ("CAP") is prepared and implemented to remedy any areas in which the Panel finds Defendants in noncompliance. (Settlement Agreement § XI.H.)  After a finding of noncompliance, DCFS must submit a CAP to the Panel within two weeks.  Within another two weeks, the Panel must either approve DCFS's CAP or allow DCFS an additional two weeks to revise its CAP.  If the Panel rejects the revised CAP, the Panel must create its own CAP. DCFS is then responsible to implement the Panel-approved or Panel-created CAP within ninety days and report back to the Panel.  If the Panel determines that Defendants have not corrected the noncompliance, the Panel may allow Defendants an additional thirty days to implement the CAP.  At the end of this time, the Panel again determines whether Defendants have remedied the noncompliance.  If the noncompliance has not been remedied,

---

[3]  In accordance with the SA, the Panel consists of three individuals: one chosen by Plaintiffs' counsel (Sherianne S. Cotterell), one chosen by Defendants (Larry V. Lunt), and one agreed upon by the parties (Pamela J. Atkinson).

"the Court may enter any necessary orders to enforce the Agreement."   (Settlement Agreement § XI.J.)

B.   The Panel Reports and Remedial History

     To date, the Panel has issued three Reports: 95-1, 95-2, and 96-1.[4]  Report 95-1 covered information from September 1994 to December 1994; Report 95-2 covered information from January 1995 to October 1995; and Report 96-1 covered information from November 1995 to March 1996.  In each Report, the Panel found Defendants to be in noncompliance with a majority of the SA's ninety-three provisions.[5]  Specifically, the Panel published the following findings:

          Report 95-1:
               Compliance                        11
               Compliance with Concerns          12
               Noncompliance with Progress       33
               Noncompliance                     15
               No data/inconclusive              22

---

     [4]  These Reports have been issued by two of the three Panel members.  The third Panel member has issued Minority Reports.

     [5]  For each provision in the SA for which there is sufficient data to make a finding, the Panel may make a finding of "Compliance," "Compliance with Concerns," "Noncompliance with Progress," or "Noncompliance."

Report 95-2:[6]
    Compliance                       8
    Compliance with Concerns     23
    Noncompliance with Progress    49
    Noncompliance                8
    No data/inconclusive         5

Report 96-1:
    Compliance                       4
    Compliance with Concerns     15
    Noncompliance with Progress    53
    Noncompliance                20
    No data/inconclusive         1

The Corrective Action Process has not worked to remedy the Panel's findings of noncompliance. After the Panel issued Report 95-1 on March 29, 1995, Defendants' CAP was due on April 13, 1995. Defendants did not act until early May 1995, at which time they submitted an outline of a CAP. The Panel notified Defendants that the outline was insufficient, provided Defendants with examples of CAPs from other jurisdictions, and set a new deadline of May 26, 1995, to submit a revised CAP. (Pls.' Reply Ex. 32.) Defendants submitted a revised CAP on June 2, 1995. After the Panel raised numerous concerns with the revised CAP, Defendants submitted a second revised CAP on June 19, 1995. On July 7, 1995, the Panel rejected Defendants' second revised CAP, stated the reasons why, and offered to discuss the necessary

---

[6] The introductory pages of Report 95-2 erroneously reported Compliance as 8; Compliance with Concerns as 26; Noncompliance with Progress as 46; Noncompliance as 7; and No data/inconclusive as 5.

revisions.  (Pls.' Reply Ex. 31.)  On August 4, 1995, Defendants submitted a third revised CAP, which the Panel approved on August 11, 1995.  However, after the ninety-day Corrective Action Period in which DCFS was to implement the CAP, Defendants failed to report back to the Panel.

The Panel issued Report 95-2 on February 2, 1996, and Defendants' CAP was due on February 16, 1996.  Having not received the CAP by that date, the Panel wrote to Mary T. Noonan ("Noonan"), the Director of DCFS, on April 17, 1996, requesting the proposed CAP be delivered by April 22, 1996.  (Pls.' Reply Ex. 35.)  The Panel rejected Defendants' proposed CAP on May 16, 1996.  On July 2, 1996, the Panel rejected Defendants' revised CAP and stated the reasons for their decision.  (Pls.' Reply Ex. 30.)  Defendants did not submit another revised CAP and the Panel did not create its own.

The same problems with the Corrective Action Process occurred after Report 96-1, issued on July 3, 1996.  Defendants submitted their proposed CAP to the Panel after the two-week deadline, the Panel rejected the proposed CAP, Defendants did not revise the CAP, and the Panel did not create its own.[7]

---

[7] The parties do not indicate whether either Plaintiffs or the Panel stipulated to any of Defendants' delays throughout the remedial history of this case.

