

Center for the Support of Families

1107 Spring Street
Suite 2C
Silver Spring, MD 20910
Phone: 301.587.9622
Fax: 301.587.9620
E-mail: info@csfmail.org
Web site: www.csfsite.org

November 30, 2010

Dewitt L. ("Rusty) Fortenberry Jr., Esq.
Kenya Key Rachal, Esq.
Baker, Donelson, Bearman, Caldwell & Berkowicz, PC
428 I-55 North
Meadowbrook Office Park
Jackson, MS 39211

Dear Mr. Fortenberry and Ms. Rachal:

On October 5, 2010, plaintiffs' attorneys in the Olivia Y vs. Barbour case filed a motion with the court requesting that the Mississippi Department of Human Services (MDHS) be held in contempt and that the court appoint a receiver to administer the Department's child welfare programs. I am writing in support of MDHS' efforts to comply with the terms of the Olivia Y Settlement Agreement and ask that a copy of this letter be provided to the court and all the parties.

I worked for 25 years for the Alabama Department of Human Resources and at my retirement was the State child welfare director, a position I held during the implementation of child welfare reforms required by a consent decree arising from a class action lawsuit. I then worked for the Federal government as a Senior Child Welfare Specialist for approximately 8 years, managing the nationwide Federal review of all States' child welfare programs. I either reviewed personally or had management responsibility for the review of every State's public child welfare program, and those of the District of Columbia and Puerto Rico. I also worked directly with many State child welfare agencies to develop and implement program improvement plans resulting from the reviews. For the past three years, I have been the Vice President for Child and Family Services for the Center for the Support of Families (CSF), a technical assistance and consulting firm.

Through CSF, I and other CSF staff have provided technical assistance to MDHS since 2009 in helping MDHS to comply with the terms of the Settlement Agreement. The MDHS Deputy Director for Child and Family Services initiated the request for technical assistance directly with me early in the implementation process, and we have worked together closely since that time. While the primary service that CSF provides to MDHS is the development and implementation of a statewide child welfare practice model, we also assist the agency in other ways, including policy, training, resource development, and in managing the reform process required by Olivia Y. As such, I have been deeply involved in efforts to improve services to the children of Mississippi and to comply with Olivia Y.

Although it is entirely accurate that MDHS did not meet a number of requirements during the initial two years of implementing Olivia Y, I believe it is important to view these shortcomings in the appropriate context. The lawsuit was brought against MDHS after several years of diminishing capacity to carry out its child welfare responsibilities effectively. Among its challenges at that time, staffing levels had been greatly reduced, staff training was extremely weak, policy was outdated or non-existent, the service procurement and contracting processes


EXHIBIT D

were not responsive to the needs of children and families, there was no quality assurance process, and the State Office had lost much of its capacity to operate its programs apart from taking on the enormous reforms included in the *Olivia Y* Settlement Agreement. The Settlement Agreement laid out a series of reformed practices and benchmarks of progress that MDHS was accountable for achieving, beginning immediately and over the course of the next five years, even though the agency lacked the staff and resource capacity to put mechanisms into place to achieve them. Further, the Settlement Agreement did not include a plan for how the reforms were to be achieved, only that benchmarks must be met. It was inevitable that MDHS would need to build the internal ability to reach even modest benchmarks of progress and begin the long process of entirely reforming its child welfare system as required by the settlement, and that the State would require substantial technical assistance in doing so.

As a vehicle for implementing many of the reforms required by the settlement, MDHS chose to develop and implement a statewide child welfare practice model that is designed to standardize its interventions with children and families across the State, and to do so in ways that reflect family-centered values and principles while meeting *Olivia Y* requirements. The MDHS administration chose voluntarily to begin early in the process to develop and implement a practice model in contrast to some other States that have adopted a practice model or some other vehicle for change after many years of struggling unsuccessfully to comply with settlements. The practice model was designed to be implemented region-by-region in the State over a period of approximately 48 months. While this may sound like an extended period of time, we know from our experience in this area that it is imperative to approach implementing large scale reforms in a planned and reasonable manner if they are to become institutionalized and sustained parts of the agency's ongoing business practice. Just as the indicators of the agency's poor performance that led to the lawsuit and Settlement Agreement did not appear overnight, repairing the system will require diligence, patience, and sustained effort by all parties in order to achieve their shared goals. The implementation plan for the practice model is designed to change practice and outcomes in ways that will outlast the Settlement Agreement rather than being simply a temporary, reactive response to the lawsuit.

MDHS still does not have all of the needed capacity to operate in conformity with *Olivia Y*, for example through acceptable caseloads and a sufficiently broad array of preventive and remedial services for children and families. However, by the time of the "Bridge Plan" (referred to in court documents as the Agreed Order) of June 2010, MDHS was able to move beyond many of the initial barriers in the first two implementation years and organize its available staff and resources to achieve a number of complex and difficult tasks, including revised policies, three substantive resource development plans, greatly improved data in a number of critical areas, foster home licensing procedures, statewide training, and other areas. These difficult tasks were accomplished in a time frame of approximately four months, and demonstrated, in my opinion, tremendous progress in the agency's ability to organize and mobilize its staff and resources and to produce timely work products of high quality. I believe that this marks a noteworthy milestone in the capacity of MDHS to comply with the Settlement Agreement and pursue its goals for a markedly improved child welfare system in Mississippi.

As noted in the contempt motion, it is true that MDHS has relied heavily on technical assistance in moving forward. This was with the agreement of all the parties and, in fact, is no different than any other State in the country working to comply with a settlement of the scope of *Olivia Y*. It is reasonable and acceptable to seek out and use expert assistance in this kind of reform, and MDHS did so without prompting early in the process. It is also true that the time frames needed to institute the scope of changes included in the Settlement Agreement may not occur within the agreement's five-year time frame. However, other States have taken as

long as 15 to 20 years or longer to turn their systems around and several are still in the process after that many years. While not advocating for protracted implementation periods, it is necessary to consider the reasonable time frames needed to implement the reforms correctly and effectively, and the parties must consider the consequences of implementing surface-level changes that may meet technical requirements of the settlement but do not, in fact, provide hope for lasting reform. Further, I am personally aware of only one other jurisdiction in the country that has been placed into receivership for failure to meet settlement requirements. Two years into the settlement, the court appointed a receiver for the District of Columbia's child welfare agency that remained in place for about five years before the District regained control of the agency. *Ten years* after re-gaining control and *17 years* after entering into the settlement, the District is still working to comply with the settlement agreement. It is difficult for me to see the advantage of this course of action in reducing the timeframes needed to comply with the settlement.

I believe that MDHS has chosen a strategy that will lead to reform of the system and compliance with the Settlement Agreement, and that the MDHS administration is continually growing and strengthening its capacity to lead these changes with the support of technical assistance. This will not be a smooth path, and I doubt that it will be the last time that disputes between the parties over progress or approaches will be brought to the court. This is a lawsuit, after all. However, I believe strongly that the MDHS administration and the other parties to the settlement are committed to making real and lasting improvements in Mississippi. The administration of MDHS has demonstrated its initiative in seeking viable ways of changing the system without having been forced and in aggressively addressing Bridge Plan requirements. Building on those successes, the Department is currently engaged in planning and implementing *Olivia Y* requirements beyond those addressed in the Bridge Plan without waiting to be directed to do so.

I believe that the vision and commitment of the MDHS administration has credibility with the staff in the field that must implement these many reforms, and is a tremendous asset in leading the reforms that should not be underestimated as decisions are made about how to move forward.

Thank you.

*[signature]*

Jerry Milner
Vice President for Child Welfare Practice