**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION**


**JAMES D. JOHNSON, AS NEXT FRIEND TO**           **PLAINTIFFS**
**OLIVIA Y., ET AL.**


**VS.**           **CIVIL ACTION NO.: 3:04CV251LN**


**HALEY BARBOUR, AS GOVERNOR OF THE**           **DEFENDANTS**
**STATE OF MISSISSIPPI, ET AL.**

---

**DEFENDANTS' MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFFS' MOTION FOR CONTEMPT AND FOR THE
APPOINTMENT OF A RECEIVER**

---

**Dewitt L. ("Rusty") Fortenberry, Jr.
(MSB #5435)
Kenya Key Rachal (MSB # 99227)
Ashley Tullos Young (MSB # 101839
BAKER, DONELSON, BEARMAN,
CALDWELL  & BERKOWITZ, PC
4268 I-55 North
Meadowbrook Office Park
P.O. Box 14167
Jackson, Mississippi 39211
Telephone: (601) 351-2400
Facsimile: (601) 351-2424**

**Harold Pizzetta, III, Esq.
Assistant Attorney General
General Civil Division
Carroll Gartin Justice Building
430 High Street
Jackson, MS 39201
Telephone: (601) 359-3816
Facsimile: (601) 359-2003**

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................ iv

I.    THE PARTIES AND THE SETTLEMENT AGREEMENT ............................................ 1

II.   PRELIMINARY STATEMENT ................................................................................ 2

III.  STATEMENT OF THE FACTS ................................................................................ 8

      A. Period 1 of the Settlement Agreement (January 4, 2008 – April 30, 2009) ...................... 8
      B. Period 2 of the Settlement Agreement (May 1, 2009, through April 30, 2010) and the
         Bridge Period (May 1, 2010, through September 1, 2010) ................................................ 11

IV.   STANDARD FOR CONTEMPT ................................................................................ 14

V.    INABILITY TO COMPLY WITH A COURT'S ORDER IS A DEFENSE TO
      CONTEMPT ................................................................................................................ 15

VI.   A FINDING OF CONTEMPT IS INAPPROPRIATE BECAUSE DEFENDANTS
      HAVE MADE, IN GOOD FAITH, ALL REASONABLE EFFORTS TO COMPLY
      WITH THE SETTLEMENT AGREEMENT ................................................................ 17

      A. Defendants Have Retained Nationally-Renowned Consultant CSF to Assist
         Defendants in Meeting the Requirements of the Settlement Agreement .......................... 17

              1.  Defendants and CSF Developed A Comprehensive Practice Model for DFCS .... 18
              2.  Plaintiffs are Hypocritical in their Criticism of Defendants for Relying on CSF .. 19

      B.  Plaintiffs Ignore That Defendants Satisfied 146 COA Standards During Period 2 .......... 20

      C. Defendants Have Made Tremendous Strides in Hiring Additional Caseworkers and
         Supervisors ...................................................................................................................... 21

      D. DFCS Caseworkers Have Access to Necessary Resources ............................................... 24

              1.  DFCS Policy is Being Revised and a New Policy Director has been Retained
                  by DFCS.................................................................................................................... 24
              2.  Plaintiffs' Mention of Caseworkers Working in Cramped Trailers is a
                  Mischaracterization and a Low Blow ...................................................................... 26
              3.  Caseworkers and Supervisors have Access to Computer Services ........................ 27
              4.  MACWIS Login and Connectivity Problems Have Been Addressed .................. 27

      E. Defendants are Taking Steps to Address MACWIS ........................................................ 29

      F. Defendants Are Actively Developing Additional Placement Options and Improving
         Placement Case Practice .................................................................................................. 32

1. Plaintiffs Ignore Data Produced During the Bridge Plan that Reflects Defendants are Making Strides in Placement Stability..........................................34

2. Defendants Have Begun Licensing Relative Placements and Have a Timeline for Licensing the Remaining Unlicensed Relative Placements ..........................35

3. Plaintiffs' Contentions Regarding Other Data Elements Are Misleading ............36

4. Defendants are Taking Steps to Improve Reunification, Adoption, and Permanency Services and Case Practice................................................................37

    a. Data produced during the Bridge Plan and Ignored by Plaintiffs Reflects That Defendants are Meeting or Exceeding Many of the Period 2 Requirements that Evaluate Reunification, Adoption and Permanency....................................................................................37

    b. Defendants Are Making Efforts to Improve Case Practice and Outcomes Related to Termination of Parental Rights, Reunification, Adoption, and Independent Living ...........................................39

G. Defendants are Addressing Maltreatment Investigation and Training Deficits ...............42

H. Defendants Have Obtained a Significant Increase in State Funding and Are Also Taking Steps to Improve Fiscal Practices and Maximize Federal Funding......................43

VII.    JUDICIAL PRECEDENT DOES NOT SUPPORT THE APPOINTMENT OF A RECEIVER ...............................................................44

VIII.    CONCLUSION...............................................................................................45

INDEX OF EXHIBITS...............................................................................................51

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>                                                                                          <u>PAGE(S)</u>

*Anderson v. Dunn*,
    19 U.S. 204 (1821)................................................................................................15

*Aspira of New York, Inc. v. Board of Ed. of City of New York*,
    423 F. Supp. 647 (D.C.N.Y. 1976) ...................................................................16

*Bracco v. Lackner*,
    462 F.Supp. 436 (N.D. Cal. 1978) ....................................................................45

*Chairs v. Burgess*,
    143 F.3d 1432 (11th Cir. 1998) ...................................................................15, 16

*Chambers v. NASCO, Inc.*,
    501 U.S. 32 (1991).......................................................................................14, 15

*David C. v. Leavitt*,
    No. 93-C-206, slip op. (D. Utah March 17, 1997).....................................2, 17, 46

*Dixon v. Berry*,
    967 F. Supp. 535 (D.D.C. 1997) .......................................................................45

*Flaksa v. Little River Marine Constr. Co.*,
    389 F.2d 885, 887 (5th Cir.), cert. denied,
    392 U.S. 928, 88 S.Ct. 2287, 20 L.Ed.2d 1387 (1968).........................................14

*Gary W. v. State of La.*,
    No. 74-2412, 1990 WL 17537, at *28 (E.D. La. Feb. 26, 1990) ...........................46

*Gebetsberger v. East*,
    627 So. 2d 823 (Miss. 1993)...............................................................................15

*Glover v. Johnson*,
    934 F.2d 703 (6th Cir. 1991) .............................................................................46

*LaShawn A. v. Kelly*,
    887 F.Supp. 297 (D.D.C. 1995) .........................................................................46

*Morgan v. McDonough*,
    540 F.2d 527 (1st Cir. 1976)........................................................................44, 46

*National Resources Defense Counsel, Inc.*,
    510 F.2d at 713 ................................................................................................16

*Newman v. Graddick*,
    740 F.2d 1513 (11th Cir. 1984) ......................................................................................16

*Petitpren v. Taylor Sch. Dist.,*
    304 N.W.2d 553 (Mich. App. 1981) ..............................................................................45

*Reed v. Iowa Marine & Repair Co*.,
    16 F.3d 82 (5th Cir. 1994) ............................................................................................15

*Riccard v. Prudential Ins. Co., Inc*.,
    307 F.3d 1277 (11th Cir. 2002) ....................................................................................15

*Shaw v. Allen*,
    771 F. Supp. 760 (S.D. W. Va. 1990) .....................................................................44, 46

*United States v. Hayes*,
    722 F.2d 723 (11th Cir. 1984) ......................................................................................16

*United States v. Prestonwood Properties, Inc*.,
    No. 3-99-CV-0495-R, 2001 WL 1076125, *2 (N.D. Tex. Sept 10, 2001) ...............15

*United States v. Rizzo*,
    539 F.2d 458  (5th Cir. 1976) .......................................................................................15

*United States v. Ryan*,
    402 U.S. 530 (1971) ......................................................................................................16

*United States v. Rylander*,
    460 U.S. 752 (1983) ......................................................................................................15

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION**

JAMES D. JOHNSON, as next friend to                                **PLAINTIFFS**
Olivia Y., et al.

vs.                                        CIVIL ACTION NO.: 3:04cv251LN

HALEY BARBOUR, as Governor of the                          **DEFENDANTS**
State of Mississippi, et al.

_____

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
MOTION FOR CONTEMPT AND FOR THE APPOINTMENT OF A RECEIVER**
_____

Defendants submit this Memorandum in Support of Their Response in Opposition to

Plaintiffs' Motion for Contempt and for the Appointment of a Receiver.

## I.  THE PARTIES AND THE SETTLEMENT AGREEMENT

Plaintiffs comprise a class of members consisting of Mississippi's foster children.  They

are represented by Children's Rights, Inc. ("CRI").  Defendants are Haley Barbour, as Governor

of the State of Mississippi, the Executive Director of the Mississippi Department of Human

Services ("MDHS"), and the Director of the MDHS Division of Family and Children's Services

("DFCS"). [1]

This Court approved the Mississippi Settlement Agreement and Reform Plan

("Settlement Agreement") on January 4, 2008.  The Settlement Agreement provides that Grace

---

[1] At the time the underlying Complaint was filed, the Defendants were Haley Barbour, as Governor of the State of Mississippi; Donald Taylor, as Executive Director of the Department of Human Services; and Billy Mangold, as Director of the Division of Family and Children's Services.  Subsequently, Governor Haley Barbour appointed Don Thompson to serve as Executive Director of the Department of Human Services.  Lori Woodruff was appointed as a Deputy Administrator of the Department of Human Services—Division of Families and Children's Services.  The pleadings have not been formally amended to reflect this change of leadership.  Acting in their official capacities, Governor Haley Barbour, Don Thompson, and Lori Woodruff are collectively referred to herein as "Defendants."

Lopes is the Federal Court Monitor ("Court Monitor") and that DFCS is to achieve accreditation by the Council on Accreditation[2] ("COA").  (Settlement Agreement at 38, §§IV and VI.A.).  The Settlement Agreement also contemplates that the parties and COA will jointly develop Annual Implementation Plans setting forth requirements that Defendants are to satisfy during 12 month periods. (Settlement Agreement at 1, §I.A.).

## II. PRELIMINARY STATEMENT

The parties agree that the systemic and comprehensive nature of the Settlement Agreement requires the implementation and refinement of DFCS' policies and programs over a number of years.  (Settlement Agreement at 40, §VII.A.).  In fact, similar attempts at institutional reform of child welfare systems have been described as complex and elaborate.  *See David C. v. Leavitt*, No. 93-C-206, slip op. at 25 (D. Utah March 17, 1997), attached to Response as Exhibit "A" ("The problems of child-welfare are very complex, Defendants' task is large, and the recognition that to effectuate change requires time reflects no more than a healthy sense of realism."). This effort on the part of the Defendants is no different.

The Period 2 Annual Implementation Plan (filed May 4, 2009 [Doc. 487]) was only the second Annual Implementation Plan negotiated by the parties.  Period 2 was also the first consecutive 12-month period in which Don Thompson and Lori Woodruff were responsible for managing DFCS.  Though diligent and good faith efforts were employed, Defendants did not fully comply with all Period 2 requirements.  And while the parties may disagree over the extent of compliance during Period 2, Defendants have never willfully disregarded any Order of this Court and they are taking every reasonable step to comply with their obligations.  Thus,

---

[2] The Council on Accreditation is a world wide independent, non-profit, accrediting organization that accredits human service agencies, including child and public service agencies in the public sector.  See Council on Accreditation's website, www.coanet.org, for more information on COA, its history, and the accreditation process.

Defendants have not acted in a contemptuous manner and the appointment of a receiver is absolutely unnecessary and improper.

Toward the end of Period 2, Plaintiffs refused to negotiate a Period 3 Implementation Plan and provided Defendants with written notice of Period 2 noncompliance on April 9, 2010. Notwithstanding their surprise and frustration that Plaintiffs refused to negotiate a Period 3 Implementation Plan and move forward in the reform effort, Defendants continued to exercise good faith by negotiating corrective actions as contemplated by the Settlement Agreement.[3]

The necessary corrective actions agreed to by the parties are detailed in the Agreed Order dated June 10, 2010 ("Bridge Plan").  (Bridge Plan [Doc. No. 501]).  The Bridge Plan clearly acknowledges that its terms are corrective action as contemplated by the Settlement Agreement. (Bridge Plan at 1, Nos. 1 and 2 *citing to* Settlement Agreement at 40, §§VII.A and VII.B.)   The Bridge Plan also specifies that its term is from May 1, 2010, through September 1, 2010 (the "Bridge Period.").  (Bridge Plan at 1, No. 2).

