**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION**


OLIVIA Y., by and through her next friend, James D. Johnson;
JAMISON J., by and through his next friend, Clara Lewis;
DESIREE, RENEE, TYSON, and MONIQUE P.,
by and through their next friend, Sylvia Forster;
JOHN A., by and through his next friend, James D. Johnson;
CODY B., by and through his next friend, Sharon Scott;
MARY, TOM, MATTHEW, and DANA W.,
by and through their next friend, Zelatra W.; and
SAM H., by and through his next friend, Yvette Bullock;
on their own behalf and behalf of all others similarly situated          PLAINTIFFS,


v.                                                        CIVIL ACTION NO. 3:04CV251LN


HALEY BARBOUR, as Governor of the State of Mississippi;
DONALD TAYLOR, as Executive Director of the Department
of Human Services; AND BILLY MANGOLD,
as Director of the Division of Family and Children's Services          DEFENDANTS.


<u>**PLAINTIFFS' REPLY IN FURTHER SUPPORT OF THEIR MOTION FOR
CONTEMPT AND FOR THE APPOINTMENT OF A RECEIVER**</u>

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................................... iii

Introduction ............................................................................................................ 1

I.     Defendants Did Not Make All Reasonable Efforts To Comply With Their
Period Two Obligations And Have Failed To Demonstrate That They
Were Unable To Comply ............................................................................... 3

     A.     Defendants Misconstrue The Standard For Contempt And Distort
The Inability Defense ........................................................................ 3

     B.     Defendants' Recent Activities Regarding Staff Recruitment Do
Not Constitute Substantial Compliance Or All Reasonable Efforts
To Comply With The Workforce Requirements Of The Period
Two Implementation Plan And Settlement Agreement ...................... 6

          1.     Defendants' Hiring Of Additional Caseworkers Does Not
Constitute Substantial Compliance Or All Reasonable Efforts
To Meet Caseload Requirements ............................................. 6

          2.     Defendants Have Failed To Make  All Reasonable Efforts To
Meet Caseworker Training Requirements ............................... 7

          3.     Defendants' Recent Efforts To Revise The Policy Manual Do
Not Constitute Substantial Compliance Or All Reasonable
Efforts To Meet The Policy Manual Requirements ................. 9

     C.     Defendants' Recent Efforts To Address Longstanding Computer
Problems Do Not Constitute Substantial Compliance Or All
Reasonable Efforts To Comply With Period Two MACWIS
Requirements ................................................................................... 11

     D.     Defendants' Recent Efforts Regarding Placement Practice Do Not
Constitute Substantial Compliance Or All Reasonable Efforts To
Comply With Period Two Placement Requirements .......................... 14

          1.     Defendants Have Not Met Their Obligations To Increase
Placement Options ................................................................. 14

          2.     Defendants' Defense Of Their Failure To Address The
Longstanding Issue Of Unlicensed Placements Completely
Ignores The Safety Provisions Of The Settlement Agreement ......................... 16

     E.     Defendants Have No Defense To Failing To Meet Their Period
Two Case Practice Obligations ........................................................ 17

i

F.  Neither The Practice Model Developed By Defendants' Consultant Nor Defendants' COA-Related Activities Constitute All Reasonable Efforts To Comply With Period Two And Settlement Agreement Requirements...................................................................................21

1.  The Practice Model Alone Is No Defense To A Finding Of Contempt..........................................................................................21

2.  Defendants' Efforts At Meeting COA Requirements Do Not Establish Substantial Compliance Or All Reasonable Efforts To Comply With Period Two Requirements..........................................23

II.  Caselaw Confirms That Defendants Have Not Established That They Were Unable To Comply With Their Period Two Obligations And That Defendants Have No Excuse For Their Contempt ............................................24

III.  Defendants' Performance Under The Bridge Plan Is No Defense To Contempt.................................................................................................................29

IV.  A Receiver Is Necessary To Ensure That Mississippi Children Are Safe From Harm And Receive The Benefits Of The Settlement Agreement ...........................32

CONCLUSION.................................................................................................................34

## <u>TABLE OF AUTHORITIES</u>

*Aspira of New York, Inc. v. Bd. of Educ. of New York,*
    423 F. Supp. 647 (S.D.N.Y. 1976)................................................................26, 27, 29

*Badgley v. Santacroce,*
    800 F.2d 33 (2d Cir. 1986)..............................................................................26

*Chairs v. Burgess,*
    143 F.3d 1432 (11th Cir. 1998) .....................................................................27, 28

*Chicago Truck Drivers Union Pension Fund v. Bhd. Labor Leasing,*
    207 F.3d 500, (8th Cir. 2000) .........................................................................5

*Commodity Futures Trading Comm'n v. Wellington Precious Metals, Inc.,*
    950 F.2d 1525 (11th Cir. 1992) ......................................................................5, 25

*David C. v. Leavitt,*
    No. 93-C-206, slip op. at 23 (D. Utah Mar. 17, 1997).....................................28

*Dixon v. Barry,*
    967 F. Supp. 535 (D.D.C. 1997) ....................................................................7, 34

*Fortin v. Comm'r of Mass. Dep't of Pub. Welfare,*
    692 F.2d 790 (1st Cir. 1982)...........................................................................5, 27

*Glover v. Johnson,*
    934 F.2d 703 (6th Cir. 1991) ..........................................................................4, 25

*LaShawn A. v. Kelly,*
    887 F. Supp. 297 (D.D.C. 1995),
    *aff'd sub nom. LaShawn A. v. Barry,*
    107 F.3d 923 (D.C. Cir. 1996).........................................................................33

*McComb v. Jacksonville Paper Co.,*
    336 U.S. 187 (1949)........................................................................................4

*Nat'l Labor Relations Bd. v. Caroline Mills, Inc.,*
    167 F.2d 212 (5th Cir. 1948) ..........................................................................4

*Newman v. Graddick,*
    740 F.2d 1513 (11th Cir. 1984) ......................................................................28

*Plata v. Schwarzenegger,*
    Case No. C01-1351 TEH, 2005 WL 2932253 (N.D. Cal. Oct. 3, 2005) ...........33, 34

*Twelve John Does v. District of Columbia*,
    855 F.2d 874 (D.C. Cir. 1988) ........................................................................26

*United States v. City of Jackson*,
    318 F. Supp. 2d 395 (S.D. Miss. 2002) ...........................................................5

*United States v. City of Jackson*,
    359 F.3d 727 (5th Cir. 2004) ..........................................................................4

*United States v. Hayes*,
    722 F.2d 723 (11th Cir. 1984) ....................................................................4, 25

*United States v. Rizzo*,
    539 F.2d 458 (5th Cir. 1976) .......................................................................3, 25

*United States v. Rylander*,
    460 U.S. 752 (1983) .......................................................................................4

*United States v. Swingline, Inc.*,
    371 F. Supp. 37 (E.D.N.Y. 1974) ..................................................................29

# INTRODUCTION

Faced with two and one-half years of massive noncompliance with their court-ordered obligations to Plaintiff foster children and no ready defense, Defendants have presented internally inconsistent positions to the Court. On the one hand, Defendants assert a novel interpretation of the inability defense to contempt, in which a showing of good faith and reasonable diligence is sufficient to excuse massive noncompliance with court-ordered mandates. On the other hand, Defendants concede noncompliance, but argue that it has been cured by their actions under the limited four-month agreement known as the Bridge Plan, which was directed at a very narrow subset of unmet Period Two requirements.

Defendants' reliance on the inability defense fails for two reasons. First, it is wrong on the law. It is well established that good faith alone does not suffice to establish an inability necessary to excuse contempt. To properly invoke the inability defense, Defendants must demonstrate that they have taken *all* reasonable efforts to comply with their obligations, a claim that simply cannot be reconciled with the Monitor's finding that Defendants' efforts during the Second Year Implementation Period were largely "belated," "not minimally adequate," and in some instances non-existent. (The Court Monitor's Report to the Court Regarding Defendants' Progress Toward Meeting Period 2 Requirements, 165, hereinafter "Period Two Report".)

Second, Defendants' assertion of inability and claims of good faith are contradicted by the simple fact that they agreed to implement the Period Two requirements after due consideration and with the best understanding of what was possible for them to accomplish during the year. Defendants offer no adequate explanation as to why they failed to meet the very obligations they asked this Court to approve. Defendants expend a considerable amount of time walking through a number of initiatives that they plan to implement and describing steps they have taken during the three years of the reform effort, including hiring additional workers,

1

issuing a practice model, and developing various resource development plans. Defendants' described actions either have no direct relationship to Period Two obligations, were undertaken after the close of Period Two, or do not come close to constituting "all reasonable efforts," as required to satisfy the inability defense. The fact that Defendants have taken some subsequent actions, and intend to undertake others, simply does not cure their massive noncompliance with their Period Two obligations. To overcome a finding of contempt, Defendants needed to demonstrate substantial compliance or offer a persuasive explanation of what changed since the time that they represented to this Court that substantial compliance was possible. Defendants do not meet their burden.

