# Exhibit 3

*Prepared for*

**Mississippi Department of Human Services
Division of Family and Children's Services
State of Mississippi**

# Mississippi Foster Care Services Assessments

# *Final Report*

**October 13, 2009**



**Center for the Support of Families, Inc. (CSF)**

1107 Spring Street, Suite 2C, Silver Spring, MD 20910 ● Phone 301-587-9622 ● Fax 301-587-9620

**Mississippi Foster Care Services Assessments**

# TABLE OF CONTENTS

Executive Summary ....................................................................................................3

Introduction ...........................................................................................................18

Methodology ..........................................................................................................20

Assessments ...........................................................................................................25

    Reunification Services Needs Assessment ……………………………………………26

    Medical, Dental, and Mental Health Services Needs Assessment …………………….44

    Independent Living Services Needs Assessment …………………………………….72

    Recruitment and Retention/Foster Care Placement Needs Assessment ……………...89

    Child Safety Assessment …………………………………………………………….112

Appendices …………………………………………………………………………….131

    Appendix A:  Staff Survey …………………………………………………………..132

    Appendix B:  Case review sample questions …..……………………………………140

# EXECUTIVE SUMMARY

The Mississippi Department of Human Services (MDHS) is currently implementing the provisions of the *Olivia Y. vs. Barbour* Settlement Agreement, approved by the court in January 2008. The implementation activities are being carried out by the MDHS Division of Family and Children's Services (DFCS). The Period 2 Annual Implementation Plan requires that MDHS conduct several foster care services assessments in conjunction with a qualified independent consultant approved by the Court Monitor,[1] as follows:

- A reunification services needs assessment;

- A medical, dental, and mental health services needs assessment;

- An independent living services needs assessment;

- A recruitment and retention of resource families assessment;

- A termination of parental rights (TPR) assessment;

- A child safety assessment; and

- A foster care placement assessment.

MDHS contracted with the Center for the Support of Families (CSF) to coordinate the completion of the assessments. Because of the similarity of information needed and topics addressed in the recruitment and retention assessment and the foster care placement assessment, we combined those two assessments. The TPR assessment, which is due on January 1, 2010, is not included in this report, and will follow separately when it is completed. Therefore, this report includes five assessments.

The methodology used to conduct these assessments included a staff survey, a series of case reviews for each of the assessments, and a number of focus groups and structured interviews. Since CSF is also contracted to develop a child welfare practice model with MDHS, we designed these information gathering processes to provide information for the practice model and the assessments. We also reviewed policy and procedural information pertaining to each assessment, along with other information such as program descriptions of services, contractual information, and MACWIS reports.

Our major findings and recommendations from each of the assessments include the following:

## *Reunification Services Needs Assessment*

**Findings**

Based on the information above, we have made the following findings:

---

[1] Period 2 Annual Implementation Plan, Mississippi Settlement Agreement and Reform Plan, Section II: Foster Care Services Assessment and Implementation Steps, 2. Foster Care Assessments. Filed May 4, 2009.

Mississippi Foster Care Services Assessments

- There is a notable lack of services in the State targeted toward reunification. MDHS staff appear to try to mobilize services, such as family preservation services that that are designed more as placement prevention services, in the absence of specific reunification services.

- The lack of services is most pronounced in rural areas of the State, although wait lists and restrictions on who may receive the services affects the accessibility of services even where they exist.

- The demand for services used to facilitate and support reunification outstrips the capacity of contract providers to provide the services, leading to wait lists or referral rejections.

- There appears to be little opportunity to individualize reunification services to the needs of particular families, owing either to the standardized design of programs, e.g., family preservation, parenting classes, or to the lack of available services and providers to match to identified needs. The services that are available, with the exception of the intensive in-home services, are categorical and standardized and may not fit with each family's needs. We believe that the effectiveness of reunification services in the State could benefit from an array that includes more in-home services that are flexible and designed to address behavioral health needs and parent support needs.

- Post-placement services to support reunification once it has occurred seem notably absent. Given the requirements in the *Olivia Y* settlement agreement for after care plans and services, this is an important finding.

- The effectiveness of services to address needs that must commonly be addressed in order to achieve and sustain reunification, such as domestic violence, substance abuse, and sexual abuse, is regarded as low by staff. Although staff rated their effectiveness in meeting the basic needs of families whose children are in foster care, e.g., food, clothing, shelter, the lack of available funds to meet these needs suggests it is an area for strengthened capacity in the way of flexible, earmarked funds for that purpose.

- Apart from contracted services, MDHS agency services/activities that support reunification need strengthening in several areas including using assessments to link services to identified needs, maintain frequent contacts among caseworkers, parents, and children, and involving both parents in case planning and service delivery.

- The involvement of birth parents in maintaining parental responsibilities to the extent that it is safe and appropriate to do so while their children are in foster care is a practice area in need of particular strengthening.

- When a number of the findings are considered together, such as the lack of specific reunification services, the lack of father involvement, the lack of capacity to respond to individual needs that are barriers to reunification, the lack of resource family involvement in reunification efforts, and some of the court-related barriers to maintaining child-parent contact, we are concerned that reunification as a viable goal requiring diligent attention may not receive the same emphasis in practice as other permanency goals, i.e., adoption. While

policy supports establishing reunification as an initial goal in most cases, we did not find policy and training that emphasize diligent and ongoing efforts to mobilize the services needed to pursue reunification actively. The new practice model will focus activities and resources heavily on proactive efforts to achieve timely and appropriate reunification which will require, in some situations, substantial shifts in perspective and approach to working with families within MDHS and among its service providers, foster caretakers, and the courts. Changing policy and training and adding to the service array will help in making this shift, but alone they will not cause staff and stakeholders to think differently about reunification and commit to addressing needs appropriately in an effort to achieve reunification. There are a number of tasks associated with elevating the importance and priority of reunification activities that will need to be addressed in order to increase effectiveness in this area.

- We did not identify MACWIS reports that provide information on reunification services provided, thus limiting the Department's ability to monitor service provision effectively.

**Recommendations**

- There is a serious need to increase the array of services in the State to be used to facilitate and sustain reunification. We are recommending that MDHS consider the following options for addressing this area:

  - Since MDHS can use Federal title IV-B funds to fund in-house staff that provides family preservation and reunification services, some consideration of this approach might be considered in order to supplement the contracted services and increase the availability of services in rural areas of the State. Since these funds are capped, this might mean diverting existing IV-B expenditures, but developing some type of in-house capacity to provide needed reunification services is worth considering as a means of making services available where they are currently unavailable.

  - We recommend that the capacity of existing contractors to provide reunification-related services be increased statewide. This can be done by increasing funding for these services as well as relaxing some of the program restrictions that now limit the access to these services by families needing reunification services. If the Department wishes to reserve family preservation families for placement prevention and reunification from short-term stays in foster care, we recommend that the expansion of services occur with intensive in-home services.

  - As also recommended in the Medical, Dental and Mental Health Services Assessment, we recommend that MDHS enter into collaborative agreements with the DMH and the State's Medicaid agency to fund mental health professionals in rural areas of the State that serve children and families served by MDHS. Since most of the families are Medicaid-eligible, we believe that the services they provide would be reimbursable through Medicaid and it would immediately increase families' access to mental health services in the State.

- We recommend that flexible funds be earmarked for use in helping to meet the basic needs of families seeking to reunify with their children in foster care, and/or that procedures for accessing available funds be clarified and simplified.

- We recommend that the State examine services and practices with established records of effectiveness in reunifying children and families timely and appropriately and, where possible, consider replicating some of those "best practices" within the State. For example, we recommend attention to the Model Youth Court program in Forest County as a means of providing services directed toward reunifying very young children in foster care with their families.

- We recommend that the reunification services provided through MDHS support be tailored to the individualized needs of the families receiving them. This can be supported in the following ways:

  - We recommend relaxing the requirements for all families to complete standardized programs regardless of their individual circumstances, strengths, and needs.

  - We recommend adding to the service array the capacity to provide more in-home services to families such as in-home behavioral health interventions as an alternative to office-based mental health counseling, and in-home parent coaching and support as an alternative to standardized parenting classes.

  - We recommend that the Department's performance-based contracting system, when implemented, support the need for providers to respond flexibly to families' needs with services that reflect their unique strengths and needs in the comprehensive family assessments and case plans.

  - We recommend strengthening both policy and practice requiring MDHS staff to coordinate case planning and service provision activities with service providers in order to ensure that services match needs, and to monitor the effectiveness of service provision in facilitating and supporting reunification.

- Consistent with other recommendations we are making with regard to implementing a child welfare practice model, we recommend that policy and training be strengthened to support improvements in practice with regard to reunification, such as the following:

  - Strengthened case planning and ISP policy and training that focus on identifying strengths and needs, matching services to needs, brokering for and obtaining needed services, and monitoring the effectiveness of services. This should include the active involvement of service providers in case planning processes whenever appropriate.

  - Strengthened policy and training with regard to visits between caseworkers and parents/children for the purposes of assessment, case planning, involvement, and case monitoring.

- Strengthened FTM policy and training that requires the bringing together of all relevant parties at frequent intervals to identify needed services, put them into place, and monitor their effectiveness.

- We recommend that as MDHS rolls out the new child welfare practice model, that leadership within the Department (statewide and regionally) develop and convey clear messages to staff, service providers, foster caretakers, and stakeholders such as the courts, with regard to the priority and importance it places on timely and appropriate reunification.

- As MDHS implements a new CQI process, we recommend that it monitor specifically for the provision of appropriate and timely reunification services, their effectiveness, and related casework activities carried out by both MDHS staff and provider staff related to reunification efforts. We also recommend that the CQI process monitor for the adequacy of the reunification-related service array statewide and provide reports and other feedback to county, regional, and State administrators on the strengths and gaps of the service array.

- We recommend that MDHS develop MACWIS reports on services provided to families with reunification as a goal that will support monitoring in this area. Reports should include, at a minimum, services provided, dates of initiating and terminating services, service provider, and case status. If possible, with the automation of the ISP, reporting on the match of needs identified in the ISP to service provided would provide an effective tool for supervisory monitoring in County Departments.

- We recommend strengthened training for resource parents in the area of supporting birth families in the reunification process, particularly in facilitating child/parent contacts and parental involvement in the care of their children while in foster care.

- We recommend active engagement of the courts around child/parent visits, given some of the concerns raised in that area. This could take the form of educational initiatives with the judiciary and/or working through the Administrative Office of Courts to facilitate discussion or training in this area. Free technical assistance from the National Resource Center for Legal and Judicial Issues should be explored in developing a strategy to address the courts' effects on the frequency of child/parent visits.


## *Medical, Dental, and Mental Health Services Needs Assessment*

**Findings**

Our findings for this assessment indicate that mental health issues are predominant, although there are some important findings regarding dental services as well. Also, poor case file documentation regarding screening/evaluation for needed services and the provision of services is a concern in that it inhibits the effective provision of all these services, particularly when there is staff turnover.

*Mental Health Services Findings*

- Some mental health initiatives offer effective approaches to meeting the mental health needs of children in the child welfare system, but are limited in scope, funding, or criteria for the population served. For example, a wraparound services approach would be beneficial to all children not just those with SED, and the inter-disciplinary approach of the MAP teams could benefit children before they exhaust other available services but funding is very limited.

- Community Mental Health Centers appear to be the primary source for MDHS to provide mental health services to children and youth in its care. Across the State, the centers do not offer a consistent range of services, particularly in rural areas of the State where services are considered to be quite limited, and they are often unable to provide the level of specialization needed by children in foster care.

- Access to private providers of mental and behavioral health services is restricted, particularly in rural areas of the State, by lack of funding to pay for the services, by wait lists to obtain services even when they are available, and by a lack of providers that will accept Medicaid.

- Obtaining psychological evaluations is particularly difficult, as there are areas of the State where this service is not available.

- Mental health screenings of children are either not conducted as consistently as needed or the case file documentation was so poor that we could not determine if a screening had been conducted or not.

- There is little or no choice of providers in rural areas.

- The effectiveness of some services is generally regarded as poor, indicating a need for more choices of providers, more accountability in service provision, and strengthened ability to tailor services to meet the individualized needs of children and youth.

*Dental Health Services Findings*

- Access to dental providers in rural areas of the State appears to be the most prominent issue. A number of providers will not accept Medicaid and families/resource families often must travel long distances to access providers.

- The dental services authorized and covered by Medicaid are limited, particularly as it relates to orthodontic care.

- Dental screenings are either not conducted as consistently as needed, or there is inadequate documentation of case files to make a determination as to whether the screening was conducted or not.

*Physical Health Services Findings*

- In general, access to physical health care appears better than dental or mental/behavioral health services.

- Although the initial physical health screenings of children occur more frequently than screenings for dental and mental/behavioral health concerns, case file documentation in this area is lacking.

- Medicaid cards and medical info may not be provided to resource parents routinely, affecting their ability to seek and provide needed services.

- At least some resource parents experience difficulty in getting the necessary medical background information on children placed in their homes, and are unaware of the medical needs of the children at the time of placement.

- Some resource parents appear to have difficulty obtaining complete medical information from physicians needed to attend to the medical needs of children in their care.

- Transportation to services (medical, dental, mental health) is a major issue in rural areas, and Medicaid only reimburses in limited circumstances.

**Recommendations**

- MDHS and MDMH should develop a collaborative program to serve the mental health needs of foster care children statewide, including specialty services, e.g., psychological examinations, treatment for abuse and neglected children and youth, etc. This should include the possibility of hiring qualified mental health professionals to be based in DHS regional offices to serve counties where the service population is the greatest or where gaps in services are the most prevalent, for example, in many of the rural areas of the State. Programs of this nature can offer a diverse range of services and can be structured to enable Medicaid billing to cover a majority of the staffing and administrative costs. The participation of the State Medicaid Agency should be pursued to explore further creation of these types of innovative programs along with funding arrangements.

- In cooperation with the colleges and universities in the State, MDHS and the State Board of Dental Examiners should intensify efforts to recruit dentists to provide services to children and youth in foster care, as well as to children served in their own homes through MDHS. This effort may be part of a more comprehensive approach to providing health care in rural and underserved areas of the State. A clinic approach that specializes in providing Medicaid-funded dental care to children can offer access that is currently unavailable, and there are models around the country to draw on in designing such a program.

- MDHS should collaborate with the State Medicaid Agency to pursue the possibility of exercising State options that could include an expansion of dental services to include orthodontic care for children and adolescents.

- MDHS collaborate with DMH and the State Medicaid Agency to establish additional waiver programs to expand its provision of mental health services to children who are placed in foster homes. The MYPAC program is one example of a waiver program that could also serve children residing in foster family homes at risk of entering PRTF's, thereby enabling these youth to receive needed services and remain in the community.

- MDHS should collaborate with the psychology and behavioral science programs of the State's post-secondary systems to explore the possibility of establishing internships and field placements within MDHS, providing opportunities for professional and academic advancement that includes direct services and interventions to children and adolescents in foster care.

- MDHS Regional Administrators and Area Social Work Supervisors should establish performance standards and monitoring practices that hold direct service staff accountable for documenting all assessment, screening, and service provision information in the case files and for maintaining current health records.

- MDHS incorporate specific measures and review processes within its CQI system to ensure that all initial screenings are conducted within established timeframes.

- MDHS should ensure that its Foster Care Reviews (FCR) include the evaluation of the provision of needed medical services as part of appropriate case planning efforts and timely achievement of case plan goals.

- MDHS should establish both supervisory practices and monitoring processes within its CQI system to ensure that resource parents are provided timely and accurate medical information that enables them to meet the needs of children in their care.

- MDHS should reimburse resource parents for transportation of children to all necessary appointments on behalf of the medical, dental, and mental health needs of children in their care.

- MDHS Regional Directors and Area Social Work Supervisors should ensure that direct staff provides health records, appropriate health referrals and relevant information about services/programs to youth exiting care and to parents or guardians at the time of case closure for the purpose of continuity of health care and service delivery. Part of the FCR process might include addressing this issue with resource families since the FCR reviews all cases of children in foster care each six months.

## *Independent Living Services Needs Assessment*

**Findings**

- The youth we spoke to who have participated in the program indicated they enjoy the program.

- Caseworkers are consistent with policy in informing youth about the Independent Living Program and encouraging them to participate.

- There are indications that the program is reaching most of the youth in foster care.

- Contracting with one agency can be beneficial, not only in developing a close rapport with one provider, but to ease MDHS' ability to provide oversight and monitor the work being done.

- We did not get the sense that the MDHS caseworker consistently reinforces the skills being taught by the service provider in the IL classes or that they consistently address IL issues with youth in their caseloads but, rather, defer to the contractor.

- Both the contractor and the Department appear to be developing IL plans for youth and we did not find indications that either of the plans was individualized to the strengths and needs of the youth, that they addressed key concerns related to achieving independence, or that they were coordinated with each other. In fact, the plans seem to be minimally completed. In the case of the MDHS plans, we did not find evidence that they were based on the findings of the Ansell-Casey Life Skills Assessment or other assessments.

- We could not find evidence that youth are actively involved in the development of either plan.

- The IL services offered are standardized and there appears to be little flexibility in the contractor's ability to tailor individual services to the strengths and needs of youth as opposed to offering the same Life Skills classes to all youth. We believe that this may be a contracting issue, in which the program requirements for the program are standardized in the contract requirements.

- Although the current contract calls for the contractor to identify 18 mentors for youth statewide, we do not believe that has occurred. Even so, 18 mentors would not begin to address the needs of the many youth in care in need of this service.

**Recommendations**

- We recommend that the contract for independent living services be modified substantially as follows:

    - The contract should permit and require diversity in the range of IL services provided, rather than requiring a standard curriculum for all youth as the core service. While we recognize the importance of the Life Skills classes, we particularly recommend that a repetition of the classes not be required and that classes be designed and tailored to individual youth's needs, strengths, level of development, and interests.

    - We recommend that the contract include the flexibility and requirement to offer a broader range of services that are identified for individual youth through the Ansell-Casey Life Skills Assessment and the MDHS comprehensive strengths and needs assessment (when this is implemented by MDHS).

- We recommend that resource family training be modified to include content on the roles and responsibilities, and the skills needed, of resource families to assist youth in their care work toward independence and transition to adulthood. MDHS should create the expectation that resource parent involvement in IL service delivery and planning is a part of the role of foster parenting for youth.

- We recommend that MDHS staff training be strengthened to address the complementary roles and responsibilities of MDHS staff and contractor staff with regard to addressing independent living for youth in care. In particular, the training should emphasize a proactive and involved role for MDHS staff that reinforces skills taught by the contractor, uses caseworker visits to address IL issues, actively engages youth in planning for independence and adulthood, and addresses the connections that youth need upon leaving foster care, such as relationships with mentors and/or families and at least one caring committed adult. The training should prepare MDHS staff to address aftercare planning and linking discharged youth with the appropriate array of services. A practice guide for MDHS staff in this area would be helpful.

- We recommend an increased emphasis on the recruitment and linking of mentors with youth in foster care. Both the Department and the contractor should be held accountable for ensuring that each youth exiting foster care is linked with at least one caring committed adult that will help the youth transition to adulthood beyond foster care. This should be a part of the contractual requirements and an item for monitoring casework practice.

- We recommend that the case planning process for youth in care be strengthened in several ways, as follows:

  - First, there should be one IL and one TL plan for each youth rather than separate plans developed by the contractor and the Department;

  - The plans should be developed in accordance with the principles of the child welfare practice model that will be implemented by MDHS which includes active involvement of the youth and the youth's significant family members and providers, including foster caretakers, in developing the plan; the plan should result from a comprehensive strengths and needs assessment which includes the Ansell-Casey Like Skills Assessment; the services in the plan should be clearly connected to the youth's strengths and needs and developmental level and capacity; and the plan should be reviewed routinely and updated as needed as the youth's needs change.

  - The plan should be developed in the context of a Family Team Meeting with the contactor and the Department working together with the youth and other participants to develop the plan.

- We recommend that MDHS develop and implement communication protocols for the contractor and MDHS staff to meet routinely with the youth to discuss progress toward goals,

Mississippi Foster Care Services Assessments

the effectiveness of services, emerging or changing needs and strengths, and critical issues to the youth's independence such as aftercare planning and needs for services, relationships with family and other individuals, and so forth. All meetings and discussions with the youth should be clearly documented in the MACWIS case file.

- We recommend an increased emphasis and accountability for sharing information between the contractor and MDHS staff, particularly as it relates to sharing the Ansell-Casey Life Skills Assessment and other information that pertains to serving the youth in care.

- We recommend that supervisory protocols and CQI processes (when implemented) address the quality and documentation of case plans for youth in care, the existence of and use of assessment information in developing plans, the youth's involvement in developing the plans, the individualization and provision of services, after care planning, and linking youth with caring committed adults.

- We recommend an increased emphasis and accountability on case file documentation of key activities, plans, assessments, and service provision for youth in care.

## *Recruitment and Retention/Foster Care Placement Needs Assessment*

**Findings**

- There is some lack of consistency in procedures and requirements among the Regional Resource Units, and the practice varies from one region to another. We could not identify coordination or collaboration from region to region.

- There is a great deal of inconsistency among regions and among counties within regions regarding the application of foster care policy and practice.

- Current policy manuals seem to be lacking, and some staff may only be aware of agency policy through word of mouth. We could not identify a place for a staff member to obtain a complete policy manual except to copy another manual. The "P" Drive contains bulletins with updated policy, but not a complete, current Volume IV manual.

- Compliance with policy regarding the placement of children seems very inconsistent.

- County workers seem to be working diligently to ensure that children in foster care have regular visits with their birth families and with their siblings not placed together.

- County workers do not consistently begin the process of evaluating the child during the initial investigation, while they are with their own family. The information obtained directly from the birth parent could be valuable, and it would provide information that could be shared with the resource parents if the child has to enter care.

- Resource families are not treated as partners in decision-making and are not consistently involved in case planning activities.

- There are no recruitment plans for resource families and no funds for recruitment efforts.

- There are no funds for certain resource parent training activities, such as refreshments.

- The cost associated with applying to become a resource family in some areas (estimated at $400+^{2}$) is prohibitive for many families.

- There are inadequate numbers of placement options for children entering foster care.

- The MACWIS system does not produce some needed aggregate reports regarding children and placement resources.

- There is no accurate differentiation in MACWIS among foster homes, adoption only homes, and relative foster homes.

- There is no single contact which has statewide information about placement resources.

- The State Office capacity for studying State and Federal law, drafting policy, and interpreting the policy for practice needs to be strengthened.

- The current process for securing a therapeutic placement is time-consuming, ineffective, and does not ensure appropriateness of service.

- Mental health services for children in foster care are inadequate and ineffective.

- Many resource workers and resource ASWS are recently promoted and have not received placement-specific training.

**Recommendations**

- Issue current, complete DFCS Policy Manuals to all DFCS staff agency-wide.

- Provide consistent training for all DFCS staff on agency policy as it relates to foster care services.  Include appropriate training on MACWIS related to foster care.

---

[2] This is based on an estimate of $150 for each adult's medical, $30 each for TB tests and more if X-rays are required, $20 each for fire extinguishers, $7 each for smoke detectors (2), and other costs for missing work for training/getting medicals/home study visits, car seats, baby beds, and so forth.

- Coordinate resource services from the State Office level so the efforts of each Regional Resource Unit can be combined with others to achieve consistency statewide. This would include becoming familiar with Federal regulations and State laws pertaining to foster care, writing policy which conforms to the Federal regulations, consulting with regional resource staff, and supervising the resource ASWSs.

- Train Resource staff specific to preparing children for placement and preparation of foster families to accept and nurture the types of children entering care.

- Initiate a statewide recruitment effort coordinated by State Office that is focused on recruiting families for the kinds of children who are entering care. Develop a uniform plan for following up with responses to the recruitment efforts.

- Initiate the Resource Placement Committee meetings at the regional and State level as outlined in the *Olivia Y* settlement agreement.

- Consider initiating support groups for children in foster care at the local level.

- Ensure that State Office staff dealing with resource issues are licensed social workers, preferably with master's degrees and that they are thoroughly oriented to the job responsibilities and are proficient in addressing resource and placement-related issues.

- Ensure that pre-service training for resource families includes a module on the financial aspects of providing foster care, including board payment rates, Medicaid, clothing vouchers and reimbursement processes and transportation reimbursement. A sample travel voucher should be given to new resource parents during this segment.

- Modify the current referral process for therapeutic placements to permit the referrals to be made by local staff (worker or ASWS) in accordance with clearly established procedures, with payment approval residing at the State Office level.

- Streamline the travel voucher system in State Office to reimburse foster parents, removing any unnecessary points of contact.

- Offer training to mental health providers on issues related to neglect and abuse, separation and attachment, and other placement issues.

- Cross-train county workers and resource workers, ASWSs and RDs on preparation of children for placement, the roles of resource families, and the respective roles and responsibilities involved in a team approach to this area of practice.

- Produce a statewide newsletter to inform all resource families of training opportunities, resources, support groups, new policy, and so forth.

- Ensure that the training curriculum for newly hired workers includes segments on placement preparation and working in partnership with resource families.

## *Child Safety Assessment*

**Findings**

- Safety assessments in investigations of child maltreatment while in foster care seem to be conducted consistently. This is based on information from interviews and case review findings.

- Screening decisions seem to be accurate for the most part, but priority levels should be clarified in policy and practice.

- There is a need to identify service needs of children and resource families with regard to safety and risk issues, and to make appropriate referrals and link them with services during the investigation if needed.

- There is a need to ensure that the child's parents are notified of reports concerning their children while they are in foster care.

- Face-to-face contact with the children during investigations does not appear to be consistent in the investigations process.

- Supervisory review of investigations should be documented more clearly and consistently.

- Investigations of reports of maltreatment in foster care do not appear to be initiated or completed in accordance with policy requirements (based on our case reviews).

- Interviews with all required parties during the investigation process are either not consistent or not well documented.

- Documentation of investigations in general is not thorough.

**Recommendations**

- We recommend that MDHS develop a simplified safety and risk assessment tool for use with children in foster care placements. SARA and the safety checklist do not seem to apply to the circumstances of those children and may not be capturing the relevant information regarding maltreatment in foster care.

- We recommend that MDHS strengthen policy regarding who is responsible for investigating reports of maltreatment of children in foster care in the County Departments, including when and how to involve the resource worker.

**Mississippi Foster Care Services Assessments**

- We recommend that policy pertaining to the use of corporal punishment of children in foster care by their resource parents or facility staff be clarified and enforced. We heard from some sources that these incidents are coded as policy violations, but we understand that the *Olivia Y* settlement agreement requires that it be treated as a maltreatment report.

- We recommend training of all investigative and resource staff on investigating reports of maltreatment in foster care.

- We recommend that ASWSs monitor and enforce the timeliness of initiating and completing investigations of reports of maltreatment in foster care. We believe that a MACWIS report that captures this information and reports on it monthly would be helpful in monitoring and enforcing the policy.

# INTRODUCTION

The Mississippi Department of Human Services (MDHS) is currently implementing the provisions of the *Olivia Y. vs. Barbour* Settlement Agreement, approved by the court in January 2008. The implementation activities are being carried out by the MDHS Division of Family and Children's Services (DFCS). The Period 2 Annual Implementation Plan requires that MDHS conduct several foster care services assessments in conjunction with a qualified independent consultant approved by the Court Monitor,[3] as follows:

a. A reunification services needs assessment;

b. A service provider needs assessment with the purpose of identifying available medical, dental, and mental health services and gaps in services;

c. An assessment of the quality and array of independent living services available to foster children ages 14-20;

d. A recruitment and retention assessment to determine the need for additional foster care support services;

e. A termination of parental rights (TPR) assessment for the purposes of identifying those children who have been in custody more than 15 of the previous 22 months and for whom DFCS has neither filed a TPR petition or documented an exception under the Federal Adoption and Safe Families Act (ASFA);

f. A child safety assessment of DFCS practice for prioritizing, screening, assessing, and investigating reports of maltreatment of children to determine the extent to which DFCS investigations and decisions are based on a full and systematic evaluation of the factors that may place child at risk; and

g. A placement assessment of current needs for achieving compliance with the placement standards set forth in Section II.B.5 of the Settlement Agreement, which shall include (1) the structure of the placement process, including the role and efficacy of the state office placement unit; (2) the services and supports available to support enhanced placement stability, including out-patient or in-home assessment and treatment services to avoid the frequent use of time-limited assessment and treatment placement programs; and (3) the placement resources needed to meet the placement needs of children in custody.

MDHS contracted with the Center for the Support of Families (CSF) to coordinate the completion of the assessments. The TPR assessment, due on January 1, 2010, is still in development and will be submitted separately from the remaining assessments.

CSF is also contracted to develop a child welfare practice model with MDHS and we designed our information gathering processes, e.g., case reviews, focus groups, staff survey, to provide information for the practice model and the assessments. Given the similarity of the assessments in paragraphs (d) and (g) above, we obtained approval to combine those two assessments,

---

[3] Period 2 Annual Implementation Plan, Mississippi Settlement Agreement and Reform Plan, Section II: Foster Care Services Assessment and Implementation Steps, 2. Foster Care Assessments. Filed May 4, 2009.

**Mississippi Foster Care Services Assessments**

resulting in the completion of six assessments, five of which are included in this report. This report provides a description of the methodology used to conduct the assessments, the findings of each assessment, and a summary of our major recommendations.

# SECTION I: METHODOLOGY

## *Approach to Conducting the Assessments*

We conducted five assessments to fulfill the requirements of the *Olivia Y* settlement agreement, as follows:

- Child Safety Assessment

- Reunification Services Needs Assessment

- Medical, Dental, and Mental Health Services Assessment

- Independent Living Services Assessment

- Foster Care Placement and Support Services Assessment

With some differences owing to the particular assessment, we organized the five assessments similarly in an attempt to address the following questions pertaining to each service area:

- What are the current needs and populations concerned with the service area?

- What policies and procedures govern the application of the services?

- What does the current service array consist of?

- What is the effectiveness of the current services?

- What gaps exist in the current service array?

- What, if any, are our recommendations for strengthening the service array?

In addressing these questions for each assessment, we used a variety of information sources. Since CSF is also contracted to develop a child welfare practice model for MDHS, we combined some of the information gathering processes to collect information that would serve multiple purposes. For example, we presented questions in a staff survey that addressed the components of the practice model and the assessments, and we asked focus group questions that pertained to multiple assessments and the practice model.

The information gathering process included the following components:

## *Staff Survey*

We designed an electronic survey with input and approval from the MDHS Central Office, and posted it on Survey Methods for completion by child welfare staff across the State. The Central Office issued an invitation by email to staff to complete the survey over a two-week period,

which we later extended by an additional week in order to provide more opportunity for staff to participate in the survey. A copy of the survey is provided in *Appendix A*.

Although we organized the survey according to the components of the practice model, we inserted questions for each assessment area that could provide us with staff's perceptions of the agency's effectiveness in each area.

Through the two response periods, 254 staff completed the survey as follows:

- 93 (36.61 percent) responses from Family Protection Specialists, 49 (19.29 percent) from ASWS, 37 (14.59 percent) from other, 30 (11.81 percent) from State Office staff, 25 (9.84 percent) from Family Protection Workers, 11 (4.33 percent) from Resource Workers, and 9 (3.54 percent) Regional Directors;

- 74 (29.13 percent) respondents have worked at MDHS for more than 10 years, 69 (27.17 percent) have worked at MDHS for 1-3 years, 47 (18.5 percent) for 5-10 years, 24 (9.45 percent) for 6 months to one year, and 18 (7.09 percent) for less than 6 months; and

- 93 (36.47 percent) respondents had been in their current position for 1-3 years, 56 (21.96 percent) for less than 6 months, 33 (12.94 percent) for six months to one year, 30 (11.76 percent) from 3-5 years, 24 (9.41 percent) for 5-10 years, and 19 (7.45 percent) for more than 10 years.

In analyzing the results of the survey, we used Survey Methods functionality to create tables that display the results. We exported data to Microsoft Excel, manually reviewed the responses to all of the open-ended survey questions, and categorized or grouped responses according to our best understanding of what the respondents indicated in their comments. The results of the staff survey are incorporated throughout the discussion of each assessment.

### *Case Reviews*

We conducted a series of case reviews that were organized around the topics of the five assessments, although information from the case reviews was also used to inform the components of the practice model.

We selected random samples for each of five sets of case reviews using the following criteria:

- *Reunification Services Needs Assessment:* We reviewed one random sample of 30 cases that met the following criteria. We requested of MACWIS a random statewide selection of 50 cases (to provide for an oversample) of children in foster care during preceding twelve months in all placement types with reunification as permanency goal for at least 60 days during the twelve month period, regardless of the current permanency goal. We did not eliminate cases based on whether they were currently open or closed for services, but required that the cases should have been opened for at least 60 consecutive days during preceding twelve months (open for services, not just open for investigation). We requested that the sample not include siblings or duplicates of the same child, for example if there were multiple episodes of foster care for a child during the twelve month period. The sample we received was not randomized, and we used a table of random numbers to select the random sample of cases reviewed.

- *Medical, Dental, and Mental Health Services Assessment:*  We reviewed one random sample of 30 cases that met the following criteria.  We requested of MACWIS a random statewide sample of 50 children (to provide for an oversample) in foster care for at least 60 days during the preceding twelve months, including any placement type and any permanency goals.  We did not eliminate cases based on whether they were currently open or closed for services, but required that the cases should have been opened for at least 60 consecutive days during preceding twelve months (open for services, not just open for investigation).  We requested that the sample not include siblings or duplicates of the same child, for example if there were multiple episodes of foster care for a child during the twelve month period.  The sample we received was not randomized, and we used a table of random numbers to select the random sample of cases reviewed.

- *Independent Living Services Assessment:* We reviewed one random sample of 30 cases that met the following criteria.  We requested of MACWIS a random statewide selection of 50 youth (to provide for an oversample) ages 14-20 in foster care for at least 60 days during the preceding twelve months, including any placement types and any permanency goals.  We did not eliminate cases based on whether they were currently open or closed for services, but required that the cases should have been opened for at least 60 consecutive days during preceding twelve months (open for services, not just open for investigation).  We requested that the sample not include siblings or duplicates of the same child, for example if there were multiple episodes of foster care for a child during the twelve month period.  The sample we received was not randomized, and we used a table of random numbers to select the random sample of cases reviewed.

- *Foster Care Placement and Support Services Assessment:*  We reviewed a random sample of 30 cases that met the same criteria as the sample for the Medical, Dental, and Mental Health Services Assessment.

- *Child Safety Assessment:* We selected two separate samples of children for whom reports of maltreatment were made while the child was in a foster care placement and the perpetrator was the foster caretaker.  The purpose of reviewing these cases was to determine whether full investigations were completed on reports of child maltreatment in foster care and whether or not reports were appropriately screened.

  The first sample consisted of screened-out reports of maltreatment in foster care, for which we requested from MACWIS the universe of all reports screened out for investigation during preceding 12 months, where the child victim was in foster care (all placement types) and the alleged perpetrator was the foster caretaker or member of foster caretaker's household or facility staff.  We requested the universe since we expected a small number of cases statewide to meet these criteria.  From the universe, we used a table of random numbers to identify a random sample of 17 cases for review.

  The second sample consisted of investigations of reports of maltreatment of children in foster care, for which we requested from MACWIS the universe of all completed investigations of reports of child maltreatment during preceding twelve months, where the child victim was in foster care and the alleged perpetrator was the foster caretaker or a member of household or

facility staff. From the universe, we used a table of random numbers to identify a random sample of 30 cases for review.

We developed individual case review protocols for each sample of cases reviewed. The case review protocols were automated in a Microsoft Access data base, and a list of the questions pertaining to each sample reviewed is included in Appendix B. All of the information from the case reviews was taken from electronic case records in the MACWIS system. We entered the information from the case reviews into a Microsoft Access data base which permitted us to develop reports and conduct an analysis of the responses.

