# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### JACKSON DIVISION

OLIVIA Y., *et al.*                                                     PLAINTIFFS


v.                                            CIVIL ACTION NO.  3:04CV251LN


PHIL BRYANT, as Governor of the State of Mississippi, *et al.*        DEFENDANTS

---

### THE COURT MONITOR'S REPORT TO THE COURT REGARDING FINDINGS FROM THE SECOND CASE RECORD REVIEW AND OTHER MATTERS RELEVANT TO DEFENDANTS' PROGRESS TOWARD SATISFYING THE REQUIREMENTS OF THE SETTLEMENT AGREEMENT

---

**Table of Contents, Report Narrative,
Index to Exhibits, and Appendix: Exhibits 1 - 30**


**June 29, 2012**

## TABLE OF CONTENTS

I.    INTRODUCTION AND SUMMARY OF FINDINGS ......................................2

II.   THE SECOND CASE RECORD REVIEW ..........................................................5

      A.  Background.......................................................................................................7

      B.  Summary of Findings for Sample One .........................................................11

           1.  Assessments and Service Planning...........................................................14
           2.  Achieving Permanency............................................................................17
           3.  Safety......................................................................................................25
           4.  Caseworker Visits with Children .............................................................30
           5.  Services for Children to Ensure their Well-Being....................................31
           6.  Placement Experiences............................................................................35

III.  PROGRESS AND CRITICAL BARRIERS......................................................38

      A.  Staffing .........................................................................................................39

      B.  Data and Management Information Systems.................................................42

IV.   CONCLUSION...............................................................................................45

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

OLIVIA Y., *et al*.                                                                PLAINTIFFS


v.                                                        CIVIL ACTION NO.  3:04CV251LN


PHIL BRYANT, as Governor of the State of Mississippi, *et al.*            DEFENDANTS

---

**THE COURT MONITOR'S REPORT TO THE COURT REGARDING
FINDINGS FROM THE SECOND CASE RECORD REVIEW AND OTHER
MATTERS RELEVANT TO DEFENDANTS' PROGRESS TOWARD
SATISFYING THE REQUIREMENTS OF THE SETTLEMENT AGREEMENT**

---

This report presents the findings from the Court Monitor's ("Monitor") second case record review, which establishes baseline measures for many of the standards required by the January 4, 2008 Mississippi Settlement Agreement and Reform Plan ("Settlement Agreement"). It also describes defendants' progress toward satisfying requirements related to child maltreatment investigations.  Staffing deficits and deficiencies in data and management information systems, factors that are critical to defendants' future progress, are addressed in the report.

A draft copy of this report was provided to the parties for review and comment on June 15, 2012.  All written comments were submitted to the Monitor by June 22, 2012.  The Monitor has considered the parties' comments and, to the extent appropriate, addressed them in this revised report.

The report is divided into four sections.  The Introduction and Summary of Findings section presents an overview of the findings addressed in the report and relevant contextual information.  The second section of the report addresses the specific findings from the second case record review.  It is followed by a section that describes recent progress as well as certain systemic challenges that the defendants must resolve.  The Conclusion is followed by an appendix with the report's exhibits, which have been redacted in the final version of the report to delete confidential information.

## I.    INTRODUCTION AND SUMMARY OF FINDINGS

As summarized below and detailed in the appendix to this report, the second case record review, which was conducted during 2011, identified fundamental aspects of case practice that are deficient, including the assessment, service planning and permanency planning processes. The findings underscore the fact that the defendants will need to make substantial improvements in many key areas implicated by the Settlement Agreement in order to ensure the safety and well being of class members and to facilitate their timely placement with legally permanent and nurturing families.

The findings from the case record review indicate that defendants must make demonstrable improvements in operations and practices to ensure the well-being of class members by providing timely and appropriate physical, dental, developmental, mental health and educational assessments and services and ensuring placement stability.  Moreover, both the case record review and more current performance data reported by defendants establish the need for defendants to strengthen substantially their efforts to implement safeguards to promote child safety, including the investigative process related to reports of child maltreatment and the frequency of caseworker visits with children in custody and with their caregivers.  The array of

2

services for children and families must be expanded, including reunification services, which promote permanency by addressing the underlying issues that give rise to custody determinations.

The findings also indicate that the defendants have been successful in meeting certain Settlement Agreement requirements related to the administrative review process and the placement of children in proximity to their homes and with their siblings.  These are important strengths that have real meaning for children who have been removed from their family homes by the defendants.

Defendants have been working to address many of the limitations identified in the case record review.  As the Monitor has reported previously, the centerpiece of defendants' strategy for improving the quality and consistency of case practice is the implementation of a new practice model, which defendants introduced in two of the Mississippi Department of Human Services' ("MDHS") Division of Family and Children's Services ("DFCS") 13 regions[1] during January 2010.[2]  The practice model has been phased-in on a regional basis through a three-stage process: a six-month planning stage, followed by a one-year initial implementation stage and an additional year that is referred to as the "full" implementation stage.  During at least part of the period covered by the most recent case record review, the practice model was in early stages of

---

[1] DFCS utilizes an administrative structure that divides Mississippi into 13 geographic regions.  Each geographic region is comprised of a cluster of contiguous counties.  DFCS managers, referred to as Regional Directors, are assigned to manage and supervise all agency casework-related activities in each region.

[2] During January 2010, the defendants introduced the practice model in two of DFCS's 13 regions, II-W and I-S. For additional background information, *see The Court Monitor's Report to the Court Regarding Defendants' Progress Toward Meeting Period 2 Requirements*, filed September 8, 2010 [hereinafter *September 2010 Report*], at 8-9; *The Court Monitor's November 23, 2010 Report to the Court Regarding the June 10, 2010 Agreed Order for Corrective Action*, filed November 23, 2010 [hereinafter *November 2010 Report*], at note 38.

the planning or implementation process in four of the 13 DFCS regions.[3]  Currently, defendants

have launched the practice model on an incremental basis in many, but not all, DFCS regions.[4]

In a report filed during September 2010, the Monitor commented that the practice model

implementation plan[5] represented "the first credible plan of action for improving the quality and

consistency of case practice."[6]  However, the Monitor cautioned that the plan would not be viable

in the absence of basic administrative and management tools and other resources that were

required by the Settlement Agreement but not yet in place.[7]

The evidence indicates that since the issuance of the Monitor's September 2010 Report,

defendants have made demonstrable progress implementing the practice model and several other

reform initiatives.  Moreover, defendants are building a talented and committed workforce with

managers, supervisors and caseworkers who care deeply about the children and families they

serve.  However, their efforts have been impeded by well-documented and long-standing

systemic barriers, including chronic understaffing in certain counties with high numbers of

children in custody and a wholly inadequate management information system.[8]  It remains true

that unless these shortcomings are addressed in an effective and enduring way, defendants will be

unable to satisfy the Settlement Agreement's requirements.  Indeed, unless the defendants

---

[3]  As noted *supra* note 2*,* the practice model was introduced in II-W and 1-S in January 2010 and thus it was underway throughout the period under review in those regions.  It was introduced in IV-N and V-W at the start of 2011 and thus it was in the early planning phase in those regions during the last several months of the review period.
[4]  The Monitor expects to report more fully on practice model implementation during Period 3.
[5]  The initial implementation timeline was inconsistent with the Settlement Agreement. *See September 2010 Report* at 8-9 for more specific information about the initial timeline.
[6]  *Id.* at 9.
[7]  *Id.*
[8]  These issues have been addressed in most of the Monitor's Reports,  *See, e.g., The Court Monitor's Report to the Court Regarding Defendants' Progress Toward Meeting Period-1Requirements*, filed June 5, 2009 [hereinafter *June 2009 Report*], at 7 (stating, *inter alia*, that defendants must fund and hire a sufficient number of qualified employees, including caseworkers and supervisors, and reporting that defendants must bolster administrative operations, including the capacity to track and report accurately and in real-time on hiring and personnel actions; reporting on the need to resolve shortcomings in the Mississippi Automated Child Welfare Information System [hereinafter MACWIS] so that it produces accurate, complete, and reliable data related to the requirements in this lawsuit that can be validated and analyzed).

institute prompt and substantial interventions to address serious deficits in staffing and data collection and management, it is likely defendants will continue to experience major shortcomings in performance during Period 3.

## II.    THE SECOND CASE RECORD REVIEW

The Monitor has conducted two case record reviews that have evaluated the defendants' performance relative to the requirements of the Settlement Agreement.  The first case record review was undertaken during Period 2.  It was limited to the Settlement Agreement's requirements concerning investigations related to reports of maltreatment in care between June 1, 2008 and June 30, 2009.[9]  The findings from the first case record review are described in substantial detail in the Monitor's September 8, 2010 Report.[10]  They serve as a baseline from which to measure progress regarding the timeliness of investigations related to reports of maltreatment in care.  Thus, the findings from the first case record review are referred to in this report for comparative purposes to evaluate progress with respect to those specific requirements.

In contrast to the first case record review, the second case record review was substantially more comprehensive in scope, addressing case records of a sample of children in custody for at least 60 days between January 1, 2009 and March 31, 2011.  In addition to the safety of children while in the custody of DFCS, it addressed Settlement Agreement standards concerning screening and assessment; service planning and monitoring; permanency planning; reunification; termination of parental rights; adoption; placements; developing and maintaining connections

---

[9]  The Settlement Agreement includes standards and outcomes that defendants are required to satisfy within a prescribed time period through an incremental remedial process that tracks progress according to prescribed benchmarks and milestones that are established by annual implementation plans.  Thus far, there have been two annual implementation plans approved by the Court: the Period 1 and Period 2 Implementation Plans.  The parties expect to file the Period 3 Implementation Plan in early July 2012.  Period 1 extended from January 4, 2008 to April 30, 2009.  Period 2 began on May 1, 2009 and ended on April 30, 2010.  Period 2 was followed by a corrective action period that is referred to as the "Bridge Period," which began on May 1, 2010 and ended on September 1, 2010.  For further background related to the Bridge Period, *see* Agreed Order, filed June 10, 2010; *see also November 2010 Report.*

[10]  *See September 2010 Report* at 13-16, 107-110 and Ex. 60.

with parents and siblings; physical, dental, developmental, and behavioral health care;

educational services; independent living services; caseworker contacts; and case closing and

aftercare.  Relevant background information concerning the second case record review is

explained below followed by a summary which addresses a number of key findings.

