**Ex. 1**

**JACQUELINE SMOLLAR, Ph.D.**
**55 Calle Del Medio**
**Sedona, AZ 86336**

**Education**

| | |
|---|---|
| 1981 | Ph.D., Developmental Psychology, Catholic University of America |
| 1976 | M.A., Developmental Psychology, Catholic University of America |
| 1967 | B.A., Sociology, New York University |

**Professional Experience**

| | |
|---|---|
| 2008 – Present | Independent Consultant |
| 2004 - 2008 | ICF Consulting/Children's Bureau |
| 1999 - 2004 | James Bell Associates, Director |
| 1998 - 1999 | CSR, Incorporated, Senior Research Associate |
| | Walter R. McDonald & Associates, Inc., Senior Research Associate |
| 1994 - 1998 | Independent Consultant |
| 1992 - 1994 | KRA Corporation, Director, Research on Children, Youth and Families |
| 1990 - 1992 | Cygnus Corporation, Director of Research |
| 1988 - 1990 | CSR, Incorporated, Senior Analyst/Project Director |
| 1973 - 1988 | Catholic University, Life Cycle Institute, Research Associate |
| 1987 - 1988 | Catholic University, Department of Psychology, Instructor |
| 1976 - 1977 | Catholic University, Department of Psychology, Instructor |
| 1976 - 1977 | American University, Department of Psychology, Instructor |
| 1976 - 1977 | Drug Abuse Council, Washington, D.C., Research Consultant |
| 1967 - 1970 | Bureau of Child Welfare, New York City, Caseworker |

**Career Brief**

I have extensive experience managing Federal contracts; conducting research and program evaluation in the areas of services to children, youth, and families and child and adolescent development; and providing program and evaluation-related technical assistance to State agencies and nonprofit service organizations. Over the past two decades, I have conducted program evaluations, developed outcome assessments and performance standards, and provided evaluation and programmatic technical assistance to the following types of programs:

- Child welfare, including family preservation and support, child protective services, foster care, and adoption programs;
- Community-based collaborations to provide comprehensive health and human services;
- Runaway and homeless youth programs;
- Child maltreatment prevention, placement prevention, and intervention programs;
- Programs addressing child maltreatment and family substance abuse;
- Programs serving pregnant and/or parenting youth;

- Substance abuse prevention and treatment programs for youth;
- Community-based nutrition education programs for low income families; and
- Head Start programs.

I also have presented numerous workshops on conducting evaluations and preparing evaluation reports and was the lead writer on two evaluation guides for program managers, one written under a contract with the Administration for Children, Youth and Families (*A Program Manager's Guide to Evaluation*), and other for the Office of the Assistant Secretary for Policy and Evaluation (*Evaluating Privatization Initiatives in Child Welfare: A Guide for Program Managers).*

## Current Projects

- **Evaluation of the Wendy's Wonderful Kids Program.** For this project, I serve as a senior research associate to Child Trends for their evaluation of the Wendy's Wonderful Kids national adoption project. I provide technical assistance to Child Trends in conducting the adoption and participate in site visits, data analyses, and report preparation.
- **Evaluation of the Mississippi Diligent Recruitment Program.** For this project, I am designing, implementing, and analyzing an outcome and implementation evaluation of a Mississippi grant program funded by the Children's Bureau of the Federal Administration for Children and Families.
- **Provision of Technical Assistance to Grantees funded under the Federal Long-Term Foster Care Prevention initiative.** For this project, I am providing technical assistance to Arizona's child welfare agency in implementing a project to address the factors that result in children remaining in foster care for long periods of time.

## Recent Projects

- **Child and Family Services Review (CFSR) Final Reports.** For this project, I serve as consultant to ICF International. I analyze the case-review data and stakeholder interview information from the onsite CFSR review, and prepare the final reports for individual States after completion of their onsite CFSR.
- **Adoption Services Specialized Administrative Support Quality Assurance.** For this project, I serve as a senior research associate to Child Trends in the provision of technical assistance to the State of Ohio in the area of adoption. In this capacity, I conduct and analyze surveys of stakeholders throughout the State of Ohio and prepare reports based on survey findings, facilitate discussion groups and focus groups, and present reports to stakeholders based on the findings of the discussion groups and focus groups. I also will work with Ohio in developing the CFSR Program Improvement Plans in the areas of adoption assessed by the CFSR.
- **Quality Improvement Center on the Privatization of Child Welfare Services.** For this project I served as a consultant to Planning and Learning Technologies, Incorporated and wrote an evaluation manual entitled *Evaluating Privatized Child Welfare Programs: A Guide for Program Managers.* The manual was part of a series of reports prepared for the Office of the Assistant Secretary for Policy and Evaluation, Department of Health and Human Services.
- **Technical Specialist for the Child and Family Services Review.** For this project, I provided technical support to the Children's Bureau of the Administration for Children and Families for the Child and Family Services Reviews (CFSR). This included the following tasks:

- Assisting the Children's Bureau data team in developing composite measures for the CFSR.
- Conducting national trainings on the composites and measure for State child welfare agency staff and Federal regional office and central office staff.
- Analyzing data for individual State CFSR reviews and preparing the State final report.

## Past Projects

Brief summaries of projects that I have been involved in or directed are provided below.

- **Preparation of Annual Report to Congress on Child Welfare Outcomes.** For this project, I analyzed data from the National Child Abuse and Neglect Data System and the Federal Adoption and Foster Care Analysis and Reporting System, prepared state-specific and national data tables pertaining to 27 national child welfare measures, and wrote the annual Report to Congress.

- **Preparation of the Final Reports for each State's Federal Child and Family Services Review (CFSR) and Analysis of Cross-State data.** Project Director. For this project, I managed a team of five staff members. I was responsible for analyzing the data from each State's CFSR, writing the individual State reports, analyzing cross-State data pertaining to CFSR findings, and preparing a report summarizing the findings. I also established a workgroup to make recommendations to the Children's Bureau regarding changes to the CFSR process and facilitated the three workgroup meetings.

- **Development of Performance Measures and a Performance-Based Incentive System for the Nation's Child Welfare System.** Project Manager (WRMA). In response to the requirements of the Adoption and Safe Families Act, the Children's Bureau of ACF initiated a process for developing outcomes and measures that could be used to assess the performance of State child welfare systems, including both the foster care and the child protective services systems. This process was to lead to a Report to Congress on State performances with respect to identified outcomes, and a Report to Congress on a Performance-Based Incentive System for Child Welfare. I assisted Children's Bureau staff in convening an advisory panel, developing outcomes and measures, identifying potential performance-based incentive systems, and preparing the reports to Congress.

- **Developing a System of Program Accountability under the John H. Chafee Foster Care Independence Program.** Subcontract Manager. For this project, James Bell Associates, as a subcontractor to Westat Corporation, assisted the Children's Bureau of ACF in developing a system (including outcomes & measures) for assessing State performance in providing independent living services to current and former foster care youth. I conducted a review of the literature of research on outcomes for youth emancipated from the foster care system and prepared a report, facilitated focus groups around the nation to obtain input from the field regarding appropriate outcomes and measures for the assessment system, assisted Westat in preparing the Report to Congress, worked with Westat in drafting and revising outcomes and measures, and co-facilitated the project's advisory group meetings. I also was involved in preparing the necessary information for developing regulations pertaining to the Chafee data system.

3

- **Evaluation of the Quality Improvement Centers (QIC).**  Senior Research Associate.  The Children's Bureau provided funding to five organizations and institutions to develop and implement Quality Improvement Centers (QIC) in child welfare focusing on child maltreatment issues (4 centers) and adoption issues (1 center).  The Children's Bureau contracted with JBA to conduct a process and outcome evaluation of these efforts.  Under this contract, I had the lead role in evaluating two of the QICs and participated in developing evaluation tools and materials.

- **Technical Assistance on Program Evaluation for Adoption Opportunities Grantees and Child Abuse and Neglect Grantees**.  Senior Research Associate. This project, conducted under contract with the Children's Bureau, involved providing evaluation-related technical assistance to the Children's Bureau grantees.  I provided evaluation-related technical assistance to grantees through site visits, telephone discussions, presentations at annual meetings, and written reports.

- **Synthesis of the Final Evaluation Findings from the School-Based Child Maltreatment Services Grantees.**  Project Director.  The Children's Bureau contracted with JBA to review and synthesize the final reports of 18 grantees that received Federal funding to develop and implement school-based child maltreatment prevention projects.  For this contract, I designed and supervised the information synthesis process and prepared the synthesis report.

- **Development of Evaluation Manuals for ACYF Grantees.**  Project Director and Independent Contractor.  For this project, I developed materials and served as the lead writer for four evaluation manuals designed to assist program managers and staff in conceptualizing and conducting their own evaluations. This included the *Program Manager's Guide to Evaluation*, and an evaluation guide for program managers operating Head Start programs, programs funded by the Family and Youth Services Bureau, and programs funded by the Children's Bureau.

- **Develop Best Practice Guidelines for the Infant Adoption Awareness Training Program**.  Senior Research Associate.  The Children's Bureau contracted with JBA to conduct a series of discussions with experts in the area of infant adoption to identify best practices with regard to training public health agency workers in presenting the adoption option to women experiencing unplanned pregnancies.  I conducted many of the interview discussions and prepared the final report presenting the experts' recommendations.

- **Evaluation Technical Assistance to Demonstration Projects Addressing the Problem of Chronic Child Neglect.**  Project Director/Independent Consultant. Eleven 5-year research and demonstration projects were funded by the Children's Bureau's Office of Child Abuse and Neglect (OCAN) to develop and evaluate innovative service approaches for families reported to child protective services for problems related to chronic neglect.  I provided evaluation-related technical assistance to the grantees and facilitated the annual grantees' meeting.

- **Family Preservation and Support Services Implementation Study.**  Senior Research Associate.  This study, conducted for ACF, examined how States and local communities implemented family preservation and family support programs under funding provided by the Family Preservation and Support Act, now known as the Promoting Safe and Stable Families Act.  For this study, I reviewed State and local documents and plans pertaining to PSSF programs, conducted interviews with State and local personnel regarding the implementation process, and prepared summary reports on individual State and local implementation processes.

4

- **Evaluation of the Emergency Services Grantees Funded by the National Center on Child Abuse and Neglect.** Project Director (KRA). In 1993, NCCAN funded 91 grantees to develop innovative approaches to providing (1) services for families experiencing substance abuse and child maltreatment problems or (2) multidisciplinary training involving both child protective services and substance abuse treatment personnel. The grantees were to hire third-party evaluators to evaluate their efforts. For this project, I managed an effort to conduct a cross-site evaluation of the emergency services projects involving collection of data on the implementation process and a meta-analysis of the findings of the individual grantee evaluations. This included developing interview and survey instruments and a survey approval package for the Office of Management and Budget (OMB).

- **Technical Assistance to Emergency Services Grantees Funded by the National Center on Child Abuse and Neglect (NCCAN).** Project Director (KRA). This project, also funded by NCCAN, involved providing programmatic and evaluation-related TA to the 91 Emergency Services grantees.

- **Evaluation of Six Native American placement prevention and reunification projects.** Project Director (CSR). For this study, funded by the Children's Bureau, I developed the research design, interview and other data collection instruments; collected and analyzed the data, and prepared the final report and a set of recommendations to the Children's Bureau.

- **Study of Short-Term Foster Care.** Project Director (CSR). This study was conducted for the Research and Evaluation Division of ACYF in conjunction with the Children's Bureau. The study was designed to assess the differences between child protective services cases involving the short-term placement of children in out-of-home care (less than 90 days) and those in which families received services while the children remained at home. Six States and 12 counties were included in the study, 3 States with very high levels of short-term foster care and 3 with very low levels. The assessment focused on analysis of State policies and data, and involved collecting data on the characteristics of the child protective services system, children, families, and caseworkers.

The following are additional projects for which I served either as a senior analyst, consultant, or project director:

- Project Director: Managed and designed assessment and survey instruments designed to provide management support and technical assistance to the Drug Abuse Prevention Programs for Runaway and Homeless Youth funded by FYSB.

- Consultant: Developed process evaluation survey instruments, constructed an analysis plan, conducted telephone and onsite interviews, and prepared case study reports for the evaluation of Team Nutrition, a national nutrition education project funded by Food and Consumer Services, USDA.

- Project Director: Managed a national project to provide evaluation TA and prepare a synthesis report on ten Community Nutrition Education Projects for low income families, funded by the Food and Consumer Services division of the United Stated Department of Agriculture.

- National Consultant: Assisted the National Resource Center on Child Maltreatment in the development and implementation of a national leadership initiative on substance

5

abuse in Child Protective Services cases leading toward the production of a monograph and the delivery of a national symposium.

- Consultant:  Developed a synthesis report of the Head Start Target Cities Demonstration Projects for the Head Start Bureau.
- Consultant:  Worked with the Head Start Bureau in developing a strategic plan for an accreditation program for Family Services Workers within the Head Start Program.
- Consultant:  Provided evaluation-related technical assistance to 18 school-based child maltreatment prevention projects funded by the Office of Child Abuse and Neglect of the Children's Bureau.
- Consultant: Provided evaluation-related technical assistance to Family Support Center demonstration projects funded by the Office of Community Services, Department of Health and Human Services.
- Consultant: Developed an inventory of effective child welfare and child protective services practices for the Department of Children and Family Services, State of Illinois.
- Consultant: Evaluated five disaster preparedness projects for the Corporation for National Service.
- Consultant: Developed a synthesis report on the Head Start Homeless Families Demonstration Projects designed to provide Head Start and other services to homeless families for the Head Start Bureau.
- Consultant: Developed a final report outline and cross-project report on the  Head Start Target Cities Demonstration Projects designed to provide substance abuse training and intervention skills to Head Start program staff.
- Consultant: Developed a cross-site analysis of the Head Start Teaching Center Demonstration Projects for the Training and Technical Assistance Division of the Head Start Bureau.
- Consultant: Assisted Baltimore City's Healthy Start, Inc. develop a needs assessment for a Management Information System.
- Consultant: Conducted an inventory analysis of the Head Start Publications Management Center and developed and tested a feedback system for assessing the use and effectiveness of selected Head Start publications.
- Project Director: Developed for FYSB a theoretical framework for understanding youth development that identified the critical characteristics associated with positive youth development and the kinds of experiences and interactions that foster development of those characteristics.
- Project Director: Developed, for ACF, a statistical profile of one-parent families and a literature review of the current state-of-the-art with respect to knowledge about these families.
- Project Director: Managed and conducted a survey for the Office of Human Development Services (now ACF) to identify best practices in DHHS-funded Youth Self-Sufficiency Projects.
- Senior analyst: Conducted a survey for the Office of the Assistant Secretary for Planning and Evaluation on family involvement in services to youth, specifically pregnant and parenting teenagers, runaway youth, and adolescent substance abusers.   Analyzed survey data and prepared final report.

6

- Senior Analyst: Participated in a study of family involvement in programs serving pregnant and parenting adolescents, funded by the Adolescent Family Life (AFL) division of the Office of Adolescent Pregnancy Prevention, DHHS.
- Principal Investigator:  Evaluated a Red Cross national pregnancy prevention program funded by AFL.
- Principal Investigator:  Assessed the Maryland State Department of Education's Home-School Cooperation Program.

In addition to the projects listed above, while employed as a Research Associate at the Life Cycle Institute at Catholic University, I conducted research in the field of adolescent cognitive and social development.  This research resulted in several publications and in the co-authorship of a book entitled ***Adolescent Relationships with Mothers, Fathers and Friends***, published by the University of Chicago Press.

**Awards**

On October, 2003:  I received the Administration for Children and Families, Assistant Secretary's 2003 Honor Award for Outstanding Contractor.

**Publications**

Mitchell, L., Hornsby, W., Smollar, J., and Milner, J.  Adoption from the foster care system: Findings from the Child and Family Services Review.  **Adoption Factbook IV,** National Council for Adoption, 2007.

Smollar, J. 2000-2004:  Various final reports, Reports to Congress, and Data Reports submitted to the Children's Bureau and the Head Start Bureau of the Administration on Children, Youth and Families.

Smollar, J., 1999. Homeless youth in America: Developmental implications of youth homelessness.  In W. Damon (ed.), **New Directions in Child Development**, San Francisco: Jossey Bass.

Smollar, J., 1999. **Understanding Performance Measurement in the Context of Human Services Delivery Programs:  Implications for Youth Development Programs.**  Family and Youth Services Bureau, Administration on Children, Youth and Families, Department of Health and Human Services, Washington, D.C.

Smollar, J., 1998: **Effective Practices of the Head Start Demonstration Projects Serving Homeless Families.**  Head Start Bureau, Administration on Children, Youth and Families, Department of Health and Human Services, Washington, D.C.

Smollar, J., 1997.  **Preliminary Report on the Head Start Teaching Center Demonstration Grants**, Head Start Bureau, Administration on Children, Youth and Families, Department of Health and Human Services, Washington, D.C.

Smollar, J., 1997.  **Final Report on the Community Nutrition Education Cooperatives Demonstration Projects**, US Department of Agriculture, Food and Consumer Service, Washington, D.C.

Smollar, J., Fairchild, C., and MacAllum, C., 1996.  **Understanding Youth Development: Promoting Positive Pathways of Growth.**  Report prepared for the Family and Youth Services Bureau of the Administration on Children, Youth and Families, Washington, D.C.

Smollar, J., 1996 (lead author) (with T. Kelly, C. Holmes Morgan, R. Newman-Smith, R. White, and M.T. Woolverton) 1996.  **The Program Manager's Guide to Evaluation**. Administration on Children, Youth and Families, Washington, D.C.

Smollar, J., Kelly, T. and Pierce, A., 1996.  **Family and Youth Service Bureau Evaluation Handbook.**  Administration on Children, Youth and Families, Washington, D.C.

English, D.T. and Smollar, J. ,1996.  **Children's Bureau Evaluation Handbook.**  Administration on Children, Youth and Families, Washington, D.C.

Smollar, J. and Woolverton, M., 1994.  **Home-Based Services Programs:  Service Models and Evaluation Findings.**  Report to the Administration on Children, Youth and Families.

Smollar, J. and Blough, B., 1993.  **Annotated Bibliography:  Publications Addressing the Coexisting Problems of Parental Substance Abuse and Child Maltreatment**.  Publication for the National Center on Child Abuse and Neglect, DHHS.

Smollar, J., Hollenberg, E., and Flanzer, S., 1992.  **Case Studies of Exemplary Demonstration Projects Serving At-Risk Youth.**  Report to the Office of Human Development Services, DHHS.

Hollenberg, E., Smollar, J., and Flanzer, S., 1991. **P.A.S.S.A.G.E.S.: Promoting Adolescent Self- Sufficiency - A Guidebook of Effective Strategies.**  Report to the Office of Human Development Services, DHHS.

Smollar, J., 1991.  **A Study of Short-Term Foster Care:  Volume 1, Final Report**.  Report to Administration on Children, Youth and Families, DHHS.

Smollar, J., 1991.  **A Study of Short-Term Foster Care, Volume 2, Case Studies Report**. Report to  Administration on Children, Youth and Families, DHHS.

Smollar, J., Hollenberg, E., and Flanzer, S., 1991.  **Identification of "Best Practices" in OHDS-Funded Youth-Related Demonstration Projects, Volume 1.**  Report to Office of Human Development Services, DHHS.

Smollar, J., 1990.  **An Evaluation of Six Native American Placement Prevention and Reunification Projects.**   Report to the Administration for Children, Youth and Families, OHDS, DHHS.

Smollar, J., and Thomas, A., 1990.  **Annotated Index of Publications: One-Parent Families 1980-1990**.  Report to the Office of Human Development Services, DHHS.

Smollar, J., and Thomas, A., 1990.  **Statistical Profile of One-Parent Families**.  Report to the Office of Human Development Services, DHHS.

Smollar, J., 1990.  **Understanding One-Parent Families:  Factors Contributing to Positive Outcomes for Children.**  Report to the Office of Human Development Services, DHHS.

Smollar, J., and Youniss, J., 1989.  Transformations in adolescents' perceptions of relationships with parents.  **International Journal of Behavioral Development.**

Smollar, J., and Ooms, T., 1988.  **Young Unwed Fathers:  Research Review, Policy Dilemmas, and Options.**  Report to the Assistant Secretary for Planning and Evaluation, DHHS.

Smollar, J., 1986.  **Home-School Cooperation:  An Assessment of Home-Reinforcement Programs in Nine Elementary Schools.**  Report to the Home-School Cooperation Committee, Maryland State Department of Education.

Smollar, J., Youniss, J., and Ooms, T., 1986.  **Family Relationships of Adolescents in Crisis:  An Assessment of Research and Programs.**  Report to the Assistant Secretary for Planning and Evaluation, DHHS.

Youniss, J., and Smollar, J., 1985.  **Adolescent Relationships with Mothers, Fathers, and Friends**.  Chicago:  University of Chicago Press.

Youniss, J., and Smollar, J., 1988.  Social bases of interpersonal relationships.  In T. Berndt and G. Ladd (eds.), **Contributions of Peer Relationships to Children's Development.**

Smollar, J., and Youniss, J.,  1989.  Self through relational development.  In H. Bosma and S. Jackson, (eds.), **Coping and Self Concept in Adolescence.**  Heidelberg: Springer.

Smollar, J., and Youniss, J.,  1985.  Self-concept development.  In R. Leahy (ed.), **The Development of the Self**.  New York:  Academic Press.

Smollar, J., and Youniss, J.,  1985.  Parent-adolescent relations of adolescents whose parents are divorced. **Journal of Early Adolescence 5**:129-144.

Smollar, J., and Youniss, J., 1982.  Social Development Through Friendship.  In K.H. Rubin and H.S. Ross (eds.), **Peer Relationships and Social Skills in Childhood**.  New York:  Springer.

Smollar, J.,  1981.  The Development of Concepts of Self:  An Interpersonal Perspective.  In J.S. Meacham and N. Santilli, (eds), **Social Development and Youth:  Structure and Content.**  Basel, Switzerland:  Karger.

Smollar, J., and Youniss, J.,  1978.  A Relational Analysis of Friendship.  In W. Damon (ed.), **Social Cognition**.  San Francisco:  Jossey-Bass.

**Ex. 2**

**March 2011**

# Moira Ann Szilagyi, MD, PhD

## Curriculum Vitae

**Business Address**:
Medical Director,
*Starlight Pediatrics*…
*dedicated to the health of children and adolescents in foster care*
Monroe County Department of Health
111 Westfall Road, Room 183
Rochester, NY  14692

Telephone:  (585) 753-5927 or (585)753-5603
Fax Number: (585) 753-5181
e-mail Address:        mszilagyi@monroecounty.gov

**Academic Appointment**
Associate Professor of Pediatrics
Golisano Children's Hospital at Strong
University of Rochester Medical Center

**Demographic**
Date of Birth:         September 4, 1951
Place of Birth:        Melbourne, Victoria, Australia
Citizenship:          United States of America, 1970

**EDUCATION**

| Institution | Degree | Field of Study | Year |
|---|---|---|---|
| Siena College | B.S. | Chemistry | 1974 (Valedictorian, Summa cum laude) |
| University of Rochester | M.S. | Biochemistry | 1979 |
| University of Rochester | Ph.D. | Biochemistry | 1980 |
| University of Rochester | M.D. | Medicine | 1984 |

**Honorary Societies**
1974:  ALPHA  KAPPA  ALPHA
1974:  DELTA EPSILON SIGMA
1978:  Elected to SIGMA XI (National Honor Society in Biochemistry)

1

## POSTDOCTORAL TRAINING

<u>6/84-6/86</u>: Internship in Pediatrics, University of Rochester School of Medicine and Dentistry, Strong Memorial Hospital, Rochester, NY. (Reduced Schedule),

<u>6/86-2/90</u>:  Residency in Pediatrics, University of Rochester School of Medicine and Dentistry, Strong Memorial Hospital, Rochester, NY. (Reduced Schedule)

## CERTIFICATION AND LICENSURE INFORMATION

| | |
|---|---|
| American Board of Pediatrics | 1990; re-certification 1997, 2004 (expires 2011). |
| New York State License | 166770-1 |
| DEA | BS0667646 |
| NCS | 1073548897 |

## FACULTY APPOINTMENTS

1990-1998     Clinical Instructor in Pediatrics, Department of Pediatrics, Strong Memorial Hospital, Rochester, New York

1998-2003     Clinical Assistant Professor, Department of Pediatrics, University of Rochester, Rochester, New York

2003-          Associate Professor of Pediatrics, Department of Pediatrics, University of Rochester, Rochester New York

## PROFESSIONAL AND ADMINISTRATIVE APPOINTMENTS

1976-1979     Adjunct Professor of Chemistry, Nazareth College, Pittsford, NY

1990-1992     Primary Care Pediatrician in private practice (part-time), Twelve Corners Pediatrics, Rochester NY

1990-1992     Primary Care Pediatrician, Children's Center (Juvenile Offender Detention; part time), Monroe County Department of Health, Rochester, NY

1990-          Medical Director, *Starlight Pediatrics* (formerly known as Foster Care Pediatrics), Monroe County Department of Health, Rochester, NY

1992-1994     Founder and Co-director, REACH Program (REACH is the regional referral center for medical evaluation of suspected child abuse and neglect), Department of Pediatrics, Strong Memorial Hospital, Rochester, New York

2

1994-          Preceptor, Illness and Continuity Clinics, Pediatric Practice at Strong, Strong
               Memorial Hospital, Rochester, New York


## MEMBERSHIPS IN LOCAL AND STATE ACADEMIC PROFESSIONAL ORGANIZATIONS

Child Abuse and Neglect
1995-1998      Board Member, New York State Professional Society, Child Abuse and Neglect.

Rochester Pediatric Society
1990-2000      Member
1996           Secretary-Treasurer, Rochester Pediatric Society.
1997           Vice-President, Rochester Pediatric Society.
1998           President, Rochester Pediatric Society

American Academy of Pediatrics, Regional and State
1995-2005      Chair, Committee on Early Childhood, Adoption and Dependent Care, American
               Academy of Pediatrics, District II, Chapter I.

1995-2005      Chair, American Academy of Pediatrics District II, New York State, Task Force
               on Foster Care Health Care


## MEMBERSHIPS IN NATIONAL AND INTERNATIONAL ACADEMIC PROFESSIONAL ORGANIZATIONS
1990-          Fellow, American Academy of Pediatrics.
1993-1998      Member, American Professional Society Child Abuse and Neglect.

American Academy of Pediatrics, National Committees
1995-1999      Section Member, Committee on Child Abuse and Neglect.
2000-2002      Steering Committee, Provisional Section on Adoption.
2001-          Member, Committee on Early Childhood, Adoption and Dependent Care.
2002-          Steering Committee, Section on Adoption and Foster Care
2003-2005      Steering Committee, Healthy Foster Care America
2006-2007      Vice-Chair, Healthy Foster Care America
2006-          Vice-chair, Task Force on Foster Care
2010-          Chair, Section on Adoption and Foster Care

Ambulatory Pediatric Association
2003-          Member

## NATIONAL LECTURESHIPS AND VISITING PROFESSORSHIPS
Visiting Professor, University of Florida at Jacksonville.  Building Systems of Health Care for
Children in Foster Care.  Jacksonville, FL. November 1-2, 2001.

3

Visiting Professor.  University of Vermont, Burlington, VT*:  Fostering Health:  Health Care for Children in Foster Care. October, 2002.
Visiting Professor, Foster Care United Services (FOCUS), University of Michigan, Department of Pediatrics, Supported by the American Academy of Pediatrics Section on Community Pediatrics, Mentorship and Technical Assistance Program (MTAP).  November 12-13, 2002.

Consultant and Speaker, ChildTrends, Consortium on Child Well-being Indicators for Child Welfare Populations, Washington, DC.  Health Care Assessments for Young Children in Foster Care. April 8, 2003.

Visiting Professor, University of Massachusetts, Building a Medical Home for Children in Foster Care:  Cross-systems collaboration.  Worcester, MA. November 14, 2003.

Visiting Professor and Keynote Speaker. *Jersey Shore Medical Center, NJ*.  Fostering Health: Children in Foster Care.  April, 2005.

Keynote Speaker and Workshop Leader, CARES Institute, Third Annual Statewide Best Practice Symposium:  Meeting the Medical and Mental Health Needs of Children in Foster Care. University of Medicine and Dentistry New Jersey, Stratford NJ.  March 15, 2007.

Keynote Speaker.  Hershey Medical Center. Harrisburg, PA. Medical Homes for Children in Foster Care. November 20, 2009.

Advisory Board.  Your Health, Your Body, Your Responsibility: Promoting Healthy Behaviors Among Teens.  Boys Town National Research Hospital.  Omaha NE.  2011.

**INTERNATIONAL LECTURESHIPS AND VISITING PROFESSORSHIPS**
Visiting Professor, MacKeith Meetings, Royal Society of Medicine, London, England. Multiply Handicapped Children in Foster Care. March 17-18,  2003.


**MEMBERSHIPS IN LOCAL AND STATE COMMUNITY SERVICE ORGANIZATIONS**

1970-1974     Tutor, Higher Educational Opportunities Program.

1972-1974     Volunteer, Big Sister. Big Brothers/Big Sisters of Albany.  Albany, NY.

1974-1979     Volunteer, Instructor for health-related fields. Career Days for High School Students.  St. John Fisher College, Rochester, NY.

1986-1989     Volunteer, Primary Care Physician, Corpus Christi Outreach Center. Rochester NY.

1986-1991     Board of Directors, Twelve Corners Daycare Center, Rochester NY.

1991-1994     Board of Directors, Kids Adjusting Through Support. Rochester NY.

1991-1996     Department of Social Services, Children's Advisory Committee.  Monroe County, NY.

1994-1995     Regional Task Force to Advise and Redesign Child Protection Services in Monroe County, NY.

1995-2000     Medical Consultant on Child Abuse. Rochester Society for the Protection and Care of Children, Committee on Legislative Issues.  Rochester, NY.

1998-2001.    CATCH Advisory Board. Mental Health Advisory Panel for Children in Foster Care.

2000     Volunteer. Flower City Habitat for Humanity.  Rochester, NY.

2001     Volunteer, Orphanage Outreach.  Monte Christi Orphanage. Monte Christi, Dominican Republic.

2001-     PLC/CARE Advisory Board (Board of Directors)

2003-     Volunteer, Youth Opportunities Unit of Foster Care.  Mentoring adolescents in or recent graduates of foster care.

2004-     Member, Planning Board for Babies Can't Wait/Adolescents Won't Wait. Developing educational curriculum on foster care issues for judicial, legal and child welfare professionals.

2005-     Member, Committee on Violence, American Academy of Pediatrics, Monroe County Medical Society.   Multidisciplinary team of health professionals reviewing evidence-based approaches to violence prevention.

2006-     Member, Board of Directors, Children's Institute, Rochester NY.

## HONORS AND AWARDS
1970-1974     Ford Foundation Scholar.
1974          Summa Cum Laude, Valedictorian, Siena College.
1975-1978     National Research Service Award (NCHSR, DHHS).
1979-1980     Elon Huntington Hooker Fellowship.
1988-1989     House-officer of the Year, Rochester Pediatric Society.
1988-1989     Burroughs-Welcome Award, Leadership in Residency.
1992          National Association of Counties, Award for Foster Care Pediatrics
1998-1999     Outstanding Clinical Faculty Teaching Award. Awarded by the Pediatric House-Staff at the University of Rochester.

5

| | |
|---|---|
| 2003 | Child Advocacy Award, from New York Chapter of National Association of Pediatric Nurse Practitioners. |
| 2003 | Ruth A. Lawrence Faculty Service Award. Golisano Children's Hospital at Strong, University of Rochester. |
| 2003 | Making a Difference Award. "For your special gifts of healing, compassion and never-ending commitment to and advocacy for children in foster care." Awarded by Department of Health and Human Services, Monroe County, NY. |
| 2004 | Pediatric Links with the Community Advocacy and Education Award. |
| 2004 | Millie and Richard Brock Pediatric Award.  New York Academy of Medicine. September 19, 2005. |
| 2007 | Health Care Achievement Award.  Rochester Business Journal. |
| 2007 | Award of Merit.  Rochester Academy of Medicine. |
| 2007. | American Professional Society on Abused Children.   Front-line Service Award. |
| 2007. | Calvin C.J. Sia Community Pediatrics Medical Home Leadership and Advocacy Award. Presented   at the American Academy of Pediatrics' Council on Community Pediatrics. October 28, 2007. |
| 2009 | W. Burt Richardson Lifetime Achievement Award, Federation of Social Workers. October 23, 2009. |
| 2011 | Dr. David Satcher Community Health Improvement Award, Senior Faculty Category.  University of Rochester Medical Center.  March 21, 2011.  Awarded for work in reducing health disparities and addressing priority community health needs, especially for children in foster care. |

## EDUCATIONAL CONTRIBUTIONS

Mentorship of Trainees and Faculty

*Mentor for Pediatric Residents*
> Michelle Jones, MD.
> Joeli Hettler, MD.
> Cara Kaupp, MD
> Robert Humphreys, MD
> Sara Eleoff MD
> Abigail Kroenig, MD.

*Mentor for Medical Students*
> Ingrid Walker
> Shanna Yin

*Mentor for Ph.D. Candidates*
> Paula Neil, M.S.N., scheduled to finish in 2010
> Anne-Marie Conn, M.S., scheduled to finish in 2011

*Mentor for Fellows*

6

Adrianne Stith, PhD.  Psychology Fellow, Department of Psychiatry, University of Rochester Medical Center.  Content mentor for mental health assessments for children in foster care.

Sandra Jee, MD, MPH.   General Academic Pediatrics, University of Michigan.  Content mentor on foster care and child welfare.

Heather Paradis, MD.  General Academic Pediatrics, University of Rochester Medical Center.  Content mentor on Parenting.

Sara Eleoff, MD.  General Academic Pediatrics, University of Rochester Medical Center.  Content mentor on foster and kinship care, child welfare, health of special needs children.

*Mentor for Faculty*

<u>Sandra Jee, MD, MPH.</u>  General Pediatrics, University of Rochester Medical Center.  Content mentor on foster care, child welfare, mental health issues of children and teens in foster care, child development, care of children with special health care needs.

For Robert Wood Johnson Award: Primary Care-Base Mental Health Screening for Adolescents in Foster, Care $300,000. 7/1/07-6/31/10 (content mentor).

<u>Wendy Nilsen, Ph.D.</u>  Psychology Faculty, Department of Psychiatry, University of Rochester Medical Center. Content mentor in foster care and child welfare.

*Advising Faculty and Fellows at other Institutions*

| Name | Institution | Position | Years |
|------|-------------|----------|-------|
| Sandra Jee, MD., MPH | University of Michigan | Pediatric Fellow | 2002-2005 |
| David Harmon, M.D. | University of Florida | Faculty | 2001-2003 |
| Barbara Frankowski, M.D. | University of Vermont | Faculty | 2002-2004 |
| Linda Sagor, M.D. | University of Massachusetts | Faculty | 2003-2006 |
| Cathleen Balance, M.D. | Jersey Shore Med Ctr | Faculty | 2005-2006 |
| Abe Bergman, M.D. | University of Washington | Faculty | 2005-2007 |
| Thomas Tonniges, M.D. | Boys Town of America | Medical Director | 2006- |
| Debra Borchers, M.D. | Private Practice Cincinnatti OH | Physician | 2008- |
| Deborah Shropshire, M.D. | University of Oklahoma | Faculty | 2006-2007 |
| Philip Scribano, M.D. | University of Ohio | Faculty | 2008- |
| Anne Armstrong, MD | Columbia University | Faculty | 2010- |
| Kelly Brown, MD | University of Milwaukee | Faculty | 2010- |

.

<u>Grand Rounds, Rochester NY</u>**:**

1. *Rochester General Hospital*:  Foster Care.  February 1991.

7

2.  *Strong Memorial Hospital:*  A Population in Crisis - Children in Foster Care.  February 1992.

3.  *Rochester* General *Hospital:*  Sexual Abuse Evaluation in the Primary Care Setting. October 1995.

4.  *Strong Memorial Hospital:*  Healthy Futures for Children in Foster Care. January 2010.

5.  *Rochester General Hospital:* Healthy Futures for Children in Foster Care. January 2010.

6.  *University of Rochester Medical Center, Department of Preventive Medicine:* Fostering Healthy Futures:  Health Needs of Children in Foster Care. March 2011.

Grand Rounds, National

1.  *Upstate Medical Center*, Syracuse, New York: Children in Foster Care. March 1993.

2.  *University of Florida at Jacksonville, Jacksonville, FL*:  Health Care for Children in Foster Care. November 2001.

3.  *University of Vermont, Burlington, VT:*  Fostering Health:  Health Care for Children in Foster Care. October, 2002.

4.  *University of Michigan, Ann Arbor, MI*:  Fostering Health:  Children in Foster Care. November 2002.

5.  *University of Massachusetts, Worcester, MA*.  Fostering Health: Health Care for Children in Foster Care.  November 2003.

6.  *Jersey Shore Medical Center, NJ*.  Fostering Health: Children in Foster Care.  April, 2005.

7.  *New York University, NY, NY*.  Fostering Health.  Health Care Issues for Children in Foster Care.  September, 2005.

8.  *Montefiore Medical Center, Bronx NY*.  Health Issues of Children in Foster Care.  January 27, 2010.

9.  *Rochester General Hospital*.  Improving Health and Mental Health Outcomes for Children in Foster Care. January 2010.

10.  *Chldren's Hospital of Milwaukee:*  Improving Health and Mental Health Outcomes for Children in Foster Care.  October 2010  .

Other Professional Presentations: Rochester NY

1. Cocaine Effects. Regional Foster Parent Training, November 1991.

2. Ongoing participation in Foster Parent Training (MAP) Series since 1992.

3. Children in Transition. University of Rochester, Regional HIV Conference, April 1995.

4. Sexual Abuse Evaluation in the Primary Care Setting. Pediatric Continuity Clinic, Teaching Sessions for Residents. Presented on multiple occasions, 1994, 1996, 1998.

5. Child Abuse. Strong Memorial Hospital, New York State Child Abuse Training. Presented on multiple occasions, 1993, 1994.

6. Adolescents in Foster Care. Leadership Education in Adolescent Health. Presented on multiple occasions, 1998, 1999, 2000, 2001, 2002, 2003.

7. Children in Foster Care:  Medical and Legal Issues.  Panel Discussion. Teaching Day for Neonatology Nursing Staff, 2000.

8. Health Issues for Children in Foster Care.  Training for Family Court Judges. New York State Judicial Commission. Rochester NY.  October 2001.

9. Reactive Attachment Disorder.  10th Annual Perspectives on Adoption and Foster Care Conference: Working Together for Children.  Adoption Resource Network, Inc. November 2001.

10. Impact of Foster Care on the Child. CHILD, Inc. Rochester NY.  December 2000, December 2001

11. Child Abuse. Monroe County Departments of Health and Social Services, New York State Child Abuse Training.  December, 2002.

12. Developmental Issues in the Foster Care Population. Center for Developmental Assessment, LEND Program, March 2001, December 2001, January 2003, December 2003, January 2005.

13. Common Medical Issues in Foster and Adopted Children.  11th Annual Perspectives on Adoption and Foster Care Conference: Working Together for Children.  Adoption Resource Network, Inc. Rochester, NY. November, 2002 .

14. Meeting the Health Needs of Children in Foster Care in Monroe County.  Children Services Subcommittee of Department of Health and Human Services.  October, 2003.

15. Common Medical Issues in Foster and Adopted Children.  12th Annual Perspectives on Adoption and Foster Care Conference: Working Together for Children.  Adoption Resource Network, Inc. Rochester, NY. November, 2003.

9

16. Care of Children in the Foster Care System.  Nursing 439: Advanced Nursing Care of Children and Families III; Leadership in Complex Organizations.  University of Rochester Clinical Nursing Program, Rochester NY. February 16, 2004.

17. Prenatal Adversity.  Presented at Babies Can't Wait training program for legal and child welfare professionals.  October, 2004.

18. Resilience:  When things go well for children in foster care.  Babies Can't Wait Training for legal and child welfare professionals.  November 2004.

19. Child Physical Abuse. Presented at the Monroe County Department of Public Health, Rochester, NY.  June 9, 2005.

20. Accurate needs assessment and best practice guidelines for children in foster care.  Babies Can't Wait Training for legal and child welfare professionals. June 2005.

21. Outcomes for children in foster care.  Babies Can't Wait Training for legal and child welfare professionals.  April 2006.

22. How to tell when it isn't ADHD in Foster Care.  Presented at Monroe County Foster Parent Training. October 2006.

23. Confidentiality Issues in Foster Care Health.  Presented at Monroe County Foster Parent Training. October 2006.

24. The Medical Home for the Child in Foster Care.  Presented at Caseworker Training, Monroe County Department of Human Services.  June 2009, December 2009, March 2010, June 2010, September 2010, March 2011.

Other Professional Presentations:  State
1. Advocacy for Children with Special Health Care Needs.  Meet the Professor at Social Pediatrics Meeting at Montefiore Hospital Department of Pediatrics, Bronx, New York

2. Healthy Futures for Children in Foster Care: Ten Things Pediatricians Need to Know about Caring for Children in Foster Care.  Presented at New Jersey Statewide AAP Meeting, June 8, 2010.

Other Professional Presentations: National
1. Primary Care for Children in Foster Care. Committee on Early Childhood, Adoption and Dependent Care, American Academy of Pediatrics, October 1991.

2. Fostering Health:  Health Care Standards for Children in Foster Care.  Ambulatory Pediatric Association Regional Meeting.  Pittsburgh, PA.  October, 2003.

3. Foster Care:  Impact on the Child. Ambulatory Pediatric Association Regional Meeting. Pittsburgh, PA.  October, 2003.

4.  The Foster Care Medical Home:  Meeting the needs of children in foster care.  Presented at the American Academy of Pediatrics District II and District IX Meeting. San Diego CA.  February 2004.

5.  Meeting the Health Needs of Children in Foster Care.  Presented at the Tenth Annual Medical Conference on Child Abuse and Neglect.  Holland, MI.  May, 2004.

6.  Health Care Solutions for Children in Foster Care.  Jersey Shore Medical Center Invited Multidisciplinary Meeting.  April, 2005.

7.  Health Disparities:  Children in Foster Care.  American Academy of Pediatrics, Annual Meeting, Districts IV and V.  Asheville, NC.  May, 2005.

8.  Wellness Outcomes in Maltreated Children: An Oxymoron.  New York Academy of Medicine.  New York, NY.  September, 2005.

9.  Models of Health Care Delivery at the Conference on Improving Health Care Services for Children in Foster Care.  Telaris Conference Center.  Seattle, WA.  September, 2005.

10. Healthy Outcomes for Children in Foster Care.  Children's Health Fund.  New York, NY.  March 2006.

11. Healthy Foster Care America.  American Academy of Pediatrics, Board of Directors.  Elk Grove Village, IL.  August 2006.

12. Health Care for Children in Foster Care.  Seminar.  American Academy of Pediatrics National Conference and Exhibition.  Atlanta, GA. October, 2006.

13. Health Issues of Children in Foster Care.  National Council of Juvenile and Family Court Judges Board of Directors Meeting.  Savannah, GA. January, 2007.

14. Professional Advocacy for Children in Foster Care.  Ambulatory Pediatric Association Regional Meeting (Regions II and III).  Stratford NJ.  March 16 2007.

15. Workshop on Health and Mental Health Issues of Children in Foster Care.  Children in Foster Care: Health Issues.  National Child Abuse and Neglect Meetings.  Portland OR.  April 19, 2007.

16. The Foster Care Medical Home.  Future of Pediatrics Conference.  American Academy of Pediatrics.  Orlando, FL.  July 1, 2007.

17. Health Care for Children in Foster Care.  American Academy of Pediatrics National Conference and Exhibition. October 2007.

18. Medical Aspects of Adoption and Foster Care. Child Welfare League of America, Shared Beliefs…Shared Values Conference. New Orleans, LA. December 2007.

19. Mental Health and Developmental Health Issues for Young Children in Foster and Kinship Care.  Child Welfare League of America, Shared Beliefs…Shared Values Conference. New Orleans, LA. December 2007.

20. Just in Time:  Health Care for Children in Foster Care.  American Academy of Pediatrics National Conference and Exhibition. October 2008.

21. Health Issues of Children in Foster Care.  National Association of Child Counselors. Brooklyn, NY. August 2009.

21. Healthy Futures for Children in Foster Care: Ten Things Pediatricians Need to Know about Caring for Children in Foster Care.  Presented at the Peds 21 Conference, Washington, D.C., October 16, 2009.

22. Children and Youth In Foster Care: Implications for Research and Practice.  Presented at the Pediatric Academic Societies meeting, Denver, CO.  April 30, 2011.


**PROFESSIONAL SERVICE ASSIGNMENTS AND RESPONSIBILITIES**
*Outpatient*
> Care of own patients:  1.5-2 days per week
> Preceptor in Pediatric Ambulatory Clinic:  ½ day per week.
> Administration of Starlight Pediatrics:  1 days per week.
> Research: 1 day per week.

*Inpatient*
> Continuity Clinic attending for Pediatric Practice at Strong, 1994-2010.
> Own patients as necessary 1990-2010.

**RESEARCH ACTIVITIES**

**Grants**

Principal Investigator
**Szilagyi M,** Merrill A.  Gaps and overlaps in mental health services for children in foster care. CATCH Planning Grant from the American Academy of Pediatrics, March 1, 1995-February 28, 2006. $10,000.

**Szilagyi M,** Jee S.  TIDES: Timely Intervention of Developmental and Emotional Services for Children in Foster Care.  Halcyon Hill Foundation, January 1, 2006-December 31, 2008. $250,000.

**Szilagyi M** (Collaborative grant with multiple organizations: Doniger A, Toth S, Lewis C, Manly J, Jewell T, Affronti M, Hightower D, Butt L.)   Healthy Futures for Children in Foster Care:  Translating Evidence into Practice.  Centers for Disease Control, September 1, 2009-August 31, 2012.  $1,338,058.

Co-Investigator
Henrichs M, **Szilagyi MA**.  Peer Support Groups for Children in Foster Care.  American Academy of Pediatrics Healthy Tomorrows Grant, July 1,1991-June 30, 1996.  Collaborative effort among Kids Adjusting Through Support (KATS), Foster Care Pediatrics and the Department of Social Services.  $250,000 awarded; $250,000 matching funds.

**Szilagyi M**, Merrill A, Lewis C.  Designing mental health services for children in foster care. Coordinated Care Services, Inc., Rochester NY.  January 1, 1997-December 31, 1997. Supported meetings of interdisciplinary group to develop mental health service model for children in foster care. $3000.

Jee S, **Szilagyi M**.  Quality of care in a foster care medical home.  Funded by Pediatric Links with the Community and the Strong Center for Clinical Research.  $11,000 over 18 months. March 1, 2005-March 1, 2006.

Doniger A, **Szilagyi M**.  Starlight Pediatrics Center.  New York State Education Department, HEAL-6 capital grant.  March 1, 2009-September 30, 2010.  $3,027, 000.

Jee S, **Szilagyi M**.  Fostering Connections (Parenting Education for Foster Parents.  Medical Home Models for Children in Foster Care.  New York State Health Foundation. 1/1/10-12/31/11. . $300,141

Szilagyi M.  Healthy Futures for Children in Foster Care:  Translating Evidence into Practice. Centers for Disease Control.  09/01/2009-08/31/2012.  $1,348,500.

Consultant.
Szilagyi PG, Halfon N.  National Children's Study and Children in Out-of-Home Care. 11/01/10-12/31/11.

Current areas of research activities will focus on improving the health care and health outcomes of children in foster care on the local, New York State, and national levels. Specific ongoing or planned research projects involving children in foster care include:
- Medical homes for children in foster care [achieving the standards of quality]
- Optimizing primary and specialty health care management for children in foster care
- Managing the unique health problems of adolescents aging out of foster care
- Integrating evidence based  trauma-focused, mental health services into the medical home for children in foster care.
- Integrating evidence-based parenting education into foster parent training
- Integrating promising and evidence-based parenting practices into foster care visitation
- Achieving adequate developmental services for children in foster care
- Trauma exposure and mental health utilization

13

- Predictors and prevention of recidivism for children and families involved with protective services

*Mentoring Faculty Development Awards*
    Sandra Jee MD, MPH.  Robert Wood Johnson Faculty


## PRESENTATIONS AT MAJOR NATIONAL OR INTERNATIONAL PROFESSIONAL MEETINGS

1. Szilagyi MA, Szilagyi PG, Webb T, Ghanizadeh H.  A Population at Risk:  Children in Foster Care.  Presentation at the 32nd Annual Meeting of the Ambulatory Pediatric Association, Baltimore, Maryland, May 4, 1992.

2. Szilagyi MA, Henrichs M, McMahon E.  Peer Support Groups for Children in Foster Care.  Presented at the American Academy of Pediatrics Meeting, Spring Session, Washington DC, 1992.

3. Szilagyi MA, Szilagyi PG, McMahon E, Jennings JA, Campbell L.  Foster Parents Respond to the Issues.  Poster Presentation at the 1994 APA/SPR/APS Annual Meeting, Seattle, Washington, May 4, 1994.

4. Szilagyi MA. Advocacy on Behalf of Children in Foster Care:  Developing Standards for Health Care Delivery. Presented to the Child Abuse Special Interest Group at the APA/SPR/APS Annual Meeting, May 2000.

5. Szilagyi MA. A Centralized Primary Care Office for Children in Foster Care: A Model for Health Care Delivery.  Presented at "Panel of Experts in Foster Care", convened by Annie E. Casey Family Foundation and Institute for Health Improvement, Dallas TX, March 2001

6. Szilagyi MA, Levitsky S.  Health Care Standards for Children in Foster Care.  Presented at the National Conference and Exhibition, American Academy of Pediatrics, October 2001.

7. Szilagyi MA.  Behavioral Disorders in Young Children in Foster Care.  The Infant Child Health Assessment Program, Medical and Health Research Association of New York, Inc., New York, NY.  October, 2002.

8. Szilagyi MA. Multiply Handicapped Children in Foster Care.  MacKeith Meetings, Royal Society of Medicine, London, England, March 2003.

9. Szilagyi, MA. "Health Care Standards for Children in Foster Care". Topic Symposium on Health Care for Children in Foster Care.   Presented at Pediatric Academic Societies Annual Meeting and Exposition, Seattle, WA. May 3, 2003.

10. Szilagyi MA, Cournos F.  "Children in Transition:  Health Care for Children in Foster Care."  American Academy of Pediatrics National Conference and Exhibition.  Atlanta, GA.  October 2006.

11. Szilagyi MA, Cournos F.  "Children in Transition:  Health Care for Children in Foster Care."  American Academy of Pediatrics National Conference and Exhibition.  San Francisco, CA.  October 2007.

12. Szilagyi MA, Springer S.  "Just in Time:  Health Care for Children in Foster Care."  American Academy of Pediatrics National Conference and Exhibition.  Boston, MA.  October 2008.

13. Szilagyi MA, Pilkin L.  "Health Issues of Children in Foster Care".   National Association of Child Counselors.  Brooklyn NY.  August 21, 2009.

14. Szilagyi MA.  "Healthy Futures:  Ten Things Pediatricians Need to Know about Children in Foster Care.  American Academy of Pediatrics Peds 21 Conference.  Washington, DC.  October 16, 2009.


## EDITORIAL ASSIGNMENTS IN PROFESSIONAL JOURNALS
Reviewer for

> *Pediatrics in Review*
> *Pediatrics*
> *Child Abuse and Neglect*
> *Academic Pediatrics*
> *Child Abuse & Neglect*
> *American Bar Association* (materials prepared for Judges and Attorneys on foster care health issues. 2006-present.)


## MEMBERSHIP AND PARTICIPATION IN NATIONAL ADVISORY AND HEALTH COUNCILS AND RESEARCH REVIEW COMMITTEES

## CONSULTATIONS TO UNIVERSITIES, HEALTH, AND SCIENCE AGENCIES

Development of Medical Services and Medical Homes for Children in Foster Care

Faculty and Consultant, Foster Care Content Expert.  Institute for Health Improvement (IHI)and Annie E. Casey Family Foundation.  *Breakthrough Collaborative on Improving Health Care for Children in Foster Care.* January 2001-September 2002:
- *Coordination, Communication and Collaboration Among Systems for Children in Foster Care*. Presented at Learning Session 1, Boston, MA. September 2001.
- *Access to Health Care Services for Children in Foster Care*. Presented at Learning Session 1, Boston, MA. September, 2001.

- Consultant for Learning Session 1, Foster Care Health Care. Boston, MA. September, 2001.
- Consultant for Learning Session 2, Foster Care Health Care. Tempe, AZ. November,2001.
- Consultant for Learning Session 3, Foster Care Health Care.  Denver, CO. March, 2002.

Visiting Professor, University of Florida at Jacksonville.  Building Systems of Health Care for Children in Foster Care.  Jacksonville, FL. November 1-2, 2001.

Visiting Professor, Foster Care United Services (FOCUS), University of Michigan, Department of Pediatrics, Supported by the American Academy of Pediatrics Section on Community Pediatrics, Mentorship and Technical Assistance Program (MTAP).  November 12-13, 2002.

Visiting Professor, University of Massachusetts, Building a Medical Home for Children in Foster Care:  Cross-systems collaboration.  Worcester, MA. November 14, 2003.

Visiting Professor and Keynote Speaker.  *Jersey Shore Medical Center, NJ*.  Fostering Health: Children in Foster Care.  Development of Medical Homes for Children in Foster Care. April, 2005.

Consultant. Models of Health Care Delivery at the Conference on Improving Health Care Services for Children in Foster Care.   Telaris Conference Center.  Seattle, WA.  September, 2005.

Keynote Speaker and Workshop Leader, CARES Institute, Third Annual Statewide Best Practice Symposium:   Meeting the Medical and Mental Health Needs of Children in Foster Care.  University of Medicine and Dentistry New Jersey, Stratford NJ.  March 15, 2007.

Keynote Speaker.  Hershey Medical Center. Harrisburg, PA. Medical Homes for Children in Foster Care. November 20, 2009.

Visiting Professor: Medical Homes and Models of Health Care Delivery for Children in Foster Care.  Milwaukee, WI.  September 30-October 1, 2010.

Ad hoc Consultation for Program Development: Medical Homes for Children in Foster Care
        University of Colorado at Denver, Sarah Carpenter, MD
        Oklahoma University Health Services Center, Deborah Shropshire, MD
        Upstate Medical Center, Steve Blatt, MD, Vicki Meguid MD
        University of Minnesota, Rachel Burgess MD
        Department of Human Services, Baltimore MD
        University of Southern California, Los Angeles, Janet Arnold-Clark MD.
        Administration for Children's Services, New York, New York, Angel Melendez, MD

Mentorship and Training Assistance Program, American Academy of Pediatrics:
- November 2002 at University of Michigan

Mental Health

| | |
|---|---|
| 1996- | Collaboration with Strong Behavioral Health.  Development of mental health intake services for children in foster care.   Partner in Child and Family Plus since 2008. |
| 2000-2002 | Member.  Mental Health Task Force.  Rochester NY.  Consultant to *Foster Care Mental Health Demonstration Project*. |
| 2000- | Collaboration with Mt. Hope Family Center and Monroe County Department of Social Services.  Mental health outreach for children in foster care.  Development of trauma-focused mental health services for children in foster care.  Introduction of evidence-based parenting interventions for families with children in foster care. |
| 2000-2009 | Collaboration with Winn Family Center.  Development of foster parent mentoring program. |

## PUBLICATIONS

**Original articles in peer-reviewed journals:**

1. McAnarney ER, Lawrence RA, Riccuti HN, Polley J, **Szilagyi MA**. Interactions of adolescent mothers and their year-old children. *Pediatrics* 78(4):585-590, 1986.

2. **Szilagyi MA.** The pediatrician and the child in foster care. *Pediatrics in Review* 18:1-16, 1998.

3. Simms MD, Dubowitz H, **Szilagyi MA**. Health care needs of children in the foster care system. *Journal of the Ambulatory Pediatric Association* 106(4):909-918, 2000.

4. Jee SH, Antonucci TC, Aida M, **Szilagyi MA**, Szilagyi P.  Emergency department utilization of children in foster care.  *Ambul Peds* 5:37-41, 2005.

5. Jee SH, Barth RP, **Szilagyi MA**, Szilagyi PG, Aida M, Davis MM.  Factors associated with chronic conditions among children in foster care. *J Health Care Poor Underserved*. 2006 May; 17(2):328-41.

6. Jee, SH, **Szilagyi M**, Nilsen W, Myoshi T, Fryer E, Toth S, Szilagyi P.  Persistence of posttraumatic stress symptoms among young adolescents in foster care: a national study. Pediatric Nursing.  2006.

7. Jee SH, Conn KM, Nilsen WJ, **Szilagyi MA**, Forbes-Jones E, and Halterman JS. Learning difficulties among children separated from a parent. A*mbulatory Pediatrics*, 8(3): 2008.

8. Jee SH and **Szilagyi MA**. Foster care issues in general pediatrics. *Current Opinions in Pediatrics*, 2008, 20: 724-728.

9. Jee, S, **Szilagyi M**, Blatt S, Meguid V, Auinger P, Szilagyi P.  Timely identification of mental health problems in two foster care medical homes. *Children and Youth Services Review*. 2010; **32**(5):685-690.
10. **Szilagyi, M**.  The Hand on the Door.  In the Moment.  *Academic Pediatrics*. In press.
11. Jee SH, Halterman JS, **Szilagyi MA**, Conn AM, Alpert-Gillis L, Szilagyi PG. Enhanced detection of social-emotional problems among youth in foster care, *Academic Pediatrics*, in press

In press
Jee SH, Conn AM, Blumkin A, Szilagyi PG, Baldwin CD, **Szilagyi MA**. Identification of social-emotional problems among young children in foster care, Journal of Child Psychology and Psychiatry. (in press)

 (Under review)
Jee SH, **Szilagyi MA**, Conn AM, Nilsen WJ, Toth S, Baldwin CD, Szilagyi PG. Psychosocial strengths and difficulties among youths in foster care, Under review.(Pediatrics--just now has been returned as a revise and resubmit)

(Manuscripts in preparation)
 Jee SH, Nilsen WJ, **Szilagyi MA,** Miyoshi T, Fryer GE, Toth ST, and Szilagyi PG.  Persistence of posttraumatic stress symptoms among young adolescents in foster care: a national study. Presented at the Pediatric Academic Societies' Meeting, San Francisco, CA, May 2006 and also at the Administration for Children and Families National Grantees Conference, Washington, DC, January 2007.   Manuscript in preparation. Need to re-do analyses.

**Szilagyi MA**, Jee SH, Nilsen WJ, Fryer GE, Miyoshi T, Thomas-Taylor D, Szilagyi PG, Toth ST. Under-utilization of outpatient specialty mental health services among children in foster and kinship care across the US. Presented by M. Szilagyi, MD, PhD at the Pediatric Academic Societies' Meeting, San Francisco, CA, May 2006.  Manuscript in preparation.

Eleoff SB, Jee SH, **Szilagyi MA**, Sturge-Apple ML, Montes G, Szilagyi PG.  Prevalence of adverse childhood experiences among children in kinship care and foster care.  Pediatric Academic Societies' Meeting.  Baltimore, MD, May 2009.  Manuscript in preparation.

**Chapters in books:**
1. Szilagyi  PG, **Szilagyi MA**. Hyperlipoprotinemia. In: *Bedside Pediatrics,* Ziai M, Ed.  Boston:  Little, Brown & Co., 1983.

2. *Szilagyi  MA*, Szilagyi PG. Foster care. In: *Serving the Underserved - A Residency Education Curriculum,* Bithony MG, et al., 1992.

3. **Szilagyi MA**.  Foster Care and Adoption. In: *Primary Pediatric Care*, Hoekelman RA, Ed., St Louis: Mosby, Inc., 2001

4. **Szilagyi MA**. Social Issues Affecting Children and Their Families.  *The Merck Manual of Medical Information—the Home Edition*. (2002)

5. **Szilagyi MA**. Foster Care. In: *About CHILDREN: An Authoritative Resource on the State of Childhood Today*, a joint venture of the Center for Child Health Research of the American Academy of Pediatrics and Social Science Research Center of Mississippi State University.  X.

6. Jee SH, **Szilagyi MA**.  Children in Foster Care. In: Garfunkel LC, Kaczorowski JM, and Christy C, eds. *Pediatric Clinical Advisor*, 2nd Ed. Philadelphia, PA: Mosby, Elsevier, 806-807, 2007.

7. **Szilagyi MA**, Jee SH.  Health Needs for Children in Foster Care. In : McInerny TK, Adam HM, Campbell DE, Kamat DM, Kelleher KJ, eds. *American Academy of Pediatrics Textbook of Pediatric Care* 1st Ed. Elk Grove Village, IL:  American Academy of Pediatrics.  2009.  Chapter 57.

8. **Szilagyi MA.**  Disabled Children in Foster Care in the United States.   in *Disabled Children Living Away from Home*.  Burns, C. ed.  MacKeith Press. London, UK. 2009.

9. Jee SH, **Szilagyi MA.** Adolescents in Foster Care.  In: Fisher, Alderman, Kreipe, Rosenfeld, eds. *American Academy of Pediatrics Textbook of Adolescent Health Care*. Elk Grove Village, IL: American Academy of Pediatrics, in press.

10. **Szilagyi MA** and Jee SH.  Epidemiology of foster care placement and overview of the foster care system in the United States. *Up To Date*, 2008.

11. Jee SH and **Szilagyi MA**.  Comprehensive health care for children in foster care. *Up To Date*, 2008.

12. **Szilagyi MA** and Eleoff SB.  Foster and Kinship Care. *Nelson's Textbook of Pediatrics*, 2009, in press.

13. **Szilagyi M**.  Youth aging out of foster care. *Child Welfare 360*. University of Minnesota, School of Social Work.  March 2008.

14. **Szilagyi M**, Jee S.  Chapter 29 Adolescents in Foster Care, in *Textbook of Adolescent Health Care*. Fisher MM, Alderman EA, Kreipe RE, Rosenfeld WA (eds).  American Academy of Pediatrics, Elk Grove Village IL, in press 2010.

**Abstracts:**

1. Szilagyi MA, Marinetti GV.  The isolation of rat cardiac myocytes. Presented at the American Biochemical Society Meeting, Toronto, Canada, 1979.

2. <u>Szilagyi MA</u>, Szilagyi PG. A population at risk: children in foster care. *AJDC* 146:476, 1992.

3. <u>Szilagyi MA</u>, Szilagyi PG, McMahon E, Jennings JA, Campbell L. Foster parents respond to the issues. *Archives of Pediatrics & Adolescent Medicine*, Abstract #139:57, 1993

4. <u>Szilagyi </u>MA, Jee S, Fryer E, Toth S, Nilsen W, Szilagyi P, Myoshi T.  Does trauma exposure predict outpatient mental health utilization by children in foster and kinship care ? *Pediatric Academic Society Meetings*.  2006.

5. Jee, SH, Szilagyi M, Myoshi T, Fryer E, Toth S, Nilsen W, Szilagyi P.   Persistence of posttraumatic stress symptoms among young adolescents in foster care: a national study.  At Pediatric Academic Societies' Meeting. 2006. San Francisco, CA.

6. Jee SH, Alpert-Gillis LJ., Girolamo, AM, Blumkin A, and <u>Szilagyi, MA</u>**.**  Behavioral health screening in a primary care foster care clinic.  Symposium presentation. American Psychological Association Annual Meeting. Boston, MA. August 2008.

8. Jee SH, Alpert-Gillis LJ., Girolamo, AM, Blumkin A, and **Szilagyi, MA.**  Behavioral health screening in a primary care foster care clinic.  Symposium presentation. American Psychological Association Annual Meeting. Boston, MA. August 2008.

9. Jee SH, Conn AM, Szilagyi PG, Blumkin A, Baldwin CD**, Szilagyi M.**  Identification of social-emotional problems among young children in foster care. Platform presentation. American Academy of Pediatrics National Conference and Exhibition. San Francisco, CA. (accepted for presentation October 2010)

**Editorship of Resource Manual:**
American Academy of Pediatrics, New York State, District II. Committee on Foster Care Health Care. Szilagyi, M. (ed.). *Fostering Health: Health Care for Children in Foster Care.*  New York, 2001.

American Academy of Pediatrics, New York State, District II. Task Force on Health Care for Children in Foster Care. Szilagyi, M. (ed.).  *Fostering Health: Health Care for Children and Adolescents in Foster Care, 2nd ed.*  Chicago,  2005.

**Development of National Website on Foster Care**

*Healthy Foster Care America Website (www.aap.org/fostercare).* American Academy of Pediatrics, Task Force on Foster Care.  2009.  Major content author and worked closely with AAP staff and CAPTUS in website development over 2 years, and will continue to add and update content.

**Other Publications:**
1. _Doctoral (Ph.D.) Thesis:_ Szilagyi MA. The Effects of Catecholaminergic Agents on Cardiac Myocyte Lipid Metabolism. University of Rochester, 1979.

2. Szilagyi MA.  Medical Issues in Children Adopted out of Foster Care. _Adoption Medical News Letter,_ 1998.

## ADVOCACY

Local
Monroe County, Committee on Child and Adolescent Mental Health; Testimony on the mental health needs of children in foster care, 1997.

Court Improvement Project Team.  Monroe County Family Court.  February 2010-ongoing.

State
New York State Proposed Daycare Regulation Changes. Testimony on behalf of American Academy of Pediatrics, March 1998, Albany, NY.

New York State Child Care Council, Testimony on behalf of children in foster care with developmental delay, October 1999.

Szilagyi MA, Murov RG, Saccaccio J.  New York State Department of Health.  Foster Care Health Care.  Presented to panel from Department of Health, Office of Children and Family Services, Office of the Budget, Managed Care Office, Governor's Office.  October 1999.

Szilagyi MA. Foster Children with HIV and Clinical Trials.  Testimony on behalf of the American Academy of Pediatrics, NYS, District II.  New York State Legislature's Committee on Children and Families and Committee on Health.  New York, NY.  September, 2005.

National
Szilagyi MA. Foster Children and Clinical Trials.  Testimony on behalf of the American Academy of  Pediatrics.  House Ways and Means Subcommittee on Human Resources Hearing. United States House of Representatives. Washington, DC. May, 2005.

Children's Defense Fund.  Consultant on developmental health issues of infants, toddlers and preschool children in foster care as they prepared testimony for Congress on this issue. Washington DC.  2005.

**Ex. 3**

**Grace M. Lopes**

| | |
|---|---|
| **From:** | Grace M. Lopes [gmlopes@oymonitor.org] |
| **Sent:** | Thursday, July 07, 2011 4:44 PM |
| **To:** | 'Rachal, Kenya Key'; 'Shirim Nothenberg' |
| **Subject:** | FINAL Case Record Review Instrument |
| **Attachments:** | Final Case Record Review Instrument.pdf |

Kenya and Shirim:  Please see attached for the final version of the case record review instrument.  Many thanks for your time and comments  Best, Grace

*Grace M. Lopes*
*Monitor, Olivia Y.*
*1350 Connecticut Avenue, N.W.*
*Suite 1000*
*Washington, D.C.  20036*
*202.232.8311*

*This email and any attachments may contain confidential and privileged information.  If you are not the intended recipient, please notify the sender immediately, destroy this email, and destroy any copies.  Any dissemination or use of this information by a person other than the intended recipient is unauthorized and may be illegal.*

# Case Record Review Instrument
## Office of the *Olivia Y.* Court Monitor in Collaboration with MDHS/DFCS

**Children in Foster Care Case Record Review, July 11-22, 2011**

---

**Period Under Review**

The period under review is January 1, 2009 through March 31, 2011.  Do not include information in case files regarding events that occurred prior to January 1, 2009 or after March 31, 2011 unless you are specifically asked to do so in the question or in the instructions.

**Sample Parameters**

*Sample 1:*  Foster children who were removed from their homes and placed in DFCS custody on or after January 1, 2009 and who had been in foster care for at least 60 consecutive days as of March 31, 2011.  Note:  If a child entered foster care twice during the period under review, the assessment would focus on the most recent entry unless the most recent entry was for less than 60 days.  In that case, the focus would be on the foster care episode prior to the most recent entry.  In a situation in which the child entered DFCS custody twice during the period under review, the questions dealing with the "earliest" events occurring during the period under review should be answered with regard to the most recent entry into custody that was at least 60 days in duration.

*Sample 2:*  Foster children who were in DFCS custody on March 31, 2011, who had entered DFCS custody prior to March 31, 2007, and who remained in custody continuously.  Information in case files for children in this sample prior to January 1, 2009 will not be collected in this case review unless specified in the question or instructions.

**General Instructions**

- Be sure to review the instructions before answering an item.  The instructions will include information about how to answer an item and also, when relevant, guidance on where to find that information in MACWIS or whether the information can be found in the case file.
- Be sure that the case that you have been assigned falls within the sample parameters for Sample 1 or Sample 2.  If it does not, please return it to the Case Record Review Coordinator and explain why it does not fall within the sample parameters.  The Case Record Review Coordinator will assign another case to you.
- Whenever the word caseworker is used, it may be assumed that the instrument is referring to either the assigned COR caseworker or the assigned COS caseworker, unless otherwise specified in the item question or instructions.  Information regarding every caseworker assigned to a child may be found under the Case bar, Case Planning icon, and under the ISP, Direct Service Tab.

**Definitions:**

- *Adoption Plan:* An adoption plan identifies the child-specific activities that DFCS will undertake to achieve the permanency goal of adoption and the timeframes within which the activities will be undertaken.
- *Adoptive Home***:** A Resource home that is licensed/approved by DFCS and meets licensure requirement for placement of a child. An adoptive home is intended to be permanent and shall be offered only for children who are legally free for adoption or whose primary permanency goal is adoption. The permanent relationship of the family and the child is formalized by the finalization of a legal adoption.
- *Another Planned Permanent Living Arrangement (APPLA)*:  This is a living arrangement that is truly planned and permanent in nature.
- *Child in Need of Supervision (CHINS)*: A legal status based on a court finding that a child has reached her/his 7th birthday and is in need of treatment or rehabilitation because the child: is habitually disobedient of her/his parent, guardian, or custodian and is ungovernable; or while being required to attend school, willfully and habitually violates the rules thereof or willfully and habitually absents herself/himself from school; or runs away from home without good cause; or has committed a delinquent act or acts.
- *Comprehensive Family Assessment (CFA)*:  The ongoing and continuous process of gathering, organizing and analyzing information for the purpose of informed decision-making and service planning concerning the safety, permanency and well-being of children and families.
- *Concurrent Planning:* Working toward the permanency plan while at the same time establishing a backup plan, thereby implementing primary and alternative plans simultaneously.
- *Court-Ordered Non-Licensed Home:* A home into which a child has been ordered by the youth court judge. These homes have not yet been licensed by DFCS. The protocol for licensing relative resource homes must be followed for court ordered non-licensed homes.
- *DFCS Custody*:  The date that the child entered foster care.
- *Diligent Search*:  The steady, earnest, and persistent effort of the caseworker to locate a parent or prospective parent whose identification or location is unknown.
- *Durable Legal Custody*:  This is a legal status created by a court order that gives the durable legal custodian the responsibilities of physical possession and care of the child.  Durable legal custody will not take effect unless the child has been in the physical custody of the proposed durable custodians for at least one year under the supervision of DFCS.  Birth parents retain their parental rights.
- *Emergency Shelter*: A short-term interim placement resource to give the caseworker time to evaluate the home situation and identify and evaluate relative resources and gather information.
- *Family Team Meeting (FTM)*: A planned, structured, and facilitated decision-making process to which members of the family both formal and informal are invited along with required DFCS staff (*e.g.*, caseworker and supervisor), foster family or facility staff, and the child (if appropriate).
- *Fictive Kin*:  Individuals who are unrelated to the child by birth, marriage, or adoption but who have an emotionally significant relationship with the child and/or family that is similar to a family relationship.

2

- *Foster Child*:  Any child receiving placement services whose legal custody and responsibility for planning have been placed with DFCS through court order, voluntary parental consent for placement, or relapsed for adoption. As long as legal custody remains with DFCS, the child is classified as a foster child. A child becomes a foster child when custody is obtained by a written emergency, temporary or verbal court order.
- *Independent Living Placements:*  A placement of a foster child in an apartment or rooming house with supervision from a licensed placement agency.
- *Individual Meeting*:  Any face-to-face meeting with any of the following: father, mother, child, primary caretaker, legal guardian, and or resource parent, for the purpose of gathering internal, external and historical factors that contribute to concerns identified in the intake and the Safety Assessment/Risk Assessment and Strengths and Risk Assessment (SARA).
- *Initiation of an Investigation*: The date that the assigned investigation caseworker has face-to-face contact with all children who are the subject of a maltreatment allegation.
- *Institution:* A 24-hour facility for the care and confinement of individuals that provides therapeutic or other services in a restricted setting.
- *Investigation Conclusion*: The date that the caseworker's supervisor has signed the investigating caseworker's report with findings related to a maltreatment investigation.
- *Investigation*:  A fact-finding process triggered by the screen-in of an intake related to a report of child maltreatment wherein an assigned caseworker collects and evaluates evidence, including data obtained from interviews with the alleged victim, alleged perpetrator, reporter and collaterals; reviews relevant background information, including prior maltreatment reports; and assesses safety, danger, and risk to make a determination regarding the validity of the allegations, and what, if any, action steps are needed to ensure the safety, permanency and well being of the child. (See definitions above for initiation of investigation and investigation conclusion.)
- *Legal Custody*:  The legal status created by a court order that gives the legal custodian the responsibilities of physical possession of the child and the duty to provide him or her with food, shelter, education, and reasonable medical care, all subject to residual rights and responsibilities of the parent or guardian.
- *Legal Father*: The father named on the child's birth certificate, the man to whom the mother was married at the time of conception, and/or the man to whom the mother was married at the time of birth, or the man who has legally adopted the child.  A child may have more than one legal father.
- *Legal Guardianship*: This is a judicially created relationship between child and caretaker that is intended to be permanent and self-sustaining as evidenced by the transfer to the caretaker of the following parental rights with respect to the child: protection, education, care and control of the person, custody of the person, and decision making. Birth parents maintain their parental rights.
- *Living Independently (permanency goal)*: This is a goal that may be considered if the youth in DFCS custody is age 16 or older and all other permanency goal options have been explored and eliminated.  A youth may remain in DFCS custody until age 21 if the youth is in the process of continuing his/her education or if the Chancery Court determines that the youth requires continued supervision.
- *Parent:* The mother or father to whom the child was born, or the mother or father by whom the child has been legally adopted.

3

- *Permanency Planning*: The systematic process of carrying out a set of plans and goal-directed activities within a time-limited period.  Activities are designed to help children live in families that offer continuity of lifetime relationships.
- *Placement Specialist*:  A resource worker assigned to the same region as the county of responsibility (COR) caseworker, who is accessible to the caseworker and has the ability to ascertain the placement resources available and their suitability for a particular child's needs.
- *Primary Caretaker*: An individual who provided care of a child the majority of the time prior to the child's removal from their home.
- *Putative Father*:  An individual who is alleged to be the father of a child, but who is not identified as the father on the child's birth certificate; a child may have a legal and a putative father or more than one putative father.
- *Relative Caretaker*: A relative who provides care to a child and who is considered to be in a caretaking role for the child.  A relative caretaker may be an individual who is not legally or biologically related to a child, but who is considered a relative due to a close and ongoing relationship with the child and/or family (see Fictive Kin).
- *Relative Resource Home*: A resource home in which the resource parents are relative caretakers to the foster child. They are related within the 5th degree of kinship to the child and placements in a relative resource home is given priority over placement in unrelated family settings.
- *Residential Child Care Facility*:  A licensed residential child caring facility that is staffed 24 hours a day and where children are in care apart from their parents, relatives, or guardians. It is to be differentiated from short-term care facilities such as emergency shelters or juvenile detention centers; long-term care facilities such as group homes, maternity residences, and treatment centers; developmentally disabled children's centers, and respite care.
- *Resource Family Home*: The home of a person or family group that is licensed for the temporary care of foster children.
- *Reunification*:  Reunification will be considered achieved when legal and physical custody is returned to a parent or primary caretaker from whom the child was removed or to a noncustodial parent at the time of the incident who was not residing in the home from which the child was removed, and the state no longer has legal custody, care or control of the child.
- *Safe Babies*:  Children who are 72 hours old or younger who have been surrendered by parents to a licensed hospital that operates an emergency department or an adoption agency.
- *Therapeutic Foster Home*: A home licensed and certified to care for children with severe behavioral, emotional and psychological impairments.
- *Treatment Plan*:  A plan developed by an appropriate professional to address a significant medical, dental, developmental, emotional or behavioral problem/diagnosis that includes action steps (*e.g.*, medication, counseling services, *etc.*) for addressing the problem.
- *Trial Home Visit*:  A placement of the child with the family/caregiver that is subject to DFCS oversight for a 90-day trial period to ensure that the family/caregiver and child are ready for reunification.

4

## SECTION 1: CASE RECORD INFORMATION

1.1 Sample Number (1 or 2) _____

1.2 Sample Case ID number _____

1.3 Case ID number (DFCS case number for target episode) _____

1.4 Child ID number (DFCS assigned number) _____

1.5 County of Responsibility (COR) on March 31, 2011 _____

1.6 County of Service (COS) on March 31, 2011 _____

1.7 Child's first name _____

1.8 Reviewer's name_____

1.9 Date reviewer received case          M [    ]  D [    ]  Y [    ]

1.10 Date reviewer completed review      M [    ]  D [    ]  Y [    ]

1.11 Quality Assurance (QA) reviewer name _____

1.12 Date QA person received case for QA review      M [    ]  D [    ]  Y [    ]

1.13 Date QA person completed QA review      M [    ]  D [    ]  Y [    ]

Instructions:  QA team member must initial and date any changes s/he makes in the instrument in red ink.

## SECTION 2: TARGET CHILD INFORMATION

**Answer all questions for Sample 1 and Sample 2 unless instructed otherwise in the item.**

2.1 Child's date of birth          M [    ]  D [    ]  Y [    ]

2.2 [    ]    Child's gender    1= Female  2 = Male

2.3 [    ]    Child's race:  (Select any or all)
      1 = American Indian or Alaskan Native
      2 = Asian
      3 = Black or African American
      4 = Native Hawaiian or Pacific Islander
      5 = Unable to determine
      6 = White
      7 = Other (specify) _____

2.4 ☐ Child's ethnicity
       1 = Hispanic or Latino in origin
       2 = Not Hispanic or Latino
       3 = Unable to determine

2.5 What is the date of the child's most recent removal from his or her home and placement into DFCS custody during which time the child remained in DFCS custody for at least 60 consecutive days? Instructions: For Sample 1, if the child entered DFCS custody prior to January 1, 2009, do not complete the review and return the case to the case record review coordinator. If the child was not in DFCS custody for 60 consecutive days prior to March 31, 2011, do not complete the review and return the case to the case record review coordinator. **For Sample 2, enter the date of the child's most recent entry into DFCS custody. Also for Sample 2, if the child entered DFCS custody after March 31, 2007, do not complete the review and return the case to the case record review coordinator.**

M ☐    D ☐    Y ☐

**Question 2-A**: What reasons are documented in the case file for the child's most recent entry into DFCS custody? Instructions: This should relate to the entry identified under 2.5. Enter a 1 in the box for all that apply, enter a 0 in the box for all that do not apply. Answer this question based on the information that is in MACWIS in the case/ISP file and in the intake and final investigation reports. The information should reflect the initial reason for the child's removal from home and NOT reasons why the child cannot return home that may have been identified later. **For Sample 2, answer this question even though the child entered foster care prior to the period under review.**

| | | |
|---|---|---|
| 2A.1 | ☐ | Abandonment |
| 2A.2 | ☐ | Adult/Caretaker Self Neglect |
| 2A.3 | ☐ | Emotional abuse/Neglect |
| 2A.4 | ☐ | Exploitation |
| 2A.5 | ☐ | Medical Neglect (lack of health care and failure to thrive) |
| 2A.6 | ☐ | Physical Abuse |
| 2A.7 | ☐ | Physical Neglect |
| 2A.8 | ☐ | Sexual abuse |
| 2A.9 | ☐ | Alcohol abuse-child |
| 2A.10 | ☐ | Alcohol abuse-parent |
| 2A.11 | ☐ | Caretaker inability to cope |
| 2A.12 | ☐ | Child behavior problem (other than substance abuse or alcohol abuse, including runaway and truancy, delinquent acts) |
| 2A.13 | ☐ | Child disability |
| 2A.14 | ☐ | Inadequate housing |
| 2A.15 | ☐ | Incarceration of parent |
| 2A.16 | ☐ | Relinquishment |
| 2A.17 | ☐ | Inadequate parenting skills |
| 2A.18 | ☐ | Inadequate income/unemployment |
| 2A.19 | ☐ | Domestic violence |
| 2A.20 | ☐ | Inadequate food supply |
| 2A.21 | ☐ | Mental injury or emotional abuse of the child; includes confinement and bizarre treatment |
| 2A.22 | ☐ | Educational neglect of the child |

6

2A.23 ☐ Parent failed to protect child from injury
2A.24 ☐ Another child in the family has died or experienced a near fatality due to child abuse or neglect
2A.25 ☐ Parent provided inadequate supervision or failed to supervise
2A.26 ☐ Parent has mental illness
2A.27 ☐ Child was substance exposed
2A.28 ☐ Parent has a developmental disability
2A.29 ☐ Parent was hospitalized
2A.30 ☐ No reason cited
2A.31 ☐ Other (specify) _____

2.6 ☐ How many times did the child enter DFCS custody during and prior to the period under review?

Instructions: Enter the number of times that the child was removed from the home and placed in DFCS custody other than a return to care from a trial reunification. If only once, skip to Section 3. If more than once, complete Grid 2-A.

**Grid 2-A: DO NOT COMPLETE THIS ITEM FOR SAMPLE 2** Dates of entries into DFCS custody, dates of discharges from DFCS custody, and reasons for discharge
Instructions: Complete the grid with the most recent entry and work backwards. Include in the first row the most recent entry, even if it is the same as the entry noted under 2.5. If a child has not been discharged from the most recent entry, then leave the discharge date boxes blank and the reason box blank. You may enter discharges and re-entries that occurred prior to the period under review.

| Entry date | Discharge date | Reason Use Key below |
|---|---|---|
| 2.7   M ☐   D ☐   Y ☐ | 2.8   M ☐   D ☐   Y ☐ | 2.9   ☐ |
| 2.10  M ☐   D ☐   Y ☐ | 2.11  M ☐   D ☐   Y ☐ | 2.12  ☐ |
| 2.13  M ☐   D ☐   Y ☐ | 2.14  M ☐   D ☐   Y ☐ | 2.15  ☐ |
| 2.16  M ☐   D ☐   Y ☐ | 2.17  M ☐   D ☐   Y ☐ | 2.18  ☐ |

**Key: Reasons for discharge**
1 = Reunification with biological parents (including non custodial parent) or primary caretaker
2 = Guardianship
3 = Adoption
4 = Emancipation (child turned 18 or was legally emancipated prior to age 18)
5 = Transfer to another service system

7

6 = Durable legal custody
7 = Permanent placement with relative
8 = Runaway – Court Ordered Discharge
9 = Other (specify in the above grid by entering the number "9" and writing in the reason below it in the answer box on the grid)
10 = No reason provided


## SECTION 3:  SCREENING AND ASSESSMENT *(II.B.1.)*

Instructions:  **DO NOT COMPLETE FOR SAMPLE 2.  If the case being reviewed is for Sample 2, skip to Section 4.**

3.1 [     ] Is there a document in the case file that provides information about an assessment of the child and/or family during the period under review? *II.B.1.a.*  Instructions:  This would either be the Strengths and Risk Assessment (SARA) and/or the Comprehensive Family Assessment (CFA). The CFA will be used in the regions where the practice model is being implemented.  The CFA will be in the hard copy case file and the SARA will be in MACWIS.  (See definition for CFA)

             1 = Yes          2 = No

Instructions: If the answer is 2, SKIP to item 3.4.
If the answer is 1, answer the questions below, and if there is a CFA, place a post-it on the CFA in the paper case record and provide the paper case record to the case record review coordinator once you complete the review of this case file.

3.2 What is the date of the earliest document during the period under review that provides information about an initial assessment of the child and family? *II.B.1.a.*

     M [          ]  D [          ]  Y [          ]

3.3 What is the name/title of this earliest document? _____

Instructions: If there is a SARA but no CFA, enter SARA.  If there is a CFA, but no SARA, enter CFA.  If both are available, enter SARA/CFA.

**Question 3-A:** Does this document include the following information? *II.B.1.a.* Instructions: Enter a 1 in the box for all that apply and a 0 for all that do not apply.

3A.1 [     ] Internal factors of the family/household contributing to the need for the child to be in foster care.  For example, the document identifies concerns such as parental substance abuse, parent unable to provide adequate supervision for child, parent mental health concerns, *etc*.

3A.2 [     ] External factors of the family context or environment contributing to the need for the child to be in foster care.  For example, the document identifies concerns such as inadequate/unsafe housing, the lack of extended family available to assist the family, family homelessness, *etc*.

8

3A.3 [ ]  Historical factors contributing to the need for the child to be in foster care. For example, the document indicates that there is or is not a history of maltreatment by parents, history of maltreatment of parents, or history of placement of a previous child.

3A.4 [ ]  Child's strengths.  For example, the document indicates that the child is a good student, exhibits positive behaviors, is loving, *etc*. Instructions: answer this only for the target child and not siblings.

3A.5 [ ]  Family strengths including but not limited to protective factors. For example, there are comments in the document related to such factors as the positive quality of family communication, the recognition by the parents that changes are needed in the household, the fact that parents have an income that is sufficient to support the family, the fact that parents appear to understand the reasons for the child's removal from the home.

3A.6 [ ]  Child's service needs. Instructions: answer this only for the target child and not siblings.

3A.7 [ ]  Family service needs.

3A.8 [ ]  Factors (including characteristics of child, sibling group size, *etc*.) pertinent to selecting an appropriate out-of-home placement.

3A.9 [ ]  Family resources available to support the child.  For example, the document identifies extended family members and fictive kin who are available to support the child in a variety of ways and be involved in the child's life while the child is in foster care as well as when the child returns home. Instructions: answer this only for the target child and not siblings.

3A.10 [ ]  Family resources available to support the family.  For example, the document identifies extended family members and fictive kin who are available to support the parents in a variety of ways while the child is in foster care and/or after the child returns home.

3.4 What is the earliest date reported in the case file that a foster care caseworker in the county of responsibility (COR) was assigned to the child after the child was removed from his or her home?

M [ ]     D [ ]     Y [ ]

**Question 3-B:** During the period under review, what is the first date noted in the case file that the child's assigned caseworker (not the investigation caseworker) in the county of responsibility had an individual meeting (face-to-face meeting) with the following people to gather information relevant to assessing the child and family? *II.B.1.b.*  Instructions:  This question is not to be answered with regard to meetings held and information gathered during the investigation.  It refers to information gathering by the foster care caseworker after assignment.  Although the assigned foster care caseworker may use information from the intake report in assessing a child and family, the focus is on the additional assessment conducted by the foster care caseworker.  If the foster care caseworker met face-to-face with any of the individuals listed below, enter a 1 in the box and provide the date.  If the worker did not meet face-to-face with an individual listed below, enter a 0 in the box and leave the date information blank. If meeting with the person was not applicable (*e.g.*, the person's whereabouts were not known, or there was no caregiver other than the biological or adoptive parents), enter an NA in the box and leave the date information blank.

9

Answer questions only for the target child and not for siblings.  A telephone contact may be substituted for a face-to-face meeting only if the person cannot be seen face-to-face because the person resides in another State, is incarcerated, or is institutionalized.

3B.1 [____] The child

        3B.1a    Date    M [____]    D [____]    Y [____]

3B.2 [____] The child's biological/adoptive mother

        3B.2a    Date    M [____]    D [____]    Y [____]

3B.3 [____] The child's biological/adoptive father

        3B.3a    Date    M [____]    D [____]    Y [____]

3B.4 [____] The primary caregivers from whom the child was removed (if other than biological/adoptive parents). For example, this would apply if the child was removed from the home of a relative or fictive kin where the child had been residing apart from biological parents and the relative or fictive kin was functioning as the primary caregiver.

        3B.4a    Date    M [____]    D [____]    Y [____]

3B.5 [____] The child's out-of-home care provider, such as at least one parent from a relative resource home, a residential facility staff member (*i.e.*, residential child care facility, institution, emergency shelter) with responsibility for the child, or a parent from a resource family home or a therapeutic foster home.

        3B.5a    Date    M [____]    D [____]    Y [____]

## SECTION 4:  DILIGENT SEARCH  *(II.B.1.c.)*

Instructions:  Answer the questions in this section for both Sample 1 and Sample 2.  **For Sample 2, answer the questions only with regard to events or activities that took place after January 1, 2009 and not prior to that date.**

Instructions:  You may limit your search in completing the items in this section pertaining to knowledge of the whereabouts of parents to the following documents:
- The social summary prepared for the first court hearing (adjudication or similar type of hearing)
- The investigation report for the allegation that resulted in DFCS removing the child from the home and placing the child in foster care
- The permanency plan

If information is not in any of these documents, you may answer the relevant question as "Information not found in identified key documents."  If, in the course of looking for information for other items, you come across additional information about the whereabouts of parents, you may amend your answers to the items in this section.  In those instances, please identify for the QA person where you found that information by writing in the location on this form.

      Write location, if relevant _____

4.1 [    ]    During the period under review, is there information in the case file about the mother's location and/or contact information for the mother?  For example, is there information about the address where she was currently living and/or a phone number where she could be reached?  Instructions:  For this item, "mother" refers to the child's biological or adoptive mother, even if the child was not living with this person at the time of the most recent entry into DFCS custody.  Answer "Yes" if there is either an address for the mother or a contact phone number noted in the case file. Answer "No" if neither one of these is noted in the case file. Answer "Not Applicable" (3) if the mother is deceased or "Not Applicable" (4) if the identity of the mother is not known.  Answer (4) ONLY if the identity of the mother was not known from the time of the child's entry into DFCS custody until the end of the period under review.

> 1 = Yes
> 2 = No, information about mother's whereabouts was not found in key documents
> 3 = Not applicable, mother is deceased
> 4 = Not applicable, identity of mother is not known
> 5 = Not applicable, mother's rights were terminated prior to the period under review

Instructions: If the answer is 1, 3, 4, or 5, SKIP to 4.3.
If the answer is 2, answer the questions below.

**Question 4-A:** During the period under review, what activities are documented in the case file that were undertaken to try to locate the mother?  Enter a 1 in the box for all that apply and a 0 for those that do not apply.  It is important to look for diligent search activities throughout the child's stay in DFCS custody and not just at the beginning.  You will need to review the case narratives in MACWIS for this information.

4A.1 [    ]    All known relatives (including the child's father, if known) were contacted and questioned about the mother's whereabouts

4A.2 [    ]    Internet searches were conducted using available people-finder websites, including the inmate search website

4A.3 [    ]    Searches were conducted of telephone directories and motor vehicle registrations

4A.4 [    ]    Contact was made with all known neighbors, friends, and employers

4A.5 [    ]    Contact was made with law enforcement offices to request a records check

4A.6 [    ]    Checking with the Division of Economic Assistance (including MAVERICS) and the Division of Child Support (including METSS and Parent Locator services)

4A.7 [    ]    No activities were documented

4A.8 [    ]    Other (specify) _____

4.2 What was the earliest date during the period under review that at least one search activity for the mother was initiated?  Instructions:  This would apply to any of the activities described above.  Enter 0s in all date boxes if there is no date information.

> M [        ]    D [        ]    Y [        ]

4.3 [    ]    How many legal fathers were identified for this child in the case file? (See definition for legal father)

11

4.4 [____] How many putative fathers were identified for this child in the case file? (See definition for putative father)

4.5 [____] During the period under review, is there information in the case file about the father's location and/or contact information for the father?  For example, is there information about the address where he was currently living and/or a phone number where he could be reached?  Instructions: For this item, "father" refers to the child's legal father or putative father, even if the child was not living with this person at the time of the most recent entry into DFCS custody.  Answer "Yes" (1) only if there is either an address or contact phone number noted in the case file for all legal and putative fathers.

> 1 = Yes - whereabouts of all legal and putative fathers were known
> 2 = Some - whereabouts of some but not all legal and putative fathers were known
> 3 = No - there was no information in the identified documents about the whereabouts of any of the legal and/or putative fathers
> 4 = Not Applicable - all legal and/or putative fathers are deceased
> 5 = Not applicable - identity of father is not known
> 6 = Not applicable - the parental rights of all legal and/or putative fathers were terminated prior to period under review

Instructions: If the answer is 1, 4, 5, or 6 SKIP to Section 5.
If the answer is 2 or 3, answer the questions below.

**Question 4-B:** What activities are documented in the case file that were undertaken to try to locate the legal and/or putative father?  Enter a 1 in the box for all that apply. You will need to review the case narratives in MACWIS to find this information or the paper file.

4B.1 [____] All known relatives (including the child's mother, if known) were contacted and questioned about the father's whereabouts

4B.2 [____] Internet searches were conducted using available people-finder websites, including the inmate search website

4B.3 [____] Searches were conducted of telephone directories and motor vehicle registrations

4B.4 [____] Contact was made with all known neighbors, friends, and employers

4B.5 [____] Contact was made with law enforcement offices to request a records check

4B.6 [____] Checking with the Division of Economic Assistance (including MAVERICS) and the Division of Child Support (including METSS and Parent Locator services)

4B.7 [____] No activities were documented

4B.8 [____] Other (specify) _____

4.6 What was the earliest date during the period under review that at least one search activity for the father was initiated?  Instructions: Enter 0s in all date boxes if there is no date information.

M [____]   D [____]   Y [____]

## SECTION 5: SERVICE PLANNING AND MONITORING

5.1 [     ]  Is there documentation in the case file that at least one Family Team Meeting (FTM) (see definition) was held during the period under review?  *II.B.2.*  Instructions:  You will need to look through the MACWIS narratives to find this information.

    1 = Yes
    2 = No

Instructions:  If the answer is 2, SKIP to item 5.48.
If the answer is 1, answer the questions below.

5.2 What was the date of the earliest FTM held during the period under review? Instructions: If there are no dates on any of the documents describing the FTM, enter 0 in all of the date boxes.

    M [     ]  D [     ]  Y [     ]

**Grid 5-A:** Participation in the earliest FTM reported during the period under review.  *II.B.2.a.*
Instructions:  For each person identified in column 1, indicate whether the person attended the earliest FTM reported during the period under review (column 2), and the reason for the person not attending in column 3.  If there are notes in the narratives describing the FTM and who was present and one of the people listed below is not identified as attending, answer "No" in column 2 for that person.  If there is only a date of the FTM and no information about who attended, answer "Cannot determine" in column 2.

| Identity of Person | Attended FTM? <br> 1 = Yes <br> 2 = No <br> 3 = Not applicable - person not part of the case <br> 4 = Not applicable - identity or whereabouts of person is not known <br> 5 = Cannot determine | Reason not attended <br><br> Enter number from Key below |
|---|---|---|
| Person who was the female primary caretaker at the time of the child's removal but not the biological/adoptive mother | 5.3 [     ] | 5.4 [     ] |
| Person who was the male primary caretaker at the time of the child's removal but is not the biological/adoptive father | 5.5 [     ] | 5.6 [     ] |
| Person(s) who is the child's caregiver while the child is in DFCS custody, including a staff member from a residential facility | 5.7 [     ] | 5.8 [     ] |
| Child's assigned caseworker (COR) | 5.9 [     ] | 5.10 [     ] |
| Caseworker's immediate supervisor (COR) | 5.11 [     ] | 5.12 [     ] |
| Child's assigned caseworker (COS) | 5.13 [     ] | 5.14 [     ] |

13

| | | | |
|---|---|---|---|
| Caseworker's immediate supervisor (COS) | 5.15 ☐ | | 5.16 ☐ |
| Child | 5.17 ☐ | | 5.18 ☐ |
| Biological/adoptive mother | 5.19 ☐ | | 5.20 ☐ |
| Biological/adoptive father | 5.21 ☐ | | 5.22 ☐ |
| Extended family members (including fictive kin) | 5.23 ☐ | | 5.24 ☐ |

**Key:  Reason for not attending**
1 = Identity of person not known
2 = Whereabouts of person not known
3 = Person (including child) is cognitively unable to comprehend the process
4 = Child's participation is not in his or her best interest
5 = Person's participation is not in the best interests of the child
6 = Court has prohibited contact between the child and this person
7 = Parental rights were terminated prior to the earliest FTM in the period under review
8 = Child asked that the person not be invited
9 = Person unable to attend meeting because of school or work demands
10 = Person did not want to attend meeting
11 = Person unable to find transportation to attend meeting
12 = Person advised by attorney not to attend meeting
13 = Person said that they would attend but then did not appear
14 = No reason identified in case file
15 = No indication that the person was invited
16 = Not applicable – person attended
17 = Other (specify in the above grid by entering the number "17" and writing in the reason below it in the answer box on the grid)

**Question 5-A:** What were the dates of the FTMs? Instructions: Provide the dates of all FTM's described in the case file after the initial date noted in item 5.2 and prior to the end of the period under review.  If the date of the FTM noted for 5.2 is the only FTM, enter 0's in the date box 5A.1 and leave the remainder blank.

| | | | | | | |
|---|---|---|---|---|---|---|
| 5A.1 | M | ☐ | D | ☐ | Y | ☐ |
| 5A.2 | M | ☐ | D | ☐ | Y | ☐ |
| 5A.3 | M | ☐ | D | ☐ | Y | ☐ |
| 5A.4 | M | ☐ | D | ☐ | Y | ☐ |
| 5A.5 | M | ☐ | D | ☐ | Y | ☐ |
| 5A.6 | M | ☐ | D | ☐ | Y | ☐ |
| 5A.7 | M | ☐ | D | ☐ | Y | ☐ |
| 5A.8 | M | ☐ | D | ☐ | Y | ☐ |

14

| | | | | |
|---|---|---|---|---|
| 5A.9 | M | D | Y | |
| 5A.10 | M | D | Y | |
| 5A.11 | M | D | Y | |
| 5A.12 | M | D | Y | |
| 5A.13 | M | D | Y | |
| 5A.14 | M | D | Y | |
| 5A.15 | M | D | Y | |
| 5A.16 | M | D | Y | |
| 5A.17 | M | D | Y | |

5.25 What is the date of the most recent FTM held during the period under review?  Instructions: If only one FTM, enter the same date as for item 5.2.

M ☐ D ☐ Y ☐

Instructions: If there was only one FTM, do not complete Grid 5-B and SKIP to 5.48.
If there was more than one FTM, complete Grid 5-B.

**Grid 5-B:** Participation in the most recent FTM reported during the period under review  *II.B.2.a.*
Instructions:  For each person identified in column 1, indicate whether the person attended the earliest FTM reported during the period under review (column 2), and the reason for the person not attending in column 3.  If there are notes in the narratives describing the FTM and who was present and one of the people listed below is not identified as attending, answer "No" in column 2 for that person.  If there is only a date of the FTM and no information about who attended, answer "Cannot determine" in column 2.

| Identity of Person | Attended FTM?<br>1 = Yes<br>2 = No<br>3 = Not applicable - person not part of the case<br>4 = Not applicable - identity or whereabouts of person is not known<br>5 = Cannot determine | Reason not attended<br><br>Enter number from Key below |
|---|---|---|
| Person who was the female primary caretaker at the time of the child's removal but not the biological/adoptive mother | 5.26 ☐ | 5.27 ☐ |
| Person who was the male primary caretaker at the time of the child's removal but is not the biological/adoptive father | 5.28 ☐ | 5.29 ☐ |
| Person(s) who is the child's caregiver while the child is in DFCS custody, including a staff member from a residential facility | 5.30 ☐ | 5.31 ☐ |
| Child's assigned caseworker (COR) | 5.32 ☐ | 5.33 ☐ |

15

| | | |
|---|---|---|
| Caseworker's immediate supervisor (COR) | 5.34 ☐ | 5.35 ☐ |
| Child's assigned caseworker (COS) | 5.36 ☐ | 5.37 ☐ |
| Caseworker's immediate supervisor (COS) | 5.38 ☐ | 5.39 ☐ |
| Child | 5.40 ☐ | 5.41 ☐ |
| Biological/adoptive mother | 5.42 ☐ | 5.43 ☐ |
| Biological/adoptive father | 5.44 ☐ | 5.45 ☐ |
| Extended family members (including fictive kin) | 5.46 ☐ | 5.47 ☐ |

**Key: Reason for not attending**
1 = Identity of person not known
2 = Whereabouts of person not known
3 = Person (including child) is cognitively unable to comprehend the process
4 = Child's participation is not in his or her best interest
5 = Person's participation is not in the best interests of the child
6 = Court has prohibited contact between the child and this person
7 = Parental rights were terminated prior to the earliest FTM in the period under review
8 = Child asked that the person not be invited
9 = Person unable to attend meeting because of school or work demands
10 = Person did not want to attend meeting
11 = Person unable to find transportation to attend meeting
12 = Person advised by attorney not to attend meeting
13 = Person said that they would attend but then did not appear
14 = No reason identified in case file
15 = No indication that the person was invited
16 = Not applicable, person attended
17 = Other (specify in the above grid by entering the number "17" and writing in the reason below it in the answer box on the grid)


5.48 ☐    Is there an ISP in the case file that includes a service plan for the child that was developed (or updated) during the period under review? *II.B.2.a.*
Instructions:  The most recent foster care policy requires that the ISP of a child in custody must include a discussion of the reason for services, the services being provided, the services necessary to achieve the permanency goal, who is responsible for the provision of those services, and when the services will be provided.  Therefore, the ISP is the place to look for a service plan.  **If the child is in Sample 2, the focus would be on the most recent updated service plan.**
　　　　　　　　1 = Yes　　　　2 = No

Instructions: If the answer is 2, SKIP to item 5.51.
If the answer is 1, answer the questions below.

5.49 During the period under review, what is the date of the earliest service plan found in the ISP developed for the child? *II.B.2.a.*

M [＿＿] D [＿＿] Y [＿＿]

**Question 5-B:** What information is in this service plan found in the child's ISP? Instructions: Enter a 1 in the box for all that apply and a 0 for those that do not apply (*i.e.*, the information is not in the service plan). Answer these items only for the target child, not the siblings of the target child.

5B.1 [＿＿]   Service needs and options to meet the needs of the child
5B.2 [＿＿]   Service needs and options to meet the needs of the family
5B.3 [＿＿]   Service goals for the child
5B.4 [＿＿]   Service goals for the family
5B.5 [＿＿]   Action steps needed to achieve goals for family
5B.6 [＿＿]   Action steps needed to achieve goals for child
5B.7 [＿＿]   Appropriateness of the child's out-of-home placement
5B.8 [＿＿]   Arrangements (including frequency and location) for child's visits with parents
5B.9 [＿＿]   Arrangements (including frequency and location) for child's visits with siblings

5.50 [＿＿]   Is there documentation in the case file indicating that the earliest service plan found in the child's ISP during the period under review was developed with the participation of attendees at a FTM? For example, does the narrative from an FTM held prior to the date of the service plan indicate that there were discussions addressing the issues to be included in the service plan? *II.B.2.a.*

    1 = Yes
    2 = No
    3 = Not applicable - there was no FTM prior to development of the service plan

If yes, what is the document providing that information ＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

**Question 5-C:** How frequently was the service plan for the child updated? Instructions: Provide the dates of all updates of service plans found in the child's ISP that are in the case file after the service plan date noted for item 5.48. If the date of the service plan noted for 5.48 is the only service plan, enter 0's in the date box 5C.1 and leave the remainder blank.

5C.1 M [＿＿] D [＿＿] Y [＿＿]
5C.2 M [＿＿] D [＿＿] Y [＿＿]
5C.3 M [＿＿] D [＿＿] Y [＿＿]
5C.4 M [＿＿] D [＿＿] Y [＿＿]
5C.5 M [＿＿] D [＿＿] Y [＿＿]
5C.6 M [＿＿] D [＿＿] Y [＿＿]

| | | | | | |
|---|---|---|---|---|---|
| 5C.7 | M | | D | | Y |
| 5C.8 | M | | D | | Y |
| 5C.9 | M | | D | | Y |
| 5C.10 | M | | D | | Y |
| 5C.11 | M | | D | | Y |
| 5C.12 | M | | D | | Y |
| 5C.13 | M | | D | | Y |
| 5C.14 | M | | D | | Y |
| 5C.15 | M | | D | | Y |
| 5C.16 | M | | D | | Y |
| 5C.17 | M | | D | | Y |

5.51 [   ]    During the period under review, is there documentation in the case file of an ISP with a service plan for the mother?

       1 = Yes
       2 = No
       3 = NA – mother is deceased
       4 = NA – DFCS sought termination of mother's parental rights shortly after the child's entry into custody
       5 = NA – Mother's parental rights were terminated prior to the period under review
       6 = NA – Court has determined that DFCS does not have to provide services to the mother
       7 = NA – Whereabouts of mother was not known any time during the period under review
       8 = Other (specify) _____

Instructions: If the answer is 2, 3, 4, 5, 6, 7, or 8 Skip to 5.54.
If the answer is 1, answer the questions below.

5.52 During the period under review, what is the date of the earliest ISP providing a service plan for the mother?  *II.B.2.b.*

          M [   ]    D [   ]    Y [   ]

**Question 5-D:** What information is in the earliest service plan found in the ISP for the mother?  Enter a 1 in the box for all that apply and a 0 for those that do not apply.

5D.1 [   ]    Service needs and options to meet the needs of the mother
5D.2 [   ]    Goals for the mother
5D.3 [   ]    Action steps needed to achieve goals for the mother
5D.4 [   ]    Arrangements (including frequency and location) for visits with child
5D.5 [   ]    Other (specify) _____

5.53 [   ]    Is there documentation in the case file indicating that the earliest service plan found in the ISP for the mother during the period under review was developed with the participation of attendees at a

FTM? For example, does the narrative from an FTM held prior to the date of the service plan indicate that there were discussions addressing the issues to be included in the service plan? *II.B.2.a.*

      1 = Yes        2 = No        3 = Not applicable (there was no FTM)


**Question 5-E:** How frequently was the service plan for the mother updated? Instructions: Provide the dates of all updates of service plans for the mother in the case file that are dated after the service plan noted for item 5.52. If the date of the service plan noted for 5.52 is the only service plan, enter 0's in the date box 5E.1 and leave the remainder blank.

| | M | D | Y |
|---|---|---|---|
| 5E.1 | | | |
| 5E.2 | | | |
| 5E.3 | | | |
| 5E.4 | | | |
| 5E.5 | | | |
| 5E.6 | | | |
| 5E.7 | | | |
| 5E.8 | | | |
| 5E.9 | | | |
| 5E.10 | | | |
| 5E.11 | | | |
| 5E.12 | | | |
| 5E.13 | | | |
| 5E.14 | | | |
| 5E.15 | | | |
| 5E.16 | | | |
| 5E.17 | | | |

5.54 [    ] During the period under review, is there documentation in the case file of an ISP with a service plan for the father?

      1 = Yes
      2 = No
      3 = NA – father is deceased
      4 = NA – DFCS sought termination of father's parental rights shortly after the child's entry into custody
      5 = NA – Father's parental rights were terminated prior to the period under review
      6 = NA – Court has determined that DFCS does not have to provide services to the father
      7 = NA – Whereabouts of father was not known at any time during the period under review
      8 = Other (specify) _____

Instructions: If the answer is 2, 3, 4, 5, 6, 7, or 8 Skip to Section 6.
If the answer is 1, answer the questions below.

5.55 During the period under review, what is the date of the earliest ISP providing a service plan for the father? *II.B.2.b.*

      M [    ]    D [    ]    Y [    ]

**Question 5-F:** What information is in the service plan found in the ISP for the father? Enter a 1 in the box for all that apply and a 0 for all that do not apply.

5F.1 [ ] Service needs and options to meet the needs of the father

5F.2 [ ] Goals for the father

5F.3 [ ] Action steps needed to achieve goals for the father

5F.4 [ ] Arrangements (including frequency and location) for visits with child

5F.5 [ ] Other (specify) _____

5.56 [ ] Is there documentation in the case file indicating that the earliest service plan found in the ISP for the father during the period under review was developed with the participation of attendees at a FTM? For example, does the narrative from an FTM held prior to the date of the service plan indicate that there were discussions addressing the issues to be included in the service plan? *II.B.2.a*
    1 = Yes        2 = No        3 = Not applicable (there was no FTM)

**Question 5-G:** How frequently was the service plan for the father updated? Instructions: Provide the dates of all updates of service plans for the father in the case file that are dated after the date of the service plan noted for item 5.55. If the date of the service plan noted for 5.55 is the only service plan, enter 0's in the date box 5G.1 and leave the remainder blank. Enter the individual dates even if the service plan for the father was updated at the same time as the service plan for the mother.

| | | | | | |
|---|---|---|---|---|---|
| 5G.1 | M | [ ] | D | [ ] | Y | [ ] |
| 5G.2 | M | [ ] | D | [ ] | Y | [ ] |
| 5G.3 | M | [ ] | D | [ ] | Y | [ ] |
| 5G.4 | M | [ ] | D | [ ] | Y | [ ] |
| 5G.5 | M | [ ] | D | [ ] | Y | [ ] |
| 5G.6 | M | [ ] | D | [ ] | Y | [ ] |
| 5G.7 | M | [ ] | D | [ ] | Y | [ ] |
| 5G.8 | M | [ ] | D | [ ] | Y | [ ] |
| 5G.9 | M | [ ] | D | [ ] | Y | [ ] |
| 5G.10 | M | [ ] | D | [ ] | Y | [ ] |
| 5G.11 | M | [ ] | D | [ ] | Y | [ ] |
| 5G.12 | M | [ ] | D | [ ] | Y | [ ] |
| 5G.13 | M | [ ] | D | [ ] | Y | [ ] |
| 5G.14 | M | [ ] | D | [ ] | Y | [ ] |
| 5G.15 | M | [ ] | D | [ ] | Y | [ ] |
| 5G.16 | M | [ ] | D | [ ] | Y | [ ] |
| 5G.17 | M | [ ] | D | [ ] | Y | [ ] |

## SECTION 6:  PERMANENCY PLANNING *II.B.3.a., II.B.3.b., II.B.3.c.*

6.1 [ ] Is there a document in the case file that was developed or updated during the period under review that describes the plan for achieving permanency for the child and that includes a statement of the child's permanency goal? *II.B.3.a.(1)* Instructions:  This information should be in the child's ISP.  A plan for achieving permanency is one that describes how the identified permanency goal will be achieved,

the expected date of achievement, the possible barriers to achievement, and the plans to address the barriers.

    1 = Yes – there is a statement of the permanency goal and a plan to achieve it
    2 = No – there is no statement of the child's permanency goal and no plan for achieving permanency
    3 = There is a statement of the child's permanency goal, but no plan for achieving it

Instructions: If the answer is 2, SKIP to Section 7.
If the answer is 3, SKIP to 6.32.
If the answer is 1, answer the questions below.

6.2 What is the **earliest** date of the document (*e.g.*, ISP) describing the plan for achieving permanency for the child during the period under review? *II.B. 3.a.(1)*

M ☐    D ☐    Y ☐

**Question 6-A:** What information is included in the document dated under item 6.2 (*e.g.*, ISP) describing the plan for achieving permanency for the child? *II.B.3.a.(1)* Instructions: Enter a 1 in the box for all that apply and a 0 for all that do not apply.

6A.1 ☐ The child's permanency goal(s)

6A.2 ☐ The timeframe for achieving the permanency goal(s) and the date that the goal is likely to be achieved

6A.3 ☐ The actions and services to be taken to achieve the permanency goal(s) and who is responsible for services

6A.4 ☐ The potential barriers to achieving the permanency goal(s) and how they will be addressed

6A.5 ☐ Assessment of the potential for achieving the goal *II.B.3.b.(1)*

6A.6 ☐ Identification of possible family (relatives) resources for permanency *II.B.3.b.(1)*

6A.7 ☐ Appropriateness of placing the child with a potentially permanent family *II.B.3.b.(1)*

6.3 ☐ Is there documentation in the case file of the persons who were involved in developing the earliest permanency plan developed during the period under review? *II.B.3.a.(1)*
    1 = Yes          2 = No

Instructions: If the answer is 2, SKIP to 6.32.
If the answer is 1, complete Grid 6-A below for all who participated and reasons for not participating.

**Grid 6-A:** Persons documented as participating in the development of the initial permanency plan *II.B.3.a.(1)* Instructions: Complete the grid only for the individuals listed below. If individuals other than the ones listed below participated in developing the permanency plan, you do not need to identify them. Participation in plan development requires that the person was present in a meeting in which discussions focused on the permanency plan or had individual discussions with the child's caseworker about what should be included in the permanency plan. If there is only a signature on the plan but no indication of further participation, then the reviewer should consider that the person **did not** participate in plan development. This information is most likely to be found in the MACWIS case narratives.

21

| Person | Participated in plan development? 1 = Yes     2 = No | Reason not Participated Use Key A |
|---|---|---|
| Female primary caregiver at the time of the child's removal but who is not the biological/adoptive mother | 6.4 ☐ | 6.5 ☐ |
| Male primary caregiver at the time of the child's removal but who is not the biological/adoptive father | 6.6 ☐ | 6.7 ☐ |
| Foster mother  (*i.e.*, female resource parent including relative resource parent, non relative resource parent, or therapeutic resource parent) | 6.8 ☐ | 6.9 ☐ |
| Foster father (*i.e.*, male resource parent including relative resource parent, non relative resource parent, or therapeutic resource parent) | 6.10 ☐ | 6.11 ☐ |
| Facility staff person where child is placed | 6.12 ☐ | 6.13 ☐ |
| Child's caseworker (COR) | 6.14 ☐ | 6.15 ☐ |
| Child's caseworker (COS) | 6.16 ☐ | 6.17 ☐ |
| Biological/adoptive mother | 6.18 ☐ | 6.19 ☐ |
| Biological/adoptive father | 6.20 ☐ | 6.21 ☐ |
| Child | 6.22 ☐ | 6.23 ☐ |
| Person(s) providing direct services to child (other than DFCS caseworker or child's caregiver) | 6.24 ☐ | 6.25 ☐ |
| Person(s) providing direct services to the parents (other than DFCS caseworker or child's caregiver) | 6.26 ☐ | 6.27 ☐ |
| Extended family members (including fictive kin) | 6.28 ☐ | 6.29 ☐ |
| CASA | 6.30 ☐ | 6.31 ☐ |

**Key A: Reasons for not participating in plan development**
1 = Identity of person not known
2 = Whereabouts of person not known
3 = Person (including child) is cognitively unable to comprehend the process
4 = Child's participation is not in his or her best interest
5 = Person's participation is not in the best interests of the child

22

6 = Parental rights were terminated for person
7 = Person (including child) did not want to participate
8 = Person advised by attorney not to participate
9 = No indication in the case file that the person was asked or given opportunity to participate
10 = Person was asked or given opportunity to participate, but did not respond
11= Not applicable because person did participate
12 = Not applicable because person is not relevant to case – that is, there was no one providing direct services to the child or the parents other than the caseworker, or there was no one who represented the mother or father to the child other than the biological/adoptive parents, or there was no COS, *etc.*
13 = Other (specify in the above grid by entering the number "13" and writing in the reason below it in the answer box on the grid)
14 = No reason provided in the case file

6.32 [____]    What is the child's permanency goal as stated in the earliest permanency plan or ISP during the period under review? *II.B.3.a.(1), (2), (3), (4)*
1 = Reunification
2 = Adoption
3 = Durable legal custody
4 = Legal guardianship
5 = Emancipation/Independent living
6 = Long-term foster care/Another Planned Permanent Living Arrangement (APPLA)
7 = Permanent placement with a fit and willing relative
8 = Concurrent goal of reunification and adoption
9 = Concurrent goal of reunification and guardianship or durable legal custody
10 = Concurrent goal of reunification and emancipation/independent living
11 = Concurrent goal of adoption and guardianship or durable legal custody
12 = Concurrent goals of adoption and emancipation/independent living
13 = Concurrent goals of adoption and permanent placement with relatives
14 = Concurrent goals of reunification and permanent placement with relatives
15 = Concurrent goals of durable legal custody or guardianship and emancipation/independent living
16 = Concurrent goals of durable legal custody/guardianship and permanent placement with relatives
17 = Concurrent goals of emancipation/independent living and permanent placement with relatives
18 = Cannot determine

6.33 What is the date during the period under review of the most recent plan or ISP identifying the child's permanency goal and actions to be taken to achieve that goal?  Instructions:  If there is only one document in the case file with the child's permanency plan or permanency goal, reenter the date from item 6.2. *II.B.3.a.(1)*

                    M [_____]   D [_____]   Y [_____]

6.34 [____]    What is the child's **most recent** permanency goal or what was the latest goal prior to discharge from custody?
1 = Reunification
2 = Adoption
3 = Durable legal custody
4 = Legal guardianship
5 = Emancipation/Independent living
6 = Long-term foster care/Another Planned Permanent Living Arrangement (APPLA)
7 = Permanent placement with a fit and willing relative
8 = Concurrent goal of reunification and adoption

23

9 = Concurrent goal of reunification and guardianship or durable legal custody
10 = Concurrent goal of reunification and emancipation/independent living
11 = Concurrent goal of adoption and guardianship or durable legal custody
12 = Concurrent goals of adoption and emancipation/independent living
13 = Concurrent goals of adoption and permanent placement with relatives
14 = Concurrent goals of reunification and permanent placement with relatives
15 = Concurrent goals of durable legal custody or guardianship and emancipation/independent living
16 = Concurrent goals of durable legal custody/guardianship and permanent placement with relatives
17 = Concurrent goals of emancipation/independent living and permanent placement with relatives
18 = Cannot determine

Instructions:  If the answer is not durable legal custody as either a single or concurrent goal, SKIP to Question 6-C.
If the answer is durable legal custody as a single or concurrent goal, answer Question 6-B below.

**Question 6-B:** If the child's **most recent** permanency goal is durable legal custody as either a single or concurrent goal, is the following information documented in the case file?  Enter a 1 in the box for all that apply and a 0 for all that do not apply.  *II.B.3.a.(2)*

6B.1 ☐ The identity of the person to whom durable legal custody will be given

6B.2 ☐ A long-term placement agreement signed by DFCS and the person(s) given durable legal custody for the child

6B.3 ☐ A reason why adoption is not a feasible option for the person assuming durable legal custody

6B.4 ☐ A reason why it is in the best interests of the child to remain with the person to be given durable legal custody

Instructions: If the answer is not emancipation/independent living as either a single or concurrent goal, SKIP to Section 7.
If the answer is emancipation/independent living as either a single or concurrent goal, answer Question 6-C below.

**Question 6-C**: If the child's most recent permanency goal is emancipation/independent living as either a single or concurrent goal, is the following information documented in the case file?  *II.B.3.a.(4)*  Enter a 1 in the box for all that apply and a 0 for all that do not apply.

6C.1 ☐ The child was age 16 or older at the time the goal of emancipation/independent living was established

6C.2 ☐ The permanency options of reunification, adoption, durable legal custody, guardianship, and permanent placement with a relative were considered prior to establishing the goal of emancipation/independent living

6C.3 ☐ There is a report in the case file that was submitted to the Youth Court providing a compelling reason why the goal of emancipation/independent living is in the best interests of the child and more appropriate than reunification, adoption, durable legal custody, guardianship, and permanent placement with relatives

## SECTION 7: PERMANENCY REVIEWS *II.B.3.c.(1) and (2)*

7.1 [    ]    Is there documentation in the case file that an administrative review (also known as a foster care review/county conference) of the child's status and permanency plan was held at some time during the period under review?  *II.B.3.c.(1)*  Instructions:  The administrative review is also referred to as the county conference or the foster care review.  The write up of the county conference will be found in MACWIS, and the form will be found in the paper file. The administrative review (county conference/foster care review) is different from supervisory administrative reviews and special case reviews that may be assigned by the regional director.  Answer the questions below only for administrative reviews.

                    1 = Yes            2 = No

Instructions:  If the answer is 2, SKIP to 7.30.
If the answer is 1, answer the questions below.

**Question 7-A**: What are the dates of the administrative reviews occurring during the period under review?  Instructions: Begin at 7A.1 with the first review that occurred during the period under review (*i.e.*, after January 1, 2009) for both Sample 1 and Sample 2.

| | | | | | |
|---|---|---|---|---|---|
| 7A.1 | M | [    ] | D | [    ] | Y | [    ] |
| 7A.2 | M | [    ] | D | [    ] | Y | [    ] |
| 7A.3 | M | [    ] | D | [    ] | Y | [    ] |
| 7A.4 | M | [    ] | D | [    ] | Y | [    ] |
| 7A.5 | M | [    ] | D | [    ] | Y | [    ] |
| 7A.6 | M | [    ] | D | [    ] | Y | [    ] |
| 7A.7 | M | [    ] | D | [    ] | Y | [    ] |
| 7A.8 | M | [    ] | D | [    ] | Y | [    ] |
| 7A.9 | M | [    ] | D | [    ] | Y | [    ] |
| 7A.10 | M | [    ] | D | [    ] | Y | [    ] |

**Grid 7-A:** People Invited to Attend the Most Recent Administrative Review
Instructions:  In column 2, use "Not Applicable" if person was not involved in the case.  If the person was notified/invited, use reason 11, "Not applicable," for column 3.  If you cannot determine whether the person identified in column 1 was invited to or notified about the administrative review, answer "Cannot determine" in column 2, and use reason 12, "Not applicable," in column 3.

| Person | Notified/invited<br>1 = Yes<br>2 = No<br>3 = Not applicable<br>4 = Cannot determine | Reason not invited<br>**Use Reason Key** |
|---|---|---|
| Female primary caregiver at the time of the child's removal who is not the biological/adoptive mother | 7.2 [    ] | 7.3 [    ] |
| Male primary caregiver at the time of the child's removal who is not the biological/adoptive father | 7.4 [    ] | 7.5 [    ] |

25

| | | |
|---|---|---|
| Foster mother (*i.e.*, female resource parent including relative resource parent, non relative resource parent, or therapeutic foster parent) | 7.6 ☐ | 7.7 ☐ |
| Foster father (*i.e.*, male resource parent including relative resource parent, non relative resource parent, or therapeutic foster parent) | 7.8 ☐ | 7.9 ☐ |
| Facility staff person where child is placed | 7.10 ☐ | 7.11 ☐ |
| Child's caseworker (COR) | 7.12 ☐ | 7.13 ☐ |
| Child's caseworker (COS) | 7.14 ☐ | 7.15 ☐ |
| Biological/adoptive mother | 7.16 ☐ | 7.17 ☐ |
| Biological/adoptive father | 7.18 ☐ | 7.19 ☐ |
| Person(s) providing direct services to the parents (other than DFCS caseworker or child's caregiver) | 7.20 ☐ | 7.21 ☐ |
| Person(s) providing direct services to the child (other than DFCS caseworker or child's caregiver) | 7.22 ☐ | 7.23 ☐ |
| Mother's attorney | 7.24 ☐ | 7.25 ☐ |
| Father's attorney | 7.26 ☐ | 7.27 ☐ |
| Guardian Ad Litem | 7.28 ☐ | 7.29 ☐ |
| CASA | 7.30 ☐ | 7.31 ☐ |

**Reason Key: Reasons why person was not invited to and/or did not attend review**

1 = Identity of person not known
2 = Whereabouts of person not known
3 = Person (including child) is cognitively unable to comprehend the process
4 = Child's participation is not in his or her best interest
5 = Person's participation is not in the best interests of the child
6 = Parental rights were terminated
7 = No indication in the case file that the person was asked or given opportunity to attend
8 = Person is not involved in the case – *i.e.*, there is no one who represents the parents to the child other than the biological parents or there is no one providing direct services to the child or parent.
9 = Other (specify in the above grid by entering the number "9" and writing in the reason below it in the answer box on the grid)
10 = No reason provided in the case file

26

11 = Not applicable, person was invited/attended
12 = Not applicable, cannot determine if person was invited and/or attended

7.32 [    ]    Is there documentation in the case file that a court review of the child's permanency plan was held at any time during the period under review?  Instructions:  A court review of the child's permanency plan is a hearing during which the plan for achieving permanency for the child and progress made with regard to that plan is reviewed and decisions made about the appropriateness of the plan and efforts to achieve it.  This may be called a permanency review hearing, a review hearing, or a 12-month review.  There is a legal screen in MACWIS that includes a brief description of each hearing.  If there is something in the MACWIS description that indicates that the hearing addressed the child's permanency plan, then the answer to this question would be "Yes."  *II.B.3.c.(1)*

     1 = Yes
     2 = No
     3 = Not applicable (child not in care long enough for a permanency hearing)

Instructions:  If the answer is 2 or 3, SKIP to Section 8.
If the answer is 1, answer the questions below.

**Question 7-B**: What are the dates of the court reviews of the permanency plan during the period under review?  Instructions:  Provide only the dates for the child's most recent episode of DFCS custody.

| 7B.1 | M [    ] | D [    ] | Y [    ] |
| 7B.2 | M [    ] | D [    ] | Y [    ] |
| 7B.3 | M [    ] | D [    ] | Y [    ] |
| 7B.4 | M [    ] | D [    ] | Y [    ] |
| 7B.5 | M [    ] | D [    ] | Y [    ] |
| 7B.6 | M [    ] | D [    ] | Y [    ] |
| 7B.7 | M [    ] | D [    ] | Y [    ] |
| 7B.8 | M [    ] | D [    ] | Y [    ] |
| 7B.9 | M [    ] | D [    ] | Y [    ] |
| 7B.10 | M [    ] | D [    ] | Y [    ] |

**Grid 7-B:** People Invited to Attend the Most Recent Court Review/Permanency Hearing
Instructions:  In column 2, use "Not applicable" if person was not involved in the case.  Do not complete columns 3 or 4 if the answer in column 2 is "Not applicable."  If there is information about people attending the hearings but you cannot determine who they are, answer 4, "Cannot determine" in column 2 and leave the remaining columns blank for that person.

| Person | Notified/invited<br>1 = Yes<br>2 = No<br>3 = Not applicable (person not involved in the case)<br>4 = Cannot determine | Type of notification<br><br>Use Key A; enter up to 2 | Reason not invited<br><br>Use Key B |
|---|---|---|---|
| Female primary caretaker at the time of the child's removal who is not the biological/adoptive mother | 7.33 [    ] | 7.34 [    ]<br><br>7.35 [    ] | 7.36 [    ] |

27

| | | | |
|---|---|---|---|
| Male primary caretaker at the time of the child's removal who is not the biological/adoptive father | 7.37 ☐ | 7.38 ☐<br><br>7.39 ☐ | 7.40 ☐ |
| Foster mother (*i.e.*, female resource parent including relative resource parent, non relative resource parent, or therapeutic foster parent) | 7.41 ☐ | 7.42 ☐<br><br>7.43 ☐ | 7.44 ☐ |
| Foster father (*i.e.*, male resource parent including relative resource parent, non relative resource parent, or therapeutic foster parent) | 7.45 ☐ | 7.46 ☐<br><br>7.47 ☐ | 7.48 ☐ |
| Facility staff person where child is placed | 7.49 ☐ | 7.50 ☐<br><br>7.51 ☐ | 7.52 ☐ |
| Child's caseworker (COR) | 7.53 ☐ | 7.54 ☐<br><br>7.55 ☐ | 7.56 ☐ |
| Child's caseworker (COS) | 7.57 ☐ | 7.58 ☐<br><br>7.59 ☐ | 7.60 ☐ |
| Extended family members | 7.61 ☐ | 7.62 ☐<br><br>7.63 ☐ | 7.64 ☐ |
| Child | 7.65 ☐ | 7.66 ☐<br><br>7.67 ☐ | 7.68 ☐ |
| Person(s) providing direct services to child (other than DFCS caseworker or child's caregiver) | 7.69 ☐ | 7.70 ☐<br><br>7.71 ☐ | 7.72 ☐ |

28

| | | | |
|---|---|---|---|
| Person(s) providing direct services to the parents (other than DFCS caseworker or child's caregiver) | 7.73 ☐ | 7.74 ☐<br><br>7.75 ☐ | 7.76 ☐ |
| Mother's attorney | 7.77 ☐ | 7.78 ☐<br><br>7.79 ☐ | 7.80 ☐ |
| Father's attorney | 7.81 ☐ | 7.82 ☐<br><br>7.83 ☐ | 7.84 ☐ |
| Guardian Ad Litem | 7.85 ☐ | 7.86 ☐<br><br>7.87 ☐ | 7.88 ☐ |
| CASA | 7.89 ☐ | 7.90 ☐<br><br>7.91 ☐ | 7.92 ☐ |
| Biological/adoptive mother | 7.93 ☐ | 7.94 ☐<br><br>7.95 ☐ | 7.96 ☐ |
| Biological/adoptive father | 7.97 ☐ | 7.98 ☐<br><br>7.99 ☐ | 7.100 ☐ |

**Key A: Type of Notification**
1 = Written letter notification from DFCS
2 = Written letter notification from the Court
3 = Telephone call from DFCS caseworker
4 = Telephone call from the Court
5 = Email from DFCS caseworker
6 = Email from the Court
7 = Announcement at court during prior review hearing
8 = Other (specify in the above grid by entering the number "8" and writing in the reason below it in the answer box on the grid)

29

9 = Not specified in the case file

**Key B: Reasons why person was not invited to attend review**
1 = Identity of person not known
2 = Whereabouts of person not known
3 = Person (including child) is cognitively unable to comprehend the process
4 = Child's participation is not in his or her best interest
5 = Person's participation is not in the best interests of the child
6 = Parental rights were terminated
7 = No indication in the case file that the person was asked or given opportunity to attend
8 = Person is not involved in the case – *i.e.*, there is no one who represents the parents to the child other than the biological parents or there is no one providing direct services to the child or parent.
9 = Other (specify in the above grid by entering the number "9" and writing in the reason below it in the answer box on the grid)
10 = No reason provided in the case file


## SECTION 8:  ACHIEVING REUNIFICATION

Instruction:  For both Sample 1 and Sample 2, complete Section 8 if the child's permanency goal was reunification at some time during the period under review.

Also, complete Section 8 if the child does not have an ISP with a formally stated permanency goal, but DFCS appears to be working toward reunifying the child even if there is no formal goal stated.  For example, DFCS is providing services to the parents, inviting the parents to meetings, *etc.*  This may often be the situation when the child has been in DFCS custody for a short period of time and the permanency plan is not yet developed.

**Question 8-A** What are the key behaviors and conditions documented in the case file that either resulted in the child's placement in DFCS custody **or** prevented the child from being reunified with family? Instructions:  Put a 1 in the box for all that apply and a 0 for all that do not apply. The responses here should be similar to Question 2-A in Section 2, but may include additional concerns that were identified after the child was in DFCS custody.

8A.1 [    ]    Abandonment of child

     a [    ]    Mother/Female primary caretaker perpetrator

     b [    ]    Father/Male primary caretaker perpetrator

     c [    ]    Other perpetrator (specify)_____

8A.2 [    ]    Adult self-neglect

     a [    ]    Mother/Female primary caretaker perpetrator

     b [    ]    Father/Male primary caretaker perpetrator

     c [    ]    Other (specify)_____

8A.3 [    ]    Emotional abuse of child

     a [    ]    Mother/Female primary caretaker perpetrator

30

b [＿＿] Father/Male primary caretaker perpetrator
c [＿＿] Other (specify)＿＿＿＿＿＿＿＿＿＿＿＿＿

8A.4 [＿＿] Exploitation of child
    a [＿＿] Mother/Female primary caretaker perpetrator
    b [＿＿] Father/Male primary caretaker perpetrator
    c [＿＿] Other (specify)＿＿＿＿＿＿＿＿＿＿＿＿＿

8A.5 [＿＿] Medical neglect of child; lack of health care or failure to thrive
    a [＿＿] Mother/Female primary caretaker perpetrator
    b [＿＿] Father/Male primary caretaker perpetrator
    c [＿＿] Other (specify)＿＿＿＿＿＿＿＿＿＿＿＿＿

8A.6 [＿＿] Physical abuse of child
    a [＿＿] Mother/Female primary caretaker perpetrator
    b [＿＿] Father/Male primary caretaker perpetrator
    c [＿＿] Other (specify)＿＿＿＿＿＿＿＿＿＿＿＿＿

8A.7 [＿＿] Physical neglect of child
    a [＿＿] Mother/Female primary caretaker perpetrator
    b [＿＿] Father/Male primary caretaker perpetrator
    c [＿＿] Other (specify)＿＿＿＿＿＿＿＿＿＿＿＿＿

8A.8 [＿＿] Sexual abuse of child
    a [＿＿] Mother/Female primary caretaker perpetrator
    b [＿＿] Father/Male primary caretaker perpetrator
    c [＿＿] Other (specify)＿＿＿＿＿＿＿＿＿＿＿＿＿

8A.9 [＿＿] Parent substance abuse
    a [＿＿] Mother/Female primary caretaker perpetrator
    b [＿＿] Father/Male primary caretaker perpetrator
    c [＿＿] Other (specify)＿＿＿＿＿＿＿＿＿＿＿＿＿

8A.10 [＿＿] Caretaker inability to cope
    a [＿＿] Mother/Female primary caretaker
    b [＿＿] Father/Male primary caretaker
    c [＿＿] Other (specify)＿＿＿＿＿＿＿＿＿＿＿＿＿

8A.11 [＿＿] Inadequate housing

31

a ☐ Mother/Female primary caretaker

b ☐ Father/Male primary caretaker

c ☐ Other (specify) _____

8A.12 ☐ Incarceration of parent

a ☐ Mother/Female primary caretaker

b ☐ Father/Male primary caretaker

c ☐ Other (specify) _____

8A.13 ☐ Relinquishment

a ☐ Mother/Female primary caretaker

b ☐ Father/Male primary caretaker

c ☐ Other (specify) _____

8A.14 ☐ Inadequate parenting skills

a ☐ Mother/Female primary caretaker

b ☐ Father/Male primary caretaker

c ☐ Other (specify) _____

8A.15 ☐ Inadequate income/employment

a ☐ Mother/Female primary caretaker

b ☐ Father/Male primary caretaker

c ☐ Other (specify) _____

8A.16 ☐ Domestic violence

a ☐ Mother/Female primary caretaker

b ☐ Father/Male primary caretaker

c ☐ Other (specify) _____

8A.17 ☐ Inadequate food supply

a ☐ Mother/Female primary caretaker

b ☐ Father/Male primary caretaker

c ☐ Other (specify) _____

8A.18 ☐ Educational neglect of the child

a ☐ Mother/Female primary caretaker

b ☐ Father/Male primary caretaker

c ☐ Other (specify) _____

32

8A.19 [____] Parent failure to protect
    a [____] Mother/Female primary caretaker
    b [____] Father/Male primary caretaker
    c [____] Other (specify) _____

8A.20 [____] Parent provided inadequate supervision or failed to supervise
    a [____] Mother/Female primary caretaker
    b [____] Father/Male primary caretaker
    c [____] Other (specify) _____

8A.21 [____] Parent mental illness
    a [____] Mother/Female primary caretaker
    b [____] Father/Male primary caretaker
    c [____] Other (specify) _____

8A.22 [____] Child was substance exposed
    a [____] Mother/Female primary caretaker
    b [____] Father/Male primary caretaker
    c [____] Other (specify) _____

8A.23 [____] Parent has a developmental disability
    a [____] Mother/Female primary caretaker
    b [____] Father/Male primary caretaker
    c [____] Other (specify) _____

8A.24 [____] Parent was hospitalized
    a [____] Mother/Female primary caretaker
    b [____] Father/Male primary caretaker
    c [____] Other (specify) _____

8A.25 [____] Child in Need of Supervision (child behavior problem)

8A.26 [____] Child disability

8A.27 [____] Other (specify problem and perpetrator)
    a [____] Mother/Female primary caretaker
    b [____] Father/ Male primary caretaker
    c [____] Other (specify)_____

8A.28 [____] None identified

33

8.1 [ ] Does the case file specify the parent with whom the child is to be reunified? *II.B.3.d.(1)*

 1 = Yes, child is to be reunified with mother only
 2 = Yes, child is to be reunified with father only
 3 = Yes, child is to be reunified with both parents who reside together
 4 = No, there is no specification of the person with whom the child will be reunified

**Grid 8-A:** Services to Mother to Address Identified Concerns

Instructions: Complete this grid for all of the behaviors and conditions identified under Question 8-A above that are relevant for the **mother.** Enter a 1 in the box in column 1 for all behaviors and conditions that are relevant, and complete the remainder of the row. Enter a 0 in the box in column 1 if the behavior or condition is not relevant and do not complete the remainder of the row.

| Identified behaviors and conditions Instructions: Put a 1 in the box for all that apply and complete the row. If does not apply, enter an 0 in the box and leave the remainder of the row blank. | Were services to address behaviors and conditions specified in a service plan that was developed during the period under review? 1 = Yes 2 = No | Evidence in the case file that mother shared in planning for services during the period under review? 1 = Yes 2 = No Instructions: Answer "Yes" if there is documentation in the case file of mother's participation in planning for services for herself, such as during a FTM or an individual meeting with the caseworker. | Evidence in the case file that the services were offered to mother during the period under review? 1 = Yes 2 = No | Types of assistance provided to access services during the period under review Use Key; enter up to 3 |
|---|---|---|---|---|
| Abandonment 8.2 [ ] | 8.3 [ ] | 8.4 [ ] | 8.5 [ ] | 8.6 [ ]  8.7 [ ]  8.8 [ ] |
| Adult self neglect 8.9 [ ] | 8.10 [ ] | 8.11 [ ] | 8.12 [ ] | 8.13 [ ]  8.14 [ ]  8.15 [ ] |
| Emotional abuse 8.16 [ ] | 8.17 [ ] | 8.18 [ ] | 8.19 [ ] | 8.20 [ ]  8.21 [ ]  8.22 [ ] |

34

| | | | |
|---|---|---|---|
| Exploitation<br>8.23 ☐ | 8.24 ☐ | 8.25 ☐ | 8.26 ☐ | 8.27 ☐<br><br>8.28 ☐<br><br>8.29 ☐ |
| Medical neglect<br>8.30 ☐ | 8.31 ☐ | 8.32 ☐ | 8.33 ☐ | 8.34 ☐<br><br>8.35 ☐<br><br>8.36 ☐ |
| Physical abuse<br>8.37 ☐ | 8.38 ☐ | 8.39 ☐ | 8.40 ☐ | 8.41 ☐<br><br>8.42 ☐<br><br>8.43 ☐ |
| Sexual abuse<br>8.44 ☐ | 8.45 ☐ | 8.46 ☐ | 8.47 ☐ | 8.48 ☐<br><br>8.49 ☐<br><br>8.50 ☐ |
| Substance abuse<br>8.51 ☐ | 8.52 ☐ | 8.53 ☐ | 8.54 ☐ | 8.55 ☐<br><br>8.56 ☐<br><br>8.57 ☐ |
| Inability to cope<br>8.58 ☐ | 8.59 ☐ | 8.60 ☐ | 8.61 ☐ | 8.62 ☐<br><br>8.63 ☐<br><br>8.64 ☐ |
| Inadequate housing<br>8.65 ☐ | 8.66 ☐ | 8.67 ☐ | 8.68 ☐ | 8.69 ☐<br><br>8.70 ☐<br><br>8.71 ☐ |

| | | | |
|---|---|---|---|
| Incarceration<br>8.72 ☐ | 8.73 ☐ | 8.74 ☐ | 8.75 ☐ | 8.76 ☐<br><br>8.77 ☐<br><br>8.78 ☐ |
| Inadequate parenting skills<br>8.79 ☐ | 8.80 ☐ | 8.81 ☐ | 8.82 ☐ | 8.83 ☐<br><br>8.84 ☐<br><br>8.85 ☐ |
| Inadequate income/employment<br>8.86 ☐ | 8.87 ☐ | 8.88 ☐ | 8.89 ☐ | 8.90 ☐<br><br>8.91 ☐<br><br>8.92 ☐ |
| Domestic violence<br>8.93 ☐ | 8.94 ☐ | 8.95 ☐ | 8.96 ☐ | 8.97 ☐<br><br>8.98 ☐<br><br>8.99 ☐ |
| Inadequate food supply<br>8.100 ☐ | 8.101 ☐ | 8.102 ☐ | 8.103 ☐ | 8.104 ☐<br><br>8.105 ☐<br><br>8.106 ☐ |
| Educational neglect<br>8.107 ☐ | 8.108 ☐ | 8.109 ☐ | 8.110 ☐ | 8.111 ☐<br><br>8.112 ☐<br><br>8.113 ☐ |
| Failure to protect child from injury<br>8.114 ☐ | 8.115 ☐ | 8.116 ☐ | 8.117 ☐ | 8.118 ☐<br><br>8.119 ☐<br><br>8.120 ☐ |
| Inadequate | 8.122 ☐ | 8.123 ☐ | 8.124 ☐ | 8.125 ☐ |

36

| | | | | |
|---|---|---|---|---|
| supervision or failure to supervise 8.121 [  ] | | | | 8.126 [  ]  <br><br>8.127 [  ] |
| Mental illness 8.128 [  ] | 8.129 [  ] | 8.130 [  ] | 8.131 [  ] | 8.132 [  ]  <br><br>8.133 [  ]  <br><br>8.134 [  ] |
| Developmental disability 8.135 [  ] | 8.136 [  ] | 8.137 [  ] | 8.138 [  ] | 8.139 [  ]  <br><br>8.140 [  ]  <br><br>8.141 [  ] |
| Hospitalized 8.142 [  ] | 8.143 [  ] | 8.144 [  ] | 8.145 [  ] | 8.146 [  ]  <br><br>8.147 [  ]  <br><br>8.148 [  ] |

**Key: Types of Assistance**
1 = Provided transportation
2 = Offered financial assistance for transportation
3 = Provided a referral for services
4 = Contacted service provider to help arrange appointment
5 = Other (specify in the above grid by entering the number "5" and writing in the reason below it in the answer box on the grid)
6 = No assistance documented in the file although there was documentation that assistance was needed
7 = NA - documentation that no assistance was needed in accessing services

**Grid 8-B:** Services to Father to Address Identified Concerns
Instructions: Complete this grid for all of the behaviors and conditions identified under Question 8-A above that are relevant for the father.  Enter a 1 in the box in column 1 for all behaviors and conditions that are relevant, and complete the remainder of the row.  Enter a 0 in the box in column 1 if the behavior or condition is not relevant and do not complete the remainder of the row.

| Identified behaviors and conditions  <br><br>Instructions:  Put a 1 in the box for all that apply and complete the row.  If does not apply, enter an 0 in the box and leave the | Were services to address behaviors and conditions specified in a service plan that was developed during the period under review? | Evidence in the case file that mother shared in planning for services during the period under review?  <br><br>1 = Yes  <br>2 = No | Evidence in the case file that the services were offered to mother during the period under review? | Types of assistance provided to access services during the period under review  <br><br>Use Key; enter up to 3 |
|---|---|---|---|---|

37

| remainder of the row blank. | 1 = Yes<br>2 = No | Instructions: Answer "Yes" if there is documentation in the case file of mother's participation in planning for services for herself, such as during a FTM or an individual meeting with the caseworker | 1 = Yes<br>2 = No | |
|---|---|---|---|---|
| Abandonment<br>8.149 ☐ | 8.150 ☐ | 8.151 ☐ | 8.152 ☐ | 8.153 ☐<br><br>8.154 ☐<br><br>8.155 ☐ |
| Adult self neglect<br>8.156 ☐ | 8.157 ☐ | 8.158 ☐ | 8.159 ☐ | 8.160 ☐<br><br>8.161 ☐<br><br>8.162 ☐ |
| Emotional abuse<br>8.163 ☐ | 8.164 ☐ | 8.165 ☐ | 8.166 ☐ | 8.167 ☐<br><br>8.168 ☐<br><br>8.169 ☐ |
| Exploitation<br>8.170 ☐ | 8.171 ☐ | 8.172 ☐ | 8.173 ☐ | 8.174 ☐<br><br>8.175 ☐<br><br>8.176 ☐ |
| Medical neglect<br>8.177 ☐ | 8.178 ☐ | 8.179 ☐ | 8.180 ☐ | 8.181 ☐<br><br>8.182 ☐<br><br>8.183 ☐ |
| Physical abuse<br>8.184 ☐ | 8.185 ☐ | 8.186 ☐ | 8.187 ☐ | 8.188 ☐<br><br>8.189 ☐<br><br>8.190 ☐ |

| Sexual abuse 8.191 ☐ | 8.192 ☐ | 8.193 ☐ | 8.194 ☐ | 8.195 ☐ <br><br> 8.196 ☐ <br><br> 8.197 ☐ |
|---|---|---|---|---|
| Substance abuse 8.198 ☐ | 8.199 ☐ | 8.200 ☐ | 8.201 ☐ | 8.202 ☐ <br><br> 8.203 ☐ <br><br> 8.204 ☐ |
| Inability to cope 8.205 ☐ | 8.206 ☐ | 8.207 ☐ | 8.208 ☐ | 8.209 ☐ <br><br> 8.210 ☐ <br><br> 8.211 ☐ |
| Inadequate housing 8.212 ☐ | 8.213 ☐ | 8.214 ☐ | 8.215 ☐ | 8.216 ☐ <br><br> 8.217 ☐ <br><br> 8.218 ☐ |
| Incarceration 8.219 ☐ | 8.220 ☐ | 8.221 ☐ | 8.222 ☐ | 8.223 ☐ <br><br> 8.224 ☐ <br><br> 8.225 ☐ |
| Inadequate parenting skills 8.226 ☐ | 8.227 ☐ | 8.228 ☐ | 8.229 ☐ | 8.230 ☐ <br><br> 8.231 ☐ <br><br> 8.232 ☐ |
| Inadequate income/employment 8.233 ☐ | 8.234 ☐ | 8.235 ☐ | 8.236 ☐ | 8.237 ☐ <br><br> 8.238 ☐ <br><br> 8.239 ☐ |

| | | | |
|---|---|---|---|
| Domestic violence<br>8.240 [ ] | 8.241 [ ] | 8.242 [ ] | 8.243 [ ] | 8.244 [ ]<br><br>8.245 [ ]<br><br>8.246 [ ] |
| Inadequate food supply<br>8.247 [ ] | 8.248 [ ] | 8.249 [ ] | 8.250 [ ] | 8.251 [ ]<br><br>8.252 [ ]<br><br>8.253 [ ] |
| Educational neglect<br>8.254 [ ] | 8.255 [ ] | 8.256 [ ] | 8.257 [ ] | 8.258 [ ]<br><br>8.259 [ ]<br><br>8.260 [ ] |
| Failure to protect child from injury<br>8.261 [ ] | 8.262 [ ] | 8.263 [ ] | 8.264 [ ] | 8.265 [ ]<br><br>8.266 [ ]<br><br>8.267 [ ] |
| Inadequate supervision or failure to supervise<br>8.268 [ ] | 8.269 [ ] | 8.270 [ ] | 8.271 [ ] | 8.272 [ ]<br><br>8.273 [ ]<br><br>8.274 [ ] |
| Mental illness<br>8.275 [ ] | 8.276 [ ] | 8.277 [ ] | 8.278 [ ] | 8.279 [ ]<br><br>8.280 [ ]<br><br>8.281 [ ] |
| Developmental disability<br>8.282 [ ] | 8.283 [ ] | 8.284 [ ] | 8.285 [ ] | 8.286 [ ]<br><br>8.287 [ ]<br><br>8.288 [ ] |
| Hospitalized | 8.290 [ ] | 8.291 [ ] | 8.292 [ ] | 8.293 [ ] |

| 8.289 ☐ | | | | 8.294 ☐ |
| | | | | 8.295 ☐ |

**Key: Types of Assistance**
1 = Provided transportation
2 = Offered financial assistance for transportation
3 = Provided a referral for services
4 = Contacted service provider to help arrange appointment
5 = Other (specify in the above grid by entering the number "5" and writing in the reason below it in the answer box on the grid)
6 = No assistance documented in the file although there was documentation that assistance was needed
7 = NA – documentation that no assistance was needed in accessing services

**Grid 8-C:** Assigned caseworker contacts with parents or guardians

Instructions:  Complete this grid for the most recent 12 months that reunification was either a single or concurrent permanency goal, working backward from the most recent month. For example, if the child was reunified in June 2010 then the grid would begin with May 2010, and then work backwards covering the prior months that reunification was the permanency goal up to 12 months.  If the child was still in DFCS custody on March 31, 2011 and the goal was reunification for that month, then March 2011 should be the first month entered on the grid.  If reunification was not a goal for the 12-month period, then leave the remaining months blank.

For columns 2 (visit with mother) and 4 (visit with father) enter "NA" if reunification with that parent was not planned and the parent was not involved in the child's life.  If reunification with that parent was not planned, but the parent was involved in the child's life, then answer "Yes" or "No" for visits.

| Months<br><br>MM/YYY | Was there at least one visit between the child's assigned case worker and mother (birth/female guardian) with whom reunification is planned?<br>1=Yes   2=No   3=NA | Issues discussed during the contact<br><br>Use Key; enter all that apply | Was there at least one visit between the child's assigned case worker and father (birth/male guardian) with whom reunification is planned?<br>1=Yes   2=No   3=NA | Issues discussed during the contacts<br><br>Use Key; enter 1 in the box for all that apply and 0 if the issue was not discussed |
|---|---|---|---|---|
| | 8.296 ☐ | 8.297 ☐<br><br>8.298 ☐<br><br>8.299 ☐<br><br>8.300 ☐ | 8.301 ☐ | 8.302 ☐<br><br>8.303 ☐<br><br>8.304 ☐<br><br>8.305 ☐ |
| | 8.306 ☐ | 8.307 ☐ | 8.311 ☐ | 8.312 ☐ |

| | | 8.308 ☐ | | 8.313 ☐ |
| | | 8.309 ☐ | | 8.314 ☐ |
| | | 8.310 ☐ | | 8.315 ☐ |
| | 8.316 ☐ | 8.317 ☐ | 8.321 ☐ | 8.322 ☐ |
| | | 8.318 ☐ | | 8.323 ☐ |
| | | 8.319 ☐ | | 8.324 ☐ |
| | | 8.320 ☐ | | 8.325 ☐ |
| | 8.326 ☐ | 8.327 ☐ | 8.331 ☐ | 8.332 ☐ |
| | | 8.328 ☐ | | 8.333 ☐ |
| | | 8.329 ☐ | | 8.334 ☐ |
| | | 8.330 ☐ | | 8.335 ☐ |
| | 8.336 ☐ | 8.337 ☐ | 8.341 ☐ | 8.342 ☐ |
| | | 8.338 ☐ | | 8.343 ☐ |
| | | 8.339 ☐ | | 8.344 ☐ |
| | | 8.340 ☐ | | 8.345 ☐ |
| | 8.346 ☐ | 8.347 ☐ | 8.351 ☐ | 8.352 ☐ |
| | | 8.348 ☐ | | 8.353 ☐ |
| | | 8.349 ☐ | | 8.354 ☐ |
| | | 8.350 ☐ | | 8.355 ☐ |
| | 8.356 ☐ | 8.357 ☐ | 8.361 ☐ | 8.362 ☐ |
| | | 8.358 ☐ | | 8.363 ☐ |

| | | | |
|---|---|---|---|
| | | 8.359 ☐<br><br>8.360 ☐ | | 8.364 ☐<br><br>8.365 ☐ |
| | 8.366 ☐ | 8.367 ☐<br><br>8.368 ☐<br><br>8.369 ☐<br><br>8.370 ☐ | 8.371 ☐ | 8.372 ☐<br><br>8.373 ☐<br><br>8.374 ☐<br><br>8.375 ☐ |
| | 8.376 ☐ | 8.377 ☐<br><br>8.378 ☐<br><br>8.379 ☐<br><br>8.380 ☐ | 8.381 ☐ | 8.382 ☐<br><br>8.383 ☐<br><br>8.384 ☐<br><br>8.385 ☐ |
| | 8.386 ☐ | 8.387 ☐<br><br>8.388 ☐<br><br>8.389 ☐<br><br>8.390 ☐ | 8.391 ☐ | 8.392 ☐<br><br>8.393 ☐<br><br>8.394 ☐<br><br>8.395 ☐ |
| | 8.396 ☐ | 8.397 ☐<br><br>8.398 ☐<br><br>8.399 ☐<br><br>8.400 ☐ | 8.401 ☐ | 8.402 ☐<br><br>8.403 ☐<br><br>8.404 ☐<br><br>8.405 ☐ |
| | 8.406 ☐ | 8.407 ☐<br><br>8.408 ☐<br><br>8.409 ☐ | 8.411 ☐ | 8.412 ☐<br><br>8.413 ☐<br><br>8.414 ☐ |

43

| | | 8.410 ☐ | | 8.415 ☐ |
|---|---|---|---|---|

**Key: Issues discussed during monthly contacts with mother or father**
1 = The parent's participation in services
2 = The parent's achievement of service goals
3 = Decisions that were made or need to be made about the child
4 = The parent's and family's current circumstances (*e.g.*, current housing status, employment status, medical issues, and recent births or deaths) *II.B.3.d.(2)*
5 = No discussion identified in the case file
6 = Other (specify in the above grid by entering the number "6" and writing in the reason below it in the answer box on the grid)


## SECTION 9:  TERMINATION OF PARENTAL RIGHTS AND ADOPTION

INSTRUCTIONS: ANSWER THE QUESTIONS IN THIS SECTION ONLY IF AT LEAST **ONE** OF THE FOLLOWING CRITERIA ARE MET:
• THE CHILD HAS BEEN IN FOSTER CARE FOR 15 OF THE MOST RECENT 22 MONTHS.
• THE CHILD HAS A PRIMARY GOAL OF ADOPTION AT SOME TIME DURING THE PERIOD UNDER REVIEW**.**

9.1 ☐  Is there documentation in the case file that during the period under review, DFCS submitted a termination of parental rights packet to the Office of the Attorney General for the child's mother? *II.B.3.e.(1)*  Instructions:  MACWIS does not have the date that the packet was submitted to the AG's office, only the date when it was sent to the court.  You will need to review the paper file for this information.
     1 = Yes
     2 = No
     3 = NA – mother is deceased
     4 = NA – mother's parental rights were terminated prior to the period under review

Instructions: If the answer is 2, 3, or 4 SKIP to 9.3.
If the answer is 1, answer the question below.

9.2 What is the date documented in the file that the termination of parental rights packet for the mother was submitted to the Office of the Attorney General? *II.B.3.e. (1)*  *II.B.3.e.(2)*  Instructions: Enter 0s in the date boxes if there is a packet, but no date is apparent.

M ☐  D ☐  Y ☐

9.3 ☐  Is there documentation in the case file that during the period under review, DFCS submitted a termination of parental rights packet to the Office of the Attorney General for all of the child's legal and/or putative fathers?
     1 = Yes
     2 = No
     3 = Not applicable – all legal and/or putative fathers are deceased

4 = Not applicable – rights of all legal and/or putative fathers were terminated prior to the period under review

Instructions: If the answer is 2, 3, or 4, SKIP to 9.5.
If the answer is 1, answer the questions below.

9.4 What is the date documented in the file that the termination of parental rights packet for the father was submitted to the Office of the Attorney General? *II.B.3.e.(1)* *II.B.3.e.(2)* Instructions: Enter 0s in the date boxes if there is a packet, but no date is apparent.

M ☐  D ☐  Y ☐

9.5 ☐ If a legal deficiency was noted by the Office of the Attorney General in response to the termination of parental rights packet for the mother, father, or both, is there evidence in the case file that the DFCS caseworker documented the steps to be taken to address the deficiency within 10 days of receiving notification from the AG's office? *II.B.3.e.(2)*
    1 = Yes
    2 = No
    3 = There is evidence that the DFCS caseworker documented steps to be taken to address the deficiency, but there is no date
    4 = Not applicable, no legal deficiency was noted

9.6 ☐ If a legal deficiency was noted, is there documentation in the case file that the DFCS caseworker and supervisor met together in person every 30 days to document progress in addressing the deficiency until it was no longer an issue? *II.B.3.e.(2)*
    1= Yes
    2 = No
    3 = There is documentation that the DFCS caseworker and supervisor discussed this issue, but no dates are provided
    4 = NA, no legal deficiency was noted

What kind of documentation was used to support your answer _____

9.7 ☐ If the child has been in DFCS custody for 15 of the most recent 22 months, is there documentation in the case file of a reason why (*i.e.*, exception to filing) the DFCS caseworker did not submit a termination of parental rights packet to the Office of the Attorney General? *II.B.3.e.(1)*
Instructions: **For Sample 2, you may look prior to the period under review to determine if a reason was provided for not filing for TPR.**
    1 = Yes
    2 = No
    3 = Not applicable (packet was submitted)
    4 = Not applicable, child not in DFCS custody for 15 of the most recent 22 months

Instructions: If the answer is 2, 3 or 4, SKIP to 9.8.
If the answer is 1, answer the question below.

**Question 9-A:** What was the reason documented in the case file that the DFCS caseworker did not submit a termination of parental rights packet to the Office of the Attorney General? *II.B.3.e.(1)* Instructions: Enter a 1 in the box for all that apply and a 0 for those that do not apply.

45

9A.1 [ ] Child is in out-of-home placement with a relative

9A.2 [ ] Child is age 14 or older and does not want to be adopted

9A.3 [ ] Family is close to reunification

9A.4 [ ] There is no identified adoptive resource for the child

9A.5 [ ] Child has bond with parent and termination of rights would not be in the child's best interest

9A.6 [ ] Other (specify) _____

ADOPTION INFORMATION STARTS HERE

9.8 [ ] Did the child have a primary goal of adoption at any time during the period under review? *II.B.3.e.(2)*

           1 = Yes         2= No

Instructions:  If the answer is 2, SKIP to Section 10.
If the answer is 1, answer the questions below.

9.9 What is the date that adoption was established as a primary goal? *II.B.3.e.(2)*  Instructions:  **If for a child in Sample 2 an adoption goal was established prior to the period under review, you may enter that date below.**

        M [ ]  D [ ]  Y [ ]

9.10 [ ] Is there evidence in the case file that during the period under review the case was assigned to an adoption resource worker to work with the child's caseworker?  *II.B.3.f.(1)*

          1=Yes        2 = No

Instructions: If the answer is 2, SKIP to item 9.12.
If the answer is 1, answer the questions below.

9.11 What is the date that the case was assigned to an adoption specialist (person responsible for securing an adoptive placement for the child) to work with the child's caseworker? *II.B.3.f.(1)*  Instructions: If no date is provided, enter 0's in all of the date boxes.  **If this is a Sample 2 child and the case was assigned to an adoption specialist prior to the period under review, you may enter that date below.**

        M [ ]  D [ ]  Y [ ]

9.12 [ ] Is there a plan in the case file that was developed during the period under review for Sample 1 or Sample 2, or updated for Sample 2, that focuses on efforts to find an adoptive family for the child if the child is not to be adopted by current foster parents? *II.B.3.f.(1)*  Instructions:  See definition for adoption plan.

        1 = Yes
        2 = No
        3 = Not applicable, child was in an adoptive placement at the start of the period under review and has remained in that placement or was discharged to a finalized adoption with that placement
        4 = Not applicable, current foster parents have agreed to adopt the child

If yes, please describe the document where you found this information_____

9.13 [    ]    Is there a plan in the case file that was developed or updated during the period under review that focuses on efforts to prepare the child for adoption?  Instructions:  See definition for adoption plan.

    1 = Yes        2 = No        3 = Not applicable, child is younger than 2

Instructions:  If the answer is 2 or 3 to items 9.12 and 9.13, or 4 to 9.12, SKIP to 9.15.
If the answer is 1 to either question, answer the questions below.

9.14 What is the date of the earliest plan during the period under review that addresses either finding an adoptive home for the child or preparing the child for adoption?  Instructions: If there is an adoption plan but no date, enter 0s in all of the date boxes.  *II.B.3.f.(1)*

        M [        ]    D [        ]    Y [        ]

**Question 9-B:** Does this plan include the following information?  Instructions: Enter a 1 in the box for all that apply and a 0 for all that do not apply.  *II.B.3.f.(1)*

9B.1 [        ]    Specific recruitment activities that DFCS will undertake to achieve the goal of adoption

9B.2 [        ]    Specific services to be provided to the child to prepare the child for adoption, for example life books, completion of any medical or dental treatments, identification of potential barriers to adoption

9B.3 [        ]    Timeframes for completing all activities

9B.4 [        ]    Child's readiness for adoption (ability to bond and develop attachments)

9.15 [        ]    **DO NOT ANSWER FOR SAMPLE 2** If the child was younger than 12 months of age at the time that the goal of adoption was established, is there evidence in the case file of a weekly meeting between the DFCS caseworker, adoption specialist, and the caseworker's supervisor to review the progress being made in achieving the goal of adoption from the time of goal establishment to the adoption finalization or to the end of the period under review? *II.B.3.f.(1)*  Instruction:  Look in both the caseworker and adoption specialist sections in MACWIS.

    1 = Yes, there is evidence of weekly meetings
    2 = There is evidence of meetings to discuss progress, but they were not held weekly
    3 = There is no evidence in the case file that there were meetings to review progress
    4 = Not applicable – child not younger than 12 months

9.16 [        ]    If the child was 12 months of age or older at the time that the goal of adoption was established, is there evidence in the case file of a monthly meeting between the DFCS caseworker, adoption specialist, and the caseworker's supervisor to review the progress being made in achieving the goal of adoption from the time of goal establishment to the adoption finalization or the end of the period under review? *II.B.3.f.(1)*  Instruction:  Look in both the caseworker and adoption specialist sections in MACWIS.

    1 = Yes, there is evidence of monthly meetings to review progress
    2 = There is evidence of meetings to review progress, but they were held less frequently than monthly
    3 = There is no evidence in the case file that there were meetings to review progress
    4 = Not applicable – child younger than 12 months

9.17 [ ] If the child became free for adoption during the period under review (that is, there was a termination of parental rights for both parents) and 6 months after termination of parental rights the child was not in an approved adoptive home, is there documentation in the file that the case was then assigned to an external adoption consultant to provide assistance to the caseworker and adoption specialist in meeting the objectives of the adoption plan?  *II.B.3.f.(2)*

    1 = Yes
    2 = No
    3 = Not applicable (child not free for adoption for 6 months)
    4 = Not applicable, child became free for adoption prior to the period under review

9.18 [ ] Is there evidence in the case file that, during the period under review, adoption was discussed with the child's foster family?  *II.B.3.f.(4)*

    1= Yes
    2 = No
    3= Not applicable, child not in a foster family home at any time during the period under review when adoption was the case plan goal

9.19 [ ] Is there evidence in the case file that, during the period under review, the child's foster family was informed about the availability of adoption subsidy payments? *II.B.3.f.(4)*

    1= Yes
    2= No
    3= Not applicable, child not in a foster family home at any time during the period under review when adoption was the case plan goal

9.20 [ ] Was the child adopted during the period under review or in an adoptive home awaiting court finalization?

    1 = Yes       2 = No

Instructions: If the answer is 2, SKIP to Section 10.
If the answer is 1, answer the question below.

**Question 9-C:** Is there evidence in the case file that the adoptive families were told about the availability of the following services post adoption finalization?  Instructions:  Enter a 1 in the box for all that apply and a 0 for all that do not apply.  This information is most likely to be in the case narratives.

9C.1 [ ] Respite
9C.2 [ ] Counseling (family and child)
9C.3 [ ] Mental/behavioral health treatment (child)
9C.4 [ ] Crisis intervention
9C.5 [ ] Family preservation services
9C.6 [ ] Peer support groups or mentoring

## SECTION 10:  CHILD SAFETY WHILE IN DFCS CUSTODY

10.1 [____] During the period under review, were there any formal reports of abuse and neglect documented in the case file in which the child was identified as an alleged victim while the child was in DFCS custody? *II.B.4.b.*  Instructions:  This would exclude reports of an abuse or neglect event that were made during the period under review but the alleged abuse or neglect occurred when the child was not in DFCS custody, even if the child was in custody when it was reported.  For example, a child's disclosure of sexual abuse that occurred prior to DFCS custody would not be included.

　　　　　　1 = Yes　　　　2 = No

Instructions: If the answer is 2, SKIP to item 10.161.
If the answer is 1, complete grids and questions below.

**Grid 10-A:**  Allegations of abuse or neglect
Instructions:  Complete this grid for all reported allegations of abuse or neglect where the child was alleged to be a victim.  Do not identify an abuse or neglect allegation in this grid unless the target child was specifically identified as an alleged victim.  For purposes of this grid, an investigation is initiated on the date that the investigation worker or other designated person has face-to-face contact with any child who is an alleged victim.  If there are multiple reports on the same date or close to the same date for the SAME maltreatment incident involving the SAME allegations and alleged perpetrator, resulting in only one investigation, enter the information only once.

| Report date | Allegation<br><br>**Use Key A;** enter up to 3 | Alleged Perpetrator<br><br>**Use Key B;** enter up to 2 | Date Formal CPS investigation or assessment initiated<br><br>Enter 8s if no CPS investigation or assessment was conducted<br><br>*II.B.4.e.* | Finding<br><br>**Use Key C;** enter 4 for "NA" if no formal investigation | Reason for lack of formal investigation<br><br>**Use Key D;** enter 5 for "NA" if no formal investigation |
|---|---|---|---|---|---|
| 10.2<br>M [__] D [__] Y [____] | 10.3 [____]<br><br>10.4 [____]<br><br>10.5 [____] | 10.6 [____]<br><br>10.7 [____] | 10.8<br>M [__] D [__] Y [____] | 10.9 [____] | 10.10 [____] |
| 10.11<br>M [__] D [__] Y [____] | 10.12 [____]<br><br>10.13 [____]<br><br>10.14 [____] | 10.15 [____]<br><br>10.16 [____] | 10.17<br>M [__] D [__] Y [____] | 10.18 [____] | 10.19 [____] |
| 10.20<br>M [__] D [__] Y [____] | 10.21 [____] | 10.24 [____] | 10.26<br>M [__] D [__] Y [____] | 10.27 [____] | 10.28 [____] |

49

| | 10.22 ☐ | 10.25 ☐ | | | |
| | 10.23 ☐ | | | | |
| 10.29 M☐☐ D☐☐ Y☐☐☐☐ | 10.30 ☐<br>10.31 ☐<br>10.32 ☐ | 10.33 ☐<br>10.34 ☐ | 10.35 M☐☐ D☐☐ Y☐☐☐☐ | 10.36 ☐ | 10.37 ☐ |
| 10.38 M☐☐ D☐☐ Y☐☐☐☐ | 10.39 ☐<br>10.40 ☐<br>10.41 ☐ | 10.42 ☐<br>10.43 ☐ | 10.44 M☐☐ D☐☐ Y☐☐☐☐ | 10.45 ☐ | 10.46 ☐ |
| 10.47 M☐☐ D☐☐ Y☐☐☐☐ | 10.48 ☐<br>10.49 ☐<br>10.50 ☐ | 10.51 ☐<br>10.52 ☐ | 10.53 M☐☐ D☐☐ Y☐☐☐☐ | 10.54 ☐ | 10.55 ☐ |
| 10.56 M☐☐ D☐☐ Y☐☐☐☐ | 10.57 ☐<br>10.58 ☐<br>10.59 ☐ | 10.60 ☐<br>10.61 ☐ | 10.62 M☐☐ D☐☐ Y☐☐☐☐ | 10.63 ☐ | 10.64 ☐ |
| 10.65 M☐☐ D☐☐ Y☐☐☐☐ | 10.66 ☐<br>10.67 ☐<br>10.68 ☐ | 10.69 ☐<br>10.70 ☐ | 10.71 M☐☐ D☐☐ Y☐☐☐☐ | 10.72 ☐ | 10.73 ☐ |
| 10.74 M☐☐ D☐☐ Y☐☐☐☐ | 10.75 ☐ | 10.78 ☐ | 10.80 M☐☐ D☐☐ Y☐☐☐☐ | 10.81 ☐ | 10.82 ☐ |

50

| | 10.76 ____ 10.77 ____ | 10.79 ____ | | | |
|---|---|---|---|---|---|
| 10.83 M ☐☐ D ☐☐ Y ☐☐☐☐ | 10.84 ____ 10.85 ____ 10.86 ____ | 10.87 ____ 10.88 ____ | 10.89 M ☐☐ D ☐☐ Y ☐☐☐☐ | 10.90 ____ | 10.91 ____ |

**Key A: Allegations**

Instructions: Note that the allegations listed below include policy violations in addition to the maltreatment type options in MACWIS.  Be sure to review intake report to ensure that both the policy violations and the maltreatment type are covered.  If there are more than three allegations, report the maltreatment type options prior to the policy violations.

1 = Abandonment
2 = Emotional abuse/neglect
3 = Exploitation
4 = Medical neglect (lack of health care and failure to thrive)
5 = Physical abuse (includes injuries resulting from excessive corporal punishment)
6 = Physical neglect
7 = Sexual abuse
8 = Substance abuse-caregiver
9 = Inadequate housing
10 = Domestic violence
11 = Inadequate food supply for child
12 = Mental injury or emotional abuse of the child; includes confinement and bizarre treatment
13 = Educational neglect of the child
14 = Failed to protect child from injury
15 = Inadequate supervision or failed to supervise
16 = Mental illness of caregiver
17 = Derogatory remarks or threats of removal from the home
18 = Withholds meals, clothing, or locks the child out of the home as a form of punishment
19 = Denies the child contact or visits with his or her family as punishment
20 = Assigns chores that are excessive or potentially harmful to the child
21 = Child on child sexual abuse due to failure of caregiver to supervise
22 = Other (specify in the above grid by entering the number "22" and writing in the reason below it in the answer box on the grid)

**Key B: Alleged Perpetrators**

1 = Foster mother - non relative
2 = Foster mother - relative
3 = Foster father - non relative
4 = Foster father - relative
5 = Other foster child in the foster home
6 = Child's sibling in the foster home

51

7 = Foster parents' biological or adopted child
8 = Other person living in the foster home
9 = Facility staff member
10 = Other child in facility
11 = Biological mother/female guardian while on trial reunification
12 = Biological mother/female guardian during unsupervised visit
13 = Biological father/male guardian while on trial reunification
14 = Biological father/male guardian during unsupervised visit
15 = Biological sibling in the family home while child is on a trial reunification or home visit
16 = Another person (not parent or sibling) living in the family home while child is on a trial reunification or home visit (specify in the above grid by entering the number "16" and writing in the reason below it in the answer box on the grid)
17 = Other (specify in the above grid by entering the number "17" and writing in the reason below it in the answer box on the grid)

**Key C: Finding**
1 = Unsubstantiated – Not Evidence
2 = Substantiated – Evidenced
3 = Other (specify in the above grid by entering the number "3" and writing in the reason below it in the answer box on the grid)
4 = NA – no formal investigation conducted
5 = NA – investigation not completed
6 = No finding reported although investigation was completed

**Key D: Reason why no formal investigation was conducted**
1 = Report was screened out for investigation
2 = Report was referred to the child's current caseworker for follow up
3 = Other (specify in the above grid by entering the number "3" and writing in the reason below it in the answer box on the grid)
4 = No reason indicated in case file
5 = Not applicable – formal investigation was conducted

**Grid 10-B**: Actions taken in response to allegations
Instructions:  Complete Grid 10-B for all allegations that had a formal investigation.  For the date the investigation was completed, enter the date that the report was approved and signed by the investigation worker's supervisor.

| Date of report<br><br>Use date reported in Grid 10-A, column 1 for allegations that were investigated | Date investigation completed<br><br>Enter 8s in the date boxes if investigation is still ongoing. If there is no date in the file, but it appears that the investigation was completed, enter 0s in the date boxes. | Is investigation report in the case file?<br><br>1 = Yes<br>2 = No<br>3 = Not applicable – investigation not completed | Actions taken<br><br>Use Key A; enter up to 2<br><br>*II.B.4.f .* | Assigned caseworker visits after investigation completed if child remained in same placement? (COR or COS)<br><br>Use Key B |
|---|---|---|---|---|
| | | | | |

| | | | | |
|---|---|---|---|---|
| 10.92 M ☐☐ D ☐☐ Y ☐☐☐☐ | 10.93 M ☐☐ D ☐☐ Y ☐☐☐☐ | 10.94 ☐ | 10.95 ☐  10.96 ☐ | 10.97 ☐ |
| 10.98 M ☐☐ D ☐☐ Y ☐☐☐☐ | 10.99 M ☐☐ D ☐☐ Y ☐☐☐☐ | 10.100 ☐ | 10.101 ☐  10.102 ☐ | 10.103 ☐ |
| 10.104 M ☐☐ D ☐☐ Y ☐☐☐☐ | 10.105 M ☐☐ D ☐☐ Y ☐☐☐☐ | 10.106 ☐ | 10.107 ☐  10.108 ☐ | 10.109 ☐ |
| 10.110 M ☐☐ D ☐☐ Y ☐☐☐☐ | 10.111 M ☐☐ D ☐☐ Y ☐☐☐☐ | 10.112 ☐ | 10.113 ☐  10.114 ☐ | 10.115 ☐ |
| 10.116 M ☐☐ D ☐☐ Y ☐☐☐☐ | 10.117 M ☐☐ D ☐☐ Y ☐☐☐☐ | 10.118 ☐ | 10.119 ☐  10.120 ☐ | 10.121 ☐ |
| 10.122 M ☐☐ D ☐☐ Y ☐☐☐☐ | 10.123 M ☐☐ D ☐☐ Y ☐☐☐☐ | 10.124 ☐ | 10.125 ☐  10.126 ☐ | 10.127 ☐ |
| 10.128 M ☐☐ D ☐☐ Y ☐☐☐☐ | 10.129 M ☐☐ D ☐☐ Y ☐☐☐☐ | 10.130 ☐ | 10.131 ☐  10.132 ☐ | 10.133 ☐ |
| 10.134 M ☐☐ D ☐☐ Y ☐☐☐☐ | 10.135 M ☐☐ D ☐☐ Y ☐☐☐☐ | 10.136 ☐ | 10.137 ☐  10.138 ☐ | 10.139 ☐ |
| 10.140 M ☐☐ D ☐☐ Y ☐☐☐☐ | 10.141 M ☐☐ D ☐☐ Y ☐☐☐☐ | 10.142 ☐ | 10.143 ☐  10.144 ☐ | 10.145 ☐ |
| 10.146 M ☐☐ D ☐☐ Y ☐☐☐☐ | 10.147 M ☐☐ D ☐☐ Y ☐☐☐☐ | 10.148 ☐ | 10.149 ☐ | 10.151 ☐ |

| | | | 10.150 [ ] | |
|---|---|---|---|---|
| 10.152<br>M [ ] [ ]  D [ ] [ ]  Y [ ] [ ] [ ] | 10.153<br>M [ ] [ ]  D [ ] [ ]  Y [ ] [ ] [ ] | 10.154 [ ] | 10.155 [ ]<br><br>10.156 [ ] | 10.157 [ ] |

**Key A: Actions**
1 = Child removed from the foster home, but other children allowed to remain (if relevant)
2 = Child removed from the foster home and child was the only child in the home
3 = Multiple children in the home and all were removed
4 = Trial home visit terminated and child returned to out-of-home care
5 = Foster home closed permanently (license revoked)
6 = Foster home closed temporarily (license suspended)
7 = Child remained in the foster home but a safety plan was developed.
8 = Child removed from the care facility but other children allowed to remain
9 = All children removed from the care facility
10 = Child remained in the care facility but a safety plan was developed
11 = Care facility closed permanently
12 = Care facility closed temporarily
13 = Facility alleged perpetrator suspended
14 = Employment of facility alleged perpetrator terminated
15 = Police called to investigate perpetrator for potential arrest
16 = Visitation with parent suspended (if parent is perpetrator)
17 = No documentation in case file of any action taken
18 = Other (specify in the above grid by entering the number "18" and writing in the reason below it in the answer box on the grid)
19 = No action needed

**Key B**
1 = Assigned caseworker (COR or COS) visited child in the placement at least two times a month for first 3 months
2 = Assigned caseworker did not visit child in the placement at least two times a month for first 3 months
3 = Not applicable – child did not remain in same placement

10.158 [ ]  At any time following an allegation of maltreatment involving a child in an out-of-home placement, including at any time prior to completion of the investigation or at the time the investigation was completed, were any safety issues identified while the child remained in the home?
          1 = Yes          2 = No

If the answer is 2, SKIP to 10.161.
If the answer is 1, answer the questions below.

10.159 What safety issues were identified?
          List:  10.159a _____
                    10.159b_____
                    10.159c_____

54

10.160 ☐ Was a safety plan completed?

    1 = Yes, in MACWIS only           2 = Yes, in MACWIS and in paper case record

    3 = Yes, in paper case record only     4 = No

Instructions: If the answer to 10.160 is 2 or 3, place a post-it on the paper safety plan in the paper case record and provide the paper case file to the case record review coordinator once you complete the review of this case file.

10.161 ☐ Is there documentation in the case file that the child was a possible victim of abuse or neglect while in DFCS custody, but no formal report was made? Instructions: Answer this question as "Yes" if the case notes, e-mails, visit reports or other documents describe a condition or behavior that would be considered abuse or neglect of the child or a serious policy violation, such as corporal punishment, but there is no evidence that a formal report was made. Answer "No" if there were conditions or behaviors that would be considered abuse or neglect, but a formal report was made regarding these conditions or behaviors.

    1 = Yes       2 = No

Instructions: If the answer is 2, SKIP to Section 11.
If the answer is 1, answer the questions below.

10.162 If yes, what is the source of information for your answer? _____

_____

**Question 10-A:** What were the types of possible abuse or neglect indicated in the case file that were not formally reported? Instructions: Enter up to two types.

10A.1 ☐
10A.2 ☐

1 = Abandonment
2 = Emotional abuse/neglect
3 = Exploitation
4 = Medical neglect (lack of health care and failure to thrive)
5 = Physical abuse (includes injuries resulting from excessive corporal punishment)
6 = Physical neglect
7 = Sexual abuse
8 = Substance abuse-caregiver
9 = Inadequate housing
10 = Domestic violence
11 = Inadequate food supply for child
12 = Mental injury or emotional abuse of the child; includes confinement and bizarre treatment
13 = Educational neglect of the child
14 = Failed to protect child from injury
15 = Inadequate supervision or failed to supervise
16 = Mental illness of caregiver
17 = Derogatory remarks or threats of removal from the home
18 = Withholds meals, clothing, or locks the child out of the home as a form of punishment

55

19 = Denies the child contact or visits with his or her family as punishment
20 = Assigns chores that are excessive or potentially harmful to the child
21 = Child on child sexual abuse due to failure of caregiver to supervise
22 = Other (specify) _____

## SECTION 11:  PLACEMENT SETTINGS

**Grid 11-A:** Child's placement history *II.B.5.d., II.B.5.l., II.B.5.m., II.B.5.n.*
Instructions:  Complete Grid 11-A for the child's first ten placements during the period under review.
**For Sample 2, begin with the placement where the child was as of January 1, 2009.**  If there are more than 10 placements, provide the information on an additional sheet.  If you cannot determine the dates of placement entry or exit from the case file, enter 8s in all of the relevant date boxes.  Remember to include only placement changes that occurred during the child's most recent entry into DFCS custody.
Instructions for completing this grid:
- Do not count placements in acute care hospitals if the child returns to or will return to the prior placement.
- If a child was removed at birth from the hospital, do not count the hospital as a placement.
- If a child is in a respite situation for a weekend, do not count that as a placement unless the respite placement exceeds 48 hours or the child does not return to the prior home or facility after the respite placement.

| Placement Number | Type Use Key A | Date Child Entered | Date Child Left Placement Enter 0s in date boxes if child did not leave placement | Primary Reasons for Placement Change Enter 98 if no placement change Use Key B |
|---|---|---|---|---|
| Initial placement | 11.1 ____ | 11.2 M___ D___ Y___ | 11.3 M___ D___ Y___ | 11.4 ____ |
| Second placement | 11.5 ____ | 11.6 M___ D___ Y___ | 11.7 M___ D___ Y___ | 11.8 ____ |
| Third placement | 11.9 ____ | 11.10 M___ D___ Y___ | 11.11 M___ D___ Y___ | 11.12 ____ |
| Fourth placement | 11.13 ____ | 11.14 M___ D___ Y___ | 11.15 M___ D___ Y___ | 11.16 ____ |
| Fifth placement | 11.17 ____ | 11.18 M___ D___ Y___ | 11.19 M___ D___ Y___ | 11.20 ____ |
| Sixth placement | 11.21 ____ | 11.22 M___ D___ Y___ | 11.23 M___ D___ Y___ | 11.24 ____ |
| Seventh placement | 11.25 ____ | 11.26 M___ D___ Y___ | 11.27 M___ D___ Y___ | 11.28 ____ |

| Eighth placement | 11.29 ☐ | 11.30 M ☐ D ☐ Y ☐ | 11.31 M ☐ D ☐ Y ☐ | 11.32 ☐ |
| Ninth placement | 11.33 ☐ | 11.34 M ☐ D ☐ Y ☐ | 11.35 M ☐ D ☐ Y ☐ | 11.36 ☐ |
| Tenth placement | 11.37 ☐ | 11.38 M ☐ D ☐ Y ☐ | 11.39 M ☐ D ☐ Y ☐ | 11.40 ☐ |

**Key A: Placement types**

Instructions: Review definitions provided if you are not sure about the type of placement.

1 = Acute care
2 = Adoption (international)
3 = Adoptive home (domestic - non relative)
4 = Adoptive home (domestic - relative)
5 = Chemically dependent group home
6 = CO – Non licensed non-relative (court ordered)
7 = CO – Non licensed relative (court ordered)
8 = CO – Non licensed detention facility/training school (court ordered)
9 = Contract facility – Non MDHS
10 = Emergency foster home
11 = Emergency shelter
12 = Expedited pending relative resource
13 = Foster home (non relative)
14 = Group home
15 = ICFMR
16 = Institution (see definition)
17 = Maternity home
18 = Medical treatment group home
19 = Medical treatment foster home
20 = Nursing home
21 = Own home – mother
22 = Own home – father
23 = Own home – parents
24 = Own home – other caretaker
25 = Relative foster home
26 = Residential child caring facility
27 = Residential treatment
28 = Respite foster home
29 = Runaway
30 = Specialized residential school
31 = Supervised independent living
32 = Teenage parent foster home
33 = Therapeutic foster home – Relative
34 = Therapeutic foster home – Non relative
35 = Therapeutic group home
36 = Other (specify in the above grid by entering the number "36" and writing in the reason below it in the answer box on the grid)

**Key B: Primary Reason Documented for Child Changing Placement**

Instructions: The following options incorporate the categories in MACWIS but also require a broader review of the case narratives to understand what occurred to bring about the placement change. Please review all of the categories and select the one that best fits the change in the child's placement and provide the information available from both the MACWIS categories and the case narratives.

1 = Child requested the placement change
2 = Placement change was made to reunify siblings
3 = Placement change was requested by birth family so that the child would be closer to them
4 = Placement change was made to place child in a pre-adoptive home
5 = Placement change was made to place teen parent and child together
6 = Placement change was made because the caregiver did not want to adopt or commit to child on a long-term basis
7 = Placement change was made because the caregiver was not providing adequate care
8 = Placement change was necessary because the foster home exceeded maximum limits
9 = Placement change was made because the child needed a higher level of care
10 = Placement change was necessary because DFCS did not issue a new license to foster parents (home closed)
11 = Placement change occurred because the child was arrested and placed in a detention facility
12 = Placement change occurred because the child's behavior presented a serious danger to self or others
13 = Child ran away from the placement
14 = Placement change was made because a medical/mental health professional recommended that the child be moved to a different setting
15 = Placement change was made because the child needed a less restrictive placement (*i.e.*, step down)
16 = Placement change was made because the caregiver (foster home or facility) requested that the child be moved due to the child's behavior
17 = Placement change was necessary because the foster caregiver was suspected of child abuse or neglect of child or other children in the home
18 = Placement change was necessary because the foster caregiver was incapacitated by illness in the family
19 = Placement change was made to move the child to a caregiver of the same race/ethnicity as the child.
20 = Placement change was made to move the child to parent's home for a trial reunification
21 = Placement change was made because trial reunification was not successful
22 = Placement change was necessary because the facility was closed by DFCS
23 = Placement change occurred because the caregiver requested that the child be moved due to lack of DFCS services and supports
24 = Placement change occurred because of a finding of abuse/neglect in placement
25 = Placement change occurred at the request of birth parents because they did not like the caregivers
26 = Placement change occurred to move the child to a more long-term stable placement, including an adoptive home
27 = Placement change occurred to move the child to a placement with a relative or fictive kin
28 = Child discharged from DFCS custody to adoption, reunification, guardianship, permanent placement with relatives or durable legal custody
29 = Child "aged out" of DFCS custody
30 = Placement change was made because child completed program
31 = Child was found or came back from a runaway episode and needed a placement
32 = Child death
33 = Shelter days used up
34 = Other (specify in the above grid by entering the number "34" and writing in the reason below it in the answer box on the grid)

11.41 [____]  Did the child have more than 10 placement settings during the period under review?
Instructions: **For Sample 2, answer this question beginning with January 1, 2009.**

1 = Yes          2 = No

Instructions:  If the answer is 2, SKIP to Grid 11-B.
If the answer is 1, answer the question below.

11.42 [____]  If there were more than 10 placements, how many total placements did the child have during the period under review?

**Grid 11-B:** Prevention of placement change
Instructions:  Complete this grid for all placement changes that the child experienced: 1) *during the period under review*, and 2) **that occurred during the child's most recent foster care episode**. The meetings described in this grid are not family team meetings.  They are meetings that include the assigned caseworker (preferably from the COR as well as the COS), the DFCS supervisor for the assigned caseworker, the foster parents, and the child (if appropriate).

| Placement Number | Type of prior knowledge of potential placement change? Use Key A | Is there evidence in the case file that a team meeting was held prior to placement change to discuss options? 1 = Yes 2 = No Team would include DFCS caseworker and supervisor, foster parents, and child (if appropriate) | Actions taken to prevent placement change Use Key B | Was a team meeting held within 5 days after placement change? 1= Yes 2 = No | What issues were discussed at the post placement change team meeting? Use Key C; enter up to 3 |
|---|---|---|---|---|---|
| Change of Initial placement | 11.43 [____] | 11.44 [____] | 11.45 [____] | 11.46 [____] | 11.47 [____] <br><br> 11.48 [____] <br><br> 11.49 [____] |
| Change of Second placement | 11.50 [____] | 11.51 [____] | 11.52 [____] | 11.53 [____] | 11.54 [____] <br><br> 11.55 [____] <br><br> 11.56 [____] |
| Change of Third placement | 11.57 [____] | 11.58 [____] | 11.59 [____] | 11.60 [____] | 11.61 [____] <br><br> 11.62 [____] |

|  |  |  |  |  | 11.63 ☐ |
|---|---|---|---|---|---|
| Change of Fourth placement | 11.64 ☐ | 11.65 ☐ | 11.66 ☐ | 11.67 ☐ | 11.68 ☐ <br><br> 11.69 ☐ <br><br> 11.70 ☐ |
| Change of Fifth placement | 11.71 ☐ | 11.72 ☐ | 11.73 ☐ | 11.74 ☐ | 11.75 ☐ <br><br> 11.76 ☐ <br><br> 11.77 ☐ |
| Change of Sixth placement | 11.78 ☐ | 11.79 ☐ | 11.80 ☐ | 11.81 ☐ | 11.82 ☐ <br><br> 11.83 ☐ <br><br> 11.84 ☐ |
| Change of Seventh placement | 11.85 ☐ | 11.86 ☐ | 11.87 ☐ | 11.88 ☐ | 11.89 ☐ <br><br> 11.90 ☐ <br><br> 11.91 ☐ |
| Change of Eighth placement | 11.92 ☐ | 11.93 ☐ | 11.94 ☐ | 11.95 ☐ | 11.96 ☐ <br><br> 11.97 ☐ <br><br> 11.98 ☐ |
| Change of Ninth placement | 11.99 ☐ | 11.100 ☐ | 11.101 ☐ | 11.102 ☐ | 11.103 ☐ |

60

| | | | | | 11.104 [    ] |
|---|---|---|---|---|---|
| | | | | | 11.105 [    ] |

**Key A: Prior knowledge of potential placement change**

1 = There was evidence in the file that the caseworker was aware that caregivers were concerned about their ability to continue to care for the child because of the child's behaviors

2 = There was evidence in the file that the caseworker was aware that the caregivers were concerned about the services they were getting to support their continued care of the child

3 = There was evidence in the file that the caseworker was aware that the caregivers were concerned about the appropriateness of the child's placement given the child's physical health or emotional needs

4 = There was evidence in the file that the caseworker was aware that the caregivers no longer wanted to continue to provide care for the child

5 = There was evidence in the file that the caseworker was planning to change the child's placement in order to promote attainment of permanency goal (*e.g.*, move to a relative or adoptive home, move to a less restrictive placement, *etc*.)

6 = There was evidence in the file that the caseworker was planning to change the child's placement in order to place child with siblings

7 = There was evidence in the file that the caseworker was planning to change the child's placement to access necessary treatment for the child

8 = Other (specify in the above grid by entering the number "8" and writing in the reason below it in the answer box on the grid)

9 = There is no evidence that the caseworker had prior knowledge of placement disruption

**Key B: Actions to prevent changes**

1 = Services provided to the caregivers to help them better address the needs of the child (*e.g.*, family counseling, additional training in specified areas such as behavior modification practices, *etc*.)

2 = Provision of respite services

3 = Provision of services to child to address behavioral concerns

4 = Other (specify in the above grid by entering the number "4" and writing in the reason below it in the answer box on the grid)

5 = No action needed as prevention of placement disruption was not appropriate

6 = No action taken

**Key C: Issues discussed at the post- change meeting**

1 = The appropriateness of the child's current placement and alternatives if the current placement is not appropriate to the child's needs

2 = An assessment of the child's needs for services that may prevent further placement disruptions

3 = Services/supports that may be needed by the foster parents to prevent further placement disruptions

4 = Other (specify in the above grid by entering the number "4" and writing in the reason below it in the answer box on the grid)

5 = NA - no team meeting was held

6 = Meeting was held but none of the issues identified above were discussed

61

**Grid 11-C:** Provision of information about the child's available medical, dental, health, educational and psychological information to foster parents or facility administration

Instructions:  For each placement during the period under review, indicate if there is documentation in the case file regarding the information provided to the caregivers at placement and within 15 days of placement.  In columns 3 and 4, provide information relevant to Medical, Dental, Educational, and Mental/Behavioral Health information separately.  The Key provides the categories for these responses.

| Placement Number | Is there documentation in the case file that information regarding the child's medical, dental, educational, and/or psychological status was provided to foster parents or to facility administration?<br><br>1 = Yes<br>2 = No<br><br>If No, leave the remaining columns blank | If Yes, what information was provided at the time of placement?<br><br>Use Key A | If Yes, what information was provided within 15 days of placement?<br><br>This may be information that is additional to what was provided at the time of placement.  If everything was provided at the time of placement, then the response for this column should be not applicable.  Use Key A to identify the correct responses for medical, dental, educational, and mental/behavioral health information. |
|---|---|---|---|
| Initial placement | 11.106 [    ] | 11.107 [    ] Medical<br>11.108 [    ] Dental<br>11.109 [    ] Educational<br>11.110 [    ] Mental/Behavioral Health | 11.111 [    ] Medical<br>11.112 [    ] Dental<br>11.113 [    ] Educational<br>11.114 [    ] Mental/Behavioral Health |
| Second placement | 11.115 [    ] | 11.116 [    ] Medical<br>11.117 [    ] Dental<br>11.118 [    ] Educational<br>11.119 [    ] Mental/Behavioral Health | 11.120 [    ] Medical<br>11.121 [    ] Dental<br>11.122 [    ] Educational<br>11.123 [    ] Mental/Behavioral Health |
| Third placement | 11.124 [    ] | 11.125 [    ] Medical<br>11.126 [    ] Dental<br>11.127 [    ] Educational<br>11.128 [    ] Mental/Behavioral Health | 11.129 [    ] Medical<br>11.130 [    ] Dental<br>11.131 [    ] Educational<br>11.132 [    ] Mental/Behavioral Health |
| Fourth placement | 11.133 [    ] | 11.134 [    ] Medical<br>11.135 [    ] Dental<br>11.136 [    ] Educational<br>11.137 [    ] Mental/Behavioral Health | 11.138 [    ] Medical<br>11.139 [    ] Dental<br>11.140 [    ] Educational<br>11.141 [    ] Mental/Behavioral Health |
| Sixth placement | 11.142 [    ] | 11.143 [    ] Medical<br>11.144 [    ] Dental<br>11.145 [    ] Educational<br>11.146 [    ] Mental/Behavioral Health | 11.147 [    ] Medical<br>11.148 [    ] Dental<br>11.149 [    ] Educational<br>11.150 [    ] Mental/Behavioral Health |
| Seventh placement | 11.151 [    ] | 11.152 [    ] Medical<br>11.153 [    ] Dental | 11.156 [    ] Medical<br>11.157 [    ] Dental |

| | | | | | |
|---|---|---|---|---|---|
| | | 11.154 ☐ | Educational | 11.158 ☐ | Educational |
| | | 11.155 ☐ | Mental/Behavioral Health | 11.159 ☐ | Mental/Behavioral Health |
| Eighth placement | 11.160 ☐ | 11.161 ☐ | Medical | 11.165 ☐ | Medical |
| | | 11.162 ☐ | Dental | 11.166 ☐ | Dental |
| | | 11.163 ☐ | Educational | 11.167 ☐ | Educational |
| | | 11.164 ☐ | Mental/Behavioral Health | 11.168 ☐ | Mental/Behavioral Health |
| Ninth placement | 11.169 ☐ | 11.170 ☐ | Medical | 11.174 ☐ | Medical |
| | | 11.171 ☐ | Dental | 11.175 ☐ | Dental |
| | | 11.172 ☐ | Educational | 11.176 ☐ | Educational |
| | | 11.173 ☐ | Mental/Behavioral Health | 11.177 ☐ | Mental/Behavioral Health |
| Tenth placement | 11.178 ☐ | 11.179 ☐ | Medical | 11.183 ☐ | Medical |
| | | 11.180 ☐ | Dental | 11.184 ☐ | Dental |
| | | 11.181 ☐ | Educational | 11.185 ☐ | Educational |
| | | 11.182 ☐ | Mental/Behavioral Health | 11.186 ☐ | Mental/Behavioral Health |

**Key A: Information provided to foster parents or facility administration**

*Medical (physical health) information*
1 = All of the child's medical records, including immunization records, the results of the child's most recent physical exam, the child's medical equipment and prescribed medication were provided
2 = Some of the child's medical records, exam information, prescribed medication, and medical equipment were provided, but not all
3 = No medical information, prescribed medication or equipment was provided
4 = Provision of medical information, prescribed medication or equipment is not applicable (*e.g.*, all was provided at placement)

*Dental information*
5 = All of the child's dental records, the results of the child's most recent dental exam, prescribed medication related to dental treatment, and the child's dental equipment were provided
6 = Some of the child's dental records, exam information, prescribed medication related to dental treatment, and dental equipment were provided but not all
7 = No dental information, prescribed medication related to dental treatment or dental equipment was provided
8 = Provision of dental information not applicable (*e.g.*, all was provided at placement)
9 = Provision of dental information is not applicable (child younger than age 3 at time of placement with no dental issues identified)

*Educational information*
10 = All of the child's educational information, including individualized education plans and report cards were provided
11 = Some of the child's educational information were provided but not all
12 = No educational information was provided
13 = Provision of educational information not applicable (all was provided at placement)
14 = Provision of educational information is not applicable (child younger than age 4 at time of placement)

63

*Mental/Behavioral Health information*

15 = All of the child's mental/behavioral health information and any medications related to
     mental/behavioral health were provided

16 = Some of the child's mental/behavioral health information and any medications related to
     mental/behavioral health were provided

17 = No mental/behavioral health related information or medication related to mental/behavioral health
     was provided

18 = Not applicable (all mental/behavioral health information was provided at placement)

19 = Not applicable (no mental/behavioral health issues identified or child was younger than age 4)

11.187 ☐ What was the child's most recent placement setting prior to discharge from custody or at
the end of the period under review? Instructions: Use Key A under Grid 11-A to identify the most recent
placement setting type.

11.188 ☐ If the child's **most recent** placement setting (prior to discharge or to the end of the period
under review) was in a shelter, a group home, or a residential facility, is there documentation in the case
file that this was the least restrictive setting for meeting the child's needs? *II.B.5.d.*

    1 =Yes          2 = No          3= Not applicable

    What is the source for this information _____

11.189 ☐ At any time during the period under review, was the child placed in a congregate care
facility when the child was younger than age 10?

    1 = Yes          2 = No          3= Not applicable

Instructions: If the answer is 2 or 3, SKIP to 11.190.
If the answer is 1, answer the question below.

**Question 11-A**: If the child was placed in a congregate care facility when the child was younger than 10
years of age, is there documentation in the case file that the following conditions were met:
Enter a 1 in the box for all that apply and a 0 for all that do not apply  *II.B.5.m.*

11A.1 ☐ Child has exceptional needs that cannot be met in a family home setting and these needs are
       specified as being available in the facility

11A.2 ☐ Child is a member of a sibling group with some siblings age 10 or older

11A.3 ☐ The Regional Director has granted express written approval for the congregate care
       placement

11A.4 ☐ The Regional Director has specified the services available in the facility that are needed

11A.5 ☐ Sibling group placed together with no siblings who are age 10 or older and the congregate
       care placement was not longer than 45 days

11.190 ☐ If the child has educational, therapeutic and/or medical needs, as identified in any ISP, is
there documentation in the case file that a resource worker within the region assisted the child's
caseworker in finding a suitable placement to meet those needs? *II.B.5.c.*

    1 = Yes          2 = No          3 = Not applicable, the child did not have special needs

64

11.191 ☐ **DO NOT ANSWER FOR SAMPLE 2** Was the child's initial placement in the same county or an adjacent county as the home from which he/she was removed or within 50 miles from the home? *II.B.5.e.*

    1 = Yes
    2 = No
    3 = Cannot determine (*e.g.*, no addresses are provided for the placement or the home from which the child was removed)

Instructions: If the answer is 1 or 3, SKIP to 11.192.
If the answer is 2, answer the question below.

**Question 11-B: DO NOT ANSWER FOR SAMPLE 2** What reasons are documented in the file for not placing the child in close proximity to the parent? Enter a 1 for all that apply and a 0 for all that do not apply. *II.B.5.e.*

11B.1 ☐ Child's needs cannot be met within that geographical area
11B.2 ☐ Child is placed through the ICPC
11B.3 ☐ Child is placed with relative or another planned permanent resource (other than adoption)
11B.4 ☐ Child was ordered to be in a child-specific foster care setting by a court
11B.5 ☐ Child is placed in a pre-adoptive home
11B.6 ☐ Other (specify) _____
11B.7 ☐ No reason is documented

11.192 ☐ During the period under review, how many siblings did the child have who were also in DFCS custody?

Instructions: If the answer is 0, SKIP to Section 12.
If the answer is 1 or more, answer the questions below.

11.193 ☐ During the period under review, was the child placed with his or her siblings during the time that the child was in DFCS custody? *II.B.4.f.*

    1 = Child was placed with all siblings during the entire time that child was in custody
    2 = Child was placed with some siblings but not all during the entire time that child was in custody
    3 = Child was not placed with any siblings during the entire time that child was in custody
    4 = Child was placed with all sibling for some of the time, but not all of the time, that child was in custody
    5 = Child was placed with some siblings for some of the time, but not all of the time, that child was in custody

Instructions: If the answer is 1, SKIP to Section 12.
If the answer is 2, 3, 4 or 5, answer the questions below.

**Question 11-C:** What was the reason for the separation of siblings documented in the case file? *II.B.5.f.*
Instructions: Enter a 1 in the box for all that apply and a 0 for all that do not apply for any separation occurring at any time during the period under review.

11C.1 ☐ Separation was necessary to prevent harm to one or more of the siblings
11C.2 ☐ Separation was done because no resource was identified that would accept the sibling group (resource availability) although documented efforts were reported in the narrative

11C.3 [ ] One of the siblings had exceptional needs
11C.4 [ ] The size of the sibling group (if 4 or more) made it difficult to find a single placement although documented efforts were reported in the narrative
11C.5 [ ] One or more of the siblings was placed with a relative who was not related by blood to the other children
11C.6 [ ] Other (specify) _____
11C.7 [ ] No reason was specified in the case file

## SECTION 12: DEVELOPING AND MAINTAINING CONNECTIONS

12.1 [ ] Did the child have a goal of reunification at some time during the period under review?
    1 = Yes    2 = No

Instructions:  If the answer is 2, Skip to 12.66.
If the answer is 1, answer the questions below.

12.2 [ ] Is there documentation in the case file of a visitation plan for the mother and the child that was developed or updated during the period under review and that specifies the frequency of visitation? *II.B.6.a.*  Instructions:  This usually is part of the ISP.  If there is a plan, but it does not specify the frequency of visitation, answer 3.
    1 = Yes
    2 = No
    3 = There is a plan that describes the type of visitation that is to occur, but it does not specify frequency
    4 = Not applicable (*e.g.*, mother is deceased, location of mother is not known, mother is not available for visitation, mother's parental rights have been terminated)

Instructions:  If the answer is 2, 3, or 4, SKIP to 12.9.
If the answer is 1, answer the questions below.

12.3 What is the earliest date during the period under review of the document containing a visitation plan for the mother?

        M [ ]  D [ ]  Y [ ]

12.4 [ ] What is the frequency of visitation with the mother described in the earliest plan during the period under review? *II.B.6.a.*
    1 = At least twice a week
    2 = At least once a week
    3 = At least twice a month
    4 = At least once a month
    5 = Less frequently than once a month
    6 = As often as possible given the circumstances of the child and mother

12.5 [ ] If less than twice a month, is there a court order in the case file that limits visits?
    1 = Yes    2 = No    3 = Not applicable

66

12.6 [ ] Is there documentation of a revised visitation plan for the mother after the one dated under item 12.3? *II.B.6.a.*

        1 = Yes          2 = No

Instructions:  If the answer is 2, SKIP to 12.9.
If the answer is 1, answer the questions below.

12.7 [ ] What is the frequency of visits stated in the most recent visitation plan for the mother?

        1 = At least twice a week
        2 = At least once a week
        3 = At least twice a month
        4 = At least once a month
        5 = Less frequently than once a month
        6 = Child to have overnight/weekend visits
        7 = Visitation terminated by the court
        8 = As often as possible given the circumstances of the child and the mother
        9 = Other (specify) _____

12.8 [ ] If visit frequency is less than twice a month, is there a court order limiting visits?  *II.B.6.a.*

        1 = Yes               2 = No          3 = Not applicable

12.9 [ ] Is there documentation in the case file of a visitation plan for the father and the child that was developed or updated during the period under review and that specifies the frequency of visitation?

        1 = Yes
        2 = No
        3 = There is a plan that describes the type of visitation that is to occur, but it does not specify frequency
        4 = Not applicable (*e.g.*, father is deceased, location of father is not known, identity of father is not known, father is not available for visitation)

Instructions:  If the answer to is 2, 3, or 4, SKIP to Grid 12-A.
If the answer is 1, answer the questions below.

12.10 What is the earliest date of the document containing a visitation plan for the father?

            M [ ]    D [ ]    Y [ ]

12.11 [ ] What is the frequency and duration of visitation with the father described in the plan?

        1 = At least twice a week
        2 = At least once a week
        3 = At least twice a month
        4 = At least once a month
        5 = Less frequently than once a month
        6 = Other (specify) _____
        7 = As often as possible given the circumstances of the child and the father

12.12 [ ] If visit frequency is less than twice a month, is there a court order limiting visits?

        1 = Yes          2 = No          3 = Not applicable

12.13 [ ] Is there documentation of a revised visitation plan for the father after the initial one?

        1 = Yes          2 = No

67

Instructions:  If the answer is 2, SKIP to Grid 12-A.
If the answer is 1, answer the questions below.

12.14 ☐  What is the visitation frequency for the most recent visitation plan for the father?
      1 = At least twice a week
      2 = At least once a week
      3 = At least twice a month
      4 = At least once a month
      5 = Less frequently than once a month
      6 = Child to have overnight/weekend visits
      7 = Visitation terminated by the court
      8 = Other (specify) _____
      9 = As often as possible given the circumstances of the child and the father

12.15 ☐  If less than twice a month, is there a court order limiting visits?
      1 = Yes      2 = No      3 = Not applicable

**Grid 12-A:** Child-Parent Visits for Children with a Goal of Reunification
Instructions:  Use Grid 12-A to identify child-parent visitation for the most recent 12-month period that the child's goal was reunification.  Working backwards, start with the month that is the most recent month when reunification was a goal.  If it was not a goal for 12 months, then leave the remainder of the month rows blank. For example, if a child had a goal of reunification from January 2009 to November 2009, you would start with November 2009, then on the second row, October 2009, the third row, September 2009, *etc*.  If the child is still in DFCS custody on March 31, 2011 and the goal is reunification, the first month in the grid would be March 2011.  *II.B.6.c.*

| Months MM/YYYY | Number of child's face-to-face visits with mother/ female primary caretaker Enter "98" if NA | If no visits, reasons why visit did not occur Use Reason Key | Number of child's face-to-face visits with father/ male primary caretaker Enter "98" if NA | If no visits, reason why no visits occurred Use Reason Key |
|---|---|---|---|---|
| | 12.16 ☐ | 12.17 ☐ | 12.18 ☐ | 12.19 ☐ |
| | 12.20 ☐ | 12.21 ☐ | 12.22 ☐ | 12.23 ☐ |
| | 12.24 ☐ | 12.25 ☐ | 12.26 ☐ | 12.27 ☐ |
| | 12.28 ☐ | 12.29 ☐ | 12.30 ☐ | 12.31 ☐ |
| | 12.32 ☐ | 12.33 ☐ | 12.34 ☐ | 12.35 ☐ |
| | 12.36 ☐ | 12.37 ☐ | 12.38 ☐ | 12.39 ☐ |
| | 12.40 ☐ | 12.41 ☐ | 12.42 ☐ | 12.43 ☐ |

| | 12.44 ☐ | 12.45 ☐ | 12.46 ☐ | 12.47 ☐ |
| | 12.48 ☐ | 12.49 ☐ | 12.50 ☐ | 12.51 ☐ |
| | 12.52 ☐ | 12.53 ☐ | 12.54 ☐ | 12.55 ☐ |
| | 12.56 ☐ | 12.57 ☐ | 12.58 ☐ | 12.59 ☐ |
| | 12.60 ☐ | 12.61 ☐ | 12.62 ☐ | 12.63 ☐ |

**Reason Key:**
1 = Caseworker did not schedule a visit
2 = Caseworker scheduled a visit but parent /legal guardian did not show up
3 = Caseworker tried to schedule a visit, but no one was available to supervise the visit
4 = Caseworker tried to schedule a visit, but no one was available to transport the child to the visit
5 = Caseworker tried to schedule a visit, but parent did not return calls
6 = Caseworker tried to schedule a visit but foster parent would not cooperate
7 = Caseworker tried to schedule a visit but child was ill
8 = Caseworker tried to schedule a visit, but child refused to attend
9 = Visitation with this parent was determined by the court to not be in the child's best interest
10 = The court suspended visits because of lack of service compliance by the mother/father
11 = The child did not want to visit with the parent
12 = NA – there was a parent/guardian visit with the child
13 = No reason was provided in the case file
14 = Other (specify in the above grid by entering the number "14" and writing in the reason below it in the answer box on the grid)


12.64 ☐  **DO NOT ANSWER FOR SAMPLE 2** At the time of the child's removal from the home, is there documentation in the case file that DFCS arranged for contact between the child and his or her mother within 24 hours of removal? *II.B.6.b.*
       1 = Yes       2 = No       3 = Not applicable (mother deceased or identity unknown)

Instructions:  If the answer is 1 or 3, SKIP to 12.65.
If the answer is 2, answer the question below.

**Question 12-A: DO NOT ANSWER FOR SAMPLE 2** What reason was documented in the case file for not arranging a visit or other contact with the mother within 24 hours of removal? Enter a 1 in the box for all that apply and a 0 for all that do not apply.

12A.1 ☐  Mother's whereabouts were not known
12A.2 ☐  Contact with mother was determined to not be in the child's best interest
12A.3 ☐  No one from DFCS arranged for the visit or contact
12A.4 ☐  Child did not want the visit or contact
12A.5 ☐  Mother was incarcerated or hospitalized
12A.6 ☐  Other (specify) _____
12A.7 ☐  No reason was documented in the case file

69

12.65 [ ]  **DO NOT ANSWER FOR SAMPLE 2** At the time of the child's removal from the home, is there documentation in the case file that DFCS arranged contact between the child and his or her father within 24 hours of removal? *II.B.6.b.*

     1 = Yes     2 = No     3 = Not applicable (father deceased or identity unknown)

Instructions: If the answer is 1 or 3, SKIP to 12.66.
If the answer is 2, answer the question below.

**Question 12-B:** **DO NOT ANSWER FOR SAMPLE 2** What reason was documented in the case file for not arranging a visit or other contact with the father? Enter a 1 in the box for all that apply.

12B.1 [ ]  Father's whereabouts were not known
12B.2 [ ]  Contact with father was determined to not be in the child's best interest
12B.3 [ ]  No one from DFCS arranged for the visit or contact
12B.4 [ ]  Child did not want the visit or contact
12B.5 [ ]  Father was incarcerated or hospitalized
12B.6 [ ]  Other (specify) _____
12B.7 [ ]  No reason was documented in the case file

12.66 [ ]  During the period under review, did the child have siblings who were also in DFCS custody but who were not in the same placement as the child?

     1 = Yes     2 = No

Instructions:  If the answer is 2, SKIP to Section 13.
If the answer is 1, answer the question below.

12.67 [ ]  Are the dates or at least months of sibling visits identified in the case file?
     1 = Yes     2 = No

Instructions:  If the answer is 2, SKIP to 12.104.
If the answer is 1, complete Grid 12-B below.

**Grid 12-B:** Sibling contacts
Instructions:  Complete Grid 12-B only if the child had siblings who were in DFCS custody at the same time as the child and they were not placed together during the most recent 12 months prior to discharge or prior to the end of the period under review.  Use Grid 12-B to describe sibling visitation for the most recent 12-month period that the child was in DFCS custody.  Working backwards, start with the month that is the most recent full month that the child was in DFCS custody.  If the child was not in DFCS custody for 12 months, leave the remainder of the month rows blank.  For example, if a child was discharged from DFCS custody on December 10, 2010, you would put November 2010 in the first row, October 2010 in the second row, September 2010 in the third row, and so on.  If the child entered DFCS custody in August, 2010, you would leave the remainder of the rows blank.  If the child was placed with all siblings during one or two months of the 12-month period, enter 98 (for Not Applicable) for those months. *II.B.6.c.*

| Month<br>MM/YYYY | Number of face-to-face visits with at least one sibling in DFCS custody | Number of face-to-face visits with all siblings in DFCS custody<br>Enter 98 if only 1 sibling | Reasons for lack of visits<br>Use Reason Key |
|---|---|---|---|
| | 12.68 ☐ | 12.69 ☐ | 12.70 ☐ |
| | 12.71 ☐ | 12.72 ☐ | 12.73 ☐ |
| | 12.74 ☐ | 12.75 ☐ | 12.76 ☐ |
| | 12.77 ☐ | 12.78 ☐ | 12.79 ☐ |
| | 12.80 ☐ | 12.81 ☐ | 12.82 ☐ |
| | 12.83 ☐ | 12.84 ☐ | 12.85 ☐ |
| | 12.86 ☐ | 12.87 ☐ | 12.88 ☐ |
| | 12.89 ☐ | 12.90 ☐ | 12.91 ☐ |
| | 12.92 ☐ | 12.93 ☐ | 12.94 ☐ |
| | 12.95 ☐ | 12.96 ☐ | 12.97 ☐ |
| | 12.98 ☐ | 12.99 ☐ | 12.100 ☐ |
| | 12.101 ☐ | 12.102 ☐ | 12.103 ☐ |

**Reason Key**
1 = No visit was arranged
2 = Child did not want to visit sibling(s)
3 = One of the siblings was in a preadoptive placement and the adoptive parents did not want the child to
     have contact with siblings
4 = A visit was planned, but transportation could not be arranged
5 = One sibling was not permitted visits with the other siblings as a disciplinary action
6 = Sibling visit was determined not to be in the best interests of one of the siblings
7 = Appears visits occurred but the months were not specified
8 = Other (specify in the above grid by entering the number "8" and writing in the reason below it in the
     answer box on the grid)
9 = No reason provided in the file

12.104 ☐ If sibling visits are not identified by date or month, are there references in the case file that visits occurred?

     1 = Yes
     2 = No
     3 = Not applicable – dates/months of sibling visits were identified

     If yes, list the types of references to sibling visits that are in the case file (*e.g.*, in the case visit notes, the foster parent mentions that the child saw her siblings recently).

     a. _____
     b. _____
     c. _____

12.105 ☐ **DO NOT ANSWER FOR SAMPLE 2** At the time of the child's removal from the home, is there documentation in the case file that DFCS arranged contact between the child and all of his or her siblings who were placed separately within 24 hours of removal?

     1 = Yes
     2 = No
     3 = Not applicable – child had no siblings in DFCS custody at the time of removal
     4 = Not applicable – child was placed with all siblings during the 24 hours after removal

Instructions:  If the answer is 1, 3 or 4, SKIP to Section 13.
If the answer is 2, answer Question 12-C below.

**Question 12-C**:  **DO NOT ANSWER FOR SAMPLE 2** What reason was documented in the case file for not arranging a visit or other contact with the siblings? Enter a 1 in the box for all that apply.

12C.1 ☐ Contact with some siblings was determined to not be in the child's best interest
12C.2 ☐ No one from DFCS arranged for the visit or contact
12C.3 ☐ Child did not want the visit or contact
12C.4 ☐ Other (specify) _____
12C.5 ☐ No reason was documented

## SECTION 13: PHYSICAL, DENTAL, DEVELOPMENTAL, AND MENTAL/BEHAVIORAL HEALTH CARE

***Mental/Behavioral Health***

13.1 ☐ Was the child age 4 or older at any time during the period under review?
     1 = Yes     2 = No

Instructions:  If the answer is 2, SKIP to 13.63.
If the answer is 1, answer the questions below.

13.2 ☐ Is there documentation in the child's case file that the child received a mental/behavioral health assessment at some time during the period under review? *II.B.7.f.*
     1 = Yes     2 = No

Instructions:  If the answer is 2, SKIP to 13.63.
If the answer is 1, answer the questions below.

13.3 What was the date of the first mental/behavioral health assessment documented during the period under review?  If there is no date associated with any mental/behavioral health assessment, enter 0s in the date boxes.

M [____]    D [____]    Y [____]

Describe the source of documentation (*i.e.*, court report, case notes, doctor's report, *etc*.):
_____

13.4 [____]    Who conducted the first mental/behavioral health assessment during the period under review?
1 = Physician, unknown type
2 = Physician, pediatrician
3 = Physician's Assistant
4 = Licensed Practical Nurse
5 = Registered Nurse
6 = Nurse Practitioner
7 = Psychiatric Nurse
8 = Psychologist
9 = Psychiatrist
10 = Licensed social worker
11 = Other (specify) _____
12 = Unknown

13.5 [____]    Is the report of the mental/behavioral health assessment dated for item 13.3 included in the child's case file? *II.B.7.f.*
        1 = Yes          2 = No

If the mental/behavioral health assessment was included in the case file, mark it with a post-it in the paper case record and provide it to the case record review coordinator at the conclusion of this case review.  In addition, if there is any documentation in the paper case record concerning the instrument that was used to conduct the mental/behavioral health assessment, mark the notation with a post-it and also provide it to the case record review coordinator at the conclusion of this case review.

13.6 [____]    Does any mental/behavioral health assessment identify any diagnoses or mental/behavioral health concern?
        1 = Yes                    2 = No

Instructions: If the answer is 2, SKIP to 13.61.
If the answer is 1, complete Grid 13-A.

**Grid 13-A:**  Services to address mental/behavioral health diagnoses or concerns

| Diagnoses or Concerns<br><br>Write in each one from assessment | Is a treatment plan to address each diagnosis or concern in the case file?<br><br>1= Yes    2 = No<br>If Yes, apply a post-it to copy in paper case record | Services Recommended<br><br>**Use Key A**; enter up to 3 | Were recommended services received?<br><br>1 = Yes (all)<br>2 = Some (specify)<br>3 = None | Reason why services were not received<br><br>**Use Key B**; enter up to 3 |
|---|---|---|---|---|
|  |  |  |  |  |

73

| | | | | |
|---|---|---|---|---|
| 13.7 | 13.8 ☐ | 13.9 ☐<br><br>13.10 ☐<br><br>13.11 ☐ | 13.12 ☐ | 13.13 ☐<br><br>13.14 ☐<br><br>13.15 ☐ |
| 13.16 | 13.17 ☐ | 13.18 ☐<br><br>13.19 ☐<br><br>13.20 ☐ | 13.21 ☐ | 13.22 ☐<br><br>13.23 ☐<br><br>13.24 ☐ |
| 13.25 | 13.26 ☐ | 13.27 ☐<br><br>13.28 ☐<br><br>13.29 ☐ | 13.30 ☐ | 13.31 ☐<br><br>13.32 ☐<br><br>13.33 ☐ |
| 13.34 | 13.35 ☐ | 13.36 ☐<br><br>13.37 ☐<br><br>13.38 ☐ | 13.39 ☐ | 13.40 ☐<br><br>13.41 ☐<br><br>13.42 ☐ |
| 13.43 | 13.44 ☐ | 13.45 ☐<br><br>13.46 ☐<br><br>13.47 ☐ | 13.48 ☐ | 13.49 ☐<br><br>13.50 ☐<br><br>13.51 ☐ |
| 13.52 | 13.53 ☐ | 13.54 ☐<br><br>13.55 ☐<br><br>13.56 ☐ | 13.57 ☐ | 13.58 ☐<br><br>13.59 ☐<br><br>13.60 ☐ |

**Key A: Services recommended**
1 = Counseling for child
2 = Outpatient mental health therapy
3 = Inpatient mental/behavioral health services/Psychiatric hospital

74

4 = Psychotropic medication
5 = Therapeutic foster home
6 = Other (specify in the above grid by entering the number "6" and writing in the reason below it in the answer box on the grid)
7 = A diagnosis/concern was identified but no services were recommended

**Key B: Reason why services were not provided**
1 = Service was not available in that locality
2 = Service was available but there was a waiting list
3 = Eligibility requirements for the service were not met
4 = Service was available but no transportation was available to access the service
5 = Parent would not consent to services
6 = Child would not consent to services and refused to cooperate
7 = Caregiver could not facilitate access to services and no other arrangements were made
8 = Caseworker did not make any arrangements for the child to receive services.
9 = No health insurance
10 = Medicaid eligible, but Medicaid card not yet received or missing (lost or unavailable)
11 = Other (specify in the above grid by entering the number "11" and writing in the reason below it in the answer box on the grid)
12 = No reason documented in the case file

13.61 [____] Is there any indication in the case record that the child had any mental/behavioral health issues or concerns that were not addressed during the review period?
     1 = Yes
     2 = No

13.62 If the answer to 13.61 is 1, please specify the mental/behavioral issues or concerns and source of information.  Instructions:  Identify the source of information in the paper case record with a post-it and provide the paper case record to the case record review coordinator once you complete the review of this case file.

    a. _____

    b. _____

    c. _____

*Physical Health*

13.63 [____] **DO NOT ANSWER FOR SAMPLE 2** Is there documentation in the child's case file that the child received an initial health screening at entry into DFCS custody? *II.B.7.a.*
     1 = Yes       2 = No

Instructions:  If the answer is 2, SKIP to 13.66.
If the answer is 1, answer the questions below.

If the screening form is included in the case file, mark it with a post-it in the paper case record and provide it to the case record review coordinator at the conclusion of this case review.  In addition, if there is any documentation in the case record concerning the instrument that was used to conduct the screening, mark the notation with a post-it and also provide it to the case record review coordinator at the conclusion of this case review.

13.64 **DO NOT ANSWER FOR SAMPLE 2** What was the date of the earliest health screening documented in the case file for the child's most recent entry into DFCS custody? *II.B.7.a.* Instructions: If there was a physical health assessment, but there is no date associated with it, enter 0s in the date boxes.

M ☐ D ☐ Y ☐

13.65 ☐ **DO NOT ANSWER FOR SAMPLE 2** Who conducted the initial health screening?
    1 = Physician, unknown type
    2 = Physician, pediatrician
    3 = Physician's Assistant
    4 = Licensed Practical Nurse
    5 = Registered Nurse
    6 = Pediatric Nurse
    7 = Nurse Practitioner
    8 = Other (specify) _____
    9 = Unknown

**Question 13-B: DO NOT ANSWER FOR SAMPLE 2** Did the initial health screening include any of the following? Instructions: Enter 1 for all that apply and 0 for all that do not apply.

13B.1 ☐ Vital signs - with blood pressure measurement if 3 years or older
13B.2 ☐ Height and weight and head circumference if younger than 3, with percentiles and body mass index
13B.3 ☐ Physical exam
13B.4 ☐ External body inspections (unclothed) for signs of acute illness, abuse (unusual bruises, welts, cuts, burns, trauma) and rash suggestive of infestation or contagious illness)
13B.5 ☐ Range of motion examination of all joints
13B.6 ☐ External genitalia inspections for signs of trauma, discharge or obvious abnormality
13B.7 ☐ Assessment of chronic conditions
13B.8 ☐ Review of available medical, developmental, and mental health history

13.66 ☐ Is there documentation in the child's case file that the child received a comprehensive health assessment during the period under review?
Instructions: This would be a health visit that occurred either at the same time as the initial health screening or sometime after the health screening which included everything listed in Question 13-C below. If the comprehensive exam occurred at the same time as the health screening, answer the questions in this section using the same date. **For Sample 2, answer these questions for the first comprehensive physical examination provided during the period under review.**
    1 = Yes        2 = No

Instructions: If the answer is 2, SKIP to 13.124.
If the answer is 1, answer the questions below.

If the comprehensive examination form was included in the case file, mark the record with a post-it in the paper case record and provide it to the case record review coordinator at the conclusion of this case review. In addition, if there is any documentation in the case record concerning the instrument that was used to conduct the examination, mark the notation with a post-it and also provide it to the case record review coordinator at the conclusion of this case review.

76

13.67 ☐ Who conducted the comprehensive assessment?
   1 = Physician, unknown type
   2 = Physician, pediatrician
   3 = Physician Assistant
   4 = Nurse Practitioner
   5 = Other (specify) _____
   6 = Unknown

13.68 What was the date of the child's first comprehensive health assessment occurring during the period under review? *II.B.7.b.*

        M ☐   D ☐   Y ☐

**Question 13-C:** What was included in the comprehensive health assessment dated above?
Instructions: Enter a 1 in the box for all that apply and a 0 for all that do not apply.

13C.1  ☐   A review of the child's medical, behavioral, developmental, and social history
13C.2  ☐   A complete unclothed physical examination
13C.3  ☐   Close inspection for and documentation of any signs of child abuse, neglect, or maltreatment
13C.4  ☐   Developmental screen with full evaluation to follow
13C.5  ☐   Mental health screen with full evaluation to follow
13C.6  ☐   Adolescent survey (if child is adolescent)
13C.7  ☐   Immunization review
13C.8  ☐   Dental and oral screen
13C.9  ☐   Human immunodeficiency virus risk assessment
13C.10 ☐   Information from laboratory tests – blood count, lead levels, tuberculin test, hepatitis "B" test, urinalysis
13C.11 ☐   Vital signs
13C.12 ☐   Vision screen
13C.13 ☐   Hearing screen

13.69 ☐ Does any comprehensive health assessment identify any medical diagnoses or concerns for the child?

        1= Yes          2 = No

Instructions: If the answer is 2, SKIP to Question 13-D.
If the answer is 1, complete Grid 13-B.

**Grid 13-B:** Services to address physical health diagnoses or concerns

| Diagnoses or Concerns Write in from assessment for each diagnosis or concern | Is a treatment plan to address each diagnosis or concern in the case file? 1= Yes 2 = No | Services Recommended Use Key A; enter up to 3 | Were recommended services received? 1 = Yes (all) 2 = Some (specify) 3 = None | Reason why services were not received Use Key B; enter up to 3 |
|---|---|---|---|---|

77

|  | If Yes, apply a post-it to copy in paper case record |  |  |  |
|---|---|---|---|---|
| 13.70 | 13.71 ☐ | 13.72 ☐<br><br>13.73 ☐<br><br>13.74 ☐ | 13.75 ☐ | 13.76 ☐<br><br>13.77 ☐<br><br>13.78 ☐ |
| 13.79 | 13.80 ☐ | 13.81 ☐<br><br>13.82 ☐<br><br>13.83 ☐ | 13.84 ☐ | 13.85 ☐<br><br>13.86 ☐<br><br>13.87 ☐ |
| 13.88 | 13.89 ☐ | 13.90 ☐<br><br>13.91 ☐<br><br>13.92 ☐ | 13.93 ☐ | 13.94 ☐<br><br>13.95 ☐<br><br>13.96 ☐ |
| 13.97 | 13.98 ☐ | 13.99 ☐<br><br>13.100 ☐<br><br>13.101 ☐ | 13.102 ☐ | 13.103 ☐<br><br>13.104 ☐<br><br>13.105 ☐ |
| 13.106 | 13.107 ☐ | 13.108 ☐<br><br>13.109 ☐<br><br>13.110 ☐ | 13.111 ☐ | 13.112 ☐<br><br>13.113 ☐<br><br>13.114 ☐ |
| 13.115 | 13.116 ☐ | 13.117 ☐<br><br>13.118 ☐<br><br>13.119 ☐ | 13.120 ☐ | 13.121 ☐<br><br>13.122 ☐<br><br>13.123 ☐ |

**Key A: Services Recommended**

Instructions:  If the services are not included in the list below, use 7 and/or 8 and write in the services recommended on the grid.

1 = Follow up services with a health care provider to address a medical condition
2 = Services of a specialist such as an allergist or eye doctor to address a medical condition, such as
      allergies or vision loss
3 = Physical therapy
4 = Dental services
5 = Medications to address a medical condition
6 = Medical equipment such as glasses, a nebulizer or an asthma pump
7 = Other (specify in the above grid by entering the number "7" and writing in the reason below it in the
      answer box on the grid)
8 = Other (specify in the above grid by entering the number "8" and writing in the reason below it in the
      answer box on the grid)
9 = Diagnosis or concern was identified, but no services were recommended

**Key B: Reason why services were not provided**

1 = Service was not available in that locality or no authorized person was available to provide service
2 = Service was available but there was a waiting list
3 = Eligibility requirements for the service were not met
4 = Service was available but no transportation was available to access the service
5 = Parent would not consent to services
6 = Child would not consent to services and refused to cooperate
7 = Caregiver could not facilitate access to services and no other arrangements were made
8 = Caseworker did not make any arrangements for the child to receive services.
9 = No health insurance
10 = Medicaid eligible, but Medicaid card not yet received or missing (lost or unavailable)
11 = Other (specify in the above grid by entering the number "11" and writing in the reason below it in
      the answer box on the grid)
12 = No reason documented in the case file

**Question 13-D**: What were the dates for all subsequent health screenings/physical exams (after the one dated for item 13.68 above) occurring during the period under review?

| | | | | | |
|---|---|---|---|---|---|
| 13D.1 | M | | D | | Y | |
| 13D.2 | M | | D | | Y | |
| 13D.3 | M | | D | | Y | |
| 13D.4 | M | | D | | Y | |
| 13D.5 | M | | D | | Y | |
| 13D.6 | M | | D | | Y | |
| 13D.7 | M | | D | | Y | |
| 13D.8 | M | | D | | Y | |
| 13D.9 | M | | D | | Y | |
| 13D.10 | M | | D | | Y | |
| 13D.11 | M | | D | | Y | |
| 13D.12 | M | | D | | Y | |

79

*Developmental Assessment*

13.124 [____] Is there documentation in the child's case file that the child received a developmental assessment at any time during the period under review?  Instructions:  For purposes of this instrument, the developmental assessment will refer to an assessment addressing developmental domains that may not have been addressed in the comprehensive health assessment, such as physical growth, gross motor skills, fine motor coordination, language and communication, problem solving, cognitive development, social development, and emotional development.  *II.B.7.g.*

      1 = Yes          2 = No

Instruction:  If the answer is 2, SKIP to 13.182.
If the answer is 1, answer the questions below.

If the developmental assessment was included in the case file, mark it with a post-it in the paper case record and provide it to the case record review coordinator at the conclusion of this case review.  In addition, if there is any documentation in the case record concerning the instrument that was used to conduct the assessment, mark the notation with a post-it and also provide it to the case record review coordinator at the conclusion of this case review.

13.125 What was the date of the first developmental assessment documented in the case file as occurring during the period under review?  Instructions:  If there was a developmental assessment, but there is no date associated with it, enter 0s in the date boxes.  *II.B.7.g.*

                    M [____]  D [____]  Y [____]

13.126 [____] Who conducted the developmental assessment?
  1 = Physician, unknown type
  2 = Physician, pediatrician
  3 = Physician Assistant
  4 = Licensed Practical Nurse
  5 = Registered Nurse
  6 = Pediatric Nurse
  7 = Developmental psychologist
  8 = Nurse Practitioner
  9 = Licensed clinical social worker
  10 = Other (specify) _____
  11 = Unknown

13.127 [____] Does any developmental assessment in the case file identify any developmental diagnoses or concerns for the child?
     1= Yes     2 = No

Instructions: If the answer is 2, SKIP to 13.182.
If the answer is 1, complete Grid 13-C.

**Grid 13-C:** Services to address developmental diagnoses or concerns

| Diagnoses or Concerns<br><br>Write in from assessment | Is a treatment plan to address each diagnosis or concern in the case file?<br><br>1= Yes 2 = No<br>If Yes, apply a post-it to copy in paper file | Services Recommended<br><br>Use Key A; enter up to 3 | Were recommended services received?<br><br>1 = Yes (all)<br>2 = Some (specify)<br>3 = None | Reason why services were not received<br><br>Use Key B; enter up to 3 |
|---|---|---|---|---|
| 13.128 | 13.129 ☐ | 13.130 ☐<br><br>13.131 ☐<br><br>13.132 ☐ | 13.133 ☐ | 13.134 ☐<br><br>13.135 ☐<br><br>13.136 ☐ |
| 13.137 | 13.138 ☐ | 13.139 ☐<br><br>13.140 ☐<br><br>13.141 ☐ | 13.142 ☐ | 13.143 ☐<br><br>13.144 ☐<br><br>13.145 ☐ |
| 13.146 | 13.147 ☐ | 13.148 ☐<br><br>13.149 ☐<br><br>13.150 ☐ | 13.151 ☐ | 13.152 ☐<br><br>13.153 ☐<br><br>13.154 ☐ |
| 13.155 | 13.156 ☐ | 13.157 ☐<br><br>13.158 ☐<br><br>13.159 ☐ | 13.160 ☐ | 13.161 ☐<br><br>13.162 ☐<br><br>13.163 ☐ |
| 13.164 | 13.165 ☐ | 13.166 ☐<br><br>13.167 ☐<br><br>13.168 ☐ | 13.169 ☐ | 13.170 ☐<br><br>13.171 ☐<br><br>13.172 ☐ |
| 13.173 | 13.174 ☐ | 13.175 ☐ | 13.178 ☐ | 13.179 ☐ |

81

| | | 13.176 ☐ | | 13.180 ☐ |
| | | 13.177 ☐ | | 13.181 ☐ |

**Key A: Services Recommended**
1 = Physical or other therapy to address developmental delays
2 = Special education services
3 = Remedial speech and language services
4 = Equipment such as wheelchairs, splints, orthotic devices, *etc.*
5 = Referral for early intervention, preschool special education, school-based special education, specialized developmental center
6 = Referral to a developmental-behavior pediatrician
7 = Referral to a developmental psychologist
8 = Other (specify in the above grid by entering the number "8" and writing in the reason below it in the answer box on the grid)
9 = A concern/diagnosis was identified but no services were recommended

**Key B: Reason why services were not provided**
1 = Service was not available in that locality or no one in the locality was authorized to provide the specialized service (such as medications)
2 = Service was available but there was a waiting list
3 = Eligibility requirements for the service were not met
4 = Service was available but no transportation was available to access the service
5 = Parent would not consent to services
6 = Child would not consent to services and refused to cooperate
7 = Caregiver could not facilitate access to services and no other arrangements were made
8 = Caseworker did not make any arrangements for the child to receive services
9 = No insurance
10 = Medicaid eligible, but Medicaid card not yet received or missing (lost or unavailable)
11 = Other (specify in the above grid by entering the number "11" and writing in the reason below it in the answer box on the grid)
12 = No reason documented in the case file

*Dental Services*

13.182 ☐ Was the child at least 3 years old at any time during the period under review?
    1 = Yes        2 = No

Instructions: If the answer is 2, SKIP to Section 14.
If the answer is 1, answer the questions below.

13.183 ☐ Is there documentation in the child's case file that the child received a dental exam during the period under review?
    1 = Yes        2 = No

Instructions: If the answer is 2, SKIP to Section 14.
If the answer is 1, answer the questions below.

If a dental examination was included in the file, mark the assessment with a post-it in the paper case record and provide it to the case record review coordinator at the conclusion of this case review. In addition, if there is any documentation in the case record concerning the instrument that was used to conduct the examination, mark the notation with a post-it and also provide it to the case record review coordinator at the conclusion of this case review.

13.184 What was the date of the first dental exam documented in the case file? *II.B.7.e.* Instruction: If there is documentation that there was a dental exam but there is no date associated with it, enter 0s in the date boxes.

M [      ]   D [      ]   Y [      ]

13.185 [      ] Who conducted the dental exam?
   1 = Dentist
   2 = Dental Assistant/Hygienist
   3 = Physician, unknown type
   4 = Physician, pediatrician
   5 = Physician Assistant
   6 = Nurse Practitioner
   7 = Pediatric Nurse
   8 = Other (specify) _____
   9 = Unknown

13.186 [      ] Does any dental exam identify dental concerns for the child?
   1= Yes      2 = No

Instructions: If the answer is 2, SKIP to Question 13-E.
If the answer is 1, complete Grid 13-D.

**Grid 13-D:** Services to address dental concerns

| Diagnoses or Concerns<br><br>Write in from assessment | Is a treatment plan to address each diagnosis or concern in the case file?<br><br>1= Yes   2 = No<br>If Yes, apply a post-it to copy in paper file | Services Recommended<br><br>Use Key A; enter up to 3 | Were recommended services received?<br><br>1 = Yes (all)<br>2 = Some (specify)<br>3 = None | Reason why services were not received<br><br>Use Key B; enter up to 3 |
|---|---|---|---|---|
| 13.187 | 13.188 [      ] | 13.189 [      ]<br><br>13.190 [      ]<br><br>13.191 [      ] | 13.192 [      ] | 13.193 [      ]<br><br>13.194 [      ]<br><br>13.195 [      ] |
| 13.196 | 13.197 [      ] | 13.198 [      ]<br><br>13.199 [      ] | 13.201 [      ] | 13.202 [      ]<br><br>13.203 [      ] |

| | | 13.200 ☐ | | 13.204 ☐ |
|---|---|---|---|---|
| 13.205 | 13.206 ☐ | 13.207 ☐<br><br>13.208 ☐<br><br>13.209 ☐ | 13.210 ☐ | 13.211 ☐<br><br>13.212 ☐<br><br>13.213 ☐ |
| 13.214 | 13.215 ☐ | 13.216 ☐<br><br>13.217 ☐<br><br>13.218 ☐ | 13.219 ☐ | 13.220 ☐<br><br>13.221 ☐<br><br>13.222 ☐ |
| 13.223 | 13.224 ☐ | 13.225 ☐<br><br>13.226 ☐<br><br>13.227 ☐ | 13.228 ☐ | 13.229 ☐<br><br>13.230 ☐<br><br>13.231 ☐ |
| 13.232 | 13.233 ☐ | 13.234 ☐<br><br>13.235 ☐<br><br>13.236 ☐ | 13.237 ☐ | 13.238 ☐<br><br>13.239 ☐<br><br>13.240 ☐ |

**Key A: Services Recommended**
1 = Dental treatments, such as filling cavities, *etc.*
2 = Orthodontics
3 = Specialized dental services
4 = Routine dental care
5 = Cleaning
6 = Periodontal services
7 = Other (specify in the above grid by entering the number "7" and writing in the reason below it in the answer box on the grid)

**Key B: Reason why services were not provided**
1 = Service was not available in that locality or no one in the locality was authorized to provide the specialized service
2 = Service was available but there was a waiting list
3 = Eligibility requirements for the service were not met
4 = Service was available but no transportation was available to access the service

84

5 = Parent would not consent to services
6 = Child would not consent to services and refused to cooperate
7 = Caregiver could not facilitate access to services and no other arrangements were made
8 = Caseworker did not make any arrangements for the child to receive services
9 = No insurance
10 = Medicaid eligible but no card yet or card is missing (lost or unavailable)
11 = Other (specify in the above grid by entering the number "11" and writing in the reason below it in the answer box on the grid)
12 = No reason documented in the case file

**Question 13-E**: What were the dates for all subsequent dental exams (after the initial one dated for item 13.184 above) documented in the case file that occurred prior to March 31, 2011?  Instructions: Do not include any exams that occurred prior to the one documented under item 13.184 above.

13E.1    M [    ]    D [    ]    Y [    ]
13E.2    M [    ]    D [    ]    Y [    ]
13E.3    M [    ]    D [    ]    Y [    ]
13E.4    M [    ]    D [    ]    Y [    ]
13E.5    M [    ]    D [    ]    Y [    ]
13E.6    M [    ]    D [    ]    Y [    ]
13E.7    M [    ]    D [    ]    Y [    ]
13E.8    M [    ]    D [    ]    Y [    ]
13E.9    M [    ]    D [    ]    Y [    ]
13E.10   M [    ]    D [    ]    Y [    ]
13E.11   M [    ]    D [    ]    Y [    ]
13E.12   M [    ]    D [    ]    Y [    ]


## SECTION 14:  EDUCATIONAL AND INDEPENDENT LIVING SERVICES

14.1 [    ]  Was the child in school or age 5 or older at any time during the period under review?
         1 = Yes        2 = No

Instructions: If the answer is 2, SKIP to Section 15.
If the answer is 1, answer the questions below.

14.2 [    ]  Is there documentation in the case file of a screening/needs assessment conducted by the assigned caseworker of the child's education-related needs during the period under review?  Instructions: There is a section of the ISP that addresses educational records and educational issues that may provide useful information about this item.  Screening means that the assigned caseworker gathered information from a review of records and discussions with those individuals likely to have knowledge relevant to the child's educational needs and documented the identified education-related needs in the case plan or documented that no education-related needs were identified.  *II.B.8.a.*
         1 = Yes    2 = No

If the answer is 2, SKIP to 14.4.
If the answer is 1, answer the questions below.

14.3 What is the date of the earliest screening/needs assessment during the period under review of the child's general and/or special education needs? *II.B.8.a.*

M ☐ D ☐ Y ☐

14.4 ☐ Is there documentation in the case file of any education-related concerns identified during the period under review?  Instructions: Do not limit this to what is in the ISP.  Review case notes and particularly child visit notes or notes from contacts with foster parents.
     1 = Yes          2 = No

Instructions:  If the answer is 2, SKIP to Grid 14-A.
If the answer is 1, answer the questions below.

**Question 14-A**: What education-related concerns were identified in the case file? Enter a 1 in the box for all that apply.

14A.1 ☐ Child was not enrolled in school although of school age
14A.2 ☐ Child was not attending school regularly
14A.3 ☐ Child was performing at below average (GPA less than 2.0)
14A.4 ☐ Child had behavior problems in school
14A.5 ☐ Child was in need of special education services and was receiving them
14A.6 ☐ Child was in need of special education services, but was not receiving them
14A.7 ☐ Child had been suspended from school for behavior problems
14A.8 ☐ Child had been expelled from school for behavior problems
14A.9 ☐ Other (specify) _____

14.5 ☐ Is there documentation in the case file that services were provided or actions taken to address the identified school-related concerns?
     1 = All - there is documentation that services/actions were provided to address all school-related concerns
     2 = Some - there is documentation that some school related concerns were addressed but not all
     3 = None - There is no documentation that school related concerns were addressed
     4 = None - There is documentation that school-related concerns were NOT addressed

14.6 ☐ Is there documentation in the case file that the child changed schools at any time during the period under review, including at entry into DFCS custody?
     1= Yes          2 = No

Instructions:  If the answer is 2, SKIP to 14.14.
If the answer is 1, complete Grid 14-A below.

**Grid 14-A:** School changes and continuity in school enrollment
Do not complete this Grid if the child did not experience any school changes, including a change at entry into DFCS custody.  *II.B.8.b., II.B.8.c.*

| School Change | Reason for Change Use Key A |
|---|---|
| First change | 14.7 ☐ |

| | | |
|---|---|---|
| Second change | 14.8 | |
| Third change | 14.9 | |
| Fourth change | 14.10 | |
| Fifth change | 14.11 | |
| Sixth change | 14.12 | |
| Seventh change | 14.13 | |

**Key A: Reason for Change (select only one)**
1 = Child completed last grade in enrolled school
2 = School staff recommended change
3 = Foster parents recommended change
4 = Child requested change
5 = Foster parent moved
6 = Child's placement was changed and placement was not in former school district and transportation
    former school was not feasible
7 = Child's behavior required special school environment
8 = No reason provided in the case file
9 = Cannot identify any school changes
10 = Other (specify in the above grid by entering the number "10" and writing in the reason below it in
    the answer box on the grid)

14.14 [____] Was the child age 14 or older at any time during the period under review?
        1 = Yes          2 = No

Instructions:  If the answer is 2, SKIP to Section 15.
If the answer is 1, answer the question below.

14.15 [____] Is there an independent living (IL) plan in the child's case file?  *II.B.11.b.*  Instructions:
There should be two plans.  The assigned caseworker's plan is in MACWIS under the Independent Living
icon.  If the child is receiving IL services from a contracted provider, the provider's plan should be in the
paper file.
        1 = Yes          2 = No

Instructions: If the answer is 2, SKIP to Section 15.
If the answer is 1, answer the question below.

14.16 What is the date of the earliest IL plan that was developed or updated during the period under
review?  Instructions:  If there is a plan, but it is not dated, enter 0s in the date boxes.

87

M [____] D [____] Y [____]

**Question 14-B**: What information is included in the IL plan that is referred to in 14.16? Enter a 1 in the box for all that apply and a 0 for all that do not apply. *II.B.11.c. and f.*

14B.1 [____]  Objectives regarding educational, vocational or employment planning and services to ensure that objectives will be attained

14B.2 [____]  Information about how the youth's transportation needs will be met in order for the youth to access educational, vocational or employment services, including assistance in obtaining a driver's license, if appropriate

14B.3 [____]  Objectives related to money management and services to ensure that objectives will be attained

14B.4 [____]  Objectives related to housing and services to ensure that objectives will be attained

14B.5 [____]  Objectives related to development of social and recreational skills and services to ensure that objectives will be attained

14B.6 [____]  Objectives related to establishing and maintaining connections with the child's family and community and services to ensure that objectives will be attained

14.17 [____]  Is there documentation in the case record indicating that during the period under review, the child received the services identified in the IL plan that is referred to in 14.16? *II.B.11.c. and f.*
    1 = All – There is documentation all identified services were provided
    2 = Some – There is documentation that some but not all identified services were provided
    3 = None – There is no documentation that identified services were provided
    4 = None – There is documentation that identified services were NOT provided

14.18 [____]  Did the child age-out of DFCS custody or become legally emancipated during the period under review?
    1 = Yes          2 = No

If the answer is 2, SKIP to Section 15.
If the answer is 1, answer Question 14-C.

**Question 14-C**: At the time that the child was discharged from custody, is there documentation in the case file that the child had the following: *II.B.11.c.*  Instructions: Enter a 1 in the box for when the answer is "Yes" and a 0 in the box when the answer is "No."

14C.1 [____]  An adequate living arrangement
14C.2 [____]  A source of income
14C.3 [____]  A source of health care
14C.4 [____]  IL stipends
14C.5 [____]  Education and training vouchers
14C.6 [____]  Documents needed, such as birth certificate, medical records, *etc.*

# SECTION 15: CASEWORKER CONTACTS

**Grid 15-A:** Assigned caseworker contacts with child  *II.B.10.a.*

Instructions:  During the most recent 12-month period that the child was in DFCS custody working backwards from the date of discharge or from March 31, 2011 (if the child is still in DFCS custody), list the total number of times the child's assigned foster care worker (either the COR or the COS worker or both) had <u>face-to-face</u> contact with the child within the month.  If the assigned COR worker and/or the assigned COS worker <u>combined</u> did not see the child at least twice a month, using the reason key, insert the reason for the lack of a visit in the corresponding box for the month.  You may insert up to two reasons.

If there are no visits in a month and the child was not in DFCS custody for the entire month, enter 98 for NA in the boxes in column 2 and 10 for NA in the reason column.  If a child was not in DFCS custody for the entire month, BUT there were face-to-face contacts by the assigned COR or COS worker while the child was in DFCS custody, enter the number of face-to-face contacts for that month. Be sure to include face-to-face contacts made with the child while the child was placed at home on a trial home visit.  If the face-to-face contact with the child was made by an aide or by a contracted service provider, do not count it as a face-to-face contact.  In all instances, be sure to indicate in the appropriate box whether the face-to-face contact was made by the assigned COR or COS worker.

Information for completing this grid is most likely to be found in the case narratives.

| Month<br><br>MM/YYYY | Number of times child's assigned caseworker (COR or COS)  had contact with the child<br><br>Enter 98 for NA | Number of times child seen in the child's placement | If not twice in the month, what is the reason child was not seen<br>Use Key A; enter up to 2 |
|---|---|---|---|
|  | 15.1 [____] COR<br><br>15.2 [____] COS | 15.3 [____] COR<br><br>15.4 [____] COS | 15.5 [____]<br><br>15.6 [____] |
|  | 15.7 [____] COR<br><br>15.8 [____] COS | 15.9 [____] COR<br><br>15.10 [____] COS | 15.11 [____]<br><br>15.12 [____] |
|  | 15.13 [____] COR<br><br>15.14 [____] COS | 15.15 [____] COR<br><br>15.16 [____] COS | 15.17 [____]<br><br>15.18 [____] |
|  | 15.19 [____] COR<br><br>15.20 [____] COS | 15.21 [____] COR<br><br>15.22 [____] COS | 15.23 [____]<br><br>15.24 [____] |
|  | 15.25 [____] COR | 15.27 [____] COR | 15.29 [____] |

| | | | |
|---|---|---|---|
| | 15.26 ☐ COS | 15.28 ☐ COS | 15.30 ☐ |
| | 15.31 ☐ COR <br> 15.32 ☐ COS | 15.33 ☐ COR <br> 15.34 ☐ COS | 15.35 ☐ <br> 15.36 ☐ |
| | 15.37 ☐ COR <br> 15.38 ☐ COS | 15.39 ☐ COR <br> 15.40 ☐ COS | 15.41 ☐ <br> 15.42 ☐ |
| | 15.43 ☐ COR <br> 15.44 ☐ COS | 15.45 ☐ COR <br> 15.46 ☐ COS | 15.47 ☐ <br> 15.48 ☐ |
| | 15.49 ☐ COR <br> 15.50 ☐ COS | 15.51 ☐ COR <br> 15.52 ☐ COS | 15.53 ☐ <br> 15.54 ☐ |
| | 15.55 ☐ COR <br> 15.56 ☐ COS | 15.57 ☐ COR <br> 15.58 ☐ COS | 15.59 ☐ <br> 15.60 ☐ |
| | 15.61 ☐ COR <br> 15.62 ☐ COS | 15.63 ☐ COR <br> 15.64 ☐ COS | 15.65 ☐ <br> 15.66 ☐ |
| | 15.67 ☐ COR <br> 15.68 ☐ COS | 15.69 ☐ COR <br> 15.70 ☐ COS | 15.71 ☐ <br> 15.72 ☐ |

**Key A: Reason child was not seen**
1 = Child in foster care in another state
2 = Assigned caseworker left DFCS
3 = Visit arranged but foster caregiver canceled visit
4 = Foster caregiver failed to cooperate with arranging visit
5 = Visit attempted, child not at location
6 = Child runaway/AWOL
7 = No indication in the record that the assigned caseworker arranged a visit
8 = Other (specify in the above grid by entering the number "8" and writing in the reason below it in the answer box on the grid)
9 = NA - child not in custody for entire month
10 = NA - Child was seen twice that month
11 = No reason provided in case file

90

12 = COR worker thought that COS worker had made the visits
13 = COS worker thought that COR worker had made the visits

15.73 [    ] Was child placed in a foster family home of any type during the most recent 12-month period prior to discharge from custody or prior to March 31, 2011?
           1 = Yes              2 = No

Instructions: If the answer is 2, SKIP to Section 16.
If the answer is 1, complete Grid 15-B.

**Grid 15-B:** Assigned caseworker contacts with foster parents
Instructions:  For the most recent 12-month period prior to discharge from custody or to the end of the period under review, report the type of foster home that the child was in, the total number of times the child's assigned caseworker (COR or COS) had face-to-face contact with the foster parent, the number of times the face-to-face contact was in the home, and the reason for lack of face-to-face contact.  If the child was not in a foster home at any time during the month leave that row blank. Start with the most recent month that the child was in foster care for the entire month first and then work backwards through the 12-month period.  If a visit to the foster home was conducted by a case aide or someone else other than the assigned caseworker, do not count it as a visit.  If column 3 (number of times caseworker saw foster parent) is 0, leave the remainder of the columns blank.  Lack of face-to-face contact means less than two times per month in the home for a therapeutic foster home and less than one time per month in the home for a non-therapeutic foster home.

| Month  MM/YYYY | Type of foster home  Use Key A | Number of times assigned caseworker saw foster caregiver | Number of times assigned caseworker saw foster caregiver in the foster home | Reason for lack of face-to-face contact  Use Key B | Content of the contact  Use Key C; enter up to 3 |
|---|---|---|---|---|---|
|  | 15.74 [    ] | 15.75 [    ] COR  15.76 [    ] COS | 15.77 [    ] COR  15.78 [    ] COS | 15.79 [    ] | 15.80 [    ]  15.81 [    ]  15.82 [    ] |
|  | 15.83 [    ] | 15.84 [    ] COR  15.85 [    ] COS | 15.86 [    ] COR  15.87 [    ] COS | 15.88 [    ] | 15.89 [    ]  15.90 [    ]  15.91 [    ] |
|  | 15.92 [    ] | 15.93 [    ] COR  15.94 [    ] COS | 15.95 [    ] COR  15.96 [    ] COS | 15.97 [    ] | 15.98 [    ]  15.99 [    ]  15.100 [    ] |
|  | 15.101 [    ] | 15.102 [    ] COR  15.103 [    ] COS | 15.104 [    ] COR  15.105 [    ] COS | 15.106 [    ] | 15.107 [    ]  15.108 [    ]  15.109 [    ] |
|  | 15.110 [    ] | 15.111 [    ] COR | 15.113 [    ] COR | 15.115 [    ] | 15.116 [    ] |

91

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  |  | 15.112 ▢ COS | 15.114 ▢ COS |  | 15.117 ▢<br>15.118 ▢ |
|  | 15.119 ▢ | 15.120 ▢ COR<br>15.121 ▢ COS | 15.122 ▢ COR<br>15.123 ▢ COS | 15.124 ▢ | 15.125 ▢<br>15.126 ▢<br>15.127 ▢ |
|  | 15.128 ▢ | 15.129 ▢ COR<br>15.130 ▢ COS | 15.131 ▢ COR<br>15.132 ▢ COS | 15.133 ▢ | 15.134 ▢<br>15.135 ▢<br>15.136 ▢ |
|  | 15.137 ▢ | 15.138 ▢ COR<br>15.139 ▢ COS | 15.140 ▢ COR<br>15.141 ▢ COS | 15.142 ▢ | 15.143 ▢<br>15.144 ▢<br>15.145 ▢ |
|  | 15.146 ▢ | 15.147 ▢ COR<br>15.148 ▢ COS | 15.149 ▢ COR<br>15.150 ▢ COS | 15.151 ▢ | 15.152 ▢<br>15.153 ▢<br>15.154 ▢ |
|  | 15.155 ▢ | 15.156 ▢ COR<br>15.157 ▢ COS | 15.158 ▢ COR<br>15.159 ▢ COS | 15.160 ▢ | 15.161 ▢<br>15.162 ▢<br>15.163 ▢ |
|  | 15.164 ▢ | 15.165 ▢ COR<br>15.166 ▢ COS | 15.167 ▢ COR<br>15.168 ▢ COS | 15.169 ▢ | 15.170 ▢<br>15.171 ▢<br>15.172 ▢ |
|  | 15.173 ▢ | 15.174 ▢ COR<br>15.175 ▢ COS | 15.176 ▢ COR<br>15.177 ▢ COS | 15.178 ▢ | 15.179 ▢<br>15.180 ▢<br>15.181 ▢ |

**Key A: Type of foster home**
1 = Relative, licensed, non therapeutic
2 = Non-relative, licensed, non therapeutic
3 = Relative, licensed, therapeutic
4 = Non-relative, licensed, therapeutic
5 = Non licensed relative
6 = Non licensed, non relative
7 = NA - child not in foster home that month

**Key B: Reason for Lack of Face-to-Face Contact (select only one)**
1 = Child in foster care out-of-state
2 = Assigned caseworker left DFCS
3 = Assigned caseworker arranged visits but foster caregiver canceled visit

92

4 = Assigned caseworker arranged visit but foster caregiver failed to cooperate
5 = Visit attempted, foster caregiver not at location
6 = Child AWOL/runaway
7 = There is no indication in the case record that assigned caseworker arranged a visit
8 = Other (specify in the above grid by entering the number "8" and writing in the reason below it in the answer box on the grid)
9 = Not applicable – foster parent was seen
10 = Not applicable – child not in foster family home for entire month

**Key C: Issues discussed during the contact**
1 = Sharing of information about the child
2 = Caseworker evaluates safety and well being in the home
3 = Caseworker and caregiver discuss services being provided to child
4 = Caseworker and caregiver discuss achievement of child's service goals
5 = There is no documentation that any of the above issues were discussed

## SECTION 16: CASE CLOSING AND AFTERCARE

16.1 [     ] Was the child residing at home on a trial home visit with the person(s) they were expected to be reunified with at any time during the period under review (January 1, 2009 through March 31, 2011)?

        1 = Yes        2 = No

Instructions:  If the answer is 2, the instrument is completed.
If the answer is 1, answer the questions below.

**Question 16-A:**  What is documented in the case file with regard to the determinations made prior to the child being placed with the family on a trial home visit?  Instructions:  Enter a 1 in the box for all that apply and a 0 for all that do not apply.  **For Sample 2, complete Question 16-A if the trial home visit began prior to the period under review but extended into the period under review.**

16A.1 [     ] All of the issues that resulted in the child's removal from the home had been resolved
16A.2 [     ] Not all of the issues that resulted in the child's removal had been resolved, but the remaining issues could be address through in-home services
16A.3 [     ] The safety assessment determined that the child could be maintained safely in the home
16A.4 [     ] There is no documentation of a safety assessment conducted prior to the trial home visit
16A.5 [     ] Other (specify)_____

16.2 What was the date that the child was placed in the home on a trial home visit?

        M [     ]  D [     ]  Y [     ]

16.3 What was the date that the trial home visit ended?  *II.B.12.a.*  Instructions: Enter 8's in all boxes if the child remained in the Trial Home Visit on March 31, 2011.

M ☐ D ☐ Y ☐

16.4 ☐ What was the reason for the ending of the trial home visit?

1 = Child returned to an out-of-home placement
2 = Child was discharged from DFCS custody to reunification
3 = Other (specify) _____
4 = Not applicable – child still on trial home visit
5 = No reason provided in the file

16.5 ☐ During the trial home visit, how frequently did the caseworker or a family preservation worker meet with the child alone (if appropriate)?  *II.B.12.a.*  Instructions: The home visit may be conducted by the COR worker, the COS worker or a family preservation worker.

1 = At least once a week
2 = Less often than once a week but at least twice a month
3 = Once a month
4 = Less frequently than once a month
5 = Frequency of meeting with the child alone is not noted in the case file

16.6 ☐ Prior to the beginning of the trial reunification, is there documentation in the case file that a team meeting was held to discuss the trial reunification?  *II.B.12.b.*

1 = Yes        2 = No

Instructions:  If the answer is 2, the instrument is completed.
If the answer is 1, answer the questions below.

**Question 16-B:**  Is there documentation in the case file that the following people were included in the team meeting?  Enter a 1 in the box for all that apply.

16B.1 ☐ Caseworker
16B.2 ☐ Supervisor
16B.3 ☐ Private agency worker
16B.4 ☐ Foster parents
16B.5 ☐ Person who child will be reunified with (parent or relative)
16B.6 ☐ Child – if age appropriate
16B.7 ☐ Guardian ad litem
16B.8 ☐ CASA
16B.9 ☐ Extended family

16.7 ☐ Is there documentation in the file that an aftercare plan was develop during the meeting that addressed the services necessary to ensure the child's safety and stability?  For example, was a meeting held or discussion held with caregivers regarding counseling, post adoption services, visitation with extended family, *etc.*

1 = Yes        2 = No

94

**Ex. 4**

# Curriculum Vitae
May 2012

Troy Blanchard
Department of Sociology
126 Stubbs Hall
Louisiana State University
Baton Rouge, LA 70803
Work Phone:(225) 578-5123  Fax: (225) 578-5102 Email: troy@lsu.edu

## Education:

BA, 1995; Louisiana State University; Sociology
MA, 1999; Louisiana State University; Sociology
PhD, 2001; Louisiana State University; Sociology

## Doctoral Dissertation

"The Mediating Effects of Civic and Economic Structures on the Relationship Between Concentrated Disadvantage and Black and White Rates of Violent Crime, 1980-1990" Investigation of the effect of civic engagement and locally oriented economies on race specific rates of homicide mortality in metropolitan and nonmetropolitan counties between 1980 and 1990.  (Dr. Forrest Andrew Deseran, chair, Dr. Charles Tolbert, co-chair).

## Fields of Interest

Social Demography; Stratification and Inequality; Community; Religion

## Awards and Fellowships

| | |
|---|---|
| 2009 | LSU Rainmaker |
| 1997 | ICPSR Fellowship to Attend Summer Program in Statistics |
| 1995 | Fred Frey Award for Outstanding Undergraduate Paper |

## Current Professional Appointments

| | |
|---|---|
| 2007-Present | Associate Professor of Sociology<br>Department of Sociology<br>Louisiana State University |
| 2000-Present | Research Associate (Special Sworn Status)<br>Center for Economic Studies, Washington D.C.<br>Census Research Data Center, Chicago Federal Reserve<br>U.S. Bureau of the Census, Department of Commerce |

2001-2007    Assistant to Associate Professor of Sociology
Department of Sociology, Anthropology, and Social Work,
Mississippi State University

2001-2009    Research Fellow
Social Science Research Center, Mississippi State University


## Publications

**Peer Reviewed Journal Articles**

Blanchard, Troy C., Charles Tolbert, and Carson Mencken.  2012.  "The Health and Wealth of U.S. Counties: How the Small Business Environment Impacts Alternative Measures of Development."  *Cambridge Journal of Regions, Economy, and Society* 5(1):149-162.

Lee, Matthew and Troy C. Blanchard.  2012.  "Attachment and Negative Affective States in the Context of the BP Deepwater Horizon Disaster." *American Behavioral Scientist* 56(1):24-37.

Blanchard, Troy C., Billy Stokes, Bobbie DeCuir, Gail Bonhomme, and Craig Forsyth. 2011.  "Does Education Solve the Problem of Poverty? A Panel Analysis of Educational Attainment and Place Poverty in Louisiana Parishes, 1990-2000."  *International Journal of Sociological Research* 4(1):1-11.

Winter, Lisa, Wanda Rushing, Martin Levin, and Troy C. Blanchard.  2011.  "Deindustrialization, Class, and Adolescents: Changing Gender Attitudes in Middletown." *Sociology Mind* 1(3): 14-20.

Berthelot, Emily, Troy C. Blanchard, and Timothy Brown.  2011.  "Commuting and Theft: The Effect of Journey to Work on Patterns on Crime Rates."  *Kentucky Journal of Anthropology and Sociology* 1(2): 39-54

Cossman, Ronald, Jeralynn S Cossman, Wesley L James, Troy Blanchard, Richard Thomas, Louis G Pol, Arthur G Cosby.  2010.  "Correlating pharmaceutical data with a national health survey as a proxy for estimating rural population health." *Population Health Metrics* 8:25.

Howell, Frank M., Jeremy R. Porter, Phil B Mason and Troy B. Blanchard.  2010.  "Spatial Contours of Potential Biomass Crop Production: An Extension and Measures of Change."  *Journal of Rural Social Sciences* 25(2):1-32.

Porter, Jeremy R., Frank M. Howell, Philip B Mason and Troy C. Blanchard.  2009.  "Existing Biomass Infrastructure and Potential Biomass Production in the U.S."  *Journal of Maps* v2009:206-218.

Tolbert, Charles, Troy Blanchard, and Michael Irwin.  2009.  "Measuring Migration: Profiling Residential Mobility Across Two Decades."  *Journal of Applied Social Science* 3(2):24-38.

Gupta, Ruchi, John Pascoe, Troy Blanchard, Diane Langkamp, Paula Duncan, Peter Gorski, and Linda Southward. 2009. "Child Health in Child Care: A Multi-State Survey of Head Start and Non-Head Start Child Care Directors." *Journal of Pediatric Health Care* 23(3):143-149.

Blanchard, Troy C. and Emily Berthelot. 2008. "The Supply Side of Crime: Assessing the Impact of Current Work Patterns and Offender Activities on Burglary Rates." *International Journal of Crime, Criminal Justice, and Law* 3(2):71-79.

Berthelot, Emily R., Troy Blanchard, and Timothy Brown. 2008. "Scots-Irish Women and the Southern Culture of Violence: The Influence of Scots-Irish Females on High Rates of Southern Violence." *Southern Rural Sociology* 23(2):157-170.

Blanchard, Troy, John Bartkowski, Todd Matthews, and Kent Kerley. 2008. "Faith, Morality, and Mortality: The Ecological Impact of Religion on Population Health." *Social Forces* 86(4):1591-1620.

Cossman, Ronald, Jeralynn Cossman, Wes James, Troy Blanchard, Richard Thomas, Louis Pol, and Arthur Cosby. 2008. "Evaluating Heart Disease Prescriptions-Filled as a Proxy for Heart Disease Prevalence Rates for Small Geographic Areas." *Journal of Health and Human Services Administration* 30(4):503-528.

Cossman, Jeralynn, Ronald Cossman, Wes James, Carol Campbell, Troy Blanchard, and Arthur Cosby. 2007. "Persistent Clusters of Mortality in the U.S." *American Journal of Public Health* 97(12):2148-2150.

Blanchard, Troy. 2007. "Conservative Protestant Congregations and Racial Residential Segregation: Evaluating the Closed Community Thesis in Metropolitan and Nonmetropolitan Counties." *American Sociological Review* 72(3):416-433.

Morton, Lois Wright and Troy Blanchard. 2007. "Starved for Access: Life in Rural America's Food Deserts." *Rural Realities* 1(4):1-10.

Blanchard, Troy and Todd Matthews. 2006. "The Configuration of Local Economic Power and Civic Participation in the Global Economy." *Social Forces* 84(4):2241-2258.

Kerley, Kent, Todd Matthews, and Troy Blanchard. 2005. "Religiosity, Religious Participation, and Negative Prison Behaviors." *Journal for the Scientific Study of Religion* 44(4):443-457.

Blanchard, Troy, Martin Levin, and Jeralynn Cossman. 2005. "Data Sources for the Estimation of Hierarchical Models of Individual Mortality Outcomes." *Journal of Economic and Social Measurement* 29(4):473-485.

Irwin, Michael, Troy Blanchard, Charles Tolbert, Thomas Lyson, and Alfred Nucci. 2004. "Why People Stay: The Impact of Community Context on Nonmigration in the USA." *Population* 59(5):567-592. <Lead Article>

Blanchard, Troy, Jeralynn Cossman, and Martin Levin. 2004. "Multiple Meanings of Minority Concentration: Incorporating Contextual Explanations into the Analysis of Individual-Level U.S. Black Mortality Outcomes." *Population Research and Policy Review* 23(3):309-326.

James, Wesley, Ronald Cossman, Jeralynn Cossman, Carol Campbell, and Troy Blanchard. 2004. "A Brief Visual Primer for the Mapping of Mortality Trend Data." *International Journal of Health Geographics* 3:7.

Tolbert, Charles, Forrest Deseran, and Troy Blanchard. 2003. "Communities of Interest, Social Justice, and Congressional Redistricting: The Case of Louisiana's Fourth District in the 1990's." *Social Justice* 30(4):91-107.

Blanchard, Troy, Michael Irwin, Charles Tolbert, Thomas Lyson, and Alfred Nucci. 2003. "Suburban Sprawl, Regional Diffusion, and the Fate of Small Retailers in a Large Retail Environment, 1977-1996." *Sociological Focus* 36(4):313-331.

## Peer Reviewed Book Chapters

Blanchard, Troy and Todd Matthews. 2007. "Retail Concentration, Food Deserts, and Food Disadvantaged Communities in Rural America", in *Remaking the North American Food System*, Claire Hinrichs and Thomas Lyson eds. Lincoln: University of Nebraska Press.

Cossman, Ronald E., Cossman, Jeralyn S., James, Wesley L., Blanchard, Troy C., and Cosby, Arthur. 2004. "Mortality Rates Across Time: Does Persistence Suggest "Healthy and Unhealthy Places" in the United States?" In *WorldMinds: Geographical Perspectives on 100 Problems*, edited by Janelle, D.G., Warf, B., and Hansen, K. Amsterdam: Kluwer Press.

## Policy Publications
**(Note that these policy reports have received front page news coverage in a National and State media outlets, such as Time Magazine, USA Today, The Times Picayune, The Advocate, and The Louisiana Radio Network)**

Blanchard, Troy C. and Karen Paterson. 2009. "The Growing Hispanic Population in Louisiana: New Evidence from the July 1, 2008 Population Estimates by Race and Ethnicity" CAPER Fact Sheet #11: May 2009.

Lee, Matthew R. and Troy C. Blanchard. 2009. "Murder and Public Health: The Gardere Community in 2008 as a Case in Point" CAPER Fact Sheet #10: January 2009.

Blanchard, Troy C. 2009. "Population Projections of Louisiana Parishes through 2030." Office of Electronic Services, Division of Administration, State of Louisiana.

Troy C. Blanchard and Matthew R. Lee. 2008. "Poverty Estimates for Baton Rouge and New Orleans, 2007" CAPER Fact Sheet #9: August 2008.

Troy C. Blanchard.  2008.  "Population Estimates by Age, Race, Sex and Hispanic Origin for East Baton Rouge, Ascension, and Livingston Parishes."  CAPER Fact Sheet #8: August 2008.

Blanchard, Troy and Thomas Lyson.  2006.  *Food Availability and Food Deserts in the Nonmetropolitan South*.  Food Assistance Needs of the South's Vulnerable Population, Number 12.

Blanchard, Troy and Thomas Lyson.  2003.  *Retail Concentration, Food Deserts, and Food Disadvantaged Communities in Rural America.*  Final Report for Food Assistance Grant Program, Southern Rural Development Center-Economic Research Service, USDA.

Blanchard, Troy and Thomas Lyson.  2002.  *Access to Low Cost Groceries in Nonmetropolitan Counties: Large Retailers and the Creation of Food Deserts.*  Proceedings of the Rural Diversity Conference, November 2002.

Tolbert, Charles, Troy Blanchard, Michael Irwin, Thomas Lyson, and Alfred Nucci.  2001.  "Engaging Business: Civic Engagement and Locally Oriented Firms."  *Southern Perspectives* Volume 5, Number 2.

## Funded Research

Blanchard, Troy and Tim Slack.  "Tracking Community Resilience in the Wake of the Deepwater Horizon Disaster: Assessing the Evidence."  $60,553.  BP Exploration and Production, GRI III.  Funded July 1, 2011-December 31, 2011.

Slack, Tim and Troy Blanchard.  "Understanding the Social Impacts of the Deepwater Horizon Oil Spill in the Context of Community Vulnerability and Resiliency."  $128,016.  BP Exploration and Production, GRI II.  Funded July 1, 2011-June 30, 2012

Blanchard, Troy, Fredrick Weil, Tim Slack, Justine Tinkler, Sarah Becker, Kirby Goidel, William Bankston, and Susan Dumais.  "Tracking Community Resilience in the Wake of the Deepwater Horizon Disaster: Developing Infrastructure for Analyzing the Impact on Coastal Communities."  $65,974.  BP Exploration and Production, GRI I.  Funded August 27, 2010 August 26, 2011.

Blanchard, Troy and Mark Schafer. "Ethnic Groups and Enclaves Affected by OCS."  Mineral and Management Service Environmental Studies Program. $755,229. Funded January 29, 2010.

Fannin, Matt, Troy Blanchard, Mark Schafer, and Tim Slack.  "A Prospectus"  Louisiana Coastal Marine Institute, Minerals and Management Service. $90,373.  Funded July 1, 2009-June 30, 2011.

Blanchard, Troy. "The Flow of Talent in Louisiana: An Analysis of Louisiana Migration Trends." Louisiana Department of Economic Development, Division of Administration, State of Louisiana. $33,925. Funded August 1, 2009-December 31, 2009.

Schafer, Mark, Troy Blanchard, Matt Fannin, and Tim Slack. "Improving Capacity for Institutional Analysis of the Oil and Gas Industry for the Gulf of Mexico Region." Louisiana Coastal Marine Institute, Minerals and Management Service. $404,553. Funded July 1, 2009-June 30, 2011.

Blanchard, Troy. The Social Context of Mortality: Evaluating the Link Between Community Organization and U.S. Life Expectancy. LSU Faculty Research Grant Program. $7,525. Funded August 1, 2008-July 31, 2009.

Blanchard, Troy. Population Projections for Louisiana Parishes. Louisiana Division of Administration, Office of Electronic Services. $19,024. Funded May 1, 2008-September 30, 2008.

Weil, Fredrick and Troy Blanchard. The Contribution of Social Capital and Social Organization to Disaster Recovery. National Science Foundation. $210,200. Funded March 1, 2008-February 28, 2010.

Blanchard, Troy and Charles Tolbert. Collaborative Research on Organizational Determinants of Job Mobility: An Analysis of U.S. Longitudinal Employer-Employee Data. National Science Foundation. $149,082. Funded September 1, 2006-August 31, 2009.

Blanchard, Troy and Charles Tolbert. Rural Retail Firms and Workers in the Age of the Big Box: Evidence from the Longitudinal Employer-Household Dynamics Program. USDA National Research Initiative. $267,300. Funded August 15, 2006-August 14, 2009.

Southward, Linda and Troy Blanchard. Research in Early Care and Education Settings (RECES)—Phase II. Early Childhood Learning Institute and the U.S. Department of Health and Human Services. $100,000. Funded April 1, 2005-May 31, 2006.

Southward, Linda and Troy Blanchard. Research in Early Care and Education Settings (RECES)—Phase I. Early Childhood Learning Institute and the U.S. Department of Health and Human Services. $70,000. Funded September 1, 2004-March 31, 2005.

Cossman, Ronald, Lynne Cossman, and Troy Blanchard. Estimating Morbidity with Prescription Data. Office of Rural Health Policy, U.S. Department of Health and Human Services. $129,000. Funded September 1, 2004-August 31, 2005.

Blanchard, Troy. Food Deserts in the U.S.: A Multilevel Analysis of Food Deserts and Nutrition Related Outcomes. Office of Rural Health Policy, U.S. Department of Health and Human Services. $65,026. Funded July 1, 2003-June 30, 2004. Co-PI.

Blanchard, Troy. Sizing Up the Big Box Retailer: The Impact of Large Retailing on Local Rural

Economies.  Research Initiation Program, Mississippi State University.  $9,985. Funded January 2003-December 2003. PI.

Tolbert, Charles and Troy Blanchard.  Delineation of U.S. Commuting Zones with 2000 Census Data.  Economic Research Service, USDA.  $32,900. Funded October 1, 2002-September 30, 2003. Co-PI.

Blanchard, Troy and Thomas Lyson.  Retail Globalization and Food Access in the South. Southern Rural Development Center and Economic Research Service, USDA.  $29,000. Funded October 1, 2002-September 30, 2003. PI.

Irwin, Michael and Troy Blanchard. Rural Civic Community and Population Stability: Linking Civic Structure and Individual Migration Behavior.  National Research Initiative Competitive Grants Program, USDA.  $132,000. Funded December 1, 2002-November 31, 2005. Co-PI.

Cossman, Lynne, Troy Blanchard, and Martin Levin.  Contextual Correlates of Mortality II. Office of Rural Health Policy, U.S. Department of Health and Human Services. $77,248. Funded July 1, 2002-June 30, 2003. Co-PI.

Cossman, Lynne, Troy Blanchard, and Martin Levin.  Contextual Correlates of Mortality. Office of Rural Health Policy, U.S. Department of Health and Human Services.  $75,037. Funded July 1, 2001-June 30, 2002. Co-PI.

## Conference Presentations

Cope, Michael, Tim Slack, Troy Blanchard.  2012.  "Vulnerability, Resiliency, and Community Disruption in Costal Louisiana: Assessing the Social Impacts of the BP Deepwater Horizon Oil Spill."  Southern Sociological Society Annual Meetings.

Blanchard, Troy and Christopher Kenny.  2011.  "Summary of Human Impacts of Deepwater Horizon Oil Spill."  The Deepwater Horizon Oil Spill Conference, Baton Rouge, LA.

Blanchard, Troy.  2011.  "Health Impacts of Deepwater Horizon Drilling Disaster on Coastal Louisiana Residents"  The Deepwater Horizon Oil Spill Conference, Baton Rouge, LA.

Blanchard, Troy.  2011.  "Oil and Gas Employment and Population in Louisiana."  Bureau of Ocean Energy Management Information Transfer Meeting.

Blanchard, Troy.  2010.  "Oil and Gas Employment and Population in Louisiana."  LSU Center for Natural Resource Economics and Policy.

Berthelot, Emily and Troy Blanchard.  2009.  Predicting Social Capital with Social Disorganization.  Paper Presented at the Southern Sociological Society Annual Meetings.

Schafer, Mark, Makiko Hori, and Troy Blanchard.  2009.  Regional Contexts: The Spatial Dynamics of School Performance in Louisiana.  Paper Presented at the Southern Sociological Society Annual Meetings.

Maddox, David, Troy Blanchard, and Fredrick Weil.  2009.  Stress and Social Support in New Orleans' Disaster Recovery.  Paper Presented at the Southern Sociological Society Annual Meetings.

Blanchard, Troy C. and Matthew Lee.  2008.  Religious Homogeneity and Lethal Violence. Paper Presented at the American Society of Criminology Annual Meetings.

Berthelot, Emily, Troy C. Blanchard, and Tim Brown.  2008.  Commuting and Theft: The Effect of Journey to Work Patterns on Crime Rates, A Spatial Analysis.  Paper Presented at the American Society of Criminology Annual Meetings.

Blanchard, Troy C.  2007.  LEHD and Possibilities for Research on Job Mobility, Stratification and Inequality, and the Potential for Linking to Health Data.  Paper Presented at the Southern Demographic Association Meetings.

Tolbert, Charles M., Michael D. Irwin, Troy C. Blanchard, and Alfred R. Nucci.  2006. Nonmetro Bound: Attributes and Correlates of Metropolitan Adults Who Migrate to Rural America.  Paper Presented at the Southern Demographic Association Meetings.

Cossman, Ronald E., Jeralynn S. Cossman, Wesley L. James, Troy Blanchard, Richard Thomas, Louis G. Pol, Arthur G. Cosby.  2006.  Comparing Dissimilar Health Data Sets.  Paper Presented at the Southern Demographic Association Meetings.

Cossman, Jeralynn S., Ronald E. Cossman, Wesley L. James, Troy Blanchard, Richard Thomas, Louis G. Pol, Arthur G. Cosby.  2006.  Testing Prescription Data as a Proxy Measure for County-Level Diabetes Prevalence.  Paper Presented at the Southern Demographic Association Meetings.

Matthews, Todd and Troy Blanchard.  2005.  Patterns of Spatial Inequality in U.S. Poverty Rates.  Paper Presented at the Southern Demographic Association Meetings.

Cossman, Ronald, Jeralynn Cossman, Wesley James, Arthur Cosby, Troy Blanchard, Richard Thomas, and Louis Pol.  2005.  Chronic Illness Versus Death: Do These Patterns Match?  Paper Presented at the Southern Demographic Association Meetings.

Irwin, Michael D., Troy Blanchard, Alfred R. Nucci, Charles M. Tolbert, and Thomas A. Lyson. 2004.  The Effect of Life Course Transitions on Mobility: Comparisons Between 1990 and 2000. Paper Presented at the Southern Demographic Association Meetings.

Blanchard, Troy C. and Michael Irwin.  2004.  Community Capital or Creative Capital? The Role of Social Context on the Flow of Talent in the U.S.  Paper Presented at the Southern Sociological Society Meetings.

Matthews, Todd and Troy C. Blanchard.  2004.  The Forgotten Debate over Community Power in the Social Sciences and its Enduring Relevance Today.  Paper Presented at the Southern Sociological Society Meetings.

Tolbert, Charles, Troy Blanchard, and Alex Trouteaud.  2004.  U.S. Commuting Zones for 2000. Poster Presented at the Population Association of America Meetings.

Blanchard, Troy and Thomas Lyson. 2003. Food Access and Nutrition Related Outcomes in the Rural South. USDA, Economic Research Service, Food Assistance Conference, Washington D.C. Invited Presentation.

Blanchard, Troy. 2003. The Contextual Effect of Income Inequality and Civic Community on the Individual Risk of Mortality for U.S. Adults.  Paper Presented at the Southern Demographic Association Meetings.

Tolbert, Charles, Troy Blanchard, Michael Irwin, Thomas Lyson, and Alfred Nucci. 2003. A Spatial Model of Rural Labor Market Inequality.  Paper Presented at the Rural Sociological Society Meetings.

Blanchard, Troy.2003. Multi-Level Explanations of Rural Nutrition and Health Related Outcomes.  Paper Presented at the Rural Sociological Society Meetings.

Blanchard, Troy, Jeralynn Cossman, and Martin Levin. 2003. Data Sources for the Estimation of Hierarchical Models of Individual Mortality Outcomes. Paper Presented at the Population Association of America Meetings.

Cossman, Ronald, Jeralynn Cossman, Troy Blanchard, Wesley James, and Carol Campbell. 2003. Spatial Implications of Different Mortality Standardization Schemes. Poster Presented at the Population Association of America Meetings.

Blanchard, Troy. 2003. Community Context and U.S. Mortality. Paper Presented at the Southern Sociological Meetings.

Tolbert, Charles, Troy Blanchard, and Alfred Nucci. Your Place or Mine? The Plausability of Place and Other Sub-County Typologies.  Paper Presented at the 2002 Measuring Rural Diversity Conference. Invited Presentation.

Blanchard, Troy and Thomas Lyson. 2002. Access to Low Cost Groceries in Nonmetropolitan Counties: Large Retailers and the Creation of Food Deserts. Paper Presented at the 2002 Measuring Rural Diversity Conference. Invited Presentation.

Blanchard, Troy C. 2002. Who Benefits from the Rural-Urban Gap in Mortality: A Race Disaggregated Analysis of Mortality in U.S. Counties, 1970-1990.  Paper Presented at the Rural Sociological Society Meetings.

Irwin, Michael, Troy Blanchard, Charles Tolbert, Alfred Nucci, and Thomas Lyson. 2002. Civic and Economic Structure and Individudal Migration Patterns. Paper Presented at the American Sociological Association Meetings.

Irwin, Michael, Troy Blanchard, Charles Tolbert, Alfred Nucci, and Thomas Lyson. 2002. Leaving Home: Modelling the Effect of Civic and Economic Structure on Individudal Migration Patterns. Paper Presented at the Population Association of America Meetings.

Cossman, Jeralyn Sitting, Troy Blanchard, and Martin Levin. 2002. Contextual Correlates of Mortality: Are There Healthy Places to Live? Poster Presented at the Population Association of America Meetings.

Blanchard, Troy, and Madelyn Wagner. 2002. Civic Infrastructure, Income Inequality, and Mortality in U.S. Counties, 1990. Paper Presented at the Southern Sociological Society Meetings.

Kerley, Kent, Jeralyn Sitting Cossman, and Troy Blanchard. 2002. Family Capital, Delinquency, and Illicit Drug Use. Paper Presented at the Southern Sociological Society Meetings.

Cossman, Jeralyn Sitting, Troy Blanchard, and Martin Levin. 2002. Contextual Correlates of Mortality: Are There Healthy Places to Live? Paper Presented at the Southern Sociological Society Meetings.

Irwin, Michael, Troy Blanchard, Charles Tolbert, Thomas Lyson, and Alfred Nucci. 2001. Dwelling Together: Community Civic Structure and Residential Integration. Paper Presented at the Southwestern Social Science Meetings.

Irwin, Michael, Troy Blanchard, Alfred Nucci, Charles Tolbert, and Thomas Lyson. 2001. Modeling the Effect of Civic and Economic Structure on Individual Migration Patterns. Paper Presented at the Southern Demographic Association.

Blanchard, Troy C., Charles Tolbert, Michael Irwin, Thomas Lyson, and Alfred Nucci. 2001. Do the Costs Outweigh the Benefits?: The Effects of Large Retailers on Local Business Environments. Paper Presented at the Annual Meeting Rural Sociological Society.

Blanchard, Troy, Carson Mencken, and Asha Luthra. 2001. Concentrated Disadvantage and Homicide in the Nonmetro U.S.: A Race Specific Analysis of Homicide in Nonmetro Counties. Paper Presented at the Annual Meetings of the Southern Sociological Society.

Manning, Amy, Charles Tolbert, Troy Blanchard, and Fredrick Weil. 2001. What if the South has Plenty of Social Capital, But Not the Kind that Benefits It?: The Case of Baton Rouge. Paper Presented at the Annual Meetings of the Southern Sociological Society.

Blanchard, Troy. 2000. Residential Exposure and Civic Community Structure: An Analysis of Residential Exposure in Selected U.S. Counties, 1990. Paper Presented at the Annual Meetings

of the American Sociological Association.

Irwin, Michael, Troy Blanchard, Charles Tolbert, Thomas Lyson, and Alfred Nucci. 2000. Civic Community and Rural Inequality: Racial Segregation and Civic Structures. Paper Presented at the Annual Meetings of the American Sociological Association.

Deseran, F.A. and Troy Blanchard. 2000. Who's Next? Social Capital, Occupational Attachment, and Succession in the Louisiana Shrimp Industry. Paper Presented at the Annual Meetings of the Rural Sociological Association.

Mencken, Carson, Charles Tolbert, and Troy Blanchard. 2000. Inequality and Spatial Autocorrelation in Mid-South Counties. Paper presented at the Annual Meetings of the Southern Sociological Association.

Deseran, Travis and Troy Blanchard. 1999. Class and Gender: Changes in the U.S. Class Structure for Men and Women, 1980 to 1990. Paper Presented at the Annual Meetings of the Southern Sociological Society.

Blanchard, Troy. 1999. The Effect of Contingent Labor on Earnings and Earnings Disparities in the U.S. Labor Market. Paper Presented at the Annual Meetings of the Southern Sociological Society.

Blanchard, Troy. 1998. Earnings Differentials and Contingent Labor in the U.S. Labor Market. Paper Presented at the Annual Meetings of the Southern Sociological Society.

Deseran, F.A., Deborah Tootle, and Troy Blanchard. 1997. Home or Just a Place to Work: Community Satisfaction and Occupational Satisfaction among Louisiana Shrimpers. Paper presented at the Annual Meetings of the Rural Sociological Society.

Blanchard, Troy. 1997. Earnings Determination and High Tech Employment. Paper Presented at the Annual Meetings of the Southern Sociological Society.

## Professional Activities

### Peer Review Activities

Ad hoc Reviewer, *American Sociological Review*
Ad hoc Reviewer, *Social Problems*
Ad hoc Reviewer, *Social Forces*
Ad hoc Reviewer, *Rural Sociology*
Ad hoc Reviewer, *Agriculture and Human Values*
Ad hoc Reviewer, *Sociological Focus*
Ad hoc Reviewer, *Sociological Spectrum*
Ad hoc Reviewer, *Deviant Behavior*

### Organizational Service

Program Committee, Southern Sociological Society, 2012-2013
Secretary-Treasurer, Southern Demographic Association, 2007-2009.
Listserv Manager, Southern Sociological Society, 2003-2007.
Assistant Secretary Treasurer of the Southern Sociological Society, 2001-2007.
Chair of Graduate Student Business Meeting, Rural Sociological Society, 2001-2002.
Faculty Liaison, Sociology Graduate Student Association, Louisiana State University 2000-2001.
President, Sociology Graduate Student Association, Louisiana State University, 1997-1999.

**Selected National Media Coverage**

April 2012 "Small Business Does a Body Good?" *Inc Magazine*
February 2012 "Study of the Day: Towns With Small Businesses Have Healthier People" *The Atlantic*
July 4, 2004  "Rural Poor Struggle to Find Healthy Food" Associated Press National Release
June 7, 2004  "Not Too Rich or Too Thin" in *Time Magazine*
May 3, 2004  "Are You Rich Enough to be Thin?" in *USA Today*

## Departmental/University Teaching and Service

**Students Advised**

| | |
|---|---|
| 2012-Present | Ya-Feng Lin, Doctoral Student, Committee Member |
| 2011-Present | Will Breyerton, Doctoral Student, Committee Member |
| 2011-Present | Michael Cope, Doctoral Student, Committee Member |
| 2011-Present | David Maddox, Doctoral Student, Committee Member |
| 2011-Present | Donovan Ceasar, Doctoral Student, Committee Member |
| 2010-Present | Brett Lehmann, Doctoral Student, Committee Member |
| 2009-Present | Sarah Walsh, Doctoral Student, Major Professor |
| 2009-Present | Lisa Winters, Major Professor |
| 2009-Present | Candice Myers, Doctoral Student, Committee Member |
| 2008-Present | Aaryn Ward, Doctoral Student, Committee Member |
| 2008-Present | Lisa Winters, Doctoral Student, Major Professor |
| 2008-Present | Kayla Fontenot, Doctoral Student, Major Professor |
| 2008-Present | Skylar Gremillion, Doctoral Student, Major Professor |
| 2008-Present | Chantel Dufrene, Doctoral Student, Committee Member |
| 2009-2011 | Jessica Doucet, Doctoral Student, Committee Member |
| 2008-2010 | Jessica Pearce, Doctoral Student, Committee Member |
| 2008-2011 | Raymond Barranco, Doctoral Student, Committee Member |
| 2008-2010 | Emily Berthelot, Doctoral Student, Co-Major Professor |
| 2008-2009 | Matt Wilkinson, Doctoral Student, Committee Member |

| | |
|---|---|
| 2007-2009 | Shaun Thomas, Doctoral Student, Committee Member |
| 2006-2008 | Rosa Nigro, Doctoral Student, Committee Member |
| 2006-2008 | Jeremy Porter, Doctoral Student, Committee Member |
| 2006-2007 | Wesley James, Doctoral Student, Committee Member |
| 2004-2007 | Todd Matthews, Doctoral Student, Committee Member |
| 2006-2007 | William Sansing, Doctoral Student, Committee Member |
| 2002-2007 | Penelope Blankenship, Doctoral Student, Committee Member |
| 2003-2007 | Debjani Chakrabarti, Doctoral Student, Committee Member |
| 2003-2006 | Michael Taquino, Doctoral Student, Committee Member |
| 2003-2007 | Michelle Estis-Sumerel, Doctoral Student, Committee Member |
| 2001-2004 | Madelyn Wagner, Master's Student, Major Professor |
| 2003-2006 | Angelo Gaspard, Master's Student, Major Professor |
| 2005-2006 | Rachelle Graham, Master's Student, Major Professor |
| 2003-2005 | Albert Jiminez, Master's Student, Committee Member |
| 2003-2005 | Wesley James, Master's Student, Committee Member |
| 2002-2005 | Yousef Al-Mlaifi, Doctoral Student, Committee Member |
| 2003-2005 | Paulette Meikle-Yaw, Doctoral Student, Committee Member |
| 2001-2005 | Steve Grice, Doctoral Student, Committee Member |
| 2002-2004 | Madalla Al-Iblei, Doctoral Student, Committee Member |
| 2002-2004 | Jeff Schultz, Doctoral Student, Committee Member |
| 2002-2003 | Laura Sun, Doctoral Student, Committee Member |
| 2002-2003 | Thomas Kerson, Doctoral Student, Committee Member |

## **Departmental/University Activities**

*Louisiana State University*
Ad Hoc Reviewer for Internal Grant Programs, Office of Research and Economic Development
Member, Social Science Research Council, 2010-Current
Member, Graduate Admissions Committee, 2008-2010
Member, Graduate Policy Committee, 2008-2010
Member, Advisory Committee, 2007-2009
Member, Faculty Recruitment Committee, 2007-2008

*Mississippi State University*
Member, Department Head Search Committee, 2006-2007
Member, University Faculty Senate, 2004-2007
Member, Department Appeals Committee, 2004-2005
Member, Graduate Admissions Committee, 2004-2007
Faculty Advisor, Alpha Kappa Delta Student Association, 2002-2004
Chair, Demography Area Committee, 2003-2004,
Member, Demography Area Committee, 2005-2007
Member, Qualifying Exam Committee, 2002-2006.
Member, Graduate Policy and Procedures Committee, 2002-2004
Departmental Website Manager, 2002-Present
Alternate Representative to the Arts and Science Council, 2001-2003
Assistant Professor Representative to the Advisory Committee, 2001-2002

Member, Undergraduate Sociology Committee, 2001-2003

**Courses Taught**

Introductory Sociology, Undergraduate Level
Methods of Social Research, Undergraduate Level
Social Research Practice, Undergraduate Level
Population Problems, Split Level
Research Design, Graduate Level
Seminar in Social Stratification, Graduate Level
Data Management in the Social Sciences, Graduate Level
Demographic Techniques, Graduate Level
Seminar in Population, Graduate Level
Seminar in Labor Markets, Graduate Level
Multilevel Analysis-Spatial Regression, Graduate Level
Sociology of Religion, Split Level

**Memberships**

Alpha Kappa Delta Sociology Honors Society
American Sociological Association
Southern Sociological Society
Rural Sociological Society
Population Association of America
Southern Demographic Association

**Ex. 5A**

DATA ANALYSIS REPORT
MISSISSIPPI CASE RECORD REVIEW
SAMPLE 1
EXECUTIVE SUMMARY

In July of 2011, the Office of the Court Monitor in conjunction with the Mississippi Department of Family and Children's Services (DFCS) conducted a case record review study of children in foster care to establish baseline data relevant to the requirements of the Mississippi Settlement Agreement and Reform Plan.  The period under review for the case record study was January 1, 2009 to March 31, 2011.  Sample 1 included the case records of children who entered foster care after January 1, 2009 and who were in DFCS custody for at least 60 days prior to March 31, 2011. To achieve a 95.0 percent confidence interval for the sample, 252 children were selected at random from a pool of 4,381 children in foster care who met the sample requirements with regard to date of entry and time in DFCS custody. The study included reviews of each child's paper case file as well as case information entered into the Mississippi Automated Child Welfare Information System (MACWIS).

**Child Characteristics**

Key child characteristics were the following:
- 140 (55.6 percent) of the children in the sample were female.
- 147 (58.3 percent) of the children in the sample were White and 98 (38.9 percent) were African American.
- 11 (4.4 percent) of the children in the sample were Hispanic.
- 100 (49.7 percent) of the children in the sample were younger than age 5 years at the time of entry into DFCS custody.
- 73 (29.0 percent) of the children in the sample were age 12 years or older at the time of entry into DFCS custody.
- The most frequently noted reasons for the child's removal from the home were physical neglect (185 [73.4 percent] children) and parent's having inadequate parenting skills (155 [61.5 percent] children).
- 31 (12.3 percent) of the children in the sample had experienced at least one episode of DFCS custody prior to the one that was the target of the case review.
- 114 (45.2 percent) of the children in the sample were discharged from DFCS custody prior to the end of the period under review, with 91 (79.9 percent) of the 114 children discharged in less than 12 months of removal from the home.
- 138 (54.8 percent) of the children in the sample remained in DFCS custody by the end of the period under review, with 64 (46.4 percent) of the 138 children having been in DFCS custody for 12 months or longer at that time.
- 101 (40.1 percent) of the 252 children had a goal of reunification at the time of discharge or the end of the period under review.

**Case review findings relevant to settlement agreement requirements**

**Settlement Agreement, II.B.1., Screening and Assessments**

**Screening and Assessment: Screening and Assessment Process**

*Settlement Agreement, II.B.1.a.: Upon taking a child into custody, DFCS shall engage in a thorough screening of the child and an individualized, strengths-based, family-focused, and culturally responsive assessment of the family, with the family's participation. Information gathered during the screening and assessment shall consist of (1) internal, external, and historical factors that may contribute to concerns identified in initial risk and safety assessments and initial screenings; (2) child and family strengths, protective factors, and needs; (3) the impact of maltreatment on the child; (4) factors and characteristics pertinent to selecting an appropriate placement; (5) family resources for the child and parents; and (6) any other material pertinent for meeting service objectives. The screening and assessment shall inform the selection of an appropriate placement, the provision of needed services, and permanency planning, and shall be completed within 30 calendar days of the child's entrance into custody and documented in the child's case record.*

Key Finding: For 46 (18.3 percent) of the 252 children, there was documentation in the case record of a screening and assessment that was completed within 30 days of the child's entry into custody and included all relevant information consistent with settlement agreement and plan requirements.

---

**Screening and Assessments: Meetings with child, mother, father, and foster care provider**

*Settlement Agreement, II.B.1.b.: DFCS shall initiate the assessment process through individual team meetings (1) with the child and the assigned DFCS caseworker within the first 72 hours of initial placement or any subsequent placement moves; (2) with the child's parents and the assigned DFCS caseworker within the first two weeks of initial placement; and (3) with the foster care provider and the assigned DFCS caseworker within the first two weeks of any placement, or within different timeframes as required by COA standards.*

Key Finding: **For 12 (4.8 percent) of the 252 children, there was documentation in the case record of an individual meeting between the caseworker and the child, the mother (when applicable), the father (when applicable), and the caregiver (when applicable) within the timeframes prescribed in the Settlement Agreement.**

---

**Screening and Assessments: Diligent Search**

*Settlement Agreement, II.B.1.c.: In all cases in which the whereabouts of one or both parents is unknown, DFCS shall immediately institute a diligent search for the parent(s), which shall be documented in the child's case record.*

Key Findings
- For 2 (50 percent) of the 4 children whose mother's whereabouts were not known, there was documentation in the case record that a diligent search for the mother was conducted.
- For 7 (16.7 percent) of the 42 children whose father's whereabouts were not known for all possible legal and/or putative fathers, there was documentation in the case record that a diligent search was conducted.

## Settlement Agreement, II.B.2., Service Planning and Monitoring

### Service Planning and Monitoring: Family Team Meeting (FTM) and Initial Service Plan

*Settlement Agreement, II.B.2.a.: Within 30 calendar days of a child's entrance into foster care, the DFCS caseworker shall convene a team meeting with the DFCS caseworker's direct supervisor, the child's family if appropriate, the foster family, and the child unless there is a justification for excluding the child from the planning process. During the team meeting, service plans shall be developed for both the child and the parents with the participation of all team meeting participants.*

Key Findings:
- For 1 (0.4 percent) of the 252 children, there was documentation in the case file of the following: (1) an initial FTM that was held within 30 days of the child's entrance into foster care, and (2) an initial FTM that included all parties specified in the settlement agreement (including the caseworker) – *i.e.*, the caseworker's direct supervisor, the child's mother and father (if applicable), the child (if applicable), and the foster care provider (if applicable).
- For 1 (0.4 percent) of the 252 children, there was documentation in the case record of (1) a FTM held within 30 days of the child's entry into DFCS custody and (2) a service plan (ISP) for the child with the same date as the FTM.
- For 1 (0.4 percent) of the 243 children for whom a service plan for the mother was applicable, there was documentation in the case record of (1) a FTM attended by the mother and held within 30 days of the child's entry into DFCS custody and (2) a service plan (ISP) for the mother with the same date as the FTM.
- For 1 (0.5 percent) of the 192 children for whom a service plan for the father was applicable, there was documentation in the case record of (1) a FTM held within 30 days of the child's entry into DFCS custody that was attended by the father and (2) a service plan (ISP) for the father with the same date as the FTM.

### Service Planning and Monitoring: Updating Service Plans

*Settlement Agreement, II.B.2.b.: Each service plan shall be reviewed and updated quarterly at a team meeting with the caseworker, the caseworker's direct supervisor, the foster parent, the child's parents if appropriate, and the child unless there is a justification for excluding the child from the planning process. If the child's placement changes, or there is a significant change*

*affecting the child or his/her family, a team meeting shall be convened and the service plan must be updated within 30 calendar days of the date of change.*

Key Findings:
- None of the 204 children for whom an updated service plan was applicable had documentation in their case files of an updated service plan with the same date as a team meeting (FTM).
- None of the 162 children for whom an updated service plan for the mother was applicable had documentation in their case files of an updated service plan with the same date as a team meeting (FTM).
- None of the 81 children for whom an updated service plan for the father was applicable had documentation in their case files of an updated service plan with the same date as a team meeting (FTM).

## Settlement Agreement, II.B.3., Child and Youth Permanency

### Child and Youth Permanency: Permanency Plan

*Settlement Agreement, II.B.3.a.1.:  Working with service providers, foster parents, the child, and the family, DFCS shall develop and document in the child's case record a permanency plan within 30 calendar days of the child's initial placement that specifies the permanency goal, a timeframe for achieving permanency, and activities that support permanency.*

Key Finding: For 2 (0.8 percent) of the 252 children, there was documentation in the case record that the following requirements were met with regard to the permanency plan: (1) the plan was developed within 30 days of the child's entrance into foster care; (2) all required areas were addressed in the plan; and (3) all relevant people (service providers, foster parents, the child and the family), if applicable, were involved in developing the permanency plan.

### Child and Youth Permanency: Children with a Goal of Durable Legal Custody

*Settlement Agreement, II.B.3.a.2.: DFCS may assign a permanency goal of durable legal custody to a child for whom it has not made adoption efforts only if an appropriate person, with preference given to relatives, has been identified; such person is willing to assume long-term responsibility for the child but has articulated a reasonable basis for not adopting the child; and it is in the child's best interests to remain in the home of such person rather than be considered for adoption by another person.  In such circumstances, there shall be in place a long-term placement agreement signed by DFCS and the relative or other appropriate person ensuring the permanency and stability of this placement barring emergency circumstances that dictate the removal of the child.*

Key Finding: None of the 32 children in the sample who had a single or concurrent goal of durable legal custody had documentation in the case file that the settlement agreement requirements regarding the permanency goal of durable legal custody had been met.

---

**Child and Youth Permanency: Emancipation/Independent Living**

*Settlement Agreement, II.B.3.a.4.: If DFCS concludes, after considering reunification, adoption, durable legal custody, and permanent placement with a relative, that these permanency plans are inappropriate or unavailable for a child, DFCS may assign a permanency goal of emancipation for the child. In such circumstances, a) the child must be at least 16 years old and b) DFCS must document to the Youth Court a compelling reason why this permanency goal is in the best interest of the child and more appropriate than reunification, adoption, durable legal custody, or permanent placement with a relative.*

Key Finding: For 2 (18.2 percent) of the 11 children who had a single or concurrent goal of emancipation as their most recent permanency goal, there was documentation in the case record that all settlement agreement requirements were met.

---

**Child and Youth Permanency: Permanency Plan Updating and Review**

**Administrative Case Reviews**

*Settlement Agreement, II.B.3.c.1.: A child's permanency plan shall be reviewed in a court or administrative case review at least every six months. DFCS will take reasonable steps, including written notice, to ensure the participation of the child, parents, caregivers, and relevant professionals in court or administrative reviews.*

Key Finding: For 81 (42.4 percent) of the 191 children who had at least one administrative review during the period under review (N=187) or were eligible for a review (*i.e.*, they had been in foster care for 6 months or longer) although they did not have one (N=4), there was documentation in the case file that both of the following settlement agreement requirements had been met: (1) the administrative review occurred in less than 6 months of the child's initial placement, and (2) all applicable persons identified in the settlement agreement had been invited to the administrative review.

---

**Child and Youth Permanency: Permanency Plan Updating and Review**

**Court Reviews/ Permanency Hearings**

*Settlement Agreement, II.B.3.c.2.: DFCS will take reasonable steps to ensure that a court review, which may be called a review, dispositional, or permanency hearing, is held for each child in foster care custody within 12 months of initial placement and annually thereafter. [DFCS will*

*take reasonable steps, including written notice, to ensure the participation of the child, parents, caregivers, and relevant professionals in court or administrative reviews.]*

Key Findings: For 42 (26.3 percent) of the 160 children for whom a permanency hearing was applicable (i.e., the children either had a court review hearing [155 children] or were eligible for a court review although they did not have one [5 children]), there was documentation in the case record that both of the following settlement agreement requirements were met: (1) the court review hearing occurred in less than 12 months from the child's initial placement, and (2) all required persons (if applicable) were invited to attend the court review hearing.

_____

**Child and Youth Permanency: Reunification Services**

*Settlement Agreement, II.B.3.d.1:  When the child's permanency goal is reunification, DFCS shall identify in the parents' service plan and make available directly or through referral those services DFCS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care and to help the parents develop strategies to facilitate permanency for the child.*

Key Findings:
- For 60 (27 percent) of the 222 children with a goal of reunification with mother, with both parents, or with an unspecified parent at some time during the period under review, there was documentation in the case file that all actions required by the settlement agreement to address mother's behaviors and conditions were taken.
- For 28 (24.8 percent) of the 113 children with a goal of reunification with father, with both parents, with an unspecified parent, or whose father was involved in their lives (although they would be reunified with the mother), there was documentation in the case file that all actions required by the settlement agreement to address father's behaviors and conditions were taken.

_____

**Child and Youth Permanency: Caseworker Contacts with Parents**

*Settlement Agreement, II.B.3.d.2.: For a child with a permanency goal of reunification, the child's assigned DFCS caseworker shall meet with the child's biological parents at least monthly to assess service delivery and achievement of service goals, to keep the family informed and involved in decisions about the child, and to remain current about the family's circumstances.*

Key Findings:
- For 2 (0.9 percent) of the 224 children for whom reunification with the mother was a possibility (222 children) or whose mother was involved in their lives although they would be reunified with the father (2 children), there was documentation in the case record that the following settlement agreement requirements were met: (1) visits occurred between the caseworker and the mother in all applicable months over the 12-month period prior to the child's discharge from DFCS custody or the end of the period under review; and (2) during

each visit, there were discussions with the mother pertaining to service delivery, achievement of service goals, decisions about the child, and current family circumstances. (Note: For one of these cases, there were only two applicable months and for the second case, there were 12 applicable months.)

- For 2 (1.3 percent) of the 155 children for whom reunification with the father was a possibility (89 children) or whose father was involved in their lives although they would be reunified with their mother (66 children), there was documentation in the child's case record that the following settlement agreement requirements were met: (1) visits occurred between the caseworker and the father in all applicable months over the 12-month period prior to the child's discharge from foster care or the end of the period under review; and (2) during each visit, there were discussions with the father pertaining to service delivery, achievement of service goals, decisions about the child, and current family circumstances. (Note: These are the same cases that met the requirements for the mother.)

---

**Child and Youth Permanency**: **Termination of Parental Rights**

*Settlement Agreement, II.B.3.e.1.:  For children who will have spent 15 of the previous 22 months in foster care, DFCS shall submit a termination of parental rights (TPR) packet to the Office of the Attorney General by the first day of the fifteenth month or document an available exception under the federal Adoption and Safe Families Act (ASFA).  The Office of the Attorney General shall file the petition for termination of parental rights by the last day of the fifteenth month to ensure compliance with the ASFA.*

Key Finding: For 2 (5.4 percent) of the 37 children for whom submitting a TPR packet was applicable (i.e., the child had been in foster care for 15 of the most recent 22 months and there was no ASFA-consistent exception noted in the file), there was documentation in the case record that a TPR packet for all applicable parents had been submitted to the Office of the Attorney General by the first day of the fifteenth month.  Parents were considered to be applicable if they were not deceased and if their identity was known.

*Settlement Agreement, II.B.3.e.2.:  When a child's primary permanency goal is established as adoption, DFCS shall submit a TPR packet to the State Office within 30 calendar days.  Within 30 calendar days of receipt of the TPR packet by the State Office, the State Office shall review the packet, remedy any deficiencies, and submit a TPR referral to the Office of the Attorney General. Within 30 calendar days of such referral, the Office of the Attorney General shall either file the petition for TPR or document to DFCS a legal deficiency preventing timely filing.  Within 10 working days of receiving documentation of a legal deficiency, the assigned DFCS caseworker shall document to the Office of the Attorney General the steps to be taken to address the deficiency.  The DFCS caseworker and that caseworker's direct supervisor shall meet in person every 30 calendar days thereafter to document progress being made to address the legal deficiency until a TPR referral has been accepted as legally sufficient by the Office of the Attorney General, who shall file the petition for TPR within 30 calendar days.*

Key Findings:
- For 6 (21.4 percent) of the 28 children who had a primary goal of adoption that was established more than 60 days prior to the end of the period under review, there was documentation in the case file that a TPR packet had been submitted to the Office of the Attorney General within 60 days of the date that the goal of adoption was established.
- No legal deficiencies were noted in the case file for any of the children who had a primary goal of adoption.

---

**Child and Youth Permanency**: **Adoption**

*Settlement Agreement, II.B.3.f.1.:  When a child's primary permanency goal is established as adoption, DFCS shall, within 10 working days, assign an adoption specialist to work with the assigned DFCS caseworker to immediately begin the process of securing an adoptive placement for the child.  Within 15 calendar days of the primary permanency goal change to adoption, the DFCS caseworker, along with the adoption specialist, shall draw up an adoption plan that identifies the child-specific activities that DFCS will undertake to achieve the permanency goal of adoption and the timeframes in which the activities will be undertaken.  An adoption status meeting with the DFCS caseworker, the adoption specialist, and the caseworker's direct supervisor to review the progress being made in achieving the goal of adoption shall occur weekly for infants and monthly for all other children awaiting adoption, and shall be noted in the child's case record.*

Key Findings:
- None of the 6 children with a goal of adoption who were younger than 12 months at the time that the goal of adoption was established had documentation in the case file of all of the following: (1) a resource worker was assigned to the child either before the goal was changed or within 10 working days of establishing the goal; (2) there was a plan to achieve the adoption that was dated; and (3) there was evidence of weekly adoption status meetings with the DFCS caseworker, adoption specialist, and caseworker's supervisor.
- None of the 26 children who had a goal of adoption who were 12 months old or older at the time that the goal of adoption was established had documentation in the case file of all of the following: (1) a resource worker was assigned to the child either before the goal was changed or within 10 working days of establishing the goal (2) a plan to achieve the adoption that was dated; and (3) evidence of monthly adoption status meetings with the DFCS caseworker, adoption specialist, and caseworker's supervisor.

**Settlement Agreement, III.D.2, Maltreatment of children in foster care**

*Settlement Agreement, III.D.2. (By the end of Implementation Period 2) The rate of abuse or maltreatment in care in the last year shall not exceed 1.14 percent.*

Key Finding: For 2 (0.8 percent) of the 252 children, there was documentation in the case record of a substantiated maltreatment report identifying a foster parent as the perpetrator.

Note:  The measure for the finding reported above is not comparable to the measure cited in the Settlement Agreement since that measure includes children during a particular one-year or 12-month period, while this measure applies to children who entered foster care at any time during the period under review, which extends from January 2009 to March 31, 2011.

## Settlement Agreement, II.B.4., Child Safety

### Child Safety: Timeliness of Investigations

*Settlement Agreement, II.B.4.e. (By the end of Implementation Period 2):  All investigations into reports of maltreatment, including corporal punishment, of children in DFCS custody must be initiated within 24 hours and completed within 30 calendar days, including supervisory approval.  DFCS shall assure that such investigations and decisions are based on a full and systematic evaluation of the factors that may place a child in DFCS custody at risk.*

Key Finding: For 32 (59.2 percent) of the 54 maltreatment reports, there was documentation in the case record that the investigation was initiated within one day of the date that the report was made and completed within 30 calendar days of initiation.

### Child Safety: Caseworker Visits Following a Maltreatment Investigation

*Settlement Agreement, II.B.4.f. (By the end of Implementation Period 1):  Any foster child who remains in the same out-of-home placement following an investigation into a report that he or she was maltreated, or subject to corporal punishment, in that placement shall be visited by a DFCS caseworker twice a month for three months after the conclusion of the investigation to assure the child's continued safety and well-being.*

Key Finding: For 22 (59.5 percent) of the 37 maltreatment reports where the child remained in the same placement (including a trial reunification) after the investigation, there was documentation in the case file that the child was visited by the assigned DFCS caseworker twice a month for three months after the conclusion of the investigation.

### Child Safety: Investigative Reports in the Case File

*Settlement Agreement, II.B.4.g. (By the end of Implementation Period 1): When a maltreatment investigation involves a foster home, DFCS shall file a copy of the approved final investigative report and any recommendations and/or corrective actions DFCS has deemed necessary, in the case record of the foster child, in the file of the foster or adoptive parents with a copy of the letter of notification to the foster or adoptive parents, and in the DFCS State Office.  DFCS shall*

9

*also provide those records to the Youth Court Judge with jurisdiction over the child and to the Monitor.*

*Settlement Agreement, II.B.4.h. (By the end of Implementation Period 1): When a maltreatment investigation involves an agency group home, emergency shelter, private child placing agency foster home, or other facility licensed by DFCS, a copy of the final investigative report shall be filed in the child's case record, in the facility licensing file, and in the DFCS State Office. DFCS shall provide the report to the Youth Court Judge with jurisdiction over the child and to the Monitor.*

Key Findings:
- For 14 (36.8 percent) of the 38 maltreatment investigations involving a child in a foster home, the investigation report was in the case file.
- For 4 (80 percent) of the 5 maltreatment investigations involving a child in a congregate care facility, the investigation report was in the case file.

## Settlement Agreement, II.B.5., Child Placement

### Child Placement: Placement in Non-Licensed Homes

*Settlement Agreement, II.B.5.a.: No foster child shall be placed in a foster care setting that has not been licensed or approved as meeting DFCS licensure standards, unless the child is placed pursuant to the following relative licensing process. The licensing process for relatives shall take place in two steps: (1) an emergency process to be developed by DFCS in conjunction with COA that enables a child to be placed with relatives as soon as the child enters placement, following an initial screen (as described at II.B.5.i. below) of the relative's home, and (2) a full licensing process, to be completed no later than 60 calendar days after the child has entered placement. DFCS may waive non-safety licensing requirements for relative foster placements in individual cases, in accordance with federal regulations.*

Key Finding: For 61 (24.2 percent) of the 252 children, there was documentation in the case record that, at some time during the period under review, the child was placed at least once in a non-licensed placement, either with a non-relative (14 children) or with a relative where the child remained in the non-licensed relative placement for longer than 60 days (47 children).

### Child Placement: Placement Resources

*Settlement Agreement, II.B.5.c.: Children with special needs shall be matched with placement resources that can meet their therapeutic, medical, and educational needs. DFCS shall ensure that each county office has access to placement specialists within its region having the ability to ascertain the placement resources available and their suitability for each particular child needing placement.*

Note:  The measure used for the data reported below is not a direct measure of the settlement agreement requirement.  It addresses whether a resource worker assisted the caseworker and not on whether the caseworker had access to a resource worker (placement specialist).

Key Finding: For 26 (29.9 percent) of the 87 children who were identified as having special educational, therapeutic, and/or medical needs, there was documentation in the case file that a resource worker assisted the child's caseworker in finding a suitable placement to meet those needs.

*Settlement Agreement, II.B.5.d.: Each foster child shall be placed in the least restrictive setting that meets his/her individual needs as determined by a review of all intake, screening, assessment, and prior placement information on the child available at the time of placement.  In order of consideration, this means placement with relatives; foster home care within reasonable proximity to the child's home community; foster home care outside of the child's home community; group home care; or institutional care.*

Key Findings:
- For 67 (26.6 percent) of the 252 children, there was documentation in the case record that their initial placement was with a relative or fictive kin (57 children) or with a biological parent (10 children).
- For 71 (28.2 percent) of the 252 children, there was documentation in the case record that their initial placement was in a congregate care facility, with 68 (27.0 percent) of the 252 children placed in a shelter setting.
- For 18 (7.1 percent) of the 252 children, there was documentation in the case record that they were in multiple congregate care placements during the period under review, with 12 (4.8 percent) of the 252 children experiencing two or more shelter placements.
- For 22 (100 percent) of the 22 children whose most recent placement setting prior to discharge from custody or the end of the period under review was a congregate care setting, there was documentation in the case file that this was the least restrictive setting for meeting the child's needs.

*Settlement Agreement, II.B.5.e.: Each child shall be placed within his/her own county or within 50 miles of the home from which he/she was removed.  This provision shall not apply if (1) the child's needs are so exceptional that they cannot be met by a family or facility within his/her own county or within 50 miles of the home from which he/she was removed; (2) the child is placed through the ICPC consistent with its terms; (3) the child is appropriately placed with relatives or another planned permanent resource; (4) the child is ordered to be placed in a child-specific foster care setting by a court; or (5) the child is placed in an adoptive home.*

Key Finding: For 243 (96.4 percent) of the 252 children, there was documentation in the case file that the child's initial placement was either (1) in the child's own county or within 50 miles of the home from which the child was removed (233 children), or (2) one of the exceptions to the provision stated in the settlement agreement was met (10 children).

*Settlement Agreement, II.B.5.f.: Siblings who enter placement at or near the same time shall be placed together unless (1) doing so would be harmful to one or more of the siblings; (2) one of the siblings has exceptional needs that can be met only in a specialized program or facility; or (3) the size of the sibling group makes such placement impractical notwithstanding diligent efforts to place the group together. If a sibling group is separated at initial placement, the caseworker shall make immediate efforts to locate or recruit a family in whose home the siblings can be reunited. These efforts will be documented and maintained in the case file.*

Key Finding: For 148 (80.9 percent) of the 183 children with siblings in DFCS custody, there was documentation in the case file that the child was placed with all siblings during the entire period under review (96 children), or there was a reason documented in the case file for the separation of siblings that is consistent with the exceptions noted in the Settlement Agreement (52 children). For 20 of the 72 children who were not placed with siblings, there was a valid reason documented in the case file for the separation of siblings, although the reason was not specified as one of the exceptions in the Settlement Agreement.

_____

**Child Placement: Provision of Information to Placement Resources**

*Settlement Agreement, II.B.5.g.: No later than at the time of placement, DFCS shall provide foster parents or facility staff with the foster child's currently available medical, dental health, educational, and psychological information, including a copy of the child's Medicaid card. DFCS shall gather and provide to foster parents or facility staff all additional current medical, dental health, educational, and psychological information available from the child's service providers within 15 days of placement.*

Key Finding: For 39 (15.5 percent) of the 252 children, there was documentation in the case file that the child's medical, dental, educational and/or psychological information had been given to the foster parents or facility staff at the time of placement for all of the child's placements during the period under review.

_____

**Child Placement: Prevention of Placement Disruption**

*Settlement Agreement, II.B.5.h.: DFCS shall take all reasonable steps to avoid the disruption of an appropriate placement and ensure placement stability for children. If a caseworker has knowledge that a placement may disrupt, the caseworker shall immediately convene a meeting with the DFCS supervisor, the foster parents, and, if appropriate, the child to determine the following: the cause of the potential disruption; whether the placement is appropriate for the child; whether additional services are necessary to support the placement; whether the child needs another placement; and, if another placement is necessary, what that placement should be. If the placement disrupts on an emergency basis, the meeting shall be held no later than five days after the disruption to address whether the child needs additional supportive services and whether the new placement is appropriate.*

Key Findings:

- For 5 (14.7 percent) of the 34 children for whom there was documentation in the case file that at least one of the child's placements disrupted (*i.e.*, it was not a planned change), and the caseworker had prior knowledge of the possibility of a disruption, there was documentation in the case file that (1) the DFCS caseworker had convened a meeting prior to all applicable placement disruptions for that child to discuss options, and (2) the meeting included the DFCS caseworker and supervisor, foster parents, and child (if appropriate). For these 5 children, there was no documentation in the file of any actions taken to prevent the placement disruption.

- For 1 (2.1 percent) of the 48 children for whom there was documentation in the case file that at least one of the child's placements disrupted on an emergency basis (*i.e.,* there was no documentation that the caseworker had prior knowledge that a disruption was possible), there was documentation in the case file that a meeting was held within 5 days after the disruption and that the key issues identified in the Settlement Agreement were discussed at that meeting.

---

**Child Placement: Placement in Emergency or Congregate Care Facilities**

*Settlement Agreement, II.B.5.k. (By the end of Implementation Period 1): No foster child shall remain in an emergency or temporary facility for more than 45 calendar days, unless, in exceptional circumstances, the Division Director has granted express written approval for the extension that documents the need for the extension.*

Key Finding: **For 6 (42.9 percent) of the 14 children who had been in an emergency or temporary facility for more than 45 days, there was no documentation in the case file of an extension that had been approved by the Division Director.**

*Settlement Agreement, II.B.5.l. (By the end of Implementation Period 2): No child shall spend more than 12 hours at a time in a DFCS office or other non-residential facility that provides intake functions. No child shall be placed in more than one emergency or temporary facility within one episode of foster care, unless an immediate placement move is necessary to protect the safety of the child or of others as certified in writing by the Regional Director.*

Key Finding: For 8 (66.7 percent) of the 12 children with multiple placements in an emergency or temporary facility, there was documentation in the case file of written approval for the placement by the Regional Director.

*Settlement Agreement, II.B.5.m. (By the end of Implementation Period 2): No child under 10 years of age shall be placed in a congregate care setting (including group homes and shelters) unless the child has exceptional needs that cannot be met in a relative or foster family home or the child is a member of a sibling group, and the Regional Director has granted express written approval for the congregate-care placement. Such approval shall be based on the Regional Director's written determination that the child's needs cannot be met in a less restrictive setting and can be met in that specific facility, including a description of the services available in the facility to address the individual child's needs. Sibling groups in which one or more of the*

*siblings are under the age of 10 shall not be placed in a congregate care setting for more than 45 days.*

**Key Finding:  For 23 (52.3 percent) of the 44 children who were younger than age 10 at the time of their placement in congregate care, there was no documentation in the case file of express written approval by the Regional Director.**

## Settlement Agreement, III.C., Outcome Measures

### Outcome Measures: Number of Placements

*Settlement Agreement, III.C.1.: Placement stability for children in foster care for less than 12 months from the time of removal (placement stability is two or fewer placements).*

**Key Finding: 99 (60.0 percent) of the 165 children in the sample who were in foster care for 12 months or less experienced two or fewer placements.**

## Settlement Agreement, II.B.6., Developing and Maintaining Connections

### Developing and Maintaining Connections: Visitation Plans

*Settlement Agreement, II.B.6.a.:  At the time of the initial team meeting when a child enters foster care, a visitation plan for the child and his/her family shall be developed as part of the child's service plan.  This visitation plan shall be developed and regularly updated in collaboration with parents, foster parents, and the child and should be appropriate to a) the child's age and developmental stage; b) the parents' strengths and needs; c) the schedule of the foster parents and parents; d) the social and cultural context of the family; and e) the status of the case and the permanency goal.  If parental visitation is appropriate based on the above factors, this visitation plan shall include a minimum of two visits per month with the parents (unless a court order in the child's case limits such visits).  For all children, regardless of permanency goal, this visitation plan shall include at least one visit per month with any siblings not in the same placement (unless a court order in the child's case limits such visits).*

Key Findings:
- For 46 (20.1 percent) of the 229 children for whom a visitation plan with mother was applicable, there was documentation in the case file of all of the following requirements: (1) a visitation plan with mother that specified at least 2 visits per month or a court order limiting visitation with mother, (2) a visitation plan that was developed within 30 days of the child's entry into foster care, and (3) a date for the visitation plan that was either before or about the same as the date of the child's service plan (indicating that the visitation plan was developed as part of the child's service plan).

14

- For 19 (10.4 percent) of the 182 children for whom a visitation plan with father was applicable, there was documentation in the case file of all of the following requirements: (1) a visitation plan with father that specified at least 2 visits per month or a court order limiting visitation with father, (2) a visitation plan for father that was developed within 30 days of the child's entry into foster care, and (3) a date for the visitation plan for father that was either before or about the same as the date of the child's service plan.

---

**Developing and Maintaining Connections: Frequency of Visits between Parents and Children and Between Siblings in Foster Care**

*Settlement Agreement, II.B.6.c.: DFCS caseworkers shall take all reasonable steps to ensure the implementation of each child's visitation plan. DFCS and its contracting agencies shall implement a policy that prohibits cancellation of visits as a disciplinary action.*

Note: The following analysis is based on a "required" visitation plan that met the minimum requirements for parent-child (at least twice a month) and sibling (at least once a month) contact rather than on the specifications in the actual visitation plans.

Key Findings: The data analyses assessed the frequency of parent-child and sibling visitation for all applicable months within a 12-month period prior to discharge or the end of the period under review. An applicable month is one in which the child was in an out-of-home placement, had a goal of reunification with at least one parent, and there was no valid reason for a visit not to occur (*e.g.*, there was no court order preventing the visit, neither the parent nor child was hospitalized or incarcerated, the visit was not deemed to be contrary to the best interests of the child, etc.).

- For 7 (3.4 percent) of the 206 children for whom visitation with mother at some time during the specified 12-month period was applicable, there was documentation in the case file that two visits with the mother occurred in all applicable months.
- For 5 (3.0 percent) of the 167 children for whom visitation with father at some time during the specified 12-month period was applicable, there was documentation in the case file that two visits with the father occurred in all applicable months.
- For 8 (15.1 percent) of the 53 children with siblings in foster care who were placed separately at some time during the specified 12-month period, and for whom data were available regarding visitation, there was documentation in the case file that at least one visit with all siblings occurred in all applicable months.

---

**Developing and Maintaining Connections: Contacts after Initial Placement**

*Settlement Agreement, II.B.6.b.: DFCS shall arrange contact for the child with his/her parents and with any siblings not in the same placement within 24 hours of foster care placement unless there are documented reasons why contact should not occur. If a visit cannot be arranged within 24 hours, a telephone call to parents, siblings, or extended family members must be provided to the child.*

15

Key Findings:
- For 28 (15.9 percent) of the 176 children for whom a contact with mother within 24 hours of placement was applicable, there was documentation in the case file that a contact between the child and his/her mother occurred within 24 hours of placement.
- For 10 (6.9 percent) of the 144 children for whom a contact with father within 24 hours of placement was applicable, there was documentation in the case file that a contact was arranged between the child and his/her father within 24 hours of placement.
- For 5 (9.4 percent) of the 53 children who were placed apart from siblings but for whom placement with siblings at the time of removal was applicable, there was documentation in the case file that a visit was arranged between the siblings within 24 hours of removal from the home.

## Settlement Agreement, II.B.7., Physical and Mental Health Care

### Physical and Mental Health Care: Mental/Behavioral Health Assessments and Services

*Settlement Agreement, II.B.7.f.: Each child four years old and older shall be provided with a mental health assessment by a qualified professional within 30 calendar days of foster care placement. Each foster child who reaches the age of four in care shall be provided with a mental health assessment within 30 calendar days of his/her fourth birthday. Each foster child shall receive recommended mental health services pursuant to his/her assessment.*

Key Finding: For 36 (21.2 percent) of the 170 children who were eligible for a mental health assessment, there was documentation in the case file of the following: (1) the child received a mental health assessment within 30 calendar days of foster care placement or within 30 days of reaching their 4th birthday while in foster care, and (2) the child either received services to address all identified mental health concerns (22 children) or no mental health concerns were identified for the child (14 children).

### Physical and Mental Health Care: Physical Health Assessments and Services

*Settlement Agreement, II.B.7.a., b., c., and d.:*
*a) Every child entering foster care shall receive a health screening evaluation from a qualified medical practitioner within 72 hours after placement that is in accordance with the health screening recommended by the American Academy of Pediatrics.*
*b) Within 30 days of placement in foster care, each child shall receive a comprehensive health assessment that is in accordance with the assessment recommended by the American Academy of Pediatrics.*
*c) Nothing in the above paragraphs shall prohibit the initial health screening evaluation and the comprehensive health assessment from being conducted in one clinical visit. However, in such instances, this combined visit shall be conducted within 72 hours of placement.*

*d) All children shall receive periodic medical examinations and all medically necessary follow-up services and treatment throughout the time they are in state custody in accordance with the time periods recommended by the American Academy of Pediatrics.*

Note:  The guidelines for time periods recommended by the American Academy of Pediatrics for physical examinations are 2 weeks old, then 2, 4, 6, 9, 12, 15, 18 and 24 months old, then annually until age 21 years.

Key Findings:
- For 40 (15.9 percent) of the 252 children, there was documentation in the case file of the following: (1) a health screen had been conducted within 72 hours of the child's placement; (2) a comprehensive health exam had been conducted within 30 days of the child's placement; and (3) all recommended services had been provided to the child (13 children) or no service needs had been identified (27 children).
- For 53 (67.9 percent) of the 78 children for whom a second comprehensive health examination was applicable, there was documentation in the case file that the second examination was done in an appropriate time frame given the child's age.

---

## Physical and Mental Health Care: Developmental Assessments and Services

*Settlement Agreement, II.B.7.g.: Each foster child age birth through three shall be provided with a developmental assessment by a qualified professional, and each child older than three shall be provided with a developmental assessment if factors indicate such an assessment is warranted. All foster children shall be provided with needed follow-up developmental services.*

Note:  The analysis presented below is based upon the American Academy of Pediatrics' recommendations related to the comprehensive health assessment, which defendants are required to implement pursuant to II.B.7.b.

Key Finding: For 10 (13.0 percent) of the 77 children who were age 3 or younger during the period under review, there was documentation in the case file that a developmental assessment had been conducted within 30 days of placement and that all recommended services had been provided (3 children) or no service needs had been identified (7 children).

---

## Physical and Mental Health Care: Dental Examination and Services

*Settlement Agreement, II.B.7.e.:  Each child three years old and older shall be provided with a dental examination within 90 calendar days of foster care placement and every six months thereafter.  Each foster child who reaches the age of three in care shall be provided with a dental examination within 90 calendar days of his/her third birthday and every six months thereafter.  Foster children shall receive all medically necessary dental services.*

Key Findings:

17

- For 81 (43.1 percent) of the 188 children for whom a dental exam was applicable (i.e., the child was 3 years of age or older at some time during the period under review and had been in foster care for 90 days or longer), there was documentation in the case file of the following: (1) a dental exam occurred within 90 days of the child's placement or the child reaching the age of 3, and (2) either all recommended dental services were received (28 children) or no dental services were recommended (53 children).
- For 28 (33.3 percent) of the 84 children for whom a second dental exam was applicable (*i.e.*, the child was in foster care for 6 months following the initial exam), there was documentation in the case file that a second exam had been provided within 6 months of the initial exam.

## Settlement Agreement, II.B.8., Educational Services

### Educational Services:  Educational Screening

*Settlement Agreement, II.B.8.a.: DFCS caseworkers shall screen each child for general and special educational needs within 30 days of his/her entry into foster care.*

Key Finding: For 33 (20 percent) of the 165 children who were in school or of school age during the period under review, there was documentation in the case file of an educational screening within 30 days of the child's entry into foster care or the child reaching his or her fifth birthday.

### Educational Services: School Stability

*Settlement Agreement, II.B.8.c.:  DFCS shall make all reasonable efforts to ensure the continuity of a child's educational experience by keeping the child in a familiar or current school and neighborhood, when this is in the child's best interest and feasible, and by limiting the number of school changes the child experiences.*

Note: Data were not collected regarding the dates of school changes. Therefore, the findings reported below do not reflect whether the school change occurred as a result of a placement change that was in the child's best interest.

Key Finding: For 70 (42.4 percent) of the 165 applicable children, there was documentation in the case file that the child changed schools at least once during the period under review, including when the child entered DFCS custody.

## Settlement Agreement, II.B.11., Transition to Independent Living

*Settlement Agreement, II.B.11.b.: Each foster youth 14-20 years old, regardless of his/her permanency plan, shall be provided with an opportunity to participate in the creation of an*

*Independent Living service plan for Independent Living preparation. DFCS shall provide each eligible youth with Independent Living services as set forth in his/her service plan.*

Key Finding: For 6 (8.7 percent) of the 69 children who were age 14 or older during the period under review, there was an Independent Living plan in the case file and documentation that all independent living services set forth in the plan had been provided to the youth.

## Settlement Agreement, II.B.10., Worker Contact and Monitoring

### Worker Contact and Monitoring: Caseworker Contacts with Child

*Settlement Agreement, II.B.10.a.: Regardless of whether a child's foster care placement is being directly supervised by DFCS or by a contract agency, the assigned DFCS caseworker (either County of Service or County of Responsibility) shall meet with the child in person and, where age-appropriate, alone at least **twice** monthly to assess the child's safety and well-being, service delivery, and achievement of permanency and other service goals. At least one visit per month shall take place in the child's placement. During a child's first month in foster care and after each change of placement, the assigned DFCS caseworker shall meet with the child in person, and, where age-appropriate, alone, to assess the child's adjustment to the placement and whether more frequent visits by the caseworker are necessary, This assessment may occur at a regularly scheduled visit with the child.*

Key Finding: For 53 (21.0 percent) of the 252 children, there was documentation in the case file of the following: (1) during the 12-month period prior to the child's discharge from DFCS custody or the end of the period under review, the assigned DFCS caseworker met with the child in person at least twice for each applicable month, and (2) at least one meeting between the caseworker and the child was in the child's placement.

### Worker Contact and Monitoring: Caseworker Contacts with Foster Parents

*Settlement Agreement, II.B.10.c.: A DFCS foster care worker shall regularly communicate with non-therapeutic foster parents who have one or more foster children residing in their home and visit the home at least monthly to (1) share all relevant and legally disclosable information concerning the foster child; (2) evaluate the foster child's safety, needs and well-being; and (3) monitor service delivery and achievement of service goals.*

Key Finding: For 6 (3.1 percent) of the 191 children who were in a non-therapeutic foster home at some time during the period under review, there was documentation in the case file of the following: (1) the assigned DFCS caseworker visited the foster parents in the child's foster home at least monthly for all applicable months, and (2) during that visit, the DFCS caseworker shared information with the child's foster parents concerning the foster child, evaluated the child's safety needs and well-being, and monitored service delivery/achievement of service goals.

19

*Settlement Agreement, II.B.10.d.:  DFCS shall maintain weekly contact with therapeutic foster parents who have one or more foster children residing in their home, and shall make a minimum of two visits per month to the home to (1) share all relevant and legally disclosable information concerning the foster child; (2) evaluate the foster child's safety, needs and well-being; and (3) monitor service delivery and achievement of service goals.*

Key Finding: For 2 (10.0 percent) of the 20 children who were in a therapeutic foster home at some time during the period under review, there was documentation in the case file that the DFCS caseworker visited the therapeutic foster parent in the home at least twice during all applicable months that the child was in the home.

## Settlement Agreement, II.B.12., Case Closing and Aftercare

*Settlement Agreement, II.B.12.a.:  For each child who has a permanency goal of reunification and who is in fact placed in the home for the purpose of reunification, DFCS shall provide, subject to the approval of the youth court, such child with a 90-day trial home visit.  During any trial home visit period, a DFCS caseworker or Family Preservation caseworker shall meet with the child in the home at least two times per month, and each meeting shall occur without the parent or caretaker present.*

Key Findings:
- For 19 (50 percent) of the 38 children on a Trial Home Visit for less than 90 days, there was documentation in the case file that the caseworker or a family preservation worker met with the child privately (if appropriate) at least twice a month during the period of the Trial Home Visit.
- For 13 (48 percent) of the 27 children on a Trial Home Visit for 90 days or longer, there was documentation in the case file that the caseworker or a family preservation worker met with the child privately (if appropriate) at least twice a month during the period of the Trial Home Visit.

*Settlement Agreement, II.B.12.b.: A recommendation to return a child to his/her home or to place the child in the custody of a relative shall be made at a meeting attended by the child's DFCS caseworker, the caseworker's supervisor, the worker from the private agency if the child is placed with a private agency, the foster parents (unless DFCS determines that the foster parent's presence would be inappropriate), the biological parents or the relative assuming custody, and the child.  At the meeting, the participants shall devise an after-care plan that identifies all of the services necessary to ensure that the conditions leading to the child's placement in foster care have been addressed, and that the child's safety and stability will be assured.  DFCS shall take reasonable steps to provide or facilitate access to all services necessary to support the child during the trial home visit.*

Key Finding: There was no documentation in the case file for any of the 65 children who were on a trial reunification at some time during the period under review that all three of the following settlement agreement requirements were met: (1) a team meeting was held prior to placement in

the trial reunification; (2) the team meeting was attended by the child's DFCS caseworker, the caseworker's supervisor, and other required parties as relevant; and (3) an aftercare plan was developed during a team meeting.

**Ex. 5B**

DATA ANALYSIS REPORT
MISSISSIPPI CASE RECORD REVIEW
SAMPLE 1

## SECTION 1: STUDY DESCRIPTION

In July of 2011, the Office of the Court Monitor in conjunction with the Mississippi Department of Family and Children's Services (DFCS) conducted a case record review study of children in foster care to establish baseline data relevant to the requirements of the Mississippi Settlement Agreement and Reform Plan.  The period under review for the case record study was January 1, 2009 to March 31, 2011.  Sample 1 included the case records of children who entered foster care after January 1, 2009 and who were in DFCS custody for at least 60 days prior to March 31, 2011. To achieve a 95.0 percent confidence interval for the sample, 252 children were selected at random from a pool of 4,381 children in foster care who met the sample requirements with regard to date of entry and time in DFCS custody.

The case record study was conducted by 21 reviewers who were DFCS employees and 6 quality assurance team members who were from the Office of the Court Monitor, the Center for the Support of Families, and DFCS.  The study included reviews of each child's paper case file as well as case information entered into the Mississippi Automated Child Welfare Information System (MACWIS).

## SECTION 2:  CHILD CHARACTERISTICS

**Key Findings**
- 140 (55.6 percent) of the children in the sample were female.
- 147 (58.3 percent) of the children in the sample were White and 98 (38.9 percent) were African American.
- 11 (4.4 percent) of the children in the sample were Hispanic.
- 100 (49.7 percent) of the children in the sample were younger than age 5 years at the time of entry into DFCS custody.
- 73 (29.0 percent) of the children in the sample were age 12 years or older at the time of entry into DFCS custody.
- The most frequently noted reasons for the child's removal from the home were physical neglect (185 [73.4 percent] children) and parent's having inadequate parenting skills (155 [61.5 percent] children).
- 31 (12.3 percent) of the children in the sample had experienced at least one episode of DFCS custody prior to the one that was the target of the case review.
- 114 (45.2 percent) of the children in the sample were discharged from DFCS custody prior to the end of the period under review, with 91 (79.9 percent) of the 114 children discharged in less than 12 months of removal from the home.
- 138 (54.8 percent) of the children in the sample remained in DFCS custody by the end of the period under review, with 64 (46.4 percent) of the 138 children having been in DFCS custody for 12 months or longer at that time.

- 101 (40.1 percent) of the 252 children had a goal of reunification at the time of discharge or the end of the period under review.
- For 59 (23.4 percent) of the 252 children, there was documentation in the case record that the child's permanency goal changed from the initial goal to the most recent goal prior to discharge or at the end of the period under review.  The most frequently noted changes were the following:
  - For 14 (23.7) of the 59 children, the permanency goal changed from reunification to adoption.
  - For 5 (8.5 percent) of the 59 children, the permanency goal changed from reunification to emancipation or independent living.
  - For 4 (6.8 percent) of the 59 children, the goal changed from a concurrent goal of reunification and placement with relatives to a single goal of adoption.

**Tables** (Percentages in tables may not total exactly 100 due to rounding)

Table: Gender of Children

| Gender | Number | Percentage |
|---|---|---|
| Female | 140 | 55.6 |
| Male | 112 | 44.4 |
| **Total** | **252** | **100** |

Table: Race of children

| Race | Number | Percentage |
|---|---|---|
| Asian | 2 | 0.8 |
| Black/African American | 98 | 38.9 |
| White | 147 | 58.3 |
| Unable to determine | 3 | 1.2 |
| Unknown* | 2 | 0.8 |
| **Total** | **252** | **100** |

*Two reviewers identified the child as Hispanic for Race but did not provide the child's Race.

Table: Hispanic ethnicity of children

| Hispanic ethnicity | Number | Percentage |
|---|---|---|
| Hispanic | 11 | 4.4 |
| Non-Hispanic | 230 | 91.3 |
| Unable to determine | 11 | 4.4 |
| **Total** | **252** | **100.1** |

Table: Age at entry into DFCS custody

| Age at entry into foster care | Number | Percentage |
|---|---|---|
| Younger than 12 months old (1 year) | 39 | 15.5 |
| At least 12 months old (1 year) but younger than 36 months old (3 years) | 36 | 14.3 |
| At least 36 months old but younger than 60 months old (5 years) | 25 | 9.9 |
| At least 60 months old but younger than 96 months old (8 years) | 39 | 15.5 |
| At least 96 months old but younger than 144 months old (12 years) | 40 | 15.9 |
| At least 144 months old but younger than 180 months old (15 years) | 41 | 16.3 |
| 180 months (15 years) and older | 32 | 12.7 |
| **Total** | **252** | **100.1** |

2

Table: Reasons for child's most recent entry into DFCS custody (can be multiple reasons) (N = 252 children)

| Reasons | Number | Percentage of children |
|---|---|---|
| Physical neglect | 185 | 73.4 |
| Inadequate parenting skills | 155 | 61.5 |
| Parent's inability to cope | 99 | 39.3 |
| Child substance exposed | 69 | 27.4 |
| Inadequate housing | 63 | 25.0 |
| Inadequate income | 61 | 24.2 |
| Parent incarceration | 43 | 17.1 |
| Physical abuse | 39 | 15.5 |
| Domestic violence | 33 | 13.1 |
| Child behavior (including Child in Need of Supervision) | 32 | 12.7 |
| Parent alcohol abuse | 31 | 12.3 |
| Emotional abuse/neglect | 29 | 11.5 |
| Inadequate supervision | 26 | 10.3 |
| Parent drug abuse | 25 | 10.0 |
| Abandonment | 23 | 9.1 |
| Sexual abuse | 20 | 7.9 |
| Inadequate food supply | 16 | 6.3 |
| Parent mental illness | 11 | 4.4 |
| Medical neglect | 11 | 4.4 |
| Educational neglect | 10 | 4.0 |
| Relinquishment | 5 | 2.0 |
| Failure to protect child from injury | 5 | 2.0 |
| Parent hospitalized | 4 | 1.6 |
| Mental injury of child | 3 | 1.2 |
| Child's disability | 2 | 0.8 |
| Child's drug abuse | 1 | 0.4 |
| Parent's self-neglect | 1 | 0.4 |
| Prior death or near fatality of other child in the family | 1 | 0.4 |
| Other* | 10* | 4.0 |

*The following responses were given for "other" category: Inadequate Family Support (5); Parent death (2); Parent in foster care (1); Child hospitalized (1); Lack of child care (1).

Table: Children's history regarding entries into DFCS custody prior to March 31, 2011

| History of entries | Number of children | Percentage of children |
|---|---|---|
| Child entered foster care only once | 221 | 87.7 |
| Child entered foster care twice | 26 | 10.3 |
| Child entered foster care three times | 4 | 1.6 |
| Child entered foster care four times | 1 | 0.4 |
| **Total** | **252** | **100** |

Table: Time to reentry into DFCS custody between the two most recent entries

| Time to reentry | Number of children reentering | Percentage of reentries | Percentage of total sample (N=252) |
|---|---|---|---|
| Less than 12 months | 17 | 54.8 | 6.7 |
| At least 12 months but less than 24 months | 6 | 19.4 | 2.4 |
| 24 months or longer | 8 | 25.8 | 3.2 |
| **Total** | **31** | **100** | **12.3** |

**Tables: Time in Foster Care**

Table: Total time that child was in foster care for a single episode from initial placement to discharge or to the end of the period under review

| Time in DFCS custody to discharge or end of PUR | Number of children | Percentage of children |
|---|---|---|
| Less than 6 months | 81 | 32.1 |
| At least 6 months but less than 12 months | 84 | 33.3 |
| At least 12 months but less than 18 months | 47 | 18.7 |
| At least 18 months but less than 24 months | 32 | 12.7 |
| 24 months or longer | 8 | 3.2 |
| **Total** | **252** | **100** |

Table: Time in foster care to discharge (N = 114)

| Time in foster care to discharge | Number of children | Percentage of children |
|---|---|---|
| Less than 6 months | 46 | 40.4 |
| At least 6 months but less than 12 months | 45 | 39.5 |
| At least 12 months but less than 18 months | 20 | 17.5 |
| At least 18 months but less than 24 months | 3 | 2.6 |
| **Total** | **114** | **100** |

Table: Time in foster care from entry to end of period under review for children who were not discharged

| Time in foster care to end of PUR | Number of children | Percentage of children |
|---|---|---|
| Less than 6 months | 35 | 25.4 |
| At least 6 months but less than 12 months | 39 | 28.3 |
| At least 12 months but less than 18 months | 27 | 19.6 |
| At least 18 months but less than 24 months | 29 | 21.0 |
| 24 months or longer | 8 | 5.8 |
| **Total** | **138** | **100.1** |

4

Table: Child's permanency goal at the time of discharge or end of the period under review

| Permanency Goal | Number of children | Percentage of children |
|---|---|---|
| Reunification | 101 | 40.1 |
| Adoption | 26 | 10.3 |
| Durable legal custody (DLC) | 4 | 1.6 |
| Legal guardianship | 0 | 0 |
| Emancipation/Independent living (IL) | 6 | 2.4 |
| Long-term foster care/Another Planned Permanent Living Arrangement | 2 | 0.8 |
| Permanent placement with a fit and willing relative | 3 | 1.2 |
| Concurrent goals of reunification and adoption | 5 | 2.0 |
| Concurrent goals of reunification and guardianship or DLC | 18 | 7.1 |
| Concurrent goals of reunification and emancipation/IL | 2 | 0.8 |
| Concurrent goal of adoption and guardianship or DLC | 4 | 1.6 |
| Concurrent goals of adoption and emancipation/IL | 0 | 0 |
| Concurrent goals of adoption and permanent placement with relatives | 5 | 2.0 |
| Concurrent goals of reunification and permanent placement with relatives | 59 | 23.4 |
| Concurrent goals of DLC or guardianship and emancipation/IL | 1 | 0.4 |
| Concurrent goals of DLC or guardianship and permanent placement with relatives | 5 | 2.0 |
| Concurrent goals of emancipation/IL and permanent placement with relatives | 2 | 0.8 |
| No permanency goal stated in file | 9 | 3.6 |
| **Total** | **252** | **100.1** |

## SECTION 3:  FINDINGS

## Settlement Agreement, II.B.1., Screening and Assessments

*Settlement Agreement, II.B.1.a.:  Upon taking a child into custody, DFCS shall engage in a thorough screening of the child and an individualized, strengths-based, family-focused, and culturally responsive assessment of the family, with the family's participation.  Information gathered during the screening and assessment shall consist of (1) internal, external, and historical factors that may contribute to concerns identified in initial risk and safety assessments and initial screenings; (2) child and family strengths, protective factors, and needs; (3) the impact of maltreatment on the child; (4) factors and characteristics pertinent to selecting an appropriate placement; (5) family resources for the child and parents; and (6) any other material pertinent for meeting service objectives.  The screening and assessment shall inform the selection of an appropriate placement, the provision of needed services, and permanency planning, and shall be completed within 30 calendar days of the child's entrance into custody and documented in the child's case record.*

**Key Findings**

- **For 46 (18.3 percent) of the 252 children, there was documentation in the case record of a screening and assessment that was completed within 30 days of the child's entry into custody and that included all relevant information consistent with settlement agreement and plan requirements.**

- For 11 (4.4 percent) of the 252 children, there was no screening and assessment documented in the case file.

- For 161 (63.9 percent) of the 252 children, there was documentation of a screening and assessment in the case file that was completed within 30 calendar days of the child's entrance into custody. However, for 115 (71 percent) of the 161 children, the screening and assessment did not include all relevant information consistent with settlement agreement and plan requirements.

- For 67 (26.6 percent) of the 252 children, there was documentation in the case record that the screening and assessment included all relevant information. However, for 21 (31.3 percent) of these 67 children, the screening and assessment was not completed within 30 days of the child's entrance into custody.

- For 229 (90.9 percent) of the 252 children, the caseworker used the SARA to conduct the assessment; for 1 (0.4 percent) of the 252 children, the caseworker used the CFA, and for 11 (4.4 percent) of the 252 children, the caseworker used both the SARA and the CFA.

**Tables** (Percentages for tables may not total exactly 100 due to rounding.)

Table: Time from child's entrance into custody to the initial screening and assessment

| Time to initial assessment | Number of children | Percentage of children |
|---|---|---|
| Less than 1 week | 49 | 19.4 |
| At least 1 week but less than 2 weeks | 35 | 13.9 |
| At least 2 weeks but less than 3 weeks | 36 | 14.3 |
| At least 3 weeks but less than 4 weeks | 32 | 12.7 |
| At least 4 weeks but less than 6 weeks | 41 | 16.3 |
| At least 6 weeks but less than 8 weeks | 14 | 5.6 |
| At least 8 weeks but less than 10 weeks | 11 | 4.4 |
| At least 10 weeks but less than 12 weeks | 4 | 1.6 |
| 12 weeks or longer | 18 | 7.1 |
| No assessment conducted | 11 | 4.4 |
| Missing data | 1 | 0.4 |
| **Total** | **252** | **100.1** |

Table: Information included in the initial child and family assessments (N = 252)

| Type of information in the initial assessment for the child and family | Number of initial assessments | Percentage of initial assessments |
|---|---|---|
| Internal factors of the family/household contributing to the need for the child to be in foster care | 222 | 88.1 |
| External factors of the family context or environment contributing to the need for the child to be in foster care | 184 | 73.0 |
| Historical factors contributing to the need for the child to be in foster care | 206 | 81.7 |
| Child's strengths | 178 | 70.6 |
| Family strengths including but not limited to protective factors | 198 | 78.6 |
| Child's service needs | 160 | 63.5 |
| Family service needs | 166 | 65.9 |
| Factors pertinent to selecting an appropriate out of home placement | 136 | 54.0 |
| Family resources available to support the child | 119 | 47.2 |
| Family resources available to support the family | 117 | 46.4 |
| No assessment documented in the case file | 11 | 4.4 |

Table: Extent of information included in the initial assessments of each child and family

| Number of factors included in the assessment of each child and family | Number of children | Percentage of children |
|---|---|---|
| All 10 factors were included | 67 | 26.6 |
| 9 out of 10 factors were included | 16 | 6.3 |
| 8 out of 10 factors were included | 25 | 9.9 |
| 7 out of 10 factors were included | 32 | 12.7 |
| 6 out of 10 factors were included | 25 | 9.9 |
| 5 out of 10 factors were included | 29 | 11.5 |
| 4 out of 10 factors were included | 19 | 7.5 |
| 3 out of 10 factors were included | 16 | 6.3 |
| 2 out of 8 factors were included | 8 | 3.2 |
| 1 out of 10 factors was included | 4 | 1.6 |
| No assessment documented in the case file | 11 | 4.4 |
| **Total** | **252** | **99.9** |

**Screening and Assessments: Meetings with child, mother, father, and foster care provider**

*Settlement Agreement, II.B.1.b.: DFCS shall initiate the assessment process through individual team meetings (1) with the child and the assigned DFCS caseworker within the first 72 hours of initial placement or any subsequent placement moves; (2) with the child's parents and the assigned DFCS caseworker within the first two weeks of initial placement; and (3) with the foster care provider and the assigned DFCS caseworker within the first two weeks of any placement, or within different timeframes as required by COA standards.*

Note: Data provided below relevant to this paragraph in the settlement agreement concern the initial placement. Data relevant to individual team meetings after each of a child's placement changes was not collected in the case record review. Also, data relevant to COA standards with regard to timeframes for meetings was not collected.

**Key Findings**

- **For 12 (4.8 percent) of the 252 children, there was documentation in the case record of an individual meeting between the caseworker and the child, the mother (when applicable), the father (when applicable), and the caregiver (when applicable) within the timeframes prescribed in the Settlement Agreement.**
- For 123 (48.8 percent) of the 252 children, there was documentation in the case record that an individual meeting between the DFCS caseworker and the child occurred within the first 72 hours of initial placement.
- For 127 (52.0 percent) of the 244 children for whom a caseworker meeting with the mother was applicable, there was documentation in the case record that an individual meeting between the DFCS caseworker and the mother occurred within the first two weeks of initial placement.  A caseworker meeting with mother was not applicable if the mother was deceased, the mother's whereabouts were unknown, the mother's parental rights had been terminated prior to the child's entry into DFCS custody, or the mother refused contact.
- For 58 (29.7 percent) of the 195 children for whom a caseworker meeting with the father was applicable, there was documentation in the case record that an individual meeting between the DFCS caseworker and the father occurred within the first two weeks of initial placement.  A caseworker meeting with father was not applicable if the father was deceased, the identity of the father was not known, the whereabouts of the father was not known, the father's parental rights had been terminated prior to the child's entry into DFCS custody, or the father refused contact.
- For 55 (22.2 percent) of the 248 children for whom a meeting with the foster care provider was applicable, there was documentation in the case record that an individual meeting between the DFCS caseworker and the foster care provider occurred within the first two weeks of initial placement. A caseworker meeting with a foster care provider was not applicable if the child's initial "placement" was with his or her parent(s).

**Tables**

Table: Time from child's entrance into custody to the DFCS caseworker's meeting with the child

| Time to meet with child | Number of children | Percentage of children |
|---|---|---|
| Within 72 hours (3 days) | 123 | 48.8 |
| 73 hours or more | 125 | 49.6 |
| Documentation of meeting with child but no dates | 1 | 0.4 |
| No documentation of meeting with child during the PUR | 3 | 1.2 |
| **Total** | **252** | **100** |

Table: Time from child's entrance into custody to DFCS caseworker's meeting with child, mother, father, and foster care provider

| Time to initial meeting | Child N (%) | Mother N (%) | Father N (%) | Care provider N (%) |
|---|---|---|---|---|
| Less than 1 week | 128 (50.8) | 98 (40.2) | 44 (22.6) | 42 (16.9) |
| At least 1 week but less than 2 weeks | 38 (15.1) | 29 (11.9) | 14 (7.2) | 13 (5.2) |
| At least 2 weeks but less than 3 weeks | 26 (10.3) | 18 (7.4) | 5 (2.6) | 13 (5.2) |
| At least 3 weeks but less than 4 weeks | 15 (6.0) | 12 (4.9) | 7 (3.6) | 8 (3.2) |
| At least 4 weeks but less than 6 weeks | 21 (8.3) | 17 (7.0) | 12 (6.2) | 16 (6.5) |
| At least 6 weeks but less than 8 weeks | 11 (4.4) | 10 (4.1) | 6 (3.1) | 8 (3.2) |
| At least 8 weeks but less than 10 weeks | 5 (2.0) | 6 (2.5) | 4 (2.1) | 1 (0.4) |
| At least 10 weeks but less than 12 weeks | 3 (1.2) | 4 (1.6) | 4 (2.1) | 2 (0.8) |
| 12 weeks or more | 1 (0.4) | 18 (7.4) | 18 (9.2) | 10 (4.0) |
| Missing information re. dates | 1 (0.4) | 0 | 0 | 2 (0.8) |
| No meeting documented during the PUR | 3 (1.2) | 32 (13.1) | 81 (41.5) | 133 (53.6) |
| **Total applicable cases** | **252** | **244** | **195** | **248** |
| Not applicable | 0 | 8 | 57 | 4 |
| Total Children | 252 | 252 | 252 | 252 |

## Screening and Assessments: Diligent Search

*Settlement Agreement, II.B.1.c.: In all cases in which the whereabouts of one or both parents is unknown, DFCS shall immediately institute a diligent search for the parent(s), which shall be documented in the child's case record.*

## Key Findings
- **For 2 (50 percent) of the 4 children whose mother's whereabouts were not known, there was documentation in the case record that a diligent search for the mother was conducted.**
- **For 7 (16.7 percent) of the 42 children whose father's whereabouts were not known for all possible legal and/or putative fathers, there was documentation in the case record that a diligent search was conducted.**

Table: Parents' whereabouts at the time of the child's entry into foster care

| Status | Mother - N (%) | Father - N (%) |
|---|---|---|
| Whereabouts known | 244 (96.8) | 181 (71.8) |
| Whereabouts known for some possible fathers but not all | NA | 14 (5.6) |
| Whereabouts not known | 4 (1.6) | 28 (11.1) |
| Parent is deceased | 3 (1.2) | 11 (4.4) |
| Identity of parent is not known | 0 | 13 (5.2) |
| TPR on parent prior to child entering custody | 1 (0.4) | 5 (2.0) |
| **Total** | **252** | **252** |

9

**<u>Settlement Agreement, II.B.2., Service Planning and Monitoring</u>**

**Service Planning and Monitoring: Family Team Meeting (FTM)**

*Settlement Agreement, II.B.2.a.:  Within 30 calendar days of a child's entrance into foster care, the DFCS caseworker shall convene a team meeting with the DFCS caseworker's direct supervisor, the child's family if appropriate, the foster family, and the child unless there is a justification for excluding the child from the planning process.  During the team meeting, service plans shall be developed for both the child and the parents with the participation of all team meeting participants.*

**Key Findings**
- **For 1 (0.4 percent) of the 252 children, there was documentation in the case file of the following: (1) an initial FTM was held within 30 days of the child's entrance into foster care, and (2) the initial FTM included all parties specified in the settlement agreement (including the caseworker) –** *i.e.,* **the caseworker's direct supervisor, the child's mother and father (if applicable), the child (if applicable), and the foster care provider (if applicable).**
- For 127 (50.4 percent) of the 252 children, there was no documentation in the case file that an FTM had occurred during the period under review.
- For 60 (23.8 percent) of the 252 children, there was documentation in the case record that a FTM was held within 30 calendar days of the child's entrance into foster care. However, for 59 of the 60 children, the FTM did not include all parties specified in the settlement agreement.
- For 64 (25.4 percent) of the 252 children, there was documentation in the case record of an FTM, but it was not held within 30 days of the child's entrance into foster care and did not include all parties specified in the settlement agreement. For one child (0.4 percent), there was documentation that an FTM was held but no date for the FTM was provided.
- The primary "reasons" noted by reviewers for a person not participating in the FTM were the following:
  - The primary reasons reported for the supervisor not attending 97 of the FTMs were "no reason in file" (41 cases) or "no indication that the person was invited" (41 cases).
  - The primary reasons for the mother not attending 19 of the FTMs were reported as "no reason provided in the file" (9 cases), or "no indication that person was invited" (6 cases).
  - The primary reasons given for the father not attending 49 of the applicable FTMs were reported as "no reason provided in the file" (19 cases) or "no indication that the person was invited" (23 cases).
  - The primary reasons for the out-of-home care provider not attending 80 of the FTMs were reported as "no reason identified in the case file" (44 cases) or "no indication that the person was invited" (35 cases).
  - The primary reasons for the child not attending 46 of the FTMs were reported as "no reason identified in case file" (22 children) or "no indication that person was invited" (20 children).

10

**Tables** (Percentages may not total to exactly100 due to rounding.)

Table: Time from child's entrance into foster care to the first family team meeting (FTM)

| Time to First FTM* | Number of children | Percentage of children |
|---|---|---|
| Less than or equal to 1 month (30 days) | 60 | 23.8 |
| At least 31 days but less than 2 months | 14 | 5.6 |
| At least 2 months but less than 4 months | 18 | 7.1 |
| At least 4 months but less than 6 months | 13 | 5.2 |
| 6 months or more | 19 | 7.5 |
| Missing date information | 1 | 0.4 |
| No FTM documented in the case file | 127 | 50.4 |
| **Total cases** | **252** | **100.0** |

*Months are calculated using "30 days" as the denominator to be consistent with plan requirements.

Table: Participation of key people during the initial FTM

| Participants | Number of initial FTMs for which participation of the person was applicable | Number in which person participated or was invited | Percentage of FTMs in which person participated or was invited |
|---|---|---|---|
| COR's Direct Supervisor | 125 | 28 | 22.4 |
| Mother | 121 | 102 | 84.3 |
| Father | 101 | 52 | 51.5 |
| Foster care provider (including congregate care provider) | 122 | 42 | 34.4 |
| Child | 94 | 48 | 51.1 |

*The total number of applicable cases cannot be determined for the child because when there was no FTM for the child, it could not be determined in all cases whether the child's participation would have been applicable.

## Service Planning and Monitoring: Individual Service Plan (ISP)/Service Plan

### Initial Service Plans

*Settlement Agreement, II.B.2.a.: . . . During the team meeting [convened within 30 calendar days of entry into foster care], service plans shall be developed for both the child and the parents with the participation of all team meeting participants.*

The case record review instrument collected information regarding the date of the team meeting and the date of the service plan, but did not collect data pertaining to the extent of participation of team meeting attendees in the development of the service plan during the team meeting

**Service Plan for the Child**

**Key Findings**
- **For 1 (0.4 percent) of the 252 children, there was documentation in the case record of (1) a FTM held within 30 days of the child's entry into DFCS custody and (2) a service plan (ISP) for the child with the same date as the FTM.**
- For 13 (5.2 percent) of the 252 children, there was no service plan for the child documented in the case record.
- For 62 (24.6 percent) of the 252 children, documentation in the case record indicated that the service plan (ISP) for the child was developed prior to the first FTM; for 117 (46.4 percent) of the 252 children, there was a service plan (ISP) in the case record but no documentation that an FTM was held.

Supplemental Findings:
- For 152 (60.3 percent) of the 252 children, the child's initial service plan did not include action steps to achieve goals for the child.
- For 150 (59.5 percent) of the 252 children, the child's initial service plan did not include action steps to achieve goals for the family.
- For 140 (55.6 percent) of the 252 children, the child's initial service plan did not include service needs or options to meet the needs of the family.

Table: Time from initial FTM to date of child's initial service plan

| Time from FTM to Date of Child's ISP | Number of children | Percentage of children |
|---|---|---|
| 0 days (i.e., ISP has same date as FTM) | 2 | 0.8 |
| At least 1 day but less than 8 days | 9 | 3.6 |
| 8 days or longer | 49 | 19.4 |
| ISP dated before first FTM | 62 | 24.6 |
| No FTM held, but ISP in the file | 117 | 46.4 |
| No FTM held or ISP in the file | 12 | 4.8 |
| FTM held, but no ISP in the file | 1 | 0.4 |
| **Total** | **252** | **100** |

Table: Time from entrance into custody to development of child's initial service plan

| Time from entry to ISP | Number of children | Percentage of children |
|---|---|---|
| One month (30 days) or less | 105 | 41.7 |
| At least 31 days but less than 2 months | 80 | 31.7 |
| At least 2 months but less than 4 months | 38 | 15.1 |
| At least 4 months but less than 6 months | 11 | 4.4 |
| 6 months or more | 3 | 1.2 |
| No ISP | 13 | 5.2 |
| Initial ISP dated after child's discharge from DFCS custody | 2 | 0.8 |
| **Total** | **252** | **100.1** |

12

Table: Information included in the child's service plan (N=252)

| Information | Number of children | Percentage of children |
|---|---|---|
| Service needs and options to meet the needs of child | 182 | 72.2 |
| Service needs and options to meet the needs of family | 112 | 44.4 |
| Service goals for the child | 157 | 62.3 |
| Service goals for the family | 134 | 53.2 |
| Action steps to achieve goals for family | 102 | 40.5 |
| Action steps to achieve goals for child | 100 | 39.7 |
| Appropriateness of out-of-home placement | 164 | 65.1 |
| Arrangements for child's visits with parents or prior caretakers | 146 | 57.9 |
| *Arrangements for child's visits with siblings | 68 | 27.0* |
| No service plan (ISP) for the child | 13 | 5.2 |

*Arrangements for visits with siblings were not applicable when the child did not have siblings or the siblings were placed together.


**Service Plan for the Mother**

**Key Findings**
- **For 1 (0.4 percent) of the 243 children for whom a service plan for the mother was applicable, there was documentation in the case record of (1) a FTM attended by the mother and held within 30 days of the child's entry into DFCS custody and (2) a service plan (ISP) for the mother with the same date as the FTM.**
- For 42 (17.3 percent) of the 243 children for whom a service plan for the mother was applicable, there was no documentation in the case file of a service plan for the mother.
- For 33 (13.6 percent) of the 243 children, there was documentation in the case file that the service plan for the mother had been developed prior to the initial FTM; for 91 (37.4 percent) of the 243 children, there was a service plan in the case record but no documentation than a FTM had been held.

**Supplemental Findings**
- For 113 (46.5 percent) of the 243 children for whom a service plan for the mother was applicable, the service plan for the mother did not include arrangements for the mother's visit with the child.

13

**Tables** (Percentages may not total to exactly 100 due to rounding)

Table: Time from FTM attended by mother to date of mother's service plan (ISP)

| Time from FTM to Mother's ISP | Number | Percentage |
|---|---|---|
| 0 days – ISP has same date as FTM attended by mother | 2 | 0.8 |
| ISP dated at least 1 day but less than 8 days after date of FTM attended by mother | 11 | 4.5 |
| ISP dated 8 days or more after date of FTM attended by mother | 45 | 18.5 |
| ISP dated before date of first FTM attended by mother | 33 | 13.6 |
| No FTM attended by mother, but ISP for mother in case file | 110 | 45.3 |
| FTM attended by mother, but no ISP for mother in case file | 11 | 4.5 |
| No FTM attended by mother and no ISP for mother in case file | 31 | 12.8 |
| **Total applicable cases for mother** | **243** | **100** |

Table: Time from child's entry into foster care to development of a service plan (ISP) for mother for those
     children for whom a service plan for mother is applicable

| Time from child's entry to mother's ISP | Number of children | Percentage of children |
|---|---|---|
| One month (30 days) or less | 86 | 35.4 |
| At least 31 days but less than 2 months | 54 | 22.2 |
| At least 2 months but less than 4 months | 33 | 13.6 |
| At least 4 months but less than 6 months | 14 | 5.8 |
| 6 months or more | 14 | 5.8 |
| No ISP for mother | 42 | 17.3 |
| **Total applicable cases for Mother** | **243** | **100.1** |

Table: Information included in the service plan for the mother for children for whom a service plan for
     mother was applicable (N=243)

| Information | Number of children | Percentage of Cases |
|---|---|---|
| Service needs and options to meet the needs of mother | 179 | 73.7 |
| Goals for the mother | 188 | 77.4 |
| Action steps to achieve goals for mother | 183 | 75.3 |
| Arrangements for visits with child | 130 | 53.5 |
| No ISP/Service plan for mother | 42 | 17.3 |

**Service Plan for the Father**

**Key Findings**

- **For 1 (0.5 percent) of the 192 children for whom a service plan for the father was applicable, there was documentation in the case record of (1) a FTM held within 30 days of the child's entry into DFCS custody that was attended by the father and (2) a service plan (ISP) for the father with the same date as the FTM.**
- For 98 (51.0 percent) of the 192 children for whom a service plan for the father was applicable, there was no documentation in the case file of a service plan for the father.
- For 87 (45.3 percent) of the 192 children for whom a service plan for the father was applicable, there was no documentation in the case record of the father attending a FTM.

14

Supplemental findings
- For more than 50 percent of the 192 children for whom a service plan for father is applicable, the service plan for the father did not include the father's service needs and options to meet the service needs of the father, goals for the father, action steps to achieve goals for the father, or arrangements for father's visits with the child.

**Tables**

Table: Time from date of FTM attended by father to date of father's ISP

| Time from date of FTM to date of ISP | Number | Percentage |
|---|---|---|
| 0 days – ISP date the same as the FTM date | 3 | 1.6 |
| At least 1 day but less than 8 days after the initial FTM | 2 | 1.0 |
| 8 days or longer from FTM to ISP | 18 | 9.4 |
| ISP dated before date of FTM | 18 | 9.4 |
| FTM attended by father but no ISP for father in case file | 11 | 5.7 |
| ISP for father in case file but no FTM | 53 | 27.6 |
| Father did not attend the initial FTM and there was no ISP for the father | 87 | 45.3 |
| **Total** | **192** | **100** |

Table: Time from entrance into custody to development of the father's service plan (ISP) for children for whom a service plan for father is applicable

| Time from entry to ISP | Number of children | Percentage of children |
|---|---|---|
| One month (30 days) or less | 30 | 15.6 |
| At least 31 days but less than 2 months | 22 | 11.5 |
| At least 2 months but less than 4 months | 18 | 9.4 |
| At least 4 months but less than 6 months | 18 | 9.4 |
| 6 months or more | 6 | 3.1 |
| No ISP for applicable cases | 98 | 51.0 |
| **Total applicable cases for Father** | **192** | **100** |

Table: Information areas included in each ISP for Father for children for whom an ISP for father is applicable (N=192)

| Information | Number of children | Percentage of Children |
|---|---|---|
| Service needs and options to meet the needs of father | 82 | 42.7 |
| Goals for the father | 88 | 45.8 |
| Action steps to achieve goals for father | 89 | 46.4 |
| Arrangements for visits with child | 59 | 30.7 |
| No ISP/Service plan for father | 98 | 51.0 |

**Service Planning and Monitoring: Updating Service Plans**

*Settlement Agreement, II.B.2.b.: Each service plan shall be reviewed and updated quarterly at a team meeting with the caseworker, the caseworker's direct supervisor, the foster parent, the child's parents if appropriate, and the child unless there is a justification for excluding the child from the planning process. If the child's placement changes, or there is a significant change affecting the child or his/her family, a team meeting shall be convened and the service plan must be updated within 30 calendar days of the date of change.*

Note:  Data were collected regarding the dates of the FTMs and the dates of the service plans. However, data were not collected regarding who attended each of the FTMs.

**Key Findings**

- **None of the 204 children for whom an updated service plan for the child was applicable had documentation in their case files of an updated service plan with the same date as a team meeting (FTM).**
- **None of the 162 children for whom an updated service plan for the mother was applicable had documentation in their case files of an updated service plan with the same date as a team meeting (FTM).**
- **None of the 81 children for whom an updated service plan for the father was applicable had documentation in their case files of an updated service plan with the same date as a team meeting (FTM).**
- For 76 (37.3 percent) of the 204 children for whom an updated service plan was applicable (i.e., the child's initial service plan was more than 13 weeks from the child's date of discharge or from the end of the period under review), there was documentation in the case record that the service plan was updated within the first quarter following the initial plan, but there was no corresponding FTM with the same date.
- For 42 (25.9 percent) of the 162 children for whom an updated service plan for the mother was applicable (i.e., the mother's initial service plan was more than 13 weeks from the child's date of discharge or from the end of the period under review), there is documentation in the case file that the service plan was updated within the first quarter following the initial plan.
- For 27 (33.3 percent) of the 81 children for whom an updated service plan for the father was applicable (i.e., the father's initial service plan was more than 13 weeks from the child's date of discharge or from the end of the period under review), there is documentation in the case file that the service plan was updated within the first quarter following the initial plan.

**Tables** (Percentages may not total to exactly 100 due to rounding.)

Table: Time from the first to the second ISP for the 204 children for whom an updated plan was applicable

| Time from first to second ISP | Number of children | Percentage of children |
|---|---|---|
| Less than 14 weeks (quarterly) | 76 | 37.3 |
| At least 14 weeks but less than 26 weeks (6 months) | 100 | 49.0 |
| No updated ISP by end of PUR, which was more than 14 weeks from the initial ISP | 21 | 10.3 |
| No updated ISP by the time of discharge, which was more than 14 weeks form the initial ISP | 7 | 3.4 |
| **Total applicable cases** | **204** | **100** |
| No update relevant (child's discharge or the end of the PUR was less than 14 weeks from initial ISP) | 33 | |
| No initial ISP | 13 | |
| Initial ISP developed after child's discharge from custody | 2 | |
| **Total children** | **252** | |

16

Table: Time from the first to the second ISP for the mother for the 162 children for whom an updated service plan for the mother was applicable

| Time from first to second ISP | Number of children | Percentage of children |
|---|---|---|
| Less than 14 weeks (quarterly) | 42 | 25.9 |
| At least 14 weeks but less than 26 weeks (6 months) | 89 | 54.9 |
| No updated ISP by end of PUR, which was more than 14 weeks from the initial ISP | 18 | 11.1 |
| No updated ISP by the time of discharge, which was more than 14 weeks form the initial ISP | 13 | 8.0 |
| **Total applicable cases** | **162** | **99.9** |
| No update relevant (child's discharge or the end of the PUR was less than 14 weeks from initial ISP) | 42 | |
| No initial ISP | 46 | |
| Initial ISP developed after child's discharge from custody | 2 | |
| **Total children** | **252** | |

Table: Time from the first to the second ISP for the father for the 81 children for whom an updated service plan for the father was applicable

| Time from first to second ISP | Number of children | Percentage of children |
|---|---|---|
| Less than 14 weeks (quarterly) | 27 | 33.3 |
| At least 14 weeks but less than 26 weeks (6 months) | 38 | 46.9 |
| No updated ISP by end of PUR, which was more than 14 weeks from the initial ISP | 12 | 14.8 |
| No updated ISP by the time of discharge, which was more than 14 weeks form the initial ISP | 4 | 4.9 |
| **Total applicable cases** | **81** | **99.9** |
| No update relevant (child's discharge or the end of the PUR was less than 14 weeks from initial ISP) | 16 | |
| No initial ISP | 153 | |
| Initial ISP developed after child's discharge from custody | 2 | |
| **Total children** | **252** | |

## Settlement Agreement, II.B.3., Child and Youth Permanency

## Child and Youth Permanency: Permanency Plan

*Settlement Agreement, II.B.3.a.1.:  Working with service providers, foster parents, the child, and the family, DFCS shall develop and document in the child's case record a permanency plan within 30 calendar days of the child's initial placement that specifies the permanency goal, a timeframe for achieving permanency, and activities that support permanency.*

**Key Findings**

- **For 2 (0.8 percent) of the 252 children, there was documentation in the case record that the following requirements were met with regard to the permanency plan: (1) the plan was developed within 30 days of the child's entrance into foster care; (2) all required areas were addressed in the plan; and (3) all relevant people (service providers, foster parents, the child and the family), if applicable, were involved in developing the permanency plan.**
- For 24 (9.5 percent) of the 252 children, there was a permanency plan documented in the case record that was developed within 30 days of the child's entry into foster care and addressed all required areas consistent with plan requirements. For 77 (30.6 percent) of the 252 children, there was a permanency plan documented in the file that was developed within 30 days of the child's entry into foster care but did not address all of the areas consistent with plan requirements. For 112 (44.4 percent) of the 252 children, a permanency plan was documented in the file, but it was not developed within 30 days of the child's entry into foster care.
- For 10 (4.0 percent) of the 252 children, there was documentation in the case file that all persons for whom participation in developing the permanency plan was applicable were involved in developing the permanency plan.
- For 30 (11.9 percent) of the 252 children, there was a document in the file that stated the child's permanency goal, but no plan for achieving permanency. For 9 (3.6 percent) of the 252 children, there was no permanency goal and no permanency plan. All 9 of these children were in foster care for longer than 30 days.
- For 61 (24.2 percent) of the 252 children, there was a document in the case file that identified the people involved in developing the child's initial permanency plan. For 191(75.8 percent) of the 252 children, there was no document in the case record identifying the people who were involved in developing the child's permanency plan.

**Tables** (Percentages may not total to exactly 100 due to rounding.)

Table: Time from the child's initial placement to development of the child's permanency plan

| Time to Permanency Plan in Months | Number of children | Percentage of children |
|---|---|---|
| Less than or equal to 1 month (30 days) | 101 | 40.1 |
| At least 31 days but less than 2 months | 59 | 23.4 |
| At least 2 months but less than 4 months | 35 | 13.9 |
| At least 4 months but less than 6 months | 13 | 5.2 |
| 6 months or more | 5 | 2.0 |
| No permanency plan documented in the case file | 39 | 15.5 |
| **Total cases** | **252** | **100.1** |

18

Table: Information included in the child's permanency plan (N = 252 children/cases)

| Information included in the child's Permanency Plan | Number of children | Percentage of children |
|---|---|---|
| The child's permanency goals | 213 | 84.5 |
| The time frame for achieving goals and the date likely to be achieved | 206 | 81.7 |
| The actions and services to be taken to achieve the permanency goals and who is responsible for the services | 140 | 55.6 |
| The potential barriers to achieving the permanency goals and how they will be addressed | 184 | 73.0 |
| Assessment of potential for achieving the goal | 100 | 39.7 |
| Identification of possible family resources for permanency | 107 | 42.5 |
| Appropriateness of placing the child with a potentially permanent family | 101 | 40.1 |
| No permanency plan in the case record | 39 | 15.5 |

Table: Number of information areas included in each child's permanency plan

| Number of information areas | Number of children | Percentage of children |
|---|---|---|
| 1 | 1 | 0.4 |
| 2 | 14 | 5.6 |
| 3 | 25 | 9.9 |
| 4 | 52 | 20.6 |
| 5 | 34 | 13.5 |
| 6 | 37 | 14.7 |
| 7 (All) | 50 | 19.8 |
| No permanency plan in case record | 39 | 15.5 |
| **Total** | **252** | **100** |

Table: The extent to which required individuals participated in the development of the child's permanency plan

| Extent to which individuals participated in the development of the permanency plan | Number of children | Percentage of children |
|---|---|---|
| All applicable required individuals participated in developing the child's permanency plan | 10 | 4.0 |
| Some but not all of the required applicable individuals participated in developing the child's plan | 45 | 17.9 |
| None of the applicable required people participated | 6 | 2.4 |
| There was no documentation about who participated in the development of the child's permanency plan | 191 | 75.8 |
| **Total** | **252** | **100.1** |

## Child and Youth Permanency: Children with a Goal of Durable Legal Custody

*Settlement Agreement, II.B.3.a.2.: DFCS may assign a permanency goal of durable legal custody to a child for whom it has not made adoption efforts only if an appropriate person, with preference given to relatives, has been identified; such person is willing to assume long-term responsibility for the child but has articulated a reasonable basis for not adopting the child; and*

19

*it is in the child's best interests to remain in the home of such person rather than be considered for adoption by another person. In such circumstances, there shall be in place a long-term placement agreement signed by DFCS and the relative or other appropriate person ensuring the permanency and stability of this placement barring emergency circumstances that dictate the removal of the child.*

**Key Findings**

- **None of the 32 children in the sample who had a single or concurrent goal of durable legal custody had documentation in the case file that all of the settlement agreement requirements regarding the permanency goal of durable legal custody had been met.**
- For 6 (18.8 percent) of the 32 children, there was documentation in the case record that three of the four settlement agreement requirements were met.


**Tables** (Percentages may not total exactly to 100 due to rounding.)

Table: Information documented in the case file for children with single or concurrent goal of durable legal custody (N=32)

| Information documented in the case record for children with a permanency goal of durable legal custody | Number of children | Percentage of children |
|---|---|---|
| The identity of the person to whom durable legal custody will be given | 23 | 71.9 |
| A long-term placement agreement signed by DFCS and the person given durable legal custody | 0 | 0 |
| A reason why adoption is not a feasible option for the person assuming durable legal custody | 11 | 34.4 |
| A reason why it is in the best interests of the child to remain with the person to be given durable legal custody | 14 | 43.8 |


Table: Number of settlement agreement requirements met with regard to documentation in the case file for children with a goal of durable legal custody (N=32)

| Number of settlement agreement requirements met | Number of children | Percentage of children |
|---|---|---|
| 0 | 6 | 18.8 |
| 1 | 12 | 37.5 |
| 2 | 8 | 25.0 |
| 3 | 6 | 18.8 |
| 4 (All) | 0 | 0 |
| **Total** | **32** | **100.1** |


**Child and Youth Permanency: Emancipation/Independent Living**

*Settlement Agreement, II.B.3.a.4.: If DFCS concludes, after considering reunification, adoption, durable legal custody, and permanent placement with a relative, that these permanency plans are inappropriate or unavailable for a child, DFCS may assign a permanency goal of emancipation for the child. In such circumstances, a) the child must be at least 16 years old and b) DFCS must document to the Youth Court a compelling reason why this permanency goal is in*

*the best interest of the child and more appropriate than reunification, adoption, durable legal custody, or permanent placement with a relative.*

**Key Finding**
- **For 2 (18.2 percent) of the 11 children who had a single or concurrent goal of emancipation as their most recent permanency goal, there was documentation in the case record that all settlement agreement requirements were met.**

Table: Information documented in the case file for children with single or concurrent goal of emancipation (N = 11)

| Information documented in the case files | Number of children | Percentage of children |
|---|---|---|
| The child was age 16 or older at the time the goal was established | 7 | 63.6 |
| The permanency options of reunification, adoption, durable legal custody, guardianship, and permanent placement with a relative were considered prior to establishing the goal of emancipation/independent living | 9 | 81.8 |
| There is a report in the case file that was submitted to the Youth Court prevising a compelling reason why the goal of emancipation is in the best interests of the child and more appropriate than reunification, adoption, durable legal custody, guardianship, and permanent placement with relatives | 3 | 27.3 |

Table: Number of settlement agreement requirements met for each child with a goal of emancipation

| Number of requirements met | Number of children | Percentage of children |
|---|---|---|
| 0 | 2 | 18.2 |
| 1 | 1 | 9.1 |
| 2 | 6 | 54.5 |
| 3 | 2 | 18.2 |
| **Total** | **11** | **100** |

**Child and Youth Permanency: Permanency Plan Updating and Review**

**Administrative Case Reviews**

*Settlement Agreement, II.B.3.c.1.: A child's permanency plan shall be reviewed in a court or administrative case review at least every six months.  DFCS will take reasonable steps, including written notice, to ensure the participation of the child, parents, caregivers, and relevant professionals in court or administrative reviews.*

**Key Findings**
- **For 81 (42.4 percent) of the 191 children who had at least one administrative review during the period under review (N=187) or were eligible for a review (*i.e.*, they had been in foster care for 6 months or longer) although they did not have one (N=4), there was documentation in the case file that both of the following settlement agreement**

21

**requirements had been met: (1) the administrative review occurred in less than 6 months of the child's initial placement, and (2) all applicable persons identified in the settlement agreement had been invited to the administrative review.** The key relevant people were the child's caseworker, the child's caregiver (foster parent or facility staff person), the child's biological/ adoptive mother and father, service providers to the parent, service providers to the child, and the child's Guardian ad Litem.

- For 181 (94.8 percent) of the 191 children who either had an administrative review (187 children) or were eligible for an administrative review (*i.e.*, they had been in foster care for more than 6 months) but did not have a review (4 children), there was documentation in the case file that the administrative review occurred in less than 6 months of the child's initial placement. For 6 (3.1 percent) of the 191 children, there was documentation in the case file of an administrative review but it occurred after the child had been in foster care for more than 6 months. For 4 (2.1 percent) of the 191 children, there was no documentation in the case file of an administrative review although the child had been in foster care for 6 months or longer.

- For 85 (97.7 percent) of the 87 children for whom at least two administrative reviews were applicable (*i.e.*, the child had been in foster care for 12 months or longer during the period under review), there was documentation in the case file of a second administrative review in less than 6 months from the first review.

## Tables

Table: Individuals invited to attend the child's most recent administrative review

| Type of individual | Number (percent) invited | Number of applicable children |
|---|---|---|
| Foster mother | 110 (76.9) | 143 |
| Foster father | 61 (67.0) | 91 |
| Facility staff person where child is placed | 5 (25.0) | 20 |
| Child's COR caseworker | 181 (96.8) | 187 |
| Biological/adoptive mother | 158 (91.9) | 172 |
| Biological/adoptive father | 119 (82.1) | 145 |
| Person providing direct services to parents | 14 (23.0) | 61 |
| Person providing direct services to child | 11 (22.0) | 50 |
| GAL | 134 (73.2) | 183 |

Table: Reason why a particular individual was not invited for applicable cases for each type of individual

| Person | No indication that person was invited | No reason given in the case file | Cannot determine if person was invited |
|---|---|---|---|
| Foster mother | 14 | 16 | 3 |
| Foster father | 12 | 9 | 9 |
| Facility staff person where child is placed | 6 | 7 | 2 |
| Child's COR caseworker | 1 | 2 | 3 |
| Biological/adoptive mother | 5 | 7 | 2 |
| Biological/adoptive father | 10 | 14 | 2 |
| Person providing direct services to parents | 13 | 14 | 20 |
| Person providing direct services to child | 10 | 15 | 14 |
| GAL | 16 | 22 | 11 |

Table: The extent to which required individuals were invited to attend the child's most recent administrative review (*i.e.*, the review that occurred prior to the child's discharge or prior to the end of the period under review)

| Extent to which required individuals were invited to attend the child's most recent administrative review* | Number of children | Percentage of children |
|---|---|---|
| All applicable persons were invited to review | 82 | 42.9 |
| Some but not all applicable persons were invited to review | 105 | 55.0 |
| No applicable persons were invited to review | 0 | 0 |
| No review although child in care for 6+ months | 4 | 2.1 |
| **Total** | **191** | **100** |

* Required individuals include the child's caseworker, the child's out-of-home care provider, the child's biological/adoptive mother, the child's biological/adoptive father, the child's service provider, the parent's service provider, and the child's Guardian ad Litem)

## Court Reviews/ Permanency Hearings

*Settlement Agreement, II.B.3.c.2.: DFCS will take reasonable steps to ensure that a court review, which may be called a review, dispositional, or permanency hearing, is held for each child in foster care custody within 12 months of initial placement and annually thereafter. [DFCS will take reasonable steps, including written notice, to ensure the participation of the child, parents, caregivers, and relevant professionals in court or administrative reviews.]*

Note:  An analysis was not done to determine whether permanency hearings were held annually after the initial hearing because of the small number of children who would have been eligible for a second permanency hearing.

## Key Findings

- **For 42 (26.3 percent) of the 160 children for whom a permanency hearing was applicable (i.e., the children either had a court review hearing [155 children] or were eligible for a court review although they did not have one [5 children]), there was documentation in the case record that both of the following settlement agreement requirements were met: (1) the court review hearing occurred in less than 12 months from the child's initial placement, and (2) all required persons (if applicable) were invited to attend the court review hearing.**  For 10 (6.3 percent) of the 160 children, there was documentation in the case record that all required persons were invited, but the hearing was held more than 12 months after the child's initial placement.
- For 130 (81.3 percent) of the 160 children for whom a court review hearing was applicable, there was documentation in the case record that the court review occurred in less than 12 months from initial placement**.**  For 25 (15.6 percent) of the 160 children, there was documentation that a court review hearing took place, but it occurred more than 12 months after the child's initial placement.  For 5 (3.1 percent) of the 160 children, there was no documentation of a court review hearing although the children had been in foster care for longer than 12 months since their initial placement.

23

**Tables**

Table: Documentation in the case file of the individuals invited to attend the child's most recent court review/permanency hearing (N=160)

| Person | Number (%) notified/invited | Number (%) received written notification | Applicable Cases* |
|---|---|---|---|
| Foster mother | 48 (41.4) | 33 (28.4) | 116 |
| Foster father | 28 (37.8) | 18 (24.3) | 74 |
| Facility staff person where child is placed | 3 (13.6) | 0 | 22 |
| Child's COR caseworker | 124 (80.0) | 65 (41.9) | 155 |
| Child | 68 (46.9) | 42 (29.0) | 145 |
| Biological/adoptive mother | 91(64.1) | 57 (40.1) | 142 |
| Biological/adoptive father | 59 (52.7) | 43 (38.4) | 112 |
| Person providing direct services to parents | 3 (6.7) | 1 (2.2) | 45 |
| Person providing direct services to child | 10 (19.2) | 7 (13.5) | 52 |
| GAL | 88 (56.8) | 52 (33.5) | 155 |
| No court review | 5 (3.1) | 0 | 160 |

*Applicable cases include all cases where the individual was involved in the case even if the reviewer could not determine if that individual had been invited or notified.

Table: Reasons why specific individuals did not attend the child's court review/permanency hearing for applicable cases

| Person | No indication that person was invited/notified | No reason given in case file | Total not invited/ notified | Cannot determine if person was invited notified |
|---|---|---|---|---|
| Foster mother | 17 | 9 | **26** | 42 |
| Foster father | 11 | 12 | **23** | 23 |
| Facility staff person where child is placed | 5 | 1 | **6** | 13 |
| Child's COR caseworker | 9 | 1 | **10** | 20* |
| Child | 14 | 13 | **27** | 50 |
| Biological/adoptive mother | 12 | 6 | **18** | 33 |
| Biological/adoptive father | 9 | 9 | **18** | 35 |
| Person providing direct services to parents | 10 | 5 | **15** | 27 |
| Person providing direct services to child | 9 | 5 | **14** | 28 |
| GAL | 10 | 9 | **19** | 48 |

*In one case, reviewer noted that the whereabouts of the COR caseworker was not known.

Table: The extent to which required individuals were invited to attend the child's most recent court review/permanency hearing

| The extent to which required individuals were invited to the child's permanency hearing | Number of children | Percentage of children |
|---|---|---|
| All applicable required people were invited | 52 | 32.5 |
| Some but not all were invited | 78 | 48.8 |
| None of the applicable required people were invited | 5 | 3.1 |
| There was no documentation identifying who was invited | 20 | 12.5 |
| There was no court review hearing although the child was eligible for one | 5 | 3.1 |
| **Total** | **160** | **100** |

## Child and Youth Permanency: Reunification Services

**Services to Achieve Reunification**

*Settlement Agreement, II.B.3.d.1: When the child's permanency goal is reunification, DFCS shall identify in the parents' service plan and make available directly or through referral those services DFCS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care and to help the parents develop strategies to facilitate permanency for the child.*

**Key Findings**

- **For 60 (27 percent) of the 222 children with a goal of reunification with mother, with both parents, or with an unspecified parent at some time during the period under review, there was documentation in the case file that all actions required by the settlement agreement to address mother's behaviors and conditions were taken**. Actions include identifying services in the mother's service plan to address behaviors and conditions resulting in child's placement, offering services to address those behaviors or conditions, and helping parents develop strategies for permanency (participate in service planning).

- **For 28 (24.8 percent) of the 113 children with a goal of reunification with father, with both parents, with an unspecified parent, or whose father was involved in their lives (although they would be reunified with the mother), there was documentation in the case file that all actions required by the settlement agreement to address father's behaviors and conditions were taken**.  Actions include identifying services in the father's service plan to address behaviors and conditions resulting in child's placement, offering services to address those behaviors or conditions, and helping parents develop strategies for permanency (participate in service planning).

- For 55 (48.7 percent) of the 113 children for whom services to the father were applicable, there was no documentation in the case file that any of the required actions were taken.

- For 79 (35.6 percent) of the 222 children for whom services to the mother were applicable, there was no documentation in the case file that any of the required actions were taken.

25

## Tables for Mother

Table: Number and percent of children with a goal of reunification with mother, with both parents, or with an unspecified parent for whom there was documentation in the case file of specific types of actions taken in response to all, some, or none of the mother's identified behaviors or conditions

| Types of Actions taken with regard to mother | Action taken for all mother's behaviors or conditions N (%) | Action taken for some of mother's behaviors or conditions N (%) | Action was not taken for any of mother's behaviors or conditions N (%) | Missing data | Total of applicable cases for mother |
|---|---|---|---|---|---|
| Services to address mother's behavior or condition were included in a service plan | 135 (60.8) | 49 (22.1) | 38 (17.1) | 0 | **222** |
| Mother shared in planning for services | 79 (35.6) | 28 (12.6) | 114 (51.4) | 1 (0.4) | **222** |
| Services were offered to mother to address identified behaviors and/or conditions | 102 (45.9) | 61 (27.5) | 56 (25.2) | 3 (1.4) | **222** |

Table: The extent to which Settlement Agreement requirements were met for each child with regard to actions take in response to the mother's identified behaviors and conditions.

| Number of requirements met* | Number of children/cases | Percentage of children/cases |
|---|---|---|
| No requirements met | 79 | 35.6 |
| 1 requirement met | 24 | 10.8 |
| 2 requirements met | 56 | 25.2 |
| 3 requirements met (All) | 60 | 27.0 |
| Missing data | 3 | 1.4 |
| **Total** | **222** | **100** |

*The Settlement Agreement requirements are: (1) including service needs and services in plan, (2) involving mother in planning for services, and (3) offering services to meet identified behaviors and/or conditions.

Table: The most frequently noted behaviors and conditions relevant to the child's mother and the response of DFCS to the behavior and condition

| Mother's identified behavior and condition relevant to the child's removal from the home or barrier to reunification after removal | Services to address behavior or condition were included in a service plan N (%) | Mother shared in planning for services N (%) | Services were offered to mother to address behavior or conditions N (%) |
|---|---|---|---|
| Inadequate parenting skills (N = 162 children) | 133 (82.1) | 63 (38.9) | 108 (66.7) |
| Substance abuse (N=119 children) | 102 (85.7) | 53 (44.5) | 87 (73.1) |
| Inability to cope (N=108 children) | 75 (69.4) | 38 (35.2) | 58 (53.7) |
| Inadequate income or employment (N=88 children) | 68 (77.3) | 33 (37.5) | 43 (48.9) |
| Inadequate housing (N = 83 children) | 66 (79.5) | 40 (48.2) | 44 (53.0) |

26

**Tables for Father**

Table: Number and percent of children for whom there was documentation in the case file of specific types of actions taken in response to the father's identified behaviors or conditions

| Types of Actions taken with regard to father | Action taken for all father's behaviors or conditions N (%) | Action taken for some of father's behaviors or conditions N (%) | Action was not taken for any of father's behaviors or conditions N (%) | Total of applicable cases for father |
|---|---|---|---|---|
| Services to address father's behavior or condition were included in a service plan | 59 (52.2) | 17 (15.0) | 37 (32.7) | **113*** |
| Father shared in planning for services | 37 (32.7) | 7 (6.2) | 69 (61.1) | **113** |
| Services were offered to father to address identified behaviors and/or conditions | 46 (40.7) | 23 (20.4) | 44 (38.9) | **113** |

*N=113 children with a goal of reunification with father, with both parents, or with an unspecified parent and children whose father was involved in their lives although they would be reunified with their mother.

Table: The extent to which Settlement Agreement requirements were met for each child with regard to actions take in response to the father's identified behaviors and conditions

| Number of requirements met* | Number of children/cases | Percentage of children/cases |
|---|---|---|
| No requirements met | 50 | 44.2 |
| 1 requirement met | 14 | 12.4 |
| 2 requirements met | 21 | 18.6 |
| 3 requirements met (All) | 28 | 24.8 |
| **Total** | **113**** | **100** |

* Requirements are: (1) including service needs and services in father's service plan, (2) involving father in planning, and (3) offering services to meet father's identified behaviors and/or conditions.
**N=113 children with a goal of reunification with father, with both parents, or with an unspecified parent and children whose father was involved in their lives although they would be reunified with mother.

Table: The most frequently noted behaviors and conditions relevant to the child's father and the response of DFCS to the behavior and condition

| Father's identified behavior and condition relevant to the child's removal from the home or barrier to reunification after removal | Services to address behavior or condition were included in a service plan N (%) | Father shared in planning for services N (%) | Services were offered to father to address behavior or condition N (%) |
|---|---|---|---|
| Inadequate parenting skills (N = 75) | 52 (69.3) | 28 (37.3) | 45 (60.0) |
| Substance abuse (N=64) | 41 (64.1) | 27 (42.2) | 41 (64.1) |
| Inability to cope (N=52) | 34 (65.4) | 18 (34.6) | 29 (55.8) |
| Inadequate housing (N = 39) | 29 (74.4) | 16 (41.0) | 15 (38.5) |
| Inadequate income or employment (N=34) | 24 (70.6) | 13 (38.2) | 31 (91.2) |

**Caseworker Contacts with Parents**

*Settlement Agreement, II.B.3.d.2.: For a child with a permanency goal of reunification, the child's assigned DFCS caseworker shall meet with the child's biological parents at least monthly to assess service delivery and achievement of service goals, to keep the family informed and involved in decisions about the child, and to remain current about the family's circumstances.*

**Key Findings**
- **For 2 (0.9 percent) of the 224 children for whom reunification with the mother was a possibility (222 children) or whose mother was involved in their lives although they would be reunified with the father (2 children), there was documentation in the case record that the following settlement agreement requirements were met: (1) visits occurred between the caseworker and the mother in all applicable months over the 12-month period prior to the child's discharge from DFCS custody or the end of the period under review; and (2) during each visit, there were discussions with the mother pertaining to service delivery, achievement of service goals, decisions about the child, and current family circumstances**. (Note: For one of these cases, there were only two applicable months and for the second case, there were 12 applicable months.)
- **For 2 (1.3 percent) of the 155 children for whom reunification with the father was a possibility (89 children) or whose father was involved in their lives although they would be reunified with their mother (66 children), there was documentation in the child's case record that the following settlement agreement requirements were met: (1) visits occurred between the caseworker and the father in all applicable months over the 12-month period prior to the child's discharge from foster care or the end of the period under review; and (2) during each visit, there were discussions with the father pertaining to service delivery, achievement of service goals, decisions about the child, and current family circumstances**. (Note: These are the same cases that met the requirements for the mother. For one of these cases, there were only two applicable months; for the second case, there were 12 applicable months.)

Table: Percentage of applicable months in which there was documentation in the case file of at least one meeting between the DFCS caseworker (COR or COS) and the child's parent

| Percentage of applicable months in which a DFCS caseworker meeting with the child's parent was documented | Number (%) of children for whom there was a documented caseworker meeting with mother | Number (%) of children for whom there was a documented caseworker meeting with father |
|---|---|---|
| Caseworker meetings with the child's parent occurred in 100 percent of applicable months | 53 (23.7) | 7 (4.5) |
| Caseworker meetings with the child's parent occurred in at least 75 percent but less than 100 percent of applicable months | 56 (25.0) | 12 (7.7) |
| Caseworker meetings with the child's parent occurred in at least 50 percent but less than 75 percent of applicable months | 40 (17.9) | 29 (18.7) |
| Caseworker meetings with the child's parent | 26 (11.6) | 25 (16.1) |

| occurred in at least 25 percent but less than 50 percent of applicable months | | |
|---|---|---|
| Caseworker meetings with the child's parent occurred in at least 1 percent but less than 25 percent of applicable months | 24 (10.7) | 54 (34.8) |
| There was no documentation of the caseworker meeting with the child's parent in any of the applicable months | 25 (11.2) | 28 (18.1) |
| **Total applicable cases** | **224 (100.1)** | **155 (99.9)** |

**Child and Youth Permanency**: **Termination of Parental Rights**

*Settlement Agreement, II.B.3.e.1.:  For children who will have spent 15 of the previous 22 months in foster care, DFCS shall submit a termination of parental rights (TPR) packet to the Office of the Attorney General by the first day of the fifteenth month or document an available exception under the federal Adoption and Safe Families Act (ASFA).  The Office of the Attorney General shall file the petition for termination of parental rights by the last day of the fifteenth month to ensure compliance with the ASFA.*

Note: Data were not collected on the dates that the petition was filed by the Office of the Attorney General.

**Key Findings**
- **For 2 (5.4 percent) of the 37 children for whom submitting a TPR packet was applicable (i.e., the child had been in foster care for 15 of the most recent 22 months and there was no ASFA-consistent exception noted in the file), there was documentation in the case record that a TPR packet for all applicable parents had been submitted to the Office of the Attorney General by the first day of the fifteenth month**. Parents were considered to be applicable if they were not deceased and if their identity was known.
- The total number of children in foster care for 15 of the most recent 22 months during the period under review was 50.  For 13 (26.0 percent) of the 50 children, there was an ASFA-consistent exception noted in the case record.

Table: Information on submission of a TPR packet for children in foster care for 15 of the most recent 22 months for whom an exception was not noted in the case file

| Information on TPR packet submission to Office of the AG for all applicable parents | Number | Percentage |
|---|---|---|
| Packet was submitted on or before the 1st day of the 15th month | 2 | 5.4 |
| No packet was submitted | 25 | 67.6 |
| Packet was submitted after the 1st day of the 15th month | 6 | 16.2 |
| Packet was submitted, but no date was documented in the case file | 4 | 10.8 |
| **Total cases applicable for TPR packet submission** | **37** | **100** |

*Settlement Agreement, II.B.3.e.2.:  When a child's primary permanency goal is established as adoption, DFCS shall submit a TPR packet to the State Office within 30 calendar days.  Within 30 calendar days of receipt of the TPR packet by the State Office, the State Office shall review the packet, remedy any deficiencies, and submit a TPR referral to the Office of the Attorney General. Within 30 calendar days of such referral, the Office of the Attorney General shall either file the petition for TPR or document to DFCS a legal deficiency preventing timely filing.  Within 10 working days of receiving documentation of a legal deficiency, the assigned DFCS caseworker shall document to the Office of the Attorney General the steps to be taken to address the deficiency.  The DFCS caseworker and that caseworker's direct supervisor shall meet in person every 30 calendar days thereafter to document progress being made to address the legal deficiency until a TPR referral has been accepted as legally sufficient by the Office of the Attorney General, who shall file the petition for TPR within 30 calendar days.*

Note: Data were not collected on submission of a TPR packet to the State Office.

**Key Findings**
- **For 6 (21.4 percent) of the 28 children who had a primary goal of adoption that was established more than 60 days prior to the end of the period under review, there was documentation in the case file that a TPR packet had been submitted to the Office of the Attorney General within 60 days of the date that the goal of adoption was established;** for 4 (12.5 percent) of the 32 children, the primary goal of adoption was established less than 60 days prior to the end of the period under review.
- **No legal deficiencies were noted in the case files of any of the children who had a primary goal of adoption.**

Table: Information on submission to the Office of the Attorney General of a TPR packet for all applicable parents of children with a primary goal of adoption

| Information on TPR packet submission to Office of the AG for all applicable parents | Number | Percentage |
|---|---|---|
| Packet was submitted within 60 days of establishing the goal of adoption | 6 | 21.4 |
| Packet was submitted 61 or more days after establishing the goal of adoption | 3 | 10.7 |
| Packet was submitted, but no date was documented in the case file | 4 | 14.3 |
| No packet was submitted although the end of the PUR was more than 60 days after the goal of adoption was established | 15 | 53.6 |
| **Total cases applicable for TPR packet submission** | **28** | **100** |

**Child and Youth Permanency**: **Adoption**

*Settlement Agreement, II.B.3.f.1.:  When a child's primary permanency goal is established as adoption, DFCS shall, within 10 working days, assign an adoption specialist to work with the assigned DFCS caseworker to immediately begin the process of securing an adoptive placement for the child.  Within 15 calendar days of the primary permanency goal change to adoption, the DFCS caseworker, along with the adoption specialist, shall draw up an adoption plan that identifies the child-specific activities that DFCS will undertake to achieve the permanency goal of adoption and the timeframes in which the activities will be undertaken.  An adoption status*

30

*meeting with the DFCS caseworker, the adoption specialist, and the caseworker's direct supervisor to review the progress being made in achieving the goal of adoption shall occur weekly for infants and monthly for all other children awaiting adoption, and shall be noted in the child's case record.*

**Key Findings**

- **None of the 6 children with a goal of adoption who were younger than 12 months at the time that the goal of adoption was established had documentation in the case file of all of the following: (1) a resource worker was assigned to the child either before the goal was changed or within 10 working days of establishing the goal; (2) there was a plan to achieve the adoption that was dated; and (3) there was evidence of weekly adoption status meetings with the DFCS caseworker, adoption specialist, and caseworker's supervisor.**

- **None of the 26 children who had a goal of adoption who were 12 months old or older at the time that the goal of adoption was established had documentation in the case file of all of the following: (1) a resource worker was assigned to the child either before the goal was changed or within 10 working days of establishing the goal (2) a plan to achieve the adoption that was dated; and (3) evidence of monthly adoption status meetings with the DFCS caseworker, adoption specialist, and caseworker's supervisor.**

- For 21 (65.6 percent) of the 32 children with a primary goal of adoption, there was documentation in the case file that a resource worker was assigned to the child either before the goal was changed or within 10 working days of establishing the goal of adoption.

- For 3 (25 percent) of the 12 children for whom a plan to achieve the adoption goal was applicable (i.e., they were not in an adoptive placement or their foster parents had not agreed to adopt them), there was documentation in the case file of a plan to achieve the adoption goal. However, no dates were documented for the plan.

- None of the 6 children who were younger than 12 months of age at the time the goal of adoption was established had documentation in their case files of weekly adoption status meetings. For 3 of these 6 children, there was documentation of adoption status meetings, but they were held less frequently than weekly.

- For 4 (15.4 percent) of the 26 children who were age 12 months or older at the time the goal of adoption was established, there was documentation of monthly adoption status meetings between the DFCS caseworker, adoption specialist, and the caseworker's supervisor to review progress in achieving the goal of adoption. For 7 (26.9 percent) of the 26 children, there was evidence in the file that such meetings took place, but less frequently than monthly. For 15 (57.7 percent) of the 26 children, there was no documentation of an adoption status meeting.

Supplemental findings regarding children with a goal of adoption

- For 24 (75 percent) of the 32 children with a primary goal of adoption, there was documentation in the case file that adoption was discussed with the child's foster parents; for 7 (21.9 percent) children, there was no documentation in the file that this discussion took place; one child (3.1 percent) was not living with a foster family at any time that the child had a goal of adoption.

- For 8 (25.0 percent) of the 32 children with a goal of adoption, there is evidence in the case file that the child's foster family was informed about the availability of adoption subsidy

payments; for 23 children (71.9 percent), there was no evidence in the case file that this information was given to foster parents; one child (3.1 percent) was not living with a foster family at any time that the child had a goal of adoption.
- 10 (31.3 percent) of the 32 children with a goal of adoption were either adopted or in an adoptive home awaiting court finalization during the period under review.

Table: The time from establishing a goal of adoption for the child and the date that a resource worker was assigned to the child

| Time from adoption goal to assignment of resource worker | Number of children | Percentage of children |
|---|---|---|
| Resource worker was assigned either before goal change or within 10 working days after goal change | 21 | 65.6 |
| Resource worker was assigned more than 10 days after goal change | 6 | 18.8 |
| Resource worker was not assigned although the goal of adoption was established more than 10 days prior to the end of the period under review | 5 | 15.6 |
| **Total** | **32** | **100** |

## Child Safety: Incidence of Maltreatment of Children While in DFCS Custody

*Settlement Agreement, III.D.2. (By the end of Implementation Period 2) The rate of abuse or maltreatment in care in the last year shall not exceed 1.14 percent.*

**Key Findings**
- For 2 (0.8 percent) of the 252 children, there was documentation in the case record of a substantiated maltreatment report identifying a foster parent as the perpetrator.

Note:  The measure for the finding reported above is not comparable to the measure cited in the Settlement Agreement since that measure includes children during a particular one-year or 12-month period, while this measure applies to children who entered foster care at any time during the period under review, which extends from January 2009 to March 31, 2011.

Supplemental findings
- For 41 (16.3 percent) of the 252 children, there was documentation in the case record that they were alleged victims of maltreatment (including corporal punishment) while they were in DFCS custody during the period under review.  There were a total of 54 maltreatment reports for the 41 children.
- For 14 (5.6 percent) of the 252 children, there was documentation in the case file that the maltreatment report was substantiated.
  - Physical abuse was at least one allegation in 5 of the 14 substantiated reports
  - Physical neglect was at least one allegation in 5 of the 14 substantiated reports
  - Sexual abuse was at least one allegation in 4 of the 14 substantiated reports
  - Emotional abuse was at least one allegation in 2 of the 14 substantiated reports
  - Inadequate supervision was at least one allegation in 2 of the substantiated reports
- For 9 (64.3 percent) of the 14 substantiated reports, the child was on a trial reunification or an unsupervised visit, with the perpetrator identified as the biological father (3 reports),

32

biological mother (3 reports), another person living in the parent's home while the child was on a trial reunification (2 reports), and the child's grandmother (1 report).  For 5 (35.7 percent) of the 14 substantiated reports, the child was in an out-of-home placement at the time of the maltreatment occurrence.  The perpetrator was identified as a non-relative foster mother (1 report), a relative foster mother (1 report), and an unspecified "other" (3 report).

**Settlement Agreement, II.B.4., Child Safety**

**Child Safety: Timeliness of Investigations**

*Settlement Agreement, II.B.4.e.; Period 2 Implementation Plan, II.6.g.(By the end of Implementation Period 2):  All investigations into reports of maltreatment, including corporal punishment, of children in DFCS custody must be initiated within 24 hours and completed within 30 calendar days, including supervisory approval.  DFCS shall assure that such investigations and decisions are based on a full and systematic evaluation of the factors that may place a child in DFCS custody at risk.*

Data were not collected regarding whether and if so, how, DFCS assured that investigations and decisions were based on a full and systematic evaluation of the factors that may place a child in DFCS custody at risk.

Also, the "one-day" timeframe for the analysis presented below included whether the investigation was initiated the same day as receipt of the report or the next day after receipt of the report. Because dates were used rather than hours, the next-day initiations could have been more than 24 hours from receipt of the report.

**Key Findings**

- **For 32 (59.2 percent) of the 54 maltreatment reports, there was documentation in the case record that the investigation was initiated within one day of the date that the report was made and completed within 30 calendar days of initiation.**
- For 39 (72.2 percent) of the 54 investigations, there was documentation that the investigation was completed within 30 calendar days from the date of initiation.
- For 45 (83.3 percent) of the 54 maltreatment reports, there was documentation in the case record that the investigation was initiated within one day of the date that the report was made.

**Tables**

Table: Time from maltreatment report date to initiation of investigation

| Time from report to initiation of investigation | Number | Percentage |
|---|---|---|
| Investigation initiated within one day of receipt of report | 45 | 83.3 |
| Investigation initiated in at least 2 days but less than 5 days from report | 2 | 3.7 |
| Investigation initiated in 5 or more days from report | 6 | 11.1 |
| No date for investigation initiation in the file | 1 | 1.9 |
| **Total** | **54** | **100** |

33

Table: Time from initiation of investigation to completion of investigation

| Time from initiation of investigation to completion of investigation | Number | Percentage |
|---|---|---|
| Investigation was completed in 20 days or less | 20 | 37.0 |
| Investigation was completed in at least 21 but less than 30 days | 19 | 35.2 |
| Investigation was completed in at least 31 but less than 60 days | 8 | 14.8 |
| Investigation was completed in 60 days or longer* | 5 | 9.3 |
| Dates for either investigation or initiation were missing | 2 | 3.7 |
| **Total** | **54** | **100** |

## Child Safety: Caseworker Visits Following a Maltreatment Investigation

*Settlement Agreement, II.B.4.f. (By the end of Implementation Period 1): Any foster child who remains in the same out-of-home placement following an investigation into a report that he or she was maltreated, or subject to corporal punishment, in that placement shall be visited by a DFCS caseworker twice a month for three months after the conclusion of the investigation to assure the child's continued safety and well-being.*

### Key Findings
- **For 22 (59.5 percent) of the 37 maltreatment reports where the child remained in the same placement (including a trial reunification) after the investigation, there was documentation in the case file that the child was visited by the assigned DFCS caseworker twice a month for three months after the conclusion of the investigation.**
- For 15 (40.5 percent) of the 37 reports where the child remained in the same placement, there was documentation in the case file indicating that the assigned DFCS caseworker visited the child less frequently than twice a month for the three months after the conclusion of the investigation.

*Settlement Agreement, II.B.4.g. (By the end of Implementation Period 1): When a maltreatment investigation involves a foster home, DFCS shall file a copy of the approved final investigative report and any recommendations and/or corrective actions DFCS has deemed necessary, in the case record of the foster child, in the file of the foster or adoptive parents with a copy of the letter of notification to the foster or adoptive parents, and in the DFCS State Office. DFCS shall also provide those records to the Youth Court Judge with jurisdiction over the child and to the Monitor.*

*Settlement Agreement, II.B.4.h. (By the end of Implementation Period 1): When a maltreatment investigation involves an agency group home, emergency shelter, private child placing agency foster home, or other facility licensed by DFCS, a copy of the final investigative report shall be filed in the child's case record, in the facility licensing file, and in the DFCS State Office. DFCS shall provide the report to the Youth Court Judge with jurisdiction over the child and to the Monitor.*

Note: The data collected do not differentiate between DFCS foster homes and foster homes of a private child-placing agency. All foster homes are included in the first bullet below. Data were

34

not collected regarding whether the report was filed in the facility licensing file or the DFCS State Office or whether the report was provided to the Youth Court Judge or to the Monitor.

**Key Findings**
- **For 14 (36.8 percent) of the 38 maltreatment investigations involving a child in a foster home, the investigation report was in the case file.**
- **For 4 (80 percent) of the 5 maltreatment investigations involving a child in a congregate care facility, the investigation report was in the case file.**

**Settlement Agreement, II.B.5., Child Placement**

**Child Placement: Placement in Non-Licensed Homes**

*Settlement Agreement, II.B.5.a.: No foster child shall be placed in a foster care setting that has not been licensed or approved as meeting DFCS licensure standards, unless the child is placed pursuant to the following relative licensing process. The licensing process for relatives shall take place in two steps: (1) an emergency process to be developed by DFCS in conjunction with COA that enables a child to be placed with relatives as soon as the child enters placement, following an initial screen (as described at II.B.5.i. below) of the relative's home, and (2) a full licensing process, to be completed no later than 60 calendar days after the child has entered placement. DFCS may waive non-safety licensing requirements for relative foster placements in individual cases, in accordance with federal regulations.*

**Key Findings**
- **For 61 (24.2 percent) of the 252 children, there was documentation in the case record that, at some time during the period under review, the child was placed at least once in a non-licensed placement, either with a non-relative (14 children) or with a relative where the child remained in the non-licensed relative placement for longer than 60 days (47 children)**; 9 children were placed with a non-licensed relative for less than 60 days.
- For 45 (17.9 percent) of the 252 children, there was documentation in the case record that their initial placement was in a court-ordered non-licensed placement; 6 (2.4 percent) of the 252 children were in a placement with a non-licensed non-relative, 33 (13.1 percent) were in placement with a non-licensed relative that lasted longer than 60 days and the relative did not become licensed within the 60-day period.

**Child Placement: Placement Resources**

*Settlement Agreement, II.B.5.c.: Children with special needs shall be matched with placement resources that can meet their therapeutic, medical, and educational needs. DFCS shall ensure that each county office has access to placement specialists within its region having the ability to ascertain the placement resources available and their suitability for each particular child needing placement.*

Note: Data were not collected regarding whether each placement resource the child experienced met his or her needs.

Note: The measure used for the data reported below is not a direct measure of the settlement agreement requirement.  The measure focuses on whether a resource worker assisted the caseworker and not on whether the caseworker had access to a resource worker (placement specialist).  The access issue is a staffing concern and is part of a different assessment.

**Key Findings**

- For 26 (29.9 percent) of the 87 children who were identified as having special educational, therapeutic, and/or medical needs, there was documentation in the case file that a resource worker (placement specialist) assisted the child's caseworker in finding a suitable placement to meet those needs.
- For 61 (70.1 percent) of the 87 children, there was no documentation in the case file that a resource worker assisted the child's caseworker in finding a suitable placement for a child with special educational, therapeutic, and/or medical needs.

*Settlement Agreement, II.B.5.d.: Each foster child shall be placed in the least restrictive setting that meets his/her individual needs as determined by a review of all intake, screening, assessment, and prior placement information on the child available at the time of placement.  In order of consideration, this means placement with relatives; foster home care within reasonable proximity to the child's home community; foster home care outside of the child's home community; group home care; or institutional care.*

Note: Data were not collected regarding an assessment of the child's placements as being "the least restrictive setting that meets his/her individual needs."

**Key Findings**

- For 67 (26.6 percent) of the 252 children, there was documentation in the case record that their initial placement was with a relative or fictive kin (57 children) or with a biological parent (10 children).
- For 71 (28.2 percent) of the 252 children, there was documentation in the case record that their initial placement was in a congregate care facility, with 68 (27.0 percent) of the 252 children placed in a shelter setting.
- For 18 (7.1 percent) of the 252 children, there was documentation in the case record that they were in multiple congregate care placements during the period under review, with 12 (4.8 percent) of the 252 children experiencing two or more shelter placements.
- For 22 (100 percent) of the 22 children whose most recent placement setting prior to discharge from custody or the end of the period under review was a congregate care setting, there was documentation in the case file that this was the least restrictive setting for meeting the child's needs.

*Settlement Agreement, II.B.5.e.: Each child shall be placed within his/her own county or within 50 miles of the home from which he/she was removed.  This provision shall not apply if (1) the child's needs are so exceptional that they cannot be met by a family or facility within his/her own county or within 50 miles of the home from which he/she was removed; (2) the child is placed through the ICPC consistent with its terms; (3) the child is appropriately placed with relatives or*

36

*another planned permanent resource; (4) the child is ordered to be placed in a child-specific foster care setting by a court; or (5) the child is placed in an adoptive home.*

**Key Findings**

- **For 243 (96.4 percent) of the 252 children, there was documentation in the case file that the child's initial placement was either (1) in the child's own county or within 50 miles of the home from which the child was removed (233 children), or (2) one of the exceptions to the provision stated in the settlement agreement was met (10 children).**

- For 6 (2.4 percent) of the 252 children, the reason identified in the case file for placement outside of the county or more than 50 miles from the home from which the child was removed was not consistent with the Settlement Agreement exceptions.  (For five children, the reason was to place the child with siblings; and for one child, the reason was that "no resource was available.").   For 3 (1.2 percent) of the 252 children, reviewers noted that there was no documentation in the case file identifying the addresses needed to determine proximity of placement.

*Settlement Agreement, II.B.5.f.: Siblings who enter placement at or near the same time shall be placed together unless (1) doing so would be harmful to one or more of the siblings; (2) one of the siblings has exceptional needs that can be met only in a specialized program or facility; or (3) the size of the sibling group makes such placement impractical notwithstanding diligent efforts to place the group together.  If a sibling group is separated at initial placement, the caseworker shall make immediate efforts to locate or recruit a family in whose home the siblings can be reunited.  These efforts will be documented and maintained in the case file.*

Note: Data were not collected regarding caseworker efforts to reunite siblings who were separated.

**Key Findings**

- **For 148 (80.9 percent) of the 183 children with siblings in DFCS custody, there was documentation in the case file that the child was placed with all siblings during the entire period under review (96 children), or there was a reason documented in the case file for the separation of siblings that is consistent with the exceptions noted in the Settlement Agreement (52 children). For 20 of the 72 children who were not placed with siblings, there was a valid reason documented in the case file for the separation of siblings, although the reason was not specified as one of the exceptions in the Settlement Agreement.**

- For the 52 children who were not placed with all of their siblings but for whom there was a reason documented consistent with the Settlement Agreement exceptions, the following reasons were documented in the case file:
    - Separation was necessary to prevent harm to one or more of the siblings (2 children).
    - Separation was done because no resource was identified that would accept the sibling group of that size although documented efforts to find a resource were reported in the narrative (20 children).
    - One of the siblings had exceptional needs, including behavioral problems (30 children).

- For 20 children who were not placed with their siblings but for whom a valid reason for separation was documented, one or more of the siblings was placed with a relative (including a father) who was not related by blood to the other children.

Table: Placement with siblings

| Placement status | Number of children | Percentage of children |
|---|---|---|
| Child was placed with all siblings at all times | 96 | 52.5 |
| Child was placed with some siblings at all times, but not all siblings at any time | 34 | 18.6 |
| Child was not placed with any siblings at any time | 15 | 8.2 |
| Child was placed with all siblings some of the time | 30 | 16.4 |
| Child was placed with some siblings some of the time, but not all of the time | 8 | 4.4 |
| **Total** | **183** | **100** |

**Child Placement: Provision of Information to Placement Resources**

*Settlement Agreement, II.B.5.g.: No later than at the time of placement, DFCS shall provide foster parents or facility staff with the foster child's currently available medical, dental health, educational, and psychological information, including a copy of the child's Medicaid card. DFCS shall gather and provide to foster parents or facility staff all additional current medical, dental health, educational, and psychological information available from the child's service providers within 15 days of placement.*

Note:  Data were not collected regarding the child's Medicaid card. Data were collected regarding information provided within 15 days of placement, but because many reviewers did not record this information, it is not reported in this document.

**Key Findings**
- **For 39 (15.5 percent) of the 252 children, there was documentation in the case file that the child's medical, dental, educational and/or psychological information had been given to the foster parents or facility staff at the time of placement for all of the child's placements during the period under review**.  For 34 (13.5 percent) of the 252 children, there was documentation in the case file that the information had been given to foster parents or facility staff at the time of some placements but not others.  For 179 (71.0 percent) of the 252 children, there was no documentation in the case file that any of the information had been given to foster parents or facility staff at the time of placement for any of the child's placements.
- For 149 (27.9 percent) of the 535 placements experienced during the period under review by the 252 children in the sample, there was documentation in the case file that the child's medical, dental, educational, and/or psychological information was provided to the foster parents or facility at the time of placement; for 386 (72.1 percent) of the 535 placements, there was no documentation that any of this information was provided to foster parents or facility administration at the time of placement.

38

Table: Provision to foster parents or facility staff of medical, dental, educational, and psychological
information and equipment at the time of child's placement (N=535 placements)*

| Extent of information provide in specified areas | Medical Information N (%) | Dental Information N (%) | Educational Information N (%) | Psychological Information N (%) |
|---|---|---|---|---|
| All information relevant to the specified area was provided at time of placement | 68  (12.7) | 26  (5.1) | 30  (5.9) | 36  (7.1) |
| Some information relevant to the specified area was provided at time of placement, but not all | 50  (9.3) | 28  (5.5) | 57  (11.1) | 46  (9.1) |
| No information relevant to the specified area was provided at time of placement | 28  (5.2) | 69  (13.5) | 37  (7.2) | 35  (6.9) |
| No information relevant to any of the specified areas was provided at time of placement | 386 (72.1) | 386 (75.4) | 386 (75.4) | 386 (76.0) |
| Missing data | 3 (0.6) | 3    (0.6) | 2   (0.4) | 5 (1.0) |
| **Total applicable placements** | **535 (99.9)** | **512 (100.1)** | **512 (100)** | **508 (100.1)** |
| Provision of information relevant to the specified area was not applicable for the child (e.g., child not in school, not old enough for dental exam, etc.) | 0 | 23 | 23 | 27 |
| **Total number of placements for all children** | **535** | **535** | **535** | **535** |

*Percentages may total to more than 100 due to rounding

## Child Placement: Prevention of Placement Disruption

*Settlement Agreement, II.B.5.h.:  DFCS shall take all reasonable steps to avoid the disruption of an appropriate placement and ensure placement stability for children.  If a caseworker has knowledge that a placement may disrupt, the caseworker shall immediately convene a meeting with the DFCS supervisor, the foster parents, and, if appropriate, the child to determine the following: the cause of the potential disruption; whether the placement is appropriate for the child; whether additional services are necessary to support the placement; whether the child needs another placement; and, if another placement is necessary, what that placement should be. If the placement disrupts on an emergency basis, the meeting shall be held no later than five days after the disruption to address whether the child needs additional supportive services and whether the new placement is appropriate.*

## Key Findings

- **For 5 (14.7 percent) of the 34 children for whom there was documentation in the case file that at least one of the child's placements disrupted (*i.e.*, it was not a planned change), and the caseworker had prior knowledge of the possibility of a disruption, there was documentation in the case file that (1) the DFCS caseworker had convened a meeting prior to all applicable placement disruptions for that child to discuss options, and (2) the meeting included the DFCS caseworker and supervisor, foster parents, and child (if appropriate).** For these 5 children, there was no documentation in the file of any

actions taken to prevent the placement disruption.  For 29 (85.3 percent) of the 34 children for whom there was documentation that the caseworker was aware of a possible placement disruption, there was no documentation in the case file that a meeting had occurred prior to the disruption.

- **For 1 (2.1 percent) of the 48 children for whom there was documentation in the case file that at least one of the child's placements disrupted on an emergency basis (*i.e.*, there was no documentation that the caseworker had prior knowledge that a disruption was possible), there was documentation in the case file that a meeting was held within 5 days after the disruption and that the key issues were discussed at that meeting.** For 47 (97.9 percent) of the 48 children with at least one placement that disrupted on an emergency basis, there was no documentation of a meeting held within 5 days after the emergency disruption of any of the child's placements.


**Child Placement: Placement in Emergency or Congregate Care Facilities**

*Settlement Agreement, II.B.5.k. (By the end of Implementation Period 1): No foster child shall remain in an emergency or temporary facility for more than 45 calendar days, unless, in exceptional circumstances, the Division Director has granted express written approval for the extension that documents the need for the extension.*

**Key Finding**
- **For 6 (42.9 percent)of the 14 children who had been in an emergency or temporary facility for more than 45 days, there was no documentation in the case file of an extension that had been approved by the Division Director.**

*Settlement Agreement, II.B.5.l. (By the end of Implementation Period 2):  No child shall spend more than 12 hours at a time in a DFCS office or other non-residential facility that provides intake functions.  No child shall be placed in more than one emergency or temporary facility within one episode of foster care, unless an immediate placement move is necessary to protect the safety of the child or of others as certified in writing by the Regional Director.*

Note: Data were not collected on the length of time children spent in a DFCS office or other non-residential facility.

**Key Findings**
- **For 8 (66.7 percent) of the 12 children with multiple placements in an emergency or temporary facility, there was documentation in the case file of written approval for the placement by the Regional Director.**
- For 4 (33.3 percent) of the 12 children with multiple placements in an emergency shelter, there was no documentation in the case file of written approval for the placement by the Regional Director.

*Settlement Agreement, II.B.5.m. (By the end of Implementation Period 2): No child under 10 years of age shall be placed in a congregate care setting (including group homes and shelters) unless the child has exceptional needs that cannot be met in a relative or foster family home or*

*the child is a member of a sibling group, and the Regional Director has granted express written approval for the congregate-care placement. Such approval shall be based on the Regional Director's written determination that the child's needs cannot be met in a less restrictive setting and can be met in that specific facility, including a description of the services available in the facility to address the individual child's needs. Sibling groups in which one or more of the siblings are under the age of 10 shall not be placed in a congregate care setting for more than 45 days.*

**Key Findings**
- **For 23 (52.3 percent) of the 44 children who were younger than age 10 at the time of their placement in congregate care, there was no documentation in the case file of express written approval by the Regional Director.**
- There were no sibling groups in which one or more of the siblings were younger than age 10 that were placed in a congregate care facility for longer than 45 days.

*Settlement Agreement, II.B.5.n. (By the end of Implementation Period 2): No foster child shall be moved from his/her existing placement to another foster placement unless DFCS specifically documents in the child's case record justifications for that move and the move is approved by a DFCS supervisor.*

Note: Data were not collected with regard to whether DFCS specifically documented in the child's case record justifications for a placement change or whether the child's move to another placement was approved by a DFCS supervisor.

## Settlement Agreement, III.C., Outcome Measures

**Outcome Measures: Number of Placements**

*Settlement Agreement, III.C.1.: Placement stability for children in foster care for less than 12 months from the time of removal (placement stability is two or fewer placements).*

**Key Finding**
- **99 (60.0 percent) of the 165 children in the sample who were in foster care for 12 months or less experienced two or fewer placements.**

Note: The measure for the finding reported above is comparable to but not identical to the measure in the Settlement Agreement since that measure includes children during a particular one-year or 12-month period, while this measure applies to children who entered foster care at any time during the period under review, which extends from January 2009 to March 31, 2011 and applies to only those children who were in foster care for 12 months or less during that 27 month period.

Supplemental Findings
- 65 (25.8 percent) of the 252 children had only one placement during the period under review; 28 (43.1) of those 65 children remained in the same placement at the end of the period under

review; 37 (56.9) of the 65 children were discharged from DFCS custody to adoption, reunification, guardianship, permanent placement with relatives, or durable legal custody.

- 82 (32.5 percent) of the 252 children had 2 placements; 73 (29.0 percent) had 3-4 placements, 19 (7.5 percent) had 5-6 placements, and 13 (5.2 percent) had 7 or more placements (3 of those 13 children had more than 10 placements).
- 42 (50 percent) of the 84 children in foster care for at least 6 months but less than 12 months, had 3 or more placements during their time in foster care; 24 (29.6 percent) of the 81 children in foster care for less than 6 months had 3 or more placements during that 6-month period.
- 91 (48.7 percent) of the 187 children who exited their first placement but were not discharged from DFCS custody spent less than 1 month in their first out-of-home placement.
- 45 (30.6 percent) of the 147 children exiting from 2 placements but not discharged from DFCS custody spent less than 3 months in their first two out-of-home placements combined; 12 (8.2 percent) of the 147 children spent less than one month in their first two placements combined.
- There were 423 placement changes for the 252 children. The most frequently provided reasons for placement change were (1) to move child to the home of a relative or fictive kin (N=65), (2) to move child to a trial reunification with one or both parents (N=61), or (3) to move child because caregiver requested the move due to the child's behavior (N=43).

**Tables** (Percentages may not total to exactly 100 due to rounding.)

Table: Time in foster care by number of placements

| Time in foster care until discharge or the end of the period under review | Number of placements | | | | | Total |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3-4 | 5-6 | 7+ | |
| Less than 6 months | 26 | 31 | 21 | 2 | 1 | 81 |
| At least 6 but less than 12 months | 19 | 23 | 29 | 7 | 6 | 84 |
| At least 12 but less than 18 months | 16 | 11 | 12 | 7 | 1 | 47 |
| 18 months or longer | 4 | 17 | 11 | 3 | 5 | 40 |
| **Total** | **65** | **82** | **73** | **19** | **13** | **252** |

Table: Time in first placement and first and second placements combined for children who exited their placement but were not discharged from DFCS custody

| Time from placement entry to exit | Number (percent) of children exiting from first placement who were not discharged from DFCS custody | Number ( percent) of children exiting from first and second placement combined who were not discharged from DFCS custody |
|---|---|---|
| Less than or equal to 7 days | 44 (23.5) | 4 (2.7) |
| At least 8 days but less than 31 days | 47 (25.1) | 8 (5.4) |
| At least 1 month (31 days) but less than 3 months | 55 (29.4) | 33 (22.4) |
| At least 3 months but less than 6 months | 20 (10.7) | 42 (28.6) |
| At least 6 months but less than 12 months | 15 (8.0) | 45 (30.6) |
| 12 months or more | 6 (3.2) | 15 (10.2) |
| Total | 187 (99.9) | 147 (99.9) |

Table: Reasons for Placement Changes (N=423 placement changes up to 10 placements excluding discharges from DFCS Custody)

| Reason for change | Number | Percentage |
|---|---|---|
| Child requested the change | 3 | 0.7 |
| Reunify siblings | 6 | 1.4 |
| Requested by family to bring child closer | 2 | 0.5 |
| Place child in pre-adoptive home | 4 | 0.9 |
| Place teen parent and child together | 7 | 1.7 |
| Caregiver not want to adopt or commit to child long term | 2 | 0.5 |
| Caregiver not providing adequate care | 4 | 0.9 |
| Child needed higher level of care | 21 | 5.0 |
| No new license issued by DFCS (Home Closed) | 2 | 0.5 |
| Child arrested and in detention | 3 | 0.7 |
| Child's behavior danger to self and others | 21 | 5.0 |
| Child ran away | 8 | 1.9 |
| Medical/mental health professional recommended change | 13 | 3.1 |
| Child needed less restrictive placement | 20 | 4.7 |
| Foster caregiver requested due to child's behavior | 43 | 10.2 |
| Foster caregiver suspected of abuse/neglect | 5 | 1.2 |
| Caregiver incapacitated | 2 | 0.5 |
| Move child to parent's home for Trial Reunification | 61 | 14.4 |
| Trial reunification was not successful | 14 | 3.3 |
| Caregiver requested due to lack of DFCS services and supports | 4 | 0.9 |
| Finding of abuse/neglect in placement | 3 | 0.7 |
| Birth parents request because they did not like caregivers | 1 | 0.2 |
| Move child to long-term stable home | 20 | 4.7 |
| Move child to placement with relative or fictive kin | 65 | 15.4 |
| Child aged out | 1 | 0.2 |
| Child completed program | 32 | 7.6 |
| Child back from runaway status | 4 | 0.9 |
| Shelter days used up | 23 | 5.4 |
| Other* | 29 | 6.9 |

*In five of these cases, the write in response was "court ordered." In the remaining cases the response was not clear.

## Settlement Agreement, II.B.6., Developing and Maintaining Connections

## Developing and Maintaining Connections: Visitation Plans

*Settlement Agreement, II.B.6.a.: At the time of the initial team meeting when a child enters foster care, a visitation plan for the child and his/her family shall be developed as part of the child's service plan. This visitation plan shall be developed and regularly updated in collaboration with parents, foster parents, and the child and should be appropriate to a) the child's age and developmental stage; b) the parents' strengths and needs; c) the schedule of the foster parents and parents; d) the social and cultural context of the family; and e) the status of the case and the permanency goal. If parental visitation is appropriate based on the above factors, this visitation plan shall include a minimum of two visits per month with the parents (unless a court order in the child's case limits such visits). For all children, regardless of*

*permanency goal, this visitation plan shall include at least one visit per month with any siblings not in the same placement (unless a court order in the child's case limits such visits).*

Note: The following data relevant to II.B.6.a were not collected during the case review:
- No data were collected pertaining to the individuals involved in developing or updating the visitation plan.
- Case reviewers were not asked to evaluate whether the visitation plan was appropriate to the factors identified in II.B.6.a.
- No data were collected to determine whether the visitation plan included visitation with siblings or whether the plan included at least one visit per month with any sibling not in the same placement.

**Key Findings**
- **For 46 (20.1 percent) of the 229 children for whom a visitation plan with mother was applicable, there was documentation in the case file of all of the following requirements: (1) a visitation plan with mother that specified at least 2 visits per month or a court order limiting visitation with mother, (2) a visitation plan that was developed within 30 days of the child's entry into foster care, and (3) a date for the visitation plan that was either before or about the same as the date of the child's service plan (indicating that the visitation plan was developed as part of the child's service plan)**. A visitation plan with mother was considered not applicable if the mother was deceased, mother's parental rights had been terminated, whereabouts of mother was not known, mother was not available for visitation, or mother did not respond to agency efforts to establish a visitation plan and showed no interest in visitation.
- **For 19 (10.4 percent) of the 182 children for whom a visitation plan with father was applicable, there was documentation in the case file of all of the following requirements: (1) a visitation plan with father that specified at least 2 visits per month or a court order limiting visitation with father, (2) a visitation plan for father that was developed within 30 days of the child's entry into foster care, and (3) a date for the visitation plan for father that was either before or about the same as the date of the child's service plan**. A visitation plan with father was considered not applicable if the father was deceased, father's parental rights had been terminated, whereabouts of father was not known, father was not available for visitation, or father did not respond to agency efforts to establish a visitation plan and showed no interest in visitation.

Supplemental findings regarding visitation plans for mother
- For 112 (48.9 percent) of the 229 children for whom a visitation plan with mother was applicable, there was documentation in the case file of a visitation plan that specified at least 2 visits per month with the mother (106 children), or there was documentation of a court order limiting visitation with the mother (6 children).
- For 150 (65.5 percent) of the 229 children for whom a visitation plan with mother was applicable, there was a visitation plan in the file that specified frequency of visits; for 17 (7.4 percent) of the 229 children, there was a visitation plan in the case file that specified type of visits but not frequency; for 62 (27.1 percent) of the 229 children, there was no documentation in the case file of a plan for the child's visits with mother.

- For 92 (40.2 percent) of the 229 children for whom a visitation plan with mother was applicable, documentation in the case file indicated that the date of the visitation plan was either before or on about the same date as the date of the child's service plan; for 56 (24.5 percent) of the 229 children, the date of the visitation plan was after the date of the child's service plan.
- For 54 (36.0) of the 150 children with an initial visitation plan with mother, there was an updated visitation plan with mother in the case file.

Supplemental findings regarding visitation plans for father
- For 51 (28.0 percent) of the 182 children for whom a visitation plan with father was applicable, there was documentation in the case file of a visitation plan that specified at least 2 visits per month with the father (46 children) or there was documentation of a court order limiting visitation with the father (5 children).
- For 82 (45.1 percent) of the 182 children for whom a visitation plan with father was applicable, there was a visitation plan in the file that specified frequency of visits with father; for 9 (4.9 percent) of the 182 children, there was a visitation plan in the case file that specified type of visits but not the frequency; for 91 (50.0 percent) of the 182 children, there was no documentation in the case file of a plan for the child's visits with father.
- For 26 (14.3 percent) of the 182 children for whom a visitation plan with father was applicable, there was documentation in the case file that the visitation plan with the father had been developed within 30 days of the child's entry into foster care and the date of the visitation plan was prior to or equal to the date of the child's service plan.
- For 35 (42.7percent) of the 82 children with an initial visitation plan with father, there was an updated visitation plan with father in the case file.

**Tables** (Percentages may not total to 100 exactly due to rounding.)

Table: Frequency of child visits with mother as specified in the mother's initial visitation plan

| Frequency of visits specified in initial plan | Children whose visitation plan with mother specifies this frequency - N (%) |
|---|---|
| Twice a week | 8 (3.5) |
| Once a week | 48 (21.0) |
| Twice a month | 50 (21.8) |
| Once a month | 18 (7.9) |
| Less frequently than once a month | 4 (1.7) |
| As often as possible given the circumstances of the parent and child | 22 (9.6) |
| No visitation plan or no plan that specified frequency of visits | 79 (34.5) |
| **Total** | **229 (100)** |

Table: Time to visitation plan for mother and relationship between visitation plan for mother and child's service plan for the 150 children who had a visitation plan and an ISP for their mother

| Time to visitation plan | | Relationship between visitation plan for mother and child's ISP | | | | Total |
|---|---|---|---|---|---|---|
| | | ISP and visitation plan for mother on or about the same day | Visitation plan for mother developed before child's ISP | Visitation plan for mother developed after child's ISP | Visitation plan for mother but no child ISP | |
| 30 days or less to visitation plan for mother | Yes | **35** | **26** | 3 | 1 | 65 |
| | No | 19 | 12 | 53 | 0 | 84 |
| Total | | 54 | 38 | 56 | 1 | *149 |

*For one child, there was a visitation plan but no date was specified.

Table: Frequency of child visits with father specified in the father's initial visitation plan

| **Frequency of visits specified in initial plan** | **Children whose visitation plan with father specifies this frequency - N (%)** |
|---|---|
| Twice a week | 4 (2.2) |
| Once a week | 22 (12.1) |
| Twice a month | 20 (11.0) |
| Once a month | 13 (7.1) |
| Less frequently than once a month | 2 (1.1) |
| As often as possible given the circumstances of the parent and child | 12 (6.6) |
| Visitation plan specifies no visits until specific conditions are met | 6 (3.3) |
| No visitation plan or no plan that specified frequency of visits | 100 (54.9) |
| Missing data on frequency specified in visitation plan | 3 (1.6) |
| **Total** | **182 (99.9)** |

Table: Time to visitation plan for father and relationship between visitation plan for father and child's service plan for the 80 children for whom there was both a visitation plan for the father and an ISP for the father

| Time to visitation plan from child's entry into foster car | | Relationship between father visit plan and child ISP | | | | Total |
|---|---|---|---|---|---|---|
| | | ISP and visitation plan for father on or about the same day | Visitation plan for father developed before Child's ISP | Visitation plan for father developed after child's ISP | Visitation plan for father but no child ISP | |
| 30 days or less to visitation plan with father | Yes | **12** | **14** | 2 | 1 | 29 |
| | No | 9 | 8 | 34 | 0 | 51 |
| Total | | 21 | 22 | 36 | 1 | *80 |

*For two cases, there was no date provided for the visitation plan.

46

**Developing and Maintaining Connections: Frequency of Visits between Parents and Children and Between Siblings in Foster Care**

*Settlement Agreement, II.B.6.c.: DFCS caseworkers shall take all reasonable steps to ensure the implementation of each child's visitation plan. DFCS and its contracting agencies shall implement a policy that prohibits cancellation of visits as a disciplinary action.*

Note: The following analysis is based on a "required" visitation plan that met the minimum requirements for parent-child (at least twice a month) and sibling (at least once a month) contact rather than on the specifications in the actual visitation plans.

**Key Findings**

The data analysis assesses the frequency of parent-child and sibling visitation for all applicable months within a 12-month period prior to discharge or the end of the period under review. An applicable month is one in which the child was in an out-of-home placement, had a goal of reunification with at least one parent, and there was no valid reason for a visit not to occur (*e.g.*, there was no court order preventing the visit, neither the parent nor child was hospitalized or incarcerated, the visit was not deemed to be contrary to the best interests of the child, etc.).

- **For 7 (3.4 percent) of the 206 children for whom visitation with mother at some time during the specified 12-month period was applicable, there was documentation in the case file that two visits with the mother occurred in all applicable months.** Visitation with mother was not applicable when the mother was deceased, the mother's parental rights had been terminated, the whereabouts or identity of the mother was not known, or the child was in a trial home placement with the mother or both parents during the specified 12-month period.

- **For 5 (3.0 percent) of the 167 children for whom visitation with father at some time during the specified 12-month period was applicable, there was documentation in the case file that two visits with the father occurred in all applicable months.** Visitation with father was not applicable when the father was deceased, the father's parental rights had been terminated, the whereabouts or identity of the father was not known, or the child was in a trial home placement with the father or both parents during the 12 month period prior to discharge from foster care or the end of the period under review.

- There were 87 children who were reported to have had siblings in foster care who were not in the same placement at some time during the period under review. For 53 (60.9 percent) of these children, reviewers found information in the case file regarding the dates of sibling visits. **For 8 (15.1 percent) of the 53 children with siblings in foster care who were placed separately at some time during the specified 12-month period, and for whom data were available regarding visitation, there was documentation in the case file that at least one visit with all siblings occurred in all applicable months.** Visitation with a sibling was not applicable during a month if it was determined that a visit was not in the child's best interest, or if one of the siblings was incarcerated, in acute care, or in residential treatment.

Supplemental findings regarding mother-child visits
- For 124 (60.2 percent) of the 206 children for whom visits with mother were applicable, there was no documentation in the case file that the child had two or more visits with his or her mother during any of the applicable months. For 53 (25.7 percent) of the 206 children, there was no documentation in the case file of any visits between the child and his or her mother during any of the applicable months.
- There were 883 applicable months in which no visits with the mother occurred. The most frequently recorded responses to the question of why visits did not occur were the following:
  o For 622 (70.4 percent) of the months in which visits did not occur, reviewers noted that there was no reason in the file as to why the visit did not occur.
  o For 53 (6.0 percent) of the months in which visits did not occur, reviewers noted that the caseworker did not schedule a visit.

Supplemental findings regarding father-child visits
- For 126 (75.4) of the 167 children for whom visits with father were applicable, there was no documentation in the case file that the child had two or more visits with his or her father during any of the applicable months. For 95 (56.9) of the 167 children, there was no documentation in the case file of any visits between the child and his or her father during any of the applicable months.
- There were 1,027 applicable months in which no visit with the father occurred. For 683 (66.5 percent) of the applicable months in which visits did not occur, reviewers noted that there was no reason in the file as to why the visit did not occur.

**Tables**

Table: Frequency of parent child visits over the 12-month period prior to discharge or to the end of the period under review

| Percentage of applicable months during which there were at least two parent-child visits | Children's visits with mother N (%) | Children's visits with father N (%) |
|---|---|---|
| Child had two or more visits with parent in 100 percent of the applicable months | 7 (3.4) | 5 (3.0) |
| Child had two or more visits with parent in at least 75 percent but less than 100 percent of the applicable months | 11 (5.3) | 4 (2.4) |
| Child had two or more visits with parent in at least 50 percent but less than 75 percent of the applicable months | 25 (12.1) | 6 (3.6) |
| Child had two or more visits with parent in at least 25 percent but less than 50 percent of the applicable months | 17 (8.3) | 15 (9.0) |
| Child had two or more visits with parent in at least 1 percent but less than 25 percent of the applicable months | 22 (10.7) | 11 (6.6) |
| There were no applicable months in which the child had two or more visits with the parent | 124 (60.2) | 126 (75.4) |
| **Total applicable children** | **206** | **167** |

Table: Frequency of visits of children with their siblings in foster care

| Percentage of applicable months during which there was at least one visit with all siblings in foster care (a single visit did not have to include all siblings together) with whom a visit was applicable | Children's visits with siblings | Percentage of cases |
|---|---|---|
| Child had at least one visit with all siblings in 100 percent of the applicable months | 8 | 15.1 |
| Child had at least one visit with all siblings in at least 75 percent but less than 100 percent of the applicable months | 9 | 17.0 |
| Child had at least one visit with all siblings in at least 50 percent but less than 75 percent of the applicable months | 12 | 22.6 |
| Child had at least one visit with all siblings in at least 25 percent but less than 50 percent of the applicable months | 14 | 26.4 |
| Child had at least one visit with all siblings in at least 1 percent but less than 25 percent of the applicable months | 7 | 13.2 |
| There were no applicable months in which the child had at least one visit with all siblings | 3 | 5.7 |
| **Total applicable children** | **53** | **100** |

**Developing and Maintaining Connections: Contacts after Initial Placement**

*Settlement Agreement, II.B.6.b.: DFCS shall arrange contact for the child with his/her parents and with any siblings not in the same placement within 24 hours of foster care placement unless there are documented reasons why contact should not occur. If a visit cannot be arranged within 24 hours, a telephone call to parents, siblings, or extended family members must be provided to the child.*

Note: The case reviewers were instructed to indicate the following in the instrument: "… is there documentation in the case file that DFCS arranged contact between the child and (mother, father, all siblings) within 24 hours of removal?" Although this incorporates telephone contact, data were not collected specifically on the number of instances in which the contact was by telephone.

**Key Findings**

- **For 28 (15.9 percent) of the 176 children for whom a contact with mother within 24 hours of placement was applicable, there was documentation in the case file that a contact between the child and his/her mother occurred within 24 hours of placement.** For 148 (84.1 percent) of the 176 children for whom a contact with mother was applicable, there was no documentation in the case file of a contact with mother within 24 hours of placement. Contact with mother was not applicable if the mother was deceased, incarcerated, hospitalized, or her whereabouts were unknown. Contacts also were not applicable if contact between child and mother was determined to not be in the best interests of the child or if the child was incarcerated or in detention.

- **For 10 (6.9 percent) of the 144 children for whom a contact with father within 24 hours of placement was applicable, there was documentation in the case file that a contact was arranged between the child and his/her father within 24 hours of placement.** For 134 (93.1 percent) of the 144 children, there was no documentation in the case file of a contact with father within 24 hours of placement. Contact with father was

not applicable if the father was deceased, incarcerated, hospitalized, or his whereabouts were unknown.  Contacts also were not applicable if contact between child and father was determined to not be in the best interests of the child or if the child was incarcerated or in detention.

- **For 5 (9.4 percent) of the 53 children who were placed apart from siblings but for whom placement with siblings at the time of removal was applicable, there was documentation in the case file that a visit was arranged between the siblings within 24 hours of removal from the home.**  For 48 (90.6 percent) of the 53 children, there was no documentation in the case file of a contact with siblings within 24 hours of placement.

**Tables**

Table: Contacts between the child and his/her mother and father within 24 hours of placement for applicable cases

| Visits | Child's contact with Mother N (%) | Child's contact with Father N (%) |
|---|---|---|
| A contact took place within 24 hours of placement | 28 (15.9) | 10 (6.9) |
| No contact took place within 24 hours of placement although contact was applicable | 148 (84.1) | 134 (93.1) |
| **Total children for whom contact with parent was applicable** | **176** | **144** |

Table: Reasons for no contact between parent and child when contact was applicable

| Reasons | Children not having contact with Mother N (%) | Children not having contact with Father N (%) |
|---|---|---|
| No one from DFCS arranged for the contact | 36 (24.3) | 31 (23.1) |
| No reason was documented in the case file | 107 (72.3) | 102 (76.1) |
| Other | 5 (3.4) | 1 (0.7) |
| **Total children for whom contact with parent was applicable** | **148** | **134** |

Table: Reasons for not applicable cases

| Reasons for not applicable cases | Children for whom contact with mother was not applicable N (%) | Children for whom contact with father was not applicable N (%) |
|---|---|---|
| Contact was not applicable because parent was deceased, whereabouts unknown, or identity unknown | 8 (10.5) | 56 (51.9) |
| Contact was not applicable because the parent was incarcerated or hospitalized | 35 (46.1) | 22 (20.4) |
| Contact was not applicable because contact with the parent was considered not in the child's best interest | 14 (18.4) | 11 (10.2) |
| Contact was not applicable because the child was incarcerated/in detention | 2 (2.6) | 0 |
| Contact was not applicable because the child did not have a goal of reunification with parent at any time during the period under review* | 17 (22.4) | 19 (17.6) |
| **Total children for whom contact with parent was not applicable** | **76** | **108** |

*Reviewers were asked to skip the questions on contacts with mother and father within 24 hours of placement if the child did not have a goal of reunification at any time during the period under review.

## Settlement Agreement, II.B.7., Physical and Mental Health Care

### Physical and Mental Health Care: Mental/Behavioral Health Assessments

*Settlement Agreement, II.B.7.f.: Each child four years old and older shall be provided with a mental health assessment by a qualified professional within 30 calendar days of foster care placement. Each foster child who reaches the age of four in care shall be provided with a mental health assessment within 30 calendar days of his/her fourth birthday. Each foster child shall receive recommended mental health services pursuant to his/her assessment.*

### Key Findings
- **For 36 (21.2 percent) of the 170 children who were eligible for a mental health assessment, there was documentation in the case file of the following: (1) the child received a mental health assessment within 30 calendar days of foster care placement or within 30 days of reaching their 4th birthday while in foster care, and (2) the child either received services to address all identified mental health concerns (22 children) or no mental health concerns were identified for the child (14 children).**
- For 111 (65.3 percent) of the 170 eligible children, there was documentation that the child had received a mental/behavioral health assessment at some time during the period under review; 46 (27.1 percent) of the 170 children had an assessment within 30 days. For 59 (34.7 percent) of the 170 eligible children, there was no documentation of a mental health assessment in the case file.
- Documentation in the case file indicated that the majority of persons conducting the mental health assessments for the 111 children were qualified professionals, including physicians (26 or 23.4 percent) and mental health professionals such as psychologists or psychiatrists (63 or 56.8 percent). In 11 (9.9 percent) cases, the profession of the person conducting the assessment was not known.

51

- The mental health assessment report was in the case file in 92 (82.9 percent) of the 111 cases in which assessments were conducted.
- Mental/behavioral health concerns were identified in 79 (71.2 percent) of the 111 cases where there was a documented mental health assessment.

## Tables

Table: Time to initial mental health assessment from child's entry into foster care or date of child's 4th birthday

| Time frame | Number of children | Percentage of children |
|---|---|---|
| 30 days or less | 45 | 26.5 |
| At least 31 days but less than 2 months | 14 | 8.2 |
| At least 2 months but less than 3 months | 12 | 7.1 |
| At least 3 months but less than 4 months | 9 | 5.3 |
| At least 4 months but less than 5 months | 6 | 3.5 |
| At least 5 months but less than 6 months | 8 | 4.7 |
| 6 months or longer | 17 | 10.0 |
| No mental health assessment | 59 | 34.7 |
| **Total** | **170** | **100** |

Table: The timeliness of the child's mental health assessment and the extent to which the child received recommended mental health services.

| Timeliness of assessment | | Were recommended services received for identified service needs | | | | Total |
|---|---|---|---|---|---|---|
| | | Child received all recommended services | Child received some but not all recommended services | Child did not receive any recommended services | No service needs were identified | |
| Time to assessment | 30 days or less | 22 | 4 | 6 | 14 | 46 |
| | More than 30 days | 22 | 12 | 13 | 18 | 65 |
| **Total** | | **44** | **16** | **19** | **32** | **111** |

Table: Persons conducting the initial mental health assessment

| Person conducting assessment | Number of children | Percentage of children |
|---|---|---|
| Physician or pediatrician | 26 | 23.4 |
| Nurse practitioner | 2 | 1.8 |
| Psychologist or psychiatrist | 63 | 56.8 |
| Licensed social worker | 4 | 3.6 |
| Other | 5 | 4.5 |
| Unknown | 11 | 9.9 |
| **Total** | **111** | **100** |

Table: Types of mental/behavioral health services recommended for the 79 children for whom services were recommended in response to identified mental health concerns

| Services recommended for child | Number of children for whom service was recommended | Percentage of children for whom service was recommended |
|---|---|---|
| Counseling for child | 63 | 79.7 |
| Outpatient mental health therapy | 42 | 53.2 |
| Inpatient mental/behavioral health services/psych. hospital | 45 | 57.0 |
| Psychotropic medications | 65 | 82.3 |
| Therapeutic foster home/group home/residential treatment | 18 | 22.8 |
| Education related services (IEP, 504 plan, speech therapy, etc.) | 15 | 19.0 |
| Other | 25 | 31.6 |

**Physical and Mental Health Care: Physical Health**

*Settlement Agreement, II.B.7.a., b., c., and d.:*
*a) Every child entering foster care shall receive a health screening evaluation from a qualified medical practitioner within 72 hours after placement that is in accordance with the health screening recommended by the American Academy of Pediatrics.*
*b) Within 30 days of placement in foster care, each child shall receive a comprehensive health assessment that is in accordance with the assessment recommended by the American Academy of Pediatrics.*
*c) Nothing in the above paragraphs shall prohibit the initial health screening evaluation and the comprehensive health assessment from being conducted in one clinical visit. However, in such instances, this combined visit shall be conducted within 72 hours of placement.*
*d) All children shall receive periodic medical examinations and all medically necessary follow-up services and treatment throughout the time they are in state custody in accordance with the time periods recommended by the American Academy of Pediatrics.*

Note: The guidelines for time periods recommended by the American Academy of Pediatrics for physical examinations are 2 weeks old, then 2, 4, 6, 9, 12, 15, 18 and 24 months old, then annually until age 21 years.

**Key Findings**
- **For 40 (15.9 percent) of the 252 children, there was documentation in the case file of the following: (1) a health screen had been conducted within 72 hours of the child's placement; (2) a comprehensive health exam had been conducted within 30 days of the child's placement; and (3) all recommended services had been provided to the child (13 children) or no service needs had been identified (27 children).**
- **For 53 (67.9 percent) of the 78 children for whom a second comprehensive health examination was applicable, there was documentation in the case file that the second examination was done in an appropriate time frame given the child's age.** Children were not applicable for an analysis of the timeliness of the second examination if there was no first examination (137 children) or if a second examination was not required during the period under review given the child's age and time in foster care (37 cases).

53

- For 74 (29.4 percent) of the 252 children, there was documentation in the case file that the child received a health screening evaluation or a combined health screening evaluation within 72 hours of placement; for 62 (24.6 percent) of the 252 children, there was no documentation that the child had a health screen during the period under review.
- For 77 (30.6 percent) of the 252 children, there was documentation in the case file that the child received a comprehensive assessment within 30 days of placement; for 140 (55.6 percent) of the 252 children, there was no documentation that the child had a comprehensive health exam during the period under review.
- For 28 (84.8 percent) of the 33 children for whom services had been recommended, there was documentation in the case file that all recommended services had been provided; for 3 of the 33 children, there was no documentation indicating that recommended services had been provided. For the five cases in which either some or no services were received, reviewers reported that no reason was documented in the file.

**Tables**

Table: The timeliness of children's health screening and comprehensive health examination and the extent to which children received recommended services

| 30 days or less to comprehensive exam | | | 3 days or less to health screen | | | |
|---|---|---|---|---|---|---|
| | | | 3 days or less | 4 or more days | No health screen | Total |
| 30 days or less | Extent to which recommended services were provided | Children received all recommended services | 13 | 7 | | 20 |
| | | Children received some but not all recommended services | 1 | 0 | | 1 |
| | | Children received no recommended services | 0 | 1 | | 1 |
| | | No service needs were identified | 27 | 28 | | 55 |
| | Total | | 41 | 36 | | 77 |
| 31 days or more | Extent to which recommended services were provided | Children received all recommended services | 2 | 6 | | 8 |
| | | Children received some but not all recommended services | 1 | 0 | | 1 |
| | | Children received no recommended services | 0 | 2 | | 2 |
| | | No service needs were identified | 4 | 20 | | 24 |
| | Total | | 7 | 28 | | 35 |
| No comprehensive exam | Extent to which recommended services were provided | | | | | |
| | | No service needs were identified | 26 | 52 | 62 | 140 |
| | Total | | 26 | 52 | 62 | 140 |

Table: Activities included in the comprehensive health assessment (N = 112 children who had an initial comprehensive health examination)

| Activities | Number of children | Percentage of children |
|---|---|---|
| Review of child's medical, behavioral, developmental and social history | 85 | 75.9 |
| Complete unclothed physical examination | 63 | 56.3 |
| Inspection for and documentation of any signs of child abuse, neglect, or maltreatment | 60 | 53.6 |
| Developmental screen with full evaluation to follow | 50 | 44.6 |
| Mental health screen with full evaluation to follow | 19 | 17.0 |
| Immunization review | 75 | 67.0 |
| Dental and oral screen | 46 | 41.1 |
| HIV risk assessment | 18 | 16.1 |
| Information from laboratory tests(blood counts, lead levels, tuberculin test, hepatitis B test, urinalysis | 59 | 52.7 |
| Vital Signs | 93 | 83.0 |
| Vision screen | 74 | 66.1 |
| Hearing screen | 69 | 61.6 |

Table: Types of services recommended for the 33 children for whom health care services were recommended

| Service Recommended | Number of children for whom service was recommended | Percentage of children |
|---|---|---|
| Follow-up services with a health care provider to address a medical condition | 14 | 42.4 |
| Services of a specialist to address a medical condition | 4 | 12.1 |
| Physical therapy | 1 | 3.0 |
| Dental services | 2 | 6.1 |
| Medications to address a medical condition | 20 | 60.6 |
| Medical equipment such as glasses, a nebulizer or asthma pump | 3 | 9.1 |
| Other | 6 | 18.2 |

Table: Timeliness of second physical examinations for children for whom a second exam was applicable given the child's age and duration in foster care

| Timeliness of second examination | Number of children | Percentage of children |
|---|---|---|
| No second examination was reported although a second examination was warranted given the child's age and time in foster care | 17 | 21.8 |
| A second examination was done within an appropriate timeframe given the child's age and duration in foster care | 53 | 67.9 |
| A second examination was conducted but it was later than appropriate given the child's age and duration in foster care | 8 | 10.3 |
| **Total children for whom a second examination was applicable** | **78** | **100** |

55

**Physical and Mental Health Care: Developmental Assessment**

*Settlement Agreement, II.B.7.g.: Each foster child age birth through three shall be provided with a developmental assessment by a qualified professional, and each child older than three shall be provided with a developmental assessment if factors indicate such an assessment is warranted. All foster children shall be provided with needed follow-up developmental services.*

Note: Data were not collected regarding whether a developmental assessment was warranted for children age four and older.

Note: The analysis presented below is based upon the American Academy of Pediatrics' recommendations related to the comprehensive health assessment, which defendants are required to implement pursuant to II.B.7.b.

**Key Findings**
- **For 10 (13.0 percent) of the 77 children who were age 3 or younger during the period under review, there was documentation in the case file that a developmental assessment had been conducted within 30 days of placement and that all recommended services had been provided (3 children) or no service needs had been identified (7 children).** For 53 (68.8 percent) of the 77 children age 3 or younger, there was no documentation in the case file that the child had received a developmental assessment; for 14 (18.2 percent) children, there was a developmental assessment, but it was conducted 31 days or more after the child had been in foster care.
- For 31 children age 4 and older, there was documentation in the case file of a developmental assessment at some time during the period under review. For 27 (87.1 percent) of these 31 children, all recommended developmental services had been provided or no service needs had been identified.

**Tables**

Table: Timeliness of developmental assessment and child's age during the period under review

| | | Age during the period under review | | |
| --- | --- | --- | --- | --- |
| | | Children age 3 or younger N (%) | Children age 4 or older N (%) | Total |
| Time to developmental assessment | 30 days or less from placement | 10 (13.0) | 16 (9.1) | 26 |
| | More than 30 days from placement | 14 (18.2) | 15 (8.6) | 29 |
| | No developmental assessment | 53 (68.8) | 144 (82.3) | 197 |
| Total | | 77 (100) | 175 (100) | 252 |

56

Table: Persons conducting developmental assessment

| Person conducting developmental assessment | Number of children | Percentage of children |
|---|---|---|
| Physician or pediatrician | 30 | 54.5 |
| Nurse practitioner | 2 | 3.6 |
| Psychologist | 10 | 18.2 |
| Licensed social worker | 2 | 3.6 |
| Other | 5 | 9.1 |
| Unknown | 6 | 10.9 |
| **Total** | **55** | **99.9** |

## Physical and Mental Health Care: Dental Services

*Settlement Agreement, II.B.7.e.: Each child three years old and older shall be provided with a dental examination within 90 calendar days of foster care placement and every six months thereafter. Each foster child who reaches the age of three in care shall be provided with a dental examination within 90 calendar days of his/her third birthday and every six months thereafter. Foster children shall receive all medically necessary dental services.*

## Key Findings

- **For 81 (43.1 percent) of the 188 children for whom a dental exam was applicable (i.e., the child was 3 years of age or older at some time during the period under review and had been in foster care for 90 days or longer), there was documentation in the case file of the following: (1) a dental exam occurred within 90 days of the child's placement or the child reaching the age of 3, and (2) either all recommended dental services were received (28 children) or no dental services were recommended (53 children).**

- **For 28 (33.3 percent) of the 84 children for whom a second dental exam was applicable (*i.e.*, the child was in foster care for 6 months following the initial exam), there was documentation in the case file that a second exam had been provided within 6 months of the initial exam.**

- For 89 (47.3 percent) of the 188 children for whom a dental exam was applicable, there was documentation in the case file that the dental exam was conducted in less than 90 days from placement; for 46 (24.5 percent) of the 188 children, there was a dental exam but it was conducted 91 or more days from placement; for 53 (28.2 percent) of the 188 children, there was no dental exam documented in the case file

- For 125 (92.6 percent) of the 135 children who received a dental exam, either all recommended services were received (45 children) or no services were recommended (80 children). For the 10 children who did not receive recommended services, reviewers noted that there was no reason documented in the file.

- Dental exams were noted to be provided by either a dentist (117 or 86.7 percent) or the provider was "unknown" (18 or 13.3 percent).

**Tables**

Table: Time to initial dental exam for all applicable children

| Timeliness of dental examination | Number of children | Percentage of children |
|---|---|---|
| 90 days or less | 89 | 47.3 |
| 91 days or more | 46 | 24.5 |
| No dental exam documented in file | 53 | 28.2 |
| **Total** | **188** | **100** |

Table: Time from first dental examination to second dental examination

| Time from first to second dental exam | Number | Percentage |
|---|---|---|
| Second dental exam occurred in less than or equal to 182 days from the initial exam | 28 | 33.3 |
| Second dental exam occurred in 183 days or more after initial exam | 26 | 31.0 |
| No second exam was documented, although the child had been in care for 6 months after the initial exam | 30 | 35.7 |
| **Total applicable children** | **84** | **100** |
| No second exam relevant (child's discharge or the end of the PUR was less than 6 months from initial exam) | 51 | |
| No initial exam | 53 | |
| **Total eligible children for at least one dental exam** | **188** | |

Table: Types of services recommended for the 55 children for whom dental services were recommended

| Service | Number of children | Percentage of children |
|---|---|---|
| Dental treatment such as filling cavities, etc. | 51 | 92.7 |
| Orthodontics | 7 | 12.7 |
| Specialized dental services | 3 | 5.5 |
| Routine dental care/cleaning | 12 | 21.8 |
| Other | 3 | 5.5 |

## Settlement Agreement, II.B.8., Educational Services

**Educational Services:  Educational Screening**

*Settlement Agreement, II.B.8.a.: DFCS caseworkers shall screen each child for general and special educational needs within 30 days of his/her entry into foster care.*

**Key Findings**

- **For 33 (20 percent) of the 165 children who were in school or of school age during the period under review, there was documentation in the case file of an educational screening within 30 days of the child's entry into foster care or the child reaching his or her fifth birthday.** For 66 (40.0 percent) of the 165 children who were in school or of school

58

age during the period under review, there was an educational screening conducted by the assigned caseworker.

- For 47 (55.3 percent) of the 85 children for whom education-related concerns were identified, there was documentation in the case file that all services needed to address educational needs were provided.
- Education-related concerns were identified in the case files of 85 (51.5 percent) of the 165 applicable children. The following concerns were identified.
  - o Child was not enrolled in school although of school age – 4 children (4.7 percent).
  - o Child was not attending school regularly – 19 children (22.4 percent).
  - o Child school performance was below average – 41 children (48.2 percent).
  - o Child had behavior problems at school – 36 children (42.4 percent).
  - o Child was in need of special education services and was receiving them – 25 children (29.4 percent).
  - o Child was in need of special education services, but was not receiving them – 17 children (20.0 percent).
  - o Child had been suspended from school for behavior problems- 14 children (16.5 percent).
  - o Child had been expelled from school for behavior problems – 2 children (2.4 percent).

Table: Provision of services to address school-related concerns

| Extent to which services were provided to address school-related concerns | Number of children | Percentage of children |
|---|---|---|
| All recommended services were provided to address all school-related concerns | 47 | 55.3 |
| Some services to address school-related concerns were provided but not all | 22 | 25.9 |
| No services to address school-related concerns were provided | 14 | 16.5 |
| Missing information | 2 | 2.4 |
| **Total** | **85** | **100.1** |


**Educational Services: School Stability**

*Settlement Agreement, II.B.8.c.: DFCS shall make all reasonable efforts to ensure the continuity of a child's educational experience by keeping the child in a familiar or current school and neighborhood, when this is in the child's best interest and feasible, and by limiting the number of school changes the child experiences.*

Note:  Data were not collected regarding the dates of school changes because the Court Monitor was informed by defendants that these data were not likely to be available in either MACWIS or the paper case files.  The findings reported below do not reflect whether the school change occurred as a result of a placement change that was in the child's best interest.

**Key Findings**

- For 86 (52.1 percent) of the 165 applicable children, there was documentation in the case file of a school change, with the 86 children experiencing 141 school changes during the period under review. Reviewers identified the following as "reasons" for the school changes:

- o 4 (2.8 percent) of the 141 school changes occurred because child completed the last grade in the enrolled school.
- o 1 (0.7 percent) of the 141 school changes occurred because the child requested the change and 1 (0.7 percent) occurred because the foster parent requested the change.
- o 105 (74.5 percent) of the 141 school changes occurred because the child's placement changed and the new placement was not in former school district and transportation to former school was considered to be not feasible. (No data were collected regarding whether this placement change was in the child's best interest.)
- o 20 (14.2 percent) of the 141 school changes occurred because the child required a special school environment.
- o For 3 (2.1 percent) of the 141 school changes, reviewers noted that no reason was provided in the case file.

## Settlement Agreement, II.B.11., Transition to Independent Living

*Settlement Agreement, II.B.11.b.: Each foster youth 14-20 years old, regardless of his/her permanency plan, shall be provided with an opportunity to participate in the creation of an Independent Living service plan for Independent Living preparation. DFCS shall provide each eligible youth with Independent Living services as set forth in his/her service plan.*

Note: Data were not collected on the participation of youth in the creation of an Independent Living service plan.

**Key Findings**
- **For 6 (8.7 percent) of the 69 children who were age 14 or older during the period under review, there was an Independent Living plan in the case file and documentation that all independent living services set forth in the plan had been provided to the youth.**
- For 51 (73.9 percent) of the 69 children age 14 or older during the period under review, there was documentation that the child had an Independent Living plan in the case file.
- For 51 children with an Independent Living plan, the following information was identified as being in the plan:
  - o Objectives regarding educational, vocational, or employment planning and services to ensure that objectives will be attained – 18 children (35.3 percent).
  - o Information about how the youth's transportation needs will be met in order for the youth to access services, including assistance in obtaining a driver's license – 24 children (47.1 percent).
  - o Objectives related to money management and services to ensure that objectives will be obtained – 16 children (31.4 percent).
  - o Objectives related to housing and services to ensure that objectives will be obtained – 16 children (31.4 percent).
  - o Objectives related to development of social and recreational skills and services to ensure that objectives will be attained – 15 children (29.4 percent).
  - o Objectives related to establishing and maintaining connections with the child's family and community and services to ensure that objectives will be attained – 13 children (25.5 percent).

Table: Provision of services to address independent living services identified in the Independent Living plan

| Extent to which independent living services identified in the child's independent living plan were provided | Number of children | Percentage of children |
|---|---|---|
| All identified services were provided | 6 | 8.7 |
| Some but not all identified services were provided | 16 | 23.2 |
| No independent living services were provided | 29 | 42.0 |
| There was no independent living plan in the case file | 18 | 26.1 |
| **Total applicable children** | **69** | **100** |

## Settlement Agreement, II.B.10., Worker Contact and Monitoring

### Worker Contact and Monitoring: Caseworker Contacts with Child

*Settlement Agreement, II.B.10.a.:  Regardless of whether a child's foster care placement is being directly supervised by DFCS or by a contract agency, the assigned DFCS caseworker (either County of Service or County of Responsibility) shall meet with the child in person and, where age-appropriate, alone at least **twice** monthly to assess the child's safety and well-being, service delivery, and achievement of permanency and other service goals.  At least one visit per month shall take place in the child's placement.  During a child's first month in foster care and after each change of placement, the assigned DFCS caseworker shall meet with the child in person, and, where age-appropriate, alone, to assess the child's adjustment to the placement and whether more frequent visits by the caseworker are necessary,  This assessment may occur at a regularly scheduled visit with the child.*

Note:  Data were not collected on whether the caseworker met with the child alone.

**Key Findings**
- **For 53 (21.0 percent) of the 252 children, there was documentation in the case file of the following: (1) during the 12-month period prior to the child's discharge from DFCS custody or the end of the period under review, the assigned DFCS caseworker met with the child in person at least twice for each applicable month, and (2) at least one meeting between the caseworker and the child was in the child's placement.**  An applicable month is one in which the child was in DFCS custody and either in an out-of-home placement or a trial reunification with parents or relatives.
- For 68 (27.0 percent) of the 252 children, there was documentation in the case file that the DFCS caseworker met with the child at least twice a month for all applicable months during the 12-month period prior to either the child's discharge from foster care or the end of the period under review.

61

Table: Number and percentage of children who had a meeting with their assigned caseworkers two or more times each applicable month, with at least one meeting being in the child's placement

| Percentage of applicable months in which the assigned DFCS caseworker met with the child twice with at least one meeting being in the child's placement | Number of Children | Percentage of Children |
|---|---|---|
| The DFCS caseworker met with the child two or more times with at least one meeting being in the placement in 100 percent of applicable months | 53 | 21.0 |
| The DFCS caseworker met with the child two or more times with at least one meeting being in the placement in at least 75 percent but less than 100 percent of applicable months | 64 | 25.4 |
| The DFCS caseworker met with the child two or more times with at least one meeting being in the placement in at least 50 percent but less than 75 percent of applicable months | 46 | 18.3 |
| The DFCS caseworker met with the child two or more times with at least one meeting being in the placement in at least 25 percent but less than 50 percent of applicable months | 31 | 12.3 |
| The DFCS caseworker met with the child two or more times with at least one meeting being in the placement in at least 1 percent but less than 25 percent of applicable months | 30 | 11.9 |
| The DFCS caseworker did not meet with the child two or more times with at least one meeting being in the placement in any of the applicable months | 28 | 11.1 |
| **Total** | **252** | **100** |

**Worker Contact and Monitoring: Caseworker Contacts with Foster Parents**

*Settlement Agreement, II.B.10.c.: A DFCS foster care worker shall regularly communicate with non-therapeutic foster parents who have one or more foster children residing in their home and visit the home at least monthly to (1) share all relevant and legally disclosable information concerning the foster child; (2) evaluate the foster child's safety, needs and well-being; and (3) monitor service delivery and achievement of service goals.*

Note:  Data were not collected on the extent of "regular" communication.

**Key Findings**
- **For 6 (3.1 percent) of the 191 children who were in a non-therapeutic foster home at some time during the period under review, there was documentation in the case file of the following: (1) the assigned DFCS caseworker visited the foster parents in the child's foster home at least monthly for all applicable months, and (2) during that visit, the DFCS caseworker shared information with the child's foster parents concerning the**

**foster child, evaluated the child's safety needs and well-being, and monitored service delivery/achievement of service goals.**

- For 27 (14.1 percent) of the 191 children who were in a non-therapeutic foster home at some time during the 12-month period prior to discharge or to the end of the period under review, there was documentation in the case file that the assigned DFCS caseworker visited the child's foster parent(s) in the home at least once every month that the child was in the home.

- For 22 (11.5 percent) of the 191 children who were in a non-therapeutic foster home at some time during the 12-month period prior to discharge or to the end of the period under review, there was documentation in the case file that during visits with the assigned caseworker, all of the key topics were discussed.

Supplemental findings

- There were 1,519 months in which a caseworker visit with a foster parent was applicable; for 788 (51.9 percent) of the 1,519 months, there was at least one visit with the foster parent in the foster parent's home; for 92 (6.1 percent) of the 1,519 months, there was no caseworker visit with the foster parent in the foster parent's home but the caseworker did have a face-to-face contact with the foster parent; for 639 (42.1 percent) of the 1,519 months, there was no caseworker face-to-face contact with the foster parents either in or out of the foster parent's home.

- The following were the primary reasons for no caseworker contacts with foster parents for the 639 months where there was no caseworker face-to-face contact with the foster parent:
  - There was no indication in the case record that assigned caseworkers arranged a visit – 554 months (86.7 percent).
  - Visit attempted but foster parent not at location – 30 months (4.7 percent).
  - Child not in foster family home for the entire month – 21 months (3.3 percent).
  - Child in foster care in another state – 15 months (2.3 percent).

- For the 880 months in which the assigned caseworker had at least one face-to-face contact with a foster parent either in or out of the home, the following content of the contact was reported:
  - Caseworker shares information about the child – 634 contacts (72.0 percent).
  - Caseworker evaluates child's safety and well-being in the home – 427 contacts (48.5 percent).
  - Caseworker and caregiver discuss services being provided to child – 242 contacts (27.5 percent).
  - Caseworker and caregiver discuss achievement of the child's service goals – 89 contacts (10.1 percent).
  - There is no documentation that any of the above issues were discussed – 74 contacts (8.4 percent).

Table: Percentage of applicable months over a 12-month period prior to discharge or to the end of the period under review in which the DFCS caseworker visited the child's non-therapeutic foster parent at least **once** in the foster parent's home

| Percentage of applicable months in which the DFCS caseworker visited the foster parent at least once in the foster parent's home* | Number of Children | Percentage of Children |
|---|---|---|
| The DFCS caseworker visited the child's foster parent in the home in 100 percent of applicable months | 27 | 14.1 |
| The DFCS caseworker visited the child's foster parent in the home in at least 75 percent but less than 100 percent of applicable months | 33 | 17.3 |
| The DFCS caseworker visited the child's foster parent in the home in at least 50 percent but less than 75 percent of applicable months | 42 | 22.0 |
| The DFCS caseworker visited the child's foster parent in the home in at least 25 percent but less than 50 percent of applicable months | 33 | 17.3 |
| The DFCS caseworker visited the child's foster parent in the home in at least 1 percent but less than 25 percent of applicable months | 14 | 7.3 |
| There is no documentation of a DFCS caseworker visit with the foster parent in the home in any of the applicable months | 42 | 22.0 |
| **Total** | **191** | **100** |

*Settlement Agreement, II.B.10.d.:* DFCS shall maintain weekly contact with therapeutic foster parents who have one or more foster children residing in their home, and shall make a minimum of two visits per month to the home to (1) share all relevant and legally disclosable information concerning the foster child; (2) evaluate the foster child's safety, needs and well-being; and (3) monitor service delivery and achievement of service goals.

**Key Findings**

- **For 2 (10.0 percent) of the 20 children who were in a therapeutic foster home at some time during the period under review, there was documentation in the case file that the DFCS caseworker visited the therapeutic foster parent in the home at least twice during all applicable months that the child was in the home.** For one of these children, the reviewer did not complete the questions about the topics discussed. For the other child, some but not all of the topics were discussed. For 13 (65.0 percent) of the 20 children, the caseworker did not visit the therapeutic foster parent in any of the months that the child was in the home.

- There were a total of 116 months overall that a child was in a therapeutic foster home. For 68 (58.6 percent) of the 116 months, there were no visits to the home of the therapeutic foster parents; for 37 (31.9 percent) of the 116 months, there was one visit to the home of the therapeutic foster parent; and for 11 (9.5 percent) of the 116 months, there were 2 or more visits to the home of the therapeutic foster parent.

- 20 (10.2 percent) of the 197 children in a foster home at some time during the 12 month period prior to discharge or to the end of the period under review were reported to be in a therapeutic foster home; 8 children were in a therapeutic foster home for all applicable months; 12 children were in both therapeutic and non-therapeutic foster family homes during the applicable months

## Settlement Agreement, II.B.12., Case Closing and Aftercare

*Settlement Agreement, II.B.12.a.: For each child who has a permanency goal of reunification and who is in fact placed in the home for the purpose of reunification, DFCS shall provide, subject to the approval of the youth court, such child with a 90-day trial home visit. During any trial home visit period, a DFCS caseworker or Family Preservation caseworker shall meet with the child in the home at least two times per month, and each meeting shall occur without the parent or caretaker present.*

### Key Findings
- **For 19 (50 percent) of the 38 children on a Trial Home Visit for less than 90 days, there was documentation in the case file that the caseworker or a family preservation worker met with the child privately (if appropriate) at least twice a month during the period of the Trial Home Visit.**
- **For 13 (48 percent) of the 27 children on a Trial Home Visit for 90 days or longer, there was documentation in the case file that the caseworker or a family preservation worker met with the child privately (if appropriate) at least twice a month during the period of the Trial Home Visit.**
- **For 31 (47.7 percent) of the 65 children who were on a trial home visit (also called a trial reunification) at some time during the period under review, there was documentation in the case file that the caseworker or a family preservation worker met with the child privately (if appropriate) at least twice a month;** for 20 (30.8 percent) of the 65 children, meetings were less frequent than twice a month; for 14 (21.5 percent) of the 65 children, the frequency of caseworker or family preservation worker contact was not documented in the case file.
- For 38 (58.5 percent) of the 65 children who were on a trial home visit, the trial home visit was less than 90 days at the time of the child's discharge from foster care or return to out-of-home placement, or at the time of the end of the period under review; for 8 (12.3 percent) of the 65 children, the trial reunification lasted longer than 200 days.
- The following information for the 65 children was documented in the case file with regard to the determinations made prior to the child being placed with the family on a trial home visit.
  - All of the issues that resulted in the child's removal from the home had been resolved – 26 children (40 percent)
  - Not all of the issues that resulted in the child's removal had been resolved, but the remaining issues could be addressed through in-home services – 30 children (46.2 percent)
  - The safety assessment determined that the child could be maintained safely in the home – 8 children (12.3 percent)

65

- There is no documentation of a safety assessment conducted prior to the trial home visit – 9 children (13.8 percent)
- For 36 (55.4 percent) of the 65 children on a trial home visit, there was documentation in the case file that the child was discharged from custody following the trial home visit; 14 (21.5 percent) of the 65 children returned to placement following the trial home visit; 12 (18.5 percent) of the 65 children remained in a trial home visit at the end of the period under review. Information regarding the outcome of the trial home visit for 3 (4.6 percent) children was not provided.

*Settlement Agreement, II.B.12.b.: A recommendation to return a child to his/her home or to place the child in the custody of a relative shall be made at a meeting attended by the child's DFCS caseworker, the caseworker's supervisor, the worker from the private agency if the child is placed with a private agency, the foster parents (unless DFCS determines that the foster parent's presence would be inappropriate), the biological parents or the relative assuming custody, and the child. At the meeting, the participants shall devise an after-care plan that identifies all of the services necessary to ensure that the conditions leading to the child's placement in foster care have been addressed, and that the child's safety and stability will be assured. DFCS shall take reasonable steps to provide or facilitate access to all services necessary to support the child during the trial home visit.*

**Key Findings**
- **None of the 65 children who were on a trial reunification at some time during the period under review had documentation in their case files that all three of the following settlement agreement requirements were met: (1) a team meeting was held prior to placement in the trial reunification; (2) the team meeting was attended by the child's DFCS caseworker, the caseworker's supervisor, and other required parties as relevant; and (3) an aftercare plan was developed during a team meeting.**
- For 14 (21.5 percent) of the 65 children who were on a trial reunification at some time during the period under review, there was documentation in the case file that a team meeting was held to prior to the trial reunification to discuss the trial reunification; for 51 (78.5 percent) of the 65 children, no team meeting prior to the decision to place the child in a trial reunification was documented in the case file.
- For the 14 cases in which a team meeting was held prior to the trial home visit, there was documentation in the case file that the following people were in attendance at the meeting:
  - The assigned caseworker – 14 cases (100 percent)
  - The person who child will be placed with – 11 cases (78.6 percent)
  - The child – 8 cases (57.1 percent)
  - Extended family – 8 cases (57.1 percent)
  - Foster parent – 5 cases (35.7 percent)
  - Supervisor for the assigned caseworker – 3 cases (21.4 percent)
  - GAL or CASA – 0 cases
- For 6 (9.2 percent) of the 65 children who were on a trial reunification at some time during the period under review, there was documentation in the case file that an aftercare plan was developed during the meeting that addressed the services necessary to ensure the child's safety and stability.

**Ex. 6**

Sample 1
Regional Data Analyses Report

In July of 2011, the Office of the Court Monitor in conjunction with the Mississippi Department of Family and Children's Services (DFCS) conducted a case record review study of children in foster care to establish baseline data relevant to the requirements of the Mississippi Settlement Agreement and Reform Plan.  The period under review for the case record was January 1, 2009 to March 31, 2011.  Sample 1 included the case records of children who entered foster care after January 1, 2009 and who were in DFCS custody for at least 60 days prior to March 31, 2011.  To achieve a 95.0 percent confidence interval for the sample, 252 children were selected at random from a pool of 4,381 children in foster care who met the sample requirements with regard to date of entry and time in DFCS custody.

This document provides the findings based on analyses of Region-level performance on several of the measures assessed as part of the Sample 1 case record review.  It is important to note that the cases for Sample 1 were randomly selected from a statewide pool and were not stratified by DFCS Regions and therefore the children in Sample 1 in each Region do not represent a randomized sample of cases in that Region.  The findings of the Region-level analyses are intended to supplement the case review findings presented in the *Data Analysis Report: Sample 1-Mississippi Case Record Review (Data Analysis Report)*, which was provided to the parties in final form on February 22, 2012.

Several measures were selected for the Region-level analyses based on the number of applicable cases overall and the number of cases meeting particular categorical requirements.  For the most part, the number of children's cases meeting all of the requirements specified in each Settlement Agreement section was too small to warrant a Region-level analysis.  However, it was possible to conduct a Region-level examination of individual requirements within various Settlement Agreement sections.  For example, although there were only 46 cases in which there was documentation in the case record of a screening and assessment completed within 30 days of the child's entry into custody that included all relevant information consistent with settlement agreement requirements, there were 161 cases in which a screening and assessment of the child was completed within 30 days of entry into DFCS custody.  Consequently, a Region-level analysis could be conducted regarding completion of a documented screening and assessment within 30 days of entry.

Findings for each of the selected measures are presented below.  Information relevant to each measure includes the following:
- A table providing performance on the measure for all 13 DFCS Regions.
- A table or tables providing performance on the measure for the six largest Regions (the Regions having both the most children in foster care in the State and the largest number of cases in the sample).
- The results of a statistical analysis (Chi-Square Test of Independence), when relevant and meaningful, identifying whether performance on a measure varied significantly across the six largest Regions.  Chi Square analyses could not be done on the data for all 13 Regions because of the small number of cases included in some of the Regions.

1

As a general note, all data for the case record review were from the case record file – either in MACWIS or in the hard copy file maintained by DFCS.  Therefore, the data reflect what the case record reviewer was able to find documented in the case file.

**Comparison between Sample and State Data**

To provide some context for the Sample 1 Region-level analysis, a comparison was conducted between the percentages of children in foster care in all 13 Regions and the percentages of children in Sample 1 in all 13 Regions. Because the data on the percentages of children in foster care in all 13 Regions is based on a MACWIS report for January 2012 that includes 3,546 children, while the cases in Sample 1 were drawn from a pool of 4,381 eligible children covering the period from January 1, 2009 to March 31, 2011, the two groups cannot be considered equivalent.  However, the data provide a rough basis for comparison, particularly with regard to variations in the size of the regional populations.  Both the MACWIS data and the Sample 1 data identify the number of children according to the Region of responsibility rather than the Region of service.

Table 1 provides the percentage of all children in foster care in each Region during January 2012 and the percentage of children in Sample 1 in each Region.  Table 2 presents the rank ordering of the six largest regions in both the MACWIS report and Sample 1. The data in both tables suggest that the Sample 1 numbers for each region are generally comparable to those from the MACWIS report.  For example, although the rank ordering of the largest six Regions is not precisely matched between the State and Sample 1, the same Regions comprise the six largest Regions in both data sets.

Table 1: Percentages of children in foster care in each DFCS Region in January 2012 and percentages of children in Sample 1 for the 13 DFCS Regions

| Region | Percentage of Children in Foster Care in the State (N=3,546) | Percentage of Children in Sample 1 (N=252) |
|---|---|---|
| I-North | 8.9 | 11.1 |
| I-South | 10.0 | 9.9 |
| II-East | 2.4 | 3.6 |
| II-West | 4.3 | 3.2 |
| III-North | 7.3 | 6.7 |
| III-South | 12.2 | 7.9 |
| IV-North | 6.7 | 5.1 |
| IV-South | 4.8 | 6.7 |
| V-East | 5.6 | 7.5 |
| V-West | 3.7 | 6.3 |
| VI | 9.6 | 8.3 |
| VII-East | 8.7 | 10.7 |
| VII-West | 15.8 | 13.1 |
| **Total percent** | **100** | **100.1** |

Table 2: Comparison of rankings of the six largest DFCS Regions based on foster care population size

| Rank order | Six largest regions based on MACWIS data | Six largest regions based on Sample 1 data |
|---|---|---|
| First largest | VII-West | VII-West |
| Second largest | III-South | I-North |
| Third largest | I-South | VII-East |
| Fourth largest | VI | I-South |
| Fifth largest | I-North | VI |
| Sixth largest | VII-East | III-South |

**Measures 1 and 2:  Timeliness and content of the initial screening and assessment of the child after entry into DFCS custody**

Measures 1 and 2 are relevant to the following Settlement Agreement Section:

> *Settlement Agreement, II.B.1.a.:  Upon taking a child into custody, DFCS shall engage in a thorough screening of the child and an individualized, strengths-based, family-focused, and culturally responsive assessment of the family, with the family's participation. Information gathered during the screening and assessment shall consist of (1) internal, external, and historical factors that may contribute to concerns identified in initial risk and safety assessments and initial screenings; (2) child and family strengths, protective factors, and needs; (3) the impact of maltreatment on the child; (4) factors and characteristics pertinent to selecting an appropriate placement; (5) family resources for the child and parents; and (6) any other material pertinent for meeting service objectives. The screening and assessment shall inform the selection of an appropriate placement, the provision of needed services, and permanency planning, and shall be completed within 30 calendar days of the child's entrance into custody and documented in the child's case record.*

The Region-level analysis addressed the following questions:

- Was there variation across Regions with regard to documentation in the case file of an initial screening and assessment that was completed within 30 calendar days of the child's entrance into custody (measure 1)?
- Was there variation across Regions with regard to documentation in the case file that the initial screening and assessment included all of the information (factors) specified in the Settlement Agreement, II.B.1.a. (measure 2)?

*Measure 1: Assessment and screening within 30 days of entry into DFCS custody*

Table 3 below presents the data for measure 1 for all 13 DFCS Regions, while table 4 provides the data for measure 1 for the six largest Regions.  For all 13 Regions, the percentages of children with an initial screening and assessment in 30 days or less ranged from 40.7 percent in Region VII-East to 81.2 percent in Region V-West.  Although there was some variation in

performance on the measure for the six largest regions, the differences in performance were not found to be significant.

Table 3: Timeliness of initial screening and assessment for children in the 13 DFCS Regions

| | | Screening and Assessment in 30 days or less | | Total |
|---|---|---|---|---|
| | | Children with assessment in 30 days or less N (%) | Children without an assessment in 30 days or less | |
| Region | I-North | 19 (67.9) | 9 | 28 |
| | I-South | 16 (64.0) | 9 | 25 |
| | II-East | 7 (77.8) | 2 | 9 |
| | II-West | 6 (75.0) | 2 | 8 |
| | III-North | 11 (64.7) | 6 | 17 |
| | III-South | 10 (50.0) | 10 | 20 |
| | IV-North | 6 (50.0) | 6 | 12 |
| | IV-South | 12 (70.6) | 5 | 17 |
| | V-East | 12 (63.2) | 7 | 19 |
| | V-West | 13 (81.2) | 3 | 16 |
| | VI | 16 (76.2) | 5 | 21 |
| | VII-East | 11 (40.7) | 16 | 27 |
| | VII-West | 22 (66.7) | 11 | 33 |
| Total | | 161 (63.9) | 91 | 252 |

Table 4: Timeliness of initial screening and assessment for children in the six largest DFCS Regions

| Region | Children with assessment in 30 days or less N (%) | Children without an assessment in 30 days or less | Total |
|---|---|---|---|
| I-North | 19 (67.9) | 9 | 28 |
| I-South | 16 (64.0) | 9 | 25 |
| III-South | 10 (50.0) | 10 | 20 |
| VI | 16 (76.2) | 5 | 21 |
| VII-East | 11 (40.7) | 16 | 27 |
| VII-West | 22 (66.7) | 11 | 33 |
| Total | 94 | 60 | 154 |

*Measure 2:  Content of the screening and assessment*

Table 5 below presents the data for measure 2 for all Regions.  As shown in table 5, for all 13 DFCS Regions, the percentage of children who had a screening and assessment that included all of the factors specified in the Settlement Agreement was relatively low, ranging from 14.3 percent in Region VI to 50.0 percent in Region II-West.

4

Table 5: Number of required factors included in the child's initial assessment in the 13 DFCS Regions

| | | Number of required factors included in the child's initial assessment | | | |
| | | Children with assessments that included all 10 factors N (%) | Children with assessments that included at least 5 but less than 10 factors | Children with assessments that included 0-4 factors or no assessment | Total |
|---|---|---|---|---|---|
| Region | I-North | 5 (17.9) | 14 | 9 | 28 |
| | I-South | 10 (40.0) | 12 | 3 | 25 |
| | II-East | 2 (22.2) | 5 | 2 | 9 |
| | II-West | 4 (50.0) | 3 | 1 | 8 |
| | III-North | 3 (17.6) | 9 | 5 | 17 |
| | III-South | 4 (20.0) | 13 | 3 | 20 |
| | IV-North | 3 (25.0) | 6 | 3 | 12 |
| | IV-South | 5 (29.4) | 10 | 2 | 17 |
| | V-East | 4 (21.1) | 10 | 5 | 19 |
| | V-West | 4 (25.0) | 11 | 1 | 16 |
| | VI | 3 (14.3) | 16 | 2 | 21 |
| | VII-East | 12 (44.4) | 7 | 8 | 27 |
| | VII-West | 6 (18.2) | 14 | 13 | 33 |
| **Total** | | **65 (25.8)** | **130** | **57** | **252** |

Table 6 presents the data for measure 2 for the six largest DFCS Regions. The Chi-Square analysis found that performance on this measure varied significantly across the six largest Regions [Chi Square (10) = 23.832, p < .008]. The percentage of children who had a screening and assessment that included all of the factors specified in the Settlement Agreement was considerably higher in Regions I-South and VII-East than it was in the other Regions. However, it is important to note that even in the two highest performing Regions, less than one-half of the children had a screening and assessment that included all of the information specified in the Settlement Agreement.

Table 6: Number of required factors included in the child's initial assessment in the six largest DFCS Regions

| Region | Children with assessments that included all 10 factors N (%) | Children with assessments that included at least 5 but less than 10 factors | Children with assessments that included 0-4 factors or no assessment | Total |
|---|---|---|---|---|
| I-North | 5 (17.9) | 14 | 9 | 28 |
| I-South | 10 (40.0) | 12 | 3 | 25 |
| III-South | 4 (20.0) | 13 | 3 | 20 |
| VI | 3 (14.3) | 16 | 2 | 21 |
| VII-East | 12 (44.4) | 7 | 8 | 27 |
| VII-West | 6 (18.2) | 14 | 13 | 33 |
| **Total** | **40** | **76** | **38** | **154** |

Chi Square (10) = 23.832, p < .008

**Measures 3 and 4: Timeliness of the initial family team meeting (FTM) and timeliness of the development of the initial service plan (ISP) for the child, mother, and father**

Measures 3 and 4 are relevant to the following Settlement Agreement section:

> *Settlement Agreement, II.B.2.a.: Within 30 calendar days of a child's entrance into foster care, the DFCS caseworker shall convene a team meeting with the DFCS caseworker's direct supervisor, the child's family if appropriate, the foster family, and the child unless there is a justification for excluding the child from the planning process. During the team meeting, service plans shall be developed for both the child and the parents with the participation of all team meeting participants.*

The Region-level analyses addressed the following questions:
- Was there variation across Regions with regard to documentation in the case file of a family team meeting (FTM) that was held within 30 days of the child's entry into DFCS custody (measure 3)?
- Was there variation across Regions with regard to documentation in the case file that an ISP was developed for the child (measure 4a), the mother (measure 4b), and the father (measure 4c) within 30 days of the child's entry into DFCS custody?

*Measure 3: Timeliness of family team meetings*

Table 7 below presents the data for measure 3 for all Regions. As shown in the table, the percentage of children who had a documented FTM within 30 days of entry into DFCS custody was low in all regions ranging from 6.1 percent in Region VII-West to 50.0 percent in Region II-West. The data in table 7 also indicate that for more than one-half of the children, there was no documentation in the case file indicating that an FTM had ever been held during the period under review.

6

Table 7: Number of children with documented FTMs and timeliness of FTMs held in the 13 DFCS Regions

| | | Timeliness of FTM | | | |
| | | Number of children with a FTM 30 days or less | Number of children with a FTM 31 days or more | Number of children with no FTM in file | Total |
|---|---|---|---|---|---|
| Region | I-North | 9 (32.1) | 9 | 10 | 28 |
| | I-South | 9 (36.0) | 10 | 6 | 25 |
| | II-East | 3 (33.3) | 1 | 5 | 9 |
| | II-West | 4 (50.0) | 2 | 2 | 8 |
| | III-North | 4 (23.5) | 5 | 8 | 17 |
| | III-South | 2 (10.0) | 4 | 14 | 20 |
| | IV-North | 1 (8.3) | 6 | 5 | 12 |
| | IV-South | 2 (11.8) | 5 | 10 | 17 |
| | V-East | 7 (36.8) | 2 | 10 | 19 |
| | V-West | 5 (31.2) | 7 | 4 | 16 |
| | VI | 6 (28.6) | 8 | 7 | 21 |
| | VII-East | 6 (22.2) | 2 | 19 | 27 |
| | VII-West | 2 (6.1) | 3 | 28 | 33 |
| **Total** | | **60 (23.8)** | **64** | **128** | **252** |

Because of the large number of children who had no FTM documented in the case file, the Region-level analysis for the six largest Regions focused on variations across Regions with regard to whether an FTM was ever held regardless of the timeliness of the FTM. These data are presented in table 8 below. As shown in the table, the percentages of children who had an FTM documented in their case file varied significantly across the six largest Regions [Chi Square (5) = 34.100; p<.000]. FTMs were more likely to be documented in the case files of children in Regions I-North, I-South, and VI, than they were in Regions VII-East, VII-West, and III-South.

Table 8: Number of children's cases documenting that a FTM was held at some time during the period under review (PUR) in the six largest DFCS Regions

| Region | Number of children with a FTM at some time during the PUR N (%) | Number of children with no FTM at any time during the PUR | Total |
|---|---|---|---|
| I-North | 18 (64.3) | 10 | 28 |
| I-South | 19 (76.0) | 6 | 25 |
| III-South | 6 (30.0) | 14 | 20 |
| VI | 14 (66.7) | 7 | 21 |
| VII-East | 8 (29.6) | 19 | 27 |
| VII-West | 5 (15.2) | 28 | 33 |
| **Total** | **70** | **84** | **154** |

Chi Square (5) = 34.100; p<.000

7

*Measure 4a: Timeliness of child's ISP*

Table 9 below presents the data for measure 4a for all Regions.  For all 13 Regions, the percentage of children who had an ISP developed in 30 days or less from the date of the child's entry into DFCS custody ranged extensively from 0 in Region IV-North and 11.1 percent in Region VII-East to 61.9 percent in Region VI and 75.0 percent in Region V-West.

Table 9: Timeliness of the development of the child's ISP across the 13 DFCS Regions

| | | Timeliness of Child ISP | | |
|---|---|---|---|---|
| | | Number of children with an ISP developed in 30 days or less N (%) | Number of children without an ISP developed in 30 days or less | Total |
| Region | I-North | 12 (42.9) | 16 | 28 |
| | I-South | 8 (32.0) | 17 | 25 |
| | II-East | 5 (55.6) | 4 | 9 |
| | II-West | 3 (37.5) | 5 | 8 |
| | III-North | 6 (35.3) | 11 | 17 |
| | III-South | 6 (30.0) | 14 | 20 |
| | IV-North | 0 (0) | 12 | 12 |
| | IV-South | 8 (47.1) | 9 | 17 |
| | V-East | 9 (47.4) | 10 | 19 |
| | V-West | 12 (75.0) | 4 | 16 |
| | VI | 13 (61.9) | 8 | 21 |
| | VII-East | 3 (11.1) | 24 | 27 |
| | VII-West | 19 (57.6) | 14 | 33 |
| **Total** | | **104 (41.3)** | **148** | **252** |

Table 10 below presents the data for measure 4a for the six largest DFCS Regions.  The results of the Chi-Square analysis indicate that performance on this measure varied significantly across the six largest Regions [Chi Square (5) = 19.485, p < .002].  The percentages of children who had an ISP completed in 30 days or less was considerably higher in Regions VI and VII-West than in the other largest Regions.  In contrast, the percentage of children who had an ISP completed in Region VII-East was considerably lower than in the other largest Regions.

8

Table 10: Timeliness of development of the child's initial ISP for the six largest DFCS Regions

| Region | Number of children with an ISP developed in 30 days or less N (%) | Number of children without an ISP developed in 30 days or less | Total |
|--------|------------------------------------------------------------------|----------------------------------------------------------------|-------|
| I-North | 12 (42.9) | 16 | 28 |
| I-South | 8 (32.0) | 17 | 25 |
| III-South | 6 (30.0) | 14 | 20 |
| VI | 13 (61.9) | 8 | 21 |
| VII-East | 3 (11.1) | 24 | 27 |
| VII-West | 19 (57.6) | 14 | 33 |
| **Total** | **61** | **93** | **154** |

Chi Square (5) = 19.485, p < .002

*Measure 4b: Timeliness of the mother's ISP*

For this measure, there were 243 cases for which an ISP for the mother was applicable. A case was not applicable for an ISP for the mother if the mother's whereabouts or identity was unknown, the mother was deceased, there had been a termination of the mother's parental rights prior to the child's entry into DFCS custody, working with the mother was considered contrary to the child's best interests, the mother was not interested in being involved with the child, or the mother was unable to be involved with the child. Table 11 below provides the data on the timeliness of the mother's ISP for all 13 Regions. Because there were a large number of cases with no ISP for the mother, a third column was added to show those numbers. As shown in table 11, the percentage of children with a documented ISP for the mother that was developed in 30 days or less from the time of the child's entry into DFCS custody ranged considerably from 12.0 percent in Region VII-East to 77.8 percent in Region II-East.

Table 12 below provides the data on the timeliness of the mother's ISP for the six largest Regions. In order to have sufficient cell sizes to conduct the Chi Square analyses, the third data column added in table 11 was combined with the second data column for the analysis of the six largest Regions. As shown in table 12, there was significant variation in performance on this measure across the six largest DFCS Regions [Chi-square (5) = 14.529; p < .013]. Regions VI and VII-West were more likely than the other largest regions to have documented ISPs for the mother that were developed within 30 days. In contrast, Region VII-East was significantly less likely than the other Regions to have ISPs for the mother that were developed in 30 days or less.

Table 11: Timeliness of development of the ISP for the child's mother across the 13 DFCS Regions

|  |  | Timeliness of Mother's Initial ISP | | | |
|---|---|---|---|---|---|
|  |  | Number of children with an ISP for the mother developed in 30 days or less N (%) | Number of children with an ISP for the mother developed in more than 30 days | Number of children with no ISP for the mother in the case file | Total |
| Region | I-North | 10 (37.0) | 12 | 5 | 27 |
|  | I-South | 7 (28.0) | 18 | 0 | 25 |
|  | II-East | 7 (77.8) | 2 | 0 | 9 |
|  | II-West | 1 (12.5) | 6 | 1 | 8 |
|  | III-North | 2 (15.4) | 9 | 2 | 13 |
|  | III-South | 3 (15.8) | 10 | 6 | 19 |
|  | IV-North | 3 (25.0) | 6 | 3 | 12 |
|  | IV-South | 5 (29.4) | 11 | 1 | 17 |
|  | V-East | 11 (57.9) | 6 | 2 | 19 |
|  | V-West | 9 (56.2) | 4 | 3 | 16 |
|  | VI | 12 (57.1) | 6 | 3 | 21 |
|  | VII-East | 3 (12.0) | 17 | 5 | 25 |
|  | VII-West | 13 (40.6) | 9 | 10 | 32 |
| Total |  | 86 (35.4) | 116 | 41 | 243 |

Table 12: Timeliness of development of the ISP for the child's mother's across the six largest DFCS Regions

| Region | Number of children with an ISP for the mother developed in 30 days or less N (%) | Number of children without an ISP for the mother developed in 30 days or less | Total |
|---|---|---|---|
| I-North | 10 (37.0) | 17 | 27 |
| I-South | 7 (28.0) | 18 | 25 |
| III-South | 3 (15.8) | 16 | 19 |
| VI | 12 (57.1) | 9 | 21 |
| VII-East | 3 (12.0) | 22 | 25 |
| VII-West | 13 (40.6) | 19 | 32 |
| Total | 48 (32.2) | 101 | 149 |

Chi-square (5) = 14.529; p < .013

10

*Measure 4c: Timeliness of the father's ISP*

There were 192 cases for which an ISP for the father was applicable. A case was not applicable for an ISP for the father if the father's whereabouts or identity was unknown, the father was deceased, there had been a termination of the father's parental rights prior to the child's entry into DFCS custody, working with the father was considered contrary to the child's best interests, the father was not interested in being involved with the child, or the father was unable to be involved with the child. Table 13 below provides the data on the timeliness of the father's ISP for all 13 Regions. As with the mother, a third column was added to this table to show the numbers of cases where there was no ISP for the father documented in the case file.

As shown in table 13, the percentages of children with a documented ISP for the father that was developed in 30 days or less from the time of the child's entry into DFCS custody was generally low, ranging from 0 in Region II-West to 33.3 percent in Region II-East. The percentages of children who did not have an ISP for an applicable father documented in their case file ranged from 24.0 percent in Region I-North to 80.0 percent in Region II-West.

Table 13: Timeliness of development of the ISP for the child's father across the 13 DFCS Regions

| | | Timeliness of Father's initial ISP | | | |
|---|---|---|---|---|---|
| | | Number of children with an ISP for the father developed in 30 days or less N (%) | Number of children with an ISP for the father developed in more than 30 days | Number of children with no ISP for the father in the case file N (%) | Total |
| Region | I-North | 6 (24.0) | 13 | 6 (24.0) | 25 |
| | I-South | 3 (13.6) | 12 | 7 (31.8) | 22 |
| | II-East | 2 (33.3) | 2 | 2 (33.3) | 6 |
| | II-West | 0 (0) | 1 | 4 (80.0) | 5 |
| | III-North | 1 (8.3) | 5 | 6 (50.0) | 12 |
| | III-South | 1 (10.0) | 1 | 8 (80.0) | 10 |
| | IV-North | 1 (9.1) | 4 | 6 (54.5) | 11 |
| | IV-South | 1 (11.1) | 4 | 4 (44.4) | 9 |
| | V-East | 1 (7.1) | 2 | 11 (78.6) | 14 |
| | V-West | 3 (25.0) | 2 | 7 (58.3) | 12 |
| | VI | 5 (29.4) | 3 | 9 (52.9) | 17 |
| | VII-East | 2 (9.1) | 7 | 13 (59.1) | 22 |
| | VII-West | 4 (14.8) | 8 | 15 (55.6) | 27 |
| **Total** | | **30 (15.6)** | **64** | **98** | **192** |

Table 14 below provides the data on the timeliness of the father's ISP for the six largest Regions. In order to have sufficient cell sizes to conduct the Chi Square analyses, the third data column added in table 13 was combined with the second data column for the analysis of the six largest

11

Regions. Although there was some observable variation in performance on the timeliness of the father's ISP across the six largest Regions, this was not found to be significant.

Table 14: Timeliness of development of the ISP for the child's father's across the six largest DFCS Regions

| Region | Number of children with an ISP for the father developed in less than 30 days N (%) | Number of children without an ISP for the father developed in 30 days or less (including those with no ISP) | Total |
|--------|-----|-----|-----|
| I-North | 6 (24.0) | 19 | 25 |
| I-South | 3 (13.6) | 19 | 22 |
| III-South | 1 (10.0) | 9 | 10 |
| VI | 5 (29.4) | 12 | 17 |
| VII-East | 2 (9.1) | 20 | 22 |
| VII-West | 4 (14.8) | 23 | 27 |
| **Total** | **21 (17.1)** | **102** | **123** |

Because for more than one-half of the children, there was no ISP for an applicable father in the case file, an additional analysis was done to examine variation in performance across the six largest regions with regard to whether there was a service plan (ISP) for the father in the child's case file regardless of the time of development. The data for this analysis are presented in table 15 below. As shown in the table, performance on this measure varied significantly across Regions [Chi-Square (5) = 14.036; p < .015]. Children in Regions I-North and I-South were more likely to have an ISP for the father in the case file than were children in the other Regions. In comparison, children in Region III-South were considerably less likely than the children in the other largest Regions to have an ISP for the father in the case file.

Table 15: Existence of an ISP for the father in the child's case file across the six largest DFCS Regions

| Region | Number of children with an ISP for the father in the file N (%) | Number of children with no ISP for the father in the file | Total |
|--------|-----|-----|-----|
| I-North | 19 (76.0) | 6 | 25 |
| I-South | 15 (68.2) | 7 | 22 |
| III-South | 2 (20.0) | 8 | 10 |
| VI | 8 (47.1) | 9 | 17 |
| VII-East | 9 (40.9) | 13 | 22 |
| VII-West | 12 (44.4) | 15 | 27 |
| **Total** | **65 (52.8)** | **58** | **123** |

Chi-Square (5) = 14.036; p < .015

**Measure 5:  Timeliness of the development of the child's initial permanency plan**

Measure 5 is relevant to the following Settlement Agreement section:

> *Settlement Agreement, II.B.3.a.1.:  Working with service providers, foster parents, the child, and the family, DFCS shall develop and document in the child's case record a permanency plan within 30 calendar days of the child's initial placement that specifies*

*the permanency goal, a timeframe for achieving permanency, and activities that support permanency.*

The Region-level analysis addressed the question of whether there was variation across Regions with regard to development of a permanency plan for the child in 30 days or less from the time of the child's entry into DFCS custody. Table 16 below provides the data for this measure for all 13 Regions. As shown in the table, there was considerable variation in the percentage of children with a permanency plan that was developed in 30 days or less from the time of entry into DFCS custody, ranging from 8.3 percent in Region IV-North to 68.7 percent in Region V-West.

Table 16: Timeliness of the child's initial permanency plan across the 13 DFCS Regions

| | | Timeliness of Permanency Plan | | |
|---|---|---|---|---|
| | | **Number of children with a permanency plan that was developed in 30 days or less from the time of entry into DFCS custody N (%)** | **Number of children without a permanency plan that was developed in 30 days or less from the time of entry into DFCS custody** | **Total** |
| Region | I-North | 9 (32.1) | 19 | 28 |
| | I-South | 9 (36.0) | 16 | 25 |
| | II-East | 5 (55.6) | 4 | 9 |
| | II-West | 2 (25.0) | 6 | 8 |
| | III-North | 6 (35.3) | 11 | 17 |
| | III-South | 6 (30.0) | 14 | 20 |
| | IV-North | 1 (8.3) | 11 | 12 |
| | IV-South | 8 (47.1) | 9 | 17 |
| | V-East | 9 (47.4) | 10 | 19 |
| | V-West | 11 (68.7) | 5 | 16 |
| | VI | 12 (57.1) | 9 | 21 |
| | VII-East | 5 (18.5) | 22 | 27 |
| | VII-West | 18 (54.5) | 15 | 33 |
| **Total** | | **101 (40.1)** | **151** | **252** |

Table 17 below provides the data on performance on this measure for the six largest DFCS Regions. Performance on the measure was found to vary significantly across the six largest regions [Chi-Square (5) = 12.398; p < .030]. The percentages of children with a permanency plan developed within 30 days was higher in Regions VI and VII-West than it was in the other Regions. In comparison, the percentages of children with a permanency plan developed within 30 days was lowest in Region VII-East.

13

Table 17: Timeliness of permanency plan for child across the six largest DFCS Regions

| Region | Number of children with a permanency plan that was developed in 30 days or less from the time of entry into DFCS custody N (%) | Number of children without a permanency plan that was developed in 30 days or less from the time of entry into DFCS custody | Total |
|---|---|---|---|
| I-North | 9 (32.1) | 19 | 28 |
| I-South | 9 (36.0) | 16 | 25 |
| III-South | 6 (30.0) | 14 | 20 |
| VI | 12 (57.1) | 9 | 21 |
| VII-East | 5 (18.5) | 22 | 27 |
| VII-West | 18 (54.5) | 15 | 33 |
| **Total** | **59 (38.3)** | **95** | **154** |

Chi-Square (5) = 12.398; p < .030


**Measure 6: Timeliness of court permanency review hearings**

Measure 6 is relevant to the following Settlement Agreement section:

> *Settlement Agreement, II.B.3.c.2.: DFCS will take reasonable steps to ensure that a court review, which may be called a review, dispositional, or permanency hearing, is held for each child in foster care custody within 12 months of initial placement and annually thereafter.*

The Region-level analysis addressed the question of whether there was variation across Regions with regard to the child having a court permanency review hearing within 12 months of entry into DFCS custody.

Table 18 below provides the data pertaining to measure 6 for all 13 DFCS Regions for all 155 applicable children. Applicable children were those who had been in foster care for at least 12 months or who had been in foster care for less than 12 months but had a permanency hearing at some time during that period. As shown in the table, the percentage of children who had a court permanency review hearing within12 months of entry into foster care ranged from 40.0 percent in Region III-South to 100 percent in Regions II-East and V-West.

Table 19 below provides the data pertaining to measure 6 for the six largest Regions. A reliable Chi-Square Test could not be performed on these data because of the relatively small number of children who did not have a permanency review.

Table 18:  Timeliness of court permanency reviews in the 13 DFCS Regions

| | | Timeliness of court/permanency review | | |
|---|---|---|---|---|
| | | **Children with a court permanency review hearing in 365 days or less from the date of entry into DFCS custody N (%)** | **Children who did not have a court permanency review hearing in 365 days or less from the date of entry into DFCS custody** | **Total** |
| Region | I-North | 16 (80.0) | 4 | 20 |
| | I-South | 16 (80.0) | 4 | 20 |
| | II-East | 7 (100.0) | 0 | 7 |
| | II-West | 3 (60.0) | 2 | 5 |
| | III-North | 8 (88.9) | 1 | 9 |
| | III-South | 4 (40.0) | 6 | 10 |
| | IV-North | 3 (75.0) | 1 | 4 |
| | IV-South | 13 (92.9) | 1 | 14 |
| | V-East | 10 (90.9) | 1 | 11 |
| | V-West | 8 (100.0) | 0 | 8 |
| | VI | 8 (80.0) | 2 | 10 |
| | VII-East | 15 (93.7) | 1 | 16 |
| | VII-West | 19 (90.5) | 2 | 21 |
| Total | | 130 (83.9) | 25 | 155 |

Table 19: Timeliness of court permanency reviews in the six largest DFCS Regions

| **Region** | **Children with a court permanency review hearing in 365 days or less from the date of entry into DFCS custody N (%)** | **Children who did not have a court permanency review hearing in 365 days or less from the date of entry into DFCS custody** | **Total** |
|---|---|---|---|
| I-North | 16 (80.0) | 4 | 20 |
| I-South | 16 (80.0) | 4 | 20 |
| III-South | 4 (40.0) | 6 | 10 |
| VI | 8 (80.0) | 2 | 10 |
| VII-East | 15 (93.7) | 1 | 16 |
| VII-West | 19 (90.5) | 2 | 21 |
| **Total** | **78 (80.4)** | **19** | **97** |

15

**Measure 7: Actions to facilitate the child's permanency through reunification with the parent**

Measure 7 is relevant to the following Settlement Agreement section:

> *Settlement Agreement, II.B.3.d.1.: When the child's permanency goal is reunification, DFCS shall identify in the parents' service plan and make available directly or through referral those services DFCS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care and to help the parents develop strategies to facilitate permanency for the child.*

The Region-level analysis addressed the following questions:
- Was there variation across Regions with regard to documentation in the case file that all Settlement Agreement requirements pertaining to facilitating reunification with the mother were met (measure 7a)?
- Was there variation across Regions with regard to documentation in the case file that all Settlement Agreement requirements pertaining to facilitating reunification with the father were met (measure 7b)?

For purposes of the analyses, the three Settlement Agreement requirements were the following: (1) identifying services in the mother's (father's) service plan to address behaviors and conditions resulting in child's placement; (2) offering services to address those behaviors or conditions (either directly or through referral); and (3) helping mothers (fathers) develop strategies for permanency by participating in service planning.

*Measure 7a: Meeting requirements for the mother*

Table 20 below presents the findings of the analyses of measure 7a for all 13 DFCS Regions. In order to present the data in a more meaningful way, the table does not provide the actual number of requirements met but instead groups them into the following categories: All Requirements Met, Some Requirements Met, and No Requirements Met. The data in table 20 indicate substantial variation across the 13 Regions with regard to meeting the requirements with the child's mother to facilitate permanency. The percentage of cases where all requirements were met for the mother ranged from 0 in Region III-North to 61.5 percent in Region V-West.

Table 21 presents the findings for the analysis of measure 7a for the six largest DFCS Regions. Although there is observable variation in performance on this measure across the six Regions, the differences were not found to be significant.

Table 20: Extent to which Settlement Agreement requirements for facilitating reunification were met for the child's mother across the 13 DFCS Regions

| | | Extent that Requirements were Met for the Mother | | | |
| | | Number of cases in which all requirements were met N (%) | Number of cases in which some requirements were met | Number of cases in which no requirements were met | Total |
|---|---|---|---|---|---|
| Region | I-North | 10 (41.7) | 9 | 5 | 24 |
| | I-South | 8 (33.3) | 7 | 9 | 24 |
| | II-East | 1 (12.5) | 5 | 2 | 8 |
| | II-West | 3 (37.5) | 3 | 2 | 8 |
| | III-North | 0 (0) | 2 | 10 | 12 |
| | III-South | 2 (13.3) | 4 | 9 | 15 |
| | IV-North | 3 (30.0) | 6 | 1 | 10 |
| | IV-South | 4 (25.0) | 9 | 3 | 16 |
| | V-East | 4 (25.0) | 7 | 5 | 16 |
| | V-West | 8 (61.5) | 4 | 1 | 13 |
| | VI | 5 (26.3) | 7 | 7 | 19 |
| | VII-East | 6 (27.3) | 5 | 11 | 22 |
| | VII-West | 6 (20.0) | 12 | 12 | 30 |
| **Total** | | **60 (27.6)** | **80** | **77** | **217** |

Table 21: Extent to which Settlement Agreement requirements for facilitating reunification were met for the child's mother across the six largest DFCS Regions

| Region | Number of cases in which all requirements were met N (%) | Number of cases in which some requirements were met | Number of cases in which no requirements were met | Total |
|---|---|---|---|---|
| I-North | 10 (41.7) | 9 | 5 | 24 |
| I-South | 8 (33.3) | 7 | 9 | 24 |
| III-South | 2 (13.3) | 4 | 9 | 15 |
| VI | 5 (26.3) | 7 | 7 | 19 |
| VII-East | 6 (27.3) | 5 | 11 | 22 |
| VII-West | 6 (20.0) | 12 | 12 | 30 |
| **Total** | **37 (27.6)** | **44** | **53** | **134** |

17

*Measure 7b: Meeting requirements for the father*

Table 22 below presents the findings of the analyses of measure 7b for all 13 DFCS Regions. As with the measure for the mother, the table does not provide the actual number of requirements met but instead groups them into the following categories: All Requirements Met, Some Requirements Met, and No Requirements Met.  The data in table 22 indicate substantial variation across the Regions with regard to meeting the requirements with the child's father to facilitate permanency.  The percentage of cases in which all requirements were met for the father ranged from 0 in Regions II-East, II-West, III-North, and III-South to 40.0 percent in V-West.  For almost all regions, the performance on this measure was considerably lower with regard to the child's father than with regard to the child's mother.

Table 22:  Extent to which Settlement Agreement requirements for facilitating reunification were met for the child's father across the 13 DFCS Regions

| | | **Extent that Requirements were Met for the Father** | | | |
|---|---|---|---|---|---|
| | | **Number of cases in which all requirements were met N (%)** | **Number of cases in which some requirements were met** | **Number of cases in which no requirements were met** | **Total** |
| Region | I-North | 5 (27.8) | 7 | 6 (33.3) | 18 |
| | I-South | 4 (23.5) | 5 | 8 (47.1) | 17 |
| | II-East | 0 (0) | 3 | 1 (25.0) | 4 |
| | II-West | 0 (0) | 1 | 1 (50.0) | 2 |
| | III-North | 0 (0) | 2 | 6 (75.0) | 8 |
| | III-South | 0 (0) | 1 | 1 (50.0) | 2 |
| | IV-North | 3 (37.5) | 2 | 3 (37.5) | 8 |
| | IV-South | 2 (28.6) | 1 | 4 (57.1) | 7 |
| | V-East | 1 (33.3) | 0 | 2 (66.7) | 3 |
| | V-West | 2 (40.0) | 3 | 0 (0) | 5 |
| | VI | 2 (20.0) | 3 | 5 (50.0) | 10 |
| | VII-East | 5 (38.5) | 2 | 6 (46.2) | 13 |
| | VII-West | 4 (26.7) | 5 | 6 (40.0) | 15 |
| **Total** | | **28 (25.0)** | **35** | **49** | **112** |

Table 23 below presents the data for measure 7b for the six largest DFCS Regions.  As shown in the table there was variation in performance across the six largest regions.  However, a meaningful Chi-Square Test could not be conducted because of the small number of cases in which all requirements were met.  In particular, Region III-South, which included 20 children in the sample, only had two children for whom working with the father to facilitate reunification was applicable.

Table 23: Extent to which Settlement Agreement requirements for facilitating reunification were met for the child's father across the six largest DFCS Regions

| Region | Number of cases in which all requirements were met N (%) | Number of cases in which some requirements were met | Number of cases in which no requirements were met | Total |
|--------|--------|--------|--------|--------|
| I-North | 5 (27.8) | 7 | 6 | 18 |
| I-South | 4 (23.5) | 5 | 8 | 17 |
| III-South | 0 (0) | 1 | 1 | 2 |
| VI | 2 (20.0) | 3 | 5 | 10 |
| VII-East | 5 (38.5) | 2 | 6 | 13 |
| VII-West | 4 (26.7) | 5 | 6 | 15 |
| **Total** | **20 (26.7)** | **23** | **32** | **75** |

## Measure 8: Frequency of caseworker meetings with parents

Measure 8 is relevant to the following Settlement Agreement section:

> *Settlement Agreement, II.B.3.d.2.: For a child with a permanency goal of reunification, the child's assigned DFCS caseworker shall meet with the child's biological parents at least monthly to assess service delivery and achievement of service goals, to keep the family informed and involved in decisions about the child, and to remain current about the family's circumstances.*

The Region-level analysis addressed the following questions:

- Was there variation across Regions with regard to monthly meeting between the DFCS caseworker and the child's mother (when applicable) in all applicable months over the most recent 12-month period that reunification was either a single or concurrent goal (measure 8a)?
- Was there variation across Regions with regard to monthly meeting between the DFCS caseworker and the child's father (when applicable) in all applicable months over the most recent 12-month period that reunification was either a single or concurrent goal (measure 8b)?

An applicable month is any month in which reunification was a single or concurrent permanency goal and the child was in DFCS custody in an out-of-home placement or in the home of a parent on a trial reunification placement.

*Measure 8a: Frequency of caseworker meetings with the mother*

Table 24 below provides the percentage of caseworker meetings with the mother at least once a month for all applicable months for all 13 Regions. As shown in the table, the frequency of caseworker meetings with mothers at least once a month in all (100 percent) applicable months ranged from 6.5 percent in Region VII-West to 55.6 percent in Region II-East.

19

Table 24: Frequency of caseworker meetings with child's mother at least once a month during all applicable months across the 13 DFCS Regions*

| Region | Percentage of applicable months that the caseworker met with the mother at least once during the 12 most recent months in which reunification was a single or concurrent goal | | | | | | Total |
|---|---|---|---|---|---|---|---|
| | Number of cases in which worker met with the mother in 100 % of applicable months | Number of cases in which worker met with the mother in 75 - <100% of applicable months | Number of cases in which worker met with the mother in 50 - < 75% of applicable months | Number of cases in which worker met with the mother in 25- <50% of applicable months | Number of cases in which worker met with the mother in 1 - < 25% of applicable cases | Number of cases in which there were no meetings between worker and the mother | |
| I-North | 6 (23.1) | 9 | 4 | 2 | 3 | 2 | 26 |
| I-South | 8 (34.8) | 9 | 1 | 4 | 0 | 1 | 23 |
| II-East | 5 (55.6) | 1 | 2 | 1 | 0 | 0 | 9 |
| II-West | 1 (12.5) | 4 | 2 | 0 | 0 | 1 | 8 |
| III-North | 1 (7.7) | 3 | 5 | 0 | 2 | 2 | 13 |
| III-South | 2 (14.3) | 1 | 3 | 1 | 2 | 5 | 14 |
| IV-North | 1 (10.0) | 6 | 0 | 2 | 1 | 0 | 10 |
| IV-South | 8 (50.0) | 2 | 6 | 0 | 0 | 0 | 16 |
| V-East | 5 (27.8) | 5 | 4 | 2 | 1 | 1 | 18 |
| V-West | 4 (28.6) | 6 | 0 | 2 | 0 | 2 | 14 |
| VI | 6 (31.6) | 2 | 3 | 4 | 2 | 2 | 19 |
| VII-East | 3 (13.6) | 3 | 2 | 8 | 1 | 5 | 22 |
| VII-West | 2 (6.5) | 5 | 8 | 0 | 12 | 4 | 31 |
| Total | 52 (23.3) | 56 | 40 | 26 | 24 | 25 | 223 |

*Applicable months are months in which reunification is a single or concurrent permanency goal and the child is in DFCS custody in an out-of-home placement or in a trial reunification placement with the parent.

Because of the overall low percentage of cases in which the caseworker met with the mother in 100 percent of applicable months, the analysis for the six largest regions combined cases into the following categories:  (1) Caseworker met with the mother once a month in 50 percent or more of applicable months; and (2) Caseworker met with the mother once a month in less than 50 percent of applicable months.  As shown in table 25, performance on these categories varied significantly across the six Regions [Chi-Square (5) = 17.176; p < .004].

20

Table 25: Frequency of caseworker meeting with child's mother at least once a month during all applicable months in the six largest DFCS Regions

| Region | Number of cases in which worker met with mother once a month in 50 percent or more of applicable months  N (%) | Number of cases in which worker met with mother once a month in less than 50 percent of applicable months | Total |
|---|---|---|---|
| I-North | 19 (73.1) | 7 | 26 |
| I-South | 18 (78.3) | 5 | 23 |
| III-South | 6 (42.9) | 8 | 14 |
| VI | 11 (57.9) | 8 | 19 |
| VII-East | 8 (36.4) | 14 | 22 |
| VII-West | 15 (48.4) | 16 | 31 |
| **Total** | **77 (57.0)** | **58** | **135** |

Chi-Square (5) = 17.176; p < .004

*Measure 8b: Frequency of caseworker meetings with the father*

Table 26 provides the percentage of caseworker meetings with the father at least once a month for all applicable months for all 13 Regions.  As shown in the table, the frequency of caseworker meetings with fathers at least one a month in all (100 percent) applicable months ranged from zero in Regions II-West, IV-North, IV-South and V-East to 20 percent in Region II-East.

21

Table 26: Frequency of caseworker meetings with the child's father at least once a month during all applicable months across the 13 DFCS Regions*

| Region | Percentage of applicable months that the caseworker met with the father at least once during the 12 most recent months in which reunification was a single or concurrent goal | | | | | | Total |
|---|---|---|---|---|---|---|---|
| | Number of cases in which worker met with the father in 100 % of applicable months | Number of cases in which worker met the father in 75 - <100% of applicable months | Number of cases in which worker met with the father in 50 - < 75% of applicable months | Number of cases in which worker met with the father in 25- <50% of applicable months | Number of cases in which worker met with the father in 1 - < 25% of applicable cases | Number of cases in which there were no meetings between worker and the father | |
| I-North | 1 (5.3) | 3 | 6 | 4 | 2 | 3 | 19 |
| I-South | 2 (10.5) | 2 | 3 | 5 | 2 | 5 | 19 |
| II-East | 1 (20.0) | 1 | 1 | 1 | 0 | 1 | 5 |
| II-West | 0 (0) | 0 | 0 | 1 | 1 | 1 | 3 |
| III-North | 1 (9.1) | 1 | 2 | 2 | 0 | 5 | 11 |
| III-South | 0 (0) | 0 | 1 | 0 | 0 | 5 | 6 |
| IV-North | 0 (0) | 1 | 2 | 2 | 1 | 3 | 9 |
| IV-South | 0 (0) | 1 | 1 | 2 | 2 | 4 | 10 |
| V-East | 0 (0) | 1 | 3 | 0 | 2 | 5 | 11 |
| V-West | 1 (11.1) | 1 | 2 | 0 | 0 | 5 | 9 |
| VI | 1 (7.7) | 0 | 3 | 2 | 3 | 4 | 13 |
| VII-East | 0 (0) | 1 | 1 | 3 | 4 | 10 | 19 |
| VII-West | 0 (0) | 0 | 3 | 4 | 7 | 7 | 21 |
| **Total** | **7 (4.5)** | **12** | **28** | **26** | **24** | **58** | **155** |

*Applicable months are months in which reunification is a single or concurrent permanency goal and the child is in DFCS custody in an out-of-home placement or in a trial reunification placement with the parent.

A similar analysis to the one done for caseworker meetings with mother was done for the six largest regions for caseworker meetings with the father. The data resulting from this analysis are presented in table 27, below. The variation across the six largest Regions with regard to performance on this assessment was found to be significant [Chi-Square (5) = 11.765; p < .038]. As shown in the table, the percentage of cases in which the caseworker met with the father at least once in 50 percent of the applicable months was higher in Region I-North than in the other Regions and a lower in Region VII-East than in the other Regions.

22

Table 27: Frequency of caseworker meeting with child's father at least once a month during all applicable months in the six largest DFCS Regions

| Region | Number of cases in which worker met with father once a month in 50 percent or more of applicable months N (%) | Number of cases in which worker met with father once a month in less than 50 percent of applicable months | Total |
|--------|---------|---------|-------|
| I-North | 10 (52.6) | 9 | 19 |
| I-South | 7 (36.8) | 12 | 19 |
| III-South | 1 (16.7) | 5 | 6 |
| VI | 4 (30.8) | 9 | 13 |
| VII-East | 2 (10.5) | 17 | 19 |
| VII-West | 3 (14.3) | 18 | 21 |
| **Total** | **27 (27.8)** | **70** | **97** |

Chi-Square (5) = 11.765; p < .038

## Measure 9: Placement stability of children in foster care for less than 12 months

Measure 9 is relevant to the following section of the Settlement Agreement:

> *Settlement Agreement, III.C.1.: Placement stability for children in foster care for less than 12 months from the time of removal (placement stability is two or fewer placements).*

Table 28 below presents the data on placement stability for all 13 DFCS Regions for children in foster care for less than 12 months during the period under review.  As shown in the table, there was substantial variation in performance on this measure across the 13 Regions with the percentages of children having two or fewer placements considerably lower in Region II-West than in the other Regions (this may be due to the small number of children in foster care for less than 12 months in that region), and higher in Regions VII-West and II-East than in the other Regions.

Table 29 below presents the data on placement stability for the six largest DFCS Regions. The variation in placement stability across Regions was found to be significant [Chi-Square (5) = 14.695; p < .012].  Overall, the percentage of children with two or fewer placements in VII-West was considerably higher than the percentage of children with two or fewer placements in the other large Regions.

Table 28: Placement stability for children in foster care for less than 12 months for the 13 DFCS Regions

| Region | Children with two or fewer placements | Children with three or more placements | Total |
|--------|---------------------------------------|----------------------------------------|-------|
| I-North | 7 (41.2) | 10 | 17 |
| I-South | 7 (53.8) | 6 | 13 |
| II-East | 5 (83.3) | 1 | 6 |
| II-West | 0 (0) | 3 | 3 |
| III-North | 7 (46.7) | 8 | 15 |
| III-South | 5 (45.5) | 6 | 11 |
| IV-North | 6 (66.7) | 3 | 9 |
| IV-South | 5 (55.6) | 4 | 9 |
| V-East | 11 (78.6) | 3 | 14 |
| V-West | 10 (66.7) | 5 | 15 |
| VI | 4 (40.0) | 6 | 10 |
| VII-East | 11 (55.0) | 9 | 20 |
| VII-West | 21 (91.3) | 2 | 23 |
| **Total** | **99 (60.0)** | **66** | **165** |

Table 29:  Placement stability of children in foster care for less than 12 months for the six largest DFCS Regions

| Region | Children with two or fewer Placements N (%) | Children with three or more placements | Total |
|--------|---------------------------------------------|----------------------------------------|-------|
| I-North | 7 (41.2) | 10 | 17 |
| I-South | 7 (53.8) | 6 | 13 |
| III-South | 5 (45.5) | 6 | 11 |
| VI | 4 (40.0) | 6 | 10 |
| VII-East | 11 (55.0) | 9 | 20 |
| VII-West | 21 (91.3) | 2 | 23 |
| **Total** | **55 (58.5)** | **39** | **94** |

Chi-Square (5) = 14.695; p < .012

## Measure 10: Frequency of children's visits with parents

Measure 10 is relevant to the following Settlement Agreement section:

> *Settlement Agreement, II.B.6.a.:  At the time of the initial team meeting when a child enters foster care, a visitation plan for the child and his/her family shall be developed as part of the child's service plan.  This visitation plan shall be developed and regularly updated in collaboration with parents, foster parents, and the child and should be appropriate to a) the child's age and developmental stage; b) the parents' strengths and needs; c) the schedule of the foster parents and parents; d) the social and cultural context of the family; and e) the status of the case and the permanency goal.  If parental visitation is appropriate based on the above factors, this visitation plan shall include a*

*minimum of two visits per month with the parents (unless a court order in the child's case limits such visits). For all children, regardless of permanency goal, this visitation plan shall include at least one visit per month with any siblings not in the same placement (unless a court order in the child's case limits such visits).*

The Region-level analysis addressed the following questions:

- Was there variation across Regions with regard to documentation in the case file of a visit between the child and her/his mother at least twice a month in all applicable months (measure 10a)?
- Was there variation across Regions with regard to documentation in the case file of a visit between the child and her/his father at least twice a month in all applicable months (measure 10b)?

An applicable month is any month that the child was in DFCS custody and in an out-of-home placement and a visit with the mother or father was appropriate and feasible.

*Measure 10a: Frequency of two visits a month between child and mother*

The data for measure 10a for all 13 Regions are provided in table 30 below.

Table 30: Frequency of visits between the child and mother for all 13 DFCS Regions

| Region | Children with two visits with the mother in applicable months | | | | | | Total |
|---|---|---|---|---|---|---|---|
| | Children with 2 visits in 100% of months N (%) | Children with 2 visits in at least 75 but less than 100% of months | Children with 2 visits in at least 50 but less than 75% of months | Children with 2 visits in at least 25 but less than 50% of months | Children with two visits in at least 1 but less than 25% of months | Children without 2 visits in any applicable month | |
| I-North | 1 (4.2) | 2 | 2 | 5 | 3 | 11 | 24 |
| I-South | 2 (9.1) | 3 | 3 | 2 | 1 | 11 | 22 |
| II-East | 1 (11.1) | 1 | 3 | 0 | 1 | 3 | 9 |
| II-West | 0 | 0 | 0 | 0 | 3 | 5 | 8 |
| III-North | 0 | 0 | 1 | 0 | 3 | 9 | 13 |
| III-South | 1 (6.7) | 0 | 1 | 0 | 1 | 12 | 15 |
| IV-North | 0 | 0 | 3 | 1 | 0 | 4 | 8 |
| IV-South | 1 (7.1) | 1 | 3 | 1 | 3 | 5 | 14 |
| V-East | 0 | 1 | 1 | 2 | 3 | 7 | 14 |
| V-West | 0 | 2 | 3 | 1 | 2 | 6 | 14 |
| VI | 0 | 0 | 4 | 2 | 1 | 9 | 16 |
| VII-East | 0 | 1 | 0 | 1 | 1 | 19 | 22 |
| VII-West | 1 (3.7) | 0 | 1 | 2 | 0 | 23 | 27 |
| **Total** | **7 (3.4)** | **11** | **25** | **17** | **22** | **124** | 206 |

25

As shown in table 30 there were two visits in all applicable months between the child and mother in only 3.4 percent of the 206 applicable cases. Because of the rarity of occurrence of two visits in all applicable months, the analysis for the six largest regions examined Region-level performance with regard to the following categories: (1) Children with two visits with mother in 50 percent or more of the applicable months; and (2) Children with two visits with mother in less than 50 percent of the applicable months. Although, as shown in table 31, below, there is some variation in performance across Regions, a meaningful Chi-Square analysis could not be done because of the small number of cases in which the child had a visit with mother twice a month in at least 50 percent of applicable months. In general, the percentage of children who had two or more visits with the mother in at least 50 percent of the applicable months was higher in Region I-South than in the other Regions.

Table 31: Frequency of child visits with mother twice a month in the six largest DFCS Regions

| Region | Children who had two visits a month with the mother in 50 percent or more of applicable months N (%) | Children who had two visits a month with the mother in less than 50 percent of applicable months | Total |
|--------|-----|-----|-----|
| I-North | 5 (20.8) | 19 | 24 |
| I-South | 8 (36.4) | 14 | 22 |
| III-South | 2 (13.3) | 13 | 15 |
| VI | 4 (25.0) | 12 | 16 |
| VII-East | 1 (4.5) | 21 | 22 |
| VII-West | 2 (7.4) | 25 | 27 |
| **Total** | **22(17.5)** | **104** | **126** |

*Measure 10b: Frequency of two visits a month between child and father*

Table 32 below presents the data on father-child visits for all 13 DFCS Regions. Again, there was a very small percentage of children in Sample 1 (3.0 percent) who had two visits a month with the father in all applicable months. In fact, as with the mother, the largest percentage (75.4 percent) of children in Sample 1 did not have any months in which they had at least two visits with the father.

Because of the small number of children who had two or more visits with their father in all applicable months, the data for the father were categorized in the same manner as those for the mother for the analysis of performance on this measure across the six largest Regions. As shown in table 33, although this analysis identified some variation in performance across Regions, similar to the analysis for the mother, the small number of cases in which there were visits in at least 50 percent of the applicable months meant that a meaningful Chi-Square analysis could not be done.

Table 32: Frequency of visits between the child and the father for all 13 DFCS Regions

| Region | Children with two visits a month with the father in applicable months | | | | | | Total |
|---|---|---|---|---|---|---|---|
| | Children with 2 visits in 100% of applicable months N (%) | Children with 2 visits in at least 75 but less than 100% of applicable months | Children with 2 visits in at least 50 but less than 75% of applicable months | Children with 2 visits in at least 25 but less than 50% of applicable months | Children with two visits in at least 1 but less than 25% of applicable months | Children without 2 visits in any applicable month | |
| I-North | 1 (4.5) | 2 | 2 | 2 | 3 | 12 | 22 |
| I-South | 0 | 1 | 0 | 1 | 1 | 15 | 18 |
| II-East | 0 | 0 | 1 | 1 | 0 | 3 | 5 |
| II-West | 0 | 0 | 0 | 0 | 1 | 5 | 6 |
| III-North | 0 | 0 | 0 | 2 | 2 | 9 | 13 |
| III-South | 1 (12.5) | 0 | 0 | 0 | 0 | 7 | 8 |
| IV-North | 1 (1.1) | 0 | 0 | 2 | 0 | 6 | 9 |
| IV-South | 0 | 0 | 1 | 1 | 0 | 9 | 11 |
| V-East | 0 | 0 | 0 | 2 | 0 | 8 | 10 |
| V-West | 0 | 1 | 0 | 1 | 1 | 7 | 10 |
| VI | 1 (7.1) | 0 | 1 | 0 | 1 | 11 | 14 |
| VII-East | 0 | 0 | 1 | 1 | 2 | 17 | 21 |
| VII-West | 1 (5.0) | 0 | 0 | 2 | 0 | 17 | 20 |
| **Total** | 5 (3.0) | 4 | 6 | 15 | 11 | 126 | 167 |

Table 31: Frequency of child visits with the father twice a month in the six largest DFCS Regions

| Region | Children who had two visits a month with father in 50 percent or more of applicable months N (%) | Children who had two visits a month with father in less than 50 percent of applicable months | Total |
|---|---|---|---|
| I-North | 5 (22.7) | 17 | 22 |
| I-South | 1 (5.6) | 17 | 18 |
| III-South | 1 (12.5) | 7 | 8 |
| VI | 2 (14.3) | 12 | 14 |
| VII-East | 1 (4.8) | 20 | 21 |
| VII-West | 1 (5.0) | 19 | 20 |
| **Total** | **11 (10.7)** | **92** | **103** |

**Measure 11:  Timeliness of mental health assessments**

Measure 11 is relevant to the following Settlement Agreement section:

> *Settlement Agreement, II.B.7.f.: Each child four years old and older shall be provided with a mental health assessment by a qualified professional within 30 calendar days of foster care placement.  Each foster child who reaches the age of four in care shall be provided with a mental health assessment within 30 calendar days of his/her fourth birthday.  Each foster child shall receive recommended mental health services pursuant to his/her assessment.*

The Region-level analysis addressed the question of whether there was variation across Regions with regard to eligible children receiving a mental health assessment in 30 days or less from the date of entry into DFCS custody or in 30 days or less from the date of the child's fourth birthday.

Table 32 below provides the data for this measure for all 13 DFCS Regions.  As shown in the table, the percentage of children with a timely mental health assessment ranged substantially from 12.5 percent in Region I-South to 81.2 percent in Region VII-East.

Table 32: Timeliness of mental health assessments for all 13 DFCS Regions

| Region | Timeliness of mental health assessment | | | Total |
| | Children with a mental health assessment in 30 days or less | Children with a mental health assessment in more than 30 days | Children with no mental health assessment in file | |
|---|---|---|---|---|
| I-North | 5 (25.0) | 9 | 6 | 20 |
| I-South | 2 (12.5) | 10 | 4 | 16 |
| II-East | 1 (20.0) | 3 | 1 | 5 |
| II-West | 1 (14.3) | 5 | 1 | 7 |
| III-North | 1 (8.3) | 7 | 4 | 12 |
| III-South | 5 (45.5) | 3 | 3 | 11 |
| IV-North | 4 (66.7) | 1 | 1 | 6 |
| IV-South | 2 (18.2) | 2 | 7 | 11 |
| V-East | 2 (15.4) | 4 | 7 | 13 |
| V-West | 4 (26.7) | 7 | 4 | 15 |
| VI | 2 (15.4) | 7 | 4 | 13 |
| VII-East | 13 (81.2) | 0 | 3 | 16 |
| VII-West | 4 (16.0) | 7 | 14 | 25 |
| Total | 46 | 65 | 59 | 170 |

The data pertaining to mental health assessments for the six largest regions is presented in table 33, below, with respect to whether there was a mental health assessment documented in the case

file, regardless of the timeliness of the assessment. The variation in performance on this measure across Regions was not found to be significant.

Table 33: Existence of a mental health assessment in the child's file in the six largest DFCS Regions

| Region | Children with a mental health assessment in the case file N (%) | Children with no mental health assessment in the case file | Total |
|---|---|---|---|
| I-North | 14 (70.0) | 6 | 20 |
| I-South | 12 (75.0) | 4 | 16 |
| III-South | 8 (72.7) | 3 | 11 |
| VI | 9 (69.2) | 4 | 13 |
| VII-East | 13 (81.2) | 3 | 16 |
| VII-West | 11 (44.0) | 14 | 25 |
| **Total** | **67 (66.3)** | **67** | **101** |

**Measure 12: Timeliness of physical health assessments**

Measure 12 is relevant to the following Settlement Agreement section:

*Settlement Agreement, II.B.7.a., b., c., and d.:*
 a) *Every child entering foster care shall receive a health screening evaluation from a qualified medical practitioner within 72 hours after placement that is in accordance with the health screening recommended by the American Academy of Pediatrics.*
 b) *Within 30 days of placement in foster care, each child shall receive a comprehensive health assessment that is in accordance with the assessment recommended by the American Academy of Pediatrics.*
 c) *Nothing in the above paragraphs shall prohibit the initial health screening evaluation and the comprehensive health assessment from being conducted in one clinical visit. However, in such instances, this combined visit shall be conducted within 72 hours of placement.*
 d) *All children shall receive periodic medical examinations and all medically necessary follow-up services and treatment throughout the time they are in state custody in accordance with the time periods recommended by the American Academy of Pediatrics.*

The Region-level analysis addressed the following questions:
- Was there variation across Regions with regard to documentation in the case file of an initial health screen conducted in 3 days or less from the date of the child's entry into DFCS custody (measure 12a)?
- Was there variation across Regions with regard to documentation in the case file of a comprehensive health screen conducted in 30 days or less from the date of the child's entry into DFCS custody (measure 12b)?

*Measure 12a: Timeliness of the initial health screen*

The data pertaining to the timeliness of the initial health screen are presented in table 34 below. As shown in the table, the percentage of children receiving an initial health screen within 3 days of entry into DFCS custody ranged extensively from 6.1 percent in Region VII-West to 66.7 percent in Region II-East.

Table 35 below presents the findings for performance on this measure for the six largest DFCS Regions. Performance on this measure was found to vary significantly across Regions [Chi-Square (10) = 51.601; p < .000], with Region I-South having the largest percentage of health screens and Region VII-West having the lowest percentage of health screens within 3 days. Regions VII-West and III-South also had the highest percentages of children who had no health screen documented in the case file.

Table 34: Timeliness of initial health screens for children entering DFCS custody across the 13 DFCS Regions

| Region | Timeliness of Initial Health Screen | | | Total |
| | Children with a health screen in 3 days or less | Children with a health screen in 4 or more days | Children with no health screen in the case file | |
|---|---|---|---|---|
| I-North | 9 (32.1) | 17 | 2 | 28 |
| I-South | 11 (44.0) | 12 | 2 | 25 |
| II-East | 6 (66.7) | 3 | 0 | 9 |
| II-West | 2 (25.0) | 6 | 0 | 8 |
| III-North | 2 (11.8) | 14 | 1 | 17 |
| III-South | 2 (10.0) | 7 | 11 | 20 |
| IV-North | 1 (8.3) | 7 | 4 | 12 |
| IV-South | 9 (52.9) | 8 | 0 | 17 |
| V-East | 7 (36.8) | 8 | 4 | 19 |
| V-West | 6 (37.5) | 7 | 3 | 16 |
| VI | 8 (38.1) | 12 | 1 | 21 |
| VII-East | 9 (33.3) | 6 | 12 | 27 |
| VII-West | 2 (6.1) | 9 | 22 | 33 |
| **Total** | **74 (29.4)** | **116** | **62** | **252** |

30

Table 35: Timeliness of child's initial health screen across the six largest DFCS Regions

| Region | Children with a health screen in 3 days or less N (%) | Children with a health screen in 4 or more days | Children with no health screen in the case file N (%) | Total |
|---|---|---|---|---|
| I-North | 9 (32.1) | 17 | 2 (7.1) | 28 |
| I-South | 11 (44.0) | 12 | 2 (8.0) | 25 |
| III-South | 2 (10.0) | 7 | 11 (55.0) | 20 |
| VI | 8 (38.1) | 12 | 1 (4.8) | 21 |
| VII-East | 9 (33.3) | 6 | 12 (44.4) | 27 |
| VII-West | 2 (6.1) | 9 | 22 (66.7) | 33 |
| **Total** | **41 (26.6)** | **63** | **50 (32.5)** | **154** |

Chi-Square (10) = 51.601; p < .000

*Measure 12b: Timeliness of comprehensive health assessment*

The data pertaining to the timeliness of the comprehensive health assessment for all 13 DFCS Regions are presented in table 36, below. As shown in the table, the percentage of children receiving a comprehensive health assessment in 30 days or less from the date of the child's entry into DFCS custody ranged from 6.1 percent in Region VII-West to 57.1 percent in Region VI.

Table 36: Timeliness of children's comprehensive health assessments for children entering DFCS custody across the 13 DFCS Regions

| Region | 30 days or less to comprehensive health assessment | | | Total |
|---|---|---|---|---|
| | Children with a comprehensive assessment in 30 days or less N (%) | Children with a comprehensive assessment in 31 days or more | Children with no comprehensive assessment | |
| I-North | 12 (42.9) | 5 | 11 | 28 |
| I-South | 12 (48.0) | 1 | 12 | 25 |
| II-East | 3 (33.3) | 4 | 2 | 9 |
| II-West | 3 (37.5) | 2 | 3 | 8 |
| III-North | 6 (35.3) | 2 | 9 | 17 |
| III-South | 4 (20.0) | 2 | 14 | 20 |
| IV-North | 2 (16.7) | 0 | 10 | 12 |
| IV-South | 8 (47.1) | 3 | 6 | 17 |
| V-East | 4 (21.1) | 3 | 12 | 19 |
| V-West | 7 (43.7) | 3 | 6 | 16 |
| VI | 12 (57.1) | 6 | 3 | 21 |
| VII-East | 2 (7.4) | 1 | 24 | 27 |
| VII-West | 2 (6.1) | 3 | 28 | 33 |
| **Total** | **77 (30.6)** | **35** | **140** | **252** |

Table 37 below presents the findings for performance with regard to a comprehensive health assessment across the six largest regions. Because of the small number of comprehensive health assessments conducted more than 30 days after the child's entry into DFCS custody, the analysis

31

for the six largest regions focused on whether there was variation across Regions with regard to documentation of a comprehensive health assessment in the child's case file. These data are presented in table 37. Performance on this measure was found to vary significantly across Regions [Chi-Square (5) = 43.407; p < .000] with the lowest percentages of children with a documented comprehensive health assessment being in Regions VII-East and VII-West and the highest percentage being in Region VI.

Table 37: Existence of a comprehensive health assessment in the case file in the six largest DFCS Regions

| Region | Children with a comprehensive health assessment documented in the case file N (%) | Children with no comprehensive health assessment documented in the case file | Total |
|--------|-----------------------------------------------------|------------------------------------|-------|
| I-North | 17 (60.7) | 11 | 28 |
| I-South | 13 (52.0) | 12 | 25 |
| III-South | 6 (30.0) | 14 | 20 |
| VI | 18 (85.7) | 3 | 21 |
| VII-East | 3 (11.1) | 24 | 27 |
| VII-West | 5 (15.2) | 28 | 33 |
| **Total** | **62 (42.8)** | **92** | **154** |

Chi-Square (5) = 43.407; p < .000

## Measure 13: Timeliness of dental examinations

Measure 13 is relevant to the following section of the Settlement Agreement:

> *Settlement Agreement, II.B.7.e.: Each child three years old and older shall be provided with a dental examination within 90 calendar days of foster care placement and every six months thereafter. Each foster child who reaches the age of three in care shall be provided with a dental examination within 90 calendar days of his/her third birthday and every six months thereafter. Foster children shall receive all medically necessary dental services.*

The Region-level analysis examined whether there was variation across Regions with regard to provision of dental examinations in 90 days or less from the date of the child's entry into DFCS custody for those children entering foster care at age 3 or within 90 days or less of the child's third birthday while in foster care.

Table 38 below presents the data on performance on this measure for all 13 DFCS Regions. As shown in the table, the percentage of children who received a dental examination in a timely manner ranged from 24.0 percent in Region VII-West to 72.2 percent in Region I-South. The percentage of children with no documented dental examination in the case file ranged from 0 in Region IV-North to 66.7 percent in Region VII-East.

32

Table 38:  Timeliness of dental examinations across the 13 DFCS Regions

| Region | Timeliness of Dental Examinations | | | |
|---|---|---|---|---|
| | Children with dental exams in 90 days or less of entry or 3rd birthday | Children with dental exams in more than 90 days of entry or 3rd birthday | Children with no dental exams documented in the case file | Total |
| I-North | 10 (45.5) | 5 | 7 (31.8) | 22 |
| I-South | 13 (72.2) | 4 | 1 (5.6) | 18 |
| II-East | 4 (57.1) | 2 | 1 (14.3) | 7 |
| II-West | 5 (71.4) | 1 | 1 (14.3) | 7 |
| III-North | 7 (43.7) | 7 | 2 (12.5) | 16 |
| III-South | 6 (46.2) | 1 | 6 (46.2) | 13 |
| IV-North | 4 (57.1) | 3 | 0 (0) | 7 |
| IV-South | 4 (40.0) | 5 | 1 (10.0) | 10 |
| V-East | 8 (57.1) | 3 | 3 (21.4) | 14 |
| V-West | 7 (50.0) | 3 | 4 (28.6) | 14 |
| VI | 9 (60.0) | 4 | 2 (13.3) | 15 |
| VII-East | 6 (28.6) | 1 | 14 (66.7) | 21 |
| VII-West | 6 (24.0) | 7 | 12 (48.0) | 25 |
| **Total** | **89 (47.1)** | **46** | **54 (28.6)** | **189** |

For the six largest regions, an analysis was done on whether there was documentation of a dental examination in the case file regardless of the timeframe for performing that examination.  As shown in table 39, below, performance with respect to these categories varied considerable and the variation was found to be significant [Chi-Square (5) = 21.223; $p < .001$].  Children were more likely to have dental exams documented in the case file in Regions I-South and VI than in the other regions; children were least likely to have dental exams documented in the case file in Region VII-East.

Table 39: Existence of dental exam documented in the case file in the six largest DFCS Regions

| Region | Children with a dental exam documented in the case file N (%) | Children without a dental exam documented in the case file | Total |
|---|---|---|---|
| I-North | 15 (68.2) | 7 | 22 |
| I-South | 17 (94.4) | 1 | 18 |
| III-South | 7 (53.8) | 6 | 13 |
| VI | 13 (86.7) | 2 | 15 |
| VII-East | 7 (33.3) | 14 | 21 |
| VII-West | 13 (52.0) | 12 | 25 |
| **Total** | **72 (63.2)** | **42** | **114** |

Chi-Square (5) = 21.223; $p < .001$

**Measure 14: Frequency of assigned caseworker visits with children**

Measure 14 is relevant to the following section of the Settlement Agreement:

> *Settlement Agreement, II.B.10.a.:  Regardless of whether a child's foster care placement is being directly supervised by DFCS or by a contract agency, the assigned DFCS caseworker (either County of Service or County of Responsibility) shall meet with the child in person and, where age-appropriate, alone at least twice monthly to assess the child's safety and well-being, service delivery, and achievement of permanency and other service goals.  At least one visit per month shall take place in the child's placement. During a child's first month in foster care and after each change of placement, the assigned DFCS caseworker shall meet with the child in person, and, where age-appropriate, alone, to assess the child's adjustment to the placement and whether more frequent visits by the caseworker are necessary. This assessment may occur at a regularly scheduled visit with the child.*

The Region-level analysis addressed the following questions:
- Was there variation across DFCS Regions with regard to the frequency of assigned caseworker visits with the child twice a month with one visit being in the child's placement for the applicable months in the 12-month period prior to discharge from foster care or the end of the period under review (measure 14a)?
- Was there variation across DFCS Regions with regard to the frequency of assigned caseworker visits with the child twice a month regardless of the location of the visit for the applicable months in the 12-month period prior to discharge from foster care or the period under review (measure 14b)?
- Was there variation across DFCS Regions with regard to the frequency of assigned caseworker visits with the child in the child's placement for the applicable months in the 12-month period prior to discharge from foster care or the period under review (measure 14c)?

An applicable month is if a child is in an out of home placement for the entire month.

*Measure 14a:  Assigned caseworker visits with children twice a month with one visit being in the child's placement*

Table 40 below provides the data for measure 14a across all 13 DFCS Regions.  As shown in the table, the percentage of children who had two visits with their assigned caseworker with one visit being in the child's placement for all applicable months ranged from 3.7 percent in Region VII-East to 43.8 percent in Region V-West.

Table 40:  Assigned caseworker visits with children twice a month with one visit being in the child's placement for the 13 DFCS Regions

| Region | Percentage of applicable months in which children were visited at least twice by the assigned caseworker with at least one visit being in the placement | | | | | | Total |
|---|---|---|---|---|---|---|---|
| | Children with 2 visits in 100% of applicable months with 1 visit in placement | Children with 2 visits in at least 75 but less than 100% of applicable months with 1 visit in placement | Children with 2 visits in at least 50 but less than 75% of applicable months with 1 visit in placement | Children with 2 visits in at least 25 but less than 50% of applicable months with 1 visit in placement | Children with two visits in at least 1 but less than 25% of applicable months with one visit in placement | Children without 2 visits in any applicable month | |
| I-North | 6 (21.4) | 5 | 9 | 7 | 0 | 1 | 28 |
| I-South | 10 (40.0) | 8 | 3 | 2 | 2 | 0 | 25 |
| II-East | 2 (22.2) | 4 | 3 | 0 | 0 | 0 | 9 |
| II-West | 3 (37.5) | 3 | 1 | 0 | 0 | 1 | 8 |
| III-North | 2 (11.8) | 5 | 5 | 2 | 3 | 0 | 17 |
| III-South | 3 (15.0) | 4 | 9 | 2 | 1 | 1 | 20 |
| IV-North | 2 (16.7) | 6 | 2 | 2 | 0 | 0 | 12 |
| IV-South | 6 (35.3) | 9 | 2 | 0 | 0 | 0 | 17 |
| V-East | 4 (21.1) | 7 | 2 | 2 | 2 | 2 | 19 |
| V-West | 7 (43.8) | 4 | 3 | 1 | 1 | 0 | 16 |
| VI | 5 (23.8) | 6 | 3 | 4 | 3 | 0 | 21 |
| VII-East | 1 (3.7) | 1 | 0 | 4 | 10 | 11 | 27 |
| Total | 53 (21.0) | 64 | 46 | 31 | 30 | 28 | 252 |

Table 41 below presents the data for the six largest DFCS Regions with regard to whether the assigned caseworker had two visits with the child in 50 percent or more of the applicable months with one visit being in the child's placement.  Performance on these categories was found to vary significantly across the six largest Regions [Chi-Square (5) = 54.317; p < .000].  Children in Regions I-South and III-South were more likely to have visits with their assigned caseworkers twice a month in 50 percent or more of applicable months than were children in the other largest Regions.  In comparison, children in Region VII-East were considerably less like than children in the other Regions to have two visits with their assigned caseworker in 50 percent or more applicable months.

Table 41: Frequency of assigned caseworker visits with the child at least twice with one visit being in the child's placement for all applicable months in the six largest DFCS Regions

| Region | Children who had visits with their assigned caseworker at least twice with one visit being in the placement in 50 percent or more of applicable months N (%) | Children who had visits with their assigned caseworker at least twice with one visit being in the placement in less than 50 percent of applicable months | Total |
|---|---|---|---|
| I-North | 20 (71.4) | 8 | 28 |
| I-South | 21 (84.0) | 4 | 25 |
| III-South | 16 (80.0) | 4 | 20 |
| VI | 14 (66.7) | 7 | 21 |
| VII-East | 2 (7.4) | 25 | 27 |
| VII-West | 8 (24.2) | 25 | 33 |
| **Total** | **81(52.6)** | **73** | **154** |

Chi-Square (5) = 54.317; p < .000

*Measure 14b: Assigned Caseworker visits with child twice a month regardless of location of visit*

Table 42 below presents the data pertaining to assigned caseworker visits with the child twice a month regardless of location for applicable months across the 13 DFCS Regions. As shown in the table, the percentage of children who had two visits with their assigned caseworker in all applicable months ranged from 3.7 percent in Region VII-East to 50 percent in Region V-West.

Table 43 below presents the data pertaining to assigned caseworker visits with the child twice a month in at least 50 percent of the applicable months regardless of location for the six largest DFCS Regions. As shown in the table, the percentages in this table are either the same or only slightly larger than the percentages in table 43. The variation across the six Regions also is similar to those found in table 43, with children in Regions VII-East and VII-West considerably less likely to have two visits with their assigned caseworkers in at least 50 percent of the applicable months.

36

Table 42: Frequency of assigned caseworker visits with children twice a month in applicable months regardless of location of the visit for the 13 DFCS Regions

| Region | Children with 2 visits from assigned caseworker in each applicable month | | | | | | Total |
|---|---|---|---|---|---|---|---|
| | Children with 2 visits in 100% of applicable months N (%) | Children with 2 visits in at least 75% but less than 100% of applicable months | Children with 2 visits in at least 50% but less than 75% of applicable months | Children with 2 visits in at least 25% but less than 50% of applicable months | Children with two visits in at least 1 but less than 25% of applicable months | Children without 2 visits in any applicable month | |
| I-North | 6 (21.4) | 5 | 9 | 6 | 2 | 0 | 28 |
| I-South | 11 (44.0) | 7 | 3 | 4 | 0 | 0 | 25 |
| II-East | 3 (33.3) | 3 | 3 | 0 | 0 | 0 | 9 |
| II-West | 4 (50.0) | 3 | 0 | 0 | 0 | 1 | 8 |
| III-North | 2 (11.8) | 5 | 5 | 4 | 1 | 0 | 17 |
| III-South | 5 (25.0) | 4 | 7 | 2 | 1 | 1 | 20 |
| IV-North | 4 (33.3) | 4 | 2 | 2 | 0 | 0 | 12 |
| IV-South | 8 (47.1) | 9 | 0 | 0 | 0 | 0 | 17 |
| V-East | 7 (36.8) | 6 | 1 | 2 | 2 | 1 | 19 |
| V-West | 8 (50.0) | 5 | 1 | 1 | 1 | 0 | 16 |
| VI | 6 (28.6) | 8 | 3 | 1 | 3 | 0 | 21 |
| VII-East | 1 (3.7) | 1 | 1 | 4 | 8 | 12 | 27 |
| VII-West | 3 (9.1) | 2 | 5 | 4 | 8 | 11 | 33 |
| **Total** | **68** | **62** | **40** | **30** | **26** | **26** | **252** |

Table 43: Frequency of assigned caseworker visits with the child at least twice in applicable months in the six largest DFCS Regions

| Region | Children who had visits with their assigned caseworker at least twice in 50 percent or more of applicable months N (%) | Children who had visits with their assigned caseworker at least twice in less than 50 percent of applicable months | Total |
|---|---|---|---|
| I-North | 20 (71.4) | 8 | 28 |
| I-South | 21 (84.0) | 4 | 25 |
| III-South | 16 (80.0) | 4 | 20 |
| VI | 17 (81.0) | 4 | 21 |
| VII-East | 3 (11.1) | 24 | 27 |
| VII-West | 10 (30.3) | 23 | 33 |
| **Total** | **87 (56.5)** | **67** | **154** |

37

*Measure 14c: Assigned caseworker visits with child at least once a month in the child's placement*

Table 44 below presents the data for assigned caseworker visits with the child at least once a month in the child's placement for all applicable months across all 13 DFCS Regions. As shown in the table, the frequency of assigned caseworker visits with child at least once in the child's placement in all applicable months ranged from 11.1 percent in Region VII-East to 68.7 percent in Region V-West, and 68.0 percent in Region I-South.

Table 44: Assigned caseworker visits with the child at least once a month in the child's placement for applicable months for the 13 DFCS Regions

| Region | Assigned caseworker visits with the child in the child's placement | | | | | | Total |
|---|---|---|---|---|---|---|---|
| | Children with 1 visit in placement in 100% of applicable months N (%) | Children with 1 visit in placement at least 75 but less than 100% of applicable months | Children with 1 visit in placement at least 50 but less than 75% of applicable months | Children with 1 visit in placement at least 25 but less than 50% of applicable months | Children with 1 visit in placement at least 1 but less than 25% of applicable months | Children without 2 visits in any applicable month | |
| I-North | 14 (50.0) | 9 | 4 | 1 | 0 | 0 | 28 |
| I-South | 17 (68.0) | 6 | 1 | 0 | 1 | 0 | 25 |
| II-East | 6 (66.7) | 2 | 1 | 0 | 0 | 0 | 9 |
| II-West | 4 (50.0) | 3 | 0 | 0 | 0 | 1 | 8 |
| III-North | 5 (29.4) | 6 | 3 | 2 | 1 | 0 | 17 |
| III-South | 10 (50.0) | 2 | 7 | 0 | 0 | 1 | 20 |
| IV-North | 5 (41.7) | 4 | 3 | 0 | 0 | 0 | 12 |
| IV-South | 9 (52.9) | 7 | 1 | 0 | 0 | 0 | 17 |
| V-East | 9 (47.4) | 7 | 1 | 2 | 0 | 0 | 19 |
| V-West | 11 (68.7) | 3 | 2 | 0 | 0 | 0 | 16 |
| VI | 9 (42.9) | 6 | 5 | 1 | 0 | 0 | 21 |
| VII-East | 3 (11.1) | 8 | 8 | 5 | 2 | 1 | 27 |
| VII-West | 6 (18.2) | 8 | 10 | 8 | 0 | 1 | 33 |
| **Total** | **108 (42.9)** | **71** | **46** | **19** | **4** | **4** | **252** |

Table 45 below provides the data for assigned caseworker visits with the child in the child's placement in at least 50 percent of the applicable months compared to less than 50 percent of the applicable months for the six largest DCFS Regions. As shown in the table, in the six Regions there was a relatively small number of children who were visited by the assigned caseworker in their placements in less than 50 percent of the applicable months.

38

Table 45: Frequency of assigned caseworker visits with the child in the child's placement in the six largest DFCS Regions

| Region | Children with at least one assigned caseworker visit in the placement in 50 percent or more of applicable months | Children with at least one assigned caseworker visit in the placement in less than 50 percent of applicable months | Total |
|---|---|---|---|
| I-North | 27 (96.4) | 1 | 28 |
| I-South10 | 24 (96.0) | 1 | 25 |
| III-South | 19 (95.0) | 1 | 20 |
| VI | 20 (95.2) | 1 | 21 |
| VII-East | 19 (70.4) | 8 | 27 |
| VII-West | 24 (72.7) | 9 | 33 |
| **Total** | **133 (86.4)** | **21** | **154** |

## Measure 15:  Caseworker visits with foster parents

Measure 15 is relevant to the following section of the Settlement Agreement

> *Settlement Agreement, II.B.10.c.:  A DFCS foster care worker shall regularly communicate with non-therapeutic foster parents who have one or more foster children residing in their home and visit the home at least monthly to (1) share all relevant and legally disclosable information concerning the foster child; (2) evaluate the foster child's safety, needs and well-being; and (3) monitor service delivery and achievement of service goals.*

The Region-level analysis addressed whether there was documentation in the case file of a monthly face-to-face visit with the child's foster parent in the foster parent's home for each applicable month during the 12-month period prior to the child's discharge from foster care or the end of the period under review.

An applicable month is if a child is in an out of home placement with a relative or non relative and licensed or non licensed foster parent.

Table 46 below provides the data for the frequency of monthly caseworker visits with the child's foster parent in the foster parent's home for the 13 DFCS Regions.  As shown in the table, the percentage of children whose caseworker visited at least once with their foster parents in the foster parent home in all applicable months ranged considerably from 0 in Region III-North to 40.0 percent in Region II-East.

Table 47 below provides the data for the six largest DFCS Regions with regard to whether caseworker visits with foster parents in the foster home occurred in at least 50 percent of the applicable months. The variation in performance on this measure was found to be significant across the Regions [Chi-Square (5) = 11.823; p < .037].  As shown in the table, children in

Region I-North were more likely to have had their caseworker visit with the foster parent in the foster parent home than children in the other largest Regions.

Table 46: Frequency of caseworker visits with foster parents in the foster parent home in the 13 DFCS Regions

| Region | Visits between foster parents and caseworker in applicable months | | | | | | Total |
|---|---|---|---|---|---|---|---|
| | Children with 1 visit between foster parent and caseworker in 100% of applicable months N (%) | Children with 1 visit between foster parent and caseworker in at least 75 but less than 100% of applicable months | Children with 1 visit between foster parent and caseworker in at least 50 but less than 75% of applicable months | Children with 1 visit between foster parent and caseworker in at least 25 but less than 50% of applicable months | Children with 1 visit between foster parent and caseworker in at least 1 but less than 25% of applicable months | Children with no visits between foster parent and caseworker in any applicable month | |
| I-North | 6 (33.3) | 3 | 4 | 2 | 2 | 1 | 18 |
| I-South | 7 (30.4) | 5 | 2 | 5 | 2 | 2 | 23 |
| II-East | 2 (40.0) | 0 | 1 | 1 | 0 | 1 | 5 |
| II-West | 1 (12.5) | 0 | 2 | 1 | 1 | 3 | 8 |
| III-North | 0 (0) | 5 | 2 | 2 | 1 | 5 | 15 |
| III-South | 2 (18.2) | 0 | 4 | 3 | 0 | 2 | 11 |
| IV-North | 1 (14.3) | 1 | 3 | 0 | 0 | 2 | 7 |
| IV-South | 1 (7.7) | 4 | 3 | 4 | 0 | 1 | 13 |
| V-East | 2 (13.3) | 3 | 3 | 3 | 1 | 3 | 15 |
| V-West | 1 (7.1) | 4 | 4 | 3 | 1 | 1 | 14 |
| VI | 1 (5.9) | 0 | 8 | 2 | 1 | 5 | 17 |
| VII-East | 1 (5.9) | 3 | 1 | 3 | 1 | 8 | 17 |
| VII-West | 2 (7.1) | 5 | 5 | 4 | 4 | 8 | 28 |
| **Total** | **27 (14.1)** | **33** | **42** | **33** | **14** | **42** | **191** |

Table 47: Frequency of caseworker meetings with foster parent in the foster home in the six largest DFCS Regions

| Region | Children whose caseworker met with the foster parent in the home at least once in 50 percent or more of the applicable months - N (%) | Children whose caseworker met with the foster parent in the home at least once in less than 50 percent of applicable months | Total |
|---|---|---|---|
| I-North | 13 (72.2) | 5 | 18 |
| I-South | 14 (60.9) | 9 | 23 |
| III-South | 6 (54.5) | 5 | 11 |
| VI | 9 (52.9) | 8 | 17 |
| VII-East | 5 (29.4) | 12 | 17 |
| VII-West | 12 (42.9) | 16 | 28 |
| **Total** | **59 (51.8)** | **55** | **114** |

Chi-Square (5) = 11.823; p < .037

**Ex. 7**

DATA ANALYSIS REPORT
MISSISSIPPI CASE RECORD REVIEW
SAMPLE 2

## SECTION 1: STUDY DESCRIPTION

In July of 2011, the Office of the Court Monitor in conjunction with the Mississippi Department of Family and Children's Services (DFCS) conducted a case record review study of children in DFCS custody to establish baseline data relevant to the requirements of the Mississippi Settlement Agreement and Reform Plan. The period under review for the case record study was January 1, 2009 to March 31, 2011.

Two different samples of case records were reviewed and analyzed. The first, referred to herein as Sample 1, is a sample of 252 children who entered foster care after January 1, 2009 and were in DFCS custody for at least 60 days. The findings related to Sample 1 were submitted to the parties in report form on February 22, 2012 for the overall findings and on March 30, 2012 for the findings by DFCS Regions. This report addresses findings related to Sample 2.

The intent of Sample 2 was to capture the experiences of children who were in DFCS custody for longer periods of time than were the children in Sample 1—at least 4 years. The sample includes the case records of 40 children who were in DFCS custody on March 31, 2011, who had entered DFCS custody prior to March 31, 2007, and who remained in custody continuously until the end of the period under review. Information in case records for children in this sample prior to January 1, 2009 was not collected in this case review unless specifically requested in a question or in the instructions. The questions where reviewers were instructed to use information prior to January 2009 related to the reason for the child entering foster care, the dates that an adoption goal was established, the date that there was a termination of parental rights for each parent, and whether a reason for not seeking termination of parental rights was documented in the case file.

Sample 2 was initially intended to be larger than the 40 cases and to be representative of the population in DFCS custody for 4 years or longer. However, it was not possible to review more than 40 of the Sample 2 cases by the end of the 10-day review period due primarily to the size of the Sample 2 case records, the extent of time needed to review the Sample 1 cases, and problems with the Mississippi Automated Statewide Child Welfare System (MACWIS) that resulted in reviewers not being able to access case records on MACWIS for most of a full day of the review period. Consequently, the cases reviewed for Sample 2 cannot be considered a representative sample of children in DFCS custody for 4 years or longer. Therefore, the findings reported in this document provide a general picture of the experiences of the children included in Sample 2, but cannot be generalized to the population of all children in DFCS custody for 4 years or longer. In addition, the Sample 2 report does not include analyses of all of the Settlement Agreement provisions that were addressed in the Sample 1 report because of the small size of Sample 2 relative to certain requirements.

The case record reviews were conducted by 21 reviewers who were DFCS employees and six quality assurance team members from the Office of the Court Monitor, the Center for the

1

Support of Families, and DFCS.  The case record review study included reviews of each child's paper case record as well as the case record in MACWIS.

## CHILD CHARACTERISTICS

### Key Findings

- 17 (42.5 percent) of the 40 children in the sample were female, 23 (57.5 percent) were male.
- 9 (22.5 percent) of the 40 children in the sample were White and 31 (77.5 percent) were African American.
- 2 (5.0 percent) of the 40 children in the sample were younger than age 5 at the start of the period under review; 18 (45.0 percent) of the 40 children in the sample were age 15 and older at the start of the period under review.
- 22 (55.0 percent) of the 40 children in the sample were age 10 years or older at the time of entry into DFCS custody.
- The most frequently noted reasons for the child's removal from the home were physical neglect (29 [72.5 percent] of the 40 children), parent's having inadequate parenting skills (19 [47.5 percent] of the 40 children), and parent's having inadequate housing (14 [35.0 percent] of the 40 children).
- 2 (5.0 percent) of the 40 children had a goal of reunification at the end of the period under review; 11 (27.5 percent) of the 40 children had a goal of adoption; and 17 (42.5 percent) of the 40 children had a goal of emancipation/independent living.
- For 16 (40.0 percent) of the 40 children, there was documentation in the case record that the child's permanency goal changed from the start to the end of the period under review.  For 10 of these children, the goal changed to emancipation/independent living.
- 19 (47.5 percent) of the 40 children were in some type of foster family placement at the end of the period under review; 16 (40 percent) of the 40 children were in some type of congregate care placement.
- 13 (32.5 percent) of the 40 children had five or more placement settings during the period under review.

**Tables** (Percentages in tables may not total exactly 100 due to rounding)

Table: Gender of Children

| Gender | Number of Children | Percentage of Children |
|---|---|---|
| Female | 17 | 42.5 |
| Male | 23 | 57.5 |
| **Total** | **40** | **100** |

Table: Race of children

| Race | Number of Children | Percentage of Children |
|---|---|---|
| Black/African American* | 31 | 77.5 |
| White | 9 | 22.5 |
| **Total** | **40** | **100** |

 *The percentage of African American children in Sample 2 (77.5 percent) is considerably higher than the percent of African American children in Sample 1 (38.9 percent).

2

Table: Age at entry into DFCS custody

| Age at entry into DFCS custody | Number of Children | Percentage of Children |
|---|---|---|
| Younger than 60 months old (5 years) | 3 | 7.5 |
| At least 60 months old but younger than 120 months old (10 years) | 15 | 37.5 |
| At least 120 months old but younger than 180 months old (15 years) | 22 | 55.0 |
| **Total** | **40** | **100** |

Table: Age at start of the period under review (January 1, 2009)

| Age at start of the period under review | Number of Children | Percentage of Children |
|---|---|---|
| Younger than 60 months old (5 years) | 2 | 5.0 |
| At least 60 months old but younger than 120 months old (10 years) | 2 | 5.0 |
| At least 120 months old but younger than 180 months old (15 years) | 18 | 45.0 |
| 180 months (15 years) and older | 18 | 45.0 |
| **Total** | **40** | **100** |

Table: Reasons for child's most recent entry into DFCS custody (can be multiple reasons) (N = 40 children)

| Reasons | Number of Children | Percentage of Children |
|---|---|---|
| Physical neglect | 29 | 72.5 |
| Inadequate parenting skills | 19 | 47.5 |
| Parent's inability to cope | 13 | 32.5 |
| Inadequate housing | 14 | 35.0 |
| Inadequate income | 9 | 22.5 |
| Parent incarceration | 5 | 12.5 |
| Physical abuse | 6 | 15.0 |
| Domestic violence | 1 | 2.5 |
| Child behavior (including Child in Need of Supervision) | 6 | 15.0 |
| Parent alcohol abuse | 7 | 17.5 |
| Emotional abuse/neglect | 7 | 17.5 |
| Parent drug abuse | 3 | 7.5 |
| Abandonment | 4 | 10.0 |
| Sexual abuse | 5 | 12.5 |
| Inadequate food supply | 5 | 12.5 |
| Medical neglect | 1 | 2.5 |
| Relinquishment | 1 | 2.5 |
| Child's disability | 3 | 7.5 |
| Child's drug abuse | 1 | 2.5 |

3

Table: Total time that child was in foster care for a single episode from initial placement to the end of the period under review

| Time in DFCS custody to end of period under review | Number of children | Percentage of children |
|---|---|---|
| At least 48 months but less than 60 months (5 years) | 11 | 27.5 |
| At least 60 months but less than 72 months (6 years) | 8 | 20.0 |
| At least 72 months but less than 84 months (7 years) | 5 | 12.5 |
| At least 84 months but less than 96 months (8 years) | 6 | 15.0 |
| 96 months or longer (8 years +) | 10 | 25.0 |
| **Total** | **40** | **100** |

Table: Child's permanency goal at the end of the period under review

| Permanency Goal | Number of children | Percentage of children |
|---|---|---|
| Reunification | 2 | 5.0 |
| Adoption | 11 | 27.5 |
| Durable legal custody (DLC) | 1 | 2.5 |
| Emancipation/Independent living (IL) | 17 | 42.5 |
| Long-term foster care/Another Planned Permanent Living Arrangement | 5 | 12.5 |
| Permanent placement with a fit and willing relative | 1 | 2.5 |
| Concurrent goals of adoption and emancipation/IL | 1 | 2.5 |
| Concurrent goals of DLC or guardianship and permanent placement with relatives | 1 | 2.5 |
| Concurrent goals of emancipation/IL and permanent placement with relatives | 1 | 2.5 |
| **Total** | **40** | **100** |

Table: Child's placement setting at the end of the period under review

| Placement Setting at the End of the PUR | Number of children | Percentage of children |
|---|---|---|
| **Foster family home** | **19** | **47.5** |
| Relative | (6) | (15.0) |
| Non Relative | (8) | (20.0) |
| Therapeutic | (4) | (10.0) |
| Pre-adoptive | (1) | (2.5) |
| **Congregate Care** | **16** | **40.0** |
| Group home | (4) | (10.0) |
| Therapeutic Group Home | (8) | (20.0) |
| Residential Child Care or Treatment Facility | (3) | (7.5) |
| Contract Facility Non MDHS | (1) | (2.5) |
| **Other** | **5** | **12.5** |
| Acute Care | (1) | (2.5) |
| ICFMR | (2) | (5.0) |
| Supervised Independent Living | (1) | (2.5) |
| Unspecified | (1) | (2.5) |
| **Total** | **40** | **100** |

4

Table: Number of placements during the period under review

| Number of placements | Number of children | Percentage of children |
|---|:---:|:---:|
| 1 placement | 11 | 27.5 |
| 2 placements | 7 | 17.5 |
| 3-4 placements | 9 | 22.5 |
| 5 or more placements | 13 | 32.5 |
| **Total** | **40** | **100** |

## Settlement Agreement, II.B.1., Screening and Assessments

### Screening and Assessments: Diligent Search

*Settlement Agreement, II.B.1.c.: In all cases in which the whereabouts of one or both parents is unknown, DFCS shall immediately institute a diligent search for the parent(s), which shall be documented in the child's case record.*

**Key Findings**
- **For 1 (33.3 percent) of the 3 children whose mother's whereabouts were not known during the period under review, there was documentation in the case record that a diligent search for the mother was conducted.**
- **For 2 (40.0 percent) of the 5 children whose father's whereabouts were not known during the period under review, there was documentation in the case record that a diligent search was conducted.**

## Settlement Agreement, II.B.2., Service Planning and Monitoring

### Service Planning and Monitoring: Updating Service Plans

*Settlement Agreement, II.B.2.b.: Each service plan shall be reviewed and updated quarterly at a team meeting with the caseworker, the caseworker's direct supervisor, the foster parent, the child's parents if appropriate, and the child unless there is a justification for excluding the child from the planning process. If the child's placement changes, or there is a significant change affecting the child or his/her family, a team meeting shall be convened and the service plan must be updated within 30 calendar days of the date of change.*

Note: Data were collected regarding the dates of the family team meetings (FTMs) and the dates of the service plans. Data were not collected with regard to FTMs occurring within 30 days of a placement change. The analysis does not include who attended the most recent FTM due to the small size of the sample.

**Key Findings**
- **None of the 40 children had documentation in the case record of an updated service plan with the same date as a team meeting (FTM).**
- **None of the 40 children had documentation in the case record of service plans that were updated on a quarterly basis (i.e., at least once every 3 months) since 2009.**

- All children had at least one service plan documented in the case record that was dated in 2009
- For 22 (55.0 percent) of the 40 children, the date of the first service plan during the period under review was more than 3 months from the start of the period under review.
- For 17 (42.5 percent) of the 40 children, the date of the last service plan during the period under review was more than 3 months from the end of the period under review.
- For 23 (60.5) percent of the children, 100 percent of the service plans in the case file dated during the period under review were more than 3 months from one another.

Table: Number of services plans dated during the period under review after the initial 2009 plan

| Number of service plans during the period under review after the initial 2009 service plan | Number of children | Percentage of children |
|---|---|---|
| 0 plans after the first one | 2 | 5.0 |
| 1-3 plans after the first one | 20 | 50.0 |
| 4-6 plans after the first one | 10 | 25.0 |
| 7-9 plans after the first one | 6 | 15.0 |
| 10 or more plans after the first one | 2 | 5.0 |
| **Total** | **40** | **100** |

Table: Percentage of service plans that were dated more than 3 months from one another after the initial service plan dated during the period under review (N= 38 children with more than one service plan during the period under review)

| Percentage of services plans that were dated more than 3 months from one another | Number of children | Percentage of children |
|---|---|---|
| 100 percent of service plans were dated more than 3 months from one another | 23 | 60.5 |
| At least 75 percent but less than 100 percent of service plans were dated more than 3 months from one another | 3 | 7.9 |
| At least 50 percent but less than 75 percent of service plans were dated more than 3 months from one another | 6 | 15.8 |
| At least 25 percent but less than 50 percent of service plans were dated more than 3 months from one another | 2 | 5.3 |
| Less than 25 percent of service plans were dated more than 3 months from one another | 4 | 10.5 |
| **Total** | **38** | **100** |

**Settlement Agreement, II.B.3., Child and Youth Permanency**

**Child and Youth Permanency: Permanency Plan**

6

*Settlement Agreement, II.B.3.a.1.:  Working with service providers, foster parents, the child, and the family, DFCS shall develop and document in the child's case record a permanency plan within 30 calendar days of the child's initial placement that specifies the permanency goal, a timeframe for achieving permanency, and activities that support permanency.*

Note: The analysis in this section focused on whether there was a permanency plan in the case record and whether that plan contained the required information.

**Key Findings**

- **For 7 (17.5 percent) of the 40 children, there was a permanency plan in the case record that specified the child's permanency goal, a timeframe for achieving permanency, and activities that support permanency.**

Table:  Permanency goals and plans

| Did children have permanency goals and plans in their case records? | Number of children | Percentage of children |
|---|---|---|
| Permanency goal and plan were in the case record | 31 | 77.5 |
| Permanency goal and plan were not in the case record | 1 | 2.5 |
| Permanency goal was stated in the record but there was no plan to achieve the goal in the case record | 8 | 20.0 |
| **Total** | **40** | **100** |

Table: Information included in the child's permanency plan (N = 40 children)

| Information included in the child's permanency plan | Number of children | Percentage of children |
|---|---|---|
| The child's permanency goals | 31 | 77.5 |
| The time frame for achieving goals and the date likely to be achieved | 29 | 72.5 |
| The actions and services to be taken to achieve the permanency goals and who is responsible for the services | 23 | 57.5 |
| The potential barriers to achieving the permanency goals and how they will be addressed | 26 | 65.0 |
| Assessment of potential for achieving the goal | 21 | 52.5 |
| Identification of possible family resources for permanency | 13 | 32.5 |
| Appropriateness of placing the child with a potentially permanent family | 15 | 37.5 |
| No permanency plan in the case record | 9 | 22.5 |

Table: Number of information areas included in each child's permanency plan

| Number of information areas | Number of children | Percentage of children |
|---|---|---|
| 1 | 0 | 0 |
| 2 | 3 | 7.5 |
| 3 | 3 | 7.5 |
| 4 | 4 | 10.0 |
| 5 | 6 | 15.0 |
| 6 | 8 | 20.0 |

| 7 (All) | 7 | 17.5 |
|---|---|---|
| No permanency plan in case record | 9 | 22.5 |
| **Total** | **40** | **100** |

**Child and Youth Permanency: Children with a Goal of Durable Legal Custody**

*Settlement Agreement, II.B.3.a.2.: DFCS may assign a permanency goal of durable legal custody to a child for whom it has not made adoption efforts only if an appropriate person, with preference given to relatives, has been identified; such person is willing to assume long-term responsibility for the child but has articulated a reasonable basis for not adopting the child; and it is in the child's best interests to remain in the home of such person rather than be considered for adoption by another person.  In such circumstances, there shall be in place a long-term placement agreement signed by DFCS and the relative or other appropriate person ensuring the permanency and stability of this placement barring emergency circumstances that dictate the removal of the child.*

**Key Findings**
- **Neither of the 2 children who had a goal of durable legal custody had documentation in the case record indicating that the Settlement Agreement requirements for children with a permanency goal of durable legal custody had been met.**

**Child and Youth Permanency: Emancipation/Independent Living**

*Settlement Agreement, II.B.3.a.4.: If DFCS concludes, after considering reunification, adoption, durable legal custody, and permanent placement with a relative, that these permanency plans are inappropriate or unavailable for a child, DFCS may assign a permanency goal of emancipation for the child.  In such circumstances, a) the child must be at least 16 years old and b) DFCS must document to the Youth Court a compelling reason why this permanency goal is in the best interest of the child and more appropriate than reunification, adoption, durable legal custody, or permanent placement with a relative.*

**Key Finding**
- **For 6 (31.6 percent) of the 19 children who had a single or concurrent goal of emancipation as their most recent permanency goal, there was documentation in the case record that all settlement agreement requirements were met.**

Table: Information documented in the case record for children with single or concurrent goal of emancipation (N = 19)

| Information documented in the case records | Number of children | Percentage of children |
|---|---|---|
| The child was age 16 or older at the time the goal was established | 13 | 68.4 |
| The permanency options of reunification, adoption, durable legal custody, guardianship, and permanent placement with a relative were considered prior to establishing the goal of emancipation/independent living | 16 | 84.2 |

8

| There is a report in the case record that was submitted to the Youth Court providing a compelling reason why the goal of emancipation is in the best interests of the child and more appropriate than reunification, adoption, durable legal custody, guardianship, and permanent placement with relatives | 12 | 63.2 |
|---|---|---|

Table: Number of settlement agreement requirements met for each child with a goal of emancipation

| Number of requirements met | Number of children | Percentage of children |
|---|---|---|
| 1 | 3 | 15.8 |
| 2 | 10 | 52.6 |
| 3 | 6 | 31.6 |
| **Total** | **19** | **100** |

## Child and Youth Permanency: Permanency Plan Updating and Review

### Administrative Case Reviews

*Settlement Agreement, II.B.3.c.1.: A child's permanency plan shall be reviewed in a court or administrative case review at least every six months. DFCS will take reasonable steps, including written notice, to ensure the participation of the child, parents, caregivers, and relevant professionals in court or administrative reviews.*

Note: Because of the small sample size, an analysis of written notice was not conducted.

### Key Findings
- **For 37 (92.5 percent) of the 40 children, there was documentation in the case record of an administrative review occurring at least every 6 months from January 2009 to the end of the period under review.**

### Court Reviews/ Permanency Hearings

*Settlement Agreement, II.B.3.c.2.: DFCS will take reasonable steps to ensure that a court review, which may be called a review, dispositional, or permanency hearing, is held for each child in foster care custody within 12 months of initial placement and annually thereafter. [DFCS will take reasonable steps, including written notice, to ensure the participation of the child, parents, caregivers, and relevant professionals in court or administrative reviews.]*

### Key Findings
- **For 30 (75.0 percent) of the 40 children, there was documentation in the case record that a permanency review court hearing had been held at least once every 12 months during the period under review.**
- For 10 (25.0 percent) of the 40 children there was no documentation of a permanency hearing at least once every 12 months during the period under review.

- For 39 (97.5 percent) of the 40 children there was documentation that at least one permanency hearing had been held during the period under review.

**Child and Youth Permanency: Reunification Services**

**Services to Achieve Reunification**

*Settlement Agreement, II.B.3.d.1:  When the child's permanency goal is reunification, DFCS shall identify in the parents' service plan and make available directly or through referral those services DFCS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care and to help the parents develop strategies to facilitate permanency for the child.*

Note:  This analysis was not conducted because only 4 children had a permanency goal of reunification (2 children had reunification as a single goal and 2 as a concurrent goal) at some time during the period under review.

**Child and Youth Permanency: Termination of Parental Rights**

*Settlement Agreement, II.B.3.e.1.:  For children who will have spent 15 of the previous 22 months in foster care, DFCS shall submit a termination of parental rights (TPR) packet to the Office of the Attorney General by the first day of the fifteenth month or document an available exception under the federal Adoption and Safe Families Act (ASFA).  The Office of the Attorney General shall file the petition for termination of parental rights by the last day of the fifteenth month to ensure compliance with the ASFA.*

**Key Findings**
- **For 5 (26.3 percent) of the 19 children whose parents' rights had not been terminated by the court prior to the period under review, there was no documentation in the case record that a TPR packet had been submitted by the agency to the Office of the Attorney General at any time during or prior to the period under review and no documentation of an ASFA-consistent exception.**
- For 21 (52.5 percent) of the 40 children, there was documentation in the case record that their parents' rights had been terminated by the court prior to the period under review or that their parents were deceased.

*Settlement Agreement, II.B.3.e.2.:  When a child's primary permanency goal is established as adoption, DFCS shall submit a TPR packet to the State Office within 30 calendar days.  Within 30 calendar days of receipt of the TPR packet by the State Office, the State Office shall review the packet, remedy any deficiencies, and submit a TPR referral to the Office of the Attorney General. Within 30 calendar days of such referral, the Office of the Attorney General shall either file the petition for TPR or document to DFCS a legal deficiency preventing timely filing.  Within 10 working days of receiving documentation of a legal deficiency, the assigned DFCS caseworker shall document to the Office of the Attorney General the steps to be taken to address*

10

*the deficiency. The DFCS caseworker and that caseworker's direct supervisor shall meet in person every 30 calendar days thereafter to document progress being made to address the legal deficiency until a TPR referral has been accepted as legally sufficient by the Office of the Attorney General, who shall file the petition for TPR within 30 calendar days.*

Note: Data were not collected on submission of a TPR packet to the State Office. The analysis focuses on whether the TPR packet was submitted to the Office of the Attorney General within 60 days of the date that the child's permanency goal was established as adoption.

**Key Findings**
- **There were 3 children who had a primary goal of adoption established during the period under review. For one child, the parents were deceased; for one child, parental rights had been terminated prior to the period under review. For 1 of the 3 children, there was no documentation of a TPR packet during the period under review.**
- **No legal deficiencies were noted in the case records of any of the children who had a primary goal of adoption.**


**Child and Youth Permanency: Adoption**

*Settlement Agreement, II.B.3.f.1.: When a child's primary permanency goal is established as adoption, DFCS shall, within 10 working days, assign an adoption specialist to work with the assigned DFCS caseworker to immediately begin the process of securing an adoptive placement for the child. Within 15 calendar days of the primary permanency goal change to adoption, the DFCS caseworker, along with the adoption specialist, shall draw up an adoption plan that identifies the child-specific activities that DFCS will undertake to achieve the permanency goal of adoption and the timeframes in which the activities will be undertaken. The adoption specialist shall be responsible for consulting with private and public professionals and identifying and ensuring the provision of targeted services necessary for the child to be adopted. An adoption status meeting with the DFCS caseworker, the adoption specialist, and the caseworker's direct supervisor to review the progress being made in achieving the goal of adoption shall occur weekly for infants and monthly for all other children awaiting adoption, and shall be noted in the child's case record.*

**Key Findings**
- **None of the 25 children with a primary goal of adoption at some time during the period under review had documentation in the case record that all of the following requirements had been met: 1) an adoption specialist had been assigned to work with the assigned caseworker; 2) the adoption specialist had been assigned within 10 days of the date that the goal of adoption was established; and 3) there was an adoption plan in the case record.**
- For 22 (88.0 percent) of the 25 children with a primary goal of adoption at some time during the period under review, there was documentation in the case record that an adoption specialist had been assigned to work with the assigned caseworker.

- For 5 (22.7 percent) of the 22 children, there was documentation in the case record that the adoption specialist had been assigned within 10 working days of the date that the goal had changed to adoption.
- For 4 (21.1 percent) of the 19 children with a goal of adoption who were not in an adoptive placement or whose foster parents had not agreed to adopt them, there was documentation of an adoption plan in the case record.

## Child Safety: Incidence of Maltreatment of Children While in DFCS Custody

*Settlement Agreement, III.D.2. (By the end of Implementation Period 2): The rate of abuse or maltreatment in care in the last year shall not exceed 1.14 percent.*

## Key Findings

- **None of the 40 children in the sample had documentation of a substantiated (evidenced) maltreatment report in the case record.**
- Eight (20.0 percent) of the 40 children were the subject of at least one maltreatment report. One of the eight children was the subject of two maltreatment reports, for a total of 9 maltreatment reports.
- For 6 (75.0 percent) of the 8 children who were the subject of at least one maltreatment report, there was documentation in the case record of a maltreatment report during the period under review involving either a foster parent (2 children) or facility staff person (4 children) as the perpetrator: 3 reports were for physical abuse, 2 were for sexual abuse, and 1 involved three allegations of emotional abuse, physical neglect, and inadequate food.
- For 3 (37.5 percent) of the 8 children who were the subject of at least one maltreatment report, there was documentation in the case record of a maltreatment report involving another child in the foster home (2 children) or the facility (1 child) as the perpetrator

## Settlement Agreement, II.B.4., Child Safety

## Child Safety: Timeliness of Investigations

*Settlement Agreement, II.B.4.e.; Period 2 Implementation Plan, II.B.6.g.: All investigations into reports of maltreatment, including corporal punishment, of children in DFCS custody must be initiated within 24 hours and completed within 30 calendar days, including supervisory approval. DFCS shall assure that such investigations and decisions are based on a full and systematic evaluation of the factors that may place a child in DFCS custody at risk.*

Data were not collected regarding whether and if so, how, DFCS assured that investigations and decisions were based on a full and systematic evaluation of the factors that may place a child in DFCS custody at risk.

## Key Findings

- **For 1 (11.1 percent) of the 9 maltreatment reports, there was documentation in the case record that the investigation was initiated within one day of the date that the report was made and completed within 30 calendar days of initiation.**
- For 6 (66.7 percent) of the 9 maltreatment reports, there was documentation in the case record that the investigation was initiated within one day of the date that the report was made.
- For 3 (33.3 percent) of the 9 maltreatment reports, there was documentation in the case record that the investigation was completed within 30 days of initiation.

**Child Safety: Caseworker Visits Following a Maltreatment Investigation**

*Settlement Agreement, II.B.4.f. (By the end of Implementation Period 1): Any foster child who remains in the same out-of-home placement following an investigation into a report that he or she was maltreated, or subject to corporal punishment, in that placement shall be visited by a DFCS caseworker twice a month for three months after the conclusion of the investigation to assure the child's continued safety and well-being.*

**Key Findings**
- **For 2 (28.6 percent) of the 7 children who were both the subject of a maltreatment report and remained in the same placement after the investigation, there was documentation in the case record that the child was visited by the assigned DFCS caseworker twice a month for three months after the conclusion of the investigation**

*Settlement Agreement, II.B.4.g. (By the end of Implementation Period 1): When a maltreatment investigation involves a foster home, DFCS shall file a copy of the approved final investigative report and any recommendations and/or corrective actions DFCS has deemed necessary, in the case record of the foster child, in the file of the foster or adoptive parents with a copy of the letter of notification to the foster or adoptive parents, and in the DFCS State Office. DFCS shall also provide those records to the Youth Court Judge with jurisdiction over the child and to the Monitor.*

*Settlement Agreement, II.B.4.h. (By the end of Implementation Period 1): When a maltreatment investigation involves an agency group home, emergency shelter, private child placing agency foster home, or other facility licensed by DFCS, a copy of the final investigative report shall be filed in the child's case record, in the facility licensing file, and in the DFCS State Office. DFCS shall provide the report to the Youth Court Judge with jurisdiction over the child and to the Monitor.*

Note: The data collected do not differentiate between DFCS foster homes and foster homes of a private child-placing agency. All foster homes are included in the first bullet below. Data were not collected regarding whether the report was filed in the facility licensing file or the DFCS State Office or whether the report was provided to the Youth Court Judge or to the Monitor.

**Key Findings**

- **For 1 (12.5 percent) of the 8 children who were the subject of an investigated maltreatment report, there was a copy of the investigation report in the case record. For 7 (87.5 percent) of the 8 children, there was no copy of the final investigation report in the case record.**

## Settlement Agreement, II.B.5., Child Placement

### Child Placement: Placement in Non-Licensed Homes

*Settlement Agreement, II.B.5.a.: No foster child shall be placed in a foster care setting that has not been licensed or approved as meeting DFCS licensure standards, unless the child is placed pursuant to the following relative licensing process. The licensing process for relatives shall take place in two steps: (1) an emergency process to be developed by DFCS in conjunction with COA that enables a child to be placed with relatives as soon as the child enters placement, following an initial screen (as described at II.B.5.i. below) of the relative's home, and (2) a full licensing process, to be completed no later than 60 calendar days after the child has entered placement. DFCS may waive non-safety licensing requirements for relative foster placements in individual cases, in accordance with federal regulations.*

**Key Findings**
- **For 4 (10.0 percent) of the 40 children in the sample, there was documentation in the case record that, at some time during the period under review, the child was placed at least once in a non-licensed relative placement for longer than 60 days; one additional child was placed in an unlicensed detention facility.**

## Settlement Agreement, II.B.7., Physical and Mental Health Care

### Physical and Mental Health Care: Mental/Behavioral Health Assessments

*Settlement Agreement, II.B.7.f.: Each child four years old and older shall be provided with a mental health assessment by a qualified professional within 30 calendar days of foster care placement. Each foster child who reaches the age of four in care shall be provided with a mental health assessment within 30 calendar days of his/her fourth birthday. Each foster child shall receive recommended mental health services pursuant to his/her assessment.*

Note: The Sample 2 analysis focuses on whether the child received a mental health assessment at any time during the period under review, if a mental health concern was identified, and if the child received services.

**Key Findings**
- **For 28 (70.0 percent) of the 40 children, there was documentation in the case record that the child had received a mental/behavioral health assessment at some time during the period under review.**

14

- **For 25 (89.3 percent) of the 28 children who had a mental/behavioral health assessment, there was documentation in the case record of a mental health concern; 17 (68.0 percent) of the 25 children received all recommended mental health services, 3 (12.0 percent) received some but not all recommended services, 3 (12.0 percent) did not receive any recommended services, and for 2 (8.0 percent) of the 25 children, there was no documentation of services recommended although there was a diagnosis.**

Table: Types of mental/behavioral health services recommended for the 23 children for whom services were recommended in response to identified mental health concerns

| Services recommended for child | Number of children for whom service was recommended | Percentage of children for whom service was recommended |
|---|---|---|
| Counseling for child | 10 | 43.5 |
| Outpatient mental health therapy | 5 | 21.7 |
| Inpatient mental/behavioral health services/psych. hospital | 16 | 69.6 |
| Psychotropic medications | 18 | 78.3 |
| Therapeutic foster home/group home/residential treatment | 4 | 17.4 |

## Physical and Mental Health Care: Physical Health

*Settlement Agreement, II.B.7.d.: All children shall receive periodic medical examinations and all medically necessary follow-up services and treatment throughout the time they are in state custody in accordance with the time periods recommended by the American Academy of Pediatrics.*

Note:  II.B.7.b of the settlement agreement was not included in this report because it applies to medical examinations at the time of entry into foster care. Since all of the children in Sample 2 entered foster care prior to the period under review, this section of the Settlement Agreement was not applicable. With regard to periodic medical examinations, for all children in Sample 2, the guideline for time periods for periodic medical examinations that are recommended by the American Academy of Pediatrics is that a medical examination should be provided annually. Therefore, the analysis conducted for II.B.7.d. focused on whether children in Sample 2 received a medical examination within 12 months of a prior medical examination during the period under review.

## Key Findings  Note:
- **For 11 (27.5 percent) of the 40 children, there was documentation in the case record that a medical examination had occurred during 2009 and that additional medical examinations had occurred within 12 months of the initial 2009 examination up to the end of the period under review.**
- For 12 (30.0 percent) of the 40 children, there was documentation in the case record of at least one medical examination in 2009, but there was no documentation of subsequent examinations.

- For 17 (42.5 percent) of the 40 children, there was no documentation in the case record of a medical examination at any time during the period under review.

Table: Frequency of medical examinations during the period under review for each child

| Frequency of medical examinations during the period under review | Number of children | Percentage of children |
|---|---|---|
| No medical examinations | 17 | 42.5 |
| One medical examination documented in 2009, but no subsequent medical examinations | 12 | 30.0 |
| One medical examination documented in 2009, and subsequent examinations in 12 months or less until the end of the period under review | 11 | 27.5 |
| **Total** | **40** | **100** |

**Physical and Mental Health Care: Dental Services**

*Settlement Agreement, II.B.7.e.: Each child three years old and older shall be provided with a dental examination within 90 calendar days of foster care placement and every six months thereafter. Each foster child who reaches the age of three in care shall be provided with a dental examination within 90 calendar days of his/her third birthday and every six months thereafter. Foster children shall receive all medically necessary dental services.*

Note: All of the children in Sample 2 were age 3 or older at some time during the period under review and all entered foster care prior to the period under review. Therefore, the analysis for this requirement focused on whether children received dental examinations at least every six months during the period under review.

**Key Findings**
- **None of the 40 children had documentation in the case record that during the period under review, they had received a dental examination every 6 months.**
- For 36 (90.0 percent) of the 40 children, there was documentation in the case record that a dental exam had taken place at least once during the period under review.
- For 16 (40.0 percent) of the 40 children, the earliest dental exam documented in the case record was more than 6 months from the start of the period under review.
- For 20 (50.0 percent) of the 40 children, the latest dental exam documented in the case record was more than 6 months from the end of the period under review.

16

Table: Number of dental exams documented during the period under review

| Number of dental exams documented during the period under review | Number of children | Percentage of children |
|---|---|---|
| No dental exams | 4 | 10.0 |
| 1-2 dental exams | 22 | 55.0 |
| 3-4 dental exams | 12 | 30.0 |
| 5 dental exams | 2 | 5.0 |
| **Total** | **40** | **100** |

Table:  Percentage of dental examinations that were dated more than 6 months from one another after the initial dental plan dated during the period under review (N= 25 children with more than one dental examination during the period under review)

| Percentage of services plans that were dated more than 3 months from one another | Number of children | Percentage of children |
|---|---|---|
| 100 percent of dental examinations were dated more than 6 months from one another | 13 | 52.0 |
| At least 50 percent but less than 100 percent of dental plans were dated more than 6 months from one another | 8 | 32.0 |
| Less than 50 percent of dental plans were dated mor than 6 months from one another | 4 | 16.0 |
| **Total** | **25** | **100** |

## Settlement Agreement, II.B.8., Educational Services

### Educational Services: School Stability

*Settlement Agreement, II.B.8.c.: DFCS shall make all reasonable efforts to ensure the continuity of a child's educational experience by keeping the child in a familiar or current school and neighborhood, when this is in the child's best interest and feasible, and by limiting the number of school changes the child experiences.*

Note: Data were not collected regarding whether the school change was in the child's best interest or feasible.

### Key Findings
- **For 23 (57.5 percent) of the 40 children, there was documentation in the case record that the child had changed schools at least once during the period under review.**

## Settlement Agreement, II.B.11., Transition to Independent Living

*Settlement Agreement, II.B.11.b.: Each foster youth 14-20 years old, regardless of his/her permanency plan, shall be provided with an opportunity to participate in the creation of an*

17

*Independent Living service plan for Independent Living preparation.  DFCS shall provide each eligible youth with Independent Living services as set forth in his/her service plan.*

Note:  Data were not collected on the participation of youth in the creation of an Independent Living service plan.

## Key Findings

- **For 4 (13.3 percent) of the 30 children who were age 14 or older during the period under review, there was an Independent Living plan in the case record and documentation that all independent living services set forth in the plan had been provided to the youth.**
- For 22 (73.3 percent) of the 30 children, there was a plan in the case record, but all of the independent living services set forth in the plan had not been provided to the youth; for 4 (13.3 percent) of the 30 children, there was no Independent Living plan in the case record.
- For the 22 children identified as having an Independent Living plan in the case record, there was documentation in the case record that the following information was in the plan:
  - Objectives regarding educational, vocational, or employment planning and services to ensure that objectives will be attained – 13 children.
  - Information about how the youth's transportation needs will be met in order for the youth to access services, including assistance in obtaining a driver's license – 12 children.
  - Objectives related to money management and services to ensure that objectives will be attained – 11 children.
  - Objectives related to housing and services to ensure that objectives will be attained – 16 children.
  - Objectives related to development of social and recreational skills and services to ensure that objectives will be attained – 8 children.
  - Objectives related to establishing and maintaining connections with the child's family and community and services to ensure that objectives will be attained –9 children.
- For 10 (33.3 percent) of the 30 children who were age 14 or older during the period under review, there was documentation of an Independent Living Plan in the case record but none of the information listed in the bullets above was in the plan.

Table: Provision of services to address independent living services identified in the Independent Living plan (N = 30 children age 14 or older during the period under review)

| Extent to which independent living services identified in the child's independent living plan were provided | Number of children | Percentage of children |
|---|---|---|
| All identified services were provided. | 4 | 10.0 |
| Some but not all identified services were provided. | 7 | 17.5 |
| No independent living services were provided. | 15 | 37.5 |
| There was no independent living plan in the case record. | 4 | 10.0 |
| **Total applicable children** | **30** | **100** |

## Settlement Agreement, II.B.10., Worker Contact and Monitoring

**Worker Contact and Monitoring: Caseworker Contacts with Child**

*Settlement Agreement, II.B.10.a.:  Regardless of whether a child's foster care placement is being directly supervised by DFCS or by a contract agency, the assigned DFCS caseworker (either County of Service or County of Responsibility) shall meet with the child in person and, where age-appropriate, alone at least twice monthly to assess the child's safety and well-being, service delivery, and achievement of permanency and other service goals.  At least one visit per month shall take place in the child's placement.  During a child's first month in foster care and after each change of placement, the assigned DFCS caseworker shall meet with the child in person, and, where age-appropriate, alone, to assess the child's adjustment to the placement and whether more frequent visits by the caseworker are necessary,  This assessment may occur at a regularly scheduled visit with the child.*

Note:  Data were not collected on whether the caseworker met with the child alone.

**Key Findings**
- **For 8 (20.0 percent) of the 40 children, there was documentation in the case record of the following: (1) during the 12-month period prior to the end of the period under review, the assigned DFCS caseworker met with the child in person at least twice for each applicable month; and (2) at least one meeting between the caseworker and the child each month was in the child's placement.**  An applicable month is one in which the child was in DFCS custody and either in an out-of-home placement or a trial reunification with parents or relatives.

Note: Data were not collected on caseworker visits with foster parents because of the small number of children in a foster family placement.

**Ex. 8**

```
Job Name: MW3JTACP                    MISSISSIPPI DEPARTMENT OF HUMAN SERVICES              Date: 05/15/2012
Program : MWZTACRB          Timely Administrative (County Conference) Reviews Summary       Time: 08:38 PM
Report  : MWZTACRS               For the Date Range of May 01,2011 thru April 30,2012       Page: 13
```

| County or Region | Children w 6 Months or More Of Custody | Children w Timely Admin Review | % with Timely Admin Review | Children w No Timely Admin Review | % with No Timely Admin Review |
|---|---|---|---|---|---|
| **Region: VII-W** | | | | | |
| Hancock | 198 | 194 | 97.98% | 4 | 2.02% |
| Harrison | 370 | 323 | 87.30% | 47 | 12.70% |
| Region Totals: | 568 | 517 | 91.02% | 51 | 8.98% |
| Statewide Totals: | 3600 | 3484 | 96.78% | 116 | 3.22% |

# Ex. 9


```
Job Name : MW3JTPHP                    MISSISSIPPI DEPARTMENT OF HUMAN SERVICES                    Date: 05/15/2012
Program  : MWZTPHRB        Children in Custody for 12+ Months with a Timely Permanency Hearing Summary    Time: 08:41 PM
Report   : MWZTPHRS                For the Date Range of May 01,2011 thru April 30,2012                    Page: 13
```

| County or Region | Total Number Of Children In Custody | Children In Custody 12 Months or More | Children With Timely PH Review | % With Timely PH Review | Children With No Timely PH Review | % With No Timely PH Review |
|---|---|---|---|---|---|---|
| **Region: VII-W** | | | | | | |
| Hancock | 329 | 156 | 84 | 53.85% | 72 | 46.15% |
| Harrison | 729 | 244 | 21 | 8.61% | 223 | 91.39% |
| **Region Totals:** | 1058 | 400 | 105 | 26.25% | 295 | 73.75% |
| **Statewide Totals:** | 6178 | 3180 | 1920 | 60.38% | 1260 | 39.62% |

**Ex. 10**

```
Job Name: MW3JWPCP                    MISSISSIPPI DEPARTMENT OF HUMAN SERVICES                    Date: 05/10/12
Program : MWZWCR3B          Children In Custody with a Permanency Plan of Re-Unification          Time: 09:37 PM
Report  : MWZWCR3S        Worker / Birth and Adopted Parent Face to Face Contacts - State Summary   Page:    3
                          For the Date Range of April 01,2012 thru April 30,2012
```

| Region | County | Children In Custody With a Plan of ReUnification | Total F2F Worker / Parent Contacts Meeting *Requirements | | Total Worker / Mother F2F Contacts | | Total Worker / Father F2F Contacts | |
|--------|--------|--------|--------|--------|--------|--------|--------|--------|
| VII-E | George | 1 | | | | | | |
| VII-E | Greene | 2 | | | | | | |
| VII-E | Jackson | 150 | 12 | 8.00% | 19 | 12.67% | 5 | 5.10% |
| Total For Region VII-E | | 153 | 12 | 7.84% | 19 | 12.50% | 5 | 5.05% |
| VII-W | Hancock | 140 | 2 | 1.43% | 8 | 5.97% | 2 | 2.08% |
| VII-W | Harrison | 323 | 7 | 2.17% | 10 | 3.27% | 5 | 3.76% |
| Total For Region VII-W | | 463 | 9 | 1.94% | 18 | 4.09% | 7 | 3.05% |
| Statewide Total | | 2,173 | 512 | 23.56% | 728 | 35.40% | 278 | 22.94% |

*Requirement:
Worker must have at least one face-to-face contact monthly with each parent (biological or adopted) identified as a case member.

**Ex. 11**



**Investigations Opened January 1, 2011 Through December 31, 2011**
**By Month Opened, Level, and Custody Status\***
(Prepared by the Office of the Court Monitor Based on DFCS Data)

Note: 12 in-custody investigations were incorrectly coded as Level 2 investigations.

Total Investigations Opened During Period = 21,751
Total Level 2 Investigations Opened = 13,394
Total Level 3 Investigations Opened = 8,357

Total Investigations Not Included in Analysis\* = 294

Total Investigations in Analysis of Children Not In Custody = 21,049
Total Investigations in Analysis of Children In Custody = 411

\* The data provided by defendants for this analysis were incomplete.  Complete data regarding an additional 229 (1.7%) Level 2 investigations and 65 (.8%) Level 3 investigations were not provided and were thus excluded.

**Ex. 12**



* The data provided by defendants for this analysis were incomplete.  Complete data regarding an additional 65 (.8%) Level 3 investigations were not provided and it could not be determined whether they involved a child in custody.

**Ex. 13**



Maltreatment Investigations Completed Within 30 Days of Intake
By Month, Children In Custody Only
January 2011 - December 2011*
(Prepared by the Office of the Court Monitor Based on DFCS Data)

Total Investigations in Analysis* = 399
Total Completed Within 30 Days = 198 (50%)
Total Not Completed Within 30 Days = 201 (50%)

Completed Within 30 Days    Not Completed Within 30 Days

* The data provided by defendants for this analysis were incomplete. Complete data regarding an additional 65 (.8%) Level 3 investigations were not provided and it could not be determined whether they involved a child in custody.

**Ex. 14**



**Distribution of Number of Days from Intake To Approved Findings for Maltreatment Investigations**
**Children In Custody, by Percentile and Month**
**January 2011  - December 2011***
**(Prepared by the Office of the Court Monitor Based on DFCS Data)**

How to Read this Chart:
-The chart illustrates the variance in the time to close Level 3 investigations of children in custody over time.

- Each month has 5 data points, corresponding to the length of time from intake to the approved findings for the 10th, 25th, 50th, 75th, and 90th percentile of investigations.

- The number of days at the 10th percentile, for example, indicates that 1 in 10 investigations, or 10% of investigations, had approved findings within the corresponding number of days.  Similarly, the number of days at the 50th percentile indicates that 5 in 10 investigations, or 50% of investigations, had approved findings within the corresponding number of days.

Overall Distribution for 2011
10th Percentile = 15 Days
25th Percentile = 24  Days
50th Percentile = 31 Days
75th Percentile = 48 Days
90th Percentile = 76 Days

Y-axis: **Days from Intake to Approved Findings**
X-axis: **Month of Investigation Intake**

Legend: 10th Percentile | 25th Percentile | 50th Percentile | 75th Percentile | 90th Percentile

* Data provided by defendants for this analysis were incomplete.  Complete data for 65 Level 3 Investigations (.8% of Level 3 Investigations) were not provided and no determination could be made regarding whether they involved a child in custody.

**Ex. 15**



Maltreatment Investigations Initiated Within 24 Hours of Intake
By Region, Children In Custody Only
January 2011 - December 2011*
(Prepared by the Office of the Court Monitor Based on DFCS Data)

* The data provided by defendants for this analysis were incomplete.  Complete data regarding an additional 65 (.8%) Level 3 investigations were not provided and it could not be determined whether they involved a child in custody.

**Ex. 16**



**Maltreatment Investigations Completed Within 30 Days of Intake**
**By Region, Children In Custody Only**
**January 2011 - December 2011***
**(Prepared by the Office of the Court Monitor Based on DFCS Data)**

Total Investigations In Analysis = 399
Total Completed Within 30 Days = 198 (50%)
Total Not Completed Within 30 (Including Investigations Open for More Than 30 Days) = 201 (50%)

For Months With Less Than 80% Completed Within 30 Days of Intake, Variance of Time From Intake to Completion for Cases Over 30 Days

**    Excludes 2 investigations not closed at time of analysis
***   Excludes 1 investigation not closed at time of analysis
**** Excludes 3 investigations not closed at time of analysis

* The data provided by defendants for this analysis were incomplete. Complete data regarding an additional 65 (.8%) Level 3 investigations were not provided and it could not be determined whether they involved a child in custody.

**Ex. 17**



**Number of Investigations of Reports of Maltreatment of In-Custody Children**
**Open for More Than 30 Days as of 12/31/11**
**By Year, Month of Report Intake, and Region**
(Prepared by the Office of the Court Monitor Based on DFCS Data)

Total Investigations of Reports of Maltreatment of Children In Custody Open for Over 30 Days = 31 Investigations

**Ex. 18**

```
Job Name : MW3JWC5P                 MISSISSIPPI DEPARTMENT OF HUMAN SERVICES                    Date: 05/05/12
Program  : MWZWCR5B        Worker/Child Face to Face Home Contact Report - State Summary       Time: 10:28 PM
Report   : MWZWC5S2          For the date range of April 01, 2012 thru April 30,2012           Page:        3
```

| Region | County | In Custody | With Any F2F Visit | Percent With F2F Visit | W/ In Home F2F Visit | Percent W/F2F Visit In Home | Total Any F2F Visits | Total In Hm F2F Visits | W/2 F2F Visits with In Home | % 2 F2F w/ InHm |
|--------|--------|-----------|---------------------|------------------------|----------------------|------------------------------|----------------------|-------------------------|------------------------------|------------------|
| VI | Forrest | 79 | 69 | 87.34% | 66 | 83.54% | 192 | 145 | 59 | 74.68% |
|  | Lamar | 25 | 16 | 64.00% | 13 | 52.00% | 38 | 19 | 9 | 36.00% |
|  | Marion | 29 | 23 | 79.31% | 17 | 58.62% | 47 | 19 | 15 | 51.72% |
|  | Pearl River | 119 | 109 | 91.60% | 103 | 86.55% | 272 | 153 | 84 | 70.59% |
|  | Perry | 11 | 10 | 90.91% | 7 | 63.64% | 22 | 10 | 6 | 54.55% |
|  | Stone | 114 | 85 | 74.56% | 73 | 64.04% | 178 | 115 | 64 | 56.14% |
| Total For Region VI | | 377 | 312 | 82.76% | 279 | 74.01% | 749 | 461 | 237 | 62.86% |
| VII-E | George | 5 | 1 | 20.00% | 1 | 20.00% | 2 | 2 | 1 | 20.00% |
|  | Greene | 2 | 0 | 0.00% | 0 | 0.00% | 0 | 0 | 0 | 0.00% |
|  | Jackson | 314 | 198 | 63.06% | 164 | 52.23% | 340 | 219 | 91 | 28.98% |
| Total For Region VII-E | | 321 | 199 | 61.99% | 165 | 51.40% | 342 | 221 | 92 | 28.66% |
| VII-W | Hancock | 194 | 76 | 39.18% | 54 | 27.84% | 117 | 68 | 30 | 15.46% |
|  | Harrison | 527 | 165 | 31.31% | 77 | 14.61% | 223 | 99 | 37 | 7.02% |
| Total For Region VII-W | | 721 | 241 | 33.43% | 131 | 18.17% | 340 | 167 | 67 | 9.29% |
| Statewide Total | | 4,009 | 3,070 | 76.58% | 2,703 | 67.42% | 7,675 | 4,493 | 2,364 | 58.97% |

**Ex. 19**

```
Job Name: MW3J518P                    MISSISSIPPI DEPARTMENT OF HUMAN SERVICES           Date: 05/15/2012
Program : MWBRD16B         Children in Custody, Ages 14-20 and Their IL Services and Skills Provided - Summary   Time: 08:49 PM
Report  : MWBRD16S                 For the Date Range of May 01, 2011 thru April 30, 2012      Page: 13
```

| County or Region | Total Number Of Children In Custody | Children Receiving IL Services and Skills | Percent of Children Receiving IL Services and Skills | |
|---|---|---|---|---|
| **Region: VII-W** | | | | |
| Hancock | 44 | 15 | 34.09% | |
| Harrison | 80 | 15 | 18.75% | |
| **Region Totals:** | 124 | 30 | 24.19% | |
| **Statewide Totals:** | 1362 | 586 | 43.02% | |

```
Note:  * Independent Living Service                                      Lawsuit Agreement: SA p32.||.8.11.e
      ** Independent Living Skill
```

**Ex. 20**

Job Name: MW3JPLCP
Program: MWZPLMCB
Report: MWZPLMCS

MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
Non-Therapeutic Care and Placement Setting Contacts Resource Summary
For the Date Range of April 01, 2012 thru April 30, 2012
County / Region / State Summary Totals

Date: 05/15/2012
Time: 09:09 PM
Page: 5

| County/Region Name | Total Children In Custody | Total Number of Days Stayed | Avg Number of Days Stayed | In Home Visits | Requirements Met | Percentage Requirements Met | Other Contacts |
|---|---|---|---|---|---|---|---|
| Region: VII-W | | | | | | | |
| Hancock | 133 | 32,593 | 245.1 | 27 | 21 | 15.78% | 47 |
| Harrison | 303 | 77,218 | 254.8 | 48 | 44 | 14.52% | 60 |
| Region Summary: VII-W | 436 | 109,811 | 251.9 | 75 | 65 | 14.90% | 107 |
| Statewide Summary | 2,389 | 777,365 | 325.4 | 1,903 | 1,220 | 51.06% | 1,501 |

**Ex. 21**

Job Name: MW3JPLBP
Program : TLZPLMBB
Report : MWZPLMS2

MISSISSIPPI DEPARTMENT OF HUMAN SERVICES
Therapeutic Care and Placement Setting Resource Contacts
Non-Group Care Summary Report
For the Date Range of April 01,2012 thru April 30,2012

Date: 05/15/2012
Time: 04:27 PM
PAGE: 5

County / Region / State Summary Totals

| County/Region Name | Total Children In Custody | Total Number of Days Stayed | Avg Number of Days Stayed | In Home Visits | Requirements Met | Percentage Requirements Met | Other Contacts |
|---|---|---|---|---|---|---|---|
| **Region: VII-E** | | | | | | | |
| George | 1 | 317 | 317.0 | 0 | 0 | 0.00% | 0 |
| Jackson | 21 | 6,662 | 317.2 | 9 | 4 | 19.04% | 10 |
| Region Summary: VII-E | 22 | 6,979 | 317.2 | 9 | 4 | 18.18% | 10 |
| **Region: VII-W** | | | | | | | |
| Hancock | 1 | 254 | 254.0 | 0 | 0 | 0.00% | 2 |
| Harrison | 11 | 5,686 | 516.9 | 3 | 1 | 9.09% | 0 |
| Region Summary: VII-W | 12 | 5,940 | 495.0 | 3 | 1 | 8.33% | 2 |
| **Statewide Summary** | 230 | 242,581 | 1,054.7 | 189 | 59 | 25.65% | 119 |

**Ex. 22**

**April 2012 Workload, Caseload, and Staffing Analysis**
**March 2012 Workload and Staffing Data**

| Region/County | January 2012 Workload | February 2012 Workload | March 2012 Workload | March % Workload Increase | March Workers Needed | March Wkrs w Caseload | March Workers Assigned | March Workers Short | March Over Full Caseload | March % Over Full | March Over 2X Caseload | March % Over Double | County Population 2010 Census | March Minutes Per Capita | March % Staff of Full Staff | Region/County |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Region 1 North** | | | | | | | | | | | | | | | | Region 1 North |
| Alcorn | 82,018 | 73,501 | 88,887 | 20.9% | 13.0 | 8 | 9 | 4.0 | 6 | 75% | 3 | 38% | 37,057 | 2.40 | 69.5% | Alcorn |
| Benton | 13,453 | 19,990 | 21,882 | 9.5% | 3.2 | 3 | 3 | 0.2 | 2 | 67% | 0 | 0% | 8,729 | 2.51 | 94.0% | Benton |
| Desoto | 191,207 | 194,152 | 194,424 | 0.1% | 28.3 | 19 | 21 | 7.3 | 12 | 63% | 6 | 32% | 161,252 | 1.21 | 74.1% | Desoto |
| Marshall | 71,216 | 66,354 | 71,445 | 7.7% | 10.4 | 6 | 7 | 3.4 | 5 | 83% | 1 | 17% | 37,144 | 1.92 | 67.2% | Marshall |
| Prentiss | 54,320 | 54,184 | 59,487 | 9.8% | 8.7 | 6 | 7 | 1.7 | 4 | 67% | 1 | 17% | 25,267 | 2.35 | 80.7% | Prentiss |
| Tippah | 65,448 | 77,010 | 75,095 | -2.5% | 10.9 | 8 | 9 | 1.9 | 5 | 63% | 0 | 0% | 22,232 | 3.38 | 82.2% | Tippah |
| Tishomingo | 34,730 | 33,902 | 31,980 | -5.7% | 4.7 | 6 | 6 | -1.3 | 2 | 33% | 0 | 0% | 19,593 | 1.63 | 128.7% | Tishomingo |
| **Totals** | 512,392 | 519,093 | 543,200 | 4.6% | 79.2 | 56 | 62 | 17.2 | 36 | 64% | 11 | 20% | 311,274 | 1.75 | 78.3% | Totals |
| **Region 1 South** | | | | | | | | | | | | | | | | Region 1 South |
| Calhoun | 24,340 | 25,141 | 28,432 | 13.1% | 4.1 | 3 | 3 | 1.1 | 3 | 100% | 0 | 0% | 14,962 | 1.90 | 72.4% | Calhoun |
| E Chickasaw | 31,674 | 25,758 | 23,392 | -9.2% | 3.4 | 4 | 5 | -1.6 | 1 | 25% | 0 | 0% | 8,686 | 2.69 | 146.6% | E Chickasaw |
| Itawamba | 65,606 | 59,785 | 65,816 | 10.1% | 9.6 | 8 | 6 | 3.6 | 6 | 75% | 1 | 13% | 23,401 | 2.81 | 62.5% | Itawamba |
| Lafayette | 48,621 | 51,345 | 52,958 | 3.1% | 7.7 | 8 | 6 | 1.7 | 4 | 50% | 0 | 0% | 47,351 | 1.12 | 77.7% | Lafayette |
| Lee | 126,790 | 125,257 | 134,765 | 7.6% | 19.6 | 16 | 16 | 3.6 | 11 | 69% | 1 | 6% | 82,910 | 1.63 | 81.4% | Lee |
| Monroe | 82,552 | 98,722 | 103,362 | 4.7% | 15.1 | 15 | 16 | -0.9 | 5 | 33% | 1 | 7% | 36,989 | 2.79 | 106.2% | Monroe |
| Pontotoc | 104,980 | 115,656 | 123,081 | 6.4% | 17.9 | 12 | 13 | 4.9 | 8 | 67% | 4 | 33% | 29,957 | 4.11 | 72.5% | Pontotoc |
| Union | 66,334 | 60,872 | 68,455 | 12.5% | 10.0 | 9 | 9 | 1.0 | 6 | 67% | 0 | 0% | 27,134 | 2.52 | 90.2% | Union |
| W Chickasaw | 31,353 | 30,617 | 33,816 | 10.4% | 4.9 | 5 | 6 | -1.1 | 3 | 60% | 0 | 0% | 8,686 | 3.89 | 121.7% | W Chickasaw |
| **Totals** | 582,250 | 593,153 | 634,077 | 6.8% | 92.4 | 80 | 80 | 12.4 | 47 | 59% | 7 | 9% | 280,096 | 2.26 | 86.6% | Totals |
| **Region 2 East** | | | | | | | | | | | | | | | | Region 2 East |
| Carroll | 6,851 | 12,465 | 6,574 | -47.3% | 1.0 | 2 | 3 | -2.0 | 0 | 0% | 0 | 0% | 10,597 | 0.62 | 313.1% | Carroll |
| Grenada | 34,941 | 34,275 | 36,938 | 7.8% | 5.4 | 5 | 5 | 0.4 | 2 | 40% | 0 | 0% | 21,906 | 1.69 | 92.9% | Grenada |
| Leflore | 41,109 | 28,807 | 38,303 | 33.0% | 5.6 | 5 | 6 | -0.4 | 3 | 60% | 0 | 0% | 32,317 | 1.19 | 107.5% | Leflore |
| Montgomery | 9,021 | 9,463 | 11,318 | 19.6% | 1.6 | 5 | 5 | -3.4 | 0 | 0% | 0 | 0% | 10,925 | 1.04 | 303.1% | Montgomery |
| Panola | 19,840 | 20,115 | 25,661 | 27.6% | 3.7 | 3 | 3 | 0.7 | 2 | 67% | 0 | 0% | 34,707 | 0.74 | 80.2% | Panola |
| Quitman | 16,568 | 16,489 | 10,664 | -35.3% | 1.6 | 3 | 2 | -0.4 | 0 | 0% | 0 | 0% | 8,223 | 1.30 | 128.7% | Quitman |
| Tallahatchie | 14,826 | 16,236 | 17,317 | 6.7% | 2.5 | 4 | 4 | -1.5 | 0 | 0% | 0 | 0% | 15,378 | 1.13 | 158.5% | Tallahatchie |
| Tate | 40,929 | 39,883 | 36,556 | -8.3% | 5.3 | 4 | 4 | 1.3 | 3 | 75% | 0 | 0% | 28,886 | 1.27 | 75.1% | Tate |
| Tunica | 13,603 | 11,480 | 10,123 | -11.8% | 1.5 | 1 | 2 | -0.5 | 1 | 0% | 0 | 0% | 10,778 | 0.94 | 135.5% | Tunica |
| Yalobusha | 22,579 | 20,222 | 22,111 | 9.3% | 3.2 | 3 | 4 | -0.8 | 1 | 33% | 0 | 0% | 12,678 | 1.74 | 124.1% | Yalobusha |
| **Totals** | 220,267 | 209,435 | 215,565 | 2.9% | 31.4 | 35 | 38 | -6.6 | 12 | 34% | 0 | 0% | 186,395 | 1.16 | 120.9% | Totals |
| **Region 2 West** | | | | | | | | | | | | | | | | Region 2 West |
| Coahoma | 29,552 | 31,496 | 31,280 | -0.7% | 4.6 | 4 | 5 | -0.4 | 3 | 75% | 1 | 25% | 26,151 | 1.20 | 109.7% | Coahoma |
| E Bolivar | 56,513 | 62,776 | 58,439 | -6.9% | 8.5 | 7 | 9 | -0.5 | 5 | 71% | 0 | 0% | 17,073 | 3.42 | 105.6% | E Bolivar |
| Humphreys | 28,968 | 28,143 | 32,404 | 15.1% | 4.7 | 5 | 5 | -0.3 | 0 | 0% | 0 | 0% | 9,375 | 3.46 | 105.9% | Humphreys |
| Sunflower | 38,093 | 38,190 | 46,226 | 21.0% | 6.7 | 5 | 5 | 1.7 | 4 | 80% | 0 | 0% | 29,450 | 1.57 | 74.2% | Sunflower |
| Washington | 199,643 | 211,604 | 195,545 | -7.6% | 28.5 | 29 | 39 | -10.5 | 12 | 41% | 1 | 3% | 51,137 | 3.82 | 136.8% | Washington |
| W Bolivar | 39,453 | 40,643 | 39,108 | -3.8% | 5.7 | 3 | 5 | 0.7 | 3 | 100% | 0 | 0% | 17,072 | 2.29 | 87.7% | W Bolivar |
| **Totals** | 392,222 | 412,852 | 403,002 | -2.4% | 58.7 | 53 | 68 | -9.3 | 27 | 51% | 2 | 4% | 150,258 | 2.68 | 115.8% | Totals |
| **Region 3 North** | | | | | | | | | | | | | | | | Region 3 North |
| Attala | 22,356 | 20,543 | 20,870 | 1.6% | 3.0 | 4 | 5 | -2.0 | 2 | 50% | 0 | 0% | 19,564 | 1.07 | 164.4% | Attala |
| Holmes | 14,933 | 12,004 | 12,878 | 7.3% | 1.9 | 3 | 3 | -1.1 | 0 | 0% | 0 | 0% | 19,198 | 0.67 | 159.8% | Holmes |
| Issaquena | 1,990 | 2,950 | 1,990 | -32.5% | 0.3 | 1 | 1 | -0.7 | 0 | 0% | 0 | 0% | 1,406 | 1.42 | 344.7% | Issaquena |
| Leake | 18,040 | 17,437 | 22,469 | 28.9% | 3.3 | 5 | 4 | -0.7 | 1 | 20% | 0 | 0% | 23,805 | 0.94 | 122.1% | Leake |
| Madison | 75,902 | 76,161 | 65,144 | -14.5% | 9.5 | 6 | 9 | 0.5 | 7 | 117% | 0 | 0% | 95,203 | 0.68 | 94.8% | Madison |
| Rankin | 245,345 | 256,866 | 235,371 | -8.4% | 34.3 | 16 | 19 | 15.3 | 14 | 88% | 9 | 56% | 141,417 | 1.66 | 55.4% | Rankin |
| Scott | 55,717 | 68,267 | 61,401 | -10.1% | 9.0 | 8 | 9 | 0.0 | 5 | 63% | 0 | 0% | 28,264 | 2.17 | 100.6% | Scott |
| Sharkey | 1,751 | 1,751 | 3,191 | 82.2% | 0.5 | 1 | 1 | -0.5 | 0 | 0% | 0 | 0% | 4,916 | 0.65 | 215.0% | Sharkey |
| Yazoo | 41,962 | 48,125 | 41,850 | -13.0% | 6.1 | 3 | 4 | 2.1 | 3 | 100% | 2 | 67% | 28,065 | 1.49 | 65.6% | Yazoo |
| **Totals** | 477,996 | 504,104 | 465,164 | -7.7% | 67.8 | 47 | 55 | 12.8 | 32 | 68% | 11 | 23% | 361,838 | 1.29 | 81.1% | Totals |
| **Region 3 South** | | | | | | | | | | | | | | | | Region 3 South |
| Hinds | 413,709 | 396,024 | 409,815 | 3.5% | 59.7 | 26 | 35 | 24.7 | 20 | 77% | 13 | 50% | 245,285 | 1.67 | 58.6% | Hinds |
| Warren | 38,483 | 37,022 | 38,400 | 3.7% | 5.6 | 6 | 6 | -0.4 | 1 | 17% | 0 | 0% | 48,773 | 0.79 | 107.2% | Warren |
| **Totals** | 452,192 | 433,046 | 448,215 | 3.5% | 65.3 | 32 | 41 | 24.3 | 21 | 66% | 13 | 41% | 294,058 | 1.52 | 62.8% | Totals |

| Region/County | January 2012 Workload | February 2012 Workload | March 2012 Workload | March % Workload Increase | March Workers Needed | March Wkrs w Caseload | March Workers Assigned | March Workers Short | March Over Full Caseload | March % Over Full | March Over 2X Caseload | March % Over Double | County Population 2010 Census | March Minutes Per Capita | March % Staff of Full Staff | Region/County |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Region 4 North** | | | | | | | | | | | | | | | | Region 4 North |
| Choctaw | 6,486 | 5,855 | 8,363 | 42.8% | 1.2 | 1 | 1 | 0.2 | 1 | 0% | 0 | 0% | 8,547 | 0.98 | 82.0% | Choctaw |
| Clay | 58,585 | 69,649 | 63,502 | -8.8% | 9.3 | 8 | 8 | 1.3 | 3 | 38% | 2 | 25% | 20,634 | 3.08 | 86.4% | Clay |
| Kemper | 10,016 | 10,913 | 10,367 | -5.0% | 1.5 | 1 | 1 | 0.5 | 1 | 100% | 0 | 0% | 10,456 | 0.99 | 66.2% | Kemper |
| Lowndes | 62,521 | 66,450 | 68,771 | 3.5% | 10.0 | 8 | 9 | 1.0 | 6 | 75% | 1 | 13% | 59,779 | 1.15 | 89.8% | Lowndes |
| Neshoba | 50,214 | 56,282 | 58,771 | 4.4% | 8.6 | 5 | 7 | 1.6 | 5 | 100% | 0 | 0% | 29,676 | 1.98 | 81.7% | Neshoba |
| Noxubee | 10,040 | 7,338 | 8,617 | 17.4% | 1.3 | 1 | 1 | 0.3 | 1 | 100% | 0 | 0% | 11,545 | 0.75 | 79.6% | Noxubee |
| Oktibbeha | 34,203 | 41,621 | 37,465 | -10.0% | 5.5 | 4 | 4 | 1.5 | 3 | 75% | 0 | 0% | 47,671 | 0.79 | 73.2% | Oktibbeha |
| Webster | 11,932 | 13,310 | 9,483 | -28.8% | 1.4 | 1 | 1 | 0.4 | 0 | 0% | 0 | 0% | 10,253 | 0.92 | 72.3% | Webster |
| Winston | 39,750 | 53,808 | 48,267 | -10.3% | 7.0 | 5 | 5 | 2.0 | 3 | 60% | 1 | 20% | 19,198 | 2.51 | 71.1% | Winston |
| **Totals** | 283,747 | 325,226 | 313,606 | -3.6% | 45.7 | 34 | 37 | 8.7 | 23 | 68% | 4 | 12% | 217,759 | 1.44 | 80.9% | Totals |
| **Region 4 South** | | | | | | | | | | | | | | | | Region 4 South |
| Clarke | 17,157 | 22,420 | 23,746 | 5.9% | 3.5 | 3 | 3 | 0.5 | 2 | 67% | 0 | 0% | 16,732 | 1.42 | 86.7% | Clarke |
| Jasper | 22,088 | 19,037 | 21,882 | 14.9% | 3.2 | 3 | 3 | 0.2 | 2 | 67% | 0 | 0% | 17,062 | 1.28 | 94.0% | Jasper |
| Jones | 48,992 | 57,281 | 53,016 | -7.4% | 7.7 | 5 | 7 | 0.7 | 5 | 100% | 0 | 0% | 67,761 | 0.78 | 90.6% | Jones |
| Lauderdale | 156,201 | 152,888 | 167,593 | 9.6% | 24.4 | 15 | 15 | 9.4 | 14 | 93% | 0 | 0% | 80,261 | 2.09 | 61.4% | Lauderdale |
| Newton | 8,614 | 9,869 | 15,053 | 52.5% | 2.2 | 2 | 2 | 0.2 | 1 | 50% | 0 | 0% | 21,720 | 0.69 | 91.1% | Newton |
| Wayne | 40,128 | 39,128 | 41,654 | 6.5% | 6.1 | 3 | 4 | 2.1 | 3 | 100% | 1 | 33% | 20,747 | 2.01 | 65.9% | Wayne |
| **Totals** | 293,180 | 300,623 | 322,944 | 7.4% | 47.1 | 31 | 34 | 13.1 | 27 | 87% | 1 | 3% | 224,283 | 1.44 | 72.2% | Totals |
| **Region 5 East** | | | | | | | | | | | | | | | | Region 5 East |
| Copiah | 31,068 | 46,383 | 67,419 | 45.4% | 9.8 | 6 | 6 | 3.8 | 5 | 83% | 2 | 33% | 29,449 | 2.29 | 61.1% | Copiah |
| Covington | 27,198 | 27,056 | 23,784 | -12.1% | 3.5 | 4 | 4 | -0.5 | 3 | 75% | 0 | 0% | 19,568 | 1.22 | 115.4% | Covington |
| Jefferson Davis | 35,011 | 31,644 | 32,982 | 4.2% | 4.8 | 3 | 5 | -0.2 | 2 | 67% | 1 | 33% | 12,487 | 2.64 | 104.0% | Jefferson Davis |
| Lawrence | 16,418 | 18,893 | 18,906 | 0.1% | 2.8 | 2 | 4 | -1.2 | 2 | 100% | 0 | 0% | 12,929 | 1.46 | 145.1% | Lawrence |
| Lincoln | 82,798 | 84,324 | 80,726 | -4.3% | 11.8 | 12 | 11 | 0.8 | 3 | 25% | 1 | 8% | 34,869 | 2.32 | 93.5% | Lincoln |
| Simpson | 81,063 | 70,891 | 73,106 | 3.1% | 10.7 | 11 | 11 | -0.3 | 3 | 27% | 0 | 0% | 27,503 | 2.66 | 103.2% | Simpson |
| Smith | 17,189 | 21,800 | 17,161 | -21.3% | 2.5 | 2 | 2 | 0.5 | 2 | 100% | 0 | 0% | 16,491 | 1.04 | 79.9% | Smith |
| **Totals** | 290,745 | 300,991 | 314,084 | 4.3% | 45.8 | 40 | 43 | 2.8 | 20 | 50% | 4 | 10% | 153,296 | 2.05 | 93.9% | Totals |
| **Region 5 West** | | | | | | | | | | | | | | | | Region 5 West |
| Adams | 80,392 | 90,274 | 93,558 | 3.6% | 13.6 | 18 | 17 | -3.4 | 3 | 17% | 1 | 6% | 32,297 | 2.90 | 124.6% | Adams |
| Amite | 30,549 | 34,795 | 32,756 | -5.9% | 4.8 | 4 | 4 | 0.8 | 1 | 25% | 1 | 25% | 13,131 | 2.49 | 83.8% | Amite |
| Claiborne | 6,043 | 7,854 | 6,751 | -14.0% | 1.0 | 3 | 3 | -2.0 | 0 | 0% | 0 | 0% | 9,604 | 0.70 | 304.8% | Claiborne |
| Franklin | 5,746 | 5,791 | 6,189 | 6.9% | 0.9 | 1 | 2 | -1.1 | 0 | 0% | 0 | 0% | 8,118 | 0.76 | 221.7% | Franklin |
| Jefferson | 11,554 | 10,845 | 13,143 | 21.2% | 1.9 | 2 | 2 | -0.1 | 0 | 0% | 0 | 0% | 7,726 | 1.70 | 104.4% | Jefferson |
| Pike | 56,420 | 51,359 | 51,204 | -0.3% | 7.5 | 7 | 8 | -0.5 | 4 | 57% | 0 | 0% | 40,404 | 1.27 | 107.2% | Pike |
| Walthall | 29,695 | 33,663 | 34,060 | 1.2% | 5.0 | 6 | 6 | -1.0 | 2 | 33% | 0 | 0% | 15,443 | 2.21 | 120.8% | Walthall |
| Wilkinson | 25,500 | 9,962 | 11,508 | 15.5% | 1.7 | 2 | 2 | -0.3 | 0 | 0% | 0 | 0% | 9,879 | 1.16 | 119.2% | Wilkinson |
| **Totals** | 245,899 | 244,543 | 249,169 | 1.9% | 36.3 | 43 | 44 | -7.7 | 10 | 23% | 2 | 5% | 136,602 | 1.82 | 121.1% | Totals |
| **Region 6** | | | | | | | | | | | | | | | | Region 6 |
| Forrest | 158,059 | 162,714 | 156,370 | -3.9% | 22.8 | 21 | 24 | -1.2 | 6 | 29% | 3 | 14% | 74,934 | 2.09 | 105.3% | Forrest |
| Lamar | 48,540 | 37,314 | 39,878 | 6.9% | 5.8 | 7 | 6 | -0.2 | 1 | 14% | 0 | 0% | 55,658 | 0.72 | 103.2% | Lamar |
| Marion | 29,882 | 24,864 | 37,234 | 49.8% | 5.4 | 4 | 3 | 2.4 | 3 | 75% | 0 | 0% | 27,088 | 1.37 | 55.3% | Marion |
| Pearl River | 100,511 | 95,079 | 100,485 | 5.7% | 14.6 | 17 | 16 | -1.4 | 7 | 41% | 0 | 0% | 55,834 | 1.80 | 109.2% | Pearl River |
| Perry | 14,036 | 13,443 | 13,418 | -0.2% | 2.0 | 2 | 2 | 0.0 | 1 | 50% | 0 | 0% | 12,250 | 1.10 | 102.3% | Perry |
| Stone | 57,111 | 72,911 | 69,722 | -4.4% | 10.2 | 7 | 7 | 3.2 | 6 | 86% | 0 | 0% | 17,786 | 3.92 | 68.9% | Stone |
| **Totals** | 408,139 | 406,325 | 417,107 | 2.7% | 60.8 | 58 | 58 | 2.8 | 24 | 41% | 3 | 5% | 243,550 | 1.71 | 95.4% | Totals |
| **Region 7 East** | | | | | | | | | | | | | | | | Region 7 East |
| George | 13,267 | 19,867 | 23,199 | 16.8% | 3.4 | 1 | 1 | 2.4 | 1 | 100% | 1 | 100% | 22,578 | 1.03 | 29.6% | George |
| Greene | 0 | 0 | 0 | 0.0% | 0.0 | 0 | 0 | 0.0 | 0 | | 0 | | 14,400 | 0.00 | 0.0% | Greene |
| Jackson | 307,986 | 328,486 | 311,384 | -5.2% | 45.4 | 26 | 28 | 17.4 | 19 | 73% | 13 | 50% | 139,668 | 2.23 | 61.7% | Jackson |
| **Totals** | 321,253 | 348,353 | 334,583 | -4.0% | 48.8 | 27 | 29 | 19.8 | 20 | 74% | 14 | 52% | 176,646 | 1.89 | 59.5% | Totals |
| **Region 7 West** | | | | | | | | | | | | | | | | Region 7 West |
| Hancock | 151,315 | 130,455 | 141,416 | 8.4% | 20.6 | 10 | 11 | 9.6 | 6 | 60% | 5 | 50% | 43,929 | 3.22 | 53.4% | Hancock |
| Harrison | 354,793 | 376,457 | 393,988 | 4.7% | 57.4 | 29 | 35 | 22.4 | 13 | 45% | 11 | 38% | 187,105 | 2.11 | 60.9% | Harrison |
| **Totals** | 506,108 | 506,912 | 535,404 | 5.6% | 78.0 | 39 | 46 | 32.0 | 19 | 49% | 16 | 41% | 231,034 | 2.32 | 58.9% | Totals |
| | | | | | 0.0 | | | | | | | | | | | |
| **State Totals** | 4,986,390 | 5,104,656 | 4,873,176 | -4.5% | 710.4 | 575 | 635 | 75.4 | 318 | 55% | 88 | 15% | 2,967,089 | 1.64 | 89.4% | State Totals |

**Notes regarding April 2012 Workload, Caseload, and Staffing Analysis:**

1. Percentage of workload increase is the percentage workload increased (or decreased from February to March.

2. Workers with caseload are caseworkers who had workload minutes reported in Macwis during March.  Only workers in FPS/FPW series PINS who are in positions designated to carry cases are counted.  Staff who appeared in the workload report with minutes assigned but who are not in caseworker positions are not included.  All workload minutes are counted for each county regardless of assignment of minutes.  Resource and Direct service staff are counted, as are the minutes assigned, in the county in which they are housed and in which the workload minutes are captured in Macwis reports.

3. Workers assigned include caseworkers in FPS/FPW series PINS who are assigned to counties and who are in positions designated to carry cases.  Non case-carrying staff in FPS/FPW positions are excluded.  Such staff include Foster Care Review staff, CQI, Regional Social Worker Advanced staff, Permanency Specialists, Practice Model Coaches, Independent Living Specialist, Resource Development Specialists, and other such positions established in counties and regions resulting from the Practice Model whose role is something other than carrying a caseload.  There are signficant numbers of staff in such positions.

4. The Workers Short column calculates the number of workers understaffed by subtracting the nu number workers assigned from the number of workers needed based on reported workload.

5. Minutes per capita calculates the number of minutes of workload per person in a county, region, and statewide.  This number could be useful in validation of reported workload or in trying to understand what is going on from county to county.  The statewide average in 1.84 minutes of workload per person.  Pontotoc County has 4.11 minutes of workload per person while Madison County only has 0.68 minutes per person.  Why is this and what does it tell us?  Pontotoc is new in leading the State in this category, with Hancock, Stone, and Washington consistently, month after month, having extremely high per capita workload and Madison, Warren, and Jones, among highly populated counties, usually being very low.  Are there practice issues here or is this court-driven?

6. Fourteen Central Intake workers and their workloads continue to appear on the Hinds County workload report with a total of 56,750 workload minutes.  Neither the minutes nor the staff are included in the numbers in the Workload, Caseload, and Staffing Analysis.  This staff should be moved from Hinds County's workload report.

7. A worker named ███████ appears on Alcorn County's workload being supervised by ███████ who is ASWS in Attala. ███████ is in Hinds County on the HR listing.

8. A worker named ███████ appears on the workload report for Hinds County.  She is not in the HR listing of employees.

**Ex. 23**



**Number of Caseworkers with Caseloads Relative to the Number of Caseworkers  Necessary to Meet Settlement Agreement Requirements, Statewide, by Month**
**April 2011 - January 2012**
[Prepared by the Office of the Court Monitor Based on DFCS Data]

This chart is based on defendants' reported data, which have not been verified by the Monitor.  Defendants recognize that the data are not completely accurate, but they are the best available data at this time.

Caseworker Surplus (Positive Values) or Deficit (Negative Values)

-180  -183  -192  -157  -149  -149  -143  -146  -116  -134

■ Apr-11  ■ May-11  ■ Jun-11  ■ Jul-11  ■ Aug-11  ■ Sep-11  ■ Oct-11  ■ Nov-11  ■ Dec-11  ■ Jan-12

**Ex. 24**



**Number of Caseworkers with Caseloads Relative to the Number of Caseworkers Necessary to Meet Settlement Agreement Requirements, by Region and Month**
**April 2011 - January 2012**
[Prepared by the Office of the Court Monitor Based on DFCS Data]

This chart is based on defendants' reported data, which have not been verified by the Monitor. Defendants recognize that the data are not completely accurate, but they are the best available data at this time.

**Ex. 25**



**Hires and Separations Among DFCS Caseworker Staff\***
**January 1, 2010 - April 30, 2012 Hires**
**January 1, 2010 - May 10, 2012 Separations**
(Prepared by the Office of the Court Monitor Based on DFCS Data)

\*Hiring data were transmitted to the Court Monitor on May 7 and 15, 2012 and separation data were transmitted on May 16, 2012 by human resources staff/management in the Mississippi Department of Human Services (MDHS).

**Ex. 26**



*Separation data were transmitted to the Court Monitor on May 16, 2012 by human resources staff/management in the Mississippi Department of Human Services (MDHS).

**Ex. 27**



*Hiring data were transmitted to the Court Monitor on May 7 and 15, 2012 and separation data were transmitted on May 16, 2012 by human resources staff/management in the Mississippi Department of Human Services (MDHS).

**Ex. 28**



**Reason for Separations Among Area Social Work Supervisors***
**January 1, 2010 - May 10, 2012**
(Prepared by the Office of the Court Monitor Based on DFCS Data)

■ Separation

**Ex. 29**

# MACWIS DOWN TIME TRACKING
## 2012

DEFINITIONS:
PLANNED DOWNTIME- an event scheduled by MIS, notice to staff given of dates/times/length of expected unavailability. All users affected.
UNPLANNED DOWNTIME- an unscheduled event that affects all users ability to access MACWIS.
UNPLANNED LIMITED ACCESS- an unscheduled even that does not affect all users. Access may be sporadic, response time slow.

| MONTH | Downtime Begin/Reported date/time | Downtime end date/time | Planned Event? | Approximate PLANNED Downtime (in hours) | Approximate UNPLANNED Downtime (in hours) | Approximate UNPLANNED LIMITED ACCESS (in hours) | Reason | Result | MIS Contact person/Responsible Party |
|---|---|---|---|---|---|---|---|---|---|
| FEBRUARY | | | | | | | | | |
| | 02/02/2012 5:00PM | 02/02/2012 10:00PM | Yes | 5 | | | Core Switch Migration | MACWIS and all desktop applications unavailable. All MIS-hosted websites also unavailable during this time - including DFCS Connection (http://dfcsmacweb/DFCSWEB/), Centralized Intake (www.msabusehotline.mdhs.ms.gov), MACWIS portal system (DFCSWEB and DFCSMACWEB). | |
| | 02/16/2012 approximately 7:00AM | 02/16/2012 9:00AM | No | | 2 | | Servers had to be rebooted | All staff received "service not registered" message when trying to access MACWIS | |
| | 2/26/2012 1:00:00PM | 02/26/2012 10:00PM | Yes | 9 | | | Core Switch Migration | MACWIS and all desktop applications unavailable. All MIS-hosted websites also unavailable during this time - including DFCS Connection (http://dfcsmacweb/DFCSWEB/), Centralized Intake (www.msabusehotline.mdhs.ms.gov), MACWIS portal system (DFCSWEB and DFCSMACWEB). | |
| | 02/29/2012 2:00PM | 03/01/2012 10:00AM | No | | 20 | | Network issues | MACWIS and all desktop applications unavailable. | |
| | FEBRUARY TOTAL DOWN TIME | | | 14 | 22 | 0 | | | |
| MARCH | | | | | | | | | |
| | 03/05/2012 7:00AM | 03/05/2012 8:45AM | No | | 1.75 | | Servers had to be rebooted | Workers received "service not registered" message when trying to access MACWIS | ▬▬▬ |
| | 03/11/2012 5:00PM | 03/11/2012 9:00PM | Yes | 4 | | | "IPL" issues on Mainframe | MACWIS and all desktop applications unavailable. | |
| | 03/14/2012 7:00AM | 03/14/2012 9:00AM | No | | | 2 | Servers 17/18 down | Limited access to MACWIS | |
| | 03/27/2012 7:00AM | 3/27/2012 10:00:00AM | No | | | 3 | Server 3 (SSL server) down | access to MACWIS unavailable for SO staff, and those who access MACWIS via the web portal (those using laptops, remote access) | ▬▬▬ |
| | 3/27/2012 1:00:00PM | 03/28/2012 11:00AM | NO | | | 22 | Server 3 (SSL server) down | access to MACWIS unavailable for SO staff, and those who access MACWIS via the web portal (those using laptops, remote access) | ▬▬▬ |
| | MARCH DOWN TIME | | | 4 | 1.75 | 27 | | | |
| APRIL | | | | | | | | | |
| | 4/9/2012 7:00 | 4/9/2012 8:30AM | NO | | | 1.5 | various, workers receiving "roamning profile" message, server 10 down and rebooted. | sporatic access | ▬▬▬ |

Page 1 of 4

# MACWIS DOWN TIME TRACKING
## 2012

**DEFINITIONS:**
PLANNED DOWNTIME- an event scheduled by MIS, notice to staff given of dates/times/length of expected unavailability. All users affected.
UNPLANNED DOWNTIME-an unscheduled event that affects all users ability to access MACWIS.
UNPLANNED LIMITED ACCESS-an unscheduled even that does not affect all users. Access may be sporadic, response time slow.

| MONTH | Downtime Begin/Reported date/time | Downtime end date/time | Planned Event? | Approximate PLANNED Downtime (in hours) | Approximate UNPLANNED Downtime (in hours) | Approximate UNPLANNED LIMITED ACCESS (in hours) | Reason | Result | MIS Contact person/Responsible Party |
|---|---|---|---|---|---|---|---|---|---|
| | 4/9/2012 7:00am | 4/9/2012 1:30pm | NO | | | 6.5 | Server 20 (helpdesk database housed) is down and requires a new driver | this should only affect state office staff with access to helpdesk database-mainly MACWIS unit staff | ▬▬▬▬▬ |

## MACWIS DOWN TIME TRACKING
### 2012

DEFINITIONS:
PLANNED DOWNTIME- an event scheduled by MIS, notice to staff given of dates/times/length of expected unavailability. All users affected.
UNPLANNED DOWNTIME-an unscheduled event that affects all users ability to access MACWIS.
UNPLANNED LIMITED ACCESS-an unscheduled even that does not affect all users. Access may be sporadic, response time slow.

| MONTH | Downtime Begin/Reported date/time | Downtime end date/time | Planned Event? | Approximate PLANNED Downtime (in hours) | Approximate UNPLANNED Downtime (in hours) | Approximate UNPLANNED LIMITED ACCESS (in hours) | Reason | Result | MIS Contact person/Responsible Party |
|---|---|---|---|---|---|---|---|---|---|
| | 4/10/2012 7:00am | 4/10/2012 12:45pm | no | | | 5.75 | MACWIS Test server crashed and incorrect version of database was loaded. Database had to be reloaded with current version of MACWIS | Only MACWIS UNIT staff affected. MACWIS Staff unable to access test database to analyze staff issues. | |
| | 04/12/2012 8:30am | 4/12/2012 4:30:00PM | no | | | 8 | Seven servers down. Users being disconencted from MACWS. Error messages received stating "citrix Presentation Server Connection Interrutped, Attempting to reconnect…" | sporatic access, MACWIS very slow, locking up. As of 11:00, four servers were back up, three were still down. As of 4:30 pm one server (server #7) was still down. Access and response time was slow, but staff were able to access MACWIS | |
| | 4/24/2012 6:30am | 4/24/2012 10:00:00AM | no | | | 3.5 | five servers down. Application stalls at "loading personal settings". MIS states that some of the components for the test envionment are missing, they are unsure how this happened but plan on reloading a backed-up version to the server which should resolve the problem regarding access to the test environment. | appears to be affecting SO staff mainly. Received a few calls from county staff around 9:00 AM and throughout the day, but most field staff have been able to get in. | |
| | 4/24/2012 6:30am | 05/01/2012 3:45pm | no | | | 27 | Server 20 (helpdesk database housed) is down | MACWIS Staff unable to access the TEST enviornment, which prevents HD staff from being able to work out some heat ticket/user issues, the analysts can't validate reports, and are limited as to what can be done regarding writing requirements for reports and FRDs as access to the test enviornment is what allows MACWIS staff to navigate the system as a workers/ASWS/RD. MACWIS staff affected only, hours shown for access issue are number of normal business hours for Thursday, Friday and Tuesday (Monday was a holiday) | |
| | APRIL DOWNTIME (4/1/12-4/30/2012) | | | 0 | 0 | 52.25 | | | |
| MAY | 5/7/2012 | | no | | | | | | |

# MACWIS DOWN TIME TRACKING
## 2012

**DEFINITIONS:**
PLANNED DOWNTIME- an event scheduled by MIS, notice to staff given of dates/times/length of expected unavailability. All users affected.
UNPLANNED DOWNTIME-an unscheduled event that affects all users ability to access MACWIS.
UNPLANNED LIMITED ACCESS-an unscheduled even that does not affect all users. Access may be sporadic, response time slow.

| MONTH | Downtime Begin/Reported date/time | Downtime end date/time | Planned Event? | Approximate PLANNED Downtime (in hours) | Approximate UNPLANNED Downtime (in hours) | Approximate UNPLANNED LIMITED ACCESS (in hours) | Reason | Result | MIS Contact person/Responsible Party |
|---|---|---|---|---|---|---|---|---|---|
| | 05/10/2012 7:00am | 05/10/2012 8:30am | no | | | 1.5 | Servers 2, 16 and 20 needed to be rebooted | Helpdesk staff had difficulty accessing Production or the helpdesk database. No calls were received from the field. Server 20 was up at 8:00, remaing servers by 8:30. | |
| | 5/29/2012 7:00:00AM | 05/29/2012 8:30am | no | | | 1.5 | servers 18, 21 and JCSMFS10 had to be rebooted | Affected Help Desk and South East portion of the state | |
| | 05/31/2012 6:00am | 5/31/2012 10:00 | no | | | 4.5 | four servers down | slow response time across the state. Two servers restored by 8:30, a third by 9:30, all were up by 10am | |
| | | | | | | | | | |
| | | | | | | | | | |
| down-time totals from 02/01/2012-06/01/2012 | | | | 18 | 23.75 | 86.75 | | | |

**Ex. 30**

PROJECT NUMBER 37921
PROFESSIONAL SERVICES AGREEMENT
BETWEEN
WALTER R. MCDONALD & ASSOCIATES, INC.
AND
MISSISSIPPI DEPARTMENT OF INFORMATION TECHNOLOGY SERVICES
AS CONTRACTING AGENT FOR THE
MISSISSIPPI DEPARTMENT OF HUMAN SERVICES

This Professional Services Agreement (hereinafter referred to as "Agreement") is entered into by and between Walter R. McDonald & Associates, Inc., a California corporation having its principal place of business at 2720 Gateway Oaks Drive, Suite 250, Sacramento, California 95833 (hereinafter referred to as "Contractor"), and Mississippi Department of Information Technology Services having its principal place of business at 301 North Lamar Street, Suite 508, Jackson, Mississippi 39201 (hereinafter referred to as "ITS"), as contracting agent for the Mississippi Department of Human Services located at 750 North State Street, Jackson, Mississippi 39202 (hereinafter referred to as "Customer"). ITS and Customer are sometimes collectively referred to herein as "State".

**WHEREAS,** Customer, pursuant to Request for Proposals ("RFP") No. 3583 requested proposals for the acquisition of analysis and recommendation services to set a direction for either the replacement or upgrade of Customer's Mississippi Automated Child Welfare Information System ("MACWIS"), and

**WHEREAS,** Contractor was the successful proposer in an open, fair and competitive procurement process to provide the services described herein;

**NOW THEREFORE,** in consideration of the mutual understandings, promises and agreements set forth, the parties hereto agree as follows:

## ARTICLE 1   PERIOD OF PERFORMANCE

**1.1**    Unless this Agreement is extended by mutual agreement or terminated as prescribed elsewhere herein, this Agreement shall begin on the date it is signed by all parties and shall continue until the close of business on December 31, 2011. At the end of the initial term, this Agreement may, upon the written agreement of the parties, be renewed for an additional term, the length of which will be agreed upon by the parties. Under no circumstances, however, shall this Agreement be renewed beyond June 30, 2012. Sixty (60) days prior to the expiration of the initial term or any renewal term of this Agreement, Contractor shall notify Customer and ITS of the impending expiration and Customer shall have thirty (30) days in which to notify Contractor of its intention to either renew or cancel the Agreement.

**1.2**    This Agreement will become a binding obligation on the State only upon the issuance of a valid purchase order by the Customer following contract execution and the issuance by ITS of the

Page 1 of 17

CP-1 Acquisition Approval Document.

## ARTICLE 2  SCOPE OF SERVICES

Contractor shall assign the individuals specified in Exhibit A, which is attached hereto and incorporated herein by reference, to Customer to produce the deliverables specified in Exhibit A and perform the analysis services for Customer's MACWIS system as specified in RFP No. 3583 and Contractor's proposal, as accepted by Customer, in response thereto, which are both incorporated herein by reference. While Contractor's work is to be performed primarily on-site in the Customer's offices in Jackson, Mississippi, it is understood that with the Customer's written approval, certain work can be performed off-site if it can be demonstrated to the Customer's satisfaction that the off-site work provides a savings to the Customer and that the work done off-site does not interfere with or slow the progress of the project or reduce the quality of the work. Contractor accepts full responsibility for all problems arising out of a decision to perform off-site work. The parties understand and agree that while the usual work hours will be 8:00 A.M. to 5:00 P.M. (Central Time) Monday through Friday, occasionally they may be required to work outside of these hours.

## ARTICLE 3  CONSIDERATION AND METHOD OF PAYMENT

**3.1**    The total compensation to be paid to the Contractor by Customer for all products, services, travel, performances and expenses under this Agreement shall not exceed the specified sum of $1,063,780.00, and shall be payable as set forth in the Payment Schedule and Deliverables List attached hereto as Exhibit A.

**3.2**    Customer shall have from three (3) to fifteen (15) working days to review each deliverable and to either notify Contractor of acceptance or to provide Contractor a detailed list of deficiencies that must be remedied prior to payment being made. In the event the Customer notifies the Contractor of deficiencies, the Contractor shall correct such deficiencies within ten (10) working days unless the Customer consents in writing to a longer period of time.

**3.3**    Contractor shall submit an invoice with the appropriate documentation to Customer upon Customer's acceptance of the deliverables. Contractor shall submit invoices and supporting documentation to Customer electronically during the term of this Agreement using the processes and procedures identified by the State. Customer agrees to make payment in accordance with Mississippi law on "Timely Payments for Purchases by Public Bodies", Section 31-7-301, et seq. of the 1972 Mississippi Code Annotated, as amended, which generally provides for payment of undisputed amounts by Customer within forty-five (45) days of receipt of the invoice. Contractor understands and agrees that Customer is exempt from the payment of taxes. All payments shall be in United States currency. Payments by state agencies using the Statewide Automated Accounting System ("SAAS") shall be made and remittance information provided electronically as directed by the State. These payments by SAAS agencies shall be deposited into the bank account of the Contractor's choice. No payment, including final payment, shall be construed as acceptance of defective or incomplete work, and the Contractor shall remain responsible and liable for full performance.

**3.4**    Acceptance by the Contractor of the last payment from the Customer shall operate as a

release of all claims against the State by the Contractor and any subcontractors or other persons supplying labor or materials used in the performance of the work under this Agreement.

## ARTICLE 4   WARRANTY

**4.1**     The Contractor represents and warrants that its services hereunder shall be performed by competent personnel and shall be of professional quality consistent with generally accepted industry standards for the performance of such services and shall comply in all respects with the requirements of this Agreement.  For any breach of this warranty, the Contractor shall, for a period of ninety (90) days from performance of the service, perform the services again, at no cost to Customer, or if Contractor is unable to perform the services as warranted, Contractor shall reimburse Customer the fees paid to Contractor for the unsatisfactory services.

**4.2** Contractor represents and warrants that it will ensure its compliance with the Mississippi Employment Protection Act, Section 71-11-1, et seq. of the Mississippi Code Annotated (Supp2008), and will register and participate in the status verification system for all newly hired employees. The term "employee" as used herein means any person that is hired to perform work within the State of Mississippi. As used herein, "status verification system" means the Illegal Immigration Reform and Immigration Responsibility Act of 1996 that is operated by the United States Department of Homeland Security, also known as the E-Verify Program, or any other successor electronic verification system replacing the E-Verify Program. Contractor agrees to maintain records of such compliance and, upon request of the State, to provide a copy of each such verification to the State. Contractor further represents and warrants that any person assigned to perform services hereunder meets the employment eligibility requirements of all immigration laws of the State of Mississippi. Contractor understands and agrees that any breach of these warranties may subject Contractor to the following: (a) termination of this Agreement and ineligibility for any state or public contract in Mississippi for up to three (3) years, with notice of such cancellation/termination being made public, or (b) the loss of any license, permit, certification or other document granted to Contractor by an agency, department or governmental entity for the right to do business in Mississippi for up to one (1) year, or (c) both. In the event of such termination/cancellation, Contractor would also be liable for any additional costs incurred by the State due to contract cancellation or loss of license or permit.

**4.3**     Contractor represents and warrants that no official or employee of Customer, and no other public official of the State of Mississippi who exercises any functions or responsibilities in the review or approval of the undertaking or carrying out of the project shall, prior to the completion of said project, voluntarily acquire any personal interest, direct or indirect, in this Agreement. The Contractor warrants that it has removed any material conflict of interest prior to the signing of this Agreement, and that it shall not acquire any interest, direct or indirect, which would conflict in any manner or degree with the performance of its responsibilities under this Agreement.  The Contractor also warrants that in the performance of this Agreement no person having any such known interests shall be employed.

**4.4**     The Contractor represents and warrants that no elected or appointed officer or other employee of the State of Mississippi, nor any member of or delegate to Congress has or shall benefit financially

Walter R. McDonald & Associates, Inc.-MDHS-37921-3583-Dec2010-Professional Services

or materially from this Agreement. No individual employed by the State of Mississippi shall be admitted to any share or part of the Agreement or to any benefit that may arise therefrom. The State of Mississippi may, by written notice to the Contractor, terminate the right of the Contractor to proceed under this Agreement if it is found, after notice and hearing by the ITS Executive Director or his/her designee, that gratuities in the form of entertainment, gifts, jobs, or otherwise were offered or given by the Contractor to any officer or employee of the State of Mississippi with a view toward securing this Agreement or securing favorable treatment with respect to the award, or amending or making of any determinations with respect to the performing of such contract, provided that the existence of the facts upon which the ITS Executive Director makes such findings shall be in issue and may be reviewed in any competent court. In the event this Agreement is terminated under this article, the State of Mississippi shall be entitled to pursue the same remedies against the Contractor as it would pursue in the event of a breach of contract by the Contractor, including punitive damages, in addition to any other damages to which it may be entitled at law or in equity.

## ARTICLE 5  EMPLOYMENT STATUS

**5.1**    Contractor shall, during the entire term of this Agreement, be construed to be an independent contractor. Nothing in this Agreement is intended to nor shall be construed to create an employer-employee relationship, or a joint venture relationship.

**5.2**    Contractor represents that it is qualified to perform the duties to be performed under this Agreement and that it has, or will secure, if needed, at its own expense, applicable personnel who shall be qualified to perform the duties required under this Agreement. Such personnel shall not be deemed in any way, directly or indirectly, expressly or by implication, to be employees of Customer.

**5.3**    Any person assigned by Contractor to perform the services hereunder shall be the employee of Contractor, who shall have the sole right to hire and discharge its employee. Customer may, however, direct Contractor to replace any of its employees under this Agreement.

**5.4**    Contractor shall pay when due, all salaries and wages of its employees and it accepts exclusive responsibility for the payment of federal income tax, state income tax, social security, unemployment compensation and any other withholdings that may be required. Neither Contractor nor employees of Contractor are entitled to state retirement or leave benefits.

**5.5**    It is further understood that the consideration expressed herein constitutes full and complete compensation for all services and performances hereunder, and that any sum due and payable to Contractor shall be paid as a gross sum with no withholdings or deductions being made by Customer for any purpose from said contract sum, except as permitted herein in the article titled "Termination".

## ARTICLE 6  BEHAVIOR OF EMPLOYEES/SUBCONTRACTORS

Contractor will be responsible for the behavior of all its employees and subcontractors while on the premises of any Customer location. Any employee or subcontractor acting in a manner determined by the administration of that location to be detrimental, abusive or offensive to any of the staff will

Walter R. McDonald & Associates, Inc.-MDHS-37921-3583-Dec2010-Professional Services

be asked to leave the premises and may be suspended from further work on the premises. All Contractor employees and subcontractors who will be working at such locations shall be covered by Contractor's comprehensive general liability insurance policy.

## ARTICLE 7  MODIFICATION OR RENEGOTIATION

This Agreement may be modified only by written agreement signed by the parties hereto, and any attempt at oral modification shall be void and of no effect. The parties agree to renegotiate the Agreement if federal and/or state revisions of any applicable laws or regulations make changes in this Agreement necessary.

## ARTICLE 8  AUTHORITY, ASSIGNMENT AND SUBCONTRACTS

**8.1**     In matters of proposals, negotiations, contracts, and resolution of issues and/or disputes, the parties agree that Contractor represents all contractors, third parties, and/or subcontractors Contractor has assembled for this project.  The Customer is only required to negotiate with Contractor, as Contractor's commitments are binding on all proposed contractors, third parties, and subcontractors.

**8.2**     Neither party may assign or otherwise transfer this Agreement or its obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld. Any attempted assignment or transfer of its obligations without such consent shall be null and void. This Agreement shall be binding upon the parties' respective successors and assigns.

**8.3**     Contractor must obtain the written approval of Customer before subcontracting any portion of this Agreement. No such approval by Customer of any subcontract shall be deemed in any way to provide for the incurrence of any obligation of Customer in addition to the total fixed price agreed upon in this Agreement. All subcontracts shall incorporate the terms of this Agreement and shall be subject to the terms and conditions of this Agreement and to any conditions of approval that Customer may deem necessary.

**8.4**     Contractor represents and warrants that any subcontract agreement Contractor enters into shall contain a provision advising the subcontractor that the subcontractor shall have no lien and no legal right to assert control over any funds held by the Customer, and that the subcontractor acknowledges that no privity of contract exists between the Customer and the subcontractor and that the Contractor is solely liable for any and all payments which may be due to the subcontractor pursuant to its subcontract agreement with the Contractor. The Contractor shall indemnify and hold harmless the State from and against any and all claims, demands, liabilities, suits, actions, damages, losses, costs and expenses of every kind and nature whatsoever arising as a result of Contractor's failure to pay any and all amounts due by Contractor to any subcontractor, materialman, laborer or the like.

**8.5**     All subcontractors shall be bound by any negotiation, arbitration, appeal, adjudication or settlement of any dispute between the Contractor and the Customer, where such dispute affects the subcontract.

## ARTICLE 9   AVAILABILITY OF FUNDS

It is expressly understood and agreed that the obligation of Customer to proceed under this Agreement is conditioned upon the appropriation of funds by the Mississippi State Legislature and the receipt of state and/or federal funds for the performances required under this Agreement. If the funds anticipated for the fulfillment of this Agreement are not forthcoming, or are insufficient, either through the failure of the federal government to provide funds or of the State of Mississippi to appropriate funds, or if there is a discontinuance or material alteration of the program under which funds were available to Customer for the payments or performance due under this Agreement, Customer shall have the right to immediately terminate this Agreement, without damage, penalty, cost or expense to Customer of any kind whatsoever. The effective date of termination shall be as specified in the notice of termination.   Customer shall have the sole right to determine whether funds are available for the payments or performances due under this Agreement.

## ARTICLE 10 TERMINATION

**10.1**    Notwithstanding any other provision of this Agreement to the contrary, this Agreement may be terminated, in whole or in part, as follows: (a) upon the mutual, written agreement of the parties; (b) If either party fails to comply with the terms of this Agreement, the non-defaulting party may terminate the Agreement upon the giving of thirty (30) days written notice unless the breach is cured within said thirty (30) day period; (c) Customer may terminate the Agreement in whole or in part without the assessment of any penalties upon thirty (30) days written notice to Contractor if Contractor becomes the subject of bankruptcy, reorganization, liquidation or receivership proceedings, whether voluntary or involuntary, or (d) Customer may terminate the Agreement for any reason without the assessment of any penalties after giving thirty (30) days written notice specifying the effective date thereof to Contractor. The provisions of this Article do not limit either party's right to pursue any other remedy available at law or in equity.

**10.2**    In the event Customer terminates this Agreement, Contractor shall be paid for satisfactory work completed by Contractor and accepted by Customer prior to the termination. Such compensation shall be based upon the amounts set forth in the Article herein on "Consideration and Method of Payment", but in no case shall said compensation exceed the total fixed price of this Agreement.

**10.3**    Notwithstanding the above, Contractor shall not be relieved of liability to Customer for damages sustained by Customer by virtue of any breach of this Agreement by Contractor, and Customer may withhold any payments to Contractor for the purpose of set off until such time as the exact amount of damages due Customer from Contractor are determined.

## ARTICLE 11 GOVERNING LAW

This Agreement shall be construed and governed in accordance with the laws of the State of Mississippi and venue for the resolution of any dispute shall be Jackson, Hinds County, Mississippi. Contractor expressly agrees that under no circumstances shall Customer be obligated to pay an attorney's fee, prejudgment interest or the cost of legal action to Contractor. Further, nothing in this Agreement shall affect any statutory rights Customer may have that cannot be waived or limited by

contract.

## ARTICLE 12 WAIVER

Failure of either party hereto to insist upon strict compliance with any of the terms, covenants and conditions hereof shall not be deemed a waiver or relinquishment of any similar right or power hereunder at any subsequent time or of any other provision hereof, nor shall it be construed to be a modification of the terms of this Agreement. A waiver by the State, to be effective, must be in writing, must set out the specifics of what is being waived, and must be signed by an authorized representative of the State.

## ARTICLE 13 SEVERABILITY

If any term or provision of this Agreement is prohibited by the laws of the State of Mississippi or declared invalid or void by a court of competent jurisdiction, the remainder of this Agreement shall be valid and enforceable to the fullest extent permitted by law provided that the State's purpose for entering into this Agreement can be fully achieved by the remaining portions of the Agreement that have not been severed.

## ARTICLE 14 CAPTIONS

The captions or headings in this Agreement are for convenience only, and in no way define, limit or describe the scope or intent of any provision or Article in this Agreement.

## ARTICLE 15 HOLD HARMLESS

To the fullest extent allowed by law, Contractor shall indemnify, defend, save and hold harmless, protect and exonerate Customer, ITS and the State, its Board Members, officers, employees, agents and representatives from and against any and all claims, demands, liabilities, suits, actions, damages, losses, costs and expenses of every kind and nature whatsoever, including without limitation, court costs, investigative fees and expenses, attorney fees and claims for damages arising out of or caused by Contractor and/or its partners, principals, agents, employees or subcontractors in the performance of or failure to perform this Agreement.

## ARTICLE 16 THIRD PARTY ACTION NOTIFICATION

Contractor shall notify Customer in writing within five (5) business days of Contractor filing bankruptcy, reorganization, liquidation or receivership proceedings or within five (5) business days of its receipt of notification of any action or suit being filed or any claim being made against Contractor or Customer by any entity that may result in litigation related in any way to this Agreement and/or which may affect the Contractor's performance under this Agreement. Failure of the Contractor to provide such written notice to Customer shall be considered a material breach of this Agreement and the Customer may, at its sole discretion, pursue its rights as set forth in the Termination Article herein and any other rights and remedies it may have at law or in equity.

## ARTICLE 17 AUTHORITY TO CONTRACT

Contractor warrants that it is a validly organized business with valid authority to enter into this Agreement; that entry into and performance under this Agreement is not restricted or prohibited by

any loan, security, financing, contractual or other agreement of any kind, and notwithstanding any other provision of this Agreement to the contrary, that there are no existing legal proceedings, or prospective legal proceedings, either voluntary or otherwise, which may adversely affect its ability to perform its obligations under this Agreement.

## ARTICLE 18 NOTICE

Any notice required or permitted to be given under this Agreement shall be in writing and personally delivered or sent by electronic means provided that the original of such notice is sent by certified United States mail, postage prepaid, return receipt requested, or overnight courier with signed receipt, to the party to whom the notice should be given at their business address listed herein. ITS' address for notice is: Mr. David L. Litchliter, Executive Director, Mississippi Department of Information Technology Services, 301 North Lamar Street, Suite 508, Jackson, Mississippi 39201. Customer's address for notice is: Mr. Tim Ragland, Chief Systems Information Officer, Mississippi Department of Human Services, 750 North State Street, Jackson, Mississippi 39202. The Contractor's address for notice is: Mr. Walter R. McDonald, President, Walter R. McDonald & Associates, Inc., 2720 Gateway Oaks Drive, Suite 250, Sacramento, California 95833. Notice shall be deemed given when actually received or when refused. The parties agree to promptly notify each other in writing of any change of address.

## ARTICLE 19 RECORD RETENTION AND ACCESS TO RECORDS

Contractor shall establish and maintain financial records, supporting documents, statistical records and such other records as may be necessary to reflect its performance of the provisions of this Agreement. The Customer, ITS, any state or federal agency authorized to audit Customer, and/or any of their duly authorized representatives, shall have unimpeded, prompt access to this Agreement and to any of the Contractor's proposals, books, documents, papers and/or records that are pertinent to this Agreement to make audits, copies, examinations, excerpts and transcriptions at the State's or Contractor's office as applicable where such records are kept during normal business hours. All records relating to this Agreement shall be retained by the Contractor for three (3) years from the date of receipt of final payment under this Agreement. However, if any litigation or other legal action, by or for the state or federal government has begun that is not completed at the end of the three (3) year period, or if an audit finding, litigation or other legal action has not been resolved at the end of the three (3) year period, the records shall be retained until resolution.

## ARTICLE 20 INSURANCE

Contractor represents that it will maintain workers' compensation insurance as prescribed by law which shall inure to the benefit of Contractor's personnel, as well as comprehensive general liability and employee fidelity bond insurance. Contractor will, upon request, furnish Customer with a certificate of conformity providing the aforesaid coverage.

## ARTICLE 21 DISPUTES

Any dispute concerning a question of fact under this Agreement which is not disposed of by agreement of the Contractor and Customer, shall be decided by the Executive Director of ITS or his/her designee. This decision shall be reduced to writing and a copy thereof mailed or furnished to

the parties. Disagreement with such decision by either party shall not constitute a breach under the terms of this Agreement. Such disagreeing party shall be entitled to seek such other rights and remedies it may have at law or in equity.

## ARTICLE 22 COMPLIANCE WITH LAWS

Contractor shall comply with, and all activities under this Agreement shall be subject to, all Customer policies and procedures, and all applicable federal, state, and local laws, regulations, policies and procedures as now existing and as may be amended or modified. Specifically, but not limited to, Contractor shall not discriminate against any employee nor shall any party be subject to discrimination in the performance of this Agreement because of race, creed, color, sex, age, national origin or disability.

## ARTICLE 23 CONFLICT OF INTEREST

Contractor shall notify the Customer of any potential conflict of interest resulting from the representation of or service to other clients. If such conflict cannot be resolved to the Customer's satisfaction, the Customer reserves the right to terminate this Agreement.

## ARTICLE 24 SOVEREIGN IMMUNITY

By entering into this Agreement with Contractor, the State of Mississippi does in no way waive its sovereign immunities or defenses as provided by law.

## ARTICLE 25 CONFIDENTIAL INFORMATION

**25.1**    Contractor shall treat all Customer data and information to which it has access by its performance under this Agreement as confidential and shall not disclose such data or information to a third party without specific written consent of Customer. In the event that Contractor receives notice that a third party requests divulgence of confidential or otherwise protected information and/or has served upon it a subpoena or other validly issued administrative or judicial process ordering divulgence of such information, Contractor shall promptly inform Customer and thereafter respond in conformity with such subpoena to the extent mandated by state and/or federal laws, rules and regulations. This Article shall survive the termination or completion of this Agreement and shall continue in full force and effect and shall be binding upon the Contractor and its agents, employees, successors, assigns, subcontractors or any party or entity claiming an interest in this Agreement on behalf of, or under the rights of the Contractor following any termination or completion of this Agreement.

**25.2**    With the exception of any attached exhibits which are labeled as "confidential", the parties understand and agree that this Agreement, including any amendments and/or change orders thereto, does not constitute confidential information, and may be reproduced and distributed by the State without notification to Contractor. ITS will provide third party notice to Contractor of any requests received by ITS for any such confidential exhibits so as to allow Contractor the opportunity to protect the information by court order as outlined in ITS Public Records Procedures.

## ARTICLE 26 EFFECT OF SIGNATURE

Each person signing this Agreement represents that he or she has read the Agreement in its entirety, understands its terms, is duly authorized to execute this Agreement on behalf of the parties and agrees to be bound by the terms contained herein. Accordingly, this Agreement shall not be construed or interpreted in favor of or against the State or the Contractor on the basis of draftsmanship or preparation hereof.

## ARTICLE 27 OWNERSHIP OF DOCUMENTS AND WORK PRODUCTS

All data, electronic or otherwise, collected by Contractor and all documents, notes, programs, data bases (and all applications thereof), files, reports, studies, and/or other material collected and prepared by Contractor in connection with this Agreement, whether completed or in progress, shall be the property of Customer upon completion of this Agreement or upon termination of this Agreement. Customer hereby reserves all rights to the databases and all applications thereof and to any and all information and/or materials prepared in connection with this Agreement. Contractor is prohibited from use of the above described information and/or materials without the express written approval of Customer. It is understood and agreed that the United States Department of Health and Human Services (HHS) Administration for Children and Families (ACF) shall be and hereby is granted a royalty-free, non-exclusive, and irrevocable license to reproduce, publish, or otherwise use and to authorize others to use for Federal Government purposes, such software, modifications, and documentation designed, developed or installed specifically under this Agreement pursuant to 45 CFR 95.617.

## ARTICLE 28 NON-SOLICITATION OF EMPLOYEES

Contractor agrees not to employ or to solicit for employment, directly or indirectly, any of the Customer's employees until at least one (1) year after the expiration/termination of this Agreement unless mutually agreed to the contrary in writing by the Customer and the Contractor and provided that such an agreement between these two entities is not a violation of the laws of the State of Mississippi or the federal government.

## ARTICLE 29 ENTIRE AGREEMENT

**29.1**    This Contract constitutes the entire agreement of the parties with respect to the subject matter contained herein and supersedes and replaces any and all prior negotiations, understandings and agreements, written or oral, between the parties relating thereto. The RFP No. 3583 and Contractor's Proposal in response to RFP No. 3583 are hereby incorporated into and made a part of this Contract.

**29.2**    The Contract made by and between the parties hereto shall consist of, and precedence is hereby established by the order of the following:

A.    This Agreement signed by the parties hereto;
B.    Any exhibits attached to this Agreement;
C.    RFP No. 3583 and written addenda, and
D.    Contractor's Proposal, as accepted by Customer, in response to RFP No. 3583.

**29.3**    The intent of the above listed documents is to include all items necessary for the proper

Page 10 of 17

execution and completion of the services by the Contractor. The documents are complementary, and what is required by one shall be binding as if required by all. A higher order document shall supersede a lower order document to the extent necessary to resolve any conflict or inconsistency arising under the various provisions thereof; provided, however, that in the event an issue is addressed in one of the above mentioned documents but is not addressed in another of such documents, no conflict or inconsistency shall be deemed to occur by reason thereof. The documents listed above are shown in descending order of priority, that is, the highest document begins with the first listed document ("A. This Agreement") and the lowest document is listed last ("D. Contractor's Proposal").

## ARTICLE 30 STATE PROPERTY
Contractor shall be responsible for the proper custody of any Customer-owned property furnished for Contractor's use in connection with work performed pursuant to this Agreement. Contractor shall reimburse the Customer for any loss or damage, normal wear and tear excepted.

## ARTICLE 31 SURVIVAL
Articles 4, 11, 15, 19, 24, 25, 27, 28, and all other articles which, by their express terms so survive or which should so reasonably survive, shall survive any termination or expiration of this Agreement.

## ARTICLE 32 DEBARMENT AND SUSPENSION CERTIFICATION
Contractor certifies that neither it nor its principals: (a) are presently debarred, suspended, proposed for debarment, declared ineligible or voluntarily excluded from covered transactions by any federal department or agency; (b) have, within a three (3) year period preceding this Agreement, been convicted of or had a civil judgment rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain or performing a public (federal, state or local) transaction or contract under a public transaction; violation of federal or state anti-trust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements or receiving stolen property; (c) are presently indicted of or otherwise criminally or civilly charged by a governmental entity with the commission of fraud or a criminal offense in connection with obtaining, attempting to obtain or performing a public (federal, state or local) transaction or contract under a public transaction; violation of federal or state anti-trust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements or receiving stolen property, and (d) have, within a three (3) year period preceding this Agreement, had one or more public transaction (federal, state or local) terminated for cause or default.

## ARTICLE 33 SPECIAL TERMS AND CONDITIONS
It is understood and agreed by the parties to this Agreement that there are no special terms and conditions.

## ARTICLE 34 COMPLIANCE WITH ENTERPRISE SECURITY POLICY
Contractor and Customer understand and agree that all products and services provided by Contractor under this Agreement must be and remain in compliance with the State of Mississippi's Enterprise

Security Policy. The parties understand and agree that the State's Enterprise Security Policy is based on industry-standard best practices, policy, and guidelines at the time of contract execution. The State reserves the right to introduce a new policy during the term of this Agreement and require the Contractor to comply with same in the event the industry introduces more secure, robust solutions or practices that facilitate a more secure posture for the State of Mississippi.

## ARTICLE 35 STATUTORY AUTHORITY

By virtue of Section 25-53-21 of the Mississippi Code Annotated, as amended, the executive director of ITS is the purchasing and contracting agent for the State of Mississippi in the negotiation and execution of all contracts for the acquisition of information technology equipment, software and services. The parties understand and agree that ITS as contracting agent is not responsible or liable for the performance or non-performance of any of Customer's or Contractor's contractual obligations, financial or otherwise, contained within this Agreement.

## ARTICLE 36 PERSONNEL ASSIGNMENT GUARANTEE

Contractor guarantees that the personnel assigned to this project will remain a part of the project throughout the duration of the Agreement as long as the personnel are employed by the Contractor and are not replaced by Contractor pursuant to the third paragraph of the Article herein titled "Employment Status". Contractor further agrees that the assigned personnel will function in the capacity for which their services were acquired throughout the life of the Agreement, and any failure by Contractor to so provide these persons shall entitle the State to terminate this Agreement for cause. Contractor agrees to pay the Customer fifty percent (50%) of the total contract amount if any of the assigned personnel is removed from the project prior to the ending date of the contract for reasons other than departure from Contractor's employment or replacement by Contractor pursuant to the third paragraph of the Article herein titled "Employment Status". Subject to the State's written approval, the Contractor may substitute qualified persons in the event of the separation of the incumbents therein from employment with Contractor or for other compelling reasons that are acceptable to the State, and in such event, will be expected to assign additional staff to provide technical support to Customer within thirty calendar days or within such other mutually agreed upon period of time, or the Customer may, in its sole discretion, terminate this Agreement immediately without the necessity of providing thirty (30) days notice. The replacement personnel shall have equal or greater ability, experience and qualifications than the departing personnel, and shall be subject to the prior written approval of the Customer. The Contractor shall not permanently divert any staff member from meeting work schedules developed and approved under this Agreement unless approved in writing by the Customer. In the event of Contractor personnel loss or redirection, the services performed by the Contractor shall be uninterrupted and the Contractor shall report in required status reports its efforts and progress in finding replacements and the effect of the absence of those personnel.

## ARTICLE 37 LIQUIDATED DAMAGES

It is agreed by the parties hereto that time is of the essence, and that in the event of a delay in the satisfactory completion and acceptance of the services provided for herein, damage shall be sustained by Customer. In the event all deliverables listed in Exhibit A have not been completed and accepted

by Customer within one (1) year of the date this Agreement is signed by all parties, Contractor shall pay Customer, within five (5) calendar days from the date of receipt of notice, fixed and liquidated damages of five hundred dollars ($500.00) per day for each calendar day of delay caused by Contractor. Customer may offset amounts due it as liquidated damages against any monies due Contractor under this Agreement. Customer will notify Contractor in writing of any claim for liquidated damages pursuant hereto on or before the date Customer deducts such sums from money payable to Contractor. Any liquidated damages assessed are in addition to and not in limitation of any other rights or remedies of Customer.

**ARTICLE 38 RETAINAGE**
To secure the Contractor's performance under this Agreement, the Contractor agrees the Customer shall hold back as retainage twenty percent (20%) of each amount payable under this Agreement. The retainage amount will continue to be held until final acceptance of the deliverables by the Customer.

**ARTICLE 39 CHANGE ORDER RATE AND PROCEDURE**
**39.1** It is understood that the State may, at any time, by a written order, make changes in the scope of the project. No changes in scope are to be conducted or performed by the Contractor except by the express written approval of the State. The Contractor shall be obligated to perform all changes requested by the Customer which have no price or schedule effect.

**39.2** The Contractor shall have no obligation to proceed with any change that has a price or schedule effect until the parties have mutually agreed in writing thereto. Neither the State nor the Contractor shall be obligated to execute such a change order; if no such change order is executed, the Contractor shall not be obliged or authorized to perform services beyond the scope of this Agreement and the contract documents. All executed change orders shall be incorporated into previously defined deliverables.

**39.3** With respect to any change orders issued in accordance with this Article, the Contractor shall be compensated for work performed under a change order according to the hourly change order rate specified in the attached Exhibit A. If there is a service that is not defined in the change order rate, the Contractor and the State will negotiate the rate. The Contractor agrees that each change order rate shall be a "fully loaded" rate, that is, it includes the cost of all materials, travel expenses, per diem, and all other expenses and incidentals incurred by the Contractor in the performance of the change order. The Contractor shall invoice the Customer upon acceptance by the Customer of all work documented in the change order, and the Customer shall pay invoice amounts on the terms set forth in this Agreement.

**39.4** Upon agreement of the parties to enter into a change order, the parties will execute such a change order setting forth in reasonable detail the work to be performed thereunder, the revisions necessary to the specifications or performance schedules of any affected project work plan, and the estimated number of professional services hours that will be necessary to implement the work contemplated therein. The price of the work to be performed under any change order will be

Page 13 of 17

determined based upon the change order rate; however, the change order will be issued for a total fixed dollar amount and may not be exceeded regardless of the number of hours actually expended by the Contractor to complete the work required by that change order. The project work plan will be revised as necessary.

**39.5**    The Contractor will include in the progress reports delivered under this Agreement the status of work performed under all then current change orders.

**39.6**    In the event the Contractor and the State enter into a change order which increases or decreases the time required for the performance of any part of the work under this Agreement, the Contractor shall submit to the Customer a revised version of the project work plan clearly indicating all changes at least five (5) working days prior to implementing any such changes.

**39.7**    The Customer shall promptly review all revised project work plans submitted under this Agreement and shall notify the Contractor of its approval or disapproval, in whole or in part, of the proposed revisions, stating with particularity all grounds for any disapproval, within ten (10) working days of receiving the revisions from the Contractor. If the Customer fails to respond in such time period or any extension thereof, the Customer shall be deemed to have approved the revised project work plan.

Walter R. McDonald & Associates, Inc.-MDHS-37921-3583-Dec2010-Professional Services

For the faithful performance of the terms of this Agreement, the parties hereto have caused this Agreement to be executed by their undersigned authorized representatives.

**State of Mississippi, Department of Information Technology Services, on behalf of Mississippi Department of Human Services**

By: _David L. Litchliter_
    Authorized Signature

Printed Name: David L. Litchliter

Title: Executive Director

Date: _3-18-11_

**Walter R. McDonald & Associates, Inc.**

By: _Martin R. Rowland_
    Authorized Signature

Printed Name: _Martin Rowland_

Title: _Financial Officer_

Date: _January 6, 2011_

**Mississippi Department of Human Services**

By: _Mark Smith_
    Authorized Signature

Printed Name: _Mark A. Smith_

Title: _Deputy Executive Director_

Date: _3/17/11_

Walter R. McDonald & Associates, Inc.-MDHS-37921-3583-Dec2010-Professional Services

## EXHIBIT A

**Payment Schedule & Deliverable List**

| Phase | Deliverables | Due Date | Cost | 20% Retainage | Actual Amount Paid |
|---|---|---|---|---|---|
| Project Initiation | Kick-off Meeting | 1/7/11 | $8,520.00 | $1,704.00 | $6,816.00 |
| | Finalized Project Work Plan, | 2/4/11 | $11,200.00 | $2,240.00 | $8,960.00 |
| | Final Project Management Plan | 2/14/11 | $19,200.00 | $3,840.00 | $15,360.00 |
| | On-going Project Management, Status Reports and Meetings | 2/28/11 | $11,200.00 | $2,240.00 | $8,960.00 |
| MACWIS Analysis | Final County Assessment | 3/29/11 | $37,930.00 | $7,586.00 | $30,344.00 |
| | Final MACWIS Functional Reference Document | 3/31/11 | $61,380.00 | $12,276.00 | $49,104.00 |
| | Final MACWIS Program Specifications | 3/31/11 | $51,480.00 | $10,296.00 | $41,184.00 |
| | State Office Assessment | 4/13/11 | $37,930.00 | $7,586.00 | $30,344.00 |
| | Assessment of Other States Report | 5/30/11 | $77,780.00 | $15,556.00 | $62,224.00 |
| | On-going Project Management, Status Reports and Meetings | 5/30/11 | $33,600.00 | $6,720.00 | $26,880.00 |
| Requirements Analysis | Final Requirements Analysis Document | 8/5/11 | $210,600.00 | $42,120.00 | $168,480.00 |
| | On-going Project Management, Status Reports and Meetings | 7/31/11 | $22,400.00 | $4,480.00 | $17,920.00 |

Walter R. McDonald & Associates, Inc.-MDHS-37921-3583-Dec2010-Professional Services

| Phase | Deliverables | Due Date | Cost | 20% Retainage | Actual Amount Paid |
|---|---|---|---|---|---|
| System Technical Planning | Final Database Specifications | 9/2/11 | $35,200.00 | $7,040.00 | $28,160.00 |
| | Final Data Dictionary | 9/2/11 | $27,000.00 | $5,400.00 | $21,600.00 |
| | Final Backup and Recovery Plan | 9/16/11 | $40,800.00 | $8,160.00 | $32,640.00 |
| | Final Disaster Plan | 9/16/11 | $40,800.00 | $8,160.00 | $32,640.00 |
| | Final Capacity Plan and Network Requirements | 9/23/11 | $59,600.00 | $11,920.00 | $47,680.00 |
| | Final System Documentation | 10/7/11 | $54,800.00 | $10,960.00 | $43,840.00 |
| | On-going Project Management, Status Reports and Meetings | 10/7/11 | $22,400.00 | $4,480.00 | $17,920.00 |
| Cost Benefit Analysis and Risk Assessment | Final Cost Benefit and Risk Assessment Report | 10/28/11 | $67,280.00 | $13,456.00 | $53,824.00 |
| | On-going Project Management, Status Reports and Meetings | 10/28/11 | $11,200.00 | $2,240.00 | $8,960.00 |
| Final Project Report | Final Project Report | 12/30/11 | $99,080.00 | $19,816.00 | $79,264.00 |
| | On-going Project Management, Status Reports and Meetings | 12/30/11 | $22,400.00 | $4,480.00 | $17,920.00 |
| | TOTAL: | | $1,063,780.00 | $212,756.00 | $851,024.00 |

**Change Order Rates**

| Personnel | Position | Base Hourly Rate | Loaded Hourly Rate |
|---|---|---|---|
| James Chappars | Engagement Manager | $160.00 | $200.00 |
| Mark Xavier | Project Manager | $110.00 | $120.00 |
| Jim Kennedy | Senior Business Analyst | $140.00 | $165.00 |
| Wayne Pittenger | Senior Business Analyst | $115.00 | $125.00 |
| Jim Storey | Technical Specialist | $170.00 | $200.00 |
| Keith Morgan | Senior Business Analyst | $180.00 | $205.00 |
| Tom Hay | Business Analyst | $120.00 | $120.00 |
| Charles Wheeler | Business Analyst | $120.00 | $120.00 |

Walter R. McDonald & Associates, Inc.-MDHS-37921-3583-Dec2010-Professional Services