IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

OLIVIA Y., *et al.*                                                        PLAINTIFFS

v.                                                          CIVIL ACTION NO. 3:04CV251LN

PHIL BRYANT, as Governor of the State of Mississippi, *et al.*          DEFENDANTS

---

## MODIFIED MISSISSIPPI SETTLEMENT AGREEMENT AND REFORM PLAN

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1
I. REFORM PLANNING AND IMPLEMENTATION ....................................................1
II. REQUIREMENTS TO BE IMPLEMENTED STATEWIDE .........................................3
  A. Systemic Infrastructure Standards ..................................................................3
    1. Agency Leadership.........................................................................................3
    2. Human Resources Management ....................................................................3
      a. Workforce: ..............................................................................................3
      b. Worker and Supervisor Qualifications: ..............................................7
      c. Training:...................................................................................................7
      d. Contract Agency Requirements: ..........................................................8
    3. Continuous Quality Improvement .................................................................9
    4. Legal and Regulatory Compliance ...............................................................9
    5. Information Management and Use .................................................................9
    6. Financial Management ..................................................................................11
    7. Recruitment and Retention of Foster Families and Therapeutic Service Providers12
  B. Foster Care Service Standards.........................................................................13
    1. Child Safety..................................................................................................13
    2. Child Placement ...........................................................................................15
    3. Physical and Mental Health Care ...............................................................21
    4. Therapeutic Services ....................................................................................25
    5. Worker Contact and Monitoring .................................................................26
    6. Permanency ..................................................................................................28
    7. Adoption.......................................................................................................29
  C. Outcome Measures ..........................................................................................31
    1. Number of Placements .................................................................................31
    2. Abuse/Neglect/Maltreatment in Care .........................................................31
III. REQUIREMENTS TO BE IMPLEMENTED REGION-BY-REGION: ......................32
  A. Systemic Infrastructure Standards .................................................................32
    1. Continuous Quality Improvement ...............................................................32
    2. Recruitment and Retention of Foster Families and Therapeutic Service Providers33
  B. Foster Care Service Standards.........................................................................33
    1. Comprehensive Family Assessments .........................................................33
    2. Individualized Case Planning ......................................................................34
    3. Child and Youth Permanency......................................................................35
      a. Permanency Plan:..................................................................................35
      b. Concurrent Planning: ...........................................................................36
      c. Permanency Plan Updating and Review: ...........................................37
      d. Reunification Services: ........................................................................38
      e. Termination of Parental Rights: ..........................................................39
    4. Case Recordings ...........................................................................................39
    5. Developing and Maintaining Connections ..................................................40
    6. Educational Services ....................................................................................41
    7. Transition to Independent Living ................................................................42

       8. Case Closing and Aftercare ..................................................................................44
  C. Outcome Measures ..................................................................................................45
     1. Reunification ......................................................................................................45
     2. Time to Adoption Finalization ...........................................................................45
IV. COA ACCREDITATION ...........................................................................................46
V. NAMED PLAINTIFFS...................................................................................................46
VI. MONITORING..............................................................................................................46
VII. DISPUTE RESOLUTION, TERMINATION, AND EXIT ...............................................48

APPENDICES:
  Appendix A:  Practice Model Rollout Schedule
  Appendix B:  Period 3 Implementation Plan
  Appendix C:  Proposed Data Reports Schedule
  Appendix D:  Mississippi Diligent Recruitment of Families for Children

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

OLIVIA Y., *et al.*                                                              PLAINTIFFS

v.                                                        CIVIL ACTION NO. 3:04CV251LN

PHIL BRYANT, as Governor of the State of Mississippi, *et al.*          DEFENDANTS

---

**MODIFIED MISSISSIPPI SETTLEMENT AGREEMENT AND REFORM PLAN**

---

INTRODUCTION

This Modified Mississippi Settlement Agreement and Reform Plan (the "Modified Settlement Agreement") shall supersede the Mississippi Settlement Agreement and Reform Plan entered as a Court Order on January 4, 2008 (the "initial Settlement Agreement"). This Modified Settlement Agreement shall resolve all remaining claims in the above-captioned case, *Olivia Y. v. Bryant, et al.*   Paragraph 1 of the Stipulated Settlement Agreement approved by the Court on May 17, 2007 is hereby incorporated into this Modified Settlement Agreement.

The United States District Court for the Southern District of Mississippi, Jackson Division, shall have continuing jurisdiction to enforce the terms of this Modified Settlement Agreement and any annual implementation plans required herein.

**I. REFORM PLANNING AND IMPLEMENTATION**

   **A.** The intent of this Modified Settlement Agreement is to require Defendants to develop the child welfare infrastructure necessary to meet and sustain statewide the child welfare standards and outcomes mandated in the Modified Settlement Agreement.  In order to accomplish this, the Modified Settlement Agreement provides for both a statewide and region-by-region approach to reform.  Section II of the Modified Settlement Agreement sets forth the child welfare infrastructure, standards, and outcomes that Defendants must meet within specified timeframes statewide.  Section III of the Modified Settlement Agreement sets forth the child welfare infrastructure, standards, and outcomes that Defendants must meet within a phased-in, region-by-region timeframe specified by when those regions implement the Practice Model.

   **B.**  Defendants shall meet the standards and outcome measurements in Sections II and III of this Modified Settlement Agreement by the conclusion of Period 6 or within any earlier interim timelines that are specified herein**.**

   **C.**  Defendants shall implement the Practice Model developed in conjunction with the Center for the Support of Families ("CSF") on a region-by-region basis in accordance with the schedule incorporated herewith at Appendix "A".  Defendants shall continue to

contract with CSF or other similar entity selected by the Defendants and approved by the Court Monitor for technical assistance and oversight of the implementation process until the Practice Model is fully implemented in all 13 DFCS regions pursuant to the Appendix "A" schedule. A region shall be deemed to have fully implemented the Practice Model after the conclusion of a six-month planning period, a 12-month initial implementation period, and a 12-month full implementation period.

**D.** For every 12-month period subsequent to the filing of this Modified Settlement Agreement, Defendants shall develop an annual implementation plan with Plaintiffs that sets forth the steps that must be taken in that 12-month period in order to meet that Period's interim benchmarks and make the progress necessary within that Period to achieve overall compliance with the Modified Settlement Agreement. Each annual implementation plan shall be Court enforceable and include specific steps and timelines to achieve compliance with this Modified Settlement Agreement.

**E.** The filing of this Modified Settlement Agreement shall constitute the commencement of Implementation Period Three. The third 12-month implementation plan is incorporated herewith at Appendix "B". Each subsequent annual implementation plan shall be developed jointly with the Parties 90 calendar days prior to the end of the previous 12-month period. Each annual implementation plan will be incorporated into this Modified Settlement Agreement.

**F.** Defendants shall produce accurate and validated reports as identified in Appendix "C" that reflect county-by-county performance. The reports that are noted as available in Appendix "C" as of the date the Court enters this Modified Settlement Agreement will be produced beginning one month from the date that the Court enters this Modified Settlement Agreement and every 30 days thereafter. Defendants shall begin producing those reports that do not exist as of the date that the Court enters this Modified Settlement Agreement by the dates set forth in Appendix "C". Data reports shall be provided to the Monitor and the Plaintiffs within 30 days of the date the report becomes available and every 30 days thereafter, with the exception of the data report on training of DFCS caseworkers which shall be produced quarterly.

**G.** Defendants do not speak for the Mississippi Legislature, which has the power under Mississippi law to determine the appropriations for the State's child welfare programs. However, at least annually after Court approval of this Modified Settlement Agreement, and consistent with existing state budgetary practices and legal requirements, Defendants shall request state funds and any federal/special fund authorization sufficient to effect the provisions and outcome measures set forth in this Modified Settlement Agreement in connection with any budget, funding, or allocation request to the executive or legislative branches of State government. To the extent that it is anticipated that the funding of critical needs shall be met, in whole or in part, by way of federal fund sources, Defendants shall request federal fund authorization in amounts which are determined to be realizable and consistent with regular budgetary needs assessments. Nothing in this paragraph in any way limits Defendants' obligations under this Modified Settlement Agreement.

**H.** Such budgetary requests, which shall be provided to the Monitor, shall, among other things, identify for the executive and legislative branches of State government, with sufficient particularity, the known and anticipated costs to the State for the timely implementation of the reforms and outcome measures provided for herein.

**I.** Defendants shall maximize available federal funding opportunities.

**J.** Nothing in this Modified Settlement Agreement shall be construed as infringing on the authority of the State courts of Mississippi to exercise their jurisdiction over individual class members. Defendants will not be held accountable for the State courts' exercise of such jurisdiction in any individual case, as long as Defendants requested that the State court exercise its jurisdiction consistent with the requirements of the Modified Settlement Agreement in that individual case.

## II. REQUIREMENTS TO BE IMPLEMENTED STATEWIDE

Defendants shall meet the following requirements, standards, interim benchmarks, and outcome measures statewide, except with respect to the staffing requirements set forth in Section II.A.2.a.9-12, which shall be measured as required in that section. For those requirements which are required to be met from the time that a region has fully implemented the Practice Model, compliance will not be measured by looking back in time at practice that pre-dates full implementation. For those requirements which are required to be met 12 months after full implementation of the Practice Model, compliance will not be measured by looking back in time at practice that pre-dates the 12 month period following full implementation.

### A. Systemic Infrastructure Standards

1. **Agency Leadership**

   The Mississippi Department of Human Services ("MDHS") shall maintain a Deputy Administrator having sole responsibility for the oversight of the Division of Family and Children's Services ("DFCS"). That person shall be qualified by: an advanced degree from an accredited college or university in a field related to the agency's mission and services; five years of related experience at minimum; competence in administering and providing services to individuals, families, and/or children; management skills in addressing human resources and financial matters; and the ability to coordinate the agency's services with other community resources.

2. **Human Resources Management**

   a. **Workforce:**

      1) No DFCS caseworker shall carry a caseload that exceeds the following:

         - 9 for dedicated adoption workers (counted by child)
         - 14 for dedicated child protection workers (counted by investigation)
         - 14 for dedicated ongoing foster care workers (counted by child)

3

- 15 for dedicated new application licensing workers (counted by home)
- 17 for dedicated in-home protection workers (counted by family)
- 25 for dedicated in-home dependency/prevention workers (counted by family)
- 36 for dedicated renewal licensing workers (counted by home)
- 118 for dedicated abuse and neglect intake workers (counted by intake).

2) Individual DFCS caseworkers with generic caseloads shall not carry a mixed caseload requiring more than a total of 6,960 minutes or 100 Workload Units of case-related work per month as enumerated below.

| Service Type | Minutes | Caseload Units |
|---|---|---|
| Adoption COS | 300 | 4.3 |
| ICPC Incoming | 106 | 1.6 |
| ICPC Outgoing | 106 | 1.6 |
| Placement COR | 254 | 3.7 |
| Placement COS | 253 | 3.6 |
| Placement R&S | 507 | 7.3 |
| Prevention COR | 138 | 2.0 |
| Prevention COS | 137 | 2.0 |
| Prevention R&S | 275 | 4.0 |
| Protective Services COR | 210 | 3.0 |
| Protective Services COS | 200 | 2.9 |
| Protective Services R&S | 410 | 5.9 |
| Case Management Intake | 59 | 0.9 |
| Court Ordered Relative Appl. | 282 | 4.1 |
| ICPC Application | 282 | 4.1 |
| Investigation Level 2 | 484 | 7.0 |
| Investigation Level 3 | 484 | 7.0 |
| General Intake | 59 | 0.9 |
| Resource Inquiry | 59 | 0.9 |
| Adoption Addendum | 191 | 2.8 |
| Foster Home Addendum | 191 | 2.8 |
| Resource Home Study | 470 | 6.8 |
| Resource Home Supervision | 140 | 2.0 |
| Resource Renewal | 191 | 2.8 |
| Courtesy Interviews | 65 | 1.0 |

3) The Parties acknowledge that the above time study standards are based on averages and that any individual case may require more or fewer minutes of case-related work per month. The Parties may agree to modify these caseload standards following an evaluation of the impact of Practice Model activities on the time needed for providing services to families.

4

4) Individual caseloads shall be measured monthly.

5) Caseworkers shall have access to a supervisor by telephone 24 hours a day.

6) No DFCS supervisor shall be directly responsible for directly supervising more than five caseworkers.

7) No supervisor shall be assigned primary responsibility for providing direct casework services for any case, except in cases of extenuating circumstances which shall last no more than four (4) weeks and have been approved in writing by the Field Operations Director of DFCS after consultation with the supervisor's Regional Director to ensure the continued proper supervision of the impacted direct service workers.

8) Within 90 days following the start of Implementation Period Three, DFCS shall formulate and begin implementing a methodology for producing accurate and validated caseworker and supervisor caseload data reports, if such reports do not currently exist.  Data reports shall be produced in each county monthly.  Within 120 days of the date this Modified Settlement Agreement is filed, DFCS shall provide the Plaintiffs and the Monitor with county-by-county caseload data on a monthly basis.

9) By the end of Implementation Period Three:

(a) At least 75% of DFCS caseworkers shall carry a caseload that does not exceed Modified Settlement Agreement caseload requirements.  No more than 10% of caseworkers shall carry a caseload exceeding twice the Modified Settlement Agreement caseload requirements.  No caseworkers shall carry a caseload exceeding three times the Modified Settlement Agreement caseload requirements.  Hancock, Harrison, Hinds, and Jackson Counties (the "Carve Out Counties") are exempt from these requirements during Implementation Period Three.

(b) No more than 10% of supervisors who are responsible for supervising DFCS caseworkers shall be responsible for directly supervising more than five caseworkers.  Hancock, Harrison, Hinds, and Jackson Counties are exempt from this requirement during Implementation Period Three.

(c) Caseworkers shall have access to a supervisor by telephone 24 hours a day.

(d) Supervisors will not be assigned primary responsibility for providing direct casework for any cases, unless under the extenuating circumstances exception as described above.

5

10) <u>By the end of Implementation Period Four</u>:

(a)  At least 85% of DFCS caseworkers shall carry a caseload that does not exceed Modified Settlement Agreement caseload requirements.  No more than 5% of caseworkers shall carry a caseload exceeding twice the Modified Settlement Agreement caseload requirements.  Hancock, Harrison, Hinds, and Jackson Counties are exempt from these requirements during Implementation Period Four.

(b)  No more than 10% of supervisors who are responsible for supervising DFCS caseworkers shall be responsible for directly supervising more than five caseworkers.  Hancock, Harrison, Hinds, and Jackson Counties are exempt from this requirement during Implementation Period Four.

11) <u>By the end of Implementation Period Five</u>:

(a)  At least 80% of DFCS caseworkers in Hancock, Harrison, Hinds, and Jackson Counties shall carry a caseload that does not exceed Modified Settlement Agreement caseload requirements.  No more than 15% of caseworkers in Hancock, Harrison, Hinds, and Jackson Counties shall carry a caseload exceeding twice the Modified Settlement Agreement caseload requirements.  No caseworkers in Hancock, Harrison, Hinds, and Jackson Counties shall carry a caseload exceeding three times the Modified Settlement Agreement caseload requirements.

(b)  No more than 5% of DFCS caseworkers in a non-Carve Out County shall carry a caseload that exceeds Modified Settlement Agreement caseload requirements.

(c)  No more than 15% of supervisors in Hinds, Hancock, Harrison, and Jackson Counties who are responsible for directly supervising DFCS caseworkers shall be responsible for directly supervising more than five caseworkers.

(d)  No more than 5% of supervisors in a non-Carve Out County who are responsible for supervising DFCS caseworkers shall be responsible for directly supervising more than five caseworkers.

12) <u>By the end of Implementation Period Six</u>:[1]

(a)  All counties, including the Carve Out Counties, shall meet the caseload standards set forth in Section II.

---

[1]Because this workforce section establishes requirements for Carve Out and non-Carve Out counties which might give rise to some confusion regarding what must be accomplished in Period Six, those Period Six requirements are explicitly set forth.  For all other sections, Period Six requirements are not explicitly stated because Section I requires that by Period Six, Defendants shall be in full compliance with all of the standards and outcome measures of the Modified Settlement Agreement.

6

b.  **Worker and Supervisor Qualification**s:

1)  DFCS shall hire only foster care workers who have an advanced degree in social work or a comparable human services field, or a B.A. in social work or a comparable human service field with two years of related experience. Should the related Council on Accreditation ("COA") standards change, the new COA worker qualifications standards will govern.

2)  DFCS shall hire or promote to the position of caseworker supervisor only persons with an advanced degree in social work or a comparable human service field and two years of experience working with children and families, preferably in foster care.  Should the related COA standards change, the new COA caseworker supervisor qualifications standards will govern.

c.  **Training:**

1)  DFCS shall establish and maintain a Training Unit, headed by a qualified director of training.  The Training Unit shall have sufficient staffing, funding, and other resources to assure that it can provide comprehensive child welfare training to enable all caseworkers, supervisors, and other child welfare agency employees to comply with the relevant mandates of this Modified Settlement Agreement, DFCS policy, and reasonable professional standards.

2)  All new DFCS caseworkers shall receive a minimum of 270 hours of pre-service training, including instructional training and supervised field training, prior to assuming any case responsibilities.  Pre-service training provided during an internship with DFCS may be counted towards this 270 hour pre-service training requirement if that training is the same training as that provided to new hires.

3)  All new caseworker supervisors hired or promoted by Defendants shall receive a minimum of 40 hours of training, directed specifically at the supervision of child welfare caseworkers, prior to being assigned any caseworkers to supervise.

