IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION


OLIVIA Y., *et al.*                                                        PLAINTIFFS


v.                                                        CIVIL ACTION NO.  3:04CV251LN


PHIL BRYANT, as Governor of the State of Mississippi, *et al.*        DEFENDANTS

---

## THE COURT MONITOR'S STATUS REPORT TO THE COURT
## REGARDING PROGRESS DURING PERIOD THREE

---

**Table of Contents, Report Narrative,
Index to Exhibits, and Appendix: Exhibits 1 - 40**


**January 25, 2013**

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................1

II.     BACKGROUND ................................................................................................4

        A.  Progress During Period 1, Period 2 and The Bridge Period.........................5

        B.  Contempt Proceedings ...................................................................................8

        C.  The Modified Settlement Agreement and Period 3 Implementation Plan.....9

III.    PROGRESS DURING PERIOD 3 ....................................................................13

IV.     CONCLUSION.................................................................................................45

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

OLIVIA Y., *et al*.                                                    PLAINTIFFS

v.                                    CIVIL ACTION NO.  3:04CV251LN

PHIL BRYANT, as Governor of the State of Mississippi, *et al.*            DEFENDANTS

---

## THE COURT MONITOR'S STATUS REPORT TO THE COURT REGARDING PROGRESS DURING PERIOD THREE

---

This status report is submitted to the Court pursuant to §VI.B. of the Modified Mississippi Settlement Agreement and Reform Plan ("MSA") approved by the Court on July 6, 2012.  A draft version of this report was provided to the parties for review and comment on January 10, 2013.  All written comments were submitted to the Court Monitor ("Monitor") by January 18, 2013.  The Monitor has considered the parties' comments, and to the extent appropriate, addressed them in this revised report.

## I.    <u>INTRODUCTION</u>

In early January 2008, the Court approved the Mississippi Settlement Agreement and Reform Plan ("Settlement Agreement").  At that time, the Court and parties envisioned a five-year reform process:  four, year-long implementation periods and one additional year during which defendants would maintain performance at required Settlement Agreement levels.  The additional year would have started in January 2013.  As documented in the Monitor's prior

reports, defendants did not achieve progress in this case as the parties initially envisioned and the Court ordered at the outset of 2008.

The first two years of this case were characterized principally by defendants achieving minimal progress with court-ordered requirements. In response, in 2010 the parties agreed to a short-term corrective action plan, which substantially narrowed defendants' obligations, focused on basic capacity building, and required defendants to engage outside expertise to assist them in advancing their reform efforts. Although defendants made progress during this period and satisfied most of the corrective action requirements, relative to the breadth of their obligations under the Settlement Agreement, their progress was not substantial. In October 2010, plaintiffs filed a motion requesting the Court find defendants in contempt and appoint a receiver. In May 2011, the Court found that defendants did not meet most of the court-ordered requirements, but declined to make a finding of contempt and to appoint a receiver. Instead, the Court directed the parties to modify the Settlement Agreement. Thus, after a period of negotiation, the parties agreed to the MSA, which the Court approved in July 2012.

The requirements of the MSA, approved over four years after the Settlement Agreement, indicate that despite years of reform efforts, defendants continued to grapple with fundamental organizational deficits that, unless corrected, would prevent them from meeting their court-ordered obligations. Persistent staffing shortages, a woefully inadequate information management system, and, at various points, the absence of a complete and permanent executive leadership team, all of which hamstrung defendants in 2008, continued to undermine defendants' efforts in 2012. Hence, the MSA included numerous remedial actions that were required but never implemented by the defendants in the 2008 Settlement Agreement.

At the same time, however, the MSA incorporated a change in defendants' reform strategy.  Since 2010, defendants' efforts have been marked by the implementation of entirely new business practices, referred to as the "practice model," which defendants are phasing in across the state, over time, on a regional basis.  The MSA defers to defendants' chosen reform strategy by holding in abeyance many performance requirements statewide in order for the defendants to implement the practice model at the regional level, and it provides for the more immediate implementation of a series of requirements intended to ensure child safety.  In addition, it holds in abeyance the measurement of performance at the regional level until defendants have fully implemented the practice model in a given region.  This strategy will enable defendants to roll out their reforms in more manageable pieces, which could allow them to learn from their mistakes in given regions; build a base of expertise in early-implementing regions that could be used in later-implementing regions; and identify and correct issues on a regional basis prior to being held accountable for performance outcomes.

The MSA has been in effect for approximately six months.  The first two regions to fully implement the practice model became accountable for their performance pursuant to the MSA in September 2012 and are currently in a data-tracking year.  Thus, at this point, it is premature to fully assess their performance.

Insofar as statewide requirements, pursuant to the MSA, defendants have continued, and in some instances made further progress, increasing caseworker staffing levels; updating the Mississippi Department of Human Services ("MDHS") Division of Family and Children's Services' ("DFCS") policy and procedure manual; implementing a viable pre-service training program for newly-hired caseworkers and supervisors that is based on an updated curriculum; building a promising continuous quality improvement ("CQI") program and conducting data

collection and evaluation activities on an on-going basis; meeting certain prerequisites to obtaining accreditation from the Council on Accreditation ("COA");[1] and delivering other training programs required by the Period 3 Implementation Plan ("Period 3 IP") to key staff members.  These are significant initiatives that will pay dividends in the short and long run.

Nevertheless, after five years marked by repeated delays and unsuccessful efforts to meet court-ordered requirements, defendants now must act deliberately to hasten their progress under the MSA.  This report focuses on a narrow, but crucial, series of requirements in the MSA, several of which the Monitor has reported on in the past.  In particular, the report describes defendants' progress hiring sufficient numbers of caseworkers and supervisors, replacing their management information system, and producing accurate, validated data reports.  It also addresses the status of implementation of the practice model.

Although only six months have lapsed since the MSA was approved, already it is apparent that defendants are not accelerating sufficiently the pace of their efforts with respect to several key areas.  As explained below, in light of the considerable risk of harm to children in defendants' custody, there is an urgent need to do so.

## II.    BACKGROUND

The Settlement Agreement was approved by the Court on January 4, 2008.  It was intended to ensure the safety and well-being of children in defendants' custody and their timely placement in permanent and nurturing homes.   The Settlement Agreement mandated an incremental remedial process that measured progress in terms of annual benchmarks and interim milestones.  The benchmarks were established in the Settlement Agreement and the interim milestones were embodied in a series of annual implementation plans that were developed

---

[1]  COA is an independent, non-profit, accrediting organization that accredits human services entities, including public sector child and family services agencies.

collaboratively by the parties. The interim milestones constituted the steps and corresponding timelines that were to be accomplished each year to achieve the benchmarks and ultimately satisfy the Settlement Agreement's requirements. Each implementation plan was incorporated into the Settlement Agreement.[2] This structure allowed the parties and the Court to measure progress over time according to clearly defined standards, affording the flexibility to develop annual requirements based on current information about defendants' performance.

Since January 2008, the defendants were ordered to implement three annual implementation plans and a corrective action plan. Defendants' performance related to these requirements is summarized below.

### A. Progress During Period 1, Period 2 and The Bridge Period

The first implementation plan, referred to as the Period 1 Implementation Plan ("Period 1 IP"), extended from January 4, 2008 through April 30, 2009.[3] As explained in the Monitor's June 2009 Report, the Period 1 requirements focused on building the capacity of MDHS/DFCS to achieve the Settlement Agreement's goals and outcomes, and also addressed interim initiatives related to child safety.[4]

As a threshold matter, because DFCS did not have the management capacity to implement the reforms mandated by the Settlement Agreement, defendants were required to appoint a qualified director for DFCS who could recruit a management team capable of assisting with the reform process.[5] As the management team was established, Period 1 requirements contemplated that key elements of the agency's infrastructure would be built through specified

---

[2] Settlement Agreement §I.B.
[3] Period 1 was extended on two occasions pursuant to consent orders issued on January 6, 2009 and March 27, 2009. *See The Court Monitor's Report to the Court Regarding Defendants' Progress Toward Meeting Period-1 Requirements*, filed June 5, 2009 [hereinafter *June 2009 Report*], at 9 for a discussion of the relevant background.
[4] *June 2009 Report* at 76-83.
[5] Settlement Agreement §II.A.1. and Period 1 IP §I.1.

initiatives and/or a planning process based on a series of assessments.  In addition to

strengthening management functions, capacity building required during Period 1 included:

1) finalizing DFCS policies and procedures to ensure consistency with the Settlement

Agreement; 2) implementing a method for measuring and tracking caseworker and supervisory

workloads; and 3) establishing an employee Training Unit.[6]  Period 1 requirements also

mandated a reform planning process based on assessments of DFCS's administrative and

management operations, including an assessment of the Mississippi Automated Child Welfare

Information System ("MACWIS"),[7] and of the service delivery system for children and families.[8]

These were considered building blocks defendants needed to put in place before they could

achieve sustainable progress toward improving outcomes.

       The defendants made limited progress meeting Period 1 requirements,[9] and as a result

they were required to meet many Period 1 requirements during Period 2.[10]  Period 2 began on

May 1, 2009 and ended on April 30, 2010.  As described in the Monitor's September 2010

Report, defendants made efforts to satisfy many Period 2 requirements, but in large part these

---

[6]  Other capacity building required during Period 1 included implementation of a separate CQI system, Settlement Agreement §II.A.3., and implementation of a performance-based contracting system, Period 1 IP §I.3.

[7]  Assessments of the workforce, training curricula, contracting practices, the CQI system, and fiscal and financial management also were required.

[8]  The assessments of foster care services included reunification, independent living, foster care support, and medical, dental and mental health services, as well as case processing and practices related to termination of parental rights [hereinafter TPR], parent/child and sibling visitation, reports of child maltreatment, and the DFCS placement array.  Generally, the goal for these assessments was to identify any critical shortcomings in the administrative, management and service delivery systems and to use these data to inform planning for remedial strategies that were required to be introduced during either Period 1 or Period 2.

[9]  Defendants restructured the DFCS executive management team to align it more closely with the principles of family-centered practice and reorganized the management structure of the agency from seven regions into 13 regions in order to strengthen accountability and more readily introduce reform initiatives.  Because of a substantial budget increase, DFCS caseworker and supervisory staffing levels increased and many required management positions were filled.  Defendants also made progress toward meeting many, albeit not all, accreditation requirements imposed by the Settlement Agreement pursuant to COA standards.  Like the Settlement Agreement, the MSA requires defendants to obtain COA accreditation.  *See* Settlement Agreement §IV; MSA §IV.

[10]  *June 2009 Report* at 4.  These unmet requirements included finalizing DFCS policies and procedures, establishing pre-service and in-service training programs for caseworkers and their supervisors, and remediating shortcomings in MACWIS in order to produce accurate, complete and reliable data related to the Settlement Agreement's requirements.

efforts were belated and, at least in some circumstances, they were not minimally adequate.[11]

Moreover, in certain instances, there was no evidence of credible efforts to satisfy Period 2

requirements,[12] including requirements that defendants had been ordered to satisfy during Period

1.[13]  Several months following the end of Period 2, the Monitor reported that defendants had not

acquired the basic tools to manage and promote the reform effort effectively, and thereby could

not provide a reasonable assurance the Settlement Agreement's requirements would be

satisfied.[14]

     In light of the limitations in defendants' performance, instead of developing a Period 3 IP,

the parties finalized an agreement on specific corrective action measures that defendants were

required to implement according to a series of deadlines between May 1 and September 1,

2010.[15]  This agreement, referred to as the "Bridge Plan," was approved by the Court in an

Agreed Order issued on June 10, 2010.[16]  The Agreed Order expressly recognized that its terms

did not preclude plaintiffs from proceeding with an enforcement action for any violation of

Period 2 requirements following the conclusion of the Bridge Period.[17]

     The Bridge Plan emphasized fundamental building blocks that defendants had been

required to implement since Period 1.  It required the defendants to demonstrate the ability to

---

[11]  *See The Court Monitor's Report to the Court Regarding Defendants' Progress Toward Meeting Period 2 Requirements*, filed September 8, 2010 [hereinafter *September 2010 Report*], at 6.

[12]  For example, there was no evidence of credible efforts to develop and implement a written plan to provide services for foster parents in every county (Period 2 IP §II.14.c.), create a resource family workgroup to develop and implement resource family practices and protocols (Period 2 IP §II.14.e.), and regionalize recruitment and retention efforts (Period 2 IP §II.14.f.).

[13]  These requirements included hiring and training adoption specialists (Period 1 IP §II.3.f.; Period 2 IP §II.5.e.4.) and contracting with external adoption specialists (Period 1 IP §II.3.f.; Period 2 IP §II.5.e.3.).

[14]  *September 2010 Report* at 7.

[15]  This four-month period is referred to in the Agreed Order as the "Bridge Period."  Pursuant to §VII.B. of the Settlement Agreement, on April 9, 2010, plaintiffs provided defendants with written notice of noncompliance.  As contemplated by the Settlement Agreement, the parties finalized the agreement for corrective action which, as noted above, was approved by the Court on June 10, 2010.  *See* Settlement Agreement §VII.B. for the full text of the corrective action provisions, which were not modified by the MSA.  *See* MSA §VII.B.

[16]  Conceptually, the Bridge Plan was intended to serve as a bridge between Period 2 and Period 3.

[17]  Agreed Order, June 10, 2010 at ¶11.

satisfy a very narrow sub-set of unmet Period 1 and Period 2 requirements[18] by supplementing their management and planning capabilities through a contract for technical assistance with the Center for the Support of Families ("CSF").[19]  In a November 2010 report, the Monitor found that defendants satisfied most, albeit not all, of the Bridge Plan's requirements,[20] noting that defendants' performance was bolstered by the technical assistance that had been provided by CSF.  In the instances in which defendants fell short, there was demonstrable progress;[21] however, limitations in the planning process and/or deficits in administrative and management systems undercut defendants' performance.[22]

### B.  Contempt Proceedings

On October 5, 2010, based on violations of the Settlement Agreement and the Period 2 Implementation Plan ("Period 2 IP"), plaintiffs filed a motion requesting that the Court find defendants in contempt and appoint a general receiver with full authority to administer Mississippi's child welfare system.[23]  On May 17, 2011, following briefing and a hearing,[24] the Court issued an order denying the motion and directing the parties to work toward a modified agreement.[25]  The Court found that plaintiffs had made a *prima facie* showing of contempt,

---

[18]  The Bridge Plan addressed contracting for a fiscal assessment and related strategic plan to maximize federal funding.  Other requirements included policy development, data collection and reporting, staffing, training, and planning activities related to mandated improvements in the array and quality of services and placements available to children in defendants' custody as well as planning for the expansion of the DFCS workforce.  In addition, the Bridge Plan required specified corrective action related to child safety, including mandated training for all DFCS caseworkers assigned to conduct maltreatment investigations.

[19]  Defendants had an existing contractual relationship with CSF dating to January 2009, when CSF was hired to work with DFCS on the development of a family-centered practice model that was intended to serve as the conceptual framework for required improvements in case practice.  *See infra* at 10 for more detailed background information.  At the time the Agreed Order was finalized, a team of CSF consultants was working with defendants on initial practice model implementation activities.  *See The Court Monitor's November 23, 2010 Report to the Court Regarding the June 10, 2010 Agreed Order for Corrective Action*, filed November 23, 2010 [hereinafter *November 2010 Report*], at 12-13.

[20]  *Id.* at 4-5.

