IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

OLIVIA Y., *et al.*                                                                                             PLAINTIFFS

v.                                                                                CIVIL ACTION NO. 3:04CV251LN

PHIL BRYANT, as Governor of the State of Mississippi, *et al.*            DEFENDANTS

---

**PLAINTIFFS' RESPONSE TO THE COURT MONITOR'S STATUS REPORT TO THE COURT REGARDING PROGRESS DURING PERIOD THREE**

---

Plaintiffs submit this Response to the Court Monitor's Status Report to the Court Regarding Progress During Period Three, dated January 25, 2013 (Dkt. No. 580) (the "Status Report"). The Status Report was submitted to the Court in accordance with Section VI.B of the Modified Mississippi Settlement Agreement and Reform Plan (the "MSA") approved by the Court on July 6, 2012 (Dkt. No. 571). During a telephonic hearing on October 25, 2012, the Court ordered the parties to submit responses to the Status Report setting forth their positions. Plaintiffs respectfully submit this Response in accordance with the Court's instructions.

**I.**     **INTRODUCTION**

Almost nine years ago, in March 2004, Plaintiffs brought this class action, civil rights lawsuit in order to vindicate their constitutional rights to be free from harm and risk of harm resulting from longstanding problems with the Mississippi child welfare system. Plaintiffs alleged serious failures of that system, including extremely high rates of maltreatment in care,

overburdened and poorly trained caseworkers, extended stays in custody, the routine use of emergency shelters and other temporary holding facilities, and overuse of group homes rather than family-like placements.

This case was settled in January 2008 when the parties entered into the Mississippi Settlement Agreement and Reform Plan (the "Settlement Agreement"). (Dkt. No. 459). As noted in the Status Report, Defendants' progress since that time has been "minimal," "not substantial," and "marked by repeated delays."[1] The Status Report states that "it is apparent that defendants are not accelerating sufficiently the pace of their efforts with respect to several key areas" and finds that "in light of the considerable risk of harm to children in defendants' custody, there is an urgent need to do so."[2]

Five years into the reform effort, many of the same problems that caused Plaintiffs to bring this litigation – including high rates of abuse and neglect of foster children, staffing shortages, and burdensome caseloads – continue to mark Defendants' operations and put children in harm's way. Given these continuing and longstanding problems, it will be extremely difficult for Defendants to come into compliance with many of the requirements of the MSA and the Period 3 Implementation Plan that come due in only five short months. While progress in many key areas continues to lag, Plaintiffs remain unsafe in Defendants' custody and languish without permanent homes and necessary services.

The Status Report focuses on a number of important issues (including internal capacity, staffing and workload issues, and practice model implementation). Plaintiffs focus this Response on three issues that are fundamental to implementation of the MSA and the safety of the children in the Mississippi child welfare system, and provide additional detail beyond what is set forth in

---

[1] Status Report at 2, 4.
[2] *Id.* at 4.

the Status Report on these issues: (1) the failure to comply with the MSA requirement to produce reliable, validated date reports; (2) the incredibly high, and possibly underreported, rate of maltreatment in care; and (3) the lack of essential leadership at the very top of the agency.

## II.   DEFENDANTS ARE UNABLE TO PRODUCE RELIABLE, VALIDATED DATA REPORTS

One of the most critical elements of the MSA is its requirement, as detailed in Section I.D.1 of the Period 3 Implementation Plan (Appendix B) and in the Proposed Data Reports Schedule (Appendix C), for Defendants to produce accurate and validated data reports to the Plaintiffs and the Monitor that are tightly linked to the requirements of the MSA.[3] As the Status Report recognized, these reports are crucial for the parties' and the Monitor's ability to determine whether Defendants are meeting the MSA's requirements.[4] Effective management of a complex agency like a child welfare system requires data reports that are up-to-date and accurate, and provide information on the critical issues.[5] Thus, these reports are also fundamental to Defendants' ability to keep the children in their custody safe, find them permanent homes quickly, and provide them with needed services.

