IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

OLIVIA Y., *et al.*                                                    PLAINTIFF

v.                                               CIVIL ACTION NO. 3:04CV251LN

PHIL BRYANT, as Governor of the State of Mississippi, *et al.*         DEFENDANTS

---

**DEFENDANTS' RESPONSE TO THE COURT MONITOR'S REPORT TO THE COURT
REGARDING PROGRESS DURING PERIOD THREE**

---

COME NOW Defendants, Phil Bryant, as Governor of the State of Mississippi, Richard

Berry, as the Executive Director of the Mississippi Department of Human Services ("MDHS"),

and the Director of the MDHS Division of Family and Children's Services ("DFCS"),

(collectively, "Defendants"), and submit their Response to the Court Monitor's Report to the

Court Regarding Progress During Period Three.  Defendants' Response is intended to respond to

and supplement the Court Monitor's Report and provide the Court with further information and

explanation regarding Defendants' activities during the first 6 months of Period 3.

**I.      Introduction**

The Court Monitor's Report (Doc. 580) begins with a lengthy recitation of the history of

the case and Defendants' prior performance under the original Settlement Agreement.

Defendants will not restate that information again here. While it may provide some context, the

Court is well aware of the case history as it has been documented in past reports filed with the

Court, and, more importantly, it is irrelevant to the question of whether Defendants are

complying with their obligations under the Modified Mississippi Settlement Agreement and

Reform Plan that is currently binding on the Defendants.  As this Court has emphasized, the

parties and the Court must focus on what is currently required of Defendants and "dwelling on Defendants' past omissions will not serve that purpose."  (Order, Doc. 557 at p. 10).

## II. The Mississippi Modified Settlement Agreement and Reform Plan and Period 3 Implementation Plan

The Mississippi Modified Settlement Agreement and Reform Plan ("MSA") was approved on July 6, 2012 (Doc. 571).  The MSA was intended to and does supersede the original Settlement Agreement and also incorporates the Period 3 Implementation Plan ("Period 3 IP"). (MSA at p. 1).  It is those benchmarks and timeframes specifically outlined in the MSA and Period 3 IP, and those alone, that Defendants are currently obligated to meet.

When negotiating the MSA and Period 3 IP, Defendants sought to follow the Court's instructions to make the MSA more reasonable and establish more realistic timeframes, while also negotiating an MSA that would incorporate the family-centered Practice Model that DFCS had already began to implement.  The Practice Model is designed to standardize DFCS' interventions with children and families across the state, and to do so in ways that reflect family-centered values and principles while meeting *Olivia Y* requirements.

The Practice Model is comprised of six broad components, including safety assurance and risk management, mobilizing appropriate services timely, involving family members in decision making and case activities, preserving relationships and connections, individualized case planning, and strengths and needs assessments.  Defendants' Practice Model is driven by a continuous quality improvement system that will implement quality assurance protocols at the county, regional, and state levels. Defendants decided that it would be advantageous to develop a child welfare practice model that could be easily understood by field staff and stakeholders across the state, even though such a mechanism was not required by the original Settlement Agreement. Defendants wisely chose to develop and implement a practice model early in the

reform process, in contrast to other states that have adopted a practice model after many years of struggling unsuccessfully to comply with settlement agreements entered into with Children's Rights, Incorporated ("CRI").

The Practice Model was designed to be rolled out in a staggered approach throughout the state's 13 regions and the MSA is intended to align with this staggered approach.    In each region, the Practice Model is implemented in distinct phases: 1) a six-month planning phase, 2) a one-year implementation stage, and 3) a one-year full implementation stage.   Following full implementation of the Practice Model, there is a 12 month period of data tracking.  Pursuant to this schedule, the first two regions to implement the Practice Model will not be subject to measurement for regional standards until the start of Period 4.

The new structure adopted in the MSA includes statewide measurements and regional measurements to account for the gradual region-by-region implementation of the Practice Model. The statewide measures focus predominantly on child safety and placement, while the regional measures address issues such as achieving permanency, case planning, and reunification, which are better suited to be measured following implementation of the family-centered Practice Model.

### III.    Defendants' Progress During Period 3

Period 3 began in July 2012 and Defendants have been working diligently to meet their obligations under the MSA and Period 3 IP.  As the Court Monitor acknowledges, Defendants have made great strides in meeting a cornerstone requirement that will lay the foundation for Defendants' reform effort.    (Monitor's Report at p. 14).   Defendants have established a sustainable pre-service training program for new caseworkers and supervisors that utilizes an up-to-date curriculum that incorporates *Olivia Y* requirements, as well as fundamental concepts from

the Practice Model. (*Id.* at p. 14). Likewise, Defendants have overhauled and updated the DFCS policy and procedure manual to reflect *Olivia Y* requirements and the family-centered Practice Model. (*Id.* at p. 13).

