IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION


OLIVIA Y., *et al*.                                                PLAINTIFFS


v.                                           CIVIL ACTION NO.  3:04CV251LN


PHIL BRYANT, as Governor of the State of Mississippi, *et al.*        DEFENDANTS

---

**THE COURT MONITOR'S UPDATE TO THE COURT REGARDING
PROGRESS DURING PERIOD 3 AS REFLECTED IN CERTAIN
DATA REPORTS PRODUCED BY THE DEFENDANTS**

---

**Table of Contents, Report Narrative,
Index to Exhibits, and Appendix: Exhibits 1A - 28**


**September 5, 2013**

# TABLE OF CONTENTS

I.      BACKGROUND ................................................................2

II.     INTRODUCTION AND SUMMARY OF FINDINGS .....................................7

III.    FINDINGS ................................................................12

        A. Statewide Performance Requirements.........................................14

        1. Safety Requirements......................................................15
              a. Children in Custody with Substantiated Findings of Maltreatment..16
              b. Children Remaining in the Same Placement Following a
                 Completed Maltreatment Investigation............................................17
              c. Investigations Into Reports of Maltreatment Initiated Within 24
                 Hours of Intake  ................................................................17
              d. Maltreatment Investigations Completed Within 30 Days.................18

        2. Worker Contact and Monitoring...........................................18
              a. Twice Monthly In-Person Visits By Assigned Caseworker ...........19
              b. Contacts in Non-Therapeutic Placement Setting ............................20
              c. Contacts in Therapeutic Placement Setting.....................................21

        3. Child Placement .........................................................22
              a. Licensed and Unlicensed Placements ...............................23
              b. Proximity of Initial Placement.........................................24
              c. Two or Fewer Placements Within First 12 Months of Latest
                 Removal From Home.................................................................25
              d. Placement of Sibling Groups .........................................25
              e. Sibling Groups With at Least One Sibling Under Age Ten in
                 Congregate Care .................................................................27
              f. Children Under Ten in a Congregate Care Setting.........................28
              g. Children in Emergency or Temporary Facilities for More Than
                 45 Days .................................................................28
              h. Children With More Than One Emergency or Temporary
                 Facility Within One Episode of Foster Care  .................................29

        4. Services (Initial Health Screenings and Comprehensive Health
           Assessments)...............................................................30
              a. Initial Health Screening Within 72 Hours of Placement .................30
              b. Comprehensive Health Assessments Within 30 Days of Entering
                 Custody .................................................................31

B. Regional Performance Requirements ............................................................32

1. Worker Contact and Monitoring ...............................................33

2. Services ............................................................................34

3. Permanency ......................................................................34
   a. Permanency Plan By 30th Day in Custody ........................35
   b. Reunification Within 12 Months ...................................35
   c. Timely Administrative Reviews ...................................36
   d. Timely Annual Court Reviews .....................................36

4. Adoption ..........................................................................37

C. Additional Considerations ..........................................................37

IV.    CONCLUSION........................................................................39

Index to Exhibits .................................................................... Index-1

APPENDIX
Exhibits 1A – 28

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION


OLIVIA Y., *et al.*                                                        PLAINTIFFS


v.                                        CIVIL ACTION NO.  3:04CV251LN


PHIL BRYANT, as Governor of the State of Mississippi, *et al.*          DEFENDANTS

---

**THE COURT MONITOR'S UPDATE TO THE COURT REGARDING
PROGRESS DURING PERIOD 3 AS REFLECTED IN CERTAIN
DATA REPORTS PRODUCED BY THE DEFENDANTS**

---

This report updates the Court on progress during Period 3 as reflected in certain data reports submitted by defendants in response to the requirements of the Modified Settlement Agreement ("MSA").[1]  It was provided to the parties in draft form on August 6, 2013 for review and comment.  All comments were received by August 23, 2013.  The Court Monitor ("Monitor") has considered the parties' comments and revised the report as appropriate.

Period 3 ended on July 5, 2013.  As contemplated by the MSA, by this point, defendants should have met numerous performance requirements and documented that performance in regular performance reports.  As the parties and the Court are aware, defendants did not meet MSA reporting requirements for Period 3 and, consequently, in June 2013 the Court issued an order requiring certain remedial actions.  In the meantime, however, the absence of complete and reliable performance reports has impeded the efforts of both parties and the Monitor to assess the

---

[1]  The MSA was approved by the Court on July 6, 2012.

defendants' performance in delivering critical services to children in the custody of the Mississippi Department of Human Services ("MDHS") Division of Family and Children's Services ("DFCS"). Moreover, it has delayed finalization of the complete Period 4 Implementation Plan.

As defendants work to meet the reporting requirements of the Court's June 2013 Order, this report is intended to provide the parties and the Court with information on certain critical services to children in custody related to: child safety; worker contact and monitoring; child placement; medical care; permanency; and adoption. The report also offers a preliminary assessment of defendants' regional reform strategy.

This report does not cover all of the Period 3 requirements. The Monitor will be issuing a comprehensive report related to Period 3 performance after all of the data reports required by the June 2013 Order are produced.[2]

## I.    **BACKGROUND**

The Period 3 Implementation Plan ("Period 3 IP"), which covered a one-year period beginning on July 6, 2012,[3] required the defendants to produce, according to a prescribed timeline, a discrete set of "accurate and validated reports . . . that reflect county-by-county

---

[2] The Monitor expects to report on the Period 3 requirements that are unrelated to the performance data required by the June 2013 Order before the end of the current calendar year.

[3] The January 4, 2008 Settlement Agreement established an incremental remedial process that measured progress in terms of annual benchmarks and interim milestones. The benchmarks were established in the Settlement Agreement and the interim milestones have been mandated in a series of annual implementation plans that were developed collaboratively by the parties. The interim milestones constitute the steps and corresponding timelines that are required to be accomplished each year to achieve the benchmarks and ultimately satisfy Settlement Agreement requirements. Each implementation plan has been incorporated into the Settlement Agreement. This structure has allowed the parties and the Court to measure progress over time according to clearly defined standards, affording the flexibility to develop annual requirements based on current information about defendants' performance. Since January 2008, the defendants have been required to implement four annual implementation plans and a corrective action plan. Because Period 3 concluded before defendants produced the data reports required by the Period 3 IP, the scope of the Period 4 Implementation Plan [hereinafter Initial Period 4 IP] is subject to renegotiation between December 1, 2013 and January 8, 2014, after defendants have produced most of the reports that were required during Period 3. *See* Initial Period 4 IP §I., filed July 18, 2013 [Dkt. No. 590-1].

performance" related to specific MSA requirements.[4]  The reports, delineated in Appendix C of

the MSA ("Appendix C reports"), include reports derived from case record data in the

Mississippi Automated Child Welfare Information System ("MACWIS") and reports derived

from data collected during the periodic and structured reviews of children's case records that are

conducted as part of the foster care review process ("FCR reports").[5]

As detailed in the Monitor's January 2013 Report,[6] defendants' performance related to

the Period 3 data reporting requirements evidenced significant and continuing limitations in the

information management systems and processes utilized by DFCS.[7]  For example, during Period

3, defendants did not produce certain validated and accurate reports that have been required but

not produced since Period 1.[8]  In other instances, although defendants produced reports in

response to the Period 3 IP, the reports did not reflect performance relative to the MSA's actual

requirements.[9]  Additionally, in some instances MACWIS captured the data the defendants were

---

[4]  Period 3 IP §I.D.1.a.-c.  The specific reports are itemized in the MSA in Appendix C.
[5]  FCR reports represent an alternative data collection method that relies upon the "foster care review," the administrative review that is conducted at six-month intervals for all cases with children in foster care.  Foster care reviewers, who are assigned to the foster care review section of the DFCS Continuous Quality Improvement [hereinafter CQI] Unit, conduct these structured reviews using an instrument that was developed during 2012 in response to the MSA's data reporting requirements.  *See* MSA, App. C at 3-5.  The defendants refer to the automated instrument as the periodic administrative determination [hereinafter PAD].  Essentially, because of limitations in MACWIS, defendants expanded the data collected during the foster care review process in order to capture specified data elements relevant to performance under the MSA.  Foster care reviewers began to collect data with the automated PAD in February 2012.  Thereafter, the PAD was automated and defendants began to collect data in MACWIS using a revised version of the PAD on October 15, 2012.  There were limitations with the instruction guide used by the reviewers to interpret the questions on the PAD and defendants report that it has undergone several revisions.  Defendants began producing the MSA-required FCR data reports to the Monitor and plaintiffs' counsel during April 2013.  Additional sets of FCR reports were submitted during June, July and August 2013.  Defendants report that the FCR data collection and reporting process is undergoing refinement.  Like some of the MACWIS reports produced during Period 3, because of the Monitor's concerns about the quality of the FCR data, the FCR data is not analyzed in this report.
[6]  *The Court Monitor's Status Report to the Court Regarding Progress During Period Three* [hereinafter *January 2013 Report*], filed January 25, 2013 [Dkt. No. 580], at 33-38.
[7]  *Id.* at 33.
[8]  *Id.* at 34 (noting that defendants were unable to produce accurate and validated reports on caseworker workloads).
[9]  *Id.* at 34-35 (describing several examples, including, the following: for children with the goal of reunification, the assigned DFCS caseworker is required to meet with the child's parent(s) with whom the child is to be reunified at least once each month to assess service delivery and achievement.  MSA §§II.B.5.b., II.B.5.e.2.  Although defendants were required to report on this requirement during Period 3, *see* Period 3 IP §I.D.1.a.-c., MSA, App. C at 1, MACWIS MWZWCR3, defendants informed the Monitor that they were unable to report on this requirement

3

required to report on,[10] but the report that defendants produced during Period 3 did not report on the MSA requirement because it was not designed to do so.[11]

In response to these issues, on June 24, 2013, the Court approved a remedial order that requires the defendants to address deficiencies in data collection and reporting.[12]  Among other mandates, the June 2013 Order requires defendants to establish and maintain an independent database that is capable of uploading and storing data that conform to all of the data reporting specifications in Appendix C; establish and implement a data cleansing and validation plan to ensure that all data maintained in the independent database are complete and accurate; develop and finalize report specifications in consultation with plaintiffs' counsel and the Monitor; and complete any indicated gap analyses in order to identify the required data that are not currently collected and/or reported and implement alternative data collection and reporting methods for certain types of required data elements.  Moreover, the June 2013 Order requires the defendants to produce complete, accurate and validated Appendix C data reports according to prescribed timelines and at staggered intervals beginning on September 1, 2013 and ending on January 15, 2014.[13]

The evidence demonstrates that defendants are working to implement the terms of the June 2013 Order.  They have contracted for required information technology, programming, project management, data cleansing and data validation services; started to construct an

---

accurately because MACWIS did not enable DFCS staff to identify and track with sufficient specificity those cases in which a child is to be reunified with only one parent.).