7

C.   Plaintiffs' Argument

Plaintiffs argue that Defendants are either unable or unwilling to comply with the SA and that court intervention is necessary to compel compliance and crucial to the safety and well-being of the class members.  To support their argument, Plaintiffs rely on: (1) the Panel Reports' documentation of Defendants' noncompliance; (2) the failure of the Corrective Action Process to remedy Defendants' noncompliance; and (3) other showings of Defendants' alleged bad faith.

First, Plaintiffs argue that the Panel Reports alone demonstrate Defendants' unwillingness or inability to comply with the SA.  In Plaintiffs' view, the Reports demonstrate that Defendants have not only failed to improve Utah's child-welfare system, but that the system has actually deteriorated since the SA took effect.  Plaintiffs relate tragic stories of a number of children for whom they claim the system has failed and assert that, unless the court intervenes, Utah's child-welfare system will continue its downward trend.

Second, Plaintiffs contend that Defendants have made little, if any, effort to correct the noncompliance through the Corrective Action Process.  Plaintiffs argue that Defendants have instead engaged in a deliberate and bad-faith attempt to obstruct the Corrective Action Process and have adopted the tactic of

merely trying to outlast the SA's four-year life span. In support, Plaintiffs point to Defendants' failure to timely submit CAPs, to prepare adequate CAPs, to incorporate the Panel's recommendations for correcting the CAPs, and to provide the report required after the ninety-day implementation period.

Third, Plaintiffs allege that Defendants have engaged in a pattern of bad-faith behavior to actively obstruct the implementation of the SA. A number of the incidents of which Plaintiffs complain follows.

(1) DCFS has referred at least one abuse report to the police instead of investigating the report itself. Plaintiffs claim that such action violates the SA's mandate that DCFS investigate all abuse reports it receives.[8]

(2) Plaintiffs allege that Noonan reversed a case worker's conclusion to substantiate a particular abuse report because the alleged perpetrator was "a friend of the agency." Such an action, if true, would violate the Code of Ethics for State Officers and Employees, Utah Code Ann. § 67-16-4(3) (1996) ("A public officer or public employee may not . . . use or attempt to use his official position to secure special privileges or exemptions for himself or others.").

---

[8] The only specific exception is in section I.A.11, regarding abuse in out-of-home placements.

(3) DHS and DCFS officials failed to disclose to the Panel the internal audits of the Moab DCFS office until months after they were complete. Six Moab reports were generated between October 6, 1995 and February 6, 1996. These reports were not released to the Panel until April 3, 1996, after an anonymous agency employee allegedly informed the Panel that the reports existed and after the Panel requested the reports on March 25, 1996. Plaintiffs claim that this action violates section XI.D. of the SA ("The panel shall have access to all internal memoranda, reports and studies generated by [DCFS] and DHS, and all [DCFS] files . . . .") and was intended to coverup violations of law and of the SA in that office.

(4) DHS and DCFS officials failed to comply with a discovery request of a guardian ad litem ("GAL") and a court order regarding that request. Again, Plaintiffs argue that this action was to coverup DCFS misconduct in the Moab office.

(5) Plaintiffs allege that Defendants are concealing other information from the Panel in violation of section XI.D, namely an internal audit of the Price DCFS office and completed fatality reviews.

(6) Plaintiffs allege that, in violation of section XI.C of the SA, Defendants deny the Panel the necessary resources to fulfill its duties. Section XI.C states: "The budget for the

Panel's . . . expenses, staff, and consultants shall be sufficient to allow the panel to fulfill its responsibilities under this Agreement . . . ." For example, if the Panel rejects DCFS's proposed CAP, the Panel is responsible for creating its own CAP. However, Plaintiffs claim that (a) Defendants did not respond to the Panel's request to retain a consultant to help prepare a CAP after the Panel rejected DCFS's CAP for Report 95-2, and (b) Defendants denied the Panel's same request after the Panel rejected DCFS's CAP for Report 96-1.

(7) Plaintiffs allege that Defendants are interpreting SA provisions in a manner that conflicts with their clear meaning. For example, section IV.A.13 requires that children in foster care be "visited" by a caseworker no less than twice a month. Defendants have instructed caseworkers that a telephone call for one of those monthly visits will satisfy this requirement.

(8) The 1995 Utah Legislature unilaterally eliminated the Grievance Council for which the SA specifically provided in section XI.L. The SA guarantees one of Plaintiffs' attorneys a seat on the Grievance Council. The Legislature replaced the Grievance Council with a Consumer Hearing Panel, but did not set aside a seat for one of Plaintiffs' attorneys. Plaintiffs argue that such action deprives Plaintiffs of the level of relief for which the class had bargained in the SA.