As the Court Monitor reported, "[c]onceptually [the] Bridge Period was intended to serve as a bridge between Period 2 and Period 3."  (Court Monitor November 23, 2010 Bridge Plan Report [Doc. No. 528] at 9).  This link is also evidenced by the parties' agreement that should the Plaintiffs determine Defendants substantially complied with its terms, the parties are to immediately negotiate a Period 3 Implementation Plan. (Bridge Plan at 4, No. 9).  So that the parties and the Court would be apprised of Defendants' progress toward satisfaction of the

---

[3]  "The parties **shall** make every reasonable effort to resolve disputes prior to seeking Court intervention." (Settlement Agreement §VII.A) (emphasis added).  "If the Plaintiffs believe that the Defendants have failed to comply with any obligation under this [Settlement Agreement] or an annual implementation plan, Plaintiffs will, prior to seeking judicial action to enforce the terms of this [Settlement Agreement] or an annual implementation plan, give written notice of non-compliance to the State.  Within 30 calendar days of Plaintiffs' notice of non-compliance, Defendants shall submit a written response to Plaintiffs.  **Plaintiffs agree to work in good faith** with the State to agree on necessary corrective actions **and avoid enforcement action**, and may not initiate court action for 60 days from the date of Plaintiffs' non-compliance notice."  (Settlement Agreement § VII.B) (emphasis added).

Bridge Plan requirements, it was agreed that the Court Monitor would report on the extent of Defendants' compliance on July 23, 2010, and then again on September 10, 2010, 10 days after the conclusion of the Bridge Period.[4]  (Bridge Plan at 4, No. 8).

On July 23, 2010, the Court Monitor issued her interim report and confirmed that Defendants had made "demonstrable progress toward satisfying each requirement in the Agreed Order on a timely basis." (Court Monitor's July 23, 2010 Interim Report [Doc. No. 502] at 5). After receiving the Court Monitor's Report, counsel for Plaintiffs felt it necessary to inform counsel for Defendants that Plaintiffs had reserved their right to seek judicial enforcement for Period 2 noncompliance upon completion of the Bridge Period. (*See* Email from Shirim Nothenberg to Kenya Key Rachal and Rusty Fortenberry dated August 4, 2010, attached to Response as Exhibit "B").  At that time, Defendants began to internally question whether Plaintiffs had acted in good faith in negotiating the Period 2 corrective actions that were incorporated into the Bridge Plan.  Regardless of whether the Court Monitor determined that Defendants substantially complied with the negotiated corrective actions, Plaintiffs were affirming their interest in litigating noncompliance.

On September 10, 2010, the Court Monitor filed a Motion to extend the deadline to issue her final report on the extent of Defendants' compliance with the Bridge Plan.  (Motion for Enlargement of Time and Order [Doc. Nos. 506-507]).  Shortly thereafter on October 5, 2010, as Defendants had suspected, Plaintiffs filed their Motion for Contempt prior to the Court Monitor issuing her final report and without concern for whether Defendants had substantially complied

---

[4] Defendants acknowledge that Plaintiffs insisted that the Bridge Plan not preclude them from seeking judicial relief for any violation of the Period 2 Annual Implementation Plan or the Period 2 requirements of the Settlement Agreement following the conclusion of the Bridge Period. (Bridge Plan at 5, No. 11). For that reason, Defendants reserved their right to assert any and all defenses should Plaintiffs proceed with enforcement action. (*Id.* at 5, No. 12).  However, Defendants believed it impractical that Plaintiffs would seek judicial enforcement for Period 2 noncompliance without a good-faith consideration of Defendants' substantial compliance with the requirements of the Bridge Plan since the Court Monitor' final report was originally to be issued 10 days after the Bridge Period.

with the negotiated court-enforceable corrective actions. (See Plaintiffs' Motion for Contempt and for Appointment of a Receiver and associated documents [Doc. Nos. 511-517]).

On November 23, 2010, the Court Monitor issued her final report on the extent of Defendants' compliance with the terms of the Bridge Plan and concluded that "[t]he evidence shows that during the corrective action period, the [D]efendants made demonstrable progress, which led to significant accomplishments." (Monitor's Bridge Plan Report [Doc. 528] at 5). The Court Monitor further reported that Defendants satisfied "most" of the Bridge Plan requirements on a timely basis and that "…in nearly all of the instances in which [D]efendants' performance fell short, there was demonstrable progress coupled with recognition and a credible effort to address shortcomings in performance." (*Id*. at 3).

Though technically permissible, Plaintiffs' decision to seek judicial enforcement at the conclusion of the Bridge Period but before the Court Monitor issued her final report regarding Defendants' compliance with the Bridge Plan is a mockery of the spirit of good faith and fair dealing. First, filing the Motion for Contempt is contrary to the Settlement Agreement directive that judicial actions be avoided. Second, for Plaintiffs to negotiate court-ordered necessary corrective actions for Period 2 noncompliance and then file judicial action for noncompliance for the same Period without knowing the outcome of the corrective actions is inequitable and inappropriate. Lastly, Plaintiffs' action essentially voided the spirit and intent of the Bridge Plan that it serve as the bridge between Period 2 and Period 3.

With judicial action for Period 2 noncompliance currently pending, Plaintiffs did not acknowledge that Defendants substantially complied with the necessary corrective actions in the Bridge Plan. That comes as no surprise because if Plaintiffs acknowledged that Defendants substantially complied with the Bridge Plan, the parties would be put in the tenuous position of

immediately negotiating a Period 3 Implementation Plan while also litigating Period 2 noncompliance and contempt, two contrary positions. Thus, one must seriously question Plaintiffs' intent in negotiating and agreeing to the Bridge Plan, as Plaintiffs chose to litigate noncompliance without any knowledge or regard for whether Defendants would substantially comply with the Bridge Plan.[5]

Defendants are compelled to also comment on the extent to which Plaintiffs are willing to twist, stretch, and ignore facts to paint Defendants in a bad light. For example, Plaintiffs amazingly quantify a small number of Period 2 requirements as the only requirements that Defendants satisfied while ignoring approximately 146 court-enforceable requirements that Defendants satisfied. Plaintiffs also present only one affidavit to support their argument that Defendants are failed managers and that a receiver should be appointed. That affidavit is the Declaration of Shirim Nothenberg, one of CRI's lawyers, who has never managed a state human services agency and who has no child welfare management experience. That Declaration pales in comparison to the leadership and experience of Don Thompson and Lori Woodruff as well as the analysis of Jerry Milner set forth in his November 30, 2010 letter. (Letter from J. Milner, attached to Response as Exhibit "D").

Mr. Milner is the Vice President for Child and Family Services for the Center for the Support of Families ("CSF") and a consultant for Defendants. Prior to his work as a consultant, Mr. Milner worked for 25 years for the Alabama Department of Human Resources and retired from the agency as the Alabama child welfare director, a position he held during the implementation of child welfare reforms that were required by a consent decree arising from a class action lawsuit similar to *Olivia Y.* (*Id.* at 1). Mr. Milner also worked for the federal

---

[5] When asked whether Defendants substantially complied with the requirements of the Bridge Plan, Plaintiffs denied substantial compliance. (Letter from S. Nothenberg dated Nov. 30, 2010, attached to Response as Exhibit "C.").

government, specifically the Administration for Children and Families ("ACF"), for 8 years and managed the nationwide Federal review of every state's child welfare program. (*Id.*)

In his letter, Mr. Milner explains that "[a]s a vehicle for implementing many of the reforms required by the settlement, [Defendants] chose to develop and implement a statewide child welfare practice model that is designed to standardize its interventions with children and families across the State, and to do so in ways that reflect family-centered values and principles while meeting *Olivia Y* requirements." (*Id.* at 2). Mr. Milner also praises Defendants because they "chose voluntarily to begin early in the process to develop and implement a practice model in contrast to some other States that have adopted a practice model or some other vehicle for change after many years of struggling unsuccessfully to comply with settlements." (*Id.*). Such analysis and support from a nationally-recognized expert as Jerry Milner demonstrates that Defendants are on the right track to reform, regardless of Plaintiffs' counsel's public commentary[6] and apparent desire to dictate the management of DFCS.

In sum, while Defendants' performance has not been perfect, Defendants have taken every reasonable step to comply with the requirements of the Settlement Agreement while also developing a strategy and Practice Model that will overhaul and improve case practice in a manner that will lead to meaningful and permanent improvement for Mississippi's foster children. Moreover, in a good-faith effort to remedy their Period 2 noncompliance, Defendants

---

[6] It should be noted that Plaintiffs' counsel chose to make multiple comments to various media outlets (Just a few of the articles featuring their comments follow: October 3, 2010 *Clarion Ledger* article: "Rights Group: Foster Care Still Lagging", October 6, 2010 WLBT article "Foster Care Lawsuit", October 6, 2010 Mississippi Public Broadcast interview "A New Lawsuit Says Mississippi Isn't Protecting Foster Children" and October 7, 2010 *Clarion Ledger* article: "Welfare Group Asks Court to Intervene in Overseeing Children", attached to Response as Exhibits "E"-"H" respectively) which Defendants consider prejudicial to the reform effort and inconsistent with the Order of this Court dated June 26, 2006 [Doc. 341] and attached to Response as Exhibit "I." Moreover, Plaintiffs' Motion for Contempt and for the Appointment of a Receiver, combined with CRI's comments to the press, have had a chilling effect on DFCS' ability to hire caseworkers and management staff. (Lori Woodruff Affidavit at 5, attached to Response as Exhibit "J") Many of the potential candidates have expressed trepidation regarding Plaintiffs' Motion and particularly the potential appointment of a receiver. (*Id*)

entered into and substantially complied with the corrective action measures incorporated into the Bridge Plan. As the Court Monitor concluded, "[D]efendants made demonstrable progress, which led to significant accomplishments." (Bridge Period Report at 5). Jerry Milner also called Defendants' performance during the Bridge Period "a noteworthy milestone in the capacity of [Defendants] to comply with the Settlement Agreement and pursue its goals for a markedly improved child welfare system in Mississippi." (Milner Ltr. at 2).

Under this backdrop, where Defendants have made all reasonable efforts to comply with the Settlement Agreement while instituting lasting reform, have never been before this Court on any allegation of ignoring an Order, and entered into a corrective action plan to remedy their noncompliance, the extraordinary relief being requested by Plaintiffs is neither proper nor necessary.

The parties negotiated, and this Court approved, a corrective action plan for Defendants' noncompliance during Period 2 and Defendants have substantially complied with that Plan. Thus, the only natural next step is for the parties to move forward and negotiate the Period 3 Implementation Plan. Any other remedy would significantly delay and/or derail the "demonstrable progress" Defendants have made and will continue to make in the future.

### III.  STATEMENT OF THE FACTS

**A.  Period 1 of the Settlement Agreement (January 4, 2008 – April 30, 2009)**

Subsequent to Court approval of the Settlement Agreement, there was a change in the executive leadership of MDHS and DFCS. During that time of transition, the position having management responsibility for DFCS was elevated to the level of Deputy Adminstrator reporting directly to the MDHS Executive Director. This elevation of authority was for the purposes of

emphasizing the importance of reform, while also increasing the salary that could be paid to recruit the most qualified person to lead DFCS.

Effective July 1, 2008, Governor Haley Barbour appointed Don Thompson to serve as Executive Director of MDHS. (News Release from Governor Barbour's Office, attached to Response as Exhibit "K").  Mr. Thompson has been described by the Court Monitor as "a seasoned public manager who actively supports the goals of the Settlement Agreement, and has made them a priority."  (Period 1 Monitoring Report [Doc. No. 488] at 4).  A copy of Mr. Thompson's resume is attached to Response as Exhibit "L."  Although not required by the Settlement Agreement and prior to the effective date of his employment, Mr. Thompson was made available to CRI and COA for questions and comment.  (Don Thompson's Affidavit attached to Response as Exhibit "M").  That effort was intended as a demonstration of Defendants' willingness to work with CRI and COA to achieve the complex reform sought by the Settlement Agreement.  The Court Monitor and counsel for Defendants also participated in this meeting in which Mr. Thompson answered questions concerning his thoughts on the reform as well as his management philosophy.  (Thompson Aff. at 2 ).