In the alternative to their flawed inability defense, Defendants claim that having agreed to a limited set of corrective actions under an agreed-upon order known as the Bridge Plan, they should not be held in contempt for their noncompliance with Period Two requirements. Period Two ended on April 30, 2010, and the Monitor's final report regarding Defendants' performance on their Period Two obligations was not filed until September 8, 2010. While awaiting the Monitor's report, the parties entered into the Bridge Plan, which required Defendants to address a very narrow subset of unmet Period Two requirements as well as to produce specific data reports. (The Court Monitor's November 23, 2010 Report to the Court Regarding the June 10, 2010 Agreed Order for Corrective Action, 2, hereinafter "Bridge Plan Report".) The Bridge Plan was the subject of a separate performance report by the Monitor that was issued on November 24, 2010. Plaintiffs reserved their rights within the Bridge Plan to assert noncompliance with Period Two requirements at the end of the Bridge Period – when the Plaintiffs knew that they would have the Monitor's final report regarding Period Two performance – without regard to Defendants' performance under the Bridge Plan. (June 10, 2010 Agreed Order ¶ 11, hereinafter

"Bridge Plan.")  Plaintiffs specifically reserved that right based upon the concern that the data

that Defendants were required to produce, as well as the Monitor's final report on Period Two

performance, could indicate that nothing short of court intervention would bring about

compliance.

Plaintiffs' concern was well-founded.  As stated by the Monitor in her report on Period

Two requirements, "regardless of the outcome of [the monitor's assessment of Bridge Plan

performance], the parties must confront the fact that at the end of this calendar year, there will be

two years left in the required five-year reform process, and there is an apparent misalignment

between the Settlement Agreement's requirements and the implementation strategy that the

defendants have adopted as well as the results that the defendants have achieved to date."

(Period Two Report at 166).  Plaintiffs exercised their right to bring their motion for contempt

because, as found by the Monitor, irrespective of Defendants' performance under the Bridge

Plan, Defendants' very approach to the reform effort, coupled with their lack of demonstrable

progress, clearly indicates that absent court intervention Defendants will continue to be unable to

comply with their obligations to protect Plaintiff children.

I.     **Defendants Did Not Make All Reasonable Efforts To Comply With Their Period Two Obligations And Have Failed To Demonstrate That They Were Unable To Comply**

A.     **Defendants Misconstrue The Standard For Contempt And Distort The Inability Defense**

Defendants seek to excuse their rampant noncompliance by asserting an inability to

comply with their obligations.  The Parties agree that in order to invoke an inability defense, the

failing party must demonstrate that it has made "in good faith *all* reasonable efforts to comply."

*See United States v. Rizzo*, 539 F.2d 458, 465 (5th Cir. 1976) (emphasis added) (citation

omitted).  Defendants have failed to demonstrate that they have in fact taken all reasonable steps

to comply with their obligations under the court-ordered Settlement Agreement and Period Two Implementation Plan ("Period Two IP"). Instead, Defendants attempt to persuade the Court that they have employed "good faith" and "reasonable diligence," which they assert is sufficient to invoke the inability defense. However, the Fifth Circuit "has consistently held that good faith is not a defense to a finding of civil contempt." *United States v. City of Jackson*, 359 F.3d 727, 735 (5th Cir. 2004). Moreover, even if Defendants were able to establish that they diligently attempted to comply with their obligations despite many of the Monitor's findings, diligence without more does not excuse noncompliance. *See, e.g.*, *Glover v. Johnson*, 934 F.2d 703, 708 (6th Cir. 1991) (citation omitted) (noting that "evidence of diligence alone does not satisfy that burden" to establish inability to comply).

That in their own estimation "Defendants have never willfully disregarded any Order of this Court" has no bearing on whether Defendants complied with their obligations or took all reasonable efforts to do so. (*See* Defs.' Mem. of Law in Opp'n to Pls.' Mot. for Contempt and for Appointment of Receiver, 2, hereinafter "Defs.' Opp'n".) The Supreme Court has long held that "[t]he absence of willfulness does not relieve from civil contempt." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949). "Obedience of judicial orders is of paramount importance and [] courts do not lightly excuse a failure to comply." *United States v. Hayes*, 722 F.2d 723, 726 (11th Cir. 1984).

The Fifth Circuit has only excused a failure to comply because of an inability in circumstances close to true impossibility. *See, e.g.*, *Nat'l Labor Relations Bd. v. Caroline Mills, Inc.*, 167 F.2d 212, 214 (5th Cir. 1948); *see also United States v. Rylander*, 460 U.S. 752, 760-61 (1983) (reversing finding of inability where defendant failed to produce documents on grounds

of Fifth Amendment privilege).[1]  The requirement to make *all* reasonable efforts is strictly

construed, *Commodity Futures Trading Comm'n v. Wellington Precious Metals, Inc.*, 950 F.2d

1525, 1529 (11th Cir. 1992), and the standard for establishing inability is "particularly strict in a

case such as this one, in which the needs of applicants are urgent," *Fortin v. Comm'r of Mass.*

*Dep't of Pub. Welfare*, 692 F.2d 790, 797 (1st Cir. 1982).

        Over the course of Period Two, Defendants overwhelmingly failed to comply with the

obligations they had negotiated and to which they had agreed.  As discussed in Plaintiffs' brief in

chief, of the 119 Period Two obligations assessed by the Monitor, Defendants fully complied

with just *eight*.  (Pls.' Mem. of Law in Supp. of Mot. for Contempt and for Appointment of

Receiver, 2, hereinafter "Pls.' Mem.".)  Even taking into account their partial compliance with

nine requirements – which is not a defense to contempt, *see United States v. City of Jackson*, 318

F. Supp. 2d 395, 417 (S.D. Miss. 2002) – Defendants still failed to meet 52 obligations, and the

Monitor could not report on Defendants' performance on 50 requirements due to Defendants'

failure to provide data as required.  (Pls.' Mem. at 2, 13; *see also* Ex. 1 to Dobies Aff., [Dkt. 514-

1], (Oct. 5, 2010) (Compliance Requirements Chart).) Although Defendants are required to

explain "categorically and in detail" the cause of their inability, *see Chicago Truck Drivers*

*Union Pension Fund v. Bhd. Labor Leasing*, 207 F.3d 500, 506 (8th Cir. 2000) (citation omitted),

Defendants do not specify what impeded their ability to comply with any of the Period Two

obligations they failed to meet.

        Defendants describe a variety of recent activities which they assert demonstrate that they

have made diligent and good faith efforts to comply with their Period Two obligations.  Yet, as

described below, Defendants fail to meet their burden of establishing that those actions either

---

[1] Defendants do not cite any caselaw from the Fifth Circuit in support of their novel
interpretation of the inability defense.

placed them in substantial compliance with their Period Two obligations or constituted all the reasonable steps that they could undertake to meet their obligations.  In some instances, their reported-on actions simply bear no relation whatsoever to any one of their more than 100 unmet obligations.  Accordingly, Defendants' contempt cannot be excused here.

> **B.     Defendants' Recent Activities Regarding Staff Recruitment Do Not Constitute Substantial Compliance Or All Reasonable Efforts To Comply With The Workforce Requirements Of The Period Two Implementation Plan And Settlement Agreement**

During Period Two, Defendants were required to develop and begin implementing a plan to hire and retain sufficient staff to meet caseload standards, to develop a training unit, to provide caseworkers with the training necessary to provide adequate child welfare services, and to revise the Policy and Procedure Manual relied upon by workers in the field.  (Period Two IP § I.2.a, I.2.d, II.1; Settlement Agreement II.2.a.10.)  Defendants neither met any of these obligations nor demonstrated that it was impossible to do so.