## *Focus Groups*

We conducted a series of focus groups in order to gather information on how various stakeholders understand and perceive their roles; the extent to which their practice supports the DFCS mission and values; to clarify how practice in the field supports policy; to obtain their first-hand view of which services, programs, and initiatives support positive outcome achievement; and to determine barriers to effective, consistent practice and service delivery. We conducted focus groups with the following representatives:

- Four groups of caseworkers representing a large number of County Departments in four areas of the State (Tupelo, Hattiesburg, Jackson area, and Greenville);

- Four groups of Area Social Work Supervisors in the same locations;

- The MDHS Regional Directors;

- A group of regional resource workers;

- A group of regional resource supervisors;

- One group of parents served by MDHS;

- Three groups of foster parents; and

- A focus group of youth in foster care through MDHS.

We developed a focus group protocol that was structured around DFCS' mission and values that we used primarily with the caseworker and supervisor focus groups. For the remaining groups, we developed specific questions for which we thought they could provide first-hand information.

## *Review of Policy and Procedures*

For each of the assessments, we conducted a review of current policy and procedures that is documented in each assessment.

## *Review of Additional Information*

We reviewed a number of other sources of information in completing the assessments, including:

- A wide range of materials from the Independent Living program, such as reports of children served by the contractor, the contract for IL services, materials produced on the range of IL services, and so forth;

- Medicaid website information on the availability of medical and dental services;

- Program descriptions of various services in the State, including services provided by the community mental health centers and the State Department of Mental Health, services provided by some contractors, and so forth; and

- MACWIS reports to determine what information MDHS currently captures relevant to the assessments.

## *Limitations of Our Approach*

While we obtained substantial information in the course of developing the practice model, there are some limitations to the information gathered. Reviewing cases entirely from the MACWIS system poses some limitations, given concerns about the thoroughness of information in the system. Given those same concerns, we made very limited use of statewide data reports that might otherwise have informed the status of services and the populations served with regard to each assessment. Also, with additional time we would have preferred to conduct more individual interviews and focus groups with representatives outside of MDHS and with consumers.

# SECTION II:  THE ASSESSMENTS

| | |
|---|---|
| **Assessments** | *Reunification Services*<br><br>*Medical, Dental, and Mental Health Services*<br><br>*Independent Living Services*<br><br>*Recruitment and Retention of Resource Homes and Placement Assessment (Combined)*<br><br>*Child Safety* |

## *Reunification Services Assessment*

The Period 2 Annual Implementation Plan requires that MDHS engage an independent contractor to conduct a reunification services needs assessment. This report provides the findings of our assessment in this area, which includes a policy and requirements review, a staff survey, interviews and focus groups, and case reviews.

## Section 1: Applicable Standards

### A.    Policy and Requirements

### Council on Accreditation Standards

MDHS is pursuing accreditation from the Council on Accreditation (COA), which includes a number of standards applicable to this assessment, including the following:

- The information gathered for assessments should include the following information:

- Includes underlying conditions and environmental and historical factors that may contribute to concerns identified in initial screening, investigation and risk and safety assessments;

- Identifies child and family strengths, protective factors, and needs;

- Includes the potential impact of maltreatment on the child;

- Includes the factors and characteristics pertinent to making an appropriate placement, if necessary;

- Identifies potential family resources for the child and parents; and

- Is limited to material pertinent for providing services and meeting objectives.

- An individualized service plan developed with each family is based on the assessment and includes agreed upon goals, desired outcomes, and timeframes for achieving them; services and supports to e provided, and by whom; timeframes for valuating family progress; and the signature of the parents and the youth, if age appropriate.

- The service plan is based on the assessment and includes service goals, desired outcomes, and timeframes for achieving them; services and supports to be provided, and by whom; and the signature of the parents and, when appropriate, the child or youth.

- Service providers, foster parents, the public authority and the court work with the child, youth and family to develop a permanency plan within 30 days of placement, which specifies the permanency goal(s); a timeframe for achieving permanency; and activities that support permanency.

- The family foster care worker meets separately with the child and the parents at least once a month to assess safety and well-being; monitor service delivery; and support the achievement of permanency and other service plan goals.

## *Olivia Y Settlement Agreement Requirements*

The *Olivia Y* settlement agreement also includes a number of requirements applicable to this assessment, including the following:

- Within 30 calendar days of a child's entrance into foster care, the DFCS caseworker is to convene a team meeting with the DFCS caseworker's direct supervisor, the child's family, the foster family, and the child unless there is justification for excluding the child from the planning process. During the team meeting, service plans are to be developed for both the child and the parents with the participation of all team meeting participants.

- Each service plan is to be reviewed and updated quarterly at a team meeting with the caseworker, the caseworker's direct supervisor, the foster parent, the child's parents if appropriate, and the child unless there is justification for excluding the child from the planning process. If the child's placement changes, or there is a significant change affecting the child or his/her family, a team meeting is to be convened and the service plan must be updated within 30 calendar days of the date of change.

- Working with service providers, foster parents, the child and the family, DFCS shall develop and document in the child's case record a permanency plan within 30 calendar days of the child's initial placement that specifies the permanency goal, a timeframe for achieving permanency and activities that support permanency.

- For children with the goal of reunification, DFCS is to engage in concurrent planning consisting of early assessment of the potential for reunification; early identification of potential family resources and early placement with a potentially permanent family resource.

- A child's permanency plan is to be reviewed in a court or administrative case review at least every six months. DFCS will take reasonable steps, including written notice, to ensure the participation of the child, parents, caregivers and relevant professionals in court or administrative reviews.

- DFCS will take reasonable steps to ensure that a court review, which may be called a review, dispositional or permanency hearing, is held for each child in foster care custody within 12 months of initial placement, and annually thereafter.

- When the child's permanency goal is reunification, DFCS is to identify in the parent's service plan and make available directly or through referral those services DFCS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care and to help the parents develop strategies to facilitate permanency for the child.

- For a child with a permanency goal of reunification, the child's assigned DFCS caseworker is to meet with the child's biological parents at least monthly to assess service delivery and achievement of service goals, to keep the family informed and involved in decisions about the child, and to remain current about the family's circumstances.

- For children with a permanency goal of reunification, the case record is to document opportunities provided to parents in support of reunification, including involvement in service planning and access to needed services; constructive visitation and on-going contact with the child, reduction of barriers to contact, visitation and involvement in the child's' care; and use of resources to prepare the family for reunification.

- Each foster child is to be placed in the least restrictive setting that meets his/her individual needs as determined by a review of all intake, screening, assessment, and prior placement information on the child available at the time of placement. In order of consideration, this means placement with relatives, foster home care within reasonable proximity to the child's home community; foster home care outside of the child's home community, group home care or institutional care.

- Each child is to be placed within his/her own county or within 50 miles of the home from which he/she was removed.

- At the time of the initial team meeting when a child enters foster care, a visitation plan for the child and his/her family is to be developed as part of the child's service plan. This visitation plan is to be developed and regularly updated in collaboration with parents, foster parents, and the child and should be appropriate to a) the child's age and developmental stage; b) the parents' strengths and needs; c) the schedules of foster parents and parents; d) the social and cultural context of the family and e) the status of the case and the permanency goal.

- Regardless of whether a child's foster care placement is being directly supervised by DFCS or by a contract agency, the assigned DFCS caseworker is to meet with the child in person and where age-appropriate, alone at least twice monthly to assess the child's safety and well-being, service delivery and achievement of permanency and other service goals.

- For each child who has a permanency goal of reunification and who is in fact placed in the home for the purpose of reunification, DFCS is to provide, subject to the approval of the youth court, such child with a 90-day trial home visit. During any trial home visit period, a DFCS caseworker or Family Preservation caseworker is to meet with the child in the home at least two times per month, and each meeting shall occur without the parent or caretaker present.

- A recommendation to return a child to his/her home or to place the child in the custody of a relative is to be made at a meeting attended by the child's DFCS caseworker, the caseworker's supervisor, the worker from the private agency if the child is placed with a private agency, the foster parents (unless DFCS determines that the foster parent's attendance would be inappropriate), the biological parents or the relative assuming custody, and the

child. At the meeting, the participants are to devise an after-care plan that identifies all of the services necessary to ensure that the conditions leading to the child's placement in foster care have been addressed, and that the child's safety and stability will be assured. DFCS is to take reasonable steps to provide or facilitate access to all services necessary to support the child during the trial home visit.

- Before the end of any trial home visit period, there shall be a final discharge staffing meeting, which shall include the child's caseworker, the caseworker's supervisor, the child and the parent or relative assuming custody, to determine the appropriateness of the final discharge. If final discharge is determined to be appropriate, DFCS shall make the appropriate application to the court to be relived of custody.

## MDHS Policy

*Reasonable Efforts:* Mississippi State Law and DFCS policy maintain that "the Agency's first priority shall be to make reasonable efforts to reunify the family when temporary placement of the child occurs or shall request a finding form the court that reasonable efforts are not appropriate or have been unsuccessful." DFCS policy defines reasonable efforts as "services provided to a family to prevent or eliminate the need for removal of the child from his/her home, unless the removal was of an emergency nature, or services provided to reunify the child safely with his/her family after placement of the child in custody".

*Permanency Plan:* DFCS recognized that foster care is to be a temporary arrangement and that permanency planning must begin immediately. DFCS policy states, "reunification with a parent or primary caretaker should be the first choice as a permanency plan for a child in care. It is selected so that a child can return to the parents or another individual who has been his/her primary caretaker."

DFCS policy delineates specific responsibilities of the caseworker in achieving reunification. The caseworker is to identify and assess the problem(s) which led to the need for foster care, the actions needed to correct the problem, and activities to be performed by all parties involved. When identifying a placement resource for the child every effort should be made to place the child in same county as parents or caretakers and whenever, possible and appropriate place siblings together.

The DFCS worker must engage with the family in order to develop an Individual Service Plan (ISP) with the adults and child/youth including identifying the tasks and goals needing to be completed in order to achieve reunification. The ISP/Service Agreement for adults is to be completed within 25 calendar days of case opening and then approved by the supervisor within 5 calendar days from receiving the plan from the worker. The ISP is then created, submitted, approved and signed every three months. The courts must render a judicial determination if the ISP/SA is to go beyond 6 months. There are six reasons that the ISP/SA may go beyond the prescribed 6 months including the parent being involved in parenting classes, and/or other services which are making progress but won't be completed within the six month timeframe. As part of the planning process, a permanency plan must be selected. Although reunification is the starting point for most cases, permanency is the ultimate plan for each child in custody. DFCS has six permanency plan options including reunification with a parent or primary caretaker;

custody with a relative; adoption; durable legal custody or legal guardianship; living independently; and long term foster care.

*Child contacts with family members:* Policy requires that a visit occur between the child and his parent occurs within the first week after placement but does not provide any other minimum timeframes. Children in placement are to visit with their siblings at least monthly. A visitation plan is to be developed with the parent, child, resource parents and other involved parties. The case worker is to see the child monthly although a best practice tip in the policy manual recommends at least two times per month and the worker is to see the birth/legal parents/guardian face to face at least monthly.

*Concurrent Planning:* Mississippi statute requires that concurrent planning be implemented at the time of placement so that permanency can occur at the earliest opportunity. Permanency planning is an ongoing process and begins as soon as the agency received the first report and continues throughout the life of the case. Eight critical areas are identified which must be considered when determining the appropriateness of concurrent planning:

- The likelihood of prompt reunification
- The past history of the family
- The barriers to reunification being addressed by the family
- The level of cooperation of the family;
- The Resource Family's willingness to work with the family to reunite
- The willingness and ability of the Resource Family or relative placement to provide an adoptive home or long-term placement
- The age of the child; and
- Placement of siblings.

## Section II:  Services and Resources

### A.  Resources

#### Family Team Meetings

On all cases, workers are to hold an Initial Family Team Meeting (FTM) within thirty (30) days from the opening of the case. Ongoing FTMs shall be convened, at a minimum, every time the Individual Service Plan (ISP) is updated. MDHS policy defines a FTM as any face-to-face meeting with one of more family members for the purpose of assessment and case planning. A FTM involves working closely with the family to identify family members, extended family, and supportive persons the family wants to engage in the assessment and case planning process. The family members should be brought in as early as possible and actively engaged throughout the life of the case in the decision-making process." The use of the FTM can be critical to the achievement of timely reunification when that is the goal for the child and family.

#### Assessment Tools

There are currently two assessment instruments available to staff in the MACWIS system which directly impact the identification and provision of appropriate reunification services. The Safety Assessment is used during the investigation/initial assessment phase of a case identifying safety

issues which must be addressed to prevent removal or facilitate reunification if removal occurs. The Safety and Risk Assessment (SARA) instrument is required for all families on which a case is opened and is considered a comprehensive assessment tool which identifies family strengths and needs that should be used in case planning and service provision toward reunification.

## *Contracted Services*

### Family Preservation and Reunification

Through contracts with two providers, family preservation and reunification services are provided statewide to 350 families throughout the year. There is a family preservation coordinator at MDHS that oversees these two contracts, and the services are closely aligned with the Homebuilders' Model of family preservation services. The family preservation services component is based on a 20-week intervention with families that are deemed to be at imminent risk of having children removed from their homes. The reunification component is based on a 12-week intervention and both are federally funded through Promoting Safe and Stable Families program under title IV-B of the Social Security Act. State Office staff indicated that these programs are always at full capacity and that there is more demand for the services than can be met although there is not consistently appropriate matching of families as referrals are made.

The family preservation program was designed for intact families as a means of keeping children with their families safely and avoiding placement in foster care or for families in which a child has been in foster care for less than 12 months. Because the program requires that families complete the entire 20-week program within 12 months of a child entering foster care, any family whose child has been in foster care for more than 90 days will not qualify to receive this service. This effectively prohibits the provision of this service to families whose children have been in foster care for lengthy periods of time but for whom reunification is the goal.

We heard that caseworkers frequently refer families that are in need of services but do not have issues that rise to the level of imminent risk of removal, and the providers typically accept the referrals regardless of the current situation. Waiting lists are not currently maintained for those referrals that are turned away. Consequently it is more difficult for MDHS to have an accurate picture of the actual need for this service or of referral rates and utilization by counties. In interviews that we conducted, we heard some references to turning down 10 to 20 referrals each month due to lack of openings.

Additionally, the length of the family preservation service intervention can be problematic as families may not remain in crisis for a full 20 weeks and if they discontinue their involvement, the program's outcome criteria considers this to be a failure on the family's part for not successfully completing it in its entirety. It was noted that caseworkers are apt to want to get services in place quickly for families and do not always distinguish what is most appropriate to meet their needs. There is not yet longitudinal information that is tracked to measure the success of the reunification services so it is not known if families have remained intact as a result of receiving these services. Our understanding is that the family preservation services are offered as a standardized program and are not individualized to the particular needs of a family or child.

**Intensive In-Home Services**

Currently, there are two contracts for intensive in-home services that are provided by the same two agencies with which DFCS has a contract for family preservation and reunification services. In contrast to family preservation and reunification services, there is no cap on the number of referrals and there are no time limits in place for the length of the interventions. These services are funded through Promoting Safe and Stable Families and CAPTA dollars, and plans are underway to re-issue RFP's for these services. These services are described as being more clinical in nature and targeted to serve families that have children with behavioral difficulties. Some of these children may be residing with relatives. There is more of a treatment team approach in working with these families, and each team can only serve six families at a time. These services are highly valued but there is concern that there needs to be more structure in the planned length of service intervention along with a different fee schedule. Our understanding is that because this is a clinical service, it can be adapted to the individualized needs of children and families as needed.

**Families First Resource Centers**

MDHS funds the Families First Resource Centers, which serve 15 south Mississippi counties. The Resource Centers provide parenting classes and serve parents in the classes whose children are in foster care. They provide classes for teenage and adult parents and the focus is on positive discipline, limit setting and consequences, the importance of routines, healthy nutrition, and self-esteem. They also provide educational programs in healthy marriage, fatherhood, and character and abstinence. Our understanding is that the parenting classes are most likely the primary service offered that is related to reunification of children in foster care with their families.

In interviews, we heard that the parenting classes are standardized six-week classes that are not typically individualized to the particular needs of parents in attendance. While we heard positive reviews of the classes, particularly the responsiveness of the coordinators, we heard that the same classes are offered regardless of the issues prompting the referral for the service. We also heard that MDHS staff in all counties served by the Resource Centers do not use the services, although we could not determine why this is the case. We also heard that following reunification, services are not put into place for the families but that the case is simply closed. Although some commenters noted that the parenting class coordinators are responsive to phone calls if needed following completion of the classes and will try to help them, there is not a formal follow-up system in place.

## *Funding for Basic Needs*

We understand that there is very limited funding for basic concrete services that County Departments may use to support families who need something like rent assistance or the purchase of emergency goods. However, the limits on the funding appear to restrict the effectiveness of this service, and we heard that some counties either do not know how to access the funds, which are provided by the county, or do not actually have the funds available. Many families seeking to have their children returned do not have money to take care of basic needs, make basic changes at home, fix things that are broken, or pay for rent, food, and utilities. When the cost of services is added to these basics, they are at a distinct disadvantage in their efforts to reunify with their children. We believe there is a clear need for earmarked funds that can be

used flexibly to support families' basic needs so that they can focus on behavioral changes needed to have their children returned.

## *Other Services*

Although we were not able to identify and evaluate all other services that might be available within the State, we did hear comments about the effectiveness of the Model Youth Court program in Forest County that focuses on children ages 0-3 in assisting with timely and appropriate reunification. We heard about the effectiveness of services provided by a contractor that receives referrals from this court and think that it bears close consideration for overall effectiveness and the possibility of replication.

## Section III:  Current Practice

We assessed the practices and services utilized by DFCS which are needed if children who have been removed from their families by DHS are to achieve reunification. The following methods were used in this assessment:

- MDHS Staff survey to identify the services available and current practice

- Focus groups with front line staff, supervisors, Regional Directors, State Office staff, and contract providers of the services described in this assessment

- Available MACWIS reports

- 30 case reviews from the cases with a goal of reunification

The following includes the information from those sources.

## *A.  Staff Survey*

We conducted a survey of MDHS child welfare staff and asked respondents to rate the agency's effectiveness of available services in several areas which are often presenting issues when a child welfare agency becomes involved with a family. As shown in the chart below, we asked respondents to the survey to rate the agency's effectiveness with regard to services to facilitate and support reunification. Just over half the respondents indicated that the agency is frequently or almost effective in this area (about 57 percent). Less than half (about 48 percent) of the respondents indicated that he agency is frequently or almost always effective in providing post-placement reunification services to prevent re-entries into foster care.

| Please rate your perception of your agency's effectiveness on each area below regarding supports related to preserving connections and relationships: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Some times | Frequently | Almost Always | No Info/N A | Total |
| Availability of services to facilitate and support | 0 (0%) | 9 (5.33%) | 48 (28.4%) | 45 (26.63%) | 49 (28.99%) | 18 (10.65%) | 169 |

| reunification | | | | | | | |
|---|---|---|---|---|---|---|---|
| Post-placement reunification services to families to prevent re-entry into foster care | 3 (1.74%) | 20 (11.63%) | 42 (24.42%) | 42 (24.42%) | 41 (23.84%) | 24 (13.95%) | 172 |

As identified in the chart below, survey respondents rated the availability of specific services often needed to facilitate and sustain reunification as frequently or almost always effective between about 37 and 70 percent of the time. The services identified as the least often effective were domestic violence services being rated as frequently or almost always effective about a third of the time (about 37 percent). Respondents rated family preservation services and services to meet a family's basic needs as frequently or almost always effective about two-thirds of the time (about 68 percent and 70 percent respectively). Services to address particular needs such as substance abuse treatment, sexual abuse treatment, and therapeutic services were rated at that level of effectiveness either a little less or a little more than half the time. These ratings raise concerns since these issues are often those that must be resolved in order to achieve and sustain safe and appropriate reunification.

| Please rate effectiveness of available services to address the following areas, including the ability to initiate the service when needed and the quality of the service: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Some times | Frequently | Almost Always | No Info/NA | Total |
| Domestic violence services | 2 (1.09%) | 24 (13.04%) | 68 (36.96%) | 47 (25.54%) | 21 (11.41%) | 22 (11.96%) | 184 |
| Substance abuse treatment services | 2 (1.09%) | 15 (8.15%) | 62 (33.7%) | 54 (29.35%) | 32 (17.39%) | 19 (10.33%) | 184 |
| Sexual abuse services | 3 (1.63%) | 17 (9.24%) | 40 (21.74%) | 57 (30.98%) | 51 (27.72%) | 16 (8.7%) | 184 |
| Therapeutic services | 0 (0%) | 9 (4.92%) | 44 (24.04%) | 59 (32.24%) | 57 (31.15%) | 14 (7.65%) | 183 |
| Family preservation services | 0 (0%) | 9 (4.89%) | 31 (16.85%) | 69 (37.5%) | 58 (31.52%) | 17 (9.24%) | 184 |
| Services to meet basic needs (food, clothing, shelter) | 1 (0.54%) | 6 (3.23%) | 37 (19.89%) | 52 (27.96%) | 78 (41.94%) | 12 (6.45%) | 186 |

We asked a question specifically regarding mental health services and the worker's ability to access different levels of these services ranging from outpatient to acute and crisis services. The availability of these types of services and their effectiveness can have a profound impact on a child's reunification and subsequent stability within their own home. Respondents rated their ability to access the lower level services (e.g. outpatient counseling and evaluations) as frequently or almost always able to be accessed nearly 60 percent of the time. With the mid-level services, (e.g. medication, day treatment), 53.26 percent of the respondents indicated that they could effectively access these services frequently or almost always. In regard to the high-end services (which would less likely be utilized at the time of reunification but must be available for certain families if they are to achieve reunification) the survey participants indicated that slightly less than 50 percent of the time could these services be accessed frequently

**Mississippi Foster Care Services Assessments**

or almost always. Crisis services, which may be utilized to prevent re-entry to care was rated as frequently or almost always able to be accessed less than half the time (about 48 percent).

| With regard to mental/behavioral health services, how effectively are you able to access the following levels of services for children and families: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Some times | Frequently | Almost Always | No Info/NA | Total |
| Lower level services, e.g., outpatient counseling and evaluation, prevention services, testing: | 1 (0.54%) | 11 (5.98%) | 43 (23.37%) | 58 (31.52%) | 51 (27.72%) | 20 (10.87%) | 184 |
| Mid-level services, e.g., behavioral health medication, day treatment, more intense out-patient psychotherapy: | 3 (1.63%) | 11 (5.98%) | 49 (26.63%) | 56 (30.43%) | 42 (22.83%) | 23 (12.5%) | 184 |
| High-end/acute services, e.g., addiction and recovery services, specialized care, psychiatric services: | 3 (1.64%) | 13 (7.1%) | 51 (27.87%) | 45 (24.59%) | 46 (25.14%) | 25 (13.66%) | 183 |
| Crisis services, e.g., crisis stabilization, psychiatric hospitalization: | 4 (2.2%) | 15 (8.24%) | 49 (26.92%) | 44 (24.18%) | 44 (24.18%) | 26 (14.29%) | 182 |

We also asked survey respondents to rate the effectiveness of service providers in meeting the needs of children and families in general. Respondents rated this area as frequently or almost always effective less than half the time (about 48 percent). In open-ended questions, they identified family preservation services, MYPAC, and Intercept as strength of the service array. They identified the availability of placement resources and lack of needed services in certain geographic areas of the State as weaknesses.

In addition to the purchased or contracted services that MDHS provides to support reunification of children with their families, we know that there are services and activities provided directly by MDHS staff that address reunification. In our staff survey, we asked respondents to rate their effectiveness in several of their activities related to reunification. The chart below provides their responses. The respondents indicated their highest levels of effectiveness in maintaining children's connections with family member while in foster care and visiting between children and their families/siblings while in foster care (frequently or almost always effective about three-quarters of the time each). These are related practice areas and have established associations with timely reunification. Respondents rated their effectiveness in birth parent involvement in parenting their children while in foster care as frequently or almost always effective less than half the time (about 48 percent). The other practices related to reunification were rated as frequently or almost always effective between 60 and 64 percent of the time.

Mississippi Foster Care Services Assessments

| Please rate your perception of your agency's effectiveness in the areas below regarding practices related to preserving connections and relationships: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Some times | Frequently | Almost Always | No Info/NA | Total |
| Placing children within their own communities when appropriate: | 0 (0%) | 11 (6.32%) | 44 (25.29%) | 44 (25.29%) | 61 (35.06%) | 14 (8.05%) | 174 |
| Maintaining connections of children to family members while in foster care: | 0 (0%) | 6 (3.45%) | 25 (14.37%) | 49 (28.16%) | 80 (45.98%) | 14 (8.05%) | 174 |
| Visiting between children in foster care and their families and siblings: | 0 (0%) | 4 (2.31%) | 23 (13.29%) | 51 (29.48%) | 81 (46.82%) | 14 (8.09%) | 173 |
| Foster parent involvement in supporting child-parent visits and other contacts: | 1 (0.58%) | 16 (9.36%) | 34 (19.88%) | 50 (29.24%) | 56 (32.75%) | 14 (8.19%) | 171 |
| Birth parent involvement in helping to care for their children while in foster care: | 7 (4.09%) | 29 (16.96%) | 37 (21.64%) | 46 (26.9%) | 37 (21.64%) | 15 (8.77%) | 171 |
| Services and support to prevent placement: | 1 (0.58%) | 7 (4.09%) | 36 (21.05%) | 44 (25.73%) | 65 (38.01%) | 18 (10.53%) | 171 |

## B. Focus Groups

The focus groups that contributed information pertaining to reunification services included youth in foster care, resource parents, birth parents, Regional Directors, resource supervisors and workers, casework supervisors, and caseworkers.

All focus groups addressed the lack of appropriate, accessible services. Participants noted that the array of services varies greatly by county across the State, with consistent references to the lack of services in rural areas. Although some contacted services, such as family preservation and intensive in-home services are offered statewide, many other services needed for

reunification are limited or do not exist in rural areas. Even when services are available they often have long waiting lists.

The ability to individualize services to families' strengths and needs was the subject of a number of comments. For example, the use of parenting classes as a task on the ISP was discussed with a wide range of opinions in almost every group. Comments ranged from the classes being very good, individualized and accessible to being "cookie-cutter" and not readily accessible. It was acknowledged that parenting classes were identified for nearly every family no matter what brought their family to the attention of DFCS. Similarly, family preservation was identified as a resource used both before and after reunification. However, some participants noted that based on the set-up of the program it cannot be used for families where the children have been in placement for more than 12 months and that the services are driven by program requirements rather than individualized needs. Some focus group participants also noted the need for more reunification services with greater flexibility including post-placement services during trial visits and post-reunification. We also heard that, at times, the burden may be placed on the parent to access the services once identified and included in the ISP.

Individual interviews supported the idea that there is a limited array of services that can be used effectively for reunification and often, workers take a service because it is available and not necessarily because it is the most appropriate service that is matched to the family's strengths and needs.

In addressing the MDHS practices related to reunification, focus group participants commented on visiting between the child and family and caseworker visits with the child and family. Some commenters noted the distance from the birth family that children often were placed thus making visitation difficult. This situation is compounded by the lack of available or affordable transportation for parents. We heard about some lengthy periods without caseworker visits with children, parents, or resource parents, and varying interpretations of what constitutes a meaningful visit, for example, incidental contact as opposed to planned visits. We also heard about some courts affecting the visits between children and parents, with examples of not allowing visits prior to the first court hearing which is usually within 24 hours but could be longer; not permitting visits until the parent has one or two clean drug screens; and not permitting visits until psychological or other assessments have been completed.

In general, we heard that fathers are often not included in case planning or service delivery, particularly if they do not reside in the home with the child. Commenters noted limited attempts to involve them or to evaluate their family members as resources for the child.

Among other issues related to reunification raised in focus groups and interviews were the following:

- The training and support of resource families with regard to working with birth families was raised as a concern. Some participants noted that some resource families are at times afraid of birth families and refuse to work with them, and may or may not actively support reunification efforts.

- Some participants noted the lack of family involvement in the case planning process. They also indicated the SARA is unwieldy and not very effective in identifying needs and strengths that can be addressed in the reunification efforts.

- FTMs were identified as being an effective tool to be used to address reunification and in identifying supports needed to assure reunification occurs and is successful.

## C. Case Reviews

We conducted a review of 30 cases with a goal of reunification by reviewing the MACWIS case file. The current placement episode start dates ranged from 8/4/2004 to 4/15/2009. As of the date of our case reviews (mid August) the average amount of time these children had a goal of reunification was 435 days (14 ½ months) with the least amount of time 113 days and the longest 1,842 days or nearly six years. Only two of the 30 cases were identified as having achieved reunification.

The reasons for the family's involvement with DFCS included drug and alcohol abuse; serious neglect; physical abuse; sexual abuse; lack of housing; lack of supervision; child behavior problems; and parent arrested and no one to care for the child. The types of services identified as being recommended for caregivers included drug and alcohol services (including screenings, in-patient, out-patient, etc); psychiatric/psychological evaluation; parenting; GED assistance; assistance in securing housing, employment services; and visitation.

We found the following information to be relevant to assessing the reunification services and achievement of reunification:

- Services were identified in the plan to address the reason for involvement in 23 cases. Reviewers determined that caregivers in ten cases actually received the services, did not receive them in ten cases, and did not have enough information to make a determination in most of the remaining cases.

- Identified services were tied to identified needs in 20 cases; in five cases the services were not linked needs, and in three cases there was not enough information to determine.

- For the majority of cases the length of time that services were delivered was listed as "ongoing".

- In four cases the contact between the caseworker and parent was monthly, more often than monthly in nine cases, and less often than monthly in 14 cases.

- Contacts between the caseworker and the child occurred monthly in 12 cases, more often than monthly in 12 cases, and less often than monthly in five cases.

- In nine cases, reviewers determined that the assessment identified needs that must be addressed through services and two cases in which the assessment did not identify needs.

- The range of time for how long it took to implement services went from immediately on several cases to several months in another.

- Reviewers determined that the services provided were effective in five cases and not effective in 12 cases. The remaining cases either did not have services implemented or there was not enough information in the file to determine.

- In reference to the lack of services being delivered the responses were primarily related to the caregiver (usually mother) failing to participate with only two identifying the lack of available and accessible services as the reason.

## D. Data Reports

### Number of Children Entering State Custody and their Permanency Plan

This monthly summary report provides a breakdown by county of the number of children and their permanency plan.  For example, for the period July 1, 2009 thru July 31, 2009 statewide 189 children entered state custody and of those 189, 129 children had a goal of reunification.  A regional report is also issued monthly that provides a breakdown of this same information by region.

### Children in Custody with a Permanency Plan of Reunification – Worker/Birth and Adopted Parent Face to Face Contact

This monthly summary report is broken out by regions and by counties within each region. There are also the statewide totals for each category.  For example, in Region 1 – North the following can be determined for the period July 1, 2009 thru July 31, 2009:

- 180 children in the region had a plan of reunification;

- 53 children in Desoto County had a goal of reunification;

- In Desoto County there were 10 face to face worker parent contacts completed for the month of July;  or 18.87 percent;

- Statewide in the month of July there were 1,751 children with a plan of reunification; and

- Statewide there were 350 worker/parent face to face contacts completed or 19.99 percent.

## Section IV:  Summary and Recommendations

### A. Summary of Findings

Based on the information above, we have made the following findings:

- There is a notable lack of services in the State targeted toward reunification.  MDHS staff appear to try to mobilize services, such as family preservation services that that are designed more as placement prevention services, in the absence of specific reunification services.

- The lack of services is most pronounced in rural areas of the State, although wait lists and restrictions on who may receive the services affects the accessibility of services even where they exist.

- The demand for services used to facilitate and support reunification outstrips the capacity of contract providers to provide the services, leading to wait lists or referral rejections.

- There appears to be little opportunity to individualize reunification services to the needs of particular families, owing either to the standardized design of programs, e.g., family preservation, parenting classes, or to the lack of available services and providers to match to identified needs. The services that are available, with the exception of the intensive in-home services, are categorical and standardized and may not fit with each family's needs. We believe that the effectiveness of reunification services in the State could benefit from an array that includes more in-home services that are flexible and designed to address behavioral health needs and parent support needs.

- Post-placement services to support reunification once it has occurred seem notably absent. Given the requirements in the *Olivia Y* settlement agreement for after care plans and services, this is an important finding.

- The effectiveness of services to address needs that must commonly be addressed in order to achieve and sustain reunification, such as domestic violence, substance abuse, and sexual abuse, is regarded as low by staff. Although staff rated their effectiveness in meeting the basic needs of families whose children are in foster care, e.g., food, clothing, shelter, the lack of available funds to meet these needs suggests it is an area for strengthened capacity in the way of flexible, earmarked funds for that purpose.

- Apart from contracted services, MDHS agency services/activities that support reunification need strengthening in several areas including using assessments to link services to identified needs, maintain frequent contacts among caseworkers, parents, and children, and involving both parents in case planning and service delivery.

- The involvement of birth parents in maintaining parental responsibilities to the extent that it is safe and appropriate to do so while their children are in foster care is a practice area in need of particular strengthening.

- When a number of the findings are considered together, such as the lack of specific reunification services, the lack of father involvement, the lack of capacity to respond to individual needs that are barriers to reunification, the lack of resource family involvement in reunification efforts, and some of the court-related barriers to maintaining child-parent contact, we are concerned that reunification as a viable goal requiring diligent attention may not receive the same emphasis in practice as other permanency goals, i.e., adoption. While policy supports establishing reunification as an initial goal in most cases, we did not find policy and training that emphasize diligent and ongoing efforts to mobilize the services needed to pursue reunification actively. The new practice model will focus activities and

resources heavily on proactive efforts to achieve timely and appropriate reunification which will require, in some situations, substantial shifts in perspective and approach to working with families within MDHS and among its service providers, foster caretakers, and the courts. Changing policy and training and adding to the service array will help in making this shift, but alone they will not cause staff and stakeholders to think differently about reunification and commit to addressing needs appropriately in an effort to achieve reunification. There are a number of tasks associated with elevating the importance and priority of reunification activities that will need to be addressed in order to increase effectiveness in this area.

- We did not identify MACWIS reports that provide information on reunification services provided, thus limiting the Department's ability to monitor service provision effectively.

## B. Recommendations

- There is a serious need to increase the array of services in the State to be used to facilitate and sustain reunification. We are recommending that MDHS consider the following options for addressing this area:

- Since MDHS can use Federal title IV-B funds to fund in-house staff that provides family preservation and reunification services, some consideration of this approach might be considered in order to supplement the contracted services and increase the availability of services in rural areas of the State. Since these funds are capped, this might mean diverting existing IV-B expenditures, but developing some type of in-house capacity to provide needed reunification services is worth considering as a means of making services available where they are currently unavailable.

- We recommend that the capacity of existing contractors to provide reunification-related services be increased statewide. This can be done by increasing funding for these services as well as relaxing some of the program restrictions that now limit the access to these services by families needing reunification services. If the Department wishes to reserve family preservation families for placement prevention and reunification from short-term stays in foster care, we recommend that the expansion of services occur with intensive in-home services.

- As also recommended in the Medical, Dental and Mental Health Services Assessment, we recommend that MDHS enter into collaborative agreements with the DMH and the State's Medicaid agency to fund mental health professionals in rural areas of the State that serve children and families served by MDHS. Since most of the families are Medicaid-eligible, we believe that the services they provide would be reimbursable through Medicaid and it would immediately increase families' access to mental health services in the State.