In recognition of the need for more accurate data to assess system performance and

measure progress, starting in June 2010, defendants began to develop and produce a series of

data reports at monthly intervals, pursuant to a corrective action process that was agreed upon by

the parties and ultimately mandated by the Court.[11]  As the Monitor has reported previously,

these data reports have been subject to a limited validation process.[12]  Many of the reports

defendants have generated are essential for planning and implementation activities related to the

practice model.  Most are relevant to, and in some instances closely align with, Settlement

Agreement requirements.  However, many of the precise performance measurements mandated

by the Settlement Agreement are not captured by the reports.[13]  This report includes updated

performance data reflected in defendant's monthly data reports with respect to a limited number

of Settlement Agreement requirements addressed by the case record review.  There are reasons

why the updated data may not be comparable to the data from the case record review; however,

the report reflects defendants' self assessment with respect to performance regarding Settlement

Agreement requirements.  Even if the defendants' reports cover different time spans or use

different methodologies than those employed herein, the data may provide some insight into

---

[11]  June 10, 2010 Agreed Order for Corrective Action ¶7.a.
[12]  The validation process has been based on a methodology designed chiefly to test the internal integrity of the data reports by ensuring the reports extract data from relevant MACWIS case records and from the correct data fields. *See November 2010 Report* at 19-23 for a description of the validation process and its limitations.  The reports have not been independently verified by the Monitor.
[13]  The Court Monitor has reported previously on this issue.  *Id.* at 19.

current performance levels and are included for reference.  Detailed findings from the second case record review are included in the appendix to this report.[14]

### A.  Background

During the first half of 2011, the Monitor worked collaboratively with the parties and several experts on designing a data collection instrument to guide the second case record review.[15]  The instrument was pilot-tested in early June 2011 by staff from DFCS and by defendants' consultants from the Center for the Support of Families ("CSF"),[16] as well as by the Monitor's staff and by Dr. Jacqueline Smollar, the Monitor's primary consultant on this project.[17]

A group of 21 reviewers and six quality assurance ("QA") team members was assembled to conduct the review.[18]  On June 22, 2011, the team participated in a one-day training session.[19]  The training curriculum was designed by Dr. Smollar in consultation with DFCS and CSF staff.  The training focused on the data collection instrument and relevant navigation in the electronic case record stored in the Mississippi Automated Child Welfare Information System ("MACWIS") and in the paper case record.[20]  The draft instrument was revised based on comments from the parties' designated representatives, feedback received during the training

---

[14]  *See* Exs. 5A and 5B, *infra* note 34; Ex. 6, *infra* note 36; Ex. 7, *infra* note 37.

[15]  The Monitor engaged Dr. Jacqueline Smollar, a highly-regarded expert in program evaluation in the child welfare context, to assist with both instrument design and data analysis.  Dr. Smollar's credentials and experience are included in the appendix to this report.  *See* Ex. 1, Curriculum Vitae, Jacqueline Smollar, Ph.D.  The Monitor also engaged Dr. Moira Ann Szilagyi as a consultant.  Dr. Szilagyi, a pediatrician who is a leading expert on health care for foster children, provided consultative services regarding the medical, dental, developmental and behavioral health care sections of the data collection instrument.  *See* Ex. 2, Curriculum Vitae, Moira Ann Szilagyi, MD, Ph.D.

[16]  CSF has provided consulting services, including technical assistance to the defendants throughout the remedial stage of this lawsuit.  *See, e.g., September 2010 Report* at 8-9 for background information related to the consulting services provided to defendants by CSF.

[17]  *See* Ex. 1, *supra* note 15, for a summary of Dr. Smollar's credentials and experience.  The pilot testing was conducted on June 1-3, 2011.

[18]  The 21 reviewers were DFCS employees selected by MDHS/DFCS management in consultation with the Court Monitor.  The QA team members were drawn from the Office of the Court Monitor, CSF, and DFCS.

[19]  The training was coordinated by the Office of the Court Monitor and conducted by the Court Monitor's consultant, Dr. Smollar, a DFCS manager and a CSF consultant.

[20]  DFCS maintains an electronic case record in MACWIS and a paper case record with key documents that are not stored in MACWIS, including birth certificates, health and educational records, and court orders.

session, and the results of the pilot-testing. By early July 2011, the 94-page data collection instrument was endorsed by the parties and finalized.[21]

The case record review was based on two random samples of case records, which are referred to as sample one and sample two.[22] Sample one was derived from a list of all children who entered DFCS custody on or after January 1, 2009 (*i.e.*, approximately one year after the Settlement Agreement was approved by the Court), and who were in foster care for at least 60 days by March 31, 2011. The Monitor, in consultation with the parties, determined that the data related to this cohort of children would be used for the purpose of establishing baseline performance measurements and for tracking progress with respect to Settlement Agreement standards.

The defendants identified 4,381 children who fell within the parameters of sample one.[23] In order to achieve a 95 percent confidence interval with a margin of error of +/- six percent, 252 randomly selected case records were reviewed. However, in order to account for misidentified records, which was a significant problem during the first case record review, a random sample consisting of 375 case records was drawn.[24] Ultimately, because of improvements in defendants' ability to identify correctly cases conforming to sample parameters, 260 cases were reviewed. In

---

[21] *See* Ex. 3, July 7, 2011 e-mail from Grace M. Lopes to Kenya Key Rachal and Shirim Nothenberg with attached Case Record Review Instrument, Office of the *Olivia Y.* Court Monitor in Collaboration with MDHS/DFCS, Children in Foster Care Case Record Review, July 11-22, 2011.

[22] The Monitor engaged Dr. Troy Blanchard, an associate professor at Louisiana State University, to provide consultative services with respect to statistics/sampling for the case record review. Dr. Blanchard's experience and credentials are set forth in Ex. 4, Curriculum Vitae of Dr. Troy Blanchard. *See September 2010 Report* at note 39 and related text for a description of the services Dr. Blanchard provided during the first case record review. The Monitor also engaged Judith Meltzer, the co-director of the Center for the Study of Social Policy in Washington, D.C., to provide consultative services related to this project. Ms. Meltzer is an expert in child welfare systems and has substantial experience conducting case record reviews in similar contexts. Like Dr. Blanchard, Ms. Meltzer provided consultative services to the Monitor during the first case record review. *Id.*

[23] The Monitor provided defendants with the sample parameters following consultation with the parties regarding the appropriate parameters for the sample.

[24] *See September 2010 Report* at Ex. 60 (indicating that 55 of 240 case records reviewed were excluded from the analysis of the data obtained during the first case record review because the records were misidentified and did not meet the criteria for review). *Id.* at 1.

contrast to the first case record review, only eight cases were excluded because they did not meet the sample parameters.[25]

Sample two was derived from a list of all children who entered DFCS custody on or before March 31, 2007 and who were in custody on March 31, 2011. The Monitor, in consultation with the parties, determined that the data related to sample two would not be used for purposes of the Monitor's formal assessment. Instead, the sample two data were intended to provide insights about the circumstances of children who had been in DFCS custody for long time periods.

The defendants identified 351 children who fell within the parameters established for sample two.[26] In order to achieve a 90 percent confidence interval with a margin of error of +/- eight percent, a random sample of 82 cases was targeted for review. However, to account for misidentified cases, a random sample of 122 cases was drawn. Due to several factors, including the time required to review each case record in sample two;[27] the amount of time consumed by the review that was conducted for sample one,[28] and limitations in MACWIS connectivity,[29] by the end of the two-week review period, the reviewers were able to complete the full review for only 40 sample two cases. Thus, the sample two cases cannot be considered to constitute a representative sample of children in DFCS custody for four years or longer. However, the results

---

[25] The eight excluded cases were not subject to the full review.
[26] The Monitor provided defendants with the parameters for sample two following consultation with the parties regarding the appropriate parameters for the sample.
[27] At least in part because the children in sample two had been in DFCS custody for substantial time periods, many had voluminous case records. For example, of the 40 paper case records that were part of the sample two review, over 75 percent were multiple-volume case records, ranging from two volumes to ten volumes.
[28] Each review was guided by the 94-page data collection instrument and some cases took a full day to review.
[29] During the review, nearly all of the reviewers were unable to access the electronic case record maintained in MACWIS for most of a full review day. In addition, episodic interruptions in connectivity occurred during the two-week review period. Dedicated staff from the MDHS Management Information System [hereinafter MIS] unit provided on-site support to the review team and they were able to quickly remedy many of the MACWIS problems that occurred. For additional information related to limitations in MACWIS, *see infra* pp. 42-45.

provide some insight concerning the experiences of children who have been in foster care for long periods of time.

The review of case records for both samples was coordinated and supervised by the Monitor's Office and conducted between July 11 and 22, 2011 at the MDHS State Office. Each targeted case record was the subject of a structured review, guided by the 94-page data collection instrument. The case record included each child's paper case file as well as the electronic case record entered in MACWIS. Immediately prior to the review, all paper records were collected from the county offices and stored at the review site. Paper records were inventoried and tracked by a designated member of the Monitor's staff. All completed instruments were reviewed by the QA team, which relied on a specially developed protocol to ensure accuracy, consistency, and an appropriate level of inter-rater reliability.[30]

Following the on-site review, the instruments were coded by the Monitor's staff. Data entry was subject to a QA process to promote accuracy.[31] Dr. Smollar analyzed the data using the standard Statistical Package for the Social Sciences ("SPSS") program. All discrepancies revealed by the analysis triggered a supplemental review of case records and/or the completed instruments by staff in the Monitor's office.

In order to facilitate the parties' then-ongoing negotiation of modifications to the Settlement Agreement and their collaborative development of the third-year implementation plan, the Monitor provided defendants and plaintiffs with preliminary findings related to the sample one analysis during the first half of September 2011.[32] Following additional supplemental review of the case records and further analysis, the Monitor transmitted a report on

---

[30] The data collected for each case reviewed were entered by the reviewer on a paper copy of the 94-page case record review instrument.

[31] These QA activities were conducted by the Monitor's staff.