4)  All caseworkers shall receive a minimum of 40 hours of ongoing in-service training each year, and all supervisors shall receive a minimum of 24 hours of in-service training each year.

5)  The caseworker pre-service training shall be based on clearly identified learning objectives and culminate in competency-based testing.  A caseworker will not be deemed as having completed training unless the caseworker earns a passing grade on the competency-based testing.  The curriculum shall be drawn from current research and data.

6) <u>By the end of Implementation Period Three</u>:

(a) Defendants shall establish and maintain a Training Unit, headed by a qualified director of training, with sufficient staffing and resources to provide or contract for the provision of comprehensive child welfare pre-service and in-service training to all caseworkers and supervisors.

(b) All new caseworkers and supervisors will complete their pre-service training consistent with the Modified Settlement Agreement requirements before they assume their respective responsibilities for carrying cases and supervising.

(c) The in-service training curriculum for caseworkers and supervisors will be developed and in-service training will have been initiated.

7) <u>By the end of Implementation Period Four</u>:

(a) All caseworkers shall receive a minimum of 40 hours of structured ongoing in-service training each year, and all supervisors shall receive a minimum of 24 hours of ongoing in-service training each year.

(b) Supervisory personnel will not be detailed from the field to provide the required pre-service and in-service training.

d. **Contract Agency Requirements:**

1) Defendants shall implement and maintain a performance-based contracting system to evaluate annually contract agency compliance with the terms of the Modified Settlement Agreement. Defendants shall take reasonable steps to ensure contract agency remediation of any identified deficiencies.

2) <u>By the end of Implementation Period Three</u>:

(a) All therapeutic resource parents who have one or more foster children residing in the home shall be visited in the home at least once per month by their private agency caseworker. These visits shall be in addition to the monthly home visit conducted by DFCS. Beginning in Implementation Period Three, all contracts executed between Defendants and private agencies that provide services to foster children shall require that the private caseworker (1) share all relevant and legally disclosable information concerning the foster child; (2) evaluate the foster child's safety, needs, and well-being; and (3) monitor service delivery and the achievement of service goals. DFCS shall require that such visits occur, that they are documented in the child's case record, and that remedial action is taken if such visits are not taking place.

8

(b) Beginning in Implementation Period Three, all contracts executed between Defendants and private agencies that provide protective, preventive, foster care, or adoption case work services shall require the contract agencies to abide by all related terms of the Modified Settlement Agreement, including, but not limited to, provisions regarding training curricula, minimum training hours, and caseload standards, with the exception that contract agency caseworkers shall not be required to undertake the hours of pre-service training required of DFCS caseworkers that pertain to MACWIS instruction and DFCS-specific workplace procedures. The training requirement of the Modified Settlement Agreement shall apply only to contract agency caseworkers and supervisors responsible for making case planning decisions and/or recommendations.

3) By the end of Implementation Period Five:

(a) In the event that private agencies provide protective, preventive, foster care, or adoption case work services under contract with DFCS, DFCS shall require the contract agencies to abide by all related terms of the Modified Settlement Agreement, including, but not limited to, provisions regarding training curricula, minimum training hours, and caseload standards. The training requirements of the Modified Settlement Agreement apply only to contract agency caseworkers and supervisors responsible for making case planning decisions and/or recommendations, and those contract agency caseworkers shall not be required to undertake the hours of pre-service training required of DFCS caseworkers that pertain to MACWIS instruction and DFCS-specific workplace procedures.

3. **Continuous Quality Improvement**

Defendants shall implement and maintain a separate CQI system that can identify areas of needed improvement and require improvement plans in support of achieving performance targets, program goals, client satisfaction, and positive client outcomes.

4. **Legal and Regulatory Compliance**

DFCS shall comply with applicable federal, state, and local laws and regulations, including but not limited to, the public child fatality reporting requirements of the Child Abuse Prevention and Treatment And Adoption Reform Act, 42 U.S.C. § 5106a(b)(2)(B)(x).

5. **Information Management and Use**

a. DFCS shall have a Mississippi Automated Child Welfare Information System (MACWIS) appropriate to its size and complexity that permits (1) timely access to information about persons served by any part of the organization, or by other

practitioners within the organization, to support child safety and continuity of care across settings and services; (2) capturing, tracking, and reporting of financial, compliance, and child welfare information, including federally required AFCARS elements; (3) longitudinal reporting and comparison of performance over time; (4) the use of clear and consistent formats and methods for reporting and disseminating data, including system-wide reports; (5) the collection of data necessary to monitor compliance with the Modified Settlement Agreement; (6) DFCS county staff access to a computerized database of the placement resources currently available for placement statewide; (7) notification to caseworkers when a foster care provider for a child assigned to the worker is under investigation, or that provider's foster care license has expired or been revoked; (8) notification to caseworkers investigating a report of abuse of subsequent reports of abuse concerning the same child or alleged perpetrator; (9) caseworkers to access information on available services statewide; and (10) review of prior (i.e. historical) case documents including Individual Service Plans.

b. Defendants shall take reasonable steps to ensure data integrity and user accountability in MACWIS.

c. <u>By the end of Implementation Period Three</u>:

    1) DFCS shall provide to all county agency staff with child welfare responsibilities access to basic computer services, consisting of access to MACWIS, word processing, and electronic mail.

    2) Consistent with the schedule set forth in Appendix "C", data related to compliance with the Modified Settlement Agreement's Foster Care Service Standards will be collected, analyzed, and disseminated at least monthly to DFCS regional and county staff.

    3) Defendants shall automate the DFCS foster care review instrument to include the foster care review data indicators as listed on Appendix "C". The child's foster care review record shall become part of the child's case file.

    4) The Director of the Foster Care Review Division of the CQI Unit of DFCS ("FCR Director") shall regularly review the documentation of the foster care reviews to ensure that the foster care reviewers are appropriately utilizing the foster care review protocol. When the FCR Director identifies concerns regarding foster care reviews, DFCS shall remediate the concerns.

d. <u>By the end of Implementation Period Four</u>:

    1) Defendants' foster care review instrument shall be revised to include reviews of all children placed in therapeutic settings – whether home-based or congregate. The foster care review of therapeutic placements shall include an assessment, reflected in the revised instrument, of whether: (1)

10

the therapeutic placement is meeting the individual child's needs; (2) any additional services are necessary to ensure that the placement meets the individual child's needs; and (3) the placement is appropriate as a therapeutic placement.  If the foster care review identifies any concerns as to the capacity of the placement to provide therapeutic care, such concerns shall be documented and provided to the Regional Director who oversees the county of responsibility for that child.  Defendants will develop and begin implementing a protocol for informing private agencies of concerns regarding the capacity of the private agency's placement to provide therapeutic care.  Defendants shall ensure that no child remains in a therapeutic placement where a foster care reviewer has identified concerns, unless a remediation plan is being implemented to address those concerns.  No new child shall be placed in a therapeutic placement where a foster care reviewer has identified concerns until a remediation plan has been fully implemented and all necessary remediation has occurred.

e.  <u>By the end of Implementation Period Five</u>:

1) DFCS county staff shall have access to a computerized database of the placement resources available for placement statewide at any given time.  The database shall permit staff to determine whether a given placement is suitable for a given child needing placement by allowing access to current caretaker placement information, including capacity limitations, current census, the placement's suitability for children by age, sex, and special needs, and any related licensing and maltreatment investigations information.

2) The MACWIS system shall have the necessary controls to decrease the risk of duplication of data and to reduce the risk of incorrect or invalid data.  The system shall provide a visible trail to the database administrators of all information entered, added, deleted, or modified, and shall have necessary security to protect data integrity.  This system shall be audited at least annually to ensure the accuracy and validity of the data in the system.  Necessary actions identified by the MACWIS data accuracy and validity audit to correct MACWIS data errors shall be implemented annually.

6. **Financial Management**

a. Defendants shall implement and maintain implementation of the May 2011 recommendations of Hornby Zeller Associates and the Center for Support of Families, as negotiated by the Parties for each Implementation Period.

b. <u>By the end of Implementation Period Three</u>:

1) Defendants shall have implemented and shall maintain implementation of the recommendations negotiated and agreed to by the Parties, and filed with the Court by July 14, 2012.

11

2) Funds realized as a result of revenue maximization activities shall not supplant appropriated state funds but shall be used in furtherance of the reforms and outcome measures provided for herein and to improve child welfare services.

c. <u>By the end of Implementation Period Four</u>:

1) As necessary, the Parties shall negotiate and agree to the implementation of additional recommendations. If the Parties so agree, Defendants shall have implemented, and shall maintain implementation of, those recommendations.

d. <u>By the end of Implementation Period Five</u>:

1) As necessary, the Parties shall negotiate and agree to the implementation of additional recommendations. If the Parties so agree, Defendants shall have implemented, and shall maintain implementation of, those recommendations.

7. **Recruitment and Retention of Foster Families and Therapeutic Service Providers**

a. Defendants shall ensure that all licensed resource families (regardless of whether they are supervised directly by DFCS or by private providers) receive at least the minimum reimbursement rate for a given level of service as established pursuant to the Modified Settlement Agreement.

b. By July 2009, Defendants shall establish and begin to pay to all licensed resource families at least the following basic monthly foster care maintenance payments: for each child ages 0-8, $555; for each child ages 9-15, $636; and for each child age 16 and older, $697. The Parties agree that these rates satisfy the requirements of 42 U.S.C. § 675(4)(A). On July 1, 2013, and every two years thereafter, Defendants shall provide increases in the foster care maintenance payments, based upon the previous year's rate of inflation and discussions with affected resource parent groups and congregate care providers, in order to continue complying with 42 U.S.C. § 675(4)(A).

c. Defendants shall, within 180 days of the Court's approval of the initial Settlement Agreement, engage a qualified independent consultant to assess board payment rates currently being paid to resource parents caring for special needs foster children and to congregate care facilities to determine the extent to which those rates meet the requirements of 42 U.S.C. § 675(4)(A) and reflect the actual cost of caring for special needs foster children and children placed in congregate care facilities, including the necessary and reasonable costs of facility administration and operation. The selection of the independent consultant shall be subject to approval by the Monitor; said approval shall not be unreasonably withheld.

d. Within a year of Court approval of the initial Settlement Agreement, the consultant shall deliver to the Parties and the Monitor a written report setting forth (1) findings regarding the adequacy of the current schedule of foster care maintenance payments made to foster care providers serving special needs children and facilities providing congregate foster care in relation to the requirements of 42 U.S.C. § 675(4)(A) and the actual cost in the state of Mississippi to provide such care; (2) the methodology utilized to determine the actual costs in the state of Mississippi to provide such care; and (3) a schedule of recommended rates for foster care providers serving special needs children and facilities providing congregate foster care. Plaintiffs shall have 30 days to raise any written objection to the schedule of recommended rates as determined by the consultant. Should Plaintiffs raise objections and should the Parties be unable to reach agreement, the consultant's schedule and Plaintiffs' objection shall be submitted to the Court for final determination.

e. <u>By the end of Implementation Period Three</u>:

   1) The rate structure recommended by the consultant for foster care providers to special needs children and for facilities providing congregate care, as agreed upon by the Parties or determined by the Court, shall be fully implemented. Defendants shall determine the funding source for this rate structure.

## B. Foster Care Service Standards

1. **Child Safety**

   a. Defendants shall maintain a well-publicized 24-hour statewide child abuse hotline for the reporting of abuse and/or neglect.

   b. Upon receipt of a report of child maltreatment in a group home, emergency shelter, or private child placing agency resource home, DFCS shall undertake a licensure investigation, that is in addition to, and independent of, any child protective investigation, that shall include an on-site inspection of the facility or home to determine the contract provider's compliance with DFCS licensure standards. If the provider is found to be in violation of licensure standards, it shall have 30 days to submit a Corrective Action Plan (CAP) with timeframes to rectify the violation and comply with the approved CAP and timeframes. If the provider does not comply with the licensure standards based on the approved CAP and timeframes, DFCS shall revoke the license.

   c. All allegations of maltreatment of a child in custody, including corporal punishment, shall be investigated by a caseworker who has received training in the investigation of maltreatment in out-of-home placements and has no ongoing connection to the foster care case.

   d. Within 30 days of the completion of any investigation of maltreatment of a child in custody, as required in Section II.B.1, DFCS shall review the maltreatment

investigation.  This review shall include: (1) identification of any case practice deficiencies; (2) identification of any remedial actions necessary to ensure the safety of the child who is the subject of the investigation as well as any other child in the home or placement as well as the timeframe in which such remedial action must take place; and (3) identification of any corrective action that is necessary to address deficiencies in case practice demonstrated by the investigation as well as the timeframe in which such remedial action must take place.  DFCS will monitor the initiation and completion of the remedial actions regarding individual child safety and case practice.  DFCS shall notify the Area Social Work Supervisor (ASWS), Regional Director, and Director of Field Operations when such remedial actions have not been initiated within five days of identification or timely completed.

e.  <u>By the end of Implementation Period Three</u>:

    1) Defendants shall assure that standardized decision-making criteria are used for prioritizing, screening, and assessing all reports of maltreatment, including corporal punishment, of children in DFCS custody.

    2) All investigations into reports of maltreatment, including corporal punishment, of children in DFCS custody must be initiated within 24 hours and completed within 30 calendar days**,** including supervisory approval. Defendants shall assure that such investigations and decisions are based on a full and systematic evaluation of the factors that may place a child in custody at risk.

    3) Any foster child who remains in the same out-of-home placement following an investigation into a report that he or she was maltreated or subject to corporal punishment in that placement shall be visited by a DFCS caseworker twice a month for three months after the conclusion of the investigation to assure the child's continued safety and well-being.

    4) When a maltreatment investigation involves a resource home, DFCS shall file a copy of the approved final investigative report, and any recommendations and/or corrective actions DFCS has deemed necessary, in the case record of the foster child, in the file of the foster or adoptive parents with a copy of the letter of notification to the foster or adoptive parents, and in the DFCS State Office.  DFCS shall also provide those records to the Youth Court Judge with jurisdiction over the child and to the Monitor.

    5) When a maltreatment investigation involves an agency group home, emergency shelter, private child placing agency resource home, or other facility licensed by DFCS, a copy of the final investigative report shall be filed in the child's case record, in the DFCS State Office licensing file, and sent to the licensed provider facility.  DFCS shall provide the report to the Youth Court Judge with jurisdiction over the child and to the Monitor.

6) For investigations of agency group homes, emergency shelters, and private child placing agency resource homes, DFCS shall undertake a separate investigation of the contract provider's compliance with DFCS licensure standards.

## 2. **Child Placement**

a. No foster child shall be placed in a foster care setting (either therapeutic or non-therapeutic) that has not been licensed or approved as meeting DFCS licensure standards, unless the child is placed pursuant to the relative licensing process.

b. All foster care settings, including relative placements, shall be screened prior to the initial placement of foster children to ensure that children receive safe, sufficient, and appropriate care. Additional screens shall be completed at least once annually thereafter and within two weeks of a reported change in the residents of a resource home. Screens shall include criminal and child welfare background checks of all household members who are at least 14 years old. No foster child shall be placed in a home prior to DFCS receipt of the background check results.

c. DFCS shall maintain an expedited process for licensing screened relative caregivers to enable a child to be placed quickly with relatives upon entering placement. The licensing process for relatives shall take place in two steps: (1) an emergency process that enables a child to be placed with relatives as soon as the child enters placement, following an initial screen (as described above) of the relative's home, and (2) a full licensing process, to be completed no later than 90 calendar days after the child has entered placement. DFCS may waive non-safety licensing requirements for relative foster placements in individual cases, in accordance with federal regulations. All relative placements approved for expedited placement shall undergo the full licensing procedure within 90 calendar days of the child's placement in the home.

d. No foster home shall provide care for more than three foster children or for a total of more than five children (including foster, biological, and adoptive children) at any given time. No more than two children in the foster home may be under the age of two or have therapeutic needs. Notwithstanding the above, a sibling group may be placed together in the same foster home in excess of these limits, but only upon written approval by the DFCS Regional Director determining that the foster children can be maintained safely in the foster home.

e. Children with special needs shall be matched with placement resources that can meet their therapeutic and medical needs. DFCS shall ensure that each county office has access to resource workers within its region who have the ability to ascertain the placement resources available and their suitability for each particular child needing placement.

f. Each foster child shall be placed in the least restrictive setting that meets his/her individual needs as determined by a review of all intake, screening, assessment, and prior placement information on the child available at the time of placement. In order of consideration, this means placement with relatives; resource home care within reasonable proximity to the child's home community; resource foster home care outside of the child's home community; group home care; or institutional care.

g. Each child shall be placed within his/her own county or within 50 miles of the home from which he/she was removed. This provision shall not apply if: (1) the child's needs are so exceptional that they cannot be met by a family or facility within his/her own county or within 50 miles of the home from which he/she was removed; (2) the child is placed through the ICPC consistent with its terms; (3) the child is appropriately placed with relatives or another planned permanent resource; (4) the child is ordered to be placed in a child-specific foster care setting by a court; or (5) the child is placed in an adoptive home.

h. Siblings who enter placement at or near the same time shall be placed together unless: (1) doing so would be harmful to one or more of the siblings; (2) one of the siblings has exceptional needs that can be met only in a specialized program or facility; or (3) the size of the sibling group makes such placement impractical notwithstanding diligent efforts to place the group together. If a sibling group is separated at initial placement, the caseworker shall make immediate efforts to locate or recruit a family in whose home the siblings can be reunited. These efforts will be documented and maintained in the case file.

i. No later than at the time of placement, Defendants shall provide resource parents or facility staff with the foster child's currently available medical, dental health, educational, and psychological information, including a copy of the child's Medicaid card. Defendants shall gather and provide to resource parents or facility staff all additional current medical, dental health, educational, and psychological information available from the child's service providers within 15 days of placement.

j. Defendants shall take all reasonable steps to avoid the disruption of an appropriate placement and ensure placement stability for children. If there is a documented indication that a placement may disrupt, the caseworker shall immediately convene a meeting with the DFCS supervisor, the resource parents, and, if appropriate, the child to determine the following: the cause of the potential disruption; whether the placement is appropriate for the child; whether additional services are necessary to support the placement; whether the child needs another placement; and, if another placement is necessary, what that placement should be. If the placement disrupts on an emergency basis, the meeting shall be held no later than five days after the disruption to address whether the child needs additional supportive services and whether the new placement is appropriate.