[21]  *Id.* at 3, 63.

[22]  *Id.* at 5-6.

[23]  Plaintiffs' Motion for Contempt and for the Appointment of a Receiver, filed October 5, 2010.

[24]  The hearing was conducted on May 13, 2011.

[25]  Order, filed May 17, 2011, at 10.

recognizing that the defendants had not complied with most of the Period 1 and Period 2 requirements and also had not complied fully with the Bridge Plan.[26]  Nonetheless, the Court did not issue a finding of contempt because it was "apparent to the court that defendants lacked the capability to comply fully, or even substantially, with all the requirements of the Period Two Plan within the time frame established,"[27] and because the Court determined that a contempt finding would not "serve any fruitful purpose."[28]  The Court clarified that by denying the contempt motion, it was not excusing defendants' performance or minimizing the gravity of the problems identified in the motion.[29]  Indeed, the Court asserted "that the shortcomings identified by plaintiffs and the Court Monitor must be confronted and rectified."[30]  Accordingly, the Court directed the parties "to work together, in consultation with the Court Monitor, to craft appropriate modifications of their existing agreements."[31]  Among other directives, the Court required the parties to prioritize goals and objectives and establish realistic timelines for their achievement.[32]

### C.  The Modified Settlement Agreement and Period 3 Implementation Plan

In the wake of the May 17, 2011 order, the parties negotiated the terms of the MSA, which was approved by the Court on July 6, 2012.  The MSA supersedes the initial Settlement Agreement and incorporates the Period 3 IP.[33]  While the MSA includes a relatively small number of changes to the Settlement Agreement's substantive requirements,[34] it reflects a very

---

[26]  The Court noted it was "undisputed" that defendants had failed to comply with "nearly all" of the Period 1 requirements, *id.* at 5-6, and "most" of the Period 2 requirements, *id.* at 4.
[27]  *Id.* at 7.  The Court indicated that the additional requirements and related time frames for meeting these requirements in the Period 2 IP were "highly ambitious" and seemed to be "ultimately unrealistic."  *Id.*
[28]  *Id.* at 10.
[29]  *Id.*
[30]  *Id.* at 9.
[31]  *Id.*
[32]  *Id.*
[33]  *See* MSA, App. B for the text of the Period 3 IP.
[34]  *Compare, e.g.,* Settlement Agreement §II.B.4.e. (requiring all investigations into reports of maltreatment to be completed within 20 days) *with* MSA §II.B.1.e.2. (requiring all investigations into reports of maltreatment to be completed within 30 days); Settlement Agreement §II.B.3.e.1. (requiring submission of a termination of parental rights [hereinafter TPR] packet for children who have spent 15 of the previous 22 months in foster care) *with* MSA

different approach to how the remedial process will be structured as well as how progress will be measured over time.  Significantly, the MSA substantially reduces defendants' obligations to meet many benchmark requirements on a statewide basis for the next several annual implementation periods.  This new approach aligns the MSA with the sequential, region-by-region implementation schedule that is a cornerstone of defendants' "practice model" reform strategy.

A brief description of the practice model and its implementation schedule helps to explain the MSA's structure.  As noted above,[35] in January 2009, defendants contracted with CSF to work with DFCS managers and staff on the development of a family-centered practice model intended to serve as the conceptual framework for required improvements in case practice.  The practice model represents a fundamental change in defendants' business policies and practices, incorporating six categories of activities that are designed to promote safety, permanency and the well-being of children and families.[36]  As conceptualized, implementation of the model is promoted through a data-driven CQI process that is used to monitor each DFCS region's progress.

Defendants elected to introduce the practice model starting in January 2010, over the course of a two-year period, at staggered intervals in each of DFCS's 13 regions.  On a regional basis, the practice model is phased-in through a multi-stage process:  1) a six-month planning phase;[37] 2) a one-year initial implementation stage;[38] and 3) a one-year full/ongoing

---

§III.B.3.e.1. (requiring submission of a TPR packet for children who have spent 17 of the previous 22 months in foster care).
[35] *See supra* note 19.
[36]  The activities fall within the following categories:  1) safety assurance and risk management; 2) strengths and needs assessments; 3) involving children and families in case planning and decision-making; 4) individualizing case planning; 5) mobilizing appropriate services timely; and 6) preserving and maintaining connections.
[37]  Practice model implementation starts with the six-month planning phase.  Among other activities that are expected to occur during this phase, DFCS staff and stakeholders participate in an orientation program.  In addition, barriers to implementation are identified and plans to address the barriers are formulated.  A CQI review is

implementation stage. These stages are followed by a data-tracking year. The practice model

implementation schedule as it appears in the MSA is set forth below:[39]

**Practice Model Rollout Schedule**

| Regions | Implementation Phase Dates | | | |
|---|---|---|---|---|
| | Planning (6 months) | Initial Implementation (One Year) | Full/Ongoing Implementation (One Year)* | Data Tracking (One Year) |
| I-South, II-West | January – June 2010 | July 2010 – June 2011 | Approx. Sept. 2011 – August 2012 | September 2012 – August 2013 |
| V-West | July – December 2010 | January – December 2011 | Approx. March 2012 – February 2013 | March 2013 – February 2014 |
| IV-North | July – December 2010 | January 2011 – June 2012 (18 months) | Approx. Sept. 2012 – August 2013 | September 2013 – August 2014 |
| I-North, III-South, IV-South | January – June 2011 | July 2011 – June 2012 | Approx. Sept. 2012 – August 2013 | September 2013 – August 2014 |
| V-East | July – December 2011 | January – December 2012 | Approx. March 2013 – February 2014 | March 2014 – February 2015 |
| III-North, VII-East | July 2011 – June 2012 (12 months) | July 2012 – June 2013 | Approx. Sept. 2013 – August 2014 | September 2014 – August 2015 |
| II-East, VI, VII-West | July – December 2012 | January – December 2013 | Approx. March 2014 – February 2015 | March 2015 – February 2016 |

Unlike the initial Settlement Agreement, the MSA has two sets of requirements related to

systemic infrastructure standards, foster care service standards and outcome measures. These

requirements are reflected in §§II and III of the MSA.

Section II of the MSA includes two types of requirements that defendants must satisfy:[40]

1) requirements that are subject to statewide performance measures; and, to a lesser degree

---

conducted at the conclusion of the planning phase to establish baseline performance measures, which serve as the basis for measuring progress.

[38] A 12-month initial implementation phase follows on the heels of the planning phase. Among other activities expected to occur in each region during this phase, supervisors and caseworkers are trained on the practice model and participate in an intensive coaching program. Following the initial implementation stage, a two-month period is used for a follow-up CQI review and planning for the full implementation stage based on the preliminary results of the review.

[39] MSA, App. A.

[40] In certain instances, defendants are not required to meet the statewide requirements in §II of the MSA until the end of the remedial phase, and thus there are no interim implementation requirements. *See, e.g.,* MSA §II.A.2.b. In other instances, performance related to some but not all implementation periods is specified. *See, e.g., id.* at §II.A.2.c. And in some instances, statewide measures as well as separate regional measures related to practice model implementation are specified in §II. *See, e.g., id.* at §II.B.5.e.-i.

2) requirements that are subject to both statewide performance measures and regional performance measures.[41]  Section III of the MSA is exclusively related to regional performance requirements.  Additionally, there are two sets of requirements in §§II and III that are related to regional performance measures.  The first are triggered when a region has fully implemented the practice model; the second, higher performance standards, are triggered when a region has reached the 12-month mark following full implementation.[42]  For purposes of the regional measurement requirements in §§II and III of the MSA, a region is deemed to have fully implemented the practice model at the start of the data tracking year.[43]  Accordingly, at a minimum,[44] during the two and two-third years that a region is undergoing the practice model phase-in process, regional performance under the MSA is not measured.[45]

    The first two DFCS regions introduced to the practice model, I-South and II-West, began implementation planning in January 2010 and commenced the data-tracking year in September 2012.  They will enter the final regional measurement phase starting in August 2013.  The other DFCS regions have been added to the implementation process at intervals of six to twelve months.  The last three DFCS regions to implement the practice model, II-East, VI, and VII-West, began the planning phase in July 2012.  Assuming there are no adjustments to the

---

[41]  *See, e.g.,* MSA §§II.B.4.a.-f. and II.B.7.a.-e.

[42]  MSA §I.A.

[43]  According to the MSA, "[a]djustments may be made to the timing of the planning and/or implementation phases based on a region's progress. The two-month period between the end of the Initial Implementation phase and the beginning of the Full Implementation phase is in place to permit the follow-up CQI review after the first 12 months of implementation and an opportunity to revise the Regional Implementation Plan based on preliminary results of the review going into the next phase of implementation."  MSA, App. A.

[44]  In the following three regions, defendants extended the implementation process because a determination was made that additional time was needed for a specific implementation phase:  III-North (afforded an additional six months for planning); IV-North (afforded an additional six months for coaching); and VII-East (afforded an additional six months for planning).

[45]  The MSA expressly recognizes that for those requirements that must be met from the time that a region has fully implemented the practice model, regional compliance is not measured by looking back in time at practice that pre-dates full implementation.  For requirements that must be met 12 months after full implementation of the practice model, compliance is not measured by practice that pre-dates the 12-month period following full implementation. MSA §§II and III.

implementation schedule,[46] these regions will not be subject to the MSA's regional performance measures until March 2015.  After all 13 DFCS regions have fully implemented the practice model, the MSA requires that all of its standards, benchmarks and outcome measures shall be measured and required statewide and shall no longer be measured on a region-by-region basis.[47]

By the time the implementation process is complete in a specific region, a minimum of two and two-third years will have elapsed following initial implementation activities in the region.  Given this schedule and opportunity to learn and correct problems, plaintiffs and the Court should expect to see demonstrable progress, if not compliance with the MSA regional performance standards.

III.    **PROGRESS DURING PERIOD 3**

Period 3 began over six months ago, in July 2012.  Defendants continue to implement the practice model in all 13 DFCS regions.  The first two regions to implement the practice model will not be subject to final regional measurement standards under the MSA until the start of Period 4.  In the meantime, defendants continue to work on long-standing priorities in this case.  This section addresses those key initiatives defendants are pursuing during Period 3.

Since the end of the Bridge Period, and more recently during the first six months of Period 3, defendants have made demonstrable progress addressing several key requirements that were not satisfied during Period 1 and/or Period 2 and have become Period 3 requirements.  For example, defendants have updated the DFCS policy and procedure manual,[48] a pivotal initiative

---

[46]  As noted *supra* note 43, the practice model rollout schedule recognizes that adjustments may be made based on a region's progress.  MSA, App. A.

[47]  MSA §III.

[48]  Period 3 IP §II.A. (requiring revisions to DFCS policy and practice guides and specifying requirements related to the content of certain policies).

that dates back to Period 1.[49]  Defendants also have established a viable pre-service training

program for newly hired caseworkers and supervisors that is based on an updated curriculum.[50]

The new curriculum reflects policy updates and is intended to incorporate MSA requirements.[51]

Defendants also have delivered other training programs required by the Period 3 IP.  For

example, DFCS CQI staff have received training on the components of the practice model and on

measurement and evaluation methods.[52]  In addition, many DFCS managers have received

required training on the use of data in management.[53]

        Implementation of a promising CQI program, an initiative that defendants were required

to implement by the end of Period 1,[54] is also underway.  Required data collection and evaluation

activities have been timely.  In addition, substantive planning has been ongoing for

implementation of a mandated maltreatment investigative review process, which must be fully

implemented by the end of Period 3.[55]  Nonetheless, the development of the CQI program has

been impeded at times by staffing deficits and it is not yet staffed at the levels that must be

maintained by the end of Period 3.[56]  Moreover, defendants have established a resource

---

[49]  Period 1 IP §II; Period 2 IP §II.1.

[50]  Period 1 IP §I.2.c.; Period 2 IP §I.2.d.

[51]  MSA §II.A.2.c.; *see also* Period 3 IP §I.A.3. (requiring revisions to the pre-service training curriculum, a staffing level of nine full-time trainers, and implementation of the following: 1) competency-based testing; and 2) a reliable and accurate system to track staff participation in training).  In early October 2011, defendants contracted with the University of Mississippi to revise the pre-service training curriculum.  The updated curriculum was completed by the end of the 2011 calendar year and it has been used since early 2012 for training newly-hired caseworkers and supervisors.

[52]  Period 3 IP §I.A.3.c.1.

[53]  *Id.* at §I.A.3.c.2.

[54]  Settlement Agreement §II.A.3.a. (requiring defendants to implement a separate continuous quality improvement system by the end of Period 1).

[55]  Period 3 IP §II.C.3.-4.

[56]  MSA §II.A.3. (requiring defendants to implement and maintain a separate CQI system that can identify areas of needed improvement and require improvement plans); *see also* Period 3 IP §I.B. (requiring the development of a CQI plan, staffing for the CQI unit, evaluation instruments and periodic baseline and follow up CQI reviews in the practice model implementation regions).  The CQI Program has several components, including an Evaluation and Monitoring Unit [hereinafter EMU] and a Foster Care Review Unit [hereinafter FCR Unit].  Defendants have made efforts, but have experienced long-standing difficulties filling all required vacancies in each of these units.  According to defendants, the MDHS Human Resources Department and State Personnel Board [hereinafter SPB] are

14

development unit within DFCS to assist in building the capacity to provide necessary services to children and families.  Like the CQI program, the full staffing complement that is required by the end of Period 3 for the resource development unit is not yet in place.[57]  In addition, defendants have continued to implement required initiatives designed to promote more timely placement of children in legally permanent and nurturing homes; however, they report that a capacity to follow-up on these initial efforts must be developed.[58]  Finally, there is evidence of ongoing efforts to design a performance-based contracting system, another Period 3 initiative that was required initially during Period 1.[59]

For the most part, just as in the Bridge Period, which required the involvement of an external entity,[60] defendants have been able to make progress in these areas by relying on outside consultants to augment DFCS's internal capacity.  For example, consistent with the MSA, the revisions to the training curriculum and delivery of the requisite pre-service training are attributable in very large measure to a consulting contract with educators at the University of Mississippi School of Social Work who have worked closely with the DFCS director of professional development.[61]  Similarly, as contemplated by the MSA, defendants have relied on

---

considering a position upgrade or reclassification.  Defendants anticipate that these measures may help to eliminate the barriers to staff recruitment.

[57]  Period 3 IP §II.B.3.c.-d.  Defendants have made progress but have not hired the full, required complement of six workers to build the resource service array.  *Id.* at §II.B.3.d.  Additional progress will be essential in order for defendants to meet requisite staffing levels by the end of Period 3.

[58]  Period 3 IP §II.B.1. (requiring continued implementation of permanency roundtables, an intervention to promote permanency that defendants have undertaken with substantial technical support from Casey Family Programs).  For general information regarding permanency roundtables, *see* http://www.casey.org/Resources/Initiatives/PermanencyRoundtables/.

[59]  MSA §II.A.2.d.  (requiring implementation of a performance-based contracting system to evaluate compliance by contract agencies with the MSA and to ensure remediation if deficiencies are identified); *see also* Period 3 IP §I.A.4. (requiring development of a plan for a performance-based contracting system with monitoring and enforcement functions, including action steps and timelines).  The Period 1 IP required defendants to develop and begin implementing this system by the end of Period 1.  Period 1 IP §I.2.d.

[60]  *See supra* at 8 for additional background information.