Despite the importance of the data reporting provisions of the MSA and the Period 3 Implementation Plan, the Status Report described in considerable detail serious, long-standing and ongoing problems with Defendants' production of these data reports.[6] One of the most

---

[3] These provisions require Defendants to produce 56 reports (the last report was listed in error) and then provide these reports on a monthly basis (except for one report that is provided quarterly) to Plaintiffs and the Monitor. Certain reports were "available" when Implementation Period Three began and others became available sometime after Implementation Period Three began. However, by January 31, 2013, all reports listed on Appendix C were supposed to be produced and provided to Plaintiffs and the Monitor.
[4] Status Report at 45.
[5] *Id.* at 33.
[6] *Id.* at 33-38.

concerning issues highlighted in the Status Report is Defendants' total failure to produce certain key reports, including those related to caseworker and supervisor workloads.[7]

After the Status Report was filed with the Court, on January 31, 2013, Defendants informed Plaintiffs for the first time that production of an additional 21 reports – known as the FCR, or Periodic Administrative Determination Reports – would be delayed beyond the January 31 deadline set out in Appendix C to the MSA.[8]  Defendants attributed this delay to unspecified "report specification changes" and stated only that they "anticipate[d] being able to produce some of the reports by the end of next week [i.e., by February 8] and [would] produce the others as soon as the reports are complete."[9]  None of these reports have been forthcoming since that time, and no information has been given to Plaintiffs about when these reports will be produced. These reports provide data about many MSA requirements, including the completion of family assessments, the provision of mental health, medical, dental and independent living services, and the review of service plans.  Without these data reports, there is no way for Plaintiffs to determine whether Defendants are in compliance with the underlying provisions of the MSA.

Plaintiffs have raised the issues related to the data reports with Defendants and will raise these issues with the Court if they are not resolved.  Defendants' ongoing non-compliance with their obligation to produce accurate, validated data reports is itself a failure to comply with the MSA.  Furthermore, it also compromises Defendants' ability to come into compliance with many of their other MSA obligations, makes it impossible for Plaintiffs and the Monitor to determine

---

[7] *Id.* at 34.  In addition to those reports that Defendants simply have not produced at all, the Status Report also describes additional serious problems with those reports that have been produced: (i) certain reports contain calculation errors, which raises broader concerns about the data validation process employed by Defendants; (ii) certain reports do not track whether the MSA requirements are being met because Defendants' data system does not capture all of the necessary data; (iii) certain reports do not track whether the MSA requirements are being met because they are designed in a way that is inconsistent with the MSA requirements; and (iv) certain reports are presented in a manner that makes it unduly difficult to determine whether the MSA requirements are being met.  *Id.* at 34-38.
[8] Email from Gwen Long to Miriam Ingber and Grace Lopes, Jan. 31, 2013, re: R7W baseline CQI rept.
[9] *Id.*

4

whether Defendants are complying with certain provisions of the MSA, and puts children at risk of harm.

### III. CHILDREN ARE ABUSED AND NEGLECTED AT ALARMINGLY HIGH, AND POSSIBLY UNDER-REPORTED, RATES

Section II.C.2.b.1 of the MSA requires that by the end of Implementation Period Three, on a statewide basis, "[t]he rate of abuse or maltreatment in care in the last year shall not exceed 1.00%." It is important to note that this rate of 1.00% maltreatment in care is approximately three times the federal standard of 0.32%.[10]

With only five months until Defendants must come into compliance with this most basic safety requirement, the rate of maltreatment in care statewide is 1.42%, almost 50 percent higher than the rate permitted by the MSA.[11] This means that, during the twelve months from January 2012 to December 2012, 86 of the 6,032 children who were in state custody were abused or neglected by a foster parent or other foster caregiver. Furthermore, it is clear that all children in state foster care custody are at heightened risk of harm as demonstrated by this unacceptable rate of maltreatment in care. This is underscored by comparing the rate of maltreatment in care in Mississippi to the rate in other states: Mississippi's rate of maltreatment in care for federal fiscal year 2011, the most recent year for which data was reported, was 1.59%, the highest in the country.[12] Indeed, Mississippi's rate of maltreatment in care has been the first or second highest in the nation for the last four years.[13]