**A. Defendants are Establishing a Solid Continuous Quality Improvement Program**

A solid continuous quality improvement ("CQI") program is what drives and sustains a successful practice model and reform effort and Defendants have made strides in implementing a quality CQI program during Period 3. The CQI unit oversees the CQI program and is led by Cynthia Greer. (Greer Aff. at p. 1, attached as Exhibit "A"). The CQI Unit helps ensure the safety, permanency, and well-being of children in DFCS custody through quality improvement reviews of cases. The resulting case review reports and feedback assist field staff by informing and thereby improving practice. The CQI Unit has several components, including an Evaluation and Monitoring Unit ("EMU"), a Foster Care Review Unit ("FCR Unit") and a MACWIS Unit. (*Id.* at p. 2).

1. The CQI unit has made progress in staffing.

Since May 2012, the CQI Unit has made progress in staffing the unit. The EMU added 2 staff members and the FCR Unit added 3 reviewers. (*Id.*). Two FCR staff also moved into FCR supervisory positions. Interviews were held on February 8, 2013, and an additional interview session is tentatively scheduled for February 25, 2013. (*Id.*). Plans are to recommend 3 candidates for FCR reviewer positions from these 2 interview sessions. (*Id.*). The MACWIS Unit added 3 QA/Validation staff, 2 hardware staff, and a replacement MACWIS Director. The Office of CQI also added 1 CQI reporting analyst in September 2012 and 1 reporting assistant in December 2012. Despite this progress in hiring, Defendants are aware that the current staffing levels do not meet the required CQI staffing levels for the end of Period 3 and understand that the requirement is that the CQI Unit be fully staffed by the end of Period 3. (*Id.*). However, it

should be emphasized that under the terms of the MSA, Defendants have until the end of Period 3 (July 5, 2013) to satisfy this staffing requirement and should not be criticized because they have not met the Period 3 requirement ahead of schedule.

    2.  <u>The CQI Unit has produced valuable reports and provided case review training</u>.

Since the start of Period 3, the CQI Unit has been actively collecting and analyzing data and drafting reports summarizing its findings. (*Id.* at p. 3). Indeed, the CQI Unit has produced over 500 pages of reports, including the first Annual Statewide CQI report that was produced in August 2012. (*Id.*). The CQI Unit has also provided and participated in extensive training since the beginning of Period 3.[1] (*Id.* at pp. 3-4).

    3.  <u>The CQI Unit is working on the Period 3 requirement of reviewing all maltreatment in care cases.</u>

Improving the quality of maltreatment in care investigations is a priority for DFCS and the CQI Unit is charged with leading and overseeing this improvement. (*Id.* at p. 4). Since Period 3 began, the CQI Unit has been working on the Period 3 requirement of reviewing all maltreatment in care ("MIC") cases. (*Id.*). Currently the EMU is finalizing the MIC review process as well as the MIC review instrument. (*Id.*). Two positions have been posted for the hire of MIC review staff. These staff members will report directly to the EMU Division Director. (*Id.*).

---

[1] The CQI EMU Unit provided EMU case review training to: Region 3-North - July 24, 2012; Region 4-South - August 21, 2012; Region 3-South - September 18, 2012; Region 7-West - October 23, 2012; Region 6-November 13, 2012; and Region 2-East - January 23, 2013. Additional training for the CQI Unit included: EMU Targeted Case Review Training – May 29-30, 2012; CQI Learning Lab for FCR and EMU – August 3 and August 17, 2012; PAD Guide Training for FCR and EMU – September 4, 2012 and February 7, 2013 (hosted by CSF); *Turning Data into Conversations and Conversations into Actions* Training hosted by National Resource Center for Child Welfare and Data Technology (NRCCWDT) – March 19-20, 2012; Monthly CQI Webinars hosted by NRCCWDT – Began June 2012 and continues indefinitely; and Reports Validation Training for MACWIS QA Staff – July 2012 and February 6, 2013 (hosted by CSF).

The CQI Unit has also recently worked with MACWIS staff to request enhancements to the current HEAT software for tracking purposes. (*Id.*). The CQI Unit plans to use the HEAT software to track all concerns reported from FCR and EMU staff that require corrective action. (*Id.*). The CQI Unit will be able to produce reports, from the HEAT software, of this tracking. (*Id.*).