[10] Some MSA requirements are subject to qualitative assessment which cannot be reflected in a MACWIS report.

[11] *January 2013 Report* at 36-37 (listing a series of examples, including data reports limited to caseworker visits with children on a single month basis despite requirements for caseworker visits with children at least twice each month for three months).  In addition, as explained in the Monitor's January 2013 Report, during Period 3 the defendants produced some Appendix C reports with obvious calculation errors, raising concerns about the reliability of the MDHS/DFCS data validation process.  *Id.* at 37-38.

[12] Project Schedule for Defendants' Production of Data Reports Required by Appendix C of the Modified Settlement Agreement, filed June 24, 2013 [Dkt. No. 589].

[13] The data reporting requirements reflected in the June 2013 Order are also incorporated into the Initial Period 4 IP. Initial Period 4 IP §II.C.

independent relational database; developed draft specifications for 29 of the 57 data reports required by Appendix C;[14] and produced drafts of several remedial plans required by the Order. The Monitor expects to report on defendants' performance with respect to requirements of the Period 3 IP and the requirements of the June 2013 Order, including the progress reflected in the validated data reports produced pursuant to the Order, in a forthcoming report.

As defendants work to correct, pursuant to the June 2013 Order, the long-standing and well-documented deficiencies with their data reports, this report is intended to provide the parties and the Court with interim information regarding defendants' self-reported performance during Period 3. During Period 3, in response to Appendix C requirements, the defendants transmitted performance reports to the Monitor and counsel for the plaintiffs on a monthly or quarterly basis.[15] Over that period, defendants submitted tens of thousands of pages of performance data. Both the volume and the presentation of that data made it difficult to assess defendants' self-reported performance over time. This report presents defendants' performance data regarding numerous critical performance requirements over a substantial portion of Period 3 in a manner designed to illuminate geographic and temporal performance levels and trends.

To the extent possible, the Monitor has analyzed the performance reports defendants submitted against the requirements of the MSA. However, in a number of instances, and for various reasons including data accuracy and completeness, the Monitor has concluded that she cannot analyze certain performance reports that the defendants submitted for the purposes of

---

[14] Ex. 1A, table produced by the Office of the Court Monitor reflecting all reports required by Appendix C and noting the reasons why certain reports were not included in the analysis presented in this report. As noted in the June 24, 2013 Order, four reports listed in Appendix C are not included herein because one report was included by mistake in Appendix C, two reports listed in Appendix C are duplicative of other reports listed in Appendix C, and two reports listed in Appendix C have been combined into one report for data reporting purposes. *See* June 24, 2013 Order, Attachment Two at note one.

[15] Defendants have continued to transmit these performance reports during Period 4. As contemplated by the June 24, 2013 Order, many of the reports are being revised and each report will be subject to a new data cleansing and validation process. *See* June 24, 2013 Order §§II., VI.D.2.; Initial Period 4 IP §II.C.

assessing performance against MSA requirements.[16]  Thus, in those instances, the Monitor has

not included any analysis of defendants' performance in this report.

The Monitor's concerns about the accuracy and completeness of the data reports

defendants produced, and the extent to which the reports track the MSA requirements, limit the

findings the Monitor may make at this juncture about defendants' performance with respect to

Period 3 requirements.  Nonetheless, a considerable portion of the data that defendants reported

during Period 3 are useful.  Even given the known problems in defendants' reported performance

data, the reports were produced consistently over time and for all 13 regions.[17]  Thus, if there are

biases in the data, as long as defendants collected and reported data in the same manner over the

period that was analyzed, those biases should be reflected consistently in the data over time.

While exact performance levels are not discernible, both performance trends within regions and

relative performance between regions should be apparent.  Furthermore, as defendants refine

their data cleansing and validation processes consistent with the June 2013 Order, the data from

Period 3 should provide a baseline against which the performance data that will be produced

pursuant to the June 2013 Order may be used to measure historical data inadequacies.

The analysis of defendants' reported performance provokes numerous secondary

questions regarding the causes of and explanations for changes in performance levels over time

and/or differences in regional performance.[18]  Answering those innumerable questions was

beyond the scope of this interim report.  However, defendants will need to answer those

questions in order to develop management strategies that are tailored to specific performance

requirements.

---

[16] *See* Ex. 1A, *supra* note 14.
[17] Possible exceptions may include the data reports defendants have produced related to development of the permanency plans within 30 days of custody.  *See infra* at 35.
[18] *See, e.g., infra* note 140 for a list of some of the questions raised by the performance data.

## II.    INTRODUCTION AND SUMMARY OF FINDINGS

The MSA includes both statewide and regional performance measures which defendants were required to satisfy during Period 3.  It aligns the remedial approach required by this lawsuit with the sequential, region-by-region implementation schedule that is at the heart of defendants' practice model reform strategy.  As the Monitor has reported, defendants began introducing the practice model in January 2010, over the course of a two-year period, at staggered intervals in each of DFCS's 13 regions.[19]  The practice model represents a core change in defendants' business policies and practices.  It is designed to be promoted through a data-driven CQI process that is used to monitor progress in each DFCS region.  Six categories of activities crafted to promote safety, permanency and the well-being of children and families are incorporated into the practice model.

On a regional basis, the practice model is phased-in through a multi-stage process:  1) a six-month planning phase;[20] 2) a one-year initial implementation stage;[21] and 3) a one-year full/ongoing implementation stage.  These stages are followed by a data-tracking year.  The point at which a region is deemed to have fully implemented the practice model coincides with the start of the data tracking year for regional measurement requirements.[22]  Thus, the first set of MSA regional performance standards are triggered when a region has fully implemented the practice model; a second set of higher performance standards are triggered when a region has reached the

---

[19] *January 2013 Report* at 3, 10-13.

[20] Practice model implementation is initiated through the six-month planning phase.  Among other activities, DFCS staff and stakeholders participate in an orientation program, barriers to implementation are identified and plans to address the barriers are formulated.  At the conclusion of the planning phase, a CQI review is conducted to establish baseline performance measures, which are intended to serve as the basis for measuring progress.

[21] A 12-month initial implementation phase follows the planning phase.  During this phase, supervisors and caseworkers are trained on the practice model and participate in an intensive coaching program.

[22] According to the MSA, "[a]djustments may be made to the timing of the planning and/or implementation phases based on a region's progress. The two-month period between the end of the Initial Implementation phase and the beginning of the Full Implementation phase is in place to permit the follow-up CQI review after the first 12 months of implementation and an opportunity to revise the Regional Implementation Plan based on preliminary results of the review going into the next phase of implementation."  MSA, App. A.

12-month mark following full implementation.[23]  Accordingly, at a minimum,[24] during the two

and two-third years that a region is undergoing the practice model phase-in process, regional

performance under the MSA is not measured.[25]

The practice model implementation schedule as it appears in the MSA is set forth

below:[26]

**Practice Model Rollout Schedule**

| Regions | Implementation Phase Dates | | | |
|---|---|---|---|---|
| | Planning (6 months) | Initial Implementation (One Year) | Full/Ongoing Implementation (One Year)* | Data Tracking (One Year) |
| I-South, II-West | January – June 2010 | July 2010 – June 2011 | Approx. Sept. 2011 – August 2012 | September 2012 – August 2013 |
| V-West | July – December 2010 | January – December 2011 | Approx. March 2012 – February 2013 | March 2013 – February 2014 |
| IV-North | July – December 2010 | January 2011 – June 2012 (18 months) | Approx. Sept. 2012 – August 2013 | September 2013 – August 2014 |
| I-North, III-South, IV-South | January – June 2011 | July 2011 – June 2012 | Approx. Sept. 2012 – August 2013 | September 2013 – August 2014 |
| V-East | July – December 2011 | January – December 2012 | Approx. March 2013 – February 2014 | March 2014 – February 2015 |
| III-North, VII-East | July 2011 – June 2012 (12 months) | July 2012 – June 2013 | Approx. Sept. 2013 – August 2014 | September 2014 – August 2015 |
| II-East, VI, VII-West | July – December 2012 | January – December 2013 | Approx. March 2014 – February 2015 | March 2015 – February 2016 |

The first two DFCS regions to introduce the practice model, Regions I-S and II-W, began

implementation planning in January 2010 and commenced the data-tracking year in September

2012, when they became subject to the MSA's regional performance requirements.[27]  The other

DFCS regions have been added to the implementation process at intervals of six to twelve

---

[23]  MSA §I.C.

[24]  As reflected in the MSA, in the following three regions, defendants extended the implementation process because a determination was made that additional time was needed for a specific implementation phase:  III-N (afforded an additional six months for planning); IV-N (afforded an additional six months for coaching); and VII-E (afforded an additional six months for planning).  MSA, App. A.

[25]  The MSA expressly recognizes that for those requirements that must be met from the time that a region has fully implemented the practice model, regional compliance is not measured by looking back in time at practice that pre-dates full implementation.  For requirements that must be met 12 months after full implementation of the practice model, compliance is not measured by practice that pre-dates the 12-month period following full implementation. MSA §§II and III.

[26]  MSA, App. A.

[27]  MSA §III.

months.  The last three DFCS regions to implement the practice model, Regions II-E, VI, and

VII-W, began the planning phase in July 2012.  Assuming there are no adjustments to the

implementation schedule,[28] these regions will not be subject to the MSA's regional performance

measures until March 2015. After all 13 DFCS regions have fully implemented the practice

model, the MSA requires that all of its standards, benchmarks and outcome measures shall be

measured and required statewide and shall no longer be measured on a region-by-region basis.[29]

Defendants report that as of April 30, 2013, there were 3,777 children in foster care

statewide.[30]  Of that number, children were in the following placements:

- 30 percent were in foster homes;
- 18 percent were in their own homes;
- 15 percent were in relative foster homes;
- ten percent were in unlicensed relative homes or relative homes pending licensure;
- eight percent were in therapeutic foster homes;
- eight percent were in residential facilities;
- seven percent were in group homes;
- two percent were in shelters;
- one percent were on runaway status; and
- one percent were in adoptive homes. [31]

Each of DFCS's 13 administrative regions vary substantially with respect to the number

of children in custody and the characteristics of the regions themselves.  For example, Region

VII-W, situated on the Gulf Coast, includes the state's second largest city, Gulfport, which has a

population of over 70,000, and Biloxi, which, with a population of approximately 45,000,

represents the state's fifth largest city.  Region VII-W had 837 children in custody as of April 30,

2013.  In contrast, Region II-E, in the north-central portion of the state, includes no cities with

---

[28] As noted *supra* note 22, the practice model rollout schedule recognizes that adjustments may be made based on a region's progress.  MSA, App. A.