11

In sum, Plaintiffs argue that Utah's child-welfare system is in a tailspin and that Defendants are either unable or unwilling to comply with the SA. Thus, Plaintiffs have moved the court for a two-pronged remedy to assure compliance. First, Plaintiffs ask the court to order the Panel to prepare a "Comprehensive Plan" to address the areas of noncompliance. Second, Plaintiffs ask that the court appoint a receiver to implement the Plan. Cf. LaShawn A. v. Kelly, 887 F. Supp. 297 (D.D.C. 1995) (placing Washington, D.C. child-welfare system under receivership pursuant to a finding of contempt). A receiver would replace the Director of DCFS, run day-to-day operations, and answer only to the court.

D. Defendants' Argument

Defendants insist that the court should not grant Plaintiffs' requested relief for several reasons. First, Defendants argue that the SA's prerequisites for court intervention have not been met. Second, Defendants assert that the remedy Plaintiffs must seek for Defendants' alleged noncompliance is contempt under 18 U.S.C. § 401(3). According to Defendants, however, Plaintiffs are not entitled to a contempt order because there is no violation of an unequivocal command. Third, Defendants contend that the Panel's findings are not binding on the court, and thus a finding of noncompliance by the

12

Panel is not the same as a finding of noncompliance with the August 29 Order.  In Defendants' view, before the court can intervene it must determine the issue of noncompliance for itself and give Defendants an opportunity to contest the Panel's findings or offer mitigating evidence.  To deny Defendants this opportunity, they contend, would violate due process.

Fourth, Defendants argue that the Panel Reports are unreliable and therefore Defendants' true level of compliance cannot be determined from them.  Defendants complain that the Panel does not have a consistent and statistically reliable methodology; has not defined the level of compliance for the different provisions; and uses statistically meaningless terms.  Because of these deficiencies in the Reports, Defendants assert that the Child Welfare Compliance Review 96-1 prepared by the Bureau of Services Review ("BSR Report 96-1") is a better tool to measure Defendants' compliance with the SA.  Defendants also assert that the most current Report does not reflect the current condition of the system because its supporting data is a year old.

Fifth, Defendants argue that they have taken every reasonable step within their power to comply with the SA, including allocating a large amount of human and financial resources into the child-welfare system, retraining DCFS staff,

and reorganizing interested agencies.  Defendants offer
statistics showing a large increase in DCFS's budget since the SA
took effect:

```
FY 1994 (pre-SA)       $48.9 million.
FY 1995                $67.8 million.
FY 1996                $83.4 million.
FY 1997 (projected) $92 million.
```

From Fiscal Year 1994 through 1998, the State anticipates to
have spent over $190 million new dollars on its child-welfare
system.  Among other things, this money will have gone to hire
385 additional DCFS staff members; provide cellular phones,
laptop computers, and transcription services for caseworkers;
increase pay for child-care providers; improve caseworker and
foster-parent training; provide subsidies to adoptive parents of
special-needs kids; improve mental health assessments and
services; provide services to preserve or reunify families; and
establish grievance procedures.  (Decl. Ron Betit, ex. A.)

Defendants claim to have initiated a variety of programs
designed to improve the child-welfare system and facilitate
compliance with the SA.  These include: Trailer Teams,
"Neighborhood" offices, Employee Contracts, caseload-reduction
strategies, the Child Welfare Management Information System; the
Office of Child Protection Ombudsman, and a Compliance Team to
work with the Panel and provide it with information.  Defendants
also point out that the Utah Legislature went beyond the SA's

requirements by establishing the Permanency Project to achieve permanency for 625 children remaining in DCFS custody for over eighteen months.  Defendants claim that the Legislature additionally has set up an Oversight Committee that meets monthly to oversee the operation of the child-welfare system.