Mr. Thompson also used the meeting as an opportunity to present the attendees with resumes´ of several applicants from across the country desiring to lead DFCS.  (Thompson Aff. at 2).  After receiving negative comments as to each applicant from CRI, Don Thompson continued his search for a Deputy Administrator to lead DFCS.  (Thompson Aff. at 2).

Shortly thereafter, Lori Woodruff surfaced as the person most qualified to serve in that capacity.  Ms. Woodruff is a licensed master social worker with both a Masters of Social Work degree (MSW) and a Masters of Education degree (M.Ed.).  As the Court Monitor recognized, Ms. Woodruff is a "highly regarded child welfare expert with over two decades of relevant

experience." (Period 1 Monitoring Report at 22). A copy of Ms. Woodruff's resume is attached to Response as Exhibit "N".

Ms. Woodruff's resumé was provided to CRI on July 10, 2008. (E-mail from Shirim Nothenberg to Kenya Key Rachal dated July 10, 2008, attached to Response as Exhibit "O".) Upon being advised that Ms. Woodruff had accepted the offer to serve as Deputy Administrator of MDHS having oversight of DFCS, counsel for Plaintiffs commented, "[t]hat is very good news." (E-mail from Shirim Nothenberg to Rusty Fortenberry dated August 1, 2008, attached to Response as Exhibit "P").

Upon their employment, Mr. Thompson and Ms. Woodruff began a diligent analysis of DFCS and its organizational structure. Their analysis concluded that in order to improve the delivery of services to foster children and meet the requirements of the Settlement Agreement, a change in the historical structure and operations of DFCS was necessary. (Woodruff Aff. at 1). Defendants presented the proposed reorganization of DFCS to Plaintiffs, COA, and the Court Monitor for comment. Plaintiffs were in agreement that to achieve the systemic and comprehensive goals contemplated by the Settlement Agreement, DFCS had to be restructured from both organizational and personnel standpoints. (*See,* January 6, 2009 Consent Order [Doc. 483] at 1, ¶4).

Defendants received Mississippi State Personnel Board approval of their proposed reorganization on November 20, 2008. (Woodruff Aff. at 2). Defendants' assessment and proposed reorganization had been expeditiously accomplished in approximately 60 days. That fundamental restructuring redefined the administrative and management functions of DFCS to more closely align those functions with core program areas. The reorganization also

reconfigured the statewide delivery of child welfare services from 7 regions to a more focused 13 regions. (Woodruff Aff. at 1)

In addition to the reorganization of DFCS, Defendants began the process of filling newly created and vacant management positions with qualified individuals. Although it was a time-consuming process, Defendants competitively advertised their position vacancies in national and local publications. (Woodruff Aff. at 2). While establishing their new core management team, Defendants began to also improve the recruitment and retention of social workers. For example, Defendants obtained approval from the Mississippi Personnel Board for a career ladder to bolster the recruitment and retention of social workers.[7] (Woodruff Aff. at 2). They also launched and established funding for a new program to encourage and reimburse social workers for the cost of achieving advanced degrees. (Woodruff Aff. at 2).

During this Period, Plaintiffs were in agreement that DFCS had to be fundamentally restructured from both organizational and personnel standpoints. (January 6, 2009 Consent Order [Doc. 483] at 1 ¶4). For this reason, the parties concluded that it had not been possible for Defendants to assess or meet all of the first year obligations and, therefore, many Period 1 requirements were negotiated into the Period 2 Implementation Plan. That Implementation Plan was approved by this Court on May 4, 2009. (Period 2 Implementation Plan [Doc. 487]).

**B. Period 2 of the Settlement Agreement (May 1, 2009 through April 30, 2010) and the Bridge Period (May 1, 2010 through September 1, 2010)**

During this Period, Defendants continued efforts to fill management positions created by the fundamental reorganization of DFCS. They also began analyzing the process of how to alter casework practice in the field to enable DFCS to achieve and sustain the reforms contemplated by the Settlement Agreement. That fundamental process was not fleshed out by the parties in the

---

[7] The Mississippi Legislature has yet to provide funding for the career ladder.

Settlement Agreement nor included in the Period 2 Annual Implementation Plan. In consultation with Jerry Milner, Defendants determined that it was necessary to invest a substantial amount of time consulting with the Center for Support of Families ("CSF") to develop a well thought out, organized process for implementing reform. (Woodruff Aff. at 2). Otherwise, reform would never be sustained. (*Id.*). After a thorough analysis of DFCS' delivery of casework practice, CSF produced a comprehensive Practice Model and Implementation Plan ("Practice Model") on September 30, 2009. That Practice Model takes into account best social worker case practice, legal requirements, and requirements of the Settlement Agreement and it has been described as the "…centerpiece of defendants' reform strategy." (Bridge Plan Report at 13, n. 38) (Woodruff Aff. at 2-3).

During Period 2, Defendants were required to satisfy 146 court-enforceable COA accreditation requirements in addition to approximately 119[8] other requirements.[9] With regard to the COA requirements, COA concluded that DFCS' submissions "…were made on a timely basis, generally well done, and included the appropriate supporting documentation." (Period 2 Monitoring Report at 136). The Court Monitor also noted that "…with very few exceptions, all of the Period 2 COA standards were satisfied." (*Id.* at 6).

Additionally, during Period 2 Defendants also filled all of the Unit Director positions (Period 2 Monitoring Report at 16-17); hired a qualified MACWIS[10] Director (*Id.*); provided caseworkers with telephone access to a supervisor 24 hours a day (*Id.* at 28); instituted

---

[8] Defendants dispute Plaintiffs' calculation that there were 119 other Period 2 requirements. (See Ex. 1 of Dobies' Affidavit [Doc. 514]). However, Defendants do not feel as though that dispute is material to this pending Motion.

[9] In their Memorandum, Plaintiffs sought to quantify the total number of requirements satisfied by Defendants during Period 2. However, they failed to consider all of the court-enforceable requirements that Defendants were required to satisfy.

[10] MACWIS is the "Mississippi Automated Child Welfare Information System."

competency-based testing to assess knowledge acquisition of newly-hired DFCS staff and newly-hired or promoted supervisors (*Id.* at 46); completed a reunification needs assessment (*Id.* at 72); completed a service provider needs assessment to identify available medical, dental, and medical health services (*Id.*); completed an assessment of the quality and array of independent living services available to foster children ages 14-20 (*Id.*); completed a TPR assessment (*Id.*); completed a safety assessment (*Id.*); and completed a recruitment and retention assessment to determine the need for additional foster care support services. (*Id.*).

While not perfect, by adding the Period 2 requirements that Plaintiffs acknowledge Defendants satisfied with the COA requirements that Defendants satisfied, Defendants diligently complied with a majority of the Period 2 requirements. Defendants did this while also continuing to build their management team capacity, managing day-to-day activities associated with Mississippi's child welfare system, and working with CSF to develop a Practice Model which is to serve as the centerpiece for actually implementing and sustaining reform. Despite Defendants' efforts and after refusing to negotiate Period 3 requirements, Plaintiffs served Defendants with written notice of noncompliance of Period 2 requirements on April 9, 2010.

As contemplated by the Settlement Agreement, the parties expended significant efforts negotiating a Bridge Plan with necessary corrective actions to be satisfied by Defendants during an abbreviated Bridge Period from May 1, 2010 through September 1, 2010. As noted above, the purpose of the Bridge Period was that if Defendants substantially complied with the terms of the Bridge Plan, the Period would serve as a bridge between Period 2 and Period 3. (Bridge Plan Report at 9). As further confirmation of this intent, the Court Monitor also noted in her Period 2 Report that although several requirements had not been satisfied during Period 2, they would be addressed in her final Bridge Plan Report. (*See* e.g. Period 2 Monitoring Report at 68-69).

13

In her November 23, 2010 final report, the Court Monitor concluded that Defendants satisfied most of the Bridge Plan requirements on a timely basis and that they made demonstrable progress, which led to significant accomplishments. (Bridge Plan Report at 4, 5). Simply put, Defendants substantially complied with the requirements of the Bridge Plan, but as a result of Plaintiffs' premature filing of their Motion for Contempt, Plaintiffs are unable to agree that Defendants substantially complied with those requirements. Otherwise, Plaintiffs would be obligated to negotiate a Period 3 Implementation Plan while absurdly litigating Period 2 requirements.

In his analysis of Defendants efforts at satisfying the Bridge Plan requirements, Jerry Milner noted,

> …by the time of the 'Bridge Plan'…MDHS was able to move beyond many of the initial barriers in the first two implementation years and organize its available staff and resources to achieve a number of complex and difficult tasks, including revised policies, three substantive resource and development plans, greatly improved data in a number of critical areas, foster home licensing procedures, statewide training, and other areas. These difficult tasks were accomplished in a time frame of approximately four months, and demonstrated…tremendous progress in the agency's ability to organize and mobilize its staff and resources and to produce timely work products of high quality. I believe that this marks a noteworthy milestone in the capacity of MDHS to comply with the Settlement Agreement and pursue its goals for a markedly improved child welfare system in Mississippi.

(Milner Ltr. at 2).

## IV.  STANDARD FOR CONTEMPT

Federal courts have inherent powers necessary to achieve the orderly and expeditious disposition of their dockets. *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43-44 (1991). These powers include the authority to punish for contempt in order to maintain obedience to court orders. *Flaksa v. Little River Marine Constr. Co.,* 389 F.2d 885, 887 (5th Cir.), *cert. denied,* 392 U.S. 928, 88 S.Ct. 2287, 20 L.Ed.2d 1387 (1968). However, because of the potency of inherent

powers, they must be used with great restraint and caution. *Chambers,* 501 U.S. at 44. Accordingly, the threshold for the use of the inherent power sanction is high. *Reed v. Iowa Marine & Repair Co.,* 16 F.3d 82, 84 (5th Cir. 1994).

Such powers may be exercised only if essential to preserve the authority of the court and the sanction chosen must employ "'the least possible power adequate to the end proposed.'" *Anderson v. Dunn,* 19 U.S. 204, 231 (1821), *quoted in Spallone v. United States,* 493 U.S. 265, 280 (1990). If there is a reasonable probability that a lesser sanction will have the desired effect, the court must try the less restrictive measure first. *Spallone,* 493 U.S. at 280.

A finding of civil contempt—willful disregard of the authority of the court—must be supported by "clear and convincing" evidence, a higher standard than the "preponderance of the evidence" standard, common in civil cases. *United States v. Rizzo*, 539 F.2d 458, 466 (5th Cir. 1976). The clear and convincing evidence must establish that 1) "the allegedly violated order was valid and lawful; 2) the order was clear and unambiguous; and 3) the alleged violator had the ability to comply with the order." *Riccard v. Prudential Ins. Co*., *Inc.*, 307 F.3d 1277, 1296 (11th Cir. 2002). Once this prima facie showing of a violation is made, the burden then shifts to the alleged contemnor to produce evidence explaining his noncompliance. *United States v. Prestonwood Properties, Inc.*, No. 3-99-CV-0495-R, 2001 WL 1076125, *2 (N.D. Tex. Sept 10, 2001), *see also United States v. Rylander,* 460 U.S. 752, 755 (1983).

## V.  INABILITY TO COMPLY WITH A COURT'S ORDER
## IS A DEFENSE TO CONTEMPT

"A contemnor may be excused because of an 'inability' to comply with the terms of the order." *Chairs v. Burgess*, 143 F.3d 1432, 1436 (11th Cir. 1998) (citing *Citronelle-Mobile Gathering, Inc*. v. *Watkins*, 943 F.2d 1297, 1301 (11th Cir. 1991)); *see also Gebetsberger v. East*, 627 So. 2d 823, 826 (Miss. 1993) ("Even where there has been established a prima facie

case of contempt, the defendant may avoid judgment of contempt by establishing that he is without present ability to discharge his obligation."). In satisfying this burden, the alleged contemnor must offer proof beyond "a mere assertion of inability" and introduce evidence supporting his claim. *United States v. Hayes*, 722 F.2d 723, 725 (11th Cir. 1984).

Parties subject to a court's order demonstrate an inability to comply by showing that they have made "in good faith all reasonable efforts to comply." *United States v. Ryan*, 402 U.S. 530, 534 (1971), *see also Newman v. Graddick,* 740 F.2d 1513, 1525 (11th Cir. 1984) ("[A] person who attempts with reasonable diligence to comply with a court order should not be held in contempt."). Failure of a district court to fully consider a State's ability, or inability, to comply with an order in the light of this 'reasonable efforts' standard is reversible error. *Chairs*, 143 F.3d at 1437.