> 1.      Defendants' Hiring Of Additional Caseworkers Does Not Constitute Substantial Compliance Or All Reasonable Efforts To Meet Caseload Requirements

Defendants concede that three years into the reform process they are currently not in compliance with all of their caseload requirements, but contend that they have hired many new caseworkers and, in their estimation, are very close to meeting the requirements, so their noncompliance should be excused.  (Defs.' Opp'n at 21-22.)  Defendants' argument totally ignores the finding by the Monitor of "critical staffing shortages in some counties, particularly counties with a high number of children in DFCS custody."  (Period Two Report at 18.) According to the Monitor, Defendants reported to her that "according to [their own] calculations, as of May 31, 2010, notwithstanding increased hiring, there were significant staffing deficits in a

number of counties, especially counties with high caseloads." (*Id.* at 25.) The Monitor found that as of September 2010, these deficits remained. (*Id.*)

Defendants seek to assure the Court that caseloads *will* improve with the as-yet-to-be finalized or implemented workforce recruitment and retention plan. (Defs.' Opp'n at 23-24.) But promises of future acts do not remedy past noncompliance. *See, e.g.*, *Dixon v. Barry*, 967 F. Supp. 535, 553 (D.D.C. 1997) ("What the [defendant] intends to do in the near future is irrelevant"). Moreover, the Monitor deemed the plan Defendants submitted to have "substantial shortcomings," and Defendants themselves concede that it continues to require revision. (Bridge Plan Report at 59-60.) Thus, Defendants still do not have a final staff recruitment or retention plan, years after committing to developing one. In addition, Defendants have failed to take needed measures to bring their current staff into compliance with the worker and supervisor qualification requirements as mandated in Period Two. (Period Two Report at 28-29; Period Two § IP 1.2.c.) Clearly, not all reasonable efforts have been taken by Defendants to address their workforce obligations.

### 2. Defendants Have Failed To Make All Reasonable Efforts To Meet Caseworker Training Requirements

Defendants assert that "additional caseworkers hired by DFCS are resulting in a tangible difference for the safety of children in DFCS' custody." (Defs.' Opp'n at 22.) Defendants fail to provide any basis for their assertion, and the data they do provide reflects that Plaintiff Children are not in fact any safer, as the rate of abuse and neglect of foster children is substantially higher than what is permissible under the Settlement Agreement or national standards. (Pls.' Mem. at 35.) This data is unsurprising in light of Defendants' failure to meet the training requirements that are specifically intended to promote foster children's safety and wellbeing.

Defendants take great pains to point out that nearly a quarter of the casework staff employed by DFCS were hired between April 2009 and April 2010. (Defs.' Opp'n at 21.) Thus, nearly one in every four caseworkers in the field making life-altering decisions for Plaintiff Children has been recently hired. Well over half of all DFCS caseworkers have been on the job for less than two years. (*Id.*) Therefore the training Defendants have provided over the last two years is critical to how well the majority of DFCS caseworkers serve and protect the children on their caseloads.

Yet not once, but twice, Defendants have failed to meet the most basic training requirements of the Settlement Agreement and the Period Two Implementation Plan. (Period Two Report at 30-32.) Defendants do not explain why they failed to meet the requirement that they draft a training plan, let alone actually implement the plan or establish a functioning training unit as required during Period Two. (Period Two IP § I.2.d.1; Period Two Report at 38-39; Pls.' Mem. 17-20.) The Monitor found that the plan that was submitted, almost five months after it was due, did not meet Period Two requirements because it did not "address action steps and timelines to hire and train staff, update the curriculum, or procure the additional resources needed" as required. (Period Two Report 39.) Moreover, the plan characterized the in-service training requirements and the system to track staff training as "long-term goals," even though the Period Two IP explicitly established that both goals were required to have been met during Period Two. (*Id.*) Because of Defendants' failure to produce the required plan and develop the training unit during Period Two, caseworkers and supervisors were not provided with required training prior to assuming their responsibilities, which puts children at risk. (Period Two Report at 41, 43-44.) The Monitor cited Defendants' "submission of [a] training plan that does not address the plain language of the applicable Period 2 requirement" as an example of an effort

that was "belated" and "not minimally adequate." (Period Two Report 6 n.9.) Defendants did

not employ all reasonable efforts to comply with this requirement.[2]

        3.      Defendants' Recent Efforts To Revise The Policy Manual Do Not
                Constitute Substantial Compliance Or All Reasonable Efforts To Meet
                The Policy Manual Requirements

Defendants assert that they have made "significant strides" in addressing their obligation

to revise the Policy Manual, which is a critical tool for guiding case practice, especially when

there is a paucity of experienced caseworkers in the field.  However, their efforts were neither

significant nor compliant with their obligations.  Defendants did not meet their obligation in

Period One to review and revise their policies and procedures to reflect the requirements of the

Settlement Agreement, so that requirement was carried over to Period Two, and again

Defendants did not comply.  (Period Two Report at 70-71.)  During the Bridge Period,

Defendants were required to finalize only two sections of the Policy and Procedure Manual: the

permanency and protection sections.  (Bridge Plan ¶ 7.d.)  According to the Monitor, neither the

permanency nor protection sections submitted by the Defendants conformed with their

obligations, as neither revised section comported with the requirements of the Settlement

Agreement.  (Bridge Plan Report at 38.)  In both instances the Monitor reported that Defendants

"recognize that the revisions submitted during the Bridge Plan need further refinement."  (*Id*.)

The Settlement Agreement and Bridge Plan requirements are clear: the policy manual is to

---

[2] Defendants claim to be addressing training deficits (Defs' Opp'n at 42-43), but only cite to the
Maltreatment Investigation training that they provided to workers pursuant to the Bridge Plan,
and even that training fell short of the mark. The Bridge Plan required that Defendants provide
workers with immediate training on how to undertake maltreatment investigations.  (Bridge Plan
¶ 7.b.) While Defendants did a commendable job in undertaking the training of all workers, as
made clear by the Monitor, those engaged in the actual investigation of the maltreatment of
Plaintiff foster children have not all received the very training DFCS has deemed relevant to
properly undertake those investigations.  As noted by the Monitor, over one-third of the 29
DFCS employees who conducted investigations of maltreatment reports regarding foster children
between March 1 and September 1, 2010, had not received the required training.  (Bridge Plan
Report at 33.)

reflect the requirements of the Settlement Agreement.  (Settlement Agreement § II.B; Bridge Plan ¶ 7.d.)  This only makes sense since Plaintiffs bargained for, and Defendants agreed to, Settlement terms governing case practice that they believed were essential to ensuring their proper care and protection.  By issuing policy and procedure manual sections that fail to reflect the requirements of the Settlement Agreement, Defendants have disregarded their obligations under the Agreement.

Moreover, Defendants' lack of urgency in addressing the need to finalize the policy and procedure manual is striking.  According to the Monitor, at the beginning of Period Two, Defendants reported that they expected to complete the revision to the Policy Manual by September 2009.  (Period Two Report at 71 n.238.)  The Monitor stated that, "[s]everal additional assurances that the revisions would be completed during Period 2 were provided." (*Id.*)  At the end of the Bridge Period, four months after the close of Period Two, the only two sections of the Policy Manual that Defendants have completed do not meet the requirements of the Settlement Agreement, and although assurances were made that it would be done in 2009, Defendants have now not committed to finalizing the manual until May 2011.  (Bridge Plan ¶ 7.d.; Pls.' Mem. at 20.)  Defendants failed to comply with their obligations regarding the Policy Manual, their efforts to do so were not reasonable, and they have failed to demonstrate why updating their policy manual in a way that conforms with the Settlement Agreement was impossible.[3]

---

[3] Defendants strongly admonish Plaintiffs for raising the problem of caseworkers working in trailers, which do not provide them with conditions that support proper case practice.  According to Defendants, because these trailers are located in Hancock County which was devastated by Hurricane Katrina in August 2005, drawing attention to the working conditions in those trailers constitutes a "low blow," and demonstrates Plaintiffs' "intent on painting Defendants in a bad light."  (Defs' Opp'n at 26.)  Defendants fail to acknowledge, however, that it was the impartial Court-appointed Monitor who reported on the work conditions she found in Hancock County,

C.    **Defendants' Recent Efforts To Address Longstanding Computer Problems Do Not Constitute Substantial Compliance Or All Reasonable Efforts To Comply With Period Two MACWIS Requirements**

Defendants have long known about the serious deficiencies in MACWIS, the State's automated child welfare data system.  When Defendants failed to meet their Period One obligations regarding MACWIS remediation, those requirements were carried over to Period Two.  During Period Two, Defendants were required to provide all county staff with basic computer services, verify MACWIS child welfare data, issue a Request For Proposal ("RFP") for an assessment of MACWIS, and execute a contract pursuant to that RFP.  (Period Two § IP I.5.)  Defendants failed to adequately take any of these actions during Period Two, and offer no basis for alleging that it was impossible to do so.