- We recommend that flexible funds be earmarked for use in helping to meet the basic needs of families seeking to reunify with their children in foster care, and/or that procedures for accessing available funds be clarified and simplified.

- We recommend that the State examine services and practices with established records of effectiveness in reunifying children and families timely and appropriately and, where possible, consider replicating some of those "best practices" within the State. For example, we recommend attention to the Model Youth Court program in Forest County as a means of providing services directed toward reunifying very young children in foster care with their families.

- We recommend that the reunification services provided through MDHS support be tailored to the individualized needs of the families receiving them. This can be supported in the following ways:

- We recommend relaxing the requirements for all families to complete standardized programs regardless of their individual circumstances, strengths, and needs.

- We recommend adding to the service array the capacity to provide more in-home services to families such as in-home behavioral health interventions as an alternative to office-based mental health counseling, and in-home parent coaching and support as an alternative to standardized parenting classes.

- We recommend that the Department's performance-based contracting system, when implemented, support the need for providers to respond flexibly to families' needs with services that reflect their unique strengths and needs in the comprehensive family assessments and case plans.

- We recommend strengthening both policy and practice requiring MDHS staff to coordinate case planning and service provision activities with service providers in order to ensure that services match needs, and to monitor the effectiveness of service provision in facilitating and supporting reunification.

- Consistent with other recommendations we are making with regard to implementing a child welfare practice model, we recommend that policy and training be strengthened to support improvements in practice with regard to reunification, such as the following:

- Strengthened case planning and ISP policy and training that focus on identifying strengths and needs, matching services to needs, brokering for and obtaining needed services, and monitoring the effectiveness of services. This should include the active involvement of service providers in case planning processes whenever appropriate.

- Strengthened policy and training with regard to visits between caseworkers and parents/children for the purposes of assessment, case planning, involvement, and case monitoring.

- Strengthened FTM policy and training that requires the bringing together of all relevant parties at frequent intervals to identify needed services, put them into place, and monitor their effectiveness.

- We recommend that as MDHS rolls out the new child welfare practice model, that leadership within the Department (statewide and regionally) develop and convey clear messages to staff, service providers, foster caretakers, and stakeholders such as the courts, with regard to the priority and importance it places on timely and appropriate reunification.

- As MDHS implements a new CQI process, we recommend that it monitor specifically for the provision of appropriate and timely reunification services, their effectiveness, and related casework activities carried out by both MDHS staff and provider staff related to reunification efforts. We also recommend that the CQI process monitor for the adequacy of the reunification-related service array statewide and provide reports and other feedback to county, regional, and State administrators on the strengths and gaps of the service array.

- We recommend that MDHS develop MACWIS reports on services provided to families with reunification as a goal that will support monitoring in this area. Reports should include, at a minimum, services provided, dates of initiating and terminating services, service provider, and case status. If possible, with the automation of the ISP, reporting on the match of needs identified in the ISP to service provided would provide an effective tool for supervisory monitoring in County Departments.

- We recommend strengthened training for resource parents in the area of supporting birth families in the reunification process, particularly in facilitating child/parent contacts and parental involvement in the care of their children while in foster care.

- We recommend active engagement of the courts around child/parent visits, given some of the concerns raised in that area. This could take the form of educational initiatives with the judiciary and/or working through the Administrative Office of Courts to facilitate discussion or training in this area. Free technical assistance from the National Resource Center for Legal and Judicial Issues should be explored in developing a strategy to address the courts' effects on the frequency of child/parent visits.

## *Medical, Dental, and Mental Health Services Needs Assessment*

The Period Two Implementation Plan of the Mississippi Settlement Agreement and Reform Plan requires that a foster care services assessment be completed that includes:

"A service provider needs assessment with the purpose of identifying available medical, dental, and mental health services and gaps in services."

This report provides the findings of our assessment in this area, which includes a policy and requirements review, a staff survey, interviews and focus groups, and case reviews.

## Section I: Applicable Standards

When a child is placed in custody of MDHS, the Division of Family and Children's Services (DFCS) assumes the responsibility of securing access for the child to dental, medical and mental health services. The provision of these services must be documented in MACWIS.  The services listed in the following sections are usually available under Medicaid, which should be the primary source of payment. County, region and State funds can be used, with prior approval, to pay for some of these services which are unavailable under Medicaid.

### *Dental Services*

The County of Responsibility (COR) worker will obtain a referral for a dental exam for children age three and older within 90 calendar days of the child entering custody. An exception may be made when the worker is provided with documentation from a dental clinician that dental exams and treatment are up to date. Dental checkups shall recur yearly. This referral can be obtained through Early Periodic Screening, Diagnostic, and Treatment (EPSDT) through the local Health Department or from any medical provider. The form for this referral can be located in MACWIS under the case navigation bar, EPSDT icon.

### *Medical Services*

The COR worker shall obtain a medical examination for all children within 72 hours of custody and yearly thereafter. This examination may be obtained through EPSDT through the local Health Department or from any medical provider. The form for this referral can be located in MACWIS under the Case navigation bar, EPSDT icon.

### *Early Intervention Program*

All children in custody, age birth up to 36 months, shall be referred to the First Steps Early Intervention program through the local Health Department for assessment and follow-up services as needed.  The existence of early intervention programs is designated in Federal and State legislation. In 1986, the Education for all Handicapped Children Act (Public Law 94-142) was amended to add rights for infants, toddlers and preschool children and their families. In 1990, the Education for all Handicapped Children Act was renamed Individuals with Disabilities Education Act (IDEA). The early intervention portion of the law was referred to as Part H-Early Intervention for Infants and Toddlers with Disabilities and their Families. Part H sought to enhance the development of infants and toddlers and minimize their potential for delay, reduce

the need for special education services, enhance the capacity of the family to meet the needs of their infants and toddlers with special needs and to meet the needs of minority, low income, and rural and underserved populations. In the 1997 reauthorization of IDEA, Part H was changed to Part C. This change brought a new spirit to the law by requiring more emphasis on at risk services, services in the natural environment, family needs assessment, and transition planning. The Mississippi definition of infants and toddlers with developmental delays or disabilities is "children ages birth to 36 months who need early intervention services."

## Immunizations

Section 41-88-3 (1) of the Mississippi Code Annotated charges the Mississippi State Department of Health (MSDH) with the responsibility "for assuring that all children in the State are appropriately immunized against vaccine-preventable diseases. In order to improve the State's immunization levels in children, the Department of Health shall enhance current immunization activities and focus on children receiving all recommended immunizations by 24 months of age. The immunizations will be administered according to the recommendations of the national Advisory Committee on Immunization Practices (ACIP)". Furthermore, Section 41-23-37 of the code makes it unlawful for any child to attend school until they have been vaccinated. In order to adhere to these laws, workers shall make every effort to assure every child in agency custody is immunized prior to enrollment in school.

The following immunizations, given as recommended by the child's physician, shall be used to guide the worker in meeting the health needs of the child in foster care. The Advisory Committee on Immunization Practices (ACIP), the American Academy of Pediatrics (AAP), and the American Academy of Family Physicians (AAFP) have all approved the following vaccinations:

- Diphtheria, Tetanus, Pertussis (DTaP, Dt, TD)
- Polio
- Measles, Mumps and Rubella (MMR)
- Hepatitis B
- Varicella (Chickenpox)

A copy of the paper immunization record must be kept in the child's case file as an extension of the child's case plan documentation.

## Mental Health Services

In order to determine if the child is in need of a psychological evaluation, a mental health assessment shall be completed as a part of the Child's Individualized Service Plan (ISP). This assessment refers to the Strengths and Risk Assessment (SARA). This assessment shall be performed on children ages four and older within 30 calendar days of child's custody. Each child who reaches the age of four in care shall be provided with a mental health assessment within 30 calendar days of his/her fourth birthday. There are 27 items on this assessment under Child Characteristics identified as areas that need further evaluation by a mental health professional.

If the worker checks one or more of these 27 items, the items checked will populate onto the child's ISP. The worker shall make a referral to a mental health facility for further evaluation of

the child. This initial screening to determine the need for further mental health assessment or referral shall be completed as indicated on the initial/review tab, even if none of the 27 items were checked by the worker.

## Other Requirements

In addition to the MDHS policies noted above, there are a number of requirements pertaining to the provision of medical, dental, and mental health services to children in foster care included in the *Olivia Y* settlement agreement (OY), the Council on Accreditation (COA) standards, and requirements of the Federal Child and Family Services Review (CFSR) as follows:

- MDHS provides, refers, contracts or arranges services including therapy, education and support, domestic violence, mental health, substance abuse treatment (CFSR/COA);

- Medical, dental, and mental health records are given to providers (OY/COA);

- Provide all children with needed mental health, developmental, substance abuse screenings and services and intensive services such as therapeutic foster care(CFSR/COA);

- Child is assisted in obtaining health insurance and health records in order to obtain needed substance abuse services, medication, and medical/mental health care after discharge (COA);

- Dental and mental health screening and services are provided if needed (OY);

- Trained and qualified providers conduct medical screenings in accordance with American Academy of Pediatrics standards (OY);

- Developmental screenings are provided for children, age three and under and mental health screenings for children age four and older within 30 days of entering foster care (OY);

- There should be an accessible service array (CFSR) and formal agreements established with medical facilities and rehabilitative providers including board certified physicians in programs if needed (COA);

- Assess and provide services to meet physical and dental health care needs (CFSR);

- Health screenings to occur within 72 hours of a child entering foster care and a comprehensive health assessment within 30 days of entering care (OY/COA);

- Dental screenings occur within 90 days of entering care for children age three and older (OY) and every six months thereafter (OY/COA);

- Health history and information is recorded and maintained and shared with providers and foster parents as appropriate (COA);

- Mental health needs are assessed and services are provided to meet needs (CFSR/COA). Children, age four and older receive mental health screenings within 30 days of entering care(OY);

- Children are assessed and provided intensive and supportive services to address developmental, emotional, or behavioral needs including placement in a therapeutic foster home (COA); and

- Potential adoptive families are advised of available subsidies including foster families caring for children who are legally free for adoption and post-adoptive services to be provided to ensure stable placements including respite, counseling, mental health treatment, crisis intervention, family preservation, and peer support (OY).

## Section II: Services

### Mental Health Services

According to information we reviewed from the FY2009 edition of the State Department of Mental Health, Division of Children and Youth Services' Directory, DMH has the responsibility for determining the mental health needs for children and youth in the State of Mississippi and for the planning and development of programs to meet those needs. These children and youth include all those in foster care needing mental health services. To do this, the DMH defines children with mental illness to be any individual, from birth up to age 21, who meets one of the eligible diagnostic categories as determined by the DMH and the identified disorder has resulted in functional impairment in basic living skills, instrumental living skills, or social skills. The need for mental health as well as other special needs services and support services is required by these children/youth and families at a more intense rate and for a longer period than children/youth with less severe emotional disorders/disturbance in order for them to meet the definition's criteria.

Children and youth defined as mentally ill by the DMH have certain characteristics. These include children with a serious emotional disorder who have problems involving a lack of awareness and/or understanding of self and environment of such duration, frequency or intensity as to result in an inability to control behavior or express feelings appropriately thereby significantly impairing performance (e.g., school, home, play, etc.). DMH criteria provide a great deal of information on children's behaviors and affect that may indicate mental illness, such as depression, aggressive, and self-abusive behaviors, physical symptoms, unrealistic fears, difficulty building or maintaining satisfactory interpersonal relationships, and significant deficits in social/emotional/educational functioning. The criteria also address risk factors that may predispose children to developing serious emotional disorders including some factors common to children served by the child welfare system, such as families who have experienced alcoholism or drug addiction or mental illness and children and adolescents who have been subject to child abuse, neglect, or sexual abuse.

The model for the 15 community mental health centers in Mississippi includes the following major components:

- Community-based prevention and identification services

- Community-based nonresidential treatment services

- Community-based residential services

- Inpatient

- Operational services

- Advocacy and protection

- Other support services

According to the DMH 2009 Directory, there is a range of community mental health services provided by the regional centers, although we understand that all of these services may not be available in all locations of the State, and that capacity for existing services varies across the State. From our individual interviews, we learned that the services that are *required* to be provided by each mental health center include diagnosis and evaluation, outpatient services, day treatment, case management, and psychiatric services. The full range of services identified in the directory includes the following:

*Prevention programs:* These programs provide services to vulnerable at-risk groups prior to the development of mental health problems.

*Early intervention programs:* Early intervention includes programs for all ages of children and adolescents and implies intervention is implemented as early or as soon as problems are suspected and/or identified.
*Crisis intervention/emergency response:* This type of emergency response can range from immediate brief response by appropriate mobile mental health response personnel up to several hours. Triage is typical in this type of immediate response.

*Diagnostic and evaluation services:* These services encompass appropriate formal early diagnostic and evaluation services, i.e., psychiatric and psychological evaluations, and social histories that must be performed to develop in the most appropriate service plan for each child.

*Outpatient services:* These services include individual, group, and family therapy and parent education classes, as well as home-based services which may or may not be crisis oriented. Home based services are intensive and include short-term therapy which is provided in the home on a 24-hour basis to families with an entire family.

*Therapeutic support services:* These include staff training, transportation, and volunteer services provided by or through the mental health provider which are critical to accessing or implementation of mental health services.

*Day treatment:* This treatment is the most intensive of the non-residential services that usually continues over a longer period of time. Children typically remain in day treatment for at least one school year although some programs provide for shorter lengths of participation. The most common day treatment model is an integrated set of intensive therapeutic services with family intervention and support services involving a child/youth for at least two hours a day, twice a week up to five hours a day, five times each week.

*Respite services:* This service is planned temporary care for a period of time ranging from a few hours within a 24-hour period to an overnight or weekend stay up to as much as 90 days depending on program guidelines.

*Emergency short-term placement:* Emergency placements of up to 72 hours in a crisis situation occur outside the home and could include crisis counseling as well as emergency evaluations if they are needed.

*Therapeutic foster homes:* These provide residential mental health services to emotionally disturbed children or adolescents in a family setting, utilizing specially trained foster parents. *Therapeutic group homes:* This treatment provides residential mental health services to children and adolescents with serious emotional disorders who are capable of functioning in a group home setting. Services are provided in homes that serve from five to ten youth with an array of therapeutic interventions provided by program staff and mental health professionals.

*Residential treatment for the substance abusing adolescent:* The purpose of the treatment is to provide a therapeutic environment in a program to treat chemically dependent adolescents. It is provided in facilities which typically serve from five to ten adolescents and provides an array of therapeutic interventions and treatment.

*Residential treatment center:* A Residential Treatment Center usually provides 24-hour per day treatment to severely emotionally disturbed children and adolescents, including a medical component and individual, group, and family therapy; behavior modification; special education and recreational therapy.

*Inpatient psychiatric hospital care*: This service may be designed to provide either acute, short-term (90 days or less) or longer-term intensive psychiatric services to more severely disturbed children or adolescents in a hospital-based residential setting. Inpatient psychiatric hospital care is reserved for extreme situations which include children and youth who demonstrate serious acute disorders or particularly perplexing and difficult ongoing problems or are an immediate danger to themselves or others.

*Inpatient alcohol and drug treatment*: These programs provide treatment for drug and alcohol abuse, operate on a 24-hour, seven day basis, and provide a structured daily schedule that typically includes individual counseling, group therapy, recreational activities, educational activities, and opportunities for family counseling. The average length of stay for inpatient treatment ranges from 30 to 45 days.

*Case management:*  This involves brokering and advocacy services for individual children and youth, ensuring that an adequate treatment plan is developed and implemented, reviewing progress, and coordinating services.

*Transitional services:*  These services are designed to help adolescents make the transition to independent living and preparation for paid employment, including providing individuals with the information and skills to manage financial, medical, housing, transportation, special/recreational, and other daily living needs.

*Family education and support services:*  This includes services to families of children with mental health needs that address educational, economic, health, vocational, family education, and other support needs.

*Advocacy and protection and support services:*  Advocacy and support are provided through agencies such as the Mississippi Families As Allies Parent network, the Mississippi Chapter of the National Alliance on Mental Illness, and the Mississippi Protection and Advocacy Center. *Multidisciplinary assessment and planning (MAP):*  The DMH has developed an interagency agreement for MAP teams to serve the following children and youth (up to age 21) with serious emotional/behavioral disorders or serious mental illness who are at risk for institutional placement due to lack of access to or availability of needed services and supports in the home and community (first priority group for receiving the service). Other criteria for providing this service include children who are Seriously Emotionally Disturbed (SED) who are returning to a primary caregiver in the community from an inpatient acute psychiatric hospital or psychiatric residential treatment facility; children/youth who are SED or Seriously Mentally Ill (SMI) who are of transition age (14-21) and need assistance with resource planning to remain in the community; and younger children (ages 3-5 years) who have been identified as being most at-risk of later SED, according to the MAP Team At-Risk Screening Checklist. MAP Teams identify community-based services that may divert children and youth from an inappropriate 24 hour institutional placement and facilitate the provision and coordination of services across agencies/entities. There is some funding to provide services for children and youth through the MAP teams. Currently, that is $550,000 that can be used as flexible funds, e.g., respite care, after school care, utilities, school needs, and so forth.  Considering that this program serves children and youth who have exhausted other, less expensive options, the funding level appears low to serve a large number of children and youth.

The DMH's Division of Children and Youth Services also pursues funding to establish special initiatives to meet the needs of children and their families, including foster care children and youth.  Currently, there are three projects that the Division manages or partners with another DMH division or other agency, as follows:

*Fetal Alcohol Spectrum Disorder (FASD) diagnosis and treatment initiative:*  This is an initiative operated by DMH with funding from 2008-2012.  The goal is to improve the functioning and quality of life of children and youth and their families by diagnosing those with an FASD and providing interventions based on the diagnosis. The initiative targets children birth to seven years old who are referred to the MAP Teams because the child is at risk of out-of-home placement or other intensive treatment.  The project includes screening, diagnosis, and treatment of children

ages 0 to seven who are found to have a FASD and includes funding to help cover the cost of services and treatment not otherwise covered for the children who will be screened and diagnosed. Our understanding is that the FASD program is not fully operational, but that MAP teams will ultimately be responsible for ensuring that children who are diagnosed with an FASD receive the recommended treatments and interventions. The Community Mental Health Centers will be responsible for collecting FASD-specific data from the MAP Teams and for submitting this data to the FASD project staff at MDMH in the form of monthly reports or other special reports.

*Youth suicide prevention:* The Mississippi Hurricane Katrina-Related Youth Suicide Prevention and Intervention Project is implementing an awareness campaign for suicide prevention and intervention, training gatekeepers in recognizing the signs and symptoms of suicide, training gatekeepers and community partners in how to apply a suicide intervention model, and training mental health clinicians in evidenced-based practices to effectively treat trauma. In an effort to reduce the number of youth suicide attempts, the project includes goals structured into three main components: awareness, training, and prevention.

*CommUNITY Cares:* CommUNITY cares is a collaborative effort between DMH, Families as Allies, and Pine Belt Mental Healthcare Resources (Region 12 CMHC) to deliver a coordinated network of community-based services and supports in the Pine Belt area. This initiative helps youth (ages 10-18) in Forrest, Lamar and Marion Counties with serious emotional needs and substance misuse issues and is made up of various partners which include youth, families, schools, health departments, family and child service agencies, juvenile justice, law enforcement, doctors, and many others. One evidence-based practice used is wraparound services, which is a family-centered, community-oriented, strengths-based planning process designed to help youth and families meet their needs and remain in their neighborhoods and homes. Families and youth are full partners in their treatment plans by setting their own goals, partnering in decisions and choosing their supports, services and providers. They are also involved in evaluating the effectiveness of treatment.

In addition to these three initiatives, the Mississippi Youth Programs Around the Clock (MYPAC) program, funded by a Mississippi Division of Medicaid waiver is part of the mental health service array in the State.

*MYPAC:* The MYPAC is a home and community-based Medicaid waiver program. MYPAC provides an array of services for Mississippi youth with SED, including alternate services to traditional Psychiatric Residential Treatment Facilities (PRTF). Services provided by MYPAC include intensive case management, wraparound services, and respite services. An ISP will be developed by each participant, parent/guardian and the MYPAC provider which will be used to identify and address participants' and their families' individual needs. Providers will be expected to be available to participants and their families around the clock. Youth may be eligible for the MYPAC program if they meet the clinical criteria for PRTF admission, are under age 21, and they meet the financial criteria for Medicaid. Family Support Specialists, who are parents or guardians of a child with SED act as advisors to children/families receiving this service. There are currently two contract providers of MYPAC services in the State.

### *Medical and Dental Services*

In order to provide an assessment of the level of medical and dental providers in the State, we used the Division of Medicaid's *Mississippi Envision Web Portal*[4] to look up providers that have an open Mississippi Medicaid provider number.  As noted on the website, appearing on the lists does not mean that the provider is available to accept new patients, may not have notified the Division of Medicaid to close their Medicaid account number, or for other reasons may not be accepting patients.  However, we believe that the information provides some sense of the overall number of key providers in the State.  As indicated in the chart below, we used the search tool on the website to identify the number of dentists with Medicaid provider numbers by county and the number of those dentists listed as pediatric dentists.  We also identified the number of "physician or related" providers with a Medicaid provider number by county (which should include all physician types, specialist and general practitioners), and the number of those physicians identified as pediatricians.  In the chart we have organized the counties by region to provide a picture of how the various regions compare with regard to Medicaid providers, and we have also included the number of children in foster care by county in order to provide some context of what the volume of need for these services might be.

---

[4] Accessed at https://msmedicaid.acs-inc.com/msenvision/providerSearch.do

| Distribution of Medicaid Providers by County/Region | | | | | |
|---|---|---|---|---|---|
| County/Region | Dentists | Pediatric Dentists[5] | Physicians[6] | Pediatricians[7] | Number of Children in Foster Care[8] |
| **Region 1-North** | | | | | |
| Alcorn | 11 | 0 | 129 | 9 | 48 |
| Benton | 0 | 0 | 3 | 0 | 1 |
| Desoto | 11 | 0 | 181 | 11 | 91 |
| Marshall | 5 | 0 | 15 | 0 | 41 |
| Tippah | 4 | 0 | 18 | 0 | 42 |
| Tishomingo | 3 | 0 | 29 | 0 | 63 |
| Prentiss | 7 | 0 | 27 | 4 | 48 |
| **Total** | **41** | **0** | **402** | **24** | **334** |
| | | | | | |
| **Region 1-South** | | | | | |
| Calhoun | 1 | 0 | 11 | 0 | 10 |
| Chickasaw | 8 | 0 | 29 | 3 | 28 |
| Itawamba | 3 | 0 | 14 | 0 | 18 |
| Lafayette | 12 | 0 | 144 | 18 | 25 |
| Lee | 26 | 2 | 351 | 30 | 37 |
| Monroe | 7 | 0 | 75 | 16 | 66 |
| Pontotoc | 0 | 0 | 16 | 0 | 41 |
| Union | 2 | 0 | 55 | 9 | 69 |
| **Total** | **59** | **2** | **695** | **76** | **294** |
| | | | | | |
| **Region II-East** | | | | | |
| Carroll | 0 | 0 | 4 | 0 | 13 |
| Grenada | 8 | 0 | 76 | 6 | 4 |
| Leflore | 11 | 0 | 110 | 4 | 18 |
| Montgomery | 3 | 0 | 19 | 0 | 6 |
| Panola | 9 | 0 | 42 | 3 | 33 |
| Quitman | 1 | 0 | 7 | 0 | 4 |
| Tallahatchie | 1 | 0 | 8 | 0 | 6 |
| Tate | 8 | 0 | 24 | 7 | 10 |
| Tunica | 2 | 0 | 14 | 0 | 16 |
| Yalobusha | 4 | 0 | 7 | 0 | 5 |
| **Total** | **47** | **0** | **311** | **20** | **115** |
| | | | | | |

---

[5] This is a sub-group of all dentists.
[6] This includes all physician types, generalist and specialist.
[7] This is a sub-group of all physicians
[8] This is based from the MACWIS report ***MWZCCURD_09152009-Children Currently in Custody by Age Race Sex Detail***, noting children in custody for the date range 8/1/2009-8/31/2009

Mississippi Foster Care Services Assessments

| Distribution of Medicaid Providers by County/Region | | | | | |
|---|---|---|---|---|---|
| County/Region | Dentists | Pediatric Dentists[5] | Physicians[6] | Pediatricians[7] | Number of Children in Foster Care[8] |
| **Region II-West** | | | | | |
| Bolivar | 12 | 1 | 60 | 9 | 28 |
| Coahoma | 13 | 0 | 69 | 5 | 24 |
| Humphreys | 1 | 0 | 12 | 0 | 25 |
| Sunflower | 9 | 0 | 27 | 1 | 14 |
| Washington | 14 | 0 | 124 | 8 | 61 |
| **Total** | **49** | **1** | **292** | **23** | **152** |
| | | | | | |
| **Region III-North** | | | | | |
| Attala | 5 | 0 | 24 | 1 | 12 |
| Holmes | 6 | 0 | 20 | 0 | 10 |
| Issaquena | 0 | 0 | 0 | 0 | 0 |
| Leake | 4 | 0 | 13 | 0 | 8 |
| Madison | 31 | 2 | 118 | 19 | 22 |
| Rankin | 50 | 2 | 298 | 19 | 57 |
| Scott | 9 | 0 | 23 | 1 | 40 |
| Sharkey | 2 | 0 | 9 | 0 | 0 |
| Yazoo | 5 | 0 | 24 | 0 | 74 |
| **Total** | **112** | **2** | **529** | **40** | **223** |
| | | | | | |
| **Region III-South** | | | | | |
| Hinds | 127 | 3 | 1279 | 183 | 357 |
| Warren | 21 | 0 | 118 | 16 | 71 |
| **Total** | **148** | **3** | **1397** | **199** | **428** |
| | | | | | |
| **Region IV-North** | | | | | |
| Choctaw | 6 | 0 | 10 | 0 | 7 |
| Clay | 2 | 0 | 25 | 6 | 31 |
| Kemper | 1 | 0 | 1 | 0 | 6 |
| Lowndes | 12 | 1 | 154 | 17 | 62 |
| Neshoba | 9 | 0 | 48 | 8 | 65 |
| Noxubee | 4 | 0 | 9 | 0 | 4 |
| Oktibbeha | 7 | 1 | 90 | 3 | 12 |
| Webster | 1 | 0 | 10 | 4 | 14 |
| Winston | 6 | 0 | 14 | 0 | 19 |
| **Total** | **48** | **2** | **361** | **38** | **220** |
| | | | | | |
| **Region IV-South** | | | | | |
| Clarke | 3 | 0 | 9 | 0 | 13 |

Mississippi Foster Care Services Assessments

| Distribution of Medicaid Providers by County/Region | | | | |
|---|---|---|---|---|
| County/Region | Dentists | Pediatric Dentists[5] | Physicians[6] | Pediatricians[7] | Number of Children in Foster Care[8] |
| Jasper | 3 | 0 | 8 | 1 | 9 |
| Jones | 12 | 0 | 136 | 29 | 33 |
| Lauderdale | 13 | 1 | 326 | 46 | 172 |
| Newton | 4 | 0 | 24 | 7 | 15 |
| Wayne | 2 | 0 | 22 | 3 | 17 |
| **Total** | **37** | **1** | **525** | **86** | **259** |
| | | | | | |
| **Region V-East** | | | | | |
| Copiah | 8 | 0 | 30 | 1 | 93 |
| Covington | 7 | 0 | 13 | 0 | 38 |
| Jefferson Davis | 5 | 0 | 16 | 0 | 34 |
| Lawrence | 5 | 0 | 16 | 1 | 17 |
| Lincoln | 7 | 0 | 62 | 10 | 41 |
| Simpson | 10 | 0 | 41 | 0 | 37 |
| Smith | 5 | 0 | 7 | 0 | 22 |
| **Total** | **47** | **0** | **185** | **12** | **282** |
| | | | | | |
| **Region V-West** | | | | | |
| Adams | 5 | 1 | 91 | 14 | 96 |
| Amite | 7 | 0 | 5 | 0 | 10 |
| Claiborne | 1 | 0 | 9 | 0 | 4 |
| Franklin | 2 | 0 | 9 | 3 | 7 |
| Jefferson | 0 | 0 | 9 | 0 | 17 |
| Pike | 23 | 1 | 105 | 21 | 37 |
| Walthall | 1 | 0 | 19 | 1 | 19 |
| Wilkinson | 5 | 0 | 17 | 0 | 3 |
| **Total** | **44** | **2** | **402** | **39** | **193** |
| | | | | | |
| **Region VI** | | | | | |
| Forrest | 31 | 0 | 329 | 53 | 132 |
| Lamar | 15 | 1 | 216 | 17 | 30 |
| Marion | 1 | 0 | 20 | 3 | 14 |
| Pearl River | 5 | 0 | 79 | 8 | 111 |
| Perry | 5 | 0 | 8 | 0 | 10 |
| Stone | 5 | 0 | 16 | 0 | 81 |
| **Total** | **62** | **1** | **668** | **81** | **378** |
| | | | | | |
| **Region VII-East** | | | | | |
| George | 9 | 0 | 26 | 3 | 3 |

**Mississippi Foster Care Services Assessments**

| Distribution of Medicaid Providers by County/Region | | | | | |
|---|---|---|---|---|---|
| County/Region | Dentists | Pediatric Dentists[5] | Physicians[6] | Pediatricians[7] | Number of Children in Foster Care[8] |
| Greene | 4 | 0 | 4 | 0 | 2 |
| Jackson | 10 | 0 | 297 | 39 | 368 |
| **Total** | **23** | **0** | **327** | **42** | **373** |
| | | | | | |
| **Region VII-West** | | | | | |
| Hancock | 10 | 0 | 64 | 8 | 156 |
| Harrison | 29 | 3 | 520 | 62 | 158 |
| **Total** | **39** | **3** | **584** | **70** | **314** |
| | | | | | |

*Dentists:* 42 counties (50 percent) have five or fewer dentists that will accept Medicaid in the county, and five counties have no dentists. Among the regions, IV-South, VII-East, and VII-West have the fewest dentists with less than 40 each in the entire region. There are only 17 pediatric dentists in the entire State. Four regions have none and the others have one, two, or three for the region.

*Physicians:* There is a tremendous range of physicians among the counties and regions, and this category covers all physician types, general and specialists. The range is from 185 in V-East to 1397 in III-South which includes Hinds County. The next highest region below III-South is I-South (includes Tupelo) with 695. As a sub-group of all physicians, the number of pediatricians ranges from 12 in V-East to 199 in III-South which includes Hinds County. The next highest region below III-South is IV-South (includes Meridian) with 86. Four regions have less than 25 pediatricians in the entire region, with each region covering from five to ten counties each.

We also obtained data from the Mississippi Division of Medicaid detailing Medicaid usage rates by county and service. The Division of Medicaid does not currently monitor usage rates for children in foster care specifically, thus the table below represents Medicaid costs by claims for all children aged birth through twenty for the last year.

| Billing Provider | Total Claim Count | Total Recipient Count | Percent Of Total |
|---|---|---|---|
| Unknown | 202 | 115 | 0.0039% |
| Adams | 67,031 | 29,026 | 1.2791% |
| Alcorn | 129,754 | 34,625 | 2.4760% |
| Amite | 6,706 | 2,529 | 0.1280% |
| Attala | 28,151 | 11,929 | 0.5372% |
| Benton | 5,885 | 2,197 | 0.1123% |

Mississippi Foster Care Services Assessments

| Billing Provider | Total Claim Count | Total Recipient Count | Percent Of Total |
|---|---|---|---|
| Bolivar | 96,692 | 37,294 | 1.8451% |
| Calhoun | 20,008 | 7,422 | 0.3818% |
| Carroll | 1,281 | 384 | 0.0244% |
| Chickasaw | 24,341 | 10,162 | 0.4645% |
| Choctaw | 8,673 | 4,283 | 0.1655% |
| Claiborne | 17,764 | 7,310 | 0.3390% |
| Clarke | 13,142 | 6,091 | 0.2508% |
| Clay | 33,744 | 15,373 | 0.6439% |
| Coahoma | 106,690 | 38,062 | 2.0359% |
| Copiah | 37,543 | 15,324 | 0.7164% |
| Covington | 22,472 | 9,759 | 0.4288% |
| Desoto | 104,464 | 42,359 | 1.9934% |
| Forrest | 245,559 | 77,504 | 4.6858% |
| Franklin | 6,665 | 2,726 | 0.1272% |
| George | 39,052 | 15,728 | 0.7452% |
| Greene | 6,628 | 2,528 | 0.1265% |
| Grenada | 43,394 | 19,818 | 0.8281% |
| Hancock | 27,245 | 11,815 | 0.5199% |
| Harrison | 228,744 | 98,200 | 4.3650% |
| Hinds | 683,173 | 331,895 | 13.0365% |
| Holmes | 45,318 | 19,013 | 0.8648% |
| Humphreys | 16,400 | 7,590 | 0.3130% |
| Issaquena | - | - | 0.0000% |
| Itawamba | 14,274 | 5,134 | 0.2724% |
| Jackson | 140,474 | 54,028 | 2.6806% |
| Jasper | 17,132 | 6,604 | 0.3269% |
| Jefferson | 9,510 | 4,166 | 0.1815% |
| Jefferson Davis | 12,001 | 5,514 | 0.2290% |
| Jones | 112,159 | 48,065 | 2.1403% |
| Kemper | 3,364 | 1,189 | 0.0642% |
| Lafayette | 81,871 | 36,382 | 1.5623% |
| Lamar | 90,363 | 40,725 | 1.7243% |
| Lauderdale | 219,794 | 73,810 | 4.1942% |
| Lawrence | 8,862 | 4,527 | 0.1691% |
| Leake | 31,493 | 13,014 | 0.6010% |
| Lee | 208,120 | 80,313 | 3.9714% |
| Leflore | 141,804 | 43,837 | 2.7060% |

Mississippi Foster Care Services Assessments

| Billing Provider | Total Claim Count | Total Recipient Count | Percent Of Total |
|---|---|---|---|
| Lincoln | 61,484 | 29,080 | 1.1733% |
| Lowndes | 90,038 | 40,665 | 1.7181% |
| Madison | 88,407 | 36,357 | 1.6870% |
| Marion | 35,029 | 13,323 | 0.6684% |
| Marshall | 30,369 | 12,952 | 0.5795% |
| Monroe | 51,118 | 20,993 | 0.9755% |
| Montgomery | 16,194 | 6,698 | 0.3090% |
| Neshoba | 45,225 | 18,798 | 0.8630% |
| Newton | 29,714 | 13,147 | 0.5670% |
| Noxubee | 20,390 | 7,918 | 0.3891% |
| Oktibbeha | 127,921 | 27,307 | 2.4410% |
| Panola | 46,309 | 21,635 | 0.8837% |
| Pearl River | 71,128 | 26,161 | 1.3573% |
| Perry | 10,764 | 4,463 | 0.2054% |
| Pike | 90,695 | 46,093 | 1.7307% |
| Pontotoc | 24,130 | 9,643 | 0.4605% |
| Prentiss | 34,196 | 12,266 | 0.6525% |
| Quitman | 15,389 | 6,380 | 0.2937% |
| Rankin | 245,084 | 52,434 | 4.6768% |
| Scott | 39,143 | 17,481 | 0.7469% |
| Sharkey | 13,091 | 6,206 | 0.2498% |
| Simpson | 59,359 | 22,682 | 1.1327% |
| Smith | 9,760 | 3,544 | 0.1862% |
| Stone | 19,606 | 7,722 | 0.3741% |
| Sunflower | 57,460 | 23,856 | 1.0965% |
| Tallahatchie | 15,249 | 6,149 | 0.2910% |
| Tate | 41,868 | 17,086 | 0.7989% |
| Tippah | 23,463 | 9,201 | 0.4477% |
| Tishomingo | 17,269 | 6,267 | 0.3295% |
| Tunica | 9,746 | 3,659 | 0.1860% |
| Union | 49,199 | 22,908 | 0.9388% |
| Walthall | 12,473 | 5,532 | 0.2380% |
| Warren | 115,708 | 37,972 | 2.2080% |
| Washington | 121,707 | 47,080 | 2.3225% |
| Wayne | 29,971 | 11,589 | 0.5719% |
| Webster | 13,389 | 5,794 | 0.2555% |
| Wilkinson | 16,256 | 6,667 | 0.3102% |
| Winston | 24,659 | 11,120 | 0.4706% |

**Mississippi Foster Care Services Assessments**

| Billing Provider | Total Claim Count | Total Recipient Count | Percent Of Total |
|---|---|---|---|
| Yalobusha | 10,904 | 4,038 | 0.2081% |
| Yazoo | 44,734 | 18,602 | 0.8536% |
| Chickasaw-W | 16 | 16 | 0.0003% |
| Alabama | 43,714 | 25,383 | 0.8342% |
| Louisiana | 13,824 | 8,026 | 0.2638% |
| Tennessee | 71,062 | 33,709 | 1.3560% |
| All Other States | 75,291 | 49,665 | 1.4367% |
| **Total** | **5,240,447** | | **100.0000%** |
| **Average** | **17,763** | | **2.2472%** |

Although this information provides little insight into Medicaid usage by children in foster care in Mississippi, it is evident that Hinds County provides the most Medicaid services to children in general of all the counties in Mississippi. In addition, Forrest, Harrison, Lauderdale, Lee and Rankin each provided more than 200,000 Medicaid services to children last year, representing nearly one-third (30.5647 percent) of all Medicaid services to children last year.