[32] Various preliminary findings were provided to both parties on a serial basis on the following dates: September 6, 8, 10, 12, 13, 14 and 16, 2011.

sample one to the parties on January 30, 2012.[33]  The parties submitted all comments on the

report by February 9, 2012.  Thereafter, on February 22, 2012, the Monitor provided the parties

with a final version of the report on sample one.[34]

In response to a request from defendants, the sample one data were analyzed on a regional

basis by Dr. Smollar.[35]  Because of the small number of sampled cases from each region, the

margin of error associated with findings about specific regions is substantially larger than the

margin of error for the overall sample.  Thus, in many cases, especially for the smaller regions, it

is not possible to conclude whether apparent differences in performance levels among the regions

are accurate reflections of differences in performance or whether they are statistical artifacts.  On

March 30, 2012, the Monitor provided the parties with a report presenting the regional analysis

of the sample one data.[36]  A draft of the report on the sample two data was transmitted by the

Monitor to the parties on April 25, 2012.  The parties submitted all comments on the draft report

by May 3, 2012.  On May 8, 2012, the Monitor provided the parties with a final version of the

report on sample two.[37]

**B.  Summary of Findings for Sample One**

Key findings from the second case record review for sample one are summarized below

in terms of Settlement Agreement standards concerning assessments and service planning;

permanency; child safety; services; and placements.  In certain instances the narrative herein

reports on a significant variation in performance among DFCS regions.  As explained above, the

variations suggest some of the larger regions may be performing better than others, but because

---

[33]  Thereafter, the analysis was supplemented further on February 8, 2012.  The supplement was limited to findings related to one standard.
[34]  *See* Ex. 5A, Executive Summary, Data Analysis Report, Mississippi Case Record Review, Sample 1; Ex. 5B, Data Analysis Report, Mississippi Case Record Review, Sample 1.
[35]  *See supra* note 1 for background information regarding the DFCS regions.
[36]  Ex. 6, Sample 1, Regional Data Analyses Report.
[37]  Ex. 7, Data Analysis Report, Mississippi Case Record Review, Sample 2.

of the small size of each regional sample, it is not possible to make definitive findings regarding a specific region's performance. The complete set of detailed findings, which is included in the appendix to this report, should be reviewed in conjunction with this summary.[38]

The characteristics of the children in sample one (*i.e.*, drawn from all children who entered DFCS custody on or after January 1, 2009, and who were in foster care for at least 60 days by March 31, 2011) are described below in terms of gender, age, race, ethnicity, and custody status. As noted in the methodology section of the report,[39] because of the large size of the random sample, these findings may be extrapolated from the sample to the population of children in custody for at least 60 days.

As reflected in the following chart, approximately half of the children in custody for at least 60 days were female.[40]



**Gender of Children In Custody
January 1, 2009 - March 31, 2011**

Male 44%
Female 56%

Additionally, approximately 16 percent of the children in custody for at least 60 days were younger than one year old and approximately 13 percent were at least 15 years old as reflected by the age distribution, charted below:

---

[38] *See* Ex. 5B, *supra* note 34, for the statewide data and Ex. 6, *supra* note 36, for the regional analysis of the data.
[39] *See supra* pp. 7-11.
[40] *See* Ex. 5B, *supra* note 34, at 1-5 for more detailed information about the characteristics of the children in sample one.



The racial composition and the Hispanic ethnicity of the children in the sample are reflected in the charts that appear below:





Twelve percent of the children in the sample experienced at least one episode of DFCS custody prior to the episode that was the subject of the case record review. Moreover, 45 percent

of the children in the sample were discharged from custody prior to the end of the period under review, and 80 percent of these children were discharged in less than 12 months of removal from their homes. Fifty-five percent of the children in the sample remained in custody at the end of the period under review, and 46 percent of these children had been in custody for 12 months or longer at that time.[41]

### 1. Assessments and Service Planning

The findings from the case record review reveal substantial limitations in assessment practices and service planning during the period under review. Currently, a comprehensive effort to improve the quality of assessment and service planning practices is underway in many of DFCS's regions as part of defendants' implementation of the new practice model;[42] however, the defendants' capacity to promote improvements has been hampered by limitations in MACWIS[43] as well as by persistent, and in some instances severe, staffing deficits in a number of the major DFCS's county/regional offices.[44]

---

[41] *Id.* at 1.

[42] As indicated *supra* note 3 and related text, at the time of the case record review the practice model had been introduced in four of DFCS's 13 regions.

[43] *See infra* pp. 42-45 for more detailed information.

[44] For example, in the December 2011 monthly report concerning practice model implementation in Region I-N, CSF reported that DeSoto County, a county with a large number of children in custody and significant understaffing relative to other counties in the region, was "not nearly as far along with the completion of CFAs [the new assessment tool] as other counties within the region." Initial Status Report- Practice Model Implementation, Mississippi Child Welfare Practice Model Implementation Project Summary, Center for the Support of Families, December 2011 at 4. CSF reported more recently that there has been a continued failure to make progress in DeSoto County, which is attributed, according to CSF's on-site consultant, to the following, among other factors: "high staff turnover," "high caseloads," and "serious backlogs of work." Initial Status Report- Practice Model Implementation, Mississippi Child Welfare Practice Model Implementation Project Summary, Center for the Support of Families, April 2012 at 7. Similarly, according to CSF, persistent staffing deficits have delayed implementation of the practice model in some regions. Initial Status Report- Practice Model Implementation, Mississippi Child Welfare Practice Model Implementation Project Summary, Center for the Support of Families, December 2011 at 9 (explaining that staffing levels were insufficient to implement the practice model in Region III-N, particularly in Rankin County); *see also* Initial Status Report- Practice Model Implementation, Mississippi Child Welfare Practice Model Implementation Project Summary, Center for the Support of Families, January 2012 at 5 and February 2012 at 8 (describing the impact staffing deficits have had on implementation of the practice model in Region III-S). *See also infra* pp. 39-41.

After a child is taken into DFCS custody, the Settlement Agreement requires the defendants to conduct "a thorough screening of the child and an individualized, strengths-based, family-focused, and culturally responsive assessment of the family, with the family's participation."[45]  The case record review found that 64 percent, or approximately two of every three, of the case files documented assessments that were conducted in accordance with the timeframes established by the Settlement Agreement.[46]  However, the assessments that were conducted frequently did not include all of the key areas specified in the Settlement Agreement.[47]  In many instances, the initial assessments were not developed as a result of required meetings conducted by the assigned caseworker on a timely basis with children, their parents, and foster care providers.[48]  The regional-level analysis suggested variation across the six largest DFCS regions with regard to the content of the initial assessments,[49] but not with regard to the timeliness of the assessments.[50]

Similarly, although service plans for children and parents were documented in the majority of case records, the case record review findings indicate that these plans were not developed, either initially or at follow up, as part of a family team meeting ("FTM") with family

---

[45]  Settlement Agreement at II.B.1.a.  The Settlement Agreement specifies the categories of information defendants are required to collect during the screening and assessment process, and in turn requires that these data inform the selection of an appropriate placement, the delivery of necessary services, and permanency planning.  The defendants are required to complete the assessment process within a 30-day period following a child's entry into custody and to document screening and assessment data in the case record.  *Id.*

[46]  *See* Ex. 5B, *supra* note 34, at 5-9.

[47]  The required areas include the following: 1) internal, external and historical factors that may contribute to concerns identified in the initial risk and safety assessments and screenings; 2) strengths, protective factors and needs of the child and family; 3) the impact of maltreatment on the child; 4) factors and characteristics pertinent to the selection of an appropriate placement; 5) family resources for the child and parents; and, 6) other material pertinent to meeting service objectives.  Settlement Agreement at II.B.1.a.

[48]  *Id.* at II.B.1.b.

[49]  The six largest regions with respect to the size of the foster care population are I-N, I-S, III-S, VI, VII-E and VII-W.  *See* Ex. 6, *supra* note 36, at 3 (comparing six largest regions in terms of size of foster care population as reflected in MACWIS and as reflected in sample one).

[50]  *Id.* at 3-6.

members and other critical parties.[51]  In fact, a key finding from the case record review is that for

50 percent of the children in sample one, there was no documentation in the case file that any

FTM occurred during the 27-month period under review.  Nearly one-fourth of the children had

documentation of a FTM that occurred in 30 days or less from the time of the child's entry into

DFCS custody.[52]  These findings are depicted below:



Moreover, there appeared to be variation across the six largest DFCS regions with regard to

whether a FTM had been held at any time during the period under review.[53]

The case record review also found that service planning with fathers occurred far less

frequently than with mothers.  Mothers were more likely to have service plans in the case records

than were fathers.  However, for those that were developed, the timeliness of the service plan and

the fact that the service plan was not developed as part of a FTM process did not differ for

mothers and fathers.[54]  Significantly, for nearly half of the mothers for whom a service plan was

---

[51]  Settlement Agreement at II.B.2.a. (requiring the assigned caseworker to convene a FTM with specified participants within 30 days of a child's entry into custody, during which time service plans for both the child and parents are to be developed);  *Id.* at II.B.2.b. (requiring each service plan to be reviewed and updated quarterly at an FTM with specified participants and within 30 days of a placement change or other significant change affecting the child or her/his family).
[52]  Ex. 5B, *supra* note 34, at 10-13.
[53]  Ex. 6, *supra* note 36, at 7.
[54]  Ex. 5B, *supra* note 34, at 13-15.

applicable, the service plan did not include arrangements for the mother's visit with the child.[55]
This is a particularly important finding in light of the fact that parent-child visitation is
considered a key element toward promoting successful family reunification.  Additionally, the
timeliness of the mother's service plan varied significantly across regions, but the timeliness of
the father's service plan did not and it was generally untimely across the regions.[56]

These findings underscore the need for defendants to strengthen the assessment and
service planning process.  A cornerstone of the new practice model is the comprehensive family
assessment ("CFA").  Defendants and their consultants have been conducting intensive, ongoing
training and individualized coaching to DFCS staff on the CFA; however, implementation of the
CFA has proven especially challenging in some regions.  These challenges are attributable, at
least in part, to staffing deficits and to the fact that that the CFA tool is not yet automated.[57]  The
Monitor expects to report more fully on this matter during the course of Period 3.

## 2. Achieving Permanency

The Settlement Agreement includes a number of requirements that are intended to
promote on a timely basis, for each child in DFCS custody, placement with a legally permanent,
nurturing family.  Case record review findings indicate that defendants generally conduct
required administrative reviews of a child's status and progress toward permanency on a timely
basis; however, significant improvement will be necessary in order for defendants to meet some

---

[55] *Id.* at 13.

[56] Ex. 6, *supra* note 36, at 9-12.

[57] For further information regarding staffing deficits *see supra* note 44 and *infra* pp. 39-41.  The failure to automate the CFA tool on a timely basis has placed a substantial burden on caseworkers who are required to complete the CFA instrument manually and also to complete the Strengths and Risk Assessment [hereinafter SARA], which is the assessment tool in MACWIS that should be obsolete in the regions that are implementing the practice model.  However, because of delays in modifying MACWIS to incorporate the new CFA tool, the SARA has not yet been supplanted by the CFA.  Defendants report that the CFA will be automated by July 1, 2012.  *See* Status Report-Mississippi Practice Model Implementation, Mississippi Child Welfare Practice Model Implementation Project Summary, March 2012 at 11 (describing barriers related to implementation of the CFA).  Automation of the CFA may help to accelerate effective implementation of the new assessment process.

pivotal requirements.  In addition to practice model implementation, other initiatives are

underway in several DFCS regions to accelerate progress toward permanency for children who

have been in foster care for significant time periods.[58]  Case record review findings concerning

core requirements related to permanency are summarized below.