16

k. No foster child shall remain in an emergency or temporary facility for more than 45 calendar days, unless, in exceptional circumstances, the Division Director or Field Operations Director has granted express written approval for the extension that documents the need for the extension.

l. No child shall spend more than 12 hours at a time in a DFCS office or other non-residential facility that provides intake functions. Defendants shall be exempt from maintaining and producing data reports regarding this requirement.

m. No child under 10 years of age shall be placed in a congregate care setting (including group homes and shelters) unless the child has exceptional needs that cannot be met in a relative or foster family home or the child is a member of a sibling group, and the Regional Director has granted express written approval for the congregate-care placement. Such approval shall be based on the Regional Director's written determination that the child's needs cannot be met in a less restrictive setting and can be met in that specific facility, including a description of the services available in the facility to address the individual child's needs. Sibling groups in which one or more of the siblings are under the age of 10 shall not be placed in congregate care settings for more than 45 days.

n. No foster child shall be moved from his/her existing placement to another foster placement unless DFCS specifically documents in the child's case record justifications for that move and the move is approved by a DFCS supervisor.

o. No child shall be placed in more than one emergency or temporary facility within one episode of foster care, unless an immediate placement move is necessary to protect the safety of the child or of others as certified in writing by the Regional Director.

p. <u>By the end of Implementation Period Three</u>:

    1) All foster care settings, including relative placements, shall be screened prior to the initial placement of foster children in accordance with this Modified Settlement Agreement.

    2) No foster child shall be placed or remain in a foster care setting that does not meet DFCS licensure standards consistent with Modified Settlement Agreement requirements, unless so ordered by the Youth Court over DFCS objection.

    3) Within 120 days of the start of Implementation Period 3, Defendants shall develop and implement an expedited process for licensing screened relative caregivers to enable a child to be placed quickly with relatives upon entering placement.

    4) All unlicensed placements in which foster children are residing as of the date the Court approves this Modified Settlement Agreement that meet the requirements of the licensure process shall be licensed. All children who

17

have been living in any of those unlicensed placements that do not meet the requirements of the licensure process shall have been moved into licensed and appropriate resource home placements, unless the Youth Court orders that the child not be moved.

5) All placements approved for relative placement after the date the Court enters this Modified Settlement Agreement shall undergo the full licensing procedure within 90 days of a child's placement.

6) No more than 40 children under 10 years of age shall be placed in a congregate care setting (including group homes and shelters) unless the child has exceptional needs that cannot be met in a relative or foster family home or the child is a member of a sibling group, and the Regional Director has granted express written approval for the congregate-care placement.

7) No more than 180 children shall be placed in more than one emergency or temporary facility within one episode of foster care, unless an immediate placement move is necessary to protect the safety of the child or of others as certified in writing by the Regional Director.

8) No foster child shall remain in an emergency or temporary facility for more than 45 calendar days, unless, in exceptional circumstances, the Field Operations Director has granted express written approval for the extension that documents the need for the extension.

9) No child shall spend more than 12 hours at a time in a DFCS office or other non-residential facility that provides intake functions. Defendants shall be exempt from maintaining and producing data reports regarding this requirement.

10) No more than 30% of resource homes shall provide care to a number of children in excess of the Modified Settlement Agreement resource home population limitations.

11) At least 60% of children with special needs shall be matched with placement resources that can meet their therapeutic and medical needs.

12) At least 75% of children in DFCS custody shall be placed in the least restrictive setting that meets their individual needs consistent with Modified Settlement Agreement requirements.

13) At least 80% of siblings who entered DFCS custody at or near the same time shall be placed together consistent with Modified Settlement Agreement requirements.

14) At least 40% of children in DFCS custody placed in a new placement during the Period shall have their currently available medical, dental, educational, and psychological information provided to their resource

parents or facility staff no later than at the time of any new placement during the Period.

15) At least 35% of children in DFCS custody with a documented indication that they were to be subject to a potential or actual placement disruption during the Period shall receive a meeting to address placement stability consistent with Modified Settlement Agreement requirements.

16) At least 85% of children who entered DFCS custody shall be placed within his/her own county or within 50 miles of the home from which he/she was removed unless one of the exceptions provided in the Modified Settlement Agreement is documented as applying.

q.  By the end of Implementation Period Four:

1) DFCS shall ensure that each county office has access to resource workers within its region having the ability to ascertain the placement resources available and their suitability for each particular child needing placement.

2) No child under 10 years of age shall be placed in a congregate care setting (including group homes and shelters) unless the child has exceptional needs that cannot be met in a relative or foster family home or the child is a member of a sibling group, and the Regional Director has granted express written approval for the congregate-care placement.

3) No child shall be placed in more than one emergency or temporary facility within one episode of foster care, unless an immediate placement move is necessary to protect the safety of the child or of others as certified in writing by the Regional Director.

4) No more than 10% of foster children shall be moved from his/her existing placement to another foster placement unless DFCS specifically documents in the child's case record justifications for that move and the move is approved by a DFCS supervisor.

5) No more than 20% of resource homes shall provide care to a number of children in excess of the Modified Settlement Agreement resource home population limitations.

6) At least 85% of children with special needs shall be matched with placement resources that can meet their therapeutic and medical needs.

7) At least 85% of children in DFCS custody shall be placed in the least restrictive setting that meets their individual needs consistent with Modified Settlement Agreement requirements.

8) At least 90% of siblings who entered DFCS custody at or near the same time shall be placed together consistent with Modified Settlement Agreement requirements.

9) At least 60% of children in DFCS custody placed in a new placement during the Period shall have their currently available medical, dental, educational, and psychological information provided to their resource parents or facility staff no later than at the time of any new placement during the Period.

10) At least 60% of children in DFCS custody with a documented indication that they were to be subject to an actual placement disruption during the Period shall receive a meeting to address placement stability consistent with Modified Settlement Agreement requirements.

11) At least 90% of children who entered DFCS custody shall be placed within his/her own county or within 50 miles of the home from which he/she was removed unless one of the exceptions provided in the Modified Settlement Agreement is documented as applying.

r.  By the end of Implementation Period Five:

1) No more than 5% of foster children shall be moved from his/her existing placement to another foster placement unless DFCS specifically documents in the child's case record justifications for that move and the move is approved by a DFCS supervisor.

2) No more than 10% of resource homes shall provide care to a number of children in excess of the Modified Settlement Agreement resource home population limitations.

3) At least 95% of children with special needs shall be matched with placement resources that can meet their therapeutic and medical needs.

4) At least 95% of children in DFCS custody shall be placed in the least restrictive setting that meets their individual needs consistent with Modified Settlement Agreement requirements.

5) At least 95% of siblings who entered DFCS custody at or near the same time shall be placed together consistent with Modified Settlement Agreement requirements.

6) At least 80% of children in DFCS custody placed in a new placement during the Period shall have their currently available medical, dental, educational, and psychological information provided to their resource parents or facility staff no later than at the time of any new placement during the Period.

7) At least 80% of children in DFCS custody with a documented indication that they were to be subject to a potential or actual placement disruption during the Period shall receive a meeting to address placement stability consistent with Modified Settlement Agreement requirements.

8) 95% of children who entered DFCS custody shall be placed within his/her own county or within 50 miles of the home from which he/she was removed unless one of the exceptions provided in the Modified Settlement Agreement is documented as applying.

s.   Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:

1) At least 80% of the foster children in that region who enter custody or experience a placement change shall be placed in accordance with each of the child placement requirements of Section II.B.2.

t.   Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:

1) At least 90% of the foster children in that region who enter custody or experience a placement change shall be placed in accordance with each of the child placement requirements of Section II.B.2.

3. **Physical and Mental Health Care**

a. Every child entering foster care shall receive a health screening evaluation from a qualified medical practitioner within 72 hours after placement that is in accordance with the health screening recommended by the American Academy of Pediatrics.

b. Every child entering foster care shall receive a comprehensive health assessment within 30 days of the placement.  The assessment shall be in accordance with the recommendations of the American Academy of Pediatrics, except that dental exams shall be governed by Section II.B.3.e of the Modified Settlement Agreement.

c. Nothing in the above paragraphs shall prohibit the initial health screening evaluation and the comprehensive health assessment from being conducted in one clinical visit.  However, in such instances, this combined visit shall be conducted within 72 hours of placement.

d. All children shall receive periodic medical examinations and all medically necessary follow-up services and treatment throughout the time they are in state custody, in accordance with the time periods recommended by the American Academy of Pediatrics.

e. Every child three years old and older shall receive a dental examination within 90 calendar days of foster care placement and every six months thereafter. Every foster child who reaches the age of three in care shall be provided with a dental examination within 90 calendar days of his/her third birthday and every six months thereafter. Every foster child shall receive all medically necessary dental services.

f. Every child four years old and older shall receive a mental health assessment by a qualified professional within 30 calendar days of foster care placement. Every foster child who reaches the age of four in care shall receive a mental health assessment within 30 calendar days of his/her fourth birthday. Every foster child shall receive recommended mental health services pursuant to his/her assessment.

g. Every foster child ages birth through three shall receive a developmental assessment by a qualified professional within 30 days of foster care placement, and each child older than three shall be provided with a developmental assessment if there are documented factors that indicate such an assessment is warranted. All foster children shall be provided with needed follow-up developmental services.

h. Nothing in the above paragraphs shall prohibit the developmental assessment and the comprehensive health assessment from being conducted in one clinical visit.

i. By the end of Implementation Period Three:

   1) At least 50% of children entering custody during the Period shall receive a health screening evaluation from a qualified medical practitioner within 72 hours after placement that is in accordance with the health screening recommended by the American Academy of Pediatrics.

   2) At least 50% of children entering custody during the Period shall receive a comprehensive health assessment consistent with Modified Settlement Agreement requirements within 30 calendar days of entering care.

   3) At least 75% of children in custody during the Period shall receive periodic medical examinations and all medically necessary follow-up services and treatment consistent with Modified Settlement Agreement requirements.

   4) At least 60% of children three years old and older entering custody during the Period or in care and turning three years old during the Period shall receive a dental examination within 90 calendar days of foster care placement or their third birthday, respectively.

   5) At least 60% of children in custody during the Period shall receive a dental examination every six months consistent with Modified Settlement Agreement requirements and all medically necessary dental services.

6) At least 50% of children four years old and older entering custody during the Period or in care and turning four years old during the Period shall receive a mental health assessment by a qualified professional within 30 calendar days of foster care placement or their fourth birthday, respectively.

7) At least 70% of children who received a mental health assessment during the period shall receive all recommended mental health services pursuant to their assessment.

8) At least 30% of children in custody ages birth through three during the Period, and older children if factors indicate it is warranted, shall receive a developmental assessment by a qualified professional within 30 calendar days of foster care placement and all needed developmental services.

j. By the end of Implementation Period Four:

1) At least 70% of children entering custody during the Period shall receive a health screening evaluation from a qualified medical practitioner within 72 hours after placement that is in accordance with the health screening recommended by the American Academy of Pediatrics.

2) At least 70% of children entering custody during the Period shall receive a comprehensive health assessment consistent with Modified Settlement Agreement requirements within 30 calendar days of entering care.

3) At least 85% of children in custody during the Period shall receive periodic medical examinations and all medically necessary follow-up services and treatment consistent with Modified Settlement Agreement requirements.

4) At least 75% of children three years old and older entering custody during the Period or in care and turning three years old during the Period shall receive a dental examination within 90 calendar days of foster care placement or their third birthday, respectively.

5) At least 80% of children in custody during the Period shall receive a dental examination every six months consistent with Modified Settlement Agreement requirements and all medically necessary dental services.

6) At least 70% of children four years old and older entering custody during the Period or in care and turning four years old during the Period shall receive a mental health assessment by a qualified professional within 30 calendar days of foster care placement or their fourth birthday, respectively.

7) At least 80% of children who received a mental health assessment during the period shall receive all recommended mental health services pursuant to their assessment.

23

8) At least 60% of children in custody ages birth through three during the Period, and older children if factors indicate it is warranted, shall receive a developmental assessment by a qualified professional within 30 calendar days of foster care placement and all needed developmental services.

k.  By the end of Implementation Period Five:

1) At least 90% of children entering custody during the Period shall receive a health screening evaluation from a qualified medical practitioner within 72 hours after placement that is in accordance with the health screening recommended by the American Academy of Pediatrics.

2) At least 90% of children entering custody during the Period shall receive a comprehensive health assessment consistent with Modified Settlement Agreement requirements within 30 calendar days of entering care.

3) At least 95% of children in custody during the Period shall receive periodic medical examinations and all medically necessary follow-up services and treatment consistent with Modified Settlement Agreement requirements.

4) At least 90% of children three years old and older entering custody during the Period or in care and turning three years old during the Period shall receive a dental examination within 90 calendar days of foster care placement or their third birthday, respectively.

5) At least 90% of children in custody during the Period shall receive a dental examination every six months consistent with Modified Settlement Agreement requirements and all medically necessary dental services.

6) At least 90% of children four years old and older entering custody during the Period or in care and turning four years old during the Period shall receive a mental health assessment by a qualified professional within 30 calendar days of foster care placement or their fourth birthday, respectively.

7) At least 90% of children who received a mental health assessment during the period shall receive all recommended mental health services pursuant to their assessment.

8) At least 80% of children in custody ages birth through three during the Period, and older children if factors indicate it is warranted, shall receive a developmental assessment by a qualified professional within 30 calendar days of foster care placement and all needed developmental services.

l.    <u>Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model</u>:

1) At least 80% of foster children in that region who enter custody shall receive physical and mental health care in accordance with each of the Modified Settlement Agreement Requirements.

m.   <u>Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model</u>:

1) At least 90% of foster children in that region who enter custody shall receive physical and mental health care in accordance with each of the Modified Settlement Agreement requirements.

4. **Therapeutic Services**

a. Each foster child requiring therapeutic and rehabilitative foster care services because of a diagnosis of significant medical, developmental, emotional, or behavioral problems shall be provided with a treatment plan and shall be provided with these services in accordance with the plan.

b. <u>By the end of Implementation Period Three</u>:

1) At least 60% of children in custody during the Period requiring therapeutic and/or rehabilitative foster care services because of a diagnosis of significant medical, developmental, emotional, or behavioral problems shall be provided with a treatment plan and services in accordance with their plan.

c. <u>By the end of Implementation Period Four</u>:

1) At least 80% of children in custody during the Period requiring therapeutic and/or rehabilitative foster care services because of a diagnosis of significant medical, developmental, emotional, or behavioral problems shall be provided with a treatment plan and services in accordance with their plan.

d. <u>By the end of Implementation Period Five</u>:

1) At least 90% of children in custody during the Period requiring therapeutic and/or rehabilitative foster care services because of a diagnosis of significant medical, developmental, emotional, or behavioral problems shall be provided with a treatment plan and services in accordance with their plan.

e. <u>Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model</u>:

    1) At least 80% of the foster children in that region who are in custody and require therapeutic and/or rehabilitative foster care services because of a diagnosis of significant medical, developmental, emotional, or behavioral problems shall be provided with a treatment plan and services during that period in accordance with their plan.

f. <u>Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model</u>:

    1) At least 90% of the foster children in that region who are in custody and require therapeutic and/or rehabilitative foster care services because of a diagnosis of significant medical, developmental, emotional, or behavioral problems shall be provided with a treatment plan and services during that period in accordance with their plan.

5. **Worker Contact and Monitoring**

a. Regardless of whether a child's foster care placement is being directly supervised by DFCS or by a contract agency, the assigned DFCS caseworker (either County of Service or County of Responsibility) shall meet with the child in person and, where age-appropriate, alone at least twice monthly to assess the child's safety and well-being, service delivery, and achievement of permanency and other service goals.  At least one visit per month shall take place in the child's placement.

b. For a child with a permanency goal of reunification, the child's assigned DFCS caseworker shall meet with the child's parent(s) with whom the child is to be reunified at least monthly to assess service delivery and achievement of service goals, to keep the family informed and involved in decisions about the child, and to remain current about the family's circumstances.

c. A DFCS foster care worker shall regularly communicate with resource parents (therapeutic and non-therapeutic) who have one or more foster children residing in their home and visit the home at least monthly to (1) share all relevant and legally disclosable information concerning the foster child;  (2) evaluate the foster child's safety, needs and wellbeing;  and (3) monitor service delivery and achievement of service goals.

d. All required visits and contacts shall be documented in the child's case record.

e. <u>By the end of Implementation Period Three</u>:

    1) At least 60% of children in custody shall receive documented twice-monthly in-person visits by the assigned DFCS caseworker during the Period, consistent with Modified Settlement Agreement requirements.

2) At least 40% of children with a goal of reunification shall have their assigned DFCS caseworker meet monthly with the child's parents, during the Period, consistent with Modified Settlement Agreement requirements, and this visit shall be documented in the child's case record.