[61]  MSA §II.A.2.c.6.a.

their contract with CSF for the design of the CQI program, the delivery of related training

initiatives, and for consultative services related to implementation of the program.[62]

This progress is welcome and consistent with the express intent of MSA provisions that

contemplate engagement of outside expertise.[63]  That defendants made progress with the

assistance of outside experts does not diminish the importance of their achievements; however,

the contrast between the progress that defendants have made with the assistance of consultants

and the relative lack of progress on initiatives in which consultants were not engaged raises

concerns that defendants, at this juncture in the remedial process, still lack essential internal

capacity necessary to meet the requirements of this lawsuit.  Certain aspects of defendants'

performance during Period 3 illustrate the contrast between internal capacity and externally led or

supported undertakings.

In order to coordinate and administer the reform effort, as contemplated by Period 3

requirements, defendants established a Statewide Implementation Team ("SIT"), comprised of

MDHS and DFCS executive staff and a CSF representative.[64]  The SIT is required to perform the

following functions: 1) manage the implementation of the MSA, the Period 3 IP and the practice

model;[65] and, 2) oversee sub-teams that have responsibility for designing and guiding work plans

for implementation of MSA and Period 3 requirements.[66]  While some of the sub-teams appear to

---

[62]  Period 3 IP §I.B.2. (requiring defendants, in consultation with CSF, or another consultant, to revise and begin implementing a CQI plan).  As noted *supra* note 58, defendants have also relied on Casey Family Programs, a private foundation, to provide technical assistance related to the permanency roundtables.  Further, as contemplated by the Period 3 IP, this funder is also providing technical support that will be used to develop the performance-based contracting plan.  *Id*. at §I.A.4.
[63]  *See, e.g., supra* notes 61 and 62.
[64]  The SIT was established before Period 3 commenced.
[65]  Period 3 IP §I.A.1.a. (requiring defendants to establish a Statewide Implementation Team responsible for prioritizing, managing, and making decisions related to implementation).
[66]  Period 3 IP §I.A.1.b.  SIT sub-teams in the following areas are required: CQI, training, resource development, policy, legal and judicial, resource parent recruitment and retention, and caseload/staffing.  In addition to the SIT and the statewide sub-teams, Regional Implementation Teams [hereinafter RITs], are required by Period 3 IP §I.A.1.c. in eight DFCS regions (I-N, I-S, II-W, III-S, IV-N, IV-S, V-E and V-W).  The RITs have the following functions:

be functioning as intended, the work products produced by other sub-teams have raised very substantial concerns about defendants' capacity to meet minimal thresholds for certain Period 3 requirements, including some requirements that date back to Period 1.

For example, historically, understaffing of caseworkers and supervisors has had a significant impact on the defendants' ability to serve class members.[67]  In turn, high caseloads and low salaries have contributed to attrition and formidable recruitment challenges, particularly in certain DFCS county offices with some of the highest numbers of children in custody.[68]  At least in part for this reason,[69] §I.A.2.b. of the Period 3 IP requires defendants to finalize and begin implementing a workforce development plan by April 2013.[70]  As contemplated by the MSA, defendants assigned responsibility for completing the workforce development plan to the SIT sub-team dedicated specifically to caseload/staffing.

---

1) monitoring progress on the region's implementation plans (which the RITs presumably would have been involved in developing during the practice model planning phase); and 2) conducting ongoing reviews of data reports and CQI assessments and acting on the results.  The RITs are required to submit periodic progress reports to the SIT.  RITs are comprised of DFCS staff, managers, representatives from other agencies and stakeholders.  The RITs are an important component of the practice model implementation process that are not yet functioning as intended in all DFCS regions.  *See, e.g.,* Monthly Status Report-Practice Model Implementation, Center for the Support of Families, October 2012, at 7.  Each RIT is required to maintain a CQI sub-team and is also charged with establishing other sub-teams, as needed.

[67] The Monitor has addressed this issue in several prior reports.  *See, e.g., June 2009 Report* at n. 20, p. 26.

[68] *Id.* at 26-27.

[69] Period 3 IP §I.A.1.b.  One of the SIT sub-teams required by the MSA is specifically devoted to caseloads and staffing.

[70] This was a Period 1 requirement which defendants should have begun to implement at the start of 2009.  Period 1 IP §I.2.a.  Period 1 was initially scheduled to end in early January 2009.  Following two extensions approved by the Court, *see supra* note 3, Period 1 concluded on April 30, 2009.  The relevant subsection in the Period 3 IP states:
> Within nine (9) months of the start of Implementation Period 3, Defendants shall have finalized and begun implementing a Workforce Development Plan.  This Workforce Development Plan shall address the recruitment and retention of DFCS professional and support staff as well as bring its current staff into substantial compliance with the worker and supervisor qualification requirements of the Modified Settlement Agreement.  The Workforce Development Plan shall identify the specific steps, strategies, financial resources, and short- and long-term staffing goals with related timeframes that are necessary to meet the staffing requirements of the Modified Settlement Agreement.  The Workforce Development Plan shall be approved by the Monitor as meeting the requirements of this Period 3 Implementation Plan and shall include a section focused specifically on recruitment and retention in Hancock, Harrison, and Jackson Counties ("Coast"), as well as strategies to support staff on the Coast, and shall also include a separate section focused specifically on recruitment, retention, and support strategies in Hinds County.

Period 3 IP §I.A.2.b.

The Period 3 IP required defendants to complete the sections of the workforce development plan that relate to Hancock, Harrison, Hinds and Jackson Counties by September 1, 2012.[71] These counties are described in the MSA as the "carve out" counties. The carve out designation is based on the parties' shared recognition that long-standing staffing deficits in these four counties justified exempting them, at least for the duration of Period 3, from the MSA's caseload and workload standards.[72] The carve out counties were treated separately in the Period 3 IP because of the defendants' long-standing failure to maintain adequate staffing levels in these specific counties, the very serious problems engendered by chronic understaffing, and the large number of children in custody in each of these counties relative to other counties in the state.

As depicted in the following chart, DFCS records show that as of November 30, 2012, nearly 40 percent[73] of the total number of children in custody were in these four counties, which represent five percent of all counties in the state in which there were children in DFCS custody:



---

[71] Period 3 IP §I.A.2.c.3.

[72] MSA §II.A.2.a.9.a.-b. The Period 3 IP includes specific recruitment and retention activities that are applicable exclusively to the carve out counties. Period 3 IP §I.A.2.c.

[73] This percentage may not be accurate due to the challenges the defendants have experienced correctly accounting for open cases in MACWIS. *See infra* at 23-24 for additional background information related to this issue.

The MSA's carve out requirements underscore the urgent need for defendants to address staffing

deficits in these four targeted counties through informed planning and on an expedited time-

frame.

On September 4, 2012, defendants submitted the section of the workforce development

plan that the sub-team designed for the carve out counties.[74]  Defendants' submission failed to

address in a minimally adequate way the recruitment of staff in any of the four targeted counties,

raising – in combination with several other deliverables produced during the first quarter of

Period 3[75] – very substantial concerns about defendants' capacity to satisfy other pivotal Period 3

requirements.  Accordingly, within a little over one week after receiving the workforce

development submission, the Monitor met with MDHS executive staff and defendants' counsel

to discuss her concerns.[76]  Following this meeting, defendants secured supplementary technical

---

[74]  Ex. 1, Mississippi Department of Human Services, Division of Family and Children Services (MDHS/DFCS), Workforce Development Plan, Phase I, Harrison, Hancock, Jackson & Hinds Counties.  This document was a formal submission by defendants through the office of defendants' counsel.  In a November 7, 2012 quarterly report submitted to the SIT by the caseload/staffing sub-team, the sub-team refers to the defendants' September 4, 2012 submission as a "draft of the Workforce Development Plan."  Ex. 2, Caseload/Staffing Subteam Quarterly Report, November 7, 2012, at 2.  However, because the document submitted to the Monitor and plaintiffs' counsel on September 4, 2012 was considered by the parties and the Monitor to be a final submission pursuant to the MSA, it is included in the appendix to this report.

[75]  For example, a submission prepared by the DFCS Legal and Judicial Sub-Team in response to the requirements imposed by Period 3 IP §I.A.2.c.4., provides for the defendants to develop and begin implementing written strategies for promoting implementation of the *Olivia Y.* standards in the Youth Courts by July 1, 2012.  This subsection of the Period 3 IP also requires defendants to implement the strategies in three specified DFCS regions (VII-W, VII-E and III-S) by the end of Period 3.  In early July 2012, the defendants submitted the written strategies developed by the Legal and Judicial Sub-Team in response to these Period 3 requirements.  Ex. 3, Strategies for Promoting Implementation of the *Olivia Y.* Standards in the Mississippi Youth Courts, Legal and Judicial Sub-Team Report on Requirements for the Modified Settlement Agreement (MSA) and Period III Implementation Plan (IP).  The document that the defendants submitted does not identify the specific *Olivia Y.* standards that have not been implemented nor describe the implementation issues.  For the most part, it frames the strategies in terms of strategies the Youth Courts agree to implement instead of strategies the defendants will implement.  Like the September 4, 2012 workforce development submission, the Youth Court strategies document fails at a basic level to address the MSA's requirements and is indicative of very serious capacity deficits.

[76]  The Monitor raised concerns about the adequacy of three key Period 3 deliverables during a meeting with defendants' representatives on September 12, 2012:  1) the workforce development plan for the carve out counties, submitted on September 4, 2012 pursuant to Period 3 IP §I.A.2.c.4.; 2) the written strategies for promoting implementation of the *Olivia Y.* standards in the Mississippi Youth Courts, submitted pursuant to Period 3 IP §I.A.2.c.4.; and 3) the assessment of the F.M. fatality, submitted pursuant to Period 3 IP §II.C.1.  On September 28, 2012, in response to defendants' request, the Monitor provided written comments on the F.M. fatality assessment and the Youth Court strategies to both parties.  The Monitor's written comments on the workforce development plan

assistance from CSF with activities related to the implementation of specific MSA requirements, including consultation related to the development of a revised workforce development plan and other Period 3 deliverables.[77]

Developing internal capacity within an organization such as DFCS requires sustained attention from agency leadership. For this reason, the MSA requires defendants to maintain a deputy administrator with sole responsibility for oversight of DFCS.[78] Additionally, the deputy is required to meet certain qualification standards.[79] Yet, for the duration of Period 3 a permanent deputy administrator has not been in place.

In September 2008, Lori L. Woodruff was hired and began working as the deputy administrator of DFCS.[80] Three and one-half years later, in March 2012, she notified MDHS officials of her intent to retire effective June 30, 2012. After an unsuccessful effort during the spring through mid-summer of 2012 to identify an appropriate candidate, defendants readvertised the position during the late summer and again during the early fall after obtaining authorization for a salary increase.[81] During the last six months of 2012, the deputy administrator position remained vacant. The MDHS deputy director has assumed many of the deputy administrator's

---

were provided to the parties on October 1, 2012. Defendants report that they are working to revise the Youth Court strategies and F.M. fatality submissions in consultation with consultants from CSF. As discussed *infra* note 77, while a draft version of this report was being prepared, defendants submitted a draft of the complete workforce development plan to the Monitor for comment.

[77] On January 1, 2013, the defendants provided the Monitor with a 47-page document titled, Workforce Development Plan, December 2012. Defendants subsequently clarified that the document is a draft version of the complete workforce development plan, and that it includes a section related to the carve out counties. This document was developed in consultation with CSF. The Monitor plans to review it and provide comments to the defendants in the near term. At least preliminarily, the new submission appears to significantly improve upon the defendants' September 4, 2012 submission.

[78] MSA §II.A.1. The Settlement Agreement referred to the position as the "director of DFCS" whereas the MSA refers to the position as the MDHS deputy administrator with sole responsibility for oversight of DFCS. *Compare* MSA§II.A.1. *with* Settlement Agreement §II.A.1.a. In practice, they are the identical position.

[79] MSA §II.A.1.

[80] *See June 2009 Report* at 22-23 for additional background data related to this matter.

[81] Defendants advertised the position vacancy during April and May 2012. By early July, they had interviewed 12 candidates. In mid-August, defendants readvertised the position, using substantially similar recruitment methods to those they employed in the spring. Thereafter, in mid-September, defendants readvertised the position with a higher salary. Between late October and early December, defendants report that they interviewed four candidates. They formally announced their selection to the Monitor and plaintiffs' counsel on December 20, 2012.

responsibilities.  Among other accomplishments, the deputy director has made demonstrable

progress streamlining and accelerating the caseworker hiring process, and has provided critical

oversight of DFCS operations; however, the deputy has other job responsibilities beyond DFCS,

and does not satisfy all of the MSA's qualification standards.  Given these circumstances, and in

light of the enormity of the challenges facing DFCS, it is unreasonable to expect the deputy

director, acting in an interim capacity, to make sufficient sustained progress in the case.

As of January 2013, defendants have not filled this critical position, which has remained

vacant for over six months.  On December 20, 2012, following plaintiffs' December 4, 2012

notice of noncompliance with MSA §II.A.1., issued pursuant to MSA §VII.B., defendants

informed plaintiffs' counsel that they had reached an agreement with Kimberly K. Shackleford,

Ph.D., LCSW, to serve as the deputy administrator effective April 1, 2013.  Thus, assuming there

are no additional delays, over one year will have elapsed between the date Ms. Woodruff

provided MDHS officials with notice of her intent to retire and the date Dr. Shackleford will

assume her position.[82]

Beyond concerns about defendants' internal capacity to achieve required reforms, the

Monitor also has concerns about defendants' Period 3 efforts to satisfy what have been long-

standing substantive requirements.  As described above,[83] historically, insufficient staffing levels

– of both caseworkers and area social work supervisors ("ASWS") – have contributed to

defendants' inability to meet many of the Settlement Agreement's requirements.  Like the

Settlement Agreement, the MSA incorporates certain staffing-related requirements intended to

---

[82] Dr. Shackleford is a well-regarded child welfare expert.  As the deputy administrator in charge of DFCS, Dr. Shackleford would be responsible for managing a governmental agency with over 1,200 employees and an annual budget of nearly $200 million dollars.  Because the Monitor cannot assess, based on Dr. Shackleford's *curriculum vitae* alone, whether she meets all of the specific qualification criteria for the deputy administrator position required by MSA §II.A.1., the Monitor has requested that defendants describe Dr. Shackleford's qualifications to hold the position relative to MSA requirements.  It is the Monitor's understanding that this information is forthcoming.
[83] *See supra* at 17.

limit caseworker caseloads as well as ASWS workloads and in turn improve the quality of service delivery to children in DFCS custody.[84]

The Settlement Agreement established specific workload requirements for caseworkers and ASWS and required certain performance levels phased-in over time.[85]  In mid-2009, the Monitor reported that because of limitations in the accuracy and completeness of the workload data that defendants collected and maintained in MACWIS, she could not assess whether defendants met caseload requirements during Period 1.[86]  The Monitor explained that defendants' inability to track and report accurately on personnel and workload data were capacity deficits that defendants would need to address in order to manage the DFCS workforce and ultimately comply with the Settlement Agreement's standards.[87]  Thereafter, over one year later, the Monitor reported that during Period 2 the defendants did not correct the documented limitations in workload data collection and reporting that existed during Period 1.[88]  For this reason, defendants were required to submit validated workload data during the Bridge Period.[89]  Nonetheless, in a November 2010 report addressing defendants' performance during the Bridge Period, the Monitor found that defendants still had not validated the DFCS workload data captured in MACWIS.[90]