While the statewide rate of maltreatment in care is alarming, it is equally concerning that the two regions that have fully implemented the Practice Model have reported rates of

---

[10] Children's Bureau, Table of Data Indicators for the Child and Family Services Reviews 1, Jan. 1, 2007, *available at* http://www.acf.hhs.gov/programs/cb/resource/data-indicators-for-cfsr, last visited on Feb. 14, 2013.
[11] MACWIS MWBRD06, Children with Alleged Maltreatment While in Custody Report, Jan. 1, 2012 to Dec. 31, 2012.
[12] Children's Bureau, Child Welfare Outcomes Report Data, *available at* http://cwoutcomes.acf.hhs.gov/data/overview, last visited on Feb. 15, 2013.
[13] *Id.*

maltreatment in care that are even higher than the statewide average. From January 1, 2012 to December 31, 2012, the rate of maltreatment in care was 1.38% in Region I-South (8 of 576 children were maltreated) and a shocking 2.59% in Region II-West (6 of 231 children were maltreated), the second highest in the state.[14] These regions are supposed to serve as models for those regions that have not yet completed implementation of the Practice Model, and the fact that their rates of maltreatment in care are so high is a worrying sign about the Practice Model, which is the cornerstone of Defendants' reform plan.

Although these maltreatment in care rates are extremely concerning, it is likely that these rates are actually underreported. As the Status Report recognized, "because of ongoing and very serious deficiencies in the quality of maltreatment investigations, which defendants have been unable to address in an effective way, there is a possibility that this rate could be even higher than the rate reported by defendants."[15] Plaintiffs have identified many serious issues with Defendants' maltreatment investigation practices. Among other problems, Plaintiffs' review of the data and the investigation reports reveals that Defendants regularly fail to timely initiate and complete investigations, interview crucial collateral contacts, and have a tendency to base their findings on the alleged perpetrators' narratives rather than the alleged victims' narratives.

---

[14] MACWIS MWBRD06, Children with Alleged Maltreatment While in Custody Report, Jan. 1, 2012 to Dec. 31, 2012.

[15] Status Report at 46-47 (citations omitted). The Status Report also discussed serious deficiencies with Defendants' report titled "Summary of Child Fatality Assessment to Improve Child Safety" as an example of Defendants' inability to adequately address child safety issues. F.M. was a child who died while in Defendants' custody. Section II.C.1 of the Period 3 Implementation Plan required Defendants to conduct an assessment of the F.M. fatality, including an assessment of their provision of foster care services, case practice and licensing practice. In addition, Defendants were required to include recommendations for ways to improve child safety and address any failings that were identified in their assessment. The Status Report described Defendants' report as "grossly inadequate, evidencing both a lack of capacity and a lack of appreciation for the importance of the assessment and the need to perform it adequately." *Id.* at 46 n.196.

Turning first to the timeliness issue, by July 2013, all investigations into allegations of maltreatment in care must be initiated within 24 hours and completed within 30 calendar days.[16] Timely initiation and completion of maltreatment investigations is critical both to the accuracy of the determinations made and the safety of the children involved.  However, despite the importance of this measure, as of December 31, 2012, only 64.1% of maltreatment in care investigations were initiated within 24 hours from the time of intake, and only 66.7% of maltreatment in care investigations were completed within 30 calendar days.[17]

Turning next to the collateral contact issue, often, individuals who could have important information about the alleged maltreatment are not interviewed.  For example, in one investigation, the report alleged that the foster mother publicly embarrassed one of her foster children by disrobing her, spanking her in a bathroom at church, and cursing and yelling at the alleged victim in public.  The report also alleged that the foster father whipped one of the other foster children.  Even though many of the alleged incidents occurred in public places, no one outside of the family and the individual that made the report were interviewed.[18]  In another investigation, the report alleged that a one-year-old was being left with the foster mother's 20-year-old son and was not being cared for properly when she was outside of daycare.  The report does not include any interviews with the 20-year-old or anyone at the daycare facility, even though these collateral contacts are central to the maltreatment allegations.[19]  These are just a few examples.  It seems difficult, if not impossible, to conduct a "full and systematic evaluation