Since the official MIC review process and corrective action process are not due until the end of Period 3 and are not yet finalized, an interim process to address child safety concerns has been put into place. (*Id.*). FCR and EMU staff report any safety, permanency and well-being concerns based on case reviews via email to the Regional Director in the region where the child is located, with a copy of the email to the CQI Director, Field Operations Director and Field Operations Bureau Director. (*Id.*). The CQI Director and Field Operations Director and Bureau Director work together to facilitate follow-up with all reports from FCR and EMU. (*Id.*).

## B. Defendants are working to sustain progress until a new management information system can be secured.

Defendants acknowledge that their current management information system, MACWIS, is antiquated and that it has considerable data reporting limitations, and Defendants have been forthcoming about this issue with the Court Monitor, Plaintiffs, and this Court.

### 1. Defendants are working as diligently as possible to secure a new management information system.

Defendants understand that remedying the issues with their information management system is critical to their success in this reform effort and Defendants are taking a dual approach. First, Defendants are working as diligently as possible to secure a new management information system to replace MACWIS. (*Id.* at p. 5). However, during this process of securing a new system, Defendants must adhere with all of the requirements and timeframes handed down by Administration for Children and Family ("ACF") of the Division of Health and Human Services

("DHHS").  (*Id.*).  While this inherently causes the process to be attenuated, it is necessary to ensure that the new information management system will comply with federal standards and also be funded in large part by federal dollars.  (*Id.*).

One of the requirements of ACF was that Defendants complete an assessment of the current MACWIS system prior to moving forward with securing a new management information system.  (*Id.*). This assessment was conducted by Walter R. McDonald & Associates, Inc. ("WRMA") and was completed in late June 2012.  (*Id.*). Since receiving the final assessment from WRMA, Defendants have been working expeditiously toward contracting for a replacement system for MACWIS.  (*Id.* at pp. 5-6). The following is a list of just some of the activities that have been undertaken since Defendants received the assessment report in late June 2012:

a.  July 2012 – Mark Jazo, ACF analyst assigned to Mississippi, arranged a September site visit.

b.  July 30, 2012 – ITS Analyst Debra Spell was contacted regarding reassignment to the new Statewide Automated Child Welfare Information System ("SACWIS")  project since she is familiar with the project already.

c.  August 02, 2012 – MACWIS Director and CQI Director began work with MDHS Management Information System ("MIS") staff on information needed by ITS to begin SACWIS project.

d.  September 19-20, 2012 – Mississippi site visit with ACF regarding SACWIS Project Status and Planning.

e.  October 5, 2012 – Requested extension for submitting 2011-2012 Advanced Planning Document Update ("APDU").

f.  October 2012 – After working with ACF analyst, a Letter of Intent was submitted on October 30, 2012.

g.  October/November 2012 – Worked on APDU submission.  Although DFCS is moving forward with a new SACWIS system effort, DFCS has to continue to request funding for current MACWIS via APDU submission. The APDU also included requests for funding of a Quality Assurance/Independent Verification and Validation ("QA/IVV") vendor for the new SACWIS project, as well as funding for the MACWIS Citrix network project to help improve MACWIS connectivity.

7

h.    November 2, 2012 – New SACWIS Project Kickoff Meeting held with MACWIS, CQI Director, MIS staff and ITS assigned analyst, Debra Spell. Debra Spell will begin writing RFP, advertise, and receive bids for QA/IV&V vendor for new SACWIS project.

i.    November 29, 2012 – New ACF contract analyst was assigned to work with Mississippi along with Mark Jazo on upcoming SACWIS project.

j.    December 17, 2012 – SACWIS Project Team formed (MACWIS and MIS staff).

k.    December 20, 2012 – Submitted finalized APDU to ACF for funding approval.

l.    January 31, 2013 – Began review of RFP 3713 (QA/IV&V Vendor Procurement – SACWIS Project).

m.    February 1, 2013 – Approval letter received from ACF for MACWIS APDU for federal funding requested.

n.    February 8, 2013 – RFP 3713 sent to Mark Jazo, ACF, for informal review.

o.    Tentative RFP Schedule -- release to vendors by March 5, 2013.

(*Id.* at pp.6-7). Defendants believe this extensive list of activities and the pace at which they occurred certainly disputes the Court Monitor's contention that the Defendants' "pace has been slow at best." (Monitor's Report at p. 30). Indeed, these activities evidence the type of coordination with and approval of federal partners that the Court Monitor acknowledges are necessary to enable federal funding of the new system. (*Id.* at p. 31.)