[29] MSA §§II., III.

[30] Ex. 1B, chart prepared by the Office of the Court Monitor, Children in Foster Care By Placement Type, Statewide, One-Month Period Ending 4/30/2013; *see also* Ex. 1C, chart prepared by the Office of the Court Monitor, Children in Foster Care by Placement Type, By Region.  According to defendants, the foster/adopt foster homes reflected in Ex. 1B are resource homes that are licensed to serve as foster and adoptive placements.  The adoptive homes reflected in the exhibit are adoptive placements in which children who remain in foster care have been placed pending finalization of their adoptions.

[31] *See* Ex. 1B, *supra* note 30.

more than 25,000 residents and had only 77 children in custody, nine percent as many as Region VII-W.  Similarly, Region VII-W is the most densely populated of all 13 regions, with an estimated 228 residents per square mile.  By comparison, the region with the lowest population density, Region V-W in the southwest portion of the state bordering the Mississippi River, had only 32 people per square mile, 14 percent as dense as Region VII-W.  Regional differences are likely to have substantial differential impacts in performance across the state, which will require defendants to adopt strategies to address region-specific performance challenges.[32]

As described in detail below, there was substantial variation in performance among DFCS's 13 regions.  To some extent, this is to be expected; the MSA contemplates defendants will phase in their reform model on a region-by-region basis and there is an expectation that performance will improve in regions concurrent with practice model implementation.  In fact, the analysis reflected in this report suggests that the first three regions to implement the practice model fully are the same three regions that are performing best relative to statewide performance requirement levels.  Indeed, as a general matter, these regions are also demonstrating progress toward satisfying a number of the regional performance requirements.  Although far from conclusive, the data from the early implementing regions is cause for optimism about the merits of defendants' reform strategy.

Nevertheless, as of April 2013, there were certain regions whose performance consistently ranked among the lowest of all regions.  In particular, the data show that Regions III-S and VII-W appear to be struggling in their efforts to meet MSA requirements.  Perhaps not surprisingly, these two regions have the largest populations of children in care and include the

---

[32]  Ex. 2, chart prepared by Office of the Court Monitor, Total Children in Custody as of April 30, 2013, by Region and Placement Type.  Relying on U.S. Census Bureau data, the chart also lists cities with populations over 25,000 in each DFCS region.  *See* U.S. Census Bureau, Population Division, Annual Estimates of the Resident Population: April 1, 2010 to July 1, 2012.

two largest cities in the state, Jackson and Gulfport.[33]  While this may help explain some of

defendants' challenges in these two regions, it does not diminish the need to attend to

performance deficits urgently, especially those having the greatest impact on child safety.

The MSA recognizes the long-standing problems in these regions, defining four "carve-

out" counties with chronic, historic staffing deficits.[34]  Two of the carve-out counties, Harrison

and Hancock, are within Region VII-W, the former of the two being four times as populous as

the latter.  One carve-out county, Hinds, the most populous county in the state, is in Region III-

S.[35]  As described in the January 2013 Report, defendants devoted resources to analyzing various

operational challenges in the carve-out counties and to implementing remedial strategies.[36]

These strategies have given rise to substantial increases in caseworker staffing levels during

2013; however they have not been effective in remedying supervisory staffing deficits and other

performance issues in at least two of the four carve-out counties.[37]  Indeed, the data reports

produced by defendants during Period 3 raise substantial concerns about performance in the three

carve-out counties that are located in Regions VII-W and III-S.

Region III-S concluded the full implementation phase of practice model implementation

at the end of August 2013.  This region will likely represent the most challenging region in which

the practice model will have been implemented fully to date and it is imperative that defendants

track progress, identify implementation problems, and institute corrective actions on an urgent

basis.  Region VII-W, however, is not scheduled to implement the practice model fully until the

---

[33]  *Id.*  As noted above, Region VII-W also includes the state's fifth largest city, Biloxi.

[34]  Period 3 IP §§I.A.2.b., c.

[35]  The other carve-out county is Jackson County, which is located in Region VII-E.

[36]  *See, e.g., January 2013 Report* at 23, 26, 43.  Among other initiatives, at the end of the 2012 calendar year, the defendants launched a short-term management strategy in the carve-out counties.  *See id.* at Ex. 37 for defendants' description of the management strategy, which has been modified but until recently was in effect in three of the four carve-out counties (*i.e.,* Harrison, Hancock and Hinds).  The fourth carve-out county, Jackson, which is in Region VII-E, is no longer included in the short-term strategy.

[37]  This is a significant concern which the Monitor underscored in the January 2013 Report, *see January 2013 Report* at 28-29, and which will be addressed by the Monitor in a forthcoming report.

end of February 2015.  Defendants cannot wait until that time to correct the most serious deficits in Region VII-W related to child safety, including ensuring – on an expedited basis – that there are appropriate and timely caseworker visits with all children in custody.

It appears that defendants very recently instituted additional remedial interventions in an attempt to address continuing performance deficits specifically in Regions III-S and VII-W.  The Monitor will track and report on defendants' efforts in a forthcoming report.

## III.    <u>FINDINGS</u>

As noted above, the MSA requires the defendants to implement certain performance requirements on a statewide basis ("statewide performance requirements") and also requires defendants to implement other performance requirements on a region-by-region basis ("regional performance requirements") at staggered intervals over time.  This report presents an analysis of defendants' reported performance with respect to a subset of these requirements for the period June 1, 2012 through April 30, 2013.

The report addresses 17 statewide performance requirements, which collectively implicate the following foster care service standard categories in the MSA: 1) child safety; 2) worker contact and monitoring; 3) child placement; and 4) services.  Although for statewide performance requirements defendants are not required to meet specific performance levels in any particular regions, performance on a regional basis, over time, was analyzed.  The goal of this exercise was threefold: 1) to identify any regional differences in performance that could help explain aggregate statewide performance levels; 2) to identify any changes in performance over time, which could be indicators of the efficacy of defendants' reform efforts; and 3) to assess whether any regions tended to perform better or worse across performance requirements relative to the other regions in the state (*i.e.,* rather than relative to the statewide performance

12

requirements), which might help indicate regions in need of resources or other management interventions, or conversely, regions having general success.

In August 2012, DFCS Regions I-S and II-W – the first two regions in which the practice model was introduced – were required to implement fully the model. This report assesses whether there is evidence as of April 2013 that implementation of the practice model in these two regions is associated with higher levels of performance with respect to statewide performance requirements that were due as of July 6, 2013 than in regions that have not fully implemented the practice model.

In addition to the statewide performance requirements, the defendants' reported performance as of April 2013 with seven regional performance requirements was analyzed. These data reports collectively implicated the following foster care service categories in the MSA that the first two implementing regions were required to satisfy beginning in September 2012: 1) worker contact and monitoring; 2) services; 3) permanency; and 4) adoption.

In total, this report presents defendants' assessment of their performance regarding 24 of the 57 performance requirements that they were required to report on during Period 3.[38] Thus, in addition to the limitations in the data that was reported, much about defendants' performance with MSA requirements during Period 3 is not known. As defendants' reporting deficits are remedied pursuant to the June 2013 Order, the Monitor will update the Court and the parties on defendants' progress.

The Monitor's findings are set forth below.

---

[38] *See* Ex. 1A, *supra* note 14 (noting the reasons why certain performance data reports were not included in the analysis presented in this report.).

## A. Statewide Performance Requirements

For the performance period ending April 30, 2013, defendants reported meeting or exceeding eight of the 17 statewide performance requirements that were analyzed for this report. For two additional performance requirements that require defendants to maintain 100 percent compliance with the standard, defendants did not meet the performance standard, but did perform well. When the 17 statewide requirements are analyzed by MSA service-standard category, the data reports defendants produced reflect the following performance as of April 30, 2013:

- Defendants met none of four statewide performance requirements related to child safety;
- Defendants met three of three statewide performance requirements related to worker contacts and monitoring;
- Defendants met five of seven statewide performance requirements related to placements;[39] and
- Defendants did not meet the two statewide performance requirements related to services.

Pursuant to the MSA, defendants were required to meet all of these requirements by July 6, 2013.

There was substantial variation in performance among DFCS's 13 regions. In order to assess how regions performed relative to one another with respect to the statewide performance requirements, average monthly performance levels for the period June 1, 2012 to April 30, 2013 for 13 of the 17 statewide requirements were calculated.[40] For each requirement, the 13 regions were ranked ordinally and a percentile rank for each region was calculated (*i.e.,* where each region performed relative to other regions, with 100 percent representing highest relative performance and zero percent representing lowest relative performance). Finally, for each measure a determination was made regarding which regions' performance fell within the top quintile and the bottom quintile.

---

[39] The Monitor analyzed defendants' performance with respect to an eighth performance standard based on data submitted as required by Appendix C; however, as explained below, defendants are not required to meet that standard during Period 3.

[40] The Monitor was not able to include in the analysis four performance requirements related to placements because, unlike the other statewide performance requirements, there was no population-controlled standard that could be applied to each region. In other words, because there was no statewide rate, it was not possible to assess how individual regions performed against that rate.

The analysis indicates that the first two regions to implement the practice model, Regions I-S and II-W, were among the top performing DFCS regions. Region II-W performed in the top quintile of regions with respect to nine statewide requirements, more than any other region.[41] Region I-S performed in the top quintile with respect to seven statewide requirements, matched only by one other region, Region V-W, the third region to implement fully the practice model.[42] Additionally, Region I-S did not perform in the bottom quintile on any of the performance requirements. Region II-W was in the bottom quintile in two instances, and Region V-W in one instance. Thus, the three regions implementing the practice model earliest are, on average, performing better across a wide range of statewide performance requirements than later-implementing regions.