Sixth, even if the court decides to fashion an enforcement order of some kind, Defendants claim that the court must impose the least intrusive remedy.  See Spallone v. United States, 493 U.S. 265, 276 (1990)(recognizing that in using remedial powers to enforce a consent judgment, district court is obliged to use least possible power necessary); Settlement Agreement § XI.J ("[T]he Court may enter any necessary orders to enforce the Agreement." (emphasis added)).  The appointment of a receiver, Defendants assert, is inappropriate because such a remedy is not the least intrusive.  Finally, Defendants raise the related concern that the appointment of a receiver would violate the Tenth and Eleventh Amendments to the U.S. Constitution.[9]

---

[9]  The Tenth Amendment states: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  The Eleventh Amendment states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

## II.  DISCUSSION

A.  Jurisdiction

The court has jurisdiction over Plaintiffs' enforcement motion.  See Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 378-81 (1994).  Defendants' obligation to comply with the SA was made part of the August 29 Order.  In that Order, the court specifically retained jurisdiction in the matter and incorporated (by reference) the provisions of the SA.  The court also specifically retained jurisdiction in the SA itself.  (Settlement Agreement § XI.J.)  Noncompliance with the SA would therefore constitute noncompliance with the August 29 Order, and the court would have jurisdiction to enforce both.  Kokkonen, 511 U.S. at 381 (holding that a court has jurisdiction over the enforcement action of a settlement agreement where "the parties obligations to comply with the terms of the settlement agreement had been made part of [a court order]--either by separate provision (such as a provision 'retaining jurisdiction' over the settlement agreement) or by incorporating the terms of the settlement agreement in the order").

Defendants argue, however, that the court may not exercise its jurisdiction to enforce the SA at this time because section XI.J makes the steps outlined in section XI.H (the "Corrective Action Period" section) prerequisites to court intervention.

16

Section XI.J states: "If non-compliance is not resolved through the corrective action process [in section XI.H], the Court may enter any necessary orders to enforce the Agreement." Defendants contend that the last step in section XI.H has not been fulfilled: the Panel never made a specific finding as to whether DCFS's implementation of the CAP remedied the noncompliance.[10] Thus, Defendants argue that the failure to fulfill the steps in section XI.H makes court intervention premature.

The court rejects this argument. First, the SA does not limit the court's enforcement authority only to instances when the Corrective Action Process is exhausted. Instead, section XI.J grants the court the authority to enter enforcement orders whenever noncompliance is not resolved through the Corrective Action Process for whatever reason; i.e., when noncompliance remains after the Corrective Action Process is exhausted, or when noncompliance remains as a result of the Corrective Action Process never beginning or breaking down. Second, even if the steps in section XI.H are prerequisites to court intervention, they have all been met. Although the Panel never released a separate document finding that DCFS's implementation of the CAP failed to remedy the noncompliance found in Report 95-1, the

---

[10] Defendants concede that, with respect to Report 95-1, all but the final step in section XI.H have been met.

17

Panel's subsequent findings of noncompliance in Reports 95-2 and 96-1 are sufficient to satisfy the final prerequisite. In sum, the court has jurisdiction over the Plaintiffs' enforcement motion and may exercise its authority to enforce the SA.[11]

B.    <u>Enforcement of the Settlement Agreement</u>

    The August 29 Order incorporated the terms and provisions of the SA and required Defendants to comply with them. Thus, Plaintiffs' motion to enforce the SA is in effect a motion to enforce a prior court order. The court's authority to enforce a prior order is not limited to situations of contempt. Neither the SA nor any other provision of law makes contempt a prerequisite to enforcing the SA. "Ensuring compliance with a prior order is an equitable goal which a court is empowered to pursue even absent a finding of contempt." <u>Berger v. Heckler</u>, 771 F.2d 1556, 1569 (2d Cir. 1985). Instead, the power to enforce may be triggered solely by noncompliance. <u>See</u> <u>Smith v. Bounds</u>, 813 F.2d 1299, 1303 (4th Cir. 1987); <u>Berger</u>, 771 F.2d at 1569; <u>Norman v. McDonald</u>, 930 F. Supp. 1219, 1226 (N.D. Ill. 1996).

_____

    [11]  The court also has jurisdiction to enforce those provisions of the SA that do not relate to the Corrective Action Process, for example: § XI.C (staff & budget); § XI.D (access to information); § XI.L (individual cases); § XI.N (attorney fees).

18

Before entering any remedial order, there are two different inquiries to undertake. First, Plaintiffs must demonstrate that Defendants are in noncompliance with a prior court order. If they are in noncompliance, the court has the equitable power to enforce the prior order. However, the second inquiry is whether the court should exercise that power and, if so, what the remedial order should be. If intervention is warranted, the court's equitable power to enforce a prior order is broad and flexible. Although this power is not unlimited, see Spallone, 493 U.S. at 276, and must be tempered by principles of comity, federalism, and judicial restraint, the power to appoint a receiver, if such an appointment is necessary, is within the court's equitable authority.[12]  See Hellebust v. Brownback, 42 F.3d 1331 (10th Cir. 1994)(affirming appointment of receiver for state board of agriculture); Morgan v. McDonough, 540 F.2d 527 (1st Cir. 1976)(affirming appointment of receiver for school); LaShawn A. v. Kelly, 887 F. Supp. 297 (D.D.C. 1995) (placing Washington, D.C. child-welfare system under receivership).