"Inability," as a defense to contempt, does not mean that compliance must be totally impossible. Indeed, where the consent decree, as in this case, "calls for elaborate and complex performance, a contempt adjudication is not required or justified merely because the results are found to be incomplete or postponed. It is a sufficient defense…if a defendant official 'has in good faith employed the utmost diligence in discharging his responsibilities.'" *Aspira of New York, Inc. v. Board of Ed. of City of New York*, 423 F. Supp. 647, 654 (D.C.N.Y. 1976) (quoting *National Resources Defense Counsel, Inc. v. Train*, 510 F.2d 692, 713 (C.A.D.C. 1975)). In sum, "[t]he sound discretion of an equity court does not embrace enforcement through contempt of a party's duty to comply with an order that calls him 'to do an impossibility.'" *National Resources Defense Counsel, Inc.*, 510 F.2d at 713 (quoting *Maggio v. Zeitz*, 333 U.S. 56, 74-76 (1948)).

In *David C. v. Leavitt*, a class-action brought against the governor of the state of Utah and other state officials involved in Utah's child-welfare system alleging a failure of Utah's child-welfare system to protect children in its custody, the court recognized that "[a] court may legitimately decline to exercise its authority to enforce a prior order for a number of practical or policy-related reasons."  No. 93-C-206, slip op. at 22 (D. Utah March 17, 1997), attached to Response as Exhibit "A".  The court explained that one reason not to intervene is when the "noncomplying party has and is taking every reasonable step within its power to comply with the prior order but, for some reason, has not been successful."  *Id.*  In such a situation, "an enforcement order may not only be futile, but obstructive to ongoing corrective measures." *Id.*  That is precisely the case here.

Defendants have**,** and are continuing, to take all reasonable steps to comply with the Settlement Agreement.  Moreover, Defendants substantially complied with the corrective action measures that were agreed to by Plaintiffs in the Bridge Plan. As confirmed by the Court Monitor, the "defendants made demonstrable progress, which led to significant accomplishments."  (Bridge Plan Report at 5).  Court intervention at this point is unnecessary and would only derail the demonstrable progress that has already been made by Defendants and delay the improvements that Defendants intend to make in the future, including the implementation of the Practice Model.

## VI.  A FINDING OF CONTEMPT IS INAPPROPRIATE BECAUSE DEFENDANTS HAVE MADE, IN GOOD FAITH, ALL REASONABLE EFFORTS TO COMPLY WITH THE SETTLEMENT AGREEMENT

### A. Defendants Have Retained Nationally-Renowned Consultant CSF to Assist Defendants in Meeting the Requirements of the Settlement Agreement

Because Defendants understood that overhauling Mississippi's child welfare system and meeting their obligations under the Settlement Agreement would be a complex and time-

consuming mission, Defendants sought out and retained nationally-renowned consultant CSF for its experience and expertise in strategic planning, agency reform, and the development of quality practice models.  (Woodruff Aff. at 2) (*see also*, Jerry Milner Resume attached to Response as Exhibit "Q.")

### 1.  Defendants and CSF Developed A Comprehensive Practice Model for DFCS

Defendants were faced with addressing multiple requirements from the Settlement Agreement, the COA accreditation standards, and federal and state law and regulations. Consequently, Defendants decided that it would be advantageous to consult with CSF and Jerry Milner and incorporate DFCS' many mandates and interventions in a child welfare practice model that could be easily understood by field staff and stakeholders across the State, even though such a mechanism was not required by the Settlement Agreement. (Woodruff Aff. at 2). In contrast to other States that have adopted a practice model after many years of struggling unsuccessfully to comply with settlements, Defendants wisely choose to develop and implement a practice model early in the reform process.  (Milner Ltr. at 2).

The Practice Model integrates the numerous legal requirements with DFCS' mission and values and is comprised of six broad components, including safety assurance and risk management, mobilizing appropriate services timely, involving family members in decision making and case activities, preserving relationships and connections, individualized case planning, and strengths and needs assessments.  (Woodruff Aff. at 2-3).  Additionally, the Practice Model includes a continuous quality improvement system that will implement quality assurance protocols at the county, regional, and state levels. (Woodruff Aff. at 3).  Defendants have devoted substantial attention and resources to the development of the Practice Model and believe that it is a crucial component in Defendants' reform strategy and will lead to compliance

with the Settlement Agreement requirements and substantive improvements in caseworker practice.  (Woodruff Aff. at 3).  As explained by Jerry Milner of CSF, "the practice model is designed to change practice and outcomes in ways that will outlast the Settlement Agreement rather than simply being a temporary, reactive response to the lawsuit." (Milner Ltr. at 2).

<u>2.  Plaintiffs are Hypocritical in their Criticism of Defendants for Relying on CSF</u>

The spirit and intent of the Settlement Agreement encourages Defendants to obtain technical support from outside consultants such as COA and CSF.  In fact, the Period 2 Implementation Plan specifically required Defendants to use outside consultants for many things, including assessments, creation of a performance-based contracting system, and the development of CQI plans.  (Year 2 Implementation Plan [Doc. 487] at 8, 9, 16, 21-22, 26, 42-43).  Moreover, Plaintiffs' overwhelming approval and promotion of Defendants' use of technical assistance from CSF is reflected in the Bridge Plan. (Bridge Plan [Doc. 501] at 1 ¶¶ 3, 4 and 5).

Because of the quality work that CSF did on the Period 2 assessments and in assisting with the development of the Practice Model, the parties agreed that an expansion of CSF's scope of services should be included as part of the Bridge Plan.  Indeed, not only did the Bridge Plan require that "Defendants immediately contract with [CSF] for additional technical assistance in management and planning activities associated with meeting the requirements of the Settlement Agreement," but it also called for CSF's involvement in numerous requirements including the federal fiscal assessment, the production and validation of MACWIS data reports, maltreatment investigation curriculum development and training, development of practice guides, the revision and expansion of policy, and the statewide resource development plans.  (Bridge Plan at ¶¶ 1-4). As the Court Monitor recognized, the "lynchpin" of the capacity building initiatives in the Bridge Plan was the requirement that Defendants contract with CSF for technical assistance in

management and planning activities. (Bridge Plan Report at 3). Jerry Milner also confirmed that "it is reasonable and acceptable to seek out and use expert assistance in this kind of reform" and that the Defendants' use of technical assistance from CSF "was with the agreement of all the parties and, in fact, is no different than any other States in the country working to comply with a settlement of the scope of *Olivia Y.*" (Milner Ltr. at 2).

In their Motion, Plaintiffs have the audacity to now fault Defendants for relying on the technical assistance provided by CSF and contend that Defendants' retention of CSF "is a costly and inefficient way to address the clear management failures which are severely hobbling the reform effort."[11] (Memorandum [Doc. 512] at 5). Defendants are amazed that Plaintiffs would compel Defendants to enter into the Bridge Plan, which requires Defendants to contract for additional technical assistance from CSF, and then criticize Defendants for doing so. Such a tactic evidences that Plaintiffs' goal is to disparage Defendants for any and everything, including requirements that have been agreed to by Plaintiffs and approved by this Court.

### B.  Plaintiffs Ignore That Defendants Satisfied 146 COA Standards During Period 2

Counsel on Accreditation ("COA") is an independent, non-profit, accrediting organization that accredits human services entities, including public sector child and family services agencies, such as DFCS. As part of the Settlement Agreement, DFCS agreed to become accredited by COA pursuant to COA's management and service standards. (Settlement Agreement, §IV.). Because the COA standards should correspond and/or relate to the Settlement Agreement requirements, the Settlement Agreement requires that the annual implementation plans be jointly developed by the parties and COA. (*Id.* at §I.A. and B.).

---

[11] Plaintiffs' contention is in stark contrast to Jerry Milner who commends Defendants for seeking out and using technical assistance "without prompting early in the [reform] process." (Milner Ltr. at 2).

During Period 2, Defendants were required to meet 146 COA standards. The Court Monitor noted that "…with very few exceptions, all of the Period 2 COA standards were satisfied." (Period 2 Monitoring Report at 6). According to the COA project director, Jim Mooney, who evaluated Defendants' submissions, Defendants' submissions were timely, generally very well done, and included the appropriate supporting documentation. (*Id.* at 136).

In their Motion, Plaintiffs' conveniently fail to discuss or acknowledge the progress Defendants made in satisfying the Period 2 COA requirements. That is misleading and improper. Neither the Settlement Agreement nor the Period 2 Implementation Plan values one requirement more than another requirement. Thus, Defendants satisfied far more Period 2 requirements than Plaintiffs would have this Court believe.

## C. Defendants Have Made Tremendous Strides in Hiring Additional Caseworkers and Supervisors

Throughout the pendency of this litigation and its remedial phase, Defendants have acknowledged that additional DFCS caseworkers and supervisors were needed in order to provide superior care to Mississippi's children. Despite Plaintiffs' characterization in their Motion to the contrary, Defendants have made tremendous progress increasing staffing levels for DFCS caseworkers and supervisors since 2008, particularly considering the extraordinarily limited state budget. As the Court Monitor acknowledged in her Period 2 Monitoring Report, 66% of the DFCS caseworkers and 15% of the DFCS supervisors were hired since 2008. (Period 2 Monitoring Report at 24). And "[i]n the 12-month period ending April 30, 2010 alone, defendants hired 151 out of the 620, or 24 percent, of the caseworkers employed by the agency at that time." (Period 2 Monitoring Report at 5).

By the end of Period 2, the Settlement Agreement requires:

At least 50% of DFCS caseworkers shall carry a caseload that does not exceed Plan caseload requirements. No more than 20% of caseworkers shall carry a caseload exceeding twice the Plan caseload requirements.

No more than 20% of supervisors who are responsible for supervising DFCS caseworkers shall be responsible for supervising more than 5 caseworkers.

(Settlement Agreement at 4, §§ II.A.2.a.10, 11). According to July 2010 caseload data produced by DFCS, 43% of DFCS caseworkers carry a caseload that does not exceed Plan caseload requirements,[12] 15% of DFCS caseworkers carry a caseload exceeding twice the Plan caseload requirements, and 23% of DFCS supervisors are responsible for supervising more than 5 caseworkers. (Bridge Plan Report, Ex. 4, pp 8-9.).

While Defendants concede that they fell short—43% versus 50%—of meeting the 50% benchmark for caseworkers carrying a caseload within Plan requirements, Defendants performed better than required on the percentage of caseworkers carrying a caseload exceeding twice the Plan caseload requirements – the Settlement Agreement required no more than 20% and Defendants were at 15%. Defendants were also very close to meeting the Period 2 requirement for the supervisor to caseworker ratio. The Agreement calls for no more 20% of supervisors being responsible for supervising more than 5 workers, and Defendants were at 23%. (*Id.*).

The additional caseworkers hired by DFCS are resulting in a tangible difference for the safety of children in DFCS' custody. Because of the increased number of caseworkers and reduced workload, caseworkers are able to spend more time working on each child's case and

---

[12] In their Motion, Plaintiffs rely on the July 2010 caseload data produced during the Bridge Plan to support their contention that "close to 60% of all DFCS caseworkers carried caseloads that exceeded the caseloads established in the Settlement Agreement." (Memorandum [Doc 512] at 16). It is important to note, however, that under the Period 2 requirements of the Settlement Agreement, Defendants were required to have no more than 50% of caseworkers that carried caseloads that exceeded the caseloads established in the Settlement Agreement. Although, Defendants admittedly fell short of this goal, 57% versus 50%, Defendants were very close to meeting that requirement.

making face-to-face visits with the child. This is reflected in the face-to-face contact data produced during the Bridge Plan.

By the end of Implementation Period 2, the Settlement Agreement requires:

At least 30% of children in custody shall receive documented twice-monthly in-person visits by the assigned DFCS caseworker during the Period, consistent with Plan requirements.

According to the data produced during the Bridge Plan, Defendants are far exceeding the 30% requirement that is dictated in the Settlement Agreement. Defendants were at 56% in May 2010, 60% in June 2010 and 58% in July 2010, almost twice the required percentage. (Bridge Plan Report at Ex. 4, pg. 7). Conveniently, Plaintiffs fail to mention or acknowledge this data anywhere in their Motion.