Instead, Defendants expend a number of pages detailing how their efforts at MACWIS remediation constitute reasonable efforts at meeting their Period Two MACWIS obligations.  The picture Defendants paint of their alleged diligence in addressing MACWIS problems is flatly contradicted by the Monitor in her Period Two report, in which she states that there is a critical need for Defendants to address MACWIS limitations on a "more expedited basis."  (Period Two Report at 65.)  That Defendants continued to dither in addressing MACWIS issues is demonstrated by an email the Monitor sent to Defendants and Plaintiffs in July 2010, which was mid-way through the Bridge Period.  In that email she states, "[t]his email explains my

---

and found them to be so troublesome that she deemed it necessary to submit photographic evidence of those conditions in addition to describing them in her report.  (Period Two Report at 64 n.221.)  Moreover, the findings of the Monitor regarding poor DFCS working conditions extend as far as Rankin and Hinds Counties.  (*Id.*)  It is not a "low blow" as Defendants assert, for the Plaintiffs to raise findings made by the Monitor that the conditions in some DFCS offices are so substandard as to directly and negatively impact caseworkers' ability to provide adequate child welfare services.   It is the responsibility of the Monitor to shed light on DFCS working conditions, and when that light reveals substandard conditions that preclude compliance with good case practice, it is Plaintiffs' attorneys' obligations to seek a remedy.

concerns regarding the failure of MDHS to address remediation of the limitations in MACWIS

on an interim basis pending implementation of a substitute for the current system.  For the

reasons set out below, I do not have confidence that the agency has the capacity to address these

issues effectively in the near term . . . ."  (*See* correspondence from G. Lopes, *Olivia Y.* Monitor,

to D. Thompson, Exec. Director, Dep't of Human Serv. (July 14, 2010), and attached hereto as

Exhibit A.)  The Monitor went on to make the following observations:

- "Because Period 1 requirements related to MACWIS were not satisfied, the Period 2 Implementation plan included several remedial requirements concerning MACWIS . . . . Despite the fact that my June 2009 report to the court on Period 1 emphasized the need for MDHS to address very significant shortcomings in MACWIS on an interim basis, there was an absence of demonstrable progress during Period 2."

- "On March 16, 2010, I met with [DFCS] to discuss the short- and long-term steps MDHS had undertaken or planned to undertake to address connectivity problems, data retention issues, the shortage of qualified programmers, the need for increased license server capacity and the procurement of additional licenses.  Despite assurances that at least some of these concerns would be addressed in the near term, there was little demonstrable progress."

- "More recently, on June 25, 2010, I met with [defendants, Jerry Milner and their counsel].  We discussed my concerns about the lack of progress on MACWIS, and in response [defendants] agreed to provide me by June 29 a list of the major milestones that MDHS planned to achieve on a short-term basis in order to meet the Settlement Agreement's MACWIS-related requirements.  In addition you agreed to include the corresponding deadline by which each milestone would be accomplished . . . .  However, instead of the list of milestones and corresponding deadlines, MDHS/MIS submitted two documents to me that raise substantial concerns about whether MDHS has the capacity to formulate and execute an effective short-term plan to address MACWIS-related requirements."

(*Id.*)  The Monitor closed the email by recognizing the "modest but important achievements"

Defendants had made during the Bridge Period, but stated that "[n]onetheless, these modest

advances do not give me confidence that MDHS has the capacity to formulate and execute an

effective short-term plan to implement the Settlement Agreement's MACWIS related

requirements."  (*Id.*)

This lack of confidence by the Monitor is well deserved as demonstrated by Defendants'
lack of urgency in their approach to this area of critically-needed reform.  DFCS only just
recently issued a Request for Proposal for a contractor to assess MACWIS capabilities and to
recommend remediation efforts, despite the fact that it was originally required to be issued in
September 2009.  (Bridge Plan Report at 17-18; Period Two IP § I.5.c.)  The RFP was initially
provided to the Monitor and Plaintiffs for comment, and found significantly wanting by both.
*See* correspondence from G. Lopes to K. Rachal and from S. Nothenberg to K. Rachal, attached
hereto as Exhibit B.  It took an entire year for Defendants to revise the RFP for the MACWIS
assessment, and even once it was revised, Defendants failed to issue it during Period Two.[4]
Defendants state that their failure to issue the RFP was "due to a myriad of factors."  (Defs'
Opp'n at 31.)  Defendants seek to excuse their delay, in part because the RFP required approval
by the U.S. Department of Health and Human Services.  (*Id.*)  However, this federal approval
requirement was known of years ago, long before Defendants agreed to the Period Two
requirement that they not only issue an RFP but also execute a contract.  (Letter from J. Bock,
Associate Comm'r, Children's Bureau, to D. Thompson, Exec. Director, Dep't of Human Serv.
(Oct. 29, 2009), attached hereto as Exhibit C.)

Thus, nearly three years after the reform effort began, Defendants have only recently
issued a RFP to assess the computer system known to be dysfunctional at the time this case
settled.  Defendants anticipate that the contract for the assessment of MACWIS will not be
executed until February 2011.  (Defs' Opp'n at 31.)  Defendants' assertion that they have made

---

[4] The email attached as Exhibit U to Defendants' Opposition, which was from Plaintiffs' counsel
complimenting Defendants on its MACWIS RFP, was sent in response to an RFP that
Defendants had to substantially revise based upon significant comments to an earlier draft from
both Plaintiffs' counsel and the Monitor.  *See* Ex. B, correspondence to K. Rachal.

all reasonable efforts is belied by their lack of both urgency and progress in meeting their

obligations in this critical area.

**D.    Defendants' Recent Efforts Regarding Placement Practice Do Not Constitute Substantial Compliance Or All Reasonable Efforts To Comply With Period Two Placement Requirements**

During Period Two, Defendants were required to undertake a number of initiatives to

increase the quality and array of foster care placements available to meet the needs of Plaintiff

foster children.  These requirements included the implementation of a resource development

plan, various foster parent recruitment and retention activities, and a plan to license unlicensed

placements.  (Period Two §§ IP II.7.b, II.14.)  Defendants' efforts in this area come nowhere

near a showing that they have undertaken all reasonable efforts to meet their placement

obligations to Plaintiff children.

**1.    Defendants Have Not Met Their Obligations To Increase Placement Options**

Defendants cite to the existence of the Placement Resource Development Plan along with

the fact that they have recently hired a resource Development Director as evidence of the

reasonable efforts they have made to comply with their obligations to improve the quantity and

quality of foster care placements.  Having failed to develop the required implementation plan to

address placement deficiencies during Period Two, Defendants were required to do so during the

Bridge Period.  The Center for the Support of Families ("CSF"), the contractor brought in to

support DFCS, developed such a plan on Defendants' behalf during the Bridge Period.  (Bridge

Plan Report at 39-41.)  Defendants state that they are "confident" that with those two pieces in

place, placement practice will improve.  (Defs' Opp'n at 33.)  However, Defendants offer no

evidence of concrete steps they are taking to implement the Resource Development Plan or any

steps to address problems with DFCS' process of placing children, as was required during Period

14

Two.  Of course, confidence that future improvements will take place is certainly no defense to past noncompliance.

Moreover, while alleging that Plaintiffs fail to paint a complete picture for this Court, Defendants conveniently ignore all of the requirements related to improving the quantity, array, and quality of foster care placement resources and services that they have failed to either meet or to demonstrate were impossible to meet.  Placement obligations that Defendants have failed to comply with include the requirement to:

- adequately undertake an assessment of rates paid to congregate care providers;

- implement a formalized protocol to provide foster parents with appropriate and available foster child information;

-  develop a written plan to provide services for foster parents to prevent and reduce stress and family crisis;

-  work with foster parents to identify additions and revisions to the foster parent curriculum necessary to adequately prepare foster parents;

- create a resource family workgroup to develop and implement resource family practices and protocols; and

- regionalize recruitment and retention efforts.

(Settlement Agreement § B.13.g-h; Period Two IP §§ II.7.j, II.14.c-f; Period Two Report at 117, 128-32.)  According to the Monitor, not a single one of these steps has been undertaken.  (*Id.*)  During Period Two, Defendants also failed to develop and begin implementing a plan to address policy and structural changes to the placement process required to bring the process into conformance with Settlement Agreement standards.  (Period Two IP § II.7.e; Period Two Report at 117.)  Defendants' confidence in what may happen in the future when and if they are able to implement the Resource Development Plan does nothing to save Defendants from a finding of

contempt based upon their current and vast noncompliance with their obligations regarding foster care placements.

    2.    <u>Defendants' Defense Of Their Failure To Address The Longstanding Issue Of Unlicensed Placements Completely Ignores The Safety Provisions Of The Settlement Agreement</u>

Pursuant to the Period Two IP, Defendants were required to develop and begin implementing a plan for the speedy licensing of current unlicensed caregivers and to subject all currently unlicensed homes to the licensing process.  (Period Two § IP II 7.b.)  Defendants failed to meet this requirement.  (Period Two Report at 116.)  Based upon Defendants' submissions pursuant to the Bridge Plan, Plaintiffs learned that there are 353 unlicensed homes in which Defendants had placed Plaintiff children.  Plaintiffs also learned that Defendants could not readily and accurately identify which homes were not licensed or which of those unlicensed homes had been the subject of a confirmed report of maltreatment.  (Bridge Plan Report at 42-46.)  According to the Monitor, the failure to readily and accurately identify these homes is due to "long-standing shortcomings in defendants' capacity to track child placement data accurately." (Bridge Plan Report at 42.)