We also obtained data detailing specific Medicaid services by the Division for Medicaid's codes for children in foster care, as detailed below. Please note that these numbers may not reflect the total foster care child population since some children in foster care receiving Medicaid services may not be identified as a child in foster care, for example, children receiving SSI who enter foster care may retain their SSI classification as opposed to a foster care designation.

| Header Type Description | Code Description[9] | Count Distinct TCNs[10] | Distinct Count Beneficiaries | Total Reimbursement Amount |
|---|---|---|---|---|
| Dental | Protected Foster Care; DHS Foster Care | 2,894 | 1,221 | $2,634,539.12 |
| Clinics | Protected Foster Care; DHS Foster Care | 1,942 | 730 | $343,846.60 |
| Services | Protected Foster Care; DHS Foster Care | 2,310 | 713 | $564,368.15 |
| Inpatient | Protected Foster Care; DHS Foster Care | 490 | 289 | $26,499,211.04 |

---

[9] Protected Foster Care and DHS Foster Care are two different Medicaid eligibility codes for children in foster care in the State. Our contact at the Division of Medicaid was unable to provide us with a clear distinction in the eligibility criteria for these two codes.
[10] TCN refers to Transaction Control Number, which uniquely identifies an individual Medicaid claim.

Mississippi Foster Care Services Assessments

| | | | | |
|---|---|---|---|---|
| Outpatient | Protected Foster Care; DHS Foster Care | 2,701 | 1,058 | $4,555,905.44 |
| Mental Health | Protected Foster Care; DHS Foster Care | 333 | 24 | $34,446.13 |
| Pharmacy (Rx) | Protected Foster Care; DHS Foster Care | 15,769 | 897 | $2,990,618.12 |
| Vision and Hearing | Protected Foster Care; DHS Foster Care | 18,358 | 1,641 | $1,603,034.14 |
| Laboratory and X-ray | Protected Foster Care; DHS Foster Care | 1,039 | 682 | $473,590.71 |
| Medical Supplies | DHS Foster Care | 140 | 50 | $47,733.36 |
| Medicare Part B Crossover | DHS Foster Care | 9 | 6 | $757.00 |
| Practitioner/ Physician | Protected Foster Care; DHS Foster Care | 9,292 | 1,704 | $2,173,075.42 |
| Nursing Facility & Long Term Care | Protected Foster Care; DHS Foster Care | 867 | 164 | $7,884,600.23 |
| Transportation (includes Ambulance) | Protected Foster Care; DHS Foster Care | 122 | 87 | $51,913.02 |
| | **Total** | **56,266** | **9,266** | **$49,857,638.48** |

The costs for Inpatient care for foster children represent over half (53.1 percent) of all service costs. The second highest cost is Nursing Facility/Long Term Care (15.8 percent), followed by Outpatient care (9.1 percent). Routine care (Dental, Practitioner/Physician and Vision and Hearing) represents only 12.9 percent of reimbursed costs for children in foster care coded in the Medicaid system last year.


## Section III: Current Practice

We assessed the practices employed by MDHS to address medical, dental and mental health services to children in its custody, as well as perceptions of the effectiveness of the current array of services to meet identified needs. The following methods were used in this assessment:

- Staff survey to describe the usefulness of tools and current practice;

- Focus groups with front line staff, supervisors, Regional Directors, youth in foster care, resource workers and supervisors, and parents served by MDHS;  and

- Individual interviews with MDHS staff and representatives of other programs including DMH; and

- 30 case reviews of children served by MDHS.

 The following includes the information from those sources.

## A.  Staff Survey

We conducted a survey of MDHS child welfare staff and asked respondents to rate the effectiveness of available services to address a range of needs of children and families involved in the child welfare system.  Included in the survey were items pertaining to services that support the agency's capacity to conduct initial assessments of the needs of children in the context of a broader comprehensive family assessment.  The survey also included additional items that specifically related to the availability, accessibility, and quality of services to meet the medical, dental, and mental health needs of children on an ongoing basis, and addressed issues such as the availability of specialized professional evaluations and screenings along with the timeliness of the referral process for securing needed services.

As indicated in the chart below, respondents rated the effectiveness of services to meet physical health needs as almost always or frequently effective nearly 70 percent of the time.  They rated the effectiveness of dental care services slightly higher, with nearly 73 percent of the respondents indicating the agency is almost always or frequently effective.  They rated the effectiveness of substance abuse treatment services much lower. Less than half of the respondents (about 47 percent) indicated that the services were frequently or almost always effective.

| Please rate effectiveness of available services to address the following areas, including the ability to initiate the service when needed and the quality of the service: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Some times | Frequently | Almost Always | No Info/NA | Total |
| Physical health services | 0 (0%) | 11 (6.01%) | 29 (15.85%) | 59 (32.24%) | 68 (37.16%) | 16 (8.74%) | 183 |
| Dental health services | 0 (0%) | 11 (5.95%) | 25 (13.51%) | 66 (35.68%) | 68 (36.76%) | 15 (8.11%) | 185 |
| Substance abuse treatment services | 2 (1.09%) | 15 (8.15%) | 62 (33.7%) | 54 (29.35%) | 32 (17.39%) | 19 (10.33%) | 184 |

The survey included several questions related to the accessibility of mental health services by the type and level of services, as indicated in the chart below. Overall, respondents did not rate access to mental/behavioral services as very effective. However, they rated the access to less intense services, such as outpatient counseling and evaluation, the most effective with about 59 percent of the respondents indicating these services were frequently or almost always effective. As the level of services increased, the effectiveness ratings decreased.  Mid-level services such as medication, day treatment, and more intense therapy were rated as frequently or almost always effective about 53 percent of the time.  Higher end services, such as specialized care and psychiatric services were rated as frequently or almost always effective only half the time (about 50 percent), and less than half of the respondents (about 48 percent) rated  crisis intervention services as frequently or almost always effective.

**Mississippi Foster Care Services Assessments**

| With regard to mental/behavioral health services, how effectively are you able to access the following levels of services for children and families: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Some times | Frequently | Almost Always | No Info/NA | Total |
| Lower level services, e.g., outpatient counseling and evaluation, prevention services, testing: | 1 (0.54%) | 11 (5.98%) | 43 (23.37%) | 58 (31.52%) | 51 (27.72%) | 20 (10.87%) | 184 |
| Mid-level services, e.g., behavioral health medication, day treatment, more intense out-patient psychotherapy: | 3 (1.63%) | 11 (5.98%) | 49 (26.63%) | 56 (30.43%) | 42 (22.83%) | 23 (12.5%) | 184 |
| High-end/acute services, e.g., addiction and recovery services, specialized care, psychiatric services: | 3 (1.64%) | 13 (7.1%) | 51 (27.87%) | 45 (24.59%) | 46 (25.14%) | 25 (13.66%) | 183 |
| Crisis services, e.g., crisis stabilization, psychiatric hospitalization: | 4 (2.2%) | 15 (8.24%) | 49 (26.92%) | 44 (24.18%) | 44 (24.18%) | 26 (14.29%) | 182 |

A key component to the capacity to screen and assess a child's need for medical, dental, and mental health services is the ability to access professional evaluations, screenings, examinations, and testing in the course of conducting a more comprehensive family assessment. As described in the chart below, survey respondents rated the agency's work in conducting initial screenings for physical health issues higher than screening in other areas. They indicated that the agency is frequently or almost always effective in screening for physical health issues about 80 percent of the time. They rated initial screenings for mental and behavioral health issues as frequently or almost always effective about two-thirds of the time (about 67 percent). They rated initial screenings for therapeutic needs and developmental needs as frequently or almost always effective about 70 percent of the time each.

| Please rank your perception of your agency's effectiveness in conducting initial screenings of children to identify needs in the following areas: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Some times | Frequently | Almost Always | No Info/NA | Total |
| Mental/behavioral health: | 0 (0%) | 6 (3.53%) | 34 (20%) | 50 (29.41%) | 64 (37.65%) | 16(9.41%) | 170 |
| Physical health: | 0 (0%) | 2 (1.18%) | 18 (10.59%) | 44 (25.88%) | 92 (54.12%) | 14 (8.24%) | 170 |
| Therapeutic needs: | 0 (0%) | 4 (2.33%) | 33 (19.19%) | 58 (33.72%) | 62 (36.05%) | 15 (8.72%) | 172 |
| Developmental levels and concerns: | 0 (0%) | 4 (2.34%) | 34 (19.88%) | 45 (26.32%) | 74 (43.27%) | 14 (8.19%) | 171 |

As indicated in the chart below, survey respondents rated the agency's effectiveness in obtaining timely professional evaluations as part of the process of conducting family strengths

and needs assessments. About two-thirds of the respondents (about 68 percent) indicated the agency was frequently or almost always effective in this area, and about 17 percent indicated that they were sometimes able to access these services on a timely basis.

| Please rate your perception of your agency's effectiveness in each area below regarding practices related to strengths and needs assessments: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Some times | Frequently | Almost Always | No Info/NA | Total |
| Obtaining timely professional specialized assessments when needed, e.g., psychological, drug evaluations, educational assessments, etc.: | 0 (0%) | 7 (4.19%) | 29 (17.37%) | 50 (29.94%) | 63 (37.72%) | 18 (10.78%) | 167 |

We also asked survey respondents to rate the effectiveness of several specific types of services that relate to the mental health resource continuum, specifically domestic violence, sexual abuse, and therapeutic services. As indicated in the chart below, respondents rated the effectiveness of therapeutic services highest, with about 63 percent indicating the services are frequently or almost always effective. Slightly fewer (about 59 percent) rated the availability of sexual abuse services as frequently or almost always effective. Respondents rated the availability of domestic violence services considerably lower, with only about 37 percent indicating those services were frequently or almost always effective.

| Please rate effectiveness of available services to address the following areas, including the ability to initiate the service when needed and the quality of the service: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Some times | Frequently | Almost Always | No Info/NA | Total |
| Domestic violence services: | 2 (1.09%) | 24 (13.04%) | 68 (36.96%) | 47 (25.54%) | 21 (11.41%) | 22 (11.96%) | 184 |
| Sexual abuse services: | 3 (1.63%) | 17 (9.24%) | 40 (21.74%) | 57 (30.98%) | 51 (27.72%) | 16 (8.7%) | 184 |
| Therapeutic services: | 0 (0%) | 9 (4.92%) | 44 (24.04%) | 59 (32.24%) | 57 (31.15%) | 14 (7.65%) | 183 |

We asked the survey respondents to comment further regarding the practice and tools related to accessing medical, dental, and mental health services. Several responses indicated that there has been an increase in the number of providers who deliver these services and there is more diversity in the types of available services such as home-based interventions. The highest number of comments regarding existing barriers to accessing needed services pertained to the lack of available providers or services in close geographical proximity to families, followed by barriers related to waiting lists for services. Respondents noted that the lack of certain types of services was more evident in the rural areas of the State.

## B. Focus Groups and Interviews

The focus groups that contributed information pertaining to the medical, dental and mental health service array for children in foster care included resource parents, MDHS resource supervisors, Regional Directors, MDHS caseworkers, and youth placed in care. We also conducted individual interviews with MDHS Central Office staff from different program areas that are responsible for licensing and placement approval, issuing proposals and developing contracts for specific services, or have oversight of county operations.  We conducted additional interviews with several providers from therapeutic group homes and therapeutic foster home programs and also with staff from the Department of Mental Health.

Among the central issues that repeatedly surfaced throughout the focus groups and interviews was the lack of available mental health services in the rural areas of the State. Focus group participants and interviewees described the necessity of traveling distances to obtain these services and delays occurring if there were waiting lists for the services.  There were numerous comments regarding the difficulty in obtaining psychological examinations due to the reliance on the local mental health centers and the high costs of using private providers, many of which do not accept Medicaid. Some participants commented on the inconsistency in quality of the mental health services in some of the counties.  In one focus group, we heard that it is often more expeditious to obtain a psychological examination and testing through placement of a child in an acute psychiatric setting than experience the delays in obtaining one through referral to the local mental health center.  There were also reports from some participants that timely screening to assess the appropriateness of psychotropic medications can be difficult along with obtaining the necessary follow-up and monitoring of children and adolescents for whom these medications have been prescribed.  Many of these same participants indicated that substance abuse services for adults are not readily available but is not as difficult to obtain for youth if needed.

In several of the interviews we heard concerns about accessing and/or providing quality mental health services because of the lack of available Medicaid providers in some of the locations of the state.  There were repeated concerns among the provider interviews that the rates paid for their services to children in out of home care were inadequate to meet their needs, particularly in regard to the provision of therapeutic treatment services.

We learned that each of the 15 Community Mental Health Centers operate independently from the Department of Mental Health and each has its own advisory board.  There is some funding for crisis interventions, though not funded by Medicaid.  There is also a plan being developed to amend the State's Medicaid plan to provide respite care which is not currently being funded. There are 36 MAP teams across the State, and Mississippi State law requires these teams cover children with multiple needs that cross the lines of agencies' services.  These teams meet once a month to review children and youth who are at risk of institutional placement in a mental health facility.  These teams develop wrap-around plans to keep children in their communities.  Each agency represented on the team provides services to the child or youth, plus there is funding to use it for respite care, after school care, utilities, schools needs, etc.

Individual interviews indicated that some Community Mental Health Centers, such as Pine Belt Behavioral Resources in Hattiesburg offer a wide range of services, while other community

mental health centers offer limited services, i.e., only the minimum required. There are barriers to obtaining therapists and psychiatrists to work in rural parts of the State.

We heard that some private providers offer some services but these providers often have waiting lists and their services are not available in the more rural counties. Most mental health services are provided by local mental health centers and there are frequent waiting lists for many of the needed services. We heard that there is not sufficient oversight of the local mental health centers and the quality of mental health services varies tremendously. Also, interviewees noted that it is sometimes impossible to identify a provider who has expertise in a specific problem and that there is no choice when it comes to choosing a provider.

We also learned from our interviews that if a family involved in family preservation services has mental health needs, the contract provider will attempt to link the family to public mental health services. If a family is receiving another service from the family preservation provider, e.g., therapeutic foster care or intensive in-home services, the contractor will provide the needed mental health services. We heard that some regional mental health centers will refuse service to a family if the family is involved with the family preservation service contractor they consider it a duplication of services. The regional mental health services are "bundled" and they must provide all services or none.

With regard to physical health services, most interviewees indicated that access to medical services is not as significant an issue as mental health because the local health departments and private providers are available to screen and treat adults and children. A few interviewees noted that in smaller and rural counties there are fewer providers and travel is sometimes necessary to obtain those services.

Among the concerns we heard with regard to medical services were expired Medicaid cards; resource parents not receiving medical information from the worker on the children in their homes; and workers making appointments at the last minute in order to meet an agency or court-imposed dead-line and expecting the resource parents to address needs with little notice. We also heard that some doctors will not provide the resource parents with information about the child's examination, so they don't know how to treat the child at home.

Most interviewees concurred that dental care is difficult to obtain because there are few dentists across the State that accept Medicaid and because of the limits on dental services covered by Medicaid. Resource parents may have to drive long distances to access dental care for children in their homes, although this was not identified as a problem in urban areas of the State. We heard that orthodontic care is especially problematic because it is not covered by Medicaid. Finally, we heard that MDHS staff seemed to lack knowledge about the need for regular vision and hearing services and mentioned that Medicaid provided only limited costs for glasses, contact lenses, and hearing aids, especially if any of these are lost or broken.

## C. Case Reviews

We conducted a review of MACWIS case files for a sample of 30 children in foster care for this assessment to determine if initial physical, dental, and mental health screenings were obtained

and if needed follow-up services were provided on a timely basis. We also reviewed cases to determine if there were specialized services that were not available to meet identified needs and if services were provided to other children in the family beyond the identified child in the case review sample. In tabulating the ratings, we noted that several of the case files did not contain sufficient documentation to make a determination regarding timely service provision. In some cases, a rating was not applicable for one reason or another. The findings from the case reviews are as follows:

## *Initial Screenings*

Of the 30 cases reviewed we found the following:

- Initial health screenings were conducted in 25 of the cases. There was not sufficient information or documentation in the remaining five cases to make a determination.

- Initial dental screenings were completed in 17 of the cases, and not completed in one of the remaining 13 cases. No determination could be made in 11 of these cases due to a lack of information while one case was determined to be not applicable.

- Twelve of the cases indicated that an initial mental health screening had been completed and was not completed in one case. Of the sample, 15 of the cases were determined to be not applicable and two cases did not have sufficient information to indicate that a screening had been done.

## *Ongoing Examinations and Screenings*

The case reviews also included an assessment of ongoing evaluation of medical, dental, and mental health services, when indicated, with consideration of whether the services were deemed to be timely and accessible. Of the cases reviewed we found the following:

- Ongoing medical screenings/care had taken place in 15 cases, and had not occurred in one of the cases. Seven of the cases had ratings of not applicable and seven cases did not have sufficient documentation to make a determination.

- Eight cases were found to have ongoing dental screenings while one of the cases did not. Fifteen of the cases reviewed for this were determined as not applicable and six did not have enough documentation.

- In regard to ongoing mental health services, three of the cases reviewed received additional mental health services beyond the initial screening while two cases did not. Nineteen of the cases reviewed were deemed to be not applicable for this item and six did not have enough documentation to determine if additional mental health services had been provided.

## *Follow Up Appointments and Services*

As a result of the screenings to determine if there are any presenting medical, dental, or mental health needs, the case reviews explored whether follow-up appointments were made and services were provided. Of the 30 cases reviewed we found the following:

- Six cases had follow-up appointments made for additional service needs, 18 were deemed as not applicable and six cases did not enough information to determine if a follow-up appointment was needed and/or made.

- In determining whether services were then provided as a follow-up in the cases that were reviewed, we found that in seven of the cases services were provided to meet identified needs. Seventeen of the cases were determined to be not applicable for this item and six of the cases did not have sufficient documentation to make a determination that services had been provided.

### Availability of Specialized Treatment

In the case reviews, we rated the availability of specialized treatment for its impact on services to children in foster care. Of the cases reviewed, seven of the cases were determined to have specialized treatment available and 17 of the cases were determined to be not applicable. In three of the cases, there was not enough information to make a determination, and in the remaining three cases the question was unanswered.

### Timely and Appropriate Services

We also rated the timeliness of services and the matching of services to needs and found the following:

- Services were provided to address identified needs in 14 of the cases reviewed and were not provided in three of the cases. Eight of the cases were rated as not applicable and five cases did not have enough information on which to base a determination.

- In reviewing for the timeliness of service provision, eleven of the cases were determined to have needs addressed in a timely manner while four were not addressed. Of the remaining cases, eight were determined to be not applicable for this rating and seven of the cases did not have sufficient information to make a determination for this item.

- In reviewing for the appropriateness of services to the *child*, children in ten of the cases reviewed were determined to have received appropriate services based on identified needs, while one case was not. Nine of the cases were rated as not applicable and ten of the cases did not have enough documentation or information to support a rating on this item.

- In reviewing for the appropriateness of services to the *family*, reviewers determined that in 11 of the cases, services to the family were delivered that matched their identified needs while the families in two cases were found to have not received services that were matched to their needs. Three of the cases were rated as not applicable and 14 of the cases did not have enough information to make a determination regarding this item.

### Service Provider Accessibility

The reviewers also evaluated the accessibility of the service provider to the child receiving services and determined that in eleven of the cases, the service provider was found to be accessible and in one case was not. Eight of the cases were rated as not applicable and ten cases did not have enough information to make a finding.

## *Unmet Needs for Services*

As a part of the assessment, reviewers evaluated not only whether the subject child of the case received services to meet identified needs but also whether the family as a whole, including other children in the family, received needed services. The findings indicated the following:

- For the subject child of the case reviews, needed services were provided in 13 of the cases and not in one case. Seven of the cases were rated as not applicable and nine of the cases did not have enough documentation to rate this item.

- For services needed by the family and siblings to the child, needed services were provided in 12 cases, but not in four of the cases. One case was rated as not applicable and 13 of the cases did not contain sufficient information to make a determination.

## Section IV: Findings and Recommendations

### *Findings*

Our findings for this assessment indicate that mental health issues are predominant, although there are some important findings regarding dental services as well. Also, poor case file documentation regarding screening/evaluation for needed services and the provision of services is a concern in that it inhibits the effective provision of all these services, particularly when there is staff turnover.

### *Mental Health Services Findings*

- Some mental health initiatives offer effective approaches to meeting the mental health needs of children in the child welfare system, but are limited in scope, funding, or criteria for the population served. For example, a wraparound services approach would be beneficial to all children not just those with SED, and the inter-disciplinary approach of the MAP teams could benefit children before they exhaust other available services but funding is very limited.

- Community Mental Health Centers appear to be the primary source for MDHS to provide mental health services to children and youth in its care. Across the State, the centers do not offer a consistent range of services, particularly in rural areas of the State where services are considered to be quite limited, and they are often unable to provide the level of specialization needed by children in foster care.

- Access to private providers of mental and behavioral health services is restricted, particularly in rural areas of the State, by lack of funding to pay for the services, by wait lists to obtain services even when they are available, and by a lack of providers that will accept Medicaid.

- Obtaining psychological evaluations is particularly difficult, as there are areas of the State where this service is not available.

Mississippi Foster Care Services Assessments

- Mental health screenings of children are either not conducted as consistently as needed or the case file documentation was so poor that we could not determine if a screening had been conducted or not.

- There is little or no choice of providers in rural areas.

- The effectiveness of some services is generally regarded as poor, indicating a need for more choices of providers, more accountability in service provision, and strengthened ability to tailor services to meet the individualized needs of children and youth.

### Dental Health Services Findings

- Access to dental providers in rural areas of the State appears to be the most prominent issue. A number of providers will not accept Medicaid and families/resource families often must travel long distances to access providers.

- The dental services authorized and covered by Medicaid are limited, particularly as it relates to orthodontic care.

- Dental screenings are either not conducted as consistently as needed, or there is inadequate documentation of case files to make a determination as to whether the screening was conducted or not.

### Physical Health Services Findings

- In general, access to physical health care appears better than dental or mental/behavioral health services.

- Although the initial physical health screenings of children occur more frequently than screenings for dental and mental/behavioral health concerns, case file documentation in this area is lacking.

- Medicaid cards and medical info may not be provided to resource parents routinely, affecting their ability to seek and provide needed services.

- At least some resource parents experience difficulty in getting the necessary medical background information on children placed in their homes, and are unaware of the medical needs of the children at the time of placement.

- Some resource parents appear to have difficulty obtaining complete medical information from physicians needed to attend to the medical needs of children in their care.

- Transportation to services (medical, dental, mental health) is a major issue in rural areas, and Medicaid only reimburses in limited circumstances.

## *Recommendations*

- MDHS and MDMH develop a collaborative program to serve the mental health needs of foster care children state wide, including specialty services e.g., psychological examinations, treatment for abuse and neglected children and youth, etc. This should include the possibility of hiring qualified mental health professionals to be based in DHS regional offices to serve counties where the service population is the greatest or where gaps in services are the most prevalent, for example, in many of the rural areas of the State. Programs of this nature can offer a diverse range of services and can be structured to enable Medicaid billing to cover a majority of the staffing and administrative costs. The participation of the State Medicaid Agency should be pursued to explore further creation of these types of innovative programs along with funding arrangements.

- In cooperation with the colleges and universities in the State, MDHS and the State Board of Dental Examiners should intensify efforts to recruit dentists to provide services to children and youth in foster care, as well as to children served in their own homes through MDHS. This effort may be part of a more comprehensive approach to providing health care in rural and underserved areas of the State. A clinic approach that specializes in providing Medicaid-funded dental care to children can offer access that is currently unavailable, and there are models around the country to draw on in designing such a program.

- MDHS should collaborate with the State Medicaid Agency to pursue the possibility of exercising State options that could include an expansion of dental services to include orthodontic care for children and adolescents.

- MDHS collaborate with DMH and the State Medicaid Agency to establish additional waiver programs to expand its provision of mental health services to children who are placed in foster homes. The MYPAC program is one example of a waiver program that could also serve children residing in foster family homes at risk of entering PRTF's, thereby enabling these youth to receive needed services and remain in the community.

- MDHS should collaborate with the psychology and behavioral science programs of the State's post-secondary systems to explore the possibility of establishing internships and field placements within MDHS, providing opportunities for professional and academic advancement that includes direct services and interventions to children and adolescents in foster care.

- MDHS Regional Administrators and Area Social Work Supervisors should establish performance standards and monitoring practices that hold direct service staff accountable for documenting all assessment, screening, and service provision information in the case files and for maintaining current health records.

- MDHS incorporate specific measures and review processes within its CQI system to ensure that all initial screenings are conducted within established timeframes.

- MDHS should ensure that its Foster Care Reviews (FCR) include the evaluation of the provision of needed medical services as part of appropriate case planning efforts and timely achievement of case plan goals.

- MDHS should establish both supervisory practices and monitoring processes within its CQI system to ensure that resource parents are provided timely and accurate medical information that enables them to meet the needs of children in their care.

- MDHS should reimburse resource parents for transportation of children to all necessary appointments on behalf of the medical, dental, and mental health needs of children in their care.

- MDHS Regional Directors and Area Social Work Supervisors should ensure that direct staff provides health records, appropriate health referrals and relevant information about services/programs to youth exiting care and to parents or guardians at the time of case closure for the purpose of continuity of health care and service delivery. Part of the FCR process might include addressing this issue with resource families since the FCR reviews all cases of children in foster care each six months.

## *Independent Living Services Assessment*

The Period 2 Annual Implementation Plan requires that MDHS conduct the following assessment:

"An assessment of the quality and array of independent living services available to foster children ages 14-20."

This is the report of our assessment and includes a review of policy, relevant program materials, interviews and focus groups with key stakeholders, a staff survey, and the review of sample of independent living cases.

## Section I: Applicable Standards and Requirements

### *MDHS Independent Living Policy*

The Foster Care Independence Act was signed into law in December 1999, with the express purpose of planning for and supporting youth in foster care. According to the Children's Bureau, "this legislation helps ensure that young people involved in the foster care system get the tools they need to make the most of their lives. They may have opportunities for additional education or training, housing assistance, counseling and other services." Among some of the listed provisions, the Foster Care Independence Act "provides for flexible funding for distribution to States through grants for program services for youth and enables youth to make better choices and accept greater responsibility for their own lives."

The MDHS has detailed policies relating to the Independent Living Services Program. Of particular interest, children aged 14 and older are required to participate in the program. Policy states "all youth must have an opportunity to participate in the Independent Living Program (ILP), without regard to the youth's permanent plan. Refusal by the youth to participate is not a valid reason for non-participation. Independent Living Services are mandatory and not optional for all youth in care who are at least 14 years or less than 21 years old." Policy also describes several roles and responsibilities for the caseworker and supervisor to follow in order to ensure youth are involved with this mandated program:

- When the youth reaches his/her 14th birthday, an Independent Living Plan must be completed in MACWIS. This Independent Living Plan must include a description of all programs and services that will help the youth prepare for transition from foster care to independent living. At the youth's 16th birthday, an ISP must include a documented Transitional Living Plan (TLP) based on an assessment of the youth's needs. The COR worker and the youth shall be involved in the development of the ISP, Independent Living Plan, and the TLP. The caseworker is responsible for carrying out the plan as established in the ISP;

- The caseworker will provide recommendations to the Youth Court Judge during review hearings that identify specific services being provided and services needed to help the youth transition from foster care to living independently;

- The caseworkers must inform the youth of all independent living activities and arrange for participation, including transportation. The transportation plan must include who will transport the youth to all of the independent living activities;

Mississippi Foster Care Services Assessments

- Caseworkers must input into MACWIS the data (life skills modules) sent from the independent living specialist, which may include the worker's professional knowledge of the youth's comprehension of life skills; and

- The supervisor is responsible for reviewing and approving the youth's ISP and TLP in MACWIS. This includes all submissions for approval under the independent living plan icon.

While there are several strengths in this policy, including requirements that the youth is to be involved in the development of the Independent and Transitional Living Plans and supervisor review, oversight and approval of all plans and requests for older youth, there are some gaps that should be noted. It does not appear to be a requirement that the caseworkers conduct any assessment prior to completing the Independent Living Plan (we do understand that the IL contractor must conduct the Ansell-Casey assessment). Without explicit requirements regarding the use of an assessment to develop the plan, there is the risk that the Department's plan will not be informed by the individual needs of the youth. In addition, there is no description of what assessment is conducted to inform the TLP developed at age 16. We did not find requirements for the service provider to be involved in the development of the plan, even though they will be predominantly working with the youth. Finally, there is no notation of a role or responsibility of caseworkers to reinforce the knowledge and skills being learned in Life Skills class with the youth during their visits.

Through funding from the Chafee Foster Care Independence Act of 1999 (PL 106-169), MDHS provides the following stipends:

- Pre-Assessment Stipend (Initial): A $25 stipend is available to all youth who complete a Life Skills Pre-Assessment form.

- Post-Assessment Stipend (Final): A $25 stipend is available to all youth who participate in the Independent Living Program and complete a Post-Assessment.

- Life Skills Training Group Stipend: A $20 stipend can be earned for the completion of ten (10) Skills Hours.

- Youth Opportunity Training Stipend: A $20 stipend can be earned for attending a Youth Opportunity Training.

- Youth Conference Stipend: A youth will receive a $30 cash stipend for successful completion of participation in the annual conference and a $200 Youth Conference Clothing Allowance prior to attending the Youth Conference.

- Newsletter Stipend: A $15 stipend is available to youth who submit an article, poem or other creative writing, as well as a letter to the editor, or an editorial to the State Independent Living Coordinator for consideration for publication in any MDHS publication.

- Senior Year Stipend: A $350 stipend is available to help defray senior/final year expenses for youth receiving a diploma, GED or a Certificate of Attendance at the close of the school/program year in which the stipend is requested.

- <u>High School Graduation Stipend</u>:  A $200 Graduation Stipend is available to all youth in custody who receive a high school diploma.

- <u>GED (General Education Diploma)/Certificate of Attendance Stipend</u>:  A $150 Stipend is available to all youth in custody who receive a Certificate of Attendance, or pass the GED (General Equivalency Diploma).

- <u>College Bound Stipend</u>:  A $600 College Bound Stipend is available to youth in care who plan to attend a post-secondary education program.

- <u>College Graduation Stipend</u>:  A $300 stipend is available for youth until their 21st birthday who complete a two-year community college, four-year college/university or full completion of a vocational program.

- <u>Start-Up Stipend</u>:  A $1000 Start-Up Stipend is available to youth who leave care after turning age sixteen (16) and who have participated in the available Independent Living Program activities.

- <u>Youth Trainer Stipend</u>:  A $20 stipend is available to youth for assisting in various training activities.  The State Independent Living Coordinator, based on recommendations from the SAILS Advisory Board, will select youth.

- <u>Aftercare Survey Stipend</u>:  A $25 stipend is available to youth upon completion and return of an Aftercare Survey.  This stipend will be paid by the contractor.

- <u>Personal Enhancement Stipend</u>:  A discretionary stipend may be awarded to a youth in custody, who has attained age 14, based on documented needs and contingent upon available funds.  The stipend cannot exceed $1,000 and must be paid to the vendor(s).

- <u>County Conference Stipend</u>:  A $25 stipend can be earned by a youth, age 14 years or older, for attending and participating in his/her FCR County Conference.

### *Olivia Y Settlement Standards*

The *Olivia Y* Settlement Agreement detailed several standards with regards to Independent Living Services:

- The Independent Living Plan is required for youth from age 14-20 to be reviewed and updated every 90 days.  DCFS directly provides, refers, contracts or otherwise arranges for needed therapeutic, educational and support services for youth in the Independent Living Program.

- There must be prompt and adequate independent living and transitional living services to youth in foster care.  The children in the ILP are supported through collaborative efforts between foster parents, parents, educators, and foster care worker.
- DFCS must ensure that youth transitioning to independence have an adequate living arrangement, a source of income, and health care.

Mississippi Foster Care Services Assessments

- DCFS must provide educational and training vouchers and assistance in locating/enrolling in educational or vocational programs for youth in ILP.

- DCFS is to assist youth in obtaining documents necessary to function as independent adults.

- Youth are to be given 6 months advance notice of cessation of health, financial, or other benefits that will occur at time of transition.

- Emancipation can only be goal for 16 yrs old with court approval and ruling out all other goals.

- DCFS to ensure youth has access to at least one committed, caring adults and to cultural supports and positive peer support (this is a Federal requirement).

- Services are linked to individualized needs identified through the assessment and case plan.

- Children must receive age-appropriate education and support. To ensure this service is met an array of educational and vocational services and resources for financial aid and housing must be available.

### Council on Accreditation Standards

A number of requirements in the *Olivia Y* settlement agreement are mirrored in COA standards, but in addition to the requirements noted above, COA standards also require the following:

- DCFS is to transfer or terminate custody and provide information about a range of services to the youth across systems.

- DCFS and family are to develop an aftercare plan in advance of case closing and identify steps for obtaining any needed services that are identified.

- Age appropriate children must receive education and support regarding pregnancy prevention, responsible parenting, and prevention of sexually transmitted diseases and assistance in obtaining medical insurance, medical records, and needed medical, developmental, substance abuse, and mental health services.

- Children are assisted in obtaining health insurance and health records in order to obtain needed substance abuse svc, medication, and medical/mental health care after discharge.

- Age-appropriate children must be involved in case plan development and signatures are required on the plan.

- Youth are to be assisted in developing social networks, meaningful relationships with caring individuals including extended family and persons with whom there was a prior relationship such as members of the child's faith community or tribe.

- Planning must place a value on the development of the youth's social support networks including mentors, community and friends.

## *Independent Living Service Provider Requirements*

DFCS currently contracts with one service provider to provide all independent living service programs to youth across the state. Their goal as it relates to ILS is 'to provide resources, education and preparation to adolescents to enable them to become fully functional citizens upon their departure from the foster care system.' They are required to:

- Provide services to youth living in foster homes, emergency shelters, group homes, relative placements, residential treatment centers, therapeutic group homes, training schools located in Mississippi and the Mobile, Alabama area.