According to the Settlement Agreement, DFCS staff are required to develop and

document in each child's case record, within 30 days of entry into custody, a permanency plan

that specifies the initial permanency goal, a timeframe for achieving permanency, and activities

that support permanency.[59]  Although the majority of children in sample one had a permanency

plan documented in the case file, 60 percent of the initial permanency plans were not developed

in accordance with the timeframes established by the Settlement Agreement.[60]  These findings

are reflected in the chart, below:



---

[58]   The Monitor expects to report on these initiatives, some of which defendants have undertaken with substantial technical support from Casey Family Programs (a private foundation that is providing various forms of technical assistance to DFCS), during Period 3.  For general information regarding permanency roundtables, *see* http://www.casey.org/Resources/Initiatives/PermanencyRoundtables/.
[59]   Settlement Agreement at II.B.3.a.1.  DFCS staff are required to develop each plan working with service providers, foster parents, the child, and the family.
[60]   Ex. 5B, *supra* note 34, at 18.

The timeliness of the permanency plan appeared to vary significantly across DFCS regions.[61]  In addition, for 76 percent of the children in the sample, there was no documentation in their case records regarding whether the individuals specified in the Settlement Agreement (*i.e.*, service providers, foster parents, the child, and the family) participated in the development of the permanency plan.[62]  Although 85 percent of permanency plans included the child's permanency goals and time frames for achieving those goals, a large percentage of the plans omitted one or more categories of material information, including an assessment of the potential for achieving the permanency goal, identification of possible family resources to promote permanency, and the appropriateness of placing the child with a potentially permanent family.[63]

The Settlement Agreement also requires that each child's permanency plan is reviewed at least every six months during a court or administrative case review and that DFCS take reasonable steps to ensure the participation of the child, parents, caregivers, and relevant professionals.[64]  The case record review indicated that DFCS has been effective in conducting administrative reviews of individual cases in a timely manner, both initially and throughout the child's time in custody.[65]  Defendants' most current data report on the timeliness of administrative reviews is consistent with the findings from the case record review, which reflects that for the period May 1, 2011 – April 30, 2012, 97 percent of children in custody for six months or more received timely administrative reviews.[66]  As depicted in the chart below, the case record review also found that the documentation in the case records indicate that many of the

---

[61]  Ex. 6, *supra* note 36, at 14.
[62]  Ex. 5B, *supra* note 34, at 19.
[63]  *Id.*
[64]  Settlement Agreement at II.B.3.c.1.
[65]  Ex. 5B, *supra* note 34, at 21-22.
[66]  Ex. 8, Mississippi Department of Human Services, Timely Administrative (County Conference) Reviews Summary, May 1, 2011 - April 30, 2012, MWZTACRS (reporting that 97 percent of children in custody for six months or more received timely administrative reviews).  These data have not been verified independently by the Monitor.

individuals specified by the Settlement Agreement, particularly caregivers, and, to a greater

degree, service providers, did not receive notice of the reviews.[67]



The Settlement Agreement also requires defendants to take reasonable steps to ensure that

a court review[68] is conducted for all children within 12 months of placement in foster care and

annually thereafter.[69]  Although the timeliness of the court permanency hearings was less

consistent than the administrative review hearings, for the most part the court hearings were held

within the time frames established by the Settlement Agreement.[70]  The case record review found

that for 81 percent of children for whom a permanency hearing was applicable, a court review

occurred in less than 12 months from initial placement.[71]  The most recent data report produced

by defendants indicates that of the approximately 3,000 children in custody for 12 months or

more between May 1, 2011 and April 30, 2012, only 60 percent received a timely permanency

---

[67] Ex. 5B, *supra* note 34, at 22.
[68] These reviews are also referred to as dispositional or permanency hearings.
[69] Settlement Agreement at II.B.3.c.2.
[70] Ex. 5B, *supra* note 34, at 23.
[71] This finding was based on a review of the 160 children for whom a court review was applicable.  Although 160 is a smaller number than the total number of cases reviewed in the case record review, it is sufficient to provide the basis for statistically valid conclusions.

hearing review.[72]  Similar to the administrative reviews, as set forth in the chart below, the case

record review found that the documentation in the case records indicate that many of the

individuals specified by the Settlement Agreement did not receive notice of the hearings.[73]



In instances in which a child's permanency goal is reunification, the Settlement

Agreement requires defendants to identify in parental service plans, and make available directly

or by referral, services to address the behaviors or conditions that resulted in the child's

placement in foster care and to help parents develop strategies to promote permanency for the

child.[74]  Although most of the children in sample one had a goal of reunification at some point

during the period under review, as depicted in the chart below, the case record review indicated

that services were not offered consistently to parents to address the parental behaviors or

---

[72]  Ex. 9, Mississippi Department of Human Services, Children in Custody for 12+ Months with a Timely
Permanency Hearing Summary, May 1, 2011 - April 30, 2012, MWZTPHRS  (reporting that 60 percent of children
in custody for 12 months or more received a timely permanency hearing).  These data have not been verified
independently by the Monitor.
[73]  Ex. 5B, *supra* note 34, at 24.
[74]  Settlement Agreement at II.B.3.d.1.

conditions that either resulted in the child's initial removal from the home or prevented the child from being returned home.[75]



In addition, in instances in which a child has a permanency goal of reunification, the Settlement Agreement requires that the child's assigned caseworker meet with the child's biological parents at least monthly for the following purposes: 1) to assess service delivery and achievement of service goals; 2) to keep the family informed and involved in decisions regarding the child; and 3) to remain current regarding the family's circumstances.[76] The case record review found that the frequency of caseworker contacts with parents was significantly below Settlement Agreement requirements, although contact with the mothers of the children was substantially more frequent than contact with the fathers of the children.[77] This is depicted in the charts that appear below:

---

[75] Ex. 5B, *supra* note 34, at 25-27.
[76] Settlement Agreement at II.B.3.d.2.
[77] The frequency of caseworker contacts with the child's mother met Settlement Agreement standards in 24 percent of the cases reviewed and the frequency of contacts with the child's father met Settlement Agreement standards in five percent of the cases reviewed. Ex. 5B, *supra* note 34, at 28-29.





Moreover, the frequency of caseworker contacts with the mothers and fathers of the children in sample one appeared to vary substantially among the six largest DFCS regions.[78]  Defendants report on this requirement monthly using a methodology that makes a direct comparison to sample one findings impossible.[79]  Nevertheless, defendants' most current data report reflects that over a one-month period defendants' performance fell far short of Settlement Agreement

---

[78]  Ex. 6, *supra* note 36, at 19-23.
[79]  In sample one, the Monitor reviewed whether defendants met the requirements over multiple months. Defendants' report reflects performance over only a one-month period.

requirements.  According to defendants' report, during April 2012, caseworkers had face-to-face monthly contacts with 35 percent of mothers and 23 percent of fathers.[80]

The Settlement Agreement also requires defendants to develop during the initial FTM, and to update regularly thereafter, a visitation plan to be implemented according to a prescribed schedule, for the child and her/his family.[81]  As depicted in the charts below, the case record review findings indicate that the frequency of parent-child visitation specified in the plans was not in accordance with the specifications of the Settlement Agreement, and in one-third of cases for the mother, and over half of cases for the father, there was no visitation plan or no plan that specified the frequency of parent-child visits.[82]





---

[80]  Ex. 10, Mississippi Department of Human Services, Children in Custody with a Permanency Plan of Re-Unification, April 1, 2012 - April 30, 2012, MWZWCR3S (reporting face-to-face contact with 35 percent of the mothers and 23 percent of the fathers during the month of April 2012).  These data have not been verified independently by the Monitor.
[81]  Settlement Agreement at II.B.6.a.
[82]  Ex. 5B, *supra* note 34, at 43-46.

The Settlement Agreement includes several requirements intended to promote timely adoptions in instances in which a child's primary permanency goal is adoption. As a threshold matter, once the primary goal of adoption is established, defendants are required to take specified actions within prescribed time frames to terminate parental rights ("TPR"), including submission of an appropriate referral packet to the Office of the Attorney General.[83] The case record review found that for the majority of children with the primary permanency goal of adoption, TPR packets were not being submitted to the Attorney General's office in accordance with the timeframes specified in the Settlement Agreement.[84]

In addition, according to the Settlement Agreement, when a child's primary permanency goal becomes adoption, an adoption specialist must be assigned within a prescribed time period to work with the caseworker to secure an adoptive placement for the child and to draw up an adoption plan that meets certain established specifications.[85] The case record review found that an adoption specialist had been assigned to assist the worker in finding a permanent home for the majority of children with a goal of adoption in sample one; however, for most of the children in the sample who had a goal of adoption but did not have an identified permanent home, there was no plan for finding an adoptive home in the case record.[86]

### 3. Safety

Among other child safety-related requirements, the Settlement Agreement includes timeframes for initiating and completing investigations of reports of maltreatment of children in DFCS custody.[87] According to the Settlement Agreement, the investigation of all reports of maltreatment of children in custody must be initiated within 24 hours and completed within 20

---

[83] Settlement Agreement at II.B.3.e.2.
[84] Ex. 5B, *supra* note 34, at 29-30.
[85] Settlement Agreement at II.B.3.f.1.
[86] Ex. 5B, *supra* note 34, at 30-31.
[87] Settlement Agreement at II.B.4.e.

calendar days, including supervisory review.[88]  However, during Period 2, which overlapped part

of the period under review, defendants were required to complete maltreatment investigations

involving class members within 30 calendar days.[89]

As context, investigations of maltreatment reports involving class members represent a

small fraction of the investigations that defendants must conduct.  According to data produced by

the defendants and analyzed by the Monitor, during calendar year 2011 there were 21,751 total

"level 2" and "level 3" investigation intakes.[90]  Of that total, 411 investigation intakes (or

approximately two percent) involved class members.[91]

As described above, the first case record review, which was undertaken during Period 2,

focused narrowly and more deeply on the Settlement Agreement's requirements concerning

investigations related to reports of maltreatment in care.[92]  The second case record review, which

was broader in scope, included, but was not limited to, reports of maltreatment of children in

care.  Because of its broader scope, it included fewer cases of investigations related to reports of

maltreatment of children in care than the first case record review, and therefore had a larger

margin of error with respect to its findings related to reports of maltreatment in care.  Thus, the

---

[88]  *Id.*

[89]  Period 2 Annual Implementation Plan at II.6.g.  Period 2 began on May 1, 2009 and ended on April 30, 2010, and
the period under review began on January 1, 2009 and ended on March 31, 2011.  *See supra* note 9 and p. 5.