3) At least 40% of resource parents (therapeutic and non-therapeutic) with at least one foster child residing in their home during the Period shall have a DFCS worker visit the home monthly, consistent with Modified Settlement Agreement requirements, and this visit shall be documented in the children's case records.

f.   By the end of Implementation Period Four:

1) At least 80% of children in custody shall receive documented twice-monthly in-person visits by the assigned DFCS caseworker during the Period, consistent with Modified Settlement Agreement requirements.

2) At least 60% of children with a goal of reunification shall have their assigned DFCS caseworker meet monthly with the child's parents, during the Period, consistent with Modified Settlement Agreement requirements, as documented in the child's case record.

3) At least 60% of resource parents (therapeutic and non-therapeutic) with at least one foster child residing in their home during the Period shall have a DFCS worker visit the home monthly, consistent with Modified Settlement Agreement requirements, as documented in the children's case records.

g.   By the end of Implementation Period Five:

1) At least 90% of children in custody shall receive documented twice-monthly in-person visits by the assigned DFCS caseworker during the Period, consistent with Modified Settlement Agreement requirements.

2) At least 90% of children with a goal of reunification shall have their assigned DFCS caseworker meet monthly with the child's parents, during the Period, consistent with Modified Settlement Agreement requirements, as documented in the child's case record.

3) At least 90% of resource parents (therapeutic and non-therapeutic) with at least one foster child residing in their home during the Period shall have a DFCS worker visit the home monthly, consistent with Modified Settlement Agreement requirements, as documented in the children's case records.

h.   Beginning by the date as set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:

1) At least 70% of children in custody in that region shall have received documented twice-monthly in-person visits by the assigned DFCS

27

caseworker during the preceding 12-month period, consistent with Modified Plan requirements.

2) At least 80% of children in that region with a goal of reunification shall have had their assigned DFCS caseworker meet monthly with the child's biological parent(s) with whom that child is to be reunified consistent with Modified Plan requirements, as documented in the child's case record.

3) At least 80% of foster parents in that region with at least one foster child residing in their home during the preceding 12-month period shall have had a DFCS worker visit the home monthly, consistent with Modified Plan requirements, as documented in the children's case records.

i. Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:

1) At least 90% of foster children in custody in that region shall receive documented twice-monthly in-person visits by the assigned DFCS caseworker, consistent with Modified Settlement Agreement requirements.

2) At least 90% of foster children in that region with a goal of reunification shall have their assigned DFCS caseworker meet monthly with the child's parent(s) with whom the child is to be reunified, consistent with Modified Settlement Agreement requirements, as documented in the child's case record.

3) At least 90% of resource parents in that region with at least one foster child residing in their home shall have a DFCS worker visit the home monthly, consistent with Modified Settlement Agreement requirements, as documented in the children's case records.

6. **Permanency**

   a. **Permanency Roundtables**

   1) Defendants shall implement a permanency roundtable process to target a population of children as indicated below with the goal of moving these children toward permanency. DFCS shall first hold permanency roundtable reviews in the applicable implementing regions for children who have been in DFCS custody for 36 months or longer and who have not achieved legal permanency.

   2) Permanency roundtables shall be conducted by a permanency roundtable team consisting of a master practitioner and/or permanency consultant, a scribe, a neutral facilitator, the caseworker, and the supervisor. Prior to conducting any roundtables, the participating DFCS staff, court personnel, and community stakeholders shall be trained on the roundtable process.

28

3) Once there are fewer than ten children in an implementing region who have been in custody 36 months or longer and who meet the roundtable requirements, the implementing region shall begin holding roundtable sessions for those children in custody 24 months or longer who have not achieved legal permanence.

4) Defendants shall have implemented permanency roundtables statewide and every region that began the permanency roundtable process before Period 5 shall have held at least two rounds of permanency roundtables in addition to engaging in permanency follow-up activities.

b. <u>By the end of Implementation Period Four</u>:

1) Defendants shall hold training sessions for DFCS's Training Unit Staff on the Permanency Values Training and Permanency Skills Training Curricula.

2) Defendants shall conduct permanency roundtables in three additional regions.

c. <u>By the end of Implementation Period Five</u>:

1) Defendants shall have conducted permanency roundtable reviews for children who have been in DFCS custody for 36 months or longer and who have not achieved legal permanency. DFCS shall have achieved legal permanency, identified permanent connections, or obtained an enhanced permanency status for at least 90% of all children in the region who have been in DFCS custody for 36 months or longer and who have not achieved legal permanency.

2) DFCS shall have conducted permanency roundtable reviews for all children who have been in DFCS custody for 24 months or longer and who have not achieved legal permanency. DFCS shall have achieved legal permanency, identified permanent connections or obtained an enhanced permanency status for at least 80% of these children.

7. **Adoption**

a. Children in custody with the primary permanency goal of adoption shall have an assigned adoption specialist and an adoption plan that identifies the child-specific activities that Defendants will undertake to achieve adoption and the timeframes in which the activities will be undertaken. The adoption specialist shall be responsible for consulting with private and public professionals and identifying and ensuring the provision of targeted services necessary for the child to be adopted. An adoption status meeting with the DFCS caseworker, the adoption specialist, and the caseworker's direct supervisor to review the progress being made in achieving the goal of adoption shall occur weekly for infants and monthly for all other children awaiting adoption, and shall be noted in the child's case record.

b.  <u>By the end of Implementation Period Four</u>:

Defendants shall maintain a process for advising all potential adoptive families, including any resource family caring for a child who has become legally available for adoption, of the availability of adoption subsidies.  This notification shall be documented in the child's record, and the family's access to such subsidies shall be facilitated.

c.  <u>By the end of Implementation Period Five</u>:

1)  Defendants shall provide and maintain an approval process by which foster parents and adoptive parents may be approved simultaneously, so that whenever possible and appropriate, placement moves can be minimized and resource parents can be eligible to adopt the children for whom they have been providing foster care.  A resource parent who has been providing foster care for a child for 12 months shall be given preference as an adoptive parent for that child should he/she become legally available for adoption, unless DFCS documents why the placement is unsuitable for adoption.

2)  Defendants shall establish and maintain a system of post-adoptive services to stabilize and maintain adoptive placements.  All adoptive families eligible for adoption subsidies shall have access to these services, which shall include respite services; counseling, mental health treatment, and crisis intervention; family preservation and stabilization services; and peer support.

3)  At least 90% of children in custody with the primary permanency goal of adoption during the Period shall have an assigned adoption specialist and an adoption plan that identifies the child-specific activities that Defendants will undertake to achieve adoption, and shall receive regular adoption status meetings consistent with Modified Settlement Agreement requirements during the Period.

d.   <u>Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model</u>:

At least 90% of children in custody in that region with the primary permanency goal of adoption during the Period shall have an assigned adoption specialist and an adoption plan that identifies the child-specific activities that Defendants will undertake to achieve adoption, and shall receive regular adoption status meetings consistent with Modified Settlement Agreement requirements during the Period.

e.  <u>Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model</u>

At least 95% of children in custody in that region with the primary permanency goal of adoption during the Period shall have an assigned adoption specialist and an adoption plan that identifies the child-specific activities that Defendants will undertake to achieve adoption, and shall receive regular adoption status meetings consistent with Modified Settlement Agreement requirements during the Period.

## C.  Outcome Measures

The following child welfare outcome measures shall be met and measured annually.

1.  **Number of Placements** (Temporary breaks in placement for children who run away, require emergency hospitalization or respite care not exceeding 14 days, or who are in residential schools such as schools for the vision or hearing impaired or colleges and universities, and who return to their immediately prior placement, shall not count as additional placements.)

   a.  In the last year, at least 86.7% of children state-wide in care less than 12 months from the time of latest removal from home shall have had two or fewer placements.

   b.  <u>By the end of Implementation Period Three:</u>

      1)  In the last year, at least 60% of children state-wide in care less than 12 months from the time of latest removal from home shall have had two or fewer placements.

   c.  <u>By the end of Implementation Period Four:</u>

      1)  In the last year, at least 75% of children state-wide in care less than 12 months from the time of latest removal from home shall have had two or fewer placements.

   d.  <u>By the end of Implementation Period Five:</u>

      1)  At least 86.7% of children state-wide in care less than 12 months from the time of latest removal from home shall have had two or fewer placements.

2.  **Abuse/Neglect/Maltreatment in Care** (This measure shall apply to reports of abuse, neglect, or maltreatment of children while in DFCS custody.)

   a.  The rate of abuse or maltreatment in care in the last year shall not exceed 0.33%.

     b.  <u>By the end of Implementation Period Three</u>:

        1)  The rate of abuse or maltreatment in care in the last year shall not exceed 1.00%.

     c.  <u>By the end of Implementation Period Four</u>:

        1)  The rate of abuse or maltreatment in care in the last year shall not exceed 0.50%.

     d.  <u>By the end of Implementation Period Five</u>:

        1)  The rate of abuse or maltreatment in care in the last year shall not exceed 0.33%.

## III. REQUIREMENTS TO BE IMPLEMENTED REGION-BY-REGION:

Defendants shall meet the following requirements, standards, interim benchmarks, and outcome measures on a region-by-region basis as regions implement the Practice Model and in accordance with the timeframes set forth below and in Appendix "A". For those requirements which are required to be met from the time that a region has fully implemented the Practice Model, compliance will not be measured by looking back in time at practice that pre-dates full implementation. For those requirements which are required to be met 12 months after full implementation of the Practice Model, compliance will not be measured by looking back in time at practice that pre-dates the 12 month period following full implementation. After all thirteen regions have fully implemented the practice model, all standards, benchmarks, and outcome measures in this Modified Settlement Agreement shall be measured and required statewide and shall no longer be measured on a region-by-region basis.

### A. Systemic Infrastructure Standards

#### 1. Continuous Quality Improvement

     a.  No later than the date set forth in Appendix "A" by which a region shall have fully implemented the Practice Model, the CQI system shall measure compliance in that region with the foster care service standard requirements of this Modified Settlement Agreement and shall ensure remediation of any identified deficiencies.

     b.  At the time that the last region listed in Appendix "A" has fully implemented the Practice Model, the CQI system shall monitor and evaluate state-wide the quality of services provided by DFCS and independent contractors and other provider organizations. The CQI system shall measure compliance state-wide with the foster care service standard requirements of this Modified Settlement Agreement and shall ensure remediation of any identified deficiencies.

2. **Recruitment and Retention of Foster Families and Therapeutic Service Providers**

    a. DFCS shall make available, either directly or through contract, a sufficient number of appropriate placements for all children in its physical and legal custody.

    b. DFCS shall make available resource parent training classes beginning every 60 calendar days in every region with individualized training available as needed, and at times convenient for the foster family.

    c. DFCS shall secure services for resource parents to prevent and reduce stress and family crisis.

**B.  Foster Care Service Standards**

  1. **Comprehensive Family Assessments**

    a. Within 30 days of taking a child into custody, DFCS shall complete a comprehensive family assessment which shall be developed through meetings (1) with the child and the assigned DFCS caseworker; (2) with the child's parents and the assigned DFCS caseworker; and (3) with the foster care provider and the assigned DFCS caseworker, and the comprehensive family assessment shall be maintained in the child's case record.

    b. In all cases in which the whereabouts of one or both parents is unknown, DFCS shall immediately institute a diligent search for the parent(s), which shall be documented in the child's case record.

    c. In instances in which it is impossible to meet with one or both parents, the assessment process will proceed as described above, notwithstanding the parent's absence.

    d. Beginning by the date set forth in Appendix "A" that a DFCS region has undergone the Initial Practice Model Implementation Period:

      1) All caseworkers assigned to active cases, and their supervisors, will have undergone training on the family team meeting protocols.

    e. Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:

      1) At least 80% of foster children in that region who enter custody shall have a thorough screening and assessment, consistent with Modified Settlement Agreement requirements, within 30 calendar days of entering custody.

      2) In at least 80% of placement cases in that region in which the whereabouts of one or both parents is unknown, DFCS shall immediately institute a

diligent search for the parent(s), which shall be documented in the child's case record.

    f.  <u>Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:</u>

      1)  At least 90% of foster children in that region who enter custody shall have a comprehensive family assessment, consistent with Modified Settlement Agreement requirements, within 30 calendar days of entering custody.

      2)  In at least 90% of placement cases in that region in which the whereabouts of one or both parents is unknown, DFCS shall immediately institute a diligent search for the parent(s), which shall be documented in the child's case record.

    g.  As of the date upon which the last region has fully implemented the Practice Model, performance on this comprehensive family assessment requirement shall be measured and required state-wide and shall no longer be measured on a region-by-region basis.

## 2. Individualized Case Planning

    a.  Within 30 calendar days of a child's entrance into foster care, the DFCS caseworker shall convene a family team meeting and develop a service plan that addresses the strengths, needs and services required for both the child and the parents as explored during that family team meeting.

    b.  A family team meeting shall be held at least quarterly. The service plan shall be reviewed and updated quarterly or more frequently as needed, including within 30 days of a placement change.

    c.  <u>Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:</u>

      1)  At least 80% of foster children in that region who enter custody shall have a family team meeting and service plans shall be developed for both the child and the parents, consistent with Modified Settlement Agreement requirements, within 30 calendar days of entry into foster care.

      2)  At least 80% of foster children in that region who enter custody shall have family team meetings at least quarterly, and their service plans shall be updated quarterly, as well as within 30 calendar days of any placement or other significant change, consistent with Modified Settlement Agreement requirements.

    d.  <u>Beginning by 12 months following the date as set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:</u>

1) At least 90% of foster children in that region who enter custody shall have a family team meeting and service plans shall be developed for both the child and the parents, consistent with Modified Settlement Agreement requirements, within 30 calendar days of entry into foster care.

2) At least 90% of foster children in that region who enter custody shall have family team meetings at least quarterly, and their service plans shall be updated quarterly, as well as within 30 calendar days of a placement change, consistent with Modified Settlement Agreement requirements.

e. As of the date upon which the last region has fully implemented the Practice Model, performance on these service plan requirements shall be measured and required state-wide and shall no longer be measured on a region-by-region basis.

## 3. Child and Youth Permanency

a. **Permanency Plan:**

1) Defendants shall work with service providers, resource parents, the child, and the family to develop and document in the child's case record a permanency plan that specifies the permanency goal, a timeframe for achieving permanency, and activities that support permanency.

2) Within 30 calendar days of the child's initial placement, a permanency plan shall be developed that specifies the permanency goal, a timeframe for achieving permanency, and activities that support permanency.

3) No child shall be assigned a permanency goal of durable legal custody unless there are documented efforts in the child's case record to move the child to adoption and documentation of a reasonable basis why it is in the child's best interests not to be considered for adoption.

4) No child shall be assigned a permanency goal of permanent foster care.

5) If DFCS concludes, after considering reunification, adoption, durable legal custody, and permanent placement with a relative, that these permanency plans are inappropriate or unavailable for a child, DFCS may assign a permanency goal of Another Permanent Planned Living Arrangement (APPLA) for the child.  In such circumstances, (1) the child must be at least 16 years old and (2) DFCS must document to the Youth Court a compelling reason why this permanency goal is in the best interest of the child and more appropriate than reunification, adoption, durable legal custody, or permanent placement with a relative.

6) <u>Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model</u>:

 (a) At least 90% of foster children in that region who enter custody shall have a permanency plan within 30 calendar days of their entry into care consistent with Modified Settlement Agreement requirements.

 (b) At least 90% of foster children in custody in that region shall have a permanency plan that is consistent with Modified Settlement Agreement requirements.

7) <u>Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model</u>:

 (a) At least 95% of foster children in that region who enter custody shall have a permanency plan within 30 calendar days of their entry into care consistent with Modified Settlement Agreement requirements.

 (b) At least 95% of foster children in custody in that region shall have a permanency plan that is consistent with Modified Settlement Agreement requirements.

8) As of the date upon which the last region has fully implemented the Practice Model, performance on these permanency planning requirements shall be measured and required state-wide and shall no longer be measured on a region-by-region basis.

b. **Concurrent Planning:**

1) For children with the goal of reunification, DFCS shall begin, within the first six months of the child's entry into care, to engage in concurrent planning.

2) <u>Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model</u>:

 (a) At least 90% of children in custody in that region with the goal of reunification shall have case record documentation reflecting active concurrent permanency planning consistent with Modified Settlement Agreement requirements.

3) <u>Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model</u>:

 (a) At least 95% of children in custody in that region with the goal of reunification shall have case record documentation reflecting active concurrent permanency planning consistent with Modified Settlement Agreement requirements.

4) As of the date upon which the last region has fully implemented the Practice Model, performance on this concurrent planning requirement shall be measured and required state-wide and shall no longer be measured region-by-region.

c. **Permanency Plan Updating and Review:**

1) A child's permanency plan shall be reviewed in a court or administrative case review at least every six months. Foster care reviews shall satisfy this administrative case review requirement. DFCS will take reasonable steps, including written notice, to ensure the participation of the child, parents, caregivers, and relevant professionals in court or administrative reviews.

2) DFCS will take reasonable steps to ensure that a court review, which may be called a review, dispositional, or permanency hearing, is held for each child in foster care custody within 12 months of initial placement, and annually thereafter.

3) DFCS shall review all documented exceptions under the federal Adoption and Safe Families Act ("ASFA") for children who have spent more than 17 of the previous 22 months in foster care during the child's foster care review.

4) Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:

   (a) At least 90% of foster children in that region who have been in custody for at least six months shall have a timely court or administrative case review consistent with Modified Settlement Agreement requirements.

   (b) At least 90% of foster children in that region who have been in custody for at least 12 months shall have a timely annual court review consistent with Modified Settlement Agreement requirements.

5) Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:

   (a) At least 95% of foster children in that region who have been in custody for at least six months shall have a timely court or administrative case review consistent with Modified Settlement Agreement requirements.

   (b) At least 95% of foster children in that region who have been in custody in that region for at least 12 months shall have a timely annual court review consistent with Modified Settlement Agreement.

6) As of the date upon which the last region has fully implemented the Practice Model, performance on this permanency planning update and review requirement shall be measured and required state-wide and shall no longer be measured on a region-by-region basis.

d. **Reunification Services:**

1) When the child's permanency goal is reunification, DFCS shall identify in the service plan and make available directly or through referral those services DFCS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care and to help the parents develop strategies to facilitate permanency for the child. Caseworkers will monitor the provision of services through visits and updating of service plans.

2) For a child with a permanency goal of reunification, the child's assigned DFCS caseworker shall meet with the child's parent(s) with whom the child is to be reunified at least monthly to assess service delivery and achievement of service goals, to keep the family informed and involved in decisions about the child, and to remain current about the family's circumstances.

3) For children with a permanency goal of reunification, the case record shall document opportunities provided to parents in support of reunification.

4) Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:

   (a) At least 80% of foster children in that region with a permanency goal of reunification shall have service plans for their parents that identify those services DFCS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care, and case record documentation that DFCS made those identified services available directly or through referral.

5) Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:

   (a) At least 90% of foster children in that region with a permanency goal of reunification shall have service plans for their parents that identify those services DFCS deems necessary to address the behaviors or conditions resulting in the child's placement in foster care and case record documentation that DFCS made those identified services available directly or through referral.

6) As of the date upon which the last region has fully implemented the Practice Model, performance on these reunification requirements shall be

measured and required state-wide and shall no longer be measured on a region-by-region basis.

e. **Termination of Parental Rights:**

1) A termination of parental rights petition ("petition to TPR") shall be filed on behalf of children who have spent 17 of the previous 22 months in foster care by the last day of a child's seventeenth month in care, unless an available exception under ASFA has been documented by Defendants in the child's case record.

2) <u>Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model</u>:

   (a) At least 80% of foster children in that region who reach the point at which they have spent 17 of the previous 22 months in foster care shall have a petition to TPR filed on their behalf or an available exception under the federal ASFA documented by the end of their seventeenth month in care.

   (b) At least 80% of foster children in that region who have spent more than 17 of the previous 22 months in foster care without a TPR petition filed on their behalf or an available ASFA exception documented shall have such a petition filed or an available exception documented.

3) <u>Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model</u>:

   (a) At least 90% of foster children in that region who reach the point at which they have spent 17 of the previous 22 months in foster care shall have a petition to TPR filed on their behalf or an available exception under the federal ASFA documented by the last day of their seventeenth month in care.

   (b) At least 90% of foster children in that region who have spent more than 17 of the previous 22 months in foster care without a TPR petition filed on their behalf or an available ASFA exception documented shall have such a petition filed or an available exception documented.

4) As of the date upon which the last region has fully implemented the Practice Model, performance on this termination of parental rights requirement shall be measured and required state-wide and shall no longer be measured on a region-by-region basis.

4. **Case Recordings**

   a. DFCS caseworkers shall compile, maintain, and keep current complete child welfare case records.

    b.  <u>Beginning by the date as set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model</u>:

        1)  At least 90% of child welfare case records in that region will be current and complete.

    c.  <u>Beginning by 12 months following the date as set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model</u>:

        1)  At least 95% of child welfare case records in that region will be current and complete.

    d.  As of the date upon which the last region has fully implemented the Practice Model, performance on this case recording requirement shall be measured and required state-wide and shall no longer be measured on a region-by-region basis.

## 5. Developing and Maintaining Connections

    a.  For all children entering foster care, a visitation plan for the child and his/her family shall be developed as part of the service plan. This visitation plan shall be developed and regularly updated in collaboration with parents, resource parents, and the child. If parental visitation is appropriate based on the above factors, this visitation plan shall include a minimum of two visits per month with the parents (unless a court order in the child's case limits such visits). For all children, regardless of permanency goal, this visitation plan shall include at least one visit per month with any siblings not in the same placement (unless a court order in the child's case limits such visits).

    b.  DFCS shall arrange contact for the child with his/her parents and with any siblings not in the same placement within 24 hours of foster care placement unless there are documented reasons why contact should not occur. If a visit cannot be arranged within 24 hours, a telephone call to parents, siblings, or extended family members must be provided to the child.

    c.  DFCS caseworkers shall take all reasonable steps to ensure the implementation of each child's visitation plan. DFCS and its contracting agencies shall implement a policy that prohibits cancellation of visits as a disciplinary action.

    d.  <u>Beginning by the date as set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model</u>:

        1)  At least 80% of foster children in that region shall be provided with contacts with their parents and with any siblings not in the same placement consistent with Modified Settlement Agreement requirements, unless it is documented that a parent or sibling failed to make himself or herself available.

e. <u>Beginning by 12 months following the date as set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model</u>:

　　1) At least 90% of foster children in that region shall be provided with contacts with their parents and with any siblings not in the same placement consistent with Modified Settlement Agreement requirements, unless it is documented that a parent or sibling failed to make himself or herself available.

f. As of the date by which the last region has fully implemented the Practice Model, performance on these visitation planning and services requirements shall be measured and required state-wide and shall no longer be measured on a region-by-region basis.

6. **Educational Services**

a. DFCS caseworkers shall review the educational record of each child who enters custody for the purpose of identifying the child's general and, if applicable, special educational needs and shall document the child's educational needs within 30 calendar days of his/her entry into foster care.

b. DFCS shall take reasonable steps to ensure that school-age foster children are registered for and attending accredited schools within three business days of initial placement or any placement change, including while placed in shelters or other temporary placements.

c. DFCS shall make all reasonable efforts to ensure the continuity of a child's educational experience by keeping the child in a familiar or current school and neighborhood, when this is in the child's best interests and feasible, and by limiting the number of school changes the child experiences.

d. <u>Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model</u>:

　　1) At least 80% of school-age foster children in that region who enter custody shall have their educational records reviewed and their educational needs documented by their DFCS caseworker within 30 calendar days of their entry into foster care.

　　2) At least 80% of school-age foster children in that region who enter custody or are subject to a change in schools due to a placement move shall be registered for and attending an accredited school within three business days of the initial placement or placement change, including while placed in shelters or other temporary placements, unless delayed by the Youth Court.

e. <u>Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model</u>:

    1) At least 90% of school-age foster children in that region who enter custody shall have their educational records reviewed and their educational needs documented by their DFCS caseworker within 30 calendar days of their entry into foster care.

    2) At least 90% of school-age foster children in that region who enter custody or are subject to a change in schools due to a placement move shall be registered for and attending an accredited school within three business days of the initial placement or placement change, including while placed in shelters or other temporary placements, unless delayed by the Youth Court.

f. As of the date upon which the last region has fully implemented the Practice Model, performance on these educational requirements shall be measured and required state-wide and shall no longer be measured on a region-by-region basis.

7. **Transition to Independent Living**

a. DFCS shall provide each youth transitioning to independence with at least six months' advance notice of the cessation of any health, financial, or other benefits that will occur at the time of transition.

b. Each foster youth 14-20 years old, regardless of his/her permanency plan, shall be provided with an opportunity to participate in the creation of an Independent Living service plan for Independent Living preparation. DFCS shall provide each eligible youth with Independent Living services as set forth in his/her service plan.

c. DFCS shall ensure that each youth transitioning to independence has available an adequate living arrangement, a source of income, health care, independent living stipends, and education and training vouchers. DFCS shall assist youth in locating and/or enrolling in educational or vocational programs appropriate to their needs, interests, abilities, and goals, such as high school or GED programs; colleges or universities; vocational training programs; and special education services.

d. DFCS shall assist youth in obtaining or compiling the following documents and such efforts shall be documented in the child's case record:

    1. an identification card;
    2. a social security or social insurance number;
    3. a resume, when work experience can be described;
    4. a driver's license, when the ability to drive is a goal;
    5. an original copy of the youth's birth certificate;
    6. religious documents and information;

7. documentation of immigration, citizenship, or naturalization, when applicable;

8. documentation of tribal eligibility or membership;

9. death certificates when parents are deceased;

10. a life book or a compilation of personal history and photographs, as appropriate;

11. a list of known relatives, with relationships, addresses, telephone numbers, and permissions for contacting involved parties;

12. previous placement information; and

13. educational records, such as a high school diploma or general equivalency diploma, and a list of schools attended, when age-appropriate.

e. Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:

    1) At least 90% of foster children in that region who are 14-20 years old shall be provided with Independent Living services as set forth in their service plan.

    2) At least 80% of foster children in that region who are transitioning to independence shall have available an adequate living arrangement, a source of income, health care, independent living stipends, and education and training vouchers. DFCS shall also assist such children in obtaining, prior to transitioning to independent living, the necessary documents and information identified in the COA standard PA-FC 13.06 for emancipating youth. Those efforts shall be documented in the child's case record.

f. Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:

    1) At least 95% of foster children in that region who are 14-20 years old shall be provided with Independent Living services as set forth in their service plan during the Period.

    2) At least 90% of foster children in that region who are transitioning to independence shall have available an adequate living arrangement, a source of income, health care, independent living stipends, and education and training vouchers. DFCS shall assist such children in obtaining, prior to transitioning to independent living, the necessary documents and information identified in the COA standard PA-FC 13.06 for emancipating youth. Those efforts shall be documented in the child's case record.

g. As of the date upon which the last region has fully implemented the Practice Model, performance on these independent living services requirements shall be measured and required state-wide and shall no longer be measured on a region-by-region basis.

8. **Case Closing and Aftercare**

   a. A recommendation to return a child to his/her home or to place the child in the custody of a relative shall be made at a meeting attended by the child's DFCS caseworker and the caseworker's supervisor.  Defendants shall invite the worker from the private agency if the child is placed with a private agency, the resource parents (unless DFCS determines that the resource parents' attendance would be inappropriate), the parents or the relative assuming custody, and the child.  An after-care plan shall be developed that identifies all of the services necessary to ensure that the conditions leading to the child's placement in foster care have been addressed, and that the child's safety and stability will be assured.  DFCS shall take reasonable steps to provide or facilitate access to all services necessary to support the child during the trial home visit.

   b. For each child who has a permanency goal of reunification and who is in fact placed in the home for the purpose of reunification, DFCS shall provide, subject to the approval of the Youth Court, such child with a 90-day trial home visit, unless that child had been in custody for less than 90 days.  During any trial home visit period, a DFCS caseworker shall meet with the child in the home at least two times per month, and each meeting shall occur without the parent or caretaker present.

   c. Before the end of any trial home visit period, there shall be a final family team meeting, which shall include the child's caseworker, the caseworker's supervisor, the child, and the parent or relative assuming custody, to determine the appropriateness of a final discharge.  If final discharge is determined to be appropriate, DFCS shall make the appropriate application to the court to be relieved of custody.

   d. Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:

      1) At least 70% of foster children in that region who are reunified and who were in custody longer than 90 days shall receive a 90-day trial home visit period or have case record documentation reflecting the Youth Court's objection to such a trial home visit.  During that trial home visit period, the child's caseworker or a Family Preservation caseworker shall meet with the child in the home at least two times per month, and DFCS shall provide or facilitate access to all services identified in the child's after-care plan, consistent with Modified Settlement Agreement requirements.

   e. Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:

      1) At least 90% of foster children in that region who are reunified and who were in custody longer than 90 days shall receive a 90-day trial home visit period or have case record documentation reflecting the Youth Court's

44

objection to such a trial home visit. During that trial home visit period, the child's caseworker shall meet with the child in the home at least two times per month, and DFCS shall provide or facilitate access to all services identified in the child's after-care plan, consistent with Modified Settlement Agreement requirements.

f. As of the date upon which the last region has fully implemented the Practice Model, performance on these case closing and aftercare requirements shall be measured and required state-wide and shall no longer be measured on a region-by-region basis.

## C. Outcome Measures

The following child welfare outcome measures shall be met and shall be measured annually:

### 1. Reunification

At least 76.2% of children state-wide discharged from custody and reunified with their parents or caretakers in the last year shall have been reunified within 12 months of the latest removal from home.

a. Beginning by the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:

1) At least 60% of foster children in that region who are discharged from custody and reunified with their parents or caretakers shall be reunified within 12 months of the latest removal from home.

b. Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:

1) At least 70% of foster children in that region who are discharged from custody and reunified with their parents or caretakers shall be reunified within 12 months of the latest removal from home.

c. Beginning by 12 months after the date by which the last region has fully implemented the Practice Model:

1) At least 76.2% of foster children state-wide who are discharged from custody and reunified with their parents or caretakers shall have been reunified within 12 months of the latest removal from home.

### 2. Time to Adoption Finalization

At least 32% of children state-wide who were discharged in the last year upon the finalization of an adoption shall have had the adoption finalized within 24 months of the latest removal from home.

45

a. Beginning by the date as set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:

    1) At least 25% of foster children in that region who are discharged upon finalization of an adoption shall have had the adoption finalized within 24 months of the latest removal from home.

b. Beginning by 12 months following the date set forth in Appendix "A" that a DFCS region has fully implemented the Practice Model:

    1) At least 30% of foster children in that region who are discharged upon finalization of an adoption shall have had the adoption finalized within 24 months of the latest removal from home.

c. Beginning by 12 months after the date by which the last region has fully implemented the Practice Model:

    1) At least 32% of foster children state-wide who were discharged upon the finalization of an adoption shall have had the adoption finalized within 24 months of the latest removal from home.

## IV. COA ACCREDITATION

DFCS's foster care services shall be accredited by COA pursuant to COA's relevant management and service standards.

## V. NAMED PLAINTIFFS

Each Agreement on Services and Plans for Named Plaintiffs entered into by the Parties pursuant to Section 4.G of the Stipulated Settlement Agreement approved by the Court on May 17, 2007 is hereby incorporated as enforceable provisions of this Modified Settlement Agreement.

## VI. MONITORING

**A.** The Parties agree that Grace Lopes shall be the Monitor of Defendants' compliance with this Modified Settlement Agreement and the annual implementation plans. Defendants shall provide the Monitor with the necessary resources to perform its duties.

**B.** The Monitor's duties shall be to confirm independently the data reports and statistics provided pursuant to this Modified Settlement Agreement and the annual implementation plans; conduct independent case record and qualitative reviews; review all plans and documents to be developed and produced by Defendants pursuant to this Modified Settlement Agreement; and report on Defendants' compliance in implementing the terms of the Modified Settlement Agreement and the annual implementation plans, and the achievement of the improved outcomes set forth therein. The Monitor shall provide the Court and the Parties with a telephonic status report on Defendants' implementation efforts no less frequently than every 90 days, and shall prepare reports that will address

those efforts and be released periodically, but no less than every six months unless the Parties and the Monitor agree otherwise. Each such report shall be presented to the Court at a Status conference no less frequently than every six months. In order to avoid duplication and to build capacity within the Agency, the Monitor will look first to Defendants' data and data analysis. Accordingly, Defendants shall provide the Monitor with access to all data reports produced in the regular course of business respecting topics covered by this Modified Settlement Agreement and the annual implementation plans. Notwithstanding the existence of Defendants' data, data analysis, and reports, however, the Monitor shall have the authority to prepare new reports on all topics covered by both this Modified Settlement Agreement and the annual implementation plans, to the extent the Monitor deems necessary.

C. Defendants agree to provide the Monitor with free and, upon request, private access to all individuals within DFCS and persons within the Executive Branch, as the Monitor chooses; to assist the Monitor in gaining access to other stakeholders in the child welfare system (including but not limited to the staff of contract providers); and to provide the Monitor with free access to all documents, data, and premises it deems relevant to its work (including but not limited to documents and data from contract agencies and courts). The Monitor agrees to respect the confidentiality of all information related to individually identifiable clients, subject to applicable law. Defendants shall take no adverse action against individuals or agencies because they shared information with the Monitor pursuant to this Modified Settlement Agreement.

D. The reports of the Monitor shall be public documents filed with the Court, except that any individually identifying information and any other confidential information protected from disclosure by law shall be redacted or otherwise removed from any public report. The Monitor shall provide copies of each of its reports to all named Defendants as well as to the heads of the State House and Senate Committees on Appropriations and Public Health. Any such information received by the Monitor, unless already public, shall not be made public without Defendants' prior written permission, except as incorporated into a public report of the Monitor.

E. The Parties shall have access, through the Monitor, to all information made available to the Monitor, and to all other information related to ensuring compliance with and enforcing this Modified Settlement Agreement and the annual implementation plans, subject to the existing confidentiality order in effect in this case. The Monitor may protect the identity of confidential sources of any such information.

F. The Parties may request that the Monitor review and issue recommendations regarding the provision of services to the Named Plaintiffs in this case.

G. The intent of the Parties is that the Monitor shall develop a plan to transfer the primary monitoring function to DFCS's CQI unit upon the termination of this Modified Settlement Agreement, or at such earlier time as provided for in Section VII.C below. The Monitor shall work in collaboration with Defendants to build DFCS's CQI capacity.

**H.** The Monitor may periodically meet privately with the Court concerning issues related to this case, provided the Parties are made aware of the occurrence of such a meeting.

**I.** If at any point the Monitor can no longer serve, the Parties shall agree on another Monitor, with input and recommendations from the outgoing Monitor.

## VII.  DISPUTE RESOLUTION, TERMINATION, AND EXIT

**A.** The Defendants shall implement all reforms necessary to effectuate this Modified Settlement Agreement and the annual implementation plans.  The Parties agree that the systemic and comprehensive nature of this Modified Settlement Agreement will require implementation and refinement of policies and programs over a number of years.  The Parties shall make every reasonable effort to resolve disputes prior to seeking Court intervention.  Plaintiffs agree not to seek relief for isolated or minor violations, or for violations related solely to an individual child, unless that child is a Named Plaintiff.