The MSA modified the caseload requirements established by the Settlement Agreement to reflect more accurately required work efforts for each specific caseworker service activity

---

[84]  *See, e.g., MSA §II.A.2.a.* (establishing caseload and workload standards for caseworkers and their supervisors and imposing benchmark requirements during Period 3 and during subsequent implementation periods); *see also* Period 3 IP §I.A.2.c.6. (requiring the assignment of a specified minimum number of caseworkers to certain counties by the end of Period 3).
[85]  Settlement Agreement §II.A.2.a.
[86]  *June 2009 Report* at 29.
[87]  *Id.* at 27-28, 32-35.
[88]  *September 2010 Report* at 19.
[89]  June 10, 2010 Agreed Order at ¶7.a. and at Ex. A, pp. 1-2.
[90]  *November 2010 Report* at 22.

collected in MACWIS.[91]  Additionally, in light of defendants' repeated failure to produce

accurate caseload reports, the MSA required that within 90 days following the start of Period 3,

defendants implement a methodology to produce accurate, validated caseload reports, and that

within 120 days following the filing of the MSA, defendants provide the plaintiffs and the

Monitor with county-by-county caseload data on a monthly basis.[92]

      As noted above, in order to support the implementation of the MSA staffing

requirements, during 2012 defendants created a SIT sub-team for caseload and staffing.  Among

other matters, the sub-team's mission includes "[i]mplementation of a methodology for

producing accurate and valid caseload data reports."[93]  During November 2012, the sub-team

reported that it had "determined that the [MACWIS] caseload reports did not accurately reflect

true staffing needs in the carve-out counties and that workload validation of some sort was

necessary."[94]  The sub-team's November 7, 2012 report describes the results of a caseload

validation process that was undertaken in the carve out counties in order to provide an accurate

understanding of current workload numbers.[95]  The report states that DFCS "staff was [sic] able

to identify numerous cases in which children are no longer in agency custody and the agency has

been absolved of responsibility of monitoring the family through the court system.  Issues in

MACWIS, *i.e.* financial, eligibility, pending ISPs, were found to be a frequent reason that cases

remain open when they should have been closed."[96]  This is a well-documented and very long-

---

[91]  MSA §II.A.2.  At the same time, the MSA created a new service unit metric referred to as "caseload units." Caseload units are calculated by expressing an individual service type as a percentage of a full caseload, defined as 6,960 minutes.  Thus, a full caseload is equivalent to 100 percent of a full caseload, or 100 caseload units of case-related work.

[92]  MSA §II.A.2.a.8.

[93]  Ex. 2, *supra* note 74, at 1.

[94]  *Id.* at 2.

[95]  *Id.*

[96]  *Id.*

standing problem that defendants have been unable to correct.[97]  The sub-team report omits any reference to another long-standing phenomenon reported to the Monitor by several members of the sub-team:  that the caseload validation process also identified open cases that are not tracked and thus not included in caseload/workload numbers because they are not identified in MACWIS as being open.[98]

On December 3, 2012, defendants notified the plaintiffs and the Monitor that the validated caseload reports could not be produced as required due to "many unanticipated difficulties in implementation of the Family Service Plan (FSP), which is replacing the Individualized Service Plan (ISP)." [99]  Defendants explained that "[b]ecause caseload report data is extracted from the ISP, a transition must be made in order to pull the data from the FSP."[100]  Additionally, defendants noted that "redesign work must be done in order to produce accurate point in time caseload measurements."[101]  Defendants expect that the reports will be produced by March 5, 2013.[102]  Regardless of the reasons for the delay, it is unclear why any issues related to the production of these long-overdue reports were not resolved sooner, in time to meet well-established deadlines.

The MSA establishes new staffing requirements that defendants must satisfy.  For example, by the end of Period 3, at least 75 percent of DFCS caseworkers in the non-carve out

---

[97] Ex. 4, Continuous Quality Improvement (CQI) Sub Team Quarterly Report (July 2012 – October 2012), at 4 (recognizing that for many years defendants have been unable to satisfy requirements related to ending the custody date recorded in MACWIS within a 60-day period following termination of custody, and commenting that defendants' failure rate continued to climb to 19 percent as documented in a May 2012 filing with federal authorities).

[98] Sub-team members and other DFCS staff report that these cases are not identified in MACWIS as being open for many of the same reasons that they are not closed, *e.g.*, delayed eligibility determinations.

[99] Ex. 5, December 3, 2012 correspondence from Kenya Key Rachal to Miriam Ingber, without attachment.

[100] *Id.*

[101] *Id.*

[102] *Id.*

counties are required to carry a caseload that does not exceed MSA caseload requirements.[103]  As indicated above, defendants still cannot produce validated caseload reports and thus remain unable to report accurately on caseworker caseloads.  Nevertheless, in the absence of more accurate data, defendants continue to rely on the demonstrably flawed caseload calculations captured in MACWIS to make significant resource allocation decisions.[104]  For this reason, an analysis of defendants' workload data is presented below.  The data presented below was compiled by a DFCS consultant.  While it is imperfect, it is better than MACWIS data insofar as it cross references caseworker assignment data from MACWIS against secondary data sources.  While this is a labor-intensive process and not a viable solution in the long run, it does provide more usable data than is available from MACWIS and it is valuable.

According to these data, as of October 31, 2012, 50 percent of caseworkers in non-carve out counties carried a caseload that did not exceed the MSA caseload requirements.[105]  There was substantial variation among the percentage of caseworkers exceeding MSA requirements from county to county.  In some counties, none of the assigned caseworkers met MSA caseload requirements; in other counties, all of the assigned caseworkers met MSA requirements.[106]  The MSA also requires that by the end of Period 3, no more than ten percent of caseworkers in non-carve out counties carry a caseload exceeding twice the MSA caseload requirements.[107]  The data defendants currently rely upon, albeit flawed, indicate that seven percent of caseworkers in non-

---

[103]  MSA §II.A.2.a.9.a.
[104]  Defendants have been relying on a consultant to produce workload reports.  The consultant's reports are based on the MACWIS caseload calculations and other sources of information, including MDHS workforce assignment records.
[105]  Ex. 6, chart prepared by the Office of the Court Monitor, Number of Caseworkers With Caseloads in Non-Carve Out Counties Exceeding and Not Exceeding MSA Caseload Requirements, By County, As of October 31, 2012.
[106]  *Id.*
[107]  MSA §II.A.2.a.9.a.

carve out counties carry a caseload exceeding twice MSA caseload requirements.[108]

Additionally, the MSA requires that by the end of Period 3, no caseworkers in non-carve out

counties shall carry a caseload exceeding three times the MSA caseload requirements.[109]  As of

mid-December 2012, a report addressing performance related to this requirement was not

produced by the defendants.[110]

The Period 3 staffing requirements for the carve out counties require that by the end of

Period 3, defendants must assign a minimum of 16 full time caseworkers to Hancock County, 42

to Harrison County, 50 to Hinds County, and 34 to Jackson County.[111]  According to data

submitted to the Monitor by defendants, as of October 31, 2012, 10 of the 16 required full time

caseworkers were assigned to Hancock County, 39 of the 42 required caseworkers were assigned

to Harrison County, 32 of the required 50 caseworkers were assigned to Hinds County, and 31 of

the required 34 caseworkers were assigned to Jackson County.[112]  While the size of the

workforce can be expected to fluctuate, defendants have reported substantial subsequent attrition

in at least one of the carve out counties.[113]

During approximately the first five months of Period 3, defendants succeeded in

increasing the size of the DFCS caseworker workforce in both the non-carve out and carve out

counties.  Between the start of Period 3 on July 6, 2012 and December 10, 2012, defendants

---

[108]  Ex. 7, chart prepared by the Office of the Court Monitor, Number of Caseworkers With Caseloads in Non-Carve
Out Counties Exceeding and Not Exceeding Twice MSA Caseload Requirements, By County, As of October 31,
2012.
[109]  MSA §II.A.2.a.9.a.
[110]  In June 2009, the Court Monitor found that defendants were not reporting on the percentage of caseworkers
exceeding twice and three times the MSA caseload requirements.  *See June 2009 Report* at 34.
[111]  Period 3 IP §I.A.2.c.6.
[112]  Ex. 8, chart prepared by the Office of the Court Monitor, Filled Caseworker Positions in Carve Out Counties, by
County, As of October 31, 2012.
[113]  During early December 2012, defendants reported that there were 3.5 case-carrying caseworkers in Hancock
County – a significant reduction in a short period of time.

increased the number of caseworkers statewide by 50 staff members.[114]  Among the four carve

out counties alone, there was a net increase during this period of 24 caseworkers.[115]  Moreover,

in late January 2013, defendants reported that there is likely to be a substantial increase in new

hires in one of the carve out counties and that they now have the authority to implement a new

and encouraging recruitment incentive in three of the carve out counties.[116]

       The longer-term trends in hiring and attrition of caseworker staff at DFCS indicate that

defendants have had sustained success increasing the size of the caseworker workforce.  In

particular, defendants have increased substantially the number of Family Protection Specialists,

one of the five positions that comprise the caseworker workforce and the position that constitutes

the largest percentage of the caseworker workforce.[117]  Between January 1 and December 10,

2012, defendants increased the ranks of Family Protection Specialists by 72 staff members.[118]

That gain was in addition to the net gain of 69 Family Protection Specialists during the prior two

calendar years.[119]  Among the other four positions that comprise the caseworker workforce,

between January 1 and December 10, 2012, DFCS increased the size of the workforce for only

one position category, Family Protection Worker I, which saw an increase of 31 staff.[120]  There

---

[114]  Ex. 9A, chart prepared by the Office of the Court Monitor, Caseworker Hires and Separations During Period 3, by County, July 6 - December 10, 2012.

[115]  *Id.*

[116]  Defendants report that as the result of a short-term management strategy introduced during the latter part of the 2012 calendar year, they are currently finalizing the hiring process for 28 new Hinds County employees. Presumably, many of these prospective employees would occupy caseworker or supervisory positions.  *See infra* at 43 for additional information about this management strategy.  Additionally, as the result of a December 2012 request that was made by the MDHS executive director, on January 17, 2013, the SPB authorized a 20 percent salary increase for caseworkers, their supervisors and regional directors in Hancock, Harrison and Jackson counties, effective January 1, 2013.  This constitutes an important recruitment incentive.  *See* Ex. 9B, January 17, 2013 correspondence from Deanne Mosley to Richard A. Berry.

[117]  Ex. 10, chart prepared by the Office of the Court Monitor, Hires (Including Hires "In Process") and Separations Among DFCS Caseworker Staff, January 1, 2010 - December 10, 2012 (with Period 3 Breakouts).

[118]  *Id.*

[119]  *Id.*

[120]  *Id.*

were relatively small net losses of staff among the other three categories of caseworker positions between January 1 and December 10, 2012.

Attrition among DFCS caseworkers since 2010 has been driven largely by resignations. Resignations, the single largest source of attrition among caseworkers, eclipsed all other categories of attrition combined, accounting for 62 percent of all caseworker staff who separated from the agency.[121]

In addition to caseworker staffing requirements, the MSA also includes Period 3 requirements related to ASWS staffing levels. The MSA specifies that by the end of Period 3, in the non-carve out counties, no more than ten percent of supervisors responsible for supervising caseworkers shall be responsible for directly supervising more than five caseworkers.[122] According to the non-validated data that is relied upon by defendants,[123] as of October 31, 2012, 18 ASWS, or 14.3 percent of ASWS supervising caseworkers in non-carve out counties, supervised more than five caseworkers.[124] Among those 18 ASWS, ten supervised six caseworkers each, three supervised seven caseworkers each, two supervised eight caseworkers each, and three supervised nine caseworkers each.[125]

Unlike the trend among the caseworker workforce, there has been a net decline in ASWS staffing levels in both 2011 and 2012.[126] During calendar year 2011, DFCS lost a net total of four ASWS staff and from January 1 to December 10, 2012, the total number of ASWS working

---

[121] Ex. 11, chart prepared by the Office of the Court Monitor, Reason for Separations Among Caseworkers, by Position, January 1, 2010 - December 10, 2012.

[122] MSA §II.A.2.a.9.b.

[123] *See, e.g., supra* at 25.

[124] Ex. 12, chart prepared by the Office of the Court Monitor, Area Social Work Supervisors (ASWS) Working in Non-Carve Out Counties, By Number of Caseworkers Supervised, As of October 31, 2012. Supervisors in carve out counties are not subject to the same ratio requirement during Period 3; however, for comparative purposes, *see* Ex. 13, chart prepared by the Office of the Court Monitor, Area Social Work Supervisors (ASWS) Working in Carve Out Counties, By Number of Caseworkers Supervised, As of October 31, 2012.

[125] Ex. 14, chart prepared by the Office of the Court Monitor, Area Social Work Supervisors (ASWS) Supervising More Than Five Caseworkers in Non-Carve Out Counties, By Region, As of October 31, 2012.

[126] Ex. 15, chart prepared by the Office of the Court Monitor, Hires and Separations Among Area Social Work Supervisory Staff, January 1, 2010 - December 10, 2012.

for DFCS decreased by ten.[127]  In Period 3 specifically, there was a net decline of six ASWS

staff.[128]  Like the caseworker workforce, between January 1 and December 10, 2012 the single

largest source of ASWS attrition was resignations, which accounted for 56 percent of ASWS

attrition.[129]  Defendants will have substantial difficulty satisfying MSA requirements if

supervisory staffing deficits are not addressed in an effective way.

In addition to capacity-building initiatives and staffing, the development of a more

functional management information system has been a priority in this case from the start.

Defendants' history of remediating the substantial shortcomings in MACWIS has been marked,

at times, by periods of inaction and unreasonable delay.[130]

The Settlement Agreement required that by the end of Period 1, DFCS staff would have

access to basic computer services;[131] that MACWIS data related to compliance with all required

foster care service standards would be collected, analyzed and disseminated on a monthly

basis;[132] and that a capacity assessment of MACWIS relative to the requirements imposed by the

Settlement Agreement would be complete.[133]  The expectation was that a qualified MACWIS

director would be at the helm to coordinate these initiatives.[134]  These requirements were not

satisfied,[135] and although they were incorporated into the Period 2 IP[136] – which substantially

---

[127]  *Id.*

[128]  *Id.*

[129]  *See* Ex. 16, chart prepared by the Office of the Court Monitor, Reason for Separations Among Area Social Work Supervisors, January 1, 2010 - December 10, 2012.

[130]  This circumstance is not attributable to the leadership in the MACWIS unit itself.  The remediation effort is plainly under-resourced and has not been treated as a priority by the defendants.

[131]  Settlement Agreement §II.A.5.b.  According to the Settlement Agreement, access to MACWIS, word processing and electronic mail constitute access to basic computer services.  *Id.*

[132]  *Id.* §II.A.5.c.  Dissemination to DFCS county and regional staff was mandated.  *Id.*

[133]  Period 1 IP §I.e.

[134]  The Settlement Agreement required assembly of a management team capable of assisting with the DFCS reform process.  *Id.* §I.1.  Early on, the defendants correctly viewed the MACWIS director as a key member of the team. *June 2009 Report* at 23-25.