---

[16] MSA § II.B.1.e.2.
[17] MACWIS MWZ1271, Custody Children in Open ANE Investigations – State Summary, Dec. 1, 2012 to Dec. 31, 2012.
[18] MDHS Division of Family and Children's Services, Safety, Permanency, and Wellbeing Serious Incident Report, Id 005789680, Nov. 19, 2012.
[19] MDHS Division of Family and Children's Services, Safety, Permanency, and Wellbeing Serious Incident Report (no ID number included), Oct. 10, 2012.

of the factors that may place a child in custody at risk,"[20] as the MSA requires, when important collateral individuals are not interviewed.

Turning finally to the tendency to rely on the perpetrator's narrative, in some investigations the workers do not give enough credence to the children's narratives, even when multiple children assert that maltreatment occurred. This situation was apparent in at least two recent investigation reports reviewed by Plaintiffs.[21] In the first report, two teenage girls stated that their foster mother and foster mother's mother called the girls "bitches, whores and sluts" and cursed them out. The teenage girls also alleged that the foster mother's mother threatened to hit one of the girls with her cane. During the investigation the foster mother and foster mother's mother asserted that they never called the girls names, cursed at them, or threatened the girls physically. Although the teenage girls' narratives and perpetrators' narratives were completely different, the worker based her finding solely on the perpetrators' narratives and did not substantiate the allegations.[22] In the second investigation report, a brother and sister alleged (separately) that on visits to their biological mother's home their biological mother's husband would pull the brother's pants down in front of groups of people to embarrass him and had hung the brother upside down by his feet. The children also asserted that in one instance the biological mother had pulled the brother to the ground by his arm. Both children stated that they did not feel safe at their biological mother's home. During the investigation, the biological mother denied all of the allegations. Despite the children's narratives and concern with their own safety

---

[20] MSA § II.B.1.e.2.
[21] MDHS Division of Family and Children's Services, Safety, Permanency, and Wellbeing Serious Incident Report, Id 005779898, Nov. 13, 2012; MDHS Division of Family and Children's Services, Safety, Permanency, and Wellbeing Serious Incident Report, Id 005800021, Nov. 29, 2012.
[22] MDHS Division of Family and Children's Services, Safety, Permanency, and Wellbeing Serious Incident Report, Id 005779898, Nov. 13, 2012.

at their biological mother's home, the worker based her finding on the mother's narrative and did not substantiate the allegations.[23]

Not only do Defendants' failures with respect to child maltreatment investigations give rise to serious safety concerns – and could give rise to underreporting of the already extremely high rate of maltreatment – these poor investigation practices are in and of themselves violations of the MSA. According to Section II.B.1.e.1-2 of the MSA, by the end of Implementation Period Three, Defendants must "assure that standardized decision-making criteria are used for . . . assessing all reports of maltreatment . . . of children in DFCS custody," and "Defendants shall assure that such investigations and decisions are based on a full and systematic evaluation of the factors that may place a child in custody at risk." Given the deficiencies in the investigations recognized by the Status Report, some of which have been described above, it is unlikely that Defendants will be able to comply with these critical safety-related provisions of the MSA by the end of Period Three.

## IV.    THERE IS A LACK OF CRITICAL LEADERSHIP AT THE TOP OF DFCS

Section II.A.1 of the MSA requires Defendants to

> maintain a Deputy Administrator having sole responsibility for the oversight of the Division of Family and Children's Services ("DFCS"). That person shall be qualified by: an advanced degree from an accredited college or university in a field related to the agency's mission and services; five years of related experience at minimum; competence in administering and providing services to individual, families, and/or children; management skills in addressing human resources and financial matters; and the ability to coordinate the agency's services with other community resources.

As described in the Status Report, Lori Woodruff, who previously filled the deputy administrator position, gave notice in March 2012 and resigned effective June 30, 2012.[24] On December 20,

---

[23] MDHS Division of Family and Children's Services, Safety, Permanency, and Wellbeing Serious Incident Report, Id 005800021, Nov. 29, 2012.
[24] Status Report at 20.