Marking further progress, just last week Defendants sent the RFP for a contract for services from a QA/IVV vendor to ACF for informal review and feedback. (Greer Aff. at p. 7). This model of hiring a QA/IVV vendor was recommended by ACF and will allow Defendants to secure a vendor that will work with Defendants during the planning, system design, development and implementation stages for the new management information system.

8

2.    <u>Until a new information system can be secured, Defendants are working to sustain progress and optimize the antiquated MACWIS system.</u>

Until a new information system can be implemented, Defendants must rely on MACWIS. Defendants are working to optimize this antiquated system that has significant data reporting limitations. (*Id.*). Understanding these inherent limitations, Defendants negotiated a constrained data reporting schedule, during the renegotiation of the MSA, so as comply with this Court's Order to create a more realistic MSA. These data reports, which are incorporated in Appendix "C" of the MSA, were intended to provide information on key MSA requirements but were never envisioned, much less promised, to be the types of reports that one would ideally have to manage a complex institutional reform effort. MACWIS simply does not have the ability to produce those type of reports.

As Defendants have explained before, MACWIS is not compatible with the more advanced internet and web-based applications of today. (Greer Aff. at p. 5). When originally developed in 1999-2001, MACWIS was not designed to produce the complex data reports that are needed to track many of the multifaceted requirements in the MSA, nor does it have the ability to produce reports that are "easily manipulable for analytical and managerial purposes." (*See* Monitor's Report at 33).

Likewise, MACWIS does not lend itself to change easily. (Greer Aff. at p. 5). For example, attempting to create a new data report in MACWIS in hopes of tracking one of the more complicated requirements of the MSA can take hundreds of hours—hours spent trying to make the system do something it was not designed to do—and still results in a data report that is unable to integrate all of elements contained in the MSA requirement. This is exacerbated by the fact that the original MACWIS system design was based on DFCS policy that was more child-centered in comparison to the family-centered practice DFCS engages in today. (*Id.*). Therefore,

forcing the current MACWIS design to adhere to policy/practice changes the system was not created to handle further contributes to system shortcomings.

Despite MACWIS' limitations and until a new information system can be implemented, Defendants are continuing to create and produce MACWIS reports (more than 25,000 pages of data reports have been produced since the start of Period 3) and to explore ways to improve the quality and reliability of these data reports. To further this effort, 2 recently-hired reporting analysts will make future performance data trending reports possible. (Greer Aff. at p. 7). Also, Defendants purchased software from TIBCO, Inc. in October 2012 to build capacity for generating county level chart data for the data dashboard. (*Id.*). MACWIS staff has been working on this effort for several months, with the goal of being able to provide county level charts once all Excel versions of MACWIS reports are completed by MIS, allowing uploading of MACWIS data into the charting software. (*Id.*).

Defendants are also refining the way the MACWIS report validation error information is utilized. (Greer Aff. at p. 10). Improvements have been made in the dissemination of MACWIS reports validation error information and MACWIS QA/Validation staff now submits a detail and narrative/summary report of errors to the Office of CQI. (*Id.*). The CQI Director Director/Bureau Director and Professional Development Director then follow up with additional training of field staff as needed. (*Id.*). The CQI Director also requires the MACWIS QA/Validation Unit to write a 'MACWIS Tips' article for the monthly DFCS newsletter. (*Id.*). The 'MACWIS Tips' article provides instructions for data entry into MACWIS based on the validation error findings. (*Id.*). Once enough validation error data is gathered, the CQI reports analyst will be able to provide a trending report to assist management. (*Id.*).

3.    Defendants are improving their information technology infrastructure.

Over the last several years, Defendants have taken steps to their improve information technology infrastructure and connectivity to MACWIS;  however, isolated system performance and connectivity problems still exist.  This is largely a result of the great increase in the number of caseworkers and staff hires combined with the complications that result from trying to connect to an antiquated system.  (Greer Aff. at p. 7).  During Period 3, Defendants have remained diligent in their efforts to remedy these issues and to improve information system performance and MACWIS connectivity.

Defendants are in the process of procuring an updated Citrix Server Environment. (Greer Aff. at p. 8).  Defendants contracted with Citrix, Inc. in May 2012, to perform an onsite Infrastructure Assessment of the current Citrix XenApp 4.5 Platinum Environment that facilitates login to the MACWIS system.  (*Id.*).  Based on the findings of Infrastructure Assessment, Defendants added more hard disk space to the Citrix XenApp Environment to help relieve the slow login for users in June 2012.  (*Id.*).