Two regions in particular stood out for having performed in the bottom quintile of regions with respect to 11 and ten, respectively, of the 13 statewide requirements that the Monitor analyzed. Those two regions – III-S and VII-W – represent the two regions with the highest populations of children in custody in the state. As of April 30, 2013, Region III-S accounted for 14 percent of the population of children in custody and Region VII-W accounted for 22 percent of the population of children in custody. Looked at another way, over one third of children in custody, 36 percent, were in the two lowest performing regions. By contrast, approximately half as many children, 16 percent, were in the three top performing regions.[43]

### 1. Safety Requirements

Analysis of defendants' reported performance with four safety requirements found that as of April 30, 2013 the defendants met none of the requirements they were required to achieve by

---

[41] Ex. 3, chart prepared by the Office of the Court Monitor, Relative Regional Performance With Respect to 13 Statewide Performance Requirements, Average Monthly Performance, June 1, 2012 – April 30, 2013.
[42] *Id.*
[43] *Id.*

July 6, 2013. The four safety requirements subject to analysis are intended to measure the following: 1) the rate of substantiated findings of maltreatment among children in custody; 2) whether children who remained in the same placement following a maltreatment investigation met with a DFCS caseworker with the required frequency over a three-month period; 3) the percentage of maltreatment investigations initiated within 24 hours of intake; and, 4) the percentage of maltreatment investigations completed within 30 days of intake.

a.   Children in Custody with Substantiated Findings of Maltreatment

The MSA requires that by July 6, 2013, the end of Period 3, the rate of abuse or maltreatment in care shall not exceed one percent.[44]  For the 12-month period ending April 30, 2013, the rate of maltreatment in care was 1.22 percent, a rate 22 percent higher than the upper limit established by the MSA.[45]  Six of the 13 regions performed better than the statewide requirement, including the region with the highest number of children in custody, Region VII-W.[46]  Several regions, including Regions II-E, V-E, V-W, and VII-E, experienced sharp drops in maltreatment rates over the period analyzed.  Interestingly, the region that performed best across all statewide performance requirements, Region II-W, performed worst on this requirement and reported the highest rate of children in custody with substantiated findings of maltreatment, three percent.  This was one of two statewide measures in the analysis on which this region performed in the bottom quintile.

---

[44]  MSA §II.C.2.b.

[45]  Ex. 4A, chart prepared by the Office of the Court Monitor, Children in Custody With Substantiated Findings of Maltreatment, by Region; *see also* Ex. 4B, corresponding table with underlying data.

[46]  Region VII-W experienced a substantial increase in the number of children in custody between September 2012 and April 2013.  This increase in the number of children in custody appears to have contributed to the drop in the maltreatment rate in that region.

b.  Children Remaining in the Same Placement Following a Completed Maltreatment Investigation

The MSA requires that by July 6, 2013, the end of Period 3, 100 percent of children remaining in the same placement following a completed maltreatment investigation receive visits by a caseworker two times per month for three months.[47]  In the month of April 2013, this requirement was applicable to 81 children in custody.  The data reports produced by defendants during Period 3 contain data on only one month of performance at a time, not three months as required by the MSA.  Thus, the performance levels reported by the defendants are likely to overstate performance relative to the MSA requirement.[48]  Nonetheless, defendants' reported performance over one-month periods fell short of the statewide performance standard.  In April 2013, 59 percent of children who remained in the same placement following a maltreatment investigation met face-to-face with a caseworker consistent with MSA requirements over a one-month period.[49]  Two regions, Regions II-W and V-W, reported meeting the performance requirement in the month of April 2013.[50]

c.  Investigations Into Reports of Maltreatment Initiated Within 24 Hours of Intake

The MSA requires that by July 6, 2013, the end of Period 3, all investigations into reports of maltreatment regarding children in DFCS custody must be initiated within 24 hours of

---

[47]  MSA §II.B.1.e.3.

[48]  If one-month performance levels were below the required level, performance over a three-month period would necessarily be equal to or lower than performance over a one-month period.

[49]  Ex. 5A, chart prepared by the Office of the Court Monitor, Children Remaining in the Same Placement Following Maltreatment Investigation Who Met Face-to-Face With Worker Twice in a One-Month Period or At Least Once if 15 Days or Less Following Completed Maltreatment Investigation, By Region; *see also* Ex. 5B, corresponding table with underlying data.  Numerous charts included as exhibits to this report include secondary Y-axes (*i.e.*, vertical axes) reflecting percentages.  On a number of these charts, the range of the values is from zero percent to some number over 100 percent.  In fact, for the performance requirements included in this report, it would not be possible for defendants to achieve performance levels higher than 100 percent.  The values on the axes exceed 100 percent strictly for design purposes, to create visual space at the top of certain charts.

[50]  *Id*.  One other region, VII-E, reported no children in custody in April 2013 to whom this requirement applied.

17

intake.[51]  Defendants reported that during April 2013, 66 investigations were open one or more

days, and that 76 percent of those investigations were initiated within 24 hours.[52]  Five regions

met the statewide performance requirement in that month.[53]  Examining a longer period, from

June 2012 to April 2013, five regions achieved an average monthly performance exceeding 90

percent.[54]  Among these five regions, one region, IV-S, met the statewide requirement in every

month.

### d.  Maltreatment Investigations Completed Within 30 Days

The MSA requires that by July 6, 2013, the end of Period 3, all maltreatment

investigations must be completed with supervisory approval within 30 days.[55]  Defendants report

using investigations closed during the month as a basis for calculation, irrespective of when the

investigations opened.  Defendants reported that during the month of April 2013, 66

investigations were open one or more days and among investigations closed during that month,

56 percent were closed within 30 days.[56]

### 2.  Worker Contact and Monitoring

Analysis of defendants' reported performance during Period 3 with three statewide

requirements related to worker contacts and monitoring found that defendants met or exceeded

all three statewide requirements as of April 30, 2013.  However, the three data reports focus

specifically on the frequency and method of contacts, not the content of the contacts and

---

[51]  MSA §II.B.1.e.2.
[52]  Ex. 6A, chart prepared by the Office of the Court Monitor, Investigations Open One or More Days During Period Initiated Within 24 Hours of Intake, By Region; *see also* Ex. 6B, corresponding table with underlying data.
[53]  *See* Ex. 6B, *supra* note 52.  The five regions were I-S, II-E, IV-S, IV-N, and V-W.
[54]  *Id.*  The five regions were I-S, II-E, II-W, IV-S, and V-W.
[55]  MSA §II.B.1.e.2.
[56]  Ex. 7A, chart prepared by the Office of the Court Monitor, Status of Maltreatment Investigations Open One or More Days During Period, By Region; *see also* Ex. 7B, corresponding table with underlying data.

therefore cannot be used to make a finding regarding defendants' performance with the full MSA requirement.[57]

The three worker contact and monitoring requirements the Monitor analyzed are intended to measure the following: 1) the rate at which children in custody receive twice-monthly in-person visits conducted by their assigned caseworkers consistent with certain additional MSA requirements; and 2) the rate at which resource parents in therapeutic and non-therapeutic foster homes who have one or more foster child residing in their homes receive monthly home visits from a foster care worker[58] consistent with certain MSA requirements.

### a.  Twice Monthly In-Person Visits By Assigned Caseworker

The MSA requires that by July 6, 2013, the end of Period 3, the assigned DFCS caseworkers meet with 60 percent of children in custody in person and, where age appropriate, alone, at least twice monthly to conduct specified assessments.[59]  At least one of the monthly visits is required to take place in the child's placement.[60]  According to the data reports defendants submitted, during April 2013 they had achieved a statewide performance level of 67 percent, exceeding during that month the statewide performance requirement that they were required to achieve by July 6, 2013.[61]  Defendants exceeded the statewide requirement in 12 of the 13 regions, six of which performed at levels at or above 90 percent.[62]  The two highest performing regions were Regions I-S and II-W, the first two regions to implement the practice

---

[57]  A different methodology must be used to assess these types of qualitative requirements, which cannot be captured by data reports.

[58]  Instead of "assigned DFCS caseworker" or "caseworker," the MSA specifically uses the term "DFCS foster care worker" in this section of the MSA.  *See* MSA §II.B.5.c.

[59]  MSA §§II.B.5.e.1., II.B.5.a.  During the visits, caseworkers are required to assess the child's safety and well-being, service delivery, achievement of permanency and other service goals.  *Id.*

[60]  *Id.*

[61]  Ex. 8A, chart prepared by the Office of the Court Monitor, Twice Monthly In-Person Visits With Child by Assigned Caseworkers, by Region; *see also* Ex. 8B, corresponding table with underlying data.

[62]  *See* Ex. 8B, *supra* note 61.

model.[63]  The sole region that did not surpass the statewide requirement was Region VII-W,

which achieved a performance level of only 20 percent.[64]  It is noteworthy, however, that Region

VII-W had nearly twice as many children in custody as the second largest region, and,

additionally, experienced a nearly 25 percent increase in children to whom the requirement

applied over the six-month period beginning October 1, 2012 and ending April 30, 2013.  This

increase corresponded with a sharp and rapid decline in performance in the region.[65]

### b.   Contacts in Non-Therapeutic Placement Setting

The MSA requires that by July 6, 2013, the end of Period 3, 40 percent of non-therapeutic

resource parents with at least one foster child residing in their home have a DFCS worker visit

the home monthly consistent with certain MSA requirements.[66]  Defendants reported that during

April 2013 this requirement applied to 2,238 non-therapeutic settings statewide and that during

that month they achieved a 57 percent statewide performance level with respect to this

requirement.[67]  The data defendants produced indicated that 11 of the 13 regions exceeded the

statewide performance requirement, but, unlike the aforementioned requirement regarding

caseworker visits with children, only one region, Region II-W, performed above the 90 percent

level.[68]  Consistent with its performance related to caseworker visits with children, Region VII-

W achieved the lowest level of success, at 19 percent.[69]  Region III-S, the other region that did

---

[63]  *See* Ex. 8A, *supra* note 61.
[64]  *See* Ex. 8B, *supra* note 61.
[65]  *See* Ex. 8A, *supra* note 61.
[66]  MSA §§II.B.5.c., II.B.5.e.3.  The purpose of the visit is to share all relevant and legally disclosable information concerning the foster child; evaluate the foster child's safety, needs and well being; and monitor service delivery and achievement of service goals.
[67]  Ex. 9A, chart prepared by the Office of the Court Monitor, Non-Therapeutic Placement Setting Contacts, By Region; *see also* Ex. 9B, corresponding table with underlying data.
[68]  *See* Ex. 9A, *supra* note 67.  Region II-W is one of the first two regions to implement the practice model.  The other region, Region I-S, achieved the second highest performance level, 88 percent.
[69]  *Id.*

not exceed the statewide standard in April 2013, achieved a 37 percent performance level, just below the 40 percent statewide requirement.[70]

       c.   Contacts in Therapeutic Placement Setting

The MSA requires that by July 6, 2013, the end of Period 3, 40 percent of therapeutic resource parents with at least one foster child residing in their home have a DFCS worker visit the home monthly consistent with certain MSA requirements.[71]  Defendants reported that during April 2013 this requirement applied to 213 therapeutic settings statewide, a number substantially lower than the number of non-therapeutic settings;[72] however, despite the relatively lower number of homes to which this requirement applied, defendants achieved a lower level of performance with respect to this requirement as of April 30, 2013, attaining exactly the 40 percent statewide performance required by the end of Period 3.[73]  Data produced by defendants indicate that a disproportionate number of therapeutic placements are located within a single region, Region III-S.[74]  Nearly 40 percent of all therapeutic placements statewide were in Region III-S in April 2013, a region that accounted for only 14 percent of the children in custody as of the end of that month.  By contrast, Region VII-W, which accounted for 22 percent of the number of children in custody at the time, had only eight percent of all therapeutic placements. The high volume of casework related to therapeutic placements in Region III-S may have contributed to the region's low performance levels, 25 percent as of April 30, 2013, and in turn reduced statewide performance levels.