---

[12]  The Tenth and Eleventh Amendments to the Constitution do not limit the court's power to issue necessary enforcement orders because the State consented to such orders in the SA. Section XI.J states: "The Court shall retain jurisdiction over these claims solely for the purpose of enforcement of the Agreement. If non-compliance is not resolved through the corrective action process . . . the Court may enter any necessary orders to enforce the Agreement." (Emphasis added.)  A "necessary order" will be the least intrusive alternative to ensure compliance.

1.  <u>Noncompliance with a Prior Court Order</u>

Under the August 29 Order, Defendants must comply with the ninety-three SA provisions and, if Defendants do not comply, they must remedy the noncompliance through the Corrective Action Process.  Plaintiffs rely on the Panel Reports and the breakdown of the Corrective Action Process to show that Defendants have not complied with the SA, and thus are in noncompliance with the August 29 Order.  Defendants argue, however, that the Panel Reports are not binding on the court and cannot be relied upon because of faulty methodology and reporting techniques. Defendants urge the court instead to use BSR Report 96-1 to determine whether they have complied with the SA provisions.

While the Panel's findings are binding on the parties for certain purposes,[13] the findings are not binding on the court.  A Panel finding of noncompliance does not necessarily lead to a finding of noncompliance with the August 29 Order, especially for purposes of entering enforcement orders.  Because of the potential severity of an enforcement order, the court must independently review the Panel Reports and other appropriate information before entering a remedial order.  Recognizing that the Panel Reports were intended to be its primary source of

---

[13]  For example, unless a party challenges the Panel's findings, those findings are binding on the parties for purposes of the Corrective Action Process.

information, the court will give the Panel findings substantial weight, especially in light of Defendants' decision not to challenge those findings.[14]

Having reviewed Panel Report 96-1, Minority Panel Report 96-1, BSR Report 96-1, and the Legislative Auditor General's Review of the BSR (November 11, 1996), the court adopts the Panel findings in Report 96-1. Understandably, Defendants are concerned with certain monitoring and reporting techniques of the Panel. Those concerns, however, do not undermine the Panel's findings to such a degree that they render the Reports unreliable. The court also concludes that Defendants did not remedy those areas of noncompliance through the Corrective Action Process. Thus, to the extent that Report 96-1 finds Defendants in noncompliance with the SA, Defendants are in noncompliance with the August 29 Order.

---

[14] Although Defendants challenged many of the findings in Report 96-1, Defendants later withdrew the challenge. Having done so, and the time to make a challenge having elapsed, the court will not allow Defendants now to challenge those findings by presenting new evidence of compliance. Because Defendants had the opportunity to challenge the Report, the court concludes that Defendants were afforded due process. However, this does not preclude the court from reviewing the relevant information already before the court.

2.   <u>Court Intervention</u>

Having found Defendants in noncompliance with the August 29 Order, the court must now decide whether it should intervene and, if so, at what level.  Plaintiffs have requested a radical two-pronged remedy: (1) an order for the Panel to prepare a "Comprehensive Plan" to remedy the areas of noncompliance; and (2) the appointment a receiver to implement this Plan. Plaintiffs argue that such drastic court intervention is necessary because the State's child-welfare system is in noncompliance with a majority of the SA provisions, the Corrective Action Process has failed, Defendants are acting in bad faith, and as a result children are suffering needlessly. Defendants, however, assert that the court should not intervene because Defendants have taken every reasonable step within their power to comply with the SA.

A court may legitimately decline to exercise its authority to enforce a prior order for a number of practical or policy-related reasons.  One reason not to intervene may be that the noncomplying party has and is taking every reasonable step within its power to comply with the prior order but, for some reason, has not been successful.  If so, an enforcement order may not only be futile, but obstructive to ongoing corrective measures.

In this case, DCFS, other interested entities, and

22

especially the individual case workers, have attempted to improve the state's child-welfare system. The employees of DCFS are committed members of the community in attempting to combat the atrocities of child abuse. The influx of financial and human resources into the system, as well as the Permanency Project and other state programs, demonstrate Defendants' recognition that problems exist in the system and desire to remedy those problems.

However, these efforts do not demonstrate that Defendants have taken every reasonable step within their power to comply with the SA. For example, Defendants did not prepare adequate or timely CAPs in response to the Panel Reports, did not submit revised CAPs after the Panel rejected proposed CAPs following Reports 95-2 and 96-1, and did not report back to the Panel after the ninety-day implementation period following Report 95-1. Furthermore, Defendants have not shown that, absent some type of court intervention, they intend to address the deficiencies found in the Panel Reports. The court concludes that intervention is warranted.