The sheer number of caseworkers and supervisors hired, the caseload and supervisor/caseworker data, and the face-to-face contact data confirms that Defendants' focus and efforts related to hiring additional caseworkers and supervisors are resulting in lower caseloads for DFCS' workers, which means better care for Mississippi's children. The strides taken by Defendants, though minimized by Plaintiffs, evidence Defendants' strong commitment to reducing high caseloads.

Finally, although Defendants have made significant progress in increasing staff, Defendants are continuing to ramp up and improve their efforts to recruit and retain a well-qualified workforce. During the Bridge Period, Defendants developed a Recruitment and Retention Plan that details Defendants' strategy for recruiting and retaining sufficient DFCS staff to comply with the caseload requirements in the Settlement Agreement. (Bridge Plan Report at 60). While Defendants concede that the Plan still needs refinement, the Plan is currently being revised and expanded by the new Director of Professional Development, who was just recently

hired near the end of the Bridge Period.  (Bridge Plan Report at 60-61). This Director will oversee DFCS staff recruitment and retention, training for DFCS staff, and the implementation of a learning management system for DFCS.  (Bridge Plan Report at 61).

The new Director of Professional Development has already hit the ground running and is currently creating a professional development work plan that is expected to be completed in December 2010.  (*Id.*).  Revisions and enhancements to the Recruitment and Retention Plan will be integrated into this work plan.  (*Id.*).  This broader scope, comprehensive plan will not only address the recruitment and retention of DFCS staff, but also the pre-service and in-service training programs for DFCS caseworkers and supervisors that are contemplated in the Settlement Agreement.  (*Id.*).

### D.  DFCS Caseworkers Have Access to Necessary Resources

#### 1.  DFCS Policy is Being Revised and a New Policy Director has been Retained by DFCS

During the Bridge Period, Defendants made significant strides in addressing and modifying DFCS policy, especially considering that the modification of policy is a fluid and time-consuming process.  Defendants filled the Policy Director position, revised and expanded two significant sections (Protection and Permanency) of the DFCS Policy Manual, and developed a schedule for the revision of the other sections of the DFCS Policy Manual.  (Bridge Plan Report at 37-38).   When discussing the newly developed Protection section of the DFCS policy manual, the Court Monitor stated that it "represents a significant improvement," "incorporates central requirements of the Settlement Agreement as well as recommendations that were made by CSF as a result of the foster care services assessment" and "is consistent with the training curriculum for maltreatment investigations that was developed during the Bridge Period."  (*Id.* at 38).  While Defendants recognize that additional revision to the Protection

section is necessary, Defendants are continuing to refine the section and will provide the updated version to the Court Monitor for review and comment.

Defendants also completed the Permanency section of the DFCS policy manual (Bridge Plan Report at 38-39) which is over 150 pages in length and addresses DFCS policy related to foster care.  However, much like the Protection section, Defendants acknowledge that additional amendments and editing of the Permanency section would be beneficial.  (*Id.* at 39).  As a result, Defendants are continuing to make revisions to this section and will submit a revised version to the Court Monitor for further review and comment.  (*Id.*).

In addition to revising and expanding DFCS policy, Defendants created 8 Practice Guides[13] and a Supervisory Protocol to supplement DFCS policy.  (*Id.* at 34).  According to the Court Monitor, the practice guides and supervisory protocol "are comprehensive, interconnected, and well thought out" and "will serve as an invaluable resource for DFCS caseworkers and supervisors alike."  (*Id.* at 36).  They present "concise guidance on expected outcomes, applicable requirements and mandated caseworker and supervisory responsibilities in each of the practice areas" and "distill a complex body of legal requirements, harmonizing them with evidence-based standards for case practice."  (*Id.*).  In sum, the practice guides "will bolster [Defendants'] efforts to strengthen both the quality of case practice and workforce accountability systems."  (*Id.*).

---

[13] The eight practice guides addressed:  1)  Mobilizing Appropriate Services Timely, 2) Individualized Case Planning, 3) Strengths and Needs Assessments, 4) Assuring Safety and Managing Risk, 5) Preserving and Maintaining Connections, 6) Involving Children and Families in Case Activities and Decision Making, 7) Social Worker Visits, and 8) Working with the Educational System.

2.  <u>Plaintiffs' Mention of Caseworkers Working in Cramped Trailers is a
    Mischaracterization and a Low Blow</u>

Plaintiffs allege in a footnote in their Memorandum that the Court Monitor reported "caseworkers in some counties share cramped trailers that do not meet minimum professional standards…." (Memorandum at 21, n. 7).  The truth of the matter is that DFCS caseworkers in only 1 of the State's 82 counties work out of trailers. (Woodruff Aff. at 3-4).  That county is Hancock County and the caseworkers there have been operating out of two trailers for the last few years because the county office building was destroyed by Hurricane Katrina, a fact Plaintiffs conveniently neglect to mention. (Period 2 Monitoring Report at 64, n. 221).  DFCS is one of many agencies in Hancock County, the Mississippi county most profoundly affected by Hurricane Katrina, that are still forced to operate out of trailers as recovery efforts continue and the thousands of buildings that were destroyed are rebuilt.

Furthermore, pursuant to Miss. Code Ann. § 43-1-9, it is the county boards of supervisors that are responsible for providing space for DFCS county office staff, not Defendants.  MISS. CODE ANN. § 43-1-9 (2010).  Thus, Defendants have little to no control over the physical space provided by each county board of supervisors for the DFCS county staff in each respective county.  Nevertheless, DFCS has been monitoring and encouraging progress in Hancock County and plans for a new county building in Hancock County have been finalized.  The new building is expected to be completed in 2012.  (Woodruff Aff. at 4).

The fact that Plaintiffs would even point out and rely on the physical conditions in Hancock County, a county that was practically wiped off the earth, demonstrates that Plaintiffs are intent on painting Defendants in a bad light and *not* painting the whole picture.

### 3. Caseworkers and Supervisors have Access to Computer Services

Defendants worked diligently during Period 2 to improve access to computer services for DFCS staff.  In order to accurately determine what needs existed, the MACWIS unit surveyed county office staff in November 2009 to determine the location and number of staff who did not have their own computers.[14]  (Period 2 Monitoring Report at 60).  According to the survey, 11% of users in the county offices did not have their own computers.  (*Id.*).  Based on the findings of the survey, DFCS distributed computers to the counties that reported a shortage.  (*Id.*).

Additionally, in 2010, DFCS replaced its outdated computers with newer, updated models.  (*Id.*).  From January 2, 2010, through June 28, 2010, all computers in 26 counties were replaced with newer V90 model Wyse terminals. (*Id.*)  From June 28, 2010, through September 24, 2010, all computers in the remaining 56 counties were replaced with newer V90 model Wyse terminals.  (*Id.*).  A recent inventory count was completed at the end of this project to determine how many V90 Wyse terminals DFCS has left. (*Id.*)  This inventory count yielded approximately 112 V90 Wyse terminals left to be used as replacement terminals or as needed for new hires. (*Id*.).  Plans are to always maintain a minimum of 25 backup Wyse terminals at all times.  (*Id. see also* Affidavit of Cindy Greer attached to Response as Exhibit "R").

### 4. MACWIS Login and Connectivity Problems Have Been Addressed

Largely due to the dramatic increase in the number of caseworkers and staff, login and connectivity problems with MACWIS developed and worsened as more and more of the newly hired caseworkers and staff were given access to the system.  As a result, in January 2010, Defendants hired a vendor who began working with MACWIS staff to analyze and resolve

---

[14] It is important to note that the Period 2 Implementation Plan simply requires that DFCS shall provide all county staff with "*access* to basic computer services, consisting of access to MACWIS, word processing and electronic mail." (Period 2 IP § I.5.a.).  Nowhere in the Implementation Plan does it require that all staff have their own computers and "access" is not defined as meaning that each staff member must have their own computer.

statewide issues concerning printing, email, and system login problems. (Greer Aff. at 2).  With the assistance of the vendor, the printing and email issues were resolved in March 2010.  (*Id.*).

In early April 2010, after further infrastructure and server analysis, the vendor made recommendations to address the system login and connectivity issues and began work on the MACWIS Citrix Server farm in May 2010 in an effort to resolve the login problems.  (*Id*. at 3.).  The work plan for the MACWIS Citrix server farm consisted of: 1) adding two additional login servers to the server farm which would allow users to be split among three servers for login purposes; (Previously all users were funneling through one login server. With the additional staff added by DFCS, one server became inadequate, hence the login/connectivity issues.)  2) purchasing additional hard drives to add to the login servers for more capacity; (Four hard drives were required to provide maximum capacity for the three login servers.)  3) restructuring the SAN Storage space to accommodate DFCS' needs; 4) re-purposing of two additional servers to add to the Citrix server farm; and 5) converting from roaming profiles to local profiles for state office users only.  (*Id.*).

During the period of May 10, 2010 through July 19, 2010, the vendor completed moving all DFCS users to the newly designated login servers. (*Id.*).  User connectivity and login times improved drastically statewide due to the finalization of this project.  (*Id.*).  Additional network SAN storage space was also configured for DFCS, and state office user profiles were reconfigured from 'roaming' (which requires more server resources that could be freed up for field staff users) to 'local' (which requires less server resources).  (*Id.*).

In July 2010, the MACWIS Unit also coordinated an upgrade of the version of Citrix software running on the server farm from version 3.0 to version 4.5.  (*Id.*).  Along with this upgrade, additional Citrix licenses were purchased, as additional licenses were needed for the

additional DFCS staff that had been hired. (*Id.*).  After much preparation and MACWIS application testing by the DFCS programming staff to ensure that MACWIS was compatible with Citrix 4.5, the vendor, with assistance from DFCS staff, began the process of rebuilding each Citrix server, installing the new Citrix 4.5 version.  (*Id.*). As of November 24, 2010, all production Citrix servers used daily by DFCS users have been upgraded from Citrix Version 3.0 to Citrix Version 4.5 and 3 additional servers were also added to the Citrix server farm for a total of 23 Citrix servers to support DFCS staff statewide.  (*Id.* at 4).  As a result, there are currently 1672 Citrix licenses available for DFCS staff, more than enough to accommodate all DFCS users. (*Id.*).

### E.  Defendants are Taking Steps to Address MACWIS

Nine years have passed since DFCS' Mississippi Automated Child Welfare Information System ("MACWIS") was created and deployed state wide.  Since that time the system has been modified and enhanced extensively in order to meet new and changing requirements.  The system is now near the end of its life cycle and is not compatible with the more-advanced internet and web-based applications of today.  Thus, in order to better track the outcome-based Settlement Agreement terms, MACWIS must be upgraded or replaced.  (Greer Aff. at 4).

In consideration of these issues, DFCS sought a knowledgeable and experienced MACWIS Director to lead the task of improving MACWIS.  DFCS had difficulty recruiting such a candidate at the position's salary.  (Thompson Aff. at 2).  As a result, DFCS made a request to the State Personnel Board to upgrade the MACWIS Director position.  (*Id.*).  The State Personnel Board granted DFCS' request, and on September 1, 2009, Cynthia Greer began work as the new MACWIS Director.  (Period 2 Monitoring Report at 17).  Ms. Greer, who the Court Monitor called "well-qualified," is an information systems project manager who has worked many years

in designing and managing databases. (*Id., see also* Resume´ of Cynthia Greer, attached to Response as Exhibit "S"and Greer Aff. at 1 ). Just prior to being recruited by DFCS, Ms. Greer worked at Mississippi Division of Medicaid on development of web applications needed for meeting the terms of a reform lawsuit. (Period 2 Monitoring Report at 25, *see also* Greer Aff. at 1).

The Period 2 Implementation Plan required that by May 1, 2010, DFCS release a request for proposals (RFP) for a comprehensive MACWIS analysis. (Period 2 Implementation Plan [Doc. 487] at 12, No. C). The selected vendor is to analyze MACWIS and its ability to perform the computer functions required by §II.A.5.a of the Settlement Agreement and provide recommendations of remedial efforts necessary to enable MACWIS to perform those Settlement Agreement requirements. (*Id.*). The analysis will also result in a recommendation regarding whether the system should be modified or replaced with another system, and if replacement is necessary, whether a federally-compliant system from another state should be used or another replacement option. (MS Dept. of Information Technology Services, RFP No. 3583, §VII.6.1.1.1., attached to Response as Exhibit "T").