Defendants offer no defense for their persistent failure to meet their court-enforceable obligation to address their continued reliance on unlicensed placements.  Instead, Defendants mischaracterize Plaintiffs' efforts to enforce the licensing obligations as illegitimate and "salacious."  (Defs' Opp'n at 35.)  Defendants go so far as to dispute that unlicensed placements are unsuitable or potentially dangerous (*id.*), despite the fact that the licensing of foster homes is one of the most fundamental bulwarks a child welfare system has for protecting foster children.

 Defendants' apparent position, that it is permissible to place and maintain children in state custody in unlicensed homes, be they relative or non-relative, demonstrates willful disregard of their obligations under the Settlement Agreement prohibiting placement of foster

children in unlicensed placements and requiring an expedited licensing process for relative placements. (*Cf.* Settlement Agreement § II.B.5.a.) As noted by the Monitor, the very purpose of these requirements is "to ensure that children in foster care settings receive safe, sufficient, and appropriate care[.]" (Bridge Plan Report at 43.) That Defendants are questioning the import of ensuring that children are in licensed placements three years after entering into the Settlement Agreement calls into question not only their good faith in agreeing to these obligations, but also their commitment to meeting well-established case practice norms.

In discussing their performance regarding their licensing obligations under the Bridge Plan, Defendants fail to note that they did not successfully meet the licensing requirements of either Period Two or the Bridge Plan. (Bridge Plan Report at 42-46.) Instead, Defendants rely on statements by the Monitor that the "Field Operations Director has made implementation of the expedited relative licensure requirement an operational priority," that a "recently hired child welfare practice specialist is also working to see that the relative licensure requirements are implemented," and that a tracking system has been established to ensure future accountability. (Defs.' Opp'n at 36.) Key to each of these statements is that they relate to the promise of some future conduct, rather than to whether Defendants have actually complied with the obligations that have come due. The fact that Defendants have now made licensing activities an "operational priority," three years after Defendants agreed to undertake those licensing activities, is a testament to their willful disregard of three years of court-ordered obligations in this area.

**E.    Defendants Have No Defense To Failing To Meet Their Period Two Case Practice Obligations**

Defendants do not specifically address the numerous Period Two requirements aimed at improving child welfare case practice with which they have failed to comply. Defendants instead assert that child welfare case practice has improved during the course of the reform

17

period, and as evidence cite to a number of Period Two permanency and placement outcome

measures which they are currently meeting.  (Defs.' Opp'n at 37-41.)[5]  However, Defendants fail

to take into account the structure of the Settlement Agreement, which requires not only that

Defendants meet outcome measures but also undertake concrete case practice requirements

calculated to improve the quality of child welfare planning and services.  Without engaging in

the underlying reforms to improve the quality of case practice, the outcome measures become

less meaningful.  For example, as evidence of alleged reforms in reunification services,

Defendants cite to their Bridge Plan data reflecting that they now meet the requirement that 30%

of foster children who are reunified with their parents in the last year are reunified within 12

months of having been removed from their homes.  (Defs.' Opp'n at 37.)  Yet, the fact that

children are timely returned to their biological family following a confirmed report of

maltreatment is only good for children if there is a basis to conclude that the decisions are not

only timely but also properly made, based on a thorough assessment of the risks and the degree

to which parents have addressed the problems that resulted in their child being removed from

their custody.  According to the assessment undertaken by CSF, DFCS reunification services are

particularly weak.  Among the CSF findings were that:

- there is a "notable" lack of available reunification services, especially in rural areas.  Available services are often not effective.  Caseworkers are often forced to rely on prevention services meant for children never removed from their homes, or to not offer any services;

---

[5] Defendants correctly fault Plaintiffs for mistakenly stating that 400 children had been placed more than once in a shelter during a thirty day period ending August 23, 2010, when in fact the data reflected the number of children who had been placed in a shelter at least twice since the child came into custody.  (Defs.' Opp'n at 36.)  Plaintiffs' confusion is explained by the title of the report submitted by Defendants which reads "Children in Custody with 2 or More Emergency or Temporary Placements For the Period 01 July, 2010 through 31 July, 2010." (Defs.' Opp'n Ex. Y, filed under seal.)  It is not surprising that entitling a report as providing information from the period of July 1, 2010 to July 31, 2010 might result in persons mistakenly believing the report reflected data from that timeframe.

- parents with children in foster care are put on waitlists for services that they are required to utilize in order to be reunified with their kids; and

- case practice around reunification is weak, marked by poor assessments and a failure to create individualized service plans.

(Ex. 3 to Nothenberg Declaration, [Ex. E to Pls.' Mem.] 39-41.)

The Settlement Agreement provisions that Defendants were to comply with to strengthen reunification case planning and service delivery include the requirement that, within 30 days of taking custody of a child, DFCS must complete a full screening and family assessment and develop a service plan that is calculated to meet the child's immediate and ongoing needs and to move that child to a permanent home as expeditiously as possible. (Settlement Agreement §§ II.B.1.a, II.B.2.a, II.B.3.a.) Children and their families are to be made a part of the permanency planning process through individual and family team meetings, and each foster child's service plan is to be routinely updated and reviewed. (*Id.* §§ II.B.1.b, II.B.2.a-b, II.B.3.c.1-2.) During Period Two Defendants failed to develop the individual and family team meeting protocols as required, which are prerequisites to complying with the team meeting requirements of the Settlement Agreement. (Period Two Report at 79-80.) At the close of Period Two, Defendants could not provide validated data regarding whether children were provided individual and family team meetings (*id.* at 82) or whether children had a permanency plan consistent with the Settlement Plan requirements (*id.* at 84-85). Defendants offer no basis for finding that compliance with these requirements was impossible.

While Defendants now have a statewide resource plan on reunification services (Defs.' Opp'n at 40), it has yet to be implemented. In addition, according to Defendants' Bridge Plan data, they are not in compliance with the requirement that, for children with a goal of reunification, caseworkers make a face-to-face visit with both parents monthly. (DHS 285382-

19

285384, "Children in Custody with a Permanency Plan of Reunification Worker/Birth and Adopted Parent Face to Face Contacts – State Summary," attached hereto as Exhibit D.)  In fact, in July 2010, such face-to-face visits with both parents occurred in fewer than 23% of the cases where reunification was the permanency goal, despite the fact that such visits are crucial to making informed recommendations as to the propriety of reunification.  (*Id.*)  The deficiencies in DFCS's reunification services, and the fact that timely reunification absent improvements in decision making is not necessarily a harbinger of good things, is illustrated by the tragic death of J.R.M.  J.R.M. was a 12-month-old baby who was beaten to death just three months after DFCS recommended that she be returned home, after having spent nine months in Defendants' custody. (Exs. 9, 16, 17 to Polansky Aff. [Dkt. Nos. 520-9, 520-16, 520-17], filed under seal.)

In addition to data regarding the timeliness of permanency decisions, Defendants also note that they have hired a Foster Care/Adoption Unit Director who has begun restructuring the department.  While such restructuring may at some future point improve case practice, it does not alone indicate such improvement and does not ameliorate Defendants' failure to comply with numerous Period Two obligations specifically geared towards improving permanency practice. Those unmet obligations include:

- By December 1, 2009, hold special permanency reviews for children in foster care more than 15 of the previous 22 months and for whom DFCS has not filed a TPR petition or documented an available ASFA exception in order to produce a written plan of action setting forth the steps to be taken by DFCS, the contract agency, and/or any other provider of services, in order to move the child to permanency as quickly as possible.

- By July 1, 2009, define the position of adoption specialists, and by April 30, 2010, take reasonable steps to hire such specialists, who are responsible for consulting with private and public professionals and identifying and ensuring the provision of targeted adoption services.

- By July 1, 2009, develop a protocol for adoption meetings, which are to be held to review the progress being made in achieving the goal of adoption for legally free children.

- By July 1, 2009, identify external adoption consultants who DFCS can contract with to provide adoption recruitment assistance to children who have been free for adoption for six or more months and who are not yet placed in an approved adoptive home.

- By October 1, 2009, develop and begin implementing a process for making legal risk placements that assures that children for whom the permanency plan is adoption but who are not yet legally free for adoption are placed in appropriate adoptive homes.