- Distribute and announce any and all activities for the Independent Living Program, to youth placed in the designated geographic areas The contractor's staff shall serve as training and technical support for all independent living practice approaches, with an emphasis on the Ansell-Casey Life Skills Assessment on-line resource, to all placement facilities licensed by MDHS and/or who place MDHS youth that provide independent living skills activities, if requested from the facility.

- Provide resource family training in conjunction with MDHS foster/adopt staff and training unit. The contractor's staff will attend a minimum of two scheduled foster/adoptive parent training sessions per Adoption District during the contract period to increase awareness of the needs of older youth. IL specialists will contact MDHS adoption administrators to obtain resource family training calendars.

- Utilize data collected and furnished by MDHS to ensure that independent living skills assessments, based on the Ansell-Casey Life Skills assessment tool, are administered to each appropriate youth who is eligible. Provide monthly statistical reports by region and counties to include the number of eligible youths for independent living services, the number of skills groups offered, the number of youth actually participating and the percentages of participation.

- Provide weekly and monthly activity reports that reflect unduplicated numbers of youth to whom services were given and the nature of the services.

- Develop a functioning after care program and develop and disseminate after care brochures, flyers, resource materials and other documents.

- Develop and implement events to enhance youth leadership including the development of selection criteria and providing supervision at the events.

- Increase Education and Training Vouchers (ETV) requests by 10%.

While DFCS is required to complete an independent and transitional living plan for all youth, SCSCY is also required to develop a separate independent living plan. The plan is developed

after the completion of the Ansell-Casey Independent Living Assessment/Intake process, through which the staff will learn about the youth's needs. The plan will be reassessed as necessary, and once it is signed by the worker, it is forwarded to the DFCS worker. It does not appear that the youth is involved in the development of the plan, as the program states "once the specialist establishes the ILP, he/she will discuss desired goals and objectives with the youth."

## Section III: Services and Resources

In order to best serve the youth in the state in preparing them for living independently upon transitioning out of foster care, DFCS, through the IL contractor and other vendors, offers an array of services and resources to youth, as described below from their program materials.

- *Life Skills Training Groups:*  The skills training is based on a nationally recognized curriculum approved by the agency.  Skills training are based on assessments, personal contact, the ILP and the TLP.  The curriculum contains the following components: Community Resources and Transportation, Communication Skills and Social Development, Employment, Money Management, Decision Making and Study Skills, Housing, Daily Living Skills, Self-Care, and Youth Law issues.  Additional curriculum units have been developed and added to include soft skills such as sexuality and social skills. These groups are scheduled monthly, by the Independent Living Specialists (contractor), in identified locations, throughout the State.  We understand that the complete cycle of Life Skills classes is offered repeatedly to youth in care, and that after a youth completes the first cycle of classes (s)he would start over with the classes again, going into greater depth on the same topics.  Our understanding is that a youth in care could go through the cycle of Life Skills classes four times if (s)he remained in care from age 14 through 18.

- *Youth Opportunity Trainings:* Formerly known as youth retreats, these are held throughout the State.  Some of these are open to youth ages 14-15, while others are open to youth ages 16 to their 21st birthday.  Overnight Youth Opportunity Trainings are held each year covering all geographical areas of the state.  The purpose of these trainings is to enhance the life skills learned in the scheduled skills groups discussed under the Life-Skills Training Groups section.  Additional life skills include, but are not limited to:  team building, leadership development, sexual responsibility, positive self expression, socialization, self esteem, and positive values.

- *Statewide Youth Conferences*:  These are held annually to benefit youth from ages 16-21st birthday.  The purpose of the Youth Conferences is to reinforce the life skills presented throughout the year at the scheduled life skills training groups and Youth Opportunity Trainings.  Youth conferences include various life skill building activities and motivational speakers.

- *Computer Camp*: One computer camp will be arranged by the contractor. PREPARE staff will act as chaperones for these events. Funds have been included in the contract to cover the cost of these camps.

- *Wildlife Event*:  One wildlife event for youth 14-15 years old is held during the summer months. The event shall not exceed 30 youth.

- *Transitional Independent Living Placements*:  These are available to youth ages 18 to their 21st birthday, upon approval from the SAILS Advisory Board.  Youth 17 years of age who have obtained a high school diploma, General Education Diploma (GED), or Certificate of Completion will also be considered for placement.

- *Newsletters*:  These contain information about the Independent Living Program is provided periodically to youth statewide.  Submissions from the youth may be included in the newsletter.

- *Handbook for Youth in Care*:  The handbook is available to all youth in the custody of the MDHS who attain the age of fourteen (14) or older when entering custody.  The handbook highlights programs, services, brochures, and guideline information for the youth while in care.  This handbook is available through the county where the youth resides and in conjunction with the Independent Living Specialist (contractor) upon the youth attending their first Life Skills group session.

- *Education and Training Voucher Program*:  The vouchers help youth make the transition to self-sufficiency and to help youth receive the education, training and services necessary to obtain employment.

- *SAILS Advisory Board*:  The **S**trategies for **A**ccessing **I**ndependent **L**iving **S**ervices (SAILS) is an advisory board composed of the State Independent Living Coordinator, MDHS staff members from each of the regions in the State, the contracted Program Director, Mississippi Board of Choctaw Indians representatives, stakeholders, and youth leaders.  The Board meets monthly to help in the decision making for recommendations of the Independent Living Program services.

- *HOPE Forum*:  The **H**elp **O**urselves **P**rosper **E**qually (HOPE) is a youth advisory group, which consists of members who are participating in the Independent Living Program.  Meetings are held at least once a quarter for the youth to discuss improvements or challenges with the Independent Living Program.

- *Aftercare Services (the PREPARE program)*:  These services are available to youth who leave care on or after their 18th birthday.  Special financial assistance will be provided for youth ages 18 until their 21st birthday who left custody on or after attaining age 18.  These services are available to youth in crisis who need additional temporary assistance to continue in the process of transitioning towards self-sufficiency.  The benefits can be distributed quarterly as long as the youth remains in crisis.  These services may include rent deposits, rent, utility payments, food and household supplies and child care.  Payment must be made to the vendor and receipts kept in the county agency file.

- *Big Brothers and Big Sisters of Mississippi:*  This mentoring program is available to youth in care ages 14-16, in selected areas of the State.

We understand that a provision in the current IL contract is for the contractor to recruit and link 18 mentors with youth in foster care statewide, but that has not been achieved at this point.  Given the Federal requirements that youth exiting foster care have a significant connection with

at least one caring, committed adult, we are concerned first that the mentors are not in place and also that the number required is very low compared to the volume of youth potentially needing this service.

## Section III: Current Practice

### A. Staff Survey

Older youth face several challenges in foster care, especially as it relates to finding an appropriate placement to meet their needs in the least restrictive and most supportive environment possible. According to the survey that was completed by staff throughout the State, over 57 percent of the respondents indicated that they have the most difficulty in finding appropriate placements for teenagers, as opposed to other age groups of children. They also noted concern with being able to provide appropriate supportive services, particularly transitional and independent living services to help prepare older youth for their transition into adulthood.

| Please rate your perception of your agency's effectiveness in the following areas of practices: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Some times | Frequently | Almost Always | No Info/NA | Total |
| Tailoring IL and transitional living services to youth in care: | 1 (0.57%) | 16 (9.2%) | 34 (19.54%) | 47 (27.01%) | 50 (28.74%) | 26 (14.94%) | 174 |
| Availability and accessibility of services to transition children into adult services systems when appropriate: | 3 (1.73%) | 23 (13.29%) | 34 (19.65%) | 44 (25.43%) | 41 (23.7%) | 28 (16.18%) | 173 |

As indicated in the chart above, when asked about DFCS' performance in tailoring and individualizing independent and transitional services to youth, just over half (about 56 percent) indicated that the Department was frequently or almost always effective. Just under half (about 49 percent) indicated that DFCS was frequently or almost always effective in accessing services to assist in transitioning children into adult service system when needed. One respondent in particular noted when asked about barriers to individualizing services to youth that the Independent Living program needs to work on individualizing their services, particularly not focusing quite so much on abstinence. We also heard this comment in other forums.

Another important way to support the transition of youth in care to adulthood is through involving them in case planning, to ensure that they are engaged and agree with the plan to support them and teach them the skills they need for independence. As indicated in the chart below, just over half of the survey respondents indicated that DFCS was frequently or almost always effective in involving age-appropriate youth in developing case plans (about 58 percent) and in reviewing, updating, and revising case plans (about about 57 percent). Respondents indicated slightly more effectiveness in using caseworker visits to involve youth in case planning and decision making (about 65 percent rated this frequently or almost always

effective), using information from youth to guide case planning and decision making (about 63 percent frequently or almost always effective), and in using information from youth to identify the services they need for successful transitions to adulthood (about 62 percent frequently or almost always effective).

| Please rate your perception of your agency's effectiveness in the following areas of practices: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Some times | Frequently | Almost Always | No Info/NA | Total |
| Involvement of age-appropriate children and youth in developing case plans: | 0 (0%) | 16 (9.64%) | 35 (21.08%) | 40 (24.1%) | 57 (34.34%) | 18 (10.84%) | 166 |
| Involvement of age-appropriate children and youth in reviewing, updating and revising case plans, goals, and services: | 0 (0%) | 13 (7.78%) | 40 (23.95%) | 44 (26.35%) | 52 (31.14%) | 18 (10.78%) | 167 |
| Use of caseworker visits with children and youth to involve them in case planning and decision making (frequency and quality of visits): | 0 (0%) | 5 (2.99%) | 36 (21.56%) | 46 (27.54%) | 62 (37.13%) | 18 (10.78%) | 167 |
| Use of information/requests from age appropriate children and youth to guide the development of the case plan, select services, and establish goals: | 0 (0%) | 10 (5.99%) | 32 (19.16%) | 43 (25.75%) | 62 (37.13%) | 20 (11.98%) | 167 |
| Involvement of youth in identifying services and supports they need to transition to adulthood: | 0 (0%) | 13 (7.98%) | 26 (15.95%) | 48 (29.45%) | 53 (32.52%) | 23 (14.11%) | 163 |

## B. Focus Groups and Interviews

We conducted several focus groups and key stakeholder interviews across the State to obtain first-hand information to inform the independent living services assessment. Among the focus group and interview participants were social workers, supervisors, Regional Directors, resource parents, individuals who directly work with the independent living program, and youth in foster care. Comments made in several of the focus groups directly relate to the independent living services program and its effectiveness in supporting older children in care and preparing them for adulthood. All youth who participated in the focus groups indicated that ILS a good program and they had all been informed about ILS by their caseworker. The one common complaint about the program from the youth related to the money received, with nearly all youth indicating that it took too long to process the payments. The youth also indicated that their caseworkers talked about the same things over and over again when they saw them, and that the youth would like more one-on-one visitation with their caseworker.

Other focus group participants had many positive comments about the program while noting some key areas that needed improvement. One focus group in particular noted that independent living services were effective in assessing and identifying the strengths of youth in care. Other focus groups commented that the services are particularly helpful for receptive youth, assist in helping children attend college, and cover general issues important in adulthood. Key informant interviews supported these claims, while adding that not only do the IL skills class workers relate well to the children and the retreats and conferences in particular are of high quality. However, several gaps were also identified. Some groups noted that the IL program is more classroom-based and not reality-based, and that even after completing the program, youth are not prepared for independent living.  Another theme noted in focus groups was the stipends received by youth for attending. Several participants indicated that youth are less receptive to the meetings and services offered through IL, but more interested in the money received.

The standardization of the program offered and of the Like Skills curriculum was the subject of several comments. Interviews indicated that there is little to no individualization of the skills classes provided, but that all the youth, regardless of their individual circumstances, go through the same regimen of Life Skills classes.  There are opportunities for some school and extra-curricular or employment activities to serve as a substitute for attending the classes, but we could not identify any tailoring of the actual IL services offered to individual youth.  Some interviewees noted a need to be able to offer the classes more flexibly to the youth who could benefit from them the most and to take a different approach with youth whose needs or developmental levels are different.  We also heard concerns raised about repeating the Life Skills classes and requiring youth to attend the same cycle of classes again.

In other focus groups, we received mixed reviews of the ILS program. For example, all resource family participants who had children in the age group stated those youth had been served. Some resource families indicated that the independent living services are helpful, but many indicated a need for more practical skills training for the youths, such as shopping at the grocery store, parenting skills and balancing a check book. Key informant interviews also revealed a need for resource parents to be trained on the skills needed for youth to successfully transitioned into adulthood. This is particularly interesting, as per policy and contract, resource parents are supposed to receive this training. In addition, some focus group participants indicated that the IL program did not do enough to reinforce the importance of education for youth, and requested that counselors encourage the youths to stay in school, go to a vocational school or get a GED. Several interviewees and focus group participants noted the lack of youth involvement in the development of plans.

Several focus group participants and individual interviewees commented on the lack of coordination between MDHS and the ILS service provider. The assessments, which are conducted by the provider, may not be shared with MDHS, and MDHS may not be requesting copies of them. In addition, MDHS and the IL provider each develop separate IL and TL plans which may not be shared with one another consistently. This lack of coordination highlights a significant concern, as there may be issues not being addressed with youth and each agency may assume the other is addressing a specific need.  We heard from some participants that with the contract in place, MDHS staff do not consistently take an active role in addressing IL issues with the youth in their caseloads but, rather, leave it to the contractor to address.

Another common area of concern noted in several focus groups was the over-emphasis on abstinence in the IL program. Considering that some of the youth already have children, there were concerns about the relevance of this emphasis in the curriculum as opposed to addressing the issues these youth are currently facing.

## C. Case Reviews

In addition to the survey and focus groups/interviews, we conducted a random sample of 30 MACWIS case reviews on youth who were receiving some form of independent living service, the results of which will be described in the first section below. In addition, we randomly selected 10 of the 30 cases, and conducted a case review from the service provider files for the purpose of comparing the information obtained by each party, which is described in the second section.

### MACWIS Case File Findings

We reviewed the MACWIS cases of 30 randomly selected youth in foster care between the ages of 14-20 for the presence of independent living services. The following represents some of the major findings from the MACWIS case reviews (note that these are the MDHS case files, not the files of the contractor).

- The average age of the youth in the case review was 16, and they had been in care an average of 2.2 years.

- Over the 30 cases, a total of 63 independent living services were received by the youth, as follows: 30 (47.6 percent of all services) Life Skills Classes or IL Hours Stipend; 11 (17.5 percent of all services) Youth Conferences; eight (12.7 percent of all services) other; seven (11.1 percent of all services) Youth Retreat; six (9.5 percent of all services) County Conference Stipends; and one (1.6 percent of all services) Educational Training Vouchers.

- In 96.7 percent of the cases (29 out of 30 cases), services were not connected to the identified needs of the child or there was either not enough information to determine the link between services and needs. Of the 63 IL services noted, in 44 (69.8 percent) services there was not enough information available to determine if the services met the needs of the child, with reviewers determining that the services met the needs of children in 15 (23.8 percent) of the services provided.

- In all of the MACWIS cases reviewed, it was unclear whether an Ansell-Casey Life Skills Assessment was conducted, and whether that information was used to develop the case plan.

- In four of 30 cases (13.3 percent), the child was involved in the development of either the MDHS or the service provider case plan. There was not enough information to determine their involvement in the remaining cases.

- It was unclear, based on the documentation in MACWIS, how frequently children attended ILS classes and what was involved in those classes.

- ILS and Transitional Living (TL) plans were minimally completed, and several were completely blank. Of the TL plans that were completed, much of the information tended to reflect the current circumstances of the child, or goals that would not be realistically obtained by children. For example, one plan noted SSI/SSA and family gifts as the financial plan for the child, which did not address emancipation, and the planned living arrangement plan was to live with family though it appeared from the narrative that the child had minimal if any contact with their relatives.

- In a couple of cases, there were instances where the child routinely expressed interest in or asked questions about educational, vocational or employment opportunities that did not appear to be followed through by the caseworker according to the case documentation.

### Service Provider Case File Comparison

In addition to reviewing 30 MACWIS cases reviewed, we identified ten of the 30 cases randomly and reviewed the IL contractor's files for those ten children using the same case review protocol as for the MACWIS case reviews.  We then compared the findings of the MACWIS reviews and the contractor's file reviews for those ten children.  The table below represents the comparison of findings for those ten youth.

|  | Service Provider's File | MACWIS file |
|---|---|---|
| Did the child regularly participate in services? | 5-Yes<br>5-No, Not Enough Info | 2-Yes<br>8-No, Not Enough Info |
| Did the child complete services? | 0-Yes<br>10-No, Not Enough Info | 1-Yes<br>9-No, Not Enough Info |
| Were the services connected to the needs? | 7-Yes<br>3-No, Not Enough Info | 0-Yes<br>10-No, Not Enough Info |
| Was the child involved in the development of either case plan? | 0-Yes<br>10-No, Not Enough Info | 0-Yes<br>10-No, Not Enough Info |
| Were there any apparent services not identified in the case plan? | 1-Yes<br>9-No, Not Enough Info | 4-Yes<br>6-No, Not Enough Info |
| Were there any apparent needs for which services were not provided? | 3-Yes<br>7-No, Not Enough Info | 4-Yes<br>6-No, Not Enough Info |

While there are some questions where similar information was found in each case file, it is clear from these varied responses that each entity, while serving the same youth, are either operating with different information and perspectives or that both are not documenting information in the files. This concern was reconfirmed when we compared the qualitative responses between the two sources of information, as follows:

- Neither the MACWIS files nor the contractor's files documented the impact of the IL service on the youth or whether it in fact met the needs of the youth.  For example, in one case the MACWIS IL plan noted the youth was attending Life Skills classes regularly and gaining general skills to help support independence.  However, the service provider file noted that the child had attended three Life Skills classes in the last three months, all of

which occurred prior to conducting the Ansell-Casey Life Skills Assessment which is conducted once annually in August.

- From the responses above, we were able to determine from the contractor's files that more needs of the youth were connected to the services, whereas we could not determine that from the MACWIS files.

- We did not find thorough case plans in either the MACWIS files or the contractor's files, nor could we identify coordination between the two plans. The MACWIS IL plans we reviewed were not routinely completed, and often only seemed to indicate which sections of the IL curriculum the youth had completed. The service provider plan appeared to be more of a checklist that notes the child's competency in each area of the curriculum. We could not identify documentation in either of the plans about the particular skills the youth needed and what are other areas that needed to be addressed.

### D. Monitoring

#### DFCS Monitoring

#### MACWIS Reports

MACWIS has two tickler systems relating to independent and transitional living services. First, MACWIS has a tickler system which notifies caseworkers when a child in their caseload reaches age 14, so they will know when to refer children to ILS provider. Second, the State Office director of ILS receives a monthly report from MACWIS of all eligible children who are not receiving ILS. Those children are then referred to the ILS service provider to determine why they are not receiving services and to contact them if needed for services.  The receipt of services is defined as having attended at least one Life Skills class during the reporting period.  The IL coordinator reported to us that the Department has about a 96 percent rate of reaching and involving youth in the program.

#### Foster Care Reviews

In addition to MACWIS reports, certain issues pertaining to older youth and the Independent Living Program are monitored through the Foster Care Reviews (FCR), as detailed in the table below. The percentages listed represent the percent of all cases cited for an issue in the FCR that are cited for that particular issue.

| | Percent of Cases Cited | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | YTD Total |
| Issues cited related to children with a plan of Living Independently or Long Term Foster Care for which other permanent plan options have | 1.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 1.2 | 1.4 | 0.0 | 3.2 | 0.0 | 0.6 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| not been considered and ruled out. | | | | | | | | | | | |
| Issues cited due to a lack of Independent Living/Transitional Living services being provided to eligible youth in state's custody. | 6.4 | 8.3 | 5.8 | 7.5 | 6.6 | 10.3 | 7.3 | 2.8 | 8.5 | 12.9 | 6.6 | 7.4 |
| Issues cited due to children for whom there is no evidence they have received allowances they are eligible for. | 10.6 | 16.7 | 12.6 | 21.5 | 16.5 | 3.8 | 15.9 | 16.9 | 15.5 | 21.0 | 13.1 | 14.8 |

Very few cases (0.6 percent YTD) during the FCR in the past year have been cited for issues concerning the permanency option of Living Independently or Long Term Foster Care without ruling out all other permanency options. The FCR found that of all issues cited, 7.4 percent were cited for eligible children not receiving independent or transitional living services. This is a relatively high percentage, considering that the only cases for which this issue can occur are children age 14 and older, as opposed to the entire child welfare population having FCRs. While 14.8 percent of all issues cited relate to no evidence of children receiving all of the allowances they are eligible for, this may include the older youth population not receiving various stipends, as well as younger children, who receive allowances for their birthday as well as other allowances.

### *Provider Monitoring*

The service provider contracted to provide Independent Living Services also monitors the provision of IL services. According to program materials, eligible youth are identified and tracked by data collected by MDHS and a computer based tracking system maintained by the contractor. The identification of eligible youth will be determined from information in the MACWIS information system maintained by MDHS and submitted to program staff on a monthly basis. This information will be utilized to allow youth to receive services more promptly rather than relying upon the MDHS county social worker to provide a notice that a youth has entered care. The tracking system will also be utilized to track youth serviced and to enable staff to submit monthly and annual data to MDHS. It is unclear how successful this tracking program is, or if MDHS has conducted a comparison of tracking information maintained by MDHS and the contractor.

## Section IV: Findings and Recommendations

### *Findings*

Based on the foregoing assessment, we have made the following findings regarding the Independent Living Program:

- The youth we spoke to who have participated in the program indicated they enjoy the program.

- Caseworkers are consistent with policy in informing youth about the Independent Living Program and encouraging them to participate.

- There are indications that the program is reaching most of the youth in foster care.

- Contracting with one agency can be beneficial, not only in developing a close rapport with one provider, but to ease MDHS' ability to provide oversight and monitor the work being done.

- We did not get the sense that the MDHS caseworker consistently reinforces the skills being taught by the service provider in the IL classes or that they consistently address IL issues with youth in their caseloads but, rather, defer to the contractor.

- Both the contractor and the Department appear to be developing IL plans for youth and we did not find indications that either of the plans was individualized to the strengths and needs of the youth, that they addressed key concerns related to achieving independence, or that they were coordinated with each other. In fact, the plans seem to be minimally completed. In the case of the MDHS plans, we did not find evidence that they were based on the findings of the Ansell-Casey Life Skills Assessment or other assessments.

- We could not find evidence that youth are actively involved in the development of either plan.

- The IL services offered are standardized and there appears to be little flexibility in the contractor's ability to tailor individual services to the strengths and needs of youth as opposed to offering the same Life Skills classes to all youth. We believe that this may be a contracting issue, in which the program requirements for the program are standardized in the contract requirements.

- Although the current contract calls for the contractor to identify 18 mentors for youth statewide, we do not believe that has occurred. Even so, 18 mentors would not begin to address the needs of the many youth in care in need of this service.

## *Recommendations*

- We recommend that the contract for independent living services be modified substantially as follows:

    - The contract should permit and require diversity in the range of IL services provided, rather than requiring a standard curriculum for all youth as the core service. While we recognize the importance of the Life Skills classes, we particularly recommend that a repetition of the classes not be required and that classes be designed and tailored to individual youth's needs, strengths, level of development, and interests.

    - We recommend that the contract include the flexibility and requirement to offer a broader range of services that are identified for individual youth through the Ansell-

Casey Life Skills Assessment and the MDHS comprehensive strengths and needs assessment (when this is implemented by MDHS).

- We recommend that resource family training be modified to include content on the roles and responsibilities, and the skills needed, of resource families to assist youth in their care work toward independence and transition to adulthood. MDHS should create the expectation that resource parent involvement in IL service delivery and planning is a part of the role of foster parenting for youth.

- We recommend that MDHS staff training be strengthened to address the complementary roles and responsibilities of MDHS staff and contractor staff with regard to addressing independent living for youth in care. In particular, the training should emphasize a proactive and involved role for MDHS staff that reinforces skills taught by the contractor, uses caseworker visits to address IL issues, actively engages youth in planning for independence and adulthood, and addresses the connections that youth need upon leaving foster care, such as relationships with mentors and/or families and at least one caring committed adult. The training should prepare MDHS staff to address aftercare planning and linking discharged youth with the appropriate array of services. A practice guide for MDHS staff in this area would be helpful.

- We recommend an increased emphasis on the recruitment and linking of mentors with youth in foster care. Both the Department and the contractor should be held accountable for ensuring that each youth exiting foster care is linked with at least one caring committed adult that will help the youth transition to adulthood beyond foster care. This should be a part of the contractual requirements and an item for monitoring casework practice.

- We recommend that the case planning process for youth in care be strengthened in several ways, as follows:

  - First, there should be one IL and one TL plan for each youth rather than separate plans developed by the contractor and the Department;

  - The plans should be developed in accordance with the principles of the child welfare practice model that will be implemented by MDHS which includes active involvement of the youth and the youth's significant family members and providers, including foster caretakers, in developing the plan; the plan should result from a comprehensive strengths and needs assessment which includes the Ansell-Casey Like Skills Assessment; the services in the plan should be clearly connected to the youth's strengths and needs and developmental level and capacity; and the plan should be reviewed routinely and updated as needed as the youth's needs change.

  - The plan should be developed in the context of a Family Team Meeting with the contactor and the Department working together with the youth and other participants to develop the plan.

- We recommend that MDHS develop and implement communication protocols for the contractor and MDHS staff to meet routinely with the youth to discuss progress toward goals, the effectiveness of services, emerging or changing needs and strengths, and critical issues to the youth's independence such as aftercare planning and needs for services, relationships with family and other individuals, and so forth.  All meetings and discussions with the youth should be clearly documented in the MACWIS case file.

- We recommend an increased emphasis and accountability for sharing information between the contractor and MDHS staff, particularly as it relates to sharing the Ansell-Casey Life Skills Assessment and other information that pertains to serving the youth in care.

- We recommend that supervisory protocols and CQI processes (when implemented) address the quality and documentation of case plans for youth in care, the existence of and use of assessment information in developing plans, the youth's involvement in developing the plans, the individualization and provision of services, after care planning, and linking youth with caring committed adults.

- We recommend an increased emphasis and accountability on case file documentation of key activities, plans, assessments, and service provision for youth in care.

## *Recruitment and Retention Assessment and Placement Assessment (Combined)*

The Period Two Implementation Plan of the Mississippi Settlement Agreement and Reform Plan requires a foster care services assessment be completed that includes:

"A recruitment and retention assessment to determine the need for additional foster care support services."

"A placement assessment of current needs for achieving compliance with the placement standards set forth in Section II.B.5 of the Settlement Agreement, which shall include (1) the structure of the placement process, including the role and efficacy of the state office placement unit; (2) the services and supports available to support enhanced placement stability, including out-patient or in-home assessment and treatment services to avoid the frequent use of time-limited assessment and treatment placement programs; and (3) the placement resources needed to meet the placement needs of children in custody."

This report provides the findings of our assessment in this area, which includes a policy and standards review, a staff survey, interviews, focus groups, and case reviews.

## Section I:  Applicable Standards

The *Olivia Y* settlement agreement includes a number of requirements applicable to this assessment, as follows:

- DFCS shall make available, either directly or through contract, a sufficient number of appropriate placements for all children in its physical and legal custody.

- DFCS shall make available foster parent training classes beginning every 60 calendar days in every region with individualized training available as needed, at times convenient for the foster family.

- DFCS shall secure services for foster parents to prevent and reduce stress and family crisis.

- DFCS shall ensure that all licensed resource families (regardless of whether they are supervised directly by DFCS or by private providers) receive at least the minimum reimbursement rate for a given level of service as established pursuant to the Plan.

- Placements are to be made in the least restrictive setting which can meet the needs of the child identified in a comprehensive assessment.  In order of consideration, this means placement with relatives, foster care home within reasonable proximity to the child's home community; foster care home outside of the child's home community; group home care; or institutional care.

- Each child shall be placed within his/her own county or within 50 miles of the home from which he/she was removed.

- Children with special needs shall be matched with placement resources that can meet their therapeutic, medical, and educational needs.

- DFCS shall ensure that each county office has access to the placement specialist within its region having the ability to ascertain the placement resources available and their suitability for each particular child needing placement.

- Siblings who enter placement at or near the same time shall be placed together, unless certain circumstances are present.

- No child shall be placed in more than one emergency or temporary facility within one episode of foster care, unless an immediate placement move is necessary to protect the safety of the child or others as certified in writing by the Regional Director.

- No child under 10 years of age shall be placed in a congregate care setting (including group homes and shelters), unless exceptional needs are present which cannot be met in a family home setting, with Regional Director approval.

- Foster homes cannot have more than 3 foster children in the home, for a total of 5, (including foster, biological and adoptive children). No more than 2 foster children can be under the age of 2 or have therapeutic needs.

- No later than at the time of placement, DFCS shall provide foster parents or facility staff with the foster child's currently available medical, dental health, educational and psychological information, including a copy of the child's Medicaid card. DFCS shall gather and provide to foster parents and facility staff all additional information within 15 days of placement.

- No foster child shall be moved from his/her existing placement to another foster placement unless DFCS specifically documents in the child's case record justifications for that move and the move is approved by a DFCS supervisor.

- DFCS shall take all reasonable steps to avoid the disruption of an appropriate placement and ensure placement stability for children. If a caseworker has knowledge that a placement may disrupt, the caseworker shall immediately convene a meeting with the DFCS supervisor, the foster parents, and, if appropriate, the child to determine the following: the cause of the potential disruption; whether the placement is appropriate for the child; whether additional services are necessary to support the placement; whether the child needs another placement; and, if another placement is necessary, what that placement should be.

MDHS is pursuing accreditation through the Council on Accreditation (COA), which also has a number of standards applicable to this assessment, as follows:

- A sufficiently diverse group of foster families is recruited, prepared, and supported to meet the needs of the children in care, and their families.

Mississippi Foster Care Services Assessments

- Recruitment and training efforts involve key stakeholders including, foster care alumni, current foster parents, foster care workers, community leaders, and other organizations in the community.

- Recruitment efforts are planned, implemented, and evaluated to ensure a suitable family is available for each child entering care.

- The agency determines the appropriate amount of mandatory pre-service and in-service education necessary to ensure that foster parents understand the agency's mission, philosophy, goals, and services; the needs of abused and neglected children; how to integrate the child into the family; the importance of culture and ethnicity for children and their families; the partnership role foster parents play in supporting the family; how to assist with visitation; sensitive and responsive practices to use with biological parents; and the use of foster care as a temporary intervention.

- Foster parents receive pre-service training on rights and responsibilities including specific duties of foster parents; identification and reporting of abuse and neglect; reimbursement for services and compensation for damages caused by children placed in the home; notice of and participation in any review or hearing regarding the child; complaint procedures; and circumstances that will result in closing a home.

- Foster parents are trained in basic first aid, medication administration, CPR, recognizing and responding to child behaviors that jeopardize health and well-being, and medical or rehabilitation interventions and operation of medical equipment required for a child's care.

- Foster parents sign a statement agreeing to refrain from the use of corporal and degrading punishment, and receive initial and ongoing training and support to promote behavior and use appropriate discipline techniques.

- Each foster family develops or uses the agency's protocols for responding to emergencies including accidents, run-away behavior, serious illness, fire and natural disasters.

- The agency provides opportunities for peer support among foster parents.

- Foster parents have access to services to prevent and reduce stress and family crisis including child care, respite care, counseling, and recreational activities.

- Each foster family receives an annual evaluation to identify areas of strength and concern, and a plan is developed to address needs for support or training.

- Foster children are placed with foster families who can meet their needs for safety, permanency, stability, and well-being.

- All foster homes are licensed, approved, or certified according to state or local regulation.

- A process that examines child and caregiver characteristics, strengths, needs, and resources is used to identify the most suitable, safe, and nurturing home for the child.

- A placement that can meet the child's needs is selected in accordance with the following priorities with siblings, with kin, or with a family that resides within reasonable proximity to the child's family and home community.

- Indian children are placed according to the placement preferences specified in the Indian Child Welfare Act.

- The home environment is considered when identifying a family for the child, and foster care homes have no more than: five children with no more than two children under age two; or two foster children with therapeutic needs.

- Placement moves are prevented to minimize trauma through supporting the child during the removal and placement process; avoiding the use of cyclical placements and minimizing other planned or administrative disruptions; providing child-specific information to the prospective foster family; arranging opportunities for the child and prospective foster family to meet when possible; and responding proactively to challenges associated with placement and assessing the need for services or placement changes.

- Children that experience multiple placements receive additional supports and services to improve stability and well-being, including sufficient advanced notice prior to a placement move to plan for and support the child through the transition; identification of new foster parents with suitable skills and characteristics to meet the child's needs or referral for temporary placement in treatment facility when the child's needs cannot be met in a home setting; and assessment and referral to additional therapeutic or other needed services.

Finally, DFCS policy on foster care services contains the following information on these matters as follows:

- Recruitment methodologies include but are not limited to using the media, including the internet, to create a positive perception of the Agency and to create public awareness about the need for foster parents; contacting one public group a month in each region to inform them of criteria to become a resource family; engaging existing resource families as part of the recruitment process; engaging the faith community; engaging the business community; engaging existing agency staff; working closely with a child or his/her family to identify a family resource already connected to the child by kinship or other established relationship; and using recruitment packets.

- Each region will develop a recruitment plan that will be reviewed and modified quarterly as needed. In addition, Resource Family Placement Committee meetings will be held on a regional and statewide basis to identify potential families from the approved pool of available resource homes and the need for child specific recruitment.

- Applicants to be resource parents are required to attend 15 hours of pre-service training, focusing on the following areas: team work and the children served; separation and attachment; developmental stages; behavior management; and permanent connections.

- Resource parents sign a statement agreeing not to use corporal punishment with children.

- Resource parents are required to obtain 5 hours of in-service training per year. (Foster Parent Support Groups, available statewide, offer in-service training hours.)

- Recertification of a resource home is done every 3 years. (Two memoranda were issued in the fall of 2008, stating resource parents will be re-certified annually. No policy has been issued which addresses this.)

- Resource homes can provide foster care for three children, and can have no more than five children in the home, including their biological or adopted children, and no more than two children under age two, or who have therapeutic needs. (Exceptions can be made for sibling groups).

- Retention is a result of having a strong agency staff, birth family and resource family relationship. Resource families continue to provide care if they believe that they are a vital and respected part of the team.

- The child should be placed in the least restrictive setting. In order of consideration, this means placement with relatives or tribal members, resource family home, group home and institution.

- The child must be placed in close geographical proximity to his/her parents' home. MDHS considers close geographical proximity to be within a fifty (50) mile radius of the child's original home.

- Siblings should be placed together and if they are not, diligent efforts must be made to place them together as expeditiously as possible. Siblings not placed together need to have regular contact.

- Prior to placement, the worker shall share the following information with the resource parents or staff of a group facility: child's name and date of birth; current medical and dental health, existing illnesses, medications, dates of medical or dental appointments, special care needs, and psychological information; education; reason for placement; permanent plan; and visitation plan with birth family.

- Following the decision to place the child, if possible, at least one pre-placement visit of the child to the resource home or child caring facility should be arranged.

- Prior to placement, the worker shall identify information such as the child's daily routine, preferred foods and activities, needed therapeutic or medical care, allergies, cultural practices and educational information.

Mississippi Foster Care Services Assessments

- The worker shall explain to the child about why he/she is in care; the worker's role in the process; placements for siblings (if siblings have separate placements); feelings of separation and loss; and the visitation plan with the biological family, including siblings.