[90]  According to the relevant DFCS policy, a level 2 maltreatment report is defined as one which meets the statutory
criteria but is not considered felony child abuse, or the alleged victim is not a foster child.  These reports are
screened in and assigned to a worker who must initiate the investigation within 72 hours of assignment.  According
to the policy, a level 3 maltreatment report is considered a felony or involves a foster child.  These reports are
screened in and assigned for investigation.  Pursuant to the policy, the assigned worker has 24 hours from
assignment to initiate the investigation.  §II.D.1. Mississippi, DFCS Policy, Section B, Intake & Assessment,
Revised June 3, 2011.

[91]  *See* Ex. 11, chart prepared by the Office of the Court Monitor, Investigations Opened January 1, 2011 Through
December 31, 2011 By Month Opened, Level, and Custody Status.

[92]  *See supra* p. 5.

Monitor also obtained electronic data from DFCS on investigations of reports of maltreatment conducted between January 2011 and March 2012 in order to assess defendants' progress.[93]

The data obtained from the first case record review indicated that approximately 47 percent of the maltreatment reports involving children in care in the sample were initiated within one day.  Furthermore, approximately 53 percent of investigations were completed in 30 days or less.[94]  Data from calendar year 2011 indicate that defendants made progress with respect to initiating investigations according to Settlement Agreement requirements, but did not make progress with respect to completing investigations in 30 days or less.[95]  Between January and December 2011, defendants initiated 80 percent of investigations within 24 hours of a report of maltreatment of a child in custody;[96] however, during the same period, defendants completed only 50 percent of investigations within 30 days.[97]  The changes between the period covered by the first case record review and the 2011 calendar year are depicted below:



<hr />

[93]  Due to certain limitations in the data provided by defendants, the Monitor was only able to analyze data regarding investigations of reports of maltreatment of children in custody for the period January 2011 to December 2011.

[94]  *See September 2010 Report*, Ex. 60 at 6-7.

[95]  The data for the 2011 calendar year were produced by defendants and analyzed by the Monitor.

[96]  *See* Ex. 12, chart prepared by the Office of the Court Monitor, Maltreatment Investigations Initiated Within 24 Hours of Intake By Month, Children in Custody Only, January 2011 – December 2011.

[97]  *See* Ex. 13, chart prepared by the Office of the Court Monitor, Maltreatment Investigations Completed Within 30 Days of Intake By Month, Children in Custody Only, January 2011 – December 2011.

To gain a more complete understanding of the variance in the time to complete maltreatment investigations of children in custody, the Monitor analyzed the distribution of time to complete investigations on a month-by-month basis.  By analyzing the distribution of time to completion of investigations, it is possible to assess not only what percentage of investigations do not meet Settlement Agreement requirements, but, as importantly, also to assess quantitatively how far defendants are from meeting the 30-day Settlement Agreement requirement.  Consistent with the data from the first case record review, the data indicate that during 2011, defendants completed approximately half of the investigations opened each month within 30 days.[98]  More broadly, defendants completed 75 percent of investigations opened each month in less than 48 days, and 90 percent of investigations in less than 76 days.[99]

Because performance can be a function of workloads, staffing levels, or any number of other variables, which vary from region-to-region, the Monitor analyzed the data on a geographic basis as well.  The data indicate that there is substantial variation in performance among the 13 DFCS regions with respect to both initiating investigations within 24 hours and completing investigations within 30 days.  For example, during 2011, the region with the largest number of maltreatment investigations involving children in custody also had the highest percentage of investigations initiated within 24 hours, 97 percent.[100]  Conversely, a region that had 75 percent fewer total maltreatment investigations in 2011 than the region with the largest number also had the lowest percentage of investigations initiated within 24 hours.[101]  It is unclear what accounts for these differences.

---

[98]  *See* Ex. 14, chart prepared by the Office of the Court Monitor, Distribution of Number of Days from Intake To Approved Findings for Maltreatment Investigations, Children in Custody, by Percentile and Month, January 2011 – December 2011.
[99]  *Id.*
[100]  *See* Ex. 15, chart prepared by the Office of the Court Monitor, Maltreatment Investigations Initiated Within 24 Hours of Intake By Region, Children in Custody Only, January 2011 – December 2011.
[101]  *Id.*

There was evidence of similar variation in performance from region-to-region with respect to the percentage of investigations of reports of maltreatment involving children in custody that were completed within 30 days of intake, even among regions with comparable numbers of investigations.  For example, the region with the fewest initiated investigations completed 100 percent of the investigations within 30 days of intake; however, a region with a comparable number of investigations completed only 19 percent of investigations within 30 days of intake.[102]

The failure to complete maltreatment investigations in a timely manner raises very substantial concerns about child safety.  Additionally, it has contributed to a substantial backlog in a number of regions and this backlog has affected defendants' ability to implement the practice model.[103]  It is noteworthy, however, that it is not the size of the backlog of investigations of reports of maltreatment of class members that is creating significant challenges for defendants, but rather the much larger backlog of investigations attributable to non-class members.  As noted above, reports of maltreatment of in-custody children account for only approximately two percent of all investigation intakes.[104]  Thus, the investigation backlog among in-custody children is much smaller than that for the larger population of investigation intakes.[105]  Nevertheless, many of the same caseworkers conduct the investigations for both class members and non-class

---

[102] *See* Ex. 16, chart prepared by the Office of the Court Monitor, Maltreatment Investigations Completed Within 30 Days of Intake By Region, Children in Custody Only, January 2011 – December 2011.

[103] An investigation is considered to be part of the backlog if it is not completed within 30 days from the date of the report of maltreatment.  *See, e.g.,* Initial Status Report- Practice Model Implementation, Mississippi Child Welfare Practice Model Implementation Project Summary, Center for the Support of Families, December 2011 at 3, 4 (addressing backlog of investigations in Regions V-W, I-N); Initial Status Report- Practice Model Implementation, Mississippi Child Welfare Practice Model Implementation Project Summary, Center for the Support of Families, February 2012 at 11 (workloads related to backlogged investigations in Region VII-E are difficult to manage and affect implementation of practice model notwithstanding a reduction in the number of backlogged investigations).

[104] *See supra* p. 26.

[105] *See* Ex. 17, chart prepared by the Office of the Court Monitor, Number of Investigations of Reports of Maltreatment of In-Custody Children Open for More Than 30 Days as of 12/31/11 By Year, Month of Report Intake, and Region.  The chart illustrates that the backlog of investigations for in-custody children as of December 31, 2011 was 31.  The backlog of investigations among non-class members was much larger than this.  The Monitor has reviewed these data, but has not included it in this report because it involves non-class members.

members.  Thus, the investigation backlog for non-class members impacts defendants' ability to meet Settlement Agreement requirements that are related to class members.

There is recent evidence that the defendants have been working to reduce the backlog of investigations in a number of DFCS regions.[106]  Defendants report that they are making progress through strategies they have employed in the past, which rely on temporarily assigning staff from elsewhere in the State to understaffed counties for the purpose of completing investigations on a short-term basis.[107]  Because the backlog is at least in part attributable to persistent and pervasive staffing deficits that are particularly acute in some counties, these quick-fix strategies have been and will continue to be ineffective in the long-run unless defendants contemporaneously address the systemic issues that have contributed to pervasive understaffing in some DFCS counties/regions.[108]

### 4. Caseworker Visits with Children

In order to assess a child's safety and well-being, service delivery, and achievement of permanency and other service goals, the assigned caseworkers are required by the Settlement Agreement to meet with all children in foster care, in-person, at least twice monthly.[109]  As shown in the following chart, the case record review found that for only 21 percent of the children in sample one, the frequency of the assigned caseworkers' face-to-face contact with the child met the requirements of the Settlement Agreement.[110]

---

[106]  Recent evidence includes MACWIS reports (that have not been validated by the Monitor), which show recent reductions in the number of backlogged investigations in certain regions and information about the strategies the defendants have instituted to reduce the backlog that has been corroborated through multiple interviews with DFCS executive and regional managers.

[107]  These reports are at least in part corroborated by MACWIS reports that have not been validated by the Monitor as well as by interview data.  The Monitor expects to report more fully on this matter during Period 3.

[108]  *See infra* pp. 39-41 for additional data related to caseworker and supervisory staffing limitations.

[109]  Settlement Agreement at II.B.10.a.  At least one visit per month must take place in the child's placement.

[110]  Ex. 5B, *supra* note 34, at 61-62.



Furthermore, the percentage of cases that met the Settlement Agreement requirements in at least 50 percent of the months that a child was in an out-of-home placement appeared to vary significantly across the six largest DFCS regions.[111]  Performance data reported by defendants each month is not directly comparable to the date in sample one.[112]  Nevertheless, defendants' data covering a recent one-month period show that defendants continue to fall short of Settlement Agreement standards.[113]

### 5.  Services for Children to Ensure their Well-Being

The Settlement Agreement includes a series of requirements related to the physical and mental health care that defendants must afford to children in DFCS custody, including requirements concerning timely mental health assessments and delivery of recommended mental health services;[114] timely physical health screenings and comprehensive physical health

---

[111]  Ex. 6, *supra* note 36, at 34-35.

[112]  During the sample one review, the Monitor assessed compliance over multiple months.  Defendants' data report covers only a one-month period.

[113]  According to data reported by the defendants for the month of April 2012, a caseworker met with 59 percent of all children in custody during the month at least twice and one of the visits was in the child's placement.  Ex. 18, Mississippi Department of Human Services, Worker/Child Face to Face Home Contact Report – State Summary, April 1, 2012 – April 30, 2012, MWZWC5S2.  These data have not been verified independently by the Monitor.

[114]  Settlement Agreement at II.B.7.f. (requiring that within 30 days of foster care placement each child four years old and older, or within 30 days of reaching the age of four while in custody, each child must be provided with a

assessments; periodic medical examinations, and medically necessary follow up services and treatment;[115] developmental assessments and necessary follow up services;[116] timely initial and periodic dental examinations and the delivery of medically necessary dental services.[117] Additionally, the Settlement Agreement requires defendants to provide children in custody with initial educational screenings for general and special education needs.[118] The findings from the case record review establish that defendants will need to make significant improvements in these areas in order to satisfy Settlement Agreement requirements.

The case record review findings indicate that the majority of children in sample one did not receive timely initial or routine assessments and services with regard to their physical, dental, developmental and mental health needs, as well as with regard to their educational needs.[119] For example, the Settlement Agreement requires that each child entering foster care receives a health screening evaluation within 72 hours following placement.[120] As shown in the chart below, the case record review indicated that the majority of children in custody did not receive timely initial health screenings, and there was no documentation that a health screening occurred for one quarter of the children in the sample.

---

mental health assessment that is conducted by a qualified professional and s/he must receive the mental health services recommended by these assessments).

[115]  *Id.* at II.B.7.a.-d. (required for all children upon entry into foster care and at specified intervals thereafter).