**B.** If Plaintiffs believe that Defendants have failed to comply with any obligation under this Modified Settlement Agreement or an annual implementation plan, Plaintiffs will, prior to seeking judicial action to enforce the terms of this Modified Settlement Agreement or an annual implementation plan, give written notice of non-compliance to the State.  Within 30 calendar days of Plaintiffs' notice of non-compliance, Defendants shall submit a written response to Plaintiffs.  Plaintiffs agree to work in good faith with the State to agree on necessary corrective actions and avoid enforcement action, and may not initiate court action for 60 days from the date of Plaintiffs' non-compliance notice.  However, in case of an emergency posing an immediate threat to the health or safety of youths, Plaintiffs may omit the notice and cure requirements herein before seeking judicial action.

**C.** The Court may terminate jurisdiction over this lawsuit if it finds that Defendants are in substantial compliance with the provisions of this Modified Settlement Agreement state-wide for two consecutive six-month reporting periods**.**

   1.  No sooner than the full implementation of the Practice Model, the Monitor shall transfer to Defendants' CQI system monitoring of all the Modified Settlement Agreement provisions under the following headings or subheadings for which Defendants have sustained state-wide compliance for at least six months on all such provisions (as reflected in monitoring report data) and where the Monitor has determined that Defendants' CQI system is adequately monitoring the Modified Settlement Agreement provisions: II.A.1, II.A.2.a, II.A.2.b, II.A.2.c, II.A.2.d, II.A.3, II.A.4, II.A.5, II.A.6, II.A.7, II.B.1, II.B.2, II.B.3, II.B.4, II.B.5, II.B.6, II.B.7, II.C.1, II.C.2, III.A.1, III.A.2, III.B.1, III.B.2, III.B.3.a, III.B.3.b, III.B.3.c, III.B.3.d, III.B.3.e, III.B.4, III.B.5, III.B.6, III.B.7, III.B.8, III.C.1, III.C.2.  The reports of the Monitor shall identify the provisions, if any, that are to be transferred to Defendants' CQI system for the subsequent monitoring period.  Plaintiffs reserve the right to object to the transfer of the monitoring of a provision to Defendants' CQI system.

   2.  Once Defendants' CQI system is responsible for the transferred monitoring of any Modified Settlement Agreement provisions, and as long as the Court retains

jurisdiction, Defendants' CQI system shall issue public monitoring reports every six months on Defendants' compliance levels with any such provisions.

3.  While Defendants shall make a good faith effort to maintain compliance with a provision transferred to its CQI system, a drop in compliance levels after the transfer of the monitoring of a Modified Settlement Agreement provision shall not be, by itself, grounds for a Motion to enforce the Modified Settlement Agreement to hold Defendants in contempt, or to bar future expiration of the Modified Settlement Agreement.  Notwithstanding the above, Plaintiffs are not precluded from seeking to enforce transferred provisions as remedial measures in connection with Motions to enforce provisions that have not been transferred.

**D.**  Defendants may seek a court-ordered modification of any provision of this Modified Settlement Agreement pursuant to Rule 60(b) of the Federal Rules of Civil Procedure if significant changes in factual conditions, beyond Defendants' control and not contemplated by the Parties at the time the Modified Settlement Agreement was entered into, make the provision unworkable, make compliance substantially more onerous, or make enforcement detrimental to the public interest, and the changed circumstance occurred despite Defendants' reasonable effort to comply with the Modified Settlement Agreement.

**E.**  All parties reserve all claims and defenses with respect to all claims for an award of attorneys' fees and litigation expenses for Plaintiffs, which claims shall be separately asserted and determined according to a schedule to be fixed by the Court.

#####

**AGREED TO AND APPROVED FOR ENTRY BY:**

**FOR PLAINTIFFS:**

/s/ Marcia Robinson Lowry
Marcia Robinson Lowry (*pro hac vice* MBN 43991)
Jessica Polansky (*pro hac vice* MBN 45356)
CHILDREN'S RIGHTS, INC.
330 Seventh Avenue, 4th Floor
New York, NY  10001
(212) 683-2210

Wayne Drinkwater (MBN 6193)
BRADLEY ARANT BOULT CUMMINGS LLP
188 East Capitol Street, Suite 400
Jackson, MS  39201
(601) 948-8000

John Lang (*pro hac vice* MBN 43987)
Attorney at Law
60 East 42nd Street
Suite 4600
New York, NY 10165
Tel. 212.300.0646

Christian D. Carbone (*pro hac vice* MBN 43986)
John Piskora (*pro hac vice* MBN 44474)
LOEB & LOEB LLP
345 Park Ave.
New York, NY  10154

**FOR DEFENDANTS:**


/s/ Phil Bryant
Governor Phil Bryant,
State of Mississippi


/s/ Jim Hood
Attorney General Jim Hood,
State of Mississippi

Dewitt L. ("Rusty") Fortenberry Jr., Esq. (MBN 5435)
Kenya Key Rachal, Esq. (MBN 99227)
Ashley Tullos Young, Esq. (MBN 101839)
BAKER, DONELSON, BEARMAN, CALDWELL, & BERKOWITZ, PC
428 I-55 North
Meadowbrook Office Park
Jackson, MS 39211
(601) 351-2400

Harold E. Pizzetta, III, Esq. (MBN 99867)
Assistant Attorney General
General Civil Division
Carroll Gartin Justice Building
430 High Street
Jackson, MS 39201


SO ORDERED AND ADJUDGED, this the 6th day of July, 2012.



/s/Tom S. Lee
DISTRICT JUDGE

**APPENDIX "A"**
Modified Mississippi Settlement Agreement and Reform Plan

# Practice Model Rollout Schedule

| Regions | Implementation Phase Dates | | | |
|---|---|---|---|---|
| | Planning (6 months) | Initial Implementation (One Year) | Full/Ongoing Implementation (One Year) | Data Tracking (One Year) |
| I-South, II-West | January-June 2010 | July 2010 – June 2011 | Approx. Sept. 2011 – August 2012 | September 2012 – August 2013 |
| V-West | July-December 2010 | January - December 2011 | Approx. March 2012 – February 2013 | March 2013 – February 2014 |
| IV-North | July – December 2010 | January 2011 – June 2012 (18 months) | Approx. Sept. 2012 – August 2013 | September 2013 – August 2014 |
| I-North, III-South, IV-South | January-June 2011 | July 2011 – June 2012 | Approx. Sept. 2012 – August 2013 | September 2013 – August 2014 |
| V-East, | July-December 2011 | January – December 2012 | Approx. March 2013 – February 2014 | March 2014 – February 2015 |
| III-North, VII-East | July 2011 – June 2012 (12 mos.) | July 2012 – June 2013 | Approx. Sept. 2013 – August 2014 | September 2014 – August 2015 |
| II-East, VI, VII-West | July-December 2012 | January – December 2013 | Approx. March 2014 – February 2015 | March 2015 – February 2016 |

Adjustments may be made to the timing of the planning and/or implementation phases based on a region's progress. The two-month period between the end of the Initial Implementation phase and the beginning of the Full Implementation phase is in place to permit the follow-up CQI review after the first 12 months of implementation and an opportunity to revise the Regional Implementation Plan based on preliminary results of the review going into the next phase of implementation.

**APPENDIX "B"**
Modified Mississippi Settlement Agreement and Reform Plan

**PERIOD 3 IMPLEMENTATION PLAN**

This is the Implementation Plan for Period 3 required by the Modified Settlement Agreement and Reform Plan (the "Modified Settlement Agreement"). Implementation Period 3 shall run for a 12-month period beginning on the date the Modified Settlement Agreement is filed. Defendants shall substantially comply with the Period 3 Implementation Plan requirements by the end of Implementation Period 3, or earlier, as specified herein.

## I. Administration and Management Implementation Steps

### A. Human Resources Management

1. Management

   a. By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants shall establish a Statewide Implementation Team. The Statewide Implementation Team will be responsible for prioritizing, managing, and making decisions relating to implementation of the requirements of the Modified Settlement Agreement, this Plan, and the Practice Model. The Statewide Implementation Team will consist of the MDHS Executive Director, MDHS Deputy Executive Director, DFCS Deputy Administrator, DFCS Director, DFCS Field Operations Director, DFCS CQI Director, and a CSF Officer or designee.

   b. By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants shall establish the following Statewide Implementation Sub-Teams: CQI, Training, Resource Development, Policy, Legal and Judicial, Resource Parent Recruitment and Retention, and Caseload/Staffing. These Statewide Implementation Sub-Teams will be responsible for designing and guiding the work plans necessary to implement the requirements of the Modified Settlement Agreement and this Plan in their respective functional areas. The Statewide Implementation Sub-Teams will report to and be directed by the Statewide Implementation Team. The Statewide Implementation Sub-Teams shall meet no less frequently than monthly, with the exception of the CQI Sub-Team and the Resource Home Recruitment and Retention Sub-team which shall meet at least quarterly, and shall issue progress reports to the Statewide Implementation Team no less frequently than every three months and which shall discuss accomplishments, challenges, and anticipated next steps. The Statewide Implementation Sub-Teams' membership will include the Unit Director responsible for that Sub-Team's particular function, a Regional Director, and such other staff persons the Statewide Implementation Team has deemed responsible for carrying out the particular Sub-Team's function. Sub-Teams may also include representatives of other state agencies or stakeholders the Statewide Implementation Team has deemed necessary to carry out the Sub-Team's function.

c. By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants shall establish Regional Implementation Teams in Regions I-N, I-S, II-W, III-S, IV-N, IV-S, V-E and V-W. The Regional Implementation Teams will be chaired by the respective Regional Director and the membership will consist of appropriate staff persons and may also include representatives of other state agencies or stakeholders the Statewide Implementation Team has deemed necessary to carry out the Team's function. The Regional Implementation Teams shall meet no less frequently than quarterly and shall issue progress reports to the Statewide Implementation Team no less frequently than quarterly. These reports shall discuss accomplishments, challenges, and anticipated next steps. The Regional Implementation Teams will include Sub-Teams in the following practice areas: CQI and Resource Parent Recruitment and Retention.

d. Within six (6) months of the start of Implementation Period 3, each of the Statewide Implementation Sub-Teams shall have finalized the work plans as described in I.A.1.b. above.

2. Workforce:

a. By August 1, 2012, Defendants shall maintain a practice coach in Regions I-N, I-S, II-E, II-W, III-N, III-S, IV-N, IV-S, V-E, V-W, VI, VII-E, and VII-W to facilitate Practice Model implementation.

b. Within nine (9) months of the start of Implementation Period 3, Defendants shall have finalized and begun implementing a Workforce Development Plan. This Workforce Development Plan shall address the recruitment and retention of DFCS professional and support staff as well as bring its current staff into substantial compliance with the worker and supervisor qualification requirements of the Modified Settlement Agreement. The Workforce Development Plan shall identify the specific steps, strategies, financial resources, and short- and long-term staffing goals with related timeframes that are necessary to meet the staffing requirements of the Modified Settlement Agreement. The Workforce Development Plan shall be approved by the Monitor as meeting the requirements of this Period 3 Implementation Plan and shall include a section focused specifically on recruitment and retention in Hancock, Harrison, and Jackson Counties ("Coast"), as well as strategies to support staff on the Coast, and shall also include a separate section focused specifically on recruitment, retention, and support strategies in Hinds County.

c. Defendants shall actively engage in recruitment and retention activities to address the workload issues in Hancock, Harrison, Hinds, and Jackson Counties as follows:

1) By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants shall have defined the role of a case aide to support caseworkers in Hancock, Harrison, Hinds, and Jackson Counties.

2) By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants shall have determined the number of case aides needed in Hancock, Harrison, Hinds, and Jackson Counties and shall begin recruiting case aides in those counties.

3) By September 1, 2012, Defendants shall have written the Coast and Hinds County sections of the Workforce Plan as required in Section I.A.2.b above.

4) By July 1, 2012, the Legal and Judicial Statewide Implementation Sub-Team shall develop and begin implementing written strategies for promoting implementation of the Olivia Y. standards in the Mississippi Youth Courts. These strategies shall be implemented in Regions VII-E, VII-W, and III-S by the end of Implementation Period 3.

5) Defendants shall offer starting salaries for employees in the counties of Hancock, Harrison, Hinds, and Jackson, as indicated below:

| Job Title | Starting Salary |
|---|---|
| Family Protection Worker I | $27,190.12 |
| Family Protection Specialist | $31,757.88 |
| Family Protection Specialist, Senior | $34,557.43 |
| Family Protection Specialist, Advanced | $37,605.49 |
| Area Social Work Supervisor | $43,138.52 |

6) The counties listed below shall have no fewer than the total number of full time caseworkers assigned to the counties as specified:

- Hancock County:      16 caseworkers
- Harrison County:      42 caseworkers
- Hinds County:      50 caseworkers
- Jackson County:      34 caseworkers

Page 3 of 13

3.   Training

   a.  Pre-Service Training

      1) By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants shall have a revised pre-service training curriculum. The revised training shall include training on the quality, frequency, purpose, and structure of meetings with foster children, parents, and foster care providers and address communicating with, interviewing, and observing foster children.

      2) By July 1, 2012, Defendants shall maintain nine (9) full-time trainers.

      3) By September 1, 2012, Defendants shall strengthen the competency-based testing to ensure that trainees have acquired adequate competencies in the areas of interviewing, critical thinking skills, and documentation skills related to child safety assessments and to preparing case summaries for submission to the Youth Court.

      4) Defendants shall have implemented an accurate and reliable system to track staff participation in all required training.

   b.  Supervisor Training

      1) By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants shall have a newly developed clinical supervisory training curriculum.

      2) All Area Social Work Supervisors (ASWSs) hired between January 1, 2012 and April 1, 2013 shall have received training pursuant to the newly developed clinical supervisory training curriculum.

   c.  Other Training

      1) By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants shall have provided training to all Foster Care Review and Evaluation and Monitoring staff employed with Defendants as of January 1, 2012 on data indicators of the six (6) practice model components and systemic factors to measure and evaluate improvement efforts.

      2) By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants shall have provided training on the Use of Data in Management to all DFCS State Office staff employed with Defendants as of January 1, 2012, who hold the position of Bureau Director II, Bureau Director I, Division Director II, Division Director I, Office Director II, or Office Director I, as well as to all Regional Directors.

3) By July 1, 2012, Defendants shall have provided training for Region V-E on the six (6) components of the practice model.

4) By the end of Implementation Period 3, Defendants shall have provided training for Regions II-E, III-N, VI, VII-E and VII-W on the six (6) components of the practice model.

4. Contract Agency Requirements

Defendants shall work with Casey Family Programs, or another consultant approved by the Monitor, for technical assistance with developing a plan with specific action steps and timeframes for a performance based contracting system with the capacity to monitor and enforce contract performance. That plan shall be complete by the end of Implementation Period 3.

**B. Continuous Quality Improvement**

1. By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants shall finalize and begin implementing the Evaluation and Monitoring instrument that was submitted in draft form during the Bridge Period.

2. By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants, in conjunction with CSF or another consultant, shall revise and begin implementing a written plan to implement a continuous quality improvement (CQI) system. That written plan shall explicitly specify the resources and staffing necessary to adequately operate the CQI unit in both the state and regional offices.

3. By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants shall maintain one (1) Program Administrator, Sr. to work in the Evaluation and Monitoring Unit.

4. By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants shall complete a baseline CQI Review for Region V-E.

5. By 30 days following the Court's approval of the Modified Settlement Agreement Defendants shall complete a follow-up CQI Review for Region I-N.

6. By 45 days following the Court's approval of the Modified Settlement Agreement, Defendants shall hire three (3) Evaluation and Monitoring Unit liaisons.

7. By 45 days following the Court's approval of the Modified Settlement Agreement, Defendants shall complete an annual CQI report covering June 1, 2010 through June 30, 2011.

8. By July 1, 2012, Defendants shall complete a second follow-up CQI Review for Regions I-S and II-W.

9.  By August 1, 2012, Defendants shall complete a base-line CQI Review for Region III-N.

10. By September 1, 2012, Defendants shall complete a follow-up CQI Review for Region IV-S.

11. By October 1, 2012, Defendants shall complete a follow-up CQI Review for Region III-S.

12. By November 1, 2012, Defendants shall complete a baseline CQI Review for Region VII-W.

13. By December 1, 2012, Defendants shall complete a baseline CQI Review for Region VI.

14. By February 1, 2013, Defendants shall complete a baseline CQI Review for Region II-E.

15. By March 1, 2013, Defendants shall complete a second follow-up CQI Review for Region V-W.

16. By April 1, 2013, Defendants shall complete a follow-up CQI Review for Region V-E.

17. By June 1, 2013, Defendants shall complete a follow-up CQI Review for Region VII-E.

18. Within 60 days of completing each CQI Review, Defendants shall complete a report regarding that review.

    a.  Within five (5) business days thereafter, Defendants will provide the completed report to Plaintiffs and to Monitor.

19. Defendants shall have hired the staff and obtained the resources required as specified in the CQI Plan developed pursuant to Section I.B.2. of the Period 3 Implementation Plan.

## C. Legal and Regulatory Compliance

By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants shall have implemented the policies and procedures necessary to comply with the public child fatality reporting requirements of the Child Abuse Prevention and Treatment and Adoption Reform Act.