[135]  *June 2009 Report* at 20 (finding that assessment of MACWIS conducted during Period 1 did not address reliability of MACWIS data, efficacy of management reports generated, nor consider whether MACWIS was capable of meeting the functionality requirements established by the Settlement Agreement); *id.* at 51-55 (finding

reduced the number of data reports that the defendants were required to produce[137] – with the

exception of filling the MACWIS director position (which had become a Period 2

requirement),[138] defendants were not able to satisfy these requirements by the end of Period 2.[139]

In fact, pursuant to the corrective action process mandated by the Bridge Plan, it was not

until July 2010, that defendants issued the RFP for the MACWIS capacity assessment.[140] The

actual assessment report was not finalized until late June 2012.[141] Since that time, progress on

contracting for a replacement system has advanced, but the pace has been slow at best.[142] Indeed,

although over seven months has lapsed since the assessment was completed, defendants have not

---

that for the most part MACWIS does not report accurately and as required on Settlement Agreement standards); *see also id.* at 25 (finding that the MACWIS director had not been hired by June 1, 2009).

[136]  Period 2 IP §I.5. (requiring defendants to provide access to basic computer services, verify a limited set of data in MACWIS, and issue an RFP and contract for an assessment of MACWIS); *see also id.* §I.1.a. (requiring defendants to hire a qualified MAWIS director by November 1, 2009).

[137]  *Id.* §I.5.b. (requiring defendants to verify MACWIS data concerning five Settlement Agreement requirements twice during Period 2).

[138]  *Id.* §I.1.a.

[139]  *September 2010 Report* at 59-64.  Pursuant to the Period 2 IP, at least some of these carry-over requirements from Period 1 were due before the conclusion of Period 2.  *See, e.g.,* Period 2 IP §I.5.c. (requiring that an RFP be issued by September 1, 2009 for a comprehensive analysis of MACWIS).

[140]  June 10, 2010 Agreed Order at ¶6.  *See November 2010 Report* at 17-18 for a summary of defendants' progress. The RFP was issued on July 27, 2010.  *See id.* at Ex. 3, Mississippi Department of Information Technology Services, RFP No. 3583.  The contract was finalized on March 18, 2011.  For a copy of the contract, *see The Court Monitor's Report to the Court Regarding Findings From the Second Case Record Review and Other Matters Relevant to Defendants' Progress Toward Satisfying the Requirements of the Settlement Agreement*, filed June 29, 2012 [hereinafter *June 2012 Report*], at Ex. 30, Project No. 37921, Professional Services Agreement Between Walter R. McDonald & Associates, Inc. and Mississippi Department of Information Technology Services as Contracting Agent for the Mississippi Department of Human Services.

[141]  Defendants transmitted a draft version of the final report to the Monitor on June 8, 2012.  The Monitor expressed concerns to defendants about some aspects of the draft report during a meeting that occurred on June 12, 2012 with representatives from MDHS, DFCS and WRMA.  Some, but not all of these concerns, were addressed in the final report.  The Monitor will report on these issues, which implicate MSA requirements, if they cannot be resolved through discussions with the parties.  The final report, which is dated June 6, 2012, is titled Final Project Report, April 20, 2012.  It was transmitted to the Monitor on July 12, 2012.  *See* Ex. 17, Walter R. McDonald & Associates, Inc., Mississippi MACWIS Alternatives Analysis, Final Project Report, April 20, 2012.  Defendants report that the assessment report was finalized during June 2012.

[142]  Approximately three months after the assessment report was issued, on October 29, 2012, defendants notified the Administration for Children and Families [hereinafter ACF] in the U.S. Department of Health and Human Services [hereinafter HHS], of their intent to develop a new automated case management system to replace MACWIS.  Ex. 18A, October 29, 2012 correspondence to Joe Bock from Richard Berry.  At that time, defendants also requested enhanced federal funding for planning activities associated with the replacement of MACWIS.  *Id.*  Thereafter, on November 30, 2012, ACF informed defendants that additional federal funding would be authorized upon the submission and approval of revised budget documents.  Ex. 18B, November 30, 2012 correspondence to Richard Berry from Joseph Bock.  The defendants submitted revised budget documents to ACF on December 20, 2012.

yet issued an RFP for a contract for services from a vendor who defendants plan to engage to help them write the actual RFP that will lead to the contract for replacement of the system.[143] Because the information management system that will replace MACWIS will be, in part, federally funded, DFCS staff have had to coordinate with and seek approval from their federal partners at various points. This required coordination accounts for some of the delay during Period 3. Nevertheless, defendants report that their federal partners have been responsive and given the project priority. According to defendants' estimated timetable, the replacement of MACWIS will involve a protracted process that will not lead to the introduction of a replacement system until sometime in late 2015 or 2016.

In the interim, over five years after the Court adopted the Settlement Agreement, defendants continue to operate with substantial limitations in their information technology systems. Indeed, despite significant efforts starting during the latter half of 2009 under the auspices of the then-newly hired MACWIS director,[144] defendants have been unable to address the limitations in the MDHS information technology infrastructure in an effective way. The limitations compromise the reliability of MACWIS case records and in turn undercut the defendants' ability to use data about system performance to make the types of changes in case practices that are required by the MSA.

DFCS caseworkers, supervisors and managers continue to report very serious problems that often compromise their ability to access and/or use MACWIS, including: 1) lengthy delays of up to several hours in logging into MACWIS; 2) difficulty remaining logged on to MACWIS;

---

[143] As a first step, defendants plan to contract for services from a Quality Assurance/Independent Verification and Validation [hereinafter QA/IVV] vendor. Defendants contemplate that the vendor would work with MDHS/DFCS staff during the planning, system design, development and implementation stages for the new system. According to the tentative schedule proposed by the Mississippi Department of Information Technology Services [hereinafter ITS], a contract to procure QA/IVV services would not be finalized until June 30, 2013.

[144] These efforts, which began after the MACWIS director was hired, included a survey of DFCS county office employees regarding staff access to computers. *See September 2010 Report* at 60-64 for background data related to this matter.

3) loss of data entered into MACWIS; 4) very slow response times; and 5) system freezes and shut downs.[145]  These problems are long-standing and well-documented.[146]  For example, according to DFCS records, between February 1 and November 30, 2012, DFCS staff experienced a minimum of 385.8 hours of unplanned, limited access to MACWIS due to recurrent problems with the basic information technology infrastructure.[147]

Because of these persistent problems, during the early part of 2012, defendants contracted for an assessment of the DFCS information technology infrastructure.  The assessment report, issued during May 2012, identified a series of shortcomings and presented short- and long-term recommendations for improving system performance.[148]  Defendants began to address these recommendations shortly after the report was issued.  Furthermore, during December 2012, defendants submitted a proposal to the federal government for partial funding of their remediation efforts, and defendants report that they have been notified informally that the proposal has been approved.  Nevertheless, as of late January 2013, seven months after the assessment report was issued, an RFP to contract for critical server and software remediation had not been finalized.  As an adjunct to addressing the recommendations in the assessment,

---

[145]  The Monitor reported on virtually identical problems in her September 2010 Report.  *September 2010 Report* at 61-62.

[146]  *See, e.g.*, *id*. at 61-63.

[147]  Ex. 19, MACWIS Down Time Tracking 2012 (submitted to the Court Monitor by DFCS MACWIS Unit on December 5, 2012).  Prior to September 2012, the tracking report was based on telephone reports from DFCS field staff to staff assigned to work at the MACWIS Help Desk.  Starting in September 2012, the MDHS Management Information System [hereinafter MIS] Unit began providing DFCS with weekly down time reports, which noted server issues that impact users in the field.  Because the MIS reports are now included in the tracking report, the tracking report reflects increases since February 2012 in system unavailability.  Defendants believe that this phenomenon is attributable to better tracking and documentation of down time.

[148]  Ex. 20, Citrix XenApp Infrastructure Assessment, May 18th, 2012, Citrix Systems, Inc.  The report describes short-term next steps as activities that should be completed within one month and long-term next steps as activities that should be completed within one to 12 months.  *Id.* at 2.

defendants are also implementing other strategies to improve the access DFCS staff have to MACWIS, including virus remediation and updating communication lines and hardware.[149]

In addition to the network and system availability problems described above, there are also ongoing deficits with the data reports that MACWIS produces. Accurate, timely, and relevant reports on agency performance are essential to managing complex institutional reform efforts successfully. Executives and managers require information on agency functions and performance to help inform their decisions and assess the success of their efforts. For this reason, these data are required by the MSA and essential to measuring defendants' progress under the MSA. Despite its many limitations described above, MACWIS does capture and report on a wide array of DFCS functions; however, as the record in this case documents, historically MACWIS data have been unreliable, difficult to access, not directly correlated to Settlement Agreement requirements, and not easily manipulable for analytical and managerial purposes.[150] Thus, the Period 3 IP requires defendants to produce a discrete set of "accurate and validated reports…that reflect county-by-county performance" related to specific MSA requirements according to a prescribed timeline.[151]

Pursuant to the Period 3 IP, in August 2012, defendants produced and submitted to the Monitor and the plaintiffs their first set of required reports.[152] While the production of certain required performance reports in Period 3 represents progress that defendants can build upon, defendants' submissions also highlight the severe limitations inherent in their extant information management systems and processes.

---

[149] Ex. 21, Division of Family and Children's Services, MACWIS Unit, MACWIS Response Time Improvement Initiatives, December 12, 2012. In response to the Monitor's request, defendants provided this summary to the Monitor on December 12, 2012. The summary includes a chronology and explanation of all ongoing initiatives to improve MACWIS response time.

[150] *See, e.g., June 2009 Report* at 27-35, 51-55, 67-69; *September 2010 Report* at 20-23, 47, 57-66, 75, 91, 99-100, 102; *November 2010 Report* at 18-19, 21-22, 43-47; *June 2012 Report* at 6, 42-45.

[151] Period 3 IP §I.D.1.a.-c.

[152] *See* MSA, App. C for a list of reports required to be submitted pursuant to Period 3 IP §I.D.1.a.-c.

As previously noted, Period 3 reporting requirements represent a substantial diminution in defendants' reporting requirements compared with the reporting requirements that were established for Period 1.[153]  Notwithstanding Period 3's pared-back reporting requirements, and despite the substantial time that has elapsed since Period 1 initially required defendants to produce accurate data reports, ongoing problems and limitations persist with defendants' reports. These deficiencies are described below.[154]

First, there are certain reports required in Period 3 that defendants are not yet able to produce.  For example, defendants remain unable to produce accurate and validated reports on caseworker workloads.[155]  It is noteworthy that defendants have been required to produce these same reports since Period 1 and the Monitor has documented in more than one report filed with the Court, the importance of these reports and the defendants' repeated failure to produce them.[156]  Accurate workload reports are fundamental to hiring the proper number of and balancing the workload among caseworkers.  The absence of such reports contributes to excessive caseworker caseloads, which compromises the safety and well-being of children who are in the custody of DFCS.

In addition to required reports that defendants are not able to produce, in a number of instances MACWIS cannot capture discrete data elements regarding defendants' performance upon which defendants are required to report in Period 3.  Thus, defendants have produced a number of data reports during Period 3 in response to Period 3 requirements that do not reflect performance relative to the MSA's actual requirements.  As one example, for children with the

---

[153] *See supra* at 29-30.
[154] Some of these key deficiencies were not evident until the latter part of the 2012 calendar year.  Starting in early October 2012, the Monitor initiated a careful examination of the data reports that defendants produced in response to Period 3 requirements.  As a result of this examination, various deficiencies in the reports were revealed and acknowledged by the defendants.
[155] *Supra* at 24-25; Ex. 5, *supra* note 99.
[156] *See, e.g., June 2009 Report* at 29, 32-35; *September 2010 Report* at 19-22; *November 2010 Report* at 22.

goal of reunification, the assigned DFCS caseworker is required to meet with the child's

parent(s) with whom the child is to be reunified at least once each month to assess service

delivery and achievement.[157]  Although defendants are required to report on this requirement in

Period 3,[158] defendants have informed the Monitor that they have not been able to report

accurately on this performance requirement because MACWIS does not enable DFCS staff to

identify and track with enough specificity those cases in which a child is to be reunified with

only one parent.  As another example, children entering foster care are required to receive from a

qualified medical practitioner both a health screening within 72 hours of placement[159] and a

comprehensive health assessment within 30 calendar days of placement.[160]  Defendants are

required to report on each requirement during Period 3.[161]  The report defendants have produced

lists what defendants present as percentages of children who received the required screenings and

evaluations within the requisite time periods; however, the report does not fully report on

performance requirements because MACWIS does not capture the data related to the MSA's

medical practitioner requirements.[162]  These types of MACWIS limitations have led defendants

to develop "work arounds" to collect essential data using processes other than DFCS's primary

---

[157]  MSA §§II.B.5.b., II.B.5.e.2.

[158]  Period 3 IP §I.D.1.a.-c.; MSA, App. C at 1, MACWIS MWZWCR3.

[159]  MSA §II.B.3.i.1.

[160]  *Id.* §II.B.3.i.2.

[161]  Period 3 IP §I.D.1.a.-c.; MSA, App. C at 3, MACWIS MWLS315; *see also* Ex. 22 for a sample page from this MACWIS report.

[162]  Defendants have confirmed that this is the case.  Prospectively, in order to report on this requirement, defendants intend to use an alternative data collection method, which is referred to in the MSA as "FCR" – an acronym for "foster care review," the administrative review that is required to be conducted at six-month intervals for all cases with children in foster care.  Foster care reviewers, who are assigned to the foster care review section of the DFCS CQI Unit, conduct these structured reviews using an instrument developed during 2012 that, according to defendants, was revised and automated in October 2012 in response to the MSA's data reporting requirements.  *See* MSA, App. C at 3-5.  The automated instrument is referred to as the periodic administrative determination [hereinafter PAD].  Essentially, because of limitations in MACWIS, defendants expanded the data collected during the foster care review process in order to capture specified data elements relevant to their performance under the MSA.  Defendants began to collect data in MACWIS with the automated PAD on October 15, 2012.  Defendants report that they are in the process of revising the instruction guide for reviewers that is used in tandem with the revised PAD.  Defendants expect that they will be able to produce the MSA-required FCR data reports to the Monitor and plaintiffs' counsel by January 31, 2013, as contemplated by the MSA.

information management system.[163]  There are other examples of data reports that defendants

have produced during Period 3 that do not report on performance relative to MSA requirements

because MACWIS does not capture data required for a correct calculation.[164]

In other instances, MACWIS captures the data elements necessary to use as a basis to

report on aspects of agency performance defendants are required to report on, but the MACWIS

report is designed in a manner that is not consistent with MSA requirements.  Consequently, the

resulting MACWIS report cannot be used to assess defendants' performance relative to the

governing MSA standard.  To illustrate, two MSA requirements on which defendants must report

in Period 3 mandate, among other things, that in certain circumstances a caseworker must meet

with a child at least twice per month for three months.[165]  Although MACWIS captures data

regarding the number of caseworker visits each month, the reports defendants have produced

---

[163] As noted *supra* note 152, Appendix C lists the specific data reports that defendants are required to produce during Period 3.  The reports are identified as MACWIS reports, manual reports or FCR (*i.e.*, foster care review) reports.  The manual reports and FCR reports constitute reports that are intended by the parties to "work around" the limitations in MACWIS.  It is noteworthy that the report related to the health screening and comprehensive health assessment, MWLS315, is listed in Appendix C as a MACWIS report.  MSA, App. C at 3.