2012, nine months after Ms. Woodruff tendered her resignation, Defendants identified Dr. Kimberly Shackleford as the new deputy administrator. She will not begin work until April 1, 2013.[25] In the interim, the deputy director of the Mississippi Department of Human Services assumed many of the deputy administrator's responsibilities; however, he "has other responsibilities beyond DFCS, and does not satisfy all of the MSA's qualification standards."[26]

Plaintiffs have been concerned throughout by the process employed by Defendants to fill this absolutely critical leadership role. First, the sheer length of time without a deputy administrator, a period of time which continues to this day – itself a violation of the MSA – has undoubtedly hampered Defendants' ability to reform their child welfare system in accordance with the MSA. More than one year will have passed from the time when Ms. Woodruff gave notice until the date when Dr. Shackleford steps in, a significant time without a qualified leader and the direction, discipline, and vision such a person brings. It is almost impossible to expect that the MSA, and most especially the requirements of the Period 3 Implementation Plan, will be implemented on schedule given Defendants' failure to replace Ms. Woodruff in a timely manner. Further, the lack of urgency demonstrated by Defendants during the search process was very disappointing. Despite urging by Plaintiffs, Defendants were unwilling or unable to raise the salary significantly or utilize an outside search firm. Plaintiffs repeatedly expressed concerns to Defendants about their failure to fill this position more quickly, and believe that Defendants could have taken steps that may have allowed for a more expeditious solution.

Plaintiffs wish to highlight here just a few examples of critical areas of poor performance by Defendants that should and could have been the focus of heightened attention by an engaged

---

[25] *Id.* at 21.
[26] *Id.* at 20-21.

10

deputy administrator if one had been in place during the past 7.5 months.[27] These areas need to be turned around quickly if there is any chance of compliance with the MSA's requirements by the end of Period Three. Specifically:

- By July 2013, 75% of caseworkers must meet MSA caseload requirements. However, as of October 31, 2012, only 50% of caseworkers in non-carve out counties carried a caseload that did not exceed the MSA caseload requirements.[28] It is especially troubling that the two regions that have fully implemented the Practice Model, Regions I-South and II-West, are well below the MSA's caseload requirement. Of the 18 counties that make up Region I-South, 10 are below the 75% MSA Period Three requirement and seven of those are below the 50% statewide average. Of the six counties that make up Region II-West, five are below the 75% MSA Period Three requirement and four of those are below the 50% statewide average.[29]

- There has been a net decline in supervisors in both 2011 and 2012.[30] As the Status Report explains, "Defendants will have substantial difficulty satisfying MSA requirements if supervisory staffing deficits are not addressed in an effective way."[31]

- By July 2013, all children who remain in an out-of-home placement following an investigation into a report of maltreatment in care must be visited twice a month for three months after the conclusion of the investigation.[32] As of December 31, 2012, this requirement was only met in 60.53% of cases.[33]

- By July 2013, at least 50% of children who entered custody during Period Three must receive a health screening within 72 hours of placement[34] and a comprehensive health assessment within 30 days of entering care.[35] As of December 31, 2012, only 20.96% of children received the required health screening[36] and only 24.29% of children received the required comprehensive health assessment.[37]

---

[27] In Plaintiffs' description of some of these issues, they have relied on data provided by Defendants. Given the data issues discussed above (Section II *supra*), it is important to utilize this data cautiously.
[28] Status Report at 25.
[29] *Id.* at Ex. 6.
[30] *Id.* at 28-29.
[31] *Id.* at 29.
[32] MSA § II.B.1.e.3.
[33] MACWIS MWLS55SA, Children Remaining in Placement Following Maltreatment and their Caseworker Contacts Summary, Dec. 1, 2012 to Dec. 31, 2012.
[34] MSA § II.B.3.i.1.
[35] MSA § II.B.3.i.2.
[36] MACWIS MWLS315, Children who received a comprehensive health assessment within 30 days if [sic] custody, Jan. 1, 2012 to Dec. 31, 2012.
[37] *Id.*

- By July 2013, 40% of children with a goal of reunification must have their assigned caseworker meet monthly with the child's parents.[38] As of December 31, 2012, only 25.05% of children met this requirement.[39]