In July 2012, Diane Mobley, who has 23 years of experience in Network with a Citrix XenApp Environment, Systems Analysis, and Programming, was hired as the new MACWIS Director.  (*Id.*).  Shortly thereafter, Defendants decided to proceed with a project for the Citrix XenApp 6.5 Platinum Edition in a VMware Virtual environment with new hardware at the ITS Data Center.  (*Id.*).  The new hardware was purchased and delivered in September 2012.  (*Id.*).  That month also marked the beginning of the procurement process for the Citrix XenApp 6.5 Project.

In November 2012, Defendants submitted required documents for the Citrix XenApp 6.5 Project to the ITS Procurement Division to start the RFP process. (*Id.*).  The ITS Procurement Division submitted the RFP for approval in January 2013. (*Id.*).  The RFP for the Citrix XenApp

6.5 Project is scheduled for advertisement by February 15, 2013, and the vendor should be selected by March 29, 2013, with work commencing by April 19, 2013. (*Id.*).

In addition to working on the procurement of the new Citrix Server Environment, Defendants assessed and upgraded data communication lines during Period 3. In August 2012, the new MACWIS Director obtained access to the State ITS eHealth System to perform analyses of the data communication lines band width usage. (*Id.*). Results showed several of the county offices were using more than 50% of the bandwidth of the line. (Greer Aff. at p. 8). Based on these findings, Defendants upgraded 11 county offices' communication lines to larger and faster lines. (*Id.*).

Communication lines are also being reviewed, as staff increases, to accommodate any over-utilization of the bandwidth. (*Id.*). For example, just this month, Defendants performed diagnostic work in the Hinds County Office to improve connectivity since additional staff will be joining the county office soon. (*Id.*). Network changes will be made, including upgrading cabling, upgrading switches and switch reconfigurations. (*Id.*). Defendants also added 6 additional servers to the ITS data center and connected them to the MACWIS Citrix server farm in early February. (*Id.*).

Defendants also recently configured and deployed new Wyse Terminals. (*Id.*). The new Wyse Terminal configuration access will provide a faster and more stable connection to the new Citrix XenApp 6.5 Environment. (*Id.*). In November and December 2012, Wyse Terminals were tested at Hinds, Madison, Rankin and Warren Counties' pilot sites and in January and February 2013, the Wyse Terminals were deployed at the remaining sites. (*Id.*). The Citrix Profiles will be completely re-worked and additional configurations affecting the MACWIS

application will be completed prior to deploying the new Citrix XenApp 6.5 Environment. (*Id.*). This should result in a noticeable improvement for system response time. (*Id.*).

Finally, during Period 3, Defendants entered into an agreement to replace all county office routers. (*Id.*). This should result in better service, uptime, communication response and stable equipment and allow a more direct path of communication back to the main MDHS Network. (*Id.*).

## C. Defendants have made Substantial Hiring Gains in the "Carve Out Counties"

The areas of the state described in the MSA as the "Carve Out Counties" consist of Hancock, Harrison, Hinds, and Jackson counties. These counties face unique challenges including judicial issues and large populations of children in custody compared to other areas of the state. (Smith Aff. at p. 2, attached as Exhibit "B"). As pointed out by the Monitor, nearly 40% of the total number of children in Defendants' custody are in these four counties. (Monitor's Report at p. 18). The Carve Out Counties have a history of staffing deficits and elevated caseworker and supervisor turnover, especially in comparison to other counties in the state. (Smith Aff. at p. 2 and Monitor's Report at p. 18).

1.    Defendants are working diligently on the development of a quality Workforce Development Plan.

As noted in the Monitor's report, Defendants met with the Monitor to discuss her concerns about Defendants' September 4, 2012 Carve Out County Workforce Development Plan submission. (Monitor's Report at p. 9). Following that meeting, Defendants secured supplementary technical assistance with the Plan through the Center for Support of Families (CSF). (*Id.* at pp. 19-20.) A full Workforce Development Plan is being developed and with regard to the Carve Out Counties, the Plan is being further refined. (Smith Aff. at p. 5). In an effort to help better ensure that the final Plan meets the Monitor's expectations, on January 1,

2013, Defendants provided her with a draft of the Plan and look forward to receiving the Monitor's feedback and comments. (*Id.*) (Monitor's Report at p. 20, FN 77).