---

[70] *Id.*
[71] MSA §§II.B.5.c., II.B.5.e.3.  *See supra* note 66 regarding the purpose of the visits.
[72] Ex. 10A, chart prepared by the Office of the Court Monitor, Therapeutic Placement Setting Contacts, By Region; *see also* Ex. 10B, corresponding table with underlying data.
[73] *See* Ex. 10A, *supra* note 72.
[74] *See* Ex. 10B, *supra* note 72.

### 3.  Child Placement

Defendants' reported performance with eight statewide requirements related to child placement was also analyzed, one of which was not a Period 3 requirement, but which was analyzed nonetheless for reasons detailed below.  According to data reported by defendants during Period 3, as of April 30, 2013, defendants met five of the requirements.  With respect to two additional requirements, by the end of Period 3 the MSA requires 100 percent performance in one instance and, in the second, zero performance deviations from the MSA requirement.  Although defendants did not meet these two requirements, the data defendants produced indicates that as of April 30, 2013 they performed well.  Similarly, with respect to the eighth performance requirement which was not applicable to Period 3, defendants did not meet the standard requiring zero deviations from the MSA requirement, but they did perform well.

The data produced by defendants related to the eight placement requirements the Monitor analyzed are intended to measure the following: 1) the percentage of children in licensed and unlicensed placements; 2) the percentage of children placed within a defined proximity to their homes; 3) the percentage of children with two or fewer placements within the first 12 months of their most recent removal from their homes; 4) the percentage of sibling groups removed from their homes who are placed together consistent with MSA requirements; 5) the number of sibling groups in which one or more sibling is under the age of ten that are placed in a congregate care setting for more than 45 days; 6) the number of children under the age of ten placed in congregate care settings unless certain conditions apply; 7) the number of foster children in emergency or temporary facilities for more than 45 days unless certain conditions apply; and 8) the number of children placed in more than one emergency or temporary facility within one episode of foster care unless certain conditions apply.

The first four of the eight statewide requirements that were analyzed establish mandates based on population-controlled rates. The latter four statewide requirements set performance limits expressed as fixed cardinal thresholds (*i.e.,* not rates).

    a.   Licensed and Unlicensed Placements

The MSA requires that by July 6, 2013, the end of Period 3, unless otherwise ordered by the Youth Court over DFCS objections, 100 percent of children shall be placed in a foster care setting that meets licensure standards consistent with MSA requirements.[75] According to data reported by defendants during Period 3, among children in custody in April 2013, 92 percent of children were in licensed placements, eight percent short of the standard that must be met by July 6, 2013.[76] However, defendants' data report does not capture placements ordered by the Youth Court over DFCS objections, which could contribute to defendants underreporting performance levels.

Twelve of the 13 regions in the state reported that in excess of 90 percent of children in their regions were placed in licensed facilities during April 2013, including the region with the second largest population of children in custody, Region III-S.[77] In fact, seven of those 12 regions reported performance levels of 97 percent or higher. The lowest performing region was Region VII-W, which reported 76 percent of children in the region were in licensed placements, a percentage that increased over the 11 months analyzed even as the population of children in custody increased substantially.

---

[75] MSA §§II.B.2.a., II.B.2.p.2., II.B.2.p.4.-5.

[76] Ex. 11A, chart prepared by the Office of the Court Monitor, Number of Children in Licensed and Unlicensed Placements, Including Approved Relative Placements Pending Full Licensure; *see also* Ex. 11B, corresponding table with underlying data.

[77] *See* Ex. 11A, *supra* note 76.

b.  Proximity of Initial Placement

The MSA requires that by July 6, 2013, the end of Period 3, 85 percent of children shall be placed within their own county or within 50 miles of their home, unless certain exceptions apply.[78]  According to data submitted by defendants during Period 3, for the 12-month period ending on April 30, 2013, 91 percent of children were initially placed consistent with this requirement.[79]  As of April 30, 2013, nine regions reported meeting or exceeding the statewide performance requirement.[80]  The four regions that did not meet or exceed the required statewide performance level represent four of the five regions on the western border of the state, bordering the Mississippi River – Regions II-E, II-W, III-N, and V-W[81] – three of which include area within the Mississippi Delta.  Two of those four regions still achieved performance levels exceeding 80 percent for the 12-month period ending April 2013.[82]  The one region with area along the banks of the Mississippi River that exceeded the statewide performance level was Region III-S, the region that includes Jackson, the state's most populous city.

The region that performed best on average over the period between June 2012 and April 2013 was the geographically smallest region, Region VII-W.  As noted above, this region includes Mississippi's second largest city, Gulfport, and fifth largest city, Biloxi.  Collectively, these data suggest that regional performance levels related to this requirement may be directly correlated to population density levels of the regions.  Although Region VII-W is geographically small, it is highly populated, which offers more placement options within the county or within 50 miles of a child's home.  The same is true of Region III-S, which includes Jackson.  Conversely,

---

[78]  MSA §§II.B.2.p.16., II.B.2.g.
[79]  Ex. 12A, chart prepared by the Office of the Court Monitor, Proximity of Initial Placement for All Children Entering Custody; *see also* Ex. 12B, corresponding table with underlying data.
[80]  *See* Ex. 12A, *supra* note 79.
[81]  *Id.*
[82]  *Id.*

in lower density areas there may be fewer placement options, requiring children to be placed out of the county and farther from home.

   c. Two or Fewer Placements Within First 12 Months of Latest Removal From Home

   The MSA requires that by July 6, 2013, the end of Period 3, 60 percent of children in care less than 12 months from the latest removal from home shall have two or fewer placements.[83] According to data reported by defendants during Period 3, on April 30, 2013 this requirement applied to 2,366 children, 67 percent of whom had two or fewer placements, a level exceeding the statewide requirement defendants must meet by the end of Period 3.[84]  Every region reported exceeding the statewide standard.

   d. Placement of Sibling Groups

   The MSA requires that by July 6, 2013, the end of Period 3, 80 percent of siblings who entered custody at or near the same time must be placed together consistent with specific MSA requirements.[85]  Defendants' data reporting practice with respect to this performance requirement changed beginning in March 2013.  Whereas prior to that month, defendants reported on 12-month performance periods, starting in March 2013, defendants began reporting on one-month periods.[86]  Because the data from the two reporting methods is not comparable, the Monitor limited her analysis to comparable, available data from Period 3, which included the 12-month period ending August 31, 2012 through the 12-month period ending February 28, 2013.[87]

---

[83]  MSA §II.C.1.b.1.
[84]  Ex. 13A, chart prepared by the Office of the Court Monitor, Children in Care Fewer Than 12 Months From the Time of Latest Removal From Home, By Region and Number of Placements; *see also* Ex. 13B, corresponding table with underlying data.
[85]  MSA §§ II.B.2.p.13., II.B.2.h.
[86]  Defendants were unaware of this change in reporting until the Monitor brought this matter to their attention on July 17, 2013.
[87]  Unlike other reports, the Monitor did not receive data for this requirement for June and July 2012.

The data defendants produced indicate that for the period ending February 28, 2013, this MSA requirement applied to 1,490 children who were members of sibling groups and that defendants met the requirement for 92 percent of those children, exceeding for the period ending February 28, 2013 the statewide performance requirement of 80 percent by the end of Period 3.[88] Defendants reported that they exceeded the statewide requirement in all 13 regions for that period.[89]

Unlike the prior four statewide placement requirements, which established performance levels based on population-controlled rates, the next four statewide placement requirements established fixed, statewide cardinal limits on certain types of placements. Thus, for these four requirements it was not possible to assess how a given region performed with respect to a statewide standard. Instead, the Monitor assessed to what extent different regions contributed to the statewide limits or performance deviations.

Five of the state's 13 regions accounted for much of the statewide performance trends across these four requirements: Regions VII-W, III-S, VI, III-N, and I-N. Not surprisingly, the first two of these regions had by far the largest numbers of children in custody as of April 30, 2013, with 837 and 514 children in custody respectively.[90] The latter three regions accounted for between 271 and 346 children in custody and were among the seven regions with the highest populations of children in custody. Two other regions in that cohort of seven regions with the highest population, Regions I-S and VII-E, contributed relatively less to the statewide performance levels.

---

[88] Ex. 14A, chart prepared by the Office of the Court Monitor, Placement of Sibling Groups Who Entered Custody At or Around the Same Time, By Region; *see also* Ex. 14B, corresponding table with underlying data.
[89] *See* Ex. 14A, *supra* note 88.
[90] *See* Ex. 3, *supra* note 41.

e.   Sibling Groups With at Least One Sibling Under Age Ten in Congregate Care

In addition to requiring certain percentages of siblings in sibling groups to be placed together,[91] the MSA establishes certain prohibitions on the housing of children under the age of ten in congregate care settings.  First, as a final performance standard in the lawsuit, the MSA requires that sibling groups in which one or more of the siblings are under the age of ten shall not be placed in congregate care settings for more than 45 days.[92]  Although the aforementioned limited prohibition is not a Period 3 requirement, defendants produce a monthly performance report regarding this performance standard as required by Appendix C.  Recognizing that the defendants are not required to meet this standard during Period 3, the Monitor analyzed the data defendants submitted, because it provides context for a Period 3 performance requirement, described below.

In the month ending April 30, 2013, defendants reported 13 sibling groups with at least one sibling under age ten in congregate care for more than 45 days.[93]  In that month, two regions had one sibling group, three regions had two sibling groups, and one region had five sibling groups in congregate care settings for more than 45 days.[94]  The region with five sibling groups placed in violation of this MSA requirement was Region VII-W, the region with the most children in custody.[95]  Five regions did not house any sibling groups in violation of this MSA requirement in any of the 11 months that were reviewed.[96]

---

[91]  *See supra* 25 for a discussion of this requirement.
[92]  MSA §II.B.2.m.
[93]  Ex. 15A, chart prepared by the Office of the Court Monitor, Number of Sibling Groups With At Least One Sibling Under Age 10 Housed in a Congregate Care Setting For More Than 45 Days, By Region; *see also* Ex. 15B, corresponding table with underlying data.
[94]  *See* Ex. 15A, *supra* note 93.
[95]  *Id.*
[96]  *Id.*

f. Children Under Ten in a Congregate Care Setting

The MSA requires that by July 6, 2013, the end of Period 3, no more than 40 children

under the age of ten should be placed in congregate care unless certain circumstances apply and

the written approval of a Regional Director is obtained.[97]  Defendants reported that for the month

ending April 30, 2013, there were a total of 87 children under the age of ten housed in congregate

care settings, nine of whom were housed in those settings without Regional Director approval.[98]

Those nine children were housed in three of the state's 13 regions, and one region, Region I-N,

accounted for six of the nine children.[99]

Among all children under the age of ten housed in congregate care settings as of April 30,

2013, 70 percent were attributable to the three regions with the largest populations of children in

custody, Regions VII-W, III-S, and VI.[100]

g. Children in Emergency or Temporary Facilities for More Than 45 Days

The MSA requires that by July 6, 2013, the end of Period 3, no foster children shall

remain in an emergency or temporary facility for more than 45 days unless certain circumstances

apply and the Field Operations Director has granted written approval for the extension that

documents the need for the extension.[101]  The data reports defendants submitted during Period 3

do not report whether the Field Operations Director provided written approval, but rather indicate

whether the Division Director provided written approval.