The level of court intervention, however, is flexible, depending upon "what is necessary, what is fair, and what is workable," Lemon v. Kurtzman, 411 U.S. 192, 200 (1973), and by "the nature of the violation," Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 16 (1971). See also Hellebust, 42 F.3d at

1336; Berger, 771 F.2d at 1569.  This determination necessarily involves the weighing of competing interests and an amalgam of pragmatic considerations.  See, e.g., Milliken v. Bradley, 433 U.S. 267, 280-81 (1977)("[T]he federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution."); Milliken v. Bradley, 418 U.S. 717, 738 (1974) (recognizing the need to balance individual and collective interests in remedial process).  Additionally, any remedy must be the least intrusive alternative to assure compliance.  Accord Spallone, 493 U.S. at 278; Whitcomb v. Chavis, 403 U.S. 124, 161 (1971)(recognizing that while "remedial powers of an equity court must be adequate to the task, . . . they are not unlimited").

a.  Receivership

The court is not willing to appoint a receiver over DCFS at this time.  There are few, if any, remedies within a federal court's arsenal more drastic than the appointment of a receiver to take over a state agency.  Given the reluctance of federal courts to encroach upon traditional state functions, receivership is a remedy of last resort, warranted only in the most compelling circumstances.  Accord Bracco v. Lackner, 462 F. Supp. 436, 455-56 (N.D. Cal. 1978)(receiver should not be appointed "if a less

drastic remedy exists."). For this court to fashion such a remedy, Plaintiffs would have to show more than noncompliance with the SA. Plaintiffs would have to convince the court that Defendants are so incompetent or antagonistic as to be entirely unable or unwilling to comply with the SA. Defendants have not made this showing.

First, although the three Panel Reports found Defendants in noncompliance with many SA provisions, the Reports do not convince the court that Defendants are unwilling or unable to correct the problems. The problems of child-welfare are very complex, Defendants' task is large, and the recognition that to effectuate change requires time reflects no more than a healthy sense of realism. Notably, fifty-three of the seventy-three Panel findings of noncompliance in Report 96-1 are "Noncompliance with Progress."[15] In addition, the court does not know Defendants' current level of compliance with the SA because the most recent Report contains year-old data (November 1995 to March 1996). The court could not confidently base a finding that Defendants are unwilling or unable to comply with the SA on year-old data.

---

[15] Plaintiffs argue that the court should look to the declining trend in the Reports and not give much weight to the "with progress" characterization of many of the Panel's findings of noncompliance. However, the court will defer to the Panel's characterizations that Defendants are progressing in those areas.

Second, while Plaintiffs make serious charges of bad faith, the acts by Defendants which concern the court are not so egregious or widespread to sustain a finding that Defendants are unable or unwilling to abide by the SA. Some incidents of which Plaintiffs complain do not cause the court concern: (1) DCFS's referral of an abuse report to the police;[16] and (2) Defendants' interpretation of certain SA provisions that may conflict with the provisions' clear meaning.[17] Other incidents concern the court, but since they are merely allegations, the court cannot

---

[16] Plaintiffs complained that DCFS referred an abuse report to the police in violation of the SA even though DCFS referred the report because of a perceived conflict of interest. The SA requires DCFS to investigate and make a finding for every child abuse report it receives, with the only specific exception being for reports of alleged abuse in out-of-home placements, in which the police conduct the investigation. Utah law provides an additional exception in cases in which DCFS has a potential conflict of interest. Utah Code Ann. § 62A-4a-409(5)(Supp. 1996) ("In any case where [DCFS] supervises, governs, or directs the affairs of any individual, institution, or facility that has been alleged to be involved in acts or omissions of child abuse or neglect, the investigation of the reported child abuse or neglect shall be conducted by an agency other than [DCFS].") Although the SA does not specifically provide for a conflict-of-interest exception, the court believes that such an exception is consistent with the SA. It would be bad policy to interpret the SA to require DCFS to investigate abuse reports in which DCFS had a conflict of interest.

[17] Disputes over the interpretation of the SA provisions are expected. Although disputes should be resolved through the Corrective Action Process or, if necessary, through a limited enforcement order, such disputes add no justification for an enforcement order at this time. Furthermore, the court is not now prepared to rule that DCFS's interpretation of section IV.A.13 (caseworker visits) is erroneous.