Shortly after being hired by DFCS, Ms. Greer drafted a new RFP for the MACWIS analysis. (Greer Aff. at 4). Since Plaintiffs had been critical of some of Defendants' RFPs in the past, in a step of good faith Defendants sought Plaintiffs' input on the new MAWCIS analysis RFP, as well as another RFP that DFCS had drafted. Although Plaintiffs now contend in their Motion that Defendants were "unable to draft a single acceptable Request for Proposal (RFP) necessary to develop DFCS capacity," Plaintiffs complimented DFCS on the MACWIS analysis RFP and the other RFP. (March 9, 2010 Email from Shirim Nothenberg to Kenya. Rachal, attached as Exhibit "U"). With regard to the RFPs, Plaintiffs' counsel noted, "[w]e think they

both look very strong". (*Id.*)   After reviewing the RFPs, Plaintiffs' counsel provided a few comments, which they termed "very minor suggestions." (*Id.*).

Due to a myriad of factors, the MACWIS RFP was not released during Period 2.  As a result, the parties agreed that the release of the MACWIS analysis RFP by September 1, 2010, would be a requirement under the Bridge Plan.  (Bridge Plan at 2, No. 5).  Because federal funding will be used to subsidize certain costs associated with the MACWIS analysis, the RFP had to be approved by the U.S. Department of Health and Human Services ("HHS"), Administration for Children and Families ("ACF").  (Bridge Plan Report at 21).  On July 27, 2010, ACF approved the release of the MACWIS RFP and DFCS released the RFP on that same day. (Greer Aff. at 5).  Proposals in response to the RFP were due by September 15, 2010.  (RFP No. 3583 at 1).

Defendants have evaluated the proposals and a vendor has been recommended.  (Greer Aff. at 5).  As part of the state contracting requirements, this recommendation must be reviewed and approved by the Mississippi Department of Information Technology Services ("MDITS") Board.[15]  The recommendation will be presented for approval at the December MDITS Board Meeting.  (*Id*).  Upon obtaining MDITS Board approval, the contract may be negotiated. (*Id.*).  The proposed contract then must be sent to ACF for additional review and approval. (*Id.*).  Without ACF's approval, the development costs will not be matched.  (*Id.*).  Because of the numerous levels of approval required, DFCS anticipates that the contract will be finalized in January or February 2011. (*Id. see also* Bridge Plan Report at 18).

---

[15] MDITS is not a part of MDHS-DFCS.  Pursuant to MISS. CODE Section 25-53-5, MDITS is the state authority on acquisition of information technology, computer equipment, and related technological services.  All State agency released requests for proposals and contracts for technological services must be approved by MDITS.

In Spring 2010, CSF and DFCS generated a list of data indicator reports that would be essential to the initial implementation of the Practice Model. (Greer Aff. at 5). As a part of the Bridge Plan, reports on these and additional data indicators regarding core DFCS operations were produced to Plaintiffs and the Court Monitor. (Bridge Plan Report at 18-19). These reports were modified and, in some cases, developed during the Bridge Period. (*Id.*). In compliance with the Bridge Plan, Defendants timely produced these reports. (Bridge Plan Report, Ex. 4). As acknowledged by the Court Monitor, this was a tremendous amount of work in a relatively short period of time. (Bridge Plan Report at 21).

During and following the Bridge Period, Defendants have continued to make progress regarding data. Technical assistance bulletins have been issued notifying users of changes to the MACWIS system. (Bridge Plan Report at 23, n. 78 and Greer Aff. at 6). In addition to the MACWIS hires made during the Bridge Period, DFCS has recruited additional employees for MACWIS positions. (*Id.*). Defendants are also continuing to move forward with CSF in the development of the next phase of data indicator reports. (Greer Aff. at 6).

F.  Defendants Are Actively Developing Additional Placement Options and Improving Placement Case Practice

In order to determine what placements were currently available for children in DFCS custody and what additional placement options were needed, DFCS contracted with CSF in 2009 to perform a Foster Care Placement Assessment. The Placement Assessment, a Period 2 requirement completed in October 2009, found that an additional array of placements should be developed in order to provide the optimum level of care for children in custody and that there is room for improvement in DFCS' placement case practice.[16] After analyzing and evaluating the

---

[16] In their Memorandum, Plaintiffs rely on the findings from the Foster Care Placement Assessment to support their contention that Defendants should be held in contempt because "Plaintiff children continue to suffer the same systemic problems caused by the lack of array and oversight of foster care placements that existed pre-settlement."

recommendations contained in the Placement Assessment, Defendants are working diligently to address the needs identified in the Assessment.

As part of the Bridge Plan, on September 1, 2010, Defendants produced a Resource Development Plan that laid out a plan for implementing the recommendations in the Placement Assessment, with specific focus given to the recruitment and retention of therapeutic and non-therapeutic resource home placements. This Plan "identifies priority recommendations and action steps with corresponding timelines established predominantly within a one-year implementation" and "promote[s] management and staff accountability by assigning responsibility for overall implementation in each area to a specific executive team manager." (Bridge Plan Report at 40). Defendants are confident that the implementation of the steps contained in this Resource Development Plan, along with the recent hiring of a new Resource Development Director, will lead to an improvement of placement quality.

Moreover, because Defendants recognized the need to continue to increase the array and quality of placement options, Defendants sought a grant from the Children's Bureau, a division of the United States Department of Health and Human Services, for recruiting and retaining foster and adoptive families. Defendants were recently notified that Mississippi is 1 of 7 grantees to receive a multi-year grant from the Children's Bureau that will provide additional financial resources and technical assistance to engage in statewide recruitment and retention activities. (Letter and attachments from C. Anderson to D. Thompson, attached to Response as

---

(Memorandum at 22). This tactic by Plaintiffs is surprising and, quite frankly, inappropriate.

Defendants were required under the Period 2 Implementation Plan to conduct Foster Care Assessments in conjunction with an independent consultant, including a placement assessment. For Plaintiffs to now use the findings of the assessment, an assessment that Plaintiffs required Defendants to complete in order to be in compliance with the Period 2 Implementation Plan, against Defendants is simply unfair. The purpose of the assessments was for DFCS to accurately access what problems and needs existed so DFCS could then develop plans and strategies for addressing the needs. The assessments were not intended to be a vehicle for Plaintiffs to prove that Defendants should be held in contempt, using the needs identified in the assessment as evidence that Defendants are not meeting their obligations under the Settlement Agreement.

Exhibit "V.").  The 5-year, $2,000,000 grant will support DFCS' effort to target families to care for children who wait longest for permanency, such as large sibling groups, sexually abused/acting out children, pregnant teen mothers, and children with physical, mental and/or behavioral problems.  The grant will also give DFCS the financial wherewithal to effect genuine change and improvement in the quality and array of placements and "serve as a catalyst in the implementation process related to the resource development plan for recruitment and retention of resource home placements."  (Bridge Plan Report at 41).

    1.   Plaintiffs Ignore Data Produced During the Bridge Plan that Reflects Defendants are Making Strides in Placement Stability

Although Plaintiffs pick and choose to use certain data produced during the Bridge Plan to support their contentions that Defendants should be held in contempt, they conveniently ignore data produced during the Bridge Plan that indicates Defendants are meeting their obligations under the Settlement Agreement and making substantive improvements.  Placement Stability is a prime example.  Plaintiffs neglect to mention that, according to data for May, June, and July 2010, Defendants far exceeded the Period 2 "Outcome Measure" for placement stability.

In the Settlement Agreement, the Outcome Measure assessing "Number of Placements," i.e. placement stability, requires

By the end of implementation Period 2:

In the last year, at least 40% of children in care less than 12 months from the time of latest removal from home shall have had two or fewer placements.

(Settlement Agreement at 36, §III.C.2). According to data produced, Defendants well exceeded the 40% requirement in May (67%), June (68%), and July (72%).  (Bridge Plan Report, Ex. 4 at 4).  These numbers reflect Defendants' efforts to provide children in custody with placement stability.  Defendants anticipate continued improvement in the near future, as Defendants

increase the array of placements with the help of the Children's Bureau grant and implementation of the resource development plan.

<u>2.  Defendants Have Begun Licensing Relative Placements and Have a Timeline for Licensing the Remaining Unlicensed Relative Placements</u>

In their Motion, Plaintiffs allege that "Defendants continue to place children in unsuitable and potentially dangerous environments and to move them from one impermanent placement to another," and rely on selective data produced during the Bridge Plan to evidence this salacious claim.  (Memorandum [Doc. 512] at 23).  For example, Plaintiffs insinuate that because 12% of children in custody are living in placements that DFCS never licensed, these placements are "unsuitable and potentially dangerous" and the children are at risk. (*Id.*).   This is simply not true.  These are relative placements, with the vast majority being court-ordered, a situation in which a child who is taken into custody is placed with a relative, the most natural placement for a child who has to be taken into custody.  As one would expect, these relatives are not licensed foster parents because they were not anticipating becoming a foster parent until their relative was taken into custody.  However, even though the relative is not licensed prior to the child being placed in the home, the home is screened, a safety check is conducted, and background checks are run on everyone 14 or older living in the home before the child is placed in the relative's home. (DFCS Policy Manual, §F, p 4515, attached to Response as Exhibit "W").

As part of the Period 2 Plan, Defendants agreed to develop and implement an expedited licensing process for relative placements so that relative placements could become licensed resource homes within 60 days of the child being placed in the home.  (Period 2 Implementation Plan at 33).  Unable to get this accomplished during Period 2, Defendants agreed to finalize the expedited licensing process for relative placements, develop a timeline for the licensure of all

relative placements, and begin licensing relative placements during the Bridge Period.  (Bridge Plan at 3-4, 7.f.).

In her report, the Court Monitor found that "[D]efendants began to implement the expedited licensure process during the Bridge Period" and "[l]icensure-related activities intensified during August 2010, after the Field Operations Director and child welfare practice specialist were hired" in early August 2010.  (Bridge Plan Report at 50).  "The Field Operations Director has made implementation of the expedited relative licensure requirement an operational priority."  (*Id.*).  She has created a viable tracking system to hold managers and their staff responsible for ensuring that relative placements are timely licensed or that the children in the home are moved to a licensed placement if the relative placement cannot meet the necessary requirements.  (*Id.*).  The recently hired child welfare practice specialist is also working to see that the relative licensure requirements are implemented.  (*Id.*). Pursuant to the schedule produced by Defendants, all relative homes are to be licensed by May 30, 2011. (DHS 286694-286706, attached, under seal, to Response as Exhibit "X").

### 3. Plaintiffs' Contentions Regarding Other Data Elements Are Misleading

Plaintiffs contend that during the 30-day period ending August 23, 2010, "close to 400 children had been placed in a shelter at least twice." (Memorandum [Doc 512] at 23).  This is simply not true.  The report that Plaintiffs relied on for this figure tracks the number of times that a child has been placed in a shelter/temporary placement *since the child came into custody*, not the number of times a child has been placed in a shelter in the past month.  (DHS 285942-286024, "Children in Custody with 2 or More Emergency or Temporary Placements", attached, under seal, to Response as Exhibit "Y.")  This is a very important distinction.  In reality, only 57 children in DFCS custody were in a shelter in July 2010 and none of them were placed in a

shelter more than one once during that time period.  (*Id.*).  Plaintiffs' mischaracterization is just

another attempt to paint Defendants in a bad light and mislead this Honorable Court.

Finally, Plaintiffs contend that almost 750 children have experienced an average of five

or more placement moves during their time in DFCS custody.  Defendants believe it is important

to point out that of those children who have come into custody since January 2008 (the time the

Settlement Agreement was signed), 322 children have experienced an average of five or more

placement moves during their time in custody. (DHS 284922-285200 – "Number of Children in

Foster Care By Placement Type," attached, under seal, to Response as Exhibit "Z").  Defendants

believe it is only appropriate they be judged on the state of affairs since the Settlement

Agreement was entered into, and not before.

### 4.  Defendants are Taking Steps to Improve Reunification, Adoption, and Permanency Services and Case Practice

#### a.  Data produced during the Bridge Plan and Ignored by Plaintiffs Reflects That Defendants are Meeting or Exceeding Many of the Period 2 Requirements that Evaluate Reunification, Adoption and Permanency

The Settlement Agreement contains an Outcome Measure that deals specifically with

Reunification. The Settlement Agreement requires

> By the end of implementation Period 2:
>
> At least 30% of children who are discharged from custody and reunified with
> their parents or caretakers in the last year shall be reunified within 12 months of
> the latest removal from home.

(Settlement Agreement at 36, § III.A.2).  According to the data produced during the Bridge Plan,

Defendants are far exceeding this requirement.  Defendants were at 70% for the month of June

and 71% for the months of July and August, more than twice the required 30%.  (Bridge Plan

Report at Ex. 4, pg. 2).