- By October 1, 2009, implement a process for advising all potential adoptive families, including any foster family caring for a child who has become legally available for adoption, of the availability of adoption subsidies.

(Period Two IP §§ II.5.d.2, II.5.e.)  According to the Monitor, Defendants did not adequately undertake any of these obligations.  (Period Two Report at 90-95.)  In short, Defendants are massively out of compliance with their obligations to Plaintiff children that Defendants agreed were necessary to timely and safely move children to permanency and have provided no basis for finding that compliance was impossible.

F.    **Neither The Practice Model Developed By Defendants' Consultant Nor Defendants' COA-Related Activities Constitute All Reasonable Efforts To Comply With Period Two And Settlement Agreement Requirements**

Defendants rely on the development of a Practice Model and their COA-related activities to support their defense that they have made all reasonable efforts to comply with their Period Two obligations.  Yet neither of these efforts addresses any specific Period Two Requirement with which the Monitor found that Defendants failed to comply.

1.    The Practice Model Alone Is No Defense To A Finding Of Contempt

Defendants describe the Practice Model developed by their hired expert consultant Jerry Milner as a "crucial component" of their reform effort, and rely upon the existence of this model as evidence of their alleged substantial compliance with the Period Two Plan.  (Defs.' Opp'n at 18.)  Yet nowhere do Defendants identify a specific Period Two obligation which is satisfied by the development of the Practice Model.

Defendants confuse the existence of the Practice Model with implementation of the model. It is only the latter – the actual execution of a Practice Model designed to ensure compliance with the Settlement Agreement – that may *potentially* bring Defendants into compliance with their obligations to Plaintiff Children. Such implementation has not taken place. In fact, in their reliance upon the Practice Model as a defense to a finding of contempt, Defendants fail to address two fundamental issues: the fact that Defendants have not developed the resources or management capabilities to execute the Practice Model, and, even if they had, that the timeline for full implementation exceeds the five years in which Defendants agreed to complete the entire reform effort. As stated by Mr. Milner of the Center for the Support of Families and the architect of the Plan, "MDHS still does not have all of the needed capacity to operate in conformity with *Olivia Y.* . . . It is also true that the time frames needed to institute the scope of changes included in the Settlement Agreement may not occur within the agreement's five-year time frame." (Defs.' Opp'n Ex. D at 2.) As recognized by the Monitor, "the plan will not be viable without the basic administrative and management tools and the other resources that are required by the Settlement Agreement, *but not yet in place*." (Period Two Report at 9 (emphasis added).) Nothing in the month between the time the Monitor made this finding and Plaintiffs filed their motion for contempt has transpired to evince that the management reforms deemed by the Monitor as necessary for successfully implementing the Practice Model have occurred.

Defendants disparage Plaintiffs as "hypocritical" for noting that Defendants have become increasingly reliant on Mr. Milner and CSF in their implementation efforts, when the Bridge Plan explicitly required such reliance. (Defs' Opp'n at 20.) Defendants entirely miss the point. Plaintiffs required CSF to provide an even greater degree of assistance than established by CSF's

original contract because it was abundantly clear that Defendants did not have the internal

management and administrative capacity to accomplish concrete goals absent such assistance.

The fact that the Bridge Plan mandated, and Defendants agreed to, extensive CSF involvement

confirms that Defendants have failed to develop the internal capacity to meet their obligations.

Plaintiffs in no way object to the use of outside consultants to provide needed child welfare or

management technical assistance.   But contracting for such assistance should not be confused

with building the much needed capacity within DFCS to implement and sustain reform.

      2.    <u>Defendants' Efforts At Meeting COA Requirements Do Not Establish<br>Substantial Compliance Or All Reasonable Efforts To Comply With<br>Period Two Requirements</u>

Defendants try to minimize the scope of their massive noncompliance with Period Two

requirements by pointing to the fact that the Council on Accreditation ("COA") determined that

they had met almost all of the COA obligations that came due during the period.  This task

required Defendants to submit documentation that reflects DFCS written policy related to each

COA standard that came due. (Period Two Report at 135-36.)  While COA deemed Defendants

to have provided sufficient documentation that they had a policy reflecting every COA standard

that was required, it did no assessment as to whether DFCS actually *complies* with any of the

submitted policies.  As pointed out by the Monitor, "COA does not assess actual agency

practices to determine compliance with COA standards until a later stage in the accreditation

process."  (Period Two Report at 135.)

The issuance of policies that reflect COA standards is unquestionably a necessary and

important first component of improving case practice and becoming accredited, which is an

objective Defendants are required to achieve within the next two years.  Nonetheless, the review

by COA without regard to whether the policies on paper are followed in practice does not

ameliorate Defendants' failure to accomplish the majority of the capacity-building requirements

23

which the Court-appointed independent Monitor was charged with assessing and with which

Defendants have consistently failed to comply.  (Pls.' Mem. at 2.)

Defendants' discussion of the Practice Model and COA activities should not obscure the

wide swath of unmet Period Two requirements that they have failed to address.  For example,

Defendants do not raise, let alone explain, why contracting for and *beginning* to develop a plan

for a performance-based contracting system by the end of Period Two as required was somehow

impossible.  Although the Defendants drafted two requests for proposals to hire a consultant to

develop the plan, at least one draft had "substantial deficiencies" and was eventually withdrawn

by Defendants.  (Period Two Report at 51.)  Defendants reported that they "conducted additional

research and consulted with experts regarding the development and implementation process," but

they did not actually hire a consultant or begin to develop the plan during Period Two as

required.  (*Id*.)  Research and consultation do not substitute for the development of a plan, and do

not constitute all reasonable efforts to do so.

Additional Period Two requirements that Defendants fail to even assert having

undertaken reasonable efforts to address include the provision of health services (Period Two

Report at 120-21), the development of a functioning quality assurance system (*id.* at 52-55), and

the manner in which Defendants process reports of child maltreatment (*id*. at 97-99).  Moreover,

even with respect to the requirements that Defendants assert they have made efforts to meet, they

have failed to demonstrate that those efforts are sufficient to fall within the meaning of "all

reasonable efforts."

## II.    Caselaw Confirms That Defendants Have Not Established That They Were Unable To Comply With Their Period Two Obligations And That Defendants Have No Excuse For Their Contempt

Neither Defendants' "belated," "minimally adequate," and sometimes nonexistent efforts

during Period Two nor their more recent efforts discussed above establish an inability defense

that would excuse contempt.  Caselaw requires that in order to utilize an inability defense, the nonperforming party must truly make *all* reasonable efforts to comply with their obligations. *See, e.g.*, *Commodity Futures Trading Comm'n*, 950 F.2d at 1529; *Rizzo*, 539 F.2d at 465. Defendants' efforts cannot be considered "all reasonable efforts" as that term has been interpreted by courts across the country.  Instead, the long periods of inadequate performance and lack of urgency by Defendants parallel other scenarios where courts have rejected the inability defense and found parties in contempt.

For example, in *United States v. Hayes*, cited by Defendants, the Eleventh Circuit failed to excuse the defendant's failure to produce partnership documents, even though the defendant had twice traveled to Switzerland in an attempt to obtain the documents from his partnership manager.  722 F.2d 723, 724-25 (11th Cir. 1984).  The court found that the defendant had not employed "all reasonable efforts" because he had failed to explore other avenues for obtaining the documents, such as removing the manager from his position in the partnership.  *Id.* at 725-26. The court held: "Even if the efforts [the defendant] did make were 'substantial,' 'diligent' or 'in good faith' . . . , the fact that he did not make 'all reasonable efforts,' establishes that [the defendant] did not sufficiently rebut the [plaintiffs'] prima facie showing of contempt."  *Id.* at 725 (citation omitted).

In another case, the Sixth Circuit rejected a contention by prison officials that they had taken "all reasonable steps" to comply with court orders mandating post-secondary education for female prisoners.  *Glover*, 934 F.2d at 708.  Although colleges and educators were outside of the defendants' control, the prison officials had failed to make necessary improvements to educational programming that they did control and had failed to explore alternative solutions.  *Id.*

Similarly, in a prison overcrowding case, the Second Circuit rejected an inability defense where the defendants failed to comply with population caps because "compliance [was] hindered by political difficulties rather than physical impossibilities." *Badgley v. Santacroce*, 800 F.2d 33, 37 (2d Cir. 1986). The court noted that contempt may be excused "because compliance is *literally impossible*," such as where an individual fails to comply with an order of payment because of poverty or insolvency, an individual is ordered to produce documents not in his possession or control, or a witness has refused to testify to a grand jury but the grand jury term has expired. *Id.* (emphasis added). However, the court found that compliance was not impossible because the defendants could stop accepting more prisoners and there was no showing that this would cause defendants to violate state law or risk contempt of state court. *Id.*; *see also Twelve John Does v. District of Columbia*, 855 F.2d 874, 878 (D.C. Cir. 1988) (acknowledging political difficulties in reducing prison overflow, but rejecting defendants' contention that this was sufficient to establish impossibility).