- On the actual date of placement in a resource family home, the worker should take a copy of the Court Order, Medicaid card, and other personal belongings to the resource home. Arrangements must be made for initial clothing by giving the resource parents a purchase order or by making some other arrangements. Efforts shall be made to provide the foster child with a significant toy or other personal item from his home.

## Section II:  Current Recruitment Efforts

The following sources were used to obtain information about the current efforts to recruit resource families:

- Focus groups with county staff, ASWSs, Regional Directors, resource ASWSs, resource workers, and resource parents.
- Staff Survey
- Interviews with State Office staff

Information from all of these sources agreed there are not enough placement resources for the children entering care.  Some comments suggested that the State Office's primary foster care role is processing referrals for therapeutic placements as opposed to recruiting and other foster care responsibilities.

There was confusion among some county staff about who is responsible for recruitment, with some staff indicating the resource units were primarily responsible for recruitment of resource homes and others indicating that everyone is responsible for recruitment.  County staff indicated that the best recruitment tool is current foster parents and word of mouth in the communities. Some resource workers go to special events in the community, such as festivals and church functions, and some speak at churches or club meetings.  Occasionally, county workers will assist the resource worker in attending a special event to recruit foster parents.

There is a toll free line in the placement unit at State Office that was originally installed for potential adoptive applicants to inquire about adoption or to respond to child-specific recruitment.  The person who answers the line obtains basic information about callers who are interested in foster care and/or adoption, then routes the information via MACWIS to the county office, instead of referring them to the resource supervisor in the regional office.

We could not identify a consistent approach to handling initial inquiries from people interested in becoming resource families.  When a call comes in to the county office, the intake workers may tell the caller to contact the resource worker and may or may not pass the inquiry along to the resource worker or enter the information into MACWIS.  When the resource workers receive a message about an inquiry call, instead of calling the applicant to discuss their interest, a packet of information is mailed out which includes the schedule for the pre-service training required of all applicants.

There has also been a shortage of resource staff in some areas and applications are backed-up, as many as 150 in one county according to some comments. Staff sees the hiring of additional

resource supervisors and resource workers as a positive sign that more recruitment will occur, resulting in more resource homes being available for children entering care.

A concern voiced in some of the groups was the issue of the roles and responsibilities of the county worker and the resource worker. Some comments suggested that following licensure, the county workers believe they have responsibility for the resource homes and have concerns about resource parents discussing with the resource worker issues pertaining to the children in their care, such as not having received a clothing allowance, a Medicaid card, or a board payment. Other comments indicated concerns about the level of respect shown to resource families by county staff. Most of the comments we received indicated a need for more clearly defined teamwork, roles, and responsibilities between county workers and resource workers, and for a clear delineation of responsibilities for recruiting resource families.

## Section III:  Current Structure of the Placement Process

DFCS Policy outlines the following array of placement resources:

- *Emergency Shelters:* These are short term (45 day maximum) interim placement resources, designed to provide time to evaluate the home situation and to work with the family for the immediate return of the child; to identify and evaluate relative resources; and gather information about the child to ensure a more appropriate foster care placement if this becomes necessary.

- *Relative Resource Home:*  These are placements with the child's extended family. The family and the physical environment must have a safety assessment and a criminal background check prior to the child being placed in the home.  The relatives become licensed as a resource home within 60 days of placement.

- *Resource Family Home:* This is the home of a person or family group, unrelated to the children placed there, which is licensed by DFCS for the temporary care of children. Resource parents receive a board payment for caring for the child.

- *Emergency Resource Home:*  This is a home designated for short-term care for children who come into care on an emergency basis.  The resource parent receives a per diem payment for each child placed in the home.  An emergency resource home shall be prepared to accept a foster child, according to the capacity and terms of the Resource Home License, 24 hours per day, 7 days per week, and shall not refuse a placement if space is available and the child is appropriate for the home.  An emergency foster parent shall transport the child for medical examinations, psychological testing, counseling, DHS approved visitations and any other services needed to assist the worker in making appropriate assessments for permanent placement.

- *Therapeutic Resource Family Home:*  This is a home designed to care for children with severe behavioral, emotional and psychological impairments.  The therapeutic resource home shall receive a comprehensive therapeutic rate based on the child's special needs.  No more than one special needs child can be placed in these homes.  Workers must visit these homes a minimum of two times per month.  Placement must be approved by State Office staff.

- *Respite Resource Family Home:*  These homes provide short-term care for a child whose regular foster parents need a break from the day-to-day care of the child.

- *Licensed Child Caring Facility:*  These are staffed 24-hour residential care facilities where children are in care apart from their parents, relatives, or guardians.  These facilities are subject to licensure certification.

- *Institution:*  This is a 24-hour facility for the care and confinement of individuals with disabling conditions such as mental, physical, and emotional handicaps which provides therapeutic or medical services to enhance the quality of life for the individual in a restricted setting.

- *Resource Home (Adoptive):* These resources are only for children who are free for adoption or whose goal or concurrent plan is adoption.

- *Special Needs Resource Home:*  These homes provide care and services for children with special medical needs.

Information about the current structure of the placement process was obtained from the following sources:

- Staff Survey
- Interviews with Placement Unit staff in State Office
- Focus groups with county workers, county ASWS's, Regional Directors, resource ASWS's, resource workers, and resource parents
- Interviews with private agency placement providers

### *Focus Groups and Interviews*

Comments from most of the focus groups indicated that when a child comes in to care, the worker calls licensed resource homes in the county until a vacancy is located, and that a vacancy may not correspond to the needs of the child or license limitations regarding age or sex of children desired.  Commenters suggested that young children with permanent plans of reunification are often placed with families who want only to adopt, and these families may be resistant to making the efforts for visitation with the birth family.  Some comments indicated that county workers often know little about a child entering care and are not able to obtain information until the child has had medical and psychological assessments completed.  Some counties utilize emergency shelters when a child first enters care so the assessments can be completed, clothing purchased, and some thought given to the most appropriate placement for the child, based on the assessments. We also heard that acute residential care is often used as a short-term placement because the county does not have a resource home available.  These placements are used to buy time to find a placement resource, and these referrals are not required to go through State Office.

A number of commenters raised concerns about the referral process for therapeutic group homes and therapeutic foster homes.  These referrals are required to go to the placement unit in the State Office.  From our interviews, the process used by the placement unit begins when they receive

the referral from the county worker with a psychological evaluation recommending therapeutic services, (the psychological assessment can be no more than one year old). The unit sends the referral to all group homes and agencies which provide therapeutic care for the age and sex of the child being referred. The placement resources respond directly to the county worker. If there is no response, the assumption is made that the resource is not interested in the child. Either the county worker or the placement agency notifies the State Office staff of the date of placement so an authorization for payment can be initiated.

We heard a number of concerns about this process, including the following:

- A number of commenters indicated that they receive no assistance from the placement unit other than sending out the referrals to all the therapeutic resources without regard for the type of therapeutic resource that might be most appropriate.

- They expressed concerns about a lack of follow-up with the referrals and not advising county workers of the status of the referrals.

- Concern was expressed about the lack of consideration of the geographical distance from the referring county.

- We heard about delays from the State Office in getting placement referrals to providers. Some participants indicated that by the time a referral reaches a provider, the county may have placed the child elsewhere, and there was general dissatisfaction with the process.

- Commenters also indicated a need to ensure that the staff that screen and refer children for therapeutic placements should have training and knowledge of the clinical issues presented by the children in order to make the most appropriate referrals.

Our interviews indicated that the State Office does not have responsibility for the placement of children in placement resources other than therapeutic group homes or foster homes, and that is tied to the funding of the placement. The foster care and adoption programs were moved to the regional level several years ago, leaving no responsibility with State Office for coordination, policy writing, or assistance to agency field staff in these program areas.

Some commenters expressed the concern that therapeutic foster homes are not therapeutic, and that some "regular" foster parents may do a better job. Several instances were cited about applicants for resource homes being rejected by MDHS, only later to be approved as a therapeutic foster home with another agency. Some staff indicated they often do not make referrals for therapeutic foster care because the process is so cumbersome.

We heard that in some regions, the county worker contacts the resource supervisor and/or the resource worker for the region to request assistance in identifying a placement resource. In other regions this is not the case, and some county workers and supervisors stated they were not aware of how to contact the resource worker. Some commenters indicated that generally, the regional resource units are not accepted in the region; therefore, they are not utilized for assistance in identifying an appropriate placement resource for a particular child, although we also heard that resource workers have information about the resource families which could be helpful to the county workers in locating placement resources.

Some focus group participants expressed concern about resource parents not receiving information about a child being placed in their home. Some participants were of the opinion that workers may withhold information because they are fearful the foster parents will not take the

child if they are given the information. Some comments suggested that resource families could do a much better job with the children placed in their homes if they were given complete information, particularly medical and behavioral issues, and that all children coming in to care should have a complete physical, dental and psychological exam immediately after coming in to care with the results being shared with the resource parents. We also heard that Medicaid eligibility should be activated immediately after placement so the child can receive needed services. The children need a clothing allowance at the time of placement so that resource parents can purchase clothing as children most often come in to care with nothing. One group suggested that children in foster care need support groups as they will often talk to each other but will not talk to the resource parents about what they are thinking or feeling. Interesting points made by the groups was that the workers should try to match the child's needs with the skills of the resource parents. They were in agreement that workers should listen to the resource family regarding the behaviors they can manage.

We heard one example of a worker sharing information with a youth in care about three group homes which she had contacted. Together, they visited all three, and the youth was allowed to choose the home he wanted.

## Staff Survey

In the staff survey, we asked staff to rate the agency's effectiveness in several areas regarding placement procedures and support resource families to help ensure placement stability. As indicated in the chart below, respondents indicated the agency is frequently or almost always effective in supporting foster families and ensuring placement stability about two-thirds of the time (about 65 percent). However, they indicated that the agency is frequently or almost always effective in placing children in placements that match their needs only about half the time (about 52 percent) even though they rated monitoring to placements are appropriate as frequently or almost always effective about two-thirds of the time (about 68 percent). They rated current procedures for identifying and obtaining access to the appropriate placement for a child as frequently or almost always effective just over half the time (about 57 percent).

| Please rate your perception of your agency's effectiveness in each area below in practices related to mobilizing services: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Some times | Frequently | Almost Always | No Info/NA | Total |
| Effectiveness of services to support foster families and assure placement stability: | 1 (0.53%) | 8 (4.23%) | 43 (22.75%) | 53 (28.04%) | 70 (37.04%) | 14 (7.41%) | 189 |
| Effectiveness in placing children in placements that are matched to their needs: | 4 (2.13%) | 11 (5.85%) | 62 (32.98%) | 42 (22.34%) | 56 (29.79%) | 13 (6.91%) | 188 |
| Monitoring to ensure placements are appropriate and meeting the needs of children: | 0 (0%) | 8 (4.32%) | 32 (17.3%) | 56 (30.27%) | 69 (37.3%) | 20 (10.81%) | 185 |

**Mississippi Foster Care Services Assessments**

| | Not at All | Rarely | Some times | Frequently | Almost Always | No Info/NA | Total |
|---|---|---|---|---|---|---|---|
| Effectiveness of current procedures for identifying and obtaining access to the appropriate placement for children entering foster care (e.g., who selects placement resource, timeliness of selecting resource, etc.): | 2 (1.07%) | 12 (6.42%) | 54 (28.88%) | 50 (26.74%) | 56 (29.95%) | 13 (6.95%) | 187 |

Asked to rate the agency's work in recruiting and retaining placement options for children in foster care, survey respondents indicated that the agency is frequently or almost always effective in recruiting appropriate placement options for children about 38 percent of the time. Similarly, they rated their ability to retain placement options for children as frequently or almost always effective about 41 percent of the time.

| Please rate your perception of your agency's effectiveness in each supports area below related to mobilizing services: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Some times | Frequently | Almost Always | No Info/NA | Total |
| Ability to recruit qualified and appropriate placement options for children: | 2 (1.08%) | 26 (13.98%) | 65 (34.95%) | 45 (24.19%) | 25 (13.44%) | 23 (12.37%) | 186 |
| Ability to retain qualified and appropriate placement options for children: | 1 (0.54%) | 18 (9.73%) | 69 (37.3%) | 44 (23.78%) | 31 (16.76%) | 22 (11.89%) | 185 |

When asked to provide explanatory comments on the strengths, barriers, and supports needed in this area, survey respondents identified caseworkers' efforts to work with resource families and to obtain needed services as one of the most commonly cited strengths. They also cited their efforts to monitor resource homes regularly as a strength of practice, and some respondents noted an effective working relationship between county staff and resource workers as a strength of practice.

The two most commonly cited barriers to effective practice in this area were the lack of resource homes that workers can match to children's needs and the lack of services to support placements. By far, most of the comments addressed the dearth of an appropriate pool of resource homes where they are needed. Many respondents addressed service-related barriers in terms of no services in some areas of the State, lack of geographic access, and concerns about the quality of some services. The supports that survey respondents indicated are most needed in this area correspond to the barriers they identified, i.e., more placement resources and more support services.

### *Case Reviews*

We reviewed the cases of 30 children in foster care to evaluate the provision of support services to the facilities/resource families and made the following findings:

- The 30 children had an average of 2.47 placements during their current episode in foster care.

- About three-quarters of the children (22 of 30, or about 73 percent) had no unplanned placement disruptions; of those that did, they had an average of 2.25 unplanned disruptions.

- About half (14 of 29 children) of the children were in related foster homes.

- Reviewers determined that the services provided to the resource families were appropriate in about two-thirds of the cases (20).

- Caseworkers visited in the resource home on a monthly basis about two-thirds of the time (19 of 30 cases).  In only three of 30 cases, were the visits less frequent than monthly.

- Siblings were placed together in 17 of 30 cases, were not placed together in seven of 30 cases, and the issue was not applicable in six of 30 cases.

- Reviewers indicated that the placement setting matched the child's needs in 26 of 30 cases.

- The current placements did not seem to present threats of disruption in 25 of the 30 cases.  In five cases, there were threats of disruption present.

- Where issues were present that threatened the stability of the placement (five cases), the agency had addressed the issues in two cases, had not addressed them in two cases, and there was not enough information to determine in one case.

- Services were being provided to the caretaker in 18 of 30 cases.  Some of these services were provided directly to the children, e.g., therapy, medical care, clothing, and other services were provided directly to the provider, e.g., respite.  Reviewers determined that services implemented in a timely manner in 18 cases – in only one case where services were needed were they not provided in a timely manner.

- Reviewers identified three of the cases where there were unmet needs for services to preserve the placement (in two cases there was not enough information to determine, and in 21 cases there were no identified unmet needs).

Apart from these specific findings, our case reviews found no narrative recording about placement disruptions, and no indication a conference was held to discuss the disruption and the need for additional services.  The child evaluations were not completed in MACWIS in the majority of the cases.  There was no indication in the case records that children had any preparation for placements or pre-placement visits when the child was moved from one placement to another or prior to entering care.

## Section IV:  Services/Supports in Place to Support Placement Stability and Retain Foster Parents

The following sources were used to obtain information about the services which support placement stability and retain resource families:

- DHS policy
- Focus groups with resource parents, resource workers, resource supervisors, Regional Directors, and youth in foster care
- Staff survey
- Interviews with State Office staff
- Case reviews
- MACWIS reports
- Interviews with service providers.

The following supports and services are in place to support placement stability and retain foster families:

## *Board Payments*

Board payments were increased significantly, in most cases more than double the previous rate, with adequate legislative funding effective July 1, 2009, and in response to the requirements of the *Olivia Y* settlement agreement to increase board payment rates. The rates are based on the age of the child and the extent of care needed from the care giver. These rates include room and board, monthly clothing allowance and the child's personal allowance. The Department is currently evaluating, through contract, the rates paid on behalf of special needs children in foster family homes and all children in congregate care settings.

Adoption assistance rates were not increased, so they remain at the level of foster board payments prior to July 1, 2009. These payments are less than half the foster board payment rate, which could serve as a disincentive for some resource families to adopt children in their care.

## *Special Clothing Allowances for Children in Foster Care*

- An initial allowance, based on the age of the child, is allotted at the time of placement in the home to provide the child with a basic wardrobe.

- School clothing at the start of each school year is based on the age of the child.

- Special event clothing is sometimes provided for children.

- Youth involved in Independent Living Skills programs and who attend the annual Foster Teen's Conference sometimes receive a clothing allowance for the conference. Funds were not available in 2009 for this service.

## *Respite Care*

MDHS contracts with one agency for a statewide respite segment specifically designed to assist resource families. Resource families request the service through their county worker or directly from the contractor, but the worker must approve the respite service. Families are eligible for three sessions of respite in a six-month period. Although the provider requests several days to arrange the service, emergency needs are accommodated whenever possible. Foster families approved by the contractor provide the respite service. The provider publicizes this service through its quarterly newsletter which is sent to all resource families receiving a board payment or adoption assistance benefits. Some resource parents prefer to use their own family members

or other resource families whom they know, and others indicated they were unaware of the service.

## Support Groups

Support groups are offered throughout the State by contract with a private agency. Thirty-one different groups meet monthly and are facilitated by the contractor's staff. Activities include short educational segments, more intense sessions which count toward the families' in-service training requirements, opportunities for networking, and special events. Most resource families indicated that they find these groups very helpful and a source of comfort and experience-based knowledge about fostering. Although the support groups are listed in the provider's newsletter, many of the resource families stated they were unaware of the groups and would like to be involved.

## On-Going Training

Participants in several of the focus groups indicated in-service training for resource families is a support for them. In addition to the educational benefit, many find the networking and camaraderie among the participants to be very helpful.

## Resource Family Special Events

Several conferences/retreats are provided for the resource families. A statewide conference "Lookin' to the Future", sponsored by DHS through a grant to a contractor, is open to DHS staff, social workers from other agencies, resource families, and youth in foster care. A limited number of scholarships are available for families and youth. During the July 2009 conference, full scholarships were given to 61 DHS resource parents and 32 youth in foster care. There was a special workshop track for the youth. Participants are chosen from each DHS region.

One week-end retreat is held each year and is open to all resource families in the state. This event is also funded through DHS's contract with a private agency. The retreat is publicized with an insertion in the board and adoption assistance checks. Participants register by paying $25, which is refunded when they arrive at the conference. In 2009, there were 452 participants with 49 DHS staff volunteering their time to facilitate groups and provide activities for the children who came with their foster families. Provision for child care is considered essential to allow parents to fully participate in the program.

Staff in some counties organize picnics, foster parent recognition dinners, or other local events, which make resource families feel more appreciated. There is no money allocated for these activities and workers seek donations from the community to fund these events.

## Women, Infants, and Children (WIC) Program

Resource parents who care for small children find the WIC program to be very helpful in providing nutrition for the children by providing food and supplies for their use in caring for the children.

## Child Care Vouchers

Children in foster care are potentially eligible for child care services and receive a high priority rating. Resource parents must meet the work/education criteria but are not required to meet the income criteria.

## *Transportation*

Some county offices are able to provide transportation services for resource families. When children are to be taken to medical appointments or family visitation, either the county worker or a homemaker/aide may drive the child. Although most resource families want to be present for medical appointments, working resource parents appreciate the availability of DHS staff to provide this service. When resource families provide transportation for these trips, they may request reimbursement for mileage based on the same rate as agency staff.

## *Local Newsletters*

At least one area of the State (the northeastern Region I) produces its own monthly newsletter which is sent to all licensed DHS resource parents in that region, regardless of whether they are receiving a board payment. The newsletter includes segments on policy changes, upcoming training and support group sessions, a recognition article on a specific resource family, and other items of interest.

## *In-Home Services*

MDHS offers in-home services through contracts with two agencies. These services are the Intercept program and Intensive In-home Services. These services are offered to intact families in an effort to prevent removal of children from the home. They could also be used with resource families to prevent disruption of a current placement. During Federal Fiscal Year 2008, one adoptive family with three children was served. From October 2008 until early September 2009, two adoptive families, involving four children, received services. No foster families received the service.

## Section V:  Services/Supports Needed to Support Placement Stability and Retain Foster Parents

The following sources were used to obtain information about the services needed to support placement stability and retain resource families:

- DHS policy
- Focus groups with resource parents, resource workers, resource supervisors, Regional Directors, and youth in foster care
- Staff survey
- Interviews with State Office staff
- Case reviews
- Foster Care Review (FCR) reports
- PATH Curriculum  (Pre-service training for resource families)
- MACWIS reports
- Interviews with service providers
- DFCS Significant Weekly Activity report

## *Information Sharing*

DHS policy requires a full disclosure to the resource family of all medical, dental, psychological and appropriate background information on the child prior to placement.  Policy also requires the

worker to share the child's permanency plan, visitation plan, and the process to secure clothing with the resource family.

Several focus groups report resource parents are unaware of the needs of the children at the time of placement. Comments indicated that children are left with them with only the clothes they are wearing and no plan for obtaining more clothes. We heard that resource parents frequently do not know medical conditions, medication regimens, or plans for securing medical assessments or treatment, and that there have been instances in which the children had infectious or contagious diseases which put the resource family at risk, and the parents were not told. We heard that one family was given incorrect names for its foster children, which led to much confusion until the resource family and children were able to determine the problem.

We also heard that resource families are sometimes given conflicting information by workers. Workers in the county of service may expect the resource family to contact the county of responsibility worker for approval for expenditures or information about the children. We heard of one resource family that gave the worker ample notice to notify the judge of a planned vacation out of State, as required by policy. When no approval came for the trip, the worker admitted no request was made to the court but gave the family permission to take the foster child on vacation, a policy violation.

Another inconsistency in practice reported by the focus groups is the varying requirements used for licensing resource homes. Some regions may require a comprehensive medical assessment, while another may require only a vital signs check and statement of general good health from the physician.

### Team Membership

Family centered practice principles indicate that the resource parent should be a participant in planning and decision-making concerning the children in their care. They should be involved in FCR conferences, FTMs where appropriate, and court hearings. Resource parent pre-service training includes a segment on being a team member.

However, we heard from some focus group participants that resource parents are generally not seen as members of the team; rather they are seen as outsiders and not included in planning for the child. Some resource parents indicated they feel like baby sitters for the agency's children. Agency policy requires workers to invite resource families to the FCR conferences and FTMs yet we heard that many resource parents have never been invited to a review conference or a FTM. Some have been informed about court hearings, but may be told they should not attend or are not required to attend.

### Mental Health Therapy for Children

Many children in foster care have emotional and behavioral issues that indicate the need for mental health services. There are private providers in the larger metropolitan areas, but these services in other areas of the State are usually secured through the community mental health centers. Mental health therapy was generally considered to be ineffective by focus group participants due to lack of knowledge and training on the part of the therapist about the needs of children in foster care and about specific disorders common to many of these children.

We heard that many resource families are willing to work with children with difficult-to-manage behaviors, but they need the help of well-trained knowledgeable professionals who can teach the

resource families techniques and methodologies to work with the children.  The providers must be easily accessible to the families.

## *Prompt Financial Reimbursement*

Resource families receive financial support in the form of board checks, Medicaid, and reimbursement for clothing and transportation expenses.  The families must often expend much money at the placement of a child.  Some commenters reported long delays, as much as six months, in receiving board payments, and that many months may pass before Medicaid eligibility is established and medical assessments can be completed.  Some focus group participants indicated that the county worker may place a low priority on establishing eligibility for payments and that they may not understand the financial stress this places on the resource family.

The amount of the initial clothing allowance for children is based on the child's age and is established in policy.  The policy requires the worker to give this information to the resource parent and make plans for clothing purchase at the time of placement.  Among the problems noted in focus groups related to clothing purchases were the following:

- Workers make no plans with the family for the purchase of clothing at placement.

- Resource parents are required to use a specific store which is more costly than other stores.  Parents think they can get more clothing for the same amount of money if permitted to shop at other stores.

- Workers instruct resource families to purchase a certain amount of clothing, and then the supervisor does not approve the amount.  The family must absorb the cost of the expenditure.

  Funds are designated to reimburse resource families for mileage to transport children in their care to medical examinations, family visitation, court hearings and other agency requests.  Comments indicated that the reimbursement process is cumbersome, resulting in late payments due to the following:

- The travel request form is complicated and often returned for corrections.  We heard that if the county worker prepares a sample of how to complete the form that is useful to the resource parents.

- Travel reimbursement forms are checked and approved by the county worker and the ASWS.  We heard that the forms are sent to the State Office where at least seven different entities handle the form before the payment voucher is sent to the Department of Finance and Administration for payment.

- We heard that at times, county workers may insist that resource families change their schedules for a last-minute appointment arranged by the worker without consideration of the resource parents' schedule.

## SECTION VI.  PLACEMENT RESOURCES NEEDED

The following sources were used to obtain information about the placement resources needed:

- DHS policy
- Focus groups with resource parents, resource workers, resource supervisors, Regional Directors, and youth in foster care
- Staff survey
- Interviews with State Office staff
- Case reviews
- FCR Reports
- MACWIS reports
- Monthly Regional Resource Reports
- Interviews with service providers
- Manual lists of licensed facilities.

In general, we found agreement on the types of children and/or behaviors for whom it is difficult to find appropriate placements, as follows:

- Large sibling groups which require a large home with a family who can financially manage without board payment or reimbursement for several months.

- Sexually abused children, as some families are afraid they will be falsely accused of molestation of the child.

- Children who act out sexually or are sexually active are difficult to place.  Resource parents worry about the other children in the home due to the behaviors of the one.

- Pregnant girls who plan to keep the baby in the foster home.  There are no funds to purchase baby furniture, clothing, or diapers to prepare for the baby.  The board rate for the young parent after the baby is born has been increased by over $800 monthly, so this rate change may have a positive effect on the issue.

- Children with severe behavioral problems.  Resource families feel they are an inappropriate placement with no therapeutic support for the child.  DHS staff state some therapeutic group homes choose not to accept children with the more difficult-to-handle behaviors, but these children are not disturbed enough for more intensive residential treatment facilities.

- Teenagers of both sexes are considered difficult to place in a family setting.

- Children with physical, emotional or intellectual challenges.  The only aggregate data available is the Adoption and Foster Care Analysis and Reporting System (AFCARS) data for April – October 2008, which shows 515 children in foster care (11.68 percent) had a disability.  The type of disability was not identified.  Disabilities for children who were

adopted were identified as follows: of a total population of 161, two (1.24 percent) were visual/hearing impaired; 14 (8.7 percent) were emotionally disturbed; and 19 (11.8 percent) had other medical conditions requiring special care. No children were identified as being developmentally delayed or physically disabled.

A major issue for family-centered practice is the placement proximity to the birth family. Focus group participants indicated that the youth who lived in the same county with the birth family had contacts and the others did not. We heard that some youth were placed several hundred miles away and never saw their families.

We also heard that the availability of resource families varies from one area of the State to the next. The chart below indicates the number of children in foster care, licensed resource homes, and pending applications for each region. The data on children was gathered from MACWIS. The information regarding resource families was supplied manually by each regional resource supervisor monthly to staff in the State Office. MACWIS has the data but is unable to generate a report at this time. Additionally, a cursory review of the MACWIS information in only two counties showed closed homes as still being active and some duplication of homes, so we have some concerns about the accuracy of the MACWIS information. Reliable breakdown by type of resource home is not available in MACWIS. The system allows resource homes to be catalogued as foster homes, adoptive homes, resource homes or child specific. There are no homes listed in the "child specific" directory, so this is not being used to indicate a relative foster home.

| Region | Number of Children in Foster Care | Number of Resource Homes | Ratio | Number of Resource Home Applications |
|--------|-----------------------------------|--------------------------|-------|--------------------------------------|
| I North | 327 | 165 | 2/1 | 82 |
| I South | 284 | 157 | 1.8/1 | 57 |
| II East | 109 | 65 | 1.7/1 | 26 |
| II West | 148 | 70 | 2/1 | 10 |
| III North | 216 | 90 | 2.3/1 | 64 |
| III South | 407 | 126 | 3/1 | 96 |
| IV North | 211 | 10 | 2/1 | 14 |
| IV South | 249 | 115 | 2.1/1 | 40 |
| V West | 184 | 40 | 4.5/1 | 1 |
| V East | 256 | 156 | 1.75/1 | 80 |
| VI | 369 | 120 | 3/1 | 151 |
| VII E & W | 774 | 221 | 3.5/1 | 424 |

An analysis of these data indicates a large number of pending resource applicants on the coast (Region VII). Following Hurricane Katrina, services on the coast were hampered by loss of staff and increased workload. The number of pending applicants in this area is actually larger than the number of licensed families. The agency has made efforts to assist in the processing of these applications. Six staff members from throughout the State spent 1-2 weeks in Region VII, processed 34 home studies, and disposed of over 100 pending applications.

The river counties in the southwest (Region V West) have the largest dearth of resource homes with 4 ½ times more children than homes, and it also has the smallest number of pending

applications (one).  The coast has 3 ½ times more children, and Region V has three times more children than homes.

There is a statewide group home capacity for 501 youth.  Of this number, 193 are located in Hinds County (Jackson), with the other homes located in only 16 other counties.  A large section of the delta and central Mississippi (Regions II West and III North) have no group homes, so children going into group care from these areas must necessarily be placed a long distance from families.

There are five private agencies offering therapeutic foster family care.  Currently 264 therapeutic resource homes are approved by the agencies to provide care for one child each.  There had been no compilation of data on these services until most recently. The State Office is now working with the agencies to provide monthly data regarding vacancies.  Some concerns were expressed that the private agencies are placing more than one child in the therapeutic home and requesting approval after the fact.  Other commenters indicated that the therapeutic home pre-service training may be less thorough than that received by the DHS parents.

## Section VI:  Summary and Recommendations

### A.  Summary of Findings

Based on the information above, we have made the following findings:

- There is some lack of consistency in procedures and requirements among the Regional Resource Units, and the practice varies from one region to another.  We could not identify coordination or collaboration from region to region.

- There is a great deal of inconsistency among regions and among counties within regions regarding the application of foster care policy and practice.

- Current policy manuals seem to be lacking, and some staff may only be aware of agency policy through word of mouth.  We could not identify a place for a staff member to obtain a complete policy manual except to copy another manual.  The "P" Drive contains bulletins with updated policy, but not a complete, current Volume IV manual.

- Compliance with policy regarding the placement of children seems very inconsistent.

- County workers seem to be working diligently to ensure that children in foster care have regular visits with their birth families and with their siblings not placed together.

- County workers do not consistently begin the process of evaluating the child during the initial investigation, while they are with their own family.  The information obtained directly from the birth parent could be valuable, and it would provide information that could be shared with the resource parents if the child has to enter care.

Mississippi Foster Care Services Assessments

- Resource families are not treated as partners in decision-making and are not consistently involved in case planning activities.

- There are no recruitment plans for resource families and no funds for recruitment efforts.

- There are no funds for certain resource parent training activities, such as refreshments.

- The cost associated with applying to become a resource family in some areas (estimated at $400+[11]) is prohibitive for many families.

- There are inadequate numbers of placement options for children entering foster care.

- The MACWIS system does not produce some needed aggregate reports regarding children and placement resources.

- There is no accurate differentiation in MACWIS among foster homes, adoption only homes, and relative foster homes.

- There is no single contact which has statewide information about placement resources.

- The State Office capacity for studying State and Federal law, drafting policy, and interpreting the policy for practice needs to be strengthened.

- The current process for securing a therapeutic placement is time-consuming, ineffective, and does not ensure appropriateness of service.

- Mental health services for children in foster care are inadequate and ineffective.

- Many resource workers and resource ASWS are recently promoted and have not received placement-specific training.

## B.  Recommendations

- Issue current, complete DFCS Policy Manuals to all DFCS staff agency-wide.

- Provide consistent training for all DFCS staff on agency policy as it relates to foster care services.  Include appropriate training on MACWIS related to foster care.

---

[11] This is based on an estimate of $150 for each adult's medical, $30 each for TB tests and more if X-rays are required, $20 each for fire extinguishers, $7 each for smoke detectors (2), and other costs for missing work for training/getting medicals/home study visits, car seats, baby beds, and so forth.

- Coordinate resource services from the State Office level so the efforts of each Regional Resource Unit can be combined with others to achieve consistency statewide. This would include becoming familiar with Federal regulations and State laws pertaining to foster care, writing policy which conforms to the Federal regulations, consulting with regional resource staff, and supervising the resource ASWSs.

- Train Resource staff specific to preparing children for placement and preparation of foster families to accept and nurture the types of children entering care.

- Initiate a statewide recruitment effort coordinated by State Office that is focused on recruiting families for the kinds of children who are entering care. Develop a uniform plan for following up with responses to the recruitment efforts.

- Initiate the Resource Placement Committee meetings at the regional and State level as outlined in the *Olivia Y* settlement agreement.

- Consider initiating support groups for children in foster care at the local level.

- Ensure that State Office staff dealing with resource issues are licensed social workers, preferably with master's degrees and that they are thoroughly oriented to the job responsibilities and are proficient in addressing resource and placement-related issues.

- Ensure that pre-service training for resource families includes a module on the financial aspects of providing foster care, including board payment rates, Medicaid, clothing vouchers and reimbursement processes and transportation reimbursement. A sample travel voucher should be given to new resource parents during this segment.

- Modify the current referral process for therapeutic placements to permit the referrals to be made by local staff (worker or ASWS) in accordance with clearly established procedures, with payment approval residing at the State Office level.

- Streamline the travel voucher system in State Office to reimburse foster parents, removing any unnecessary points of contact.

- Offer training to mental health providers on issues related to neglect and abuse, separation and attachment, and other placement issues.

- Cross-train county workers and resource workers, ASWSs and RDs on preparation of children for placement, the roles of resource families, and the respective roles and responsibilities involved in a team approach to this area of practice.

- Produce a statewide newsletter to inform all resource families of training opportunities, resources, support groups, new policy, and so forth.

**Mississippi Foster Care Services Assessments**

- Ensure that the training curriculum for newly hired workers includes segments on placement preparation and working in partnership with resource families.

## *Child Safety Assessment*

The Period Two Implementation Plan of the Mississippi Settlement Agreement and Reform Plan requires that a foster care services assessment be completed that includes:

"A child safety assessment of DFCS practice for prioritizing, screening, assessing, and investigating reports of maltreatment of children to determine the extent to which DFCS investigations and decisions are based on a full and systematic evaluation of the factors that may place child at risk."

This report provides the findings of our assessment in this area, which includes a policy and requirements review, a staff survey, interviews and focus groups, and case reviews.

### Section I: Applicable Standards

### A. Policy and Requirements

MDHS is pursuing accreditation through the Council on Accreditation (COA), which includes a number of standards applicable to this assessment, including the following:

- The agency maintains a well publicized, 24 hour access line to receive reports of suspected abuse and neglect;

- Standardized decision-making criteria are used, in consultation with supervisory personnel to determine if the report meets statutory and agency criteria, and if the case will be screened out, referred for alternative response services, investigated, and/or reported to other authorities;

- Cases are assigned for investigation, referred, or screened out within 24 hours;

- The investigator conducts a comprehensive evaluation of risk and protective factors that include child safety, family strengths and needs, and history and impact of prior child abuse or neglect, domestic violence, or substance abuse and family connections; and

- The information gathered for assessments includes underlying conditions and environmental and historical factors that may contribute to concerns identified in initial screening, investigation, and risk and safety assessments; identifies child and family strengths, protective factors and needs; includes the potential impact of maltreatment on the child; includes factors and characteristics pertinent to making an appropriate placement, if necessary; identifies potential family resources for the child and the parents; and is limited to material pertinent for providing services and meeting objectives.