[116]  *Id.* at II.B.7.g. (requiring developmental assessments conducted by qualified professionals for each child from birth through three years and for each child older than three years as needed).

[117]  *Id.* at II.B.7.e. (required for each child three years or older within a prescribed period following foster care placement and at specified intervals thereafter).

[118]  *Id.* at II.B.8.a. (required for each child within 30 days of entry into foster care).

[119]  Ex. 5B, *supra* note 34, at 51-59.

[120]  Settlement Agreement at II.B.7.a. (also requiring that the initial screening be conducted by a qualified practitioner pursuant to prescribed standards).



Additionally, the Settlement Agreement requires that within 30 calendar days of placement in foster care, a child must receive a comprehensive health assessment.[121]  As depicted below, the case record review found that 30 percent of children in custody more than 60 days received a timely comprehensive health examination and over half of the children in custody more than 60 days did not receive a comprehensive health examination at all.



The Settlement Agreement also addresses requirements for dental examinations, prescribing a dental examination within 90 days of foster care placement for all children who are three years old or older, or within 90 days of reaching her/his third birthday.[122]  As set forth in the chart below, for those children in custody for more than 60 days for whom an initial dental examination was required, the case record review determined that just under half received a

---

[121]  *Id.* at II.B.7.b.  (requiring that the comprehensive assessment conform to specified standards).
[122]  *Id.* at II.B.7.e.

timely initial dental examination, and over one-quarter did not have an initial dental examination documented in their case records.



Moreover, the timeliness of initial health screenings,[123] and the percentage of children who received dental examinations, appeared to vary significantly across the six largest DFCS regions.[124]

In addition, the Settlement Agreement requires that defendants provide to each child in foster care who is between the ages of 14 and 20, an opportunity to participate in developing an independent living service plan to prepare her/him for living independently as well as with the services specified in the plan.[125]  For 75 percent of the children who were age 14 or older during the period under review, there was evidence reflected in the case record of an independent living plan; however, the extent to which services were provided to the child in accordance with plan specifications varied widely.  All identified services were provided in only nine percent of the cases.  In an additional 23 percent of cases, some, but not all services, were provided.[126]  Data

---

[123] Ex. 6, *supra* note 36, at 28-29.
[124] *Id.* at 33.
[125] Settlement Agreement at II.B.11.b.
[126] Ex. 5B, *supra* note 34, at 60-61.  This requirement applied to only 69 of the children in the sample.  Because of the relatively smaller number of children in this cohort, the margin of error is greater than the margin of error for the larger sample.  Nevertheless, even with the larger margin of error it appears that defendants are not meeting the Settlement Agreement requirements.

reported by defendants for May 1, 2011 through April 30, 2012[127] indicate that 43 percent of children to whom this requirement applied received the independent living services and skills required by their independent living plans.[128]

Defendants report that they have begun to address shortcomings in the delivery of required health, educational, and independent living services by, among other things, establishing a centralized resource development unit with certain dedicated staff. However, current staffing levels in this unit are inadequate.[129] The Monitor expects to report on defendants' progress during Period 3.

### 6. Placement Experiences

The Settlement Agreement also includes a series of requirements related to placements for children in foster care. Defendants' performance with respect to a number of these requirements was examined during the case record review. Key findings are summarized below.

According to the Settlement Agreement, except for specified circumstances, children must be placed together with siblings if they enter DFCS custody at or near the same time,[130] within their own county or within 50 miles of the home from which the children are removed.[131] The case record review indicates that most children were placed initially near the home from

---

[127] Defendants' data report does not distinguish between some services being included and all required services and thus these data may not be comparable to the data in sample one.

[128] Ex. 19, Mississippi Department of Human Services, Children in Custody Ages 14-20 and Their IL Services and Skills Provided - Summary, May 1, 2011 - April 30, 2012, MWBRD16S. These data have not been verified independently by the Monitor.

[129] Defendants established the resource development unit in July 2010, but it is not yet staffed at adequate levels. During February 2012, a nurse was hired and charged with the following duties: monitoring the timeliness of mental health assessments in the practice model roll-out regions; the statewide monitoring of youth who are prescribed psychotropic medications; and the development of health passports, which defendants plan to use statewide as a repository for each child's relevant health information in order to make it accessible to caretakers. Although one nurse cannot perform all of these functions, staffing levels have not been augmented and, as of June 15, 2012, it did not appear that any additional positions had been identified. Despite the fact that the resource unit was, at least in part, established to address deficits in educational screenings and assessments on a statewide basis for children in custody, an educational specialist was not hired until June 2012.

[130] Settlement Agreement at II.B.5.f.

[131] *Id.* at II.B.5.e.

which they were removed or in close proximity to family, and most were placed with siblings when that was in the best interests of all siblings.[132] These findings reflect demonstrable strengths in case practice.

The Settlement Agreement also includes safeguards to minimize the likelihood of inappropriate disruptions in child placements. Defendants are required to take all reasonable steps to avoid the disruption of an appropriate placement and ensure placement stability.[133] In instances in which a caseworker has knowledge that a placement may be disrupted, s/he he is required to convene a special meeting to determine the following specified matters: 1) the cause of the potential disruption; 2) whether the placement is appropriate for the child; 3) whether additional services to support the placement are necessary; and, 4) whether the child needs another placement, and if so, what it should be.[134]

The case record review findings indicate that many of the children in the sample did not experience placement stability. Forty-two percent of the children in the sample had three or more placement settings during the period under review. Moreover, 40 percent of the children in the sample who were in custody for less than 12 months had three or more placement settings, and 30 percent of the children in custody for less than six months had three or more placement settings.[135] Placement stability appeared to vary significantly across the six largest DFCS regions.[136]

According to the Settlement Agreement, by the time of a child's placement, defendants must provide to foster parents or staff at a facility in which a child is placed, the child's currently

---

[132] Ex. 5B, *supra* note 34, at 35-38.
[133] Settlement Agreement at II.B.5.h.
[134] *Id.*
[135] Ex. 5B, *supra* note 34, at 39-43.
[136] Ex. 6, *supra* note 36, at 23-24.

available medical, dental, educational, and psychological information.[137]  The case record review indicates that caregivers rarely were provided with information about the child's medical, dental, educational, and psychological status and needs by or at the time of placement.[138]

Moreover, caseworkers are required by the Settlement Agreement to communicate regularly with non-therapeutic foster parents and to visit the home on a monthly basis for the following purposes: 1) to share relevant information about the child; 2) to evaluate the child's safety, needs and well-being; and, 3) to monitor the delivery of services and achievement of service-related goals.[139]  In instances in which a child is in a therapeutic foster home, caseworkers are required to maintain weekly contact with the foster parents and to visit the home twice each month.[140]  The case record review found that for children who were in both therapeutic and non-therapeutic foster homes, the frequency of caseworker contacts with the child's foster family did not meet Settlement Agreement requirements.[141]  Defendants' performance with respect to these requirements appears to vary substantially across the six largest DFCS regions.[142]  Data reported by defendants for the month of April 2012[143] indicate that defendants met Settlement Agreement requirements for caseworker contacts with foster parents in 51 percent of applicable cases for children in non-therapeutic placements and in 26 percent of applicable cases for children in therapeutic placements.[144]

---

[137]  Settlement Agreement at II.B.5.g.  Thereafter, within 15 days of placement, the defendants must collect and provide to foster parents and facility staff, all additional current data related to the child with respect to each of the specified categories.  *Id.*

[138]  Ex. 5B, *supra* note 34, at 38-39.  *See supra* note 129 regarding defendants' plans to implement health passports.

[139]  Settlement Agreement at II.B.10.c.

[140]  *Id.* at II.B.10.d.

[141]  Ex. 5B, *supra* note 34, at 62-65.

[142]  Ex. 6, *supra* note 36, at 39-40.

[143]  Unlike defendants' data report, which covers only a one-month period, the case record review examined performance over longer time periods.  Thus, the data are not directly comparable.

[144]  Ex. 20, Mississippi Department of Human Services, Non-Therapeutic Care and Placement Setting Contacts - Resource Summary, April 1, 2012 - April 30, 2012, MWZPLMCS; Ex. 21, Mississippi Department of Human Services, Therapeutic Care and Placement Setting Resource Contacts, April 1, 2012 - April 30, 2012, MWZPLMS2. These data have not been verified independently by the Monitor.

III.    <u>**PROGRESS AND CRITICAL BARRIERS**</u>

The parties have been negotiating the terms of a modified settlement agreement and an implementation plan for Period Three since May 2011.  During this thirteen-month period, defendants have launched or broadened ongoing initiatives that are designed to improve many aspects of case practice.  For example, the defendants introduced the practice model in several additional DFCS regions;[145] strengthened the DFCS training program for caseworkers and their supervisors;[146] expanded initiatives designed to promote permanency for children who have been in foster care for long time periods;[147] and continued implementing a diligent recruitment program to identify and support resource and adoptive families for children for whom defendants have had the most difficulty finding permanent homes.[148]  Coincident with these efforts, defendants continued working with the Council on Accreditation ("COA"), which reports certain milestones related to the accreditation process have been satisfied.[149]

Defendants are at the threshold of the third annual implementation plan.  MDHS management has bolstered its ability to oversee implementation plan activities by adopting a management review and decision-making structure designed to promote accountability for

---

[145]  Defendants initiated the planning phase for practice model implementation in several regions during this period.

[146]  Defendants bolstered staffing levels in the training unit and contracted for additional services.  By December 2011, the pre-service curriculum was revised to reflect many Settlement Agreement requirements and to incorporate updated policy directives.  Defendants began to deliver the new pre-service training to caseworkers in February 2012, training an initial class of 35 new staff members.  A second class with 25 staff members began the new pre-service training program during April 2012.  The defendants also developed a 40-hour clinical supervisory training program for new supervisors, introducing it to a class of 10 supervisors during late February 2012.  A second cohort of 12 supervisors received the new pre-supervisory service training during April 2012.  Defendants also report that they are in the process of developing an in-service training curriculum which they expect to complete by the end of the calendar year.

[147]  *See supra* note 58 and related text.

[148]  For additional background regarding the diligent recruitment program, *see November 2010 Report* at 41.

[149]  Among other milestones, COA reports that each of the 13 DFCS Regions have completed accreditation preparation reviews and there has been a DFCS State Office review; supervisory training relevant to COA standards has been conducted; technical assistance sessions related to COA site review expectations has been undertaken; three mock site reviews have been undertaken; an accreditation site review schedule has been developed (which indicates that the first site review will commence in January 2013); and DFCS has initiated its work on a self-study which must be submitted to COA during August 2012.

meeting the requirements of this lawsuit on a timely basis.  Recent evidence, which suggests that managers may be starting to rely on performance data, is encouraging.