**D. Information Use and Management**

1.  Defendants shall produce accurate and validated reports as identified in Appendix C"to the Modified Settlement Agreement that reflect county-by-county performance.

    a.  The reports that are noted as available in Appendix "C" as of the beginning of Implementation Period 3 shall be produced beginning one month from the beginning of Implementation Period 3 and every thirty (30) days thereafter.

    b.  Defendants shall begin producing those reports that do not exist as of the beginning of Implementation Period 3 by the dates set forth in Appendix "C."

    c.  Data reports shall be provided to the Monitor and the Plaintiffs within thirty (30) days of the date the report becomes available and every thirty (30) days thereafter, with the exception of the data report on training of DFCS caseworkers which shall be produced quarterly.

2.  Defendants shall ensure that the computer and electronic access problems identified in Dkt. No. 502, ps. 68-72 of the Court Monitor's September 8, 2011 report to the Court are remedied.

3.  Consistent with the schedule set forth in Appendix "C," Defendants shall collect, analyze and disseminate data, related to compliance with the Foster Care Service Standards set forth in Sections II.B and III.B of the Modified Settlement Agreement, at least monthly, to DFCS regional and county staff.

4.  Defendants shall provide training for all foster care reviewers on the foster care review instrument and on processes related to addressing concerns identified during a foster care review.

**E. Case Recordings and Information**

Defendants shall revise the Supervisory Administrative Review process to require a review of whether DFCS child welfare case records are current, complete, made by the appropriate caseworker, and signed and dated by supervisors.

**F. Financial Management**

1.  By the end of Implementation Period 3, Defendants shall have implemented and shall maintain implementation of those recommendations made by Hornby Zeller Associates ("HZA") and the Center for Support of Families negotiated and agreed to by the Parties, and filed with the Court by July 14, 2012. The recommendations negotiated and agreed to by the Parties and filed with the Court shall become an enforceable part of this Period 3 Implementation Plan.

2. Defendants shall issue a written report on the impact of HZA's recommendations on Defendants' ability to increase federal funding and any barriers to implementation. Defendants shall share the report with the Monitor and Plaintiffs.

## II. Foster Care Services Assessment

### A. Policy

1. Defendants shall have completed all revisions to the DFCS policies and practice guides as necessary to reflect the COA foster care services standards and the requirements set forth in Sections II.B and III.B of the Modified Settlement Agreement, and shall assess what training is necessary in order to effectuate any new and revised policies and develop training curricula.

2. Service Planning and Monitoring: The revised policies shall require that each service plan, and revision of such plan, meet the requirements of Section III.B.2 of the Modified Settlement Agreement and:

   a. are based on the assessment required by Section III.B.1 of the Modified Settlement Agreement;

   b. include: service goals, desired outcomes, and timeframes for achieving them; services and supports to be provided, and by whom; and the signature of the parent(s) with whom reunification is planned and, when appropriate, the child or youth; and

   c. address, as appropriate: unmet service and support needs that impact safety, permanency, and well-being; maintaining and strengthening relationships; educational needs and goals; and the need for culturally responsive services and the support of the family's informal social network.

3. Permanency Plan: The revised policies shall require that Individual or Family Service Plans contain the following:

   a. how the permanency goal will be achieved;

   b. what services are necessary to make the accomplishment of the goal likely;

   c. who is responsible for the provision of those services;

   d. when the services will be provided; and

   e. the date by which the permanency goal is likely to be achieved.

4. Defendants shall develop a process for the Foster Care Review Unit to assess and report on whether permanency plans contain all of the elements listed in Section II.A.3 above.

**B. Child and Youth Permanency**

   1.  Permanency Roundtables

       a.  In addition to Regions II-W, 5-W, and VII-E, which have already conducted permanency roundtables, by July 1, 2012, Defendants, with the assistance and support of Casey Family Programs, shall have conducted permanency roundtables in Regions I-N, I-S, and II-E.  The permanency roundtables will target a population of children who have been in Defendants' custody for at least thirty-six (36) months with the goal of moving these children toward permanency.

       b.  By 45 days following the Court's approval of the Modified Settlement Agreement, Defendants, in consultation with Casey Family Programs, shall develop a schedule for permanency roundtables in four(4) additional regions and those roundtables shall be conducted prior to the end of Implementation Period 3.

       c.  Each permanency roundtable shall be conducted in accordance with Section II.B.6.a.2 of the Modified Settlement Agreement.

   2.  Permanency Planning Updating and Review

       a.  Within six (6) months of the start of Implementation Period 3, Defendants shall develop a system for tracking the annual court reviews for each child in care.  Defendants' policy shall require that the Youth Court with jurisdiction is provided with a detailed up-to-date report on the current status of the child's placement, visitation, permanent plan progress, and service needs.  Defendants shall begin implementing that system before the end of Implementation Period 3.

       b.  The child's assigned caseworker or supervisor shall attend every child's annual court review unless there are exceptional circumstances that do not allow attendance.

   3.  Service Array

     In order to build the capacity of Defendants to begin meeting the needs identified in the "Foster Care Services Reunification Needs Assessment," Defendants shall, by the end of Implementation Period 3:

       a.  develop a Foster Care Unit;

       b.  hire a Division Director II to lead the Foster Care Unit;

       c.  hire a Medical-Mental Health Specialist;  and

       d.  hire six (6) workers to build the resource service array.

4. Termination of Parental Rights/Special Permanency Reviews

  a. Within six (6) months of the start of Implementation Period 3, Defendants, in conjunction with a qualified independent consultant, shall develop a remedial plan with related action steps and time frames necessary to address the deficiencies found by the TPR Assessment in case practice and documentation related to the timely filing of termination of parental rights on behalf of children who have spent 17 of the previous 22 months in foster care, and for whom an available exception under the Adoption and Safe Families Act ("ASFA") has not been documented. The issues that the remedial plan shall address include:

    1) accurately identifying children for whom the ASFA TPR requirements apply;

    2) adequate training for caseworkers regarding the circumstances that qualify as exceptions to filing TPRs pursuant to ASFA; and

    3) appropriately documenting exceptions.

  b. Defendants shall have begun implementing the TPR remedial plan by the end of Implementation Period 3.

5. Adoption

  a. By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants shall implement a process for advising all potential adoptive families, including any resource family caring for a child who has become legally available for adoption, of the availability of adoption subsidies. This notification shall be documented in the child's record, and Defendants shall facilitate the family's access to such subsidies.

  b. By 45 days following the Court's approval of the Modified Settlement Agreement, Defendants shall define the job description, responsibilities, and qualifications for the position of adoption specialist. The adoption specialist's responsibilities shall include consulting with private and public professionals and identifying and ensuring the provision of targeted services necessary for the child to be adopted.

  c. By 45 days following the Court's approval of the Modified Settlement Agreement, Defendants shall revise the protocol for adoption meetings such that it provides sufficient information to guide case practice on how to review the progress being made in achieving the goal of adoption for legally free children.

  d. By 45 days following the Court's approval of the Modified Settlement Agreement, Defendants shall develop and begin implementing a process for making legal risk placements that assures that children for whom the

permanency plan is adoption but who are not yet legally free for adoption are placed in appropriate adoptive homes.

e. By 45 days following the Court's approval of the Modified Settlement Agreement, Defendants shall have begun to hire and train adoption specialists.

f. Defendants shall have taken reasonable steps to hire (or promote) and train a sufficient number of adoption specialists to meet the adoption requirements of the Modified Settlement Agreement and adoption status meetings shall have begun to be held.

## C. Child Safety

1. By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants shall conduct an assessment of the FM fatality, including an assessment of any failings by Defendants in the provision of foster care services, in case practice, and in licensing practice. The written assessment shall be provided to the Monitor and Plaintiffs and shall include recommendations for ways to improve child safety and address any identified failings.

2. Defendants shall have developed and begun implementing a plan to ensure that DFCS utilizes standardized decision-making criteria for prioritizing, screening, and assessing all reports of maltreatment of children via centralized intake.

3. Defendants shall have developed the training and processes required for:

   a. review of in-care maltreatment investigations to identify case practice deficiencies;

   b. identification of remedial actions necessary to ensure the safety of the child who is the subject of the investigation as well as any other child in the home or placement;

   c. identification of any corrective action that is necessary to address deficiencies in case practice demonstrated by the investigation;

   d. monitoring of the initiation and completion of the remedial actions regarding individual child safety and notification to the ASWS, Regional Director, and Director of Field Operations when such remedial actions have not been initiated within five (5) days of identification or timely completed; and

   e. monitoring of the initiation and completion of the remedial actions regarding case practice and notification to the ASWS, Regional Director, and Director of Field Operations when such remedial actions have not been initiated within twenty (20) working days of identification or timely completed.

4. The maltreatment investigation review process shall be fully implemented.

**D. Child Placement**

1. By 45 days following the Court's approval of the Modified Settlement Agreement, Defendants shall implement policy to provide resource parents with all appropriate and available information about a child prior to or at the time of placement and for supplementing that information as further information is gathered.

2. Defendants shall develop and begin implementing a plan with specific action steps and timeframes to address changes in the State Office's therapeutic placement process identified as necessary to ensure the most appropriate placement for children in need of therapeutic placement.

**E. Developing and Maintaining Connections**

1. Defendants shall ensure caseworkers are provided training that addresses case practice associated with parent-child and sibling visitation as a component of the Practice Model training.

2. Defendants shall track the frequency of parent-child and sibling visitation in MACWIS.

**F. Physical, Dental, and Mental Health**

1. By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants shall maintain a staff person in the Resource Development Unit whose job responsibility it will be to develop and coordinate a broader and more geographically diverse array of physical, dental, and mental health services available to foster children.

2. The physical, dental, and mental health program manager shall have developed a written plan for increasing the array of services available to foster children.

**G. Educational Services**

1. By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants shall have hired a staff person in the Resource Development Unit whose job responsibility will be to promote and coordinate educational services including tutoring, preparation for a general equivalency diploma (GED), and college preparation available to foster children.

2. By September 1, 2012, Defendants shall have developed a protocol and associated caseworker training for conducting a review of a child's educational record for the purpose of identifying the child's general and, if applicable, special educational needs.

**H.  Transition to Independent Living**

1.  By 30 days following the Court's approval of the Modified Settlement Agreement, Defendants shall develop a current resource guide necessary to assist youth in locating and/or enrolling in educational or vocational programs appropriate to their needs, interests, abilities, and goals, such as high school or GED programs, colleges or universities, vocational training programs, and special education services.  This guide shall provide information on resources for all regions.

2.  By 45 days following the Court's approval of the Modified Settlement Agreement, all youth ages sixteen (16) and older in DFCS custody shall have been offered a copy of the resource guide.

**I.  Recruitment and Retention of Resource Families and Therapeutic Service Providers**

1.  By September 30, 2012, Defendants shall meet the Year 2 requirements as set forth in its implementation plan for the Diligent Recruitment of Families for Children as shown in attached Appendix "D." The implementation plan for the Diligent Recruitment of Families for Children shall become an enforceable part of this Period 3 Implementation Plan.

2.  In consultation with Mississippi resource parents, Defendants shall identify additions and revisions to the current resource parent training curriculum that are necessary to adequately train resource parents to meet the needs of the children placed in their care.  Resource parent training classes based upon the revised curriculum shall be available in every region.

**APPENDIX "C"**

Modified Mississippi Settlement Agreement and Reform Plan

**Proposed Data Reports Schedule - Period 3 Implementation Plan**[1]

| Data Report | MACWIS Report Number, Manual Report, or FCR | Current or Projected Availability |
|---|---|---|
| Number of Children in Foster Care by Placement Type. | MWZ0510 | Currently Available |
| Number of Licensed Foster Family Homes. | MWZRESL | Currently Available |
| During trial home visit period, child's caseworker or a Family Preservation caseworker meets with child in the home at least twice a month. *(MSA III.B.8.b)* | MWLS54A | Currently Available |
| Investigations of reports of maltreatment of children in DFCS custody must be initiated within 24 hours. *(MSA II.B.1.e.2)* | MWZ1271 | Currently Available |
| Investigations of reports of maltreatment of children in DFCS custody must be completed within 30 calendar days, including supervisory approval. *(MSA II.B.1.e.2)* | MWZ1271 | Currently Available |
| Children remaining in the same out-of-home placement following an investigation into a report of maltreatment are visited by a DFCS caseworker twice a month for 3 months. *(MSA II.B.1.e.3)* | MWLS55SA | Currently Available |
| No child shall remain in an emergency/temp facility for more than 45 calendar days (exceptions may apply). *(MSA II.B.2.k)* | MWLS50D | Currently Available |
| No child under 10 will be placed in a congregate care setting unless the child has exceptional needs that can't be met in a relative or foster family home (other conditions may apply.) *(MSA II.B.2.m)* | MWLS52HS | Currently Available |
| Sibling groups, in which there is at least one sibling under age 10, will not be placed in congregate care settings for more than 45 days. *(MSA II.B.2.m)* | MWWLS53HS | Currently Available |
| No child will be placed in more than 1 emergency/temp facility within 1 episode of foster care (exceptions may apply). *(MSA II.B.2.o)* | MWLS51D/S | Currently Available |
| For children with goal of reunification, the assigned DFCS caseworker will meet with the child's bio parents at least once a month to assess service delivery and achievement. *(MSA II.B.5.b) (MSA III.B.3.d.2)* | MWZWCR3 | Currently Available |
| A DFCS caseworker will visit the home of non-therapeutic resource parents, who have at least 1 foster child residing in the home, at least once a month *(MSA II.B.5.c)* | MWZPLMC | Currently Available |

[1] Appendix "C" will be updated, as needed, for each year's Implementation Plan.

**APPENDIX "C"**
Modified Mississippi Settlement Agreement and Reform Plan

| Data Report | MACWIS Report Number, Manual Report, or FCR | Current or Projected Availability |
|---|---|---|
| A DFCS caseworker will visit the home of therapeutic resource parents, who have at least 1 foster child residing in the home, at least once a month *(MSA II.B.5.c.)* | MWZPLMB | Currently Available |
| Children in care fewer than 12 months from time of latest removal from home shall have had 2 or fewer placements. *(MSA II.C.1)* | MWZPLM5S | Currently Available |
| The rate of abuse/maltreatment in care in the last year *(MSA II.C.2)* | MWBRD06 | Currently Available |
| A child's permanency plan will be reviewed in a court or administrative case review at least every 6 months. *(MSA III.B.3.c.1)* | MWZTACR | Currently Available |
| DFCS will take reasonable steps to ensure a court review is held for children in custody within 12 months of initial placement and annually thereafter. *(MSA III.B.3.c.2)* | MWZTPHR | Currently Available |
| Children who've spent more than 17 of the previous 22 months in foster care without a TPR petition filed or exception documented shall have a petition filed or exception noted. *(MSA III.B.3.e.1)* | MWZ014D1 and MWZ014D2 | Currently Available |
| Children in custody, ages 14-20, shall be provided with independent living services as set forth in their service plans. *(MSA III.B.7.b)* | MWBRD16 | Currently Available |
| Children discharged and reunified in the last year shall have been reunified within 12 months of latest removal. *(MSA III.C.1)* | MBWRD05 | Currently Available |
| Number of Pending Foster Family Homes. | MWZRESPD | Currently Available |
| Child's permanency plan will be developed within 30 calendar days of initial placement and documented in the child's case record.  *(MSA III.B.3.a.1-2)* | MWLS312D | Currently Available |
| Assigned DFCS caseworker (COR or COS) will meet with child in person and, where age appropriate, alone at least twice a month to assess child's safety and wellbeing.  At least 1 visit during the month will take place in the child's placement.  *(MSA II.B.5.a)* | MWZWC5D | Currently Available |
| New caseworkers/supervisors complete their training requirements before assuming their responsibilities.  *(MSA II.A.2.c.2-3)*[2] | Manual Report | 90 days after start of IP3 |
| Caseworkers shall carry a caseload that doesn't exceed Plan requirements. *(MSA II. A.2.a.1)* | Manual Report | 120 days after start of IP3 |
| Caseworkers do not carry a caseload exceeding 2x the caseload requirements. *(MSA II.A.2.a.1)* | Manual Report | 120 days after start of IP3 |

[2] Quarterly Report

**APPENDIX "C"**

Modified Mississippi Settlement Agreement and Reform Plan

| Data Report | MACWIS Report Number, Manual Report, or FCR | Current or Projected Availability |
|---|---|---|
| Supervisors, responsible for supervising caseworkers, shall be responsible for supervising no more than 5 caseworkers. *(MSA II.A.2.a.6)* | Manual Report | 120 days after start of IP3 |
| Children discharged in last year on finalization of adoption shall have had the adoption finalized within 24 mo. of latest removal from home. *(MSA III.C.2)* | MWBRD10 | Currently Available |
| Children shall be placed within their own county or within 50 miles of the home from which they were removed (with exceptions).  *(MSA II.B.2.g)* | MWLS314 | 06/15/12 |
| Children entering foster care shall receive a health screening evaluation from a qualified medical practitioner within 72 hours of placement. *(MSA II.B.3.a)* | MWLS315 | 06/15/12 |
| Within 30 calendar days of placement in foster care, children shall receive a comprehensive health assessment.  *(MSA II.B.3.b)* | MWLS315 | 06/15/12 |
| Children reaching the point at which they have spent 17 of previous 22 months in foster care during the period shall have TPR petition filed or exception documented by the last day of the 17th month *(MSA III.B.3.e.1)* | MACWIS Report Number TBD | 07/11/12 |
| Siblings who enter placement at/near the same time are placed together (with exceptions).  *(MSA II.B.2.h)* | MWLS316 | 07/15/12 |
| Children in custody are provided with contacts with their parents/siblings not in same placement within 24 hours of placement (exceptions may apply). *(MSA III.B.5.b)* | MACWIS Report Number TBD | 07/15/12 |
| Children are not placed in a foster care setting that has not been licensed or approved as meeting DFCS licensure standards unless placed pursuant to relative licensing process. *(MSA II.B.2.a)* | MWZ0151 | 7/31/12 |
| Children with special needs shall be matched with placement resources that can meet their therapeutic and medical needs. *(MSA II.B.2.e)* | FCR | 12/31/12 |
| Children are placed in the least restrictive setting that meets his/her individual needs as determined by a review of all intake, screening, assessment and prior placement information on the child available at the time of placement. *(MSA II.B.2.f)* | FCR | 12/31/12 |
| No later than time of placement, DFCS will provide resource parents/facility staff with foster child's current available medical, dental, educational and psychological information (including certain specific info). *(MSA II.B.2.i)* | FCR | 12/31/12 |