[164] *See*, *e.g.*, Ex. 23, sample page from MACWIS MWLS50DS, required by Period 3 IP §I.D.1.a.-c.; MSA, App. C at 1.  The underlying requirement – MSA §II.B.2.p.8. – states that no foster child shall remain in an emergency or temporary facility for more than 45 calendar days unless the Field Operations Director has granted express written approval.  However, MACWIS does not capture data on approvals by the Field Operations Director.  *See also* Ex. 24, sample page from MACWIS MWZRESPS, required by Period 3 IP §I.D.1.a.-c.; App. C at 2.  This report is deemed by defendants as essential to the implementation of the Practice Model and it is intended to report on the number of foster homes in the licensure process.  However, defendants have informed the Monitor that the numbers reported in the report comingle the number of foster homes that are actively in the licensure process with the number of homes that have not applied for licensure, and may not ever apply, but for which an inquiry has been made about the licensure process.  *See also* Ex. 25, sample page from MACWIS MWLS319S, required by Period 3 IP §I.D.1.a.-c.; MSA, App. C at 3 (note that DFCS changed this report number from MWZ0151).  The underlying requirement – MSA §II.B.2.p.2. – states that no child shall be placed in a foster care setting that has not been licensed unless s/he is ordered into the placement by the Youth Court over DFCS objections.  MACWIS does not capture data on placements ordered by the Youth Court over DFCS objections, and thus the report cannot include that data.  Defendants report that they intend to address this problem using the PAD.  *See supra* note 162.  *See also* Ex. 26, sample page from MACWIS MWLS318S, required by Period 3 IP §I.D.1.a.-c.; MSA, App. C at 3.  The underlying requirements – MSA §§III.B.5.b. and III.B.5.d.1. – state that at least 80 percent of foster children in regions that have fully implemented the Practice Model shall be provided with contacts with their parents and any siblings not in the same placement consistent with MSA standards, which require the contact within 24 hours of placement (unless there are documented reasons why the contact should not occur).  However, defendants have informed the Monitor that MACWIS does not capture data regarding whether children were provided with these contacts within 24 hours of placement.

[165] *See* MSA §§III.B.8.b., III.B.8.d.1.; II.B.1.e.3.  For the related reporting requirements, *see* Period 3 IP §I.D.1.a.-c.; MSA, App. C at 1, MACWIS MWLS54A and MACWIS MWLS55SA.

during Period 3 are limited to data regarding caseworker visits only during one-month periods.[166] Thus, it is not possible to use the data reports to determine defendants' performance with respect to the required three-month performance period. There are other reports that defendants were required to produce, which were provided to the Monitor and plaintiffs' counsel during Period 3, that have similar deficiencies.[167]

Additionally, some of the data reports defendants have produced in response to Period 3 requirements have included calculation errors which raise continuing concerns about the DFCS data validation process. For example, the Period 3 IP requires defendants to report on an MSA requirement regarding the placement of siblings who entered DFCS custody at or near the same time who are placed together consistent with MSA requirements.[168] The MACWIS report produced by defendants pursuant to this MSA requirement contained errors in the calculation of certain statewide summary data.[169] Although the calculation errors did not impact the accuracy of the

---

[166] *See* Ex. 27, sample page from MACWIS MWLS54AS and Ex. 28, sample page from MACWIS MWLS55AS.

[167] *See*, *e.g.,* Ex. 29, sample page from MACWIS MWZ1271S, required by Period 3 IP §I.D.1.a.-c.; MSA, App. C at 1. The underlying requirement – MSA §II.B.1.e.2. – states that all investigations into reports of maltreatment shall be completed within 30 calendar days. Defendants' report on this requirement examines only the most recent 30 days and uses as a basis of calculation only cases that were closed during the month included in the report. Although this is a meaningful way to look at the data, it represents far too limited a window into defendants' performance. Defendants should also report on performance among all investigations opened during specific time periods. *See also* Ex. 30, sample page from MACWIS MWZPLMS2, required by Period 3 IP §I.D.1.a.-c.; MSA, App. C at 2. The underlying requirements – MSA §§II.B.5.c. and II.B.5.e.3. – provide that at least 40 percent of resource parents (therapeutic and non-therapeutic) with at least one foster child shall have a DFCS worker visit the home at least once monthly. The reports defendants have produced on therapeutic foster homes indicates that MSA requirements were met when there were two visits in one month by a DFCS worker, not one visit. Defendants are aware of this problem and state that they are working to amend the report. It should be noted that the Settlement Agreement previously required twice monthly visits in this circumstance. *See* Settlement Agreement §II.B.10.h. *See also* Ex. 31, sample page from MACWIS MWZWC5S2, required by Period 3 IP §I.D.1.a.-c.; MSA, App. C at 2. The underlying requirements – MSA §§II.B.5.a. and II.B.5.e.1. – state that at least 60 percent of children in custody shall receive twice monthly in-person visits by the assigned DFCS caseworker consistent with the MSA requirements, which include meeting with the child alone, where age appropriate. Although MACWIS captures data regarding participants in meetings during home visits, the MACWIS report on this performance measure does not distinguish between meetings that were conducted alone with a child and meetings that included other participants and therefore the report does not report accurately on whether the in-person meetings met the MSA requirement.

[168] *See* Period 3 IP §I.D.1.a.-c.; MSA, App. C at 3, MACWIS MWLS316; MSA §§II.B.2.h. and II.B.2.p.13.

[169] *See* Ex. 32, sample page from MACWIS MWLS316S that reflects the calculation errors. The calculations of both the percentage of children in sibling groups who were not initially placed together, but were placed together within 30 days and the percentage of children "who entered as runaway" were incorrect.

county-level data, they do raise questions about the reliability of the data validation process that defendants have employed. [170]

Finally, in a limited number of cases, the data reports defendants produced during Period 3 contained data that corresponded to MSA requirements, but the data was presented in a manner that made it unduly difficult to determine defendants' performance relative to MSA requirements. For example, the MSA requires that by the end of Period 3, 85 percent of children shall be placed within their own county or within 50 miles from the home from which they were removed, unless certain exceptions apply.[171] Although defendants' report on this requirement contained information to determine performance levels, it requires the reader to calculate the number rather than simply presenting it in a straightforward manner.[172]

The data reports defendants have generated during Period 3 represent a step in the evolution of their reporting capacity. Overall, however, defendants' progress has been plodding, hobbled by a grossly inadequate information system and insufficient resources devoted to capacity building. In their current form, MACWIS reports are limited in scope and difficult to use as a management tool. The reports cannot be used readily to track DFCS progress over time, which presents a challenge for managers who should use the reports to assess and adjust resource allocation decisions. Furthermore, MACWIS is not adaptable enough to answer specific managerial questions that may arise in a timely manner.

---

[170] As described in the Monitor's *November 2010 Report*, during the Bridge Period a three-person team with two external consultants was used to validate the data reports that were produced pursuant to Bridge Plan requirements. *November 2010 Report* at 20-21. It appeared that the validation method was designed primarily to test the internal integrity of the data reports by ensuring the reports extracted data from the relevant case records and the correct data fields. The methodology that was used was limited to ensuring that MACWIS reports accurately reflected the data contained in the system. It did not assess whether the data entered into the system accurately reflected the facts of the case.

[171] MSA §§II.B.2.g. and II.B.2.p.16.

[172] *See* Ex. 33, sample page from MACWIS MWLS314S. It is difficult to determine from the report the number or percentage of children who were placed either within their county or within 50 miles from their home, as required by the MSA. Defendants have reported that they are aware of this issue and intend to correct it.

Since mid-December 2010, defendants have used MACWIS reports to generate periodic "dashboard reports," which are charts that present defendants' monthly MACWIS report data in a visual summary format and which are made widely available to DFCS staff for review.[173] Defendants have reported to the Monitor that in November 2012, they increased the frequency with which they update the dashboard reports from quarterly to monthly, a practice that will provide managers with more timely data. Nevertheless, because defendants' dashboard reports are based upon MACWIS reports, they are subject to the same shortcomings and limitations as the MACWIS reports upon which they are based.[174]

---

[173] *See, e.g.*, Ex. 34A, DFCS data dashboard report, 90 Day Trial Home Visit (9/01/2012-9/30/2012); Ex. 34B, DFCS data dashboard report, Adoption Finalization (10/01/2011-9/30/2012); Ex. 34C, DFCS data dashboard report, All Children Investigation Completed (9/01/2012-9/30/2012); Ex. 34D, DFCS data dashboard report, All Child ANE Investigations Initiated (9/01/2012-9/30/2012); Ex. 34E, DFCS data dashboard report, Children in Emergency Shelter > 45 Days (9/01/2012-9/30/2012); Ex. 34F, DFCS data dashboard report, Children in More Than 1 Emergency Placement (9/01/2012-9/30/2012); Ex. 34G, DFCS data dashboard report, Children Under Age 10 in Emergency Placement (9/01/2012-9/30/2012); Ex. 34H, DFCS data dashboard report, Custody Children Investigation Completed Timely (9/01/2012-9/30/2012); Ex. 34I, DFCS data dashboard report, Custody Children Investigation Initiated (9/01/2012-9/30/2012); Ex. 34J, DFCS data dashboard report, Family Based vs Non-Family Based Placement (9/01/2012-9/30/2012); Ex. 34K, DFCS data dashboard report, Independent Living Services (9/01/2012-9/30/2012); Ex. 34L, DFCS data dashboard report, Maltreatment Rate Custody Children (10/1/11-9/30/12); Ex. 34M, DFCS data dashboard report, Children Re-entering Foster Care w/1 year of Reunification (10/1/11-9/30/12); Ex. 34N, DFCS data dashboard report, Children W/Perm_Plan Developed w/30 days of Entry into Foster Care; Ex. 34O, DFCS data dashboard report, MWLS314S-Proximity of Initial Placement (10/1/11-9/30/12); Ex. 34P, DFCS data dashboard report, MWLS314S-Proximity of Initial Placement (10/1/12-9/30/12) (2) [sic] (it appears the correct time period should be listed as 10/1/11-9/30/12); Ex. 34Q, DFCS data dashboard report, MWLS314S-Proximity of Initial Placement (10/1/11-9/30/12) (3); Ex. 34R, DFCS data dashboard report, MWLS314S-Proximity of Initial Placement (10/1/12-9/30/12) (4) [sic] (it appears the correct time period should be listed as 10/1/11-9/30/12); Ex. 34S, DFCS data dashboard report, Children receiving a comprehensive health assessment (10/1/11-9/30/12); Ex. 34T, DFCS data dashboard report, Children contacts with parents and siblings (9/1/12-9/30/12); Ex. 34U, DFCS data dashboard report, Children in Unlicensed Placements (9/1/2012-9/30/2012); Ex. 34V, DFCS data dashboard report, MWZ017S1_Children in Custody 17-22 Months (9/1/12-9/30/12); Ex. 34W, DFCS data dashboard report, Non-Therapeutic Home Contacts (9/01/2012-9/30/2012); Ex. 34X, DFCS data dashboard report, Placement Stability (9/01/2012-9/30/2012); Ex. 34Y, DFCS data dashboard report, Prevention Cases (as of 10/15/2012); Ex. 34Z, DFCS data dashboard report, Protection Cases (as of 10/15/2012); Ex. 34AA, DFCS data dashboard report, Reunification (10/01/2011-9/30/2012); Ex. 34BB, DFCS data dashboard report, Sibling Groups in Congregate Care (9/01/2012-9/30/2012); Ex. 34CC, DFCS data dashboard report, Therapeutic Home Contacts (9/01/2012-9/30/2012); Ex. 34DD, DFCS data dashboard report, Timely County Conference (10/01/2011-9/30/2012); Ex. 34EE, DFCS data dashboard report, Timely Permanency Hearing (10/01/2011-9/30/2012); Ex. 34FF, DFCS data dashboard report, Exceptions TPR Filing for Children (as of 10/5/12); Ex. 34GG, DFCS data dashboard report, Visitation With Children (9/01/2012-9/30/2012); Ex. 34HH, DFCS data dashboard report, Visitation With Parents (9/01/2012-9/30/2012); Ex. 34II, DFCS data dashboard report, Visits W/Children Remaining in Placement Following Investigation.

[174] Those problems and limitation are described *supra* at 34-38.

While it is encouraging that defendants have developed management information reports

and have increased the frequency with which they are producing those reports, they must

continue to enhance this capacity.  As described in detail above, ultimately this will require

replacing MACWIS; however, even with their current data reports, defendants could produce

more robust dashboard reports for DFCS managers and executives.[175]  Using data reports that

they already produce, defendants could generate monthly dashboard reports that, among other

things, make clearer evolving performance trends over multiple months among regions,[176] rather

than only comparing regions in individual months;[177] break out practice model regions from non-

---

[175] The DFCS Division of Evaluation and Monitoring produces annual CQI reports on a regional basis that provide a wide variety of comparative data over time.  Many of these reports are required by the MSA.  Period 3 IP §I.B. However, because these reports are produced annually, they serve a different management purpose from the more frequent dashboard reports.

[176] This is ultimately required by the MSA.  See MSA §II.A.5.a.  Defendants report that they have taken steps to enhance DFCS reporting capacity and expect to be able to produce future trending reports related to DFCS performance at some point in the future.

[177] See, e.g., Ex. 35A, Chart Prepared by the Office of the Court Monitor, Children in Custody With Substantiated Findings of Maltreatment, by Region, During 12-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12; Ex. 35B, Chart Prepared by the Office of the Court Monitor, Monthly In-Person Visits With Child by Assigned Caseworkers, by Region, One-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12; Ex. 35C, Chart Prepared by the Office of the Court Monitor, Proximity of Initial Placement for All Children Entering Custody, 12-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12; Ex. 35D, Chart Prepared by the Office of the Court Monitor, Children Entering Custody Who Received an Initial Health Screening Within 72 Hours of Entering Custody, 12-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12; Ex. 35E, Chart Prepared by the Office of the Court Monitor, Children in Custody 30+ Days Who Received a Comprehensive Health Assessment Within 30 Days of Entering Custody, 12-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12; Ex. 35F, Chart Prepared by the Office of the Court Monitor, Placement of Sibling Groups Who Entered Custody At Or Around the Same Time, By Region, 12-Month Periods Ending 8/31/12 and 9/30/12; Ex. 35G, Chart Prepared by the Office of the Court Monitor, Number of Children in Licensed and Unlicensed Placements, Including Approved Relative Placements Pending Full Licensure, One-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12; Ex. 35H, Chart Prepared by the Office of the Court Monitor, Investigations Open One or More Days During Period Initiated Within 24 Hours of Intake, By Region, One-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12; Ex. 35I, Chart Prepared by the Office of the Court Monitor, Status of Maltreatment Investigations Open One or More Days During Period, By Region, One-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12; Ex. 35J, Chart Prepared by the Office of the Court Monitor, Children Remaining in the Same Placement Following Maltreatment Investigation Who Met Face-to-Face With Worker Twice in a One-Month Period or At Least Once if 15 Days or Less Following Completed Maltreatment Investigation, By Region, One-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12; Ex. 35K, Chart Prepared by the Office of the Court Monitor, Children in Emergency Shelter or Temporary Facility for Over 45 Days With and Without the Division Director Approval, By Region, One-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12; Ex. 35L, Chart Prepared by the Office of the Court Monitor, Children Under Age 10 Housed in a Congregate Care Setting With and Without Regional Director Approval, By Region, One-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12; Ex. 35M, Chart Prepared by the Office of the Court Monitor, Number of Sibling Groups With At Least One Sibling Under Age 10 Housed in a Congregate Care Setting For More Than 45 Days, By Region, During Months Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12;

practice model regions to make assessment of practice model implementation efforts easier;[178]
and accelerate revisions to reports so that they track actual MSA requirements and make explicit
that there are limitations in the underlying data used as a basis for the charts that they produce.[179]

Despite the ongoing challenges described above that the defendants face, they are
continuing to advance their reform efforts through the practice model.  Since January 2010,
defendants have introduced the practice model at staggered intervals in each of DFCS's 13
regions.[180]  As required by the MSA, defendants have continued to contract with CSF for
technical assistance and oversight of the implementation process on a statewide basis.[181]  CSF
has provided DFCS managers and staff with substantial ongoing support related to practice

---

Ex. 35N, Chart Prepared by the Office of the Court Monitor, Children With Two or More Emergency or Temporary Facility Placements At Any Time Within One Episode of Foster Care With and Without Regional Director Approval, By Region, During Months Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12; Ex. 35O, Chart Prepared by the Office of the Court Monitor, Non-Therapeutic Placement Setting Contacts, By Region, One-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12; Ex. 35P, Chart Prepared by the Office of the Court Monitor, Therapeutic Placement Setting Contacts, By Region, One-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12; Ex. 35Q, Chart Prepared by the Office of the Court Monitor, Children in Care Fewer Than 12 Months From the Time of Latest Removal From Home, By Region and Number of Placements, For the Dates 6/30/12, 7/31/12, 8/31/12, and 9/30/12.