In addition to the long delay between Ms. Woodruff's resignation and Dr. Shackleford's start date, Plaintiffs also have some concerns about the new deputy administrator's qualifications. On February 14, 2013, Plaintiffs spoke to Dr. Shackleford and counsel for Defendants regarding her qualifications and experience. While Dr. Shackleford is unquestionably a child welfare expert who is familiar with DFCS, she simply does not have experience managing a budget or staff anywhere close to the size she will be required to administer in this critical position.[40] Dr. Shackleford expressed a commitment to moving the reform process forward; however, Plaintiffs are concerned that her selection, given her lack of high-level administrative experience and the inevitable time it will take her to get up to speed, could lead to additional delays in implementing the MSA.

## V.     CONCLUSION

During the first seven months they have had to implement the MSA, Defendants have failed to meet a number of critical provisions, including those related to data reports and the leader of the agency. They have also consistently displayed a lack of urgency about turning around the reform effort,imagination which is now entering its fifth year. With the highest rate of maltreatment in care in the country and extremely poor investigation practices, children in Defendants' custody are being harmed and placed at risk of harm every day, even while this agency is under the supervision of the federal court. Unless there are significant changes in both

---

[38] MSA § II.B.5.e.2.
[39] MACWIS MWZWCR3, Children in Custody with a Permanency Plan of Re-Unification: Worker/Birth and Adopted Parent Face to Face Contacts – State Summary, Dec. 1, 2012 to Dec. 31, 2012.
[40] Dr. Shackleford has never managed a budget larger than approximately $1.5-$2.0 million, while the budget of DFCS is approximately $200 million. Dr. Shackleford has never managed more than 75-100 workers (and that was only for short periods of time many years ago), while DFCS has approximately 1,200 employees. *See also* Status Report at 21 n.82.

efforts and outcomes in the next five months, Plaintiffs are extremely concerned that many of the requirements of the MSA which come due at the end of Period Three will not be met, and that the only solution will be to ask this Court to intervene in order to protect the children of Mississippi.

Respectfully submitted this 15th day of February, 2013.

/s/ *Miriam Ingber*
Marcia Robinson Lowry (MBN 43991 *pro hac vice*)
Miriam Ingber (MBN 46823 *pro hac vice*)
Sarah Russo (MBN 46802 *pro hac vice*)
CHILDREN'S RIGHTS
330 7th Avenue, 4th floor
New York, New York  10001
Telephone: (212) 683-2210

W. Wayne Drinkwater, Jr. (MBN 6193)
BRADLEY ARANT ROSE & WHITE LLP
188 East Capitol Street, Suite 450
Jackson, Mississippi  39201
Telephone: (601) 948-8000
Facsimile: (601) 948-3000

Christian Carbone (MBN 43986 *pro hac vice*)
John Piskora (MBN 44474 *pro hac vice*)
LOEB & LOEB LLP
345 Park Ave.
New York, New York  10154
Telephone: (212) 407-4000

John Lang (MBN 43987 *pro hac vice*)
Attorney at Law
Suite 4600
60 East 42nd Street
New York, NY 10165

*PLAINTIFFS' COUNSEL*

## CERTIFICATE OF SERVICE

I, Miriam Ingber, do hereby certify that on February 15, 2013, I electronically filed the foregoing Plaintiffs' Response to the Court Monitor's Status Report to the Court Regarding Progress During Period Three using the ECF system, which sent notification of such filing to the following:

> Dewitt L. ("Rusty") Fortenberry Jr., Esq.
> Kenya Key Rachal, Esq.
> Ashley Tullos Young, Esq.
> BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC
> 428 I-555 North Meadowbrook Office Park
> Jackson, Mississippi 39211
> Telephone: (601) 351-2400
>
> Harold E. Pizzetta, III, Esq.
> Assistant Attorney General
> General Civil Division
> Carroll Gartin Justice Building
> 430 High Street
> Jackson, Mississippi  39201

SO CERTIFIED this 15th day of February, 2013.

                                       /s/ *Miriam Ingber*
                                       Miriam Ingber