      2.      <u>Defendants are aggressively addressing staffing deficits</u>

The Monitor's Report emphasized that the MSA's Carve Out County requirements reflect "the urgent need for defendants to address staffing deficits in these four targeted counties through informed planning and on an expedited timeframe." (Monitor's Report at p. 19). Defendants certainly recognize this need and have, in fact, taken steps to aggressively address staffing deficits in the Carve Out Counties.

In an effort to increase recruitment of staff in the Carve Out Counties, as well as statewide, Defendants streamlined the hiring process. (Smith Aff. at p. 3). A protocol was implemented to more efficiently and quickly process applications. (*Id.*) This process has been helpful with regard to staffing statewide as well as in the Carve Out Counties. Between July 6, 2012, and February 8, 2013, Defendants made a statewide net gain of 56 caseworkers. (*Id.* at p. 5). To increase staffing in the Carve Out Counties as quickly as possible, additional, more targeted initiatives have been undertaken by Defendants in those counties.

In November 2012, Defendants initiated a management team strategy to address understaffing and other issues in the Carve Out Counties. (Attached as Exhibit "D"). This strategy involved the deployment of high level managers to each of the Carve Out Counties. (Smith Aff. at p. 3). These management teams help to supplement, not replace, the existing management structure and focus on assisting staff make improvements in vital practice areas such as caseworker visits with children and parents, timely initiation and completion of maltreatment investigations, and investigation quality. (*Id.*)

As a part of the management team strategy in the Carve Out Counties, staff from DFCS and Human Resources attended job fairs and followed up on recruitment leads. (*Id.* at p. 4). DFCS management teams coordinated with the counties to review applications and assist in conducting interviews. (*Id.* at p. 3). The Carve Out County management team also provides mentorship to the new caseworkers and supervisors in order to support them as they go through the new hire process. (*Id.* at p. 4). DFCS' Training Unit has coordinated pre-service training dates so the newly hired workers complete their training soon after hire. (*Id.* ). The management team strategy has been very effective in the hiring process for each of the Carve Out Counties. (*Id.*).

As a result of the focused efforts to recruit caseworkers and supervisors, Hinds County made substantial gains in hiring. (*Id.*). Recruitment was more difficult in the coastal Carve Out Counties as there are post-hurricane housing shortages and more competition from other social work employers who offer higher salaries than DFCS. (*Id.*).

In an effort to improve the chances of recruiting in the coastal Carve Out Counties, in December 2012, Defendants requested that the Mississippi State Personnel Board (SPB) approve an additional increase in salaries for the caseworkers, supervisors, and regional directors in Hancock, Harrison, and Jackson counties. (*Id.*). On January 17, 2013, SPB granted that request, resulting in a 20% salary increase for those employed in Hancock, Harrison, and Jackson counties. (*Id.*). This increase is in addition to a 15% recruitment flex SPB approved in 2011 for caseworkers and supervisors in those counties. The 15% recruitment flex also applies to Hinds County caseworkers and supervisors. (*Id.*).

3.    <u>Defendants' targeted management team strategy resulted in major hiring gains.</u>

The Period 3 IP requires that by the end of Period 3 (July 5, 2013), Defendants must

assign a minimum of 16 full time caseworkers to Hancock County, 42 to Harrison County, 50 to Hinds County, and 34 to Jackson County.  (Period 3 IP at p. 58).  As a result of the efforts to streamline the hiring process and accelerate worker recruitment, Defendants have not only already met, but surpassed, these hiring requirements in Harrison, Hinds, and Jackson Counties. Presently Harrison County has 53 full time caseworkers and 8 applicants in the final approval process, Hinds County has 55 caseworkers and 6 applications in the final approval process, and Jackson County has 43 caseworkers and 4 applications in the final approval process.  (Smith Aff. at p. 5).

In Hancock County, DFCS is just 1 worker short of meeting the requirement.  In light of the fact that there are presently 15 full time caseworkers assigned to Hancock County[2] and 5 more applicants are in the final approval process, Defendants anticipate meeting this requirement very soon.  (*Id.*).

### D. DFCS has Taken Steps to Actively Recruit the Right Candidate for the Deputy Administrator MDHS-DFCS Position

On March 14, 2012, the Deputy Administrator of MDHS-DFCS, Lori Woodruff, announced plans to retire effective July 1, 2012 (Berry Aff. at p. 2, attached as Exhibit "C"). Considering the level of reforms that are a part of the *Olivia Y* MSA, as well as the fact that Plaintiffs essentially sought to replace management through a motion for appointment of a receiver, DFCS found it imperative to find *the right candidate* for the job, not just *a* candidate.