According to defendants' data, in the month of April 2013, there were a total of 34

children in emergency shelters or temporary facilities for over 45 days and only one of those 34

---

[97]  MSA §II.B.2.p.6.
[98]  Ex. 16A, chart prepared by the Office of the Court Monitor, Children Under Age 10 Housed in a Congregate Care
Setting With and Without Regional Director Approval, By Region; *see also* Ex. 16B, corresponding table with
underlying data.  Defendants' performance report does not report on whether the applicable children have
exceptional needs as contemplated by the MSA.
[99]  *See* Ex. 16A, *supra* note 98.
[100]  *See* Ex. 16B, *supra* note 98.
[101]  MSA §§II.B.2.k., II.B.2.p.8.

children received approval from the Division Director.[102]  One region, Region VII-W, accounted

for 20 of those 34 children in April 2013, approximately 60 percent of the monthly total.[103]  Over

the longer, 11-month period that was reviewed, four regions in particular regularly housed

children in violation of this requirement:  Regions VII-W, III-S, III-N, and VI.  As noted above,

three of those regions, Regions VII-W, III-S, and VI were, respectively, the regions with the first,

second, and third highest populations of children in custody as of April 30, 2013.

> h.  Children With More Than One Emergency or Temporary Facility Within One
> Episode of Foster Care

In addition to creating limits on the duration of placements in emergency or temporary

facilities, the MSA creates limits on the number of those placements during one episode of foster

care.  The MSA requires that by July 6, 2013, the end of Period 3, no more than 180 children

may be placed in more than one emergency or temporary facility within one episode of foster

care unless an immediate placement move is necessary to protect the safety of the child or others

as certified in writing by the Regional Director.[104]  According to the data produced by defendants

during Period 3, during the month of April 2013, there were 289 children in custody with two or

more emergency or temporary facility placements within one episode of foster care, of whom 234

had the requisite written approval and 55 did not have the requisite written approval.[105]

As of April 2013, five regions accounted for approximately 80 percent of the total

number of children placed in more than one emergency or temporary facility and approximately

---

[102]  Ex. 17A, chart prepared by the Office of the Court Monitor, Children in Emergency Shelter or Temporary Facility for Over 45 Days With and Without the Division Director Approval, By Region; *see also* Ex. 17B, corresponding table with underlying data.

[103]  *See* Ex. 17A, *supra* note 102.

[104]  MSA §II.B.2.p.7.

[105]  Ex. 18A, chart prepared by the Office of the Court Monitor, Children with Two or More Emergency or Temporary Facility Placements At Any Time Within One Episode of Foster Care With and Without Regional Director Approval, By Region; *see also* Ex. 18B, corresponding table with underlying data.

three quarters of those placements had the approval of a Regional Director: Regions III-S, VI, VII-W, VII-E, and III-N.[106]

### 4. Services (Initial Health Screenings and Comprehensive Health Assessments)

Defendants reported performance with two statewide requirements related to the health services required by the MSA. According to the data reports defendants produced during Period 3, for the 12-month period ending on April 30, 2013, the defendants did not meet or exceed the performance standards they were required to satisfy by July 6, 2013, the end of Period 3.

The two requirements that were reviewed measure whether children received an initial health screening within 72 hours of entering custody and whether children received a comprehensive health assessment within 30 days of entering custody. Performance related to each requirement is described below.

### a. Initial Health Screening Within 72 Hours of Placement

The MSA requires that by July 6, 2013, the end of Period 3, 50 percent of children entering custody must receive a health screening evaluation from a qualified practitioner that meets specified standards within 72 hours of placement.[107] The data reports defendants produced during Period 3 do not indicate whether initial health screenings were conducted by qualified medical practitioners or whether the screenings were conducted in a manner consistent with the recommendations of the American Academy of Pediatricians, as required by the MSA. Nevertheless, the data indicate that for the 12-month period ending on April 30, 2013, 22 percent of children who entered custody received initial health screenings within 72 hours.[108] By the end of April 2013, two regions, Regions I-S and II-W, the first two regions to implement fully the

---

[106] *See* Ex. 18B, *supra* note 105.
[107] MSA §II.B.3.i.1.
[108] Ex. 19A, chart prepared by the Office of the Court Monitor, Children Entering Custody Who Received an Initial Health Screening Within 72 Hours of Entering Custody; *see also* Ex. 19B, corresponding table with underlying data.

practice model, exceeded the statewide performance requirement.[109]  Both regions demonstrated

rapid and sustained progress over the 11-month period that was analyzed.[110]  On the opposite end

of the performance spectrum, four regions, Regions III-N, III-S, VII-E, and VII-W, delivered

initial health screenings within 72 hours to ten percent or fewer of the children entering custody

during the 12-month period ending on April 30, 2013.[111]  The two regions with the lowest

performance were also the regions with the largest populations of children in custody, Regions

III-S and VII-W.

   b. Comprehensive Health Assessments Within 30 Days of Entering Custody

  The MSA requires that by July 6, 2013, the end of Period 3, 50 percent of children

entering custody who remain in custody more than 30 days receive a comprehensive health

assessment within 30 calendar days of entering custody consistent with certain MSA

requirements.[112]  The data reports that defendants produced during Period 3 do not capture

whether the health assessments met all of the MSA requirements.  Nonetheless, defendants'

reported performance with this requirement closely tracked their performance with the

requirement to provide initial health screenings within 72 hours.  According to these data, 24

percent of children to whom this requirement applied during the 12-month period ending April

30, 2013 received a comprehensive health assessment within 30 days of entering custody.[113]  As

was the case with respect to the initial health screenings, two regions surpassed the statewide

performance requirement, Regions I-S and II-W, the first two regions to implement fully the

---

[109] *See* Ex. 19A, *supra* note 108.
[110] *Id.*
[111] *Id.*
[112] MSA §§II.B.3.i.2., II.B.3.b.
[113] Ex. 20A, chart prepared by the Office of the Court Monitor, Children in Custody 30+ Days Who Received a Comprehensive Health Assessment Within 30 Days of Entering Custody; *see also* Ex. 20B, corresponding table with underlying data.

practice model.[114]  Two regions achieved lower than ten percent with respect to this performance requirement, Regions VII-W and III-S.  Region VII-W achieved only a one percent performance rate over the 12-month period ending in April 2013.[115]

### B.  Regional Performance Requirements

For the performance period ending April 30, 2013, seven regional MSA performance requirements for which defendants submitted data reports during Period 3 were analyzed.[116]  For purposes of the MSA's regional requirements the presentation below focuses on Regions I-S and II-W because these regions fully implemented the practice model and entered the data tracking year in September 2012 when they became responsible for meeting the first set of regional performance requirements.[117]  The only other region to fully implement the practice model during the performance period ending April 30, 2013 was Region V-W, which fully implemented the practice model in February 2013 and entered the data tracking year in March 2013.  Performance trends for Region V-W could not be assessed because only two months of performance data were available.

As the analysis of statewide performance requirements indicated, Regions I-S and II-W performed best on average among all regions with respect to the statewide requirements.  While not conclusive, these results are encouraging and suggest that implementation of the practice model is having a generalized positive impact on service delivery in those regions of the state in which it is implemented.  The data tracking year for Regions I-S and II-W ended in August 2013.  The performance period that was analyzed in this report includes the first eight months, or two

---

[114]  *See* Ex. 20A, *supra* note 113.

[115]  *Id.*

[116]  For informational purposes only, the analysis extends beyond the two regions that will be implicated by the MSA's performance requirements during the current calendar year.  The analysis addresses performance in all 13 regions and also includes statewide performance.  *See* Exs. 21A-27B.

[117]  *See supra* note 25 (addressing the MSA's temporal compliance measurement requirements).

thirds, of the data tracking year.  This eight-month period is sufficient to assess the trends in defendants' performance.

Nevertheless, because of the method and format that defendants used to report performance, it was not possible to isolate their performance exclusively to the period beginning at the start of a data tracking year as required by the MSA.[118]  This prevented the Monitor from making findings about defendants' reported performance following full implementation and during the data tracking year.  The Monitor anticipates that this deficiency will be corrected by the reports addressing Period 3 regional performance that must be produced pursuant to the requirements of the June 2013 Order.

The Monitor's findings are addressed more specifically below.

    1.  Worker Contact and Monitoring

The MSA requires that beginning by September 2012, 70 percent of children in Regions I-S and II-W, the first two regions to implement the practice model, who are in custody longer than 90 days and reunified, receive a 90-day trial home visit or have documentation in their case records reflecting the Youth Court's objection.  During the trial home visit period, the child's caseworker is required to meet with the child in the home at least two times per month without a parent or caretaker present, and defendants are required to provide or facilitate access to all services identified in the child's aftercare plan.[119]

During Period 3, defendants produced data reports for children on trial home visits which reflected the number of caseworker visits conducted in one-month periods.  While these reports do not address the full MSA requirement, because they provide important information about

---

[118]  For six of the seven data reports, defendants reported performance for rolling 12-month periods.  These 12-month periods included data from months prior to the start of the data tracking year and it was not feasible to manipulate the data to exclude those months.  For the seventh report, defendants reported performance during individual months; however, the MSA required defendants to report for each relevant child performance over a 90-day period.

[119]  MSA §§III.B.8.d.1., III.B.8.b.

limited aspects of defendants' performance they are addressed in this report. According to the reports that defendants produced, as of April 30, 2013, 79 percent of children on trial home visits in Region I-S and 88 percent of children on trial home visits in Region II-W, who were in custody for longer than 90 days and reunified, met with their caseworkers at least twice during a one-month period.[120] This is encouraging. Nevertheless, because this requirement is based on three-months of performance data, defendants' ability to meet the requirement will be contingent upon the ability of caseworkers to conduct these visits at the required frequency intervals month after month.