26

consider them in fashioning any remedy, let alone the appointment of a receiver: (1) the allegation that Noonan reversed a case worker's conclusion to substantiate a particular abuse report because the alleged perpetrator was "a friend of the agency"; and (2) the allegation that DHS and DCFS officials are concealing an internal audit of the Price DCFS office and completed fatality reviews.  Still other incidents concern the court but do not warrant any remedial action at this time: (1) DHS and DCFS not timely providing the Panel with the Moab internal audits;[18] and (2) DHS and DCFS not providing the GAL with documents.[19] Finally, two incidents concern the court and warrant some level of remedial action; however, they do not warrant the appointment

---

[18]  Under section XI.D, DCFS reports must be released to the Panel in a timely manner.  If Defendants do not comply, Plaintiffs may seek appropriate relief.  If such relief does not correct the problem, persistent violations of section XI.D may be a factor to support additional court intervention.

[19]  This issue has been resolved in Utah's Seventh Judicial District Juvenile Court.  The court found that DCFS wrongfully withheld information that the GAL was entitled to and that the court had previously ordered the agency to disclose.  Among other sanctions, the court "[found] it reasonable to use the contempt sanction" against those responsible for the wrongful conduct.  In re S.C., No. 874709, Memorandum Decision, at 11 (May 13, 1996, Utah 7th Dist. Juv. Ct.).  However, unable to conclude what individuals were responsible on the evidence presented, the court allowed the GAL "to present evidence of which specific individuals should be held in contempt."  Id. at 12.  The GAL never requested an additional hearing; instead the parties entered into a stipulated agreement for sanctions of $3,850.17.  The court adopted this agreement as its final order.  In re S.C., No. 874709, Order (July 17, 1996, Utah 7th Dist. Juv. Ct.).

of a receiver: (1) Defendants' denying the Panel the resources necessary to fulfill their duties; and (2) the Utah Legislature's unilateral elimination of the Grievance Council.

Additionally, Plaintiffs have not shown that the appointment of a receiver is the least intrusive remedy needed to ensure compliance. Without having previously ordered other, less radical means, the court doubts that a receiver is the only way to ensure compliance. It is also questionable whether a receiver could implement the necessary changes any better or more expediently than the current management. Beyond the numerous practical concerns,[20] an appointment of a receiver would invite risks that the court is not willing to take at this time. The court believes that both Defendants' problems with noncompliance and the acts characterized by Plaintiffs as "bad faith" which concern the court can be resolved through a more limited enforcement order than the appointment of a receiver.

---

[20] As only one of numerous examples, there are serious practical concerns about what the scope of a receiver's functions would be. When asked what state position a receiver would replace, Plaintiffs' attorney replied that the receiver would replace the director of DCFS. (Tr. of Proceedings, Jan. 31, 1997, at p.18.) The duties of DCFS are statutorily enumerated in Utah Code Ann. § 62A-4a-105 (Supp. 1996). However, it is not clear whether all of these duties relate to the SA. If, in fact, DCFS has statutory duties outside of the SA, appointment of a receiver would split the agency.

In sum, the Panel Reports, the breakdown of the Corrective Action Process, and some of Defendants' actions characterized by Plaintiffs as "bad faith" demonstrate that serious problems remain in the state's child-welfare system.  However, even taken together, they do not show Defendants' complete defiance to the SA or total incompetence that would lead the court to conclude that Defendants are unwilling or unable to comply with the SA.  Such a remedy is also not necessary because Plaintiffs' concerns can be addressed through less intrusive means.  The drastic remedy of appointing a receiver is simply not justified.[21]

    b.  <u>The Comprehensive Plan and Other Remedial Action</u>

Although the court declines to appoint a receiver, the court believes that some level of court intervention is warranted. Accordingly, the court will issue the least intrusive remedial order to address the problems most apparent to the court.

First, Defendants have not fully participated in the Corrective Action Process.  Accordingly, the court grants Plaintiffs' motion to order the Panel to prepare a Comprehensive Plan and orders the following:

---

[21]  Plaintiffs requested that, if the court did not appoint a receiver, the court appoint a special master to oversee the process.  The court denies Plaintiffs' request but may reconsider it at a future time.

1.   The Panel shall prepare a Report for months October
     1996 through March 1997 consistent with section XI.G
     ¶ 2.[22]  The Panel should indicate compliance standards
     in the Report.

2.   With the Report, the Panel shall inform the court what
     resources (including consultants) it will need to
     prepare the Comprehensive Plan.

3.   The parties shall bypass the Corrective Action Process.

4.   Following section XI.I ¶ 3, and the court's prior
     orders, the parties may challenge (a) the Panel
     findings, and (b) the resources claimed to be needed.
     The court will make the final determination as to the
     scope of the plan and resources.