The timely termination of parental rights is an important element of achieving adoption and permanency for children in custody.  With regard to the termination of parental rights ("TPR"), the Settlement Agreement requires

By the end of implementation Period 2:

At least 40% of children in custody reaching the point at which they have spent 15 of the last 22 months in foster care during the Period shall have a petition for TPR filed on their behalf on an available exception under the federal ASFA documented by the end of their fifteenth month in care.

(Settlement Agreement at 16, §II.B.3.e.3.).  According to the data produced during the Bridge Plan, Defendants are meeting this requirement.  Defendants were at 45% in May 2010, 48% in June 2010, and 46% in July 2010.  (Bridge Plan Report at Ex. 4, pg. 6).

The data indicates Defendants are also performing at almost twice the required percentage in the time to adoption finalization.  The Outcome Measure addressing adoption in the Settlement Agreement requires

By the end of Implementation Period 2:

At least 15% of children who were discharged in the last year upon finalization of an adoption shall have had the adoption finalized within 24 months of the latest removal from home.

According to the data collected during the Bridge Plan, Defendants were at 31% in June 2010 and 34% in July 2010.  (Bridge Plan Report at Exhibit 4, pg. 2).

The data reflects Defendants are also performing better than required in seeing that children in custody are having their annual and semi-annual court reviews and permanency hearings.  The Settlement Agreement requires

By the end of Implementation Period 2:

At least 50% of children in custody at least 12 months during the Period shall have had a timely annual court review consistent with Plan requirements during the Period.

(Settlement Agreement at 14, §II.B.3.c.4). According to data produced during the Bridge Plan, Defendants were at 65% in July 2010. (Bridge Plan Report at Exhibit 4, pg 2). With regard to semi-annual case reviews, the Settlement Agreement requires

> By the end of Implementation Period 2:
>
> At least 50% of children in custody at least six months during the Period shall have a timely court or administrative case review consistent with Plan requirements during the Period.

Data produced during the Bridge Period indicated Defendants were at 94% in June 2010 and 95% in July 2010, well exceeding the 50 percent requirement for Period 2 (Bridge Period Report at Exhibit 4, pg. 3)

Tellingly, in their Motion, Plaintiffs fail to mention any of this data, which indicates Defendants are doing better than required on many key data indicators addressing adoption and permanency. In particular, the data indicators regarding "Reunification" and "Time to Adoption Finalization" that were ignored by Plaintiffs are 2 of the 4 "Outcome Measures" that are set-off in a separate section near the end of the Settlement Agreement. (Settlement Agreement at 36-38, §III.A-D).

Plaintiffs are asking that this Court find Defendants in contempt and appoint a receiver without giving the Court a fair appraisal of Defendants' efforts and achievements. It appears Plaintiffs are more interested in litigation than working with Defendants to ensure that children are receiving adequate care.

      b.  <u>Defendants Are Making Efforts to Improve Case Practice and Outcomes Related to Termination of Parental Rights, Reunification, Adoption, and Independent Living</u>

During Period 2, Defendants engaged CSF to undertake assessments of its reunification, termination of parental rights, and independent living services. As contemplated, the

assessments recognized deficits and provided recommendations for corrections of the identified deficits. In order to address the needs identified in the reunification assessment, Defendants developed a statewide resource plan on reunification services. (Bridge Plan Report at 39-40). This plan contains definitive timelines and will be used by Defendants to develop additional resources which will result in substantive progress in improving reunification services.

The implementation of the recommendations contained in these assessments and the resource plan will be managed by the new Foster Care/Adoption Unit Director, who was recently hired by DFCS as part of the Bridge Plan. (Bridge Plan Report at 49). The new Director has over 20 years of "substantial casework, administrative and supervisory experience in licensure and adoption." (Bridge Plan Report at 49).

Since being hired, the new Director has already begun to make significant improvements, including restructuring DFCS' Adoption/Resource Unit and adding more staff. (Woodruff Aff. at 4). The Unit is currently in the process of filling the position of Program Administrator, Senior. (Woodruff Aff. at 4). This person will serve as a liaison between County staff and State Office staff and will assist in the resource development for all resource homes, train resource staff as needed, assist with statewide recruitment of resource homes, and implement procedures and protocols in the Resource Unit to bring about uniform case practice throughout the state. (Woodruff Aff. at 4). Additionally, the Unit is currently taking applications for two Family Protection Workers who will be primarily designated for recruitment of resource homes, with one designated as a teen-focused recruiter and the other as a media-focused recruiter. (Woodruff Aff. at 4).

In an effort to increase the number of adoptions and improve DFCS case practice related to permanency and adoption, DFCS Resource Supervisors attended Adoption Competency

Training conducted by the National Resource Center for Adoption on May 24-26, July 14-16, and September 1-3, 2010.[17] (Woodruff Aff. at 4).  The training's comprehensive curriculum included the latest research in adoption practice, addressed the most important issues in the adoption of children/youth in the child welfare system, and focused on the challenges that occur when the child/youth is transitioning from foster care to adoption. (Woodruff Aff. at 4)

In addition to the Adoption Competency Training, DFCS partnered with Casey Family Programs[18] to host the 2010 Permanency Summit in November 2010.  (Woodruff Aff. at 4). All DFCS Resource Supervisors, Area Social Worker Supervisors, and Regional Directors attended the Permanency Summit, along with a number of Youth Court judges and stakeholders. (Woodruff Aff. at 4).  The Summit focused on the importance of permanency, the current state of permanency in Mississippi, family centered practice, Mississippi's new Practice Model, concurrent planning, and how to increase permanency for children in Mississippi going forward. (Woodruff Aff. at 4-5).

Finally, Defendants also developed and finalized Practice Guides that will improve case practice on reunification.  These Practice Guides entitled "Preserving and Maintaining Connections" and "Involving Children and Families in Case Activities and Decision Making" are being further enhanced and will be distributed to caseworkers and included in the Practice Model implementation.  (Bridge Plan Report Exhibits 21 and 22).

---

[17] The National Resource Center for Adoption is a service of the Children's Bureau.  The mission of the National Resource Center for Adoption is to assist States, Tribes and other federally funded child welfare agencies in building their capacity to ensure the safety, well being, and permanency of abused and neglected children through adoption and post legal adoption services program planning, policy development and practice.  For more information regarding the National Resource Center for Adoption, see www.nrcadoption.org.

[18] Casey Family Programs is the nation's largest operating foundation focused entirely on foster care and improving the child welfare system. Founded in 1966, Casey works to provide and improve ─ and ultimately prevent the need for ─ foster care in the United States.  For more information regarding Casey Family Programs, *see* www.casey.org.

G. Defendants are Addressing Maltreatment Investigation and Training Deficits

In response to the Safety Assessment conducted by CSF during Period 2 that identified limitations in DFCS' maltreatment investigation process, Defendants, with the help of CSF, developed a training curriculum that focused on how to conduct maltreatment investigations, how to develop a safety plan, and how to implement a safety plan.  (Bridge Plan Report at 24). The finalization of this curriculum and the training of all caseworkers involved in maltreatment investigations were incorporated as requirements under the Bridge Plan.   (Bridge Plan at 2, 7.b.).

The Court Monitor described the maltreatment investigation training curriculum as "well-designed and comprehensive."  (Bridge Plan Report at 25). The curriculum included "detailed instruction on a revised safety assessment tool, a new safety plan, a revised risk assessment instrument, interviewing, and investigative protocols and practices" and "provided guidance on how to assess and monitor child safety and risk on an ongoing basis for all children within a home." (*Id.*).

In an effort to be proactive and in genuine commitment to improving maltreatment investigations, Defendants elected to provide the maltreatment investigation training to all caseworkers, and not just to caseworkers who conduct maltreatment investigations.  (Bridge Plan Report at 26).  Additionally, because the curriculum was expansive and included the roll-out of a new safety plan and a revised safety and risk assessment, Defendants concluded that all DFCS supervisors and regional directors should also receive the training during the Bridge Period. (*Id.*).  The net result was over 700 DFCS staff members being trained in a span of just 5 weeks. (Bridge Plan Report at 4).

Defendants are confident that the intensive training on maltreatment investigations will lead to significant improvements in the quality of investigations.  Defendants will continue to

enhance training for DFCS caseworkers under the guidance of the Director of Professional Development, a recent Bridge Period hire, who will oversee training for DFCS staff and the implementation of a learning management system. (Bridge Plan Report at 61).

As noted above, the new Director is creating a professional development work plan scheduled for completion in December 2010. (*Id.* at 62). This work plan will guide the improvement of the pre-service and in-service training programs for DFCS caseworkers and supervisors that are contemplated in the Settlement Agreement. (*Id.*).

> H. Defendants Have Obtained a Significant Increase in State Funding and Are Also Taking Steps to Improve Fiscal Practices and Maximize Federal Funding

During State Fiscal Year ("FY") 2008, the Mississippi Legislature appropriated $26,293,499.00 to DFCS for foster care. (Thompson Aff. at 2). By FY 2011, the Mississippi Legislature appropriated $46,957,982.00 to DFCS for foster care. (Thompson Aff. at 3). No other factor is a greater confirmation of Defendants' dedication to complying with the Settlement Agreement. While the State of Mississippi has suffered through its greatest budget crisis since the Great Depression and funding for virtually every state agency has been reduced, Defendants successfully persuaded the Mississippi Legislature to almost double the annual funding of DFCS over the last 3 years. This fact alone directly reflects Defendants' commitment to reforming Mississippi's child welfare system.

Further, Defendants also acknowledge that increasing federal funding is important and would lessen the State's financial burden. During Period 2, Defendants were to contract with an independent consultant to conduct an assessment of actual federal funding levels and develop a plan to establish the resources and infrastructure necessary to maximize the amount of federal funds received. (Period 2 Implementation Plan §1.7.a). Accordingly, Defendants issued an RFP related to the assessment on March 22, 2010. (Period 2 Monitoring Report at 68). However, at

the time the RFP was issued, Bridge Plan negotiations were underway and "in order to promote efficiencies and maximize the efficacy of the assessment, the Court Monitor suggested that the parties consider incorporating the assessment into the technical assistance addressed by the Bridge Plan." (*Id.*). The parties followed the Court Monitor's suggestion and the Bridge Plan included the requirement that Defendants modify their contract with CSF to include the federal fiscal assessment by September 1, 2010. (Bridge Plan at 2, ¶5).

The contract between Defendants and CSF for the fiscal assessment and the related plans was finalized in August 2010 and was effective as of September 1, 2010. (Bridge Plan Report at 16). CSF has subcontracted with Hornby Zeller,[19] an organization with substantial expertise in financial/fiscal assessment, and the following activities will be performed under the contract: 1) assess MDHS/DFCS policies, procedures and practices that relate to or impact securing, increasing and/or maximizing federal funding/reimbursement; 2) analyze federal funding/ reimbursement that has been received, as well as anticipated levels of funding/reimbursement, 3) analyze practices and fiscal policies, and 4) develop recommendations as well as an implementation plan related to revenue maximization. (Bridge Plan Report at 16). The assessments began in September and the implementation plan related to revenue maximization is to be completed on or before April 30, 2011. (Bridge Plan Report at 16).

## VII. JUDICIAL PRECEDENT DOES NOT SUPPORT THE APPOINTMENT OF A RECEIVER

Pursuant to its equity jurisdiction, a federal court has the power to take remedial action to effectuate compliance with its orders and this power includes the power to appoint a receiver. *Morgan v. McDonough*, 540 F.2d 527, 533 (1st Cir. 1976). The decision to appoint a receiver is one of reasonableness under the circumstances. *Shaw v. Allen*, 771 F. Supp. 760, 762 (S.D. W.

---

[19] For more information regarding Hornby Zeller, visit their website at http://hornbyzeller.com.

Va. 1990). The most significant factor in determining whether the appointment of a receiver is appropriate is whether any other remedy is likely to be successful. *Shaw*, 771 F. Supp. at 762; *see also Bracco v. Lackner*, 462 F.Supp. 436, 456 (N.D. Cal. 1978) (holding that a receiver is a "remedy of last resort; a receiver should not be appointed if a less drastic remedy exists"); *Petitpren v. Taylor Sch. Dist.*, 304 N.W.2d 553, 557 (Mich. App. 1981) (finding that the appointment of a receiver is appropriate only when "other approaches have failed to bring compliance with a court's orders, whether through intransigence or incompetence.").