This instant scenario is analogous to *Aspira of New York, Inc. v. Bd. of Educ. of New York*, where the defendants' "inattention, lethargy, and drift" defeated their contention of inability. 423 F. Supp. 647, 659 (S.D.N.Y. 1976). In that case, the board of education failed to take measures to create a bilingual education program as required under a consent decree. As here, "defendants or their responsible subordinates knew the facts. *What was lacking was the concern and vigor necessary to remedy the defects.*" *Id.* at 655 (emphasis added).

Defendants were not called on to do the impossible during Period Two. Defendants themselves negotiated and agreed to the very Period Two obligations that they now contend would be "an impossibility." (Defs.' Opp'n 16.) In order for this contention to be even marginally credible, Defendants would have had to argue one of the following: that they

somehow did not understand the very obligations to which they agreed; that they knew at the time they entered into the agreement that it would be impossible to comply yet negotiated nonetheless in bad faith; or that they encountered massive and unforeseeable obstacles to implementation. Understandably, Defendants make none of these arguments. Moreover, these obligations that Defendants contend are impossible are simply the very tasks that must be undertaken to competently operate any child welfare system.

Nor are Defendants' recent plans and limited accomplishments following the conclusion of Period Two a defense to contempt. As a court assessing an inability claim in another institutional reform case stated:

> Defendants insist vigorously that they are now in compliance and that a finding of contempt would therefore be impermissibly "punitive." Assuming there is total compliance at this time, the conclusion would not follow. Defendants were in contempt for a long time . . . . Today's adjudication is appropriate not merely to record the violations and to compensate plaintiffs for their corrective endeavors, but to underscore the importance of avoiding similar disobedience in the future.

*Aspira*, 423 F. Supp. at 659 n.9 (S.D.N.Y. 1976); *see also Fortin*, 692 F.2d at 797 ("The fact that efforts and improvements have been made does not prove that further improvement would be impossible.").

The cases Defendants cite do not support a finding of inability here. Defendants rely on *Chairs v. Burgess*, 143 F.3d 1432 (11th Cir. 1998), in which the Alabama Department of Corrections was required to remove state prisoners from a county jail to a state prison under a consent decree. *Id*. at 1434. In overturning the district court's order of contempt, the Eleventh Circuit specifically noted that the state was subject to *ninety-two* similar orders requiring the removal of prisoners from county jails, and that the district court had excluded evidence offered by the state showing that its compliance with the decree at issue could cause it to violate the removal orders of other courts. *Id*. at 1437, 1437 n.5. The court found that the defendants had

27

taken "all reasonable efforts" to comply and excused their noncompliance because compliance would most likely cause the defendants to violate other court orders. *Id*. at 1437-38. Defendants here have put forward no evidence of other court orders or conflicting decrees which would make them "unable" to comply with the Settlement Agreement.[6]

Defendants also rely on *David C. v. Leavitt*, but in that case, the court explicitly noted that the defendants' efforts "do not demonstrate that Defendants have taken every reasonable step within their power to comply" with the settlement agreement. No. 93-C-206, slip op. at 23 (D. Utah Mar. 17, 1997) (attached to Defs.' Opp'n as Ex. A). Although the defendants had increased the agency budget, hired more caseworkers, and instituted a new permanency project, the agency had not prepared adequate corrective action plans or reported on its implementation as required. The court acknowledged that it had the power to decline to enforce a prior order, but held that "intervention [wa]s warranted" given the defendants' noncompliance. *Id.* at 23.[7]

Defendants have no defense to contempt here. Just like *Aspira*, where the court rejected an inability defense, Defendants "have neglected to marshal their own resources . . . . They have allowed deadlines to pass without advance announcements . . . . They have borne with seeming equanimity long periods of nonperformance, inadequate performance, or outright defiance from key constituents . . . . They have tolerated slipshod procedures. . . . They have displayed an

---

[6] Defendants' reliance on *Newman v. Graddick*, 740 F.2d 1513 (11th Cir. 1984), is similarly unavailing. There, the Eleventh Circuit reversed a finding of contempt in another prison case where the district court had first denied a motion for contempt, but then, without notice or a hearing, held the defendants in contempt, despite the fact that the prison commissioner faced conflicting state and federal court orders, and could not comply with one without violating the other. *Id.* at 1522-24. There are no such conflicting orders here.

[7] Defendants without any explanation contend that court intervention "would only derail" the reform effort. (Defs.' Opp'n 17.) Defendants have failed to explain how Court enforcement or a finding of contempt might "derail" any purported progress, nor can they. In fact, court involvement would *improve* Defendants' performance.

evident sense of nonurgency bordering on indifference . . . ." *Aspira*, 423 F. Supp. at 654. As another court stated: "The proof here falls far short of showing impossibility. The most it shows is that performance was difficult and that it would have required more intensive effort than [the defendant] was willing to devote to the task." *United States v. Swingline, Inc.*, 371 F. Supp. 37, 44 (E.D.N.Y. 1974). Defendants' failure to devote more intensive efforts to the reform process does not excuse their contempt here.

### III.    Defendants' Performance Under The Bridge Plan Is No Defense To Contempt

Defendants strenuously assert that this Court should not find them in contempt because of the timing of Plaintiffs' motion. Defendants seek to deflect responsibility for their failures because Plaintiffs' contempt motion was filed before the Monitor had issued her final report on Defendants' performance under the Bridge Plan. The Parties began negotiating the Bridge Plan in early May 2010, after the close of Period Two. At that time, the Monitor had already provided the Parties with a chart reflecting that Defendants were in massive noncompliance with their Period Two obligations, but had not yet issued her final report on Period Two performance. (*See Olivia Y. v. Barbour*: Draft Outline of Interim Findings Related to Period 2 Requirements, February 16, 2010, attached hereto as Exhibit E.) Absent a final report for Period Two, Plaintiffs could not move for a finding that Defendants were in contempt of their obligations during that period. However, the preliminary findings by the Monitor of a second year of near total noncompliance made it clear to Plaintiffs that it would be futile to negotiate yet another year's implementation plan. Plaintiffs therefore negotiated a short-term probationary agreement that required Defendants to produce child welfare data necessary for Plaintiffs to assess the wellbeing of children and to take immediate action on a very narrow set of requirements deemed most paramount to the safety and wellbeing of foster children.

29

The purpose of the Bridge Plan was threefold: to elicit the data necessary to determine the current wellbeing of Plaintiff children; to require some interim corrective actions to address the most striking failures in case practice while Plaintiffs awaited the Monitor's Period Two report; and to require Defendants to take specific actions, such as drafting resource development plans, that Plaintiffs deemed a prerequisite to even beginning many aspects of the reform effort and that that had still not been undertaken almost two and one-half years after the Settlement Agreement was signed. As it was clear that the management of DFCS was proving unable to implement reform, the Bridge Plan also required Defendants to increase the scope of work and authority of CSF.

In light of the Bridge Plan's four-month timeframe and the limited number of issues it addressed, it cannot reasonably be construed as corrective action for the entirety of Defendants' wide-ranging noncompliance with their Period Two obligations, nor was it so intended. In addition to obligating Defendants to produce data, the Bridge Plan addressed only 15 of the unmet capacity building requirements of the Period Two Plan. *See* Period Two Requirements and Correlated Requirements of the June 10, 2010 Agreed Order Chart, attached as Exhibit 1 to Dobies Aff. (Dec. 23, 2010), attached hereto as Exhibit F. In almost every instance, the Bridge Plan required performance on only a small aspect of a larger requirement. For instance, during Period Two, Defendants were required to develop and implement a written plan to provide comprehensive child welfare pre-service and in-service training to all caseworkers and supervisors. (Period Two § IP I.2.d.1.) The training plan was required to include action steps and timelines to hire and train staff, to update the training curriculum, and to "procure all additional resources needed to operate a training unit." (*Id.*) Moreover, Defendants were required to actually deliver such training to all caseworkers and supervisors. (Settlement

Agreement § II.A.2.c.7.)  Defendants failed to comply with these training requirements.  (Period Two Report at 30-40.)