The *Olivia* Y settlement agreement also includes a number of requirements applicable to this assessment, including the following:

- DFCS shall maintain a well publicized 24-hour statewide child abuse hotline for reporting of abuse and/or neglect;

- Upon receipt of a report of child maltreatment in a group home, emergency shelter, or private group home, DFCS shall undertake a licensure investigation that is additional to,

and independent of, any child protective investigation, that shall include an onsite inspection of the facility or home to determine the contract provider's compliance with DFCS licensure standards;

- All allegations of maltreatment of a child in custody, including corporal punishment, shall be investigated by a caseworker who has received training in the investigation of maltreatment in out-of-home placements and has no ongoing connection to the foster care case;

- DFCS shall assure that standardized decision-making criteria are used for prioritizing, screening and assessing all reports of maltreatment, including corporal punishment, of children in DFCS custody; and

- All investigations into reports of maltreatment, including corporal punishment, of children in DFCS custody must be initiated within 24 hours and completed within 20 calendar days, including supervisory approval. DFCS shall assure that such investigations and decisions are based on a full and systematic evaluation of the factors that may place a child in DFCS custody at risk.

The settlement agreement contains additional protective measures to be implemented after maltreatment investigations and assessments have been completed.

DFCS policy and practice address this area of practice in the following ways:

- Intake requests for services are accepted at all county offices of the Division of Family and Children's Services within the Mississippi Department of Human Services. Section 43-21-353 of the Mississippi Code details how intake reports of suspected child abuse/neglect are made and the actions that shall be taken by the agency.

- Maltreatment, including the use of corporal punishment, by a resource parent (relative or not) on foster children is strictly forbidden by policy. If any DFCS staff has suspicion that a child in DHS custody is being maltreated or that corporal punishment is being used within a resource home, a formal report must be made.

- The supervisor will determine if a report may be screened out during the intake process using the policy guidance that provides general guidance on situations that allow screen outs, such as reports on dirty houses and no indications of life or health threatening conditions, inappropriately dressed children, allegations about parental behaviors rather than children's conditions, crowded homes, inappropriate expenditure of money/benefits, reports applicable to other agencies (e.g., lack of school attendance), reports lacking sufficient information, reports on children over age 18, reports on unborn children, sexual activity of children over age 16 that meet certain criteria, reports of rape or exploitation that meet certain criteria including no involvement by the parent or caretaker, reports involving lack of immunizations, suicidal threats where no parental/caretaker abuse or neglect is involved, physical injury of a child by another child under certain conditions, and requests for assistance with material needs and other services. In most of these circumstances, policy requires actions or referrals by the agency to address needs other than treating the information as a report of child maltreatment.

## Screening Reports and Assigning Response

A supervisor must determine if there is adequate information to locate family; if the alleged perpetrator is a parent or guardian; if the report meets state defined maltreatment; and if the child is in immediate harm. If the first three criteria are met but there is not enough evidence to determine harm, the supervisor will instruct the worker to complete a safety assessment with the family. If there is enough information to determine, the supervisor will instruct the worker to complete a safety assessment with the family. If there is enough information to determine the child is at risk, the supervisor will assign the case for investigation. Within 24 hours of receipt of report, the supervisor will use one of the following levels to determine the disposition of the report and assign it to a worker:

1. *Level One:* The report is screened out for child protective services and may receive a referral for information or a referral for services.

2. *Level Two:* The report is screened in and assigned to a worker who must initiate a safety assessment within 72 hours of assignment of the report. The worker has 7 days from initiation to complete the safety assessment and send it to the supervisor for approval.

3. *Level Three:* The report is screened in and assigned for a full investigation. The worker has 24 hours to initiate the investigation and 30 days to complete the investigation. A safety assessment and any safety plan shall be completed within 7 days from initiation.

A supervisor who receives a report by phone, in person, or in writing that a child has been maltreated in certain ways e.g., intentionally burned or tortured, seriously injured or where serious injury was attempted, sexually abused, or otherwise abused in a felony manner, must immediately call the law enforcement agency in whose jurisdiction the crime occurred and give all information available.

## Procedure for Notification of Potential Child Abuse/Neglect

After the supervisor screens in the report, the assigned worker has timeframes that must be followed for notifying the following professionals:

- The appropriate prosecutor and law enforcement in the jurisdiction where the abuse occurred shall be notified immediately.

- After the investigation is initiated, DFCS and law enforcement shall file the "Preliminary Report" with appropriate prosecutor's office within 24 hours.

- Advise the youth court and youth court prosecutor within 72 hours after the report, and continue to update this information as it becomes available.

## Same Reports

In order to classify a report as the same report and to screen it out for investigation, the supervisor must determine if the new information includes the same alleged perpetrator, the same victim(s), the same types of maltreatment, and the same incident. If a prior investigation has

been completed, the supervisor must always make sure the prior report was thoroughly investigated. Information on the same report will be entered into MACWIS and the system will attach this information to the previous information that was entered.

The agency sometimes receives additional information regarding an incident or situation that is already being investigated. If the worker is involved in an investigation and observes or receives information about additional maltreatment to the victim or another victim in the household, the worker should discuss this new maltreatment with the supervisor within 24 hours. The supervisor will determine if the new information is entered as a post-allegation investigated to determine if additional safety factors are present or if it is entered as a new report.

## False Reports

An intentional false report is a report in which it is concluded that not only is there no evidence under the state law or policy that a child was maltreated or at risk of maltreatment, but the reporter knew the allegation was false. The worker should request that the reporter verify that the allegations made were false.

## Investigation of Suspected Child Abuse/Neglect

Any report that is not a felony crime under state law, must be initiated within timeframes allowed for the level assigned to the report. This assessment is completed in MACWIS within 7 days of the report being assigned. When the worker completes an investigation, a determination is made to support the disposition of the report. This determination is made based upon:

- Evidence criteria
- MDHS-SS-442-B, Safety Assessment
- Information gathered and entered in MACWIS
- Direct observation/Medical or Psychological information

The investigating worker must complete a safety assessment to submit to the supervisor within 7 days of report assignment. If the determination is made that a child is unsafe, the worker must ensure a safety plan or whatever intervention is needed to make the child safe. Report findings are either "no evidence" or "evidence of abuse/neglect." Report information must be entered in MACWIS on appropriate screens as information is received.

The Worker has 25 days to complete the investigation from date of assignment of report. The Supervisor has 5 days to review and approve or disapprove the investigation.

## Safety Assessment and Safety Plan

The policy below was released in June 2009 to describe risk and safety assessments for all investigations, to include maltreatment of children in DFCS custody.

The safety assessment is used in situations when the report has been assigned a Level Two or Level Three investigation. This assessment is completed in MACWIS within seven (7) days of the report being assigned. In circumstances where safety issues are identified, a safety plan will be developed with the family, documented in MACWIS, and will be implemented immediately. In cases where no safety issues are identified, the report is closed after the supervisor approves of closure.

Mississippi Foster Care Services Assessments

## *Risk Assessment*

The risk assessment must be completed simultaneously with the safety assessment. During this assessment, the worker should be assessing the well-being of the child and the risk factors for abuse and neglect. This assessment must be completed within the same 7 day time span applied to the safety assessment.

The risk assessment should identify and document certain information, including the caretaker's response regarding the initial report; any history of child abuse and/or neglect; any current family stressors; the caretaker's level of functioning; current health concerns of household members; how each child functions in school; family support systems; family strengths; family relationships; and a summary of combined information and risks noted during the assessment. Workers are directed to be sensitive to cultural practices within the home during the assessment. Risk assessments must be entered into MACWIS within 7 days from assignment of an investigation. All identified risks must be addressed within the safety plan.

## *Resource Family Homes*

The following policy addresses reports of maltreatment of child in resource family homes. When an abuse/neglect report is received in intake that involves a resource family home (foster, adoptive, kinship/relative) the worker shall:

- Immediately notify his/her Supervisor, who will in turn :

  - Notify the Regional Director for the county where the home is located, County Service (COS), and the Regional Resource Family Supervisor.

  - Notify the Regional Director and Supervisor for the County of Responsibility (COR), and the Regional Resource Family Supervisor for the county where the victim lives.

  - The Regional Director of the COR shall determine whether or not the child(ren) should be removed from the home or further recommendations be made.

  - Notify the parent(s) of the alleged abuse or neglect unless parental rights have been terminated, or the child has been released for adoption. The supervisor will disclose to the parents the allegations of abuse/neglect, as well as the nature of any action taken to prevent further abuse or neglect of the child.

  - Notify parent(s) as to the outcome of the investigation.

- Immediately notify law enforcement and the district attorney's office of jurisdiction, if the report involves felony child abuse/neglect. This notification to law enforcement may also be a request for them to accompany the worker, if deemed necessary.

- Immediately give the report, by telephone, to the COS supervisor, if appropriate.

- Notify the supervisor who, in turn, shall:

  - Notify the Protection Unit. The Protection Unit will log the report and notify the Division Director, the Deputy Administrators, the Placement Unit Director and Regional Resource Family Supervisors of the report and the nature of the allegations of abuse/neglect in the agency home.

The Regional Director for the county where the report originated will assign agency staff to complete a full investigation and monitor the completion of the investigation final report. The worker who licensed the resource family will not take an active role in the investigation but mat accompany the assigned worker on the investigation. The licensing worker's role will be that of a mediator, if necessary, between the resource family and the assigned worker.

The alleged victim(s) must be interviewed the on the same day that the report is received to insure immediate safety. The child victim(s) is to be interviewed individually, privately, and preferably away from the resource family home. No additional children are to be placed in the home pending completion of the investigation.

## Licensed Placements for Facilities

The agency will investigate reports on other licensed placements such as group homes, emergency shelters and private child placing agency foster homes. The Regional Director shall assign a worker to investigate, which may be a supervisor, COR staff or COS staff. The Regional Director shall also notify the Protection Unit, Placement Unit Director, Licensure Director, and the Division Director. If the report involves felony child abuse, law enforcement must be notified immediately. The licensing agency is to accompany or otherwise support the assigned worker on the initial visit with the facility director or the child placing agency director.

## Special Safety Review Team

The *Olivia Y.* Settlement Agreement requires DFCS to undertake a special safety review, including an unannounced site visit, of all currently licensed resource homes with two or more reports of maltreatment, including corporal punishment, within the last three years to determine whether any children placed in these homes are at risk of harm in any licensing standards related to child safety are not being met. For groups homes and other residential facilities that house children in custody that have three or more reports of maltreatment, including corporal punishment, within the last two years to determine whether any children placed in these facilities are at risk of harm or any licensing standards related to child safety are not being met. Any necessary corrective actions will be identified and tracked.

To meet this requirement, two licensed social workers were hired to conduct Special Safety Reviews on resource homes having two or more reports of abuse or neglect in a three-year time frame and group homes and other residential facilities which house children in DHS custody and have three or more reports of abuse and neglect in a two-year time frame. The purpose of these reviews is to determine whether any children placed in those homes or facilities are at risk of harm and/or any licensing standards related to child safety are not being met. The Special Safety Reviews on resource homes are to be completed by October 1, 2009 and the Special Safety Reviews on facilities are to be undertaken by December 1, 2009. The reviews on homes and facilities are almost completed. It was determined that reviewers would visit all facilities which house children in DHS custody, not just the ones meeting the settlement criteria. Children and adults were interviewed in regard to safety, permanency, and well-being. Children, resource parents, and facility staff welcomed reviewers and were pleased to express their opinion regarding current placements and hopes for the future. Reports are written on the reviews and sent to other divisions in the agency, such as licensure unit, independent living unit, and regional directors, so that issues disclosed can be addressed and resolved. Once all reviews are

conducted, data from the reports will be gleaned from them and used to improve policy and practice.

## Section II: Current Tools

### A. Policy

DFCS uses several tools or instruments in addressing safety and risk of children, including the following:

### Maltreatment Intake Tool

The MACWIS intake screen records the date and time of maltreatment reports, provides a summary of the allegations, lists complainant, victim(s), perpetrator(s), household members, roles and relationships, locations and living arrangements. Special handling is documented for maltreatment of children in custody and these reports are automatically assigned Level 3 status for a 24 hour response.

### Screening Tool

The screening tool contains five general screening filters: (1) Is it a duplicate of the same report, (2) Can the family be located, (3) Is the alleged perpetrator the parent, guardian, custodian or other person responsible for the child's care and support, (4) Is there an allegation of child abuse and/or neglect meeting the legal definition in Mississippi code, and (5) Are there other allegations of abuse/neglect that require intervention.

After the intake worker secures available information and makes a screening recommendation, the recommendation is sent automatically to the Regional Director for screening approval and assignment, as appropriate. The Regional Director's decision is documented by time and date, and the Regional Director gives additional justification for the screening decision by narrative and by selection from check boxes of a number of more specific issues that may apply such as duplicate reports; reports of dirty homes; abuse/neglect occurring before, but reported after a person reaches age 18. At this point law enforcement and district attorney referrals are generated and sent, if applicable.

After screening, the Regional Director assigns the investigation to a staff member not directly involved in the case. The screening/ assignment tool lists the time and date of the assignment with provision for a narrative of special instructions by the Regional Director.

### Safety Assessment Tool

The safety assessment tool contains a list of 20 general questions and a number of conditions which document safety concerns. These include:

1. A child has received serious physical harm or injury that appears to be inflicted (non-accidental).

2. A child has physical injuries resulting from use of instruments (e.g. cigarette burns, hot water, belts, sticks) to inflict severe pain upon a child or injuries due to dangerous acts (e.g. choking, shaking of an infant, or cruelty).

Mississippi Foster Care Services Assessments

3.  A child has a serious physical injury and the caregiver has given an explanation that is inconsistent, insufficient, or will not explain.

4.  A child has exceptional or special needs, behaviors or medical concerns that are not being met or managed, and failure to do so is resulting in the child being in danger of serious harm.

5.  The caregiver has not, cannot, or will not protect the child from potential serious harm (dangerous persons, situations, or conditions), and/or caretaker overtly rejects any safety intervention.

6.  Caregiver or other person currently threatening to seriously harm child.

7.  The behavior of any member of the household or other person having access to the child is violent and/or out of control and this behavior places the child in danger of serious harm.

8.  Caretaker perceives the child in extremely negative terms and that perception/belief places the child in danger of serious harm.

9.  Caretaker has extremely unrealistic expectations of the child, and these perceptions place the child in danger of serious harm.

10.  Drug and/or alcohol use by any member of the household or other person having access to the child places the child in danger of serious hare (incapacitation, aggression, or missing).

11.  Behavior(s) of any member of the household or any person having access to the child is symptomatic of mental or physical illness or disability and this condition is uncontrolled and places the child in danger of serious harm.

12.  Caretaker is unwilling, unable to meet the child's needs for sufficient supervision, food, clothing, and/or shelter to protect child from danger of serious harm.

13.  Caretaker is unwilling or unable to meet the immediate physical or mental health needs of a child whose condition is fragile due to physical or mental handicaps and failure to do so may result in the child being in danger of serious harm.

14.  Household environmental hazards or living conditions place a child in danger of serious harm.

15.  Acts of domestic violence (e.g. family violence or batterer violence) have occurred that places the child in danger of serious harm.

16.  Sexual abuse/exploitation is suspected and circumstances suggest that a child may be in danger of serious harm.

17.  A child is exposed to dangerous activities or environments (e.g. the manufacture and distribution of drugs, drug trafficking or sale of illegal drugs, DUI with child in car) that places a child in danger.

18. There is reason to believe a child is in danger of serious harm and the family refuses access to the child, the child's whereabouts cannot be ascertained, caregiver's whereabouts cannot be ascertained or there is reason to believe the family will flee.

19. A child is fearful of caregiver(s), other family members, or other people living in or having access to the home and there is an indication of a credible threat.

20. Other, please explain.

The safety assessment concludes with a safety assessment summary and a safety plan. These are narrative accounts intended to furnish a summary of safety issues and concerns and a plan to address those concerns. A safety checklist is completed and is supposed to be given to parents of children 0-5 years of age.

## Risk Assessment

The risk assessment is supposed to be completed simultaneously with the safety assessment. During this assessment, the worker should be assessing the well-being of the child and the risk factors for abuse and neglect.   This assessment is to be completed within the same 7 day time span applied to the safety assessment. This risk assessment was just released in July 2009 and was not included in the sample cases reviewed. Policy does not indicate specifically where the worker is supposed to document the following risk issues. Perhaps these would be documented in the safety assessment narrative, but there needs to be clarification on this point.

The following is supposed to be documented during the risk assessment:

- Describe the caretaker's response regarding the initial report;

- Describe any history of child abuse and/or neglect;

- Describe any current family stressors;

- Describe the caretaker's level of functioning;

- Describe any current health concerns of household members;

- Describe how each child functions in school (grade level, attendance, parental support);

- Describe family support systems;

- Identify and describe family strengths;

- Describe family relationships; and

- Complete a summary of combined information and risks noted during the assessment.

## Investigations Overview

The Safety Assessment and Safety Plan are components of the Investigations Overview screen which, in addition to the safety assessment information, provides for documentation of medical evidence, evidence criteria, contributing factors, worker's findings, supervisor's approval of findings and recommendations for services. Some of the documentation provided on this tool

includes substantiation criteria (specified in policy), contributing factors, the worker's findings, the supervisor's approval of the findings, and recommendations for services.

## Section III: Current Practice

We assessed the tools and practices employed by DFCS to prioritize, screen, investigate and assess reports of maltreatment of children in DFCS custody to determine the extent to which DFCS investigations and decisions are based on a full and systematic evaluation of the factors that may place a child at risk. The following methods were used in this assessment:

- staff survey to describe the usefulness of tools and current practice

- focus groups with front line staff, supervisors, Regional Directors and state office staff

- available MACWIS reports

- 30 case reviews of the total of reports investigated and assessed, and 15 reviews of the total of reports screened out

The following includes the information from those sources.

## A. Staff Survey

We conducted a survey of MDHS child welfare staff and asked respondents to rate the agency's effectiveness in addressing practices pertaining to ensuring the safety of children who are in foster care. The safety practices addressed in the survey addressed issues such as screening and prioritizing reports, monitoring for safety and risk, addressing safety and risk at key points, and the investigation process for reports of maltreatment of children in foster care.

As indicated in the chart below, respondents rated the agency's effectiveness in these safety related practices as almost always or frequently effective between about 74 and 83 percent of the time, mostly indicating that the agency was frequently or almost effective about three-quarters of the time. Respondents gave their highest ratings to monitoring safety of children in foster care, monitoring the risk of harm to children in foster care, and conducting safety and risk assessments with regard to reunification (respectively, about 86 percent, 83 percent, and 80 percent frequently or almost always effective).

Staff responding to the survey addressed the actual handling of reports of maltreatment of children in foster care by indicating that the agency was frequently or almost always effective in screening and prioritizing incoming reports, initiating and completing investigations timely, and conducting thorough investigations between 75 and 78 percent of the time.

| Please rate your perception of your agency's effectiveness in each area below of practices relating to ensuring child safety for children in foster care: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Some times | Frequently | Almost Always | No Info/NA | Total |
| Screening foster families for safety related issues prior to placing children, e.g., conducting | 3 (1.44%) | 4 (1.91%) | 14 (6.7%) | 45 (21.53%) | 113 (54.07%) | 30 (14.35%) | 209 |

| | | | | | | |
|---|---|---|---|---|---|---|
| background checks on all family members age 14 and older: | | | | | | |
| Monitoring the safety of children while in foster care: | 0 (0%) | 3 (1.42%) | 8 (3.77%) | 59 (27.83%) | 124 (58.49%) | 18 (8.49%) | 212 |
| Monitoring the risk of harm to children in foster care: | 0 (0%) | 3 (1.42%) | 13 (6.16%) | 59 (27.96%) | 116 (54.98%) | 20 (9.48%) | 211 |
| Safety and risk assessments in reunification: | 0 (0%) | 3 (1.42%) | 15 (7.11%) | 63 (29.86%) | 105 (49.76%) | 25 (11.85%) | 211 |
| Safety and risk assessments in visitation: | 0 (0%) | 6 (2.84%) | 26 (12.32%) | 57 (27.01%) | 99 (46.92%) | 23 (10.9%) | 211 |
| Screening incoming reports of maltreatment to accept for investigation for children in foster care: | 5 (2.39%) | 2 (0.96%) | 8 (3.83%) | 48 (22.97%) | 114 (54.55%) | 32 (15.31%) | 209 |
| Prioritizing incoming reports of maltreatment for children in foster care, i.e., assigning the correct priority based on the allegations: | 4 (1.9%) | 4 (1.9%) | 13 (6.19%) | 41 (19.52%) | 117 (55.71%) | 31 (14.76%) | 210 |
| Timeliness of initiating investigations: | 0 (0%) | 3 (1.43%) | 18 (8.57%) | 45 (21.43%) | 117 (55.71%) | 27 (12.86%) | 210 |
| Timeliness of completing investigations: | 1 (0.48%) | 5 (2.39%) | 20 (9.57%) | 55 (26.32%) | 101 (48.33%) | 27 (12.92%) | 209 |
| Thoroughness of investigations involving children in foster care, e.g., interviewing all parties, using prior history information, etc..: | 0 (0%) | 6 (2.87%) | 17 (8.13%) | 42 (20.1%) | 115 (55.02%) | 29 (13.88%) | 209 |
| Addressing the safety of all children in the foster home, as opposed to only the child who is the subject of the report: | 0 (0%) | 11 (5.34%) | 10 (4.85%) | 47 (22.82%) | 112 (54.37%) | 26 (12.62%) | 206 |

We also asked survey respondents to rate the agency's effectiveness with regard to certain systemic supports associated with ensuring the safety of children while in foster care as well as the safety of children in their own homes. Respondents gave their highest ratings to providing families and children with services to address safety issues and to supervisory oversight of safety and risk issues, rating the agency as frequently or almost always effective in these two areas about three-quarters of the time (about 77 percent and 76 percent respectively). Respondents indicated that the agency's training regarding safety and risk issues was less effective, rating pre-service and in-service training as frequently or almost always effective about 59 percent and 56 percent of the time. They also rated the SARA and quality assurance monitoring of safety and risk related issues as frequently or almost always effective a little more than half the time (about 59 percent and 61 percent respectively).

**Mississippi Foster Care Services Assessments**

Respondents to the survey were asked to comment of current tools and practices related to assuring child safety. The largest number of comments described the safety and risk assessment tools they use as strengths of practice in this area. While most comments did not differentiate between the safety checklist and SARA, some did, and they seemed to reflect general satisfaction with the thoroughness of the tools if they are used correctly. There were also indications that both tools could be improved. A few respondents cited family team meetings as effective mechanisms for ensuring child safety. One respondent specifically commented on the need for improved assessment of foster homes while children are in placement.

In commenting on the barriers to more effective practice regarding the safety of children and managing risk, most respondents also cited the safety and risk assessment tools (safety checklist and SARA). Those respondents identifying the tools as barriers most often described the length of SARA as a problem, the lack of applicability to the circumstances of some children and families, the forcing of answers that may not apply, the lack of applicability to children in foster care, staff not using the instruments correctly, and the lack of attention to risk issues.

Apart from the comments on the safety and risk assessment tools, other comments were spread among issues pertaining to the courts as barriers, the lack of priority given to children placed out of their county of residence, and the lack of safety-related services.

| Please rate your perception of your agency's effectiveness in each area below of supports relating to assuring safety and managing risk for both in-home and foster care: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Not at All | Rarely | Some times | Frequently | Almost Always | No Info/NA | Total |
| Providing families and children with the appropriate services to address safety issues: | 0 (0%) | 2 (0.94%) | 28 (13.21%) | 65 (30.66%) | 99 (46.7%) | 18 (8.49%) | 212 |
| Effectiveness of supervision in addressing safety and risk-related issues: | 0 (0%) | 6 (2.84%) | 25 (11.85%) | 59 (27.96%) | 102 (48.34%) | 19 (9%) | 211 |
| Effectiveness of the safety assessment as a tool to identify safety and risk-related issues during investigations: | 1 (0.48%) | 7 (3.33%) | 42 (20%) | 56 (26.67%) | 84 (40%) | 20 (9.52%) | 210 |
| Effectiveness of SARA in identifying risk: | 5 (2.42%) | 16 (7.73%) | 38 (18.36%) | 58 (28.02%) | 65 (31.4%) | 25 (12.08%) | 207 |
| Use of case plans to eliminate safety threats and reduce risk: | 0 (0%) | 7 (3.32%) | 26 (12.32%) | 64 (30.33%) | 89 (42.18%) | 25 (11.85%) | 211 |
| Pre-service staff training on safety and risk: | 2 (0.98%) | 10 (4.88%) | 42 (20.49%) | 65 (31.71%) | 56 (27.32%) | 30 (14.63%) | 205 |
| In-service staff training on safety and risk: | 3 (1.46%) | 9 (4.39%) | 53 (25.85%) | 58 (28.29%) | 56 (27.32%) | 26 (12.68%) | 205 |
| Usefulness of policy on safety and risk-related issues: | 1 (0.49%) | 6 (2.94%) | 40 (19.61%) | 67 (32.84%) | 67 (32.84%) | 23 (11.27%) | 204 |

**Mississippi Foster Care Services Assessments**

| Monitoring of safety-related practices and outcomes, e.g., quality assurance: | 1 (0.49%) | 16 (7.8%) | 36 (17.56%) | 60 (29.27%) | 65 (31.71%) | 27 (13.17%) | 205 |
|---|---|---|---|---|---|---|---|

In commenting on supports needed to enable workers to effectively ensure the safety of children and manage risk, survey respondents identified the most needs with regard to training, followed by improved safety-related services, improved safety and risk assessment tools, improved placement options for children in foster care, automation support, and policy changes.

The training related comments indicated a need for more in-service training, and training devoted to the process of safety and risk assessment. Some respondents commented on the need for training on the use of assessment tools and using the information to develop case plans. Others requested training on policy and resources available to serve children and families with safety-related needs.

Comments related to improved safety-related services highlighted the lack of services in some counties in the State, indicating a need for more services in general. In particular, a number of respondents indicated the need for more family-preservation services without wait lists, and services that can be provided in families' homes. Several respondents indicated a need for concrete services and access to services in emergency situations.

The comments regarding the safety and risk assessment tools generally reflected a desire for more user-friendly tools that can be used in the field and tools that apply to children within certain age ranges. Comments regarding placement options generally indicated a need for a broader array of foster homes to be able to place children appropriately, and for homes that are well prepared to care for children in the Department's custody. Only a few respondents commented on the need for automation support and improved policy.

## B. Focus Groups

The focus groups that contributed information pertaining to the safety of children in foster care included the groups of parents served by MDHS, resource parents, MDHS resource supervisors, Regional Directors, and MDHS caseworkers.

Participants in at least two of the focus groups noted that reports are often made on resource families. One group noted that many of these reports pertain to licensing violations. One group also noted that incidents of corporal punishment of children in care are coded as policy violations. In one group, we heard about children being maltreated in foster care and the parents not being made aware of it, but heard of it in a court hearing.

Focus group participants indicated that workers check foster homes for compliance with safety standards, including making unannounced visits. There were also descriptions of workers, including those of child-placing agencies making frequent visits to the homes, but there was uncertainty about the extent to which these visits actually involved assessing for safety-related issues.

Mississippi Foster Care Services Assessments

MDHS staff in focus groups indicated that assessing maltreatment in foster care is much improved, and that investigations are conducted consistently when reports are received. There were some concerns indicated about the thoroughness of the investigations and indications that who is assigned to conduct investigations of reports of maltreatment in foster care may vary by region, including resource workers, senior caseworkers, and staff from other areas.

Concerns were also raised about the usefulness of SARA regarding maltreatment in foster care, and we heard that SARA is not completed on children in foster care. Similar concerns about SARA in general were raised in focus groups as in the survey, e.g., the length and complexity of the tool, the inapplicability of the questions to many situations, and so forth.

Some concerns were raised about the resource workers' involvement in reports of maltreatment of children in foster care. Some comments indicated that resource workers may not always be aware that reports have been received or the disposition of the reports. These participants were concerned that policy is not followed in that respect and indicated they should be given the information and the opportunity to accompany the investigator to the resource home.

## C. Case Reviews

We conducted a review of MACWIS case files for two samples of children for this assessment. We reviewed the cases of 17 children with reports of maltreatment in foster care that had been screened out for the purpose of assessing the criteria for screening out these reports. We also reviewed the cases of 30 children with investigated reports of maltreatment in foster care for the purpose of assessing the investigation process.

### Screened-Out Findings

In the 17 reports we reviewed, all 17 appeared to be treated as a new report and appropriately screened. All were prioritized at Level One. All 17 reports were reviewed by either the Area Social Work Supervisor or the Regional Director. Perpetrators in ten of the 17 reports were either foster caretakers or facility staff.

The allegations in these screened out reports included emotional maltreatment (2), neglect (7), physical abuse (4), and sexual abuse (4). Seven of the children were in unrelated foster homes, two were in related foster homes, and the remaining children were in various congregate care facilities or unlicensed relative care.

Reviewers agreed with the screening decisions in 12 of the 17 reports, did not agree with two decisions, and did not have enough information to make a decision in three reports. In explaining their reasons for disagreeing with the screening decisions or not having enough information to make a decision, reviewers cited disagreement with the *reasons* for screening the report out rather than actually screening them out, inadequate documentation of addressing the allegations, or allegations not meeting the legal definitions of maltreatment.

Mississippi Foster Care Services Assessments

### *Investigations Findings*

Of the 30 children for whom investigations of maltreatment in foster care were conducted, 26 were placed in foster family homes and the remainder was in group care (2), kin foster care (4), or residential care (1). Twenty-six of the reports were Level Two priority and four were Level Three priority.

The investigations were initiated within policy timeframes in only 8 of the 30 investigations. The investigations were concluded within policy timeframes in 13 of the 30 investigations (one case lacked documentation of the concluding date). The average time frame between case assignment and initiation of the investigations was 1.76 days, and the average time frame between initiating and concluding the investigations was 30.59 days. Reviewers disagreed with screening decisions on 22 of the 30 reports, all due to assigning the priority as Level Two when they thought it should have been assigned as Level Three.

In terms of the quality of the investigations, we found the following:

- A full investigation was conducted in 23 of the 30 investigations, and not in six. There was insufficient information to make a determination in one investigation. In the investigations where the reviewers indicated a full investigation was not conducted, reviewers cited the lack of interviews with all appropriate parties.

- The investigator conducted a visit to the home in 28 of the 30 investigations.

- The method of initiating the investigation was an unannounced home visit in 13 of the investigations; in15 of the investigations the method was "other."

- The investigator had face-to-face contact with the child on the same day of the report in only 10 of the 30 investigations. However, the investigators interviewed the children privately during the investigation in 23 of the 30 investigations.

- The child's caretaker was the alleged perpetrator in 28 of the investigations, and the investigator interviewed the perpetrator in 25 of the 30 investigations.

- The investigator had face-to-face contact with the child's caretaker in 28 of the 30 investigations.

- Collateral contacts were interviewed by the investigator in 23 of the 30 investigations.

- A safety assessment of the child was conducted in all 30 investigations.

- There was evidence of supervisory review in 24 of the 30 investigations.

- Safety and risk issues were addressed for all children in the resource home (not just for the child who was the subject of the report) in 16 of the investigations, and not in 10 of the investigations. In the remaining 4 investigations it was either not applicable or there was not enough information to make a determination.

**Mississippi Foster Care Services Assessments**

- Reviewers were not able to identify any safety or risk issues that the investigator failed to identify in 15 of the 30 investigations. In ten of them, there were unidentified safety or risk factors.

- In 10 of the 30 investigations, there were no indications that the investigator distinguished between immediate safety issues and risk issues. In 13 of the investigations, the investigator made this distinction. In the remaining investigations, there was some combination of addressing risk and/or safety issues.

In regard to procedural issues, we found the following in reviewing the investigations:

- Reviewers could determine that biological parents were notified of the reports in five of the 30 investigations. In 17, there was not enough information in the record to make a determination, and in the remaining cases, they either did not notify the parents (four) or it was not applicable (four).

- The child was removed from the resource home in nine of the 30 investigations.

- Medical resources, legal resources, law enforcement, and other State agencies were involved appropriately in the investigations with only a slight deviation regarding medical resources (three investigations) and law enforcement (one investigation).

  With regard to the outcomes of the investigations, we found the following:

- Of the 30 investigations, the dispositions included 24 "no evidence," three "policy violations," and three "evidence."

- A safety plan or safety-related services was required by the child or resource family to address safety and/or risk issues in 14 of the investigations.

- The resource families were referred for services where the need was indicated in eight of the 30 investigations, and not referred in 11. The issue was not applicable in nine investigations and there was inadequate documentation to make a determination in two investigations. Where services seemed to be indicated but not received, reviewers noted identified needs of either the child or resource parents for which service referrals were not made, and inadequate assessment of needs in order to determine what services would have been helpful.

- The actions taken by the agency mitigated the safety and/or risk concerns in 18 of the 30 investigations, did not mitigate in two, and either was not applicable or there was inadequate documentation in the remaining investigations.

- The child's case plan was not changed in 28 of the investigations as a result of the report.

- The reviewers agreed with the investigators' dispositions of the reports in 21 of the 30 investigations. The reviewer disagreed with six of the dispositions, and there was not enough information to make a decision on the remaining investigations. Where reviewers did not agree with the dispositions, they generally commented that the dispositions were based on incomplete information, such as not interviewing all parties.

## D. Data Reports

### Children with Alleged Maltreatment While in Agency Custody

A monthly summary report is generated from the MACWIS system "Children with Alleged Maltreatment While in Agency Custody." This report contains the following data: Unduplicated count of children, total number of intakes, average intakes per child, findings (evidence or no evidence), findings with evidence and percent of findings with evidence. For a period of January 1, 2008 through May 31, 2009 the following statewide statistics were reported:

- Unduplicated count of children with maltreatment reports – 952

- Total number of intakes – 1182

- Average number of intakes per child – 1.24

- Total findings – 1364 (more than one type of maltreatment)

- Findings with evidence – 352

- Percent of findings with evidence – 25.8%

A monthly individual report is generated for each child who was the subject of maltreatment reports. This report is sorted by county and region and contains the following data: child's name, intake date, investigation findings, maltreatment type(s), maltreatment finding(s).

### Licensed Resource Homes with ANE Findings

Monthly reports are generated through MACWIS data to report resource homes with one ANE complaint, and a separate report for two or more ANE complaints. These two reports contain the following information: name of resource home, status of home (active or inactive), number of reported ANE and number of evidenced ANE reports.

In addition, two summary reports by county, region and state detail the number of resource homes, number of reports and number of reports evidenced.

The data from July 1, 2008 through June 30, 2009 indicate that 144 homes were reported with only one ANE complaint. Of these 32 were evidenced. During this same time period, 37 resource homes were reported for two or more ANE reports. There were a total of 85 ANE reports for these 37 homes. Of these 37 homes, 8 were evidenced.

### Licensed Facilities with ANE Findings

Similar reports are generated on licensed facilities with ANE reports. The individual monthly reports contain the name of the licensed facility, status, number of ANE reports and number of reports evidenced.

Two summary reports are generated, both collecting a summary of all reports made since June 1, 2007 until the present reporting month. One report contains the facilities on which one ANE report has been made. For these facilities there have been 14 facilities during this period, 14 total reports and 3 evidenced. The second report of facilities with 2 or more ANE complaints indicates that there are 15 identified facilities, 56 total reports and 11 reports evidenced.

### Screen-outs of ANE of Children in Custody

A specific MACWIS report is not currently in production to indicate the screened-out ANE involving children in custody. A recent special report pulled from MACWIS data shows that from June 1, 2008 till June 30, 2009 there have been 1612 total maltreatment **report types** of children in custody, of which 245 or 15% were screened out.

## Section IV: Summary and Recommendations

### A.  Summary of Findings

Based on the information above, we have made the following findings:

- Safety assessments in investigations of child maltreatment while in foster care seem to be conducted consistently.  This is based on information from interviews and case review findings.