Nonetheless, there are substantial challenges which defendants must confront and resolve during Period 3 in order to make demonstrable and enduring progress toward improving case practice and ultimately satisfying the outcomes required by this lawsuit.  Because demonstrable shortcomings in staffing and data collection and management continue to serve as two of the most critical systemic barriers to continued progress, they are addressed below.

### A.  Staffing

As described in the Monitor's prior reports, persistent staffing deficits have compromised defendants' ability to satisfy certain key Settlement Agreement requirements.[150]  Moreover, recent evidence indicates that understaffing has affected both the pace at which the practice model can be implemented and whether implementation efforts are effective.[151]  Recent reports produced by defendants regarding caseworker workloads reflect understaffing statewide, disproportionate distribution of caseworkers among regions, and substantially uneven distribution of caseloads even within given geographical areas.[152]  For example, defendants' data reflect that 710.4 caseworkers were needed in March 2012, but that only 635 caseworkers were assigned to work, or 89 percent of the necessary number, and that only 575 workers, or 80.9 percent of the

---

[150]  *See, e.g., September 2012 Report* at 43 (reporting that due to staffing deficits newly-hired caseworkers were assigned to perform clinical case-related work such as conducting home visits or maltreatment investigations before they completed the pre-service training required by the Settlement Agreement).

[151]  *See supra* note 44 (describing the impact of staffing deficits on implementation of the practice model in Regions I-N, III-N and III-S); *see also* Initial Status Report- Practice Model Implementation, Mississippi Child Welfare Practice Model Implementation Project Summary, Center for the Support of Families, November 2011 at 7 (implementation of practice model delayed and planning phase to be extended for six-month period in Regions VII-E and III-N in order to address serious staffing shortfalls).

[152]  *See* Ex. 22, table produced by DFCS, *April 2012 Workload, Caseload, and Staffing Analysis*, redacted.  The Monitor has documented shortcomings with the manner in which defendants capture and report caseload data in prior reports filed with the court.  *See September 2010 Report* at 18-23.

necessary number, actually carried a caseload.[153]  With respect to disproportionate distribution of

casework staff among regions, defendants' data show a wide variance in the percentage of the

necessary number of staff assigned among the 13 regions.  Three regions, which were among

those with the highest numbers of children in DFCS custody,[154] had approximately 60 percent of

the caseworker staff necessary to comply with Settlement Agreement requirements, while three

other regions, which have the lowest numbers of children in custody,[155] had over 100 percent of

the caseworker staff required during the month.[156]  Finally, even within regions, there was wide

variation from county-to-county in the percentage of required staff who were assigned, with

some counties having fewer caseworkers than required while others had an apparent surplus of

assigned caseworkers.[157]

        These are not new problems for DFCS.  Monthly staffing reports produced by defendants

for the period April 2011 to January 2012 evidence both persistent understaffing statewide and

uneven distribution of staff among the 13 regions over time.  According to defendants' data,

between April 2011 and January 2012, defendants had a statewide shortage of between 192 and

116 caseload-carrying caseworkers.[158]  The data reflect a gradual decrease in the statewide

staffing shortage (*i.e.,* an increased number of caseload-carrying staff) over the period covered by

the Monitor's analysis.[159]  Defendants' historical staffing data also illustrate the substantial

---

[153]  *See* Ex. 22, *supra* note 152.
[154]  Regions III-S, VII-E and VII-W.
[155]  Regions II-E, II-W and V-W.
[156]  *Id.*
[157]  *Id.*
[158]  *See* Ex. 23, chart prepared by the Office of the Court Monitor, Number of Caseworkers with Caseloads Relative to the Number of Caseworkers Necessary to Meet Settlement Agreement Requirements, Statewide, by Month, April 2011 – January 2012.
[159]  *Id.*

variations in staffing deficits among the 13 regions over time.[160]  Some regions,[161] in some

months had staffing deficits of more than 15 caseload-carrying caseworkers, and others had

staffing deficits of greater than 25 caseworkers for multiple months.[162]  Other regions[163]

consistently had small staffing surpluses.[164]  In some regions there appeared to be improvements

in staffing levels over time.

As detailed above, while defendants' data indicate that workload balancing is necessary,

it also is essential that defendants hire and retain at a higher rate additional caseworkers and

supervisors.  DFCS data indicate that between January 2010 and approximately April 2012,

DFCS hired a net total of 73 caseworker staff.[165]  The data suggest that defendants' rate of hiring

caseworkers has accelerated each year.  For example, defendants hired 50 percent more staff in

2011 than they did in 2010.  As of the end of April 2012, or one-third of the way through the

calendar year, defendants already hired nearly 50 percent of the total casework staff hired during

all of 2011.  Nevertheless, this progress not only must be sustained, it also must be intensified in

order for defendants to meet Settlement Agreement requirements.  There has not been a similar

trend among supervisory staff.  Between January 2010 and April 2012 there has been a net loss

of four area social work supervisory staff.[166]

---

[160] *See* Ex. 24, chart prepared by the Office of the Court Monitor, Number of Caseworkers with Caseloads Relative to the Number of Caseworkers Necessary to Meet Settlement Agreement Requirements, by Region and Month, April 2011 – January 2012.

[161] This includes Regions I-N, I-S, III-N, III-S, VII-E, and VII-W.

[162] *Id.*  Regions III-S, VII-E, and VII-W had staffing deficits of greater than 25 caseworkers for multiple months. Region VII-W experienced the most acute staffing deficits and in one month had a staffing deficit of 56 caseload-carrying staff.

[163] This includes Regions V-W and II-E.

[164] *Id.*

[165] *See* Ex. 25, chart prepared by the Office of the Court Monitor, Hires and Separations Among DFCS Caseworker Staff, January 1, 2010 - April 30, 2012 Hires, January 1, 2010 - May 10, 2012 Separations.  For a breakdown of the reasons accounting for staff attrition, *see* Ex. 26, chart prepared by the Office of the Court Monitor, Reason for Separations Among Caseworkers, by Position, January 1, 2010 - May 10, 2012.

[166] *See* Ex. 27, chart prepared by the Office of the Court Monitor, Hires and Separations Among Area Social Work Supervisory Staff, January 1, 2010 - April 30, 2012.  For a breakdown of the reasons accounting for supervisory staff

## B.  Data and Management Information Systems

The record in this case documents the substantial limitations in defendants' data collection, recording and analysis systems and the impact these limitations have had on the accuracy of data in MACWIS and, in turn, on the quality of case practice.[167]  These deficits implicate defendants' ability to allocate and manage scarce resources and to deliver essential services to children and their families.  Although defendants made some progress toward addressing these shortcomings during 2010,[168] defendants still cannot produce accurate and complete data related to the majority of the Settlement Agreement's requirements.[169]

The Period 3 Implementation Plan that will be submitted to the Court for approval requires defendants to produce a wide range of reports related to the Settlement Agreement's precise requirements.  Unless defendants can bolster the DFCS data collection and reporting capacity in the near-term, the defendants will have substantial difficulty meeting both Period 3 requirements related to timely report production and substantive requirements related to required improvements in case practices and outcomes.[170]

---

attrition, *see* Ex. 28, chart prepared by the Office of the Court Monitor, Reason for Separations Among Area Social Work Supervisors, January 1, 2010 - May 10, 2012.

[167] *See, e.g., June 2009 Report* at 26-35, 47-48, 51-55 and 67-69; *September 2010 Report* at 7, 21-23, 57-58, 59-65, 75 and 91.

[168]  In recognition of the need for more accurate data to assess system performance and measure progress, the June 10, 2010 Agreed Order required the defendants to produce a specified series of data reports at monthly intervals. June 10 2010 Agreed Order at ¶7.a.  As the Monitor has reported previously, the defendants produced the required reports at the prescribed intervals; however, many of the precise performance standards mandated by the Settlement Agreement are not captured by these reports, which defendants have continued to produce.  *November 2010 Report* at 19.

[169]  The Settlement Agreement contemplated that defendants would provide MACWIS data related to the Settlement Agreement's foster care service standards during Period 1.  Settlement Agreement at II.A.5.b.  Moreover, it requires defendants to maintain an information system with specified functions, such as longitudinal reporting and comparison of performance over time and the collection of data necessary to monitor compliance with the Settlement Agreement.  *Id.* at II.A.5.a.

[170]  Defendants have automated the foster care review instrument and are using it to collect case record data relevant to certain settlement agreement requirements.  By the end of the 2012 calendar year, defendants expect to supplement the data reports that are available through MACWIS by relying on reports derived from the analyses of data collected during the foster care review process.   This is a promising short-term strategy; however, it is likely that the efficacy of this initiative will be compromised unless defendants address persistent staffing deficits in the DFCS foster care review and evaluation and monitoring units.

At the same time, defendants must begin the process of replacing MACWIS with management information systems that are more appropriate for a modern child welfare agency serving thousands of children and their families at any time.  According to defendants, MACWIS is based on an antiquated technology platform and there are few individuals who are able to extract data or produce custom reports.  This limits managers' ability to use data to answer questions about agency performance and make necessary corrections in agency practices.[171]  Additionally, defendants do not maintain complete, accurate and readily accessible data on fundamental organizational functions such as staff hiring and attrition. Particularly at a time when defendants are struggling to increase staffing levels, these data are essential to track and analyze over time in order to satisfy requirements in this lawsuit.

Moreover, defendants struggle with basic and ongoing limitations in the reliability of the MDHS information system.  Caseworkers and their supervisors experience regular and unscheduled interruptions in their ability to access MACWIS, which directly impacts the work they are required to perform.[172]  The Monitor has documented these identical issues in her prior reports.[173]

The replacement of the data and management information systems that support DFCS requires a long-term investment in creating a system in which executives and managers can monitor performance, identify problems in real time, and ensure the safety and well being of

---

[171]  Indeed, despite multiple efforts over the course of a one-month period, defendants were unable to respond to the Monitor's recent request for a complete custom report reflecting maltreatment investigations related to class members that were opened between January 1, 2011 and March 31, 2012.  Although defendants ultimately were able to produce partially responsive data, defendants report that this undertaking consumed a substantial amount of staff and management resources.  As such, it is prohibitively resource-intensive and should not be replicated on a regular basis.  Given the utility of these data, defendants must develop a more efficient method to extract and analyze data related to Settlement Agreement requirements.

[172]  *See, e.g.,* Ex. 29, DFCS MACWIS Down Time Tracking Report, 2012, redacted (documenting scheduled and unscheduled periods of system down time between February 1 and June 1, 2012).  *See also supra* note 29 and related text for a discussion of the system reliability issues that were evident during the case record review.