3

**APPENDIX "C"**
Modified Mississippi Settlement Agreement and Reform Plan

| Data Report | MACWIS Report Number, Manual Report, or FCR | Current or Projected Availability |
|---|---|---|
| DFCS will take all reasonable steps to avoid disruption of appropriate placements and ensure placement stability; if worker has knowledge of disruption possibility, s/he must convene FTM immediately. *(MSA II.B.2.j)* | FCR | 12/31/12 |
| Children shall have a family assessment³ completed within 30 calendar days of the child's entrance into custody which is documented in the child's case record. *(MSA III.B.1.a)* | FCR | 12/31/12 |
| Foster children will receive recommended mental health services pursuant to his/her assessment. *(MSA II.B.3.f)* | FCR | 12/31/12 |
| Foster children shall be provided with needed follow-up developmental services. *(MSA II.B.3.g)* | FCR | 12/31/12 |
| DFCS caseworkers will screen children for general/special educational needs within 30 calendar days of his/her entry into foster care. *(MSA III.B.6.a)* | FCR | 12/31/12 |
| DFCS shall take reasonable steps to ensure that school-age foster children are registered for and attending accredited schools within 3 business days of initial placement or other placement changes (including shelters or other temp placements unless delayed by Youth Court). *(MSA III.B.6.b)* | FCR | 12/31/12 |
| Children requiring thera. and/or rehab. foster care services (because of diagnosis of significant medical, developmental, emotional or behavioral problems) have been provided a treatment plan and services in accordance with the plan. *(MSA II.B.4.a)* | FCR | 12/31/12 |
| In cases where the whereabouts of one/both parents is unknown, DFCS will immediately institute a diligent search for the parents which shall be documented in the child's case record. *(MSA III.B.1.b)* | FCR | 12/31/12 |
| Within 30 days of a child's entrance into foster care, the caseworker will convene a team meeting with specified parties to develop service plans. *(MSA III.B.2.a)* | FCR | 12/31/12 |
| Service plans shall be reviewed and updated quarterly at a team meeting and within 30 days of a placement change. *(MSA III.B.2.b)* | FCR | 12/31/12 |
| Appropriate permanency goals include: no goal of permanent foster care; durable legal custody only after other goals are ruled out; and conditions for APPLA. *(MSA III.B.3.a.3-5)* | FCR | 12/31/12 |

---

³ This assessment will become the Comprehensive Family Assessment as regions fully implement the Practice Model.

4

**APPENDIX "C"**
Modified Mississippi Settlement Agreement and Reform Plan

| Data Report | MACWIS Report Number, Manual Report, or FCR | Current or Projected Availability |
|---|---|---|
| For children with goals of reunification, DFCS will engage in concurrent planning within the 1st 6 months of custody *(MSA III.B.3.b.1)* | FCR | 12/31/12 |
| Youth in custody transitioning to independence shall have available:  an adequate living arrangement;  a source of income;  health care;  IL stipends;  education/training vouchers. *(MSA III.B.7.c)* | FCR | 12/31/12 |
| Children in custody will receive periodic medical exams and all medically necessary follow-up services/treatment throughout the time they are in State custody. *(MSA II.B.3.d)* | FCR | 12/31/12 |
| Children, 4 years and older, shall be provided a mental health assessment by a qualified professional within 30 calendar days of foster care placement.  *(MSA II.B.3.f)* | FCR | 12/31/12 |
| Children, birth-3 years, will be provided a developmental assessment by a qualified professional and each child older than age 3 shall be provided with a developmental assessment if factors indicate such an assessment is warranted.  *(MSA II.B.3.g)* | FCR | 12/31/12 |
| Children, age 3 and older, shall be provided a dental exam within 90 calendar days of foster care placement and every 6 months thereafter. *(MSA II.B.3.e)* | FCR | 12/31/12 |
| Children reaching age 3 in care shall be provided a dental exam within 90 days of his/her 3rd birthday and every 6 months thereafter. *(MSA II.B.3.e)* | FCR | 12/31/12 |
| Supervisors shall receive a minimum of 24 hours annual on-going, in-service training.  *(MSA II.A.2.c.4)* | Manual Report | 12/31/12 |

5

**APPENDIX "D"**
Modified Mississippi Settlement Agreement and Reform Plan

| Mississippi Diligent Recruitment of Families for Children<br>**Implementation Plan - Phase II, Version A** | | | | | | |
|---|---|---|---|---|---|---|
| **Cooperative Agreement Items** | **Goal/Activity** | **Year 2** | **Year 3** | **Year 4** | **Year 5** | **Responsibility** |
| **1. Recruitment Activities** | | | | | | |
| **A. Targeted Recruitment: Market Segmentation** | | | | | | |
| D,E,F | 1. Map current resources against predicted need based on survey analysis | X | X | | | Evaluator; CSF; Project Team |
| D,E,F | 2. Generate a series of maps showing where recruitment activities should be directed | X | X | | | Evaluator; CSF; Project Team |
| D,E,F | 3. Identify specific mediums of communication most used by potential resource families in identified recruitment areas | X | X | | | Evaluator; CSF; Project Team |
| D,E,F | 4. Identify Specific recruitment strategies for engaging targeted families | X | X | | | Evaluator; CSF; Project Team |
| D,E,F | 5. Prioritize recruitment plans for most critical needs of children entering care | X | X | | | Evaluator; CSF; Project Team |
| **B. Targeted Recruitment Diligent Recruitment Specialists** | | | | | | |
| J,K,U | 1. Evaluate current training | X | | | | Project Team |
| J,K,U | 2. Identify areas needing development & strengthening | X | | | | Project Team; CSF; Training Unit |
| J,K,U | 3. Determine areas that should be included in pre-service and/or in-service training | X | | | | Project Team; CSF; Training Unit |
| J,K,U | 4. Make modifications as necessary | | X | | | Project Team |
| J,K,U | 5. Develop a plan to ensure diversity training is offered on a consistent basis | | X | X | X | Project Team; Training Unit |

**APPENDIX "D"**
Modified Mississippi Settlement Agreement and Reform Plan

| Cooperative Agreement Items | Goal/Activity | Year 2 | Year 3 | Year 4 | Year 5 | Responsibility |
|---|---|---|---|---|---|---|
| D,E,F | 6. Develop a plan for disseminating market segmentation information to regions & private agencies | X | X | | | Project Director |
| D,E,F | 7. Disseminate market segmentation data including family portraits and recruitment strategies reports to Regional Implementation Teams | X | X | | | Recruitment Support Specialists |
| D,E,F | 8. Develop or update Regional Recruitment Plans based on market segmentation data including family portraits and recruitment strategies reports | X | X | | | Recruitment Support Specialists; Regional Implementation Team |
| D,E,F | 9. Develop and implement a plan for including LPCAs in targeted recruitment activities | X | X | | | Project Team |
| D,E,F | 10. Recruitment Support Specialists will act as supports to the regions and LCPAs and assist in securing tools necessary to implement recruitment strategies outlined Regional Recruitment Plans | X | X | X | X | Recruitment Support Specialists |
| **C. Child Specific Recruitment** | | | | | | |
| D,E,G,P,Q | 1. Fully implement the expedited licensure process for related resource homes | | X | | | Project Team; Policy Director |
| D,E,P,Q | 2. Evaluate Mississippi's current utilization of AdoptUSKids adoption photo listing exchange | | X | | | Project Director; State Co-Leads |
| D,E,P,Q | 3. Determine feasibility to modify current usage of AdoptUSKids photo exchange for both children in care and resource parents. | | X | | | Project Director; State Co-Leads |
| D,E,P,Q | 4. Develop Mississippi statewide adoption photo exchange if needed | | | X | | Project Director; State Co-Leads |
| **D. General Recruitment** | | | | | | |
| D,E,G | 1. Develop plan for ensuring inquires from prospective resource families are handled in a timely and  consistent manor | X | | | | Project Team |

**APPENDIX "D"**
Modified Mississippi Settlement Agreement and Reform Plan

| Cooperative Agreement Items | Goal/Activity | Year 2 | Year 3 | Year 4 | Year 5 | Responsibility |
|---|---|---|---|---|---|---|
| D,E,G | 2. Implement plan for ensuring inquiries from prospective resource families are handled in a timely and consistent manor | | X | X | | Project Team |
| D,E,G | 2. Establish a toll-free number for prospective resource families to call | | X | | | Project Director; State Co-Leads |
| D,E,G | 3. Add to MDHS web site to address recruitment | X | | | | Project Director; State Co-Leads; CSF |
| D,E,G | 4. Develop and implement statewide broadcast activities | | | X | X | Project Team, Grant Implementation Team, CSF |
| L | 5. MDHS has 3 Spanish translators on staff and that they are available to assist staff in working with clients and in translating materials | X | X | X | X | DFCS Translators |
| T | 6. MDHS Practice Model implementation moves the program towards a philosophy of working on permanency from the first day children enter the child welfare system | X | X | X | X | CSF; Project Team; Field Staff; Regional Resource Staff |
| **2. Resource Licensure** | | | | | | |
| **A. Resource Applicants** | | | | | | |
| H | 1. Define current application process | X | | | | Project Director; State Co-Leads |
| H | 2. Develop and implement internal tracking procedures to monitor application process | X | | | | Evaluator; Project Director |
| H | 3. Train resource staff on utilization of internal tracking tools | X | X | | | Project Director; Recruitment Support Specialists |

**APPENDIX "D"**
Modified Mississippi Settlement Agreement and Reform Plan

| Cooperative Agreement Items | Goal/Activity | Year 2 | Year 3 | Year 4 | Year 5 | Responsibility |
|---|---|---|---|---|---|---|
| H | 4. Develop and implement exit survey to identify dropout rates/reasons at various states of the process | X | | | | Evaluator; Project Team |
| H | 5. Adapt procedures for receiving and responding to applications and inquires based on data | | X | | | Evaluator; Project Team |
| H | 6. Train resource staff on skills and strategies for responding to inquires and retaining families throughout the licensure process | X | X | | | Project Team |
| H | 7. Design and implement coaching process to ensure resource staff are using learned skills and strategies | X | | | | Project Team; Director of Field Operations |
| **B. Resource Family Training** | | | | | | |
| I,K,U | 1. Evaluate current training in regards to characteristics, needs & issues of children in care/adoption clinical issues | | X | | | Project Team |
| I,K,U | 2. Modify training or develop additional training as needed | | | X | | Project Team; Grant Implementation Team work group |
| I,K,U | 3. Address shared parenting and supporting family relationships | X | X | X | X | Project Team; Regional Resource Staff |
| **C. Home Study Format** | | | | | | |
| N | 1. Evaluate current home study format | X | | | | Project Director; State Co-Leads; MACWIS |
| N | 2. Identify a home study format that would provide necessary information in a consistent manner | X | | | | Project Director; State Co-Leads |
| G,N | 3. Develop plan to ensure all resource workers are utilizing the same home study format | | X | | | Project Director; State Co-Leads |

**APPENDIX "D"**
Modified Mississippi Settlement Agreement and Reform Plan

| Cooperative Agreement Items | Goal/Activity | Year 2 | Year 3 | Year 4 | Year 5 | Responsibility |
|---|---|---|---|---|---|---|
| G,N | 4. Provide training to resource staff on revised home study format | | X | | | Project Director; State Co-Leads |
| G,N | 5. Design coaching process to ensure resource staff are using learned skills and strategies | | X | | | Project Team; Director of Field Operations |
| **D. Home Study Process** | | | | | | |
| G | 1. All prospective parents currently have access to the home study process | X | X | X | X | Project Team; Regional Resource Staff |
| E,G | 2. Ensure home studies are completed in a timely manner | X | X | X | X | Evaluator; Project Team; Regional Resource Staff |
| E,G,N,O | 3. Mississippi Resource homes are licensed for both foster care and adoption in a single application process which facilitates concurrent planning. | X | X | X | X | Regional Resource Staff |
| **3. Customer Service Model** | | | | | | |
| H,I,P | 1. Schedule site visit with AdoptUSKids | X | | | | Project Director |
| H,I,P | 2. Determine which staff members will participate in AUK "train the trainer" site visit | X | | | | Project Director; State Co-Leads; Training Unit |
| H,I,P | 3. Develop and Implement plan for providing customer service model training to MDHS field staff | X | X | | | Project Director; State Co-Leads; Training Unit |
| H,I,P | 4. Make needed changes to policy and procedure to include customer service related issues | | X | | | Project Director; State Co-Leads; Policy Director |
| H,I,P | 5. Ensure customer service model techniques are being implemented by staff and are sustainable. | | X | X | X | Project Team; Field Operations |

**APPENDIX "D"**
Modified Mississippi Settlement Agreement and Reform Plan

| Cooperative Agreement Items | Goal/Activity | Year 2 | Year 3 | Year 4 | Year 5 | Responsibility |
|---|---|---|---|---|---|---|
| **4. Contract with the Licensed Child Placing Agencies** | | | | | | |
| R | 1. Release RFP | X | | | | Congregate Care Director; Permanency Unit Director; DFCS Finance and Administration |
| R | 2. Review proposals | X | | | | Congregate Care Director; Permanency Unit Director; DFCS Finance and Administration |
| R | 3. Prepare contracts and issue | X | | | | Congregate Care Director; Permanency Unit Director; DFCS Finance and Administration |
| R | 4. Plan for contract monitoring | | X | X | X | Congregate Care Director; Permanency Unit Director; DFCS Finance and Administration |
| **5. Family/Child Matching** | | | | | | |
| **A. Characteristics of Children in Care** | | | | | | |
| A,Q | 1. Establish baseline and benchmarks 3-6 months prior to regional implementation roll out | X | X | | | Evaluator; Project Team |
| A,Q | 2. Aggregate data by county & make available to regions, counties, and private agencies | X | X | | | Evaluator; Project Team |
| A,Q | 3. Develop and implement plan for consistently updating the characteristics of children in care | | X | X | X | Project Director; State Co-Leads, MACWIS; Evaluator |
| A,Q | 4. Work with MACWIS to ensure regular characteristic reports are available | | | X | X | Project Director; State Co-Leads, MACWIS; Evaluator |
| A,Q | 5. Address characteristics of children in care and their placement needs though regular placement committee meetings | | | X | X | Project Team; Regional Resource Staff |

**APPENDIX "D"**
Modified Mississippi Settlement Agreement and Reform Plan

| Cooperative Agreement Items | Goal/Activity | Year 2 | Year 3 | Year 4 | Year 5 | Responsibility |
|---|---|---|---|---|---|---|
| **B. Resource Family Characteristics** | | | | | | |
| B,Q | 1. Develop and implement plan for consistently updating the characteristics of licensed resource families | | X | | | Project Team; CSF; Evaluator |
| B,Q | 2. Develop a database of characteristics of current resource families by county | | X | X | X | Project Team; Evaluator; CSF, MACWIS |
| B,Q | 4. Work with MACWIS to ensure regular resource family characteristic reports are available | | X | X | X | Project Team; Evaluator; CSF, MACWIS |
| B,Q | 5. Address placement needs by matching children with families though regular placement committee meetings | X | X | X | X | Project Team; Regional Resource Staff |
| **8. Collaboration/Public-Private Partnerships** | | | | | | |
| C | 1. Use consumer data to determine communities with highest placement rates by zip code | X | X | | | CSF; MACWIS; Project Team |
| C | 2. Identify prospective neighborhoods for recruitment activities | X | X | | | CFS; Project Team |
| C | 3. Adapt Regional Implementation Plans to address community outreach | X | X | X | X | Project Team; Regional Resource Staff |
| C | 4. Adapt staff and resource families to include/work with community partners | X | X | X | X | Project Team; CSF; Regional Resource Staff |
| **10. Website** | | | | | | |
| I,K,Q,U | 1. Consult with MACWIS related to website modification and development | | X | | | Project Director; State Co-Leads; CSF; MACWIS |
| I,K,Q,U | 2. Assess information currently available on MDHS website | | X | | | Project Director |

**APPENDIX "D"**
Modified Mississippi Settlement Agreement and Reform Plan

| Cooperative Agreement Items | Goal/Activity | Year 2 | Year 3 | Year 4 | Year 5 | Responsibility |
|---|---|---|---|---|---|---|
| I,K,Q,U | 3. Identify what type of modifications and additions are needed | | X | | | Project Team; MACWIS; CSF |
| I,K,Q,U | 4. Gather or develop needed information | | X | | | Project Team; MACWIS; CSF |
| I,K,Q,U | 5. Develop a plan for adding and maintaining information | | | X | | Project Director; MACWIS; CSF |
| **11. Evaluation Activities** | | | | | | |
| | 1. See attached evaluation plan | X | X | X | X | Evaluator |