[178] *See, e.g.,* Ex. 36A, Chart Prepared by the Office of the Court Monitor, During Trial Home Visit Period, Number of Children Who Met With Their Caseworker or Family Preservation Caseworker in the Home Twice in a One-Month Period or At Least Once Monthly if 15 Days or Less, By Practice Model Fully Implemented Date, By Region, One-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12; Ex. 36B, Chart Prepared by the Office of the Court Monitor, Children in Custody for Six Months or More With an Administrative Review Every Six Months, By Region and By Practice Model Fully Implemented Date, 12-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12; Ex. 36C, Chart Prepared by the Office of the Court Monitor, Children in Custody for 12 Months or More With a Timely Permanency Hearing, By Practice Model Fully Implemented Date, By Region, 12-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12; Ex. 36D, Chart Prepared by the Office of the Court Monitor, Children Ages 14-20 Receiving Independent Living Services As Set Forth In Service Plan, By Practice Model Fully Implemented Date, By Region, 12-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12; Ex. 36E, Chart Prepared by the Office of the Court Monitor, Children Leaving State Custody and Reason, By Practice Model Fully Implemented Date, By Region, and Percentage of Children Reunified With Parent or Caretaker In Under 12 Months From Latest Removal, 12-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12; Ex. 36F, Chart Prepared by the Office of the Court Monitor, Children With a Permanency Plan By Their 30th Day of Custody, By Practice Model Fully Implemented Date, By Region, 12-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12; Ex. 36G, Chart Prepared by the Office of the Court Monitor, Length of Time Between Court Custody and Finalization of Adoption, By Practice Model Fully Implemented Date, By Region, 12-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12.

[179] *See, e.g*., Ex. 35B-Ex. 35L, *supra* note 177; Ex. 35N-Ex. 35P, *supra* note 177; Ex.36A-36B, *supra* note 178; and Ex. 36F, *supra* note 178.

[180] *See supra* at 11 for a copy of the practice model rollout schedule.

[181] MSA §I.C.

model implementation, including training, intensive coaching,[182] and other necessary on- and off-site consultative services.  Additionally, CSF has assisted in facilitating various CQI activities, which are required by the MSA.[183]  The range of services provided by CSF is intended to build DFCS's internal capacity as well as promote improvements in case practices.[184]

Overall, the practice model has been introduced in each of DFCS's 13 regions according to the implementation schedule established by the MSA.  The training curriculum for DFCS staff has been modified to reflect practice model principles, and defendants report that policies are being reviewed on an ongoing basis in light of practice model doctrines.  Moreover, DFCS caseworkers, their supervisors and management staff have received core training in the principles of the practice model.  While there have been significant delays hiring practice coaches in several regions,[185] and difficulty retaining coaching staff in some regions,[186] DFCS staff report that substantial benefits are derived from the intensive coaching afforded to staff by both CSF and DFCS coaches during the practice model implementation process.  Defendants, with support from CSF, are working currently to strengthen the DFCS coaching program.

While introduction of the practice model in DFCS's 13 regions has been timely relative to the MSA's "rollout" schedule,[187] as the Monitor has reported previously, the regions have not had basic elements of the necessary infrastructure in place to support implementation of the practice model.  Indeed, implementation efforts have been undercut in some regions, particularly,

---

[182]  Intensive coaching has been provided through the CSF contract for DFCS supervisory staff.  For the most part, caseworkers are coached by DFCS coaches who have received extensive training and coaching from CSF consultants.
[183]  Period 3 IP §I.B.
[184]  There is some evidence that DFCS is developing the organizational capacity to manage discrete aspects of the practice model implementation process.  For example, DFCS recently added several mid-level management positions in order to centralize responsibility for supervising the DFCS practice coaches who are assigned to each region to work with field staff.
[185]  It appears that Regions I-N, III-S and IV-N experienced the most significant delays in hiring.
[186]  In several regions, practice coaches have resigned, but for the most part they continue to work at DFCS in other capacities.
[187]  *See supra* at 11 for a copy of the schedule.

as noted above, in the regions that include the carve out counties, by persistent, and at times very serious, staffing deficits.[188]   Moreover, implementation of the model has been impeded statewide by the inability of MACWIS to readily capture and report on case-related information in a manner consistent with practice model specifications.[189]   Nevertheless, the implementation schedule was designed to be long enough to allow for defendants to address exactly these types of obstacles and defendants must do so in order to successfully meet MSA deadlines.

In recognition of this and other systemic challenges that have impeded implementation of the practice model,[190] at the end of the 2012 calendar year, in collaboration with CSF, defendants launched a promising short-term management strategy to address understaffing and other systemic problems in the carve out counties.[191]   Currently, this initiative is in its early stages. The Monitor will report on defendants' progress, as appropriate; however, ultimately, the efficacy of this effort will be determined by whether the MSA's Period 3 outcome standards are satisfied.

The 13 DFCS regions are now in various stages of the practice model implementation process.  Pursuant to the MSA, two regions, I-S and II-W, are deemed to have fully implemented

---

[188]  *See, e.g., supra* at 17-18; *see also June 2012 Report* at 14 and n. 44.

[189]  In addition to the data reporting issues described in this and previous monitoring reports, *see, e.g., supra* at 34-38, MACWIS has not captured data in a manner that facilitates implementation of the practice model.  For example, as explained in the Monitor's *June 2012 Report*, a key component of the practice model is the comprehensive family assessment [hereinafter CFA], which is an evaluation of the strengths and needs of all family members.  *Id.* at 17. As the practice model was being introduced, and thereafter, CSF and DFCS staff provided intensive training and individualized coaching to DFCS caseworkers and supervisors on the new assessment process.  However, implementation of the CFA has been complicated and protracted by the fact that that the CFA tool was not automated until July 2, 2012 – two and one-half years after the practice model implementation process began.  Up until that date, as each region implemented the practice model, caseworkers were required to complete both a manual version of the CFA instrument and an automated version of the Strengths and Risk Assessment [hereinafter SARA], which is the assessment tool in MACWIS that should have been obsolete in the regions once they began to implement the practice model.  Similarly, a core element of the practice model is the family service plan [hereinafter FSP].  The FSP, which is based on an individualized, ongoing, collaborative assessment process, was not incorporated into MACWIS until December 3, 2012.

[190]  There are a number of barriers that defendants will need to address, including the fact that regional management structure and related resources do not adequately reflect the widely disparate demands among the regions.

[191]  Ex. 37, Strategy for Addressing Carve Out Counties.  *See supra* note 116 for information related to one of the initial and encouraging results of this management strategy.

the practice model.[192]  Beginning in September 2012, these regions were required to meet

specified MSA requirements on a prospective basis during a data tracking year that concludes in

August 2013.  Thus, at this juncture, it would be inappropriate to draw any conclusions about

whether and to what extent the practice model has resulted in the mandated improvements in case

practice in those two specific regions.  It is too soon to draw any conclusions about the success of

the regional implementation strategy.  At this point the Monitor has analyzed only four months of

the limited data that is available from Period 3.[193]  Progress in these circumstances is rarely linear

and any conclusions based on four months of data would be premature.  Nevertheless, it is

imperative for defendants to monitor their progress in these regions and make corrections as

necessary.  Available data indicate that there is still substantial progress to be made before the

conclusion of the data tracking year.[194]

IV.    **CONCLUSION**

While defendants have made demonstrable efforts over the past five years to implement

the requirements of the Settlement Agreement and the MSA, their efforts have been

compromised by their failure to satisfy certain substantive requirements in this lawsuit with a

greater sense of urgency.  Over this period, there has been progress on some key initiatives that

were either mandated or contemplated by Period 1 requirements.  For example, DFCS has hired

committed and talented managers and field staff and increased caseworker staffing levels in

many, but not all, regions.  Agency policies and procedures have been revised, at times

extensively, to align with the Settlement Agreement's requirements.  Moreover, although not yet

staffed at the levels required by the end of Period 3, continuous quality improvement and

resource development programs have been established.  Finally, a revised curriculum has been

---

[192] *See supra* at 11.
[193] *See, e.g.,* Exs. 36A-36G, *supra* note 178.
[194] *See, e.g.,* Exs. 36A, 36C-36G, *supra* note 178.

developed for the pre-service training program that is offered for DFCS caseworkers and their supervisors, and enhanced training is being delivered to staff on a more timely basis.  Defendants also are making progress toward meeting COA standards.  Unfortunately, progress in each of these areas has been much slower than contemplated by the Settlement Agreement and more recently the MSA, and these initiatives represent a very small number of the obligations that the defendants have been required to satisfy.

July 2012, the advent of Period 3, marked a new start for defendants under a new reform model.  Yet progress still appears to move slowly.  Defendants now have completed a necessary assessment of their information system and are collaborating with their federal partners on funding the new system.  Nevertheless, defendants stand before the Court in the sixth year of the remedial process unable to satisfy many of the Settlement Agreement's core data reporting requirements about their own performance, and without having issued a request for proposals for a replacement system.

There is an urgent need for defendants to produce timely, accurate and validated reports about performance related to MSA requirements and for replacing MACWIS, within a reasonable time period, with a system that meets the MSA's requirements.  Among other purposes, accurate performance reports should serve the parties and the Monitor as an early warning system to identify ongoing performance problems and potential risks to the safety and well-being of children in defendants' custody.  These reports are long overdue and defendants must now address this problem.

Defendants' unnecessarily protracted efforts to replace the deputy administrator, who they knew was leaving since March 2012, is also emblematic of the unduly slow pace at which defendants are pursuing important initiatives.  Assuming there are no additional delays, over one

45

year will have elapsed between the date the prior deputy administrator provided MDHS officials

with notice of her intent to retire and the date a new deputy will fill that executive vacancy.

The lack of urgency with which defendants are proceeding is unacceptable in light of the

impact the deficits in their performance have had and continue to have on the safety and well-

being of the nearly 3,800 children in DFCS custody.[195]  As the MSA itself recognizes, there have

been, at times, tragic outcomes for the children defendants are charged to protect, and there is a

need to address any shortcomings that have contributed to these outcomes on an urgent basis.[196]

The statewide rate of maltreatment of children in defendants' custody far exceeds national

standards, and in many DFCS regions the rate has been more than double the Period 3 statewide

performance requirements.[197]  Moreover, because of ongoing and very serious deficiencies in the

quality of maltreatment investigations,[198] which defendants have been unable to address in an

---

[195]  DFCS Significant Weekly Activities Report, December 14, 2012.  As of December 7, 2012, defendants reported "preliminary data" indicating that there were 3,798 children in custody.  According to MACWIS data, as of September 30, 2012, almost half of the children in defendants' custody were in foster homes and an additional 10 percent in unlicensed relative homes.  For a breakdown of placements for children in DFCS custody as of September 30, 2012, see Ex. 38, chart prepared by the Office of the Court Monitor, Children in Foster Care by Placement Type, Statewide, One-Month Period Ending 9/30/12.  For a regional breakdown of placement types, see Ex. 39, chart prepared by the Office of the Court Monitor, Children in Foster Care by Placement Type, By Region, One-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12.

[196]  Section II.C.1. of the Period 3 IP required the defendants to conduct an assessment of the F.M. fatality and provide a written assessment report to the Monitor and plaintiffs' counsel by 30 days following the Court's approval of the MSA.  F.M. was a child in defendants' custody who died in a DFCS placement under very troubling circumstances.  The assessment was required to address any failings by defendants in the delivery of foster care services, case practice and licensing practice as well as recommendations for ways to improve child safety and address any identified deficiencies.  On August 6, 2012, defendants submitted, through counsel, a document titled "Summary of Child Fatality Assessment to Improve Child Safety."  Defendants' submission failed to include any assessment of foster care services, case practice or licensing practices in light of DFCS policies nor in light of any other applicable practice standards such as the standards imposed by the MSA.  Simply put, defendants' submission was grossly inadequate, evidencing both a lack of capacity and a lack of appreciation for the importance of the assessment and the need to perform it adequately.

[197]  The MSA imposes a statewide performance requirement related to the rate of maltreatment in care.  MSA §II.C.2.  Nonetheless, it is useful to review variations in regional performance.  See Ex. 35A, supra note 177 (chart prepared by the Office of the Court Monitor based on MACWIS data depicting the region-by-region rate of maltreatment in care for four 12-month periods ending September 30, 2012); see also Ex. 40, chart prepared by the Office of the Court Monitor, Total Number of Children in Custody With Findings of Maltreatment During 12-Month Period Ending 9/30/12.

[198]  The Monitor will report in detail about this very serious problem, and the remedial efforts that are underway pursuant to MSA §II.B.1., in her final report on defendants' performance during Period 3.  The Period 3 IP includes a series of requirements related to this matter, which defendants are required to complete and/or implement by the

effective way, there is a possibility that this rate could be even higher than the rate reported by defendants.[199]

After five years, the pace of reform in this lawsuit must accelerate.  The MSA was born of a prior agreement whose terms defendants were, by and large, not able to meet.  Although the MSA is still in its infancy, important deadlines are already fast approaching and the pipeline of regions completing their data tracking year will open in September 2013.  In light of the record, the opportunities defendants have been afforded, and the ongoing risk to children in defendants' custody, it is imperative that defendants demonstrate that they can meet their obligations under the MSA by the end of Period 3.

The Monitor will be available to address the matters set forth in this report during the February 21, 2013 status hearing.

_____/ s / _____
Grace M. Lopes (MBN 45693 *pro hac vice*)
Court Monitor
1350 Connecticut Avenue, N.W.
Suite 1000
Washington, D.C.  20036
(202) 232-8311
gmlopes@oymonitor.org

---

end of Period 3.  *See* Period 3 IP §II.C. (requiring, *inter alia*, implementation of a plan to ensure defendants utilize standardized decision-making criteria for prioritizing, screening, and assessing all reports of maltreatment as well as the development of training and processes concerning a systematic review of maltreatment investigations related to the children in defendants' custody).