1.  <u>Defendants immediately began efforts to recruit the right candidate for Deputy Administrator of MDHS-DFCS.</u>

In an effort to find the right candidate, Defendants reached out to Plaintiffs, through

---

[2] It is important to note that as a result of Hurricane Katrina, Hancock County's office was completely destroyed along with other buildings that housed governmental agencies.  (Smith Aff. at p. 5).  The Hancock County office employees, as well as those of other governmental agencies, worked out of trailers until the offices could be rebuilt by the Hancock County Board of Supervisors.  It is anticipated that the Hancock County office of DFCS will move into a new permanent building in April 2013.  (*Id.*)

counsel, shortly after Ms. Woodruff's announcement, and asked Plaintiffs to encourage qualified applicants to apply. The inquiry to Plaintiffs yielded no applicants. (*Id.*). Defendants began officially publically advertising the Deputy Administrator position on April 3, 2012. (*Id.*). The position was advertised within Mississippi and nationally so that Defendants could select from as many qualified applicants as possible. (*Id.*). Defendants' advertising efforts resulted in the receipt of over 100 applications. Those applications were reviewed and narrowed down based on how well their qualifications matched up to the requirements for the Deputy Administrator MDHS-DFCS position. (*Id.*).

Interviews were conducted on June 1, 2012, with 6 in-state applicants and on June 6, 2012, with 1 in-state applicant. (*Id.* at pp. 2-3). Also between June 18-19, 2012, 3 out-of-state applicants were interviewed. The applicants were interviewed by a panel of 4 including Rickey Berry (Executive Director of MDHS), Mark Smith (Deputy Executive Director of MDHS), Lori Woodruff (then still Deputy Administrator), and Kenya Key Rachal (Attorney for Defendants in the *Olivia Y* case). (*Id.* at p. 3). The fourth out-of-state candidate was unable to sit for an interview on those dates and had to reschedule. (*Id.*).

Effective July 1, 2012, Lori Woodruff retired. (*Id.*). The Deputy Executive Director of MDHS, Mark A. Smith, began serving as interim Deputy Administrator. (Smith Aff. at p. 2).[3]

On July 3, 2012, the fourth out of state candidate interviewed via telephone with a panel of 4. The panelists for these interviews included Rickey Berry, Mark Smith, John Davis (Social Worker and Deputy Administrator of Programs at MDHS), and Kenya Key Rachal. This applicant's interview, experience, and background information established the applicant as the leading candidate for the Deputy Administrator position. (Berry Aff. at p. 3).

On July 5, 2012, through counsel, Defendants provided the resumes of the 4 finalists for

---

[3] For Mr. Smith's credentials, please see his affidavit attached as Exhibit "B"

the Deputy Administrator position to Plaintiffs and the Monitor. *(Id.)*. It was noted that while Defendants would make the ultimate decision on which applicant is hired, Defendants requested feedback on the applicants by July 13, 2012. On July 16, 2012, the applicant Defendants considered to be the leading candidate, withdrew from consideration due to an unforeseen personal matter. *(Id.)*. Plaintiffs responded on July 18, 2013, that they had "serious concerns about whether any of the four finalists are up to the challenge of turning things around at DFCS." *(Id.)*. On August 8, 2012, through counsel Defendants advised Plaintiffs that 1 of the 4 finalists had withdrawn from consideration and that Defendants planned to re-advertise the position. *(Id.)*.

      2.    <u>Defendants' recruitment efforts led to the selection of the Deputy Administrator of MDHS-DFCS.</u>

As a result of the August advertisements, Defendants received applications, but most of the applicants were unqualified for the position. In an effort to improve the chances of recruiting more qualified candidates, Defendants requested an increase in the starting salary for the Deputy Administrator position from the SPB. *(Id.* at p. 4).

On September 20, 2012, SPB approved a $7,769.70 increase in the starting salary for the Deputy Administrator position resulting in a maximum stating salary of $104,898.46. *(Id.)*. *(See also* Monitor's Report at p. 20, FN 81). On September 21, 2012, Defendants began re-advertising the position nationally reflecting the increased starting salary. (Berry Aff. at p. 4).

Several interviews resulted from these efforts. On October 22, 2012, 2 in-state candidates were interviewed by the panel of 4. *(Id.)*. This panel also interviewed an out-of-state candidate on October 25, 2012 and an in-state applicant on October 29, 2013. *(Id.* at p. 5). An in-state applicant was interviewed by Mark Smith on November 9, 2012 and on November 29, 2012, Rickey Berry interviewed this same applicant. *(Id.)*. On December 5, 2012, this in-state

candidate was interviewed by Kenya Key Rachal. *(Id.)*. This concluded all of the interviews conducted for the Deputy Administrator position. *(Id.)*.