### 2. Services

The MSA requires that beginning by September 2012, 90 percent of children who are ages 14-20 in Regions I-S and II-W must be provided with the independent living services specified in their service plans.[121] According to the data reports defendants produced during Period 3, for the 12-month period ending April 30, 2013, 70 percent of the targeted cohort in Region I-S and 82 percent of the targeted cohort in Region II-W were provided with the independent living services set forth in their service plans.[122]

### 3. Permanency

The Monitor analyzed performance as of April 30, 3013 in Regions I-S and II-W related to four regional permanency standards. Each region's performance is described below.

---

[120]  Ex. 21A, chart prepared by the Office of the Court Monitor, During Trial Home Visit Period, Number of Children Who Met With Their Caseworker or Family Preservation Caseworker in the Home Twice in a One-Month Period or At Least Monthly if 15 Days or Less, By Practice Model Fully Implemented Date, By Region; *see also* Ex. 21B, corresponding table with underlying data.

[121]  MSA §III.B.7.e.1.

[122]  Ex. 22A, chart prepared by the Office of the Court Monitor, Children Ages 14-20 Receiving Independent Living Services As Set Forth in Service Plan, By Practice Model Fully Implemented Date, By Region; *see also* Ex. 22B, corresponding table with underlying data.

a. Permanency Plan By 30th Day in Custody

According to the data reports defendants produced during Period 3, for the 12-month period ending April 30, 2013,[123] there was a clear and on its face troubling trend over the 11-month period examined. In each of the 13 regions there was a period of improved performance followed by sharp and steady declines around the end of 2012. This drop, however, may reflect a change in defendants' business practices and not necessarily a true change in performance (*i.e.*, the data may not be comparable over time). In any event, assuming the data does reflect changes in practice, and the more recent data reflects defendants' current practices, it may indicate that substantial progress will be necessary in order for defendants to satisfy this performance requirement.

b. Reunification Within 12 Months

The MSA requires that beginning by September 2012, 60 percent of foster children in Regions I-S and II-W who are discharged from custody and reunified with their parents or caretakers must be reunified within 12 months of the latest removal from the home.[124] According to the data submitted by defendants during Period 3, for the 12-month period ending April 30, 2013, Region I-S had exceeded this standard by two percentage points.[125] In contrast, the data show that Region II-W reached a high of 54 percent on this performance standard by November 30, 2012; however, since that time performance levels have decreased substantially and as of April 30, 2013, Region II-W had a performance rate of 32 percent.[126] Interestingly, the region

---

[123] Ex. 23A, chart prepared by the Office of the Court Monitor, Children with a Permanency Plan by their 30th Day of Custody, By Practice Model Fully Implemented Date, By Region; *see also* Ex. 23B, corresponding table with underlying data.

[124] MSA §III.C.1.a.1.

[125] Ex. 24A, chart prepared by the Office of the Court Monitor, Children Leaving State Custody and Reason, By Practice Model Fully Implemented Date, By Region, and Percentage of Children Reunified With Parent or Caretaker In Under 12 Months from Latest Removal; *see also* Ex. 24B, corresponding table with underlying data.

[126] *See* Ex. 24A, *supra* note 125.

that reported the highest success rate was Region VII-W, a region that has struggled with many other performance requirements.[127]

### c. Timely Administrative Reviews

Additionally, the MSA requires that beginning by September 2012, 90 percent of the foster children in Regions I-S and II-W who have been in custody for at least six months must have a timely administrative review consistent with MSA requirements.[128]  The MSA requires defendants to provide written notice of the review to ensure the participation of specified participants.  It also requires review of the permanency plan during the administrative review process.[129]  The data submitted by defendants during Period 3 does not address the full MSA requirement; it is limited to the timeliness requirement.  Nonetheless, it is helpful in providing insight into a key aspect of performance in each region.  According to these data, for the 12-month period ending April 30, 2013, both regions exceeded the timeliness requirement established by this performance standard.[130]  It is noteworthy that 12 of the DFCS regions satisfied this requirement, and the region that did not, III-S, failed to meet the requirement by two percentage points.[131]

### d. Timely Annual Court Reviews

The MSA also requires that beginning by September 2012, 90 percent of the foster children in Regions I-S and II-W who have been in custody for at least 12 months must have a timely annual court review consistent with MSA requirements.[132]  The MSA requires defendants to take reasonable steps to ensure that the court review is conducted within the 12-month period

---

[127]  Statewide performance satisfied this performance standard for the 12-month period ending April 30, 2013.  *Id.*
[128]  MSA §§III.B.3.c.4.a.
[129]  *Id.* §III.B.3.c.1.
[130]  Ex. 25A, chart prepared by the Office of the Court Monitor, Children in Custody for Six Months or More With an Administrative Review Every Six Months, By Region and By Practice Model Fully Implemented Date; *see also* Ex. 25B, corresponding table with underlying data.
[131]  Statewide performance exceeded this performance standard as of April 30, 2013.  *Id.*
[132]  MSA §III.B.3.c.4.b.

of initial placement and annually thereafter.[133]  The data reports defendants produced during

Period 3 address the timeliness of the court review.  According to these data, for the 12-month

period ending April 30, 2013, Region I-S was performing at 77 percent and Region II-W at 85

percent.[134]

> 4.  Adoption

The Monitor analyzed one regional performance standard related to adoption, which

requires that beginning by September 2012, at least 25 percent of foster children in both Regions

I-S and II-W who are discharged from DFCS custody upon finalization of adoption must have

had their adoptions finalized within 24 months of the latest removal from home.[135]  According to

the data submitted by the defendants during Period 3, for the 12-month period ending April 30,

2013, Region I-S had exceeded the performance standard and Region II-W was at ten percent.[136]

As with the performance standard related to reunification,[137] Region VII-W out-performed every

other region on average over the period analyzed.[138]

**C.  Additional Considerations**

This report underscores the essential role that quality data and analysis must serve in

promoting defendants' statewide reform effort.  In addition to in-depth qualitative, case-level

data, agency executives must have access to aggregate assessments of progress over time.[139]  As

the data presented in this report illustrate, defendants' performance varied widely across the state,

---

[133]  *Id.* §III.B.3.c.2.
[134]  Ex. 26A, chart prepared by the Office of the Court Monitor, Children in Custody for 12 Months or More With a Timely Permanency Hearing, By Practice Model Fully Implemented Date, By Region; *see also* Ex. 26B, corresponding table with underlying data.
[135]  MSA §III.C.2.a.1.
[136]  Ex. 27A, chart prepared by the Office of the Court Monitor, Length of Time Between Court Custody and Finalization of Adoption, By Practice Model Fully Implemented Date, By Region; *see also* Ex. 27B, corresponding table with underlying data.
[137]  *See supra* 35-36 for the narrative related to the reunification standard.
[138]  Statewide performance as of April 30, 2013 was just under the performance standard requirement at 23 percent.
[139]  This capacity is required by the MSA.  MSA §II.A.5.a.

by MSA service category, and over time.  If defendants are not able to detect geographically-based trends in relative real time, and thereafter answer questions that emerge regarding the causes of performance levels, their ability to intervene effectively will be severely diminished.

The June 2013 Order directly addresses the need for complete, accurate, timely, and accessible data in this case.  As discussed above, during the process of analyzing the performance data defendants submitted through Period 3, questions arose about various, ostensibly meaningful data points or trends.[140]  Each of the questions bears on some aspect of the MSA and yet, there are no clear, convincing answers to these questions at this point.  The June 2013 Order requires defendants to implement processes to scrub their automated data, an essential first step in detecting and preventing the inclusion of certain errors in performance reports.

As important as routine data scrubbing, defendants are required to maintain data in an independent database.  The value of this database cannot be overstated.  Historically, one of the primary problems defendants have encountered regarding their data has been one of accessibility.  Data in the existing MACWIS system is not easily extracted or manipulated.  Defendants' new database bypasses this problem and should enable defendants to create custom data queries to address *ad hoc* questions about performance trends quickly.  As defendants develop the information technology infrastructure to perform these sorts of queries, it will be important for

---

[140]  For example, why did the population of children in custody increase so precipitously in Region VII-W between October 2012 and April 2013 and not in other regions?  Why was there an apparent aberrant decrease in the number of reported, open investigations of maltreatment in January 2013?  Why was there a consistent dip in performance with respect to the requirement related to children having a permanency plan by their 30th day in custody in every region starting around the end of 2012?  Why did the reporting methodology for one report change beginning in March 2013?  Why did it appear on some reports that there were more children in custody in some regions on April 30, 2013 than on other reports?

them also to dedicate sufficient human resources to capitalize on the value of the data and in turn influence the speed and efficacy of the current reform effort.

## IV.    <u>CONCLUSION</u>

Period 3 ended in July 2013.  During Period 3, the defendants produced tens of thousands of pages of data reports related to their performance.  Although the reports were produced in response to MSA requirements, many had significant limitations.  Additionally, some required reports were produced late and others were not produced at all.  A remedial Order issued in June 2013 requires defendants to correct the deficiencies in Period 3 data reporting.  Pursuant to the Order, complete, accurate and validated data reports that reflect all Period 3 data reporting requirements are scheduled to be produced between September 2013 and January 2014.  The evidence indicates that defendants are working diligently to implement the June 2013 Order.

This report provides information about some aspects of defendants' progress toward meeting Period 3 requirements based on a number of the data reports that defendants produced during Period 3.  While there are well-documented and long-recognized limitations in these reports, they provide information about defendants' own assessment of their performance.

Based on the data analyzed in this report, it appears that defendants have formidable challenges that they will need to overcome, at least in some DFCS regions, in order to satisfy MSA requirements.  For example, the data indicate that in certain regions, in particular the two regions serving the largest number of children in custody, defendants are struggling to meet many MSA requirements.  At the same time, however, the data also indicate that those regions in which defendants have implemented the practice model earliest are performing better across a range of requirements than later-implementing regions.  This is cause for optimism about the potential efficacy of defendants' reform strategy.

Perhaps above all else, this report illustrates a theme that has been repeated throughout the Monitor's reports:  complete, accurate, and timely performance data will be critical to defendants' efforts to advance their progress in this case.  The June 2013 Order requires defendants to begin to address some of their current capacity deficits in specific ways.  The Monitor will be assessing defendants' ability to meet those requirements and anticipates that she will be in a position to report to the Court on all Period 3 performance data subsequent to the production of the performance reports required by the June 2013 Order.