5.   The Panel will then prepare a Comprehensive Plan
     addressing those areas of noncompliance in the new
     Report where the Panel has previously found
     noncompliance.

6.   DCFS and the Panel will follow section XI.H ¶¶ 3-4 in
     the implementation and monitoring of the Comprehensive
     Plan.

---

[22]  The Panel has not prepared Reports for April through
September 1996.  The court will excuse the Panel from preparing
these Reports so that the Panel may immediately begin preparing
both a Report for October 1996 through March 1997 and the
Comprehensive Plan.

Second, Defendants have not given the Panel the necessary resources to meet its obligations under the SA. Accordingly, the court orders the Panel to submit, within twenty days from the date of this Order, its current budget and a list of additional resources reasonably needed to fulfill its duties under the SA.[23] Hopefully, Defendants will agree or negotiate on the Panel's requests. If no agreement can be reached, Defendants will have twenty days from the date of the Panel's submission to respond. Plaintiffs will then have ten days to reply.

Third, the Grievance Council agreed to in the SA has been abolished and Plaintiffs' attorneys do not have a seat on the Consumer Hearing Panel. As a result, Plaintiffs have been deprived of the level of relief for which they had bargained. Thus, the court orders both Defendants and Plaintiffs to submit, within twenty days from the date of this Order, suggestions regarding how to resolve this situation. Hopefully, the parties will agree or negotiate on this issue. If no agreement can be reached, each party will have twenty days from the date of the other party's submission to respond to that party's suggestions. Each party will then have ten days to reply.

---

[23] The court has received Panel member Larry V. Lunt's letter dated February 13, 1997, suggesting that the court appoint an expert to assist the Panel. The court has also received Panel member Pamela J. Atkinson's letter dated March 10, 1997, suggesting additional changes.

31

### III. <u>ORDER</u>

For the foregoing reasons, the court denies in part and grants in part Plaintiffs' motion to enforce the SA and to appoint a receiver.  It is so ordered.

DATED this _17th_ day of March, 1997

David K. Winder
Chief Judge

<u>CERTIFICATE OF MAILING</u>

I hereby certify that on the _14th_ day of March, 1997, I mailed a copy of the foregoing by United States Mail to the following named counsel:

Carol Clawson
OFFICE OF THE UTAH ATTORNEY GENERAL
236 State Capitol Building
Salt Lake City, UT  84114

H. Wayne Wadsworth
JONES, WALDO, HOLBROOK & McDONOUGH
1500 First Interstate Plaza
170 South Main Street
Salt Lake City, UT  84101

William L. Grimm
NATIONAL CENTER FOR YOUTH LAW
114 Sansome Street, Suite 900
San Francisco, CA  94104

Harold J. McElhinny
Morrison & Foerster, LLP
345 California Street
San Francisco, CA  94104-2675

Herschel J. Saperstein
Ray, Quinney & Nebeker
79 South Main, Suite 500
Salt Lake City, UT 84111

Pamela J. Atkinson
Intermountain Health Care
36 South State, 22nd Floor
Salt Lake City, UT 84111

Larry V. Lunt
225 West 100 South
Salt Lake City, UT 84101

Sherianne S. Cotterell
Sorenson Multi-Cultural Center
855 West California Avenue
Salt Lake City, UT 84104

_____
Secretary

United States District Court
for the
District of Utah
March 17, 1997

tl

* * MAILING CERTIFICATE OF CLERK * *

Re:  2:93-cv-00206

True and correct copies of the attached were mailed by the clerk to the
following:

Richard M. Pearl, Esq.
LAW OFFICES OF RICHARD M PEARL
685 Market Street, Suite 690
San Francisco, Ca  94105

Gregory P. Dresser, Esq.
MORRISON & FOERSTER LLP
425 MARKET ST
SAN FRANCISCO, CA  94105-2482

Kathryn C. Palamountain, Esq.
NATIONAL CENTER FOR YOUTH LAW
114 SANSOME ST STE 900
SAN FRANCISCO, CA  94104

Mr. L. A. Dever, Esq.
UTAH ATTORNEY GENERALS OFFICE
236 STATE CAPITOL
SALT LAKE CITY, UT  84114

Lynn A. Jenkins I
3 East 2750 South
Bountiful, UT  84010

Mr. Steven T Waterman, Esq.
RAY QUINNEY & NEBEKER
79 SOUTH MAIN STREET
PO BOX 45385
SALT LAKE CITY, UT  84145-0385