In evaluating whether the appointment of a receiver is the only remedy left for the court, the court should consider whether there were repeated failures to comply with the court's orders, whether continued insistence that compliance with the court's orders would lead only to confrontation and delay, if there is a lack of sufficient leadership to turn the tide within a reasonable time period, whether there was bad faith, and whether resources are being wasted. *Dixon*, 967 F. Supp. at 550.

While Plaintiffs insinuate that courts are not hesitant to appoint receivers to operate state or local agencies, this contention is not supported by the precedent offered by Plaintiffs. The common thread in the cases presented by Plaintiffs is that the appointment of a receiver was a decision that was not taken lightly and was implemented only after long and careful deliberation. For example, in *Dixon v. Berry*, the court found that its use of a "remedy of last resort" was warranted because the District of Columbia had been unable to comply with the court's orders for 17 years, the court had "tried every conceivable remedy," and the actions of the District in evading the court's prior orders supported a finding of bad faith. 967 F. Supp. 535, 554 (D.D.C. 1997). In *Petitran v. Taylor Sch. Dist.*, the court explained that "the appointment of receiver is a harsh remedy which should only be resorted to extreme cases" and held that "while there are

undoubtedly circumstances where judicial interference on such a scale is warranted," the case record failed to establish that a receiver was warranted. 304 N.W.2d at 559.  A comparable line of reasoning is apparent in each of the remaining cases cited by the plaintiffs. *Glover v. Johnson*, 934 F.2d 703, 714 (6th Cir. 1991) (requiring the Department to hire a special administrator to bring Department into compliance with court's order was appropriate because the Department was given ample opportunity during the last 10 years to comply with the court's order); *Morgan v. McDonough,* 540 F.2d 527 (1st Cir. 1976) ("Obviously the substitution of a court's authority for that of elected and appointed officials is an extraordinary step warranted only by the most compelling circumstances.");   *LaShawn A. v. Kelly,* 887 F.Supp. 297, 299 (D.D.C. 1995) (appointing a receiver 4 years after the issuance of the court's order was appropriate because the remedial phase of the case had "been marked by repeated cycles of noncompliance and sluggish progress, frustration and requests for court intervention, promises to improve, and further noncompliance after a flurry of attempts to make short-term changes."); *Shaw v. Allen,* 771 F. Supp. 760, 762-63 (S.D. W.Va. 1990) (acknowledging that "the establishment of a receivership is an intrusive remedy which should only be resorted in extreme cases;" however a receivership was appropriate because the county jail had been in substantial noncompliance for almost 8 years and the court's deference and the 3 prior contempt proceedings had been to no avail); and *Gary W. v. State of La.,* No. 74-2412, 1990 WL 17537, at *28 (E.D. La. Feb. 26, 1990) (finding that a receiver was appropriate because "despite repeated efforts and an array or orders, conferences, and remedies undertaken by th[e] court over the past 15 years, the defendants still have not complied" with the court's orders).

In *David C. v. Leavitt*, the court refused to appoint a receiver over Utah's child-welfare system, despite the court's finding that the Utah officials had failed to comply with the

Settlement Agreement.  No. 93-C-206, slip op. (D. Utah March 17, 1997), attached to Response as Exhibit "A".  The court stated that "[t]here are few, if any, remedies within a federal court's arsenal more drastic than the appointment of a receiver to take over a state agency" and "[g]iven the reluctance of federal courts to encroach upon traditional state functions, receivership is a remedy of last resort, warranted only in the most compelling circumstances." (*Id.* at 24).  Thus, "for [the] court to fashion such a remedy, [p]laintiffs would have to show more than noncompliance with the [settlement agreement].  Plaintiffs would have to convince the court that [d]efendants are so incompetent or antagonistic as to be entirely unable or unwilling to comply with the [settlement agreement]."  (*Id.* at 25).  The court found that the plaintiffs failed to meet this extraordinarily high burden.  (*Id.*).  Although the monitoring reports found the defendants in noncompliance with many of the settlement agreement provisions, such findings did not "convince the court that the [d]efendants were unwilling or unable to correct the problems." (*Id.*). The court also explained that "[t]he problems of child-welfare are very complex, [d]efendants' task is large, and the recognition that to effectuate change requires time reflects no more than a healthy sense of realism." (*Id.* at 25).

The court also noted that the plaintiffs failed to show that the appointment of a receiver was the least intrusive remedy needed to ensure compliance with the settlement agreement.  (*Id.* at 28).  Since the court had not previously ordered other, less radical, enforcement, the court doubted that a receiver was the only way to ensure compliance.  (*Id.*).  The court also questioned "whether a receiver could implement the necessary changes any better or more expediently than the current management." (*Id.*).  Ultimately, the court found that despite plaintiffs' accusations that the defendants were acting in "bad faith," plaintiffs failed to evidence the "defendants' complete defiance to the settlement agreement or total incompetence that would convince the

court to conclude that the defendants are unwilling or unable to comply with the [settlement agreement.]" (*Id.* at 29). Thus, "[t]he drastic remedy of appointing a receiver [was] simply not justified." (*Id.*).

The drastic remedy sought by Plaintiffs of appointing a "general receiver with full authority to administer Mississippi's child welfare system" is not justified or warranted. (Plaintiffs' Motion [Doc. 511] at 47). Defendants have never been found to be in noncompliance with any Order of this Court, and, as is detailed above, Defendants have made in good faith all reasonable efforts to comply with their obligations. Under these circumstances, where no other, less drastic, remedy has ever been employed and Defendants are moving judicially toward compliance, it would be inappropriate to order the remedy of last resort, the appointment of a receiver.

## VIII. CONCLUSION

Plaintiffs clearly have not met their burden of proving that judicial interference on the scale of a finding of contempt or appointment of a receiver is appropriate and that another, less radical, remedy would be unsuccessful. In support of their contention that a finding of contempt is necessary and that a receiver should be appointed, Plaintiffs rely solely on their own attorney, Shirim Nothenberg, who contends that Defendants are failed managers. This is in stark contrast to child welfare expert Jerry Milner who describes Defendants as "a tremendous asset in leading the reforms that should not be underestimated" and believes Defendants have "chosen a strategy that will lead to reform of the system and compliance with Settlement Agreement." (Milner Ltr. at 3).

To find Governor Haley Barbour, Don Thompson, and Lori Woodruff in contempt and appoint a receiver at this point in the reform effort would be extremely detrimental and only

derail the "demonstrable progress" they made during Period 2 and the Bridge Period. They have made every effort to comply with the Settlement Agreement and also developed a Practice Model that "is designed to change practice and outcomes in ways that will outlast the Settlement Agreement rather than being a temporary, reactive response to the lawsuit." (*Id*. at 2). These Defendants deserve the opportunity to see their strategy and reform efforts through to completion.

WHEREFORE, Defendants move that this Court deny Plaintiffs' Motion for Contempt and for the Appointment of a Receiver.

Respectfully submitted, this the 3rd day of December, 2010.

/s/ Dewitt L. ("Rusty") Fortenberry, Jr.
Dewitt L. ("Rusty") Fortenberry, Jr. (MSB #5435)
Kenya Key Rachal (MSB # 99227)
Ashley Tullos Young (MSB # 101839)
BAKER, DONELSON, BEARMAN, CALDWELL
& BERKOWITZ, PC
4268 I-55 North
Meadowbrook Office Park
P.O. Box 14167
Jackson, Mississippi 39211
Telephone: (601) 351-2400
Facsimile: (601) 351-2424


Harold Pizzetta, III, Esq.
Assistant Attorney General
General Civil Division
Carroll Gartin Justice Building
430 High Street
Jackson, MS 39201
Telephone: (601) 359-3816
Facsimile: (601) 359-2003

## <u>CERTIFICATE OF SERVICE</u>

I, Dewitt L. "Rusty" Fortenberry, Jr., do hereby certify that on December 3, 2010, I electronically filed a true and correct copy of the foregoing document with the Clerk of court using the ECF system which sent notification of such to counsel as follows:

> Shirim Nothenberg (MBN 43990 *pro hac vice*)
> Marcia Robinson Lowry (MBN 43991 *pro hac vice*)
> Jessica Polansky (MBN 45356 *pro hac vice*)
> CHILDREN'S RIGHTS
> 330 Seventh Avenue, 4th Floor
> New York, NY 10001
>
> W. Wayne Drinkwater, Jr. (MBN 6193)
> BRADLEY ARANT ROSE & WHITE LLP
> 188 East Capitol Street, Suite 450
> Jackson, MS 39201
>
> John Lang (MBN 43987 *pro hac vice)*
> John Piskora (MBN 44474 *pro hac vice*)
> LOEB & LOEB, LLP
> 345 Park Avenue
> New York, New York 10154

SO CERTIFIED, this the 3rd day of December, 2010.

<u>/S/ DEWITT L. ("RUSTY') FORTENBERRY, JR.</u>

## INDEX OF EXHIBITS
### to Defendants' Response to Plaintiffs' Motion for Contempt and Appointment of Receiver

Exhibit "A"        *David C. v. Leavitt*, No. 93-C-206, Slip Op (D. Utah, March 17, 1997)

Exhibit "B"        August 4, 2010 Email from Shirim Nothenberg to Kenya Rachal and Rusty Fortenberry re reserving Plaintiffs' right to seek judicial enforcement of Period 2 non-compliance

Exhibit "C"        November 30, 2010 Letter from Shirim Nothenberg to Rusty Fortenberry re Plaintiffs' decision that Defendants did not substantially comply with Bridge Plan requirements

Exhibit "D"        November 29, 2010 Letter from Jerry Milner to Rusty Fortenberry and Kenya Rachal re his position on Defendants' status of compliance with Settlement Agreement

Exhibit "E"        October 3, 2010 *Clarion Ledger* article "Rights Group:  Foster Care Still Lagging"  http://pqasb.pqarchiver.com/clarionledger/access/2152609271.html

Exhibit "F"        October 6, 2010 WLBT interview transcript "Foster Care Lawsuit" http://www.wlbt.com/global/story.asp?S=13282234&clienttype=printable

Exhibit "G"        October 6, 2010 MBP interview transcript "A New Lawsuit Says Mississippi Isn't Protecting Foster Children" http://mpbonline.org/news/story/new-lawsuit-says-mississippi-isnt-protecting-foster-children

Exhibit "H"        October 7, 2010 *Clarion Ledger* article "Welfare Group Asks Court to Intervene in Overseeing Children"" http://pqasb.pqarchiver.com/clarionledger/access/21526331231.html

Exhibit "I"        June 26, 2006 Order of the Court re Confidentiality

Exhibit "J"        Affidavit of Lori Woodruff

Exhibit "K"        June 10, 2010 News Release from the Office of the Governor, Haley Barbour re appointment of Don Thompson http://www.governorbarbour.com/news/archive/news/2008/jun/DHSappointment.htm

Exhibit "L"        Resume of Don Thompson - **redacted**

Exhibit "M"        Affidavit of Don Thompson

Exhibit "N"        Resume of Lori Woodruff - **redacted**

Exhibit "O"        July 10, 2008 Email from Shirim Nothenbery to Kenya Rachal acknowledging receipt of Lori Woodruff's resume

| | |
|---|---|
| Exhibit "P" | August 1, 2008 Email from Shirim Nothenberg to Rusty Fortenberry re acknowledgement of Lori Woodruff's hiring |
| Exhibit "Q" | Resume of Jerry Milner |
| Exhibit "R" | Affidavit of Cindy Greer |
| Exhibit "S" | Resume of Cindy Greer - **redacted** |
| Exhibit "T" | MS Dept. of Information Technology Services, RFP #3583 re MACWIS |
| Exhibit "U" | March 9, 2010 Email from Shirim Nothenberg to Kenya Rachal re RFPs |
| Exhibit "V" | September 23, 2010 Letter and attachments from Children's Bureau to Don Thompson re 5-year, $2,000,000 grant for recruitment and retention activities |
| Exhibit "W" | August 2008 update to MDHS Policy Manual, §F, p 4515 |
| Exhibit "X" | Relative Placement Licensing Schedule, DHS 286694-286706 - **under seal** |
| Exhibit "Y" | "Children in Custody with 2 or More Emergency or Temporary Placements" report for July 2010, DHS 285942-286024  - **under seal** |
| Exhibit "Z" | "Number of Children in Foster Care by Placement Type" report for July 2010, DHS 284922-285200 - **under seal** |