The Bridge Plan provided corrective action only with respect to the failure by Defendants to provide workers with the skills needed to undertake a proper child abuse investigation. (Bridge Plan ¶ 7.b.)  The Bridge Plan does not in any way purport to correct Defendants' failure to develop and implement a full scale training unit and provide pre-service and in-service training on all other areas of child welfare practice.  Under Defendants' skewed interpretation of the Bridge Plan, providing workers with training regarding maltreatment investigations constitutes corrective action for *all* the training requirements of the Period Two IP, and would therefore relieve Defendants of their obligation to provide comprehensive pre-service and in-service training to caseworkers and supervisors.  Moreover, such an interpretation of the Bridge Plan would render the provision reserving Plaintiffs' right at the close of the Bridge Plan to move for contempt for failure to meet Period Two requirements a nullity.

Plaintiffs exercised their right as established by the Bridge Plan to file for contempt at the end of the Bridge Period based upon the following considerations: the Monitor had by then issued her final report regarding Defendants' Period Two performance detailing how poor management and planning were impeding Defendants from meeting their obligations in Period Two; Defendants had no plans to address core management weaknesses; Defendants had produced data which reflected ongoing problems with case practice; and Defendants had continued to adhere to unacceptably attenuated timeframes for accomplishing critical tasks such as implementing the Practice Model and finalizing the Policy Manual.  Defendants' purported "surprise" that Plaintiffs exercised their agreed-upon right to move for court enforcement before the Monitor issued a report on Bridge Plan performance is disingenuous at best.  And even

Defendants are forced to concede that Plaintiffs were well within their rights to move for contempt. (Defs.' Opp'n at 5.)

As the independent Monitor recognized, "regardless of the outcome" of the Bridge Plan, Defendants' efforts have not produced adequate reforms to Mississippi's child welfare system, and have adhered to a reform strategy more attenuated than permitted by the Settlement Agreement. (Period Two Report at 166.) This, coupled with their stark noncompliance with Period Two obligations and failure to address core management deficits, provides ample ground for a finding of contempt and the appointment of a receiver.

## IV.    A Receiver Is Necessary To Ensure That Mississippi Children Are Safe From Harm And Receive The Benefits Of The Settlement Agreement

Defendants contend that a receiver is not warranted here because it is premature and because no intermediate remedies have been imposed. These arguments are not well taken. While there is no doubt that it takes time to effectuate the change necessary to reform a child welfare system (*see* Defs.' Opp'n at 47), this does not excuse Defendants' failure to make any meaningful start toward compliance. This argument might be compelling if Defendants had diligently attempted to comply with their first and second year obligations and simply needed more time to accomplish the required reforms. However, Defendants squandered the first two and one-half years of the reform period with virtually no progress, and their limited accomplishments during the Bridge Period occurred solely after Plaintiffs laid out a roadmap of specific tasks to accomplish during a four-month period. By its very terms, the Bridge Plan demonstrates the management vacuum at DFCS, which is hobbling the reform effort. The Plan dictated in virtually two-week increments exactly what Defendants needed to accomplish, required the oversight of an outside consultant, and required Defendants to report monthly on progress meeting the requirements. Thus, the Bridge Plan provided precisely what was missing

in management: implementation planning, oversight, and accountability.  In order for Defendants to comply with the Settlement Agreement and implement sustainable reform, DFCS needs the management capacity to do its own planning, exercise oversight, and require accountability, or needs to have that management imposed on it.

At this point, the Parties are three years into the five-year reform process, with Defendants having accomplished just a fraction of what they agreed to do *during Period One*. This is the same point at which other courts have imposed receiverships in similar reform litigation.  *See Plata v. Schwarzenegger*, Case No. C01-1351 TEH, 2005 WL 2932253, at *1, *33 (N.D. Cal. Oct. 3, 2005) (imposing receivership over prison system three years after entry of consent decree); *LaShawn A. v. Kelly*, 887 F. Supp. 297, 298, 316 (D.D.C. 1995) (appointing general receiver over child welfare system four years after entry of consent decree), *aff'd sub nom. LaShawn A. v. Barry*, 107 F.3d 923 (D.C. Cir. 1996).  Defendants have had the time and opportunity to tackle the complex problems of child welfare reform, but have failed to make any meaningful efforts to begin the process necessary to protect the children in their custody.

Defendants also oppose the imposition of a receivership because "no other, less drastic, remedy has ever been employed."  (Defs.' Opp'n at 48.)  This contention is not completely accurate.  A number of less drastic remedies were incorporated directly into the Settlement Agreement.  As noted in Plaintiffs' motion, the reform scheme includes step-by-step annual implementation plans, a Court-appointed Monitor, and technical assistance by the Council on Accreditation.  (Pls.' Mem. at 49-50.)  Accordingly, the remedies that are typically instituted prior to the appointment of a receiver cannot be imposed here, because they are already built into the Settlement.  Defendants have suggested no other, less intrusive remedies that would fill the management vacuum and increase DFCS' capacity.

33

Moreover, Defendants' contention that they have never previously been found to be in noncompliance with a court order is disingenuous. (*See* Defs.' Opp'n at 48.) The only reason there has not yet been a court finding of noncompliance is because Plaintiffs attempted to avoid court enforcement and negotiate with Defendants as required under the Settlement Agreement. Defendants cannot seriously contend that the Court would have found them to be in compliance with the Period One Implementation Plan and Period One obligations of the Settlement Agreement had Plaintiffs moved to enforce them.

One of the predominant factors courts consider in assessing whether the appointment of a receiver is appropriate in the context of institutional reform is "whether there is a grave and immediate threat or actuality of harm to plaintiffs." *Plata*, 2005 WL 2932253, at *23. Tragically, foster children in Mississippi continue to be at risk due to Defendants' ongoing failure to implement the reforms to which they have agreed in order to ensure Plaintiffs' safety, wellbeing, and permanency. Given the continuing risk of harm to Plaintiff children, the lack of management capacity to institute the required reforms, the unavailability of other, less intrusive remedies that have not already been incorporated into the Settlement, the likelihood that a receiver will be effective, and Defendants' longstanding noncompliance, the appointment of a receiver is necessary here. *See Plata*, 2005 WL 2932253 at *23; *Dixon v. Barry*, 967 F. Supp. 535, 550 (D.D.C. 1997).

## CONCLUSION

For the foregoing reasons, and for all of the reasons set forth in Plaintiffs' Motion for Contempt and for the Appointment of a Receiver and Memorandum of Law in Support, Plaintiffs request that this Court find that Defendants are in noncompliance with the Settlement Agreement and the Period Two Implementation Plan and in contempt of court, appoint a general receiver with full authority to administer Mississippi's child welfare system to bring it into compliance

34

with the orders of this Court, and grant such other and further relief as this Court deems

necessary and proper.

Respectfully submitted, this 23rd day of December, 2010.

/s        Shirim Nothenberg
Marcia Robinson Lowry (MBN 43991 *pro hac vice*)
Shirim Nothenberg (MBN 43990 *pro hac vice*)
Jessica Polansky (MBN 45356 *pro hac vice*)
  CHILDREN'S RIGHTS
  330 7th Avenue, 4th floor
  New York, New York  10001
  Telephone: (212) 683-2210
  E mail: mlowry@childrensrights.org

W. Wayne Drinkwater, Jr. (MBN 6193)
  BRADLEY ARANT BOULT CUMMINGS LLP
  One Jackson Place, Suite 400
  188 East Capitol Street
  Jackson, Mississippi  39201
  Telephone:  (601) 948-8000
  Facsimile:  (601) 948-3000
  E mail: wdrinkwater@babc.com

John Lang (MBN 43987 *pro hac vice*)
  Attorney at Law
  60 East 42nd Street
  Suite 4600
  New York, NY 10165
  Telephone: (212) 300-0646
  E mail: john.lang@attorneylang.com

Christian Carbone (MBN 43986 *pro hac vice*)
John Piskora (MBN 44474 *pro hac vice*)
  LOEB & LOEB LLP
  345 Park Ave.
  New York, New York 10154
  Telephone: (212) 407-4000
  E mail: ccarbone@loeb.com

  *Plaintiffs' Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2010, I electronically filed the foregoing Plaintiffs'

Reply In Support Of Their Motion For Contempt And For The Appointment Of A Receiver with

the Court using the ECF system, which sent notification of such filing to the following:

Dewitt L.  ("Rusty") Fortenberry Jr., Esq.
Kenya Key Rachal, Esq.
Gretchen L. Zmitrovich, Esq.
Ashley Tullos Young, Esq.
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC
428 I-55 North
Meadowbrook Office Park
Jackson, MS 39211
(601) 351-2400

Harold E. Pizzetta, III, Esq.
Assistant Attorney General
General Civil Division
Carroll Gartin Justice Building
430 High Street
Jackson, Mississippi  39201

*Attorneys for Defendants Haley Barbour, et al.*


/s       Shirim Nothenberg