- Screening decisions seem to be accurate for the most part, but priority levels should be clarified in policy and practice.

- There is a need to identify service needs of children and resource families with regard to safety and risk issues, and to make appropriate referrals and link them with services during the investigation if needed.

- There is a need to ensure that the child's parents are notified of reports concerning their children while they are in foster care.

- Face-to-face contact with the children during investigations does not appear to be consistent in the investigations process.

- Supervisory review of investigations should be documented more clearly and consistently.

- Investigations of reports of maltreatment in foster care do not appear to be initiated or completed in accordance with policy requirements (based on our case reviews).

- Interviews with all required parties during the investigation process are either not consistent or not well documented.

- Documentation of investigations in general is not thorough.

## B.  Recommendations

- We recommend that MDSH develop a simplified safety and risk assessment tool for use with children in foster care placements.  SARA and the safety checklist do not seem to apply to the circumstances of those children and may not be capturing the relevant information regarding maltreatment in foster care.

- We recommend that MDHS strengthen policy regarding who is responsible for investigating reports of maltreatment of children in foster care in the County Departments, including when and how to involve the resource worker.

- We recommend that policy pertaining to the use of corporal punishment of children in foster care by their resource parents or facility staff be clarified and enforced.  We heard from some sources that these incidents are coded as policy violations, but we understand that the *Olivia Y* settlement agreement requires that it be treated as a maltreatment report.

- We recommend training of all investigative and resource staff on investigating reports of maltreatment in foster care.

- We recommend that ASWSs monitor and enforce the timeliness of initiating and completing investigations of reports of maltreatment in foster care.  We believe that a MACWIS report that captures this information and reports on it monthly would be helpful in monitoring and enforcing the policy.

Mississippi Foster Care Services Assessments

## *Appendices*

**Appendix A:  Staff Survey**

**Appendix B:  Case review sample questions**

## Appendix A:  Mississippi Practice Model and Assessment Staff Survey

### Assuring Safety and Managing Risk (Child Safety Assessment)

Please rate your perception of your agency's effectiveness in each area below in ensuring child safety.

(**Not at all, Rarely, Sometimes, Frequently, Almost Always, No Information/Not Applicable**)

*Practice related to children in their own homes (not children in foster care):*

- Screening incoming reports of maltreatment to accept for investigation
- Prioritizing incoming reports of maltreatment, i.e., assigning the correct priority based on the allegations
- Initial safety assessments
- Initial risk assessments
- Ongoing safety assessments in open protective services cases
- Ongoing risk assessments in open protective services cases
- Timeliness of initiating investigations
- Timeliness of completing investigations
- Thoroughness of investigations, e.g., interviewing all parties, using information on history of prior maltreatment, identifying relevant issues, evaluating protective capacities of parents
- Identification of underlying issues related to maltreatment, such as substance abuse, domestic violence, other family dynamics
- Timely identification of services needed to address safety
- Investigating reports of maltreatment on children in cases already opened for services (in-home protective services cases)
- Use of safety plans
- Addressing the safety of all children in the home, as opposed to only the child who is the subject of the report
- Evaluating safety and risk factors at the time of case closure

*Practice related to children in foster care:*

- Screening foster families for safety related issues prior to placing children in their homes, e.g., conducting child welfare and criminal background checks on all family members age 14 and older
- Monitoring the safety of children while in foster care
- Monitoring the risk of harm to children in foster care
- Screening incoming reports of maltreatment to accept for investigation for children in foster care
- Prioritizing incoming reports of maltreatment for children in foster care, i.e., assigning the correct priority based on the allegations
- Timeliness of initiating investigations
- Timeliness of completing investigations

- Thoroughness of investigations involving children in foster care, e.g., interviewing all parties, using information on history of prior maltreatment, identifying relevant issues
- Addressing the safety of all children in the foster home, as opposed to only the child who is the subject of the report

*Supports related to assuring safety and managing risk (for in-home and foster care):*

- Providing families and children with the appropriate services to address safety issues
- Timeliness of initiating services to address safety
- Effectiveness of supervision in addressing safety and risk-related issues
- Effectiveness of the safety checklist as a tool to identify safety and risk-related issues during investigations
- Pre-service staff training on safety and risk
- In-service staff training on safety and risk
- Usefulness of policy on safety and risk-related issues
- Monitoring of safety-related practices and outcomes, e.g., quality assurance

*Open Ended Questions*

- Please describe any **strengths** in current tools and practice in assuring the safety of children and managing risk
- Please describe any **barriers** in current tools and practice in assuring the safety of children and managing risk
- Please note any **supports needed** (tools, services, practices) to better enable workers to effectively assure the safety of children and manage risk in the home

### Mobilizing Appropriate Services Timely (Reunification Assessment, Medical/Dental/Mental Health Services Assessment, Independent Living Services Assessment, and Recruitment/Retention/Foster Care Placement Assessments)

Please rate your perception of your agency's effectiveness in each area below in mobilizing appropriate services timely.
**(Not at all, Rarely, Sometimes, Frequently, Almost Always, No Information/Not Applicable)**

*Practice related to mobilizing services:*

- Ability to access services to meet safety-related needs of children and families during an investigation
- Quality of safety-related services provided to children and families
- Effectiveness of services to address the following areas (includes ability to initiate the service when needed and the quality of the service):
  - Domestic violence services
  - Substance abuse treatment services
  - Therapeutic services
  - Family preservation services

Mississippi Foster Care Services Assessments

- o Physical health services
- o Dental health services
- o In-home services
- o Post-adoption support services
- o Services to meet basic needs (food, clothing, shelter)
- o Independent living services for youth in care ages 14-20
- o Transitional living services for youth in care

- With regard to mental/behavioral health services, how effectively are you able to access the following levels of services for children and families:
  - o Lower level services, e.g., outpatient counseling and evaluation, prevention services, testing
  - o Mid-level services, e.g., behavioral health medication, day treatment, more intense out-patient psychotherapy
  - o High-end/acute services, e.g., addiction and recovery services, specialized care, psychiatric services
  - o Crisis services, e.g., crisis stabilization, psychiatric hospitalization for children
- Effectiveness of services to support foster families and assure placement stability
- Effectiveness in placing children in placements that are matched to their needs
- Effectiveness of current procedures for identifying and obtaining access to the appropriate placement entering foster care (e.g., who selects placement resource, timeliness of selecting resource, etc.)

*Supports related to mobilizing services:*

- Ability to recruit qualified and appropriate placement options for children
- Ability to retain qualified and appropriate placement options for children
- Array of service providers to meet identified needs of children and families (identify in open-ended questions those that are effective and those that are not)
- Training to match services to identified needs
- Supervisory oversight of service provision
- Monitoring to ensure placements are appropriate and meeting the needs of children
- Monitoring to ensure services and service providers are available, appropriate and meeting the needs of children

*Open Ended Questions*

- Please describe any ***strengths*** in current tools and practice in mobilizing appropriate services for children and families in a timely manner:
- Please describe any ***barriers*** in current tools and practice in mobilizing appropriate services for children and families in a timely manner:
- Please note any ***supports needed*** (tools, services, practices) to better enable workers to effectively mobilize appropriate services for children and families in a timely manner:
- What services do resource families need the most for themselves in order to help them provide stable placements for children in their care?

- To what extent are those services available and accessible?
- What services do children in foster care need in order to maintain the stability of their placements and avoid disruptions?
- To what extent are those services available and accessible?
- Identify the availability of services to support reunification in your area, and indicate the effectiveness of these services in achieving timely reunification of children in foster care.

| Service | Level of Effectiveness (Almost always, frequently, etc.) |
|---------|----------------------------------------------------------|
|         |                                                          |
|         |                                                          |
|         |                                                          |
|         |                                                          |

## *Individualized Case Planning (Medical/Dental/Mental Health Services Assessment, Independent Living Services Assessment, Termination of Parental Rights Assessment, and Recruitment/Retention/Foster Care Placement Assessments)*

Please rate your perception of your agency's effectiveness in each area below in individualizing case planning.

(**Not at all, Rarely, Sometimes, Frequently, Almost Always, No Information/Not Applicable**)

*Practice related to individualized case planning:*

- Use of assessments to determine individualized needs
- Use of assessments to guide decisions about services
- Effectiveness of case planning process in addressing individualized needs
- Concurrent planning for children in foster care
- Cultural responsiveness of services
- Making timely decisions about TPR and adoption
- Determining and documenting exceptions to filing TPR petitions for children in foster care 15 of 22 months
- Ability to tailor services to individual children and families
- Tailoring IL and transitional living services to youth in care
- Availability and accessibility of services to transition children into adult services systems when appropriate
- Availability and accessibility of services to youth post-transition out of DCF care

*Supports needed to individualize case planning:*

- Adequate array of placement resources that are matched to children's needs
- Flexibility of service providers to address unique needs of children and families
- Flexibility of funding and contracting procedures to purchase individualized services

**Mississippi Foster Care Services Assessments**

*Open Ended Questions*

- Please describe any *strengths* in current tools and practice in individualizing case planning for children and families:
- Please describe any *barriers* in current tools and practice in individualizing case planning for children and families:
- Please note any *supports needed* (tools, services, practices) to better enable workers to effectively individualize case planning for children and families:
- Identify the types of children for whom you have the most difficulty making the most appropriate placement in foster care:

### Preserving Connections and Relationships (Reunification Assessment and Recruitment/Retention/Foster Care Placement Assessments)

Please rate your perception of your agency's effectiveness in each area below in preserving connections and relationships.

**(Not at all, Rarely, Sometimes, Frequently, Almost Always, No Information/Not Applicable)**

*Practices related to preserving connections and relationships:*

- Identifying and addressing cultural issues relevant to families and children
- Post-placement reunification services to families to prevent re-entry into foster care
- Identification and use of relatives as placement resources
- Placing siblings together in same foster care setting
- Placing children within their own communities when appropriate
- Maintaining connections of children in foster care to family members while in foster care
- Visiting between children in foster care and their families and siblings
- Maintaining tribal relationships and connections for Native American children in foster care
- Providing that youth in foster care have connections to at least one committed, caring adult to aid in the youth's transition from foster care
- Maintaining children in their same school setting when placed in foster care
- Foster parent involvement in supporting child-parent visits and other contacts
- Birth parent involvement in helping to care for their children while in foster care

*Supports related to preserving connections and relationships:*

- Pre-service training on preserving connections and relationships
- On-going training on preserving connections and relationships
- Foster parent training on preserving connections and relationships
- Policy on preserving connections and relationships, including policy on parent-child visiting while in foster care and policy related to use of relatives as placement resources
- Availability of services to facilitate and support reunification

*Open Ended Questions*
- Please describe any *strengths* in current tools and practice in preserving connections and relationships:

Mississippi Foster Care Services Assessments

- Please describe any **barriers** in current tools and practice in preserving connections and relationships:
- Please note any **supports needed** (tools, services, practices) to better enable workers to effectively preserve connections and relationships:

### Strengths and Needs Assessments (Medical/Dental/Mental Health Services Assessment, Independent Living Assessment, Child Safety Assessment, and Recruitment/Retention/Foster Care Placement Assessments)

Please rate your perception of your agency's effectiveness in each area below in assessing strengths and needs.

(**Not at all, Rarely, Sometimes, Frequently, Almost Always, No Information/Not Applicable**)

*Practices related to strengths and needs assessments:*

- Conducting initial screenings of children to identify needs in the following areas:
    - Mental/behavioral health (Effectiveness rating for each one)
    - Physical health
    - Therapeutic needs
    - Education
    - Developmental levels and concerns
- Conducting initial comprehensive strengths and needs assessments of children and families prior to developing a case plan
- Conducting on-going assessments of strengths and needs throughout the life of the case
- Assessing the strengths and needs of non-custodial parents
- Assessing the strengths and needs of custodial parents
- Assessing the strengths and needs of all children in the home
- Assessing foster caretakers' ability to provide safe and appropriate care for children
- Assessing educational needs of children
- Obtaining timely professional specialized assessments when needed, e.g., psychological, drug evaluations, educational assessments, etc.

*Supports needed for strengths and needs assessments:*

- Pre-service training on assessing strengths and needs
- On-going training on assessing strengths and needs
- Policy on assessing strengths and needs
- Effectiveness of the strengths and needs assessment tool (SARA)
- Availability of providers to conduct effective specialized assessments

*Open Ended Questions*

- Please describe any **strengths** in current tools and practice in assessing the strengths and needs of children and families:
- Please describe any **barriers** in current tools and practice in assessing the strengths and needs of children and families:

- Please note any ***supports needed*** (tools, services, practices) to better enable workers to effectively assess the strengths and needs of children and families:

### *Involving Children and Families in Decision Making (Reunification Assessment, Independent Living Assessment, and Recruitment/Retention/Foster Care Placement Assessments)*

Please rate your perception of your agency's effectiveness in each area below in involving children and families in case activities and decision making.
(**Not at all, Rarely, Sometimes, Frequently, Almost Always, No Information/Not Applicable**)

*Practices related to involving children and parents in decision making:*

- Effectiveness of efforts to identify and locate non-custodial parents to determine whether they should be involved in case planning and decision making
- Involvement of custodial parents in developing case plans
- Involvement of non-custodial parents, when appropriate, in developing case plans
- Involvement of age-appropriate children and youth in developing case plans
- Involvement of custodial parents in reviewing, updating and revising case plans, goals, and services
- Involvement of non-custodial parents, when appropriate, in reviewing, updating and revising case plans, goals, and services
- Involvement of age-appropriate children and youth in reviewing, updating and revising case plans, goals, and services
- Use of family team meetings or conferences as the means of involving parents and children in case planning and decision making
- Use of caseworker visits with parents, including non-custodial parents when appropriate, to involve them in case planning and decision making (frequency and quality of visits)
- Use of caseworker visits with children and youth to involve them in case planning and decision making (frequency and quality of visits)
- Use of information/requests from parents to guide the development of the case plan, select services, and establish goals
- Use of information/requests from age appropriate children and youth to guide the development of the case plan, select services, and establish goals
- Ability to identify and address cultural issues of children and parents, including language barriers, that affect their involvement in case planning and decision making
- Involvement of youth in identifying services and supports they need to transition to adulthood

*Supports needed to involve children and parents in decision making:*

- Pre-service training on involving children and families in decision making
- On-going training on involving children and families in decision making
- Foster parent training on how to involve children and families
- Policy on involving children and families in decision making
- Use of family team meetings as a forum for case planning activities

**Mississippi Foster Care Services Assessments**

- Availability of culturally appropriate services for children and families that support their involvement in case planning and decision making

*Open Ended Questions*

- Please describe any ***strengths*** in current tools and practice in involving children and families in decision making:
- Please describe any ***barriers*** in current tools and practice in involving children and families in decision making:
- Please note any ***supports needed*** (tools, services, practices) to better enable workers to effectively involve children and families in decision making:

## Appendix B:  Case Review Sample Questions

| Screened Out Investigations of Child Maltreatment Sample | |
|---|---|
| **Question** | **How to Fill Out/Drop Down Options** |
| Case Number | Enter Case Number |
| Date of Report | Enter date of report |
| Victim Child 1-5 | Note suffix of child (as assigned from previous Basic Information Page). Options for 5 Victim children in report (maximum number of kids to be in foster home) |
| Perpetrator Relationship to Each Child | For victim child, note the relationship of the perpetrator to the child. Note that there is the possibility of 2 relationships for each child (i.e., a perpetrator can be noted as both a relative and a foster mother, should that apply). Drop Down Box: Adoptive Father, Adoptive mother, Biological Father, Biological Mother, Father's Partner- In Home, Foster Father, Foster Mother, Grandfather-maternal, Grandfather-paternal, Grandmother-maternal, Grandmother-paternal, Group home staff, Legal Guardian, Mother's Partner-In Home, Relative, Sibling-Brother, Sibling-Sister, Step-father, Step-mother, Unrelated Caretaker-In Home, Unrelated Caretaker-Out of Home, NA, No Documentation, Other Person, Unknown |
| Perpetrator Allegations for Each Child | For each victim child and each perpetrator, note the allegations of the report. There are two perpetrator options and two allegation options per perpetrator. Drop Down Box: Congenital Drug Addiction, Death, Emotional Maltreatment, Failure to Thrive, Neglect, Physical Abuse, Sexual Abuse, NA, No Documentation |
| What was the type of placement where report was received? | Drop Down Box: Emergency Placement, Foster Home, Group Home, Inpatient Facility, Kin Foster Home, Residential Facility, Supervised independent living, Unlicensed kin placement |
| Was it treated as a new report and screened accordingly? | Drop Down Box: Yes, No, Not Enough Information |
| Screening disposition? | Drop Down Box: Level 1, Level 2, Level 3, No Documentation |
| Was the screening decision reviewed by a ASWS or RD? | Drop Down Box: Yes, No, Not Enough Information |
| Does reviewer agree with screening decision? | Drop Down Box: Yes, No, Not Enough Information |
| **Investigations of Child Maltreatment Sample** | |
| **Question** | **How to Fill Out/Drop Down** |
| Case Number | Enter case Number |
| Placement Type | Drop Down Box: Emergency Placement, Foster Home, Group Home, Inpatient Facility, Kin Foster Home, Residential Facility, Supervised independent living, Unlicensed kin placement |

## Mississippi Foster Care Services Assessments

| Date of Report | Enter date of report |
|---|---|
| Level of Report | Drop Down Box: Level 1, Level 2, Level 3, No Documentation |
| Does reviewer agree with screening disposition? | Drop Down Box: Yes, No, Not Enough Information |
| Reason disagree with screening disposition: | Open-ended to field to explain answer |
| Was the full investigation conducted? | Drop Down Box: Yes, No, Not Enough Information |
| If not, describe how the report was addressed? | Open-ended to field to explain answer |
| Date assigned for investigation | Enter date |
| Date investigation initiated | Enter date |
| Initiated within required timeframe? | Drop Down Box: Yes No NA |
| Date investigation concluded | Enter Date |
| Within policy requirements? | Drop Down Box: Yes No NA |
| Method of initial contact for investigation? | Drop Down Box:  Mail, Phone call, Unannounced home visit, NA, No documentation, Other |
| Was the safety assessment conducted during investigation? | Drop Down Box: Yes, No, Not Enough Information |
| Was a law enforcement referral made? | Drop Down Box: Yes, No, Not Enough Information |
| If yes, what was the reason for referral? | Drop Down Box: Abuse that would be a felony, Intentional burns, Intentional torture, Serious injury/attempted serious injury, Sexual abuse |
| Investigation outcome | Drop Down Box: Continue Case Management Services, No Services Required, Refer for Services, No Documentation |
| Disposition supported? | Drop Down Box:  All Supported, All Unsupported, None Unsupported, Some Supported, NA, No Documentation |
| Reviewer agree w disposition? | Drop Down Box: Yes, No, Not Enough Information |
| Reason disagree with disposition: | Open-ended to field to explain answer |
| Was there a home visit during investigation? | Drop Down Box: Yes No NA |
| Face to face contact with children in report | Drop Down Box: Yes No NA |
| Was the victim child interviewed individually, privately? | Drop Down Box: Yes, No, Not Enough Information |
| Were the biological parents notified of the report? | Drop Down Box: Yes, No, Not Enough Information |
| Were the biological parents notified of the invest finding? | Drop Down Box: Yes, No, Not Enough Information |
| Face to face contact other children in HH | Drop Down Box: Yes No NA |
| Reason for no contact with each child in the home | Open-ended to field to explain answer |
| Face to face contact with caregiver | Drop Down Box: Yes No NA |
| Was caretaker perpetrator? | Drop Down Box: Yes, No, Not Enough Information |
| Interview with perpetrator | Drop Down Box: Yes No NA |
| Interview with collaterals | Drop Down Box: Yes No NA |
| Evidence of adequate supervisory review | Drop Down Box: Yes No NA |
| Investigator evaluated safety/risk issues | Drop Down Box:  All children, None of the children, Some children, NA, No Documentation |
| Reason no safety/risk evaluated | Open-ended to field to explain answer |
| Was the child removed from the foster home during investigation? | Drop Down Box: Yes No NA |
| Investigator refer the perpetrator to DA or law attention | Drop Down Box: Yes No NA |
| Medical professionals involved | Drop Down Box: Yes No NA |

**Mississippi Foster Care Services Assessments**

| | |
|---|---|
| Medical professionals involved appropriately | Drop Down Box: Yes No NA |
| Legal professionals involved | Drop Down Box: Yes No NA |
| Legal professionals involved appropriately | Drop Down Box: Yes No NA |
| Law enforcement involved | Drop Down Box: Yes No NA |
| Law enforcement involved appropriately | Drop Down Box: Yes No NA |
| Other State Agencies involved | Drop Down Box: Yes No NA |
| Other State Agencies involved appropriately | Drop Down Box: Yes No NA |
| Distinguish, address immediate safety issues vs risk factors | Drop Down Box:  No (neither risk nor safety), Yes (risk and safety), Yes (risk only), Yes (safety only), NA not applicable, No Documentation |
| Child & res family needed immediate services to address S&R | Drop Down Box:  No (neither risk nor safety), Yes (risk and safety), Yes (risk only), Yes (safety only), NA not applicable, No Documentation |
| If yes, were safety services received by all who required? | Drop Down Box: Yes, No, Not Enough Information |
| Was the case plan changed as a result of the safety issues identified? | Drop Down Box: Yes, No, Not Enough Information |
| Was a safety plan/safety services required during investigation? | Drop Down Box: Yes, No, Not Enough Information |
| Did actions (safety plan/removal) mitigate? | Drop Down Box: Yes, No, Not Enough Information |
| Were safety and risk issues of all kids in res home? | Drop Down Box: Yes, No, Not Enough Information |
| Resource family referred to service where needs identified | Drop Down Box: Yes No NA |
| Unidentified needs safety or risk of harm | Drop Down Box: Yes No NA |
| Caregiver S&R services not received | Open-ended to field to explain answer |
| Reported children S&R services not received | Open-ended to field to explain answer |
| Other children in HH  S&R services not received | Open-ended to field to explain answer |
| Other persons S&R services not received | Open-ended to field to explain answer |

| **Foster Care Support Services Sample** | |
|---|---|
| **Question** | **How to Fill Out/Drop Down Box** |
| Case Number | Enter Case Number |
| How many placements during current episode? | Please enter the total  number of placements the child has experienced during the current episode (including any emergency or other placements) |
| How many of the changes in placement were due to unplanned disruptions? | Please enter the number, based on your opinion |
| Were all prior placements in episode in foster care setting | Drop Down Box: Yes No NA |
| If no, please explain | Open ended field where reviewer can explain their answer |
| How long has child been in current placement | Please answer question in weeks, months, years |
| What is the frequency of visitation in the home by the case worker? | Drop Down Box: At least bi-weekly, At least monthly, At least once a week, Less than Monthly, Less than quarterly, Monthly, More than monthly, Quarterly |
| How long has the foster caretaker been licensed to care for foster children? | Please answer question in weeks, months, years |
| Is this a kin foster placement? | Drop Down Box: Yes No NA |
| If no, has the child been placed prior in a kin home? | Drop Down Box: Yes No NA |
| If no, why? If yes, explain what happened? | Open ended field where reviewer can explain their answer |

Mississippi Foster Care Services Assessments

| | |
|---|---|
| Does the placement match the identified needs of the child? | Drop Down Box: Yes, No, Not Enough Information |
| Please Explain: | Open ended field where reviewer can explain their answer |
| Does the placement seem free of threats of disruption for foreseeable future? | Drop Down Box: Yes, No, Not Enough Information |
| Please Explain: | Open ended field where reviewer can explain their answer |
| How many children are in the home? | Please enter number of children, including subject child |
| Are any siblings of subject child in home? | Drop Down Box: Yes No NA |
| What are the identified needs of the child in foster care? | Open ended field where reviewer can explain their answer |
| Have any issues arisen with the child threatening the stability of the placement? | Drop Down Box: Yes, No, Not Enough Information |
| Please Explain: | Open ended field where reviewer can explain their answer |
| If yes, have the issues been addressed | Drop Down Box: Yes, No, Not Enough Information |
| Please Explain: | Open ended field where reviewer can explain their answer |
| Are any services being provided to the foster caretaker? | Drop Down Box: Yes, No, Not Enough Information |
| If yes, please describe the services: | Open ended field where reviewer can explain their answer |
| Are the services appropriate, based on needs in home: | Based on Reviewer opinion<br>Drop Down Box: Yes No NA |
| Were they implemented in a timely fashion? | Based on Reviewer opinion<br>Drop Down Box: Yes No NA |
| Please describe any impact you can see of the services, including quality of services: | Open ended field where reviewer can explain their answer |
| Are there any unmet service needs to support placement? | Drop Down Box: Yes, No, Not Enough Information |
| If yes, please describe: | Open ended field where reviewer can explain their answer |
| Why have these services not been implemented? | Open ended field where reviewer can explain their answer |
| Did the foster caretaker refuse any service offerings? | Drop Down Box: Yes No NA |

| Reunification Services Sample | |
|---|---|
| **Question** | **How to Fill Out/Drop Down Box Options** |
| Case Number | Enter case number |
| Date goal changed to reunification | Enter date of goal change |
| Date of another goal change, reunification, or date of review | Enter date if goal changed to something else after reunification; date of reunification if achieved; or current date (if child is still in care and goal is still reunification). This will be used to help calculate how long they received any potential reunification services |
| Was reunification achieved? | Drop Down Box: Yes No NA |
| What was the initial reason for removal? | Describe the reason the child was removed from their home |
| Were services identified in case plan to address reasons? | Drop Down Box: Yes, No, Not Enough Information |
| Were identified services tied to needs? | Drop Down Box: Yes, No, Not Enough Information |
| If no, why not? | Open Ended field for reviewer to explain their answer |
| What services were recommended for caregivers? | Open Ended field for reviewer to explain/describe their answer |
| Did they receive services? | Drop Down Box: Yes, No, Not Enough Information |

### Mississippi Foster Care Services Assessments

| | |
|---|---|
| If yes, what was the length of services? | Please enter length of time in weeks or months |
| How long did it take to implement services? | Please enter length of time in weeks or months |
| If no, or they were not completed, please explain: | Open Ended field for reviewer to explain/describe their answer |
| What services were recommended for removal child(ren) | Open Ended field for reviewer to explain/describe their answer |
| Did they receive services? | Drop Down Box: Yes, No, Not Enough Information |
| If yes, what was the length of services? | Please enter length of time in weeks or months |
| How long did it take to implement services? | Please enter length of time in weeks or months |
| If no, or they were not completed, please explain: | Open Ended field for reviewer to explain/describe their answer |
| What services were recommended for non-removed siblings? | Open Ended field for reviewer to explain/describe their answer |
| Did they receive services? | Drop Down Box: Yes, No, Not Enough Information |
| If yes, what was the length of services? | Please enter length of time in weeks or months |
| How long did it take to implement services? | Please enter length of time in weeks or months |
| If no, or they were not completed, please explain: | Open Ended field for reviewer to explain/describe their answer |
| What services were recommended for other adult household members? | Open Ended field for reviewer to explain/describe their answer |
| Did they receive services? | Drop Down Box: Yes, No, Not Enough Information |
| If yes, what was the length of services? | Please enter length of time in weeks or months |
| How long did it take to implement services? | Please enter length of time in weeks or months |
| If no, or they were not completed, please explain: | Open Ended field for reviewer to explain/describe their answer |
| Were the services located in their community? | Drop Down Box: Yes, No, Not Enough Information |
| If no, please explain: | Open Ended field for reviewer to explain/describe their answer |
| In your opinion, were the services effective? | Drop Down Box: Yes, No, Not Enough Information |
| If no, please explain: | Open Ended field for reviewer to explain/describe their answer |
| How frequent were caregiver/child visitation? | Drop Down Box: At least bi-weekly, At least monthly, At least once a week, Less than Monthly, Less than quarterly, Monthly, More than monthly, Quarterly |
| How frequent was face to face contact between SW and caregiver? | Drop Down Box: At least bi-weekly, At least monthly, At least once a week, Less than Monthly, Less than quarterly, Monthly, More than monthly, Quarterly |
| How frequent was face to face contact between SW and child? | Drop Down Box: At least bi-weekly, At least monthly, At least once a week, Less than Monthly, Less than quarterly, Monthly, More than monthly, Quarterly |
| How frequent was contact between SW and service provider? | Drop Down Box: At least bi-weekly, At least monthly, At least once a week, Less than Monthly, Less than quarterly, Monthly, More than monthly, Quarterly |
| If any visitation was not regular, please explain: | Open Ended field for reviewer to explain/describe their answer |
| Was a comprehensive strengths and needs assess on all relevant | Drop Down Box: Yes, No, Not Enough Information |
| If yes, please describe the assessment used? | Open Ended field for reviewer to explain/describe their answer |
| Did the assessment identified needs that must be addressed through services prior to reunification? | Drop Down Box: Yes, No, Not Enough Information |
| If not, who did not receive an assessment? | Open Ended field for reviewer to explain/describe their |

**Mississippi Foster Care Services Assessments**

|  | answer |
|---|---|
| Were there apparent needs for services but no services were provided? | Drop Down Box: Yes, No, Not Enough Information |
| Why or why not? | Open Ended field for reviewer to explain/describe their answer |
| What services were provided by MDHS worker? | Open Ended field for reviewer to explain/describe their answer |
| What services were provided by contracted provider (specify who) | Open Ended field for reviewer to explain/describe their answer |

| Medical, Dental, and Mental Health Services Sample | |
|---|---|
| **Question** | **How to Fill Out/Drop Down Options** |
| Case Number | Enter case number |
| Was there an initial health screening exam completed? | Drop Down Box: Yes, No, Not Enough Information |
| How long after case opening was it completed? | Please enter time in days, weeks, months |
| Who was the provider of the screening | Please name the provider who conducted the screening, and type of professional |
| Was there an initial dental screening exam completed? | Drop Down Box: Yes, No, Not Enough Information |
| How long after case opening was it completed? | Please enter time in days, weeks, months |
| Who was the provider of the screening | Please name the provider who conducted the screening, and type of professional |
| Was there an initial mental health screening evaluation completed? | Drop Down Box: Yes, No, Not Enough Information |
| How long after case opening was it completed? | Please enter time in days, weeks, months |
| Who was the provider of the screening | Please name the provider who conducted the screening, and type of professional |
| Please detail any reasoning noted for delays in screenings: | Open ended field for reviewer to explain their answer |
| Were follow up appointments made/kept for specialized treatment? | Drop Down Box: Yes No NA |
| Was specialized treatment available? | Drop Down Box: Yes, No, Not Enough Information |
| Were services provided? | Drop Down Box: Yes, No, Not Enough Information |
| Please describe any barriers to accessing special treatment, inc payment | Open ended field for reviewer to explain their answer |
| Was there ongoing health screenings? | Drop Down Box: Yes, No, Not Enough Information |
| Who was the provider of the screening/exam? | Please name the provider who conducted the screening, and type of professional |
| Did the ongoing health updates appear to be timely? | Drop Down Box: Yes No NA |
| Was there ongoing dental screenings? | Drop Down Box: Yes, No, Not Enough Information |
| Who was the provider of the screening/exam? | Please name the provider who conducted the screening, and type of professional |
| Did the ongoing dental updates appear to be timely? | Drop Down Box: Yes No NA |
| Was there ongoing mental health screenings? | Drop Down Box: Yes, No, Not Enough Information |
| Who was the provider of the screening/exam? | Please name the provider who conducted the screening, and type of professional |
| Did the ongoing mental health updates appear to be timely? | Drop Down Box: Yes No NA |
| How accessible were the health, dental, MH | Open ended field for reviewer to explain their answer |

## Mississippi Foster Care Services Assessments

| | |
|---|---|
| providers? Please Explain | |
| During course of case, were any treatment needs identified: | Drop Down Box: Yes No NA |
| If yes, please describe: | Please briefly describe the needs |
| Were services provided to address identified needs? | Drop Down Box: Yes, No, Not Enough Information |
| Were needs addressed in timely manner? | Drop Down Box: Yes, No, Not Enough Information |
| Were services provided appropriate | Drop Down Box: Yes, No, Not Enough Information |
| Was service provider accessible to child? | Drop Down Box: Yes, No, Not Enough Information |
| Were any services needed but not provided to subject child? | Drop Down Box: Yes No NA |
| Please describe: | Open ended field for reviewer to explain their answer |
| Were any services needed but not provided to other family/siblings? | Drop Down Box: Yes No NA |
| Please describe: | Open ended field for reviewer to explain their answer |
| Did the worker accurately match needs to services for all family | Drop Down Box: Yes No NA |
| Please Explain: | Open ended field for reviewer to explain their answer |
| Identify the provider of the services, e.g., private physician, | Please name the provider who conducted the screening, and type of professional |
| Was the lack of accessibility to providers a factor in the child | Open ended field for reviewer to explain their answer |

| | |
|---|---|
| **Independent Living Services Sample** | |
| **Question** | **How to Fill Out/Drop Down Boxes** |
| Case Number | Enter case number |
| Age of child | Enter age of child in years and months (ie 14.6) |
| Current Placement Type | Drop Down Box: Emergency Placement, Foster Home, Group Home, Inpatient Facility, Kin Foster Home, Residential Facility, Supervised independent living, Unlicensed kin placement |
| Date entered FC in current episode | Enter date enter care |
| Date left care or today's date | Enter date child left care (if child has left care) or date reviewer is reviewing case. This will be used to help calculate time in care |
| Permanency Goal | Drop Down Box: Adoption, Independent Living, Long-term Foster Care, No Documentation, Reunification |
| What was the reason the child was placed? | Please describe the reason why the child was placed |
| What were the identified needs of the child re: IL or Transitional Living? | Open Ended field for reviewers to explain their answer |
| Did the child complete the services? | Drop Down Box: Yes, No, Not Enough Information |
| Were the services connected to the identified needs? | Drop Down Box: Yes, No, Not Enough Information |
| Please Explain: | Open Ended field for reviewers to explain their answer |
| Please describe the IL specific services provided:1-4 | Reviewers will have the opportunity to describe up to 4 different IL services provided to the child, and answer the following 5 questions for each service. Drop Down Box: Educational Training Vouchers, Life Skills Classes, Other, Retreats |
| If other service, please specify:1-4 | If service described is not one of the drop down options, please describe it |

**Mississippi Foster Care Services Assessments**

| | |
|---|---|
| At what age did they begin?1-4 | Enter age of child in years and months (ie 14.6) |
| Based on review of plan, were these services consistent and appropriate based on the identified needs?1-4 | Drop Down Box: Yes, No, Not Enough Information |
| Were services initiated in a timely manner? 1-4 | Drop Down Box: Yes, No, Not Enough Information |
| Please explain your answers: 1-4 | Open Ended field for reviewers to explain their answer |
| How accessible were the services to the child? Please explain | Open Ended field for reviewers to explain their answer |
| Did the child regularly participate? | Drop Down Box: Yes, No, Not Enough Information |
| Please explain you answer | Open Ended field for reviewers to explain their answer |
| Was the Ansell Casey assessment completed? | Drop Down Box: Yes, No, Not Enough Information |
| Were the results of this assessment used to develop the IL plan? | Drop Down Box: Yes, No, Not Enough Information |
| Was the child involved in the development of either case plan? | Drop Down Box: Both Case Plans, MDHS Case Plan, Neither Case Plan, Not Enough Information, Svc Provider Case Plan |
| Were there any apparent IL or Transitional Living services not identified in the assessment or plan? | Drop Down Box: Yes, No, Not Enough Information |
| Please explain your answer: | Open Ended field for reviewers to explain their answer |
| Were there any identified IL or Transitional living needs for which services were not provided? | Drop Down Box: Yes, No, Not Enough Information |
| Please explain your answer: | Open Ended field for reviewers to explain their answer |