[173]  *See, e.g., September 2010 Report* at 61-64.

children in their care.  Toward this end, the Period 2 Implementation Plan ("Period 2 IP")

required defendants to issue a Request for Proposals ("RFP") by September 1, 2009 for a

comprehensive analysis of MACWIS, including its ability to perform the functions specified by

the Settlement Agreement.[174]  Because defendants did not satisfy this requirement on a timely

basis, the June 10, 2010 Agreed Order required defendants to issue the RFP by September 1,

2010.[175]  The defendants issued the required RFP on July 27, 2010.[176]  The contract for the

assessment was finalized on March 18, 2011 with a private consulting firm, Walter R. McDonald

& Associates, Inc. ("WRMA").[177]  The WRMA assessment was designed to consider alternatives

for the replacement of MACWIS; present a cost/benefit analysis regarding possible replacement

options; and produce a set of functional and technical requirements for a replacement system.

On June 8, 2012, defendants transmitted a draft of WRMA's final assessment report to

the Monitor.  Thereafter, on June 12, 2012, the Monitor participated in a meeting with defendants

and WRMA representatives regarding the findings and recommendations in the draft report.[178]

The Monitor has expressed concerns to defendants about some aspects of the draft report that

implicate the requirements in this lawsuit and will report on this matter, as appropriate, if these

---

[174]  Period 2 IP §I.5.c. states:
   I. Administration and Management Implementation Steps
      5. Information Management and Use
         c.  DFCS shall issue a RFP for the comprehensive analysis of the MACWIS system and its ability to
             perform the computer functions required by section II.A.5.a of the Settlement Agreement and for
             recommendations of remedial efforts necessary to enable MACWIS to perform those Settlement
             Agreement requirements.  DFCS shall undertake all reasonable efforts to expeditiously issue such
             RFP, which shall issue by September 1, 2009.
[175]  Agreed Order, June 10, 2010 at ¶6.
[176]  See November 2010 Report at Ex. 3, Mississippi Department of Technology Services, RFP No. 3583, for a copy
of the RFP.
[177]  Ex. 30, Project Number 37921, Professional Services Agreement Between Walter R. McDonald & Associates,
Inc. and Mississippi Department of Information Technology Services as Contracting Agent for the Mississippi
Department of Human Services.  (The schedule included with the contract as Ex. A was modified after the contract
was finalized to accommodate the March 18, 2011 finalization date.)
[178]  The Monitor participated by telephone in the meeting.

issues are not addressed in the final version of the MACWIS assessment report. A final assessment report is expected in the near term.

Defendants must make substantial progress on short-and long-term solutions to these issues during Period 3. The Monitor will report on defendants' efforts in a subsequent report.

## IV.    CONCLUSION

As this report documents, there is a substantial gap between the Settlement Agreement's ultimate requirements and defendants' performance levels established by the case record review. The case record review revealed deficiencies in fundamental aspects of case practice, including the assessment process, service planning and delivery, permanency planning and investigative practices. These deficiencies impact the safety and well being of the children in defendants' custody.

In order to address systemic performance deficits, defendants are relying on the incremental implementation of the practice model, which is a promising reform strategy, but one that requires time as well as ongoing evaluation and correction to be effective. Defendants have made demonstrable progress toward implementing the practice model in certain regions of the state. Furthermore, the case record review findings indicate that defendants have been successful in meeting Settlement Agreement requirements related to the administrative review process and the placement of children in proximity to their homes and with their siblings.

While the progress is encouraging, it also is limited relative to the scope of the required reforms. The evidence indicates that the pace and quality of practice model implementation has been impeded in some regions by well-documented and long-standing organizational shortcomings. For example, pervasive staffing deficits, particularly in the regions with the highest numbers of children in DFCS custody, have contributed to backlogs in investigations of

45

maltreatment reports.  These backlogs exacerbate safety risks to the children in defendants'

custody and have in some instances delayed the practice model implementation schedule.

Additionally, defendants' data collection, recording and analysis system, which should guide the

allocation and management of scarce agency resources as the practice model is implemented, is

wholly inadequate.

Defendants are at the threshold of Period 3.  They have the opportunity to address these

fundamental systemic challenges now and must ensure that the resources are available to do so.

As described in this report, defendants are making promising efforts to implement the practice

model on a statewide basis.  However, these efforts are unlikely to accomplish the core

objectives of the Settlement Agreement if the systemic barriers that have undercut reform

initiatives are not addressed in an effective and enduring way.

_____/ s /_____

Grace M. Lopes (MBN 45693 *pro hac vice*)
Court Monitor
1350 Connecticut Avenue, N.W.
Suite 1000
Washington, D.C.  20036
(202) 232-8311
gmlopes@oymonitor.org

## CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2012, the Court Monitor's Report to the Court Regarding Findings from the Second Case Record Review and Other Matters Relevant to Defendants' Progress Toward Satisfying the Requirements of the Settlement Agreement, was transmitted electronically to the following counsel of record in this matter:

Dewitt L. ("Rusty") Fortenberry Jr.
Kenya Key Rachal
Ashley Tullos Young
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
428 I-55 North
Meadowbrook Office Park
Jackson, Mississippi  39211

Harold E. Pizzetta, III
Assistant Attorney General
General Civil Division
Carroll Gartin Justice Building
430 High Street
Jackson, MS 39201

W. Wayne Drinkwater, Jr.
BRADLEY ARANT ROSE & WHITE LLP
188 East Capital Street, Suite 450
Jackson, Mississippi  39201


Marcia Robinson Lowry
Miriam Ingber
Jessica Polansky
Sarah Russo
CHILDREN'S RIGHTS
330 Seventh Avenue
New York, New York  10001

John Lang
John Piskora
LOEB & LOEB LLP
345 Park Ave.
New York, New York  10154

_____/ s / _____
Grace M. Lopes

**Index to Exhibits**

Ex. 1          Curriculum Vitae, Jacqueline Smollar, Ph.D.

Ex. 2          Curriculum Vitae, Moira Ann Szilagyi, MD, Ph.D.

Ex. 3          July 7, 2011 e-mail from Grace M. Lopes to Kenya Key Rachal and
               Shirim Nothenberg with attached Case Record Review Instrument, Office
               of the *Olivia Y.* Court Monitor in Collaboration with MDHS/DFCS,
               Children in Foster Care Case Record Review, July 11-22, 2011

Ex. 4          Curriculum Vitae of Dr. Troy Blanchard

Ex. 5A         Executive Summary, Data Analysis Report, Mississippi Case Record
               Review, Sample 1

Ex. 5B         Data Analysis Report, Mississippi Case Record Review, Sample 1

Ex. 6          Sample 1, Regional Data Analyses Report

Ex. 7          Data Analysis Report, Mississippi Case Record Review, Sample 2

Ex. 8          Mississippi Department of Human Services, Timely Administrative
               (County Conference) Reviews Summary, May 1, 2011 - April 30, 2012,
               MWZTACRS

Ex. 9          Mississippi Department of Human Services, Children in Custody for 12+
               Months with a Timely Permanency Hearing Summary, May 1, 2011 -
               April 30, 2012, MWZTPHRS

Ex. 10         Mississippi Department of Human Services, Children in Custody with a
               Permanency Plan of Re-Unification, April 1, 2012 - April 30, 2012,
               MWZWCR3S

Ex. 11         Chart prepared by the Office of the Court Monitor, Investigations Opened
               January 1, 2011 Through December 31, 2011 By Month Opened, Level,
               and Custody Status

Ex. 12         Chart prepared by the Office of the Court Monitor, Maltreatment
               Investigations Initiated Within 24 Hours of Intake By Month, Children in
               Custody Only, January 2011 – December 2011

Ex. 13         Chart prepared by the Office of the Court Monitor, Maltreatment
               Investigations Completed Within 30 Days of Intake By Month, Children
               in Custody Only, January 2011 – December 2011

Ex. 14          Chart prepared by the Office of the Court Monitor, Distribution of Number of Days from Intake To Approved Findings for Maltreatment Investigations, Children in Custody, by Percentile and Month, January 2011 – December 2011

Ex. 15          Chart prepared by the Office of the Court Monitor, Maltreatment Investigations Initiated Within 24 Hours of Intake By Region, Children in Custody Only, January 2011 – December 2011

Ex. 16          Chart prepared by the Office of the Court Monitor, Maltreatment Investigations Completed Within 30 Days of Intake By Region, Children in Custody Only, January 2011 – December 2011

Ex. 17          Chart prepared by the Office of the Court Monitor, Number of Investigations of Reports of Maltreatment of In-Custody Children Open for More Than 30 Days as of 12/31/11 By Year, Month of Report Intake, and Region

Ex. 18          Mississippi Department of Human Services, Worker/Child Face to Face Home Contact Report – State Summary, April 1, 2012 – April 30, 2012, MWZWC5S2

Ex. 19          Mississippi Department of Human Services, Children in Custody Ages 14-20 and Their IL Services and Skills Provided - Summary, May 1, 2011 - April 30, 2012, MWBRD16S

Ex. 20          Mississippi Department of Human Services, Non-Therapeutic Care and Placement Setting Contacts - Resource Summary, April 1, 2012 - April 30, 2012, MWZPLMCS

Ex. 21          Mississippi Department of Human Services, Therapeutic Care and Placement Setting Resource Contacts, April 1, 2012 - April 30, 2012, MWZPLMS2

Ex. 22          Table produced by DFCS, April 2012 Workload, Caseload, and Staffing Analysis, redacted

Ex. 23          Chart prepared by the Office of the Court Monitor, Number of Caseworkers with Caseloads Relative to the Number of Caseworkers Necessary to Meet Settlement Agreement Requirements, Statewide, by Month, April 2011 - January 2012

Ex. 24          Chart prepared by the Office of the Court Monitor, Number of Caseworkers with Caseloads Relative to the Number of Caseworkers

Necessary to Meet Settlement Agreement Requirements, by Region and Month, April 2011 – January 2012

Ex. 25          Chart prepared by the Office of the Court Monitor, Hires and Separations Among DFCS Caseworker Staff, January 1, 2010 – April 30, 2012 Hires, January 1, 2010 – May 10, 2012 Separations

Ex. 26          Chart prepared by the Office of the Court Monitor, Reason for Separations Among Caseworkers, by Position, January 1, 2010 - May 10, 2012

Ex. 27          Chart prepared by the Office of the Court Monitor, Hires and Separations Among Area Social Work Supervisory Staff, January 1, 2010 - April 30, 2012

Ex. 28          Chart prepared by the Office of the Court Monitor, Reason for Separations Among Area Social Work Supervisors, January 1, 2010 – May 10, 2012

Ex. 29          DFCS MACWIS Down Time Tracking Report, 2012, redacted

Ex. 30          Project Number 37921, Professional Services Agreement Between Walter R. McDonald & Associates, Inc. and Mississippi Department of Information Technology Services as Contracting Agent for the Mississippi Department of Human Services