[199] Defendants have made efforts, but they have been unable to make demonstrable improvements in the quality of maltreatment investigations.  For example, during the Bridge Period, defendants were required to conduct specialized training to address this issue.  Agreed Order at ¶7.b.  For the most part, this initiative has not had a fundamental impact on the quality of investigations as documented in the investigative reports that are issued with respect to allegations of abuse and/or neglect of children in defendants' custody.

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that on January 25, 2013, the Court Monitor's Status Report to the Court Regarding Progress During Period Three, was transmitted electronically to the following counsel of record in this matter:

   Dewitt L. ("Rusty") Fortenberry Jr.
   Kenya Key Rachal
   Ashley Tullos Young
   Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
   428 I-55 North
   Meadowbrook Office Park
   Jackson, Mississippi 39211

   Harold E. Pizzetta, III
   Assistant Attorney General
   General Civil Division
   Carroll Gartin Justice Building
   430 High Street
   Jackson, MS 39201

   W. Wayne Drinkwater, Jr.
   BRADLEY ARANT ROSE & WHITE LLP
   188 East Capital Street, Suite 450
   Jackson, Mississippi 39201

   Marcia Robinson Lowry
   Miriam Ingber
   Sarah Russo
   CHILDREN'S RIGHTS
   330 Seventh Avenue
   New York, New York 10001

   John Lang
   John Piskora
   LOEB & LOEB LLP
   345 Park Ave.
   New York, New York 10154

        _____ / s / _____
          Grace M. Lopes

**Index to Exhibits**

Ex. 1       Mississippi Department of Human Services, Division of Family and
            Children Services (MDHS/DFCS), Workforce Development Plan, Phase I,
            Harrison, Hancock, Jackson, & Hinds Counties

Ex. 2       Caseload/Staffing Subteam Quarterly Report, November 7, 2012

Ex. 3       Strategies for Promoting Implementation of the *Olivia Y.* Standards in the
            Mississippi Youth Courts, Legal and Judicial Sub-Team Report on
            Requirements for the Modified Settlement Agreement (MSA) and Period
            III Implementation Plan (IP)

Ex. 4       Continuous Quality Improvement (CQI) Sub Team Quarterly Report (July
            2012 – October 2012)

Ex. 5       December 3, 2012 correspondence from Kenya Key Rachal to Miriam
            Ingber without attachment

Ex. 6       Chart prepared by the Office of the Court Monitor, Number of
            Caseworkers With Caseloads in Non-Carve Out Counties Exceeding and
            Not Exceeding MSA Caseload Requirements, By County, As of October
            31, 2012

Ex. 7       Chart prepared by the Office of the Court Monitor, Number of
            Caseworkers With Caseloads in Non-Carve Out Counties Exceeding and
            Not Exceeding Twice MSA Caseload Requirements, By County, As of
            October 31, 2012

Ex. 8       Chart prepared by the Office of the Court Monitor, Filled Caseworker
            Positions in Carve Out Counties, by County, As of October 31, 2012

Ex. 9A      Chart prepared by the Office of the Court Monitor, Caseworker Hires and
            Separations During Period 3, by County, July 6 - December 10, 2012

Ex. 9B      January 17, 2013 correspondence from Deanne Mosley to Richard A.
            Berry

Ex. 10      Chart prepared by the Office of the Court Monitor, Hires (Including Hires
            "In Process") and Separations Among DFCS Caseworker Staff, January 1,
            2010 - December 10, 2012 (with Period 3 Breakouts)

Ex. 11      Chart prepared by the Office of the Court Monitor, Reason for Separations
            Among Caseworkers, by Position, January 1, 2010 - December 10, 2012

Ex. 12        Chart prepared by the Office of the Court Monitor, Area Social Work
              Supervisors (ASWS) Working in Non-Carve Out Counties, By Number of
              Caseworkers Supervised, As of October 31, 2012

Ex. 13        Chart prepared by the Office of the Court Monitor, Area Social Work
              Supervisors (ASWS) Working in Carve Out Counties, By Number of
              Caseworkers Supervised, As of October 31, 2012

Ex. 14        Chart prepared by the Office of the Court Monitor, Area Social Work
              Supervisors (ASWS) Supervising More Than Five Caseworkers in Non-
              Carve Out Counties, By Region, As of October 31, 2012

Ex. 15        Chart prepared by the Office of the Court Monitor, Hires and Separations
              Among Area Social Work Supervisory Staff, January 1, 2010 - December
              10, 2012

Ex. 16        Chart prepared by the Office of the Court Monitor, Reason for Separations
              Among Area Social Work Supervisors, January 1, 2010 - December 10,
              2012

Ex. 17        Walter R. McDonald & Associates, Inc., Mississippi MACWIS
              Alternatives Analysis, Final Project Report, April 20, 2012

Ex. 18A       October 29, 2012 correspondence to Joe Bock from Richard Berry

Ex. 18B       November 30, 2012 correspondence to Richard Berry from Joseph Bock

Ex. 19        MACWIS Down Time Tracking 2012

Ex. 20        Citrix XenApp Infrastructure Assessment, May 18th, 2012, Citrix Systems,
              Inc.

Ex. 21        Division of Family and Children's Services, MACWIS Unit, MACWIS
              Response Time Improvement Initiatives, December 12, 2012

Ex. 22        Sample page from MACWIS MWLS315S

Ex. 23        Sample page from MACWIS MWLS50DS

Ex. 24        Sample page from MACWIS MWZRESPS

Ex. 25        Sample page from MACWIS MWLS319S

Ex. 26        Sample page from MACWIS MWLS318S

Ex. 27        Sample page from MACWIS MWLS54AS

Ex. 28        Sample page from MACWIS MWLS55AS

Ex. 29        Sample page from MACWIS MWZ1271S

Ex. 30        Sample page from MACWIS MWZPLMS2

Ex. 31        Sample page from MACWIS MWZWC5S2

Ex. 32        Sample page from MACWIS MWLS316S

Ex. 33        Sample page from MACWIS MWLS314S

Ex. 34A       DFCS data dashboard report, 90 Day Trial Home Visit (9/01/2012-
              9/30/2012)

Ex. 34B       DFCS data dashboard report, Adoption Finalization (10/01/2011-
              9/30/2012)

Ex. 34C       DFCS data dashboard report, All Children Investigation Completed
              (9/01/2012-9/30/2012)

Ex. 34D       DFCS data dashboard report, All Child ANE Investigations Initiated
              (9/01/2012-9/30/2012)

Ex. 34E       DFCS data dashboard report, Children in Emergency Shelter > 45 Days
              (9/01/2012-9/30/2012)

Ex. 34F       DFCS data dashboard report, Children in More Than 1 Emergency
              Placement (9/01/2012-9/30/2012)

Ex. 34G       DFCS data dashboard report, Children Under Age 10 in Emergency
              Placement (9/01/2012-9/30/2012)

Ex. 34H       DFCS data dashboard report, Custody Children Investigation Completed
              Timely (9/01/2012-9/30/2012)

Ex. 34I       DFCS data dashboard report, Custody Children Investigation Initiated
              (9/01/2012-9/30/2012)

Ex. 34J       DFCS data dashboard report, Family Based vs Non-Family Based
              Placement (9/01/2012-9/30/2012)

Ex. 34K       DFCS data dashboard report, Independent Living Services (9/01/2012-
              9/30/2012)

Ex. 34L       DFCS data dashboard report, Maltreatment Rate Custody Children
              (10/1/11-9/30/12)

Ex. 34M       DFCS data dashboard report, Children Re-entering Foster Care w/1 year
              of Reunification (10/1/11-9/30/12)

Ex. 34N       DFCS data dashboard report, Children W/Perm_Plan Developed w/30
              days of Entry into Foster Care

Ex. 34O       DFCS data dashboard report, MWLS314S-Proximity of Initial Placement
              (10/1/11-9/30/12)

Ex. 34P       DFCS data dashboard report, MWLS314S-Proximity of Initial Placement
              (10/1/12-9/30/12) (2) [sic]

Ex. 34Q       DFCS data dashboard report, MWLS314S-Proximity of Initial Placement
              (10/1/11-9/30/12) (3)

Ex. 34R       DFCS data dashboard report, MWLS314S-Proximity of Initial Placement
              (10/1/12-9/30/12) (4) [sic]

Ex. 34S       DFCS data dashboard report, Children receiving a comprehensive health
              assessment (10/1/11-9/30/12)

Ex. 34T       DFCS data dashboard report, Children contacts with parents and siblings
              (9/1/12-9/30/12)

Ex. 34U       DFCS data dashboard report, Children in Unlicensed Placements
              (9/1/2012-9/30/2012)

Ex. 34V       DFCS data dashboard report, MWZ017S1_Children in Custody 17-22
              Months (9/1/12-9/30/12)

Ex. 34W       DFCS data dashboard report, Non-Therapeutic Home Contacts
              (9/01/2012-9/30/2012)

Ex. 34X       DFCS data dashboard report, Placement Stability (9/01/2012-9/30/2012)

Ex. 34Y       DFCS data dashboard report, Prevention Cases (as of 10/15/2012)

Ex. 34Z       DFCS data dashboard report, Protection Cases (as of 10/15/2012)

Ex. 34AA      DFCS data dashboard report, Reunification (10/01/2011-9/30/2012)

Ex. 34BB      DFCS data dashboard report, Sibling Groups in Congregate Care
              (9/01/2012-9/30/2012)

Ex. 34CC        DFCS data dashboard report, Therapeutic Home Contacts (9/01/2012-9/30/2012)

Ex. 34DD        DFCS data dashboard report, Timely County Conference (10/01/2011-9/30/2012)

Ex. 34EE        DFCS data dashboard report, Timely Permanency Hearing (10/01/2011-9/30/2012)

Ex. 34FF        DFCS data dashboard report, Exceptions TPR Filing for Children (as of 10/5/12)

Ex. 34GG        DFCS data dashboard report, Visitation With Children (9/01/2012-9/30/2012)

Ex. 34HH        DFCS data dashboard report, Visitation With Parents (9/01/2012-9/30/2012)

Ex. 34II        DFCS data dashboard report, Visits W/Children Remaining in Placement Following Investigation

Ex. 35A         Chart Prepared by the Office of the Court Monitor, Children in Custody With Substantiated Findings of Maltreatment, by Region, During 12-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12

Ex. 35B         Chart Prepared by the Office of the Court Monitor, Monthly In-Person Visits With Child by Assigned Caseworkers, by Region, One-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12

Ex. 35C         Chart Prepared by the Office of the Court Monitor, Proximity of Initial Placement for All Children Entering Custody, 12-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12

Ex. 35D         Chart Prepared by the Office of the Court Monitor, Children Entering Custody Who Received an Initial Health Screening Within 72 Hours of Entering Custody, 12-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12

Ex. 35E         Chart Prepared by the Office of the Court Monitor, Children in Custody 30+ Days Who Received a Comprehensive Health Assessment Within 30 Days of Entering Custody, 12-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12

Ex. 35F     Chart Prepared by the Office of the Court Monitor, Placement of Sibling Groups Who Entered Custody At Or Around the Same Time, By Region, 12-Month Periods Ending 8/31/12 and 9/30/12

Ex. 35G     Chart Prepared by the Office of the Court Monitor, Number of Children in Licensed and Unlicensed Placements, Including Approved Relative Placements Pending Full Licensure, One-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12

Ex. 35H     Chart Prepared by the Office of the Court Monitor, Investigations Open One or More Days During Period Initiated Within 24 Hours of Intake, By Region, One-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12

Ex. 35I     Chart Prepared by the Office of the Court Monitor, Status of Maltreatment Investigations Open One or More Days During Period, By Region, One-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12

Ex. 35J     Chart Prepared by the Office of the Court Monitor, Children Remaining in the Same Placement Following Maltreatment Investigation Who Met Face-to-Face With Worker Twice in a One-Month Period or At Least Once if 15 Days or Less Following Completed Maltreatment Investigation, By Region, One-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12

Ex. 35K     Chart Prepared by the Office of the Court Monitor, Children in Emergency Shelter or Temporary Facility for Over 45 Days With and Without the Division Director Approval, By Region, One-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12

Ex. 35L     Chart Prepared by the Office of the Court Monitor, Children Under Age 10 Housed in a Congregate Care Setting With and Without Regional Director Approval, By Region, One-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12

Ex. 35M     Chart Prepared by the Office of the Court Monitor, Number of Sibling Groups With At Least One Sibling Under Age 10 Housed in a Congregate Care Setting For More Than 45 Days, By Region, During Months Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12

Ex. 35N     Chart Prepared by the Office of the Court Monitor, Children With Two or More Emergency or Temporary Facility Placements At Any Time Within One Episode of Foster Care With and Without Regional Director Approval, By Region, During Months Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12

Ex. 35O    Chart Prepared by the Office of the Court Monitor, Non-Therapeutic Placement Setting Contacts, By Region, One-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12

Ex. 35P    Chart Prepared by the Office of the Court Monitor, Therapeutic Placement Setting Contacts, By Region, One-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12

Ex. 35Q    Chart Prepared by the Office of the Court Monitor, Children in Care Fewer Than 12 Months From the Time of Latest Removal From Home, By Region and Number of Placements, For the Dates 6/30/12, 7/31/12, 8/31/12, and 9/30/12

Ex. 36A    Chart Prepared by the Office of the Court Monitor, During Trial Home Visit Period, Number of Children Who Met With Their Caseworker or Family Preservation Caseworker in the Home Twice in a One-Month Period or At Least Once Monthly if 15 Days or Less, By Practice Model Fully Implemented Date, By Region, One-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12

Ex. 36B    Chart Prepared by the Office of the Court Monitor, Children in Custody for Six Months or More With an Administrative Review Every Six Months, By Region and By Practice Model Fully Implemented Date, 12-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12

Ex. 36C    Chart Prepared by the Office of the Court Monitor, Children in Custody for 12 Months or More With a Timely Permanency Hearing, By Practice Model Fully Implemented Date, By Region, 12-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12

Ex. 36D    Chart Prepared by the Office of the Court Monitor, Children Ages 14-20 Receiving Independent Living Services As Set Forth In Service Plan, By Practice Model Fully Implemented Date, By Region, 12-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12

Ex. 36E    Chart Prepared by the Office of the Court Monitor, Children Leaving State Custody and Reason, By Practice Model Fully Implemented Date, By Region, and Percentage of Children Reunified With Parent or Caretaker In Under 12 Months From Latest Removal, 12-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12

Ex. 36F    Chart Prepared by the Office of the Court Monitor, Children With a Permanency Plan By Their 30th Day of Custody, By Practice Model Fully Implemented Date, By Region, 12-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12

Ex. 36G       Chart Prepared by the Office of the Court Monitor, Length of Time Between Court Custody and Finalization of Adoption, By Practice Model Fully Implemented Date, By Region, 12-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12

Ex. 37       Strategy for Addressing Carve Out Counties

Ex. 38       Chart Prepared by the Office of the Court Monitor, Children in Foster Care By Placement Type, Statewide, One-Month Period Ending 9/30/12

Ex. 39       Chart Prepared by the Office of the Court Monitor, Children in Foster Care By Placement Type, By Region, One-Month Periods Ending 6/30/12, 7/31/12, 8/31/12, and 9/30/12

Ex. 40       Chart Prepared by the Office of the Court Monitor, Total Number of Children in Custody With Findings of Maltreatment During 12-Month Period Ending 9/30/12