On December 4, 2012, Plaintiffs sent a letter of non-compliance invoking Section V.II.B. of the MSA. Plaintiffs alleged that Defendants had failed to comply with Section II.A.1. of the MSA that relates to the requirement to maintain a Deputy Administrator of DFCS.

3.    <u>Defendants have recruited and hired a qualified candidate for the position of Deputy Administrator MDHS-DFCS.</u>

Kimberly K. Shackelford, Ph.D., LCSW accepted the position of Deputy Administrator of MDHS-DFCS and on December 20, 2012, Defendants advised Plaintiffs, through counsel, of Dr. Shackelford's hire. *(Id.)*. As the Court Monitor acknowledged, Dr. Shackelford is a "well-regarded child welfare expert." (Monitor's Report at p. 21). Dr. Shackelford is also a child welfare consultant and professor of social work at the University of Mississippi. (Berry Aff. at p. 5). She is a former director of the University of Mississippi Department of Social Work Baccalaureate Program and former MDHS-DFCS caseworker/supervisor. *(Id.)*. The interview and background information on Dr. Shackelford revealed her to be the best candidate for the job.

Dr. Kimberly Shackelford satisfies the requirements of Section II.A.1. of the MSA. A copy of Dr. Shackelford's resume is attached as Exhibit "E". Dr. Shackelford accepted the Deputy Administrator position with a start date of April 1, 2013, a date that allows her to complete her contractual obligations to the University of Mississippi. (Berry Aff. at p. 5). Although the recruiting process has taken time, this process was necessary in order to hire the right person to further the *Olivia Y* reform efforts. *(Id.)*.

**IV. Conclusion**

Defendants have been working diligently to meet the requirements of the MSA and Period 3 IP. Major strides have been made in key areas such as the pre-service training program

for workers and development of a solid CQI program. The intensive management team strategy undertaken by Defendants has produced a substantial increase in the number of staff in the Carve Out Counties. Defendants look forward to the upcoming status conference and appreciate the opportunity to meet with the Court, the Monitor, and Plaintiffs to discuss the status of Period 3.

RESPECTFULLY SUBMITTED, this the 15th day of February 2013.

**FOR DEFENDANTS**

/s/ Dewitt L. ("Rusty") Fortenberry, Jr.
Dewitt L. ("Rusty") Fortenberry Jr., Esq. (MBN 5435)

Dewitt L. ("Rusty") Fortenberry Jr., Esq. (MBN 5435)
Kenya Key Rachal, Esq. (MBN 99227)
Ashley C. Tullos, Esq. (MBN 101839)
BAKER, DONELSON, BEARMAN, CALDWELL, & BERKOWITZ, PC
428 I-55 North
Meadowbrook Office Park
Jackson, MS 39211
(601) 351-2400

Harold E. Pizzetta, III, Esq. (MBN 99867)
Assistant Attorney General
General Civil Division
Carroll Gartin Justice Building
430 High Street
Jackson, MS 39201

Governor Phil Bryant,
State of Mississippi

Attorney General Jim Hood,
State of Mississippi

## CERTIFICATE OF SERVICE

I, Dewitt L. "Rusty" Fortenberry, Jr., do hereby certify that I electronically filed a true and correct copy of the foregoing document with the Clerk of Court using the ECF system, which sent notification of such to counsel as follows

Marcia Robinson Lowry (*pro hac vice* MBN 43991)
Jessica Polansky (*pro hac vice* MBN 45356)
CHILDREN'S RIGHTS, INC.
330 Seventh Avenue, 4th
New York, NY 10001

Wayne Drinkwater (MBN 6193)
BRADLEY ARANT BOULT CUMMINGS LLP
188 East Capitol Street, Suite 400
Jackson, MS 39201

John Lang (*pro hac vice* MBN 43987)
Attorney at Law
60 East 42nd Street
Suite 4600
New York, NY 10165

Christian D. Carbone (*pro hac vice* MBN 43986)
John Piskora (*pro hac vice* MBN 44474)
LOEB & LOEB LLP
345 Park Ave.
New York, NY 10154

SO CERTIFIED, this the 15th day of February, 2013.

/S/ DEWITT L. ("RUSTY') FORTENBERRY, JR.