Respectfully submitted,


_____/ s /_____
Grace M. Lopes (MBN 45693 *pro hac vice*)
Court Monitor
Mark Jordan[*]
1220 19th Street, N.W.
Suite 500
Washington, D.C.  20036
(202) 232-8311
gmlopes@oymonitor.org


## CERTIFICATE OF SERVICE

I hereby certify that on September 5, 2013, the Court Monitor's Update to the Court Regarding Progress During Period 3 as Reflected in Certain Data Reports Produced By the Defendants, was transmitted electronically to the following counsel of record in this matter:

Dewitt L. ("Rusty") Fortenberry Jr.
Kenya Key Rachal
Ashley Tullos Young
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
428 I-55 North
Meadowbrook Office Park
Jackson, Mississippi  39211

---

[*] The quantitative analysis in this report was conducted by Mark Jordan, a consultant to the Office of the Court Monitor.  Mr. Jordan's academic background and professional experience are summarized in Ex. 28.  Mia Caras, Special Assistant to the Court Monitor, provided extensive support to the data analysis.

Harold E. Pizzetta, III
Assistant Attorney General
General Civil Division
Carroll Gartin Justice Building
430 High Street
Jackson, MS 39201

W. Wayne Drinkwater, Jr.
BRADLEY ARANT ROSE & WHITE LLP
188 East Capital Street, Suite 450
Jackson, Mississippi  39201

Marcia Robinson Lowry
Miriam Ingber
Julia Davis
CHILDREN'S RIGHTS
330 Seventh Avenue
New York, New York  10001

John Lang
John Piskora
LOEB & LOEB LLP
345 Park Ave.
New York, New York  10154


_____/ s /_____
Grace M. Lopes

## Index to Exhibits

Appendix

Ex. 1A          Table produced by the Office of the Court Monitor reflecting all reports required by Appendix C and noting the reasons why certain reports were not included in the analysis presented in this report

Ex. 1B          Chart prepared by the Office of the Court Monitor, Children in Foster Care By Placement Type, Statewide, One-Month Period Ending 4/30/2013

Ex. 1C          Chart prepared by the Office of the Court Monitor, Children in Foster Care By Placement Type, By Region

Ex. 2           Chart prepared by the Office of the Court Monitor, Total Children in Custody as of April 30, 2013, by Region and Placement Type

Ex. 3           Chart prepared by the Office of the Court Monitor, Relative Regional Performance With Respect to 13 Statewide Performance Requirements, Average Monthly Performance, June 1, 2012 – April 30, 2013

Ex. 4A          Chart prepared by the Office of the Court Monitor, Children in Custody With Substantiated Findings of Maltreatment, by Region

Ex. 4B          Corresponding table with underlying data for chart related to Children in Custody With Substantiated Findings of Maltreatment, by Region

Ex. 5A          Chart prepared by the Office of the Court Monitor, Children Remaining in the Same Placement Following Maltreatment Investigation Who Met Face-to-Face With Worker Twice in a One-Month Period or At Least Once if 15 Days or Less Following Completed Maltreatment Investigation, By Region

Ex. 5B          Corresponding table with underlying data for chart related to Children Remaining in the Same Placement Following Maltreatment Investigation Who Met Face-to-Face With Worker Twice in a One-Month Period or At Least Once if 15 Days or Less Following Completed Maltreatment Investigation, By Region

Ex. 6A          Chart prepared by the Office of the Court Monitor, Investigations Open One or More Days During Period Initiated Within 24 Hours of Intake, By Region

Ex. 6B          Corresponding table with underlying data for chart related to Investigations Open One or More Days During Period Initiated Within 24 Hours of Intake, By Region

Ex. 7A          Chart prepared by the Office of the Court Monitor, Status of Maltreatment Investigations Open One or More Days During Period, By Region

Ex. 7B          Corresponding table with underlying data for chart related to Status of Maltreatment Investigations Open One or More Days During Period, By Region

Ex. 8A          Chart prepared by the Office of the Court Monitor, Twice Monthly In-Person Visits With Child by Assigned Caseworkers, by Region

Ex. 8B          Corresponding table with underlying data for chart related to Twice Monthly In-Person Visits With Child by Assigned Caseworkers, by Region

Ex. 9A          Chart prepared by the Office of the Court Monitor, Non-Therapeutic Placement Setting Contacts, By Region

Ex. 9B          Corresponding table with underlying data for chart related to Non-Therapeutic Placement Setting Contacts, By Region

Ex. 10A         Chart prepared by the Office of the Court Monitor, Therapeutic Placement Setting Contacts, By Region

Ex. 10B         Corresponding table with underlying data for chart related to Therapeutic Placement Setting Contacts, By Region

Ex. 11A         Chart prepared by the Office of the Court Monitor, Number of Children in Licensed and Unlicensed Placements, Including Approved Relative Placements Pending Full Licensure

Ex. 11B         Corresponding table with underlying data for chart related to Number of Children in Licensed and Unlicensed Placements, Including Approved Relative Placements Pending Full Licensure

Ex. 12A         Chart prepared by the Office of the Court Monitor, Proximity of Initial Placement for All Children Entering Custody

Ex. 12B         Corresponding table with underlying data for chart related to Proximity of Initial Placement for All Children Entering Custody

Ex. 13A         Chart prepared by the Office of the Court Monitor, Children in Care Fewer Than 12 Months From the Time of Latest Removal From Home, By Region and Number of Placements

Ex. 13B      Corresponding table with underlying data for chart related to Children in
             Care Fewer Than 12 Months From the Time of Latest Removal From
             Home, By Region and Number of Placements

Ex. 14A      Chart prepared by the Office of the Court Monitor, Placement of Sibling
             Groups Who Entered Custody At or Around the Same Time, By Region

Ex. 14B      Corresponding table with underlying data for chart related to Placement of
             Sibling Groups Who Entered Custody At or Around the Same Time, By
             Region

Ex. 15A      Chart prepared by the Office of the Court Monitor, Number of Sibling
             Groups With At Least One Sibling Under Age 10 Housed in a Congregate
             Care Setting For More Than 45 Days, By Region

Ex. 15B      Corresponding table with underlying data for chart related to Number of
             Sibling Groups With At Least One Sibling Under Age 10 Housed in a
             Congregate Care Setting For More Than 45 Days, By Region

Ex. 16A      Chart prepared by the Office of the Court Monitor, Children Under Age
             10 Housed in a Congregate Care Setting With and Without Regional
             Director Approval, By Region

Ex. 16B      Corresponding table with underlying data for chart related to Children
             Under Age 10 Housed in a Congregate Care Setting With and Without
             Regional Director Approval, By Region

Ex. 17A      Chart prepared by the Office of the Court Monitor, Children in Emergency
             Shelter or Temporary Facility for Over 45 Days With and Without the
             Division Director Approval, By Region

Ex. 17B      Corresponding table with underlying data for chart related to Children in
             Emergency Shelter or Temporary Facility for Over 45 Days With and
             Without the Division Director Approval, By Region

Ex. 18A      Chart prepared by the Office of the Court Monitor, Children with Two or
             More Emergency or Temporary Facility Placements At Any Time Within
             One Episode of Foster Care With and Without Regional Director
             Approval, By Region

Ex. 18B      Corresponding table with underlying data for chart related to Children
             with Two or More Emergency or Temporary Facility Placements At Any
             Time Within One Episode of Foster Care With and Without Regional
             Director Approval, By Region

Ex. 19A        Chart prepared by the Office of the Court Monitor, Children Entering
               Custody Who Received an Initial Health Screening Within 72 Hours of
               Entering Custody

Ex. 19B        Corresponding table with underlying data for chart related to Children
               Entering Custody Who Received an Initial Health Screening Within 72
               Hours of Entering Custody

Ex. 20A        Chart prepared by the Office of the Court Monitor, Children in Custody
               30+ Days Who Received a Comprehensive Health Assessment Within 30
               Days of Entering Custody

Ex. 20B        Corresponding table with underlying data for chart related to Children in
               Custody 30+ Days Who Received a Comprehensive Health Assessment
               Within 30 Days of Entering Custody

Ex. 21A        Chart prepared by the Office of the Court Monitor, During Trial Home
               Visit Period, Number of Children Who Met With Their Caseworker or
               Family Preservation Caseworker in the Home Twice in a One-Month
               Period or At Least Once Monthly if 15 Days or Less, By Practice Model
               Fully Implemented Date, By Region

Ex. 21B        Corresponding table with underlying data for chart related to During Trial
               Home Visit Period, Number of Children Who Met With Their Caseworker
               or Family Preservation Caseworker in the Home Twice in a One-Month
               Period or At Least Once Monthly if 15 Days or Less, By Practice Model
               Fully Implemented Date, By Region

Ex. 22A        Chart prepared by the Office of the Court Monitor, Children Ages 14-20
               Receiving Independent Living Services As Set Forth in Service Plan, By
               Practice Model Fully Implemented Date, By Region

Ex. 22B        Corresponding table with underlying data for chart related to Children
               Ages 14-20 Receiving Independent Living Services As Set Forth in
               Services Plan, By Practice Model Fully Implemented Date, By Region

Ex. 23A        Chart prepared by the Office of the Court Monitor, Children with a
               Permanency Plan by their 30th Day of Custody, By Practice Model Fully
               Implemented Date, By Region

Ex. 23B        Corresponding table with underlying data for chart related to Children
               with a Permanency Plan by their 30th Day of Custody, By Practice Model
               Fully Implemented Date, By Region

Ex. 24A        Chart prepared by the Office of the Court Monitor, Children Leaving State
               Custody and Reason, By Practice Model Fully Implemented Date, By

Region, and Percentage of Children Reunified With Parent or Caretaker In Under 12 Months from Latest Removal

Ex. 24B    Corresponding table with underlying data for chart related to Children Leaving State Custody and Reason, By Practice Model Fully Implemented Date, By Region, and Percentage of Children Reunified With Parent or Caretaker In Under 12 Months from Latest Removal

Ex. 25A    Chart prepared by the Office of the Court Monitor, Children in Custody for Six Months or More With an Administrative Review Every Six Months, By Region and By Practice Model Fully Implemented Date

Ex. 25B    Corresponding table with underlying data for chart related to Children in Custody for Six Months or More With an Administrative Review Every Six Months, By Region and By Practice Model Fully Implemented Date

Ex. 26A    Chart prepared by the Office of the Court Monitor, Children in Custody for 12 Months or More With a Timely Permanency Hearing, By Practice Model Fully Implemented Date, By Region

Ex. 26B    Corresponding table with underlying data for chart related to Children in Custody for 12 Months or More With a Timely Permanency Hearing, By Practice Model Fully Implemented Date, By Region

Ex. 27A    Chart prepared by the Office of the Court Monitor, Length of Time Between Court Custody and Finalization of Adoption, By Practice Model Fully Implemented Date, By Region

Ex. 27B    Corresponding table with underlying data for chart related to Length of Time Between Court Custody and Finalization of Adoption, By Practice Model Fully Implemented Date, By Region

Ex. 28    Resume of Mark Jordan